# EXHIBIT 20

The New York Times

October 9, 2013

# Partly by Shunning Documentary, ESPN Lifts It

By **RICHARD SANDOMIR**

In August, ESPN pulled its name and logo from "League of Denial," a "Frontline" documentary about how the N.F.L. handled — or, more appropriately, mishandled — the concussion crisis among its players. ESPN's decision came seven weeks before the documentary was scheduled to run and ended a 15-month collaboration with "Frontline" that had already produced nine separate reports.

At the time, ESPN said that it had decided to end the collaboration because it belatedly realized that it did not have editorial control over anything "Frontline" televised or posted online, including an online promotion that angered the league and ESPN.

But The New York Times reported that ESPN had backed out after being pressured by the N.F.L., its most important television partner.

By ending its agreement with "Frontline," ESPN could not erase its influence on the two-hour documentary, which ran Tuesday on PBS stations. The film is based largely on the work of two of ESPN's investigative reporters, Steve Fainaru and Mark Fainaru-Wada.

And the Fainaru brothers were the on-air reporters for an engrossing and disturbing telling of a nearly 20-year story about the league's resistance to acknowledging the growing evidence of the link between concussions and progressive degenerative brain disease.

So while ESPN could strike its name from "League of Denial," it could not make the brothers disappear.

ESPN's pullout was a boon for "Frontline." The attention paid to ESPN's hasty decision made a lot of people aware of "League of Denial." Had ESPN quietly accepted the collaboration ground rules with "Frontline" and told the N.F.L. that it would be a public relations error to pull out, many people might not have been alerted to the documentary.

"Frontline," of course, wanted the connection to ESPN. It had spent 15 months working with ESPN and wanted to augment its audience with ESPN's when it showed the documentary. But the breakup potentially jeopardized the possibility that ESPN would carry excerpts from

it on "SportsCenter" and "Outside the Lines" and on ESPN.com. ESPN was always going to promote the Fainarus' book, which is also called "League of Denial." But hyping only the book might have had little effect on the documentary.

Raney Aronson-Rath, the deputy executive producer of "Frontline," said she had been reassured after ESPN's unexpected departure from the project that the sports channel would still try to show excerpts. There was, however, no certainty or clarity. "But clearly, considering the fact that they withdrew from the editorial collaboration, we had no idea what would happen in the end," she wrote in an e-mail.

Then, about two weeks ago, Dwayne Bray, senior coordinating producer of ESPN's news-gathering unit, called Aronson-Rath to resurrect the relationship. He wanted to work out a deal to carry excerpts, and he had the backing of John Skipper, ESPN's president, to pursue one. "He felt it would be powerful to have them," Aronson-Rath said in a telephone interview.

"It was a conversation about what would work best for them, and, in collaboration with the Fainarus, we chose the excerpts," she said. "We had had such a productive relationship with Dwayne that we're pleased this came through."

Aronson-Rath said three clips were chosen: one for "SportsCenter" and two for "Outside the Lines." They began to run last week. "Outside the Lines" has used excerpts several times. ABC News and the PBS program "NewsHour" have also showed clips.

Skipper told a somewhat different version: that ESPN had had every intention of running excerpts, even after it withdrew from the collaboration. "That was part of our original support for the Fainaru brothers," he said.

He said it was possible that ESPN's intentions had not been clearly conveyed to "Frontline" until Bray called Aronson-Rath.

After the abrupt end of the collaboration, she said, "you can understand why we had no idea what they would decide."

The decision to show excerpts, after the flap caused by ESPN's withdrawal from the project, apparently increased "League of Denial's" audience. The documentary drew an average of 2.2 million viewers, according to overnight Nielsen figures, well above the program's average of 1.5 million viewers. "Frontline" also had one of its heaviest days of traffic to its Web site.

For Skipper, one lesson of the flap over "League of Denial" is that he should have ended the collaboration a lot sooner.

Case 2:12-md-02323-AB   Document 6455-23   Filed 12/02/14   Page 4 of 51

"I wish I'd made the decision a year ago," he said. "I still think it was the right decision, while I understand that it opened us up for appropriate criticism."

He stood by his reasoning that ESPN should not have entered into a venture that did not allow it editorial control over everything. And, he added, no one at the N.F.L. has called to rebuke him for showing excerpts from the documentary.

*E-mail: sandor@nytimes.com*

# EXHIBIT 21

Mass Tort Litigation Blog

Tuesday, November 18, 2014

# The NFL Concussion Settlement: Class Action Exploitation

By Joe Tort

By Howard Erichson

Tomorrow in Philadelphia, lawyers for the NFL and lawyers for former football players will try to persuade Judge Anita Brody to approve their settlement of claims that the League concealed chronic risks of concussions and failed to protect players. The judge, the players, and the public should view the settlement with suspicion.

We have grown so accustomed to "settlement class actions" that we have lost sight of what is strange and troubling about them. Class actions serve an essential function in our legal system by empowering claimants in mass disputes, and I reject the knee-jerk criticisms of class actions that I hear too often. But when the class action tool is exploited by defendants to buy peace on the cheap, and when class members are harmed by the alignment of interests between defendants and class counsel, I feel the need to speak up.

Who reached this agreement with the NFL? Not the thousands of former football players. The deal was struck by lawyers who purported to represent the players but who had not actually gotten the go-ahead to litigate for the class. To litigate a class action, lawyers must get the class certified. But in this case, the lawyers negotiated their settlement before the court certified the class.

It makes sense that the NFL would want to do it this way. By negotiating before class certification, the NFL knew that the plaintiffs' lawyers lacked the leverage that comes with being able to say, "See you at trial." And it makes sense that the players' lawyers would go along. They stand to make $112 million plus up to five percent of each award going forward. If these lawyers failed to reach agreement with the NFL, they risked being cut out if the League struck a deal with someone else.

In a "settlement class action" like the NFL deal, lawyers ask the court to certify the class for settlement only, as opposed to a standard class action that can be litigated or settled. This ought to be the first question people ask when they hear about a class action settlement: Was the class certified for litigation? If not, then class members are especially vulnerable to exploitation.

It is not an obscure problem. As I explain in The Problem of Settlement Class Actions, settlement class actions have become more common than standard class actions. And while good settlements exist, we see mischief too often. Three weeks ago, the Seventh Circuit heard arguments in Pearson v. NBTY, a settlement class action about false labeling for glucosamine supplements. Among numerous other problems, the lawyers' fees were more than double the amount actually paid to the class. The district court's opinion approving the settlement is disturbing, and Ted Frank's argument for the objectors is powerful. And in Lane v. Facebook, a settlement class action involving claims that Facebook illegally shared information about members' Internet activity, Facebook paid over $2 million to the plaintiffs' lawyers, $6.5 million to a foundation that Facebook would partly control, and zero to the class members. Facebook discontinued the challenged program but could reinstate it under a different name. Facebook wiped away its liability while the class members got nothing of value. Chief Justice Roberts was horrified.

Compared to these settlements, the NFL deal looks pretty good. For some players, it offers immediate compensation, and for others it offers long-term insurance. Judge Brody initially rejected the settlement but then gave it preliminary approval after the NFL removed a cap on the fund. But the dynamic of settlement class actions should make us ask questions. The settlement rewards certain diagnoses (Alzheimer's, Parkinson's, ALS) over others (CTE). It pays for cognitive impairment but not mood disorders. The objectors make a strong argument that these items are crucial. The settlement imposes a registration requirement and other hurdles that objectors say are intended only to reduce claims. I can see why the deal has drawn so much fire and why Public Citizen sought to intervene.

The truth is, it is always hard to judge whether a class settlement is fair. A settlement, after all, is a compromise. There is no magic formula by which a football fan or a federal judge can evaluate whether the settlement is good enough. What we *can* ask, however, is whether the settlement resulted from a fair process, a negotiation on a level playing field. The answer is no.

The concern in every settlement class action is that lawyers may have struck the deal not because it was the best the class members could have gotten, but because it was the best the lawyers could get for themselves. If the settlement proves inadequate, then the lawyers get rich, the League gets off easy, and the football players – damaged forever – are left without the money they need to take care of themselves and their families for the rest of their lives.

There is, of course, something the judge can do about it. Reject this settlement, and on a proper motion, certify the class for litigation as well as settlement. Rest assured, there will be a better offer on the table. Although the judge would still face the difficult task of evaluating a class settlement and would still have to be on the lookout for abuse, at least she would know that the players weren't disempowered from the start.


http://lawprofessors.typepad.com/mass_tort_litigation/2014/11/the-nfl-concussion-settlement-and-class-action-exploitation.html

© Copyright 2004-2013 by Law Professor Blogs, LLC. All rights reserved.

# EXHIBIT 22

# THE NATIONAL LAW JOURNAL

     Click to Print or Select '**Print**' in your browser menu to print this document.

