```
 1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   IN RE NATIONAL FOOTBALL    )  No. 2:12-md-02323-AB
     LEAGUE PLAYERS' CONCUSSION )
 4   INJURY LITIGATION          )  MDL No. 2323
     _____)
 5                              )  Philadelphia, PA
     THIS DOCUMENT RELATES TO   )  November 19, 2014
 6                              )  9:58 a.m.-3:20 p.m.
     All Actions                )
 7   _____)

 8          FAIRNESS HEARING/AMENDED TRANSCRIPT
           BEFORE THE HONORABLE ANITA B. BRODY
 9

10   APPEARANCES:

11   CHRISTOPHER SEEGER, ESQ.
     BRAD S. KARP, ESQ.
12   STEVEN MOLO, ESQ.
     MARTIN TOTARO, ESQ.
13   THOMAS WIEGAND, ESQ.
     THOMAS DEMETRIO, ESQ.
14   WILLIAM GIBBS, ESQ.
     JOHN PENTZ, ESQ.
15   LANCE LUBEL, ESQ.
     MICHAEL ROSENTHAL, ESQ.
16   PARAG SHAH, ESQ.
     GLENN MANOCHI, ESQ.
17   EUGENE MOORE
     MARY HAWKINS
18   ELEANOR PERFETTO
     BENJAMIN J. UTECHT
19   REBECCA CARPENTER
     BRUCE BIRENBOIM, ESQ.
20   DAVID BUCHANAN, ESQ.

21   ESR OPERATOR:         Katie Furphy

22

23          Veritext National Court Reporting Company
                    Mid-Atlantic Region
24           1801 Market Street - Suite 1800
                   Philadelphia, PA 19103
25                   1-888-777-6690
```

```
 1                    I N D E X

 2   ARGUMENT                              PAGE

 3   Mr. Seeger                            7
     Mr. Karp                             47
 4   Mr. Molo                             68
     Mr. Totaro                          105
 5   Mr. Wiegand                         115
     Mr. Demetrio                        120
 6   Mr. Gibbs                           125
     Mr. Pentz                           128
 7   Mr. Lubel                           135
     Mr. Rosenthal                       146
 8   Mr. Shan                            150
     Mr. Manochi                         153
 9   Mr. Moore                           158
     Ms. Hawkins                         163
10   Ms. Perfetto                        170
     Mr. Utecht                          174
11   Ms. Carpenter                       179
     Mr. Birenboim                       187
12   Mr. Seeger                          194
     Mr. Karp                            200
13   Mr. Buchanan                        208

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S

 2      (Call to Court)

 3              THE CLERK:  Now in session.  The

 4  Honorable Anita B. Brody presiding.  Good morning,

 5  Your Honor.

 6              THE COURT:  Good morning.

 7      (A chorus of good morning)

 8              THE COURT:  Won't you be seated.

 9              We're here in the case of NFL Players

10  Concussion Litigation, multi-district litigation

11  number 12-23-23.

12              And there are a few things that I want

13  to take care of before we -- before we begin.  I want

14  to introduce Mr. Perry Golkin.  Why don't you stand,

15  Mr. Golkin, who is my special master for financial

16  matters, and he has been just invaluable, and I want

17  to publicly thank you, Perry, you're been wonderful.

18              And if I decide to approve this

19  settlement and grant the motion I want to introduce

20  two people that I have designated for -- thank you --

21  two people that I have -- will be designating for

22  special master's implementation of the agreement.

23              And first, Dean Wendell Prichett, why

24  don't you stand -- Dean Pritchett who is the -- are

25  you the interim dean, isn't that correct, at the
```

1    University of Pennsylvania Law School, and he's a

2    professor of law.  Thank you.

3                    And also Jo-Ann Verrier who will cover

4    the administrative matters.  Jo -- full disclosure.

5    Jo-Ann was a law clerk of mine 30 years ago and she is

6    now vice dean of -- for administration at the

7    University of Pennsylvania law School.  Thank you.

8                    And Judge Strawbridge who is my

9    magistrate judge.  And any time the agreement says

10   that it will be -- the Court will adjudicate the

11   matter it may be me or it may be Judge Strawbridge.

12   Thank you, David, I appreciate that.

13                   Okay.  Let's begin.  Mr. Seeger.

14                   MR. SEEGER:  Yes, Your Honor.

15                   Your Honor, if you don't mind I'm going

16   use this podium for a few minutes and then switch over

17   to this one.

18                   THE COURT:  Oh, wow.  Okay.  I'm glad I

19   have four of those podiums.

20                   MR. SEEGER:  I don't want to mess up --

21   I don't want to mess up the technology here.

22                   THE COURT:  All right.  Okay.

23                   MR. SEEGER:  Good morning, Your Honor.

24                   THE COURT:  Good morning, Mr. Seeger.

25                   MR. SEEGER:  Thank you for this

1   opportunity.

2            I'd like to start by just introducing

3   if you don't mind, Your Honor, a few people that are

4   in the courtroom.

5            THE COURT:  Oh, certainly.

6            MR. SEEGER:  Chea (ph) Smith is with

7   us.  She's the wife of Steve Smith, retired NFL

8   player, who's too sick to be here today, he's

9   suffering from ALS.

10            THE COURT:  Okay.

11            MR. SEEGER:  Also with us is our class

12   representative --

13            THE COURT:  You know I think that the

14   -- if you use the microphone everybody can hear a

15   little -- yeah, that's better.

16            MR. SEEGER:  I'll do that.

17            THE COURT:  Yeah.

18            MR. SEEGER:  Thank you, Mrs. Smith.

19            Also with us is Shawn Wooden, who's our

20   subclass representative, retired NFL player as well,

21   for Subclass I.

22            Our subclass representative, Kevin

23   Turner, for Subclass II could not make it.  His

24   condition has deteriorated to the point where he is

25   now on a breathing -- he needs assistance with his

1  breathing and he's got a feeding tube, so his medical

2  professionals didn't think it would be appropriate for

3  him to travel, but he did want to be here and he

4  wanted me to mention that.

5                    THE COURT:  Okay.

6                    MR. SEEGER:  So thank you, Your Honor.

7                    Also with me is our counsel I should

8  note.  Co-lead counsel, Saul Weiss is here, Your

9  Honor.

10                    MR. WEISS:  Good morning, Your Honor.

11                    THE COURT:  Good morning.

12                    MR. SEEGER:  Also some members of the

13  negotiating team in the PEC, Gene Locks (ph) is here.

14                    THE COURT:  Hi.

15                    MR. SEEGER:  Steve Marks (ph).  And

16  subclass counsel Arnold Levin (ph) and Diane Nest

17  (ph).

18                    MR. MARKS:  Good morning, Your Honor.

19                    THE COURT:  Good morning.

20                    MR. SEEGER:  And, Judge, before I start

21  I would like to just spend a moment to thank Your

22  Honor for everything you've done in this case.  The

23  way you've handled it, the way you've managed it, and

24  at times the parties, as you know, this was a tough

25  fought litigation as well as a negotiation, and we

 1  needed a kick in the pants at times and we got that

 2  from Your Honor, and I want to thank you.

 3           THE COURT:  I never -- I never withhold

 4  that.

 5     (Laughter)

 6           MR. SEEGER:  And at times when it got

 7  difficult we came to Your Honor and we asked for help.

 8  And one of the things we asked you for is to appoint

 9  Judge Lane Phillips to help us out, and you did that,

10  Your Honor, and he helped us get at least to the first

11  point that we got to.

12           And at that point Your Honor had some

13  questions about the deal and you needed those

14  responded to and studies, and you appointed Special

15  Master Golkin.  And I want to thank Special Master

16  Golkin as well for the work he did in this case and

17  Your Honor for appointing him.

18           Judge, we're here today seeking final

19  approval of this landmark and historic settlement.  I

20  say landmark because this settlement uses state of the

21  art diagnostic tools and tests that will assist in the

22  diagnosis, treatment, and prevention of diseases

23  associated with mild traumatic brain injury,

24  concussions, and sub-concussive hits.

25           There are numerous studies that

1   indicate the importance of early detection and

2   treatment and prevention in staving off some of the

3   serious conditions from a degenerative brain disease

4   like -- that are dealt with in this litigation, not to

5   mention the fact that the information that'll be

6   generated through our baseline assessment program will

7   be very important for science and scientists and

8   doctors who study this disease and try to come up with

9   answers to some of the things we don't -- answers that

10  we don't have today.

11             I also refer to this settlement as

12  historic because 5,000 brave NFL players put their

13  name and reputations on the line and took on the NFL

14  in what everyone understood would be a long and hard

15  fought battle.  Those men, their wives, and their

16  families made this happen.  They achieved something

17  that no one two years ago thought was possible could

18  be achieved, something that no one before was able to

19  achieve.  They want an outstanding results for all NFL

20  retired NFL players whether they are vested union

21  members or not.

22             The settlement I'm about to discuss

23  gets immediate help to retired NFL players like Kevin

24  Turner suffering from a debilitating disease like ALS,

25  it helps those with Alzheimer, dementia, and

1    Parkinson's.  No retired NFL player needs to prove he

2    sustained a concussion or prove causation in this

3    settlement.  He only need be a retired NFL player.

4                All retired NFL players will have the

5    ability to get tested by a competent medical

6    professional located where they live.

7                Before I go into the details about the

8    benefits provided in the settlement I'd like to set

9    the stage for the settlement discussions.

10               This groundbreaking resolution is the

11   result of many months of intense, hard fought, arms

12   length negotiations.  I have extensive experience in

13   trying individual cases, mass cases, class cases

14   involving personal injuries.  I've personally

15   negotiated over $8 billion in settlements for victims

16   suffering from personal injuries in pharmaceutical

17   cases and all kinds of different cases.

18               In a case like this it's class

19   counsel's duty to negotiate -- to consider the class

20   as a whole when negotiating a global resolution and to

21   achieve the best results under the circumstances in

22   the particular case.

23               Although we were prepared to litigate

24   each and every one of these cases to trial, and in

25   fact we were in the middle of litigating preemption

1   when we settled this case, that issue alone could have

2   dismissed thousands of cases in this litigation.

3                Co-lead counsel decided that the class

4   as a whole be best served by a global resolution if

5   one could be achieved on the right terms.

6                At the urging of Your Honor the parties

7   began a series of meetings to explore settlement.

8   Coming into these negotiations we were prepared to

9   make demands on all categories of injuries.  In our

10  complaint we allege that concussions and sub-

11  concussive hits result in Alzheimer, ALS, dementia,

12  Parkinson's, anger, mood swings, depression, sleep

13  loss, we had a whole number of injuries.

14                In the end, based upon the back and

15  forth of these hard fought negotiations, the

16  scientific considerations, and the legal issues

17  foreseeable in the case, the parties agreed to the

18  settlement terms we now present to this Court today

19  for approval.

20                The question for Your Honor today is

21  not whether the settlement is perfect, but whether

22  it's fair, reasonable, and adequate, and under the

23  circumstances of this case and the controlling Third

24  Circuit law this settlement is entitled to a

25  presumption of fairness.

1                    So, Judge, now I'd like to go through

2    the settlement and some of the issues in the case for

3    class certification.

4                    Your Honor, I just want to -- do you

5    see my PowerPoint up on your screen?

6                    THE CLERK:  He has to touch the feed.

7                    MR. SEEGER:  What's that?

8                    THE CLERK:  He has to tap your feed.

9                    MR. SEEGER:  Tap the feed.  Whatever

10   that means.

11                   THE COURT:  Do you want to help him?

12        (Pause)

13                   MR. SEEGER:  All right.

14                   THE COURT:  I don't have it, Jim.

15   Thank you.  All right, I can see it now.

16                   MR. SEEGER:  All right.

17                   THE COURT:  There's no problem now.

18   Can everybody see it?

19                   MR. SEEGER:  And you know what, Your

20   Honor, maybe -- I also have a hard copy if you want to

21   follow along that way.

22                   THE COURT:  Perfect.

23                   MR. SEEGER:  So I'll hand you two.  One

24   for Jack as well.

25                   THE COURT:  Okay, that's fine.

1                    MR. SEEGER:  Okay.

2                    THE COURT:  And I don't -- can

3    everybody see -- can you see it, Ms. --

4                    UNIDENTIFIED SPEAKER:  (Indiscernible -

5    10:08:26).

6                    THE COURT:  Okay.  That's fine.  Okay.

7                    MR. SEEGER:  Your Honor, there are

8    three components to the settlement.  There's a

9    baseline assessment program, monetary award fund, and

10   an educational fund.

11                   Let's talk about the baseline

12   assessment.  I'll try to get through some of this

13   quickly because I know I have a limited amount of

14   time.

15                   It's a -- there is $75 million

16   committed to the baseline assessment program.  It

17   includes neurological examinations and comprehensive

18   neuropsychological tests for all NFL players that want

19   to avail themselves of it.  We're hopping all of them

20   do.

21                   The BAP (ph) administrator will select

22   an independent group of medical professionals who will

23   handle these tests, and all you need to be able to go

24   through the baseline assessment program is a half a

25   season -- a half eligible season in the settlement,

Page 13

1   and if the players are age 43 or older they have two

2   years to be tested, and if they're younger than 43

3   they have up to 10 years to be tested.

4              And again, I mentioned that we don't

5   have to spend a lot of time on this, the importance --

6   it is throughout the medical literature the importance

7   of diagnosing these diseases early, getting the

8   treatment, and prevention.  This is a very important

9   part of the program, Your Honor.

10             So what could be diagnosed through the

11  BAP testing program?  The levels of neurocognitive

12  disease that we've identified.  Level 2, which is

13  moderate dementia.  Level 1.5, which is what we call

14  early or mild dementia, Your Honor.

15             THE COURT:  Is that the same?  Because

16  sometimes it's called earlier and sometimes it's

17  called mild.

18             MR. SEEGER:  It's referred to both in

19  the literature, Your Honor.  And I think for the

20  purpose --

21             THE COURT:  And so that --

22             MR. SEEGER:  Yes.

23             THE COURT:  Do you agree with that?

24             MR. KARP:  We do, Your Honor.

25             THE COURT:  Okay.  All right.

1                MR. SEEGER:  Thank you for pointing

2    that out, Your Honor.

3                And then we provide supplemental

4    benefits.  So if somebody doesn't rise to the level of

5    a qualifying condition, Your Honor, but they're

6    diagnosed with impairment not rising to the level of

7    qualifying condition we will get them that important

8    additional testing medical treatment and

9    pharmaceutical care, if necessary.

10                The monetary award fund critically and

11    very important to this is uncapped.  Every qualifying

12    diagnosis over the 65-year life of this settlement

13    will be paid.  That is guaranteed now by the NFL.  The

14    qualifying diagnoses are ALS, Parkinson's, Alzheimer,

15    Level 2, which is moderate dementia, Level 1.5, which

16    is earlier mild dementia, and that's with CTE for

17    players who passed away prior to July 7th, 2014 and

18    has a pathological finding of CTE on the brain.

19                Again, the highlights, no player need

20    establish causation as they would have to do if this

21    were being -- this were a case tried before a jury.

22                And the diagnoses are all going to be

23    made by qualified professionals, and the diagnosis

24    will be set at the date that the diagnosis is made by

25    a medical professional for the purposes of

1    compensation.

2              There are adjustments in the payment

3    scheme that deal with the number of years played in

4    the NFL, the age of the player at the time of

5    diagnosis, and I'll talk about those later in my

6    presentation, and there are adjustments for players

7    who suffered a stroke prior to certain conditions and

8    brain trauma not related to football play.

9              And here's just a -- how the seasons

10   breakdown, the number of seasons needed to qualify for

11   a full award.

12             Now, importantly in a player is

13   diagnosed with Level 1.5 dementia let's say, Your

14   Honor, which is early to mild, and they progress into

15   Level 2, they will get a supplemental benefit.  We

16   will look at it again and they will be paid additional

17   money that correlates with where they are on the grid

18   for Level 2 dementia.  If they advance into Alzheimer

19   they could be -- they could be eligible for an

20   additional compensation there.  That's very important.

21   They can reapply to the program throughout their life.

22             And one thing that we all encountered,

23   those of us who talk to players all the time as we

24   have throughout, is they may have a diagnosis which is

25   just short of a qualifying diagnosis.  Well they're

1    not out of the program, they can keep coming back if

2    these are degenerative diseases, and we don't wish

3    these on anybody, but God forbid a player digresses

4    and he gets sicker he can reapply for these awards,

5    and that can happen throughout his lifetime.

6              Statutory lien is a very important

7    aspect of this settlement are being dealt with by

8    plaintiffs' counsel, by class counsel.  We're taking

9    the power and the size of this fund and we're going to

10   negotiate lien reductions for the players far beyond

11   anything an individual lawyer could do or the player

12   could do for themselves.  These lien reductions will

13   be substantial, and it won't affect their eligibility

14   if they're getting Medicare or Medicaid.  Their future

15   eligibility is preserved.

16              And finally in terms of additional

17   features is that we will allow modifications to the

18   settlement to incorporate new diagnostic tools, and

19   the parties are going to continually, even though the

20   agreement says every ten years, we're going to work

21   together all the time to keep an eye on this, and we

22   will in good faith make sure that if they're necessary

23   and needed they will be implemented.

24              THE COURT:  So if it's good faith your

25   representation; is that correct?

1                    MR. KARP:  It is, Your Honor.

2                    THE COURT:  All right.  That means that

3     there is -- there can be judicial oversight of that.

4                    MR. SEEGER:  Yes, Your Honor.

5                    THE COURT:  Do you agree with that,

6     Mr. Karp?

7                    MR. KARP:  We do.  It's laid out in the

8     agreement.  Yes.

9                    THE COURT:  Okay.  Thank you.

10                    MR. SEEGER:  Thank you, Your Honor.

11                    And finally the education fund, which

12    in terms of the dollar amount is a small aspect of

13    this, but it's important, because it's going to be

14    used to educate retired players regarding benefits

15    that are available to them that they may not be aware

16    of.  We've had numerous discussions with players who

17    would qualify for benefits that are provided now by

18    the NFL that don't know they're there for whatever

19    reason, and we're going to make sure that they know

20    whatever benefits they are.  Counseling, whatever it

21    is.

22                    And we're going to try to establish

23    programs and work with programs to make football safer

24    so that players learn how to hit in a safer way to

25    avoid some of these injuries.

 1                      Also the agreement there are numerous

 2    CBA benefits that have been collectively bargained

 3    for.  I just mentioned them.

 4                      What we learned while we were

 5    negotiating is that in the 2011 collective bargaining

 6    agreement there's a neurocog program -- a

 7    neurocognitive impairment program that had a waiver in

 8    it.  The waiver said you either go into the benefits

 9    program or you go into the tort system, but you

10    couldn't do both.  The NFL in the context of this

11    settlement has agreed to waive that.  So now players

12    can avail themselves of the settlement and they can

13    avail themselves of the benefits.  There's going to be

14    no problem there with that.

15                      THE COURT:  That's correct, is it not?

16                      MR. KARP:  It is, Your Honor, and I'll

17    be addressing that in my remarks shortly.

18                      THE COURT:  Okay.

19                      MR. SEEGER:  We don't touch workers'

20    compensation claims, they can still file them, or

21    other claims.  If a player thinks that they should

22    bring a case against their high school or their -- or

23    college they can do that.  There's no release of those

24    claims.

25                      I'd like to talk for a minute now about

1  class notice.  I've never been involved in a case

2  where the notice was as extensive, as well written as

3  in this case, and there is evidence -- there is

4  evidence of the effect of this good notice, which I'm

5  going to get to, but let me first mention that we

6  directly mailed over 33,000 notices -- actual notice

7  to retired players and their families.

8              We had it on television programs, we

9  published notice, we had short forms of the notice

10  that said -- even though it didn't lay out in that

11  one-page short form the entire deal, it told them

12  where to go to find out, and that's important.

13              We had a website.  That's important

14  because we -- I'm going to show you in the next slide,

15  but I want to spend a moment on this, I want to talk

16  about media, but on the next slide I'm going to show

17  you what the impact of that notice was.  We can do

18  that here.

19              This case was extensively covered in

20  the media from the time we filed the case.  Every

21  aspect of it, every change in the settlement, when

22  Your Honor denied preliminary approval stories were

23  run, they were repeated hundreds of times, every

24  aspect of the settlement was discussed and criticized

25  by the press, and some aspects I believe unfairly, but

1  it was out there, you know, everybody was talking

2  about it.

3            In addition to that the objectors had

4  their own websites.  Mr. Molo had a website with his

5  objectors putting in my view misinformation out there

6  about the settlement.  But they did it and that's what

7  it is.  It didn't really have much of an impact, but

8  I'll come back to the point about why it's important.

9            As a result of this notice we had

10 66,000 visits to our website in a class of over

11 20,000.  That's amazing.  That means family members

12 for those who probably couldn't -- are checking the

13 website and getting information.

14            We had more than 4,500 calls to our

15 call center.  Twenty-three hundred callers spoke with

16 a live operator.

17            Over 5,000 players preregistered

18 themselves for benefits, and the registration program

19 is not yet open, but they've asked to be included and

20 gave their identifying information.

21            And as a result of that we have less

22 than one percent of the class has opted out.  And I'll

23 tell you something interesting about that.  That

24 number is going down.  Because if you -- if we -- you

25 look at the reports filed by BrownGreer players are

1    coming back and saying I made a mistake, I want to

2    come back in.  I hope that continues.  They can come

3    back in.  But the number was up over 200 and now it's

4    down as of today to 199.  So players are coming back.

5                     Now why is that important?  Because I'm

6    not aware of a case that had so much information.

7    There was extensive press coverage as I said, and in

8    addition to that websites like Mr. Molo where they

9    spoofed off our name where the name of our website was

10   "Concussion Settlements," he's created a website

11   called "Concussion Settlement Facts."

12                     MR. MOLO:  Judge --

13                     MR. SEEGER:  I'm presenting Mr. Molo.

14                     THE COURT:  You can respond.

15                     MR. SEEGER:  You've spoken, this is my

16   time.

17                     THE COURT:  You can respond.

18                     MR. MOLO:  No, because this is not

19   correct.  Thank you.

20                     MR. SEEGER:  I get to speak for the

21   class.

22                     Judge, I'm not upset with Mr. Molo

23   about it.  It's important -- it's an important fact

24   for the record.

25                     THE COURT:  Well despite the fact that

1    you're not happy about it I appointed Mr. Molo to

2    represent the defendants.

3               MR. SEEGER:  No, I wasn't happy about

4    it.

5               MR. MOLO:  Thank you.

6               MR. SEEGER:  I'm not even happy he's

7    here.

8         (Laughter)

9               MR. SEEGER:  But now I get a chance to

10   talk to Your Honor, and I get to speak for the over

11   20,000 players who said yes for the settlement.

12               The one -- the less than one percent

13   who have opted out has gone down, but the only point I

14   want to include on, and I'm going to move off it, is

15   the fact that I'm not aware, except in one other case

16   we found from the district of New Jersey, where

17   objectors launched a campaign against our notice

18   campaign and we still have this result.  That's my

19   only point.  And less than one percent objecting.

20               Your Honor, I'm going go through some

21   of the Rule 23 factors pretty quickly because we don't

22   really have a disagreement, even the objectors don't

23   dispute that there's numerosity in this case, we have

24   over 20,000 retired players.

25               The common questions there's no real

1   dispute.  What are they?  The -- some of the questions

2   that are common to this class are the nature and

3   extent of the duty of the NFL to the retired players,

4   whether the duty was breached, whether the NFL knew

5   and suppressed information, whether these concussive

6   and sub-concussive hits increased the risk of the

7   Alzheimer, ALS, Parkinson's, dementia, and

8   neurocognitive impairment, whether the NFL's

9   affirmative defenses are preemption workers' comp

10  would have barred discovery.  Those are the common

11  questions, no real dispute on that.

12              Typicality is met in this case, because

13  the conduct that we allege arises -- it's the same

14  conduct throughout the class.  The class

15  representatives, Shawn Wooden, played nine seasons in

16  the NLF, he experienced concussive and sub-concussive

17  hits, he suffers from neurological symptoms, although

18  they're not a qualifying diagnosis, and he has

19  headaches, sleep problems, mood swings, concentration

20  loss, all the things that we had in our complaint.  He

21  has not been diagnosed with a qualifying injury.

22              Kevin Turner who is our Subclass II

23  representative played eight seasons in the NFL for the

24  Patriots and the Eagles.  He experienced numerous

25  concussive and sub-concussive hits and he was

1    diagnosed with ALS, which is a qualifying condition in

2    2010.

3              So the conduct arises from the same

4    conduct.  Shawn Wooden, Kevin Turner, retired NFL

5    players whose claims arise from the same conduct as

6    the two subclasses.

7              Predominance.  Again, these questions

8    predominate over individual issues.  No real dispute

9    here, not many objectors have even raised this as a

10   concern.

11             Superiority we know under Anchem (ph) is

12   really not an issue because the whole idea here is to

13   avoid a trial.  So the issue of manageability is a

14   non-issue here.

15             Adequacy we do have some push back from

16   some of the objectors, and I'll spend a minute or two

17   talking about it.  Adequacy is a two-prong inquiry.

18   It looks at the qualifications of counsel and it looks

19   to whether there's a conflict between the subclass

20   representatives and their interests and the interest

21   of the class.

22             Co-lead counsel -- my qualifications

23   are in my affidavit, Your Honor.  When you look at my

24   qualifications, Saul Weiss' qualifications, Gene

25   Locks, Steve Marks, Arnold Levin, Diane Nest, these

1  are attorneys who do this every day.  This is not our

2  first case like it is for some of the objectors'

3  counsel.  We do -- we handle personal jury cases.

4  This is what we do.  And we do it time in and time and

5  again, and our qualifications are pretty well laid

6  out.  We have tried numerous bell weather cases.  I

7  myself have tried numerous bell weather cases in MDLs

8  and in front of many judges in state and federal

9  court, which are representative trials.

10          We have litigated preemption issues,

11  Daubert issues, dispositive challenges involving

12  complex injury claims.

13          We've negotiated the resolutions -- if

14  you add my co-counsel in the number will go up to many

15  billions of dollars in settlements that have been

16  handled.  Arnold Levin was co-lead counsel in the Diet

17  Drugs litigation.  A multi-billion settlement right

18  here in the Eastern District.  We have handled --

19          THE COURT:  Someone is having trouble.

20  Yeah, maybe they want some water?

21          MR. SEEGER:  Oh.

22          THE COURT:  We don't give much around

23  here, but we do -- we do give water.

24          MR. SEEGER:  I've got an extra bottle

25  right here.  I have a cold so you won't want mine.

1            The lien --

2            THE COURT:  Thank you.

3            MR. SEEGER:  -- resolution program that

4   we are presenting to Your Honor as part of this deal,

5   this is -- we've done this in numbers of cases.  In

6   fact I believe it might have been -- I was co-lead

7   counsel in a case in front of Jack Weinstein involving

8   a drug called Zyprexa where it was one of the first

9   cases where we rolled out the lien resolution program

10  on a mass-wide basis throughout -- make sure she's

11  okay?  You all right?  And it was very, very

12  successful there.  It was very successful in Vioxin

13  and many other cases where it's been done.

14            So we've got the -- we've got the two

15  separate subclasses.  Subclass I, who Mr. Wooden

16  represents, are players who've been injured, have

17  played in the NFL, suffered concussions but not yet

18  have a qualifying diagnosis.  Kevin Turner, Subclass

19  II representative has had concussions, played in the

20  NFL, represents players with a qualifying diagnosis.

21            And why this works and why there are no

22  conflicts, Your Honor, is for the reason in this

23  slide.  The motivation of Subclass I was to insure

24  that without -- that players without a qualifying

25  injury today would have the money later to compensate

1    injuries that would come down the road in the future.

2                     Subclass II was motivated to bargain

3    for the best deal that they could presently get, and

4    because the monetary award fund is an inflation

5    adjusted and uncapped any possibility of a conflict

6    between those two classes is eliminated.

7                     And we have language from prudential

8    where it says:

9                     "Where both named plaintiffs and other

10   class members would need to prove the same allegations

11   in order to succeed on any of the claims the proposed

12   class satisfies the adequacy of representation

13   requirement of 23(a)."

14                    Now what are some of objectors'

15   adequacy complaints?  Well they say we should have had

16   numerous subclasses.  When you figure out all the

17   subclasses that all the objectors together say we

18   should have had, when you layer on top of that public

19   citizen we would have had the problem that we were

20   warned against in the Cendant litigation, which is a

21   balkanization of this class action to the point where

22   every little interest would be represented and you

23   would never be able to put a settlement together with

24   the NFL or any defendant.  It would -- the settlement

25   would implode on itself.  That was the problem.

1                    The interests are represented by the

2      class by these two subclass represents, the classes

3      work perfectly, they involve all NFL players diagnosed

4      and not diagnosed today, it is uncapped and inflation

5      adjusted.  There is no conflict.

6                    As our expert, Professor Calanoff (ph)

7      says, too many subclasses is just inherently

8      unmanageable.

9                    So what do they say?  The settlement

10     should provide what they're specifically saying,

11     because this really isn't about adequacy, it's about

12     where you draw the line.  We want more money, we

13     should have gotten more money, we should have defined

14     the qualifying diagnoses differently, we should employ

15     different award reductions, they don't like the way we

16     did that, and they don't -- they generally just don't

17     like the way we did it, so they want to do it their

18     way.  But these aren't objections to adequacy, they're

19     objections to where the lines were drawn.

20                   As you can see from Judge Phillips'

21     quote from his affidavit, "The compromise was reached

22     after many months of vigorous arms length negotiations

23     supervised by a court-appointed mediator."  In that

24     case it was Judge Phillips, and in the settlement

25     after you denied preliminary approval, Your Honor, it

1   was Special Master Golkin.

2            The class representatives' interest are

3   closely aligned with those of the class members such

4   that fair and adequate representation can be insured

5   and sufficient unity exists for the settlement class

6   certification purposes.

7            There are no Anchem issues as has been

8   asserted.  There are no futures issue.  The entire

9   class played in the NFL is discernible and was exposed

10  to head impacts.  The monetary award fund is uncapped.

11  Awards are inflation adjusted and there's no cash flow

12  maximum.  After final approval the NFL is bound, they

13  can't walk from the deal.  And the two subclasses and

14  separate representation afforded structural protection

15  beyond those afforded by the deal itself, Your Honor.

16            So, I'd spoke earlier about the strong

17  presumption in the Third Circuit in favor of voluntary

18  settlement agreements.  This presumption is especially

19  strong in class actions.  That's from the Sullivan

20  case.  And there's an overriding public interest in

21  settling class action litigation.

22            In order for Your Honor to assess the

23  fairness of this Girsh versus Jepson says to Your

24  Honor there are nine factors that have to be

25  satisfied, and I will quickly go through those.

1                The first one is the complexity and the

2     duration of the litigation.  Well the complexity --

3     just think about what the discovery would have been

4     like in this case in any kind of a case involving

5     neurocognitive problems.  Let's take, you know,

6     depression, for example.

7                I have handled suicide cases, I've

8     handled depression cases, I know what discovery looks

9     like in those cases.  I've personally handled those.

10    They ask for everything.  They ask for educational

11    records that go back to the time you were

12    kindergarten.  They want the educational records of

13    your parents, because part of the neurocognitive

14    profile is it's a loss of intelligence so they want to

15    -- they want to get those records.  When you're

16    talking about depression they want to know what kind

17    of drugs you take.  Are they legal or are they

18    illegal?  Do you drink alcohol?  What is your -- what

19    is your sexual orientation is important.  I've had

20    that come up in depression cases.  Do you -- are you

21    involved in extramarital affairs?  Do you have

22    financial problems?

23                You could just imagine I could go on

24    and on what the list would be of what the NFL would

25    want in a case that was going to trial involving the

 1    claim of anger or depression or some of those other

 2    things.

 3              The NFL would attack plaintiffs'

 4    experts on Daubert.  You've seen their affidavits,

 5    Your Honor, that's a glimpse of what the case is going

 6    to look like for opt outs who will want to go to

 7    trial.  That's what they'll be dealing with.

 8              Prior to trial the NFL would challenge

 9    many of the legal issues.  We were fighting

10    preemption.  Your Honor noted herself the risk

11    involved in that.  But, you know, when -- and I have a

12    slide where I want to talk about preemption.  The NFL

13    has one preemption cases in other parts of the

14    country.  It's not like, you know, we just said, hey,

15    there's risk, I'm talking about now co-lead counsel's

16    assessment of the risk on that, which is important.

17    It doesn't relate to anything that happened in this

18    court.  I was able to look at what the law was and

19    look at what the risk was in other courts, and I'll

20    talk about that.

21              And it would be a -- it would have been

22    an expensive, scorched earth litigation, we know that

23    because parties who have litigated with the NFL know

24    that they're in it typically for the long haul and

25    what that means.

 1              The reaction of the class to the

 2    settlement, I speak about it in the notice.  We had

 3    extensive notice, we had extensive media coverage,

 4    including misinformation campaigns, and then unrelated

 5    to what Mr. Molo is doing, we had players themselves

 6    -- this is a cohesive community.  I mean these guys

 7    are like the marines, they talk to each other, there

 8    is a -- there is a brotherhood here.  If you go on any

 9    chat room or blog site there are many of them

10    discussing the settlement all long.  And they talk to

11    each other, they have email lists for each other.  I

12    mean we're talking about like household names.  When

13    you mention the name of an NFL player all these other

14    plays know who they are, they're friends with them.

15    So they're very cohesive and they were talking to each

16    other, and they decided to overwhelmingly accept this

17    deal.

18              So the class reaction has been

19    extremely positive, and in the Third Circuit really

20    argues in favor of approval just on that point alone.

21              The stage of the proceedings we were

22    in, I mean Your Honor knows this, we were in the

23    process of litigating a threshold issue on preemption.

24    We had very important legal issues besides the

25    preemption issue.  The NFL, and they've said this in

1    their papers, intended to bring a motion to hold the

2    NFL as a co-employer with the teams.  If that would

3    have happened all of the players would have been

4    relegated to a workers' comp claim.  And as I said,

5    they would have challenged the science at every level.

6                    And at the end of the day this was a

7    science-driven case.  Everything that the plaintiffs'

8    lawyers needed to know about the science was in the

9    medical literature.  We've read it -- we read it all,

10   we studied it all, we know everything that the experts

11   that are proposed by the objectors have had to say, we

12   know everything they've published, we know everything

13   our experts have said, we know -- we knew everything

14   that was out there, and at the end of the day it was a

15   science-driven case.

16                    People can talk about discovery, you

17   can talk about fraud, you can talk about these issues,

18   but you don't get to jump over causation and go right

19   to those issues.  As you know, Your Honor, we would

20   have to prove all of those elements to get the case to

21   the jury.

22                    The parties and Judge Phillips, says,

23   this is a comment from his affidavit:

24                    "The parties consulted with and relied

25   on their respective independent medical experts in the

1   fields of neurology, neuropsychological, and other

2   relevant specialties in order to understand the

3   science regarding the diseases associated with

4   concussive head trauma and their pathologies to

5   evaluate the strength of plaintiffs' claims."

6           The risks of establishing liability,

7   risk of establishing damages, factors four and five

8   under Girsh.  Well, I've been through these and I

9   don't think I need to spend too much more time on

10  them.

11          Statute of limitations would have been

12  a big part.  Our settlement allows a player who played

13  in the '80s if he gets sick today to come in and get

14  compensated.  You know, I'm not going predict whether

15  that claim would be dismissed on a statute of

16  limitations, but we could all as attorneys and judges,

17  we can all look at that and see that there are issues

18  there whether that case would be time barred or not.

19  It isn't time barred in this settlement.

20          Assumption of risk would have been a

21  big factor by the NFL.

22          Now, I want to talk a little bit about

23  the preemption issue, because it gets pooh-poohed from

24  time to time, but it was a big issue, Your Honor, and

25  if you remember we brought in one of the country's

1    best authorities on preemption, David Fredericks, to
2    come in here and argue to Your Honor.  The NFL brought
3    in an expert.  We extensively briefed it.  I mean the
4    briefs went on for pages and pages and pages.  Your
5    Honor unfortunately had to read all that because we
6    settled right before you were about to rule.  But
7    here's a case involving a player, Stringer, where the
8    Court found preemption and dismissed the case.  That
9    was a factor going into this.
10                   THE COURT:  Is that the California
11   case?
12                   MR. SEEGER:  This was Corey Stringer.
13   The Corey Stringer case.  I'm not exactly sure what
14   court.
15                   MR. KARP:  I believe it's Minnesota.
16                   THE COURT:  Minnesota.  Okay.
17                   MR. SEEGER:  Thank you.
18                   THE COURT:  Thank you.
19                   MR. SEEGER:  Maxwell versus the NFL.
20   Here we have a quote from the opinion that says, "The
21   Court finds that plaintiff's second cause of action
22   for negligence against the NFL is preempted."
23                   And although this next one I'm showing
24   I'm not asserting for the fact -- I'm not saying the
25   case has been dismissed at any means, Mr. Duerson (ph)

1    is in the class, but here is a case from the Northern

2    District of Illinois where the judge in a different

3    context commented:

4                    "That even if the NFL's duties -- I'm

5    sorry -- NFL's duty arises apart from the CBAs

6    therefore the necessity of interpreting the CBAs" --

7    the collective bargaining agreements -- "to determine

8    the standard of care still leads to preemption."

9                    This is what the players were up

10   against, Your Honor.

11                   And we would have had to establish, as

12   I've commented both general causation, that is due

13   concussions caused these diseases, and then we would

14   have had to prove specific causation.  So the player

15   would have had to prove that there was a documented

16   concussion, that his problems occurred in the NFL as

17   opposed to college, high school, or pop warner, and

18   that the specific disease we were complaining of in

19   that case was directly related to the concussions.

20                   Girsh factor six, the risks of

21   maintaining a class action.

22                   Well, Your Honor, the one big piece of

23   this case that gets put aside in the context of a

24   settlement, because the idea is to avoid a trial, is

25   the issue of manageability.  That issue in the context

 1    of a settlement is put aside.  But in the context of a

 2    litigation between us and the NFL the NFL would have

 3    fought manageability very tough and it could have been

 4    a big issue there.  It could have prevented class

 5    certification.  And then even if Your Honor granted

 6    the class for us, as we believe we would have asked

 7    you to and think you should have, the NFL had the

 8    right to go up to the Third Circuit, as Mr. Molo did

 9    when he took us up on the 23(f) appeal, the NFL could

10    have done that.

11                 The seventh factor, the ability of the

12    defendants to withstand a greater judgment.  Your

13    Honor, I don't have to spend a lot of time on this

14    because Your Honor has written on this.  This is a

15    case that you handled, Your Honor.  I'm going to say

16    it wrong, I think it's Jakesian (ph).  I guess, you

17    know, the only thing -- the only question I raise

18    here --

19                 THE COURT:  You're insisting I be

20    consistent, is that what you're -- are you insisting

21    that I be consistent?

22                 MR. SEEGER:  Yes, we would like you to

23    be, Your Honor.

24         (Laughter)

25                 MR. SEEGER:  I'm quoting back your

1    case.  Which is something actually by way of passing

2    I'll note that Mr. Molo waited until the day before

3    our brief was due to actually brief this factor.  And

4    guess what he -- he put a lot of information about how

5    much money the NFL has, all their contracts, guess

6    what he didn't put in that supplemental brief?  Your

7    case.  I can't figure that out.  Maybe he can explain

8    that when he stands up.

9                    And Your Honor said and that courts in

10   this district regularly find that, you know, the issue

11   is really neutral on the ability to pay.  It really is

12   a factor when you have a defendant who might not be

13   able to pay.  That's not the case here, Your Honor.

14                   The range of reasonableness of the

15   settlement in light of the best recovery.  Well, I

16   mentioned earlier I, co-lead counsel, class counsel,

17   the PEC, and we draw upon that experience, have

18   negotiated many of these settlements.

19                   I will tell you that the values

20   achieved in this settlement are on the high end of

21   what anybody could find that's out there in the

22   context of a class or even a mass aggregate

23   settlement.  These are very rich values.  In many

24   cases with the younger players that go into millions

25   of dollars, and with the older players they don't go

```
1    into millions of dollars.  And I'll discuss why -- why
2    that adjustment was made, but they're still very
3    significant values that I would challenge anybody to
4    say anything about in the context of a deal like this.
5    They are on the high end.
6                    I handled the PPA litigation in front
7    of Judge Barbara Rothstein who ultimately -- who
8    approved that -- that was a class case -- who approved
9    that.  This settlement had better values.  That
10   involved injuries relating to stroke, and she
11   ultimately became the head of the Federal Judicial
12   Center.  In Diet Drugs, Arnold Levin handled that
13   case.  Those are substantial values.  I would say this
14   settlement has richer values than that one does.  And
15   in Vioxx, a case that I handled that settled for
16   almost $5 billion.  I could tell you that on a
17   generalized basis the values here are higher.
18                   And I said in my declaration that we
19   strived to obtain the best overall deal we could for
20   plaintiffs taking into consideration the projected
21   incidents of plaintiffs' injuries, the value of the
22   claims, the risk of the litigation, including the
23   pending motions at the time on preemption.
24                   And Judge Phillips says:
25                   "In particular it's my considered
```

1    judgment that plaintiffs would be unlikely to have

2    obtained more money and benefits without going through

3    years of discovery and trial where they would face

4    substantial risk of loss due to their inability to

5    prove negligence or fraud on the part of the NFL

6    parties or judgments below what they will receive in

7    this proposed litigation -- this proposed settlement."

8              So, I want to deal now with some of the

9    objectors' concerns, because they don't really impact

10   at all the fairness of this case.  It's really line

11   drawing that they could have done it better or should

12   have gotten more, should have tweaked this that way.

13             So they say the settlement doesn't

14   compensate CTE in living persons.  That is one of the

15   biggest misinformation points that some of objectors'

16   counsel has put out there.

17             This settlement does not compensate

18   CTE, it compensates the injuries and the diseases, the

19   most significant ones that we were able to agree upon.

20   The injuries and diseases associated with CTE.  So

21   let's make that clear right off the bat.

22             CTE is not diagnosable in living

23   people.  Their experts agree with that.  There is for

24   way to detect CTE in a living person today.  And the

25   settlement -- the settlement compensates the most

1    serious neurocognitive and neuromuscular injuries

2    associated with TBI, and that is ALS, Alzheimer,

3    Parkinson's, and dementia, which had been reported in

4    patients determined to have CTE.  Those are from our

5    declarations of our experts Dr. Fisher and Dr. Deza

6    (ph).

7                    Through the pathological diagnosis of

8    -- though the pathological diagnosis of CTE is not

9    compensated as an injury perspectively, the most

10   serious cognitive impairments developed in living

11   retired players that have been associated with the

12   literature we see here are compensated.  The most

13   serious diseases are compensated.

14                   It says, "The settlement doesn't

15   compensate" -- and these are all the things they say

16   that could have been compensated in their opinion.

17   Epilepsy, multiple sclerosis, deafness, dizzy spells,

18   vision problems, headaches, depression, mood swings,

19   substance abuse.

20                   The plaintiffs -- we demanded going

21   into this settlement we wanted compensation on all of

22   those things, they're alleged in our complaint, but as

23   I said early when we started, that when you get into a

24   tough negotiation with a party like the NFL and things

25   have to be factored in.  The science of the case, the

1    risks of litigating, all those things come to play.

2    At the end of the day we wound up with an excellent

3    settlement that tests young players or even older

4    players to find out if they have any of these

5    problems, if they do and they have a qualifying

6    diagnosis they get compensated, and if they don't

7    they're going to find out right away what their

8    condition is.  And if they ever progress down the road

9    the fund will be there for them.

10              Now one of the problems that we have,

11   and maybe the objectors can address this when they

12   stand up, is that these things that they said need to

13   be included, depression, these are things that occur

14   in the general population and are reported independent

15   of concussions.

16              If you go a search on Goggle right now

17   for the amount of money the pharmaceutical industry

18   makes selling antidepression drugs you will find out

19   that tens of millions of people take them and they

20   make tens of billions of dollars selling they will,

21   and those people don't play in the NFL.

22              I'm not pooh-poohing or diminishing

23   depression, I believed it was associated with

24   concussions, but you have to take the science as it

25   exists at the time you're negotiating, and even

1   plaintiffs' experts can't conclusively say that

2   depression is associated with it -- I mean objectors.

3              It's reasonable for settling parties to

4   make choices and compromises.  If a class member with

5   one of the excluded conditions was upset he had the

6   opportunity to opt out, and that's something that did

7   not occur in a big way in this case.  There are under

8   200 opt outs in a class of over 20 something

9   thousands.

10             So the objectors say monetary award

11  offsets are unfair and they have complaints concerning

12  the reductions for fewer than five years in the NFL

13  play, reductions based on age, reductions based on

14  stroke or severe brain trauma before a qualifying

15  diagnosis.  And each and every one of those reductions

16  had a reason in logic, science, and fact.

17             The reductions as Tom Vasquez (ph), our

18  expert says -- our economist:

19             "Reduction is based on years -- on

20  years played accounts for reduced exposure to the NFL

21  impact relative to a player's earlier years of play

22  versus college, high school, and grade school.

23             Reductions based on age at diagnosis

24  reflects relative grade or joint casualty for

25  background risks with increasing age."

1              What we found in the medical literature

2    is that when you get over the age of 60, when you're

3    70 years old you're -- the chance of developing

4    dementia just by the aging process and other things

5    that go on in the body, was much higher than the risk

6    of you developing that -- and I say you in the generic

7    way -- or a player developing that because it related

8    to concussions or NFL play, which would have occurred

9    20, 30 years prior.

10             Reductions for stroke and severe TBI

11   parallel medical references showing increased risk for

12   such events and greater difficulty establishing

13   liability at a trial with such facts.  Each of these

14   points though --

15             THE COURT:  What's TBI?

16             MR. SEEGER:  Traumatic brain injury.

17             THE COURT:  Okay.  Thank you.

18             MR. SEEGER:  Each of these points I

19   want to make clear though was the subject of fierce

20   and protracted negotiations.  We fought on every

21   single one of them, and there were times they walked

22   out of the room, and there were times we walked out of

23   the room, and we were screaming at each other on the

24   phone in the early morning hours while objectors --

25   many of the objectors' counsel didn't even have a

1    horse in the race.  Some of them don't even have

2    clients that filed a case.  They were not involved.

3    They didn't offer their services to us then.  We only

4    found out about them once the settlement came up.

5                    Professor Calanoff says:

6                    "Objectors' complaints reduced to one

7    of how the settle's lines were drawn.  If drawn

8    differently or more favorably toward objectors another

9    class member would have a concern as to the place

10   where that line fell."

11                   You're not going to make anybody happy

12   in a line drawing battle.

13                   So what we got, as I started out

14   saying, was something that maybe isn't perfect, but it

15   is really good and it is clearly fair.

16                   And that is the end of my presentation.

17   And I actually think I came up a little bit early on

18   time, Your Honor.

19                   THE COURT:  Okay.

20                   MR. SEEGER:  So I will hand off now to

21   Mr. Karp.

22                   THE COURT:  One second.  Let me -- let

23   me speak with counsel at side bar, please.

24                   MR. SEEGER:  Sure.

25                   THE COURT:  For one moment.  No, I'm

```
 1   going to speak to -- Mr. Molo, I just want to speak to
 2   counsel who were up here.  I'll speak to you later.
 3   This is -- this has to do with --
 4        (Sidebar)
 5                THE COURT:  (Indiscernible - 10:44:11).
 6   All right.  Please come forward.
 7                MR. SEEGER:  Do you want us to remain
 8   up here?
 9                THE COURT:  Yes.  Please come up.
10   Yeah.  (Indiscernible - 10:44:32).  Listen, the
11   question -- and I want you to be prepared, the
12   question I -- Mr. Molo, hello.
13                MR. MOLO:  Hello, Judge.  Thank you for
14   having me.
15                THE COURT:  Right.  Because if they
16   finish early I'm going start with you.
17                MR. MOLO:  Whatever -- however you want
18   to handle it.  However you want to do it.  Can we take
19   a break at 11:00 (indiscernible - 10:44:54) to be able
20   to complete my presentation at noon time
21   (indiscernible - 10:44:57).
22                THE COURT:  Yes.  Okay.  Well then you
23   should be able to go to 1 o'clock.
24                MR. MOLO:  Yeah.  Yes.
25                THE COURT:  I mean I don't think a half
```

1  hour should be -- we're at 11:00, and it would take

2  five minutes for a break, it's 12:00, and we'll have

3  -- we'll put your particular presentation on.

4            MR. MOLO:  Okay.  Okay.

5            THE COURT:  All right.  (Indiscernible

6  - 10:45:16) come back.

7            MR. MOLO:  Sure.

8            THE COURT:  Is that okay?

9            MR. MOLO:  Yes.

10            UNIDENTIFIED SPEAKER:  Thank you, Your

11  Honor.

12            THE COURT:  All right.  Okay.

13     (Sidebar concluded)

14            THE COURT:  Just a little bit of

15  tidying up about when we're going to again and when

16  we're going end.

17            Okay.  Mr. Karp, are you next?

18            MR. KARP:  I am, Your Honor.

19            THE COURT:  All right.

20            MR. KARP:  Okay.  Good morning, Your

21  Honor.

22            THE COURT:  Good morning.

23            MR. KARP:  I'm Brad Karp, counsel for

24  the National Football League and for NFL Properties.

25  With me at counsel table are my partner, Bruce

Page 48

1  Birenboim.

2                  MR. BIRENBOIM:  Good morning, Your

3  Honor.

4                  MR. KARP:  NFL senior counsel Anastasia

5  Danias, Bob Heim from the Dechert firm.

6                  MR. HEIM:  Your Honor.

7                  MR. KARP:  And I would also like to

8  introduce my stellar team at Paul, Weiss.  We have my

9  partner, Lynn Bayard.

10                  MS. BAYARD:  Good morning, Your Honor.

11                  MR. KARP:  Brian Stekloff.

12                  MR. STEKLOFF:  Good morning, Your

13  Honor.

14                  MR. KARP:  Doug Burns.

15                  MR. BURNS:  Good morning, Your Honor.

16                  MR. KARP:  Ralia Polechronis.

17                  MS. POLECHRONIS:  Good morning.

18                  MR. KARP:  And we're also pleased to

19  have with us today Sheila Burnbalm (ph).

20                  MS. BURNBALM:  Thank you.

21                  MR. KARP:  Uh-huh.  I will try to keep

22  my opening remarks brief, Your Honor, and I'll try not

23  to repeat each of the points raised by Mr. Seeger.

24                  THE COURT:  Okay.  Thank you.

25                  MR. KARP:  Although I will repeat the

1   point raised at the outset by Mr. Seeger that the NFL

2   believes too that this is an historic settlement.

3                    The proposed settlement provides

4   substantial and monetary compensation, indeed

5   unprecedented monetary compensation up to $5 million

6   per player for retired NFL players who develop

7   significant neurocognitive and neuromuscular

8   impairments associated with specific diseases and

9   specific conditions.

10                    The proposed settlement provides the

11  substantial monetary awards without requiring any

12  showing whatsoever of causation.  In other words,

13  there is no requirement that players prove that

14  playing in the NFL caused their impairments.

15                    The settlement program runs for 65

16  years, a period of time sufficient to cover each of

17  the 22,000 plus retired players.

18                    The monetary awards are inflation

19  protected.

20                    The NFL has guaranteed payment of full

21  compensation to every eligible retired player over the

22  life of the settlement, and the NFL's ultimate

23  liability is uncapped.

24                    In addition to these uncapped,

25  inflation protected, substantial monetary awards the

1    proposed settlement also includes a comprehensive

2    program of baseline neurocognitive testing.  This

3    program to be funded entirely by the NFL provides

4    therapy, treatment, and medicine to NFL players who

5    show early signs of neurocognitive decline, and it

6    will help NFL retired players and their families

7    understand the player's current level of cognitive

8    functioning.

9                    I want to emphasize, Your Honor, that

10   these monetary compensation awards and these

11   supplemental benefits are on top of the NFL's existing

12   health benefits and disability programs, programs that

13   have been collectively bargained and that will remain

14   in full force and full effect.

15                   As part of this settlement the NFL has

16   agreed not to seek offsets and not to seek reductions

17   for payments made to NFL players under these programs.

18                   And finally, as Mr. Seeger noted, the

19   proposed settlement establishes an education fund

20   which will be funded by the NFL and overseen by this

21   Court.  That fund will support safety and injury

22   protection programs at all levels of football and will

23   educate retired NFL players about the NFL's existing

24   medical and disability benefit programs.

25                   The NFL is proud of this settlement.

```
 1                    THE COURT:  One second before you go on
 2      about the education fund you know there has been a
 3      good deal of criticism sipray (ph), and I've been
 4      criticized for allowing certain sipray conditions.
 5      Would you consider this sipray?
 6                    MR. KARP:  No, this is an independent
 7      part of the settlement that is funded separately and
 8      distinct from the BAP program and from the monetary
 9      award program, and under the Third Circuit's decision
10      in Baby Products it is not a sipray issue, and we
11      discuss that in our brief pages 139 to 141.
12                    Again, Your Honor, the NFL is proud of
13      this settlement.
14                    In entering into it the league put
15      aside its very strong legal and factual defenses and
16      we agreed not to litigate.  Instead, as Your Honor is
17      aware, we focused on negotiating a settlement that
18      would provide substantial compensation and other
19      critical benefits to retired players and years and
20      years and years sooner than would have been possible
21      in a litigated context.
22                    And it's important to keep in mind --
23      and this has been missing from the public debate --
24      that the NFL had a fundamental choice to make in this
25      matter.  The league could have fought these claims,
```

1   successfully fought these claims in my view for many,

2   many years.  But as Your Honor observed in your

3   July 14th preliminary approval decision, and as

4   Mr. Seeger stressed in his opening remarks, the league

5   has several powerful -- indeed the league had several

6   dispositive legal and factual defenses to the claims

7   asserted by plaintiffs.  The objectors entirely ignore

8   this reality and this context in their extensive

9   papers.

10                  I don't want to belabor this point, but

11  I would like to provide some context here.

12                  This settlement cannot be viewed in a

13  vacuum as the objectors and as many in the media have

14  attempted.

15                  The NFL, as you heard a few moment ago,

16  has a significant pending motion before this Court

17  that these cases should be dismissed at the very

18  outset because the underlying claims asserted by the

19  plaintiffs are governed by the players' collective

20  bargaining agreements with the NFL and therefore are

21  preempted by federal labor law.

22                  As Mr. Seeger noted while this Court

23  has not yet decided the NFL's preemption motion,

24  numerous courts around the country have and they have

25  agreed with the NFL's position.

 1               This single threshold issue posing

 2   enormous risks to retired players, risks that have

 3   been entirely ignored by the objectors in their

 4   papers.  And the challenge is that plaintiffs would

 5   face in this litigation, as Your Honor is aware and as

 6   Your Honor wrote, extend far, far beyond preemption.

 7               For example, even if some of these

 8   cases survived a preemption ruling plaintiffs would

 9   still face numerous substantial legal and factual

10   hurdles that would likely result in the dismissal of

11   their claims, if not at the outset of litigation, most

12   certainly before trial.

13               These defenses include statutes of

14   limitation, assumption of risk, causation, the lack of

15   any factual support for plaintiffs' claim of

16   concealment, and on and on and on.  These defenses are

17   outlined in some detail in our brief asking this Court

18   to grand final approval.  The objectors entirely

19   ignore the existence of all of these defenses and the

20   huge risks they pose for plaintiffs.

21               The proposed settlement agreed to by

22   the NFL eliminates not only the very significant risks

23   of defeat for the retired players, but also the huge

24   cost to all retired players of years and years of

25   contested litigation.

 1                    To put this in perspective consider if

 2      you will the reality of how this would play out in the

 3      absence of a settlement.  Absent a settlement

 4      currently symptomatic retirees, if their claims

 5      somehow were to survive preemption, would be required

 6      to spend many years and many, many millions of dollars

 7      in legal fees litigating highly uncertain claims that

 8      likely in our view would leave them empty handed in

 9      the end.

10                    And absent a settlement currently

11      asymptomatic retirees, if their claims were to somehow

12      survive preemption, would face an uncertain future

13      knowing that if they ever developed a significant

14      neurocognitive or significant neuromuscular impairment

15      they would then, and only then, need to embark on a

16      protracted and expensive litigation with the odds

17      stacked decidedly against any recovery.

18                    The proposed settlement before Your

19      Honor entirely eliminates all of these very

20      substantial risks.  It provides all retired players,

21      whether symptomatic or asymptomatic, with the peace of

22      mind that substantial monetary compensation and other

23      substantial benefits will be available if and when

24      they are needed without any risk and without any

25      uncertainty.

1           What has been lost in the fog of the

2    objections is that the league chose to do the right

3    thing here.  It agreed to put aside its substantial

4    factual and legal defenses to work with plaintiffs

5    under the supervision of this Court, the mediator, and

6    the court-appointed Special Master Perry Golkin, to

7    negotiate the consensual resolution that provides

8    substantial monetary compensation and substantial

9    other benefits to retired NFL players and to their

10   families.

11           The settlement provides this

12   compensation and these benefits to those who are most

13   deserving and most in need of immediate help, and

14   critically it provides this compensation and these

15   benefits many, many years sooner than would have been

16   possible through a protracted and bitterly contested

17   litigation.

18           The product of this year-long effort is

19   the proposed settlement pending before Your Honor.

20           For all the reasons set forth in our

21   extensive papers and supported by our medical and

22   expert declarations we submit that the proposed

23   settlement is fair, reasonable, and adequate under

24   well-settled law in this circuit.

25           First the settlement is fair,

1    reasonable, and adequate in absolute terms for the

2    reasons I've outlined, but just as important and

3    conspicuously absent from the broad public debate and

4    from the lengthy papers submitted by the objectors,

5    this settlement is manifestly fair, reasonable, and

6    adequate when one evaluates it in context.

7              In other words, how would the retired

8    players fair if they actually were to litigate these

9    cases?  What relief would the retired players likely

10   secure five years or ten years from now if they

11   litigated these claims against the National Football

12   League?

13             Fair, reasonable, and adequate as

14   compared to the alternatives.  That is the appropriate

15   inquiry.  That analysis is entirely missing from the

16   public debate and from the objectors' papers.

17             I submit, Your Honor, that the proposed

18   settlement is measurably superior for the retired

19   players than the likely outcome of a protracted and

20   expensive litigation.

21             And of course as Mr. Seeger pointed

22   out, and as Your Honor knows only too well, any

23   retired player in the settlement class who believes

24   differently was free to opt out of the settlement and

25   free to pursue a litigation against the National

1   Football League.

2            At the end of the day this Court need

3   not accept my word and this Court need not accept Mr.

4   Seeger's word that the settlement is fair, reasonable,

5   and adequate.  We urge the Court to consider the

6   overwhelmingly positive reaction from the 22,000 plus

7   retired players in the settlement class.  They have

8   spoken clearly, they have spoken loudly, and they have

9   spoken unambiguously.

10            Under Third Circuit law, as Your Honor

11   knows, the reaction of directly affected class members

12   is persuasive evidence of a settlement's fairness,

13   reasonableness, and adequacy, and that is especially

14   true in this case.

15            And why do I say that?  It is not

16   overstatement or hyperbole, Your Honor, to suggest

17   that the proposed settlement in this case has been

18   scrutinized and dissected more closely, more

19   relentlessly, and more publicly than any class

20   settlement in history.

21            The debate over its terms has been

22   widespread, it has been intense, and it has been

23   uniquely public.

24            The media presence here today is

25   emblematic of the unprecedented level of public

1    scrutiny that this settlement has attracted.  And I'm

2    not only referring to scrutiny by the media, numerous

3    experienced and well-funded attorneys have vehemently

4    and publicly criticized the deal and campaigned

5    relentlessly to try to persuade class members to opt

6    out of the settlement class even creating websites to

7    do so.

8              Several of them are here today in this

9    courtroom, Your Honor, and they have been supported in

10   this effort by powerful voices in the media who have

11   wanted for their own purposes to see this settlement

12   fail.

13             But notwithstanding this unprecedented

14   level of scrutiny and these concerted efforts to

15   induce opt outs, more than 99 percent of the 22,000

16   plus class members have endorsed this settlement and

17   have decided to remain in the class.  More than 99

18   percent of the class members support this settlement.

19             Why have the retired players supported

20   this settlement so overwhelmingly?  There's several

21   reasons.

22             First, they recognize that the

23   settlement provides very substantial monetary and very

24   substantial other benefits.

25             Second, they recognize that the

1   settlement provides these monetary payments and other

2   benefits promptly, consistently, and fairly.

3                And third, and perhaps most important,

4   they recognize that this settlement will spare

5   thousands of retirees and their families the severe

6   financial and emotional cost, not to mention the very

7   substantial risk of defeat, associated with years and

8   years of litigation.

9                Nor we submit, Your Honor, should this

10  overwhelming showing of support be the least bit

11  surprising.

12               This settlement has been carefully

13  structured by the parties under the supervision of

14  this Court, the mediator, and the court-appointed

15  special master to be as fair as possible.  Thus the

16  baseline assessment program provides class members

17  with a comprehensive program of neurocognitive testing

18  and related medical benefits funded by the NFL.

19               The monetary payments as noted up to

20  $5 million per player will be made to retired players

21  who present medical evidence of qualifying diagnoses

22  without requiring these players to make any showing

23  whatsoever of causation.  These diagnoses will be made

24  by qualified independent doctors working with the

25  settlement administrator appointed by this Court.

1              The offsets contained in the settlement

2    for age of diagnosis and for years played are

3    appropriate proxies for both causation and exposure

4    and are fully supported by established medical

5    science.

6              The awards are inflation protected.

7              The agreement provides for adequate

8    security of future payments, and the NFL's ultimate

9    liability in this settlement is uncapped.  A point

10   that we appreciate was very important to Your Honor.

11             This overwhelming nearly unanimous show

12   of support by the class members themselves powerfully

13   underscores the fairness, reasonableness, and adequacy

14   of the proposed settlement.

15             You'll here next from the objectors,

16   Your Honor, and I would like to note that the

17   objections before this Court are entirely typical of

18   objections seen in settlements of this type.

19             The objections are directed primarily

20   at attempting to increase for select categories or

21   groupings of retired players the already generous

22   awards provided by the settlement.

23             The objections, in our view, and as

24   laid out in our briefs, are entirely without merits.

25             And of course once again, Your Honor,

1    any retired player in the class who believed that the

2    awards should have been greater or the categories of

3    compensable conditions broader, or the procedural

4    protections more lax, or the applicable offsets more

5    modest, any player in the class was free to opt out of

6    the settlement and to pursue his own litigation

7    against the NFL.

8                There is certainly a have their cake

9    and eat it too aroma to these objections.

10               We'll respond to the specific

11   objections later this afternoon, but I'd like to spend

12   just a moment, if I may, Your Honor, addressing the

13   headline objection that the settlement does not cover

14   CTE.

15               That objection, as Your Honor know

16   doubt is aware, has received a great deal of public

17   attention, but that objection and the reporting of

18   that objection reflects a fundamental, if not a

19   deliberate, misunderstanding of this settlement, how

20   it works, and its scope.

21               As is crystal clear from its terms, and

22   Mr. Seeger made this point in his opening remarks,

23   this settlement compensates retired players who were

24   diagnosed with severe neurocognitive and neuromuscular

25   impairments.

1              As such, this settlement expressly does

2    compensate the significant neurocognitive and

3    neuromuscular impairments that allegedly are

4    associated with CTE, such as memory loss, such as loss

5    of executive function, such as attention difficulties,

6    such as loss of spatial and reasoning skills.

7              The objectors' suggestion that this

8    settlement does not cover CTE is not only not true,

9    but we submit that it is a deliberate effort to

10   mislead this Court and to mislead class members, an

11   effort that I might add has failed spectacularly since

12   99 percent plus of the class members did not fall for

13   it and now support the settlement.

14             The other CTE-related objection that

15   the settlement does not compensate mood disorder and

16   depression allegedly associated with CTE, likewise

17   reflects a fundamental misunderstanding of this

18   settlement and of settlement negotiations more

19   generally.

20             Mood disorders and depression are not

21   compensated under this settlement for a very simple

22   reason.  These conditions are widely distributed

23   across the general population and have more proven

24   causes that have nothing in the world to do with

25   football and with CTE.

Page 63

1                  The fact that this settlement draws

2      lines on compensable conditions at various levels of

3      severity is entirely reasonable, entirely fair, and

4      frankly entirely predictable.

5                  Every settlement of this type on

6      record, every single one does exactly the same thing,

7      and courts in this circuit, and for that matter courts

8      in every circuit in this nation, have found such line

9      drawing to be an appropriate and inevitable product of

10     arms length negotiations between experienced

11     plaintiffs' counsel and experienced defense counsel.

12                  And, Your Honor, I would add again,

13     that any retired players who believed that mood

14     disorders or depression should be a compensable

15     condition was free to opt out of this litigation and

16     pursue those claims in a litigation against the NFL.

17                  The fact again that more than 99

18     percent of the retired players chose to support this

19     settlement, perhaps the most publicly covered

20     settlement in history, speaks volumes about what they

21     and about what objectors' counsel really think about

22     the legal bona fides and the value of these claims.

23                  Let me touch upon very briefly, if I

24     may, Your Honor, the objectors' other complaints.

25                  For example, the reductions and offsets

1   contained in the settlement for age of diagnosis and

2   seasons played.  They are entirely appropriate proxies

3   for causation and for exposure and are fully supported

4   by established medical and scientific science --

5   evidence.

6               Everyone in the medical and scientific

7   community, and in that regard I do mean everyone,

8   agrees that neurocognitive and neuromuscular decline

9   increases as one ages for reasons entirely dependent

10  of playing football.  And it makes good sense to use

11  the amount of time played in the National Football

12  League as a proxy for alleged exposure to repetitive

13  concussive and sub-concussive events, which happens to

14  be the common allegation in all of these cases.

15              Finally the objection that the proposed

16  settlement imposes unfair administrative burdens on

17  retired players is particularly difficult to

18  understand.  Again, Your Honor, we urge you to

19  consider the reality here.

20              This settlement requires retired

21  players to do no more than to secure a diagnosis of an

22  eligible compensable condition from a rooster of

23  qualified independent doctors and to submit that

24  diagnosis with supporting documentation to the court-

25  appointed claims administrator.  That's it.  That's

1   all they're required to do.  A retired player seeking

2   millions of dollars of monetary benefits can hardly be

3   heard to object to that process.  And the NFL, which

4   has agreed to pay these substantial monetary awards

5   without any cap on its total liability, is surely

6   entitled to a claims process that is fair and that is

7   structured to be untainted by fraud and unaffected by

8   abuse.

9                   I fully appreciate Your Honor that the

10  objectors and some of the retired players would like

11  this settlement to be even richer, even more generous

12  than it is, that is true as Your Honor who's

13  experienced well knows in every settlement on record.

14                  And I appreciate that the retired

15  players and some of the objectors would like the

16  settlement to cover every physical and every

17  psychological condition under the sun, and I

18  appreciate that some retired players and some in media

19  have decided to blame professional football for a

20  broad, broad catalog of evils and frustrations.

21                  Perhaps all of this is understandable,

22  perhaps it's not, but in the end however we ought not

23  lose sight of the fact that this Court is being asked

24  to evaluate a particular settlement, one that was

25  negotiated at arms length by the parties, one that was

1   later revised to take into account specific concerns

2   raised by this Court and by Mr. Golkin.

3                No one in good faith can deny that the

4   settlement pending before this Court provides

5   substantial benefits and substantial other relief to

6   retired NFL players or that it provides retired

7   players with an outcome far, far superior to what they

8   likely would achieve through a protracted and costly

9   litigation against the NFL.  More than 99 percent of

10  the class members have already publicly acknowledged

11  as much.

12               Viewed as it must be through the prism

13  of this circuit's precedent we submit this settlement

14  undeniably is fair, that it undeniably is reasonable,

15  that it undeniably is adequate, and we urge its final

16  approval.

17               But before I sit down, Your Honor, I

18  would like to thank this Court for its extraordinary

19  efforts superintending this very complicated MDL

20  litigation and for closely supervising this settlement

21  progress, and for allowing the parties to enlist

22  retired Federal District Judge Lane Phillips as

23  mediator and for involving Special Master Perry Golkin

24  in these settlement efforts.

25               As you heard from Mr. Seeger and as you

1    yours know only too well, negotiating this settlement

2    was an extraordinarily challenging, complicated, and

3    daunting undertaking.  This historic agreement would

4    not have been possible without the commitment,

5    dedication, patience, and judgment provided by Your

6    Honor throughout this process.

7                      I thank you very much, Judge Brody.

8                      THE COURT:  All right.  Thank you.

9    Okay.  What we have decided to do is to take a ten-

10   minute recess, and then Mr. Molo, you will begin.

11                     MR. MOLO:  Yes, Your Honor.

12                     THE COURT:  Okay?  And then we'll have

13   lunch when the judge gets hungry?  No, when you

14   finish.

15        (Laughter)

16                     THE COURT:  Okay.  Court is recessed

17   until 25 after 11:00.

18        (Recessed at 11:12 a.m.; reconvened at 11:22

19   a.m.)

20                     THE CLERK:  Be seated, everyone.

21                     THE COURT:  My goodness I've been a

22   judge for 33 years and I never had to use a gavel.

23        (Laughter)

24                     THE COURT:  Okay.  You don't have to

25   stand.  Once a day is enough.  Thanks.

1              We'll wait a second, just wait until

2    everybody comes back in.  There are a lot of people in

3    the courtroom.

4         (Pause)

5              THE COURT:  Steven Molo; is that

6    correct?

7              MR. MOLO:  That's correct, Judge.

8              THE COURT:  Okay.  You may begin.

9              MR. MOLO:  Good morning, Your Honor.

10             THE COURT:  Good morning.

11             MR. MOLO:  Thank you for --

12             THE COURT:  It's still morning.  Wow.

13             MR. MOLO:  It's still morning.  Thank

14   you --

15             THE COURT:  Okay.

16             MR. MOLO:  -- for giving me the

17   opportunity to address the Court and for the other

18   objectors to address the Court as well.

19             Since Mr. Karp got to introduce his

20   team I can't go back to New York without introducing

21   mine.

22             THE COURT:  Okay.

23             MR. MOLO:  So in addition to

24   Mr. Weigand and Mr. Totaro, who are over there to my

25   right, I have the skilled, abled Philadelphia,

1    Mr. Hangley with me at counsel table, and then seated

2    with me are Kaitlin O'Donnell, Eric Nitz, and Ray

3    Hashem from my office.

4               THE COURT:  Okay.  Thank you.

5               MR. MOLO:  And Mr. Moore who is one of

6    the original objectors in the case and he happens to

7    be here as well.

8               Your Honor, I think -- I just want to

9    be absolutely clear up front, we want a settlement.

10   There's no question we want a settlement.  I agree

11   with much of what was said by Mr. Karp and Mr. Seeger;

12   however, we want a settlement that is fair, adequate,

13   and reasonable.  And the settlement that before the

14   Court today is not that.

15              I think it's important to understand

16   the settlement is a compromise, yes, but a compromise

17   of what?  What were the nature of these very claims

18   here that are being put to rest as a result of this

19   settlement?

20              The allegations were fraud.  Fraud of

21   the most serious kind.  Not out of someone's -- the

22   plaintiffs weren't defrauded out of their money,

23   that's not what they alleged, they were alleging that

24   they were defrauded out of their health with all the

25   consequences that has not just to them but to their

1   families, to their girlfriends, to their wives, to all
2   those around them.
3                   And yes, the plaintiffs face
4   significant obstacles and the settlement allows them
5   to avoid those risks, but the NFL avoids pretty
6   significant risks here too in this settlement.  They
7   avoid the risk of having to pay billions of dollars in
8   damages, not just compensatory damages, but possibly
9   punitive damages.
10                   They avoid the risk of having to go
11   through discovery.  There's been no discovery in this
12   case.  It's extraordinary that a settlement of this
13   nature would be reached without any discovery, and
14   there's been no disclosure by class counsel of any
15   informal discovery.
16                   So the NFL avoids, if the allegations
17   that class counsel have put forth are to be true,
18   producing evidence that they in fact sponsor junk
19   science, that they affirmatively lied to their
20   players, all in the name of corporate profit.
21                   The choice, contrary to what Mr. Karp
22   says, isn't just opt out if you don't like the
23   settlement, the choice is to have a settlement that is
24   legally sufficient or to opt out.  And this Court is
25   well aware and has very carefully undertaken its duty

1    to be the safeguard of that class.

2              I'm going to address three primary

3    issues.  I'm not going to address every issue that

4    Mr. Seeger raised, I'm not going address every issue

5    Mr. Karp raised.  As Your Honor is well aware other

6    counsel will be speaking.  I'm going to address the

7    issue that you directed me to first and foremost,

8    which is CTE, and how the release of the CTE claims,

9    while compensating only a small percentage of the CTE

10   cases in this case, renders the settlement in and of

11   itself unfair.

12             Secondly, I'm going to address

13   conflicts within the class, specifically with respect

14   to the treatment of CTE, and also with respect to the

15   treatment of players who played in the NFL Europe.

16             And third, I'm going to address the

17   deficient notice in this case.

18             Those issues all raise issues not just

19   of questions of the Federal Rules of Civil Procedure

20   but of constitutional magnitude.

21             Mr. Totaro is going address the issue

22   of defects and claims process, and Mr. Weigand will

23   address the problems with testing.

24             I think it's very helpful to start with

25   the legal framework on the issues that I raise,

1    because I don't disagree with most of the analysis

2    under the Girsh factors.

3                 The first point on the legal factors --

4    if we could pull up the first slide, please, Josh.

5                 THE COURT:  Okay.

6                 MR. MOLO:  Okay.  The law is clear that

7    denial of final approval is appropriate where a

8    settlement treats similarly situated class members

9    differently or where the settlement releases claims of

10   the parties who receive no compensation in the

11   settlement.  It's Third Circuit law and it comes

12   straight from the manual for complex litigation.

13                Does the release -- is the release

14   justified, are parties in fact being compensated in

15   exchange for giving that release?  And then what does

16   the release say here?

17                The release here -- if you would -- is

18   peculiarly both very broad and very specific.  And I

19   have a stack here if this would be beneficial.

20                THE COURT:  No, I can see it.

21                MR. MOLO:  Okay.

22                THE COURT:  It's okay.  Thank you.

23                MR. MOLO:  It's an unusual release in

24   that it's both broad and specific.  As Your Honor can

25   see it says, "The class members waive and forever

1    discharge and hold harmless the released parties from

2    any and all past, present, and future claims," then it

3    talks generally about claims arising out of or

4    relating to brain or cognitive injury, but then

5    specifically -- specifically it says, "Arising out of

6    or relating to CTE."

7                    So what is CTE and what is this disease

8    that this release applies to?  Oddly enough we're

9    largely in agreement, the experts they submitted 11

10   affidavits I think it was a week ago, it might be more

11   than that from a host of people, I submitted

12   affidavits from 2 of the most prominent people in this

13   field, Dr. Stern and Dr. Gandy.  Dr. Stern is at the

14   BU Center for CTE at Boston University Medical Center.

15   Dr. Gandy is at Mount Sinai.

16                   And I want to add, Judge, both of those

17   doctors submitted those affidavits without any charge

18   because they feel so strongly about the wrongness of

19   this settlement.  And before we're done today I would

20   appreciate it if the Court would require plaintiffs'

21   counsel and class counsel to disclose the financial

22   interests and arrangements between their experts, the

23   monies that was paid to their experts, as well as the

24   arrangements, there was one or two experts that said

25   we weren't paid, but their programs were funded by the

1    NFL.

2                    What is CTE?  If you look here at the

3    brain it's a hideous, hideous disease.  Up on top is a

4    healthy brain, on the bottom we see a diseased brain

5    with CTE.  Just physically they look different.  It's

6    a progressive degenerative disease in people who have

7    suffered repetitive brain trauma, and that's

8    repetitive brain trauma whether you've received a

9    concussion or whether it's sub-concussive.

10                   And again, you see the agreement and

11   the objectors between Dr. Gandy and class counsels'

12   expert (indiscernible - 11:29:20) there was an

13   agreement there between the class counsels' expert and

14   the objectors' expert.

15                   How does this CTE actually -- how does

16   a brain come to look like that?  There are actually

17   specific definitive scientific methods for detecting

18   it as we can see on the next slide.

19                   If you look to the left, Judge, you'll

20   see these little clusters and dots, and we can't see

21   -- okay.  Okay.  And those little clusters and dots

22   indicate what they call tau tangles.  There is a

23   protein called the tau protein, and when it forms in

24   certain patterns in the brain that is in effect the

25   symptom or a sign of CTE.  That is CTE.  If you look

1    to the right a healthy brain doesn't have those tau

2    tangles, to the left CTE does.  And again, there's

3    agreement between the parties to that.

4                    Now CTE has some very -- if you can go

5    to the next , please -- interesting things.  In

6    contrast to Alzheimer, Parkinson --

7                    THE COURT:  No, no, may I have the --

8    let me have --

9                    MR. MOLO:  Sure.

10                    THE COURT:  -- what you -- what I --

11                    MR. MOLO:  Sure.

12                    THE COURT:  -- the first time said I

13    was not interested in seeing.  It's difficult for me

14    to see it.

15                    MR. MOLO:  What's interesting about CTE

16    as it relates to this case, and it's interesting

17    because it relates to something that Mr. Karp said and

18    Mr. Seeger did as well, CTE requires repetitive head

19    trauma.  In other words, you can't get CTE without

20    being hit in the head and repeatedly.

21                    In contrast Alzheimer, Parkinson's,

22    ALS, and CTE all can be found in the general

23    population.  And when they talk about well we can't

24    compensate mood disorders because -- or depression

25    because depression is found in the general population,

1    Alzheimer, Parkinson's, ALS are all found in the

2    general population, and unfortunately many of us here

3    know people who never played football who contracted

4    those diseases.  And that's why it's been termed --

5    CTE has been termed in the popular presses the

6    industrial disease of football.

7                        Now much has been made of the inability

8    to diagnose CTE only post-mortem, and that is true

9    that a definitive -- absolutely definitive diagnosis

10   of CTE only comes on an autopsy of a person's brain

11   and the research on a person's brain where those

12   microscopic slides are formed and then they're able to

13   analyze the tau proteins.

14                        But, Judge, it's true also that there's

15   a great deal of imprecision about the diagnoses of

16   these other forms of neurological disease as well.

17                        Alzheimer while people say so and so,

18   my aunt, my friend has Alzheimer, often it's not such

19   a definitive diagnosis.  In those diagnoses frequently

20   most instances can't be definitively formed until the

21   person has unfortunately died and there's an

22   examination of their brain.

23                        Now, I will say that the science today

24   to diagnose Alzheimer and Parkinson's and ALS in

25   people who are alive is farther advanced than it is in

1    CTE, but we are very, very close on CTE.

2                    Within the next five to ten years, as

3    Dr. Stern has stated in his affidavit, there'll be

4    highly accurate, clinically accepted methods to

5    diagnose CTE to a great certainty.  And obviously

6    Dr. Stern says that, but in addition class counsels'

7    own expert says this.  This clinic that they have at

8    UCLA, which is doing these -- this research now, there

9    are players being told that they have CTE.  And I'll

10   come to that in a moment.

11                   So -- and there's an eye clinic in

12   Chicago.  We cite all of this in our papers.

13                   And contrary to what Mr. Karp says

14   about the science, Anchem clearly teaches -- Anchem

15   clearly teaches that you cannot freeze science in

16   place.  A settlement has to account for the

17   development of science, especially when we're talking

18   about a situation like this.

19                   Now one of the class -- the -- that's

20   the science of CTE in an overview.

21                   I want to talk now about how CTE

22   actually manifests itself and the symptoms.  What is

23   CTE to a person that has it?  And it displays itself

24   in four stages, Judge.  Can we go to the first stage?

25                   Stage 1 CTE -- is it possible to get

1    that a little bit cleaner on the screen?  Stage 1 CTE,

2    and Judge, this is on page 8 of the overall chart of

3    your -- of your book.  But people at Stage 1 are

4    suffering from short-term memory difficulties,

5    executive dysfunction, loss of attention and

6    concentration, explosivity, and aggression.  And, you

7    know, unfortunately we have seen these reports of

8    domestic abuse and domestic violence to the NFL, and

9    CTE is unquestionably a factor in that.  It does not

10   excuse the behavior, I'm not suggesting for a moment

11   it does, but we would be all ignoring the science and

12   the most important people who are speaking on this

13   issue to say that having CTE and having a violent and

14   explosive and an aggressive personality and behavior

15   are unrelated.

16                In addition to that and what is

17   extraordinary is at its earliest stages, at Stage 1

18   CTE manifests, one of the symptoms is suicidality.

19   Suicidality.

20                And interestingly enough suicidality

21   does not present in Parkinson's, it does not present

22   in Alzheimer, it does not present in ALS, but

23   suicidality presents in CTE and at its very earliest

24   stages.

25                When you move to Stage 2 CTE, and it

1    does progress, and if you have CTE you will progress

2    for all four stages if you live long enough -- if you

3    live long enough, and many people don't.

4                    At the second stage, in addition to the

5    things that I mentioned, the short-term memory loss,

6    again the explosivity and aggression, impulsivity and

7    mood swings develop, and again the suicidality is

8    present.

9                    At Stage 3.  At Stage 3 -- Stage 1 had

10   short-term memory loss and difficulty, Stage 2 short-

11   term memory loss.  At Stage 3 we finally see memory

12   loss with mild dementia.  At Stage 3 CTE.  And at

13   Stage 3 --

14                   THE COURT:  How -- this is -- all comes

15   from this McKee (ph) report, is that what this --

16                   MR. MOLO:  This is from the McKee

17   report.

18                   THE COURT:  But how do they -- but what

19   was their evidence of that?

20                   MR. MOLO:  Well they are -- I mean

21   Dr. Stern and -- has put forth an affidavit they have

22   done, BU has put forth the most -- and this is not

23   controverted by the other side.

24                   THE COURT:  But now that you have CTE

25   only after death I don't quite understand how you can

1  come to conclusions about Stage 1, Stage 2, and

2  Stage 3.  Are you asking families, is that what you're

3  doing?

4          MR. MOLO:  They have gone back and

5  interviewed -- they have interviewed family members

6  and they have gone through and dealt with this, and

7  this is not just the people at BU, there's people at

8  UCLA and other people around the country that are

9  studying this.

10          THE COURT:  Well right now you cite

11  McKee, but I read that -- I read -- is it a she?  Yes.

12  I read her submissions -- her submissions of

13  scientific papers and it says that the only way they

14  know about this is that they asked family members.

15          MR. MOLO:  Correct.

16          THE COURT:  So family members are

17  making a decision about Stage 1, Stage 2, Stage 3?

18          MR. MOLO:  No, family members are not,

19  Judge.  The family members are providing information

20  to train scientists who do this very thing, and in

21  doing this very thing this is -- the study as to how

22  these symptoms display themselves, and it is only at

23  stage 4 that we see that CTE evolves to severe memory

24  loss with dementia, again, with the explosivity, the

25  aggression, suicidality, and paranoia.

 1                I'm telling you that CTE is linked to

 2   playing in the NFL and that CTE is the industrial

 3   disease of the NFL, but I'm not the only person who is

 4   before this Court who's told you that and who believes

 5   that.

 6                Let's start with where it appears in

 7   the class complaint.  They specifically allege:

 8                "That for decades the NFL has been

 9   aware of paragraph 89 that multiple blows to the head

10   can lead to long-term brain injury, including, but not

11   limited to, memory loss, dementia, depression, and CTE

12   and related symptoms."

13                That allegation was made by this cadre

14   of lawyers that Mr. Seeger talked about this morning,

15   these people who had settled billions of dollars of

16   claims, were the world's leading experts in bringing

17   claims on injuries like this, and after their studied

18   view of this case, after their great detailed study

19   and their analysis and their research they put their

20   names to a complaint in which this was the allegation

21   that was made.  And you know what, they were right to

22   do so, because the science supports it.

23                If you go to the next slide we'll see

24   what BU did.  You know, BU has the leading center on

25   the study of CTE, and in 2013 they published the study

1    in Brain Journal, which is the leading journal in

2    neurology, and in that study it showed that 34 of 35

3    deceased professional players were diagnosed with CTE,

4    and that slide says deceased professional players

5    because one of them happened to not play in the NFL,

6    he played in the Canadian Football League.

7                    That research was recently updated, not

8    in a paper, but they've announced that research was

9    updated, and the 2014 research shows that 76 of 79

10   deceased NFL players have been diagnosed with CTE

11   post-mortem.

12                   So again, the allegation that was made

13   linking CTE to the NFL is supported by the science.

14                   Lastly, what has class counsel said

15   throughout this litigation up until just recently?

16   Mr. Seeger on his own website told the world:

17                   "that multiple medical studies have

18   found direct correlation between football and

19   concussions and suffering from symptoms of chronic

20   traumatic encephalopathy, also known as CTE.

21                   CTE is believed to be the most serious

22   and most harmful disease that results from the NFL on

23   concussions."

24                   That was on his website until the day

25   after the argument in the Third Circuit when it raised

1    it at the Third Circuit, then it came down.

2                    So for all of their experience, for all

3    of their research, for all of their work on the case

4    up until whatever it was, six weeks ago, eight weeks

5    ago, plaintiffs' counsel was telling the world that

6    CTE is believed to be the most serious and harmful

7    disease that results from the NFL and concussions.

8                    So what does a player that is living

9    with CTE now after July 7th of 2014 get for having

10   CTE, the most serious and harmful disease?  Gets zero.

11   Gets zero.  Mr. Seeger's declaration at paragraph 37

12   says it, the NFL's brief at paragraph 78 -- at page 78

13   says it.  CTE is not compensated in the living, it is

14   simply not compensated.

15                   Now, I've heard about -- we heard a

16   little bit today and we've seen it in the papers that

17   they said, well really it's not CTE, even though we're

18   compensating Parkinson's, ALS, Alzheimer because those

19   are diseases that are more readily, not to 100 percent

20   certainty necessarily, but more readily diagnosable

21   right now ARE people that are living we're going to

22   give them actual cash awards.  But the CTE people are

23   really sort of taken care of any way.  And let's see

24   how that works out.

25                   Well the compensation that they're

1    referring to, death with CTE before July 7th of 2014,

2    which they valued with a maximum award of $4 million,

3    so they're saying that CTE has a value, as they

4    should, but if you were diagnosed with CTE at Stage 1,

5    Stage 2, Stage 3, or Stage 4 you could get up to a

6    $4 million award for any of those stages.

7              Now this sort of sloppy after the fact

8    argument to sort of apologizing and address the very

9    obvious issue that CTE is not compensated, they say,

10   well really they're compensated with CTE through

11   dementia.  But how would that occur?  Well you could

12   have CTE at Stage 1 or 2 and not have dementia, and in

13   that case you die with it, it could be diagnosed in

14   your brain, just like the people who died before

15   July 7th of 2014 have that same definitive post-mortem

16   diagnosis and they get nothing.  They get nothing.

17   But if you have Stage 3 or 4 and you might -- and you

18   die also by the way just the after fact diagnosis

19   you're not going to get anything even though it's

20   definitive.

21             But the argument that's being made is

22   that the way that CTE victims get somehow compensated

23   through this settlement is that they get to go through

24   the claims process, which we're going to talk about

25   the problems with that in a moment, have that

1    uncertainty of the claims process, and then -- and

2    then if after going through the claims process there

3    is a determination -- and I'm not even going to call

4    it a diagnosis -- but a determination of dementia 1.5,

5    because it's not really in the medical literature,

6    something called dementia 1.5, they could get a

7    maximum award of up to 1.5 million.  And similarly if

8    you get a diagnose or a determination of dementia at

9    2.0 you could get up to a $3 million award.

10                   So compensation for dementia simply

11   does not equal compensation for CTE.

12                   Now there was a statement made by

13   Mr. Klonoff, one of the affiants at paragraph 86 where

14   he makes what I consider to be quite a remarkable

15   statement and one that has been muddered around in the

16   press and has come -- been attributed to various

17   people on the plaintiffs' side of this case, is the

18   reason we didn't provide a benefit for CTE in people

19   after July 7th of 2014 is that would somehow

20   incentivize people to commit suicide.

21                   Well if you were really interested in

22   addressing suicidality among players who were the

23   victims of this disease that you class counsel had

24   researched with all of your resources and experience

25   and have alleged in the complaint and proclaimed to

1    the world and in website, why didn't you do something,

2    why didn't you build something into the settlement

3    that would deal with the issue of suicide when people

4    were suffering from CTE at Stage 1 or 2, not the

5    mention 3 or 4?

6                    I mean I believe that that statement

7    and that argument is an insult, it's an absolute

8    insult to the memory of the players who have taken

9    their lives and who under the scheme of this

10   settlement would never have been compensated or their

11   families would not be compensated, even though they're

12   suffering from this hideous disease.

13                   Now the CTE sets up in a different way

14   in addition to just that alone the inadequacy and the

15   failure to compensate CTE is enough to find this

16   settlement unfair and inadequate.

17                   Additionally, Judge, there are

18   intraclass conflicts, and again, we're not just

19   talking about leaving out a disease, we're not talking

20   about line drawing, we're talking about the disease

21   that is most central and the one that is only

22   exclusively obtained through contact in the head being

23   left out of the settlement.  There's a release without

24   compensation for those people, but they did provide

25   some compensation, there is some CTE compensation, and

1    that CTE compensation is for people who died with CTE

2    before July 7th of 2014.  As I said, the award that

3    those people may get would be up to -- up to

4    $4 million.

5              The issue here is are the class

6    representatives -- the Third Circuit deals with the

7    this issue, which is really under Rule 23(a)(4) about

8    adequacy of representation, intraclass conflicts

9    within Third Circuit law is addressed through the

10   issue of adequacy of representations.

11             The class representatives failed to

12   fairly and adequately represent the interest of the

13   class, and the adequacy requirement here, the lynchpin

14   of the adequacy requirement is the alignment of the

15   interests and the incentives between the

16   representative plaintiffs and the class.  The

17   alignment of the interests and the incentives between

18   the representative interests of the class, the rest of

19   the class.

20             What did the -- what did the class

21   members here allege?  The representative class members

22   do not allege -- and I believe it's paragraph 4 for

23   Mr. Wooden and paragraph 7 for Mr. Turner -- they do

24   not allege they have or at risk of having CTE, they do

25   not allege that they played football in the NFL

1    Europe, which is excluded and I'll come to in one

2    second, and they do not allege that they were subject

3    to the TBI, traumatic brain injury, and stroke set

4    offs.  And the rights of people who do have CTE and

5    the rights of the people who have played in the NFL

6    Europe and the rights of the people who have TBI and

7    stroke set offs those rights were bargained away.  And

8    it makes sense, because class counsel -- I mean the

9    class representatives do not allege that they are

10   subject to any of those things.

11                  As I said, the intraclass conflict.

12   The CTE issue presents itself as an intraclass

13   conflict as well.  We have the $4 million award for

14   those who die with CTE or died with CTE, Stages 1

15   through 4, any of those stages -- any of those stages,

16   death with a diagnosis of Stages 1 through 4 qualified

17   someone for a payment of up to $4 million, whereas,

18   death with CTE at Stages 1 through 4 on or after

19   July 7th, 2014 results this zero.

20                  Let's assume for a moment that you

21   can't diagnose people -- let's assume for a moment

22   that you can't diagnose people with CTE while they're

23   living.  There's no justification for not providing

24   that same CTE benefit with that same diagnosis for

25   people who die after July 7th of 2014.  None.  And

1    none has been offered.  The closest they've come is

2    this outrageous statement by Klonoff about this was in

3    concern for people not inducing suicidality or

4    inducing suicide.

5                    In addition to the intraclass conflict

6    there's a conflict with the players who play in the

7    NFL Europe who receive no compensation or no credit I

8    should say for the years that are played.

9                    As Your Honor is aware the settlement

10   is set up with a grid where if you play a certain

11   amount of time you get a certain award.

12                    Now the NFL Europe was a league that

13   was actually operated and owned by the NFL from 1991

14   to 1992 and 1995 to 2007.  All of the people in NFL

15   Europe are included in the class and all of them

16   provide a release.

17                    The NFL Europe had essentially the same

18   rules, there were very, very minor rule differences.

19   They played with the same equipment.  And you know

20   what else?  They played with the same players.  They

21   played with the same players.  Mr. Morey in his

22   affidavit says that he played 1 year 30 games between

23   the --

24                    THE COURT:  Well he's opted out hasn't

25   he?

1           MR. MOLO:  He has opted out.

2           THE COURT:  Then you can't cite him.

3           MR. MOLO:  But there are other -- the

4    evidence is of the record that he played 30 games, and

5    Mr. -- there's another affidavit by Mr. Heimburger,

6    who has not opted out.

7           THE COURT:  Okay.

8           MR. MOLO:  And players played in both

9    the NFL Europe and they played in the NFL in the

10   United States.  And at one point in the meeting

11   Mr. Seeger was saying, well, maybe they didn't hit as

12   hard in Europe.  I don't -- I don't think that that

13   can seriously be contended.  These are the same

14   players that played in the NFL.  These are NFL

15   players.

16           They also say, well, you know, the NFL

17   Europe was really a developmental league so that's not

18   really entitled.  Forget about the fact that someone

19   who may go on and play on a Super Bowl team or play on

20   a Super Bowl team that year may go over and play in

21   the NFL Europe, they're saying it's really a

22   developmental league.

23           Well let's see how they treat those

24   people.  So to be eligible for an award if you played

25   in the NFL, if you played three or more games on an

1   active rooster that counted as one eligible season

2   under the award.  And if you've played eight or if you

3   served ought or more games on a developmental squad

4   you were eligible for .5 seasons.

5                  So the fact that the NFL season was 16

6   games or 14 games or 140 games didn't matter because

7   you qualify with 3.  And the NFL Europe game -- season

8   was 10 games.  So a player could play three games very

9   easily in the NFL Europe.  And to the extent that they

10  claim it's a developmental squad there's no

11  justification for dividing out these players from the

12  NFL Europe.  And again, those players from the NFL

13  Europe give the same release as everyone else.

14                  Now again, you don't have to

15  necessarily take my word for it, Mr. Klonoff here who

16  I criticized a moment ago I think is brilliant in this

17  assessment where he says that class counsel -- he

18  discussed this issue of excluding the players from NFL

19  Europe from credit and he says:

20                  "I believe as well that the parties

21  should consider modifications to the settlement

22  agreement to address the NFL Europe issue.

23                  It is my belief that the parties should

24  consider modifications to the settlement to address

25  this issue."

1              And that's the Cludoff declaration at

2     paragraph 16 and 93.

3              And we raise other issues concerning

4     the offsets for non-NFL traumatic brain injury in our

5     objection, I'm not going address those, but what I am

6     going talk about next is the question of notice.

7              I've heard about today, this morning

8     this historic settlement that over 20,000 players

9     endorse this agreement.  No such thing.  There's no

10    such endorsement.  There are not players all standing

11    up here saying that we are fully behind this.  And,

12    you know, it's not surprising why that's the case that

13    we have not seen a relatively low number of objectors.

14    By the way, this number of objectors and these

15    percentages of objectors is not all that low.  It's in

16    fact greater than the number of opt outs and objectors

17    in the GM Trucks case in which the Third Circuit

18    reversed due to inadequate representation.  And the

19    issue is whether or not the objections raised fairly

20    questioned the fairness, adequacy, and reasonableness

21    of the settlement.

22              So let's consider what we heard about,

23    all this notice that was given.  The long-form notice,

24    the short-form notice, the website.

25              The website statistics are striking.

1    Mr. Seeger cited some terrific numbers that he gave

2    you about how many people visited the website.  But if

3    you go and read the declaration of the person that

4    managed that for him, 78 percent of the 65,000 people

5    who visited the website looked only at the first page,

6    the average viewer looked at the website for a minute

7    or less.  That is in the declaration of Mr. Brown,

8    which is attachment 7.

9                The -- and what did they see once they

10   got there?  What they saw on the home page of the

11   website was essentially the short-form notice, and the

12   short-form notice was displayed or published in other

13   places as well.

14                But what did the short-form notice say?

15   It said that players -- if they were looking at what

16   their benefit would be that they would receive as part

17   of this settlement, which would -- I think would be

18   the thing that people would look to -- what are the

19   monetary awards, that middle bullet point, it said:

20                "Awards for diagnosis of ALS, Lou

21   Gehrig's disease, Alzheimer disease, Parkinson's,

22   dementia, and certain cases of traumatic -- chronic

23   traumatic encephalopathy or CTE, a neuropathological

24   finding, diagnosed after death."

25                That's what the short-form notice says.

 1    It doesn't say diagnosed after death if you died

 2    before July 7th of 2014.

 3                      And a player could very reasonably

 4    conclude that this notice, as well as the website, if

 5    they went and visited the website, said, you know

 6    what, this may not be a good deal, it may not be the

 7    deal I want, but at least I know I'm safe and my

 8    family is safe because I'm going to get a CTE benefit

 9    after I die.  And it's a very reasonable conclusion

10    for a player to draw.

11                      And then when you go to the long-form

12    notice, which was this slickly magazined packaged up

13    23-page magazine that they published and -- or sent

14    out, that's also false and misleading.

15                      When you look to the long-form notice

16    at Section 14, again, what would be the diagnosis that

17    people would look to first and -- what would they look

18    to first and foremost?  What diagnosis qualified for

19    monetary awards?  Of course this happened to be by the

20    way the centerfold.  When you open this up this is on

21    centerfold of -- it's not a centerfold like that, it's

22    a centerfold when you open the pages, and it says that

23    "Monetary awards are available for the diagnosis of

24    ALS, Parkinson's, Alzheimer, Level 1 neurocognitive

25    impairment, early dementia, or death with CTE."  And

1    then they take death with CTE, along with those

2    others, and they give it a defined term, they call it

3    a qualifying diagnosis.  And then it says, "A

4    qualifying diagnosis may occur at any time until the

5    end of a 65-year term of the monetary award fund."

6    Well that's certainly not true if in fact death with

7    CTE before July 7th of 2014 is what gets you an award.

8                    So again, a player reading the long-

9    form notice would be misled.

10                   And I can go through more of these, but

11   if you take it they use the same point again

12   throughout where they talk about qualifying diagnosis.

13   And if you look at that again qualifying diagnosis and

14   death with CTE diagnosed after death, $4 million.

15                   Now, yes, there is mention at one point

16   about July 7th of 2014, it's -- they say it's

17   mentioned three times.  Twice it's in defining the

18   class representatives in the subclassing, and there's

19   no mention of you have to get -- you have to die

20   before July 7th of 2014 to get the benefit.  And the

21   one disclosure that is made is distinct from these

22   others and is distinct from the tremendous impression

23   that's created throughout this.

24                   So we see that, you know, the long-form

25   notice itself was misleading.

1                And, you know, we cited some cases in

2    our brief that went beyond class certification or in

3    class notice issues that looked to other areas of the

4    law, and I thought it was informative.

5                You know, if we're going to require

6    accuracy for somebody to make a claim for their, you

7    know, an insurance policy on a class action where the

8    insurance policy was inaccurate or they're making a

9    claim, a consumer fraud claim for some product that's

10   returned, I mean we hold that to a stringer standard

11   than we're going to hold a situation where -- the

12   parties in a situation where the stakes are someone's

13   life and someone's health?  That just is not right.

14               So the total mix here is completely

15   irrelevant, and they're completely disingenuous,

16   dishonest, misleading statements that are made.

17               Now the settlement notice became worse

18   by what happened after it went out.  As we said, and

19   I'm not going to go through all of this, but class

20   counsel undertook a very vigorous media campaign.  I

21   thought it was kind of funny to hear Mr. Karp talk

22   about the powerful journalists.  All one has to do is

23   turn on a television set between August and February

24   and the NFL seems to be on virtually every night of

25   the week where people are talking about the NFL.

1   There's no more powerful media agent in the United

2   States than the NFL.

3                    But Mr. Seeger went out and started

4   selling the deal to players, and this was an interview

5   that he gave to Sporting News.  He's telling:

6                    "CTE is not a relevant marker for

7   anything in the settlement, it's the symptoms.  If you

8   have all the symptoms that are related to CTE or the

9   diseases that are related like dementia and Alzheimer

10   and ALS, then that determines it.

11                    If a player thinks he has any symptoms

12   of it that's the reason to stay in the deal."

13                    If a player thinks he has any symptoms

14   of it that's the reason to stay in the deal.  But we

15   know that many of the symptoms of CTE, including some

16   of the most serious symptoms of CTE, not just for the

17   players but for their wives, girlfriends, and those

18   around them, are not in any way compensated under this

19   settlement.

20                    Now you might think, boy, Mr. Molo this

21   is all sort of fanciful thinking and you've threaded

22   together this argument and it all flows very nicely to

23   meet your point, but no player really would do that.

24   Well that's -- that would be wrong if you were to

25   think that or if someone were to argue that, and I can

1   show you why.  Because if you look at an objection

2   that was filed by a player by the name of Eric

3   Williams, and it's moving, and I've read these

4   objections and I've read the letters, like the letter

5   from the mother who lost her son to CTE who played

6   football, Mr. Williams' objection set forth to this

7   Court and it's filed says first of all when he's

8   describing his situation says, "Diagnosed with CTE at

9   UCLA subject NFL form."  Diagnosed with CTE.

10                  Now maybe technically under the legal

11  definition of a diagnosis or maybe under the issue of

12  -- under the scrutiny of diagnosis to the finest and

13  final degree of medical certainty he didn't have CTE

14  because it only can be diagnosed post-mortem, but he

15  was told, or at least he believes he was told, that he

16  was diagnosed with CTE at UCLA.  Probably by these

17  very people who were affiants for the class counsel.

18                  And then what does he say?  He says

19  that, "Players diagnosed with CTE and living today

20  have to kill themselves or die for their family to

21  ever benefit, for their family to ever benefit.  In my

22  case, based upon all my other reports, there's an

23  overwhelming chance my family had a lifetime of

24  medical bills, including long-term care on its

25  horizon.  But the only time the family can get relief

1    is after I'm dead."

2              If he wrote you this letter, that's

3    simply not the case.  I mean, the only time someone

4    would get a benefit for CTE is had they died before

5    July 7th of 2014.

6              So it's not a question of me getting up

7    here and saying, you know, this notice is inadequate

8    and they left out a word here and a player looking at

9    this would logically -- would logically believe that

10   CTE is covered.  This is evidence that a player does

11   believe it and I'm certain, Judge, that there are

12   many, many more out there like him.

13             I would like to know whether class

14   counsel, any of them, all of them with all of their

15   experience got on the phone, the minute they read this

16   objection and said, Mr. Williams, we want you to

17   understand you're incorrect.  You're misinformed.

18   Even though we're your fiduciary, we're your guardian

19   and we want you to know that you've been misinformed.

20   Your family doesn't get any benefit.  Maybe we could

21   hear about that this afternoon, that phone call and

22   how it went.

23             Now, Judge, this was a deal that was

24   negotiated without any discovery.  It contains a clear

25   sailing provision that calls for up to $112 million

1   fee award, $112 million fee award without --

2                   THE COURT:  Well, that --

3                   MR. MOLO:  -- any discovery.

4                   THE COURT:  -- that comes after.

5   That's not --

6                   MR. MOLO:  It does after, Judge, but

7   it's part of the settlement agreement that you're

8   going to --

9                   THE COURT:  Well, that --

10                  MR. MOLO:  -- prove.

11                  THE COURT:  No.  That wasn't what it

12  said.  It said they -- that the NFL would not object

13  --

14                  MR. MOLO:  Correct.

15                  THE COURT:  -- which is a very

16  different --

17                  MR. MOLO:  I agree.

18                  THE COURT:  I decide this.

19                  MR. MOLO:  I agree.  We agree.  It's

20  what they call in a literature, I guess, a clear,

21  sailing agreement.  The -- part of the settlement

22  agreement says the NFL would not object.  I understand

23  it's still within the Court's discretion to make the

24  award that it's going to make, but up to $112 million

25  to have someone say that, I'll agree to pay you up to

1   $112 million, subject to the Court's discretion, and

2   not compensate the core disease, the core injury to

3   the class.  It's a -- we've got all this experience.

4   We've negotiated billions of dollars of claims.  Well,

5   how -- you know, they -- what difference does that

6   make.  These are injured people who are going without

7   compensation, and they have a fiduciary duty to them.

8                    I know, too, that by the way they get

9   paid under that agreement within 60 days and the --

10  these class members are left to struggle through the

11  system for however long it takes.  I'll talk about

12  some of the difficulties with that in a moment.

13                   So I understand the decision before the

14  Court today is up or down, either to approve the

15  settlement as fair, adequate and reasonable and fully

16  compliant with Rule 23, including Rule 23(a)(4), or to

17  say, no --

18                   THE COURT:  You don't think I have any

19  discretion to adjust it?

20                   MR. MOLO:  I agree.

21                   THE COURT:  You -- is that -- do you

22  think I don't?

23                   MR. MOLO:  I think -- no.  I think that

24  your decision today is to approve the settlement or to

25  reject the settlement.  But in rejecting the

 1    settlement --

 2                THE COURT:  Well, I mean, if there's --

 3    if I -- in other words I can't make any adjustments to

 4    that -- to this settlement that I think is are -- they

 5    are reasonable and adequate in order to make it an

 6    agreement --

 7                MR. MOLO:  Correct.

 8                THE COURT:  -- that we can --

 9                MR. MOLO:  But I believe that the Court

10    can exercise extraordinary influence in seeing that

11    the parties do incorporate some things.

12                And what might those be, if I may,

13    because, again, we want to see a settlement.  I want

14    to make no mistake about that.  Just, these would be

15    some things, some things that would go toward just

16    making it at least closer to fair, reasonable and

17    adequate.

18                Simply on the notice issue, notice has

19    to be done in a way where it's clear, consistent, and

20    accurate language.  On the question of the NFL Europe,

21    you've got to give credit for those players.  Those

22    are things that can be done quite simply.

23                With respect to the non-NFL induced

24    traumatic brain injury or stroke and those offsets,

25    those should be reduced to a reasonable number where

1  there's an evidence-based percentage.  There's no real

2  evidentiary based percentage for those then.

3           And then for this core issue, Judge, on

4  CTE, what can be done?  Well, the settlement can

5  include compensation for CTE after death of July 7th

6  of 2014.  So taking away the issue of whether or not

7  CTE can be diagnosed in someone that's living, this

8  benefit can be extended to anyone who dies with CTE

9  and has a diagnosis of CTE after they die.  And just

10  like the people who had that benefit if the player

11  died before July 7th of 2014.

12           Another thing that could be done is to

13  include compensation for CTE while people are living

14  once more reliable scientific tests are done, or at

15  least making an effort to address those issues now

16  while the science catches up knowing what the symptoms

17  are.

18           And then also to treat all symptoms of

19  CTE, Stages 1 through 4.  As we've seen, assuming that

20  you buy the argument that CTE's really -- the symptoms

21  of CTE are really treated through the dementia,

22  they're not.  There's no question, and you will hear

23  from lawyers today who represent players who did not

24  demonstrate the symptoms of Stages 3 and 4, and those

25  players displayed extraordinary symptoms.  Their lives

 1    devolved and fell apart.  And in stages -- with Stages

 2    1 and 2, and it ultimately resulted, unfortunately,

 3    very, very sadly in suicide.  And that happened with

 4    several prominent players.

 5                    So something must be done for that.

 6    And the alternative to that is to go back to what the

 7    bargain is and say, well, then, if you're not going to

 8    do those things, if you're not going to compensate the

 9    core disease, the one that only -- is the only disease

10    that's at issue here that results from playing

11    football and not one that's found in the general

12    population, then eliminate the CTE release.  Don't let

13    the benefit -- the NFL have that benefit.  They're not

14    entitled to it.  They're providing no compensation for

15    it and they say as much.

16                    This is not a fair, adequate and

17    reasonable settlement, Judge, and I can't tell you how

18    much gratitude my clients feel and many other players

19    who have contacted me and feel for allowing me the

20    opportunity to come here and raise these concerns

21    because they have lived through hell, the misery that

22    they have experienced with their families, with their

23    sons and daughters, with their wives and girlfriends.

24    We've seen these domestic abuse issues that have been

25    all over the media.  This is an insidious disease and

1    it deserves compensation, and it frankly deserve

2    affirmative action in people doing something to treat

3    it, not cover it up.

4              The motion for final approval should be

5    rejected.  The matter should be remanded.  If the

6    parties want to negotiate, there should be adequate

7    representation for those whose rights were bargained

8    away already in this first settlement.  And then

9    hopefully, hopefully we'll get a settlement when it's

10   fair, adequate and reasonable and, frankly, worthy of

11   these people who have been subjected to a terrible,

12   terrible wrong.

13             Thank you.

14             THE COURT:  Thank you.

15             Okay.  We have some lawyers from your

16   firm who are going to say a few words.

17             MR. MOLO:  Yes.

18             THE COURT:  Okay.  I think that the

19   first person is --

20             MR. MOLO:  Mr. Totaro.

21             THE COURT:  -- Mr. Totaro who has ten

22   minutes.

23             MR. TOTARO:  Thank you, Your Honor.

24             Martin Totaro of Mololamken.  I would

25   like to spend a few minutes discussing the various

1    procedural flaws in the various claims provisions that

2    render the settlement unfair.  I will briefly address

3    three categories of flaws.  First --

4                    THE COURT:  Before -- can -- before

5    that, and I just noticed this from my list here, did

6    you -- who objected, who -- one of your clients that

7    didn't opt out?  Mori (ph) -- is it Manny Morey, yeah,

8    Morey opted out.

9                    MR. TOTARO:  Allan Faneca would be one

10   example of someone --

11                   THE COURT:  And this -- that person

12   made an objection?

13                   MR. TOTARO:  I -- yes.  Our objection

14   was filed on behalf --

15                   THE COURT:  Oh, okay.  Your object --

16                   MR. TOTARO:  -- of all seven.

17                   THE COURT:  Okay.  That's fine.

18                   MR. TOTARO:  Some opted out, some

19   didn't.

20                   THE COURT:  Thank you.

21                   MR. TOTARO:  Thank you, Your Honor.

22                   So the first deficiency I wanted to

23   raise was the fact that the settlement is opt-in, not

24   opt-out, second, deficiencies in the baseline

25   assessment program; and, third, deficiencies in how

1    players with qualifying diagnoses actually receive

2    awards.  So I would like to start out with a slide

3    that provides an overview of what I'm talking about.

4    I think it's up.

5                    Thank you.

6                    So, Your Honor, this is an opt-in

7    settlement.  A class member does not have an automatic

8    right to receive benefits from the settlement.  The

9    class member must instead opt-in to this settlement by

10   registering with the claims administrator within six

11   months or forever be barred for receiving any

12   compensation regardless of whether the person would

13   otherwise merit compensation.

14                   Now the settling parties come back and

15   say, well, precedent doesn't unilaterally bar

16   registration requirements in every case.  But the

17   settling parties cite no case where the courts have

18   allowed this opt-in procedure where the class injuries

19   themselves could cause the injury that allows -- that

20   causes the player to miss the deadline.

21                   And more fundamentally, Your Honor, the

22   settling parties provide no reason why you would have

23   an opt-in requirement.  There's simply no need for an

24   opt-in requirement.  If you are a class member and you

25   are entitled to compensation, then you should receive

1   compensation.  In other words, everyone who is a class

2   member should automatically be registered.  There

3   should be no opt-in requirement.

4              Moving to the second issue on the

5   slide, deficiencies in the baseline assessment

6   program.  If we could put up the next slide.

7              So the settling parties have said over

8   and over that the settlement is uncapped.  That simply

9   is not true.  The baseline assessment program is very

10  much capped at $75 million and that cap moreover, as

11  we point out in our papers, is based on several

12  unrealistic assumptions, including the cost of

13  treating members of the class who have dementia who

14  don't qualify for an award.

15             Now the settling parties' response here

16  I think is very telling to the way this case has been

17  handled by the settling parties.  They say that their

18  actuaries estimate that the $75 million should be more

19  than enough.  If that is true, Your Honor, then there

20  is no need for a cap.  And if it's not true, then the

21  cap should be lifted because class members with

22  dementia who do not qualify for an award can receive

23  benefits under the settlement.

24             Now Mr. Seeger said something here

25  today that I think is -- is worth mentioning.  When he

1  was discussing participation in the baseline

2  assessment program he said, "We're hoping all of the

3  players participate."  That came as quite a surprise

4  to me.  Class counsel's own expert estimates that only

5  a little over half the players will participate,

6  11,886, and that's on paragraph 23 of the Vasquez

7  declaration.  If Mr. Seeger is actually hoping that

8  all the players will participate and all the players

9  actually do participate, that cap will far fall

10 woefully short.

11            The baseline assessment program also

12 doesn't address mood and behavioral symptoms, so it

13 will add nothing to the many players who are suffering

14 from those symptoms.  As Mr. Molo explained

15 previously, if CTE is to receive compensation, then

16 mood and behavioral symptoms should also be covered

17 under the baseline assessment program.

18            The baseline assessment program's

19 supplemental benefits were supposed to provide

20 meaningful medical and counseling benefits.  A capped

21 time-limited fund simply does not do that.

22            If I could go to the third topic I will

23 speak about, deficiencies in how players with

24 qualifying diagnoses actually receive awards.  The

25 next slide.  Thank you.

1            So even if a class member has opted

2    into the settlement, even if a class member has

3    participated in the baseline assessment program and

4    met that deadline, that class member would still face

5    several hurdles before he can recover on even a valid

6    claim.

7            A qualifying diagnosis can only come

8    from what's called under the settlement a MAF

9    physician, and that just means a monetary award fund

10   physician.  And that person has to be approved by the

11   NFL, and the player has to pay for the visit and the

12   examination.

13           Now the settling parties come back and

14   say, well, we actually need our own physicians, these

15   MAF physicians to protect against fraud.  But, Your

16   Honor, that cuts in our favor.  If these physicians

17   are put in place to protect against fraud, then other

18   hurdles faced by class members before recovery are

19   totally unnecessary.  Why would there be a complicated

20   claims package that must be submitted even after

21   you've received a qualifying diagnosis from an NFL-

22   approved doctor.

23           Why does the NFL get to appeal a

24   decision where its own doctor that it picked decided

25   that a class member deserves an award.  These burdens

1    simply make no sense if, as the NFL and class counsel

2    suggests, their own physicians are already policing

3    against fraud.

4              And it's also going to be very

5    difficult to actually find these physicians and put

6    them into the -- into place.  The country, large parts

7    of the country are facing a nationwide shortage in

8    qualified neurologists.  And there's no guarantee in

9    the settlement that a class member will be within X or

10   Y number of miles of one of these physicians who can

11   actually diagnose them with a qualifying disease.

12             And I would also note that the NFL

13   agrees that a "qualified neurologist" under the

14   settlement may make a qualifying diagnosis for a

15   player before the settlement would get approved.  That

16   should be all that's required for after certification

17   as well.  At a minimum that should be all that's

18   required if there's a player in a rural area, for

19   example, who is not close to a MAF physician.

20             I would also like to note, Your Honor,

21   that even after a player receives a diagnosis from an

22   NFL picked doctor, he still faces many hurdles before

23   actually recovering.  He must submit a claim package

24   within two years of receiving a qualifying diagnosis.

25   And I think most absurdly for me, that player has to

1    submit some sort of proof that he actually played in

2    the NFL.  And a player who fails to do so receives an

3    80 percent offset in any award.

4              Now the settling parties say that,

5    well, the NFL has a duty under the settlement

6    agreement to provide evidence in "good faith" if the

7    player's application is insufficient to demonstrate

8    that the player did play in the NFL.  But with all due

9    candor, Your Honor, we don't want to good faith

10   standard.  We don't want to give the NFL discretion.

11   We want clear, bright-lined rules that allow recovery

12   where recovery is due.

13             My final point, Your Honor, is that the

14   appeal process is very much asymmetrical.  A class

15   member has to pay a $1,000 award for an appeal to this

16   Court, but the NFL pays nothing.  That's simply a fee-

17   shifting provision.  There's also no hardship

18   provision for any NFL player to appeal if the player

19   has become poor.  And as we note on Footnote 89 of our

20   brief, that's unfortunately a common result after

21   playing in the NFL.

22             A player also has to satisfy a clear

23   and convincing evidence standard and must do so within

24   five pages, and under settlement Section 9.7 they

25   don't even get to file a reply.  I know there have

 1   been a lot of pages filed in this case.  Some people

 2   might think there's been too many, but five pages to

 3   satisfy a clear and convincing evidence standard seems

 4   to me to be an unfairly high limit imposed on these

 5   players.

 6              Now what did the settling parties

 7   respond?  Well, they say that the $1,000 fee is meant

 8   to "discourage baseless appeals," but there's no fee

 9   limit or limit on the number of appeals that the NFL

10   can take.  And the NFL, moreover, has little incentive

11   not to appeal and prolong the process.  Here again,

12   the only limit on the number of NFL appeals is that

13   they must be in good faith.

14              But I would also like to note one

15   peculiarity about this settlement.  Section 9.6(b)

16   doesn't even allow the appellant, the player, the

17   class member, to challenge whether the NFL is acting

18   in good faith.  Instead, curiously, that job falls on

19   class counsel, not the actual player whose -- whose

20   been affected.

21              And so like Mr. Molo, I would like to

22   put up a slide that suggests how this settlement might

23   be a little better.  So you could lift the cap on the

24   BAP, the $75 million cap; that if Mr. Seeger is

25   correct, if all the players participate, it wouldn't

1    come close to covering all the benefits that the

2    baseline assessment program is supposed to provide.

3                    Another simple fix would be to extend

4    the baseline assessment program to the full term of

5    the settlement instead of having it ten years with the

6    possible enhancement of five more years at the -- on

7    the outside.

8                    You could also eliminate the

9    unnecessary opt-in requirement hurdle.

10                   You could, Your Honor, make it easier

11   to get a qualifying diagnosis by eliminating the MAF

12   physician requirement, at least where these physicians

13   aren't close to any class member.

14                   And then, finally, you could even up

15   the appeal process to make it symmetrical.

16                   Your Honor, I'm happy to answer any

17   questions you might have, but otherwise that's it.

18                   THE COURT:  Okay.  Thank you.

19                   MR. TOTARO:  Thank you for giving me

20   the opportunity to speak.

21                   THE COURT:  Okay.  Mr. Demetrio.

22                   MR. MOLO:  Actually, Mr. -- Mr.

23   Wiegand, I believe, Judge.

24                   THE COURT:  Oh, it says on the list

25   here that I've sent out --

1              MR. MOLO:  You had -- you turned it

2    around the other way, I think.  You said you wanted to

3    hear from all the Mololamken lawyers' first?

4              THE COURT:  Well, I thought that --

5              MR. MOLO:  However -- however you want

6    to proceed.  If you don't mind, his short and Mr.

7    Demetrio's is longer.

8              THE COURT:  Well, it doesn't make a

9    difference.  I'm going to hear both of them before

10   lunch.  If you want to go --

11             MR. MOLO:  Go ahead.

12             THE COURT:  -- Mr., -- I'm not going to

13   -- that's not -- that's irrelevant.  You can go for

14   five minutes.

15             MR. MOLO:  Thank you, Judge.

16             THE COURT:  Okay.  Mr. Wiegand.

17             MR. WIEGAND:  Thank you, Your Honor,

18   and good afternoon.

19             THE COURT:  Good afternoon.

20             MR. WIEGAND:  Tom Wiegand of

21   Mololamken.

22             Your Honor, the problems with the test

23   battery are not limited to the fact that it does not

24   cover CTE or its symptoms.  I am going to address the

25   problem with the testing procedures used in the

1  baseline assessment program being arbitrary and not

2  scientifically accepted.

3           Now the categories of dementia that are

4  created in the settlement, Levels 1.0, 1.5 and 2.0,

5  neurocognitive impairment is how they've been titled,

6  are determined through a testing procedure that is set

7  forth in Exhibit 2 to the proposed settlement.

8           I have highlighted on the screen the

9  five areas that are put into the determination of

10  neurocognitive impairment under this proposed test

11  procedure.  You'll see under each of those highlighted

12  areas there are specific subtests.  So for the first

13  one, complex attention, there are six subtests.  The

14  point that the settling parties have made is that

15  these tests are commonly used, known and accepted.

16           Those six subtests, each on its own, is

17  that.  It is known, used and accepted.  When you

18  combine this page of various subtests in these five

19  domains, that is new.  In fact, they combine them in

20  ways that depending on how one tests in different of

21  the subtests that you will be determined either as

22  1.0, 1.5 or 2.0 level dementia.

23           Your Honor, if you were to Google, as I

24  did, Level 1.5 dementia, you will find references to

25  the NFL concussion settlement.  It is nowhere else in

1    the scientific or medical literature.

2                    THE COURT:  But they do talk about mild

3    dementia.  All the papers that I read that were

4    submitted to me refer to mild dementia.

5                    MR. WIEGAND:  The -- and this is not a

6    known or accepted test for mild dementia.  That is --

7    how neurologists and neuropsychologists determine that

8    is not what we are seeing.  So the requirements that

9    are being set forth here, we -- we don't dispute that

10   test batteries can be used, but test batteries only

11   get used and are accepted after years of experience.

12                   And so the concern here is that this is

13   a test battery that no one knows about, that there is

14   no experience with.  Our expert, Dr. Stern, has

15   submitted an affidavit as has been referred to.  And

16   Dr. Stern identifies deficiencies with the test

17   battery in quite clear language.  He states, the

18   specific tests selected and the life of the battery

19   would not be consistent with that given by the large

20   majority of neuropsychologists who specialize in

21   neurodegenerative disease.

22                   So to your point, Your Honor, people in

23   the field, neuropsychologists, are determining

24   moderate dementia on a daily basis with their

25   patients.  They are not using this test battery to do

Page 118

1    it.  They have never done it.  It has never been

2    identified.

3              Dr. Stern also states in paragraph 50

4    of his declaration that the criteria used in the

5    settlement could require that the players' test

6    performance be even more impaired than what is often

7    seen in well-diagnosed cases of moderate stage

8    dementia.

9              Your Honor, that was our concern.  Dr.

10   Stern verified it; that even if you had a moderately

11   impaired patient with dementia, they may not qualify

12   under the test battery.  It is untested and our expert

13   believes that they won't qualify.  That's

14   unacceptable.

15             Your Honor, it gets worse.  The way

16   that a player's intellectual functioning pre-NFL is

17   determined is based on a test that is biased against

18   players from rural areas or worse school programs, and

19   that's because this -- it's called a pre-morbid test.

20   And they try -- the purpose of it is to determine

21   where was this player's intellect prior to playing in

22   the NFL.  So they give a test and they ask for

23   pronunciation of certain words.

24             Well, if you have an accent, rural or

25   cultural accent, if you were from a school system that

1    didn't expose you, even if you have the same intellect

2    to someone who was in a good school system, if you're

3    in a lesser school system you may not have heard of

4    these words.  You're not going to pronounce them as

5    well.

6              It is known that that will cause a

7    person to function more poorly.  By making such a

8    rigid pre-morbid test, we are locking in an unfairness

9    that we believe is also inappropriate.  That is also

10   dealt with in Dr. Stern's declaration.

11             THE COURT:  All right.  You have to

12   wrap up.

13             MR. WIEGAND:  So, Your Honor, the

14   settling parties have not met their burden to show

15   that the proposed test battery can properly measure

16   even (indiscernible) injury in retired football

17   players.

18             THE COURT:  Okay.

19             MR. WIEGAND:  And there are three -- if

20   I could say there are three things --

21             THE COURT:  Well, just --

22             MR. WIEGAND:  -- what would improve it.

23             THE COURT:  -- put them up because I

24   have limited -- you know, Mr. Molo gave me limitations

25   on the times and I think we can all see them --

1        (Laughter)

2                    THE COURT:  -- and I'll certainly take

3    that.

4                    MR. WIEGAND:  Thank you, Your Honor.

5                    THE COURT:  Okay.  Well, I -- in other

6    words, you -- you told me -- I gave you a tote (sic).

7                    Okay.

8                    MR. WIEGAND:  Thank you, Your Honor.

9                    THE COURT:  Thank you very much.

10                    Okay.  Now I think we can hear Mr.

11    Demetrio.

12                    You have ten minutes, Mr. Demetrio.

13                    MR. DEMETRIO:  Thank you for that ten

14    minutes, Your Honor.

15                    THE COURT:  You're welcome.

16                    MR. DEMETRIO:  Judge Pausner (ph), a

17    distinguished judge in the Seventh Circuit, rendered

18    an opinion, published an opinion this year in a case

19    called Eubank versus Hella Windows (ph).  And I would

20    just like to quote a couple of lines from that

21    opinion.  I find them apropos:

22                    "Class members have no control over

23    class counsel."  This was, by the way, a class action

24    lawsuit that he found to be scandalous.  He found that

25    the approval of the settlement was wrong, and he

1    stated, "When a judge is being urged by both

2    adversaries to approve the class action settlement

3    that they've negotiated, she's at a disadvantage in

4    evaluating the fairness of the settlement to the

5    class.

6              "Enter the objectors," said Judge

7    Pausner.  "Members of the class who smell a rat can

8    object to the approval of a settlement," and he talks

9    about Rule 23 and the importance of the

10   representatives, class representatives representing

11   the best interest of all the class members.

12             He also states parenthetically that in

13   that case there was a study he cites that states that

14   "in class action lawsuits less than one-tenth of one

15   percent of the class members opt-out."

16             Judge Kazinski (ph), Alex, Ninth

17   Circuit in a case pending right now against Nissan

18   where he filed an objection states that, it's not

19   uncommon at all for people to not object, not opt-out

20   in class action lawsuits.

21             And pursuant to that we have a tsunami

22   of people who have opted-out and who have objected.

23   The fact of the matter is this is arbitrary, it's

24   unfair, and respectfully we hope you do not approve of

25   it as it is.

1              I would like the courtesy of

2  introducing Tregg Duerson and his mother, Alicia.  May

3  I do that, Your Honor?

4              THE COURT:  I told you that -- I had a

5  rule.  You can introduce -- they can stand up.

6              MR. DEMETRIO:  Introduce them.

7              THE COURT:  Okay.  Let them stand.

8      (Pause)

9              THE COURT:  Okay.  Thank you very much.

10             MR. DEMETRIO:  This is their day in

11  court, the closest thing they're going to get to one,

12  and as I understand it you've ruled that they cannot

13  speak.

14             THE COURT:  Well, I have ruled that

15  anyone who is represented by counsel, which is an

16  ordinary rule of a court, anyone who is represented by

17  counsel cannot speak.  This is not a criminal case.

18  You have no right of allocution.  That's my ruling.

19             Go on.

20             MR. DEMETRIO:  After Tregg's father

21  filed a bullet into his heart and killed himself, his

22  family found notes begging them to have his brain

23  examined by the good folks at Boston University.  This

24  was done.  The findings were third stage CTE and that

25  his death with CTE was representative of what's turned

1   out to be now 79 others.

2                    At the settlement table in this case no

3   class representative was there to advocate for the

4   people who died with CTE.  No one.  No one was

5   advocating that post-July 7th CTE needs to be

6   compensated.  Say what they will, CTE is real. It's

7   with us.  It's not going away and there are over

8   20,000 potential people who are going to suffer from

9   it.

10                    As far as I'm concerned the only lawyer

11  in this room who deserves $112 million is Mr. Karp.

12  The NFL by this settlement will never have to say what

13  they knew, when they knew it, and CTE, poof, it's

14  gone.  Now I heard Mr. Karp say, no, CTE's very much a

15  part of this.  Take it out, then.  Take it out of the

16  release.  Let the future Dave Duerson's families be a

17  part of this settlement.  Let them be at the table.

18  They weren't when it was negotiated.

19                    The NFL is proud of this settlement.

20  Yeah, no kidding.  I would be, too.  Ninety-nine

21  percent groundswell, everybody's saying this is the

22  greatest settlement ever.  No.  Mr. Molo covered that

23  quite well.  But Mr. Seeger said something that caught

24  my attention.  Early detection is very, very

25  important.  Well, yeah.  That's the whole purpose of

1    this lawsuit.  That's the fraud that we're never going

2    to know about.  If the Dave Duerson's of the world

3    knew what the problem might be, yeah, they could have

4    gotten attention earlier.  So, yeah, early detection

5    is important.

6                   And the smoking gun of all smoking

7    guns, this very accomplished, he told us, attorney on

8    his own website while he was negotiating away CTE for

9    all time says, it's the most serious of all illnesses

10   related to NFL concussions.  That is the motherload of

11   a smoking gun.

12                  And then to sound like we're Mother

13   Theresa, we don't want others committing suicide.

14   Yeah.  Okay.  Well, others are.  And under this

15   unfair, arbitrary settlement, they're not going to be

16   compensated.

17                  Chris Seeger publicly told the world,

18   this isn't my case.  This isn't my legacy case.  But

19   he said it's Judge Brody's.  And I submit to you,

20   Judge, what is your legacy going to be if he is

21   correct?  Are you going to just sort of approve this

22   as it is, unfair, as arbitrary as it is, or are you

23   going to let these former players, and I refer you to

24   our objections that we filed with you, Claude and

25   Clara, I ask you to read about Claude and Clara.  They

1    don't know they need your vigilance, but we lawyers

2    know it, and that's what we ask for.

3                        Thank you, Judge.

4                        THE COURT:  Thank you.

5                        Okay.  Mr. Gibbs has five minutes.

6                        MR. GIBBS:  Good morning, Your Honor.

7                        THE COURT:  Good morning.

8                        MR. GIBBS:  And thank you for --

9                        THE COURT:  Good afternoon.

10                       MR. GIBBS:  Good afternoon.  And thank

11   you for allowing me the opportunity to present our

12   arguments.

13                       Judge, in sum and substance this

14   settlement as currently constructed cannot and will

15   not stand the test of time.  Because of an overbroad

16   release, an over-narrow qualifying diagnoses that will

17   be frozen in time forever, the statement will not

18   fulfill its goal. Instead players and their families

19   will be left out in the cold.

20                       The men who may be suffering from

21   today, or who will suffer from in the future, CTE or

22   other similar neurodegenerative diseases have had

23   their claims forever eviscerated.  Even if the science

24   advances and CTE is the subject of epidemiological

25   studies, families who will lose their loved ones and

1    discover the CTE or other neurodegenerative processes

2    in their brains will have no recourse or no remedy.

3              This morning we heard that this is a

4    science-driven case and that we were promised the

5    settling parties will "continue to work together to

6    allow modifications."  What does this mean pursuant to

7    the terms of the agreement?  How will this be

8    accomplished pursuant to the terms of this agreement?

9    How will that be enforced?  How does a class member

10   come and trigger judicial oversight?  None of that is

11   addressed in this settlement agreement.  The only

12   thing that this settlement agreement states as to a

13   development of the qualifying diagnoses is that in

14   Section 6.4(a) on a periodic basis not to exceed once

15   every ten years. Co-lead class counsel and counsel for

16   the NFL will agree to discuss things and will modify

17   it if they come to a written agreement.  That's it.

18   That's all the agreement says.

19              Judge, 65 years is a long time.  These

20   men and their families will suffer during those 65

21   years.  We cannot allow these qualifying diagnoses,

22   these four limited qualifying diagnoses to be the only

23   thing that they can rely upon until the year 2079.

24              On behalf of the Duerson family, the

25   Blue (ph) family, and the other families that

1  inevitably will suffer from these horrific diseases

2  brought by repetitive head trauma sustained during an

3  NFL career, we ask that you deny final approval of

4  this settlement.

5                    THE COURT:  Thank you.

6                    MR. GIBBS:  Thank you.

7                    THE COURT:  All right.  I think we're

8  going to break for lunch.  I'm going to take till --

9  let's see.  One moment, please.  Don't stand yet.  Let

10  me just figure this out.

11       (Pause)

12                    THE COURT:  We'll come back at -- I'll

13  take 25 of two.  Okay.  That's 55 minutes.  Okay.

14  1:35.  Court is recessed till 1:35.

15       (A chorus of thank you)

16       (Recess taken at 12:38 p.m.; resume at 1:33 p.m.)

17                    THE CLERK:  Please remain seated.  This

18  court is now again in session.

19                    THE COURT:  Once a day -- once a day

20  standing --

21       (Laughter).

22                    THE COURT:  -- in respect for the

23  Court, but not -- not all the time.

24                    Okay.  One second.  Well, did you put

25  that back in?  I have -- because I have to know who

Page 128

1    you are.  You are Mr. Pentz, right?

2                    MR. PENTZ:  Yes, Your Honor.

3                    THE COURT:  Good.  Okay.  You have ten

4    minutes.

5                    MR. PENTZ:  My name is John Pentz.  I

6    represent Fred Smerlas, Cleo Miller and eight other

7    former NFL football players, but I will be speaking

8    today in support of an objection made by Ben Utecht

9    who is in the courtroom and who will be speaking later

10   today.  That objection --

11                   THE COURT:  That's not --

12                   MR. PENTZ:  -- has to do --

13                   THE COURT:  We can't do that.  That's -

14   - that is not -- I'm sorry, Mr. Pentz.  That, I think,

15   was made clear.

16                   MR. MOLO:  Yeah.  Judge --

17                   THE COURT:  Is that right, Mr. Molo?

18                   MR. MOLO:  Judge, in the -- Mr. -- I

19   believe Mr. Pentz had told me you're adopting Mr.

20   Utecht's objection and in the interest of organizing

21   people to allow people who wanted to speak and speak,

22   this was done this way.

23                   So I certainly -- it was within --

24   clearly within the spirit of what you were trying to

25   do, Judge, and we mentioned that.  I wouldn't

 1    (indiscernible).  So --

 2                    MR. PENTZ:  Your Honor --

 3                    THE COURT:  What --

 4                    MR. PENTZ:  -- Mr. Utecht's lawyer is

 5    in the courtroom prepared to speak on this if --

 6                    MR. MOLO:  Well, Mr. Utecht's going to

 7    speak, so --

 8                    THE COURT:  Mr. Utecht's going to

 9    speak.

10                    MR. MOLO:  Yes.

11                    THE COURT:  I can't have Mr. Utecht's

12    lawyer speak.  Whom do you represent?

13                    MR. PENTZ:  That's why I'm here to

14    speak.  Fred Smerlas, Cleo Miller, Judson Flynn and

15    seven other NFL -- former NFL players.

16                    THE COURT:  So it's not Mr. Utecht,

17    then?

18                    MR. PENTZ:  No.  I never entered an

19    appearance on his behalf.  No.

20                    THE COURT:  Well, what are you going to

21    speak about?

22                    MR. PENTZ:  I'm going to speak in

23    support of Mr. Utecht's objection that there may not

24    be enough money in the settlement fund to play -- to

25    pay claims 30, 40, or 50 years into the future.

Page 130

1                    THE COURT:  All right.  Okay.  Tell me
2      why you --
3                    MR. PENTZ:  Okay.  Thank you, Your
4      Honor.
5                    THE COURT:  You think it's the demise
6      of the NFL?  Is that what you're concerned about?
7                    MR. PENTZ:  Well, that's one of the
8      possibilities, but there are --
9           (Laughter)
10                   MR. PENTZ:  -- other ones here.
11                   THE COURT:  Well, give me more
12     realistic ones.
13                   MR. PENTZ:  When you -- when you
14     rejected the original settlement, Your Honor, you
15     stated that:
16                   "I am primarily concerned that not all
17     retired NFL football players who ultimately receive a
18     qualifying diagnosis or their related claimants will
19     be paid.  In various hypothetical scenarios the
20     monetary award fund may lack the necessary funds to
21     pay monetary awards for qualifying diagnoses."
22                   Now even though this current amended
23     settlement is uncapped, it doesn't actually guarantee
24     the payments as that term is understood.
25                   THE COURT:  How would you do that?

1                    MR. PENTZ:  Well, Your Honor, it would

2    be impossible to -- we have a couple of ideas.  One is

3    you could bond it or you could insure it with an

4    insurance company.

5                    THE COURT:  And they're better off than

6    the NFL.

7        (Laughter)

8                    MR. PENTZ:  Right.

9                    THE COURT:  Okay.  I just wanted to

10   know what your --

11                   MR. PENTZ:  It would have --

12                   THE COURT:  -- assumptions are.

13                   MR. PENTZ:  -- to be.  Yeah.

14   Obviously, because in the -- the way the settlement

15   now works there are two funds that -- the monetary

16   awards fund and then something called a statutory

17   trust which is meant to secure that monetary awards

18   fund.

19                   In year 11 of the settlement the NFL is

20   required to fund a statutory trust with enough money

21   to pay all claims for the next 55 years.  That is an

22   impossibility.  Nobody can forecast what amount that

23   would be.  The NFL is doing this, is going to

24   determine this amount in its sole discretion.

25                   THE COURT:  But I thought that they

1    have -- they are -- aren't they responsible for

2    payment for 65 years?

3                    MR. PENTZ:  They are, Your Honor.

4                    THE COURT:  Okay.

5                    MR. PENTZ:  But Mr. Utecht's concern is

6    that if he got an award down the road, say 30 or 40

7    years from now, all he would have at that point would

8    be a breach of contract claim against the NFL if they

9    didn't pay his award.

10                   THE COURT:  Oh, okay.  Okay.  I

11   understand your argument.

12                   MR. PENTZ:  And one of the --

13                   THE COURT:  Good thing I'm not going to

14   be around to decide that.

15        (Laughter)

16                   MR. PENTZ:  Well, I don't think any of

17   us will, Your Honor.

18                   Your Honor, that's part of the problem,

19   seriously, is that -- well, our main concern is Seeger

20   and Weiss because they're responsible for enforcing

21   all of the clauses.

22                   THE COURT:  You don't think that

23   they're going --

24                   MR. SEEGER:  I won't be around.

25                   THE COURT:  -- to be around.  You don't

1    think  --

2                    MR. PENTZ:  They won't be around.  Will

3    their firm be around?  Will an associate in that firm

4    be available 50 years from now when Mr. Utecht calls

5    and says, they're not paying my claim?

6                    THE COURT:  Okay.  I hope --

7                    MR. PENTZ:  That's what we're --

8                    THE COURT:  -- I --

9                    MR. PENTZ:  -- worried about.

10                   THE COURT:  Okay.  I understand your

11   concern.  I think that you've explained it and I don't

12   think I need any further explanation.  I certainly

13   will -- I'll think about it.  Okay.

14                   MR. PENTZ:  Okay, Your Honor.  I

15                   THE COURT:  Thank you --

16                   MR. PENTZ:  -- have more, but --

17                   THE COURT:  -- very much.

18                   MR. PENTZ:  -- if that's all you want

19   to hear  --

20                   THE COURT:  No.  That's it.  Thank you

21   --

22                   MR. PENTZ:  Okay.

23                   THE COURT:  -- Mr. Pentz.

24                   MR. PENTZ:  Thank you.

25                   THE COURT:  Okay.  Mr. Lubel.  Okay.

Page 134

1        (Pause)

2              THE COURT:  Mr. Lubel, you're the one

3    who asked me to postpone this hearing because you

4    couldn't get here today or something.

5              MR. LUBEL:  No, ma'am.  I asked you if

6    we could continue the hearing because of the mass dump

7    -- document dump that was done --

8              THE COURT:  All right.  I --

9              MR. LUBEL:  -- a week ago.

10             THE COURT:  I -- obviously I denied --

11   I didn't have a chance for anyone to respond to that.

12   But I did look where you were from, and now that you

13   speak two or three words I know it's not New York.

14       (Laughter)

15             MR. LUBEL:  Well, it's funny you say

16   that, Your Honor, because when I showed up this

17   morning downstairs --

18             THE COURT:  Yes.

19             MR. LUBEL:  -- the marshals wanted to

20   make sure I wasn't from Dallas.

21       (Laughter)

22             MR. LUBEL:  And I assure you I'm not.

23             THE COURT:  Okay.  I -- where are you,

24   Beaumont, Texas?

25             MR. LUBEL:  You know, I grew -- I was

 1   actually raised in Beaumont, but I split time between
 2   San Antonio where the Alamo is and Houston.
 3                   THE COURT:  Okay.  All right.
 4                   MR. LUBEL:  So I appreciate your time.
 5                   THE COURT:  Okay.  Thank you.
 6                   MR. LUBEL:  Judge, I've been asked to
 7   address two components or features of this settlement
 8   agreement that arbitrarily and unnecessarily will
 9   reduce monetary awards if the settlement is approved
10   to various class members.
11                   Number one are the eligible seasons,
12   that's one of the components, and number two is the
13   age for which the qualifying diagnosis is made.  You
14   will find the eligible seasons on page 9, a definition
15   at -- on page 9 of the settlement under (kk).  And
16   then on page 36 you will actually see a chart that I
17   will refer to later that provides how those deductions
18   are applied.
19                   On Point Number 2, the age at the time
20   of the qualifying diagnosis, that is strictly Exhibit
21   3 to the settlement.
22                   Judge, both of these components or
23   features of the settlement are flawed for two reasons.
24   Neither of them is reasonable and, number two, both
25   did not provide for the structural protections that

1   Anchem required in the United States Supreme Court

2   decision.  Let me address that one first.

3                    There's two subclass representatives,

4   Mr. Turner and Mr. Wooden (ph).  And when you look at

5   both of their allegations what you will find is that

6   both of them played in the NFL for eight to nine

7   years.  And so if you play in the NFL for more than

8   five -- we'll come back -- it's actually more detailed

9   than that.  But there's a -- an arbitrary cutoff if

10  you will at five.  And for -- after -- below five

11  years you get deducted.  Both of the class

12  representatives played in excess of that, far in

13  excess of that, and so they are not impacted by the

14  deductions that occur under the eligible season

15  section.

16                   Under the age for qualifying diagnosis, they

17  likewise are not adequate representatives because Mr.

18  Turner was diagnosed with his illness, based on his

19  allegations, before he reached 45 years old.  And that

20  arbitrary line that they drew for what -- when the

21  deductions kick in or the reductions and monetary

22  awards is at 45 years old or older.

23                   Now Mr. Wooden, the allegations are

24  that he has not currently been diagnosed with any of

25  the qualifying diagnose -- diseases or disorders.

1   However, best I can tell he's 40 or 41 years old and

2   he has time, three or four years, for which he could

3   be diagnosed with a qualifying diagnosis and,

4   therefore, he would not be impacted.

5                   And so for those reasons, Your Honor,

6   we do not believe that either Mr. Wooden or Mr. Turner

7   are adequate representatives of the class or the

8   absentee members because neither of them appear to be

9   impacted when we focus in on these two sections.

10                  THE COURT:  Okay.

11                  MR. LUBEL:  Now I -- I'm sure the Court

12  has heard, I heard it before today and then I heard it

13  again, and that is this settlement does not require

14  any proof of causation.  I heard it again today.  Both

15  Mr. Karp and Mr. Seeger, on behalf of their groups,

16  said it.  However, it wasn't within minutes, maybe 15

17  minutes within both of them saying that they were

18  using causation as justification for both of the

19  components of the settlement for which I'm complaining

20  about or which the objectors are complaining about.

21  And the exact words that I heard were, they service

22  proxies for causation and exposure and they are

23  scientifically based.  Those are the words I heard.

24                  Now I would like to -- if we can pull

25  up Exhibit 3 first.

```
 1        (Pause)
 2                  MR. LUBEL:  Well, I could do it on
 3   ELMO.
 4                  THE COURT:  Where's Jim?  Jim?  One
 5   second.
 6        (Pause)
 7                  THE COURT:  What would I do without
 8   you, Jim?  They could do without me, but not without
 9   you.
10        (Pause)
11                  THE COURT:  Is that it?
12                  MR. LUBEL:  Yes, Your Honor.
13                  THE COURT:  Okay.
14                  MR. LUBEL:  That is Exhibit 3 to the
15   settlement.
16                  THE COURT:  Okay.
17                  MR. LUBEL:  It was.  It vanished.
18                  THE COURT:  We'll get it back.  Right
19   now I'm not concerned.
20                  MR. LUBEL:  It's one way to cut down on
21   my argument, Judge.
22        (Laughter)
23                  MR. LUBEL:  That's it.
24                  THE COURT:  That's it?  Oh, okay.
25                  UNIDENTIFIED SPEAKER:  Here you go.
```

1    Sorry about that.

2                    MR. LUBEL:  No.  Thanks, Jim.

3                    Your Honor --

4                    THE COURT:  Yes.

5                    MR. LUBEL:  -- this is Exhibit 3.

6                    THE COURT:  Okay.  I see it.

7                    MR. LUBEL:  This is the section dealing

8    with age at the time of qualifying diagnosis.

9                    THE COURT:  Okay.  All right.

10                    MR. LUBEL:  If you look at the top, on

11    the left-hand column you'll see age group and you'll

12    see under 45 and you'll see what appear to be fairly

13    large settlement numbers starting with ALS at $5

14    million; death with CTE at 4 million and on and on.

15                    If -- they claim that this is

16    scientifically based.  So what evidence have they

17    provided, much less what argument, that somebody

18    between 25 and 45 should get exactly the same thing?

19    Is it their claim, is it the NFL's claim that somebody

20    that's diagnosed with any of these disorders, these

21    diseases at 25 years old has the same range of damages

22    as somebody does at 44?

23                    Now they're the ones that -- Judge,

24    they have to prove that this is reasonable, that it's

25    rationally based.  That's what Professor Calanoff has

1  said.  That's the test.  They provided the Court with

2  no rationalization on how somebody under 45, that that

3  whole age range group of people should be treated

4  exactly the same.

5            By the same token, if you focus in on

6  death with CTE and you look at the -- consider what a

7  44 year old would get.  So a 44 year old diagnosed

8  with CTE before you approve, preliminarily approve the

9  settlement that is, would receive $4 million assuming

10  no other setoffs or offsets.  A 45 year old would

11  receive 3.2 million.

12            Now where's the science behind that,

13  Judge?  Common sense tells you that a one-year change

14  in life expectancy does not justify, much less could

15  it be scientifically justified an $800,000 delta.  If

16  you go and you look even below that, if you're -- if

17  you're 49 and you're diagnosed, death with CTE, you

18  get $3.2 million assuming no other offsets.  If you're

19  50 you get $900,000 less.  That's with a -- again,

20  with a one-year change in life expectancy.  And these

21  people have passed.  They're already dead.  There is -

22  - there can be -- they've offered no scientific basis

23  for this categorization nor the numbers.

24            Your Honor, just another example.  If

25  you look at Alzheimer's, if you're 44 years old and

1  you're diagnosed.  You have a qualifying diagnosis of

2  Alzheimer's with -- assuming everything else is the

3  same, you get $3.5 million.  If you're 45, one year

4  difference, you get $1,200,000 less.

5              Now what's that based on?  Do they have

6  evidence that that one-year change in diagnosis date

7  has resulted in a million-two less in medical; that

8  it's somehow altered your life by worthy of $1,200,000

9  change?

10              Judge, there -- there is no rational

11  basis for the numbers.  What I suspect happened, and

12  it's pure speculation, is that when they initially sat

13  down and settled this case for $650 plus million

14  before you rejected it, they tried to back in to how

15  the numbers would play out.  And I'm not here to

16  debate the whole process of trying to back in and

17  fulfill your fiduciary obligations, but I -- but it

18  does offer you an explanation as to how this happens,

19  but it's not a rational explanation, nor is it

20  scientifically based as they told you.

21              I think it's also important to notice,

22  if you look at the -- if we can go to the 60 to 64

23  category, that whole line.  Now Mr. Seeger told you

24  when he stood up that the primary basis for having

25  these deductions or reductions in monetary awards

Page 142

1   based on age were because the science showed that when

2   you got into your 60s -- he either said age 60 or when

3   you entered your 60s -- the risk of being diagnosed

4   with these disorders, Parkinson's, Alzheimer's,

5   dementia-type disorders, they go up.

6               Well, is that -- look what we see,

7   Judge.  He said it like there's some stark difference

8   at 60 years old or in the decade of your 60s.  Do we

9   see a big difference between 55 and 60?  We actually

10   see bigger differences when we looked at Alzheimer's,

11   Judge -- look at the difference between the 55

12   category under Alzheimer's and the 60.  That's like a

13   $200,000 difference.

14          Now they're focused in supposedly on this

15   decade of the -- your 60s.  Now when we go back to the

16   first example I used on Alzheimer's, how do they

17   justify a million-two reduction between ages 44 and

18   ages 45 diagnosis?  They can't do it.  There's no

19   doctor that will give them that.  There's no

20   scientific article that will justify it.  They just

21   don't have it.  And so it's their burden to prove to

22   the court that these are reasonable and they're

23   rational, and they're just not.

24               If we could move to --

25               THE COURT:  Okay.  Thank you.  Are you

Page 143

1    -- you've got more than the age?

2                    MR. LUBEL:  Not on this category, Your

3    Honor.

4                    THE COURT:  Okay.  But --

5                    MR. LUBEL:  Just --

6                    THE COURT:  -- you know you're almost

7    finished with time, so why don't you -- yes.

8                    MR. SEEGERT:  I might be able to save

9    Mr. Lubel and the Court some time.  If Mr. Lubel would

10   just, for the first time, apparently, read the

11   language at the bottom of that grid which explains

12   everything he just spent 15 minutes discussing.  How

13   about blowing up that paragraph right underneath the

14   numbers?

15                    Thank you, nice and big, nice and big

16   if you can.  And then there's a word, average, in that

17   first sentence.  You want to read that?  I can read

18   it.  It says, "The above monetary award levels are the

19   average based monetary awards for each qualifying

20   diagnosis."  Now this won't make Mr. Lubel stop

21   complaining, but the -- in the grid category he was

22   talking about, 50 to 54 for ALS, there's a $4 million

23   number.  So that's the amount for a 47 year old.  And

24   if you're a little younger it goes up and if you're a

25   little older it goes down.  There are gradations

Page 144

1    within each box.

2                    THE COURT:  Okay.

3                    MR. SEEGERT:  There isn't a big jump.

4                    Thank you, Judge.

5                    MR. LUBEL:  The jump is not -- the

6    delta, Judge, has not been proven to be rational or

7    reliable --

8                    THE COURT:  But that's not what you

9    said before.  Okay.  And that will be on them to do.

10                   Okay.  And what's your second -- you

11   have a second --

12                   MR. LUBEL:  If we can go to the

13   eligible seasons.  This one -- so, Judge, if you were

14   to look at page 9 of the settlement there's a

15   definition of eligible seasons.  Let me give you the

16   short version.  Essentially, it is if you're on a

17   active roster of an NFL team for three or more games,

18   you -- you're entitled to an -- you get a season.  If

19   you're on a (indiscernible) practice or developmental

20   squad for eight or more games you get a half a season.

21                   When you look at the number of eligible

22   seasons, under five eligible seasons you start to get

23   deducts.  And if we -- let's just focus on Number 5,

24   which is the two-and-a-half eligible seasons.  The

25   problem they have here, Judge, is that when they

1    defined eligible seasons they did not include that you

2    had to play or what position you were, whether you

3    were a high impact position:  Were you a cornerback;

4    were you a wide receiver; were you a linebacker; what

5    were you; did you play at all?

6                    And so you've got players that in an

7    extreme example fit the definition of being in five

8    eligible seasons and not -- not deducted at all.

9                    And so you've got players that in an

10   extreme example fit the definition of being in five

11   eligible seasons and not -- not deducted at all.  No

12   deduction whatsoever that never played.  They were on

13   an active roster for three or more games, for five

14   seasons, they had a qualifying diagnosis, they

15   wouldn't get deducted.  Whereas the quarterback that

16   fell into the definition for two and a half years back

17   in the '70s or '80s where they didn't have these rules

18   that were designed to start protecting the

19   quarterbacks, if that quarterback only played or was

20   on an active roster for two and a half eligible

21   seasons he'd get 50 percent less, and that quarterback

22   could have played 16 games for 2 seasons versus the

23   field goal kicker, second string, that didn't play at

24   all, or the first string that was rarely on the goal.

25   The field goal kicker, whether he played or not, would

1    get twice the money as the quarterback that played

2    under their scenario.

3              There's no scientific basis for their

4    eligible seasons, there's no good reason to apply it

5    that way.

6              THE COURT:  Thank you very much.

7              MR. LUBEL:  Thanks, Judge.

8              Okay, Mr. Rosenthal.  Okay.

9              MR. ROSENTHAL:  Thank you, Your Honor.

10   My name is Michael Rosenthal, I represent Andrew

11   Stewart who played in the NFL from 1989 to 1993.

12              He has a qualifying diagnosis of

13   Parkinson's disease, but his objection is the

14   definition of eligible season, because the definition

15   here requires playing in a minimum of three games in a

16   regular season and excludes players like Andrew who

17   were put on injured reserve prior to that third game.

18              Both class counsel and the NFL have

19   submitted elaborate expert valuations of this

20   settlement, but neither use the criteria for eligible

21   season that they now insist are critical to this

22   settlement.

23              Neither class counsel nor the NFL

24   counsel has offered any explanation for why their

25   respective expert reports on the value of the

1  settlement failed to use the actual eligible season

2  criteria in their analysis.

3              Instead the NFL expert has based his

4  analysis on credited seasons, that's a concept from

5  the retirement plan where players vest, based on

6  number of credited seasons, they have eligibility for

7  pension based on the number of credited seasons.

8              The NFL's expert said that credited

9  seasons were a proxy -- his words -- a proxy for

10 eligible seasons.  And they use the creditable season

11 data because that was readily available from the NFL.

12 Why didn't they use eligible season data?  I think the

13 answer is because eligible season data is much more

14 difficult to come by, and that data is the data that

15 the players under this agreement would now have to

16 provide.  Otherwise it would have been provided by the

17 NFL for the NFL's analysis.  So it's left up to the

18 class members to dig up this data, establish the

19 number of eligible seasons.

20             But what did they have to do?  They

21 have to submit, and it's their burden to submit by

22 objective evidence -- objective evidence the number of

23 eligible seasons that they have.  There's no

24 definition of objective evidence and it's simply let

25 to the unfettered discretion of the claims

1   administrator.  And usually when there's unfettered

2   discretion it means that the decision cannot be

3   overturned unless there's an abuse of discretion.

4   That's a very difficult standard to overcome, and it's

5   an unnecessary burden on the players here, all of whom

6   would be coming into this settlement who were seeking

7   benefits already having a qualifying diagnosis.

8              Now the NFL has contended in its papers

9   that the line drawing is fair because there's an

10  exception for players whose IR, injured reserve,

11  status was due to a concussion, but that's an illusory

12  benefit.

13             The NFL had an injury surveillance

14  system in place for a long time and they've had

15  studies of concussions.  From 1995 through 2006 they

16  did a 12-year study of concussions.  And during that

17  period, from 1996 to 2001, for example, only one

18  player lost more than 61 days before returning to

19  play.  There's no evidence that any player went on

20  injured reserve because of or due to a concussion.

21             So the fact that they're offering that

22  as a protection is really illusory, when in fact we

23  know from the documents that I've submitted as well as

24  public records that the players during training camp

25  are suffering concussions, during pre-seasons are

1    suffering concussions, there were 61 at least in this

2    past pre-season.

3                    Our solution is that the agreement

4    should include credited seasons as defined by the

5    retirement plan to account for pre-season and training

6    camp time.  There's no dispute that concussive and

7    sub-concussive trauma occurred during those games and

8    during training camp.  And in fact when my client,

9    Andrew, was playing in the '80s and '90s training

10   camps were far more brutal than they are today.

11                   Finally, there's no additional

12   financial risk to the NFL if credited season is used

13   instead of eligible season or credited seasons added

14   to the definition of -- credited seasons is made to be

15   the objective evidence necessary to qualify.

16                   Under the NFL's own analysis

17   $675 million is more than sufficient to cover the

18   payments to cover class members and they use credited

19   season data.  So using eligible season data by

20   definition will reduce the value to the players.

21                   Given that we think that credited

22   season offers the players a better deal and a better

23   chance that the monetary payments will fairly --

24   fairly compensate them for their cognitive injuries

25   and loss of suffering.

1                    THE COURT:  Thank you, Mr. Rosenthal.

2                    MR. ROSENTHAL:  Thank you.

3                    THE COURT:  All right, Mr. Shah?

4                    MR. SHAH:  Good afternoon, Your Honor.

5                    THE COURT:  Good afternoon.

6                    MR. SHAH:  I'm here on behalf of the

7    family of Dale Williams.

8                    Our objection is about whether

9    Mr. Williams died with ALS, and I'd like to read an

10   excerpt from three documents.

11                   Mr. Williams' death certificate that

12   says "cause of death cardiac arrest as a result of

13   respiratory acidosis as a consequence of ALS."

14                   His obituary published by the New York

15   Times in 1984 that says:

16                   "Dale Williams, a former star offensive

17   guard at Florida State University and with the New

18   Orleans Saints, died Wednesday at age 39 of ALS."

19                   Another obituary published by the

20   Tallahassee Democrat in 1984 that says:

21                   "Earlier this year Williams came in a

22   wheelchair to Live Oak for a last reunion.  The

23   disease that struck down Lou Gehrig hit Williams late

24   last season.

25                   In October he saw a neurologist, but it

1   was not until last February that his affliction was

2   diagnosed by the Mayo Clinic."

3               Under this proposed settlement the NFL

4   will not acknowledge that Mr. Williams died with ALS.

5               The NFL has made a commitment to fully

6   compensate those players who have received the worst

7   cognitive diseases.  They have said based on their

8   compensation grid that ALS is the worst of these

9   diseases.  And in fact they have agreed that athletes

10  who have played at least 5 eligible seasons and are

11  under the age of 45 deserve to be fully compensated

12  because they have this strongest causal link between

13  playing in the NFL and being inflicted with one of

14  these neurocognitive diseases.

15              Mr. Williams played seven seasons with

16  the New Orleans Saints.  He died at the age of 39, 10

17  years after retiring from the NFL.  This settlement is

18  intended to protect Mr. Williams.

19              Now, Mr. Williams' family has to prove

20  his diagnosis through certain medical records, and

21  Mr. Williams was diagnosed in 1984 and by the Mayo

22  Clinic.

23              In November of '84 he was treated at

24  Baptist Memorial Hospital by Dr. Theal (ph), who's a

25  pulmonologist.  Mr. Williams died in November of 1984,

1    Dr. Theal died in 2011, and Baptist Memorial Hospital

2    was swept away by Hurricane Katrina.

3                 Mr. Williams' family has no way to

4    submit any medical records, but the NFL does say on

5    page 132 to 133 of their response that a death

6    certificate can be considered a medical record.  But

7    here's the thing, the death certificate has to be

8    signed by a neurologist, neurosurgeon, or

9    neurospecialist.  This rigid requirement as to the

10   type of physician that must sign the death certificate

11   leaves Mr. Williams and others in his position without

12   an ability to prove his illness, and in fact the Mayo

13   Clinic states that the most common cause of death with

14   ALS is respiratory failure, which means most patients

15   at the end of their life will see a pulmonologist like

16   Dr. Theal who will sign the death certificate.

17                 Now the NFL suggests that this is an

18   anti-fraud measure, but there's nothing unreliable

19   about the contents of a death certificate simply

20   because it was signed by someone other than a

21   neurosurgeon.

22                 In fact the American Academy of

23   Neurology in their paper published in 2012 linking

24   degenerative disease -- causes of death among retired

25   NFL players bases their conclusions after reviewing

1    death certificates.

2              The Journal of Epidemiology in

3    Community Health in 1992 concluded that death

4    certificates diagnoses of ALS were adequate.

5              Finally in terms of to anti-fraud

6    argument.  As Mr. Rosenthal just said, when they're

7    talking about eligibility they can use objective

8    evidence such as pay stubs, newspaper printouts, but

9    when it comes to proving the illness something as

10   objective as an obituary can't be used.

11             I'm here on behalf of Mr. Williams and

12   his family.  The only fair thing to do is to modify

13   this settlement so that he is protected.

14             THE COURT:  Thank you.  Appreciate

15   that, Mr. Shah.

16             Mr. Manochi?

17             MR. MANOCHI:  Good afternoon, Your

18   Honor.  Thank you for giving us the opportunity this

19   afternoon to speak on behalf of objectors Craig and

20   Dawn Heimburger.

21             Mr. Heimburger I think would be

22   categorized as a journeyman player playing basically

23   between four and five seasons, one of which was in the

24   NFL Europe, and in the years 1999 to 2002.

25             He feels very strongly that the

1  settlement agreement should not be approved, and we

2  therefore respectfully request that the Court

3  carefully review each of the objections in

4  Mr. Heimburger's objections submitted with the Court

5  and give it the due consideration that it deserves.

6             The -- I don't want to belabor the

7  point, I think Mr. Molo and Mr. Lubel have raised the

8  point nicely with regard to the Amchem issue, I just

9  simply point out that here Mr. Heimburger in the 2000

10 year played for the NFL Europe, we -- as been pointed

11 out that both Mr. Turner and Mr. Wooden were five-

12 season players in the NFL, there were no issues there

13 with regard to Europe, so we think some consideration

14 should have been given in terms of a subclass of some

15 sort to deal with the issues that are raised by the

16 reductions off of the eligible seasons for various

17 years.  We won't belabor the point, we just simply put

18 it -- leave it at that.

19             The more important aspect of my

20 presentation this afternoon is to discuss the sipray

21 elements of the settlement agreement, it's the

22 $10 million that's been --

23             THE COURT:  Let me ask you something.

24 Would you be happy with this agreement if they just

25 weren't -- they weren't obligated to give any money to

Page 155

1    the education fund?

2                  MR. MANOCHI:  No, we think --

3                  THE COURT:  Would that solve the sipray

4    issue?

5                  MR. MANOCHI:  No, I don't think it's --

6                  THE COURT:  And should I strike it?

7                  MR. MANOCHI:  No, I think it should be

8    reallocated, and here's the -- here's the reasons,

9    Your Honor.  The -- we can sit here and debate whether

10   sipray or not, we don't agree with the NFL's version

11   that just because it's -- there's not going to be an

12   unclean running here so it's not sipray.

13                 THE COURT:  Exactly.

14                 MR. MANOCHI:  We -- we kind of -- we

15   suggest that the Court respectfully look at what Judge

16   Roberts in the (indiscernible - 2:08:58) case defined

17   it as and what the Third Circuit defined it as in

18   connection with its review of the matter in the Baby

19   Products case.

20                     Judge Roberts calls sipray the

21   distribution of settlement funds --

22                 THE COURT:  There's no question about

23   the fact I was the -- I was the judge in the Baby

24   Products case so I'm very familiar with that.

25                 MR. MANOCHI:  Okay.  Okay.

1            THE COURT:  So it was sipray.

2            I don't quite understand if I strike

3    the $10 million for education then everybody who

4    complains about sipray should be a lot happier.

5            MR. MANOCHI:  No, I think my argument,

6    Your Honor, is those monies are better allocated to

7    the -- to going toward other elements of the class,

8    and here's a perfect example, okay?  NFL Europe for

9    instance.  Mr. Heimburger played in Europe for a year,

10   he doesn't get any credit for it.  If we look to

11   Mr. Calanoff, the law professor and plaintiffs'

12   expert, settling class counsels' expert, he says that

13   the NFL Europe amounts should have been included as an

14   eligible season, okay?

15           So the point simply is being that the

16   monies, even by plaintiffs' own omission -- I mean the

17   whole purpose of the class action settlement is to

18   directly -- to compensate to the members of the class

19   as directly as possible, and Mr. Heimburger is a

20   member of the class.  He's not getting any eligibility

21   for NFL Europe.  Now, Mr. Calanoff seems to suggest

22   that that should be an element that is compensated.

23           So to the extent that with the sipray

24   element we think the record is uncontroverted as a

25   matter of fact that the members of the class aren't

1    being compensated as directly as possible.  To the

2    extent that the sipray element goes to that imperfect

3    third-party element of whatever a distribution is,

4    that is what our concern is.

5                   THE COURT:  Well, I understand that.

6    Thank you.

7                   MR. MANOCHI:  Okay.  Thank you.

8                   And one suggestion -- I mean there is

9    -- there may have been ways other to more closely --

10   to more closely define how it is that those monies are

11   spent.  We don't happen to think that an education

12   fund directly benefits the members of this class,

13   which are defined as retired NFL football players.

14   They don't have to worry about issues of safety, they

15   don't play football anymore.

16                  So we simply suggest that that's

17   another element here which indicates that it's not

18   truly something that should be a part of this

19   settlement.  If the NFL wants to do it independently

20   God bless them.

21                  THE COURT:  Okay.

22                  MR. MANOCHI:  I -- you know, I'm

23   done --

24                  THE COURT:  Would you like me to --

25   okay.  Thank you very much.

 1                    MR. MANOCHI:  I appreciate your time.

 2      Thank you.

 3                    THE COURT:  You're welcome.

 4                    Okay.  We're going to hear from some of

 5      the individual players.  Mr. Molo, I have covered all

 6      the lawyers; is that correct?

 7                    MR. MOLO:  Everyone, Judge, that is on

 8      the list that I have, yes.

 9                    THE COURT:  Okay, good.

10                    All right, Eugene Moore, is he here?  I

11      don't want -- good afternoon, Mr. Moore.  I don't want

12      to cut anyone off, but you understand that you have

13      five minutes.

14                    MR. MOORE:  Okay.

15                    THE COURT:  Thank you.

16                    MR. MOORE:  As a -- I may be 30 seconds

17      over.  As a player --

18                    THE COURT:  No, no, no, no, no.

19                    MR. MOORE:  Okay.  All right.  Okay.

20                    My name is Eugene Player, I am a former

21      player, and I think it's very important that my

22      perspective as a former player be taken seriously.

23                    And first of all I'd like to say good

24      morning, Your Honor, and thank you for keeping this

25      process on track.  I got it.  I got it.

1                    THE COURT:  Good afternoon.

2                    MR. MOORE:  You read my summary.  Okay.

3                    The first thing I'd like to say is I

4     was drafted by the 49's, I bounced around for three

5     years, five training camps, four teams.

6                    I'd like to preface my objections by

7     saying that I believe that -- and many others that

8     I've spoken to -- that class counsel has utterly, and

9     I -- with all due respect -- failed the players and

10    their spouses.

11                   Why do I say that?  Because they had an

12    obligation and responsibility to fight for the

13    players.  By allowing the elimination of CTE and

14    overly broad releases they failed.  It's as though

15    there was some sort of alternative universe being

16    constructed into which all of the figures and

17    computations were entered.

18                   The preliminary concussion settlement

19    had its origins as a CTE litigation.  They're gone.

20    There's nowhere to be found in the document.  How does

21    that happen?  It's astonishing, it's more than

22    astonishing.  There's something -- well let's just say

23    it's astonishing and breathtaking.  It's akin to

24    bringing a coal miner's health claim without black

25    lung disease or an asbestos health claim without

1   asbestosis.  How could that be that we're here today

2   even expressing our objection to a settlement that

3   does not include CTE is astonishing.

4               Number two, the NFL preliminary

5   settlement functionally excludes a majority of players

6   whoever strapped on a helmet.  Why do I say that?  And

7   if it doesn't exclude them it places insurmountable

8   hurdles in the way in their road to claiming -- to

9   basically receiving their claim.  And that's been

10  addressed by several people here.  I can't even begin

11  to contemplate a more exclusionary agreement.

12              While contemplating this a couple of

13  weeks ago I realized that one of the underlying

14  structural flaws is the assumption and premise that

15  NFL -- that the amount of contact that an NFL player

16  takes is based primarily on the assumption of game

17  day.  There is something called pre-season, there's

18  something that predates pre-season that's called

19  training camp.

20              In training camp, and I can tell you

21  because I was in enough of them, you hit two times a

22  day, you go through two a days.  You are fighting for

23  a job whether you're a rookie, whether you're coming

24  off of injured reserve, whether you are trying to make

25  the (indiscernible - 2:15:27) again, whether you were

1    on the cusp, you were fighting for a position, thus

2    you have a lot of fights during training camp, it's a

3    hyper-competitive, people are at each other, you're

4    doing thing ins training camp that would cause a team

5    to be fined during training camp.  Survey enough

6    players they will agree.

7                    My educated guess is that from the

8    beginning of training camp through to pre-season the

9    amount of impact that you take during those first 6 to

10   8 weeks is at least 50 percent of the total and maybe

11   more, and you start bouncing around, as I did, and it

12   is going to be more, because you don't let an

13   opportunity pass to hit somebody.  And you have the

14   language of the coaches, hit him, lay him out, knock

15   him on the rear, whatever, I mean it's a lot more

16   colorful than that.  So --

17                    THE COURT:  I appreciate your

18   restraint.

19                    MR. MOORE:  Pardon?

20                    THE COURT:  I said I appreciate your

21   restraint.  I'm only teasing.

22        (Laughter)

23                    MR. MOORE:  Okay.  All right.  All

24   right.

25                    And at the end of the process it's a

1   part of the process and we all live with it and so

2   forth, only a select few make it to the regular

3   season, not guaranteed.  Contracts aren't guaranteed.

4   A lot of people are surprised when they hear that.  I

5   signed in 1969 for $12,500.  No one is -- and a 12,500

6   salary.

7              One of the reasons I say that is

8   because if I impute the -- or I did impute the grid,

9   because the structural (indiscernible - 2:17:00) flows

10  down through to the compensation assumptions and

11  calculations in the grid, I get a $5,000 maximum

12  award, and the discounts for -- let's say if I'm 70

13  years old, 71, 72, I've gotten to $40,000 with

14  institutional care now running over $150,000 for a

15  large NFL ex-player, my 27 -- now 27 and 29 year old

16  children -- I'm divorced -- are now left to assume the

17  burden, and we've got to talk about burden and spouses

18  -- and I realize I can't now.

19              THE COURT:  I have to cut you off.

20              MR. MOORE:  The only other thing I'd

21  like to --

22              THE COURT:  I'd like you to finish up.

23              MR. MOORE:  Judge, may I just --

24              THE COURT:  Just conclude what you're

25  going to say.

Page 163

```
 1                    MR. MOORE:  Pardon me?
 2                    THE COURT:  Please conclude what you're
 3    going to say.
 4                    MR. MOORE:  Okay.  This is -- Your
 5    Honor, this is the conclusion.
 6                    This is a fairness proposal, a modest
 7    suggestion, that the NFL simply take care of the
 8    treatment expenses for all living players.  The older
 9    ones are going to die sooner, so they can run the
10    numbers, if they really care.
11                    Two, provide a stipend for the spouses
12    and/or caregivers, because they are taking the hit
13    too.
14                    And lastly, if I may, I would like your
15    permission to file a post-hearing memo.
16                    THE COURT:  Okay.
17                    MR. MOORE:  Okay.  Thank you very much.
18                    THE COURT:  Thank you very much.  You
19    have -- nobody has any objection to that?
20                    UNIDENTIFIED SPEAKER:  No, Your Honor.
21                    UNIDENTIFIED SPEAKER:  No, Your Honor.
22                    THE COURT:  Okay.
23               All right, Ms. Hawkins.  Mary Hawkins.
24                    MS. HAWKINS:  Good afternoon, Judge
25    Brody.
```

1          THE COURT:  Good afternoon,

2    Ms. Hawkins.

3          MS. HAWKINS:  I thank you for the

4    opportunity to submit by objection to the proposed

5    settlement.

6          I am the spouse of Mr. Ross Hawkins,

7    Sr., who's also known as Rip, R-I-P, who was a second

8    round draft choice of the original Minnesota Vikings

9    team and as a middle linebacker, he served as co-

10   captain and defensive captain, and played for five

11   seasons from 1961 to 1965 until he retired to leave

12   the team to complete law school at Emery University,

13   and also to direct his energy toward the care of his

14   wife at that time who was ill and later died.

15         I'm here today as wife and care partner

16   for my husband Rip as his representative.  My husband

17   can no longer consistently participate in his dialogue

18   with the same succinct, robust quality that he may

19   have demonstrated as a player or a co-captain or as he

20   did in his subsequent years as his career as a

21   district attorney.

22         So I'm here to offer a voice that

23   shares my experiences, insights, and our concerns to

24   the proposed settlement, and I am attempting to

25   articulate these in a manner that accurately reflects

1   his perspective as I have known them in our nearly 30-

2   year relationship.

3                  I'm here also as a seasoned healthcare

4   provider who has for more than 40 years mad advocacy

5   my primary goal for those whom I have the privilege to

6   serve across several disciplines from newborn to

7   geriatric, acute care, chronic care, including trauma

8   units, rehabilitation of TBI or traumatic brain

9   injury, neurologic diseases, spinal cord injury,

10  cardiac rehab, pain management, neonatal intensive

11  care, as well as clinical research.

12                 I've also had the honor and privilege

13  of accompanying patients and their families as a

14  hospice volunteer serving care partners and families

15  of those in their near end of life decisions.

16                 I will say that despite my many years

17  of experience professionally and personally it was not

18  nearly enough to prepare me for the most challenging

19  role that I have assumed over the last five years as

20  my husband progresses in his course of neurocognitive

21  decline.

22                 October 2013 he was enrolled in the 88

23  plan.  And I'm making ever effort -- excuse me --

24                 THE COURT:  It's okay.

25                 MS. HAWKINS:  -- daily to provide care

1    that will allow him to maintain the highest quality of

2    life.

3                    THE COURT:  Okay.  Would you like --

4    just direct yourself --

5                    MS. HAWKINS:  Thank you.

6                    THE COURT:  -- to the objection that

7    you have.

8                    MS. HAWKINS:  Okay.  My objections

9    include the process of diagnosis.  Primary care

10   physicians were dismissive and often indifferent to my

11   husband's symptoms and needs.  He was diagnosed only

12   one year ago with -- excuse me -- he assumed the

13   rigorous neuropsychological testing and he was

14   diagnosed with post-concussive dementia, and a year

15   later he was reassessed by a neurologist for a

16   diagnosis of dementia with lewy bodies and a very

17   different care plan was recommended.  And our

18   experience illustrates the difficulty of assessment

19   and accurate diagnosis.

20                    Nearly 80 percent of people with lewy

21   body receive a diagnosis for a different cognitive,

22   movement or psychiatric disorder before ultimately

23   learning that they have lewy body, and half of the

24   people saw 3 or more doctors for 10 visits over the

25   course of a year before they were diagnosed, and

1  diagnosis required more than 2 years from the onset of

2  symptoms for 31 percent of the cases.

3              Lewy body dementia is the second most

4  common form of degenerative dementia affecting an

5  estimated 1.3 million people in the United States and

6  is most often misdiagnosed as Alzheimer disease, and

7  despite its prevalence there is no designated sub-

8  category for dementia of lewy body diagnosis in the

9  structured settlement as a core feature.

10             So do former players diagnosed with

11  lewy body dementia fall in the category of

12  Parkinson's?  Because lewy body is considered part of

13  the Parkinson's spectrum, and as its name also implies

14  the dementia is part of its core feature.  So are they

15  in the category of Parkinson's or dementia?  It

16  presents a puzzling conundrum with significant

17  financial consequences.

18             Research by Bostrum (ph) identified

19  utilization resources are greater with patients of

20  dementia with lewy body and use more than double the

21  amount of resources compared to Alzheimer diseased

22  patients.  They use specially greater resources in

23  accommodation, long-term care, required more

24  outpatient care, informal care, community services,

25  and pharmaceutical care.

1            The cost for care for dementia of the

2  lewy body patients who present with apathy was almost

3  three times as high as Alzheimer patients with apathy.

4            And these findings were collected from

5  the general population and do not even consider the

6  psychosocial dynamics of former athletes nor the

7  typical large physical size that presents additional

8  care management problems.

9            While the baseline assessment program

10  may offer an infrastructure to direct the assessment

11  intervention process, our personal experience and the

12  data provide -- illustrate the manifold changes --

13  challenges in the assessment process.

14            THE COURT:  Ms. Hawkins, I'm going to

15  have to ask you to --

16            MS. HAWKINS:  Okay.

17            THE COURT:  -- conclude.

18            MS. HAWKINS:  $10 million designated

19  for education is described in some reports as

20  targeting youth football, and those who have been

21  diagnosed with neurocognitive disease and those caring

22  for them it's little consolation for the fund -- that

23  this fund may be allocated for education that allows

24  the NFL to continue to market the game under the veil

25  of enhanced safety.

1                What would be more appropriate in terms

2    of informed choice is education and public service

3    announcements comparable to those mandated for the

4    tobacco industry that have graphically depicted the

5    affects of smoking.

6                    THE COURT:  Okay.  Thank you.

7                    MS. HAWKINS:  So in conclusion --

8                    THE COURT:  Yes.

9                    MS. HAWKINS:  -- in conclusion in care-

10   related areas there's a troublesome feature.

11               My final objection that I present today

12   relates to what I believe is the prejudicial nature of

13   the settlement, distribution based on player age.

14               While age is certainly recognized as a

15   significant factor in the development of

16   neurocognitive disease these older alumni are being

17   penalized for the fact that medical discoveries and

18   the awareness of neurodegenerative diseases related to

19   head trauma did not exist decades ago, even though for

20   many players their unrecognized and untreated symptoms

21   were prevalent.

22               What did exist was a culture bravado

23   that fosters denial of pain and symptoms and rewarded

24   these men for their stoicism, often with the

25   administration of pharmaceutical agents that

1    contributed to their long-term sequela.

2                    THE COURT:  I have to cut you off.  I

3    understand your position on that --

4                    MS. HAWKINS:  All right.

5                    THE COURT:  -- on age.  And I think

6    that's -- I'm going have to cut it off.

7                    MS. HAWKINS:  And there was no early

8    metric for that.

9                    THE COURT:  Okay.  Thank you very much.

10                   MS. HAWKINS:  Thank you.

11                   THE COURT:  Thank you, Ms. Hawkins.

12                   Ms. Perfetto?

13                   MS. PERFETTO:  Your Honor, thank you so

14   much for allowing me to be here today, I really

15   appreciate your time.

16                   I want to address a number of things

17   that were talked about today, and I actually sat in

18   the back of the room listening to everything that was

19   said and I threw my original notes away and started

20   all over again.  I will.

21                   THE COURT:  Five minutes.

22                   MS. PERFETTO:  I will.

23                   My objection -- well let me begin with

24   some of the things that were said about the opt outs,

25   so let me tell you why I did not opt out.

1                    I did not opt out because I wanted to

2    be able to have this opportunity to speak with you

3    today, and if I opted out I would not be able to do

4    that, that's why I did not opt out.  So please be

5    aware of that.

6                    My objection -- my main objection is to

7    the age of the player at diagnosis.  As you've already

8    heard discussed today and you saw the grid that was

9    put up on the screen, I heard about scientific

10   evidence, about causality and risk and what that was

11   based on.

12                   Your Honor, I'm trained as an

13   epidemiologist, I know about causality and risk.  I

14   also know about something called detection bias.  And

15   detection bias is when you don't find a disease

16   because you're not looking for it, or when you do find

17   more of a disease because you've learned that you need

18   to start looking for it.

19                   The most credible example that I can

20   find to you that I -- that brings to mind today is

21   that of Katie Couric talking about her husband having

22   colon cancer.  When she brought that to the public eye

23   many people started to be tested for colon cancer, and

24   lo and behold we found more colon cancer in this

25   country.  Was it because there was a sudden increase

 1    in colon cancer?  No, it was because we started

 2    looking for it.

 3                Well we did not look for diseases like

 4    CTE, and what we're looking for in players today, we

 5    didn't do that prior to the early 2000s, because we

 6    didn't know to look for it.  And one of the reasons we

 7    didn't know is exactly the reason why we are here

 8    today, it's the reason for this case, because the NFL

 9    is accused of hiding that information and putting out

10    false information.

11                So the detection bias that was

12    perpetuated through that is the reason why many

13    players never got a diagnosis in the first place or

14    they were diagnosed very late or they were

15    misdiagnosed, and now that poor diagnosis that we had

16    in the past, that detection bias that we had in the

17    past is the reason why those players who are older and

18    their families and their widows, like myself, and

19    wives and children will be getting a lower amount of

20    money than if we had known about this information

21    earlier and if it had not been hidden.

22                I've also heard a lot of presumptions

23    today about why the objectors are objecting, and I can

24    tell you that I've heard from many other wives and

25    widows, there's confusion, they don't know what

1  they're being offered, they didn't know what to do,

2  they don't understand what's in the document, and they

3  weren't getting appropriate help in understanding

4  what's in there.

5          When I asked them point-blank do you

6  know how much you're being offered, do you know what

7  the amount is?  They had absolutely no idea, they just

8  say to me, no, but at my age I can't turn it down.  So

9  there's substantial fear.  Confusion multiplied by

10  fear, multiplied by desperation in some circumstances

11  because they have some desperate financial

12  circumstances because of their husband's illness.

13          So, I think when you multiply all of

14  those kinds of things you're looking at unfairness in

15  this settlement when it comes to those older players,

16  and they're put in the position, I feel, of gravelling

17  -- gravelling for more, and that's really what they're

18  being accused of is only being an objector because

19  they want more.

20          I think what they're actually asking

21  for, Your Honor, is fairness in this so that their

22  issues will be considered, and I think that with

23  appropriate looking at the settlement the way that it

24  is that these kinds of things can be remedied and that

25  a good settlement can come out of this.

1                    I just respectfully request that you

2    consider those things, and that if the NFL really

3    wants to do the right thing it can do the right thing.

4    It should have done the right thing a long time ago

5    and there's nothing from stopping it from doing the

6    right thing now.

7                    If it takes gravelling I'm here to

8    gravel for the families of those older players for

9    fairness.

10                   Thank you.

11                   THE COURT:  Thank you.  Thank you very

12   much.

13                   Mr. Utecht?

14                   MR. UTECHT:  Good afternoon.

15                   THE COURT:  Remember what this means.

16                   MR. UTECHT:  Five minutes.

17                   THE COURT:  That's right.

18                   MR. UTECHT:  I gotcha.

19                   THE COURT:  You got me.

20                   MR. UTECHT:  Thank you so much for

21   this, Your Honor.  I'm a kid from a small town,

22   Rivertown in Minnesota.  If you told me I'd be

23   standing on this platform I would have laughed at you.

24                   THE COURT:  I would say the same thing

25   about myself, so.

Page 175

1                    MR. UTECHT:  Okay.

2          (Laughter)

3                    THE COURT:  We all feel that way.

4                    MR. UTECHT:  And also my lawyer was

5     unable to speak about my objections --

6                    THE COURT:  Okay.

7                    MR. UTECHT:  -- because he's giving me

8     the chance to speak, so I do have my brief if you want

9     a better understanding of its --

10                    THE COURT:  Well just tell me what your

11    concern is.

12                    MR. UTECHT:  Okay.  Thank you very

13    much.

14                    My background is this.  I played six

15    years in the NFL, I was fortunate enough to win the

16    Super Bowl in 2006 with the Indianapolis Colts, went

17    onto play two years with Cincinnati.  I'm a father of

18    three beautiful girls, I love my wife, and I'm trying

19    to redefine myself now as a man.

20                    If I'm being completely vulnerable with

21    you I'm just going to be honest.  I love -- I love

22    football.  I love the game of football for so many

23    reasons.

24                    One of the most important reasons is

25    memory.  Your Honor, I hope -- I hope I never -- I

1    hope I never forget the first time I played catch in

2    the backyard with my dad, the third grade.  I hope

3    that I never forget the look on mom's face when I came

4    back as a junior in high school and told her that I

5    had just been offered a full scholarship to the

6    University of Minnesota.  And I hope that I never

7    forget February of 2007 when I stepped on the biggest

8    stage in the world with Super Bowl XXXXI.

9                     Unfortunately in 2009 I regained

10    consciousness in Kentucky -- in training camp with the

11    Cincinnati Bengals facing my fifth documented

12    concussion.  Your Honor, that sent me into an eight-

13    month rehabilitation process before I was cleared --

14    actually cleared to go back to play.

15                     THE COURT:  Let me hear your objection.

16    I want to make sure you get to it because I --

17                     MR. UTECHT:  I'm getting right to it

18    here.

19                     THE COURT:  -- do care and I'm very --

20    I want to know what your objection to the settlement

21    is.

22                     MR. UTECHT:  Thank you very much.  That

23    leads into my objection and my concern, which is this.

24                     According to Section 25 I don't believe

25    that this settlement guarantees that I will able to

1    receive an award 65 years down the road.

2                    Now when the gentleman tried to offer

3    that objection it was received with laughs, but this

4    is my life.  I'm one of the youngest in this case.

5    I'm 33 years old and I suffer from memory problems at

6    33 years old.  So I'm going to potentially be bringing

7    an award 30, 40 years from now, and the language --

8                    THE COURT:  Are you afraid of -- tell

9    me what you're afraid.  You're afraid that there won't

10   be enough money there?

11                   MR. UTECHT:  I'm afraid that there

12   won't be enough money there, that the security is not

13   there and it's not available to me because of the

14   issues within the trust.

15                   THE COURT:  Well as I understood it,

16   and I'm going to ask the NFL to explain it to me in

17   rebuttal, but my understanding is they are always

18   responsible.  If -- I mean I don't know what better

19   guarantees you can have than having an institution

20   like the NFL, which you do care about --

21                   MR. UTECHT:  Well, I care about

22   football.

23                   THE COURT:  -- behind their agreement.

24   These -- this security is just additional as I

25   understand it, but I will ask about that.

1                MR. UTECHT:  Thank you.

2                THE COURT:  And I expect Mr. --

3     Mr. Karp, you'll address that, won't you?

4                MR. KARP:  I will, Your Honor.

5                THE COURT:  Okay.  That's what I'm --

6     and I have to know about that, because that's

7     something that I was concerned about from the very

8     start, and that's why I'm capless, to make sure that

9     there was a top --

10               MR. UTECHT:  Correct.

11               THE COURT:  -- number that they have to

12    insulate -- that they could insulate themselves with.

13               MR. UTECHT:  Correct.

14               THE COURT:  So that's -- you and I

15    share that concern.

16               MR. UTECHT:  And that's why I brought

17    forth this objection.

18               THE COURT:  Okay.

19               MR. UTECHT:  There are many other

20    objections that I can relate to, but I also understand

21    how the settlement works.

22               I brought this objection forward

23    because the language that we found in that section

24    does not support their being the security that gives

25    me enough comfort to say I feel like this is going to

Page 179

1    be there for me in 65 years or not.

2                   THE COURT:  Okay.  I appreciate that.

3    Thank you very much.

4                   MR. UTECHT:  Thank you for your time.

5                   THE COURT:  That's what I wanted to

6    know.

7                   MR. UTECHT:  Okay.

8                   THE COURT:  Okay.

9                   All right.  Mr. Erickson?

10   Mr. Erickson.  Is there a Mr. Erickson?  Okay.

11                  All right.  Ms. Carpenter?  Rebecca

12   Carpenter?

13                  I think one more -- Mr. Erickson?  Did

14   you speak with Mr. Erickson?

15                  MR. MOLO:  I personally did not.  I'll

16   go -- I'll look in the hall.

17                  THE COURT:  No, it's okay.  We'll do it

18   after this -- after Ms. Carpenter.

19                  MS. CARPENTER:  Hi.

20                  THE COURT:  Hello, Ms. Carpenter.

21                  MS. CARPENTER:  I'm sorry, I'm so

22   nervous.

23                  THE COURT:  Oh, I understand.

24                  MS. CARPENTER:  Thank you.

25                  THE COURT:  Just relax.  I am very

1    scary.

2        (Laughter)

3            MS. CARPENTER:  Thank you for taking

4    the time to listen to me.

5            My objection concerns primarily I guess the

6    lack of screening medical services, counseling, and

7    family support services for families who are living

8    with symptoms other than significant dementia.  I'm

9    one of those former kids.

10            THE COURT:  And you are -- are you --

11    and you are a child of --

12            MS. CARPENTER:  I am a child, although

13    I don't look like one, but yes.

14            THE COURT:  Are you a child of a former

15    player?

16            MS. CARPENTER:  Yeah, I'll tell you who

17    he is, Your Honor.

18            THE COURT:  Okay.

19            MS. CARPENTER:  My father was Lew

20    Carpenter, he played for ten years in the NFL as a

21    running back, he was a Packer, he played in three

22    world championships.  He was a coach for 30 years in

23    the NFL.  He also coached in NFL Europe.

24            His onset of his symptoms, I would say

25    he fell under the mood disorder category and other

1  symptoms, which were very different and significant.

2               I want to read, because I don't want to

3  miss my points and I'll try to go quickly.

4               I think that it's real important for

5  people to understand that there's a 20- to 30-year

6  period between the onset of initial symptoms and the

7  onset of full-blown dementia in men like my father.

8               Long (indiscernible - 2:37:52) dementia

9  diagnosis symptoms can derail both family life and

10  career.

11              Lew Carpenter was diagnosed his case

12  and there were 17 of the disease we're currently

13  calling CTE, and I'm here in part to put a face on

14  what it means to live with a parent who has a mood

15  disorder due to a brain injury.

16              I have a second interest in being here

17  and that has to do with my love of children and my

18  desperate desire to make sure that the children of

19  these men become partially the focus of this hearing.

20              I have a masters in teaching from the

21  University of Southern California, I have a particular

22  passion for working with children coming from high-

23  stress environments and particularly high poverty or

24  violence or children who are confronted with scarcity

25  (indiscernible - 2:38:30) material scarcity, but

1   scarcity of mom, scarcity of dad, situations where

2   parents are tremendously overburdened by the demands

3   of daily life.

4            There's a technical term for that, it's

5   called proximal abandonment.  Like Pauline Bosh (ph)

6   she talks about her books on living with people with

7   disease and other chronic disease.  And this can be

8   devastating for a child.

9            In the case of a traumatic brain injury

10  or CTE the proximal abandonment is due to the

11  devastating implications of behaviors relating to the

12  disease.  It's not just the loss of the father, it's

13  often loss of the mother too.

14           The wives are overwhelmed with the

15  demands of caring for their husband's symptoms, mom

16  isn't present, the children are often -- become the

17  caregiver for dad, and in the worse of the situations

18  the kids are in the cross fire of dad's erratic

19  behaviors.

20           I've spent much of the last two years

21  talking and meeting with people who my dad played with

22  and coached trying to understand really how

23  significant this disease was, is, and how pervasive it

24  is, when do people see the onset of symptoms, what are

25  they like?

 1              I didn't believe this whole drama that

 2   was surrounding it because I just -- I really learned

 3   to kind of find out for myself, you know, and I also

 4   interviewed a dozen neurologists, neurosurgeons,

 5   neuroscientists, (indiscernible - 2:30:51)

 6   neuropsychologists, neuropsychologists outside of the

 7   (indiscernible - 2:39:55) group because I really

 8   wanted to understand this.

 9              And, you know, I would say that

10   (indiscernible - 2:40:00) my question there a thousand

11   Lew Carpenters and I think that's a problem.

12              My father's symptoms would not be

13   covered under this current settlement.  He's dead now

14   but I really want to make sure that this is --

15              THE COURT:  How long ago did he pass

16   away?

17              MS. CARPENTER:  Four years almost

18   exactly.  Yeah.

19              The moms become exhausted, they're

20   stretching their breaking point trying to hold it

21   together.  Sometimes she's not just the caregiver for

22   the children, she's the primary breadwinner, she's

23   ashamed of what's happening at home, she's socially

24   isolated, she's afraid from the outbursts that are

25   taking place, everybody is walking on egg shells.  The

1  children usually blame themselves.  And no matter how

2  many people I talk to the stories are frighteningly

3  familiar.

4           You could do an overlay, you could do a

5  grid.  I think Elanore was right, when you start to

6  look for it you just -- you see it so starkly it's

7  like it's hard to believe you didn't see it so clearly

8  before.

9           And the final thing I want to say is,

10  you know, I think a lot about what is the job

11  (indiscernible - 2:41:00), what is good enough

12  parenting?

13          The job of a parent is to provide a

14  safe and stable environment for children to reach

15  their developmental milestones in a good enough way.

16  To provide safety, structure, three hots in a cot as

17  my dad used to say.  To provide adequate validation,

18  to help kids learn to set goals and provide them with

19  the tools to achieve them, assuming the kids are

20  willing to put in the work.  To teach kids how to be

21  moral and ethical human beings and to help them create

22  an internal map.  This is primary relationships and a

23  person's life will be fulfilling, safe, and

24  worthwhile.  All of this is compromised in a household

25  living with untreated brain injury and CTE.

1              My research has shown me there's much

2    we can do to help men and their families navigate this

3    disease through early intervention, ongoing cognitive

4    behavioral therapy, and drug therapies.  These

5    treatments are expensive and lifelong, but they can

6    help these men manage their mood swings, help them to

7    be more present in their lives and their work, and

8    increase their quality of life, including their most

9    intimate relationships.

10              From my perspective the criteria for

11   receiving services related to repetitive brain injury

12   in the case called CTE is not solely about a man's

13   ability to hold down a job.  My father was gainfully

14   employed by the NFL for 40 years.  I was raised in the

15   NFL, I have three sisters, there are only four girls,

16   everybody I grew up with, the guys called themselves

17   my brothers.  We were the daughters, they were the

18   sons.  This is everybody I know.

19              It's really important to make sure that

20   we protect the children.

21              THE COURT:  Thank you very much.  Okay.

22        Jim, would you go outside and just ask if

23   there's a John Erickson?  I don't know -- all right?

24   Or the CE can go out.  Thanks.  You go out and ask if

25   there's a John Erickson.  Just one second.  And do you

```
 1    need a moment to organize your thoughts for rebuttal?

 2                    MR. SEEGER:  No, we're -- I'm ready.

 3                    MR. KARP:  We're ready.

 4                    UNIDENTIFIED SPEAKER:  We're ready.

 5                    THE COURT:  Oh, okay.  One second,

 6    let's -- let's -- who's going to go first, have you

 7    decided?

 8                    Mr. Birenboim, you're going to go?

 9                    MR. BIRENBOIM:  Yes, Your Honor.

10                    THE COURT:  Okay.  Just one second.

11    Mr. Birenboim, just one second while -- 'til I make

12    sure that there's no one by that name outside.  I

13    don't want to eliminate someone because -- Marshal,

14    just make sure that -- if you don't mind.  Thanks.

15    Okay.  Thanks so much.

16                    Okay.  All right.  Mr. Birenboim?

17                    MR. BIRENBOIM:  May I proceed, Your

18    Honor?

19                    THE COURT:  Absolutely.

20                    MR. BIRENBOIM:  Good afternoon --

21                    THE COURT:  Just put the microphone

22    down a little bit if you don't mind.  Thanks.

23                    MR. BIRENBOIM:  This okay?

24                    THE COURT:  Yeah.  And I hear better

25    that way.  Yes.
```

Page 187

1              MR. BIRENBOIM:  Good afternoon, Bruce

2    Birenboim from Paul, Weiss for the NFL.

3              I'm going to spend a few minutes on

4    rebuttal addressing some, but not all, of the issues

5    that were raised by the various objectors, and in

6    particular I want to spend a few minutes on a few of

7    Mr. Molo's comments.

8              We heard a lot statements in Mr. Molo's

9    presentation, a lot of -- not a lot of citation to the

10   medical evidence and the science, and I think as we

11   discussed this morning, Your Honor, this is a science-

12   driven settlement.  And rather than the Court hearing

13   my views of Mr. Molo's views, I thought I would just

14   spend a few minutes on the science and why the science

15   supports the reasonableness of the settlement that has

16   been presented to the Court.

17             Mr. Molo basically raised and the other

18   objectors have raised three issues about CTE, that

19   it's not compensated at all, allegedly, that mood and

20   behavior disorders are not compensated, and that the

21   provision for compensation for death with CTE is not a

22   rational exception.  All of those I would submit are

23   very rational in the context of this litigation

24   settlement.

25             As Mr. Karp and Mr. Seeger discussed

1    this morning, this is a litigation settlement, so we

2    need to focus on the elements approving the claims in

3    this case and whether they were appropriately

4    compromised.

5              Causation is clearly a key element of

6    any claim in this case.

7              And the question then for the Court is

8    whether -- not whether the settlement is perfect or

9    whether every condition is compensated for, but

10   whether the proposed settlement is fair, reasonable,

11   and adequate given the strengths and weaknesses of the

12   claims.

13             And it's striking that none of the

14   objectors really evaluated the CTE claims in terms of

15   likelihood of success and difficulty of proving CTE.

16             But we have submitted affidavits from

17   Dr. Yaffey (ph) and Dr. Sneider (ph) which addressed

18   that issue, and they have both opined, they are very

19   experienced doctors and psychologists, have both

20   opined that based on the current state of knowledge,

21   the current state of scientific knowledge it would be

22   extremely difficult to prove that football causes CTE

23   or that CTE causes any particular symptoms.

24             The research in this area, it is

25   undisputed, is in its infancy.  The National Institute

1    of Health has said that, the Institute of Medicine has

2    said that.  There are essentially one or two studies

3    that have studied 200 brains of deceased players and

4    others, and that is really the entirety of the

5    research in this area.  It is new, it is far, far, far

6    behind where we are in Alzheimer and Parkinson's, and

7    all of that.

8              In the expert opinions to the effect of

9    the difficulty of proving causation with respect to

10   CTE really is unrebutted.  And the -- there have been,

11   Your Honor, no double blind studies, there have been

12   no perspective studies, there have been no cross-

13   sectoral studies, there have been no case control

14   studies.  All there have been have been a couple of

15   case studies.

16             The sciences is in it infancy, and this

17   is not a trial, Your Honor, where one side or the

18   other is required to prove that CTE is or isn't a

19   cause of this or that.  The question on the table is

20   whether this issue, the issue of causation and CTE,

21   would will hotly contested at trial.

22             There can be no dispute on this

23   scientific record that those -- that issue would be

24   hotly contested, and therefore the issue is simply

25   whether the line drawing was reasonable in the context

1   of the hot dispute there.

2              So what was the resolution in this

3   case?  The resolution is that CTE is not per se

4   covered, but the significant symptoms of CTE are

5   covered.

6              And in fact the objectors -- the

7   objectors' own doctors, Dr. Stern and Dr. McKee who

8   performed studies with Dr. Stern, they have found that

9   there are four -- they hypothesize that there are four

10  levels of CTE.  And Levels 3 and 4, which coincide

11  with the decline in neurocognitive behavior in

12  dementia, the McKee study found -- and this is in the

13  Yaffey affidavit at paragraph 83 -- that 89 percent of

14  the patients that were studies by Dr. Yaffey had

15  either Level 3 or Level 4.  And those levels would be

16  covered by this settlement.

17              So as a factual matter it's just not

18  the case that the principal symptoms of CTE are not

19  covered.  They are covered, but the symptoms that are

20  not covered are mood behavior and depression.  And it

21  is also undisputed that mood behavior and depression

22  are prevalent in the general population, there are

23  many, many, many, many other causes.

24              The difficulty of proving causation in

25  that case would be extremely difficult, and I would

1    just cite the Court Dr. Sneider's affidavit at

2    paragraph 45.  She talks about how for years it was

3    thought that depression was caused by Alzheimer.  It's

4    now proven that it's not caused by Alzheimer.  This is

5    why you can't assume that there's as causal link.

6                    So this settlement draws a line --

7    draws a line at the more significant aspects of CTE,

8    which are covered under the dementia categories, and

9    does not cover mood and behavioral problems.

10                   And lastly on this point, and it's a

11   point that's been ignored by all the objectors, the

12   assumption in the objectors' presentation is that

13   there are players who have a certain set of symptoms

14   today caused by CTE that might not be covered, period,

15   as if time doesn't go on and if as those players who

16   may not be covered for mood issues today as if they

17   will not be covered next week or next month or next

18   year if, as is often the case, these conditions

19   progress.

20                   So all the players who have CTE may

21   progress into Levels 3 and 4 and be covered by this

22   settlement.

23                   The question for the Court in the last

24   analysis is, is the line that was drawn here fair and

25   reasonable given the science?  And we think given the

1    causation issues and given the infancy of the research

2    in this area the line was clearly a fair line.

3                   Now let me just address for one second

4    the death with CTE point.

5                   The settlement covers death with CTE

6    prepreliminary approval precisely because obviously by

7    definition players who have deceased prior to

8    preliminary approval cannot get a qualifying diagnosis

9    and be covered.

10                   So the coverage for death with CTE

11    prepreliminary approval was an expansion of the

12    settlement so those players who had CTE and were

13    deceased were covered.  So it expanded coverage for

14    those people and it also demonstrates that their

15    interests were in fact being looked after.

16                   I mean if it were in fact the case, as

17    some of the objectors have alleged, that there was no

18    one at the table looking after the CTE -- players who

19    had CTE then you wouldn't have that provision.  That

20    provision there would you describe to protect pre-

21    deceased CTE death with CTE before preliminary

22    approval.

23                   Let me address for a second the science

24    issue.

25                   Mr. Molo and other objectors have made

1    the point that the science of CTE is changing and it

2    may be that in five or ten years we will be able to

3    diagnose CTE pre-death.  Now you can only diagnose it

4    post-death.  That actually doesn't change anything

5    about the settlement, Your Honor, it doesn't affect

6    the settlement, because as the Court knows the purpose

7    of the settlement is to compensate for actual

8    manifested cognitive impairment.  If we could -- if we

9    could determine today that a certain protein

10   associated with CTE was in the brain but there were no

11   cognitive impairments there would be no compensation.

12   That's the entire theory of the case.  It's to

13   compensate players who have cognitive impairments.

14              So if a test were developed tomorrow

15   showing CTE that would not change the outcome

16   whatsoever.  And in this respect Dr. Sneider in

17   paragraph 44 of her affidavit notes that a third of

18   older persons post-death, the pathology shows that

19   they have full Alzheimer in their brains with no pre-

20   death symptoms whatsoever.

21              The purpose of the settlement is not to

22   compensate protein in the brain or not to compensate a

23   particular structure, it's to compensate cognitive

24   impairment.

25              And just as a side note there's nothing

1   in Amchem, Your Honor, that requires that an agreement

2   change over time.  The issue in Amchem was whether the

3   interests of the futures, the people in the class who

4   had not yet developed any symptoms, were protected,

5   and in this case we have a subclass that protects

6   those interests.

7                    I have no further comments, Your Honor.

8   I think Mr. Karp has a few comments.

9                    MR. SEEGER:  Thank you, Your Honor.  I

10  just wanted to, you know; in some respects maybe add

11  on to what was just caught into.  You know, Mr. Molo

12  very confidently stood up here and said to Your Honor,

13  we know that suicidality is related to CTE.  And he

14  speaks about CTE like he has confirmation.

15                   So let's just play a little bit of a

16  game for a second, and I know this isn't the game.

17  But let's imagine that we were at a trial, because

18  Mr. Molo and I know he doesn't -- he's never handled a

19  PI case, a personal injury case and has never tried

20  one.  But I just want him to understand what he would

21  be confronted with when puts his own experts on the

22  stand.  He has two experts he continues to talk about,

23  Dr. Stern and Dr. Gandy.

24                   And this is what Dr. Stern said.

25  Dr. Stern is an author.  He's the lead author on this

1  study.  He says, "There is no epidemiological cross-

2  sectional prospective studies of CTE that currently

3  exist."  That was Dr. Stern's opinion in 2013.  I

4  don't know if that's in his affidavit.  But I can go

5  back and check.

6              Dr. Gandy acknowledges however there

7  have no prospective studies in clinical and

8  neuropsychological characterization of CTE is yet to

9  be properly developed.

10             So, Your Honor, in the context of a

11  Daubert hearing this is some of the things, the

12  writings of the experts that Mr. Molo has put forward,

13  the things that you'd be asked to decide whether a

14  jury could hear that CTE is a disease and causes

15  suicidality and these other things.

16             THE COURT:  You're saying to me -- am I

17  understanding to say that if the plaintiffs were to

18  try their case, they would be facing a Daubert Hearing

19  where you're challenging whether or not I'd even allow

20  CTE to be in?

21             MR. SEEGER:  I invited him to -- I was

22  prepared to try that case in front of Your Honor.

23  It's Mr. Molo who comes in here leading Objectors and

24  convincing them and others that we have failed to

25  compensate or do something in the settlement.

1            We failed to compensate CTE, which Mr.

2    Birenboim has just done a great job explaining why

3    he's wrong on that.  But I think he needs to

4    understand that his own experts -- that Mr. Molo did

5    not point these sections out.  I'm pointing them out

6    because this is the published literature that his own

7    experts will put their names on.  This isn't in their

8    affidavits necessarily, but this is what they say in

9    their published literature that goes out to the

10   medical community.

11           Dr. Gandy, "We have little idea,

12   however of the risk of developing CTE following

13   carotid brain injury.  We have little idea of the risk

14   of developing CTE" -- which their full objection --

15   "following a traumatic brain injury, a concussion, for

16   example."

17           Dr. Stern, 2014, "There are no

18   objective validated in vivo by in large with CTE.

19   Another way of saying we can't determine whether it's

20   in living people.

21           And finally and maybe most importantly,

22   Dr. Stern in 2011 agrees with this settlement although

23   he doesn't say it in his affidavit.  Maybe Mr. Molo

24   should have paid him.

25           It says, "the differential diagnosis of

1    CTE often include that's Alzheimer's and frontal

2    temporal dementia, although a history of remote head

3    trauma may be suggested of CTE, head trauma" -- this

4    is very important, Judge -- "has been implicated as a

5    risk factor for Alzheimer's, Parkinson's disease, ALS,

6    and other neurodegenerative diseases."  That's what we

7    compensated in settlement, Your Honor.

8              I just wanted to spend a moment if I

9    could -- that I was going onto the notices

10   (indiscernible).

11             UNIDENTIFIED SPEAKER:  Sure.

12             MR. SEEGER:  Well, but, just one quick,

13   I mean just the one because I think this may help Mr.

14   Lubel who didn't read the language on the slide that

15   said that those numbers were averages, those payouts.

16             We also in Mr. Vasquez's affidavit for

17   this case, he talks about the reason for the

18   differences that are in the grid with the lower

19   payments after a certain age.  And just by way of

20   example, and I'm not going to spend time on this,

21   Judge, because everybody can go and read the

22   affidavits.

23             After 75 years a person is 302 times

24   more likely to develop dementia after that age.

25   That's a much higher risk factor than anybody has ever

1   attributed to concussions or anything else.

2              Finally, just a couple points on the

3   notice because Mr. Molo wanted to use -- and this has

4   nothing to do with Mr. Eric Williams who I respect and

5   I respected every word he said.  But Mr. Molo wanted

6   to use Mr. Williams's objection as a reason for

7   showing why the notice wasn't good.  The only problem

8   Mr. Molo has is that we received Mr. Williams's

9   objection on July 3rd, 2014, two months before the

10  notice went out.  So that's a little bit of a problem.

11             And then with regard to the notice,

12  just a couple of last points.  Again, this -- there's

13  nothing that has been more advertised in the press

14  everywhere than the notice in this case.

15             Mr. Molo was critical of the summary

16  notice.  This is a summary notice.  Mr. Molo is a

17  lawyer.  He understands what this means.  He

18  understands that at the very bottom it tells everybody

19  to go look at the website where to register for

20  benefits and what number to call if you have

21  questions.  It also indicates that there's a

22  settlement agreement.  People can get the settlement

23  agreement.

24             But then he goes on to criticize the

25  long form notice and he says that we only mention the

1   fact that in the long form notice that there was death

2   with CTE prior to July of 2014.

3              Well, the problem that he has there

4   besides the legal issue which I'll go into is the

5   summary notice makes it very clear under the section

6   entitled "What are the benefits of the settlement?"

7   That's the section.  Right under there it says

8   monetary awards for diagnosis of death with CTE prior

9   to July 7, 2014.  I think if you're reading the

10  notice, the section if you want to know what your

11  benefits are, you're probably going to go to the

12  section that says, what are the benefits of the

13  settlement?  The notice does that.  And then, finally

14  the last legal --

15             THE COURT:  Say that again.  What are

16  -- refresh my memory on that.

17             MR. SEEGER:  There is Section 5 of the

18  long form notice.  It is entitled, "What are the

19  benefits of the settlement?"

20             THE COURT:  Okay.  Read it slow.

21             MR. SEEGER:  Section 5, What are the

22  benefits of the settlement?  And below that in the

23  second bullet point, the very first sentence,

24  "Monetary awards for diagnosis of death with CTE prior

25  to July 7th, 2014."   It's right there in the notice.

Page 200

1    And there is a legal presumption.  And it's in re:
2    Domestic Air Antitrust litigation that there's a
3    presumption that the notices are read in their
4    entirety, Your Honor.
5                    That's all I have at this point unless
6    you have any questions of me.
7                    THE COURT:  No.  No, I'm -- I frankly
8    read we have an MDL -- an MDL website and I -- before
9    I helped draft this notice, because I thought that was
10   my notice too.
11                   MR. SEEGER:  I know that.
12                   THE COURT:  I read them and I thought
13   that this one was very specific.  I mean if anyone
14   wants to review them, they ought to review all the
15   others.
16                   MR. SEEGER:  Yeah.  It would be helpful
17   to actually read all the sections.  Thank you.
18                   THE COURT:  Yeah.  Okay.  Thank you.
19   You have anything further, Mr. Karp?
20                   MR.  KARP:  I know -- I know you had a
21   question for me so I'm clearly going to stand up and
22   answer that question.
23                   THE COURT:  Okay.
24                   MR. KARP:  On the -- just on the notice
25   point, just because there was a lot highfalutin

Page 201

1    rhetoric flowing from one of the objectors who

2    described the long form notice as slick.

3                    THE COURT:  Wow.  I've never been so

4    flattered.

5                    MR. KARP:  Yeah.  All I would say --

6                    THE COURT:  Because I wrote a lot of

7    it.

8                    MR. KARP:  If slick means accurate and

9    comprehensive, I think thee long form notice was very

10   slick indeed.  You had a couple of questions regarding

11   how the security --

12                   THE COURT:  Oh, yeah.

13                   MR. KARP:  -- work and I know

14   Mr. Utecht spent some time expressing concern would

15   the money --

16                   THE COURT:  Which I appreciated.

17                   MR. KARP:  -- be there, which I

18   appreciated as well.  Maybe it makes sense for me to

19   spend two minutes just to go through the structure of

20   how the security is set up in the settlement.  And in

21   doing so we were aided significantly by Mr. Golkin,

22   the court appointed special master, who found it

23   within his province and Your Honor directed to make

24   sure the economics and financial aspects of this

25   settlement work.  And not that they work for five

1    years or ten years, or 20 years, but they be

2    structured so as to work for the entire 65-year

3    duration of the settlement.

4                    And we spent hours and hours and weeks

5    and in fact probably months with Mr. Golkin going

6    through different formulations and different

7    structures until we and Mr. Seeger had satisfied him

8    that the economic structure of this settlement worked,

9    was sensible, and would protect claimants and class

10   members like Mr. Utecht.

11                   The way this structure works is that

12   during the first ten years of the settlement, the NFL

13   is obligated to pay claims as they are approved by the

14   settlement claims administrator.  There has been

15   widespread public criticism of the settlement by the

16   Objectors and certain folks in the media that the

17   settlement is too inexpensive because the NFL

18   allegedly is awash in money, whether it's from

19   broadcast deals, sponsorship arrangements, or other

20   forms of revenue.

21                   The criticism is the NFL has so much

22   money at its disposal; it should be paying a lot more

23   in the settlement.   That position advocated by some

24   of the Objectors and the media obviously is

25   inconsistent with the concern that the NFL will not

1   have the financial wherewithal during years one

2   through ten to pay claims as they come due.  So that's

3   point number one.

4                  The way that we structured the

5   settlement with Mr. Golkin's assistance is that the

6   NFL is obligated after year ten to set up a statutory

7   trust which is intended to have sufficient funds to

8   pay all remaining expected claim for the remaining 55-

9   year life of the settlement.  And that statutory trust

10  in theory will millions and millions and millions of

11  dollars.  We will have ten-year track record of having

12  seen what claims have been approved by the claims

13  administrator up to that point and we will be able to

14  make reasoned assumptions going forward.

15                 Now, Your Honor adverted to a belt and

16  suspender aspect of the settlement from years 10 to

17  year 65 which is absolutely accurate.  Entirely

18  independent of the statutory trust, the NFL at all

19  times --

20                 THE COURT:  Uh-huh.

21                 MR. KARP:  -- from the moment this

22  settlement becomes effective until 65 years later; the

23  NFL has an independent obligation under the settlement

24  agreement to pay every single claim that is approved

25  by the claims administrator on a timely basis.  And

1    that is an obligation that has tremendous teeth behind

2    it.

3                    If the NFL fails to pay a claim, or

4    defaults on a claim, for whatever reason, Your Honor

5    or whoever succeeds Your Honor in superintending this

6    settlement will have the ability to nullify the class-

7    wide release that flows to the NFL.  So every

8    claimant, every class member who has not received

9    payment will then be able to return to the tort system

10   and continue the litigation against the league.

11                   So the NFL has funds now, will have

12   funds in years 10 through 65 and in the event the NFL

13   ever were to default, the punishment for such a

14   default is draconian, and I hope that satisfies Your

15   Honor and I certainly hope it satisfies Mr. Utecht and

16   those in a position like Mr. Utecht.

17                   The only other point I'd like to make

18   -- there was a lot of discussion by the Objectors and

19   the --

20                   THE COURT:  That was the solution in

21   the Fen-Fen litigation, I believe.

22                   MR. KARP:  It was, Your Honor.  And in

23   factually in other mass tort class action settlements

24   as well.  We've put a lot of discussion by the

25   Objectors and by certain of the players or players'

1   representatives that they would like the settlement to

2   be more generous in this regard.

3              They'd like the claims covered whether

4   physical or psychological to be broader.  That, as

5   noted earlier, is true in every settlement.  We

6   respect the objections.  We listened to the objections

7   with great care.  But there is compromise.  There is

8   laundering.  This is the settlement of a litigated --

9   a case that would be litigated and we have very strong

10  defenses as adverted to.

11             I'd like to close if I may just by

12  referring very briefly to a couple of statements that

13  Ms. Hawkins and Ms. Perfetto made just a couple of

14  moments ago.  Ms. Hawkins who spoke so eloquently on

15  behalf of her husband, Ross, said, I just wish that

16  testing was in place years earlier.  I wish it were

17  possible to have diagnosed my husband years earlier

18  because there are things that could have been done

19  medically to help assuage some of the conditions and

20  difficulties that he faced and that the family faced

21  as a result.

22             One of the aspects of this settlement

23  that the NFL is very proud of is the BAP program, the

24  baseline neurocognitive testing program.  The whole

25  purpose behind that program, Your Honor, is to ensure

1    that the 22,000-plus retired NFL players will receive

2    the moment this settlement becomes effective,

3    neurocognitive testing.  That they will understand

4    their neurocognitive impairment level if, in fact,

5    they're impaired.

6              A baseline will be set so that if they

7    are tested in the future, trajectories and trends will

8    be able to be noted.  And to the extent they have

9    early neurocognitive impairment; under the program

10   they will receive treatment.  They will receive

11   therapy.  They will receive medicine.  And I'd like to

12   believe that Mr. Hawkins would have benefited from

13   such a program being in place that Ms. Perfetto's late

14   husband would have benefited from such a program being

15   put in place.  It is an important aspect of this

16   settlement.

17             And the only other point I'd like to

18   add is Mr. Hawkins is receiving disability benefits

19   under the EDA disability plan provided by the NFL.

20             One of the issues in our settlement

21   negotiations with Mr. Seeger and the Plaintiffs'

22   Steering Committee was do we allow players to continue

23   to receive those disability and medical benefits or do

24   we somehow structure the settlement in a way that

25   provides an offset or a reduction in any monetary

Page 207

1    compensation awards?

2                 And this was another example, Your

3    Honor, in which the League very much wanted to do the

4    right thing or try to do the right thing on behalf of

5    its retired players.  The League agreed not to seek

6    any offset or reduction, but to allow the players who

7    are receiving monies and other benefits under the

8    League's current disability plans also to receive

9    benefits under this settlement under the monetary

10   award compensation program.

11                The League really is proud of this

12   settlement.  We appreciate the patience that Your

13   Honor has displayed not just today, but over the past

14   several years in putting up with the parties.  And

15   thank you very much for your attention.

16                THE COURT:  Thank you.  Okay.  All

17   right.

18                MR. SEEGER:  Just one very -- one last

19   point.  It will be made in two minutes, Judge, if my

20   partner, Mr. Buchanan, can just address the point that

21   Mr. Wiegand made about the baseline testing.  It will

22   two minutes.

23                THE COURT:  That's what -- that's what

24   I wrote down.

25                MR. SEEGER:  It's a two-minute point.

1              THE COURT:  Okay.

2              MR. BUCHANAN:  Thank you, Your Honor.

3              THE COURT:  Okay.  Let me hear from

4    you.

5              MR. BUCHANAN:  Thank you, Your Honor.

6              THE COURT:  One second.  We have some

7    -- is that computer -- oh, you're going to do the old

8    fashioned?

9              MR. BUCHANAN:  Old fashioned.  Old

10   school.

11             THE COURT:  Oh. Okay.  What is it, we

12   have to -- Bill, make sure you put on the

13   (indiscernible).  Yeah.  Okay.

14             MR. BUCHANAN:  Is there a mic here as

15   well?

16             UNIDENTIFIED SPEAKER:  Yes.

17             MR. BUCHANAN:  Thank you.  Can you help

18   me focus that?

19             THE COURT:  No.  Where's?  Okay.

20             MR. BUCHANAN:  Your Honor, there was an

21   article that was shown and we discussed earlier today.

22   It was the work of Dr. McGee and Stern and others

23   concerning CTE.  And you have the comments obviously

24   of Mr. Seeger and Mr. Birenboim as well as the

25   affidavits.

1               What I wanted to address in the context

2    of the BAP is there's an argument that the BAP,

3    obviously, isn't evaluating some of the core symptoms

4    that have been reported in connection with CTE.

5               I did want to highlight something

6    that's interesting in this article, and I'm sorry for

7    the page list.  We'll get to the relevant page.  It's

8    right here and this is a chart where -- actually, can

9    you zoom out, please, PJ?  Thank you.  Or is that me

10   doing it?

11              PJ: No that's Mr. Jones doing that for

12   you.

13              MR. BUCHANAN:  Oh, thank you, Mr.

14   Jones.  Could you actually pull out a little bit?

15   Okay.  There we go.  It's going to be hard to read,

16   but the highlighted columns and it -- on the left;

17   Stage 1 CTE, Stage 2 CTE, Stage 3 CTE, Stage 4.

18              What I wanted to highlight are these

19   points that I've already highlighted before I got up

20   here, Your Honor; Attention, Executive Function,

21   Memory, Language, and Visual Spatial.  Those are

22   cognitive domains that are evaluated through the BAP

23   and actually inform whether somebody could be a Level

24   1, a Level 1 and a half, or a Level 2 in terms of the

25   neurocognitive impairments.

1              It was interesting to follow the -- you

2    can see, you know, by the plus signs in the columns --

3              THE COURT:  Where are you getting this

4    from?

5              MR. BUCHANAN:  Yeah, this is the 2013

6    publication by Dr. McKee and I think Dr. Stern is also

7    coauthor.

8              THE COURT:  Oh, that's that -- that was

9    the -- those are Ms. Molo's.  Okay.  That's it.

10             MR. BUCHANAN:  Yeah, I think it was

11   within his deck and I think he drew data from this

12   where he talked about the staging of CTE.

13             THE COURT:  Yeah.

14             MR. BUCHANAN:  There's another column

15   off to the right.  And, Mr. Jones, I don't know if you

16   can zoom in on the dementia column.  And what you see

17   is actually -- that's going to be a little hard.

18             So up top it says dementia and as you

19   scroll down you see with great frequency, obviously,

20   it greater and later stages of CTE Stage that's been

21   reported is Stage 3 and Stage 4, dementia as being a

22   very common and frequent -- frankly, I think there was

23   only patient perhaps that didn't have a diagnosis of

24   Dementia Phase 3 and 4.

25             THE COURT:  They actually said that.

 1    They actually said -- I noticed that.  When I read

 2    those articles that they did actually mention that in

 3    it that except in very rare circumstances everybody

 4    had history.  Remember, this was all history as I

 5    understood it.

 6                   MR. BUCHANAN:  It is.  These are case

 7    series, Your Honor.  They're based on really, I think,

 8    a sample that would be self-selected or perhaps even

 9    argued by the defense as biased.  But nonetheless, the

10    symptoms have been documented in the research.

11                   But what's interesting is the BAP

12    actually is picking up the cognitive domains that have

13    been specifically assessed.

14                   And you saw even in Level 1 --

15    actually, Mr. Jones, could I show it again real quick?

16    Because it's even more common -- well, it's going to

17    be harder for me find the page.  It's even more common

18    at Stage 1 and Stage 2 CTE to see reports of

19    complaints either in a 1-plus sign or a 2-plus sign in

20    those five cognitive domains and some of the other

21    things that have been reported.

22                   So you see, you know, persistent

23    cognitive impairments that have been associated in

24    these familial reports in the literature with what's

25    subsequently diagnosed as CTE.

1                Getting specifically to the BAP design, the

2     B-A-P design, we have a lot of acronyms in the

3     courtroom today.  But the design of the BAP, this

4     wasn't designed by lawyers.

5                It was designed, frankly, by scientists who

6     we consulted with as part of our negotiations and

7     trying to get baseline assessments of the players.

8     And we worked with people who designed batteries and

9     do this.  This was not unscientific and I heard that

10    argument today, that this was really just some

11    scattershot approach to testing former players.

12                    In fact, 16 of the 22 tests that are in

13    the BAP -- there's 22 tests in the battery we run

14    designed to test those various domains.  And then

15    there's also some supplemental ones that are for

16    screening and for the benefit of players and their

17    families.

18                    But 16 of the 22 tests are relied upon,

19    frankly, in the literature cited by the Objectors and

20    by Dr. Stern and his publication in looking at

21    cognitive impairments in MCI, mild cognitive impaired

22    people, and dementia.  The pool is 16.

23                    And then the question of the quarter

24    maybe others might be well why, you know, why did you

25    add the other six?   Why did you go beyond that?

1          One of the challenges we had as

2  counsel, frankly, in the scientists in trying to

3  design something that could be applied throughout the

4  country for a player base that may be diverse both by

5  age, racially, demographics, education, et cetera is

6  having good normative data.

7          In other words, a player comes in and

8  takes a test, but what do we evaluate that score

9  against?  Do we have population sample that we can

10  compare that to, to evaluate whether the player has

11  truly declined or whether maybe they're just -- have

12  they truly declined where they should have been

13  relative to their pre-morbid or Pre-NFL function?

14          So you want to consider people in that

15  context.  And what the experts did was identify tests

16  that had good normative data samplings so that we

17  could make correct comparisons and appropriate

18  comparisons.

19          And this was done scientifically.  It

20  was done on the basis of empirical data.  It was done

21  and supported by the literature, and it was done,

22  obviously, with one of our experts, Dr. Kelp, who's

23  designed test batteries for the military.  I think he

24  designed a battery that screened 50,000-plus military

25  personnel pre-battle, obviously, in connection with

Page 214

1    them being enlisted.

2              Dr. Grant Iverson whose work has been

3    published in reference text books that's cited

4    throughout the affidavits.  I'd encourage Your Honor

5    actually to look if you have a question about the

6    scientific backing behind the BAP.

7              You can look at the declarations that

8    were submitted of Dr. Kelp.  You can also look at the

9    literature cited therein.  And you can also look at

10   Dr. Hamilton, a doctor who was not involved in the

11   creation of the BAP, who evaluated it though from the

12   perspective of a practicing neuropsychologist who also

13   says they are sound scientific methods, empirical

14   principles that underline the BAP.  Thank you.

15             THE COURT:  Thank you, very much.

16   Okay.  A couple of -- let me see three lawyers at

17   sidebar, please.  Not three, it can be six, seven, I

18   don't care whatever it is.

19        (Sidebar under seal)

20        (Conclusion of requested excerpt at 3:22 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E
2

3

          I do hereby certify that I am a Court
4    approved transcriber and the foregoing
     testimony is a true and correct transcript
5    from the official electronic sound recording
     of the proceedings in teh above entitled
6    matter.
7

8

9

10

11

12   Dated:        _____
13

14          _____
            Dawn South
15

          Approved Transcriber
16

17

18

19

20

21

22

23

24

25

**A**

**AAERT** 215:8
**abandonment**
182:5,10
**ability** 9:5 37:11
38:11 152:12
185:13 204:6
**able** 8:18 12:23
27:23 31:18 38:11
40:19 46:19,23
76:12 143:8 171:2
171:3 176:25
193:2 203:13
204:9 206:8
**abled** 68:25
**absence** 54:3
**absent** 54:3,10 56:3
**absentee** 137:8
**absolute** 56:1 86:7
**absolutely** 69:9
76:9 173:7 186:19
203:17
**absurdly** 111:25
**abuse** 41:19 65:8
78:8 104:24 148:3
**Academy** 152:22
**accent** 118:24,25
**accept** 32:16 57:3,3
**accepted** 77:4
116:2,15,17 117:6
117:11
**accommodation**
167:23
**accompanying**
165:13
**accomplished**
124:7 126:8
**account** 66:1 77:16
149:5
**accounts** 43:20
**accuracy** 96:6
**accurate** 77:4
102:20 166:19
201:8 203:17
215:4
**accurately** 164:25

**accused** 172:9
173:18
**achieve** 8:19 9:21
66:8 184:19
**achieved** 8:16,18
10:5 38:20
**acidosis** 150:13
**acknowledge** 151:4
**acknowledged**
66:10
**acknowledges**
195:6
**acronyms** 212:2
**acting** 113:17
**action** 27:21 29:21
35:21 36:21 96:7
105:2 120:23
121:2,14,20
156:17 204:23
**actions** 1:6 29:19
**active** 91:1 144:17
145:13,20
**actual** 19:6 83:22
113:19 147:1
193:7
**actuaries** 108:18
**acute** 165:7
**add** 25:14 62:11
63:12 73:16
109:13 194:10
206:18 212:25
**added** 149:13
**addition** 20:3 21:8
49:24 68:23 77:6
78:16 79:4 86:14
89:5
**additional** 14:8
15:16,20 16:16
149:11 168:7
177:24
**Additionally** 86:17
**address** 42:11
68:17,18 71:2,3,4
71:6,12,16,21,23
84:8 91:22,24
92:5 103:15 106:2
109:12 115:24

135:7 136:2
170:16 178:3
192:3,23 207:20
209:1
**addressed** 87:9
126:11 160:10
188:17
**addressing** 18:17
61:12 85:22 187:4
**adequacy** 24:15,17
27:12,15 28:11,18
57:13 60:13 87:8
87:10,13,14 92:20
**adequate** 10:22
29:4 55:23 56:1,6
56:13 57:5 60:7
66:15 69:12
101:15 102:5,17
104:16 105:6,10
136:17 137:7
153:4 184:17
188:11
**adequately** 87:12
**adjudicate** 4:10
**adjust** 101:19
**adjusted** 27:5 28:5
29:11
**adjustment** 39:2
**adjustments** 15:2,6
102:3
**administration** 4:6
169:25
**administrative** 4:4
64:16
**administrator**
12:21 59:25 64:25
107:10 148:1
202:14 203:13,25
**adopting** 128:19
**advance** 15:18
**advanced** 76:25
**advances** 125:24
**adversaries** 121:2
**adverted** 203:15
205:10
**advertised** 198:13
**advocacy** 165:4

**advocate** 123:3
**advocated** 202:23
**advocating** 123:5
**affairs** 30:21
**affect** 16:13 193:5
**affiants** 85:13
98:17
**affidavit** 24:23
28:21 33:23 77:3
79:21 89:22 90:5
117:15 190:13
191:1 193:17
195:4 196:23
197:16
**affidavits** 31:4
73:10,12,17
188:16 196:8
197:22 208:25
214:4
**affirmative** 23:9
105:2
**affirmatively** 70:19
**affliction** 151:1
**afforded** 29:14,15
**afraid** 177:8,9,9,11
183:24
**afternoon** 61:11
99:21 115:18,19
125:9,10 150:4,5
153:17,19 154:20
158:11 159:1
163:24 164:1
174:14 186:20
187:1
**age** 13:1 15:4 43:13
43:23,25 44:2
60:2 64:1 135:13
135:19 136:16
139:8,11 140:3
142:1,2 143:1
150:18 151:11,16
169:13,14 170:5
171:7 173:8
197:19,24 213:5
**agent** 97:1
**agents** 169:25
**ages** 64:9 142:17,18

**aggregate** 38:22
**aggression** 78:6
79:6 80:25
**aggressive** 78:14
**aging** 44:4
**ago** 4:5 8:17 52:15
73:10 83:4,5
91:16 134:9
160:13 166:12
169:19 174:4
183:15 205:14
**agree** 13:23 17:5
40:19,23 69:10
100:17,19,19,25
101:20 126:16
155:10 161:6
**agreed** 10:17 18:11
50:16 51:16 52:25
53:21 55:3 65:4
151:9 207:5
**agreement** 3:22 4:9
16:20 17:8 18:1,6
60:7 67:3 73:9
74:10,13 75:3
91:22 92:9 100:7
100:21,22 101:9
102:6 112:6 126:7
126:8,11,12,17,18
135:8 147:15
149:3 154:1,21,24
160:11 177:23
194:1 198:22,23
203:24
**agreements** 29:18
36:7 52:20
**agrees** 64:8 111:13
196:22
**ahead** 115:11
**aided** 201:21
**Air** 200:2
**akin** 159:23
**Alamo** 135:2
**alcohol** 30:18
**Alex** 121:16
**Alicia** 122:2
**aligned** 29:3
**alignment** 87:14,17

**alive** 76:25
**Allan** 106:9
**allegation** 64:14
81:13,20 82:12
**allegations** 27:10
69:20 70:16 136:5
136:19,23
**allege** 10:10 23:13
81:7 87:21,22,24
87:25 88:2,9
**alleged** 41:22 64:12
69:23 85:25
192:17
**allegedly** 62:3,16
187:19 202:18
**alleging** 69:23
**allocated** 156:6
168:23
**allocution** 122:18
**allow** 16:17 112:11
113:16 126:6,21
128:21 166:1
195:19 206:22
207:6
**allowed** 107:18
**allowing** 51:4
66:21 104:19
125:11 159:13
170:14
**allows** 34:12 70:4
107:19 168:23
**ALS** 5:9 8:24 10:11
14:14 23:7 24:1
41:2 75:22 76:1
76:24 78:22 83:18
93:20 94:24 97:10
139:13 143:22
150:9,13,18 151:4
151:8 152:14
153:4 197:5
**altered** 141:8
**alternative** 104:6
159:15
**alternatives** 56:14
**alumni** 169:16
**Alzheimer** 8:25
10:11 14:14 15:18

23:7 41:2 75:6,21
76:1,17,18,24
78:22 83:18 93:21
94:24 97:9 167:6
167:21 168:3
189:6 191:3,4
193:19
**Alzheimer's** 140:25
141:2 142:4,10,12
142:16 197:1,5
**amazing** 20:11
**Amchem** 154:8
194:1,2
**amended** 130:22
**American** 152:22
**amount** 12:13
17:12 42:17 64:11
89:11 131:22,24
143:23 160:15
161:9 167:21
172:19 173:7
**amounts** 156:13
**analysis** 56:15 72:1
81:19 147:2,4,17
149:16 191:24
**analyze** 76:13
**Anastasia** 48:4
**Anchem** 24:11 29:7
77:14,14 136:1
**Andrew** 146:10,16
149:9
**and/or** 163:12
**anger** 10:12 31:1
**Anita** 1:8 3:4
**announced** 82:8
**announcements**
169:3
**answer** 114:16
147:13 200:22
**answers** 8:9,9
**antidepression**
42:18
**Antitrust** 200:2
**anti-fraud** 152:18
153:5
**Antonio** 135:2
**anybody** 16:3

38:21 39:3 45:11
197:25
**anymore** 157:15
**apart** 36:5 104:1
**apathy** 168:2,3
**apologizing** 84:8
**apparently** 143:10
**appeal** 37:9 110:23
112:14,15,18
113:11 114:15
**appeals** 113:8,9,12
**appear** 137:8
139:12
**appearance** 129:19
**APPEARANCES**
1:10
**appears** 81:6
**appellant** 113:16
**applicable** 61:4
**application** 112:7
**applied** 135:18
213:3
**applies** 73:8
**apply** 146:4
**appoint** 7:8
**appointed** 7:14
22:1 59:25 64:25
201:22
**appointing** 7:17
**appreciate** 4:12
60:10 65:9,14,18
73:20 135:4
153:14 158:1
161:17,20 170:15
179:2 207:12
**appreciated** 201:16
201:18
**approach** 212:11
**appropriate** 6:2
56:14 60:3 63:9
64:2 72:7 169:1
173:3,23 213:17
**appropriately**
188:3
**approval** 7:19
10:19 19:22 28:25
29:12 32:20 52:3

53:18 66:16 72:7
105:4 120:25
121:8 127:3 192:6
192:8,11,22
**approve** 3:18
101:14,24 121:2
121:24 124:21
140:8,8
**approved** 39:8,8
110:10,22 111:15
135:9 154:1
202:13 203:12,24
**approving** 188:2
**apropos** 120:21
**arbitrarily** 135:8
**arbitrary** 116:1
121:23 124:15,22
136:9,20
**area** 111:18 188:24
189:5 192:2
**areas** 96:3 116:9,12
118:18 169:10
**argue** 35:2 97:25
**argued** 211:9
**argues** 32:20
**argument** 2:2
82:25 84:8,21
86:7 97:22 103:20
132:11 138:21
139:17 153:6
156:5 209:2
212:10
**arguments** 125:12
**arises** 23:13 24:3
36:5
**arising** 73:3,5
**arms** 9:11 28:22
63:10 65:25
**Arnold** 6:16 24:25
25:16 39:12
**aroma** 61:9
**arrangements**
73:22,24 202:19
**arrest** 150:12
**art** 7:21
**article** 142:20
208:21 209:6

**articles** 211:2
**articulate** 164:25
**asbestos** 159:25
**asbestosis** 160:1
**ashamed** 183:23
**aside** 36:23 37:1
51:15 55:3
**asked** 7:7,8 20:19
37:6 65:23 80:14
134:3,5 135:6
173:5 195:13
**asking** 53:17 80:2
173:20
**aspect** 16:7 17:12
19:21,24 154:19
203:16 206:15
**aspects** 19:25 191:7
201:24 205:22
**asserted** 29:8 52:7
52:18
**asserting** 35:24
**assess** 29:22
**assessed** 211:13
**assessment** 8:6
12:9,12,16,24
31:16 59:16 91:17
106:25 108:5,9
109:2,11,17,18
110:3 114:2,4
116:1 166:18
168:9,10,13
**assessments** 212:7
**assist** 7:21
**assistance** 5:25
203:5
**associate** 133:3
**associated** 7:23
34:3 40:20 41:2
41:11 42:23 43:2
49:8 59:7 62:4,16
193:10 211:23
**assuage** 205:19
**assume** 88:20,21
162:16 191:5
**assumed** 165:19
166:12
**assuming** 103:19

140:9,18 141:2
  184:19
**assumption** 34:20
  53:14 160:14,16
  191:12
**assumptions**
  108:12 131:12
  162:10 203:14
**assure** 134:22
**astonishing** 159:21
  159:22,23 160:3
**asymmetrical**
  112:14
**asymptomatic**
  54:11,21
**athletes** 151:9
  168:6
**attachment** 93:8
**attack** 31:3
**attempted** 52:14
**attempting** 60:20
  164:24
**attention** 61:17
  62:5 78:5 116:13
  123:24 124:4
  207:15 209:20
**attorney** 124:7
  164:21
**attorneys** 25:1
  34:16 58:3
**attracted** 58:1
**attributed** 85:16
  198:1
**August** 96:23
**aunt** 76:18
**author** 194:25,25
**authorities** 35:1
**automatic** 107:7
**automatically**
  108:2
**autopsy** 76:10
**avail** 12:19 18:12
  18:13
**available** 17:15
  54:23 94:23 133:4
  147:11 177:13
**average** 93:6

143:16,19
**averages** 197:15
**avoid** 17:25 24:13
  36:24 70:5,7,16
**avoids** 70:5,16
**award** 12:9 14:10
  15:11 27:4 28:15
  29:10 43:10 51:9
  84:2,6 85:7,9 87:2
  88:13 89:11 90:24
  91:2 95:5,7 100:1
  100:1,24 108:14
  108:22 110:9,25
  112:3,15 130:20
  132:6,9 143:18
  162:12 177:1,7
  207:10
**awards** 16:4 29:11
  49:11,18,25 50:10
  60:6,22 61:2 65:4
  83:22 93:19,20
  94:19,23 107:2
  109:24 130:21
  131:16,17 135:9
  136:22 141:25
  143:19 199:8,24
  207:1
**aware** 17:15 21:6
  22:15 51:17 53:5
  61:16 70:25 71:5
  81:9 89:9 171:5
**awareness** 169:18
**awash** 202:18
**a.m** 1:6 67:18,19

—————————
## B
**B** 1:8 3:4
**Baby** 51:10 155:18
  155:23
**back** 10:14 16:1
  20:8 21:1,2,3,4
  24:15 30:11 37:25
  47:6 68:2,20 80:4
  104:6 107:14
  110:13 127:12,25
  136:8 138:18
  141:14,16 142:15

145:16 170:18
  176:4,14 180:21
  195:5
**background** 43:25
  175:14
**backing** 214:6
**backyard** 176:2
**balkanization**
  27:21
**BAP** 12:21 13:11
  51:8 113:24
  205:23 209:2,2,22
  211:11 212:1,3,13
  214:6,11,14
**Baptist** 151:24
  152:1
**bar** 45:23 107:15
**Barbara** 39:7
**bargain** 27:2 104:7
**bargained** 18:2
  50:13 88:7 105:7
**bargaining** 18:5
  36:7 52:20
**barred** 23:10 34:18
  34:19 107:11
**base** 213:4
**based** 10:14 43:13
  43:13,19,23 98:22
  103:2 108:11
  118:17 136:18
  137:23 139:16,25
  141:5,20 142:1
  143:19 147:3,5,7
  151:7 160:16
  169:13 171:11
  188:20 211:7
**baseless** 113:8
**baseline** 8:6 12:9
  12:11,16,24 50:2
  59:16 106:24
  108:5,9 109:1,11
  109:17,18 110:3
  114:2,4 116:1
  168:9 205:24
  206:6 207:21
  212:7
**bases** 152:25

**basically** 153:22
  160:9 187:17
**basis** 26:10 39:17
  117:24 126:14
  140:22 141:11,24
  146:3 203:25
  213:20
**bat** 40:21
**batteries** 117:10,10
  212:8 213:23
**battery** 115:23
  117:13,17,18,25
  118:12 119:15
  212:13 213:24
**battle** 8:15 45:12
**Bayard** 48:9,10
**Beaumont** 134:24
  135:1
**beautiful** 175:18
**began** 10:7
**begging** 122:22
**beginning** 161:8
**behalf** 106:14
  126:24 129:19
  137:15 150:6
  153:11,19 205:15
  207:4
**behavior** 78:10,14
  187:20 190:11,20
  190:21
**behavioral** 109:12
  109:16 185:4
  191:9
**behaviors** 182:11
  182:19
**behold** 171:24
**beings** 184:21
**belabor** 52:10
  154:6,17
**belief** 91:23
**believe** 19:25 26:6
  35:15 37:6 86:6
  87:22 91:20 99:9
  99:11 102:9
  114:23 119:9
  128:19 137:6
  159:7 169:12

176:24 183:1
  184:7 204:21
  206:12
**believed** 42:23 61:1
  63:13 82:21 83:6
**believes** 49:2 56:23
  81:4 98:15 118:13
**bell** 25:6,7
**belt** 203:15
**Ben** 128:8
**beneficial** 72:19
**benefit** 15:15 50:24
  85:18 88:24 93:16
  94:8 95:20 98:21
  98:21 99:4,20
  103:8,10 104:13
  104:13 148:12
  212:16
**benefited** 206:12
  206:14
**benefits** 9:8 14:4
  17:14,17,20 18:2
  18:8,13 20:18
  40:2 50:11,12
  51:19 54:23 55:9
  55:12,15 58:24
  59:2,18 65:2 66:5
  107:8 108:23
  109:19,20 114:1
  148:7 157:12
  198:20 199:6,11
  199:12,19,22
  206:18,23 207:7,9
**Bengals** 176:11
**BENJAMIN** 1:18
**best** 9:21 10:4 27:3
  35:1 38:15 39:19
  121:11 137:1
**better** 5:15 39:9
  40:11 113:23
  131:5 149:22,22
  156:6 175:9
  177:18 186:24
**beyond** 16:10 29:15
  53:6 96:2 212:25
**bias** 171:14,15
  172:11,16

**biased** 118:17
211:9
**big** 34:12,21,24
36:22 37:4 43:7
142:9 143:15,15
144:3
**bigger** 142:10
**biggest** 40:15 176:7
**Bill** 208:12
**billion** 9:15 39:16
**billions** 25:15
42:20 70:7 81:15
101:4
**bills** 98:24
**Birenboim** 1:19
2:11 48:1,2 186:8
186:9,11,16,17,20
186:23 187:1,2
196:2 208:24
**bit** 34:22 45:17
47:14 59:10 78:1
83:16 186:22
194:15 198:10
209:14
**bitterly** 55:16
**black** 159:24
**blame** 65:19 184:1
**bless** 157:20
**blind** 189:11
**blog** 32:9
**blowing** 143:13
**blows** 81:9
**Blue** 126:25
**Bob** 48:5
**bodies** 166:16
**body** 44:5 166:21
166:23 167:3,8,11
167:12,20 168:2
**bona** 63:22
**bond** 131:3
**book** 78:3
**books** 182:6 214:3
**Bosh** 182:5
**Boston** 73:14
122:23
**Bostrum** 167:18
**bottle** 25:24

**bottom** 74:4 143:11
198:18
**bounced** 159:4
**bouncing** 161:11
**bound** 29:12
**Bowl** 90:19,20
175:16 176:8
**box** 144:1
**boy** 97:20
**Brad** 1:11 47:23
**brain** 7:23 8:3
14:18 15:8 43:14
44:16 73:4 74:3,4
74:4,7,8,16,24
75:1 76:10,11,22
81:10 82:1 84:14
88:3 92:4 102:24
122:22 165:8
181:15 182:9
184:25 185:11
193:10,22 196:13
196:15
**brains** 126:2 189:3
193:19
**bravado** 169:22
**brave** 8:12
**breach** 132:8
**breached** 23:4
**breadwinner**
183:22
**break** 46:19 47:2
127:8
**breakdown** 15:10
**breaking** 183:20
**breathing** 5:25 6:1
**breathtaking**
159:23
**Brian** 48:11
**brief** 38:3,3,6 48:22
51:11 53:17 83:12
96:2 112:20 175:8
**briefed** 35:3
**briefly** 63:23 106:2
205:12
**briefs** 35:4 60:24
**bright-lined** 112:11
**brilliant** 91:16

**bring** 18:22 33:1
**bringing** 81:16
159:24 177:6
**brings** 171:20
**broad** 56:3 65:20
65:20 72:18,24
159:14
**broadcast** 202:19
**broader** 61:3 205:4
**Brody** 1:8 3:4 67:7
163:25
**Brody's** 124:19
**brotherhood** 32:8
**brothers** 185:17
**brought** 34:25 35:2
127:2 171:22
178:16,22
**Brown** 93:7
**BrownGreer** 20:25
**Bruce** 1:19 47:25
187:1
**brutal** 149:10
**BU** 73:14 79:22
80:7 81:24,24
**Buchanan** 1:20
2:13 207:20 208:2
208:5,9,14,17,20
209:13 210:5,10
210:14 211:6
**build** 86:2
**bullet** 93:19 122:21
199:23
**burden** 119:14
142:21 147:21
148:5 162:17,17
**burdens** 64:16
110:25
**Burnbalm** 48:19,20
**Burns** 48:14,15
**buy** 103:20
**B-A-P** 212:2

———————
**C**
———————
**C** 3:1
**cadre** 81:13
**cake** 61:8
**Calanoff** 28:6 45:5

139:25 156:11,21
**calculations** 162:11
**California** 35:10
181:21
**call** 3:2 13:13 20:15
74:22 85:3 95:2
99:21 100:20
198:20
**called** 13:16,17
21:11 26:8 74:23
85:6 110:8 118:19
120:19 131:16
160:17,18 171:14
182:5 185:12,16
**callers** 20:15
**calling** 181:13
**calls** 20:14 99:25
133:4 155:20
**camp** 148:24 149:6
149:8 160:19,20
161:2,4,5,8
176:10
**campaign** 22:17,18
96:20
**campaigned** 58:4
**campaigns** 32:4
**camps** 149:10
159:5
**Canadian** 82:6
**cancer** 171:22,23
171:24 172:1
**candor** 112:9
**cap** 65:5 108:10,20
108:21 109:9
113:23,24
**capless** 178:8
**capped** 108:10
109:20
**captain** 164:10,10
**cardiac** 150:12
165:10
**care** 3:13 14:9 36:8
83:23 98:24
162:14 163:7,10
164:13,15 165:7,7
165:11,14,25
166:9,17 167:23

167:24,24,25
168:1,8 169:9
176:19 177:20,21
205:7 214:18
**career** 127:3
164:20 181:10
**carefully** 59:12
70:25 154:3
**caregiver** 182:17
183:21
**caregivers** 163:12
**caring** 168:21
182:15
**carotid** 196:13
**Carpenter** 1:19
2:11 179:11,12,18
179:19,20,21,24
180:3,12,16,19,20
181:11 183:17
**Carpenters** 183:11
**case** 3:9 6:22 7:16
9:18,22 10:1,17
10:23 11:2 14:21
18:22 19:1,3,19
19:20 21:6 22:15
22:23 23:12 25:2
26:7 28:24 29:20
30:4,4,25 31:5
33:7,15,20 34:18
35:7,8,11,13,25
36:1,19,23 37:15
38:1,7,13 39:8,13
39:15 40:10 41:25
43:7 45:2 57:14
57:17 69:6 70:12
71:10,17 75:16
81:18 83:3 84:13
85:17 92:12,17
98:22 99:3 107:16
107:17 108:16
113:1 120:18
121:13,17 122:17
123:2 124:18,18
126:4 141:13
155:16,19,24
172:8 177:4
181:11 182:9

185:12 188:3,6
189:13,15 190:3
190:18,25 191:18
192:16 193:12
194:5,19,19
195:18,22 197:17
198:14 205:9
211:6
**cases** 9:13,13,13,17
9:17,24 10:2 25:3
25:6,7 26:5,9,13
30:7,8,9,20 31:13
38:24 52:17 53:8
56:9 64:14 71:10
93:22 96:1 118:7
167:2
**cash** 29:11 83:22
**casualty** 43:24
**catalog** 65:20
**catch** 176:1
**catches** 103:16
**categories** 10:9
60:20 61:2 106:3
116:3 191:8
**categorization**
140:23
**categorized** 153:22
**category** 141:23
142:12 143:2,21
167:8,11,15
180:25
**caught** 123:23
194:11
**causal** 151:12
191:5
**causality** 171:10,13
**causation** 9:2 14:20
33:18 36:12,14
49:12 53:14 59:23
60:3 64:3 137:14
137:18,22 188:5
189:9,20 190:24
192:1
**cause** 35:21 107:19
119:6 150:12
152:13 161:4
189:19

**caused** 36:13 49:14
191:3,4,14
**causes** 62:24
107:20 152:24
188:22,23 190:23
195:14
**CBA** 18:2
**CBAs** 36:5,6
**CE** 185:24
**Cendant** 27:20
**center** 20:15 39:12
73:14,14 81:24
**centerfold** 94:20,21
94:21,22
**central** 86:21
**CERITIFIED** 215:8
**certain** 15:7 51:4
74:24 89:10,11
93:22 99:11
118:23 151:20
191:13 193:9
197:19 202:16
204:25
**certainly** 5:5 53:12
61:8 95:6 120:2
128:23 133:12
169:14 204:15
**certainty** 77:5
83:20 98:13
**certificate** 150:11
152:6,7,10,16,19
**certificates** 153:1,4
**certification** 11:3
29:6 37:5 96:2
111:16 215:1
**CERTIFY** 215:3
**CET** 215:8
**cetera** 213:5
**challenge** 31:8 39:3
53:4 113:17
**challenged** 33:5
**challenges** 25:11
168:13 213:1
**challenging** 67:2
165:18 195:19
**championships**
180:22

**chance** 22:9 44:3
98:23 134:11
149:23 175:8
**change** 19:21
140:13,20 141:6,9
193:4,15 194:2
**changes** 168:12
**changing** 193:1
**characterization**
195:8
**charge** 73:17
**chart** 78:2 135:16
209:8
**chat** 32:9
**Chea** 5:6
**check** 195:5
**checking** 20:12
**Chicago** 77:12
**child** 180:11,12,14
182:8
**children** 162:16
172:19 181:17,18
181:22,24 182:16
183:22 184:1,14
185:20
**choice** 51:24 70:21
70:23 164:8 169:2
**choices** 43:4
**chorus** 3:7 127:15
**chose** 55:2 63:18
**Chris** 124:17
**CHRISTOPHER**
1:11
**chronic** 82:19
93:22 165:7 182:7
**Cincinnati** 175:17
176:11
**circuit** 10:24 29:17
32:19 37:8 55:24
57:10 63:7,8
72:11 82:25 83:1
87:6,9 92:17
120:17 121:17
155:17
**circuit's** 51:9 66:13
**circumstances** 9:21
10:23 173:10,12

211:3
**citation** 187:9
**cite** 77:12 80:10
90:2 107:17 191:1
**cited** 93:1 96:1
212:19 214:3,9
**cites** 121:13
**citizen** 27:19
**Civil** 71:19
**claim** 31:1 33:4
34:15 53:15 91:10
96:6,9,9 110:6
111:23 132:8
133:5 139:15,19
139:19 159:24,25
160:9 188:6 203:8
203:24 204:3,4
**claimant** 204:8
**claimants** 130:18
202:9
**claiming** 160:8
**claims** 18:20,21,24
24:5 25:12 27:11
34:5 39:22 51:25
52:1,6,18 53:11
54:4,7,11 56:11
63:16,22 64:25
65:6 69:17 71:8
71:22 72:9 73:2,3
81:16,17 84:24
85:1,2 101:4
106:1 107:10
110:20 125:23
129:25 131:21
147:25 188:2,12
188:14 202:13,14
203:2,12,12,25
205:3
**Clara** 124:25,25
**class** 5:11 9:13,18
9:19 10:3 11:3
16:8 19:1 20:10
20:22 21:21 23:2
23:14,14 24:21
27:10,12,21 28:2
29:2,3,5,9,19,21
32:1,18 36:1,21

37:4,6 38:16,22
39:8 43:4,8 45:9
56:23 57:7,11,19
58:5,6,16,17,18
59:16 60:12 61:1
61:5 62:10,12
66:10 70:14,17
71:1,13 72:8,25
73:21 74:11,13
77:6,19 81:7
82:14 85:23 87:5
87:11,13,16,18,19
87:20,21 88:8,9
89:15 91:17 95:18
96:2,3,7,19 98:17
99:13 101:3,10
107:7,9,18,24
108:1,13,21 109:4
110:1,2,4,18,25
111:1,9 112:14
113:17,19 114:13
120:22,23,23
121:2,5,7,10,11
121:14,15,20
123:3 126:9,15
135:10 136:11
137:7 146:18,23
147:18 149:18
156:7,12,17,18,20
156:25 157:12
159:8 194:3 202:9
204:6,8,23
**classes** 27:6 28:2
**Claude** 124:24,25
**clauses** 132:21
**cleaner** 78:1
**clear** 40:21 44:19
61:21 69:9 72:6
99:24 100:20
102:19 112:11,22
113:3 117:17
128:15 199:5
**cleared** 176:13,14
**clearly** 45:15 57:8
77:14,15 128:24
184:7 188:5 192:2
200:21

**Cleo** 128:6 129:14
**clerk** 3:3 4:5 11:6,8
  67:20 127:17
**client** 149:8
**clients** 45:2 104:18
  106:6
**clinic** 77:7,11 151:2
  151:22 152:13
**clinical** 165:11
  195:7
**clinically** 77:4
**close** 77:1 111:19
  114:1,13 205:11
**closely** 29:3 57:18
  66:20 157:9,10
**closer** 102:16
**closest** 89:1 122:11
**Cludoff** 92:1
**clusters** 74:20,21
**coach** 180:22
**coached** 180:23
  182:22
**coaches** 161:14
**coal** 159:24
**coauthor** 210:7
**cognitive** 41:10
  50:7 73:4 149:24
  151:7 166:21
  185:3 193:8,11,13
  193:23 209:22
  211:12,20,23
  212:21,21
**cohesive** 32:6,15
**coincide** 190:10
**cold** 25:25 125:19
**collected** 168:4
**collective** 18:5 36:7
  52:19
**collectively** 18:2
  50:13
**college** 18:23 36:17
  43:22
**colon** 171:22,23,24
  172:1
**colorful** 161:16
**Colts** 175:16
**column** 139:11

210:14,16
**columns** 209:16
  210:2
**combine** 116:18,19
**come** 8:8 20:8 21:2
  21:2 27:1 30:20
  34:13 35:2 42:1
  46:6,9 47:6 74:16
  77:10 80:1 85:16
  88:1 89:1 104:20
  107:14 110:7,13
  114:1 126:10,17
  127:12 136:8
  147:14 173:25
  203:2
**comes** 68:2 72:11
  76:10 79:14 100:4
  153:9 173:15
  195:23 213:7
**comfort** 178:25
**coming** 10:8 16:1
  21:1,4 148:6
  160:23 181:22
**comment** 33:23
**commented** 36:3
  36:12
**comments** 187:7
  194:7,8 208:23
**commit** 85:20
**commitment** 67:4
  151:5
**committed** 12:16
**Committee** 206:22
**committing** 124:13
**common** 22:25
  23:2,10 64:14
  112:20 140:13
  152:13 167:4
  210:22 211:16,17
**commonly** 116:15
**community** 32:6
  64:7 153:3 167:24
  196:10
**comp** 23:9 33:4
**company** 1:23
  131:4
**comparable** 169:3

**compare** 213:10
**compared** 56:14
  167:21
**comparisons**
  213:17,18
**compensable** 61:3
  63:2,14 64:22
**compensate** 26:25
  40:14,17 41:15
  62:2,15 75:24
  86:15 101:2 104:8
  149:24 151:6
  156:18 193:7,13
  193:22,22,23
  195:25 196:1
**compensated** 34:14
  41:9,12,13,16
  42:6 62:21 72:14
  83:13,14 84:9,10
  84:22 86:10,11
  97:18 123:6
  124:16 151:11
  156:22 157:1
  187:19,20 188:9
  197:7
**compensates** 40:18
  40:25 61:23
**compensating** 71:9
  83:18
**compensation** 15:1
  15:20 18:20 41:21
  49:4,5,21 50:10
  51:18 54:22 55:8
  55:12,14 72:10
  83:25 85:10,11
  86:24,25,25 87:1
  89:7 101:7 103:5
  103:13 104:14
  105:1 107:12,13
  107:25 108:1
  109:15 151:8
  162:10 187:21
  193:11 207:1,10
**compensatory** 70:8
**competent** 9:5
**complaining** 36:18
  137:19,20 143:21

**complains** 156:4
**complaint** 10:10
  23:20 41:22 81:7
  81:20 85:25
**complaints** 27:15
  43:11 45:6 63:24
  211:19
**complete** 46:20
  164:12
**completely** 96:14
  96:15 175:20
**complex** 25:12
  72:12 116:13
**complexity** 30:1,2
**compliant** 101:16
**complicated** 66:19
  67:2 110:19
**components** 12:8
  135:7,12,22
  137:19
**comprehensive**
  12:17 50:1 59:17
  201:9
**compromise** 28:21
  69:16,16 205:7
**compromised**
  184:24 188:4
**compromises** 43:4
**computations**
  159:17
**computer** 208:7
**concealment** 53:16
**concentration**
  23:19 78:6
**concept** 147:4
**concern** 24:10 45:9
  89:3 117:12 118:9
  132:5,19 133:11
  157:4 175:11
  176:23 178:15
  201:14 202:25
**concerned** 123:10
  130:6,16 138:19
  178:7
**concerning** 43:11
  92:3 208:23
**concerns** 40:9 66:1

104:20 164:23
  180:5
**concerted** 58:14
**conclude** 94:4
  162:24 163:2
  168:17
**concluded** 47:13
  153:3
**conclusion** 94:9
  163:5 169:7,9
  214:20
**conclusions** 80:1
  152:25
**conclusively** 43:1
**concussion** 1:3 3:10
  9:2 21:10,11
  36:16 74:9 116:25
  148:11,20 159:18
  176:12 196:15
**concussions** 7:24
  10:10 26:17,19
  36:13,19 42:15,24
  44:8 82:19,23
  83:7 124:10
  148:15,16,25
  149:1 198:1
**concussive** 10:11
  23:5,16,25 34:4
  64:13 149:6
**condition** 5:24 14:5
  14:7 24:1 42:8
  63:15 64:22 65:17
  188:9
**conditions** 8:3 15:7
  43:5 49:9 51:4
  61:3 62:22 63:2
  191:18 205:19
**conduct** 23:13,14
  24:3,4,5
**confidently** 194:12
**confirmation**
  194:14
**conflict** 24:19 27:5
  28:5 88:11,13
  89:5,6
**conflicts** 26:22
  71:13 86:18 87:8

confronted 181:24
194:21
confusion 172:25
173:9
connection 155:18
209:4 213:25
consciousness
176:10
consensual 55:7
consequence
150:13
consequences
69:25 167:17
consider 9:19 51:5
54:1 57:5 64:19
85:14 91:21,24
92:22 140:6 168:5
174:2 213:14
consideration
39:20 154:5,13
considerations
10:16
considered 39:25
152:6 167:12
173:22
consistent 37:20,21
102:19 117:19
consistently 59:2
164:17
consolation 168:22
conspicuously 56:3
constitutional
71:20
constructed 125:14
159:16
consulted 33:24
212:6
consumer 96:9
contact 86:22
160:15
contacted 104:19
contained 60:1
64:1
contains 99:24
contemplate
160:11
contemplating

160:12
contended 90:13
148:8
contents 152:19
contested 53:25
55:16 189:21,24
context 18:10 36:3
36:23,25 37:1
38:22 39:4 51:21
52:8,11 56:6
187:23 189:25
195:10 209:1
213:15
continually 16:19
continue 126:5
134:6 168:24
204:10 206:22
continues 21:2
194:22
contract 132:8
contracted 76:3
contracts 38:5
162:3
contrary 70:21
77:13
contrast 75:6,21
contributed 170:1
control 120:22
189:13
controlling 10:23
controverted 79:23
conundrum 167:16
convincing 112:23
113:3 195:24
copy 11:20
cord 165:9
core 101:2,2 103:3
104:9 167:9,14
209:3
Corey 35:12,13
cornerback 145:3
corporate 70:20
correct 3:25 16:25
18:15 21:19 68:6
68:7 80:15 100:14
102:7 113:25
124:21 158:6

178:10,13 213:17
correlates 15:17
correlation 82:18
cost 53:24 59:6
108:12 168:1
costly 66:8
cot 184:16
counsel 6:7,8,16
10:3 16:8,8 24:18
24:22 25:3,16
26:7 38:16,16
40:16 44:25 45:23
46:2 47:23,25
48:4 63:11,11,21
69:1 70:14,17
71:6 73:21,21
82:14 83:5 85:23
88:8 91:17 96:20
98:17 99:14 111:1
113:19 120:23
122:15,17 126:15
126:15 146:18,23
146:24 159:8
213:2
counseling 17:20
109:20 180:6
counsels 74:11,13
77:6 156:12
counsel's 9:19
31:15 109:4
counted 91:1
country 31:14
52:24 80:8 111:6
111:7 171:25
213:4
country's 34:25
couple 120:20
131:2 160:12
189:14 198:2,12
201:10 205:12,13
214:16
Couric 171:21
course 56:21 60:25
94:19 165:20
166:25
court 1:1,23 3:2,6,8
4:10,18,22,24 5:5

5:10,13,17 6:5,11
6:14,19 7:3 10:18
11:11,14,17,22,25
12:2,6 13:15,21
13:23,25 16:24
17:2,5,9 18:15,18
21:14,17,25 25:9
25:19,22 26:2
31:18 35:8,10,14
35:16,18,21 37:19
44:15,17 45:19,22
45:25 46:5,9,15
46:22,25 47:5,8
47:12,14,19,22
48:24 50:21 51:1
52:16,22 53:17
55:5 57:2,3,5
59:14,25 60:17
62:10 64:24 65:23
66:2,4,18 67:8,12
67:16,16,21,24
68:5,8,10,12,15
68:17,18,22 69:4
69:14 70:24 72:5
72:20,22 73:20
75:7,10,12 79:14
79:18,24 80:10,16
81:4 89:24 90:2,7
98:7 100:2,4,9,11
100:15,18 101:14
101:18,21 102:2,8
102:9 105:14,18
105:21 106:4,11
106:15,17,20
112:16 114:18,21
114:24 115:4,8,12
115:16,19 117:2
119:11,18,21,23
120:2,5,9,15
122:4,7,9,11,14
122:16 125:4,7,9
127:5,7,12,14,18
127:19,22,23
128:3,11,13,17
129:3,8,11,16,20
130:1,5,11,25
131:5,9,12,25

132:4,10,13,22,25
133:6,8,10,15,17
133:20,23,25
134:2,8,10,18,23
135:3,5 136:1
137:10,11 138:4,7
138:11,13,16,18
138:24 139:4,6,9
140:1 142:22,25
143:4,6,9 144:2,8
146:6 150:1,3,5
153:14 154:2,4,23
155:3,6,13,15,22
156:1 157:5,21,24
158:3,9,15,18
159:1 161:17,20
162:19,22,24
163:2,16,18,22
164:1 165:24
166:3,6 168:14,17
169:6,8 170:2,5,9
170:11,21 174:11
174:15,17,19,24
175:3,6,10 176:15
176:19 177:8,15
177:23 178:2,5,11
178:14,18 179:2,5
179:8,17,20,23,25
180:10,14,18
183:15 185:21
186:5,10,19,21,24
187:12,16 188:7
191:1,23 193:6
195:16 199:15,20
200:7,12,18,23
201:3,6,12,16,22
203:20 204:20
207:16,23 208:1,3
208:6,11,19 210:3
210:8,13,25
214:15
courtesy 122:1
courtroom 5:4 58:9
68:3 128:9 129:5
212:3
courts 31:19 38:9
52:24 63:7,7

107:17
**Court's** 100:23
  101:1
**court-appointed**
  28:23 55:6 59:14
**cover** 4:3 49:16
  61:13 62:8 65:16
  105:3 115:24
  149:17,18 191:9
**coverage** 21:7 32:3
  192:10,13
**covered** 19:19
  63:19 99:10
  109:16 123:22
  158:5 183:13
  190:4,5,16,19,19
  190:20 191:8,14
  191:16,17,21
  192:9,13 205:3
**covering** 114:1
**covers** 192:5
**co-captain** 164:19
**co-counsel** 25:14
**co-employer** 33:2
**co-lead** 6:8 10:3
  24:22 25:16 26:6
  31:15 38:16
  126:15
**Craig** 153:19
**create** 184:21
**created** 21:10
  95:23 116:4
**creating** 58:6
**creation** 214:11
**credible** 171:19
**credit** 89:7 91:19
  102:21 156:10
**creditable** 147:10
**credited** 147:4,6,7
  147:8 149:4,12,13
  149:14,18,21
**criminal** 122:17
**criteria** 118:4
  146:20 147:2
  185:10
**critical** 51:19
  146:21 198:15

**critically** 14:10
  55:14
**criticism** 51:3
  202:15,21
**criticize** 198:24
**criticized** 19:24
  51:4 58:4 91:16
**cross** 182:18
  189:12 195:1
**crystal** 61:21
**CTE** 14:16,18
  40:14,18,20,22,24
  41:4,8 61:14 62:4
  62:8,16,25 71:8,8
  71:9,14 73:6,7,14
  74:2,5,15,25,25
  75:2,4,15,18,19
  75:22 76:5,8,10
  77:1,1,5,9,20,21
  77:23,25 78:1,9
  78:13,18,23,25
  79:1,12,24 80:23
  81:1,2,11,25 82:3
  82:10,13,20,21
  83:6,9,10,13,17
  83:22 84:1,3,4,9
  84:10,12,22 85:11
  85:18 86:4,13,15
  86:25 87:1,1,24
  88:4,12,14,14,18
  88:22,24 93:23
  94:8,25 95:1,7,14
  97:6,8,15,16 98:5
  98:8,9,13,16,19
  99:4,10 103:4,5,7
  103:8,9,13,19,21
  104:12 109:15
  115:24 122:24,25
  123:4,5,6,13
  124:8 125:21,24
  126:1 139:14
  140:6,8,17 159:13
  159:19 160:3
  172:4 181:13
  182:10 184:25
  185:12 187:18,21
  188:14,15,22,23

189:10,18,20
  190:3,4,10,18
  191:7,14,20 192:4
  192:5,10,12,18,19
  192:21,21 193:1,3
  193:10,15 194:13
  194:14 195:2,8,14
  195:20 196:1,12
  196:14,18 197:1,3
  199:2,8,24 208:23
  209:4,17,17,17
  210:12,20 211:18
  211:25
**CTE's** 103:20
  123:14
**CTE-related** 62:14
**cultural** 118:25
**culture** 169:22
**curiously** 113:18
**current** 50:7
  130:22 183:13
  188:20,21 207:8
**currently** 54:4,10
  125:14 136:24
  181:12 195:2
**cusp** 161:1
**cut** 138:20 158:12
  162:19 170:2,6
**cutoff** 136:9
**cuts** 110:16

---

## D

**D** 2:1 3:1
**dad** 176:2 182:1,17
  182:21 184:17
**dad's** 182:18
**daily** 117:24 165:25
  182:3
**Dale** 150:7,16
**Dallas** 134:20
**damages** 34:7 70:8
  70:8,9 139:21
**Danias** 48:5
**data** 147:11,12,13
  147:14,14,18
  149:19,19 168:12
  210:11 213:6,16

213:20
**date** 14:24 141:6
**Daubert** 25:11 31:4
  195:11,18
**daughters** 104:23
  185:17
**daunting** 67:3
**Dave** 123:16 124:2
**David** 1:20 4:12
  35:1
**Dawn** 153:20 215:3
  215:7
**day** 25:1 33:6,14
  38:2 42:2 57:2
  67:25 82:24
  122:10 127:19,19
  160:17,22
**days** 101:9 148:18
  160:22
**dead** 99:1 140:21
  183:13
**deadline** 107:20
  110:4
**deafness** 41:17
**deal** 7:13 15:3
  19:11 26:4 27:3
  29:13,15 32:17
  39:4,19 40:8 51:3
  58:4 61:16 76:15
  86:3 94:6,7 97:4
  97:12,14 99:23
  149:22 154:15
**dealing** 31:7 139:7
**deals** 87:6 202:19
**dealt** 8:4 16:7 80:6
  119:10
**dean** 3:23,24,25 4:6
**death** 79:25 84:1
  88:16,18 93:24
  94:1,25 95:1,6,14
  95:14 103:5
  122:25 139:14
  140:6,17 150:11
  150:12 152:5,7,10
  152:13,16,19,24
  153:1,3 187:21
  192:4,5,10,21

193:20 199:1,8,24
**debate** 51:23 56:3
  56:16 57:21
  141:16 155:9
**debilitating** 8:24
**decade** 142:8,15
**decades** 81:8
  169:19
**deceased** 82:3,4,10
  189:3 192:7,13,21
**Dechert** 48:5
**decide** 3:18 100:18
  132:14 195:13
**decided** 10:3 32:16
  52:23 58:17 65:19
  67:9 110:24 186:7
**decidedly** 54:17
**decision** 51:9 52:3
  80:17 101:13,24
  110:24 136:2
  148:2
**decisions** 165:15
**deck** 210:11
**declaration** 39:18
  83:11 92:1 93:3,7
  109:7 118:4
  119:10
**declarations** 41:5
  55:22 214:7
**decline** 50:5 64:8
  165:21 190:11
**declined** 213:11,12
**dedication** 67:5
**deducted** 136:11
  145:8,11,15
**deduction** 145:12
**deductions** 135:17
  136:14,21 141:25
**deducts** 144:23
**default** 204:13,14
**defaults** 204:4
**defeat** 53:23 59:7
**defects** 71:22
**defendant** 27:24
  38:12
**defendants** 22:2
  37:12

**defense** 63:11
211:9
**defenses** 23:9 51:15
52:6 53:13,16,19
55:4 205:10
**defensive** 164:10
**deficiencies** 106:24
106:25 108:5
109:23 117:16
**deficiency** 106:22
**deficient** 71:17
**define** 157:10
**defined** 28:13 95:2
145:1 149:4
155:16,17 157:13
**defining** 95:17
**definition** 98:11
135:14 144:15
145:7,10,16
146:14,14 147:24
149:14,20 192:7
**definitive** 74:17
76:9,9,19 84:15
84:20
**definitively** 76:20
**defrauded** 69:22,24
**degenerative** 8:3
16:2 74:6 152:24
167:4
**degree** 98:13
**deliberate** 61:19
62:9
**delta** 140:15 144:6
**demanded** 41:20
**demands** 10:9
182:2,15
**dementia** 8:25
10:11 13:13,14
14:15,16 15:13,18
23:7 41:3 44:4
79:12 80:24 81:11
84:11,12 85:4,6,8
85:10 93:22 94:25
97:9 103:21
108:13,22 116:3
116:22,24 117:3,4
117:6,24 118:8,11

166:14,16 167:3,4
167:8,11,14,15,20
168:1 180:8 181:7
181:8 190:12
191:8 197:2,24
210:16,18,21,24
212:22
**dementia-type**
142:5
**Demetrio** 1:13 2:5
114:21 120:11,12
120:13,16 122:6
122:10,20
**Demetrio's** 115:7
**demise** 130:5
**Democrat** 150:20
**demographics**
213:5
**demonstrate**
103:24 112:7
**demonstrated**
164:19
**demonstrates**
192:14
**denial** 72:7 169:23
**denied** 19:22 28:25
134:10
**deny** 66:3 127:3
**dependent** 64:9
**depending** 116:20
**depicted** 169:4
**depression** 10:12
30:6,8,16,20 31:1
41:18 42:13,23
43:2 62:16,20
63:14 75:24,25
81:11 190:20,21
191:3
**derail** 181:9
**describe** 192:20
**described** 168:19
201:2
**describing** 98:8
**deserve** 105:1
151:11
**deserves** 105:1
110:25 123:11

154:5
**deserving** 55:13
**design** 212:1,2,3
213:3
**designated** 3:20
167:7 168:18
**designating** 3:21
**designed** 145:18
212:4,5,8,14
213:23,24
**desire** 181:18
**desperate** 173:11
181:18
**desperation** 173:10
**despite** 21:25
165:16 167:7
**detail** 53:17
**detailed** 81:18
136:8
**details** 9:7
**detect** 40:24
**detecting** 74:17
**detection** 8:1
123:24 124:4
171:14,15 172:11
172:16
**deteriorated** 5:24
**determination** 85:3
85:4,8 116:9
**determine** 36:7
117:7 118:20
131:24 193:9
196:19
**determined** 41:4
116:6,21 118:17
**determines** 97:10
**determining**
117:23
**devastating** 182:8
182:11
**develop** 49:6 79:7
197:24
**developed** 41:10
54:13 193:14
194:4 195:9
**developing** 44:3,6,7
196:12,14

**development** 77:17
126:13 169:15
**developmental**
90:17,22 91:3,10
144:19 184:15
**devolved** 104:1
**Deza** 41:5
**diagnosable** 40:22
83:20
**diagnose** 76:8,24
77:5 85:8 88:21
88:22 111:11
136:25 193:3,3
**diagnosed** 13:10
14:6 15:13 23:21
24:1 28:3,4 61:24
82:3,10 84:4,13
93:24 94:1 95:14
98:8,9,14,16,19
103:7 136:18,24
137:3 139:20
140:7,17 141:1
142:3 151:2,21
166:11,14,25
167:10 168:21
172:14 181:11
205:17 211:25
**diagnoses** 14:14,22
28:14 59:21,23
76:15,19 107:1
109:24 125:16
126:13,21,22
130:21 153:4
**diagnosing** 13:7
**diagnosis** 7:22
14:12,23,24 15:5
15:24,25 23:18
26:18,20 41:7,8
42:6 43:15,23
60:2 64:1,21,24
76:9,19 84:16,18
85:4 88:16,24
93:20 94:16,18,23
95:3,4,12,13
98:11,12 103:9
110:7,21 111:14
111:21,24 114:11

130:18 135:13,20
136:16 137:3
139:8 141:1,6
142:18 143:20
145:14 146:12
148:7 151:20
166:9,16,19,21
167:1,8 171:7
172:13,15 181:9
192:8 196:25
199:8,24 210:23
**diagnostic** 7:21
16:18
**dialogue** 164:17
**Diane** 6:16 24:25
**die** 84:13,18 88:14
88:25 94:9 95:19
98:20 103:9 163:9
**died** 76:21 84:14
87:1 88:14 94:1
99:4 103:11 123:4
150:9,18 151:4,16
151:25 152:1
164:14
**dies** 103:8
**Diet** 25:16 39:12
**difference** 101:5
115:9 141:4 142:7
142:9,11,13
**differences** 89:18
142:10 197:18
**different** 9:17
28:15 36:2 74:5
86:13 100:16
116:20 166:17,21
181:1 202:6,6
**differential** 196:25
**differently** 28:14
45:8 56:24 72:9
**difficult** 7:7 64:17
75:13 111:5
147:14 148:4
188:22 190:25
**difficulties** 62:5
78:4 101:12
205:20
**difficulty** 44:12

79:10 166:18
188:15 189:9
190:24
**dig** 147:18
**digresses** 16:3
**diminishing** 42:22
**direct** 82:18 164:13
166:4 168:10
**directed** 60:19 71:7
201:23
**directly** 19:6 36:19
57:11 156:18,19
157:1,12
**disability** 50:12,24
206:18,19,23
207:8
**disadvantage** 121:3
**disagree** 72:1
**disagreement**
22:22
**discernible** 29:9
**discharge** 73:1
**disciplines** 165:6
**disclose** 73:21
**disclosure** 4:4
70:14 95:21
**discounts** 162:12
**discourage** 113:8
**discover** 126:1
**discoveries** 169:17
**discovery** 23:10
30:3,8 33:16 40:3
70:11,11,13,15
99:24 100:3
**discretion** 100:23
101:1,19 112:10
131:24 147:25
148:2,3
**discuss** 8:22 39:1
51:11 126:16
154:20
**discussed** 19:24
91:18 171:8
187:11,25 208:21
**discussing** 32:10
105:25 109:1
143:12

**discussion** 204:18
204:24
**discussions** 9:9
17:16
**disease** 8:3,8,24
13:12 36:18 73:7
74:3,6 76:6,16
81:3 82:22 83:7
83:10 85:23 86:12
86:19,20 93:21,21
101:2 104:9,9,25
111:11 117:21
146:13 150:23
152:24 159:25
167:6 168:21
169:16 171:15,17
181:12 182:7,7,12
182:23 185:3
195:14 197:5
**diseased** 74:4
167:21
**diseases** 7:22 13:7
16:2 34:3 36:13
40:18,20 41:13
49:8 76:4 83:19
97:9 125:22 127:1
136:25 139:21
151:7,9,14 165:9
169:18 172:3
197:6
**dishonest** 96:16
**disingenuous** 96:15
**dismissal** 53:10
**dismissed** 10:2
34:15 35:8,25
52:17
**dismissive** 166:10
**disorder** 62:15
166:22 180:25
181:15
**disorders** 62:20
63:14 75:24
136:25 139:20
142:4,5 187:20
**display** 80:22
**displayed** 93:12
103:25 207:13

**displays** 77:23
**disposal** 202:22
**dispositive** 25:11
52:6
**dispute** 22:23 23:1
23:11 24:8 117:9
149:6 189:22
190:1
**dissected** 57:18
**distinct** 51:8 95:21
95:22
**distinguished**
120:17
**distributed** 62:22
**distribution** 155:21
157:3 169:13
**district** 1:1,1 22:16
25:18 36:2 38:10
66:22 164:21
**diverse** 213:4
**dividing** 91:11
**divorced** 162:16
**dizzy** 41:17
**doctor** 110:22,24
111:22 142:19
214:10
**doctors** 8:8 59:24
64:23 73:17
166:24 188:19
190:7
**document** 1:5
134:7 159:20
173:2
**documentation**
64:24
**documented** 36:15
176:11 211:10
**documents** 148:23
150:10
**doing** 32:5 77:8
80:3,21 105:2
131:23 161:4
174:5 201:21
209:10,11
**dollar** 17:12
**dollars** 25:15 38:25
39:1 42:20 54:6

65:2 70:7 81:15
101:4 203:11
**domains** 116:19
209:22 211:12,20
212:14
**domestic** 78:8,8
104:24 200:2
**don't** 132:16
**dots** 74:20,21
**double** 167:20
189:11
**doubt** 61:16
**Doug** 48:14
**downstairs** 134:17
**dozen** 183:4
**Dr** 41:5,5 73:13,13
73:13,15 74:11
77:3,6 79:21
117:14,16 118:3,9
119:10 151:24
152:1,16 188:17
188:17 190:7,7,8
190:14 191:1
193:16 194:23,23
194:24,25 195:3,6
196:11,17,22
208:22 210:6,6
212:20 213:22
214:2,8,10
**draconian** 204:14
**draft** 164:8 200:9
**drafted** 159:4
**drama** 183:1
**draw** 28:12 38:17
94:10
**drawing** 40:11
45:12 63:9 86:20
148:9 189:25
**drawn** 28:19 45:7,7
191:24
**draws** 63:1 191:6,7
**drew** 136:20
210:11
**drink** 30:18
**driven** 187:12
**drug** 26:8 185:4
**drugs** 25:17 30:17

39:12 42:18
**due** 36:12 38:3 40:4
92:18 112:8,12
148:11,20 154:5
159:9 181:15
182:10 203:2
**Duerson** 35:25
122:2 126:24
**Duerson's** 123:16
124:2
**dump** 134:6,7
**duration** 30:2
202:3
**duties** 36:4
**duty** 9:19 23:3,4
36:5 70:25 101:7
112:5
**dynamics** 168:6
**dysfunction** 78:5
**D-408** 215:8

_____

**E**

**E** 2:1 3:1,1
**Eagles** 23:24
**earlier** 13:16 14:16
29:16 38:16 43:21
124:4 150:21
172:21 205:5,16
205:17 208:21
**earliest** 78:17,23
**early** 8:1 13:7,14
15:14 41:23 44:24
45:17 46:16 50:5
94:25 123:24
124:4 170:7 172:5
185:3 206:9
**earth** 31:22
**easier** 114:10
**easily** 91:9
**Eastern** 1:1 25:18
**eat** 61:9
**economic** 202:8
**economics** 201:24
**economist** 43:18
**EDA** 206:19
**educate** 17:14
50:23

educated 161:7
education 17:11
    50:19 51:2 155:1
    156:3 157:11
    168:19,23 169:2
    213:5
educational 12:10
    30:10,12
effect 19:4 50:14
    74:24 189:8
effective 203:22
    206:2
effort 55:18 58:10
    62:9,11 103:15
    165:23
efforts 58:14 66:19
    66:24
egg 183:25
eight 23:23 83:4
    91:2 128:6 136:6
    144:20 176:12
either 18:8 101:14
    116:21 137:6
    142:2 190:15
    211:19
elaborate 146:19
Elanore 184:5
ELEANOR 1:18
ELECTRONIC
    215:8
element 156:22,24
    157:2,3,17 188:5
elements 33:20
    154:21 156:7
    188:2
eligibility 16:13,15
    147:6 153:7
    156:20
eligible 12:25 15:19
    49:21 64:22 90:24
    91:1,4 135:11,14
    136:14 144:13,15
    144:21,22,24
    145:1,8,11,20
    146:4,14,20 147:1
    147:10,12,13,19
    147:23 149:13,19

151:10 154:16
    156:14
eliminate 104:12
    114:8 186:13
eliminated 27:6
eliminates 53:22
    54:19
eliminating 114:11
elimination 159:13
ELMO 138:3
eloquently 205:14
email 32:11
embark 54:15
emblematic 57:25
Emery 164:12
emotional 59:6
emphasize 50:9
empirical 213:20
    214:13
employ 28:14
employed 185:14
empty 54:8
encephalopathy
    82:20 93:23
encountered 15:22
encourage 214:4
endorse 92:9
endorsed 58:16
endorsement 92:10
energy 164:13
enforced 126:9
enforcing 132:20
enhanced 168:25
enhancement 114:6
enlist 66:21
enlisted 214:1
enormous 53:2
enrolled 165:22
ensure 205:25
Enter 121:6
entered 129:18
    142:3 159:17
entering 51:14
entire 19:11 29:8
    193:12 202:2
entirely 50:3 52:7
    53:3,18 54:19

56:15 60:17,24
    63:3,3,4 64:2,9
    203:17
entirety 189:4
    200:4
entitled 10:24 65:6
    90:18 104:14
    107:25 144:18
    199:6,18
environment
    184:14
environments
    181:23
epidemiological
    125:24 195:1
epidemiologist
    171:13
Epidemiology
    153:2
Epilepsy 41:17
equal 85:11
equipment 89:19
Eric 69:2 98:2
    198:4
Erickson 179:9,10
    179:10,13,14
    185:23,25
erratic 182:18
especially 29:18
    57:13 77:17
ESQ 1:11,11,12,12
    1:13,13,14,14,15
    1:15,16,16,19,20
ESR 1:21
essentially 89:17
    93:11 144:16
    189:2
establish 14:20
    17:22 36:11
    147:18
established 60:4
    64:4
establishes 50:19
establishing 34:6,7
    44:12
estimate 108:18
estimated 167:5

estimates 109:4
et 213:5
ethical 184:21
Eubank 120:19
Eugene 1:17
    158:10,20
Europe 71:15 88:1
    88:6 89:7,12,15
    89:17 90:9,12,17
    90:21 91:7,9,12
    91:13,19,22
    102:20 153:24
    154:10,13 156:8,9
    156:13,21 180:23
evaluate 34:5 65:24
    213:8,10
evaluated 188:14
    209:22 214:11
evaluates 56:6
evaluating 121:4
    209:3
event 204:12
events 44:12 64:13
everybody 5:14
    11:18 12:3 20:1
    68:2 156:3 183:25
    185:16,18 197:21
    198:18 211:3
everybody's 123:21
evidence 19:3,4
    57:12 59:21 64:5
    70:18 79:19 90:4
    99:10 112:6,23
    113:3 139:16
    141:6 147:22,22
    147:24 148:19
    149:15 153:8
    171:10 187:10
evidence-based
    103:1
evidentiary 103:2
evils 65:20
eviscerated 125:23
evolves 80:23
exact 137:21
exactly 35:13 63:6
    139:18 140:4

155:13 172:7
    183:18
examination 76:22
    110:12
examinations
    12:17
examined 122:23
example 30:6 53:7
    63:25 106:10
    111:19 140:24
    142:16 145:7,10
    148:17 156:8
    171:19 196:16
    197:20 207:2
exceed 126:14
excellent 42:2
exception 148:10
    187:22
excerpt 150:10
    214:20
excess 136:12,13
exchange 72:15
exclude 160:7
excluded 43:5 88:1
excludes 146:16
    160:5
excluding 91:18
exclusionary
    160:11
exclusively 86:22
excuse 78:10
    165:23 166:12
executive 62:5 78:5
    209:20
exercise 102:10
exhausted 183:19
Exhibit 116:7
    135:20 137:25
    138:14 139:5
exist 169:19,22
    195:3
existence 53:19
existing 50:11,23
exists 29:5 42:25
expanded 192:13
expansion 192:11
expect 178:2

**expectancy** 140:14
140:20
**expected** 203:8
**expenses** 163:8
**expensive** 31:22
54:16 56:20 185:5
**experience** 9:12
38:17 83:2 85:24
99:15 101:3
117:11,14 165:17
166:18 168:11
**experienced** 23:16
23:24 58:3 63:10
63:11 65:13
104:22 188:19
**experiences** 164:23
**expert** 28:6 35:3
43:18 55:22 74:12
74:13,14 77:7
109:4 117:14
118:12 146:19,25
147:3,8 156:12,12
189:8
**experts** 31:4 33:10
33:13,25 40:23
41:5 43:1 73:9,22
73:23,24 81:16
194:21,22 195:12
196:4,7 213:15,22
**explain** 38:7 177:16
**explained** 109:14
133:11
**explaining** 196:2
**explains** 143:11
**explanation** 133:12
141:18,19 146:24
**explore** 10:7
**explosive** 78:14
**explosivity** 78:6
79:6 80:24
**expose** 119:1
**exposed** 29:9
**exposure** 43:20
60:3 64:3,12
137:22
**expressing** 160:2
201:14

**expressly** 62:1
**extend** 53:6 114:3
**extended** 103:8
**extensive** 9:12 19:2
21:7 32:3,3 52:8
55:21
**extensively** 19:19
35:3
**extent** 23:3 91:9
156:23 157:2
206:8
**extra** 25:24
**extramarital** 30:21
**extraordinarily**
67:2
**extraordinary**
66:18 70:12 78:17
102:10 103:25
**extreme** 145:7,10
**extremely** 32:19
188:22 190:25
**ex-player** 162:15
**eye** 16:21 77:11
171:22

**F**

**face** 40:3 53:5,9
54:12 70:3 110:4
176:3 181:13
**faced** 110:18
205:20,20
**faces** 111:22
**facing** 111:7 176:11
195:18
**fact** 8:5 9:25 21:23
21:25 22:15 26:6
35:24 43:16 63:1
63:17 65:23 70:18
72:14 84:7,18
90:18 91:5 92:16
95:6 106:23
115:23 116:19
121:23 148:21,22
149:8 151:9
152:12,22 155:23
156:25 169:17
190:6 192:15,16

**199:1 202:5 206:4**
212:12
**factor** 34:21 35:9
36:20 37:11 38:3
38:12 78:9 169:15
197:5,25
**factored** 41:25
**factors** 22:21 29:24
34:7 72:2,3
**facts** 21:11 44:13
**factual** 51:15 52:6
53:9,15 55:4
190:17
**factually** 204:23
**fail** 58:12
**failed** 62:11 87:11
147:1 159:9,14
195:24 196:1
**fails** 112:2 204:3
**failure** 86:15
152:14
**fair** 10:22 29:4
45:15 55:23,25
56:5,8,13 57:4
59:15 63:3 65:6
66:14 69:12
101:15 102:16
104:16 105:10
148:9 153:12
188:10 191:24
192:2
**fairly** 59:2 87:12
92:19 139:12
149:23,24
**fairness** 1:8 10:25
29:23 40:10 57:12
60:13 92:20 121:4
163:6 173:21
174:9
**faith** 16:22,24 66:3
112:6,9 113:13,18
**fall** 62:12 109:9
167:11
**falls** 113:18
**false** 94:14 172:10
**familial** 211:24
**familiar** 155:24

184:3
**families** 8:16 19:7
50:6 55:10 59:5
70:1 80:2 86:11
104:22 123:16
125:18,25 126:20
126:25 165:13,14
172:18 174:8
180:7 185:2
212:17
**family** 20:11 80:5
80:14,16,18,19
94:8 98:20,21,23
98:25 99:20
122:22 126:24,25
150:7 151:19
152:3 153:12
180:7 181:9
205:20
**fanciful** 97:21
**Faneca** 106:9
**far** 16:10 53:6,6
66:7,7 109:9
123:10 136:12
149:10 189:5,5,5
**farther** 76:25
**fashioned** 208:8,9
**father** 122:20
175:17 180:19
181:7 182:12
185:13
**father's** 183:12
**favor** 29:17 32:20
110:16
**favorably** 45:8
**fear** 173:9,10
**feature** 167:9,14
169:10
**features** 16:17
135:7,23
**February** 96:23
151:1 176:7
**federal** 25:8 39:11
52:21 66:22 71:19
**fee** 100:1,1 112:16
113:7,8
**feed** 11:6,8,9

**feeding** 6:1
**feel** 73:18 104:18
104:19 173:16
175:3 178:25
**feels** 153:25
**fees** 54:7
**fell** 45:10 104:1
145:16 180:25
**Fen-Fen** 204:21
**fewer** 43:12
**fides** 63:22
**fiduciary** 99:18
101:7 141:17
**field** 73:13 117:23
145:23,25
**fields** 34:1
**fierce** 44:19
**fifth** 176:11
**fight** 159:12
**fighting** 31:9
160:22 161:1
**fights** 161:2
**figure** 27:16 38:7
127:10
**figures** 159:16
**file** 18:20 112:25
163:15
**filed** 19:20 20:25
45:2 98:2,7
106:14 113:1
121:18 122:21
124:24
**final** 7:18 29:12
53:18 66:15 72:7
98:13 105:4
112:13 127:3
169:11 184:9
**finally** 16:16 17:11
50:18 64:15 79:11
114:14 149:11
153:5 196:21
198:2 199:13
**financial** 3:15
30:22 59:6 73:21
149:12 167:17
173:11 201:24
203:1

**find** 19:12 38:10,21
42:4,7,18 86:15
111:5 116:24
120:21 135:14
136:5 171:15,16
171:20 183:3
211:17
**finding** 14:18 93:24
**findings** 122:24
168:4
**finds** 35:21
**fine** 11:25 12:6
106:17
**fined** 161:5
**finest** 98:12
**finish** 46:16 67:14
162:22
**finished** 143:7
**fire** 182:18
**firm** 48:5 105:16
133:3,3
**first** 3:23 7:10 19:5
25:2 26:8 30:1
55:25 58:22 71:7
72:3,4 75:12
77:24 93:5 94:17
94:18 98:7 105:8
105:19 106:3,22
115:3 116:12
136:2 137:25
142:16 143:10,17
145:24 158:23
159:3 161:9
172:13 176:1
186:6 199:23
202:12
**Fisher** 41:5
**fit** 145:7,10
**five** 34:7 43:12 47:2
56:10 77:2 112:24
113:2 114:6
115:14 116:9,18
125:5 136:8,10,10
144:22 145:7,10
145:13 153:23
154:11 158:13
159:5 164:10

165:19 170:21
174:16 193:2
201:25 211:20
**fix** 114:3
**flattered** 201:4
**flawed** 135:23
**flaws** 106:1,3
160:14
**Florida** 150:17
**flow** 29:11
**flowing** 201:1
**flows** 97:22 162:9
204:7
**Flynn** 129:14
**focus** 137:9 140:5
144:23 181:19
188:2 208:18
**focused** 51:17
142:14
**fog** 55:1
**folks** 122:23 202:16
**follow** 11:21 210:1
**following** 196:12
196:15
**football** 1:3 15:8
17:23 47:24 50:22
56:11 57:1 62:25
64:10,11 65:19
76:3,6 82:6,18
87:25 98:6 104:11
119:16 128:7
130:17 157:13,15
168:20 175:22,22
177:22 188:22
**Footnote** 112:19
**forbid** 16:3
**force** 50:14
**forecast** 131:22
**foremost** 71:7
94:18
**foreseeable** 10:17
**forever** 72:25
107:11 125:17,23
**forget** 90:18 176:1
176:3,7
**FORGOING** 215:3
**form** 19:11 95:9

98:9 167:4 198:25
199:1,18 201:2,9
**formed** 76:12,20
**former** 124:23
128:7 129:15
150:16 158:20,22
167:10 168:6
180:9,14 212:11
**forms** 19:9 74:23
76:16 202:20
**formulations** 202:6
**forth** 10:15 55:20
70:17 79:21,22
98:6 116:7 117:9
162:2 178:17
**fortunate** 175:15
**forward** 46:6
178:22 195:12
203:14
**fosters** 169:23
**fought** 6:25 8:15
9:11 10:15 37:3
44:20 51:25 52:1
**found** 22:16 35:8
44:1 45:4 63:8
75:22,25 76:1
82:18 104:11
120:24,24 122:22
159:20 171:24
178:23 190:8,12
201:22
**four** 4:19 34:7
77:24 79:2 126:22
137:2 153:23
159:5 183:17
185:15 190:9,9
**framework** 71:25
**frankly** 63:4 105:1
105:10 200:7
210:22 212:5,19
213:2
**fraud** 33:17 40:5
65:7 69:20,20
96:9 110:15,17
111:3 124:1
**Fred** 128:6 129:14
**Fredericks** 35:1

**free** 56:24,25 61:5
63:15
**freeze** 77:15
**frequency** 210:19
**frequent** 210:22
**frequently** 76:19
**friend** 76:18
**friends** 32:14
**frighteningly** 184:2
**front** 25:8 26:7
39:6 69:9 195:22
**frontal** 197:1
**frozen** 125:17
**frustrations** 65:20
**fulfill** 125:18
141:17
**fulfilling** 184:23
**full** 4:4 15:11 49:20
50:14,14 114:4
176:5 193:19
196:14
**fully** 60:4 64:3 65:9
92:11 101:15
151:5,11
**full-blown** 181:7
**function** 62:5 119:7
209:20 213:13
**functionally** 160:5
**functioning** 50:8
118:16
**fund** 12:9,10 14:10
16:9 17:11 27:4
29:10 42:9 50:19
50:21 51:2 95:5
109:21 110:9
129:24 130:20
131:16,18,20
155:1 157:12
168:22,23
**fundamental** 51:24
61:18 62:17
**fundamentally**
107:21
**funded** 50:3,20
51:7 59:18 73:25
**funds** 130:20
131:15 155:21

203:7 204:11,12
**funny** 96:21 134:15
**Furphy** 1:21
**further** 133:12
194:7 200:19
**future** 16:14 27:1
54:12 60:8 73:2
123:16 125:21
129:25 206:7
**futures** 29:8 194:3

---

**G**

**G** 3:1
**gainfully** 185:13
**game** 91:7 146:17
160:16 168:24
175:22 194:16,16
**games** 89:22 90:4
90:25 91:3,6,6,6,8
91:8 144:17,20
145:13,22 146:15
149:7
**Gandy** 73:13,15
74:11 194:23
195:6 196:11
**gavel** 67:22
**Gehrig** 150:23
**Gehrig's** 93:21
**Gene** 6:13 24:24
**general** 36:12
42:14 62:23 75:22
75:25 76:2 104:11
168:5 190:22
**generalized** 39:17
**generally** 28:16
62:19 73:3
**generated** 8:6
**generic** 44:6
**generous** 60:21
65:11 205:2
**gentleman** 177:2
**geriatric** 165:7
**getting** 13:7 16:14
20:13 99:6 156:20
172:19 173:3
176:17 210:3
212:1

**Gibbs** 1:14 2:6
125:5,6,8,10
127:6
**girlfriends** 70:1
97:17 104:23
**girls** 175:18 185:15
**Girsh** 29:23 34:8
36:20 72:2
**give** 25:22,23 83:22
91:13 95:2 102:21
112:10 118:22
130:11 142:19
144:15 154:5,25
**given** 92:23 117:19
149:21 154:14
188:11 191:25,25
192:1
**gives** 178:24
**giving** 68:16 72:15
114:19 153:18
175:7
**glad** 4:18
**GLENN** 1:16
**glimpse** 31:5
**global** 9:20 10:4
**GM** 92:17
**go** 9:7 11:1 12:23
18:8,9 19:12
22:20 25:14 29:25
30:11,23 31:6
32:8 33:18 37:8
38:24,25 42:16
44:5 46:23 51:1
68:20 70:10 75:4
77:24 81:23 84:23
90:19,20 93:3
94:11 95:10 96:19
102:15 104:6
109:22 115:10,11
115:13 122:19
138:25 140:16
141:22 142:5,15
144:12 160:22
176:14 179:16
181:3 185:22,24
185:24 186:6,8
191:15 195:4

197:21 198:19
199:4,11 201:19
209:15 212:25
**goal** 125:18 145:23
145:24,25 165:5
**goals** 184:18
**God** 16:3 157:20
**goes** 143:24,25
157:2 196:9
198:24
**Goggle** 42:16
**going** 4:15 14:22
16:9,19,20 17:13
17:19,22 18:13
19:5,14,16 20:24
22:14,20 30:25
31:5 34:14 35:9
37:15 40:2 41:20
42:7 45:11 46:1
46:16 47:15,16
71:2,3,4,6,12,16
71:21 83:21 84:19
84:24 85:2,3 92:5
92:6 94:8 96:5,11
96:19 100:8,24
101:6 104:7,8
105:16 111:4
115:9,12,24 119:4
122:11 123:7,8
124:1,15,20,21,23
127:8,8 129:6,8
129:20,22 131:23
132:13,23 155:11
156:7 158:4
161:12 162:25
163:3,9 168:14
170:6 175:21
177:6,16 178:25
186:6,8 187:3
197:9,20 199:11
200:21 202:5
203:14 208:7
209:15 210:17
211:16
**Golkin** 3:14,15
7:15,16 29:1 55:6
66:2,23 201:21

202:5
**Golkin's** 203:5
**good** 3:4,6,7 4:23
4:24 6:10,11,18
6:19 16:22,24
19:4 45:15 47:20
47:22 48:2,10,12
48:15,17 51:3
64:10 66:3 68:9
68:10 94:6 112:6
112:9 113:13,18
115:18,19 119:2
122:23 125:6,7,9
125:10 128:3
132:13 146:4
150:4,5 153:17
158:9,11,23 159:1
163:24 164:1
173:25 174:14
184:11,15 186:20
187:1 198:7 213:6
213:16
**goodness** 67:21
**Google** 116:23
**gotcha** 174:18
**gotten** 28:13 40:12
124:4 162:13
**governed** 52:19
**gradations** 143:25
**grade** 43:22,24
176:2
**grand** 53:18
**grant** 3:19 214:2
**granted** 37:5
**graphically** 169:4
**gratitude** 104:18
**gravel** 174:8
**gravelling** 173:16
173:17 174:7
**great** 61:16 76:15
77:5 81:18 196:2
205:7 210:19
**greater** 37:12 44:12
61:2 92:16 167:19
167:22 210:20
**greatest** 123:22
**grew** 134:25 185:16

**grid** 15:17 89:10
143:11,21 151:8
162:8,11 171:8
184:5 197:18
**groundbreaking**
9:10
**groundswell**
123:21
**group** 12:22 139:11
140:3 183:7
**groupings** 60:21
**groups** 137:15
**guarantee** 111:8
130:23
**guaranteed** 14:13
49:20 162:3,3
**guarantees** 176:25
177:19
**guard** 150:17
**guardian** 99:18
**guess** 37:16 38:4,5
100:20 161:7
180:5
**gun** 124:6,11
**guns** 124:7
**guys** 32:6 185:16

**H**
**half** 12:24,25 46:25
109:5 144:20
145:16,20 166:23
209:24
**hall** 179:16
**Hamilton** 214:10
**hand** 11:23 45:20
**handed** 54:8
**handle** 12:23 25:3
46:18
**handled** 6:23 25:16
25:18 30:7,8,9
37:15 39:6,12,15
108:17 194:18
**Hangley** 69:1
**happen** 8:16 16:5
157:11 159:21
**happened** 31:17
33:3 82:5 94:19

96:18 104:3
141:11
**happening** 183:23
**happens** 64:13 69:6
141:18
**happier** 156:4
**happy** 22:1,3,6
45:11 114:16
154:24
**hard** 8:14 9:11
10:15 11:20 90:12
184:7 209:15
210:17
**harder** 211:17
**hardship** 112:17
**harmful** 82:22 83:6
83:10
**harmless** 73:1
**Hashem** 69:3
**haul** 31:24
**Hawkins** 1:17 2:9
163:23,23,24
164:2,3,6 165:25
166:5,8 168:14,16
168:18 169:7,9
170:4,7,10,11
205:13,14 206:12
206:18
**head** 29:10 34:4
39:11 75:18,20
81:9 86:22 127:2
169:19 197:2,3
**headaches** 23:19
41:18
**headline** 61:13
**health** 50:12 69:24
96:13 153:3
159:24,25 189:1
**healthcare** 165:3
**healthy** 74:4 75:1
**hear** 5:14 96:21
99:21 103:22
115:3,9 120:10
133:19 158:4
162:4 176:15
186:24 195:14
208:3

**heard** 52:15 65:3 66:25 83:15,15 92:7,22 119:3 123:14 126:3 137:12,12,12,14 137:21,23 171:8,9 172:22,24 187:8 212:9
**hearing** 134:3,6 181:19 187:12 195:11,18
**HEARING/AM...** 1:8
**heart** 122:21
**Heim** 48:5,6
**Heimburger** 90:5 153:20,21 154:9 156:9,19
**Heimburger's** 154:4
**hell** 104:21
**Hella** 120:19
**hello** 46:12,13 179:20
**helmet** 160:6
**help** 7:7,9 8:23 11:11 50:6 55:13 173:3 184:18,21 185:2,6,6 197:13 205:19 208:17
**helped** 7:10 200:9
**helpful** 71:24 200:16
**helps** 8:25
**hey** 31:14
**Hi** 6:14 179:19
**hidden** 172:21
**hideous** 74:3,3 86:12
**hiding** 172:9
**high** 18:22 36:17 38:20 39:5 43:22 113:4 145:3 168:3 176:4 181:22,23
**higher** 39:17 44:5 197:25
**highest** 166:1

**highfalutin** 200:25
**highlight** 209:5,18
**highlighted** 116:8 116:11 209:16,19
**highlights** 14:19
**highly** 54:7 77:4
**historic** 7:19 8:12 49:2 67:3 92:8
**history** 57:20 63:20 197:2 211:4,4
**hit** 17:24 75:20 90:11 150:23 160:21 161:13,14 163:12
**hits** 7:24 10:11 23:6 23:17,25
**hold** 33:1 73:1 96:10,11 183:20 185:13
**home** 93:10 183:23
**honest** 175:21
**honor** 3:5 4:14,15 4:23 5:3 6:6,9,10 6:18,22 7:2,7,10 7:12,17 10:6,20 11:4,20 12:7 13:9 13:14,19,24 14:2 14:5 15:14 17:1,4 17:10 18:16 19:22 22:10,20 24:23 26:4,22 28:25 29:15,22,24 31:5 31:10 32:22 33:19 34:24 35:2,5 36:10,22 37:5,13 37:14,15,23 38:9 38:13 45:18 47:11 47:18,21 48:3,6 48:10,13,15,22 50:9 51:12,16 52:2 53:5,6 54:19 55:19 56:17,22 57:10,16 58:9 59:9 60:10,16,25 61:12,15 63:12,24 64:18 65:9,12 66:17 67:6,11

68:9 69:8 71:5 72:24 89:9 105:23 106:21 107:6,21 108:19 110:16 111:20 112:9,13 114:10,16 115:17 115:22 116:23 117:22 118:9,15 119:13 120:4,8,14 122:3 125:6 128:2 129:2 130:4,14 131:1 132:3,17,18 133:14 134:16 137:5 138:12 139:3 140:24 143:3 146:9 150:4 153:18 155:9 156:6 158:24 163:5,20,21 165:12 170:13 171:12 173:21 174:21 175:25 176:12 178:4 180:17 186:9,18 187:11 189:11,17 193:5 194:1,7,9 194:12 195:10,22 197:7 200:4 201:23 203:15 204:4,5,15,22 205:25 207:3,13 208:2,5,20 209:20 211:7 214:4
**Honorable** 1:8 3:4
**hope** 21:2 121:24 133:6 175:25,25 176:1,2,6 204:14 204:15
**hopefully** 105:9,9
**hoping** 109:2,7
**hopping** 12:19
**horizon** 98:25
**horrific** 127:1
**horse** 45:1
**hospice** 165:14
**Hospital** 151:24 152:1

**host** 73:11
**hot** 190:1
**hotly** 189:21,24
**hots** 184:16
**hour** 47:1
**hours** 44:24 202:4 202:4
**household** 32:12 184:24
**Houston** 135:2
**huge** 53:20,23
**human** 184:21
**hundred** 20:15
**hundreds** 19:23
**hungry** 67:13
**hurdle** 114:9
**hurdles** 53:10 110:5,18 111:22 160:8
**Hurricane** 152:2
**husband** 164:16,16 165:20 171:21 205:15,17 206:14
**husband's** 166:11 173:12 182:15
**hyperbole** 57:16
**hyper-competitive** 161:3
**hypothesize** 190:9
**hypothetical** 130:19

_____

**I**

**idea** 24:12 36:24 173:7 196:11,13
**ideas** 131:2
**identified** 13:12 118:2 167:18
**identifies** 117:16
**identify** 213:15
**identifying** 20:20
**ignore** 52:7 53:19
**ignored** 53:3 191:11
**ignoring** 78:11
**II** 5:23 23:22 26:19 27:2

**ill** 164:14
**illegal** 30:18
**Illinois** 36:2
**illness** 136:18 152:12 153:9 173:12
**illnesses** 124:9
**illusory** 148:11,22
**illustrate** 168:12
**illustrates** 166:18
**imagine** 30:23 194:17
**immediate** 8:23 55:13
**impact** 19:17 20:7 40:9 43:21 145:3 161:9
**impacted** 136:13 137:4,9
**impacts** 29:10
**impaired** 118:6,11 206:5 212:21
**impairment** 14:6 18:7 23:8 54:14 94:25 116:5,10 193:8,24 206:4,9
**impairments** 41:10 49:8,14 61:25 62:3 193:11,13 209:25 211:23 212:21
**imperfect** 157:2
**implementation** 3:22
**implemented** 16:23
**implicated** 197:4
**implications** 182:11
**implies** 167:13
**implode** 27:25
**importance** 8:1 13:5,6 121:9
**important** 8:7 13:8 14:7,11 15:20 16:6 17:13 19:12 19:13 20:8 21:5 21:23,23 30:19

31:16 32:24 51:22
56:2 59:3 60:10
69:15 78:12
123:25 124:5
141:21 154:19
158:21 175:24
181:4 185:19
197:4 206:15
**importantly** 15:12
196:21
**imposed** 113:4
**imposes** 64:16
**impossibility**
131:22
**impossible** 131:2
**imprecision** 76:15
**impression** 95:22
**improve** 119:22
**impulsivity** 79:6
**impute** 162:8,8
**inability** 40:4 76:7
**inaccurate** 96:8
**inadequacy** 86:14
**inadequate** 86:16
92:18 99:7
**inappropriate**
119:9
**incentive** 113:10
**incentives** 87:15,17
**incentivize** 85:20
**incidents** 39:21
**include** 22:14 53:13
103:5,13 145:1
149:4 160:3 166:9
197:1
**included** 20:19
42:13 89:15
156:13
**includes** 12:17 50:1
**including** 32:4
39:22 81:10 97:15
98:24 101:16
108:12 165:7
185:8
**inconsistent** 202:25
**incorporate** 16:18
102:11

**incorrect** 99:17
**increase** 60:20
171:25 185:8
**increased** 23:6
44:11
**increases** 64:9
**increasing** 43:25
**independent** 12:22
33:25 42:14 51:6
59:24 64:23
203:18,23
**independently**
157:19
**Indianapolis**
175:16
**indicate** 8:1 74:22
**indicates** 157:17
198:21
**indifferent** 166:10
**indiscernible** 12:4
46:5,10,19,21
47:5 74:12 119:16
129:1 144:19
155:16 160:25
162:9 181:8,25
183:5,7,10 184:11
197:10 208:13
**individual** 9:13
16:11 24:8 158:5
**induce** 58:15
**induced** 102:23
**inducing** 89:3,4
**industrial** 76:6
81:2
**industry** 42:17
169:4
**inevitable** 63:9
**inevitably** 127:1
**inexpensive** 202:17
**infancy** 188:25
189:16 192:1
**inflation** 27:4 28:4
29:11 49:18,25
60:6
**inflicted** 151:13
**influence** 102:10
**inform** 209:23

**informal** 70:15
167:24
**information** 8:5
20:13,20 21:6
23:5 38:4 80:19
172:9,10,20
**informative** 96:4
**informed** 169:2
**infrastructure**
168:10
**inherently** 28:7
**initial** 181:6
**initially** 141:12
**injured** 26:16
101:6 146:17
148:10,20 160:24
**injuries** 9:14,16
10:9,13 17:25
27:1 39:10,21
40:18,20 41:1
81:17 107:18
149:24
**injury** 1:4 7:23
23:21 25:12 26:25
41:9 44:16 50:21
73:4 81:10 88:3
92:4 101:2 102:24
107:19 119:16
148:13 165:9,9
181:15 182:9
184:25 185:11
194:19 196:13,15
**inquiry** 24:17
56:15
**ins** 161:4
**insidious** 104:25
**insights** 164:23
**insist** 146:21
**insisting** 37:19,20
**instance** 156:9
**instances** 76:20
**Institute** 188:25
189:1
**institution** 177:19
**institutional**
162:14
**insufficient** 112:7

**insulate** 178:12,12
**insult** 86:7,8
**insurance** 96:7,8
131:4
**insure** 26:23 131:3
**insured** 29:4
**insurmountable**
160:7
**intellect** 118:21
119:1
**intellectual** 118:16
**intelligence** 30:14
**intended** 33:1
151:18 203:7
**intense** 9:11 57:22
**intensive** 165:10
**interest** 24:20
27:22 29:2,20
87:12 121:11
128:20 181:16
**interested** 75:13
85:21
**interesting** 20:23
75:5,15,16 209:6
210:1 211:11
**interestingly** 78:20
**interests** 24:20 28:1
73:22 87:15,17,18
192:15 194:3,6
**interim** 3:25
**internal** 184:22
**interpreting** 36:6
**intervention**
168:11 185:3
**interview** 97:4
**interviewed** 80:5,5
183:4
**intimate** 185:9
**intraclass** 86:18
87:8 88:11,12
89:5
**introduce** 3:14,19
48:8 68:19 122:5
122:6
**introducing** 5:2
68:20 122:2
**invaluable** 3:16

**invited** 195:21
**involve** 28:3
**involved** 19:1 30:21
31:11 39:10 45:2
214:10
**involving** 9:14
25:11 26:7 30:4
30:25 35:7 66:23
**IR** 148:10
**irrelevant** 96:15
115:13
**isolated** 183:24
**issue** 10:1 24:12,13
29:8 32:23,25
34:23,24 36:25,25
37:4 38:10 51:10
53:1 71:3,4,7,21
78:13 84:9 86:3
87:5,7,10 88:12
91:18,22,25 92:19
98:11 102:18
103:3,6 104:10
108:4 154:8 155:4
188:18 189:20,20
189:23,24 192:24
194:2 199:4
**issues** 10:16 11:2
24:8 25:10,11
29:7 31:9 32:24
33:17,19 34:17
71:3,18,18,25
92:3 96:3 103:15
104:24 154:12,15
157:14 173:22
177:14 187:4,18
191:16 192:1
206:20
**Iverson** 214:2

**J**

**J** 1:18
**Jack** 11:24 26:7
**Jakesian** 37:16
**Jepson** 29:23
**Jersey** 22:16
**Jim** 11:14 138:4,4,8
139:2 185:22

**Jo** 4:4
**job** 113:18 160:23
  184:10,13 185:13
  196:2
**John** 1:14 128:5
  185:23,25
**joint** 43:24
**Jones** 209:11,14
  210:15 211:15
**Josh** 72:4
**journal** 82:1,1
  153:2
**journalists** 96:22
**journeyman**
  153:22
**Jo-Ann** 4:3,5
**judge** 4:8,9,11 6:20
  7:9,18 11:1 21:12
  21:22 28:20,24
  33:22 36:2 39:7
  39:24 46:13 66:22
  67:7,13,22 68:7
  73:16 74:19 76:14
  77:24 78:2 80:19
  86:17 99:11,23
  100:6 103:3
  104:17 114:23
  115:15 120:16,17
  121:1,6,16 124:19
  124:20 125:3,13
  126:19 128:16,18
  128:25 135:6,22
  138:21 139:23
  140:13 141:10
  142:7,11 144:4,6
  144:13,25 146:7
  155:15,20,23
  158:7 162:23
  163:24 197:4,21
  207:19
**judges** 25:8 34:16
**judgment** 37:12
  40:1 67:5
**judgments** 40:6
**judicial** 17:3 39:11
  126:10
**Judson** 129:14

**July** 14:17 52:3
  83:9 84:1,15
  85:19 87:2 88:19
  88:25 94:2 95:7
  95:16,20 99:5
  103:5,11 198:9
  199:2,9,25
**jump** 33:18 144:3,5
**junior** 176:4
**junk** 70:18
**jury** 14:21 25:3
  33:21 195:14
**justification** 88:23
  91:11 137:18
**justified** 72:14
  140:15
**justify** 140:14
  142:17,20

**K**

**Kaitlin** 69:2
**Karp** 1:11 2:3,12
  13:24 17:1,6,7
  18:16 35:15 45:21
  47:17,18,20,23,23
  48:4,7,11,14,16
  48:18,21,25 51:6
  68:19 69:11 70:21
  71:5 75:17 77:13
  96:21 123:11,14
  137:15 178:3,4
  186:3 187:25
  194:8 200:19,20
  200:24 201:5,8,13
  201:17 203:21
  204:22
**Katie** 1:21 171:21
**Katrina** 152:2
**Kazinski** 121:16
**keep** 16:1,21 48:21
  51:22
**keeping** 158:24
**Kelp** 213:22 214:8
**Kentucky** 176:10
**Kevin** 5:22 8:23
  23:22 24:4 26:18
**key** 188:5

**kick** 7:1 136:21
**kicker** 145:23,25
**kid** 174:21
**kidding** 123:20
**kids** 180:9 182:18
  184:18,19,20
**kill** 98:20
**killed** 122:21
**kind** 30:4,16 69:21
  96:21 155:14
  183:3
**kindergarten** 30:12
**kinds** 9:17 173:14
  173:24
**kk** 135:15
**Klonoff** 85:13 89:2
  91:15
**knew** 23:4 33:13
  123:13,13 124:3
**knock** 161:14
**know** 5:13 6:24
  11:19 12:13 17:18
  17:19 20:1 24:11
  30:5,8,16 31:11
  31:14,22,23 32:14
  33:8,10,12,12,13
  33:19 34:14 37:17
  38:10 51:2 61:15
  67:1 76:3 78:7
  80:14 81:21,24
  89:19 90:16 92:12
  94:5,7 95:24 96:1
  96:5,7 97:15 99:7
  99:13,19 101:5,8
  112:25 119:24
  124:2 125:1,2
  127:25 131:10
  134:13,25 143:6
  148:23 157:22
  171:13,14 172:6,7
  172:25 173:1,6,6
  176:20 177:18
  178:6 179:6 183:3
  183:9 184:10
  185:18,23 194:10
  194:11,13,16,18
  195:4 199:10

  200:11,20,20
  201:13 210:2,15
  211:22 212:24
**knowing** 54:13
  103:16
**knowledge** 188:20
  188:21
**known** 82:20
  116:15,17 117:6
  119:6 164:7 165:1
  172:20
**knows** 32:22 56:22
  57:11 65:13
  117:13 193:6

**L**

**labor** 52:21
**lack** 53:14 130:20
  180:6
**laid** 17:7 25:5
  60:24
**LANCE** 1:15
**landmark** 7:19,20
**Lane** 7:9 66:22
**language** 27:7
  102:20 117:17
  143:11 161:14
  177:7 178:23
  197:14 209:21
**large** 111:6 117:19
  139:13 162:15
  168:7 196:18
**largely** 73:9
**lastly** 82:14 163:14
  191:10
**late** 150:23 172:14
  206:13
**laughed** 174:23
**laughs** 177:3
**Laughter** 7:5 22:8
  37:24 67:15,23
  120:1 127:21
  130:9 131:7
  132:15 134:14,21
  138:22 161:22
  175:2 180:2
**launched** 22:17

**laundering** 205:8
**law** 4:1,2,5,7 10:24
  31:18 52:21 55:24
  57:10 72:6,11
  87:9 96:4 156:11
  164:12
**lawsuit** 120:24
  124:1
**lawsuits** 121:14,20
**lawyer** 16:11
  123:10 129:4,12
  175:4 198:17
**lawyers** 33:8 81:14
  103:23 105:15
  115:3 125:1 158:6
  212:4 214:16
**lax** 61:4
**lay** 19:10 161:14
**layer** 27:18
**lead** 81:10 194:25
**leading** 81:16,24
  82:1 195:23
**leads** 36:8 176:23
**league** 1:3 47:24
  51:14,25 52:4,5
  55:2 56:12 57:1
  64:12 82:6 89:12
  90:17,22 204:10
  207:3,5,11
**League's** 207:8
**learn** 17:24 184:18
**learned** 18:4
  171:17 183:2
**learning** 166:23
**leave** 54:8 154:18
  164:11
**leaves** 152:11
**leaving** 86:19
**left** 74:19 75:2
  86:23 99:8 101:10
  125:19 147:17
  162:16 209:16
**left-hand** 139:11
**legacy** 124:18,20
**legal** 10:16 30:17
  31:9 32:24 51:15
  52:6 53:9 54:7

55:4 63:22 71:25
72:3 98:10 199:4
199:14 200:1
**legally** 70:24
**length** 9:12 28:22
63:10 65:25
**lengthy** 56:4
**lesser** 119:3
**letter** 98:4 99:2
**letters** 98:4
**let's** 4:13 12:11
15:13 30:5 40:21
81:6 83:23 88:20
88:21 90:23 92:22
127:9 144:23
159:22 162:12
186:6,6 194:15,17
**level** 13:12,13 14:4
14:6,15,15 15:13
15:15,18 33:5
50:7 57:25 58:14
94:24 116:22,24
190:15,15 206:4
209:23,24,24
211:14
**levels** 13:11 50:22
63:2 116:4 143:18
190:10,10,15
191:21
**Levin** 6:16 24:25
25:16 39:12
**Lew** 180:19 181:11
183:11
**lewy** 166:16,20,23
167:3,8,11,12,20
168:2
**liability** 34:6 44:13
49:23 60:9 65:5
**lied** 70:19
**lien** 16:6,10,12 26:1
26:9
**life** 14:12 15:21
49:22 96:13
117:18 140:14,20
141:8 152:15
165:15 166:2
177:4 181:9 182:3

184:23 185:8
203:9
**lifelong** 185:5
**lifetime** 16:5 98:23
**lift** 113:23
**lifted** 108:21
**light** 38:15
**likelihood** 188:15
**likewise** 62:16
136:17
**limit** 113:4,9,9,12
**limitation** 53:14
**limitations** 34:11
34:16 119:24
**limited** 12:13 81:11
115:23 119:24
126:22
**line** 8:13 28:12
40:10 45:10,12
63:8 86:20 136:20
141:23 148:9
189:25 191:6,7,24
192:2,2
**linebacker** 145:4
164:9
**lines** 28:19 45:7
63:2 120:20
**link** 151:12 191:5
**linked** 81:1
**linking** 82:13
152:23
**list** 30:24 106:5
114:24 158:8
209:7
**listen** 46:10 180:4
**listened** 205:6
**listening** 170:18
**lists** 32:11
**literature** 13:6,19
33:9 41:12 44:1
85:5 100:20 117:1
196:6,9 211:24
212:19 213:21
214:9
**litigate** 9:23 51:16
56:8
**litigated** 25:10

31:23 51:21 56:11
205:8,9
**litigating** 9:25
32:23 42:1 54:7
**litigation** 1:4 3:10
3:10 6:25 8:4
10:2 25:17 27:20
29:21 30:2 31:22
37:2 39:6,22 40:7
53:5,11,25 54:16
55:17 56:20,25
59:8 61:6 63:15
63:16 66:9,20
72:12 82:15
159:19 187:23
188:1 200:2
204:10,21
**little** 5:15 27:22
34:22 45:17 47:14
74:20,21 78:1
83:16 109:5
113:10,23 143:24
143:25 168:22
186:22 194:15
196:11,13 198:10
209:14 210:17
**live** 9:6 20:16 79:2
79:3 150:22 162:1
181:14
**lived** 104:21
**lives** 86:9 103:25
185:7
**living** 40:14,22,24
41:10 83:8,13,21
88:23 98:19 103:7
103:13 163:8
180:7 182:6
184:25 196:20
**lo** 171:24
**located** 9:6
**locking** 119:8
**Locks** 6:13 24:25
**logic** 43:16
**logically** 99:9,9
**long** 8:14 31:24
32:10 79:2,3 95:8
101:11 126:19

148:14 174:4
181:8 183:15
198:25 199:1,18
201:2,9
**longer** 115:7
164:17
**long-form** 92:23
94:11,15 95:24
**long-term** 81:10
98:24 167:23
170:1
**look** 15:16 20:25
24:23 31:6,18,19
34:17 74:2,5,16
74:19,25 93:18
94:15,17,17 95:13
98:1 134:12 136:4
139:10 140:6,16
140:25 141:22
142:6,11 144:14
144:21 155:15
156:10 172:3,6
176:3 179:16
180:13 184:6
198:19 214:5,7,8
214:9
**looked** 93:5,6 96:3
142:10 192:15
**looking** 93:15 99:8
171:16,18 172:2,4
173:14,23 192:18
212:20
**looks** 24:18,18 30:8
**lose** 65:23 125:25
**loss** 10:13 23:20
30:14 40:4 62:4,4
62:6 78:5 79:5,10
79:11,12 80:24
81:11 149:25
182:12,13
**lost** 55:1 98:5
148:18
**lot** 13:5 37:13 38:4
68:2 113:1 156:4
161:2,15 162:4
172:22 184:10
187:8,9,9 200:25

201:6 202:22
204:18,24 212:2
**Lou** 93:20 150:23
**loudly** 57:8
**love** 175:18,21,21
175:22 181:17
**loved** 125:25
**low** 92:13,15
**lower** 172:19
197:18
**Lubel** 1:15 2:7
133:25 134:2,5,9
134:15,19,22,25
135:4,6 137:11
138:2,12,14,17,20
138:23 139:2,5,7
139:10 143:2,5,9
143:9,20 144:5,12
146:7 154:7
197:14
**lunch** 67:13 115:10
127:8
**lung** 159:25
**lynchpin** 87:13
**Lynn** 48:9

**M**

**mad** 165:4
**MAF** 110:8,15
111:19 114:11
**magazine** 94:13
**magazined** 94:12
**magistrate** 4:9
**magnitude** 71:20
**mailed** 19:6
**main** 132:19 171:6
**maintain** 166:1
**maintaining** 36:21
**majority** 117:20
160:5
**making** 80:17 96:8
102:16 103:15
119:7 165:23
**man** 175:19
**manage** 185:6
**manageability**
24:13 36:25 37:3

managed 6:23 93:4
management
  165:10 168:8
mandated 169:3
manifested 193:8
manifestly 56:5
manifests 77:22
  78:18
manifold 168:12
manner 164:25
Manny 106:7
Manochi 1:16 2:8
  153:16,17 155:2,5
  155:7,14,25 156:5
  157:7,22 158:1
manual 72:12
man's 185:12
map 184:22
marines 32:7
marker 97:6
market 1:24 168:24
Marks 6:15,18
  24:25
Marshal 186:13
marshals 134:19
Martin 1:12 105:24
Mary 1:17 163:23
mass 9:13 38:22
  134:6 204:23
mass-wide 26:10
master 3:15 7:15
  7:15 29:1 55:6
  59:15 66:23
  201:22
masters 181:20
master's 3:22
material 181:25
matter 4:11 51:25
  63:7 91:6 105:5
  121:23 155:18
  156:25 184:1
  190:17
matters 3:16 4:4
maximum 29:12
  84:2 85:7 162:11
Maxwell 35:19
Mayo 151:2,21

152:12
ma'am 134:5
McGee 208:22
MCI 212:21
McKee 79:15,16
  80:11 190:7,12
  210:6
MDL 1:4 66:19
  200:8,8
MDLs 25:7
mean 32:6,12,22
  35:3 43:2 46:25
  64:7 79:20 86:6
  88:8 96:10 99:3
  102:2 126:6
  156:16 157:8
  161:15 177:18
  192:16 197:13
  200:13
meaningful 109:20
means 11:10 17:2
  20:11 31:25 35:25
  110:9 148:2
  152:14 174:15
  181:14 198:17
  201:8
meant 113:7
  131:17
measurably 56:18
measure 119:15
  152:18
media 19:16,20
  32:3 52:13 57:24
  58:2,10 65:18
  96:20 97:1 104:25
  202:16,24
mediator 28:23
  55:5 59:14 66:23
Medicaid 16:14
medical 6:1 9:5
  12:22 13:6 14:8
  14:25 33:9,25
  44:1,11 50:24
  55:21 59:18,21
  60:4 64:4,6 73:14
  82:17 85:5 98:13
  98:24 109:20

117:1 141:7
151:20 152:4,6
169:17 180:6
187:10 196:10
206:23
medically 205:19
Medicare 16:14
medicine 50:4
  189:1 206:11
meet 97:23
meeting 90:10
  182:21
meetings 10:7
member 43:4 45:9
  107:7,9,24 108:2
  110:1,2,4,25
  111:9 112:15
  113:17 114:13
  126:9 156:20
  204:8
members 6:12 8:21
  20:11 27:10 29:3
  57:11 58:5,16,18
  59:16 60:12 62:10
  62:12 66:10 72:8
  72:25 80:5,14,16
  80:18,19 87:21,21
  101:10 108:13,21
  110:18 120:22
  121:7,11,15
  135:10 137:8
  147:18 149:18
  156:18,25 157:12
  202:10
memo 163:15
Memorial 151:24
  152:1
memory 62:4 78:4
  79:5,10,11,11
  80:23 81:11 86:8
  175:25 177:5
  199:16 209:21
men 8:15 125:20
  126:20 169:24
  181:7,19 185:2,6
mention 6:4 8:5
  19:5 32:13 59:6

86:5 95:15,19
198:25 211:2
mentioned 13:4
  18:3 38:16 79:5
  95:17 128:25
mentioning 108:25
merit 107:13
merits 60:24
mess 4:20,21
met 23:12 110:4
  119:14
methods 74:17 77:4
  214:13
metric 170:8
mic 208:14
Michael 1:15
  146:10
microphone 5:14
  186:21
microscopic 76:12
middle 9:25 93:19
  164:9
Mid-Atlantic 1:23
mild 7:23 13:14,17
  14:16 15:14 79:12
  117:2,4,6 212:21
miles 111:10
milestones 184:15
military 213:23,24
Miller 128:6
  129:14
million 12:15 49:5
  59:20 84:2,6 85:7
  85:9 87:4 88:13
  88:17 95:14 99:25
  100:1,24 101:1
  108:10,18 113:24
  123:11 139:14,14
  140:9,11,18 141:3
  141:13 143:22
  149:17 154:22
  156:3 167:5
  168:18
millions 38:24 39:1
  42:19 54:6 65:2
  203:10,10,10
million-two 141:7

142:17
mind 4:15 5:3
  51:22 54:22 115:6
  171:20 186:14,22
mine 4:5 25:25
  68:21
miner's 159:24
minimum 111:17
  146:15
Minnesota 35:15
  35:16 164:8
  174:22 176:6
minor 89:18
minute 18:25 24:16
  67:10 93:6 99:15
minutes 4:16 47:2
  105:22,25 115:14
  120:12,14 125:5
  127:13 128:4
  137:16,17 143:12
  158:13 170:21
  174:16 187:3,6,14
  201:19 207:19,22
misdiagnosed
  167:6 172:15
misery 104:21
misinformation
  20:5 32:4 40:15
misinformed 99:17
  99:19
mislead 62:10,10
misleading 94:14
  95:25 96:16
misled 95:9
missing 51:23
  56:15
mistake 21:1
  102:14
misunderstanding
  61:19 62:17
mix 96:14
moderate 13:13
  14:15 117:24
  118:7
moderately 118:10
modest 61:5 163:6
modifications

16:17 91:21,24
126:6
**modify** 126:16
153:12
**Molo** 1:12 2:4 20:4
21:8,12,13,18,22
22:1,5 32:5 37:8
38:2 46:1,12,13
46:17,24 47:4,7,9
67:10,11 68:5,7,9
68:11,13,16,23
69:5 72:6,21,23
75:9,11,15 79:16
79:20 80:4,15,18
90:1,3,8 97:20
100:3,6,10,14,17
100:19 101:20,23
102:7,9 105:17,20
109:14 113:21
114:22 115:1,5,11
115:15 119:24
123:22 128:16,17
128:18 129:6,10
154:7 158:5,7
179:15 187:17
192:25 194:11,18
195:12,23 196:4
196:23 198:3,5,8
198:15,16
**Mololamken**
105:24 115:3,21
**Molo's** 187:7,8,13
210:9
**mom** 182:1,15
**moment** 6:21 19:15
45:25 52:15 61:12
77:10 78:10 84:25
88:20,21 91:16
101:12 127:9
186:1 197:8
203:21 206:2
**moments** 205:14
**moms** 183:19
**mom's** 176:3
**monetary** 12:9
14:10 27:4 29:10
43:10 49:4,5,11

49:18,25 50:10
51:8 54:22 55:8
58:23 59:1,19
65:2,4 93:19
94:19,23 95:5
110:9 130:20,21
131:15,17 135:9
136:21 141:25
143:18,19 149:23
199:8,24 206:25
207:9
**money** 15:17 26:25
28:12,13 38:5
40:2 42:17 69:22
129:24 131:20
146:1 154:25
172:20 177:10,12
201:15 202:18,22
**monies** 73:23 156:6
156:16 157:10
207:7
**month** 176:13
191:17
**months** 9:11 28:22
107:11 198:9
202:5
**mood** 10:12 23:19
41:18 62:15,20
63:13 75:24 79:7
109:12,16 180:25
181:14 185:6
187:19 190:20,21
191:9,16
**Moore** 1:17 2:9
69:5 158:10,11,14
158:16,19 159:2
161:19,23 162:20
162:23 163:1,4,17
**moral** 184:21
**Morey** 89:21 106:7
106:8
**Mori** 106:7
**morning** 3:4,6,7
4:23,24 6:10,11
6:18,19 44:24
47:20,22 48:2,10
48:12,15,17 68:9

68:10,12,13 81:14
92:7 125:6,7
126:3 134:17
158:24 187:11
188:1
**mother** 98:5 122:2
124:12 182:13
**motherload** 124:10
**motion** 3:19 33:1
52:16,23 105:4
**motions** 39:23
**motivated** 27:2
**motivation** 26:23
**Mount** 73:15
**move** 22:14 78:25
142:24
**movement** 166:22
**moving** 98:3 108:4
**muddered** 85:15
**multiple** 41:17 81:9
82:17
**multiplied** 173:9,10
**multiply** 173:13
**multi-billion** 25:17
**multi-district** 3:10

--------

**N**

**N** 2:1 3:1
**name** 8:13 21:9,9
32:13 70:20 98:2
128:5 146:10
158:20 167:13
186:12
**named** 27:9
**names** 32:12 81:20
196:7
**nation** 63:8
**National** 1:3,23
47:24 56:11,25
64:11 188:25
**nationwide** 111:7
**nature** 23:2 69:17
70:13 169:12
**navigate** 185:2
**near** 165:15
**nearly** 60:11 165:1
165:18 166:20

**necessarily** 83:20
91:15 196:8
**necessary** 14:9
16:22 130:20
149:15
**necessity** 36:6
**need** 9:3 12:23
14:19 27:10 34:9
42:12 54:15 55:13
57:2,3 107:23
108:20 110:14
125:1 133:12
171:17 186:1
188:2
**needed** 7:1,13
15:10 16:23 33:8
54:24
**needs** 5:25 9:1
123:5 166:11
196:3
**negligence** 35:22
40:5
**negotiate** 9:19
16:10 55:7 105:6
**negotiated** 9:15
25:13 38:18 65:25
99:24 101:4 121:3
123:18
**negotiating** 6:13
9:20 18:5 42:25
51:17 67:1 124:8
**negotiation** 6:25
41:24
**negotiations** 9:12
10:8,15 28:22
44:20 62:18 63:10
206:21 212:6
**neither** 135:24
137:8 146:20,23
**neonatal** 165:10
**nervous** 179:22
**Nest** 6:16 24:25
**neurocog** 18:6
**neurocognitive**
13:11 18:7 23:8
30:5,13 41:1 49:7
50:2,5 54:14

59:17 61:24 62:2
64:8 94:24 116:5
116:10 151:14
165:20 168:21
169:16 190:11
205:24 206:3,4,9
209:25
**neurodegenerative**
117:21 125:22
126:1 169:18
197:6
**neurologic** 165:9
**neurological** 12:17
23:17 76:16
**neurologist** 111:13
150:25 152:8
166:15
**neurologists** 111:8
117:7 183:4
**neurology** 34:1
82:2 152:23
**neuromuscular**
41:1 49:7 54:14
61:24 62:3 64:8
**neuropathological**
93:23
**neuropsychologi...**
12:18 34:1 166:13
195:8
**neuropsychologist**
214:12
**neuropsychologi...**
117:7,20,23 183:6
183:6
**neuroscientists**
183:5
**neurospecialist**
152:9
**neurosurgeon**
152:8,21
**neurosurgeons**
183:4
**neutral** 38:11
**never** 7:3,3 19:1
27:23 67:22 76:3
86:10 118:1,1
123:12 124:1

172:13 175:25
176:1,3,6 194:18
194:19 201:3
**new** 16:18 22:16
68:20 116:19
134:13 150:14,17
151:16 189:5
**newborn** 165:6
**News** 97:5
**newspaper** 153:8
**NFL** 3:9 5:7,20
8:12,13,19,20,23
9:1,3,4 12:18
14:13 15:4 17:18
18:10 23:3,4,23
24:4 26:17,20
27:24 28:3 29:9
29:12 30:24 31:3
31:8,12,23 32:13
32:25 33:2 34:21
35:2,19,22 36:16
37:2,2,7,9 38:5
40:5 41:24 42:21
43:12,20 44:8
47:24 48:4 49:1,6
49:14,20 50:3,4,6
50:15,17,20,23,25
51:12,24 52:15,20
53:22 55:9 59:18
61:7 63:16 65:3
66:6,9 70:5,16
71:15 74:1 78:8
81:2,3,8 82:5,10
82:13,22 83:7
87:25 88:5 89:7
89:12,13,14,17
90:9,9,14,14,16
90:21,25 91:5,7,9
91:12,12,18,22
96:24,25 97:2
98:9 100:12,22
102:20 104:13
110:11,21,23
111:1,12,22 112:2
112:5,8,10,16,18
112:21 113:9,10
113:12,17 116:25

118:22 123:12,19
124:10 126:16
127:3 128:7
129:15,15 130:6
130:17 131:6,19
131:23 132:8
136:6,7 144:17
146:11,18,23
147:3,11,17 148:8
148:13 149:12
151:3,5,13,17
152:4,17,25
153:24 154:10,12
156:8,13,21
157:13,19 160:4
160:15,15 162:15
163:7 168:24
172:8 174:2
175:15 177:16,20
180:20,23,23
185:14,15 187:2
202:12,17,21,25
203:6,18,23 204:3
204:7,11,12
205:23 206:1,19
**NFL's** 23:8 36:4,5
49:22 50:11,23
52:23,25 60:8
83:12 139:19
147:8,17 149:16
155:10
**nice** 143:15,15
**nicely** 97:22 154:8
**night** 96:24
**nine** 23:15 29:24
136:6
**Ninety-nine** 123:20
**Ninth** 121:16
**Nissan** 121:17
**Nitz** 69:2
**NLF** 23:16
**non-issue** 24:14
**non-NFL** 92:4
102:23
**noon** 46:20
**normative** 213:6,16
**Northern** 36:1

**note** 6:8 38:2 60:16
111:12,20 112:19
113:14 193:25
**noted** 31:10 50:18
52:22 59:19 205:5
206:8
**notes** 122:22
170:19 193:17
**notice** 19:1,2,4,6,9
19:9,17 20:9
22:17 32:2,3
71:17 92:6,23,23
92:24 93:11,12,14
93:25 94:4,12,15
95:9,25 96:3,17
99:7 102:18,18
141:21 198:3,7,10
198:11,14,16,16
198:25 199:1,5,10
199:13,18,25
200:9,10,24 201:2
201:9
**noticed** 106:5 211:1
**notices** 19:6 197:9
200:3
**notwithstanding**
58:13
**November** 1:5
151:23,25 215:10
**nullify** 204:6
**number** 3:11 10:13
15:3,10 20:24
21:3 25:14 92:13
92:14,16 102:25
111:10 113:9,12
135:11,12,19,24
143:23 144:21,23
147:6,7,19,22
160:4 170:16
178:11 198:20
203:3
**numbers** 26:5 93:1
139:13 140:23
141:11,15 143:14
163:10 197:15
**numerosity** 22:23
**numerous** 7:25

17:16 18:1 23:24
25:6,7 27:16
52:24 53:9 58:2

------

**O**

**O** 3:1
**Oak** 150:22
**obituary** 150:14,19
153:10
**object** 65:3 100:12
100:22 106:15
121:8,19
**objected** 106:6
121:22
**objecting** 22:19
172:23
**objection** 61:13,15
61:17,18 62:14
64:15 92:5 98:1,6
99:16 106:12,13
121:18 128:8,10
128:20 129:23
146:13 150:8
160:2 163:19
164:4 166:6
169:11 170:23
171:6,6 176:15,20
176:23 177:3
178:17,22 180:5
196:14 198:6,9
**objections** 28:18,19
55:2 60:17,18,19
60:23 61:9,11
92:19 98:4 124:24
154:3,4 159:6
166:8 175:5
178:20 205:6,6
**objective** 147:22,22
147:24 149:15
153:7,10 196:18
**objector** 173:18
**objectors** 20:3,5
22:17,22 24:9,16
25:2 27:14,17
33:11 40:9,15
42:11 43:2,10
44:24,25 45:6,8

52:7,13 53:3,18
56:4,16 60:15
62:7 63:21,24
65:10,15 68:18
69:6 74:11,14
92:13,14,15,16
121:6 137:20
153:19 172:23
187:5,18 188:14
190:6,7 191:11,12
192:17,25 195:23
201:1 202:16,24
204:18,25 212:19
**obligated** 154:25
202:13 203:6
**obligation** 159:12
203:23 204:1
**obligations** 141:17
**observed** 52:2
**obstacles** 70:4
**obtain** 39:19
**obtained** 40:2
86:22
**obvious** 84:9
**obviously** 77:5
131:14 134:10
192:6 202:24
208:23 209:3
210:19 213:22,25
**occur** 42:13 43:7
84:11 95:4 136:14
**occurred** 36:16
44:8 149:7
**October** 150:25
165:22
**Oddly** 73:8
**odds** 54:16
**offensive** 150:16
**offer** 45:3 141:18
164:22 168:10
177:2
**offered** 89:1 140:22
146:24 173:1,6
176:5
**offering** 148:21
**offers** 149:22
**office** 69:3

**offs** 88:4,7
**offset** 112:3 206:25
207:6
**offsets** 43:11 50:16
60:1 61:4 63:25
92:4 102:24
140:10,18
**oh** 4:18 5:5 25:21
106:15 114:24
132:10 138:24
179:23 186:5
201:12 208:7,11
209:13 210:8
**okay** 4:13,18,22
5:10 6:5 11:25
12:1,6,6 13:25
17:9 18:18 26:11
35:16 44:17 45:19
46:22 47:4,4,8,12
47:17,20 48:24
67:9,12,16,24
68:8,15,22 69:4
72:5,6,21,22
74:21,21 90:7
105:15,18 106:15
106:17 114:18,21
115:16 119:18
120:5,7,10 122:7
122:9 124:14
125:5 127:13,13
127:24 128:3
130:1,3 131:9
132:4,10,10 133:6
133:10,13,14,22
133:25,25 134:23
135:3,5 137:10
138:13,16,24
139:6,9 142:25
143:4 144:2,9,10
146:8,8 155:25,25
156:8,14 157:7,21
157:25 158:4,9,14
158:19,19 159:2
161:23 163:4,16
163:17,22 165:24
166:3,8 168:16
169:6 170:9 175:1

175:6,12 178:5,18
179:2,7,8,10,17
180:18 185:21
186:5,10,15,16,23
199:20 200:18,23
207:16 208:1,3,11
208:13,19 209:15
210:9 214:16
**old** 44:3 136:19,22
137:1 139:21
140:7,7,10,25
142:8 143:23
162:13,15 177:5,6
208:7,9,9
**older** 13:1 38:25
42:3 136:22
143:25 163:8
169:16 172:17
173:15 174:8
193:18
**omission** 156:16
**once** 45:4 60:25
67:25 93:9 103:14
126:14 127:19,19
**ones** 40:19 125:25
130:10,12 139:23
163:9 212:15
**one-page** 19:11
**one-tenth** 121:14
**one-year** 140:13,20
141:6
**ongoing** 185:3
**onset** 167:1 180:24
181:6,7 182:24
**open** 20:19 94:20
94:22
**opening** 48:22 52:4
61:22
**operated** 89:13
**operator** 1:21
20:16
**opined** 188:18,20
**opinion** 35:20
41:16 120:18,18
120:21 195:3
**opinions** 189:8
**opportunity** 5:1

43:6 68:17 104:20
114:20 125:11
153:18 161:13
164:4 171:2
**opposed** 36:17
**opt** 31:6 43:6,8
56:24 58:5,15
61:5 63:15 70:22
70:24 92:16 106:7
170:24,25 171:1,4
**opted** 20:22 22:13
89:24 90:1,6
106:8,18 110:1
171:3
**opted-out** 121:22
**opt-in** 106:23 107:6
107:9,18,23,24
108:3 114:9
**opt-out** 106:24
121:15,19
**order** 27:11 29:22
34:2 102:5
**ordinary** 122:16
**organize** 186:1
**organizing** 128:20
**orientation** 30:19
**original** 69:6
130:14 164:8
170:19
**origins** 159:19
**Orleans** 150:18
151:16
**ought** 65:22 91:3
200:14
**outbursts** 183:24
**outcome** 56:19 66:7
193:15
**outlined** 53:17 56:2
**outpatient** 167:24
**outrageous** 89:2
**outs** 31:6 43:8
58:15 92:16
170:24
**outset** 49:1 52:18
53:11
**outside** 114:7 183:6
185:22 186:12

**outstanding** 8:19
**overall** 39:19 78:2
**overbroad** 125:15
**overburdened**
182:2
**overcome** 148:4
**overlay** 184:4
**overly** 159:14
**overriding** 29:20
**overseen** 50:20
**oversight** 17:3
126:10
**overstatement**
57:16
**overturned** 148:3
**overview** 77:20
107:3
**overwhelmed**
182:14
**overwhelming**
59:10 60:11 98:23
**overwhelmingly**
32:16 57:6 58:20
**over-narrow**
125:16
**owned** 89:13
**o'clock** 46:23
**O'Donnell** 69:2

**P**

**P** 3:1
**PA** 1:5,24
**package** 110:20
111:23
**packaged** 94:12
**Packer** 180:21
**page** 2:2 78:2 83:12
93:5,10 116:18
135:14,15,16
144:14 152:5
209:7,7 211:17
**pages** 35:4,4,4
51:11 94:22
112:24 113:1,2
**paid** 14:13 15:16
73:23,25 101:9
130:19 196:24

**pain** 165:10 169:23
**pants** 7:1
**paper** 82:8 152:23
**papers** 33:1 52:9
53:4 55:21 56:4
56:16 77:12 80:13
83:16 108:11
117:3 148:8
**PARAG** 1:16
**paragraph** 81:9
83:11,12 85:13
87:22,23 92:2
109:6 118:3
143:13 190:13
191:2 193:17
**parallel** 44:11
**paranoia** 80:25
**Pardon** 161:19
163:1
**parent** 181:14
184:13
**parenthetically**
121:12
**parenting** 184:12
**parents** 30:13
182:2
**Parkinson** 75:6
**Parkinson's** 9:1
10:12 14:14 23:7
41:3 75:21 76:1
76:24 78:21 83:18
93:21 94:24 142:4
146:13 167:12,13
167:15 189:6
197:5
**part** 13:9 26:4
30:13 34:12 40:5
50:15 51:7 93:16
100:7,21 123:15
123:17 132:18
157:18 162:1
167:12,14 181:13
212:6
**partially** 181:19
**participate** 109:3,5
109:8,9 113:25
164:17

**participated** 110:3
**participation** 109:1
**particular** 9:22
  39:25 47:3 65:24
  181:21 187:6
  188:23 193:23
**particularly** 64:17
  181:23
**parties** 6:24 10:6
  10:17 16:19 31:23
  33:22,24 40:6
  43:3 59:13 65:25
  66:21 72:10,14
  73:1 75:3 91:20
  91:23 96:12
  102:11 105:6
  107:14,17,22
  108:7,15,17
  110:13 112:4
  113:6 116:14
  119:14 126:5
  207:14
**partner** 47:25 48:9
  164:15 207:20
**partners** 165:14
**parts** 31:13 111:6
**party** 41:24
**pass** 161:13 183:15
**passed** 14:17
  140:21
**passing** 38:1
**passion** 181:22
**pathological** 14:18
  41:7,8
**pathologies** 34:4
**pathology** 193:18
**patience** 67:5
  207:12
**patient** 118:11
  210:23
**patients** 41:4
  117:25 152:14
  165:13 167:19,22
  168:2,3 190:14
**Patriots** 23:24
**patterns** 74:24
**Paul** 48:8 187:2

**Pauline** 182:5
**Pause** 11:12 68:4
  122:8 127:11
  134:1 138:1,6,10
**Pausner** 120:16
  121:7
**pay** 38:11,13 65:4
  70:7 100:25
  110:11 112:15
  129:25 130:21
  131:21 132:9
  153:8 202:13
  203:2,8,24 204:3
**paying** 133:5
  202:22
**payment** 15:2
  49:20 88:17 132:2
  204:9
**payments** 50:17
  59:1,19 60:8
  130:24 149:18,23
  197:19
**payouts** 197:15
**pays** 112:16
**peace** 54:21
**PEC** 6:13 38:17
**peculiarity** 113:15
**peculiarly** 72:18
**penalized** 169:17
**pending** 39:23
  52:16 55:19 66:4
  121:17
**Pennsylvania** 1:1
  4:1,7
**pension** 147:7
**Pentz** 1:14 2:6
  128:1,2,5,5,12,14
  128:19 129:2,4,13
  129:18,22 130:3,7
  130:10,13 131:1,8
  131:11,13 132:3,5
  132:12,16 133:2,7
  133:9,14,16,18,22
  133:23,24
**people** 3:20,21 5:3
  33:16 40:23 42:19
  42:21 68:2 73:11

73:12 74:6 76:3
  76:17,25 78:3,12
  79:3 80:7,7,8
  81:15 83:21,22
  84:14 85:17,18,20
  86:3,24 87:1,3
  88:4,5,6,21,22,25
  89:3,14 90:24
  93:2,4,18 94:17
  96:25 98:17 101:6
  103:10,13 105:2
  105:11 113:1
  117:22 121:19,22
  123:4,8 128:21,21
  140:3,21 160:10
  161:3 162:4
  166:20,24 167:5
  171:23 181:5
  182:6,21,24 184:2
  192:14 194:3
  196:20 198:22
  212:8,22 213:14
**percent** 20:22
  22:12,19 58:15,18
  62:12 63:18 66:9
  83:19 93:4 112:3
  121:15 123:21
  145:21 161:10
  166:20 167:2
  190:13
**percentage** 71:9
  103:1,2
**percentages** 92:15
**perfect** 10:21 11:22
  45:14 156:8 188:8
**perfectly** 28:3
**Perfetto** 1:18 2:10
  170:12,13,22
  205:13
**Perfetto's** 206:13
**performance** 118:6
**performed** 190:8
**period** 49:16
  148:17 181:6
  191:14
**periodic** 126:14
**permission** 163:15

**perpetuated**
  172:12
**Perry** 3:14,17 55:6
  66:23
**persistent** 211:22
**person** 40:24 76:21
  77:23 81:3 93:3
  105:19 106:11
  107:12 110:10
  119:7 197:23
**personal** 9:14,16
  25:3 168:11
  194:19
**personality** 78:14
**personally** 9:14
  30:9 165:17
  179:15
**personnel** 213:25
**persons** 40:14
  193:18
**person's** 76:10,11
  184:23
**perspective** 54:1
  158:22 165:1
  185:10 189:12
  214:12
**perspectively** 41:9
**persuade** 58:5
**persuasive** 57:12
**pervasive** 182:23
**ph** 5:6 6:13,15,16
  6:17 12:21 24:11
  28:6 35:25 37:16
  41:6 43:17 48:19
  51:3 79:15 106:7
  120:16,19 121:16
  126:25 136:4
  151:24 167:18
  182:5 188:17,17
**pharmaceutical**
  9:16 14:9 42:17
  167:25 169:25
**Phase** 210:24
**Philadelphia** 1:5,24
  68:25
**Phillips** 7:9 28:20
  28:24 33:22 39:24

66:22
**phone** 44:24 99:15
  99:21
**physical** 65:16
  168:7 205:4
**physically** 74:5
**physician** 110:9,10
  111:19 114:12
  152:10
**physicians** 110:14
  110:15,16 111:2,5
  111:10 114:12
  166:10
**PI** 194:19
**picked** 110:24
  111:22
**picking** 211:12
**piece** 36:22
**PJ** 209:9,11
**place** 45:9 77:16
  110:17 111:6
  148:14 172:13
  183:25 205:16
  206:13,15
**places** 93:13 160:7
**plaintiffs** 16:8 27:9
  31:3 33:7 34:5
  39:20,21 40:1
  41:20 43:1 52:7
  52:19 53:4,8,15
  53:20 55:4 63:11
  69:22 70:3 73:20
  83:5 85:17 87:16
  156:11,16 195:17
  206:21
**plaintiff's** 35:21
**plan** 147:5 149:5
  165:23 166:17
  206:19
**plans** 207:8
**platform** 174:23
**play** 15:8 42:1,21
  43:13,21 44:8
  54:2 82:5 89:6,10
  90:19,19,20 91:8
  112:8 129:24
  136:7 141:15

145:2,5,23 148:19
157:15 175:17
176:14 194:15
**played** 15:3 23:15
23:23 26:17,19
29:9 34:12 43:20
60:2 64:2,11
71:15 76:3 82:6
87:25 88:5 89:8
89:19,20,21,22
90:4,8,9,14,24,25
91:2 98:5 112:1
136:6,12 145:12
145:19,22,25
146:1,11 151:10
151:15 154:10
156:9 164:10
175:14 176:1
180:20,21 182:21
**player** 5:8,20 9:1,3
14:19 15:4,12
16:3,11 18:21
32:13 34:12 35:7
36:14 44:7 49:6
49:21 56:23 59:20
61:1,5 65:1 83:8
91:8 94:3,10 95:8
97:11,13,23 98:2
99:8,10 103:10
107:20 110:11
111:15,18,21,25
112:2,8,18,18,22
113:16,19 148:18
148:19 153:22
158:17,20,21,22
160:15 164:19
169:13 171:7
180:15 213:4,7,10
**players** 1:3 3:9
8:12,20,23 9:4
12:18 13:1 14:17
15:6,23 16:10
17:14,16,24 18:11
19:7 20:17,25
21:4 22:11,24
23:3 24:5 26:16
26:20,24 28:3

32:5 33:3 36:9
38:24,25 41:11
42:3,4 49:6,13,17
50:4,6,17,23
51:19 52:19 53:2
53:23,24 54:20
55:9 56:8,9,19
57:7 58:19 59:20
59:22 60:21 61:23
63:13,18 64:17,21
65:10,15,18 66:6
66:7 70:20 71:15
77:9 82:3,4,10
85:22 86:8 89:6
89:20,21 90:8,14
90:15 91:11,12,18
92:8,10 93:15
97:4,17 98:19
102:21 103:23,25
104:4,18 107:1
109:3,5,8,8,13,23
113:5,25 118:5,18
119:17 124:23
125:18 128:7
129:15 130:17
145:6,9 146:16
147:5,15 148:5,10
148:24 149:20,22
151:6 152:25
154:12 157:13
158:5 159:9,13
160:5 161:6 163:8
167:10 169:20
172:4,13,17
173:15 174:8
189:3 191:13,15
191:20 192:7,12
192:18 193:13
204:25,25 206:1
206:22 207:5,6
212:7,11,16
**player's** 43:21 50:7
112:7 118:16,21
**playing** 49:14
64:10 81:2 104:10
112:21 118:21
146:15 149:9

151:13 153:22
**plays** 32:14
**please** 45:23 46:6,9
72:4 75:5 127:9
127:17 163:2
171:4 209:9
214:17
**pleased** 48:18
**plus** 49:17 57:6
58:16 62:12
141:13 210:2
**podium** 4:16
**podiums** 4:19
**point** 5:24 7:11,12
20:8 22:13,19
27:21 32:20 49:1
52:10 60:9 61:22
72:3 90:10 93:19
95:11,15 97:23
108:11 112:13
116:14 117:22
132:7 135:19
154:7,8,9,17
156:15 183:20
191:10,11 192:4
193:1 196:5
199:23 200:5,25
203:3,13 204:17
206:17 207:19,20
207:25
**pointed** 56:21
154:10
**pointing** 14:1 196:5
**points** 40:15 44:14
44:18 48:23 181:3
198:2,12 209:19
**point-blank** 173:5
**Polechronis** 48:16
48:17
**policing** 111:2
**policy** 96:7,8
**poof** 123:13
**pooh-poohed** 34:23
**pooh-poohing**
42:22
**pool** 212:22
**poor** 112:19 172:15

**poorly** 119:7
**pop** 36:17
**popular** 76:5
**population** 42:14
62:23 75:23,25
76:2 104:12 168:5
190:22 213:9
**pose** 53:20
**posing** 53:1
**position** 52:25
145:2,3 152:11
161:1 170:3
173:16 202:23
204:16
**positive** 32:19 57:6
**possibilities** 130:8
**possibility** 27:5
**possible** 8:17 51:20
55:16 59:15 67:4
77:25 114:6
156:19 157:1
205:17
**possibly** 70:8
**postpone** 134:3
**post-concussive**
166:14
**post-death** 193:4
193:18
**post-hearing**
163:15
**post-July** 123:5
**post-mortem** 76:8
82:11 84:15 98:14
**potential** 123:8
**potentially** 177:6
**poverty** 181:23
**power** 16:9
**powerful** 52:5
58:10 96:22 97:1
**powerfully** 60:12
**PowerPoint** 11:5
**PPA** 39:6
**practice** 144:19
**practicing** 214:12
**pre** 192:20 193:19
**precedent** 66:13
107:15

**precisely** 192:6
**predates** 160:18
**predict** 34:14
**predictable** 63:4
**Predominance** 24:7
**predominate** 24:8
**preempted** 35:22
52:21
**preemption** 9:25
23:9 25:10 31:10
31:12,13 32:23,25
34:23 35:1,8 36:8
39:23 52:23 53:6
53:8 54:5,12
**preface** 159:6
**prejudicial** 169:12
**preliminarily**
140:8
**preliminary** 19:22
28:25 52:3 159:18
160:4 192:8,21
**premise** 160:14
**prepare** 165:18
**prepared** 9:23 10:8
46:11 129:5
195:22
**prepreliminary**
192:6,11
**preregistered**
20:17
**presence** 57:24
**present** 10:18
59:21 73:2 78:21
78:21,22 79:8
125:11 168:2
169:11 182:16
185:7
**presentation** 15:6
45:16 46:20 47:3
154:20 187:9
191:12
**presented** 187:16
**presenting** 21:13
26:4
**presently** 27:3
**presents** 78:23
88:12 167:16

168:7
**preserved** 16:15
**presiding** 3:4
**press** 19:25 21:7
    85:16 198:13
**presses** 76:5
**presumption** 10:25
    29:17,18 200:1,3
**presumptions**
    172:22
**pretty** 22:21 25:5
    70:5
**prevalence** 167:7
**prevalent** 169:21
    190:22
**prevented** 37:4
**prevention** 7:22 8:2
    13:8
**previously** 109:15
**pre-battle** 213:25
**pre-death** 193:3
**pre-morbid** 118:19
    119:8 213:13
**pre-NFL** 118:16
    213:13
**pre-season** 149:2,5
    160:17,18 161:8
**pre-seasons** 148:25
**Prichett** 3:23
**primarily** 60:19
    130:16 160:16
    180:5
**primary** 71:2
    141:24 165:5
    166:9 183:22
    184:22
**principal** 190:18
**principles** 214:14
**printouts** 153:8
**prior** 14:17 15:7
    31:8 44:9 118:21
    146:17 172:5
    192:7 199:2,8,24
**prism** 66:12
**Pritchett** 3:24
**privilege** 165:5,12
**probably** 20:12

98:16 199:11
    202:5
**problem** 11:17
    18:14 27:19,25
    115:25 124:3
    132:18 144:25
    183:11 198:7,10
    199:3
**problems** 23:19
    30:5,22 36:16
    41:18 42:5,10
    71:23 84:25
    115:22 168:8
    177:5 191:9
**procedural** 61:3
    106:1
**procedure** 71:19
    107:18 116:6,11
**procedures** 115:25
**proceed** 115:6
    186:17
**proceedings** 32:21
    215:4
**process** 32:23 44:4
    65:3,6 67:6 71:22
    84:24 85:1,2
    112:14 113:11
    114:15 141:16
    158:25 161:25
    162:1 166:9
    168:11,13 176:13
**processes** 126:1
**proclaimed** 85:25
**producing** 70:18
**product** 55:18 63:9
    96:9
**Products** 51:10
    155:19,24
**professional** 9:6
    14:25 65:19 82:3
    82:4
**professionally**
    165:17
**professionals** 6:2
    12:22 14:23
**professor** 4:2 28:6
    45:5 139:25

156:11
**profile** 30:14
**profit** 70:20
**program** 8:6 12:9
    12:16,24 13:9,11
    15:21 16:1 18:6,7
    18:9 20:18 26:3,9
    49:15 50:2,3 51:8
    51:9 59:16,17
    106:25 108:6,9
    109:2,11,17 110:3
    114:2,4 116:1
    168:9 205:23,24
    205:25 206:9,13
    206:14 207:10
**programs** 17:23,23
    19:8 50:12,12,17
    50:22,24 73:25
    118:18
**program's** 109:18
**progress** 15:14
    42:8 66:21 79:1,1
    191:19,21
**progresses** 165:20
**progressive** 74:6
**projected** 39:20
**prolong** 113:11
**prominent** 73:12
    104:4
**promised** 126:4
**promptly** 59:2
**pronounce** 119:4
**pronunciation**
    118:23
**proof** 112:1 137:14
**properly** 119:15
    195:9
**Properties** 47:24
**proposal** 163:6
**proposed** 27:11
    33:11 40:7,7 49:3
    49:10 50:1,19
    53:21 54:18 55:19
    55:22 56:17 57:17
    60:14 64:15 116:7
    116:10 119:15
    151:3 164:4,24

188:10
**prospective** 195:2,7
**protect** 110:15,17
    151:18 185:20
    192:20 202:9
**protected** 49:19,25
    60:6 153:13 194:4
**protecting** 145:18
**protection** 29:14
    50:22 148:22
**protections** 61:4
    135:25
**protects** 194:5
**protein** 74:23,23
    193:9,22
**proteins** 76:13
**protracted** 44:20
    54:16 55:16 56:19
    66:8
**proud** 50:25 51:12
    123:19 205:23
    207:11
**prove** 9:1,2 27:10
    33:20 36:14,15
    40:5 49:13 100:10
    139:24 142:21
    151:19 152:12
    188:22 189:18
**proven** 62:23 144:6
    191:4
**provide** 14:3 28:10
    51:18 52:11 85:18
    86:24 89:16
    107:22 109:19
    112:6 114:2
    135:25 147:16
    163:11 165:25
    168:12 184:13,16
    184:17,18
**provided** 9:8 17:17
    60:22 67:5 139:17
    140:1 147:16
    206:19
**provider** 165:4
**provides** 49:3,10
    50:3 54:20 55:7
    55:11,14 58:23

59:1,16 60:7 66:4
    66:6 107:3 135:17
    206:25
**providing** 80:19
    88:23 104:14
**province** 201:23
**proving** 153:9
    188:15 189:9
    190:24
**provision** 99:25
    112:17,18 187:21
    192:19,20
**provisions** 106:1
**proxies** 60:3 64:2
    137:22
**proximal** 182:5,10
**proxy** 64:12 147:9
    147:9
**prudential** 27:7
**psychiatric** 166:22
**psychological**
    65:17 205:4
**psychologists**
    188:19
**psychosocial** 168:6
**public** 27:18 29:20
    51:23 56:3,16
    57:23,25 61:16
    148:24 169:2
    171:22 202:15
**publication** 210:6
    212:20
**publicly** 3:17 57:19
    58:4 63:19 66:10
    124:17
**published** 19:9
    33:12 81:25 93:12
    94:13 120:18
    150:14,19 152:23
    196:6,9 214:3
**pull** 72:4 137:24
    209:14
**pulmonologist**
    151:25 152:15
**punishment** 204:13
**punitive** 70:9
**pure** 141:12

**purpose** 13:20
118:20 123:25
156:17 193:6,21
205:25
**purposes** 14:25
29:6 58:11
**pursuant** 121:21
126:6,8
**pursue** 56:25 61:6
63:16
**push** 24:15
**put** 8:12 27:23
36:23 37:1 38:4,6
40:16 47:3 51:14
54:1 55:3 69:18
70:17 79:21,22
81:19 108:6
110:17 111:5
113:22 116:9
119:23 127:24
146:17 154:17
171:9 173:16
181:13 184:20
186:21 195:12
196:7 204:24
206:15 208:12
**puts** 194:21
**putting** 20:5 172:9
207:14
**puzzling** 167:16
**p.m** 1:6 127:16,16
214:20

**Q**

**qualifications**
24:18,22,24,24
25:5
**qualified** 14:23
59:24 64:23 88:16
94:18 111:8,13
**qualify** 15:10 17:17
91:7 108:14,22
118:11,13 149:15
**qualifying** 14:5,7
14:11,14 15:25
23:18,21 24:1
26:18,20,24 28:14

42:5 43:14 59:21
95:3,4,12,13
107:1 109:24
110:7,21 111:11
111:14,24 114:11
125:16 126:13,21
126:22 130:18,21
135:13,20 136:16
136:25 137:3
139:8 141:1
143:19 145:14
146:12 148:7
192:8
**quality** 164:18
166:1 185:8
**quarter** 212:23
**quarterback**
145:15,19,21
146:1
**quarterbacks**
145:19
**question** 10:20
37:17 46:11,12
69:10 92:6 99:6
102:20 103:22
155:22 183:10
188:7 189:19
191:23 200:21,22
212:23 214:5
**questioned** 92:20
**questions** 7:13
22:25 23:1,11
24:7 71:19 114:17
198:21 200:6
201:10
**quick** 197:12
211:15
**quickly** 12:13
22:21 29:25 181:3
**quite** 79:25 85:14
102:22 109:3
117:17 123:23
156:2
**quote** 28:21 35:20
120:20
**quoting** 37:25

**R**

**R** 3:1
**race** 45:1
**racially** 213:5
**raise** 37:17 71:18
71:25 92:3 104:20
106:23
**raised** 24:9 48:23
49:1 66:2 71:4,5
82:25 92:19 135:1
154:7,15 185:14
187:5,17,18
**Ralia** 48:16
**range** 38:14 139:21
140:3
**rare** 211:3
**rarely** 145:24
**rat** 121:7
**rational** 141:10,19
142:23 144:6
187:22,23
**rationalization**
140:2
**rationally** 139:25
**Ray** 69:2
**reach** 184:14
**reached** 28:21
70:13 136:19
**reaction** 32:1,18
57:6,11
**read** 33:9,9 35:5
80:11,11,12 93:3
98:3,4 99:15
117:3 124:25
143:10,17,17
150:9 159:2 181:2
197:14,21 199:20
200:3,8,12,17
209:15 211:1
**readily** 83:19,20
147:11
**reading** 95:8 199:9
**ready** 186:2,3,4
**real** 22:25 23:11
24:8 103:1 123:6
181:4 211:15

**realistic** 130:12
**reality** 52:8 54:2
64:19
**realize** 162:18
**realized** 160:13
**reallocated** 155:8
**really** 20:7 22:22
24:12 28:11 32:19
38:11,11 40:9,10
45:15 63:21 83:17
83:23 84:10 85:5
85:21 87:7 90:17
90:18,21 97:23
103:20,21 148:22
163:10 170:14
173:17 174:2
182:22 183:2,7,14
185:19 188:14
189:4,10 207:11
211:7 212:10
**reapply** 15:21 16:4
**rear** 161:15
**reason** 17:19 26:22
43:16 62:22 85:18
97:12,14 107:22
146:4 172:7,8,12
172:17 197:17
198:6 204:4
**reasonable** 10:22
43:3 55:23 56:1,5
56:13 57:4 63:3
66:14 69:13 94:9
101:15 102:5,16
102:25 104:17
105:10 135:24
139:24 142:22
188:10 189:25
191:25
**reasonableness**
38:14 57:13 60:13
92:20 187:15
**reasonably** 94:3
**reasoned** 203:14
**reasoning** 62:6
**reasons** 55:20 56:2
58:21 64:9 135:23
137:5 155:8 162:7

172:6 175:23,24
**reassessed** 166:15
**Rebecca** 1:19
179:11
**rebuttal** 177:17
186:1 187:4
**receive** 40:6 72:10
89:7 93:16 107:1
107:8,25 108:22
109:15,24 130:17
140:9,11 166:21
177:1 206:1,10,10
206:11,23 207:8
**received** 61:16 74:8
110:21 151:6
177:3 198:8 204:8
**receiver** 145:4
**receives** 111:21
112:2
**receiving** 107:11
111:24 160:9
185:11 206:18
207:7
**recess** 67:10 127:16
**recessed** 67:16,18
127:14
**recognize** 58:22,25
59:4
**recognized** 169:14
**recommended**
166:17
**reconvened** 67:18
**record** 21:24 63:6
65:13 90:4 152:6
156:24 189:23
203:11 215:4
**records** 30:11,12
30:15 148:24
151:20 152:4
**recourse** 126:2
**recover** 110:5
**recovering** 111:23
**recovery** 38:15
54:17 110:18
112:11,12
**redefine** 175:19
**reduce** 135:9

149:20
reduced 43:20 45:6
102:25
reduction 43:19
142:17 206:25
207:6
reductions 16:10
16:12 28:15 43:12
43:13,13,15,17,23
44:10 50:16 63:25
136:21 141:25
154:16
refer 8:11 117:4
124:23 135:17
reference 214:3
references 44:11
116:24
referred 13:18
117:15
referring 58:2 84:1
205:12
reflects 43:24 61:18
62:17 164:25
refresh 199:16
regained 176:9
regard 64:7 154:8
154:13 198:11
205:2
regarding 17:14
34:3 201:10
regardless 107:12
Region 1:23
register 198:19
registered 108:2
registering 107:10
registration 20:18
107:16
regular 146:16
162:2
regularly 38:10
rehab 165:10
rehabilitation
165:8 176:13
reject 101:25
rejected 105:5
130:14 141:14
rejecting 101:25

relate 31:17 178:20
related 15:8 36:19
44:7 59:18 81:12
97:8,9 124:10
130:18 169:10,18
185:11 194:13
relates 1:5 75:16,17
169:12
relating 39:10 73:4
73:6 182:11
relationship 165:2
relationships
184:22 185:9
relative 43:21,24
213:13
relatively 92:13
relax 179:25
release 18:23 71:8
72:13,13,15,16,17
72:23 73:8 86:23
89:16 91:13
104:12 123:16
125:16 204:7
released 73:1
releases 72:9
159:14
relegated 33:4
relentlessly 57:19
58:5
relevant 34:2 97:6
209:7
reliable 103:14
144:7
relied 33:24 212:18
relief 56:9 66:5
98:25
rely 126:23
remain 46:7 50:13
58:17 127:17
remaining 203:8,8
remanded 105:5
remarkable 85:14
remarks 18:17
48:22 52:4 61:22
remedied 173:24
remedy 126:2
remember 34:25

174:15 211:4
remote 197:2
render 106:2
rendered 120:17
renders 71:10
repeat 48:23,25
repeated 19:23
repeatedly 75:20
repetitive 64:12
74:7,8 75:18
127:2 185:11
reply 112:25
report 79:15,17
reported 41:3
42:14 209:4
210:21 211:21
reporting 1:23
61:17
reports 20:25 78:7
98:22 146:25
168:19 211:18,24
represent 22:2
87:12 103:23
128:6 129:12
146:10
representation
16:25 27:12 29:4
29:14 87:8 92:18
105:7
representations
87:10
representative 5:12
5:20,22 23:23
25:9 26:19 87:16
87:18,21 122:25
123:3 164:16
representatives
23:15 24:20 29:2
87:6,11 88:9
95:18 121:10,10
136:3,12,17 137:7
205:1
represented 27:22
28:1 122:15,16
representing
121:10
represents 26:16

26:20 28:2
reputations 8:13
request 154:2
174:1
requested 214:20
require 73:20 96:5
118:5 137:13
required 54:5 65:1
111:16,18 131:20
136:1 167:1,23
189:18
requirement 27:13
49:13 87:13,14
107:23,24 108:3
114:9,12 152:9
requirements
107:16 117:8
requires 64:20
75:18 146:15
194:1
requiring 49:11
59:22
research 76:11
77:8 81:19 82:7,8
82:9 83:3 165:11
167:18 185:1
188:24 189:5
192:1 211:10
researched 85:24
reserve 146:17
148:10,20 160:24
resolution 9:10,20
10:4 26:3,9 55:7
190:2,3
resolutions 25:13
resources 85:24
167:19,21,22
respect 71:13,14
102:23 127:22
159:9 189:9
193:16 198:4
205:6
respected 198:5
respectfully 121:24
154:2 155:15
174:1
respective 33:25

146:25
respects 194:10
respiratory 150:13
152:14
respond 21:14,17
61:10 113:7
134:11
responded 7:14
response 108:15
152:5
responsibility
159:12
responsible 132:1
132:20 177:18
rest 69:18 87:18
restraint 161:18,21
result 9:11 10:11
20:9,21 22:18
53:10 69:18
112:20 150:12
205:21
resulted 104:2
141:7
results 8:19 9:21
82:22 83:7 88:19
104:10
resume 127:16
retired 5:7,20 8:20
8:23 9:1,3,4 17:14
19:7 22:24 23:3
24:4 41:11 49:6
49:17,21 50:6,23
51:19 53:2,23,24
54:20 55:9 56:7,9
56:18,23 57:7
58:19 59:20 60:21
61:1,23 63:13,18
64:17,20 65:1,10
65:14,18 66:6,6
66:22 119:16
130:17 152:24
157:13 164:11
206:1 207:5
retirees 54:4,11
59:5
retirement 147:5
149:5

**retiring** 151:17
**return** 204:9
**returned** 96:10
**returning** 148:18
**reunion** 150:22
**revenue** 202:20
**reversed** 92:18
**review** 154:3
 155:18 200:14,14
**reviewing** 152:25
**revised** 66:1
**rewarded** 169:23
**rhetoric** 201:1
**rich** 38:23
**richer** 39:14 65:11
**right** 4:22 10:5
 11:13,15,16 13:25
 17:2 25:17,25
 26:11 33:18 35:6
 37:8 40:21 42:7
 42:16 46:6,15
 47:5,12,19 55:2
 67:8 68:25 75:1
 80:10 81:21 83:21
 96:13 107:8
 119:11 121:17
 122:18 127:7
 128:1,17 130:1
 131:8 134:8 135:3
 138:18 139:9
 143:13 150:3
 158:10,19 161:23
 161:24 163:23
 170:4 174:3,3,4,6
 174:17 176:17
 179:9,11 184:5
 185:23 186:16
 199:7,25 207:4,4
 207:17 209:8
 210:15
**rights** 88:4,5,6,7
 105:7
**rigid** 119:8 152:9
**rigorous** 166:13
**Rip** 164:7,16
**rise** 14:4
**rising** 14:6

**risk** 23:6 31:10,15
 31:16,19 34:7,20
 39:22 40:4 44:5
 44:11 53:14 54:24
 59:7 70:7,10
 87:24 142:3
 149:12 171:10,13
 196:12,13 197:5
 197:25
**risks** 34:6 36:20
 42:1 43:25 53:2,2
 53:20,22 54:20
 70:5,6
**Rivertown** 174:22
**road** 27:1 42:8
 132:6 160:8 177:1
**Roberts** 155:16,20
**robust** 164:18
**role** 165:19
**rolled** 26:9
**rookie** 160:23
**room** 32:9 44:22,23
 123:11 170:18
**rooster** 64:22 91:1
**Rosenthal** 1:15 2:7
 146:8,9,10 150:1
 150:2 153:6
**Ross** 164:6 205:15
**roster** 144:17
 145:13,20
**Rothstein** 39:7
**round** 164:8
**rule** 22:21 35:6
 87:7 89:18 101:16
 101:16 121:9
 122:5,16
**ruled** 122:12,14
**rules** 71:19 89:18
 112:11 145:17
**ruling** 53:8 122:18
**run** 19:23 163:9
 212:13
**running** 155:12
 162:14 180:21
**runs** 49:15
**rural** 111:18
 118:18,24

**R-I-P** 164:7
————————
**S**
**S** 1:11 3:1
**sadly** 104:3
**safe** 94:7,8 184:14
 184:23
**safeguard** 71:1
**safer** 17:23,24
**safety** 50:21 157:14
 168:25 184:16
**sailing** 99:25
 100:21
**Saints** 150:18
 151:16
**salary** 162:6
**sample** 211:8 213:9
**samplings** 213:16
**San** 135:2
**sat** 141:12 170:17
**satisfied** 29:25
 202:7
**satisfies** 27:12
 204:14,15
**satisfy** 112:22
 113:3
**Saul** 6:8 24:24
**save** 143:8
**saw** 93:10 150:25
 166:24 171:8
 211:14
**saying** 21:1 28:10
 35:24 45:14 84:3
 90:11,21 92:11
 99:7 123:21
 137:17 159:7
 195:16 196:19
**says** 4:9 16:20 27:8
 28:7 29:23 33:22
 35:20 39:24 41:14
 43:18 45:5 70:22
 72:25 73:5 77:6,7
 77:13 80:13 82:4
 83:12,13 89:22
 91:17,19 93:25
 94:22 95:3 98:7,8
 98:18 100:22

 114:24 124:9
 126:18 133:5
 143:18 150:12,15
 150:20 156:12
 195:1 196:25
 198:25 199:7,12
 210:18 214:13
**scandalous** 120:24
**scarcity** 181:24,25
 182:1,1
**scary** 180:1
**scattershot** 212:11
**scenario** 146:2
**scenarios** 130:19
**scheme** 15:3 86:9
**scholarship** 176:5
**school** 4:1,7 18:22
 36:17 43:22,22
 118:18,25 119:2,3
 164:12 176:4
 208:10
**science** 8:7 33:5,8
 34:3 41:25 42:24
 43:16 60:5 64:4
 70:19 76:23 77:14
 77:15,17,20 78:11
 81:22 82:13
 103:16 125:23
 140:12 142:1
 187:10,11,14,14
 191:25 192:23
 193:1
**sciences** 189:16
**science-driven** 33:7
 33:15 126:4
**scientific** 10:16
 64:4,6 74:17
 80:13 103:14
 117:1 140:22
 142:20 146:3
 171:9 188:21
 189:23 214:6,13
**scientifically** 116:2
 137:23 139:16
 140:15 141:20
 213:19
**scientists** 8:7 80:20

 212:5 213:2
**sclerosis** 41:17
**scope** 61:20
**scorched** 31:22
**score** 213:8
**screaming** 44:23
**screen** 11:5 78:1
 116:8 171:9
**screened** 213:24
**screening** 180:6
 212:16
**scroll** 210:19
**scrutinized** 57:18
**scrutiny** 58:1,2,14
 98:12
**se** 190:3
**seal** 214:19
**search** 42:16
**season** 12:25,25
 91:1,5,7 136:14
 144:18,20 146:14
 146:16,21 147:1
 147:10,12,13
 149:12,13,19,19
 149:22 150:24
 154:12 156:14
 162:3
**seasoned** 165:3
**seasons** 15:9,10
 23:15,23 64:2
 91:4 135:11,14
 144:13,15,22,22
 144:24 145:1,8,11
 145:14,21,22
 146:4 147:4,6,7,9
 147:10,19,23
 149:4,13,14
 151:10,15 153:23
 154:16 164:11
**seated** 3:8 67:20
 69:1 127:17
**second** 35:21 45:22
 51:1 58:25 68:1
 79:4 88:2 106:24
 108:4 127:24
 138:5 144:10,11
 145:23 164:7

167:3 181:16
185:25 186:5,10
186:11 192:3,23
194:16 199:23
208:6
**Secondly** 71:12
**seconds** 158:16
**section** 94:16
112:24 113:15
126:14 136:15
139:7 176:24
178:23 199:5,7,10
199:12,17,21
**sectional** 195:2
**sections** 137:9
196:5 200:17
**sectoral** 189:13
**secure** 56:10 64:21
131:17
**security** 60:8
177:12,24 178:24
201:11,20
**see** 11:5,15,18 12:3
12:3 28:20 34:17
41:12 58:11 72:20
72:25 74:4,10,18
74:20,20 75:14
79:11 80:23 81:23
83:23 90:23 93:9
95:24 102:13
116:11 119:25
127:9 135:16
139:6,11,12,12
142:6,9,10 152:15
182:24 184:6,7
210:2,16,19
211:18,22 214:16
**Seeger** 1:11 2:3,12
4:13,14,20,23,24
4:25 5:6,11,16,18
6:6,12,15,20 7:6
11:7,9,13,16,19
11:23 12:1,7
13:18,22 14:1
17:4,10 18:19
21:13,15,20 22:3
22:6,9 25:21,24

26:3 35:12,17,19
37:22,25 44:16,18
45:20,24 46:7
48:23 49:1 50:18
52:4,22 56:21
61:22 66:25 69:11
71:4 75:18 81:14
82:16 90:11 93:1
97:3 108:24 109:7
113:24 123:23
124:17 132:19,24
137:15 141:23
186:2 187:25
194:9 195:21
197:12 199:17,21
200:11,16 202:7
206:21 207:18,25
208:24
**SEEGERT** 143:8
144:3
**Seeger's** 57:4 83:11
**seeing** 75:13 102:10
117:8
**seek** 50:16,16 207:5
**seeking** 7:18 65:1
148:6
**seen** 31:4 60:18
78:7 83:16 92:13
103:19 104:24
118:7 203:12
**select** 12:21 60:20
162:2
**selected** 117:18
**self-selected** 211:8
**selling** 42:18,20
97:4
**senior** 48:4
**sense** 64:10 88:8
111:1 140:13
201:18
**sensible** 202:9
**sent** 94:13 114:25
176:12
**sentence** 143:17
199:23
**separate** 26:15
29:14

**separately** 51:7
**sequela** 170:1
**series** 10:7 211:7
**serious** 8:3 41:1,10
41:13 69:21 82:21
83:6,10 97:16
124:9
**seriously** 90:13
132:19 158:22
**serve** 165:6
**served** 10:4 91:3
164:9
**service** 137:21
169:2
**services** 45:3
167:24 180:6,7
185:11
**serving** 165:14
**session** 3:3 127:18
**set** 9:8 14:24 55:20
88:3,7 89:10
96:23 98:6 116:6
117:9 184:18
191:13 201:20
203:6 206:6
**setoffs** 140:10
**sets** 86:13
**settled** 10:1 35:6
39:15 81:15
141:13
**settlement** 3:19
7:19,20 8:11,22
9:3,8,9 10:7,18,21
10:24 11:2 12:8
12:25 14:12 16:7
16:18 18:11,12
19:21,24 20:6
21:11 22:11 25:17
27:23,24 28:9,24
29:5,18 32:2,10
34:12,19 36:24
37:1 38:15,20,23
39:9,14 40:7,13
40:17,25,25 41:14
41:21 42:3 45:4
49:2,3,10,15,22
50:1,15,19,25

51:7,13,17 52:12
53:21 54:3,3,10
54:18 55:11,19,23
55:25 56:5,18,23
56:24 57:4,7,17
57:20 58:1,6,11
58:16,18,20,23
59:1,4,12,25 60:1
60:9,14,22 61:6
61:13,19,23 62:1
62:8,13,15,18,18
62:21 63:1,5,19
63:20 64:1,16,20
65:11,13,16,24
66:4,13,20,24
67:1 69:9,10,12
69:13,16,19 70:4
70:6,12,23,23
71:10 72:8,9,11
73:19 77:16 84:23
86:2,10,16,23
89:9 91:21,24
92:8,21 93:17
96:17 97:7,19
100:7,21 101:15
101:24,25 102:1,4
102:13 103:4
104:17 105:8,9
106:2,23 107:7,8
107:9 108:8,23
110:2,8 111:9,14
111:15 112:5,24
113:15,22 114:5
116:4,7,25 118:5
120:25 121:2,4,8
123:2,12,17,19,22
124:15 125:14
126:11,12 127:4
129:24 130:14,23
131:14,19 135:7,9
135:15,21,23
137:13,19 138:15
139:13 140:9
144:14 146:20,22
147:1 148:6 151:3
151:17 153:13
154:1,21 155:21

156:17 157:19
159:18 160:2,5
164:5,24 167:9
169:13 173:15,23
173:25 176:20,25
178:21 183:13
187:12,15,24
188:1,8,10 190:16
191:6,22 192:5,12
193:5,6,7,21
195:25 196:22
197:7 198:22,22
199:6,13,19,22
201:20,25 202:3,8
202:12,14,15,17
202:23 203:5,9,16
203:22,23 204:6
205:1,5,8,22
206:2,16,20,24
207:9,12
**settlements** 9:15
21:10 25:15 38:18
60:18 204:23
**settlement's** 57:12
**settle's** 45:7
**settling** 29:21 43:3
107:14,17,22
108:7,15,17
110:13 112:4
113:6 116:14
119:14 126:5
156:12
**seven** 106:16
129:15 151:15
214:17
**seventh** 37:11
120:17
**severe** 43:14 44:10
59:5 61:24 80:23
**severity** 63:3
**sexual** 30:19
**Shah** 1:16 150:3,4
150:6 153:15
**Shan** 2:8
**share** 178:15
**shares** 164:23
**Shawn** 5:19 23:15

24:4
**Sheila** 48:19
**shells** 183:25
**shifting** 112:17
**short** 15:25 19:9,11
  79:10 109:10
  115:6 144:16
**shortage** 111:7
**shortly** 18:17
**short-form** 92:24
  93:11,12,14,25
**short-term** 78:4
  79:5,10
**show** 19:14,16 50:5
  60:11 98:1 119:14
  211:15
**showed** 82:2
  134:16 142:1
**showing** 35:23
  44:11 49:12 59:10
  59:22 193:15
  198:7
**shown** 185:1
  208:21
**shows** 82:9 193:18
**sic** 120:6
**sick** 5:8 34:13
**sicker** 16:4
**side** 45:23 79:23
  85:17 189:17
  193:25
**sidebar** 46:4 47:13
  214:17,19
**sight** 65:23
**sign** 74:25 152:10
  152:16 211:19,19
**signed** 152:8,20
  162:5
**significant** 39:3
  40:19 49:7 52:16
  53:22 54:13,14
  62:2 70:4,6
  167:16 169:15
  180:8 181:1
  182:23 190:4
  191:7
**significantly**

201:21
**signs** 50:5 210:2
**similar** 125:22
**similarly** 72:8 85:7
**simple** 62:21 114:3
**simply** 83:14 85:10
  99:3 102:18,22
  107:23 108:8
  109:21 111:1
  112:16 147:24
  152:19 154:9,17
  156:15 157:16
  163:7 189:24
**Sinai** 73:15
**single** 44:21 53:1
  63:6 203:24
**sipray** 51:3,4,5,10
  154:20 155:3,10
  155:12,20 156:1,4
  156:23 157:2
**sisters** 185:15
**sit** 66:17 155:9
**site** 32:9
**situated** 72:8
**situation** 77:18
  96:11,12 98:8
**situations** 182:1,17
**six** 36:20 83:4
  107:10 116:13,16
  175:14 212:25
  214:17
**size** 16:9 168:7
**skilled** 68:25
**skills** 62:6
**sleep** 10:12 23:19
**slick** 201:2,8,10
**slickly** 94:12
**slide** 19:14,16
  26:23 31:12 72:4
  74:18 81:23 82:4
  107:2 108:5,6
  109:25 113:22
  197:14
**slides** 76:12
**sloppy** 84:7
**slow** 199:20
**small** 17:12 71:9

174:21
**smell** 121:7
**Smerlas** 128:6
  129:14
**Smith** 5:6,7,18
**smoking** 124:6,6,11
  169:5
**Sneider** 188:17
  193:16
**Sneider's** 191:1
**socially** 183:23
**sole** 131:24
**solely** 185:12
**solution** 149:3
  204:20
**solve** 155:3
**somebody** 14:4
  96:6 139:17,19,22
  140:2 161:13
  209:23
**someone's** 69:21
  96:12,13
**son** 98:5
**sons** 104:23 185:18
**sooner** 51:20 55:15
  163:9
**sorry** 36:5 128:14
  139:1 179:21
  209:6
**sort** 83:23 84:7,8
  97:21 112:1
  124:21 154:15
  159:15
**sound** 124:12
  214:13
**SOURH** 215:3
**SOUTH** 215:7
**Southern** 181:21
**spare** 59:4
**spatial** 62:6 209:21
**speak** 21:20 22:10
  32:2 45:23 46:1,1
  46:2 109:23
  114:20 122:13,17
  128:21,21 129:5,7
  129:9,12,14,21,22
  134:13 153:19

171:2 175:5,8
  179:14
**SPEAKER** 12:4
  47:10 138:25
  163:20,21 186:4
  197:11 208:16
**speaking** 71:6
  78:12 128:7,9
**speaks** 63:20
  194:14
**special** 3:15,22
  7:14,15 29:1 55:6
  59:15 66:23
  201:22
**specialize** 117:20
**specially** 167:22
**specialties** 34:2
**specific** 36:14,18
  49:8,9 61:10 66:1
  72:18,24 74:17
  116:12 117:18
  200:13
**specifically** 28:10
  71:13 73:5,5 81:7
  211:13 212:1
**spectacularly**
  62:11
**spectrum** 167:13
**speculation** 141:12
**spells** 41:17
**spend** 6:21 13:5
  19:15 24:16 34:9
  37:13 54:6 61:11
  105:25 187:3,6,14
  197:8,20 201:19
**spent** 143:12
  157:11 182:20
  201:14 202:4
**spinal** 165:9
**spirit** 128:24
**split** 135:1
**spoke** 20:15 29:16
  205:14
**spoken** 21:15 57:8
  57:8,9 159:8
**sponsor** 70:18
**sponsorship** 202:19

**spoofed** 21:9
**Sporting** 97:5
**spouse** 164:6
**spouses** 159:10
  162:17 163:11
**squad** 91:3,10
  144:20
**Sr** 164:7
**stable** 184:14
**stack** 72:19
**stacked** 54:17
**stage** 9:9 32:21
  77:24,25 78:1,3
  78:17,25 79:4,9,9
  79:9,10,11,12,13
  80:1,1,2,17,17,17
  80:23 84:4,5,5,5
  84:12,17 86:4
  118:7 122:24
  176:8 209:17,17
  209:17,17 210:20
  210:21,21 211:18
  211:18
**stages** 77:24 78:17
  78:24 79:22 84:6
  88:14,15,15,16,18
  103:19,24 104:1,1
  210:20
**staging** 210:12
**stakes** 96:12
**stand** 3:14,24 42:12
  67:25 122:5,7
  125:15 127:9
  194:22 200:21
**standard** 36:8
  96:10 112:10,23
  113:3 148:4
**standing** 92:10
  127:20 174:23
**stands** 38:8
**star** 150:16
**stark** 142:7
**starkly** 184:6
**start** 5:2 6:20 46:16
  71:24 81:6 107:2
  144:22 145:18
  161:11 171:18

178:8 184:5
**started** 41:23 45:13
   97:3 170:19
   171:23 172:1
**starting** 139:13
**state** 7:20 25:8
   150:17 188:20,21
**stated** 77:3 121:1
   130:15
**statement** 85:12,15
   86:6 89:2 125:17
**statements** 96:16
   187:8 205:12
**states** 1:1 90:10
   97:2 117:17 118:3
   121:12,13,18
   126:12 136:1
   152:13 167:5
**statistics** 92:25
**status** 148:11
**statute** 34:11,15
**statutes** 53:13
**statutory** 16:6
   131:16,20 203:6,9
   203:18
**staving** 8:2
**stay** 97:12,14
**Steering** 206:22
**Stekloff** 48:11,12
**stellar** 48:8
**stepped** 176:7
**Stern** 73:13,13 77:3
   77:6 79:21 117:14
   117:16 118:3,10
   190:7,8 194:23,24
   194:25 196:17,22
   208:22 210:6
   212:20
**Stern's** 119:10
   195:3
**Steve** 5:7 6:15
   24:25
**Steven** 1:12 68:5
**Stewart** 146:11
**stipend** 163:11
**stoicism** 169:24
**stood** 141:24

**194:12**
**stop** 143:20
**stopping** 174:5
**stories** 19:22 184:2
**straight** 72:12
**strapped** 160:6
**Strawbridge** 4:8,11
**Street** 1:24
**strength** 34:5
**strengths** 188:11
**stress** 181:23
**stressed** 52:4
**stretching** 183:20
**strictly** 135:20
**strike** 155:6 156:2
**striking** 92:25
   188:13
**string** 145:23,24
**stringer** 35:7,12,13
   96:10
**strived** 39:19
**stroke** 15:7 39:10
   43:14 44:10 88:3
   88:7 102:24
**strong** 29:16,19
   51:15 205:9
**strongest** 151:12
**strongly** 73:18
   153:25
**struck** 150:23
**structural** 29:14
   135:25 160:14
   162:9
**structure** 184:16
   193:23 201:19
   202:8,11 206:24
**structured** 59:13
   65:7 167:9 202:2
   203:4
**structures** 202:7
**struggle** 101:10
**stubs** 153:8
**studied** 33:10 81:17
   189:3
**studies** 7:14,25
   82:17 125:25
   148:15 189:2,11

189:12,13,14,15
   190:8,14 195:2,7
**study** 8:8 80:21
   81:18,25,25 82:2
   121:13 148:16
   190:12 195:1
**studying** 80:9
**sub** 10:10 167:7
**subclass** 5:20,21,22
   5:23 6:16 23:22
   24:19 26:15,18,23
   27:2 28:2 136:3
   154:14 194:5
**subclasses** 24:6
   26:15 27:16,17
   28:7 29:13
**subclassing** 95:18
**subject** 44:19 88:2
   88:10 98:9 101:1
   125:24
**subjected** 105:11
**submissions** 80:12
   80:12
**submit** 55:22 56:17
   59:9 62:9 64:23
   66:13 111:23
   112:1 124:19
   147:21,21 152:4
   164:4 187:22
**submitted** 56:4
   73:9,11,17 110:20
   117:4,15 146:19
   148:23 154:4
   188:16 214:8
**subsequent** 164:20
**subsequently**
   211:25
**substance** 41:19
   125:13
**substantial** 16:13
   39:13 40:4 49:4
   49:11,25 51:18
   53:9 54:20,22,23
   55:3,8,8 58:23,24
   59:7 65:4 66:5,5
   173:9
**subtests** 116:12,13

116:16,18,21
**sub-concussive**
   7:24 23:6,16,25
   64:13 74:9 149:7
**succeed** 27:11
**succeeds** 204:5
**success** 188:15
**successful** 26:12,12
**successfully** 52:1
**succinct** 164:18
**sudden** 171:25
**suffer** 123:8 125:21
   126:20 127:1
   177:5
**suffered** 15:7 26:17
   74:7
**suffering** 5:9 8:24
   9:16 78:4 82:19
   86:4,12 109:13
   125:20 148:25
   149:1,25
**suffers** 23:17
**sufficient** 29:5
   49:16 70:24
   149:17 203:7
**suggest** 57:16
   155:15 156:21
   157:16
**suggested** 197:3
**suggesting** 78:10
**suggestion** 62:7
   157:8 163:7
**suggests** 111:2
   113:22 152:17
**suicidality** 78:18,19
   78:20,23 79:7
   80:25 85:22 89:3
   194:13 195:15
**suicide** 30:7 85:20
   86:3 89:4 104:3
   124:13
**Suite** 1:24
**Sullivan** 29:19
**sum** 125:13
**summary** 159:2
   198:15,16 199:5
**sun** 65:17

**Super** 90:19,20
   175:16 176:8
**superintending**
   66:19 204:5
**superior** 56:18 66:7
**Superiority** 24:11
**supervised** 28:23
**supervising** 66:20
**supervision** 55:5
   59:13
**supplemental** 14:3
   15:15 38:6 50:11
   109:19 212:15
**support** 50:21
   53:15 58:18 59:10
   60:12 62:13 63:18
   128:8 129:23
   178:24 180:7
**supported** 55:21
   58:9,19 60:4 64:3
   82:13 213:21
**supporting** 64:24
**supports** 81:22
   187:15
**supposed** 109:19
   114:2
**supposedly** 142:14
**suppressed** 23:5
**Supreme** 136:1
**sure** 16:22 17:19
   26:10 35:13 45:24
   47:7 75:9,11
   134:20 137:11
   176:16 178:8
   181:18 183:14
   185:19 186:12,14
   197:11 201:24
   208:12
**surely** 65:5
**surprise** 109:3
**surprised** 162:4
**surprising** 59:11
   92:12
**surrounding** 183:2
**surveillance** 148:13
**Survey** 161:5
**survive** 54:5,12

survived 53:8
suspect 141:11
suspender 203:16
sustained 9:2 127:2
swept 152:2
swings 10:12 23:19
  41:18 79:7 185:6
switch 4:16
symmetrical
  114:15
symptom 74:25
symptomatic 54:4
  54:21
symptoms 23:17
  77:22 78:18 80:22
  81:12 82:19 97:7
  97:8,11,13,15,16
  103:16,18,20,24
  103:25 109:12,14
  109:16 115:24
  166:11 167:2
  169:20,23 180:8
  180:24 181:1,6,9
  182:15,24 183:12
  188:23 190:4,18
  190:19 191:13
  193:20 194:4
  209:3 211:10
system 18:9 101:11
  118:25 119:2,3
  148:14 204:9

————————
T
table 47:25 69:1
  123:2,17 189:19
  192:18
take 3:13 30:5,17
  42:19,24 46:18
  47:1 66:1 67:9
  91:15 95:1,11
  113:10 120:2
  123:15,15 127:8
  127:13 161:9
  163:7
taken 83:23 86:8
  127:16 158:22
takes 101:11

160:16 174:7
  213:8
talk 12:11 15:5,23
  18:25 19:15 22:10
  31:12,20 32:7,10
  33:16,17,17 34:22
  75:23 77:21 84:24
  92:6 95:12 96:21
  101:11 117:2
  162:17 184:2
  194:22
talked 81:14
  170:17 210:12
talking 20:1 24:17
  30:16 31:15 32:12
  32:15 77:17 86:19
  86:19,20 96:25
  107:3 143:22
  153:7 171:21
  182:21
talks 73:3 121:8
  182:6 191:2
  197:17
Tallahassee 150:20
tangles 74:22 75:2
tap 11:8,9
targeting 168:20
tau 74:22,23 75:1
  76:13
TBI 41:2 44:10,15
  88:3,6 165:8
teach 184:20
teaches 77:14,15
teaching 181:20
team 6:13 48:8
  68:20 90:19,20
  144:17 161:4
  164:9,12
teams 33:2 159:5
teasing 161:21
technical 182:4
technically 98:10
technology 4:21
teeth 204:1
television 19:8
  96:23
tell 20:23 38:19

39:16 104:17
  130:1 137:1
  160:20 170:25
  172:24 175:10
  177:8 180:16
telling 81:1 83:5
  97:5 108:16
tells 140:13 198:18
temporal 197:2
ten 16:20 56:10
  67:9 77:2 105:21
  114:5 120:12,13
  126:15 128:3
  180:20 193:2
  202:1,12 203:2,6
tens 42:19,20
ten-year 203:11
term 79:11 95:2,5
  114:4 130:24
  182:4
termed 76:4,5
terms 10:5,18
  16:16 17:12 56:1
  57:21 61:21 126:7
  126:8 153:5
  154:14 169:1
  188:14 209:24
terrible 105:11,12
terrific 93:1
test 115:22 116:10
  117:6,10,10,13,16
  117:25 118:5,12
  118:17,19,22
  119:8,15 125:15
  140:1 193:14
  212:14 213:8,23
tested 9:5 13:2,3
  171:23 206:7
testing 13:11 14:8
  50:2 59:17 71:23
  115:25 116:6
  166:13 205:16,24
  206:3 207:21
  212:11
tests 7:21 12:18,23
  42:3 103:14
  116:15,20 117:18

212:12,13,18
  213:15
Texas 134:24
text 214:3
thank 3:17,20 4:2,7
  4:12,25 5:18 6:6
  6:21 7:2,15 11:15
  14:1 17:9,10
  21:19 22:5 26:2
  35:17,18 44:17
  46:13 47:10 48:20
  48:24 66:18 67:7
  67:8 68:11,13
  69:4 72:22 105:13
  105:14,23 106:20
  106:21 107:5
  109:25 114:18,19
  115:15,17 120:4,8
  120:9,13 122:9
  125:3,4,8,10
  127:5,6,15 130:3
  133:15,20,24
  135:5 142:25
  143:15 144:4
  146:6,9 150:1,2
  153:14,18 157:6,7
  157:25 158:2,15
  158:24 163:17,18
  164:3 166:5 169:6
  170:9,10,11,13
  174:10,11,11,20
  175:12 176:22
  178:1 179:3,4,24
  180:3 185:21
  194:9 200:17,18
  207:15,16 208:2,5
  208:17 209:9,13
  214:14,15
Thanks 67:25
  139:2 146:7
  185:24 186:14,15
  186:22
Theal 151:24 152:1
  152:16
thee 201:9
theory 193:12
  203:10

therapies 185:4
therapy 50:4 185:4
  206:11
Theresa 124:13
They'd 205:3
thing 15:22 37:17
  55:3 63:6 80:20
  80:21 92:9 93:18
  103:12 122:11
  126:12,23 132:13
  139:18 152:7
  153:12 159:3
  161:4 162:20
  174:3,3,4,6,24
  184:9 207:4,4
things 3:12 7:8 8:9
  23:20 31:2 41:15
  41:22,24 42:1,12
  42:13 44:4 75:5
  79:5 88:10 102:11
  102:15,15,22
  104:8 119:20
  126:16 170:16,24
  173:14,24 174:2
  195:11,13,15
  205:18 211:21
think 5:13 6:2
  13:19 30:3 34:9
  37:7,16 45:17
  46:25 63:21 69:8
  69:15 71:24 73:10
  90:12 91:16 93:17
  97:20,25 101:18
  101:22,23,23
  102:4 105:18
  107:4 108:16,25
  111:25 113:2
  115:2 119:25
  120:10 127:7
  128:14 130:5
  132:16,22 133:1
  133:11,12,13
  141:21 147:12
  149:21 153:21
  154:7,13 155:2,5
  155:7 156:5,24
  157:11 158:21

170:5 173:13,20
173:22 179:13
181:4 183:11
184:5,10 187:10
191:25 194:8
196:3 197:13
199:9 201:9 210:6
210:10,11,22
211:7 213:23
**thinking** 97:21
**thinks** 18:21 97:11
97:13
**third** 10:23 29:17
32:19 37:8 51:9
57:10 59:3 71:16
72:11 82:25 83:1
87:6,9 92:17
106:25 109:22
122:24 146:17
155:17 176:2
193:17
**third-party** 157:3
**THOMAS** 1:13,13
**thought** 8:17 96:4
96:21 115:4
131:25 187:13
191:3 200:9,12
**thoughts** 186:1
**thousand** 183:10
**thousands** 10:2
43:9 59:5
**threaded** 97:21
**three** 12:8 71:2
90:25 91:8 95:17
106:3 119:19,20
134:13 137:2
144:17 145:13
146:15 150:10
159:4 168:3
175:18 180:21
184:16 185:15
187:18 214:16,17
**threshold** 32:23
53:1
**threw** 170:19
**tidying** 47:15
**till** 127:8,14

**time** 4:9 12:14 13:5
15:4,23 16:21
19:20 21:16 25:4
25:4 30:11 34:9
34:18,19,24,24
37:13 39:23 42:25
45:18 46:20 49:16
64:11 75:12 89:11
95:4 98:25 99:3
124:9 125:15,17
126:19 127:23
135:1,4,19 137:2
139:8 143:7,9,10
148:14 149:6
158:1 164:14
170:15 174:4
176:1 179:4 180:4
191:15 194:2
197:20 201:14
**timely** 203:25
**times** 6:24 7:1,6
19:23 44:21,22
95:17 119:25
150:15 160:21
168:3 197:23
203:19
**time-limited**
109:21
**titled** 116:5
**tobacco** 169:4
**today** 5:8 7:18 8:10
10:18,20 21:4
26:25 28:4 34:13
40:24 48:19 57:24
58:8 69:14 73:19
76:23 83:16 92:7
98:19 101:14,24
103:23 108:25
125:21 128:8,10
134:4 137:12,14
149:10 160:1
164:15 169:11
170:14,17 171:3,8
171:20 172:4,8,23
191:14,16 193:9
207:13 208:21
212:3,10

**token** 140:5
**told** 19:11 77:9
81:4 82:16 98:15
98:15 120:6 122:4
124:7,17 128:19
141:20,23 174:22
176:4
**Tom** 43:17 115:20
**tomorrow** 193:14
**tools** 7:21 16:18
184:19
**top** 27:18 50:11
74:3 139:10 178:9
210:18
**topic** 109:22
**tort** 18:9 204:9,23
**total** 65:5 96:14
161:10
**totally** 110:19
**Totaro** 1:12 2:4
68:24 71:21
105:20,21,23,24
106:9,13,16,18,21
114:19
**tote** 120:6
**touch** 11:6 18:19
63:23
**tough** 6:24 37:3
41:24
**town** 174:21
**track** 158:25
203:11
**train** 80:20
**trained** 171:12
**training** 148:24
149:5,8,9 159:5
160:19,20 161:2,4
161:5,8 176:10
**trajectories** 206:7
**TRANCRIPT**
215:3
**TRANSCRIBER**
215:8
**TRANSCRIPT** 1:8
**trauma** 15:8 34:4
43:14 74:7,8
75:19 127:2 149:7

165:7 169:19
197:3,3
**traumatic** 7:23
44:16 82:20 88:3
92:4 93:22,23
102:24 165:8
182:9 196:15
**travel** 6:3
**treat** 90:23 103:18
105:2
**treated** 103:21
140:3 151:23
**treating** 108:13
**treatment** 7:22 8:2
13:8 14:8 50:4
71:14,15 163:8
206:10
**treatments** 185:5
**treats** 72:8
**Tregg** 122:2
**Tregg's** 122:20
**tremendous** 95:22
204:1
**tremendously**
182:2
**trends** 206:7
**trial** 9:24 24:13
30:25 31:7,8
36:24 40:3 44:13
53:12 189:17,21
194:17
**trials** 25:9
**tried** 14:21 25:6,7
141:14 177:2
194:19
**trigger** 126:10
**trouble** 25:19
**troublesome**
169:10
**Trucks** 92:17
**true** 57:14 62:8
65:12 70:17 76:8
76:14 95:6 108:9
108:19,20 205:5
215:3
**truly** 157:18 213:11
213:12

**trust** 131:17,20
177:14 203:7,9,18
**try** 8:8 12:12 17:22
48:21,22 58:5
118:20 181:3
195:18,22 207:4
**trying** 9:13 128:24
141:16 160:24
175:18 182:22
183:20 212:7
213:2
**tsunami** 121:21
**tube** 6:1
**turn** 96:23 173:8
**turned** 115:1
122:25
**Turner** 5:23 8:24
23:22 24:4 26:18
87:23 136:4,18
137:6 154:11
**tweaked** 40:12
**Twenty-three**
20:15
**twice** 95:17 146:1
**two** 3:20,21 8:17
11:23 13:1 24:6
24:16 26:14 27:6
28:2 29:13 73:24
111:24 127:13
131:15 134:13
135:7,12,23,24
136:3 137:9
145:16,20 160:4
160:21,22 163:11
175:17 182:20
189:2 194:22
198:9 201:19
207:19,22
**two-and-a-half**
144:24
**two-minute** 207:25
**two-prong** 24:17
**type** 60:18 63:5
152:10
**typical** 60:17 168:7
**Typicality** 23:12
**typically** 31:24

**U**

**UCLA** 77:8 80:8
  98:9,16
**Uh-huh** 48:21
  203:20
**ultimate** 49:22 60:8
**ultimately** 39:7,11
  104:2 130:17
  166:22
**unable** 175:5
**unacceptable**
  118:14
**unaffected** 65:7
**unambiguously**
  57:9
**unanimous** 60:11
**uncapped** 14:11
  27:5 28:4 29:10
  49:23,24 60:9
  108:8 130:23
**uncertain** 54:7,12
**uncertainty** 54:25
  85:1
**unclean** 155:12
**uncommon** 121:19
**uncontroverted**
  156:24
**undeniably** 66:14
  66:14,15
**underline** 214:14
**underlying** 52:18
  160:13
**underneath** 143:13
**underscores** 60:13
**understand** 34:2
  50:7 64:18 69:15
  79:25 99:17
  100:22 101:13
  122:12 132:11
  133:10 156:2
  157:5 158:12
  170:3 173:2
  177:25 178:20
  179:23 181:5
  182:22 183:8
  194:20 196:4

206:3
**understandable**
  65:21
**understanding**
  173:3 175:9
  177:17 195:17
**understands**
  198:17,18
**understood** 8:14
  130:24 177:15
  211:5
**undertaken** 70:25
**undertaking** 67:3
**undertook** 96:20
**undisputed** 188:25
  190:21
**unfair** 43:11 64:16
  71:11 86:16 106:2
  121:24 124:15,22
**unfairly** 19:25
  113:4
**unfairness** 119:8
  173:14
**unfettered** 147:25
  148:1
**unfortunately** 35:5
  76:2,21 78:7
  104:2 112:20
  176:9
**UNIDENTIFIED**
  12:4 47:10 138:25
  163:20,21 186:4
  197:11 208:16
**unilaterally** 107:15
**union** 8:20
**uniquely** 57:23
**United** 1:1 90:10
  97:1 136:1 167:5
**units** 165:8
**unity** 29:5
**universe** 159:15
**University** 4:1,7
  73:14 122:23
  150:17 164:12
  176:6 181:21
**unmanageable**
  28:8

**unnecessarily**
  135:8
**unnecessary**
  110:19 114:9
  148:5
**unprecedented**
  49:5 57:25 58:13
**unquestionably**
  78:9
**unrealistic** 108:12
**unrebutted** 189:10
**unrecognized**
  169:20
**unrelated** 32:4
  78:15
**unreliable** 152:18
**unscientific** 212:9
**untainted** 65:7
**untested** 118:12
**untreated** 169:20
  184:25
**unusual** 72:23
**updated** 82:7,9
**upset** 21:22 43:5
**urge** 57:5 64:18
  66:15
**urged** 121:1
**urging** 10:6
**use** 4:16 5:14 64:10
  67:22 95:11
  146:20 147:1,10
  147:12 149:18
  153:7 167:20,22
  198:3,6
**uses** 7:20
**usually** 148:1 184:1
**Utecht** 1:18 2:10
  128:8 129:16
  133:4 174:13,14
  174:16,18,20
  175:1,4,7,12
  176:17,22 177:11
  177:21 178:1,10
  178:13,16,19
  179:4,7 201:14
  202:10 204:15,16
**Utecht's** 128:20

129:4,6,8,11,23
  132:5
**utilization** 167:19
**utterly** 159:8

**V**

**vacuum** 52:13
**valid** 110:5
**validated** 196:18
**validation** 184:17
**valuations** 146:19
**value** 39:21 63:22
  84:3 146:25
  149:20
**valued** 84:2
**values** 38:19,23
  39:3,9,13,14,17
**vanished** 138:17
**various** 63:2 85:16
  105:25 106:1
  116:18 130:19
  135:10 154:16
  187:5 212:14
**Vasquez** 43:17
  109:6
**Vasquez's** 197:16
**vehemently** 58:3
**veil** 168:24
**verified** 118:10
**Veritext** 1:23
**Verrier** 4:3
**version** 144:16
  155:10
**versus** 29:23 35:19
  43:22 120:19
  145:22
**vest** 147:5
**vested** 8:20
**vice** 4:6
**victims** 9:15 84:22
  85:23
**view** 20:5 52:1 54:8
  60:23 81:18
**viewed** 52:12 66:12
**viewer** 93:6
**views** 187:13,13
**vigilance** 125:1

**vigorous** 28:22
  96:20
**Vikings** 164:8
**violence** 78:8
  181:24
**violent** 78:13
**Vioxin** 26:12
**Vioxx** 39:15
**virtually** 96:24
**vision** 41:18
**visit** 110:11
**visited** 93:2,5 94:5
**visits** 20:10 166:24
**Visual** 209:21
**vivo** 196:18
**voice** 164:22
**voices** 58:10
**volumes** 63:20
**voluntary** 29:17
**volunteer** 165:14
**vulnerable** 175:20

**W**

**wait** 68:1,1
**waited** 38:2
**waive** 18:11 72:25
**waiver** 18:7,8
**walk** 29:13
**walked** 44:21,22
**walking** 183:25
**want** 3:12,13,16,19
  4:20,21 6:3 7:2,15
  8:19 11:4,11,20
  12:18 19:15,15
  21:1 22:14 25:20
  25:25 28:12,17
  30:12,14,15,16,25
  31:6,12 34:22
  40:8 44:19 46:1,7
  46:11,17,18 50:9
  52:10 69:8,9,10
  69:12 73:16 77:21
  94:7 99:16,19
  102:13,13 105:6
  112:9,10,11 115:5
  115:10 124:13
  133:18 143:17

154:6 158:11,11
170:16 173:19
175:8 176:16,20
181:2,2 183:14
184:9 186:13
187:6 194:20
199:10 209:5
213:14
**wanted** 6:4 41:21
58:11 106:22
115:2 128:21
131:9 134:19
171:1 179:5 183:8
194:10 197:8
198:3,5 207:3
209:1,18
**wants** 157:19 174:3
200:14
**warned** 27:20
**warner** 36:17
**wasn't** 22:3 100:11
134:20 137:16
198:7 212:4
**water** 25:20,23
**way** 6:23,23 11:21
17:24 28:15,17,18
38:1 40:12,24
43:7 44:7 80:13
83:23 84:18,22
86:13 92:14 94:20
97:18 101:8
102:19 108:16
115:2 118:15
120:23 128:22
131:14 138:20
146:5 152:3 160:8
173:23 175:3
184:15 186:25
196:19 197:19
202:11 203:4
206:24
**ways** 116:20 157:9
**We'll** 138:18
**weaknesses** 188:11
**weather** 25:6,7
**website** 19:13 20:4
20:10,13 21:9,10

82:16,24 86:1
92:24,25 93:2,5,6
93:11 94:4,5
124:8 198:19
200:8
**websites** 20:4 21:8
58:6
**Wednesday** 150:18
**week** 73:10 96:25
134:9 191:17
**weeks** 83:4,4
160:13 161:10
202:4
**Weigand** 68:24
71:22
**Weinstein** 26:7
**Weiss** 6:8,10 24:24
48:8 132:20 187:2
**welcome** 120:15
158:3
**well-diagnosed**
118:7
**well-funded** 58:3
**well-settled** 55:24
**Wendell** 3:23
**went** 35:4 94:5 96:2
96:18 97:3 99:22
148:19 175:16
198:10
**weren't** 69:22
73:25 123:18
154:25,25 173:3
**we'll** 47:2,3 61:10
67:12 68:1 81:23
105:9 127:12
136:8 179:17
209:7
**we're** 3:9 7:18
12:19 16:8,9,20
17:19,22 32:12
47:1,15,16 48:18
73:8,19 77:17
83:17,21 84:24
86:18,19,20 96:5
96:11 99:18,18
109:2 124:1,12
127:7 133:7 158:4

160:1 172:4
181:12 186:2,3,4
**we've** 13:12 17:16
25:13 26:5,14,14
33:9 83:16 101:3
101:4 103:19
104:24 162:17
204:24
**whatsoever** 49:12
59:23 145:12
193:16,20
**wheelchair** 150:22
**wherewithal** 203:1
**who've** 26:16
**wide** 145:4 204:7
**widely** 62:22
**widespread** 57:22
202:15
**widows** 172:18,25
**Wiegand** 1:13 2:5
114:23 115:16,17
115:20,20 117:5
119:13,19,22
120:4,8 207:21
**wife** 5:7 164:14,15
175:18
**WILLIAM** 1:14
**Williams** 98:3,6
99:16 150:7,9,11
150:16,21,23
151:4,15,18,19,21
151:25 152:3,11
153:11 198:4
**Williams's** 198:6,8
**willing** 184:20
**win** 175:15
**Windows** 120:19
**wish** 16:2 205:15
205:16
**withhold** 7:3
**withstand** 37:12
**wives** 8:15 70:1
97:17 104:23
172:19,24 182:14
**woefully** 109:10
**wonderful** 3:17
**Wooden** 5:19 23:15

24:4 26:15 87:23
136:4,23 137:6
154:11
**word** 57:3,4 91:15
99:8 143:16 198:5
**words** 49:12 56:7
75:19 102:3
105:16 108:1
118:23 119:4
120:6 134:13
137:21,23 147:9
213:7
**work** 7:16 16:20
17:23 28:3 55:4
83:3 126:5 184:20
185:7 201:13,25
201:25 202:2
208:22 214:2
**worked** 202:8
212:8
**workers** 18:19 23:9
33:4
**working** 59:24
181:22
**works** 26:21 61:20
83:24 131:15
178:21 202:11
**world** 62:24 82:16
83:5 86:1 124:2
124:17 176:8
180:22
**world's** 81:16
**worried** 133:9
**worry** 157:14
**worse** 96:17 118:15
118:18 182:17
**worst** 151:6,8
**worth** 108:25
**worthwhile** 184:24
**worthy** 105:10
141:8
**wouldn't** 113:25
128:25 145:15
192:19
**wound** 42:2
**wow** 4:18 68:12
201:3

**wrap** 119:12
**writings** 195:12
**written** 19:2 37:14
126:17
**wrong** 37:16 97:24
105:12 120:25
196:3
**wrongness** 73:18
**wrote** 53:6 99:2
201:6 207:24

---

**X**

**X** 2:1 111:9
**XXXXI** 176:8

---

**Y**

**Y** 111:10
**Yaffey** 188:17
190:13,14
**yeah** 5:15,17 25:20
46:10,24 106:7
123:20,25 124:3,4
124:14 128:16
131:13 180:16
183:18 186:24
200:16,18 201:5
201:12 208:13
210:5,10,13
**year** 89:22 90:20
120:18 126:23
131:19 140:7,7,10
141:3 143:23
150:21 154:10
156:9 162:15
165:2 166:12,14
166:25 191:18
203:6,9,17
**years** 4:5 8:17 13:2
13:3 15:3 16:20
40:3 43:12,19,20
43:21 44:3,9
49:16 51:19,20,20
52:2 53:24,24
54:6 55:15 56:10
56:10 59:7,8 60:2
67:22 77:2 89:8
111:24 114:5,6

117:11 126:15,19
126:21 129:25
131:21 132:2,7
133:4 136:7,11,19
136:22 137:1,2
139:21 140:25
142:8 145:16
151:17 153:24
154:17 159:5
162:13 164:20
165:4,16,19 167:1
175:15,17 177:1,5
177:6,7 179:1
180:20,22 182:20
183:17 185:14
191:2 193:2
197:23 202:1,1,1
202:12 203:1,16
203:22 204:12
205:16,17 207:14
**year-long** 55:18
**York** 68:20 134:13
150:14
**young** 42:3
**younger** 13:2 38:24
143:24
**youngest** 177:4
**youth** 168:20

_____

**Z**

**zero** 83:10,11 88:19
**zoom** 209:9 210:16
**Zyprexa** 26:8

_____

**$**

**$1,000** 112:15
113:7
**$1,200,000** 141:4,8
**$10** 154:22 156:3
168:18
**$112** 99:25 100:1
100:24 101:1
123:11
**$12,500** 162:5
**$150,000** 162:14
**$200,000** 142:13
**$3** 85:9

**$3.2** 140:18
**$3.5** 141:3
**$4** 84:2,6 87:4
88:13,17 95:14
140:9 143:22
**$40,000** 162:13
**$5** 39:16 49:5 59:20
139:13
**$5,000** 162:11
**$650** 141:13
**$675** 149:17
**$75** 12:15 108:10
108:18 113:24
**$8** 9:15
**$800,000** 140:15
**$900,000** 140:19

_____

**1**

**1** 46:23 77:25 78:1
78:3,17 79:9 80:1
80:17 84:4,12
86:4 88:14,16,18
89:22 94:24
103:19 104:2
209:17,24,24
211:14,18
**1-plus** 211:19
**1-888-777-6690**
1:25
**1.0** 116:4,22
**1.3** 167:5
**1.5** 13:13 14:15
15:13 85:4,6,7
116:4,22,24
**1:33** 127:16
**1:35** 127:14,14
**10** 13:3 91:8 151:16
166:24 203:16
204:12
**10:08:26** 12:5
**10:44:11** 46:5
**10:44:32** 46:10
**10:44:54** 46:19
**10:44:57** 46:21
**10:45:16** 47:6
**100** 83:19
**105** 2:4

**11** 73:9 131:19
**11,886** 109:6
**11:00** 46:19 47:1
67:17
**11:12** 67:18
**11:22** 67:18
**11:29:20** 74:12
**115** 2:5
**12,500** 162:5
**12-year** 148:16
**12-23-23** 3:11
**12:00** 47:2
**12:38** 127:16
**120** 2:5
**125** 2:6
**128** 2:6
**132** 152:5
**133** 152:5
**135** 2:7
**139** 51:11
**14** 91:6 94:16
**14th** 52:3
**140** 91:6
**141** 51:11
**146** 2:7
**15** 137:16 143:12
**150** 2:8
**153** 2:8
**158** 2:9
**16** 91:5 92:2 145:22
212:12,18,22
**163** 2:9
**17** 181:12
**170** 2:10
**174** 2:10
**179** 2:11
**1800** 1:24
**1801** 1:24
**187** 2:11
**19** 1:5
**19103** 1:24
**194** 2:12
**1961** 164:11
**1965** 164:11
**1969** 162:5
**1984** 150:15,20
151:21,25

**1989** 146:11
**199** 21:4
**1991** 89:13
**1992** 89:14 153:3
**1993** 146:11
**1995** 89:14 148:15
**1996** 148:17
**1999** 153:24

_____

**2**

**2** 13:12 14:15 15:15
15:18 73:12 78:25
79:10 80:1,17
84:5,12 86:4
104:2 116:7
135:19 145:22
167:1 209:17,24
211:18
**2-plus** 211:19
**2.0** 85:9 116:4,22
**2:08:58** 155:16
**2:12-md-02323-AB**
1:3
**2:15:27** 160:25
**2:17:00** 162:9
**2:30:51** 183:5
**2:37:52** 181:8
**2:38:30** 181:25
**2:39:55** 183:7
**2:40:00** 183:10
**2:41:00** 184:11
**20** 43:8 44:9 181:5
202:1
**20,000** 20:11 22:11
22:24 92:8 123:8
**200** 2:12 21:3 43:8
189:3
**2000** 154:9
**2000s** 172:5
**2001** 148:17
**2002** 153:24
**2006** 148:15 175:16
**2007** 89:14 176:7
**2009** 176:9
**2010** 24:2
**2011** 18:5 152:1
196:22

**2012** 152:23
**2013** 81:25 165:22
195:3 210:5
**2014** 1:5 14:17 82:9
83:9 84:1,15
85:19 87:2 88:19
88:25 94:2 95:7
95:16,20 99:5
103:6,11 196:17
198:9 199:2,9,25
215:10
**2079** 126:23
**208** 2:13
**22** 212:12,13,18
215:10
**22,000** 49:17 57:6
58:15
**22,000-plus** 206:1
**23** 22:21 101:16
109:6 121:9
**23(a)** 27:13
**23(a)(4)** 87:7
101:16
**23(f)** 37:9
**23-page** 94:13
**2323** 1:4
**25** 67:17 127:13
139:18,21 176:24
**27** 162:15,15
**29** 162:15

_____

**3**

**3** 79:9,9,11,12,13
80:2,17 84:5,17
86:5 91:7 103:24
135:21 137:25
138:14 139:5
166:24 190:10,15
191:21 209:17
210:21,24
**3rd** 198:9
**3.2** 140:11
**3:20** 1:6
**3:22** 214:20
**30** 4:5 44:9 89:22
90:4 129:25 132:6
158:16 165:1

177:7 180:22
**30-year** 181:5
**302** 197:23
**31** 167:2
**33** 67:22 177:5,6
**33,000** 19:6
**34** 82:2
**35** 82:2
**36** 135:16
**37** 83:11
**39** 150:18 151:16

**4**
**4** 80:23 84:5,17
  86:5 87:22 88:15
  88:16,18 103:19
  103:24 139:14
  190:10,15 191:21
  209:17 210:21,24
**4,500** 20:14
**40** 129:25 132:6
  137:1 165:4 177:7
  185:14
**41** 137:1
**43** 13:1,2
**44** 139:22 140:7,7
  140:25 142:17
  193:17
**45** 136:19,22
  139:12,18 140:2
  140:10 141:3
  142:18 151:11
  191:2
**47** 2:3 143:23
**49** 140:17
**49's** 159:4

**5**
**5** 91:4 144:23
  151:10 199:17,21
**5,000** 8:12 20:17
**50** 118:3 129:25
  133:4 140:19
  143:22 145:21
  161:10
**50,000-plus** 213:24
**54** 143:22

**55** 127:13 131:21
  142:9,11 203:8

**6**
**6** 161:9
**6.4(a)** 126:14
**60** 44:2 101:9
  141:22 142:2,8,9
  142:12
**60s** 142:2,3,8,15
**61** 148:18 149:1
**64** 141:22
**65** 49:15 126:19,20
  132:2 177:1 179:1
  203:17,22 204:12
**65,000** 93:4
**65-year** 14:12 95:5
  202:2
**66,000** 20:10
**68** 2:4

**7**
**7** 2:3 87:23 93:8
  199:9
**7th** 14:17 83:9 84:1
  84:15 85:19 87:2
  88:19,25 94:2
  95:7,16,20 99:5
  103:5,11 123:5
  199:25
**70** 44:3 162:12
**70s** 145:17
**71** 162:13
**72** 162:13
**75** 197:23
**76** 82:9
**78** 83:12,12 93:4
**79** 82:9 123:1

**8**
**8** 78:2 161:10
**80** 112:3 166:20
**80s** 34:13 145:17
  149:9
**83** 190:13
**84** 151:23
**86** 85:13

**88** 165:22
**89** 81:9 112:19
  190:13

**9**
**9** 135:14,15 144:14
**9.6(b)** 113:15
**9.7** 112:24
**9:58** 1:6
**90s** 149:9
**93** 92:2
**99** 58:15,17 62:12
  63:17 66:9