# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| : | |
| IN RE: NATIONAL FOOTBALL LEAGUE: | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION : | |
| INJURY LITIGATION : | MDL No. 2323 |
| : | |
| : | |
| Kevin Turner and Shawn Wooden, : | |
| *on behalf of themselves and* : | |
| *others similarly situated,* : | |
| Plaintiffs, : | CIVIL ACTION NO: 14-cv-0029 |
| : | |
| v. : | |
| : | |
| National Football League and : | **Hon. Anita B. Brody** |
| NFL Properties LLC, : | |
| successor-in-interest to : | |
| NFL Properties, Inc., : | |
| Defendants. : | |
| : | |
| : | |
| THIS DOCUMENT RELATES TO: : | |
| ALL ACTIONS : | |
| : | |

# NATIONAL FOOTBALL LEAGUE'S AND NFL PROPERTIES LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT AGREEMENT <u>AND IN RESPONSE TO OBJECTIONS</u>

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT.....................................................................................................4

    A.    Objectors' CTE Arguments Have No Merit ................................5

        1.    CTE Is Included in the Settlement...................................5

        2.    The Settlement Properly Does Not Cover Mood and Behavioral Symptoms for Any Qualifying Diagnosis, Including CTE .............9

        3.    Objectors' Attacks on the NFL Parties' Experts are Meritless......13

    B.    Objectors' Remaining Arguments Largely Repeat Their Original Submissions .............................................................15

CONCLUSION.................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Girsh* v. *Jepson*,
  521 F.2d 153 (3d Cir. 1975) .................................................................................1, 4

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) ...................................................................................13

*In re Serzone Prods. Liab. Litig.*,
  231 F.R.D. 221 (S.D. W.Va. 2005) ........................................................................13

*Smith* v. *Nat'l Football League Players Ass'n*,
  4:14-cv-01559, E.D. Mo. Dec. 2, 2014 ................................................................ 4-5

**STATUTES**

28 U.S.C. § 2412.........................................................................................................14

**OTHER AUTHORITIES**

3 Fed. Evid. § 6:78 (4th ed.) ........................................................................................14

98 C.J.S. Witnesses § 86...............................................................................................14

Defendants National Football League ("NFL") and NFL Properties LLC (together with the NFL, the "NFL Parties") respectfully submit this reply memorandum in further support of final approval of the Class Action Settlement Agreement dated June 25, 2014 ("Settlement Agreement" or "Settlement") and preliminarily approved by this Court on July 7, 2014.  (*See* Order, July 7, 2014, Doc. No. 6084.)

## PRELIMINARY STATEMENT

The NFL Parties' Final Approval papers demonstrated that this Settlement—guaranteeing generous Monetary Awards and other substantial benefits to every Retired NFL Football Player who receives a diagnosis of debilitating neurocognitive and neuromuscular impairment over the next 65 years—is fair, reasonable and adequate under the settled law of this Circuit, and that no objection to the Settlement has merit.  Nothing in Objectors' supplemental briefing refutes that showing.

As the NFL Parties' moving papers established, the Settlement easily satisfies the factors set forth in *Girsh* v. *Jepson*.  In their supplemental briefs, no Objector disputes that the complex legal, factual and scientific issues in this case would make continued litigation significantly prolonged and expensive.  No Objector contests that over 99% of Settlement Class Members remained in the Settlement—support that continues to grow given the several Opt Outs who have revoked their requests for exclusion following the Fairness Hearing.  No Objector refutes the serious risks of litigation faced by Plaintiffs in the absence of settlement, including the likely insurmountable legal obstacles of preemption and causation, or that those risks have grown more—not less—serious with the passage of time.  And no Objector debates that the Settlement is well within the range of reasonableness in light of the best possible recovery in litigation, and likely exceeds it.

Rather, in their supplemental briefs, Objectors rehash their misguided complaint that CTE purportedly has been excluded from the Settlement. As the NFL Parties and Class Counsel showed in their moving papers and at the Fairness Hearing, that is not true. The Settlement indisputably compensates the manifest neurocognitive deficits allegedly associated with CTE according to the research of Objectors' own experts. Objectors do not, and cannot, contend otherwise. Instead, they argue that the criteria used to diagnose those deficits are somehow infirm, notwithstanding that such criteria are scientifically sound and were designed by highly qualified expert consultants retained by the parties. At bottom, Objectors' CTE grievance is that the Settlement does not compensate the mood and behavioral symptoms that Objectors argue are associated with the purported early stages of CTE. Leaving aside that Objectors' arguments regarding the alleged mood and behavioral symptoms of CTE are scientifically speculative, the Settlement intentionally does not compensate those symptoms for CTE *or any Qualifying Diagnosis* because they are so common in the general population and derive from multiple causes—a fact that Objectors do not seriously dispute. The decision to exclude those symptoms from compensation was fair and the result of arm's-length negotiations.

