# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

<u>**CO-LEAD CLASS COUNSEL'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR AN ORDER GRANTING FINAL APPROVAL OF SETTLEMENT AND CERTIFICATION OF CLASS AND SUBCLASSES AND OMNIBUS RESPONSE TO POST-FAIRNESS HEARING SUBMISSIONS**</u>

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................. 1

II.  ARGUMENT .................................................................................................... 5

  A.  The Settlement Appropriately and Fairly Provides Different Benefits to
      Class Members Based on Objective Variations in Their Injuries and Conditions. ............ 5

    1.  ALS ........................................................................................................ 7

    2.  Parkinson's Disease ............................................................................... 8

    3.  Alzheimer's Disease .............................................................................. 9

    4.  Level 2 and Level 1.5 Neurocognitive Impairment ....................................... 10

    5.  Death with CTE ................................................................................... 11

  B.  No Further Subclassing Is Required or Appropriate ........................................... 15

  C.  The Fact that the Settlement Does Not Compensate Certain Symptoms
      Anecdotally Associated with CTE Does Not Detract from the Fairness,
      Reasonableness or Adequacy of the Settlement. ............................................ 16

  D.  There Are No Disabling *Amchem* Conflicts To Impugn the Integrity of the
      Settlement or the Class and Subclass Representation. ...................................... 29

    1.  The Class and Subclasses Were Well Represented by Qualified and
        Experienced Class Counsel ..................................................................... 29

    2.  Class Counsel and Subclass Counsel Had No Incentive To Exclude
        Any Group of Class Members or Minimize Their Recovery. ............................ 31

  E.  The Right To Opt-Out Was an Option for Those Who Were Not Satisfied
      with the Proposed Settlement – An Option Which Should Not Be
      Discounted – Indeed, the Right to Opt-Out Is Part of the *Prudential* Considerations ....... 34

  F.  Objectors' Argument that Class Plaintiffs' Experts Are Compromised
      Because They Were Paid Falls Flat. ............................................................. 36

  G.  The Alleged Procedural Hurdles for Class Members To Participate in the
      BAP and To Obtain Monetary Awards Are Typical of the Procedural
      Requirement Used in Many Medical Monitoring Cases and Cases Using
      Compensation Grids ................................................................................ 37

  H.  The Objectors' Claim that There Is No Guarantee that the Settlement
      Will Be Funded Is Not Supported ............................................................... 40

  I.  Offsets and Reductions in Awards Based upon Degree of Exposure
     and/or Potential Alternative Causes Are Standard and Are Not Unfair,
     As Class Counsel Previously Explained. ....................................................... 42

i

J.      The Alleged Problems with Notice Are Contrived............................................................ 43

K.      Attorney's Fees .................................................................................................................. 43

III.    CONCLUSION.................................................................................................................... 44

## TABLE OF AUTHORITIES

**Federal Cases**

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) .................................................... passim

*Banks v. United States*, 102 Fed. Cl. 115 (2011) ......................................................... 36

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834
(D. Mass. Aug. 22, 2006) ......................................................................................... 43

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ................................................... 7, 14

*Decker v. GE Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) ........................................ 8

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ................... 1, 5

*Duerson v. National Football League, Inc.,* No. 12 C 2513, 2012 WL 1658353
(N.D. Ill. May 11, 2012) .......................................................................................... 17

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ...................................................... 7

*Frederick v. Range Resources-Appalachia, LLC*, C.A. No. 08–288,
2011 WL 1045665 (W.D. Pa. Mar. 17, 2011) ......................................................... 35

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ...................................................... 1, 31

*Goble v. Aztec Min. Co., Inc.*, 454 Fed.Appx. 500 (6th Cir. 2012) ............................ 36

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) ........................ 5

*Grimes v. Vitalink Comm'ns Corp.*, 17 F.3d 1553 (3d Cir. 1994) .............................. 28

*In re AOL Time Warner ERISA Litig.*, No. 02 Cv.8853,
2007 U.S. Dist. LEXIS 99769 (S.D.N.Y. Nov. 28, 2007) ...................................... 43

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005) .................................... 16

*In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) .......... 5, 13, 30

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995) .......................................................................... 14, 34, 35

*In re Imprelis Herbicide Marketing, Sales Practices and Prods. Liab. Litig.*,
296 F.R.D. 351 (E.D. Pa. 2013) .............................................................................. 30

*In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp.2d 210 (S.D.N.Y 2010) ................................ 43

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)..................................... 16

*In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) .......................... 5

*In re Perry H. Koplik & Sons, Inc.*, 357 B.R. 231 (S.D.N.Y. 2006).................................... 4

*In re Phenylpropanoloamine Prods. Liab. Litig.*, 227 F.R.D. 553 (W.D. Wash. 2004).............. 13

*In re Propulsid Prods. Liab. Litig.*, 261 F. Supp.2d 603 (E.D. La. 2003) .................................. 25

*In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ................................................................................. passim

*In re Walmart Wage & Hour Emp't Practices Litig.*, MDL No. 1735,
    2010 WL 786513 (D. Nev. Mar. 8, 2010).................................................................... 43

*Klein v. O'Neal, Inc.*, 705 F. Supp.2d 632 (N.D. Tex. 2010) ........................................ 13, 14, 31

*Lan v. Ludrof*, 2008 WL 763763 (W.D. Pa. Mar. 21, 2008) ........................................ 35

*Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581 (3d Cir. 1999)........................................... 34

*McGowan Investors LP v. Meyer*, 392 Fed. Appx. 39 (3d Cir. Aug. 12, 2010) .......................... 28

*Milstein v. Werner*, 57 F.R.D. 515 (S.D.N.Y. 1972) ..................................................... 14

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ...................................................... 3, 5

*Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005)......................................... 7, 30

*Perry v. Novartis Pharma. Corp.*, 564 F. Supp.2d 452 (E.D. Pa. 2008) ......................... 24, 25, 29

*Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978),
    *cert. denied*, 439 U.S. 1115 (1979) ........................................................................ 7

*Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983) .......................................... 31

*Richardson v. Perales*, 402 U.S. 389 (1971) ........................................................... 36

*Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996) ........................................... 25

*Sheridan v. NGK Metals Corp.*, 609 F.3d 239 (3d Cir. 2010)................................... 23, 29

*Smith v. National Football League Players Ass'n,* 2014 WL 6776306
   (E.D. Mo. Dec. 2, 2014) ........................................................................ 17

*Tasini v. New York Times Co., Inc.,* 184 F. Supp.2d 350 (S.D.N.Y. 2002) .................................. 4

*Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956 (3d Cir. 1983) ................................ 34

**State Cases**

*Pohl v. NGK Metals Corp.,* 936 A.2d 43 (Pa. Super. 2007) ........................................ 23

**Federal Statutes**

28 U.S.C. § 1407 .................................................................................... 29

Labor Management Relations Act, 29 U.S.C.§ 186 ................................................ 17

**Other Authorities**

Brooks BL, Iverson GL, Feldman HH, Holdnack JA.  Minimizing misdiagnosis:
   Evaluating new psychometric criteria for memory impairment using the
   WMS-III with patients with known dementia.  *J. Neurol. Neurosurg.
   Psychiatry.* 2008;14(S2):82 .................................................................. 39

Brooks BL, Iverson GL, Feldman HH, Holdnack JA.
   Psychometric guidelines for determining possible and probable memory
   impairment in older adults.  *Dementia and Geriatric Cognitive Disorders.*
   2009; 27:439-450 .............................................................................. 39

Brooks BL, Weaver LE, Iverson GL.  Reliability and factor structure of the
   Frontal Assessment Battery with questionable and mild dementia of the
   Alzheimer's type.  *Archives of Clinical Neuropsychology,* 2005; 20(7):850 .......................... 39

Doody RS, Pavlik V, Massman P, Rountree S, Darby E, Chan W.  Predicting
   progression of Alzheimer's disease.  *Alzheimer's Res. Ther.* 2010;2(1):2 ................................ 9

Evans J.  The natural history of treated Parkinson's disease in an incident,
   community-based cohort.  *J. Neurol. Neurosurg. Psychiatry.* 2011; 82:1112-1118 ................ 9

Gavett BE, Ozonoff A, Doktor V, Palmisano J, Nair AK, Green RC,
   Jefferson AL, Stern RA.  Predicting cognitive decline and conversion to
   Alzheimer's disease in older adults using the NAB List Learning test.
   *J. Int'l Neuropsych. Soc.* 2010; 16, 651-660 .................................................. 9

Gavett BE, Stern RA, *et al*.  Chronic Traumatic Encephalopathy:
   A Potential Late Effect of Sport-Related Concussive and Subconcussive
   Head Trauma.  *Clin. Sports Medicine* 2011; (30)179-188 ....................................................... 20

Iverson GL, Echemendia RJ, LaMarre, AK, Brooks BL, Gaetz MB.
   Possible lingering effects of multiple past concussions. *Rehabilitation*
   *Research & Practice*. (2012) (Article ID 316575) ................................................................... 39

Kiernan M. Amyotrophic lateral sclerosis. *Lancet*. 2011; 377:942-955......................................... 8

Lange RT, Brickell TA, French LM, Merritt VC, Bhagwat A, Pancholi S,
   Iverson GL.  Neuropsychological outcome from uncomplicated mild TBI,
   complicated mild TBI, and moderate TBI in U.S. military personnel.
   *Archives of Clinical Neuropsychology*.  2012; 47:480-494 ...................................................... 39

McKee AC, Stein TD, Nowinski CJ, Stern RA, *et al*. The spectrum of
   disease in chronic traumatic encephalopathy. *Brain*. 2013; 136........................................ 19, 20

Samil A.  Parkinson's Disease.  *Lancet*. 2004; 363:1783............................................................. 8

Stanley K, Walker Z. Do patients with young onset Alzheimer's disease
   deteriorate faster than those with late onset Alzheimer's disease?
   A review of the literature. *Int Psychogeriatr*. Dec. 26, 2014; 26(12):1945-53......................... 10

Ueki A, Goto K, Sato N, Iso H, Morita Y.  Prepulse inhibition of acoustic startle
   response in mild cognitive impairment and mild dementia of Alzheimer type.
   *Psychiatry Clin. Neurosci*., 2006; 60: 55-62 ............................................................................... 9

## I.      **INTRODUCTION**

The supplemental post-Fairness Hearing briefing by Objectors presents nothing new and nothing that will assist the Court in its analysis of the Settlement under the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) and the considerations of *In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) or FED. R. CIV. P. 23.  The Objectors' filings consist of arguments already presented and duplicative supplemental expert declarations, as well as hundreds of pages of newspaper articles and even an entire 300-plus page book written by journalists, which do not constitute admissible evidence of any kind.  None of this material impeaches the substantial and competent evidence submitted by Class Counsel and the NFL Parties in support of the fairness of the Settlement and certification of the Class and Subclasses.  Despite the large volume of post-Fairness Hearing submissions, four points remain clear:

(1)      A class settlement is not compromised simply because there may be differences in either the condition or treatment of different class members.  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 185-86 (3d Cir. 2012).  In fact, where the claimed tortious conduct is common to all class members, as it is here, it is not only acceptable, but expected that there will be variations in injuries among class members.  *Id.*  Awarding different benefits to claimants based on objective determinations of the types or quantum of damages sustained neither thwarts settlement approval nor defeats class certification.  *Id.*  This is especially true here, where the compensation fund is uncapped and monies are available for 65 years so that all retired players may have an opportunity to make a claim for a Monetary Award and Supplemental Monetary Award in the event the retired player's condition deteriorates.

