Attachment

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD DENT, JEREMY NEWBERRY,
ROY GREEN, J.D. HILL, KEITH VAN
HORNE, RON STONE, RON PRITCHARD,
JAMES MCMAHON, MARCELLUS
WILEY, and JONATHAN REX HADNOT,
on behalf of themselves and all others
similarly situated,

              Plaintiffs,

  v.

NATIONAL FOOTBALL LEAGUE,
a New York unincorporated association,

              Defendant.

No. C 14-02324 WHA

**ORDER RE MOTIONS TO
DISMISS AND REQUESTS
FOR JUDICIAL NOTICE**

**INTRODUCTION**

      In this putative class action alleging improper administration of pain medications to

professional football players, defendant has filed two sets of motions to dismiss the operative

complaint, based on (1) preemption under Section 301 of the Labor Management Relations Act;

and (2) the statute of limitations and improper pleading. To the extent stated herein, the motion

to dismiss under Section 301 is **GRANTED**. Defendant's other motion to dismiss is **DENIED AS**

**MOOT**.

**STATEMENT**

      The following well-pled facts are assumed to be true for purposes of the present motions.

Defendant National Football League is an unincorporated association of 32 separately-owned

United States District Court

For the Northern District of California

and independently-operated professional football "clubs" or teams across the country. Named plaintiffs are ten retired individuals who played for a number of those individual football teams at various points in time, some as early as 1969 and others as recently as 2012 (Second Amd. Compl. ¶¶ 23–49, 55). On May 20, 2014, those ten plaintiffs sued the NFL and are now on their second amended complaint.

Here is the nub of it. Since 1969, doctors and trainers from the individual clubs have allegedly supplied players with a consistent string of pain medications — including opioids, Toradol and other non-steroidal anti-inflammatory medications, local anesthetics, and combinations thereof — all in an effort to return players to the game, rather than allow them to rest and heal properly from serious, football-related injuries. The medications "were often administered without a prescription and with little regard for a player's medical history or potentially-fatal interactions with other medications," and were distributed in ways that violated federal laws (both criminal and civil) as well as the American Medical Association's Code of Ethics (*id.* ¶¶ 10–22, 63–122).

For example, while still playing football, plaintiffs "rarely, if ever, received written prescriptions" for their pain medications, which could come in either injection or pill form. "The bulk of their pills [were] not in bottles . . . but rather in small manila envelopes that often had no directions or labeling," and "NFL doctors and trainers" would then fail to disclose to plaintiffs the side effects and risks posed by such medication, instead rushing plaintiffs to return to the field (regardless of the injuries still suffered). The result now is that after years of taking such medication without proper disclosure about the medical side effects and risks, plaintiffs suffer from debilitating physical and mental heath issues, including nerve, knee, and elbow injuries that never healed properly, heart disease, renal failure, and drug addiction (*id.* ¶¶ 23–49, 242–47, 287).

The operative complaint seeks relief against the league, the NFL, not against the clubs. It asserts nine claims: (1) declaratory relief; (2) medical monitoring; (3) fraud; (4) fraudulent concealment; (5) negligent misrepresentation; (6) negligence *per se* in connection with the federal Controlled Substances Act, the federal Food, Drug, and Cosmetic Act, "state laws," and

2

United States District Court
For the Northern District of California

1    ethical codes governing the acquisition, storage, dispensation, and record keeping of prescription

2    medications; (7) loss of consortium on behalf of putative class members' spouses; (8) negligent

3    hiring of medical personnel; and (9) negligent retention of medical personnel (*id.* ¶¶ 373–80).

4    Now, the NFL has filed two sets of motions to dismiss. *First*, the league argues that

5    plaintiffs' negligence and fraud-based claims *i.e.*, Claims Three, Four, Five, Six, Eight, and

6    Nine, are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. 185(a).

7    This motion also asserts that all remaining claims *i.e.*, Claims One, Two, and Seven, are

8    derivative such that they too are preempted. *Second*, the league moves to dismiss the operative

9    complaint as time-barred under the statute of limitations, for failure to plead fraud-based claims

10   with sufficient particularity, and for failure to plead other claims adequately. Both sides also

11   request judicial notice of various documents relating to medical studies, workers' compensation

12   proceedings, arbitration matters, and other topics.

13   Following the hearing on November 6, 2014, the Court propounded a series of requests

14   for additional briefing, including from the union (which is not a party herein). The Court thanks

15   counsel for their prompt follow-up and responses.

**ANALYSIS**

16

17   **1.    JUDICIAL NOTICE.**

18   Defendant appended the various collective-bargaining agreements as exhibits to its

19   motion to dismiss (Curran Exhs. 1–13). Defendant also appended several player grievance

20   letters to its brief. The Court then requested that both parties explain whether or not the Court

21   could consult these agreements and grievance letters in ruling on defendant's Rule 12 motion.

