## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILILNOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  NATIONAL COLLEGIATE | ) | |
| ATHLETIC ASSOCIATION | ) | **MDL No. 2492** |
| STUDENT-ATHLETE CONCUSSION | ) | |
| INJURY LITIGATION | ) | **Master Docket No. 13 C 9116** |
| | ) | |
| | ) | **Judge John Z. Lee** |
| | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| This Document Relates to All Cases | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this multidistrict litigation are current and former collegiate athletes who have sued the National Collegiate Athletic Association ("NCAA") on a classwide basis, claiming that the NCAA breached certain contractual obligations and common law duties to Plaintiffs in the way it handled student-athlete concussions and concussion-related risks.  After conducting extensive discovery, the parties engaged in a lengthy mediation process and now ask this Court to preliminarily approve their negotiated settlement pursuant to Fed. R. Civ. P. 23(e).

In short, the settlement provides medical monitoring and other associated relief to the class and requires the NCAA to enact policy changes to its "return-to-play" guidelines for student-athletes who suffer concussions or concussion-related symptoms.  In return, class members would release the NCAA and its affiliated organizations from all medical monitoring claims and waive the right to pursue on a classwide basis compensation for individual personal injury claims.  Additionally, as part of the settlement approval process, the settling Plaintiffs ("Plaintiffs") and the NCAA request that the Court certify the proposed settlement class under Fed. R. Civ. P. 23(b)(2) or Fed. R. Civ. P. 23(b)(3).

The proposed settlement is not without its detractors. Most prominently, putative class member Anthony Nichols opposes the settlement, arguing that its terms are insufficient to protect the class and improperly waives the right of class members to seek monetary damages on a classwide basis.

The Court previously has questioned the ability of the current class representatives, who consist of participants in contact sports, to adequately represent the interest of the proposed class, which is comprised of participants in both contact and non-contact sports. Adequacy of representation, of course, is a requirement of Rule 23(a). Fed. R. Civ. P. 23(a)(4). The parties informed the Court at the last hearing that they are in the process of trying to address this issue. After reviewing the various settlement submissions, the Court has identified a number of additional concerns regarding the implementation of the medical monitoring program and the adequacy of Plaintiffs' notice program. Although these concerns may prove surmountable, the Court cannot grant preliminary approval of the settlement as currently proposed. Accordingly, the motions for preliminary approval are denied.

**Procedural Background**

On September 12, 2011, Adrian Arrington filed a class action lawsuit against the NCAA on behalf of a putative class of student-athletes. *See Arrington, et al. v. Nat'l Collegiate Athletic Ass'n*, No. 11-cv-06356 (N.D. Ill.). Derek Owens subsequently filed a separate class action lawsuit, also on behalf of a putative class of student-athletes, which was consolidated with *Arrington. See Owens v. Nat'l Collegiate Athletic Ass'n*, No. 11-cv-6816 (N.D. Ill.). After consolidation, several additional student-athletes joined the case as plaintiffs, seeking medical monitoring for all current and former student-athletes along with changes to the NCAA's return-to-play guidelines for students who experience concussions or concussion-related symptoms. At the time, the *Arrington* Plaintiffs also sought monetary damages for their injuries.

2

After the Court appointed Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Joseph Siprut of Siprut PC as Interim Co-Lead Counsel on behalf of the putative class, Plaintiffs filed a Consolidated Class Action Complaint and conducted extensive discovery. On March 11, 2013, Plaintiffs filed their Second Amended Class Action Complaint, and, shortly thereafter, moved to certify the class for medical monitoring purposes only. *Arrington* Dkt. 135, 174. Before the NCAA was to file a response, however, the parties mutually sought a stay of the Court's consideration of the motion pending settlement negotiations. On August 15, 2013, the Court granted the stay.

Once the *Arrington* case was stayed and settlement negotiations had begun, numerous other actions on behalf of current and former NCAA student-athletes were filed against the NCAA nationwide. The Judicial Panel for Multidistrict Litigation consolidated the individual cases in *In re National Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, MDL No. 2492, Master Dkt. No. 1:13-cv-09116 (N.D. Ill.) (the "MDL").[1] The Related Actions were transferred to this Court as part of the MDL for coordinated and consolidated pre-trial proceedings. Settlement negotiations continued between the *Arrington* Plaintiffs and the NCAA. These negotiations were aided by the oversight of two distinguished retired federal judges, Judge

