## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>              Plaintiffs, | : : : : : : | CIVIL ACTION NO: 14-cv-0029 |
| v. | : : | |
| National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>              Defendants. | : : : : : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : : : | |

### CLASS COUNSEL AND THE NFL PARTIES' JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN <u>SUPPORT OF FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT</u>

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ....................................................................1

SUMMARY OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ............................................................................................................4

FINDINGS OF FACT .............................................................................13

I. BACKGROUND.................................................................................13

    A.    Parties ............................................................................13

    B.    Initial Lawsuits ..............................................................14

    C.    MDL 2323 and Plaintiffs' Allegations ..............................16

    D.    Motion to Dismiss Based on Section 301 LMRA Preemption.................19

II. SETTLEMENT AGREEMENT ..........................................................21

    A.    Negotiation of the Settlement Agreement ........................21

    B.    The Settlement Agreement ..............................................26

        1.    The Monetary Award Fund ........................................28

            (a)    Overview...............................................................28

            (b)    Qualifying Diagnoses ..........................................29

                (i)    Overview of the Qualifying Diagnoses .................29

                (ii)    The Settlement Does Not Compensate Other Conditions.............................................................32

                    (A)    CTE Pathology Post Final Approval .........32

                    (B)    Mood, Behavioral and Other Conditions...................................................38

            (c)    Maximum Monetary Award for Each Qualifying Diagnosis ........................................................40

            (d)    Calculation of Monetary Award .......................41

                (i)    Age at the Time of Qualifying Diagnosis.............41

(ii)     Offset for Non-Football Stroke or TBI .................42

(iii)    Eligible Seasons .......................................43

(iv)     Participation in the BAP ..........................44

(e)      Representative Claimants of Retired NFL Football
         Players Who Died Prior to 2006 .........................45

2.       Baseline Assessment Program .....................................46

(a)      Structure of the BAP .......................................46

(b)      BAP Funding ...................................................48

(c)      BAP Test Battery ............................................49

(d)      The Specific Impairment Criteria ......................51

3.       Education Fund ...................................................51

4.       Registration for Settlement Benefits .............................51

5.       Claims and Appeals Process .....................................52

6.       Funding and Security ...........................................56

7.       Release of Claims, Covenant Not to Sue and Bar Order ..............58

8.       Lien Resolution ...................................................60

9.       Attorneys' Fees .................................................61

C.   Settlement Class Notice ..............................................62

D.   Class Members' Response to the Settlement .............................66

E.   Fairness Hearing ...................................................67

CONCLUSIONS OF LAW ...................................................77

I. THE SETTLEMENT CLASS SHOULD BE CERTIFIED ...........................77

A.   The Settlement Class Meets Rule 23(a)'s Requirements .....................77

1.   The Settlement Class Satisfies the Numerosity Requirement ......77

2.   The Settlement Class Satisfies the Commonality
     Requirement ...................................................78

3.　　The Settlement Class Satisfies the Typicality Requirement..........80

4.　　The Settlement Class Satisfies the Adequacy Requirement..........81

    (a)　　Co-Lead Class Counsel and Subclass Counsel Are Experienced and Vigorously Represented the Interests of the Class and Subclasses................................82

    (b)　　Subclass Representatives' Interests are Aligned with Interests of Subclass Members .................................82

B.　　The Settlement Class Meets Rule 23(b)(3)'s Requirements....................93

1.　　The Settlement Class Satisfies the Predominance Requirement....................................................................93

2.　　The Settlement Class Satisfies the Superiority Requirement ........97

II. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE........................98

A.　　The Settlement Is Presumptively Fair....................................101

B.　　An Evaluation of the *Girsh* Factors Confirms that the Settlement Is Fair, Reasonable and Adequate ............................................104

1.　　The Complex Legal, Factual and Scientific Issues in This Case Would Make Continued Litigation Significantly Prolonged and Expensive ............................................104

2.　　99% of the Settlement Class Members Have Remained in the Class, and 19 Settlement Class Members Have Revoked Their Opt Out Requests ............................................108

3.　　Class Counsel Adequately Appreciated the Merits of the Case Prior to Settlement Negotiations........................110

4.　　Absent Settlement, Plaintiffs Face Significant Hurdles to Establishing Liability and Damages ............................117

5.　　Absent Settlement, Plaintiffs Face the Risk of Maintaining a Class Action Through Trial ....................................127

6.　　The Ability of the NFL Parties to Withstand a Greater Judgment Is Irrelevant Because the Settlement Fund Is Uncapped ............................................................128

7.　　The Settlement Is Well Within the Range of Reasonableness in Light of the Best Possible Recovery and the Attendant Risks of Litigation.................................130

C.      The *Prudential* Factors Also Support Approval of the Settlement..........134

III. THE REMAINING OBJECTIONS TO THE  SETTLEMENT HAVE NO
     MERIT ...............................................................................................................138

   A.    CTE-Related Objections Should Be Overruled ........................................139

         1.     The Settlement Compensates Individuals Who Manifest
                Impairment While Living ............................................................139

         2.     The Settlement Appropriately Was Driven by Current
                Science .........................................................................................143

         3.     Death with CTE Was Included in the Settlement For
                Families of Decedents with CTE Who Were Unable to
                Otherwise Obtain Qualifying Diagnoses ....................................145

   B.    Objections to the Exclusion of Other Alleged Conditions Have No
         Merit ..........................................................................................................145

   C.    The Standard for a Qualifying Diagnosis of Dementia  Is
         Scientifically Valid and Reasonable ........................................................148

   D.    The Amount of, and Offsets to, Monetary Awards Are Fair and
         Reasonable .................................................................................................149

         1.     Maximum Awards Are Sufficient ...............................................149

         2.     The Award Reductions Are Reasonable and Justified ................151

                (a)    Age Reduction Is Fair and Reasonable...........................153

                (b)    The Stroke Offset Is Scientifically Justified and
                       Reasonable .....................................................................155

                (c)    The Traumatic Brain Injury Offset Is Scientifically
                       Justified and Reasonable.................................................157

                (d)    The Eligible Seasons Offset Is Fair and Reasonable .......158

                (e)    The Offset for Non-Participation in the BAP is Fair
                       and Reasonable ...............................................................161

   E.    Limiting Representative Claimants' Eligibility for Monetary
         Awards Is Fair............................................................................................162

   F.    The Scope of the BAP Is Sufficient and Appropriate...............................165

         1.     The BAP Is Adequately Funded ..................................................165

iv

2.      The Test Battery and Specific Impairment Criteria Are
        Based on Well-Accepted and Scientifically Validated Tests ......166

3.      The Pre-Selection of Qualified Neuropsychologists Is
        Appropriate and Necessary To Ensure Medically Sound
        Diagnoses................................................................................168

4.      Mail Order Pharmacies Are Reasonable for Distributing
        Non-Experimental Medication ..................................................168

G.      The Settlement Program Procedures Are Justifiable and Fair................169

1.      Cognitively Impaired Settlement Class Members ......................170

2.      The Registration Requirements ..................................................171

3.      The BAP Baseline Assessment Examination Deadline..............173

4.      The Claim Package .....................................................................174

5.      Qualified MAF Physicians .........................................................178

6.      The Appeal Procedures................................................................179

7.      The Anti-Fraud Provisions .........................................................181

H.      The Education Fund Is Not a *Cy Pres* Distribution................................182

I.      The Settlement Agreement's Release Is Appropriate.............................185

J.      The Security Provision is Appropriate ...................................................188

K.      The Opt-Out Deadline Was Appropriate.................................................190

L.      The Notice Was Proper.............................................................................193

1.      Notice Satisfies Both the Requirements of Rule 23 and Due
        Process .......................................................................................193

2.      The Objections Relating to the Purported Deficiencies in
        the Notice Are Meritless .............................................................195

M.      Compensation of Class Counsel's and the NFL Parties' Experts
        Does Not Compromise Their Opinions ...................................................197

N.      Attorneys' Fees Do Not Counsel Against Approval ..............................197

Class Counsel, together with Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP," and together with the NFL, the "NFL Parties"), jointly submit the following proposed findings of fact and conclusions of law in support of final approval of the Class Action Settlement Agreement dated June 25, 2014, as amended as of February 13, 2015 ("Settlement Agreement" or "Settlement").

## PRELIMINARY STATEMENT

Before the Court is the settling parties' motion for final approval of a proposed class action settlement of litigation brought to address claims relating to injuries allegedly resulting from head trauma experienced by former NFL players. The Settlement Class includes more than 20,000 former players and their families, and includes claims dating back more than half a century arising out of injuries allegedly sustained in several different professional football leagues operated by or merged with the National Football League.

The Settlement is truly historic and merits the Court's full endorsement. It will provide immediate benefits to all retirees in the form of baseline medical examinations and supplemental benefits. It will provide continuing benefits through an uncapped, inflation-protected and guaranteed fund, which will pay generous monetary awards to retired players and their families who provide a diagnosis that the retiree suffers from one or more forms of cognitive, neurological, or neuromuscular impairment that the parties agreed would be compensated.

Significantly, *no claimant* will need to show that his injuries were caused by head trauma experienced while he played in the NFL. *No claimant* will be required to litigate complex issues of labor preemption, statute of limitations, assumption of risk, workers compensation exclusivity, or any of the NFL's other substantial legal defenses.

*No claimant* will be required to forfeit or limit his access to the extensive suite of collectively-bargained benefits available to NFL retirees. *No claimant* will be required to prove his actual damages. *No claimant* will be required to retain experts to litigate profound and continuing uncertainties surrounding the scientific and medical issues presented in the underlying litigation.

Simply put, *no claimant will be required to accept the delay, or bear the expense, uncertainty and substantial risk, that would accompany litigation of the underlying claims.*

The settling parties agreed to the proposed Settlement because the better outcome is not to spend a decade or more litigating claims that the plaintiffs believe are meritorious and that the NFL Parties believe are subject to dispositive defenses. Rather, with the assistance of the Court, the settling parties have concluded that agreeing to a compromise that provides substantial and ongoing benefits to retired players and their families, and avoids the delay, expense, and risk of litigation, is not only the preferable thing, but also the right thing to do. The proposed Settlement does just that in a way that is fair, reasonable and adequate, and it provides peace of mind and financial benefits to tens of thousands of former players and their families for more than half a century.

Because the benefits to retired players and their families are so clear and compelling, and so substantial and immediate, more than 99 percent of the Settlement Class have accepted the Settlement Agreement. And the number of Class Members who have chosen to opt out is shrinking by the day—almost ten percent of the opt outs

have now *revoked* their decision to opt out and have decided to *rejoin* the members of the Settlement Class who have accepted the Settlement Agreement.

And it can hardly be said that the Settlement Agreement—and the overwhelmingly positive response to it—are somehow the results of hurried negotiations or an effort to rush the process of notice and approval. Quite the contrary, the settling parties bargained hard and negotiated a Settlement that is a fair balancing of plaintiffs' claims and the NFL Parties' significant defenses. The negotiations began almost two years ago, superintended first by retired federal district judge Layn Phillips and then by Special Master Perry Golkin. The Court has exercised extraordinary oversight over this process, diligently reviewing every aspect of the Settlement Agreement in detail, and enhancing the benefits and protections to the retirees and their families.

Because of the constant and intense interest in professional football, the Settlement itself has been the subject of unprecedented levels of analysis and scrutiny in the mainstream and sports media. Articles about the Settlement routinely appear in major newspapers across the country; its benefits—and alleged deficiencies—are debated on television and radio programs, not only on sports networks, but also on respected public affairs programs like *Meet the Press*. Despite their long experience with class action litigation, counsel cannot recall another case in which so much attention was paid to the terms of a settlement agreement. The level of media attention to the Settlement, the underlying litigation, and the issues surrounding head injuries in football, combined with the careful preparation of the notice to the Settlement Class and the comprehensive and overlapping plan of notice approved by the Court, have

3

ensured that members of the Settlement Class are fully informed of the benefits offered by the Settlement, the alternatives available to class members, and the rights that they have to object to or opt out of the Settlement.

In the pages that follow, we address the negotiating history, the legal issues and precedents that govern approval of class action settlements, and the extensive factual record before the Court.  And while this discussion and analysis are appropriate, and the settling parties are hopeful that it will assist the Court, the fundamental reality of this Settlement should not be overlooked.  Through its vigorous encouragement of settlement negotiations, and its careful supervision of negotiations over the past 24 months, the Court has before it a historic achievement, one that will provide substantial medical and financial benefits to tens of thousands of retired football players and their families.  Without this agreement, many of these men and their families would have no prospect of receiving any of these benefits, or the benefits that they might receive would be sharply diminished by the passage of time and the burden of legal fees, litigation expenses, and the substantial risk of losing everything.

The Settlement Agreement deserves the Court's strong endorsement.  The Motion for Final Approval, we respectfully submit, should be granted without further delay.

## SUMMARY OF PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    In light of the volume of information and documentation placed before the Court, the settling parties hope to assist the Court by including the below summary.

2.    This was a contentious litigation for both sides.  The NFL Parties are confronting claims over the alleged serious health issues purportedly associated with

football-induced head injuries and their alleged knowledge and concealment of those issues.  The Plaintiffs are advancing a tort theory subject to a threshold preemption defense, which threshold issue has led to dismissals of cases brought against the NFL Parties by players in other federal courts.  Should Plaintiffs survive the motions to dismiss, they would then face the NFL Parties' other defenses and challenges attendant to demonstrating causation.

3.       The parties ultimately agreed to a resolution that will provide substantial benefits to all eligible Retired NFL Football Players, including those with objectively verifiable and serious diseases, *i.e.*, early and moderate dementia, Alzheimer's Disease, Parkinson's Disease, and Amyotropic Lateral Sclerosis ("ALS").

4.       The creation of two Subclasses consisting of (1) those without a Qualifying Diagnosis, but who are at risk for developing a range of neuromuscular and neurocognitive diseases allegedly associated with mild traumatic brain injuries, such as early and moderate dementia, Alzheimer's Disease, Parkinson's Disease, and ALS, allegedly as a result of having played professional football, and (2) those with a Qualifying Diagnosis – with  separate representation and counsel, appropriately follows the teachings of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999).

5.       The resolution provides significant immediate monetary compensation for all Retired NFL Football Players manifesting a threshold level of impairment (without requiring a showing of causation), provides immediate baseline testing for all eligible Retired NFL Football Players, allows for future recovery for any Settlement Class Member whose condition deteriorates to a Qualifying Diagnosis, and establishes

a $10 million Education Fund to support safety and injury prevention programs in all levels of football and to educate Retired NFL Football Players about the NFL Parties' widespread benefits programs.  In addition, the NFL Parties' current extensive suite of collectively bargained health and disability programs, including neurocognitive benefits, are expressly and fully protected under the Settlement.  Almost unique among class action settlements, the compensation is uncapped and the tremendous financial weight of the NFL stands behind the future compensation to the Class.

6.     The Settlement is structured to organize compensation by Qualifying Diagnosis and the age of the Retired NFL Football Player at the time of diagnosis.  In addition, compensation levels depend on length of exposure, among other potential Offsets.  This conforms to the best practices for mass harm settlements, and the criteria used are the appropriate ones for this case.

7.     The parties engaged in long-term, hard-fought, court-ordered negotiations to resolve this matter.  The negotiations were at arms' length and non-collusive, supervised by a court-appointed mediator and aided by a court-appointed special master, who reviewed independently all the financial and actuarial assumptions underlying the proposed settlement.

8.     The parties consulted extensively with their own medical and actuarial experts throughout the litigation and settlement negotiations.

9.     Co-Lead Class Counsel, Subclass Counsel and other Class Counsel are seasoned trial lawyers with vast class action experience.  Collectively, they have tried to verdict and/or settled hundreds of class action, mass tort, and individual personal

injury cases.   Even before commencing litigation, Class Counsel began to educate themselves in the relevant medical and scientific research.

10.    Similarly, Counsel for the NFL Parties are seasoned trial lawyers who understood both the NFL's significant defenses and the medicine and science at issue.

11.    Absent a settlement, there would have been a detailed, lengthy and costly litigation which undoubtedly would have involved a "battle of the experts" over complex medical and scientific issues, assuming the Plaintiffs prevailed on the motion to dismiss and later challenges by the NFL Parties on other legal and science defenses.

12.    The parties bargained hard over the terms of the Settlement, including the compensable conditions.   Ultimately, the parties agreed to a settlement based on manifest impairments of objectively verifiable and serious diseases, *i.e.*, early and moderate dementia, Alzheimer's Disease, Parkinson's Disease, and ALS.

13.    Although Objectors insist that there must be compensation for Chronic Traumatic Encephalopathy ("CTE"), the NFL Parties were unwilling to settle claims based solely on a specific pathological finding of CTE rather than on manifest neurocognitive deficits allegedly associated with the condition, except in the cases of Death with CTE prior to final approval to allow families of deceased players to use Death with CTE as a proxy for diseases the diagnosis of which their decedents' deaths prevented.

14.    Class Counsel were cognizant of the following:

   a. The scientific and medical literature concerning CTE, which has been based and characterized on retrospective case series, is such that not all

those people who were found to have CTE post-mortem manifested symptoms while living.

b. Many of the behavioral and mood conditions claimed to be associated with CTE are prevalent within the general public.

c. The NFL Parties would rely on evidence at trial supporting their argument that no conclusions relating to the causes of CTE or the diagnostic and clinical profile of CTE can yet be credibly or reliably established.

d. There is no pre-mortem test that can diagnose CTE.

e. Without requiring a specific pathological finding, the NFL Parties were amenable to a settlement that would compensate Retired NFL Football Players through the specified Qualifying Diagnoses for the most serious conditions that have been described in people diagnosed with CTE post-mortem.

15.    Based on these and other factors, the experienced Class Counsel accepted the terms of the settlement in order to achieve immediate compensation for those whose manifest neurocognitive or neuromuscular conditions that have impaired their lives and to enable those who do not yet manifest those conditions to be tested now, with the assurance that compensation will be provided if one develops a Qualifying Diagnosis in his lifetime.

16.    Class Counsel determined, and the Class Representatives agreed, that the litigation risks were too great (including surviving the motions to dismiss and the other substantial defenses) and the likelihood of prevailing at trial on claims of certain conditions associated with CTE was too low, given the science.

17.     Class Counsel zealously represented the Class and obtained the best result possible in light of the substantial litigation risks.

18.     Despite the individual representation of many Class Members by lawyers outside the ranks of Class Counsel, there were very few opt outs and objections.  Moreover, nineteen Settlement Class Members have revoked their request to opt out.  This is even more compelling in view of the fact that the Class obtained more notice, directly and through the overwhelming media attention to this case, than is likely ever to have been obtained by any other class action settlement.

19.     Additionally, this has been a matter of tight judicial supervision for over a year.  The first settlement structure presented was not preliminarily approved by this Court due to certain concerns that the Court expressed in its opinion.  *See* Memorandum Opinion, dated January 14, 2014 (ECF No. 5657).  The parties re-negotiated, and reached and presented a new deal with an uncapped Monetary Award Fund; and the Court granted Preliminary Approval.  *See* Memorandum Opinion, dated July 7, 2014 (ECF No. 6083).  Following the Fairness Hearing, the Court expressed other specific concerns about certain issues, *see* Order, dated February 2, 2015 (ECF No. 6479), and the parties again worked to address the Court's concerns and presented an amended Settlement Agreement.  *See* Class Action Settlement Agreement (As Amended) (ECF No. 6481-1).  This extraordinary level of judicial oversight demonstrates that the Class has been well represented, that the Class is overwhelmingly better off for the fact of this Settlement, and that Class Counsel have obtained exactly the benefits the Class needed.

20.   Measured against the needs of the Class, the significant Settlement benefits, and the risk of losing everything had this case proceeded through litigation, the Settlement Class meets the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3), and is fair, reasonable and adequate under Federal Rule of Civil Procedure 23(e), as evaluated under the governing standards of *Girsh* v. *Jepson*, 521 F.2d 153 (3d Cir. 1975) and *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998).

21.   The objections to the Settlement are without merit.  First, Objectors repeatedly argue that CTE is not covered by the Settlement.  The objections related to CTE, like most of the other objections raised in this case, involve line-drawing.  Every settlement is subject to line-drawing attacks.  The question is not whether the Settlement is perfect, but whether the lines that have been drawn have a rational basis and were carefully considered.  Although it is always possible to argue that the lines could have been drawn differently, the parameters of this Settlement are fair, reasonable, and adequate.

22.   In addition, Objectors' argument for a CTE exposure subclass misunderstands the role of a representative action.  Class actions are made up of people, not claims.  Under Objectors' own theories, all Class Members are at risk of the brain protein formations that define CTE and the physical manifestations that allegedly may ensue therefrom.  Thus, the Class already included the at-risk population and obtained for them the benefits of medical testing and substantial compensation at the moment of manifestation of compensable conditions.  Accordingly, a "CTE subclass" would include all Class Members and would be indistinguishable from the Class that the Court

10

is certifying.  The request for a "CTE subclass" is, therefore, not a question of distinct representation for a subset of the Class, but rather a variant on the claim that there should be a different compensatory scheme for the class overall—something that is addressed separately. The Class Representatives therefore adequately represent the entire CTE at-risk population of Retired NFL Football Players.

23.     Moreover, the Settlement compensates Retired NFL Football Players who are found to have serious neurocognitive and neuromuscular impairments, including those allegedly associated with the advanced stages of CTE according to Objectors' own experts.  Mood and behavioral disorders—of whatever etiology—are not compensable under the Settlement.  While Class Counsel alleged that these conditions were associated with repetitive head trauma, the NFL submitted evidence that that mood and behavioral disorders are widely distributed across the general population and have multiple proven causes entirely unrelated to football and/or CTE. The fact that the Settlement draws this particular line on compensable conditions at this particular level of severity is an entirely reasonable and fair compromise reflecting both the result of the parties' hard-fought negotiations, and based on scientifically validated issues of causation and proof.

24.     The Objectors' other objections are equally unfounded.  For example, the reductions and Offsets contained in the Settlement for "age at diagnosis" and "Eligible Seasons" are proper proxies for causation and exposure, supported by medical science and concepts of fairness.  Neurocognitive and neuromuscular decline increases as one ages for reasons entirely independent of playing football.  In addition, to the extent Retired NFL Football Players have alleged that playing football caused their

injuries, it is proper to use the amount of time a Retired NFL Football Player played in the NFL as a fair proxy for alleged exposure to repetitive concussive and sub-concussive events.

25.     Finally, the objection that the Settlement imposes unfair administrative burdens on Retired NFL Football Players is meritless.  In fact, Retired NFL Football Players are required to do no more than obtain a diagnosis of an eligible condition from a roster of highly qualified independent medical specialists and submit that information with appropriate supporting documentation to an independent Claims Administrator.  A Retired NFL Football Player seeking millions of dollars of monetary benefits can hardly object to this process.  And the NFL Parties—which have agreed to pay these substantial benefits without any cap—are entitled to a claims process that is fair and free from fraud and abuse.  That is precisely the kind of administrative process that the parties agreed to here and is well supported by applicable case law.  It is also far less than the administrative, financial, and other burdens associated with litigating these claims.  The remainder of the objections are equally meritless.

26.     In conclusion, Co-Lead Class Counsel and the NFL Parties submit that for the reasons set forth above and in the Joint Proposed Findings of Fact and Conclusions of Law in Support of Final Approval of the Class Action Settlement, and for the reasons previously set forth in other filings and at the Fairness Hearing, this Court should certify the Settlement Class, grant final approval of the Settlement and enter the Proposed Final Order and Judgment.

# FINDINGS OF FACT[1]

## I.
## BACKGROUND

**A.      Parties**

27.      Settlement Class Members are: (i) All living NFL Football players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players, or were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and who no longer are under contract to a Member Club and are not seeking active employment as players with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club ("Retired NFL Football Players"); (ii) Authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players ("Representative Claimants"); and (iii) Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player ("Derivative Claimants").    (Settlement Agreement §§ 2.1(ee), (eeee), (ffff).)

28.      The NFL is an unincorporated association of 32 Member Clubs that promotes, organizes and regulates the sport of professional football in the United

---

[1]      To the extent that any of proposed findings of fact might more properly be deemed conclusions of law, they are incorporated within the proposed conclusions of law.

States.  (Def. NFL Rule 5.1 Corporate Disclosure Statement, MDL No. 2323, Doc. No. 3; *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 898 (S.D. Ohio 2007).)

29.     NFLP is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.   NFLP is the authorized representative of the NFL and its Member Clubs for the licensing and protection of their trademarks and logos.  (Def. NFL Properties LLC Rule 5.1 Corporate Disclosure Statement, MDL No. 233, Doc. No. 7; Licensing Pre-Qualification Terms and Conditions, NFL.BIZ, *available at* https://www.nfl.info/NFLConsProd/Welcome /cpAgreement.htm.

30.     The terms and conditions of professional football players' employment are defined by the Collective Bargaining Agreements ("CBAs") that were operative during the players' careers.   The CBAs provide that the Member Clubs and their physicians have certain responsibilities relating to player medical care, including the responsibility for treating player injuries, making return-to-play decisions, and informing players of medical risks associated with continued play.   (*See* Decl. of Dennis L. Curran in Supp. of Defs.' Mot. to Dismiss Am. Master Administrative Compl., Exs. 1-14, Doc. Nos. 3589-3-99.)

**B.      Initial Lawsuits**

31.     In July 2011, the first group of retired professional football players (and the spouses of some of them) filed a lawsuit in the Superior Court of California, Los Angeles County against the NFL Parties and Riddell, Inc., All American Sports Corporation, Riddell Sports Group, Inc., Easton-Bell Sports, Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG Holdings Corp.   *See* Compl*., Maxwell* v. *Nat'l*

*Football League*, No. BC465842 (Cal. Super. Ct. July 19, 2011) (the "*Maxwell* Complaint").

32.     After *Maxwell*, similar lawsuits were filed in the Superior Court of California, Los Angeles County (*Barnes* v. *Nat'l Football League*, BC468483 and *Pear* v. *Nat'l Football League*, LC094453) and in this Court (*Easterling* v. *Nat'l Football League*, 11-cv-05209).

33.     These complaints alleged claims against the NFL Parties seeking relief for alleged repetitive head trauma injuries sustained during the playing careers of Retired NFL Football Players.  *See*, *e.g.*, *Maxwell* Compl.

34.     The NFL Parties removed *Maxwell*, *Pear*, and *Barnes* to the United States District Court for the Central District of California on the basis of federal question jurisdiction under Section 301 of the Labor Management and Relations Act ("LMRA"), asserting that plaintiffs' claims arose from or the resolution thereof substantially depended on an interpretation of terms of the CBAs and thus were preempted by Section 301.  *See*, *e.g.*, Notice of Removal, *Maxwell*, No. 2:11-cv-08394, Doc. No. 1 (C.D. Cal. Oct. 11, 2011).  Plaintiffs moved to remand.  *See*, *e.g.*, Pls.' Mot. to Remand, *Maxwell*, No. 11-cv-08394, Doc. No. 21 (C.D. Cal. Nov. 7, 2011).

35.     On December 8, 2011, the United States District Court for the Central District of California denied plaintiffs' remand motion and held that plaintiffs' negligence claims were preempted because they were "inextricably intertwined with and substantially dependent upon an analysis of certain CBA provisions imposing duties on the clubs with respect to the medical care and treatment of NFL players."

Order Den. Pls.' Mot. to Remand at 1-2, *Maxwell*, No. 2:11-cv-08394, Doc. No. 58 (C.D. Cal. Dec. 8, 2011).

36.     Following the denial of plaintiffs' motion to remand, the NFL (and NFLP, where applicable) moved to dismiss the amended complaints in *Maxwell, Pear, Barnes* and *Easterling* (which was a purported class action) on numerous grounds, including preemption, failure to state a claim, and statutes of limitations.  *See, e.g.*, Defs.' Mot. to Dismiss, *Easterling*, No. 2:11-cv-05209, Doc. No. 19 (E.D. Pa. Nov. 9, 2011); Defs.' Mot. to Dismiss, *Maxwell*, No. 2:11-cv-08394, Doc. No. 67 (C.D. Cal. Dec. 20, 2011).

**C.     MDL 2323 and Plaintiffs' Allegations**

37.     On January 31, 2012, prior to a decision on those motions to dismiss and by motion of the NFL Parties, the Judicial Panel on Multidistrict Litigation consolidated *Maxwell, Pear, Barnes* and *Easterling* in this Court as *In re: National Football League Players' Concussion Injury Litigation* ("MDL 2323").   (Transfer Order, Doc. No. 1, MDL 2323.)  Since that time, more than 5,000 former players have filed over 300 substantially similar lawsuits, nearly all of which have been consolidated in this Court.  (Mem. Op., July 7, 2014 at 21, Doc. No. 6083.)

38.     On April 26, 2012, this Court appointed Co-Lead Counsel (Christopher A. Seeger, Esq.), an Executive Committee, and a Steering Committee for Plaintiffs. (Case Mgmt. Order No. 2 ("CMO No. 2") at 1-2, Doc. No. 64; *see also* Case Mgmt. Order No. 3, Doc. No. 72 (appointing Sol Weiss as additional Co-Lead Counsel and appointing additional members of the Steering Committee).)

39.     In an effort to streamline the hundreds of cases in MDL 2323, the Court ordered Plaintiffs to submit both a Master Administrative Long-Form Complaint

("MAC") and a Master Administrative Class Action Complaint ("MACAC," and together with the MAC, the "Complaints"), which were filed on June 7, 2012.  (Doc. Nos. 83-84; *see also* CMO No. 2 at 3.)  The MAC was amended on July 17, 2012.  (Doc. No. 2642 (the "Am. MAC").)  These Complaints superseded all complaints previously filed by individual plaintiffs and all putative class action complaints pleading nationwide classes, and together with each Plaintiff's Short-Form Complaint, became the operative pleadings.  (Case Mgmt. Order No. 4 ("CMO No. 4") ¶ 1, Doc. No. 98.)

40.    Plaintiffs alleged that the NFL had a "duty to provide players with rules and information to protect the players as much as possible from short-term and long-term health risks" of repetitive traumatic brain injuries, a duty "to take all reasonable steps necessary to ensure the safety of players," including "promulgat[ing] rules affecting the return-to-play rules when concussive events are detected," and a "duty to advise Plaintiffs" that "the repeated traumatic head impacts the Plaintiffs endured while playing NFL football were likely to expose them to excess risk to neurodegenerative disorders."  (Am. MAC ¶¶ 6, 90, 248, 333.)

41.    Among those neurodegenerative disorders—like dementia, Alzheimer's Disease and ALS—Plaintiffs alleged that the repetitive head trauma sustained while playing football causes the "gradual build-up of Tau protein" which, in turn, causes CTE.  (*Id*. ¶ 251.)  Plaintiffs alleged that CTE causes "neuro-cognitive changes over time" that manifest in "varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage and, sometimes, fully developed encephalopathy."  (*Id*. ¶¶ 254-55.)  Plaintiffs alleged that the NFL breached purported duties by failing "to

inform NFL players of the risks associated with MTBI [mild traumatic brain injury]," and failing "to warn and/or impose safety regulations governing this health and safety problem." (*Id.* ¶¶ 8-9.)  Plaintiffs accused the NFL of failing "to exercise reasonable care." (*See, e.g., id.* ¶ 346.)

42.     Plaintiffs also alleged that the NFL misled Plaintiffs and "willfully and intentionally concealed from" them the "heightened risk" of neurodegenerative disorders, and "concealed from then-current NFL players and former NFL players the risks of head injuries in NFL games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury." (*Id.* ¶¶ 248, 276.)  Plaintiffs further claimed that, "[b]efore June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms," and allowed members of its Mild Traumatic Brain Injury Committee (the "MTBI Committee") "to mislead the Plaintiffs" regarding "the permanent brain injury risks associated with repetitive head impacts in the game of football." (*Id.* ¶¶ 308, 374, 381.)

43.     Plaintiffs purported to assert claims against the NFL for negligence, medical monitoring, fraudulent concealment, fraud, negligent misrepresentation, negligent hiring, negligent retention, wrongful death and survival, "civil conspiracy/fraudulent concealment," loss of consortium, and declaratory relief, and, against NFLP, for "civil conspiracy/fraudulent concealment." (*Id.* ¶¶ 246-382, 422-25, and Prayer for Relief.)  Plaintiffs sought declaratory relief, "an injunction and/or other

equitable relief against the NFL and in favor of the Plaintiffs for the requested medical monitoring," and compensatory and punitive damages.  (*Id*., Prayer for Relief.)

44.     Plaintiffs claimed that the NFL Parties' actions caused them to suffer a variety of purported injuries, including headaches, depression, dementia, ALS, Alzheimer's Disease, CTE, loss of memory, sleeplessness, mood swings, personality changes, confusion, the inability to function, dizziness, deficits in cognitive functioning, and reduced processing speed, attention and reasoning.  (*Id*. ¶¶ 18, 58, 72-74, 214, 245.)

## D.     Motion to Dismiss Based on Section 301 LMRA Preemption

45.     As part of its initial case management orders, the Court determined that the NFL Parties' threshold preemption defense under Section 301 of the LMRA should be heard before proceeding to the merits of the litigation.  (CMO No. 2 at 2-3; CMO No. 4 ¶ 3.)  Accordingly, the Court stayed all other matters, including discovery, and denied a pending discovery motion filed by Co-Lead Counsel Sol Weiss.  (*See* Order, Aug. 21, 2012, Doc. No. 3384.)

46.     The NFL Parties filed their motions to dismiss the Complaints on preemption grounds on August 30, 2012.  (Defs.' Mot. to Dismiss Am. MAC, Doc. No. 3589; Defs.' Mot. to Dismiss MACAC, Doc. No. 3590.)  The NFL Parties argued that, to resolve Plaintiffs' claims, the Court would be required to interpret the CBAs to determine whether the NFL had any pertinent duties, the scope of any such duties, and the reasonableness of the NFL Parties' conduct in light of the CBA provisions.  (*See* Defs.' Mem. in Supp. of Mot. to Dismiss Am. MAC, Doc. No. 3589-1; Defs.' Mem. in Supp. of Mot. to Dismiss MACAC, Doc. No. 3590-1.)

47.     Two district courts considering the very claims presented in MDL 2323 had already held that the "physician provisions" of the CBAs "must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  Order Den. Pls.' Mot. to Remand at 1-2, *Maxwell*, No. 2:11-cv-08394, Doc. No. 58 (C.D. Cal. Dec. 8, 2011) (denying plaintiffs' motion to remand); *see also* Order Den. Pls.' Mot. to Remand at 1-2, *Pear* v. *Nat'l Football League*, No. 2:11-cv-08395, Doc. No. 61 (C.D. Cal. Dec. 8, 2011) (same); Order Den. Pls.' Mot. to Remand at 1-2, *Barnes* v. *Nat'l Football League*, No. 2:11-cv-08396, Doc. No. 58 (C.D. Cal. Dec. 8, 2011) (same); *see also Duerson* v. *Nat'l Football League*, 2012 WL 1658353, at \*4, 6 (N.D. Ill. May 11, 2012) (denying remand and holding that the plaintiffs' claims were preempted because the court could "plausibly interpret [the player health and safety CBA provisions] to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football" such that the "NFL could then reasonably exercise a lower standard of care in that area itself").  In addition, other courts have held that a football player's tort claims against the NFL and/or its Member Clubs are preempted under Section 301.  *See Williams* v. *Nat'l Football League*, 582 F.3d 863, 881-82 (8th Cir. 2009); *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178-79 (N.D.N.Y. 1990); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412-14 (N.C. Ct. App. 2009).

20

48.     Plaintiffs argued that Section 301 of the LMRA did not preempt their claims because their claims arose from the NFL Parties' actions and relationship with Plaintiffs—not from CBA duties—and to the extent any CBA provisions were applicable to their claims, the Court would not need to interpret those provisions.  (*See* Pls.' Opp. to Mot. to Dismiss Am. MAC at 2, Doc. No. 4130.)

49.     The parties completed briefing on January 28, 2013, and the Court heard oral argument on April 9, 2013.  (*See, e.g.,* Pls.' Surreply, Jan. 28, 2013, Doc. No. 4589; PDF File with Audio File Attach., Apr. 9, 2013, Doc. No. 4737.)

## II.
## SETTLEMENT AGREEMENT

### A.     Negotiation of the Settlement Agreement

50.     Prior to ruling on the NFL Parties' motions to dismiss, the Court ordered the NFL Parties and Co-Lead Counsel to mediation under the supervision of retired United States District Court Judge Layn R. Phillips to determine whether settlement was possible.  (Order, July 8, 2013, Doc. No. 5128.)

51.     During the negotiations, multiple law firms and individual counsel were involved on behalf of both sides, presenting "an impressive array of legal experience, talent, and expertise."  (Decl. of Layn R. Phillips ("Phillips Decl.") ¶ 7, Doc. No. 6073-4.)

52.     Plaintiffs were represented by "highly experienced, effective and aggressive counsel," including Co-Lead Class Counsel, Christopher A. Seeger and Sol Weiss, and Subclass Counsel, Arnold Levin and Dianne M. Nast (Subclass Counsel for Subclasses 1 and 2, respectively).  (*Id.*)

53.    Co-Lead Class Counsel and Subclass Counsel have substantial experience in class actions, mass torts, complex personal injury suits, and multidistrict litigation, having served as lead counsel and/or as members of the plaintiffs' executive committees or steering committees on over one-hundred actions, including significant actions in this District.  (*See* Decl. of Christopher A. Seeger ("Seeger Decl.") ¶¶ 2, 5, 32, Doc. No. 6423-2; Decl. of Dianne M. Nast ("Nast Decl.") ¶¶ 2-4, Doc. No. 6423-11; Decl. of Arnold Levin ("Levin Decl.") ¶¶ 2, 3, 15, Doc. No. 6423-10.)  In addition, Co-Lead Class Counsel thoroughly investigated the claims brought in the Complaints (including by creating and maintaining a comprehensive database of the Plaintiffs' claims and symptoms), retained medical and economic experts, were well-versed in the relevant medical literature and issues, and having completed extensive briefing on the NFL Parties' preemption motions to dismiss, had a thorough and adequate appreciation of the merits of the preemption arguments.  (*See* Seeger Decl. ¶¶ 19-22, 25, 30, 32.)

54.    Although Co-Lead Class Counsel took the lead on negotiating the settlement, counsel for the two Subclasses played an active role in the mediation process.  (Levin Decl. ¶¶ 5, 9; Nast Decl. ¶¶ 6, 9.)

