# EXHIBIT

# "A"

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br> MDL No. 2323 |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | **Hon. Anita B. Brody** |

**April 22, 2015**                                    **Anita B. Brody, J.**

I.    Background and Procedural History ........................................................... 4

   A.   Initial Lawsuits and Consolidation ....................................................... 4

   B.   Motions to Dismiss Based on Preemption ............................................ 7

   C.   Settlement Negotiations and Preliminary Approval ............................. 8

   D.   The Settlement ..................................................................................... 12

      i.    Monetary Award Fund ................................................................. 14

      ii.   Claims Process ............................................................................ 17

      iii.  Baseline Assessment Program ..................................................... 18

      iv.   Education Fund ............................................................................ 19

      v.    Releases of Claims ...................................................................... 20

      vi.   Attorneys' Fees ........................................................................... 21

   E.   Reactions to the Settlement and Resulting Amendments ................... 21

II.   Class Certification ...................................................................................... 23

   A.   Numerosity .......................................................................................... 24

   B.   Commonality ....................................................................................... 24

   C.   Typicality ............................................................................................. 26

   D.   Adequacy of Representation ................................................................ 28

      i.    Adequacy of Class Counsel ........................................................ 29

1

ii.     Adequacy of Named Parties ................................................................ 33

iii.    Absence of Conflicts of Interest ........................................................ 34

E.   Predominance ............................................................................................. 42

F.   Superiority .................................................................................................. 47

III.  Notice ............................................................................................................. 49

A.   Content of Class Notice ............................................................................. 50

B.   Distribution of Class Notice ...................................................................... 53

C.   Notice of Amendments to the Settlement ................................................. 55

IV.  Final Approval of the Settlement ................................................................ 56

A.   The Presumption of Fairness ..................................................................... 58

B.   The *Girsh* Factors ...................................................................................... 60

i.      The Complexity, Expense, and Likely Duration of the Litigation ............... 60

ii.     The Reaction of the Class to the Settlement .................................... 62

iii.    The Stage of the Proceedings and the Amount of Discovery Completed ........ 63

iv.     The Risks of Establishing Liability and Damages ...................................... 66

v.      The Risks of Maintaining the Class Action through Trial ............................ 72

vi.     The Ability of Defendants to Withstand a Greater Judgment ...................... 73

vii.    The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of All Attendant Risks of Litigation ...................................... 73

C.   The *Prudential* Factors .............................................................................. 75

V.   Responses to Specific Objections ................................................................. 77

A.   Objections Related to CTE ......................................................................... 78

i.      State of Scientific and Medical Knowledge of CTE .................................... 79

ii.     Compensation of Symptoms Allegedly Associated with CTE .................... 83

iii.    Compensation of Death with CTE ..................................................... 87

iv.     Development of Scientific and Medical Knowledge of CTE........................ 89

B.   Objections to Monetary Awards ................................................................ 91

i.      Definitions of Levels 1.5 and 2 Neurocognitive Impairment....................... 91

ii.     List of Qualifying Diagnoses and their Maximum Awards ......................... 94

C.   Objections to Offsets.................................................................................. 98

i.      Age Offset ........................................................................................... 98

ii.   Severe TBI Offset ................................................................ 100

iii.  Stroke Offset ...................................................................... 101

iv.  Eligible Season Offset ........................................................ 102

v.   BAP Offset ......................................................................... 106

D.   Objections to the Baseline Assessment Program .......................... 106

i.    BAP Fund ........................................................................... 106

ii.   Test Battery ........................................................................ 107

iii.  BAP Protocols .................................................................... 110

iv.  Selection Process for Qualified BAP Providers .................. 111

v.   Use of Mail Order Pharmacy Vendors ............................... 112

E.   Objections to the Claims Process ................................................... 113

i.    Cognitive Impairment of Certain Retired Players .............. 114

ii.   Registration Requirement ................................................... 115

iii.  Use of Qualified MAF Physicians ...................................... 116

iv.  Claim Package .................................................................... 117

v.   Appeals Process .................................................................. 119

vi.  Anti-Fraud Provisions ........................................................ 120

F.   Other Objections ........................................................................... 120

i.    Education Fund ................................................................... 120

ii.   Statutes of Limitations Waiver ........................................... 122

iii.  Releases .............................................................................. 124

iv.  NFL Parties' Security ......................................................... 125

v.   Objector Signature Requirement ........................................ 127

vi.  Lien Resolution Program .................................................... 127

vii.  Parties' Experts .................................................................. 129

viii. Parties' Disclosures ........................................................... 130

ix.  Opt-Out Procedure ............................................................. 131

VI.  Conclusion ........................................................................................... 132

## MEMORANDUM

Plaintiffs Kevin Turner and Shawn Wooden, through their Co-Lead Class Counsel, Class

Counsel, and Subclass Counsel, and Defendants National Football League ("NFL") and NFL

Properties LLC (collectively, the "NFL Parties") have negotiated and agreed to a Class Action

Settlement (the "Settlement") that will resolve all claims against the NFL Parties in this

multidistrict litigation.

On November 12, 2014, Class Plaintiffs moved for class certification and final approval of

the Settlement.[1]  Pursuant to Federal Rule of Civil Procedure 23, I certify the Settlement Class

and Subclasses, find that the Settlement is fair, reasonable, and adequate, and approve the

Settlement in its entirety.  Therefore, I will grant the motion for class certification and final

approval of the Settlement.

## I.    Background and Procedural History

### A.    Initial Lawsuits and Consolidation

On July 19, 2011, 73 former professional football players filed suit in the Superior Court of

California, Los Angeles County, against the NFL Parties.  *See* Compl., *Maxwell v. Nat'l Football

League*, No. BC465842 (Cal. Super. Ct. July 19, 2011).  They alleged that the NFL Parties failed

to take reasonable actions to protect players from the chronic risks created by concussive and

sub-concussive head injuries and fraudulently concealed those risks from players.  Three

substantially similar lawsuits followed in quick succession.  *See* Compl., *Pear v. Nat'l Football

League*, No. LC094453 (Cal. Super. Ct. Aug. 3, 2011); Compl., *Barnes v. Nat'l Football League*,

No. BV468483 (Cal. Super. Ct. Aug. 26, 2011); *see also Easterling v. Nat'l Football League*,

---

[1] The Settlement was initially filed on June 25, 2014, and amended on February 13, 2015.  *See* Parties'
Joint Amendment, Ex. A.  As used in this Memorandum, the term Settlement refers to the amended
version, except when the history of the initial filing is discussed.

No. 11-5209, ECF No. 1 (E.D. Pa. Aug. 17, 2011).  In response, the Judicial Panel on

Multidistrict Litigation consolidated these cases before this Court as a multidistrict litigation

("MDL"), pursuant to 28 U.S.C. § 1407.  *See* MDL Panel Transfer Order, ECF No. 1.

Since consolidation, about 5,000 players ("MDL Plaintiffs") have filed over 300 substantially

similar lawsuits against the NFL Parties,[2] all of which have been transferred to this Court.  To

effectively manage these actions, I appointed Christopher Seeger and Sol Weiss as Co-Lead

Class Counsel, and appointed individuals to a Plaintiffs' Executive Committee and a Steering

Committee.  *See* Case Mgmt. Order No. 2 at 1-2, ECF No. 64; Case Mgmt. Order No. 3 at 1,

ECF No. 72 (appointing Sol Weiss as additional Co-Lead Class Counsel and appointing

additional members of the Steering Committee).  I ordered Co-Lead Class Counsel to submit

both a Master Administrative Long-Form Complaint and a Master Administrative Class Action

Complaint, which were filed on June 7, 2012.  *See* Case Mgmt. Order No. 4 at 1-3, ECF. No. 98.

Subsequently, Co-Lead Class Counsel filed an Amended Master Administrative Long-Form

Complaint.  This Amended Complaint, along with the Master Administrative Class Action

Complaint (collectively, the "Complaints"), became the operative pleadings of this MDL.  *See*

Master Administrative Class Action Compl., ECF No. 84; Am. Master Administrative Long-

Form Compl., ECF No. 2642 ("Am. MAC").

In the Complaints, MDL Plaintiffs allege that the NFL Parties had a "duty to provide players

with rules and information that protect [players] as much as possible from short-term and long-

---

[2] Many MDL Plaintiffs also brought suit against Riddell, Inc., All American Sports Corporation, Riddell
Sports Group, Inc., Easton-Bell Sports Inc., Easton-Bell Sports, LLC, EB Sports Corp., and RBG
Holdings Corp. (collectively, the "Riddell Defendants").  The Judicial Panel on Multidistrict Litigation
also transferred claims against the Riddell Defendants into this MDL.  The Riddell Defendants, however,
are not parties to the Settlement.

term health risks," including from the risks of repetitive mild traumatic brain injury ("TBI").[3]

Am. MAC ¶ 6, 8. They claim "the NFL held itself out as the guardian and authority on the issue

of player safety," yet failed to properly investigate, warn of, and revise league rules to minimize

the risk of concussive and sub-concussive hits in NFL Football games. *See id.* ¶¶ 6, 43, 86.

MDL Plaintiffs allege that the NFL Parties fostered a culture surrounding football that glorified

violence and a gladiator mentality, encouraging NFL players to play despite head injuries.

MDL Plaintiffs also allege that, as concern about head injuries in contact sports grew in the

medical community, "the NFL voluntarily inserted itself into the private and public discussion"

regarding these dangers. *Id.* ¶ 150. In 1994, the NFL Parties created a Mild Traumatic Brain

Injury Committee ("MTBI Committee") to study the effects of concussive and sub-concussive

injuries on their players. Through the MTBI Committee, the NFL Parties allegedly obfuscated

the connection between NFL Football and long-term brain injury, despite knowing "for decades"

that such a connection exists. *Id.* ¶¶ 108, 243. The MTBI Committee also allegedly pressured

those who criticized its conclusions to retract or otherwise distance themselves from their

findings. MDL Plaintiffs claim that, "[b]efore June of 2010, the NFL made material

misrepresentations to its players, former players, the United States Congress, and the public at

large that there was no scientifically proven link between repetitive traumatic head impacts and

later-in-life cognitive/brain injury." *Id.* ¶ 308.

MDL Plaintiffs allege that head injuries lead to a host of debilitating conditions, including

Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing

speed, attention and reasoning, loss of memory, sleeplessness, mood swings, and personality

---

[3] The scientific community recognizes three categories of TBI: mild, moderate, and severe. *See* Decl. of
Dr. Kristine Yaffe ¶ 41, ECF No. 6422-36. NFL Football allegedly puts players at risk of repetitive mild
TBI, including concussions. Am. MAC. ¶ 2; Decl. of Dr. Christopher Giza ¶ 12, ECF No. 6423-18
(noting "concussion overlaps significantly" with mild TBI).

changes.  MDL Plaintiffs also allege that the repetitive head trauma sustained while playing

football causes a gradual build-up of tau protein in the brain, resulting in Chronic Traumatic

Encephalopathy ("CTE").  CTE allegedly causes an increased risk of suicide, and many

symptoms often associated with Alzheimer's Disease and dementia, as well as with mood

disorders such as depression and loss of emotional control.

The Complaints assert fourteen claims against the NFL Parties, which can be generally

grouped into negligence claims and fraud claims.[4]  MDL Plaintiffs seek declaratory relief,

medical monitoring, and damages.  *See* Am. MAC at Prayer for Relief.

**B.    Motions to Dismiss Based on Preemption**

Before allowing the litigation to proceed to its merits, I determined that a significant

threshold legal issue had to be addressed: whether MDL Plaintiffs' negligence and fraud claims

are preempted by the Collective Bargaining Agreements ("CBAs") between the Retired Players

and the 32 Member Clubs that make up the National Football League.  I was aware that in a

number of analogous cases, courts ruled that state law claims brought against the NFL and

associated parties implicated provisions of the CBAs.  Accordingly, § 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. 185(a), preempted those state law claims.  A

preemption ruling in this MDL would necessarily require MDL Plaintiffs to resolve their claims

through arbitration rather than in federal court because the CBAs contain mandatory arbitration

provisions.  Because of the importance of this issue, I stayed discovery and granted the request of

the NFL Parties to file motions to dismiss on the preemption argument only.  *See* Case Mgmt.

Order No. 2 at 2 (noting that preemption was to be considered on an expedited basis); Case

---

[4] Specifically, the Complaints assert claims against the NFL Parties for declaratory relief, medical
monitoring, wrongful death and survival actions, fraudulent concealment, fraud, negligent
misrepresentation, negligence (three separate counts), loss of consortium, negligent hiring, negligent
retention, and civil conspiracy.  Am MAC. ¶¶ 246-382, 422-25, Prayer for Relief.

Mgmt. Order No. 4 at 3-4; Tr. of Organizational Courtroom Conference, Apr. 25, 2012 at 28:14-16 (staying discovery); Order, Aug. 21, 2012, ECF No. 3384.

On August 30, 2012, the NFL Parties moved to dismiss both Complaints. *See* Defs.' Mot. to Dismiss Am. MAC, ECF No. 3589; Defs.' Mot. to Dismiss Master Administrative Class Action Complaint, ECF No. 3590. The NFL Parties argue that MDL Plaintiffs' claims necessarily implicate provisions of the CBAs that address player safety. Specifically, they argue that the CBAs control or implicate the duties of the NFL Parties and individual Member Clubs to treat player injuries, make return-to-play decisions, inform players of medical risks associated with continuing to play, and promulgate rule changes to enhance player safety. *See* Mot. to Dismiss Am. MAC at 12-18. If the NFL Parties are correct, then § 301 of the LMRA requires MDL Plaintiffs to arbitrate their claims because they agreed in the CBAs to resolve their disputes before an arbitrator, not in federal court.

The parties completed briefing on the motions to dismiss on January 28, 2013, and I heard oral argument on April 9, 2013. The NFL Parties' motions to dismiss remain pending.

C.   **Settlement Negotiations and Preliminary Approval**

On July 8, 2013, I ordered the Parties to participate in mediation with the hope that a negotiated, mutually beneficial settlement could be reached. Pending their negotiations, I agreed to withhold my ruling on the motions to dismiss that might have sent the litigation to arbitration. *See* Order, July 8, 2013, ECF No. 5128. I appointed retired United States District Court Judge Layn Phillips as mediator to help the Parties explore settlement. *Id.*

A genuine dialogue between zealous and well-prepared adversaries transpired. Judge Phillips reports that the Parties engaged in "arm's-length, hard-fought negotiations." Decl. of Layn R. Phillips ¶ 5, ECF No. 6073-4 ("Phillips Decl."). During this time, the Parties met for

8

more than "twelve full days" of formal mediation. *See id.* ¶¶ 5-6; Decl. of Christopher Seeger ¶ 31, ECF No. 6423-3 ("Seeger Decl."). "The negotiations were intense, vigorous, and sometimes quite contentious." Supplemental Decl. of Layn R. Phillips ¶ 4, ECF No. 6423-6 ("Phillips Supp. Decl.").

The Parties came prepared for these discussions. The Parties had already retained well-qualified medical experts to help determine the merits of the case. These experts advised the Parties on difficult questions such as the type of head trauma associated with NFL Football and the long term health effects of trauma on Retired Players. *See* Phillips Decl. ¶ 8; Seeger Decl. ¶ 32; Decl. of Arnold Levin ¶¶ 14-15, ECF No. 6423-10 ("Levin Decl."); Decl. of Dianne Nast ¶¶ 13-14 ("Nast Decl."); Decl. of Dr. Scott Millis ¶ 11, ECF No. 6422-34 (noting he "assisted the NFL Parties during their negotiations" regarding the Test Battery and other Settlement provisions) ("Dr. Millis Decl."); Decl. of Dr. John Kelip ¶ 16, ECF No. 6423-20 (noting he has consulted with Class Counsel on scientific issues since the summer of 2013) ("Dr. Kelip Decl."). Judge Phillips met with the Parties' experts and observed the valuable services they provided. *See* Phillips Decl. ¶8.

In addition to experts, the Parties had access to considerable information about the Retired Players, including from the short form complaints filed with the Court. The NFL Parties' records provided the Parties with biographical information about the vast majority of the former players, including the number of seasons played. *See* Material Provided by Counsel to Pls., Report of the Analysis Research Planning Corp. to Special Master Perry Golkin at 13-15, ECF No. 6167 ("Class Counsel's Actuarial Materials"); Material Provided by Counsel to the NFL, Report of the Segal Group to Special Master Perry Golkin ¶ 16, ECF No. 6168 ("NFL Parties' Actuarial Materials"). Co-Lead Class Counsel also created and maintained a comprehensive

database of the symptoms of MDL Plaintiffs. As a result, the Parties had information about the current cognitive impairment of over 1,500 Retired Players. *See* NFL Parties' Actuarial Materials ¶ 16; Seeger Decl. ¶ 20.

The mediation efforts were successful. On August 29, 2013, after two months of near continuous negotiations, the Parties signed a term sheet setting forth the "principal terms of a settlement." *See* Order, Aug. 29, 2013, ECF No. 5235. The term sheet included $765 million to fund medical exams and provide compensation for player injuries. *Id.* Given the Parties' progress in reaching a settlement, I continued to withhold decision on the NFL Parties' motions to dismiss on preemption grounds. *Id.*

The Parties negotiated further, and over the next four months established the specific terms of the Settlement. On January 6, 2014, Class Counsel,[5] with Kevin Turner and Shawn Wooden as Class Representatives, filed the complaint in *Turner v. Nat'l Football League*, No. 14-0029, ECF No. 1 (E.D. Pa. Jan. 6, 2014) (the "Class Action Complaint").[6] In that action, Class Counsel sought preliminary class certification and preliminary approval of their proposed settlement. *See* Mot. for Prelim Approval, Jan. 6, 2014, ECF No. 5634.

Though I commended the Parties for their efforts, I denied the motion for preliminary class certification and preliminary approval of the Settlement without prejudice. *See* Order Den. Mot. for Prelim. Approval, ECF No. 5658. I was primarily concerned that the capped fund would exhaust before the 65-year life of the Settlement; I feared that "not all Retired Players who ultimately receive[d] a Qualifying Diagnosis or their related claimants will be paid." Mem. Op.

---

[5] Class Counsel includes Co-Lead Class Counsel Christopher Seeger and Sol Weiss, Subclass Counsel Arnold Levin and Dianne Nast, as well as Gene Locks and Steven Marks. *See* Settlement § 2.1(r).
[6] *Turner* was originally marked as a related action to this MDL. On June 25, 2014, "in the interest of justice and to promote judicial economy and avoid duplication," I ordered that "[a]ll motion practice and other filings related to or based on *Turner v. NFL*, shall be filed only on [this] MDL docket . . . ." *Turner*, ECF No. 20.

at 10, ECF No. 5657. I was also concerned that the deal released claims against the National

College Athletic Association ("NCAA") and other collegiate, amateur, and youth football

organizations. *Id.* at 10 n.6. To address my concerns, I ordered the Parties to share the actuarial

data and analyses performed by their economic experts[7] with Special Master Perry Golkin.[8]

Five more months of arm's-length, hard fought negotiations followed. Special Master

Golkin oversaw these negotiations, during which the Parties revisited many provisions of the

Settlement. *See* Seeger Decl. ¶ 61.

These negotiations proved fruitful. The Parties ultimately reached a revised settlement. The

revised deal retained the same basic structure as the original, and included large maximum

awards for Qualifying Diagnoses subject to a series of offsets, a separate fund to allow for

baseline assessment examinations for Retired Players, and a fund dedicated to educating former

players and promoting safety and injury prevention for football players of all ages. Crucially,

this revised deal uncapped the fund to compensate Retired Players with Qualifying Diagnoses;

the NFL Parties agreed to pay all valid claims over the duration of the settlement regardless of

the total cost. The NFL Parties also agreed to narrow the scope of the Releases. In exchange for

these concessions, the NFL Parties received heightened anti-fraud provisions to ensure that funds

were only disbursed to deserving claimants. On June 25, 2014, Class Counsel filed a motion for

preliminary class certification and preliminary approval of the Settlement. *See* Mot. for Prelim.

Approval, June 25, 2014, ECF No. 6073.

---

[7] The Parties have since disclosed this information, and it is publicly available. *See* Class Counsel's
Actuarial Materials; NFL Parties' Actuarial Materials.
[8] I appointed Special Master Golkin on December 16, 2013 in light of the "expected financial complexity
of the proposed settlement." *See* Order Appointing Special Master at 1, ECF No. 5607. As always, I am
grateful to Mr. Golkin for his forthright and astute advice.

On July 7, 2014 ("Preliminary Approval Date"), after making a preliminary determination on class certification for the purpose of issuing notice of settlement,[9] I granted the motion for preliminary class certification and preliminary approval of the Settlement. *See* Order Granting Prelim. Approval, ECF No. 6084. As discussed more fully *infra* Section I.E, on February 13, 2015, the Parties amended the Settlement, making it more favorable to the Class. *See* Parties' Joint Amendment, ECF No. 6481.

### D. The Settlement

The Class consists of "[a]ll living NFL Football Players who, prior to the date of Preliminary Approval . . . retired . . . from playing professional football with the NFL," as well as their Representative and Derivative Claimants. *See* Settlement §§ 1.1, 2.1(ffff). Representative Claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent Retired Players. *See id.* § 2.1(eeee). Derivative Claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of Retired Players. *See id.* § 2.1(ee).

The Settlement sorts Class Members into one of two subclasses based on Retired Players' injuries as of the Preliminary Approval Date. Subclass 2 consists of:

> Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death or who died prior to the date of the Preliminary Approval and Class Certification Order and who received a postmortem diagnosis of CTE.

*Id.* § 1.2(b).

---

[9] Despite language in the Preliminary Approval Order and accompanying Memorandum that the Class had been "conditionally" certified, I reserved class certification analysis until after the Fairness Hearing to allow for full development of the record. *See In re Nat'l Football Players Concussion Injury Litig.*, 775 F.3d 570, 584-87 (3d Cir. 2014).

12

Subclass 1 consists of the remainder:

> Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of the Preliminary Approval and Class Certification Order and their Representative Claimants and Derivative Claimants.

*Id.* § 1.2(a).

The Settlement has three primary components. An uncapped Monetary Award Fund ("MAF"), overseen by a Claims Administrator, provides compensation for Retired Players who submit sufficient proof of Qualifying Diagnoses. A $75 million Baseline Assessment Program ("BAP") provides eligible Retired Players[10] with free baseline assessment examinations of their objective neurological functioning. BAP funds will also be used to provide BAP Supplemental Benefits, including counseling and prescription drug benefits, to those who are impaired but have not deteriorated to the point of receiving a Qualifying Diagnosis. Third, an Education Fund will educate Class Members regarding the NFL Parties' existing CBA Medical and Disability Benefits programs, and promote safety and injury prevention for football players of all ages, including youth football players. I will appoint Wendell Pritchett and Jo-Ann Verrier jointly as Special Master responsible for overseeing, implementing, and administering the entire Settlement. *See id.* § 10.1.

---

[10]   Only Retired Players may receive Qualifying Diagnoses or baseline assessment examinations because they are the only Class Members who played NFL Football. Because Representative Claimants assume the legal rights of the Retired Players they represent, the Settlement treats them similarly to Retired Players for the purposes of calculating, submitting, and receiving Monetary Awards.

Derivative Claimants are Class Members because of their relationship with a Retired Player, not because they stand in the shoes of a Retired Player. As a result, the Derivative Claimant Awards work somewhat differently. Derivative Claimants are eligible to receive up to 1% of a Retired Player's Monetary Award. Unlike a Representative Claimant, a Derivative Claimant must wait until a Retired Player files for a Monetary Award, and then file a Derivative Claim Package seeking a portion of that Award. *See* Settlement § 7.2. In most other respects, Derivative Claimants are treated similarly to Representative Claimants.

Because a Retired Player is essential to every claim, for ease of reference I generally describe the requirements Retired Players must satisfy to receive benefits of the Settlement.

i. **Monetary Award Fund**

The Monetary Award Fund is an uncapped, inflation-adjusted fund that provides cash awards for Retired Players who receive Qualifying Diagnoses. By cost, the MAF constitutes the majority of the Settlement.[11]

The Settlement creates six Qualifying Diagnoses: Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, Amyotrophic Lateral Sclerosis ("ALS"), and Death with CTE.

Levels 1.5 and 2 Neurocognitive Impairment are defined by the Settlement. They require both a decline in cognitive function and a loss of functional capabilities, such as the ability to hold a job or perform household chores. *See generally id.* Ex. 1. These diagnoses correspond with commonly accepted clinical definitions of mild[12] and moderate dementia, respectively.[13]

The Settlement adopts the definitions of Alzheimer's Disease, Parkinson's Disease, and ALS found in the World Health Organization's International Classification of Diseases. *Id.* Diagnoses of Alzheimer's Disease or Parkinson's Disease may alternatively meet the definitions provided by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). *Id.* Death with CTE requires a post-mortem diagnosis of CTE made by a board-certified neuropathologist. *Id.*

After the Effective Date of the Settlement, only pre-approved Qualified MAF Physicians and Qualified BAP Providers may render Qualifying Diagnoses. *See id.* §§ 5.7(a)(i), 6.3(b), 6.5(a), Ex. 1. The Claims Administrator and BAP Administrator will select these specialists, subject to the written approval of Co-Lead Class Counsel and the NFL Parties. *See id.* §§ 5.7(a)(i), 6.5(a).

---

[11] The MAF accounted for roughly 90% of the original settlement. *See* Mem. Op. at 4-5, ECF No. 5657. Uncapped, this percentage may grow.

[12] As stated on the record at the Fairness Hearing, for the purposes of the Settlement, the terms mild dementia and early dementia are synonymous. *See* Am. Fairness Hr'g Tr. at 13:11-25, ECF No. 6463.

[13] *See infra* Section V.B.i.

14

The Settlement will also honor Qualifying Diagnoses made before the Effective Date by appropriately credentialed medical professionals. *See id.* §§ 6.3(c)-6.3(e).

Both Qualified MAF Physicians and Qualified BAP Providers may render Qualifying Diagnoses of Levels 1.5 and 2 Neurocognitive Impairment, but only Qualified MAF Physicians may render Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease, and ALS. *Id.* § 6.3(b). A Retired Player may only receive a Qualifying Diagnosis of Death with CTE if he died before the Final Approval Date of the Settlement. *Id.* Ex. 1.

A Qualifying Diagnosis entitles a Retired Player to a substantial maximum award, subject to mitigating offsets. The Settlement waives all causation requirements for Qualifying Diagnoses. A Retired Player is *not* required to show that playing in the NFL caused his injury or show actual damages. The maximum awards are as follows:

| Qualifying Diagnosis | Maximum Award |
|---|---|
| Level 1.5 Neurocognitive Impairment | $1.5 Million |
| Level 2 Neurocognitive Impairment | $3 Million |
| Parkinson's Disease | $3.5 Million |
| Alzheimer's Disease | $3.5 Million |
| Death with CTE | $4 Million |
| ALS | $5 Million |

If a Retired Player's condition worsens to the point that he receives an additional Qualifying Diagnosis meriting a higher award, he is entitled to a Supplemental Monetary Award to make up the difference. *See id.* § 6.8.

A Retired Player's Monetary Award is subject to a series of incremental offsets. The older a Retired Player is at the time he receives a Qualifying Diagnosis, the smaller his award will be.[14] *Id.* Ex. 3. A Retired Player who played fewer than five Eligible Seasons in the NFL will see his

---

[14] *See infra* Section V.C.i.

award decreased as well.[15]  *See id.* § 6.7(b).  A Retired Player who has not yet received a Qualifying Diagnosis will be subject to an offset if he fails to participate in the BAP.[16]  *See id.*

Some medical conditions also trigger more substantial offsets in Monetary Awards.  A Retired Player who suffers a Stroke or a severe TBI outside of NFL Football will receive a significantly smaller award.  *See id.*[17]  However, a Retired Player subject to these offsets will have the opportunity to challenge whether his Stroke or severe TBI is related to his Qualifying Diagnosis.  *See id.* § 6.7(d).

Finally, any Monetary Award will be reduced by the extent necessary to satisfy any applicable and legally enforceable government liens.  *See id.* § 11.3(c)(iv).  Federal and state law allow the Medicare and Medicaid programs to recoup any health insurance payments made to an insured if a third party is found responsible for the underlying injury.[18]  Pursuant to the Settlement, a Lien Resolution Administrator will identify and resolve these liens and reimbursement claims on behalf of Class Members.  *See id.* § 11.1.  Class Members are already required by law to repay these obligations, but will likely do so at a discount because the Lien Resolution Administrator will be able to negotiate on a class-wide basis.  *See* Aff. of Matthew Garretson ¶¶ 23-29, ECF No. 6423-4 (noting success of similar programs in the *Vioxx*, *Avandia*, *Zyprexa*, and *Deepwater Horizon* settlements) ("Garretson Aff.").  The lien resolution process represents a substantial benefit for Class Members.

Because the MAF is uncapped, every Class Member who timely registers and qualifies for a Monetary or Derivative Claimant Award will receive an award.  Additionally, every eligible

---

[15] *See infra* Section V.C.iv.

[16] *See infra* Section V.C.v.

[17] *See infra* Sections V.C.ii and V.C.iii.

[18] Because significant penalties exist for noncompliance with these requirements, virtually all defendants in mass tort personal injury settlements, including the NFL Parties, require that liens be satisfied as a condition of any cash payout.  *See* Affidavit of Matthew Garretson ¶ 23, ECF No. 6423-4.

