# EXHIBIT 1

[Of Counsel:
GALIHER DeROBERTIS WAXMAN

GARY O. GALIHER                  2008
ILANA K. WAXMAN                  8733
CLARISSE M. KOBASHIGAWA  9314
(clarisse.kobashigawa@galiherlaw.com)
ALLISON M. AOKI                  6912
ALYSSA R. SEGAWA                 9798
ANTHONY M. CARR                  9956
(anthony.carr@galiherlaw.com)
610 Ward Avenue
Honolulu, Hawaii  96814-3308
Telephone:  (808) 597-1400]

~~CHRISTOPHER A. DIAS          6265-0~~
~~Clifford Center~~
~~810 Richards Street, Suite 810~~
~~Honolulu, Hawaii  96813~~
~~Telephone:  (808) 524-4600~~
~~Email: chrisdias@hawaii.rr.com~~

~~GENE LOCKS (Pro Hac Vice Motion to be Submitted)~~
~~DAVID D. LANGFITT (Pro Hac Vice Motion to be Submitted)~~
~~LOCKS LAW FIRM~~
~~601 Walnut Street, Suite 720 East~~
~~Philadelphia, Pennsylvania 19106~~
~~Telephone: (866) 562-5752~~
Attorneys for Plaintiff[s]
[DIONE ELIZABETH SMITH,
Individually and as Personal Representative of
the Estate of JOHN LEONARD WILBUR; LINDSEY K. WILBUR; and
NATHAN HALSEY WILBUR]
~~JOHN LEONARD WILBUR~~

IN THE UNITED STATES DISTRICT COURT

[FOR THE EASTERN DISTRICT OF PENNSYLVANIA]
~~DISTRICT OF HAWAII~~

| | |
|---|---|
| ~~JOHN LEONARD WILBUR~~ [DIONE ELIZABETH SMITH, Individually and as Personal Representative of the Estate of JOHN LEONARD WILBUR; LINDSEY K. WILBUR; and NATHAN HALSEY WILBUR] | ~~CV 13 00330 LEK KSC~~ [NO. 2:13-cv-04457-AB MDL-2323] |
| Plaintiff[s], | [FIRST AMENDED] COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |
| vs. | |
| THE NATIONAL FOOTBALL LEAGUE, et al. | |
| Defendants. | |

## [FIRST AMENDED] COMPLAINT

iii

# **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................1

PARTIES .........................................................................................10

JURISDICTION AND VENUE ...........................................................15

GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS ......................16

    The NFL's Influence ...................................................................18

    The NFL Has Mythologized Violence Through the
    Media. ........................................................................................18

    The NFL Markets and Glorifies Football's Violence
    Through NFL Films. ....................................................................19

    Head Injuries, Concussions, and Neurological Damage ...............23

    The NFL Was and Is in a Superior Position of
    Knowledge and Authority and Owed a Duty to Players ................28

    The NFL Knew the Dangers and Risks Associated with
    Repetitive Head Impacts and Concussions ...............................36

    The NFL Voluntarily Undertook the Responsibility of
    Studying Head Impacts In Football, Yet Fraudulently
    Concealed Their Long-Term Effects. ...........................................47

    The Congressional Inquiry and The NFL's
    Acknowledgement of the Concussion Crisis ...............................64

    The NFL's New Committee .........................................................69

COUNT I ACTION FOR DECLARATORY RELIEF – LIABILITY
(Plaintiff[s] ~~John Wilbur~~ Against the NFL) .........................................71

COUNT II FRAUDULENT CONCEALMENT (Plaintiff[s] ~~John Wilbur~~
Against the NFL) .............................................................................73

COUNT III FRAUD (Plaintiff[s] ~~John Wilbur~~ Against the NFL) ......................77

COUNT IV NEGLIGENT MISREPRESENTATION (Plaintiff[s] ~~John
Wilbur~~ Against the NFL) ..................................................................80

COUNT V NEGLIGENCE (Plaintiff[s] ~~John Wilbur~~ Against the NFL) ..............84

COUNT VI NEGLIGENT HIRING (Plaintiff[s] ~~John Wilbur~~ Against the

NFL)..................................................................................................................90

COUNT VII NEGLIGENT RETENTION (Plaintiff[s] ~~John Wilbur~~ Against
the NFL)..........................................................................................................92

COUNT VII CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT
(Plaintiff[s] ~~John Wilbur~~ Against all Defendants)....................................93

[COUNT VIII LOSS OF CONSORTIUM ..........................................................94

PRAYER FOR RELIEF ......................................................................................95

[Plaintiffs DIONE ELIZABETH SMITH, LINDSEY K. WILBUR and NATHAN HALSEY WILBUR  (hereinafter also called "Plaintiffs") are collectively the children of JOHN LEONARD WILBUR, deceased (hereinafter also called "Decedent.").  DIONE ELIZABETH SMITH is the Personal Representative of the Estate of JOHN LEONARD WILBUR, and brings this action individually and as Personal Representative of the Estate of JOHN LEONARD WILBUR.]

The Plaintiff[s], ~~John Leonard Wilbur ("John Wilbur")~~, by and through [their undersigned counsel, brings this Complaint against the Defendants, the National Football League ("NFL" or "League") and NFL Properties LLC ("NFL Properties"), alleges, upon facts and information and belief as follows.

## INTRODUCTION

1.     This case seeks a declaration of liability and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by [Decedent] ~~John Wilbur~~ as a result of the Defendants' intentional tortious misconduct, including fraud, intentional misrepresentation, fraudulent concealment, and negligence.

2.     This action arises from the pathological and debilitating effects of mild traumatic brain injuries (referenced here as "MTBI") caused by the

1

concussive and sub-concussive impacts that have afflicted former professional football players in the NFL, including [Decedent] ~~John Wilbur~~.

3. For many decades, evidence has linked repetitive MTBI to long-term neurological problems in many sports, including football. The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which MTBI is a regular occurrence and in which players are at risk for MTBI, was aware of the evidence and the risks associated with repetitive traumatic brain injuries virtually at the inception of the League, but deliberately ignored and actively concealed the information from [Decedent] ~~John Wilbur~~ and all others who participated in organized football at all levels.

4. The published medical literature, as detailed later in this Complaint, contains studies of athletes dating back as far as 1928 demonstrating a scientifically observed link between repetitive blows to the head and neuro-cognitive problems (both short-term and long-term). The earliest studies focused on boxers, but by the 1950s and 1960s, the decades during which [Decedent] ~~John Wilbur~~ played in the NFL, a substantial body of medical and scientific evidence had been developed specifically relating to neuro-cognitive injuries in the sport of football.

5. Since the NFL's inception in the first half of the 20th Century, the NFL has been aware of the growing body of scientific evidence and its compelling

conclusions that professional football players who sustain repetitive sub-concussive and concussive impacts during their careers are at greater risk for chronic neuro-cognitive illness and disabilities both during their football careers and later in life.

6.     Notwithstanding that it was aware of this body of scientific evidence, the NFL ignored, minimized, disputed, and actively suppressed broader awareness of the link between sub-concussive and concussive injuries in football and the chronic neuro-cognitive damage, illnesses, and decline suffered by former players, including [Decedent] ~~John Wilbur~~.

7.     Since its inception, the NFL has recognized, acknowledged and acted in a monopolistic manner, intent on controlling and regulating every aspect of the game of professional football, particularly with respect to player safety and health. The NFL has used this authority to compel all NFL players, coaches, and participants to follow the policies, rules, and regulations the NFL has enacted and imposed.  As the governing body of professional football, the NFL has held itself out as the guardian and authority on the issue of player safety and has unilaterally shouldered for itself a common law duty to provide players, such as [Decedent] ~~John Wilbur~~, with rules and information that protect the players as much as possible from short-term and long-term health risks.

8.     The NFL's role as the guardian of player health and safety began in the 1930s, continued throughout the 1940s, 1950s and 1960s, and continues up through the present day.  The NFL has exercised that role through its unilateral decisions to issue rules to improve upon NFL football's public acceptance, to increase profits, and to address issues of player safety.  During these decades, the NFL voluntarily provided Teams and players with information and regulations that directly affected the short-term and long-term health of NFL players, including [Decedent] ~~John Wilbur~~.

9.     Despite the NFL's assumption of this responsibility, the NFL was negligent and failed to carry out this duty in that it failed to inform [Decedent] ~~John Wilbur~~ (and all other NFL players) of the risks associated with sub-concussive and/or concussive blows to the head and/or it was willfully blind to the medically proven fact that such repetitive head impacts would lead to neuro-cognitive injuries in many NFL players, including [Decedent] ~~John Wilbur~~.  Further, the NFL actively suppressed and kept secret information about MTBI it knew would change the economics of the game and the health of players such as [Decedent] ~~John Wilbur~~.

10.     The NFL, like the sport of boxing, was aware of the health risks associated with repetitive blows that produce sub-concussive and concussive results and the fact that some members of the NFL player population were at significant risk of developing long-term brain damage and cognitive decline as a result, including but

not limited to offensive lineman, such as [Decedent] ~~John Wilbur~~, who were subjected to repeated blows to the head during NFL practices and games.  Despite its knowledge and controlling role in governing player conduct on and off the field, the NFL turned a blind eye (that is, was willfully blind) to the risk to players and failed to warn and/or properly govern this specific health and safety problem.

11.    The NFL has exacerbated the health risk to players by marketing violence as a commodity, even as NFL players and their families, including [Decedent] ~~John Wilbur~~ and his family, have looked to the NFL for guidance on player safety issues.

12.    The NFL has promoted the violence of the game and marketed the violence through its wholly-owned media entities, NFL.com and NFL Films, both of which mythologize and sell extreme violence on the field for the purposes of expanding the League's appeal and increasing profits.  A consequence of this approach is that NFL players were and are praised for staying in games and returning to play in games despite being rendered disoriented and/or temporarily unconscious by sub-concussive or concussive forces.

13.    In its supervisory role, as well as in its position as arbiter of all aspects of professional football, the NFL has, since its inception, unilaterally and voluntarily chosen how to spend its funds to investigate and regulate many different circumstances affecting player health and safety, including, but not limited to, requiring players to

wear certain equipment, designating some player gear as illegal, and ultimately deciding what helmet brand should be recognized as the official equipment of the NFL.

14.     During the decades of the 1960s and 1970s, the NFL was aware of publications in the medical science community that established that concussive and sub-concussive injuries to athletes and the general population were a significant risk factor for short-term and long-term neuro-cognitive health complications, both as single incidents and particularly as repetitive impacts.  During those years, while [Decedent] ~~John Wilbur~~ was a player, the NFL voluntarily participated, albeit inadequately, in the work of various entities studying the performance and effectiveness of safety gear to reduce the risk of neurological injury.  The NFL's participation in these activities was voluntary and a continuance of the historic duty it had assumed in the first half of the twentieth century.

15.     By the early 1990s, the consensus among experts in the scientific community forced the NFL to take a different approach to the growing problem of MTBI among existing and former NFL players.  In or around 1992, the NFL knew that many football players, including, by way of example, Al Toon, a Pro Bowl receiver for the New York Jets, had developed brain injuries, including chronic severe headaches, malaise, intolerance of loud noises, depression, and emotional labiality as a

consequence of multiple "dings," sub-concussive injuries, and concussions.  The NFL was aware that Mr. Toon retired in 1992 because of these chronic problems.

