# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : : : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | | |

**DECLARATION OF MATTHEW GARRETSON ON PREPARATION TO IMPLEMENT THE SETTLEMENT PROGRAM AFTER THE EFFECTIVE DATE**

I, Matthew Garretson, hereby declare and state as follows:

1. On May 8, 2015, this Court entered its Amended Final Order and Judgment in this action. In the order, the Court certified the Settlement Class and Subclasses under Federal Rule of Civil Procedure 23 and approved the Settlement Agreement. (ECF No. 6534 ¶¶ 2, 7.) It also ordered the Parties "to implement each and every obligation set forth in the Settlement Agreement in accordance with the terms and provisions of the Settlement Agreement" (*id.* ¶ 9) and, to further the implementation of the Settlement Agreement, confirmed the appointment of The Garretson Resolution Group, Inc. ("GRG") as the Baseline Assessment Program ("BAP") Administrator and Lien Resolution Administrator (*id.* ¶ 13).

2. Below is an outline of the current status and progress completed by GRG, in accordance with its duties and responsibilities as the BAP Administrator and Lien Resolution Administrator under the Settlement Agreement, in preparation for the implementation of the Settlement Program after the Effective Date. In summary, GRG is actively identifying and recruiting Qualified BAP Providers, developing the forms and processes to ensure that the BAP

delivers benefits easily and efficiently to eligible Retired NFL Football Players, and has already negotiated advantageous agreements with governmental agencies to resolve any medical liens that may be placed against the Monetary Awards of Settlement Class Members. GRG will launch the BAP and meet its lien resolution obligations by the deadlines set forth in the Settlement Agreement after the Settlement becomes effective.

**BASELINE ASSESSMENT PROGRAM**

3. As the BAP Administrator, GRG is responsible for establishing and maintaining a network of Qualified BAP Providers to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. (*Id.* § 5.7(a)(i).) This network of Qualified BAP Providers must be established within 90 days after the Effective Date.

4. Under the Settlement Agreement, the BAP Administrator must select Qualified BAP Providers based on the following criteria:

    a. education, training, licensing, credentialing, board certification, and insurance coverage;

    b. ability to provide the specified baseline assessment examinations under the BAP;

    c. ability to provide medical services under the BAP Supplemental Benefits;

    d. ability to provide all required examinations and services in a timely manner;

    e. geographic proximity to Retired NFL Football Players; and

    f. rate structure and payments terms. (ECF No. 6481-1, Settlement Agreement § 5.7(a)(2).)

5. In order to ensure that the network of Qualified BAP Providers is established within 90 days after the Effective Date, GRG has established an enrollment process that consists of the following steps:

    a. identification of suitable Qualified BAP Provider candidates, based on the criteria listed above;

    b. initial contact with key decision makers in key provider organizations employing such Qualified BAP Provider candidates;

    c. securing applications from Qualified BAP Provider candidates;

    d. reviewing the credentials of Qualified BAP Provider candidates who have applied for participation in the BAP;

    e. submitting Qualified BAP Provider candidates to Co-Lead Class Counsel and Counsel for the NFL Parties for approval or veto in accordance with Section 5.7(a)(i) of the Settlement Agreement; and

    f. contracting with approved Qualified BAP Provider candidates for enrollment in the Qualified BAP Provider network after the Settlement becomes effective.

6. GRG has made significant progress in creating a nationwide Qualified BAP Provider network. In order to plan for appropriate coverage, GRG analyzed preliminary ZIP-code-level data provided by the Claims Administrator to estimate the relative distribution of Retired NFL Football Players across the country. This analysis showed that by targeting efforts toward fifty-three cities (comprising the fifty largest metropolitan statistical areas in the United States, plus Anchorage, Alaska; Honolulu, Hawaii; and Green Bay, Wisconsin), GRG will be able to effect broad coverage in geographic proximity to the vast majority of Retired NFL

Football Players. This analysis also has enabled GRG to estimate the relative number of Qualified BAP Providers needed in each city.

7. To date, GRG has identified key provider organizations with board-certified neurologists and ABPP- and ABCN-certified clinical neuropsychologists meeting the above criteria to serve as Qualified BAP Providers in each of the fifty-three target cities. GRG's efforts to secure applications from each key provider organization are underway and are on track for establishing the network of Qualified BAP Providers within the timeline established by the Settlement Agreement.

8. GRG also has identified additional Qualified BAP Provider candidates outside the key provider organizations in order to ensure adequate network capacity for the forecasted level of participation in the BAP. Efforts to contact these additional Qualified BAP Provider candidates are also underway and are on track for establishing the network of Qualified BAP Providers within the timeline established by the Settlement Agreement.

9. In addition to its work on establishing the network of Qualified BAP Providers, GRG has worked to ensure the best possible experience for Settlement Class Members as they utilize the BAP. Key elements of these efforts include:

    a. coordination with the Claims Administrator to ensure Settlement Class Members can access benefits information and interact with the Claims Administrator via a simple, uniform, and secure online portal;

    b. creation of a process for the Claims Administrator to securely transmit Settlement Class Member identifying information necessary to schedule and administer baseline assessment examinations as soon as the Claims Administrator determines that a given Settlement Class Member is eligible to participate in the BAP;

4

    c. development of an easy-to-understand process for requesting scheduling of a baseline assessment examination with Qualified BAP Providers;

    d. design and configuration of GRG's secure web portal for Settlement Class Members to request baseline assessment examinations and review BAP-related documents;

    e. design and configuration of GRG's secure web portal for Qualified BAP Providers to report the results of each baseline assessment examination and upload program-related documentation, including Diagnosing Physician Certification Forms and supporting medical records.

