**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, | Civil Action No. 2:14-cv-00029-AB |
| Plaintiffs, | |
| v. | |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., | |
| Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**FANECA OBJECTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**PETITION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 2

III.  PROCEDURAL HISTORY ............................................................................ 5

      A.   The Precursor Lawsuits and the Initial Settlement ............................ 5

      B.   The Faneca Objectors' Efforts To Improve the Settlement ............... 8

           1.   The Motion To Intervene ........................................................... 8

           2.   The Opposition to Preliminary Approval ................................... 9

           3.   The Rule 23(f) Petition to the Third Circuit ............................. 10

           4.   The Objection ........................................................................... 11

           5.   The Pre-Fairness Hearing Proceedings .................................... 13

           6.   The Fairness Hearing and Post-Hearing Submissions ............. 14

      C.   Final Approval of the Settlement Adopting Changes Urged by the
           Faneca Objectors .............................................................................. 17

           1.   The Court-Recommended Improvements ................................. 17

           2.   The Final Settlement ................................................................ 17

      D.   The Faneca Objectors' Separate Negotiations with the NFL .......... 18

      E.   The Third Circuit Appeal .................................................................. 19

IV.   THE INCREASE IN THE SETTLEMENT'S VALUE .................................. 20

      A.   Uncapping the BAP Fund To Guarantee a Baseline Assessment for Every Eligible
           Class Member .................................................................................... 21

      B.   Eligible-Season Credit for Seasons Played in NFL Europe ............. 22

      C.   The Expanded Scope of the Death with CTE Qualifying Diagnosis .......... 26

      D.   Elimination of the $1,000 Appeal Fee in Cases of Financial Hardship ..... 27

V.    THE REQUESTED AWARD OF FEES AND COSTS .................................. 28

VI.  ARGUMENT ............................................................................................ 32

    A.  The Work of Counsel for the Faneca Objectors Merits the Requested Fee Award .... 32

        1.  The Direct Benefit from the Faneca Objectors' Challenge to the Settlement Supports the Requested Fee .............................................................. 33

        2.  The Direct Benefit of the $102.5-Million Increase in Settlement Value Supports the Requested Fee ...................................................................... 36

        3.  The Amount of the Fee Request Is Reasonable ................................................ 39

           i.  The Fee Request Is a Reasonable Percentage of the Benefit Conferred ... 39

           ii.  The *Gunter/Prudential* Factors Support the Requested Fee .................... 40

           iii.  The Requested Fee Is a Reasonable Multiple of Counsel's Investment ... 47

    B.  The Requested Fees Should Be Paid from the Attorneys' Fees Qualified Settlement Fund ........................................................................................... 48

VII.  CONCLUSION ............................................................................................ 49

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 07-MD-01871,
   2012 WL 6923367 (E.D. Pa. Oct. 19, 2012)................................................................45

*In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751 (S.D. Ohio 2008) ............................34

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001) ......................................1, 32, 36

*In re Cendant Corp. PRIDES Litig.*, 264 F.3d 201 (3d Cir. 2001) ................................................47

*Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373 (D.N.J. 2012)......................................5, 40, 45

*In re Diet Drugs*, No. Civ. A. 99-20593, 2003 WL 21641958
   (E.D. Pa. May 15, 2003) ...........................................................................................43

*In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524 (3d Cir. 2009)..........................................40, 47

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993)........................29, 33

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).....................................................................33

*Frankenstein v. McCrory Corp.*, 425 F. Supp. 762 (S.D.N.Y. 1977)............................................34

*Gates v. Rohm & Haas Co.*, No. 06-cv-1743, 2008 WL 4078456
   (E.D. Pa. Aug. 22, 2008)...........................................................................................43

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995).....................................................................................32, 42

*Great Neck Capital Appreciation Inv. P'ship, LP v. PricewaterhouseCoopers,
   LLP*, 212 F.R.D. 400 (E.D. Wis. 2002) ...................................................................32, 49

*Howes v. Atkins*, 668 F. Supp. 1021 (E.D. Ky. 1987).............................................................34, 35

*In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ..................33, 41, 45, 48

*In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136 (D.N.J. 2013)............................................47

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986) ...........................................................................46

*Lan v. Ludrof*, No. 1:06-cv-114, 2008 WL 763763 (W.D. Pa. 2008).....................................40, 45

*In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350
   (E.D. Pa. June 2, 2004) .............................................................................................47

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................48

*McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626 (E.D. Pa. 2015) ............................. *passim*

*In re Nat'l Football League Players' Concussion Injury Litig.*, 775 F.3d 570
    (3d Cir. 2014)................................................................................................................11

*In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410
    (3d Cir. 2016).........................................................................................................20, 36

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    961 F. Supp. 2d 708 (E.D. Pa. 2014) .......................................................................7, 8

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563
    (D.N.J. 2003)...................................................................................................................39

*In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)...................................................................................40, 47

*In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) .........................................48

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005).........................................................47

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997).........................................................48

*In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. 2001) ...............................48

*In re Schering-Plough Corp. Enhance Sec. Litig.*, Nos. 08-cv-397, 08-cv-2177,
    2013 WL 5505744 (D.N.J. Oct. 1, 2013)......................................................................43

*In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) .............................................................46

*Sioux Nation of Indians v. United States*, 650 F.2d 244 (Ct. Cl. 1981)........................................41

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578,
    2005 WL 1213926 (E.D. Pa. May 19, 2005)..................................................................48

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) ...................................32, 41

*White v. Auerbach*, 500 F.2d 822 (2d Cir. 1974)....................................................................1, 36

**Rules of Procedure**

Fed. R. Civ. P. 23(a) ..........................................................................................35, 37, 43

Fed. R. Civ. P. 23(a)(4).........................................................................................................9, 10

Fed. R. Civ. P. 23(c) ...............................................................................................................11

Fed. R. Civ. P. 23(e) ...........................................................................................................19, 35

Fed. R. Civ. P. 23(f) .....................................................................................................10, 11, 44

Fed. R. Civ. P. 23(h) ...............................................................................................................1

**Other Authorities**

7B Charles A. Wright & Arthur Miller, *Federal Practice & Procedure* § 1803
    (3d ed. 2004) ...................................................................................................................32

Pursuant to Fed. R. Civ. P. 23(h), objectors Alan Faneca, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine respectfully move for an award of attorneys' fees and reimbursement of expenses. " '[I]t is well settled that objectors have a valuable and important role to perform in preventing . . . unfavorable settlements, and . . . they are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts.' " *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 743 (3d Cir. 2001) (quoting *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974)).

## I.   INTRODUCTION

This historic litigation attracted international attention.[1]  The core allegation – that the billionaire owners of America's most popular professional sport put profit before safety, defrauding players out of their health and well-being – raised awareness of the dangers of sports head injuries at every level of play.[2]  The legal battle that resulted in the Final Settlement not

---

[1] *See, e.g.*, Alan Rappeport, *NFL Agrees To Settle Concussions Lawsuit for $765m*, Fin. Times (Aug. 29, 2013), https://www.ft.com/content/5974edd6-10dc-11e3-b291-00144feabdc0; Hunter Felt, *Concussions Lawsuit Settlement Lets NFL Off the Hook*, The Guardian (Aug. 29, 2013), 2013 WLNR 21618288; C.H., *Safety in American Football: Back to the Drawing Board*, Economist (Feb. 6, 2014), http://www.economist.com/blogs/gametheory/2014/02/safety-american-football; Thomas Barrabi, *NFL Concussion Lawsuit Settlement Approved by Federal Judge, Could Cost League $1B over 65 Years*, Int'l Bus. Times (Apr. 22, 2015), http://www.ibtimes.com/nfl-concussion-lawsuit-settlement-approved-federal-judge-could-cost-league-1b-over-65-1892922; Sophia Pearson, *NFL's $987 Million Concussion Settlement Upheld by Appeals Court*, The Sydney Morning Herald (Apr. 19, 2016), *available at* http://www.smh.com.au/sport/us-sports/nfls-987-million-concussion-settlement-upheld-by-appeals-court-20160418-go9hg0.html; Associated Press, *Concussion Case Comes to a Head*, China Daily (Apr. 20, 2016), http://www.chinadaily.com.cn/cndy/2016-04/20/content_24686586.htm.

[2] *See, e.g.*, Amy Laskowski, *Could Pee-Wee Football Lead to Brain Injury?*, BU Today (Sept. 3, 2015) (discussing youth-league football), https://www.bu.edu/today/2015/pee-wee-football-brain-injury; Barney Thompson, *Time To Tackle Rugby Injuries*, Fin. Times (May 24, 2015) (discussing rugby injuries in light of NFL concussion litigation), https://www.ft.com/content/32959f8c-0070-11e5-a908-00144feabdc0; Ben Strauss, *U.S. Soccer, Resolving Lawsuit,*

only brought relief for the class, it made the sport safer for those who play it – while decreasing the likelihood of a similar fraud being perpetrated in the future.

The Faneca Objectors come before this Court to request an award of attorneys' fees and costs that reflects the substantial role they played in that battle and in significantly enhancing the Final Settlement.

## II.   BACKGROUND

The central dispute before this Court was not whether the NFL defrauded its players or whether the injuries suffered by players were caused by that fraud.  The central dispute was whether the settlement reached by the NFL and Class Counsel was fair, adequate, and reasonable.  The proponents of the settlement presented a powerful case through some of the nation's leading advocates.

The class was represented by several of the country's top mass-tort lawyers.  Co-Lead Class Counsel Christopher Seeger, of Seeger Weiss LLP, has been "widely praised for his advocacy skills" and has been described in the legal press as "'one of the big players' at the plaintiffs' bar."[3]  Joining him in leading the efforts for the class was Sol Weiss, a dean of the Philadelphia tort bar and the recent recipient of the *Legal Intelligencer* Lifetime Achievement

---

*Will Limit Headers for Youth Players*, The N.Y. Times (Nov. 9, 2015) (discussing youth soccer), http://www.nytimes.com/2015/11/10/sports/soccer/us-soccer-resolving-lawsuit-will-limit-headers-for-youth-players.html; Lindsay Gibbs, *Concussion Expert Says Extent of Brain Damage in Youth Football 'Took My Breath Away'*, ThinkProgress (Nov. 23, 2016) (discussing high-school football), https://thinkprogress.org/youth-football-concussion-crisis-f2fc701ca204; Chuck Gormley, *New Protocol Is Helping Curb Concussions, but NHL Can Do More, Eric Lindros Says*, ESPN (Nov. 15, 2016) (discussing professional hockey), http://www.espn.com/nhl/story/_/id/18053749/nhl-new-protocol-helping-curb-concussions-league-do-more-curtail-head-injuries-says-eric-lindros; Motez Bishara, *Will Smith: Movie 'Concussion' Touches a Raw Nerve for the NFL*, CNN (Jan. 29, 2016) (discussing attention drawn to MTBI and CTE by 2015 Hollywood film "Concussion"), http://edition.cnn.com/2015/12/18/sport/nfl-head-injuries-will-smith-movie-concussion.

[3] Chambers & Partners, *Product Liability: Plaintiffs – Nationwide* (discussing Christopher A. Seeger), http://www.chambersandpartners.com/12788/990/editorial/5/1.

Award.[4]  Arnold Levin, named a "Top 100 Trial Lawyer" in Pennsylvania by the professional organization The National Trial Lawyers, served as counsel for the subclass of players who did not already have a diagnosis of an MTBI-related disease.[5]  Dianne Nast, who has been included in the legal publication *The Best Lawyers in America* since 2003, served as counsel for the subclass of players who already had such a diagnosis.[6]  Also representing the class were the prominent attorneys and firms on the Plaintiffs' Executive Committee: Larry Coben of Anapol Schwartz, Thomas Girardi and Graham B. Lippsmith of Girardi Keese, Michael Hausfeld and Richard Lewis of Hausfeld LLP, Gene Locks and David Langfitt of the Locks Law Firm, Ricardo Martinez-Cid and Steven Marks of Podhurst Orseck, and David Buchanan of Seeger Weiss.  Counsel for the plaintiffs also worked with one of the nation's acclaimed academic experts on class action practice, Prof. Samuel Issacharoff of New York University Law School.

The NFL was represented by one of the nation's premier law firms, Paul, Weiss, Rifkind, Wharton & Garrison LLP, described in the legal press as a "formidable courtroom advocate[ ]" and a "preeminent litigation firm."[7]  The Paul Weiss team was led by the firm's chairman, Brad Karp, who has been called "one of the 'country's lead lawyers' when it comes to litigating bet-the-company cases,"[8] as well as senior partner Bruce Birenboim, recognized by legal publication

---

[4] *Lifetime Achievement Award Winners*, The Legal Intelligencer (June 20, 2016), http://www.thelegalintelligencer.com/id=1202760308387/lifetime-achievement-award-winners.

