# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | No. 12-md-2323 (AB)<br><br>MDL No. 2323<br><br><br>Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

REPORT OF PROFESSOR CHARLES SILVER ON MATTERS RAISED BY THE ESTATE OF KEVIN TURNER'S MOTION TO RESOLVE ATTORNEY FEE DISPUTE AND TO APPEAR AS COUNSEL FOR PAUL RAYMOND TURNER, THE PERSONAL REPRESENTATIVE OF THE ESTATE OF KEVIN TURNER

I, Charles Silver, declare as follows:

## I.    SUMMARY OF OPINIONS

1.    The engagement agreement that Mr. Kevin Turner entered into with the law firms of Pohurst Orseck, P.A., James E. Doddo, P.A., and Bradley K. Blank, Esq. was valid when signed and continues to be so because nothing in the federal class action rule or the pending settlement alters its status.

1

2.    A decision to invalidate the engagement agreement would undermine lawyers' incentives to represent mass tort claimants, generate strong opposition to class actions, and make class actions harder to certify.

## II.    CREDENTIALS

3.    In this Declaration, I offer my perspective as an expert on class actions, attorneys' fees, and legal ethics, subjects I have studied and written about for years.  My résumé appears below in Appendix A.

4.    I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees in the following major cases, as well as many smaller ones: *In re: Urethane Antitrust Litigation*, 2016 WL 4060156 (D. Kan. July 29, 2016) ($974 million recovery); *San Allen, Inc. v. Buehrer, Administrator, Ohio Bureau of Workers' Compensation*, (Ohio Common Pleas—Cuyahoga County, 2014) (recovery of $420 million); *Silverman v. Motorola, Inc*., No. 07 C 4507, 2012 WL 1597388   (N.D. Ill. May 7, 2012) (unpublished) ($200 million recovery); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ($410 million recovery); *In re Enron Corp. Securities, Derivative & "ERISA" Litig*., 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($7.2 billion recovery); *Allapattah Services, Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (recovery in excess of $1 billion).

5.    Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at the University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

6.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's Principles of the Law of Aggregate Litigation (2010).  Many courts have cited the Principles with approval, including the U.S. Supreme Court.

7.      I have taught, researched, written, consulted with lawyers, and testified about class actions, mass tort lawsuits, and related subjects for 30 years.  I have published over 90 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report.  In 2015, two coauthors and I published a major study of fee awards in securities class actions in the Columbia Law Review.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015).  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), and the RESTATEMENT (THIRD) OF THE LAW OF RESTITUTION AND UNJUST ENRICHMENT.  In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

8.      Finally, because awards of attorneys' fees raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field.  For example, I am a coauthor of William T. Barker and Charles Silver, PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (LexisNexis Mathew Bender, Updated 2014).  I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.  I have also taught the subject of legal ethics

for years, including a specialized course titled Professional Responsibility for Civil Litigators that includes a good deal of material on aggregate lawsuits and lawyers' fees.

## III.   DOCUMENTS REVIEWED

9.     When preparing this Declaration, I reviewed the items listed below, which, unless noted otherwise, were generated in connection with this case.  I may also have reviewed other items including, without limitation, rules, cases, treatises, news reports, correspondence, and published scholarly works.

- Estate of Kevin Turner's Motion to Resolve Attorney Fee Dispute and to Appear as Counsel for Paul Raymond Turner, the Personal Representative of the Estate of Kevin Turner (Including All Exhibits)

- In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 438 (3d Cir. 2016), as amended (May 2, 2016)

- Homepage, NFL Concussion Settlement Website, https://www.nflconcussionsettlement.com/

- Third Circuit Opinion Affirming Final Approval (filed April 18, 2016)

- Order Clarifying Paragraph 16 of the Amended Final Order and Judgment (filed May 11, 2015)

- Amended Final Order and Judgment (filed May 8, 2015)

- Final Approval Order and Judgment (filed April 22, 2015)

- Final Approval Memorandum Opinion

- Amended Class Action Settlement Agreement (filed February 13, 2015)

- Class Action Settlement Agreement with Exhibits (filed June 25, 2014)

- Injury Definitions

4

- Thomas Vasquez, Ph.D., NFL Concussion Liability Forecast, Feb. 10, 2014

## IV. FACTUAL BACKGROUND

10. The facts stated below are taken *from Estate of Kevin Turner's Motion to Resolve Attorney Fee Dispute and to Appear as Counsel for Paul Raymond Turner, the Personal Representative of the Estate of Kevin Turner* (the "*Turner Estate's Motion*") and documents attached thereto as exhibits, and do not appear to be in dispute in this litigation.

11. On January 18, 2012, Kevin Turner retained the law firms of Pohurst Orseck, P.A., James E. Doddo, P.A., and Bradley K. Blank, Esq. (the Attorneys) to handle claims for damages against the NFL and others for injuries he suffered as a player.

