## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>       Plaintiffs,<br><br>       v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>       Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF CO-LEAD CLASS COUNSELS'
PETITION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT
OF COSTS AND EXPENSES, ADOPTION OF A SET-ASIDE OF EACH
MONETARY AWARD AND DERIVATIVE CLAIMANT AWARD,
AND CASE CONTRIBUTION AWARDS FOR CLASS REPRESENTATIVES**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    THE SETTLEMENT BENEFITS ...................................................................... 5

III.   PROCEDURAL HISTORY................................................................................ 8

    A.    Initiation of NFL Players' Concussion Injury Litigation and Formation of the MDL.................................................................................... 8

    B.    Early Proceedings in This Court ........................................................... 9

    C.    Mediation ............................................................................................ 12

    D.    Public Announcement of the Proposed Settlement and Further Negotiations...... 15

    E.    Court Appointment of Special Master Perry Golkin ........................... 16

    F.    Initial Preliminary Class Certification Motion and Decision .............. 16

    G.    Renegotiations and Preliminary Approval........................................... 17

    H.    First Appeal and Multiple Briefings .................................................... 19

    I.    Fairness Hearing .................................................................................. 21

    J.    Post-Hearing Briefing and Court-Proposed Modifications to the Settlement ...... 23

    K.    Final Approval and Third Circuit Appeal............................................ 24

    L.    Petitions for Writ of *Certiorari*......................................................... 24

    M.    Initial Settlement Implementation Efforts .......................................... 25

    N.    The Settlement Agreement and Fees ................................................... 26

IV.   ARGUMENT................................................................................................... 27

    A.    Third Circuit Legal Standards for Fee Applications............................ 27

    B.    Analysis Under the Percentage of Recovery Method Supports the Requested Award....................................................................................... 30

        1.    The Size of the Fund and the Number of Persons Benefited.................... 30

2. Whether Members of the Class Have Raised Substantial Objections to the Settlement Terms or Fee Proposal ........................................................... 35

3. The Skill and Efficiency of the Attorneys Involved ................................. 36

4. The Complexity and Duration of the Litigation ....................................... 38

5. The Risk of Nonpayment ......................................................................... 39

6. The Amount of Time That Plaintiffs' Counsel Devoted to the Case ........ 42

7. Fee Awards in Similar Cases .................................................................... 44

8. The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups .................................................... 47

9. The Percentage Fee That Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel Was Retained ............................................................................ 48

10. The Settlement Agreement Contains Many Innovative Features ............. 49

C. A Lodestar Cross-Check Shows That the Fee Request Is Reasonable ................. 52

1. Plaintiffs' Counsels' Lodestar Is Eminently Reasonable......................... 53

2. The Requested Award Reflects a Suitable Multiplier............................... 56

D. Plaintiffs' Counsel's Expenses Were Reasonably and Appropriately Incurred, and Are Adequately Documented................................................................................ 56

E. The Five Percent Set-Aside Is Necessary to Support Effectuation and Administration of the Settlement ......................................................................... 59

F. Incentive Awards for Subclass Representatives .................................................. 64

V. CONCLUSION.................................................................................................................. 69

# **TABLE OF AUTHORITIES**

Cases

*Abrams v. Liehtolier Inc.*,
  50 F.3d 1204 (3d Cir. 1995).................................................................................. 57

*Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529,
  2006 WL 3378705 (S.D.N.Y.  Nov. 16, 2006)......................................................... 47

*Alexander v. Washington Mut., Inc.*,
  No. 07-4426, 2012 WL 6021103 (E.D. Pa. Dec. 4, 2012)................................... 44, 48

*Allapattah Servs., Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) .............................................................. 45, 47

*Allis-Chalmers Corp. v. Lueck*,
  471 U.S. 202 (1985).............................................................................................. 41

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................... 13, 14, 15

*Armstrong v. NFL*,
  137 S. Ct. 607 (2016)................................................................................. 25, 26, 27

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  513 F. Supp. 2d 322 (E.D. Pa. 2007) ..................................................................... 44

*Briggs v. PNC Fin. Servs. Grp., Inc.*,
  No. 1:15-CV-10447, 2016 WL 7018566 (N.D. Ill. Nov. 29, 2016) ........................ 65

*Brotherton v. Cleveland*,
  141 F. Supp. 2d 907 (S.D. Ohio 2001) .................................................................. 69

*Chakejian v. Equifax Info. Svcs, LLC*,
  275 F.R.D. 201 (E.D. Pa. 2011).......................................................................... 49, 55

*Cullen v. Whitman Med. Corp.*,
  197 F.R.D. 136 (E.D. Pa. 2000)..................................................................... 30, 45, 58, 68

*Dewey v. Volkswagen Aktiengesellschaft*,
  558 F. App'x 191 (3d Cir. 2014) ........................................................................... 28

*Duerson v. Nat'l Football League*,
  12-C-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012)...................................... 41

*Esslinger v. HSBC Bank Nevada, N.A.*,
   No. 10-3213, 2012 WL 5866074 (E.D. Pa. Nov. 20, 2012) ............................................... 48, 49

*Gilchrist v. NFL*,
   137 S. Ct. 591 (2016) .................................................................................................................. 25

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir. 2000) ........................................................................................................ 30

*Hadix v. Johnson*,
   322 F.3d 895 (6th Cir. 2003) ....................................................................................................... 65

*Haught v. Summit Res., LLC*,
   No. 1:15-cv-0069, 2016 WL 1301011 (M.D. Pa. Apr. 4, 2016) ....................................... 48, 49

*Hegab v. Family Dollar Stores, Inc.*,
   No. 11-1206, 2015 WL 1021130 (D.N.J. Mar. 9, 2015) ..................................................... 29, 39

*In re Aetna Inc. Secs. Litig.*,
   MDL No. 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) .................................................. 49, 53

*In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*,
   263 F.R.D. 226 (E.D. Pa. 2009) ........................................................................................... 40, 58

*In re AT & T Corp.*,
   455 F.3d 160 (3d Cir. 2006) ........................................................................................... 36, 48, 53

*In re ATI Techs. Inc. Sec. Litig.*,
   No. 01-2541, 2003 WL 1962400 (E.D. Pa. Apr. 28, 2003) ..................................................... 44

*In re Automotive Refinishing Paint Antitrust Litig.*,
   MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ........................................... 43, 44, 59

In re Avandia Mktg., Sales Practice & Prods. Liab. Litig.,
   No. 07-md-01871, 2012 WL 6923367 (E.D. Pa. Oct. 19, 2012) ....................................... 55, 60

*In re Baycol Prods. Litig.*,
   MDL 1431, 2002 WL 32155266 (D. Minn. June 14, 2002) .................................................... 60

*In re Cell Pathways Secs. Litig. II*,
   No. 01-cv-1189, 2002 WL 31528573 (E.D. Pa. Sept. 23, 2002) ............................................ 44

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ........................................................................................................ 39

iv

*In re Cendant Corp. Sec. Litig.*,
404 F.3d 173 (3d Cir. 2005)...................................................................... 28

*In re CertainTeed Fiber Cement Siding Litig.*,
303 F.R.D. 199 (E.D. Pa. 2014)................................................................. 48

*In re Corel Corp., Inc. Sec. Litig.*,
293 F. Supp. 2d 484 (E.D. Pa. 2003) ........................................................ 44

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .................................................................... 35

*In re Diet Drugs Prods. Liab. Litig.*,
226 F.R.D. 498 (E.D. Pa. 2005) ................................................. 17, 18, 19, 20

*In re Diet Drugs Prods. Liab. Litig.*,
553 F. Supp. 2d 442 (E.D. Pa. 2008) ....................................... 39, 40, 60

*In re Diet Drugs Prods. Liab. Litig.*,
582 F.3d 524 (3d Cir. 2009)...................................................... 30, 47, 56, 60

*In re Diet Drugs Prods. Liab. Litig.*,
MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000).................. 37

*In re Fasteners Antitrust Litig.*,
No. 08-MD-1912, 2014 WL 296954 (E.D. Pa. Jan. 27, 2014) ................. 58

*In re Flonase Antitrust Litig.*,
291 F.R.D. 93 (E.D. Pa. 2013).................................................... 43, 57, 58

*In re Flonase Antitrust Litig.*,
951 F. Supp. 2d 739 (E.D. Pa. 2013) ........................................................ 44

*In re Greenwich Pharm. Sec. Litig.*,
No. 92-3071, 1995 WL 251293 (E.D. Pa. Apr. 25, 1995)........................ 45

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) .............................................. 29, 31

*In re Ikon Offices Solutions Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)........................................................ passim

*In re Ins. Brokerage Antitrust Litig.*,
282 F.R.D. 92 (D.N.J. 2012).................................................................... 49

*In re Linerboard Antitrust Litig.*,
   No. MDL-1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004)........................................... passim

*In re Mercedes Benz Tele Aid Contract Litig.*,
   No. 07-2720, 2011 WL 4020862 (D.N.J. Sept. 9, 2011) ........................................................ 55

*In re Merck & Co., Inc. Vytorin Erisa Litig.*,
   No. 08-cv-285, 2010 WL 547613 (D.N.J. Feb. 9, 2010) ........................................................ 56

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ............................................................................................ 47

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   842 F. Supp. 2d 1378 (J.P.M.L. 2012)................................................................................... 8, 9

*In re NFL*,
   775 F.3d 570 (3d Cir. 2014)....................................................................................... 20, 22, 24

*In re NFL*,
   821 F.3d 410 (3d Cir. 2016)........................................................................................... passim

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20,2010*
   910 F. Supp. 2d 891 (E.D. La. 2012)..................................................................................... 34

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*
   No. 2179, 2016 WL 6215974 (E.D. La., 2016) ...................................................................... 31

*In re Plastic Tableware Antitrust Litig.*,
   No. 94-CV-3564, 1995 WL 723175 (E.D. Pa. Dec. 4, 1995)........................................... 68, 69

*In re Priceline.com, Inc. Sec. Litig.*, No.,
   00-1884, 2007 WL 2115592 (D. Conn. July 20, 2007) ........................................................ 47

*In re Processed Egg Prods. Antitrust Litig.*,
   MDL No. 2002, 2012 WL 5467530 (E.D. Pa. Nov. 9, 2012).................................................. 44

*In re Protegen Sling and Vesica System Prods. Liab. Litig.*,
   MDL 1387, 2002 WL 31834446 (D. Md. Apr. 12, 2002) ...................................................... 60

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)........................................................................................... passim

*In re Ravisent Techs., Inc. Sec. Litig.*,
   No. 1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005) .......................................................... 44

*In re Remeron Direct Purchaser Antitrust Litig.,*
   No. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ........................................ 48

*In re Rent-Way Secs. Litig.,*
   305 F. Supp. 2d 491 (W.D. Pa. 2003) .................................................................. 44

*In re Residential Doors Antitrust Litig.,*
   Nos. 93-3744, 96-2125, 1998 WL 151804 (E.D. Pa. Apr. 2, 1998) ........................................ 65

*In re Rezulin Prods. Liab. Litig.,*
   MDL No.,1348, 2002 WL 441342 (S.D.N.Y. Mar. 20, 2002) ..................................... 60, 62, 63

*In re Rite Aid Corp. Sec. Litig,*
   396 F.3d 294 (3d Cir. 2005).................................................................... passim

*In re Rite Aid Corp. Sec. Litig.,*
   146 F. Supp. 2d 706 (E.D. Pa. 2001) .................................................................. 47

*In re Rite Aid Corp. Sec. Litig.,*
   269 F. Supp. 2d 603 (E.D. Pa. 2003) .................................................................. 46

*In re Rite Aid Corp. Sec. Litig.,*
   362 F. Supp. 2d 587 (E.D. Pa. 2005) .................................................................. 46

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
   461 F. Supp. 2d 383 (D. Md. 2006) .................................................................... 47

*In re Safety Components, Inc. Sec. Litig.,*
   166 F. Supp. 2d 72 (D.N.J. 2001) .................................................................. 54, 57

*In re Schering-Plough Corp.,*
   No. 08-2177, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ................................... 38, 54

*In re St. Jude Med., Inc.,*
   MDL 1396, 2002 WL 1774232 (D. Minn. Aug.1, 2002) .................................... 60

*In re Synthroid Mktg. Litig.,*
   264 F.3d 712 (7th Cir. 2001) ........................................................................ 45

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   No. M 07-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ............................... 47

*In re Transpacific Passenger Air Transp. Antitrust Litig.,*
   No. C 07-05634 CRB, 2015 WL 4776946 (N.D. Cal. Aug. 13, 2015)...................... 64

*In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*,
    886 F. Supp. 445 (E.D. Pa. 1995) ...................................................... 54

*In re Viropharma Inc. Sec. Litig.*,
    No. 12-2714, 2016 WL 304040 (E.D. Pa. Jan. 25, 2016) ...................... 58

*In re Viropharma Inc., Sec. Litig.*,
    No. 12-2714, 2016 WL 312108 (E.D. Pa. Jan. 25, 2016) ............... 44, 55, 58

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ........................................................... 45

*In re Warner Communications Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985) ..................................................... 37

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................. 37

*Ins. Brokerage Antitrust Litig.*,
    No. 04-5184, 2009 WL 411856 (D.N.J. Feb 17, 2009) ......................... 40

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
    426 F.3d 694 (3d Cir. 2005) .............................................................. 54

*Jackson v. Wells Fargo Bank, N.A.*,
    136 F. Supp. 3d 687 (W.D. Pa. 2015) ................................................. 28

*King Drug Co. of Florence v. Cephalon*,
    No. 06-cv-01797-MSP, 2015 WL 12843830 (E.D. Pa. Oct. 15, 2015) ............ 46, 69

*Lanni v. New Jersey*,
    259 F.3d 146 (3d Cir. 2001) .............................................................. 54

*Lazy Oil Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997) ................................................... 45

*Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*,
    No. 03-CV-4372 DMC, 2009 WL 4730185 (D.N.J. Dec. 4, 2009) ............ 56

*Lugus IP, LLC v. Volvo Car Corp.*, No.,
    12-2906, 2015 WL 1399175 (D.N.J. Mar. 26, 2015) ............................ 56

*McDonough v. Toys R Us, Inc.*,
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ................................................... 55

*McGee v. Continental Tire of N. Am.*,
   No. 066234, 2009 WL 539893 (D.N.J. Mar. 4, 2009) ............................................... 40

*Meijer, Inc. v. 3M*,
   No. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) .................................... 36, 38, 39, 44

*Milliron v. T-Mobile USA, Inc.*,
   423 F. App'x 131 (3d Cir. 2011) ........................................................................... 58

*Mirakay v. Dakota Growers Pasta Co.*,
   No. 13-CV-4429 JAP, 2014 WL 5358987 (D.N.J. Oct. 20, 2014) ............................. 56

*Moore v. GMAC Mortgage*,
   No. 07-4296, 2014 WL 12538188 (E.D. Pa. Sept. 19, 2014) ........................................ 28, 55, 56

*O'Keefe v. Mercedes-Benz USA, LLC*,
   214 F.R.D. 266 (E.D. Pa. 2003) ............................................................................... 28

*Ratner v. Bennett*,
   No. 92-4701, 1996 WL 243645 (E.D. Pa. May 8, 1996) ............................................. 45

*Rodriguez v. Infinite Care, Inc.*,
   No. 15-1824, 2016 WL 6804430 (E.D. Pa. Nov. 17, 2016) .................................... 65, 66, 67, 68

*Schuler v. Meds Co.*,
   No. 14-1149, 2016 WL 3457218 (D.N.J. June 24, 2016) ............................................. 49

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ........................................................................ 47

*Stagi v. Nat'l R.R. Passenger Corp.*,
   880 F. Supp. 2d 564 (E.D. Pa. 2012) ..................................................................... 38, 44

*Stringer v. Nat'l Football League*,
   474 F. Supp. 2d 894 (S.D. Ohio 2007) .................................................................... 41

*Sullivan v. DB Invs., Inc.*,
   No. 04-2819 SRC, 2008 WL 8747721 (D.N.J. May 22, 2008) ................................. 56

*Tavares v. S-L Distrib. Co.*,
   13-cv-1313, 2016 WL 1732179 (M.D. Pa. May 2, 2016) ......................................... 49

*Tenuto v. Transworld Sys., Inc.*,
   No. 99-4228, 2002 WL 188569 (E.D. Pa. Jan. 31, 2002) ......................................... 65

*Tyco Int'l, Ltd. Multidist. Litig.*,
    535 F. Supp. 2d 249 (D.N.H. 2007) ............................................................... 47

*Welch & Forbes, Inc. v. Cendant Corp.(In re Cendant Corp. PRIDES Litig.)*
    243 F.3d 722 (3d Cir. 2001) ............................................................... passim

*Wellbutrin SR Antitrust Litig.*,
    No. 04-5525,2011 U.S. Dist. LEXIS 158833, (E.D. Pa. Nov. 21, 2011) ..................... 43,45 ,52


Statutes


28 U.S.C. § 1292(a)(1) ............................................................... 20

28 U.S.C. § 1407 ............................................................... 8, 9

29 U.S.C. § 185 ............................................................... 10

29 U.S.C. § 185(a) ............................................................... 41


Rules


Fed. R. Civ. P. 53 ............................................................... 16

Federal Rule of Civil Procedure 23(f) ............................................................... 20

Rule 23(e) ............................................................... 21

Rule 23(e)(2) ............................................................... 22


Other Authorities


*Annotated Manual for Complex Litigation, Fourth* § 14.121 (rev. ed. 2016) ............................ 30

*Litigating Mass Tort Cases* § 7:35 (2010) ............................................................... 61

*4 Newberg on Class Actions* § 14:9 (4th Ed. 2002) ............................................................... 30, 61

## I.      **INTRODUCTION**

On December 12, 2016, following years of hard-fought litigation, negotiation, and ultimately, numerous challenges on appeal, the United States Supreme Court denied further review of the historic and groundbreaking settlement negotiated by Plaintiffs' Counsel and approved by this Court.[1]  With the High Court's denial, the Settlement has become effective, and the program established thereunder is now poised to begin providing settlement benefits to the more than 20,000 Retired National Football League Players that comprise the Class.

With the Settlement now effective (and in anticipation thereof), Plaintiffs' Counsel has engaged in months of regular meetings with the Court-appointed Claims, Baseline Assessment Program ("BAP"), and Lien Resolution Administrators, and the NFL Parties to negotiate the documents and processes that will be used for registration, the BAP, and the claims process, and to further establish the independent Provider and Physician Networks that will provide diagnostic services for the Retired NFL Football Players.[2]  As a result, the BAP and claims process, the two cornerstones of the Settlement Agreement ("Settlement"), will be delivering benefits to Class Members shortly, now that registration has begun (as of February 6, 2017), and the program is expected to begin delivering benefits to Class Members in the next several months.

