## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody**<br><br>CIVIL ACTION NO: 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

### DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF CO-LEAD CLASS COUNSELS' PETITION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS AND EXPENSES, ADOPTION OF A SET-ASIDE OF FIVE PERCENT OF EACH MONETARY AWARD AND DERIVATIVE CLAIMANT AWARD, AND CASE CONTRIBUTION AWARDS FOR CLASS REPRESENTATIVES

Christopher A. Seeger declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information and belief, the following:

1.      I am fully familiar with the matters set forth herein, including the procedural history of this litigation and the class-wide settlement that this Court approved.  I submit this Declaration in support of the consolidated petition of Class Counsel for a global award of attorneys' fees and reimbursement of expenses, the adoption of a set-aside of five percent of each monetary award and derivative claimant award, and case contribution (*i.e.*, incentive) awards for the Class Representatives.

*Overview*

2.       I was appointed by the Court in *In re National Football League Players'*
*Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.) on April 25, 2012, to serve as
Plaintiffs' Co-Lead Counsel, and as a member of the Plaintiffs' Executive Committee ("PEC")
[ECF No. 64].  I was the principal negotiator and architect of the Class Action Settlement dated
June 25, 2014 between the Plaintiff Class and the Defendants National Football League and
NFL Properties LLC (collectively, the "NFL Parties") [ECF No. 6073-2], which was
preliminarily approved on July 7, 2014 [ECF No. 6084, ¶ 3(b)], and thereafter amended on
February 13, 2015 [ECF No. 6481-1] (the "Settlement").  Prior to this litigation, I had served
as plaintiffs' lead counsel or as a member of the plaintiffs' executive committee or steering
committee in dozens of cases.  *See* ECF No. 6423-3, ¶¶ 2-4.  In particular, I served as lead
plaintiffs' negotiator for multiple large settlements, including the *Vioxx* mass personal injury
settlement in MDL No. 1657 in the Eastern District of Louisiana, totaling $4.85 billion; the
DePuy Orthopaedics Inc., ASR Hip Implant Products, MDL 2197 in the Northern District of
Ohio settlement, totaling nearly $2.5 billion; and the first two *Zyprexa* mass personal injury
settlements in MDL No. 1596 in the Eastern District of New York, which resulted in a total
$1.2 billion payout.

3.       The Court granted final approval to the Settlement on April 22, 2015.  ECF Nos.
6509, 6510.  On December 12, 2016, following years of hard-fought litigation, negotiation, and
ultimately, numerous challenges on appeal, the United States Supreme Court denied further
review of the Settlement.  By its terms, the Settlement became effective on January 7, 2017,
the day after the expiration of the time to seek rehearing of the denials of petitions for writ of
*certiorari*.  *See* Settlement § 2.1(j) [ECF no. 6481-1, at 12-13].

4.      Since the inception of this litigation in 2011, Plaintiffs' Counsel vigorously litigated this case, and labored to achieve a groundbreaking settlement that will benefit a class estimated at over 20,000 Retired National Football League ("NFL") Players.  Beginning over five years ago, Plaintiffs' Counsel undertook this matter, in the face of long odds and significant risk, on a wholly contingent basis, dedicating their time, money and energy on behalf of Retired NFL Football Players[1] and their families.

5.      Following the formation of this multidistrict litigation ("MDL"), the Court appointed the PEC, me, another Plaintiffs' Co-Lead Counsel (Sol Weiss of the firm then known as Anapol Schwartz, and now known as Anapol Weiss), and the Plaintiffs' Steering Committee ("PSC") composed of various counsel for Plaintiffs in the constituent cases in this MDL [ECF No. 72].  All of the attorneys appointed to the PEC and the PSC demonstrated extensive experience in and impressive credentials for representing plaintiffs alleging personal injuries in aggregate litigation, including multidistrict litigation.

6.      The groundbreaking global resolution in these proceedings was the result of many months of intense, hard-fought, arm's-length negotiations between the parties, encompassing collectively thousands of hours of professional time with input from medical, actuarial, and other experts.

7.      This Settlement establishes a $75 million Baseline Assessment Program ("BAP") designed to determine the existence and extent of neurocognitive impairment in living Retired NFL Football Players.   In the event they are found to suffer from moderate neurocognitive impairment ("Level 1 Neurocognitive Impairment"), they will be entitled to

---

[1]      I employ the term used in the Settlement.  *See* Settlement § 2.1(ffff) [ECF No. 6481-1, at 18].

supplemental benefits in the form of medical treatment and/or evaluation, including counseling and pharmaceutical coverage.

8.      The Settlement also establishes an *uncapped* Monetary Award Fund ("MAF") to provide much-needed relief to (i) seriously injured retired players with a "Qualifying Diagnosis" (*see* ECF No. 6481-1, at 17, 106-10) [Settlement § 2(yyy) & Ex. A-1]), of Level 1.5 Neurocognitive Impairment (early dementia), Level 2 Neurocognitive Impairment (moderate dementia), Alzheimer's Disease, Parkinson's Disease, and/or Amyotrophic Lateral Sclerosis ("ALS"); (ii) the representatives of certain deceased players who received a Qualifying Diagnosis while living; and (iii) the representatives of certain players who died before the date of Final Approval of the Settlement, April 22, 2015, and were diagnosed post-mortem with Chronic Traumatic Encephalopathy ("CTE"); and their families.  In order to receive a Monetary Award, Class Members will not be required to prove that their injuries were caused by the NFL Parties, let alone concussions suffered during professional football play.

9.      Another Settlement component is a $10 million Education Fund to promote safety and injury prevention in football players, including youth football players, and to educate Retired NFL Players regarding the NFL's medical and disability benefits programs and initiatives.

10.     Significantly, the Settlement preserves Retired NFL Football Players' rights to pursue claims for worker's compensation and any and all medical and disability benefits under any applicable collective bargaining agreement ("CBA"), including the NFL's Neuro-Cognitive Disability Benefit.  Settlement § 18.6 [ECF No. 6481-1, at 79-80].  In addition, the Settlement will ensure that the provision included in Article 65 of the current CBA, Section 2 –

requiring that players execute a release of claims and covenant not to sue in order to be eligible for the NFL's Neuro-Cognitive Disability Benefit – will not be enforced or used against Class Members in connection with the Settlement. *Id.* § 29.1 [ECF No. 6481-1, at 96].

11.     This Settlement represents the resolution of more than 5,000 lawsuits in this MDL and thousands of additional Retired NFL Football Players' claims against the NFL Parties for injunctive relief, medical monitoring, and compensation for the long-term health risks of mild traumatic brain injuries and other losses suffered by them, allegedly as a result of the NFL Parties' tortious conduct.  Considering the volume of the news reports and associated public attention concerning the Settlement, as well as the state-of-the-art class notice program, the reaction of the Class was extremely favorable.  Fewer than one percent of Class Members filed requests for exclusion from the Class and over 12,000 potential Settlement beneficiaries have signed up to receive further notices regarding the Settlement and claims process to date. Since the registration period opened on February 6, 2017, the Settlement Claims Administrator has received over 6,100 registrants.

**_Procedural History of the Litigation_**

12.     This MDL was established on January 31, 2012 when the Judicial Panel on Multidistrict Litigation ("JPML") centralized several actions in this District for coordinated pretrial proceedings, pursuant to 28 U.S.C. § 1407.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 842 F. Supp. 2d 1378 (J.P.M.L. 2012) (MDL No. 2323).  The JPML found that these cases "share[d] factual issues arising from allegations against the NFL stemming from injuries sustained while playing professional football, including damages resulting from the permanent long-term effects of concussions while playing professional football in the NFL" and that "centralization under Section 1407 in the Eastern District of

Pennsylvania w[ould] serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *Id.* at 1379.

13.     At the time of argument before the JPML in January 2012, there were sixteen potentially related actions pending against the NFL Parties. *Id.* at 1378.  Soon thereafter, 123 cases were filed directly in the MDL or removed from Pennsylvania state court to this Court, and the JPML transferred an additional 163 cases to the MDL.

14.     At the first MDL status conference on April 25, 2012, the Court appointed me as Plaintiffs' Co-Lead Counsel for the MDL proceedings, and requested that another co-lead counsel from a Philadelphia-based firm also be selected.  Case Mgmt. Order ("CMO") No. 2 [ECF No. 64].  Plaintiffs selected, and the Court confirmed, the appointment of Sol Weiss of Anapol Weiss as Co-Lead Counsel.  CMO No. 3 [ECF No. 72].

15.     Plaintiffs also created and the Court appointed the PEC and PSC, composed of several of the counsel for Plaintiffs in the cases pending before the Court.  ECF Nos. 64, 72. The PEC included counsel who were ultimately also appointed as Class Counsel, Gene Locks and Steven C. Marks, and the PSC included those ultimately also appointed as Subclass Counsel, Arnold Levin and Dianne M. Nast.  The appointments of Mr. Weiss and me ultimately changed from Co-Lead Counsel to Co-Lead Class Counsel.  ECF No. 6084.  The Court confirmed these appointments in the Final Approval of the Settlement on April 22, 2015 [ECF No. 6510].

16.     As part of its initial case management orders, the Court determined that the NFL Parties' threshold federal preemption defense under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, should be addressed before proceeding to the merits of Plaintiffs' claims.  CMO No. 2 [ECF No. 64] at 2-3; CMO No. 4 [ECF No. 98] ¶ 3.

Accordingly, the Court stayed formal discovery.  *See* ECF No. 3384.  The Court established a schedule for Plaintiffs to file Master Administrative Complaints and for the NFL Parties to brief the threshold legal issue of whether Plaintiffs' claims were preempted by federal labor law.  ECF No. 64.

17.    Plaintiffs' Counsel researched, drafted, and filed a Master Administrative Long-Form Complaint, ECF No. 83, and a Master Administrative Class Action Complaint for Medical Monitoring, ECF No. 84, on June 7, 2012.  Plaintiffs then filed an Amended Master Administrative Long-Form Complaint, ECF No. 2642, on July 17, 2012.

18.    Plaintiffs' Counsel conducted extensive research in connection with the filing of these complaints, preparing 50-state surveys on medical monitoring, preemption, tolling, and fraudulent concealment.  Plaintiffs' Counsel also closely examined the worker's compensation laws of the 50 states during this time.

19.    The NFL Parties filed their motions to dismiss the operative complaints on federal preemption grounds on August 30, 2012, ECF Nos. 3589, 3590.  Plaintiffs' Counsel prepared and filed opposition papers to the motions, ECF Nos. 4130-34.  The NFL Parties filed reply papers, ECF Nos. 4254-55, and Plaintiffs' sur-replies closed the briefing, ECF Nos. 4589, 4591.

20.    Because of the importance of the preemption motions, Plaintiffs' Counsel spent significant time analyzing, researching, drafting, and discussing their opposition to the NFL Parties' motions.  Plaintiffs' Counsel also conducted several mooting sessions, which included leading academics and practitioners in the field, to prepare for oral argument.  The Court heard oral argument on the motions on April 9, 2013.     ECF Nos. 4737-38.

21.     On a separate track, mindful of the pending and anticipated actions in this MDL, as well as the pending putative class claims on behalf of all Retired NFL Football Players, Plaintiffs' leadership carefully evaluated the potential to resolve Plaintiffs' claims on a class basis.  In doing so, we took into consideration the significance and severity of the alleged injuries, the science issues relative to causation and mild traumatic brain injuries, and our ability to achieve "full value" compensation for serious injuries related to concussions and sub-concussive hits through settlement, without the need for trials and appeals.

22.     In light of the fact that so many former players were extremely ill and dying, we weighed the inherent delays and costs involved in protracted litigation, as well as the risks of litigation, including the array of potential defenses of the NFL Parties, particularly preemption, but also statutes of limitations, statutory employer, and assumption of risk, among others,[2] and the difficulties in proving general and specific causation.  Given the Court's determination at the outset, even before discovery, to address the threshold question of whether the Plaintiffs' claims were preempted under federal law (CMO No. 2 at 2 [ECF No. 64]), there was a real threat to the viability of Plaintiffs' case.  This evaluation involved the substantial abilities, as well as the committed efforts, of Plaintiffs' legal and science teams.

### *Settlement Discussions and Mediation*

23.     Accordingly, after thoroughly researching the state of the science regarding injuries associated with concussions and sub-concussive hits, we approached the NFL Parties about the possibility of settlement.  The parties thereafter engaged in discussions regarding settlement structures and injury categories.  We had demanded that a broad range of additional alleged injuries be compensated in the Settlement.  The Defendants held firm in their

---

[2]     These defenses include both those that the NFL had already asserted or which it advised Class Counsel that it intended to invoke.

willingness to compensate only objectively verifiable and serious injuries, which are supported by the available science.  They seemed willing to accept the risk that opt-outs might pursue those additional conditions in litigation outside of the Settlement.  Importantly, although not every Retired NFL Player has been diagnosed with a qualifying injury today, all of the Retired Players are eligible to seek a monetary award if and when their symptoms progress to a compensable level and a supplemental monetary award if their condition worsens after that.

24.     At the Court's urging, the Parties began to discuss settlement in Jan. 2013, and although Plaintiffs' Counsel worked intensely, progress was slow.  In early July 2013, in anticipation of its decision on the preemption motions, the Court "held an informal exploratory telephone conference with lead counsel [and directed the] parties, through their lead counsel, to engage in mediation to determine if consensual resolution [wa]s possible."  ECF No. 5128. The Court appointed retired United States District Judge Layn R. Phillips as the mediator, and directed that Judge Phillips report back to the Court on or before September 3, 2013 as to the results of the mediation.  *Id.*

25.     Co-Lead Counsel formed a negotiating committee, consisting of myself; Messrs. Weiss, Levin, Locks, and Marks; and Ms. Nast (Mr. Levin and Ms. Nast being the respective counsel for the two Subclasses; *see* ¶¶ 121-29, *infra*).  ECF Nos. 6423-3 ¶ 27, 6423-10 ¶¶ 5, 9, and 6423-11 ¶¶ 6, 9.  Plaintiffs' negotiating team was aware of the ramifications of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and its progeny – namely, the necessity to ensure adequate and unconflicted representation for all Class Members, and the need for the creation of subclasses and separate representation for those with present injuries and those without present injuries.  ECF Nos. 6073-4 ¶¶ 7, 11; 6423-3 ¶¶ 11, 12, 29; 6423-6 ¶ 7.

26.     The members of Plaintiffs' negotiating team were fully prepared to negotiate with the NFL Parties' lawyers.   As further detailed below, Plaintiffs' Counsel thoroughly investigated and analyzed the claims brought in the operative Complaints, retained medical and economic experts, and were well-versed in the relevant medical literature and related issues. Additionally, having completed extensive briefing on the NFL Parties' preemption motions to dismiss, we had a thorough appreciation of the merits of the threshold preemption arguments. *See* ECF No. 6423-3 ¶¶ 19-22, 25, 30, 32.

27.     As part of their due diligence and consistent with their responsibilities to the Class and Subclasses, Plaintiffs' Counsel engaged multiple experts in the fields of medicine, namely neurology, neuropsychology, and neuropsychiatry; actuarial science; economics; claims administration; and lien identification and satisfaction to determine, develop, and test an appropriate settlement framework to evaluate and meet the needs of Retired NFL Football Players suffering from or at increased risk for the claimed injuries related to neuromuscular and neurocognitive impairment, and their family members.   *See*, *e.g.*, ECF Nos. 6423-3 ¶¶ 32, 43; 6423-17 ¶¶ 6-9; 6423-18 ¶ 21; 6423-19 ¶¶ 19, 25, 27.   The economists and actuaries assisted in modeling the possible disease incidence and adequacy of funding for the Monetary Award levels contained in the Settlement.   *See* ECF No. 6423-3 ¶ 30.

28.     For nearly two months, the Plaintiffs' negotiating team worked at an intense and grueling pace, expending, collectively, thousands of professional hours and often working around the clock to negotiate a fair and reasonable class settlement on behalf of all Retired NFL Football Players, their Representative Claimants, and Derivative Claimants.[3]

---

[3]     I employ the latter two terms as used in the Settlement.   *See* Settlement §§ 2.1(ee) & (eeee), ECF No. 6481-1, at 12, 18].

29.     Starting before mediation began, and expanding and refining their work through the mediation process, Plaintiffs' Counsel expended significant time and effort thoroughly researching the medical and scientific issues implicated by Plaintiffs' claims, including, among others, the science of concussions and mild traumatic brain injuries, the effects of sub-concussive hits, the neurocognitive and neuromuscular injuries and progression of disease associated with such brain injuries, the epidemiology of the Qualifying Diagnoses, and the methods of diagnosis and treatment for the Qualifying Diagnoses.  In doing so, and guided by our medical and scientific experts, Plaintiffs' Counsel conducted a comprehensive review of peer-reviewed medical literature to support settlement discussions and negotiations.  Plaintiffs' Counsel further researched and investigated the appropriate settlement structures to effectively compensate these diseases.

30.     Beyond their work with medical and scientific experts, Plaintiffs' Counsel also worked closely with economic and actuarial experts to hone appropriate incidence rates, compensation structures, and funding models for the Settlement.

31.     Plaintiffs' Counsel, as well as Plaintiffs' experts, were greatly aided in their understanding of Retired NFL Football Players' head injuries, and the incidence of neurocognitive ailments, through the creation of the Retired Player database.  Analyzing the records of over 2,000 Retired NFL Players, Plaintiffs' Counsel essentially created an epidemiological study of their clients.  This database required extensive professional work.

32.     The database was vitally important to the entire negotiation process because it enabled Plaintiffs' Counsel to appropriately characterize disease and symptom occurrence across the broader Retired NFL Football Player population.  The database also served as a

useful cross-check of the published epidemiology of neurocognitive and neuromuscular diseases reportedly associated with NFL football play.

33.     In addition to the vigorous conventional legal work that went into this case, early in the litigation, Plaintiffs' Counsel organized and oversaw a communications plan for the litigation.  As the litigation – including the settlement discussions and formal mediation – steadily unfolded, Plaintiffs' Counsel were concerned about the dissemination of incomplete or misleading information to Plaintiffs, the broader player community, and the public at large. Plaintiffs' Counsel thus worked to ensure that all were apprised of the relevant factual, medical, and legal issues encompassed by Plaintiffs' claims and the litigation.  Given the broad interest in the litigation and its associated issues, Plaintiffs' Counsel worked regularly, both before and after the Settlement was announced, to provide full and complete information to all interested parties.

34.     Judge Phillips actively supervised numerous mediation sessions, presiding over dozens of in-person and telephonic meetings with counsel for both sides, either jointly or in separate groups.  He also met with the parties' respective experts, without counsel present, to get answers to questions he had regarding the scientific, actuarial, and financial aspects of the settlement.  *See* ECF No. 6073-4 (Phillips Decl.) ¶¶ 2 & 5-7; ECF No. 6423-6 ¶ 4.  The mediation process culminated in the execution of a Term Sheet on August 29, 2013.

**_Initial Settlement Agreement_**

35.     That day, the Court announced that "in accordance with the reporting requirements in [its] order of July 8, 2013, the Honorable Layn Phillips, the court-appointed mediator, [had] informed [the Court] that the plaintiffs and the NFL defendants had signed a Term Sheet incorporating the principal terms of a settlement."  ECF No. 5235.  In its Order, the

- 12 -

Court reserved judgment on the fairness and adequacy of the settlement pending the Settling Parties' presentation to the Court of the settlement agreement, along with motions for preliminary and, eventually, final approval.  *Id.*

36.     As the Court noted, during their initial negotiations, the Parties did not discuss fees until after the key terms of the Settlement – including the total size of the original, capped MAF – were publicly announced on the docket.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 374 (E.D. Pa. 2015) ("According to [Judge] Phillips, the Parties were careful not to discuss fees until after the Court had announced, on the record, an agreement regarding the total compensation for Class Members."); *see* Phillips Supp. Decl. ¶¶ 18-19 [ECF No. 6423-6, at 9]; ECF No. 5235.

