# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**DECLARATION OF STEVEN C. MARKS IN SUPPORT OF CO-LEAD CLASS COUNSEL'S PETITION FOR AN AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF COSTS AND EXPENSES**

STEVEN C. MARKS declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a Partner of the law firm of Podhurst Orseck, P.A.  I submit this declaration in support of Co-Lead Class Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Costs and Expenses in connection with and for services rendered and expenses incurred for the common benefit of the Settlement Class in the above-captioned multidistrict litigation ("Action") from the inception of the litigation through July 15, 2016, as well as for the payment of expenses incurred therewith.  I have personal knowledge of the

matters set forth in this declaration and, if called upon, I could and would testify competently thereto.

2.      This multi-district litigation has its roots in the independent efforts of multiple law firms, including my own, in 2011 to investigate the epidemic of traumatic brain injury among retired NFL players.  My firm began investigating the possibility of a suit against the NFL in the Summer of 2011, after receiving inquiries on behalf of several former players.  After investigating the history of the NFL's handling of the problem and researching the law applicable to potential claims and likely defenses, our firm make the commitment to devote the considerable resources of personnel, time, and funds that would be necessary to take on the goliath of the NFL on an issue of vital importance to its business.

3.      We were formally retained by a number of former players in October 2011.  After performing additional research and consulting experts in the field of neurology, we prepared and on December 22, 2011, filed a complaint on behalf of our initial clients in federal court in Miami, Florida. That case is captioned *Jones v. National Football League*, Case No. 11-cv-25494 (S.D. Fla.).

4.      Largely as a result of that filing, my partners and I were thereafter contacted and ultimately retained by dozens of additional former players who also wished to assert claims against the NFL.  Notably, on January 18, 2012, we were retained by Kevin Turner, a former NFL veteran player who had recently been diagnosed with ALS.  We amended the *Jones* complaint on January 20, 2012 to include additional clients as plaintiffs.

5.      As other attorneys across the country began filing similar lawsuits, the NFL sought to centralize the litigation and filed a petition with the Judicial Panel on Multidistrict Litigation ("JPML").  The petition was set for hearing on the JPML's January 25, 2012 sitting,

which happened to be in Miami.  My firm, which is located in Miami, arranged and hosted an organizational meeting of lawyers who had filed cases against the NFL in advance of, and after, the JPML hearing.  The purpose and result of the meeting was to facilitate tentative agreements on coordination and leadership among the majority of counsel representing former players.  My firm shared with the assembled counsel its legal research and strategy, including a substantive memorandum containing our research on the NFL's primary defense of preemption under the Labor Management Relations Act ("LMRA").

6.      Following the decision of the JPML to consolidate the proceedings in the United States District Court for the Eastern District of Pennsylvania (Brody, J.), our firm continued to play a lead role with respect to the voluntary organization of leadership among plaintiffs' counsel.  We, along with other counsel, jointly filed motions proposing various positions and a structure of leadership, which this Court largely adopted with some minor modification.

7.      Thereafter, we participated with Co-lead counsel regarding a proposed case management order. From that point on, we were one of very few firms who moved the case along which ultimately led to this historic settlement.  My partner, Ricardo M. Martinez-Cid, and I were appointed to the Plaintiffs' Executive Committee and my partner Stephen F. Rosenthal was designated by Co-Lead Counsel to serve as one of the Co-Chairs of the Legal and Briefing Committee.

8.      At the outset of the MDL, Mr. Rosenthal played an important role for the Plaintiffs' team.  Between January and July 2012, the Legal and Briefing Committee prepared the Joint Prosecution Agreement, drafted the master complaints (ECF Nos. 83, 84, 2642), developed and implemented a strategy to protect existing plaintiffs and future plaintiffs from statute-of-limitations defenses, and coordinated the filing of short-form complaints by all

plaintiffs.  Subsequently, Mr. Rosenthal performed substantial work in researching, drafting, and editing the response to the NFL Defendants' motion to dismiss on LMRA preemption grounds. He also participated in a moot argument for David Frederick, who handled the oral argument for the Plaintiffs on the pivotal motion to dismiss based on LMRA preemption.

9.     During this same period, Mr. Martinez-Cid played an active role in the preparation for coordinated discovery efforts.  As Co-Chair of the Discovery and Document Repository Committee, he coordinated efforts to obtain access to former players' records from the NFL, helped craft the plaintiffs' discovery plan, and along with his Co-Chairs, prepared discovery requests to be sent to the NFL.

