# EXHIBIT T

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br><br>        Plaintiffs,<br><br>            v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>        Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS |  |

## DECLARATION OF CRAIG R. MITNICK IN SUPPORT OF CO-LEAD CLASS COUNSEL'S PETITION FOR AN AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF COSTS AND EXPENSES

Craig R. Mitnick, Esq. declares as follows pursuant to 28 U.S.C. § 1746:

1.  I am a partner of the law firm of Mitnick Law Office, LLC and submit this declaration in support of Co-Lead Class Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Costs and Expenses in connection with and for services rendered and expenses incurred for the common benefit of the Settlement Class in the above-captioned multidistrict litigation ("Action") from the inception of the litigation through July 15, 2016, as

well as for the payment of expenses incurred therewith.  I have personal knowledge of the
matters set forth in this declaration and, if called upon, I could and would testify competently
thereto.

2. The role of Mitnick Law Office / Craig R. Mitnick in the common benefit litigation
against the NFL parties as directed by Co-Lead Counsel is as follows :

    a. Over the past several decades I have developed friendships and professional
       relationships with countless individuals who played professional football for the
       NFL and who are now part of the NFL retired player community. Many of these
       relationships date back almost three decades.

    b. At all times throughout my participation in the MDL on behalf of the Plaintiff
       Class, I worked to protect, educate, and provide value to all parties involved in the
       matter, including Class Counsel and the global Class of Plaintiffs.

    c. I became involved in the NFL Retired Player's Injury Litigation in December of
       2011. Shortly after I became involved in the MDL, I spent an exurbanite amount
       of time working from early 2012 through the latter part of 2014 engaging
       hundreds, if not thousands of former NFL players to communicate the importance
       of the litigation to each of them.

    d. From early 2012 until the time the District Court issued preliminary approval of
       the matter's Settlement Agreement in April of 2014, I spent hundreds of hours
       educating and informing Members of the Retired NFL Player Community as to
       the importance of becoming a named Plaintiff in the litigation. This was not only
       for their personal well-being, but to better the game of football by protecting the
       well-being of its' young players and by creating awareness surrounding the issues

of concussions and cognitive decline. Given efforts during the pre-settlement phase of the MDL litigation, I am confident that I played an extensive role in how quickly the litigation gained momentum within the Retired NFL Player Community.

e.  I garnered the early endorsements of key retired players in order to further drive the momentum of the MDL. Additionally, I personally met with individual key decision makers and influencers within the NFL Alumni Community to gain their support for the litigation. Several of the key influencers who endorsed the litigation early on through my efforts include; *Joseph Pisarcik*, President and CEO of the NFL Alumni Association, *Bart Oates* (President of the New York/New Jersey NFL Alumni Chapter and member of the NFL Alumni Association's Board of Directors), *Al Smith* (President of the Tennessee NFL Alumni Chapter and member of the Alumni Association's Board of Directors), *John Haines* (President of the Austin, Texas NFL Alumni Chapter and member of the Association's Board of Directors), *Ron Jaworski* (Member of the Alumni Association Board of Directors), *Bill Schultz* (President of the Indianapolis, Indiana NFL Alumni Chapter and member of the Association's Board of Directors, *Ron Rice* (President of the Detroit, Michigan NFL Alumni Chapter and member of the Association's Board of Directors), *Jim Karsatos* (President of the Columbus, Ohio NFL Alumni Chapter), *Steve Thurlow* (President of the Stanford, Connecticut NFL Alumni Chapter), *Beasley Reece* (President of the Philadelphia, Pennsylvania NFL Alumni Chapter), *Raul Allegre,* (Former member of the Association's Board of Directors), *Jeffery Nixon*, NFL retired player influencer

3

and most prominent blogger within the retired player community and Derrick

Frost, (Former member of the Board of Directors of the NFLPA.

f.   In early September of 2013, almost immediately after the terms of the initial

Settlement Agreement were made public, I met with Co-lead counsel, Christopher

Seeger in the Northern New Jersey/New York City area. After discussions with

Mr. Seeger, I began to spend as much time and energy as was necessary to

educate, inform and ultimately garner the endorsement of the Settlement

Agreement by the global class of plaintiffs. From the time of that initial meeting

with Mr. Seeger and continuing through the time that the District Court granted

final Approval of the Settlement Agreement in April of 2015, I spent an

exhaustive number of hours on educating retired players throughout the country

on the terms of the proposed Settlement, the legal obstacles that both the NFL and

