**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB |
| | MDL No. 2323 |
| | **Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, | |
| Plaintiffs, | Civ. Action No. 14-00029-AB |
| v. | |
| National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc., | |
| Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**<u>CO-LEAD CLASS COUNSEL'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR AN INJUNCTION PROHIBITING
IMPROPER COMMUNICATIONS WITH THE CLASS BY
CLASS MEMBER, FRED WILLIS,
THROUGH HIS ORGANIZATIONS,
NFL PLAYERS BRAINS MATTER™, HPN NEUROLOGIC®, AND
HPN CONCUSSION MANAGEMENT®, OR OTHERWISE</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ............................................................................................................... 4

III.  ARGUMENT ...................................................................................................... 9

    A.    The Court Has Broad Authority To Prohibit and Regulate
        Improper Communications with Class Members Pursuant to
        Federal Civil Procedure 23(d) and the All Writs Act and Should
        Exercise That Authority To Enjoin These Improper
        Communications ........................................................................................ 9

    B.    The Standard Is Met for a Permanent Injunction .................................... 14

IV.   CONCLUSION .................................................................................................. 17

i

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Exxon Mobil Corp.*,
   734 F.3d 237 (4th Cir. 2013) ................................................................................ 14

*Brandt v. Burwell*,
   43 F. Supp.3d 462 (W.D. Pa. 2014) ...................................................................... 16

*Central Hudson Gas Co. v. Public Service Commission*,
   447 U.S. 557 (1980) ............................................................................................... 10

*Coles v. Marsh*,
   560 F.2d 186 (3d Cir. 1977) .................................................................................. 11

*Erhardt v. Prudential Group, Inc.*,
   629 F.2d 843 (2d Cir. 1980) .................................................................................. 12

*Georgine v. Amchem Prods., Inc.*,
   160 F.R.D. 478 (E.D. Pa. 1995) ...................................................................... 12, 13

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) .................................................................................. 9, 10, 11, 12

*Haffer v. Temple University*,
   115 F.R.D. 506 (E.D. Pa. 1987) ...................................................................... 12, 13

*Hampton Hardware, Inc. v. Cotter & Co.*,
   156 F.R.D. 630 (N.D. Tex. 1994) .................................................................... 11, 13

*Hoffman-LaRoche Inc. v. Sperling*,
   493 U.S. 165 (1989) ................................................................................................. 9

*In re Baldwin United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
   770 F.2d 328 (2d Cir. 2001) .................................................................................. 14

*In re Lupron Marketing and Sales Practices Litigation*,
   No. 01-cv-10861, 2004 WL 3049754 (D. Mass. Dec. 21, 2004) ........................... 13

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp.2d 1239 (N.D. Cal. 2000) ................................................................. 12

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   307 F.R.D. 351 (E.D. Pa. 2015) ..................................................................... 2, 3, 6

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
   No. 05-MD-1720, 2014 WL 4966072 (E.D.N.Y. Oct. 3, 2014) ...................... passim

ii

*In re School Asbestos Litig.*,
    842 F.2d 671 (3d Cir. 1988) ............................................................................... 9, 10

*In re Synthroid Marketing Litig.*,
    197 F.R.D. 607 (N.D. Ill. 2000) ................................................................................ 13

*In re Visa Check/MasterMoney Antitrust Litig.*,
    No. CV-96-5238, 2006 WL 1025588 (E.D.N.Y. Mar. 31, 2006) ............................ 13

*Klay v. United Healthgroup, Inc.*,
    376 F.3d 1092 (11th Cir. 2004) ................................................................................ 14

*Kleiner v. First Nat. Bank of Atlanta*,
    751 F.2d 1193 (11th Cir. 1985) ........................................................................... 9, 10

*McWilliams v. Advanced Recovery Systems, Inc.*,
    176 F. Supp.3d 635 (S.D. Miss. 2016) ............................................................... 13, 15

*Ralph Oldsmobile, Inc. v. Gen. Motors Corp.*,
    No. 99 Civ. 4567, 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001) ........................ 12, 13

*Rossini v. Ogilvy & Mather, Inc.*,
    798 F.2d 590 (2d Cir. 1986) ...................................................................................... 9

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977) ............................................................................................ 13, 14

*United States v. Silva*,
    140 F.3d 1098 (7th Cir. 1998) .................................................................................. 13

