UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | **Hon. Anita B. Brody**<br><br>Civ. Action No. 14-00029-AB |
| THIS DOCUMENTS RELATES TO: ALL ACTIONS | |

**MEMORANDUM IN SUPPORT OF PETITION OF OBJECTORS PRESTON AND KATHERINE JONES FOR AWARD OF ATTORNEYS' FEES FOR SUCCESSFUL EFFORTS TO IMPROVE THE SETTLEMENT <u>FOR NFL EUROPE LEAGUE PLAYERS</u>**

**I.      Introduction and Background**

Class members and objectors to the June 25, 2014 proposed settlement Preston and Katherine Jones (the "Jones Objectors") submit this petition pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure for an award of attorneys' fees for work performed in the successful effort to improve the value of the final Class Settlement for many retired NFL players who played one or more seasons in the NFL's Europe leagues in lieu of long professional football careers in the U.S.  The preliminarily approved June 25, 2014 proposed settlement

offered by Class Counsel and the NFL Parties (ECF Nos. 6073, 6084) did not provide any settlement benefits credit to those retired players for any of their playing seasons in Europe (ECF No. 6087, June 25, 2014 proposed settlement, p. 9, §2.1(kk)).

Through experienced counsel,[1] the Jones Objectors objected only, and successfully, to the June 25, 2014 proposed settlement in this Court. They did not participate in the unsuccessful subsequent challenges to the final Settlement in this Court and in the Third Circuit, nor in any of the other unsuccessful appellate actions in this case, and seek no compensation for any such work. The June 25, 2014 proposed settlement did not credit any NFL European league season play toward qualification for settlement benefits. Under the proposed settlement, retired players who played only in Europe were denied 97.5% of benefits of the settlement, no matter how many years they played. So to take a stark example, five years played in U.S. would garner 100% eligibility for benefits on the settlement benefits schedule, while the same five years in a Europe league would still yield eligibility for only the token 2.5% of benefits—a differential of forty times, or nearly four-thousand percent. The Jones Objectors filed their written objection on October 14, 2014 (ECF No. 6235; Exhibit A hereto.)[2]

The Court issued its February 2, 2015 Order declining to approve the proposed settlement agreement in light of certain specific objections to the proffered settlement (ECF No. 6479). The first bullet point in the Court's Order called upon Class Counsel and counsel for the NFL to fix the problem of the extraordinarily poor treatment of Europe league players in the proposed settlement. The Order instructed the parties that "[t]he settlement should provide for some

---

[1] See concurrently-filed Declaration of James T. Capretz.
[2] See also http://www.usatoday.com/story/sports/nfl/players/2014/10/16/nfl-europe-doesnt-count-in-proposed-concussion-deal/17385147/ (USA Today article about the October 14, 2014 objection of the Jones Objectors).

Eligible Seasons credit for play in the World League of American Football, the NFL Europe League, and the NFL Europa League."

Eleven days later, a revised settlement of February 13, 2015 (ECF No. 6481-1)—which would become the final approved Settlement (ECF No. 6509, at p. 4 & n. 1)—provided a half-season of credit for each Europe league season played. To use the earlier example again, five seasons played in an NFL Europe league now qualifies a retired player for two-and-a-half seasons of benefits eligibility, for an entitlement of 50% of scheduled benefits, instead of 2.5%—a differential of twenty times, or nearly two-thousand percent. Additional seasons played in Europe (up to ten total) increase benefits even more, up to 100% of scheduled benefits. In addition, approximately 2,300 retired players who played *only* in NFL Europe leagues and therefore would have accumulated zero season credits for their play under the June 25, 2014 proposed settlement now qualified for "baseline assessment program" medical exams (which require at least a one-half season credit under section 5.1 of both versions of the settlement) and resulting medical treatment for "level 1" neurocognitive impairment that is expected to be diagnosed in a certain percentage of such examinations.