Page printed from: _National Law Journal_

---

Podium

# Op-Ed: Concussion Settlement Is Deeply Flawed

Proposed deal between the NFL and former players lacks compensation for host of injuries.

Michael V. Kaplen and Shana De Caro, The National Law Journal

July 21, 2014

An analysis of the proposed National Football League settlement affecting about 20,000 retired players that U.S. District Judge Anita Brody preliminarily approved on July 7 exposes significant flaws. Many classes of players are not adequately represented, and most NFL players are all but ignored by the attorneys who negotiated the agreement. Certain, small and discrete groups are designated for compensation, but players experiencing physical, emotional and behavioral impairments remain excluded.

No specific amount was identified in the deal, but Brody previously rejected a $675 million settlement between the parties as insufficient. This latest proposal purports to generously provide financial stability for players with traumatic brain injury, but a closer look reveals a systematic design to exclude most players from participation and to reduce payments to the small group who meet arbitrary criteria. It imposes unfair and illogical restrictions on the categories of compensable injuries and requires NFL participation for excessively long periods.

The settlement excludes many known conditions and creates arbitrary distinctions based upon years of service and age of the player at the time of onset. In addition, the class-representative attorneys have an inherent conflict in simultaneously representing players in different categories with differing injuries, unfairly favoring some of them with no rational basis.

A glaring, wide-ranging inadequacy is the complete omission of any player who has suffered physical, emotional and behavioral consequences across the entire spectrum of mild, moderate or severe brain injury. This proposal is limited to players who have demonstrable cognitive injuries from moderate or severe traumatic brain injury and excludes those suffering emotional and behavioral difficulties but not cognitively impaired.

The subgroup with behavioral and emotional symptoms of chronic traumatic encephalopathy (CTE) is also excluded from compensation. The families of former players with postmortem evidence of CTE who died from suicide, such as Junior Seau and Dave Duerson, would receive no benefits under this settlement if they died after preliminary approval was granted. Inexplicably omitted are traumatic epilepsy, seizure disorders, hormonal deficiencies and

stroke, though well known to be caused by isolated or repeated head trauma.

Many retired players receive Medicaid and Medicare benefits or may be entitled because of football-related brain trauma. Settlement funds must be expended to satisfy these statutory liens for past traumatic brain injury benefits and additional funds segregated to satisfy Medicare's future interests (Medicare set-aside). Considering these limitations, the gross sum recovered may provide little or no financial benefit. Player compensation determined by years of play and age at time of symptom onset ignores the reality that the permanent consequences of brain injury can be sustained at any time in a professional career, from preseason forward. This settlement ignores players whose careers are terminated by preseason traumatic brain injury.

The baseline assessment program purportedly evaluates and provides benefits to players who meet its criteria. Neuropsychological testing, in isolation, disregards the physical, emotional and behavioral injuries historically recognized in postconcussive syndrome. Mood changes, depression, impulsivity and aggressive disorder are excluded. Persistent and debilitating headaches, dizziness and sleep disorders are excluded.

The baseline assessment program deliberately disregards prior neuropsychological testing and overlooks pre- and postinjury observations of family members, friends and associates all embodied within a meaningful diagnosis. The baseline assessment program embraces inappropriate measures of exaggeration, malingering and effort to deny valid claims. These "tests" purportedly distinguish the malingerer from one with legitimate brain damage, implicitly assuming that a test can establish this distinction.

This supposition disregards and dismisses fundamental, recognized characteristics of traumatic brain injury. The conclusion of malingering presupposes that a brain-injured person cannot fail the exam. Performance below recommended cutoffs is not the essential condition of "malingering."

For those few who meet the baseline assessment program criteria and are deemed to have sustained a qualifying neurocognitive impairment, benefits are limited to medical treatment and examination, counseling and pharmaceuticals. These ostensible benefits fail to provide most players with many required and valuable services. These players require home- and community-based services to help them live as independently as feasible.

Spouses of qualifying retired players are improperly and unfairly treated. The settlement deducts a percentage from the player's award and redistributes it to the spouse. No compensation is provided for spouses who abandon their own careers to care for their husbands.

The underpinnings of this lawsuit were the deliberate, long-standing NFL misrepresentations concerning the known health risks associated with concussions. This proposal changes nothing. The court has an obligation to protect all class members.

Any settlement that fails to should be rejected as fundamentally unfair and contrary to the best interests of the majority of class members.

*Michael V. Kaplen and Shana De Caro are partners at De Caro & Kaplen in Pleasantville, N.Y. Kaplen teaches a course in traumatic brain injury at George Washington University Law School. De Caro is chairwoman-elect of the traumatic brain injury litigation group of the American*

*Association for Justice.*

---

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# EXHIBIT 23

# [San Diego Reader](#)



- These brain-concussion lawsuits will stretch on until somebody invents brain-replacement surgery.

- [Sporting Box](#)

## Settlement II: Concussion cases become a headache for NFL

 0

By [Patrick Daugherty,](#) [July 9, 2014](#)

World Cup soccer fans, cheer up, the NFL preseason starts in 24 days. Since we have time to kill, the pre-preseason may be the perfect occasion for a heart-to-heart about — always a crowd favorite — brain

concussions.

If you've read this far, you'll recall the original NFL concussion settlement — featuring a $675 million payout, agreed to by retired players' lawyers and the NFL — was so unfair that a Philadelphia federal district court judge, Anita Brody, rejected it. Whoa.

You have this front page, coast-to-coast lawsuit, both sides agree to a resolution, but the resolution is so obviously bad, so obviously unfair, even the referee can't stomach it. Like nothing else, this explains how this lawsuit is about the NFL avoiding the discovery process and plaintiffs' attorneys getting paid (attorneys are due up to $112.5 million within 60 days of settling).

So, settlement I is shelved. So, plaintiffs' lawyers and NFL lawyers have to cook up something else to sell to the judge. Concussion Settlement II was submitted to Judge Brody on June 25, 2014.

There won't be caps on how much money the NFL will spend, but *caps remain* on how much each retired player may receive for each covered medical condition. If the NFL actuaries are correct — and we don't know, since their work hasn't been shown to the public, but if they're right, the actual outlay of NFL money won't change. If they're wrong, the total payout might be more, might be less. In either case no player will receive more money than what was due in Settlement I.

I wrote about a preliminary Settlement I draft last September. "The money is distributed over a 20-year period. Half to be paid out in three years, the other half to be paid out over 17 years. The NFL is making $10 billion in yearly revenue, projected to be $25 billion by 2027. But, let's suppose the NFL's revenue stays flat at $10 billion a year, and let's suppose there is zero inflation for the next two decades. Journalist David Tigabu, commenting on how much money the NFL will take in over the next 20 years, writes, "...the $675 million figure being distributed to the players through this settlement amounts to *.34% of the NFL's total projected* revenue over this period.' Less than one-half of one percent."

The corporate media doesn't talk about one-half of one percent. It's too complex, takes a paragraph to explain; better say $675 million and move on. Not remotely accurate, but it is easy.

Settlement I limited the NFL to ten appeals per year. Settlement II allows the NFL unlimited audits and appeals on players' claims. In other words, if the NFL wants to trim expenses, they could demand this proof or that form, say this wasn't filled out right and that wasn't dotted. They could wage a paper war until the beneficiary gives up or dies.

In Settlements I and II, the NFL admits no liability, doesn't have to answer a shit-storm blizzard of subpoenas about who knew what and when, won't have a generation of NFL executives, coaches, trainers, and doctors deposed or made to testify in court, won't have emails revealed, or dirty secrets exposed. Now that's worth one-half of one percent.

In Settlement II, the NFL must deposit $120 million in a brain-damage award fund within six months of closing. After that, the league is only obliged to make deposits "as needed" to keep the fund at $10 million for the first ten years. Only needs to keep the fund at $5 million for the 11th through 50th year. At $1 million from the 51st through 60th year, and $250,000 though the 65th year. Suddenly, the only guaranteed money seems to be the initial $120 million. That one-half of one percent just took a brutal hit.

Case 2:12-md-02323-AB   Document 6455-23   Filed 12/02/14   Page 15 of 51

Since retired players' attorneys are looking at a $112.5 million payday within 60 days of settling, and the NFL is looking at a flood tide of brain-concussion lawsuits that will stretch on until somebody invents brain-replacement surgery, you can't find two sides who are more eager to settle.

Then there are the retired players. You have to do something about them. If the judge approves Settlement II, it will be sent to 18,000 plaintiffs and their beneficiaries. Retired players will vote to approve the settlement, opt out, or object to. How long will that take? No player will be paid until all appeals are exhausted.

Next up, 750 former NFL players are involved in a lawsuit, filed in federal court, alleging the NFL illegally and unethically supplied them with drugs designed to mask pain. If this keeps up, the NFL might have to move their payout needle to one percent.