Lacking a persuasive response on the merits of the NFL Parties' CTE arguments, Objectors resort to attacking the experts of the NFL Parties and Class Counsel as biased because they are being paid at standard hourly rates and allegedly have made prior inconsistent statements about the science. Those claims have no merit. The NFL Parties' experts are leading practitioners in their respective fields and have offered objective opinions in their declarations, and the allegedly "inconsistent statement" is no

such thing.   In any event, there is no dispute among the experts—Objectors' and the parties' alike—on the material issue here:  the neurocognitive deficits and the Qualifying Diagnoses compensated by the Settlement are associated with CTE and thus Retired NFL Football Players living with CTE who manifest those deficits or Qualifying Diagnoses are *included* in the Settlement.

Finally, none of Objectors' remaining arguments—all of which have been addressed in detail in the NFL Parties' moving papers—has merit.  The amount of, and Offsets to, the Monetary Awards are fair and reasonable.   The Settlement's claims process is a structured program designed to operate functionally, efficiently, consistent with due process, and without fraud, in order to provide Settlement Class Members with substantial benefits for 65 years.  And no Objector rebuts the NFL Parties' argument as to why the Education Fund is not a *cy pres* distribution.   As for the argument that the Settlement's security provision is insufficient to ensure that all Monetary Awards will be paid over the Settlement's 65-year term, again Objectors miss the point of the provision. The NFL Parties are providing security in the amount of money that they believe will be necessary given reasonable assumptions about investment returns.  This protection is in addition to the contractual obligation of the NFL Parties to pay all valid claims as they come due.   Moreover, Settlement Class Members have remedies—both legal and equitable—to redress any hypothetical payment obligation failures of the NFL Parties over the term.

For the reasons below and in the NFL Parties' and Class Counsel's moving papers, the NFL Parties respectfully submit that the Court should grant final approval of the Settlement.

## ARGUMENT

The NFL Parties' moving papers established that the Settlement is presumptively fair.[1]  It was the product of hard-fought arm's-length negotiations by experienced counsel well versed in the strengths and weaknesses of Plaintiffs' claims. No Objector contests that over 99% of Settlement Class Members remained in the Settlement—indeed, several Opt Outs have revoked their requests for exclusion following the Fairness Hearing.[2]  (NFL Parties' Mem. in Supp. of Final Approval ("NFL Parties' Mem.") at 45-47, Doc. No. 6422.)

The NFL Parties also showed that the *Girsh* factors confirm that the Settlement is fair, reasonable and adequate.  (*Id*. at 41-74.)  That showing essentially is conceded by Objectors, who do not dispute that continued litigation would be long-lasting, complex, expensive and enormously risky given the likely insurmountable legal obstacles faced by Plaintiffs—including causation, statutes of limitations, assumption of risk and the NFL Parties' preemption argument that could have and likely would have resulted in the outright dismissal of Plaintiffs' claims.[3]  (*See id*. at 42-45, 55-68.)

---

[1]  Unless otherwise defined, the capitalized terms used in this memorandum have the same meaning as those in the Settlement Agreement.

[2]  *See* Fourth Opt Out Report Submitted by the Claims Administrator at 3, Doc. No. 6465 (revocation of Opt Outs by Steve August and George Youngblood).  In addition, Joshua Cribbs, who submitted an Opt Out form, is no longer a Settlement Class Member because he has signed with an NFL Member Club to play football and thus is not a Retired NFL Football Player.  *Id*.

[3]  Indeed, just within the last month another federal district court ruled that negligent misrepresentation claims against the NFL Players Association ("NFLPA") identical to those asserted against the NFL in this MDL are preempted because resolution of the claims substantially depends on interpretation of the NFL Collective Bargaining Agreement player health and safety provisions.  (*See* Suppl. Decl. of Douglas M. Burns ("Suppl. Burns Dec.") Ex. 1, Mem. & Order 1-2, 14, *Smith* v. *Nat'l Football League Players Ass'n*, 4:14-cv-01559 (E.D. Mo. Dec. 2, 2014), Doc. No. 34 ("*Smith*

In their supplemental briefs, Objectors instead argue that CTE is excluded from the Settlement.  Objectors also repeat several other objections made in their original submissions and fully addressed in the NFL Parties' and Class Counsel's moving papers. None of Objectors' supplemental arguments has merit.