(2)     No further subclassing is required in this case.  From the outset, separate

subclasses with separate, independent representation were created to structurally protect the

interests of *all* Settlement Class Members, *i.e.* (a) retired players who are at risk for but have not

yet been diagnosed with a qualifying condition for compensation on the monetary award grid;

and (b) Class Members who already have been diagnosed with such qualifying conditions for

compensation.  The Objectors misunderstand the role of subclasses, which, like classes

themselves, are made up of people and not legal claims.  They urge that a subclass of "CTE

claimants" was required, and, yet, they contend that all Class Members are at risk of Chronic

Traumatic Encephalopathy ("CTE").  By their own definition, the so-called "CTE at-risk

subclass" consists of every single Class Member.  There is no authority in any case law for

dividing a class into multiple subclasses and then having the same population within each.

(3)     Objectors' substantive claims are based on a mischaracterization of the state of

the relevant science.  As even they admit, and the Record demonstrates, there is no scientifically

accepted means to diagnose CTE in a living person.  Conspicuously, Objectors do not suggest

anywhere in their papers that they can identify some but not other retired players who are at risk

of CTE.  Their response to this fatal infirmity is a collection of supplemental affidavits from

experts claiming to "believe that a reliable, valid, and clinically accepted diagnosis of CTE,

based, in part, on objective biomarkers, *will likely be possible* in the next decade, if not sooner."

The Court, however, must rule on the fairness and adequacy of the Settlement based on the

science that exists today rather than conjecture about what *may* transpire in the future.  The

Settlement provides compensation for "Qualifying Diagnoses," namely, ALS, Alzheimer's

Disease, Parkinson's Disease and dementia, which are medically and scientifically well-defined

syndromes that have been associated with repeated traumatic brain injury, and which have been

reported in patients who are diagnosed post-mortem with advanced CTE pathology.  Importantly, the Settlement Agreement allows for modifications to the definitions and/or protocols for the Qualifying Diagnoses, in light of generally accepted advances in medical science.  Therefore, the interests of all Class Members who do not have a confirmed Qualifying Diagnosis at this point are protected prospectively.

(4)     Completely absent from the objections is any claim of disabling conflict that compromises the integrity of the Settlement.  There was no *Amchem*-style[1] conflict here, wherein Class Counsel and Subclass Counsel had any incentive to exclude any group of Class Members or to minimize their recovery.  Nor is there any *Ortiz*-style[2] conflict in which the entitlement of one sub-group (there, the limited insurance coverage that expired in the 1950s) is being redirected to another sub-group.  Rather, all Class Members benefit from the same Settlement guarantees of compensation if they manifest the covered conditions.  Simply pointing out differences in class members does not identify a legally relevant conflict.  *See Prudential*, 148 F.3d at 313 ("*Amchem*, of course, found the proposed class did not meet the adequacy of representation standard because the interests of those with present injuries differed from those with 'futures' claims.")

Among the thousands of retired player-clients of the Plaintiffs' Executive and Steering Committees are many Class Members who suffer from a range of conditions, including depression, mood swings, anger, and other behavioral disorders, as unfortunately do many people in the general population.  There was no legal conflict that led Class Counsel to eschew seeking compensation for these conditions, only the inability to make a scientifically-grounded

---

[1] *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997).

[2] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

case sufficient to prevail in hard-fought negotiations with the NFL Parties.  Without any

identified conflict in representation, Objectors who seek compensation for uncompensated

emotional disorders were free to opt out of the Settlement.  Importantly, this Settlement is

transparent as to what is and is not covered.  There are no traps for the unwary.  No one is worse

off for the Settlement being on the table, and over 99% of the Class consider themselves to be

better off for the fact that the Settlement is before them.  This Settlement will provide immediate

and important medical testing for living Retired NFL Football Players to determine whether they

are suffering from neurocognitive impairment, and, if so, further medical treatment and

pharmaceutical benefits, as needed.  In addition, the Settlement awards from an uncapped fund

substantial monetary benefits to seriously injured Plaintiffs suffering from Qualifying Diagnoses.

Co-Lead Class Counsel submit this reply memorandum in further support of Class

Plaintiffs' Motion for an Order Granting Final Approval of Settlement and Certification of Class

and Subclasses [ECF No. 6423].[3]  As set forth below, none of the post-Fairness Hearing

---

[3]  This Memorandum responds to:  Supplemental Objection to Settlement by Miller, *et al*.
("Miller Supp. Objection") [ECF No. 6452]; Response of Sixteen Objectors to the Motions for
Settlement Approval Filed by the NFL and Class Plaintiffs ("Sixteen Objectors' Resp.") [ECF
No. 6453]; Final Supplement to Utecht Objections ("Utecht Supp. Objections") [ECF No. 6454];
Supplemental Brief in Support of Their Objections To Class Action Settlement of Estate of
David Duerson, *et al*. ("Duerson Supp. Brief") [ECF No. 6456]; and Post-Fairness Hearing
Supplemental Briefing of Objectors Sean Morey, *et al*. ("Morey Supp. Brief") [ECF No. 6455].
This Court should not entertain objections filed by Mr. Molo on behalf of clients who have opted
out of the settlement.  *See* Fairness Hearing Transcript ("Fairness Hrg. Trans."), at 89-90.  Such
individuals are no longer Class Members and do not have standing to object.

Nor should the Court allow the Morey Objectors to compromise the integrity of the Fairness
Hearing record by dumping into the record hundreds of pages of media articles.  *See*
Supplemental Declaration of Eric R. Nitz and Exhibits thereto [ECF No. 6455-12 to 6455-23],
including even an entire book (over 300 pages), League of Denial, authored by two journalists.
*See* ECF No. 6455-15 to -22.  "Newspaper articles are simply not evidence of anything other
than the fact they were published; they are not admissible to prove the truth of the matter
asserted therein."  *In re Perry H. Koplik & Sons, Inc*., 357 B.R. 231, 240 (S.D.N.Y. 2006) (citing
*Tasini v. New York Times Co., Inc*., 184 F. Supp.2d 350, 357 n.8 (S.D.N.Y. 2002)).  Objectors

complaints has merit.  These objections, as well as the complaints concerning security for the

Settlement, class notice, and opt-out rights, should be overruled.

## II.   <u>ARGUMENT</u>

### A.   <u>The Settlement Appropriately and Fairly Provides Different Benefits to Class Members Based on Objective Variations in Their Injuries and Conditions.</u>

Rule 23 and Due Process permit different types of benefits and quantization of awards to

be made in a class settlement based on objective and rational factors.  Indeed, governing Third

Circuit law and class action jurisprudence recognize that "differently weighted interests [of class

members] are not detrimental ... [b]ecause few people are ever identically situated...."  *Dewey*,

681 F.3d at 186 (quoting *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir.

2012)).  To otherwise hold that "differing valuations by themselves render the representative

plaintiff inadequate would all but eviscerate the class action device."  *Id*. at 186-87; *see also In*

*re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 135 (E.D. La. 2013) (the fact that

class members manifest different conditions does not defeat class certification because "variation

in injury is acceptable").  If Objectors were correct, then the class settlement in *In re Diet Drugs*

*Prods. Liab. Litig*., 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000), *e.g.*, could never have been

upheld.

A disabling conflict under the law is presented when money is taken from Peter to pay

Paul, as when the interests of future claimants were compromised to compensate current

claimants in *Amchem* or when insurance proceeds were redistributed in *Ortiz*.  Here, there is an

uncapped fund that will provide monetary benefits to any and all Class Members who receive

Qualifying Diagnoses during their lifetimes.  The complaints of Objectors are that some Class

---

appear to confuse these impressionistic journalistic accounts for peer-reviewed medical literature
– which clearly they are not.

Members want more money, and some claims warrant greater compensation, not that there is a conflict.  If the rule were that all class members had to be compensated as much as they wanted, there could be no settlements of class actions under Rule 23(b)(3).  The Rule requires "predominance" of common issues, not "identity" of class recovery.

The existence of variations in the maximum compensation values for each of the Qualifying Diagnoses (namely, $5 million for ALS, $4 million for Death with CTE, $3.5 million for Parkinson's Disease and Alzheimer's Disease, $3 million for Level 2 Neurocognitive Impairment, and $1.5 million for Level 1.5 Neurocognitive Impairment) in no way evidences that the representation for the Settlement Class and Subclasses was inadequate or that the Settlement is fundamentally unfair.  The Record overwhelmingly establishes that the grid values achieved in this Settlement are the result of vigorous, hard-fought, arm's-length negotiations that were supervised by the Court-appointed Mediator.  Supplemental Declaration of Layn R. Phillips ("Phillips Supp. Decl."), at ¶¶ 1-2 [ECF No. 6423-6]; Declaration of Layn R. Phillips ("Phillips Decl."), at ¶¶ 1-2, 5 [ECF No. 6073-4]; Declaration of Christopher A. Seeger ("Seeger Decl."), at ¶ 32 [ECF No. 6423-3]; ECF No. 5128.  Each side was represented by zealous advocates who consulted with a host of medical and actuarial experts throughout the process.  *See* Phillips Decl., at ¶¶ 7, 11.

The Objectors appear to assume that it is impermissible in a class action settlement to award a larger sum to retired players who develop ALS, for example, than other players with a different Qualifying Diagnosis (say, Parkinson's Disease).  The Record establishes, however, that there are objective variations in the severity of symptoms, progression of disease, and types of complications presented by the different Qualifying Diagnoses.  In the tort system, these distinctions would warrant different levels of damages compensation.  Accordingly, in the

context of this Settlement, they present a rational and equitable basis for the variances in the maximum grid values.[4]

As set forth in the submissions to this Court, based on Co-Lead Class Counsel's independent and sound judgment, drawn from decades of experience in litigating and settling class claims, "[t]he parties reached an agreement to pay significant, 'full value' maximum awards for each injury category."  Seeger Decl. at ¶ 51.  Indeed, "the values achieved in this settlement are on the high end of what anybody could find that's out there in the context of a class or even a mass aggregate settlement.  These are very rich values."[5]  Fairness Hrg. Trans., at 38:15-23; *see also* Phillips Supp. Decl. at ¶ 9.  The variations in awards for these conditions are rational and fair, based on the nature of the injuries.

### 1.    ALS

Under the Settlement, a diagnosis of ALS earns the highest payment, which has prompted the unseemly claim that ALS victims have been improperly preferred.  Such complaints spring from ignorance.  ALS is a horrific disease – a wasting, rapidly progressive degeneration of the neuromuscular system until the person ultimately succumbs to its wrath.  Death is the outcome.  Sadly, ALS victims watch as the disease marches on its progression to that ultimate outcome.  At the end, ALS victims require a feeding tube and ventilator, and medical care 24 hours per day.

---

[4]  Notably, Objectors ignore the fact that the Settlement provides Supplemental Monetary Awards in the event a player's condition worsens and he is diagnosed with a different Qualifying Diagnosis that pays more.  Settlement Agreement [ECF No. 6087], at Section 6.8.

[5]  Courts may reasonably rely on the opinions of experienced counsel for the class in approving class action settlements.  *See Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115 (1979) ("trial court is entitled to take account of the judgment of experienced counsel for the parties"); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("the trial court is entitled to rely upon the judgment of experienced counsel for the parties"); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975).

Kiernan M. Amyotrophic lateral sclerosis. *Lancet*. 2011; 377:942-955.[6]  In Class Counsel's view

(informed by hundreds of jury trials for seriously injured people and specific representation of

thousands of retired players in this litigation), Retired NFL Football Players suffering from ALS

presented the greatest potential verdict value, and, correspondingly, they deserved the greatest

Settlement awards.  Through fierce negotiations over financial terms with the NFL Parties, *see*

Phillips Decl.; Phillips Supp. Decl.; Seeger Decl., the ultimate Monetary Award values for ALS

reflected the NFL Parties' agreement in that regard.  The maximum Settlement award of $5

million for a diagnosis of ALS is reasonable under these circumstances.  *Cf. Decker v. GE*

*Healthcare Inc.*, 770 F.3d 378, 382, 383 (6th Cir. 2014) (upholding jury verdict of $5 million in

damages for Nephrogenic Systemic Fibrosis, which "causes fibrosis of the skin, connective

tissue and organs throughout the body" and "is a painful, progressive and debilitating disease.").