22   Both parties agreed that under FRE 201(b), the Court should judicially notice the agreements and

23   letters (Dkt. Nos. 95, 97–98, 105). Accordingly, defendant's requests for judicial notice of

24   Curran Exhibits 1–13 and Nash Exhibit A are **GRANTED.** Because this order need not consider

25   the other materials for which the parties seek judicial notice, those requests are **DENIED AS**

26   **MOOT**.

27

28

3

United States District Court
For the Northern District of California

2. **PREEMPTION AND SECTION 301 IN THE SUPREME COURT.**

Unlike ordinary contracts, collective-bargaining agreements enjoy preemptive effect over state common law duties. Section 301 of the Labor Management Relations Act governs "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. 185(a). In enacting Section 301, Congress intended that the rights and duties created through collective-bargaining, involving as they do the collective strength of the unionized workers and their employer, should ordinarily trump common law remedies.

In *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456 (1957), the Supreme Court concluded that Congress, through Section 301, had authorized federal courts to create a body of federal law for the enforcement of collective-bargaining agreements, "which the courts must fashion from the policy of our national labor laws."

In *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962), the Supreme Court concluded that "in enacting Section 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Lucas Flour* described the need for strong enforcement of collective-bargaining agreements:

> The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation.

In *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985), the Supreme Court examined an employee's state law tort action against his employer for bad faith handling of disability-benefit payments due under a collective-bargaining agreement. The employee alleged that his employer and its insurance company breached a state law duty to act in good faith in paying disability benefits. *Allis-Chalmers* held that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a

4

labor contract, that claim must either be treated as a Section 301 claim, or dismissed as pre-empted by federal labor-contract law." A tort claim "inextricably intertwined with consideration of the terms of the labor contract" must be deemed preempted under Section 301. The Court found that the claims against the employer and the insurer were thus preempted under Section 301. Significantly, *Allis-Chalmers* went beyond preempting only claims in express conflict with a collective-bargaining agreement.

Lastly, in *International Brotherhood Of Electric Workers v. Hechler*, 481 U.S. 851, 859 (1987), the Supreme Court concluded that "we must determine if respondent's claim is sufficiently independent of the collective-bargaining agreement to withstand the pre-emptive force of Section 301." The Court determined that plaintiff's claim was not sufficiently independent. In assessing tort liability, "a court would have to ascertain, first, whether the collective-bargaining agreement in fact placed an implied duty of care on the union to ensure that Hechler was provided a safe workplace, and, second, the nature and scope of that duty, that is whether, and to what extent, the union's duty extended to the particular responsibilities alleged by respondent in her complaint. Thus, in this case, as in *Allis-Chalmers*, it is clear that 'questions of contract interpretation . . . underlie any finding of tort liability.'" *Id*. at 862 (internal citations omitted). Again, an express conflict between the claim asserted and the collective-bargaining agreement was not required.

In sum, Section 301 preempts state-law claims that are "founded directly on rights created by collective-bargaining agreements," as well as claims that are "substantially dependent on analysis of a collective-bargaining agreement."

On Section 301 preemption, our court of appeals has summarized the law as follows:

> If the plaintiff's claim cannot be resolved without interpreting the applicable CBA . . . it is preempted. Alternatively, if the claim may be litigated without reference to the rights and duties established in a CBA . . . it is not preempted. *The plaintiff's claim is the touchstone for this analysis; the need to interpret the CBA must inhere in the nature of the plaintiff's claim . . . .* A state law claim is not preempted under [Section] 301 *unless it necessarily requires the court to interpret an existing provision of a CBA that can reasonably be said to be relevant to the resolution of the dispute.*

5

United States District Court
For the Northern District of California

1    *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683, 689–93 (9th Cir. 2001) (en banc)

2    (emphasis added) (internal citations omitted).  "A creative linkage between the subject matter of

3    the claim and the wording of a CBA provision is insufficient; rather, the proffered interpretation

4    argument must reach a reasonable level of credibility."  *Id.* at 691–92.

5        **3.    NEGLIGENCE-BASED CLAIMS.**

6        The essence of plaintiffs' claim for relief is that the individual clubs mistreated their

7    players and the league was negligent in failing to intervene and stop their alleged mistreatment.

8    Plaintiffs anchor this claim for relief in supposed common law duties of each of the various

9    states whose law would apply and vaguely suggest that all such states would impose the same

10   uniform duty on the league to oversee the clubs.

11       One problem is this:  no decision in any state (including California) has ever held that a

12   professional sports league owed such a duty to intervene and stop mistreatment by the league's

13   independent clubs.  During oral argument, plaintiffs' counsel repeatedly cited *Rowland v.*

14   *Christian*, 69 Cal. 2d 108, 113 (1968), a California Supreme Court decision that recognized the

15   existence of an individual's common law duty of reasonable care based on the foreseeability of

16   harm (and a number of other considerations).  But *Rowland* addressed those considerations to

17   determine the liability of a land possessor, not the liability of an unincorporated association of

18   independent clubs therein.  There is simply no case law that has imposed upon a sports league a

19   common law duty to police the health-and-safety treatment of players by the clubs.