---

[1] As of this date, the subsequently-filed actions are as follows: (i) *Walker, et al. v. NCAA*, No. 1:13-cv-00293 (E.D. Tenn., filed Sept. 3, 2013); (ii) *DuRocher, et al. v. NCAA*, No. 1:13-cv-01570 (S.D. Ind., filed Oct. 1, 2012); (iii) *Doughty v. NCAA*, No. 3:13-cv-02894 (D.S.C., filed Oct. 22, 2013); (iv) *Caldwell, et al. v. NCAA*, No. 1:13-cv-03820 (N.D. Ga., filed Oct. 18, 2013); (v) *Powell, et al. v. NCAA*, No. 4:13-cv-01106 (W.D. Mo., filed Nov. 11, 2013); (vi) *Morgan, et al. v. NCAA*, No. 0:13-cv-03174 (D. Minn., filed Nov. 19, 2013); (vii) *Walton, et al. v. NCAA*, No. 2:13-cv-02904 (W.D. Tenn., filed Nov. 20, 2013); (viii) *Washington, et al. v. NCAA*, No. 4:13-cv-02434 (E.D. Mo., filed Dec. 3, 2013); (ix) *Hudson v. NCAA*, No. 5:13-cv-00398 (N.D. Fla., filed Dec. 3, 2013); (x) *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill., filed Feb. 11, 2014); and (xi) *Wolf v. NCAA*, No. 1:13-cv-09116 (N.D. Ill., filed Feb. 20, 2014) (collectively, the "Related Actions"). Since the MDL was formed, two additional cases have been transferred to the MDL and are included in the definition of Related Actions: *Jackson v. NCAA*, No. 1:14-cv-02103 (E.D.N.Y., filed Apr. 2, 2014); and *Whittier v. NCAA*, No. No. 1:14-cv-0978 (W.D. Tex., filed Oct. 27, 2014).

Layn Phillips (ret.) and Judge Wayne Anderson (ret.). Plaintiffs' counsel in the Related Actions also were provided an opportunity participate in these discussions.

One of the Related Actions, *Nichols v. NCAA*, No. 1:14-cv-00962 (N.D. Ill), bears special mention. While the majority of the Related Actions sought only Medical Monitoring relief, the *Nichols* action also sought to certify a class of plaintiffs seeking monetary damages. The *Nichols* plaintiffs currently oppose the proposed settlement with the NCAA on numerous grounds and wish to retain their rights to pursue monetary damages on a classwide basis, something that the settlement, if approved, would prohibit.

### The Proposed Settlement

After lengthy negotiations, Plaintiffs and the NCAA have agreed to the terms of an Amended Class Settlement Agreement and Release (the "Settlement Agreement"). Dkt. 92, Ex. A.[2] A brief summary of its terms is provided below.

As an initial matter, the proposed Settlement Class is defined as:

> All current or former student-athletes who played an NCAA-sanctioned sport at an NCAA member institution on or prior to the Preliminary Approval Date.

SA ¶ II(D). The proposed Settlement Class Representatives are:

| Representative | Sport | Institution | Participation Dates |
|---|---|---|---|
| Adrian Arrington | Football | Eastern Illinois University | 2006—09 |
| Derek Owens | Football | University of Central Arkansas | 2008—11 |
| Angelica Palacios | Soccer | Ouachita Baptist University | 2010—11 |

---

[2] Plaintiffs filed an Amended Motion for Preliminary Approval and an Amended Class Settlement Agreement and Release on October 21, 2014. Dkt. 91. This supplemented Plaintiffs' original motion filed on July 29, 2014. Dkt. 64. Capitalized terms, to the extent they appear in this order, are as defined in the Amended Settlement Agreement. Unless otherwise noted, "Dkt. __" refers to documents filed in the MDL, No. 13-cv-9116.

| Kyle Solomon | Hockey | University of Maine | 2008—10 |
| Abram Robert Wolf | Football | Simpson College | 2012—present |
| Sean Sweeney | Wrestling | Buena Vista College | 1991—93 |
| Jim O'Conner | Football | Drake University | 1971—74 |
| Dan Ahern | Football | North Carolina State University | 1972—76 |
| Paul Morgan | Football | Vanderbilt University | 1994—97 |
| Jerry Caldwell | Football | Georgia Tech University | 1995—98 |
| John DuRocher | Football | University of Oregon; University of Washington | 2003—06 |
| Sharron Washington | Football | University of Missouri | 1987—91 |

Each of the Settlement Class Representatives has suffered concussions or was exposed to subconcussive hits, and each is in need of medical monitoring. Dkt. 65 at 16-17.