55.    Under Judge Phillips's supervision, the parties conducted "arm's-length, hard-fought negotiations" for over two months.  (Phillips Decl. ¶ 5; *see also* Seeger Decl. ¶¶ 27, 31-32.)  During this time, the parties met for "more than twelve full days" of formal mediation and spent "considerable hours" negotiating outside the formal sessions during which the parties discussed issues relating to possible settlement with the mediator "[o]n almost every day between [his] appointment as mediator and the announcement of the settlement."  (Phillips Decl. ¶¶ 5-6.)  "[T]he parties aggressively

asserted their respective positions on a host of issues," and Judge Phillips "was satisfied throughout the negotiations that the parties' positions were thoroughly explored and advanced." (*Id.* ¶ 7.)

56.     On August 29, 2013, the parties executed a term sheet setting forth the "principal terms of a settlement." (*See* Order, Aug. 29, 2013, Doc. No. 5235.)

57.     Following the announcement of the August 29, 2013 term sheet, the parties proceeded to negotiate the detailed terms of the settlement agreement itself. These continued negotiations remained at arm's-length and hard-fought. (*See* Seeger Decl. ¶ 34; Suppl. Decl. of Layn R. Phillips ("Phillips Suppl. Decl.") ¶¶ 2, 4, Doc. No. 6423-6.)

58.     On January 6, 2014—after over four months of additional negotiations—Co-Lead Class Counsel submitted a motion for preliminary approval of a Class Action Settlement incorporating the terms of the August 29, 2013 term sheet. (Mem. in Supp. of Prelim. Approval at 3, Jan. 6, 2014, Doc. No. 5634-5.) This settlement agreement limited the funding of the Monetary Award Fund to $675 million, which the parties and their actuarial and economic experts believed was sufficient to pay all benefits throughout the 65-year term of the proposed settlement. (Class Action Settlement Agreement § 23.1, Jan. 6, 2014, Doc. No. 5634-2; Report of the Segal Group to Special Master Perry Golkin ¶¶ 19-20, Doc. No. 6168.)

59.     Also on January 6, 2014, Co-Lead Class Counsel, Class Counsel, and Subclass Counsel filed the *Turner* Complaint on behalf of named Plaintiffs Kevin Turner and Shawn Wooden. (Mot. for Prelim. Approval, Jan. 6, 2014, Doc. No. 5634.) The *Turner* Complaint is substantially similar to the Am. MAC and MACAC, and

includes additional allegations relating to class treatment.  *See* Compl., *Turner* v. *Nat'l Football League*, No. 2:14-cv-00029, Doc. No. 1 (E.D. Pa. Jan. 6, 2014).

60.   Approximately one week later, the Court denied the motion for preliminary approval of the settlement and preliminary class certification without prejudice.  (Mem. Order Den. Mot. for Prelim. Approval, Jan. 14, 2014, Doc. No. 5657.)  The Court expressed concern as to the adequacy of the proposed $675 million Monetary Award Fund and assigned Special Master Perry Golkin—who was previously appointed by the Court on December 16, 2013 in light of the "expected financial complexity of the proposed settlement"—to supervise the parties' efforts to reach a revised settlement.  (*Id.* at 10-12; Order Appointing Special Master at 1, Doc. No. 5607.)

61.   The parties negotiated for an additional five months, during which time they were assisted by Special Master Golkin, numerous medical experts (including the NFL Parties' experts Dr. Kristine Yaffe and Dr. Scott Millis, and Class Counsel's expert Dr. John Keilp), and actuaries and economists (including the NFL Parties' consultants at The Segal Group and Class Counsel's consultants at Analysis Research Planning Corp).  (*See, e.g.*, Seeger Decl. ¶ 61.)

62.   Class Counsel and the NFL Parties financially restructured the settlement to ensure that during the entire term "all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related claimants will be paid." (Mem. Op. at 10, July 7, 2014, Doc. No. 6083.)  These further negotiations resulted in an uncapped Monetary Award Fund, thereby guaranteeing payment to Settlement Class Members with Qualifying Diagnoses no matter when in the Settlement Agreement's

65-year term they receive their Qualifying Diagnoses (except for Death with CTE). (*See* Settlement Agreement § 6.10.)  In addition, the parties strengthened the anti-fraud provisions.  (*See* Seeger Decl. ¶ 62.)  On June 25, 2014, Co-Lead Class Counsel, Class Counsel, and Subclass Counsel filed a motion for preliminary approval of the revised proposed settlement agreement and preliminary class certification.  (Mot. for Prelim. Approval, June 25, 2014, Doc. No. 6073.)

63.     On July 7, 2014, the Court granted the motion for preliminary approval of the Settlement Agreement and preliminary class certification.  (Mem. Op., July 7, 2014, Doc. No. 6083.)  The Court concluded there were no obvious deficiencies in the Settlement Agreement, it appeared to be "the product of good faith, arm's-length negotiations," "proposed Co-Lead Class Counsel, Class Counsel and Subclass Counsel possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties," and the Settlement Agreement did "not appear to provide undue preferential treatment to any individual Settlement Class Member or Subclass."  (*Id*. at 9-11.)

64.     In addition, the Court established a process and schedule for Settlement Class Members to object to or to opt out of the Settlement Agreement.  (Order, July 7, 2014, Doc. No. 6084, ¶¶ 4-5.)  Pursuant to the Court's order, Settlement Class Members had until October 14, 2014 to file written objections or an opt-out request. (*Id*. ¶¶ 4(g)-(h).)  The Court also ordered that a Fairness Hearing be held on November 19, 2014 to determine whether to finally approve the Settlement Agreement as fair, reasonable and adequate, and finally certify the Settlement Class.  (*Id*. ¶ 5.)  The Court

required Settlement Class Members wishing to be heard at the Fairness Hearing to submit a written notice to the Court by November 3, 2014.  (*Id.* ¶ 4(i).)

**B.     The Settlement Agreement**

65.     The Settlement Agreement provides: (i) an uncapped, inflation-adjusted 65-year Monetary Award Fund for making payments to all Retired NFL Football Players (and their Representative Claimants or Derivative Claimants) who have or receive in the future a Qualifying Diagnosis, as defined in Exhibit 1 of the Settlement Agreement; (ii) a $75 million BAP that provides a baseline neuropsychological and neurological evaluation of each qualified Retired NFL Football Player and BAP Supplemental Benefits in the form of certain medical benefits to those diagnosed with Level 1 Neurocognitive Impairment; and (iii) a $10 million Education Fund to support safety and injury prevention programs for football players of all ages and to educate Settlement Class Members regarding the NFL's existing medical and disability programs.  (Settlement Agreement §§ 2.1(ii), 5.1, 5.11, 5.14, 6.9, 6.10, 12.1.)

66.     The Settlement Class is divided into two Subclasses.  (*Id.* § 1.2.) Subclass 1 consists of Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.  (*Id.* § 1.2(a).)  Subclass 2 consists of Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of

the Preliminary Approval and Class Certification Order and who received a postmortem diagnosis of CTE.  (*Id*. § 1.2(b).)

67.      Shawn Wooden is the preliminarily appointed Subclass Representative for Subclass 1.  (Order, July 7, 2014, Doc. No. 6084, ¶ 2(c)(i); *see also* Settlement Agreement § 2.1(yyyy).)  Wooden is a Retired NFL Football Player who has not been diagnosed with a Qualifying Diagnosis.  (Aff. of Shawn Wooden ("Wooden Aff.") ¶ 1, Doc. No. 6423-8.)  Wooden alleges that he sustained repetitive traumatic head impacts during NFL games and/or practices, and that he is at increased risk of developing a range of neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries, such as dementia, Alzheimer's Disease, Parkinson's Disease, and/or ALS.  (*Id*. ¶¶ 1-2; *see also* Compl. ¶ 125, *Wooden* v. *Nat'l Football League*, No. 1:12-cv-20269, Doc. No. 1 (S.D. Fla. Jan. 24, 2012).)  Since his retirement from football, Wooden has experienced neurological symptoms, including migraine headaches, sleep problems, concentration issues, and mood swings.  (Wooden Aff. ¶ 1.)  Wooden (along with the other members of Subclass 1) does not know which, if any, Qualifying Diagnoses he may develop.

68.      Subclass Counsel Arnold Levin met with Wooden concerning the proposed settlement agreement while negotiations were ongoing.[2]  (Wooden Aff. ¶¶ 4-5, 7; Levin Decl. ¶ 8.)

69.      Kevin Turner is the preliminarily appointed Subclass Representative for Subclass 2.  (Order, July 7, 2014, Doc. No. 6084, ¶ 2(c)(ii); *see also* Settlement

---

[2]      The role of Subclass Representative 1 was originally filled by Retired NFL Player Corey J. Swinson.  (Levin Decl. ¶ 9.)  Mr. Swinson unexpectedly passed away on September 10, 2013; after Mr. Swinson's unfortunate passing, Mr. Wooden assumed the role of Subclass 1 Representative.  (*Id*.)

Agreement § 2.1(yyyy).)   Turner is a Retired NFL Football Player who has been diagnosed with ALS.  (Aff. of Kevin Turner ("Turner Aff.") ¶¶ 2-3, Doc. No. 6423-7.) Turner alleges that he sustained repetitive, traumatic sub-concussive and/or concussive head impacts during NFL games and/or practices, and that he suffers from symptoms of brain injury caused by those head impacts.  (*Id.* ¶ 5.)

70.     Subclass Counsel Diane Nast met with Turner concerning the proposed settlement agreement while negotiations were ongoing.  (*Id*. ¶¶ 6-7, 9; Nast Decl. ¶¶ 6, 9.)

## 1.     The Monetary Award Fund

### (a)     Overview

71.     The Monetary Award Fund is a 65-year, uncapped, inflation-adjusted fund from which Settlement Class Members will receive Monetary and Derivative Claimant Awards for Qualifying Diagnoses, in accordance with the terms of the Settlement Agreement.  (Settlement Agreement Art. VI.)

72.     Every Settlement Class Member who timely registers and qualifies for a Monetary Award or Derivative Claimant Award during the Settlement's 65-year term is guaranteed a Monetary Award or Derivative Claimant Award.  (*Id*. § 6.10.)

73.     If, after receiving an initial Monetary Award, a Retired NFL Football Player later receives a different Qualifying Diagnosis, that Retired NFL Football Player (or his Representative Claimant, if applicable) may receive a Supplemental Monetary Award—representing the difference between the two awards—to ensure that he receives the maximum award to which he is entitled.  (*Id*. § 6.8.)

(b)    **Qualifying Diagnoses**

(i)    **Overview of the Qualifying Diagnoses**

74.    The Qualifying Diagnoses are Level 1.5 Neurocognitive Impairment (early Dementia), Level 2 Neurocognitive Impairment (moderate Dementia), Alzheimer's Disease, Parkinson's Disease, ALS, and Death with CTE.  (*Id*. § 6.3(a).)

75.    Levels 1.5 and 2.0 Neurocognitive Impairment (and Level 1.0 Neurocognitive Impairment (moderate cognitive impairment), for which BAP Supplemental Benefits are available, are based on well-established and scientifically validated principles and guidelines, including the National Alzheimer's Coordinating Center's Clinical Dementia Rating ("CDR") scale and the Neurocognitive Disorders section of the most recent version of the Diagnostic and Statistical Manual for Mental Disorders ("DSM-5").   (Decl. of Scott R. Millis, PhD ("Dr. Millis Decl.") ¶ 32, Doc. No. 6422-34; Decl. of John G. Keilp, PhD ("Dr. Keilp Decl.") ¶ 24, Doc. No. 6423-20.)

76.    Diagnoses of Alzheimer's Disease or Parkinson's Disease must meet the definitions contained in the World Health Organization's International Classification of Diseases, 9th or 10th Editions ("ICD-9" and "ICD-10", respectively), or alternatively the definitions of DSM-5.  (Settlement Agreement Ex. 1, a 4-5.)  ALS must meet the definitions contained in ICD-9 or ICD-10.  (*Id*.)

77.    Except for Death with CTE, a Settlement Class Member may receive a Qualifying Diagnosis before the Effective Date of the Settlement by being examined by an appropriately credentialed physician and diagnosed based on the diagnostic criteria set forth in the Settlement Agreement. (*See* Settlement Agreement § 6.3(a), Settlement Agreement Ex. 1.)

29

78.   A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, except that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.  (Settlement Agreement § 6.3(f).)

79.   Following the Effective Date of the Settlement, a Qualifying Diagnosis (except Death with CTE) must be made by a Qualified MAF Physician or a Qualified BAP Provider.  (*See* Settlement Agreement §§ 5.2, 6.3(b), Settlement Agreement Ex. 1.)

80.   A Qualified MAF Physician is defined as a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician who is part of an approved list of physicians authorized to make Qualifying Diagnoses.  (*Id*. §§ 2.1(www), 6.5(b).)   The Qualified MAF Physicians are selected by the Claims Administrator pursuant to criteria intended to reduce any burden on Retired NFL Football Players, including based on geographic proximity to retired players and insurance coverage and accessibility. (*Id*. § 6.5(b).)   The approval right of Co-Lead Class Counsel and Counsel for the NFL Parties may "not be unreasonably withheld." (*Id*. § 6.5(a).)   The Claims Administrator has the power to address logistical issues, such as the expense of travel, that may make it difficult for a Retired NFL Football Player to visit a Qualified MAF Physician and which create unreasonable hardships for Retired NFL Football Players (in consultation with Co-Lead Class Counsel, Counsel

for the NFL Parties and the Special Master to be appointed by the Court to oversee the Settlement).  (*See id*. § 10.2(b)(8).)

81.    A Qualified BAP Provider is defined as a neuropsychologist certified by the American Board of Professional Psychology or the American Board of Clinical Neuropsychology, a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, or a board-certified neurologist, and is part of an approved list of medical professionals eligible to conduct baseline assessments of Retired NFL Football Players under the BAP.  (*Id*. §§ 2.1(vvv), 5.7.)

82.    Class Counsel submitted evidence that in their view established an association between mild repetitive traumatic brain injury ("TBI") and the Qualifying Diagnoses.  (*See, e.g.*, Seeger Decl. ¶ 22.)

83.    The NFL Parties submitted evidence that the nature of any association between mild repetitive TBI and the Qualifying Diagnoses is not clear, and that no causal association between mild repetitive TBI and any Qualifying Diagnosis has been established.  (*See* Decl. of Dr. Kristine Yaffe ("Dr. Yaffe Decl.") ¶ 39, Doc. No. 6422-36.)  The NFL Parties also submitted evidence that there is no scientific or medical consensus or certainty about the role that concussions play in later-life impairment, the incidence and prevalence of injury in former professional athletes, including football players, and the role of other genetic, environmental or lifestyle factors (such as age, a specific genetic profile or gene, obesity, cardiovascular disease, depression, post-traumatic stress disorder, or substance abuse) in neurocognitive impairment and neurological disease.  (*See id*. ¶¶ 14-15; Decl. of Douglas M. Burns ("Burns Decl."), Nov. 12, 2014, Ex. 6, Christopher Randolph, Stella Karantzoulis & Kevin Guskiewicz,

*Prevalence and Characterization of Mild Cognitive Impairment in Retired National Football League Players*, 19 J. Int'l Neuropsychological Soc'y 873, 877 (2013), Doc. No. 6422-7 ("[T]here has not yet been a well-controlled study exploring the prevalence of long-term cognitive or behavioral impairment in . . . American football . . . [and n]o prospective study has explored the prevalence of any particular neuropathological finding . . . in these athletes compared to non-athlete controls."); *see also* Phillips Decl. ¶¶ 5-7, 18-19.)

84.     Although the Settlement compensates Qualifying Diagnoses, a Settlement Class Member need not prove that participation in the NFL caused the Qualifying Diagnosis, or that the NFL Parties are legally responsible for his injuries, to receive a Monetary Award.

### (ii)     The Settlement Does Not Compensate Other Conditions

85.     The Settlement does not provide Monetary Awards for conditions other than the Qualifying Diagnoses.  (*See* Settlement Agreement § 6.2(a).)

### (A)     CTE Pathology Post Final Approval

86.     Post Final Approval, a post-mortem diagnosis of CTE is not compensated, except where a Retired NFL Football Player died between July 7, 2014 and the Final Approval Date and receives a post-mortem diagnosis of CTE by a board-certified neuropsychologist within 270 days from his date of death.  (Settlement Agreement § 6.3(f).)

87.     As of today, CTE can only be diagnosed post-mortem, and is reportedly characterized by distinct neuropathological findings of tau protein.  (Decl. of Dr. Julie Ann Schneider ("Dr. Schneider Decl.") ¶¶ 21-23, Doc. No. 6422-35; Dr. Yaffe Decl. ¶ 55; Decl. of Dr. Kenneth C. Fischer ("Dr. Fischer Decl.") ¶ 10, Doc. No. 6423-17.)

88.     The Settlement Agreement does not compensate for the mere presence of tau proteins in the brain.  Indeed, the presence of such proteins does not always manifest in the showing of symptoms.  (*See* Dr. Schneider Decl. ¶¶ 44, 47 (one-third of older persons who die without cognitive impairment have undiagnosed full Alzheimer's Disease pathology in their brains, and it is not yet known whether individuals who have CTE pathology will necessarily exhibit symptoms during life); Decl. of David Allen Hovda, PhD ("Dr. Hovda Decl.") ¶ 24, Doc. No. 6423-19 ("We know from studies of Alzheimer's disease that there are those patients with Alzheimer's pathology post-mortem that were asymptomatic while alive[.]"); *see also* Dr. Yaffe Decl. ¶ 72 (noting Stern Study included three subjects diagnosed post-mortem with CTE who were asymptomatic while living).)  Rather, the Settlement compensates neurocognitive or neuromuscular impairments that are manifest and materially impact daily life irrespective of pathological cause.  (Dr. Yaffe Decl. ¶¶ 82-83; Dr. Schneider Decl. ¶¶ 43-51.)

89.     The NFL Parties submitted evidence illustrating the current state of scientific knowledge regarding CTE.  For example, to date there have been no published prospective, longitudinal or cross-sectional studies regarding CTE; the only available studies are case reports that look retrospectively at exposure and outcomes, and do not have control groups.  (Dr. Schneider Decl. ¶¶ 20, 24, 26; Dr. Yaffe Decl. ¶¶ 56-58, 66, 74; Dr. Millis Decl. ¶ 27; *see also* Dr. Fischer Decl. ¶ 11; Decl. of Richard Allen Hamilton, PhD ("Dr. Hamilton Decl.") ¶ 33, Doc. No. 6423-25; Burns Decl. Ex. 14, Jesse Mez, Robert A. Stern & Ann C. McKee, *Chronic Traumatic Encephalopathy: Where Are We and Where Are We Going?*, 13 Current Neurology & Neuroscience Rep.

407, 415 (2013), Doc. No. 6422-15 ("As noted throughout this review, CTE research is just beginning."); Burns Decl. Ex. 8, Nat'l Insts. of Health, *Report on the Neuropathology of Chronic Traumatic Encephalopathy Workshop* (2012), Doc. No. 6422-9 (listing various outstanding questions regarding CTE)).

90.     The NFL Parties also submitted evidence that the cause of CTE, or even its association with football, is currently unknown.  (Dr. Yaffe Decl. ¶¶ 66-67, 78-79 ("Because of the limited research available on CTE, and the lack of long-term, prospective studies, very little is known about CTE.  The scientific community does not completely understand the cause or causes of CTE.  Nor does the scientific community understand the diagnostic and clinical profile of CTE."); Dr. Schneider Decl. ¶¶ 24, 27-28 ("Because of the limited number of studies available, and the nature of the case reports that have been published, it is my opinion that we do not know enough about CTE to adequately understand its risk factors, the relation between repetitive TBI and CTE, or the diagnostic and clinical profile of CTE."); *see also* Decl. of Dr. Christopher C. Giza ("Dr. Giza Decl.") ¶ 18, Doc. No. 6423-18 ("There is ongoing discussion in the scientific community but general agreement that our understanding of CTE is early and incomplete with regards to causality, epidemiology and clinical characterization."); Dr. Hovda Decl. ¶¶ 20-23 ("Inferring the presence of CTE pathology from the presence of various clinical and symptomatic manifestations in living patients is, in my opinion, scientifically unsupported."); Dr. Hamilton Decl. ¶¶ 30-33; Burns Decl. Ex. 15, Andrew Gardner et al., *Chronic Traumatic Encephalopathy in Sport: A Systematic Review*, 48 Brit. J. Sports Med. 84, 89 (2014), Doc. No. 6422-16 (stating that because no current "large-scale, prospective, longitudinal, clinicopathological studies" have yet

occurred regarding CTE, "it is important to conduct systematic research [regarding CTE] to address specific unanswered questions," including the "clinical characteristics" of CTE, whether CTE has a genetic component, whether CTE causes neuropsychiatric symptoms, and the establishment of diagnostic criteria for CTE); Burns Decl. Ex. 7, Paul McCrory et al., *Consensus Statement on Concussion in Sport:  The 4th International Conference on Concussion in Sport Held in Zurich, November 2012*, 47 Brit. J. Sports Med. 250, 257 (2013), Doc. No. 6422-8 (consensus statement agreeing "that CTE was not related to concussions alone or simply exposure to contact sports" and that "[o]wing to the nature of the case reports and pathological case series that have been published, it is not possible to determine the causality or risk factors with any certainty" and thus "the speculation that repeated concussion or subconcussive impacts cause CTE remains unproven"); Burns Decl. Ex. 9, Inst. of Med. of the Nat'l Acads., *Sports-Related Concussions in Youth: Improving the Science, Changing the Culture* (2013), Doc. No. 6422-10 ("[I]t remains unclear whether repetitive head impacts and multiple concussions sustained in youth lead to long-term neurodegenerative diseases, such as chronic traumatic encephalopathy[.]"); Burns Decl. Ex. 11, Ann C. McKee et al., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43, 61 (2013) (the "McKee Study"), Doc. No. 6422-12 ("[N]o generalizations regarding the incidence and prevalence of CTE in living athletes and veterans can be made."); Decl. of Eric R. Nitz, Oct. 6, 2014, Ex. 12, Robert Stern et al., *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1123, 1127 (2013), Doc. No. 6201-4 (the "Stern Study") (concluding that "[f]uture research is needed to clarify the clinical presentation of CTE" and warning against interpreting and generalizing its results

35

because "there was no comparison group of former athletes without CTE," which "may limit the ability to draw conclusions that the clinical presentation described is specifically due to the effects of CTE."); Burns Decl. Ex. 8, Nat'l Insts. of Health, *Report on the Neuropathology of Chronic Traumatic Encephalopathy Workshop* (2012), Doc. No. 6422-9 ("[V]ery few studies have looked at biomarkers that address the long-term disease processes of CTE. Much work remains to identify useful, validated biomarkers that provide information about the injury mechanisms of CTE.").)

91.    Class Counsel were well aware of all of the scientific and medical literature related to TBI and CTE, including the McKee Study and the Stern Study. (*See* Seeger Decl. ¶ 18.)

92.    The McKee Study and the Stern Study are the two case studies relied upon by Objectors to link head trauma and CTE.  (*See, e.g.,* Morey Obj., Doc. No. 6201.)  The McKee Study reviewed the pathology of 85 brains that belonged to deceased former athletes, military veterans, and civilians with a history of repetitive mild TBI.  (Dr. Yaffe Decl. ¶¶ 69-70.)  It concluded that CTE is a progressive disease in four stages—CTE I through IV—and ascribed symptoms to each stage based on retrospective phone calls to family members of the decedents.  (*Id.* at 51-60; *see also* McKee Study at 45.)  The Stern Study used the same methodology to assess further the clinical symptoms allegedly associated with CTE.  (Dr. Yaffe Decl. ¶ 72; *see also* Stern Study at 1123.)

93.    In reporting the symptoms associated with each stage, the McKee Study concluded that memory problems, attention and concentration problems, and executive dysfunction were associated with all four stages, especially stages III and IV.  (McKee

Study at 51-59.)   Similarly, the Stern Study found that out of the 33 symptomatic patients (3 were asymptomatic, including 2 former professional football players), almost 85% experienced memory impairment, almost 79% experienced executive dysfunction, almost 73% experienced attention and concentration difficulties, almost 58% experienced language impairment, and 54.5% experienced visuospatial difficulties.  (Dr. Yaffe Decl. ¶ 72; *see also* Stern Study at 1126-27.)  The Qualifying Diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment specifically measure the existence of neurocognitive impairment in these cognitive domains.  (*See* Dr. Millis Decl. ¶¶ 16, 18, 21.)

94.    In addition, the McKee Study reported that "[t]hirty-one of the 34 former professional American football players had stage III–IV CTE or CTE plus co-morbid disease (89%)."   (McKee Study at 59.)  "CTE plus co-morbid disease" refers to players who were diagnosed with CTE and one of the following:  Alzheimer's Disease, Parkinson's Disease, ALS, or frontotemporal dementia.  (McKee Study at 61; *See* Dr. Yaffe Decl. ¶¶ 70, 80, 84; Dr. Schneider Decl. ¶¶ 31, 49, 51-52.)  Alzheimer's Disease, Parkinson's Disease and ALS are Qualifying Diagnoses.   In addition, dementia is compensated under the Settlement Agreement through the Qualifying Diagnoses of Level 1.5 and Level 2 Neurocognitive Impairment.  (*See* Dr. Millis Decl. ¶¶ 16, 18, 21.)

95.    The Settlement Agreement tests for neurocognitive deficits allegedly associated with all stages of CTE identified in the McKee Study and provides compensation for such deficits when the deficits are of a certain severity.   In fact, according to the McKee Study, subjects with the alleged later stages of CTE (CTE III or CTE IV) progressed to dementia.  Moreover, many of the subjects in the McKee

37

Study had co-morbid disease with CTE that is compensated under the Settlement Agreement.  Overall, based on the findings in the McKee Study, it appears that at least 89% of the former NFL players studied in the McKee Study would have been eligible for a Qualifying Diagnosis while living under the Settlement, and the remaining 3 of 34 players in the McKee Study also may have received compensation while living, depending on their symptoms and the severity of their impairment.  (Dr. Yaffe Decl. ¶ 82-83; Dr. Schneider Decl. ¶  49; *see also* McKee Study at 58-59.)

### (B)      Mood, Behavioral and Other Conditions

96.      Mood and behavioral conditions are not included among the Qualifying Diagnoses.  (*See* Settlement Agreement Ex. 1.)  The settling parties' agreement not to compensate these symptoms was a result of their good faith bargaining and the inevitable line-drawing inherent in any settlement.  Moreover, the NFL Parties have introduced evidence showing that mood and behavioral conditions, such as depression, irritability, aggressiveness, and suicide have numerous, multifactorial causes unrelated to NFL Football, some of which are also common among the general population and afflict many people, including individuals dealing with the ramifications of neurocognitive or neuromuscular impairment.  (*See* Dr. Schneider Decl. ¶ 39; Dr. Yaffe Decl. ¶ 75; *see also* Dr. Hamilton Decl. ¶ 29.)

97.      The NFL Parties further submitted evidence that it has not been established that CTE causes mood or behavioral changes, or that CTE is correlated with suicide.  (Dr. Schneider Decl. ¶ 29 ("[I]t is premature to consider mood and behavioral conditions as part of the diagnostic and clinical profile of CTE[.]"); *id*. ¶ 45 (providing example of now refuted long-standing belief in scientific and medical communities that depression was part of the diagnostic and clinical profile of Alzheimer's Disease); Dr.

Yaffe Decl. ¶ 75 ("[I]t is not yet possible to state with any certainty whether CTE causes any mood or behavioral symptoms."); *id.* ¶ 76 (Dr. Yaffe is aware of no published cross-sectional, epidemiological or prospective studies that show a relationship between contact sports and risk of suicide, or any correlation between CTE and suicidal tendencies); *see also* Burns Decl. Ex. 12, Grant L. Iverson, *Chronic Traumatic Encephalopathy and Risk of Suicide in Former Athletes*, 48 Brit. J. Sports Med. 162, 162 (2014), Doc. No. 6422-13 (collecting studies, including one suggesting that retired NFL players have lower rates of death by suicide than the general population).)

98.     The above-described scientific and medical literature, along with the litigation risks, were considered by the parties throughout the arm's-length, hard-fought settlement negotiations, and these considerations informed their line-drawing decisions regarding compensation for certain conditions and not others.

99.     The Complaints did not contain allegations related to multiple sclerosis or epilepsy, and thus, those diseases were rightly never raised in the negotiations. Based on objections to the Settlement, however, the NFL Parties submitted medical studies showing that there is no association between head trauma and multiple sclerosis.  (Dr. Yaffe Decl. ¶ 91; *see also* Burns Decl. Ex. 16, C.C.H. Pfleger et al., *Head Injury Is Not a Risk Factor for Multiple Sclerosis: A Prospective Cohort Study*, 15 Multiple Sclerosis 294, 294 (2009), Doc. No. 6422-17; Burns Decl. Ex. 17, M.J. Goldacre et al., *Risk of Multiple Sclerosis After Head Injury: Record Linkage Study*, 77 J. Neurology, Neurosurgery & Psychiatry 351, 351 (2006), Doc. No. 6422-18.)  Similarly, the NFL Parties' evidence submitted in response to objections

demonstrates that TBI without loss of consciousness (or amnesia) may not increase the risk for epilepsy, and that for mild TBI that results in loss of consciousness (or amnesia) for 30 minutes or less, there is no increased risk of epilepsy associated with mild TBI.  (*See* Burns Decl. Ex. 18, John F. Annegers et al., *A Population-Based Study of Seizures After Traumatic Brain Injuries*, 338 New Eng. J. Med. 20, 20 (1998), Doc. No. 6422-19.)

<b>(c)</b>       <b>Maximum Monetary Award for Each Qualifying Diagnosis</b>

100.    A Retired NFL Football Player's maximum Monetary Award is calculated by his age at the time of his Qualifying Diagnosis, with headline awards decreasing as he ages.  (Settlement Agreement Ex. 3.)  The maximum recovery for each Qualifying Diagnosis is as follows:

- Level 1.5 Neurocognitive Impairment:  $1.5 million

- Level 2 Neurocognitive Impairment:  $3 million

- Alzheimer's Disease:  $3.5 million

- Parkinson's Disease:  $3.5 million

- Death with CTE:  $4 million

- ALS:  $5 million

(*See id*.)

101.    Derivative Claimants are entitled to 1% of the Monetary Award (*i.e.*, a "Derivative Claimant Award") received by the Retired NFL Football Player or Representative Claimant (for deceased, incompetent, or incapacitated retired players) through whom the relationship is the basis of the claim (such that the Retired NFL Football Player or Representative Claimant will receive 99% of the Award).

(Settlement Agreement § 7.3.)  If there are multiple Derivative Claimants, then the Derivative Claimant Award will be divided among them based on the laws of the state where the Retired NFL Football Player to whom they are related (or his Representative Claimant, if any) is domiciled.  (*Id.*)

### (d)     Calculation of Monetary Award

102.    A Retired NFL Football Player's individual Monetary Award will be determined based on a number of adjustments or Offsets.  (Settlement Agreement § 6.7.)

### (i)     Age at the Time of Qualifying Diagnosis

103.    The Qualifying Diagnoses are progressive and generally associated with advanced age.  (*See* Decl. of Thomas Vasquez, PhD ("Vasquez Decl.") ¶¶ 10, 11, Doc. No. 6423-21 ("[A]s an individual ages, his probability of contracting one of the compensable diseases increases dramatically regardless of whether or not he played football . . . As former players age, the relative contribution of concussions experienced as a player declines in importance . . . ."); *see also* Dr. Schneider Decl. ¶ 42 ("Alzheimer's Disease and other dementias are present in over 10% of the persons over the age of 65 years, and rises to almost 50% after the age of 85 years old.").)

104.    In addition, the age of a claimant generally affects the value of his claim in the tort system, with the older individual receiving a lower award.  (*See* Vasquez Decl. ¶ 15 ("It has long been recognized that the age of a claimant affects the value of his claim in the tort system; all else equal, the older the individual is, the lower the award.").)

105.    Consequently, a Retired NFL Football Player's Monetary Award will be adjusted depending on his age when he received/receives a Qualifying Diagnosis.  (*See* Settlement Agreement Ex. 3.)

### (ii)    Offset for Non-Football Stroke or TBI

106.    Stroke and/or TBI are major contributive factors for neurocognitive impairment.  (*See* Dr. Yaffe Decl. ¶¶ 85-90.)

107.    First, there is a scientifically established association between Stroke and the Qualifying Diagnoses, as well as neurocognitive decline generally.  (Dr. Yaffe Decl. ¶ 86; Dr. Fischer Decl. ¶ 18.)  Strokes are recognized as the second most common cause of dementia, known in the scientific community as "vascular dementia."  (Dr. Yaffe Decl. ¶ 87; *see also* Dr. Fischer Decl. ¶ 18.)  This is a distinct kind of dementia primarily caused by the occurrence of one or more strokes.  (Dr. Yaffe Decl. ¶¶ 87-88; *see also* Dr. Fischer Decl. ¶ 18.)

108.    Second, moderate and severe TBIs have a strong association with dementia, Alzheimer's Disease, and Parkinson's Disease.  (Dr. Yaffe Decl. ¶ 90 ("[A]cute and severe TBIs—including one single acute and severe TBI—are [ ] risk factor[s] for these conditions with a relative risk ranging between 1.5 and 2.0."); Dr. Fischer Decl. ¶ 21 ("In my opinion, the connection between severe TBI and the diagnoses at issue in the settlement is scientifically sound.").)

109.    Thus, the Settlement Agreement applies a 75% Offset if the Retired NFL Football Player suffered a stroke or a severe TBI before receiving a Qualifying Diagnosis.  (Settlement Agreement § 6.7(b)(ii)-(iii).)  Neither the Stroke, nor the TBI Offset includes injuries sustained during and relating to the Retired NFL Football Player's NFL Football career.  (*See id*. § 2.1 (wwww) (limiting Stroke Offset to strokes

suffered prior to or after the Retired NFL Football Player's NFL career), (aaaaa) (excluding from the TBI Offset any TBI related to the Retired NFL Football Player's NFL career).)  Retired NFL Football Players subject to these Offsets will have the opportunity to present clear and convincing evidence to the Claims Administrator that the Stroke or severe TBI is not casually related to the Qualifying Diagnosis in order to avoid the Offset.  (*Id*. § 6.7(d).)

(iii)    <strong>Eligible Seasons</strong>

110.    The Eligible Season Offset applies when a Retired NFL Football Player has fewer than five Eligible Seasons.  (*Id*. § 6.7(b)(i).)  The fewer Eligible Seasons played, the larger the Offset, for a maximum Offset of 97.5%.  (*Id*.)

111.    An Eligible Season is defined as a season in which a Retired NFL Football Player was: (i) on a Member Club's Active List on the date of three or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one or more regular or postseason games, and then spent at least two regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury.  (*Id*. § 2.1(kk).)

112.    A half of an Eligible Season is defined as a season in which a Retired NFL Football Player was: (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight regular or postseason games; (ii) on a World League of American Football, NFL Europe League, or NFL Europa League (collectively, "NFL Europe") team's active roster for three or more games; or (iii) on an NFL Europe team's active roster for one or more regular or postseason games, and then spent at least two regular or postseason games on the NFL Europe League injured reserve list or team inactive list due to a concussion or head injury.  (*Id*.)

43

113.   A Retired NFL Football Player will not receive credit for more than one Eligible Season per year.  (*Id.*)

114.   NFL Europe, an affiliate of the NFL, was a developmental league with a shorter season.  (Decl. of T. David Gardi ("Gardi Decl.") ¶ 14, Doc. No. 6422-33.) Play in NFL Europe occurred in the NFL offseason and did not preclude participation in the NFL.  (*Id.*)  NFL Europe directly employed the players and provided workers' compensation coverage under the laws of various states.  (*See id*. ¶¶ 5, 8-9, 11-13.)

### (iv)   Participation in the BAP

115.   The Settlement Agreement applies a 10% Offset to certain Retired NFL Football Players who do not participate in the BAP.  (*Id*. § 6.7(b)(iv).)

116.   All Retired NFL Football Players age 43 or older as of the Effective Date must receive the BAP examination within two years of the Effective Date if they choose to participate.  (*Id*. § 5.3.)  Retired NFL Football Players under the age of 43 as of the Effective Date must receive the examination within 10 years of the commencement of the BAP, or before they turn 45, whichever occurs first.  (*Id*.)

117.   The 10% Offset for failure to participate in the BAP does *not* apply to (i) Retired NFL Football Players in Subclass 1 (*i.e.*, those without Qualifying Diagnoses prior to July 7, 2014) who later receive (a) a Qualifying Diagnosis of ALS or (b) any Qualifying Diagnosis prior to his deadline to receive a BAP baseline assessment examination; or (ii) Retired NFL Football Players in Subclass 2 (*i.e.*, those with Qualifying Diagnoses prior to July 7, 2014).  (*Id*.)

(e)     **Representative Claimants of Retired NFL Football Players Who Died Prior to 2006**

118.    For Representative Claimants of deceased Retired NFL Football Players who died prior to January 1, 2006, the Representative Claimant may receive a Monetary Award only if the "Court determines that a wrongful death or survival claim filed by the Representative Claimant would not be barred by the statute of limitations under applicable state law" as of the date the Representative Claimant filed a litigation or the Settlement Date, whichever is earlier.  (*Id.* § 6.2(b).)

119.    Because New York maintains a six-year statute of limitations for fraud—the longest period of the claims alleged—the parties negotiated back six years from 2012 (when the MDL Master Administrative Complaints were filed) to 2006, and agreed that, in order to receive a Monetary Award, decedents who passed away in that year or later need not prove the timeliness of a litigation claim.  (NFL Parties' Mem. of Law in Supp. of Final Approval of the Class Action Settlement Agreement and in Resp. to Objections at 115 (the "NFL Parties' Final Approval Mem."), Doc. No. 6422.)

120.    In determining whether a wrongful death or survival claim filed by the Representative Claimant would have been "barred by the statute of limitations under applicable state law as of . . . the Settlement Date" for claims filed by Representative Claimants of deceased Retired NFL Players who died before January 1, 2006—and who never filed suit against the NFL Parties—the Court's statute of limitations analysis will, in appropriate circumstances, consider when the wrongful death or survival claim accrued under applicable state law.  (*See* Settlement Agreement § 6.2(b).)