Representative Claimant of a deceased Retired Player who died on or after January 1, 2006 will receive a Monetary Award. However, any eligible Representative Claimant of a deceased Retired Player who died prior to January 1, 2006 will receive a Monetary Award only if he can show that his wrongful death or survival claim would not be barred by the statute of limitations under applicable state law. *See* Settlement § 6.2(b).

### ii. Claims Process

To collect from the MAF or participate in the BAP, a Class Member must register with the Claims Administrator within 180 days of receiving notice that the Settlement has been approved and is in effect. *See id.* §§ 4.2(c), 14.1(d). A Class Member must provide basic biographical and contact information and, in the case of a Representative or Derivative Claimant, identify the Retired Player whose injuries form the basis of the claim. *See id.* § 4.2(b). If a Class Member can demonstrate good cause, then he may receive an extension to the 180-day registration period. *See id.* § 4.2(c).

A Claim Package "must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or within two (2) years after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later." *Id.* § 8.3(a)(i). Failure to comply with the applicable Claim Package submission deadline will preclude a Class Member from receiving an award, unless he can show substantial hardship. *See id.* The Claim Package must include a certification by the physician who diagnosed the Retired Player, medical records supporting that diagnosis, and proof that the Retired Player played in the NFL.[19] *See id.* § 8.2(a). The Claims Administrator, after providing the Class Member with an opportunity to

---

[19] If a Retired Player lacks these records, the NFL Parties have a good faith obligation to provide any records in their possession. *See id.* § 9.1(a).

cure an incomplete or insufficient Claim Package, must notify the Class Member within 60 days whether he is entitled to an award. *Id.* § 9.1(b).

Class Members, Co-Lead Class Counsel, and the NFL Parties have the right to appeal a Monetary Award determination, a right they must exercise in good faith. *See id.* §§ 9.5, 9.6(a). To appeal, a Class Member must submit a $1,000 fee, which will be refunded if his appeal is successful. *Id.* § 9.6(a). The Claims Administrator may waive the fee if the Class Member can show financial hardship. *Id.* § 9.6(a)(i). Appellants have five single-spaced pages to prove their case by clear and convincing evidence. *Id.* § 9.7(a). The Court is the ultimate arbiter of any appeal, and may consult an Appeals Advisory Board for medical advice. *See id.* § 9.8.

The Claims Administrator must, and Co-Lead Class Counsel and the NFL Parties may, audit approved Monetary Awards to prevent fraud. *See id.* §§ 10.3(a), 10.3(c). The Claims Administrator must complete a monthly audit of 10% of the Monetary Awards and Derivative Claimant Awards approved in the preceding month. *See id.* § 10.3(c). Co-Lead Class Counsel and the NFL Parties have the right to audit as many claims as they wish, but must do so at their expense and in good faith. *See id.* § 10.3(a).

### iii. Baseline Assessment Program

The BAP is a $75 million fund that provides Retired Players with an opportunity to be tested for cognitive decline. Any Retired Player who has played at least half of an Eligible Season can receive a baseline assessment examination, even if he has not yet developed any adverse symptoms nor received a Qualifying Diagnosis. *See id.* § 5.1. A baseline assessment examination consists of a standardized neuropsychological examination and a basic neurological

examination.[20]  Appropriately credentialed physicians selected by a court-appointed BAP Administrator will provide these examinations at no cost to Retired Players.  *See id.* § 5.6(a)(i).

Baseline assessment examinations serve several functions.  Exams may produce a Qualifying Diagnosis.  Qualified BAP Providers may diagnose Retired Players with Level 1, 1.5, or 2 Neurocognitive Impairment; the latter two are Qualifying Diagnoses that entitle a Retired Player to a Monetary Award.[21]  *Id.* Ex. 1.  The results of BAP examinations can also be compared with any future tests to determine whether a Retired Player's cognitive abilities have deteriorated.

Finally, a baseline assessment examination may entitle a Retired Player to BAP Supplemental Benefits.  Retired Players diagnosed with Level 1 Neurocognitive Impairment— evidencing some objective decline in cognitive function, but not yet rising to the level of early dementia—are eligible to receive medical benefits, including further testing, treatment, counseling, and pharmaceutical coverage.  *See id.* §§ 5.2, 5.11, Ex. 1.

The BAP lasts for ten years.  *Id.* § 5.5.  Every eligible Retired Player age 43 or over must take a baseline assessment examination within two years of the BAP's commencement.  *Id.* § 5.3.  Every eligible Retired Player younger than age 43 must do so before the end of the program or by his 45th birthday, whichever comes first.  *Id.*

### iv.  Education Fund

The Education Fund is a $10 million fund to promote safety and injury prevention for football players of all ages, including youth football players.  The fund will also educate Retired Players about their NFL CBA Medical and Disability Benefits.  Co-Lead Class Counsel and the

---

[20] For an in-depth discussion of the contents of a baseline assessment examination, see *infra* Section V.D.ii.

[21] The BAP is not designed to test for Alzheimer's Disease, Parkinson's Disease, or ALS.  Retired Players may not be diagnosed with these Qualifying Diagnoses during a baseline assessment examination.

NFL Parties, with input from Retired Players, will propose specific initiatives for the Court's approval. *See id.* § 12.1.

v. **Releases of Claims**

In exchange for the benefits described above, Class Members release and dismiss with prejudice all claims and actions against the Released Parties "arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or sub-concussive events," including claims relating to CTE. *Id.* Art. XVIII. Class Members also covenant not to sue the Released Parties. *Id.* All claims that "were, are or could have been asserted in the Class Action Complaint" are also released. *Id.*

Class Members, however, remain free to pursue a number of claims for their injuries even after the Settlement takes effect. Claims against the Riddell Defendants, who are not parties to this Settlement, remain pending. The Releases similarly have no effect on claims against the NCAA or other collegiate, amateur, or youth football organizations.

Additionally, the Releases do not compromise the benefits that Retired Players are entitled to under their CBAs with individual Member Clubs. These NFL CBA Medical and Disability Benefits provide significant additional compensation. For example, the "88 Plan" reimburses or pays for up to $100,000 of medical expenses per year for qualifying Retired Players with dementia, ALS, and Parkinson's Disease. *See* Decl. of Dennis Curran ¶¶ 5-7, ECF No. 6422-32 ("Curran Decl."). Retired Players also retain access to a Neuro-Cognitive Disability Benefit, which provides compensation for those who have mild or moderate neurocognitive impairment. *See id.* ¶¶ 8-9. General retirement benefits, disability benefits, and health insurance programs are also left unaffected. *See id.* ¶¶ 11-17.

### vi.  Attorneys' Fees

During their initial negotiations, the Parties did not discuss fees until after the key terms of the Settlement—including the total size of the original capped fund—were publicly announced on the docket. *See* ECF No. 5235; Phillips Supp. Decl. ¶ 19.

The NFL Parties have agreed not to contest any award of attorneys' fees and costs equal to or below $112.5 million.  Any fee award will be separate from, and in addition to, the NFL Parties' other obligations under the Settlement. *See* Settlement § 21.1.  Class Counsel have not yet moved for any fee award.  I will determine an appropriate fee award at a later date.

The Settlement also provides that Co-Lead Class Counsel may petition the Court to set aside up to 5% of each Monetary and Derivative Claimant Award to administer the Settlement.  This request is subject to court approval, and any petition must include the amount of any set aside and its proposed use. *Id*.

### E.  Reactions to the Settlement and Resulting Amendments

The order granting preliminary approval afforded Class Members 90 days to review the Settlement, object, and opt out. *See* Order Granting Prelim. Approval ¶ 4.  Ultimately, 208 Class Members submitted requests to exclude themselves[22] from the Settlement, and a total of 205 Objectors filed 83 written objections.[23]  These figures each represent approximately one percent of Retired Players. *See* Class Counsel's Actuarial Materials at 13-14; NFL Parties' Actuarial Materials ¶ 16 (estimating over 20,000 Retired Players).  Retired Players, as opposed to their Representative or Derivative Claimants, submitted the vast majority of the objections and opt-out

---

[22] *See* Eighth Opt-Out Report of Claims Administrator ¶ 2, ECF No. 6507.  As of the Fairness Hearing, there were 234 timely and untimely opt-out requests.  Since then, 26 Class Members have revoked these requests and have been allowed back into the Settlement. *Compare id. with* First Opt-Out Report of Claims Administrator ¶ 3, ECF No. 6340.

[23] All objections are publicly available on this MDL's docket.  A list of Objectors can be found at Appendix A of the NFL Parties' Memorandum of Law in Support of Final Approval, ECF No. 6422, and Exhibit 12 of Class Plaintiffs' Motion for Final Approval and Class Certification, ECF No. 6423-14.

requests. *See* Eighth Opt-Out Report of Claims Administrator ¶ 2, ECF No. 6507. I also

accepted *amicus curiae* submissions from two groups. *See* Submission of Brain Injury

Association of America, Decl. of Drs. Brent Masel & Gregory O'Shanick, ECF No. 6180-2

("Drs. Masel & O'Shanick Decl."); Mem. of Public Citizen, ECF. No. 6214-1; Supp. Mem. of

Public Citizen, ECF. No. 6451-1.

On November 12, 2014, Class Plaintiffs moved for class certification and final approval of

the Settlement. *See* Class Plaintiffs' Mot. for Final Approval and Class Certification, ECF No.

6423. On November 19, 2014, I held a day-long final Fairness Hearing on the merits of the

Settlement. *See* Am. Fairness Hr'g Tr., ECF No. 6463. Because many of the objections raised

duplicative issues, I asked Objectors represented by attorneys to coordinate their presentations to

streamline the Fairness Hearing.[24] Every Class Member who submitted a timely objection, and

who was not represented by an attorney, was given an opportunity to speak at the Fairness

Hearing. *See* Notice, Nov. 4, 2014, ECF No. 6344; Notice of Fairness Hr'g Schedule, ECF No.

6428.

Though participants discussed a host of issues, much of the Fairness Hearing focused on the

scientific underpinnings of CTE. In support of their positions, the Parties, Objectors, and Amici

collectively submitted briefs, hundreds of pages of exhibits, dozens of scientific articles, and 22

expert declarations.

After reviewing the moving papers, the objections, and the arguments made at the Fairness

Hearing, I proposed several changes to the Settlement that would benefit Class Members. *See*

Order, Feb. 2, 2015, ECF No. 6479. Specifically, I requested that:

---

[24] *See* Notice, Nov. 4, 2014, ECF No. 6344. At my request, attorney Steven Molo and his firm undertook
this task.

- Retired Players receive credit for time they spent playing in overseas NFL affiliate leagues;[25]

- All Retired Players who seek and are eligible for a baseline assessment examination receive one, notwithstanding the $75 million cap;

- The NFL Parties compensate Qualifying Diagnoses of Death with CTE up until the Final Approval Date;

- The Parties relax certain procedural requirements in the claims process in extenuating circumstances.

*Id.* On February 13, 2015, Class Counsel and the NFL Parties agreed with my proposed changes in their entirety, and submitted the amended Settlement described *supra* Section I.D. *See* Parties' Joint Amendment.

## II.    Class Certification

For a class action to have preclusive effect and bind absent class members, a class must first be certified.  Rule 23(a) of the Federal Rules of Civil Procedure lays out four threshold requirements for certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).  Because this is a Rule 23(b)(3) class, two additional requirements must be met: (1) common questions must predominate over any questions affecting only individual members, and (2) class resolution must be superior to other available methods to adjudicate the controversy. Fed. R. Civ. P. 23(b)(3).

Class certification "demand[s] undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*

---

[25] These include the World League of American Football, NFL Europe League, and NFL Europa League (collectively, "NFL Europe").

*Liab. Litig.*, 55 F.3d 768, 797-99 (3d Cir. 1995) (hereinafter "*GM Trucks*").  However, the existence of a settlement means that "certain Rule 23 considerations . . . are not applicable." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 378 (3d Cir. 2013).  For example, because a settlement obviates the need for trial, concerns regarding the manageability of a Rule 23(b)(3) class disappear.  *See Amchem*, 521 U.S. at 619; *see also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc) (noting that "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("[C]oncerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant . . . ." (citing *Amchem*, 521 U.S. at 620)).

The proposed Class and Subclasses meet the Rule 23(a) and 23(b)(3) requirements and warrant certification.

### A.   Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Thousands of Retired Players have filed suit against the NFL Parties in this MDL.  The Parties estimate that there are over 20,000 Retired Players in the Class, as well as additional Representative Claimants and Derivative Claimants.  *See* Class Counsel's Actuarial Materials at 3; NFL Parties' Actuarial Materials ¶ 16.  The numerosity requirement of Rule 23(a) is satisfied.  *See, e.g., Stewart v. Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001) (noting requirement typically satisfied by more than 40 plaintiffs).

### B.   Commonality

Rule 23(a)(2) requires that class members' claims share common questions of law or common questions of fact.  The standard is not stringent; only one common question is required.

*See Rodriguez*, 726 F.3d at 382 (concluding the bar commonality sets "is not a high one"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir. 1998) (factor satisfied "if the named plaintiffs share at least one question of fact or law" with the prospective class (internal quotation marks omitted)). To satisfy commonality, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

Commonality is satisfied here. The critical factual questions in this case are common to all Class Members. These include whether the NFL Parties knew and suppressed information about the risks of concussive hits, as well as causation questions about whether concussive hits increase the likelihood that Retired Players will develop conditions that lead to Qualifying Diagnoses. Class Members also face a host of common legal questions, such as the nature and extent of any duty owed to Retired Players by the NFL Parties, and whether LMRA preemption, workers' compensation, or some affirmative defense would bar their claims.

Citing *Wal-Mart*, Objectors contend that commonality is not satisfied because each Retired Player was injured "in unique and disparate ways."[26] Heimburger Obj. at 13, ECF No. 6230. While it is true that no two Retired Players' concussion history or symptoms are identical, commonality still exists. Common legal and factual questions are at the heart of this case. Essential questions include whether the CBAs mandate compulsory arbitration, and whether the

---

[26] Section V addresses the majority of the objections. Where relevant however, specific objections to class certification, Class Notice, and the application of the factors enunciated in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) and *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998) are discussed in Sections II, III, and IV, respectively.

NFL Parties used the MTBI Committee to fraudulently refute the dangers of head injuries. No Class Member could prevail without proving the NFL Parties' misconduct.

The common issues in this case satisfy the Supreme Court's concerns in *Wal-Mart*. In *Wal-Mart*, a putative class of female employees argued they were systematically denied promotions and pay raises because of their gender. The Court found no commonality because Wal-Mart had no formal policy regarding either promotions or pay raises; each decision was left to a local manager's discretion. *Wal-Mart*, 131 S. Ct. at 2554. Thus, the determination that one manager's decision was sexist would not affect the determination of whether another manager's decision in a different store was sexist as well. *Id.* By contrast, the NFL Parties allegedly injured Retired Players through the same common course of conduct: refusing to alter league rules to make the game safer, failing to warn of the dangers of head injuries, and establishing the MTBI Committee. *See Sullivan*, 667 F.3d at 299.

The commonality requirement is satisfied.

## C.   Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is designed to align the interests of the class and the class representatives . . . ." *Prudential*, 148 F.3d at 311.

The Third Circuit has "set a low threshold for satisfying" the typicality requirement. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). "'Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." *Prudential*, 148 F.3d at 311 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)); *see also Warfarin*, 391 F.3d at 532 (holding district court did not

abuse its discretion in finding the typicality requirement was satisfied where the claims of the representative plaintiffs arose "from the same alleged wrongful conduct . . . [and] the same general legal theories")

The Class Representatives have claims typical of those they represent. Shawn Wooden, the Representative of Subclass 1, is a Retired Player who has not been diagnosed with a Qualifying Diagnosis. Like many other Class Members, he seeks a baseline assessment examination to determine whether he has any neurocognitive impairment resulting from his years of playing NFL Football. If he ultimately develops a Qualifying Diagnosis, he will seek a Monetary Award. Kevin Turner, the Representative of Subclass 2, is a Retired Player who has been diagnosed with ALS. Similar to other Class Members who have already received Qualifying Diagnoses, he seeks compensation from the NFL Parties for his injuries.

Wooden and Turner seek recovery pursuant to the same legal theories as the absent Class Members. They claim the NFL Parties should have known of, or intentionally concealed, the risks of head injuries in NFL Football. The claims of all Class Members, Wooden and Turner included, derive from the same wrongful course of conduct: the NFL Parties' decision to promote and structure NFL Football in a way that increased concussive impacts.

Some Objectors argue that Wooden's and Turner's claims are not typical because they did not play in NFL Europe, and they both had long careers in the NFL while others' careers were relatively brief. Objectors point to Retired Player Craig Heimburger as an example that typicality is lacking because Heimburger had a relatively short career and neither Representative suffers from Heimburger's specific symptoms. *See* Heimburger Obj. at 3, 12.

The factual differences among Retired Players do not defeat typicality. Class members need not "share identical claims." *Baby Neal*, 43 F.3d at 56. "[C]ases challenging the same unlawful

conduct which affects both the named plaintiffs and the putative class usually satisfy the

typicality requirement irrespective of the varying fact patterns underlying the individual claims."

*Id.* at 58. Heimburger's short form complaint demonstrates that his damages stem from the same

source as Wooden's and Turner's damages: "repetitive, traumatic sub-concussive and/or

concussive head impacts during NFL games and/or practices." Heimburger Short Form Compl.

at 2, ECF No. 1938. Like Wooden, Heimburger seeks medical monitoring. *Id.* at 5. Like

Wooden's and Turner's injuries, Heimburger's injuries sound in negligence and fraud. *Id.* The

remaining differences between Heimburger and the Class Representatives are immaterial to the

typicality analysis.

The typicality requirement is satisfied.

**D.   Adequacy of Representation**

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of

the class." Fed. R. Civ. P. 23(a)(4). It tests both the qualifications of class counsel and the class

representatives to represent a class. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir.

1977) (requiring both "representatives and their attorneys [to] competently, responsibly and

vigorously prosecute the suit"), *abrogated on unrelated grounds by In re Ins. Brokerage*

*Antitrust Litig.*, 618 F.3d 300, 325 n.25 (3d Cir. 2010). It also seeks to uncover conflicts of

interest between class representatives and the class they represent. *See Warfarin*, 391 F.3d at

532.

i. **Adequacy of Class Counsel**

When examining settlement classes, courts "have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." [27] *GM Trucks*, 55 F.3d at 801.

No Objector challenges the expertise of Class Counsel. Co-Lead Class Counsel Christopher Seeger has spent decades litigating mass torts, class actions, and multidistrict litigations. He has served as plaintiffs' lead counsel, or as a member of the plaintiffs' executive committee or steering committee in over twenty cases. *See* Seeger Decl. ¶¶ 2-4. Co-Lead Class Counsel Sol Weiss, Subclass Counsel Arnold Levin and Dianne Nast, and Class Counsel Gene Locks and Steven Marks possess similar credentials. *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *44 (E.D. Pa. Aug. 28, 2000) ("Each of the Class Counsel [Arnold Levin, Sol Weiss, Gene Locks and others] are experienced in the conduct of class litigation, mass tort litigation and complex personal injury litigation . . . ."); Seeger Decl. ¶ 27 (noting that Steven Marks and Sol Weiss are "attorneys with decades of class action and MDL litigation experience"); Levin Decl. ¶ 2 (noting leadership positions in over 100 class actions, mass torts, and complex personal injury suits); Nast Decl. ¶ 2 (noting leadership positions in over 48 complex cases).

---

[27] In 2003, Congress amended Rule 23 to include subdivision 23(g), which provides a non-exhaustive list of factors for a court to consider when scrutinizing the adequacy of class counsel's representation. *See* Fed R. Civ. P. 23(g). The addition was meant to transfer the analysis of class counsel's representation from Rule 23(a)(4), where it had little textual support, to Rule 23(g). *See* Newberg on Class Actions § 3:80 (5th ed.). Rule 23(g) "builds on" the existing 23(a)(4) jurisprudence instead of "introducing an entirely new element into the class certification process." *See* Fed. R. Civ. P. 23(g) advisory committee's notes (2003 amendments). Accordingly, the Third Circuit continues to apply the factors *GM Trucks* relied on prior to the addition of Rule 23(g). *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 304-05 (3d Cir. 2010); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307 (3d Cir. 2005). Class Counsel's representation of the Class satisfies both Rule 23(g) and 23(a)(4).

Class Counsel vigorously prosecuted the action at arm's length from the NFL Parties. Mediator Judge Phillips notes that during negotiations "Plaintiffs' counsel [] consistently and passionately expressed the need to protect the interests of the retirees and their families and fought hard for the greatest possible benefits . . . ." Phillips Supp. Decl. ¶¶ 2-5, 8-10; Phillips Decl. ¶¶ 2, 5-7, 11; Mem. in Supp. of Preliminary Approval Order, ECF No. 6083 ("[I]t appears that the proposed Settlement is the product of good faith, arm's length negotiations."). "It was evident throughout the mediation process that Plaintiffs' counsel were prepared to litigate and try these cases . . . if they were not able to achieve a fair and reasonable settlement . . . ." Phillips Supp. Decl. ¶ 3.

The substantial concessions Class Counsel were able to extract from the NFL Parties confirm Judge Phillips' observations. "[T]he uncapped nature of the proposed settlement . . . indicate[s] that class counsel and the named plaintiffs have attempted to serve the best interests of the class as a whole." *Prudential*, 148 F.3d at 313.

Some Objectors point to Class Counsel's proposed fee award as evidence that representation was collusive or self-serving.[28] *See, e.g.*, Morey Obj. at 79-80, ECF No. 6201; Heimburger Obj. at 19-21. Class Counsel, however, did not move for a fee award in connection with final approval. At an appropriate time after the Effective Date of the Settlement, Class Counsel may file a fee petition that Class Members will be free to contest. Any award will be separate from, and in addition to, the NFL Parties' other obligations under the Settlement. *See* Settlement § 21.1. The NFL Parties have agreed not to contest any award of attorneys' fees and costs equal to or below $112.5 million.

None of the fee provisions in the Settlement indicate inadequate representation. Courts are wary when attorneys' fees are taken from a common fund because any fee given to class counsel

---

[28] For an additional discussion of fees, see *infra* Section IV.C.

will detract from funds available to the class.  Courts are sometimes wary even when attorneys'

fees are taken from an ostensibly separate fund because of the fear that the formal division

between fees and class funds is illusory and that attorneys' fees will still deplete the amount

available to the class.  *See GM Trucks*, 55 F.3d at 803-05, 819-20.

A fee award in this case will not come from a common fund.  The ultimate amount the NFL

Parties must pay in attorneys' fees will have no impact on the Monetary Awards paid or baseline

assessment examinations given because the NFL Parties have already guaranteed these benefits,

in full, to eligible claimants.  *See* Settlement § 21.1; *see also Court Awarded Attorney Fees:*

*Report of the Third Circuit Task Force*, 108 F.R.D. 238, 266 (1985) (noting a conflict of interest

exists when "a large attorney's fee means a smaller recovery to plaintiff").

Moreover, the course of negotiations in this case provides assurances that attorneys' fees did

not reduce the recovery available to the Class.  According to Mediator Phillips, the Parties were

careful not to discuss fees until after the Court had announced, on the record, an agreement

regarding the total compensation for Class Members.  *See* Phillips Supp. Decl. ¶ 19; Order, Aug.

29, 2013.  Because Class benefits were fixed by the time the Parties discussed fees, the amount

given to the Class was not compromised.  *See In re Oil Spill by Oil Rig Deepwater Horizon*, 295

F.R.D. 112, 138 (E.D. La. 2013) ("*Deepwater Horizon Clean-Up Settlement*") (noting mediator's

involvement during negotiations "further ensured structural integrity"); *cf. In re Cmty. Bank of N.*

*Va.*, 418 F.3d 277, 308 (3d Cir. 2005) (noting "special danger of collusiveness" when fees "were

negotiated simultaneously with the settlement").

Finally, Objectors point to the presence of a clear sailing provision, meaning that the NFL

Parties have agreed not to contest any award of attorneys' fees and costs equal to or below

$112.5 million, as evidence of collusion.  While Objectors are correct that a clear sailing

provision "should put a court on its guard," *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991), "not every 'clear sailing' provision demonstrates collusion." *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012). "[N]umerous cases . . . have approved agreements containing such clear-sailing clauses." *Deepwater Horizon Clean-Up Settlement*, 295 F.R.D at 138.

A clear sailing provision does not "bar approval of [a] [s]ettlement" where a court "strictly scrutinize[s] both the process and substance" of the proposed agreement. *In re Excess Value Ins. Coverage Litig.*, MDL No. 1339, 2004 WL 1724980, at *10 (S.D.N.Y. July 30, 2004). As discussed, the negotiation process that led to the Settlement in this case indicates that the clear sailing provision is not problematic. *See Shames v. Hertz Corp.*, No. 07-2174, 2012 WL 5392159, at *13 (S.D. Cal. Nov. 5, 2012) (overruling objection based on clear sailing provision in part because the "fee amount was negotiated separately and only after the class settlement was finalized"); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 813 (E.D. Wis. 2009) (overruling objection to a clear sailing provision in part because "the settlement was achieved after arms-length negotiation with the assistance of a Seventh Circuit mediator").

The substance of the Settlement likewise indicates an absence of collusion. The Settlement provides uncapped, guaranteed Monetary Awards and baseline assessment examinations. *See LaGarde v. Support.com, Inc.*, No. 12-0609, 2013 WL 1283325, at *10 (N.D. Cal. Mar. 26, 2013) (noting that "Plaintiffs did not bargain away benefits to the class . . . when they secured the clear sailing provision" because "[h]ad Plaintiffs colluded . . . the settlement would not [have] provide[d] such a substantial value").

Moreover, the clear sailing provision caps uncontested attorneys' fees at just over 10% of the Parties' estimates of Class recovery. *Compare* Settlement § 21.1 *with* Class Counsel's Actuarial

Materials at 3 *and* NFL Parties' Actuarial Materials ¶ 20.  Courts are wary of clear sailing

provisions when they insulate disproportionate fee awards.  *In re Bluetooth Headset Prods. Liab.*

*Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (clear sailing provision was a "warning sign[]" when

attorneys' fees cap was "up to eight times the monetary *cy pres* relief afforded the class," and

there was no other recovery); *cf. Gooch*, 672 F.3d at 426 ("We find collusion particularly

unlikely in this instance where the clear sailing provision caps attorney compensation at

approximately 2.3% of the total expected value of the settlement to the class members.  The

majority of common fund fee awards fall between 20% and 30% of the fund." (internal quotation

marks omitted)); *Harris v. Vector Mktg. Corp.*, No. 08-5198, 2012 WL 381202, at *5 (N.D. Cal.

Feb. 6, 2012) (approving revised settlement because "[u]nlike the initial settlement, the award to

the class . . . [was] not substantially outstripped by a 'clear sailing' attorney fee provision").

Here, the uncontested fee award cap is not disproportionate to the compensation provided to the

Class.

Of course, the clear sailing provision does not require the Court to approve the uncontested

$112.5 million award, or any other requested amount.  The Court reserves full discretion to

award reasonable attorneys' fees.  *See infra* Section IV.C.

### ii.  Adequacy of Named Parties

A class representative must also capably and diligently represent a class.  This standard is

easily met: "A class representative need only possess a minimal degree of knowledge" about the

litigation to be adequate.  *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313

(3d Cir. 2007) (internal quotation marks omitted); *see also Greenfield v. Villager Indus., Inc.*,

483 F.2d 824, 832 n.9 (3d Cir. 1973) ("Experience teaches that it is counsel for the class

representative and not the named parties, who direct and manage these actions.").  Despite this,

Objectors challenge whether Shawn Wooden and Kevin Turner fulfilled their roles as Class Representatives. *See* Morey Obj. at 80; Heimburger Obj. at 12-13; Utecht Obj. at 6-7, ECF No. 6243 (arguing that Class Representatives should be required to testify that they were advised of various provisions of the Settlement).

Both Class Representatives ably discharged their duties. Wooden and Turner have followed the litigation closely, including the negotiations process and the multiple revisions to the Settlement. *See* Aff. of Kevin Turner ¶¶ 6-9, ECF No. 6423-7 ("Turner Aff."); Aff. of Shawn Wooden ¶¶ 3-5, 7, ECF No. 6423-8 ("Wooden Aff."). Each authorized the filing of the Class Action Complaint and approved the Settlement. Turner Aff. ¶¶ 8-9; Wooden Aff. ¶¶ 6-8. Although Wooden and Turner did not actively participate in settlement negotiations, their participation is not required. *See Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982) ("The adequacy-of-representation test is not concerned [with] whether plaintiff . . . will personally be able to assist his counsel."), *abrogated on other grounds by Garber v. Lego*, 11 F.3d 1197, 1206-07 (3d Cir. 1993).

### iii.  Absence of Conflicts of Interest

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-58, n.13 (1982)). The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

Not every distinction between a class member and a class representative renders the representative inadequate. "A conflict must be fundamental to violate Rule 23(a)(4)." *Id.* at 184

(internal quotation marks omitted).  "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* (alteration in original) (internal quotation marks omitted).  This occurs when, "by maximizing their own interests, the putative representatives would necessarily undercut the interests of another portion of the class."  Newberg on Class Actions § 3:58 (5th ed.).  Benefits awarded to some class members, but not others, without adequate justification may indicate that other class members were inadequately represented.  *See GM Trucks*, 55 F.3d at 797.

Structural protections in the class definition and settlement, such as separate subclasses or an uncapped fund, may eliminate fundamental conflicts.  *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996) (suggesting use of "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests"), *aff'd sub nom. Amchem*, 521 U.S. at 591.  In this case, no fundamental conflicts exist.