16.    In 1994, the NFL, through its own initiative and voluntary undertaking, took its historic duty and unilateral authority regarding player health and safety one step further.  The NFL created and/or decided to fund the NFL's so-called Mild Traumatic Brain Injury Committee (the "MTBI Committee") ostensibly to research and study MTBI affecting NFL players. Notwithstanding this purported purpose, and despite clear medical evidence that on-field sub-concussive and concussive injuries can produce MTBI with tragic results, the NFL (a) failed to inform its current and former players, such as [Decedent] ~~John Wilbur~~, of the true risks associated with MTBI; (b) failed to inform NFL coaches of the true risks associated with MTBI in football; and (c) purposefully misrepresented and/or concealed medical evidence on that issue.

17.    Through its MTBI Committee, the NFL gratuitously and voluntarily inserted itself into the scientific research and discussion concerning the link between sub-concussive and concussive impacts sustained by NFL players and short-term and long-term impairment of the brain.  By voluntarily inserting itself into the MTBI research and public discourse, the NFL gratuitously undertook a responsibility (a) to make truthful statements; (b) not to wrongfully advance improper, biased, and falsified industry-generated studies; (c) not to discredit well-researched

7

and credible studies that came to a conclusion that did not comport with the NFL's financial and political interests; and, (d) to inform all former players, all current players, and the football-playing public, including young people and their families, regarding the risks of MTBI in football.

18.    At the same time, the NFL and its agents continued to market, as they had in the past, the ferocity and brutality of the sport that helped give rise to the latent and debilitating neuro-cognitive conditions and injuries from which [Decedent] ~~John Wilbur~~ suffered.

19.    After voluntarily assuming a duty to investigate, study, and truthfully report the medical risks associated with MTBI in football, the NFL produced industry-funded, biased, and falsified research that claimed that concussive and sub-concussive head impacts in football do not present serious, life-altering risks.

20.    During the last years of [Decedent] ~~John Wilbur~~'s retirement, the NFL actively and continuously denied any link between MTBI sustained by former NFL players in NFL games and practices and the neurological symptoms and problems (such as headaches, dizziness, loss of memory, mood swings, poor judgment, and dementia) from which many former NFL players now suffer.

21.    The NFL made its biased and falsified position known by way of gratuitous press releases, publications in scientific literature, and other communications to NFL players, coaches, and retired NFL players.

22.     Consistent with its historic role as the guardian of player health and safety, the NFL intended for the general public, then-current NFL players, retired NFL players such as [Decedent] ~~John Wilbur~~, and participants at every level of the game to rely on the misinformation it propagated.

23.     During the same time period, the NFL actively sought to suppress the findings of other members of the medical communities that showed the link between on-field sub-concussive and concussive head impacts and post-career neuro-cognitive damage, illness, and decline.

24.     The NFL's active and purposeful concealment and misrepresentation of the severe neurological risks of repetitive MTBI exposed players to dangers they could have avoided had the NFL provided them with truthful and accurate information.  Many of the players, including [Decedent] ~~John Wilbur~~, sustained repetitive MTBI during on-field play in the NFL, but were urged and/or forced by the NFL to continue to play and to continue to sustain MTBI in the same game and/or in consecutive games.  As a result of the repetitive MTBI sustained in the NFL, on information and belief, [Decedent] ~~John Wilbur~~ [suffered] ~~now suffers~~ from chronic traumatic encephalopathy ("CTE").

25.     The NFL caused or contributed to the injuries sustained by [Decedent] ~~John Wilbur~~ through its acts and omissions by, among other things: (a) historically ignoring the true risks of MTBI in NFL football; (b) failing to disclose the true

risks of repetitive sub-concussive and concussive impacts to NFL players and coaches; and (c) since 1994, deliberately spreading misinformation concerning the cause and effect relationship between MTBI in NFL football and latent neurodegenerative disorders and diseases.

26.     On information and belief, the NFL's motive to ignore and misrepresent the link between MTBI sustained in NFL play and neuro-cognitive injury and decline was economic.   The NFL knew or suspected that any rule changes that sought to recognize that link and the health risk to NFL players would impose an economic cost that would significantly and adversely change the profit margins enjoyed by the NFL and its Teams.

27.     On information and belief, all NFL policies and decisions relevant to the conduct alleged herein occurred primarily in the NFL corporate offices in New York.

## PARTIES

28.     [Decedent] ~~John Wilbur~~ was born in San Diego, California in 1943, the son of an attorney who graduated from Stanford University.  He [resided] ~~currently resides~~ in Honolulu, Hawai'i and [had] ~~has~~ a mailing address of P.O. Box 4533, Honolulu, Hawai'I 96813.

29.     [Decedent] ~~John Wilbur~~ was an outstanding student and college football player.  He attended Stanford University, from which he graduated in 1965.  That same year, the Kansas City Chiefs drafted Jon Wilbur, but he started

10

playing in the NFL for the Dallas Cowboys in the 1966 NFL season as an offensive lineman. He played four seasons for the Cowboys, one for the Los Angeles Rams, and four for the Washington Redskins. He retired from the NFL in 1974.

30. During the years [Decedent] ~~John Wilbur~~ played in the NFL, he sustained multiple repetitive traumatic head impacts, sub-concussive blows to the head, and concussions. On information and belief, [Decedent] ~~John Wilbur~~ [suffered] ~~now suffers~~ from, among other things, CTE, the signature disease that arises from repetitive head impacts in football and is both subtle and progressive.

31. The changes to [Decedent] ~~John Wilbur~~ began in or around the 1990s. During that time period, [Decedent] ~~John Wilbur~~ demonstrated a slow but developing lack of capacity to maintain and operate his real estate brokerage business as a reliable income producing entity. [Decedent] ~~John Wilbur~~ also demonstrated over that time period slowly developing symptoms of depression, mood swings, anger management issues, disoriented thinking, and poor judgment.

32. These symptoms were gradual and progressive, and they developed over many years. For [Decedent] ~~John Wilbur~~'s family and friends, the symptoms were not recognized for what they were, because none of [Decedent] ~~John Wilbur~~'s friends and family could diagnose the symptoms as arising from slow and progressive brain damage.

11

33.     [Decedent] ~~John Wilbur~~'s short-term memory deteriorated gradually over the last two years, but this change was marked and obvious beginning on or around April 2012.

34.     In the last two years, [Decedent] ~~John Wilbur~~'s other symptoms [became] ~~have also become~~ pronounced, such as anger management issues, poor judgment, and disorientation.

35.     In November 2012, [Decedent] ~~John Wilbur~~ suffered a stroke ~~from which he is currently recovering~~.

36.     [Plaintiff JOHN LEONARD WILBUR passed on December 9, 2013 in Honolulu, Hawaii.]

37.     [Plaintiff DIONE ELIZABETH SMITH is the daughter of JOHN LEONARD WILBUR and the duly appointed Personal Representative of the Estate of JOHN LEONARD WILBUR and, at all times relevant hereto, resides in France.]

38.     [Plaintiffs LINDSEY K. WILBUR and NATHAN HALSEY WILBUR, at all times relevant hereto, reside in the City and County of Honolulu, State of Hawai'i.]

39.     As set forth in this Complaint, the NFL had an ongoing and voluntarily assumed duty to disclose to [Decedent] ~~John Wilbur~~ the fact that he was at significant risk for long-term neuro-cognitive brain injury and CTE.  The NFL, however, fraudulently concealed from [Decedent] ~~John Wilbur~~ and his family the existence of

12

the risk of long-term brain damage to NFL players by repeatedly denying any link between head impacts in pro football and long-term brain injury, including CTE.

40.     The NFL's fraudulent acts occurred before, during and after [Decedent] ~~John Wilbur~~'s career as a player and included (a) a failure to warn, (b) a failure to disclose, and (c) affirmative and intentional misstatements of fact regarding the risks and actual damage to which [Decedent] ~~John Wilbur~~ and other former NFL players have been exposed.

41.     [Decedent] ~~John Wilbur~~ reasonably relied on the NFL's fraudulent acts and omissions, and he was deceived into believing that any changes he sustained, to the extent he was able to recognize them at all, were the result of the natural aging process or personal issues that were difficult to resolve.

42.     The injuries and damages sustained by [Decedent] ~~John Wilbur~~ were latent, progressive, and continuing in nature, and the Defendants are legally responsible for those injuries and damages.

43.     At all times herein mentioned, Defendants, and each of them, were the agents, servants, and employees of each of the other, acting within the course and scope of said agency and employment.

44.     Defendant NFL, which maintains its offices at 345 Park Avenue, New York, New York, is an unincorporated association consisting of 32 separately

13

owned and independently-operated professional football Teams which operate out of many different cities and states with in this country.

45.    The NFL is engaged in interstate commerce in the business of, among other things, promoting, operating, organizing, and regulating the major professional football league in the United States.

46.    The NFL is not, and has not been, the employer of [Decedent] ~~John Wilbur~~, who was employed during his career in professional football as a player by independent clubs known the Dallas Cowboys, the Los Angeles Rams, and the Washington Redskins.  The United States Supreme Court held in *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010), that each Team that is a member of the NFL is a legally distinct and separate entity from both the other Teams and the NFL itself.

47.    Defendant NFL Properties, LLC, is located at 280 Park Avenue, New York, New York 10017.  It is the successor-in-interest to National Football League Properties, Inc. ("NFL Properties"), and is a limited liability company organized and existing under the laws of the State of Delaware with its headquarters in the State of New York.   NFL Properties is engaged in, among other activities, approving, licensing, and promoting equipment used by all the NFL Teams.  NFL Properties solicits bids from vendors on an exclusive headwear license for the National Football League, including helmets.  NFL Properties regularly conducts

14

its business in New York and many other states.   Together with the NFL,

Defendant NFL Properties is referred to herein as the "NFL Defendants."

## JURISDICTION AND VENUE

48.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because the plaintiff is a citizen of the State of Hawai'i, the Defendants are citizens of different states, and the amount in controversy exceeds $75,00, exclusive of interest and costs.

49.   This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the State of Hawai'i.

50.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the progressive injury and deterioration of [Decedent] ~~John Wilbur~~ occurred in the State of Hawai'i, and that progressive injury gave rise to the claims asserted by [Decedent] ~~John Wilbur~~, and because the Defendants conduct a substantial part of their business within this district.

51.   [On July 29, 2013, this case was conditionally transferred under 28 U.S.C. § 1407 to the Eastern District of Pennsylvania and assigned to the Honorable Anita B. Brody as part of MDL Docket No. 2323.]

52.   [On July 31, 2013 this case was electronically transferred to the United States District Court, Eastern District of Pennsylvania.]

15

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

53.     The NFL was founded as the American Professional Football Association in 1920.

54.     The American Professional Football Association changed its name to the National Football League in 1922.  By 1924, there were 23 franchises or Teams in the NFL.

55.     In 1970, the NFL merged with the rival American Football League to form one league with two conferences.

56.     Today, the NFL consists of two structured conferences, the AFC and the NFC, with 32 total Teams.  Each team functions as a separate business but operates under shared revenue generated in part through broadcasting, merchandising, and licensing.

57.     The NFL oversees America's most popular spectator sport, acting as a trade association for the benefit of the thirty-two independently operated Teams.

58.     The NFL generates approximately $9,500,000,000.00 in income per year, and this income is expected to rise significantly by 2014 because of the increased number of games, including Thursday night games, and increased revenues from television dollars.