10. As stated above, GRG will implement the BAP after the Settlement becomes effective and within the time period prescribed by the Settlement Agreement.

**HEALTHCARE LIEN RESOLUTION**

11. The NFL Settlement Agreement charges GRG, as the Lien Resolution Administrator, with the following responsibilities, among others:

    a. administer[ing] the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3 (ECF No. 6481-1, Settlement Agreement § 11.1(b)), which includes:

        i. fulfilling all state and federal reporting obligations (*id.* § 11.3(c)(iii)),

        ii. "[s]atisfy[ing] Lien amounts owed to a Governmental Payor or, to the extent identified by the Class Member pursuant to Section 11.3(a), Medicare Part C or Part D Program sponsor for medical items, services, and/or prescription drugs" (*id.* § 11.3(c)(iv)), and

        iii. "[t]ransmit[ting] all information received from any Governmental Payor or Medicare Part C or Part D Program sponsor pursuant to such

5

authorizations (i) to the NFL Parties, Claims Administrator, and/or Special Master solely for purposes of verifying compliance with the MSP Laws or other similar reporting obligations and for verifying satisfaction and full discharge of all such Liens" (*id.* § 11.3(c)(v)).

12. As described herein, GRG has made significant progress in terms of establishing uniform and efficient processes to identify and resolve healthcare Liens and reimbursement claims that may be associated with a Settlement Class Member's settlement award through coordination with entities such as the Centers for Medicare and Medicaid Services ("CMS"), individual state Medicaid agencies, and other healthcare payers/providers.

**Medicare Part A & Part B Resolution**

13. With respect to Medicare Parts A & Part B, the Settlement Agreement provides, among other things, that the Lien Resolution Administrator shall undertake to obtain an agreement in writing with CMS that "[e]stablishes a global repayment amount per Qualifying Diagnosis and/or for all or certain Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program, or, alternatively, otherwise sets forth a conditional payment resolution process." (*Id.* § 11.3(c)(ii)(1).)  To this end, GRG has obtained CMS' agreement to globally resolve its Medicare Part A and Part B reimbursement claims for some Qualifying Diagnoses, to individually resolve those claims for the rest of the Qualifying Diagnoses, and to not assert a recovery claim against the BAP or the Education Fund.

14. To begin, GRG has secured CMS' agreement to a global resolution methodology and associated global repayment values to satisfy Medicare's Part A and/or Part B fee-for-service recovery claims associated with Settlement Class Members who are or were entitled to benefits under the Medicare Program and are awarded compensation from the Monetary Award Fund ("MAF") for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment and/or

6

Level 2 Neurocognitive Impairment. Global resolution involves resolving Medicare Part A and/or Part B reimbursement claims based on values derived from compensable injury categories. The global repayment values further account for factors unique to each individual including, but not limited to, the date of injury in relation to the date of Medicare coverage and the existence of other primary payer coverage. These factors allow for adjustments in the values (where appropriate) to ensure that the repayment obligation to Medicare aligns with the circumstances of each individual Settlement Class Member.

15. With respect to Medicare-entitled Settlement Class Members who receive compensation from the MAF for a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's Disease, Death with Chronic Traumatic Encephalopathy, or Amyotrophic Lateral Sclerosis (also known as Lou Gehrig's Disease), CMS has agreed to resolve its Medicare Part A and/or Part B fee-for-service recovery claims through the traditional recovery demand process. Under CMS' traditional recovery demand process, GRG secures claims on an individual basis to identify the exact amounts CMS has paid on behalf of a Settlement Class Member. GRG then audits each claim to ensure that only medical expenses related to the compensable injury from the date of injury through the date of settlement are included in the repayment obligation.

16. Finally, as mentioned above, GRG has also secured CMS' agreement that it will not assert a Medicare Part A and/or Part B fee-for-service recovery claim against the BAP or the Education Fund.

**Medicaid Resolution**

17. With respect to state Medicaid reimbursement obligations, GRG presented each of the state Medicaid agencies with a standard protocol agreement and proposed resolution methodology to resolve all Medicaid recovery claims against the compensation the Settlement Class Members will receive from the MAF for Qualifying Diagnoses. Forty-four of the fifty-

two Medicaid agencies have adopted the agreement and methodology. Discussions with the remaining eight Medicaid agencies are still ongoing.

18. GRG's standard protocol agreements include a proposal that each Medicaid agency's recovery claim will not exceed a certain percentage ("Holdback") of a Settlement Class Member's gross settlement award. Since the Holdback amount is the maximum a Medicaid Agency can recover, this allows funds in excess of the Holdback amount to be disbursed to the Settlement Class Member (subject to Holdback amounts established for other lien types if applicable to the Settlement Class Member). In addition, these protocol agreements include a proposal that each Medicaid agency agree to an automatic reduction of the agency's final recovery claim by a certain percentage.

I, Matthew Garretson, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 7th day of October, 2016.

_____
Matthew Garretson