[5] *See* Am. Registry, *Top 100 Trial Lawyers: Pennsylvania* (Mar. 2010) (listing Arnold Levin), http://www.americanregistry.com/recognition/top-100-trial-lawyers-pennsylvania/104311.

[6] Am. Bar Ass'n, *Philadelphia Lawyer Dianne Nast To Receive TIPS's Pursuit of Justice Award* (Apr. 20, 2015) (discussing Dianne Nast), http://www.americanbar.org/news/abanews/aba-news-archives/2015/04/philadelphia_lawyer.html.

[7] *See* Chambers & Partners, *Litigation: Securities – New York* (discussing Paul Weiss), http://www.chambersandpartners.com/12806/413/editorial/5/1.

[8] Chambers & Partners, *USA Guide* (profile of Brad S. Karp), http://www.chambersandpartners.com/USA/person/194898/brad-s-karp.

*Lawdragon* as one of the 500 Leading Lawyers in America since 2013.  The NFL defense team included additional exceptional talent from the firm Dechert LLP, whose efforts were led by Robert C. Heim, described as "one of Pennsylvania's leading trial lawyers,"[9] and from Quinn Emanuel Urquhart & Sullivan LLP, whose efforts were led by Sheila Birnbaum, recognized as "one of the great thought leaders" of the products liability defense bar.[10]  The NFL legal team also included one of the nation's most distinguished appellate lawyers, Paul Clement, former Solicitor General of the United States.

Class Counsel and counsel for the NFL engaged in preliminary motion practice, briefing and arguing a motion to dismiss on the question of whether federal labor law preempted the action.  Then, at the direction of this Court, the matter proceeded to mediation and the case was settled.  There was no decision on the motion to dismiss, no discovery, no contested class certification, no summary judgment practice, and no bellwether trial.  Thus, this case was ***all about*** the negotiated settlement.

However, as this Court recognized *sua sponte*, the Initial Settlement was inadequate.  Then came a modified settlement.  But the Faneca Objectors proved that inadequate as well.  They:

- Raised the key legal issues, a number of which were novel and complex, early;

- Supported their challenge with extensive scientific evidence and legal analysis;

- Sought discovery to inform the proceedings with evidence relating not only to the settlement negotiations but the underlying claims as well;

---

[9] Chambers & Partners, *USA Guide* (profile of Robert C. Heim), http://www.chambersand partners.com/USA/person/179257/robert-c-heim.

[10] Chambers & Partners, *Product Liability & Mass Torts – Nationwide* (discussing Sheila Birnbaum), http://www.chambersandpartners.com/12788/1802/editorial/5/1.

- Led the objectors' efforts at the fairness hearing and in post-hearing briefing that brought about the revised Final Settlement, with a value enhanced by more than $100 million;

- Tested the possibility of a further enhanced settlement through independent negotiations with the NFL; and

- Led the efforts to test the Final Settlement on appeal.

The substantial work by the Faneca Objectors occurred over a period of three years. They pushed the proceedings, often filing pleadings before deadlines in an effort to expedite a resolution and accelerate relief to the injured class. Counsel for the Faneca Objectors – MoloLamken LLP, Hangley Aronchick Segal Pudlin & Schiller, and Prof. Linda S. Mullenix – expended a total of more than 6,300 hours and absorbed out-of-pocket costs of more than $50,000 in the battle. They did so working on a 100% contingency basis, with full risk of non-payment.

Their extensive work "transform[ed] the settlement hearing into a truly adversarial proceeding." *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 395 (D.N.J. 2012) (quotation marks omitted) (awarding objectors' counsel fees). The result of that "truly adversarial" fairness hearing is a vastly improved Final Settlement that provides more relief for a far greater number of class members than the deals previously advanced by the settling parties. Moreover, it is a Final Settlement that has had its fairness tested in the crucible of robust, high-level advocacy – allowing the courts, class members, and the public to conclude that the result achieved, while perhaps not perfect, is just.

### III.   <u>PROCEDURAL HISTORY</u>

#### A.  The Precursor Lawsuits and the Initial Settlement

In 2011, several retired NFL players and their families sued the NFL, alleging that the NFL misled them about the risks of repeated multiple traumatic brain injury ("MTBI"), thus

breaching its duty to protect players' health and safety.  Dkt. 6073-5 at 4.  Those cases were consolidated in this Court on January 31, 2012.  Dkt. 1.  The NFL moved to dismiss the complaints on preemption grounds.  Dkts. 3590, 4737, 4738.  While that motion was pending, this Court ordered the parties to mediation and appointed retired United States District Court Judge Layn Phillips as mediator.  Class Counsel and the NFL announced the Initial Settlement in August 2013.  Dkt. 6201 at 4.

On January 6, 2014, Class Counsel filed a putative class action complaint on behalf of Kevin Turner and Shawn Wooden as representatives for all retired NFL players.  *See* Complaint, *Turner v. Nat'l Football League*, No. 2:14-cv-29 (E.D. Pa. filed Jan. 6, 2014) ("Class Action Complaint").  Class Counsel simultaneously filed a motion for preliminary approval of the Initial Settlement.  Dkt. 5634.  The Initial Settlement created a Monetary Award Fund ("MAF") – capped at $675 million – to provide compensation for retired players diagnosed with one of five specific Qualifying Diagnoses.  Dkt. 5634-5 at 3.  Despite the numerous diseases and symptoms linked to MTBI in the Class Action Complaint, the MAF provided awards only for individuals diagnosed with ALS, Parkinson's disease, Alzheimer's disease, and sufficiently severe dementia (dubbed "Level 1.5" and "Level 2" neurocognitive impairment).  *Id.*

Absent from the Initial Settlement was any ongoing award for retired players diagnosed with chronic traumatic encephalopathy ("CTE"), the disease at the heart of the Class Action Complaint and many of the precursor lawsuits.  Dkt. 5634-5 at 3-4.  Instead, the Initial Settlement provided compensation – by way of a "Death with CTE" qualifying diagnosis – only for players who died and received a post-mortem diagnosis of CTE before preliminary approval of the settlement.  *Id.* at 11.

The Initial Settlement also applied several criteria to determine each claimant's award. There was a maximum award for each Qualifying Diagnosis. But that award would be reduced depending on the player's age and the number of seasons he played in the NFL (with at least five "eligible seasons" being required for a full award). Dkt. 5634-5 at 13, 19. The Initial Settlement "specifically excluded" seasons played in NFL Europe (or the NFL's other European leagues) from eligible-season credit, even though it fully released players' claims for injuries suffered during those seasons. *Id.* at 20, 26-27. The Initial Settlement also reduced awards by 75% for any player who suffered a single stroke, or a single instance of traumatic brain injury not related to NFL play. *Id*. at 20-21. Finally, it imposed a $1,000 fee on class members who wished to appeal adverse determinations of their MAF claims. *Id*. at 22.

Additionally, the Initial Settlement created a $75-million Baseline Assessment Program Fund ("BAP Fund"), which was to provide eligible players with an examination to establish a baseline for each player's neurocognitive functioning. Dkt. 5634-5 at 3. But not every class member was entitled to such an examination. Only class members with at least half of an eligible season could participate in the BAP. *Id*. at 15-16. The BAP examination would also screen players for dementia or neurocognitive impairment. *Id*. at 16. Players diagnosed with "Level 1" neurocognitive impairment by the examination could receive "supplemental benefits" to cover the cost of treatment. *Id*. The Initial Settlement applied a $75-million cap on those benefits.

On January 14, 2014, this Court *sua sponte* denied the motion for preliminary approval. *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 716 (E.D. Pa. 2014). Noting its "duty to protect the rights of all potential class members," *id.* at 710, the Court found that the Initial Settlement could not be preliminarily approved because the

"Monetary Award Fund may lack the necessary funds to pay Monetary Awards for Qualifying Diagnoses," *id.* at 715.

## B.  The Faneca Objectors' Efforts To Improve the Settlement

### 1.  The Motion To Intervene

On May 5, 2014, seven former NFL players (the "Faneca Objectors") represented by MoloLamken, Hangley Aronchick Segal Pudlin & Schiller, and Prof. Linda Mullenix, filed a 27-page motion seeking leave to intervene in this case.  Dkt. 6019-1.[11]  The Faneca Objectors initially included retired NFL players Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick Cartwright, Jeff Rohrer, and Sean Considine.  Since leaving the NFL, all of the Faneca Objectors had suffered MTBI-related symptoms, including symptoms indicative of CTE.  *Id.* at 5.  In their motion to intervene, the Faneca Objectors explained that their interests were not adequately represented in the negotiation of the Initial Settlement, as evidenced by the significant intra-class conflicts in the settlement.  *Id.* at 14-21.  They explained that they were at risk of developing CTE.  Because the Initial Settlement would not have compensated CTE victims except for players who died before preliminary approval, the Faneca Objectors argued that their interests were not adequately represented by the proposed class representatives – neither of whom had claimed a risk of developing CTE.  *Id.* at 6.  The Faneca Objectors also noted the potential intra-class conflict created by the 75% reductions for stroke or non-NFL TBI, given

---

[11] In earlier proceedings, this Court referred to the Faneca Objectors as the Morey Objectors. Sean Morey participated in the proceedings along with the other Faneca Objectors until he opted out of the settlement on October 14, 2014.  Ben Hamilton and Robert Royal also opted out. Thus, throughout this submission, the clients of MoloLamken, Hangley Aronchick Segal Pudlin & Schiller, and Prof. Linda Mullenix are referred to as the Faneca Objectors.

that neither class representative had stated that he would be subject to them.  *Id.* at 19-21.  That was the first time any party had identified those potential intra-class conflicts in the settlement.[12]

### 2.  The Opposition to Preliminary Approval

On June 25, 2014 – while the Faneca Objectors' motion to intervene was still pending – Class Counsel submitted the Revised Settlement, along with a motion for preliminary approval. Dkt. 6073-2.  The Revised Settlement addressed the district court's concerns over the Initial Settlement's inability to satisfy all class members' claims by eliminating the $675-million cap on the MAF.  However, Class Counsel maintained that the total compensation under the settlement would not exceed $675 million.  Dkt. 6073-5 at 12-13.  The Revised Settlement also retained the $75-million cap on the BAP Fund, *id.* at 4, continued to deny any credit for seasons played in NFL Europe, Dkt. 6087 § 2.1(kk), and retained the 75% reductions for stroke or non-NFL TBI, *id.* § 6.7(b)(ii)-(iii).

Just one week after the motion for preliminary approval of the Revised Settlement was filed, on July 2, 2014, the Faneca Objectors filed a 47-page opposition to that motion.  Dkt. 6082.  They were the first – ***and only*** – class members to oppose preliminary approval. Expanding on their motion to intervene, they reiterated that the Revised Settlement's failure to provide any compensation for CTE in the living or for those who died with CTE following the preliminary approval date created an impermissible intra-class conflict that precluded certification of the settlement class under Rule 23(a)(4).  *Id.* at 19-26.[13]  Similarly, the Faneca

---

[12] Class Counsel opposed the motion to intervene, Dkt. 6046, but the NFL did not.  The Faneca Objectors sought leave to file a reply on May 27, 2014, attaching the proposed reply as an exhibit.  Dkt. 6047.  This Court granted leave and ordered the proposed reply to be deemed filed on July 29, 2014.  Dkt. 6106.  It denied the motion to intervene on the same day.  Dkt. 6107.

[13] The Faneca Objectors provided detailed scientific analysis concerning the nature and symptoms of CTE and its relationship to repetitive head injury.  Dkt. 6082 at 7-11, 21-23, 27; *see id.* at v-ix.  They were the first class members to identify such scientific evidence for the Court.

Objectors reiterated their objections to the 75% reductions.[14]   The Faneca Objectors also objected to the Revised Settlement's failure to credit seasons played in NFL Europe, thereby reducing awards.  *Id.* at 28-29.[15]   Because neither representative plaintiff had played in NFL Europe, the Faneca Objectors argued that an intra-class conflict existed and that adequate representation was lacking under Fed. R. Civ. P. 23(a)(4).   And they raised objections to unnecessary procedural hurdles that threatened to unfairly impede recovery under the settlement, such as the fee to appeal an adverse claim determination.  *Id.* at 32-35.

On July 7, 2014, this Court granted preliminary approval to the Revised Settlement and conditionally certified the class "for settlement purposes only."  Dkt. 6084.