12. The terms of the retention are set out in a contract entitled *Authority to Represent* that was signed by Mr. Turner on or about January 18, 2012, and was subsequently confirmed in writing by the Attorneys.

13. In the *Authority to Represent*, Mr. Turner agreed to pay the Attorneys as legal fees 40 percent of his gross recovery if the case resolved without any appellate proceedings or post-judgment action, and 45 percent if otherwise. The gross recovery was defined to include "any awarded attorneys' fees." *Authority to Represent*, p. 1. Mr. Turner also agreed to cover various litigation costs.

14. The *Authority to Represent* placed no express limits on the Attorneys' freedom to employ litigation tactics or procedures when litigating on Mr. Turner's behalf. For example, it did not indicate the forum in which a complaint was to be filed. Nor did it require the Attorneys to combine Mr. Turner's lawsuit with cases brought by other NFL players or forbid them from doing so. It contained no provisions whatsoever that governed the procedural means by which Mr. Turner's lawsuit could be pressed.

15.     Sometime in or about July of 2013, Steven Marks of Pohurst Orseck, P.A. informed Mr. Turner that settlement negotiations were underway and that the prospect had arisen of settling NFL players' concussion lawsuits collectively via a class action.  Mr. Marks and Mr. Turner discussed the possibility that Mr. Turner would serve as a class representative of a subpart of the class and also discussed the proposed settlement terms.

16.     In early January of 2014, Mr. Turner authorized the Attorneys to file a class action complaint in which he was named as a class representative and approved the terms of the proposed class action settlement agreement that was filed with the Court.  See *Affidavit of Kevin Turner in Support of Final Approval of Settlement and Certification of Class and Subclasses*, ECF 6423-7 (the *Turner Affidavit*).

17.     In the *Turner Affidavit*, Mr. Turner stated that he followed the litigation on his behalf closely, and had "countless meetings, telephone conferences and email exchanges with [his] counsel Steve Marks about the status of the proceedings" and other subjects.  *Id*., ¶ 6.

18.     Mr. Turner also reported that, in the company of Mr. Marks, he discussed "in detail" the terms of the proposed class settlement with Diane Nast and Daniel Gallucci, that Ms. Nast "answered all of [his] questions, and that he reviewed the proposed term sheet, approved it, and strongly supported the settlement.

19.     The *Turner Affidavit* does not mention attorneys' fees and nothing in the document appears to bear on that subject, except insofar as fees had been provided for in the proposed class action settlement agreement.  One may reasonably infer from Mr. Turner's statements that he knew about the relevant provisions and approved of them.

20.     The *Turner Affidavit* is dated November 11, 2014.  Months later, on April 13, 2015, Mr. Turner sent Mr. Marks an email in which he expressed a concern about the payment of fees.

6

In particular, he worried that NFL players who took no action to vindicate their claims but who were class members would "wind up receiving 30-40% more than those who," like him, "went public when it was not popular to do so." *Email from Kevin Turner to Steven C. Marks dated April 13, 2015*, ECF 7029-4. Mr. Turner also expressed the concern that if his contract with Podhust Orseck "were to remain valid, the attorneys would get paid by two sources." *Id*.

## V.   THE TURNER ESTATE'S CONTENTIONS

21.   In its *Motion*, the Turner Estate claims that the Authority to Represent was superseded by the Class Action Settlement Agreement which, in its view, provides that "all of Podhurst's fees will be paid, upon application and with Court approval, by the NFL out of the $112.5 million Attorneys' Fees Qualified Settlement Fund." *Turner Estate's Motion*, ¶ 14. Indeed, the Turner Estate thinks it an "obvious fact that the individual contingent fee agreement" signed by Mr. Turner "no longer governs." *Id*. ¶ 17.

## VI.   ANALYSIS

22.   When thinking about the issues raised by the *Turner Estate's Motion*, it is helpful to begin by establishing certain undisputed facts. As I read the *Motion* and its attached exhibits, the Turner Estate denies neither (1) that the *Authority to Represent* was valid when signed, nor (2) that the fee it provided for was reasonable under the circumstances that existed at the outset of litigation, nor (3) that the Attorneys performed the services they were contractually bound to provide, nor (4) that the Attorneys performed work and incurred risks that would have sufficed to justify them in collecting the fee provided for in the *Authority to Represent*, had there been no class action. To put the point another way, the Turner Estate does not deny that, but for the occurrence of the class action settlement, the *Authority to Represent* would be valid, ethical, and binding. Had the Attorneys recovered $5 million for Mr. Turner individually without the class

7

action overlay, it would have been perfectly proper for them to have collected the contingent fee pursuant to the *Authority to Represent*.