What is now recognized as a landmark settlement began over five years ago as a high-risk, long-odds litigation undertaken by Plaintiffs' Counsel on a wholly contingent basis.  From the outset, Plaintiffs' Counsel committed substantial time, resources, and expertise in pursuit of recovery for retired NFL players and their families.  *See* Decl. of Christopher A. Seeger in

---

[1]      In accordance with Sup. Ct. R. 44(2) & 45(2)-(3), the Supreme Court's disposition became final on January 6, 2016, upon the expiration of the time for filing a rehearing petition.

[2]      This term is employed as defined in the Settlement.  *See* Settlement § 2.1(ffff) [ECF No. 6481-1, at 18].

Support of Co-Lead Class Counsel's Petition for an Award of Attorneys' Fees and Expenses, dated February 13, 2017 ("Seeger Decl.") ¶ 4.  Indeed, over the course of those years, Plaintiffs' Counsel expended many thousands of hours of attorney and professional time, and incurred and advanced millions of dollars in expenses, for the benefit of the Class, to achieve and facilitate the Settlement that is now effective.

In that respect, the parties' Settlement, approved by the Court in April 2015, provides that "the NFL Parties shall pay class attorneys' fees and reasonable costs," and that "Class Counsel shall be entitled . . . to petition the Court on behalf of all entitled attorneys for an award of class attorneys' fees and reasonable costs."  Settlement § 21.1 [ECF No. 6481-1, at 81-82].[3]  The NFL Parties have agreed not to oppose or object to a petition seeking an award of class attorneys' fees and reasonable costs of up to $112.5 million.  *Id*.

With the Settlement now effective, through the instant application, Co-Lead Class Counsel Christopher A. Seeger of Seeger Weiss LLP, and Sol Weiss of Anapol Weiss ("Petitioners"), on behalf of Plaintiff's Counsel,[4] respectfully petition the Court for an award of attorneys' fees and reimbursement of costs and litigation expenses for their work to date in this litigation.

---

[3]     All page number references in this memorandum to documents filed on the Court's ECF system are to the ECF pagination rather than the pagination at the bottom of the original document.

[4]     "Plaintiffs' Counsel" refers collectively to the lawyers and law firms that comprise the Plaintiffs' Executive Committee and the Plaintiffs' Steering Committee.  The Court's Case Management Orders ("CMO") Nos. 2 and 3 [ECF Nos. 64, 72] appointed those firms to their respective positions.  "Plaintiffs' Counsel" also includes the law firms that have done important common benefit work for the litigation, approved by Co-Lead Class Counsel, and are submitting declarations in support of this Petition.

In addition, as provided by section 21.1 of the Settlement, Plaintiffs' Counsel further requests the holdback of five percent of each Monetary Award and Derivative Claimant Award. The funds provided by such holdbacks are designed to support the substantial common benefit work that will be necessary over the 65-year life of the Settlement program, so as to ensure that Class Members receive the Monetary Awards or other benefits to which they are entitled.[5] Plaintiffs' Counsel must accomplish numerous tasks in overseeing the implementation of the Settlement – including the administration of the Monetary Award Fund ("MAF") and BAP, as well as the appeals process – to ensure that the Settlement program is properly administered and provides appropriate benefits to all eligible Retired NFL Football Players and their family members. Given the 65-year duration of the MAF, Plaintiffs' Counsels' obligations with respect to the administration of the Settlement will continue for many years.

Lastly, Plaintiffs' Counsel requests Case Contribution Awards of $100,000 for the Class Representatives. Subclass 1 representatives Corey Swinson[6] and Shawn Wooden and Subclass 2 representative Kevin Turner[7] all made invaluable contributions to the achievement of the Settlement, and are fully deserving of this incentive award.

Petitioners seek a total award of $112.5 million. The request covers both attorneys' fees and reimbursement of costs and out-of-pocket expenses. The attorneys' fee request is $106,817,220.62, which, as discussed in further detail below, represents about nine percent of

---

[5]      Should the Court approve the request for the set-aside, Plaintiffs' Counsel will submit a detailed plan for administering and allocating these funds. Seeger Decl. ¶ 119.

[6]      Corey Swinson passed away suddenly in September 2013. Therefore, Petitioners seek an incentive award to be paid to Plaintiff Swinson's estate. Seeger Decl. ¶ 122.

[7]      Kevin Turner passed away on March 24, 2016 due to Amyotrophic Lateral Sclerosis ("ALS"). Seeger Decl. ¶ 129. Accordingly, Petitioners seek an incentive award to be paid to Plaintiff Turner's estate.

the value of the benefits conferred on the Class and is well within the ranges accepted by courts within this Circuit.  Petitioners' reimbursable out-of-pocket expenses are $5,682,779.38.  For lodestar cross-check purposes, the lodestar amassed by Plaintiffs' Counsel since the inception of this multidistrict litigation ("MDL") in connection with common benefit work is $40,559,978.60. This Petition, together with the accompanying supporting declarations, sets forth the extensive work that was undertaken by all Plaintiffs' Counsel to obtain the extraordinary relief recovered for the Class.  The requested fee is reasonable and appropriate, particularly given the complex subject matter of the case, the exceptional results achieved against daunting odds, the substantial litigation risks incurred by Plaintiffs' Counsel, and the overwhelmingly strong support for the Settlement from the Class following nearly unprecedented media attention and public scrutiny.

The requested award will be used to compensate the attorneys listed in this Petition only for common benefit work performed in this MDL to date.  A number of law firms involved in this litigation were retained by individual Class Member clients.  This petition does not include attorney time or expenses specific to their individual clients' cases.[8]

When compared with numerous fee awards granted in this District, the totality of the global fee request represents a relatively modest percentage of the recovery achieved under the Settlement.  As demonstrated below, the fee award requested herein falls easily within acceptable limits established by the Third Circuit's attorneys' fees jurisprudence.

---

[8]     Co-Lead Class Counsel's firm, Seeger Weiss LLP, had been individually retained by a number of Class Members.  Seeger Weiss has waived attorneys' fees and expenses from Class Members whom the firm represents on an individual basis, and will seek compensation solely from common benefit funds given that its work and expenditures have overwhelmingly focused on common benefit efforts.  Seeger Decl. ¶ 98.  Other firms, however, are asserting their rights to be compensated pursuant to their retainers for work done on behalf of their individual clients. *See* ECF Nos. 7071, 7073, 7075, 7085.

Finally, Plaintiffs' Counsel request that, as is frequently done in the case of class action common benefit fee awards, the discretion and responsibility to allocate the fees be entrusted to Co-Lead Class Counsel Christopher A. Seeger, who has exercised overall oversight and leadership of this litigation and thus has familiarity with the roles and contributions of participating Plaintiffs' Counsel.  Seeger Decl. ¶ 99.

## II.    THE SETTLEMENT BENEFITS

The groundbreaking global resolution in this MDL was the result of many months of intense, hard-fought, arm's-length negotiations among the parties, encompassing collectively thousands of hours of professional time with substantial input from medical, actuarial, and other experts.  Plaintiffs' Counsel fully brought to bear their abundant experience in complex litigation to conceive, structure, and gain approval of an agreement that will protect many thousands of Retired NFL Football Players and their families for decades.  The Settlement resolves the claims of the more than 5,000 cases filed directly in or transferred to this MDL, as well as the claims of thousands of additional Retired Players against the NFL Parties for injunctive relief, medical monitoring, and compensation for the long-term neurocognitive and neuromuscular injuries and other losses suffered by them allegedly as a result of the Defendants' tortious conduct.  Seeger Decl. ¶ 11.

The reach and relief offered by the Settlement is substantial and without easy comparison.  Retired NFL Football Players who last played in the league long ago, and who have yet to develop a Qualifying Diagnosis, will receive full value for any ultimate qualifying claim – regardless of whether they commenced an underlying action.  The novel resolution provided by the Settlement provides broad reach and protection to Retired NFL Football Players and their families.

Plaintiffs' Counsel negotiated to ensure that the Settlement created an uncapped MAF to provide much-needed relief to (i) seriously injured retired players with a "Qualifying Diagnosis" of Level 1.5 Neurocognitive Impairment (early dementia), Level 2 Neurocognitive Impairment (moderate dementia), Alzheimer's Disease, Parkinson's Disease, and/or ALS; (ii) the representatives of deceased players who received a Qualifying Diagnosis while living; and (iii) the representatives of certain players who died before Final Approval (April 22, 2015) and were diagnosed post-mortem with Chronic Traumatic Encephalopathy ("CTE"), and their families.  In the event a players' condition worsens, he and his family will be able to seek additional payments.  The MAF will be available for 65 years to ensure that even the youngest retired players will have an opportunity to receive these benefits should they become eligible. Importantly, in order to receive a Monetary Award, Class Members will *not* be required to prove that their injuries were caused by the NFL Parties, let alone concussions suffered during professional football play.

Significantly, the Settlement preserves Retired NFL Football Players' rights to pursue claims for worker's compensation and any and all medical and disability benefits under any applicable collective bargaining agreement, including the NFL's Neuro-Cognitive Disability Benefit.  In addition, the Settlement ensures that the provision included in Article 65 of the current collective bargaining agreement ("CBA"), Section 2 – requiring that players execute a release of claims and covenant not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit – will not be enforced or used against players in connection with the Settlement.

The Settlement also establishes a $75 million BAP designed to determine the existence and extent of cognitive impairment in living Retired NFL Football Players.  In the event that they

6

are found to suffer from moderate cognitive impairment ("Level 1 Neurocognitive Impairment"), they will be entitled to supplemental benefits in the form of medical treatment and/or evaluation, including counseling and pharmaceutical coverage. Another component of the Settlement is a $10 million Education Fund to promote safety and injury prevention in football players, including youth football players, and to educate Retired NFL Players regarding the NFL's medical and disability benefits programs and initiatives.

The MAF and the BAP are highly innovative means to implement major objectives of the Settlement. These objectives are to provide the opportunity for Retired NFL Football Players to obtain diagnoses and compensation. The level of planning, research, and coordination required to establish two nationwide networks of board-certified, highly-qualified medical professionals is extremely high, and required a substantial amount of behind-the-scenes work by Plaintiffs' Counsel. Moreover, information gained through the BAP, combined with the Education Fund, has the potential to greatly improve the understanding, and treatment of head injuries generally, including football and other sports.

This Settlement received unprecedented publicity (and scrutiny) from the moment of its announcement. Considering the ubiquity of the news reports and associated public attention concerning the Settlement and the state-of-the-art class notice program, the reaction of the Class has been extremely favorable. Fewer than one percent of Class Members filed requests for exclusion,[9] and over 12,000 potential Settlement beneficiaries and their counsel have signed up to receive further notices regarding the Settlement and claims process. Declaration of Orran L. Brown, Sr., in Support of Co-Lead Class Counsels' Petition for an Award of Attorneys' Fees and

---

[9] The number of opt-outs continues to decrease. Nineteen Class Members who had opted out have, with the Settling Parties' agreement and the Court's approval, rescinded their decision and rejoined the Class. *See* ECF Nos. 7117-1 (¶¶ 5-6), 7119.

Expenses, dated Feb. 8, 2017 ("Brown Decl."), at 3-4.  Since the registration period opened on February 6, 2017, the Settlement Claims Administrator has received over 6,100 registrants. Seeger Decl. ¶ 11.  This high level of favorable response is remarkable.

Plaintiffs' Counsel expended a great deal of time, energy, and resources to defend this historic Settlement against challenges filed in this Court, the Third Circuit, and the Supreme Court by objectors who doggedly pursued their objections and appeals.  Those relentless challenges threatened not only to undo the Settlement itself but also to irreversibly wreck any prospect of a class-wide resolution of the Plaintiffs' claims in this MDL.  Until the Supreme Court declined consideration of the last of those misguided challenges, long-awaited relief could not begin flowing to Class Members.  As the Court is aware from recent filings, including applications for approval of pre-registration and supplemental notice to Class Members, Plaintiffs' Counsel is currently taking the final steps antecedent to the launch of the Settlement program.  *E.g.*, ECF Nos. 7104, 7115 (Orders approving amended pre-registration notice and Supplemental Class Notice); Seeger Decl. ¶¶ 107-18 (discussing initial and long-term implementation steps).

## III.    PROCEDURAL HISTORY

### A.    Initiation of NFL Players' Concussion Injury Litigation and Formation of the MDL

This MDL was established on January 31, 2012 when the Judicial Panel on Multidistrict Litigation ("JPML") centralized the actions filed against the NFL Parties and the Riddell Defendants by dozens of former NFL players and certain of their wives in this District for coordinated pretrial proceedings, pursuant to 28 U.S.C. § 1407.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 842 F. Supp. 2d 1378 (J.P.M.L. 2012).  The JPML found that these cases "share[d] factual issues arising from allegations against the NFL stemming from

8

injuries sustained while playing professional football, including damages resulting from the permanent long-term effects of concussions while playing professional football in the NFL" and that "centralization under Section 1407 in the Eastern District of Pennsylvania w[ould] serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *Id.* at 1379. By the time of argument on the Section 1407 centralization motion in January 2012, sixteen potentially related actions pending against the NFL Parties were before the JPML. *Id.* at 1378. Soon thereafter, 123 cases were directly filed in the MDL or removed from Pennsylvania state court to this Court, and the JPML transferred an additional 163 cases to the MDL. Seeger Decl. ¶ 13.

**B.**     **Early Proceedings in This Court**

At the first MDL status conference on April 25, 2012, the Court selected Christopher A. Seeger of Seeger Weiss LLP as Plaintiffs' Co-Lead Counsel for the MDL proceedings, and requested that another co-lead counsel from a Philadelphia-based firm also be selected. CMO No. 2 [ECF No. 64]. Plaintiffs selected and the Court confirmed the appointment of Sol Weiss of Anapol Schwartz (now Anapol Weiss) as Co-Lead Counsel. CMO No. 3 [ECF No. 72]. Plaintiffs also created and the Court appointed a Plaintiffs' Executive Committee ("PEC") and a Plaintiffs' Steering Committee ("PSC") composed of several of the counsel for Plaintiffs in the cases pending before the Court. ECF Nos. 64, 72. The PEC included counsel who were ultimately also appointed as Class Counsel, Gene Locks and Steven C. Marks, and the PSC included those ultimately also appointed as Subclass Counsel, Arnold Levin and Dianne M. Nast.[10] Seeger Decl. ¶¶ 14-15.

---

[10]     The Court later appointed Class Counsel and Subclass Counsel, resulting in Messrs. Seeger's and Weiss' positions ultimately changing from Co-Lead Counsel to Co-Lead Class Counsel, in accordance with the Preliminary Approval Order, dated July 7, 2014 [ECF No.

(Footnote continued . . .)

As part of its initial case management orders, the Court identified the NFL Parties' preemption defense under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, as a threshold legal issue to be addressed before proceeding to the broader merits of Plaintiffs' claims.  CMO No. 2 at 2-3; CMO No. 4 [ECF No. 98] ¶ 3.  Accordingly, the Court stayed formal discovery, ECF No. 3384, and set a schedule for the filing of Plaintiffs' Master Administrative Complaints and for the NFL Parties to brief the threshold legal issue of whether Plaintiffs' claims were preempted by federal labor law.  ECF No. 64.

Thereafter, Plaintiffs' Counsel conducted significant investigation and research in connection with the preparation of and filing of these complaints, preparing 50-state surveys on medical monitoring, preemption, tolling, and fraudulent concealment.  Plaintiffs' Counsel also examined the worker's compensation laws of the fifty states during this time.  Seeger Decl. ¶ 18.  On June 7, 2012, Plaintiffs' Counsel filed a Master Administrative Long-Form Complaint, ECF No. 83, and a Master Administrative Class Action Complaint for Medical Monitoring, ECF No. 84.  On July 17, 2012, Plaintiffs then filed an Amended Master Administrative Long-Form Complaint, ECF No. 2642.  Seeger Decl. ¶¶ 16-17.

On August 30, 2012, the NFL Parties filed motions to dismiss the operative complaints on federal preemption grounds.  ECF Nos. 3589, 3590.  Plaintiffs' Counsel prepared and filed opposition papers to the motions, ECF Nos. 4130-34.  The NFL Parties filed reply papers, ECF Nos. 4254-55, and Plaintiffs' sur-replies closed the briefing, ECF Nos. 4589, 4591.  Mindful that the fate of the litigation hinged on the preemption motions, Plaintiffs' Counsel spent significant time analyzing, researching, drafting, and discussing their opposition to the NFL Parties'

---

6084].  These appointments were confirmed upon Final Approval on April 22, 2015 [ECF No. 6510].

motions.[11]  Plaintiffs' Counsel also conducted several mooting sessions, which included leading academics and practitioners in the field, to prepare for oral argument.  The Court heard oral argument on the motions on April 9, 2013.  ECF Nos. 4737-38; Seeger Decl. ¶ 20.

Early in this high-profile litigation, Plaintiffs' Counsel conceived, organized, and directed a communications strategy, so as to ensure that the broader player community (and the public at large) was fully apprised of the factual, medical, and legal issues encompassed by Plaintiffs' claims and the litigation, and to counteract any misinformation from whatever source.  *Id.* ¶ 33. Plaintiffs' Counsel worked closely with one another to implement the Plaintiffs' communications strategy, which involved consistent and committed efforts both before and after the Settlement was announced.  *Id.*

At the outset of this litigation, the Court advised the Parties to explore the possibility of settlement.  Consistent with that instruction, and with Plaintiffs' Counsels' fiduciary duties to zealously represent the interests of all Retired NFL Football Players and their families, Plaintiffs' Counsel carefully evaluated the potential to settle Plaintiffs' claims.  *Id.* ¶ 21.  Counsel took into consideration the significance and severity of the alleged injuries, the scientific and medical issues relative to causation and concussions, and the ability to achieve through settlement "full value" compensation for serious concussion-related injuries without trials and appeals.  *Id.* Counsel also weighed the inherent delays and costs involved in protracted litigation where so

---

[11]    As discussed in further detail below, the NFL Parties had successfully employed the preemption defense in several member cases of this MDL, a fact the Court acknowledged in its opinion approving the Settlement.  *See In re Nat'l Football League Players' Concussion Injury Litig.* ["*In re NFL*"], 307 F.R.D. 351, 391 (E.D. Pa. 2015) ("Other courts have accepted the NFL Parties' preemption arguments.").  The Third Circuit also acknowledged this, stating that it "concur[ed] with the District Court that this factor weighed in favor of settlement because class members "face[d] stiff challenges surmounting the issues of preemption and causation."  *In re NFL*, 821 F.3d 410, 439 (3d Cir. 2016).