37.     Following the announcement of the August 29, 2013 Term Sheet, the parties proceeded to negotiate the detailed terms of the settlement agreement itself.  Plaintiffs' Counsel conducted numerous meetings with the NFL Parties, continued to work with their consultants, and spent significant time researching an appropriate settlement claims process, which would not be overly burdensome for Class Members, and which would include the right to appeal adverse claims determinations.  *See* ECF Nos. 6423-3 ¶ 34, 6423-6 ¶¶ 2, 4.

38.     On December 16, 2013, pursuant to Fed. R. Civ. P. 53, the Court appointed Perry Golkin to serve as Special Master to assist the Court in evaluating the financial aspects of the proposed settlement in view of its financial complexities.

39.     On January 6, 2014 – after over four months of additional and extensive negotiations – Plaintiffs' Counsel researched, briefed, and filed a motion for preliminary approval of a Class Action Settlement incorporating the terms of the August 2013 Term Sheet. ECF No. 5634-5.  This motion contained the negotiated settlement agreement, multiple

supporting declarations from Class Counsel, Subclass Counsel, and player representatives, and extensive briefing. This initial settlement agreement limited the funding of the MAF to $675 million, which the parties and their actuarial and economic experts believed would be sufficient to pay all benefits throughout the 65-year term of the proposed settlement. *See* Class Action Settlement Agreement (ECF No. 5634-2) § 23.1 (Jan. 6, 2014); Report of Analysis Research Planning Corp. to Special Master Perry Golkin (ECF No. 6167) at 33-36; Report of the Segal Group to Special Master Perry Golkin (ECF No. 6168) ¶¶ 19-20.

40.     Also on January 6, 2014, Plaintiffs' Counsel filed the *Turner* Complaint on behalf of named Plaintiffs Kevin Turner and Shawn Wooden. ECF No. 5634.

41.     On January 14, 2014, the Court denied the motion without prejudice. ECF No. 5657. The Court praised the "commendable effort" of the parties to reach the negotiated class action settlement, but expressed concern as to the adequacy of the proposed $675 million MAF in light of its 65-year lifespan, the settlement class size of more than 20,000 members, and the potential magnitude of the awards. The Court directed the parties to share the documentation described in their submissions with the Special Master. ECF No 5658.

*Further Negotiations and New Agreement*

42.     The parties worked intensely from January to June 2014 to provide the Court with the assurance that "all Retired NFL Football Players who ultimately receive a Qualifying Diagnosis or their related claimants will be paid." ECF No. 5657 at 10. The parties and their actuarial and economic experts met separately with Special Master Golkin and with one another to further analyze the data and to determine whether, and if so, in what manner, the settlement could be amended that would be acceptable to the parties while at the same time satisfying the Court's concerns.

43.     Notably, Plaintiffs' Counsel refined and tightened definitions of key terms in the settlement, and improved claim procedures to protect against fraud.  These changes were the result of significant analysis, coordination, and research, and they required hundreds of attorney hours to accomplish.  These further analyses led to an uncapping of the deal and a revised settlement agreement.

44.     Under the revised agreement, the NFL Parties were to pay all valid claims for the next 65 years, and the MAF was no longer fixed at $675 million.  At the time of this Court's Final Approval of the Settlement, actuarial projections were that the MAF will pay out some $900-$950 million by the end of its 65-year term, with the risk of any additional payment for claims being borne entirely by the NFL Parties.[4]  The NFL Parties remained responsible for providing all of the funding for the MAF, BAP, and Education Fund, as well as paying, either directly or through their funding of the MAF or the BAP, for Class Notice costs, class attorneys' fees, and the fees and expenses of the Special Master, the Claims Administrator, and the BAP Administrator and certain fees of the Lien Resolution Administrator.

45.     During this additional five-month negotiation, Plaintiffs' Counsel were assisted by Special Master Golkin, numerous medical and scientific experts, and actuaries and economists.  Plaintiffs' Counsel modified the settlement documents to reflect these new features and prepared new briefing to support approval of the revised agreement.

---

[4]     The actuarial model that we developed anticipated certain participation rates for filed and unfiled cases.  It also anticipated certain incident rates for the compensable disease categories (*i.e.*, the Qualifying Diagnoses).  Specifically, we assumed a 50% participation rate for Class Members who had not filed suit and a 90% participation rate for those who had.  If registrations exceed the participation assumption, as may occur given the pre-registrations and registrations to date, the value of the Settlement, given the negotiated uncapped nature of the MAF, will likely exceed prior valuations.

46.     On June 25, 2014, Plaintiffs' Counsel filed a motion for preliminary approval of the revised proposed settlement agreement and preliminary class certification.  ECF No. 6073. The Court granted preliminary approval of the settlement on July 7, 2014, ECF Nos. 6083-84, and, on July 9, 2014, approved the notice to be disseminated to putative class members, ECF No. 6093.

### *Efforts to Keep Class Members Informed*

47.     Plaintiffs' Counsel supervised the setup of the informational Settlement Website www.NFLconcussionsettlement.com, which has provided invaluable information to Class Members and has allowed the Claims Administrator to refine the data in its Class Member database, improving its ability to provide information to the Class.

48.     The Settlement Website has been a tremendous source of information for Retired NFL Football Players and family members.  The website has received over 180,000 unique visits and provides access to the Settlement Agreement, the Court-approved notices, the Court's Orders and frequently asked questions, among other documents and information.  *See* Declaration of Orran R. Brown, Sr., Feb. 8, 2017, at 2 ("Brown Decl."), attached hereto as Exhibit A.

49.     The Claims Administrator's other efforts to provide accurate information to Class Members, coordinated with Plaintiffs' Counsel, have been equally successful.  The Claims Administrator has received nearly 1,100 written communications and responded those that asked questions about the settlement.  The Settlement Call Center has received over 14,000 calls with over 7,200 of these callers speaking directly to live operators for nearly 500 hours.  *See* Brown Decl. at 2-3.

50.     To date, over 12,000 Class Members and their counsel had signed up for information about the Settlement Program, and provided the Claims Administrator with contact information to receive notification once the Settlement became effective.  Thousands more had communicated with the Claims Administrator about the Settlement since it received this Court's Final Approval.  *See* Brown Decl. at 3.

51.     Starting after the Court granted preliminary approval to the Settlement, and continuing to the present, Co-Lead Class Counsel, as well as other Plaintiffs' Counsel, have devoted hundreds of hours to communicating with Retired NFL Football Players and family members.  Co-Lead Class Counsel has conducted multiple seminars and presentations with Retired NFL Football Player groups throughout the country, including presentations at the Super Bowl and the Pro Football Hall of Fame.

52.     These sessions, which were very well attended, have educated Retired NFL Football Players about the Settlement's benefits and procedures, and proved to be a valuable and effective means of spreading accurate information about the Settlement.  Co-Lead Class Counsel also hosted a series of webinars, with the same goal of increasing awareness of the Settlement.   Co-Lead Class Counsel also hosts frequent telephone conference calls with retired players and family members to provide updates on the Settlement.

### *The Defense of the Settlement Following Preliminary Approval*

53.     Following preliminary approval, Plaintiffs' Counsel had to contend with a wide array of motions and attempted interlocutory appeals by certain objectors.  One group of objectors, represented by MoloLamken LLP, filed a petition for interlocutory review with the Third Circuit, arguing that review of the Court's preliminary approval order was appropriate under Federal Rule of Civil Procedure 23(f) because of this Court's provisional certification of

a settlement class.  Those objectors protested the fairness of the Settlement and challenged the preliminary class certification.  They maintained that Rule 23(f) allowed immediate appellate review even though there had been no final ruling on class certification.

54.      Plaintiffs' Counsel filed an opposition to the 23(f) petition and, after requesting a reply brief from the objectors, the Third Circuit heard oral argument on September 10, 2014.  The Court of Appeals denied the petition the next day in a one-page order.  The Court subsequently issued a written opinion explaining its ruling, *see In re Nat'l Football League Players' Concussion Injury Litig.*, 775 F.3d 570 (3d Cir. 2014).  The majority held that the Third Circuit lacked jurisdiction under Rule 23(f) because this Court had "yet to issue 'an order granting or denying class certification.'"  *Id.* at 588-89.

55.      In addition to this unsuccessful 23(f) attack, six other Class Members, led by Roy Green and represented by three Missouri-based law firms, mounted their own challenge, filing an appeal to the Third Circuit by invoking appellate jurisdiction under 28 U.S.C. § 1292(a)(1), on the basis that this Court's Preliminary Approval Order had enjoined Class Members' prosecution of litigation against the NFL Parties and was therefore an interlocutory order granting an injunction.  After the completion of briefing of that appeal, Plaintiffs' Counsel successfully moved to dismiss it as moot because, in the meantime, the appellants had opted out of the settlement class and were hence no longer Class Members subject to any injunction.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 14-3520 (3d Cir. June 4, 2015) (Order dismissing appeal).

56.      Plaintiffs' Counsel handled a variety of other motions during this time as well, all in an effort to expedite the process and begin implementation of the Settlement.  These

included third-party intervention motions seeking access to documents[5]; Class Member bids to take discovery of Class Counsel as to how the Settlement was negotiated or requests to obtain additional information about the Settlement[6]; motions to intervene[7]; motions seeking to extend the opt-out deadline[8]; amicus curiae requests[9]; and a motion to prevent improper communication with Class Members.[10]

57.     The Court received all timely objections to the Settlement by October 14, 2014. On November 12, 2014, Plaintiffs' Counsel filed their brief and exhibits in support of final approval, pursuant to Rule 23(e).  ECF No. 6423.  Plaintiffs' thorough briefing addressed these objections by approximately 200 represented and pro se objectors, and fully described the Settlement.   Plaintiffs' Counsel prepared the Class's motion for final approval of the Settlement, as well as the supporting memorandum of law.  The preparation of Plaintiffs' final approval motion papers entailed extensive coordination with the Settlement's administrative support providers for their declarations in support of the motion.   This included Katherine

---

[5]     ECF No. 6101 (July 24, 2014) (Am. Mot. to Intervene to Seek Access to Docs. and Inform., filed by Bloomberg L.P., ESPN, Inc.).

[6]     ECF No. 6155 (July 31, 2014) (Mot. to Permit Access to Med., Actuarial, and Econ. Info. Used to Support the Settlement Proposal); ECF No. 6169 (Sept. 13, 2014) (Morey Plaintiffs' motion for leave to take "limited discovery").

[7]     ECF No. 6131 (Aug. 13, 2014) (Mot. to Intervene, filed by Richard Dent).

[8]     ECF No. 6172 (Sept. 19, 2014) (Emergency Mot. to Modify or Amend the July 7, 2014 Order Requiring Opt-Outs on or before Oct. 14, 2014).

[9]     ECF No. 6180 (Sept. 30, 2014) (Mot. for Leave to File *Amicus Curiae* Brief in opposition to final approval of the settlement, filed by Brain Injury Ass'n of Am.).

[10]     ECF No. 6257 (Oct. 24, 2014) (Motion for Order Prohibiting Improper Communications with the Class by MoloLamken LLP, filed by the undersigned).

Kinsella, for the notice plan; the Garretson Firm, for BAP and lien resolution administration; and BrownGreer, for claims administration.

58.     The Court held an all-day Fairness Hearing, pursuant to Rule 23(e)(2), on November 19, 2014.  *See* Fairness Hr'g Tr., Nov. 19, 2014 (ECF No. 6463).  At the hearing, the Court heard from fourteen counsel for the various objector groups and the settling parties, and from five unrepresented objectors.  ECF No. 6463 *passim*.  My partner David Buchanan and I made the presentation on behalf of the Settling Plaintiffs.

59.     Plaintiffs assembled and developed a top-flight group of experts to assist in developing the Settlement, and the petition for final approval included declarations from them: Drs. Kenneth C. Fischer, Christopher Giza, David A. Hovda, John G. Keilp, and Richard Hamilton – preeminent specialists in, respectively, the fields of neurology (Dr. Fischer), neuropsychiatry (Dr. Giza), neurosurgery (Dr. Hova), neuropsychology (Dr. Keilp), and sports concussions (Dr. Hamilton).  *See* ECF Nos. 6423-17 to 6423-20.

60.     The work of Plaintiffs' expert Thomas Vasquez provided important guidance in negotiating, modeling, and valuing the settlement.  Dr. Vasquez, a Vice President for Analysis Research Planning Corporation, with over 35 years of experience in management consulting for private sector clients, and the development of economic models for governments and industry, assisted in developing a monetary award grid that could be used in valuing claims and modeling the total cost of resolving all pending and future claims by Retired NFL Players. ECF No. 6423-21.

61.     Dr. Grant Iverson is a professor at Harvard University's Medical School, in the department of Physical Medicine and Rehabilitation.  He is a specialist in neuropsychology and a clinician scientist in the area of mild traumatic brain injury and mental health, and also

worked extensively with Plaintiffs' Counsel on the Settlement.  Dr. Iverson leads an internationally-recognized research program in outcome from mild traumatic brain injury in athletes, civilians, military service members, and veterans.  Together with Dr. Keilp, Dr. Iverson's assistance was instrumental in designing the BAP testing program.

62.     The Court permitted post-hearing briefing to address certain issues and to afford objectors additional time to file a response to Plaintiffs' Counsels' final approval motion papers.  *See* ECF Nos. 6444, 6453-56.  On December 12, 2014, Plaintiffs' Counsel filed their reply to the objectors' post-hearing submissions.  ECF No. 6467.

### *Post-Fairness Hearing Amendments to the Settlement*

63.     On February 2, 2015, the Court "proposed several changes to the Settlement that would benefit Class Members."  ECF No. 6479.  These were: (1) providing some "Eligible Season" credit for play in NFL Europe; (2) assurance that despite the $75 million cap on the BAP, all those timely registering will receive a baseline assessment examination; (3) moving the cutoff date for a "Death with CTE" award from the preliminary settlement approval date to the final approval date; (4) allowing for a waiver of the appeal fee for those showing financial hardship; and (5) providing the opportunity to demonstrate a Qualifying Diagnosis without the required medical documentation in instances where such documentation was destroyed by a *force majeure* type event.

64.     After a new round of negotiations, Plaintiffs' Counsel secured agreement on every change that the Court suggested, and on February 13, 2015, submitted a revised Settlement Agreement, which is the operative Settlement that the Court reviewed and is now effective in the wake of the Supreme Court's denial of *certiorari*.  ECF No. 6481.

65.     Plaintiffs' Counsel also prepared and filed extensive proposed findings of fact and conclusions of law on March 12, 2015.  *See* ECF No. 6497.

66.     This Court granted final approval to the Settlement (and final class certification) on April 22, 2015.  ECF Nos. 6509-10.   The Court's published 132-page opinion comprehensively addressed class certification; the fairness, adequacy, and reasonableness of the Settlement; and, of course, the myriad arguments raised by the objectors.

### *The Defense of the Settlement Following Final Approval*

67.     On May 13, 2015, the first of several notices of appeal from the Court's grant of final approval was filed.  ECF No. 6539.  Ultimately, objectors filed eleven separate briefs in connection with their appeals, which were briefed in tandem and consolidated for argument and decision by the Third Circuit.  After receiving the objectors' briefs and those of the two amici curiae opposed to the Settlement (the Brain Injury Association of America ("BIAA") and Public Citizen), Plaintiffs' Counsel devoted extensive attorney time to analyzing the various briefs and researching and drafting their answering brief.  Also, Plaintiffs' Counsel prepared for the Third Circuit oral argument, which was held on November 19, 2015.

68.     On April 18, 2016, the Third Circuit issued its opinion unanimously affirming this Court in all respects.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016).  Certain objectors then filed petitions for *en banc* rehearing.  The petitions were denied on June 1, 2016, and the Third Circuit issued its mandate on June 9, 2016.

69.     Following the Third Circuit's denial of *en banc* rehearing, two groups of objectors filed petitions for writ of *certiorari* with the United States Supreme Court.  *See Gilchrist v. Nat'l Football League*, No. 16-283 (U.S. filed Aug. 30, 2016); *Armstrong v. Nat'l*

*Football League*, No. 16-413 (U.S. filed Sept. 26, 2016).  The same two partisan amici curiae (BIAA and Public Citizen) filed briefs in support of the *certiorari* petitions.  Plaintiffs' Counsel prepared and filed their brief in opposition to the petitions on November 4, 2016.  On December 12, 2016, the Supreme Court denied the two *certiorari* petitions.   *See* 137 S. Ct. 591, 607 (2016).

70.     Thus, Plaintiffs' counsel expended a great deal of time, energy, and resources to defend this historic Settlement against challenges filed in this Court, the Third Circuit, and the Supreme Court by what were a small, but nonetheless dogged, band of objectors (and their supporting amici), whose relentless challenges threatened not only to undo the Settlement itself but also to irreversibly wreck any prospect of a class-wide resolution of the Plaintiffs' claims in this MDL.  Until the Supreme Court declined review of the last of those misguided challenges, long-awaited relief could not begin flowing to Class Members.

### *Fees and Expenses of Plaintiffs' Counsel*

71.     In Case Management Order No. 5:  Submission of Plaintiffs' Time and Expense Reports and Appointment of Auditor ("CMO5"), ECF No. 3710, the Court defined "Compensable Time Categories" and "Compensable Expense Categories" and set forth the guidelines for time and expense submission.

72.     To date, all PSC members have participated actively in funding the coordinated prosecution of Plaintiffs' (and the Class's) claims, by performing work on a priority basis as assigned and authorized by the undersigned, by incurring the necessary and appropriate out-of-pocket travel and administrative costs to do so, and additionally by contributing assessments to a common benefit fund.  This fund has been used, *inter alia*, to retain experts for the litigation, including scientific, medical, actuarial, technical, and procedural experts.

73.     An ongoing effort has been made to include and involve interested counsel in the common benefit work of the MDL.  To date, attorneys from 23 firms have been requested and authorized by the undersigned to perform work for this MDL, and have submitted records of the time and work performed.

74.     Section 21.1 of the Settlement provides that Class Counsel "shall be entitled, at an appropriate time to be determined by the Court, to petition the Court on behalf of all entitled attorneys for an award of class attorneys' fees and reasonable costs."  Provided that the "petition does not seek an award of class attorneys' fees and reasonable costs exceeding One Hundred and Twelve Million, Five Hundred Thousand United States dollars (U.S. $112,500,000), the NFL Parties agree not to oppose or object to the petition."  *Id.* [ECF No. 6481-1, at 82].  As stated in earlier submissions to the Court, the Settling Parties did not enter into attorneys' fee negotiations until after they had agreed upon the Settlement Term Sheet.

75.     Pursuant to the procedures outlined in CMO5, attorneys and staff working at my direction and under my supervision collected and reviewed submissions of common benefit time and reimbursable costs and expenses submitted by the PEC, PSC and by other firms to which I had assigned common benefit work.

76.      Only time and expenses that inured to the common benefit of the Class, and that advanced the claims resolved in the Settlement, have been included in the time presented, and the costs submitted herein.

77.     The final common benefit time submission includes entries from 23 law firms.

78.     The total number of common benefit hours associated with the prosecution and resolution of the claims is 50,912.39.  This results in a combined lodestar of $40,559,978.60. The total fees requested – $106,817,220.62 – represent a 2.6 lodestar multiplier.

79.     The range of hourly rates varies considerably given the diversity of lawyers and law firms tasked to perform the common benefit work, including some of the most qualified and experienced lawyers in the country whom the Court appointed to the PEC and the PSC. The hourly billing rates ranged from $400 to $1,350 for partners, from $275 to $575 for associates, and from $125 to $340 for paralegals.  These are the customary billing rates of the submitting lawyers and paralegals, reflecting their respective experience.   My customary hourly rate, for example, which has been accepted and awarded by federal courts, is $985 per hour.

80.     The aggregate common benefit costs and expenses total is $5,682,779.38 million.

81.     Attached hereto at the noted exhibit references[11] are true and correct copies of the declarations submitted in support of the instant fee petition of the 22 law firms other than Seeger Weiss LLP that have worked for the common benefit of the Class:

Exhibit C:  Declaration of Arnold S. Levin (Levin Sedran & Berman)

Exhibit D:  Declaration of Gene Locks (Locks Law Firm)

Exhibit E:  Declaration of Steven Marks (Podhurst Orseck, P.A.)