10.     In my capacity as Co-Chair of the Communications and Ethics Committee, I was able to help lay the groundwork for the favorable outcome in this case by developing a communications and media plan that would place unrelenting pressure on the NFL by shedding light on its actionable practices.  I was instrumental in this effect, which included educating former players and the public regarding the issues of this litigation and creating awareness of the risks of playing football that had been actively concealed by the NFL.  I worked along with an outside consultant which the PEC/PSC engaged on messaging, talking points, media strategies and OpEds to reinforce the significance of this litigation and the risks involved at all levels. Many of our players, including in particular Kevin Turner, wanted to make sure there was public awareness of this problem.  To that end, I am very proud of the work we accomplished together not only to advance the class but also to force changes at all levels of contact sports to make player participation safer.  I daresay there are very few parents or coaches now who are not aware of the risks of concussions or repetitive head trauma.  I am also very proud that I played a major role as to this issue.

11.     I was also tasked with identifying players who could serve as spokespersons for the proposed class. This process involved going through medical records of hundreds of players and interviewing them to determine how well they would perform with the media. I ultimately identified many of the players who served in this capacity. The two main spokespersons were our clients, Kevin Turner and Shawn Wooden.

12.     I traveled extensively with the class representatives and organized, along with outside consultants, countless interviews and media events.

13.     I traveled to New York and Philadelphia on multiple occasions with Kevin Turner and Shawn Wooden and assisted with the preparation of talking points and primed them for questioning. Along with the two class representatives, I also did this with many other players, and their loved ones, including Herb Orvis, Chie Smith, and others. I also spearheaded identifying suitable players and in the preparation of the "Day in the Life" video that was prepared for potential use at the Final Fairness hearing. That professionally prepared video showed firsthand the devastating effects of multiple head trauma in the daily lives of these former players. My partners also assisted with some of these tasks, which formed part of the coordinated communications and media plan.

14.     Our associate, Matthew Weinshall, assisted with the legal research on myriad issues bearing on our firm's participation in the case. Mr. Weinshall actively participated in virtually all aspects of the case by assisting me throughout with my many responsibilities, as detailed further below.

15.     In addition to my continuing duties as Co-Chair of the Communications and Ethics Committee, I also served as one of four members of the Class Settlement Committee.

16.     In September of 2012, Co-Lead Counsel were presented with an opportunity to engage in settlement discussions with the NFL.  Thereupon, the PEC created a Class Settlement Committee, consisting of the two Co-Leads, myself, and Gene Locks.  I respectfully believe that I played an important role in obtaining the settlement with the NFL.  For example, I wrote the original Memorandum of Understanding ("MOU") which set out the basic framework of the settlement that this Court ultimately approved.  In fact, the various categories and compensation amounts that I originally proposed were accepted by the NFL and approved by this Court.  So too were the deductions for age and years played, which in large part derived from my firm's proposal.  In addition, I drafted the original structure for the Baseline Assessment Program and medical treatment benefits program which, in large part, was also accepted by the NFL and ultimately approved by this Court.

17.     After the initial draft of the MOU, it became apparent that we needed to engage various experts to ascertain the cost of these programs and the amount of money that would be necessary to assure that all former players could partake in these benefits.  We also needed to engage experts in various medical disciplines regarding the means of diagnosing the players.

18.     In this regard, I played almost an exclusive role working with the actuarial experts for months in order to determine how many players would likely suffer from one or more of the eligible disease groups. This analysis required review of literally hundreds of players' medical records, which I and my firm undertook, to develop reliable estimates of incident rates.  We also needed to analyze the age of the population of players to determine the incident rate and age upon which they would likely receive a diagnosis. This work not only required a great deal of time evaluating player histories and extensive medical records but also reviewing historical and demographic information as to the likelihood that a player who actually had a compensable

condition would actually submit a claim.  Additionally, I participated in meetings with expert, Grant L. Iverson, Ph.D., to develop the testing protocols and DSM injury definitions that would ultimately become part of the settlement agreement which this Court approved.  This extensive review process had the additional benefit of revealing that many of the former players whose records we analyzed may actually have a compensable condition but had not yet received a diagnosis.

19.    Although this process was complicated and time-intensive, we were nevertheless able to develop various charts with a number of assumptions to start pricing out the cost of the compensation part of the settlement.

20.    The work with respect to the medical-benefit program side of the settlement was no less complex. It involved researching the geographical location of the former player population to determine whether proper care was in close proximity to their homes and the expected cost of that care. It required research as to the available medical facilities and the specialists that would be needed to provide proper diagnosis and, if needed, follow-up medical care.

21.    After reaching a point where the Settlement Committee felt comfortable with its initial proposal, my colleagues on the Committee and I participated in face-to-face negotiations with the NFL.  As a condition of these face-to-face discussions, the NFL required strict confidentiality which, of course, we took seriously and never breached.

22.    During the negotiation process, I, along with my associate, Mr. Weinshall, reviewed drafts of various proposals, and continued to provide background research and comment as to the terms the settlement agreement which the Court ultimately approved.