Retired Players faced by way of preemption, statute of limitations and causation.

g.   I traveled speaking to groups of Retired NFL Players of all ages and

demographics throughout the country, including presentations at the XLVIII

Super Bowl venue in New York, New York on January 29, 2014 and at the 2014

Hall of Fame ceremony in Canton, Ohio on August 1, 2014. These presentations

were geared to educate and engage Retired NFL Players attending these to garner

their endorsement of the Settlement Agreement. Additionally, over the course of

34 months between October 3, 2013 through August 10, 2016, I traveled the

country engaging thousands of retired players at their respective NFL Alumni

chapter meetings. These in-person Chapter presentations were highly publicized

by Alumni Chapter Presidents to ensure heavy turnouts by the Retired Player

Community. Informational and Frequently asked question sessions were held in cities that included Austin, Texas on October 30, 2013; New York, New York on October 2, 2013, June 7, 2014 and June 6, 2014; Greenwich, Connecticut on May 5, 2014; Indianapolis, Indiana on December 17, 2013; Hackensack-Meadowlands, New Jersey on October 1, 2013, Fargo, North Dakoda on October 21, 2014; Orlando, Florida on March 21, 2014; Cincinnati, Ohio on December 18, 2013; Denver, Colorado on October 25, 2014; Franklin, Tennessee on February 5, 2015; Birmingham, Alabama on October 23, 2014; Phoenix, Arizona on April 14, 2015; Las Vegas, Nevada on April 25, 2014; Chicago, Illinois on May 27, 2014; and San Diego, California on August 10, 2016. In addition to these Alumni Chapter presentations, I traveled to various parts of the country to reinforce the endorsements of individual key decision makers and influencers within the Retired NFL Community. Without exception, high quality brochures and informational materials, detailing the terms of the final Settlement Agreement were distributed at every NFL Retired Player event where a presentation took place. Printed materials always reflected the most reflect up-to-date relevant information on the Settlement. Copies of the informational materials were also distributed to attending spouses, as the players' spouses are often times the main influencers of the household.

h.  In addition to in-person group presentations, hundreds, if not thousands of Retired Players were engaged through telephonic conference calls that focused primarily on the current status of the Settlement followed by extensive frequently asked question sessions. An example is a conference call that took place on March 12,

2014. The conference call included operator assisted services and took place from the National Football League Alumni Association's corporate office in Mount Laurel, New Jersey. Participation during the call included hundreds of Retired NFL Alumni Members and the call lasted over an hour and a half. Members were asked to submit their questions or concerns prior to the call by emailing them directly to the Alumni Association, at which time the most commonly asked questions were defined and subsequently answered during the conference call. Additionally, Retired Players from around the Country, as well as from Canada were able to ask live questions utilizing the operator assistance service during the latter part of the call. Additional conference calls, similar to the call described above took place from October of 2013 through the time the Settlement received final approval in July of 2015. These calls varied from mass attendee participation to far more intimate calls where key influencers within the NFL Player Community listened to status updates and then participated in open discussions. During the time-period between March of 2012 and May of 2015, multiple calls took place with the NFL Alumni Association Board of Directors and the NFL Alumni Chapter Presidents, as well as with key influencers and decision makers within the NFLPA to garner additional endorsements within the Retired Player Community.

i.  To further solidify existing endorsements of the Settlement Agreement and garner new ones, in-person presentations were also conducted at the NFL Alumni Association's annual meetings in April of 2014, April of 2015 and April of 2016, as well as at the NFL Players Association 2014 annual conference that took place

during the week of March 20, 2014 in Orlando, Florida. These larger alumni venues were utilized to inform and educate attending NFL Players on Settlement details and to provide one-on-one informational sessions to those Retired Players who requested more information, or who had concerns regarding the Settlement.

j.  The goal of each in-person presentation, or telephonic conference call described above, was to garner the endorsement of as many Retired NFL Players as possible by educating the players on the favorable medical and financial benefits afforded to each of them through the Settlement Agreement. This was not an easy task as many Retired Players had misinformation regarding the Settlement, the medical testing that was proposed through BAP, the financial compensation that was being offered through MAF, as well as the overall risk and obstacles that the Players faced in continuing to litigate the matter in lieu of Settling the MDL.