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .................................................................................................. 10

*Waldo v. Lakeshore Estates, Inc.*,
    433 F. Supp. 783 (E.D. La. 1977) ............................................................................ 10

**Statutes**

28 U.S.C. § 1651 ............................................................................................... 4, 13, 15

**Rules**

Fed. R. Civ. P. 23 .................................................................................................... 3, 11

Fed. R. Civ. P. 23(c)(2) ............................................................................................... 12

Fed. R. Civ. P. 23(d) ................................................................................................. 4, 9

Fed. R. Civ. P. 23(d)(1)(B)(i) ....................................................................................... 9

Fed. R. Civ. P. 23(d)(2)................................................................................................ 16

Fed. R. Civ. P. 65 ............................................................................................... 14, 16

**Other Authorities**

Manual for Complex Litigation, Fourth §21.33 (2004)......................................... 10, 16

## I.    <u>INTRODUCTION</u>

Co-Lead Class Counsel respectfully submit this memorandum in support of the motion for a permanent injunction against Class member, Fred Willis, and the organizations he has founded and/or currently leads, namely, NFL Players Brains Matter™, HPN Neurologic®, and HPN Concussion Management® (hereinafter, unless otherwise specified, Mr. Willis and his three organizations will be referred to collectively as "Willis").  The first purpose of the motion is to make the Court aware of the false and misleading information about the National Football League Players' Concussion Injury Settlement (the "Settlement") which Willis has been spreading, and to request that the Court issue an injunction ordering Willis to cease and desist. Secondarily, if the Court determines that the misrepresentations had such an effect on the Class Members as would require another Class Notice to correct the false and misleading information disseminated by Willis and to clear up any confusion among Class Members resulting from Willis' communications, Co-Lead Class Counsel respectfully request that Willis be ordered to pay for such Curative Class Notice.  Finally, Co-Lead Class Counsel suspect that one or more lawyers may be behind Willis' communications.  Therefore, we request the Court's authorization to conduct discovery of Willis in order to determine (1) whether Willis is working with any lawyers and/or litigation funders, and, if so, their identities, so that this Court can be made aware of any potential ethical violations by lawyers who may have registered or who may be registering clients to participate in the Settlement's benefits; and (2) whether the misinformation has resulted in any Retired Players signing up with his organizations and if so, their identities.

In an email/advertisement sent by Willis on Wednesday, February 8, 2017, as well as on Willis' websites and in social media, he claims that the fastest route to obtaining a Qualifying Diagnosis, filing a Claim and obtaining a Monetary Award under the Settlement, would be

through examinations by the network of doctors set up by Willis, via his "Players Friendly Fast Track Team."   Willis also questions the integrity of the doctors who will participate in conducting the examinations in connection with the Settlement's Baseline Assessment Program ("BAP") and Monetary Award Fund ("MAF"), by claiming that they are controlled by, or chosen by, the NFL.

This "fast track" claim is blatantly false.   The Effective Date for the Settlement was January 7, 2017.   During the Post-Effective Date time period, the only means through which a Retired Player can obtain a Qualifying Diagnosis ("QD") under the terms of the Settlement is through the Settlement Program, *i.e.*, by a Qualified BAP Provider or Qualified MAF Physician. *See* Class Action Settlement Agreement (As Amended) [ECF No. 6481-01] at §6.3(b).   This Court has recognized that "[a]fter the Effective Date of the Settlement, only pre-approved Qualified MAF Physicians and Qualified BAP Providers may render Qualifying Diagnoses." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 366 (E.D. Pa. 2015).   Thus, it is false and misleading for Willis to suggest that a Retired Player could now obtain a QD through the Willis organizations' network of doctors.

Willis also falsely claims that "The NFL Now Has Control Over the Testing, Treatment and Diagnosis of Any Player."   To the contrary, as this Court recognized, "[t]he Claims Administrator and BAP Administrator will select these specialists, subject to the written approval of Co–Lead Class Counsel and the NFL Parties." *Id.*  This Court already has rejected claims that the BAP Providers would not be fair in their determinations on QDs, and instead has found that the BAP Providers will be conflict-free and will be selected based upon merit. Specifically, this Court noted that the "selection requirement is reasonable.   Qualified BAP Providers must be well-trained and credentialed. Neurologists must be board certified, and

neuropsychologists must certified by the American Board of Professional Psychology or the American Board of Clinical Neuropsychology…. Co–Lead Class Counsel also have the ability to veto potential Qualified BAP Providers, and an absolute right to exclude any BAP Provider with some connection to the litigation as an expert witness or consultant [for the NFL]." *Id.* at 413. *See* Settlement Agreement [ECF No. 6481-01] at §5.7(a); §6.5.