The Third Circuit recognizes the significant role of objectors in protecting absent class members from unfavorable settlements, and a corresponding entitlement to attorneys' fees when it is shown that a class settlement was improved as a result of their efforts. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 743 (3d Cir. 2001). The Court's April 22, 2015 Order approving the final Settlement called out the efforts of the three respective law firms for objectors Morey, Slack, and Jones, as well as letters from pro se class members Duff and Zeno, on the issue of improving the settlement terms for the retired Europe-league players (ECF No. 6509, 4/22/15 Order at p. 104, n. 76).

## II.     Valuation of the Europe Season Enhancement

Common fund principles support awards of attorneys' fees based on a percentage of the benefit conferred upon the Class. *See McDonough v.Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015); *see also Dewey v. Volkswagen Aktiengesellschaft*, 558 Fed. Appx. 191, 197 (3d Cir. 2014) (finding a "constructive common fund"). For players who played primarily or exclusively in the NFL's European leagues, the effect of the Europe season credit improvement between the June 20, 2014 proposed settlement and the final approved Settlement provides at least a *several hundred percent* increase in payable benefits under the Settlement. The June 20, 2014 proposed settlement provided only token consideration for any amount of European play (i.e., 2.5% of scheduled benefits, no matter how many years the retired player played in NFL Europe leagues). The final Settlement confers a half-season credit for each season a retired player played in Europe.

The ultimate value of the settlement improvement for players in the Europe leagues will be mainly a function the number of participating Europe league players who did not receive the maximum five-eligible-season credit (and therefore 100% settlement benefits) through additional U.S. league play.  The number of retired players who played in one or more of the NFL Europe leagues appears to be approximately 3,200.  See http://www.footballdb.com/nfl-europe/nfleplayers.html (listing all players who played in any of the NFL Europe leagues for one or more seasons).  Of that number, it appears that approximately 2,300 played *only* in Europe[3] and therefore benefitted most dramatically from receiving credit for one or more seasons of play

---

[3] *See and compare, e.g.,* http://www.footballdb.com/nfl-europe/nfleplayers.html *and* http://www.footballdb.com/players/index.html (showing seasons of play for all NFL players in NFL U.S. and Europe leagues).

(whereas under the June 25, 2014 proposed settlement, they received none). They also now each qualify for medical examinations under the "baseline assessment program," valued by Class Counsel and the NFL Parties at $3,500 per qualifying player (ECF No. 6423-21, at ¶ 24), and for additional "BAP Supplemental Benefits" deriving from diagnoses of "level 1" neurocognitive impairment pursuant to such examinations (ECF No. 6481-1 at §§ 2.1(j) and 5.11), which the Court has noted may be expected to be valued from $35,000 to $52,000 per retired player (ECF No. 6509 at p. 107). It appears that approximately 900 additional Europe-league players also played for professional NFL teams in the U.S., but the vast majority of those played fewer than the five seasons required for 100% benefits eligibility under the Settlement, and therefore benefitted from the additional credit awarded for their Europe league playing seasons.

    As other parties have noted, the close of registration for participation in the Settlement does not occur until August 2017, so the basic universe of participating players, and therefore the number of compensable seasons played on each continent, will not be known with precision until then. Likewise, the NFL may possess the most reliable and official records of seasons played by class members in its Europe leagues.[4] But if the Court proceeds with an analysis of fee awards now, reasonable estimates from current registrations and reasonably reliable player data might be made today, on the same basis for objectors as for Class Counsel.

    The Jones Objectors necessarily defer to the Court's global methodology for making such estimates. Although the Jones Objectors do not know the most current information on settlement registrations by class members, Class Counsel reported more than 6,100 registrants in the opening week (ECF No. 7151-1 at p. 19). Based in further part on third-party data suggesting

---

[4] For example, the Faneca Objectors submitted a chart listing eligible seasons of retired players, reportedly based on data from a third-party website, but its listing for objector Preston Jones is incorrect, as it omits to credit his 1993 eligible NFL season in the United States with the Philadelphia Eagles (ECF No. 7070-2 at p. 170).

that approximately 2,300 retired players played *only* in Europe (and are therefore known to have received the full benefit of Europe season credits without needing to analyze the number of U.S. league seasons played, including new eligibility for the BAP); the assumption that the average number of playing seasons of additional retired players who played on both continents will tend toward an estimated average NFL playing career of 4.5 seasons[5]; and the average estimated per-credited-season value of Settlement benefits overall, the Jones Objectors respectfully suggest that a reasonable conservative estimate of the value of the Europe season credits added to the final Settlement is $20 million.