# EXHIBIT 24

# Bloomberg

# NFL Critics Say Concussion Accord Ignores Broken Lives

By Sophia Pearson and Jef Feeley - Nov 19, 2014

Andy Miketa was known as the NFL's lightest center during his two-year career with the Detroit Lions in the 1950s. At 6-foot-2 and 210 pounds, Miketa used his speed and toughness to stymie defensive linemen who outweighed him by 75 pounds.

Sally Miketa Stern remembers her father's stories about the 1954 National Football League championship game between the Detroit Lions and the Cleveland Browns. That game and others took their toll, she recalls.

Miketa's mental deterioration after multiple concussions left him homeless and alone later in life, his daughter said in a letter to the judge who today will consider final approval of the league's $765 million settlement with former players and their families. Stern's letter is one of more than 60 urging U.S. District Judge Anita Brody in Philadelphia to reject the settlement in its current form.

The letters describe as the legacy of repetitive hits on the gridiron a multitude of injuries such as gnawing headaches, hearing loss, blurred vision, explosive anger, debilitating paranoia and dementia. The settlement, they conclude, is simply not enough to compensate players and their families.

In the 1954 championship game, Miketa suffered a concussion while protecting Hall of Fame quarterback Bobby Layne. He returned to the Lions' offensive line, only to have his eye sockets smashed during the next play. Dizzy and nauseated, he returned to the field again and got a broken nose in the 56-10 drubbing by the Otto Graham-led Browns.

## Gridiron Legacy

Miketa endured repeated concussions in the 1953 and 1954 seasons, laying the groundwork for future heartache, his daughter said. The Ohio native died in 2010 at the age of 80, after spending the last quarter-century of his life battling homelessness, subsisting on Social Security checks and "wandering around aimlessly, climbing into dumpsters," Stern wrote in her letter to Brody.

Although he managed to become a dentist after the NFL, the "best of his mind was destroyed by football," she said.

Case 2:12-md-02323-AB   Document 6455-23   Filed 12/02/14   Page 18 of 51

"He died without any life insurance, without a cent to his name, owning nothing," Stern wrote. "I had to ask the NFL to pay for his cremation."

Objectors such as Stern argue the settlement falls especially short for those who have symptoms of chronic traumatic encephalopathy, or CTE, a brain disease diagnosed only after death. CTE was linked to the suicides of Pro Bowl linebacker Junior Seau in 2012 and Chicago Bears safety David Duerson in 2011.

## 'Advantageous Deal'

"Maybe in the back of everyone's mind is the perception that the NFL got off very easily in the proposed settlement, in comparison to the revenue the league and teams earn," said Mark Conrad, a law professor and director of the sports-business program at Fordham University.

"As of now I do think the NFL owners particularly got a very advantageous deal," he said.

About 5,000 players have sued the league seeking damages for head injuries. In July, Brody granted preliminary approval to a revised deal in which the league would pay at least $675 million in cash to retirees suffering from a list of qualified injuries including Alzheimer's disease, Parkinson's disease and amyotrophic lateral sclerosis, known as ALS or Lou Gehrig's disease.

Medical monitoring and educational programs bring the total settlement to $765 million. The league estimates it will have to pay out no more than $900 million.

## Players Approved

The deal, which was approved by 99 percent of the roughly 21,000 retired players in the class, will "spare thousands of retirees and their families the financial and emotional cost associated with years of litigation," the NFL said in papers filed ahead of the hearing.

"This settlement will provide the benefits we need to take care of our families and have the best quality of life we are able to have," Kevin Turner, a former fullback for the Philadelphia Eagles who now suffers from ALS, said in a statement. "The sooner the agreement is approved and its benefits begin to flow, the bigger the difference it will make in the lives of those who are hurting."

Chris Seeger, the lead plaintiffs' lawyer who helped negotiate the settlement, urged Brody to approve the deal as fair and reasonable while stressing the uncertainty of a court loss on the league's argument that the claims are preempted and barred by labor agreements with the players' union. Brody ordered the parties into mediation before ruling on that issue last year.

## 'Death Knell'

"A loss on the preemption issue could have been the death knell to class members' claims," Seeger said in court papers.

About 17 percent of the class, or 3,600 players, are expected to have or develop compensable injuries covered by the deal, according to analyses done for lead plaintiffs' lawyers and the league and made public in September following a request by Bloomberg News. Of that number, the families of about 50 players who were diagnosed with CTE posthumously would be paid for those claims, according to the reports.

Dozens of players and their relatives have objected to the pact, saying it fails to address wrongful-death claims, it unfairly penalizes the league's oldest players and excludes from consideration seasons played in NFL Europe.

The most contentious objections are focused on the exclusion of ex-players suffering from early effects of CTE. The families of players who died from the brain disease before the settlement's July 7 preliminary approval date might receive as much as $4 million each under the agreement. Because CTE is now confirmed only by autopsy, players living with symptoms stand to get nothing.

## Egregious Exclusion

"If you are a former player existing in a living hell, bereft of memories and facing even more deterioration in the future, you and your family get nothing," said Erik Gordon, a professor at the University of Michigan's business and law schools who teaches about class-action settlements. "But if you kill yourself, your family potentially has a claim for millions. It just sounds crazy to the average person."

The fact that CTE put football brain damage into the national spotlight makes the exclusion of living players with symptoms that much more egregious, Mitchell Toups, a lawyer in Beaumont, Texas, said in court papers filed on behalf of objecting players.

The settlement's restrictions on CTE claims "are designed to save the NFL a substantial amount of money on the very disease giving rise to the litigation," Toups said in the filing.

Initially discovered in boxers in the 1920s, CTE results from repeated shaking of the brain. It involves the formation of abnormal protein tangles that hamper communication between cells and lead to cell death. Functions such as memory and anger-control can disappear and dementia and death can follow. CTE symptoms can mimic those of Alzheimer's, Parkinson's and ALS.

## Brain Disease

Since 2005, CTE has been discovered in the brains of at least 76 deceased NFL players. Duerson, Seau

and Andre Waters, a Philadelphia Eagles defensive back, all suffered from the neurodegenerative brain disease.

The late Pittsburgh Steelers players Mike Webster and Terry Long were also diagnosed with CTE. Webster died of heart disease at age 50 in 2002 after suffering from dementia. Long killed himself in 2005 at age 45 by drinking antifreeze.

In September, a study done by the Department of Veterans' Affairs brain depository in Bedford, Massachusetts, found CTE in 76 of 79 former NFL players, PBS Frontline reported. An earlier study done in 2012 by the Boston University Center for the Study of Traumatic Encephalopathy, which maintains an ex-athletes brain bank, found the disease in 34 of 35 former NFL players examined.

## Duerson's Suicide

Duerson, 50, killed himself in February 2011 with a gunshot to the chest after enduring intense headaches and deteriorating memory. He left a note asking that his brain go to the Boston University lab where it was determined he had CTE.

Researchers at the National Institutes of Health said last year that brain-tissue samples showed Seau had CTE. Seau's family sent his brain tissue to the NIH in July 2012, two months after he shot himself in the chest outside his home in Oceanside, California. His family has opted out of the litigation and will pursue a wrongful-death claim in state court, according to attorney Steven Strauss.

Two weeks before Seau's death, former Atlanta Falcons safety Ray Easterling shot himself at his ranch home in Richmond, Virginia, after years of insomnia and depression spiraled into early stages of dementia in the early 2000s while still in his 50s.

## Brain Bank

Robert Stern, a co-founder of the Boston brain bank, said in court papers submitted ahead of the hearing that players with early symptoms of CTE, those exhibiting changes in mood and behavior, aren't likely to be found impaired and eligible for compensation under the settlement's baseline medical monitoring program.

Had they both died after July 7, Seau and Duerson probably wouldn't have been found impaired under the settlement, Stern said.

"Their primary symptoms involved mood and behavioral disturbance, neither of which is compensable in the settlement," he said.

Kristine Yaffe, a University of California professor who led a Veterans Health Administration study on

the link between traumatic brain injury, or TBI, and dementia, countered that a causal relationship between football and qualifying conditions under the settlement is tenuous at best. Even more so when it comes to CTE.

# CTE Science

"The science regarding CTE is still in its infancy and the causes of CTE are unknown," Yaffe said in court papers filed on behalf of the league. "There are significant challenges to establishing that, even on a broad population level, single or repetitive or mild TBIs resulting from NFL football are the cause -- or even one cause -- of an individual's development of CTE."

Mood and behavioral symptoms, such as depression, have many risk factors and could be completely unrelated to CTE, Yaffe said.

The CTE issue is a legitimate concern for players, although not as strong as the gamble of opting out of the deal altogether, Conrad said. About 220 players chose to take their chances with individual suits.

# Player Gamble

"Time is not on the side of the victims because there are conditions that, if they're there, will become more acute and more care will be needed," he said. "There is a certain gamble on the part of a lot of players. If you opt out, you go it alone, and you're going to have to have proof."