### A.   Objectors' CTE Arguments Have No Merit

The NFL Parties have repeatedly demonstrated that the Settlement Agreement provides for Monetary Awards for living Retired NFL Football Players with the manifest neurocognitive deficits allegedly associated with CTE, as well as those Retired NFL Football Players who develop them in the future.  Objectors' supplemental arguments do not refute this fact.

### 1.   CTE Is Included in the Settlement

In their moving papers and at the Fairness Hearing, the NFL Parties demonstrated that the Settlement compensates the key, manifest deficits of CTE identified in the two main studies conducted to date regarding CTE.  (NFL Parties' Mem. at 80-85.)  Specifically, those studies claim that former NFL players diagnosed post-mortem with CTE had neurocognitive impairment while living that was consistent with

---

Mem. & Order").)  Specifically, the Court found that determining whether the players justifiably relied on the NFLPA's assurances that they would protect players and act in their interests substantially depends on an interpretation of these provisions.  (*Id.*) Justifiable reliance is also an element of Plaintiffs' fraud-based claims.  (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Am. MAC at 27-30, Doc. No. 3589-1; Defs.' Mem of Law in Supp. of Mot. to Dismiss MACAC at 24-25, Doc. No. 3590-1.)  In addition, the *Smith* Court denied the Settlement Class Members' argument that preemption is inapplicable because they are now retired.  Instead, "the events occurred while Plaintiffs were current members of the collective bargaining unit" and thus preemption of claims based on those events is a valid finding.  (*Smith* Mem. & Order at 12.)  This holding also supports the NFL Parties' position in their pending motions to dismiss.  (Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss Am. MAC at 22-25, Doc. No. 4252; Defs.' Reply Mem. of Law in Further Supp. of Mot. to Dismiss MACAC at 23-25, Doc. No. 4253.)

dementia or co-morbid diseases such as ALS, Parkinson's Disease, Alzheimer's Disease, or frontotemporal dementia. Thus, according to these studies, at least 89% of the former NFL players studied would have been eligible for a Qualifying Diagnosis while living under the Settlement, proving that CTE is, in fact, compensated under the Settlement. (Decl. of Dr. Kristine Yaffe Decl. ("Dr. Yaffe Decl.") ¶¶ 82-84 (citing Ann McKee et al., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43, 59 (2013) ("McKee Study") (reporting that "'CTE plus co-morbid disease' refers to players who were diagnosed with CTE and one of the following: Alzheimer's Disease, Parkinson's Disease, ALS, or frontotemporal dementia.")), Doc. No. 6422-36; Decl. of Dr. Julie Ann Schneider ("Dr. Schneider Decl.") ¶¶ 51-52, Doc. No. 6422-35; Post-Fairness H'g Suppl. Br. of Morey Obj. at 20 n.21, Doc. No. 6455.)[4]

Tellingly, Objectors do not dispute the point. They argue instead that the specific terms in the Settlement Agreement for mild dementia and moderate dementia, that is, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment— and the test and criteria for diagnosing them, that is, the BAP Test Battery and Specific Impairment Criteria contained in Exhibit 2 to the Settlement Agreement—are not recognized within the medical and scientific communities and do not diagnose the allegedly "unique" disease of CTE. Again, Objectors are wrong. (*See* Post-Fairness H'g Suppl. Br. of Morey Obj. at 18-20, 22-23, Doc. No. 6455; Suppl. Decl. of Robert A. Stern ¶¶ 14-16, Doc. No. 6455-1; Decl. of Dr. Wayne Gordon ("Dr. Gordon Decl.") ¶ 9, Doc.

---

[4]    Moreover, the studies do not show that the remaining 11% (three players) were unqualified for compensation under the Settlement, but rather that the information provided in the McKee Study—which was based on the retrospective recollections of family members—was insufficient to draw any conclusions one way or the other. (Dr. Yaffe Decl. ¶ 83.)