## 2.    Parkinson's Disease

Parkinson's Disease is a degenerative disease of the central nervous system.  First

described almost 200 years ago, Parkinson's Disease is well-characterized, and its natural history

well-understood.  *See* Declaration of Kenneth C. Fischer, M.D. ("Fischer Decl."), at ¶ 8 [ECF

No. 6423-17]; Declaration of David Allan Hovda, Ph.D. ("Hovda Decl."), at ¶ 24 [ECF No.

6423-19]; Declaration of Richard Allen Hamilton, Ph.D. ("Hamilton Decl."), at ¶¶ 24, 34 [ECF

No. 6423-25]; Samil A.  Parkinson's Disease. *Lancet*. 2004; 363:1783.  Its early forms are

characterized by tremors, rigidity, posture, and gait disorders, which can be modulated and,

---

[6]  Subclass 2 representative Kevin Turner was diagnosed with ALS in June 2010.  As his disease
has progressed, his quality of life has been increasingly and substantially impaired.  *See* Affidavit
of Kevin Turner ("Turner Aff.") [ECF No. 6423-7], at ¶ 3.  Mr. Turner has experienced a severe
decline of muscle movement, motor function and the ability to speak.  He is no longer able to
feed himself, brush his teeth, shave, bathe or dress himself, and he requires round-the-clock
assistance with even the simplest, most basic routine activities.  He has been hospitalized
numerous times and, due to severe dehydration and the inability to eat properly, Mr. Turner has
recently required the insertion of a feeding tube so his body can receive the proper nutrients.  *Id.*

unfortunately, complicated by therapies (resulting in other movement disorders). As Parkinson's Disease advances, it progresses through distinct stages, often resulting in sensory and cognitive deficits, and, later, dementia. Evans J. The natural history of treated Parkinson's disease in an incident, community-based cohort. *J. Neurol. Neurosurg. Psychiatry*. 2011; 82:1112-1118. Though dementia is commonly seen in Parkinson's Disease, the additional neuromuscular impairment and other concerns objectively render Parkinson's Disease a more damaging injury than Level 1.5 and Level 2 Neurocognitive Impairments. As set forth in the Record at the Fairness Hearing, this warranted, in Class Counsel's view, a higher payment on the grid than dementia.

### 3. Alzheimer's Disease

The clinical picture, progression of disease, and natural course of Alzheimer's Disease have been well characterized throughout the more than 50 years of prospective and longitudinal research with the disease. *See* Hovda Decl., at ¶ 24. There is no dispute among Objectors and Class Counsel in that regard.[7] As a result of such lengthy and involved study, Alzheimer's Disease can be diagnosed clinically with reasonable specificity, and its disease course reasonably assessed or predicted. Hovda Decl., at ¶ 26; Hamilton Decl., at ¶ 24. In particular, studies provide predictive factors concerning, among other things, the timing and necessity of nursing care, accelerated progression of disease outcomes, and early mortality with accelerated or early onset disease.[8] Beyond the broader science concerning mild traumatic brain injury, traumatic

---

[7] *See* Gavett BE, Ozonoff A, Doktor V, Palmisano J, Nair AK, Green RC, Jefferson AL, Stern RA. Predicting cognitive decline and conversion to Alzheimer's disease in older adults using the NAB List Learning test. *J. Int'l Neuropsych. Soc.* 2010; 16, 651-660.

[8] Doody RS, Pavlik V, Massman P, Rountree S, Darby E, Chan W. Predicting progression of Alzheimer's disease. *Alzheimer's Res. Ther.* 2010;2(1):2; Ueki A, Goto K, Sato N, Iso H, Morita Y. Prepulse inhibition of acoustic startle response in mild cognitive impairment and mild dementia of Alzheimer type. *Psychiatry Clin. Neurosci.*, 2006; 60: 55-62; Stanley K, Walker Z.

brain injury, and Alzheimer's disease, Class Counsel considered such factors in pressing their demands for greater compensation to retired players obtaining an Alzheimer's diagnosis and their families.  In Class Counsel's experience, the greater specificity around diagnosis and disease course provided greater likelihood that non-speculative present and prospective damages could be demonstrated to the satisfaction of a jury at trial.  Class Counsel's efforts in pressing for enhanced Monetary Awards for Alzheimer's Disease were successful, and inure to the benefit of all Class Members diagnosed with Alzheimer's Disease.  Moreover, the Settlement provides a guarantee for those with any lesser injury, given that Class Members may seek Supplemental Monetary Awards if a retired player's condition deteriorates.

### 4.    Level 2 and Level 1.5 Neurocognitive Impairment

The Level 2 and Level 1.5 Neurocognitive Impairment Qualifying Diagnoses represent cognitive and functional deficits present in retired players without regard to underlying pathology or specific etiology.  Though the specific pathology may be unknown or not otherwise encompassed within another Qualifying Diagnosis (*e.g.*, Alzheimer's Disease or Parkinson's Disease), the life impact to retired players and their loved ones in connection with such conditions is quite severe.  *See* Fischer Decl., at ¶ 9; Hamilton Decl., at ¶ 11; Declaration of John G. Keilp, Ph.D. ("Keilp Decl."), at ¶¶ 11, 22-23 [ECF No. 6423-20].  Class Counsel believe that the underlying conditions and deficits warrant serious compensation and they negotiated hard to get it.  With broad experience in settling stroke, traumatic brain injury, and other catastrophic injury claims, Class Counsel set the bar high.  Phillips Decl. at ¶¶ 6-11; Seeger Decl. at ¶¶ 4, 32; Declaration of Robert H. Klonoff ("Klonoff Decl."), at ¶ 32 [ECF No. 6423-9].  In the end, Class

---

Do patients with young onset Alzheimer's disease deteriorate faster than those with late onset Alzheimer's disease? A review of the literature. *Int Psychogeriatr.* Dec. 26, 2014; 26(12):1945-53.

Counsel exceeded that bar.  Phillips Decl., at ¶¶ 18-19; Seeger Decl., at ¶¶ 33-34, 38-41, 51;

Declaration of Arnold Levin ("Levin Decl."), at ¶¶ 22-26 [ECF No. 6423-10]; Declaration of

Dianne M. Nast ("Nast Decl."), at ¶¶ 16, 20-23, 31 [ECF No. 6423-11]; Klonoff Decl. at ¶ 143.

Though the base monetary award for Level 2 (or Level 1.5) Neurocognitive Impairment is less

than that for Alzheimer's Disease, a player who initially qualifies for Level 2 or Level 1.5, but

subsequently satisfies the diagnostic criteria for Alzheimer's Disease, will receive the enhanced

award amount for such condition.  Settlement Agreement, at Section 6.8.

### 5.     Death with CTE

Finally, Objectors challenge the Settlement's payment to families of retired players who

died prior to preliminary approval and obtained a post-mortem pathological diagnosis of CTE.

In particular, Objectors question the $4 million Monetary Award value for that Qualifying

Diagnosis.  As Class Counsel explained previously, the "Death with CTE" benefit was designed

to provide a means for the families of retired players who died prior to preliminary approval of

the Settlement to obtain compensation where there otherwise would be none, because there was

no knowledge of the need of the then-living retired player to seek out or obtain a Qualifying

Diagnosis.  Seeger Decl. at ¶ 37; Plaintiffs' Final Approval Memo. at 59-60.[9]

In terms of the level of the grid value for Death with CTE (which is determined according

to the player's age at death), since the diagnosis of another of the Qualifying Diagnoses would be

expected to precede death (and thus be obtained at a younger age), the player, had he obtained

that diagnosis, would have received a greater award by virtue of having that Qualifying

Diagnosis at the younger age (as opposed to at the age of death).  To ameliorate that disparity

---

[9]  Going forward, retired players will have an opportunity to be tested in the BAP to determine
whether they suffer from any neurocognitive impairment, and if so, the extent of their
impairment.

and further account for the range of Qualifying Diagnoses for which the retired player may have qualified, had he been tested while living, Class Counsel pressed for and was able to secure a greater baseline award value for Death with CTE claims.

The story recounted by Objector Eleanor Perfetto illustrates how this difference in the Injury Grid can be fair and reasonable. Her husband, a former player, died at age 69 and was diagnosed with CTE. [ECF No. 6371.] He allegedly was diagnosed with early dementia thirteen years prior (at age 56), and in her view, progressed through Levels 1.5 and 2 Neurocognitive Impairment prior to death. *Id*. Under the Settlement Agreement, assuming the application of no Offsets, his Death with CTE Monetary Award would be $828,000. But had he been diagnosed under the Settlement Agreement with Level 2 Neurocognitive Impairment at, for example, age 57, his Monetary Award would be $950,000 (or at age 59, the Award would be $802,000). Thus, the Monetary Award that his Estate would receive for Death with CTE is a fair approximation of the Monetary Award he may have received for a Level 2 Neurocognitive Impairment diagnosis when living. If Death with CTE simply mirrored the lower Level 2 Neurocognitive Impairment figures by age, his Monetary Award, based on date of death, would be substantially less – $312,000.[10]

At bottom, it appears that Objectors claim that it would have been fairer for the Class if Class Counsel had gotten less for Death with CTE claimants. Of course, Class Counsel represented all retired players, regardless of the Qualifying Diagnosis, and were thus motivated to obtain the maximum Monetary Award for retired players in each of the Qualifying Diagnoses.

---

[10] This analysis also demonstrates the falsity – in the context of individual Settlement Class Members – of the Objectors' argument that a Settlement Class Member with a dementia diagnosis would "never be able to receive the same maximum compensation through a dementia diagnosis as could be received through a diagnosis of death with CTE before July 7, 2014." Morey Supp. Brief. [ECF No. 6455], at 19.

That they were able to achieve that result is not a basis for criticism, especially in light of the fact that the MAF is uncapped.  No Settlement Class Member will be harmed by these awards.  This is a contrived objection.

* * *

As explained by Co-Lead Class Counsel, when negotiating an aggregate settlement in a complex case, the goal is to achieve the best possible overall result that the defendants could accept and that satisfies Due Process and Rule 23.  *See* Seeger Decl. at ¶ 8.  There are a myriad of factors that Class Counsel must evaluate and consider, including an analysis of the types of alleged injuries, their range of values generally in the tort system, and the state of the science supporting the claims, among other things.  Seeger Decl. at ¶ 6.  Additionally, it is imperative for Class Counsel to assess the risks of litigation in the event a settlement is not achieved.  *See* Seeger Decl. at ¶ 7; Levin Decl. at ¶ 3.

The Record shows that grid values set forth in the Settlement are based on a reasoned assessment of the objective values of the various claims in the litigation and reasonably and fairly reflect all of the risks of litigation presented and the structural protections in place.  *See Diet Drugs*, 2000 WL 1222042, at *19-23 (approving personal injury class settlement providing monetary awards ranging from $3,000 up to approximately $1.5 million for valvular heart disease, subject to matrix criteria, such as age, duration of use, and severity of injury); *In re Phenylpropanoloamine Prods. Liab. Litig.*, 227 F.R.D. 553, 557-58 (W.D. Wash. 2004) (granting final approval to personal injury class settlement providing awards ranging from $100 up to $5 million, for ischemic stroke and other injuries, depending on matrix criteria of age, severity of injury, etc.); *Klein v. O'Neal, Inc.*, 705 F. Supp.2d 632, 641 (N.D. Tex. 2010)

(approving class settlement that allocated funds among claimants according to categories assigned by medical experts, "with stronger claims resulting in higher-paying categorization.").[11]

The question before the Court is not whether the Settlement fulfilled every individual's wish list, but whether it is fair, reasonable and adequate under all of the circumstances.  Rather than constituting an exact science, "the art of settlement is the art of compromise."  Levin Decl. at ¶ 3.  As courts have acknowledged, it should not "be forgotten that compromise is the essence of a settlement."  *Cotton*, 559 F.2d at 1330; Phillips Supp. Decl. at ¶ 2; Klonoff Decl., at ¶ 121.  In other words, "[t]he question . . . is not whether the settlement is perfect, but whether the lines that have been drawn have a rational basis and were carefully considered."  Klonoff Decl., at ¶ 17.