20       Nevertheless, in assessing the Section 301 issue, this order accepts for the sake of

21   argument that the asserted claims for relief would be recognized under the common law of at

22   least California.  That is, this order takes at face value the common law theories expressed in the

23   operative complaint and then determines whether those claims for relief are preempted under

24   Section 301.

25

26

27

28

United States District Court

For the Northern District of California

**A.      In Evaluating the Negligence Claims, the Court Would Have to Consider the Positive Protections the NFL has Imposed on Clubs Via Collective Bargaining.**

In evaluating any possible negligence by the NFL as alleged in the operative pleading, it would be necessary to take into account what the NFL has affirmatively done to address the problem, not just what it has not done.

The league has taken many steps to address the issue of player medical care by imposing on the clubs detailed provisions in numerous collective-bargaining agreements between the players' union and the NFL from 1968 onward.  During the bargaining pursuant to the National Labor Relations Act, the players and the league imposed numerous duties upon the clubs for the protection of the players' health and safety.  Through these CBAs, players' medical rights have steadily expanded.  These provisions cover, among other things, the duties of individual clubs to hire doctors and trainers and to provide medical care and information to players.  By way of examples, this order now marches through several provisions in chronological order:

The 1971 CBA imposed a requirement that the home team provide an ambulance (Curran Exh. 12 at Article XIX, Section 19.5) (1971):

> MEDICAL FACILITIES:  The home team shall provide a
> physician and an ambulance at each game available to both teams.

The 1980 CBA imposed a process for club physicians to document expected player recovery time (Curran Exh. 13 at 12) (1980):

> DOCUMENTATION:  All determinations of recovery time for
> major and minor injuries must be by the Club's medical staff and
> in accordance with the Club's medical standards. . . . The
> prognosis of the player's recovery time should be as precise as
> possible.

The 1982 CBA imposed a club requirement to have a board-certified orthopedic surgeon as one of the club physicians, to absorb the cost of doing so, and imposed further requirements regarding notice to players of injuries (Curran Exh. 5 at Article XXXI, Section 1) (1982):

> PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT
>
> Section 1.  Club Physician:  Each Club will have a board-certified
> orthopedic surgeon as one of its Club physicians.  The cost of

7

**United States District Court**
For the Northern District of California

> medical services rendered by Club physicians will be the
> responsibility of the respective Clubs.  If a Club physician advises
> a coach or other Club representative of a player's physical
> condition which adversely affects the player's performance or
> health, the physician will also advise the player.

The 1982 CBA imposed regulations on the clubs regarding player access to medical

records (Curran Exh. 5 at Article XXXII, Section 2) (1982):

> MEDICAL RECORDS:  Player may examine his medical and
> trainers' records in the possession of the Club or Club physician
> two times each year, once during the pre-season and again after the
> regular season.

The 1982 CBA imposed club requirements regarding chemical abuse and dependency

(Curran Exh. 5 at Article XXXI, Section 7) (1982):

> TESTING:  The Club physician may, upon reasonable cause,
> direct a player . . . for testing for chemical abuse or dependency
> problems.

The 1982 CBA imposed regulations on the clubs regarding the certification of trainers

(Curran Exh. 5 at Article XXXI, Section 2) (1982):

> CLUB TRAINERS:  All full-time head trainers and assistant
> trainers hired after the date of execution of this Agreement will be
> certified by the National Athletic Trainers Association.  All part-
> time trainers must work under the direct supervision of a certified
> trainer.

The 1993 CBA imposed a duty on the clubs to advise the player in writing if a condition

could be significantly aggravated by returning to the field (Curran Exh. 6 at Article XLIV,

Section 1) (1993):

> If such condition could be significantly aggravated by continued
> performance, the physician will advise the player of such fact in
> writing before the player is again allowed to perform on-field
> activity.

The 1993 CBA imposed a right to medical care for injuries and placed the scope of such care in the hands of the club physicians (Curran Exh. 6, Appendix C, at ¶ 9) (1993) (emphasis added):

> INJURY:  Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract *as the Club physician may deem necessary* . . .

The 1993 CBA imposed obligations on the clubs relating to substance abuse (Curran Exh. 6 at Article XLIV, Section 6) (1993):

> SUBSTANCE ABUSE:  [I]t is the responsibility of the parties to deter and detect substance abuse . . . and to offer programs of intervention, rehabilitation, and support players who have substance abuse problems.

The 2002 CBA provided a right for a player to receive a second medical opinion (Curran Exh. 9 at Article XLIV, Section 3) (2002):

> PLAYERS RIGHT TO A SECOND MEDICAL OPINION:  A player will have the opportunity to obtain a second medical opinion.

The 2002 CBA imposed a requirement that players receive pre-season physicals from club physicians (Curran Exh. 9 at Article XLIV, Section 5) (2002):

> STANDARD MINIMUM PRE-SEASON PHYSICAL:  Each player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician.