The NCAA has agreed to the following terms to effectuate the settlement. The NCAA and its insurers will pay $70 million to create a Medical Monitoring Fund (the "Fund"). The Fund will be used to pay the expenses associated with the Medical Monitoring Program, including: Screening Questionnaires, Medical Evaluations, Notice and Administrative Costs, Medical Science Committee Costs, Attorneys' Fees and Costs, and Class Representatives' Service Awards. SA ¶ IV(A)(1)(b). The Medical Monitoring Program (the "Program") will last for a fifty-year Medical Monitoring Period. The NCAA also is providing $5 million in additional funds for concussion-related research. SA ¶ IX(A).

Under the terms of the Program, members of the Settlement Class may participate in the Program during the Medical Monitoring Period. The Program has two phases: screening and evaluation. In the screening phase, Class Members may assess their own symptoms by completing a Screening Questionnaire in hard copy or online up to a maximum of five times

during the Medical Monitoring Period. Their scores on the Screening Questionnaire will determine whether they qualify for a Medical Evaluation. The standard for determining whether a Class Member qualifies for a Medical Evaluation will be set by the Medical Science Committee (the "Committee"), which will consist of four (4) medical experts, who have expertise in diagnosis, care, and management of sports-related concussions, and in mid- to late-life neurogenerative disease. These medical experts will be appointed jointly by the parties, and the Committee will be chaired by Judge Anderson. SA ¶ (V)(A)(1).

With respect to the evaluation phase, Class Members will be notified if they qualify for a Medical Evaluation and instructed on where and how to obtain one. There will be ten Program Locations nationwide at which the Medical Evaluations will take place.[3] The Program Administrator will assist Class Members who qualify for Medical Evaluations to find the most convenient location. Class Members may qualify for up to two Medical Evaluations during the Medical Monitoring Period and may seek a third, if necessary, by submitting an appropriate request to the Committee. The Medical Evaluations will be submitted to a physician, who will provide a diagnosis as well as the results of the testing to the Class Member or their physician, at the option of the Class Member.[4]

The Committee will determine the scope of the Medical Evaluations, and will consider the following types of testing for inclusion: neurological; neuropsychological; mood, behavioral,

---

[3]     Although the Settlement Agreement contemplates ten Program Locations, during a recent hearing, Plaintiffs' counsel indicated that the parties are considering increasing this number to thirty-three locations.

[4]     Under the Settlement Agreement, if a class member lives more than two hundred miles from the nearest Program Location, the individual has two options. He or she can request to receive a mileage reimbursement for travel to the Program Location, or he or she can choose to have a Medical Evaluation performed by a local physician and seek reimbursement for out-of-pocket costs in the amount of the actual costs for the evaluation or the average costs of the Medical Evaluation within the Program, whichever is lesser. SA ¶ VI(A)(IV).

and movement evaluation; and any ancillary testing suggested by a neurologist. The Committee also will review annually and amend as needed the Questionnaire and the scope of the Evaluations; oversee the performance of the Program Locations; provide a written report regarding their responsibilities and performance for submission to the Court; and recommend how research funds should be expended. The Committee will be compensated at a reasonable hourly rate from the Fund by the Program Administrator.[5]

The NCAA also has agreed to make changes to its concussion-management and return-to-play policies.[6] First, the NCAA will institute a policy requiring all student-athletes to undergo pre-season baseline testing for each sport they play prior to beginning practice or competition. SA ¶ VIII(A)(1). Second, the NCAA will revise its return-to-play guidelines to provide that "[s]tudents with a diagnosed concussion will be prohibited from returning to play or participation in any practice or game on that same day and must be cleared by a physician before being permitted to return to play in practice or competition." SA ¶ VIII(A)(3). Third, medical personnel, who are trained in the diagnosis, treatment, and management of concussions, will be present at all games of Contact Sports—defined as football, lacrosse, wrestling, ice hockey, field hockey, soccer, and basketball—and be available during all Contact Sports practices. SA ¶ VIII(4)-(5). Fourth, the NCAA will enact a reporting process for schools to report diagnosed concussions and their resolution, and for concerned persons to report potential problems directly to the NCAA. SA ¶ VIII(D). Fifth, the NCAA will require its schools to provide NCAA-

---

[5]    In the event that the Fund is depleted before the expiration of the fifty-year period, the Settlement Agreement provides that the class members once again will be free to pursue claims for medical monitoring against the NCAA on "an individual, non-class basis." SA ¶ IV(A)(5). The parties agree that the statute of limitations with respect to such claims will be tolled during the period that the Program is in effect. *Id.* Alternatively, at the request of Class Counsel, the NCAA may agree to provide additional funding for the Program, although it has no obligation to do so. SA ¶ IV(A)(7).