2.      **Baseline Assessment Program**

(a)      **Structure of the BAP**

121.    All Retired NFL Football Players who are credited with at least one-half of an Eligible Season and who timely register to participate in the Class Action Settlement may participate in the BAP and receive a baseline neuropsychological and neurological evaluation.  (*See* Settlement Agreement §§ 5.1-5.2.)  The term of the BAP is 10 years.  (*Id*. § 5.5.)  The BAP's term may be extended by 5 years for the purposes of providing BAP Supplemental Benefits to Retired NFL Football Players diagnosed with Level 1 Neurocognitive Impairment.  (*Id*.)  BAP Supplemental Benefits include medical treatment, counseling and/or examination by Qualified BAP Providers, including, if medically needed and prescribed by a Qualified BAP Provider, pharmaceuticals by a Qualified BAP Pharmacy Vendor.  (*Id.* § 5.11.)

122.    The BAP program serves several purposes.  It may result in diagnoses entitling the Retired NFL Football Player to BAP Supplemental Benefits or to a Monetary Award under the Monetary Award Fund.  (*Id*. § 5.2.)  The maximum per player BAP Supplemental Benefit is to be determined (with the approval of the Court) on the one-year anniversary of the commencement of the BAP by accounting for such factors as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment in the first year.  (*Id*. § 5.14(b).)  In addition, the results of the BAP examinations may be used as a benchmark against which to measure any future tests to determine whether the Retired NFL Football Player's neurocognitive abilities have deteriorated.  Moreover, if the informed consent of the Retired NFL Football Player is obtained and there is compliance with all applicable privacy and health laws, the medical data generated can be made available for use by

46

those conducting medical research on neurocognitive impairment, safety, and injury prevention.  (*Id*. § 5.10.)

123.    The BAP baseline assessment examination is a detailed, standardized neuropsychological examination performed by Qualified BAP Providers.  (*Id*. § 5.2.) The BAP was not designed to test for Alzheimer's Disease, Parkinson's Disease, or ALS.  (*See id*.)  Settlement Class Members must obtain diagnoses of those impairments from a qualified doctor outside the BAP.

124.    Garretson Resolution Group, Inc. ("Garretson") has been preliminarily appointed as BAP Administrator.   (Order ¶ 3(e), July 7, 2014, Doc. No. 6084.) Garretson is widely respected and has served as administrator in class action settlements similar to the Settlement Agreement.  (Aff. of Matthew L. Garretson ("Garretson Aff.") ¶¶ 1-20, Doc. No. 6423-4.)

125.    The BAP Administrator will (i) send reminders to class members about the BAP deadlines, (ii) work with retired players who register and are eligible for the BAP, including explaining to retired players how to arrange for an initial baseline assessment examination, and (iii) set up the network of Qualified BAP Providers to administer the baseline assessment examinations for Retired NFL Football Players. (Settlement Agreement §§ 5.6-5.7(a); *see also* Garretson Aff. ¶¶ 11-18.)

126.    The BAP Administrator will also select Qualified BAP Pharmacy Vendors based on the following criteria: (i) proper licensing for operation as a mail order pharmacy in all U.S. states and territories; (ii) nationwide coverage and ease of administration; and (iii) rate structure and payment terms.  (Settlement Agreement § 5.7(b)(ii).)

127.    The BAP Administrator will work with all potential Qualified BAP Pharmacy Vendors to ensure that each enrolled Qualified Pharmacy Vendor also offers the option to fill prescriptions at a local retail pharmacy, when necessary, due to the transportation and storage requirements of required therapies; the necessity of frequent medication dose adjustments during therapeutic trials by treating physicians; or the desire of Class Members to avail themselves of 'face-to-face' counseling.  In enrolling Qualified Pharmacy Vendors, the BAP Administrator will work to find the best balance between cost and accessibility options for Class Members, to include ensuring the ability of retail options.  (*See* Garretson Aff. ¶ 15.)

> **(b)    BAP Funding**

128.    The BAP will be funded by the $75 million BAP Fund.  (Settlement Agreement §§ 5.14, 23.1(b).)

129.    The BAP Fund is sufficient to fund the BAP.  (Material Provided by Counsel to the NFL, Report of the Segal Group to Special Master Perry Golkin at 10, Doc. No. 6168 (finding that there could be "an $11 million surplus on a net present value basis[.]"); *see also* Vasquez Decl. ¶¶ 17-28 (stating the BAP Fund will be adequate and could allow for BAP Supplemental Benefits between $35,000 and $52,000).)

130.    The Settlement provides that every qualified Retired NFL Football Player is entitled to one baseline assessment examination, and that if the $75 million BAP Fund "is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination . . . , the NFL Parties agree to pay the amount of money necessary to provide the examinations

in accordance with th[e] Settlement Agreement."  (Settlement Agreement § 23.1(b); *see also id.* § 23.3(d).)

### (c)    BAP Test Battery

131.    The BAP Test Battery is a battery of neuropsychological tests designed to provide Retired NFL Football Players with a baseline assessment of their cognitive functions and to evaluate whether Retired NFL Football Players are currently suffering from moderate cognitive impairment (Level 1 Neurocognitive Impairment), early dementia (Level 1.5 Neurocognitive Impairment) or moderate dementia (Level 2 Neurocognitive Impairment).  (*See id*. § 5.2, Settlement Agreement Ex. 2 § 1.)

132.    Measures selected for these tests are among the most widely used in Clinical Neuropsychology, and are available to clinicians throughout the country.  (Dr. Keilp Decl. ¶ 28.)

133.    Each test in the Test Battery has a specific purpose and is well accepted, widely used, and scientifically validated in the scientific and medical communities. (Dr. Millis Decl. ¶¶ 16, 18, 25; Dr. Hamilton Decl. ¶¶ 14, 23 ("In particular, the BAP test battery comprises well-regarded mainstream examinations with well-developed normative data.  These tests are very similar (and, in many cases, identical) to those that I, and others in our field of expertise, use in our everyday practice. . . .  the BAP test battery and associated criteria adopted as part of this Settlement are a reasonable and scientifically well-founded plan."); Dr. Keilp Decl. at 20 ("The BAP test battery and the related Injury Definitions are a fair and objective means of determining the level of neurocognitive impairment based on standard procedures in Clinical Neuropsychology."); *see also id.* ¶ 28.)

49

134.    The tests include: (i) the Advanced Clinical Solutions Test of Premorbid Functioning to assess premorbid intellectual functioning, *i.e.*, the functioning of the player before the onset of any illness or disease (Dr. Keilp Decl. ¶ 33; Dr. Millis Decl. ¶ 17); (ii) a series of tests that assess an individual's current level of functioning in five areas, known as "cognitive domains" that are accepted and scientifically valid for diagnosing moderate cognitive impairment or dementia, including learning and memory, complex attention, executive function, language, and spatial-perceptual functioning (Dr. Keilp Decl. ¶ 31); (iii) two neuropsychiatric tests, the MMPI-2RF and the Mini International Neuropsychiatric Interview, to assess emotional functioning and aspects of personality (Dr. Millis Decl. ¶ 19; Dr. Hamilton Decl. ¶ 22; Dr. Keilp Decl. ¶ 34); and (iv) a series of "validity" measures enabling a clinician to assess whether the patient is trying to do his best on the test or if he is trying to appear to be impaired when he is not (Dr. Keilp Decl. ¶ 32).

135.    In addition, certain safeguards have been built into the Test Battery to increase the accuracy of the performance validity tests and to eliminate the concern that a player will be "disqualified based on a false positive diagnostic error."  (*See* Dr. Millis Decl. ¶ 30; *see also* Settlement Agreement Ex. 2 at 2-3; Dr. Keilp Decl. ¶ 44.)

136.    Patients with definable neurocognitive impairments are able to tolerate the length of the test battery and complete it in good order.  (Dr. Keilp Decl. ¶¶ 36, 40.) In addition, most of the tests in the Test Battery have "stopping rules" that allow the examiner to discontinue or shorten the length of the test when the patient fails to complete items correctly.  (Dr. Millis Decl. ¶ 26.)

(d)    **The Specific Impairment Criteria**

137.    The Settlement uses Specific Impairment Criteria to set forth the levels that must be met in the BAP Test Battery for a player to be diagnosed with moderate cognitive impairment or dementia, and therefore to be potentially eligible for certain benefits under the Settlement.  (Settlement Agreement Ex. 2, § 4; *see supra* ¶¶ 131-36.)

138.    The BAP Test Battery and thresholds specified in the Specific Impairment Criteria have been tested and found to perform as intended.  (Dr. Keilp Decl. ¶ 36.)  They provide sound methodology to assess the cognitive impairments that the Settlement compensates.  (Dr. Hamilton Decl. ¶¶ 14, 23.)

3.    **Education Fund**

139.    The Settlement Agreement establishes a $10 million Education Fund to support safety and injury prevention programs for football players of all ages. (Settlement Agreement §§ 12.1-12.2.)  This Fund will also promote education of Settlement Class Members regarding the NFL's existing medical, disability and other benefit programs.  (*Id.*)

4.    **Registration for Settlement Benefits**

140.    The Settlement Agreement requires that Settlement Class Members register for the benefits provided by the Settlement within 180 days after the Settlement Class Supplemental Notice is posted on the Settlement Website.    (Settlement Agreement § 4.2(c).)  The Settlement Class Supplemental Notice will be posted on the Settlement Website within 30 days of the Settlement's Effective Date.  (*Id*. § 14.1(d).)

141.    As of November 9, 2014, over 5,200 Settlement Class Members had signed up for future information about registration.  (*See* Burns Decl. Ex. 1, Claims Administrator Update as of Nov. 9, 2014, Doc. No. 6422-2.)

142.    The Settlement Agreement provides flexibility with respect to how Settlement Class Members can register by allowing either online or hard copy submission.  (Settlement Agreement § 4.2(a).)

143.    The 180-day registration deadline provides Settlement Class Members with ample time to gather and submit the necessary information, and the Settlement Agreement further provides a "good cause" exception for missing the registration deadline.  (*Id*. § 4.2(c).)

144.    The Settlement Agreement provides both Settlement Class Members and the NFL Parties with the right to challenge registration determinations.  (*Id*. § 4.3(a)(ii)-(iii).)

145.    Representative Claimants (for legally incapacitated or incompetent Retired NFL Football Players) and individual counsel representing Settlement Class Members can carry out the claims process in a representative capacity by "submit[ing] all claim forms, proof, correspondence, or other documents to the Special Master, BAP Administrator, Claims Administrator or Lien Resolution Administrator on behalf of that Settlement Class Member."  (*Id*. § 30.2(a).)

**5.    Claims and Appeals Process**

146.    To receive a Monetary Award, a Settlement Class Member must submit a Claim Package or Derivative Claim Package to the Claims Administrator. (Settlement Agreement § 8.1.)  The Claim Package must include information in support of the Retired NFL Football Player's Qualifying Diagnosis and NFL Football career, including medical records reflecting the Qualifying Diagnosis, and will form the basis for the Claims Administrator's Award determination.  (*Id*. § 8.2.)

147.    If the deceased Retired NFL Football Player's medical records are unavailable due to a force majeure type event (*e.g.*, flood, hurricane, fire) and the Representative Claimant makes a showing of reasonable effort—the sufficiency of which is to be determined by the Claims Administrator—to obtain the medical records from any available source, then the Claims Administrator may determine in its discretion that the Representative Claimant may present a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living.  (*Id*. at 8.2(a)(ii).)  If the diagnosing physician is unable to provide a Diagnosing Physician Certification due to the unavailability of medical records, the Claims Administrator may allow in its sole discretion a sworn affidavit from the diagnosing physician attesting to the reasons why the diagnosing physician is unable to provide a Diagnosing Physician Certification without the medical records, along with the presentation of a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living.  (*Id*.)

148.    When a Claim Package contains insufficient evidence to substantiate the claimed Eligible Seasons, "the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith."  (*Id*. § 9.1(a).)

149.    A Claim Package must be submitted within two years of receiving a Qualifying Diagnosis, or two years after Settlement Class Supplemental Notice (which will include previously disclosed deadlines for registration, participation in the BAP, and submission of Claim Packages) is posted on the Settlement Website, whichever is

later.  (Settlement Agreement §§ 8.3(a), 14.1(d).)  There is an exception to this deadline
where the Settlement Class Member can demonstrate "substantial hardship" and
submits the Claim Package within four years of the date of the Qualifying Diagnosis (or
the Settlement Class Supplemental Notice being posted on the Settlement Website,
whichever is later).  (*Id*. § 8.3(a)(1).)  A Derivative Claim Package must be submitted
no later than 30 days after the Retired NFL Football Player through whom the
relationship is the basis of the claim (or his Representative Claimant, as applicable)
receives notification that he has been determined to be entitled to a Monetary Award.
(*Id*. § 8.3(a)(ii).)

150.    Upon receipt and review of the Claim Package, the Claims
Administrator will make a determination as to whether the claimant is entitled to a
Monetary Award.  (*Id*. §§ 9.1, 9.2.)

151.    Either the NFL Parties or the Settlement Class Member who submitted
the Claim Package may appeal the Claims Administrator's Award determination.  (*Id*. §
9.6.)  The appellant will submit an appeal through use of an Appeals Form, present
evidence in support of the appeal, and satisfy a clear and convincing evidentiary
standard to prevail.  (*Id*. §§ 9.7-9.8.)  The appellant is provided the discretion to submit
a supplemental written statement not to exceed five single-space pages in length. (*Id*. §
9.7(a).)  Co-Lead Class Counsel also have the right to submit papers in support of, or in
opposition to, an appeal.  (*Id*. § 9.7(c).)  The NFL Parties may take an appeal only in
"good faith."  (*Id*. § 9.6(b).)  Co-Lead Class Counsel may petition the Court for
appropriate relief if they believe that the NFL Parties are submitting vexatious,
frivolous or bad faith appeals.  (*Id*.)

152.    Although Settlement Class Members are charged $1,000 to discourage appeals that lack merit, a Settlement Class Member who takes a successful appeal is reimbursed the fee in full.  (*Id*. § 9.6(a).)  Settlement Class Members may petition the Claims Administrator to waive the $1,000 if it represents a financial hardship.  (*Id*. § 9.6(a)(i).)

153.    The Settlement Agreement also includes anti-fraud provisions beyond the appeal fee.  Each Settlement Class Member claiming a Monetary Award or Derivative Claimant Award authorizes the Claims Administrator to "verify facts and details of the Claim Package or Derivative Claim Package." (*Id*. § 8.6(a).)  This will be accomplished by the Claims Administrator conducting an audit of 10% of the total Claim Packages and Derivative Claim Packages that were found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month—either on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package.  (*Id*. § 10.3(c).)  The obligation of the Settlement Class Member to cooperate with an audit by providing additional records and information is limited by reasonableness—a claim will be denied only if the Settlement Class Member "unreasonably" fails or refuses to provide the material within the time frame specified. (*Id*. § 10.3(b)(ii).)  The Settlement Agreement makes clear that the types of records and information that may be requested focus on information about the claimed Qualifying Diagnosis, the Retired NFL Football Player's health over the past five years, and his NFL employment records. (*Id*. § 10.3(e)(i-v).)

154.    The NFL Parties or Co-Lead Class Counsel likewise have the right to conduct an audit to verify a Monetary Award claim, although this right is limited in that

the audit must be taken in good faith and at their sole expense.  (*Id*. § 10.3(a).)
Claimants are required to reasonably cooperate with an audit by providing additional
records and information.  (*Id*. § 10.3(b)(i)-(ii).)

155.    Finally, members of the Appeals Advisory Panel and Appeals Advisory
Panel Consultants (as well as Qualified BAP Providers, Qualified MAF Physicians)
cannot hold their positions if serving as expert witnesses or consultants for Opt Outs in
litigation.  (Settlement Agreement §§ 5.7, 6.5, 9.8.)

### 6.    Funding and Security

156.    The Settlement Agreement sets forth the NFL Parties' payment
obligations and schedule.  (*See* Settlement Agreement Art. XXIII.)  The Agreement
also provides security for the payment of valid claims for the 65-year term of the
Settlement.  (*Id*. § 25.6.)

157.    Within six months of the Effective Date, the NFL Parties will deposit
$120 million into a Settlement Trust Account for the payment of Monetary Awards.
(*Id*. § 23.3(b).)  The NFL Parties will make additional monthly deposits, as needed,
based upon a targeted reserve of $10 million through the tenth year of its existence; $5
million reserve for its eleventh through fiftieth years; a $1 million reserve for its fifty-
first through sixtieth years; and a $250,000 reserve through its sixty-fifth year.  (*Id*. §
23.3(b)(v))

158.    With respect to security, the Settlement Agreement includes a
representation and warranty by the NFL Parties that the NFL currently maintains, and
will continue to maintain, an investment grade rating on its Stadium Program Bonds, as
rated by Fitch Ratings.  This investment grade rating shall serve as security that the

NFL Parties will meet their payment obligations for the first ten years of the Settlement. (*Id*. § 25.6(a).)

159.    In addition, by the tenth anniversary of the Settlement, the NFL Parties agree to establish a Statutory Trust that they will fund so that, by the tenth anniversary, it shall contain funds that in the reasonable belief of the NFL Parties, and after taking into account reasonably expected investment returns over time, will be sufficient to satisfy the NFL Parties' remaining anticipated payment obligations as they come due over the 65-year term.  (*Id*. § 25.6(d).)  The NFL Parties cannot pledge or assign the property of the Statutory Trust to any third-party and no other creditor of any of the NFL Parties shall have any rights in the property.  (*Id*.)  Funds may be withdrawn only to satisfy payment obligations under the Settlement Agreement, for costs and expenses related to the Statutory Trust, and for certain other limited purposes that require approval of the Court.  (*Id*.)

160.    If the Statutory Trust's investment returns fall short, the NFL Parties remain obligated to pay as much money as necessary to fulfill the obligations of the Monetary Award Fund for its full 65-year term.  (*See* Settlement Agreement §§ 23.1(a), 23.3(b).)

161.    To the extent that the NFL Parties materially default in satisfying payment obligations under the Settlement Agreement, and fail to cure such material default in compliance with an order from the Court, then the Court may ultimately render null and void the Releases and Covenants Not to Sue provided to Released Parties by Settlement Class Members who have received a final, favorable Notice of Registration Determination and have not received a final and accrued Monetary Award

or final and accrued Derivative Claimant Award as of the date of such application, or who have received only a final and accrued Monetary Award for a Level 1.5 Neurocognitive Impairment or a final and accrued Derivative Claimant Award for a Level 1.5 Neurocognitive Impairment as of the date of such application.  (*Id*. § 25.6(e), (g).)

162.    The NFL is a multi-billion dollar business with substantial revenue streams, including its television contracts that run longer than ten years.  (*See* Burns Decl. Ex. 30, Richard Sandomir, *ESPN Extends Deal with N.F.L. for $15 Billion*, N.Y. Times, Sept. 8, 2011, Doc. No. 6422-31 (regarding contract running through 2021).)

### 7.    Release of Claims, Covenant Not to Sue and Bar Order

163.    In exchange for the significant benefits provided under the Settlement Agreement, Settlement Class Members will release, covenant not to sue, and dismiss with prejudice actions and claims against the Released Parties.  (*See* Settlement Agreement Art. XVIII; Settlement Agreement, Ex. 4 ¶ 12.)

164.    The Release covers all claims and actions "arising out of, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, referred to or relating to the Class Action Complaint and/or Related Lawsuits," including, without limitation, claims and actions that "were, are or could have been asserted in the Class Action Complaint or any other Related Lawsuit" or "arising out of, or relating to, head, brain and/or cognitive injury[.]"  (Settlement Agreement § 18.1(a).)

165.    Retired NFL Football Players do not release claims for workers' compensation or entitlements to any NFL CBA Medical and Disability Benefits.  (*Id*. §§ 2.1(e)(e)(e), 18.6, 29.1-29.2.)  In addition, although Retired NFL Football Players

ordinarily must execute a release of claims and covenant not to sue in order to receive the Neuro-Cognitive Disability Benefit, the Settlement Agreement provides that the NFL will not enforce or use that provision against Retired NFL Football Players in connection with the acceptance of Settlement benefits (except where they opted out of the Settlement Class).  (*Id.* § 29.1; Seeger Decl. ¶ 10.)

166.    The medical and disability benefits available under the current CBA include, for certain Retired NFL Football Players:  (i) 88 Plan medical benefits, which reimburse certain costs related to dementia, ALS, and/or Parkinson's Disease currently up to $100,000 per year if an in-patient at an eligible institution, or up to $88,000 per year if not so admitted; (ii) the Neuro-Cognitive Disability Benefit, which pays monthly payments for 180 months (or until a player's 55th birthday, whichever occurs first) in the form of either a Moderately Impaired Benefit (currently paying no less than $3,500 per month) or a Mildly Impaired Benefit (currently paying no less than $1,875 per month); (iii) Total and Permanent Disability Benefits, which currently pay a minimum of between $50,000 and $250,000 per year depending on injury categorization; (iv) a Line of Duty Disability Benefit for former players with a substantial permanent disability as a result of NFL football activities who apply within 48 months of retiring from the NFL (or longer for those who played four or more seasons), which provides a monthly payment of no less than $2,000 for 90 months; (v) the Player Insurance Plan and the Gene Upshaw NFL Player Health Reimbursement Account Plan, which provide medical benefits for 60 months following retirement and thereafter provide health credits to reimburse medical expenses, currently worth $25,000 per Credited Season up to a maximum account balance of $300,000 or $350,000 (depending on years of play);

(vi) Long Term Care Insurance for which the NFL pays premiums for those ages 50 to 76 if they satisfy the underwriting requirements, and for which the maximum benefit is $219,000; and (vii) a Former Player Life Improvement Plan that, among other things, coordinates comprehensive neurological care evaluation at top tier medical facilities, provides a Medicare benefit ($120 per month toward supplemental Medicare insurance), provides a discount prescription drug benefit, and provides an assisted living benefit that offers special discounts and preferred access to providers throughout the United States.  (*See* Decl. of Dennis L. Curran ("Curran Decl.") ¶¶ 6, 9, 11-17, Doc. No. 6422-32.)

167.   In addition, the parties have moved, as a condition to approval of the Class Action Settlement, the Court for a bar order and judgment reduction provision to be part of the Final Order and Judgment, in order to bar other parties from seeking indemnification or contribution from the Released Parties for claims relating to this litigation.  (*See* Settlement Agreement Ex. 4, ¶ 12.)

### 8.    Lien Resolution

168.   Once a Monetary Award is calculated by the Claims Administrator, the Lien Resolution Administrator will administer the process for identifying and settling (in certain instances, through global resolution discounts) all applicable and legally enforceable liens, which may include, among others, those related to state or federal government payors, Medicare Parts A and B (as contemplated by the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)), Medicare Part C or Part D plans, Medicaid and other state or federal governmental healthcare programs with statutory reimbursement or subrogation rights (such as TRICARE, the Department of Veterans Affairs, and Indian Health Services).  (Settlement Agreement § 11.3.)

169.    The amount of any liens will be deducted from a Settlement Class Member's Monetary Award or Derivative Claimant Award, along with the reasonable costs incurred by the Lien Resolution Administrator, except that costs related to lien verification will be paid by the Monetary Award Fund.  (*Id.*)

170.    The appointment and use of a Lien Resolution Administrator is also beneficial to the Settlement Class Members.  Through the creation and administration of a global lien resolution process, the Lien Resolution Administrator seeks to leverage the large volume of claims to achieve maximum possible reductions in liens for Settlement Class Members with the same or similar Qualifying Diagnosis.  (*See* Garretson Aff. ¶¶ 4, 28(a)(4).)  As a result, all things otherwise being equal, Settlement Class Members with liens participating in the Settlement would be expected to achieve greater recoveries on their Monetary Awards by virtue of the Settlement's use of a Lien Resolution Administrator than if no Lien Resolution Administrator had been utilized.

### 9.    Attorneys' Fees

171.    Attorneys' fees will be paid by the NFL Parties separate from, and in addition to, all of their other funding obligations under the Settlement Agreement. (Settlement Agreement § 23.7.)

172.    The provision of attorneys' fees was not negotiated between the parties until after the material terms of the Settlement Agreement were agreed upon.   (Seeger Decl. ¶ 46; Supplemental Declaration of Judge Layn R. Phillips ("Suppl. Phillips Decl." ¶¶ 18-19, Doc. No. 6423-6.)

173.    Co-Lead Class Counsel will file a petition for an award of attorneys' fees and reimbursement of costs after the Effective Date.  (*See* Seeger Decl. ¶ 54.) Under the terms of the Settlement Agreement, the NFL Parties will not object to an

application by Class Counsel for an award of attorneys' fees of up to $112.5 million. (Settlement Agreement § 21.1.)  Settlement Class Members will have an opportunity to comment on or object to the petition.  (Seeger Decl. ¶ 54.)  The Court will determine the amount of the attorneys' fees.  (Settlement Agreement § 21.1.)

174.    After the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent of each Monetary Award and Derivative Claimant Award to facilitate the settlement program and related efforts of Co-Lead Class Counsel, Class Counsel, and Subclass Counsel.  (*Id.* § 21.1.)  These set-aside monies will be held in a separate fund overseen by the Court.  (*Id.*)  Any such future petition for a set-aside will describe:  (i) the proposed amount; (ii) how the money would be used; and (iii) any other relevant information.  (*Id.*)  No money will be held back or set aside from any Monetary Award or Derivative Claimant Award without Court approval.  (*Id.*)

## C.    Settlement Class Notice

175.    In connection with Preliminary Approval, the Court concluded that "[t]he dissemination[,] . . . form and content of the proposed Long-Form Notice and Summary Notice . . . satisfy the requirements of Rule 23 and Due Process."  (Mem. Op. at 18-19, July 7, 2014, Doc. No. 6083; *see also* Order ¶ 4, July 7, 2014, Doc. No. 6084.)

176.    The notice plan was fully implemented by Kinsella Media, the Court-appointed Settlement Class Notice Agent, with the assistance of Co-Lead Class Counsel, BrownGreer PLC, and Heffler Claims Group.  (*See generally* Decl. of Katherine Kinsella, Nov. 12, 2014, Doc. No. 6423-12.)

177.    First, using a number of sources, Settlement Class Notice was disseminated by first-class mail directly to over 30,000 addresses by July 24, 2014.

(*See* Decl. of Katherine Kinsella ¶¶ 8-10, Notice Plan p. 9, June 25, 2014, Doc. No. 6073-3.)   The mailing list was created by BrownGreer PLC from 33 different data sources, including the NFL Parties, NFL teams, the NFL.com website and other third party sources.  (Decl. of Orran L. Brown, Sr. ("Brown Decl.") ¶¶ 8-23, Doc. No. 6423-5.)

178.   The Settlement Class Notice described the Settlement Agreement in plain, easily understood language; it advised Settlement Class Members of the definition of the Settlement Class, their rights regarding opting out of the Settlement or objecting thereto, and the date, time, and location of the Fairness Hearing; it apprised all Settlement Class Members of the nature of the action and the Settlement Class claims and issues including, among other things, the maximum recovery for Monetary Awards, Offsets to Monetary Awards, and that the Qualifying Diagnosis of Death with CTE includes only "diagnoses of Death with CTE prior to **July 7, 2014**"; it identified the 180-day registration requirement, stating in bold on the cover that "**Settlement Class Members will need to register to get benefits**"; and it directed Settlement Class Members to seek additional information about the Settlement and updates on the registration process from a toll-free number (1-855-887-3485) or to sign up at http://www.nflconcussionsettlement.com/ (the "Settlement Website").  (*See generally* Mot. for Approval of Completed Versions of Long-Form Notice and Summ. Notice Ex. 1 ("Long-Form Notice"), Doc. No. 6086-1 (emphasis in original); Decl. of Katherine Kinsella ¶¶ 4-30, Nov. 12, 2014, Doc. No. 6423-12; Brown Decl. ¶ 37.)

179.   Second, Co-Lead Class Counsel purchased advertisements on television (including ABC, CBS, CNN, The Weather Channel and Headline News), radio

(including on American Urban Radio), and in other media (including internet banner ads through NFL.com, CNN.com, Facebook.com, Weather.com and Yahoo.com).  (*See* Decl. of Katherine Kinsella ¶¶ 17-26, Nov. 12, 2014, Doc. No. 6423-12.)

180.    Third, Co-Lead Class Counsel published the one page short-form notice in various publications, including *Time*, *Ebony*, *People*, and *Sports Illustrated* by August 26, 2014.  (*Id.* ¶¶ 14-16, 22; Order ¶ 4, July 7, 2014, Doc. No. 6084.)  The Short-Form Notice provides similar information—in condensed form—as that in the Long-Form Notice, and states, among other things, that the Settlement Agreement provides recovery for "*certain* cases of chronic traumatic encephalopathy or CTE . . . diagnosed after death."  (Mot. for Approval of Completed Versions of Long-Form Notice and Summ. Notice, Ex. 2 ("Short-Form Notice") at 1, Doc. No. 6086-2 (emphasis added).)

181.    Fourth, Co-Lead Class Counsel established the Settlement call center and Settlement Website.  The call center was initiated on July 10 2014, by directing callers to the Settlement Website.  Beginning on July 17, 2014, the call center provided callers with the ability to listen to many Frequently Asked Questions ("FAQs"), the ability to leave contact information for the receipt of future information (including registration), and the option to speak with live operators who were trained on the details of the Settlement.  (Decl. of Katherine Kinsella ¶¶ 24, 27, Nov. 12, 2014, Doc. No. 6423-12.)

182.    The Settlement Website was established by July 14, 2014.  It includes extensive FAQs; links to additional documents and pleadings; a sign-up page to receive further information in the future (including information about registration); and the

Court-approved notices.  (Decl. of Katherine Kinsella ¶¶ 8, 24, 27, Nov. 12, 2014, Doc. No. 6423-12; Brown Decl. ¶¶ 37-44; *see also* Decl. of Edward J. Radetich, Jr. ("Radetich Decl.") ¶¶ 4-8, Doc. No. 6423-13.)

183.   An internet keyword search program commenced on July 21, 2014. Certain words and phrases were registered with major Internet search engines to direct persons to "sponsored ads," which linked to the Settlement Website.  (Decl. of Katherine Kinsella ¶ 25, Nov. 12, 2014, Doc. No. 6423-12.)

184.   Finally, at the end of August, a letter with the Summary Notice was sent to over 60,000 nursing homes and outreach was made to several organizations of NFL players, including chapters of the NFL Players Association ("NFLPA") and the NFL Alumni Association, and the NFL Player Care Foundation, as well as other entities. (*Id.* ¶ 23.)

185.   The Notice Plan reached over 90% of Settlement Class Members by means of the direct mail notice in combination with paid media placements.  (Decl. of Katherine Kinsella ¶ 37, June 25, 2014, Doc. No. 6073-3.)

186.   In addition to the formal notice plan, the Settlement has been the subject of extensive coverage in media, including news shows, the press, coverage during NFL games, and internet sites and blogs.  (*See* Seeger Decl., Media Analysis and Media Analysis Circulation Report; *see also* Decl. of Katherine Kinsella ¶ 30, Nov. 12, 2014, Doc. No. 6423-12.)  This Settlement has been extensively covered and debated in the popular media and amongst Retired NFL Football Players for over a year.  (*See, e.g.*, Burns Decl. Ex. 2, Ken Belson & Bill Pennington, *Former N.F.L. Players Face Deadline to Opt Out of Concussion Settlement*, N.Y. Times, Oct. 14, 2014, Doc. No.

6422-3; Burns Decl. Ex. 3, Ken Belson, *For Retirees, Decision on Concussion Settlement Will Not Be a Simple One*, N.Y. Times, July 22, 2014, Doc. No. 6422-4; Burns Decl. Ex. 4, Sam Farmer, *Revised NFL Concussion Settlement Gets U.S. Judge's Preliminary OK*, L.A. Times, July 7, 2014, Doc. No. 6422-5; *see also* Gary Mihoces, *NFL Concussion Settlement Gets Preliminary Approval*, USA Today, July 7, 2014; Seeger Decl. ¶ 70.)  This coverage provided a form of notice beyond that which this Court could possibly direct, and widened the reach of the notice to the Settlement Class.  (Decl. of Katherine Kinsella ¶ 30, Nov. 12, 2014, Doc. No. 6423-12.)

D.   **Class Members' Response to the Settlement**

187.   As of November 9, 2014, over 64,000 unique visitors had accessed the Settlement Website, and over 5,200 Settlement Class Members had signed up to receive additional information and updates concerning the Class Action Settlement, including information on registration for Settlement benefits.  (Burns Decl. Ex. 1, Claims Administrator Update as of Nov. 9, 2014.)  Over 4,500 calls were made to the call center, with callers spending over 265 hours listening to the pre-recorded FAQs, and over 2,300 callers spoke with the trained operators.  (Decl. of Katherine Kinsella ¶ 28, Nov. 12, 2014, Doc. No. 6423-12; Radetich Decl. ¶ 9.)

188.   As of November 12, 2014, only 234 individuals out of a class of over 20,000 sought to opt out of the Settlement—*i.e.*, fewer than 1% of the estimated Class Members.  (Burns Decl. Ex. 1, Claims Administrator Update as of Nov. 9, 2014.)  This included 210 retired players and 24 family members.  *Id.*  Since that time, one Settlement Class member has submitted an untimely request to opt out, and nineteen Settlement Class Members have sought to revoke their requests to opt out.  The parties

have consented to these revocations. (*See* Sixth Opt Out Report Submitted by the Claims Administrator, Doc. No. 6496.)

189. Similarly, fewer than 1% of the Class Members (206 Class Members) have objected to the Settlement Agreement. These 206 Objectors filed a total of 82 written submissions in advance of the Fairness Hearing. Of these, six filed their objections late and five have since opted out (additionally, one late objector is not a member of the Settlement Class). (*See generally* Amicus Curiae Objection of Dawn Astle and Claire Astle to Class Action Settlement, Doc. No. 6439.) Objectors also filed 62 pages of supplemental briefing following the Fairness Hearing. (*See* Doc. Nos. 6439, 6453, 6954, 6455, 6456.)

## E. <u>Fairness Hearing</u>

190. In advance of the Fairness Hearing, Class Counsel and the NFL Parties submitted 266 pages of briefing and eight affidavits from medical or scientific experts as evidence that the Settlement is fair and reasonable. (*See* NFL Parties' Final Approval Mem., Doc. No. 6423; Class Counsel's Mem. of Law in Supp. of Final Approval of Settlement and Certification of Class and Subclasses, Doc. No. 6423-1.) Class Counsel and the NFL Parties also submitted 64 pages of supplemental briefing following the Fairness Hearing. (*See* Doc. Nos. 6466, 6467.)

191. The NFL Parties' and Class Counsel's medical experts are as follows:

a. Dr. Kristine Yaffe is a professor in the Departments of Psychiatry, Neurology and Epidemiology at University of California San Francisco ("UCSF"). In addition, Dr. Yaffe is a clinical neurologist and geropsychiatrist focusing on the treatment of patients with neurodegenerative diseases. Dr. Yaffe serves as the Director of the UCSF

Dementia Epidemiology Research Group and as the Chief of Geriatric Psychiatry and Director of the Memory Disorders Clinic at San Francisco Veteran's Affairs Medical Center. She is the principal investigator of seven grants from the National Institutes of Health, including grants related to cognitive decline, and has authored over 300 peer-reviewed articles. Dr. Yaffe also serves as the Roy and Marie Scola Endowed Chair in Psychiatry and the Vice Chair of clinical and translational research at UCSF. (Dr. Yaffe Decl. ¶¶ 2-8.)

b.  Dr. Julie Ann Schneider is a professor of pathology (neuropathology) and neurological sciences at Rush University Medical Center in Chicago, Illinois. In addition, Dr. Schneider is a board-certified practicing clinical neuropathologist and neurologist. She serves as Associate Director, Neuropathology Core Leader, and Senior Neuropathologist of the Rush Alzheimer's Disease Center, is part of 17 investigative teams with grants to study various pathologies, and has authored over 180 peer-reviewed scientific articles. Dr. Schneider was recently recognized by Thompson Reuters as being among the top 1% of highly cited researchers in the world in the area of neuroscience and behavior. She was an invited member of the expert panel convened by the National Institute on Aging – Alzheimer's Association to provide new guidelines for the criteria for a pathologic diagnosis of Alzheimer's Disease in 2012. (Dr. Schneider Decl. ¶¶ 2-12.)

c.  Dr. Scott Millis is a tenured professor in the Department of Physical Medicine and Rehabilitation at Wayne State University School of Medicine and Director of Research at the Detroit Medical Center's Rehabilitation Institute of Michigan.  In addition, Dr. Millis is a board-certified clinical neuropsychologist and psychologist.  He maintains an active program of research in traumatic brain injury, has authored over 130 peer-reviewed publications relating to neurobehavioral outcome and neuropsychology, and his research has been supported by the United States Department of Defense, National Institutes of Health, and the United States Department of Education.  Dr. Millis previously served as the Chief of Neuropsychology at the Detroit Medical Center Rehabilitation Institute of Michigan, and as the statistician for the Traumatic Brain Injury National Data Center over a ten-year period.  (Dr. Millis Decl. ¶¶ 2-9.)

d.  Dr. Kenneth C. Fischer is a board-certified neurologist with 39 years of clinical practice experience and is currently a member of the teaching faculty at the University of Miami School of Medicine Department of Neurology.  Dr. Fischer has served on the Executive Committee of the Board of Trustees of Catholic Health Services, as well as Chief of Professional Affairs of that organization, which owns and administers more than 30 facilities in the South and Central Florida region, including rehabilitation hospitals, skilled nursing facilities, intermediate care facilities, and outpatient home health agencies. From 1978 through 2002,

Dr. Fischer served as a special senior consultant for neurological injuries for the Veterans Administration Hospital.  Dr. Fischer is also a designated Expert Medical Advisor for the judiciary in the State of Florida for workers compensation injuries.  (Dr. Fischer Decl. ¶¶ 2-3.)

e.   Dr. Christopher C. Giza is a neurologist in the Division of Pediatric Neurology at the Mattel Children's Hospital and the David Geffen School of Medicine at UCLA.  He is also a Professor of Pediatric Neurology and Neurosurgery in the UCLA Brain Injury Research Center, Director of the UCLA Steve Tisch BrainSPORT Program, and a Diplomat of the American Board of Psychiatry and Neurology.  Dr. Giza is also involved in concussion-related professional committees, and has authored multiple publications and given more than 170 lectures over the past decade regarding concussion, traumatic brain injury and the pathophysiology of injury and recovery.  (Dr. Giza Decl. ¶¶ 2-9.)

f.   Dr. Allen Hovda serves as a professor in the Departments of Neurosurgery and Molecular and Medical Pharmacology at the David Geffen School of Medicine at UCLA, Los Angeles, California. He also serves as the Vice Chair of Academic Affairs, in the Department of Neurosurgery at the David Geffen School of Medicine at UCLA. Dr. Hovda is the Director of the UCLA Brain Injury Research Center, and has served as the Chair of the National Institutes of Health Study Section NSD-A (2001-2003), Brain Injury and Neurovascular Pathologies (2005-2008), and Multi-Drug Combinations to Promote Neurological Recovery in Traumatic Brain

Injury (2009) for National Institute of Neurological Disorders and Stroke. He has further held numerous positions in national and international committees and societies.  Dr. Hovda has published 175 peer-reviewed papers with many of them relating to research and clinical work regarding brain injury and the physical and developmental outcome, including the neurophysiology of concussion and the physical and psychological outcome from chronic traumatic brain injury.  (Dr. Hovda Decl. ¶¶ 2-11.)

g.  Dr. John G. Keilp is a Research Scientist at the New York State Psychiatric Institute, an Assistant Professor of Clinical Psychology at the Columbia University College of Physicians and Surgeons, and a Clinical Psychologist and Neuropsychologist.  Dr. Keilp is head of the Neuropsychology Laboratory in the Division of Molecular Imaging and Neuropathology at the New York State Psychiatric Institute.  Dr. Keilp has authored 71 peer-reviewed publications in medical, psychological, and neuropsychological journals, and has been a principal investigator or investigator on 24 grants, from both the National Institutes of Health as well as private foundations.  (Dr. Keilp Decl. ¶¶ 2 ,4.)

h.  Dr. Allen Hamilton is a licensed psychologist, and Board Certified Brain Injury Specialist Trainer by the Academy of Certified Brain Injury Specialists of the Brain Injury Association of America.  Dr. Hamilton serves as the Clinical Director, Sports Concussion Clinic, Baptist Hospital, Miami, Florida, Symposium, Clinical Director, CARF Accredited Inpatient and Outpatient Brain Injury Programs at Baptist Hospital, Co-

Director of Baptist Hospital's Annual Brain Injury Symposium, and Co-Director of the Baptist Hospital's Annual Behavioral Medicine.  He also serves on a variety of departmental committees and extra-departmental committees related to the clinical practice of neuropsychology and rehabilitative medicine.  Dr. Hamilton has published papers and presented numerous lectures to medical and psychological professionals throughout the United States in the fields of neuropsychological diagnoses, testing, assessment, and rehabilitation, and he has for a number of years organized and directed an annual symposium regarding the research and clinical developments in the assessment and rehabilitation of patients with various types of neurologic injury.  (Dr. Hamilton Decl. ¶¶ 1, 2, 6.)