All Class Members allegedly were injured by the same scheme: the NFL Parties negligently and fraudulently de-emphasized the medical effects of concussions to keep Retired Players in games.  Class incentives are aligned because "[t]he named parties, like the members of the class, would need to establish this scheme in order to succeed on any of the claims" asserted. *Prudential*, 148 F.3d at 313; *see also Warfarin*, 391 F.3d at 532 (finding adequacy satisfied in part because "all shared the same goal of establishing the liability of DuPont").

The Class includes two Subclasses that prevent conflicts of interest between Class Members. *Amchem* held that an undifferentiated class containing those with present injuries and those who have not yet manifested injury is beset by a conflict of interest.  *See Prudential*, 148 F.3d at 313. Recognizing this problem, Class Counsel subdivided the Class into two Subclasses: Retired Players who have already received a Qualifying Diagnosis (and their Representative and

35

Derivative Claimants) and Retired Players who have not. *See Ortiz v. Fibreboard*, 527 U.S. 815, 856 (1999) (holding that "a class including holders of present and future claims . . . requires division into homogenous subclasses"). Each Subclass has its own independent counsel. *Warfarin*, 391 F.3d at 533 (noting that "any potential for conflicts of interest . . . that may have arisen prior to and during the settlement negotiations were adequately [addressed] by the presence of separate counsel").

Each Subclass Representative's interests reflect the interests of the Subclass as a whole. As with all other Retired Players who already have a Qualifying Diagnosis, Kevin Turner is interested in immediately obtaining the greatest possible compensation for his injuries and symptoms. Shawn Wooden, like all other Retired Players without a Qualifying Diagnosis, is interested in monitoring his symptoms, guaranteeing that generous compensation will be available far into the future, and ensuring an agreement that keeps pace with scientific advances. Because Wooden does not know which, if any, condition he will develop, he has an interest in ensuring that the Settlement compensates as many conditions as possible.

Additional structural protections in the Settlement ensure that each Class Member is adequately represented. Every Retired Player who receives a Qualifying Diagnosis during the 65-year life of the Settlement is entitled to a Monetary Award. The Monetary Award Fund is uncapped and baseline assessment examinations are guaranteed for all eligible Retired Players. That one Retired Player receives a Monetary Award or undergoes a baseline assessment examination presents no impediment to any other Class Member's recovery. *See Warfarin*, 391 F.3d at 532 (holding that the district court did not abuse its discretion in finding adequacy of representation satisfied in part because "recovery did not change depending on the number of the people in the class, [avoiding] the problem of 'splitting the settlement'"). Monetary Awards are

36

also indexed to inflation.  Retired Players who receive Qualifying Diagnoses in the future will be

on equal footing with those who are currently suffering.  Additionally, the Settlement provides

Supplemental Monetary Awards for worsening symptoms.  Retired Players who receive more

severe Qualifying Diagnoses after receiving initial Monetary Awards are entitled to

supplemental payments.  *See Diet Drugs*, 2000 WL 1222042, at *49 (noting that class members

with injuries that will worsen over time "are protected by the settlement in that they may 'step

up' to higher amounts of compensation on the matrices as their level of disease progresses").

Moreover, the presence of Mediator Judge Phillips and Special Master Golkin helped

guarantee that the Parties did not compromise some Class Members' claims in order to benefit

other Class Members.  "Plaintiffs' counsel . . . fought hard for the greatest possible benefits for

*all* of the players" and "demanded that a range of injuries consistent with those alleged in the

Complaints be considered eligible for a monetary award."  Phillips Supp. Decl. ¶¶ 2, 8 (emphasis

added).

Objectors contend that an additional subclass is necessary for Retired Players who suffer

from CTE.  They argue that Subclass Representative Shawn Wooden does not allege that he is at

risk of developing the disease.  *See, e.g.*, Morey Obj. at 27 ("Mr. Wooden, by contrast, has not

alleged that he suffers from CTE."); Chelsey Obj. at 11, ECF No. 6242; Duerson Obj. at 17-18,

ECF No. 6241; Miller Obj. at 3-4, ECF No. 6213; Chelsey Supplemental Obj. at 7, ECF No.

6453.

Shawn Wooden has adequately alleged that he is at risk of developing CTE.  In the Master

Administrative Class Action Complaint, one of the operative pleadings for this MDL, Wooden

alleges he "is at increased risk of latent brain injuries caused by [] repeated traumatic head

impacts," which, as Objectors point out, include CTE.  *See* Master Administrative Class Action

37

Complaint ¶ 7; Morey Obj. at 21 (alleging "CTE . . . is associated with repetitive mild traumatic brain injury" (internal quotation marks omitted)).  Moreover, as Subclass Representative, Wooden authorized the filing of the Class Action Complaint, which alleges that Retired Players are at risk for developing "mood swings, personality changes, and the debilitating and latent disease known as CTE."  Class Action Complaint ¶ 61; *see also* Wooden Aff. ¶ 6.

A subclass of CTE sufferers is both unnecessary and poses a serious practical problem.  It is impossible to have a Class Representative who has CTE because, as Objectors concede, CTE can only be diagnosed after death.  *See, e.g.*, Morey Obj. at 26; Chelsey Obj. at 9; *infra* Section V.A.i.  Thus, the best Subclass Representative for individuals who will be diagnosed with CTE post mortem is one who alleges exposure to the traumatic head impacts that cause CTE and who has an incentive to negotiate for varied and generous future awards in light of the current uncertainty in his diagnosis.  In other words, the best Subclass Representative for CTE is someone in Shawn Wooden's position.

Finally, Objectors and Amici incorrectly allege that a variety of fundamental conflicts exist because Retired Players receive different compensation based on their age,[29] medical history,[30] the number of seasons they played,[31] and other distinctions contained within the Settlement.[32]  In the same vein, Amici argue that inadequate representation exists because different Qualifying Diagnoses have different maximum awards.[33]  Retired Players with ALS, for example, can receive a maximum award of $5 million, while Retired Players with Alzheimer's Disease can

---

[29] *See* Mem. of Public Citizen at 4, ECF. No. 6214-1 (alleging conflict of interest based on age offsets).
[30] *See, e.g.*, Morey Obj. at 32-34, ECF No. 6201 (objecting to Stroke and severe TBI offsets); Armstrong Obj. at 17, ECF No. 6233.
[31] *See* Armstrong Obj. at 15-16. (alleging conflict of interest based on number of eligible seasons offset).
[32] Many Objectors also point to the lack of Eligible Season credit for Retired Players who played in NFL Europe as evidence of inadequate representation.  However, the Parties amended the Settlement to address this concern, so this objection is no longer relevant. *See infra* Section V.C.iv.
[33] *See* Mem. of Public Citizen at 5 ("The third set of conflicts relates to how and why the dollar figures were assigned for each compensated disease category on the grid.").

only receive a maximum award of $3.5 million. Additionally, Objectors argue that many symptoms, particularly mood and behavioral symptoms such as depression, impulsivity, or suicidality, are not compensated.[34] They call for increased benefits under the Settlement and the creation of additional subclasses. *See, e.g.*, Heimburger Obj. at 8 ("Two settlement classes are not enough for a fact-pattern this complex . . . .").

Adequacy of representation of a class is not compromised simply because there may be differences in the condition or treatment of different class members. "[V]aried relief among class members with differing claims is not unusual. Such differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) (citations omitted). Differing recovery is "simply a reflection of the extent of the injury that certain class members incurred." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009). Plaintiffs with different injuries can coexist in a class consistent with Rule 23 and Due Process. *See Warfarin*, 391 F.3d at 532 (upholding class certification of "a single class including several types of injured plaintiffs").

In this case, differing levels of compensation in the Settlement reflect the underlying strength of Class Members' claims. *See Pet Food*, 629 F.3d at 347 (affirming district court's conclusion that differing awards to class members "reflect the relative value of the different claims," not "divergent interests between the allocation groups"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140,

---

[34] *See, e.g.*, Heimburger Obj. at 10, ECF No. 6230 (noting conflict because of "cognitive injur[ies] . . . not compensated by the [S]ettlement"); Duerson Obj. at 20-21, 25, ECF No. 6241 (noting lack of compensation for "sensitivity to noise, visual impairment, chronic pain, chronic headaches, incessant ringing in ears, attention disorders, trouble sleeping, aggression, agitation, impulsivity, suicidal thoughts and difficulty regulating, expressing and controlling complex emotions," and epilepsy); Armstrong Obj. at 10-12 (listing pituitary hormonal dysfunction, atherosclerosis, fatigue, decreased muscle mass and weakness, mood abnormalities, epilepsy, vestibular (balance) disturbances, anosmia, ageusia, and other "physical, neurological and neurobehavioral consequences" that are "missing from the list of [Q]ualifying [D]iagnoses in the [Settlement]"); Chelsey Obj. at 5, ECF No. 6242 (noting lack of compensation for "chronic headaches, depression, mood disorders, sleep dysfunction," and other symptoms).

1146 (8th Cir. 1999) ("If the objectors mean . . . that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable.").

The factual basis for the distinctions among Class Members will be addressed in detail during the Rule 23(e) analysis because Objectors' challenges to the fairness of the Settlement overlap with their challenges to adequacy of representation.[35] A brief summary of the justifications for distinctions made between Class Members follows.

The different maximum awards that Class Members receive for different Qualifying Diagnoses reflect the severity of the injury and symptoms suffered by each Retired Player, and do not indicate inadequate representation. *See Diet Drugs*, 2000 WL 1222042, at *21-22 (approving personal injury class settlement providing a range of monetary awards based on severity of injury).

The offset for Retired Players with fewer than five Eligible Seasons is a reasonable proxy for Retired Players' exposure to repetitive head trauma in the NFL. Retired Players with brief careers endured fewer hits, making it less likely that NFL Football caused their impairments. Research supports the claim that repeated head trauma has an association with the Qualifying Diagnoses.

The Stroke, severe TBI, and age offsets all represent scientifically documented risk factors for the Qualifying Diagnoses. Each is strongly associated with neurocognitive illness. Older Retired Players, as well as Retired Players who suffered from Stroke or severe TBI outside of NFL Football, would find it more difficult to prove causation if they litigated their claims, justifying a smaller award. *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227

---

[35] For a discussion of the Settlement's offsets, see *infra* Section V.C. For a discussion of the differences in monetary awards, and which conditions are compensated, see *infra* Section V.B.ii. For a discussion of CTE, see *infra* Section V.A.

F.R.D. 553, 562 (W.D. Wash. 2004) ("[D]isparate treatment of claims is obviously necessary if claims are to be valued . . . . Placing a lower value on claims that would have been barred by a defense . . . is hardly evidence of a conflict.").

Finally, the Settlement's failure to compensate every alleged symptom related to concussive hits is not fatal to the adequacy of representation requirement. Because Wooden does not yet know which symptoms he will contract, he had an incentive to ensure that the Settlement compensated as many symptoms as possible. Additionally, the decision to exclude mood and behavioral symptoms is reasonable because Retired Players typically have many other risk factors for these symptoms, such as exposure to major lifestyle changes, a history of drug or alcohol abuse, and a high Body Mass Index ("BMI").

To address the factual distinctions between Class Members, Objectors suggest the creation of a number of additional subclasses. A proliferation of subclasses to address each difference between Class Members, however, would not leave Class Members better off. "'[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.'" *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) (alteration in original) (quoting "leading expert" John C. Coffee Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 398 (2000)). The result, "a class action containing a multitude of subclasses[,] loses many of the benefits of the class action format." *Id.*

Objections related to the symptoms that the Settlement fails to compensate are a perfect example of the risks involved in creating additional subclasses to address each difference. Several Objectors claim that there is inadequate representation because the Settlement fails to

compensate dozens of symptoms allegedly associated with repeated concussions.[36]  They assert

that because Class Representative Kevin Turner only has ALS, he cannot adequately represent

individuals with different symptoms.  *See* Morey Obj. at 27; Miller Obj. at 3; Mem. of Public

Citizen at 3.  Requiring independent representation to address each of these symptoms likely

would not have increased the total recovery of Class Members.  Instead, negotiations probably

would have ground to a halt.  Moreover, Shawn Wooden, Class Representative for Subclass 1,

already represents all Class Members because he does not know which, if any, condition he will

develop.  Thus, he has an interest in ensuring that the Settlement compensates as many

conditions and symptoms as possible, and provides Class Members with the highest possible

maximum award for each Qualifying Diagnosis.

In conclusion, Class Counsel and Class Representatives adequately represented absent Class

Members.  There are no fundamental conflicts of interest between Class Representatives and the

Class.  The adequacy of representation requirement is satisfied.

### E.   Predominance

Under Rule 23(b)(3), an opt-out class may be maintained if "the court finds that the questions

of law or fact common to class members predominate over any questions affecting only

individual members."  Fed. R. Civ. P. 23(b)(3).  Predominance "tests whether proposed classes

are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, to

determine whether the proposed class "'would achieve economies of time, effort, and expense.'"

*Id.* at 615 (quoting Fed R. Civ. P. 23(b)(3) advisory committee's notes (1966 amendments)).

The predominance inquiry is a more stringent version of the commonality analysis; common

questions must drive the litigation.  *See Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141,

148 (3d Cir. 2008) ("[T]he commonality requirement is subsumed by the predominance

---

[36] *See supra* note 34.

requirement." (internal quotation marks omitted)); *Warfarin*, 391 F.3d at 528 (noting the predominance requirement to be "far more demanding" than the commonality requirement).

"[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, 667 F.3d at 298.  A common scheme generates predominant legal and factual questions.  *See Community Bank*, 418 F.3d at 309 ("[T]he record below supports . . . a finding of predominance.  All plaintiffs' claims arise from the same alleged fraudulent scheme."); *Warfarin*, 391 F.3d at 528 (upholding certification where "plaintiffs have alleged that DuPont engaged in a *broad-based campaign*" (emphasis added)); *Prudential*, 148 F.3d at 314-15 (holding fraudulent sales practices by the defendant sufficient for common issues to predominate despite existence of individual questions of reliance for each investor).

Central to this case are factual questions regarding the NFL Parties' knowledge and conduct.  Class Members' negligence claims depend on establishing that the NFL Parties knew of the dangers of concussive hits, yet failed to modify the rules of NFL Football to mitigate them, or even to warn Retired Players that they were risking serious cognitive injury by continuing to play.  Class Members' fraud claims suggest a similarly far-reaching scheme, alleging that the NFL Parties' MTBI Committee repeatedly obfuscated the link between football play and head trauma.  *See Prudential*, 148 F.3d at 314-15 (affirming district court's finding of predominance where case "involve[ed] a common scheme to defraud millions of life insurance policy holders").

Importantly, the NFL Parties' alleged conduct injured Class Members in the same way: Retired Players all returned to play prematurely after head injuries and continued to experience concussive and sub-concussive hits.  Predominance exists even though these hits resulted in different symptoms with different damages.  The calculation of damages on an individual basis

does not prevent certification.[37] *See Insurance Brokerage*, 579 F.3d at 269 (3d Cir. 2009)

("[W]e are satisfied that . . . the fact of damages [] is susceptible to common proof, even if the

amount of damage that each plaintiff suffered could not be established by common proof."); *GM*

*Trucks*, 55 F.3d at 817 ("Because separate proceedings can, if necessary, be held on

individualized issues such as damages or reliance, such individual questions do not ordinarily

preclude the use of the class action device.").

Additionally, the NFL Parties' alleged conduct raises common and dispositive scientific

questions.  Each Class Member would have to confront the same causation issues in proving that

repeated concussive blows give rise to long-term neurological damage.

Resolution of these issues would "so advance the litigation that they may fairly be said to

predominate," *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986), because the "same

set of core operative facts and theory of proximate cause apply to each member of the class." *In*

*re Pet Food Prods. Liab. Litig.*, No. 07-2867, 2008 WL 4937632, at *6 (D.N.J. Nov. 18, 2008),

*aff'd in part, vacated in part, remanded*, 629 F.3d 333 (3d Cir. 2010).

This case is far more cohesive than the "sprawling" class at issue in *Amchem*.  There, the

Supreme Court found a settlement class of asbestos victims overbroad because class members

were exposed to the different asbestos products of over twenty companies during a variety of

---

[37] The Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), does not
undermine this conclusion. "*Comcast* . . . did not hold that proponents of class certification must rely
upon a classwide damages model to demonstrate predominance." *Roach v. T.L. Cannon Corp.*, 778 F.3d
401, 407 (2d Cir. 2015). All of the Circuit Courts that have had an opportunity to apply *Comcast* have
reached this same conclusion. *Id.* at 408 (citing opinions of the First, Fifth, Sixth, Seventh, Ninth, and
Tenth Circuits). Rather, "*Comcast* held that a model for determining classwide damages relied upon to
certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted
theory of injury . . . ." *Id.* at 407. Thus, in order to prove predominance, "a plaintiff cannot rely on
challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23
unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the
standard set out in *Daubert*." *In re Blood Reagents Antitrust Litig.*, --- F.3d---, No. 12-4067, 2015 WL
1543101, at *3 (3d Cir. Apr. 8, 2015) (discussing *Comcast*). Here, Class Plaintiffs seek to certify a class
for settlement purposes, and the NFL Parties do not challenge any expert testimony relied on to establish
predominance. Thus, *Comcast* and *Blood Reagents* are inapposite to this case.

different activities. *See Amchem*, 521 U.S. at 597, 624. Here, all injuries stem from repeated participation in the same activity, NFL Football, an activity created and administered only by the NFL Parties.

Further, *Amchem* involved thousands of plaintiffs who had little or no relationship with each other. Many did not even know definitively whether they had been exposed to asbestos. *See* 521 U.S. at 628. By contrast, Retired Players are of course all aware of the fact that they played in the NFL. Indeed, Retired Players and their families think of themselves as a discrete group, and many continue to interact with one another because they all shared the common experience of professional football. *See, e.g.*, Am. Fairness Hr'g Tr. at 185:14-18 (one Objector noting that she was "raised in the NFL" because she spent a lot of time around Retired Players and that former players called themselves her "brothers"). Class Members in this case self-associate in a way that those in a typical mass tort, involving, for example, purchasers of a car with a defective part, simply do not. *Cf. Dewey*, 681 F.3d at 170. As a result, the Class is far more cohesive.

Additionally, settlement itself allows common issues to predominate. "[C]ourts are more inclined to find the predominance test met in the settlement context," *Sullivan*, 667 F.3d at 304 n.29 (3d Cir. 2011) (internal quotation marks omitted), because the "individual issues which are normally present in personal injury litigation become irrelevant, allowing the common issues to predominate." *Diet Drugs*, 2000 WL 1222042, at *43; *see also* Newberg on Class Actions § 4:63 (5th ed.) ("[I]n settlement class actions . . . predominance . . . recedes in importance . . . . Thus, many courts have held that individualized issues may bar certification for adjudication because of predominance-related manageability concerns but that these same problems do not bar certification for settlement.").

Objectors argue that "courts simply do not permit the certification of personal-injury classes." Heimburger Obj. at 15. This is incorrect. Even *Amchem*, the case on which they primarily rely, states that "the text of [Rule 23] does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number." 521 U.S. at 625. Indeed, the trend has been particularly strong where, as here, "there are no unknown future claimants and the absent class members are readily identifiable and can be given notice and an opportunity to opt out."[38] Manual for Complex Litigation § 22.72 (4th ed.); *see, e.g., Diet Drugs*, 2000 WL 1222042, at *68 (certifying personal injury settlement class for individuals who received harmful drug prescriptions); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 369 F.3d 293, 317 (3d Cir. 2004) (describing settlement as a "landmark effort to reconcile the rights of millions of individual plaintiffs with the efficiencies and fairness of a class-based settlement"); *Deepwater Horizon Clean-Up Settlement*, 295 F.R.D. at 161 (certifying a Rule 23(b)(3) settlement class for personal injuries resulting from oil spill); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 223 (S.D. W. Va. 2005) (certifying a Rule 23(b)(3) settlement class of "users and purchasers" of pharmaceutical products alleging a "range of physical and economic injuries"); *PPA Prods. Liab. Litig.*, 227 F.R.D. at 555-56 (certifying a Rule 23(b)(3) class and approving settlement of claims alleging "increased risk of hemorrhagic stroke" and "a variety of injuries" caused by defective products).

The predominance requirement is satisfied.

---

[38] See *infra* Section III.B, discussing how Class Members are easily identifiable by virtue of having played NFL Football, a well-catalogued and documented event. Because the Settlement covers only Retired Players (and their Representative and Derivative Claimants), the Class is a closed set and the Court and the Parties have an almost complete list of possible claimants. *See* Class Counsel's Actuarial Materials at 13-14 (concluding that because "extensive historical data are available from a variety of authoritative sources . . . the entire population of former NFL players," including the deceased, have been identified).

**F.    Superiority**

Rule 23(b)(3)'s superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication." *Warfarin*, 391 F.3d at 533-34 (internal quotation marks omitted).

Superiority is satisfied because the Settlement avoids thousands of duplicative lawsuits and enables fast processing of a multitude of claims.  The Third Circuit recognizes that "concentrating the litigation of [] claims in a single superior action" is preferable to "numerous individual suits brought by claimants." *Sullivan*, 667 F.3d at 311-12 (internal quotation marks omitted).

The Class consists of over 20,000 Retired Players, as well as their Representative and Derivative Claimants.  *See supra* Section I.E.  Consolidated in this MDL are over 300 lawsuits representing the claims of about 5,000 Retired Players.  In the absence of aggregate resolution, more lawsuits will surely follow.  *See Prudential*, 148 F.3d at 316 (finding superiority satisfied because of the "sheer volume" of individual claims).  These cases could result in decades of litigation at significant expense.  *See* Am. Fairness Hr'g Tr. at 51:25-52:2 (Counsel for the NFL Parties noting: "The [NFL Parties] could have fought these claims, successfully fought these claims in [his] view for many, many years.").  Compensation would be uncertain, and many Retired Players with progressive neurodegenerative conditions would continue to suffer while awaiting relief.

Rule 23(b)(3) specifically directs a court to consider the "desirability . . . of concentrating the litigation of the claims in the particular forum," and "class members' interests in individually controlling the prosecution or defense of separate actions." Fed R. Civ. P. 23(b)(3).[39]

---

[39] Rule 23 also requires consideration of "the extent and nature of any litigation concerning the controversy already begun" and "the likely difficulties in managing a class action." Fed. R. Civ. P.

Because I currently oversee the MDL involving these cases and have coordinated pretrial proceedings, there is a unique advantage to class resolution by this Court. *See Diet Drugs*, 2000 WL 1222042, at \*55 (noting that "from the perspective of judicial efficiency, there is a strong desirability in implementing a settlement in this MDL [] transferee court, the jurisdiction with the most individual and class actions pending").

Finally, Class Members have not demonstrated that they have an interest in individually resolving their claims against the NFL Parties. Despite extensive notice and generous opportunity to opt out, only one percent of the Class elected to pursue separate litigation. *See supra* Section I.E; *infra* Section III; *see also Warfarin*, 391 F.3d at 534 (finding superiority even though some plaintiffs had "significant individual claims" because they had the opportunity to opt out); *Community Bank*, 418 F.3d at 309 (same). Thus, the superiority requirement is satisfied.

In conclusion, I will certify the Class because the requirements of Rule 23(a) and 23(b)(3) are met.

---

23(b)(3). The Advisory Committee notes to Rule 23 indicate that the extent and nature of ongoing litigation ties into class members' interests in individually controlling their own claims. *See* Newberg on Class Actions § 4:70 (5th ed.). Additionally, because this is a settlement, there are no manageability concerns. *See Amchem*, 521 U.S. at 620.

## III.   Notice[40]

Because Class Counsel seek simultaneous certification of the proposed Class and approval of

the proposed Settlement, notice must satisfy both the requirements of Rule 23(c)(2)(B) and Rule

23(e)(1).  *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324 (E.D. Pa. 1993).

For a class certified under Rule 23(b)(3), "the court must direct to class members the best

notice that is practicable under the circumstances, including individual notice to all members

who can be identified through reasonable effort." Fed R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2)(B)

provides:

> The notice must clearly and concisely state in plain, easily understood
> language:
>
> (i) the nature of the action; (ii) the definition of the class certified; (iii) the
> class claims, issues, or defenses; (iv) that a class member may enter an
> appearance through an attorney if the member so desires; (v) that the court
> will exclude from the class any member who requests exclusion; (vi) the
> time and manner for requesting exclusion; and (vii) the binding effect of a
> class judgment on members under Rule 23(c)(3).

*Id.*

Rule 23(e)(1) of the Federal Rules of Civil Procedure requires a district court to "direct

notice in a reasonable manner to all class members who would be bound by the proposal." Fed.

R. Civ. P. 23(e)(1). "Rule 23(e) notice is designed to summarize the litigation and the settlement

and to apprise class members of the right and opportunity to inspect the complete settlement

---

[40] Within ten days of Class Counsel moving for preliminary approval of the Settlement, the NFL Parties
sent copies of the Class Action Complaint and the proposed Settlement, as well as a list of Class Members
organized by state residence to the United States Attorney General, and to the Attorney General for each
state, the District of Columbia, and the territories. *See* ECF No. 6501 at 2-3.  Within ten days of the
Preliminary Approval Date, the NFL Parties sent these same officials copies of this Court's Preliminary
Approval Order and Memorandum, copies of the Long-Form Notice and Summary Notice, and notice of
the date, time, and location of the Fairness Hearing. *See id.*  These mailings satisfy the notice
requirements of the Class Action Fairness Act. *See* 28 U.S.C. § 1715(b).  Because final approval of the
Settlement will occur more than 90 days after the relevant Attorneys General received these materials, the
timing requirements of the Class Action Fairness Act have also been satisfied. *See id.* § 1715(d).

documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (internal quotation marks omitted).

In addition to the requirements of Rule 23, the Due Process Clause of the Fourteenth Amendment requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The content of the Settlement Class Notice and the methods chosen to disperse it satisfy all three requirements.

## A. Content of Class Notice

The content of the Long-Form Notice and Summary Notice satisfy the requirements of Rule 23 and due process. *See* Long-Form Notice, ECF No. 6093-1; Summary Notice, ECF No. 6093-2. Each was written in plain and straightforward language. The Long-Form Notice apprised all Class Members of: the nature of the action; the definition of the Class; the Class claims and issues; the opportunity to enter an appearance through an attorney at the Fairness Hearing; the opportunity to opt out of the Settlement; and the binding effect of a class judgment on Class Members under Rule 23(c)(3)(B). The Long-Form Notice also properly disclosed the date, time, and location of the Fairness Hearing.

Objectors contend that the notice materials "misleads [C]lass [M]embers about the basic compromise of the settlement" because they failed to inform Class Members that there is no compensation for Death with CTE for Retired Players who died after the Preliminary Approval Date.[41] Morey Obj. at 38; *see also* Miller Obj. at 7-8; Alexander Obj. at 2-3, ECF No. 6237;

---

[41] Before the parties amended the Settlement, the cutoff date for compensation for Death with CTE was the Preliminary Approval Date, July 7, 2014. *See* Settlement as of June 25, 2014, ECF No. 6073-2 § 6.3(f). The cutoff date is now the Final Approval Date. *See* Settlement § 6.3(f). Because amendment

Duerson Obj. at 29-30 (calling notice "misleading, at best—blatantly wrong, at worst").

Objectors first argue that the Summary Notice is misleading because it neglects to mention the

cutoff date for Death with CTE claims. *See* Morey Obj. at 38-40. The Summary Notice states

that only "*certain* cases of chronic traumatic encephalopathy" receive Monetary Awards.

Summary Notice at 1 (emphasis added). In context, this is more than adequate: none of the other

Qualifying Diagnoses listed contain any type of limiting language. *Id.* Moreover, the purpose of

the one-page Summary Notice is not to provide exhaustive information, but to alert Class

Members to the suit and direct them to more detailed information. *See Varacallo v. Mass Mut.

Life Ins. Co.*, 226 F.R.D. 207, 227 (D.N.J. 2005) (explaining that settlement notice is "designed

only to be a summary of the litigation and the settlement and should not be unduly specific"

(internal quotation marks omitted)). The Summary Notice does exactly that, with a large banner

at the bottom of the page listing both a toll-free phone number and the URL of the Settlement

Website.

   Objectors unsuccessfully argue that the Long-Form Notice is also misleading. Objectors

concede that that the Long-Form Notice states that compensation is limited to "diagnoses of

Death with CTE prior to **July 7, 2014**." [42] Long-Form Notice at 6. Yet they maintain that this

statement is misleading because it "does not outright disclose" that those who die after that date

will not be compensated. Morey Obj. at 41. This is not enough to confuse a careful reader. *See

In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 199 (5th Cir. 2010) ("The choice of words,

while less than one hundred percent accurate, does not render the notice so clearly misleading . .

. ."); *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977) (noting

notice need not "[be] perfectly correct in its form," and instead that "[t]he standard [] is that the

---

of the Settlement occurred after the Fairness Hearing, the Settlement Class Notice, and the objections
discussing it, refer to the Preliminary Approval Date.
[42] *See supra* note 41.

notice . . . must contain information that a reasonable person would consider to be material in making an informed, intelligent decision" about whether to opt out); *Rodgers v. U.S. Steel Corp.*, 70 F.R.D. 639, 647 (W.D. Pa. 1976) (holding that notice is adequate when it "enable[s] reasonable and competent individuals to make an informed choice" and there is "no reason to believe . . . that the language of the tender notice and release forms must be reduced to a pablum in order for [class members] to digest its import").