59.     The NFL's average attendance per game in 2012 to date has been in excess of 70,000 persons.

16

60.     As of 2012, the estimated market value of twenty (20) of the thirty-two (32) NFL Teams exceeds $1 billion, and the Dallas Cowboys' 2012 market value exceeds $2 billion.  By way of example only, as of 2012, the Philadelphia Eagles had a market value of $1.26 billion and an annual profit to the owner of $48 million.  By contrast, the purchase price of the Philadelphia Eagles in 1994 was $185,000,000.  The current market value is a 700 percent increase in value in eighteen (18) years which exceeds almost any other investment opportunity that existed in 1994.  The market value and annual profit of the Philadelphia Eagles and most other NFL Teams is expected to rise indefinitely.

61.     The NFL earns billions of dollars from its media deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

62.     In part, the exponential rise since 1994 in the value and profits of the NFL and the Teams is attributable to the concurrent rise of the internet, satellite television, and cable television, through which the NFL Defendants are repeatedly able to sell and market the same games and content globally to an ever increasing number of buyers everywhere on the planet.

63.     Annually, the NFL redistributes approximately $4 billion in radio, television, and digital earnings to the Teams or approximately $125 million per Team. Those revenue numbers show no sign of declining and have increased since 2009.

17

64.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the Federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 Teams as a single unit.

## The NFL's Influence

65.     In part because of their financial power, monopoly status, and high visibility, the NFL Defendants have had enormous influence over the game of football at all levels of the game.

66.     Over many decades, the NFL Defendants' influence has been expanded through their use of the media. Through NFL films, the NFL Network, and www.NFL.com, the NFL Defendants have promoted NFL football via every mass communication medium available.

## The NFL Has Mythologized Violence Through the Media.

67.     Part of the NFL Defendants' strategy to promote NFL football is: (a) to mythologize players and Teams; (b) to glorify the accomplishments of individuals and Teams; and (c) to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions, and simultaneously propagating the fraudulent representation that "getting your bell rung," "being dinged", and putting big hits on others is a badge of courage and does not seriously threaten one's health.

68.     As a result of this strategy, the NFL Defendants have propagated the false myth that collisions of all kinds, including brutal and ferocious collisions,

many of which lead to short-term and long-term neurological damage to current and former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of players involved at every level of the game.

69.     As a result of this strategy, and the overwhelming influence of the NFL Defendants at every level of the game, the NFL Defendants have generated for themselves and others billions of dollars every year by promoting a product of brutality and ferocity and inculcating in players at every level of the game the false and life-threatening ideas that (a) brutal, ferocious, and debilitating collisions are a required and desired outcome in the game of football; and (b) playing despite repetitive head impacts is a laudable and desirable goal.

### The NFL Markets and Glorifies Football's Violence Through NFL Films.

70.     NFL Films is an agent and instrumentality of the NFL Defendants devoted to producing promotional films for the NFL.  One television critic described NFL Films as "the greatest in-house P.R. machine in pro sports history…an outfit that could make even a tedious stalemate seem as momentous as the battle for the Alamo."

71.     NFL Films is known for the style it features in all of its productions, capturing the NFL games, plays, players, and overall NFL environment in an artistic, promotional fashion.  NFL Films cinematography is intended to create

19

compelling storylines and highlight certain aspects of the game. NFL Films takes viewers right into the game with close-ups and slow motion depiction of all the hard-hitting action on the field.

72. NFL Films focuses on violence as one of the NFL's greatest selling points: the football player as gladiator. To advance the NFL Defendants' purpose, NFL Films has created numerous highlight features that focus solely on the hardest-hits in pro football. These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

73. The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: "*NFL*: *Moment of Impact*" (2007); "*NFL's 100 Greatest Tackles*" (1995); "*Big Blocks and King Size Hits*" (1990); "*The Best of Thunder and Destruction – NFL's Hardest Hits*"; "*NFL Films Video: Strike Force*" (1989); "*The NFL's Greatest Hits*" (1989); "*Crunch Course*"; "*Crunch Course II*" (1988); "*Crunch Masters*"*;* "*In the Crunch*" (1987); "*NFL Rocks*"*;* "*NFL Rocks: Extreme Football*" (1993).

74. NFL Films created the "*Top Ten Most Feared Tacklers*" series that was shown on the NFL Network. Now, it has its own section on the NFL's website. These features are comprised of videos highlighting the most vicious tacklers the NFL has ever seen. These videos contain numerous explicit examples of how the NFL Defendants market and glorify the violent nature of the NFL. The

back cover of 2007 film "*Moment of Impact*" advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole.  Suddenly you're down, and you're looking through your helmet's ear hole.  Pain?  That's for tomorrow morning.  Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact."

75.    The entire message deemphasizes the acute and chronic risks associated with head impacts.  The 1990 film "*Big Blocks and King Size Hits*" prominently features a head-to-head collision between Minnesota Vikings' defender Jack Tatum and Oakland Raiders' receiver Sammy White in Super Bowl XI in which White's helmet is knocked off his head.  In 1993's "*NFL Rocks*," the late Junior Seau offers his opinion on the measure of a punishing hit:  "If I can feel some dizziness, I know that guy is feeling double [that]."  In a segment of the same film, glorifying gutsy receivers who expose themselves to big hits by going "over the middle" of the field, former Houston Oilers receiver Ernest Givens is quoted as saying:  "I get knocked out a lot, I get concussions, I get broken noses, that is part of being a receiver, that's what separates you from being a typical receiver than a great receiver."  Former Dallas Cowboys receiver Michael Irvin recites a similar unawareness of the risks of concussions:  "Before the game, I go to the [defensive backs] and tell them, 'Hey, you know I'll trade a concussion for a reception!'"

21

76.     NFL Films, therefore, advances the NFL Defendants' agenda to promote the most violent aspects of NFL football and to urge players at every level of the game to disregard the results of violent head impacts.

77.     The NFL Defendants strategically use NFL Films' cinematography and on-field microphones to exaggerate and emphasize vicious hits, which take on the appearance of the slow motion crash test videos that appear in many car commercials, and the players take on the role of the crash-test dummies.

78.     The NFL Defendants, through NFL Films, promote a culture in which playing hurt or with an injury is both expected and acclaimed in a mythical gladiator world.  Through NFL Films, the NFL has produced videos that praise players who embody the ethos of playing hurt (for example, "*Top Ten Gutsiest Performances*").  This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including injuries that arise from repetitive sub-concussive and concussive blows to the head.

79.     This culture encourages NFL players to play despite a head injury. Moreover, failure to play through such an injury creates the risk that the NFL player will lose playing time, a starting position, and possibly a career.

80.     Within this culture, the NFL Defendants purposefully profit from the violence they promote.

81.     A few examples demonstrate its indelible place in the modus operandi of the NFL Defendants.  After joining the NFL, the Cleveland Browns were led by Hall of Famer Otto Graham to many consecutive championships.  The media and the NFL management at the time were well aware of the targeted blows to the head suffered by Graham, with resulting loss of consciousness.  Nevertheless, Graham was encouraged to come back and play in each game.

82.     This attitude and League-sponsored mayhem continued in the decades of the 1980s, 1990s and 2000s, with players lauded for their "head hunting" skills. As recently as October 2010, the NFL fined some players for what it characterized as "illegal and dangerous hits", yet the NFL Defendants sought to profit by selling photos of the illegal hits on its website for between $54.95 and $249.95.

### Head Injuries, Concussions, and Neurological Damage

83.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause sub-concussive and/or concussive brain injuries with a heightened risk of long term, chronic neuro-cognitive sequelae.

84.     The NFL Defendants have known or should have known for many years that the American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and

level of consciousness, resulting from mechanical force or trauma." The AANS

defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that
> disrupts the normal function of the brain. TBI can result when
> the head suddenly and violently hits an object, or when an
> object pierces the skull and enters brain tissue. Symptoms of a
> TBI can be mild, moderate or severe, depending on the extent
> of damage to the brain. Mild cases may result in a brief change
> in mental state or consciousness, while severe cases may result
> in extended periods of unconsciousness, coma or even death.

85.     The NFL Defendants have known or should have known for many

years that sub-concussive and concussive brain injuries generally occur when the

head either accelerates rapidly and then is stopped, or is rotated rapidly. The

results frequently include, among other things, confusion, blurred vision, memory

loss, nausea, and sometimes unconsciousness.

86.     The NFL Defendants have known or should have known for many

years that medical evidence has shown that symptoms of sub-concussive and/or

concussive brain injuries can appear hours or days after the injury, showing that

the injured party has not healed from the initial blow.

87.     The NFL Defendants have known or should have known for many

years that once a person suffers sub-concussive and/or concussive brain injuries, he

is up to four times more likely to sustain a second one. Additionally, after

suffering even a single sub-concussive or concussive blow, a lesser blow may

cause brain injury, and the injured person requires more time to recover. This goes

24

to the heart of the problem: players such as [Decedent] ~~John Wilbur~~ were unaware of the serious risk posed to their long-term neuro-cognitive health by sub-concussive and concussive impacts.

88.     The NFL Defendants have known or should have known for many years that clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during an NFL player's career can cause severe neuro-cognitive problems such as depression and early-onset of dementia.

89.     The NFL Defendants have known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive and concussive blows) cause ongoing and latent brain injury.  These injuries have been documented and associated with sports-related head impacts in both football and boxing.

90.     The NFL Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention

25

and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as CTE.  The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above.  CTE is also is associated with an increased risk of suicide.

91.     The NFL Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma.  Published papers have shown that this condition is prevalent in retired professional football players who have a history of head injury.  The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

92.     The NFL Defendants have known for many years of the reported papers and studies documenting autopsies of many former NFL players.  The papers and studies show that over ninety percent of the players suffered from CTE.

93.     As a result, published peer reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing professional football are linked to significant risk for permanent brain injury.

26

94.     A recent study conducted and published by Boston University in December 2012 provided more evidence of the link between repetitive head trauma in professional football and degenerative brain disease.  The study, which included brain samples donated by thirty-five deceased NFL players, found degenerative brain disorder in thirty four of the tested samples. The study found all but one of the brains showed signs of CTE.

95.     Published peer reviewed scientific studies have shown that 28% of the NFL retirees studied suffered from depression, whereas the prevalence of depression in the general population is 9.5%.

96.     Published peer reviewed scientific studies have shown that 36% of the NFL retirees age 65-75 participating in the studies suffered from dementia, whereas the prevalence of dementia in the general population for the same age group is merely 2.2-6.5%.

97.     Published peer reviewed scientific studies have shown that retired players with three or more reported concussions had a fivefold prevalence of mild cognitive impairment (MCI) and a threefold prevalence of significant memory problems, compared to other retirees.

98.     In a study of NFL retirees, 11.1% of all respondents reported having a diagnosis of clinical depression.

99.     NFL retirees experience earlier onset of Alzheimer's-like symptoms more frequently than the general American male population in the same age range.

100.    Repeated head trauma can also result in so-called "Second Impact Syndrome," in which re-injury to a person who has already suffered a concussion triggers swelling that the skull cannot accommodate.

### The NFL Was and Is in a Superior Position of Knowledge and Authority and Owed a Duty to Players

101.    At all times, the NFL's unique historical vantage point at the apex of the sport of football, paired with its unmatched resources as the most well-funded organization devoted to the business of the game, has afforded it unparalleled access to data relating the effect of head impacts on football players and made it an institutional repository of accumulated knowledge about head injuries to players.

102.    The NFL's accumulated knowledge about head injuries to players and the associated health risks was at all times vastly superior to that available to [Decedent] John Wilbur and his family.