### 3.   The Rule 23(f) Petition to the Third Circuit

The Faneca Objectors sought appellate review of that order under Fed. R. Civ. P. 23(f). Case No. 14-8103, Doc. 003111686114 (3d Cir. July 21, 2014).   On the merits, the Faneca Objectors raised the same concerns as in their motion to intervene and opposition to preliminary approval: they challenged the settlement's treatment of CTE, lack of NFL Europe credit, and the 75% reductions, arguing that the settlement created intra-class conflicts that precluded class certification under Rule 23(a)(4).  *Id.* at 10-16.   The petition also raised an important legal issue of first impression in the Third Circuit: whether Rule 23(f) permits interlocutory review of an

---

[14] The Faneca Objectors maintained their objection that the 75% reductions created an intra-class conflict (between players who had suffered prior strokes or non-NFL TBI and those who had not) that the settlement failed to remedy.  Dkt. 6082 at 26-27.

[15] Under the Revised Settlement, class members who played in NFL Europe (and its predecessor leagues) would not have received any eligible-season credit for seasons they played in those leagues.  Dkt. 6073-2 §2.1(kk).   Because the settlement tied monetary awards to a player's eligible seasons, those players would receive greatly reduced monetary awards.  *Id.* §6.7(b)(i). For example, a class member who played only in NFL Europe would have had zero eligible seasons, triggering a ***97.5% reduction*** in any award that player would receive from the MAF. Such a class member also could not participate in the BAP, which is available only to class members with half an eligible season.  *Id.* §5.1.

order "conditionally" or "preliminarily" certifying a class.  *In re Nat'l Football League Players'*
*Concussion Injury Litig.*, 775 F.3d 570, 578 (3d Cir. 2014).  No other objector sought review of
the preliminary approval order.

Oral argument was held in a special sitting on September 10, 2014.  On September 11,
2014, the Third Circuit found that it lacked jurisdiction to hear the petition.  It held that Rule
23(f) permits appeals only of "final" class-certification orders issued pursuant to Rule 23(c).
775 F.3d at 588.  That ruling was so significant that it became the subject of consideration by the
Advisory Committee on Civil Rules.[16]  Importantly, the petition did not delay the proceedings in
this Court.

### 4.  The Objection

Following denial of their Rule 23(f) petition, the Faneca Objectors redoubled their efforts
in this Court to improve the settlement.  On September 13, 2014, they filed a motion seeking
limited discovery to obtain information from Class Counsel and the NFL that was necessary to
evaluate the fairness of the settlement.  Dkt. 6169.  The Faneca Objectors noted that Class
Counsel had conducted no discovery before settling and sought the information Class Counsel
and the NFL relied upon to justify the settlement.  Dkt. 6169-1 at 2.  The Faneca Objectors thus
urged the Court to permit limited discovery into (1) how the settlement was negotiated and
(2) the strengths and weaknesses of the NFL's defenses, to allow class members to properly
evaluate the Revised Settlement.  *Id*. at 8.   The Faneca Objectors prepared proposed
interrogatories, document requests, and notices of depositions, which they attached to the
motion.  Dkt. 6169-2.  This Court denied the discovery motion on October 15, 2014.  Dkt. 6245.

---

[16] In 2016, the Advisory Committee on Civil Rules recommended that the Committee on Rules
of Practice and Procedure approve and publish amendments to Rule 23(f) that would resolve
precisely the question raised by the Faneca Objectors in their appeal.  *See* Mem. from Hon. John
D. Bates to Hon. Jeffrey S. Sutton (May 12, 2016).

On October 6, 2014 – more than *a week before the objection deadline* set by this Court – the Faneca Objectors filed their comprehensive objection to final approval of the Revised Settlement.  Dkt. 6201.  The objection exceeded 85 pages and was supported by 82 exhibits totaling more than 700 pages.  The objection again addressed the settlement's defects: the failure to meaningfully compensate CTE, the 75% reductions, and the lack of credit for NFL Europe play.  Dkt. 6201 at 20-36, 54-84.  It also noted other problems: the cap on the BAP Fund could prevent some eligible players from receiving the baseline examination, *id.* at 72-73, and the $1,000 fee for appealing adverse claim determinations could cause undue hardship, *id.* at 76-77.  The objection also challenged aspects of the class notice.  *Id.* at 38-54.

The Faneca Objectors worked with two leading neuroscientists, Dr. Robert Stern and Dr. Sam Gandy, who submitted declarations in support of the objection.  *See* Dkts. 6201-16, 6232-1.[17]  Dr. Stern is a Professor of Neurology, Neurosurgery, and Anatomy & Neurobiology at Boston University School of Medicine.  He is a co-founder of the BU Center for the Study of Chronic Traumatic Encephalopathy, and a leading expert in the causes of neurodegeneration in athletes.  Dr. Gandy is Professor of Alzheimer's Disease Research and Professor of Neurology and Psychiatry at Mt. Sinai School of Medicine.  He is also Associate Director of the Mount Sinai Alzheimer's Disease Research Center.

Dr. Stern and Dr. Gandy explained the science behind CTE, how it is a disease that is widely recognized in the scientific community, and the debilitating consequences of the disease.  Dkts. 6201-16, 6232-1.  Those declarations were the first scientific evidence presented by class members in the case – long before Class Counsel or the NFL offered any expert evidence.  In addition to those declarations, the Faneca Objectors provided the Court with extensive scientific

---

[17] Dr. Gandy's declaration was filed as a supplement to the Faneca Objectors' objection, but still prior to the deadline for filing objections.  Dkt. 6232.

evidence supporting Drs. Gandy and Stern.[18]  The Faneca Objectors thus effectively framed the scientific debate.

Eighty-two other objections were filed in the proceeding.  Nearly all prepared by counsel were filed *at least one week after* that of the Faneca Objectors.  And ***none*** included an original expert declaration.[19]

### 5.   The Pre-Fairness Hearing Proceedings

On October 21, 2014, the Faneca Objectors filed a motion seeking to require the settling parties to produce evidence in advance of the November 19, 2014 fairness hearing.  Dkt. 6252. The Faneca Objectors noted that Class Counsel's failure to conduct discovery had left class members in the dark, unable to evaluate the fairness of the Revised Settlement.  *Id*. at 2.  The Faneca Objectors thus sought from Class Counsel and the NFL, in advance of the fairness hearing, (1) the name, contact information, and a summary of the testimony of any witness they intended to call at the fairness hearing; (2) expert declarations setting forth the basis of any expert testimony they would offer at the hearing; and (3) any documents they intended to introduce at the hearing.  *Id.* at 3.  The NFL and Class Counsel filed oppositions to the motion on October 31, 2014.  Dkts. 6332, 6333.  This Court denied the motion on April 21, 2015.  Dkt. 6508.

On November 3, 2014, the Faneca Objectors filed their notice of intent to appear at the fairness hearing.  Seeking to further develop the record, they requested that this Court conduct an evidentiary hearing – offering the expert testimony of Drs. Stern and Gandy, along with

---

[18] *See* Dkt. 6201-1, Exs. 5-23, 59-67, 70, 80, 85, 87, and 89.

[19] The Chesley Objectors, represented by Zuckerman Spaeder LLP, attached to their filing a copy of the Declaration of Dr. Robert Stern, which was originally prepared for and filed as part of the Faneca Objectors' objection.  Dkt. 6242-1.  They did so without disclosing its actual source – the Faneca Objectors' filing – fostering a misimpression that this was evidence they obtained themselves instead of borrowing from the Faneca Objectors.

testimony from former NFL players Alan Faneca and Sean Morey, as well as Rebecca Carpenter (daughter of deceased player Lewis Carpenter, who had CTE).  Dkt. 6339 at 3-6.  They also requested the opportunity to cross-examine Co-Lead Class Counsel and former members of the NFL's MTBI Committee.  *Id*. at 8-9.  The Court denied that request on November 17, 2014.  Dkt. 6428.[20]

On November 4, 2014, this Court appointed Steven Molo of MoloLamken and William Hangley of Hangley Aronchick Segal Pudlin & Schiller, counsel for the Faneca Objectors, to coordinate arguments on behalf of all objectors at the fairness hearing.  Dkt. 6344.  In that capacity, Mr. Molo held multiple phone conferences with the Court and the NFL and Class Counsel, as well as with the other objectors.  Mr. Molo coordinated with the other objectors to plan the content and sequence of each objector's presentation at the fairness hearing.

On November 11, 2014, the Faneca Objectors filed a supplement to their October 6, 2014 objection.  Dkt. 6420.  They offered additional evidence that the NFL could pay a much larger judgment – a factor weighing against final approval of the Revised Settlement.  *Id*. at 3-9.  They also suggested specific, concrete improvements to the Revised Settlement: uncapping the BAP Fund, giving credit for seasons played in NFL Europe, and compensating all cases of Death with CTE.  *Id*. at 9-10.

### 6.  The Fairness Hearing and Post-Hearing Submissions

On November 19, 2014, this Court conducted the fairness hearing.  Steven Molo made the primary argument for objectors.  He addressed CTE, the exclusion of NFL Europe, notice, and the 75% reductions.  MoloLamken lawyers Thomas Wiegand and Martin Totaro addressed deficiencies in the settlement process, including the cap on the BAP Fund and the $1,000 appeal

---

[20] The Court did permit Ms. Carpenter to address the Court at the fairness hearing.

fee imposed on class members.  Dkt. 6428 at 1; Dkt. 6469 at 32-33; Dkt. 6463 at 112:13-114:15.
The Faneca Objectors emphasized that, while some sort of settlement was desirable, the Revised
Settlement could not be approved without improvements.  Dkt. 6463 at 69-71.

The Faneca Objectors vigorously challenged the case for final approval presented by
Class Counsel and the NFL.  They relied on and explained the extensive scientific studies and
expert declarations submitted in their papers.  The Faneca Objectors concluded by urging this
Court to use its influence to secure further improvements to the settlement.  They provided the
Court with specific proposals for improving the settlement: eliminating the cap on the BAP
Fund, Dkt. 6463 at 108:19-23; giving credit for seasons played in NFL Europe, *id*. at 102:20-21;
using evidence-based reductions for stroke and TBI, *id*. at 102:23-103:2; extending the benefit
for Death with CTE, *id*. at 103:3-11; and adding a hardship provision for players who cannot
afford the appeal fee, *id*. at 112:14-21.  *See also* Dkt. 6469 at 28, 33, 37.  Several other objectors
made short presentations.

On December 2, 2014, the Faneca Objectors filed a 30-page supplemental objection.
Dkt. 6455.  They offered ***still more scientific evidence regarding CTE*** and the injuries
associated with repetitive head injury.  That evidence included additional declarations from Drs.
Stern and Gandy regarding the causes and symptoms of CTE.  It also included the declarations of
nine additional prominent scientists and researchers – all at the top of their fields and all experts
on brain injury and neurodegenerative disease:

- Patrick R. Hof, MD, who is the Regenstreif Professor of Neuroscience at the Icahn
  School of Medicine at Mount Sinai, New York.  Dr. Hof has authored or co-authored
  over four hundred papers and publications in the field of neurology.  Dkt. 6455-3.

- Jing Zhang, MD, PhD, who is the Endowed Chair of Neuropathology at the University of
  Washington.  Dr. Zhang is one of the leading researchers in the field of using biomarkers
  to detect neurodegenerative disease.  Dkt. 6455-4.

- Martha E. Shenton, PhD, who is a Professor in the Department of Psychiatry and Radiology at the Brigham and Women's Hospital and Harvard Medical School. Professor Shenton has received numerous awards for her neurology and psychiatry studies.  Dkt. 6455-5.

- Charles Bernick, MD, MPH, who serves as the Associate Director at the Cleveland Clinic Lou Ruvo Center for Brain Health.  Dkt. 6455-6.

- Michael Weiner, MD, who is a Professor of Radiology and Biomedical Engineering, Medicine, Psychiatry, and Neurology at the University of California, San Francisco.  Dr. Weiner has published extensively on the use of neuroimaging to study neurocognitive impairment and neurodegenerative disease.  Dkt. 6455-7.

- James R. Stone, MD, PhD, who serves as Associate Professor of Radiology and Medical Imaging as well as of Neurological Surgery at the University of Virginia.  A leader in the field of sports-related MTBI, Dr. Stone serves as the co-director of the Brain Injury and Sports Concussion Institute.  Dkt. 6455-8.

- Thomas Wisniewski, MD, who is a Professor of Neurology, Pathology, and Psychiatry at New York University School of Medicine.   Dr. Wisniewski is an expert on neurodegenerative diseases and is the co-director of the NIH-funded Alzheimer's Disease Center at NYU.  Dkt. 6455-9.