23.    The question is, then, whether a lawyer's right to a collect a payment pursuant to a valid engagement contract is reduced or even eliminated when a client's recovery flows through a class action settlement rather than a settlement of a client's individual case.  In the Estate's view, a class action settlement nullifies the fee agreements that individual class members signed and replaces them with a right to a court-determined share of a class action fee award.

### A.    A Decision in Favor of the Turner Estate Would Generate Strong Opposition to Class Actions in Multi-District Litigations

24.    Before getting into the merits, it is worth observing that a decision in the Turner Estate's favor would encourage some lawyers to opt their signed clients out of class actions. Knowing that their contractual rights to fees and cost reimbursements would be nullified, some lawyers with signed clients would want nothing to do with class actions and would be incentivized to exclude their clients from them.  Because class actions for damages almost always allow class members to opt out, this would be easy to accomplish.  A lawyer need only tell a client that he or she can reasonably expect to do better in separate litigation.  Even when the recommendation to opt out was unethically made to defend an attorney's right to fees rather than to help a client, it would be easy to defend and thus difficult to prove that the attorney acted unethically.

25.    In this case, if the Attorneys and other lawyers with signed clients had known that a class action settlement would invalidate their contractual right to fees and reimbursements, they would have been incentivized to oppose class litigation from the outset.  Their opposition would have posed a formidable obstacle to a class-wide settlement too.  It is my understanding that the class contains over 20,000 former NFL players, 5,000 of whom are represented by retained

attorneys in this MDL. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 438 (3d Cir. 2016), *as amended* (May 2, 2016).  It seems unlikely that the Defendants would have been willing to negotiate a class-wide settlement had they known that 25 percent of the players would have opted out and proceeded individually.  Their reluctance seems especially obvious when one considers that the players who retained counsel probably have more severe injuries on average or are more litigation-minded than other players for other reasons.

26.     With 25 percent of the class opposed, certification of a class action and approval of a class-wide settlement would have been more difficult as a legal matter too.  Judges are reluctant to certify classes in personal injury cases when large numbers of victims object, and they routinely discuss the number of opt outs when considering the superiority of class actions and the reasonableness of class settlements.  Rule 23 of the Federal Rules of Civil Procedure requires judges to consider "class members' interests in individually controlling the prosecution or defense of separate actions" when assessing superiority.  Fed. R. Civ. P. 23(b)(3)(A).  This interest is heightened in cases like this one, where victims' injuries are large.  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.921 ("as the amount of damages at stake increases, a class member's interest in individual control typically increases [too]").  The reaction of the class also bears on the reasonableness of proposed settlements.  The Third Circuit considered it when affirming the Court's decision to approve this settlement.

27.     Finally, a large number of opt outs may also have doomed the settlement.  Per Section 16.1 of the Class Action Settlement Agreement (As Amended), the NFL Parties reserved the right to cancel the agreement prior to final approval.  An opt out rate of 25 percent would surely have caused them considerable heartburn, and possibly scuttled the deal.

28.    This litigation could have proceeded without a class action too.  Many personal injury multi-district litigations (MDLs) have produced global settlements without class action overlays.  Consider the Vioxx MDL, *In re: Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La).  It encompassed about 30,000 cases filed by plaintiffs who claimed to have been injured as a result of taking Vioxx, a medication for arthritis.  A global settlement worth $4.85 billion resolved the vast majority of the cases, without a class action overlay.

29.    If lawyers with signed clients knew or feared that class certification would wipe out their contractual rights to fees and cost reimbursements, they would be incentivized to demand that MDLs proceed as ordinary aggregate settlements without class action overlays, as the Vioxx MDL did and as many other MDLs have.  As a result, the advantages that flow from class certification would be lost.  As the Third Circuit observed when finding that a class action was superior to a series of individual lawsuits in this MDL:

> Assuming the retired players' claims survived the NFL's motions to dismiss, the resolution of so many individual lawsuits would have presented serious challenges for the District Court. Given our experience with similar MDLs, we expect the proceedings would result in years of costly litigation and multiple appeals, all the while delaying any potential recovery for retired players coping with serious health challenges.

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435 (3d Cir. 2016), *as amended* (May 2, 2016).

10

**B.      The Federal Class Action Rule Has No Effect on Lawyers' Contractual Rights to Fee Payments and Cost Reimbursements**

30.      As stated, the *Turner Estate's Motion* asks whether a lawyer's right to a collect a payment pursuant to a valid engagement contract is reduced or even eliminated when a client's recovery flows through a class action settlement rather than a settlement of a client's individual case.

31.      Nothing in the federal class action rule requires or even suggests that this question must be answered affirmatively.  Federal Rule 23 mentions lawyers' fees in two subparagraphs. In subdivision (g), its states that a court

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs; [and]

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

And in subdivision (h) it states:

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.

Both provisions plainly relate to class counsel's compensation, not to the rights of lawyers to collect fees and cost reimbursements pursuant to valid retainer agreements.