11

many former players are extremely ill and dying, as well as the risks of litigation, including the array of potential defenses of the NFL Parties – particularly preemption, but also lack of causation, statutes of limitations, the statutory employer defense, and assumption of risk, among others. This evaluation involved the substantial abilities and committed efforts of Plaintiffs' legal and science teams. *Id.* ¶ 22.

Armed with a thorough assessment of the legal, factual, and scientific issues associated with Plaintiffs' claims, Plaintiffs' Counsel engaged the NFL Parties about the possibility of settlement. The parties thereafter commenced discussions regarding settlement structures and injury categories.[12] *Id.* ¶ 23.

### C.    Mediation

In early July 2013, in anticipation of its decision on the preemption motions, the Court "held an informal exploratory telephone conference with lead counsel [and directed the] parties, through their lead counsel, to engage in mediation to determine if consensual resolution [wa]s possible." ECF No. 5128. The Court appointed retired United States District Judge Layn R. Phillips as the mediator, and directed that Judge Phillips report back to the Court on or before September 3, 2013 as to the results of the mediation. *Id.*

Co-Lead Counsel formed a negotiating committee, consisting of Messrs. Seeger, Weiss, Levin, Locks, and Marks, and Ms. Nast (Mr. Levin and Ms. Nast being the respective counsel for the two Subclasses). Seeger Decl. ¶ 25; ECF Nos. 6423-3 ¶ 27, 6423-10 ¶¶ 5, 9, and 6423-11 ¶¶

---

[12]    The Court has commended the intense preparations undertaken by Plaintiffs' Counsel prior to mediation. "A genuine dialogue between zealous and well-prepared adversaries transpired." *In re NFL*, 307 F.R.D. at 363. As the Court stated, "[t]he Parties came prepared for these discussions. The Parties had already retained well-qualified medical experts to help determine the merits of the case. These experts advised the Parties on difficult questions such as the type of head trauma associated with NFL Football and the long term health effects of trauma on Retired Players." *Id.*

6, 9.  Mindful of the teachings of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and its progeny, Plaintiffs' Counsel ensured adequate and unconflicted representation for all Class Members and the creation of Subclasses and separate representation for those currently diagnosed with injuries associated with concussive and sub-concussive head trauma and those without such current ailments.  Seeger Decl. ¶ 25; ECF Nos. 6073-4 ¶¶ 7, 11; 6423-3 ¶¶ 11-12, 29; 6423-6 ¶ 7.

Plaintiffs' Counsel further investigated and analyzed the claims brought in the Complaints (including the creation and maintenance of a comprehensive database of the Plaintiffs' claims and symptoms collected from over 2,000 Retired NFL Players); retained medical and economic experts; became well-versed in the relevant medical literature[13] and related issues; and, having completed extensive briefing on the NFL Parties' preemption motions to dismiss, achieved a thorough appreciation of the merits of the threshold preemption arguments.  Seeger Decl. ¶ 26; ECF No. 6423-3 ¶¶ 19-22, 25, 30, 32.

As part of Plaintiffs' Counsels' due diligence and consistent with their fiduciary responsibilities to the Class and Subclasses, Plaintiffs' Counsel engaged multiple experts in the fields of medicine, namely neurology, neuropsychology, and neuropsychiatry; actuarial science; economics; claims administration; and lien identification and satisfaction, all to determine, develop, and test an appropriate settlement framework to evaluate and meet the needs of Retired NFL Football Players suffering from or at increased risk for the claimed injuries related to

---

[13]    Plaintiffs' Counsel and their experts conducted a comprehensive review of peer-reviewed medical literature to support settlement discussion and negotiations.  With expert guidance, Plaintiffs' Counsel canvassed the peer-reviewed medical and scientific literature on, *inter alia*, brain injury, concussions, the effect of sub-concussive hits to the head on the brain, the epidemiology of the Qualifying Diagnoses, and the methods of diagnosis and treatment for the Qualifying Diagnoses.  Seeger Decl. ¶ 29.

concussions and mild traumatic brain injury.  Seeger Decl. ¶ 27; ECF Nos. 6423-3 ¶¶ 32, 43; 6423-17 ¶¶ 6-9; 6423-18 ¶ 21; 6423-19 ¶¶ 19, 25, 27.  The economists and actuaries assisted Plaintiffs' Counsel in modeling the possible disease incidence and adequacy of funding for the monetary award levels contained in the Settlement.  Seeger Decl. ¶ 27; ECF No. 6423-3 ¶ 30.

Plaintiffs' Counsel expended significant time, effort, and funding in preparation for, and during, the settlement discussions, which began in earnest in January 2013, and continued through the mediation process.  For almost two months during the mediation process, the Plaintiffs' negotiating team worked at an intense and grueling pace, collectively expending thousands of professional hours and often working around the clock to negotiate a fair and reasonable class settlement on behalf of all retired NFL players, their representative claimants, and derivative claimants.  Seeger Decl. ¶¶ 28-30.

Plaintiffs' Counsel, as well as Plaintiffs' experts, were greatly aided in their understanding of Retired NFL Players' head injuries, and the incidence of neurocognitive ailments, through the creation of the Retired NFL Player database.  *Id.* ¶¶ 31-32.  Analyzing the records of over 2,000 players, Plaintiffs' Counsel created, in essence, an epidemiological study of their clients.  *Id.*  This database required extensive professional work.  The database was vitally important to the entire negotiation process, because it enabled Plaintiffs' Counsel to evaluate disease incidence and occurrence across the retired NFL player population, and appropriately model and negotiate settlement benefits.  *Id.*  It also served as a cross-check of the epidemiology of neurocognitive disease suffered by retired NFL players.  *Id.*

Judge Phillips actively supervised numerous mediation sessions, presiding over dozens of in-person and telephonic meetings with counsel for both sides, either jointly or in separate groups.  *Id.* ¶ 34.  He also met with the parties' respective experts, without counsel present, to

14

obtain answers to questions he had regarding the scientific, actuarial, and financial aspects of the settlement. *Id.*; ECF No. 6073-4 (Phillips Decl.) ¶¶ 2 & 5-7; ECF No. 6423-6 ¶ 4. The mediation process culminated in the execution of a Term Sheet on August 29, 2013.

As the Court noted, during their initial negotiations, the Parties did not discuss fees until after the key terms of the settlement – including the total size of the original capped fund – were publicly announced on the docket. *In re NFL*, 307 F.R.D. at 374 ("According to [Judge] Phillips, the Parties were careful not to discuss fees until after the Court had announced, on the record, an agreement regarding the total compensation for Class Members."); *see* Phillips Supp. Decl. ¶¶ 18-19 [ECF No. 6423-6, at 9]; ECF No. 5235.[14]

**D.     Public Announcement of the Proposed Settlement and Further Negotiations**

On August 29, 2013, the Court announced that "in accordance with the reporting requirements in [its] order of July 8, 2013, the Honorable Layn Phillips, the court-appointed mediator, [had] informed [the Court] that the plaintiffs and the NFL defendants had signed a Term Sheet incorporating the principal terms of a settlement." ECF No. 5235. In its Order, the Court reserved judgment on the fairness and adequacy of the settlement pending the Settling Parties' presentation to the Court of a settlement agreement, along with motions for preliminary and, eventually, final approval. *Id.*

Following the announcement of the August 29, 2013 term sheet, the parties proceeded to negotiate the detailed terms of the settlement agreement itself. Plaintiffs' Counsel conducted numerous meetings with the NFL, continued to work with their consultants, and spent significant

---

[14]    As the Court further stated, "[b]ecause Class benefits were fixed by the time the Parties discussed fees, the amount given to the Class was not compromised." *In re NFL*, 307 F.R.D. at 374 (citing cases).

time researching an appropriate settlement claims process, to include appeal rights. *See* ECF Nos. 6423-3 ¶ 34, 6423-6 ¶¶ 2, 4.

On January 6, 2014 – after over four months of additional, extensive, and often grueling negotiations – Co-Lead Class Counsel completed negotiation of the settlement agreement and submitted a motion for preliminary approval of a class action settlement incorporating the terms of the settlement agreement.  Seeger Decl. ¶ 39; ECF No. 5634-5.  This settlement agreement limited the funding of the MAF to $675 million, which the parties and their actuarial and economic experts believed would be sufficient to pay all benefits throughout the 65-year term of the proposed settlement.  Class Action Settlement Agreement [ECF No. 5634-2] § 23.1 (Jan. 6, 2014); Report of Analysis Research Planning Corp. to Special Master Perry Golkin [ECF No. 6167] at 33-36; Report of the Segal Group to Special Master Perry Golkin [ECF No. 6168] ¶¶ 19-20.  Also on January 6, 2014, Co-Lead Class Counsel, Class Counsel, and Subclass Counsel filed the class action complaint in *Turner v. NFL*, No. 14-cv-00029-AB (E.D. Pa.), naming Plaintiffs Kevin Turner and Shawn Wooden as proposed Class Representatives.  Seeger Decl. ¶ 40; ECF No. 5634.

### E.  Court Appointment of Special Master Perry Golkin

On December 16, 2013, pursuant to Fed. R. Civ. P. 53, the Court appointed Perry Golkin to serve as Special Master to assist the Court in evaluating the financial aspects of the proposed settlement in view of its financial complexities.  Seeger Decl. ¶ 38.

### F.  Initial Preliminary Class Certification Motion and Decision

Plaintiffs' Counsel researched, briefed, and filed their initial motion for preliminary approval of the settlement and certification of a settlement class on January 6, 2014.  ECF No. 5634.  This motion consisted of the negotiated settlement agreement; multiple supporting declarations from Class Counsel, Subclass Counsel, and player representatives; and extensive

briefing.  On January 14, 2014, the Court denied the motion without prejudice.  ECF No. 5657.

The Court praised the "commendable effort" of the parties to reach the negotiated class action

settlement, but expressed concern as to the adequacy of the proposed $675 million MAF, in light

of the 65-year lifespan of the MAF, the settlement class size of more than 20,000 members, and

the potential magnitude of the awards.  Seeger Decl. ¶ 41.  The Court directed the parties to share

the documentation described in their submissions with the Special Master.  *Id.*; ECF No. 5658.

G.       **Renegotiations and Preliminary Approval**

Guided by the Court's Memorandum Opinion and the Special Master, the parties worked

nearly around the clock from January to June 2014 to provide the Court with the assurance that

"all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related

claimants will be paid."  Seeger Decl. ¶ 42; ECF No. 5657 at 10.  The parties and their actuarial

and economic experts met separately with Special Master Golkin and with one another to further

analyze the data and to determine whether, and if so, in what manner, the settlement could be

amended that would be acceptable to the parties while at the same time satisfying the Court's

concerns.  Seeger Decl. ¶ 42.  Notably, Plaintiffs' Counsel refined and tightened definitions of

key terms in the Settlement, and improved claim procedures in order to protect against fraud.[15]

---

[15]        The concerns about fraud and abuse were not idle.  Aside from these concerns being
overriding to the NFL Parties were the MAF to be uncapped, Plaintiffs' Counsel was fully aware
of the need to ensure the integrity of the Settlement's claims process.  In *In re Diet Drugs*, a
settlement in this District that contained a testing component, the Court was faced with a motion
"to disqualify all 60,000 echocardiograms conducted by a company known as EchoMotion from
supporting claims for matrix benefits on the grounds that these echocardiograms were not
'conducted under the supervision' of a Board-Certified Cardiologist as required by § VI.C.1.b(4)
of the Settlement Agreement."  Whether "the individuals performing these echocardiograms
were properly supervised by cardiologists and whether these echocardiograms therefore should
be disregarded in determining benefits [became] a major controversy before the court."
Questions regarding the echocardiograms "generated many hotly contested issues and substantial
motion practice" which "unduly delayed the payment of valid claims."  *In re Diet Drugs Prods.
Liab. Litig.*, 226 F.R.D. 498, 507-08 (E.D. Pa. 2005).

These changes were the result of significant analysis, coordination, and research, and required many hundreds of attorney hours to accomplish. *Id.* ¶ 43. These further analyses led to an uncapping of the deal and a revised settlement agreement. *Id.*

Under the revised agreement, the NFL Parties were to pay all valid claims for the next 65 years, and the MAF was no longer fixed at $675 million. *Id.* ¶ 44. The NFL Parties became responsible for providing all of the funding for the MAF, BAP, and Education Fund, as well as paying, either directly or through their funding of the MAF or the BAP, for Class Notice costs, class attorneys' fees, and the fees and expenses of the Special Master, Claims Administrator, and BAP Administrator, as well as certain fees of the Lien Resolution Administrator. *Id.* During this additional five-month negotiation, Plaintiffs' Counsel was assisted by Special Master Golkin, numerous medical experts, and actuaries and economists. *Id.* ¶ 45. Plaintiffs' Counsel modified the settlement documents to reflect these new features and prepared new briefing to support approval of the revised agreement. *Id.*

On June 25, 2014, Plaintiffs' Counsel filed a motion for preliminary approval of the revised proposed settlement agreement and for preliminary class certification. ECF No. 6073. On July 7, 2014, the Court granted preliminary certification and approval of the settlement, ECF Nos. 6083-84, and on July 9, 2014, approved the notice to be disseminated to putative Class Members, ECF No. 6093. Seeger Decl. ¶ 46. Plaintiffs' Counsel established and supervised the set-up of the informational website "www.NFLconcussionsettlement.com," which has provided invaluable information to Class Members and has allowed the Claims Administrator to refine the data in its Class Member database, improving its ability to provide information to the Class. *Id.* ¶ 47.

The Settlement website has been a tremendous source of information for Retired NFL Players and family members.  As of February 6, 2017, it had already received over 180,000 unique visits; it provides access to the Settlement Agreement, the Court-approved notices, the Court's Orders and frequently asked questions, among other documents and information.  Brown Decl. at 2.  The Claims Administrator's other efforts to provide accurate information to Class Members, coordinated with Plaintiffs' Counsel, have been equally successful.  The Claims Administrator has received over 1,000 written communications and responded to those that asked questions about the Settlement.  *Id.*  The Settlement Call Center has received over 14,000 calls with well over 7,000 of these callers speaking directly to live operators, for a combined total of nearly 500 hours.  *Id.* at 3.

Starting after the Court granted preliminary approval to the Settlement, and continuing to the present, Co-Lead Counsel, as well as other Plaintiffs' Counsel, have devoted hundreds of hours to communicating with Retired NFL Players and family members concerning the Settlement.  Seeger Decl. ¶ 51.  Co-Lead Class Counsel has conducted multiple seminars and presentations with Retired NFL Player groups throughout the country, including presentations at the Super Bowl and the Pro Football Hall of Fame.  *Id.*  These well-attended sessions have educated Retired NFL Players about the Settlement's benefits and procedures, and have been a valuable and effective means of spreading information about the Settlement.  *Id.* ¶ 52.  Co-Lead Class Counsel also hosted a series of webinars, with the same goal of increasing awareness of the Settlement.  Co-Lead Class Counsel also hosts frequent telephone conference calls with Retired NFL Players and family members to provide updates on the Settlement.  *Id.*

## H.    First Appeal and Multiple Briefings

After preliminary approval, Plaintiffs' Counsel dealt with a wide array of motions and attempted interlocutory appeals by certain objectors.  *Id.* ¶ 53.  A group of objectors, represented

by Steven F. Molo of MoloLamken LLP, filed a petition for interlocutory review with the Third Circuit, arguing that immediate review of the Court's preliminary approval was appropriate under Federal Rule of Civil Procedure 23(f) because of the Court's provisional certification of a settlement class. *Id*. Those objectors protested the fairness of the proposed settlement and challenged the preliminary class certification. They maintained that Rule 23(f) allowed immediate appellate review even though there had been no final ruling on class certification. *Id*.

Plaintiffs' Counsel and the NFL Parties both filed opposition papers to the 23(f) petition and, after requesting a reply brief from the objectors represented by Mr. Molo, the Third Circuit heard oral argument on September 10, 2014. *Id*. ¶ 54. The Court of Appeals denied the petition the next day in a one-page order. ECF No. 6166. The Court subsequently issued a written opinion explaining its ruling, *see In re NFL*, 775 F.3d 570 (3d Cir. 2014). The majority held that the Third Circuit lacked appellate jurisdiction under Rule 23(f) because this Court had "yet to issue 'an order granting or denying class certification.'" *Id.* at 588-89.[16]

In addition to this unsuccessful 23(f) attack, six other Class Members, led by Roy Green and represented by three Missouri-based law firms, mounted their own challenge, filing an appeal to the Third Circuit by invoking appellate jurisdiction under 28 U.S.C. § 1292(a)(1), on the reasoning that this Court's Preliminary Approval Order had enjoined Class Members' prosecution of litigation against the NFL Parties and was therefore an interlocutory order granting an injunction. Seeger Decl. ¶ 55. Following the completion of briefing of that appeal, Class Plaintiffs successfully moved to dismiss it as moot because, in the meantime, the

---

[16]     Judge Ambro dissented from that jurisdictional rationale but nonetheless concurred that the petition should be denied because the Molo-led objectors were creating "inefficient (indeed, chaotic) piecemeal litigation that would interfere with the formal fairness hearing on the settlement." *Id.* at 589.

appellants had opted out of the settlement class and were hence no longer Class Members subject to any injunction.  *See In re NFL*, No. 14-3520 (3d Cir. June 4, 2015) (Order dismissing appeal).

In addition to fending off these interlocutory appellate attacks, Plaintiffs' Counsel handled a myriad of other motions during this time, all in an effort to expedite the process and begin implementation of the Settlement.   Seeger Decl. ¶ 56.   These included third-party intervention motions seeking access to documents[17]; Class Member bids to take discovery of Class Counsel as to how the Settlement was negotiated or requests to obtain additional information about the Settlement[18]; motions to intervene[19]; motions seeking to extend the opt-out deadline[20]; requests for *amicus curiae* participation in the Rule 23(e) fairness proceedings[21]; and a motion to prevent improper communication with Class Members.[22]

## I.       Fairness Hearing

The Court received all timely objections to the Settlement by October 14, 2014.  On November 12, 2014, Plaintiffs' Counsel filed their brief and extensive exhibits in support of final approval.  ECF No. 6423.  Plaintiffs' thorough briefing addressed objections by approximately

---

[17]      ECF No. 6101 (July 24, 2014) (Am. Mot. to Intervene to Seek Access to Docs. and Inform., filed by Bloomberg L.P., ESPN, Inc.).