Exhibit F:  Declaration of Dianne M. Nast (NastLaw LLC)

Exhibit G:  Declaration of Sol H. Weiss (Anapol Weiss)

Exhibit H:  Declaration of Garrett D. Blanchfield, Jr. (Reinhardt Wendorf & Blanchfield)

Exhibit I:   Declaration of William G. Caldes (Spector Roseman Kodroff & Willis, P.C.)

Exhibit J:  Declaration of Leonard A. Davis (Herman, Herman & Katz)

---

[11]     Exhibit Y is a true and correct copy of the article *An Empirical Study of Class Action Settlements*, 7 Journal of Empirical Legal Studies, 811-46 (Dec. 2010), by Professor Brian T. Fitzpatrick.

Exhibit K: Declaration of James R. Dugan, II (The Dugan Law Firm)

Exhibit L:  Declaration of Daniel C. Girard (Girard Gibbs LLP)

Exhibit M: Declaration of Thomas V. Girardi (Girardi Keese)

Exhibit N: Declaration of Bruce A. Hagen (Hagen, Rosskopf & Earle, LLC)

Exhibit O: Declaration of Samuel Issacharoff

Exhibit P: Declaration of Richard Lewis (Hausfeld LLP)

Exhibit Q: Declaration of Jason E. Luckacevic (Goldberg, Persky & White, P.C.)

Exhibit R: Declaration of Derriel C. McCorvey (McCorvey Law, LLC)

Exhibit S:  Declaration of Michael L. McGlamry (Pope McGlamry)

Exhibit T: Declaration of Craig R. Mitnick (Mitnick Law Office, LLC)

Exhibit U: Declaration of David A. Rosen (Rose, Klein & Marias LLP)

Exhibit V: Declaration of Frederick Schenk (Casey, Gerry, Schenk, Francavilla, Blatt & Penfield, LLP)

Exhibit W: Declaration of Anthony Tarricone (Kreindler & Kreindler LLP)

Exhibit X: Declaration of Charles S. Zimmerman (Zimmerman Reed LLP)

### *Fees and Expenses – Seeger Weiss LLP*

82.      As noted, I was appointed by the Court to serve as Plaintiffs' Co-Lead Counsel at the outset of this MDL.  I was later appointed as Co-Lead Class Counsel in connection with the Court's certification of the settlement class and final approval of the Settlement.  As a result, my firm has played a critical role in each step of this litigation.  As Co-Lead Counsel and Co-Lead Class Counsel, I was personally involved in each of the activities described above in this declaration.  Attorneys at my firm – partners, counsel, and associates – also expended significant time and energy in this litigation.  To highlight the contributions of my firm, even prior to formal mediation, my Seeger Weiss colleagues and I spent many hours analyzing

Plaintiffs' claims, and the NFL Parties' defenses.  We also studied the critical medical and scientific issues of the litigation at that time.  The firm examined possible settlement structures, consulted extensively with other Plaintiffs' counsel, and consulted with experts to explore potential settlement options.

83.    Seeger Weiss attorneys devoted thousands of hours to initial negotiations, mediation, and drafting of the initial Term Sheet for the Settlement.  This involved significant time spent with Plaintiffs' experts in various fields, with other Plaintiffs' Counsel in the mediation process, and in meetings and negotiations with the NFL Parties.  Seeger Weiss conducted hundreds of hours of medical research on brain injuries and the progression of brain disease, and hundreds of hours further researching and developing appropriate settlement structures to effectively compensate these diseases.  We also worked extremely closely with our experts; hundreds of hours were spent in honing economic and actuarial modeling for the Settlement.

84.    Seeger Weiss attorneys conducted a comprehensive review of peer-reviewed medical literature to support settlement discussion and negotiations.  We and other Plaintiffs' Counsel studied articles on brain injury, concussions, the effect of sub-concussive hits to the head on the brain, the epidemiology of the Qualifying Diagnoses, and the methods of diagnosis and treatment for the Qualifying Diagnoses, to name several of the categories of articles studied.

85.    After the announcement of the Term Sheet, Seeger Weiss attorneys devoted significant amounts of time to preparing the Settlement Agreement, all supporting documents for the Settlement Agreement, and working through long negotiations with the NFL Parties for the many provisions, exhibits, and modifications of this agreement.

86.     Seeger Weiss took the leading role in coordinating and preparing all post-Term Sheet briefing, including motions for preliminary and final approval of the Settlement, and responses to the many assorted motions filed by various objectors' counsel after preliminary approval.  These briefing assignments required hundreds of hours of attorney time.

87.     After the submission of the initial motion for preliminary approval, Seeger Weiss attorneys led the renewed negotiations on behalf of Plaintiffs.  The results of these many hours spent with the NFL Parties were the refining of many key terms of the Settlement, the uncapping of the MAF, and the strengthening of anti-fraud provisions for the claims administration process.

88.     Seeger Weiss attorneys also had leading roles in preparing briefing, expert declarations, and exhibits for the Rule 23(e)(2) Fairness Hearing, and for the Plaintiffs' presentation in support of the Settlement at the Fairness Hearing, expending hundreds of hours on these crucial projects.

89.     The firm conducted extensive coordination with the BAP and Lien Resolution Administrator, as well as the Claims Administrator.  Additionally, Seeger Weiss prepared updates for Class Members and fielded phone calls to provide further information on the updates to Class Members.

90.     Seeger Weiss played a key role in preparing oppositions for the multiple appeals filed in the case, as well as Supreme Court briefing.

91.     The schedule attached hereto as Addendum 1 of this Declaration is a detailed summary indicating the amount of common benefit time spent by the attorneys and professional support staff of my firm who were involved in, and billed fifty or more hours to,

this litigation, and the lodestar calculation for those individuals based on my firm's current billing rates.

92.     For personnel who are no longer employed by my firm, the lodestar calculation is based on the billing rates of such personnel in their final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm.  Time expended in connection with the preparation of this application for attorneys' fees and expenses has been excluded.

93.     The hourly rates for the attorneys and professional support staff of my firm included in Addendum 1 of this Declaration are the same as the regular rates charged for their services in other contingent matters and have been accepted by other federal courts in other class action cases prosecuted by my firm.

94.     The total number of hours expended on the common benefit of this litigation by my firm during the time period is 21,044.06 hours.  The total lodestar for my firm for those hours is $18,124,869.10 consisting of $17,742,064.30 for attorneys' time and $382,804.80 for professional support staff time.

95.     My firm's lodestar figures are based solely upon my firm's billing rates, which rates do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

96.     As detailed in Addendum 2 hereto, my firm is seeking reimbursement of a total of $1,498,690.99 in common benefit expenses incurred in connection with the prosecution of this litigation.  These expenses are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records, and other source material, and are an accurate record of the expenses incurred.

97.     With respect to the standing of my firm to share in an award of fees, costs, and expenses, attached hereto as Addendum 3 is a biography of my firm, including the attorneys in my firm who were principally involved in this litigation.

98.     Although Seeger Weiss was retained by a number of Class Members, it is waiving any claim to fees pursuant to its individual retainers and will seek compensation only from a common benefit fee and expense award made by this Court, given that my work and that of my colleagues and employees of the firm, and the expenditures incurred by my firm, were overwhelmingly focused on common benefit efforts.

99.     I respectfully request that the Court confer upon me, as Co-Lead Class Counsel, the discretion and responsibility to allocate the overall fee and expense award that the Court ultimately makes among Class Counsel and those counsel for non-objecting Class Members who performed common benefit work and incurred common benefit expenses, inasmuch as I have exercised overall oversight and leadership of this litigation and thus have familiarity with the respective roles and contributions of participating Plaintiffs' Counsel.  In the alternative, the Court should permit me to propose an allocation of the award – which I would do in a written report – subject to the Court's final approval of the allocation.  As discussed in the accompanying memorandum of law in support of the Petition, this is something that courts typically do in the case of class action common benefit fee and expense awards.

100.     With respect to the fee petitions filed (or to be filed) by counsel for the Faneca and Jones Objectors (*see* ECF Nos. 7070, 7116), I respectfully propose that the Court direct a segregation or set-aside from the Attorneys' Fees Qualified Settlement Fund (*see* ¶ 121 n.10, *infra*) of whatever amount it deems appropriate pending resolution of those petitions, but

otherwise permit the allocation and distribution of fees and reimbursement of expenses among non-objectors' counsel.

***Five Percent Set-Aside from Monetary Awards and Derivative Claimant Awards***

101.    The Settlement provides that "[a]fter the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent (5%) of each Monetary Award and Derivative Claimant Award to facilitate the Settlement program and related efforts of Class Counsel.  These set-aside monies shall be held in a separate fund overseen by the Court." Settlement § 21.1 [ECF No. 6481-1, at 82].

102.    Pursuant to this section, Petitioners request a five percent holdback or set-aside of each Monetary Award and Derivative Claimant Award.

103.    In accordance with the Settlement, for a Class Member represented by individual counsel, any set-aside from a Monetary Award or Derivative Claimant Award will reduce the attorney's fee payable to that counsel by the amount of the set-aside.  Settlement § 21.1 [ECF No. 6481-1, at 82].

104.    The purpose of the set-aside will be to compensate Plaintiffs' Counsel going forward for common benefit work in the post-Effective Date time frame, so as to ensure the successful operation of the Settlement over the course of its 65-year program life.  This is distinct from the $112.5 million in attorneys' fees and reimbursement of costs and expenses to be paid by the NFL Parties, which fees are designed to compensate Plaintiffs' Counsel for past common benefit work and past costs and expenses.

105.    As the Court is aware, although the Settlement is now effective, there will be continuing stewardship of the Settlement by Class Counsel for years – indeed decades – to come.

106.    The work on behalf of the Class was far from finished upon the Supreme Court's rejection of the last judicial challenge to the Settlement.  With those challenges out of the way, the Settlement now has to be administered, implemented, and enforced until its benefits have been delivered to all successful Claimants.

107.    Even before the Effective Date, since April 2016, the Settling Parties have had regular working calls with Claims Administrator BrownGreer PLC ("BrownGreer") and Lien Resolution and BAP Administrator Garretson Resolution Group, Inc. ("Garretson") to review work plans, draft materials, and settlement implementation issues. BrownGreer prepared and after the Effective Date promptly launched the registration process contemplated by Article IV of the Settlement and the network of physicians who will serve as Qualified BAP Providers and Qualified MAF Physicians is being set up.  To date, Plaintiffs' Counsel and the claims and lien resolution administrators have invested significant time and resources to various implementation tasks.  ECF No. 6919.  *See* Brown Decl.; Declaration of Matthew L. Garretson, dated Jan. 25, 2017, attached hereto as Exhibit B.

108.    Post-Effective Date common benefit work began almost immediately. Plaintiffs' Counsel have had to finalize retention of administrators and special masters; finalize the Settlement Trust Agreement; and prepare conflicts of interest plans (in order to secure the Court's approval by April 7, 2017).

109.    Moreover, Class Counsel have had (and will have) to engage in a good deal of work related to the need to ensure that Class Members timely register in order to qualify for

settlement benefits.  These efforts included the finalization and dissemination of Supplemental Class Notice regarding the registration and benefits timetable, finalizing and overseeing the effectuation of registration forms, overseeing the transition of call center operations to the Claims Administrator, and continuing revisions to the Settlement website (including FAQs).

110.    Other efforts are and will be expended in connection with the June 6, 2017 launch of the BAP.  These include the review of applications of BAP Providers and vetting candidates for retention, receiving reports on contracting with Providers in order to establish networks convenient to a majority of players by metropolitan region, and finalizing BAP procedures (including assessment scheduling and Supplemental Benefits).  Still other work has pertained or will pertain to the MAF (whose claims platform for pre-Effective Date Qualifying Diagnoses opens on March 23, 2017; Retired NFL Football Players will contact MAF physicians on their own from the MAF Network that will open on April 7th): the review of applications of MAF Physicians and vetting candidates for retention, finalizing claims forms and processes, and finalizing appeals forms and processes.  As these BAP Providers and MAF Physicians retire over time, or, for other reasons, become unable or unwilling to continue to serve in those capacities, over the next 65 years, they will have to be replaced, involving additional common benefit work by Plaintiffs' Counsel.

111.    Continuing over the lengthy period of the Settlement's life, attorneys will continue to spend time and effort to coordinate and work with the Claims Administrator, the BAP Administrator, Lien Resolution Administrator, the Settlement Trustee, and the Court to ensure that Retired NFL Football Players and Derivative Claimants receive their benefits. Plaintiffs' Counsel will also be required, over the next 65 years, to consult with experts to stay abreast of medical developments.

112.    Plaintiffs' Counsel will also have work to perform in connection with the administrative appeals process.  Co-Lead Class Counsel have standing to appeal as part of the Settlement.  Settlement § 9.50 [ECF No. 6481-1, at 51].  The Settlement provides rights to appeal various decisions, including denial of registration, denial of Monetary Awards, and the amount of a Monetary Award.  *Id.*  Plaintiffs' Counsel will also be called upon to provide assistance for all claimants who have not retained lawyers, and in some instances to assist counsel representing individual plaintiffs.  This work will continue over the 65-year life of the Settlement.

113.    In this respect, Class Counsel must retain the Appeals Advisory Panel (composed of five neurologists/board certified neurospecialists) and Appeals Advisory Panel Consultants (three neuropsychologists) by April 7, 2017.  This body is charged, at the outset, with reviewing diagnoses made prior to the Effective Date of the Settlement.  *Id*. § 6.43 [ECF No. 6481-1, at 37-38].  These physicians will be advising the Special Masters and the Court.  Thus, this work is critical because it will set the tone for the administration of the Settlement.  As these physicians retire or for other reasons become unable or unwilling to serve on the Appeals Advisory Panel or as Appeals Advisory Consultants, they will need to be replaced, involving additional common benefit work by Plaintiffs' Counsel.

114.    The Settlement requires that the Parties revisit the science every ten years to discuss in good faith possible prospective modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science.  *Id*. § 6.6 [ECF No. 6481-1, at 35].  This too, is anticipated future common benefit work to be performed by Plaintiffs' Counsel.

115.    Class Counsel will also need to establish, review, and conduct ongoing auditing and financial reporting on the BAP and MAF programs. *Id*. § 10.3 [ECF No. 6481-1, at 59-62].

116.    Finally, Class Counsel will need to monitor and ensure the NFL Parties' compliance with the funding and the maintenance of the targeted reserves for the MAF and BAP, as well as to monitor the Settlement Trust and Trustee under Article 23 of the Settlement.

117.    The set-aside thus provides a source to facilitate fair and reasonable compensation for these and other necessary services of Plaintiffs' Counsel for the benefit of the Class over the coming years.  Although Class Counsel cannot fully predict the scope or extent of those necessary services, it is clear that such services will be required to some extent.

118.    Moreover, given the 65-year length of this Settlement, at some point Class Counsel may need to transition the responsibilities for representing the Class and overseeing the implementation of the Settlement to other law firms.  Indeed, it is quite possible (if not likely) that this need will rise more than once.  The set-aside will also ensure that prospective incoming firms have the financial incentive to undertake these responsibilities by making sure that there is a pool of funds to compensate them for getting up to speed and taking up the mantle.

119.    If the Court approves the proposed 5% set-aside concept, Plaintiffs' Counsel will submit, within thirty days of the Court's Order approving the set-aside, a detailed plan of administration, including how the funds created from the holdbacks will be pooled and maintained, and how any attorney will apply for compensation for post-Settlement work performed.  As experience with the Settlement Program unfolds and as applications for compensation are presented, the Court can adjust the set-aside administration protocols.

*Incentive Awards for Class Representatives*

120.    Last but not least, Petitioners request that the Court make Case Contribution awards (also commonly known as incentive or service awards) of $100,000.00 to each of the three representatives of the two Subclasses – Messrs. Corey Swinson, Shawn Wooden, and Kevin Turner.[12]  Through their efforts, the Class Representatives have conferred benefits on all other Class Members, and should be compensated accordingly.

121.    For Subclass 1, Plaintiff Swinson served as the original representative.  As an integral part of his work as representative, he met with Subclass 1 counsel Arnold Levin.  A retired player who was not diagnosed with neurocognitive impairment, Mr. Swinson had standing to assert the rights of Subclass 1 members (those not currently diagnosed with injuries associated with concussive and sub-concussive head trauma).  During the summer 2013 negotiations, Co-Lead Class Counsel and Mr. Levin conferred with Mr. Swinson concerning the terms of the proposed settlement.  Mr. Swinson was aware of and agreed to the terms of the settlement and he reviewed drafts of the Term Sheet before it was executed.

122.    After the Term Sheet was announced, and when Mr. Swinson passed away suddenly in September 2013,[13] Plaintiff Shawn Wooden became the proposed Subclass 1 representative.  ECF No. 6423-10 ¶ 6.  Mr. Wooden played professional football in the NFL from 1996-2004.

123.    On January 24, 2012, Mr. Wooden had filed a complaint, through his attorney, Class Counsel Steven C. Marks of Podhurst Orseck, PA, against the NFL Parties in the

---

[12]    If the Court grants this request, the total sum of $300,000 in Case Contribution Awards would be paid out of the $112.5 million Attorneys' Fees Qualified Settlement Fund, *see* Settlement § 21.2 & 23.7 [ECF No. 6481-1, at 82, 90], and will not increase the NFL's obligations.

[13]    Given Mr. Swinson's passing, we request that the Case Contribution Award be made to his estate.

Southern District of Florida (*Wooden v. National Football League*, No. 1:12-cv-20269-JEM). *Id.* ¶ 7.  That action was transferred to this MDL on February 23, 2012.  Thereafter, on June 7, 2012, a Master Administrative Class Action Complaint for Medical Monitoring was filed on his behalf in the MDL.  *Id.*

124.    Throughout these proceedings, Mr. Wooden has followed the litigation closely. ECF No. 6423-8  ¶  3.   He has had various meetings, telephone conferences and email exchanges with Mr. Marks about the status of proceedings, the NFL Parties' preemption motions, and the oral argument on the motions, among other things.  *Id.*  In addition, he has reviewed numerous press articles about the litigation and the settlement.  *Id.*  Since final approval of the Settlement, Mr. Wooden has remained involved, frequently talking to other retired NFL players and family members to provide information about the Settlement.

125.    On October 16, 2013, Subclass Counsel Arnold Levin met with Mr. Wooden in his offices in Philadelphia regarding his prospective representation of Subclass 1 Class Members in the proposed settlement class action.  *Id.* ¶ 4.  Mr. Wooden asked a number of questions regarding the settlement and the proposed class action mechanism by which it would be implemented, and Mr. Levin comprehensively discussed these issues with him.  *Id.*  He supported the Settlement and agreed to participate as the proposed representative of Subclass 1. *Id.*

126.    Subclass 2 was represented by Kevin Turner.  This Subclass consisted of players who were diagnosed with injuries associated with concussive and sub-concussive head trauma.  ECF No. 6423-7.  Mr. Turner played professional football in the NFL as a fullback from 1992-99.  In June 2010, at the age of 41, he was diagnosed with ALS.  ECF No. 6423-7 ¶¶ 1-2.

127.    On January 20, 2012, Mr. Turner, through his attorney, Class Counsel Steven Marks, had filed a complaint against the NFL Parties in the Southern District of Florida (*Jones v. National Football League*, No. 1:11-cv-24594-JEM).   That action was transferred to this MDL on February 14, 2012.   On July 11, 2012, Mr. Turner filed a Short Form Complaint in the MDL against the NFL Parties.

128.    Throughout these proceedings, Mr. Turner followed the litigation closely.   ECF No. 6423-7 ¶ 6.   He had numerous meetings, telephone conferences, and email exchanges with Mr. Marks about the status of proceedings, the NFL Parties' preemption motions and the oral argument on same.   *Id*.   Beginning in about July 2013, Mr. Marks informed Mr. Turner of the settlement negotiations between the Plaintiffs and the NFL Parties and discussed his possible representation of Subclass 2 members.   *See id*.