23.     Early in the settlement process it became apparent to the Committee that we would need class representatives to serve in what was determined to be two subclasses: symptomatic former players and asymptomatic former players.  I was tasked with vetting the background and medical records of hundreds of former players to identify suitable class representatives.  This task entailed investigating their backgrounds, interviewing family and friends, and conducting detailed research into their playing histories to make sure that they were adequate and proper class representatives.

24.     As the Court is aware, the two class representatives whom the Committee selected were Kevin Turner, for the symptomatic class, and Shawn Wooden for the asymptomatic class. Both of these class representatives happened to be my firm's clients.  Each served in his role with great effectiveness, poise, and distinction.  In fact, there was never a serious question raised as to the adequacy of these class representatives.  This fact demonstrates the extensive amount and quality of the work my firm did in identifying and getting those two star individuals to serve in those vitally important roles in this litigation.

25.     After many months of negotiations, while the media was pounding the NFL on a daily basis with criticism for its handling of the concussion crisis, we reached a point where we came very close to a deal with the NFL.  However, for a number reasons, we seemed to stall until the Court ultimately appointed Layne Phillips as Mediator, who took control of the discussions. Judge Phillips was brilliant, and over the next few months, he played a critical role in bridging what seemed to be an insurmountable gap between the parties.

26.     After agreeing upon the material terms of a deal, a great number of details needed to be accomplished by both sides. The work on the actuarial side needed to be finalized, and experts needed to be retained to review and explain the key terms of the deal.  Again, I played

the leading role in interfacing with the actuarial experts.   As the Court is well aware, since it was instrumental in improving the settlement agreement by pushing for a virtually unprecedented uncapped fund, the issue of actuarial support became less important.   Nevertheless, this work needed to be done to explain the basis for the settlement terms that had been proposed.

27.     In addition, to support the medical aspects of the proposed settlement, medical experts needed to be retained.   As the court may recall, two of those experts were Drs. Richard Hamilton and Kenneth Fisher, both of whom the Court quoted in its final order approving the settlement.   I researched countless possible experts to serve as experts in the fields of Neurology and Neuro-psychology.   I interviewed these physicians, who I came to know from prior cases, to ascertain if they were not only competent in these specific areas but were also willing to serve in an expert capacity.   I explained in detail the terms of the proposed settlement agreement and all of the issues involved in the case.   My time records probably do not fairly capture the amount of time I spent on this aspect of the settlement-approval process.   The fact that the Court quoted their declarations in the final approval order evidences the quality of and value that their expert opinions brought to the case.

28.     After the Court's final approval of the settlement, during the lengthy appellate process, Messrs. Rosenthal and Weinshall were periodically called upon to review, comment upon, and edit drafts of Class Counsel's appellate briefs, both in the Third Circuit and the United States Supreme Court.

29.     The schedule attached hereto as Exhibit 1 is a detailed summary indicating the amount of common-benefit time spent by the attorneys and professional support staff at my firm who participated in, and billed at least fifty (50) hours for work done in, this Action, as well as the lodestar calculation for those individuals based on my firm's current billing rates.   For

personnel who are no longer employed by my firm, the lodestar calculation is based on the billing rates of such personnel in their final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm. We have excluded from that schedule the time expended in preparing this application for attorney's fees and expenses.

30.     The hourly rates for the attorneys and professional support staff of my firm included in Exhibit 1 are the same as they charge for non-contingent work that is paid on an hourly basis. And the rates are comparable to those of attorneys with similar experience and reputations in the relevant legal market. Our rates have been accepted by other federal courts in class action cases prosecuted by my firm.

31.     The total number of hours expended on the common benefit of this Action by my firm during the time period is 4,510.8 hours. The total lodestar for my firm for those ours is $3,005,744.50, consisting of $2,660,476.50 for attorneys' time and $345,268.00 for professional support staff time.

32.     We hereby voluntarily withdraw the following 9 hours which were previously reported. These hours are not included in the total number of hours stated in paragraph 31, above.

| Timekeeper | Date | Task/Expense - Description | Amount |
|---|---|---|---|
| Lauren Littleton Barrington | 4/10/12 | Draft state court complaint | 1.5 |
| Lauren Littleton Barrington | 4/11/12 | Draft state court complaint and new federal laws | 2.5 |
| Lauren Littleton Barrington | 4/16/12 | Meeting with SFR, re: state and federal complaints. Draft state court complaint | 1 |

| | | | |
|---|---|---|---|
| Lauren Littleton Barrington | 4/18/12 | Draft federal court complaint for new clients. Meeting with SFR re: same | 4 |

33.      My firm's lodestar figures are based solely upon my firm's billing rates, which rates do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

34.      As detailed in Exhibit 2 hereto, my firm is seeking reimbursement of a total of $771,127.79 in common-benefit expenses incurred in connection with the prosecution of this Action.  These expenses are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records, and other source material, and are an accurate record of the expenses incurred.