k.  Throughout my travels, I was forced to dispel much of the misinformation that was spreading among retired players regarding the litigation with accurate, relevant and timely information. Many retired players and their spouses, some of who had filed suit and others that had not, had either misinformation or no information at all regarding the litigation, causing doubt with the proposed settlement. Many players and their spouses were so uninformed that they believed that by endorsing the litigation, they would be perceived within their community as greedy. The stigma that existed early on in the litigation by the public "that no real correlation existed between concussions and long term injury" and that "those retired players who were filing suit against the NFL were in it for a money grab" was still resonating with many players and their wives. It was apparent that

7

educating these former players and their spouses about the MDL, including the proposed Settlement Agreement, the validity of the entire subject matter, as well as having them understand the legal obstacles that they faced (pre-emption, causation, statute of limitations) would be critical to their endorsement of the Settlement and to the Settlement receiving final approval by the District Court, as well as within the court of public opinion.

l.  Numerous Quotes from key decision makers and high profile individuals within the Retired NFL Player Community were garnered throughout the litigation through my efforts. The importance of these endorsements is evident their inclusion in Class Counsel's brief in support of Final Settlement Approval.

m.  The countless hours of preparation time, travel time, presentation time and time spent on development and distribution of informational materials was instrumental to the unprecedented approval rate of over 99% of the 22,000-member Plaintiff-Class who ultimately endorsed the Settlement. This unprecedented Class endorsement was a critical factor in lead counsel's final argument in support of Final Approval for approval at the Final Fairness Hearing on November 19, 2014.

n.  In Summary, I worked in excess of 1900 hours during the course of the litigation, always with a sense of continued passion and respect for the MDL. Countless hours were spent on the preparation and distribution of hard-copy presentation materials; drafting and publishing up-to-date information; engaging in individual and mass player conference calls; providing in-person group presentations; continually distributing, publishing and updating frequently asked question

materials; as well as, continuously and positively reinforcing the litigation to ensure that players understood the fairness, reasonableness and tremendous value of the settlement agreement.

o. Consistent and persuasive arguments as to why each player in the plaintiff class should endorse the final Settlement Agreement took place on a daily basis from the date the Settlement received preliminary approval until the matter received final approval by the Court. Prior to my efforts being focused on the endorsement of the final Settlement Agreement, hundreds of man hours were spent on promoting the litigation, clearly leading to an exponential increase in the momentum of the litigation. This is evident by the ultimate number of players (5,000 plus) who placed their reputations on the line to become involved in the hundreds of lawsuits that were filed, at such a rapid pace from the onset of the action.

p. In addition to the efforts set forth above, countless hours were expended on obtaining written and video endorsements of the Settlement terms from some of the most influential and high profile players within the Retired NFL Player Community. These endorsements were placed in videos and disseminated to the Retired Player Community. Videos produced include "Settlement Urgency", released June 8, 2015; "Consequences of Opting Out of the Concussion Settlement", released July 20, 2015, "Settlement Pros and Cons", released April 2, 2015, "The Legal Battle", released May 18, 2013, "Concussion Litigation Question and Answer", released September 14, 2014 and "The NFL Concussion Settlement Retired Player Opinions", released August 18, 2014.

q.  My efforts throughout the litigation on behalf of the global Class of Plaintiffs have resulted in tremendous value to the Plaintiff Class, their spouses, Class Counsel, and the NFL parties. Additionally, these efforts in part, greatly helped catapult the unexpected passion within the Retired NFL Player Community in promoting concussion awareness. Retired NFL Players of all ages and backgrounds spoke out to the media, as well as to members of their own communities about the importance of player safety. This new found passion by retired players was a major contributing factor in the fundamental change that has occurred in how the world now views the correlation between concussions and long term injury. Children and athletes of all ages and skill sets are protected now more than even before. The significant changes in medicine, science and law that have come about could not have materialized without the mass support of the Retired Player Community.

r.  The time and energy that was expended in educating the Retired NFL Player Community on the science of concussions and the depth and reach of the terms of Settlement Agreement was an enormous task that ultimately took almost 2000 hours of my time.

s.  From the onset of the multidistrict litigation through today, I gave up most of my practice of law, as that time was necessary to accomplish the goals set forth in this Declaration.  Prior to the litigation, I was personally responsible for the majority of net revenues to my firm.  The large majority of those revenues were forgone during the concussion litigation, given the risk that I incurred to assist with a successful resolution for the Plaintiff Class.

t.   Throughout my entire involvement in the matter, I continually endorsed Class
     Counsel without exception and I specifically endorsed the efforts of Co-Lead
     Counsel, Chris Seeger in the overwhelmingly successful negotiation of the
     Concussion Settlement Agreement.  The combined efforts of all parties in this
     historic case will now allow 20,000 retired NFL players living throughout North
     America to receive medical benefits, as well as financial compensation in excess
     of $1 billion dollars.

u.   Letter from Joseph Pisarcik, President and CEO of the NFL Alumni Association;
     Declaration of the NFLAA Board of Directors; and Letter from Val Butts, wife of
     Retired player Marion Butts are attached hereto as Exhibit 4.