Pursuant to its Fed. R. Civ. P. 23 obligations, this Court has taken a strong interest in ensuring that truthful and accurate communications are disseminated to Class Members.  As the Court noted, "[t]he content of the Long–Form Notice and Summary Notice satisfy the requirements of Rule 23 and due process."  307 F.R.D. at 383.  "Each was written in plain and straightforward language.  The Long–Form Notice apprised all Class Members of: the nature of the action; the definition of the Class; the Class claims and issues …." *Id.*  Furthermore, Class Counsel have taken significant steps to notify the Class Members and to keep them informed. The Settlement website, www.nflconcussionsettlement.com, which is officially sanctioned by the Court, is available to assist both class members and their attorneys with information about the Settlement, the registration process, and the claims process.  The Claims Administrator also maintains a Post Office Box to which Class Members can send questions, *see* ECF No. 6919-1, at 3, a Claims Administrator e-mail Inbox, *id.* at 4, and a Call Center, *id.* at 5, all to provide accurate information to Class Members.  This work is jeopardized when misleading communications are spread by persons angling to make a profit from Retired Players.

In addition to the other channels through which Class Members can obtain Court-sanctioned and truthful information about the details of the Settlement, on February 8, 2017, this Court held a status conference, which was live-streamed, in an effort to insure that Class Members understand the next steps they must take now that the Settlement has become effective.

One of the key messages that the Court, Co-Lead Class Counsel and the Administrators conveyed to the Retired Players during that conference was that the doctors who will be participating in the Settlement Program as BAP Providers and MAF Physicians will be fully vetted and will not be, as had been suggested by some, hand-picked by or controlled by the NFL. The second key message that the Court, Co-Lead Class Counsel and the Administrators wanted to make clear to the Class Members was that all efforts were being made to insure that the Settlement Program is easy to navigate, that BAP testing will be provided on an expedient basis and, for those who already have QDs, claims will be processed as quickly as possible. Willis' communication may have undone what the status conference was designed to do.

Co-Lead Class Counsel request that the Court put an end to this dissemination of falsehoods, enter an injunction preventing Willis from making claims and advertisements that are inconsistent with the Court-approved Notice and Settlement Agreement, and impose any other sanctions upon Willis which this Court deems proper, including ordering that curative notice shall be disseminated and paid for by Willis, and that Co-Lead Class Counsel may obtain discovery from Willis. The undersigned submit, as further detailed below, that a permanent injunction is appropriate under the circumstances, pursuant to the All Writs Act, 28 U.S.C. § 1651, and Fed. R. Civ. P. 23(d).

## II.   FACTS

Fred Willis, as per his Short Form Complaint [ECF No. 2757], resides in Salem, Massachusetts, and played NFL Football from 1971 to 1976 for the Cincinnati Bengals, the Houston Oilers and the Denver Broncos.[1]   He is the Founder and Executive Director of NFL

---

[1]    Co-Lead Class Counsel note that Willis has been registered for Settlement benefits by the Locks Law Firm.  However, Co-Lead Class Counsel in no way insinuate that the Locks Law Firm had anything to do with the misinformation disseminated by Willis.

Players Brains Matter™ and the Founder, President and CEO of HPN Neurologic®, and HPN Concussion Management®, a division of HPN Neurologic®.[2]  Both HPN Neurologic® and HPN Concussion Management® are located at 8 Ferry Lane Marblehead, MA 01945.  "HPN" stands for High Performance Neurofeedback.

On Wednesday, February 8, 2017, shortly after this Court held its live-streamed status conference, Willis sent the NFL player community an email/advertisement, under the banner of his NFL Players Brains Matter™ organization, but designed to drive traffic to his HPN Concussion Management® organization and its "Players Friendly Fast Track Team."  That email/advertisement purported to be an "Update on Status Conference of today's concussion settlement     implementation"     and     is     also     available     at     http://us3.campaign-archive2.com/?u=5970239c236f408d79ebacc7a&id=2e3f0bdbf6&e=d468cdfb8b.[3]  *See* Exhibit A attached to the Declaration of Christopher A. Seeger in support of Motion for Injunction Prohibiting Improper Communications with the Class ("Seeger Declaration").