### III. Allocation of Responsibility for the Value of the Europe Season Settlement Enhancement

Assessing how the June 25, 2014 proposed settlement treated retired players from the NFL Europe leagues in did not implicate any expert testimony or analysis. There was no medical issue of concussive hits being different in games played in Europe versus the United States. The June 25 proposed settlement simply tried to sell out the interests of one subclass (retired players who played entirely or substantially in Europe) for the benefit of another (players with NFL careers centered in the U.S.). The June 25, 2014 proposed settlement presented by Class

---

[5] The average length of an NFL playing career, measured in playing seasons, has probably shortened somewhat over time. See http://www.si.com/nfl/2016/03/01/nfl-careers-shortened-two-years-data-analysis (citing Wall Street Journal data analysis). The relevant time period here is the period during which the NFL operated its international leagues between 1991 - 2007. Estimates of relatively current average NFL career length by the NFL Players Association, the NFL, and outside commentators or analysts seem to vary between approximately 3.5 and 6 seasons. See, e.g., http://www.sharpfootballanalysis.com/blog/2014/average-nfl-career-length ; https://nfllabor.wordpress.com/2011/04/18/what-is-average-nfl-player%E2%80%99s-career-length-longer-than-you-might-think-commissioner-goodell-says/ ; see also ECF No. 6167 at p. 9 (Table 2-3). There is probably reason to infer that relative "star" NFL players, including many first-round draft picks, are likely both to have longer-than-average professional playing careers, and to be less likely to have ever played in Europe.

Counsel and the NFL Parties clearly reflected the NFL's desire that players in the Europe leagues be *bound* by the settlement (hence the original token 2.5% benefit allowance) without being allowed meaningfully to *participate* in it (hence the zero credit for any seasons played in Europe). For the nominal cost to the NFL of a flat 2.5% entitlement to fractional settlement benefits regardless of how many years the player may have played in Europe, the NFL, with Class Counsel's acquiescence, attempted to buy peace without having to pay for it with respect to thousands of retired players whose careers were centered in Europe rather than the United States. The Court did not permit the gambit to stand; the first bullet point in the Court's February 2, 2015 Order rejecting the June 25, 2014 proposed settlement cited the failure to confer settlement participation credit for any NFL seasons played in Europe as a principal defect in the proposed settlement that the parties had to correct (ECF No. 6479 at p. 2).

The Court's April 22, 2015 Order approving the final Settlement cites the brief of the Jones Objectors regarding the improvement of the settlement for retired players who played in NFL Europe leagues. (ECF No. 6509, 4/22/15 Order at p. 104 and n. 76.) That brief by the Jones Objectors is attached as Exhibit A hereto. In addition to the Jones Objectors, the Court's Order also cited Europe-league season credit objections by Morey et al. (now labeled by their counsel as "Faneca Objectors"), Slack, Duff, and Zeno. (ECF No. 6509, 4/22/15 Order at p. 104, n. 76.) The letters, briefs, or Europe-related excerpts of longer briefs from these parties are attached hereto respectively as Exhibits B, C, D, and E. In addition, although not cited by the Court in its April 22, 2015 Order approving the final Settlement, objection filings by Alexander and Heimburger on predominately different grounds appear to have at least mentioned or acknowledged the Europe league season credit issue; for completeness, Europe-related excerpts from those two additional briefs are attached hereto respectively as Exhibits F and G.

Ultimately, only the Court in hindsight can assess the value to the Court of the contributions of the parties to the Court's analysis of the June 25, 2014 proposed settlement with respect to the NFL Europe leagues, leading to the Court's February 2, 2015 Order disapproving the proposed settlement on that point, which resulted (less than two weeks later) in the final Settlement containing the stark improvements for retired NFL Europe-league players. The Jones Objectors respectfully request that their contribution be considered in the Court's assessment.