Stern said in court papers that highly accurate clinically accepted methods to diagnose CTE during life are at the most 10 years away. A study being conducted by the center through a grant from the NIH seeks to develop biomarkers for detection and diagnosis of the disease.

Excluding compensation for CTE symptoms is premature, said Paul Anderson, a lawyer for ex-players who writes a blog on concussion litigation. "They're attempting to wipe CTE from the lexicon completely and league history itself."

The case is In re National Football Players' Concussion Injury Litigation, 12-md-02323, U.S. District Court, Eastern District of Pennsylvania (Philadelphia).

To contact the reporters on this story: Sophia Pearson in federal court in Philadelphia at

spearson3@bloomberg.net; Jef Feeley in Wilmington, Delaware at jfeeley@bloomberg.net

To contact the editors responsible for this story: Michael Hytha at mhytha@bloomberg.net Charles Carter, Rob Gloster

EXHIBIT 25

print

**BETA**                                                      **THE**              **CHANNELS**



# THE NFL CONCUSSION SETTLEMENT IS PURE EVIL

October 28, 2014 | 8:25 AM   Patrick Hruby (/contributor/patrick-hruby)

SHARE        TWEET

(/)

Ken McClain figured the National Football League was preparing to screw his clients. Question was, just how badly?

A Kansas City-based attorney, McClain represents two dozen former professional football players in their mid-30s to 60s whom he says suffer from depression, impulsivity, and other life-altering symptoms of brain damage—damage presumably accumulated during years of on-the-job helmet-knocking. In theory, all of them ought to be covered by the proposed NFL concussion lawsuit settlement; a multimillion dollar class action agreement that promises to compensate ailing retirees and is moving toward final approval in federal court.

In practice, McClain discovered, the deal works a bit differently.

Over a two-month span and at a rough cost of $10,000 per person, McClain says, he had his clients screened using the specific neurocognitive tests and diagnoses spelled out in the settlement. He then had those same former players evaluated by doctors at Boston University who specialize in chronic traumatic encephalopathy (CTE), football's industrial disease—a neurodegenerative condition that was found in the brain tissue of deceased retirees Junior Seau and Mike Webster and sits at the heart of both the suits against the league and the damning investigative journalism of the documentary League of Denial.

The results?

"Our worst fears were realized," McClain says. "We found our players had significant emotional and impulse control problems that according to [Boston University] are tied to head injury. All of our guys. And none of them qualify for awards under the settlement.

"It's a bogus deal. A fraudulent deal on its face, completely illusory, designed to pay very few people except the lawyers and the players in the most extreme [illness] category. All of these men saddled with neurological problems throughout their lifetimes are not the NFL's concern. The NFL's concern is containing risk, just as if they were [General Motors] and these players are faulty ignitions."

Of course, the NFL doesn't put things that way. Nor do the top lawyers representing the more than 4,500 former players suing the league. They call the settlement "extraordinary." (http://www.latimes.com/sports/nfl/la-sp-nfl-settlement-20140708-story.html) A deal that "reaffirms the [league's] commitment (http://www.nfl.com/news/story/0ap2000000361552/article/revised-settlement-in-concussion-suit-reached-funds-uncapped) to provide help to those retired players and their families who are in need." When federal judge Anita Brody gave the agreement preliminary approval last July, both sides touted it as being "uncapped," and with good reason: Brody had previously rejected a settlement paying out a maximum of $675 million over 65 years. Now, the max has been removed. Every retiree who qualifies for an award will receive cash, regardless of the total cost to the NFL. Suffering men and their families won't—can't—be left high and dry.

"If you get sick, period, you still get paid," (http://www.sportingnews.com/nfl/story/2014-07-14/nfl-concussions-lawsuit-cte-symptoms-eligible-settlement-tony-dorsett-wycheck-seeger) says Chris Seeger, co-lead counsel for the players and one of a handful of attorneys who negotiated the deal with the league.

Er, not exactly.

Seeger is lying. Or at least bullshitting. As currently written, the settlement isn't designed to help hurting former players. To the contrary, it's designed to save the NFL as much money as possible, to the tune of billions of dollars of potential brain damage liability. If the deal goes through, many sick retirees won't get paid. Most of those who do will receive minuscule sums, hardly commensurate with their injuries, far from the hefty maximum awards—amyotrophic lateral sclerosis sufferers get $5 million! Parkinson's victims get $3.5 million! Everyone gets a car! —reported in the press and cited by the settlement's supporters. Only don't take my word for it. Or even McClain's.

Instead, ask the people who cut the deal in the first place.

Then, check the math and the fine print.



Demaryius Thomas after suffering a football injury. Photo by Mitch Stringer-USA TODAY Sports

According to documents filed in federal court, an actuary for the top plaintiff's lawyers—note: the people who are supposed to be negotiating the best possible deal for former players—predicts that while 5,900 of the approximately 21,000 retirees covered by the settlement will be sick enough with specific neurodegenerative ailments to receive compensation, only 3,600 of them will actually receive cash awards. As for the awards themselves, the same actuary estimates that the average former player will be 77 years old at the time the settlement's diagnostic tests qualify them for payment.

Why does that matter? Simple. The deal reduces payouts on a progressive, age-based scale: the older retirees are when they're deemed worthy of awards, the smaller those awards will be. For a 77-year-old former NFL player with amyotrophic lateral sclerosis (ALS), that means an 80 percent reduction from the maximum payout, from $5 million to $1 million; for the same player with Parkinson's, Alzheimer's, or debilitating dementia, that means reductions of 96 to 97 percent, from as much as $3.5 million to as little as $40,000.

Small wonder, then, that both the NFL's lawyers and Seeger have told Brody that they remain confident that total payments by the league over the lifetime of the settlement will not exceed the deal's original $675 million cap. Small wonder, too, that Wisconsin-based brain injury attorney and advocate Gordon Johnson—who has actually read the through entire 163-page settlement and supplemental court filings—says the league will probably end up paying out even less, as little as $250 million, all thanks to a deal he describes as a "hoodwinking."

"It looks like going into negotiations, the NFL authorized its attorneys to pay a billion dollars, or at least three quarters of a billion," says Johnson. "And then it became a contest among the lawyers for the league to see how they could define the terms of the settlement so that they didn't have to pay up."

It's a horrifying thought, but imagine you are the NFL. How do you win said cost-cutting contest, creating a settlement that only looks sufficient? Follow along...

Step 1: Ignore Your Industrial Disease

Picture a pair of clear plastic jars. Each contains the brain of an NFL retiree. Both brains have been examined by neuropathologists and diagnosed with CTE. Under a microscope, both brains show the same telltale tangles of tau protein that are the hallmark of the disease.

One retiree died between January 1, 2006 and July 7, 2014. Under the settlement's qualifying diagnoses of "Death with CTE," his family qualifies for an award of as much as $4 million. The other retiree died outside of those dates. Under the same settlement, his family qualifies for nothing.

Sound fair?

CTE is largely why the settlement exists in the first place. Pittsburgh-based lawyer Jason Luckasevic, who filed the very first brain damage lawsuit against the NFL, calls the consolidated suits against the league "a CTE case." The actual class action complaint devotes nine paragraphs to the disease; by contrast, ALS, Alzheimer's, and Parkinson's merit two paragraphs—combined.

A 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded just 17 combined cases of the aforementioned three diseases among the former players surveyed. Meanwhile, 76 of the 79 deceased league retirees whose brains have been examined for CTE have been diagnosed with the condition.

And yet, the proposed settlement pays out for ALS, Alzheimer's, and Parkinson's disease going forward. It limits "Death with CTE" awards to the families of former players who died after January 1, 2006 and before July 7, 2014. Seeger argues that the cutoff is both appropriate and necessary for two related reasons: 1) As of now, CTE can only be definitively diagnosed via autopsy, and the settlement is designed to put cash in the hands of living, suffering retirees; 2) said retirees with CTE will be able to qualify for the settlement's generalized "neurocognitive impairment" awards, which are as high as $3 million.

"I think people got really hung up on CTE, but, you know, this is all about symptoms," Seeger said during a CBS Sports radio interview (http://www.sportsonearth.com/article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby) this summer. "If you're sick, and your activities of daily living are being interfered with, you can't function, you're going to get paid whether or not you have CTE."

This makes sense. Unless, of course, you know the first thing about the science of the disease. To qualify for the aforementioned neurocognitive impairment awards, retirees must undergo and perform poorly on a battery of neuropsychological tests that measure cognitive decline, which is measured using symptoms like memory lapses and executive dysfunction. Problem is, CTE patients often suffer from mood and behavior disorders: emotional explosiveness, impulsive behavior, poor judgement, outbursts of violence, (http://www.hbo.com/video/video.html/?autoplay=true&vid=1396254&filter=real-sports-with-bryant-gumbel&view=null) depression, and hopelessness. Think Seau's reported gambling, drinking, and relationship woes (http://espn.go.com/nfl/story/_/id/9410051/a-year-later-one-junior-seau-close-friends-comes-forward-recount-version-descent) before his suicide via gunshot wound to the chest, or Dave Duerson assaulting his wife, getting divorced, and watching his business empire implode

(http://articles.chicagotribune.com/2011-02-26/sports/ct-spt-0227-dave-duerson-final-days--20110226_1_dave-duerson-alicia-duerson-tregg/2) before his own suicide via gunshot wound to the chest.