No. 6455-11.)   Although the descriptive terms used in the Settlement—Level 1.5 and Level 2 Neurocognitive Impairment—are unique to the Settlement, the BAP Test Battery and Specific Impairment Criteria used to determine such "Levels"—far from "fantasy"— were developed in consultation with highly qualified consultants acting on behalf of Class Counsel and the NFL Parties, are consistent with relevant medical and neuropsychological literature, and provide a sound methodology to assess the neurocognitive impairments that the Settlement compensates.   (NFL Parties' Mem. at 118-22; *see*, *e.g.*, Decl. of Dr. John G. Keilp ("Dr. Keilp Decl.") ¶¶ 22, 28-45, Doc. No. 6423-20; Decl. of Dr. Scott Richard Millis ("Dr. Millis Decl.") ¶¶ 16-34, Doc. No. 6422-34; Decl. of Dr. Richard Allen Hamilton ("Dr. Hamilton Decl.") ¶¶ 14-23, Doc. No. 6423-25; Decl. of Dr. Kenneth C. Fischer ("Dr. Fischer Decl.") ¶¶ 8, 9, 14, Doc. No. 6423-17.)   They were not designed to, and do not purport to, diagnose any unique pathology—such as CTE or Alzheimer's Disease.[5]   Rather, these diagnostic tests identify the severe neurocognitive deficits compensated by the Settlement and associated with these and other neurocognitive pathologies.   The Test Battery and Specific Impairment Criteria function as intended:   The test results correlate well with the clinical reality and presentation of the patients.   (Dr. Keilp Decl. ¶ 36.)

Objectors' purported "case study in the unfairness, unreasonableness, and inadequacy of the settlement proposal" in fact illustrates that the Settlement compensates

---

[5]   Objectors' related assertion that clinicians may be able to diagnose CTE in living persons in the next decade, particularly because of the possible development of a biomarker that allows clinicians to identify the presence of tau in an individual's brain, is irrelevant for the same reason.   The Settlement does not compensate individuals because of the presence of a protein in their brains.   Instead, the Settlement provides compensation for a certain severity of neurocognitive impairment irrespective of pathological cause.   This is true for *all* of the Qualifying Diagnoses in the Settlement Agreement, other than pre-Settlement Death with CTE.

CTE and that the Test Battery and Specific Impairment Criteria capture the manifest impairments allegedly associated with CTE.  (Resp. of Chesley Obj. to the Mots. for Settlement Approval at 4, Doc. No. 6453.)   According to Objectors, Retired NFL Football Player Jesse Solomon was examined by a neuropsychologist and a neurologist in 2011.  Those practitioners determined that, among other issues, Mr. Solomon had "severe problems with" memory, "poor concentration and focus," and became "easily distracted" (*id*. at 5)—learning, memory and complex attention problems that specifically are tested for under the Test Battery in the Settlement.

Thus, depending on the severity of Mr. Solomon's deficits in learning, memory and complex attention, he likely would have been compensated under the Settlement Agreement for Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment in 2011 when he went to the neurologist and neuropsychologist purportedly "exhibiting the signs and symptoms of chronic traumatic encephalopathy (CTE)."  (*Id*.)  Moreover, because the Settlement is not static, even if Mr. Solomon would not have qualified for compensation in 2011, as his condition progressed—a key feature of CTE, according to Objectors and the McKee Study—he would have become eligible for compensation at the point at which his neurocognitive impairment reached the requisite severity, and would continue to be eligible for Supplemental Monetary Awards if and when his condition deteriorated further. Accordingly, Mr. Solomon's case, rather than demonstrating that the Settlement is unreasonable, proves that the Settlement compensates individuals with CTE while living, and that the Test Battery and Specific Impairment Criteria are scientifically valid.

Finally, Objectors' argument that CTE must be its own Qualifying Diagnosis under the Settlement because it is a unique condition allegedly caused by "[r]epetitive brain trauma" ignores a principal benefit of the Settlement—namely that it does not require a Retired NFL Football Player to establish causation to obtain compensation for any Qualifying Diagnosis.  (*See*, *e.g.*, Post-Fairness H'g Suppl. Br. of Morey Obj. at 6, Doc. No. 6455; Suppl. Decl. of Dr. Sam Gandy ("Dr. Gandy Suppl. Decl.") ¶ 14, Doc. No. 6455-2; Dr. Gordon Decl. ¶ 4.)  Thus, any causal relationship between football and CTE—an issue of great scientific debate—is irrelevant because the Settlement compensates neurocognitive deficits of a certain severity, regardless of their underlying cause or pathology—whether CTE, Alzheimer's Disease, frontotemporal dementia, Lewy body dementia, or otherwise.[6]

In sum, far from excluding a claimed "unique" pathology purportedly caused by football, the Settlement broadly includes debilitating neurocognitive impairments of any cause, including CTE.