For this reason, courts do not require proponents of a proposed settlement to "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."  *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972).  The Third Circuit has cautioned that courts should "guard against demanding too large a settlement based on [their] view of the merits . . . ."  Klonoff Decl., at ¶ 13 (citing *Prudential*, 148 F.3d at 317 and quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Trucks*"), 55 F.3d 768, 806 (3d Cir. 1995)) (internal quotes omitted).

In this case, Class Counsel were aware of and understood the mainstream medical literature linking traumatic brain injury to an increase in the likelihood for developing early-

---

[11]   In *Klein*, death claims were awarded more than claims for cerebral palsy and other neuroglial impairment injuries.  Subcategories were created to distinguish among severe, moderate, and mild impairment, with decreasing awards, respectively, for each of those subcategories.  *See id*. at 642-45.

onset dementia, Alzheimer's Disease, Parkinson's Disease, and ALS.  *See* Seeger Decl., at ¶ 16.
They carefully considered the significance and severity of the alleged injuries (some of them
fatal), the science issues relative to causation and concussions, and Plaintiffs' ability to achieve
through settlement "full value" compensation for serious concussion-related injuries without the
risks associated with trials and appeals.  *See* Seeger Decl., at ¶ 19; *see also id.*, at ¶¶ 17-18.
Based on this information and drawing from their experience and expertise, Class Counsel
developed a competent and fair damages matrix for the Qualifying Diagnoses that will be
compensated in the Settlement, *id.* at ¶ 20.

### B.      No Further Subclassing Is Required or Appropriate.

Early on, Co-Lead Class Counsel determined that a class settlement structured with two
separate subclasses, each with its own independent class representative and experienced subclass
counsel, would best serve all Class Members' interests and meet with Due Process.  The first
subclass includes those Class Members who have not been diagnosed with a qualifying injury
but are at increased risk for suffering from neuromuscular or neurocognitive impairment due to
their NFL football play, and the second subclass encompasses Class Members already diagnosed
with a qualifying injury.  Seeger Decl., at ¶ 29; Levin Decl., at ¶¶ 4-13; Nast Decl., at ¶¶ 5-12;
Phillips Decl., at ¶ 7 ("in order to ensure the adequate and unconflicted representation of all of
the proposed class members, Plaintiffs agreed during the negotiations to create two proposed
separate subclasses, each represented by separate counsel.").

The Objectors suggest that a separate subclass for each injury and condition suffered by
Class Members (*e.g.*, all of the Qualifying Diagnoses, as well as multiple sclerosis,
hypopituitarism, epilepsy, depression, aggression, sleep disorders, etc.) was required, and that a
dozen or so subclasses would not be problematic.  They misunderstand, however, the role of

subclasses, which consist of people and not legal claims.  "[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened."  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) (quoting law review article); *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009).

If there were claims in this case that were unique to some individuals but not others, or if the overall potential compensation were limited, then a stronger argument for additional subclassing could be made.  Ironically, Objectors have pushed hardest for a subclass of "CTE claimants," yet, they contend that all Class Members are at risk of CTE.  By their own definition, the so-called "CTE at-risk subclass" consists of every single Class Member.  There is no authority in any case law for dividing a class into multiple subclasses and then having the same population within each.

### C.   The Fact that the Settlement Does Not Compensate Certain Symptoms Anecdotally Associated with CTE Does Not Detract from the Fairness, Reasonableness or Adequacy of the Settlement.

Objectors mischaracterize the state of the relevant science regarding CTE.  The running theme of the post-Fairness Hearing submissions, parroting the central theme of the initial objections, is that CTE should be compensated.  *See*, *e.g.*, Morey Supp. Brief, at 1-20, and original Objection of Sean Morey, *et al*. ("Morey Objection") [ECF No. 6201], at 21-32, 69-70. Objectors claim that certain symptoms anecdotally associated with CTE, including, suicidality, depression, aggression and other mood and behavioral disorders, should be compensated in the Settlement and that a subclass representative(s) and additional subclass counsel should have been appointed to represent those Class Members experiencing such symptoms.  *See*, *e.g*., Sixteen Objectors Response, at 10 (suggesting that "[t]he Court defer consideration of the settlement

16

until representatives and counsel have been appointed to represent the subclass of former players who currently have, or are at risk of developing, CTE.").  Also, they claim that Death with CTE should be compensated for those who die after July 7, 2014, or the compensation for those who died with CTE prior to July 7, 2014 should be eliminated, or CTE should be eliminated from the Release.  *See* Miller Supp. Objection, at 3-5.

As explained in detail in Plaintiffs' Final Approval Memorandum [ECF No. 6423-1, at 54-60], throughout the litigation and during the settlement negotiations, Class Counsel zealously advocated for compensation for all symptoms and diseases exhibited by Class Members which could possibly be attributable to concussive and subconcussive brain injuries sustained during professional football play.  Class Counsel learned, however, which conditions the NFL Parties were willing to resolve on a global basis and those which they were not, *i.e.*, where the NFL Parties would draw the line and refuse to settle.  In addition, Class Counsel were armed with the knowledge as to the status of the science based upon consultation with numerous experts.  *See* Seeger Decl., at ¶¶ 16-23.  They were abundantly qualified to assess the litigation risks posed by legal hurdles[12] that would face the Plaintiffs in advancing the cases to trial and once at the trial stage, the risks of establishing causation and optimal damage valuations before the finder of fact, in light of the science and jury perceptions.

---

[12]  Among those legal hurdles, as discussed in Plaintiffs' Final Approval Memorandum, was surviving the threshold motion to dismiss upon preemption grounds.  *See Duerson v. National Football League, Inc.,* No. 12 C 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) (denying motion to remand and holding that negligence claims were completely preempted by Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186, because plaintiff's claims were substantially dependent upon interpretation of Collective Bargaining Agreements); *see also Smith v. National Football League Players Ass'n,* 2014 WL 6776306 (E.D. Mo. Dec. 2, 2014) (similarly denying motion to remand because claims completely preempted by LMRA).

The basic tenet concerning the state of the science on CTE – a tenet upon which all of the experts agree – is that presently, CTE is NOT diagnosable except upon autopsy.  Indeed, the experts upon whom the Morey Objectors rely have stated, "there currently are no *in vivo* biomarkers that can be used to reliably diagnose CTE"[13] and "there is no currently accepted and validated diagnosis of CTE in the living."[14]  Yet, these same experts boldly make predictions as to when such methods for diagnosing CTE in the living will become available, stating "within the next five to ten years there will be highly accurate, clinically accepted, and FDA-approved methods to diagnose CTE during life," *see* Stern Decl., at ¶ 38,[15] and "it is only a matter of time" before there will be a "reliable clinical diagnosis of CTE in the living," *see* Gandy Supp. Decl., at ¶ 10.  It is upon this guesswork that the Objectors rely in lodging their objections concerning CTE.[16]  At any rate, the ability to make a determination in the living as to whether there exists

---

[13]  *See* Supplemental Declaration of Sam Gandy, M.D., Ph.D. ("Gandy Supp. Decl."), at ¶10 [ECF No. 6455-2].

[14]  *See* Supplemental Declaration of Robert A. Stern ("Stern Supp. Decl."), at ¶ 10 [ECF No. 6455-1].

[15]  It is interesting to note that while Dr. Stern was quite certain in his original Declaration that there "*will be* … highly accurate, clinically accepted … methods" in the next five to ten years, he is not so certain in his Supplemental Declaration, wherein he says that such "*will likely* be possible within the next decade."  *See* Stern Supp. Decl., at ¶ 9.

[16]  The futility of trying to make these types of predictions as to when an *in vivo* biomarker or other clinically accepted valid method for detecting CTE in the living may be uncovered or developed is evidenced by the history of research into Alzheimer's Disease.  "Tremendous research and thousands of clinical studies on hundreds of thousands (if not millions) of individuals over the past fifty years has been conducted, yet much uncertainty as to its causes and effects continues to exist.  And it took decades of prospective studies involving such patients before the diagnostic and clinical profile of Alzheimer's was understood in the scientific community."  Hovda Decl., at ¶ 24.  As the noted Danish physicist Niels Bohr stated, "Prediction is very difficult, especially about the future."

certain protein deposits on the brain is irrelevant – the Settlement compensates the manifestation of disease, deficits in neurocognitive and neuromuscular functionality.

To recap the other highlights from Plaintiffs' Final Approval Memorandum and the Exhibits submitted therewith, the status of the medicine/science of which Class Counsel were aware is as follows:

- The current state of the science and medicine is such that it would be premature to draw conclusions about whether mild traumatic brain injuries cause the ultimate finding of CTE on autopsy, and whether certain symptoms are appropriately associated with CTE.[17]

---

[17] *See* Declaration of Christopher C. Giza, M.D. ("Giza Decl."), at ¶ 19 [ECF No. 6423-18] ("The existing published research, while important, is not yet sufficient for the scientific community to make key conclusions regarding CTE and prospective, longitudinal studies are needed.  Because of these limitations any assumptions about a causal association between CTE and mild concussions or subconcussive brain injuries are premature.  Similarly, any assumptions regarding symptoms that constitute the diagnostic and clinical profile of CTE are premature."); Hovda Decl., at ¶ 23 ("Inferring the presence of CTE pathology from the presence of various clinical and symptomatic manifestations in living patients is, in my opinion, scientifically unsupported.  Likewise, assuming that the presence of certain tau pathology in selected player patients is causally associated with and foretells, various clinical and symptomatic manifestations and risk in those patients is, in my opinion, similarly speculative and scientifically premature.  Well-controlled and prospective/longitudinal studies have not yet been conducted.").

In fact, Ann C. McKee, the Boston University School of Medicine researcher to whom Objectors often cite regarding her research, has written that "a brain donation study and autopsy directed case series will never establish the incidence or prevalence of a disorder such as CTE owing to ascertainment biases…."  McKee AC, Stein TD, Nowinski CJ, Stern RA, *et al*. The spectrum of disease in chronic traumatic encephalopathy. *Brain*. 2013; 136 ("The McKee Study").  The following was further reported as to The McKee Study:

> Even though the brain donors were not screened for cognitive impairments, an autopsy-based case series is limited by significant ascertainment bias, as families of individuals showing behavioural or cognitive symptoms are much more likely to initiate and participate in a brain donation programme than families of normally functioning individuals. Consequently, no generalizations regarding the incidence and prevalence of CTE in living athletes and veterans can be made. Furthermore, in several of the cases, the clinical symptoms were confounded by drug and

- In contrast, all of the "Qualifying Diagnoses," namely, ALS, Alzheimer's Disease, Parkinson's Disease and dementia, are medically and scientifically well-defined syndromes that have been associated with repeated traumatic brain injury.[18]

- Each of the Qualifying Diagnoses can be fairly diagnosed and confirmed by clinical and ancillary findings or can be objectively delineated on neurological examination and neurological testing.[19]

- The diseases and certain conditions that have been reported in patients who are determined post-mortem to have advanced CTE pathology are compensated by this Settlement as "Qualifying Diagnoses."[20]

---

alcohol abuse; therefore, the degree to which the extensive p-tau, TDP-43 and axonal pathology and neurodegeneration is responsible for the subject's clinical presentation is unclear.