The 2011 CBA required the clubs to expand the menu of physician types they employed and required that any newly-hired physician have a certification in sports medicine (Curran Exh. 11 at Article 39, Section 1) (2011):

(a) Medical Credentials. Each Club will have a board-certified orthopedic surgeon as one of its Club physicians, and all other physicians retained by a Club to treat players shall be board-certified in their field of medical expertise. Each Club will also have at least one board-certified internist, family medicine, or emergency medicine physician (non-operative sports medicine specialist). Any Club medical physician (internist, family medicine or emergency medicine) hired after the effective date of this Agreement must also have a Certification of Added Qualification (CAQ) in Sports Medicine; any head team physician (orthopedic or medical) hired after the effective date of this Agreement must have a CAQ in Sports Medicine; and any current team physician promoted to head team physician after the effective date of this Agreement has until February 2013 to obtain a CAQ in Sports Medicine or relinquish the position.

The 2011 CBA clarified, if it was not already clear, that club physicians must comply with all federal, state, and local requirements, including all ethical standards established by any applicable government and/or other authority that regulates the medical profession (Curran Exh. 11 at Article 39, Section 1(c)) (2011) (emphasis added):

DOCTOR/PATIENT RELATIONSHIP:

The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs, but each Club physician's primary duty in providing player medical care shall be not to the Club but instead to the player-patient. This duty shall include traditional physician/patient confidentiality requirements. *In addition, all Club physicians and medical personnel shall comply with all federal, state, and local requirements, including all ethical rules and standards established by any applicable government and/or other authority that regulates or governs the medical profession in the Club's city.* All Club physicians are required to disclose to a player any and all information about the player's physical condition that the physician may from time to time provide to a coach or other Club representative, whether or not such information affects the player's performance or health. If a Club physician advises a coach or other Club representative of a player's serious injury or career threatening physical condition which significantly affects the player's performance or health, the physician will also advise the player in writing. The player, after being advised of such serious injury or career-threatening physical condition, may request a copy of the Club physician's record from the examination in which such physical condition was diagnosed and/or a written explanation from the Club physician of the physical condition.

10

United States District Court

For the Northern District of California

The 2011 CBA required all clubs to employ at least two full-time certified trainers and required all clubs to retain at least one certified physical therapist (Curran Exh. 11 at Article 39, Section 2) (2011):

> CLUB TRAINERS:  All athletic trainers employed or retained by Clubs to provide services to players, including any part time athletic trainers, must be certified by the National Athletic Trainers Association and must have a degree from an accredited four-year college or university.  Each Club must have at least two full-time athletic trainers.  All part-time athletic trainers must work under the direct supervision of a certified athletic trainer.  In addition, each Club shall be required to have at least one full time physical therapist who is certified as a specialist in physical therapy to assist players in the care and rehabilitation of their injuries.

The 2011 CBA required the league to maintain an electronic medical record system (Curran Exh. 11 at Article 40, Section 3) (2011):

> ELECTRONIC MEDICAL RECORD SYSTEM:  The NFL shall develop and implement an online, 24-hour electronic medical record system within 24 months of the effective date of this Agreement or such longer period as the parties may agree.

As demonstrated by the scope and development of these provisions, this is not a situation in which the NFL has stood by and done nothing.  The union and the league have bargained extensively over the subject of player medical care for decades.  While these protections do not specifically call out the prescribing of drugs and painkillers, they address more generally medical care, player health, and recovery time, and proper administration of drugs can reasonably be deemed to fall under these more general protections.  Put differently, the right to medical care established by the CBAs, moreover, presumably included and still includes proper medical care in accordance with professional standards — including for the administration of drugs and painkillers — or at least a fair question of interpretation in that regard is posed.

\*          \*          \*

Under these circumstances, this order agrees with the NFL and holds that Section 301 preempts plaintiffs' negligence-based claims. In determining the extent to which the NFL was negligent in failing to curb medication abuse by the clubs, it would be essential to take into account the affirmative steps the NFL has taken to protect the health and safety of the players, including the administration of medicine. The NFL addressed the problem of adequate medical care for players in at least one important and effective way, *i.e.*, through a bargaining process that imposed uniform duties on all clubs — without diminution at the whim of individual state tort laws. Therefore, the NFL should at least be given credit, in any negligence equation, for the positive steps it has taken and imposed on the clubs via collective bargaining.

Plaintiffs' negligent hiring and negligent retention claims, for example, allege that the NFL had a duty to "hire and retain educationally well-qualified, medically-competent, professionally-objective and specifically-trained professionals not subject to any conflicts" (Second Amd. Compl. ¶ 388). The CBA addressed this duty by requiring each club to retain a "board-certified orthopedic surgeon." Additionally, the CBA required all full time trainers to be "certified by the National Athletic Trainers Association" (Curran Exh. 6 at Article XLIV, Section 1; Exh. 5 at Article XXXI, Section 2). Whether the NFL was negligent cannot be fairly determined without ascertaining the full scope of player benefits contained in these clauses. To determine if the NFL negligently hired and retained medical personnel, this Court would need to interpret what the NFL has already required in the various CBA provisions outlined above.