[6]    According to the NCAA, a number of these changes already have been, or are in the process of being, implemented.

approved concussion education and training to student-athletes, coaches, and athletic trainers prior to the start of each athletic season. SA ¶ VIII(F). Sixth, the NCAA will provide education for faculty with respect to allowing academic accommodations for students suffering from concussions.

As consideration for the Settlement Terms outlined above, the Class Representatives and the Settlement Class "have agreed to release (i) any and all claims seeking damages or other legal or equitable relief for medical monitoring related to concussions or subconcussive hits sustained during participation in collegiate sports as an NCAA student-athlete; and (ii) any and all claims seeking relief for personal injury on a class-wide basis related to concussions or subconcussive hits sustained during participation in collegiate sports as an NCAA student-athlete." Dkt. 65 at 26 (citing SA ¶ XIV(A)(7)). However, the Class Representatives and the Settlement Class "are not releasing, and have expressly reserved, individual personal injury claims, as well as any other claims unrelated to medical monitoring relief for concussions or subconcussive hits." *Id.* This release would inure to the benefit of "the NCAA, its member institutions (past and present), its current and former officers, directors, employees, insurers, attorneys, and agents." SA ¶ PP (defining "Released Persons"). Additionally, the NCAA has agreed to toll the statute of limitations for all personal injury claims from September 12, 2011, (the date the *Arrington* action was filed) through the date of the Court's decision with respect to the Settlement's final approval. SA ¶ XX(S).

The parties state that the issue of attorneys' fees was deferred until after the agreement in principal was reached on all material terms during the mediation process. Since that time, the parties have arrived at an agreement as to the amount of attorneys' fees that the attorneys for the proposed class would receive if and when the Settlement is approved. Specifically, the NCAA

has agreed that it will not oppose an award of Attorneys' Fees and Expenses up to $15,000,000.00 and up to $750,000.00 in out-of-pocket expenses. SA ¶ XVI. As Class Counsel will have a continuing obligation to implement the terms of the Settlement throughout the Medical Monitoring Period, the NCAA also has agreed not to object to applications from Lead Counsel and one member of the Plaintiffs' counsel Executive Committee for additional attorneys' fees, at a rate not to exceed $400.00 per hour to a maximum of $500,000.00 for work performed after the first year from the Effective Date of Settlement. *Id.* Plaintiffs also intend to apply to the Court for reasonable service awards for the Class Representatives in this matter, which will be paid from the Fund. The NCAA agrees not to object to Service Awards in the amount of $5,000.00 for the Class Representatives deposed in the *Arrington* matter (namely, Adrian Arrington, Derek Owens, Angelica Palacios, and Kyle Solomon), and $2,500.00 for each Settlement Class Representative who has not been deposed. *Id.*

## **Legal Standard**

Approval of a class action settlement under Rule 23(e) is a two-stage process. *Gautreaux v. Pierce,* 690 F.2d 616, 621 n.3 (7th Cir. 1982). First, the Court considers the proposed settlement to determine whether the settlement is "'within the range of possible approval.'" *Id.* (internal citations omitted). During this stage, the Court also must determine whether certification of the proposed class is appropriate under Rule 23(a) and (b). *See Amchem v. Windsor*, 521 U.S. 591, 620 (1997) (noting that a court should give "heightened" attention to ensure that the requirements of Rule 23, with the exception of Rule 23(b)(3)(D)'s manageability requirement, are met in the context of settlement classes).[7] Along these lines, "a district court may not abandon the Federal Rules merely because a settlement seems fair, or even if the

---

[7] Because the Court has not previously certified a class in this case, the Court also has the discretion at the preliminary approval stage to conditionally certify the class for purposes of providing notice to putative class members. *See Manual for Complex Litigation (Fourth)* § 21.632 (2004).

settlement is a 'good deal.'" *Uhl v. Thoroughbred Tech. & Telecoms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002). Indeed, "the Rule 23 requirements may be even more important for settlement classes, for which . . . the district court must act almost as a fiduciary of the class when approving settlements." *Id.* (citing *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002). If these questions are answered in the affirmative, the Court will order Plaintiffs to provide notice of the settlement to the class "in a reasonable manner" so that the class members can raise any objections to the settlement. Fed. R. Civ. P. 23(e)(1).