192.    The Fairness Hearing was held on November 19, 2014 from 10 a.m. to 3:20 p.m. before the Honorable Anita B. Brody.  (Fairness Hearing Transcript, Nov. 19, 2014 ("Fairness Hearing Transcript"), Doc. No. 6463.)

193.    On behalf of Settlement Class Members and the NFL Parties, Christopher A. Seeger and David R. Buchanan of Seeger Weiss LLP, and Brad S. Karp and Bruce Birenboim of Paul, Weiss, Rifkind, Wharton & Garrison LLP spoke in favor of the Settlement.  (*See* Fairness Hearing Transcript.)

194.    Steven F. Molo of MoloLamken LLP, counsel for certain of the Objectors, coordinated the arguments of the Objectors who wished to speak pursuant to the Court's November 4, 2014 Order.  (Court Notice Regarding the Fairness Hearing, Nov. 4, 2014, Doc. No. 6344.)  Ten counsel spoke on behalf of objecting class members.  (*See* Fairness Hearing Transcript.)   Five settlement class members also

spoke at the hearing. (*See id*.) Another settlement class member was also on the list to speak but was not present when called. (*See id.*)

195. Objectors generally contend that the Settlement Class does not meet the requirements of Rule 23, and that the Settlement is not fair, reasonable and adequate under *Girsh* v. *Jepson*, 521 F.2d 153 (3d Cir. 1975) and *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998).

196. First, Objectors claim that the scope of the Qualifying Diagnoses and amount of the Monetary Awards are insufficient. Objectors argue that diagnoses of CTE made after preliminary approval (now, the Final Approval Date) should be compensated, and there exist other medical conditions that are omitted from the Settlement, making the Settlement unfair and, in some instances, creating class certification problems. Relatedly, Objectors argue that the maximum Monetary Awards available for Qualifying Diagnoses are insufficient and that the potential reductions to the Awards (due to a Retired NFL Football Player's age or any applicable Offsets) are improper. Objectors also argue that the standard for a Qualifying Diagnosis of dementia is unreasonably high.

197. Second, Objectors challenge the requirement that, in order to receive a Monetary Award, Representative Claimants of Retired NFL Football Players who died prior to January 1, 2006 (more than seven years before the Preliminary Approval date) must demonstrate that their claim would not be barred by any applicable statutes of limitations.

198.   Third, Objectors contend that the $75 million BAP Fund is inadequate because it will not cover the cost of treating dementia and that the particular BAP testing protocols described in the Settlement Agreement are too burdensome.

199.   Fourth, Objectors criticize the Settlement process, including the registration and claims processes, the deadline for enrollment in the BAP, the Settlement provisions requiring the use of Qualified MAF Physicians, the Claim Package, the appeals process for Monetary Award determinations, and the anti-fraud provisions relating to the Claims Administrator's investigation and audit of Claim Packages.

200.   Fifth, although the Monetary Award Fund is uncapped, Objectors argue that the $10 million Education Fund is an inappropriate *cy pres* award that diverts monies away from Settlement Class Members.

201.   Sixth, Objectors contend that the Release is overbroad because it allegedly releases without compensation claims for CTE.

202.   Seventh, Objectors argue that the NFL Parties may default on the payments required by the Settlement Agreement because the provision of security is insufficient.

203.   Eighth, Objectors argue that the timing of the opt-out deadline is unfair and should be revised.  Specifically, Objectors argue that:  (i) a delayed opportunity to opt out after the Fairness Hearing should be permitted, and (ii) Objectors should have been permitted to object and appear at the Fairness Hearing and later to opt out.

204.    Ninth, Objectors claim that the notice provided and approved by this Court was deficient and misleading in its characterization of the instances of CTE that are compensated.

205.    Tenth, Objectors argue that the Class Counsel's and the NFL Parties' expert witnesses are biased because they received compensation.

206.    Finally, Objectors contend that the attorneys' fees provision renders the Settlement unfair.

207.    As noted above, the Court authorized supplemental briefing following the Fairness Hearing concerning issues addressed in papers filed in support of final approval of the Settlement or raised at the Fairness Hearing.  (*See* Order, Oct. 9, 2014, Doc. No. 6203.)

208.    On February 2, 2015, the Court issued an order directing the parties to address (i) the lack of any Eligible Seasons credit for play in NFL Europe; (ii) the lack of assurance that all living Retired NFL Football Players who timely register for the Settlement, who are eligible to participate in the BAP, and who timely seek a BAP baseline assessment examination, will receive the examination regardless of any funding limitations in the agreement; (iii) the treatment of the Qualifying Diagnosis of Death with CTE with respect to Retired NFL Football Players who die between the date of Preliminary Approval and Final Approval of the Settlement; (iv) the lack of a hardship provision with respect to the appeal fee for Settlement Class Members; and (v) the lack of reasonable accommodation for Settlement Class Members who do not possess medical records in support of a Qualifying Diagnosis due to *force majeure* type events.   On February 13, 2015, the parties addressed the Court's stated concerns

through amendment of the Settlement, as included in the description of the Settlement above.

## CONCLUSIONS OF LAW

## I.
## THE SETTLEMENT CLASS
## SHOULD BE CERTIFIED[3]

209.    In order to approve the certification of a settlement class under Rule 23

of the Federal Rules of Civil Procedure, the requirements of Rule 23(a) and 23(b)(3)

must be met.  *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d

Cir. 2004).  Under Rule 23(a), the parties seeking certification must show that "(1) the

class is so numerous that joinder of all members is impracticable; (2) there are

questions of law or fact common to the class; (3) the claims or defenses of the

representative parties are typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the interests of the class."  Fed.

R. Civ. P. 23(a).  Rule 23(b)(3) further requires that "questions of law or fact common

to the class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy."  Those requirements are satisfied here.

A.    **The Settlement Class Meets Rule 23(a)'s Requirements**

1.    **The Settlement Class Satisfies the Numerosity Requirement**

210.    Numerosity is satisfied when the "class is so numerous that joinder of all

members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "No minimum number of

plaintiffs is required to maintain a suit as a class action, but generally if the named

---

[3]    Section I of the Proposed Conclusions of Law, which explains that the Settlement
Class may be certified for settlement purposes pursuant to Rule 23(a) and 23(b)(3) of
the Federal Rules of Civil Procedure, is submitted exclusively by Class Counsel, and
not by the NFL Parties.  The NFL Parties do not oppose Class Counsel's request, in
connection with settlement only, on the condition that the Court grants final approval
to the Settlement Agreement.

plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart* v. *Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001).

211.    No Objector has argued that numerosity is not met.  Nor could it.  The Settlement Class is comprised of over 20,000 Retired NFL Football Players.  This figure is even larger when including the Retired NFL Football Players' Derivative Claimants.

212.    Joinder of all members of the Settlement Class is, therefore, impracticable, and thus the numerosity requirement is satisfied.  *See, e.g., id.* at 227-28.

## 2.    The Settlement Class Satisfies the Commonality Requirement

213.    Rule 23(a)'s commonality requirement is met when the parties seeking certification show that there is at least one question of law or fact common to the class. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527-28 (3d Cir. 2004).  Common questions are those "depend[ing] upon a common contention" and are "capable of classwide resolution."  *Wal-Mart* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011).

214.    Here, there is more than one common question of law and fact central to the negligence and fraud claims of Settlement Class Members.  With respect to the negligence claims, a factfinder, for example, would need to resolve common questions relevant to whether the NFL Parties breached a duty to Settlement Class Members. Similarly, the fraud claims allege that the NFL Parties used the formation of the Mild Traumatic Brain Injury Committee in 1994 to fraudulently conceal and to affirmatively misrepresent the long-term effects of Plaintiffs' injuries, and whether the NFL Parties, in fact, engaged in such fraudulent concealment and/or affirmative misrepresentation is relevant to the claims of all Settlement Class Members.

78

215.    Specific common questions include, among others: whether the injuries in question are generally caused by concussions from playing football; whether the NFL withheld or misrepresented critical information about the dangers of football-related concussions; and whether the claims are preempted by Section 301 of the LMRA.  (*See* Decl. of Robert H. Klonoff ("Klonoff Decl.") ¶ 27, Doc. No. 6423-9.)

216.    Objectors' argument that under *Wal-Mart* and *M.D.* v. *Perry*, 675 F.3d 832 (5th Cir. 2012), commonality is not present because Settlement Class Members "have been injured in unique and disparate ways" has no merit.  (*See* Heimburger Obj. at 13-15, Doc. No. 6230.)

217.    In *Wal-Mart*, while the putative class of female Wal-Mart employees may have established they suffered individual acts of discrimination, they had not proven Wal-Mart adopted a company-wide policy of discrimination impacting the class as a whole and justifying class treatment.  131 S. Ct. at 2552-57.  In *M.D.*, the Fifth Circuit remanded the action for further proceedings because the purported common question—whether there were systematic deficiencies in Texas's foster care program—was too general and untethered to the specific claims in the case.  675 F.3d at 841-45.

218.    By contrast, the common questions here are relevant to the specific claims made by the Settlement Class as a whole.  A "classwide proceeding" would, therefore, "drive the resolution of the" negligence and fraud claims, "generat[ing] common answers" regarding, for example, whether the NFL concealed the long-term neurocognitive impacts of participation in NFL Football.  *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation marks omitted).

219.    Therefore, the commonality requirement is satisfied.

### 3.    The Settlement Class Satisfies the Typicality Requirement

220.    The typicality requirement is satisfied when "claims of representative plaintiffs arise from the same alleged wrongful conduct" as the claims of other class members. *Warfarin*, 391 F.3d at 532. "The typicality inquiry is intended to assess . . . whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal* v. *Casey*, 43 F.3d 48, 57 (3d Cir. 1994). When plaintiffs challenge "a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries" resulting from the practice. *Id.* at 58.

221.    Here, the claims of the Subclass Representatives and other Settlement Class Members are based on the same legal theories of negligence and fraud, and arise from the NFL Parties' same alleged conduct and practice. Both Shawn Wooden, the Subclass Representative for Subclass 1, and Kevin Turner, the Subclass Representative for Subclass 2, assert claims of negligence and fraud relating to the alleged conduct (or omissions) by the NFL Parties in establishing guidelines for returning to play after suffering concussive or sub-concussive head impacts, and for the MTBI Subcommittee's alleged misrepresentations concerning the long-term neurocognitive impacts of play in NFL Football.

222.    The Subclass Representatives' claims also are the same as those asserted by Settlement Class Members in their respective Subclasses. Like the other members of Subclass 1, Wooden is a Retired NFL Football Player who has not been diagnosed with a Qualifying Diagnosis and seeks a baseline assessment screening to determine whether he has any neurocognitive impairment resulting from his years of playing NFL football and the opportunity to receive a Monetary Award should he receive a

Qualifying Diagnosis later in life.  Similarly, Turner, like the other members of Subclass 2, has been diagnosed with a Qualifying Diagnosis and seeks compensation from the NFL Parties for his injuries.

223.    Objectors argue that the Subclass Representatives' claims are not typical under Rule 23 because they accumulated more than five Eligible Seasons, did not play in NFL Europe, and have injuries that differ from those of certain Objectors.  (*See*, *e.g.*, Heimburger Obj. at 12, Doc. No. 6230.)  This objection has no merit, however, because the typicality inquiry does not require that the Subclass Representatives' claims be factually identical to those of other Settlement Class Members.  Instead, this requirement is satisfied where, as here, the Subclass Representatives purportedly were harmed by the same conduct that harmed the other Settlement Class Members.  *See Baby Neal*, 43 F.3d at 58 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." (citation omitted)); *see also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) ("Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence.").

224.    Therefore, the typicality requirement is satisfied.  (*See* Klonoff Decl. ¶¶ 28-29.)

### 4.    The Settlement Class Satisfies the Adequacy Requirement

225.    Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4); *see also Dewey* v. *Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012).  The two components

to this inquiry—(a) the experience and performance of class counsel, and (b) the interests and incentives of the representative class members—are met here.  *Id*.; Klonoff Decl. ¶ 30.

> **(a)** **Co-Lead Class Counsel and Subclass Counsel Are Experienced and Vigorously Represented the Interests of the Class and Subclasses**

226.   As set forth in detail above, Co-Lead Class Counsel Christopher A. Seeger and Sol Weiss, and Subclass Counsel Arnold Levin and Dianne M. Nast (Subclass Counsel for Subclasses 1 and 2, respectively), are well-qualified and experienced, having served as lead counsel and/or as members of the plaintiffs' executive committees or steering committees in more than one hundred actions.  (*See* Phillips Decl. ¶ 7; Seeger Decl. ¶¶ 2-5; Nast Decl. ¶¶ 2-4; Levin Decl. ¶¶ 2-3.)

227.   Moreover, as also described above, Co-Lead Class Counsel and Subclass Counsel participated vigorously and zealously represented their clients' interests in settlement negotiations.  (*See* Seeger Decl. ¶¶ 27, 31-32; Levin Decl. ¶¶ 5, 11-12; Nast Decl. ¶¶ 6, 10-11; *see also* Phillips Decl. ¶ 5-7.)  As Court-appointed mediator Retired U.S. District Court Judge Layn Phillips observed, it "was evident throughout the mediation process that Plaintiffs' counsel were prepared to litigate and try these cases, and face the risk of losing with no chance to recover for their labor or their expenses, if they were not able to achieve a fair and reasonable settlement result for the proposed class."  (Phillips Decl. ¶ 11.)

> **(b)** **Subclass Representatives' Interests are Aligned with Interests of Subclass Members**

228.   A named class representative satisfies Rule 23(a)(4)'s requirements when he or she is capable of "fairly and adequately protect[ing] class [or subclass

interests." *Sullivan* v. *DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (internal quotation marks omitted). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 625 (1997). "[N]ot all intra-class conflicts will defeat the adequacy requirement." *Dewey*, 681 F.3d at 184. Only "fundamental" conflicts pose an obstacle to class certification. *Id*. Such conflicts arise where "some [class] members claim to have been harmed by the same conduct that benefitted other members of the class"—that is, where money is taken from Peter to pay Paul, as when the interests of future claimants are compromised to compensate current claimants.

229.    Fundamental intra-class conflicts can be cured through proper structural assurances of fair and adequate representation in the settlement, such as separate subclasses with separate representation. *See id*. at 182-85; *Amchem*, 521 U.S. at 627; *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 212 (E.D. Pa. 2014); Klonoff Decl. ¶ 30.

230.    Here, the Subclass Representatives satisfy Rule 23(a)(4) because they fairly and adequately protected the interests of the Subclasses they represent. Moreover, the Settlement Agreement contains numerous structural features to ensure fair and adequate representation, including an uncapped Settlement Fund, an inflation adjustment for Monetary Awards, oversight of settlement negotiations by a mediator, and two separate Subclasses with separate representation.

231.    First, Shawn Wooden and Kevin Turner were appropriate Subclass Representatives under Rule 23(a)(4) capable of fairly and adequately protecting the

interests of their Subclasses because they shared the same interests and incentives as the Settlement Class Members they represented, and they were kept informed about and provided input into the settlement negotiations.  (Wooden Aff. ¶¶ 3-5, 7; Turner Aff. ¶¶ 6-7, 9; *see also* Nast Decl. ¶¶ 6, 8-10; Levin Decl. ¶¶ 6, 8-10.)

232.    Shawn Wooden, like the other Settlement Class Members in Subclass 1, has not been diagnosed with a Qualifying Diagnosis, and he does not know which, if any, condition he will develop.  It was, therefore, in Wooden's interest to include as many conditions in the Settlement Agreement as possible—including CTE—and to ensure the Settlement funds and Awards were substantial and protected against depletion and inflation.  For this reason, Wooden is an appropriate subclass representative for Subclass 1 for Retired NFL Football Players who may one day be diagnosed with a Qualifying Diagnosis.  There is no need for a separate, so-called CTE-only subclass for Retired NFL Football Players at risk for developing those conditions allegedly associated with CTE in the living, as well a CTE pathological finding upon death, as Objectors argue.  Moreover, under Objectors' own theory, every Retired NFL Football Player is at risk for CTE, including Subclass 1 Representative Wooden. Indeed, a "CTE subclass" would include all Settlement Class Members and would be indistinguishable from the Settlement Class that the Court is certifying.   The request for a "CTE subclass" is, therefore, not a question of distinct representation for a subset of the Settlement Class, but rather a variant on the claim that there should be a different compensatory scheme for the Settlement Class overall.

233.    Kevin Turner, like the other Retired NFL Football Players in Subclass 2, has been diagnosed with a Qualifying Diagnosis (in Turner's case, ALS).  Turner could

still be diagnosed with other medical conditions, however, and it therefore was in his interest to include as many conditions in the Settlement Agreement as possible—including CTE—and to ensure the Settlement funds and Awards were substantial and protected against depletion and inflation.

234.    In addition, the Settlement Agreement contains numerous important structural assurances of fair and adequate representation under Rule 23(a)(4).

235.    First, because the Settlement Agreement is uncapped there is no concern that Settlement Class Members with current Qualifying Diagnoses will deplete the Settlement Funds, and the uncapped nature of the fund guarantees that any Settlement Class Member receiving a Qualifying Diagnosis at any time throughout the Settlement's 65-year term will receive the full Monetary or Derivative Claimant Award to which he or she is entitled.

236.    Second, the Settlement Agreement provides that Monetary Awards will increase by up to 2.5% per year to adjust for inflation, placing Settlement Class Members who may receive a Qualifying Diagnosis in the future on the same footing as Settlement Class Members with a current Qualifying Diagnosis.

237.    Third, the Settlement negotiations were overseen by mediator Retired U.S. District Court Judge Layn Phillips—who described the negotiations as arm's length and hard-fought—adding a further assurance of fairness.

238.    Finally, as discussed above, the Settlement Class is separated into two Subclasses with separate representation based on whether the Settlement Class Member had a Qualifying Diagnosis as of the Preliminary Approval date.  *See Juris* v. *Inamed Corp.*, 685 F.3d 1294, 1324 (2d Cir. 2012) ("This combination of named plaintiffs

representing the full spectrum of breast implant claimants and separate counsel to represent the present injury and future injury claimants addressed the potential and actual divergent interest within the . . . class.").

239.    Objectors nevertheless assert several objections.  First, Objectors argue that the Settlement must include two additional structural protections: a provision requiring that the Settlement keep pace with changing science, and a back-end opt out right.  Neither is required.

240.    Objectors rely on the Supreme Court's decision in *Amchem* in support of the claim that the Settlement must include a provision that takes into account evolving science, but nowhere—in *dicta* or otherwise—did the Supreme Court require the type of fluid settlement provisions which the Objectors seem to suggest.  In addition, unlike the Settlement Agreement here (where Settlement Class Members without a Qualifying Diagnosis were separately represented), in *Amchem* the exposure-only class members lacked their own representation.  In any event, the Settlement here does not freeze in place the relevant science.  To the contrary, the Settlement Agreement provides that "following the Effective Date, on a periodic basis not to exceed once every ten (10) years, Co-Lead Class Counsel and Counsel for the NFL Parties agree to discuss in good faith possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science."  (Settlement Agreement § 6.6(a).)

241.    Nor is a back-end opt-out right required.  Settlement Class Members already have all the information they need to make an informed decision about whether to participate in the Settlement.  They have been made aware of the Qualifying

Diagnoses compensated under the Settlement and the amounts to which they would be entitled if they receive any such Qualifying Diagnoses in the future.  They will, thus, be on the same footing as a Settlement Class Member with a current Qualifying Diagnosis because the Monetary Awards are inflation-protected, and there is no risk of depleting the Monetary Award Fund because it is uncapped.  Consequently, a back-end opt out serves no purpose, given the Settlement's existing structural protections.

242.    Second, Objectors argue that there are intra-class conflicts precluding certification; relying on the Supreme Court's decision in *Amchem*, Objectors contend that numerous conflicts of interest exist among Settlement Class Members based on differences in factual circumstances that can only be ameliorated by creating a myriad of subclasses, each with its own representation.  Thus, Objectors contend that there must be separate representation for Settlement Class Members who have fewer than five Eligible Seasons, Settlement Class Members who have suffered a stroke or TBI outside of NFL Football, and Settlement Class Members who played in NFL Europe.  Objectors also contend that there should be a separate Subclass with separate representation for Settlement Class Members with medical conditions not covered by the Settlement Agreement, including CTE.  These objections have no merit.

243.    In *Amchem*, the Supreme Court held that a "sprawling" settlement class failed to meet Rule 23(a)(4)'s adequacy of representation requirement when, without subclasses, it was comprised of all persons exposed to asbestos occupationally or "through the occupational exposure of a spouse or household member"—regardless of whether that exposure had manifested into mesothelioma or other asbestos-related injury.  *Amchem*, 521 U.S. at 602, 622.  Concerned that the currently-injured settlement

class members might have pursued their own interests (large, immediate payouts) at the expense of the latent injury class members' interests (inflation-protected awards and ample settlement funds guaranteeing future payments), the Court held that class certification was inappropriate absent sufficient structural assurances of fair and adequate representation under Rule 23(a)(4).  *Id*. at 626-27.

244.  As described above, the Settlement Agreement includes structural assurances of fair and adequate representation not present in *Amchem*, including an uncapped Monetary Award Fund ensuring all eligible claims will be paid, inflation-adjusted Monetary Awards, and separate subclasses with separate representation to advocate for the interests of Settlement Class Members with and without a Qualifying Diagnosis.  *Amchem*, therefore, does not prevent certification here.  (*See* Klonoff Decl. ¶ 35.)

245.  In any event, a class settlement is not compromised simply because there may be differences in either the condition or treatment of class members, and not every distinction drawn by a Settlement Agreement requires a new subclass.  *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) ("[V]aried relief among class members with differing claims in class settlements is not unusual."); *Dewey*, 681 F.3d at 186-87 ("To hold that [ ] differing valuations by themselves render the representative plaintiff inadequate would all but eviscerate the class action device."); *Petrovic* v. *Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, . . . that [ ] argument is untenable."); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W. Va. 2005)

("By nature of the settlement, the parties have negotiated values to assign to claims based on the severity of physical injury. [The Court] do[es] not consider the assignment of a lower value to claims where injuries are less serious to be evidence of conflict.").

246.    The distinctions drawn by the Settlement Agreement are appropriate "reflection[s] of the extent of the injury that certain class members incurred and does not clearly suggest that the class members had antagonistic interests," *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009), or are based on "factors that would make it difficult for [Settlement Class Members] to prove that their [condition] was caused by" defendant's conduct. *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *22 (E.D. Pa. Aug. 28, 2000).

247.    Thus, providing for different maximum awards for different Qualifying Diagnoses represents the nature of the injury suffered by each Retired NFL Football Player and does not create a conflict of interest between Settlement Class Members. *See Diet Drugs*, 2000 WL 1222042, at *1, 21-22 (approving personal injury class settlement providing a range of monetary awards for valvular heart disease, subject to matrix criteria, such as age, duration of use, and severity of injury); *Klein* v. *O'Neal, Inc.*, 705 F. Supp. 2d 632, 639, 641 (N.D. Tex. 2010) (approving class settlement that allocated funds among claimants according to categories assigned by medical experts, "with stronger claims resulting in higher-paying categorization."); *In re Phenlpropanolamine Prods. Liab. Litig.*, 227 F.R.D. 553, 555, 557-58 (W.D. Wash. 2004) (granting final approval to personal injury class settlement providing awards ranging from $100 up to $5 million, for ischemic stroke and other injuries, depending on matrix criteria of age, severity of injury, etc.).   The grid values provided in this

Settlement are the result of vigorous, hard-fought, arm's-length negotiations that were supervised by the Court-appointed Mediator.  (*See* Seeger Decl. ¶ 32.)  Moreover, there are objective variations in the severity of symptoms, progression of the Qualifying Diagnoses, and types of complications presented by the different Qualifying Diagnoses, and here, as in the tort system, these distinctions would warrant different levels of compensation.

248.    The same is true for the Settlement Agreement's Offsets.  The Offset for Retired NFL Football Players with fewer than five Eligible Seasons is a reasonable proxy for the degree to which the Retired NFL Football Player was exposed to repetitive head trauma in the NFL—an important factor relating both to liability and damages.  (Klonoff Decl. ¶ 98; Vasquez Decl. ¶ 13.)  The Offset for non-football strokes and TBI reflects the fact that these conditions are scientifically supported risk factors for developing the Qualifying Diagnoses and would, therefore, pose an obstacle for any Settlement Class Member attempting to prove that such injuries were caused by NFL Football.  The Settlement Agreement has been amended to credit a season played in NFL Europe as half an Eligible Season (previously, seasons played in NFL Europe did not count towards Eligible Seasons).   This reflects that NFL Europe was a developmental league with a shorter season than the NFL, and that NFL Europe players face a particularly acute litigation risk due to workers' compensation exclusivity laws because each American football player who chose to play in NFL Europe, an affiliate League of the NFL, signed a contract that made him an employee of NFL Europe, and, in turn, NFL Europe generally provided workers' compensation coverage for any injuries that occurred.  (*See* Gardi Decl. ¶¶ 5, 8-9, 11-14.)

249.    In sum, these distinctions do not create fundamental conflicts of interest requiring separate subclasses.  *See Pet Food*, 629 F.3d at 347 ("[A]lleged differences in the strength of the various claims asserted in this class action do not, by themselves, demonstrate conflicting or antagonistic interests within the class that would require subclasses."); *In re Phenylpropanolamine*, 227 F.R.D. at 562 ("Placing a lower value on claims that would have been barred by a defense .  .  . is hardly evidence of a conflict.").

250.    Nor does an intra-class conflict arise from the fact that certain medical conditions are not included among the Qualifying Diagnoses.  *See Diet Drugs*, 2000 WL 1222042, at *47 (overruling Rule 23 adequacy of representation objection that class settlement compensating heart valve injuries should also compensate neuropsychiatric injuries).  As for CTE, there is no intra-class conflict because, as set forth above, each Retired NFL Football Player's interest is identical insofar as, under Objectors' own theories, they are all alleged to be at risk for developing CTE.

251.    Non-compensation of mood and behavioral disorders does not create a fundamental conflict of interest either because settlements are not required to compensate conditions when the connection between the condition and defendant's alleged conduct is not scientifically supported or is "controvers[ial]."  *See Diet Drugs*, 2000 WL 1222042, at *47 (overruling Rule 23 adequacy of representation objection when there was a "significant degree of controversy in the available literature" over the connection between diet drugs and the neuropsychiatry injury not covered by the

settlement).  That is the case here,[4] and it follows that there is no fundamental conflict of interest requiring separate representation.  Simply, reasonable lines were drawn through arm's-length, hard-fought negotiations.

252.    Finally, adopting Objectors' position would quickly lead to an unwieldy multitude of subclasses, each with its own subclass representative and counsel.  Courts have rejected such an unworkable approach.  *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) ("[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened." (internal quotation marks omitted)); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (same); *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am.* v. *Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007) ("[I]f every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair.").  Rejecting similar objections in *Deepwater Horizon*, Judge Barbier explained that creating subclasses for each type of injury"—each with separate class representatives and counsel—would have greatly complicated both the settlement negotiations and the overall administration of the litigation."  *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 920 (E.D. La. 2012); *see also* Klonoff Decl. ¶¶ 36-38, 44-48.  So too here.

253.    Therefore, the adequacy of representation requirement is satisfied.

---

[4]    As explained in detail below, the NFL Parties have introduced evidence that it has not been established that CTE causes mood or behavioral changes, or that CTE is correlated with suicide.  (*See* Dr. Schneider Decl. ¶¶ 29, 45; Dr. Yaffe Decl. ¶¶ 75, 76; *see also* Dr. Hamilton Decl. ¶¶ 31, 33.)

**B.**     **The Settlement Class Meets Rule 23(b)(3)'s Requirements**

254.    Rule 23(b)(3) requires:  (i) that the court find that common questions of law or fact predominate over individual questions; and (ii) that a class action is superior to other available methods of adjudication.   The Settlement Class satisfies these requirements.

**1.     The Settlement Class Satisfies the Predominance Requirement**

255.    "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Sullivan* v. *DB Inv., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc) (internal quotation marks omitted).  In the context of a class settlement, "individual issues which are normally present in personal injury litigation," including differences in state law and issues of causation, "become irrelevant, allowing the common issues to predominate." *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *43 (E.D. Pa. Aug. 28 2000); *see also In re Phenylpropanolamine Prods. Liab. Litig.*, 227 F.R.D. 553, 563 (W.D. Wash. 2004) (predominance inquiry was satisfied where proponents of the class settlement "argue[d] that because the [settlement award] Matrix specifically addresses issues of product identification, causation, injury and damages, it effectively nullifies those issues which otherwise would be considered individual, allowing common issues to predominate.").   Here, questions of law and fact surrounding the NFL Parties' liability for the alleged injuries suffered by Settlement Class Members predominate over any issues affecting individual members. (*See* Klonoff Decl. ¶¶ 51-57.)

256.    First, the common questions noted above for Rule 23(a)(2) commonality purposes—whether the injuries in question are generally caused by concussions from playing football and whether the NFL withheld or misrepresented critical information

about the dangers of football-related concussions—are central to this litigation.  *See Powers* v. *Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("predominance requirement is met if [a] common question is at the heart of the litigation"); *Buford* v. *H & R Block, Inc*., 168 F.R.D. 340, 356 (S.D. Ga. 1996) ("A single common issue may be the overriding one in litigation, despite the fact that the suit also entails numerous remaining individual questions."), *aff'd sub nom. Jones* v. *H & R Block Tax Servs*., 117 F.3d 1433 (11th Cir. 1997).

257.   Second, Plaintiffs' claims for compensatory relief and medical monitoring are founded upon a common legal theory based on the NFL Parties' alleged knowledge and concealment of the effects of concussions in NFL Football.  *See Amgen Inc*. v. *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.  Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class[.]").

258.   Third, the NFL Parties' alleged withholding of such information was purportedly the cause of all Settlement Class Members' alleged injuries.  *Sullivan*, 667 F.3d at 298 ("[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct.").

259.    Indeed, the Settlement Class here closely resembles the nationwide personal injury class action settlement that satisfied the predominance requirement in *Diet Drugs*.  2000 WL 1222042, at *1, 41-43.

260.    As in *Diet Drugs*, the Retired NFL Football Players' claims relate to the "common injury" of neurocognitive and neuromuscular harm.  *Id.*, 2000 WL 1222042, at *41 (claims alleged "in general, a common injury" pertaining to diet drug-related damage to heart valves).  Also as in *Diet Drugs*, the Retired NFL Football Players' claims pertain to a common course of conduct by one primary defendant—here, the NFL's alleged knowledge of the purportedly harmful effects of repetitive head impacts in NFL Football and its alleged failure to reasonably prevent or mitigate those injuries.  *Id.*, 2000 WL 1222042, at *42 ("Although there are some individual differences among class members, the common class-wide focus on [defendant's] knowledge and conduct predominate such that judicial efficiency will be improved through the class mechanism as opposed to relitigating these same issues in a series of individual cases."); *see also In re Phenylpropanolamine*, 227 F.R.D. at 562-63 (settlement class consisting of all users of a particular drug was sufficiently cohesive when proponents of the settlement argued that the class "involves a common injury type, a common body of science, and allegations involving a common course of conduct by the defendant."); *Chiang* v. *Veneman*, 385 F.3d 256, 273 (3d Cir. 2004) (holding predominance requirement met even though individual proofs of damages would be required), *abrogated on other grounds by Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 n.18 (3d Cir. 2008); *In re Oil Spill by Oil Rig Deepwater Horizon*, 739 F.3d 790, 815-16 (5th Cir. 2014); 2 Newberg on Class Actions § 4:54 (5th ed.) ("[C]ourts in every circuit have therefore

uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations . . . .   Indeed, a class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings."); *see* Class Action Complaint ¶¶ 274-389.

261.   Citing *Amchem Prods., Inc.* v. *Windsor*, Objectors nevertheless argue that the predominance prong of Rule 23(b)(3) is not met.  *Amchem*, however, states that Rule 23 "does not categorically exclude mass tort cases from class certification," and "[e]ven mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement."  521 U.S. 591, 625 (1997); *see also* Klonoff Decl. ¶¶ 53-56.

262.   Moreover, in *Amchem*, the settlement class was "sprawling" and made up of an "[u]ntold numbers of individuals" exposed to asbestos occupationally (regardless of occupation) or "through the occupational exposure of a spouse or household member."  *Amchem*, 521 U.S. at 592, 602.  As a result, there was likely to be significant variation among settlement class members on matters such as which asbestos-containing product (manufactured by one of 20 different defendants) the settlement class member was exposed to and how the settlement class member was exposed.

263.   By contrast, the Settlement Class here is orders of magnitude smaller and significantly more uniform.  Instead of defining the class to include all occupations, only Retired NFL Football Players (and their Derivative and/or Representative Claimants) are Settlement Class Members.   Unlike the settlement class members in

*Amchem*, all Retired NFL Football Players were allegedly "exposed" in precisely the same way: head impacts during participation in professional football. In contrast to *Amchem*, where the products and conduct of twenty defendants were at issue, here all Retired NFL Football players were allegedly harmed by the same purported misconduct by the NFL Parties.

264. This Settlement Class is also materially different from the class decertified in *Barnes* v. *American Tobacco Company,* 161 F.3d 127 (3d Cir. 1998). There, the Third Circuit affirmed the decertification of a tobacco-related medical monitoring class involving the entire tobacco industry—including hundreds of different products manufactured by a number of different defendants containing varying ingredients and levels of nicotine. No such individual issues divide the Settlement Class here because only the NFL Parties' conduct is at issue. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) ("[C]ommon issues . . . predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did." (internal quotation marks omitted)).

265. Therefore, the predominance requirement is satisfied.

### 2. The Settlement Class Satisfies the Superiority Requirement

266. The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (internal quotation marks omitted). Factors the court may consider include "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against members of the class; the desirability or

undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action."  Fed. R. Civ. P. 23 (b)(3)(A)-(D). When the class is being certified for purposes of settlement, the Court need not consider difficulties likely to be encountered in maintaining a class action through trial. *Amchem*, 521 U.S. at 620.

267.   The Class Action Settlement is the superior method of adjudicating the claims because (i) it offers prompt relief and the likely alternative is years of expensive, difficult, and uncertain litigation, with no assurance of recovery, while retired players' physical and mental conditions continue to deteriorate; and (ii) it conserves the resources of the parties and the judiciary by avoiding numerous trials (to date over 5,000 plaintiffs have filed actions against the NFL for injuries sustained allegedly as a result of concussive or sub-concussive head impacts in NFL football) re-litigating many of the same issues.  *See Sullivan* v. *DB Inv., Inc.*, 667 F.3d 273, 311-12 (3d Cir. 2011) (en banc) (recognizing the benefits of "concentrating the litigation of claims in a single superior forum," rather than requiring "numerous individual suits brought by claimants." (internal quotation marks omitted)).

268.   Therefore, the superiority requirement is satisfied.

\*      \*      \*

269.   For the reasons stated above, the requirements of Rule 23(a) and (b)(3) have been met.

## II.
## THE SETTLEMENT IS
## FAIR, REASONABLE AND ADEQUATE

270.   Third Circuit law strongly favors pretrial settlement of complex class actions and repeatedly recognizes "an overriding public interest in settling class action

litigation." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) ("We reaffirm the overriding public interest in settling class action litigation." (internal quotation marks omitted)); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting Third Circuit's policy of "encouraging settlement of complex litigation that otherwise could linger for years"); *Austin* v. *Pa. Dep't of Corr.*, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) ("the extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy of encouraging settlements to 'an overriding public interest'").

271.    As the "fiduciary [who] guard[s] the claims and rights of the absent class members," the court must determine whether the settlement is fair, reasonable and adequate. *Pet Food*, 629 F.3d at 349-50 (internal quotation marks omitted).

272.    At the outset of the evaluation of a class action settlement, a district court should "apply an initial presumption of fairness [to the settlement] where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"   *Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

273.    The court then considers the factors set forth in *Girsh* v. *Jepson*, 521 F.2d 153, 157 (3d Cir. 1975):

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

274.    A court also may consider additional factors identified by the Third

Circuit in *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148

F.3d 283 (3d Cir. 1998), as appropriate, for a "thoroughgoing analysis of a settlement's

terms." *See Pet Food*, 629 F.3d at 350.