Objectors further argue that the Long-Form Notice is confusing because the term "Death with CTE" appears several times without the accompanying cutoff date. *See* Morey Obj. at 43-44. Both the Summary Notice and the Long-Form Notice indicate that only "certain" cases of CTE are covered. *See* Summary Notice at 1; Long-Form Notice at 1.

Even if the Long-Form Notice were unclear, it repeatedly instructs readers to sources that can answer their questions. Like the Summary Notice, the Long-Form Notice contains a banner at the bottom of each page directing those with "Questions?" to call a toll-free support number or visit the Settlement Website. Warnings that the Long-Form Notice is only a summary and that readers should look to the Settlement for specific details appear five times in the Long-Form Notice.[43] *See* Long-Form Notice at 2, 6, 7, 15, 19 ("This Notice is only a summary of the Settlement Agreement and your rights. You are encouraged to carefully review the complete Settlement Agreement [on the Settlement Website].").

Finally, Objectors argue that Co-Lead Class Counsel made misleading statements during interviews, news articles, and other media outreach. *See* Morey Obj. at 48-52. Any allegedly

---

[43] Amici contend that the notice materials are inadequate because they insufficiently disclose that Monetary Awards are subject to reduction because of applicable Medicare and Medicaid liens. *See* Mem. of Public Citizen at 11. Yet they concede that the Long-Form Notice discusses possible reductions based on "[a]ny legally enforceable liens on the award." *See* Long-Form Notice at 11, ECF No. 6093-1. Because the Notice directly alerts Class Members of this possibility, and refers them to the Settlement where this topic is discussed in detail, the argument is meritless.

misleading statements made by Co-Lead Class Counsel are irrelevant, however, because only the

Summary Notice and the Long-Form Notice are pertinent to the analysis of Rule 23 and due

process. *See* Newberg on Class Actions § 16:20 (4th ed.) ("In reviewing the class notice to

determine whether it satisfies [the notice] requirements, the court must look *solely to the*

*language of the notices* and the manner of their distribution." (emphasis added)); *Adams v. S.*

*Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1286 (11th Cir. 2007) (same).

### B. Distribution of Class Notice

No objection challenges the efforts undertaken to distribute notice. Class Counsel conducted

a thorough campaign across several fronts that successfully apprised the Class of the suit. They

retained three separate firms—Kinsella Media LLC ("Kinsella Media"), BrownGreer PLC

("BrownGreer"), and Heffler Claims Group ("Heffler")—to design, implement, and distribute

Settlement Class Notice. *See Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 WL

950616, at *10 (E.D. Pa. Apr. 22, 2005) (praising use of a professional firm experienced in class

action notice).

First, BrownGreer constructed a master list of all readily identifiable Class Members and

their addresses by aggregating 33 datasets of information from the NFL Parties, individual

Member Clubs, sports statistics databases, and prior class actions involving Retired Players. *See*

Decl. of Katherine Kinsella ¶ 7, ECF No. 6423-12 ("Kinsella Decl."); Decl. of Orran L. Brown

¶¶ 8-14, 25-26, ECF No. 6423-5 ("Brown Decl."). Kinsella Media used that master list to send a

cover letter and a copy of the Long-Form Notice through first-class mail to the over 30,000

addresses identified. *See* Kinsella Decl. ¶¶ 8-10; *Zimmer Paper Prods., Inc. v. Berger &*

*Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-

class mail and publication in the press fully satisfy the notice requirements of both Fed. R. Civ. P. 23 and the [D]ue [P]rocess [C]lause.").

Second, Kinsella Media supplemented the direct notice with extensive publication notice. Kinsella Media placed advertisements in major publications, including full-page advertisements in *Ebony, People, Sports Illustrated*, and *Time*, and thirty-second television commercials on ABC, CBS, CNN, and others. *See* Kinsella Decl. ¶¶ 15-18, 21; *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 481-82 (E.D. Pa. 2010) (approving a class action settlement with a notice program including ads placed on four national cable networks); *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *5 (E.D. Pa. Jan. 4, 2001) (approving notice program that included first-class mail and publication notice in the *Wall Street Journal*). Internet ads were also placed on popular sites such as CNN, Facebook, Weather.com, and Yahoo!. *See* Kinsella Decl. ¶¶ 19-20.

Third, BrownGreer established a Settlement Website containing links to the Long-Form Notice and the Settlement and providing answers to frequently asked questions. Brown Decl. ¶¶ 37, 39-41. Fourth, Heffler established and maintained a dedicated toll-free number that provided the opportunity to speak with a live operator to answer any questions about the case. *See* Decl. of Edward Radetich ¶¶ 3-10, ECF No. 6423-13 ("Radetich Decl."); *Carlough*, 158 F.R.D. at 333 (finding notice satisfied in personal injury tort case where advertisements "urge[d] class members to call the toll-free number to obtain the complete individual notice materials").

Finally, independent of any efforts of Class Counsel, national broadcasts and major news programs covered the case extensively. Over 900 articles have been published since the Parties first announced their initial settlement on August 29, 2013. Seeger Decl. Attachment. This "unsolicited news coverage" supplemented "the combination of individual and publication notice

. . . [and] greatly increased the possibility" that Class Members were informed of the litigation.
*Prudential*, 148 F.3d 283, 327.

Within three weeks of the Preliminary Approval Date, the Settlement Website was launched,
the toll-free number became available, and direct notice was mailed.  *See* Kinsella Decl. ¶¶ 8-10,
27; Brown Decl. ¶ 37; Radetich Decl. ¶¶ 4-8.  As a result, Class Members had approximately 90
days to determine whether to object or opt out.  Courts routinely hold that between 30 and 60
days is a sufficient amount of time for class members to evaluate the merits of a settlement.  *See
In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997)
(citing cases).  Kinsella Media estimates that these programs reached 90% of Class Members.
*See* Kinsella Decl. ¶ 48; *see also In re Heartland Payment Sys., Inc. Customer Data Sec. Breach
Litig.*, 851 F. Supp. 2d 1040, 1061 (S.D. Tex. 2012) (notice plan that expert estimated would
reach 81.4% of class was sufficient); *Alberton v. Commonwealth Land Title Ins. Co.*, No. 06-
3755, 2008 WL 1849774, at *3 (E.D. Pa. Apr. 25, 2008) (direct notice projected to reach 70% of
class plus publication in newspapers and internet was sufficient); *Grunewald v. Kasperbauer*,
235 F.R.D. 599, 609 (E.D. Pa. 2006) (direct mail to 56% of class and publication in three
newspapers and on internet sites was sufficient).

In conclusion, the Settlement Class Notice clearly described of the terms of the Settlement
and the rights of Class Members to opt out or object.  Class Counsel's notice program ensured
that these materials reached those with an interest in the litigation.  The requirements of Rule 23
and due process are satisfied.

## C.   Notice of Amendments to the Settlement

After the Fairness Hearing, the Parties made several amendments to the Settlement that I
proposed in consideration of some of the issues raised by Objectors.  *See* Parties' Joint

Amendment. Class Members who opted out ("Opt Outs") received adequate notice of these changes, and notification of Class Members is not required.

The Settlement allows Opt Outs the opportunity to rejoin the Class any time before the Final Approval Date. *See* Settlement § 14.2(c). After making amendments to the Settlement, Class Counsel informed all Opt Outs by first-class mail of the revisions to the Settlement and their right to revoke their requests to opt out. *See* Notice, Mar. 31, 2015, ECF No. 6500.

Because these changes improved the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Members is unnecessary. *See Prudential*, 962 F. Supp. at 473 n.10 (holding that class members "need not be informed of the Final Enhancements to the settlement because the Proposed Settlement is only more valuable with these changes. Plainly, class members who declined to opt out earlier, would not choose to do so now."); *Trombley v. Bank of Am. Corp.*, No. 08-0456, 2013 WL 5153503, at *6 (D.R.I. Sept. 12, 2013) ("Because the compensation provided by the Revised Settlement Agreement is more beneficial to the class than the compensation offered by the original settlement agreement, no additional notice nor a second hearing is necessary."); *Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985) (finding new notice unnecessary when "plaintiff class [was] in no way impaired by the amendment").

## IV.   Final Approval of the Settlement

A class action cannot be settled without court approval, based on a determination that the proposed settlement is fair, reasonable, and adequate. *See Prudential*, 148 F.3d at 316; Fed. R. Civ. P. 23(e)(2).

"[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged." *Warfarin*, 391 F.3d at 535 (citing *GM Trucks*, 55 F.3d at 784). These

complex actions "consume substantial judicial resources and present unusually large risks for the

litigants." *GM Trucks*, 55 F.3d at 805.  When evaluating a settlement, a court should be "hesitant

to undo an agreement that has resolved a hard-fought, multi-year litigation." *In re Baby Prods.*

*Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (citing *Warfarin*, 391 F.3d at 535).

"Settlements are private contracts reflecting negotiated compromises. The role of a district

court is not to determine whether the settlement is the fairest possible resolution—a task

particularly ill-advised given that the likelihood of success at trial (on which all settlements are

based) can only be estimated imperfectly." *Id.* at 173-74 (citation omitted).  A court must

recognize that a settlement is a "yielding of the highest hopes in exchange for certainty and

resolution" and "guard against demanding too large a settlement based on its view of the merits."

*GM Trucks*, 55 F.3d at 806; *see also In re Imprelis Herbicide Mktg. Sales Practices & Prods.*

*Liab. Litig.*, 296 F.R.D. 351, 364 (E.D. Pa. 2013) ("[B]ecause a settlement represents the result

of a process by which opposing parties attempt to weigh and balance the factual and legal issues

that neither side chooses to risk taking to a final resolution, courts have given considerable

weight to the views of experienced counsel as to the merits of a settlement.")

In this vein, "[a] presumption of correctness is said to attach to a class settlement reached in

arms-length negotiations between experienced, capable counsel after meaningful discovery." *In*

*re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) (internal quotation

marks omitted); *see also Warfarin*, 391 F.3d at 535 (holding presumption of fairness applied

even though settlement negotiations preceded certification); *In re Cendant Corp. Litig.*, 264 F.3d

201, 232 n.18 (3d Cir. 2001).

Despite the strong policy favoring private resolution, "the district court acts as a fiduciary

who must serve as a guardian of the rights of absent class members." *GM Trucks*, 55 F.3d at 785

(internal quotation marks omitted). This role requires special rigor "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin*, 391 F.3d at 534. The fiduciary obligation "is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members." *Prudential*, 148 F.3d at 317 (internal quotation marks omitted).

### A.   The Presumption of Fairness

The Third Circuit applies "an initial presumption of fairness . . . where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Warfarin*, 391 F.3d at 535 (quoting *Cendant*, 264 F.3d at 232 n.18 (3d Cir. 2001)). Each factor is satisfied.

At every stage of the proceedings, Class Counsel vigorously pursued Class Members' rights at arm's length from the NFL Parties. As Judge Phillips notes, "[t]he negotiations were intense, vigorous, and sometimes quite contentious. At all times the talks were at arm's length and in good faith. There was no collusion." Phillips Supp. Decl. ¶ 4; *see also* Phillips Decl. ¶¶ 2, 5-7, 11; *In re Cigna Corp. Sec. Litig.*, No. 02-8088, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007) (agreement presumptively fair in part because "negotiations for the settlement occurred at arm's length, as the parties were assisted by a retired federal district judge who . . . served as a mediator"). The Parties tabled discussion of attorneys' fees until after they reached an agreement in principle, and the Settlement provides that attorneys' fees will be paid out of a fund that is separate from the funds available to Class Members. *See* Phillips Supp. Decl. ¶ 19; Settlement § 21.1.

As discussed more thoroughly in Section IV.B.iii, Class Counsel were aware of the strengths and weaknesses of their case through informal discovery. Class Counsel created and maintained a comprehensive database of claims and symptoms of thousands of individual MDL Plaintiffs. *See* Seeger Decl. ¶ 20. Class Counsel also retained numerous medical experts to analyze issues of general and specific causation. When settlement negotiations began, Class Counsel's strategy "reflected a sound appreciation of the scientific issues" and an "aware[ness] of mainstream medical literature." Phillips Supp. Decl. ¶ 8; *see also In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (applying presumption in part because "although no formal discovery was conducted . . . [class counsel] conducted informal discovery, including, *inter alia*, independently investigating the merits").

Additionally, Class Counsel have decades of experience in these matters. Co-Lead Class Counsel, Subclass Counsel, and Class Counsel collectively have served as class counsel or as members of leadership committees in over 170 class actions, mass torts, and complex personal injury suits. *See* Seeger Decl. ¶¶ 2-4; Levin Decl. ¶ 2; Nast Decl. ¶ 2.

Finally, as discussed in greater detail in Section IV.B.ii, the Class has tacitly endorsed the Settlement. Estimates indicate that Class Counsel reached over 90% of Class Members through direct mail and indirect advertisements. Furthermore, major newspapers and television programs consistently discussed the Settlement and its terms. Given this publicity, an opt-out and objection rate of approximately 1% each reflects positively on the Settlement. *See Processed Egg Prods.*, 284 F.R.D. at 269 (applying presumption of fairness when 1.14% of class opted out, noting that the opt-out rate was "virtually *di minimis*").

Therefore, the presumption of fairness applies.

**B.    The *Girsh* Factors**

In evaluating a settlement, a court must consider the factors set forth in *Girsh v. Jepson*:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted).  These factors indicate that the Settlement is a fair, reasonable, and adequate compromise.

### i.    The Complexity, Expense, and Likely Duration of the Litigation

This factor captures "the probable costs, in both time and money, of continued litigation." *GM Trucks*, 55 F.3d at 812 (internal quotation marks omitted); *see also Cendant*, 264 F.3d at 233.  The litigation attempts to resolve issues of considerable scale.  Class Members allege negligence and a fraudulent scheme dating back a half-century.  The claims of over 20,000 Retired Players are at issue.  *See Prudential*, 148 F.3d at 318 (noting "sheer magnitude of the proposed settlement class").  The sheer size of the Class supports settlement.

The case implicates complex scientific and medical issues not yet comprehensively studied.  As discussed in greater detail in Section IV.B.iv, the association between repeated concussive trauma and long-term neurocognitive impairment remains unclear.  *See* Decl. of Dr. Kristine Yaffe ¶¶ 13, 22, ECF No. 6422-36 ("Dr. Yaffe Decl.") (noting "emerging consensus," but stressing that "the medical and scientific communities have not yet determined that mild repetitive TBI causes any of the Qualifying Diagnoses").  Even if general causation could be proven, an even more daunting question of specific causation would remain.

Absent settlement, Class Members would have to conclusively establish what and when the NFL Parties knew about the risks of head injuries. This would require voluminous production from the NFL Parties, and time to sort through decades of records. Non-party discovery would be inevitable; Class Members would seek documents from individual NFL Member Clubs. To fully investigate scientific causation, the Parties would have to continue to retain costly expert witnesses. *See Prudential*, 148 F.3d at 318 (noting necessity of "several expert witnesses" supported factor). In turn, the NFL Parties would seek discovery about the medical history of 20,000 Retired Players. *See GM Trucks*, 55 F.3d at 812 (concluding that the need for class discovery by the defendants "into the background of the six million vehicles owned by class members" pointed towards settlement).

Finally, continued motion practice in this MDL would be burdensome, expensive, and time consuming. For example, the Parties likely would seek to exclude each other's scientific evidence, and a battle of the experts would ensue.

All the while, Retired Players with Qualifying Diagnoses would continue to suffer while awaiting uncertain relief. *See Prudential*, 148 F.3d at 318 (noting "trial . . . would be a long, arduous process requiring great expenditures of time and money" and that "such a massive undertaking clearly counsels in favor of settlement"); *Warfarin*, 391 F.3d at 536. Class Representative Kevin Turner, who suffers from ALS, is a sobering example. Between the Preliminary Approval Date and the Fairness Hearing, Turner's symptoms worsened to the point that he was unable to attend the Fairness Hearing because he can no longer breathe or eat without assistance. *See Am. Fairness Hr'g Tr.* at 5:22-6:4 (noting Kevin Turner "has deteriorated to the point where he is now on a breathing—he needs assistance with his breathing and he's got a feeding tube . . . .").

The complexity, expense, and likely duration of the litigation weigh in favor of approving the Settlement.

ii.   **The Reaction of the Class to the Settlement**

This factor "attempts to gauge whether members of the class support the settlement" and to use their opinions as a proxy for the settlement's fairness. *Prudential*, 148 F.3d at 318.  Courts look "to the number and vociferousness of the objectors," while "generally assum[ing] that silence constitutes tacit consent to the agreement." *GM Trucks*, 55 F.3d at 812 (internal quotation marks omitted).  The Class has tacitly consented to this Settlement.

"[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *Id.*  In this case, however, so many Class Members were intimately aware of the Settlement that an inference of support from silence is sound.  Class Counsel provided an estimated 90% of Class Members with notice through direct mail and a variety of secondary publications. *See supra* Section III.B.  Substantial and sustained media coverage notified the entire country, not just Class Members, of the Settlement's terms. *See supra* Section III.B.

Class Counsel's records confirm Class Members' active engagement.  Since the Preliminary Approval Date, the Settlement Website has received 62,989 unique visitors, and the Settlement's toll-free hotline received 4,544 calls.  Brown Decl. ¶ 43; Kinsella Decl. ¶ 28.  2,302 callers requested to speak to a live operator, and received 140 hours of personal support.  Radetich Decl. ¶ 9.  3,175 website visitors and 1,800 callers signed up to receive additional information about the Settlement.  Kinsella Decl. ¶ 26; Brown Decl. ¶ 43; Radetich Decl. ¶ 10.

Despite this, only approximately 1% of Class Members filed objections, and only approximately 1% of Class Members opted out.[44] These figures are especially impressive considering that about 5,000 Retired Players are currently represented by counsel in this MDL, and could easily have objected or opted out to pursue individual suits. For comparison, at least eight times as many Class Members registered to receive additional information about the Settlement as expressed formal dissatisfaction with its terms.

The reaction of the Class to the Settlement weighs in favor of approving the Settlement. *See, e.g., Prudential*, 148 F.3d at 318 (affirming district court's conclusion that class reaction was favorable when 19,000 out of 8,000,000 class members opted out and 300 objected); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (concluding that "response of the class members . . . strongly favor[ed] settlement" where roughly 10% of 281 class members objected); *Processed Egg Prods.*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (approving settlement with no objections and an opt-out rate of 1.14% from an original notice to 13,200 class members, which was "virtually *de minimis*").

### iii.   The Stage of the Proceedings and the Amount of Discovery Completed

This factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *GM Trucks*, 55 F.3d at 813. The aim is to avoid settlement "at too incipient a stage of the proceedings." *Id.* at 810; *see also In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ("*Deepwater Horizon Economic Loss*

---

[44] The Morey Objectors point out that some Retired Players criticized the Settlement in the media. *See* Morey Obj. at 59-60. Tellingly, however, only one of the seven Retired Players identified by the Morey Objectors opted out, and none of them objected. *See* Eighth Opt-Out Report of Claims Administrator Exs. 1-2, ECF Nos. 6507-1, 6507-2; NFL Parties' Mem. of Law in Supp. of Final Approval App. A.

*Settlement*") ("Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ." (internal quotation marks omitted)).

"The Third Circuit Court of Appeals has recognized that, even if a settlement occurs in an early stage of litigation, there are means for class counsel to apprise themselves of the merits of the litigation . . . ." *Processed Egg Prods.*, 284 F.R.D. at 270. Formal discovery is not necessary where other means of obtaining information exist. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) ("[W]e are not compelled to hold that formal discovery was a necessary ticket to the bargaining table."). Despite this Court's stay of discovery, Class Counsel adequately evaluated the merits of two dispositive issues in the case: preemption and scientific causation. *See Prudential*, 148 F.3d at 319 (finding no error with the district court's conclusion that "use of informal discovery was especially appropriate . . . because the Court stayed plaintiffs' right to formal discovery for many months, and because informal discovery could provide the information that plaintiffs needed" (internal quotation marks omitted)).

First, the Parties completed full, adversarial, briefing about whether the Retired Players' Collective Bargaining Agreements preempt their negligence and fraud claims. *See Pet Food*, 2008 WL 4937632, at *14 (factor satisfied when "Plaintiffs . . . performed an extensive analysis of the legal claims"); *cf. GM Trucks*, 55 F.3d at 814 (concluding stage of proceedings factor weighed against settlement approval where there was "little adversarial briefing on either class status or the substantive legal claims."). The NFL Parties' motions to dismiss remain pending, and have the potential to eliminate all or a majority of Class Members' claims. Because preemption is a legal question, further discovery would not have increased Class Counsel's

understanding of this issue. *Cendant*, 264 F.3d at 236 (noting when viability of defense "turns more on *legal considerations than on factual development* [] it does not substantially affect [objectors'] claim that more discovery was needed" (emphasis added) (citation omitted)); *Briggs v. Hartford Fin. Servs. Grp., Inc.*, No. 07-5190, 2009 WL 2370061, at *11, 13 (E.D. Pa. July 31, 2009) (noting that "counsel could reasonably estimate the strength and value of the case . . . based on an assessment of Pennsylvania law" in part because of a "threshold" legal issue).

This preemption research occurred before the Parties began settlement discussions, and influenced their strategy during negotiations. *See* Phillips Supp. Decl. ¶ 20 ("Ever present in the minds of the parties . . . were the potential risks of litigation . . . [including] Defendants' preemption motions . . . .").

Second, Class Counsel had an adequate appreciation of the scientific issues relating to causation. Class Counsel constructed a dataset to catalogue the cognitive impairment of thousands of MDL Plaintiffs. *See* NFL Parties' Actuarial Materials ¶ 16; Seeger Decl. ¶ 20. From there, Class Counsel retained multiple medical, neurological, neuropsychological, and actuarial experts to both interpret this data and the science underlying these injuries. *See* Seeger Decl. ¶ 30. Class Counsel's research occurred prior to settlement negotiations, and played a vital role in their negotiation strategy. *See id.* ¶¶ 20, 22; Phillips Supp. Decl. ¶ 5.

Like the legal authorities on preemption, the scientific literature discussing repetitive mild traumatic brain injury is publicly available. Formal discovery, or discovery from the NFL Parties, would not have enhanced Class Counsel's position on causation. *Pet Food*, 2008 WL 4937632 at *12, 14 (factor satisfied when "informal discovery, including extensive consultation with experts" occurred with respect to "complex medical and toxicological issues").

65

Objectors focus narrowly on the lack of discovery concerning the NFL Parties' conduct, ignoring preemption and causation to argue that Class Counsel lacked an adequate appreciation of the merits of the case before negotiating. *See* Morey Obj. at 55 (noting that "Class Counsel appear to have conducted *no discovery*" and that "[t]he absence of discovery is particularly glaring because the [Class Action Complaint] alleges fraud and negligent concealment, where the best evidence is likely in the Defendants' hands").[45]  However, proof that the NFL Parties believed concussions to be harmful would not help Class Members remain in federal court if their CBAs required them to submit their claims to an arbitrator.

Objectors rely heavily on *GM Trucks* to support their argument that insufficient discovery occurred here. *GM Trucks*, however, involved far more nascent proceedings.  Only four months separated the filing of the consolidated complaint from the filing of the proposed Settlement. *See GM Trucks*, 55 F.3d at 813.  By contrast, this case involved over ten months of settlement negotiations overseen by both a mediator and a special master.  Class counsel in *GM Trucks* had neither "conducted significant independent discovery," nor "retained their own experts." *Id.* at 813-14.  Both occurred here.

In sum, Class Counsel were intimately aware of the potential limitations of their case with respect to two dispositive issues as they entered settlement negotiations.  The stage of the proceedings and the amount of discovery completed weigh in favor of approving the Settlement.

#### iv.  The Risks of Establishing Liability and Damages

The next two *Girsh* factors consider the risks of establishing liability and damages should the case go to trial.  Because these two *Girsh* factors are closely related, they are addressed together.  The analysis of these factors "need not delve into the intricacies of the merits of each side's

---

[45] The same Objector, several pages later, argues that "[t]he publicly available facts show that the NFL was aware of its responsibility to protect its players." Morey Obj. at 61.

arguments." *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005); *see also Diet Drugs*, 2000 WL 1222042, at * 61 (acknowledging that "the risks of establishing liability and damages are readily apparent" and "not[ing] several obstacles that [plaintiffs] would have to overcome" to recover). These factors are satisfied because Class Members face stiff challenges surmounting the issues of preemption and causation. Other legal issues also weigh in favor of approving this Settlement.

The NFL Parties' motions to dismiss based on preemption under § 301 of the LMRA remain pending. The NFL Parties argue that Class Members' claims must be dismissed because they would require a judge to interpret provisions of the Retired Players' Collective Bargaining Agreements, many of which address player health and safety. If the NFL Parties prevailed on their motions, many, if not all, of Class Members' claims would be dismissed.

Other courts have accepted the NFL Parties' preemption arguments. Many of the cases transferred into this MDL were originally filed in state court. The NFL Parties removed these cases to federal court on the basis of federal question jurisdiction under § 301 of the LMRA. When the plaintiffs in these actions sought to remand, the NFL Parties made the same arguments in support of jurisdiction that they assert in their motions to dismiss: that the former players' tort claims require interpretation of players' CBAs. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (noting that § 301 preemption "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule") (internal quotation marks omitted)).

For example, in *Duerson v. National Football League*, Retired Player David Duerson's representative alleged that the NFL Parties "fail[ed] to educate players about the risks of concussions and the dangers of continuing to play after suffering head trauma." No. 12-2513,

2012 WL 1658353, at *1, 4, 6 (N.D. Ill. May 11, 2012). The court denied Duerson's motion to remand because resolving his claims would implicate provisions of the CBAs that require player notice if the player possessed an injury that could be exacerbated by returning to the field. Similarly, in *Maxwell v. National Football League*, the court denied Retired Player Vernon Maxwell's motion to remand because resolving his claims would implicate provisions of the CBAs that give team physicians "primary responsibility" for diagnosing player injuries. Order Den. Pls.' Mot. to Remand at 1-2, *Maxwell*, No. 11-8394, ECF No. 58 (C.D. Cal. Dec. 8, 2011); *see also* Order Den. Pls.' Mot. to Remand at 1-2, *Pear v. Nat'l Football League*, No. 11-8395, ECF No. 61 (C.D. Cal. Dec. 8, 2011); Order Den. Pls.' Mot. to Remand at 1-2, *Barnes v. Nat'l Football League*, No. 11-8396, ECF No. 58 (C.D. Cal. Dec. 8, 2011); *Smith v. Nat'l Football League Players Ass'n*, No. 14-1559, 2014 WL 6776306, at *8 (E.D. Mo. Dec. 2, 2014) (finding negligent misrepresentation claims relating to concussive injury preempted based on provision in CBA that also bound the NFL).[46]

Based on similar reasoning, other courts have outright dismissed claims involving other injuries allegedly resulting from NFL Football. In *Stringer v. National Football League*, Retired Player Korey Stringer's representative alleged that the NFL Parties had a duty "to use ordinary care in overseeing, controlling, and regulating practices, policies, procedures, equipment, working conditions and culture of the NFL teams . . . to minimize the risk of heat-related illness." 474 F. Supp. 2d 894, 899 (S.D. Ohio 2007). The court granted summary judgment for

---

[46] Objectors rely exclusively on *Green v. Ariz. Cardinals Football Club LLC*, which granted a motion to remand on the same issue. No. 14-0461, 2014 WL 1920468, at *3 (E.D. Mo. May 14, 2014). *Green* is an outlier, and is insufficient to show that there is no litigation risk on this issue. *See Prudential*, 148 F.3d at 319-20 (holding fourth and fifth *Girsh* factors satisfied in part because district court took notice of adverse outcome in one similar case against the defendant); *Aetna*, 2001 WL 20928, at *9 (noting that "[i]f further litigation presents a realistic risk of dismissal," then "plaintiffs have a strong interest to settle the case early").

the NFL Parties because it found that these claims "must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players." *Id.* at 910. In *Dent v. National Football League*, the court dismissed claims that the NFL Parties negligently and fraudulently concealed the dangers of repeated painkiller use to allow players to return to the field. Order at 7-10, 20-21, *Dent v. Nat'l Football League*, No. 14-2324, ECF No. 106 (N.D. Cal. Dec. 17, 2014). The court held that the claims were encompassed by the CBAs because it was "through [] CBAs [that] players' medical rights have steadily expanded." *Id.* at 7, 12.

Class Members also face serious hurdles establishing causation. Though "[t]here has been widespread media coverage and speculation regarding the late-life or post-retirement risks of cognitive impairment in athletes who engaged in sports involving repetitive head trauma[,] . . . there has been very little in the way of peer-reviewed scientific literature involving data that suggests any such risk." Christopher Randolph et al., *Prevalence and Characterization of Mild Cognitive Impairment in Retired National Football League Players*, 19 J. Int'l Neuropsychological Soc'y 873, 873 (2013), ECF No. 6422-7 (noting "the first attempt to systematically explore late-life cognitive impairments in retired NFL players" occurred in 2005); Paul McCrory et al., *Consensus Statement on Concussion in Sport: The 4th International Conference on Concussion in Sport Held in Zurich, November 2012*, 47 Brit. J. Sports. Med 250, 257 (2013), ECF No. 6422-8 ("*Consensus Statement on Concussions*") (noting that "the speculation that repeated concussion or subconcussive impacts cause CTE remains unproven").