103.    From its inception, the NFL unilaterally created for itself the role of protecting players, informing players of safety concerns, and imposing unilaterally a wide variety of rules to protect players from injuries that were costly to the player, the game, and profits.  From the beginning, the NFL held itself out and acted as the guardian of the players' best interests on health and safety issues.

104.    For these reasons, players and their families have relied on the NFL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

105.    In a recent public admission, the NFL stated that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." (www.nflhealthsasfety.com/commitment/regulations) (2011-2012).

106.    On information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and sub-concussive injuries.  Such ongoing medical advice and knowledge placed the NFL in a position of ongoing superior knowledge to the players.  Combined with the NFL's unilateral and monopolistic power to set rules and determine policies throughout its game, the NFL at all relevant times was in a position to influence and dictate how the game would be played and to define the risks to which players would be exposed.

107.    As a result, from its earliest years, the NFL unilaterally assumed a duty to act in the best interests of the health and safety of NFL players, to provide

truthful information to NFL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

108.   The NFL's voluntary actions and authority throughout its history show that as early as the 1920s the NFL shouldered for itself the common law duty to make the game of professional football safer for the players and to keep the players, including but not limited to [Decedent] ~~John Wilbur~~, informed of safety information they (he) needed to know.

109.   The NFL's historical actions in connection with these legal duties have included, but are not limited to, the following: adding a field judge (1929); establishing hash-marks at 10 yards from the sidelines (1933); establishing the penalty of unnecessary roughness for a deliberate rough contact on the passer after the pass is made (1938); making helmets mandatory (1943); adding a back field judge (1947); establishing a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955); establishing a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player (1956); establishing a penalty for grabbing the face mask of any opponent except a runner (1956); establishing a penalty of grabbing the face mask of any opponent (1962); requiring that goal posts be offset from the goal line (1966); establishing a rule that a player who signals for a fair catch cannot block or

30

initiate contact with one of the kicking team's players until the ball touches a

player (1967); establishing a rule that a defensive player who jumps or stands on a

teammate or who is picked up by a teammate cannot attempt to block an

opponent's kick (1973); establishing a rule that no receiver can be blocked below

the waist after moving beyond the line of scrimmage (1974); establishing a rule

that eligible receivers who take a position more than two yards from the tackle

cannot be blocked below the waist (1974); establishing a rule that a defender is not

permitted to run or dive into a ball carrier who has fallen to the ground untouched

(1976); establishing a rule that it is illegal for a defensive lineman to strike an

opponent above the shoulders during his initial charge (1977) (previously the NFL

made this illegal only during the first step); establishing that it is illegal for a wide

receiver to clip an opponent anywhere (1977); establishing rules as to mandatory

equipment (1979); establishing that it is illegal for a player in the backfield to chop

an outside rusher on a pass play (1979); establishing that it is illegal to throw a

punch or forearm or to kick an opponent (1979); and establishing that it is illegal to

strike, swing, or club an opponent in the head, neck or face (1980).

110.    As the sport's governing entity (with monopolistic power), the NFL

has made it known to players and Teams alike that the NFL actively and

pervasively governs player conduct and health and safety both on and off the field.

In public statements since its inception, the NFL has stated that its goals include

taking necessary steps for the safety, health and well-being of players and their families.

111.    The NFL's approach has been paternalistic and has included comprehensive rookie training programs to teach new players how to manage their personal lives, inquiries from the media, and newly acquired income.

112.    For decades, the NFL voluntarily instituted programs to support player health and safety on and off the field, and the players and their families looked to the NFL for guidance on these issues.

113.    By way of example only, in during the years [Decedent] ~~John Wilbur~~ played in the NFL, the NFL unilaterally established medical, life insurance, and retirement plans, funded the plans, and controlled the nature and extent of each of these plans without any player involvement.  The NFL made all changes to the plans unilaterally.

114.     Despite its unilateral duty and power to govern player conduct on and off the field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

115.    As one example, Cleveland Browns Quarterback Otto Graham was knocked unconscious during a game against the San Francisco 49ers in 1953 and

he was carried off the field.  After regaining consciousness, however, Graham
returned to the field and played the balance of the game.  Even now, this is a
routine occurrence in NFL football games.  For many former players the result has
been tragic and catastrophic.

116.    Thus, since its inception, and continuing into the present, the NFL
has been in a position that affords it a special relationship to NFL players as the
guardian of their health and safety.  For that reason, from its inception and
continuing into the present, the NFL owed a duty of reasonable care to keep NFL
players, including [Decedent] ~~John Wilbur~~, informed of neurological risks, to
inform them truthfully, and not to mislead them about the risks of permanent
neurological damage that can arise from repetitive sub-concussive and/or
concussive blows to the head while playing NFL football.

117.    By way of example only, during the decades of the 1930s through the
1960s, the NFL – in its supervisory role as guardian of player safety -- identified
tackling techniques that  exposed players to increased risks of injury, including
head, neck, and leg injuries.  Once identified, the NFL issued regulations that
served as daily warnings to players of the hazardous nature of continuing to follow
hazardous tackling techniques.

118.    As a result of its position of authority and repository of a composite of
information throughout the League, the NFL was aware of how to protect NFL

33

players from dangerous circumstances on the field of play and took unilateral, but insufficient, measures to do so.

119.   Thus, for decades, the NFL failed to warn NFL players, including [Decedent] ~~John Wilbur~~, of the medical risks associated with repetitive head impacts during NFL on-field play.

120.   Instead, the NFL ignored the risks and/or was willfully blind to the risks and/or actively concealed the risks from NFL players, including [Decedent] ~~John Wilbur~~, despite its historic and proactive role as the guardian of player safety. For that reason, the NFL breached its common law duty of reasonable and ordinary care to [Decedent] ~~John Wilbur~~ by failing to provide him with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during NFL on-field play.

121.   For nine seasons as an NFL offensive lineman, [Decedent] ~~John Wilbur~~ exposed himself personally to long-term neuro-cognitive risk and damage. Had [Decedent] ~~John Wilbur~~ known that the brain injury risks to which he exposed himself and others would later render him and other former NFL players unable to care for themselves and their families, he would have acted differently.

122.   On information and belief, over the past two decades, the NFL continued to exercise this common law duty and its unilateral authority to investigate and advise NFL players on many diverse and important topics, and that

34

should have included the recognition of circumstances that can precipitate MTBI, the long-term potential consequences of brain injury to NFL players, and solutions for players who have sustained such brain injury.

123.    Moreover, from 1994 until 2010, the NFL publicly inserted itself into the business of head injury research and openly disputed that any short-term or long-term harmful effects arose from football-related sub-concussive and concussive injuries.  The NFL propagated its own industry funded and falsified research to support its position, despite its historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusion.

124.    As such, the NFL continued its existing common law duty to provide truthful scientific research and information about the risks of concussive and/or sub-concussive brain injuries to NFL players, including [Decedent] ~~John Wilbur~~, who relied on the NFL's research, pronouncements, and/or silence on that subject.

125.    The NFL knew, reasonably expected, and intended former NFL players, including [Decedent] ~~John Wilbur~~, to rely on its research, pronouncements, and/or silence on that subject, in part, because of the historic special relationship between the NFL and the players and, in part, because the NFL knew that the vast majority of former NFL players, including [Decedent] ~~John Wilbur~~, played under non-guaranteed contracts and would willingly (and

unknowingly) expose themselves and others to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.

126.    The NFL had, in fact, developed over time a market brand analogous to that of Roman Gladiators that urged players to sacrifice all for "the game" as an essential mentality for play in the NFL.   The 2007 NFL Films video "*Moment of Impact*" emphasized that "3rd and 4th stringers, special team players will risk life and limb to catch the coach's eye" for a spot on an NFL roster.  During a voice-over emphasizing that these players hope "to make the team by making an impact," the video depicts a Buffalo Bills defender delivering a devastating blow directly to the head of the vulnerable Indianapolis Colts' kick-return man who had just caught the ball.

### The NFL Knew the Dangers and Risks Associated with Repetitive Head  Impacts and Concussions

127.   For decades, the NFL has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

128.   In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").  The article was published in the *Journal of the American Medical Association*.  The Martland

study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

129.   In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

130.   In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers.  After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

131.   The recommendations were codified as rules of the New York State Athletic Commission.

132.   In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

133.   That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football after receiving their third concussion.)

134.   In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

135.   A 1963 study by Drs. Mawdsley & Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries.  This damage manifested in the form of dementia and impairment of motor function.

136.   A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

137.   In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended

38

that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

138.   In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing.  This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

139.   A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion.  The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

140.   In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram.  By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

141.   In 1973, a potentially fatal condition known as "Second Impact Syndrome" - in which re-injury to the already-concussed brain triggers swelling

39

that the skull cannot accommodate - was identified.  It did not receive this name until 1984.  Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty football players.

142.   Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions.  These studies collectively established that:

Repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

Encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

Acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

With respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

Immediate retrograde memory issues occur following concussions;

Mild head injury requires recovery time without risk of subjection to further injury;

Head trauma is linked to dementia;

A football player who suffers a concussion requires significant rest before being subjected to further contact; and,

40

> Minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

143.   In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

144.   In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI also suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

145.   The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

146.   In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

147.    By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

148.    On information and belief, by 1991, the NCAA football conferences and individual college teams' medical staffs, along with many lower-level football groups (*e.g.,* high school, junior high school, and pee-wee league) had disseminated information and adopted criteria to protect football players even remotely suspected of having sustained concussions.

149.    Further, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: "[b]oxers that suffered concussion by KO [loss of consciousness], should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but not limited to KO's, and should not compete in a boxing match in less than 75 days."

150.    In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

42

151.   In 1999, former Pittsburgh Steeler and Hall of Fame inductee Mike Webster filed with the NFL a request that he receive complete disability benefits based on the fact that he had sustained repeated and disabling head impacts while a player for the Steelers.  In 1999, Webster submitted extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

152.   The NFL's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

153.   Webster died in 2002 at the age of fifty.  In December 2006, the Estate of Mike Webster received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District Court that the administrator had wrongly denied him benefits.  In its opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974-1990) ". . . had caused Webster eventually to suffer total and permanent mental disability . . . ."

154.   Thus, the NFL, through its own expert medical testimony and the expert testimony submitted by Webster knew and accepted that repetitive traumatic

43

brain injuries sustained by a Hall of Fame player led to long-term encephalopathy and permanent mental disability.

155.   A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers.  Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

156.   Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (3) eight suffered from Alzheimer's disease.

44

157.    A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990.  Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%.  High school football produced the greatest number of football head-related deaths.  From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

158.    In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

159.    This echoed similar medical protocol established at a Vienna conference in 2001.  These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

160.    The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

45

161.   The chart on the following page, which was excerpted from an article in the 2010 *New England Journal of Medicine* entitled "Traumatic Brain Injury— Football, Warfare, and Long-Term Effects," shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.

162.   A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

163.   Indeed, while the NFL knew for decades of the harmful effects of sub-concussive and concussive injuries on a player's brain, it actively concealed these facts from coaches, players, and the public.

164.   On information and belief during every decade referenced above, the NFL was advised by physicians of all kinds regarding the risks associated with playing the game of football, including the risks associated with head impacts and MTBI.

165.   As described above, the NFL has known for decades that MTBI can and does lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

166.   Rather than take immediate measures to protect NFL players (including [Decedent] ~~John Wilbur~~) from these known dangers, between the 1950s and 1994, the NFL failed to disseminate to then-current and former NFL players relevant health information it possessed regarding the significant risks associated with MTBI.