- Steven T. DeKosky, MD, who served as the Dean of the University of Virginia School of Medicine until 2013, and who is currently the Aerts-Cosper Professor of Alzheimer's Research at the University of Florida College of Medicine.  He has published extensively on CTE and other neurodegenerative diseases.  Dkt. 6455-10.

- Dr. Wayne Gordon, PhD, who is the Jack Nash Professor and Vice Chair of the Department of Rehabilitation Medicine at the Icahn School of Medicine at Mount Sinai in New York.  Dkt. 6455-11.

Those experts described the scientific consensus concerning CTE.  They opined that the science of CTE is advancing and that a reliable diagnosis for CTE will be available before the settlement expires.  Dkt. 6455 at 17.  The Faneca Objectors also offered into the record 27 exhibits, including further scientific studies – in addition to those they submitted in support of their initial objection – to underscore those points.  Dkt. 6455-13 to 23.

The supplemental briefing also argued that the failure to credit NFL Europe play rendered the settlement unfair.  Dkt. 6455 at 20-22.  And it reiterated the Faneca Objectors' concern that the BAP Fund might be exhausted before every entitled class member received a

baseline examination.  *Id.* at 22.  The Faneca Objectors again suggested concrete improvements to the settlement.  Those included (1) lifting the monetary cap on the BAP Fund; (2) extending the BAP to the full term of the settlement; (3) affording credit for seasons played in NFL Europe; (4) eliminating the fee for class members appealing adverse claim determinations; (5) compensating CTE in the living once reliable tests exist; and (6) eliminating CTE from the release.  *Id.* at 30-31.

### C.  Final Approval of the Settlement Adopting Changes Urged by the Faneca Objectors

#### 1.  The Court-Recommended Improvements

Upon considering the evidence and arguments, this Court issued an order identifying five specific improvements to the settlement that would, in the Court's view, "enhance the fairness, reasonableness, and adequacy of" the Revised Settlement.  Dkt. 6479.  It stated that the "settlement should provide for some Eligible Seasons credit for play in the World League of American Football, the NFL Europe League, and the NFL Europa league."  *Id.* at 2.  It further stated that the "settlement should assure that all living Retired NFL Football Players who timely register for the Settlement" receive a BAP baseline examination.  *Id.*  It urged that the "Qualifying Diagnosis of Death with CTE" should include players who die between the dates of preliminary approval and final approval.  *Id.*  And it recommended that the settlement provide a hardship provision for the appeal fee, as well as an accommodation for class members who do not possess required medical records due to *force majeure* events.  *Id.*  Each of those recommendations, save for the one concerning *force majeure* events, addressed settlement defects raised first and most fully by the Faneca Objectors.

#### 2.  The Final Settlement

On February 13, 2015, Class Counsel and the NFL submitted a further revised Final Settlement.  Dkt. 6481.  The Final Settlement amended the Revised Settlement agreement to

17

address each of the Court's suggestions.  It ensured that *every* retired player eligible to receive a BAP examination would receive one, even if the cost of all examinations exceeded the $75-million cap on the BAP Fund.  *Id.* at 4.  It also provided one-half an eligible-season credit for any player who was on an NFL Europe roster for three or more regular or postseason games, or was on an active roster for one regular or postseason game and subsequently was on an injured reserve list or an inactive list for two games due to a concussion or head injury.  *Id.* at 2.  The Final Settlement also extended eligibility for diagnoses of Death with CTE to players who died before the date of *final* approval, rather than *preliminary* approval.  *Id.* at 4-5.[21]  And it adopted the Court's recommendations regarding the appeal-fee hardship provision, *id*. at 5, and the unavailability of medical records due to *force majeure* events, *id*. at 5-6.  This Court granted final approval to this Final Settlement on April 22, 2015, and also certified the class for settlement purposes.  Dkt. 6510.

### D.  The Faneca Objectors' Separate Negotiations with the NFL

The Faneca Objectors' attempts to improve the settlement did not stop with this Court's order granting final approval.  MoloLamken, counsel for the Faneca Objectors, reached out to Class Counsel and received their blessing to attempt further negotiations with the NFL to address the Faneca Objectors' remaining concerns.  Rather than immediately file a notice of appeal, MoloLamken used the possibility of not appealing as leverage in an effort to negotiate a better settlement.

In the month following final approval, attorneys from MoloLamken met several times in person and over the phone with the NFL's counsel.  MoloLamken proposed means to address the Faneca Objectors' concerns regarding the settlement's treatment of CTE as well as creative ways

---

[21] Ultimately, this change extended the qualifying period for a Death with CTE award by over nine months, from July 7, 2014 (preliminary approval) until April 22, 2015 (final approval).

to fund those improvements and thus make them more appealing to the NFL.   MoloLamken offered two separate, specific alternatives to the NFL that created the opportunity to provide additional funds to address class members' injuries.   The proposals were concrete, not abstract, citing to specific sources of funds and were provided to the NFL in writing.   The NFL considered those revisions, going back and forth with MoloLamken, but ultimately rejected them.   Molo Decl. ¶¶ 36-37.

### E.  The Third Circuit Appeal

In May 2015, twelve groups of objectors – including the Faneca Objectors – appealed the final approval order.   On appeal, the Faneca Objectors argued that the settlement's treatment of CTE was not fair, reasonable, and adequate under Rule 23(e), Faneca CA3 Br., No. 15-2304, at 37-46, and that the Final Settlement could not be approved under the Third Circuit's *Girsh* analysis*, id*. at 52-60.   They also maintained their argument that the class lacked adequate representation because of persistent intra-class conflicts with respect to CTE and the 75% reductions.   *Id.* at 29-37, 47-50.   In support of those arguments, the Faneca Objectors cited to the extensive scientific evidence they had submitted to the district court, including their thirteen declarations from leading experts.   Other appealing objectors relied heavily on the evidentiary record that had been compiled by the Faneca Objectors.[22]

The Third Circuit heard oral argument on November 19, 2015.   The extended hearing allowed for a total of two hours of argument.   The Faneca Objectors took the lead at oral

---

[22] *See, e.g.*, Armstrong CA3 Br., No. 15-2272, at 6-11, 13-14, 18-19, 34-36; Jones CA3 Br., No. 15-2291, at 4.   Others adopted the Faneca Objectors' arguments by reference.   *See* Heimburger CA3 Br., No. 15-2206, at 5; Carrington CA3 Br., No. 15-2234, at 6, 11, 15; Armstrong CA3 Br., No. 15-2272, at 5 n.1; Anderson CA3 Br., No. 15-2230, at 25.   Several objectors filed appeals to the Third Circuit.   Their briefs were either duplicative of the issues raised by the Faneca Objectors – first in this Court and then on appeal – or raised minor issues that were unlikely to, and indeed did not, receive serious attention by the Third Circuit.

argument, addressing the settlement's fundamental fairness under Rule 23(e), adequacy of representation, and, specifically, addressing the CTE issue. On April 18, 2016 (amended May 2, 2016), in a 70-page opinion, the Third Circuit affirmed this Court's order granting final approval as to all issues. *See In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016). Because the Faneca Objectors recognized the lack of issues that would result in Supreme Court review and because they did not want to delay class members' receipt of the settlement's benefits, the Faneca Objectors did not file a petition for a writ of *certiorari*. The settlement had been improved substantially as a result of their efforts and its fairness had been tested through their vigorous advocacy: their job was done.[23]

Recognizing the serious nature of class members' injuries and the need for prompt relief, the Faneca Objectors at all times proceeded with deliberate speed – often filing papers before established deadlines and always attempting to move the process forward. Their (correct) decision to neither seek rehearing nor petition the Supreme Court for review was consistent with that approach.

## IV.    THE INCREASE IN THE SETTLEMENT'S VALUE

The improvements to the Final Settlement brought about by the efforts of the Faneca Objectors can fairly be valued in excess of $100 million. Based on the arguments made by the Faneca Objectors, this Court encouraged the settling parties to permit NFL Europe players to

---

[23] Two groups of objectors – the Miller Objectors, represented by John J. Pentz, and Darren R. Carrington, represented by the Law Offices of Darrell Palmer PC – filed petitions for rehearing, which were denied on June 1, 2016. Order, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 15-2217 (3d Cir. June 1, 2016). Those petitions for rehearing delayed implementation of the settlement by one month. Two other groups of objectors – the Armstrong Objectors, represented by Gupta Wessler PLLC, and the Estate of Carlton Chester "Cookie" Gilchrist, represented by Cullin O'Brien Law, P.A. – filed petitions for *certiorari*. The Supreme Court denied the petitions on December 12, 2016. The petitions for *certiorari* delayed implementation of the settlement by more than four additional months (the Armstrong Objectors having twice sought and received extensions of time to file their petition).

20

participate in the MAF and BAP, expand the scope of the Death with CTE benefit, uncap the BAP Fund to ensure every eligible class member receives a baseline examination, and waive the $1,000 appeal fee in cases of financial hardship.   The class benefits enormously from these enhancements.

## A. Uncapping the BAP Fund To Guarantee a Baseline Assessment for Every Eligible Class Member

The Final Settlement entitles many class members to receive a BAP baseline examination when, under the Revised Settlement, they would not have received one.  This is perhaps the greatest overall achievement of the Faneca Objectors: players who might not have otherwise been able to have their health evaluated *and a course of treatment charted now* will be able to do so.  The benefits to the quality of life of those players and their loved ones exceeds any monetary valuation.

Based on the calculations done in the settlement process, however, a monetary value can be assigned to this achievement.  The Revised Settlement capped the total value of BAP benefits – baseline examinations plus the cost of treatment for "Level 1" neurocognitive impairment – at $75 million.  Dkt. 6087 § 23.3(d).  Under the Final Settlement that resulted from the Faneca Objectors' efforts, however, every qualified class member will receive a baseline examination notwithstanding the $75-million cap.  Dkt. 6481-1 §§ 23.1(b), 23.3(d).  The NFL's actuary estimated that the BAP would pay out $27 million in supplemental benefits from the BAP Fund. Dkt. 6168 ¶ 54.[24]  Separately, the total cost of baseline examinations – each worth $3,500, Dkt. 6423-21 ¶ 24 – for the 16,962 living class members[25] eligible for one could reach $59.4 million.[26]

---

[24] We assume the level of supplemental benefits will remain unchanged because the Court relied upon that projection in deciding to grant preliminary approval.  *See* Dkt. 6509 at 107.

[25] That figure is computed as follows.  According to Class Counsel's actuary, 15,227 class members have not yet filed a complaint, and 4,207 class members have filed a complaint.  Dkt.

The total cost of these two benefits – the baseline examinations and the BAP supplemental benefits – exceeds the Revised Settlement's $75-million cap by $11.4 million. The elimination of that cap thus renders a benefit of as much as $11.4 million to the class.

### B. Eligible-Season Credit for Seasons Played in NFL Europe

The Final Settlement confers greatly expanded benefits to class members who played in NFL Europe. It creates the possibility that as many as 2,300 class members who played *only* in NFL Europe can now be eligible to participate in the settlement. Before the efforts of the Faneca Objectors, those players' claims were released with minimal consideration. The Final Settlement also increases the value of monetary awards for players who played in both the NFL and NFL Europe because it credits seasons played in NFL Europe in calculating those awards.

*Providing for larger awards due to increased number of seasons*. Under the settlement, class members with longer careers receive higher monetary awards than those with shorter careers (all else equal). The settlement measures the longevity of a class member's career in "eligible seasons." Class members with five or more eligible seasons receive 100% of any monetary award for which they might qualify. *E.g.*, Dkt. 6481-1 §6.7(b)(i). That percentage decreases as a class member's number of eligible seasons decreases. *Id.* For example, a class member with four eligible seasons receives 80% of his maximum award, a class member with only two eligible seasons receives 40% of his maximum award, and a class member with no eligible seasons receives only 2.5% of his maximum award.

---

6167 at 18 (Table 4-3). Of the 4,207 class members who have filed a complaint, however, 76 are deceased and would not participate in the BAP. *Id.* at 14 (Table 4-1 n.1). Another 96 have already received a qualifying diagnosis and would not participate in the BAP. *See* Dkt. 6423-21 ¶23. And 2,300 class members played only in NFL Europe. Molo Decl. Ex. 11. (The value of BAP examinations provided to players who played only in NFL Europe is addressed in Part IV.B, *infra*.) That leaves 16,962.

[26] That figure is calculated by multiplying the 16,962 eligible members in the class by $3,500 (the cost of each BAP examination). *See* Dkts. 6167 at 18 (Table 4-3), 6423-21 ¶24.