32.      The Advisory Committee's Notes on the amendments to Rule 23 that produced subdivisions (g) and (h) leave no doubt that these provisions focus on class counsel's compensation and say nothing about other lawyers' rights to compensation.  Thus, the Note on subdivision (g) begins by observing that the new provision "responds to the reality that the selection and activity

11

of class counsel are often critically important to the successful handling of a class action."
*Committee Notes on Rules—2003 Amendment*, *Subdivision (g)*.  It then adds that the point of the
amendment was to provide separately for review of named plaintiffs and class counsel:

> Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative,
> while this subdivision will guide the court in assessing proposed class counsel as
> part of the certification decision. This subdivision recognizes the importance of
> class counsel, states the obligation to represent the interests of the class, and
> provides a framework for selection of class counsel.

*Id.*  Finally, the Note adds that "[t]he new subdivision also provides a method by which the
court may make directions from the outset about *the potential fee award to class counsel*
in the event the action is successful."  *Id.* (emphasis added).  Neither subdivision (g) nor
the Committee Note on it discusses lawyers who are not class counsel at all.

33.    The Note on subdivision (h) is longer and mentions fees more often, but the
exclusion of contractual fees and cost reimbursements from its scope may be inferred from the
following passage:

> This subdivision authorizes an award of "reasonable" attorney fees and nontaxable
> costs. This is the customary term for measurement of fee awards in cases in which
> counsel may obtain an award of fees under the "common fund" theory that applies
> in many class actions, and is used in many fee-shifting statutes. Depending on the
> circumstances, courts have approached the determination of what is reasonable in
> different ways. In particular, there is some variation among courts about whether
> in "common fund" cases the court should use the lodestar or a percentage method
> of determining what fee is reasonable. The rule does not attempt to resolve the

12

question whether the lodestar or percentage approach should be viewed as preferable.

*Committee Notes on Rules—2003 Amendment, Subdivision (h).*   Plainly, the purpose of the amendment was to set out procedures to govern the sizing of fee awards—a defined term that includes awards from common funds and awards authorized by fee-shifting statutes.  The Note does not mention fees paid pursuant to contracts at all, and gives no indication of any intention to regulate them.

34.     The various provisions of Rule 23(h) lead inevitably to the same conclusion.  All of them concern or relate to fees that are awarded as a result of motions.  Such motions are made when lawyers seek fees from common funds and when prevailing plaintiffs seek fees from losing defendants.  By contrast, lawyers do not file motions when collecting fees from signed clients.  They receive clients' settlement checks, deduct the payments to which they are entitled, and pass on the net proceeds.

35.     The Advisory Committee's restriction of the term "fee award" to fees that are drawn from common funds or paid by losing defendants is entirely in keeping with ordinary usage.  In my decades-long experience studying and writing about lawyers' fees, I may have heard contractual fee payments described as "fee awards" once or twice, but this usage is unusual, confusing, and improper.  Contractual fees are paid, not awarded.

## C.     The Class Action Settlement Agreement Has No Effect on Lawyers' Contractual Rights to Fee Payments and Cost Reimbursements

36.     For the reason just stated, I find the *Turner Estate's Motion* jarring.  It repeatedly elides the distinction between common fund and statutory "fee awards," on the one hand, and contractual "fee payments," on the other.

37.     For example, in ¶ 10, the *Motion* asserts that Section 21.1 of Article XXI in the Class Action Settlement Agreement provides that "the NFL Parties will pay attorneys' fees '[s]eparately and in addition to' the Monetary award paid to class members."  *Turner Estate's Motion*, ¶ 10.  But the title of Section 21.1—"Award"—and the language it contains make it clear that the section has nothing to do with contractual fee payments.  It governs the NFL Parties' responsibilities for fees awarded to Class Counsel by the Court pursuant to a motion that Class Counsel will file.  The section even sets a limit on the amount for which Class Counsel may apply.

38.     The *Turner Estate's Motion* also conflates contractual fee payments with judicial fee awards a second time in the same paragraph, when it argues that the Court's Final Approval Memorandum "confirms that attorneys' fees are not to be taken from the Monetary Award or Funds available to the class."  *Id*. (quoting *Final Approval Memorandum Opinion*, p. 31).  But in the passage quoted, which begins with the observation that "[a] fee award in this case will not come from a common fund," the Court is plainly talking about the fee award that Class Counsel will receive, not about retained lawyers' contractual fee payments.  The context makes this clear. The Court observed that the fee award would not come from a common fund to rebut the accusation, made by several objectors, that Class Counsel provided inadequate representation. That's why the preceding paragraph starts with the sentence: "None of the fee provisions in the Settlement indicate inadequate representation."  *Final Approval Memorandum Opinion*, p. 30. Because the duty of adequate representation applies to Class Counsel, not to lawyers who represent individual class members, it is self-evident that the Court's discussion of the few award provisions concerned only Class Counsel's fees.