[18]      ECF No. 6155 (July 31, 2014) (Mot. to Permit Access to Med., Actuarial, and Econ. Info. Used to Support the Settlement Proposal); ECF No. 6169 (Morey Plaintiffs' motion for leave to take "limited discovery").

[19]      ECF No. 6131 (Aug. 13, 2014) (Mot. to Intervene, filed by Richard Dent).

[20]      ECF No. 6172 (Sept. 19, 2014) (Emergency Mot. to Modify or Amend the July 7, 2014 Order Requiring Opt-Outs on or before Oct. 14, 2014).

[21]      ECF No. 6180 (Sept. 30, 2014) (Mot. for Leave to File *Amicus Curiae* Brief in opposition to final approval of the settlement, filed by Brain Injury Ass'n of Am.); ECF No. 6214 (Oct. 14, 2014 (Mot. for Leave to File *Amicus Curiae* Mem., filed by Pub. Citizen).

[22]      ECF No. 6257 (Oct. 24, 2014) (Motion for Order Prohibiting Improper Communications with the Class by MoloLamken LLP, filed by Mr. Seeger).

200 represented and pro se objectors, and fully described the Settlement.  Seeger Decl. ¶ 57.

Plaintiffs' Counsel prepared the Class's motion for final approval of the Settlement, as well as

the supporting memorandum of law.   They coordinated extensively with the Settlement's

administrative support providers in securing the latter's declarations in support of the final

approval motion.  *Id.*  These included Katherine Kinsella, for the notice plan; the Garretson Firm,

for lien administration; and BrownGreer, for claims administration.   Plaintiffs' Counsel also

continued their work with several medical and other experts – including Drs. Kenneth C. Fischer

(neurology), Christopher C. Giza (neurology and neurosurgery), David Hovda (neurosurgery and

brain injury), Richard Hamilton (sports concussions), and John Keilp (neuropsychology) – and

submitted declarations regarding the science on various points raised by objectors.  *Id.* ¶¶ 59-60;

*see also* ECF Nos. 6423-17 to 6423-20, 6423-23.[23]

The Court held an all-day Fairness Hearing, pursuant to Rule 23(e)(2), on November 19,

2014.  *See* Fairness Hr'g Tr., Nov. 19, 2014 [ECF No. 6463].  At that hearing, the Court heard

from fourteen counsel for the various objector groups and the Settling Parties, and from five

---

[23]      Although he did not submit a declaration for Plaintiffs' final approval papers, Dr. Grant Iverson also worked extensively with Plaintiffs' Counsel.  Seeger Decl. ¶ 61.  Dr. Iverson is a professor at Harvard Medical School in the Department of Physical Medicine and Rehabilitation. He is a specialist in neuropsychology and a clinician scientist in the area of mild traumatic brain injury and mental health.   He has an internationally-recognized research program concerning outcomes from mild traumatic brain injury suffered by athletes, civilians, military service members, and veterans.  His work was instrumental in designing the BAP testing program.  The work of Plaintiffs' expert Thomas Vasquez was also integral in modelling the economics of the proposed settlement during negotiations, based on financial and epidemiological principles.  Dr. Vasquez is the Vice President of Analysis Research Planning Corporation and has over 35 years of experience in management consulting for private sector clients, and the development of economic models for the U.S. and foreign governments to analyze and develop tax, expenditure, and regulatory policy.   His analysis assisted in developing a monetary award grid that could be used in negotiating claims and modeling the total cost of resolving all pending and future claims by former NFL players.  Seeger Decl. ¶ 60; ECF No. 6423-21.

unrepresented objectors.  ECF No. 6463 *passim*.  Plaintiffs' Counsel prepared the comprehensive presentation for the Court for the Fairness Hearing, and Mr. Seeger and his partner, David Buchanan, presented on behalf of the Settling Plaintiffs.  Seeger Decl. ¶ 58.

      **J.**      **Post-Hearing Briefing and Court-Proposed Modifications to the Settlement**

The Court permitted post-hearing briefing to address certain issues and to afford objectors additional time to file a response to Plaintiffs Counsels' final approval motion papers. *See* ECF Nos. 6444, 6453-56.  In December 2014, Plaintiffs' Counsel filed their reply to the objectors' post-hearing submissions.  ECF No. 6467.

On February 2, 2015, the Court "proposed several changes to the Settlement that would benefit Class Members."  Seeger Decl. ¶ 63; ECF No. 6479.  These were: (1) providing some "Eligible Season" credit for play in NFL Europe; (2) assuring that despite the $75 million cap on the BAP, all those timely registering will receive a baseline assessment examination; (3) moving the deadline for a "Death with CTE" award from the preliminary settlement approval date to the final approval date; (4) allowing for a waiver of the fee for appealing Monetary Award and Derivative Claimant Award determinations for those showing financial hardship; and (5) providing the opportunity to demonstrate a Qualifying Diagnosis without the required medical documentation in instances where such documentation was destroyed by a *force majeure* type event.  Seeger Decl. ¶ 63.

After a new round of negotiations, Plaintiffs' Counsel secured agreement on every change that the Court suggested, and on February 13, 2015, the parties submitted a revised settlement agreement, which is the operative Settlement that the Court approved and is now effective in the wake of the Supreme Court's denial of *certiorari*.  Seeger Decl. ¶ 64; ECF No. 6481-1.  In connection with such approval, Plaintiffs' Counsel also prepared extensive proposed findings of fact and conclusions of law.  ECF No. 6497.

### K.      Final Approval and Third Circuit Appeal

On April 22, 2015, the Court granted final approval to the Settlement (and final class certification).   ECF Nos. 6509-10.   The Court's published 132-page opinion exhaustively addressed class certification; the fairness, adequacy, and reasonableness of the Settlement; and, of course, the myriad arguments raised by the objectors.  The Court issued an Amended Final Order and Judgment on May 8, 2015.  ECF No. 6534.

On May 13, 2015, the first of several notices of appeal from the Court's grant of final approval was filed.   ECF No. 6539.   Ultimately, objectors filed eleven separate briefs in connection with the appeals from the Court's final approval decision.  Seeger Decl. ¶ 67.  The appeals were briefed in tandem and consolidated for argument and decision by the Third Circuit. *Id*.  After receiving the objectors' briefs and those of the two *amici curiae* opposed to the Settlement (the Brain Injury Association of America ["BIAA"] and Public Citizen, who had also appeared in this Court as *amici curiae*), Plaintiffs' Counsel devoted extensive hours to analyzing the various briefs and researching and drafting their answering brief.   *Id*.   Also, Plaintiffs' Counsel prepared for and presented at the Third Circuit oral argument, which was held on November 19, 2015.  *Id*.

On April 18, 2016, the Third Circuit issued a published opinion unanimously affirming this Court in all respects.  *In re NFL*, 821 F.3d 410 (3d Cir. 2016).  Certain objectors then filed petitions for *en banc* rehearing.  The Third Circuit denied those petitions on June 1, 2016, and issued its mandate on June 9, 2016.  ECF No. 6840.

### L.      Petitions for Writ of *Certiorari*

Following the Third Circuit's denial of *en banc* rehearing, two groups of objectors filed petitions for writ of *certiorari* with the United States Supreme Court.  *See Gilchrist v. Nat'l Football League*, No. 16-283 (U.S. filed Aug. 30, 2016); *Armstrong v. Nat'l Football League*,

No. 16-413 (U.S. filed Sept. 26, 2016).  The same two *amici curiae* who had opposed the Settlement in both this Court and the Third Circuit (BIAA and Public Citizen) filed briefs in support of the *certiorari* petitions.  Plaintiffs' Counsel prepared and filed their brief in opposition to the petitions and *amici* briefs on November 4, 2016.  Seeger Decl. ¶ 69.  On December 12, 2016, the Supreme Court denied both petitions.  *Gilchrist v. NFL*, 137 S. Ct. 591 (2016); *Armstrong v. NFL*, 137 S. Ct. 607 (2016).  In accordance with Supreme Court Rules 44(2) & 45(2)-(3), the Supreme Court's disposition became final on January 6, 2016, upon the expiration of the time for filing a rehearing petition.  Seeger Decl. ¶ 69; Sup. Ct. R. 44(2) & 45(2)-(3).

### M.     Initial Settlement Implementation Efforts

Meanwhile, even before the Supreme Court's rejection of the two *certiorari* petitions, Plaintiffs' Counsel began the groundwork for the implementation of the Settlement.  Since April 2016, Plaintiffs' Counsel has had regular working calls with Claims Administrator BrownGreer PLC and Lien Administrator Garretson Resolution Group, Inc. to review work plans, draft materials, and settlement implementation issues.  *Id*. ¶ 108.  Plaintiffs' Counsel have finalized retention of administrators and special masters; the Settlement Trust Agreement; and prepared conflicts of interest plans.  *Id*. ¶ 109.

Moreover, Plaintiffs' Counsel finalized and the Court has approved [ECF Nos. 7107, 7115] Preregistration and Supplemental Class Notices to be disseminated to Class Members to advise them concerning the registration and benefits timetable, and Plaintiffs' Counsel will oversee the effectuation of registration forms, the transition of call center operations to the Claims Administrator, and ongoing revisions of the Settlement website (including FAQs). Seeger Decl.  ¶ 109.

Other implementation efforts are in connection with the upcoming June 6, 2017 launch of the BAP.  These include reviewing the applications of BAP Providers and vetting candidates for

retention, receiving reports on contracting with providers in order to establish networks convenient to a majority of players by metropolitan region, and finalizing BAP procedures (including assessment scheduling and Supplemental Benefits). *Id.* ¶¶ 108, 110. Still other work has pertained or will pertain to the MAF (whose claims platform for pre-Effective Date Qualifying Diagnoses opens on March 23, 2017; Retired NFL Football Players will contact MAF physicians on their own from the MAF Network that will open on April 7th): the review of applications of MAF Physicians and vetting candidates for retention, finalizing claims forms and processes, and finalizing appeals forms and processes. *Id.*

Still other Settlement implementation steps include the retention of the Appeals Advisory Panel (composed of five neurologists/board certified neurospecialists) and Appeals Advisory Panel Consultants (3 neuropsychologists)  by April 7, 2017. *Id.* ¶ 113. This body is charged with reviewing diagnoses made prior to January 7, 2017, and will be advising the Special Masters and the Court. *Id.*

## N.    The Settlement Agreement and Fees

As noted above and as the Court is already aware, the parties discussed the payment of attorneys' fees separate and apart from all other Settlement benefits. Section III.C, *supra*; Seeger Decl. ¶ 74. The NFL Parties have agreed to pay attorneys' fees and reasonable costs and expenses incurred by Plaintiffs' Counsel provided that the request does not exceed $112.5 million. Seeger Decl. ¶ 74 (citing Settlement § 21.1 [ECF No. 6481-1, at 82]). Thus, unlike traditional common fund cases, where attorneys' fees are paid as a percentage of the recovery, the NFL Parties will pay any fee award over and above the Settlement's benefits and thus the Class here is further benefitted by not incurring such payment for work done for its common benefit.

Due to the lengthy term of the Settlement (65 years) and the necessary involvement of Plaintiffs' Counsel in the coming years (indeed, decades) to ensure that its terms are met and that Class Members' rights and interests are protected, *see* Seeger Decl. ¶¶ 101-19, the Settlement includes a provision authorizing a petition to the Court to set aside up to five percent of each monetary award and Derivative Claimant award to facilitate the Settlement program and related efforts of Plaintiffs' Counsel. *See id.*; ECF No. 6423-3, ¶ 55. The provision was expressly mentioned in the Class Notice. ECF No. 6086-1, at 18.

If a Class Member is represented by individual counsel, the attorney's fees payable to that counsel would be reduced by the amount of this proposed set-aside, so that the holdback will in no way increase the attorney's fees paid by Class Members who hire their own counsel on a contingency fee basis. Seeger Decl. ¶ 103; Settlement § 21.1 [ECF No. 6481-1, at 82]. These monies will be held in a separate fund overseen by the Court, pending subsequent application to the Court for remuneration of those counsel performing settlement-related work. Seeger Decl. ¶ 101. The NFL Parties will take no position on this issue. Settlement § 21.1.

## IV.   ARGUMENT

### A.   Third Circuit Legal Standards for Fee Applications

Two methods are generally used for determining attorneys' fees in class action cases: the percentage-of-recovery method and the lodestar method. *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998). In the Third Circuit, "[t]he percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. PRIDES Litig.)*, 243 F.3d 722, 732 (3d Cir. 2001) (quoting *In re Prudential*, 148 F.3d at 333).

The lodestar method is more commonly used in statutory fee-shifting cases. *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 300 (3d Cir. 2005). The Third Circuit recommends, but does not require, that district courts using the percentage of the fund method conduct a lodestar cross-check on the reasonableness of the fee award. *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 183 n.4 (3d Cir. 2005) (affirming district court's percentage of the fund fee award, even though district court did not conduct lodestar cross-check); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 310 (E.D. Pa. 2003) (Third Circuit recommends but does not require lodestar cross-check). Thus, the lodestar cross-check is "suggested," but not mandatory. *Moore v. GMAC Mortgage*, No. 07-4296, 2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) (citing *In re Cendant Corp. PRIDES Litig*., 243 F.3d at 735).

The instant case does not involve either an application for assessment of fees against the defendant pursuant to a fee-shifting statute, or a traditional common fund out of which payment of fees are sought. As this Court has noted, "[a] fee award in this case will not come from a common fund. The ultimate amount the NFL Parties must pay in attorneys' fees will have no impact on the Monetary Awards paid or baseline assessment examinations given because the NFL Parties have already guaranteed these benefits, in full, to eligible claimants." *In re NFL*, 307 F.R.D. at 374 (citing Settlement § 21.1).

Nevertheless, the principles employed in assessing a percentage-of-the common fund attorneys' fees claim are appropriate here because the sundry settlement benefits secured by Plaintiffs' Counsel, totaling over $1 billion in value, are a *constructive* common fund. In such circumstances, courts often rely on common fund principles and their inherent management powers to award fees to lead counsel in cases that do not actually generate a common fund. *See*, *e.g*., *Dewey v. Volkswagen Aktiengesellschaft*, 558 F. App'x 191, 197 (3d Cir. 2014); *Jackson v.*

*Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) ("[G]iven that each of these amounts will be paid by defendants, the economic effect essentially is that of a common fund."); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1072 (S.D. Tex. 2012) ("Having two funds—one for the claimants, one for the attorneys—is a well-recognized variant of a common-fund arrangement."). Furthermore, although it is uncapped, there is a clearly delineated fund recovered on behalf of the Class that lends itself well to valuation. In fact, the MAF has been valued by both Class Plaintiffs and the NFL Parties' experts.

By contrast, "[t]he lodestar method is generally applied in statutory fee shifting cases and 'is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation.'" *Hegab v. Family Dollar Stores, Inc.*, No. 11-1206, 2015 WL 1021130, at *11 (D.N.J. Mar. 9, 2015) (citing *In re Cendant Corp.*, 243 F.3d at 732). Also, the lodestar method is preferable where "the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). This concern is inapplicable here because, as noted above, the Settlement's components lend themselves to valuation. Moreover, Plaintiffs' Counsel are not applying for an award of fees against the NFL Parties pursuant to a statute that carves an exception from the "American Rule" that each side is responsible for its own attorneys' fees, so this is plainly not a statutory fee-shifting case. Nonetheless, because the Third Circuit recommends a lodestar cross-check in addition to the percentage of fee recovery analysis, both methods are discussed below.

**B.**   **Analysis Under the Percentage of Recovery Method Supports the Requested Award**

There are ten factors that the Third Circuit has identified in considering whether an attorneys' fee award is reasonable under the percentage-of-recovery method.   Known as the *Gunter/Prudential* factors, these are:

> 1. The size of the fund and the number of persons benefited;
> 2. Whether members of the class have raised substantial objections to the settlement terms or fee proposal;
> 3. The skill and efficiency of the attorneys involved;
> 4. The complexity and duration of the litigation;
> 5. The risk of nonpayment;
> 6. The amount of time devoted to the case by Plaintiffs' counsel;
> 7. The fee awards in similar cases;
> 8. The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;
> 9. The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and
> 10. Any innovative terms of settlement.

*In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009); *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 197-201 (3d Cir. 2000); *In re Prudential*, 148 F.3d at 336-40.

**1.**   **The Size of the Fund and the Number of Persons Benefited**

"In applying the percentage-of-recovery method, [the Court] must begin by making a reasonable estimate of the settlement value."   *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 147 (E.D. Pa. 2000).   "Generally, the factor given the greatest emphasis [in awarding a percentage of the recovery] is the size of the [recovery] created, because [the recovery] 'is itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded.'"   David F. Herr, *Annotated Manual for Complex Litigation, Fourth* § 14.121, at 220 & n.518 (rev. ed. 2016) (quoting 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* ["*Newberg on Class Actions*"] § 14.6, at 547, 550 (4th ed. 2002)).

30

When calculating the value of a settlement, courts usually include any cash compensation to class members, cash the defendant must pay to third parties, non-cash relief that can be reliably valued, attorneys' fees and expenses, and administrative costs paid by the defendant. *E.g.*, *In re: Heartland Payment*, 851 F. Supp. 2d at 1080; *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974, at *15-16 (E.D. La. Oct. 25, 2016).

Here, the Class is estimated to exceed 20,000.  The Class is composed of three types of claimants:

> (1) Retired NFL Football Players, defined as all living NFL Football Players who, prior to the date of the Preliminary Approval and Class Certification Order, retired, formally or informally, from playing professional football with the NFL or any Member Club, including American Football League, World League of American Football, NFL Europe League and NFL Europa League players ….
>
> (2) Representative Claimants, defined as authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased or legally incapacitated or incompetent Retired NFL Football Players; and
>
> (3) Derivative Claimants, defined as spouses, parents, and children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with a Retired NFL Football Player or deceased Retired NFL Football Player.

Settlement §§ 1.1(a) & 2(ee), (eeee), (ffff) [ECF No. 6481-1, at 8, 12, 18].