129.    In August 2013, Subclass Counsel Dianne Nast met with Mr. Turner at Ms. Nast's offices in Philadelphia regarding his potential representation of Subclass 2 members of the proposed settlement class.   *Id*.   Mr. Marks was present at that meeting, and the three discussed in detail the impending proposed class-wide settlement.   After the meeting, counsel determined that Mr. Turner had standing to assert the rights of Subclass 2 members and that he was an adequate representative for them.   Following this Court's April, 2015 Final Approval ruling, Mr. Turner continued to actively monitor and discuss the litigation with Class Counsel, even though his physical condition gravely deteriorated on account of the ALS with which he was afflicted.   Mr. Turner passed away on March 24, 2016, during the pendency of objectors' Third Circuit appeals.[14]

---

[14]    Given Mr. Turner's passing, we request that the Case Contribution Award be made to his estate.

130.    In short, all three Subclass Representatives were actively involved in this litigation and made valuable contributions to its final outcome far beyond those of representatives of typical certified classes, and their superior contributions on behalf of the many absent Class members should be appropriately recognized.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of February, 2017.


*s/ Christopher A. Seeger*
CHRISTOPHER A. SEEGER
Co-Lead Class Counsel

# ADDENDUM 1

**IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**

**No. 12-md-2323-AB**

**SEEGER WEISS LLP**

**LODESTAR REPORT**

**January 31, 2012 through December 28, 2016**

| NAME | HOURS | HOURLY RATE | AMOUNT |
|---|---|---|---|
| **PARTNERS:** | | | |
| Christopher A. Seeger | 6,955.90 | 985 | $6,851,561.50 |
| David Buchanan | 3,867.10 | 975 | 3,770,422.50 |
| Dion Kekatos | 722.00 | 925 | 714,100.00 |
| Jonathan Shub | 133.30 | 750 | 99,975.00 |
| Michael L. Rosenberg | 180.00 | 825 | 148,500.00 |
| Moshe Horn | 630.90 | 850 | 536,265.00 |
| TerriAnne Benedetto | 3,331.54 | 895 | 2,981,728.30 |
| **OF COUNSEL:** | | | |
| Christopher M. Van de Kieft | 1,532.00 | 785 | $1,202,620.00 |
| Jim O'Brien | 313.60 | 775 | 243,040.00 |
| Scott George | 1,337.60 | 795 | 1,063,392.00 |
| **ASSOCIATES:** | | | |
| Denise Stewart | 91.60 | 600 | $54,960.00 |
| **STAFF ATTORNEYS:** | | | |
| | | | |
| **CONTRACT ATTORNEYS:** | | | |
| Jacob Abbott | 151.00 | 500 | $75,500.00 |
| **PARALEGALS:** | | | |
| Caitlyn Garcia | 130.40 | 215 | $28,036.00 |
| Constance Guistwhite | 87.80 | 215 | 18,877.00 |
| Corey Madin | 50.20 | 215 | 10,793.00 |
| Daniel Mora | 88.60 | 295 | 26,137.00 |
| Keri L. Newman | 991.52 | 215 | 213,176.80 |
| Lauren Griffith | 399.00 | 215 | 85,785.00 |
| **TOTALS:** | **21,044.06** | | **$18,124,869.10** |

# ADDENDUM 2

**IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**

**No. 12-md-2323-AB**

**SEEGER WEISS LLP**

**COST AND EXPENSE REPORT**

**January 31, 2012 through December 28, 2016**

| NUMBER | CATEGORY | AMOUNT |
|--------|----------|--------|
| 1 | Assessments | $500,000.00 |
| 2 | Commercial Copies | $12,704.07 |
| 3 | Computerized Research | $42,250.30 |
| 4 | Court Reporters/Transcripts | $1,576.90 |
| 5 | Expert Services | $729,782.98 |
| 6 | Facsimile | |
| 7 | Filing & Service Fees | $1,777.92 |
| 8 | In-House Copies | $8,694.45 |
| 9 | Long Distance Telephone | $5,443.60 |
| 10 | Postage/Express Delivery | $6,312.10 |
| 11 | Travel/Meals/Lodging | $185,732.68 |
| 12 | Miscellaneous | $4,415.99 |
| **TOTAL EXPENSES** | | **$1,498,690.99** |

# ADDENDUM 3



| NEW YORK, NY | NEWARK, NJ | PHILADELPHIA, PA |
|---|---|---|
| 77 Water Street | 550 Broad St | 1515 Market St |
| New York, NY 10004 | Newark, NJ 07102 | Philadelphia, PA 19102 |
| (212) 584-0700 | (973) 639-9100 | (215) 564-2300 |
| (212) 584-0799 fax | (973) 639-9393 fax | (215) 851-8029 fax |

www.seegerweiss.com

_____

# Firm Biography

Founded in 1999, SEEGER WEISS LLP is broadly admired as one of the nation's premier plaintiffs' law firms. The Firm currently numbers approximately 25 attorneys operating out of offices in New York City; Newark, NJ; and Philadelphia, PA, and regularly litigates in state and federal courts throughout the United States. It focuses on mass tort and class action litigation, with particular emphasis in the areas of products liability, pharmaceutical injury, consumer protection, environmental and toxic tort, securities fraud, antitrust, insurance, ERISA, employment, and *qui tam* litigation. The Firm is made up of experienced litigators, including former state and federal prosecutors. Seeger Weiss's reputation for leadership and innovation has resulted in its appointment to numerous plaintiffs' steering and executive committees in a variety of multidistrict litigations throughout the United States, and it regularly serves as court-appointed Liaison Counsel in New York and New Jersey federal and state courts.

The Firm's manifold accomplishments—including favorable jury verdicts for $47.5 million in *Humeston v. Merck & Co.* (N.J. Super. Ct. Atlantic County); over $10.5 million in *Kendall v. Hoffman-La Roche, Inc.* (N.J. Super. Ct. Atlantic County); $11.05 million in *Owens, et al v. ContiGroup Companies, et al* (Mo. Cir. Ct., Jackson County); and $25.16 million in *McCarrell v. Hoffman-La Roche, Inc.* (N.J. Super. Ct. Atlantic County)—earned it the distinction of being one of only 8 law firms named by the *National Law Journal* to its exclusive "Plaintiffs' Hot List," among numerous awards and recognitions bestowed upon the firm.

Building off its successes in the courtroom and ability to litigate successfully to trial, the Firm has been at the helm of some of the most notable settlements in recent decades, including:

- The settlement in *In re National Football League Players' Concussion Injury Litigation* estimated to be worth $1 billion which includes a Baseline Assessment Program to evaluate the current cognitive state of retired NFL players and provide immediate treatment and therapies to qualified players, as well as monetary payments

of up to $5 million to certain qualifying diagnoses over the 65 year term of the settlement.

- The $14.7 billion settlement in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation* which combines a massive buyback program, paying pre-scandal buyback pricing to eligible owners, as well as billions of dollars to environmental remediation efforts and green vehicle technology.

- A $47.5 million jury verdict in the key bellwether Vioxx trial,  *Humeston v. Merck & Co.*, which laid the foundation for the eventual $4.85 billion global settlement covering more than 45,000 personal injury claims for heart attack, sudden cardiac death, and ischemic stroke.

- The $700 million first-round settlement of over 8,000 Zyprexa claims alleging that Zyprexa caused diabetes and diabetes-related injuries and the subsequent, second-round settlement of $500 million.

## Mass Torts and Pharmaceutical Litigation

During the past 15 years, Seeger Weiss has emerged as one of the premier mass torts firms in the United States, particularly in the area of pharmaceutical torts. The Firm's expertise in this area has been recognized by courts throughout the U.S. which have appointed the Firm to numerous plaintiffs' steering committees in a variety of multidistrict litigations, including, among others:

**Vioxx**. Seeger Weiss has served at the helm of the nationwide Vioxx litigation since its inception, playing highly prominent roles in both the federal and New Jersey state court litigations against Merck & Co, the manufacturers of the prescription arthritis drug now thought to lead to an increased risk of heart attack and stroke. On April 8, 2005, the Honorable Eldon E. Fallon, who presides over the Vioxx multidistrict litigation in New Orleans, Louisiana, appointed firm partner, Christopher A. Seeger, as Co-Lead of the Plaintiffs' Steering Committee. Additionally, partner David R. Buchanan was appointed Co-Liaison counsel in the New Jersey state Vioxx litigation before the Honorable Carol E. Higbee, J.S.C. In a 2005 class certification ruling involving claims brought on behalf of all third-party payors, including health-maintenance organizations, managed-care organizations, employers and unions, challenging Merck's advertising practices and pricing policies, Judge Higbee recognized Seeger Weiss's prominence in Vioxx-litigation in noting that "there is probably no other law firm as knowledgeable about Vioxx."

In 2007, Mr. Seeger served as Lead Co-Counsel in *Humeston v. Merck & Co.* in New Jersey Superior Court, Atlantic County. There, he and other Seeger Weiss partners David R. Buchanan, Moshe Horn and Laurence Nassif obtained a $47.5 million jury verdict for the



plaintiff for injuries caused by Vioxx—as cited in the "Top 20 Personal Injury Awards of the Year (2007)" published by the *New Jersey Law Journal*.

Only months after achieving that verdict, Mr. Seeger, along with co-counsel on the Vioxx Negotiating Committee, concluded a $4.85 billion global settlement with Merck, covering more than 45,000 personal injury claims for heart attack, sudden cardiac death, and ischemic stroke. It represents the largest "global" settlement of personal injury claims stemming from a pharmaceutical product in U.S. history.

**Zyprexa**. In 2004, Seeger Weiss partner Christopher Seeger was appointed by the Honorable Jack B. Weinstein of the U.S. District Court for the Eastern District of New York to serve as Liaison Counsel in the multidistrict litigation against Ely Lilly & Co. relating to the anti-psychotic drug Zyprexa. On June 7, 2005, Eli Lilly and Mr. Seeger, on behalf of the Plaintiffs' Steering Committee, announced a $700 million settlement of over 8,000 Zyprexa claims alleging that Zyprexa caused diabetes and diabetes-related injuries. Mr. Seeger was one of the chief architects and leading negotiators of this landmark settlement. He also took a leading role in negotiating a second-round settlement of $500 million between plaintiffs and Eli Lilly.

**Accutane**. In 2005, Seeger Weiss partners Christopher Seeger and Dave Buchanan were jointly named to serve on the Plaintiffs' Steering Committee in connection with consolidated litigation against New Jersey based Hoffman-LaRoche, Inc., involving the company's acne medication, Accutane. The mass tort litigation, which came before the Honorable Carole E. Higbee in Atlantic County, involved the consolidation of claims throughout the state of New Jersey alleging severe side effects resulting from the use of Accutane, including birth defects; suicidal impulses among young adults; and inflammatory bowel disease ("IBD"), including Chrohn's disease and ulcerative colitis, a debilitating and life-altering disease with no known cure.

To date, Mr. Buchanan—who, with Seeger Weiss partner Christopher Seeger, served as liaison counsel for the New Jersey coordinated proceedings in the Accutane litigation—has served as co-trial counsel in the three cases tried in New Jersey that involved Accutane-related injuries, all of which resulted in verdicts for the Plaintiff. One, *McCarrell v. Hoffman-La Roche, Inc.*, in New Jersey Superior Court, Atlantic County, resulted in a $25.16 million verdict for the Plaintiff, an Alabama resident who suffered IBD from using Accutane. Seeger Weiss partner Michael Rosenberg also served on the trial team in that case. Another, *Kendall v. Hoffman-La Roche, Inc*., in the same court, resulted in a verdict for the plaintiff, a Utah woman who suffered the same ailment from using Accutane, of nearly $10.6 million. The third, a consolidated trial for *Mace v. Hoffmann LaRoche Inc.*, *Speisman v. Hoffmann LaRoche Inc*., and *Sager v. Hoffmann LaRoche Inc*., garnered a $12.9 million award from the New Jersey jury in November 2008.



**Rezulin**. Seeger Weiss plays a major role in products liability actions against Pfizer and Warner Lambert involving Rezulin, a prescription drug used to treat Type II diabetes. The Firm is a court-appointed member of the Executive Committee in the federal suits coordinated by the Judicial Panel on Multidistrict Litigation ("JPML") before Judge Lewis A. Kaplan in the U.S. District Court for the Southern District of New York. The Firm is also a member of the New Jersey Rezulin Steering Committee in In re: Rezulin Litigation, currently pending before the Superior Court of New Jersey, Middlesex County. The Firm also successfully represented numerous individuals who commenced personal injury damage actions in various courts throughout the country, all of which claims have been resolved through confidential settlement.

Notably, in March 2003, following a six-week jury trial, the Firm achieved a $2 million verdict against Pfizer on behalf of Concepcion Morgado, a Brooklyn resident who sustained liver injury and was hospitalized for 10 days following her Rezulin use. The case was the first and only Rezulin matter to be tried in New York and represented a watershed result in the nationwide Rezulin litigation.

**Vytorin and Zetia**. Seeger Weiss has taken the lead in Zetia and Vytorin litigation, negotiating a $41.5 million settlement with Merck & Co., Inc. and Schering-Plough Corporation, which resolved nationwide fraud claims that arose from the sale and marketing of the companies' co-ventured prescription drugs. Plaintiffs contend that Merck conspired with Schering-Plough in 2003 to combine Zocor—an enormously popular statin cholesterol drug, with Zetia—another widely used non-statin cholesterol drug, under the new name Vytorin. The two companies began marketing Vytorin as more effective in reducing cholesterol than Zetia and Zocor alone, as well as being effective in blocking arterial plaque that can cause heart attack and stroke. The lawsuits allege that the companies have known since 2006 that Vytorin was no more effective than the generic version of Zocor in blocking plaque, despite being effective in lowering LDL, or "bad" cholesterol. In failing to disclose these facts, Merck and Schering-Plough were allegedly able to cause consumers and third-party purchasers to pay significantly higher prices than the cost of equally effective alternatives available on the market.

Founding partners Christopher A. Seeger and Stephen A. Weiss served as Co-Liaison Counsel for the Plaintiffs' Executive Committee for *In Re Vytorin/Zetia Marketing, Sales Practices and Products Liability Litigation*, the coordinated group of 140 actions against the two pharmaceutical companies, located in Newark before the Honorable Dennis M. Cavanaugh of the United States District Court of New Jersey. Seeger acted as the principal negotiator for the Plaintiffs' Executive Committee, aided by Weiss and Seeger Weiss partner Diogenes P. Kekatos.



4

*Noteworthy Current Pharmaceutical Mass Tort Prosecutions*

**Gadolinium**. The Firm is at the forefront of litigation against multiple defendant manufacturers of Gadolinium-based contrast agents ("GBCAs") used in certain diagnostic imaging procedures.  In December 2006 the U. S. Food and Drug Administration ("FDA") issued a second and stronger Public Health Advisory concerning a link between GBCAs used during Magnetic Resonance Imaging ("MRI") and Magnetic Resonance Angiography ("MRA") procedures, and a debilitating and potentially fatal skin disorder known as Nephrogenic Systemic Fibrosis or Nephrogenic Fibrosing Dermopathy ("NSF/NFD"). Since it released its first Public Health Advisory in June 2006, the FDA has been further investigating the apparent relationship between contrast agents containing gadolinium and NSF/NFD. As of December 2006, the FDA had received reports of 90 patients that developed NSF/NFD within 2 days to 18 months after exposure to such contrast agents.

In February 2008, the Judicial Panel on Multidistrict Litigation ordered all federal actions involving personal injuries stemming from Gadolinium-based contrast dyes centralized in the U.S. District Court for the Northern District of Ohio, before the Honorable Dan Aaron Polster, who has appointed Seeger Weiss partner Christopher Seeger to serve on the Plaintiffs' Steering Committee and Executive Committee in the multidistrict litigation against multiple defendant manufacturers of GBCAs used in MRI and MRA diagnostic imaging procedures. Partner Dave Buchanan serves as court-appointed Federal-State Liaison Counsel for the litigation. Also in 2008, Seeger Weiss partners Christopher Seeger and Dave Buchanan were appointed Liaison Counsel in connection with the consolidated mass tort litigation against manufacturers of GBCAs in New Jersey, before the Honorable Jamie D. Happas of the Superior Court of New Jersey, Middlesex County.

**Fosamax**.  In August 2006, the JPML ordered all federal litigation involving Merck & Co.'s prescription medication Fosamax—used in the treatment of osteoporosis but found to have caused a number of adverse effects, in particular, osteonecrosis (death of bone tissue)—centralized in the U.S. District Court for Southern District of New York (Manhattan), before the Honorable John F. Keenan.  Seeger Weiss partner Christopher A. Seeger has been appointed Plaintiffs' Liaison Counsel, and also served on the Executive Committee of the Plaintiffs' Steering Committee in the multidistrict litigation.

**Mirena**.  In April 2013, the JPML ordered all federal litigation involving Bayer's intrauterine ("IUD") device marketed under the brand name Mirena—an IUD containing a hormone, levonorgestrel, designed to be implanted in the uterus for as long as five years——centralized in the U.S. District Court for Southern District of New York (in White Plains, New York), before the Honorable Cathy Seibel.  Meanwhile, many hundreds of lawsuits in the New Jersey state courts have been centralized before the Honorable Brian R. Martinotti in Bergen



County.  The Plaintiffs allege that Bayer failed to warn about the longer-term risks of migration of the Mirena device and perforation of the user's uterus, having warned about the risk of migration and perforation only at the time of device's insertion.  Other complications that Bayer failed to warn about include migration and embedment of the device in the uterus.  Seeger Weiss partners Diogenes P. Kekatos and David R. Buchanan have been appointed as Plaintiffs' Liaison Counsel in the federal multidistrict and New Jersey state multicounty Mirena litigation, respectively.

**Yaz, Yasmin, and Ocella**. In November 2009, Seeger Weiss partner Christopher A. Seeger was named to the Plaintiff's Steering Committee in the *Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation* (MDL No. 2100) by Judge David R. Herndon, United States District Court, Southern District of Illinois. More than a hundred lawsuits have been filed against Bayer Healthcare, the pharmaceutical giant that produces Yaz and Yasmin. This litigation, which is expected to include hundreds of women asserting severe health complications resulting from taking these birth control pills, was centralized in the Southern District of Illinois in October 2009 by order of the United States Judicial Panel on Multidistrict Litigation.

**Actos**. In November 2012, founding partner Christopher A. Seeger was appointed to the Multidistrict Litigation (MDL) Actos Product Liability Plaintiffs' Steering Committee. In June 2011, a European study found that among a group of 155,000 patients, one fifth of those who developed bladder cancer had been taking the drug Actos. However, the health warnings that accompany the prescription fail to alert users of this risk. The governments of France and Germany have now banned the type-2 diabetes medication, and the FDA has issued warnings to American doctors who prescribe the drug. Takeda Pharmaceutical Co., the makers of Actos and Asia's largest pharmaceutical company, may face up to as many as 10,000 claims.

*Other Pharmaceutical and Medical Device Prosecutions*

**Depuy Orthopaedics, Inc ASR Hip Implant Products**. Seeger Weiss partner Christopher A. Seeger was named to the Plaintiffs' Executive Committee in the *In Re: Depuy Orthopaedics, Inc ASR Hip Implant Products* (MDL No. 2197) by Judge David A. Katz, United States District Court, Northern District of Ohio in January 2011. More than a hundred lawsuits have been filed against Johnson & Johnson, the pharmaceutical giant that is also the parent company of Depuy Orthopaedics, Inc. In August 2010, Johnson & Johnson and its medical device subsidiary, DePuy Orthopaedics, recalled two acetyabular cups hip replacement systems because of their high rate of failures, after a study from the National Joint Registry of England and Wales showed that 1 out of every 8 patients (12%-13%) who had the devices had to undergo revision surgery within five years of receiving it. By the time of the recall, more than 93,000 patients worldwide were fitted with an ASR hip implant. Roughly a third of those were patients



in the United States. This litigation was centralized in the North District of Ohio in December 2010 by order of the United States Judicial Panel on Multidistrict Litigation.