35.      We hereby voluntarily withdraw reimbursement for the following $3,367.64 expenses which were previously reported.  These expenses are not included in the total number of expenses stated in paragraph 34, above.

| Timekeeper | Date | | Amount |
|---|---|---|---|
| | 2/16/12 | E97065- La Loggia/2-2-12- Lunch Meeting RAR/BRS | $126.16 |
| | 2/16/12 | E97065- La Loggia/2-8-12 Lunch Meeting SFR | $20.36 |
| S. Rosenthal | 3/14/12 | EA2994-S.Rosenthal-1/20/12 | $12.82 |
| Steven Marks | 6/26/12 | EE8440- S.Marks NY 6-12 | $493.30 |
| Steven Marks | 6/26/12 | EE8440- S.Marks NY 6-12 | $1,149.60 |
| Steven Marks | 6/28/12 | EE8440- S.Marks NY 6-7-12 | $703.80 |
| S. Rosenthal | 7/18/12 | EE7448-SFR/NY/7-5-12 | $861.60 |

11

| | | TOTAL | $3,367.64 |
|---|---|---|---|

36.     With respect to the standing of my firm to share in an award of fees, costs, and expenses, attached hereto as Exhibit 3 is a biography of my firm, including the attorneys in my firm who were principally involved in this Action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10th, 2017, at Miami, Florida.

Steven C. Marks, Esq.
Fla. Bar No. 516414
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 2700
Miami, Florida  33131
(305) 358-2800 / Fax (305) 358-2382
Email: smarks@podhurst.com

# EXHIBIT 1

# IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

## No. 12-md-2323-AB

## PODHURST ORSECK, P.A.

## LODESTAR REPORT

### Inception through July 15, 2016

| NAME | HOURS | HOURLY RATE | AMOUNT |
|------|-------|-------------|--------|
| PARTNERS: | | | |
| Steven C. Marks | 2267.2 | $895.00 | $2,029,144.00 |
| Stephen F. Rosenthal | 398.4 | $695.00 | $282,795.50 |
| Ricardo Martinez-Cid | 109.5 | $695.00 | $76,102.50 |
| | | | |
| ASSOCIATES: | | | |
| Matthew P. Weinshall | 483.20 | $495.00 | $239,184.00 |
| | | | |
| STAFF ATTORNEYS: | | | |
| Lauren M. Barrington | 82.10 | $405.00 | $33,250.50 |
| | | | |
| PARALEGALS: | | | |
| Gina Palacio, FRCP | 1049.3 | $295.00 | $309,543.50 |
| | | | |
| LAW CLERKS: | | | |
| Brad Sohn | 121.10 | $295.00 | $35,724.50 |
| | | | |
| TOTALS: | 4510.8 | | $3,005,744.50 |

# EXHIBIT 2

**IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**

**No. 12-md-2323-AB**

**PODHURST ORSECK P.A.**

**COST AND EXPENSE REPORT**

**Inception through July 15, 2016**

| NUMBER | CATEGORY | AMOUNT |
|---|---|---|
| 1 | Assessments | 625,000.00 |
| 2 | Commercial Copies | 0 |
| 3 | Computerized Research | 21,246.88 |
| 4 | Court Reporters/Transcripts | 0 |
| 5 | Expert Services | 1,000.00 |
| 6 | Facsimile | 7.75 |
| 7 | Filing & Service Fees | 0 |
| 8 | In-House Copies | 1,732.10 |
| 9 | Long Distance Telephone | 2,095.77 |
| 10 | Postage/Express Delivery | 2,121.33 |
| 11 | Travel/Meals/Lodging | 77,005.28 |
| 12 | Miscellaneous | 40,918.68 |
| **TOTAL EXPENSES** | | 771,127.79 |

# EXHIBIT 3



# FIRM PROFILE

## PRINCIPAL PRACTICE AREAS

*Personal Injury and Wrongful Death Litigation*
*Aviation Litigation*
*Class Action*
*Commercial Litigation*
*General Tort Practice Concentrating in*
*Automobile Negligence, Product Liability and Medical Malpractice*
*Litigation*
*Criminal Litigation*
*Appellate Practice*

# ABOUT THE FIRM

    Podhurst Orseck continues a legal practice, established in 1967, concentrating exclusively in trial and appellate litigation.  The firm is dedicated to offering the highest caliber legal representation in both federal and state trial and appellate courts.  The firm's general tort practice places a major emphasis upon aviation, automobile, products liability and medical malpractice litigation.  In addition, the firm has a substantial practice in commercial and criminal litigation, as well as complex commercial tort litigation and class actions.  From its inception, the firm has also cultivated an appellate practice, handling appeals of not only the firm's own trial lawyers, but also of other lawyers throughout the State of Florida, in the various state and federal appellate courts.  The firm's practice serves clients and corporations throughout the United States, and in several foreign countries.   Our firm has consistently received an AV-Rating from Martindale-Hubbell Law Directory, the highest possible rating, based on legal ability and general ethical standards.