3.   Additionally, the schedule attached hereto as Exhibit 1 is a detailed summary
indicating the amount of common benefit time spent by me on behalf of the global Class of
Plaintiffs in this matter. My hourly rates are based on my current billing rates. The schedule was
prepared from contemporaneous daily time records regularly prepared and maintained by my
firm.  Time expended in preparing this application for attorney's fees and expenses has been
excluded.

4.   The hourly rates set forth in Exhibit 1 are the same as the regular rates charged for my
services in other contingent matters.

5.   The total number of hours expended on the common benefit of this Action by my
firm during the time period is 1,198.15 hours.  The total lodestar for my firm for those hours is
$898,612.50, consisting entirely of my fees.

6.   My firm's lodestar figures are based solely upon my firm's billing rates, which rates

do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

      7.   As detailed in Exhibit 2 hereto, my firm is seeking reimbursement of a total of $83,082.20  in common benefit expenses incurred in connection with the prosecution of this Action.  These expenses are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records, and other source material, and are an accurate record of the expenses incurred.

      8.   With respect to the standing of my firm to share in an award of fees, costs, and expenses, attached hereto as Exhibit 3 is a biography of my firm and myself.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2017, at Haddonfield, New Jersey.

CRAIG R. MITNICK, Esquire

# EXHIBIT 1

# EXHIBIT 1

**IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**

**No. 12-md-2323-AB**

**MITNICK LAW OFFICE, LLC**

**LODESTAR REPORT**

**Inception through July 15, 2016**

| NAME PARTNERS: | HOURS | HOURLY RATE | AMOUNT |
|---|---|---|---|
| Craig R. Mitnick | 1,198.15 | $750.00 | $898,612.50 |

**ASSOCIATES:**

None

**STAFF ATTORNEYS:**

None

**CONTRACT ATTORNEYS:**

None

**PARALEGALS:**

None

| TOTALS: | 1,198.15 | $750.00 | $898,612.50 |
|---|---|---|---|

# EXHIBIT 2

# EXHIBIT 2

**IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**

**No. 12-md-2323-AB**

**MITNICK LAW OFFICE**

**COST AND EXPENSE REPORT**

**Inception through July 15, 2016**

| NUMBER | CATEGORY | AMOUNT |
|:---:|---|:---:|
| 1 | Assessments | N/A |
| 2 | Commercial Copies | $23,321.60 |
| 3 | Computerized Research | N/A |
| 4 | Court Reporters/Transcripts | N/A |
| 5 | Expert Services | N/A |
| 6 | Facsimile | N/A |
| 7 | Filing & Service Fees | N/A |
| 8 | In-House Copies | N/A |
| 9 | Long Distance Telephone | N/A |
| 10 | Postage/Express Delivery | $972.52 |
| 11 | Travel/Meals/Lodging | $26,799.08 |
| 12 | Miscellaneous | $31,989 |
| **TOTAL EXPENSES** | | $83,082.20 |

# EXHIBIT 3

# EXHIBIT 3

## MITNICK LAW OFFICE / CRAIG R. MITNICK, ESQUIRE

1. I am the Managing Partner of Mitnick Law Office, LLC with primary offices located in Haddonfield, New Jersey. Mitnick Law Office is a boutique litigation firm that specializes in the areas of civil and criminal litigation, as well as mass tort claim resolution.

2. I have extensive experience in the areas of complex civil and criminal litigation, public speaking and mass communication. I received my BBA in finance from Emory University (Atlanta, Georgia) in May of 1984 and subsequently received my Juris Doctor from the George Washington University School of Law (Washington DC) in May of 1987.

3. I am licensed to practice law and a member in good standing with the Courts in the state of New Jersey, including the United States District Court for the District of New Jersey. Additionally, I am licensed to practice law and I am in good standing with the Courts of the Commonwealth of Pennsylvania, including the United States District Court for the Eastern District of Pennsylvania and the United States Third Circuit Court of Appeals.