The communication contained the following flagrant falsehoods, purportedly keying off of information provided during the status conference:

1.      "The NFL Now Has Control Over the Testing, Treatment and Diagnosis of Any Player.  The BAP Baseline Assessment Program Is Now in Effect and Why You Don't Want to Participate in the BAP!  Here's Why!"

---

[2]      *See* http://hpnconcussionmanagement.com/.

[3]      That email also referred recipients to the following websites: nflplayersbrainsmatter.com; http://concussiontreatmenthelp.com/;               www.hpnconcussionmanagement.com; www.hpnneurologic.com.  *See also* http://www.hpnhighperformanceneurofeedback.com/.

2.      "Don't Wait Until June 6th Or Longer for a BAP Exam, Find Out Your Options for a No Cost 'Qualifying Diagnosis'[4] and Settlement for the NFL Concussion Lawsuit and File Your Claim Now!"

3.      "The NFL Player Friendly Brains Matter Fast Track Team, is your only option NOW to get a 'Qualifying Diagnosis' and file your claim by March 23rd!"

4.      "Our Doctors are BAP Approved Board Certified Neurologists and Neuropsychologists Memory Specialists."

5.      "Registration for the NFL Concussion Settlement opens on February 6, 2017! You must register on or before August 7, 2017 to participate in the Settlement and be eligible for any benefits!  **All players who have used the NFL Players Brains Matter Fast Track team have been registered and claims will be filed by March 23**."

*See* Seeger Declaration at Exhibit A.

As to No. 1, the NFL does not control the testing, treatment and diagnosis of any Retired Player.  To the contrary, as was made clear at the status conference, the BAP Providers and MAF Physicians will be selected by the Claims Administrator and BAP Administrator "subject to the written approval of Co–Lead Class Counsel and the NFL Parties."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 366.  Further, as to No. 1, for Willis to actively encourage Retired Players to NOT participate in the BAP, undermines all that this Court is trying to do.

As to Nos. 2, 3 and 4 above, Willis wrongly states that his organizations can, at this juncture, provide Retired Players with Qualifying Diagnoses.  Since the January 7, 2017

---

[4]     *See infra* discussion of the NFL Players Brains Matter™ website regarding whether Willis' intent is truly to provide diagnostic services at "no cost."

Effective Date for the Settlement has passed, a Retired Player who does not already have a QD can only get one from a BAP Provider or an MAF Physician.  Neither of the two medical persons on Willis' "Players Friendly Fast Track Team,"[5] namely, Jeff Bullard, M.D. and George Rozelle, Ph.D., are among those candidates currently being considered to be BAP Providers or MAF Physicians.  It is an outright lie for Willis to claim, as per No. 4, that his organizations' doctors are "BAP Approved."

As to No. 5, unless Willis has obtained a power of attorney for every Retired Player, neither he nor his organizations may register Class Members.  Only Class Members themselves (and their family members) and their lawyers may register.  Likely, Willis is working in conjunction with a lawyer(s) (who he does not identify) and the intention is that the lawyer(s) will register or has already registered those who sign up with Willis' NFL Players Brains Matter Fast Track Team.

Willis' February 8, 2017 email hyperlinks, via the "Fast Track Team," to Willis' NFL Players Brains Matter™ website, which represents the following about said team:

> Our "Players Friendly Fast Track Team" process to get a qualifying diagnosis **will pay in full for all your medical neurological exams and expenses relating to qualification** and our team will never abandon you.…  The NFL settlement claims process will involve very detailed paperwork with specific deadlines and document requests.  Our "Players Friendly Fast Track Team" will work on all stages of the process for acceptance for The NFL Concussion Lawsuit, The 88 Plan and Total and Permanent Disability Benefits ("T&P"), they will help you gather all of the necessary information and make sure your paperwork is

---

[5]     The Players Friendly Fast Track Team consists of Willis and six others:  George Rozelle, Research & Treatment Advisor; Brian T. McConnell, Player Relations Coordinator; Darlene Willis, Family Advisor; Jeff Bullard, M.D., Medical Advisor; Mark Madeira, Law and Ethics Advisor; and Paul Scott, Retired Player Disability Advisor.