### IV.     Source of Attorney Fee Awards

Co-Lead Class Counsel has suggested that the right of objectors to claim from the $112.5 million Attorneys' Fees Qualified Settlement Fund created by the Settlement for benefits rendered to the Class by counsel is dependent on the filing of a timely "response" to Class Counsel's fee petition (ECF No. 7228, Motion for Extension of Time to File Response/Reply at p. 2, n. 1). Whether or not it is correct that an objector's fee petition should be treated as a "response" to Class Counsel's fee petition as Class Counsel proposed, the present fee petition by the Jones Objectors is timely by Class Counsel's criterion and this Court's March 8, 2017 Order setting March 27, 2017 as the filing deadline for "[a]ll objections or other responses to Co-Lead Class Counsel's Petition" (ECF No. 7261, 3/8/17 Order at p. 1).  *See also Dewey v. Volkswagen Aktiengesellschaft*, 558 Fed. Appx. 191, 197 (3d Cir. 2014) (noting that even where the defendant pays attorneys' fees separately from the fund created for benefits to the class, "the reality is that the fund and the fee are paid from the same source," rendering the arrangement, "for practical purposes, a constructive common fund").

Co-Lead Class Counsel also suggests in its fee petition that the Court "set aside" some portion of the $112.5 million attorney fee escrow account (the portion size to be determined in the Court's discretion) sufficient to pay anticipated fee claims of any objectors (ECF No. 7151-1

at p. 70; ECF No. 7151-2 at p. 30, ¶ 100). Certainly the Court could do so, although the preemptive set-aside would be necessary only if the Court intended to address objector fee petitions separately from (and after) Class Counsels' fee petition.  But there does not seem to be any particular reason for the Court to consider Class Counsel's fee petition in a vacuum, and it seems more efficient simply to consider all fee petitions together, especially to the extent they all seek from a fixed fund, and given that the Court's March 8, 2017 scheduling Order provides for an "omnibus memorandum in reply" by Co-Lead Class Counsel "to all objections, petitions, and other responses" (ECF No. 7261 at p. 1).[6]

In addition to the money in the 9-figure Attorneys' Fees Qualified Settlement Fund, the Jones Objectors note that Class Counsel has additionally requested a 5% tax on all ongoing benefits distributed to class members, ostensibly to fund ongoing "[e]ffectuation," "[a]dministration," and "facilitat[ion]" of the Settlement (ECF No. 7151-1 at p. 70).  The Jones Objectors do not believe taxing the benefits payable to retired players or their families is either appropriate or necessary, particularly in light of the very large and fully funded Attorneys' Fees Qualified Settlement Fund.  But moreover, in particular reference to the additional settlement

---

[6] In addition to the Attorneys' Fees Qualified Settlement Fund, the Settlement provides for a common benefit "Monetary Award Fund" ("MAF") for distribution to Class Member beneficiaries.  (ECF No. 6509, 4/22/15 Final Settlement Approval Order, p. 13.) The MAF may constitute a more traditional and familiar source of "common fund" attorneys' fees. *E.g., Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980); *Dewey v. Volkswagen Aktiengesellschaft*, 558 Fed. Appx. 191, 197 (3d Cir. 2014) ("constructive common fund").  But the Jones Objectors agree with Class Counsel that it is preferable, and in the better interests of the Class, that common benefit attorney fee awards be made from the attorney fee escrow fund created for that purpose—whether through a preemptive "set-aside" for objector fee requests as Class Counsel suggest, or alternatively by simply considering together all claims on the fee escrow fund based on benefits obtained for members of the Class, as the Court's March 8, 2017 scheduling Order seems to contemplate. *See, e.g., Great Neck Capital Appreciation Investment Partnership, L.P. v. PricewatershouseCoopers (In re Harnischfeger Indus. Inc.)*, 212 F.R.D. 400, 417 (E.D. Wisc. 2002) (ordering that attorneys' fees awarded to objector "be paid by class counsel and the defendants as they may agree but without diminution of the sum awarded to the class").