Last year, Boston University CTE researcher Robert Stern and other scientistspublished a detailed study (http://www.bu.edu/cte/files/2013/09/CTE-Neurology-2013-Stern-1122-9.pdf) of 36 adult males who had CTE. Thirty-three suffered symptoms while alive. Twenty-nine played football. As I've written before, (http://www.sportsonearth.com/article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby) the men fell into two distinct groups. One group, 11 men, first suffered from cognitive symptoms. They tended to live longer, and their symptoms tended to show up later in life, typically in their late 50s. By contrast, the 22 men in the second group first suffered from mood and behavior issues. They generally died younger, and their symptoms appeared earlier.

Mood and behavior disorders are a sign of brain damage. They absolutely interfere with your daily life, with having a family, or holding down a job. Only the settlement doesn't compensate players suffering from those symptoms. It doesn't even screen for them, something McClain's clients learned the hard way. If the deal goes through, the lone cold hope for them and all CTE-afflicted retirees who fall into Stern's second group—the bigger group—is to live and suffer long enough to develop cognitive problems. Then, and only then, will they possibly qualify for cash awards.

Of course, those same awards will be subject to age-based reductions.



Jason Campbell after suffering a football injury. Photo by Kirby Lee-USA TODAY Sports

If the above sounds like it was purposefully engineered by NFL lawyers to both save money and perpetuate the ongoing lie that CTE doesn't really exist, (http://www.nytimes.com/2013/03/28/sports/football/doctor-for-nfl-says-study-overstates-effects-of-cte.html?pagewanted=all&_r=0) then you're starting to see how the game is played. After all, the league certainly is aware of Stern's study. Moreover, the NFL has known about CTE's mood and behavioral symptoms since at least 2009, when neuropathologist Dr. Ann McKee—an expert on the disease—met with league doctors and a group of independent researchers at NFL headquarters in New York City.

In a transcript of the meeting obtained by VICE Sports, McKee says the following:

"… personality and behavior changes are usually prominent and are seen in about two-thirds [of CTE patients]. Aggressive or violent behaviors are most common, followed by confusion. There's dysphoria, meaning depression or mania. Most of them are depressed but some of them have sort

of a bipolar look. They have alternating euphoria and depression. Many of them are irritable. A lot of them have poor insight or judgment, agitation, and some of the things that are less frequently seen are apathy and hypersexuality…"

Later, McKee discusses a CTE-afflicted boxer who retired at age 22 and was misdiagnosed with Alzheimer's disease in his 70s. Someone else at the meeting asks: was the boxer okay until then?

McKee responds:

"He was not okay. He would get disoriented when he went traveling and his wife called him punch drunk, but he stayed more or less stable until his 70's, when he started deteriorating more. It's a slowly progressive disease. Sometimes it smolders for years."

As for only being able to diagnose CTE after death? In September, researchers at Mount Sinai Hospital in New York City announced that an experimental brain imaging technique allowed them to identify (http://www.cbsnews.com/news/new-test-to-shed-light-on-football-players-brain-injuries-cte-dementia/) the disease in the brain in former New York Jets lineman Dave Herman—who played in the 1969 Super Bowl and happens to still be alive. Stern believes a verified, Food and Drug Administration-approved test for the disease will be available within the next decade, probably sooner. So how does the settlement account for future scientific advances?

By foreclosing on them. The deal specifically prohibits the NFL and the players' top lawyers from meeting more than once every decade to discuss possible changes to the tests used to determine brain damage, with each side holding a veto. (If the league doesn't like the Mount Sinai test, for instance, it simply can refuse to incorporate it.) Moreover, the actual diagnoses that qualify retirees for money can "in no event" be modified, which means there will never be a "Life with CTE" award, no matter what researchers learn over the next 65 years about identifying and treating the disease.

Again, the NFL knows what it's doing.

How much is the league saving through a settlement that eliminates and/or deeply discounts future CTE cases? The answer depends on how you crunch the numbers. Start with how many former players can reasonably be expected to develop the disease. No one knows for sure. But we can make a conservative, reasonably informed guess.

Between 2006 and the middle of last year, 1,128 former NFL players died. Fifty-two of the tested retirees—4.6 percent—were diagnosed with CTE. Apply that rate to the 19,400 living retirees covered by the settlement, and you end up with approximately 892 future cases.

For an even more conservative number, assume that the settlement had no Death with CTE cutoff date, and instead paid for future cases. Court documents filed by top player lawyers identify 46 CTE cases among 1,700 deceased retirees, which equals a disease rate of 2.7 percent. Apply that number to the same 19,400 living former player pool, and you get 524 future cases.

In court documents, the NFL estimates that Death with CTE cases will pay out $1.44 million per player after accounting for age and other built-in settlement discounts. Multiply that number by our 524 still-to-come cases, and you end up with roughly $755 million the league will keep in its coffers —a windfall larger than the total sum it expects to pay out under the current settlement.

If asbestos companies could write mesothelioma out of their settlements, they'd save an awful lot of money, too.

## Step 2: Define Away Other Types of Brain Damage

Last week, former NFL quarterback Kevin Kolb wrote about retiring from the league at age 29 (http://mmqb.si.com/2014/10/23/kevin-kolb-concussions-mexico-hurricane/) because of concussions and about the brain damage symptoms he continues to suffer:

"…some symptoms are impossible to ignore. The ringing is like someone shooting a shotgun right next to my ear, every second of every day. It doesn't go away.

The sensitivity to light also has a profound impact. I'll be in a business meeting indoors and have to politely ask to put on my sunglasses before the headaches and double vision start…"

Neither of those problems is covered by the settlement. Nor are chronic headaches, numbness, burning, tingling, attention disorders, sleep disorders, loss of sense of smell and taste, balance problems, and other life-altering symptoms of brain damage. While people who suffer a single traumatic brain injury have a 150 percent greater risk of developing epilepsy than those who don't, seizures aren't part of the deal. Similarly, pituitary dysfunction doesn't qualify—even though (a) brain injury increases the risk of a problem that can result in fatigue, mood and cognition problems, and hardening of the arteries; (b) a recent study of 68 retired players found significant hormonal abnormalities (http://www.ncbi.nlm.nih.gov/pubmed/24552537) in 25 percent (16) of them.



Kevin Kolb after suffering a football injury. Photo by Mark J. Rebilas-USA TODAY Sports

Randy Benson is a neurologist and clinician at the Michigan-based nonprofit Center for Neurological Studies. He once testified before the House Judiciary Committee about brain injuries in football, and has studied and treated dozens of former NFL players, some sent to him by lawyers suing the league over concussions. "I get a checklist," Benson says. "Do they have ALS? Do they have Alzheimer's? The answer is, the bulk of the guys I see don't have that stuff. But what they do have is neurological impairment—we can see it with imaging—and they're in a bad way psychologically because of their brain injuries. These guys can't earn a living any more. They don't have a lot of money left. They end up alienating and isolating themselves."

Based on experience, Benson suspects damage to the pituitary gland—a pea-sized gland that sits at the base of the brain and secretes hormones that regulate many bodily functions—is common among the group. "We know with non-sports brain injuries the rate of pituitary deficiency is about a third of population," he says. "You can imagine people exposed to hits day in and out are really at risk. And those deficiencies can have pretty devastating consequences to people from the standpoint of psychological health."

The good news? Some of the same deficiencies are treatable. Working carefully with an endocrinologist, Benson has prescribed hormones to many brain injury patients, including a retired NFL lineman who came to Benson's clinic from a psychiatric ward, depressed and wanting to take his own life. "He is not suicidal anymore," Benson says. "He went home and hasn't felt this good in years."

The retired lineman wouldn't be helped by the settlement. Nor will Kolb. Again, how much is the league saving by pretending that certain types of brain damage don't matter, and that only severe neurodegenerative diseases saddle former players with pain, suffering, and medical costs? Impossible to say, but consider this: according to the Brain Injury Association of America (BIAA), human growth hormone and other drugs given to treat pituitary dysfunction can cost $15,000-$20,000 a year. For one person. For life. If a quarter of living retired players (4,850) have pituitary damage and need an average of, say, 30 years of treatment costing $17,500 annually, that's another $2.5 billion. Of course the NFL would rather not fork it over.

Step 3: Rig the Rules

Let's say you're a retired player who does qualify for settlement compensation. As mentioned earlier, your maximum possible award is subject to reductions based on age and the amount of time you played in NFL. The older you are at the time of a qualifying diagnoses and the fewer credited professional seasons you have, the smaller your payout.