### 2.    The Settlement Properly Does Not Cover Mood and Behavioral Symptoms for Any Qualifying Diagnosis, Including CTE

At bottom, Objectors' fundamental complaint about CTE is that the alleged mood and behavioral symptoms that Objectors *speculate* are associated with it are

---

[6]    The elimination of causation from the analysis of whether a Retired NFL Football Player qualifies for a Monetary Award is a major benefit for Settlement Class Members.  Objectors' CTE-related objections—like all of the objections—ignore the context in which this Settlement is being reached and the alternative of vigorously contested litigation.  There can be no dispute that causation would be heavily disputed if these cases proceeded to trial and that Plaintiffs would face enormous challenges proving both general causation—whether concussions and repetitive head trauma are capable of causing long-term neurocognitive impairments in the first place—and specific causation—whether a player's specific concussion(s) actually caused his long-term injury and whether the NFL Parties' alleged conduct substantially contributed to that injury.  (*See*, *e.g.*, Dr. Yaffe Decl. ¶¶ 51-53.)

not compensated under the Settlement Agreement.  Objectors are correct that these symptoms are not covered—not for CTE or for any other Qualifying Diagnosis.

First, the Settlement Agreement treats mood and behavioral symptoms consistently across *all* Qualifying Diagnoses:  Mood and behavioral symptoms simply and definitively are not covered under the Settlement Agreement.  As the NFL Parties' moving papers showed, the settling parties' decision not to compensate mood and behavioral symptoms—allegedly associated with CTE or otherwise—is for good reason.  Mood and behavioral symptoms, such as depression, irritability, and aggressiveness are common in the general population and often have multifactorial causation, meaning that the causes of these symptoms can be attributed to numerous factors wholly unrelated to CTE, head trauma, or NFL Football.  (*See* NFL Parties' Mem. at 83-85, Doc. No. 6422; Dr. Schneider Decl. ¶¶ 39, 42; *see also* Dr. Yaffe Decl. ¶ 75; Dr. Hamilton Decl. ¶ 29, 33.)  Retired NFL Football Players also may have one of several significant risk factors for depression, including, but not limited to, sleep apnea, higher Body Mass Index, exposure to severe lifestyle changes, or drug or steroid abuse, which have been shown to increase the risk of depression or other behavioral symptoms.  (Dr. Yaffe Decl. ¶ 75; Dr. Schneider Decl. ¶ 39.)  Moreover, mood and behavioral symptoms experienced by individuals with other Qualifying Diagnoses, such as Alzheimer's Disease, do not result in compensation under the Settlement.  And individuals with other Qualifying Diagnoses, such as Alzheimer's Disease, often experience mood and behavioral symptoms like depression.  In fact, although the medical and scientific communities have now determined that depression is not part of the clinical profile of Alzheimer's Disease, it was believed to be decades ago.  (Dr. Schneider Decl. ¶¶ 39, 42.)

Second, Objectors continue to ignore the state of the science regarding CTE. All experts agree that: (i) the specific diagnostic profile of CTE and its causes or even association with football are unknown (*See* Dr. Yaffe Decl. ¶¶ 66-67, 78-79; Dr. Schneider Decl. ¶¶ 24, 27-28; Dr. Hamilton Decl. ¶¶ 26-27, 30-31; Decl. of Dr. Christopher C. Giza ("Dr. Giza Decl.") ¶¶ 18-20, Doc. No. 6423-18; Decl. of Dr. David Allen Hovda ("Dr. Hovda Decl.") ¶ 26, Doc. No. 6423-19; *see also* McKee Study at 61-62; Decl. of Eric R. Nitz, Ex. 12, Robert A. Stern et al., *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neuro. 1122, 1125-27 (2013) ("Stern Clinical Presentation Study"), Doc. No. 6201-4); (ii) there have been no prospective, longitudinal epidemiological studies to determine the incidence and prevalence of CTE in the general population and to analyze whether a causal link exists between head injury and CTE (Dr. Yaffe Decl. ¶¶ 66-67; Dr. Schneider Decl. ¶¶ 25-27; Dr. Fischer Decl. ¶ 11; Dr. Hamilton Decl. ¶ 28; Dr. Giza Decl. ¶ 16; Dr. Hovda Decl. ¶¶ 20-23, 26; Dr. Keilp Decl. ¶ 38; *see also* Stern Clinical Presentation Study at 1127 ("Future research is needed to clarify the clinical presentation of CTE")); and (iii) the *two* studies that Objectors rely upon to support their speculation about mood and behavioral symptoms—the McKee Study and the Stern Clinical Presentation Study—are case reports with numerous inherent limitations including, but not limited to, information bias based on retrospective calls to family members to determine subjects' alleged symptoms. (Dr. Yaffe Decl. ¶ 64; Dr. Schneider Decl. ¶¶ 25-26; Dr. Giza Decl. ¶ 17.) Put simply, there is no scientific basis to claim that mood and behavioral symptoms are part of CTE. (Dr. Yaffe Decl. ¶ 75; Dr. Hamilton Decl. ¶ 31 ("The current state of the science does not allow us to determine the extent to which repetitive neurotrauma uniquely causes or contributes to specific clinical

symptoms such as depression, personality changes, or cognitive impairment."); Dr. Schneider Decl. ¶ 29 ("[I]t is premature to consider mood and behavioral symptoms as part of the diagnostic and clinical profile of CTE.").)