Inclusion of more rigorous control subjects, such as individuals who experienced repetitive mild traumatic brain injury and did not develop behavioural or cognitive abnormalities, will be extremely useful in future studies designed to delineate critical aspects of the traumatic exposure and susceptibility to trauma-induced neurodegeneration.

[18] *See* Fischer Decl., at ¶ 6. *See infra* fn. 20 as to Objectors' expert, Dr. Stern, agreeing with this proposition.

[19] *See* Fischer Decl. at ¶¶ 8, 9.

[20] The writings of Objectors' expert, Dr. Stern, support these facts. "The differential diagnosis of CTE often includes AD [Alzheimer's Disease] and frontotemporal dementia (FTD) … Although a history of remote head trauma may be suggestive of CTE, head trauma has been implicated as a risk factor of AD, Parkinson disease, ALS, and other neurodegenerative diseases." Gavett BE, Stern RA, *et al.* Chronic Traumatic Encephalopathy: A Potential Late Effect of Sport-Related Concussive and Subconcussive Head Trauma. *Clin. Sports Medicine* 2011; (30)179-188. *See* McKee Study ("Thirty-one of the 34 former professional American football players had stage III-IV CTE or CTE plus co-morbid disease (89%)." Thus, 89% of retired players with advanced CTE would likely qualify for one of the Qualifying Diagnoses.

The Objectors dismiss out of hand Plaintiffs' detailed discussion about "line-drawing" as to certain symptoms associated with CTE.  They contend that a CTE subclass representative was needed, but, they fail to explain how there could be a "living" CTE subclass representative. Such an individual would be, given the current state of the science, someone with no diagnosis of CTE but at risk of development.  There are two problems with this.  First, this subclass would subsume the entire class itself – there is no way to exclude pre-death any retired NFL player from this group.  Second, whether the retired player chosen as a sub-class representative in fact has/had CTE would not be knowable until he dies.  Objectors urge a veritable Schrödinger's cat situation – the uncertainty of whether or not the player had CTE could only be resolved upon his death and autopsy.

Somehow Objectors seek to create a conflict in representation by challenging the risks and injuries suffered by Shawn Wooden based on a curious reading of his Affidavit.  *See* Sixteen Objectors' Response, at 7-8.  The Record shows that Shawn Wooden already has some of the symptoms often associated with CTE, namely, "migraine headaches, sleep problems, concentration issues and mood swings."  *See* Affidavit of Shawn Wooden ("Wooden Aff."), at ¶ 1 [ECF No. 6423-8].  He also has represented in the allegations set forth in the complaints filed on his behalf, that he is at risk for developing and experiencing in the future any and all symptoms which might arise from the concussive and subconcussive head traumas experienced while playing professional football, including symptoms often associated with CTE, as well as the Qualifying Diagnoses compensated in this case.[21]

---

[21]  In the Master Administrative Class Action Complaint for Medical Monitoring, he represented that "I alleged that I sustained repetitive traumatic head impacts during NFL games and/or practices, and that I am at increased risk of suffering from brain injuries caused by these head impacts."  *Id.* at ¶2.  He also authorized the filing of Plaintiffs' Class Action Complaint.  *Id.* at ¶ 6.  The Class Action Complaint in *Turner v. National Football League*, Civ. A. No. 14-cv-

Objectors cannot have it both ways.  Some Objectors have alleged that CTE is equivalent to an industrial/occupational disease and that all those who played professional football are at risk for contracting it.  *See* Fairness Hrg. Trans. at 159:23 -160:1 (Objector, Evan J. Moore, claimed the failure to include symptoms associated with CTE in the Settlement is "akin to bringing a coal miner's health claim without black lung disease or an asbestos health claim without asbestos.").  *See also* Morey Objection [ECF No. 6201], at 21 (characterizing CTE as "football's industrial disease"); original Objection of Sixteen Plaintiffs [ECF No. 6242], at 3 (calling CTE the "NFL's industrial disease").  Yet, this claim apparently excludes Subclass 1 representative Shawn Wooden.  By their own account Mr. Wooden is at risk for exhibiting the symptoms allegedly associated with CTE, as is every other member of the Class, including for that matter, Mr. Turner as well.  Because the Class Representatives are in the same situation as all other Class members, there was and is no need for a "CTE Subclass Representative" and separate counsel, since all Class Members were adequately represented by the Class Representatives.  Even taken on its own terms, the Objectors' CTE claim does not point to any conflict or any need for subclassing; they only assert that a claim structure should have been created based upon their certainty that at some point in the future the science would support such a claim.  As the Subclass 1 Representative, Shawn Wooden was fully aware of the scope of the claims he initially brought and which claims are and which are not covered by the proposed

---

00029-AB (E.D. Pa.) [ECF No. 1], at paragraph 61, alleges that class members are at risk for developing "one or more of the following conditions:  early-onset of Alzheimer's, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as CTE.  The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above.  CTE is also is associated with an increased risk of suicide."

Settlement.  He decided, in conjunction with Subclass 1 Counsel, Arnold Levin, and Co-Lead

Class Counsel[22] that the Settlement was fair, reasonable and adequate under the circumstances.

Courts often draw lines on the exposure-to-disease continuum, based upon the status of

the science/medicine at the time.  In *Sheridan v. NGK Metals Corp.*, 609 F.3d 239 (3d Cir.

2010), in relying on a related state court case that had addressed the same issue and in affirming

the trial court's grant of defendants' motion to dismiss, for judgment on the pleadings and for

summary judgment in a toxic exposure case seeking medical monitoring, Judge Scirica explained

that "[a]lthough the [state court's] opinion suggests that *future developments in science's*

*understanding* of the effects of beryllium exposure and its relationship with CBD [chronic

beryllium disease] *may result in a different outcome*, … it drew a line along the exposure-to-

disease continuum at sensitization."  *Id.* at 254 (emphasis added).  The state court decision upon

which he relied was *Pohl v. NGK Metals Corp.*, 936 A.2d 43, 51 (Pa. Super. 2007), wherein the

court recognized the difference between beryllium sensitivity and beryllium susceptibility,

noting that recovery would be allowed for the former but not the latter, because the experts

agreed that "the concept of beryllium susceptibility is only a hypothesis" and "there is currently

no test available to determine whether an individual is 'susceptible' to an adverse beryllium

health effect."  This line-drawing by the *Sheridan* and *Pohl* Courts is analogous to the line-

drawing done by Class Counsel with respect to certain symptoms often associated with CTE.[23]

---

[22]  Class Counsel represent individually thousands of absent Class Members who have
experienced various symptoms that run the gamut, from those which would be each of the
"Qualifying Diagnoses," to those which are allegedly associated with early CTE and are not
"Qualifying Diagnoses," such that Class Counsel had no incentive to favor those with certain
symptoms or diseases over those with other symptoms or diseases.

[23]  If a player complains of depression, the Objectors assume that he has CTE.  They ignore the
fact that symptoms of depression are pervasive in the population, including among those people
who never played a contact sport.  *See* Giza Decl., at ¶ 14 ("Many of these symptoms [including

Class Counsel negotiating the Settlement were cognizant of the state of the science, particularly as to CTE, and recognized the import of science and the competing experts if the cases were to be tried.  Despite all of the experts who submitted declarations in support of the Morey Objectors' contention that all symptoms alleged to be associated with CTE should have been compensated in the Settlement, the Morey Objectors ignore the realities of the trial setting.

In *Perry v. Novartis Pharma. Corp.*, 564 F. Supp.2d 452 (E.D. Pa. 2008) (Dalzell, J.), a case in which Co-Lead Class Counsel's firm was involved, the district court granted the pharmaceutical company's motion to exclude certain of plaintiffs' experts because the court found their opinions to be unreliable, as the studies upon which they relied lacked statistical significance and a reliable scientific link between the exposure and the disease.  The court reasoned as follows:

> [W]e must make clear that the nonexistence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science. In cases where no adequate study shows the link between a substance and a disease, expert testimony will generally be inadmissible, even if there are hints in the data that some link might exist.  This may mean that early victims of toxic torts are left without redress because they are unable to prove their cases with the scientific data that exists.  While this is a regrettable result in those individual cases, it is an unavoidable reality of the structure of our legal system and is necessary to protect the interests of defendants who might otherwise be subject to crippling verdicts on the basis of slender scientific evidence.  As the Seventh Circuit has noted, "[t]he courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it."

---

depression] are common in healthy individuals and increase under stressful situations unrelated to brain trauma.  It remains a challenge with an individual patient to discern whether or not these symptoms are a consequence of head injury or associated with comorbidities (*e.g.*, preexisting stress and social difficulties, learning disabilities, alcohol or drug abuse, etc.)."). *See also* Hovda Decl., at ¶ 21 ("Thus, the reported clinical observations (*i.e.*, aggression, disinhibition, suicidality, etc.) are likely to be skewed by selection bias.  Just systematically study the presence or absence of CTE pathology in non-concussed men and women in a reasoned effort to determine what causal inferences can appropriately be made based on a finding of CTE in decedents who were exposed to concussive events.").

*Id.* at 467-68 (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)).  *See also In re Propulsid Prods. Liab. Litig.*, 261 F. Supp.2d 603, 615 (E.D. La. 2003) (Fallon, J.) ("The Court is aware that the future may shed more light on this matter.  Medical science may one day determine with sufficient reliability that a causal relationship exists between a sustained prolonged QT interval and Propulsid but it is not there yet and may never be.…  A trial court must function in the present assessing evidence that presently exists.").[24]

The experts relied upon by the Objectors make just such unsupported conclusions based upon "hints in the data that some link might exist."  *Perry*, 564 F. Supp.2d at 468.  Several of the experts state:  "Mood and behavioral impairments such as depression, suicidality, hopelessness, impulsivity, explosiveness, rage and aggression, although present in the general population, appear more frequently in individuals suffering from CTE than in the general population."[25]  *See* Morey Supp. Brief, at 7.  None of these experts, who espouse this exact tenet, explains the source for their belief, *i.e.*, upon which studies and/or research he/she relies, quantifies the increase in frequency, or asserts that the alleged increased frequency is statistically significant.  Further, none explains whether, when referring to "individuals suffering from CTE," they are referring only to those whose brains have undergone autopsies and have been found to have CTE.  If such

---

[24]  Perhaps, the Morey Objectors ignore these realities because Mr. Molo and his partners do not try personal injury cases – Class Counsel try personal injury cases, mass tort cases and class action cases.  *See* Fairness Hrg. Trans., at 25:3-6 ("[W]e handle personal injury cases.  This is what we do. … We have tried numerous bell weather cases.") and Section II.D.1, *infra,* describing Class Counsel's qualifications and experience in personal injury cases.

[25]  *See* Declaration of Patrick R. Hof, M.D., at ¶6 [ECF No. 6455-3]; Declaration of Jing Zhang, at ¶6 [ECF No. 6455-4]; Declaration of Martha E. Shenton, Ph.D., at ¶6 [ECF No. 6455-5]; Declaration of Charles Bernick, M.D., M.P.H., at ¶6 [ECF No. 6455-6]; Declaration of Michael Weiner, at ¶6 [ECF No. 6455-7]; Declaration of James R. Stone, M.D., Ph.D., at ¶6 [ECF No. 6455-8]; Declaration of Thomas Wisniewski, M.D., at ¶6 [ECF No. 6455-9]; Declaration of Steven T. DeKosky, M.D., at ¶6 [ECF No. 6455-10]; Declaration of Dr. Wayne Gordon, at ¶6 [ECF No. 6455-11].

is not the case, then, their reasoning is circular, as the exhibited symptoms in the living are being used to make a clinical diagnosis of CTE.  Even Objectors' experts agree, there is currently no method of rendering "a reliable clinical diagnosis of CTE in the living."  *See*, *e.g.*, Gandy Supp. Decl., at ¶10.