The same analysis applies to plaintiffs' claims for negligent misrepresentation and negligence per se. Plaintiffs state that the NFL had a "duty to protect the Class Members, and to disclose to them the dangers of Medications." Further, plaintiffs claim that the NFL had a duty to follow federal and state laws regarding medications and to "act with reasonable care toward the Class Members" (Second Amd. Compl. ¶¶ 355, 370–80, 386).

To determine whether the NFL breached these duties, we would need to consult, construe, and apply what was required by the CBA provision stating that if a "condition could be significantly aggravated by continued performance, the physician will advise the player of

12

United States District Court

For the Northern District of California

such fact in writing before the player is again allowed to perform on-field activity."  Other CBA

provisions outlined above that would need consultation and interpretation provide for a player's

right to a second medical opinion, access to medical records, access to medical facilities, and

require that the "prognosis of the player's recovery time should be as precise as possible."

(Curran Exh. 6 at Article XLIV, Section 1; Exh. 13 at 12).  It is impossible to determine the

scope of the NFL's duties in relation to misrepresentation of medical risks, and whether the

NFL breached those duties, without reference to the CBA provisions outlined above.

In sum, in deciding whether the NFL has been negligent in policing the clubs and in

failing to address medical mistreatment by the clubs, it would be necessary to consider the ways

in which the NFL has indeed stepped forward and required proper medical care — which here

prominently included imposing specific CBA medical duties on the clubs.  Contrary to

plaintiffs' arguments, the lengths the NFL has gone in imposing duties on the clubs to protect

the health and safety of the players cannot be ignored in evaluating whether or not it has been

careless.

*          *          *

To this, plaintiffs reply that the Court can analyze the NFL's duties separate and apart

from the duties owed by the individual clubs and their medical personnel.  In fact, plaintiffs

state that they did not sue "teams, team doctors or trainers" and thus interpretation of CBA

provisions relating to the individual clubs "are completely unnecessary for resolving Plaintiffs'

state law claims against the league" (Opp. at 2, 9).

This is simply not true.  The nub of plaintiffs' claims is that the NFL is responsible for,

and acts through, the clubs' medical staffs.  As described above, plaintiffs claim that the NFL

owed a supervisory duty regarding the medical care of the players.  To determine what the

scope of this supervisory duty was, and whether the NFL breached it, the Court would need to

determine, to repeat, what the NFL, through the CBAs, required of the individual clubs and club

physicians.  The NFL's overarching duty would then depend on the extent to which the various

CBAs required the clubs to protect the players' medical interests.  It would thus be impossible

13

United States District Court
For the Northern District of California

for the Court to analyze whether the NFL acted negligently, and whether the NFL's conduct caused the players' injuries, without consulting the specific CBA provisions that cover the individual clubs' duties to the players.

**B.** **In Light of the Many Health-and-Safety Duties Imposed at the Club Level, the Absence of any Express CBA Duty at the League Level Implies that the CBA Has Allocated Such Duties to the Clubs and Elected Not to Allocate Them to the League.**

It is true, as the union points out, that the CBAs had no express provision (one way or another) as to any league duty to police the clubs' medical treatment of players. In that narrow sense, the CBAs do not conflict with the common law theories of the operative complaint. Nevertheless, because the CBAs expressly and repeatedly allocate so many health-and-safety duties to the clubs, the CBAs can fairly be interpreted, by implication, to negate any such duty at the league level. Even if this interpretation were ultimately rejected, it is a fair one and that is sufficient for Section 301 preemption.

Notably, the league has expressly — in other contexts — taken on a duty of oversight of the clubs. For example, the league oversees the discipline of players and the CBAs have outlined the process by which the Commissioner can veto player contracts. Moreover, the 2011 CBA provided for league regulation of club off-season workouts and also provided for an NFLPA Medical Director that is to have "a critical role in advising the NFLPA on health and safety issues." (Curran Exh. 5 at Article VIII; Exh. 7 at Article XIV, Section 6; Exh. 11 at Article 39, Section 3). In sum, the NFL and the union have bargained for ongoing league oversight in some areas — but have not done so in others.

Where health and safety are concerned, the CBAs have allocated specific responsibilities to the clubs — but not to the league. By implication, this is tantamount to an agreement that the league has no oversight responsibility on these subjects. It would be reasonable to place all responsibility at the club level, for that level is where the play-or-not-play decisions are made, where the medical records are kept, and where players have daily contact with doctors. This line of interpretation has a "reasonable level of credibility," *Cramer*, 255 F.3d at 692, and that alone is enough to trigger preemption.

14

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C. Although Our Court of Appeals Has No Section 301 Decision on Point, the Prevailing Case Law Favors Preemption.

Turning back to the Section 301 case law, there is no published decision from our court of appeals on the issue of preemption and professional football players' medical care. *Hendy v. Losse*, No. CV 88 1802, 1991 WL 17230, at *2 (9th Cir. 1991), though relevant, may not be considered, since it is a pre-2007 decision (CTA9 Rule 36-3(a)–(b)). Counsel should not have cited it.