Once the class is provided with notice of the settlement and an opportunity to object, the Court conducts a final approval hearing as part of the second stage to determine whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). If the Court is satisfied that the settlement meets these criteria, it will grant final approval of the settlement, which binds the defendant and all class members to the terms of the settlement.

Because each and every member of the class will be bound by a settlement that receives final approval, the Court's review of the settlement is critical. As the Seventh Circuit has explained, when parties seek approve of a class action settlement, the lack of the customary adversarial relationship between the plaintiffs and defendants, as well as the potential conflicts of interest that may arise between class counsel and the class members, requires that district judges "give careful scrutiny to the terms of the proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (Posner, J.); *see also Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014) (noting that, when approving a settlement in a class action, a judge "is not to assume the passive role that is appropriate when there is genuine adverseness between the parties").

## Discussion

I.      **Rule 23(a)(4)'s Adequacy Requirement**

The Court previously has expressed its concern that the current Class Representatives will not "fairly and adequately protect the interests of the class" as required by Rule 23(a)(4).  In short, the definition of the settlement class includes current and former student-athletes who play or played any NCAA-sanctioned sport at any NCAA member institution.  It includes student-athletes who played both Contact Sports (football, lacrosse, wrestling, ice hockey, soccer, and basketball) and non-Contact Sports (such as baseball, water polo, cross-country, golf, and riflery, to name a few).  The proposed settlement, however, treats these categories differently.[8]

First, as between participants in Contact Sports and non-Contact Sports, the proposed settlement provides for certain additional return-to-play protections for participants in Contact Sports by requiring medical personal with training in the diagnosis, treatment and management of concussions to be "present" at all Contact Sports games and "available" at all Contact Sports practices.  SA ¶ VIII(A)(4)-(5).  No such provision is made for non-Contact Sports games and practice.  This is not to say that the student-athletes who play or played non-Contact Sports would demand (or even desire) such protections as part of a negotiated settlement.  Perhaps, the benefits of the future medical monitoring plan that the settlement provides would outweigh the benefits of such staffing at non-Contact Sports events.  But, in light of the undisputed data that more than half of the approximately 4.2 million potential class members play or played non-Contact Sports, the current Class Representatives simply are not qualified to make that decision for them.

---

[8]      Prior to the issuance of this order, Plaintiffs filed a motion to join additional class representatives to address these concerns.  Dkt. 105. That motion remains pending.

This is not to say that every single NCAA-sanctioned sport must be represented in this action. But, as NCAA's counsel acknowledged, the risks of suffering a concussion while playing NCAA-sanctioned sports are scattered along a continuum with football on the highest end and sports such as riflery on the lower end. The class representatives as a group must adequately represent this continuum as a whole so that the various interests along the continuum can be voiced as part of the settlement process.

Along these lines, the Court further notes that, when opining that $70 million is sufficient to fund the fifty-year medical monitoring program, Plaintiff's expert Bruce Deal calculated the anticipated participation rate based upon the rate of reported concussions for student-athletes in Contact Sports only. Dkt. 70 at 6-7, 13. But it is undisputed that players in non-Contact Sports can and do suffer concussions. Take, for example, a catcher in baseball or a center in water polo. And the NCAA not only maintains this data, but has produced it during the course of discovery in this case. Although Plaintiffs' counsel stated during the hearing that Deal considered this data, his report is devoid of any analysis (or mention) of occurrences of concussions in non-Contact Sports. This gives rise to a concern that the estimated participation rates calculated by Deal are not entirely reliable, and that the $70 million Fund would be insufficient to fully fund the Program.

Furthermore, although the medical monitoring program will be available to the entire class, by providing additional return-to-play protections for current and prospective student-athletes, the proposed settlement confers more benefits to current players than former players. The current class representatives include former players of certain Contact Sports, but not non-Contact Sports. The Court believes that additional representation is necessary for those putative class members who formerly played both non-Contact Sports, as well as Contact Sports other

12

than football.  Only in this way will the class representatives adequately represent the interests of the entire putative settlement class, rather than only parts of it.

## II.     Ascertainability and the Proposed Notice Plan

In order to obtain class certification, Plaintiffs also must demonstrate that the class is sufficiently "identifiable as a class."  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (citing *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981), and *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)); *see also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012) ("a class must be sufficiently definite that its members are ascertainable").  "A class is sufficiently definite if its members can be ascertained by reference to objective criteria and may be defined by reference to defendants' conduct."  *Hinman v. M&M Rental Ctr.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008).