275.    These "*Prudential* factors" are: "[(1)] the maturity of the underlying

substantive issues, as measured by experience in adjudicating individual actions, the

development of scientific knowledge, the extent of discovery on the merits, and other

factors that bear on the ability to assess the probable outcome of a trial on the merits of

liability and individual damages; [(2)] the existence and probable outcome of claims by

other classes and subclasses; [(3)] the comparison between the results achieved by the

settlement for individual class or subclass members and the results achieved—or likely

to be achieved—for other claimants; [(4)] whether class or subclass members are

accorded the right to opt out of the settlement; [(5)] whether any provisions for

attorneys' fees are reasonable; and [(6)] whether the procedure for processing

individual claims under the settlement is fair and reasonable." *Prudential*, 148 F.3d at

323.

276.    No single factor is dispositive, and not every factor need weigh in favor

of the settlement for it to be approved. *See Cendant*, 264 F.3d at 242-43 (affirming a

final settlement approval when not all factors weighed in favor of approval); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 277-78 (E.D. Pa. 2012) (same); *Hall* v. *Best Buy Co.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011) ("No single factor is dispositive."); *In re Am. Family Enters.*, 256 B.R. 377, 418 (D.N.J. 2000) ("These factors are a guide and the absence of one or more does not automatically render the settlement unfair."); *see also* Klonoff Decl. ¶ 132.  Moreover, "because a settlement represents the result of a process by which opposing parties attempt to weigh and balance the factual and legal issues that neither side chooses to risk taking to final resolution, courts have given considerable weight to the views of experienced counsel as to the merits of a settlement."  *In re Imprelis Herbicide Mktg. Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 364 (E.D. Pa. 2013); *Lake* v. *First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class." (internal quotation marks omitted)).

277.    Here, as detailed below, the Settlement Agreement is presumptively fair because the settlement negotiations occurred at arm's length, Class Counsel possessed adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties, the proponents of the Settlement are experienced in similar litigation, and only a small fraction of the class opted out.  The *Girsh* and *Prudential* factors confirm that presumption and strongly favor approval.

A.    **The Settlement Is Presumptively Fair**

278.    Each of the criteria for applying an initial presumption of fairness is satisfied in this case.

279.    First, the presumption of fairness applies because settlement negotiations occurred at arm's length and there is no evidence of collusion.  (Phillips Decl. ¶¶ 5-7; *see also In re Cigna Corp. Sec. Litig.*, No. 2:02-cv-08088, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007) (agreement presumptively fair where "negotiations for the settlement occurred at arm's length, as the parties were assisted by a . . . mediator"). Moreover, the Settlement Agreement does not provide undue preferential treatment to any individual Settlement Class Member or Subclass, and attorneys' fees were not discussed until the parties had reached an agreement in principle and will be paid by the NFL Parties separate from the funds available to Settlement Class Members.  (*See* Seeger Decl. ¶¶ 46, 49, 54.)

280.    Second, although formal discovery in this case was stayed pending consideration of a threshold jurisdictional preemption issue that may have ended the litigation, the presumption of fairness applies because counsel "possess[ed] adequate information concerning the strengths and weaknesses of Plaintiffs' claims against the NFL Parties." (Mem. Op. 10-11, July 7, 2014, Doc. No. 6083; *see also, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 235-36 (3d Cir. 2001) (affirming approval of settlement even though litigation was "settled at an early stage" after only "informal" discovery because "Lead Plaintiff had an excellent idea of the merits of its case . . . before Settlement"); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (despite no formal discovery, presumption of fairness applied where Class Counsel had "independently investigat[ed] the merits" of the claims prior to filing the complaint).)  Here, Class Counsel had a robust understanding of the merits of the case because they thoroughly investigated the claims brought in the Complaints,

researched and briefed opposition papers in response to the NFL Parties' motions to dismiss on preemption grounds, retained medical and economics experts, and were well-versed in the relevant medical literature and issues.  (*See* Seeger Decl. ¶¶ 19-22, 25, 30, 32.)

281.    Third, the presumption of fairness applies because, as noted by Judge Phillips, "Plaintiffs . . . were represented by highly experienced, effective and aggressive counsel" who "thoroughly explored and advanced" the parties' positions. (Phillips Decl. ¶ 7; Seeger Decl. ¶¶ 2, 5, 31; Nast Decl. ¶¶ 2-4, 14; Levin Decl. ¶¶ 2, 3, 15; *In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498, 521 (E.D. Pa. 2005) (attaching presumption of fairness where the settlement "resulted after intense arm's length negotiations between experienced counsel"); *Processed Egg,* 284 F.R.D. at 267 (settlement was presumptively fair where "Interim Co-Lead Counsel [we]re extremely experienced in class action litigation, and specifically, similar antitrust litigation"); *McCoy* v. *Health Net, Inc.*, 569 F. Supp. 2d 448, 458-59 (D.N.J. 2008) (presumption of fairness applied where settlement was negotiated by "well-seasoned" counsel who "demonstrated adequacy and tenacity" during the negotiations).)

282.    Finally, the presumption of fairness applies because fewer than 1% of the Settlement Class objected to the Settlement Agreement and fewer than 1% opted out.  Indeed, of the 234 Settlement Class Members who initially opted out, nineteen have rescinded their opt-out request.  (*See* Sixth Opt Out Report Submitted by the Claims Administrator, Doc. No. 6496.)  This amount is similar to, or less than, the amount of objections in other cases involving settlements that courts have presumed to be fair and reasonable.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535

(3d Cir. 2004) (district court did not abuse its discretion in determining that the presumption of fairness properly attached to a settlement that "was objected to by only a small fraction of the purported class").

283.     In sum, the Settlement Agreement is presumptively fair.

**B.      An Evaluation of the *Girsh* Factors Confirms that the
Settlement Is Fair, Reasonable and Adequate**

284.     Because a rebuttable presumption of fairness attaches to this Settlement, Objectors bear the burden of establishing that it is unreasonable under the *Girsh* factors. *See First State Orthopaedics* v. *Concentra Inc.*, 534 F. Supp. 2d 500, 516 (E.D. Pa. 2007) ("[T]he settlement should be presumed fair. However, this is a rebuttable presumption."); *see also* 2 McLaughlin on Class Actions § 6:7 (10th ed.) ("While the initial presumption of fairness does not dilute the court's review on final approval, it does place the burden on any objectors of persuading the court that the proposed settlement is unreasonable." (citing *New Eng. Health Care Emps. Pension Fund* v. *Fruit of the Loom, Inc.*, 234 F.R.D. 627, 631 (W.D. Ky. 2006), *aff'd sub nom. Fidel* v. *Farley*, 534 F.3d 508 (6th Cir. 2008))). Objectors have not met this burden because the application of the *Girsh* factors confirms that the Settlement Agreement is fair, reasonable and adequate and should be finally approved.

**1.      The Complex Legal, Factual and Scientific Issues in This Case Would
Make Continued Litigation Significantly Prolonged and Expensive**

285.     Under the first *Girsh* factor the court "must balance the Proposed Settlement against the time and expense of achieving a potentially more favorable result through further litigation. Where the complexity, expense and likely duration of litigation are significant, the Court will view this factor as weighing in favor of settlement." *Lenahan* v. *Sears, Roebuck & Co.*, 2006 WL 2085282, at *12 (D.N.J. July

24, 2006) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 536 (D.N.J. 1997)), *aff'd*, 266 F. App'x 114 (3d Cir. 2008)); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (stating that this factor takes into account the "probable costs, in both time and money, of continued litigation." (internal quotation marks omitted)).  More specifically, courts in this Circuit consider: (i) the scope and breadth of the litigation; (ii) whether complex scientific issues would likely require multiple experts, at an "enormous cost," who would be delving "into somewhat new territory"; (iii) the likelihood that discovery would be extensive and require significant resources; and (iv) counsels' representation that litigating the action through pretrial motion practice, formal discovery, and trial would add additional years to the litigation and could deprive class members of relief.  *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010).  Each consideration is satisfied here, and this *Girsh* factor weighs in favor of settlement.  (*See* Klonoff Decl. ¶¶ 64, 134.)

286.    First, the scope and breadth of the litigation weigh in favor of settlement, given that the Settlement Class includes over 20,000 Retired NFL Football Players with unique medical histories and careers in football and whose alleged injuries date back over half a century.  Moreover, the cases involve numerous NFL Member Clubs, each with its own medical staff.  *See, e.g., Prudential*, 148 F.3d at 318 (noting the "sheer magnitude of the proposed settlement class" in discussing this factor); *Cendant*, 264 F.3d at 233 ("number of defendants" favored settlement); *Pet Foods*, 629 F.3d at 351 (noting the number and nationwide character of the related lawsuits).

287.    Second, the medical and scientific issues involved weigh in favor of settlement because they are complex and will require numerous experts.  Should this

litigation continue, it would demand a comprehensive analysis of the relationship between concussive and sub-concussive repetitive head trauma injuries sustained while playing NFL Football and long-term brain injury, including physical, psychiatric and neurocognitive impairment, *and* a scientific analysis as to whether the Retired NFL Football Player's repetitive head trauma caused his neurocognitive, neuromuscular or other impairment.  Such an analysis would require multiple experts in the fields of neuroscience and general medicine, among others.  (*See* Klonoff Decl. ¶ 64 (noting the considerable expert costs the parties would incur due to the complicated scientific issues at the heart of the case).)

288.    Third, discovery in this litigation would be extensive and require significant resources.  Class Counsel would have to expend substantial resources seeking discovery from multiple defendants, the Member Clubs, and numerous physicians.  The NFL Parties, in turn, would likely seek discovery relating to the medical, education, and social histories of Plaintiffs.  The NFL Parties would further seek to depose all Plaintiffs in this litigation, who reside throughout the country, on numerous issues, including their medical histories, their playing histories, the types of treatment received for concussions or other head injuries, and their purported knowledge and reliance on statements made by the NFL concerning the underlying facts at issue in this litigation, among numerous other issues.  In addition, the NFL Parties would likely seek to depose many of their family members and friends, and numerous physicians on these same issues.  Expert discovery in these cases would also be far-reaching.  (Klonoff Decl. ¶ 64.)

289.    Finally, litigating the action through discovery, trial, and appellate proceedings would likely add years to the litigation and could deprive class members of relief.  (*See* Phillips Decl. ¶ 19; Klonoff Decl. ¶ 134; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) ("Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce any value of the recovery to the class."); *In re Prudential Ins. Co. Am. Sales Practices Litig.,* 148 F.3d 283, 318 (3d Cir. 1998) ("[W]e conclude the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003) ("[R]egardless [of] which party or parties prevail at trial, a direct appeal would be virtually certain to follow, resulting in further expense and protraction of the proceedings.").)

290.    Plaintiffs also would face significant and continuing threats to the viability of their claims.  Indeed, several more months of litigation and a ruling on preemption could have resulted in the vast majority, if not all, of Plaintiffs' claims being dismissed.

291.    The risk of delay is particularly troubling in this case because retired players' physical and mental conditions continue to deteriorate.  (*See* Phillips Suppl. Decl. ¶¶ 23-25.)   Should litigation continue, Subclass 1 Class Members will not immediately receive the benefits of the BAP and, as a result, may not get tested.  And Subclass 2 Class Members will not receive compensation promptly.

292.    By contrast, a settlement now, at this stage of the litigation, "save[s]" both sides from incurring significant additional expense for experts, for discovery compliance, and for legal fees and time," which "weighs heavily in favor of the settlement." *In re Imprelis Herbicide Mktg. Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 365 (E.D. Pa. 2013); *see also Pet Food*, 629 F.3d at 351 (first *Girsh* factor favored settlement where "the complex medical and toxicological issues" would have required multiple experts and there was likelihood that discovery would be "extensive and require significant resources" (internal quotation marks omitted)).

293.    Thus, the first *Girsh* factor weighs in favor of settlement.

**2.    99% of the Settlement Class Members Have Remained in the Class, and 19 Settlement Class Members Have Revoked Their Opt Out Requests**

294.    Under the second *Girsh* factor, the court "attempts to gauge whether members of the class support the settlement." *Prudential*, 148 F.3d at 318.  Some courts have, in fact, expressed the view that class members' reaction to a settlement "may be *the most* significant factor" in the final approval inquiry.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (emphasis added), *aff'd sub nom. Wal-Mart Stores, Inc.* v. *Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005); *accord Shuford* v. *Ala. State Bd. of Educ.*, 897 F. Supp. 1535, 1548 (M.D. Ala. 1995) ("In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself.").

295.    The second *Girsh* factor weighs heavily in favor of settlement here because the reaction of Class Members to the Settlement has been overwhelmingly positive.  The record indicates that the Notice Plan reached over 90% of Settlement

Class Members, and yet only 1% of the Settlement Class Members have filed objections to the Class Action Settlement and only 1% have opted out; indeed, of the 234 Settlement Class Members who initially opted out, to date nineteen have revoked their opt out request. *See* Sixth Opt Out Report Submitted by the Claims Administrator, Doc. No. 6496; *see also In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 342 (E.D. Pa. 2007) ("The fact that an overwhelming majority of the Class did not file objections is a significant element to consider in determining the overall fairness of the settlements."); *Visa*, 396 F.3d at 118 ("a small number of objections . . . can be viewed as indicative of the adequacy of the settlement" (internal quotation marks omitted)); *In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 644 (D.N.J. 2004) ("The absence of objections from the overwhelming majority . . . [of] Class Members should be considered in approving the Settlement.").  These objection and opt-out rates are well within the range that courts have deemed indicative of broad support for settlement agreements in other cases.  *See, e.g., Stoetzner* v. *U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("response of the class members . . . strongly favors settlement" where 29 out of 281 class members (roughly 10%) objected); *see also In re Metro. Life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871, at *26 (W.D. Pa. Dec. 28, 1999) (opt-out rate amounting to about 0.33% of the class); *In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*, No. 2:05-cv-232, 2008 WL 4974782, at *6-7 (E.D. Pa. Nov. 21, 2008) ("responses received weigh[ed] in favor of settlement," where there were 32 written objections, 7 verbal comments and/or objections at the fairness hearing, and 80 opt outs, out of a class of approximately 29,000); *Little-King* v. *Hayt Hayt & Landau*, 2013 WL 4874349, at *9 (D.N.J. Sept. 10,

2013) (22 opt outs and 4 objections out of a class of 50,000 was "small" and "create[s] a presumption that . . . weighs in favor of settlement"); *Weiss* v. *Mercedes Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) (100 objectors out of 30,000 potential class members weighed in favor of settlement).

296.    The low opt-out and objection numbers demonstrate strong support by the Settlement Class given that the Settlement is highly publicized and many of the Settlement Class Members have a significant stake in the litigation and are represented by counsel.  (*See* Klonoff Decl. ¶ 135.)

297.    In addition, the fact that over 64,000 unique visitors have visited the Settlement Website and over 5,200 Settlement Class Members have signed up to receive additional information is "indicative of affirmative endorsement of the settlement" particularly given the "extensive notice and outreach program," to Settlement Class Members.  *Varacallo* v. *Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 237 (D.N.J. 2005) (fact that "over 80,000 Class Members have utilized the toll-free telephone numbers to contact the call center or contacted Class Counsel for additional information about the Settlement and how to be included" weighed in favor of settlement approval); *see also* Brown Decl. ¶ 43 and Attachment 7; Burns Decl. Ex. 1, Claims Administrator Update as of Nov. 9, 2014; Decl. of Katherine Kinsella ¶¶ 26, 28 n.4, Nov. 12, 2014, Doc. No. 6423-12.

298.    Accordingly, the second *Girsh* factor strongly favors approval.

**3.      Class Counsel Adequately Appreciated the Merits of the Case Prior to Settlement Negotiations**

299.    Where Class Counsel had an "adequate appreciation of the merits of the case before negotiating [the settlement]," the third *Girsh* factor favors final approval of

the Settlement, even where no formal discovery was conducted. *Cendant*, 264 F.3d at 319 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995)); *see also Prudential*, 148 F.3d at 319 (quoting the same); *Ripley* v. *Sunoco, Inc.*, 287 F.R.D. 300, 312 (E.D. Pa. 2012) (granting final approval of class action settlement at early stage of discovery and noting that counsel engaged in "exhaustive investigation of the facts and the underlying claims and defenses in this litigation" (internal quotation marks omitted)); *Little-King* v. *Hayt Hayt & Landau*, 2013 WL 4874349, at *10 (D.N.J. Sept. 10, 2013) ("Even settlements reached at a very early stage and prior to formal discovery are appropriate when there is no evidence of collusion and the settlement represents substantial concessions by both parties."); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) ("[W]e are not compelled to hold that formal discovery was a necessary ticket to the bargaining table.  Because the plaintiffs did have access to information, this case cannot be characterized as an instance of the unscrupulous leading the blind.").

300.    Even without any formal discovery, Class Counsel here had the ability to evaluate the merits of the case on at least two significant and potentially dispositive issues:  preemption and causation.  Moreover, Class Counsel created and maintained a comprehensive database of the Plaintiffs' claims and symptoms, and Class Counsel conducted extensive factual, legal, medical, scientific, economic, and actuarial research and consulted with numerous experts, both before commencing suit and during the settlement negotiations.  (*See* Seeger Decl. ¶¶ 20, 30.)

301.    First, prior to the onset of settlement negotiations, Class Counsel faced a significant risk that Plaintiffs' claims could be dismissed in their entirety on the basis of

LMRA preemption.  Had the Court accepted the NFL Parties' arguments, Plaintiffs' claims could have been dismissed outright or severely jeopardized or impaired.  This threshold legal issue created a powerful impetus to engage in negotiations while Plaintiffs' claims remained legally viable, as this Court recognized in ordering the parties to mediation.

302.    Having completed extensive briefing on the NFL Parties' preemption motions to dismiss, Class Counsel had a thorough and adequate appreciation of the merits of the preemption arguments.  (*See* Seeger Decl. ¶ 20.)  Merits discovery would not have aided experienced Class Counsel in further evaluating their likelihood of success on preemption; as a result, the lack of such discovery in this matter does not counsel against approval.  *See, e.g.*, *Briggs* v. *Hartford Fin. Servs. Grp. Inc.*, No. 2:07-cv-5190, 2009 WL 2370061, at *13, 16 (E.D. Pa. July 31, 2009) (approving final settlement despite absence of formal discovery and holding that no discovery was necessary where a threshold legal issue was presented to the court).

303.    Second, even if Plaintiffs succeeded in defeating some portion (or all) of the NFL Parties' preemption motions to dismiss, Plaintiffs would face difficulty proving causation given the state of the science/medicine and the uncertainty surrounding the causal relationship between TBI and their alleged injuries.  (*See* Dr. Yaffe Decl. ¶¶ 16, 39; Seeger Decl. ¶¶ 19, 22; Klonoff Decl. ¶ 18.)  Class Counsel engaged in significant investigation concerning the science regarding the injuries alleged by Plaintiffs, which permitted Class Counsel to evaluate the strengths of their positions on significant and complex medical issues regarding causation that would arise if the litigation were to continue.  (*See* Seeger Decl. ¶ 30.)

304.   In addition, Plaintiffs would have faced numerous and significant obstacles in pursuing their claims that would not have benefitted from formal discovery including, for example, the NFL Parties' assumption of risk defense.  (*See infra* ¶¶ 329-30.)  Nor would discovery have assisted in evaluating the strength of certain other defenses, including statute of limitations, for which Class Counsel possessed sufficient information to determine the weakness Plaintiffs would have had to overcome on that threshold issue.  (*See infra* ¶¶ 325-28.)

305.   Moreover, unlike in most other cases, there has been an extraordinary amount of public discussion and debate about the issues underlying this litigation and related, publicly available research, providing Class Counsel with a great deal of information to evaluate Plaintiffs' claims without formal discovery.  (*See* Seeger Decl. ¶ 20; *see also In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 270 (E.D. Pa. 2012) (although the litigation settled at an early stage, Class Counsel had "adequate knowledge of the litigation and informed negotiations" due to Class Counsel's "extensive investigations into the [nature of the antitrust conspiracy] in preparation for filing the complaint"); *In re ATI Techs., Inc. Sec. Litig.*, No. 2:01-cv-02541, 2003 WL 1962400, at *2 (E.D. Pa. Apr. 28, 2003) (although lacking formal discovery, the parties were able to "assess their strengths and weaknesses" prior to settlement).)

306.   In short, formal discovery was not necessary to evaluate the strengths and weaknesses in Plaintiffs' case.  (*See* Seeger Decl. ¶ 20.)

307.   Despite these hurdles, Objectors contend that Class Counsel's discovery efforts "fall well short of the benchmark" established in other cases where courts have

granted final approval after "extensive discovery." (*See* Morey Obj. at 56-57, Doc. No. 6201.)[5]  These objections have no merit.

308.  "Even settlements reached at a very early stage and prior to formal discovery are appropriate when there is no evidence of collusion and the settlement represents substantial concessions by both parties." *Little-King*, 2013 WL 4874349, at *10.  There is no evidence of collusion here.  Instead, counsel for the parties engaged in hard-fought, adversarial negotiations over the course of a year with assistance and oversight from both a former United States district court judge and a court-appointed special master, and the NFL Parties made substantial concessions in reaching this Settlement Agreement, including carving out from the Release former players' rights to seek recovery under the 88 Plan and the Neurocognitive Disability Benefit and also waiving any requirement for a Settlement Class Member to prove causation prior to

---

[5]   Certain Objectors also contend that the Settlement Agreement should not be finally approved because "the NFL and Co-Lead Class Counsel have not disclosed the full extent of the underlying analyses, documents and information on which the [Settlement Agreement] is predicated." (Armstrong Obj. at 25, Doc. No. 6233; *see also* Alexander Obj. at 5, Doc. No. 6237.)  This Court already has considered and rejected similar requests for discovery concerning settlement negotiations, including the evidence on which the parties relied when negotiating the Settlement Agreement. (*See* Order at 1, Oct. 15, 2014, Doc. No. 6245.)   As this Court held, and as demonstrated by the Parties in their opposition brief, discovery into the settlement negotiations is improper absent evidence of collusion between class counsel and the defendants, of which there is none here.  (*See* Co-Lead Class Counsel's Mem. in Resp. to Mot. of Morey, et al., for Leave to Conduct Limited Disc. at 6-12, Doc. No. 6183; Resp. of NFL in Opp'n to Mot. for Leave to Conduct Limited Disc. at 16-19, Doc. No. 6185 (citing *Lobatz* v. *U.S. W. Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000) ("'[s]ettlement negotiations involve sensitive matters" and "'discovery of settlement negotiations is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive'" (quoting *Mars Steel Corp.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 834 F.2d 677, 684 (7th Cir. 1987) (Posner, J.))) and *Thornton* v. *Syracuse Sav. Bank*, 961 F.2d 1042, 1046 (2d Cir. 1992) (quoting the same)).)

receiving a Monetary or Derivative Claimant Award.  (*See* Phillips Decl. ¶ 18; *see also* Mem. Op. at 11, July 7, 2014, Doc. No. 6083.)  Moreover, the careful supervision of the Court has ensured that the interests of all members of the Settlement Class are properly considered, and the Court has not hesitated to encourage revisions to the Agreement where it deemed them appropriate.

309.    The cases cited by Objectors are inapposite.  First, none of the plaintiffs in *Warfarin*, *Cendant* or *Prudential*—unlike Plaintiffs here—was faced with outright dismissal of his or her claims.  Rather, those cases settled after dispositive motions had already been denied.  *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 523-24 (3d Cir. 2004) (motion to dismiss had been denied); *Cendant,* 264 F.3d at 226 (same); *Prudential*, 148 F.3d at 292-93 (no motion to dismiss pending when plaintiffs obtained discovery); *Gen. Motors Corp. Pick-Up Truck,* 55 F.3d at 779-80 (same).

310.    Although plaintiffs in *Prudential* received some discovery, that case is distinguishable.  There, the Court had granted defendants' motion to dismiss the complaint without prejudice to plaintiffs' right to refile an amended complaint, which plaintiffs ultimately did.  148 F.3d at 292-93.  In the meantime, the court ordered defendants to provide plaintiffs with copies of the substantial discovery materials already provided to the New Jersey Multi-State Life Insurance Task Force, which had simultaneously been conducting an internal investigation of defendants' sales practices, which were at issue in the litigation.  (*Id*.)  No such facts are present here.

311.    Second, this Circuit's decisions in *Community Bank* and *General Motors Corp. Pick-Up Truck* did not hold that discovery was required in this circumstance and, in fact, merely reiterated the established law that, pursuant to *Girsh*, courts must

"determine whether counsel had an adequate appreciation of the merits of the case before negotiating [settlement]." *Gen. Motors Corp. Pick-Up Truck*, 55 F.3d at 813 (remanding to the district court when only "four months [had] elapsed from the filing of the consolidated complaint to the reaching of the settlement agreement," and the court was confronted with evidence of collusion between the parties due to the high amount of attorneys' fees, the manner in which such fees were negotiated and the lack of monetary relief available to settlement class members—who would receive a $1,000 coupon toward the purchase of a new GM truck); *see also In re Cmty. Bank of N. Va.*, 418 F.3d 277, 316 (3d Cir. 2005) (noting that although "no formal discovery was undertaken by class counsel," it was nevertheless "likely that [counsel for objectors] ha[d] developed sufficient facts regarding this matter and its prospective settlement value such that it would be able to present a cogent and supportable objection at the fairness hearing," but remanding so that the district court could "develop fully the record" to reevaluate whether discovery would aid the court).

312.   Given the sound reasons for the stay of discovery, and the significant legal obstacles Plaintiffs face in proving their case—which further discovery would not have aided—Class Counsel had an adequate appreciation for the merits of Plaintiffs' claims prior to entering into settlement negotiations, and, thus, the third *Girsh* factor weighs strongly in favor of final approval.  (*See* Klonoff Decl. ¶ 136 ("[T]he parties' ability to reach a comprehensive settlement here in a relatively short amount of time is a testament to the highly skilled work of class counsel under the supervision of the Mediator and the Special Master.  It is not a negative factor in my view.").)

### 4.   Absent Settlement, Plaintiffs Face Significant Hurdles to Establishing Liability and Damages

313.    *Girsh* factors four and five—the risks of establishing liability and proving damages—"survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319.   In examining these factors, this Court "need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'" *Perry* v. *FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting *Lachance* v. *Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)).

314.    These factors weigh in favor of settlement here because Settlement Class Members would face significant hurdles in litigation, including, but not limited to, overcoming the NFL Parties' preemption, assumption of risk and statute of limitations defenses and proving causation and damages. *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *61 (E.D. Pa. Aug. 28, 2000) ("Although the court makes no determination of the merits of the claims of plaintiffs, it notes several obstacles that they would have to overcome . . . [among other things, the speculative nature of future medical costs, debate over defendant's awareness of the dangers posed by their products, causation issues, defenses of comparative and contributory negligence, scientific complexity of the case, and statute of limitations defenses] . . . . These risks to establishing liability and damages show that plaintiffs' success at trial cannot be guaranteed.  Thus, these factors weigh in favor of settlement.").

315.    Indeed, the NFL was recently involved in another class action case that highlights the risks of establishing liability and damages in continuing to litigate rather than settling a class action.  In *Dryer* v. *National Football League*, 2013 WL 5888231 (D. Minn. Nov. 1, 2013) the court granted final approval after conducting the Eighth Circuit's equivalent of a *Girsh*-factor analysis, noting, in pertinent part:

> Nearly all of the objections boil down to what is, in the Court's view, the objectors' very mistaken belief that they could reap significant financial benefits from continuing this case. . . .  As discussed more fully below with respect to the strength-of-case factor, the chances that this lawsuit—or indeed any class-action lawsuit seeking to recoup sums for the alleged infringement of former NFL players' publicity rights by NFL Films—will succeed are slim at best. Too many obstacles stand in the way of that success.  But the objectors want a financial payout more than they want to embrace the reality of the limitations of their claims. Fortunately for the absent class members, experienced counsel and a knowledgeable and extremely capable Magistrate Judge saw the case for what it was, and negotiated a settlement that is truly one-of-a-kind, and a remarkable victory for the class as a whole.

*Id*. at *2-3.  A year later, after opt outs continued to litigate, the district court granted the NFL's motion for summary judgment, leaving the remaining plaintiffs with no recovery.  *Dryer* v. *Nat'l Football League*, 2014 WL 5106738, at *19-20 (D. Minn. Oct. 10, 2014).

316.    ***Preemption*.**   The NFL Parties' pending motions to dismiss the Complaints on preemption grounds presented a significant roadblock to prosecution of Plaintiffs' claims because, if successful, they would have resulted in the Complaints being dismissed in their entireties, and Plaintiffs would have received *no* relief in the courts.  Indeed, two federal courts already have denied motions to remand the cases of Settlement Class Members because those claims—the precise claims raised in this litigation—are preempted by federal labor law.  For example, in *Duerson*, the court held that a concussion-related negligence claim against the NFL similar to that alleged

118

here was preempted because, in order to evaluate the reasonableness of the NFL's conduct, the court would have been required to interpret the terms of the CBA setting forth the duties of the NFL Member Clubs to protect player health and safety. *Duerson* v. *Nat'l Football League*, 2012 WL 1658353, at *4, 6 (N.D. Ill. May 11, 2012). And in *Maxwell* v. *National Football League*, the Court held that "[t]he CBA places primary responsibility for identifying . . . physical conditions on the team physicians . . . . The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players." Order Den. Pls.' Mot. to Remand at 1-2, *Maxwell*, No. 2:11-cv-08394, Doc. No. 58 (C.D. Cal. Dec. 8, 2011); *see also* Order Den. Pls.' Mot. to Remand at 1-2, *Pear* v. *Nat'l Football League*, No. 2:11-cv-08395, Doc. No. 61 (C.D. Cal. Dec. 8, 2011); Order Den. Pls.' Mot. to Remand at 1-2, *Barnes* v. *Nat'l Football League*, No. 2:11-cv-08396, Doc. No. 58 (C.D. Cal. Dec. 8, 2011).

317.   Numerous courts, consistent with settled labor preemption precedent, have held that player tort claims against the NFL and/or its Member Clubs are preempted under Section 301. *See, e.g.*, *Williams* v. *Nat'l Football League*, 582 F.3d 863, 881-82 (8th Cir. 2009) (breach of fiduciary duty, negligence, gross negligence, fraud, constructive fraud, negligent misrepresentation, and intentional infliction of emotional distress claims preempted); *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010) (outrageous conduct, negligent infliction of emotional distress, and breach of duty of good faith and fair dealing claims preempted); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-11 (S.D. Ohio 2007) (wrongful

death claim preempted); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178-79 (N.D.N.Y. 1990) (negligence, fraud, negligent misrepresentation, and negligent and intentional infliction of emotion distress claims preempted); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412-14 (N.C. Ct. App. 2009) (negligent retention and intentional misconduct claims preempted).

318.    In addition, a federal district court in *Dent* v. *National Football League* recently granted the NFL's motion to dismiss on the ground that the retired NFL players' claims concerning the alleged improper or illegal use and dispensing of medications in the NFL were preempted by Section 301 of the LMRA—the same basis upon which the NFL relied in moving to dismiss this case—because it would be "impossible" to resolve their negligence and fraud-based common law claims "without taking into account the adequacy and scope of the [Collective Bargaining Agreement ('CBA')] duties already [ ] in place," including those related to medical care.  Order at 13, 21-22, *Dent* v. *Nat'l Football League*, No. 14-cv-02324, Doc. No. 106 (N.D. Cal. Dec. 17, 2014); Judgment, *Dent* v. *Nat'l Football League*, No. 14-cv-02324, Doc. No. 107 (N.D. Cal. Dec. 31, 2014); *see generally* Co-Lead Class Counsel's Notice of Suppl. Auth., Doc. No. 6468.

319.    Similarly, the Eastern District of Missouri recently held that retired NFL players' negligent misrepresentation claims were preempted in Mem. & Order at 14, *Smith* v. *National Football League Players Association*, 4:14-cv-01559, Doc. No. 34 (E.D. Mo. Dec. 2, 2014).    There, plaintiffs alleged that NFLPA negligently misrepresented the alleged dangers of head impacts in NFL football.  *Id*. at 1.  The Court, however, concluded that to resolve the claims it would need to interpret the NFL

120

CBA provisions arguably placing a responsibility on NFLPA to keep players informed about alleged dangers of participation in NFL football—including alleged neurocognitive dangers—and therefore, the LMRA preempted the plaintiffs' claims regardless of whether or not they were active players or retirees. *Id*. at 11-14.

320.    Even if only a portion of the NFL Parties' motions were granted, a significant portion of the Settlement Class would have been left with no recourse.  This Settlement Agreement removes the substantial risk posed by the NFL Parties' strong preemption arguments. *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *9 (E.D. Pa. Jan. 4, 2001) ("If further litigation presents a realistic risk of dismissal on summary judgment or an exonerating verdict at trial, the plaintiffs have a strong interest to settle the case early."); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1065-66 (S.D. Tex. 2012) (fact that defendants planned to bring motion to dismiss which had reasonable likelihood of success was a factor in favor of approving settlement); *In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784, at *3, 5 (N.D. Cal. Nov. 5, 2008) (approving settlement agreement and noting that defendants may have been successful on a second motion to dismiss); *Trombley* v. *Nat'l City Bank*, 826 F. Supp. 2d 179, 195-96 (D.D.C. 2011) (approving class action settlement in part because "the legal landscape for [overdraft fee litigation] remains challenging and riddled with uncertainty" where a federal law preemption issue had not yet been decided by any federal appeals court); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 962 (N.D. Ill. 2011) (granting final approval of class action settlement in part because defendants had a "strong argument to compel the Class Representatives to arbitrate their claims, rather than proceeding

with their class action" and "Class Members subject to mandatory arbitration could not obtain recovery in court").

321.    ***Causation.***   Plaintiffs would also face significant challenges proving at trial both general causation—whether concussions and repetitive head trauma are capable of causing long-term neurocognitive impairments in the first place on a population basis—and specific causation—whether a player's specific concussion(s) actually caused his long-term injury and whether the NFL's alleged conduct substantially contributed to that injury.   *See Soldo* v. *Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 524-25 (W.D. Pa. 2003) ("[T]o meet her causation burden, plaintiff must first establish that [defendant's product] is capable of causing [the injury] (general causation).   She must then establish that, in her particular case, [defendant's product] did in fact cause her [injury] (specific causation) . . . Plaintiff must prove medical causation to a reasonable degree of medical certainty." (internal citations and quotation marks omitted)).   This is because, as evidence submitted by the NFL Parties shows, research from independent scientists demonstrates uncertainty about the role that concussions play in later-life impairment, the incidence and prevalence of injury in former professional athletes, and the role of other genetic, environmental or lifestyle factors in neurocognitive impairment and neurological disease.   (*See* Dr. Yaffe Decl. ¶¶ 16, 39; *see also* Seeger Decl. ¶¶ 19, 22; Klonoff Decl. ¶ 18.)

322.    First, to prove general causation, Plaintiffs faced an uphill battle establishing a causal connection between concussions (and repetitive head trauma) and long-term neurocognitive impairments, given that the NFL Parties have submitted evidence showing that the issue is subject to intense debate in the scientific community.

*See Diet Drugs*, 2000 WL 1222042, at *61 ("[T]he scientific complexity of this case is likely to lead to a battle of expert testimony which enhances the unpredictability of a trial outcome."); *In re Pet Food Prods. Liab. Litig.*, 2008 WL 4937632, at *15 (D.N.J. Nov. 18, 2008), *aff'd in part, vacated in part, remanded by* 629 F.3d 333 (3d Cir. 2010) (plaintiffs' admission that "the issue of causation would be a major battleground with the outcome unknown . . . satisf[ied] the fourth and fifth *Girsh* factors").

323.    Second, each Plaintiff also would have had to prove *specific* causation—that is, that the actions of the NFL Parties were the cause of that player's injuries, as opposed to some cause related to prior football experience in middle school, high school, college or another professional football league (*e.g.*, the Canadian Football League or the Arena Football League), or unrelated to football.  For members of the proposed Settlement Class who had short NFL careers compared to their amateur and non-NFL professional football exposure, this burden would be particularly problematic. There are also many members of the proposed Settlement Class who developed their symptoms later in life and may have difficulties proving that their alleged injuries were not a result of the normal aging process.  Thus, the burden and expense of proving causation and negligence or intentional concealment would have been substantial, and the results at trial highly uncertain.

324.    By contrast, the Settlement Agreement has taken causation out of the case.  No Settlement Class Member need prove that his Qualifying Diagnosis was caused by the NFL.  No proof of causation is required at all.  This is a significant benefit to the Settlement Class and heavily weighs in favor of approval.

325.   ***Statutes of Limitations.***   Another significant potential risk for Settlement Class Members moving forward with this litigation is the NFL Parties' statute of limitations defenses, given that many of the Retired NFL Football Players were allegedly injured, and knew they were injured, long ago.  *See*, *e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss at 24-25, *Maxwell* v. *Nat'l Football League*, No. 2:11-cv-08394, Doc. No. 67 (C.D. Cal. Dec. 20, 2011); *see also* 42 Pa. Cons. Stat. Ann. § 5524(2) (two-year statute of limitations for personal injury claims in Pennsylvania); N.Y. C.P.L.R. § 214 (three-year statute of limitations for personal injury claims in New York).

326.   This is no less true in states with a discovery rule.  Pennsylvania's discovery rule, for example, places the burden on the plaintiff to show that the rule applies.  *See*, *e.g.*, *Dalrymple* v. *Brown*, 701 A.2d 164, 167 (Pa. 1997) ("The party seeking to invoke the discovery rule bears the burden of establishing the inability to know of the injury despite the exercise of reasonable diligence").  The discovery rule tolls the statute of limitations only "until the discovery of the injury is reasonably possible," which requires the plaintiff to prove that he engaged in objectively reasonable diligence.  *Id*.  Here, it may be difficult for Retired NFL Football Players to prove that they were unable to know of their injuries despite the exercise of reasonable diligence.  And given the significant publicity surrounding this issue, Plaintiffs would face a difficult battle relying on the discovery rule.

327.   Moreover, several states have declined to adopt a discovery rule for personal injury claims, holding that a plaintiff's claim accrues upon the date of the injury.  *See*, *e.g.*, *Blanco* v. *Am. Tel. & Tel. Co.*, 689 N.E.2d 506, 509-10 (N.Y. 1997)

(New York does not recognize a discovery rule tolling its three-year personal injury limitations period except in circumstances that are inapplicable here); Va. Code Ann. § 8.01-230 ("the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person").

328.   The fact that the Settlement Agreement appropriately factors in, and avoids, the significant risks presented by the NFL Parties' statute of limitations defenses weighs strongly in favor of settlement.