A consensus is emerging that repetitive mild brain injury is associated with the Qualifying Diagnoses. Dr. Yaffe Decl. ¶ 13; Decl. of Dr. Kenneth Fischer ¶¶ 6-7, 9, ECF No. 6423-17 ("Dr. Fischer Decl."); Decl. of Dr. Christopher Giza ¶ 21, ECF No. 6423-18 ("Dr. Giza Decl."); Decl.

of Dr. David Hovda ¶ 25, ECF No. 6423-19 ("Dr. Hovda Decl."). However, the available

research is not nearly robust enough to discount the risks that Class Members would face in

litigation. The scientific community has long recognized the existence of multiple categories of

traumatic brain injury. *See* Dr. Yaffe Decl. ¶ 41 (noting scientists "categorize[] TBI into three

categories: severe, moderate, and mild"). However, investigation into repetitive mild TBI,

typical of Retired Players, is relatively new. Most studies linking head injury with Qualifying

Diagnoses have been limited to serious brain injuries, often involving a loss of consciousness.

*See* Dr. Yaffe Decl. ¶¶ 42-45. Results regarding the effect of repetitive mild TBI have been

more mixed. *See* Yi-Kung Lee et al., *Increased Risk of Dementia in Patients with Mild*

*Traumatic Brain Injury: A Nationwide Cohort Study*, 8 PLOS ONE 1, 1 (2013), ECF No. 6422-

26 ("A [s]ystematic review has found that [Alzheimer's Disease] was associated with moderate

and severe TBI, but not with mild TBI unless there was loss of consciousness . . . ."); *id.* at 7 ("A

history of severe and moderate TBI increased the risk of dementia, but there was no significant

risk of dementia . . . in those with mTBI."); M. Anne Harris et al., *Head Injuries and Parkinson's*

*Disease in a Case-Control Study*, 70 Occupational & Envtl. Med. 839, 839 (2013), ECF No.

6422-27 ("Severe injuries and those entailing loss of consciousness seem more strongly

associated with [Parkinson's Disease]." (footnotes omitted)); Inst. of Med. of the Nat'l Acads.,

*Sports-Related Concussions in Youth: Improving the Science, Changing the Culture* (2013), at 2,

ECF No. 6422-10 ("*Changing the Culture*") ("[I]t remains unclear whether repetitive head

impacts and multiple concussions sustained in youth lead to long-term neurodegenerative

diseases . . . ."). Complicating matters, scientists have only recently begun to standardize the

criteria used to discuss the differing levels of severity of TBI. Therefore, it is difficult to

determine any one study's utility to Class Members' case. *See* Dr. Yaffe Decl. ¶ 41.

70

Given this background, continued litigation would be a risky endeavor. Even if Class Members ultimately prevailed, a battle of the experts would be all but certain. *See Sullivan*, 667 F.3d at 322 ("find[ing] no flaw in the District Court's decision that the additional risk in establishing damages counsel[ed] in favor of approval of the settlement" when "proceedings would likely entail a battle of the experts" (internal quotation marks omitted)); *Prudential*, 962 F. Supp. at 539 ("[A] jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials. And, divergent expert testimony leads inevitably to a battle of the experts.").

Even if Class Members could conclusively establish general causation, the problem of specific causation remains. Class Members argue that the cumulative effect of repeated concussive blows Retired Players experienced while playing NFL Football led to permanent neurological impairment. Yet the overwhelming majority of Retired Players likely experienced similar hits in high school or college football before reaching the NFL. Brain trauma during youth, while the brain is still developing, could also play a large role in later neurological impairment. *See* Inst. of Med., *Changing the Culture* at 2 ("[L]ittle research has been conducted specifically on changes in the brain following concussions in youth . . . ."). Isolating the effect of hits in NFL Football from hits earlier in a Retired Player's career would be a formidable task. *See id.* ("Currently, there is a lack of data concerning the overall incidence of sports-related concussions in youth, although the number of reported concussions has risen over the past decade.").

Finally, in addition to preemption and causation risks, Class Members would face other legal barriers to successful litigation, such as affirmative defenses and risks establishing damages. For example, Retired Players would have to demonstrate that their claims would not be barred by the

71

relevant state's statute of limitations in order to proceed with litigation.  This is especially true given that many of these players have been suffering, and may have been aware of their suffering for some time.  Further, Class Members' recovery might be compromised by a state's comparative fault or contributory negligence regime.  Football is an inherently violent sport and a voluntary activity.  If a Retired Player contributed to his injury in any way, such as a particularly aggressive playing style or poor tackling form, he could see his award reduced or eliminated.  *See* Dr. Hovda Decl. ¶ 18 (noting that "some risks for repeat concussion are bio-behavioral, that is, aggressive styles of play or poor playing style").

In sum, Class Members would face a host of challenges if they proceeded with litigation.  The Settlement eliminates or mitigates each of these substantial risks.  The risks of establishing liability and damages weigh strongly in favor of approving the Settlement.

### v.   The Risks of Maintaining the Class Action through Trial

This factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537.  Because class certification is subject to review and modification at any time during the litigation, the uncertainty of maintaining class certification favors settlement. *See Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976).

The Third Circuit, however, cautions that this factor is somewhat "toothless" when analyzing settlement class actions. *Prudential*, 148 F.3d at 321.  "Because the district court always possesses the authority to decertify or modify a class that proves unmanageable, examination of this factor in the standard class action [] appear[s] to be perfunctory." *Id.* (noting "that after *Amchem* the manageability inquiry in settlement-only class actions may not be significant").

The risks of maintaining this Class Action through trial weigh in favor of approving the Settlement; however, this factor warrants only minimal consideration.

### vi.    The Ability of Defendants to Withstand a Greater Judgment

This factor assesses the ability of defendants to withstand a greater judgment, and is "most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011). However, when there is no "reason to believe that [d]efendants face any financial instability[,] . . . this factor is largely irrelevant." *Id.*; *see also Sullivan*, 667 F.3d at 323 ("[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." (internal quotation marks omitted)).

This is not the case here. The NFL Parties do not claim that the Settlement is fair because they could not pay more. Rather, by uncapping the Monetary Award Fund and establishing adequate security, they have guaranteed that all Retired Players who receive Qualifying Diagnoses will be able to receive an award. *See Warfarin*, 391 F.3d at 538 ("[T]he fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached.").

The ability of the NFL Parties to withstand a greater judgment is a neutral factor.

### vii.    The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and in Light of All Attendant Risks of Litigation

In evaluating these factors, a Court must ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. Put another way,

a court must compare "the amount of the proposed settlement" with "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing." *GM Trucks*, 55 F.3d at 806.  The settlement must be judged "against the realistic, rather than theoretical, potential for recovery after trial." *Sullivan*, 667 F.3d at 323 (internal quotation marks omitted).

The Settlement offers Monetary Awards of up to $5 million for serious medical conditions associated with repeated head trauma.  Retired Players whose symptoms worsen will receive Supplemental Monetary Awards to ensure that they receive the maximum possible compensation for their symptoms.  Unlike recoveries achieved after continued litigation, these awards will be promptly available to Retired Players currently suffering.  *See Prudential*, 962 F. Supp. at 537 (emphasizing that settlement "would afford plaintiffs relief months and perhaps years earlier than would be possible in a litigation environment").

The Settlement allows Class Members to choose certainty in light of the risks of litigation.  The Settlement eliminates the possibility that a Class Member's claims could be arbitrated.  It also eliminates the potentially dispositive issues of issues of general causation, specific causation, statutes of limitations, and other defenses.  The Settlement insulates Class Members from the practical vagaries of litigation, including the particular judge, jury panel, and the skill of the attorneys involved.  Because the MAF is uncapped, it ensures that all Class Members who receive Qualifying Diagnoses within the next 65 years will receive compensation.  It ensures that all Retired Players with half of an Eligible Season credit have access to free baseline assessment examinations so that they may monitor their symptoms, and receive Qualifying Diagnoses more easily if their symptoms worsen.  Finally, for Retired Players who believed they could fare better in litigation, there was a lengthy opt-out period.  *See Diet Drugs*, 2000 WL 1222042, at *62

74

("[T]he settlement . . . offers choice. Class members who wish to bear the risks of trial had an initial opt out right . . . ."). In light of these benefits, Class Members receive fair value for their claims.

Objectors rely on *GM Trucks* to argue that the Settlement is unfair because it allegedly does not compensate CTE, which was "at the heart of the Class Action Complaint." Morey Obj. at 69-70. In *GM Trucks*, the Third Circuit explained that "the relief sought in the complaint serves as a useful benchmark" in evaluating a settlement. 55 F.3d at 810. However, *GM Trucks* is distinguishable. In *GM Trucks*, the complaint alleged that the fuel tank design on certain pick-up trucks made them especially vulnerable to fires, and sought recall of, or repairs for, the trucks at issue. *GM Trucks*, 55 F.3d at 777-79. The settlement, however, only offered coupons towards the purchase of new trucks. In part, the Third Circuit vacated the settlement because the proposed coupons would do little to remove the dangerous trucks from the road, risking new injuries. *Id.* at 810 n.28. Here, Retired Players are at no further risk of injury; they are retired. The Settlement compensates the key harm alleged—the long term effects of repeated concussive hits—through medical monitoring and cash awards. Moreover, as discussed in depth *infra* Section V.A, Objectors' claims that the Settlement ignores CTE are baseless.

The range of reasonableness factors weigh in favor of approving the Settlement.

## C.   The *Prudential* Factors

A court may also consider the additional factors identified by the Third Circuit in *In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998), when examining a settlement's fairness. Unlike the mandatory *Girsh* factors, the *Prudential* factors are "permissive and non-exhaustive, 'illustrat[ing] . . . [the] additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms.'" *Baby*

*Prods.*, 708 F.3d at 174 (quoting *Pet Food*, 629 F.3d at 350); *see also Processed Egg Prods.*, 284 F.R.D. at 268 (noting *Prudential* factors "are not essential or inexorable").

*Prudential* asks a court to consider:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

148 F.3d at 323-24.

The relevant *Prudential* factors weigh in favor of approving the Settlement. Class Counsel were able to make an informed decision about the probable outcome of trial. *See supra* Sections IV.B.iii-IV.B.iv; *infra* Section V.A; *Pet Food*, 2008 WL 4937632, at *24 (noting *Prudential* factors "are substantially similar to the factors provided in *Girsh*"). All Class Members had the opportunity to opt out. Finally, the claims process is reasonable in light of the substantial monetary awards available to Class Members, and imposes no more requirements than necessary. *See infra* Section V.E.

Whether any provisions for attorneys' fees are reasonable is a neutral factor because Class Counsel have not yet moved for a fee award. *See Processed Egg Prods.*, 284 F.R.D. at 277 (holding fifth *Prudential* factor neutral when fee motion would be filed at a later date). Amici argue that "[t]he absence of a fee application . . . prevents a complete evaluation of the fairness of the settlement." Mem. of Public Citizen at 7-8. Although there is no fee application pending, the Class Notice explained: the NFL Parties have agreed not to contest any award of attorneys'

fees and costs equal to or below $112.5 million; there may be set-off provisions; and Class

Members with individual counsel may see their awards diminished pursuant to retainer

agreements. *See* Long-Form Notice at 11, 17.

At an appropriate time after Final Approval, Class Counsel will file a fee petition that Class

Members will be free to contest. This is an accepted approach. *See* Newberg on Class Actions

§ 14:5 (5th ed.) ("In some situations, the court will give final approval to a class action

settlement and leave fees and costs for a later determination."); *In re Diet Drugs*

*(Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*, 582 F.3d 524, 534-35 (3d Cir.

2009) (upholding award of attorneys' fees made six years after final approval of settlement); *In*

*re Orthopedic Bone Screw Prods. Liab. Litig.*, No. 1014, 2000 WL 1622741, at * 1 (E.D. Pa.

Oct. 23, 2000) (approving fee award three years after final approval). Once Class Counsel files

their fee petition, Objectors will have an opportunity to submit objections to the proposed fee

award. Pursuant to Rule 23(h), the Court will then schedule a hearing to evaluate the

reasonableness of any such fees sought. *See Processed Egg Prods.*, 284 F.R.D. at 277.

Objectors' arguments regarding attorneys' fees will be considered at that time.

The *Prudential* factors weigh in favor of approving the Settlement.

**V.   Responses to Specific Objections**

Rule 23 does not require a settlement to be perfect, only "fair, reasonable, and adequate."

Fed. R. Civ. P. 23(e)(2); *see also Baby Prods.*, 708 F.3d at 173-74 ("The role of a district court is

not to determine whether the settlement is the fairest possible resolution . . . ."). Settlements are

negotiated compromises. Inherent in the negotiation process is "a yielding of the highest hopes

in exchange for certainty and resolution;" no Class Member, nor the NFL Parties, will ever

receive everything sought. *GM Trucks*, 55 F.3d at 806; *see also Hamlon v. Chrysler Corp.*, 150

F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.").

Objectors raised some valid concerns. At my request, the Parties addressed these concerns by revising the Settlement to improve the deal for Class Members. Retired Players who played overseas in NFL Europe now receive some Eligible Season credit. Notwithstanding the $75 million funding cap to the BAP, all Retired Players with half of an Eligible Season credit are now entitled to a baseline assessment examination. The Settlement now compensates Death with CTE up until the Final Approval Date, instead of the Preliminary Approval Date. The Claims Administrator now has the authority to waive the $1,000 appeal fee for those who demonstrate financial hardship. Finally, the Settlement eases the requirements for establishing proof of a Qualifying Diagnosis for Retired Players whose medical records have been lost because of *force majeure* type events. *See* Parties' Joint Amendment.

### A.    Objections Related to CTE

The most commonly raised objection relates to the Settlement's treatment of Chronic Traumatic Encephalopathy.[47] Objectors argue that CTE is the most prevalent, and thus most important, condition afflicting Retired Players—"the industrial disease of football." *See* Am. Fairness Hr'g Tr. at 76:5-6; Chelsey Obj. at 3 (calling CTE the "NFL's industrial disease"). Objectors contend that ending compensation for the disease on the Final Approval Date renders the Settlement hollow. *See* Armstrong Obj. at 17, ECF No. 6233 (CTE "is at the heart of this litigation); Duerson Obj. at 10 ("This has always been a CTE case."); Chelsey Obj. at 7 (noting

---

[47] *See, e.g.*, Morey Obj. at 22-29; Miller Obj. at 4-5, ECF No. 6213; Jones Obj. at 3-4, ECF No. 6235; Alexander Obj. at 6-7, ECF No. 6237; Flint Obj. at 1, ECF No. 6347; Gilchrist Obj. at 1, ECF No. 6364; Jordan Obj. at 1, ECF No. 6375; Carrington Obj. at 2-3, ECF No. 6409.

lack of CTE compensation is "extraordinary"). Thus, Objectors argue that the Settlement cannot be fair, reasonable, and adequate unless it continues to compensate Retired Players with CTE.

Objectors are incorrect. Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown. But the Settlement *does* compensate the cognitive symptoms allegedly associated with CTE. The studies relied on by Objectors indicate that the majority of Retired Players whose brains were examined would have received compensation under the Settlement if they were still alive. Furthermore, it is reasonable not to compensate the mood and behavioral conditions anecdotally associated with CTE. Indeed, limiting compensation to objectively measurable symptoms of cognitive and neuromuscular impairment is a key principle of the Settlement. The compensation provided for Death with CTE is reasonable because it serves as a proxy for Qualifying Diagnoses deceased Retired Players could have received while living. The Parties provided compensation for Death with CTE until the Final Approval Date because they recognized that Retired Players who died prior to final approval did not have sufficient notice that they had to obtain Qualifying Diagnoses. Finally, the Settlement recognizes that knowledge about CTE will expand, and requires the Parties to confer in good faith about possible revisions to the definitions of Qualifying Diagnoses based on scientific developments.

### i.  State of Scientific and Medical Knowledge of CTE

The study of CTE is nascent, and the symptoms of the disease, if any, are unknown. Chronic Traumatic Encephalopathy is a neuropathological diagnosis that currently can only be made post mortem.[48] Dr. Yaffe Decl. ¶ 55. This means no one can conclusively say that someone had CTE until a scientist looks at sections of that person's brain under a microscope to see if abnormally phosphorylated tau protein ("abnormal tau protein") is present, and if so whether it is present in a

---

[48] Objectors do not dispute this fact. *See supra* Section II.D.iii.

reportedly unique pattern.[49]  *See id.*; Decl. of Dr. Julie Ann Schneider ¶ 22, ECF No. 6422-35

("Dr. Schneider Decl.").

Beyond identifying the existence of abnormal tau protein in a person's brain, researchers

know very little about CTE.  They have not reliably determined which events make a person

more likely to develop CTE.  McCrory et al., *Consensus Statement on Concussions* at 257 ("[I]t

is not possible to determine the causality or risk factors [for CTE] with any certainty.  As such,

the speculation that repeated concussion or subconcussive impacts cause CTE remains

unproven.").  More importantly, researchers have not determined what symptoms individuals

with CTE typically suffer from while they are alive.  *See* Dr. Schneider Decl. ¶ 38; Dr. Hovda

Decl. ¶ 25.

Arguably, these uncertainties exist because clinical study of CTE is in its infancy.[50]  Only

200 brains with CTE have ever been examined, all from subjects who were deceased at the time

---

[49] Some scientists even dispute whether CTE is a unique neuropathology—that is, the extent to which tissue samples from CTE are distinct from tissue samples associated with other diseases.  Abnormal tau protein is also a primary component of other neurodegenerative conditions such as Alzheimer's Disease. Dr. Schneider Decl. ¶ 21.  Even if CTE is a unique neuropathology, studies examining it have found significant differences among subjects, including where the abnormal tau protein typically accumulates in the brain.  *Id.* ¶ 23.

[50] Objectors point out that researchers have been aware of CTE since the 1920s, previously labeling it "dementia pugilistica" or "punch drunk syndrome."  While this is true, the rigorous study necessary to understand the symptoms associated with CTE, or its prevalence, have not taken place.  *See, e.g.*, Robert C. Cantu, *Chronic Traumatic Encephalopathy in the National Football League*, 61 Neurosurgery 223, 224 (2007), ECF No. 6201-11 (chronicling history of CTE research and admitting that "[t]he most pressing question to be answered concerns the prevalence of the problem" and that "[o]nly an immediate prospective study will determine the true incidence of this problem"); Philip H. Montenigro et al., *Clinical Subtypes of Chronic Traumatic Encephalopathy: Literature Review and Proposed Research Diagnostic Criteria for Traumatic Encephalopathy Syndrome*, 6 Alzheimer's Research & Therapy 68, 70 (2014), ECF No. 6201-4 ("The scientific community also has become dramatically more aware of CTE since it was discovered in American football players.").  The studies of dementia pugilistica and punch drunk syndrome Objectors identify are the same type of limited case series reports as those discussed *infra* by Drs. McKee and Stern.  As a result, these studies suffer from the same limitations and biases. *See Cantu, supra*, at 224 (noting several studies of boxers with CTE); *see also* Baugh et al., *Current Understanding of Chronic Traumatic Encephalopathy*, 16 Current Treatment Options in Neurology 306, 307 (2014), ECF No. 6201-4 (noting that "much of the scientific literature on CTE, to-date, is derived

the studies began.  Dr. Schneider Decl. ¶ 25; Dr. Yaffe Decl. ¶ 68.  This is well short of the of the sample size needed to understand CTE's symptoms with scientific certainty.  Dr. Schneider Decl. ¶ 25.  The studies that have occurred suffer from a number of biases intrinsic to their design that make it difficult to draw generalizable conclusions.  *Id.* ¶¶ 24-25; Dr. Yaffe Decl. ¶¶ 56, 66.

Objectors principally rely on two studies: Ann McKee et al., *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43 (2013), ECF No. 6201-2 ("McKee Study") and Robert Stern et al., *Clinical Presentation of Chronic Traumatic Encephalopathy*, 81 Neurology 1122 (2013), ECF No. 6201-4 ("Stern Study").  The McKee Study and the Stern Study are representative of both the broader literature and the limitations of current medical knowledge about CTE.  *See* Dr. Schneider Decl. ¶¶ 26, 30; Dr. Fischer Decl. ¶ 11; Dr. Hovda Decl. ¶ 22.

The McKee Study and the Stern Study collectively examined the brains of 93 deceased subjects.[51]  Subjects were selected because they had a history of repetitive mild TBI.  McKee Study at 45; Stern Study at 1123.  In the McKee Study, 18 individuals without a history of repetitive mild TBI served as the control group; in the Stern Study, there was no control group. McKee Study at 45; Stern Study at 1127.  The studies found abnormal tau protein accumulation indicative of CTE in the majority of the brains examined.  From there, each study attempted to reconstruct the symptoms the subjects experienced during life by asking their family members to describe their behaviors before death.  In the McKee Study, researchers only reconstructed the symptoms of about half of the subjects.  *See* Dr. Schneider Decl. ¶ 31.  Thus, the symptoms, if any, of half of the subjects during life remain unknown.

---

from clincopathologic [sic] case series" and "early literature about the disease focused on the boxing population").

[51] The McKee Study and the Stern Study both drew from the same bank of brains diagnosed with CTE. The McKee Study examined 85 brains.  *See* McKee Study at 45.  The Stern Study examined 36 brains, 28 of which had already been examined by the McKee Study.  *See* Stern Study at 1123 & n.1.

Predictive, generalizable conclusions about CTE cannot be drawn from case reports such as these.[52] *See* Dr. Giza Decl., ¶¶ 16-19; Dr. Yaffe Decl. ¶ 66. Because the studies examined only 93 brains, statistically significant conclusions are difficult to draw. Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 576 (3d ed. 2011) ("FJC Manual") (noting that "[c]ommon sense" dictates that "a large enough sample of individuals must be studied"). Because the studies selected subjects with a history of repetitive brain injury, a selection bias exists that makes it difficult to infer the incidence of CTE in the general population, or even among athletes. FJC Manual at 583-84; Dr. Hovda, Decl. ¶ 21 ("[S]cience [] has yet to systematically study the presence or absence of CTE pathology in non-concussed men and women . . . ."). Because the researchers had to rely on the subjects' family members instead of medical professionals to determine how the subjects behaved during life, any attempt to tie the existence of abnormal tau protein to particular symptoms is suspect. FJC Manual at 586. Finally, the studies did not control for other potential risk factors for impairment that Retired Players commonly share, such as higher BMI, lifestyle change, age, chronic pain, or substance abuse. *See* McCrory et al., *Consensus Statement on Concussions* at 257 ("The extent to which age-related changes, psychiatric or mental health illness, alcohol/drug use or co-existing medical or dementing illnesses contribute to [CTE] is largely unaccounted for in the published literature."); FJC Manual at 552 ("[I]t should be emphasized that *an association is not equivalent to causation*.").

Because of these limitations, researchers do not know the symptoms someone with abnormal tau protein in his brain will suffer from during life. No diagnostic or clinical profile for CTE exists. Establishing the relationship between abnormal tau protein and specific symptoms requires long-term, longitudinal, prospective epidemiological studies in living subjects. *See* Dr.

---

[52] All agree that Drs. McKee and Stern merit praise for their important and valuable scientific research. Objectors, however, overstate the results of their studies.

Yaffe Decl. ¶¶ 23-38, 59-67. For CTE, this long process is just beginning.[53] *See* McCrory et al., *Consensus Statement on Concussions* at 257 ("At present, the interpretation of causation in the modern CTE case studies should proceed cautiously.").

### ii.   Compensation of Symptoms Allegedly Associated with CTE

Objectors allege that CTE is associated with both neurocognitive symptoms and mood and behavioral symptoms. The Settlement compensates Retired Players with the neurocognitive symptoms allegedly associated with CTE. The Settlement reasonably does not compensate Retired Players with the mood and behavioral symptoms allegedly associated with CTE—or any other Qualifying Diagnosis.

Relying on the McKee Study, Objectors allege that CTE progresses in four stages. In Stages I and II, the disease allegedly affects mood and behavior while leaving a Retired Player's cognitive functions largely intact. Headache, aggression, depression, explosivity, and suicidality are common. *See e.g.*, Morey Obj. at 22-23. Later in life, as a Retired Player progresses to Stages III and IV, severe memory loss, dementia, loss of attention and concentration, and impairment of language begin to occur. *Id.* at 23.

No definitive clinical profile yet exists for CTE, however, and the idea that CTE progresses in defined stages—or even that it is associated with the symptoms listed—has not been sufficiently tested in living subjects. *See supra* Section V.A.i; Dr. Hovda Decl. ¶ 20 ("CTE does not appear to advance in a predictable and sequential series of stages and progression of physical

---

[53] Alzheimer's Disease provides a useful contrast and a cautionary lesson. Establishing the clinical profile of Alzheimer's Disease took decades of studies of millions of subjects. *See* Dr. Hovda Decl. ¶ 24; Dr. Yaffe Decl. ¶ 68. Initial conclusions were not always correct. For example, the medical community once believed that changes in mood, specifically depression, were associated with Alzheimer's Disease. This belief has now been thoroughly refuted. *See* Dr. Schneider Decl. ¶ 45.

symptoms . . . ."); Dr. Schneider Decl. ¶ 29 ("[A]ssumptions regarding symptoms that constitute the diagnostic and clinical profile of CTE are premature.").

Assuming *arguendo* that Objectors accurately describe the symptoms of CTE, the existing Qualifying Diagnoses compensate the neurocognitive symptoms of the disease.  Levels 1.5 and 2 Neurocognitive Impairment compensate all objectively measurable neurocognitive decline, *regardless of underlying pathology*.  These Qualifying Diagnoses provide relief for Retired Players who exhibit decline in two or more cognitive domains, including complex attention and processing speed, executive function, learning and memory, language, and spatial-perceptual.  *See* Settlement Ex. 1; Dr. Kelip Decl. ¶ 29.  Any Retired Player who becomes sufficiently impaired in these areas is entitled to compensation, whether his impairment is the result of abnormal tau protein or any other irregular brain structure.

In the McKee Study, almost all subjects with late-stage CTE allegedly showed decline in cognitive domains compensated by Levels 1.5 and 2 Neurocognitive Impairment.  For Stage III, "[t]he most common presenting symptoms were memory loss, executive dysfunction . . . and difficulty with attention and concentration."  McKee Study at 56.  The McKee Study states that "[s]eventy-five per cent [sic] of subjects were considered cognitively impaired."  *Id.*  For Stage IV, "[e]xecutive dysfunction and memory loss were the most common symptoms at onset, and all developed severe memory loss with dementia."  *Id.* 58-59; *see also* Dr. Yaffe Decl. ¶¶ 72, 81-82.

Additionally, CTE studies to date have found a high incidence of comorbid disease.  This means that, in addition to CTE neuropathology, subjects had other conditions, including ALS, Alzheimer's Disease, Parkinson's Disease, and frontotemporal dementia.  *See* Dr. Fischer Decl. ¶ 12; Dr. Giza Decl. ¶ 16; Dr. Schneider Decl. ¶ 43.  In the McKee Study, for example, 37% of

those with CTE had comorbid disease, including Parkinson's Disease and Alzheimer's Disease. McKee Study at 61. The Stern Study excluded from consideration 35% of potential subjects because they had comorbid disease such as Alzheimer's Disease. Stern Study at 1123.

In sum, even if CTE is a unique disease, it inflicts symptoms compensated by Levels 1.5 and 2 Neurocognitive Impairment and is strongly associated with the other Qualifying Diagnoses in the Settlement. "[A]ccepting the findings in the McKee Study as accurate, at least 89% of the former NFL players studied by Dr. Stern, Dr. McKee, and their colleagues would have been compensated under the [S]ettlement while living." Dr. Yaffe Decl. ¶ 83.

Objectors also argue that the alleged mood and behavioral symptoms of early stage CTE, such as irritability, depression, and proclivity to commit suicide, are excluded from the Settlement.[54] Objectors are correct. The Settlement does not compensate these symptoms, a result not limited to CTE. Mood and behavioral symptoms do not entitle a Retired Player to any Qualifying Diagnosis. *See* Settlement § 6.6(b) ("Monetary Awards . . . shall compensate Settlement Class Members only in circumstances where a [Retired Player] manifests actual cognitive impairment and/or actual neuromuscular impairment . . . .").

Excluding mood and behavioral symptoms from the Settlement is reasonable. While Objectors list many symptoms they believe are linked to head trauma, *see supra* note 34, the Settlement only provides compensation for serious, objectively verifiable neurocognitive and neuromuscular impairment with an established link to repetitive head injury. *See Deepwater Horizon Clean-Up Settlement*, 295 F.R.D at 156 (approving settlement that provided

---

[54] *See* Morey Obj. at 28-29; Armstrong Obj. at 19 ("By exclusively focusing on cognitive impairment, the same BAP program that is supposed to assist CTE sufferers by giving them a general dementia diagnosis excludes retirees suffering from mood, behavioral and other non-cognitive symptoms . . . ."); Duerson Obj. at 20 ("This Settlement proposes to take care of the minority of retired NFL players who suffer from cognitive impairment, while leaving the majority of former players with nothing."); Flint Obj. at 1; Johnson Obj. at 2, ECF No. 6395.

compensation for conditions that had a medical basis to support causation and excluding those lacking that proof).

Class Members would face more difficulty proving that NFL Football caused these mood and behavioral symptoms than they would proving that it caused other symptoms associated with Qualifying Diagnoses. Mood and behavioral symptoms are commonly found in the general population and have multifactorial causation.[55] Dr. Schneider Decl. ¶ 39; Dr. Yaffe Decl. ¶¶ 75-76. Even if head injuries were a risk factor for developing these symptoms, many other risk factors exist. *See* Dr. Giza Decl. ¶ 14 ("While medical literature and clinical practice has *associated* psychological symptoms such as anxiety, depression, lability, irritability and aggression in patients with a history of concussions, this association has not led to *conclusive causation*.").