### The NFL Voluntarily Undertook the Responsibility of Studying Head Impacts In Football, Yet Fraudulently Concealed Their Long-Term Effects.

167.   In 1994, then NFL commissioner Paul Tagliabue agreed to fund a committee to study the issue of head injury in the NFL. The NFL voluntarily and unilaterally formed the MTBI Committee to study the effects of concussions and sub-concussive injury on NFL players.

168.   At that time, the current NFL Commissioner, Roger Goodell, was the NFL's Vice President and Chief Operating Officer.

169.   With the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.  Through its voluntary creation of the MTBI Committee, the NFL affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of

47

football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

170.   Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of fraudulent and negligent conduct, which included a campaign of disinformation designed to (a) dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

171.   The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players has been, until very recently, a concerted effort of deception and denial.   The NFL actively tried to and did conceal the extent of the concussion and brain trauma problem, the risks to [Decedent] ~~John Wilbur~~, and the risks to anyone else that played football.

172.   The NFL's unparalleled status in the world of football gave the MTBI Committee's pronouncements on concussions authority and validity.   [Decedent] ~~John Wilbur~~, therefore, reasonably relied on the NFL's pronouncements and/or its silence on this vital health issue.

173.   The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline

solutions.  Ironically, the MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

174.   By 1994, when the NFL formed the MTBI Committee, independent scientists and neurologists alike were already convinced that all concussions—even seemingly mild ones—were serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to heal properly.

175.   The MTBI Committee was publicized by the NFL as independent from the NFL, consisting of a combination of doctors and researchers.

176.   The MTBI Committee, however, was not independent.  It consisted of at least five (5) persons who were already affiliated with the NFL.

177.   Instead of naming a noted neurologist to chair the MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Commissioner Tagliabue appointed Dr. Elliot Pellman, a rheumatologist who lacked any specialized training or education relating to concussions, and who was a paid physician and trainer for the New York Jets.

178.   Dr. Pellman had reportedly been fired by Major League Baseball for lying to Congress regarding his resume.

179.   Dr. Pellman would chair the MTBI Committee from 1994-2007, and his leadership of the Committee came under frequent and harsh criticism related to his deficient medical training, background, and experience.

180.   The fact that Dr. Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Dr. Pellman independent of the NFL, because he was paid on an ongoing basis by an NFL Team.

181.   The NFL failed to appoint any neuropathologist to the MTBI Committee.

182.   From its inception in 1994, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players.

183.   Current NFL Commissioner Goodell confirmed this in June 2007 when he stated publicly that the NFL had been studying the effects of traumatic brain injury for "close to 14 years…."

184.   Under Dr. Pellman, the MTBI Committee spearheaded a disinformation campaign.

185.   Dr. Pellman and two other MTBI Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies that linked head impacts and concussions received by NFL players to neuro-cognitive disorders and disabilities.

50

186.   The MTBI Committee did not publish its first findings on active players until 2003.  In that publication, the MTBI Committee stated, contrary to years of independent findings, that there was no long-term negative health consequence associated with concussions.

187.   The MTBI Committee published its findings in a series of sixteen (16) papers between 2003 and 2009.  According to the MTBI Committee, all of their findings supported a conclusion that there was no long term negative health consequence associated with concussions or sub-concussive injuries sustained by NFL players.  These findings regularly contradicted the research and experiences of neurologists who treat sports concussions and the players who endured them.

188.   Completely contrary to peer reviewed scientific publications, the NFL's team of hand-picked so-called experts on the MTBI Committee did not find concussions to be of significant concern and felt it appropriate for players suffering a concussion to continue playing football during the same game or practice in which one was suffered. This recommendation and practice by the NFL, promoted by the MTBI Committee, was irresponsible and dangerous.

189.   The MTBI Committee's methodology and the conclusions reached in its research were criticized by independent experts due to the numerous flaws in the study design, methodology, and interpretation of the data, which led to conclusions at odds with common medical knowledge and basic scientific protocol.

190.   For example, in 2004 the MTBI Committee published a conclusion in which it claimed that its research found no risk of repeated concussions in players with previous concussions and that there was no "7-to-10 day window of increased susceptibility to sustaining another concussion."

191.   In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

192.   As a further example, an MTBI Committee conclusion in 2005 stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.   Return to play does not involve a significant risk of a second injury either in the same game or during the season."   "These data suggest," the MTBI Committee reported, "that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

193.   Yet, a 2003 NCAA study of 2,905 college football players found just the opposite:   "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

194.   Support for this same conclusion was developed as early as 1982 in studies conducted at the University of Virginia.

195.   Dr. Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players."

196.   The 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina, however, found a link between multiple concussions and depression among former professional players with histories of concussions. A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

197.   Other contrary conclusions that the MTBI Committee published at the behest, urging, and sponsorship of NFL over several years include, but are not limited to, the following:

> Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [TBIs] in professional football are not serious injuries";

> That NFL players did not show a decline in brain function after a concussion;

> That there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;

> That "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and

> That NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

198.    The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data-collection techniques. They received significant criticism in the scientific and medical media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

199.    Moreover, the conclusions of the MTBI Committee completely contradicted the medical testimony Hall of Fame player Mike Webster submitted to the NFL in his application for disability, including the testimony the NFL's own paid expert submitted in connection with Mr. Webster's application.

200.    Renowned experts Dr. Robert Cantu and Dr. Julian Bailes wrote harshly critical reviews of the studies' conclusions.

201.    Dr. Cantu observed that the extremely small sample size and voluntary participation in the NFL's study suggested there was bias in choosing the sample. According to Dr. Cantu, no conclusions should be drawn from the NFL study.

202.    A different scientist who reviewed the MTBI Committee's work further stated that the NFL appeared to be primarily preparing a defense for when

54

injured players eventually sued, and that it seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

203.   Dr. Kevin Guskiewicz has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

204.   The MTBI Committee's work was criticized when repeated inconsistencies and irregularities in the MTBI Committee's data were revealed.

205.   The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

206.   The results reported by Dr. Pellman and the MTBI Committee selectively excluded at least 850 baseline tests.   In a paper published in *Neurosurgery* in December 2004, Dr. Pellman and the other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing. They concluded that NFL players did not show a decline in brain function after suffering concussions. Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more.   The paper did not explain where the players in the study

groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

207.   Pellman subsequently fired William Barr, a neuropsychologist for the New York Jets, after Dr. Barr presented at a conference some NCAA study findings that contradicted NFL practices.

208.   As described in the following paragraphs, when faced with studies which tended to show a causal link between MTBI and cognitive degeneration, the NFL, through the MTBI Committee, produced contrary findings that were false, distorted, and deceptive to NFL players, participants in football nationwide, and the public at large.

209.   Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.  Dr. Omalu concluded that the players suffered from CTE.

210.   All of these individuals suffered multiple concussions during their NFL careers.  Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression.

211.   Some of Dr. Omalu's findings were published in *Neurosurgery*. Those findings included that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their activity in the NFL.

56

212.   In response to Dr. Omalu's articles, the MTBI Committee wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

213.   In an article published in *Neurosurgery* in 2007, Dr. Cantu reached a similar conclusion regarding Waters as Dr. Omalu had reached as to Webster and Long.

214.   A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression.   The study found that having three or four concussions meant twice the risk of depression as never-concussed players and five or more concussions meant a nearly three-fold risk.

215.   The NFL's MTBI Committee attacked these studies.

216.   In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.   Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program.   On the program, Dr. Pellman stated unequivocally that he did not believe the results of the study led by Dr. Guskiewicz.

217.   In 2005, Dr. Guskiewicz performed a clinical follow-up study, and found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees

without a history of concussions.   In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.

218.   The MTBI Committee attacked and sought to undermine the study, issuing the following excuse and delay tactic:  "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

219.   In August 2007, the NFL, in keeping with its scheme of fraud and deceit, issued a concussion pamphlet to players which stated:

> Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly.  It is important to understand that there is no magic number for how many concussions is too many.  Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes.

220.   In a statement made around the time that the concussion pamphlet was released, NFL Commissioner Roger Goodell said, "We want to make sure all NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions."  The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline in later life.

58

221.   Goodell also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

222.   [Decedent] ~~John Wilbur~~, a player in the NFL for nine seasons, relied to his detriment on the NFL's disinformation, all of which was contrary to the findings of the independent scientists regarding the causal link between multiple head injuries and concussions and cognitive decline.

223.   The NFL's conflict of interest and motive to suppress information regarding the risks of repetitive traumatic brain injuries and concussions was vividly demonstrated by Dr. Pellman's treatment of a concussion sustained by former star New York Jets player Wayne Chrebet.  This occurred in 2003, the same time period when Dr. Pellman chaired the MTBI Committee.

224.   In November 2003, Chrebet sustained a concussion from another player's knee to the back of his head.  The impact left him face down on the field in an unconscious state for several minutes.  Once Chrebet was on the sideline and conscious, Dr. Pellman administered tests.  Dr. Pellman knew that Chrebet had sustained a concussion, but reportedly Chrebet performed adequately on standard memory tests.  According to reports, Dr. Pellman asked Chrebet some questions, including whether he was "okay."  Chrebet responded that he was.  Reportedly, Dr.

Pellman told Chrebet that, "This is very important for your career," and sent Chrebet back into the game.  Shortly thereafter, Chrebet was diagnosed with post-concussion syndrome and kept out of games for the remainder of the 2003 season.

225.   Today, Chrebet is 38 years old and reportedly suffers from depression and memory problems.

226.   In 2005, the MTBI Committee published a paper that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

227.   Facing increasing media scrutiny over the MTBI Committee's questionable studies, Pellman eventually resigned as chair of the Committee in February 2007.  Although Pellman was replaced as chair by Dr. Ira Casson and Dr. David Viano, he remained a member of the MTBI Committee.

228.   Moreover, to this day, Pellman is a paid medical advisor to the NFL and was described as "our medical director" in Spring 2012 by NFL Executive Vice President and General Counsel Jeffrey Pash.  Notwithstanding his lack of expertise and his efforts to suppress information regarding the adverse effects on players of head impacts in NFL football, Pellman still exerts substantial influence in the NFL with respect to the diagnosis and treatment of head injuries of all kinds and return to play rules.

229.   Dr. Guskiewicz, research director of the University of North Carolina's Center for the Study of Retired Athletes, said at the time that Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

230.   Regarding Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Pellman] continued to say on the record that's not what they find and there's no truth to it."

231.   Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.   In 2007, in a televised interview on HBO's Real Sports, Dr. Casson unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

232.   In June 2007, the NFL convened a concussion summit for team doctors and trainers.   Independent scientists, including Drs. Cantu, and Guskiewicz, presented their research to the NFL.

233.   Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.   Dr. Bailes

recalled that the MTBI's Committee's reaction to his presentation was adversarial: "The Committee got mad . . . we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding? Alienate the scientist who found it?  Refuse to accept the science coming from him?'"

234.   At the summit, Dr. Casson told team doctors and trainers that CTE has never been scientifically documented in football players.

235.   After reviewing five years of data of on-field concussions, the NFL falsely concluded that there was no evidence for an increase in secondary brain injuries after a concussion.

236.   In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale.  Dr. McKee stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions."  Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

237.   A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal.  When Dr. McKee's research was published in 2009, Dr. Casson

asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long-term brain damage."

238.   In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players.  Over 1,000 former NFL players took part in the study. The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population---including a rate of 19 times the normal rate for men ages 30 through 49."