The Initial and Revised Settlements awarded eligible-season credit **only** for seasons played in the NFL.[27]  Under those earlier versions, players received **no** eligible-season credit for seasons played in NFL Europe or its predecessor leagues.  The Final Settlement addresses that defect.  It provides one-half of an eligible-season credit to class members who were on the active roster of an NFL Europe team for three or more regular or postseason games, or were on an active roster for one regular or postseason game and subsequently were on an injured reserve list or an inactive list for two games due to a concussion or head injury.  Dkt. 6481-1 § 2.1(kk).  The additional eligible-season credit that class members receive from NFL Europe is substantial.

Review of a specific player's situation is illustrative.  Werner Hippler played 11 seasons in NFL Europe.  Molo Decl. Ex. 11 at 34.  Under the earlier settlements, he would have no eligible seasons and would have received only 2.5% of the maximum benefit, should he qualify for any monetary award.  But under the Final Settlement, he has 5.5 eligible seasons – thus qualifying for the maximum benefit.  In most cases, even an additional one-half of an eligible season yields a 10% increase in the value of a monetary award.  Dkt. 6481-1 § 6.7(b)(i).  Accordingly, absent the improvements obtained by the Faneca Objectors, he would have received a maximum payment of $47,500 upon a qualifying diagnosis of "Level 2" neurocognitive impairment at his current age of 46.  However, pursuant to the Final Settlement, with the improvements urged by the Faneca Objectors, he would receive as much as $1,900,000.

The aggregate value of the increased monetary awards attributable to eligible seasons from NFL Europe is approximately $24 million:  The Initial and Revised Settlements – which

---

[27] Specifically, a class member would have been credited with a full eligible season if he was on an NFL team's "Active List" on the date of three or more regular or postseason games.  Dkt. 6087 § 2.1(kk).  And the Initial and Revised Settlements awarded one-half an eligible season to class members who were on an NFL team's practice, developmental, or taxi squad for at least eight regular or postseason games.  *Id.*

awarded no eligible-season credit for NFL Europe – compensated 60,350 eligible seasons.[28]  The

MAF used to compensate those 60,350 eligible seasons was valued at $675 million.  Thus, under

the Initial and Revised Settlements, each compensated eligible season was worth, on average,

about $11,200.  Extending eligible-season credit to seasons played in NFL Europe increased the

total number of compensated eligible seasons by 2,143.  Molo Decl. Ex. 11.[29]  Because each

eligible season is worth $11,200 on average, the total value of that benefit to the class, with the

uncapped MAF, is $24 million.

> *Providing "NFL Europe-only" players eligibility for baseline assessments and*
> *supplemental benefits*.  In addition to providing class members greater awards by increasing a
> player's "eligible seasons," the NFL Europe modification provides players who played only in
> NFL Europe with both a baseline examination and "supplemental benefits" under the BAP.
> Under the Initial and Revised Settlements, class members did not receive eligible-season credit
> for seasons played in NFL Europe.  Thus, under the earlier versions of the settlement, a class
> member who played *only* in NFL Europe would have had zero eligible seasons and would not

---

[28] This number is derived from Class Counsel's actuarial data.  Table 4-3 of Class Counsel's actuarial report shows how many class members played a given number of seasons.  *See* Dkt. 6167 at 18 (Table 4-3); Molo Decl. Ex. 10.  For class members who played fewer than five seasons, the aggregate number of eligible seasons that are compensated under the settlement can be calculated by multiplying the number of class members by the number of seasons.  *Id*.  For class members who played five or more seasons, the aggregate number of eligible seasons that are compensated under the settlement can be calculated by multiplying the number of class members by five eligible seasons.  Because class members who play more than five seasons receive no further increase in the size of their monetary award, Dkt. 6481-1 § 6.7(b)(i), they are compensated only for five eligible seasons whether they in fact played five or ten.  Using this methodology, the Initial and Revised Settlements compensated a total of 60,350 seasons.  Molo Decl. Ex. 10.

[29] The increase of 2,143 in eligible seasons does not include any eligible seasons beyond five, the minimum number of eligible seasons needed to receive the full monetary award.  For example, Mr. Hippler played 11 seasons in NFL Europe, *see* p. 23, *supra*, entitling him to 5.5 eligible seasons.  But the additional one-half eligible season was not included in the 2,143-eligible-season increase because it does not result in any increase to any monetary award Mr. Hippler might receive.

have qualified for the BAP, which requires one-half an eligible-season credit for participation, Dkt. 6481-1 § 5.1.

By revising the settlement to award one-half of an eligible season for each season of play in NFL Europe, Dkt. 6481-1 § 2.1(kk), the Final Settlement now ensures that all players who played at least one season in NFL Europe will qualify for the benefits of the BAP, *see id.* § 5.1. Approximately 2,300 class members played *only* in NFL Europe. *See* Molo Decl. Ex. 11 (identifying 2,302 NFL Europe players who did not play in NFL). Those players are now eligible to participate in the BAP and to receive all the benefits of that program. For example, those players may now receive a BAP baseline examination – a $3,500 benefit according to Class Counsel. Dkt. 6423-21 ¶ 24. The total value of those additional baseline examinations is approximately $8.1 million. Those 2,300 class members will also now be eligible for BAP supplemental benefits, which provide certain medical treatment to class members whose BAP examination reveals a diagnosis of "Level 1" neurocognitive impairment. According to Class Counsel, about 4.4% of class members examined in the BAP will receive such a diagnosis. Thus about 4.4% of the 2,300 – or 101 additional class members – will become eligible for BAP supplemental benefits.[30]  Because supplemental benefits are valued at $35,000 per player, *see* Dkt. 6168 ¶ 54; Dkt. 6509 at 107, class members who played only in NFL Europe will now

---

[30] That figure is calculated as follows. The NFL's actuary estimated that about 750 of 16,962 class members, *see* pp. 21-22 n.25, *supra*, would receive a "Level 1" neurocognitive impairment diagnosis, making them eligible for supplemental BAP benefits. Dkt. 6168 ¶ 53. Assuming that the prevalence of such diagnoses is the same among the 2,300 class members who played only in NFL Europe, an additional 101 class members (4.4% of 2,300) will receive a "Level 1" neurocognitive impairment diagnosis and be eligible for supplemental BAP benefits.

receive additional supplemental benefits of $3.5 million.  Thus, the total increased value based on enhanced benefits for "NFL Europe-only" class members is $11.6 million.[31]

Accordingly, providing eligible-season credit for seasons played in NFL Europe increased the value of the settlement by $35.6 million.[32]

### C. The Expanded Scope of the Death with CTE Qualifying Diagnosis

The Final Settlement also offers some relief to class members who suffered with CTE by expanding the time period for the Death with CTE qualifying diagnosis.  Under the Revised Settlement, class members who died and were diagnosed with CTE post-mortem after the date of preliminary approval would have received nothing.  Dkt. 6087 Ex. B-1 ¶5.  The Final Settlement extends the time frame for receiving a Death with CTE qualifying diagnosis – which carries up to a $4 million award – by over nine months, from July 7, 2014 to April 22, 2015.  Dkt. 6481-1 Ex. B-1 ¶5.  During that period, 111 class members passed away.[33]  According to recent Boston University research, CTE was present in the brains of 96% of deceased NFL players whose brains were examined in an autopsy.[34]  Thus, of those 111 deceased class members, 106 can be expected to have CTE and to qualify for the expanded Death with CTE payment.  Molo Decl. Ex. 12.  The estates of those class members will be eligible for an average award under the Death

---

[31] $8.1 million for baseline examinations + $3.5 million for supplemental benefits = $11.6 million.

[32] $24 million based on larger awards for increased number of seasons + $11.6 million for providing "NFL Europe-only" players eligibility for baseline assessments and supplemental benefits = $35.6 million.

[33] Mortality data were drawn from *Oldest Living Pro Football Players, 2016-2010 Pro Football Necrology List*, http://www.oldestlivingprofootball.com/present2010necrology.htm#961267027.

[34] Breslow, *New: 87 Deceased NFL Players Test Positive for Brain Disease*, Frontline (Sept. 18, 2015),   http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/new-87-deceased-nfl-players-test-positive-for-brain-disease.

with CTE Qualifying Diagnosis of approximately $421,000 accounting for age at death and their number of eligible seasons.[35]  That is a $44.6-million increase in the value of the settlement.[36]

### D.  Elimination of the $1,000 Appeal Fee in Cases of Financial Hardship

The Final Settlement reduces obstacles to receipt of monetary awards.  To receive a monetary award, players must submit a Claim Package to the Claims Administrator, who may approve or deny the claim.  Dkt. 6481-1 § 9.3.  When the Claims Administrator denies a class member's claim, that class member may appeal the denial to the Court (in consultation with the Appeals Advisory Panel and/or Appeals Advisory Panel Consultant).  *Id*. § 9.8.  But first, the class member must pay a $1,000 appeal fee that is only refunded if the appeal is successful.  *Id*. § 9.6(a).  Under the Revised Settlement, that fee was to be paid regardless of a retired player's financial circumstances.  Dkt. 6087 § 9.6(a).  The Final Settlement, however, allows that fee to be waived "for good cause."  Dkt. 6481-1 § 9.6(a)(i).  That waiver provision will significantly increase the class's recovery by allowing claims that are denied at first, but nonetheless are meritorious, to be pursued through appeal and ultimately paid.

Experience with the NFL's disability-claims process shows that about 16.2% of all the claims the NFL ultimately pays are denied in the first instance and approved only after appeal.[37]

---

[35] An estimated CTE award was calculated for each player who died between preliminary and final approval, taking account of offsets for the player's age at death and number of Eligible Seasons.  (Data regarding each player's number of eligible seasons were drawn from NFL.com.)  Those estimated awards were used to calculate an average payment.

[36] The $44.6-million total increase was calculated by multiplying the average estimated CTE award ($421,000) by the estimated number of individuals who would be diagnosed with Death with CTE (106).  Molo Decl. Ex. 12 at 5.

[37] *See* L. Elaine Halchin, *Former NFL Players: Disabilities, Benefits, and Related Issues*, Congressional Research Service (April 8, 2008), at 82, *available at* http://digitalcommons.ilr. cornell.edu/cgi/viewcontent.cgi?article=1530&context=key_workplace.  From July 1, 1993 to June 26, 2007, there were 1,052 applications for disability benefits.  *Id*.  358 applications were initially approved, and another 69 were initially denied but approved after appeal.  *Id*.  Thus of the 427 total approvals, 16.2% (69 divided by 427) were approved only after appeal.

Class Counsel's actuary calculated that 3,596 class members will be entitled to receive an award. Dkt. 6167 at 5 (Table 2-1).  If the claims process here is similar to the NFL's process for disability claims, about 582 awards will be denied initially and approved only after appeal.  If the $1,000 appeal fee deterred just 10% of those appeals,[38] about 58 class members would not receive monetary awards that they should have received under the actuary's calculation.  Now, those denials will be appealed and those awards will be paid.  The value of those additional awards amounts to $10.9 million.[39]

## V.   THE REQUESTED AWARD OF FEES AND COSTS

Like counsel for the NFL and the Class, counsel for the Faneca Objectors are highly skilled advocates and have been recognized by the profession as such.  MoloLamken LLP is a leading national litigation boutique.[40]  Steven Molo, the lead partner on this matter, has for the

---

[38] That is a conservative estimate of the proportion of the class that is in financial distress and could not afford a $1,000 appeal fee.  For example, within two years of retirement, 78% of former NFL players are under financial stress.  Pablo S. Torre, *How (and Why) Athletes Go Broke*, Sports Illustrated (Mar. 23, 2009), http://sportsillustrated.cnn.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke.  In fact, 15.7% of players file for bankruptcy within twelve years of retirement.  *See* Kyle Carlson et al., *Bankruptcy Rates among NFL Players with Short-Lived Income Spikes*, 105 American Economic Review 5 (April 2, 2015).  And one charitable organization, the NFL Player Care Foundation, has provided charitable grants to 956 former players – about 5% of the class – just since 2007.  *See* NFL Player Care Foundation, http://www.nflplayercare.com (last visited Dec. 20, 2016).

[39] The actuary estimates the value of 3,596 awards at $675 million, or an average of $187,708 for each award.  The value of 58 additional awards is thus $10.9 million.