39.     The Turner Estate "firmly believes that the Class Action Settlement Agreement does not permit Podhurst to deduct any attorney fees from Kevin Turner's $5 million Monetary

Award, under a superseded individual contingent fee agreement or otherwise." *Turner Estate's Motion*, ¶ 14. Instead, it asserts, "all of Podhurst's fees will be paid, upon application and with Court approval, by the NFL out of the $112.5 million Attorneys' Fees Qualified Settlement Fund." *Id*.

40.     Having read Article XXI of the Class Action Settlement Agreement, I can report finding nothing in it that supports this assertion. And if the Turner Estate's assertion was correct, I am confident that an express statement abrogating retained lawyers' contractual fee rights would have been included. The abrogation of lawyers' contractual rights to fees and expense reimbursements is an issue of great importance that would have been dealt with expressly. It would not have been left to chance or implied subtly.

41.     The Vioxx Master Settlement Agreement, available at http://www.officialvioxxsettlement.com/documents/Master%20Settlement%20Agreement%20-%20new.pdf, provides supporting evidence. It required lawyers who enrolled even one client in the aggregate settlement to withdraw from representing all non-settling clients and to abrogate their fee interests in all non-settling clients' cases. It also provided directly for the impact the holdback for common benefit fees would have on settlement payments to claimants and, by extension, to their lawyers' contingent fees. These matters were dealt with expressly. The Vioxx MSA neither left them to the imagination nor required subtle inferences from provisions that dealt with other matters. Because some of the lawyers serving as Class Counsel in this case also held leadership positions in the Vioxx MDL, it is reasonable to think that a similarly forthright approach would have been taken in the Class Action Settlement Agreement, had lawyers' contractual rights been superseded as the Turner Estate claims.

15

42.     The Turner Estate also failed to explain how Class Counsel and the NFL Parties came to have the power to use their settlement negotiations to alter or eliminate substantive rights that arose under contracts to which they were not parties and that were not at issue in the concussion litigation.  That the NFL Parties had no such power seems self-evident.  That Class Counsel had no such power is also clear.  The various inquiries required by Rule 23(a) and (b) normally establish only that class litigation is appropriate on claims that absent class members have against defendants.  I know of no instance in which class litigation was also authorized against class members' individually retained attorneys, and the Turner Estate provides no evidence of such authorization here.

43.     Finally, the Turner Estate's assertion that "the Class Action Settlement Agreement provides for two separate funds—one which is solely for the benefit of Class Members and the other which is solely for the payment of attorneys' fees and reasonable costs to Class Counsel," *Turner Estate's Motion*, ¶ 20, is completely undercut by Section 21.1.  The section does this in two ways.

44.     First, it expressly allows "Co-Lead Class Counsel [to] petition the Court to set aside up to five percent (5%) of each Monetary Award and Derivative Claimant Award to facilitate the Settlement program and related efforts of Class Counsel."  *Class Action Settlement Agreement (As Amended)*, Section 21.1.  This makes hash of the Turner Estate's assertion that the entirety of the Monetary Award Fund is reserved for claimants.

45.     Second, Section 21.1 also states that a petition by Class Counsel for a set-aside from the Monetary Award Fund will provide "relevant information (for example, the assurance that any 'set-aside' from a Monetary Award or Derivative Claimant Award for a Settlement Class Members represented by his/her individual counsel will reduce the attorney's fee payable to that

counsel by the amount of the 'set-aside.')"  *Id.*  For this example to make any sense at all, Class Counsel and the NFL Parties must have expected that individually retained lawyers would receive fees out of their clients' monetary awards.  Otherwise, it would be impossible for a set-aside to reduce the fee payable to a class member's individual counsel, the fee already being $0.

46.      In short, nothing in the Class Action Settlement Agreement has any bearing on the validity of the contingent fee contracts that thousands of retired players signed when hiring lawyers.  To the contrary, section 21.1 shows conclusively that Class Counsel and the NFL Parties expected those agreements to remain intact and to be enforced.

### D.      The Turner Estate's Fairness Argument

47.      The Turner Estate argues that if the retained attorneys' contingent fee agreements are enforced, unfairness will occur because class members who hired lawyers will pay more in fees than those who did not.  It continues by pointing out that the players who will pay the most are those who spearheaded the litigation.  NFL retirees who sat on the sidelines will benefit from the settlement while paying less in fees than those whose efforts produced it.  *Turner Estate's Motion*, ¶ 12.

48.      Although this objection has considerable rhetorical force and intuitive moral appeal, it misses the fundamental point.  *Without the contingent fee agreements, the NFL concussion litigation would not have occurred*.  There would have been no MDL, no class-based settlement, nor any individual settlements.  For all of the retired NFL players who will benefit from this settlement, the contingent fee was the key to the courthouse door.