The Class consists of two Subclasses.  Subclass 1 is defined as Retired NFL Football Players who were not diagnosed with a Qualifying Diagnosis prior to the date of Preliminary Approval (July 7, 2014), and their Representative Claimants and Derivative Claimants.  *Id.* § 1.2(a) [ECF No. 6481-1, at 8].  Subclass 2 is defined as Retired NFL Football Players who *were* diagnosed with a Qualifying Diagnosis prior to July 7, 2014, and their Representative Claimants

31

and Derivative Claimants, and the Representative Claimants of deceased Retired NFL Football Players who were diagnosed with a Qualifying Diagnosis prior to death, or who died prior to April 22, 2015 and who received a post-mortem diagnosis of CTE. *Id.* §§ 1.2(b), 6.3(f) [ECF No. 6481-1, at 8].

The Settlement has three components: the uncapped MAF; the BAP, a $75 million medical testing and benefit program, with its central function of establishing the neurocognitive conditions of players when they enter the settlement program; and a $10 million education fund "to promote safety and injury prevention for football players of all ages[.]"

The MAF is an uncapped, inflation-adjusted fund that provides cash awards for Retired NFL Players who receive Qualifying Diagnoses over the next 65 years. In dollar terms, the MAF constitutes the bulk of the Settlement. Actuarial projections are that the MAF will pay out some $900-$950 million by the end of its 65-year term, with the risk of any additional payment for claims being borne entirely by the NFL. *In re NFL*, 307 F.R.D. at 364-66, 418; ECF No. 6167, at 4.[24] The Settlement offers monetary awards of up to $5 million for serious medical conditions associated with concussions and other brain traumas associated with NFL play; the medical conditions include Parkinson's Disease, Alzheimer's Disease, ALS, and others. *See* Settlement, Ex. A-3 [ECF No. 6481-1, at 122 (Monetary Award Grid)]. In terms of the designated dollar amounts, the Court found that "[t]he maximum awards are in line with other personal injury settlements." *In re NFL*, 307 F.R.D. at 405.

---

[24]     The actuarial model that Class Counsel developed anticipated certain participation rates for filed and unfiled cases. It also anticipated certain incident rates for the compensable disease categories (*i.e.*, the Qualifying Diagnoses). Specifically, Class Counsel assumed a 50% participation rate for Class Members who had not filed suit and a 90% participation rate for those who had. Seeger Decl. ¶ 44 n.1. If registrations exceed the participation assumption, as may occur given the pre-registrations and registrations to date, the value of the Settlement, given the negotiated uncapped nature of the MAF, will likely exceed prior valuations. *Id.*

Although the BAP is initially funded at $75 million, a baseline examination is guaranteed for all participating Class Members by the NFL, even if the initial $75 million is exhausted:  the Settlement "ensures that all Retired Players with half of an Eligible Season credit have access [during a specified period] to free baseline assessment examinations so that they may monitor their symptoms, and receive Qualifying Diagnoses more easily if their symptoms worsen."  *Id.* at 395.  Finally, the Settling Parties created a $10 million fund to promote safety and injury prevention for football players of all ages, including youth football players, and to educate Class Members about their NFL CBA Medical and Disability Benefits.  Settlement Art. XII [ECF No. 6481-1, at 68]; *In re NFL*, 307 F.R.D. at 368-69.

Under the terms of the Settlement, the NFL Parties are obligated to fund the administrative costs of the Settlement program.  First, the NFL Parties paid $4 million for the notice plan.  Settlement § 14.1(b) [ECF No. 6481-1, at 70].  Second, the compensation for the Special Masters is paid by the NFL Parties, through the MAF (without, of course, reducing any Class Member's individual MAF benefit because the MAF is uncapped).  *Id.* § 10.1(c) [ECF No. 6481-1, at 55].  Third, compensation for the Appeals Advisory Panel and Appeals Advisory Panel Consultants will also be paid by the NFL Parties from the MAF (again, without reducing any Class Member's individual MAF benefit).  *Id.* § 9.8(a)(v) [ECF No. 6481-1, at 53].  Fourth, the Settlement also provides that the NFL Parties will pay the reasonable compensation of the Claims Administrator (*id.* § 10.2(c) [ECF No. 6481-1, at 58]) and the Lien Resolution Administrator (*id.* § 11.1(c) [ECF No. 6481-1, at 63-64]) from the MAF.

It is important to note that although the compensation amounts for the Special Master, Appeals Advisory Panel and Appeals Advisory Panels Consultants, the Claims Administrator, and the Lien Resolution Administrator will be paid from the MAF, these amounts are *not* part of

the approximately $950 million actuarial calculations as what the MAF will pay out as *benefits* awards to Class Members over the 65-year term of the Settlement. *See In re NFL*, 307 F.R.D. at 365, 418.   Consequently, all of these administrative costs to be borne by the NFL Parties represent an added benefit to the Class.

Finally, as noted in Section III above, an additional value conferred on the Class is that Members will have Plaintiffs' Counsel's attorneys' fees and reimbursement of expenses for common benefit work paid for by the NFL Parties, rather than have a portion of the settlement recovery sliced off to pay fees and expenses, which is ordinarily the case with common fund recoveries.

Thus, when considering these amounts, Plaintiffs' Counsel secured a benefit of nearly $1.2 billion for the Class:

| BENEFIT | AMOUNT/VALUE | SOURCE |
|---------|--------------|--------|
| Monetary Award Fund | $950,000,000 | ECF No. 6167, at 4 (NFL Concussion Liability Forecast) |
| Baseline Assessment Program | $75,000,000 | Settlement § 23.1(b) |
| Education Fund | $10,000,000 | Settlement § 23.1(c) |
| Notice Costs | $4,000,000 | Settlement § 14.1(b) |
| Claims Administration | $11,925,000 | Decl. of Orran Brown, Sr. |
| Attorneys' Fees Provision | $112,500,000 | Settlement § 21.1 |
| **TOTAL:** | **$1,163,425,000** | |

These are remarkable benefits for a large class and this factor favors approval of the requested fee and expense award, which seeks an award equal to approximately nine percent of the value of the recovery.   Again, it bears repeating that not a penny of this award will come out of the pockets of a single Class Member. *See In re Oil Spill by Oil Rig Deepwater Horizon in*

34

*Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 909, 933-34 (E.D. La. 2012) (settlement that provided that defendant would not oppose "a significant award of common benefit attorneys' fees and costs, effectively spar[ed] the class from having to pay for common-benefit fees and expenses"), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014).

### 2. Whether Members of the Class Have Raised Substantial Objections to the Settlement Terms or Fee Proposal

It cannot genuinely be disputed that the reaction of the Class – approximately one-quarter of whose members had individual representation – to the Settlement was overwhelmingly positive.[25]  As the Third Circuit noted in affirming this Court's final approval of the Settlement, only about one percent of Class Members objected to the Settlement and approximately another one percent opted out.  *In re NFL*, 821 F.3d at 438.  Notably, of those opt-outs, a significant number have since revoked their opt-outs with the consent of the Settling Parties and the approval of the Court.  *See* ECF Nos. 7117-1 (¶¶ 5-6), 7119.[26]

It was not just the paucity of objections and opt-outs that demonstrated the resoundingly positive response to the Settlement.  While objectors' appeals were proceeding, Class Members and their counsel expressed significant interest in the commencement of the Settlement program, and the Settling Parties worked hard to prepare for implementation.  At present, more than 12,000 Class Members and their counsel have signed up for future information about the

---

[25]     Prior to the Fairness Hearing, several objectors included challenges to the amount provided for in the Settlement.  *See, e.g.*, ECF Nos. 6213, 6233, 6237.  These objections baldly asserted that the fees were excessive, with no analysis of relevant Third Circuit caselaw.  As discussed throughout this brief, the requested fee is reasonable and any objection asserting that it is excessive lacks merit.

[26]     As this Court observed at the time of Final Approval, "[t]hese figures [we]re especially impressive considering that about 5,000 Retired Players [were] represented by counsel in this MDL, and could easily have objected or opted out to pursue individual suits."  *In re NFL*, 307 F.R.D. at 389.

settlement program, and provided the Claims Administrator with contact information to receive notification once the Settlement becomes effective. Brown Decl. at 2. Thousands more have communicated with the Claims Administrator about the Settlement since it received this Court's Final Approval. The Settlement website has received over 180,000 unique visits. *Id*. The Claims Administrator has received nearly 1,100 written communications and responded to the over 1,000 that asked questions about the Settlement. The Settlement Call Center has received over 14,000 calls with well over half of the callers speaking directly to live operators for a total of nearly 500 hours. *Id.* at 2-3. "The absence of substantial objections by class members to the fees requested by counsel strongly supports approval." *In re AT & T Corp.*, 455 F.3d 160, 170 (3d Cir. 2006).

### 3.    The Skill and Efficiency of the Attorneys Involved

"The skill and efficiency of Plaintiffs' Counsel is measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Meijer, Inc. v. 3M*, No. 04-5871, 2006 WL 2382718, at *21 (E.D. Pa. Aug. 14, 2006) (citation omitted). Here, "[c]ounsel are experienced practitioners . . . [t]his experience and the results obtained for the class reflect Class Counsel's skill and efficiency." *In re Wellbutrin SR Antitrust Litig*., No. 04-5525, 2011 U.S. Dist. LEXIS 158833, at *16-17 (E.D. Pa. Nov. 21, 2011); *In re Linerboard Antitrust Litig*., No. MDL-1261, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004).

No objector challenged the expertise of Plaintiffs' Counsel. Co-Lead Class Counsel Christopher Seeger has spent a quarter-century litigating mass tort and class actions, particularly in the MDL context. He has served as plaintiffs' lead counsel or as a member of the plaintiffs' executive committee or steering committee in dozens of cases. *See* ECF No. 6423-3 (¶¶ 2-4);

Seeger Decl. ¶ 2.  In particular, he has served as lead plaintiffs' negotiator for multiple large settlements, including the *Vioxx* settlement totaling $4.85 billion, the DePuy Orthopaedics, Inc. ASR Hip Implant Products settlement, totaling nearly $2.5 billion, and the first and second *Zyprexa* settlements, which resulted in a total $1.2 billion payout.  *Id*. ¶ 2.

Co-Lead Class Counsel Sol Weiss, Subclass Counsel Arnold Levin and Dianne Nast, and Class Counsel Gene Locks and Steven Marks possess similarly impeccable credentials.  *See In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042, at *44 (E.D. Pa. Aug. 28, 2000) ("Each of the Class Counsel [Messrs. Levin, Weiss, Locks, and others] are experienced in the conduct of class litigation, mass tort litigation and complex personal injury litigation[.]"); ECF No. 6423-3 (¶ 27) (noting that Messrs. Marks and Weiss are "attorneys with decades of class action and MDL litigation experience"); ECF No. 6423-10 (¶ 2) (describing Mr. Levin's leadership positions in over 100 class actions, mass torts, and complex personal injury suits); ECF No. 6423-9 (¶ 2) (discussing Ms. Nast's leadership positions in over 48 complex cases). Plaintiffs' appellate counsel, Professor Samuel Issacharoff of the New York University School of Law, is also an extremely experienced and talented advocate.  Professor Issacharoff helped steer the defense of the 23(f) and final approval appeals, successfully arguing twice before the Third Circuit, and serving as counsel of record in the Supreme Court in opposition to the two *certiorari* petitions.  Seeger Decl., Ex. O (Issacharoff Decl.).

The achievements of Plaintiffs' Counsel are particularly noteworthy because they went up against the NFL Parties' counsel – Paul, Weiss, Rifkind, Wharton & Garrison – one of this nation's premier law firms.  The firm is commonly recognized for its excellence, *see*, *e.g.*, *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 358 (S.D.N.Y. 2005)

(stating defense counsel, including Paul, Weiss, the lead defense firm, were "formidable opposing counsel" and among "some of the best defense firms in the country"); *In re Schering-Plough Corp.*, No. 08-2177, 2013 WL 5505744, at *27 (D.N.J. Oct. 1, 2013) (noting caliber of the Paul Weiss firm), and it routinely leads the defense of immensely complex and challenging litigation.

The NFL called upon the services of other elite law firms as well in this litigation, such as Dechert LLP and Paul D. Clement (formerly of Bancroft PLLC and now with Kirkland & Ellis), who argued the NFL's motion to dismiss on federal preemption grounds.  Simply put, "[c]lass counsel . . . faced formidable opposition from the skilled counsel opposing this litigation.  All of these facts weigh in favor of granting Class Counsel's request for attorneys' fees."  *In re Wellbutrin SR Antitrust Litig.*, 2011 U.S. Dist. LEXIS 158833, at *16-17; *see also Meijer, Inc. v. 3M*, No. 04-5871, 2006 WL 2382718, at *21 (E.D. Pa. Aug. 14, 2006) ("Defense Counsel are also very experienced … and have defended this suit skillfully."); *Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 570 (E.D. Pa. 2012) ("[T]he fact that Plaintiffs' counsel obtained this settlement in the face of formidable legal opposition further evidences the quality of their work.").

### 4. The Complexity and Duration of the Litigation

As this Court noted, this MDL involved a large class, with events and injuries spread over decades.  The litigation "attempt[ed] to resolve issues of considerable scale.  Class Members allege[d] negligence and a fraudulent scheme dating back half a century."  *In re NFL*, 307 F.R.D. at 388.  "The claims of over 20,000 Retired Players [we]re at issue."  *Id.*  The litigation also encompassed "complex scientific and medical issues not yet comprehensively studied."  *Id.*  The Court noted further that document discovery, medical record discovery, expert discovery, and motion practice would be complex.  *Id.*  In particular, the Court noted the

38

uncertainties in linking CTE to head trauma suffered playing professional football "because clinical study of CTE is in its infancy." *Id*. at 398.

The Third Circuit agreed, concurring with this Court that the "stiff challenges surmounting the issues of preemption and causation" that Class Members faced strongly weighed in favor of the Settlement's approval. *Id.* at 439; *see also id*. at 435 ("Given our experience with similar MDLs, we expect the proceedings would result in years of costly litigation and multiple appeals, all the while delaying any potential recovery for retired players coping with serious health challenges."). In addition, as discussed below, Class Members would have had to confront a litany of defenses, including federal preemption, assumption of risk, lack of causation (both general and specific), and, for many, the statute of limitations. *See generally* Section IV.B.5, *infra*. Given the complexity of this case and the daunting obstacles that stood in the path to a favorable judgment, the settlement benefits of almost $1.2 billion that were secured for the Class truly represent a remarkable achievement, amply justifying the fees requested here that equal approximately nine percent of that recovery.

### 5.    The Risk of Nonpayment

The Court's analysis should logically proceed from the beginning of the case with an evaluation of the serious risks of non-recovery faced by Plaintiffs' Counsel when they committed themselves to this litigation on a contingency basis. *See In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 478 (E.D. Pa. 2008). "Risk must be assessed *ex ante* from the outset of the case, not in hindsight." *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).

"Plaintiffs' Counsel's compensation for their services in this case was wholly contingent on the success of the litigation." *Meijer, Inc.*, 2006 WL 2382718 at *21; *Hegab v. Family Dollar Stores, Inc.*, No. 11-1206, 2015 WL 1021130, at *13 (D.N.J. Mar. 9, 2015) ("Class counsel undertook this action on a contingent fee basis, assuming a substantial risk that they might not be

compensated for their efforts. . . .  Courts recognize the risk of non-payment as a major factor in considering an award of attorney fees.").  This factor further supports the requested award.  *E.g.*, *In re Diet Drugs*, 553 F. Supp. 2d at 479 ("At the inception, and throughout this litigation, there was a substantial risk that the efforts of the Joint Fee Applicants would not be successful."); *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D. Pa. 2009) (fee request reasonable where class counsel "undertook representation on a contingency basis[,] . . . advanced hundreds of thousands of dollars in expenses" and prosecuted the case "without any guarantee of payment"); *McGee v. Continental Tire of N. Am.*, No. 066234, 2009 WL 539893, at *15 (D.N.J. Mar. 4, 2009) ("Class Counsel accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award.  Accordingly, this factor weighs in favor of approval."); *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2009 WL 411856, at *5 (D.N.J. Feb 17, 2009) (same).

This litigation presented very significant legal and scientific challenges, any one of which would have spelled doom for Plaintiffs.  From the initiation of the litigation, Plaintiffs' claims were at risk due to the NFL Parties' threshold argument that federal labor law precludes the litigation of Plaintiffs' claims in court.  In particular, in their motions to dismiss the Master Administrative Class Action Complaint and the Amended Master Administrative Long-Form Complaint on Preemption Grounds, the NFL Parties claimed that Section 301 of the LMRA mandates the preemption of all state-law claims – whether based in negligence or fraud – whose resolution is substantially dependent upon or inextricably intertwined with the terms of a CBA,

or that arise under the CBA.  *See* 29 U.S.C. § 185(a) (codifying Section 301(a)); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).[27]

The formidable issue of federal preemption aside, the NFL Parties also could have asserted statute of limitations defenses in future motions to dismiss, a significant potential risk for Plaintiffs and Class Members (several thousand of whom had suits that had been centralized in this MDL at the time of the settlement).  *See* ECF 6073-4 (Phillips Decl. ¶ 15).  Many of the Retired NFL Football Players have not played for years, or even decades.  Certain Class Members' brain injuries and symptoms have been present for several years or even decades.  Clearly, these circumstances presented potentially fatal obstacles to Plaintiffs' Counsels' efforts to secure compensation for the Class.  Another potential defense for the NFL Parties was the statutory employer defense – with the consequence that Class Members' exclusive remedy would be workers compensation benefits.  This is a defense that the NFL Parties had stated they would raise.  *See* Seeger Decl. ¶ 22 n.2.

In addition to those threshold defenses, as it has done in other litigation, the NFL would undoubtedly have raised the defense that Plaintiffs had assumed the risks of the cognitive injuries they developed.  *See* ECF No. 6073-4 (Phillips Decl. ¶ 15).  It is well known that football poses serious injury risks, as countless individuals (at all levels of the game) incur personal injuries every year while playing the sport.  It is also well known that countless individuals suffer serious

---

[27]    The risk that Plaintiffs faced on account of this defense is not idle speculation.  The NFL had successfully invoked this defense in several individual suits.  *E.g.*, *Duerson v. Nat'l Football League*, 12-C-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Maxwell v. Nat'l Football League*, 11-08394, Order (C.D. Cal. Dec. 8, 2011); *see also Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894 (S.D. Ohio 2007).  In each of these cases, the courts held that the NFL players' claims against the NFL or its member clubs relating to duties that are imposed by the CBAs were preempted because they required interpretation of CBA terms.  The *Duerson* and *Maxwell* cases involved head injuries and were transferred to this MDL.

head trauma, including concussions, while playing football.  Therefore, the NFL Parties would have presented a strong assumption of risk defense to Plaintiffs' claims.