**PPA**. Seeger Weiss remains actively involved in litigation against numerous manufacturers of pharmaceutical products containing PPA (phenylpropanolamine), until 2000 an ingredient in virtually every over-the-counter cold medication and many appetite suppressant products. The Firm serves on the Plaintiffs' Steering Committee in the federal suits consolidated by the JPML in the U.S. District Court for the Western District of Washington, and as the court-appointed Liaison Counsel in the New York PPA actions coordinated before Judge Helen Freedman. In 2003, the Firm was one of the lead negotiators of a nationwide settlement agreement with the manufacturers of Dexatrim, a leading over-the-counter appetite suppressant that until 2000 contained PPA. The settlement covers the claims of all individuals who suffered stroke-related injuries resulting from the ingestion of PPA-containing Dexatrim.

**Propulsid**. Seeger Weiss held national leadership positions in pharmaceutical products liability litigation against Johnson & Johnson and Janssen Pharmaceutica, Inc., the manufacturers of Propulsid—a prescription drug used to treat nocturnal heartburn. Seeger Weiss LLP was a member of the court-appointed Plaintiffs' Steering Committees in both the federal litigation, which have been consolidated by the JPML in the Eastern District of Louisiana, and in the statewide consolidated actions in Middlesex County, New Jersey. The Firm served as counsel to numerous individuals who have commenced personal injury damage actions in various courts throughout the country.

**Guidant and Medtronic Heart Device Litigations**. Seeger Weiss served as a court-appointed member of the Plaintiffs' Steering Committee in multidistrict litigation in the U.S. District Court for the District of Minnesota against Medtronic and Guidant involving defective heart defibrillators and pacemakers. The heart devices at issue are surgically implanted in persons who have a type of heart disease that creates the risk of a life-threatening heart arrhythmia (abnormal rhythm). Both Medtronic and Guidant had disclosed defects in certain of their defibrillators that caused the devices to fail without warning. The Firm filed one of the first actions in the U.S. against Guidant on behalf of patients.

**Other Pharmaceutical Products**. In addition to aforementioned pharmaceutical, the Firm serves or has served as counsel in numerous lawsuits in state and federal courts throughout the country brought by individuals who have suffered personal injury or death resulting from the use of various pharmaceutical or medical device products, including **Baycol**, **Celebrex**, **Elidel**, **Ephedra**, **Fen-Phen**, **Kugel Mesh** hernia patches, **Lamisil**, **Neurontin**, **OxyContin**, **Ortho Evra** birth control patches, **Protopic**, **Serevent**, **Serzone**, and **Sporanox**.



## Consumer Litigation

Seeger Weiss LLP has achieved notable recoveries and currently holds leadership roles in many major consumer class action litigations throughout the country. Among the consumer class action litigations in which Seeger Weiss LLP plays or has played a major role are, in alphabetical order:

*Alexander v. Coast Professional Services.* Seeger Weiss represented federal student loan borrowers who were in default on their student loan payments, but denied federally mandated offers of rehabilitation by Coast Professional Services, one of the private collecting agency under contract with the United States Department of Education. After obtaining class certification, Seeger Weiss negotiated a settlement which provided the maximum statutory damages available to the class under the Fair Debt Collections Practices Act. Scott Alan George was primarily responsible for the litigation

*In re Armstrong World Industries, Inc*.: $7 million settlement achieved in the United States Bankruptcy Court for the District of Delaware after transfer. The Firm represented the State of Connecticut, one of numerous property damage claimants which sought injunctive relief and monetary damages resulting from the presence of Armstrong-manufactured asbestos-containing resilient floor tile and sheet vinyl in residences and buildings throughout the United States.

*In re Azek Building Products, Inc. Marketing and Sales Practices Litigation*. Pending in the District of New Jersey, this litigation seeks relief for purchasers of Azek composite decking, marketed to consumers as a high-end, low-maintenance, and fade-resistant decking. Despite these representations, this expensive decking line contains a design defect which makes it prone to significant fading in outdoor exposure. Rather than replace the defective decking or compensate consumers, the Defendant recommended the application of an expensive after market product, DeckMax, which only temporarily masks the manifestation of the defect and requires a laborious application process. Seeger Weiss is interim co-lead counsel in the case. The parties recently concluded a hard fought discovery process and Plaintiffs are now preparing to file a motion for class certification.

*In re Bridgestone/Firestone, Inc. ATX, ATX II and Wilderness Tires Products Liability Litigation*: Seeger Weiss represented Firestone tire owners and purchasers of Ford Explorers equipped with certain models of Firestone tires. Plaintiffs sought damages flowing from design defects that resulted in severe, life-threatening accidents. Specifically, the consumer class sought a tire recall, recovery for the cost of tire replacement, and recovery for the diminution in the value of Ford Explorer vehicles resulting from the subject design defects. Following the filing of a number of federal class actions, the litigations were transferred for pre-trial proceedings to the



Federal court in Indianapolis. In those coordinated actions, which the JPML had centralized before the Honorable Sarah Evans Barker of the U.S. District Court for the Southern District of Indiana (Indianapolis), Seeger Weiss served as a member of the Plaintiffs' Law Committee. Following extensive discovery and motion practice, Plaintiffs achieved a favorable nationwide settlement of their class claims.

*In re Caterpillar, Inc., C13 and C15 Engine Products Liability.*  Representing the Plaintiffs in the first filed action in this Multi-District Litigation, Seeger Weiss was among the firms that brought substantial relief to owners of busses and trucks with Caterpillar's C13 and C15 diesel engines.  These diesel engines used a defective "Caterpillar Regeneration System," an anti-pollution system that was designed to ensure engine emissions complied with federal regulations, but would fail under normal operating conditions leading the engines to "de-rate" and shut down without warning.

After fully briefing class certification for the first-filed Plaintiffs, the MDL Plaintiffs prevailed against two motions to dismiss, including a motion arguing for federal preemption of all claims.  The settlement discussion which quickly followed resulted in a $60 million common fund class settlement, providing up to $10,000 per engine (depending on the number of de-ratings) or $15,000 in proven consequential losses. Approval of this settlement is currently pending.

*Ecker v. Ford*: The Superior Court of California granted final approval to the class action settlement in this litigation after the Firm obtained contested class certification. The settlement provided full cash reimbursement for qualifying parts and labor for all California owners and lessees of Ford Focus vehicles who experienced premature front brake wear, including reimbursement for brake pads and rotors. The court had earlier appointed the Firm to act as co-lead counsel in the litigation. Seeger Weiss partner Christopher Seeger and Scott Alan George were primarily responsible for the litigation.

*In re: Ford Fusion and C-Max Fuel Economy Litigation.* Pending in the Southern District of New York, this Multi-District litigation seeks relief for purchasers and lessees of Ford's 2013 CMax and Fusion hybrid cars. As of mid-2012, Ford held a tiny fraction of the hybrid market. But with the 2013 model year, Ford launched a massive and misleading advertising campaign designed to convey to the auto-buying public that two of its new 2013 hybrid models—the all new second generation Fusion Hybrid and the C-MAX—had made a quantum leap in fuel economy and now delivered 47 city, 47 highway and 47 MPG combined. While Ford realized record sales of its new hybrid vehicles, the owners and lessees of these cars realized no better fuel efficiency than earlier models.  Seeger Weiss is serving as a member of the Plaintiffs' Steering Committee with Scott Alan George having primary responsibility.



***Lester v. Percudani***: The Firm represented over 170 first-time homeowners in the United States District Court for the Middle District of Pennsylvania who purchased homes at inflated valuations based upon fraudulent appraisals and in violation of federal mortgage lending guidelines. The action includes federal civil RICO and state consumer fraud claims against a group of RICO co-conspirators.  In 2008, the district court denied motions for partial summary judgment that had been filed by two of the Defendants (Chase Home Finance LLC and one of its officers), and later denied their motion for reconsideration of that ruling. Following those rulings, the parties entered court-approved mediation, which resulted in a settlement that provided millions of dollars' worth of relief to the aggrieved homeowners, including substantial mortgage rate reductions.

***In re MCI Non-Subscriber Telephone Rates Litigation***: $88 million class settlement completed in the United States District Court for the Southern District of Illinois following a transfer to that district by the JPML. The settlement resolved claims brought by class members to recover overcharges arising from MCI's improper imposition of non-subscriber rates and surcharges on certain of its customers. Seeger Weiss was a member of the Plaintiffs' Steering Committee and served as Chair of the Discovery Committee.

***In re Mercedes-Benz Emissions Litigation.***  In the wake of the Volkswagen "clean diesel" scandal, Seeger Weiss was one of the first firms to first investigate and initiate litigation an action against Mercedes-Benz for its own long-term efforts to cover-up the fact that their own BlueTEC "clean diesel" vehicles pollute far more than regular engines and more than regulations allow.  The litigation is pending in the United States District Court for the District of New Jersey where several similar actions have been consolidated.  Christopher Seeger and Scott Alan George are primarily responsible for this litigation.

***Pro et al. v. Hertz Equipment Rental Corporation.*** This nationwide settlement in the United States District Court for the District of New Jersey provided both substantial monetary and injunctive relief  related to Hertz Equipment Rental Corporations' ("Hertz") deceptive charges for Loss and Damage Waivers ("LDW") and Environmental Recovery Fees ("ERF"). Plaintiffs' claimed that Hertz's LDW and Environmental Recovery Fee ("ERF") were unconscionable in that the LDW provided only illusory coverage and that the ERF did not reflect any actual additional fees or expenses related to the protection of the environment.  Plaintiffs succeeded in certifying a national class of purchasers before undertaking court-ordered mediation in 2012.  Two members of Seeger Weiss, Scott Alan George and Jonathan Shub, were appointed as part of the settlement to serve as Co-lead Counsel.  Under the terms of the Settlement, Hertz reimbursed Class members who paid for damages sustained to equipment they rented up to 75% of the amount of the deductible paid during the class period *or* provided partial reimbursement for the total amount of LDW paid during the Class period, offering the choice of



either future rental discounts or cash payment.  Hertz also agreed to improve the disclosures it makes about the LDW and ERF programs.

***In Simply Orange Orange Juice Marketing and Sales Practices Litigation.***  Seeger Weiss is co-lead counsel in a pivotal litigation regarding food fraud in connection with the most widely consumed juice in the United States—orange juice, and some of the mostly widely consumed products by the American public—Simply Orange and Minute Maid orange juice products.  Unknown to consumers, Coca-Cola, the manufacturer of these juices, adds flavors to the juices, to impart a signature, market-distinguishing taste to the juices and to mask flavor loss that occurs during long term storage of the juice.  Coca-Cola adds these flavors to the juices but omits disclosure of them while marketing the juices as 100% Pure Squeezed Orange Juice with no additives.  The practice violates the federal standard of identity for pasteurized and from concentrate orange juices as well as state laws prohibiting misleading marketing and advertising.  The litigation has been hard fought; the parties' summary judgment motions were denied last year and the parties are now in the midst of class certification briefing.  The case is pending in the Western District of Missouri.

***Sternberg v. Apple Computer, Inc.*** **and** ***Gordon v. Apple Computer, Inc***.: Nationwide settlement completed in California state court. Plaintiffs recovered class-wide damages resulting from Apple's deceptive advertisements for its iMac and G4 brand computers—specifically the functionality of the DVD playback feature. Seeger Weiss served as co-lead counsel for the classes.

***Taha v. Bucks County.***  The firm served as co-counsel and was appointed Co-class Counsel by the United States Court for the Eastern District of Pennsylvania to represent a class of persons whose privacy rights had been violated by Bucks County Prison.  In contravention of Pennsylvania state law, Bucks County Prison began in 2011 to post publicly and freely on the Internet through its "Inmate Look-Up Tool" the intake information and photos of each person who had passed thorough the facility since 1938.  Seeger Weiss obtained both certification of a class and summary judgment on liability.  Appeal by defendants is currently pending to the Third Circuit.

***Tennille v. The Western Union Company***.  Seeger Weiss served as co-Class Counsel in consolidated nationwide class action suits filed in the U.S. District Court for the District of Colorado, alleging that Western Union, in violation of consumer fraud laws, wrongly failed to inform customers who purchased money transfers if a money transfer failed to go through to the intend recipient.  Western Union could then sit on the funds for years, earning income and administrative fees off them while , in many cases, the funds eventually escheated to state governments.  Following years of  extensive discovery and motion practice, including defeating Western Union's bid to compel arbitration, the parties reached a settlement, brokered by the



Tenth Circuit's chief mediator.  Under the settlement, Western Union agreed to the establishment of a cash fund (valued at over $135 million at the time of final approval of the settlement) for the return to class members of funds not already escheated to states; the payment of interest to those class members whose wire transfer funds had already escheated to a state government; the formation of a process for assisting class members in securing the return of their funds if they have already escheated; the creation of a 7-1/2 year notice plan, whereby Western Union was required to inform customers within 60 days if their wire transfers are unsuccessful; and the undertaking of robust efforts to update customers' stale contact information.  The settlement received final approval from U.S. District Judge John L. Kane in June 2013.

*In re Tropicana Orange Juice Marketing and Sales Practices Litigation.*  The allegations in this case are similar to the *Simply Orange* litigation.  As with Coca-Cola, Tropicana Products adds flavors to Tropicana Orange Juice to alter and improve the flavor of stored orange juice with flavors created by fragrance and flavor manufacturers and specifically designed to meet consumer taste preferences.  Despite the addition of flavors, Tropicana markets the juice as pure and fails to disclose the addition of flavors to consumers.  Seeger Weiss along with co-counsel recently filed a motion for class certification.   Along with the motion for class certification, Seeger Weiss filed a motion for appointment as co-lead counsel.  The case is pending in the District of New Jersey.

*Truth-in-Lending Act Litigation*: The Firm served as co-counsel in several dozen proposed nationwide class actions that were filed in 2007 and 2008 in the various federal courts in California against banks and other mortgage lenders, asserting claims under the federal Truth-in-Lending Act ("TILA"), and California consumer fraud statutes and common law. These actions sought recovery of damages as well as equitable relief, including rescission, in connection with highly-deceptive so-called Option Adjustable Rate Mortgage ("ARM") loans. The loan documents given to Option ARM borrowers failed to adequately disclose to borrowers that the initial "teaser" interest rate of 1%-3% would last only 30 days and that, after that time, the minimum payment specified in the payment schedule would be insufficient to cover even monthly interest charges, let alone loan principal. As a result, borrowers who secured these deceptive loans lost equity in their homes and were no longer able to secure the refinancing necessary to get out from under these loans.  In several of the lawsuits, the courts sustained the Plaintiffs' claims against the defendant lenders' dispositive motions, and several cases resulted in the certification of classes.  A number of the suits culmimated in settlements providing cash and/or other relief to borrowers.  Seeger Weiss partners Christopher A. Seeger, Jonathan Shub, and Diogenes P. Kekatos all played a substantial role in these hard-fought litigations.

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*:  In the largest consumer automotive industry class action settlement in history, Volkswagen ("VW") has agreed to create a funding pool of over $10 billion, an amount which is



sufficient to allow for buybacks of 100% of the VW and Audi 2.0-liter diesel vehicles in the United States which are equipped with "defeat device" software.  This software was designed to allow vehicles to meet emissions standards when undergoing emissions testing, but to bypass emissions controls at all other times and pollute the environment by emitting nitrous oxides at levels up to 40 times higher than when the vehicles are being tested.  In addition to the direct monetary benefits to consumers, VW also has agreed to pay $2.7 billion for environmental remediation and to make a $2 billion investment in "green" vehicle technology.

The settlements were reached with VW through the efforts of lawyers on behalf of the consumer class, working in conjunction with government lawyers, including those from the Environmental Protection Agency and the Federal Trade Commission.  The judge overseeing the Multidistrict litigation centralized in the Northern District of California, the Honorable Charles R. Breyer, pushed the lawyers involved to work diligently and quickly in order to reach the settlements expeditiously (or face a quick trial) in order to meet the ultimate goal of removing the polluting cars from the roads as soon as possible.

Christopher Seeger was appointed by Judge Breyer to serve on the Plaintiffs' Steering Committee ("PSC").  He worked closely with court-appointed Lead Counsel, Elizabeth Cabraser, spending countless hours poring over settlement documents and in meetings with VW's lawyers and the government's lawyers in order to reach a fair settlement.  Indeed, at the Status Conference held on May 24, 2016, Judge Breyer even commented that he had been advised by the Settlement Master that all of the lawyers had "devoted substantial efforts, weekends, nights, and days, and perhaps at sacrifice to your family" in order to reach the proposed settlement. David Buchanan was one of the counsel on the PSC leading this effort.  In addition, TerriAnne Benedetto, Scott Alan George and others spent significant hours on the case, both on the settlement and litigation tracks.

*In re Vonage Marketing and Sales Practice Litigation*: Seeger Weiss was co-Lead Counsel in this litigation which culminated in a nationwide settlement in the United States District Court for the District of New Jersey. The lawsuit involved Vonage's promotional "one month free" and "money back guarantee" offers and application of certain charges (disconnection, cancellation and termination fees, and subscription fees despite requests for cancellation), which allegedly violated the laws of several states. Vonage agreed to pay $4.75 million to fund the settlement, which offered eligible class members full reimbursements for certain payments made by Vonage subscribers.

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation.*  This hard-fought Multi-District Litigation (relating to Whirlpool washers) pending in the Northern District of Ohio running parallel to the *Butler v. Sears Roebuck & Co.* (relating to Kenmore washers) pending in the Northern District of Illinois provided substantial relief to owners of early-year



13

Whirlpool and Kenmore front-loading washing machines which are prone to develop mold and foul smells in ordinary use.  With two members on the Plaintiffs' Steering Committee (Scott Alan George and Jonathan Shub), Seeger Weiss was a leader among the firms that obtained certification of classes in both the Whirlpool and Kenmore litigations and, ultimately a substantial settlement after a bellwether trial of Ohio purchasers. Under the settlement, owners of the front-loading washers can choose among a range of benefits, including reimbursements of up to $500 for out-of-pocket expenses for repairs or replacements due to mold or odor problems.

## Securities Litigation

Seeger Weiss has emerged as a leading innovator in the realm of securities litigation, with special emphasis on IPO litigation, auction rate securities, securities fraud class action, and, recently, the Bernard Madoff Ponzi scheme. The Firm brought action against some of the largest financial entities in the world, including Goldman Sachs, Morgan Stanley, Credit Suisse, JPMorgan Chase, Bank of America and Merrill Lynch.

*IPO Litigation*

***In re Initial Public Offering Securities Litigation*** is one of the largest and most significant coordinated securities fraud prosecutions in United States history. In this coordinated action, Seeger Weiss serves on the Plaintiffs' Steering Committee and as Co-Chair of the Plaintiffs' Legal Committee. The litigation consists of 310 class actions involving IPOs marketed between 1998 and 2000. The defendants include 310 individual companies and 55 investment bank underwriters, which includes Wall Street's largest and most well-known investment houses, including Goldman Sachs, Morgan Stanley, and Credit Suisse. The class actions allege that the IPOs were manipulated by the issuers and investment banks to artificially inflate the market price of the securities of those companies by inducing customers to engage in aftermarket "tie-in" agreements in exchange for IPO allocations.  The cases further allege that the investment banks extracted significant undisclosed compensation from their customers in exchange for giving them the IPO allocations.  The actions are coordinated before Judge Shira A. Scheindlin in the U.S. District Court for the Southern District of New York (Manhattan).

In connection with these actions, the Firm was instrumental in defeating a recusal motion brought by certain of the underwriter-defendants in 2001, and was the principal author of the electronic data preservation protocol that was entered by Judge Scheindlin in the litigation.  The Firm has been extensively involved in all phases of the litigation, which recently entered a new phase of class certification proceedings following the U.S. Court of Appeals' 2007 reversal of Judge Scheindlin's certification of six test classes.