## STEVEN C. MARKS

*Personal Injury and Wrongful Death Litigation*
*Class Actions*
*Product Liability*
*Aviation Litigation*
*Commercial Litigation*

**S**teven C. Marks holds a BA from the University of Florida (cum laude) and a JD from the University of Miami (cum laude), where he was editor-in-chief of the Law Review. He is an alumni editorial-board member of the University of Miami Law Review. Steve is admitted to the Florida Bar. He is a member of the Bar and Gavel Law Society and the Order of the Coif, and is on the Board of Directors of the University of Miami Law School Alumni Association (2003 to 2006). Steve is also an inaugural member of the University of Miami Law School Dean's Council and a member of the University of Miami Law Review Alumni Advisory Board.

He is a member of the Dade County Bar Association, American Bar Association (Aviation & Space Law Committee, Program Planning Committee for National Institute on Aviation Litigation, editorial board member, Torts and Insurance Practice Section and Tort and Insurance Law Journal Committee, and The Brief); The Florida Bar; Academy of Florida Trial Lawyers; The Association of Trial Lawyers of America (Aviation Law Section, Aviation Section); Dade County Trial Lawyers; Lawyer-Pilots Bar Association; American Board of Trial Advocates (Miami Chapter); Fellow, Litigation Counsel of America, Trial Lawyers Honorary Society, and the Inns of Court.

Steve was recently appointed to the Legal Advisory Committee for the International Civil Aeronautical Organization.

He is listed in Florida Trend's "Florida Legal Elite," (2009, 2013); Florida Super Lawyers, 2006-2016; Lawdragon 500 Leading Litigators "New Star" 2006 and 2007; South Florida Legal Guide, Top Lawyers, 2007-2016; The Expert Guide to the World's Leading Aviation Lawyers, 2008-2016; Best Lawyers in America 2007-2016; Chamber's USA's Guide to Leading Lawyers for Business (2008-2010, 2014-2015) and named in the Daily Business Review's Most Effective Lawyers 2010.

Steve focuses on personal injury and wrongful death litigation, product liability, aviation litigation, commercial litigation, class actions, medical malpractice, premise liability, and admiralty.

He has acted as lead counsel, appointed court counsel and/or counsel representing victims in a number of commercial class actions and major airline crashes, including: NFL Concussion Litigation Executive Committee Member and co-lead settlement class counsel, 2014; acting as lead Plaintiffs' counsel in the American Airlines Flight 331, crash in Jamaica, 2010; acting as co–lead trial counsel for the California State Court plaintiffs' after a Silk Air crash between Jakarta and Singapore in 1997; acting as lead liaison counsel for the State Court and Federal multi–district litigation (MDL) plaintiffs' steering committees over the ValuJet Flt.

592 crash, Everglades, 1996, and acting as a member of the MDL plaintiff's steering committee for the Arrow Air military charter crash, Newfoundland, 1985.