4. I began my professional career as a New Jersey County Assistant Prosecutor in September of 1987, almost 30 years ago. I began my litigation experience by being assigned to a Superior Court trial team where I tried dozens of Jury trials and negotiated hundreds of resolutions to matters that were assigned to me. Around the same time, I was selected by my superiors to become a certified instructor of law and procedure at two large county law enforcement academies located in Southern New Jersey. Several years later, after leaving the public sector in 1991, I entered the private practice of law where I began to focus on the practice of

complex civil and criminal litigation. I have since litigated over 50 jury trials in the Superior Court of New Jersey, The United States District Court of New Jersey, The Superior Court of the Commonwealth of Pennsylvania and the District Court for The Eastern District of Pennsylvania. Given my diverse litigation and public speaking experience, I was contracted as an on-air legal analyst for Fox News Channel, Fox News Syndicated Radio Station Group, Fox affiliate channels, as well as the CBS syndicated Radio Network from January 2004 until September of 2008. It was during this five (5) year time span that I analyzed complex legal matters that were being covered by the local, reginal and national media. Subject matters included Congressional hearings, United States Supreme Court decisions, matters involving multidistrict and mass tort litigation (including the World Trade Center First Responder litigation, asbestos litigation and various Bellwether trials).

5. Additionally, my professional affiliations include membership in the American Bar Association, The National Association of Criminal Defense Attorneys, The New Jersey Bar Association, The Pennsylvania Bar Association, Top American Lawyers, ASLA and The American Institute of Criminal Defense Attorneys. I have also been selected for inclusion into Distinguished Attorneys (Civil Litigation Division), and The National Trial Attorneys top 100.

# EXHIBIT 4



November 29, 2016

The Honorable Anita Brody

    RE:   NFL Concussion Litigation Acknowledgment

To the Court:

    As the President and CEO of the NFL Alumni Association, I speak with retired NFL players living throughout the country on a daily basis. Sadly, I have seen, and continue to see, the cognitive deterioration of many of my former teammates whose lives have been dramatically changed due to their days playing professional football.

    Initially, back in early 2012, when I learned of the lawsuits that were being filed against the NFL for concussions, I contacted Craig Mitnick, an attorney who I knew personally and trusted implicitly, in hopes of finding out more details about the lawsuit.

    Many of the members of the NFL Alumni Association were very hesitant about joining the suit and attaching their name because they feared the possibility of being labeled by the public in a negative light, such as being greedy. Craig was instrumental in changing so many of their minds because he explained to them thoroughly the lawsuit and its ramifications for us financially and really let us make a decision on our own to be involved or to opt out.

    Craig convinced hundreds, if not thousands of former players that supporting the lawsuit, whether they formally joined or not, was the correct thing to do. I truly believe that if not for Craig Mitnick's efforts and passion for their cause, far less of a percentage of retired players around the country would have joined the suit as quickly as they did. It was Craig's passion and detailed knowledge about the lawsuit and its importance that caused players to step up to the plate in order to not only protect themselves, but to also better the game of football by making it a safer sport.

    Throughout the entire course of the litigation Craig, at his own expense, visited Alumni Chapters around the country to clarify the details of the lawsuit, inform players of its importance and to address any questions and concerns they or their wives had. He visited San Diego, Austin, Tennessee, Chicago, Indianapolis, the Hall of Fame in Canton, Ohio and Orlando to name a few. He never once asked for reimbursement. He just wanted to get the players knowledgeable, up to speed with full disclosure regarding the concussion lawsuit.

8000 MIDLANTIC DRIVE SUITE 130 SOUTH | MOUNT LAUREL, NJ | 08054
OFFICE: (877) 258-6635 | FAX: (862) 772-0277
WWW.NFLALUMNI.ORG



There is absolutely no doubt in my mind, given my first-hand knowledge, that Craig was instrumental in how quickly the case grew in numbers and how quickly the momentum behind the case increased. I believe him, in working with Chris Seeger, in getting information to our Alumni and to our members was instrumental in letting them make their decisions of not opting out of the suit.

Through educating and keeping our members up to date on the litigation, Craig was consistent from the time the suits were filed and remains consistent in his efforts as the claim process will hopefully now begin. In fact, Craig's efforts were complimented by the passion he always exhibited for the well-being of the players and the ultimate success of the case. During several meetings, as well as conference calls with Alumni and members of the Board of Directors, he was always able to handle players who were adverse to the lawsuit, most of the time changing their dislike for the litigation into support of it.