> filed correctly and on time.   Missing deadlines or incomplete
> paperwork may result in a denial or a long delay of compensation.

*See* Seeger Declaration at Exhibit B, http://nflplayersbrainsmatter.com/ (emphasis added).  While

Willis seemingly is providing diagnostic services gratis, as per this website, under the tab for

Step 3, it states as follows:  "100% of any and all expenses for neurological medical exams will

be paid for in full on a non-recourse basis, **until** a Specific Qualifying Diagnosis classification is

received."  *Id.* (under Step 3 of "If you're interested in obtaining these benefits the first steps

are:") (emphasis added).  *See also id.* at tab "1) Qualifying Diagnosis" under "If Your (sic)

Diagnosed with Neurocognitive Impairment" ("100% of any and all expenses for neurological

medical exams will be paid for in full on a non-recourse basis, **until** a Specific Qualifying

Diagnosis classification is received.") (emphasis added).  Thus, after a QD is received, Willis

will get paid.  Co-Lead Class Counsel believe that the use of the "non-recourse" language may

mean that a litigation funder may be involved in addition to lawyers.  These are facts which Co-

Lead Class Counsel hope to uncover by conducting discovery of Willis.

In addition to the above, Willis, and those with whom he may be working, are also

motivated by the potential to make money from treating the Retired Players after diagnoses.

HPN Concussion Management® provides 10 steps to an HPN treatment program and touts it as

having "been shown to be the most effective, cutting edge and promising treatment to date for

post-concussion    syndrome."    *See*    Seeger    Declaration    at    Exhibit    C,

http://hpnconcussionmanagement.com/.  Willis and one of the members of the Fast Track Team

even reported on the conducting "clinical trials" and extoled the virtues of the HPN

Neurofeedback.  *See* Seeger Declaration at Exhibit D ("2016 NFL Players & HPN High

Performance Neurofeedback Study - Evaluating the Effectiveness of Ultra Low Power, Pulsed

Electric Current EEG Biofeedback in Treating Symptoms of Repetitive Traumatic Brain Injury

in Retired NFL Athletes"). Not surprisingly, one of the Summary Conclusions of the Study (conducted on all of five subjects) was that "HPN is an effective treatment for NFL players." *Id.* at 18.

For his own pecuniary gains, Willis (and whichever lawyer(s) and/or litigation funder(s) with whom he may be working) is disseminating false and confusing information to Class Members. An injunction preventing Willis and his cohorts from continuing to spread misinformation is wholly appropriate, as explained below.

## III.   ARGUMENT

### A.   The Court Has Broad Authority To Prohibit and Regulate Improper Communications with Class Members Pursuant to Federal Rule of Civil Procedure 23(d) and the All Writs Act and Should Exercise That Authority To Enjoin These Improper Communications

District courts have broad discretionary powers under Fed. R. Civ. P. 23(d) to supervise communications with class members. Rule 23(d), in relevant part, states:

> **Conducting the Actions.**
> (1) ***In General.*** In conducting an action under this rule, the court may issue orders that:
> . . .
> (B) require – to protect class members and fairly conduct the action – giving appropriate notice to some or all class members of:
> (i)   any step in the action …

Fed. R. Civ. P. 23(d)(1)(B)(i). *See Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 171 (1989); *see also Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100-01 (1981).

Courts have long recognized the potential for abuse that may occur when a party or its counsel communicate with members of a class or proposed class. *See Gulf Oil Co.*, 452 U.S. at 99-100; *In re School Asbestos Litig*., 842 F.2d 671, 679-80 (3d Cir. 1988); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 601-02 (2d Cir. 1986); *Kleiner v. First Nat. Bank of Atlanta*, 751

F.2d 1193, 1201-03 (11th Cir. 1985).[6]   Specifically, misleading communications to class members regarding the litigation pose a significant threat to the fairness of the proceedings, the fundamental rights of parties, the adequacy of representation and the general administration of justice generally.   *In re School Asbestos Litig.*, 842 F.2d at 680; *see also Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 783, 790-91 (E.D. La. 1977), *appeal dismissed*, 579 F.2d 642 (5th Cir. 1978) ("Unapproved communications to class members that misrepresent the status or effect of the pending action also have an obvious potential for confusion and/or adversely affecting the administration of justice.").