benefits now payable <u>for seasons played in the NFL Europe leagues</u>, it seems perverse for Class Counsel to attempt to seize any benefits payable to retired Europe league players as a result of Europe league play. Class Counsel *opposed* all of those benefits, and actively litigated against them in (unsuccessfully) opposing the objections to the treatment of Europe-league players in the June 25, 2014 proposed settlement. Any attorney remuneration coming out of such additional benefits would more properly be awarded to counsel for successful objectors rather than Class Counsel.[7]

### V. The Fee Request of the Jones Objectors Regarding the Europe Season Credit Settlement Enhancement

Litigation over attorneys' fees should not become a major litigation following settlement of the underlying case. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). There may be a danger of that in the present case, where a very large fund has been pre-earmarked for attorneys' fees, even while many major anticipated aspects of the class litigation itself (e.g., class certification, discovery, and summary judgment practice) were very limited. Certain information about the Settlement—such as the exact number and identities of retired players with European-league season credit who will register to participate by the August 2017 deadline—is also not fully known. Still, if the Court proceeds to address attorneys' fees at this time, there is "by any measure . . . a substantial percentage of potential claimants and a group large enough on which to base a fee award." *Great Neck Capital Appreciation Investment Partnership, L.P. v.*

---

[7] Indeed, even the core fees now being sought by Class Counsel from the Attorneys' Fees Qualified Settlement Fund seem ironically to include claims for attorney hours spent *opposing* objections to the unconscionable treatment of players in the NFL Europe leagues in the June 25, 2014 proposed settlement. And then on top of that, after the successful objections quickly resulted in enhanced benefits for many Europe league players and their families, Class Counsel apparently included the value of that enhancement in its projected valuation of the final Settlement for which it seeks full credit and fees.

*PricewatershouseCoopers (In re Harnischfeger Indus, Inc.)*, 212 F.R.D. 400, 414 (E.D. Wisc. 2002). Fee awards in class action cases for providing a common benefit to class members (as opposed to statutory fee shifting) are usually most appropriately guided by the value provided to the class. *See Krell v. Prudential Ins. Co. of America (In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 333 (3d Cir. 1998).

In light of all of the foregoing, and necessarily subject to the Court's determination of the value to the Court of objectors' filings regarding the Europe season credit enhancement embodied in the final Settlement, the Jones Objectors request a fee award of 1.5 % of the value of the additional Europe-league benefits in the final Settlement, as determined by the Court. For example if, based on currently available information a reasonably conservative ballpark estimate of the increase in value of the final Settlement due to the much-improved treatment of the substantial number of Class Members who played in the NFL's Europe leagues is $20 million (see section II, above), that would imply an award of $300,000.

As separate form of "cross-check," an objector fee claim and contribution to the Class may be compared to the fee claim and contribution of Class Counsel. *See Great Neck Capital*, 212 F.R.D. at 416 (comparing "the relative value of the objector's counsel's contribution to that of class counsel" in an attempt to make the determination of the objector's attorney fee award "somewhat less subjective" when the value of the benefits conferred by the objector were not yet known). So for example, Class Counsel has requested north of $100 million in fees for a Settlement that it values at approximately $1 billion. If the value of the Europe season enhancements is estimated at $20 million, it would represent a little more than 2% of the value of the Settlement supporting Class Counsel's request for $100 million in fees, suggesting a shift of about $2 million in fees from Class Counsel to counsel for objectors on that issue.

## VI. <u>Conclusion</u>

For the foregoing reasons, the Jones Objectors respectfully request that the Court grant the instant Petition.


Dated: March 27, 2017

                                                Respectfully submitted,

                                                */s/ James T. Capretz*
                                                James T. Capretz
                                                CAPRETZ & ASSOCIATES
                                                5000 Birch Street, Suite 4600
                                                Newport Beach, California 92660
                                                Telephone: (949) 724-3000
                                                Facsimile: (949) 757-2635
                                                Email: jcapretz@capretz.com

## **CERTIFICATE OF SERVICE**

  I hereby certify that a copy of the foregoing was served on all counsel of record via the Court's ECF system on Marcy 27, 2017.


               */s/ James T. Capretz*
               James T. Capretz