On paper, this makes a kind of rough sense—players who had longer careers were exposed to more head injury risk, and cognitive ailments are more common among older people, regardless of having played in the league. In a memo filed with Brody, however, the BIAA argues three key points:

1) A single concussion can result in permanent brain damage.

2) Multiple concussions sustained over a single season or a short period of time can be more harmful than those sustained over a long career.

3) As a result, "the nature and extent of the impairment - not the number of seasons played - should be the determining factor in any monetary award."

University of Maryland health policy professor Eleanor Perfetto has a related concern with the settlement, which she shared with me (http://www.sportsonearth.com/article/85045740/nfl-concussion-settlement-cuts-cte-coverage-short-patrick-hruby) last summer. Her husband, NFL veteran Ralph Wenzel, died in 2012 at age 69 and was posthumously diagnosed with Alzheimer's and CTE. He originally was diagnosed with dementia in 1999, and began experiencing memory loss five years earlier.

"With many of the older [NFL retirees], the date of their formal diagnoses is probably many years after they became sick," Perfetto told me. "So, like Ralph, maybe they had symptoms for five or 10 years before a formal diagnosis. And one of the reasons they didn't realize they needed to get checked out, or did get checked out but doctors couldn't figure out what was wrong with them, was all of the efforts the NFL made to smokescreen that this problem didn't exist."

Perfetto says her attorney told her that her husband is due a $1.4 million payout for his postmortem diagnosis of CTE, based on his official dementia diagnosis at age 56. Had Wenzel instead been diagnosed in 1994, his award would have been closer to $3 million.

"This is the one thing that bothers me a lot," Perfetto told me. "The NFL has actually managed to reward themselves for their deceit."

Also saving the league money? A series of settlement eligibility hoops that act as a kind of bureaucratic poll tax for brain-damaged retirees. If former players fail to register with a claims administrator within 180 days of a class notice being distributed following final settlement approval, they'll be denied awards. The same holds true for retirees over age 43 who fail to undergo baseline neurological exams within two years, and for younger former players who fail to do the same by their 45th birthday or the 10th year of the baseline program, whichever comes first. Now, imagine that you're a homeless retiree like Terry Tautolo, (http://www.cbsnews.com/news/former-nfl-player-tackles-homelessness-after-living-under-la-freeway/) or living in a dementia ward (http://www.washingtonpost.com/wp-dyn/content/article/2007/03/15/AR2007031501929.html) like Willie Wood. Are deadlines and paperwork really your forte?

(Speaking of paperwork, the settlement also requires all former players to produce "objective evidence beyond [a] sworn statement" of NFL employment and participation in more than one eligible season or have their awards reduced by 80 percent—even though the league keeps historical records of its own players. Do they want retirees to produce old copies of Madden NFL? Dog-eared football cards? As far as obvious cost-cutting measures go, this would be funny if it wasn't so transparent.)



Joseph Addai after suffering a football injury. Photo by Mitch Stringer-USA TODAY Sports

To receive a qualifying diagnoses—and with it, cash—former players have to be examined by doctors who have been approved by both the top players' lawyers and the NFL. Those same retirees have to pay for their travel and exams, no matter how poor or sick they happen to be. The league can appeal an unlimited number of awards per year at no cost; by contrast, former players have to pay a $1,000 fee to appeal denied claims, and are limited to submitting just five pages of supporting evidence. "You can't do that in five pages," says Johnson, the brain injury lawyer. "I'm in the middle of a relatively straightforward mild brain injury case right now—I have to persuade a mediator—and those documents could fit into a banker's box. I have 80 pages summarizing 500 pages."

Further, Johnson says that the neuropsychological tests used by the settlement to determine impairment are both flawed and insufficient, and figure to disqualify deserving, brain-damaged NFL retirees. Stern, the Boston University CTE and neurodegenerative disease researcher, agrees. For

payout purposes, the settlement places former players into three neurocognitive impairment buckets: Level 1, Level 1.5, and Level 2. Only the latter two groups receive cash awards. In an affidavit filed in support of an objection to the settlement, Stern states that:

"…the algorithm used in the Settlement to translate test performance into compensable Neurocognitive Impairment categories is not one that is used in any known or published set of criteria for the determination of dementia, and utilizes a threshold of impairment that would exclude many [retired players] with dementia … the criteria used in the Settlement would require that [retired players'] test performance be even more impaired than what is often seen in well-diagnosed cases of moderate stage dementia…"

To illustrate, Stern notes that under the settlement's testing and diagnostic criteria, two retirees of the same age and same number of credited NFL seasons could score exactly the same on a series of memory and intellectual functioning tests with the exception of a single word pronunciation exam—an exam stacked against people with dysarthria, a speech impediment that affects 10 to 12 percent of people who have suffered brain injuries—and as a result, one player would qualify for Level 1.5 impairment while the other would not. Never mind that both retirees, Stern writes, would be "so severely impaired in several areas of cognitive functioning that they would require assistance in many activities of daily living."

To weed out people who are attempting to fake brain injuries, neuropsychological testers use a concept called "malingering." Over a series of exams, sometimes lasting as long as five hours, patients are expected to give a consistent, emotionally-neutral effort—if they don't, there's a good chance they'll be labeled as frauds. Johnson says NFL retirees run a high risk of earning the same designation, even if they're truly sick. "This is a group of people who are emotional wrecks," he says. "And they're in pain. Pain makes you moody, makes you irritable. Most of these guys are probably too sore to sit in the same chair for five hours.

"If I were a defense neuropsychiatrist, my goal would be to piss off one of these guys during the exam and then say he's malingering. Not that the doctors will have to be that dishonest. People getting to this level of senility won't test well, anyway. Now add in the personality of someone who

has played pro football, who has progressing CTE, who is in pain—it's all going to work together to come out badly."

Step 4: Ding 'Em With Demographics

Retired NFL lineman Craig Heimburger is 37 years old. A fringe pro, he played for five league teams over a four-season span, spent much of his career on preseason or practice squads, and appeared in 15 games for the Rhein Fire of NFL Europe. Heimburger suffered at least three concussions that he played through, including one with the Fire that caused memory loss and vomiting. In court papers, he claims that he now suffers from "personality changes, cognitive impairment," and pituitary damage, and that it's "virtually certain" he has CTE.

Under the terms of the settlement, however, any award Heimburger qualifies for will be reduced by as much as 60 percent. The reason? Time spent in NFL Europe doesn't count toward the deal's "eligible seasons," even though players across the Atlantic were still getting hit in the head while working for the league, and even though injured players were often flown back to the United States for surgery and rehabilitation. Given that approximately 3,500 retirees spent some or all of their careers overseas, that's likely millions more dollars that will remain in the league's hands for no good reason.

But wait. It gets worse.

All former players who suffer a single stroke or non-football-related traumatic brain injury—for instance, a concussion during a car accident—are subject to 75 percent award reductions. Does this make scientific sense? Not really. There's no way to determine that a stroke or slip-and-fall on an ice rink has caused three-quarters of the brain damage suffered by someone who has spent years bashing helmets on a football field. Nevertheless, NFL actuaries expect 4.5 percent of league retirees to suffer strokes, which means it also expects at least 162 settlement award recipients to forfeit three-quarters of their cash.

Oh, and about that 4.5 percent figure: It's likely to be higher. After all, concussions increase the risk of stroke. So does using Toradol, a painkiller league doctors spent two decades administering to players. Moreover, obesity and large body size make strokes more likely, and black people are 1.3 times more likely to suffer strokes than other races.

In other words, the settlement isn't just parsimonious. The case could be made that it's structurally racist.

Step 5: Sweeten the Deal

A few weeks ago, lead player lawyer Seeger admitted to ESPN (http://espn.go.com/espn/otl/story/_/id/11693012/opposition-nfl-concussion-settlement-falls-apart-deadline-looms) that he "couldn't get the NFL to pay on every single set of injuries." True enough. And perfectly fair. But left undiscussed? Just how hard he and others negotiating on behalf of league retirees tried to get those same players paid at all.

Fact: Seeger and the other top player lawyers did not subject the NFL to discovery, nor did they take a single deposition to test the strength of their claims.

Fact: They reportedly engaged in only twelve days of mediation with the league before producing the initial settlement, a deal that is almost identical to the one awaiting final judicial approval.

Fact: The NFL has agreed to pay Seeger and a handful of other lawyers a separate $112.5 million fee within 60 days of final approval, in addition to their individual client fees and a provision in the deal that allows them to petition the court for five percent of every settlement award going forward.

Did the league buy itself a favorable settlement for less money than it costs to buy 15 minutes of television ad time (http://admeter.usatoday.com/story/sports/ad-meter/super-bowl/2014/01/20/ad-meter-story-super-bowl-ad-costs/4476441/) during the Super Bowl? Not necessarily. Were the top player lawyers incentivized to fight tooth and nail for the best deal possible? Not in the least.