None of Objectors' newly-submitted, virtually identical medical declarations from various professors and physicians offers scientific grounds to support Objectors' position to the contrary. Not a single declarant for Objectors cites a prospective, longitudinal study that explains the causes of CTE, the diagnostic or clinical profile of CTE, including whether that diagnostic or clinical profile includes mood or behavioral symptoms, or the prevalence and incidence of CTE in any specific population. Nor could they because no such studies exist. In fact, the two studies relied upon by Objectors openly acknowledge the inherent limitations of the science to date and the inability to draw conclusions from *either* study regarding CTE. *See* Stern Clinical Presentation Study at 1127 ("Results from this study should not be interpreted in terms of population prevalence or generalized to living athletes with CTE . . . [T]here was no comparison group of former athletes without CTE. This may limit the ability to draw conclusions that the clinical presentation described is specifically due to the effects of CTE."); McKee Study at 61 ("[A]n autopsy-based case series is limited by significant ascertainment bias, as families of individuals showing behavioural or cognitive symptoms are much more likely to initiate and participate in a brain donation programme than families of normally functioning individuals. Consequently, no generalizations regarding the incidence and prevalence of CTE in living athletes and veterans can be made.").

In sum, even if science reaches the point where mood and behavioral symptoms are identified as part of the diagnostic profile of CTE, the parties' decision to not compensate mood and behavioral symptoms associated with *any* conditions is entirely reasonable. *In re Serzone Prods. Liab. Litig.,* 231 F.R.D. 221, 233 (E.D. Va. 2005) (overruling objection that the settlement failed to compensate additional injuries when the excluded injuries had multiple potential causes); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (disparate treatment "reflect[ing] . . . the extent of the injury that certain class members incurred . . . does not clearly suggest that the class members had antagonistic interests").

### 3.   Objectors' Attacks on the NFL Parties' Experts are Meritless

Recognizing that the Settlement, in fact, includes CTE, Objectors resort to attacking the NFL Parties' experts, arguing that they are biased.  (*See* Post-Fairness H'g Suppl. Br. of Morey Obj. at 8-11, 16-17, Doc. No. 6455.)  Nothing could be further from the truth.  Dr. Kristine Yaffe and Dr. Julie Ann Schneider are leading practitioners in their respective fields.  They practice at elite institutions, have each published hundreds of peer-reviewed articles, and have devoted their careers to treating patients suffering from and conducting research regarding dementia, Alzheimer's Disease, and other neurodegenerative conditions.  Dr. Scott Millis is a leading researcher in the field of traumatic brain injury who has published over 100 peer-reviewed articles relating to neurobehavioral outcome and neuropsychology.  Their credentials are impeccable, and, not surprisingly, are not directly challenged by Objectors.[7]  That they are paid for their

---

[7]   On the one hand, Objectors point to the fact that Drs. Yaffe and Schneider have co-authored numerous academic papers with Drs. Stern and Gandy as evidence that Drs. Stern and Gandy are well-qualified (*see* Post-Fairness H'g Suppl. Br. of Morey Obj. at 8 n.5, Doc. No. 6455), while at the same time seeking to discredit Drs. Yaffe and

work is of no consequence.  All of the NFL Parties' experts focus their careers on the treatment of patients, research into medical or scientific issues, or their academic responsibilities.  It is standard for experts to receive hourly compensation for secondary expert work that takes them away from their primary responsibilities.  *See generally* 28 U.S.C. § 2412(d)(2)(A) (defining "fees and other expenses" to include reasonable expert fees "necessary for the preparation of the party's case"); 3 Fed. Evid. § 6:78 (4th ed.) ("[I]t is of course not only permissible, but indeed standard practice, to pay witnesses for aid in preparing the case."); 98 C.J.S. Witnesses § 86 ("[A]n expert witness is entitled to reasonable compensation for court appearances and work in preparation of his or her testimony.").  That is the case here.