The Objectors criticize Class Counsel for allegedly attacking Dr. Stern and Dr. Gandy at the Fairness Hearing, and supposedly distorting their work.  *See* Morey Supp. Brief [ECF No. 6455], at 2, 5.[26]  Clearly, the Objectors missed the point of Co-Lead Class Counsel's rebuttal, which was not to undermine or discredit these experts' work.  The point was not to demonstrate that the experts supporting the Objectors' position are wrong (and our experts are right).  Rather, Co-Lead Class Counsel's rebuttal was designed to give the Court and the Objectors a glimpse as to what the "battle of the experts" would look like at a *Daubert* hearing or at trial in order to help further illustrate the litigation risk.

Knowledge of the state of the medicine and science, as well as the significant litigation risks involved with continuing to litigate the case rather than settling, experienced Class Counsel determined that the terms reached on the Settlement were fair, reasonable and adequate.  The fact that the Settlement does not compensate certain symptoms in living, retired players, like depression, suicidality, and mood swings, which have been anecdotally associated with CTE, does not make the Settlement unfair, unreasonable or inadequate.

The Miller Objectors suggest in their Supplemental Objection that an alleged intra-class conflict can be "cured" by including Death with CTE going forward as a Qualifying Diagnosis, by eliminating the compensation for Death with CTE prior to July 7, 2014, or by removing

---

[26]  *See also* Stern Supp. Decl., at ¶¶ 18-22; Gandy Supp. Decl., at ¶¶ 12-13.

reference to CTE from the release.  *See* ECF No. 6452, at 3-5.  As Class Counsel explained in our initial briefing, there is no conflict to be cured.

First, Class Counsel fought to secure recovery for the families of those who died and whose brains revealed a pathological finding of CTE before this Settlement came to fruition, in recognition of the fact that they could not have known that they needed to secure a Qualifying Diagnosis prior to death, because they were unaware that this Settlement would be an option. *See* Plaintiffs' Final Approval Memo. [ECF No. 6423-1], at 59-60.  *See also* Seeger Decl., at ¶ 37; Phillips Supp. Decl., at ¶ 11.  The monies paid to these families will have no effect on the monies available to compensate other Class Members in this uncapped deal.  At this point in time, retired players and/or their family member care-givers are aware of this preliminarily approved settlement and that they will be required to obtain a Qualifying Diagnosis in order to receive compensation should the Settlement be finally approved.  If they are neurocognitively impaired, they should obtain a Qualifying Diagnosis.  *See* Seeger Decl., at ¶ 45.  There is nothing unfair about the manner in which compensation is determined under the Settlement.[27]

The Miller Objectors' suggestion that the Release be edited to exclude from the Release claims arising out of or relating to CTE (*see* Settlement Agreement, at Section 18.1(a)(iv)) has previously been addressed by Class Counsel.  *See* Plaintiffs' Final Approval Memo., at 83-84. As previously noted, certain symptoms which have been reported in patients who are diagnosed post-mortem to have advanced CTE pathology are being compensated and thus released, namely, dementia, Alzheimer's Disease, Parkinson's Disease and ALS.  With regard to other symptoms anecdotally reported as associated with CTE, which are not being compensated, like depression,

---

[27] We surmise that some would have deemed unfair a settlement which did not recognize that those who already died could not know that they needed to obtain a Qualifying Diagnosis during their deceased family member's life in order to recover under a Settlement that had yet to exist.

suicidality, and mood swings, we note that these may progress to the compensable "Qualifying Diagnoses." Further, Class Members had the option to opt out, as discussed below. *See* Section II.E, *infra.* Finally, releases in personal injury cases invariably include broad language requiring the release of unknown and unknowable claims to provide the defendant with "global peace." The Third Circuit has upheld broad releases in other class action cases. *McGowan Investors LP v. Meyer*, 392 Fed. Appx. 39, 47 (3d Cir. Aug. 12, 2010) ("the release itself is consistent with broad release language that we have upheld in previous cases") (citing *Prudential*, 261 F.3d at 367; and *Grimes v. Vitalink Comm'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994)).

Also related to their CTE Arguments, Objectors complain again in their post-Fairness Hearing submission, that the science is "frozen." *See* Morey Supp. Brief [ECF No. 6455], at 17-18. The science is not frozen. Class Counsel insisted in the negotiations upon accounting for the possibility of new testing or markers in the future that might provide additional methods to identify the "Qualifying Diagnoses," in addition to the testing protocol set forth in Exhibit 2 to the Settlement Agreement, at 112-120. *See* Plaintiffs' Final Approval Memo., at 84-85. The Court confirmed this at the Fairness Hearing:

> MR. SEEGER:  And finally in terms of additional features is that we will allow modifications to the settlement to incorporate new diagnostic tools, and the parties are going to continually, even though the agreement says every ten years, we're going to work together all the time to keep an eye on this, and we will in good faith make sure that if they're necessary and needed they will be implemented.
>
> THE COURT:  So if it's good faith your representation; is that correct?
>
> MR. KARP:  It is, Your Honor.
>
> THE COURT:  All right.  That means that there is -- there can be judicial oversight of that.
>
> MR. SEEGER:  Yes, Your Honor.
>
> THE COURT:  Do you agree with that, Mr. Karp?

28

MR. KARP:  We do.  It's laid out in the agreement.  Yes.

*See* Fairness Hrg. Trans., at 16:16 – 17:8.

However, that does not mean that the compensable "Qualifying Diagnoses" themselves are malleable – only the methods for diagnosing those specific conditions will be revisited in the future.  As noted above, in the discussions of *Perry* and *Sheridan*, *supra*, the lines drawn on the exposure to disease continuum are fixed at the place where Settlement dictates, based upon the current status of the science.

### D.    There Are No Disabling *Amchem* Conflicts To Impugn the Integrity of the Settlement or the Class and Subclass Representation.

The structural protections of the Settlement comport with the Supreme Court's rulings in *Amchem*.  Objectors have failed to present any disabling conflicts that would render the Settlement fundamentally unfair or prevent certification of the Class and Subclasses before the Court, despite their attempt to cast aspersions on the adequacy of Class Counsel.  *See* Miller Supp. Objection, at 5 ("Class Counsel should be ashamed"); Morey Supp. Brief, at 21-22 (arguing that Class Counsel failed to provide adequate representation and claiming that the "rights of class members were bargained away"); Sixteen Objectors Response, at 9 (criticizing the "line-drawing" done by Class Counsel and asserting an absence of adequate representation).

### 1.    The Class and Subclasses Were Well Represented by Qualified and Experienced Class Counsel.

The Plaintiffs' negotiating team in this case was comprised of Plaintiffs' Co-Lead Counsel and members of the Court-appointed Plaintiffs' Executive and Steering Committees.  *See* Seeger Decl., at ¶ 27.  Collectively, these counsel have an unparalleled breadth of experience in prosecuting claims for personal injuries in mass torts, through complex class actions, and as part of multidistrict litigation pursuant to 28 U.S.C. § 1407.  *See*, *e.g.*, Seeger Decl., at ¶¶ 2-4

(appointed to leadership positions in more than 20 MDLs and class actions and extensive

experience negotiating class settlements providing substantial financial benefits to tens of

thousands of victims suffering catastrophic and other personal injuries, including brain injuries

related to strokes); Levin Decl., at ¶ 2 (over 50 years of experience settling personal injury

claims in class actions and MDLs and appointments to leadership positions in more than 100

cases); Nast Decl., at ¶¶ 2-3 (appointments to leadership positions in more than 48 cases,

including as Subclass Counsel in *Diet Drugs*); ECF Nos. 54-1 & 54-2 (resumes of Class

Counsel).[28]

No one can dispute that Class Counsel have "an appreciation of the ranges of valuations

that courts, juries, and experts place on various types of alleged injuries, as well as the risks,

including difficulties proving liability and causation, inherent delays, and expenses involved in

trying these cases."  Seeger Decl., at ¶ 5; *see also* Levin Decl., at ¶ 3; Nast Decl., at ¶ 4.

Throughout the arm's-length negotiations of the Settlement terms, the Plaintiffs' negotiating

team drew upon their wealth of experience, and exercised sound judgment regarding what is

required to achieve the best results possible for personal injury victims, in terms of the types of

relief available, the quantum of benefits attainable, and the expediency of delivery of those

benefits to the class.[29]  Class Counsel were well-suited to act and did act in the best interests of

Class Members in order to create a fair, reasonable, and adequate Settlement of Plaintiffs' claims

---

[28]  *See also supra* fn. 24.

[29]  Where "the Court is satisfied that the settlement is the product of arm's-length negotiation, [it] gives considerable weight to the views of experienced counsel as to the merits of the settlement." *See Perry*, 229 F.R.D. at 115.  *See also In re Imprelis Herbicide Marketing, Sales Practices and Prods. Liab. Litig.*, 296 F.R.D. 351, 364 (E.D. Pa. 2013) ("because a settlement represents the result of a process by which opposing parties attempt to weigh and balance the factual and legal issues that neither side chooses to risk taking to final resolution, courts have given considerable weight to the views of experienced counsel as to the merits of a settlement").

that meets the requirements of Rule 23 and satisfies *Girsh* factors and *Prudential* considerations.[30]

> ### 2.  Class Counsel and Subclass Counsel Had No Incentive To Exclude Any Group of Class Members or Minimize Their Recovery.

By creating structural protections in the negotiations for those players currently undiagnosed with any neurocognitive or neuromuscular impairment, this Settlement avoids all of the problems at issue in *Amchem*.  Class Counsel were all-inclusive in their approach to compensating Class Members who manifested actual neurocognitive or neuromuscular impairment as a result of having played NFL football.  The members of the Plaintiffs' Executive and Steering Committees represent thousands of individual Retired NFL Football Players with a wide array of injuries who brought suit against the NFL Parties.  Many of these Class Members, like Shawn Wooden, have not yet been diagnosed with a Qualifying Diagnosis, while many others already have a Qualifying Diagnosis.  There simply was no incentive for Class Counsel to ignore the interests of any particular group of Plaintiffs or treat any group of Plaintiffs unfairly, nor did they.  Moreover, from the outset, separate Subclass Counsel and Subclass Representatives were designated, and they worked hard to protect the interests of those players in their respective Subclasses, who either have not been diagnosed with any impairment, or those who already suffer from dementia, Parkinson's Disease, Alzheimer's Disease, and/or ALS. Phillips Decl., at ¶¶ 7, 11; Philips Supp. Decl., at ¶ 2; Seeger Decl., at ¶ 29; Levin Decl., at ¶ 4; Nast Decl., at ¶ 5.

---

[30]  *See Klein*, 705 F. Supp.2d at 649 (noting that "[t]he adequacy of the representation [of the class] is linked to the question whether the settlement is fair and reasonable."); *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983).

In *Amchem*, there were no subclasses for the sprawling class that included persons who "were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time."  Some class members were currently injured, but others had exposure-only, and problematically, they "may not even know of their exposure" to asbestos.  521 U.S. at 609.  Thus, the Court held, "[t]he interests of those within the single class are not aligned."  *Id*. at 626.  Significantly, "for the currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."  *Id*.  Without subclasses, there was "no structural assurance of fair and adequate representation for the diverse groups and individuals affected."  *Id*. at 627.[31]

Here, in contrast, not only are the undiagnosed retired players aware they played football and were exposed to head impacts, they had independent, unconflicted representation for their subclass throughout the settlement negotiations.[32]  Subclass 1 Representative Shawn Wooden alleged in his complaint against the NFL Parties that he "sustained repetitive traumatic head impacts during NFL games and/or practices, and that [he is] at increased risk of suffering from brain injuries caused by these head impacts."  Wooden Aff., at ¶ 2.  He acknowledges that he is "at increased risk of developing a range of neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries, such as Dementia, Alzheimer's Disease, Parkinson's Disease,

---

[31]  Most troubling, in that case, even though "counsel for masses of inventory plaintiffs endeavored to represent the interests of the anticipated future claimants," they entered into separate inventory settlements for their clients outside of the class settlement.  *Id.* at 601.