This order finds instructive several out-of-circuit decisions. In *Williams v. National Football League*, 582 F.3d 863, 870–81 (8th Cir. 2009), current football players sued the NFL for fraud, negligence, and negligent misrepresentation (among other claims), after the players had tested positive for a banned substance in dietary supplements and were suspended thereafter. The essence of those claims was that the NFL owed "a common duty," separate from the CBAs, to provide the players "[an] ingredient-specific warning" for the dietary supplements. The Eighth Circuit disagreed, explaining (emphasis added) (internal citations omitted):

> However, whether the NFL . . . owed the Players a duty to provide such a warning *cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy*. Thus, the breach of fiduciary duty, negligence, and gross negligence claims are "inextricably intertwined with consideration of the terms of the [Policy]." Because the claims "relating to what the parties to a labor agreement agreed . . . must be resolved by reference to uniform federal law," . . . they are preempted by [S]ection 301.

Likewise, in *Stringer v. National Football League*, 474 F. Supp. 2d 894, 898–99, 910–11 (S.D. Ohio 2007) (Judge John David Holschuh), a football player died from heat exhaustion during his team's summer training camp. Thereafter, his widow brought negligence-based claims against the NFL and others, alleging that the league had negligently republished "Hot Weather Guidelines" that had been in effect at the time of the player's death. *Stringer* held that this allegation was "inextricably intertwined with certain key provisions of the CBA," because "[w]hile the standard of care remains constant, the degree of care varie[d] with the facts and circumstances surrounding each particular case," including the "pre-existing

15

United States District Court
For the Northern District of California

contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players." In particular, *Stringer* pointed to provisions of the CBAs that addressed certification of individual teams' trainers and duties imposed on team physicians, explaining that resolution of the negligence-based claims was substantially dependent on such provisions "in determining the degree of care owed by the NFL and what was reasonable under the circumstances."

So too in *Duerson v. National Football League, Inc.*, No. 12 C 2513, 2012 WL 1658353, at *3–4 (N.D. Ill. May 11, 2012) (Judge James F. Holderman). There, a former football player committed suicide as a result of brain damage incurred during his NFL career. His estate sued the NFL for negligently failing to educate players about the risks of concussions. In its defense, the NFL pointed to a 1993 CBA provision that required team physicians to advise a player in writing about "significantly aggravated" physical conditions (one of the same collective-bargaining provisions at issue here). The district court concluded that if the player's team had such a duty to warn him about his concussive brain trauma as being "significantly aggravated," "it would be one factor tending to show that the NFL's alleged failure to take action to protect [the player] from concussive brain trauma was reasonable." In other words, determining the meaning of the CBAs was "necessary to resolve [the player's] negligence claim," because "[t]he NFL could . . . reasonably exercise a lower standard of care in that area itself" if "[a] court could plausibly interpret [the CBAs] to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football."

Finally, in *Smith v. National Football League Players Association*, No. 14 C 10559, 2014 WL 6776306 at *6–8 (E.D. Mo. Dec. 2, 2014) (Judge Ernest Webber), a putative class of retired players sued the NFLPA, asserting several fraud and negligence based claims relating to the union's treatment of concussions. Plaintiffs claimed the union negligently failed to research ways to prevent or mitigate brain trauma and fraudulently concealed concussion related information from the players. *Smith* acknowledged that the CBA did "not explicitly say the NFLPA has a duty to inform its members on the risks and consequences of head injuries."

16

United States District Court
For the Northern District of California

Despite this, in assessing the scope of the union's duties in relation to plaintiffs' negligence and fraud claims, *Smith* found that "interpretation of the CBA is necessary."  Furthermore, *Smith* concluded that "[t]he fact Plaintiffs are now retirees does not preclude preemption of claims based on events which occurred while Plaintiffs were members of the bargaining unit."

### D.    The Remaining Points Plaintiffs Raise Are Not Persuasive.

To the foregoing case law, plaintiffs respond as follows.  *First*, plaintiffs say that *Williams*, *Stringer*, *Duerson*, and *Smith* contradict our court of appeals' decision in *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108–11 (9th Cir. 2000).  Not true. *Balcorta* found no Section 301 preemption applicable because the plaintiff's statutory claims — for payments deemed late under a state labor statute — required resolution of factual issues under that statute, and not interpretation of any provision of the CBA therein.  In comparison, this order finds that it would be necessary to interpret the CBAs' provisions on medical care to determine the NFL's own supposed negligence.  *Cramer*, 255 F.3d at 693.