The proposed Settlement Class is, by its terms, sufficiently definite.  The objective criteria are clear: it consists of all current and former student-athletes at all NCAA member institutions.  But the class is not limited by gender, by time frame, by member institution, or by sport.  And the sheer breadth of the class definition makes it difficult to ascertain the individual members of the class in practice.  The difficulty of identifying all putative class members manifests itself starkly in the context of Plaintiffs' notice program.

Here, Plaintiffs request that the Court certify the settlement class as a "hybrid class" under Rule 23(b)(2) and 23(d)(1)(B).  Pls.' Mem. Supp. Mot. Preliminary Approval at 28 (Dkt. 65).  In so doing, the parties propose that the members of the settlement class be provided notice and an opportunity to opt-out of the settlement.[9]  As part of the proposed notice plan, the parties intend to provide some form of direct notice to the class members.  10/23/14 Hearing Tr. (Dkt.

---

[9]     Whether the proposed settlement class is suited for such "hybrid" treatment under Rule 23(b)(2) and 23(d)(1) is an issue that remains under consideration at this time.

103) 18:21-22:13.  To do this, the NCAA will send a written request to all NCAA member schools for address data and contact information for all current and former participants in NCAA-sanctioned sports at those schools.  But the parties acknowledged that they do not know whether and in what manner the individual schools maintained such data over the years.  *Id.* 18:21-19:4.  Indeed, the further back in time information is sought, the less likely it will be that the individual schools would have ripe contact information.  It is reasonable to assume that many class members will have moved or changed their names (or both) in the intervening years.  This is not an insignificant problem given the importance that Plaintiffs have attached to the issuance of notice to the class and the fact that approximately two-thirds of the settlement class graduated from school more than ten years ago.  *See* Deal Rpt. (Dkt. 70) at 17.  What is more, it was not entirely clear whether the NCAA has the authority to mandate that a member institution comply with the information request in a timely manner.

Given the dearth of information, the Court is unable to determine on the current record the plausibility and appropriateness of a direct notice program.  The present lack of information also impairs the parties' ability to estimate how much an effective direct notice program would cost.  As Plaintiffs' counsel and their proposed Notice Administrator, Alan Vazquez, acknowledged at the hearing, the estimated costs of the notice program provided by the parties does not include a direct notice component.  10/23/14 Hearing Tr. (Dkt. 103) 19:21-21:20. And presumably the costs of such a program would come out of the $70 million Fund, thereby decreasing the funds available for other purposes.  *See* SA ¶ IV(A)(2)(d).[10]  Accordingly, given the paucity of information, the Court cannot determine whether and to what extent a direct notice program would be appropriate under Rule 23(d)(1)(B) and Rule 23(e)(1).

---

[10]     The Court further notes that the cost of the notice program, which is estimated to be at least $800,000.00 *without* a direct notice component, is not included in the $6.7 million of administrative costs considered by Deal in his report.  *Id.*

To obtain additional information for this analysis, the Court directs the parties to select nine different NCAA-member institutions, three from each division, and request that the institutions provide the address and contact information that they have for members of the putative settlement class. This initial sampling should provide additional information to the parties and the Court regarding the plausibility of a direct notice program and the attendant costs. Plaintiffs and the NCAA should submit a report summarizing their efforts and the results within sixty days of the issuance of this order. To the extent that the results from this initial sampling impact the parties' evaluation of the contemplated direct notice program and its costs, the report should include a discussion of these issues.

Additionally, in the Settlement Class Representatives' Motion for Approval of Notice Plan (Dkt. 84), Plaintiffs assert that proposed notice plan will reach "at least 80% of the Settlement Class." *Id.* at 9. Moreover, during the hearing, Plaintiffs' counsel provided "estimated reach" calculations in the range of 80.37% to 84.66%. However, neither the parties' briefs nor the declaration of Alan Vazquez sets forth with any specificity the basis for these calculations. The Court requests that the parties provide additional information regarding the basis of these calculations in the same report.

## III. Additional Fairness Concerns

In addition to the issues discussed above, the Court requests that Plaintiffs and the NCAA address the following fairness concerns regarding the proposed settlement as part of the approval process.