329.   ***Assumption of Risk.***   The doctrine of assumption of risk also poses a significant challenge to Plaintiffs' claims going forward.  Under that doctrine, one who voluntarily participates in an activity, such as tackle football, consents to those commonly appreciated risks that are inherent in and arise out of the nature of the activity and flow from such participation.  *See, e.g., Alqurashi* v. *Party of Four, Inc.*, 89 A.D.3d 1047, 1047 (N.Y. App. Div. 2011) ("The doctrine of primary assumption of risk provides that a voluntary participant in a sporting or recreational activity consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation" (internal quotations marks omitted)); *Ciocca* v. *BJ's Wholesale Club, Inc.*, No. 2:04-cv-05605, 2011 WL 5553646, at *4 (E.D. Pa. Nov. 14, 2011) ("Assumption of the risk is a complete defense to . . . negligence claims under Pennsylvania law.").

330.   Contrary to Objectors' contention that the "obscure and unobserved" nature of the injuries at issue were not "fully appreciated" by Retired NFL Football Players, courts repeatedly have held that the doctrine precluded personal injury claims

involving players who were injured while playing football.  *See, e.g., Zemke* v. *Arreola*, 2006 WL 1587101, at *3 (Cal. Ct. App. June 12, 2006) ("the risk of a head injury is inherent in the sport of football"); *Glazier* v. *Keuka Coll.*, 275 A.D.2d 1039, 1039 (N.Y. App. Div. 2000) (plaintiff assumed risk of injuries because "as an experienced football player, [he] was aware that being tackled in a violent manner is an inherent part of football"); *Hunt* v. *Skaneateles Cent. Sch. Dist.*, 227 A.D.2d 939, 939-40 (N.Y. App. Div. 1996) (high school student assumed risk of football-related injury despite defendant's failure to require players to wear potentially protective equipment during practice); *Knight* v. *Jewett*, 834 P.2d 696, 708-12 (Cal. 1992) (risks of collision and injury are inherent in football and participants generally have no duty to eliminate or protect a plaintiff against such risks); *Benitez* v. *N.Y.C. Bd. of Educ.*, 541 N.E.2d 29, 33 (N.Y. 1989) (same); *Breheny* v. *Catholic Univ. of Am.*, 1989 WL 1124134, at *7 (D.D.C. Nov. 22, 1989) (finding personal injury claim barred because plaintiff knew and appreciated risks of playing touch football game).

331.   ***Damages.***   Plaintiffs also would face significant risks in recovering damages.  If Retired NFL Football Players are shown to have contributed to their own injuries, they face the possibility of significantly reducing recovery or, in some circumstances, eliminating any chance of recovery altogether due to the contributory negligence and comparative fault regimes in certain states.   *See, e.g., Litchford* v. *Hancock*, 352 S.E.2d 335, 337 (Va. 1987) (contributory negligence is defense which bars recovery in Virginia); *Garrett* v. *NationsBank, N.A. (S.)*, 491 S.E.2d 158 (Ga. Ct. App. 1997) (contributory negligence is defense in Georgia); Mass. Gen. Laws Ann. ch. 231, § 85 (contributory negligence is defense in Massachusetts); Mich. Comp. Laws

Ann. § 600.2959 (comparative fault is defense in Michigan); 42 Pa. Cons. Stat. Ann. § 7102 (comparative negligence is defense in Pennsylvania).  Here, by contrast, the Settlement Agreement does not require Settlement Class Members to prove damages as long as they suffered a compensable injury in accordance with the Agreement.  This presents a significant benefit to Settlement Class Members that weighs in favor of settlement.

*     *     *

332.    In sum, the fourth and fifth *Girsh* factors focus on the landscape of hurdles that Plaintiffs could face absent settlement.  *See Perry* v. *FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) ("the Court need not delve into the intricacies of the merits of each side's arguments, but rather may give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." (citations omitted)).  Further, credence should be given to experienced Class Counsel's estimation of the probability of success and the strength of the NFL Parties' defenses as reflected in the terms of the Settlement.  *See id.*, 229 F.R.D. at 115.  There can be no dispute here that significant hurdles pose a very material threat to Plaintiffs' ultimate success in litigation.

### 5.    Absent Settlement, Plaintiffs Face the Risk of Maintaining a Class Action Through Trial

333.    The sixth *Girsh* factor considers whether the class action could be maintained through trial, or whether it would pose "intractable management problems if it were to become a litigation class and therefore be decertified." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004).  As this Circuit has

127

explained, "under Federal Rule of Civil Procedure 23(a), a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable," and "proceeding to trial would always entail the risk, even if slight, of decertification." *In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) (internal quotation marks omitted).    Therefore, courts have held that this *Girsh* factor—potential unmanageability—is either neutral or weighs in favor of settlement. *See*, *e.g.*, *Cendant*, 264 F.3d at 239 (neutral); *In re Imprelis Herbicide Mktg. Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 365 (E.D. Pa. 2013) (favoring settlement); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 369 (E.D. Pa. 2012) (favoring settlement); *Little-King* v. *Hayt Hayt & Landau*, 2013 WL 4874349, at *11 (D.N.J. Sept. 10, 2013) (neutral or slightly favoring settlement); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 540 (D.N.J. 1997) (favoring settlement).

334.    Here, this *Girsh* factor weighs in favor of settlement.    Given the size of the Settlement Class, intractable management problems might well have arisen once the litigation reached the trial stage, with the result that Plaintiffs would be unable to maintain a class.

### 6.    The Ability of the NFL Parties to Withstand a Greater Judgment Is Irrelevant Because the Settlement Fund Is Uncapped

335.    The NFL Parties' agreement to uncap the Monetary Award Fund is a "fact which weighs strongly in favor of the settlement," *Prudential,* 148 F.3d at 328, even if the NFL Parties could withstand a greater judgment.

336.    The fact that the NFL Parties "could afford to pay more does not mean that [they are] obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached."

*See Warfarin*, 391 F.3d at 538 (finding no error in district court's conclusion that defendants' ability to pay a higher amount was "irrelevant to determining the fairness of the settlement" where objectors could not establish that they would have received more if the case were tried); *see also* Klonoff Decl. ¶ 141 ("The NFL certainly has ample financial resources, but that does not mean that it would agree to exhaust those resources to settle a case that it views as questionable.").  Instead, where the benefits to the Settlement Class Members are significant—as they are here—the theoretical ability of the defendant to pay a greater judgment has to be balanced against the likelihood that a plaintiff could obtain a greater judgment.  *See Warfarin*, 391 F.3d at 538.  Otherwise, in every case, anything less than a settlement that financially cripples a defendant would weigh against final approval.  That is not the law.  *See Chakejian* v. *Equifax Info. Serv., LLC*, 275 F.R.D. 201, 214 (E.D. Pa. 2011) (finding this factor to be neutral where the defendant might be able to pay greater amount, but the plaintiffs' recovery appeared to be fair); *Bredbenner* v. *Liberty Travel, Inc.*, 2011 WL 1344745, at *15 (D.N.J. Apr. 8, 2011) ("courts in this district regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts"); *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *23 (D.N.J. Sept. 13, 2005) ("[M]any settlements have been approved where a settling defendant has had the ability to pay greater amounts. . . . This factor does not favor nor disfavor settlement."); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) ("Although it appears that the defendant bank has the ability to withstand a greater financial judgment, the Court finds that, given the substantial risks and obstacles faced by the classes in proceeding to trial as discussed herein, such factor does not weigh against

approving the settlement."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("[T]he fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate.").

337.    Relying on *Ortiz* v. *Fibreboard*, 527 U.S. 815 (1999), Objectors contend that the NFL Parties have an obligation to disclose the extent of any insurance coverage for these claims.   But *Ortiz*, which did not involve an evaluation of a settlement's fairness under the *Girsh* factors, has no such requirement.   Rather, the case "turn[ed] on the conditions for certifying a mandatory settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B)."   *Ortiz*, 527 U.S. at 821.   The Court held that "applicants for contested certification on this rationale must show that the fund is limited by more than the agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing any conflicting interests of class members."   *Id.*

**7.    The Settlement Is Well Within the Range of Reasonableness in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

338.    The *Girsh* analysis also requires the Court to assess the reasonableness of a proposed settlement seeking monetary relief.   In order to do so, the Court should consider "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing."   *Prudential*, 148 F.3d at 322 (citing *Gen. Motors Corp. Pick-Up Truck*, 55 F.3d at 806); *see also In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170 (3d Cir. 2006) (finding settlement was an "excellent" result in light of risk of establishing liability and damages despite fact that settlement possibly represented only 4% of the total damages claimed).   "While the court is

obligated to ensure that the proposed settlement is in the best interest of the class members by reference to the best possible outcome, it must also recognize that settlement typically represents a compromise and not hold counsel to an impossible standard." *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001); *Gen. Motors Corp. Pick-Up Truck*, 55 F.3d at 806 (noting that "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution"); *Lazy Oil* v. *Wotco Corp.*, 95 F. Supp. 2d 290, 338-39 (W.D. Pa. 1997) (stating that a court "should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of highest hopes.'" (quoting *Cotton* v. *Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977))), *aff'd*, 166 F.3d 581 (3d Cir. 1999).

339.    With respect to the Monetary Awards, the Settlement Agreement is well within the range of reasonableness because it provides generous cash awards in a timely manner, regardless of whether a Retired NFL Football Player has already received benefits under the 88 Plan, the Neuro-Cognitive Disability Benefit, or any other benefit programs provided by the NFL Parties, while eliminating the significant hurdles that Plaintiffs would face leading up to and at trial. *See In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003) ("[A] future recovery, even one in excess of the proposed Settlement, may ultimately prove less valuable to the Class than receiving the benefits of the proposed Settlement at this time."); *see also* Klonoff Decl. ¶ 143; Phillips Decl. ¶ 18.    Moreover, the Settlement Agreement is reasonable because it preserves Retired NFL Football Players' rights to pursue workers' compensation and to

participate in or claim entitlement to any medical or disability benefits available under the 2011 NFL CBA.  (*See* Settlement Agreement §§ 29.1-29.2.)

340.    The uncapped, inflation-adjusted nature of the Monetary Award Fund, in combination with the fact that Retired NFL Football Players may obtain a Qualifying Diagnosis at any time until the end of the 65-year term of the Fund, ensures that Retired NFL Football Players will have an opportunity to participate in the Settlement even if they develop neurocognitive impairments in the future.   This provides incalculable "piece of mind" to Retired NFL Football Players that compensation will be there years in the future if they later develop compensable conditions.  *See In re Diet Drugs Prods. Litig.*, 226 F.R.D. 498, 522-23 (E.D. Pa. 2005) (eighth and ninth *Girsh* factors favored settlement where "infusion of funds assures that all deserving class members will receive fair compensation" and settlement "guarantees payment to all class members who suffer injuries caused by diet drug-induced valvular heart damage"); *Processed Egg*, 284 F.R.D. at 275 (uncapped settlement fund confers "real and substantial benefits upon the [settling] Class" and weighs in favor of final approval).

341.    The headline awards under the Monetary Award Grid also are well within the bounds of reasonableness when compared to jury awards in similar lawsuits.

342.    Where, as here, Settlement Class Members are eligible to quickly and efficiently recover significant awards in the face of significant expense, delay and risks inherent in the litigation process, the eighth and ninth *Girsh* factors favor settlement. (*See* Phillips Suppl. Decl. ¶ 30 ("I believe that the Settlement is fair and reasonable in light of the parties' claims and defenses, and the expense, uncertainty and time inherent in litigating the players' claims to judgment.   In particular, it is my considered

judgment that Plaintiffs would be unlikely to have obtained more money and benefits without going through years of discovery and trial, where they would face substantial risks of loss due to their inability to prove negligence or fraud on the part of the NFL Parties. . . ."); *see also*, *e.g.*, *In re AT&T Corp. Sec. Litig.,* 455 F.3d at 170 (settlement was an "excellent" result given risk of establishing liability and damages where settlement possibly represented only 4% of the total damages claimed); *Chakejian*, 275 F.R.D. at 215 ("[T]his settlement offers an immediate benefit, whereas litigation would prolong resolution of this controversy, particularly in the event of likely appeals."); *Gates* v. *Rohm & Haas Co.*, No. 2:06-cv-01743, 2008 WL 4078456, at *7 (E.D. Pa. Aug, 22, 2008) (holding that because the "[s]ettlement eliminates the need for—and the risk of—proving on an individual basis" plaintiffs' damages, the eighth and ninth *Girsh* factors weigh in favor of the reasonableness of the settlement); *cf. Processed Egg*, 284 F.R.D. at 276 (fact that "results achieved by the settlement for the Class and Subclasses are immediate, concrete, and realized without the costs and delays associated with extensive discovery and other later stages of litigation" weighs in favor of settlement).)

343.   In other cases involving personal injuries, courts have approved class settlements that use matrices of diagnostic or other evaluative criteria to assign appropriate values to injury classifications.  *See, e.g., Diet Drugs*, 2000 WL 1222042, at *19-23 (approving a personal injury class settlement for valvular heart disease caused by diet drugs, where settlement provided for initial screening program followed by injury awards subject to matrix criteria, such as age and severity of injury, for eligible claimants, in values ranging from $5,000 in medical services or $3,000 in cash, up to approximately $1.5 million); *In re Phenylpropanoloamine Prods. Liab. Litig.*, 227

F.R.D. 553, 557-58 (W.D. Wash. 2004) (granting final approval to personal injury class action for users of Dexatrim for ischemic stroke and other injuries, with awards ranging from $100 to $5 million, depending on matrix criteria of age, severity of injury, etc.).

344.    For Settlement Class Members who prefer to undertake litigation risk, the Settlement Agreement provided a choice—the right to opt out and incur the significant costs and attorneys' fees associated with ongoing litigation.  Objectors who urge the court to reject this Settlement are, in essence, arguing that all claimants must be risk-takers willing to proceed with litigation; rejection of the Settlement would force them to do so—and negate their ability to receive substantial, and likely otherwise unattainable, Monetary Awards.  This result not only disregards the desires of those who prefer an efficient and immediate resolution of their claims, but also holds them hostage to the few who wish to risk continued litigation.  *See Diet Drugs*, 2000 WL 1222042, at *62 (finding eighth and ninth *Girsh* factors favored settlement where agreement offered class members the choice to opt out).

345.    Thus, all of the *Girsh* factors favor settlement.

**C.    The *Prudential* Factors Also Support Approval of the Settlement**

346.    "While the Court must make findings as to the *Girsh* factors to approve a settlement as fair, reasonable and adequate, the *Prudential* factors are illustrative of additional factors that may be useful even though they are not essential or inexorable depending upon the specific circumstances."  *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 268 (E.D. Pa. 2012); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 323 (3d Cir. 1998).

347.   Here, the relevant *Prudential* factors—the extent to which class counsel can assess the probable outcome of a trial on the merits and individual damages, whether class members have the right to opt out of the settlement, whether the claims process is fair and reasonable, and whether attorneys' fees are fair and reasonable— support final approval.

348.   First, as discussed above, Class Counsel have sufficient information to make an informed decision about the merits of the case and the risks of proceeding to trial, and about the fairness of the Settlement terms.   *See In re Fasteners Antitrust Litig.*, No. 2:08-md-1912, 2014 WL 285076, at *9, 11 (E.D. Pa. Jan. 24, 2014).

349.   Second, Class Members had the opportunity to opt out of the Settlement and pursue their claims on an individual basis.   Over 99% chose not to opt out; and instead to receive the Settlement's substantial benefits.

350.   Third, the procedure for processing individual claims is fair and reasonable.   Although, as described in detail above, Class Members must register and submit materials in support of their claims, they will receive mailings alerting them to the requirements and reminding them to comply, the Settlement Website and toll-free number offer similar information, and the Settlement defines the criteria for class members to qualify for benefits, establishes a network of specialists to perform the BAP examinations and provide Qualifying Diagnoses, and includes audit and appeal procedures to protect against fraud.   *See Rowe* v. *E.I. DuPont de Nemours & Co.*, 2011 WL 3837106, at *17 (D.N.J. Aug. 26, 2011); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *63 (E.D. Pa. Aug. 28, 2000); *see also* Settlement Agreement §§ 4.1, 5.9, 14.1(d).

351.    Fourth, the provision for attorneys' fees weighs in favor of settlement because such fees will not be paid out of the Monetary Award Fund available to Settlement Class Members; attorneys' fees will thus have no bearing on the ability of Settlement Class Members to obtain settlement benefits, including Monetary Awards and access to the Baseline Assessment Program.  (*See* Settlement Agreement § 21.1.) The provision for attorneys' fees also weighs in favor of settlement because at a future date—consistent with Rule 23(h) of the Federal Rules of Civil Procedure—Settlement Class Members will have the opportunity to object to Class Counsel's petition for attorneys' fees, should they so desire.  *See* Fed. R. Civ. P. 23(h)(2) ("A class member . . . may object to the [attorneys' fees] motion."); *see also Prandini* v. *Nat'l Tea Co.*, 557 F.2d 1015, 1021 (3d Cir. 1977) (finding that settlements with separate funds for attorneys' fees and class member awards reduce the "conflict between client and attorney," "make the court's task less burdensome and remove a source of uneasiness over the settlement procedure without in any way impairing the power to set a proper fee").

352.    Although the court in *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768 (3d Cir. 1995), stated in dicta that even attorneys' fees paid from a separate fund could impact class members' interests, *id.* at 819-20, that case arose in a context completely different from the one here.  In that case, the district court had initially awarded attorneys' fees without any independent review of the fees whatsoever on the basis that the fee arrangement was a private "matter of contract between the parties . . . and . . . will have no impact on the class members."  *Id.* at 819.  On appeal, the Third Circuit reversed and remanded on other

grounds, stating that "a thorough judicial review of fee applications is required in all class action settlements." *Id.*  The court went on to note, in dicta, that, contrary to the district court's holding, the fee award to be paid by General Motors could, in theory, impact the total amount available to settlement class members to the extent the defendant is concerned with limiting his total liability arising from the lawsuit; therefore, paying a higher attorney fee could result in the defendant paying a lower settlement amount, particularly where—as in the case before it—the attorneys' fees and the settlement amount were likely negotiated simultaneously.  *Id.* at 803-04 (citing *Prandini*, 557 F.2d at 1021).  Here, attorneys' fees and the settlement terms were *not* negotiated simultaneously.  (*See* Seeger Decl. ¶ 46; Phillips Suppl. Decl. ¶ 18.) Moreover, unlike in *General Motors Corp. Pick-Up Truck,* the Settlement Agreement provides a vehicle for the Court to review Class Counsel's attorneys' fee petition at an appropriate time (after the Fairness Hearing), at which time Settlement Class Members will have a full opportunity to object to the petition.  Thus, the dicta from *General Motors Corp. Pick-Up Truck* is inapposite.

353.    Finally, the manner in which the attorneys' fees were negotiated weighs in favor of settlement, particularly given that the settling parties represented that they did not discuss the issue of attorneys' fees until after an agreement in principal was reached on all material Settlement terms providing benefits to the Settlement Class and Subclass Members and after the Term Sheet was inked, in an abundance of caution and consistent with *Prandini* v. *National Tea Co.*, 585 F.2d 47 (3d Cir. 1978).   (*See* Mem. in Supp. of Prelim. Approval at 30, June 25, 2014, Doc. No. 6073-5; Seeger Decl. ¶ 46; Suppl. Phillips Decl. ¶¶ 18-19.)

\*        \*        \*

354.    In sum, because (i) an initial presumption of fairness attaches, (ii) the *Girsh* factors weigh in favor of final approval, and (iii) the additional *Prudential* factors weigh in favor of final approval, this Court finds that the Settlement Agreement is fair, reasonable and adequate.

### III.
### THE REMAINING OBJECTIONS TO THE
### SETTLEMENT HAVE NO MERIT

355.    Once a court has granted preliminary approval to a class action settlement, the settlement is presumed reasonable and "an individual who objects has a heavy burden of demonstrating the settlement is unreasonable." *DeHoyos* v. *Allstate*, 240 F.R.D. 269, 293 (W.D. Tex. 2007); *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 2451960, at \*5 (S.D. Fla. July 8, 2005).

356.    A court "should not withhold approval of a settlement merely because some Class Members object." *IUE-CWA* v. *Gen. Motors Corp.*, 238 F.R.D. 583, 600 (E.D. Mich. 2006) (citation omitted) (internal quotation marks omitted).  The Court "has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement."  *DeHoyos*, 240 F.R.D. at 286 (quoting *Mich. Hosp. Ass'n* v. *Babcock*, 1991 U.S. Dist. LEXIS 2058, at \*10 (W.D. Mich. 1991)); *see also Reed* v. *Gen. Motors Corp.*, 703 F.2d 170, 174-75 (5th Cir. 1983) (approving settlement over objections by 40% of the class).

357.    None of the objections in this case renders the Settlement Agreement unfair, unreasonable, or inadequate.

### A.    CTE-Related Objections Should Be Overruled

358.    Objectors criticize the Settlement's treatment of CTE.  At bottom, they argue that the failure to compensate Death with CTE as a Qualifying Diagnosis after July 7, 2014 and the alleged failure to compensate "CTE" in the living creates class certification problems (as addressed above) and renders the Settlement Agreement fundamentally unfair.  These CTE-related objections are meritless.

#### 1.    The Settlement Compensates Individuals Who Manifest Impairment While Living

359.    Objectors' CTE-related objections are premised on the argument that the Settlement Agreement does not compensate conditions in living players that have been retrospectively associated in certain studies with a post-mortem diagnosis of CTE.  This objection misses the mark.  First, the studies upon which the Objectors rely reveal that the Settlement does compensate conditions allegedly associated with the advanced stages of CTE.  Moreover, the studies that Objectors rely on have many limitations, including, but not limited to, the retrospective reporting of alleged symptoms experienced by subjects while living by family members of those diagnosed post-mortem with CTE.  But more generally, the purported failure of the Settlement to explicitly compensate other conditions allegedly associated with CTE, would not render the Settlement unfair, unreasonable or inadequate.  This agreement was an arm's-length compromise reached by the settling parties, who were aware of the relevant science and informed by competent experts in the field.

360.    As described in detail in the proposed Findings of Fact, the McKee Study (as well as the Stern Study) found that most former NFL players diagnosed post-mortem with CTE suffered from co-morbid diseases such as ALS, Parkinson's Disease,

or Alzheimer's Disease while living, or had neurocognitive impairment while living characteristic of dementia, which is compensated in the Settlement Agreement under the definition of Level 1.5 and Level 2 Neurocognitive Impairment.  (*See* Dr. Fischer Decl. ¶ 12; Dr. Schneider Decl. ¶¶ 48-52; *see also* Dr. Yaffe Decl. ¶¶ 80-84.)  Indeed, the Monetary Awards for Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment compensate Settlement Class Members who experience neurocognitive impairment in the following areas characteristic of those described by McKee/Stern, *e.g.*, learning and memory, complex attention, executive functioning, language, and visual-perceptual.  The Settlement, however, does not require a Retired NFL Football Player with a particular Qualifying Diagnosis to separately demonstrate the presence of a particular pathology, *e.g.*, CTE, to obtain recovery.

361.    Moreover, the NFL Parties have introduced evidence supporting their contention that no conclusions relating to the causes of CTE or the diagnostic and clinical profile of CTE can yet be credibly or reliably established.  (*See* Dr. Yaffe Decl. ¶¶ 56-58, 66-67, 74, 78-79; Dr. Schneider Decl. ¶¶ 24, 27-28; *see also* Dr. Giza Decl. ¶¶ 18-19; Dr. Hovda Decl. ¶¶ 22-23, 25-26; Dr. Hamilton Decl. ¶ 30.)  Such evidence speaks to the litigation risks attendant to Objectors' CTE claims, and the due consideration and deference owed to the good-faith, arm's-length, hard-fought negotiations between Class Counsel and Counsel for the NFL Parties in negotiating the compromise of Plaintiffs' claims.

362.    Objectors' CTE arguments hinge on the Settlement's exclusion of compensation for alleged mood and behavioral symptoms allegedly associated with CTE.  Class Counsel had pushed for a broad range of injuries to be included in the

Settlement.  (*See* Seeger Decl. ¶ 35.)  But ultimately, the settling parties negotiated at arm's-length and reasonably agreed in good faith that the Settlement would not compensate mood and behavioral symptoms such as depression, irritability, and aggressiveness (*whatever* the cause).  Moreover, according to evidence submitted by the NFL Parties, such symptoms are common in the general population and often have multifactorial causation, meaning that the causes of these symptoms can be attributed to numerous factors wholly unrelated to CTE, head trauma, or NFL Football.  (Dr. Yaffe Decl. ¶ 75; Dr. Schneider Decl. ¶ 39.)  The NFL Parties argued, with citation to scientific support, that this is especially true in the context of Retired NFL Football Players who may have one of several significant risk factors for depression and other mood and behavioral conditions.  Indeed, the NFL Parties have introduced into the record evidence stating that it was once believed by the scientific community that mood and behavioral conditions were part of the clinical profile of Alzheimer's Disease, but as research advanced, it became clear that belief was wrong.  (Dr. Schneider Decl. ¶¶ 39, 45.)  The same may be true here.

363.   In not compensating for those mood and behavioral conditions, the Settlement Agreement does not single out CTE as compared to other potentially compensable conditions that may result in the same problems.  (*See* Dr. Schneider Decl. ¶¶ 39, 42.)  Mood and behavioral conditions are not compensated in the Settlement Agreement for anyone.  The NFL Parties introduced into the record testimony from well-respected scientists stating that such symptoms are common and afflict many people, including individuals dealing with the ramifications of

neurocognitive or neuromuscular impairment.  (Dr. Schneider Decl. ¶¶ 39, 42; *see also* Dr. Yaffe Decl. ¶ 75.)

364.    Objectors also focus on suicide as a purportedly known, established symptom of CTE.  As described above, the NFL Parties have introduced evidence stating that there are no scientifically established studies which show a relationship between contact sports of any kind and risk of suicide.  (*See* Dr. Yaffe Decl. ¶ 76.)  To the contrary, one published epidemiological study introduced by the NFL Parties suggests that retired NFL players have lower rates of death by suicide than the general population.  *See* Grant L. Iverson, *Chronic Traumatic Encephalopathy and Risk of Suicide in Former Athletes*, 48 Brit. J. Sports Med. 162, 162 (2014).  The "causes of suicide are also complex, multifactorial, and difficult to predict in individual instances." (Dr. Yaffe Decl. ¶ 76.)  As such, the NFL Parties have introduced evidence that Objectors' arguments that CTE is causally linked to suicide, as with other behavioral or mood driven conditions, would be subject to significant litigation risk and serious scientific challenge on the merits.

365.    Given these considerations, the settling parties, as part of the overall compromise achieved through the Settlement, reasonably agreed to compensate neurocognitive and neuromuscular impairment of a certain severity.  This agreement to provide compensation for certain alleged deficits, but not others, is consistent with the notion that a settlement is a compromise and line-drawing is always involved.  (*See supra* ¶¶ 338, 377, 382.)

366.    Here, the Settlement Class Members had clear notice regarding that compromise and the specific deficits that would be compensated.  They were in a

position to assess the risk of pursuing individual litigation in which they would need to establish a causal link between their alleged mood and behavioral symptoms and their NFL careers, and they were in a position to opt out and litigate their claims if they so desired. Thus, the compromise reached by the parties to compensate neurocognitive and neuromuscular impairment, but not mood and behavioral symptoms, was fair, reasonable, adequate and accepted by the vast majority of the Settlement Class.

### 2. The Settlement Appropriately Was Driven by Current Science

367.    Objectors argue that the science may develop and that the Settlement should account for those changes. Specifically, Objectors assert that clinicians will be able to identify tau protein consistent with the presence of CTE in living individuals in the next five to ten years. But even if the science developed over that term, it would make no difference to the fairness of the Settlement Agreement.

368.    First, a biomarker that will allow clinicians to identify the tau protein, and therefore CTE, in living people will not change the conclusion that the Settlement Agreement is fair, reasonable and adequate.

369.    The Settlement Agreement compensates Settlement Class Members who experience neurocognitive or neuromuscular impairment, not the presence of proteins in the brain. This is true with respect to all of the Qualifying Diagnoses. For example, Retired NFL Football Players are not compensated for Alzheimer's Disease because they have amyloid, a protein used to diagnose Alzheimer's Disease post-mortem, present in their brain in a certain pattern; they are compensated for Alzheimer's Disease if they manifest neurocognitive impairment consistent with Alzheimer's Disease. Indeed, many individuals in the general population have been found post-mortem to possess the amyloid protein consistent with Alzheimer's Disease, but were

143

asymptomatic while living.  (Dr. Schneider Decl. ¶¶ 44, 47.)  As discussed above, the Stern Study included three subjects diagnosed with CTE who were asymptomatic while living.  (*See* Dr. Yaffe Decl. ¶ 72.)

370.    In sum, the Settlement does not compensate pathologies; it compensates significant neurocognitive or neuromuscular impairment that impacts the lives of Retired NFL Football Players and their families while they are living.

371.    Second, even if science reaches the point where mood and behavioral symptoms are identified as part of the diagnostic profile of CTE, the parties' agreement not to compensate mood and behavioral symptoms associated with *any* condition is justified, as discussed above.  Just as the settling parties engage in line-drawing, courts often draw lines on the exposure-to-disease continuum based on the status of the science/medicine at the time.  *See Sheridan* v. *NGK Metals Corp.*, 609 F.3d 239, 254 (3d Cir. 2010) (relying on related state court case that had addressed the same issue and affirming summary judgment dismissing toxic exposure case because "[a]lthough the [state court's] opinion suggests that future developments in science's understanding of the effects of beryllium exposure and its relationship with [chronic beryllium disease] may result in a different outcome, it drew a line along the exposure-to-disease continuum at sensitization." (internal citation omitted)).

372.    Finally, the Settlement Agreement expressly recognizes keeping abreast of scientific and medical developments.  (*See* Settlement Agreement §6.6(a), 30.11, Art. XXVI.)

3.    **Death with CTE Was Included in the Settlement For Families of Decedents with CTE Who Were Unable to Otherwise Obtain Qualifying Diagnoses**

373.    The agreement to compensate post-mortem CTE pathological diagnoses that occurred prior to the Final Approval Date is also fair and reasonable.  Retired NFL Football Players diagnosed with CTE upon autopsy prior to the Final Approval Date may have qualified for Monetary Awards associated with Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, or one of the other Qualifying Diagnoses while they were living.  Given their deaths, however, they cannot now comply with the definitions and testing protocol set forth in the Settlement Agreement.  Thus, the parties agreed to compensate the estates of such Retired NFL Football Players based on the neuropathological diagnosis of CTE, using such diagnosis as a proxy, which is far from unfair or unreasonable.

**B.    Objections to the Exclusion of Other Alleged Conditions Have No Merit**

374.    Various Objectors complain that other conditions are not compensated under the Settlement.  Those conditions include multiple sclerosis, epilepsy, hypopituitarism, post-concussion syndrome, deafness, dizzy spells, vision problems, headaches, mood swings, and grand mal seizures.  Most—if not all—of these conditions were never raised in Complaints filed in this litigation.  If Objectors wanted to pursue claims against the NFL Parties regarding any of these diagnoses, they were free to opt out and do so.  (*See* Klonoff Decl. ¶ 92 ("[I]t is reasonable for settling parties to make choices and compromises.  If a class member with one of the excluded conditions was upset with the settlement, he had the opportunity to opt out.").)  They have not done so, and therefore, objections relating to any additional conditions have no merit.  (*See supra* ¶ 295 (citing cases).)

375.    Moreover, a settlement agreement need not compensate every injury alleged in the complaint, let alone those that are not even alleged.  *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 156 (E.D. La. 2013) (overruling objection that settlement compensation matrices should "include additional or different conditions" when there was no "medical or scientific basis" to conclude those conditions were connected to the defendant's conduct); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *47-49 (E.D. Pa. Aug. 28, 2000) (overruling objection that class settlement compensating certain physical injuries must also compensate neuropsychiatric injuries where there was a "significant degree of controversy in the available literature" over the connection between the diet drugs and neuropsychiatric injury); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 233 (S.D. W.Va. 2005) (objectors complained that the settlement failed to compensate other possible injuries, but the court overruled the objections, noting that the objectors advocated for the inclusion of injuries that had multiple potential causes); *see also* Dr. Yaffe Decl. ¶ 91.

*     *     *

376.    At bottom, Settlement Class Members had clear notice of the nature of the compromise and the specific deficits that would—and would not—be compensated. Class Counsel, throughout the litigation and during the negotiations, consulted with experts to investigate the range of conditions that could be associated with TBIs.  (*See* Phillips Suppl. Decl. ¶¶ 5; Seeger Decl. ¶¶ 16-18, 22.)  Class Counsel were in a position to assess the risk of pursuing individual litigation involving conditions in addition to the Qualifying Diagnoses in which they would need to establish a causal link between

146

Settlement Class Members' alleged injuries or symptoms and Settlement Class Members' NFL careers.  Instead, experienced and informed Class Counsel engaged in line-drawing and agreed to the proffered Settlement, while also affording Class Members the option to opt out and litigate if they so desired.  *See*, *e.g.*, *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 211, 233 (S.D. W.Va. 2005) (noting that the appropriate remedy for class members who wished to recover for other medical conditions was "to opt out and seek recovery in the tort system.").

377.    Thus, the agreement to provide compensation for certain alleged deficits, but not others, is consistent with the notion that a settlement is a compromise, and it does not render the Settlement Agreement unfair or unreasonable.  *See*, *e.g.*, *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) (noting that "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution"); *Lazy Oil, Co.* v. *Witco Corp.*, 95 F. Supp. 2d 290, 338-39 (W.D. Pa. 1997) (stating that a court "should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of highest hopes.'" (quoting *Cotton* v. *Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977))); *see also* Klonoff Decl. ¶ 17 ("In my experience, every settlement is subject to line-drawing attacks.  The question, however, is not whether the settlement is perfect, but whether the lines that have been drawn have a rational basis and were carefully considered.").  Because

Objectors knew of these compromises, which were reasonable, and did not opt out, their objections are without merit.

**C.     The Standard for a Qualifying Diagnosis of Dementia**
**      Is Scientifically Valid and Reasonable**

378.    Certain Objectors argue that the Settlement sets an unreasonably high bar to qualify for dementia.   These Objectors claim that the thresholds to establish impairment are too high, and argue that the functional impairment standard is too severe.  These objections have no merit.

379.    As described in detail above, the criteria used for the definitions of Level 1.5 and Level 2 Neurocognitive Impairment, including the thresholds and functional impairment criteria, are directly supported by relevant medical and neuropsychological literature.  (*See* Dr. Millis Decl. ¶¶ 15-37.)  More specifically, the thresholds are premised upon empirically based and scientifically accepted research.  (*Id*. ¶¶ 21, 32.)  They are thus fair, reasonable and adequate.

380.    In any event, eligibility for compensation under the Settlement is not static.  BAP Supplemental Benefits are available for qualified Retired NFL Football Players who are diagnosed with Level 1 Neurocognitive Impairment, *i.e.*, moderate cognitive impairment.   If a Retired NFL Football Player's Level 1 Neurocognitive Impairment progresses to dementia or any other Qualifying Diagnosis other than Death with CTE, he then will be eligible for a Monetary Award.   Similarly, Retired NFL Football Players who currently are asymptomatic will remain eligible for Monetary Awards for all of the Qualifying Diagnoses—other than Death with CTE—if they develop such conditions over the 65-year term of the Settlement.

**D.**  **The Amount of, and Offsets to, Monetary Awards Are Fair and Reasonable**

381.   Objectors argue that the maximum Monetary Awards available for Qualifying Diagnoses are not sufficiently high and/or that the various reductions to these Awards—whether for age at the time of Qualifying Diagnosis, non-NFL Football related Stroke or TBI, number of Eligible Seasons, or non-participation in the BAP— are somehow unjustified.  None of these objections has merit.

**1.**  **Maximum Awards Are Sufficient**

382.   Objectors argue the maximum Monetary Awards available for Qualifying Diagnoses are not sufficiently high, yet they simply demand more money without providing any compelling basis to conclude that the agreed-upon amounts are not fair, reasonable and adequate.   The maximum Monetary Awards under the Settlement Agreement, which provide cash awards up to $5 million while eliminating the attendant risks of litigation, are the fair, reasonable and adequate product of a hard-fought, arm's-length compromise between the parties.   *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) ("[A] settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."); *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 316-17 (3d Cir. 1998) ("In deciding the fairness of a proposed settlement, we have said that the evaluating court must, of course, guard against demanding too large a settlement based on its view of the merits of the litigation[.]" (internal quotation marks omitted)); *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001) ("[The court] must . . . recognize that settlement typically represents a compromise and not hold counsel to an impossible standard."); *Henderson* v. *Volvo Cars of N. Am., LLC*, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) ("complaining

that the settlement should be 'better' . . . is not a valid objection" and "lack[s] merit."
(internal citation omitted)); *Alin* v. *Honda Motor Co.*, 2012 WL 8751045, at *14
(D.N.J. Apr. 13, 2012) ("full compensation is not a prerequisite for a fair settlement.");
*In re Am. Bus. Fin. Servs. Noteholders Litig.*, No. 2:05-cv-00232, 2008 WL 4974782, at
*7 (E.D. Pa. Nov. 21, 2008) ("[T]he settlement is not intended to compensate each and
every aggrieved individual fully for his loss, but instead represents a reasonable amount
of relief for the settlement class, given the risks inherent in further litigation); *see also*
*Priddy* v. *Edelman,* 883 F.2d 438, 447 (6th Cir. 1989) ("fact that the plaintiff might
have received more if the case had been fully litigated is no reason not to approve the
settlement"); *Thomas* v. *Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998) ("The court
should not reject a settlement merely because individual class members complain that
they would have received more had they prevailed after a trial."); *In re Toyota Motor*
*Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 2013 WL
3224585, at *14 (C.D. Cal. June 17, 2013) ("[S]ettling plaintiffs trade the risk of
recovering nothing for a reward that is necessarily less than their full *potential*
recovery." (emphasis in original)); *Hall* v. *AT&T Mobility LLC*, 2010 WL 4053547, at
*30 (D.N.J. Oct. 13, 2010) (objectors' preference for greater compensation "has no
bearing on whether the terms of the Settlement Agreement itself are fair and
reasonable.  After all, a settlement is, by its very nature, a compromise that naturally
involves mutual concessions."); *In re Currency Conversion Fee Antitrust Litig.*, 263
F.R.D. 110, 125 n.4 (S.D.N.Y. 2009) (refusing to consider broad unsupported
objections by class members as to the amount of compensation they will receive under

the settlement because they "are of little aid to the Court"), *aff'd sub. nom Priceline.com, Inc.* v. *Silberman*, 405 F. App'x 532 (2d Cir. 2010).