Retired Players tend to have many other risk factors for mood and behavioral symptoms. For example, a typical Retired Player is more likely than an average person to have experienced sleep apnea, a history of drug and alcohol abuse, a high BMI, chronic pain, or major lifestyle changes. Dr. Schneider Decl. ¶ 39; Dr. Yaffe Decl. ¶¶ 75-76 (noting Retired Players' risk factors for mood and behavioral issues, as well as for suicide); Dr. Giza Decl. ¶ 14. An individual Retired Player would have a difficult time showing that head impacts, as opposed to any one of these other factors, explain his symptoms. *See* Dr. Giza Decl. ¶ 14 ("It remains a challenge with an individual patient to discern whether or not these symptoms are a consequence of a head

---

[55] Objectors argue that the link between NFL Football and CTE would be easier to prove at trial because unlike the Qualifying Diagnoses, repetitive head trauma is a necessary condition for developing CTE. *See* Morey Obj. at 30; Chelsey Obj. at 10. As discussed *supra*, CTE studies to date have not had sufficient control groups to confirm this link. Moreover, other researchers dispute whether repetitive head trauma is a prerequisite for developing CTE. *See* McCrory et al., *Consensus Statement on Concussions* at 257 ("It was further agreed that CTE was not related to concussions alone or simply exposure to contact sports."); Dr. Schneider Decl. ¶ 35. Moreover, even if head trauma were a necessary condition for CTE, the clinical profile is insufficiently developed to indicate whether specific mood disorders are associated with the neuropathology.

injury or associated with comorbidities (e.g., preexisting stress and social difficulties, learning disabilities, alcohol or drug abuse, etc.) . . . . ").

The Settlement simply does not entitle any Retired Player with mood and behavioral symptoms to any Qualifying Diagnosis.

### iii. Compensation of Death with CTE

Objectors argue that even if the Settlement compensates the symptoms of CTE in living Retired Players, it unfairly treats those currently living with CTE less favorably than those with CTE who died before the Final Approval Date. They argue that there is no reason for Death with CTE compensation to end.[56] They also argue that Death with CTE benefits are comparatively more generous than the benefits for the remaining Qualifying Diagnoses, which compensate living Retired Players allegedly suffering from CTE. *See, e.g.*, Alexander Obj. at 2; Jones Obj. at 3-4, ECF No. 6235.

Sound reasons exist to distinguish between Retired Players with CTE who died before the Final Approval Date and those still alive after that date. A prospective Death with CTE benefit would incentivize suicide because CTE can only be diagnosed after death. One Retired Player wrote to the Court expressing this concern. E. Williams Obj. at 3, ECF No. 6345 ("Players diagnosed with CTE (living) today, have to kill themselves or die for their family to ever benefit.").

More importantly, after the Final Approval Date, a living Retired Player does not need a death benefit because he can still go to a physician and receive a Qualifying Diagnosis. The Death with CTE benefit provides awards to families of Retired Players with compensable symptoms who died before the Settlement became operative, because neither Retired Players nor

---

[56] *See, e.g.*, Morey Obj. at 25-26; Miller Obj. at 4-5; Jones Obj. at 3-4; Moore Obj. at 3-4, ECF No. 6399; Carrington Obj. at 2-3.

their families had sufficient notice that they had to obtain Qualifying Diagnoses.[57]  Thus, Death

with CTE serves as a proxy for Qualifying Diagnoses deceased Retired Players *could* have

received while living.

The Parties extended the Death with CTE benefit from the Preliminary Approval Date to the

Final Approval Date because they recognized that Retired Players who died before final approval

would not have had sufficient notice of the need to obtain Qualifying Diagnoses.  *See* Parties'

Joint Amendment at 4-5.  Preliminary Approval of the Settlement and the accompanying notice

program informed Retired Players of the need to seek testing in order to obtain Qualifying

Diagnoses.  However, the Parties did not expect that Retired Players could do so immediately.

By final approval, living Retired Players should be well aware of the Settlement and the need to

obtain Qualifying Diagnoses if sick.  Thus, by final approval, there no longer is a need for Death

with CTE to serve as a proxy for Qualifying Diagnoses.

Additionally, the benefits for Death with CTE are not more generous than the benefits for

those who receive Qualifying Diagnoses while alive.  *See, e.g.*, Morey Post-Fairness Hearing

Supplemental Obj. at 19, ECF No. 6455 ("Morey Final Obj.") (arguing that "a class member

with CTE would never be able to receive the same maximum compensation through a dementia

diagnosis as could be received through a diagnosis of [D]eath with CTE . . . .").  Monetary

Award values for Death with CTE are higher than awards for Levels 1.5 and 2 Neurocognitive

Impairment in the same age bracket because the alleged symptoms Death with CTE compensates

---

[57] Some Objectors contend that Qualifying Diagnoses are "not the kinds of conditions that could have been missed during the deceased players' lifetimes."  Miller Supplemental Obj. at 2, ECF No. 6452.  However, the NFL Parties allegedly encouraged a gladiator mentality, teaching players to ignore or minimize their injuries as a demonstration of strength.  Am. MAC ¶¶ 62, 107.  Many Retired Players allegedly retained that outlook well after retirement, refusing to seek medical help.  *See, e.g.*, Stern Obj. at 1, ECF No. 6355 ("Like most men of his generation going to the doctor was for women and children not men . . . ."); Hawkins Obj. at 9, ECF No. 6373 ("[T]heir pride and honor . . . [have] overshadowed their willingness to admit their past and current needs or their vulnerability.").

did not begin when Retired Players died.  Retired Players living with Levels 1.5 and 2 Neurocognitive Impairment now know to seek Qualifying Diagnoses as early as possible.  The Death with CTE awards reflect that deceased Retired Players with CTE did not have that opportunity.

### iv.  Development of Scientific and Medical Knowledge of CTE

Finally, Objectors argue that the Settlement unreasonably excludes CTE in light of expected scientific advances.  Specifically, they argue that "CTE will be reliably detectable before death; within five to ten years, CTE will likely be diagnosed in the living."  Morey Obj. at 26; *see also* Morey Final Obj. at 12; Flint Obj. at 1, ECF No. 6347; Chelsey Obj. at 9; Carrington Obj. at 4, ECF No. 6409.

Objectors again overstate the conclusions of their experts.  A reliable method of detecting CTE via buildup of abnormal tau protein during life may well be available in the next decade, but the longitudinal epidemiological studies necessary to build a robust clinical profile will still take a considerable amount of time.  *See* Dr. Schneider Decl. ¶ 47 (noting "the presence of a biomarker for a protein does not currently tell us whether an individual is exhibiting symptoms or the likelihood that he will experience symptoms"); Dr. Yaffe Decl. ¶ 77 (noting that even an FDA approved test "does not mean that we will soon understand what causes CTE or the diagnostic profile of CTE" and that "[i]t will take many years before science can fully understand these issues").  The Settlement compensates symptoms that cause Retired Players to suffer, not the presence of abnormal tau protein (or any other irregular brain structure) alone.  *See* Settlement § 6.6(b) ("Monetary Awards . . . shall compensate Settlement Class Members only in circumstances where a [Retired Player] manifests actual cognitive impairment and/or actual neuromuscular impairment . . . .").

Even if Objectors are correct, and researchers ultimately determine that CTE causes the mood and behavioral symptoms they allege, the Settlement will still be reasonable. As discussed *supra*, the decision to compensate only cognitive and neuromuscular impairment across all Qualifying Diagnoses is justified. Those symptoms tend to be more serious and more easily verifiable than mood and behavioral symptoms. *See supra* Section V.A.ii.

The Monetary Award Fund lasts for 65 years; researchers may learn more about CTE and head trauma in that time. Recognizing this, the Settlement requires the Parties to meet at least every ten years and confer in good faith about possible modifications to the definitions of Qualifying Diagnoses. *See* Settlement § 6.6(a).

Objectors argue that this is an empty benefit because the NFL Parties must consent to any prospective changes. *See e.g.*, Armstrong Obj. at 27 ("[I]f the NFL unilaterally does not want to accept a new method of detecting CTE, for example, it will not be required to do so."); Utecht Obj. at 7-8. While this is true, the process is subject to judicial oversight, and the NFL Parties stipulated that they will not withhold their consent in bad faith. *See* Am. Fairness Hr'g Tr. at 16:16-17:8 (Counsel for the NFL Parties agreeing that "modifications to the settlement" will "in good faith . . . be implemented"). Independently, the Settlement requires the NFL Parties to implement the entire agreement in good faith. Settlement § 30.11 ("Counsel for the NFL Parties will undertake to implement the terms of this Settlement Agreement in good faith."); *id.* § 26.1 ("The Parties will cooperate, assist, and undertake all reasonable actions to accomplish the steps contemplated by this Settlement . . . .").

### B.    Objections to Monetary Awards

#### i.   Definitions of Levels 1.5 and 2 Neurocognitive Impairment

To receive a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment through the

BAP,[58] a Retired Player must perform 1.7-1.8 standard deviations worse than his expected level

of pre-impairment ("premorbid") functioning in two cognitive domains tested by the Test

Battery, and exhibit mild functional impairment consistent with the National Alzheimer's

Coordinating Center's Clinical Dementia Rating ("CDR") scale.  Settlement Ex. 1, at 2; *id.* Ex.

2, at 5.  Level 2 Neurocognitive Impairment requires a performance 2 standard deviations worse

than a Retired Player's expected premorbid functioning, and moderate functional impairment on

the CDR scale.  *Id.* Ex. 1, at 3; *id.* Ex. 2, at 5.  A diagnosis of Level 1 Neurocognitive

Impairment, which triggers BAP Supplemental Benefits as opposed to a Monetary Award,

occurs when a Retired Player performs 1.5 standard deviations worse than his expected

functioning, and exhibits questionable functional impairment on the CDR.  *Id.* Ex. 1, at 1; *id.* Ex.

2, at 5.

Objectors contend that these cutoffs are "unreasonably high" and will prevent the

compensation of many Retired Players whom physicians typically would diagnose with

dementia.  Morey Obj. at 71-72; *see also* Johnson Obj. at 2, ECF No. 6395 ("I feel the bar should

be lowered even more below the standard 1.0 or 1.5 . . . .").  These concerns are misguided.

Both the cognitive and functional cutoffs are drawn directly from well-established sources.

The Neurocognitive Disorders section of the Diagnostic and Statistical Manual of Mental

Disorders, Fifth Edition (DSM-5), a universally recognized classification and diagnostic tool,

divides neurocognitive disorders into mild and major disorders based on the severity of the

---

[58] Retired Players may also receive diagnoses of Levels 1.5 and 2 Neurocognitive Impairment outside the BAP, but the diagnosing physician must use similar diagnostic criteria.  *See* Settlement Ex. 1, at 2-3.

impairment. *See* Dr. Kelip Decl. ¶ 21. Major disorders require impairment 2 or more standard deviations below a person's expected premorbid capabilities. *Id.* ¶ 22. When this type of impairment extends beyond a single cognitive domain, it corresponds with a diagnosis of moderate dementia. *Id.* Mild disorders fall between 1 and 2 standard deviations below premorbid expectations. Empirical research demonstrates that 1.5 standard deviations below population norms is a relevant boundary—it substantially increases the likelihood of progression from a mild disorder to a major one. *Id.* ¶ 23.

Thus, the levels of neurocognitive impairment recognized by the Settlement are empirically tied to the cutoffs in the DSM-5.[59] Level 1 triggers BAP Supplemental Benefits because Retired Players with that score risk progressing from mild cognitive impairment to dementia. Level 2 matches the DSM-5's definition of moderate dementia.[60] Level 1.5 includes early dementia and begins at the midway point between Level 1 and moderate dementia.[61]

Likewise, the functional impairment criteria are directly adopted from the CDR scale. The CDR is a highly validated test for functional impairment associated with dementia. *See* Keith Wesnes, *Clinical Trials in Which The CDR System Has Been Employed to Detect Enhancements in Cognitive Function* (Feb. 2013), *available at* http://bracketglobal.com/sites/default/files/

---

[59] One Objector argues that the Settlement is "vague, ambiguous, and/or not sufficiently disclosed" because, among other things, the user manual participating physicians will receive setting out the specific cutoff scores for each test within the Test Battery has not been disclosed. Alexander Obj. at 4-5. This objection is overruled because the methodology is sufficiently clear from the Settlement and the record.
[60] Objectors argue that "it is not common for dementia patients to score consistently more than two standard deviations below healthy controls." Dr. Stern Decl. ¶ 50, ECF No. 6201-16. The Settlement's algorithm, however, recognizes that "[p]eople with neurocognitive impairment and dementia exhibit a range of scores on neuropsychological testing." Decl. of Dr. Richard Hamilton ¶ 17, ECF No. 6423-25. While "some of [the Test Battery's] scores must be low," others "can be in the average range (or even above average)," yet still qualify a Retired Player for a Monetary Award. *Id.*
[61] Objectors provide affidavits from eight physicians indicating that they are "not aware of the use of the diagnostic or classification categories" of Levels 1, 1.5, and 2 Neurocognitive Impairment anywhere in the medical community. *See* Morey Final Obj. Exs. 3, 5-11. This is irrelevant. Although the precise terms are unique to the Settlement, the levels of impairment they represent are well established.

ISCTM-Spring-4.pdf (last accessed Apr. 21, 2015) (stating that CDR has been used in approximately 1,400 clinical trials on over 8,000 patients).

Objectors also contend that the algorithm for translating test performance into compensable neurocognitive impairment categories is arbitrary and unknown in the medical fields. *See* Decl. of Robert Stern ¶¶ 48-51, ECF No. 6201-16 ("Dr. Stern Decl."). Specifically, they argue that "it is uncommon to require distinct criteria tables for levels of impairment based on a single estimate of premorbid functioning to be used across large groups of individuals." *Id.* ¶ 51.

The algorithm is reasonable. A single test score is meaningless because there is no baseline for comparison. The Settlement's Test Battery includes a test designed to estimate premorbid function in a test taker.[62] That premorbid estimate compares the test taker's score to the scores of other individuals with similar premorbid intelligence. Dr. Kelip Decl. ¶ 45 ("[I]t is a standard feature of any neuropsychological assessment to only judge raw scores in the context of demographic factors and estimates of premorbid ability."); Decl. of Dr. Richard Hamilton ¶ 15, ECF No. 6423-25 ("Dr. Hamilton Decl.") (noting "using the [TOPF] together with a complex demographics statistical model . . . is a fair and reasonable manner to account for individual variability"). Simply put, Retired Players with lower estimated pre-injury IQs must do comparatively worse on the same test to qualify for compensation than Retired Players with higher pre-injury ability. The practice of grouping test scores based on estimated premorbid intelligence, as well as the specific cutoffs for the three distinct groupings the Settlement uses, are all based on preexisting empirical research. Dr. Millis Decl. ¶ 21; Dr. Kelip Decl. ¶ 33 ("It is well known . . . that premorbid ability has a profound effect on the expression of deficits following brain injury or disease."). The Settlement's algorithm for translating these scores into

---

[62] See *infra* Section V.D.ii for a more in-depth discussion of this test, including evidence that it is commonly administered as a standalone estimate of premorbid function.

compensable diagnoses is empirically based and transparent in its rationale.  *See* Dr. Millis Decl.
¶ 33; Dr. Kelip Decl. ¶ 41; Dr. Hamilton Decl. ¶ 16, 23 ("The principles underlying the
algorithms have been published in many studies, and have been derived from statistical analyses
of cognitive test data from thousands of healthy subjects.").

### ii.  List of Qualifying Diagnoses and their Maximum Awards

Objectors argue that the Settlement excludes dozens of other conditions associated with
repetitive mild traumatic brain injury, from pituitary hormonal dysfunction to epilepsy to sleep
disorders.[63]  Objectors also argue that the maximum awards for each Qualifying Diagnosis
should be larger, and that the different maximum awards for each Qualifying Diagnosis are
arbitrary.  However, the current Qualifying Diagnoses and their maximum awards are
reasonable.

Alzheimer's Disease, Parkinson's Disease, and ALS are all well-defined and robustly studied
conditions.  Epidemiological study has associated each of these diseases with repetitive mild
traumatic brain injury.  Dr. Fischer Decl. ¶¶ 6-7; Dr. Yaffe Decl. ¶ 13.  Levels 1.5 and 2
Neurocognitive Impairment compensate a broad range of functional and neurocognitive
symptoms regardless of underlying pathology.[64]  Dr. Fischer Decl. ¶ 9.  These objectively
measurable symptoms have also been associated with concussions through epidemiological
study.  *Id.*

---

[63] *See, e.g.*, Davis Obj. at 1-2, ECF No. 6354 (seeking to include hearing loss); Collier Obj. at 2-3, ECF
No. 6220 (seeking to include multiple sclerosis); Barber Obj. at 3, ECF No. 6226 (seeking to include
post-concussion syndrome); *supra* note 34.  Most Objectors cite no record evidence that these symptoms
are associated with repetitive head trauma.  *Cf.* Dr. Yaffe Decl. ¶ 91 (concluding that there is no link
between multiple sclerosis and repeated head trauma).  Additionally, many Objectors argue that mood and
behavioral disorders, such as an increased propensity to commit suicide, should be compensated.
Because these objections are frequently tied to a lack of coverage for CTE, they are discussed *supra*
Section V.A.ii.
[64] *See infra* Section V.D.ii.

94

Tellingly, no Objector disputes that it is appropriate to include these conditions. Instead, Objectors seek to revise the Settlement to include additional maladies. This type of objection could be made to any class settlement. The essence of settlement is compromise; neither side will achieve a perfect outcome. *See GM Trucks*, 55 F.3d at 806. A settlement need not compensate every injury to be fair, especially where class members "not satisfied with the benefits provided in the Settlement may opt out of the Settlement."[65] *Deepwater Horizon Clean-Up Settlement*, 295 F.R.D. at 158 ("It is well established that parties can settle claims without providing compensation for every alleged injury." (citing *Maher v. Zapata Corp.*, 714 F.2d 436, 438 (5th Cir. 1983))).

Objectors also argue that maximum awards for the Qualifying Diagnoses should be greater. Many contend that awards are insufficient to cover the cost of care for these conditions, especially as Retired Players age.[66] Because class action settlements must be negotiated in the shadow of what could be achieved through a lengthy and uncertain litigation process, they are rarely able to make injured victims whole. *See, e.g., In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170 (3d Cir. 2006) (holding that "[t]he District Court did not abuse its discretion in concluding that in light of the risks of establishing liability and damages, the $100 million settlement was an 'excellent' result," despite the fact that the settlement likely provided compensation for only 4% of the total damages claimed); *Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146, 2013 WL 1192479, at *9 (D.N.J. Mar. 22, 2013) ("A settlement is, after all, not full relief but an acceptable compromise." (internal quotation marks omitted)). Additionally, the maximum awards are in line with other personal injury settlements. *See, e.g., PPA Prods. Liab. Litig.*, 227 F.R.D. at 556-

---

[65] A major benefit of the Settlement is that Retired Players retain their NFL CBA Medical and Disability Benefits. *See* Settlement §§ 2.1(zzz), 18.1(a)(viii), 18.6. Some of the uncompensated conditions likely trigger benefits under these benefit plans. The Settlement provides the certainty of compensation for more serious conditions that Retired Players may develop.

[66] *See, e.g.*, Grimm Obj. at 1, ECF No. 6346; LaPlatney Obj. at 1, ECF No. 6390; Moore Obj. at 4-5.

57 (approving class action settlement where class members asserted claims for "increased risk of hemorrhagic stroke" and other injuries; settlement provided for awards ranging from $100 to $5 million); *Serzone Prods. Liab. Litig.*, 231 F.R.D. at 229-30 (approving class action settlement where class members asserted claims for "serious hepatic injuries," including liver failure; settlement provided for awards ranging from $100,000 to $3.5 million).

Moreover, the relative differences in maximum awards for the Qualifying Diagnoses ($1.5 million for Level 1.5 Neurocognitive Impairment, $3 million for Level 2 Neurocognitive Impairment, $3.5 million for Alzheimer's Disease and Parkinson's Disease, and $5 million for ALS) are supported by objective variations in the severity of symptoms and the scientific understanding of each condition.

Level 1.5 Neurocognitive Impairment compensates objectively measurable cognitive decline in five cognitive domains: complex attention and processing speed, executive functioning, learning and memory, language, and spatial-perceptual. *See* supra Section V.B.i; *infra* Section V.D.ii. Level 2 Neurocognitive Impairment compensates these same impairments when they become more severe, justifying a higher award. *See supra* Section V.B.i.; *infra* Section V.D.ii.

Alzheimer's Disease, Parkinson's Disease, and ALS[67] also affect the five cognitive domains compensated by Levels 1.5 and 2 Neurocognitive Impairment, but additional considerations specific to each justify higher awards. *See* Dr. Hamilton Decl. ¶ 13.

Alzheimer's Disease is well-defined and its clinical progression is well understood. *See* Dr. Hovda Decl. ¶ 24; Dr. Schneider Decl. ¶ 42. The course of Alzheimer's Disease, including the timing and necessity of medical care, can be predicted with reasonable specificity. Dr. Schneider Decl. ¶ 42 (noting that highly accurate initial clinical diagnosis of Alzheimer's Disease is possible). Unlike Alzheimer's Disease, Levels 1.5 and 2 Neurocognitive Impairment

---

[67] Compensation for Death with CTE is discussed *supra* Section V.A.iii.

compensate a broad range of cognitive decline regardless of the link to any established disease or syndrome. Thus, whether Retired Players' symptoms for Levels 1.5 and 2 Neurocognitive Impairment will worsen and what the cost of their care will be are difficult to predict. *See* Dr. Fischer Decl. ¶ 9. Retired Players with Alzheimer's Disease, on the other hand, would face an easier task proving their injury is related to concussive hits and establishing their prospective damages. Therefore, the Settlement justifiably provides higher awards for Retired Players with Alzheimer's Disease than for Retired Players with Levels 1.5 and 2 Neurocognitive Impairment.

Parkinson's Disease and ALS cause debilitating neuromuscular impairment in addition to cognitive impairment. Because people with Parkinson's Disease and ALS must endure additional symptoms, the Settlement justifiably provides higher awards for Retired Players with these Qualifying Diagnoses than for Retired Players with Levels 1.5 and 2 Neurocognitive Impairment. The additional symptoms of Parkinson's Disease include tremors, rigidity, and posture and gait disorders. *See* Ali Samii et al., *Parkinson's Disease*, 363 The Lancet 1783, 1783-1784 (May 29, 2004). People with ALS experience rapid and sweeping degeneration of the entire neuromuscular system. They watch their bodies decompose until they require a feeding tube, ventilator, and 24-hour medical care merely to stay alive.[68] *See* Matthew C. Kiernan et al., *Amyotrophic Lateral Sclerosis*, 377 The Lancet 942, 944-45 (Feb. 7, 2011) (noting that 50% of victims die within three years of symptom onset). ALS' horrific symptoms explain why Retired Players with this Qualifying Diagnosis are eligible for the highest maximum award.

In conclusion, the record demonstrates that Class Counsel negotiated at arm's-length from the NFL Parties for most of a year with the guidance of Mediator Judge Phillips and Special

---

[68] Regrettably, Class Representative Kevin Turner has already begun to decline to this point. *See supra* Section IV.B.i.

Master Golkin. Class Counsel's decision to seek compensation for the conditions underlying the Qualifying Diagnoses at the levels specified in the Settlement is supported by scientific evidence. The nature of the negotiations and the scientific evidence in the record establish that the Qualifying Diagnoses and their maximum awards are reasonable.

### C.    Objections to Offsets

#### i.    Age Offset

Monetary Awards decrease as the age at which a Retired Player receives a Qualifying Diagnosis increases. *See* Settlement Ex. 3. Some Objectors argue that this offset should be eliminated.[69] Other Objectors argue that if age is relevant, then Class Members should have the opportunity to prove Retired Players experienced symptoms before a formal diagnosis was made in order to decrease their age bracket and increase their award.[70] Both the offset, and exclusive reliance on the date of a Retired Player's Qualifying Diagnosis, are reasonable.

The age offset has considerable scientific support. Epidemiologically, Retired Players' most significant risk factor for developing each of the Qualifying Diagnoses is age. Dr. Yaffe Decl. ¶ 50. For example, a 75 year old is 302 times more likely to have dementia than a 45 year old. *See* Decl. of Thomas Vasquez ¶ 12, ECF No. 6423-21 ("Vasquez Decl."); FJC Manual at 602. As a Retired Player ages and becomes further removed from NFL Football, the likelihood that NFL Football caused his impairment decreases. Because it would be more difficult for an older Retired Player to prove specific causation at trial, this offset is justified.

---

[69] *See, e.g.*, Flint Obj. at 1 ("[A]s we get older the money goes down instead of up."); Duncan Obj. at 2-3, ECF No. 6357; Wilson Obj. at 1, ECF No. 6361; Alexander Stewart Obj. at 1, ECF No. 6392; Decl. of Drs. Brent Masel & Gregory O'Shanick ¶ 18, ECF No. 6180-2 ("The consequences of a brain injury are the same whether experienced in the past . . . or the future . . . .").

[70] *See, e.g.*, Barber Obj. at 5-6; Duerson Obj. at 21-23; Daniel Obj. at 1, ECF No. 6367 ("Most people with symptoms of Alzheimer's [D]isease have suffered for a long time prior to diagnosis."); Perfetto Obj. at 2-5, ECF No. 6371.

Additionally, it is reasonable to provide greater compensation to younger Retired Players. Retired Players who did not become impaired until later in life enjoyed a longer life without neurological injury. In the tort system, awards for the same condition tend to be smaller for older plaintiffs. *See* Vasquez Decl. ¶ 15.

Objectors also argue that some Retired Players neglected to receive a Qualifying Diagnosis until after they had already suffered for many years. *See, e.g.*, Hawkins Obj. at 9, ECF No. 6373 ("[O]lder alumni are being penalized for the fact that the medical discoveries and the awareness of neurodegenerative diseases related to head trauma did not exist decades ago, even though for many players, their unrecognized and untreated symptoms were prevalent."). Objectors argue that NFL Football's alleged culture of downplaying injury exacerbated this issue. Owens Obj. at 1, ECF No. 6210 ("The NFL [Parties] encouraged a warrior mentality, leading its players to ignore pain and eventually, the damaging symptoms of brain disease."). Objectors take issue with the Settlement's exclusive reliance on a Retired Player's age at the time he received a Qualifying Diagnosis for calculating compensation. They argue that a Retired Player should be permitted to present evidence about the onset of his impairment in order to use his younger age for calculating compensation. While these concerns may well be true, the Settlement is nonetheless reasonable.

Only physicians with sufficient qualifications in the field of neurology may make Qualifying Diagnoses. *See* Settlement §§ 6.3(b)-6.3(f) (noting that, with one exception to accommodate deceased Retired Players, all physicians must be board certified). Objectors, in effect, wish to expand this list to include friends, family members, and others without formal medical training who may have observed symptoms in a Retired Player before he received a Qualifying Diagnosis.

The potential for wrongful manipulation of such an exception is too great.  Even if an appropriately credentialed physician subsequently confirms a diagnosis, it would be very difficult to retrospectively determine with any certainty when the condition first manifested.  *See* Dr. Yaffe Decl. ¶ 93.  Contemporaneous evaluation of a Retired Player's symptoms by a clinician is necessary.  The formal diagnosis requirement incentivizes Retired Players to actively seek the care they need, whether through the BAP or a Qualified MAF Physician.

### ii.  Severe TBI Offset

The Settlement offsets a Monetary Award by 75% if a Retired Player suffers a severe TBI unrelated to NFL Football.  *See* Settlement § 6.7(b)(iii).  Objectors argue that a single severe TBI should not have such a large effect on a Retired Player's Monetary Award because the NFL Parties allegedly exposed Retired Players to dozens of such hits over the course of their careers.  *See, e.g.*, Morey Obj. at 32; Duerson Obj. at 25-27.

This objection stems from a misunderstanding of terms.[71]  Retired Players were allegedly at an increased risk of repetitive mild traumatic brain injuries, including concussions.  After suffering a mild traumatic brain injury, a Retired Player became impaired, but usually remained conscious, allowing him to return to play and continue experiencing dangerous blows.  *See* Dr. Hovda Decl. ¶ 14.  The traumatic brain injuries that trigger the offset are much more serious: "open or closed head trauma resulting in a loss of consciousness for greater than 24 hours."  Dr. Fischer Decl. ¶ 21; *see also* Settlement § 2.1(aaaaa) (defining "Traumatic Brain Injury" consistent with World Health Organization's International Classification of Diseases that are used for severe TBIs).  Severe TBI is well-studied, and a single severe TBI has a very strong

---

[71] This is not necessarily Objectors' fault.  The medical community is still in the process of developing uniform definitions for the severity of various TBIs: "[W]hen a study finds that a TBI is a risk factor for or associated with a certain condition, it is often unclear whether the study means severe TBI, moderate TBI, mild TBI, or repetitive TBI—or any mix of these combinations."  Dr. Yaffe Decl. ¶ 41.

association with dementia, Alzheimer's Disease, and Parkinson's Disease.[72]  Dr. Yaffe Decl.

¶ 90.  This strong association justifies the 75% offset for Retired Players who suffered a severe

TBI.

Moreover, even if a Retired Player suffered a severe TBI, the Settlement still provides that

Retired Player with an opportunity to demonstrate by clear and convincing evidence that the

severe TBI did not cause his Qualifying Diagnosis.  *See* Settlement § 6.7(d).