239.   The NFL, who commissioned the study, responded to these results by claiming that the study was incomplete, and that further findings would be needed. NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia.  Dr. Casson implied that the Michigan study was inconclusive and stated that further work was required.  Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

### The Congressional Inquiry and
### The NFL's Acknowledgement of the Concussion Crisis

240.   Shortly after the results of the Michigan study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

241.   Drs. Cantu and McKee testified before the House of Representatives, Committee on the Judiciary, to discuss the long-term impact of football-related head injuries.

242.   At the first hearing in October 2009, NFL Commissioner Roger Goodell acknowledged that the NFL owes a duty to the public at large to educate them as to the risks of concussions due to the League's unique position of influence: "In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well.  We must act in their best interests even if these young men never play professional football."

243.   When Representative Linda Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded answering the questions.

244.   On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, who played in the NFL from 2004 to 2009, died after falling from the

back of a truck.  Drs. Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed him with CTE.

245.   In January 2010, the House Judiciary Committee held further hearings on football player head injuries.  Representative Conyers observed that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

246.   Representative Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

247.   In the 2010 Congressional hearings, Dr. Casson gave testimony that denied the validity of other non-NFL studies and stated that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

248.   The members of the MTBI Committee, however, knew of the decades-old studies linking MTBI to long-term neurological problems.  Casson, a MTBI Committee member since its inception, stated before Congress on January 4, 2010, that he was "the lead author of a landmark paper on brain damage in modern boxers that was published in the [Journal of the American Medical Association] in 1984."  That paper, which referenced the many studies documenting CTE in boxers, studied eighteen former and active boxers and found that eighty-seven

percent of the professional boxers had definite evidence of brain damage. Specifically, the study determined that the subjects performed particularly poorly on neuropsychological tests measuring short-term memory.

249. In his written statement to Congress, Casson stated that he has "been concerned about the possibility of long term effects on the brain related to football for close to thirty years." Dr. Casson offered that one of the reasons he "was asked to be on the NFL MTBI committee was because of [his] knowledge of and experience treating boxers with chronic traumatic encephalopathy (CTE)."

250. This testimony contradicted Casson's testimony that "there is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

251. On February 1, 2010, Dr. Omalu spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football." In his prepared testimony, he explained:

> Glenn Pop Warner [1871 – 1954] founded the Pop Warner youth football league in 1929. He still remains one of the greatest football coaches in the history of American football. The single event, which necessitated the use of pads and helmets by football players took place in 1888 when the annual rules convention for the emerging sport of college football passed a rule permitting

tackling below the waist.

Football changed dramatically. Teams no longer arrayed themselves across the entire breath of the field. Teams bunched themselves around the runner to block for him. The wedge and mass play arrived. Football became, for a time, a savage sport full of fights, brawling, even fatalities."

In 1912, Pop Warner said: "Playing without helmets gives players more confidence, saves their heads from many hard jolts, and keeps their ears from becoming torn or sore. I do not encourage their use. I have never seen an accident to the head which was serious, but I have many times seen cases when hard bumps on the head so dazed the player receiving them that he lost his memory for a time and had to be removed from the game."

We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

252.   After the Congressional hearings, the NFLPA called for the removal of Dr. Casson as MTBI Committee co-chair, and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

253.   In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that

Pellman would no longer be a member of the panel.  Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Casson and Viano.  The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

254.   Notwithstanding the fact that Pellman was fired from the MTBI Committee, he remains as "[the NFL's] medical director," according to the NFL's Executive Vice President and General Counsel Jeffrey Pash.

255.   Under its new leadership, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew.  The Medical Committee formally requested that Dr. Pellman not speak at one of its initial conferences.

256.   During a May 2010 Congressional hearing, a Congressman made it plain to Drs. Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is . . . to mop [it] up."

257.   After the May hearings, Dr. Batjer was quoted as admitting, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us.  I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

258.   In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

259.   On February 17, 2011, former Chicago Bears and New York Giants player Dave Duerson committed suicide.  Fifty years old at the time, Duerson had suffered months of headaches, blurred vision, and faltering memory.

260.   Before his death, Duerson wrote a final note that asked that his brain be given to the NFL brain bank for evaluation.   After his death, Dr. Cantu determined that Duerson  suffered from CTE.

261.   When this information was reported, NFLPA Executive Director DeMaurice Smith stated that the fact that Duerson suffered from CTE

> makes it abundantly clear what the cost of football is for the men who played and the families.  It seems to me that any decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie, but doing a disservice to what [Duerson] feared and what he wanted to result from the donation of his brain to science.

262.   In July 2011, John Mackey, former tight end of the Baltimore Colts died.  Mackey was diagnosed with front temporal lobe dementia in 2007, forcing him to live full-time in an assisted living facility.

### The NFL's New Committee

263.   In October 2011, Dr. Mitchel Berger of the NFL's new Head, Neck, and Spine Medical Committee announced that a new study was in the planning

process.  He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that."  Dr. Berger further stated that data from the previous study would not be used.  "We're really moving on from that data.  There's really nothing we can do with that data in terms of how it was collected and assessed."

264.  Why in 1994 (and far earlier) the NFL (and its MTBI Committee) failed to share accurate information and take appropriate actions is difficult to comprehend in light of the fact that the NFL has known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms.  Instead, the NFL misled players, coaches, trainers, and the public, and actively spread disinformation to, among others, [Decedent] ~~John Wilbur~~ and his family.

265.  It took decades for the NFL to admit that there was a problem and sixteen years to admit that its information was false and inaccurate.  The NFL's conduct in this regard is willful and wanton and exhibits a reckless disregard for the safety of its players and the public at large.  At a minimum, the NFL acted with callous indifference to the duty it voluntarily assumed to [Decedent] ~~John Wilbur~~ and to players at every level of the game.

266.  As a direct result of the NFL's fraudulent concealment and misrepresentations, [Decedent] ~~John Wilbur~~ and his family were led to believe that

the symptoms and changes in his behavior were unconnected with the head impacts he sustained while he played in the NFL.  As a result of the NFL's willful and malicious conduct, [Decedent] ~~John Wilbur~~ endured years of pain and suffering and was deprived of proper medical strategies, treatment, and care, and [Decedent] ~~John Wilbur~~ and his family were deprived of the knowledge with which they could care for and address [Decedent] ~~John Wilbur~~'s health problems and plan for his future and the family's future.

## COUNT I
## ACTION FOR DECLARATORY RELIEF – LIABILITY
### (Plaintiff[s] ~~John Wilbur~~ Against the NFL)

267.   Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 266 set forth above as if fully set forth herein.

268.   There is a case and controversy among Plaintiff[s] ~~John Wilbur~~ on the one hand and the NFL on the other.

269.   Pursuant to the law of Hawai'i, Plaintiff[s] ~~John Wilbur~~ seeks a declaration as to the following:

a)   that the NFL knew or reasonably should have known, at all times material, that the repeated traumatic head impacts sustained by [Decedent] ~~John Wilbur~~ while playing NFL football were likely to expose him to excess risk of neurodegenerative disorders and diseases, including but not limited to CTE (from which he

71

suffered), Alzheimer's disease, or similar cognitive-impairing conditions;

b)   that based on the NFL's historic and long-standing voluntary undertaking, to advise all players on health risks and implement and policies and rules to make the game safer for players, the NFL had a duty to advise and warn [Decedent] ~~John Wilbur~~ both during his playing years and after he retired of the heightened risk of long-term brain injury from repetitive head impacts in pro football;

c)   that based on the NFL's voluntary undertaking in 1994 to study the issue of MTBI, the NFL had a duty not to falsify information the NFL's MTBI Committee generated but, rather, to speak truthfully and to advise [Decedent] ~~John Wilbur~~ (as a retired player) of the heightened risk, so that he could act to mitigate the damage he had already sustained;

d)   that the NFL willfully and intentionally concealed from and misled [Decedent] ~~John Wilbur~~ and his family concerning the heightened risk of long-term brain injury and the cause of the damage he sustained; and

e)   that between 1966 and 1974 (while he was an NFL player) and on and ongoing basis in the decades since that time period, the NFL recklessly endangered [Decedent] ~~John Wilbur~~ by failing to inform him of the brain injury he would and did sustain.

## COUNT II
## FRAUDULENT CONCEALMENT
(Plaintiff[s] ~~John Wilbur~~ Against the NFL)

270.   Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 269 set forth above as i~~s~~f~~~ fully set forth herein.

271.   Between 1966 and 1974, which includes the entire time period within which [Decedent] ~~John Wilbur~~ played the game, the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during sparring and actual prize fights.

272.   The NFL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NFL players are exposed.

273.   During that time period, the NFL knowingly and fraudulently concealed from current NFL players and retired NFL players, including [Decedent] ~~John Wilbur~~, the risks of head injuries in NFL games and practices, including the

73

risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

274.   As a result of the NFL's concealment, neither [Decedent] ~~John Wilbur~~ nor his family was aware that the concussive and sub-concussive blows to the head [Decedent] ~~John Wilbur~~ had sustained while a player in the NFL would and did result in ongoing and progressive brain damage.  As a result of that progressive brain damage, [Decedent] ~~John Wilbur~~ endured, among other things, pain, suffering, confusion, disordered thinking, anger, and loss of work and revenue.

275.   From 1994 through June of 2010, the NFL's fraudulent concealment continued and took on a more active dimension.  During that time period, when [Decedent] ~~John Wilbur~~ demonstrated symptoms of progressive and subtle brain damage, such as mood swings, depression, disordered thinking, eccentric behavior, and anger, the NFL voluntarily funded and produced its own purported scientific research.  With that purported research, the NFL repeatedly misrepresented to then-current and former NFL players, including [Decedent] ~~John Wilbur~~ and his wife Ann, the United States Congress, and the general public, that there is no link (or an insufficient scientific link) between sub-concussive and/or concussive head impacts in NFL games and practices and later-in-life cognitive/brain injury, including CTE and its related symptoms.

276.   Given the NFL's superior and unique vantage point, [Decedent] ~~John Wilbur~~ reasonably looked to the NFL for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts [Decedent] ~~John Wilbur~~ sustained while a player in the NFL.

277.   The NFL's MTBI Committee published articles and the concussion pamphlet referenced above, all of which concealed and minimized the risks of repetitive brain impacts the NFL knew existed for its then-current players and for its former players, such as [Decedent] ~~John Wilbur~~, who (along with his family) reasonably relied on the NFL's false pronouncements and/or silence on this vital health issue.

278.   The NFL's concussion pamphlet created an atmosphere of trust that the NFL had carefully undertaken its voluntary responsibility to research, test, study, and report accurate findings to the players and former players.  The NFL stated that "[w]e want to make sure all NFL players ... are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions."

279.   The concealment was ongoing.  Dr. Ira Casson provided oral and written testimony during 2010 congressional hearings in which he continued to deny the validity of other studies.  Dr. Casson also denied the link between

repetitive brain impacts and short- and long-term brain damage in public interviews.

280.   The NFL, therefore, concealed material facts and information with the intent to deceive and defraud, which caused [Decedent] ~~John Wilbur~~ to become increasingly exposed to the ongoing harm referenced above as a retired player, when the insidious and latent effects of the injuries were causing him pain and suffering and adversely affecting him and his family.

281.   The NFL knew and expected that [Decedent] ~~John Wilbur~~ would rely on the NFL's silence on this issue and on the NFL's false and inaccurate pronouncements.  [Decedent] ~~John Wilbur~~ did in fact reasonably rely on the NFL's silence on this issue during his playing career and, later, on the NFL's false and inaccurate information after his retirement as a player.