[40] MoloLamken has been named to *The National Law Journal*'s Litigation Boutiques Hot List and *Benchmark Litigation*'s Top 10 Litigation Boutiques in America.  In addition, MoloLamken and its lawyers have been recognized by *Chambers & Partners*; *SuperLawyers*; *Lawdragon*; *Best Lawyers in America*; *Euromoney*; *PLC Which Lawyer*; *Leading Lawyers*; *Washingtonian Magazine*; *New York Magazine*; *Martindale Hubbell*; *U.S. News and World Report*; *Vault.com*; and *International Global Law Experts*.  *See* Molo Decl. ¶3.  MoloLamken first appeared in this matter on May 15, 2014.  Dkts. 6040-6043.

past eight years been recognized by *Lawdragon* as one of the 500 leading lawyers in America[41] and has been named by *Benchmark Litigation* to its list of the top 100 trial lawyers in America.[42] Hangley Aronchick Segal Pudlin & Schiller also is recognized as a leading litigation firm.[43] William Hangley, the lead partner on this matter, also has been named to the *Benchmark Litigation* list of top 100 trial lawyers in the United States[44] and has been listed in *Chambers & Partners' Guide to America's Leading Lawyers* – which calls him a "towering figure in commercial litigation" – since its inception.[45]   Professor Linda Mullenix, of the University of Texas Law School, is widely regarded as the nation's leading authority on class actions.[46]

Together, counsel for the Faneca Objectors expended a total of 6,357.2 hours working to enhance the settlement for the class.  Their vigorous, often creative, advocacy "sharpen[ed] the issues and debate on the fairness of the settlement."  *In re Domestic Air Transp. Antitrust Litig.*,

---

[41] Lawdragon, *Lawyer Limelight: Steven Molo*, http://www.lawdragon.com/2016/10/04/lawyer-limelight-steve-molo; *see* Molo Decl. ¶3.

[42] Benchmark Litigation, *Benchmark Litigation Top 100 Trial Lawyers 2017*, https://www.benchmarklitigation.com/general/GEOFPLPE.

[43] Hangley Aronchick Segal Pudlin & Schiller was recently named to *The National Law Journal*'s Midsize Hot List, and it has been named by *Benchmark Litigation* as Pennsylvania Law Firm of the Year.  The firm and its attorneys have been honored by *Legal Intelligencer*, *Best Lawyers in America*, *Vault.com*, *Chambers & Partners*, *U.S. News and World Report*, *SuperLawyers*, and the Philadelphia Bar Foundation.  *See* Hangley Decl. ¶3.  The firm first appeared in this matter on May 19, 2014.  Dkt. 6045.

[44] Benchmark Litigation, *Benchmark Litigation Top 100 Trial Lawyers 2017*, https://www.benchmarklitigation.com/general/GEOFPLPE.

[45] Chambers & Partners, *USA Guide* (profile of William T. Hangley), http://www.chambersandpartners.com/USA/person/179385/william-t-hangley; *see* Hangley Decl. ¶4.

[46] Professor Mullenix is the Morris & Rita Atlas Chair in Advocacy at the University of Texas School of Law.  She has authored or co-authored twenty-two books and has published hundreds of articles in leading law reviews.  Her work on civil procedure and complex litigation has been cited by courts throughout the United States.  *See* Mullenix Decl. ¶¶2-4.  She appeared in this matter on May 15, 2014.  Dkt. 6044.

148 F.R.D. 297, 358 (N.D. Ga. 1993) (awarding objector fees).  Moreover, it brought about a tangible financial benefit to the class, fairly valued in excess of $100 million.

The fee requested by the Faneca Objectors will in no way diminish the financial benefits to class members.  The Final Settlement provides that, separate and apart from any financial payments to the class, the NFL will pay reasonable attorneys' fees and costs subject to the approval of this Court.  Dkt. 6481-1 § 21.1.  The NFL is to pay $112.5 million into the Attorneys' Fees Qualified Settlement Fund and has agreed not to oppose any request for fees not exceeding that amount.  *Id.* § 21.2.[47]

Class Counsel unquestionably is entitled to a substantial award for the significant work done in: developing a theory of the case; organizing and communicating with the class – which included many members represented by separate counsel – throughout the proceedings; preparing master administrative long-form complaints, a short-form complaint system, and a class action complaint; briefing and arguing the limited motion to dismiss; negotiating the complex settlement; and defending the settlement against the formidable opposition of the Faneca Objectors in the post-settlement proceedings.  Again, though, this was not a litigated case, except for the litigation pitting the settling parties against the Faneca Objectors.  Awarding the full $112.5 million to Class Counsel without compensating counsel for the Faneca Objectors – given how this matter played out – would be an inequitable result.

---

[47] The size of the $112.5 million attorneys' fee award that the NFL has agreed not to oppose was established by the Initial and Revised Settlement agreements when the settlement was valued at $760 million.  *E.g.*, Dkt. 5634-2 §§ 21.1-21.2.  The increased value of the Final Settlement, which now exceeds $860 million, thus could justify an attorneys' fee fund that exceeds the $112.5-million fund established based on the lower economic values of the Initial Settlement and the Revised Settlement, which had been pegged at $760 million.  Co-Lead Class Counsel are not precluded from requesting a fee larger than $112.5 million, although the NFL has reserved the right to object to any such fee request.  Dkt. 6481-1 § 21.1.

Based on their substantial contributions, the Faneca Objectors request an attorneys' fee award of $20 million.   This represents approximately 2.3% of the overall $862.5-million financial value of the settlement (assuming the fair value of the Revised Settlement at $760 million prior to the $102.5-million increase brought about by the Faneca Objectors).   It also represents approximately 19.5% of that $102.5-million increase in financial value.   Finally, it represents approximately 17.8% of the total $112.5 million to be paid into the Attorneys' Fees Qualified Settlement Fund.   In addition to the $20 million in attorneys' fees, the Faneca Objectors request an award of $51,827.52 in reasonable associated costs.

Should the Court grant this request for fees and costs, Class Counsel may still receive in excess of $92 million from the Attorneys' Fees Qualified Settlement Fund – in a case in which no discovery, contested class certification hearing, summary judgment practice, or trial occurred.[48]   It should also be noted that many of the attorneys serving on the Plaintiffs' Steering Committee and leading the efforts of the class will also be compensated through individual representation agreements with players.   If so, they will receive a percentage of any payment made to a player they represent *in addition to* any payment from the Attorneys' Fees Qualified Settlement Fund.   Those agreements may call for the attorney to receive as much as 45% of the award going to the player.   *See, e.g.*, Dkt. 7029 ¶6 (counsel for the estate of Kevin Turner arranged to receive up to 45% of recovery).[49]   Counsel for the Faneca Objectors have no such individual representation agreements with any class members.

---

[48] In addition to any fee paid from the Attorneys' Fees Qualified Settlement Fund, the Final Settlement's provisions regarding attorneys' fees authorize Co-Lead Class Counsel to petition the Court for up to a 5% set-aside – drawn from the monetary awards paid to class members – to "facilitate the Settlement program and related efforts of Class Counsel."  Dkt. 6481-1 §21.1.

[49] This may result in a considerable payment to some lawyers.  For example, Thomas V. Girardi, who sits on the Plaintiffs' Executive Committee, *see* Dkt. 64, represents 561 players.   And Steven C. Marks, who also sits on the Plaintiffs' Executive Committee and who served as Class

## VI.   <u>ARGUMENT</u>

### A.  The Work of Counsel for the Faneca Objectors Merits the Requested Fee Award

Objectors who confer a material benefit on the class are entitled to a fee award.  *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 744 (3d Cir. 2001); *see also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 748 (7th Cir. 2011); 7B Charles A. Wright & Arthur Miller, *Federal Practice & Procedure* §1803 n.6 (3d ed. 2004) (collecting cases awarding objector fees).  Objectors "serve as a highly useful vehicle for class members, for the court and for the public generally" to bring adversarial scrutiny to proposed class action settlements.  *Great Neck Capital Appreciation Inv. P'ship, LP v. PricewaterhouseCoopers, LLP*, 212 F.R.D. 400, 412 (E.D. Wis. 2002).  "Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service."  *Id.* at 413.

Objectors play a valuable role given the awkward dynamic inherent to class action settlements:  The defendant is motivated to settle as cheaply as possible and, as a practical matter, does not care whether its payment benefits primarily the class or class counsel so long as it gets a release; class counsel may have an opportunity to maximize fees at the expense of maximum relief to the class; and the court, of course, must scrutinize the proposed settlement acting in its role as a fiduciary to the class.  *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("*GM Trucks*").  The more significant the issue litigated in the case and the larger the potential fee award, the greater the problem posed by this dynamic.

---

Counsel, represents 535 players.  *Id.*; Dkt. 6423 at 3.  Should the Court deem the details of these arrangements relevant and useful, the Faneca Objectors are prepared to pursue any appropriate discovery on this issue.

This necessarily imposes an extraordinary burden on the court.  As Judge Posner explained, "American judges are accustomed to presiding over adversary proceedings.  They expect the clash of the adversaries to generate the information that the judge needs to decide the case."  *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (reversing approval of class action settlement based on objectors' arguments).  Thus, vigorous, articulate objections by competent counsel acting for individual class members allow a judge to overcome a "disadvantage in evaluating the fairness of the settlement to the class."  *Id*.

Counsel for the Faneca Objectors performed that valuable service to the Court and to the class in this matter.  The Revised Settlement was moving forward with the force of a steamroller fueled by an incredibly powerful, media-savvy defendant, two sets of highly skilled advocates, and a laudable intent in aiding a *subset* of the class in need of immediate relief.  The Faneca Objectors stood before that steamroller with counsel who could match the lawyers of the settling parties blow for blow.  They did so, serving the *entire* class in two ways – *first*, by turning the fairness hearing into a true adversarial process; and *second*, by achieving a substantial financial benefit through an enhanced Final Settlement.

### 1.   The Direct Benefit from the Faneca Objectors' Challenge to the Settlement Supports the Requested Fee

"If objectors' appearance sharpens the issues and debate on the fairness of the settlement, their performance of the role of devil's advocate warrants a fee award."  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 358 (N.D. Ga. 1993) (awarding objector fees); *see In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (awarding objector fees for "sharpen[ing] debate" in proceeding).  Courts recognize that even where their efforts do not directly increase the size of the settlement fund, "objectors add value to the class-action settlement process" by "transforming the fairness hearing into a truly adversarial proceeding"

33

and "supplying the Court with both precedent and argument to gauge the reasonableness of the settlement." *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008). Thus even objections that are "ultimately overruled" may merit a fee award if "the presence of an objector represented by competent counsel transformed the settlement into a truly adversary proceeding." *Frankenstein v. McCrory Corp.,* 425 F. Supp. 762, 767 (S.D.N.Y. 1977) (awarding objector fees).

In *Frankenstein*, for example, objectors challenged the fairness of a settlement resolving claims of Securities Act violations in connection with the sale of certain debentures.   425 F. Supp. at 763.  The largest class benefit provided under the proposed settlement resulted from the defendant's agreement to repurchase the debentures from class members who still held them. *Id*. at 764.  Objectors challenged that provision as unfair, because it discriminated among class members, providing a larger benefit to class members who held the debentures longer.  *Id*.  The district court granted final approval; the objectors took an appeal, but withdrew it.  *Id*.  The district court nonetheless granted objectors' fee petition.  *Id*. at 767.

The court noted that the objectors had "produced a beneficial effect upon the progress of the litigation" by advancing arguments that, "although ultimately overruled, were not frivolous" and "transformed the settlement hearing into a truly adversary proceeding."  *Id.*  The court found the objection added value by causing the court "to spend even more hours in analyzing and assessing the complex settlement agreement, and cast[ing] in sharp focus the question of fairness and adequacy of the settlement to all members of the class."  *Id.*

Likewise, in *Howes v. Atkins*, objectors challenged a settlement where the parties settled for an amount that was low relative to the optimistic initial views of plaintiffs' counsel.  668 F. Supp. 1021, 1027 (E.D. Ky. 1987).  Objectors to the settlement "made a vigorous attack on the

settlement and pursued extensive discovery," but were unable to find "any reason for the modest settlement except that the evidence had not developed as plaintiffs' counsel had first anticipated." *Id*. The district court awarded objectors' counsel 10% of the settlement fund, holding that "even though the settlement was not improved," objectors' counsel were entitled to fees for "ably perform[ing] the role of devil's advocate" and "ma[king] the court much more comfortable in approving the settlement." *Id*.

Similarly, here, the advocacy of counsel for the Faneca Objectors fleshed out complex issues important to a determination of the fairness of the settlement. The Faneca Objectors took the lead in addressing the key fairness question in this case: whether the settlement's compromise regarding CTE – giving direct monetary compensation for the disease only to those class members who died by a certain date – was "fair, reasonable, and adequate" under Rule 23(e) and met Rule 23(a)'s requirement of adequate representation. The CTE question was highly complex and hotly contested – particularly given the prominence class counsel gave CTE in their early pleadings and statements about the case. To have approved the settlement without a full airing of the CTE issue would have been a grave injustice.