49.      Recognizing this, one must also see that a decision to invalidate the contingent fee agreements on the ground of perceived unfairness (or any other) would have serious adverse effects.  It would close the courthouse doors to future claimants by making contingent fee

agreements unreliable.  It would generate enormous opposition to class actions.  And it would alter the course of settlement negotiations in class suits, potentially to the detriment of the persons it seeks to protect.

50.    That the contingent fee opened the courthouse doors to the retired NFL players is clear from the history of this litigation.  When the Judicial Panel on Multidistrict Litigation (JPML) centralized this proceeding in the Eastern District of Pennsylvania, it initially transferred four federal lawsuits.  *Transfer Order*, *In re: National Football League Players' Concussion Injury Litigation*, MDL No. 2323, January 31, 2012.  In subsequent conditional transfer orders the JPML transferred several more.  But these cases were merely the tip of the iceburg.  "[M]ore than 700 individual personal injury claims by plaintiffs [were pending in] dozens of states."  *Plaintiffs' Joint Application for Appointment of Plaintiffs' Executive Committee, Plaintiffs' Steering Committee, and Plaintiffs' Liaison Counsel*, Dkt. Entry 54, April 3, 2012, p. 4.  These cases were the source of considerable leverage in settlement negotiations with the NFL Parties, and the vast majority of them, perhaps even all, were filed by lawyers who were working on contingency.

51.    *The settlement class for damages was the product of that leverage*, not the source of it.  Having studied class actions for decades, I can confidently report that the prospects for certifying a litigation class of personal injury claimants for damages were poor.  Such class actions are both rare and strongly disfavored.  The class whose members will share in the recovery was created during the negotiations between the Lead Attorneys and the NFL Parties *for settlement purposes only*.  *Class Action Settlement Agreement (As Amended)*, Section 13.4.  Apparently, the NFL Parties preferred a class-based settlement to a conventional non-class aggregate settlement as a vehicle for encompassing and resolving all present and future claims.

52.     That the contingent fee played an essential role in this litigation is normal, not surprising.  It played the same role in every other MDL and aggregate settlement I can think of.  This will be obvious to anyone who understands that the purpose of the MDL is to handle a litigation flood.  When more lawsuits are filed than can efficiently be dealt with separately, the JPML consolidates them for coordinated pre-trial processing in a single federal court.  Why does the flood occur?  Because lawyers agree to work for dozens, hundreds, or thousands of clients on contingency.  Without the wave of contingent fee lawsuits, there would be no litigation flood and no need for the MDL procedure either.

53.     But for the contingent fee, injured persons would be denied civil justice too.  This case makes that clear.   Only because lawyers agreed to represent retired NFL players on contingency was a class-wide settlement negotiated.  A decision to invalidate the contingent fee agreements might benefit the retired players now that the settlement has been approved, but it would have doomed them if it had been announced before the first cases were filed several years ago.  Then, Mr. Turner would not have had to worry about paying more in fees than other retired players.  He would have received no compensation at all because no lawyer would have sued on his behalf or on behalf of any other injured player.  That is the fate that will await other victims if the Turner Estate's fairness-based objection is sustained.

54.     That a policy of invalidating contingent fee agreements would cause plaintiffs' attorneys to oppose class-wide settlements is obvious, too.  Nothing requires the lead attorneys in any MDL to negotiate a class-based deal and many settlements occur without them.  For example, the Vioxx settlement mentioned above was a conventional non-class aggregate resolution.  Here too, the Lead Attorneys could have rebuffed the NFL Parties' demand for a class and negotiated a settlement that benefited only retired players with filed cases.  And they would have had an

19

incentive to do so had they known that a class-based settlement would extinguish their contract-based compensation claims.

55.     Even more perversely, the Lead Attorneys could also have side-stepped the Turner Estate's objection by leaving money on the table. To see this, suppose that the Lead Attorneys had negotiated the Monetary Award Fund but not the additional $112.5 million fee award fund to cover Class Counsel's attorney fees. Then, the Turner Estate would not be able to argue that fees are to be paid solely from the fee award fund *because that fund would not exist*. Yet, it is evident that the fee award fund makes the Class $112.5 million better off. Needless to say, a policy that would encourage class action lawyers to protect themselves by leaving money on the table is not a good one.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

January 10, 2017

_____
CHARLES SILVER

EXHIBIT A

RESUME OF PROFESSOR CHARLES SILVER

# CHARLES SILVER

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## ACADEMIC EMPLOYMENTS

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

HARVARD LAW SCHOOL

| | |
|---|---|
| Visiting Professor | Fall 2011 |

VANDERBILT UNIVERSITY LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 2003 |

UNIVERSITY OF MICHIGAN LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 1994 |

UNIVERSITY OF CHICAGO

| | |
|---|---|
| Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy | 1983-1984 |

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)

23

BA 1979, University of Florida (Political Science)

## SPECIAL PROJECTS

Associate Reporter, Principles of the Law of Aggregate Litigation, American Law Institute (2010) (with Samuel Issacharoff (Reporter), Robert Klonoff and Richard Nagareda (Associate Reporters)).