Further hurdles remained.  From a scientific standpoint, as the Court aptly noted, "even if Class Members could conclusively establish general causation, the problem of specific causation remain[ed].  Class Members argue[d] that the cumulative effect of repeated concussive blows Retired Players experienced while playing NFL Football led to permanent neurological impairment.  Yet the overwhelming majority of Retired Players likely experienced similar hits in high school or college football, before they ever reached the NFL.  Brain trauma during youth, while the brain is still developing, could also play a large role in later neurological impairment." *In re NFL*, 307 F.R.D. at 393.  It would have been difficult, therefore, to isolate "the effect of hits in NFL Football from hits earlier in a Retired Player's career." *Id*.

The Third Circuit agreed with this Court's assessment, stating that it "concur[ed] with the District Court that this factor weighed in favor of settlement because Class Members face[d] stiff challenges surmounting the issues of preemption and causation." *In re NFL*, 821 F.3d at 439 (citing this Court's opinion; internal quotation marks omitted).  In short, Plaintiffs would have had a panoply of daunting (and possibly insurmountable) hurdles to overcome in obtaining a favorable judgment.  The risk of non-payment to Plaintiffs' Counsel was therefore, to say the least, considerable.

### 6.    The Amount of Time That Plaintiffs' Counsel Devoted to the Case

Plaintiffs' Counsel have expended a total of almost 51,000 hours on this litigation (including innumerable late nights, weekends, and holidays).  Seeger Decl. ¶ 78. As detailed above, this time has included many hours in mediation and negotiations; extensive research of claims from both legal and scientific standpoints; research and briefing for multiple filings and appeals; and wide-ranging coordination with both the Claims Administrator and the Lien

Administrator to establish the administrative infrastructure to ensure effectiveness of the Settlement.  *See* Sections III.B-M, *supra*.  The needed commitment of so much time and resources to this undertaking – which necessarily resulted in Plaintiffs' Counsel foregoing other professional opportunities – further militates in favor of the instant application.  *See*, *e.g.*, *Wellbutrin SR Antitrust Litig.*, 2011 U.S. Dist. LEXIS 158833, at *17 (more than 41,000 hours spent on case was a "substantial" time commitment favoring approval of fee application).

To be sure, as some objectors noted (and misguidedly placed undue reliance upon), there may not have been *formal* discovery, but that certainly does not mean that these claims were not intensely litigated or that a great deal of time and resources did not go into achieving the Settlement and putting it into effect.  Those efforts included researching Plaintiffs' claims, developing information about the Class, contesting the NFL Parties' threshold preemption motions, consulting with numerous experts (including medical, economic, and actuarial),[28] exchanging reams of information with the NFL Parties, extensive and spirited mediation, and defending the Settlement at three judicial levels (including unorthodox onslaughts such as the attempts at interlocutory review of the Court's preliminary approval).  *See* Sections III.B-L, *supra*.  "The record of this litigation . . . indicates that the time spent by Plaintiffs' counsel was necessary for the successful prosecution of this case, considering both the complexity of the issues and the robust defense mounted by the defendants."  *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 104 (E.D. Pa. 2013); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) ("amount of time and expense"

---

[28]     Plaintiffs' Counsel, with the assistance of  their experts, also thoroughly reviewed peer-reviewed medical literature on, *inter alia*, brain injury, concussions, the effect of sub-concussive hits to the head on the brain, the epidemiology of the Qualifying Diagnoses, and the methods of diagnosis and treatment for the Qualifying Diagnoses.  Seeger Decl. ¶ 29.

demonstrated counsel's "significant commitment of resources" to litigation and weighed in favor

of approving fee petition).

### 7.    Fee Awards in Similar Cases

"This factor requires the Court to compare the percentage of recovery requested as a fee

in this case against the percentage of recovery awarded as a fee in other common fund cases in

which the percentage of recovery method, rather than the lodestar method, was used." *Meijer,*

*Inc.*, 2006 WL 2382718 at *22; *In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 737.   Here,

Plaintiffs' Counsel request an award amounting to approximately nine percent of the value of the

total relief secured for the Class.   This is a modest percentage that is well within the parameters

for class action fee awards in this Circuit.[29]   Indeed, in *In re Rite Aid*, the Third Circuit noted

---

[29]       *E.g.*, *Bodnar v. Bank of Am. N.A.*, No. 14-3224 (E.D. Pa. Aug. 4, 2016) (ECF No. 90)
(approving  fee request that "would be approximately 36.8 percent of the mere cash value of the
fund, and considering non-monetary, injunctive relief as well"); *In re Viropharma Inc., Sec.
Litig.*, No. 12-2714, 2016 WL 312108, at *16 (E.D. Pa. Jan. 25, 2016) (approving 30% of $8
million settlement fund); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013)
(awarding one-third fee on settlement of $150 million); *In re Processed Egg Prods. Antitrust
Litig.*, MDL No. 2002, 2012 WL 5467530, at *1 (E.D. Pa. Nov. 9, 2012) (approving fees equal
to 30% of $25 million fund); *Alexander v. Washington Mut., Inc.*, No. 07-4426, 2012 WL
6021103, at *3 (E.D. Pa. Dec. 4, 2012) (30% of $4 million fund); *Stagi v. Nat'l R.R. Passenger
Corp.*, 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) ("[T]his District's fee awards generally range
between nineteen and forty-five percent of the common fund.") (citing *In re Corel Corp., Inc.
Sec. Litig.*, 293 F. Supp. 2d 484, 497 (E.D. Pa. 2003), and other cases); *In re Auto. Refinishing
Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *3 (E.D. Pa. Jan. 3, 2008) (33% of
$39 million supplement to fund); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d
322, 342 (E.D. Pa. 2007) (approving 35% of $81 million, plus reimbursement of expenses); *In re
Ravisent Techs., Inc. Sec. Litig.*, No. 1014, 2005 WL 906361, at *10-11 (E.D. Pa. Apr. 18, 2005)
(33% of $7 million fund, and noting that "courts within the [Third Circuit] have typically
awarded attorneys' fees of 30% to 35% of the recovery, plus expenses"); *In re Linerboard
Antitrust Litig.*, No. MDL 1261, 2004 WL 1221350, at *1 (E.D. Pa. June 2, 2004) (awarding
30% of $202,572,489 settlement fund), *amended*, 2004 WL 1240775, at *1 (June 4, 2004); *In re
Rent-Way Secs. Litig.*, 305 F. Supp. 2d 491, 519 (W.D. Pa. 2003) (25% of $25 million settlement
fund); *In re Flat Glass Antitrust Litig.*, MDL No. 1200 (W.D. Pa. May 20, 2003) (33% of fund);
*In re ATI Techs. Inc. Sec. Litig.*, No. 01-2541, 2003 WL 1962400, at *2 (E.D. Pa. Apr. 28, 2003)
(30% of $8 million fund); *In re Cell Pathways Secs. Litig. II*, No. 01-cv-1189, 2002 WL
31528573, at *1 (E.D. Pa. Sept. 23, 2002) (30% of fund comprised of $2 million and 1.7 million
                                                                        (Footnote continued . . .)

44

three studies which found that fee awards ranging between 25-33 percent of common funds were not unusual. *In re Rite Aid*, 396 F.3d at 303. If anything, Plaintiffs Counsel's fee request is well below the norm.

Although in the Third Circuit "it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries[,] . . . the declining percentage concept does not trump the fact-intensive *Prudential/Gunter* analysis." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 302-03. Indeed, "there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund." *Id.*[30]

---

shares of common stock); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262-63 (D. Del. 2002) (22.5% of $44.5 million settlement); *In re Ikon Offices Solutions Inc. Sec. Litig.*, 194 F.R.D. at 192 (30% of $108,915,874.43 settlement fund); *Cullen*, 197 F.R.D. at 150 ("[T]he award of one-third of the fund for attorney's fees is consistent with fee awards in a number of recent decisions within this district."); *Ratner v. Bennett*, No. 92-4701, 1996 WL 243645, at *9 (E.D. Pa. May 8, 1996) (35% of $400,000); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 322-23 (W.D. Pa. 1997) (28% of $18.9 million settlement fund); *In re Greenwich Pharm. Sec. Litig.*, No. 92-3071, 1995 WL 251293, at *6 (E.D. Pa. Apr. 25, 1995) (33.3% of $4,375,000 fund).

[30]    Many courts and commentators reject the sliding scale or "mega-fund" (as it is sometimes referred to) approach, including because it irrationally punishes lawyers for achieving large recoveries on behalf of classes. *E.g.*, *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *16-17 (E.D. Pa. June 2, 2004) ("The Court rejects [the sliding scale] in this case because the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success. Moreover, the sliding scale approach is economically unsound."); *In re Ikon Office Solutions, Inc., Secs. Litig.*, 194 F.R.D. at 197 ("[A]pproach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time. . . . We have never suggested that a 'megafund rule' trumps these market rates[.]"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 8:10-mdl-02151-JVS, at 17 n.16 (C.D. Cal. Jun. 17, 2013) ("The Court also agrees with . . . other courts . . . which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class."); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006)

(Footnote continued . . .)

As the Court of Appeals explained in *Rite Aid*, "the reason courts apply the declining percentage principle 'is the belief that in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *Id.* at 302 (quoting *In re Prudential*, 148 F.3d at 339 (internal quotations omitted). That cannot genuinely be said here.

Thus, in *In re Prudential*, in vacating the fee award of $90 million on a settlement estimated at $1 billion, *id.* at 338-40, much of the Third Circuit's concern was case-specific. In particular, the Court of Appeals questioned such a sizable fee award when much of the settlement apparently had resulted from the work of state regulators and a multi-state insurance task force. *See In re Prudential*, 148 F.3d at 342. In *Rite Aid*, in contrast, the Court found that class counsel's "extraordinarily deft and efficient" handling of the complex securities matter had resulted in a "rich settlement," *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 609-11 (E.D. Pa. 2003), and although it remanded the Court's fee award for further determination because of an error in the lodestar cross-check, it nonetheless agreed that "class counsel's efforts [had] played a significant role in augmenting and obtaining an immense fund," and that the Court had acted within its discretion in declining to apply a "sliding scale" percentage. *In re Rite Aid*, 396 F.3d at 303.

But even taking this "mega-fund" approach into account, an award of approximately nine percent is still well within the norm in this Circuit for class counsel fees in cases involving recoveries that exceed $100 million. *E.g.*, *King Drug Co. of Florence v. Cephalon*, No. 06-cv-01797-MSP, 2015 WL 12843830 at *5 (E.D. Pa. Oct. 15, 2015) (awarding 27.5% of $512 million settlement); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 588-90 (E.D. Pa. 2005)

---

(sliding scale does not "reward[] Class Counsel for the additional work necessary to achieve a better outcome for the class" and "creates the perverse incentive for Class Counsel to settle too early for too little.").

(awarding 25% of $125 million fund); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736, n.44 (E.D. Pa. 2001) (25% of $193 million fund); *In re Ikon Offices Solutions Inc. Sec. Litig.*, 194 F.R.D. 166, 192 (E.D. Pa. 2000) (30% of $108,915,874.43 settlement fund).[31]   In fact, a frequently cited study of class action recoveries found that the average fee award for large class settlements was 13.7% nationwide, with a median of 9.5 percent.   Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements*, 7 J. of Empirical Legal Stud., 811-46, 839 (Dec. 2010) (Table 11) (copy annexed to Seeger Decl. as Exhibit Y).

### 8.   The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups

"This factor seeks to compare the actions of government prosecutions, similar private cases, and agency litigation to the instant private litigation."   *In re Diet Drugs*, 582 F.3d at 544. Here, as noted, Plaintiffs' Counsel began this litigation in 2011, and there was no similar, previously-existing litigation against the NFL that could be used as a template.   Plaintiffs' Counsel conducted their own extensive research, developed their own experts, briefed all the

---

[31]    It is also within the norm of awards made by courts outside this Circuit. *E.g.*, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-C05893, ECF No. 2265, at 1-2 (N.D. Ill. Nov. 10, 2016) (awarding 24.68% of $1.575 billion settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) (28.5% of $1.1 billion fund); *In re Priceline.com, Inc. Sec. Litig.*, No. 00-1884, 2007 WL 2115592, at *5 (D. Conn. July 20, 2007) (30% of $80 million fund); *In re Tyco Int'l, Ltd. Multidist. Litig.*, 535 F. Supp. 2d 249, 266, 272, 274 (D.N.H. 2007) (14.5% of $3.3 billion fund); *In re Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529, 2006 WL 3378705, at *1, *3 (S.D.N.Y.  Nov. 16, 2006) (awarding 21.4% of $455 million fund); *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), slip op. at 1 (S.D.N.Y. Oct. 27, 2006) (20% of $410 million fund); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 387 (D. Md. 2006) (12% of $1.1 billion fund); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1192 (S.D. Fla. 2006) (31.33% of $1.1. billion fund); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) (15% of $1-1.1 billion award); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 485-86 (S.D.N.Y. 1998) (14% of $1.027 billion fund).

relevant issues in multiple filings to the Court, and conducted their negotiation sessions without the benefit of previous lawsuits or government prosecutions.

Although there were congressional hearings[32] regarding head injuries in the NFL that produced some useful documentation and testimony, there was no parallel state or federal action that provided any impetus toward resolution – as in, for example, an antitrust case.   Here, "[t]here is no contention . . . that the settlement could be attributed to work done by other groups, such as government agencies." *Esslinger v. HSBC Bank Nevada, N.A.*, No. 10-3213, 2012 WL 5866074, at *14 (E.D. Pa. Nov. 20, 2012).   Thus, "class counsel in this case was not aided by a government investigation. . . . [T]his [i]s a significant factor for courts to consider." *In re AT & T Corp.*, 455 F.3d at 173,  Put simply, there was no "litigation roadmap" of which Plaintiffs' Counsel could avail themselves.  *Haught v. Summit Res., LLC*, No. 1:15-cv-0069, 2016 WL 1301011, at *10 (M.D. Pa. Apr. 4, 2016).  This factor thus further supports the requested award.

> **9.     The Percentage Fee That Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel Was Retained**

Also weighing in favor of the requested award is the fact that the size of the award as a percentage of the recovery obtained (nine percent) is markedly below the "percentage fee that would have been subject to a private contingent fee agreement at the time counsel was retained." *In re AT & T*, 455 F.3d 160 (citing *In re Prudential*, 148 F.3d at 340); *In re CertainTeed Fiber Cement Siding Litig.,* 303 F.R.D. 199, 224 (E.D. Pa. 2014).[33]  "In private contingency fee cases,

---

[32]     *E.g.*, in 2009 and 2010, the U.S. House of Representatives Judiciary Committee held several hearings related to head injuries in the NFL.

[33]     *Accord, Alexander v. Washington Mut., Inc.*, No. 07-4426, 2012 WL 6021103, at *3 (E.D. Pa. Dec. 4, 2012) (citing *Esslinger*, 2012 WL 5866074, at *14); *In re Remeron Direct Purchaser Antitrust Litig.,* No. 03-0085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in

(Footnote continued . . .)

lawyers routinely negotiate agreements between 30% and 40% of the recovery." *Esslinger*, 2012 WL 5866074 at \*14 (citing *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 123 (D.N.J. 2012)); *Schuler v. Meds Co.*, No. 14-1149, 2016 WL 3457218, at \*10 (D.N.J. June 24, 2016) ("The attorneys' fees request one-third of the settlement fund . . . comports with privately negotiated contingent fees privately negotiated on the open market.") (citation and internal quotation marks omitted).[34]

## 10.     The Settlement Agreement Contains Many Innovative Features

Also favoring approval of the instant fee petition is that this Settlement contains multiple innovative terms.  *See Haught v. Summit Res., LLC*, No. 1:15-cv-0069, 2016 WL 1301011, at \*11 (M.D. Pa. Apr. 4, 2016) ("Particularly where a settlement involved 'innovative' or unique terms, such a finding [that the results achieved by class counsel were nothing short of remarkable] may be warranted."); *Tavares v. S-L Distrib. Co.*, 1:13-cv-1313, 2016 WL 1732179, at \*13 (M.D. Pa. May 2, 2016) (same).

As noted above, the Settlement provides a 65-year, inflation-adjusted Monetary Award for several Qualifying Diagnoses – including neurological manifestations of a certain severity

---

non-class, commercial litigation."); *In re Aetna Inc. Secs. Litig.*, MDL No. 1219, 2001 WL 20928, at \*14 (E.D. Pa. Jan. 4, 2001) ("[A]n award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation."); *In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.").

[34]     In *Chakejian v. Equifax Info. Svcs, LLC*, 275 F.R.D. 201 (E.D. Pa. 2011), the Court analyzed a fee application that involved an attorneys' fees payment that was not to be taken from a common fund but, rather, to be paid separately by the defendant pursuant to a statutory fee-shifting provision.  *Id.* at 216.  Although there would be no reduction to any common fund to pay attorney's fees, the Court nevertheless looked to the percentage of recovery method as a cross-check, noting that "contingency fees representing 30% to 40% of recovery are fairly typical" and that class counsel's request for attorney's fees equivalent to 11% of the benefits obtained for the class was "comparatively very reasonable."  *Id.* at 220.

that are associated with CTE, even though CTE cannot be diagnosed in living people.  The Settlement provides an innovative matrix to establish award amounts, based on a Retired NFL Football Player's age at time of diagnosis, and the amount of years played in the NFL (a reasonable proxy for the resulting degree of exposure to concussive and sub-concussive hits). Although a matrix for monetary awards had been used in other mass tort settlements, the application of this concept to multiple neurocognitive and neuromuscular diseases, using years played as a proxy for exposure to head trauma, was truly innovative.

Providing assessments and Qualifying Diagnoses to retired players in various age groups, spread throughout the country, by qualified medical professionals, called for creating medical networks – the Qualified BAP Providers and the Qualified MAF Physicians.  The use of these networks will further the Settlement's goals of providing accurate and consistent diagnoses, as well as ready access to qualified medical providers by Retired NFL Players and their families.