SEEGER WEISS LLP
COMPLEX LITIGATION | SIMPLE JUSTICE

*Auction Rate Securities*

Seeger Weiss is part of a consortium of law firms that have taken a leading role in bringing actions against the broker-dealers involved in the auction rate securities market's collapse. Seeger Weiss has sued UBS, DeutscheBank, Merrill Lynch, Wachovia, TD Ameritrade, Morgan Stanley, JPMorgan Chase, E*Trade, Raymond James, Wells Fargo, Oppenheimer, Bank of America and Royal Bank of Canada, alleging that they knew, but failed to disclose material facts about the auction rates market and the securities they sold to their investors, including that the securities were not cash alternatives, like money market funds but, rather, were complex, long-term financial instruments with 30-year or longer maturity dates; and that they were only liquid at the time of sale because the broker-dealers were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability. Indeed, the broker-dealers simultaneously withdrew their support of the auction rate securities market on the same day in February 2008, resulting in its collapse. One *New York Times* reporter has referred to the collapse of the auction rates market as a "hostage crisis," in which thousands of investors, including senior citizens, have hundreds of billions of dollars in investments that they cannot access despite having been told that they were liquid investments that were as good as cash.

The Honorable Shira A. Scheindlin of the U.S. District Court for the Southern District of New York (Manhattan) has appointed Seeger Weiss to serve as Liaison Counsel in *Waldman v. Wachovia*, No. 08 Civ. 2913 (SAS) (S.D.N.Y.). Seeger Weiss also was appointed as Liaison Counsel in *Chandler v. UBS AG*, No. 08 Civ. 2697 (SAS) (LMM) (S.D.N.Y.); *Humphrys v. TD Ameritrade*, No. 08 Civ. 2912 (PAC) (S.D.N.Y.); and *Ciplet v. JPMorgan Chase & Co.*, 08 Civ. 4580 (RMB) (S.D.N.Y.). Additionally, counsel with whom Seeger Weiss is working have been appointed Lead Counsel in these and several other cases against the broker-dealers.

*Securities Fraud Class Actions*

The Firm holds leadership roles in a variety of national securities class action litigations. For example, Seeger Weiss LLP served as lead counsel in an action against *ATEC Group, Inc.*, in which the Firm recovered $1.7 million for the class in the United States District Court for the Eastern District of New York. Additionally, Seeger Weiss LLP serves as lead counsel in an action against *The Miix Group*, a medical malpractice insurance carrier based in New Jersey, and several of its former and current directors and officers which is pending in the District of New Jersey, and chaired the Executive Committee in a derivative action against *Legato Systems, Inc.* in California.



The Firm also represents or has represented shareholders in a variety of securities litigations, including those against *ATEC Group* (E.D.N.Y.); *Axonyx* (S.D.N.Y.); *Bell South* (N.D. Ga.); *Bradley Pharmaceutical* (D.N.J.); *Broadcom Corp*. (C.D. Ca.); *Buca, Inc*. (D. Minn.); *Cryo-Cell International, Inc*. (M.D. Fl.); *eConnect, Inc*. (C.D. Ca.); *FirstEnergy Corp*. (N.D. Ohio); *Friedman, Billings, Ramsey Group* (S.D.N.Y.); *Gander Mountain* (D. Minn.); *Genta* (D.N.J.); officers and directors of *Global Crossing* (C.D. Ca.); *Grand Court Lifestyles, Inc*. (D.N.J.); *Impath* (S.D.N.Y.); *IT Group Securities* (W.D. Pa.); *Mattel, Inc*. (C.D. Ca); *Matrixx Initiatives* (D. Ariz.); *MBNA* (D. Del.); *MIIX Group* (D.N.J.); *Molson Coors Brewing Company* (D. Del.); *Mutual Benefits Corp*. (S.D. Fla.); *New Era of Networks, Inc*. (M.D.N.C.); *Nuance Communications* (N.D. Ca.); *NVE Corporation* (D. Minn.); *Omnivision Technologies, Inc*. (N.D. Ca.); *Par Pharmaceuticals* (D.N.J.); *Pixelplus, Co*. (S.D.N.Y.); *Procter & Gamble Co*. (S.D. Ohio); *Priceline.com* (D. Conn.); *Purchase Pro* (S.D.N.Y.); *Quintiles Transnational* (D. Colo.); *Read Rite Corporation* (N.D. Ca.); *Sagent Technology* (N.D. Ca.); *Sina Corporation* (S.D.N.Y.); *The Singing Machine, Inc*. (S.D. Fl.); *Terayon, Inc*. (C.D. Ca.); and *Tesoro Petroleum Corp*. (E.D. Tex); *Viisage Technology, Inc*. (D. Mass.), among others.

### *Madoff Investment Securities Litigation*

Seeger Weiss LLP has moved to the forefront of litigation against Bernard L. Madoff Investment Securities, the engine of Madoff's $50 billion Ponzi scheme, and has been retained to represent more than $500 million in claims from defrauded shareholders around the world. Madoff's brand of deception, though similar to a pyramid scheme, proved far more insidious because it relied Madoff's good standing and the fundamental trust the trading community placed in his abilities. Investors were lead to believe that their investments would be handled competently by Madoff and that their returns would be produced through sound investments. Thousands of investors and institutions have been defrauded by Madoff and his firm.

Seeger Weiss, along with co-counsel from Milberg LLP, filed a petition in April 2009 that, if granted, could make Madoff's personal assets available for investors to recover a portion of their investments. The petition was filed soon after Judge Louis Stanton reversed an earlier decision that blocked that option. The SEC and the prosecution maintained that nearly all of Madoff's personal assets were linked to his financial crimes, and personal bankruptcy could delay recovery by victims of his Ponzi scheme, but Judge Stanton disagreed, and reversed the prior holding.



## General Complex Class Action Litigation

Seeger Weiss has long excelled at general complex class action litigation, having achieved major victories in the past and working on several important class action cases in the present, against large agricultural and pharmaceutical corporations.

***Bayer CropScience Rice Contamination MDL***. The Firm served as a member of the court-appointed Plaintiffs' Executive Committee in this MDL brought on behalf of national rice-growers who sought to recover damages against Bayer CropScience and numerous parents and affiliates to the value of their rice crops resulting from contamination by LLRICE 601 and LLRICE 604, varieties of long-grain rice that have been genetically modified to produce rice crops resistant to glufosinate—the active ingredient in Liberty® Herbicide, another Bayer product. This "glufosinate-tolerant" trait allows growers to spray Liberty® herbicide over the entire crop, killing all weeds without risking any damage to the rice crop. Following revelations in August 2006 and again in March 2007 that U.S. rice crops had been found to be contaminated with these varieties (which, at the time, had not been approved for commercial use), the world's leading importers of American rice, including the European Union, Japan, and South Korea, quickly announced embargoes of U.S. rice, triggering sharp declines in the market price of U.S. rice.  The JPML centralized these actions, and others similar, before the Honorable Catherine D. Perry of the U.S. District Court for the Eastern District of Missouri (St. Louis). Following the district court's denial of class certification, the cases proceeded to completion of discovery and trial. Following multiple bellwether trials before Judge Perry, both resulting in significant victories for the Plaintiffs, the parties entered into a global settlement totaling $750 million.

***In re "StarLink" Corn Products Litigation***. Similar to the rice contamination litigation against the Bayer companies, this litigation was centralized by the JPML in the U.S. District Court for the Northern District of Illinois, Eastern Division (Chicago). The U.S. Environmental Protection Agency had licensed "StarLink" brand corn—which had been genetically-modified to create its own insecticidal protein, making it resistant to various corn pests—only for the growing of corn used for animal feed and industrial purposes (such as the growing of corn for manufacturing ethanol), was found to have entered the U.S. food chain. The news swiftly led to Japan and other major overseas buyers of U.S. corn placing embargoes on American corn, and the resulting collapse of the export market for U.S. corn and a sharp decline in the market price of U.S. corn. The Firm was one of four court-appointed co-lead counsel for a class of corn farmers in various corn-belt states against Aventis CropScience USA—the developer of StarLink corn seed (which was later purchased by Bayer AG and became Bayer CropScience, the developer of the genetically-modified rice seeds that are the sources of the rice contamination litigation in which the Firm is currently involved)—and Garst Seed Company, the principal licensee and distributor of the corn seed. In the actions, the corn growers sought damages representing the loss in value of their corn crops due to the improper marketing, handling, and



distribution of StarLink corn. In April 2003, following much discovery and the denial of the Defendants' motion to dismiss the Plaintiffs' claims, U.S. District Judge James B. Moran gave final approval to a $110 million nationwide settlement of the class claims.

***OxyContin Third-Party Payor Litigation***. Seeger Weiss has been appointed co-lead counsel in a proposed class action pending in the U.S. District Court for the Southern District of New York (Manhattan) before the Honorable John G. Koeltl. The litigation against the drug's maker, Purdue Pharma LLP, involves the marketing and promotion of OxyContin. In 2007, Purdue pled guilty to federal violations of misbranding of OxyContin, for which it was fined over $600 million in criminal and civil penalties. The Firm represents insurance providers and other "third-party payors," including self-funded health plans, which have purchased, reimbursed, or otherwise paid for OxyContin for their plan members or participants. The Plaintiffs assert violations of federal RICO and state consumer fraud statutes. Specifically, they allege that, as a result of Defendants' fraudulent over-promotion and off-label promotion of OxyContin, members of the class paid a much higher price, for many more prescriptions, than they would have absent Defendants' fraudulent over-promotion. After discovery, spirited negotiations, and briefing and argument on Purdue's motion to dismiss the complaint, Seeger Weiss secured a $20 million settlement, which received preliminary approval from the district court in December 2008. A final approval (fairness) hearing is scheduled for May 15, 2009.

## Environmental and Toxic Tort Litigation

Seeger Weiss has brought several environmental and toxic tort cases on behalf of homeowners, small landowners and farmers who have suffered from environmental damage and degradation.

***Factory Hog and Poultry Farm Environmental Litigation***. The Firm was involved in the prosecution of various environmental and common law claims against several of the nation's largest industrial hog and poultry farm operators. These cases, which were filed in various jurisdictions throughout the country, were brought on behalf of riparian property owners and other residents in the vicinity of factory hog and poultry farms who suffered from atmospheric degradation caused by the illegal discharge of harmful toxins and other pollutants contained in the enormous quantities of hog and poultry feces and other wastes produced by the industrial farmer defendants. The Firm served as co-lead counsel in several of these actions. For example, the Firm served as court-appointed co-lead counsel in an action in the state District Court of Mayes County, Oklahoma pertaining to environmental damages to the Grand Lake O'Cherokees caused by the disposal of massive quantities of chicken litter by the operations of various major poultry integrators and their contract growers. In that action, the Firm achieved the certification of two classes of owners of property around the 44,000-acre lake after a three-day hearing by the District Court, and that ruling was only narrowly overturned by the Oklahoma appellate courts



during nearly two and one-half years of appeals. The Firm dismissed these claims following the class decertification.

**Hog Odor Nuisance Litigation**.  In September 2006, following a three-week trial in which Firm partner, Stephen A. Weiss, served as co-lead trial counsel, a state court jury sitting in Jackson County, Missouri returned a $4.5 million combined verdict against industrial hog producers Premium Standard Farms, Inc. and ContiGroup Companies, Inc. in favor of six neighbors of the Defendants' vast farm operations in northern Missouri. In March 2010, a group of fifteen neighbors brought Premium Standard Farms before the state court again, alleging that the overpowering hog odors had not abated since the original trial. A Jackson County jury awarded the plaintiffs an $11.05 million verdict. This verdict is the largest monetary award against a hog farm in an odor nuisance case.  Following these verdicts, Mr. Weiss served as lead negotiator of a global settlement that successfully resolved approximately 300 related claims against these Defendants on a confidential basis.

**Lead Poisoning Litigation**. The Firm represented families and property owners living within Tar Creek, one of the nation's most notorious hazardous waste sites, situated within the former Picher Mining Field in Northeast Oklahoma. The site had ranked consistently near the top of EPA's National Priorities List for over a decade.  Seeger Weiss pursued two types of cases on behalf of the residents: claims on behalf of seven minor children who have irreversible brain damage as a result of exposure to the lead left behind by the mining companies; and a prospective class of residents whose properties have been devalued and who have been exposed to this toxic mining waste.  These claims were successfully resolved through confidential settlements.

**Chinese-Manufactured Drywall**. Seeger Weiss is currently pursuing action against Chinese manufacturers of contaminated drywall, which is reported to contain high levels of hydrogen sulfides, compounds that when exposed to prolonged heat or humidity, release sulfur gasses resulting in terrible odors, metal corrosion, and physical injuries. Christopher A. Seeger was named to the Plaintiff's Steering Committee in the Chinese-Manufactured Drywall Products Liability Litigation (MDL No. 2047) by Judge Eldon E. Fallon, United States District Court, Eastern District of Louisiana. This litigation, which includes thousands of claimants asserting property damage and personal injury claims, was centralized in the Eastern District of Louisiana in June 2009 by order of the United States Judicial Panel on Multidistrict Litigation.

Mr. Seeger tried the first defective Chinese-manufactured drywall case in the country, resulting in a $2.6 million verdict for seven Virginia families. Mr. Seeger also tried the second bellwether case, which determined whether manufacturers were responsible for damages the drywall's toxic fumes cause to plumbing, electronics, and appliances, securing a $164,049 judgment for the Hernandez family.



With those successes, Mr. Seeger was a key part of a negotiating team that obtained a breakthrough settlement to remediate homes affected by Chinese drywall. The agreement was reached with several key defendants including Knauf Plasterboard Tianjin (KPT), builders, drywall suppliers and their insurers, and other Knauf entities, and totaled over $1 billion in recoveries.  Seeger Weiss remains engaged in litigation against the other, key manufacturer of this contaminated drywall as well as its parent corporations.

## Asbestos Litigation

Seeger Weiss handles numerous lawsuits seeking compensation for victims of asbestos and mesothelioma and has recovered millions of dollars for mesothelioma victims nationwide. These cases include a $3.1 million settlement on behalf of an auto mechanic and Navy veteran who was diagnosed with mesothelioma at age 61, and a $2 million settlement on behalf of an 80-year-old California man who was diagnosed with mesothelioma after having worked on shipyards in California and across the country.

## Fair Labor Standards Act Litigation

Seeger Weiss LLP is engaged in a wide variety of Fair Labor Standards Act ("FLSA") litigation matters representing aggrieved employees in courts throughout the country. The following are examples of such FLSA actions in which the Firm is involved:

Seeger Weiss served as lead counsel in an action—titled *Schaefer-LaRose v. Eli Lilly & Co.*, which was filed in November 2006 and transferred to the U.S. District Court for the Southern District of Indiana—charging that Eli Lilly & Co. had a common practice of refusing to pay overtime compensation to its pharmaceutical representatives—including Sales Representatives, Senior Sales Representatives, Executive Sales Representatives, Senior Executive Sales Representatives, and those with similar job descriptions and duties—in violation of the federal FLSA. The plaintiffs, Lilly employees who promoted or detailed pharmaceutical products to medical professionals, alleged that Lilly unlawfully characterized its employees as exempt in order to deprive them of overtime pay. In February 2008, the court approved Plaintiffs' motion to conditionally certify the case as a collective action—the FLSA equivalent of a class action. The class consisted of approximately 400 current and former pharmaceutical representatives employed by Lilly across America.

Seeger Weiss was also co-counsel in a similar federal collective action lawsuit charging that Pfizer Inc. had adopted a common practice of refusing to pay overtime compensation to its



pharmaceutical representatives—including Professional Healthcare Representatives, Therapeutic Specialty Representatives, Institutional Healthcare Representatives, Specialty Healthcare Representatives, Specialty Representative, and Sales Representatives—in violation of the FLSA. That action, *Coultrip v. Pfizer Inc.*, was filed in October 2006 in the U.S. District Court for Southern District of New York. In August 2008, that court granted Plaintiffs' motion to certify the case as a FLSA collective action.

The FLSA litigations against the various drug-makers were extremely hard fought and led to a split among the circuit courts of appeals, with the Seventh Circuit affirming the district court's grant of summary judgment in favor of Eli Lilly and the Ninth Circuit similarly holding in favor of defendant SmithKline Beecham, while the Second Circuit held in favor of the plaintiffs in a cognate action brought against Novartis. The claims wound their way up to the U.S. Supreme Court, where a sharply-divided Court affirmed the Ninth Circuit in a 5-4 decision in June 2012. Seeger Weiss partner Stephen A. Weiss and Counsel James A. O'Brien III (who argued the plaintiffs' appeal in the Seventh Circuit) spearheaded the litigation for Seeger Weiss.

### Pension and ERISA Litigation

Seeger Weiss has represented thousands of clients whose employers recklessly tampered with their retirement benefits.

***Schol v. Bakery and Confectionary Union and Industry Int'l Pension Fund***. Seeger Weiss represented eight former union employees of the Entemann's Bakery in Bay Shore, New York and two from the now-shuttered Keebler Food Co. plant in Denver, in a class action lawsuit filed against the Bakery and Confectionery Union and Industry International Pension Fund. Many of these and other union workers accepted "buy-out" offers from the company as it downsized its personnel in recent years or accepted management positions, based on the understanding and expectation that they would qualify for a full pension under alternative formulas known as Plan G and Plan C, or more commonly the "Golden 80" and "Golden 90" options, respectively, whereby pension plan participants could quality for a full pension if their age and combined years of service added up to 80 and 90, respectively. But as of July 1, 2010, Pension Plan participants not already eligible for their full pension under the Golden 80 and 90 formulas lost their right to qualify for those pensions if they were no longer in working in covered (unionized) employment. The result of this amendment was that participants could qualify for a full pension only at age 65 and the only early retirement pension available to them was a reduced benefit hat was as much as 60% lower than the Golden 80 and 90 pensions. The *Schol* action—the first one of several filed in the country to challenge the pension plan amendment—was filed in the U.S. District Court for the Eastern District of New York and subsequently transferred to the Southern District of New York (in White Plains, New York), where it was consolidated with a similar action, ***Alcantara v. Bakery and Confectionary Union and Industry Int'l Pension Fund***. In June 2012, Judge Vincent L. Briccetti granted Plaintiffs' motion for judgment on the pleadings, agreeing with Plaintiffs that the Pension Plan's 2010 amendment violated ERISA's prohibition against the cutback of accrued pension benefits.



Judge Briccetti agreed that the pension Plaintiffs had been promised and were earning credits toward was an accrued benefit, and could not be reduced merely because they had not already reached the required number of total credits of age plus years of service before last July 1, 2010. In May 2014, the U.S. Court of Appeals for the Second Circuit affirmed Judge Briccetti's decision in a published opinion, ***Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71 (2d Cir. 2014)**.  The victory secured by Seeger Weiss and its co-counsel has benefitted over 540 Pension Plan participants.  The case was successfully prosecuted by Seeger Weiss partner Diogenes P. Kekatos .

*In re Delta Air Lines Inc*. Seeger Weiss served as Lead Counsel in a nationwide ERISA multidistrict litigation centralized by the JPML in the federal court in Atlanta, Georgia before the Honorable Julie E. Carnes. The Firm represented active and retired Delta Air Lines pilots challenging various company pension plan amendments and practices that had caused them to forfeit accrued and vested pension benefits.  Plaintiffs challenged, among other things, the methodology employed by Delta in calculating and paying lump sums of pension benefits to pilots, the company's retroactive freeze of a benefit formula previously pegged to increases in investment performance, and automatic reductions of pension benefits of married retirees hired before 1972. In September 2005, the federal court in Atlanta granted final approval to a class action settlement providing for payment of $16 million in cash to certain retired Delta pilots hired before 1972 or their spouses or beneficiaries and 1 million stock purchase warrants to lump sum pension benefits recipients. The settlement represented a significant recovery in light of Delta Air Lines' rapidly-deteriorating financial plight, with the court's final approval coming only days before Delta filed for bankruptcy protection. Seeger Weiss continued to represent Plaintiffs and class members through a number of twists and turns in the bankruptcy proceedings and beyond, and vigorously fought for and, in 2008, secured the complete and final distribution of all settlement proceeds to the class members.