General and major commercial airline crashes he has handled include: Metrojet Flt. 9268, from Egypt, en route to Saint Petersburg, Russian, 2015; Germanwings Flt. 9525, from Barcelona, Spain to Dusseldorf, Germany; 2015; Malaysian Airlines, Flt. MH370, from Kuala Lumpur to Beijing, 2014; Gulfstream IV, crash on take-off, Bedford, Massachusetts, 2014; IBC Airways, La Alianza, Puerto Rico, 2013; Dana Air, Flt. 992, Abuja, Nigeria, 2012;Central American Airways Flight 731, Tegucigalpa, Honduras, 2011; Conviasa Airlines, Flt. 2350, Bolivar, Venezuela, 2010; Aires Airlines Flt. 8250, San Andres Island, Colombia, 2010; Ethiopian Airlines Flt. 409, Mediterranean Sea, 2010; American Airlines Flt. 331, Kingston, Jamaica, 2009; Air France Flt. 447, Atlantic Ocean, 2009; Colgan Air – Continental, Flt. 3407, Buffalo, New York, 2009; Aeroflot-Nord, Flt. 821, Perm Airport, Russia, 2008; SpanAir, Flt. 5022, Barajas Airport, Spain, 2008; TACA Airlines, Flt. 390, Tegucigalpa, Honduras, 2008; Santa Barbara Airlines, S.A., Flt. 518, near Merida, Venezuela (2008); TAM Airlines, Flt. 3054, Congonhas Airport, Sao Paulo, Brazil, 2007; Comair, Flt. 5191, crash on takeoff from Lexington, Kentucky, 2006; Sibir Airlines Flt. 778 from Moscow Russia, 2006; GOL Airlines, Flt. 1907, mid-air collision in the Amazon, Brazil (2006); Chalk's Ocean Airways Flt. 101 air disaster, Miami, Fl, 2005; Helios Airways air disaster near Cyprus, 2005; Tropical Air, LET 410, Cap Haitian, Haiti, 2003; mid-air collision over German airspace involving Bashkirian Airlines Flt. 2937 and DHL Flt. 611, 2002; American Airlines, Flt. 587, crash in Belle Harbor, Queens, N.Y., 2001; Papillon Airways, Inc. Eurocopter AS350-B2 helicopter in the Grand Canyon, AZ, 2001; Scandinavian Airlines at Linate Airport, Milan, Italy, 2001; Air France Concorde tragedy 2000; Bell Helicopter BH 407 in Brazil, 1999; Cubana Air, Flt. 3010, YAK-42, Valencia, Venezuela, 1999; TAESA Airlines Flt. 725 from Uruapan, Michoacán, Mexico, 1999; Hot Air Expeditions, near Cave Creek, AZ, 1999; Occidental Petroleum's chartered Boeing 737 in Peru's northern jungle, 1998; American Airlines, Flt. 1420, Little Rock, Arkansas, 1999; TAME Flight 422 near Bogota, Colombia, 1998; Swissair, Flt. 111, Atlantic Ocean near Hailfax, Nova Scotia, 1998; Silk Air, Flt. MI185, Palembang, Indonesia, 1997; Fine Air, Flt. 101, Miami, Fl, 1997; Bell 407 helicopter in the Andros Islands, 1996; Millon Air Flt. 406 en route to Miami, Florida from Manta, Ecuador, 1996; ValuJet, Flt. 592, Florida Everglades, 1996; Aero-Peru Flt. 603 en route to Santiago, Chile from Lima, Peru, 1996; Aviation Development Corp. Airlines, Nigeria, 1996; Tarom Airlines, Flt. R0371, Bucharest, Romania, 1995; El Al cargo, Amsterdam, Holland, 1992; Surinam Airways Flt. PY764 in Paramaribo, Surinam, 1989; Grand Canyon Airlines, Grand Canyon National Park Airport, AZ, 1989; and Independent Air Flt. 1851, Bergamo, Italy, 1989 and Arrow Air Flight 1285, Gander, Canada.

He also acts as lead trial counsel for countless victims of general aviation and military accidents, many involving foreign claimants, ranging from air balloons, flight training, ground school, air ambulances, banner planes, aerobatics, helicopters, and propeller, turbo-prop and jet-powered aircraft, including, but not limited to, Cessnas, Cirrus, Beechcraft, Pipers, Bellancas, Lear Jets, Citation Jets, Bell Helicopters, Sikorsky Helicopters, Robinson Helicopters, Aerospatiale Helicopters and countless

other aviation manufacturers, operators, maintenance facilities and private & public air traffic control centers.

In addition to his aviation, general personal injury and wrongful death practice, he also counsels foreign governments, including the Russian Federation, the Republic of Venezuela, Ecuador, Belize, Honduras and numerous Brazilian states.

Among his many speaking engagements have been:
- An Introduction to the Foreign Sovereign Immunities Act," invited guest lecturer, Embry-Riddle 2001. Also an invited lecturer on the Embry-Riddle Aviation Program 2006;
- "Recent Developments in Aviation Law," ABA Litigation in Aviation Seminar 1991 (co-author);
- Masters of the Courtroom Seminar, Dade County Trial Lawyers, 2002 and the Dade County Trial Masters Program, 2002-2003;
- Forum Non-Conveniens panel member and co-chair, ABA Aviation & Space Law Convention Tort Trial and Insurance Practice Section Conference 2003;
- ABA Panel on Forum Non-Conveniens, "An Update of Recent Decisions and An Analysis of the Legal Criteria," 2003;
- Discovery in Aviation cases, ABA Conference, Washington DC 2004, invited lecturer;
- ATLA Aviation Section Program, Chicago, Program Chair;
- Miami-Dade County Bar Association Young Lawyer Section's First Annual "SuperLawyer Mock Trial Demonstration Seminar 2006";
- "A Discussion on the Basics of Litigating the Foreign Crash", ABA Aviation & Space Law Convention 2006;
- ABA Conference, Washington, D.C., October 2007 session on Aviation and Space Law Litigation, lectured on "Foreign Accidents--U.S. Defendants Frequently Argue Forum Non-Conveniens Motions; How are they Doing?";
- National Association of Legal Investigators, Inc., Mid-Winter Conference, Ft. Lauderdale, FL, January 2008;
- Embry Riddle Aeronautical University's 19th Annual Aviation Law and Insurance Symposium, lectured on "Handling Foreign Crash Litigation in the U.S. and Abroad";
- American Association for Justice, Annual Convention in Philadelphia, lectured on "The Fundamentals of Obtaining a Just or Full Compensation Aviation Jury Verdict", July 2008;
- Speaker at the Conference of the International Bar Association, Vancouver, Canada, October 2010;
- McGill Conference on International Aviation Liability and Insurance, Moot Court Panels, Legal Argument, Forum non-conveniens and Mediation, Montreal, Canada, May 2011.