Throughout the course of the last several years, I have spoken with and met several attorneys involved in the case. Lastly, I must say Craig was the only one who was willing to drop his percentage drastically for all of his clients involved in the lawsuit. I really respected his willingness to take a large cut in commission and for coming to our players' aid.

Sincerely,

JOSEPH PISARCIK
President & CEO
NFL Alumni Association

**DECLARATION OF THE NATIONAL FOOTBALL LEAGUE ALUMNI ASSOCIATION BOARD OF DIRECTORS IN
SUPPORT OF MITNICK LAW OFFICE, LLC'S FEE PETITION IN THE MATTER OF**
*In Re National Football League Player's Concussion Injury Litigation*

The members declare, pursuant to 28 U.S.C. Section 1746, based upon each of our personal knowledge,
information and belief, the following:

1. Almost four (5) years ago many of us, along with our NFL Alumni Chapter
   members, began to hear rumblings that concussions may possibly lead to
   longer-term health issues.  We learned that several of our teammates had filed
   lawsuits against the NFL for their lack of honesty when it came to the League's
   knowledge in regard to any correlation between concussions and their
   relationship to our long-term health.

2. The litigation was very confined at the time and based on our own
   conversations with many of our Chapter Presidents and members, we believe
   that the lawsuits would have remained confined, or in the very least would have
   moved at a much slower pace if not for the efforts and passion of a few
   individuals involved in the litigation, including Craig Mitnick, Esquire.

3. Given how quickly the case picked up momentum and was Settled in such a
   short time by way of negotiation, many retired NFL players throughout the
   country can rest more comfortably knowing that the medical testing and
   financial benefits available to us will increase the quality of our lives.

4. Just as important as the protection of retired NFL players is the fact that
   athletes, medical doctors and scientific experts are now aware of the effect
   concussions can have on our brains and the long-term damage they can cause
   to us.  It is now the children and the generations to follow who will benefit
   forever into the future from our sacrifice.

5. Many retired players initially were extremely cautious to get involved in the
   lawsuits, given the fear of being labeled incompetent and the fear of being
   labeled greedy.  Craig Mitnick kept our Board of Directors, executive staff, and
   most importantly, our members informed and up to date during the initial
   filings of the lawsuits and then educated us with regard to the Settlement terms
   and why they were so beneficial to all of us. Craig personally convinced many of
   our Chapter leaders and members around the Country to get involved with the
   litigation and as Chris Seeger worked so diligently to find a favorable settlement
   for us, Craig continued to keep us educated, informed and reduced the
   uncertainty that many of us felt.  It was not the money that he spoke about, or
   a sales pitch to become a client of his firm, rather his passion was grounded

upon the awareness of the consequences that concussions could have on our long-term health, as well as on our children and grandchildren's health.

6. Craig continually made sure that retired players in our Chapters had literature that they could take home to their wives and to show other players the benefits of joining the litigation and remaining in the litigation. Whether Craig spoke at the Superbowl, the Hall of Fame, or at the NFLAA Chapter meetings, the information received was critical to many retired players' endorsement of the case, as we were able to understand the obstacles we faced and the benefits of the ultimate Settlement.

7. We feel that the hard work, passion, and personal interaction by Craig Mitnick, with hundreds, if not thousands of our members was a driving factor in how quickly the case picked up momentum and how quickly the matter was ultimately endorsed by ninety-nine (99%) percent of our player community.

8. What others may not have realized is that many of our wives were more concerned than we were about our reputations being ruined and our ability to financially support our families being jeopardized, yet after personal conversations with Craig early on, they became as passionate as we became about the case.

9. We are fully aware that Attorneys involved in the case took on different roles at different times and all of them should be commended. However, specifically Chris Seeger's efforts in getting the deal done and Craig Mitnick's efforts in solidifying the Settlement with former players by educating us, keeping us informed and explaining the legalities and benefits of the deal were unmatched. We thank both of them immensely!

10. Lastly, we would like to thank your Honor for the passion, fairness and courage in protecting all of us and for making football a safer sport with the NFL being a safer playing field.

I declare under penalty of perjury that the foregoing statements are true and correct.
Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct.
Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct.
Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct.
Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct.
Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct. Executed on this _____ day of November, 2016.