Because of the potential for abuse, many courts have found that this regulatory power is adjunct to the authority of the courts themselves.   District courts have "both the duty and the broad authority to ... enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co.*, 452 U.S. at 100; *In re School Asbestos Litig.*, 842 F.2d at 679-80; *see also Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1205-06 (11th Cir. 1985).   "The judge has ultimate control over communications among the parties, third parties, or their agents and class members on the subject matter of the litigation to ensure the integrity of the proceedings and the protection of the class."   Manual for Complex Litigation, Fourth §21.33, at 300 (2004) (hereafter "MCL"); *see also In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720, 2014 WL 4966072, at *31 (E.D.N.Y. Oct. 3, 2014)

---

[6]   As the 11th Circuit noted in *Kleiner*, "[a]s a threshold matter, untruthful or misleading speech has no claim on first amendment immunity.… Commercial speech merits constitutional safeguards only to the extent it is accurate, in keeping with its purpose of insuring the free flow of reliable information crucial to independent decisionmaking."   *Kleiner*, 751 F.2d at 1204 (citing *Central Hudson Gas Co. v. Public Service Commission*, 447 U.S. 557, 566 (1980) and *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)).

(same).  "The court may take curative action – such as requiring the distribution of corrective notices or entering injunctive relief – where misleading or false statements are made to class members."  *Id.  See also In re Lupron Marketing and Sales Practices Litig.*, MDL No. 1430, Civ. A. 01-10861-RGS, ECF Nos. 264-2, 281, 295, and 306 (ordering that Curative Notice was appropriate and that it be paid for by law firm who put misleading and inaccurate information concerning certified class on its websites and in direct mailings to class members).

In *Gulf Oil*, the Supreme Court advised courts that any order regulating communications with putative class members should be "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."  452 U.S. at 101.  In discussing the requirements for an order regulating communications with potential class members, the Supreme Court in *Gulf Oil* quoted *Coles v. Marsh*, 560 F.2d 186 (3d Cir. 1977), *cert. denied*, 434 U.S. 985 (1977):

> [T]o the extent that the district court is empowered ... to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a specific record showing by the moving party of the particular abuses by which it is threatened.  Moreover, the district court must find that the showing provides a satisfactory basis for relief and that the relief sought would be consistent with the policies of Rule 23 giving explicit consideration to the narrowest possible relief which would protect the respective parties.

*Coles*, 560 F.2d at 189 (quoted in *Gulf Oil,* 452 U.S. at 102).  In seeking an order limiting a party's communications with class members, plaintiffs must show that a restricting order would guard against the likelihood of serious abuses.  *Gulf Oil*, 452 U.S. at 104.  Showing that the "interests embodied in Rule 23 might be hindered is a sufficient finding upon which to base an order limiting contacts."  *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630, 633 (N.D. Tex. 1994).

Following *Gulf Oil*, many courts have been confronted with the need to supervise inherently coercive communications with absent class members.  In these situations, courts almost uniformly order limitations on such communications, if not curtailing the communications altogether.  *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 502-03 (E.D. Pa. 1995); *Haffer v. Temple University*, 115 F.R.D. 506, 512 (E.D. Pa. 1987); *Erhardt v. Prudential Group, Inc*., 629 F.2d 843, 845 (2d Cir. 1980); *Ralph Oldsmobile, Inc. v. Gen. Motors Corp.*, No. 99 Civ. 4567, 2001 WL 1035132, at *2 (S.D.N.Y. Sept. 7, 2001).

In *Erhardt*, the Second Circuit recognized that it was the responsibility of the district court to prevent any unauthorized notices to class members:

> It is the responsibility of the court to direct the "best notices practicable" to class members, Rule 23(c)(2), and to safeguard them from unauthorized, misleading communications from the parties or their counsel.  Unapproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice.  To prevent abusive practices in the absence of a local rule, the court should include in its order of notice a provision limiting within constitutional parameters any unauthorized correspondence by parties and their counsel with class members.

*Erhardt*, 629 F.2d at 846.