"The way the class counsel's fees are structured, they don't pay the price down the road for this having turned out badly," Johnson says. "Wouldn't it have been a lot fairer to make their fee based on contingency, like one-third of what gets paid out in the future? They could still get to $112 million, but I bet the qualifying diagnoses would be a lot different. They would have wanted players to get paid as soon as possible, not when they are 77 years old."



Trent Edwards after suffering a football injury. Photo by The Star-Ledger-USA TODAY Sports

Earlier this month, Debra Pyka wrote a letter to Brody, (https://www.scribd.com/doc/242658109/Letter-to-Judge-Anita-Brody-from-Debra-Pyka) the federal judge overseeing the settlement. Pyka's son, Joseph, committed suicide at age 25. He played Pop Warner and high school football. He never played in college or the NFL. After his death, he was diagnosed with CTE. (http://www.sportslegacy.org/research/legacy-donors/joseph-chernach/)

The settlement, Pyka wrote, isn't just unfair to former players. It's unfair to mothers like herself:

"…to this date the NFL has not made the research re: head trauma and concussions public … I am furious with the NFL for keeping this research from the public. The NFL sponsors these young kids in Pop Warner through high school. I, and every parent along with the players, have a right to know of the dangers of playing football along with the brain diseases and brain trauma our children could possibly suffer in the future.

I do not know whether you are married or have children, but I'm sure you can relate to my pain and suffering. Try to imagine what life would be like without your child or spouse. Imagine watching them suffer from a brain disease or head trauma due to the negligence of an organization to fail to release information to prevent the suffering and death of many. Had the research been made public many years ago, these tragedies could have been prevented. I look forward to the day that those who knew of the dangers and let people suffer and die will be banned from the NFL and prosecuted…"

The league is not settling out of the goodness of its corporate heart, or because it truly cares about its brain-damaged former employees. The league is settling out of fear. Fear of liability. Fear of accountability. Fear of Pkya's question, the same one haunting McClain's clients, 24 of whom have opted out of the deal to pursue their case in state court: What did the NFL know, and when did it know it?

For a price that will likely be significantly lower than the $1.17 billion value of the average team, (http://www.forbes.com/sites/kurtbadenhausen/2013/08/14/nfl-stadiums-by-the-numbers/) the league will never have to answer. So maybe Seeger is right. Maybe the proposed settlement truly is extraordinary. After all, the NFL isn't just buying silence. It's buying it on the cheap.

-

Tags: nfl (/topic/nfl), football (/topic/football), concussions (/topic/concussions), brain trauma (/topic/brain-trauma), settlement (/topic/settlement), lawsuit (/topic/lawsuit), kevin kolb (/topic/kevin-kolb), dave duerson (/topic/dave-duerson), junior seau (/topic/junior-seau), dave herman (/topic/dave-herman), mike webster (/topic/mike-webster), als (/topic/als), parkinson's (/topic/parkinson39s), alzheimer's (/topic/alzheimer39s), cte (/topic/cte)

EXHIBIT 26





• SUBSCRIBE
• RENEW
• GIVE A GIFT
• DIGITAL EDITION

Print | Close

# The NFL Dodges on Brain Injuries

By Patrick Hruby

As the National Football League season kicks off, the sport's most significant contest isn't happening on the field. Rather, it's taking place in federal court, where a group of former players has challenged the proposed settlement of a class-action brain damage lawsuit filed against the league. Whether you're a diehard fan or utterly indifferent to football's charms, a practicing neuropathologist or someone who can't distinguish a concussion from a toothache, you might want to pay attention. Because the outcome of the legal battle won't just affect NFL owners and retirees.

To the contrary, the concussion settlement is a matter of public health—and potentially, significant public cost.

Related Story



Why Football Must Get Safer

A quick review of the basics: More than 4,500 retirees have sued the league, alleging that the NFL downplayed, dismissed, and covered up the long-term neurological harm associated with football-induced concussions and hits to the head—allegations detailed in "League of Denial" and elsewhere—thereby placing players at increased and unnecessary risk. While denying any wrongdoing, the league nevertheless has moved to settle the case, tentatively agreeing to fund an award program that would diagnose and compensate brain-damaged ex-players for the next 65 years, in exchange for virtual immunity from future litigation and Big Tobacco-style discovery of what the NFL knew and when it knew it.

So far, so good, right? America's favorite league, it seems, takes care of its own. Are you ready for some football? Not quite. While federal judge Anita Brody has given the deal a preliminary go-ahead, a group of seven former players including Super Bowl winners Alan Faneca and Sean Morey is attempting to appeal the settlement before it can receive final approval from Brody later this year. Essentially, they're arguing that many retirees were inadequately represented during settlement negotiations.

A closer look at their objections and at the proposed settlement reveals the league trying to shirk full responsibility for the public health crisis it caused, maintaining a murky status quo of public equivocation and half-denial.

* * *

It sounds like a lot of money: Under the terms of the deal, former players will receive up to $3 million for a dementia diagnosis; $3.5 million for Alzheimer's and Parkinson's disease; $4 million for death with chronic traumatic encephalopathy (CTE); and $5 million for amyotrophic lateral sclerosis (ALS).

But those amounts are maximums. The actual awards are subject to a series of reductions and offsets. Former players with fewer than five credited years of NFL experience will see their awards reduced, some by more than half. The same holds true for retirees over age 45—the older players are when diagnosed with one of the above diseases, the less money they'll receive. And all of that comes before legal fees. Earlier this year, ESPN's Lester Munson calculated that a player who faced dementia after age 60 might end up collecting around $375,000 after costs.

Other loopholes and reductions verge on absurd. While the settlement forbids former NFL Europe players from suing the league, it does not credit their overseas seasons toward award calculations—never mind that getting hit in the head wearing a London Monarchs helmet is biologically the same as getting hit in the head while playing for the Jacksonville Jaguars. Similarly, retirees who have suffered a single non-football-related traumatic brain injury or stroke will have their awards reduced by 75 percent, even though there's no scientific reason to assume that a concussion sustained in a post-career car crash would account for three-quarters of a former player's cognitive or neurobehavioral impairment, and even though NFL team doctors may have increased many former players' risk of stroke by administering the painkilling drug Toradol in a manner contrary to Food and Drug Administration warning label guidelines for roughly two decades.

Also note: Current and future NFL players are not eligible for cash awards, regardless of their neurological afflictions. The same holds true for players who have retired since the settlement received preliminary approval on July 7—including 27-year-old Seattle Seahawks receiver Syndey Rice, who walked away from football on July 23 due to concussions.

As for sick retirees who are covered, actually receiving money won't be easy. Not when the proposed deal's diagnosis and claims system features a number of hurdles that could trip up brain-damaged applicants, some of them already struggling mightily with everyday life, others in assisted care or indigent. Consider:

Retirees unable to register within 180 days of a supplemental settlement notice being distributed are ineligible for awards. So are former players over age 43 who fail to get a required neurocognitive exam within two years. These deadlines might seem reasonable—but could prove problematic for cognitively

challenged retirees who have a hard time with paperwork and punctuality.

The required exams—which are paid for by the settlement fund—are not sufficient to diagnose Alzheimer's, Parkinson's, or ALS. Former players who worry they may have those conditions will have to pay for additional testing themselves.

While the NFL can make unlimited appeals of award claims free of charge, retirees must pay a $1,000 fee to contest those appeals.

Perhaps the best illustration of the settlement's limitations involves CTE, the neurodegenerative disease at the heart of League of Denial, long associated with boxing, first linked to football through an autopsy of Hall of Famer Mike Webster's brain and since implicated in the suicide deaths of Junior Seau, Dave Duerson, Ray Easterling, and others. A 2013 National Institute for Occupational Safety and Health study of nearly 3,500 NFL retirees who played at least five seasons between 1959 and 1988 recorded 17 combined cases of ALS, Alzheimer's, or Parkinson's. Meanwhile, 33 of the 34 deceased league players in a 2010 study were diagnosed with CTE, a finding that left neuropathologist Ann McKee to wonder whether "every single football player doesn't have" the condition.

Given CTE's public prominence and potential prevalence, you might expect the settlement to generously compensate players who develop it. But only the families of NFL retirees who died between January 1, 2006, and June 7, 2014, and were subsequently diagnosed with the disease are eligible for "Death with CTE" payouts. Died on June 8? Still alive to read this? Tough break. Your family gets nothing, no matter how riddled with destructive tau protein slices of your brain appear to be during posthumous examination.

Chris Seeger, the top lawyer for the retired players during settlement negotiations, argues that the CTE cutoff date was necessary for two reasons: (a) the disease currently can only be diagnosed after death; (b) the settlement is designed to help former players while they're still alive. If retirees suffer CTE symptoms, he insists, they will be covered by the agreement's dementia awards.