Objectors' argument that Dr. Yaffe previously made an allegedly inconsistent statement about CTE has no greater merit.  Objectors quote from an article authored by 15 experts, including Dr. Yaffe, who participated in a meeting hosted by the Alzheimer's Association and the Veterans' Health Research Institute (NCIRE) in May 2012, which "brought together experts from the U.S. military and academic medical centers around the world to discuss current evidence and hypotheses regarding the pathophysiological mechanisms linking [Traumatic Brain Injury, Post-Traumatic Stress Disorder, and Alzheimer's Disease]."  (Suppl. Decl. of Eric R. Nitz ("Suppl. Nitz Decl."), Ex. 14, Michael W. Weiner et al., *Military Risk Factors for Alzheimer's Disease*, 9 Alzheimer's & Dementia 445, 445 (2013), Doc. No. 6455-14.)  Objectors point to statements in the article regarding CTE, including its possible association with head

---

Schneider.  Moreover, the fact that Drs. Yaffe and Schneider acknowledge the "important" work being done by the Boston University team and "praise" their studies as "pioneering" is a testament to their objectivity.  (*Id.* at 8-9.)

trauma and that it manifests initially with emotional and behavioral symptoms.  Although Objectors spend much time attempting to put prior statements of Drs. Stern and Gandy in context given Mr. Seeger's (fair and accurate) arguments at the Fairness Hearing, they ignore completely the context in which they purport to quote Dr. Yaffe.  Had the Morey Objectors described the context of the paper, they would have noted that it was a "*Perspective* article" in which the numerous authors "summarize[d] information presented at [the] meeting" by the many participants in an effort to further "research efforts that are needed or are underway to advance our understanding of the pathophysiological mechanisms that may underlie and link [Traumatic Brain Injury, Post-Traumatic Stress Disorder, and Alzheimer's Disease]."  (*See* Suppl. Nitz Decl., Ex. 14 at 446.)  Dr. Yaffe did not present the CTE-related information that is summarized in the paper.  Simply put, nothing in the article alters any of the opinions offered by Dr. Yaffe in her declaration.

### B.  Objectors' Remaining Arguments Largely Repeat Their Original Submissions

None of Objectors' remaining arguments has merit—and most have been addressed in detail in the NFL Parties' moving papers.[8]  The only additional arguments that warrant a response are Objectors' complaints that, notwithstanding the NFL Parties'

---

[8]  The amount of, and Offsets to, the Monetary Awards are fair and reasonable, including where reductions to Awards are proxies for causation and exposure in a Settlement Agreement that does not require Settlement Class Members to prove causation in order to claim Awards.  (*See* NFL Parties' Mem. at 95-114.)  The Settlement's claims process is a structured program designed to operate functionally, efficiently, consistent with due process, and without fraud, for 65 years, in order to provide Settlement Class Members with substantial benefits; its fair and reasonable nature is highlighted by the various accommodations outlined in the NFL Parties' moving brief and ignored by Objectors.  (*See id*. at 123-39.)  And no Objector rebuts the NFL Parties' argument as to why the Education Fund is not a *cy pres* distribution.  (*See id*. at 142-46.)

obligation under the Settlement Agreement to pay all valid Monetary Awards, the Settlement's security provision does not provide fully collateralized security for 65 years and the remedies available to Settlement Class Members to address any theoretical payment obligation failures of the NFL Parties are somehow insufficient.

The NFL Parties' final approval submission sets forth why the NFL's investment grade rating on its Stadium Program Bonds is adequate security that the NFL Parties will meet their payment obligations for the first ten years of the Settlement, particularly in light of the NFL's substantial revenue streams, the lack of any legal requirement to pledge collateral, and the right of the Court to render null and void the Releases and Covenants Not to Sue provided to the Released Parties by Settlement Class Members affected by any failure to meet the payment obligations.  (*See* NFL Parties' Mem. at 149-51.)   The NFL Parties also explained that their obligation under the Settlement Agreement to pay all valid Monetary Awards mitigates any concern about underfunding the statutory trust.  (*Id*. at 150-51.)

Nonetheless, Objectors repeat their initial arguments in supplemental submissions and now seek to impose collateral-guaranteed security terms into the Settlement Agreement in order to obviate the need to avail themselves of legal and equitable remedies to address any (highly unlikely) failure of the NFL Parties to meet their obligations.  (*See generally* Suppl. to Utecht Obj., Doc. No. 6437; Final Suppl. to Utecht Obj., Doc. No. 6454; Post-Fairness H'g Suppl. Br. of Morey Obj. at 29, Doc. No. 6455.)  These arguments lack merit.