[32]  Shawn Wooden, through his counsel Steve Marks and Subclass 1 Counsel Arnold Levin, kept abreast of the litigation proceedings and the settlement negotiations.  *Id*. at ¶¶ 3-5, 7.  He "strongly" supports approval of the Settlement.  *Id*. at ¶¶ 6, 8-9.

and/or [ALS], as a result of having played professional football in the NFL."[33]  Wooden Aff. at ¶ 1.

For their protection, the <u>uncapped</u> MAF will continue to be funded for 65 years to ensure the availability of awards for even the youngest retired players in the event they receive a Qualifying Diagnosis.  In addition, the Settlement includes adjustments to the Monetary Awards for inflation.  In *Amchem*, there was "no adjustment for inflation."  521 U.S. at 627.  Moreover, the *Amchem* settlement contained "'case flow maximums,' which capped the number of claims payable for each disease in a given year."  *Id*. at 604.  Also problematic was the fact that class members were "bound by the settlement in perpetuity," but the defendants were entitled to "withdraw from the settlement after ten years."  521 U.S. at 604-05.

Although the Objectors also now claim that in *Amchem* the Supreme Court "made clear that the settlement provisions must keep pace with changing science and medicine," this recasts the Supreme Court's language.  Morey Supp. Brief, at 17.  The Supreme Court noted only that the Third Circuit appreciated the importance of evolving science to the exposure-only class members' interests.  The Supreme Court did not require the type of fluid settlement provisions which the Morey Objectors seem to suggest.  Further, while the state of evolving science may have been a concern in *Amchem*, where there was no separate representation for the exposure-

---

[33]  Objectors assert that a back-end opt-out right is required for the undiagnosed players, because allegedly "there is simply no structural assurance that the thousands of Absent Class Members that do not now comprehend the extent to which their brain damage may progress over time are protected."  Duerson Supp. Brief, at 4.  However, Retired NFL Football Players already have all the information they need to make an informed decision about whether to participate in the Settlement.  They have been made aware of the Qualifying Diagnoses compensated under the Settlement and the amounts to which they would be entitled if they receive any of these diagnoses in the future.  In such an event, they will be on the same footing as Retired NFL Football Players with a current Qualifying Diagnosis, because the Monetary Awards are inflation-protected and there is no risk of depleting the uncapped Settlement fund.  These structural protections obviate any alleged need for a back-end out-opt right.

only class members, such is not the case herein.  Finally, as discussed *supra¸* the parties have

agreed in good faith to revisit the science over time in terms of keeping abreast of new testing or

markers that might in the future provide additional methods to identify the "Qualifying

Diagnoses."

     The Settlement before the Court does not contain any of these infirmities despite

Objectors' claims to the contrary.

     **E.**     **<u>The Right To Opt-Out Was an Option for Those Who Were Not Satisfied
with the Proposed Settlement – An Option Which Should Not Be Discounted
– Indeed, the Right to Opt-Out Is Part of the <em>Prudential</em> Considerations.</u>**

     The Morey Objectors cite to *GM Trucks*, 55 F.3d at 809, and argue that "the right of

parties to opt out does not relieve the court of its duty to safeguard the interests of the class."  *See*

Morey Supp. Brief [ECF No. 6455], at 2.  Plaintiffs do not disagree.  But, as explained above,

the Court has ample facts upon which to determine that the interests of the Class, as a whole,

were safeguarded.  The absent Class Members were adequately represented by experienced Class

Counsel and the Subclass Representatives.  Merely because certain Objectors may be unsatisfied

with the Settlement reached does not mean that the representation was inadequate.  *See Walsh v.

Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) ("Class counsel's duty to the class

as a whole frequently diverges from the opinion of either the named plaintiff or other

objectors.").  *See also Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 590-91 (3d Cir. 1999) (finding

no error in district court's "finding that Class Counsel adequately represented the interests of all

class members, even if some class members and some of the class representatives are unsatisfied

with the results of Class Counsel's efforts.").

     Additionally, "whether class or subclass members are accorded the right to opt out of the

settlement" is part of the *Prudential* considerations, and, providing such right bodes in favor of

the settlement.  *Prudential*, 148 F.3d at 323.  *See* Plaintiffs' Final Approval Memo. [ECF No. 6423-1] at 64-66.  *See also Frederick v. Range Resources-Appalachia, LLC*, C.A. No. 08–288, 2011 WL 1045665, at *8 (W.D. Pa. Mar. 17, 2011) (citing to *Prudential* in connection with noting that opt-out right existed and favored approval of proposed settlement); *Lan v. Ludrof*, 2008 WL 763763, at *17 (W.D. Pa. Mar. 21, 2008) (same).  The fact that these Class Members had the option to opt out is an important factor, not to be disregarded.  Opting out was a real option in this case – indeed, over 5,000 players had filed individual suits in this MDL, evidencing their willingness to proceed against the NFL on their own.

The *GM Trucks* quote was taken out of context by the Morey Objectors.  The *GM Trucks* Court recognized that the court's duty to safeguard the interests of the class was not relieved by the provision of an opt-out right after noting that the claims were likely too small to be pursued on their own if a class member were to opt out.  And, there, it was recognized that only those who could afford otherwise to buy a new car could use the coupons, which were the only type of monetary compensation provided for class members under that settlement. 55 F.3d at 809 ("The named plaintiffs argue that, if certain fleet buyers and individuals were dissatisfied with the settlement's terms, they could simply opt out of the class and pursue their own relief individually.  While such an argument might theoretically be true, it ignores the realities of pursuing small claims. It would cost considerably more to litigate individual claims than the litigant could recover…."). That case is inapposite to the scope of the benefits provided by this Settlement, as well as the values in the Monetary Award Grid, and in light of the fact that thousands of individual cases had been filed before this case began to proceed as a class action.

F.    **Objectors' Argument that Class Plaintiffs' Experts Are Compromised Because They Were Paid Falls Flat.**

The Morey Objectors mistakenly contend that Co-Lead Class Counsel's and the NFL Parties' experts are biased because they received compensation.  Morey Supp. Brief, at 9.  The premise underlying their contention is, of course, specious:  "[b]ias cannot be presumed from the fact that an expert receives compensation from one party."  *Goble v. Aztec Min. Co., Inc.*, 454 Fed. Appx. 500 (6th Cir. 2012) (citing *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 637 n.6 (6th Cir. 2009).  *See also Richardson v. Perales*, 402 U.S. 389, 403 (1971) ("We cannot, and do not, ascribe bias to the work of these independent physicians, or any interest on their part in the outcome of the administrative proceeding beyond the professional curiosity a dedicated medical man possesses" for receiving compensation to testify in legal proceeding); *Banks v. United States*, 102 Fed. Cl. 115, 170 n.85 (2011) ("[T]he fact that [witness] was paid for his services as an expert is not, without more, evidence of bias.").  Nor, for example, is the Objectors' inference of bias by Drs. Hovda and Giza reasonable simply because they are employed by UCLA, which institution (not the individuals) received a philanthropic donation by the owner of the New York Giants.  Such cavalier assertions of bias are not well taken.

Moreover, these assertions of bias emanate from Objectors whose own experts' biases are acknowledged – they "so strongly believe" in their position that they have relinquished any request for compensation.  Morey Supp. Brief, at 9.   These experts' immediate renouncement of payment does not preclude them from delayed gratification.  An ulterior purpose appears to be lurking: these experts are using this litigation as a platform by which they can attempt to garner acceptance of their still formative theories in the medical community.

The present record fully supports the generally accepted principles pronounced by the NFL and Co-Lead Class Counsel's experts.  There is no support for this Court to be dissuaded

from relying on these experts' opinions based upon the speculative assertions of bias by Mr. Molo.

**G.   The Alleged Procedural Hurdles for Class Members To Participate in the BAP and To Obtain Monetary Awards Are Typical of the Procedural Requirement Used in Many Medical Monitoring Cases and Cases Using Compensation Grids.**

Plaintiffs' Final Approval Memorandum addressed the litany of complaints by the Objectors concerning the procedures required to obtain a Monetary Award and to obtain the benefits of the BAP.  *See* ECF No. 6423-1, at 71-78, 85-86.

The only arguably new arguments in these post-Fairness Hearing submissions were made by the Morey Objectors.  They claim that the testing protocol is invalid because the names of the Settlement's Qualifying Diagnoses of Level 1.0, 1.5 and 2.0 Neurocognitive Impairment are unknown in the medical and scientific communities.  *See* ECF No. 6455, at 22-23. Plaintiffs never contended that the designations of Level 1.0, 1.5 and 2.0 used in the  Injury Definitions, *see* ECF No. 6087 at 106-110, the Baseline Neuropsychological Test Battery and Specific Impairment Criteria, *id*. at 112-120 and Monetary Award Grid, *id*.at 122, were medically defined terms.  They are injury thresholds and compensation levels negotiated by the parties and memorialized in the Settlement.  They exist for the principal purpose of objectively assessing and characterizing a retired player's cognitive and functional impairments in the Settlement, and providing compensation corresponding to those injury levels.

As described by Dr. Fischer:

The settlement appropriately recognizes and categorizes such individuals by gradations in the severity of their neurocognitive impairments.  In particular, the settlement recognizes three grades of neurocognitive impairment:  Level 1 Neurocognitive Impairment (moderate cognitive impairment), Level 1.5 Neurocognitive Impairment (early dementia), and Level 2 Neurocognitive Impairment (moderate dementia).  These different categories have defined levels of deficit and dysfunction that can be confirmed by detailed neurological

examination and concomitant neuropsychological testing, and reflect reasonable criteria and methods [aimed] at ascertaining the level of impairments the settlement seeks to compensate.

*See* Fischer Decl., at ¶ 9.

More generally, the sound underpinnings and foundation for the Level 1, 1.5, and 2 injury definitions were thoroughly set forth in Class Counsel's final fairness papers and supporting declarations.  *See* Keilp Decl., at ¶¶16-45, Hamilton Decl., at ¶¶ 11-24.  Though the Morey Objectors continue to challenge these definitions under a mantle of "science," they studiously avoid discussing the specific literature that served as the framework for the definitions.  In his expert declaration, Dr. Keilp explained that the neurocognitive impairment definitions were based on the framework set forth in the Diagnostic and Statistical Manual for Mental Disorders, revision 5 (DSM-5).  Keilp Decl., ¶ 17.  The DSM-5 identifies Major and Minor Neurocognitive Disorders, independent of and without regard to etiology, based on cognitive and functional considerations.  It likewise provides general criteria for these disorders, cognitive domains for evaluation, and approximate deficit thresholds that place patients in the Minor versus Major category.  Keilp Decl., ¶¶ 17-28.  As Dr. Keilp explained, the DSM-5 framework for Major and Minor Neurocognitive Disorders informed and underlies the injury definitions for Level 1, 1.5, and 2.  The absence of any citation in any of Objectors' expert reports or supplemental memoranda to the DSM-5 – or to Dr. Keilp's detailed description of how the neurocognitive impairment definitions relate to and derived from it—exposes the utter vacuousness of Objectors' challenge to the reasonableness of the neurocognitive injury definition framework.

Unable (or unwilling) to challenge the actual scientific underpinnings of the definitions, the Morey Objectors challenge the knowledge and experience of Class Counsel's experts to inform Class Counsel on the relevant issues underlying them.  Objectors' specifically call out Dr.