*Second*, plaintiffs reply that their claims are based on illegal conduct.  This, however, misunderstands the Supreme Court's holding on this issue of illegality.  In *Allis-Chalmers*, 471 U.S. at 211–12, the Supreme Court stated the following in the context of labor rights (emphasis added):

> Section 301 on its face says nothing about the substance of what private parties may agree to in a labor contract.  Nor is there any suggestion that Congress, in adopting [Section] 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation.  Such a rule of law would delegate to Unions and Unionized employers the power to exempt themselves from whatever state labor standards they disfavored.  *Clearly,* [*Section*] *301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law.  In extending the pre-emptive effect of* [*Section*] *301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.*

Accordingly, in *Cramer*, 255 F.3d at 685–88, our court of appeals recognized that CBAs touching on drug use and surveillance videotapes did not preempt an employer's "surreptitious"

United States District Court
For the Northern District of California

video camera surveillance in employee bathrooms.  The plaintiffs there had brought a *state statutory claim* for invasion of privacy.  The resolution of such a statutory claim required no interpretation of any CBA in that case.  So too in *Burnside v. Kiewit Pacific Corp.*, 491 F.3d 1053, 1071 (9th Cir. 2007), in which Judge Marsha Berzon wrote that employees' *state statutory claims* to be compensated for compulsory round-trip travel required no interpretation of any CBA.

To be sure, the operative complaint here alleges violations of federal and state statutes — but only as an antecedent and predicate for follow-on *state common law claims*.  No right of action is allowed or asserted under the statutes themselves.  Those statutes creep into our picture only as a step in an ordinary negligence theory, *i.e.* the clubs violated the federal statutes (allegedly) and the league was negligent (allegedly) in failing to detect and right it.

*Third*, plaintiffs contend that they cannot grieve and arbitrate their claims against the NFL through the procedures set forth under the CBAs because as retired players, plaintiffs are no longer part of the bargaining unit and are no longer subject to the CBA, which reportedly covers "only" future and current players (Br. 2).  This order, however, holds that plaintiffs' retiree status is not a bar to the grievance procedures.  On this issue, the union's letter has explained that "the current CBA and former CBAs have included various provisions negotiated on behalf of current and future players that continue to benefit those players after they retire from the NFL," such as provisions on retirement plans or termination pay (Dkt. No. 92 at 1–2).  Accordingly, "*a player who has retired from the NFL may initiate and prosecute a grievance under the CBA if the retired player has a cognizable claim to grieve . . .* and the grievance satisfies the required limitations period," at least in the union's view (*id.* at 2) (emphasis added).  In fact, former players in other cases have been able to arbitrate their grievances against the NFL or individual clubs, notwithstanding their prior retirement from the league (*see, e.g.*, Curran Exh. 3 at Article X; Exh. 11 at Article 43, Section 2).  *See also Matthews v. National Football League Management Council*, 688 F.3d 1107, 1109–10 (9th Cir. 2012); *and Givens v.*

18

*Tennessee Football, Inc.*, 684 F. Supp. 2d 985, 991 (M.D. Tenn. 2010) (Judge Todd J. Campbell).

Moreover, the NFL conceded at oral argument that plaintiffs' status as retirees does not affect their ability to grieve claims under the CBA. The NFL's counsel stated (Tr. 15):

> As a matter of fundamental labor law, parties who are subject to a bargaining unit and a collective bargaining agreement have rights and they retain those rights after retirement. The easiest example is the plaintiffs here all have numerous rights, even today, under the collective bargaining agreement for certain retirement benefits. There's retirement plans. There are even disability benefits that we've cited in the CBA that covers the kinds of injuries that they're complaining about here. Those benefits and those rights don't go away simply because it's either –- that they retire, and the law is quite clear on that.

What is more, the NFL has more recently conceded herein that the retired players likely had grievable claims if the allegations in the complaint are true. In its supplemental brief, the league stated that if the players' allegations are true, they "could have been grieved under several 'longstanding' CBA provisions." The NFL pointed to many of the CBA provisions outlined above, which provide for the qualifications of club physicians, procedures for treating injury, and requirements for informing players of the risks of continued performance (Dkt. No. 103). The league also provided examples of specific grievances players filed in the past, recounting many of the same allegations the players have put forth in this case. In fact, named plaintiff Richard Dent filed a grievance against the San Francisco 49ers in 1995, alleging many of the same abuses plaintiffs allege here. Dent claimed the 49ers failed to warn him of the risks of returning to the field and sent him back to play with a "clearly improper purpose." Dent further alleged that the 49ers did not provide "written notification of the risk inherent at that time by continued performance" (Nash Exh. A at 1–2).

To be clear, preemption does not require that the preempted state law claim be replaced by an analogue claim in the collective-bargaining agreement. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 391 n.4 (1987). Nevertheless, the types of claims asserted in the operative complaint are grievable in important respects under the various CBAs.

19

**United States District Court**
For the Northern District of California

1    Lastly, this order addresses the gap period between applicable CBAs. The NFL has

2   always operated under a CBA, with two exceptions: (1) from August 31, 1987 to March 29,

3   1993, following the expiration of the 1982 CBA and prior to the enactment of the 1993 CBA;

4   and (2) from March 11, 2011 to August 4, 2011 (Curran Exhs. 1–11).