### A. NCAA's Ability To Bind Its Member Institutions

The Settlement Agreement, if approved, would preclude class members from bringing claims against Released Persons. Released Persons, in turn, includes not only the NCAA, but its

member institutions—*i.e.*, the NCAA-affiliated schools.   It is unclear, however, whether the NCAA has the authority to mandate that its member schools implement the proposed "return-to-play" policies and what enforcement mechanisms will be in place in the event of noncompliance. Given the wide array of schools that are affiliated with the NCAA, it is reasonable to believe that some schools may face financial or logistical challenges in implementing some of the changes that are proposed.   Accordingly, it is critical for the Court to understand the range of actions the NCAA may take against a member institution that either intentionally or inadvertently fails to comply with the terms of the Settlement Agreement.   Furthermore, to the extent that a member school fails to comply with the provisions of the Settlement Agreement, it seems unfair to provide such a school with the benefits of the settlement without any of its costs.   Put another way, a class member student-athlete who plays football at School A should not be precluded from suing School A, if the school refuses (either because it is unwilling or unable) to comply with the terms of the Settlement Agreement.   The NCAA believes this scenario to be extremely unlikely, and perhaps so.   But there is nothing in the record to enable the Court to make this determination.

### B. Criteria Used To Evaluate and Score Questionnaires

The Settlement Agreement contemplates a process by which a participating class member submits a Questionnaire to the Committee, which then evaluates and scores the Questionnaire to determine whether the individual would qualify for a Medical Evaluation.   The Settlement Agreement, however, lacks specificity as to the criteria that the Committee will employ to evaluate and score the Questionnaires.   When questioned about this issue at oral argument, Plaintiffs' counsel raised some concern that disclosure of the particular criteria and methodology used in these assessments might promote manipulation, thereby preventing the fair and effective

administration of the medical monitoring program.  10/23/14 Hearing Tr. (Dkt. 103) 56:11-57:7.
But the criteria and methodology used by the Committee to determine who will receive a
Medical Evaluation will directly impact the number of Medical Evaluations that will be offered
over the life of the program and, in turn, the Program's anticipated costs.  For instance, the
review criteria could be so exacting so as to artificially limit the number of class members who
were eligible for a Medical Evaluation, thus endangering the health of individuals who should be
receiving treatment and subverting the entire purpose of the Program.  Conversely, if the criteria
are more lenient and too many class members who have no need of treatment receive
evaluations, the funds allotted for the Program could be exhausted far too soon.  According, the
review criteria bear directly on the settlement's anticipated benefits to the class as well as the
sufficiency of the proposed Fund.

Although the Court is mindful of the concerns raised by Plaintiffs' counsel, the parties
need to provide the Court with a more specific framework for how the Committee intends to
score the Questionnaires, along with any support declarations from their medical experts
regarding its appropriateness.  This information need not consist of a detailed recitation of the
actual criteria and methodology that will be employed, but must be sufficient to apprise the Court
of the general standards and guidelines that the Committee will use in its review.  Such
information also will be valuable to putative class members as they weigh the benefits of the
Settlement Agreement.

### C.    Limitations on Questionnaires and Evaluations

The Settlement Agreement limits the maximum number of times that a class member
may complete a Questionnaire to five during the entire fifty-year period, and limits the number
of Medical Evaluations to two during that same time frame.  However, the scholarship on

Chronic Traumatic Encephalopathy ("CTE") demonstrates that individuals who have been affected may be asymptomatic for many years. *See* Cantu Report (Dkt. 69) ¶ 41. The Court needs further information as to how the parties plan to address the situation where a former student-athlete completes the maximum number of Questionnaires permitted, but later begins suffering from CTE-related symptoms. While the Settlement Agreement contains a provision allowing a class member to ask the Committee for additional Medical Evaluations, SA ¶ IV(B)(4)(h), it should provide a more specific procedure for doing so, including but not limited to an established time frame for the Committee to respond.

### D.    Program Locations

The Settlement Agreement contemplates at least ten Program Locations nationwide where class members can go to receive Medical Evaluations. The placement of these Program Locations will directly impact participation rates from the Settlement Class. While the Settlement Agreement indicates that the locations will be evaluated by the Medical Science Committee, it does not provide any factors that the Committee should consider when making its decision. It would assist the Court in conducting its fairness review to understand the Committee's decision-making process and the parameters they used when selecting locations.

Furthermore, Plaintiffs' counsel now indicates that they are looking to increase the number of Program Locations to at least thirty-three different sites that would cover approximately 90% of the population within 200 miles. When asked why 200 miles was selected as the yardstick, Plaintiffs' counsel responded that the parties just thought it was a reasonable distance. The Court believes that the Program Locations should be situated so that a class member will be able to travel to the site, take the Medical Evaluation, and return to his or her home in one day, without the need for overnight accommodations. Because the record does not

indicate how long a Medical Evaluation would take, whether the 200-mile limitation would satisfy this requirement is unclear.

### E.    Retention Provision

The Settlement Agreement provides that, at the end of the fifty-year period, any unused funds would revert back to the NCAA.  SA ¶ XIX(C)(4).  Such retention provisions have the potential of creating conflicts of interest in the administration of class action settlements and generally are disfavored.  *See*, *e.g.*, *In re Lupron Mktg. and Sales Practices Litig.*, 677 F.3d 21, 32-33 (1st Cir. 2012) (citing Am. Law Inst., Principles of the Law of Aggregate Litig. § 3.07(b) (2010)); *Mirfasihi*, 356 F.3d at 784 (endorsing use of *cy pres* trust for balance of class action settlement funds to prevent windfall to defendant).  In this case, such a provision could create incentives for the Committee and the Program Administrator (either now or in the future) to artificially curtail the number of Medical Evaluations so that the Program could minimize its costs and leave a balance at the end of the fifty-year term.[11]  Accordingly, the Court rejects Section XIX(C)(4) of the proposed Settlement Agreement.  Instead, the Court suggests that, to the extent that any of the original $70 million remains in the Fund at the end of the fifty-year period, the parties agree to use the remaining funds to extend the fifty-year term, thereby providing additional benefits to the class, or donate the unused funds to an appropriate independent institution devoted to concussion research or treatment.  Such alternative uses of the remaining funds would benefit the class, minimize the potential for a conflict of interest in the implementatison of the Program, and ensure that the entire $70 million will benefit the class members in some fashion.

---

[11]    As discussed above, imposing overly stringent criteria to review and score Questionnaires is one potential way this could be accomplished.

That said, if it appears that the $70 million will be depleted before the end of the fifty-year term, the Settlement Agreement also permits the NCAA and/or its insurers to deposit additional funds above and beyond the $70 million for the medical monitoring program. *See* SA ¶ IV(A)(7). In such an event, the Court does not believe that allowing the NCAA to retain any unused funds at the end of the fifty-year period would be unreasonable and, in fact, would encourage the NCAA to do so.

Additionally, if the $70 million is insufficient to cover the Program for 50 years, the Settlement Agreement allows the class members to pursue their medical monitoring claims at that time. SA ¶ IV(A)(5). However, they may only pursue such claims on "an individual, non-class basis." *Id.* Given the costs of mounting such a challenge on an individual basis, the Court concludes that such a waiver is unreasonable and unfair. The Settlement Agreement contemplates a fifty-year medical monitoring program. To the extent that the Program is unable to operate for those 50 years, the class members should have the right to reassert their medical monitoring claims either on an individual or classwide basis.

At this point, it also bears noting that, in light of the numerous issues discussed throughout this order, the Court does not have sufficient information to determine whether the proposed $70 million will be sufficient to implement the Program as it is described in the Settlement Agreement. The additional information requested by the Court will be salient to this analysis.

### F. Fees of Objectors and Continuing Oversight

Two minor points remain to be addressed. First, the Settlement Agreement provides that any attorneys' fees incurred by objectors to the Settlement must be borne by the objector. SA ¶ XI(C)(1)(p). At oral argument, the Court queried whether the Parties would agree to modify that

provision, allowing the Court to award fees at its discretion from the Fund to objectors as appropriate. The Parties indicated they would not object to that modification, and future drafts of the Settlement Agreement should reflect that change. Second, the Settlement Agreement calls for continuing supervision by the Court. Given the long length of time allotted for the Plan and the potential for numerous issues to arise, at least at inception, the Court suggests that the Parties consider the utility of allowing the Court to appoint a Special Master to oversee the implementation of Settlement Agreement with appropriate oversight from the Court.

### Conclusion

The Settlement Agreement proposed by the parties is a significant step in trying to arrive at a resolution of this highly complex matter. In light of the concerns expressed above, however, the Court must deny Plaintiffs' Motion for Preliminary Approval of Amended Class Settlement and Certification of Settlement Class [Dkt. 64] and Amended Motion [Dkt. 91]. The denial is without prejudice, and the Court encourages the parties to continue their settlement discussions in order to address these concerns.

SO ORDERED          ENTERED

John Z. Lee
United States District Judge

Dated: December 17, 2014