383.    In addition, Objectors' argument about the insufficiency of the Awards is based on a crude calculation of an average anticipated Monetary Award between $135,000 and $225,000.  That analysis is flawed.  Estimated "average" figures are meaningless; the average is skewed by significant reductions for Retired NFL Football Players who, for example, are age 80 or older at the time of Qualifying Diagnosis or earned no Eligible Seasons in the NFL.  Simply averaging all Monetary Awards across the entire Settlement Class proves nothing.  The issue is whether Settlement Class Members with particular age and career length characteristics are entitled to Monetary Awards that are "unfair."  Here, the Monetary Awards—providing compensation of many millions in many circumstances—are anything but.

384.    Objectors also argue that the maximum Monetary Awards are insufficient because they will not be paid immediately.  The fact that the Monetary Awards under the Settlement are inflation protected, however, eliminates concerns about the passage of time and the fact that they will not be paid immediately to all eligible Settlement Class Members.  (*See* Settlement Agreement § 6.9.)

## 2.    The Award Reductions Are Reasonable and Justified

385.    Objectors argue that the reductions to the Monetary Awards—for age at time of Qualifying Diagnosis, non-NFL Football related Stroke or TBI, number of Eligible Seasons, or non-participation in the BAP—are unfair.  These objections have no merit.

386.    Instead of requiring Settlement Class Members to prove causation, as it could have, the Settlement Agreement uses age-based award reductions and Offsets as

proxies for causation and exposure to differentiate, in a reasonable and just manner, levels of recovery between Settlement Class Members with the same Qualifying Diagnosis.  *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *68 (E.D. Pa. Aug. 28, 2000)  (approving class settlement that provided differentiated recovery of benefits based on objective criteria on matrix without need to demonstrate causation, while noting that establishing causation at trial would have been difficult for certain class members).  Settlements often use similar methods to value class members' claims. As one court has recognized, "disparate treatment of claims is obviously necessary if claims are to be valued and a settlement is to occur."  *In re Phenylpropanolamine Prods. Liab. Litig.*, 227 F.R.D. 553, 563-64 (W.D. Wash. 2004) (overruling objection to the discounting of claims based upon the statute of limitations because "it is simply not tenable to argue that this sort of negotiated compromise renders the Settlement unfair because it allocates amounts among Class Members").  The reductions and Offsets are also the reasonable result of a hard-fought, arm's-length compromise, and are based on objective criteria.

387.   Other courts have approved settlements that include similar offsets and reductions.  In *Prudential*, for example, the Third Circuit affirmed a class settlement in which insurance claims were evaluated and scored to arrive at differing compensation values.  *Prudential*, 148 F.3d at 296-97.  Likewise, in *Diet Drugs*, the court overruled objections to a settlement where certain awards were determined subject to matrix criteria like age and severity of injury.  2000 WL 1222042, at *22.  And in the *Deepwater Horizon* case, the court overruled objections that the settlement "should contain different dollar values, different conditions, payments based on severity of

disease and impairment, payments for relocation costs, and/or different standards of proof" because the settlement matrix was "based on medical and empirical data, developed through arms-length negotiations, and related to the relative strengths and merits of similarly situated claims." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 140, 151-52 (E.D. La. 2013).

### (a)     Age Reduction Is Fair and Reasonable

388.    Objectors contend that: (i) any reduction to the Monetary Awards based upon the age of the Retired NFL Football Player at the time of Qualifying Diagnosis is unfair; and (ii) if any reduction based on age is to occur, it should be based upon the age of the Retired NFL Football Player at the time of the onset of impairment, rather than the date of Qualifying Diagnosis.  These objections are without merit.

389.    First, the reduction in Monetary Award by age at the time of Qualifying Diagnosis accounts for the likelihood of neurocognitive impairment increasing with age in the general population and that many former football players and non-football players alike will experience diminished neurocognitive functioning in their advanced years for reasons entirely unrelated to their participation in professional football.

390.    This reduction also accounts for the fact that a Retired NFL Football Player diagnosed later in life with neurocognitive impairment enjoyed a quality of life after NFL Football—at least with respect to neurocognitive issues—for a greater duration of time than a Retired NFL Football Player diagnosed with that same neurocognitive impairment at a younger age.  *See Diet Drugs*, 2000 WL 1222042 at *22 (approving class settlement where compensation matrices included 11 separate age intervals ranging from those who are less than or equal to 24 years old to those who are 79 years of age, with compensation generally decreasing with age in part "because

younger individuals have a longer damage period"); *In re Phenylpropanolamine*, 227 F.R.D. at 557, 567 (granting final approval to class settlement that paid different compensation in part based on age of settlement class member at time of injury); *see also* Klonoff Decl. ¶ 100 ("[I]t is not unreasonable, in my view, to reduce awards based on age.  If, for example, a player is diagnosed with Alzheimer's Disease at age 35, that player may have a strong case that the disease was caused by concussions suffered while playing football.  On the other hand, if Alzheimer's Disease is not diagnosed until age 80, the NFL's argument that football was not the cause is much stronger, given the much higher prevalence of Alzheimer's Disease in the general population in the age 80 category than in the age 45 category."); Vasquez Decl. ¶¶ 10-11, 15; *see also* Schneider Decl. ¶ 42.)  Thus, the reduction is fair and reasonable.

391.   Second, the Settlement's requirement of measuring age at Qualifying Diagnosis—rather than age at onset of impairment—is fair and reasonable because it is an objective criterion that avoids burdensome mini-trials on what constitutes "credible" evidence of onset of impairment and is necessary to prevent fraud.  To allow Settlement Class Members to claim Qualifying Diagnoses based upon personal statements, anecdotal evidence, or retrospective assessments would undermine the Injury Definitions and allow guesswork to dictate substantial Monetary Award decisions.  *See In re Pet Food Prods.*, 2008 WL 4937632, at *11 (D.N.J. Nov. 18, 2008) (overruling objection concerning omission of future expenses from settlement compensation coverage where calculation would be highly speculative and incapable of reasonable determination absent expert analysis, would potentially require prolonged involvement

by the claims administrator and the Court, and may expose the claims process to potential exaggeration and fraud); *see also* Dr. Yaffe Decl. ¶ 93.

392.    Certain Objectors argue that a reduction based on age at the time of Qualifying Diagnosis is unfair because the NFL Parties' purported fraud concerning the connection between football and brain trauma discouraged Settlement Class Members from seeking medical care or counseling related to perceived cognitive and mental health issues.  It is, however, fair and reasonable to expect that a patient visits his doctor because of the effect of neurocognitive or neuromuscular impairment, not its purported cause.

393.    Pegging compensation to the date of diagnosis is also fair and reasonable because it encourages Settlement Class Members to seek medical diagnosis promptly upon experiencing neurocognitive impairment.  As a result, Retired NFL Football Players will better understand their neurocognitive condition and, if warranted, receive Monetary Awards that will assist in managing the impairment moving forward.

**(b)    The Stroke Offset Is Scientifically Justified and Reasonable**

394.    Objectors also contend that the Stroke Offset is not scientifically justified.  This Objection is meritless because, as discussed above, there is a scientifically established association between Stroke and the Qualifying Diagnoses, as well as neurocognitive decline generally (*see* Dr. Yaffe Decl. ¶¶ 86-87; Dr. Fischer Decl. ¶ 18), and it was accordingly fair and reasonable for the settling parties to agree to this Offset.  (*See* Klonoff Decl. ¶ 94 ("It certainly cannot be disputed that, in a contested trial against the NFL, a player who had suffered a prior stroke . . . would be vigorously cross-examined on that possible alternative cause (and the NFL would offer expert testimony to support that theory).  Thus, such claims are weaker than those by

players who have not suffered prior strokes or traumatic brain injury.  It is only logical that weaker claims should be paid less.").)

395.    The Stroke Offset is also fair and reasonable because if there is no relationship between a Stroke and a Qualifying Diagnosis in a particular case, the Settlement Agreement provides the Settlement Class Member with a vehicle to challenge the application of the Offset; namely, the Settlement Class Member can demonstrate, by clear and convincing evidence, that his Qualifying Diagnosis was not related to the Stroke, and if he does so, the Offset will not apply.   (Settlement Agreement § 6.7(d).)   In addition, the Stroke Offset excludes "a transient cerebral ischaemic attack and related syndromes," thereby excluding more mild ischaemic attacks.  (*Id.* § 2.1(wwww).)  This is consistent with the scientific association between more severe strokes and the various Qualifying Diagnoses.  (Dr. Yaffe Decl. ¶¶ 86-87; Dr. Fischer Decl. ¶ 18.)

396.    Notwithstanding the recognized connection between Stroke and dementia, and the exception that allows Settlement Class Members to prove otherwise in appropriate cases, Objectors argue that no Stroke Offset should apply because football allegedly causes Stroke through TBI and the administration of Toradol (a medication that is sometimes administered to players to treat moderate to severe pain).  Objectors point to two studies in ostensible support of this TBI-related argument, but neither study addresses the relationship between mild repetitive TBI and stroke.  (*See* Morey Obj. at 33, Doc. No. 6201 (citing James F. Burke et al., *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 33 (2013)); Masel/O'Shanick Decl. ¶ 17 (citing Burns Decl. Ex. 21, Yi-Hua Chen et al., *Patients*

*with Traumatic Brain Injury: Population-Based Study Suggests Increased Risk of Stroke*, 42 Stroke 2733 (2011)).)

397.    As for Toradol, Objectors do not cite a single study suggesting that Toradol leads to increased microbleeding,[6] which in turn leads to an increased risk of stroke.[7]  (*See* Dr. Fischer Decl. ¶ 20.)

398.    Objections that the Stroke Offset is not scientifically justified have no merit.

        **(c)    The Traumatic Brain Injury Offset Is Scientifically Justified and Reasonable**

399.    Objectors also protest the fact that the Settlement provides an Offset for a severe TBI unrelated to NFL Football.  These objections have no merit because, as described above, there is a scientifically established relationship between severe TBIs and the Qualifying Diagnoses (*see* Dr. Yaffe Decl. ¶¶ 90; Dr. Fischer Decl. ¶ 21), and

---

[6]    Objectors cite two additional studies in support of their argument that the Stroke Offset is unreasonable.  Neither study meets Objectors' goal because the studies do not assess mild TBI and stroke.  (*See* Morey Obj. at 33 nn.36 & 38, Doc. No. 6201 (citing Ira R. Casson et al., *Is There Chronic Brain Damage in Retired NFL Players? Neuroradiology, Neuropsychology, and Neurology Examination of 45 Retired Players*, 6 Sports Health 384 (2014) and Puneet Kakar et al., *Cerebral Microbleeds: A New Dilemma in Stroke Medicine*, 1 J. Royal Soc'y Med. Cardiovascular Disease 1 (2012)).)  A third study described by Objectors (*see* Burns Decl. Ex. 22, Chien-Chang Liao et al., *Stroke Risk and Outcomes in Patients with Traumatic Brain Injury: 2 Nationwide Studies*, 89 Mayo Clinic Proc. 163 (2014)), although not cited, found that mild TBI was associated with stroke during the 24-month period following the TBI; this study does not address the theory that mild repetitive TBI causes remote stroke years after NFL play.

[7]    While Objectors note that the FDA-approved label for nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as Toradol, states that NSAIDs increase the risk of stroke, the standard for warning about a condition on an FDA-approved label is quite different than an epidemiological study.  In any event, if Objectors are correct, a Settlement Class Member can always establish that the exception applies to his circumstance.

the settling parties reasonably agreed, at arm's-length, to adopt this Offset.   (*See* Klonoff Decl. ¶ 94.)

400.   Objectors nevertheless maintain that the Offset is unfair because it applies regardless of the number of TBIs a player suffered during his NFL Football career, or because just one independent TBI can be grounds for the Offset.   These arguments are wrong and ignore the severity of the TBI necessary for the Offset to apply—severe TBI, as opposed to mild or even moderate TBI.   The Offset is additionally fair and reasonable because the Settlement Agreement excludes severe TBI related to NFL play and also allows a Retired NFL Football Player to demonstrate that the Offset should not apply to his award if the severe TBI that he suffered did not causally relate to his Qualifying Diagnosis.

### (d)      The Eligible Seasons Offset Is Fair and Reasonable

401.   Objectors also challenge the Settlement Agreement's use of "Eligible Seasons" as an Offset in order to provide greater potential Monetary Awards to those who played in the NFL the longest.   Objectors argue that: (i) any Offset as a proxy for exposure is unfair; (ii) the Eligible Season's lack of credit for training camp/preseason and for NFL Europe is unfair; and (iii) the use of Eligible Seasons as opposed to "Credited Seasons" as defined in the Bert Bell/Pete Rozelle NFL Players Retirement Plan (the "Retirement Plan") is unfair.   None of these objections has merit.

402.   First, the Eligible Seasons Offset is fair and reasonable because it directly mirrors the theory of the cases that are being settled.   Plaintiffs alleged that the NFL Parties are liable for failing to warn players about the dangers of *repetitive* head impacts, and Eligible Seasons serve as reasonable proxies for exposure to head impacts in NFL Football.   (*See* Vasquez Decl. ¶ 13 ("[T]he number of years played by a former

player is used as a proxy for the exposure to concussions and TBI.  It is assumed that the longer an individual played, the greater the number and severity of impacts he experienced and the greater should be his monetary award."); Klonoff Decl. ¶ 98.) Plaintiffs alleged that the NFL Parties are liable for failing to warn players about the dangers of repetitive head impacts.  (*See* Turner Compl. ¶¶ 3, 54, 61, 62, 78, 86, 89, 116, 131, 133, 184, 203, 238, 253-63, 275-76, 281, 283, 293-94, 297, 302, 309-312, 314, 331, 346, 364, 374-75, 377, 380-81, 384, 387-88.)  Indeed, a federal district court denying the remand motion of one of the objectors to this Class Action Settlement specifically held that it would be impossible to consider the damage alleged without looking at the totality of the former player's NFL career.  *See Duerson* v. *Nat'l Football League*, 2012 WL 1658353, at *3 (N.D. Ill. May 11, 2012) ("[I]t is not possible for Duerson successfully to limit the time period to which his complaint refers" because to prove his claims he "must show that the CTE from which David Duerson suffered was caused by repeated blows to the head during his time as an NFL player.  When making that showing, it would be exceedingly implausible to contend that the CTE was caused only by trauma suffered from 1987 through early 1993, and not by trauma from 1983 to 1986 or later in 1993.").

403.    Although Objectors contend that even one concussion, or multiple concussions sustained over a short period of time, can result in long-lasting injury, it is nonetheless fair and reasonable that the Offset is not assigning any weight of causation to any given impact—whether concussive or not—over any other.  Instead, it serves solely as a proxy for the length of exposure.  In fact, certain Objectors concede that "it is reasonable to assume that exposure to mild TBI increases as playing time increases."

(Armstrong Obj. at 15, Doc. No. 6233 (quoting, without attribution, Masel/O'Shanick Decl. ¶ 16).)

404.   Second, the Settlement's exclusion of participation in training camp/preseason games in the criteria for earning an Eligible Season is fair and reasonable.  Players who make regular season rosters, as opposed to those who are cut during training camp or preseason prior to the regular season, experience longer periods of exposure to concussive and sub-concussive hits.  The dividing line reached was reached as part of arm's length-negotiation, and Objectors have not presented any compelling argument for why the Offset is not fair and reasonable.  *See Diet Drugs*, 2000 WL 1222042, at *19 (granting final approval to settlement where recovery was based on matrix compensation and reduced compensation where claimant took drug for fewer than 61 days).

405.   In addition, it is fair and reasonable that Retired NFL Football Players who played in NFL Europe are credited with only half of an Eligible Season for their participation.  NFL Europe was a developmental league with a shorter season than the NFL.  (Gardi Decl. ¶ 14.)  Moreover, NFL Europe players face a unique litigation risk due to workers' compensation exclusivity laws.  (*Id.* ¶¶ 5, 8-9, 11-13; *see also*, *e.g.*, Fla. Stat. §§ 440.04(2), 440.10, 440.11, 440.151(2); Ga. Code Ann. §§ 34-9-11, 34-9-280.  Such immunity applies even where the injuries occurred outside the state in which workers' compensation was procured.  *See*, *e.g.*,  Fla. Stat. § 440.09(1)(d); Ga. Code Ann. § 34-9-242.  The fact that a former player may have sued the NFL, as opposed to its affiliate NFL Europe, does not prevent the NFL from asserting the defense.  *See Gulfstream Land & Dev. Corp.* v. *Wilkerson*, 420 So. 2d 587, 589 (Fla. 1982) (stating

that one corporation could invoke workers' compensation exclusivity in an action by another company's employee when there was "absolute integration" of the companies); *Coker* v. *Great Am. Ins. Co.*, 659 S.E.2d 625, 627-28 (Ga. Ct. App. 2008) (company could invoke workers' compensation exclusivity when subsidiary employed plaintiff); Ga. Code Ann. §§ 34-9-11(a), 34-9-224.  This legal hurdle justifies the differentiated Monetary Award treatment for NFL Europe participation.

406.    Third, the Settlement's use of "Eligible Season," rather than "Credited Season" as defined in the Retirement Plan is fair and reasonable.  Objectors contend that Eligible Season is unfairly narrow because it does not include seasons in which a Retired NFL Football Player was placed on injured reserve before the third game of the regular season unless it was because of a concussion or head injury.  Because the Eligible Season Offset operates as a proxy for exposure, however, it is fair and reasonable to limit the injured reserve exception to head injuries.  For example, a Retired NFL Football Player who suffers a broken leg on the first day of training camp is unlikely to have experienced the same level of exposure as a player who played for a Member Club all season long.

### (e)    The Offset for Non-Participation in the BAP is Fair and Reasonable

407.    Objectors oppose the 10% Monetary Award Offset for Retired NFL Football Players who do not elect to participate in the BAP.  Again, this objection is without merit.

408.    This Offset is fair and reasonable because it is designed to encourage Retired NFL Football Players to participate in the BAP, which offers significant benefits.  More specifically, by participating in the BAP, Retired NFL Football Players

will be evaluated through objective means for evidence of neurocognitive decline, provided medical treatment and further testing if found to be suffering from Level 1 Neurocognitive Impairment, given documented baseline results for comparison against any future tests to determine whether neurocognitive abilities have deteriorated, and informed about their current level of neurocognitive functioning (while allowing them to ask related questions of the examining neuropsychologist and neurologist).

409.    This Offset is also reasonably limited in scope because it does not apply to Retired NFL Football Players in Subclass 2 (*i.e.*, those with Qualifying Diagnoses prior to July 7, 2014) nor to Retired NFL Football Players in Subclass 1 (*i.e.*, those without Qualifying Diagnoses prior to July 7, 2014) who later receive a Qualifying Diagnosis of ALS or who receive any Qualifying Diagnosis prior to their deadline to receive a BAP baseline assessment examination.   Instead, it applies only to those Retired NFL Football Players for whom there is a reasonable basis to encourage participation in the BAP for the reasons discussed above.   (Settlement Agreement § 6.7(b)(iv).)

## E.    Limiting Representative Claimants' Eligibility for Monetary Awards Is Fair

410.    Objectors challenge the requirement that Representative Claimants of Retired NFL Football Players who died prior to January 1, 2006 must demonstrate the timeliness of a litigation claim in order to receive a Monetary Award.   Specifically, these objections complain about (i) the use of January 1, 2006 as a cut-off date; and (ii) the use of the Settlement Date as the time for consideration of whether an unfiled litigation claim would be timely.   Neither objection has merit.

411.   First, the requirement that Representative Claimants of Retired NFL Football Players who died prior to January 1, 2006 demonstrate the timeliness of a litigation claim in order to receive a Monetary Award is fair and reasonable.

412.   The use of the 2006 date of death is a fair and reasonable compromise of a settlement negotiation.  Instead of requiring all decedents to prove the timeliness of their claims (as is in the NFL Parties' interest) or requiring no decedents to prove timeliness, the parties reached a hard-fought compromise based on the MDL Master Administrative Complaints filed in 2012, which alleged that the NFL's "policies and decision making relevant to its conduct and the risks of latent brain injury alleged herein[] occurred primarily at its corporate offices in New York City."  (MACAC ¶ 14.) Because New York maintains a six-year statute of limitations for fraud (N.Y. C.P.L.R. § 213(8))—the longest period of the claims alleged—the parties negotiated back six years from 2012 to 2006, and agreed that, in order to receive a Monetary Award, decedents who passed away in that year or later need not prove the timeliness of a litigation claim.   This was a fair and reasonable solution.   *See*, *e.g.*, *In re Phenylpropanolamine Prods. Liab. Litig.*, 227 F.R.D. 553, 564 (W.D. Wash. 2004) (overruling objection regarding class settlement that reduced monetary awards based on defense related to statute of limitations where cut-off date was "not arbitrary" because it corresponded to typical time for running of personal injury statutes of limitations).

413.   Moreover, the requirement to prove the timeliness of the claim is no different than in continued litigation.  For example, under Louisiana law, the right of action that would allow Objector to sue on behalf of the decedent prescribes one year to file from the death of the deceased absent tolling.  *See* La. Civ. Code art. 2315.1.

Moreover, the parties here ensured that the Settlement accounted for the fact that there are variances in state law in that claimants may recover despite the January 1, 2006 limitation if they can show that their claim would not be barred by the applicable statute of limitations.  (Settlement Agreement § 6.2(b).)

414.    Second, the use of the Settlement Date as the time for consideration of whether an unfiled litigation claim would be timely is fair and reasonable.  Objectors contend that use of the Settlement Date is unfair because Co-Lead Class Counsel filed the *Easterling* putative class action lawsuit on August 17, 2011, which the Objectors argue tolled the claims of Representative Claimants under *American Pipe & Construction Co*. v. *Utah*, 414 U.S. 538 (1974).  The Court's statute of limitations analysis for any such Representative Claimant will consider when the wrongful death or survival claim accrued under applicable state law, including tolling arguments under *American Pipe*.  (*See* Settlement Agreement § 6.2(b).)  Assuming *arguendo* that Objectors are correct on the merits of the tolling argument, there is no prejudice to the Representative Claimant because the Representative Claimant would not be barred under the statute of limitations.

415.    The NFL Parties were not required to categorically abandon all statute of limitations defenses as to each and every Settlement Class Member, even those who passed away decades ago.  The compromise reached by the parties was reasonable.  *See, e.g., In re Phenylpropanolamine*, 227 F.R.D. at 564 (overruling objection regarding class settlement that reduced monetary awards based on defense related to statute of limitations where cut-off date was "not arbitrary" because it corresponded to typical time for running of personal injury statutes of limitations).

**F.      The Scope of the BAP Is Sufficient and Appropriate**

416.    Objectors challenge the sufficiency of the BAP's funding and testing protocols.  Specifically, Objectors criticize (i) the BAP's funding; (ii) the Test Battery and Specific Impairment Criteria used by the BAP; (iii) the BAP's selection of neuropsychologists; and (iv) the use of mail order pharmacies for distributing non-experimental medication.  Because the BAP is well-funded and its testing protocols are medically justified, these objections have no merit.

**1.      The BAP Is Adequately Funded**

417.    Objectors' claim that the BAP is insufficiently funded was premised on an assumption that the actual cost of treating dementia can reach $56,000 per year.  But in doing so Objectors misunderstand the purpose and use of the BAP Supplemental Benefit, leading to inflated cost estimates.

418.    First, the sufficiency of the $75 million BAP Fund is established in the reports of the parties' actuarial and financial reports to the Special Master.  (*See* Material Provided by Counsel to the NFL, Report of the Segal Group to Special Master Perry Golkin, Doc. No. 6168; Material Provided by Counsel to Plaintiffs, Report of the Analysis Research Planning Corp. to Special Master Perry Golkin, Doc. No. 6167; Vasquez Decl. ¶¶ 17-28.)  Moreover, if the $75 million "is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination . . . , the NFL Parties agree to pay the amount of money necessary to provide the examinations in accordance with th[e] Settlement Agreement."  (Settlement Agreement § 23.1(b); *see also id.* § 23.3(d).)

419.    Second, Objectors misunderstand the purpose and scope of the BAP Supplemental Benefits, which are not used to treat dementia—which is covered under

the Monetary Award Fund, and not the BAP Fund—but instead are used to provide medical treatment, including, as needed, counseling and pharmaceutical coverage to individuals with Level 1 Neurocognitive Impairment (moderate neurocognitive impairment). (*See id.* §§ 2.1(j), 5.11; *id.* Ex. 1.) The maximum per player BAP Supplemental Benefit payable is to be determined (with the approval of the Court) on the one-year anniversary of the commencement of the BAP, which allows for control of any unanticipated variable in cost to ensure the BAP Fund's sufficiency.

**2.     The Test Battery and Specific Impairment Criteria Are Based on Well-Accepted and Scientifically Validated Tests**

420.   Objectors claim that the Test Battery excludes certain Qualifying Diagnoses, fails to test for mood and behavioral symptoms, and includes lengthy and inappropriate testing. Objectors' arguments as to the specific tests and criteria used are, however, without merit—each test and each threshold has a relevant and necessary purpose, and is based on scientifically valid and widely used and accepted neuropsychological tests and principles. (*See* Dr. Keilp Decl. ¶¶ 22, 25-26, 35-36; Dr. Hamilton Decl. ¶¶ 14, 23; Dr. Millis Decl. ¶ 35; Dr. Fischer Decl. ¶¶ 8, 9, 14.)

421.   First, Objectors assert that the BAP does not test for Alzheimer's Disease, Parkinson's Disease, or ALS, but this objection is misguided. The BAP was not designed to test for these conditions, a diagnosis for which can be obtained from a Qualified MAF Physician or, in appropriate circumstances, a qualified doctor outside of the BAP.

422.   Second, Objectors complain that the BAP does not test for mood and behavioral disorders. The Test Battery, however, includes two tests that address mood and behavioral symptoms: the MMPI-2RF and the Mini International Neuropsychiatric

Interview.  Moreover, as discussed above, mood and behavioral symptoms are not compensated under the Settlement.  (Dr. Millis Decl. ¶ 27.)  Nonetheless, to provide participating Retired NFL Football Players with a full assessment of the player's impairment, and to allow the diagnosing physicians to recommend further testing or treatment in the event a player qualifies for BAP Supplemental Benefits, the parties to the Settlement agreed to include these tests.

423.   Third, Objectors complain that the Test Battery is too long and certain tests are inappropriate for individuals with neurodegenerative disease.  The Test Battery's length and tests are, however, appropriate.  The Test Battery includes "stopping rules" that allow the examiner to discontinue or shorten the length of the test when the patient fails to complete items correctly, and patients with definable neurocognitive impairments have been able to tolerate the length of the test battery and complete it in good order (Dr. Millis Decl. ¶ 26; Dr. Keilp Decl. ¶¶ 36, 40); it includes validity testing—which tests for whether Retired NFL Football Players are exhibiting proper effort during the tests or whether they are faking impairment—that is both necessary in this context to ensure that BAP Supplemental Benefits and Monetary Awards are provided only to qualified Retired NFL Football Players and scientifically justified (Dr. Millis Decl. ¶¶ 28-30); and it uses a Test of Premorbid Function— essentially establishing a baseline—that is required whenever attempting to discern the extent of any cognitive impairment in a particular patient and is standard practice in all neuropsychological assessments to estimate premorbid ability.  (Dr. Keilp Decl. ¶ 33.)

424.   The Settlement Agreement's use of the Test Battery and Specific Impairment Criteria is fair, reasonable and adequate.

### 3. The Pre-Selection of Qualified Neuropsychologists Is Appropriate and Necessary To Ensure Medically Sound Diagnoses

425. Objectors complain that BAP neuropsychologists should not be pre-selected because pre-selected neuropsychologists will purportedly be less likely to determine a Retired NFL Football Player is suffering from impairment than non-pre-selected neuropsychologists. This objection is without merit.

426. The requirement that a Retired NFL Football Player be examined prospectively by medical professionals screened for their credentials is entirely reasonable as an anti-fraud measure. Moreover, it benefits the Retired NFL Football Player and ensures consistent treatment amongst Settlement Class Members. The BAP provides Retired NFL Football Players with free access to highly credentialed Qualified BAP Providers. (*See* Settlement Agreement § 2.1(vvv).) To the extent a Retired NFL Football Player already has seen properly credentialed medical professionals and received a Qualifying Diagnosis, he need not obtain another Qualifying Diagnosis. (*See id*. § 6.3(c)-(d); *id*. Ex 1.)

427. Thus, the pre-selection of qualified neuropsychologists is fair and reasonable. (Dr. Keilp Decl. ¶ 44; Dr. Millis Decl. ¶ 26 n.1.)

### 4. Mail Order Pharmacies Are Reasonable for Distributing Non-Experimental Medication

428. Objectors complain that pharmaceuticals provided as BAP Supplemental Benefits should not be limited to distribution from mail order providers. This objection has no merit.

429. The mail order pharmacies are flexible and will work with local, brand pharmacies to prescribe drugs that cannot be shipped by mail order—assuming such drugs should be available in this context. The mail order pharmacies also do not

require 90-day prescriptions in all instances and will work with the BAP Administrator to address clinicians' concerns in this regard.  (*See* Garretson Aff. ¶ 15.)

\*     \*     \*

430.    In sum, the myriad of complaints about the BAP have no merit.  The BAP is consistent with well-accepted and scientifically valid principles, provides substantial benefits to the Settlement Class, and as such supports the conclusion that the Settlement Agreement is fair, reasonable and adequate.

**G.      The Settlement Program Procedures Are Justifiable and Fair**

431.    Objectors assert that: (i) cognitively impaired Settlement Class Members may be unable to follow the procedural requirements; (ii) the registration requirement and the NFL's right to challenge such registration is inappropriate; (iii) the BAP baseline assessment examination deadline is unreasonable; (iv) the Claim Package is a barrier to recovery because of its burdensome requirements and deadline for submission; (v) Settlement Class Members should not be required to see Qualified MAF Physicians; (vi) the appeals process is unfair; and (vii) the anti-fraud provisions operate as anti-payment provisions.  None of these arguments has merit.  The Settlement Agreement sets forth a structured program designed to operate functionally, efficiently, consistent with due process, and without fraud, for 65 years, in order to provide Settlement Class Members with substantial benefits.

432.    In order to execute a settlement of this magnitude, deadlines, forms, and supporting documents are needed to ensure an orderly and fair dispensation of settlement benefits to all eligible class members.  "Class members must usually file claim forms providing details about their claims and other information needed to administer the settlement."  Manual for Complex Litigation § 21.66 (4th ed.).

169

433.   In fact, similar settlement procedures have been approved and used successfully in class action settlements in this district and nationwide.   *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 259 n.17 (3d Cir. 2009); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 294-96 (3d Cir. 1998); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 474-76 (E.D. Pa. 2010); Imprelis Class Action Settlement, https://treedamagesettlement.com/Class1/CLAIMSPROCESS.aspx (last visited Feb. 2, 2015); Deepwater Horizon Court-Supervised Settlement Program, http://www.deepwaterhorizonsettlements.com/Default.aspx (last visited on Feb. 2, 2015); AHP Diet Drug Settlement, http://www.settlementdietdrugs.com/index.asp (last visited on Feb. 2, 2015); *see also* Brown Decl. ¶¶ 57-59; Klonoff Decl. ¶ 103 ("These requirements strike me as reasonable ways to prevent fraud and assure timely review of the medical evidence.").

## 1.   Cognitively Impaired Settlement Class Members

434.   Objectors hypothesize that cognitively impaired Settlement Class Members may be unable to follow the procedural requirements of the Class Action Settlement and, therefore, may have valid claims denied or reduced.  But Class Counsel and Counsel for the NFL Parties structured the Settlement Agreement to allow Representative Claimants (for legally incapacitated or incompetent Retired NFL Football Players) and individual counsel representing Settlement Class Members to carry out the claims process in a representative capacity.   (*See*, *e.g.*, Settlement Agreement § 30.2(a).)   In addition, family members and close friends may assist Retired NFL Football Players with the claims process.

435.   While the Settlement Class Member must sign his or her Claim Form, Derivative Claim Form, or Appeals Form, this requirement does not impair the ability of counsel to coordinate the claims process itself.  (*Id*.)  Retired NFL Football Players are, therefore, provided fair, reasonable and adequate structural protections to help them in the claims process.

## 2.   The Registration Requirements

436.   Objectors challenge both the requirement that Settlement Class Members register for participation in the Class Action Settlement and the NFL's right to challenge such registration.  Neither objection has any merit.

437.   The parties provided Settlement Class Members with ample notice of the registration requirement.  The Long-Form Notice sets forth the registration requirement and the 180-day registration deadline in several places.  (*See* Long-Form Notice at 1, 15, 20.)   The Settlement Website homepage similarly informs Settlement Class Members when they can register and includes a link to "Sign Up for Future Information" when the registration period opens.  (*See* Settlement Website.)

438.   The 180-day registration deadline is also fair and reasonable in that it provides Settlement Class Members with ample time to gather and submit the necessary information, allows Settlement Class Members the flexibility to register via online or hard copy submission, and includes a "good cause" exception for missing the registration deadline.  (*Id*. § 4.2(a), (c); *see In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 317-18 (3d Cir. 2001) (summarizing that settlement class members, in order to perfect rights to recovery, must file registration form by given date to participate in settlement, and later file proof of claim form to seek monetary award); *In re Diet Drugs Prods. Liab. Litig.*, No. 2:99-cv-20593, 2007 WL 433476, at

*1-2 (E.D. Pa. Feb. 2, 2007) (noting the Settlement Agreement required class members to register with the settlement trust by a given date in order to be entitled to monetary benefits).)  Moreover, the 180-day period begins only after Supplemental Notice—which includes previously disclosed deadlines for registration, participation in the BAP, and submission of Claim Packages—is posted on the Settlement Website.  (Settlement Agreement § 4.2(a), (c).)

439.    The registration process also assists the administrators overseeing the Settlement program in several ways.  First, the registration process provides the BAP Administrator and Claims Administrator with the necessary biographical information to ensure that Qualified BAP Physicians and Qualified MAF Physicians are selected in sufficient quantity and geographic scope to cover the needs of Settlement Class Members. (*See id*. §§ 5.7(a)(ii), 6.5(b).)  Second, the BAP Administrator will use the registration database to encourage prompt participation in the BAP—for the benefit of the Retired NFL Football Players and to help determine the maximum per player BAP Supplemental Benefit on the one-year anniversary of the commencement of the BAP. (*See, e.g., id.* § 5.14(b).)

440.    The ability of the NFL Parties to challenge a determination as to whether a Settlement Class Member has properly registered is an important anti-fraud protection.  *See In re Diet Drugs*, MDL No. 1203, 2000 WL 1222042, at *63 (E.D. Pa. Aug. 28, 2000) (finding settlement procedures to be fair in part because "the audit and appeal procedures protect against fraud and the misuse of Settlement funds"); Manual for Complex Litigation § 21.66 (4th ed.); *see also* Klonoff Decl. ¶ 103.  The NFL Parties may be in a position, based upon institutional knowledge and historic records, to

detect fraudulent registrations that the Claims Administrator would have no reason to believe are false.  Moreover, both Settlement Class Members and the NFL Parties have the right to challenge registration determinations.  (Settlement Agreement § 4.3(a)(ii)-(iii).)

441.    The registration procedures are fair, reasonable and adequate.

**3.    The BAP Baseline Assessment Examination Deadline**

442.    Objectors further protest the deadline for Retired NFL Football Players to undergo a BAP baseline assessment examination.  (*See id*. § 5.3.)  There is no basis for the objection.

443.    Requiring Retired NFL Football Players age 43 or older to participate in the BAP within two years furthers the goal of encouraging screening for, and detection of, Qualifying Diagnoses.   As a general matter, the likelihood of neurocognitive impairment—as tested for in the BAP—increases with age in the general population. (Dr. Yaffe Decl. ¶¶ 22, 50.)  Prompt detection of such impairment, or the benefit of a baseline assessment for later comparison, is to the advantage of the Retired NFL Football Player.

444.    Relatedly, the Settlement Agreement's Monetary Award Grid reduces awards by age at the time of Qualifying Diagnosis, beginning at age 45.   By encouraging a prompt examination for those 43 and older, the deadline protects against Retired NFL Football Players delaying examination to their own detriment.   Longer registration deadlines would also create administrative expense.   Thus, the deadline is fair and reasonable.

### 4.       The Claim Package

445.    Objectors argue that the Claim Package that Settlement Class Members must submit to receive Monetary or Derivative Claimant Awards is unfair because: (i) Retired NFL Football Players must submit the Claim Package within two years of receiving a Qualifying Diagnosis; (ii) the Settlement Agreement does not disclose the proposed claim form and instructions for submission; (iii) Settlement Class Members are required to provide objective evidence beyond a sworn statement of NFL employment and participation if claiming more than one Eligible Season; and (iv) required medical records may be unavailable for legitimate reasons.  These objections have no merit.  (*See* Klonoff Decl. ¶ 103 ("These requirements strike me as reasonable ways to prevent fraud and assure timely review of the medical evidence . . . Indeed, courts have routinely approved similar kinds of procedures.").)

446.    First, the two-year window for submission of a Monetary Award Claim Package[8] is ample time for Settlement Class Members (and their counsel, Representative Claimants and/or family and friends) to gather the necessary information for inclusion in the Claim Package.  *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 2007 WL 542227, at *10 (D.N.J. Feb. 16, 2007) (holding five months to submit claim form to be "a reasonable amount of time"), *aff'd*, 579 F.3d 241 (3d Cir.

---

[8]    The deadline that a Derivative Claim Package must be submitted no later than 30 days after the Retired NFL Football Player through whom the relationship is the basis of the claim (or his Representative Claimant, as applicable) receives notification that he has been determined to be entitled to a Monetary Award is also reasonable and necessary because Derivative Claimant Awards are compensated by reducing a Retired NFL Football Player's Monetary Award by 1%.  (Settlement Agreement §§ 6.7(a), 8.3(a)(ii).)  Therefore, the Claims Administrator must determine whether a valid Derivative Claimant Award exists prior to paying the Retired NFL Football Player, and if so, how many Derivative Claimants assert valid claims.  (*Id.* § 7.3.)

2009).  Moreover, if the Settlement Agreement were to allow five, ten, or fifteen years, the passage of time would risk undermining the effectiveness of the Agreement's anti-fraud provisions because the ability of the Claims Administrator to verify facts in the Claim Package may become increasingly difficult with the passage of time due to record preservation issues.  (*See* Settlement Agreement §§ 8.6, 10.3.)

447.   The Settlement Agreement also provides reasonable accommodation in the form of an exception to the two-year deadline for Settlement Class Members who can show that "substantial hardship" extending beyond the Qualifying Diagnosis precluded compliance with the deadline (provided that the Settlement Class Member submits the Claim Package within four years after the date of the Qualifying Diagnosis or after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later).  (*Id*. § 8.3.)

448.   Second, with respect to the detailed content of the claim form and instructions for submission, the parties are not obligated to create all of the working documents that will underlie a settlement program—such as the proposed claim form and instructions for submission—prior to its approval.  Settlement Class Members are protected by the continuing and exclusive jurisdiction of this Court, including over the Settlement Agreement and its interpretation, implementation and enforcement, to the extent that any such issues do arise.  (*Id*. § 20.1(n); *see also id*. Ex. 4, Proposed Final Order and Judgment at 4-5.)

449.   Third, the requirement that a Settlement Class Member present evidence beyond a sworn statement to support an assertion of *more than one* Eligible Season is a reasonable anti-fraud provision.  (*See id.* §§ 8.2(a), 9.1(a)(i).)  This is fair and

reasonable in light of the Settlement Agreement's provision stating that "the Claims Administrator will request that the NFL Parties and Member Clubs provide any employment or participation records of the Retired NFL Football Player in their reasonable possession, custody or control, which the NFL Parties and Member Clubs will provide in good faith" when a Claim Package contains insufficient evidence to substantiate the claimed Eligible Seasons. (*See id.* § 9.1(a); *see also Varacallo* v. *Mass. Mut. Life Ins. Co*., 226 F.R.D. 207, 243 (D.N.J. 2005) (overruling objection that requirement of submitting supporting document was unfair because it was not unreasonable to assume settlement class member would have retained documentation supporting allegation, relief at lower value still available without supporting documentation, and defendant required to provide information that may support the claim); *see also In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 121, 161 (E.D. La. 2013) (approving as fair and reasonable class action settlement structure that paid greater compensation where settlement class members provided medical records as opposed to only sworn declarations regarding medical condition).

450.    Fourth, the requirement that medical records in support of a Qualifying Diagnosis be submitted is fair and reasonable. *See In re Diet Drugs*, MDL No. 1203, 2013 WL 1796989, at *3 (E.D. Pa. Apr. 26, 2013) ("The situation besetting plaintiff is not unique in the administration of the Settlement Agreement. There have been times throughout the years when a claimant, through no fault of his or her own, has been unable to obtain various medical or pharmacy records and thus has been precluded from obtaining certain benefits. This has not previously and cannot now be a basis for

reading a provision out of the Settlement Agreement which was negotiated at arm's length and approved by this court after extensive hearings").

451.   Moreover, the Settlement has been amended to allow the Claims Administrator, in its discretion, to accept Claim Packages where medical records are unavailable for specified reasons, or to allow a sworn affidavit when the diagnosing physician is unable to provide a Diagnosing Physician Certification due to the unavailability of medical records.  (Settlement Agreement § 8.2(a)(ii).)

452.   The cases cited by Objectors to argue that the Claim Package is too onerous are inapposite because they involved small settlement awards not justifying a detailed claims process, while here Retired NFL Football Players may receive a Monetary Award varying by age at the time of Qualifying Diagnosis between $25,000 and $5,000,000.  *See In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171, 176 (3d Cir. 2013) (voicing concern with the claims process where "many settlement class members did not submit claims because they lacked the documentary proof [of purchase and of the actual price paid] necessary to receive the higher awards contemplated"—$60, with an estimated $180 possible based on enhancements—"and the $5 award they could receive left them apathetic."); *Eubank* v. *Pella Corp.*, 753 F.3d 718, 720-25 (7th Cir. 2014) (involving a complex claims process for only a "modest[]" settlement that limited damages to $750 for claims submitted to the defendant or $6,000 for claims sent to arbitration where the defendant maintained the right to legal defenses including lack of product defect, statutes of limitations, comparative fault and failure to mitigate damages); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (reversal of class certification and settlement due to preferential treatment of class counsel and only

perfunctory relief for unnamed settlement class members); *Walter* v. *Hughes Cmmc'ns, Inc.*, 2011 WL 2650711, at *15 (N.D. Cal. July 6, 2011) (finding proposed claims process unreasonable "in light of the small cash benefits contemplated"—a "mere $5" for "the vast majority of class members who would receive any cash payment under the settlement").

453.    The objections to the Claim Package thus have no merit.

**5.    Qualified MAF Physicians**

454.    Objectors assert that requiring a Qualified MAF Physician to provide Qualifying Diagnoses after the Effective Date of the Settlement Agreement is unfair because: (i) they are "being required to guess" whether their condition "rise[s] to the level of Level 1.5 Cognitive Impairment"; (ii) Qualified MAF Physicians must be approved by Co-Lead Class Counsel and Counsel for the NFL Parties; and (iii) the Settlement Agreement does not include a hardship provision for those who live far away from a Qualified MAF Physician or are too ill to travel even a short distance. These objections have no merit.

455.    First, an Objector need not guess whether he has a Qualifying Diagnosis. Under the Settlement Agreement, he could have received a diagnosis of Level 1.5 Neurocognitive Impairment prior to filing his objections, and still can receive such a diagnosis up to the Effective Date of the Settlement without being required to see a Qualified BAP Provider or Qualified MAF Physician.  He need only be examined by an appropriately credentialed physician and diagnosed based on evaluation and evidence generally consistent with the diagnostic criteria set forth in the Settlement Agreement. (*See* Settlement Agreement § 6.3(c)-(d); *id*. Ex 1.)

456.    Second, to the extent Objectors argue that it is unfair that, as of the Effective Date, they must be examined by a Qualified MAF Physician approved by Co-Lead Class Counsel and Counsel for the NFL Parties to receive a Qualifying Diagnosis, such a requirement is reasonable given that a diagnosis may result in a Monetary Award of millions of dollars, and given that the Qualified MAF Physicians are properly credentialed physicians with board-certification in their relevant fields who possess the ability to provide the specified examinations and services in a timely manner.  (*Id.* §§ 2.1(www), 6.5(b); *see also* Klonoff Decl. ¶ 108 ("This limitation strikes me as a reasonable way to ensure that the diagnoses have consistency and integrity."); Brown Decl. ¶ 59; *Diet Drugs*, 2000 WL 1222042, at *63 (finding that claim procedures were fair when "an intricate network of cardiologists ha[d] been established to perform echocardiograms, interpretive visits and additional medical services").

457.    Third, the Settlement seeks to mitigate any concerns about logistical issues and any unreasonable hardship for Retired NFL Football Players in that these issues can be addressed by the Claims Administrator in consultation with Co-Lead Class Counsel, Counsel for the NFL Parties and the Special Master to be appointed by the Court to oversee the Settlement.  (Settlement Agreement § 10.2(b)(8).)

458.    The objections to the Qualified MAF Physician provisions have no merit.

### 6.    The Appeal Procedures

459.    Objectors further argue that the appeals process for Monetary Award determinations is unfair because:  (i) Settlement Class Members must pay a $1,000 fee for unsuccessful appeals while the NFL has "unlimited appeals"; and (ii) Settlement

Class Members must present evidence in support of an appeal and satisfy a clear and convincing evidentiary standard to prevail.  These objections have no merit.

460.    First, the $1,000 fee operates as a reasonable disincentive to the taking of frivolous appeals that burden the Court, the NFL Parties, the Appeals Advisory Panel and Appeals Advisory Panel Consultants.  (*See id.* §§ 9.6-9.8; *see also* Klonoff Decl. ¶ 112 (noting that the $1,000 fee "discourages groundless appeals but should not deter players who genuinely believe in the strength of their claims").)  A Settlement Class Member who takes a successful appeal is reimbursed the $1,000 fee in full.  (Settlement Agreement § 9.6(a).)  Moreover, Settlement Class Members may petition the Claims Administrator to waive the $1,000 if it represents a financial hardship.  (*Id.* § 9.6(a)(i).)  The NFL Parties are also limited to taking appeals in "good faith," and Co-Lead Class Counsel may petition the Court for appropriate relief if they believe that the NFL Parties are submitting vexatious, frivolous or bad faith appeals.  (*Id.* § 9.6(b).)

461.    Second, *all* appellants—whether Settlement Class Members or the NFL Parties—must follow the same process, including using an Appeals Form, presenting evidence, and satisfying a clear and convincing evidentiary standard to prevail.  (*Id.* §§ 9.7-9.8.)  Objectors do not, and cannot, explain how such an appeal system favors the NFL Parties at the expense of Settlement Class Members.  *See In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 947 (E.D. La. 2012) ("Because appellate proceedings ensure that Settlement payments comply with the terms of the Settlement Agreement, they reduce uncertainty" and "numerous courts" have approved them).

462.    The appeal procedures are fair, reasonable and adequate.

### 7.     The Anti-Fraud Provisions

463.    Finally, Objectors assert that the anti-fraud provisions in the Settlement Agreement operate as "anti-payment" provisions.   They specifically challenge the auditing of Claim Packages and the right of the Claims Administrator to investigate claims and request additional documentation.   These objections have no merit because the complained-of provisions are legitimate and important anti-fraud provisions.

464.    As an initial matter, fraudulent conduct in class action settlement programs is a legitimate concern.   For example, the September 6, 2013 Independent External Investigation of the Deepwater Horizon Court Supervised Settlement Program authored by Special Master Louis J. Freeh found evidence of fraudulent claims and stated a need for the application of "closer scrutiny and sound anti-fraud and business practices review" of claims.   *See id*. at 10-12, *In re Oil Spill by Oil Rig Deepwater Horizon*, No. 2:10-md-02179, Doc. No. 11287 (E.D. La. Sept. 6, 2013); *see also In re Diet Drugs Prods. Liab. Litig.*, 573 F. App'x 178, 180 (3d Cir. 2014) (summarizing that "the Trust was inundated with fraudulent claims that included manipulated . . . test results" (citing *In re Diet Drugs Prods. Liab. Litig.*, 543 F.3d 179, 182 n.4 (3d Cir. 2008))).   Thus, the ability of the Claims Administrator "to verify facts and details of . . . the Claim Package or Derivative Claim Package" in connection with the submission of a Monetary Award claim (Settlement Agreement § 8.6(a))—some seeking up to $5,000,000—is an important check on fraud.   That check is particularly important here, where the NFL Parties commit to provide for an uncapped Monetary Award Fund.

465.    The mandatory audit of 10% of total Claim Packages that the Claims Administrator has found to qualify for Awards during the prior month—either on a random basis or to address a specific concern raised by the Package—is a legitimate

anti-fraud provision and a deterrent for bad actors.  (*Id*. § 10.3(c).)  The right of the

NFL Parties or Co-Lead Class Counsel to conduct an audit to verify an Award claim is

also tailored to avoid abuse by requiring that the audit be taken in good faith and at

their sole expense.  (*Id*. § 10.3(a).)  These types of audit rights—some even more

stringent—have been previously approved by this Court in similar class action

settlements.  *See In re Diet Drugs Prods. Liab. Litig.*, 434 F. Supp. 2d 323, 329 (E.D.

Pa. 2006) (noting class action settlement "permitted quarterly audits of up to 15% of

claims submitted to the Trust in order to prevent fraud, with the right of the court to

require additional audits for 'good cause shown'" (citations omitted)); *see also* Manual

for Complex Litigation § 21.66 (4th ed.).

466.    Finally, the obligation of the Settlement Class Member to cooperate with

an audit by providing additional records and information is limited by

*reasonableness*—a claim will be denied only if the Settlement Class Member

"unreasonably" fails or refuses to provide the material within the time frame specified.

(Settlement Agreement § 10.3(b)(ii).)

467.    Objections to the anti-fraud provisions, therefore, have no merit.

**H.    The Education Fund Is Not a *Cy Pres* Distribution**

468.    Objectors' argument that the Settlement Agreement is unfair because it

includes a $10 million Education Fund—contending that it is an improper *cy pres*

distribution—is without merit.

469.    *Cy pres* distributions involve the provision of unclaimed monies from a

settlement fund to third parties—usually charities picked by the court.  *See McDonough*

v. *Toys "R" Us, Inc.*, 834 F. Supp. 2d 329, 351 (E.D. Pa. 2011) (explaining in the

context of class-action suits that a "*cy pres* distribution is designed to be a way for a

court to put any unclaimed settlement funds to their next best compensation use . . . ." (quoting *Klier* v. *Elf Atochem N. Am.*, *Inc.*, 658 F.3d 468, 474 (5th Cir. 2011))); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 138-39 (E.D. La. 2013). The cases upon which Objectors rely involved either distributions of excess funds that remained after all individual claims had been satisfied, or settlements that exclusively provided for *cy pres* distributions in lieu of any direct payments to class members.

470. Here, by contrast, the Education Fund does not consist of unclaimed amounts from the BAP Fund or the Monetary Award Fund, but instead is $10 million in independent, supplemental funding designated for educational programming. (*See* Settlement Agreement §§ 2.1(ii), 2.1(oo), 23.1(c).) Moreover, the Education Fund benefits Settlement Class Members directly because—in addition to funding football injury prevention education—it specifically funds "programs promoting . . . the education of *Retired NFL Football Players* regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players." (*Id*. § 12.1 (emphasis added).) Thus, the concern expressed by some courts, reviewing very different settlements, about a tradeoff between direct payments to class members and *cy pres* distributions to third parties is inapplicable. *See*, *e.g.*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172-76 (3d Cir. 2013).

471. The Education Fund is similar to the Gulf Region Health Outreach Program approved in the *Deepwater Horizon* class settlement over a *cy pres* objection. The Outreach Program was established to expand regional healthcare by improving access in underserved communities and funding medical training for healthcare workers and other persons in those communities; objectors argued it was an improper *cy pres*

distribution to non-class members (*i.e.*, persons who did not have a "Specified Physical Condition" caused by the oil spill).  *See Deepwater Horizon*, 295 F.R.D. at 138-39. The court found that the Outreach Program, like the Education Fund here, provided benefits to class members as well as to non-class members, and it was not designed to be funded with unclaimed monies from other settlement funds.  *Id*. at 122, 139.  The court emphasized that funding for the Outreach Program did not "detract from the compensation that Class Members receive for Specified Physical Conditions" because funding for such compensation—like the Monetary Award Fund here—was "uncapped . . . in that all qualifying claims will be paid."  *Id*.  Finally, just like eliminating the Education Fund would not increase amounts Settlement Class Members receive for Qualifying Diagnoses, the court held that "[e]liminating the Outreach Program would not result in higher payments" because those payments were "based on negotiation of the fair value of those claims."  *Id*. at 139.  Thus, the Education Fund, like the Outreach Program, "does not constitute an improper cy pres distribution."  *Id*.

472.   Even if the Education Fund were a *cy pres* distribution, it would nonetheless be proper.  The Third Circuit has held that a *cy pres* award may be appropriate if the settlement as a whole is fair, reasonable and adequate, and where, as here, the propriety of such distributions relate to the class injury and represent only a small portion of the overall settlement. *Baby Prods.*, 708 F.3d at 172-74.  The litigation being settled concerns long-term injuries purportedly resulting from NFL Football, and the Education Fund relates to safety and injury prevention in football and "programs promoting . . . the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting

Retired NFL Football Players."   (Settlement Agreement § 12.1; *see also Lane* v. *Facebook, Inc*., 696 F.3d 811, 821 (9th Cir. 2012) (distribution "bears a substantial nexus to the interests of the class members" and "will benefit class members and further the purposes of [the claims] that form the basis for the class-plaintiffs' lawsuit.").)   In addition, the Settlement provides substantial, direct benefits to Settlement Class Members valued at hundreds of millions of dollars versus the Education Fund cap of $10 million.  *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *24, 27-28 (E.D. Pa. Aug. 28, 2000) (billion-dollar settlement included direct payments to class members as well as the establishment of a $25 million medical research fund); *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 588 F.3d 24, 34-35 (1st Cir. 2009) (approving class settlement where *cy pres* award was expected to be nearly one-third of the aggregate amount paid directly to settlement class members); *see also In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 14 (D.D.C. 2013) (approving class settlement even though *cy pres* award was greater than aggregate direct benefit to claimants (citing *Baby Prods.*, 708 F.3d at 174)); Klonoff Decl. ¶ 114 ("The Education Fund . . . lines up perfectly with the compensation scheme in the settlement.").

473.   The Objections concerning the Education Fund thus have no merit.

**I.** **The Settlement Agreement's Release Is Appropriate**

474.   Objectors contend that the Release should exclude claims of CTE because, they argue, the Settlement does not provide compensation for CTE.   This objection has no merit.

475.   The settling parties' agreement to release all claims asserted or which could have been asserted in the Class Action Complaint or any Related Lawsuit is fair and reasonable.

476.   Releases are designed to achieve finality and to avoid duplicate recovery for the same injuries arising out of the same alleged conduct.   *See Fineman* v. *Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir. 1992) ("A plaintiff whose case concerns a single course of conduct . . . and a single injury . . . [may not] recover those profits twice or thrice over."); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 187, 2013 WL 4828225, at *2 (E.D. Pa. Sept. 9, 2013) (release—which covered all injuries related to defendant's product—barred plaintiff's complaint, which arose "out of the same alleged conduct by [defendant] and the same alleged injuries to Plaintiff as the settled case").

477.   Likewise, the Third Circuit has recognized that "achieving global peace is a valid, and valuable, incentive to class action settlements."   *Sullivan* v. *DB Inv., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 366-67 (3d Cir. 2001) (refusing to grant broad release would undermine multidistrict class settlements because of defendants' concern that their exposure would be too great); *McGowan Investors LP* v. *Keefe Bruyette & Woods, Inc.*, 540 F. Supp. 2d 571, 577 (E.D. Pa. 2008) ("The Third Circuit consistently finds broad release language in class action settlement orders legally enforceable."); *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 962 (E.D. La. 2012) ("The law is settled that defendants entering into a class action settlement are entitled to

obtain global peace and that class action releases may be broader than the claims directly compensated under the Settlement.").

478.    The Release is the result of careful negotiation by Class Counsel based on their evaluation of the strengths and weaknesses of the case. *See DeHoyos* v. *Allstate Corp.*, 240 F.R.D. 269, 312 (W.D. Tex. 2007) ("[T]he undisputed evidence shows the release has been executed voluntarily and with adequate knowledge, as Class Counsel have evaluated the relative merits of each party's case and entered into the settlement with a full and fair view of the case's strengths and weaknesses."); *Cicero* v. *DirecTV, Inc.*, 2010 WL 2991486, at *8 (C.D. Cal. July 27, 2010) ("The language of the release was the product of careful bargaining by Class Counsel and DirecTV and the Court sees no need to modify it.  To do so may risk undoing a process which resulted in a very fair and reasonable settlement for the many Class Members.").

479.    Objectors' proposal to exclude claims for CTE from the scope of the Release ignores the fact that Retired NFL Football Players participating in the Settlement receive—in addition to the benefits of a baseline assessment and, as appropriate, BAP Supplemental Benefits—the right to receive a Monetary Award for a Qualifying Diagnosis while living.  As noted *supra*, the literature upon which Objectors rely reflects that 89% of the professional football players who were determined post-mortem to have CTE pathology, suffered from dementia or co-morbid conditions while living that are compensated as Qualifying Diagnoses under the Settlement (*e.g.*, Alzheimer's Disease, Parkinson's Disease or ALS).  *See* McKee Study at 59, 61.  The parties' agreement to afford settlement benefits and compensation to Retired NFL Football Players for impairments and conditions while living, in exchange for a release

that encompasses potential or contingent claims for CTE, is a fair and reasonable compromise among the parties, and further fairly protects against post-Settlement claims encompassing CTE pathology.

480.    The Settlement provides real and significant value to Class Members and it need not have compensated every condition alleged to be possibly remotely connected to TBIs or professional football.   Settlement Class Members were fully informed of what is and what is not being compensated under the Settlement and they were provided with the option to opt out if they chose not to take advantage of the Settlement's benefit and not to be bound by the Release.

481.    Thus, the Release is fair and reasonable.[9]

## J.    The Security Provision is Appropriate

482.    Objectors contest the Security provision in the Settlement Agreement by asserting that: (i) it does not provide any actual security backing payment obligations during the first ten years of the Settlement; (ii) the amount that the NFL Parties agreed to set aside in a Statutory Trust by the tenth anniversary of the Effective Date of the Settlement cannot be relied upon to be paid out to the Monetary Award Fund; and (iii) despite the express language in the Settlement, the Court cannot issue an order voiding

---

[9]    Certain Objectors also contend that the Release is overbroad because it arguably releases the Class Members' claims in *Dent* v. *National Football League*, a case concerning the alleged improper or illegal use and dispensing of medications in the NFL.  That objection was mooted on December 17 and December 31, 2014, when the *Dent* Court entered an order and judgment, respectively, dismissing the case on the NFL's motion to dismiss on the grounds that the plaintiffs' claims were preempted by Section 301 of the LMRA.  *See* Order, *Dent* v. *Nat'l Football League*, No. 14-cv-02324, Doc. No. 106 (N.D. Cal. Dec. 17, 2014); Judgment, *Dent* v. *Nat'l Football League*, No. 14-cv-02324, Doc. No. 107 (N.D. Cal. Dec. 31, 2014); *see also* Co-Lead Class Counsel's Notice of Suppl. Auth., Doc. No. 6468.

Settlement Class Members' Releases if the NFL Parties do not fulfill their payment obligations.  These objections are without merit.

483.   First, the Settlement includes a representation and warranty by the NFL Parties that the NFL currently maintains, and will continue to maintain, an investment grade rating on its Stadium Program Bonds, as rated by Fitch Ratings, which investment grade rating shall serve as security that the NFL Parties will meet their payment obligations for the first ten years of the Settlement.  (Settlement Agreement § 25.6(a).)  There is no need for the NFL to pledge collateral as security for the first ten years of the Settlement given the NFL's substantial revenue streams, including its substantial television contracts that run beyond those ten years.   Moreover, this provision is not misleading; instead, the provision is clear on its face.

484.   Second, the security provisions are fair and reasonable, and Objectors' concern that the NFL might underfund the Statutory Trust intended to contain moneys that, in the reasonable belief of the NFL Parties, will be sufficient to satisfy the NFL Parties' remaining payment obligations as they come due given reasonably expected investment returns is unfounded.  The NFL Parties have an obligation to pay all valid Monetary Awards regardless of the amount held by the Statutory Trust for the Settlement's full 65-year term.  (*See id*. §§ 23.1(a), 23.3(b).)

485.   Moreover, the purpose of the Security provision is not to require that the Settlement Trust be guaranteed to contain 100% of the NFL Parties' payment obligations.   There is no requirement that a security term cover the full potential liability.

486.   In addition, although there is a right of the NFL Parties to the return of excess monies in the Statutory Trust under specified circumstances, that right is reasonable given that Court approval is required prior to such withdrawal.

487.   Finally, if the NFL Parties violate the terms of the Settlement Agreement by failing to meet their payment obligations, the Court may render null and void the Releases and Covenants Not to Sue provided to Released Parties by Settlement Class Members affected by the non-payment.  (*Id*. § 25.6(g).)   The Settlement Agreement provides sufficient protection of the Settlement Class.

488.   Objections regarding the Security provision have no merit.

## K.   The Opt-Out Deadline Was Appropriate

489.   Objectors argue that the timing of the opt-out deadline is unfair and should be revised because: (i) a delayed opportunity to opt out after the Fairness Hearing should have been permitted; (ii) Objectors should have been permitted to object and appear at the Fairness Hearing even if they filed requests to opt out; (iii) and the Settlement impairs the ability of Opt Outs to litigate claims against the NFL Parties because Qualified BAP Providers, Qualified MAF Physicians, members of the Appeals Advisory Panel, and Appeals Advisory Panel Consultants cannot hold their positions if serving as expert witnesses or consultants for Opt Outs in litigation against the NFL Parties relating to the subject matter of the Class Action Complaint.  These objections have no merit.

490.   First, no delayed opportunity to opt out after the Fairness Hearing is required or appropriate.  The Court provided Settlement Class Members with sufficient notice under Federal Rule of Civil Procedure 23 and due process to review the terms of the Settlement Agreement and to decide whether to opt out or remain in the Settlement

Class.  *See Hainey* v. *Parrott*, 617 F. Supp. 2d 668, 679 (S.D. Ohio 2007) (denying request by objectors for second opt-out period partially because "[t]he class members had enough information at that time to make a reasoned decision whether or not to opt out of the settlement."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347, at *3-4 (N.D. Ill. Apr. 4, 1996) (denying request for additional opt-out period where the notice had fully informed class members of the claims asserted, their rights to opt out, and that if they remained in the class, then they would be bound by the court's judgments).

491.    In addition, under well-established Third Circuit precedent, in analyzing the fairness of a proposed class action settlement under *Girsh* v. *Jepson*, 521 F.2d 153 (3d Cir. 1975), the Court must look to, among other things, how the settlement class has reacted to the proposed settlement, including how many settlement class members have opted out.  If Settlement Class Members are permitted to opt out after the fairness hearing and after the Court's ruling on final approval of the Class Action Settlement, then the Court would be unable to address this necessary factor and the parties and objectors will not be able to present argument to the Court regarding the factor at the fairness hearing.

492.    There is no merit to the argument that the 2003 amendments to Federal Rule of Civil Procedure 23(c)(1)(C), which deleted the provision that a class certification "may be conditional," provided Settlement Class Members with the ability to opt out at any time before the Court grants final approval.  The Third Circuit's affirmance of class settlements that have required class members to opt out before final approval (and final class certification) confirms the amendments did not change the

well-established law in this regard.  *See, e.g., In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 339-340 (3d Cir. 2010); *see also Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 270 & n.8 (2d Cir. 2006) (rejecting claim that amendment to Rule 23(c)(2)(B) "indicates that no opt-out notice can be sent until after certification").

493.    Second, Objectors should not be permitted to simultaneously object and opt out.  It is well established that class members must choose between objecting and opting out.  *See, e.g., In re Ins. Brokerage Antitrust Litig.,* 282 F.R.D. 92, 110 (D.N.J. 2012) ("The case law does not suggest that a class member requesting exclusion from a settlement may nonetheless object to that settlement."); *Olden* v. *LaFarge Corp.,* 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007) (allowing a class member to simultaneously opt out of a settlement and object to the settlement "would countenance the practice of influencing litigation—or attempting to do so—in which the class member really has no stake"); *In re Vitamins Antitrust Class Actions,* 215 F.3d 26, 29-30 (D.C. Cir. 2000) ("[C]lass members who have opted out of a 23(b)(3) class action have no standing to object to a subsequent class settlement; by opting out they escape the binding effect of the class settlement." (internal quotation marks omitted)); *In re Del-Val Fin. Corp. Sec. Litig.,* 162 F.R.D. 271, 275 (S.D.N.Y. 1995) ("Rule 23 requires potential class members to make a trade-off: an individual either decides to remain a class member, bound by any and all judgments rendered in the class action but spared the expense of litigating on her own behalf, or she elects exclusion.  If she chooses exclusion, she is required to expend her own resources to bring her claims against the defendants, but she may potentially be rewarded by receiving a larger recovery.").

494.    Third, the Settlement reasonably prohibits Qualified BAP Providers, Qualified MAF Physicians, members of the Appeals Advisory Panel, and Appeals Advisory Panel Consultants from holding their positions if serving as expert witnesses or consultants for Opt Outs in litigation against the NFL relating to the subject matter of the Class Action Complaint.   Objections to this provision would pose clear conflicts of interest.  It is unreasonable for Objectors to expect that the NFL Parties would agree to allow a paid expert in an ongoing litigation against the NFL Parties to serve as a purportedly neutral expert in a Settlement program where the NFL Parties are responsible for financing Monetary Awards that are in part determined based upon the work of that expert.   Moreover, Objectors make no showing that the universe of potential expert witnesses and consultants is so limited that the existence of the Settlement program will foreclose the retention of experts in litigation.

495.    These objections have no merit.

**L.    The Notice Was Proper**

496.    Notice was proper and satisfied the requirements of Rule 23 and due process.  Objectors argue, however, that the Settlement Class Notice is misleading in its description of the Settlement's compensation of Death with CTE.  These objections are without merit.

**1.    Notice Satisfies Both the Requirements of Rule 23 and Due Process**

497.    Under Rule 23(e)(1) of the Federal Rules of Civil Procedure, district courts "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  In addition, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified

through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 617 (1997); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).

498.   Due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane* v. *Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950); *see also DeJulius* v. *New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005).  Rule 23(c)(2)(B) provides that the "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).

499.   The form and content of the notices satisfied the requirements of Rule 23(e)(1) and due process.  Each form of notice was written in plain and straightforward language consistent with Rules 23(c)(2)(B) and 23(e)(1).  The notices objectively and neutrally apprised Class Members of the nature of the action; the definition of the Settlement Class sought to be certified for purposes of the Settlement; the claims and issues; that Class Members could enter an appearance through an attorney before the Court at the Fairness Hearing (in accordance with the procedures set forth in the notice); that the Court would exclude from the Class anyone who elects to opt out of

the Settlement (and the procedures and deadlines for doing so); and the binding effect of a class judgment on Class Members under Rule 23(c)(3)(B). The notices also disclosed the date, time, and location of the Fairness Hearing, and the procedures and deadlines for the submission of objections to any aspect of the Settlement. (*See* Decl. of Katherine Kinsella Exs. 1 & 3, June 25, 2014, Doc. No. 6073-3.)

500. In addition, given the extent and reach of the notice program, there is no contesting the fact that the notice provided to the Settlement Class was the best notice practicable. (*See generally* Decl. of Katherine Kinsella, Nov. 12, 2014, Doc. No. 6423-12.) Moreover, as noted above, the court-approved notice was supplemented by very substantial publicity about the Settlement and its terms, which were prominently discussed in major newspapers, on television, and in other communications with Settlement Class Members and their families.

## 2. The Objections Relating to the Purported Deficiencies in the Notice Are Meritless

501. Objectors contend that the notice is misleading—or at minimum ambiguous—because it allegedly creates the impression that the Settlement Agreement provides recovery for CTE when, in fact, it provides recovery only for Settlement Class Members who died with CTE prior to Final Approval. These objections are without merit.

502. The Summary Notice says that only "certain cases" of CTE will be eligible for monetary awards. A reader with questions about what cases of CTE will be eligible is directed to the Settlement Website and call center for further details. Further, the Long-Form Notice, which was mailed to Class Members and widely distributed, makes clear that only "certain cases" of CTE are eligible for compensation and explains

195

in three different places that only diagnoses of "Death with CTE prior to July 7, 2014"[10] are eligible for compensation. Readers of the notice who were still unsure if they might qualify had several sources of additional information, including the call center, Class Counsel, the Claims Administrator, and their own counsel if they were independently represented. Importantly, simple consultation of the Settlement Website would have made clear that: "Players who die after the date of Preliminary Approval, July 7, 2014, are not eligible for benefits for 'Death with CTE'."

503.   Such language is sufficient, and the Settlement Notice was not required to reiterate this information elsewhere, such as alongside the Monetary Award Grid. *See*, *e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 554 (N.D. Ga. 1992). There is a presumption that notices will be read in their entirety, so there is no need to repeat even required information multiple times.

504.   The few cases the objectors cite are distinguishable because the notices omitted important information about the settlement. *See In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197-98 (5th Cir. 2010) (notice failed to apprise class that all of settlement funds might go to *cy pres* distribution rather than to class members); *Molski* v. *Gleich*, 318 F.3d 937, 952 (9th Cir. 2003) (notice failed to state that claims for emotional distress were released despite stating that "personal injury actions" were not released), *overruled on other grounds by Dukes* v. *Wal-Mart Stores, Inc.*, 131 S. Ct.

---

[10]   Since distributing the Settlement Notice, the settling parties amended the Settlement to provide that a Qualifying Diagnosis of Death with CTE "shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis." (Settlement Agreement § 6.3(f).)

2541 (2011); *see also Eubank* v. *Pella Corp.*, 753 F.3d 718, 722-725, 728 (7th Cir. 2014) (finding many problems with settlement, including notice that was "incomplete and misleading [in failing] . . . to mention that . . . the only original representative who supported the settlement was the father-in-law of the lead class counsel who was both in financial trouble and ethically challenged").

505.    The objections to the Settlement Notice have no merit.

**M.    Compensation of Class Counsel's and the NFL Parties' Experts Does Not Compromise Their Opinions**

506.    Objectors argue that Class Counsel's and the NFL Parties' expert witnesses are biased because they received compensation.  Class Counsel's and the NFL Parties' experts are, however, highly qualified, and the Court will not presume bias merely from the fact that expert witnesses were compensated for providing services that took them away from their primary employment.  *See Goble* v. *Aztec Min. Co., Inc.*, 454 F. App'x 500, 502 (6th Cir. 2012) ("Bias cannot be presumed from the fact that an expert receives compensation from one party."); *Banks* v. *United States*, 102 Fed. Cl. 115, 170 n.85 (Fed. Cl. 2011) (same).

**N.    Attorneys' Fees Do Not Counsel Against Approval**

507.    Objections concerning the amount of the attorneys' fees that Class Counsel may request are premature because that issue is not yet before the Court, and thus does not render the Settlement unreasonable or unfair.

508.    As explained in the notice and Settlement Agreement, Class Counsel will file their motion for attorneys' fees at an appropriate time after the Court rules on the motion for final approval of the Settlement, and will address the basis for their fee request in detail in that motion.  (Klonoff Decl. ¶¶ 126-29 ("[T]he issue of fees is not

before the Court at the November 19, 2014 hearing. If the Court approves the settlement, class members will have a subsequent opportunity to object to the attorneys' fees motion."); *see also* Settlement Agreement § 21.1.)  Settlement Class Members will then have an opportunity to review the fee motion and file objections, and to address the fee motion at a hearing.  This approach has been used by other courts in this Circuit.  *See In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 530, 533-35, 553 (3d Cir. 2009) (affirming award of attorneys' fees where motion for fees was filed after final approval of settlement and objections to fees were permitted); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 2000 WL 1622741, at *1 (E.D. Pa. Oct. 23, 2000) (awarding attorneys' fees where motion for fees was filed after settlement approval).  It is also consistent with Federal Rule of Civil Procedure 23(h).  *See*, *e.g.*, *In re Ferrero Litig.*, 583 F. App'x 665, 667-68 (9th Cir. 2014) (class members had adequate notice of class counsel's request for attorneys' fees in compliance with Rule 23(h) where they had opportunity to object after class counsel filed their motion); *Cassese* v. *Williams*, 503 F. App'x 55, 57 (2d Cir. 2012) (Rule 23(h)(1) was satisfied where notice stated amount of fees class counsel intended to apply for and class counsel filed their motion two weeks before fairness hearing); *see also* Fed. R. Civ. P. 23(h) (governing court award of attorneys' fees in class actions).

509.    Thus, objections relating to attorneys' fees are premature.

\*       \*       \*

510.    In sum, the Settlement Class meets the requirements of Rule 23, the Settlement Agreement is fair, reasonable and adequate and the objections to the Settlement Agreement lack merit.

Dated:  March 12, 2015

/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Main: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

and

Sol Weiss
ANAPOL SCHWARTZ
1710 Spruce Street
Philadelphia, PA 19103
Main: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolschwartz.com

**_Co-Lead Class Counsel_**

Respectfully submitted,

/s/ Brad S. Karp
Brad S. Karp
Theodore V. Wells Jr.
Bruce Birenboim
Lynn B. Bayard
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
bkarp@paulweiss.com
twells@paulweiss.com
bbirenboim@paulweiss.com
lbayard@paulweiss.com

Beth A. Wilkinson
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Main: 202.223.7300
Fax: 202.223.7420
bwilkinson@paulweiss.com

and

Robert C. Heim (Pa. Atty. ID 15758)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Main: 215.994.4000
Fax: 215.994.2222
Robert.heim@dechert.com

**_Attorneys for National Football League and_**
**_NFL Properties LLC_**

*Class Counsel*

Steven C. Marks
PODHURST ORSECK P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Main: (305) 358-2800
Fax: (305) 358-2382
smarks@podhurst.com

Gene Locks
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Main: 866-562-5752
Fax: (215) 893-3444
glocks@lockslaw.com

*Subclass Counsel*

Arnold Levin
LEVIN FISHBEIN SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Main: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Dianne M. Nast
NAST LAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Main: (215) 923-9300
Fax: (215) 923-9302
DNast@nastlaw.com

**Counsel for Subclass 1**

**Counsel for Subclass 2**

*Of Counsel*

Thomas V. Girardi
Graham B. LippSmith
GIRARDI KEESE
1126 Wilshire Blvd
Los Angeles, CA 90017
Main: (213) 977-0211
Fax: (213) 481-1554
tgirardi@girardikeese.com
glippsmith@girardikeese.com

Michael D. Hausfeld
Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Main: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
rlewis@hausfeldllp.com

James R. Dugan, II
THE DUGAN LAW FIRM
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Phone: (504) 648-0180
Fax: (504) 648-0181
jdugan@dugan-lawfirm.com

Anthony Tarricone
KREINDLER & KREINDLER LLP
277 Dartmouth Street
Boston, MA 02116
Main: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com

Michael L. McGlamry
POPE, MCGLAMRY, KILPATRICK
    MORRISON & NORWOOD, P.C.
3455 Peachtree Road, NE
The Pinnacle, Suite 925
P.O. Box 191625 (31119-1625)
Atlanta, GA 30326-3243
Main: (404) 523-7706
Fax: (404) 524-1648
efile@pmkm.com

Charles S. Zimmerman
ZIMMERMAN REED PLLP
1100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Main: (612) 341-0400
Fax: (612) 341-0844
charles.zimmerman@zimmreed.com

David S. Casey, Jr.
Fred Schenk
CASEY GERRY SCHENK
    FRANCAVILLA BLATT &
    PENFIELD LLP
110 Laurel Street
San Diego, CA 92101-1486
Main: (619) 238-1811
Fax: (619) 544-9232
dcasey@cglaw.com
fschenk@cglaw.com

David A. Rosen
ROSE, KLEIN & MARIAS LLP
801 South Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Main: (213) 626-0571
Fax: (213) 623-7755
d.rosen@rkmlaw.net

Derriel McCorvey
THE LAW FIRM OF DERRIEL C.
    MCCORVEY
115 W. Main Street, Suite 14
P.O. Box 2473
Lafayette, LA 70501
Main: (337) 291-2431
derriel@mccorveylaw.com

201

**CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 12th day of March, 2015, upon all counsel of record.


Dated: March 12, 2015                                    /s/ Brad S. Karp
                                                          Brad S. Karp