### iii.  Stroke Offset

Objectors similarly contend that the 75% offset for Stroke is unreasonable.  *See* Morey Obj.

at 32-34; Barber Obj. at 6-8, ECF No. 6226.

Like severe TBI, Stroke is a well-known cause of the Qualifying Diagnoses.  Indeed, the

medical community recognizes that Stroke is the second most common cause of dementia.  Dr.

Yaffe Decl. ¶ 87.  Doctors often refer to this particular type of dementia as vascular dementia.

Dr. Fischer Decl. ¶ 18.

Objectors do not dispute this, and instead argue that the repetitive mild TBI Retired Players

were exposed to also cause Stroke.  *See* Morey Obj. 32-33; Decl. of Drs. Masel & O'Shanick

¶ 17.  However, the studies they cite do not support this proposition.  Two of the cited studies

examine the effects of moderate and severe TBI, not repetitive mild TBI, on Stroke.[73]  Other

---

[72] Objectors argue that CTE causes severe TBI because CTE impedes impulse control and increases the risk of severe TBI through car accidents. *See* Morey Obj. at 32 n.33; Duerson Obj. at 26.  Even if true, this risk is too attenuated to render this offset unfair.

[73] *See* James F. Burke et al., *Traumatic Brain Injury May Be an Independent Risk Factor for Stroke*, 81 Neurology 1, 2 (2013), ECF No. 6201-6 (limiting study to individuals with head injury so serious that it required a visit to a hospital emergency room or inpatient admission); Yi-Hua Chen et al., *Patients with Traumatic Brain Injury: Population-Based Study Suggests increased Risk of Stroke*, 42 Stroke 2733, 2734 (2011), ECF No. 6422-22 (limiting study to individuals "who had visited ambulatory care centers . . . or had been hospitalized with a principal diagnosis of TBI" and finding a large portion of Stroke risk occurred in the three months after experiencing severe TBI).

studies do not address Stroke at all.[74]  Objectors also argue that the NFL Parties' alleged administration of the drug Toradol to Retired Players increased the risk of Stroke, but cite no studies in support of this claim.  *See* Duerson Obj. at 26-27; *see also* Dr. Fischer Decl. ¶ 20 ("I am not aware of any scientific support for [the contention that Toradol increases latent stroke risk], and I have seen no such reference in any of the papers cited by the objectors.").  The Stroke offset is reasonable.

Moreover, as with the severe TBI offset, any Retired Player has an opportunity to demonstrate by clear and convincing evidence that the Stroke he suffered did not cause his Qualifying Diagnosis.  *See* Settlement § 6.7(d).[75]

### iv.  Eligible Season Offset

Objectors argue that the offset for playing fewer than five Eligible Seasons is unfair because "[a] single severe concussion in the first game of a player's career could cause a player to suffer dementia."  Armstrong Obj. at 16; *see also* Drs. Masel & O'Shanick Decl. ¶ 16 ("[A] single concussion . . . is capable of generating debilitating physical, cognitive and behavioral impairments . . . ."); Duncan Obj. at 2, ECF No. 6357 ("[B]rain damage is sustained from the intensity and severity of the incident and could result from a single hit.").

---

[74] *See* Erin D. Bigler, *Neuropsychology and Clinical Neuroscience of Persistent Post-Concussive Syndrome*, 14 J. Int'l Neuropsychological Soc'y 1 (2008), ECF No. 6201-6 (failing to mention Stroke). Objectors also contend that repetitive mild TBI increases microbleeds, which increase Stroke.  Although the study they cite found that 4 out of 45 Retired Players had microbleeding, researchers were unable to conclude that this percentage was any higher than what would be found in a control group.  *See* Ira R. Casson et al., *Is There Chronic Brain Damage in Retired NFL Players?  Neuroradiology, Neuropsychology, and Neurology Examinations of 45 Retired Players*, 6 Sports Health 384, 391 (2014), ECF No. 6201-6 ("It is not yet known whether the 9% frequency of microbleeds is higher than what might appear in an age-matched normal population . . . .").  Moreover, the study does not address Stroke.
[75] Objectors contend that the NFL Parties should bear the burden of proving that the offsets for severe TBI and Stroke are reasonable.  *See* Barber Obj. at 6-8.  Given the strength of the association between these events and neurocognitive impairment, placing the burden of proof on a Retired Player is reasonable.

The Eligible Season offset serves as a proxy for the number of concussive hits a Retired Player experienced as a result of playing NFL Football. *See* Drs. Masel & O'Shanick Decl. ¶ 16 (conceding it is "reasonable to assume that that exposure to mild TBI increases as playing time increases"). Retired Players with brief careers endured fewer hits, making it less likely that NFL Football caused their impairments. Research supports the claim that *repeated* mild TBI have an association with Qualifying Diagnoses. *See* Dr. Fischer Decl. ¶¶ 6-7; Dr. Yaffe Decl. ¶ 13.

Objectors cite no authority for the assertion that a single mild TBI is enough to create long lasting, permanent neurological damage. *See* Dr. Fischer Decl. ¶¶ 5-6 (noting "the critical subgroup [is] those individuals who have sustained repeated clinical and subclinical traumatic brain injuries over a significant period of time" and that Qualifying Diagnoses have been associated with "repeated traumatic brain injury"). Short-term concussion symptoms—the wooziness typically experienced after a hit—come from the release of the excitatory amino acid glutamate. Dr. Hovda Decl. ¶ 15. An isolated concussion does not result in cell death or structural damage to the brain and is a largely recoverable diagnosis. Dr. Giza Decl. ¶ 12. However, permanent damage can occur if the brain continues to experience trauma before making a full recovery, such as when people experience additional head injuries. *Id.* Thus, the offset for playing fewer than five Eligible Seasons is reasonable.

A Retired Player receives an Eligible Season credit if he was on an NFL Member Club's Active List for at least three regular or postseason games, or if he was on a Member Club's Active List for at least one regular season or postseason game and spent two games on an inactive list or injured reserve list due to a concussion or head injury. *See* Settlement § 2.1(kk). A Retired Player receives half of an Eligible Season credit if he satisfied either of these criteria playing for a team in the World League of American Football, NFL Europe League, or NFL

Europa League (collectively, "NFL Europe").  A Retired Player receives half of an Eligible

Season credit if he was on an NFL Member Club's practice, developmental, or taxi squad roster

for at least eight regular or postseason games.  *Id.*

Objectors argue that the definition of an Eligible Season should derive from the definition of

"Credited Season" used in the Bert Bell/Pete Rozelle NFL Player Retirement Plan because the

latter credits seasons in which a Retired Player was placed on injured reserve at any time, for any

injury.  *See, e.g.*, Slack Obj. at 6-7, ECF No. 6223.  Objectors contend that "[t]he basis for

limiting the injured reserve credit to players on injured reserve due to a concussion or head injury

is not explained in the proposed Settlement."  Andrew Stewart Obj. at 3, ECF No. 6175.

Eligible Seasons are a proxy for exposure to concussive hits.  Retired Players on injured

reserve did not play or practice.  A Retired Player on injured reserve because of a concussion

was almost certainly at a higher risk of long-term neurological damage than a Retired Player on

injured reserve for an injury unrelated to concussive hits.  Limiting Eligible Season credit to

Retired Players placed on injured reserve with a head injury is reasonable.

Objectors also argue that Retired Players who played in NFL Europe should receive full

Eligible Season credit.  As amended, the Settlement now allows Retired Players to earn half of

an Eligible Season credit for time spent on an active roster in NFL Europe.[76]  *See* Settlement

§ 2.1(kk).  A Retired Player may combine his half of a season credit with other Eligible Season

credit from time spent on a domestic Member Club's roster, but may only earn one total Eligible

Season credit per year.[77]  *See id.* § 6.7(c).

---

[76] Previously, Retired Players received no Eligible Season credit for participation in NFL Europe.  The amendment addresses concerns raised by several Objectors.  *See, e.g.*, Morey Obj. at 34-36; Slack Obj. at 3-4, ECF No. 6223; Duff Obj. at 1, ECF No. 6348; Jones Obj. at 2-4; Zeno Obj. at 1-2, ECF No. 6386.
[77] Seasons in NFL Europe occurred in the spring, and did not overlap with the domestic NFL Football season.  Without this limitation, a Retired Player who, in one year, played three games on an Active List

NFL Europe had a shorter regular season than domestic NFL Football—10 games rather than 16—and held fewer practices. Decl. of T. David Gardi ¶ 14, ECF No. 6422-33. Additionally, NFL Europe Retired Players face a litigation risk that other Retired Players do not. To play in NFL Europe, Retired Players had to sign employment contracts that provided workers' compensation benefits. Florida and Georgia law govern these agreements and mandate that workers' compensation is the exclusive remedy for work related injuries. *See id.* ¶¶ 5, 8-9, 12. The NFL Europe Eligible Season credit is reasonable.

Lastly, Objectors challenge the exclusion of training camp and preseason games from the calculation of Eligible Season credit. They argue that these activities exposed Retired Players to concussive hits because many Retired Players had to play hard to ensure roster spots. *See, e.g.,* Andrew Stewart Obj. at 4-5 ("Training camps were full contact, twice a day for 3.5 hours each session."); Moore Obj. at 2, ECF No. 6399 (noting that "the hitting in scrimmages and live practices was (is) just as intense, if not more so, than in the regular season games").

While training camp and preseason were undoubtedly brutal, so too were the regular and postseason games that qualify a Retired Player for Eligible Season credit. It is reasonable to assume that Retired Players who made the roster, and thus continued to play NFL Football that season, were exposed to a greater number of potentially harmful hits. While the Settlement may have been more generous if Retired Players received Eligible Season credit for training camp and preseason participation, the lack of credit does not render the Settlement unfair.

In sum, the calculation of Eligible Season credit is reasonable.

---

for both NFL Europe and domestic NFL Football could have earned one-and-a-half Eligible Season credits.

### v.  BAP Offset

Retired Players who neglect to take a baseline assessment examination and who later develop a Qualifying Diagnosis will see their awards reduced by 10%. *See* Settlement § 6.7(b)(iv). Objectors challenge this provision as arbitrary.  Morey Obj. at 74.

The offset is a reasonable means to encourage Retired Players to participate in the BAP. Baseline assessment examinations either result in a Qualifying Diagnosis or produce a more complete picture of a Retired Player's neurocognitive profile.  The latter makes a subsequent Qualifying Diagnosis easier to render by providing a point of comparison. *See infra* Section V.D.i. The scope of the offset confirms that its purpose is to incentivize baseline assessment examinations.  The offset does not apply to Retired Players who received Qualifying Diagnoses before the Preliminary Approval Date or those without Qualifying Diagnoses who are still eligible to participate in the BAP. *See* Settlement § 6.7(b)(iv).

### D.   Objections to the Baseline Assessment Program

### i.  BAP Fund

The primary purpose of the BAP is to provide free, comprehensive neurological and neuropsychological examinations to Retired Players.  Retired Players may receive diagnoses of Level 1 Neurocognitive Impairment and Qualifying Diagnoses of Levels 1.5 and 2 Neurocognitive Impairment through baseline assessment examinations.[78]  Class Counsel's actuarial expert predicts that the cost of these exams will account for less than two thirds of the $75 million BAP Fund. *See* Vasquez Decl. ¶¶ 23-24.  Even if the costs of these exams exceed the $75 million BAP Fund, the Parties amended the Settlement to guarantee that every eligible

---

[78] Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease, and ALS cannot be made through baseline assessment examinations. *See infra* Section V.D.ii. Retired Players must visit Qualified MAF Physicians to receive any of these Qualifying Diagnoses. Qualified MAF Physicians may also provide Retired Players with Qualifying Diagnoses of Levels 1.5 and 2 Neurocognitive Impairment. *See* Settlement § 6.3(b).

Retired Player can receive an exam regardless of the total cost. *See* Parties' Joint Amendment at 3-4.

Any remaining money in the BAP Fund will go toward BAP Supplemental Benefits for Retired Players who are diagnosed with Level 1 Neurocognitive Impairment. *See* Settlement § 5.14(b) (noting that benefits per Retired Player will be calculated in light of the cost of providing Retired Players with baseline assessment examinations). Objectors argue that these benefits are insufficient because the annual cost of treating dementia is allegedly $56,000. *See* Morey Obj. at 72. Objectors, however, compare apples to oranges. Level 1 Neurocognitive Impairment is not early dementia; it is less severe. *See* Settlement Ex. 1, at 1-2; *supra* Section V.B.i. If a Retired Player progresses to early dementia (Level 1.5 Neurocognitive Impairment), he will be entitled to compensation from the uncapped Monetary Award Fund. *See* Settlement §§ 23.1(a)-(b).

Moreover, Class Counsel's actuary estimates that the average BAP Supplemental Benefit per Retired Player will range from $35,000 to $52,000; the NFL Parties' actuaries predict that there may be an $11 million surplus in the BAP Fund even after payment of BAP Supplemental Benefits to Retired Players. Vasquez Decl. ¶ 28; NFL Parties' Actuarial Materials ¶ 10.

### ii. Test Battery

Baseline assessment examinations subject Retired Players to a Test Battery that provides a comprehensive neuropsychological and neurological examination. The Test Battery consists of four components, all administered by a board-certified neurologist and an appropriately credentialed neuropsychologist. First, the Advanced Clinical Solutions Test of Premorbid Functioning ("TOPF") is used to estimate a Retired Player's basic pre-injury ability level. *See* Settlement Ex 2. Second, a series of tests assesses a Retired Player's level of functioning in five

cognitive domains, including complex attention and processing speed, executive functioning, learning and memory, language, and spatial-perceptual. *Id.* The series also includes tests of functional impairment, such as a Retired Player's ability to perform daily chores. Third, the Test Battery includes two tests that focus on emotional functioning and aspects of personality, the MMPI-2RF and the Mini International Neuropsychiatric Review ("Mini"). *Id.* Finally, there are several "validity" measures, designed to ensure that test takers are not intentionally submitting incorrect answers to seem impaired. *Id.*

Collectively, these tests provide Retired Players with a comprehensive baseline assessment of their cognitive capabilities and their neuropsychological state. See Dr. Fischer Decl. ¶ 14. Numerous empirical studies show that these tests are effective at identifying impairment, especially in persons who have sustained brain injury. *Id.* ¶ 16. It would be very difficult for any significant neurological abnormalities to escape an examination of this breadth.[79]

Objectors argue that the Test Battery does not resemble exams typically given by neuropsychologists in the field.[80] This is incorrect. The Parties and their experts did not construct any test from scratch; each individual exam in the Test Battery is a well-established and validated tool for diagnosing neurocognitive impairment in any age group and is supported by extensive empirical testing to ensure its validity. *See, e.g.*, Dr. Kelip Decl. ¶¶ 28, 33; Dr. Millis Decl. ¶¶ 17-20, 24-25; Dr. Hamilton Decl. ¶ 14 (practicing physician noting that the Test Battery includes exams that are "very similar (and, in many cases, identical)" to tests used in every day practice for these types of diagnoses). The TOPF is a well-accepted exam for

---

[79] *See* Dr. Fischer Decl. ¶ 14 (noting that the Test Battery will include "constitutional evaluation, mental status testing, speech testing, full cranial nerve investigation, motor function, sensory function, coordinative testing, reflex testing, back and neck evaluation, and gait and posture").

[80] *See, e.g.*, Morey Obj. at 73 ("The testing protocols prescribed by the Settlement are generally considered inappropriate for the evaluation of individuals with neurodegenerative diseases."); Drs. Masel & O'Shanick Decl. ¶ 12 (arguing for a "more holistic, human-based, and less linguistically reliant" examination); Duerson Obj. at 24.

estimating premorbid function.[81]  Dr. Millis Decl. ¶ 17.  The cognitive domains tested in the Test

Battery are those laid out in the Neurocognitive Disorders section of the DSM-5.  *See* Dr. Kelip

Decl. ¶ 17.  Functional impairment is measured by the National Alzheimer's Coordinating

Center's CDR scale, a validated and commonly-used scale for assessing the progression of

dementia symptoms.  *See* Settlement Ex. 1; Dr. Kelip Decl. ¶ 35.  A survey of 747 well-

credentialed psychologists "shows that the tests included in the Test Battery are among the most

widely used neuropsychological tests across all patient groups."  Dr. Millis Decl. ¶ 25.

Objectors also argue that the Test Battery's five-hour length is excessive, and that many

genuinely impaired Retired Players will be unable to complete it.  *See* Morey Obj. at 73; Dr.

Stern Decl. ¶ 44.  The Test Battery contains countermeasures to ensure that this does not occur.

Most of the individual tests administered have "stopping rules" that allow the examiner to

shorten the exam based on how the participant is performing.  *See* Dr. Millis Decl. ¶ 26.  More

broadly, the neurologists and neuropsychologists who will administer the Test Battery will have

training and experience administering tests of this length to impaired subjects.  *See id.*; Dr. Kelip

Decl. ¶ 40.  Empirical evidence shows that patients suffering from dementia can tolerate tests of

this length.  *See* Dr. Kelip Decl. ¶¶ 36, 40.

Objectors also challenge the Test Battery's validity measures and argue that these exams will

produce false positives and exclude Retired Players who are legitimately impaired.  *See* Dr. Stern

Decl. ¶ 46.  Validity measures, however, are universally regarded as a necessary component of

any neurocognitive testing because they ensure the reliability of the data.  Dr. Millis Decl. ¶ 28;

Dr. Kelip Decl. ¶ 43.  They are particularly reasonable where, as here, test takers have a

---

[81] Some Objectors argue that the TOPF disadvantages those with accents because one component asks participants to read a list of words and pronounce them exactly.  *See* Drs. Masel & O'Shanick Decl. ¶ 14. The TOPF, however, also includes demographic formulas based on age, education, and gender that provide an alternative means for assessing premorbid ability.  Dr. Millis Decl. ¶ 37.

significant financial incentive to appear impaired.  The Test Battery incorporates well-established validity criteria that take into account the overall performance of the subject and how that performance compares to known patterns of impairment. Dr. Millis Decl. ¶ 30; Dr. Kelip Decl. ¶ 44.

Finally, many Objectors argue that the Test Battery provides insufficient testing for mood and behavioral conditions allegedly associated with CTE.[82]  Because the Settlement does not compensate these conditions, more limited testing is reasonable.  Nonetheless, the Test Battery does include two tests, the Mini and MMPI-2RF, which exclusively test for mood and behavioral abnormalities.  These two tests include questions on irritability, lowered inhibitions, suicidal thinking, and depression. *See* Dr. Kelip Decl. ¶ 39; Dr. Hamilton Decl. ¶ 22.  Red flags on these neuropsychological tests can become the focus of follow up care, including additional testing and treatment.

### iii.  BAP Protocols

Objectors challenge the age cutoffs for baseline assessment examinations and the ten-year length of the BAP.[83] *See* Morey Obj. at 74; Armstrong Obj. at 19-20; Alexander Obj. at 7. These requirements are both reasonable and scientifically based.

A Retired Player who is younger than 43 has ten years or until his 45th birthday, whichever happens first, to receive a baseline assessment examination. *See* Settlement § 5.3.  A Retired Player 43 or older has two years from the commencement of the BAP to receive an exam. *Id.*  In all circumstances, a Retired Player will have at least two years to receive a baseline assessment

---

[82] *See, e.g.*, Duerson Obj. at 23 ("The BAP does not test for the mood and behavioral disorders that plague many individuals who suffer from CTE, effectively excluding a significant number of Class Members from the possibility of compensation."); Morey Supplemental Obj. at 3, ECF No. 6232.

[83] Objectors also challenge the 180-day registration requirement. *See* Armstrong Obj. at 19. Because this is a prerequisite to many settlement benefits, it is discussed *infra* Section V.E.ii.

examination. Two years is a reasonable period of time for a Retired Player to complete a free, five-hour exam.

Both the structure of the Settlement and neurological science justify these deadlines. The age offset decreases the Monetary Awards for Qualifying Diagnoses rendered after age 45. *See* Settlement Ex. 3. As discussed *supra*, this is because Retired Players' most significant risk factor for developing each Qualifying Diagnosis is age. *See* Vasquez Decl. ¶ 11; Dr. Yaffe Decl. ¶ 50. Timely baseline assessment examinations ensure that funds are most likely to be distributed to Retired Players whose symptoms are a result of playing NFL Football. These deadlines also work to the benefit of Retired Players. Earlier exams may lead to earlier Qualifying Diagnoses and result in higher awards. Even if a Retired Player is not yet impaired, an earlier exam will provide a more accurate picture of the Retired Player's premorbid functioning. The same reasoning justifies the ten-year limit on the BAP.

### iv. Selection Process for Qualified BAP Providers

Only pre-selected Qualified BAP Providers may administer baseline assessment examinations. Settlement § 5.2. The BAP Administrator will select these BAP Providers, subject to limited veto rights of both the NFL Parties and Co-Lead Class Counsel. *See id.* § 5.7(a)(i) (providing for 20 vetoes each). Some Objectors argue that this unfairly slants the process towards the NFL Parties because the neuropsychologists selected "are likely to be far more conservative in 'calling' impairment than a neuropsychologist chosen by a player." Armstrong Obj. at 20; *see also* Alexander Obj. at 8.

The selection requirement is reasonable. Qualified BAP Providers must be well-trained and credentialed. Neurologists must be board certified, and neuropsychologists must certified by the American Board of Professional Psychology or the American Board of Clinical

Neuropsychology. *See* Settlement § 5.2.  A BAP Provider is ineligible if he has committed a crime of dishonesty. *Id.* § 5.7(a)(ii).  Co-Lead Class Counsel also have the ability to veto potential Qualified BAP Providers, and an absolute right to exclude any BAP Provider with some connection to the litigation as an expert witness or consultant.[84] *Id.* § 5.7(a)(i).

### v.  Use of Mail Order Pharmacy Vendors

The Qualified BAP Pharmacy Vendors that provide prescription drugs as part of BAP Supplemental Benefits are all mail order pharmacies. *See id.* §§ 2.1(xxx); 5.7(b).  Objectors challenge this limitation, claiming that mail order pharmacies may be unable to deliver certain necessary medications because of storage requirements and will "deprive Class Members of the personal, face-to-face counseling available at local 'brick and mortar' pharmacies."  Armstrong Obj. at 23.

The Claims Administrator intends to work with all potential mail order Qualified BAP Pharmacy Vendors to ensure that each "offers the option to fill prescriptions at a local retail pharmacy, when necessary, due to the transportation and storage requirements of required therapies; the necessity of frequent medication dose adjustments . . . [and] the desire of Class Members to avail themselves of 'face-to-face' counseling."  Garretson Aff. ¶ 15.  Thus, there is no reason for concern.

For all of the reasons discussed above, the Baseline Assessment Program is reasonable. Objections to the BAP are overruled.

---

[84] Some Objectors argue that this rule is unfair because it prejudices the ability of Opt Outs to retain experts to prosecute their cases.  Because a physician cannot be both an Opt Out's expert witness and a Qualified BAP Provider, Objectors imply that physicians will choose to become Qualified BAP Providers rather than serve as experts for Opt Outs. *See* Morey Obj. at 86.  However, Objectors lack standing to assert the rights of Opt Outs because they are Class Members.  Moreover, Objectors cite no evidence that the pool of available physicians is small enough for this to be a burden.

E.    **Objections to the Claims Process**

Objectors argue that the claims process is unduly burdensome.  They fear that few Class

Members will submit claims, and that Class Members who do submit claims will be thwarted by

a "complex and burdensome administrative process."  Morey Obj. at 73; Heimburger Obj. at 18.

Objectors fail to consider that the claims process needs to be rigorous enough to deter

submission of fraudulent claims.  Monetary Awards may amount to hundreds of thousands if not

millions of dollars to eligible Class Members.  Settlement Ex. 3.  The NFL Parties are entitled to

reasonable procedures and documentation to ensure that large awards go to deserving claimants.

In cases with large awards, an overabundance of fraudulent claims, rather than a dearth of valid

ones, is the main concern.  Submission of fraudulent claims to class settlements is, unfortunately,

a documented phenomenon.  *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine)*

*Prods. Liab. Litig.*, 573 F. App'x 178, 180 (3d Cir. 2014) (noting that the settlement was

"inundated with fraudulent claims that included manipulated [medical] test results"); *United*

*States v. Penta*, No. 08-0550 (E.D. Pa. Sept. 11, 2008) (indictment charging five people, who all

ultimately pleaded guilty, with submitting $40 million in fraudulent claims to the *Nasdaq*

*Market-Makers*, *Cendant*, and *BankAmerica Securities* settlements); *Oetting v. Green Jacobson,*

*P.C.*, No. 13-1148, 2014 WL 942952, at *1 (E.D. Mo. Mar. 11, 2014) (noting millions of dollars

of false claims submitted in *BankAmerica Securities* settlement).

Objectors also fail to consider the protections built into the Settlement to ensure that

deserving claims are approved.  Specifically, the Claims Administrator responsible for

implementing the claims process is an independent entity subject to oversight by an independent

Special Master and, ultimately, this Court.  *See* Settlement § 5.6(a)(iv) ("The Special Master . . .

will oversee the BAP Administrator, and may, at his or her sole discretion, request reports or

information from the BAP Administrator"); *id.* § 10.2(a)(iii) ("The Court may, at its sole discretion, request reports or information from the Claims Administrator."); *id.* § 10.2(e) (Claims Administrator may be replaced for cause upon order of the court, or by joint motion of the Parties). This independent oversight will ensure that all claims are objectively evaluated. Additionally, the NFL Parties have contracted to implement the Settlement in good faith, and remain subject to this Court's continuing jurisdiction and oversight. *See id.* §§ 20.1(n), 27.1 ("[T]he Court retains continuing and exclusive jurisdiction . . . to interpret, implement, administer and enforce the Settlement . . . ."); *id.* § 30.11 ("Counsel for the NFL Parties will undertake to implement the terms of this Settlement in good faith.").

### i. Cognitive Impairment of Certain Retired Players

Objectors argue that the claims process is unreasonable because Retired Players suffering from cognitive impairment cannot be expected to keep track of forms, deadlines, and submission requirements. *See, e.g.*, Morey Obj. at 78 ("Someone laboring under [a Qualifying Diagnosis] has little hope of navigating the procedural morass required to claim payment under the Settlement."); Carrington Obj. at 7.

The Settlement reasonably accommodates the needs of cognitively impaired Retired Players. The Settlement allows any Class Member to use a representative to conduct the claims process for him. Any Class Member may retain counsel to compile and submit any relevant forms on his behalf. Settlement § 30.2(a). The Settlement provides an extension of the registration deadline for good cause, and an opportunity for any Class Member to cure an incomplete Claim Package. *See id* §§ 4.2(c)(i), 8.5. The Claims Administrator, who is experienced in administering claims in personal injury settlements, will be especially sensitive to the needs of cognitively impaired Retired Players. *See* Brown Decl. ¶ 57.

114

### ii.  Registration Requirement

Class Members must register with the Claims Administrator within 180 days of receiving notice that the Settlement has gone into effect. *See* Settlement § 4.2(c).  Registration is a prerequisite to Class Members' receipt of most Settlement benefits, including receipt of Monetary Awards and participation in the BAP. *See id.* §§ 5.1, 6.2.  Objectors assert that this creates an unfair "opt in" settlement.  Morey Obj. at 74.  The registration requirement is reasonable, not onerous. *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 316 (3d Cir. 2001) ("[D]eadlines are an integral component of effective consolidation and management of the modern mass tort class action.").

To register, a Class Member must only submit basic biographical information, including name, contact information, and the dates and nature of a Retired Player's employment with the NFL Parties sufficient to determine that the registrant is a Class Member.[85] *See* Settlement § 4.2(b).  In the event that a Class Member cannot register in the six-month window, the Settlement provides an extension for good cause. *Id.* § 4.2(c).  If the Claims Administrator rejects a Class Member's application, he has an opportunity to appeal. *Id.* § 4.3(a)(ii); *see also Diet Drugs*, 2000 WL 1222042, at *20, 23-24 (describing various registration requirements for benefits).

Class Members will receive ample reminders to complete the registration process.  Within 30 days of the Effective Date of the Settlement, Class Members will be mailed materials reminding them to register.  Settlement § 14.1(d).  An automatic telephone service established by the Claims Administrator will likewise inform Class Members of upcoming deadlines. *See id.* §§ 4.1(b), 10.2(b)(i)(2), 14.1(d).

---

[85] Representative and Derivative Claimants must also identify the Retired Player through whom they have a claim. *See* Settlement §§ 4.2(b)(i)-(ii).

The registration requirement is not a meaningless exercise; rather, it enables the Settlement to provide key services. The BAP Administrator and Claims Administrator must approve lists of Qualified BAP Providers and Qualified MAF Physicians to provide baseline assessment examinations and make Qualifying Diagnoses. Class Members' contact information enables the BAP Administrator to appoint physicians in sufficient quantity and geographical distribution to ensure that all Class Members can access these benefits. *See id.* §§ 5.7(a)(ii), 6.5(b). Registration also enables more effective communication between the Claims Administrator and the Class, so that Class Members may remain abreast of deadlines and other relevant information. *See id.* § 4.2(b) (asking registrants to choose between email, U.S. mail, and other methods of communication); *id.* § 4.3(a)(i) (noting that, upon successful registration, Class Members will receive access to a secure web-based portal that provides information regarding the Claim Package and awards).

### iii. Use of Qualified MAF Physicians

After the Effective Date, Retired Players must, at their own expense, visit Qualified MAF Physicians to receive a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, or ALS.[86] *See id.* §§ 6.3(b), 6.5(a). Objectors argue that Class Members should be allowed to choose their own physicians to reduce the burden of obtaining Qualifying Diagnoses. *See* Morey Obj. at 76 (noting lack of hardship provision for Class Members geographically isolated from a Qualified MAF Physician); Daniel Obj. at 1-2, ECF No. 6367; Erickson Obj. at 5, ECF No. 6380; Taylor Obj. at 2-3, ECF No. 6397.

Requiring Retired Players to visit a Qualified MAF Physician to receive certain Qualifying Diagnoses is reasonable. Qualified MAF Physicians must be board certified and able to perform

---

[86] Qualifying Diagnoses of Levels 1.5 and 2 Neurocognitive Impairment may be made by both Qualified MAF Physicians and through the BAP by Qualified BAP Providers. *See id.* § 6.3(b). Compensation for Death with CTE ends on the Final Approval Date. *See supra* Section V.A.iii.

the exams necessary to render Qualifying Diagnoses.  *See* Settlement §§ 2.1(www), 6.5(c).  A

Retired Player's primary care physician will not necessarily have this training.  Moreover,

visiting a Qualified MAF Physician is not an undue burden.  The Claims Administrator must take

into account geographic proximity to Retired Players when selecting Qualified MAF Physicians.

*See id.* § 6.5(b).

### iv.  Claim Package

To receive a Monetary Award, a Class Member must submit a Claim Package that includes a

signed Claim Form, records demonstrating employment with the NFL Parties, a Diagnosing

Physician Form, and medical records reflecting a Qualifying Diagnosis.  *Id.* § 8.2(a).  As

amended, the Settlement allows a Representative Claimant of a deceased Retired Player to

petition the Claims Administrator to excuse the latter two requirements if those records were lost

in a hurricane or other *force majeure* type event, and the Representative Claimant can produce a

death certificate referencing the Qualifying Diagnosis.[87]  *Id.* § 8.2(a)(ii).  To demonstrate that a

Retired Player participated in more than one Eligible Season, a Class Member must include

evidence beyond a Retired Player's sworn statement attesting to his playing time.  *Id.* § 9.1(a)(i).

A Claim Package "must be submitted to the Claims Administrator no later than two (2) years

after the date of the Qualifying Diagnosis or within two (2) years after the Settlement Class

Supplemental Notice is posted on the Settlement Website, whichever is later."  *Id.* § 8.3(a)(i).

The contents of the Claim Package are reasonable.  "Class members must usually file claims

forms providing details about their claims and other information needed to administer the

settlement."  Manual for Complex Litigation § 21.66 (4th ed.).  Only information necessary to

determine that a Retired Player played in the NFL and received a Qualifying Diagnosis is

---

[87] The amendment addresses the concerns raised in the objection of Delano Williams.  *See* D. Williams Obj. at 4-6, ECF No. 6221.

required.  Objectors complain that the specific forms constituting the Claim Package have not been disclosed, but cite no source requiring disclosure at this stage.  *See* Morey Obj. at 75.  Class Members will receive "detailed information regarding the Claim Package" and application process upon registration.  Settlement § 4.3(a)(i).

Objectors challenge the requirement that a Retired Player needs to submit more than just a sworn statement in order to receive more than one Eligible Season credit.  *See id.* § 9.1(a)(i); Morey Obj. at 75 (contending that there is "no possible justification for this procedural hurdle because *the NFL itself has this data*").  This requirement, however, is reasonable as an initial screen to weed out fraudulent claims.  If a Class Member's proffered evidence is insufficient, the NFL Parties and individual Member Clubs are required to turn over, in good faith, any records that they possess.  *See id.* § 9.1(a); *Varacallo*, 226 F.R.D. at 243 (concluding that it is reasonable to require submission of documents in support of a claim even though the defendant was also required to submit a file that "may [have] contain[ed] information that would support" the claim).  Moreover, Retired Players likely retain employment records, especially because their retirement and disability benefits similarly turn on the number of seasons played.  *See* Andrew Stewart Obj. at 7 ("The Term 'Credited Season' is familiar to all players and is routinely used to determine eligibility pension and disability benefits."); *id.* Ex. 6, ECF No. 6175-3 (Bert Bell/Pete Rozelle NFL Player Retirement Plan).

Finally, Objectors challenge the two-year window the Settlement provides Class Members to submit a Claim Package after a Retired Player has received a Qualifying Diagnosis.  However, courts in the Third Circuit have upheld far shorter periods.  *See In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, 2007 WL 542227, at *10 (D.N.J. Feb. 16, 2007) (holding that five-month period to submit claims forms is reasonable), *aff'd*, 679 F.3d 241 (3d Cir. 2009); *Processed Egg*

*Prods.*, 284 F.R.D. at 256 (approving settlement where class members had "127 days from the postmark date that the notice of the settlement was mailed by first-class mail . . . to return a completed Claim Form to make a claim for benefits"). Moreover, if a Class Member can demonstrate substantial hardship, then this window may be expanded by an additional two years. *See* Settlement § 8.3(a)(i).

### v.  Appeals Process

Class Members, Co-Lead Class Counsel, and the NFL Parties may each appeal the Claims Administrator's decision as to whether a Class Member is entitled to a Monetary Award. *Id.* § 9.5. To appeal, a Class Member must pay a $1,000 fee, which will be refunded if the appeal is successful. *Id.* § 9.6(a). As amended, the Settlement allows the Claims Administrator to waive the fee if a Class Member can show financial hardship.[88] *Id.* § 9.6(a)(i). Appeals are limited to five single-spaced pages, and subject to proof by clear and convincing evidence. *Id.* §§ 9.7(a), 9.8. The Court is the ultimate arbiter of any appeal, and may consult a member of an Appeals Advisory Panel for medical advice. *Id.* § 9.8.

Objectors contend that exempting the NFL Parties from an appeal fee is unfair, and that the exemption will allow them to undertake unlimited appeals. Armstrong Obj. at 23-24; *see also* Morey Obj. at 76. The NFL Parties may only undertake appeals in good faith, and Co-Lead Class Counsel may petition this Court for appropriate relief if the NFL Parties subvert this requirement. *See* Settlement § 9.6(b).

Objectors also argue that the five-page limit and the clear and convincing standard will make successful appeals "extremely rare." Armstrong Obj. at 24. These provisions, however, also apply to the NFL Parties and thus protect favorable awards to Class Members. Moreover, the

---

[88] This amendment addresses a concern raised by several Objectors. *See, e.g.*, Morey Obj. at 76; Armstrong Obj. at 23-24.

five-page limit applies only to written statements; additional medical records and other evidence in support of an appeal are exempted. *See* Settlement § 9.7(a). Furthermore, even if an appeal is unsuccessful, a Class Member may submit another Claim Package.[89]

### vi.  Anti-Fraud Provisions

To ensure that only Retired Players actually affected by neurocognitive or neuromuscular impairment—and their Representative and Derivative Claimants—receive Monetary Awards, the Settlement establishes an audit system. Objectors incorrectly contend that these are "anti-payment provisions." Morey Obj. at 77 (internal quotation marks omitted).

Audits are particularly appropriate in this case because the Settlement offers substantial cash awards; Class Members will receive hundreds of thousands, if not millions of dollars. *See* Manual for Complex Litigation § 21.66 (4th ed.) ("Large claims might warrant a field audit to check for inaccuracies or fraud."). Additionally, the proposed audits are reasonable in scope. The Claims Administrator will randomly audit 10% of each month's successful award applications. *See* Settlement § 10.3(c). It will also audit claims that raise predetermined red flags, such as those from Class Members who already submitted an unsuccessful Claim Package in the last year. *See id.* § 10.3(d). Though an audit may require Class Members to submit additional documentation, only those who unreasonably refuse to comply with the procedure will forfeit their claims. *See id.* §§ 10.3(b)(ii), 10.3(e). While the NFL Parties may conduct their own audits, they may only do so in good faith and at their expense. *Id.* § 10.3(a).

### F.  Other Objections

### i.  Education Fund

Objectors argue that the Education Fund, which provides $10 million in funding to youth football safety initiatives and programs educating Retired Players about their NFL CBA Medical

---

[89] Repeated Claim Package submissions may trigger audits. *See infra* Section V.E.vi.

and Disability Benefits, is an improper *cy pres* distribution and should be eliminated. *See* Heimburger Obj. at 21-23; Armstrong Obj. at 29-34; Settlement § 12.1. The Education Fund is not a *cy pres* distribution, and even if it were, it is reasonable.

*Cy pres* involves the distribution of unclaimed or residual settlement funds to third parties. *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) ("[A] *cy pres* distribution is designed to be a way for a court to put any *unclaimed* settlement funds to their next best compensation use . . . ." (emphasis added) (internal quotation marks omitted)); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2008 WL 4542669, at *3 (E.D. Pa. Oct. 3, 2008) (noting that federal courts create *cy pres* distributions based upon their "broad discretionary powers to shape equitable decrees for distributing *unclaimed* class action funds" (emphasis added)); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 362 F. Supp. 2d 574, 576 (E.D. Pa. 2005) ("A court may also utilize *cy pres* principles to distribute *unclaimed funds* from a class action settlement." (emphasis added)).

In this case, the Education Fund is a separate allocation distinct from the Monetary Award Fund and the BAP Fund, and does not direct how unclaimed funds should be distributed. Eliminating the Education Fund would not result in more Class Members receiving Monetary Awards or baseline assessment examinations because the NFL Parties have already guaranteed these benefits to eligible claimants. Moreover, Education Fund benefits inure in part directly to Class Members; the Fund educates Retired Players about their medical and disability benefits under their Collective Bargaining Agreements.

Even if the Education Fund were a *cy pres* distribution, it is nonetheless justified. In *Baby Products*, the Third Circuit noted that *cy pres* provisions are appropriate if a settlement contains sufficient direct benefit to the class. 708 F.3d at 174; *see also id.* at 176 ("We do not intend to

raise the bar for obtaining approval of a class action settlement simply because it includes a *cy pres* provision.").

Direct distributions to Class Members constitute the vast majority of the Settlement. *Compare* Settlement § 23.1(c) (noting Education Fund is $10 million), *with* Class Counsel's Actuarial Materials at 3 (estimating "total compensation of approximately $950 million") *and* NFL Parties' Actuarial Materials ¶ 20 (estimating "approximately $900 million will be paid out"). Additionally, by funding football safety initiatives, the Education Fund deals with the chief harm alleged in the Class Action Complaint: the risks of head injury from football. *See Baby Prods.*, 708 F.3d at 172 ("We join other courts of appeals in holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury."); *Harlan v. Transworld Sys., Inc.*, No. 13-5882, 2015 WL 505400, at *10 (E.D. Pa. Feb. 6, 2015) (approving a settlement with a *cy pres* distribution when it assisted "Class Members in knowing and protecting their rights"); *cf. Schwartz*, 362 F. Supp. 2d at 577 (E.D. Pa. 2005) (rejecting a *cy pres* "distribution to either a law school's legal clinic or a charter school . . . [because it] does not touch upon the subject matter of the law suit (football or sports-related activities)").

The Education Fund is not a *cy pres* distribution. Even if it were, it is reasonable.

### ii. Statutes of Limitations Waiver

Class Counsel negotiated a statutes of limitations waiver for any Representative Claimants of Retired Players who died on or after January 1, 2006. Representative Claimants of Retired Players who died prior to January 1, 2006 must demonstrate that their claims would not be barred by the relevant state's statute of limitations in order to be eligible for Monetary Awards.

Settlement § 6.2(b). For statutes of limitations analyses, the Settlement deems Class Members who have not commenced individual suits against the NFL Parties to have filed their claims on June 25, 2014, the date Class Counsel moved for preliminary approval of the Settlement. *See id.* §§ 2.1(pppp), 6.2(b).

Objectors challenge the 2006 cutoff date for any waiver of a statute of limitations. *See* D. Williams Obj. at 1-4, ECF No. 6221. That additional Class Members may have benefitted from a more generous rule does not render the 2006 cutoff date unfair. "[L]ines must be drawn somewhere, and the objectors have failed to demonstrate that the line drawn here was not reasonable." *Deepwater Horizon Economic Loss Settlement*, 910 F. Supp. 2d at 949. Moreover, that Class Counsel were able to negotiate any waiver represents a benefit to the Class.

Objectors also argue that the June 25, 2014 filing date—the date Class Counsel moved for preliminary approval—is prejudicial. They claim that under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the statutes of limitations for their claims were tolled as of August 17, 2011, the date Class Counsel filed the *Easterling* putative class action, and that the date Class Counsel moved for preliminary approval is irrelevant. *See* Kinard Obj. at 3-4, ECF No. 6219.

Contrary to Objectors' assertion, if a state has adopted an analogue to the *American Pipe* rule,[90] Class Members will be able to argue that their claims are timely. The Court will consider all applicable state law—including tolling rules—to determine if a Class Member is eligible for a Monetary Award. Moreover, the Parties recognize the Court's authority to conduct a statute of limitations analysis for each wrongful death or survival claim. *See* Settlement § 6.2(b) (recognizing that a "Representative Claimant of a deceased Retired NFL Football Player will be

---

[90] *American Pipe* itself does not apply because the doctrine deals only with federal statutes of limitations, and the Class Action Complaint included only state law claims. *See* McLaughlin on Class Actions § 3:15 (11th ed.) ("*American Pipe* did not itself announce any tolling rule applicable to state law claims."); *Vincent v. Money Store*, 915 F. Supp. 2d 553, 561 (S.D.N.Y. 2013) ("The plaintiffs must look to any state analogue to *American Pipe* tolling rather than *American Pipe* itself.").

eligible for a Monetary Award . . . if the Court determines that a wrongful death or survival

claim filed by the Representative Claimant would not be barred by the statute of limitations

under applicable state law"); Parties' Joint Proposed Findings of Fact ¶ 414, ECF No. 6497.

### iii.  Releases

Objectors argue that the Releases are overbroad because they release CTE claims.  This

position, however, is merely an extension of the argument that the Settlement does not

compensate CTE.  *See e.g.*, Morey Obj. at 28 ("Class Counsel and the NFL have offered no

justification for the Settlement's failure to compensate current and future cases of CTE—while at

the same time requiring a release of all CTE claims."); Alexander Obj. at 9-10.  Because this is

incorrect, *see supra* Section V.A, this objection is overruled.

Indeed, failing to release CTE when its alleged symptoms are included in other Qualifying

Diagnoses would permit Class Members double recovery.  *See Prudential*, 148 F.3d at 326

(holding that the settlement properly released all claims arising out of "a common scheme of

deceptive sales practices").  Moreover, a broad release that "achiev[es] global peace is a valid,

and valuable, incentive to class action settlements."  *Sullivan*, 667 F.3d at 311 (rejecting

dissenting colleagues' suggestion to limit class to those with colorable claims because "those

ultimately excluded would no doubt go right back into court to continue to assert their claims");

*see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 366 (3d Cir. 2001)

(noting that "permitting parties to enter into comprehensive settlements that prevent relitigation

of settled questions" serves an "important policy interest of judicial economy" (internal quotation

marks omitted)).[91]

---

[91] Objectors also argue that the Releases could be construed as a release of claims in *Dent*, a related
lawsuit against the NFL Parties.  *See* Armstrong Obj. at 34.  This objection is now moot.  On December
17, 2014, the *Dent* court held that the plaintiffs' claims were preempted by their Collective Bargaining
Agreements.  Order, *Dent*, No. 14-2324, ECF No. 106 (N.D. Cal. Dec. 17, 2014); *supra* Section IV.B.iv.

The Releases are fair and reasonable.

### iv.  NFL Parties' Security

Objectors question whether sufficient funds will exist throughout the 65-year life of the

Monetary Award Fund to pay all valid claims.  Specifically, they challenge the security that the

Statutory Trust provides.  The Settlement's security provisions, however, are adequate.

"No later than the tenth anniversary of the Effective Date,"[92] the NFL Parties will establish a

Statutory Trust that as of the tenth anniversary date "shall contain funds that, in the reasonable

belief of the NFL Parties . . . will be sufficient to satisfy the NFL Parties' remaining anticipated

payment obligations."  Settlement § 25.6(d).  The NFL Parties' creditors will not be able to

access this fund, and its sole purpose will be to ensure that funds are available to pay Monetary

Awards.  *Id.* (noting withdrawals will only be permitted to pay claims, maintain the Trust, return

excess security, and wind down the Trust when the Settlement expires).

Objectors argue that the NFL Parties' "'reasonable belief'" of what is sufficient is an illusory

protection because financial predictions decades in advance are unreliable.  Utecht Obj. at 11

(quoting Settlement § 25.6(d)); *see* Utecht Supplemental Obj. at 7, ECF No. 6437.  Several

factors, however, limit the uncertainty the NFL Parties will face when determining how much to

place into the Trust.  The pool of Retired Players, and thus potential claimants, is finite.

Additionally, other than adjustments for inflation, Monetary Awards are fixed sums.  Most

importantly, the Settlement delays creation of the Trust precisely to allow the NFL Parties to

---

After the plaintiffs failed to amend their complaint, the court dismissed the case. *See* Judgment, *Dent*, No. 14-2324, ECF No. 107 (N.D. Cal. Dec. 31, 2014).

[92] Objectors do not seriously question the security for the first ten years of the Settlement.  The NFL Parties promise to pay $120 million over the first six months of the Settlement. *See* Settlement § 23.3(b). Thereafter, they will refill the Settlement Trust Account based on the Claims Administrator's monthly funding requests. *Id.* § 23.3(b)(ii).  A targeted reserve will ensure a surplus over the life of the Settlement. *See id.* § 23.3(b)(v).  The NFL Parties also warrant that they will maintain an investment grade rating on their Stadium Program Bonds during this ten-year period to serve as additional security. *See id.* § 25.6(a).

collect ten years of data regarding payouts from the Monetary Award Fund. The NFL Parties will use this data to create a reasonable estimate of the financial needs of the MAF for its remaining 55 years. Claims data from Retired Players who retired decades ago will provide a useful estimate of the funds required to ensure that younger Retired Players will receive payment as they age.

Moreover, independent of the Statutory Trust, the NFL Parties remain personally liable for their payments under the Settlement.[93] In the event of material default, the Settlement provides that the Court may nullify the Releases, allowing Class Members to return to the tort system. *See* Settlement § 25.6(g). Though Objectors are correct that anything can happen over the course of 55 years, the personal liability of the NFL Parties nonetheless provides real security. The NFL Parties have substantial and reliable revenue streams. *See, e.g.*, Morey Obj. at 58 (noting that the NFL Parties have $10 billion in annual revenue in part because of renewable TV deals). While the NFL Parties' income is not projected to decline, the Settlement's pool of potential claimants will decrease in size as Class Members age. Thus, the Settlement becomes comparatively less of a liability to the NFL Parties as time passes.

Finally, Objectors insist on a "*fully collateralized guaranty,*" but provide no legal precedent in support of that requirement.[94] Utecht Final Obj. at 7, ECF No. 6454. In sum, the NFL Parties' proffered security is reasonable.

---

[93] Objectors contend that the NFL Parties are not personally liable because they have "agreed only to pay money into certain trusts from which awards may be paid." Utecht Supplemental Obj. at 10, ECF No. 6437. This is incorrect. Independent of the provisions establishing the Statutory Trust, the Settlement states that "the NFL Parties will pay . . . money sufficient to make all payments [in the Monetary Award Fund.]" Settlement § 23.1. Moreover, trust law mandates the inclusion of the Settlement provision cited by Objectors. Pursuant to trust law, after initial instructions, the entity that establishes a trust may not order the trustee to make specific disbursements.

[94] Objectors repeatedly allege that the NFL Parties and Co-Lead Class Counsel falsely represented the security provisions of the Settlement. *See* Utecht Supplemental Obj. at 14-16; Utecht Final Obj. at 1,

### v. Objector Signature Requirement

Amici contend that requiring Class Members to personally sign their objections to the Settlement is an unnecessary hurdle designed to deter filings. *See* Mem. of Public Citizen at 9-11. However, they cite no relevant support for their argument. Requiring Class Members to personally sign their objections does not violate Federal Rule of Civil Procedure 23(c)(2)(B)(iv), which allows Class Members to "enter an appearance through an attorney," or 28 U.S.C. § 1654, which allows parties to "plead and conduct their [] cases . . . by counsel." *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 355 (6th Cir. 2009) (holding that "the district court appropriately exercised its power by requiring individually signed opt-out forms" and noting that the right in the Michigan Constitution to prosecute a suit by an attorney did not save the objector's argument).

On the contrary, a class member's signature is commonly required to object or opt out. *See, e.g., Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 501 n.43 (E.D. Pa. 1995) (noting denial of requests "to permit attorneys' signatures on exclusion request forms"); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *15 (E.D. La. Jan. 10, 2012) ("All objections must be signed by the individual Class Member . . . .").

### vi. Lien Resolution Program

Amici challenge the Lien Resolution requirements in the Settlement, claiming they "could indefinitely block payments to [C]lass [M]embers." Mem. of Public Citizen at 11. Amici argue that payments will necessarily be delayed because the Settlement mandates satisfaction of a Class Member's governmental health insurance liens before the payment of any award. *See*

---

ECF No. 6454. This claim has no merit. The terms of the Settlement were readily available for Class Members to inspect, and no evidence of fraudulent intent exists.

127

Settlement § 11.3(g). Contrary to Amici's characterization, however, the Lien Resolution program that accompanies these provisions is a substantial benefit for Class Members.

The NFL Parties' insistence on lien satisfaction as a precondition to disbursement of awards is reasonable. Similar lien satisfaction provisions exist in virtually all mass tort and class action personal injury settlements. Garretson Aff. ¶ 23. Federal law mandates Medicare's secondary payer status, and requires states to seek reimbursement as a condition of receiving Medicaid funds. 42 U.S.C. § 1395y(b)(2)(B)(ii)-(iv); 42 U.S.C. § 1396a(a)(25). Settling tortfeasors that fail to comply with these reimbursement requirements face significant penalties. *See, e.g.*, 42 U.S.C. § 1395y(b)(2)(B)(iii) (authorizing the United States to sue for double damages); Garretson Aff. ¶ 23.

The Lien Resolution program will streamline this necessary process and ensure that Class Members receive Monetary Awards as quickly as possible. The Lien Resolution Administrator, Garretson Resolution Group ("GRG"), pioneered the practice and has successfully administered it in four other mass tort settlements. *See In re Zyprexa Prods. Liab. Litig.*, 451 F. Supp. 2d 458, 461 (E.D.N.Y. 2006) (praising "unique series of agreements" that could "provide a model for the handling of Medicare and Medicaid liens in future mass actions"); Garretson Aff. ¶ 25. GRG intends to execute an aggregate resolution of many of Class Members' claims, avoiding the delays inherent in individual processing. *See* Garretson Aff. ¶¶ 28(a)(1)-(4). For the remaining Class Members, GRG expects to be able to determine "holdback" amounts that will allow for immediate disbursement. GRG will estimate the expected future costs of a particular Qualifying Diagnosis, and withhold that sum from a Class Member's Monetary Award, distributing the remainder to the Class Member immediately. In the event that a Class Member's medical costs

ultimately fall short of this initial estimate, he will be entitled to a refund. *See id.* ¶¶ 28(b)(2), 29(a)(2).

### vii. Parties' Experts

Objectors argue that the scientific experts retained by the Parties cannot be trusted because they received compensation for their services. *See* Morey Final Obj. at 3, 9-11 (arguing against use of "bought-and-paid-for experts"). This argument has no merit.

The Parties' experts have extensive qualifications. Included among them are professors of psychology, neuropsychology, neurosurgery, neurology, psychiatry, and epidemiology, as well as a board-certified neurologist with 39 years of clinical practice experience and a licensed psychologist. Each expert deals routinely with neurodegenerative conditions or the effects of traumatic brain injury. Collectively, the experts have authored over 850 peer-reviewed scientific articles.[95] Several experts provided months of assistance throughout the negotiation process to ensure that the Settlement was grounded in current science. It is unreasonable to expect any expert to provide such a substantial contribution for free.

A presumption of bias does not arise merely because an expert receives compensation. *See Richardson v. Perales*, 402 U.S. 389, 403 (1971). Moreover, that some of these experts work at institutions that have received grants from the NFL Parties and their affiliates does not compromise these experts' objectivity. *See* Morey Final Obj. at 10-11. For example, the Boston University CTE Center, with which Drs. McKee and Stern are associated, has received donations from the NFL Parties. Yet the Objectors do not question the objectivity of Drs. McKee and Stern, whose studies they rely upon. *See Chronic Traumatic Encephalopathy*, Boston University

---

[95] *See generally* Dr. Millis Decl. ¶¶ 2-9; Dr. Schneider Decl. ¶¶ 2-12; Dr. Yaffe Decl. ¶¶ 2-8; Dr. Fischer Decl. ¶¶ 2-3; Dr. Giza Decl. ¶¶ 2-9; Dr. Hovda Decl. ¶¶ 2-11; Dr. Kelip Decl. ¶¶ 2, 4; Dr. Hamilton Decl. ¶¶ 1, 2, 6.

School of Medicine, http://www.bumc.bu.edu/supportingbusm/research/brain/cte/ (last accessed Apr. 21, 2015) (noting Center is "[s]upported by grants from . . . the NFL").

### viii.  Parties' Disclosures

Objectors argue that they lacked the information to properly evaluate the Settlement because they did not have access to materials the Parties relied on during negotiations. *See* Morey Obj. at 80-81 (claiming that "[C]lass [M]embers have been left in the dark"); Mot. for Disclosure of Docs. Relevant to Fairness of Settlement, ECF No. 6461 (moving for access to documents relating to CTE, and the NFL Parties' insurance). These claims largely repeat those made in prior requests for discovery. *See, e.g.*, Mem. in Supp. of Mot. for Disc. at 8, ECF No. 6169-1 (requesting "information Class Counsel relied on in entering the preliminary settlement"). I have already denied Objectors' prior requests, with good reason. *See* Order Den. Mots. for Disc., ECF No. 6245.

Objectors have no absolute right to discovery. *Community Bank*, 418 F.3d at 316. Though discovery may be appropriate if the record is inadequate to support approval of a settlement or if objectors are denied meaningful participation in a fairness hearing, neither circumstance exists here. *Id.* The Parties, Objectors, and Amici collectively submitted dozens of scientific articles and 22 expert declarations discussing the critical scientific issues underlying the Settlement. Objectors' concerns also materially impacted the Settlement—the Parties revised the agreement to address deficiencies identified at the Fairness Hearing. *See* Parties' Joint Amendment.

Objectors also argue that because "[b]rain damage from playing football is a public health issue," the NFL Parties must disclose what they knew about the dangers of concussions. Alexander Obj. at 5; *see also* Pyka Obj. at 1, ECF No. 6359 ("I and every parent along with the players had and have a right to know of the dangers of playing football . . . ."). Settlements,

however, are private compromises, and the NFL Parties need not make this information public to

obtain approval. *See, e.g.*, *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010)

(holding that class action settlement that admitted no wrongdoing and denied all liability was a

"binding and enforceable contract"); *Ripley v. Sunoco, Inc.*, 287 F.R.D. 300, 318 (E.D. Pa. 2012)

(approving class action settlement that admitted no wrongdoing).  Nonetheless, the Settlement

contributes to the public's knowledge on these issues.  Subject to the consent of Retired Players,

data from baseline assessment examinations will be used in medical research about safety and

injury prevention in football. *See* Settlement § 5.10(a).

### ix.  Opt-Out Procedure

Objectors reiterate their unsuccessful request for an opportunity to opt out after the Fairness

Hearing.  They claim their request is justified because being forced to choose between opting out

and objecting is coercive, and because notice was inadequate for Retired Players to understand

the ramifications of the Settlement. *See* Utecht Obj. at 3-6; Duerson Obj. at 28-29.  I have

already denied this request, and these additional arguments do not demonstrate that the opt-out

structure was unfair. *See* Order, Oct. 9, 2014, ECF No. 6204.

Due process does not require a second opt-out period.  In a class action, class members'

rights are sufficiently protected when there is: "(1) adequate notice to the class; (2) an

opportunity for class members to be heard and participate; (3) the right of class members to opt

out; and (4) adequate representation by the lead plaintiff(s)." *Cobell v. Salazar*, 679 F.3d 909,

922 (D.C. Cir. 2012) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)).  As

discussed *supra*, each of these requirements is satisfied.  Notice cogently described the key

elements of the Settlement, and Class Members had 90 days to review the agreement and either

opt out or object. *See supra* Section III.  Class Counsel and the Class Representatives fought

zealously for Class Members, and no fundamental conflicts of interest existed to undermine the adequacy of their representation. *See supra* Section II.D.

The choice between opting out and objecting is not coercive. It is well established that "class members may either object or opt out, but they cannot do both." Newberg on Class Actions § 13:23 (5th ed.). Moreover, the Third Circuit has implicitly rejected Objectors' position; it would be impossible to consider "the reaction of the class to the settlement" for the purposes of Rule 23(e)(2) if Class Members were allowed to opt out up until the point of final approval. *Girsh*, 521 F.2d at 157 (internal quotation marks omitted); *see also Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 936 (E.D. Mich. 2007) ("There are several examples of federal cases where the opt-out deadline matches the objection deadline."). Thus, the opt-out procedure was reasonable, and no additional opportunity to opt out was required.

## VI.  Conclusion

For the reasons set forth above, I will certify the proposed Class pursuant to Rule 23(a) and 23(b)(3). I will also approve the Settlement as fair, reasonable, and adequate pursuant to Rule 23(e).

s/ Anita B. Brody

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                   Copies **MAILED** on _____ to:

132