282.   As a direct and proximate result of the NFL's fraudulent conduct, [Decedent] ~~John Wilbur~~ suffered physical injury, including, but not limited to, existing and latent neuro-cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, economic losses, and the pain and suffering that naturally arises from progressive brain injury.

283.   As a direct and proximate result of the NFL's fraudulent and willful concealment, [Decedent] ~~John Wilbur~~ suffered substantial injuries, brain damage, emotional distress, pain and suffering, and economic and non-economic damages

that were ongoing and continuing in nature.  As a result of the NFL's fraudulent misconduct, [Decedent] ~~John Wilbur~~ did not recognize the condition, injuries, or symptoms from which he suffered.

284.   As a result of the NFL's misconduct as alleged herein, the NFL is liable to the [Decedent] ~~John Wilbur~~ for the full measure of damages allowed under applicable law.

## COUNT III
## FRAUD
(Plaintiff[s]  ~~John Wilbur~~ Against the NFL)

285.   Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 284 set forth above as if fully set forth herein.

286.   At least since the early 1950s the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

287.   The NFL knew that the risks of brain injury could be reduced by implementing changes to the game, akin to the ones the NFL belatedly adopted in 2011, such as (1) the baseline cognitive testing of players for comparison purposes during and after contact play, (2) the active monitoring of players for signs of MTBI, (3) the employment of a neurologist on the sidelines, and (4) return-to-play rules consistent with proper medical management of MTBI.

288.   Given the NFL's superior and unique vantage point and its historical role as the guardian of player safety, [Decedent] ~~John Wilbur~~ and all other NFL players reasonably looked to the NFL for guidance on issues related to repetitive head impacts, sub-concussive brain injuries, and concussive brain injuries.

289.   The NFL, however, withheld the information it knew about the risks of head injuries in football from, among other players, [Decedent] ~~John Wilbur~~.

290.   On information and belief, the NFL deliberately delayed implementing changes to the game it knew could reduce players' exposure to the risk of life-altering head injuries, because those changes would be expensive and would reduce the NFL's profitability.

291.   The NFL has been aware of and understood the significance of the published medical literature dating from as early as 1928 that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which all NFL players are exposed, particularly offensive lineman such as [Decedent] ~~John Wilbur~~.

292.   Before and during [Decedent] ~~John Wilbur~~'s playing years, the NFL purposefully ignored, was willfully blind, and/or actively concealed the brain injury risk to which it exposed NFL players, including [Decedent] ~~John Wilbur~~. The NFL's misconduct continued for many years after [Decedent] ~~John Wilbur~~ had retired as a player.

293.   In 1994, the NFL and its agents took their concealment activities another step.   The NFL, its agents, and its consultants agreed to use the MTBI Committee to populate the published scientific literature with "studies" that disputed the conclusions of independent researchers regarding the long-term chronic disabilities and injuries associated with head injury and that made material misrepresentations with the intent to defraud the then-current NFL players and former NFL players, including [Decedent] ~~John Wilbur~~.

294.   Beginning in 1994, the NFL and its agents funded and created a falsified body of purported scientific research that misrepresented to then-current NFL players, all former NFL players, the United States Congress, and the general public that there was no scientifically proven link between repetitive sub-concussive and concussive injuries sustained during football and brain injury, including but not limited to CTE and its related symptoms.

295.   The NFL, its agents, and its consultants made these material misrepresentations with the intent to defraud all former players, including [Decedent] ~~John Wilbur~~.

296.   During his NFL playing years and the years after he had retired from football, [Decedent] ~~John Wilbur~~ justifiably and reasonably relied on the NFL's omissions and misrepresentations to his detriment.

297.   As a result of the NFL's misconduct as alleged herein, the NFL is liable to [Decedent] ~~John Wilbur~~.

298.   [Decedent] ~~John Wilbur~~ and his estate have been damaged by the NFL's misconduct, and that harm includes substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages.

299.   As a result of the NFL's fraud, the NFL is liable to [Decedent] ~~John Wilbur~~ for the full measure of damages allowed under applicable law.

### COUNT IV
### NEGLIGENT MISREPRESENTATION
(Plaintiff[s] ~~John Wilbur~~ Against the NFL)

300.   Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 299 set forth above as if fully set forth herein.

301.   A special relationship exists between the NFL and [Decedent] ~~John Wilbur~~ sufficient to impose a duty on the NFL to disclose accurate information to him.

302.   Long before 1994, and during the years when [Decedent] ~~John Wilbur~~ played in the NFL, the NFL knew that repetitive head impacts in football games and practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during sparring and prize fights.

303.   Prior to 1994 (and specifically during the years [Decedent] ~~John Wilbur~~ played pro football), the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed.

304.   The NFL, however, withheld this information from NFL players, including [Decedent] ~~John Wilbur~~, ignored the risks to NFL players, and/or was willfully blind to the risk and likely harm.

305.   Before June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

306.   Defendant NFL, therefore, failed to reveal and/or negligently misrepresented the dangers [Decedent] ~~John Wilbur~~ faced in returning to action after sustaining a sub-concussive and/or concussive head injury and the long-term effects of continuing to play football after such an injury.

307.   Further, from 1994 forward, the NFL's MTBI Committee made public statements, published articles, and issued the concussion pamphlet to its players, which the NFL knew or should have known were misleading, because it downplayed and obfuscated to NFL players, former NFL Players such as

[Decedent] ~~John Wilbur~~, and their families the true and serious risks of repetitive traumatic head impacts.

308.   The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and other information issued to current and former NFL Players.

309.   At all times, both before and after 1994, [Decedent] ~~John Wilbur~~'s reliance on the NFL was reasonable, given the NFL's superior and unique vantage point regarding the risks associated with repetitive sub-concussive and concussive head impacts during NFL on-field play.

310.   The NFL's misrepresentations included the false statement that present NFL players were not at an increased risk of short-term and long-term adverse consequences if they returned too soon to NFL games or practices after suffering head trauma.   The NFL, therefore, also misrepresented to [Decedent] ~~John Wilbur~~ that he had not been exposed to such increased risk as a player in the NFL.

311.   The NFL's misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts that NFL players regularly sustained.

312.   The NFL made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior

position of knowledge, that NFL players of every era, including [Decedent] ~~John Wilbur~~, faced serious health problems if they returned to a game too soon after sustaining a concussion.

313.  The NFL knew or should have known the misleading nature of its statements when it made the statements.

314.  The NFL made the misrepresentations and actively concealed information knowing that former NFL players, such as [Decedent] ~~John Wilbur~~, would and did rely on the misrepresentations or omissions in, among other things, how [Decedent] ~~John Wilbur~~ and his friends and family addressed (or failed to address) the brain damage symptoms from which he suffered.

315.  The NFL's concerted misrepresentations and concealment of the risks to which [Decedent] ~~John Wilbur~~ had been exposed on the playing field delayed his ability to plan for his future, to plan for his family's future, and to seek appropriate treatment for his latent neurodegenerative conditions.

316.  As a result of the NFL's misrepresentations, the NFL is liable to [Decedent] ~~John Wilbur~~.

317.  As a direct and proximate result of the NFL's negligent misrepresentations, [Decedent] ~~John Wilbur~~ suffered serious personal injury, including neuro-cognitive brain disease and associated damages including mental

disability, loss of income, pain and suffering, and emotional distress.  Plaintiff[s] ~~John Wilbur~~ seeks the full measure of damages allowed under applicable law.

**COUNT V**
**NEGLIGENCE**
(Plaintiff[s] ~~John Wilbur~~ Against the NFL)

318.  Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 317 as set forth above as if fully set forth herein.

319.  In 1922, the American Professional Football Association became the National Football League.  In 1933, the NFL began developing rules and regulations of play that were significantly different from those previously followed and were used by collegiate football leagues.

320.  In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

321.  Between 1933 and 1968, the NFL assumed and carried out a duty to supervise how the game of football was played in the United States.

322.  Between 1933 and 1968, the NFL assumed and carried out a duty to inform and advise players and Teams of the foreseeable harm that can arise from such things as the use of leather helmets, the need to wear hard plastic helmets to reduce head wounds and internal injury (1943) and the grabbing of an opponent's facemask—to minimize or avoid head and neck injuries (1956/1962).  These

warnings and imposed safety rules were furnished by the NFL because it had assumed a duty to provide a safe environment for players and because of its superior knowledge of the risks of injury to players.

323.   The NFL voluntarily inserted itself into the tasks assumed by others to develop helmet safety standards to reduce the risk of head injury while playing football.   Despite its voluntary participation in these activities, the defendant negligently failed to adopt these standards for a considerable period of time after others had done so.

324.   During this time period, the NFL knew or should have known of medical or scientific literature regarding the risks of short-term and long-term neuro-cognitive disabilities and deficits to athletes exposed to MTBI.

325.   During this time period, the NFL knew or should have known that repetitive sub-concussive and concussive blows to the heads of NFL players can and do result in short-term and long-term brain damage.

326.   During this time period, the NFL knew or should have known that it was the practice in the NFL to compel or cajole players to play with injuries, including sub-concussive injuries, concussive injuries, and injuries involving a loss of consciousness.

327.   During this time period, the NFL had superior knowledge (as compared to the NFL players and coaches themselves) that athletic sporting events

causing sub-concussive and concussive injuries, posed a serious risk of short-term and long-term cognitive disabilities.

328.   The NFL's failure to address the continuing health risks associated with sub-concussive and/or concussive injuries that NFL players sustained constituted a breach of its duty to these players, which resulted in long-term neuro-cognitive problems and disabilities to former NFL players, including [Decedent] ~~John Wilbur~~.

329.   During this time period, the NFL continued to propagate the dangerous myth that NFL players are tough and can withstand "getting their bell rung," "suffering dings," or temporarily losing consciousness while playing.  The perpetration of misleading and false statements and a philosophy of invincibility nurtured and publicized by the NFL throughout this time period constitutes continuing negligent conduct that the NFL never stopped perpetrating until subject to Congressional scrutiny and the civil lawsuits brought by former NFL players for brain trauma.

330.   Given the NFL's superior and unique vantage point on the issue of head injuries and concussions, [Decedent] ~~John Wilbur~~ reasonably relied to his detriment on the NFL's actions and omissions on this subject.

331.   The failure of the NFL to publicize within the League (to active players, retirees such as [Decedent] ~~John Wilbur~~, and to the public at large) the

mounting evidence in the scientific literature of the developing and chronic neuro-cognitive problems among former players caused then-current players and retired players such as [Decedent] ~~John Wilbur~~ to believe that problems they faced were neither serious nor related to football. These commissions or omissions caused [Decedent] ~~John Wilbur~~ believe that his condition was unrelated to football and adversely affected their ability to address the problems from which he suffered.

332. Likewise, these omissions and commissions had the institutional effect of reducing the interest in helmet safety research, avoiding changes in rule-playing to minimize head injury, avoiding the need to promulgate return-to-play rules that specifically addressed sub-concussive and concussive events, and establishing programs to educate players about the long-term health risks of sub-concussive and concussive impacts.

333. Increasingly during this time period, the NFL (and its marketing entities) promoted the game of football as acceptably violent, and it rewarded its most violent players for the most violent collisions. This marketing technique was directed to the general public and organized football at every level of the game, including, Pop Warner, high school, and college. In pursuing these concerted marketing techniques, the NFL defendants knew or should have known that combining concussion-inducing collisions and violence with athletic heroism

87

would induce NFL players (and those who aspired to play in the NFL) to play with reckless violence.

334.   In its marketing scheme, the NFL developed print and film packages that were widely distributed throughout the United States to media outlets and organized football programs.   The purpose of the marketing scheme was to convince current players and those in college and high school football that powerful and debilitating impacts against an opposing player was the purpose of the game and would lead to accolades.

335.   In the early 1990s, the NFL voluntarily undertook to study the issue of neuro-cognitive injuries in former NFL players.

336.   In 1994, in connection with that voluntary undertaking, the NFL created the aforementioned MTBI Committee.

337.   The NFL recognized that its voluntary undertaking to study and report information about the effect of head impacts on NFL players would not just be for the benefit of then-present and former NFL players alone.   Since the NFL is the most prominent and influential entity in the sport of football, the NFL knew or should have known that the NFL MTBI Committee's statements would have a broad public impact.

338.   By voluntarily undertaking to study and report on the issue of the neuro-cognitive effects of head impacts in professional football, the NFL assumed

a duty to exercise reasonable care in the MTBI Committee's work and the NFL and its agents' public statements about the substance of the Committee's work.

339.   However, the MTBI Committee negligently performed the NFL's voluntarily undertaken research mission.

340.   In addition, from 1994 through June of 2010, the NFL and its MTBI Committee made material misrepresentations to players, former players (such as [Decedent] ~~John Wilbur~~), the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

341.   The NFL's failure to exercise reasonable care in its voluntarily assumed duty that began in 1994 meant that former NFL players such as [Decedent] ~~John Wilbur~~ were misinformed and lulled into believing that he had not suffered long-term neuro-cognitive injuries that could be addressed with medical therapies and/or by counseling and education.

342.   [Decedent] ~~John Wilbur~~ reasonably relied to their detriment on the NFL's actions and omissions on this subject.

343.   Under all of the above circumstances, it was foreseeable that the NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the personal injuries suffered by [Decedent] ~~John Wilbur~~.

344.   The NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to [Decedent] ~~John Wilbur~~'s latent and progressive injuries.

345.   As a result of the NFL's negligence, the NFL is liable to the [Decedent] ~~John Wilbur~~, who is entitled to and seeks all damages allowed by applicable law.

**COUNT VI**
**NEGLIGENT HIRING**
(Plaintiff[s] ~~John Wilbur~~ Against the NFL)

346.   Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 345 set forth above as if fully set forth herein.

347.   The NFL voluntarily and gratuitously inserted itself into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury.

348.   In doing so, the NFL assumed a duty to [Decedent] ~~John Wilbur~~ and the general public to retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on the relationship between repetitive head impacts in football and brain injury and to ensure that those whom it hired had no conflict of interest and that each had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest.

349.   The NFL breached its duty by hiring persons who:

a.      were unqualified;

b.      were not competent to engage in rigorous and defensible scientific research;

c.      were not competent to render valid and defensible opinions;

d.      created fraudulent industry-funded research; and/or

e.      attacked as not credible the valid and defensible research and opinions generated by neuro-scientists who were unconnected to and not paid by the NFL.

350.    The NFL's negligence in this regard resulted in a body of falsified industry-funded research that purposefully and/or negligently contested and suppressed valid and truthful bio-medical science.  The NFL's negligence allowed the MTBI Committee to use falsified industry-funded research to mislead all former NFL players (including [Decedent] ~~John Wilbur~~), and the general public regarding the risks associated with repetitive head impacts in the game of football.

351.    As a result of the NFL's negligence, [Decedent] ~~John Wilbur~~ sustained ongoing and progressive brain injuries and did not take the protective measures or seek the diagnosis and treatment he (and his family) would have sought had the NFL told them the truth.

## COUNT VII
## NEGLIGENT RETENTION
### (Plaintiff[s] ~~John Wilbur~~ Against the NFL)

352.   Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1 through 351 set forth above as if fully set forth herein.

353.   The NFL knew or should have known that the controlling members of the MTBI Committee demonstrated an ongoing lack of competence, objectivity and inadequate judgment to study and render expert opinions on the issue of the relationship between repetitive head impacts in football and brain injury.

354.   The NFL voluntarily assumed a duty to [Decedent] ~~John Wilbur~~ and the general public not to allow those incompetent persons it had hired within the MTBI Committee to continue to conduct incompetent and falsified studies and render incompetent opinions on the relationship between repetitive head impacts in football and brain injury.

355.   During the time period when the MTBI Committee was conducting its purported research and rendering its purported opinions, the NFL knew or should have known that the purported research and opinions of the MTBI Committee were false and indefensible.

356.   The NFL breached its duty by allowing these incompetent and unqualified persons, under the auspices and with the imprimatur of the NFL:

   a.      to continue to create incompetent and indefensible

research,

b.  to continue to render invalid and indefensible opinions,

and

c.  to continue to attack the credible and defensible research

and opinions of neuro-scientists not connected to or paid by the

NFL.

357.  The NFL's negligence allowed the incompetent members of the

MTBI Committee to continue to advance their false and incompetent research and

opinions in an attempt to suppress valid bio-medical science.  The NFL's

negligence allowed the MTBI Committee members to mislead [Decedent] ~~John Wilbur~~, other former NFL players, and the general public regarding the permanent

brain injury risks associated with repetitive head impacts in the game of football.

358.  As a result of the NFL's negligence, [Decedent] ~~John Wilbur~~

sustained ongoing and progressive brain injuries and did not take the protective

measures or seek the diagnosis and treatment he would have sought had the NFL

told him and other former players the truth.

## COUNT VII
## CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT
(Plaintiff[s] ~~John Wilbur~~ Against all Defendants)

359.  Plaintiff[s] ~~John Wilbur~~ incorporates by reference paragraphs 1

through 358 set forth above as if fully set forth herein.

93

360.   For decades, the NFL and NFL Properties, along with others who were consultants and agents of the NFL, including those consultants who participated in the MTBI Committee, acted in concert to conceal from NFL players and the public the link between repetitive head impacts in football and long-term neuro-cognitive damage, illness, and decline.

361.   The Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive head impacts in football games and practices created any known long-term neuro-cognitive risks to present or former NFL players.   The misconduct by the Defendants, its consultants, and agents exposed [Decedent] ~~John Wilbur~~ to an increased risk of brain injury and was the proximate cause of the brain damage from which [Decedent] ~~John Wilbur~~ suffered.

362.   [Decedent] ~~John Wilbur~~, therefore, has suffered substantial personal injuries and pain and suffering as a result of the improper concerted activities of the NFL, its agents and consultants, and NFL Properties, and has consequently been damaged.

### [COUNT VIII
### LOSS OF CONSORTIUM

363.   Plaintiffs incorporate by reference paragraphs 1 through 362 set forth above as is fully set forth herein.

364.   By reason of the death to Decedent, JOHN LEONARD WILBUR, Plaintiffs DIONE ELIZABETH SMITH, LINDSEY K. WILBUR, and NATHAN HALSEY WILBUR, suffered loss of affection, society, company, support, consortium, companionship, comfort and protection and suffered serious emotional distress.]

## **PRAYER FOR RELIEF**

[WHEREFORE, Plaintiffs ~~the Plaintiff John Leonard Wilbur~~, prays for judgment as follows:

A.     With respect to Count I, granting Declaratory relief as requested against the NFL;

B.     With respect to Count II through VII, granting an award of compensatory and punitive damages against the NFL;

C.     With respect to Count VIII, granting an award of compensatory and punitive damages against all Defendants;

D.     With respect to all counts, awarding Plaintiff[s] ~~John Wilbur~~ such other and further relief as may be appropriate; and

E.     Granting an award to Plaintiff[s] ~~John Wilbur~~, of prejudgment interest, costs and attorneys fees.

DATED: Honolulu, Hawaii, _____.

95

_____

~~CHRISTOPHER A. DIAS~~

~~GENE LOCKS (Pro Hac Vice Motion to be Submitted)~~

~~DAVID D. LANGFITT (Pro Hac Vice Motion to be Submitted)~~

[GARY O. GALIHER

ILANA K. WAXMAN

CLARISSE M. KOBASHIGAWA

ALLISON M. AOKI

ALYSSA R. SEGAWA

ANTHONY M. CARR]

Attorneys for Plaintiffs

DIONE ELIZABETH SMITH, Individually and as Personal Representative of the Estate of JOHN LEONARD WILBUR; LINDSEY K. WILBUR and NATHAN HALSEY WILBUR]

~~JOHN LEONARD WILBUR~~

96

IN THE UNITED STATES DISTRICT COURT

[FOR THE EASTERN DISTRICT OF PENNSYLVANIA]
~~DISTRICT OF HAWAII~~

| | |
|---|---|
| ~~JOHN LEONARD WILBUR~~ [DIONE ELIZABETH SMITH, Individually and as Personal Representative of the Estate of JOHN LEONARD WILBUR; LINDSEY K. WILBUR; and NATHAN HALSEY WILBUR], <br><br> Plaintiff[s], <br><br> vs. <br><br> THE NATIONAL FOOTBALL LEAGUE, et al. <br><br> Defendants. | ~~CV 13 00330 LEK KSC~~ [NO. 2:13-cv-04457-AB MDL-2323] <br><br><br> DEMAND FOR JURY TRIAL |

## DEMAND FOR JURY TRIAL

PLAINTIFF[S] [DIONE ELIZABETH SMITH, Individually and as

Personal Representative of the Estate of JOHN LEONARD WILBUR; LINDSEY

K. WILBUR; and NATHAN HALSEY WILBUR] ~~JOHN LEONARD WILBUR~~

hereby demands a trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, _____.


                                                    _____

~~CHRISTOPHER A. DIAS~~
~~GENE LOCKS~~
[GARY O. GALIHER
ILANA K. WAXMAN
CLARISSE M. KOBASHIGAWA
ALLISON M. AOKI
ALYSSA R. SEGAWA
ANTHONY M. CARR]
Attorneys for Plaintiffs
DIONE ELIZABETH SMITH,
Individually and as Personal
Representative of the Estate of JOHN
LEONARD WILBUR; LINDSEY K.
WILBUR; and NATHAN HALSEY
WILBUR]

2

IN THE UNITED STATES DISTRICT COURT

[FOR THE EASTERN DISTRICT OF PENNSYLVANIA]
~~DISTRICT OF HAWAII~~

| | |
|---|---|
| ~~JOHN LEONARD WILBUR~~ [DIONE ELIZABETH SMITH, Individually and as Personal Representative of the Estate of JOHN LEONARD WILBUR; LINDSEY K. WILBUR; and NATHAN HALSEY WILBUR] | ~~CV  13-00330 LEK KSC~~ [NO. 2:13-cv-04457-AB MDL-2323] |
| Plaintiff[s], | SUMMONS |
| vs. | |
| THE NATIONAL FOOTBALL LEAGUE, et al. | |
| Defendants. | |

SUMMONS

~~STATE OF HAWAII~~

TO THE ABOVE-NAMED DEFENDANTS:

~~You are hereby summoned and required to file with the Court and serve upon Plaintiff's attorney, an answer to the Complaint which is herewith served upon you, within 21 days after service of this Summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.~~

~~This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.~~

~~A failure to obey this summons may result in an entry of default and default judgment against the disobeying person or party.~~

[A lawsuit has been filed against you.]

[Within 21 days after service of this summons on you (not counting the day you received it) – or 60 days if you are in the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

[Galiher DeRobertis Waxman
610 Ward Avenue
Honolulu, Hawaii 96814]

[If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.]

CLERK OF COURT

DATED: _____        _____

                                       DEPUTY CLERK