The Faneca Objectors also raised other potential intra-class conflicts that were problematic under Rule 23(a) – exclusion of credit for NFL Europe and the 75% reductions. Recognizing how fundamental these issues were to deciding whether to approve the settlement, the Faneca Objectors sought interlocutory review of the preliminary approval order – which led the Third Circuit to resolve a legal question of first impression. *See* pp. 10-11, *supra*.

The Faneca Objectors addressed these essential questions through extensive briefing, *see* pp. 11-17, *supra*, and a detailed presentation to this Court at the fairness hearing, *see* pp. 14-15, *supra*, as well as through briefing and argument to the Court of Appeals, *see* pp. 19-20, *supra*.

The Faneca Objectors also built a substantial record – a particularly important service here, as the settlement was reached without formal discovery. They worked with eleven experts to submit a total of thirteen expert declarations. *See* pp. 12-13, 15-16, *supra*. And they filed several motions requesting discovery – seeking information about the negotiation of the settlement, the strength of the NFL's defenses, the parties' evidence supporting the settlement, and the compensation of the NFL's and Class Counsel's experts. *See, e.g.*, Dkts. 6461, 6462; pp. 11, 13, *supra*. Finally, the Faneca Objectors performed an additional service by organizing the presentations of the other objectors at the fairness hearing. *See* pp. 14-15, *supra*.

### 2. The Direct Benefit of the $102.5-Million Increase in Settlement Value Supports the Requested Fee

Because "objectors have a valuable and important role to perform in preventing . . . unfavorable settlements, . . . they are entitled to an allowance as compensation for attorneys' fees and expenses where . . . ***the settlement was improved*** as a result of their efforts." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 743 (quoting *White*, 500 F.2d at 828) (emphasis added) (vacating and remanding order denying objector fee request). Here, there is no doubt that the "settlement was improved." As the Third Circuit recognized, the Final Settlement's changes from the Revised Settlement "benefit[ed] class members." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d at 423. Indeed, the changes relating to NFL Europe, CTE, the BAP, and the appeal fee added $102.5 million to the settlement's value. *See* pp. 20-28, *supra*.

It is likewise clear that those improvements were the "result of [the] efforts" of the Faneca Objectors. Counsel for the Faneca Objectors were, as the *Washington Post* recognized, "lead counsel for those objecting to the settlement."[50] Even after the Faneca Objectors' motion

---

[50] Rick Maese, *Judge Orders Further Revisions in NFL Concussion Lawsuit Settlement*, The Wash. Post (Feb. 2, 2015), https://www.washingtonpost.com/sports/redskins/judge-orders-

to intervene – filed long before any other objector appeared on the scene – was denied, they litigated the case as if they were a party and put forth significant evidence and argument.  Instead of simply pointing to the settlement's flaws, they offered concrete ways to improve it.  In fact, the improvements in the Final Settlement that have the greatest value to class members had their roots in the Faneca Objectors' suggestions.

For example, the BAP Fund was uncapped in response to the Faneca Objectors' arguments.  They were the first to address the problem with the BAP Fund cap.  *See* p. 12, *supra*.  And at the fairness hearing, they pointed out that if "all the [eligible] players will participate" in the capped BAP, the $75-million fund "will . . . fall woefully short."  Dkt. 6463 at 109:7-10.  They also offered a concrete solution.  They recommended that the parties "[l]ift the cap on the BAP."  Dkt. 6469 at 33.  And in post-hearing briefing, they recommended a "revised, uncapped, baseline assessment program."  Dkt. 6420 at 10.  Though the Final Settlement did not completely adopt that recommendation, it met the Faneca Objectors halfway by uncapping the BAP Fund as to baseline examinations.  *See* pp. 17-18, *supra*.  The $11.4-million class benefit that will result is attributable to the Faneca Objectors.  *See* pp. 21-22, *supra*.

The Final Settlement offers credit for NFL Europe play because the Faneca Objectors pointed out that excluding those players would raise serious Rule 23(a) concerns.[51]  The Faneca Objectors raised that issue in their opposition to the settling parties' motion for preliminary approval – something no other objector filed.  Dkt. 6082 at 28-29.  They also debunked the settling parties' *post hoc* rationales for excluding NFL Europe, for example by highlighting statements where Class Counsel admitted to bargaining away recovery for NFL Europe players

---

further-revisions-in-nfl-concussion-lawsuit-settlement/2015/02/02/3b44b18e-ab22-11e4-8876-460b1144cbc1_story.html.

[51] Sean Morey, until opting out following final approval, had been one of the MoloLamken clients.  Unlike either of the class representatives, Mr. Morey actually played in NFL Europe.

in favor of other class members.  Dkt. 6201 at 35.  The $35.6-million class benefit resulting from better treatment of NFL Europe players in the Final Settlement is attributable to the efforts of counsel for the Faneca Objectors.  *See* pp. 22-26, *supra*.

The Final Settlement's extension of the deadline for filing Death with CTE claims to the date of final approval is likewise traceable to the Faneca Objectors' efforts.  Their motion to intervene brought CTE to the forefront.  Dkt. 6019-1 at 15-18.  They not only devoted extensive briefing to the issue, *see* pp. 8-12, 15-17, *supra*, they were the only objectors to build an independent scientific record to justify more compensation for CTE.  *See* pp. 12-13, 15-16, *supra*.  The Faneca Objectors highlighted the arbitrariness of the Revised Settlement's preliminary-approval deadline for Death with CTE claims.  At the fairness hearing, they pointed out that if a player died and received a diagnosis of CTE the ***day before*** preliminary approval, his estate would receive up to $4 million, whereas if that player died the ***day after*** preliminary approval, his estate would receive nothing.  Dkt. 6463 at 83:8-84:6; Dkt. 6469 at 17.  The Final Settlement addressed that unfairness – at least in part.  Though the Faneca Objectors sought to have the deadline for CTE claims extended further, the date of final approval was at least a rational place to draw the line.  The $44.6-million benefit to the class resulting from that change is attributable to the Faneca Objectors.  *See* pp. 26-27, *supra*.

Finally, the hardship provision for the appeal fee is attributable to the Faneca Objectors.  They noted the problems with the appeals process – which requires players, but not the NFL, to pay to appeal – in their opposition to preliminary approval.  Dkt. 6082 at 33-34.  They pointed to the fact that 78% of former NFL players face financial distress within two years of retiring from the NFL as reason to believe that the "appeal fee will discourage many retired players from challenging adverse claim determinations."  *Id*. at 33 n.43.  The $10.9-million benefit to the class

resulting from making the appeal process fairer is the result of their efforts.  *See* pp. 27-28, *supra*.

### 3.   The Amount of the Fee Request Is Reasonable

The $20-million fee award sought by the Faneca Objectors represents 19.5% of the $102.5-million financial benefit conferred – a reasonable percentage under this Circuit's precedent.[52]   Application of this Circuit's *Gunter/Prudential* factors further confirms that the requested percentage is a reasonable one.   Finally, the lodestar cross-check shows that the requested fee is a reasonable multiple of counsel's investment in this case.

### i.   The Fee Request Is a Reasonable Percentage of the Benefit Conferred

When the efforts of counsel result in a large recovery for the class, under common-fund principles an award of a percentage of the benefit conferred is appropriate.  *See McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015).   That "percentage-of-recovery method is designed to reward attorneys for" "adding value to the class settlement."   *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563, 566 (D.N.J. 2003).   The $20-million award sought by the Faneca Objectors represents 2.3% of the total $862.5-million financial benefit the class will receive through the vigorously litigated settlement.   The settlement had been valued at $760 million prior to the improvements resulting from the Faneca Objectors' work, so that increase in the financial value of the settlement brought about by the Faneca Objectors is $102.5 million, or 13.5% more than the Revised Settlement.   The requested award is just 19.5% of that increase in value.   Courts in this Circuit have approved similar awards (as a percentage of the improvement achieved by objectors) in other cases.   For example, in *Dewey v. Volkswagen of America*, the court awarded objectors' counsel "13.4% of the benefit

---

[52] Of course, this is only the financial benefit.   It does not account for the benefit of the adversarial challenge to the overall fairness of the complex settlement.

conferred," explaining that was "within the range of acceptable percentages-of-recovery." 909 F. Supp. 2d at 397; *see also Lan v. Ludrof*, No. 1:06-cv-114, 2008 WL 763763, at *30 (W.D. Pa. 2008) (awarding objector 25% of increase in settlement value).

### ii.    The Gunter/Prudential *Factors Support the Requested Fee*

The reasonableness of the fee request is further confirmed by application of the *Gunter/Prudential* factors:  (1) "the size of the fund created and the number of beneficiaries," (2) "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel," (3) "the skill and efficiency of the attorneys involved," (4) "the complexity and duration of the litigation," (5) "the risk of nonpayment," (6) "the amount of time devoted to the case by plaintiffs' counsel," (7) "the awards in similar cases," (8) "the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations," (9) "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained," and (10) "any innovative terms of settlement."  *In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009); *In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 336 (3d Cir. 1998).  These factors are used to evaluate the fee requests of both plaintiffs' counsel and objectors' counsel.  *See McDonough*, 80 F. Supp. 3d at 660 (applying *Gunter/Prudential* factors to evaluate objector's fee request).  Those factors that apply all weigh in favor of the requested fee award.[53]

**The size of the fund created by the efforts of counsel for the Faneca Objectors favors the requested fee**.  The $102.5-million increase here would be a large recovery in its own

---

[53] The factor pertaining to the number of objections is inapplicable here.  In the context of an objector's fee petition, courts have construed that factor as referring to the number of objections to the fee petition filed by objector's counsel, which is unknown at this time.  *See McDonough*, 80 F. Supp. 3d at 660.

right in another case.   Indeed, that increase dwarfs the *entire* $35.5 million settlement in *McDonough*, 80 F. Supp. 3d at 651, and is commensurate with large settlement funds in other cases.   *See, e.g.*, *In re Trans Union*, 629 F.3d 741 ($110 million settlement); *Sioux Nation of Indians v. United States*, 650 F.2d 244, 249 (Ct. Cl. 1981) (describing $102-million fund as "extraordinary").   Moreover, courts routinely award class counsel large percentages as attorneys' fees in cases involving settlements in the neighborhood of $100 million.   *See, e.g.*, *In re Ikon Office Sols., Inc.*, 194 F.R.D. at 196-97 (awarding 30% fee in case involving $111-million settlement).   The magnitude of the additional value conferred by the Faneca Objectors' efforts – more than a 13.5% increase over the $760-million valuation of the Revised Settlement – weighs in favor of the requested fee award.

**The number of beneficiaries favors the requested fee**.   The Faneca Objectors' efforts benefited the whole class.   Any class member can receive benefits from the uncapped BAP Fund that he might not have received had the Revised Settlement's capped BAP Fund run out.   Any class member can qualify for waiver of the appeal fee if he falls into financial hardship.   And the estate of any class member who died between the dates of preliminary approval and final approval can benefit from the extension of the deadline for Death with CTE claims.   Moreover, as a result of the improvements urged by the Faneca Objectors, thousands of class members who played in NFL Europe will receive even greater benefits.   They will receive larger awards due to credit for NFL Europe seasons, and the more than 2,300 players who played solely in NFL Europe (over 10% of the class) will be eligible for monetary awards and participation in the BAP that they were not eligible to receive before.   *See* pp. 20-28, *supra*.   Most importantly, because the settlement fund is uncapped, these increased benefits do not reduce the recovery of other

41

class members – the additional funds will be paid by the NFL.  The number of class members benefiting from the Faneca Objectors' efforts supports the requested fee.

**The value of benefits attributable to the efforts of counsel for the Faneca Objectors relative to the efforts of other groups favors the requested fee**.  The Faneca Objectors were the moving force in improving a settlement that was, according to Class Counsel, itself "the product of many months of hard-fought, arm's-length and vigorous negotiations by highly experienced counsel" supervised by one of the nation's most respected mediators.  Dkt. 6423-1 at 2.  Nonetheless, this Court denied preliminary approval of the Initial Settlement.  *Id*. at 99.  The parties went back to the negotiating table for ***five more months*** before reaching the compromise that was the Revised Settlement.  *Id*. at 99-100.  The Revised Settlement was the best deal Class Counsel, through all their able efforts, were able to extract from the NFL.  The irresistible force had met the immovable object.  But as a result of the intense pressure created by the Faneca Objectors – and this Court's scrupulous efforts to "play[ ] the important role of protector of the absentees' interests, in a sort of fiduciary capacity," *GM Trucks*, 55 F.3d at 785 – the NFL yielded further.[54]

The Faneca Objectors were the first to raise the key issues underlying the Final Settlement's improvements – credit for NFL Europe play, CTE, the capped BAP Fund, and the appeal fee, *see, e.g.*, Dkt. 6019-1 at 14-21; Dkt. 6082 at 19-28, 32-35.  Other objectors repeated the arguments advanced by the Faneca Objectors or adopted their arguments wholesale.  *See, e.g.*, Dkt. 6242 at 7-15 & n.4.  The Faneca Objectors built the extensive evidentiary record in

---

[54] This case is thus distinguishable from ones where objectors "did not increase the amount of the settlement," but only "spur[red] a change in allocation of the settlement."  *McDonough*, 80 F. Supp. 3d at 661.  In those cases, it might be appropriate to split credit for the increased benefit to the class between Class Counsel and objector's counsel.  Here, it was the Faneca Objectors who were solely responsible for the increased settlement value.

support of objectors' arguments, submitting hundreds of pages of scientific articles and declarations from preeminent scientists and doctors. *See, e.g.*, Dkt. 6201-1 & Exs. 1-82; Dkt. 6201-16; Dkt. 6232-1; Dkt. 6455-1 to -11; Dkt. 6455-12 & Exs. 1-27. No other objector offered similar evidence to assist the Court. Moreover, the Faneca Objectors pushed the proceedings at every turn in an effort to bring prompt relief to the class.

It should be noted that the Faneca Objectors did ***not*** raise the issue of class members who lacked necessary medical records due to *force majeure* events, which was raised by objector Delano R. Williams, Dkt. 6221, represented by the Shah Law Firm, and addressed in the Final Settlement.

**The complexity and duration of the litigation favors the requested fee**. As this Court noted in approving the settlement, this "case implicates complex scientific and medical issues not yet comprehensively studied." Dkt. 6509 at 60. The Faneca Objectors engaged directly with the NFL and Class Counsel in litigating those issues. Litigation involving such scientifically complex issues supports an attorneys' fees award. *See, e.g.*, *In re Schering-Plough Corp. Enhance Sec. Litig.*, Nos. 08-cv-397, 08-cv-2177, 2013 WL 5505744, at *13-16, *27 (D.N.J. Oct. 1, 2013) (complexity of case supported fee award because it involved "complex scientific and statistical data"); *In re Diet Drugs*, No. Civ. A. 99-20593, 2003 WL 21641958, at *9 (E.D. Pa. May 15, 2003) (noting "complex work" involving "scientific evidence" in support of fee award); *see also Gates v. Rohm & Haas Co.*, No. 06-cv-1743, 2008 WL 4078456, at *4 (E.D. Pa. Aug. 22, 2008) (noting complexity of case "requiring extensive scientific, technical and modeling evidentiary submissions" supported approval of settlement).

The case also involved complex legal issues, in particular adequacy of representation under Rule 23(a) in connection with the settlement's treatment of CTE, the 75% reductions, and

NFL Europe play.  *See* Dkt. 6201 at 20-38.  Even beyond litigating those legally complex questions, the Faneca Objectors employed novel and thoughtful strategies in an attempt to address the settlement's deficiencies early on so that a fair settlement could be reached quickly and class members could receive the help they need.  For example, the Faneca Objectors moved to intervene when it became apparent that intra-class conflicts could result in core class constituencies, like individuals with CTE, receiving less than their fair due under the settlement.  *See* Dkt. 6019-1.  And they pushed hard for early appellate review of those issues, pressing the Third Circuit to review the preliminary approval order under Rule 23(f), *see* CA3 Case No. 14-8103 – a novel use of the rule that provoked consideration of rules amendments from the Rules Advisory Committee.  *See* Memo. from Hon. John D. Bates to Hon. Jeffrey S. Sutton (May 12, 2016).

**The amount of time devoted to the case, and the skill and efficiency of the attorneys involved, favors the requested fee**.  The Faneca Objectors' counsel invested more than three years and over 6,300 billable hours on this litigation.  At their current hourly billing rates, their investment exceeds $4 million.  All of that effort – from the motion to intervene to the Third Circuit appeal – was expended trying to improve the settlement.  *See* pp. 8-20, *supra*.

Notwithstanding their enormous investment in the case, the Faneca Objectors' counsel acted with skill and efficiency.  The results speak for themselves.  The Faneca Objectors secured benefits for the class exceeding $100 million in value – while litigating against some of the best lawyers in the country.  That is no small feat.  The outcome confirms the professional recognition that counsel for the Faneca Objectors have received for their work apart from their efforts in this case.  *See* Molo Decl. ¶¶ 3-6; Hangley Decl. ¶¶ 3-5.

**The risk of non-payment favors the requested fee**.  The extensive investment of time in this case by the Faneca Objectors' counsel is particularly significant given that counsel accepted the case on a ***100% contingency fee basis***.  The risk of non-payment was high.  Many objectors receive no fee for their efforts, and here the settlement being challenged had been negotiated by some of the best lawyers in the country with the assistance of a highly regarded mediator and special master.  Had the Faneca Objectors "been unsuccessful" in their quest to improve the settlement, then counsel might not have received any compensation.  *See McDonough*, 80 F. Supp. 3d at 26.  "This factor counsels in favor of granting a fee award."  *Id.*

**The awards in similar cases favor the requested fee**.  Although this Court has recognized that fee awards for objectors are infrequent, *McDonough*, 80 F. Supp. 3d at 661, courts have awarded objectors' counsel fees equal to 13-25% of the increase in settlement value when objectors successfully obtained a large benefit for the class.  *See, e.g.*, *Dewey*, 909 F. Supp. 2d at 397 (awarding 13.4% of increase in settlement value); *Lan*, 2008 WL 763763, at *28 (awarding 25% of increase in settlement value).  That said, the weighting of this factor should account for the fact that this case is unique in the sheer magnitude of the benefit conferred and the degree to which the Faneca Objectors were engaged and instrumental in improving as well as testing the fairness of the settlement.

**The percentage fee that would have been negotiated in a private contingent fee arrangement weighs in favor of the requested fee**.  The fee requested by the Faneca Objectors represents 19.5% of the increase in the value of the benefits to the class which resulted from their work.  That is far less than the contingency fees of 30-40% of total recovery that are "routinely negotiate[d]" in tort cases like this one.  *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 07-MD-01871, 2012 WL 6923367, at *8 (E.D. Pa. Oct. 19, 2012) (quoting *In re Ikon*

*Office Sols., Inc., Sec. Litig.*, 194 F.R.D. at 194); *see Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986) ("40% is the customary fee in tort litigation"); *In re Shell Oil Refinery*, 155 F.R.D. 552, 571 (E.D. La. 1993) ("customary contingency fee" in personal injury case "is between 33⅓% and 40%").   Moreover, that percentage fee is also significantly lower than what the Faneca Objectors' counsel would have negotiated as a private fee arrangement for a 100% contingency matter.   *See* Molo Decl. ¶46.   And that percentage is much less than what some counsel representing individual players in this action have negotiated in private arrangements with those players.   *See* pp. 31-32, *supra*.   For example, counsel for the estate of Kevin Turner have arranged for a contingency fee of up to 45%, *see* Dkt. 7029 ¶6, more than double the percentage sought by the Faneca Objectors.

**Finally, the innovative terms of the settlement improvements favor the requested fee**.   The improvements in the Final Settlement are innovative.   They focus not on adding a fixed amount of money to the settlement fund, but rather on ensuring that all class members receive a fair recovery for their injuries.   For example, uncapping the BAP Fund – which the Faneca Objectors urged the parties to do – ensures that all class members receive the benefits of a baseline examination, and requires the NFL to pay whatever additional amounts are necessary to make that happen.   *See* pp. 21-22, *supra*.   Moreover, allowing for this complete access to examinations through the BAP benefits players and their loved ones because they will be able to receive an early diagnosis and assessment and put a plan of treatment in place to effectively address the issues caused by their injuries at the earliest possible date.   And providing credit for NFL Europe seasons – which the Faneca Objectors likewise urged – allows thousands of class members to receive a fair monetary award, without limiting the total benefit to a specific dollar

value.  The innovative character of the improvements suggested by the Faneca Objectors that were incorporated into the Final Settlement supports the requested fee.

*     *     *

Where the *Gunter/Prudential* factors weigh heavily in favor of a fee award – as they do here – courts in this circuit regularly find fee awards of 15-33% of the amount of the total class benefit to be reasonable.  *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) (collecting cases); *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *14 (E.D. Pa. June 2, 2004) (noting Federal Judicial Center study finding median fee award to be 27-30% and approving 30% fee award after applying *Gunter* factors).  An award of 19.5% of the benefit conferred is thus on the lower end of that range.  However, given the large value of the increased benefit, that percentage is reasonable.[55]

### iii.    The Requested Fee Is a Reasonable Multiple of Counsel's Investment

A "lodestar cross-check" confirms the reasonableness of the requested award.  Courts in this Circuit compare a fee award to counsel's lodestar (*i.e.* the reasonable value of counsel's invested time) to verify that a fee award is justified by the effort expended by counsel.  *See In re Cendant Corp. PRIDES Litig.*, 264 F.3d 201, 285 (3d Cir. 2001); *In re Diet Drugs*, 582 F.3d at 540.  The lodestar multiplier – the awarded fee divided by the lodestar – "need not fall within any pre-defined range, provided that the District Court's analysis justifies the award."  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005).

The Faneca Objectors seek an award of $20 million.  As shown in the summary attached as an exhibit to this memorandum, MoloLamken's lodestar is $4,312,565 at current market

---

[55] When the common fund is very large, it may be appropriate to award fees that are a smaller percentage of the total fund amount.  *See In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d at 339.

47

hourly billing rates that other clients have agreed to pay.  *See* Molo Decl. ¶¶ 45-50 & Exs. 5, 6, 8 and 9.[56]  Thus, the lodestar cross-check here yields a multiplier of 4.6.[57]

This further confirms the reasonableness of the fee request.   Lodestar multipliers exceeding 5 have been recognized as reasonable in appropriate cases.  *See In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding fee of 6.96 times the lodestar); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197-98 (S.D.N.Y. 1997) (awarding fee of 5.5 times the lodestar); *see also Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005 WL 1213926, at *16 (E.D. Pa. May 19, 2005) (citing Class Action Reporter survey that "found that the ***average*** lodestar multiplier was 4.5 for percentage of recovery fee awards in cases with common funds of $100 million or more" (emphasis added)); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (finding 4.65 to be a "modest multiplier" and citing cases awarding multiples up to 7.7).

**B.  The Requested Fees Should Be Paid from the Attorneys' Fees Qualified Settlement Fund**

The fees requested by the Faneca Objectors should be drawn from the $112.5 million the NFL is required to contribute to the Attorneys' Fees Qualified Settlement Fund, or, alternatively, paid by the NFL and/or Class Counsel.  It is well within this Court's discretion to require objectors' fees to be paid from Class Counsel's award or by the defendant to "avoid dilution of the settlement fund."  *In re Ikon Office Sols., Inc., Secs. Litig.*, 194 F.R.D. at 197 (ordering objectors' fees and costs to be paid from class counsel's award); *see Great Neck Capital Appreciation Inv. P'ship, L.P.*, 212 F.R.D. at 417 (requiring objectors' fees to "be paid by class

---

[56] The lodestar is computed at the current hourly rates of the Faneca Objectors' counsel, as is common practice in this Circuit.  *See In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 103 (D.N.J. 2001) ("calculating the lodestar of Plaintiffs' Counsel using current hourly rates is appropriate").

[57] $20,000,000 ÷ $4,312,565 = 4.6.

counsel and the defendants as they may agree but without diminution of the sum awarded to the class").

## VII.    CONCLUSION

The petition for attorneys' fees and reimbursement of expenses should be granted.


Dated: January 11, 2017

Respectfully submitted,

/s/ Steven F. Molo

William T. Hangley
Michele D. Hangley
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
(215) 496-7001 (telephone)
(215) 568-0300 (facsimile)
whangley@hangley.com
mdh@hangley.com

Linda S. Mullenix
2305 Barton Creek Blvd.
Unit 2
Austin, TX 78735
(512) 263-9330 (telephone)
lmullenix@hotmail.com

Steven F. Molo
Thomas J. Wiegand
MOLOLAMKEN LLP
430 Park Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com

Eric R. Nitz
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
enitz@mololamken.com

*Attorneys for Objectors Alan Faneca, Roderick "Rock" Cartwright,
Jeff Rohrer, and Sean Considine*