Co-Reporter, Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the Defense Counsel J. in January 2004).

## BOOKS IN PROGRESS

Expensive By Design: Why American Health Care Costs Too Much And Delivers Too Little (coauthored with David A. Hyman)

To Sue is Human: Medical Malpractice Litigation in Texas 1988-2005 (coauthored with Bernard Black, David Hyman, and William Sage).

## BOOKS

Health Law and Economics, Edward Elgar (2016) (coedited with Ronen Avraham and David Hyman).

Law of Class Actions and Other Aggregate Litigation, 2nd Edition, Foundation Press (2013) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley).

Professional Responsibilities of Insurance Defense Counsel, LexisNexis Mathew Bender (2012) (with William T. Barker) (Annual Updates 2013-2105).

## PUBLICATIONS AND WORKS IN PROGRESS

1.  "A Private Law Defense of the Fiduciary Duty" (in progress) (presented at several law schools and conferences), available at http://ssrn.com/abstract=2728326.

2.  "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

3.  "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (forthcoming 2017).

4.   "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," in I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds., Oxford Handbook of American Health Law (2016) (with David A. Hyman).*

5.   "Compensating Persons Injured by Medical Malpractice and Other tortious behavior for Future Medical Expenses Under the Affordable Care Act," 25 Annals of Health Law 35 (2016) (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)

6.   "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010**,"** 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

7.   "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

8.   "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," Rutgers U. L. Rev. (forthcoming 2015) (with William T. Barker) (symposium issue).

9.   "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

10.   "Fix Problems Where They Arise: The Liability System Is Not To Blame For The Problems of Healthcare," Oxford Handbook of American Health Law (Glenn I. Cohen, Allison Hoffman, and William Sage, eds.) (forthcoming 2015) (with David A. Hyman) (invited chapter).

11.   "Policy Limits, Payouts, and Blood Money: Another Look at Med Mal Settlements in the Shadow of Insurance," U.C. Irvine L. Rev. (forthcoming 2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

12.   "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., *Research Handbook in the Law & Economics of Insurance* (forthcoming 2015) (peer-reviewed).

13.   "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with David A. Hyman, Bernard S. Black and Myungho Paik) (peer-reviewed), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.

14.   "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

15.   "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

16.     "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

17.     "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 DePaul L. Rev. 574 (2014) (with David A. Hyman) (invited symposium).

18.     "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

19.     "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

20.     "Five Myths of Medical Malpractice," 143:1 Chest 222-227 (January 2013) (with David A. Hyman) (peer-reviewed).

21.     "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017 (peer-reviewed).

22.     "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

23.     "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

24.     "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?", in Ken Oliphant & Richard W. Wright (eds.) Medical Malpractice and Compensation in Global Perspective (2013), originally published in 87 Chicago-Kent L. Rev. 163 (2012) (coauthored with David A. Hyman).

25.     "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman) (peer reviewed).

26.     "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012) (peer-reviewed).

27.     "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

26

28.     "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

29.     "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard Black and David A. Hyman) (peer reviewed).

30.     "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

31.     "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard Black and David A. Hyman) (peer reviewed).

32.     "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

33.     "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

34.     "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black) (peer-reviewed).

35.     "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue) (peer-reviewed).

36.     "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate 25 (2008) (with David A. Hyman and Bernard Black) (invited symposium).

37.     "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard Black, David A. Hyman, and William M. Sage) (peer-reviewed).

38.     "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

39.     "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 33 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with David A. Hyman, Bernard S. Black, William M. Sage and Kathryn Zeiler) (peer-reviewed).

40.     "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard Black, David A. Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

41.     "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

42.     Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider, 20 The NAPPA Report 7 (Aug. 2006).

43.     "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

44.     "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

45.     "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

46.     "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

47.     "A Rejoinder to Lester Brickman: *On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

48.     "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

49.     "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

50.     "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

51.     "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

52.     "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

53.     "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

54.     "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

55.   "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 <u>Ariz. L. Rev.</u> 787 (2002) (invited symposium).

56.   "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

57.   "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

58.   "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 <u>G'town J. Legal Ethics</u> 29 (2001) (with Ellen S. Pryor).

59.   "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

60.   "You Get What You Pay For: Result-Based Compensation for Health Care," 58 <u>Wash. & Lee L. Rev.</u> 1427 (2001) (with David A. Hyman).

61.   "The Case for Result-Based Compensation in Health Care," 29 <u>J. L. Med. & Ethics</u> 170 (2001) (with David A. Hyman).

62.   "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 <u>Tex. L. Rev.</u> 599 (2000) (with Ellen S. Pryor).

63.   "What's Not To Like About Being A Lawyer?," 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

64.   "Due Process and the Lodestar Method: You Can't Get There From Here," 74 <u>Tul. L. Rev.</u> 1809 (2000) (invited symposium).

65.   "The Aggregate Settlement Rule and Ideals of Client Service," 41 <u>S. Tex. L. Rev.</u> 227 (1999) (with Lynn A. Baker) (invited symposium).

66.   "Representative Lawsuits & Class Actions," in <u>Int'l Ency. Of L. & Econ.</u>, B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

67.   "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

68.   "The Lost World: Of Politics and Getting the Law Right," 26 <u>Hofstra L. Rev.</u> 773 (1998) (invited symposium).

69.   "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 <u>Conn. Ins. L. J.</u> 205 (1998) (invited symposium).

70. "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 <u>Va. L. Rev.</u> 1465 (1998) (with Lynn A. Baker) (invited symposium).

71. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

72. "Mass Lawsuits and the Aggregate Settlement Rule," 32 <u>Wake Forest L. Rev.</u> 733 (1997) (with Lynn A. Baker) (invited symposium).

73. "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 <u>Fordham L. Rev.</u> 233 (1996) (invited symposium).

74. "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 <u>Coverage</u> 47 (May/June 1996) (with Michael Sean Quinn).

75. "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 <u>Coverage</u> 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

76. "Bargaining Impediments and Settlement Behavior," in <u>Dispute Resolution: Bridging the Settlement Gap</u>, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

77. "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

78. "Do We Know Enough About Legal Norms?" in <u>Social Rules: Origin; Character; Logic; Change</u>, D. Braybrooke, ed. (1996).

79. "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud), reprinted in <u>Ins. L. Anthol.</u> (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

80. "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

81. "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

82. "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994), reprinted in Practising Law Institute, <u>Insurance Law: What Every Lawyer and Businessperson Needs To Know</u>, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

83.     "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice (3d)</u> (Texas Center for Legal Ethics and Professionalism 1996).

84.     "Getting and Keeping Clients," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice (3d)</u> (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

85.     "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 <u>Law and Contemporary Problems</u> 213 (1995) (with John S. Dzienkowski, Sanford Levinson, and Amon Burton).

86.     "Advertising and Marketing Legal Services," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice</u> (Texas Center for Legal Ethics and Professionalism 1994).

87.     "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice</u> (Texas Center for Legal Ethics and Professionalism 1994).

88.     "Thoughts on Procedural Issues in Insurance Litigation," VII <u>Ins. L. Anthol.</u> (1994).

89.     "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 <u>Clearinghouse Rev</u>. 114 (June 1994) (with Stephen Yelenosky).

90.     "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 <u>Tex. Rev. of Litig.</u> 301 (1993).

91.     "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 <u>Va. L. Rev.</u> 1585 (1991), reprinted in VI <u>Ins. L. Anthol.</u> 857-870 (1992).

92.     "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 <u>Tex. L. Rev.</u> 865 (1992).

93.     "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

94.     "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

95.     "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 <u>L. & Phil.</u> 381 (1987) (peer-reviewed).

96.     "Justice In Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman) (peer-reviewed).

97.     "Negative Positivism and the Hard Facts of Life," 68 <u>The Monist</u> 347 (1985) (peer-reviewed).

98.     "Utilitarian Participation," 23 <u>Soc. Sci. Info.</u> 701 (1984) (peer-reviewed).

99.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic
       Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro) (peer-
       reviewed).

## NOTABLE SERVICE ACTIVITIES

Associate Reporter, American Law Institute Project on the Principles of Aggregate Litigation

Interested Party, Statistical Information Task Force, National Association of Insurance
Commissioners, Model Medical Malpractice Closed Claim Reporting Law

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task
Force on the Contingent Fee


Chair, Dean Search Committee, School of Law, University of Texas at Austin

Chair, Budget Committee, School of Law, University of Texas at Austin

Coordinator, General Faculty Colloquium Series, School of Law, University of Texas at Austin

Sole Drafter, Assessment Report for the Juris Doctor Program at the School of Law, University of
Texas at Austin, for the Commission on Colleges of the Southern Association of Colleges and
Schools

## RECENT AWARDS

Distinguished Fellow, Searle Center on Law, Regulation, and Economic Growth, Northwestern
University School of Law (2014)

Robert B. McKay Law Professor Award, Tort Trial & Insurance Practice Section, American Bar
Association (2009)

Faculty Research Grants, University of Texas at Austin (various years)

## MEMBERSHIPS

American Bar Foundation

Texas Bar Foundation (Life Fellow)

State Bar of Texas (admitted 1988)

Tort Trial and Insurance Practice Section, American Bar Association

Society for Empirical Legal Studies

American Law and Economics Association

American Association for Justice

Association of American Law Schools