The BAP will provide neurocognitive testing for thousands of Retired NFL Football Players.  It is an innovative feature designed to detect and diagnose Level 1, Level 1.5 and Level 2.0 Neurocognitive Impairment.  The program requires the BAP Administrator to create a network of qualified medical professionals to administer and evaluate the tests, and to provide BAP Supplemental Benefits.  Settlement § 5.7(a)(i) [ECF No. 6481-1, at 28].  Qualified BAP Providers from all over the country will participate in the program, easing travel burdens for Retired NFL Players.  *Id*. § 5.7(a)(ii) [ECF No. 6481-1, at 28-29].  The BAP includes state-of-the art neuropsychologial exams, and Plaintiffs' Counsel and their experts drafted guidelines for these tests for the doctors to apply.

The Settlement also creates a network of board-certified neurologists, neurosurgeons, and other neuro-specialist physicians – the Qualified MAF Physicians' network.  Settlement § 6.5(a)

[ECF No. 6481-1, at 38].  This network will operate for 65 years, in order to provide Qualifying Diagnoses for Retired NFL Football Players for the duration of their lifetimes.  As with the BAP, Qualified MAF Physicians will be available throughout the country, and the Settlement will ease the difficulty of Retired Players finding qualified healthcare providers.

As the Court observed, "Retired Players cannot be compensated for CTE in life because no diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown.  But the Settlement *does* compensate the cognitive symptoms allegedly associated with CTE."  *In re NFL*, 307 F.R.D. at 396-97 (emphasis in original).  CTE "inflicts symptoms compensated by Levels 1.5 and 2 Neurocognitive Impairment and is strongly associated with the other Qualifying Diagnoses in the Settlement."  *Id.* at 400.  The ability to compensate these cognitive symptoms despite the current lack of scientific means to diagnose CTE in a living retired NFL player, is another innovative aspect of the Settlement.

Also innovative is the Settlement's lien resolution program, which will lower Class Members' costs.  The Settlement provides for the retention of an expert (the Lien Resolution Administrator) for the purpose of negotiating collective resolution of governmental and health benefit liens against class member recoveries.  Absent global resolution, as is common in an individual injury action, such liens can reduce a claimant's gross award by a third or more.  As the Court found, "the lien resolution program will streamline this necessary process and ensure that Class Members receive Monetary Awards as quickly as possible," and "the lien resolution process represents a substantial benefit for Class Members" because the appointed administrator "will be able to negotiate on a class-wide basis" and thereby obtain a "discount" for the Class.  *In re NFL*, 307 F.R.D. at 367, 421; *see also* Seeger Decl., Ex B (Decl. of Matthew L. Garretson, dated Jan. 20, 2017).

In addition, the Settlement is innovative in that it protects neurocognitive benefits that Retired NFL Players had bargained for.  The Settlement ensures that settlement benefits do not in any way compromise pre-existing benefits to which a Retired Player might be entitled. Significantly, it preserves Retired NFL Football Players' rights to pursue claims for workers compensation and any and all medical and disability benefits under any applicable collective bargaining agreement, including the NFL's Neuro-Cognitive Disability Benefit and the "88 Plan" (which reimburses or pays for up to $100,000 in medical expenses per year for qualifying retired players with dementia, ALS, and Parkinson's Disease).   Settlement § 18.6 [ECF No. 6481-1, at 79-80].  In addition, the Settlement ensures that the provision included in Article 65 of the current CBA, Section 2 – requiring that players execute a release of claims and covenant not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit – will not be enforced or used against Class Members in connection with this Settlement.  *Id*. § 29.1 [ECF No. 6481-1, at 96].

The appeals process is also an innovative feature of the Settlement in that it provides added structural protections for Class Members.  Co-Lead Counsel have standing to appeal as part of the Settlement Agreement.  *Id.* § 9.5 [ECF No. 6481-1, at 51].  The Settlement provides rights to appeal various decisions, including denial of registration, denial of Monetary Awards, and the amount of a Monetary Award.  *Id.*

### C.    A Lodestar Cross-Check Shows That the Fee Request Is Reasonable

As noted above, *see* Section IV.A, *supra*, while it has not made it mandatory, the Third Circuit has suggested that, in addition to reviewing the fee award reasonableness factors, "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method."  *In re Rite Aid*, 396 F.3d at 305 (citing *In re Prudential,* 148 F.3d at 333).  The lodestar is calculated by multiplying the number of hours worked by the hourly rates of counsel.  The

proposed percentage of the recovery award is then divided by the lodestar to yield the "lodestar multiplier." *In re AT & T Corp.*, 455 F.3d at 164. "The court may then multiply the lodestar calculation to reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Aetna Inc. Secs. Litig.*, No. MDL 1219, 2001 WL 20928, at *15 (E.D. Pa. Jan. 4, 2001) (citing *In re Ikon*, 194 F.R.D. at 195).

The lodestar cross-check however, "does not trump the primary reliance on the percentage of common fund method." *In re Rite Aid*, 396 F.3d at 307. Moreover, "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. . . . [T]he resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *Id.* at 306-07 (footnotes and citations omitted). In short, a lodestar cross-check serves merely as a rough yardstick to gauge the reasonableness of a common benefit fee request.

### 1. Plaintiffs' Counsels' Lodestar Is Eminently Reasonable

Here, Plaintiffs' Counsels' lodestar totals $40,559,978.60. *See* Seeger Decl. ¶ 78 & Exs. C-X (compiling supporting declarations of Co-Lead Counsel, Class Counsel, Subclass Counsel, and all other firms having performed common benefit work). The total hours expended on this litigation were 50,912.39, which included time reasonably spent investigating the claims, conferring on and formulating case strategy, drafting complaints and master administrative complaints, defending against dispositive motions, the extensive and spirited mediation (including the second round that followed the Court's January 2014 rejection of the first settlement agreement), the actual negotiation and drafting of the Settlement (including its precursors), the drafting of Rule 23(e) preliminary and final approval papers, overseeing the preparation and dissemination of Class Notice, dealing with innumerable Class Members,

preparing for implementation of the Settlement, and defending against multiple appeals (both interlocutory and from the final judgment and order approving the Settlement).

Besides the time reasonably expended in this complex MDL and its many (and sundry) moving parts, the hourly attorney rates underlying the lodestar are reasonable.  Specifically, Seeger Weiss' rates range from $985 to $500 per hour, Seeger Decl., Addendum 1; Anapol Weiss' rates range from $650 to $275 per hour (Seeger, Decl., Ex. G [Weiss Decl., Ex. 1]); Podhurst Orseck's rates range from $895 to $405 per hour (Seeger Decl., Ex. E [Marks Decl., Ex. 1]); the Locks Law Firm's rates range from $900 to $550 per hour (Seeger Decl., Ex. D [Locks Decl., Ex. 1]); Levin, Sedran & Berman's rates range from $1,350 to $525 per hour (Seeger Decl., Ex. C [Levin Decl., Ex. 1]); and NastLaw's rates range from $800 to $560 per hour (Seeger Decl., Ex. F [Nast Decl., Ex. 1]).[35]

The next question is whether these rates are consistent with prevailing rates in this District.  *See generally Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 705 (3d Cir. 2005) (district courts in this Circuit must look to "forum rates," save where special expertise of counsel from distant district is shown or when local counsel are unwilling to handle the case).  The answer to that is yes.

---

[35]    The firms' rates are current, not historical, rates.  That reflects the Third Circuit's preference, *see Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001) ("When attorney's fees are awarded, the current market rate must be used."), and counterbalances the delay in payment of counsel given the contingent nature of the services rendered.  *E.g.*, *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F. Supp. 445, 479 (E.D. Pa. 1995); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-2177 DMC, 2013 WL 5505744, at *33 n.28 (D.N.J. Oct. 1, 2013) (citing cases).  "[D]istrict [C]ourts in this [C]ircuit do award attorneys' fees based on the current billing rate."  *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 103 n.11 (D.N.J. 2001) (internal quotations and citations omitted); *in re Ikon Office Sols., Inc., Secs. Litig.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000) ("Each attorney's hourly rates were appropriately calculated by reference to current rather than historic rates.").

The prevailing market rate is ordinarily reflected in a law firm's normal billing rate. *See In re Avandia Mktg., Sales Practice & Prods. Liab. Litig.*, No. 07-md-01871, 2012 WL 6923367, at *10 (E.D. Pa. Oct. 19, 2012). "The value of an attorney's time generally is reflected in his normal billing rate." *Moore v. GMAC Mortgages*, No. 07-4296, 2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) (internal citation omitted). Because a "reasonable hourly rate" reflects an attorney's experience and expertise, the rates for individual attorneys vary. *Id.*

Whether the rate charged is reasonable is determined by "assessing the experience and skill of the prevailing party's attorneys and by looking at the market rates in the relevant community for lawyers of reasonably comparable skill, experience and reputation." *Chakejian v. Equifax Info. Svcs, LLC*, 275 F.R.D. 201, 217 (E.D. Pa. 2011) (internal citations and quotations omitted). Here, counsel has applied normal billing rates, rates that have been approved in this Circuit. *E.g*, *In re Viropharma Inc., Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) (hourly billing rates of all of plaintiff's counsel ranged from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys); *McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 657 n.30 (E.D. Pa. 2015) (Seeger Weiss LLP's rates approved); *In re Mercedes Benz Tele Aid Contract Litig.*, No. 07-2720, 2011 WL 4020862, at *7 (D.N.J. Sept. 9, 2011) (rates of $500-$855 per hour for partners and $370 to $475 for associates were "comparable to rates the courts have approved in similar cases in other metropolitan areas"); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 2012 WL 6923367, at *10 (E.D. Pa. Oct. 19, 2012) ("According to a 2011 sampling of nationwide billing rates submitted by the Fee Committee, of which this Court takes judicial notice, partners at GSK's Philadelphia-based firm (Pepper Hamilton) bill up to $825 per hour, and partners at other Philadelphia law firms have similar top hourly rates ($900 at Cozen O'Connor, $875 at Duane Morris, $750 at

Saul Ewing, and $725 at Fox Rothschild")"; *In re Merck & Co., Inc. Vytorin Erisa Litig*., No. 08-cv-285, 2010 WL 547613, at *13 (D.N.J. Feb. 9, 2010) (approving Seeger Weiss LLP's billing rates, which at the time ranged from $345 - $775).[36]

### 2. The Requested Award Reflects a Suitable Multiplier

In performing a lodestar cross-check, it is appropriate for the Court to consider the multipliers utilized in comparable cases. *In re Rite Aid*, 396 F.3d at 307 n.17. The Third Circuit has recognized that multipliers "'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *In re Cendant PRIDES,* 243 F.3d at 742 (quoting *In re Prudential,* 148 F.3d at 341). Here, as noted above, Plaintiffs' Counsels' combined lodestar is $40,559,978.60. Given the requested attorneys' fees component of the award of $106,817,220.62, the lodestar multiplier in this case is 2.6, which is well within the norm in this Circuit.

### D. Plaintiffs' Counsel's Expenses Were Reasonably and Appropriately Incurred, and Are Adequately Documented

Under the common fund doctrine, "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation[.]" *In re Diet Drugs*, 582 F.3d at 540

---

[36]    *See also Moore v. GMAC Mortg.*, No. 07-4296, 2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) (finding reasonable rates that "range from $325 per hour for an associate to $860 per hour for an experienced bankruptcy partner"); *Lugus IP, LLC v. Volvo Car Corp.*, No. 12-2906, 2015 WL 1399175, at *6, *8 (D.N.J. Mar. 26, 2015) (finding rates "between $274.50 and $895.50" to be "reasonable given the experience and specialized expertise of the attorneys involved"); *Mirakay v. Dakota Growers Pasta Co.*, No. 13-CV-4429 JAP, 2014 WL 5358987, at *14 (D.N.J. Oct. 20, 2014) (allowing rates that, "range[d] from $350.00 to $850.00 per hour"); *Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, No. 03-CV-4372 DMC, 2009 WL 4730185, at *9 (D.N.J. Dec. 4, 2009) (allowing hourly rates, "ranging from $225 to $830"); *Sullivan v. DB Invs., Inc.*, No. 04-2819 SRC, 2008 WL 8747721, at *35 (D.N.J. May 22, 2008) (allowing "hourly rates of the attorneys and paralegals . . . which range[d] from $800 to $185 per hour") (emphasis added).

(citations omitted).  "[C]ounsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action."  *In re Safety Components, Inc. Secs. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001) (citing *Abrams v. Liehtolier Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995)).  Here, "[c]ounsel had a strong incentive to conserve their expenses, given that they were incurred with no guarantee of recovery."  *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013).

The supporting declarations of Plaintiffs' Counsel describe the expenses incurred in connection with this litigation.  *See*, *e.g.*, Seeger Decl. ¶ 96 & Addendum 2; *id.*, Ex. G (Weiss Decl. ¶ 7 & Ex. 2); *id.* , Ex. E (Marks Decl. ¶ 34 & Ex. 2); *id.*, Ex. D (Locks Decl. ¶ 23 & Ex. 2); *id.*, Ex. C (Levin Decl. ¶ 7 & Ex. 2); *id.*, Ex. F (Nast Dec. ¶ 8 & Ex. 2).  These expenses are amply documented, and were reasonably incurred in the prosecution and resolution of the litigation.  Plaintiffs' Counsel will briefly highlight major categories of expenditure to assist the Court in its evaluation of this application.

This litigation involved detailed scientific and medical research and calculations.  For Plaintiffs' Counsel, it was absolutely necessary to understand the types of neurocognitive illnesses that would warrant compensation, to determine how many Retired NFL Football Players had suffered from these illnesses in the past, and to forecast how many Retired NFL Football Players would be diagnosed with them in the future.  This is especially so given the NFL's extensive resources and its ability to marshal its own expert analyses.

The case also involved extremely complicated statistical calculations.  Incidence rates of the Qualifying Diagnoses had to be calculated several decades out.  This also required extensive expert analysis, which is reflected in Plaintiffs' Counsel's expenses.  Moreover, as detailed above, Plaintiffs' Counsel formulated and employed an effective public relations strategy, which

kept Class Members informed, counteracted inaccurate information about the litigation and Settlement, and assisted in settlement efforts.  Courts routinely allow recovery for expert fees of the sort incurred here.  *E.g.*, *In re Viropharma Inc., Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) (counsel in a class action are entitled to reimbursement of expenses that were "adequately documented and reasonable and appropriately incurred in the prosecution of the class action"); *In re Flonase Antitrust Litig.*, 291 F.R.D. at 106 (costs of "experts, investigators, [and] accountants"); *Cullen*, 197 F.R.D. at 151 (expenses that were "adequately documented, proper and reasonable" reimbursed).

* * *

Lastly, as noted at the outset of this memorandum, Co-Lead Class Counsel Christopher Seeger respectfully requests that the Court entrust him with the responsibility and discretion for making the ultimate allocation of the fee award among counsel for non-objecting Plaintiffs who performed common benefit work (and incurred common benefit expenses) given that he has had overall charge of this litigation for some time now, including the formulation of case strategy, the spearheading of negotiations with the NFL Parties, and the defense of the Settlement.[37] Seeger Decl. ¶ 99.  Courts commonly delegate such allocation authority.  *E.g.*, *Milliron v. T-Mobile USA, Inc.*, 423 F. App'x 131, 134 (3d Cir. 2011) ("Generally, a district court may rely on lead counsel to distribute attorneys' fees among those involved[.]"); *In re Am. Inv'rs Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 251 (E.D. Pa. 2009) (conferring "sole discretion" on Co-Lead Counsel to allocate award of fees and expenses); *In re Viropharma Inc. Sec. Litig.*, Civ. No. 12-2714, 2016 WL 304040, at *4 (E.D. Pa. Jan. 25, 2016) ("Lead

---

[37]  In the alternative, the Court should allow Mr. Seeger to make a proposed allocation, subject to the Court's final approval.  *See* Seeger Decl. ¶ 99.

Counsel shall allocate the attorneys' fees awarded amongst Plaintiff's Counsel in a manner which it, in good faith, believes reflects the contributions of such counsel to the institution, prosecution and settlement of the Action."); *In re Fasteners Antitrust Litig.*, No. 08-MD-1912, 2014 WL 296954, at *10 (E.D. Pa. Jan. 27, 2014) (conferring responsibility on Co-Lead Counsel "for allocating and distributing counsel fees and expenses to be paid to Class Counsel"); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) (noting that co-lead counsel had "directed this case from its inception and [we]re best able to assess the weight and merit of each counsel's contribution"; "allowing Counsel to allocate fees conserves the time and resources of the courts") (citing *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18).

As for the fee petitions filed (or to be filed) by counsel for certain objectors, Plaintiffs' Counsel respectfully propose that the Court direct a segregation or set-aside from the Attorneys' Fees Qualified Settlement Fund of whatever amount it deems appropriate pending resolution of those petitions, but otherwise permit the allocation and distribution of fees and reimbursement of expenses among counsel non-objector Plaintiffs who performed common benefit work and incurred common benefit expenses to proceed.  Seeger Decl. ¶ 100.

### E.   The Five Percent Set-Aside Is Necessary to Support Effectuation and Administration of the Settlement

Anticipating the substantial future efforts that will be necessary for the common benefit of the Class over the coming decades, Section 21.1 of the Settlement provides:

> After the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent (5%) of each Monetary Award and Derivative Claimant Award to facilitate the Settlement program and related efforts of Class Counsel. These set-aside monies shall be held in a separate fund overseen by the Court. Any future petition for a set-aside will describe:  (i) the proposed amount; (ii) how the money will be used; and (iii) any other relevant information (for example, the assurance that any "set-

aside" from a Monetary Award or Derivative Claimant Award for a Settlement Class Member represented by his/her individual counsel will reduce the attorney's fee payable to that counsel by the amount of the "set-aside"). No money will be held back or set aside from any Monetary Award or Derivative Claimant Award without Court approval.

ECF No. 6481-1, at 82.

The Third Circuit has approved the establishment of separate funds in settlements to provide future common benefit fees for attorneys. As the Court of Appeals explained in *In re Diet Drugs*, 582 F.3d at 532, "[t]he MDL and settlement process yielded four potential sources for fees to compensate the PMC and other attorneys who had a hand in creating common benefits for the enormous class of claimants. First . . . the District Court ordered Wyeth to withhold 9% of the payments it made to plaintiffs whose cases were transferred to the MDL and place those funds in the "MDL Fee and Cost Account," from which Class Counsel would be compensated for providing case-wide services." *Id.* Furthermore, the district court "provided for the sequestration of 6% of the value of claims in state court cases where the litigation was coordinated with the MDL. That money also went into the MDL Fee and Cost Account. The percentages were to be deducted from the fees due to the individual lawyers for the opt-out claimants who recovered against Wyeth." *Id.* Here, the holdback from a particular award will cover work done during the time period from the Effective Date of the Settlement to the player's award date.[38]

---

[38]    A set-aside of five percent is reasonable, and consistent with holdbacks in MDLs that courts have adopted for the purpose of creating a pool out of which attorneys can be compensated for common benefit work. *E.g.*, *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 1871, 2012 WL 6923367, at *1 (E.D. Pa. Oct. 19, 2012) (7% of individual settlements paid into common benefit fund); *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d at 457-58, 491-96 (describing 9% federal and 6% state assessments later reduced to 6% and 4%, respectively); *In re Genetically Modified Rice Litig.*, MDL 06-1811, 2010 WL 716190, at *6 (E.D. Mo. Feb. 24, 2010) (6% to 8% fee assessments, plus  additional 3% for costs); *In re St.

(Footnote continued . . .)

As the Court is well aware, the Settlement is to cover a period of sixty-five years. Settlement § 6.10 [ECF No. 6481-1, at 42 (Monetary Award Fund Term)].   Common benefit work in connection with the Settlement's implementation – such as the lining of BAP physicians; the drafting, submission for this Court's approval, and dissemination of Supplemental Class Notice; finalization and submission for the Court's approval of the Settlement Trust Agreement; and registration program preparations has already begun.  *See* Section III.M, *supra* Seeger Decl. ¶¶ 107-08; ECF Nos. 7107, 7115, 7118.

Plaintiffs' Counsel have had (and will have) to engage in a good deal of work to ensure that Class Members timely register in order to qualify for Settlement benefits.  These efforts include the finalization and dissemination of Supplemental Class Notice regarding the registration and benefits timetable, finalizing and overseeing the effectuation of registration forms, overseeing the transition of call center operations to the Claims Administrator, and continuing revisions to the Settlement website (including FAQs).  Seeger Decl. ¶ 109.  Other efforts are and will be expended in connection with the June 6, 2017 launch of the BAP, including the review of applications of BAP Providers and vetting candidates for retention, receiving reports on contracting with Providers in order to establish networks convenient to a majority of players by metropolitan region, and finalizing BAP procedures (including assessment

---

*Jude Med., Inc.,* MDL 1396, 2002 WL 1774232, at *2 (D. Minn. Aug.1, 2002) (6% assessment both for Federal and State cases); *In re Baycol Prods. Litig.,* MDL 1431, 2002 WL 32155266, at *4 (D. Minn. June 14, 2002) (6% assessment for Federal cases and qualifying State cases); *In re Protegen Sling and Vesica System Prods. Liab. Litig.*, MDL 1387, 2002 WL 31834446, at *1, *3 (D. Md. Apr. 12, 2002) (9% assessment for Federal cases and 6% assessment for State cases); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2002 WL 441342, at *1 (S.D.N.Y. Mar. 20, 2002) (6% withholding in federal cases, 4% in participating state cases); 4 *Newberg on Class Actions* § 14:9 ("Most [MDL] courts have assessed common benefit fees at about a 4-6% level, generally 4% for a fee and 2% for costs."); Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:35 (2010) ("[P]ercentages awarded for common funds in recent MDLs . . . were in the 4-6% range.") (citation omitted).

scheduling and Supplemental Benefits). *Id.* ¶ 110. Still other work has pertained or will pertain to the MAF: the review of applications of MAF Physicians and vetting candidates for retention, finalizing claims forms and processes, and finalizing appeals forms and processes. *Id.* As these BAP Providers and MAF Physicians retire over time, or, for other reasons, become unable or unwilling to continue to serve in those capacities, over the next 65 years, they will have to be replaced, involving additional common benefit work by Plaintiffs' Counsel. *Id.*

In the course of all this, as Supplemental Notice is prepared and registration begins, and continuing over the lengthy period of the Settlement's life, attorneys will continue to spend time and effort to coordinate and work with the Claims Administrator, the BAP Administrator, Lien Resolution Administrator, the Settlement Trustee, and the Court to ensure that Retired NFL Football Players and Derivative Claimants receive their benefits. Plaintiffs' Counsel will also be required, over the next 65 years, to consult with experts to stay abreast of medical developments. *Id.* ¶ 111.

Plaintiffs' Counsel will also have work to perform in connection with the administrative appeals process. They will be called upon to provide assistance for all claimants who have not retained lawyers, and in some instances to assist counsel representing individual Plaintiffs. Co-Lead Class Counsel have standing to appeal as part of the Settlement. Settlement § 9.50 [ECF No. 6481-1, at 51]. The Settlement provides rights to appeal various decisions, including denial of registration, denial of Monetary Awards, and the amount of a Monetary Award. *Id.* Plaintiffs' Counsel will also be called upon to provide assistance for all claimants who have not retained lawyers, and in some instances to assist counsel representing individual plaintiffs. This work will continue over the 65-year life of the Settlement. Seeger Decl. ¶ 112.

In this respect, Plaintiffs' Counsel must retain the Appeals Advisory Panel (composed of five neurologists/board certified neurospecialists) and Appeals Advisory Panel Consultants (three neuropsychologists) by April 7, 2017. *Id*. ¶ 113. This body is charged, at the outset, with reviewing diagnoses made prior to the Effective Date of the Settlement. Settlement § 6.43 [ECF No. 6481-1, at 37-38]. These physicians will be advising the Special Masters and the Court. Seeger Decl. ¶ 113. Thus, this work is critical because it will set the tone for the administration of the Settlement. *Id*. As these physicians retire or for other reasons become unable or unwilling to serve on the Appeals Advisory Panel or as Appeals Advisory Consultants, they will need to be replaced, involving additional common benefit work by Plaintiffs' Counsel. *Id*.

The Settlement requires that the Parties revisit the science every ten years to discuss in good faith possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science. *Id*. § 6.6 [ECF No. 6481-1, at 35]. This too, is anticipated future common benefit work to be performed by Plaintiffs' Counsel.

Plaintiffs' Counsel will also need to establish, review, and conduct ongoing auditing and financial reporting on the BAP and MAF programs. *Id*. § 10.3 [ECF No. 6481-1, at 59-62]. Finally, Plaintiffs' Counsel will need to monitor and ensure the NFL Parties' compliance with the funding and the maintenance of the targeted reserves for the MAF and BAP, as well as to monitor the Settlement Trust and Trustee under Article 23 of the Settlement. Seeger Decl. ¶ 116.

The requested set-aside thus provides a source to facilitate fair and reasonable compensation for these and other necessary services of Plaintiffs' Counsel for the benefit of the Class over the coming years. Although Plaintiffs' Counsel cannot fully or accurately predict the

scope or extent of those necessary services, it is clear that such services will be required to some extent.

Moreover, given the 65-year length of this Settlement, at some point Plaintiffs' Counsel may need to transition the responsibilities for representing the Class and overseeing the implementation of the Settlement to other law firms.  Indeed, it is quite possible (if not likely) that this need will rise more than once.  The set-aside will also ensure that prospective incoming firms have the financial incentive to undertake these responsibilities by making sure that there is a pool of funds to compensate them for getting up to speed and taking up the mantle.

In accordance with the Settlement, any set-aside from a Monetary Award or Derivative Claimant Award for Class Members represented by their individual counsel will reduce the attorneys' fee payable to that counsel by the amount of the holdback.  Seeger Decl. ¶ 103. Should the Court approve the proposed 5% set-aside, Plaintiffs' Counsel will submit, within thirty days of the Court's Order, a detailed plan of administration, including how the funds created from the holdbacks will be pooled and maintained, and how any attorney will apply for compensation for post-Settlement work performed.  *Id.* ¶ 119.

## F.    Incentive Awards for Subclass Representatives

Finally, Petitioners request Case Contribution Awards (often referred to as incentive or service awards) of $100,000 for each of the Class Representatives – Messrs. Swinson, Wooden, and Turner (or, where applicable, their estates). These awards will be taken from the $112,500,000 award requested herein and thus will not increase the NFL's liability for fees, costs, and expenses.  *See* Seeger Decl. ¶ 120 n.10; *cf. In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 4776946, at *2 (N.D. Cal. Aug. 13, 2015) ("Incentive awards . . . typically come from the class fund.").

There is ample authority in this District and elsewhere for such incentive awards.  *E.g.*, *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004) ("Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly."); *Tenuto v. Transworld Sys., Inc.,* No. 99-4228, 2002 WL 188569, at *5 (E.D. Pa. Jan. 31, 2002) (incentive award appropriate where class representative "actively assisted counsel in the prosecution of this litigation to the benefit of the class").[39]

For Subclass 1, Plaintiff Swinson served as the original representative.  As an integral part of his work as a representative, he met with Subclass 1 counsel Arnold Levin.  Seeger Decl. ¶ 121.  A retired player who was not diagnosed with neurocognitive impairment, Mr. Swinson had standing to assert the rights of Subclass 1 members.  During the negotiations of settlement terms in the summer of 2013, Co-Lead Class Counsel and Mr. Levin conferred with Mr. Swinson concerning the terms of the proposed Settlement.  *Id.*  Mr. Swinson was aware of and had agreed to the terms of the settlement and he reviewed drafts of the Term Sheet before it was executed.  Given Mr. Swinson's passing, Plaintiffs' Counsel accordingly request that the proposed incentive award be paid to Mr. Swinson's estate.  *Id.* ¶ 122 n.11.

---

[39]    *See also Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) (noting that courts make incentive awards "to class representatives for their often extensive involvement with a lawsuit" and that "[n]umerous courts have authorized incentive awards") (citing cases); *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 1:15-CV-10447, 2016 WL 7018566, at *2 (N.D. Ill. Nov. 29, 2016) ("Incentive awards serve the important purpose of compensating plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs.") (citing cases); *In re Residential Doors Antitrust Litig.,* Nos. 93-3744, 96-2125, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) (incentive awards granted to four class representatives whose actions "resulted in a significant benefit to the class"); *Rodriguez v. Infinite Care, Inc.*, No. 15-1824, 2016 WL 6804430, at *10 (E.D. Pa. Nov. 17, 2016) (incentive payment awarded where representative plaintiff "devoted time and energy to the litigation, including assisting with discovery and at the mediation").

After the Term Sheet was announced, and following Mr. Swinson's passing, Plaintiff Wooden became the proposed Subclass 1 representative.  ECF Nos.  6423-8 (¶4), 6423-10 (¶ 6).  Mr. Wooden played professional football in the NFL from 1996-2004.  ECF No. 6423-8 (¶ 1)  During his NFL career, he experienced repeated traumatic head impacts, and since his retirement from football he has experienced neurological symptoms, including migraine headaches, sleep problems, concentration issues, and mood swings.  *Id.*  Mr. Wooden has not been diagnosed with any neurocognitive impairment, but is at increased risk of developing a range of neuromuscular and neurocognitive diseases associated with mild traumatic brain injuries and as alleged in the Complaints, such as dementia, Alzheimer's Disease, Parkinson's Disease, or ALS, as a proximate result of having played professional football in the NFL.  *Id.*

On January 24, 2012, Mr. Wooden filed a complaint, through his attorney, Class Counsel Steven Marks of Podhurst Orseck, against the NFL Parties in the Southern District of Florida (*Wooden v. Nat'l Football League*, No. 1:12-cv-20269-JEM).  *Id.* ¶ 2.  That action was transferred to this MDL on February 23, 2012.  Thereafter, on June 7, 2012, a Master Administrative Class Action Complaint for Medical Monitoring was filed on his behalf in the MDL, a complaint whose filing he authorized.  *Id.*

Throughout these proceedings, Mr. Wooden followed the litigation closely.  *Id.* ¶ 3.  He had various meetings, telephone conferences, and email exchanges with Mr. Marks about the status of proceedings, the NFL Parties' preemption motions and the oral argument on the motions, among other things.  *Id.*

After meeting with Subclass Counsel Arnold Levin at the latter's offices in Philadelphia, Mr. Wooden agreed to participate as the proposed representative of Subclass 1.  *Id.* ¶ 4.  Mr. Wooden monitored the progress of settlement negotiations, and he reviewed with counsel drafts

of the settlement agreements and exhibits thereto. *Id.* ¶¶ 5, 7. In addition, he reviewed numerous press articles about the litigation and the settlement. *Id.* ¶¶ 3, 7. Since final approval of the Settlement, Mr. Wooden has remained involved, frequently talking to other Retired NFL Players and family members to provide information about the Settlement. Seeger Decl. ¶ 125.

Subclass 2 was represented by Kevin Turner. This subclass consisted of players who were diagnosed with injuries associated with concussive and sub-concussive head trauma. ECF No. 6423-11 (¶ 5). Mr. Turner played professional football in the NFL as a fullback from 1992-1999. In June 2010, at the age of 41, he was diagnosed with ALS. ECF No. 6423-7 (¶¶ 1-2). As this degenerative disease rapidly progressed, Mr. Turner required around-the-clock care and assistance with even the simplest, most basic daily activities, such as bathing, shaving, and brushing his teeth. Mr. Turner had three young children. *Id.*

On January 20, 2012, Mr. Turner, through his attorney, Class Counsel Steven Marks, filed a complaint against the NFL Parties in the Southern District of Florida (*Jones v. Nat'l Football League*, No. 1:11-cv-24594-JEM). *Id.* ¶ 5. That action was transferred to this MDL on February 14, 2012. *Id.* On July 11, 2012, Mr. Turner filed a Short-Form Complaint against the NFL Parties. *Id.*; ECF No. 1318. In that complaint, he incorporated by reference the allegations of the Master Administrative Long-Form Complaint and specifically alleged that he had sustained repetitive, traumatic sub-concussive or concussive head impacts during NFL games and/or practices, and that he suffered from symptoms of brain injury caused by these head impacts.

Like Mr. Wooden, Mr. Turner followed the litigation closely. ECF No. 6423-7 (¶ 6.) He had numerous meetings, telephone conferences, and email exchanges with Mr. Marks about the status of proceedings, the NFL Parties' preemption motions and the oral argument on same. *Id.*

Beginning in about July 2013, Mr. Marks informed Mr. Turner of the settlement negotiations between the Plaintiffs and the NFL Parties and his possible representation of Subclass 2 members.  *See id.*

In August, 2013, Mr. Turner met with Subclass Counsel Dianne Nast at her offices in Philadelphia, regarding his prospective representation of Subclass 2 members in the proposed class action.  *Id.*  Mr. Marks was present at that meeting, and the three discussed in detail the impending class settlement.  After the meeting, counsel determined that Mr. Turner had standing to assert the rights of Subclass 2 members and that he was an adequate representative for them.  Mr. Turner monitored the progress of settlement negotiations, and he reviewed drafts of the settlement agreements.  *Id.* ¶¶ 7-9.  In addition, he reviewed numerous press articles about the Settlement.  *Id.* ¶ 7.  Mr. Turner passed away on March 24, 2016, shortly before the Third Circuit affirmed this Court's final approval of the Settlement.  Seeger Decl. ¶ 129.   Plaintiffs' Counsel accordingly request that the proposed Case Contribution Award be paid to Mr. Turner's estate.  *Id.* ¶ 129 n.12.

In short, Messrs. Swinson, Wooden, and Turner were actively engaged in this litigation, including the settlement negotiations, and they contributed valuable efforts on behalf of the absent members of their respective Subclasses.   Their contributions should be recognized accordingly.  *See In re Plastic Tableware Antitrust Litig.*, No. 94-CV-3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995) ("Payments to class representatives may be . . . treated as a reward for public service and for the conferring of a benefit on the entire class"); *Cullen*, 197 F.R.D. at 145 ("Courts routinely approve incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action litigation.") (citation and internal quotation marks omitted).

68

To be sure, the amount of the incentive award requested, $100,000, is higher than that awarded in typical cases.  As the Court is well aware, though, this was no ordinary or routine case.  This has been an extremely high-profile litigation, and at times the Class Representatives were subjected to attacks by objectors and in the press.  Moreover, the Class Representatives here were much more actively involved in the settlement process and the overall outcome than are class representatives in more routine litigations.  In any event, other courts have occasionally rendered high incentive awards.  *E.g., King Drug Co. of Florence v. Cephalon, Inc.,* Civ. No. 06-cv-01797-MSP,  2015 WL 12843830 at *5 (E.D. Pa. Oct. 15, 2015) ($500,000 collective award for six plaintiffs); *In re Graphite Electrodes Antitrust Litig.*, MDL No. 1244 (E.D. Pa. Order of Sept. 8, 2003) ($80,000); *Brotherton v. Cleveland,* 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) ($50,000).   The amount requested for the three Class Representatives here is particularly warranted here, given the historic nature of Settlement, the tremendous work that went into achieving it, the Class Representatives' active involvement (both with their lawyers and their peers), the magnitude of the relief obtained, and the great number of Class Members who stand to benefit.

## V.     CONCLUSION

For the foregoing reasons, the Court should grant the instant Petition and (i) award the full $112.5 million in fees and reimbursement of costs and expenses to Plaintiffs' Counsel that the NFL Parties agreed to separately pay; (ii) entrust to Co-Lead Class Counsel Christopher Seeger the responsibility for allocating the attorneys' fees and costs and expenses award among Plaintiffs' Counsel; (iii) establish a five-percent set-aside from MAF awards to create a fund pool for the purpose of allowing counsel to seek compensation for future work to be performed in the implementation of the Settlement, and (iv) grant Case Contribution Awards of $100,000.00 to the Subclass Representatives (or, as applicable, their estates).

Respectfully submitted,

<u>s/ Christopher A. Seeger</u>
Date: February 13, 2017                                     Christopher A. Seeger
Seeger Weiss LLP
77 Water Street
New York, New York 10005
cseeger@seegerweiss.com
(T) 212-584-0700
(F) 212-584-0799

***Co-Lead Class Counsel***

Sol Weiss
ANAPOL WEISS
One Logan Square
130 N. 18th St. Ste. 1600
Philadelphia, PA 19103
(T) 215- 735-1130
(F) 215-735-2024
sweiss@anapolweiss.com

***Co-Lead Class Counsel***

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a copy of the foregoing was served on all counsel of record via the Court's ECF system on February 13, 2017.


       <u>s/ Christopher A. Seeger</u>
       Christopher A. Seeger