*In re BellSouth Corp. ERISA Litigation*. Seeger Weiss represented tens of thousands of aggrieved BellSouth management employees in a class action suit against the company and the administrators of the employees' 401K plan, in connection with "Enron-like" breaches of fiduciary duty. These claims stemmed from Defendants' failures to advise employees of investment diversification options and their having created a falsely optimistic outlook in Defendant BellSouth's stock as a prudent investment for the plan. Defendants encouraged employees to invest their earnings in company stock at a time when the company was noting positive operating results, artificially-optimistic revenue growth, and other financial indicators that were found to be materially false, including revelations of accounting irregularities and losses from the company's risky venture into the highly-speculative Latin American wireless phone market. In 2006, after considerable motion practice and discovery in the litigation, the federal court in Atlanta, Georgia, which oversaw the litigation, granted final approval to a class action settlement that provides for, among other things, BellSouth to make matching 401K plan contributions to employees for a three-year period in cash rather than company stock; for



employees during that period to have the same investment options for the company's matching contributions as they have for their own contributions; the availability of certain additional investment choices; and during that period a guaranteed minimum percentage for one of the components in the formula used to determine the company's matching contributions.

## Insurance Litigation

For over a decade, the Firm has played a pivotal role in many notable insurance market practices class actions brought against members of the life insurance industry. These nationwide suits resulted from alleged misrepresentations made in connection with the sale of certain life insurance products, including "vanishing premium" policies which, due to market-sensitive dividend projections, required customers to pay premiums on a more prolonged basis than originally expected. The Firm has also reviewed annuity claims in the Claims Review Process.

The firm serves on the Plaintiffs' Executive Committee in the multidistrict *Aetna UCR Litigation* (MDL No. 2010), pending before Judge Katherine Hayden in the United District Court for the District of New Jersey.  That litigation raises ERISA and other claims against Aetna, Ingenix, and UnitedHealth Group pertaining to reimbursement rates for out-of-network heath care services.  The insurers were reported to have knowingly created and used flawed data – a rigged database created by Ingenix, which was once the largest provider of healthcare billing information in the country and is now a subsidiary of UnitedHealth Group – to produce reimbursements often far below genuinely usual, customary, and reasonable rates.

In 1995, the firm was appointed as the national Policyowner Representative in *Wilson v. New York Life Insurance Company* sales practices litigation, the first settlement of a nationwide class action relating to the vanishing premium insurance product. *Wilson* involved claims brought by a class of approximately 3.2 million New York Life policyowners who suffered damages as the result of allegedly improper sales practices by the company and its agents, including the alleged failure to properly disclose the market-sensitivity of the company's premium payment projections. As Policyowner Representative, the firm served as the principal advocate on behalf of members of the class who elected to pursue individual claim relief before independent appeal boards.

Following its appointment in the *New York Life* litigation, the firm served as the Attorney Representative in the *In re Prudential Life Insurance Sales Practices Litigation*. In that role, the firm, and others serving under its auspices, represented individual class members in connection with over 53,000 separate claim arbitrations.

In addition to the *New York Life* and *Prudential* matters, the firm has served as the Policyowner Representative, Attorney Representative, or Claim Evaluator in the following



insurance and annuity sales practices class actions: *Ace Seat Cover Company v. The Pacific Life Insurance Co.*; *Benacquisto v. American Express Financial Corporation*; *Duhaime v. John Hancock Mutual Life Ins. Co.*; *Garst v. The Franklin Life Insurance Co.*; *In re General American Life Insurance Co. Sales Practices Litigation*, *In re Great Southern Life Insurance Co. Sales Practices Litigation*; *Grove, et al. v. Principal Mutual Life Insurance Co.*; *Joseph F. Kreidler, et al. v. Western-Southern Life Assurance Co.; Lee v. US Life Corp.*; *In re Lutheran Brotherhood Variable Products Co. Sales Practices Litigation*; *Manners and Philip A. Levin v. American General Life Insurance Co.*; *In re Manufacturers Life Insurance Co. Premium Litigation*; *In re Metropolitan Life Insurance Co. Sales Practices Litig.*; *Moody v. American General Life and Accident Insurance Co.*; *In re New England Mutual Life Insurance Company Sales Practices Litigation*; *Roy v. Independent Order of Foresters*; *Murray v. Indianapolis Life Insurance Co.*; *Snell v. Allianz Life Insurance Company of North America*; *In re Sun Life Assurance Company of Canada Insurance Litigation*; *Varacallo, et al. v. Massachusetts Mutual Life Insurance Co.;* and *Wemer v. The Ohio National Life Insurance Co.*

### Nursing Home Litigation

Seeger Weiss LLP has served as counsel in over two dozen personal injury and wrongful death actions on behalf of victims of severe nursing home abuses and neglect. These cases, both pending and settled, were litigated in various state courts throughout the country and have earned the Firm a national reputation in the area of nursing home litigation.

### Personal Injury Litigation

The Firm maintains a highly-selective docket of matters involving serious personal injury or wrongful death. Unlike many personal injury practices in which attorneys may handle hundreds of slip-and-fall matters at a time, the Firm's philosophy is to allow its attorneys to concentrate on a smaller number of "high-end" catastrophic injury cases, thereby permitting the highest quality of attention and service available in the field.

***In re National Football League Players' Concussion Injury Litig.***   Christopher Seeger served as co-lead counsel to NFL players and lead negotiator in the NFL concussion litigation, multidistrict litigation involving thousands of lawsuits brought by former NFL players that the JPML ordered centralized in the Eastern District of Pennsylvania), in which the players alleged that the League had suppressed information concerning the linkage between repeated head trauma and serious neurological ailments.  The litigation has gained significant media attention.



Judge Brody appointed Seeger Weiss founding partner Christopher A. Seeger as Co-Lead counsel for the Plaintiffs, and several other Seeger Weiss partners and other attorneys, including David R. Buchanan and TerriAnne Benedetto, have been actively involved in the litigation.  The settlement was achieved after many months of spirited negotiations led by Mr. Seeger, including before a court-appointed mediator.

The settlement will provide an uncapped Monetary Award Fund  for 65 years which will pay all valid claims  for certain neuro-cognitive impairments, with individual awards of up to $5 million; $75 million to fund a Baseline Assessment Program Fund that will offer eligible retired NFL players a baseline neuropsychological and neurological examination to determine the existence and extent of any cognitive deficits, and in the event retired players are found to suffer from moderate cognitive impairments certain supplemental benefits in the form of specified medical treatment and/or evaluation, including, as needed, counseling and pharmaceutical coverage; and a $10 million Education Fund to fund safety and injury-prevention programs for football players.

The U.S. Court of Appeals rebuffed the effort of a small group of objectors to challenge the preliminary approval determination in an opinion published at 775 F.3d 570.  After extensive proceedings, culminating in a final approval hearing in November 2014, Judge Brody approved the settlement in an exhaustive opinion issued in April 2015 (published at 307 F.R.D. 351), agreeing with Seeger Weiss and its co-counsel that the objections to the settlement lodged by a small percentage of class members lacked merit.  In May 2016, a U.S. Court of Appeals for the Third Circuit panel unanimously affirmed Judge Brody's final approval determination in a published opinion and denied rehearing *en banc*.  And finally, in December 2016, the United States Supreme Court denied a petition for certiorari relating to the settlement.  The denial of certiorari removed the final obstacle to implementation of the landmark settlement.

In addition to Christopher Seeger, partners David Buchanan and TerriAnne Benedetto and counsel Scott Alan George are responsible for this litigation.

***Wildcats Bus Crash Litigation***.  In June 2009, Seeger Weiss was lauded for its staunch representation of 11 victims and their families in the Wildcats Bus Accident Case, after the defendants' agreed during trial to accept 100% of the responsibility for the tragic crash. The horrific accident, which resulted in four fatalities and countless other serious injuries, occurred when a Coach Canada bus carrying an "under 21" Canadian female hockey team named the Wildcats veered off of Interstate 390 near Rochester, New York and struck a parked tractor-trailer on the shoulder of the roadway.  Led by Christopher Seeger, Moshe Horn and Marc Albert, the Seeger Weiss team took more than 20 depositions, reviewed thousands of pages of documents and retained multiple experts in preparation for the trial in the Supreme Court,



Livingston County.  Seeger Weiss represented a total of eleven victims of the accident and their families. In March 2010, a jury awarded $2.25 million to three of the victims and their families, who were represented by partners Moshe Horn and Marc Albert. Following this verdict, the Firm successfully negotiated a global settlement of $36 million on behalf of all of the Wildcats bus accident victims.

   ***Other Personal Injury Matters***.  Partner Christopher A. Seeger represented a six-year-old boy and his family in a medical malpractice action against a hospital for failing to timely diagnose meningitis, which resulted in severe brain damage to the boy. The case settled for $3.25 million in the Supreme Court of Kings County.

   Partners Christopher A. Seeger and Stephen A. Weiss represented the wife and two minor children of a 41-year-old successful technologist who was tragically killed when a boat upon which he was a passenger collided with the Greenport Breakwater, a 1,000 foot long structure constructed of large boulders in Greenport, Long Island. The victim was thrown from the boat upon impact and ultimately drowned. This case was settled for $2.9 million.

   Seeger Weiss secured a $1.4 million verdict for client Debbie D'Amore in her case against Met Life and American Building Maintenance for serious injuries which she suffered as a result of a fall on July 13, 2004 at the Met Life Building in New York City. Ms. D'Amore was vigorously represented by Christopher Seeger and Marc Albert of Seeger Weiss LLP over the course of the week-long trial held before the Honorable Judge Michael Stallman of the Supreme Court, New York County. The jury deliberated over a two day period and returned with a $1.4 million verdict, $1 million of which was awarded for Ms. D'Amore's past pain and suffering, with $400,000 awarded for future pain and suffering. The jury found defendants Met Life and its cleaning contractor, American Building Maintenance responsible for the fall and the serious injuries which Ms. D'Amore sustained as a result. Ms. D'Amore suffered a tri-malleolar ankle fracture in the fall which required multiple surgeries, including ultimately, an ankle fusion.

## Antitrust Litigation

   Seeger Weiss LLP has been involved in nationally-prominent antitrust litigation, where it has recently expanded its presence.



*Compact Disc Litigation.* Seeger Weiss was involved in this consumer antitrust litigation, which sought damages against the wholesale sellers of pre-recorded music sold in the form of compact discs. The Plaintiffs alleged that the Defendants had conspired to artificially inflate the retail prices of compact discs in violation of the Sherman Act. The litigation was settled favorably in the United States District Court for the District of Maine, where the litigation had been centralized for coordinated pretrial proceedings by the JPML.

*McDonough v. Toys "R" Us, Inc.*  Seeger Weiss represents a proposed class of consumers and smaller retailers of baby and juvenile products against Babies "R" Us (an affiliate of the Toys "R" Us chain) and several manufacturers of baby products, including strollers, bedding, car seats, and other items, in consolidated actions pending in the U.S. District Court for the Eastern District of Pennsylvania (Philadelphia) before the Honorable Anita B. Brody. The Plaintiffs allege that Babies "R" Us conspired with the manufacturers of baby products in a scheme whereby the manufacturers required other retailers to sell their products at prices above those being charged by Babies "R" Us. As a result, Babies "R" Us was able to monopolize the retail market, resulting in consumers being forced to pay more for baby products. The district court denied the Defendants' motion to dismiss the consolidated complaints. Briefing of Plaintiffs' motion for class certification has been completed, and a decision from the court is expected shortly.

*Monsanto Genetically-Modified Soybean and Corn Seed Litigation.* The Firm serves as Co-Lead Counsel in *Schoenbaum v. E.I. DuPont de Nemours and Company*, thirteen consolidated proposed class actions against Monsanto Company, E.I. DuPont de Nemours and Company, and Pioneer Hi-Bred International Inc. currently pending before the Honorable E. Richard Webber in the U.S. District Court for the Eastern District of Missouri (St. Louis). These lawsuits, brought on behalf of farmers who purchased genetically-modified Roundup Ready soybean and YieldGard corn seeds, allege violations of federal and state antitrust, state unfair trade practices statutes, and common law claims for unjust enrichment. The claims stem from the defendants' conspiracy to fix the price of these seeds through the imposition of "technology fees," ostensibly for the purpose of allowing Monsanto to recoup its research and development costs of those seed products but which, in reality, capitalized on and exploited Monsanto's development of those seeds in order to monopolize -the market for those seeds and thereby charge and collect premium prices. After extensive briefing, both pre- and post-argument, and an all-day hearing on the Defendants' motion to dismiss the Plaintiffs' Master Consolidated Amended Action Complaint, the district court sustained most of Plaintiffs' claims. Following spirited motion practice, which included discovery disputes and the Plaintiffs' motion for leave to file an amended complaint in order to, among other things, assert additional claims against Monsanto for misuse of patent, Plaintiffs reached individual settlements with all of the



defendants. The settlements will provide a significant recovery to each of the more than two dozen named Plaintiffs.

*In re Packed Ice Antitrust Litigation*. The Firm represents direct purchasers of packaged ice in a proposed class action brought against the five American and Canadian manufacturers and distributors who possess the dominant share of the $2.5 billion per year packaged ice industry in North America. The Firm has been appointed Co-Chair of the Class Certification Committee in that litigation. Plaintiffs allege that Defendants have violated the antitrust laws by conspiring to fix prices and allocate market share for packaged ice.  The U.S. Justice Department's Antitrust Division commenced an investigation into the packaged ice industry sometime prior to March 2008 and grand jury subpoenas were issued to the Defendants.  The cases from around the country have been centralized in the U.S. District Court for the Eastern District of Michigan, and a hearing will be held in March 2009 respecting the selection of Lead Counsel.

*In re Rail Freight Fuel Surcharge Antitrust Litigation*. The Firm represents shipping customers in a proposed class action brought against the country's four major railroads for antitrust violations. The Defendants in this multidistrict litigation, pending in the U.S. District Court for the District of Columbia, are alleged to have conspired to fix the prices of "rail fuel surcharges" above competitive levels, causing the Plaintiffs to pay exorbitant rates for unregulated rail freight transportation services—rates that were unrelated to fuel costs. The district court denied the Defendants' motions to dismiss the direct purchasers' claims and the indirect purchasers' federal antitrust claims. The district court held a two-day hearing on Plaintiffs' motion for class certification in October 2010 and, in June 2012, issued an exhaustive 145-page decision, granting the motion.  In August 2013, the D.C. Circuit remanded the case for further proceedings, principally in light of the Supreme Court's then-recent decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  Further proceedings have been conducted on remand, including additional expert witness discovery and voluminous briefing.  The district court will soon hold a multi-day hearing on the class certification motion. Seeger Weiss serves as Co-Chair of the Law and Briefing Committee.

## Other Commercial Litigation

In addition to its diverse complex litigation practice, Seeger Weiss LLP is engaged in a wide variety of commercial litigation matters representing individuals and businesses in state and federal courts throughout the country. The following are examples of such commercial actions in which the Firm is involved:

*Automobile Dealership Warranty Litigation*: The Firm represents dozens of franchised automobile dealerships located throughout New York State in separate actions against the "Big Three" automobile manufacturers — Ford, General Motors, and DaimlerChrysler. These actions



are pending in federal court in New York and are based on the manufacturers' failure to comply with the New York State Vehicle & Traffic Law § 465. These actions assert claims that in violation of New York State statute and the franchise agreement that governs the relationship between the dealerships and the factories, the manufacturers have failed to adequately reimburse the dealerships for parts used in performing repairs pursuant to the manufacturers' warranties. In addition to the three federal court actions, the Firm also represents close to a dozen franchised Chrysler dealerships in arbitrations pending before the American Arbitration Associations asserting the same claims.

*Arzoomanian v. British Telecommunications PLC*. The Firm represented a small businessman who had brokered a multi-million dollar global telecommunications deal between two multi-national corporations, British Telecommunications PLC ("BT") and Unilever PLC, and then was cut out of the deal by the companies and refused his fee. In 2004, the Firm successfully overcame BT's motion to dismiss the action on *forum non conveniens* grounds (in which BT argued that the action should not have been brought in the United States). After extensive discovery—both in the United States and overseas—and further motion practice, the case was settled in 2007.  This is one of a number of cases that the Firm has handled on behalf of small businesses which have been wronged by behemoth corporations.

*In re ETS Praxis Principles of Learning and Teaching: Grades 7-12 Litigation* is a consolidated national class action on behalf of more than 4,100 prospective teachers as to whom ETS negligently and wrongfully reported failing scores on the Praxis Principles of Learning and Teaching test for grades 7 through 12 (the "PPLT" test) during the period from January 2003 through April 2004. The PPLT is a test that is required in many states in order for teachers to obtain their teaching certification. In December 2004, the various class actions filed around the country were transferred to the Honorable Sarah Vance of the United States District Court for the Eastern District of Louisiana (New Orleans). Judge Vance appointed Seeger Weiss LLP to the position of State Court Litigation Liaison Counsel.  This case was settled in 2006 for $11.1 million.

*HMO Litigation*. The Firm was counsel to individual doctor-members of the Connecticut State Medical Society ("CSMS") and the Medical Society of the State of New York ("MSSNY") in connection with various putative statewide class actions filed in Connecticut and New York state courts, respectively against several national health management organizations (HMOs). The class members sought damages resulting from the defendants' improper, unfair and deceptive practices designed to deny, impede or delay lawful reimbursement to CSMS and MSSNY physicians which rendered necessary healthcare services to members of the HMO managed care plans.  The case was successfully resolved.



*VOIP, Inc. v. Google, Inc.* The Firm represents VOIP, Inc. in a trade secrets and breach of contract action filed in New York State Supreme Court in February 2011. The suit claims that Google developed its "Click to Call" feature, which allows users to make Internet phone calls by just clicking on a link, using misappropriated VoIP trade secrets.





Selected Attorney Biographies

*Partners*

**Christopher A. Seeger**

*Position*: Founding Member Co-Managing Partner.

*Admitted*: New Jersey, 1990; New York, 1991;

U.S. District Court for the Southern District of New York and U.S. District Court for the District of New Jersey, 1991; U.S. District Court for the Eastern District of New York, 2000; U.S. District Court for the District of Colorado, 2011.

*Education*: Hunter College of the City University of New York (B.A., *summa cum laude*, 1987); Benjamin N. Cardozo School of Law (J.D., *magna cum laude*, 1990).

*Honors*: Managing Editor, *Cardozo Law Review*.

*Author*: "The Fixed Price Preemptive Right in the Community Land Trust Lease," 11 *Cardozo Law Review* 471, 1990; "Developing Assisted Living Facilities," New York Real Estate Law Reporter, Volume XII, Number 10, August 1998.

*Lecturer*: "The Use of ADR in Class Actions and Mass Torts," New York University School of Continuing and Professional Studies, October 13, 2000.

*Director*: American Friends of Rabin Medical Center, Inc.; Benjamin N. Cardozo School of Law, Yeshiva University, 1999-2000.

*Co-Chair*: Cardozo Law School Alumni Annual Fund, 1998-2000.

*Awards*: Best Lawyers in America, 2006, 2012; New York Super Lawyer, 2006-2013; New Jersey SuperLawyers, 2006-2014; Law Dragon 500, 2007-2013; Best Lawyers, Mass Tort Litigation; Hunter College Hall of Fame, 2007; Cardozo Alumnus of the Year, 2009.

*Member*: The Association of the Bar of the City of New York; New Jersey State Bar Association; Board of Advisors, New York Real Estate Law Reporter; Annual Fund Committee, 1999-present; American Bar Association; American Association for Justice, Trail Lawyers for Public Justice; Fellow, American Bar Foundation.

*Practice Areas*: Consumer Fraud, Products Liability, Antitrust; Insurance, Class Actions, Mass Torts.



### Stephen A. Weiss

*Position*: Founding Member and Co-Managing Partner.

*Admitted*: New York, 1991; U.S. District Courts for the Southern and Eastern Districts of New York, 1991.

*Education*: Brandeis University (B.A., 1986); Benjamin N. Cardozo School of Law (J.D., 1990).

*Honors*: Business Editor, *Cardozo Law Review*, 1989-1990.

*Author*: "Environmental Liability Disclosure Under the Federal Securities Law," *Law Education Institute*, Inc., 1998; "Liability Issues and Recent Case Law Developments Under CERCLA, New Environmental Issues of Liabilities of Government Agencies & Government Contractors," *Federal Publications*, Inc., Chapter 4, 1995; "New York Proposes Legislation to Restrict Shareholder Derivative Suits," *Insights*, Vol. 8, No. 3, p. 24, 1994; "Suretyship as Adequate Protection Under Section 361 of the Bankruptcy Code," *Cardozo Law Review*, Vol. 12, p. 285, 1990.

*Director or Officer*: Benjamin N. Cardozo School of Law, Yeshiva University, 2000-present; New York State Trial Lawyers Association, 2012-present; New York State Academy of Trial Lawyers, Vice President,1[st] Department, 2012-2013.

*Co-Chair*: Cardozo Law School Alumni Annual Fund, 1998-2000.

*Awards*: International Humanitarian Achievement Award, Shaare Zedek Medical Center, 2002; Trial Lawyer of the Year, Finalist, Public Justice Foundation, 2010.

*Member*: American Association for Justice; American Bar Association; Badge of Honor Memorial Foundation, General Counsel, 2008-present.

*Practice Areas*: Complex Litigation, including Antitrust, Consumer, Employment, Environmental, Insurance, Products Liability, Pharmaceutical, Qui Tam and Securities Litigation.

### David R. Buchanan

*Position*: Member.

*Admitted*:  New Jersey, 1993; New York, 1994; U.S. District Court for the District of New Jersey, 1993; U.S. District Court for the Southern District of New York, 1994; U.S. District Court for the Eastern District of New York, 1999.

*Education*: University of Delaware (B.S., 1990); Benjamin N. Cardozo Law School (J.D., *magna cum laude*, 1993)

*Honors*: Samuel Belkin Scholar, 1993; Member, 1991-93, and Administrative Editor, 1992-93, *Cardozo Law Review*.

*Awards*: Best Lawyers in America, 2007, 2012; New York Super Lawyer, 2007; Legal 500; Law Dragon 3000

*Member*: American Bar Association (Litigation, Intellectual Property sections).

*Practice Areas*: Complex and Mass Tort Litigation, including Antitrust, Consumer, Environmental, Insurance, Intellectual Property, Pharmaceutical, Products Liability, and Securities Litigation.



## Diogenes P. Kekatos

*Position*: Member.

*Admitted*: New York, 1984; U.S. District Courts for the Southern and Eastern Districts of New York, 1984; U.S. Courts of Appeals for the Second, Third, Seventh, Eighth, Ninth, and Tenth Circuits, 1985, 2008-14; U.S. Supreme Court, 1987.

*Education*: Columbia College, Columbia University (B.A., Dean's List all 8 semesters, 1980); Brooklyn Law School (J.D., 1983).

*Honors*: Named to New York *Super Lawyers*, 2013-16; recipient of letters of commendation from the U.S. Court of Appeals Staff Counsels and from Attorney General Janet Reno for outstanding performance and high level of professionalism in appellate mediation, 1999.

*Experience*: Special Assistant U.S. Attorney, 1986-88, and Assistant U.S. Attorney, 1988-2000; Office of the United States Attorney for the Southern District of New York, and Chief, Financial Litigation Unit, 1988-90; and Immigration Unit, 1990-2000. Has argued some 130 appeals and motions in the U.S. Court of Appeals for the Second Circuit, including a successful *en banc* rehearing, with scores of cases resulting in published opinions; and has handled hundreds of appellate mediations.

*Awards:* Executive Office for U.S. Attorneys Director's Award for Superior Performance as an Assistant U.S. Attorney, 1996; Award from U.S. Attorney Mary Jo White for Exceptional Achievement, 1995; and numerous other award nominations.

*Practice Areas*: Class Action and Complex Litigation, Federal Civil Litigation, Federal Appellate Litigation.

## Moshe Horn

*Position*: Member.

*Admitted*: New York and New Jersey, 1994; U.S. District Courts for the Southern and Eastern Districts of New York.

*Education*: George Washington University (B.A., 1989); Benjamin N. Cardozo School of Law (J.D., 1993).

*Honors*: Member of Championship team in a national Securities Law Moot Court competition at Fordham University, 1993; Winner tri-state trial competition, runner up Best Advocate, 1993.

*Experience*: Assistant District Attorney, New York County, 1993-2002 (where he held numerous supervisory positions and tried 50 jury cases); Senior Associate, Kaye Scholer LLP, 2002-2004. Member of the Firm's trial team that achieved a $47.5 million verdict for Vioxx-related cardiovascular injury in *Humeston v. Merck & Co.* in 2007 in the New Jersey Superior Court, Atlantic County. Member of the Firm's trial team that achieved a $1.4 million verdict for  Currently an Adjunct Professor of Law at Benjamin N. Cardozo School of Law, teaching "Introduction to Trial Advocacy." Has previously taught "Advanced Trial Advocacy" and "Mass Torts," and served as advisor and coach to the law school's Mock Trial Team.



*Member*: American Bar Association, American Association for Justice, New York State Trial Lawyers Association.

*Practice Areas*: Pharmaceutical and Medical Device Litigation, Personal Injury Litigation, Complex Litigation, Asbestos Litigation, Criminal Defense.

## Michael L. Rosenberg

*Position*: Member.

*Admitted*: New Jersey, 1989; U.S. District Court, District of New Jersey, 1989; New York, 1990.

*Education*: Rutgers-Camden School of Law (J.D., 1989), University of Delaware (B.A. 1986).

*Experience*: Has been with the Firm since its 1999 inception. Has negotiated individual settlements on behalf of hundreds of clients injured by pharmaceutical products, including over-the-counter medicines containing PPA and the anti-cholesterol drug Baycol. Played an integral role in the settlement of personal injury claims against the manufacturers of Dexatrim, a PPA-containing weight loss product, on behalf of 500 stroke victims who claimed that their strokes were caused by Dexatrim. The settlement is valued at approximately $200 million. Serves as a member of the Delaco Trust Advisory Committee tasked with overseeing the administration of the settlement. Was a member of the trial team that won a $2.6 million verdict for the Plaintiff in *McCarrell v. Hoffman-La Roche, Inc*, in New Jersey Superior Court, Atlantic County.

*Member*: American Bar Association and American Association for Justice.

*Practice Areas*: Complex and Mass Tort Litigation, including Pharmaceutical, Products Liability and Insurance Litigation.

## Terrianne Benedetto

*Position*: Member.

*Admitted*: Pennsylvania, 1990; New Jersey, 1991; U.S. District Courts for the District of New Jersey, 1991; Eastern District of Pennsylvania, 1991; Western District of Wisconsin, 1993; New York Supreme Court, Appellate Division, Third Department, 2009; and New York Superior Court, 2009.

*Education*: Franklin & Marshall College (B.A., 1986); Villanova University (J.D., 1990).

*Honors*: Member of the *Villanova Law Review*; Law Clerk to the Honorable Jacob Kalish of the Commonwealth Court of Pennsylvania, and the Honorable William W. Vogel of the Montgomery County Court of Common Pleas.

*Author*: "Database Technology: A Valuable Tool for Defeating Class Action Certification," published in *Pennsylvania Law Weekly*, Vol. XX, No. 47, November 24, 1997, and *Mealey's Litigation Report*: *Lead*, Vol. 7, No. 14, April 24, 1998.

*Experience*: At the beginning of her career as a class action litigator, was co-counsel for defendants in *Reilly v. Gould Inc.*, 965 F. Supp. 588 (M.D. Pa. 1997); *Dombrowski v. Gould Electronics Inc.*, 954 F. Supp. 1006 (M.D. Pa. 1996); and *Ascher v. Pennsylvania Insurance*



*Guaranty Association*, 722 A.2d 1078 (Pa. Super. 1998). Thereafter, joined nationally recognized plaintiffs' firms where she represented individuals, small businesses and the Office of the Attorney General for the Commonwealth of Pennsylvania in numerous antitrust and consumer fraud class actions, many resulting multimillion dollar settlements, including *In re Lupron Marketing and Sales Practices Litigation*, MDL No. 1430 (D. Mass.); *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456 (D. Mass.); *In re Graphite Electrodes Antitrust Litigation*, No. 2:97-CV-4182 (E.D. Pa.); *In re Magnetic Audiotape Antitrust Litigation*, No. 99 Civ. 1580 (S.D.N.Y); *In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.); *In re Maltol Antitrust Litigation*, No. 99 Civ. 5931 (S.D.N.Y.); *In re Compact Disc Antitrust Litigation*, MDL No. 1216 (C.D. Cal.); *In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D. Pa.); and *In re Carpet Antitrust Litigation*, MDL No. 1075 (N.D. Ga.).

*Member*: Pennsylvania Trial Lawyers Association, Philadelphia Bar Association.

*Practice Areas*: Complex Commercial and Class Action Litigation, including Consumer Protection, Antitrust, Products Liability, and Securities Litigation.


## *Counsel*


### James A. O'Brien III

*Position*: Counsel.

*Admitted*: New York, 2000; Massachusetts, 1988; U.S. District Court, District of Massachusetts, 1991.

*Education*: University of Massachusetts at Amherst (B.A., 1984); New England School of Law (J.D., 1988).

*Experience*: Attorney Advisor, U.S. Department of Labor, 1988-89; Assistant District Counsel, U.S. Immigration and Naturalization Service, 1990; Special Assistant United States Attorney, 1990-2001, Southern District of New York.

*Practice Areas*: Class Action and Complex Litigation, Federal Civil Litigation, Federal Appellate Litigation.


### Scott Alan George

*Position*: Counsel.

*Admitted*: Pennsylvania and New Jersey, 1998; U.S. District Courts for the Eastern District of Pennsylvania and the District of New Jersey, 1998; U.S. Court of Appeals for the Third Circuit, 1998; New York (2010); U.S. District Court for the Northern District Illinois (2012); U.S. District Court for the Eastern District of Michigan (2016).

*Education*: Stevens Institute of Technology (1984); Goddard College (B.A., 1989); Temple University School of Law (J.D., *cum laude*, 1998).

*Author*: Spotlight on Cost-Shifting of E-Discovery, Law 360, Nov 6, 2012 (with Jonathan Shub)



*Experience*:  In addition to providing occasional lectures at Temple University and litigation seminar on class actions, he has been in the leadership of many complex cases and class actions, including: *Pro et al. v. Hertz Equipment Rental Corporation*, 06-3830 (D.N.J.) (appointed co-lead for class settlement); *In re Whirlpool Corporation Front Loading Washer Products Liability Litigation*, MDL 2001 (N.D.Oh.) (member of the Plaintiff Steering Committee); *Alexander v. Coast Professional Services*, 2:12-cv-01461  (E.D.Pa.) (appointed co-Class Counsel); *Taha v. Bucks County*, 2:12-cv-06867 (E.D.Pa.) (appointed class counsel); and *In re Ford Fusion and CMax Fuel Economy Litigation*, MDL 2450 (S.D.N.Y) (Plaintiffs Executive Committee).  Additionally, he has been a key member in litigation such as:  *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, MDL 2672 (N.D.Ca.); *In re Caterpillar, Inc., C13 and C15 Engine Products Liability.* MDL 2450 (D.N.J.); *In re National Football League Players' Concussion Injury Litigation,* MDL 2323 (E.D.Pa.); *In re Chinese Manufactured Drywall Products Liability Litigation,* MDL 2047 (E.D.La.); *In re Vonage Marketing and Sales Practices Litigation*, MDL 1862 (D.N.J.),

*Honors*: Member of the Moot Court Honor Society.

*Practice Areas*: Complex and Class Action Litigation.

## Christopher Van de Kieft

*Position*: Counsel.

*Admitted*: New York, 2003; U.S. District Courts for the Southern and Eastern Districts of New York, 2005.

*Education*: Johns Hopkins University (B.A., 1990), Benjamin N. Cardozo School of Law (J.D., 2002).

*Honors*: Editor-in-Chief, *Cardozo Law Review*; recipient of Cardozo Law School's prestigious Samuel Belkin Award, awarded each year to one graduating student for "exceptional contribution to the growth and development of the Law School."

*Experience*: Prior to attending law school, served in the U.S. Army from 1990-98, attaining rank of Captain.  Prior to joining the Firm was an associate at Fried Frank Harris Shriver & Jacobson.

*Practice Areas*: Pharmaceutical and Medical Device Mass Tort Litigation; Class Action Litigation.

## *Associates*

## Parvin K. Aminolroaya

*Position*: Associate.

*Admitted*: New Jersey, 2008; New York, 2009; U.S. District Court, District of New Jersey, 2008.

*Education*: Fordham University (B.A., 2004, with honors); Benjamin N. Cardozo School of Law (J.D., 2008).



*Honors*: Named to New York Rising Stars *Super Lawyers*, 2014-16; Cardozo Alumni Association Young Leadership Award, 2016; Jacob Burns Medal awarded for outstanding contribution to Moot Court; Benjamin N. Cardozo Writing Award; Editorial Board, Moot Court Honor Society; First Place Oralist Team and First Place Brief, Regional Competition of the New York City Bar Association, National Moot Court Competition, 2007; First Place Brief and Second Place Oralist Team, Fordham Irving Kaufman Securities Moot Court Competition, 2007.

*Member*: Executive Committee, Benjamin N. Cardozo School of Law Alumni Association; Vice-Chair, Benjamin N. Cardozo School of Law Black Asian Latino Alumni Group Association, 2012-2016.

*Practice Areas*:  Complex Litigation, including Antitrust, Consumer, Products Liability, Pharmaceutical, and Securities Litigation.

### Asim M. Badaruzzaman

*Position*: Associate.

*Admitted*: New Jersey, 2010.

*Education*: Rutgers University (B.A., with honors, 2006); Seton Hall University School of Law (J.D., 2009).

*Honors*: Best Brief Author for Appellate Advocacy, 2008; William Paterson Award, New Jersey Lawyer Chapter of the American Constitution Society.

*Experience*: Marketing Contractor at Anadigics, Inc., 2006-2007; Research Assistant to Professor Mark P. Denbeaux, 2007; Legal Intern to Professor Meetali Jaine at the Center for Social Justice at Seton Hall, 2007; Intern at the Civil Litigation Clinic, 2009; Law clerk at Seeger Weiss LLP, 2008; Associate at Seeger Weiss LLP, 2009.

*Member*: American Bar Association, New Jersey State Bar Association.

*Practice Areas*: Pharmaceutical Drug Injury, Medical Device Liability, Mass Tort Litigation.

### Asa R. Danes

*Position*: Associate.

*Admitted*: New York State, 2004; United States District Courts for the Eastern and Southern Districts of New York, 2006 and Western District of Tennessee, 2009.

*Education*: Oberlin College (B.A., 1994); Brooklyn Law School (J.D., *cum laude*, 2001).

*Honors*: Notes and Comments Editor, *Brooklyn Journal of International Law*.

*Experience*: Associate at Paul, Hastings, Janofsky & Walker LLP; Law Clerk to the Honorable James T. Trimble, Jr. in the United States District Court for the Western District of Louisiana.

*Practice Areas*: Complex personal injury matters; mass tort, consumer fraud and securities class actions; shareholder derivative and corporate governance disputes and other commercial litigation.

### Michael C. Hughes



*Position*: Associate.

*Admitted*: New Jersey, 2013; U.S. District Court, District of New Jersey, 2013, New York, 2014.

*Education*: Seton Hall University (B.A., 2009); Seton Hall University School of Law (J.D., 2013).

*Experience*: Law Clerk and Contract Attorney at Seeger Weiss, LLP; Legal Extern to Hoboken Mayor Dawn Zimmer and Office of Corporation Counsel; Legal Intern at Meadowlands Hospital Medical Center In-House Counsel; Law Clerk at Blume Donnelly Fried Forte Zerres & Molinari (formerly Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C.)

*Honors:* Certificate, J.D. Program Health Law Concentration

*Practice Areas*: Pharmaceutical Injury Litigation, Medical Device Litigation, Mass Tort Litigation.

### James J. Leavy

*Position*: Associate.

*Admitted*: New Jersey, 2008; U.S. District Court, District of New Jersey, 2008.

*Education*: University of Phoenix (B.A., 2005, with honors 3.89/4.00); Seton Hall University School of Law (J.D., 2008).

*Honors*: Interscholastic Moot Court Board, Member; 2008 Lefkowitz National Moot Court Championships, 3rd Place; 2008 Lefkowitz National Moot Court Eastern Regional Champion & Best Brief Award; 2007 BMI Entertainment and Media Law Moot Court Competition, Quarterfinalist.

*Practice Areas*: Mass Torts and Pharmaceutical Product Liability Litigation.

### Perpetua N. MgBada

*Position*: Associate.

*Admitted*: New York, 1995; Nigeria 1984.

*Education*: University of Maiduguri, Bornu State (LL.B., 1983); University of Nigeria, Enugu State (LL.M., 1998).

*Experience*: Works on various Mass Torts and Pharmaceutical Product Liability cases, including information management, maintaining spreadsheets, case reviews, all intake related functions, reviewing medical records, preparing settlement enrollment materials, reviewing cases for ineligibility and points, preparing appeals, preparing extraordinary injury claims and uploading relevant documents to the portal, as well as handling client contact.

*Practice Areas*: Mass Torts and Pharmaceutical Product Liability.



**Andrea Mercedes Pi-Sunyer**

*Position*: Associate.

*Admitted*: New York, 1996.

*Education*: Oberlin College (B.A., 1987); Northeastern University School of Law (J.D., 1994).

*Experience*: Processes settlements obtained in the firm's pharmaceutical injury practice; Has worked with hundreds of clients in this process and has guided them through complex issues, including helping them decide whether a structured settlement or a Special Needs Trust is most appropriate for their needs; Has significant experience negotiating with Medicare and Medicaid when clients have obtained relief in pharmaceutical injury cases and works extensively with co-counsel in states throughout the country to obtain court approval for certain settlements involving minors, estates, or guardianships; Has more than one hundred hours of training and practicum in both Basic Mediation Training and Divorce Mediation.

*Practice Areas*: Pharmaceutical Injury Litigation, focusing on settlement effectuation matters involving the Firm's clients.

**Denise K. Stewart**

*Position*: Associate.

*Admitted*:  Florida, 1982 (currently inactive); New Jersey, 1990; U.S. District Court for the District of New Jersey, 1990.

*Education*: Monmouth University (B.A., 1972); University of Miami School of Law (J.D., 1982).

*Experience*: Prior to joining the Firm at its inception in 1999, litigated personal injury and professional malpractice cases in Florida. Has been involved in state and federal complex mass tort and multidistrict litigation, including New Jersey litigation against Hoffmann-La Roche relating to gastrointestinal injuries stemming from use of the prescription acne drug Accutane; New Jersey litigation against Ortho-McNeil Pharmaceutical involving strokes, deep vein thromboses, and other thrombotic events related to use of the birth control patch Ortho Evra; and a nationwide settlement involving individuals who suffered strokes caused by use of over-the-counter products containing PPA.

*Practice Areas*: Pharmaceutical Product Liability Litigation.

**David R. Tawil**

*Position:* Associate.

*Admitted:* New Jersey, 2014.

*Education:* New York University (B.A. History, 2007); Tulane University (J.D., 2012).

*Honors:* Senior Notes and Comments Editor, Tulane Journal of International and Comparative Law; Associate Justice, Tulane University Law School's Moot Court Board.



*Author:* Kiobel v. Royal Dutch Petroleum Co*.: The Second Circuit Rejects Corporate Liability Under the Alien Tort Statute* (19 Tul. J. Int'l & Comp. L. 709) and *Implications of* PLIVA, Inc. v. Mensing: *The Reemergence of Federal Preemption* (unpublished).

*Experience:* Law clerk to the Honorable Jessica R. Mayer, J.S.C., one of New Jersey's three Multicounty Litigation judges; certified trained mediator by the New Jersey Courts.

*Member:* John C. Lifland American Inn of Court.

*Practice Areas:* Drug and Medical Devices.