- 5th Annual McGill Conference on International Aviation Liability and Insurance, Moot Court Panels, Legal Argument, Forum non-conveniens and Mediation, Montreal, Canada, October 2013.
- Florida Justice Association, Workhorse Seminar; Into the Wild Blue Yonder: Exploring New Frontiers in Aviation Litigation, February 2014
- FIU Law Legal Seminar (LATAM) December 3, 2014
- Embry Riddle Aeronautical University / Aviation Law & Insurance Symposium in Orlando - January 28-30, 2015
- FIU Aviation and Space Law Symposium in Miami - February 20, 2015
- 8th Annual McGil Conference on Aviation Liability and Insurance Conference, Complexity of International Aviation Litigation Against Multiple Tortfeasors, April 17-18, 2015
- 21st Annual ABA Conference, Annual National Institute on Aviation Litigation, New York City, June 4, 2015
- South Florida Trial Bar - Superstars Mock Trial and Expert Jury Selection, February 12, 2016
- December 2, 2016, Panelist at Miami Law Class Action & Complex Litigation Forum on the discussion of Settlement and Resolution of Class Action litigation, discussing mediation, confirmation discovery, objectors, attorneys' fees and notice issues.

Steve has made several guest appearances on CNN News, Wall Street Live News and CBC Sky News. Steve is also the co-author, "Recent Developments in Aviation Law," ABA Litigation in Aviation Seminar, 1991. Author, "The Admissibility and Use of Demonstrative Aids," ABA, The Brief Tort Trial & Insurance Practice Section, Vol. 32, No. 4, Summer 2003; "Handling Foreign Aviation Cases in the United States"; ABA Publication entitled "Litigating the Aviation Case from Pre-trial to Closing Argument," Third Edition, 2008. Author, "The Admissibility and Use of Demonstrative Aids," ABA, The Brief (2003); and "Handling Foreign Aviation Cases in the United States", ABA Publication entitled "Litigating the Aviation Case from Pre–trial to Closing Argument", Third Edition, 2008.

# STEPHEN F. ROSENTHAL

*Appellate Practice*
*Personal Injury and Wrongful Death Litigation*
*Class Actions*
*Aviation Litigation*
*Product Liability*
*Commercial Litigation*
*Constitutional and Election Law*

S tephen focuses on complex litigation and appeals. He has tried cases to verdict in state and federal courts and has argued nearly 40 appeals in state and federal appellate courts across the country. His practice spans class actions, aviation accidents, personal injury, commercial disputes, professional malpractice, and whistle blower claims.

His abilities have been recognized in numerous publications. Benchmark Appellate has observed that Stephen "possesses the rare skill set allowing him to excel at both trial and appellate litigation." Other national publications have praised his "sharp intellect" and "extremely creative legal analysis skills," listing him among the best lawyers in the country in the categories of appellate and personal injury litigation. Stephen is also an experienced hand at election litigation. He was appointed by the President's re-election campaign to serve as State Counsel for Florida, a general counsel-like position where he developed legal strategy and oversaw 4,500 volunteer lawyers in voter-protection efforts. He played a similar role in the 2010 gubernatorial and 2008 presidential elections. He has advised numerous candidates on legal issues affecting campaigns.

He joined the firm in 2001 and has been a partner since 2005. Prior to entering private practice, he worked at the Department of Justice in Washington, defending federal programs and agencies. He had the honor of serving as a law clerk to Judges Rosemary Barkett on the U.S. Court of Appeals for the Eleventh Circuit and Mark Wolf of the U.S. District Court for the District of Massachusetts. He is a graduate of Harvard Law School (J.D., cum laude, 1996) and of Harvard College (A.B., magna cum laude, 1992), and spent the year after college in England as a Rotary Foundation Ambassadorial Scholar.

He was appointed in 2009 by the judges of the -U.S. Court of Appeals for the Eleventh Circuit as one of six lawyers in Florida on its Lawyers Advisory Committee. Stephen is an active member of his community. He serves on the Steering Committee of the fund-raising arm of Legal Services of Greater Miami, Inc., is active in leadership at Temple Judea of Coral Gables, and has previously served as Chairman of the Board of the American Constitution Society, South Florida Chapter, and was on the Board of Directors of the Florida Justice Association. He is a member of the Leadership Florida Class of 2007.

He has lectured on a wide range of topics, including appellate practice, class action law, Florida's Unfair and Deceptive Trade Practices Act, attorney's fees in wrongful death cases, and the treatment of worker's compensation liens in wrongful death cases, and has published work on the law of religious freedom under the First Amendment. He speaks Spanish and has previously worked in Spain and Central America.

# RICARDO M. MARTINEZ-CID

*Personal Injury and Wrongful Death Litigation*
*Product Liability*
*Aviation Litigation*
*Commercial Litigation*

R icardo M. Martinez-Cid is a partner at Podhurst Orseck, P.A., in Miami. He earned his undergraduate degree in only three years at the University of Miami (B.A. cum laude 1997) and his Juris Doctorate at Yale Law School (J.D. 2000) where he was the William S. Beinecke Scholar. While a law student, Ricardo was a director at Yale's renowned clinical program. He served on the Board of Directors of the Latino Law Students Association, and was an editor of the Yale Journal of International Law. Before joining the firm, Ricardo served as a law clerk to the Honorable James Lawrence King on the United States District Court for the Southern District of Florida. He joined the firm in 2002 and was named a partner in 2005.

Ricardo is an accomplished trial lawyer, having obtained multi-million dollar verdicts on behalf of his clients in both federal and state courts.  He has been named "Legal Elite" by Florida Trend Magazine, "Top Lawyer" by both Expert Guides and the South Florida Legal Guide, and is listed in The Best Lawyers in America. According to the National Law Journal, his verdict of over 195 million dollars in the Fondo Vision matter was one of the ten largest jury verdicts of 2010. On multiple years, The Daily Business Review has recognized him at its Most Effective Lawyers' event.

Although Ricardo handles select commercial matters, much of his practice involves personal injury, wrongful death, and product liability cases with a focus on mass torts and aviation litigation. He is experienced in Multi-District Litigation and currently serves on the Plaintiffs' Executive Committee for the NFL Concussion Litigation.

Ricardo is Board Certified in Aviation Law, thereby accrediting him as an expert within the field of practice. According to the Florida Bar, certification is its highest level of evaluation of competency and experience within an area of law, as well as professionalism and ethics in practice. In addition to handling general aviation cases involving fixed-wing and rotary aircraft, Ricardo regularly represents victims of commercial aviation disasters. He has been appointed lead counsel or otherwise taken a leadership role in many of these cases, including American Airlines Flight 331, Jamaica (2009); SpanAir Flight 5022, Spain (2008); TACA Airlines, Flight 390, Honduras (2008); Santa Barbara Airlines, S.A., Flight 518, Venezuela (2008); TAM Airlines, Flight 3054, Brazil (2007); GOL Flight 1906, Brazil (2006); Comair Flight 5191, Lexington, Kentucky (2006); Chalk's Ocean Airways Flight 101, Miami Beach, Florida (2005); Helios Airways Flight 2U522, Cyprus (2005); Tropical Air Flight 1301, Haiti (2003); Scandinavian Airlines Flight 686, Milan, Italy (2001); TAESA Airlines Flight 725, Mexico (1999); and Silk Air Flight MI 185, between Jakarta and Singapore (1997).

Ricardo was appointed by the Florida Supreme Court to serve on the Standing Committee on Fairness and Diversity and by the Chief Justice to serve on his Pro Bono Advisory Committee.  He is Co-Chair of the Aviation and Space Law Committee of the American Bar Association, a Past Chair of the Aviation Law Section of the American Association for Justice, the Immediate Past President of the Cuban American Bar Association, and he serves on the Board of Governors of the American Association of Justice and of the Florida Justice Association.

Ricardo has authored and published work for the American Bar Association, Westlaw Journal, and the American Association for Justice. He is a frequent lecturer on aviation law and general trial tactics. The many venues he has been invited to speak at include American Bar Association programs in New York and Washington, D.C.; the Southern Methodist University Air Law Symposium in Dallas; the PEOPIL/McGill University Conference on Aviation Law and Insurance in Amsterdam; the Embry-Riddle University Aviation Law and Insurance Symposium in Orlando, and AviCon Conferences in London and New York City. He has also served on the faculty of the Al J. Cone Trial Advocacy Institute.

He is fluent in English, Spanish and Portuguese.

## MATTHEW P. WEINSHALL

**M**atthew is an honors graduate of Harvard College (A.B. cum laude 2002) and of the University of Miami School of Law (J.D. summa cum laude 2010), where he was an editor of the University of Miami Law Review.  Prior to law school, Matt worked as an equities trader for three years and as a foreign exchange trader for two years.  After law school, Matt served as a law clerk to Judge Rosemary Barkett of the U.S. Court of Appeals for the Eleventh Circuit.

Matt is admitted to the Florida Bar and focuses his practice on complex commercial litigation and class actions.