_December_

Name: _Kenneth Byers_

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct. Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct. Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct. Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct. Executed on this _____ day of November, 2016.

Name: _____

Signature: _____

I declare under penalty of perjury that the foregoing statements are true and correct
Executed on this            day of November, 2016.

*Beasley Y. Reece Jr., President Philadelphia Chapter NFLA.*

I declare under penalty of perjury that the foregoing statements are true and correct
Executed on this            day of November, 2016.

I declare under penalty of perjury that the foregoing statements are true and correct
Executed on this            day of November, 2016.

I declare under penalty of perjury that the foregoing statements are true and correct
Executed on this            day of November, 2016.

I declare under penalty of perjury that the foregoing statements are true and correct
Executed on this            day of November, 2016.

To whom it may concern:

In October 1998, at the very young age of 31 years old, my husband, Marion Butts, was seen by neurologists for symptoms for post traumatic head injuries sustained during his football career with the National Football League. He was diagnosed with permanent neurological damage and dementia. In 2002, Marion was declared permanently disabled by the Social Security Administration. Marion's struggle with neurological problems began long before Social Security deemed him totally and permanently disabled, nevertheless, after a more exacerbating struggle for many more years, the National Football League also followed suit and granted my husband his full disability benefits. This struggle has been a very arduous and devastating task for my family and many other NFL families who we have come to know over the years. Our struggles were battles that we all felt were being fought alone and without any advocacy. Many NFL players and their families are not versed in legal matters, and that includes my family as well. I was asked to speak before the United States Congress in the early years when concussions and deaths of NFL players where beginning to draw the attention of lawmakers. I decided  not to appear because I did not want our private lives to be put on public display for the world to see. Most NFL players do not want people to know that they are having cognitive and neurological problems, and this does include my husband. This is precisely why I feel it is incumbent of me to work behind the scenes to help my husband and every other NFL player that I come in contact with. I have taken on this challenge and duty for my husband for many years, but many players do not have the means or wherewithal to fight for themselves, so it is imperative that we have committed, compassionate and vigilant people who can help us further our journey.

I was given the name of Craig Mitnick from a friend at a law firm I contacted. At 9.38 am on September 13, 2013, I contacted Mr. Craig Mitnick with regards to the concussion litigation.This was the most important call that I had ever made because it changed the course of our lives. After a very long detailed conversation detailing with what my husband and many other NFL players have endured with regards to injuries and deaths, I was certain, that finally my husband and all the other NFL players who had no one previously to advocate for them, now, had that advocate. I had never spoken to or met Mr. Mitnick prior to this initial conversation. What any person or family member who is related to a NFL player knows is that the large majority of players do not know what is happening to their brains and why they are having so many neurological issues that are turning their lives upside down.

To make matters even worse, NFL players have never had someone who can very poignantly and succinctly educate them regarding this very complicated concussion litigation. Mr. Craig Mitnick is the only lawyer who has taken the time, literally years, to travel across the country to meet with thousands of NFL players, their families, and their unions to inform and educate them about this settlement and how it can be advantageous to them and their families for their lifetime. Years prior to the settlement announcement, while in the litigation stage, Mr. Mitnick put in hundreds, if not thousands, of hours educating and updating our families about this concussion settlement and how it could effect us. We were all quite confused about whether or not we should opt in or out because no one was out there to help us understand what was going

on and how the lawsuit would effect us. Many NFL families, as well as our own, were reluctant to opt in because we were all afraid of signing our lives away and give away our rights to future litigation.  I know for a fact, from the many discussions that I have had with other NFL players and their wives and families, that without Mr. Mitnick's dedication and commitment to our well-being, thousands of players would have opted out of this lawsuit.

I can also attest to the most important thing that players find more honorable about Mr. Mitnick than anything money or a settlement can buy... that Mr. Mitnick unselfishly gives the same resolute, undivided and dedicated attention to every NFL payer that he comes in contact with, regardless of whether he represents them or not. This is why I know that my husband and many NFL players across the country now have an advocate who has, and will continue to, dedicate a huge part of his life and practice to the betterment of players. His vigilance and knowledge has brought my family and the families of NFL players throughout the country the solace and peace that they all deserve.

This has been a hard struggle for all of the NFL payers and our families, but I am now optimistic and assured that our fight is going to be a much easier one with Mr. Mitnick on our side.  Thank you for your care and concern regarding this matter.


Sincerely,

Valicia Butts, wife of Marion Butts