Of particular concern are communications by non-parties, including outside attorneys, with putative class members that are misleading as to a proposed settlement, the status of pending class action, or that induce class members to opt-out or not cooperate with class counsel. *See In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Supp. 2d 1239, 1244, 1245 (N.D. Cal. 2000) (finding that "solicitation materials were misleading, if not intentionally deceptive" and recognizing that while there may be "circumstances in which putative class members would seek separate representation and enter into agreements with their attorneys that give the attorneys

authorization to opt out of a class," "when the agreements are solicited by mass mailings or over the internet … the prospects for abuse are simply too great").[7]

While Willis, who filed a Short Form Complaint and did not opt out, is a Class Member and is subject to this Court's jurisdiction (*i.e.*, he is not a third party to this litigation), the Court also has the authority to enjoin a third party pursuant to the All Writs Act, 28 U.S.C. § 1651(a).[8] *In re Payment Card Interchange Fee,* 2014 WL 4966072, at *31. "Where, as here, a district court retains exclusive jurisdiction over settlement agreements and distribution of settlement funds pursuant to those agreements, it may issue orders necessary to protect the settlement from threats by both parties and non-parties." *In re Visa Check/MasterMoney Antitrust Litig.*, No. CV-96-5238, 2006 WL 1025588, at *4 (E.D.N.Y. Mar. 31, 2006). To the extent that Willis is working with lawyers and/or litigation funders in spreading this misinformation and in

---

[7]    *See Georgine v. Amchem Prods.*, 160 F.R.D. at 489, 496-98  (invalidating opt-outs and creating second opt-out period where several law firms opposed to the settlement sent misleading communications and advertisements to absent class members); *Haffer*, 115 F.R.D. at 512-513 (corrective notice sent after defendants improperly communicated with class members and discouraged them from meeting with class counsel); *see also McWilliams v. Advanced Recovery Systems, Inc.*, 176 F. Supp.3d 635, 644-45 (S.D. Miss. 2016) (granting motion for protective order preventing third-party attorneys from soliciting or communicating with class members following dissemination by those attorneys of solicitation letters containing misinformation and ordering notice be sent to recipients of solicitations); *Hampton Hardware*, 156 F.R.D. at 633 (holding that letters from defendant to potential class members warning of potential costs of litigation and advising not to participate in the suit were an improper "attempt to prevent member participation in the class action"); *In re Lupron Marketing and Sales Practices Litigation*, No. 01-cv-10861, 2004 WL 3049754 (D. Mass. Dec. 21, 2004) (counsel for intervenors ordered to remove website content found to be "blatantly misleading" and to provide corrective notice); *Ralph Oldsmobile, Inc.*, 2001 WL 1035132 at *4-6 (court required sending of corrective notice).

[8]    *See also In re Synthroid Marketing Litig.*, 197 F.R.D. 607, 610 (N.D. Ill. 2000) ("An injunction, where necessary to protect the court's earlier orders … is authorized under the All Writs Act, 28 U.S.C. § 1651(a).  That power extends to non-parties.") (citing *United States v. New York Tel. Co.,* 434 U.S. 159, 174 (1977) and *United States v. Silva,* 140 F.3d 1098, 1104 (7th Cir. 1998)).

soliciting and registering Class Members, those lawyers and/or litigation funders also are subject to orders issued by this Court relating to the Settlement.

### B.    The Standard Is Met for a Permanent Injunction

As the Second Circuit noted, "[i]njunctions issued under the authority of the All Writs Act stem from very different concerns than those motivating preliminary injunctions governed by Federal Rule of Civil Procedure 65.  Preliminary injunctions under Rule 65 are designed to preserve the status quo between the parties before the court pending a decision on the merits of the case at hand."  An injunction issued under the All Writs Act, however, is "needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it."  Furthermore, "there is a difference between the power to enjoin an unrelated non-party pursuant to the All Writs Act and the narrower authority delineated by Rule 65(d), which confines the application of injunctions to parties, 'their officers, agents, servants, employees, and attorneys, and [to] those persons in active concert or participation with them who receive actual notice of the order.'"  *In re Baldwin United Corp. (Single Premium Deferred Annuities Ins. Litig*.), 770 F.2d 328, 338–39 (2d Cir. 2001).

In the context of the All Writs Act, "courts have recognized that injunctions exist outside of the traditional injunction framework governed by Fed. R. Civ. P. 65."  *Ackerman v. Exxon Mobil Corp*., 734 F.3d 237 (4th Cir. 2013).  *See also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.") (citing *United States v. New York Tel. Co.,* 434 U.S. 159, 174 (1977) (affirming grant of injunction under the All Writs Act without regard to traditional four factors)).  Courts can therefore issue injunctions pursuant to the

All Writs Act "if doing so would be 'necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law,' 28 U.S.C. § 1651(a), and provided that the terms of the injunction are sufficiently 'specific and definite' to apprise the party enjoined of the conduct which is prohibited and that the party enjoined receive notice of the injunction entered against them." *In re Payment Card Interchange Fee*, 2014 WL 4966072, at *32.

The requested injunction meets these requirements. Co-Lead Class Counsel request that the Court enjoin Willis and any lawyers and/or litigation funders with whom he is working from continuing to disseminate misleading and deceptive communications regarding the Settlement. These communications are present on the aforementioned Willis organization websites, have been disseminated on social media and/or have been directly communicated orally and/or in writing to Class Members. This action is necessary and appropriate in aid of the Court's efficient administration of the Settlement, to prevent confusion among Class Members, and to prevent improper solicitation[9] of Class Members. The Settlement Agreement and the Notice materials – to which all Class Members have access – clearly describe the registration requirements, Qualifying Diagnoses, and the qualifications and requirements for MAF Physicians and BAP Providers and provide the basis for accurate web-based content about the Settlement. Additionally, the Settlement website continues to be updated with new information as the Settlement implementation progresses.

---

[9]     *See, e.g., McWilliams*, 176 F. Supp.3d at 641 (determining that letter from counsel to class members was improper solicitation where, *inter alia*, recipients of her solicitation may have concluded "that they were definitively members of the class (given the language '*You fit in this class*'), that hiring [the attorney] was the only way to recover damages, or that [the attorney] was class counsel.") (emphasis in original).

Although the reasoning behind the request for this injunction supports the approach detailed above, under a Rule 65 analysis, the result is the same – an injunction is proper. According to well-established principles of equity, "[a] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Brandt v. Burwell*, 43 F. Supp.3d 462, 482 (W.D. Pa. 2014).

Here Class Members may suffer injury by incurring medical expenses and/or entering into contracts with the Willis entities, contracts for the payment of private counsel fees, or contracts with litigation funders.  Monetary damages do not properly compensate for the injury. It is not a hardship for Willis to cease misleading advertising.  The public interest, and the interests of the Class Members, are served by the elimination of inaccurate information about the Settlement.

In the instant matter, Willis' misrepresentations have obstructed the orderly process contemplated by this Court.  An injunction protecting Class Members and otherwise protecting the integrity of the class action process is therefore appropriate.  *See* MCL §21.33 at 300 n.917 ("Corrective or prophylactic notice to potential class members may be ordered under Rule 23(d)(2) at any stage of the proceedings").  Injunctive relief is required because "[e]ven if Class counsel were in a position to know that misleading or false communications would be made … beforehand, which it is not, the damage may be done in an instant." *In re Payment Card Interchange Fee,* 2014 WL 4966072, at *33.

IV.     **CONCLUSION**

For the reasons stated, the improper conduct of Willis should be prohibited. Co-Lead Class Counsel's motion for an injunction to prohibit improper advertising and communications with the Class should be granted, along with any other relief that this Court deems proper, including curative notice and the taxing of the costs of disseminating such notice upon Willis. Further, Co-Lead Class Counsel should be permitted to serve interrogatories upon Willis, and to take his deposition, and Willis should be ordered to cooperate fully, so that any potential ethical issues can be brought before this Court.

Should Co-Lead Class Counsel learn of any other persons or entities engaging in similar misrepresentations to the Class, we shall alert this Court immediately.


Dated:  February 21, 2017                     Respectfully submitted,


                                              /s/ Christopher A. Seeger
                                              Christopher A. Seeger
                                              SEEGER WEISS LLP
                                              77 Water Street
                                              New York, NY 10005
                                              Phone: (212) 584-0700
                                              Fax: (212) 584-0799
                                              cseeger@seegerweiss.com

                                              **Co-Lead Class Counsel**

                                              Sol Weiss
                                              ANAPOL WEISS
                                              One Logan Square
                                              130 N. 18th St. Ste. 1600
                                              Philadelphia, PA 19103
                                              Phone: (215) 735-1130
                                              Fax: (215) 735-2024
                                              sweiss@anapolweiss.com

                                              **Co-Lead Class Counsel**