This is half-true at best. Some former players with CTE likely will be covered, albeit with reduced awards. Others will be shut out entirely. How so? According to a study of 36 adult males—29 of them retired football players—diagnosed with CTE, the disease presents in two distinct ways, both consistent with case reports of former boxers. Some victims suffer first from the same sort of cognitive impairment that characterizes dementia. These men tend to live longer, and their symptoms tend to show up later in life, typically in their late 50s.

Other victims die younger. Their symptoms appear earlier and are neurobehavioral: emotional explosiveness, impulse control problems, violent outbursts, and depression. In the study, this second group of CTE sufferers was twice as large as the first group—yet the proposed settlement's diagnostic program only screens for the cognitive impairment that characterizes the smaller group. In addition, the agreement ignores a series of symptoms associated with both CTE and general brain damage, including visual impairment, chronic pain, chronic headaches, numbness, burning, tingling, incessant ringing in the ears, sensitivity to noise, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts, and difficulty regulating, expressing, and controlling complex emotions.

Many researchers studying CTE believe doctors will be able to diagnose the disease in living people via biomarkers or brain scans within the next five years. However, the proposed settlement only allows for

changes to its diagnostic criteria in light of scientific advances once every 10 years, and does not allow for any changes to the types of brain damage that qualify for cash awards. There never will be a "Life with CTE" award, no matter how many living, suffering players are eventually diagnosed with the disease.

"The vast majority of players who have what has been traditionally been referred to as post concussion syndrome are not going to receive anything from this settlement—any player who has behavioral problems or emotional issues as a result of concussions is omitted," says Michael Kaplen, a New York-based personal injury lawyer who teaches a brain injury course at George Washington University. "They're cherry picking what they choose to pay for or not pay for, kicking their responsibility over to someone else."

All of the above figures to significantly reduce the NFL's ultimate total payout to retirees. Neither the league nor Seeger argues otherwise. In court documents filed in support of the settlement, both parties express confidence that an initially proposed and since scrapped $675 million fund amount would be more than enough to cover all player awards for the next 65 years. During an interview with CBS Sports radio, Seeger also said that he expects between 3,000 and 5,000 retirees to receive cash compensation. Do the math, and that means the average expected award is between $135,000 and $225,000—far less than the deal's highly publicized $1 million-plus maximum amounts.

Why is this significant? Because brain damage isn't cheap. Retirees who can't hold down jobs or keep their families together cost money. Retirees who need feeding tubes and ventilators cost even more money. Frank Neuhauser, the executive director of the Center for the Study of Social Insurance at the University of California, Berkeley, told the Los Angeles Times that dementia and Alzheimer's patients can cost "millions of dollars and can involve 10, 20, 30 years of medical care and income support." University of Toronto neurosurgeon Charles Tator told Medscape Medical News that the total costs related to repetitive traumatic brain injury—including lost productivity and medical and custodial care —are in the ballpark of $10 million per case. If the $9 billion-a-year professional football industry lowballs former players, society will be forced to make up the difference—through Medicare, higher private insurance premiums, and charitable contributions.

When I asked investigative reporter David Cay Johnston about a potentially insufficient settlement last year, he was downright apoplectic.

"You, the NFL, caused this problem," Johnson, a Pulitzer winner and the author of Free Lunch: How the Wealthiest Americans Enrich Themselves at Government Expense and Stick You With The Bill, said. "You profited from this problem. You should pay 100 percent of the costs. Imagine somebody was running a company that was knowingly dumping pollution. We would say, 'You have to pay to clean that up.' I think it's unconscionable that taxpayers should be looking at picking up any of this."

In a New York Times editorial published last fall, former NFL linebacker Scott Fujita raised another major problem with the deal. "Is this not an issue of public safety," he wrote, "especially when it comes to children? Did the plaintiffs not deserve to discover exactly what was known by the NFL about head injuries, and when? What about the public?"

Fujita was right. Football-induced brain damage is a public health and safety issue. And the public deserves to know as much possible in order to quantify the medical risks of a sport primarily played not

Case 2:12-md-02323-AB Document 6455-23 Filed 12/02/14 Page 48 of 51

by a small number of well-compensated adult men represented in collective bargaining by a full-fledged union, but by millions of uncompensated children and college students representing public institutions.

To come up with the settlement's original $675 million fund cap, both the NFL and the top players' lawyers said in court documents that they consulted with medical experts, actuaries, and economists to produce "thorough analyses" estimating both the prevalence and extent of brain damage in retired players. However, neither party has shown those figures to Brody, shared them with other player lawyers or filed them in open court. Earlier this week, the league agreed to release its actuarial report contingent on Brody's approval; for now, however, the math remains a mystery.

By contrast, a proposed NCAA class-action concussion lawsuit settlement features a detailed report that estimates that of 1.8 million former college athletes who played contact sports—700,000 of them ex-football players—approximately 60 to 350 per year over the next half-century will be diagnosed with either CTE or post-concussion syndrome. Parents trying to decide whether to allow their child to play football deserve to see the NFL's numbers as well. So do players.

Ever since Representative Linda Sanchez, a California Democrat, challenged NFL commissioner Roger Goodell while likening his organization to Big Tobacco at 2009 Congressional hearings, the league has attempted to take a leadership role in addressing football-induced brain damage. That's possibly out of sincere concern, probably out of public-relations panic, and likely due to a bit of both. The NFL has donated $30 million to the National Institutes of Health to study brain damage and other health ailments. It has partnered with General Electric on a $60 million program to improve brain injury diagnosis and treatment. It has held safety summits for both mommy bloggers and international sports leagues alike. Through its youth arm, USA Football, the league is even pushing a "Heads Up" program that purports to teach children safer tackling techniques. Yet by buying silence through the settlement, the league also is undercutting its own credibility. Learning exactly what the NFL knew and when it knew it, Kaplen says, is essential for evaluating whether the league can be trusted as an honest broker of concussion information going forward.

Earlier this week, relatives of Seau announced that they intend to opt out of the settlement and instead pursue a wrongful death suit filed against the NFL last year. "The family want to know why this settlement seems designed for expediency for the NFL and to ensure that information doesn't come out," Steven Strauss, a Seau family lawyer, told ESPN. "And the Seau family wants the truth to come out. Since this litigation started, there hasn't been one document produced, there hasn't been one deposition taken. It seems very clearly designed to nip this in the bud and not have the truth come out, and that's not acceptable to the Seau family, and it's not acceptable to Junior's legacy." Should it be acceptable to anyone else?

This article available online at:

http://www.theatlantic.com/entertainment/archive/2014/09/the-nfl-dodges-on-brain-injuries/379557/

Copyright © 2014 by The Atlantic Monthly Group. All Rights Reserved.

EXHIBIT 27

# Time's Running Out to Stop Bad NFL Concussion Settlement

U.S. District Judge Anita Brody will hold a hearing on November 19th to determine whether or not to grant final approval to a concussion settlement between the NFL and former players.

In mid-October, players had the option of opting out of the settlement and pursuing their own legal remedies. Some did just that, most stayed in, and other groups of players filed court objections to the proposed settlement. The primary objection is that the settlement places unfair limits on who would be eligible for compensation and when.

"The court has its own playbook for managing class action litigation," said Jim Ryan, an employment attorney.

> "They look at what the reaction has been since the preliminary approval and see what the objectors have brought forth as to why the settlement is inadequate. A lot of time, just because it was approved at the preliminary stage does not mean it's going to be approved at the final stage. … The court is going to be very, very in tune to what the objectors are saying."

Nevertheless, most experts believe Brody will finalize the settlement. That likelihood is disturbing on many fronts. For one, under the settlement proposal in front of Judge Brody, players with less severe brain damage caused by repetitive blows to the brain likely won't receive any money from the settlement.

Also, the proposed settlement doesn't address future scientific and medical advances. Currently, chronic traumatic encephalopathy (CTE) can only be diagnosed after death. However, Boston University researcher, Robert Stern, believes an FDA-approved test for CTE will be available within the next decade. That type of scenario isn't addressed in the proposed settlement.

Findings from a study prepared by actuaries hired by the NFL show that nearly a third of retired players will develop long-term cognitive problems and that brain-related problems will likely emerge at "notably younger ages" than in the general population.

"It's a bogus deal," says Kansas City attorney Ken McClain, who represents two dozen former players.

> "A fraudulent deal on its face, completely illusory, designed to pay very few people except the lawyers and the players in the most extreme [illness] category. All of these men saddled with neurological problems throughout their lifetimes are not the NFL's concern. The NFL's concern is containing risk, just as if they were [General Motors] and these players are faulty ignitions."

Just how flawed this proposed settlement is is outlined by Patrick Hruby in a recent in-depth article

Just how flawed this proposed settlement is is outlined by Patrick Hruby in a recent in-depth article.

Let's hope Judge Brody gives the concerns of the objectors full consideration.

*— Ken Reed, Sports Policy Director, League of Fans*