First and foremost, Objectors improperly imply a guarantee into the Statutory Trust provision that does not exist.  Objectors argue that the Statutory Trust "is

required" to have sufficient funds "so that there is no risk that money will not be available to pay in the event that the NFL does not timely pay." (Final Suppl. to Utecht Obj. at 1-2, Doc. No. 6454.) Not so. As a form of security, the NFL Parties are to fund the Statutory Trust with the amount that *in their reasonable belief* will be sufficient. (*See* NFL Parties' Mem. at 149-51; Settlement Agreement § 25.6(d).) Nothing in the Settlement Agreement requires that the security provision serve as 100% collateralized protection of future risk. Nor does anything in the law suggest this is necessary for the Settlement to be approved as fair, reasonable and adequate. And Objectors cite no support to that effect. Instead, Objectors conclusorily argue they need absolute certainty in the form of fully collateralized security because the NFL could run into financial trouble and even face bankruptcy. (*See* Final Suppl. to Utecht Obj. at 2 n.1, Doc. No. 6454; Post-Fairness H'g Suppl. Br. of Morey Obj. at 29, Doc. No. 6455.) But this risk is run by contractual counterparties to all companies, municipalities and other entities, and creditor rights provide a means of potential recovery in such unlikely circumstances. Moreover, it defies logic for Objectors to make this argument while simultaneously contending that the NFL's long-term television agreements provide annual revenue that is "almost ten times the amount the NFL" estimates will be needed to pay Monetary Awards over the 65-year period. (Suppl. to Morey Obj. at 5, Doc. No. 6420.)

Separately, the NFL Parties are contractually obligated to pay all valid Monetary Awards for the 65-year term, and Settlement Class Members can avail themselves of remedies if the NFL Parties do not meet their obligations. Objectors nevertheless argue that there is a "serious anticipated breach of contract" by the NFL Parties and that a breach of contract action against them would somehow inevitably result

in a compromised settlement of the claim involving substantial class counsel fees.  (Final Suppl. to Utecht Obj. at 2, 7, Doc. No. 6454.)  But Objectors do not explain why a breach of contract action is not a fair and reasonable remedy.  Nor do they explain how the contractual obligation of a multi-billion dollar business that has been in existence for nearly 100 years, *combined* with a creditor-protected Statutory Trust with the amount expected to be needed to pay all claims, is not reasonable and fair security resulting from arm's-length negotiation.

Objectors also argue that the right of this Court to render null and void the Releases and Covenants Not to Sue is somehow "deceptive" and "does not even pass the good faith test" because it would be difficult for a smaller "class of plaintiffs . . . to prevail against the massive defense that the NFL would mount."  (*Id.* at 7 n.3.)[9]  This conclusory argument rings hollow especially in light of the fact that this same Objector—and many others—sued the NFL in an individual capacity in the first place.  *See* Compl., *Alt* v. *Nat'l Football League, Inc*., 2:12-cv-04180 (E.D. Pa. July 23, 2012), Doc. No. 1.

In sum, the Settlement's security provisions are reasonable and no objection to the contrary has merit.

---

[9]   Objectors also attempt to predict this Court's future actions by arguing that it would not rescind the Releases because rescission is an equitable remedy and such equitable relief "cannot be granted in cases where a claim for monetary damages is available," here in the form of a breach of contract claim.  (Suppl. to Utecht Obj. at 1-2, Doc. No. 6437.)  This argument ignores that the parties agreed to a Settlement Agreement that, as a matter of contract, confirms the Court's ability to provide such equitable relief if the NFL Parties fail to meet their payment obligations and thereafter fail to cure in compliance with an order from this Court.  (*See* Settlement Agreement § 25.6(g).)

## CONCLUSION

For the foregoing reasons, the NFL Parties respectfully submit that this Court should grant final approval of the Settlement Agreement and overrule each of the objections.

Dated:  December 12, 2014                     Respectfully submitted,

/s/ Brad S. Karp
Brad S. Karp
Theodore V. Wells Jr.
Bruce Birenboim
Lynn B. Bayard
PAUL, WEISS, RIFKIND, WHARTON &
     GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
bkarp@paulweiss.com
twells@paulweiss.com
bbirenboim@paulweiss.com
lbayard@paulweiss.com

Beth A. Wilkinson
PAUL, WEISS, RIFKIND, WHARTON &
     GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Main: 202.223.7300
Fax: 202.223.7420
bwilkinson@paulweiss.com

and

Robert C. Heim (Pa. Atty. ID 15758)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Main: 215.994.4000
Fax: 215.994.2222
Robert.heim@dechert.com

**Attorneys for National Football League
and NFL Properties LLC**

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 12th day of December, 2014, upon all counsel of record.


Dated: December 12, 2014                    /s/ Brad S. Karp
                                            Brad S. Karp