38

Iverson, one of Class Counsel's consulting experts whose work was referenced and cited.

However, Objectors' expert acknowledges that Dr. Iverson, and his publications that have been

cited herein, "are well-respected in the field of neuropsychological assessment and

psychometrics." Stern Supp. Decl., ¶ 17. Indeed, Dr. Stern acknowledged that he has published

with Dr. Iverson. *Id.* In retreat, Objectors question whether Dr. Iverson has credentials and

skills concerning dementia. A review of Dr. Iverson's publications reveals the fallacy of

Objectors' flailing challenge.[34] Similarly, Dr. Keilp's research and experience in the relevant

disciplines at issue cannot be seriously challenged. His CV reflects numerous research papers

concerning the study or evaluation of neurocognitive impairments, including dementia, as well as

the design of test batteries to assess such impairments and conditions. *See* Keilp Decl.,

Attachment.

The Level 1, 1.5, and 2 neurocognitive impairment injury definitions derive from sound

scientific foundation, informed by knowledgeable experts, and negotiated by skilled counsel in

the broader context of issues in this litigation. At bottom though, nothing in any of Objectors'

submissions suggests that the Settlement's neurocognitive injury definitions or testing protocols

---

[34] All Objectors needed to do was to do some quick searches in PubMed in order to find Dr. Iverson's many publications concerning neurocognitive impairment, dementia, and the assessment and evaluation of such conditions. *See, e.g.,* Iverson GL, Echemendia RJ, LaMarre, AK, Brooks BL, Gaetz MB. Possible lingering effects of multiple past concussions. *Rehabilitation Research & Practice.* (2012) (Article ID 316575); Lange RT, Brickell TA, French LM, Merritt VC, Bhagwat A, Pancholi S, Iverson GL. Neuropsychological outcome from uncomplicated mild TBI, complicated mild TBI, and moderate TBI in U.S. military personnel. *Archives of Clinical Neuropsychology.* 2012; 47:480-494; Brooks BL, Iverson GL, Feldman HH, Holdnack JA. Psychometric guidelines for determining possible and probable memory impairment in older adults. *Dementia and Geriatric Cognitive Disorders.* 2009; 27:439-450; Brooks BL, Iverson GL, Feldman HH, Holdnack JA. Minimizing misdiagnosis: Evaluating new psychometric criteria for memory impairment using the WMS-III with patients with known dementia. *J. Int'l Neuropsych. Soc.* 2008;14(S2):82; Brooks BL, Weaver LE, Iverson GL. Reliability and factor structure of the Frontal Assessment Battery with questionable and mild dementia of the Alzheimer's type. *Archives of Clinical Neuropsychology,* 2005; 20(7):850.

will not identify the cognitive and functional deficits that the Settlement seeks to identify and compensate.  *Cf.* Keilp Decl., at ¶ 36; Hamilton Decl., at ¶ 23 (noting that the BAP test protocol does and will identify the deficits/injuries that the settlement seeks to compensate).

**H.    The Objectors' Claim that There Is No Guarantee that the Settlement Will Be Funded Is Not Supported.**

Mr. Utecht repeats his initial objection [ECF No. 6243] that there is no "security" backing up the NFL Parties' payment obligations based on his speculative contentions that*, inter alia*, the Statutory Trust "will not be sufficient to pay all awards."  *See* Utecht Supp. Objections, at 2.  Following the Fairness Hearing, Mr. Utecht's objection is now joined by the Morey Objectors.  *See* Morey Supp. Brief, at 29.  Ignoring the responses of the NFL Parties and Co-Lead Class Counsel to these fanciful contentions, and the involvement of Special Master Golkin, these Objectors return to the same refrain that the funds of the NFL Parties to be set aside in the Statutory Trust on the tenth anniversary of the Settlement cannot be relied upon today to meet all future obligations of the NFL under the Settlement.  *See* Settlement Agreement, at Sections 23.5(d) and 25.6(d) & (e).

The NFL Parties addressed these arguments in their Final Approval Memorandum, at 150-51 [ECF No. 6422].  *See also* Plaintiffs' Final Approval Memo., at 15-16 & n.6.  Therein, it was explained that any concern about the NFL's reasonable belief regarding the amount of money necessary to fund the Statutory Trust to satisfy the NFL Parties' remaining payment obligations as they come due, given reasonably expected investment returns over time, being insufficient is mitigated by the NFL Parties' separate obligation under the Settlement Agreement to pay all valid Monetary Awards regardless of the amount held by the Statutory Trust.  Again, at the Fairness Hearing, Counsel for the NFL Parties explained as follows:

> MR. KARP:  The way that we structured the settlement with Mr. Golkin's assistance is that the NFL is obligated after year ten to set up a statutory trust which is intended to have sufficient funds to pay all remaining expected claim for the remaining 55-year life of the settlement.  And that statutory trust in theory will [be] millions and millions and millions of dollars.  We will have ten-year track record of having seen what claims have been approved by the claims administrator up to that point and we will be able to make reasoned assumptions going forward.
>
> Now, Your Honor adverted to a belt and suspender aspect of the settlement from years 10 to year 65 which is absolutely accurate.  Entirely independent of the statutory trust, the NFL at all times --
>
> THE COURT:  Uh-huh.
>
> MR KARP:-- from the moment this settlement becomes effective until 65 years later; the NFL has an independent obligation under the settlement agreement to pay every single claim that is approved by the claims administrator on a timely basis.  And that is an obligation that has tremendous teeth behind it.  If the NFL fails to pay a claim, or defaults on a claim, for whatever reason, Your Honor or whoever succeeds Your Honor in superintending this settlement will have the ability to nullify the class-wide release that flows to the NFL.  So every claimant, every class member who has not received payment will then be able to return to the tort system and continue the litigation against the league.
>
> So the NFL has funds now, will have funds in years 10 through 65 and in the event the NFL ever were to default, the punishment for such a default is draconian, and I hope that satisfies Your Honor and I certainly hope it satisfies Mr. Utecht and those in a position like Mr. Utecht.

*See* Fairness Hrg. Trans., at 203:4 – 204:19.  This should suffice to meet final approval.

Objectors' demand for a guarantee that the Statutory Trust provision be collateralized is improper.  Objectors argue that the Statutory Trust "is required" to have sufficient funds "so that there is no risk that money will not be available to pay in the event that the NFL does not timely pay."  Utecht Supp. Objections, at 1.  But that is not true.  As a form of security, the NFL Parties are to fund the Statutory Trust with the amount that in their reasonable belief will be sufficient.  However, this funding obligation will be Court-approved, overseen by the Special Master and subject to various statutory requirements.  *See* Settlement Agreement, at Section 23.5(c).

Separately, whether or not the amount approved to fund the trust proves out, the NFL Parties remain bound to pay all obligations under the Settlement Agreement, including all valid Monetary Awards.  *See id.,* at Article III.

The Settlement Agreement is fair, reasonable and adequate because the NFL Parties have contractually obligated themselves to pay all valid Monetary Awards for the 65-year term, and Settlement Class Members can avail themselves of remedies if the NFL Parties do not meet their obligations.  *See* Settlement Agreement, at Section 25.6(e), (g) (regarding the Court's entry of an "order directing the NFL Parties to meet their payment obligations" and the Court's entry of an order rendering "null and void the Releases and Covenants Not To Sue provided to the Released Parties").  Nevertheless, Objectors remain unsatisfied.  They argue there is a "serious anticipated breach of contract" by the NFL Parties and that a breach of contract action against them would somehow inevitably result in a compromised settlement of the claim involving substantial class counsel fees.  *See* Utecht Supp. Objections, at 2, 7.  Additionally, Mr. Utecht discounts the Court's power to order rescission of the releases, by asserting such a right is somehow "deceptive" and "does not pass the good faith test" because it would be difficult for a smaller "class of plaintiffs . . . to prevail against the massive defense that the NFL would mount."  *Id*. at 7 n.3.  But these bald assertions are as unsupported as they are unjustified.

The Settlement is adequately secured.  The objections should be overruled.

**I.      Offsets and Reductions in Awards Based upon Degree of Exposure and/or Potential Alternative Causes Are Standard and Are Not Unfair, As Class Counsel Previously Explained.**

The arguments made by Objectors in the post-Fairness Hearing briefing concerning alleged unfairness of the offsets and reductions are merely repetitive of those arguments made in the filings from October.  *See* ECF No. 6455, at 20-21; and ECF No. 6456, at 6.  Class Counsel

refer the Court to the corresponding section of Plaintiffs' Final Approval Memorandum.  *See* ECF No. 6423-1, at 66-69 and the Declarations cited therein

**J.      The Alleged Problems with Notice Are Contrived.**

The arguments concerning alleged inadequacy of the Notice made by Objectors in the post-Fairness Hearing briefing are merely repetitive of those arguments made in the filings from October.  *See* ECF No. 6455, at 24-25.[35]  Class Counsel refer the Court to the corresponding section of Plaintiffs' Final Approval Memorandum.  *See* ECF No. 6423-1, at 34-41, 47-49.

**K.      Attorney's Fees**

The Miller Objectors again raise the issue of attorney's fees.  *See* Miller Supp. Objection, at 5-6.  As was noted in Class Counsel's prior submission, attorney's fees are not yet before the Court.  *See* Plaintiffs' Final Approval Memo., at 89.

---

[35]  It is interesting to note when the Morey Objectors attempted to cite to an example of a class member who allegedly was confused by the Notice, they identify Judson Flint.  *See* ECF No. 6455, at 24-25.  Mr. Flint, however, not only filed his own Objection in August, *see* ECF No. 6347, he was also included in the Miller Objection filed in October, *see* ECF No. 6213, and the Miller Supplemental Objection, *see* ECF No. 6452.  Mr. Flint is represented by Messrs. Pentz and Cochran, who clearly understand the Settlement and presumably explained its terms to Mr. Flint before the Opt-Out deadline, including the fact that a finding of CTE on autopsy for death after July 2014 would not be a "Qualifying Diagnosis."  Mr. Flint's counsel, *i.e.*, the Miller counsel, have a history of making contrived objections.  *See, e.g. , In re Walmart Wage & Hour Emp't Practices Litig.*, MDL No. 1735, 2010 WL 786513, at *1, at *17 (D. Nev. Mar. 8, 2010) (stating that Pentz "has a documented history of filing notices of appeal from orders approving class action settlements, and thereafter dismissing said appeals when (he) and (his) clients were compensated by the settling class or counsel"); *Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834, at *1 (D. Mass. Aug. 22, 2006) (Pentz is a "professional objector" who seeks to "make a living simply by filing frivolous appeals and thereby slowing down the execution of the settlements"); *In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp.2d 210, 214-15 (S.D.N.Y 2010) (Pentz is a "serial objector" and there was evidence that he acted in "bad faith" and engaged in "vexatious conduct"); *In re AOL Time Warner ERISA Litig.*, No. 02 Cv. 8853, 2007 U.S. Dist. LEXIS 99769, at 3 & n.2 (S.D.N.Y. Nov. 28, 2007) (Pentz's objections "contained several arguments that were irrelevant or simply incorrect," "were "counterproductive," and "were supported by no evidence whatsoever").

**III.**   **CONCLUSION**

In conclusion, Co-Lead Class Counsel submit that for the reasons set forth above, and for the reasons set forth in the previously submitted Plaintiffs' Final Approval Memorandum, this Court should certify the Settlement Class, grant final approval of the Settlement and enter the Proposed Final Order and Judgment.

Dated:  December 12, 2014

Respectfully submitted,
/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

**Co-Lead Class Counsel**

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

**Co-Lead Class Counsel**

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 12th day of December, 2014, upon all counsel of record.

Dated: December 12, 2014                    /s/ Christopher A. Seeger

                                            Christopher A. Seeger