5

6    The NFL argues that this does not affect its Section 301 preemption claim because "a

    CBA was in effect during at least a portion of the time during which all ten Plaintiffs played."

7   Furthermore, defendant adds (Br. n. 1):

8

9        Because Plaintiffs' claims allege duties and breaches for the
         entirety of their careers, the fact that "the CBAs were in effect

10        during at least some of the events alleged in the complaint" is
         sufficient to require preemption. *See Duerson v. National Football*

11        *League*, Inc., No. 12 C 2513, 2012 WL 1658353, at *3 (N.D. Ill.
         May 11, 2012); *see also Sherwin v. Indianapolis Colts, Inc.*, 752 F.

12        Supp. 1172, 1174 n.2 (N.D.N.Y. 1990) (finding claim related to
         player medical care in 1988 preempted because parties continued

13        to operate under terms and conditions of expired CBA).

14   Plaintiffs did not respond to this issue in any of their briefing. In fact, plaintiffs' counsel

15   conceded that this was not a relevant issue at oral argument, stating (Tr. 13–14):

16        There was a period, I believe it was between 1998 and 2003, when
         there was no agreement. I might have those years wrong. But the

17        NFL has put it as, I think, their second footnote in their brief about
         when there was a gap year because they use it to make the point

18        that, well, at least at some point all of the players were under a
         CBA. We don't have any quarrel with that.

19

20   Based on the foregoing, this order finds that the gap does not affect Section 301 preemption.

21    As such, this order holds that Claims Five, Six, Eight, and Nine are preempted by

22   Section 301. The motion to dismiss those claims is **GRANTED**.

23    **4.    FRAUD-BASED CLAIMS.**

24

25    The NFL further argues that Section 301 preempts plaintiffs' fraud-based claims — *i.e.*,

26   Claims Three and Four for fraud and fraudulent concealment — regarding the league's reported

27   concealment of the pain medications' side effects and risks.

28

United States District Court

For the Northern District of California

Without repeating the discussion above, this order finds that the same arguments regarding the necessity of interpreting the CBAs applies to both fraud-based claims here. In *Williams*, preemption applied to the players' claims of fraud and constructive fraud because the players "cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy." *Williams* explained that "the question of whether the Players can show that they reasonably relied on the lack of a warning that [the dietary supplements] contained bumetanide cannot be ascertained apart from the terms of the Policy, specifically section eight, entitled 'Masking Agents and Supplements' and Appendix G, entitled 'Supplements.'" So too here. It would be necessary to interpret the CBA provisions on the disclosure of medical information to determine whether plaintiffs reasonably relied on the alleged lack of proper disclosure by the NFL (Curran Exh. 6 at Article XLIV, Section 1; Exh. 13 at Article XVII).

The same reasoning also applies to the fraudulent-concealment claim. To resolve what duty the NFL owed to players in disclosing information about pain medication, interpretation of the CBAs would be required to determine the duty of care owed by individual clubs' physicians and trainers in disclosing information about the pain medications.

Accordingly, this order holds that Claims Three and Four are preempted by Section 301. The motion to dismiss those claims is therefore **GRANTED**.

**5.  REMAINING CLAIMS.**

All that remains are Claims One, Two, and Seven for declaratory relief, medical monitoring, and loss of consortium on behalf of putative class members' spouses. These claims are derivative of the ones addressed above and fail for the same reason — Section 301.

## CONCLUSION

In ruling against the novel claims asserted herein, this order does not minimize the underlying societal issue. In such a rough-and-tumble sport as professional football, player injuries loom as a serious and inevitable evil. Proper care of these injuries is likewise a

United States District Court
For the Northern District of California

paramount need. The main point of this order is that the league has addressed these serious concerns in a serious way — by imposing duties on the clubs via collective bargaining and placing a long line of health-and-safety duties on the team owners themselves. These benefits may not have been perfect but they have been uniform across all clubs and not left to the vagaries of state common law. They are backed up by the enforcement power of the union itself and the players' right to enforce these benefits. Given the regime in place after decades of collective bargaining over the scope of these duties, it would be impossible to fashion and to apply new and supplemental state common law duties on the league without taking into account the adequacy and scope of the CBA duties already set in place. That being so, plaintiffs' common law claims are preempted by Section 301 of the Labor Management Relations Act of 1947. The motion to dismiss all of plaintiffs' claims based on preemption grounds under Section 301 is **GRANTED**. The NFL's other motion to dismiss is **DENIED AS MOOT**.

Plaintiffs may have until **DECEMBER 30, 2014, AT NOON**, to file a motion for leave to amend their claims, noticed on the normal 35-day calendar. A proposed amended complaint must be appended to any such motion. Plaintiffs must plead their best case. Any such motion should clearly explain how the amended complaint cures the deficiencies identified herein, and should include as an exhibit a redlined or highlighted version identifying all changes. If counsel prefer to stand on the present pleading for appeal purposes, judgment will be entered, the case will be closed, and an appeal may proceed.

**IT IS SO ORDERED.**

Dated: December 17, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE