# Exhibit A

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>        Plaintiffs,<br><br>                v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>        Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**EXPERT DECLARATION OF**

**Joseph J. Floyd**

**March 27, 2017**

FLOYD ADVISORY LLC

155 FEDERAL ST, 14TH FLOOR

BOSTON, MA 02110

**TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF OPINION ..............................................1

       A.   Introduction ...........................................................................................1

       B.   Expert Qualifications ............................................................................1

       C.   Basis for Opinions and Information Considered....................................2

       D.   Summary of Opinion..............................................................................3

II.    BACKGROUND ...................................................................................................4

       A.   Key Events..............................................................................................4

III.   ANALYSIS .............................................................................................................4

       A.   June 2014 Settlement Terms and Added Value of Improvements............4

       B.   Valuation Analysis .................................................................................5

**LIST OF ATTACHMENTS AND EXHIBITS**

| | |
|---|---|
| Attachment A | Professional Biography of Joseph J. Floyd |
| Attachment B | Documents and Information Considered |
| Exhibit A | June 2014 Settlement Terms and Added Value of Improvements |
| Exhibit B | Baseline Assessment Program Fund Calculation |
| Exhibit C | Monetary Award Fund Calculation |
| Exhibit D | Profile of Former NFL Players by Age |
| Exhibit E | Eligible Seasons per Player Analysis |
| Exhibit F | NFL Europe Eligible Seasons included in the June 2014 Settlement Terms Analysis |

I, Joseph J. Floyd, declare as follows pursuant to 28 U.S.C. § 1746:

## I.   INTRODUCTION AND SUMMARY OF OPINION

### A.     Introduction

I have been engaged by MoloLamken LLP ("Objectors' Counsel") as an accounting and finance expert. In that capacity, I have assessed the reasonableness of MoloLamken LLP's estimated value of the improvements to the June 25, 2014 Settlement Terms ("Added Value of Improvements"). I have also conducted independent valuation analyses to test the assumptions and judgments made by MoloLamken LLP.

To perform my analyses, I reviewed the June 2014 Settlement Terms as of June 25, 2014[1] ("June 2014 Settlement Terms") and the Final Settlement Terms as of February 13, 2015[2] ("Final Settlement Terms") agreed to by both parties and the Court in the National Football League Players' Concussion Injury Litigation ("Litigation"); defined added value consistent with the "before and after" accepted valuation and finance calculation approach; prepared a summary of the June 2014 Settlement Terms and the Added Value of Improvements to the Final Settlement Terms; reviewed the Vasquez Declaration Analysis Research Planning Document[3] ("Analysis Document"); and restated the June 2014 Settlement Terms' value, explained in the Analysis Document, to calculate an Independent Added Value of Improvements ("Independent Valuation Assessment").

### B.     Expert Qualifications

I am the founder and President of Floyd Advisory LLC, a consulting firm with offices in Boston and New York City.  Before founding Floyd Advisory LLC, I was one of the founders and a Managing Director of Huron Consulting Group.  Prior to Huron Consulting Group, I served as the partner in charge of Arthur Andersen's Financial Consulting practice in New England.

I earned a Bachelor of Business Administration degree from the University of Massachusetts at Amherst, where I majored in accounting.  I also hold a Juris Doctor degree from Suffolk University Law School.  I am a licensed Certified Public Accountant in New York and have earned the American Institute of Certified Public Accountants' ("AICPA") Accreditation in Business Valuation ("ABV") and Certification in Financial Forensics ("CFF").  I am a Certified Fraud Examiner ("CFE").

---

[1] Document 6087, Class Action Settlement Agreement as of June 25, 2014.
[2] Document 6481-1, Exhibit A.
[3] Document 6423-21, Declaration of Thomas Vasquez Ph.D.

During my approximately thirty-four-year career in the accounting and consulting profession, I have worked on numerous financial analysis engagements, valuation assignments, financial reporting projects, and other similar assignments, including intellectual property valuations and damages calculations.  I have been qualified as an expert and have provided testimony on accounting and financial issues in the United States District Courts in Connecticut, Massachusetts, and Virginia, in the United States Bankruptcy Courts in New York and Massachusetts, and in the trial courts of various states.  I have also appeared before the U.S. Securities and Exchange Commission ("SEC") to discuss and explain the underlying facts, accounting treatment, and reasons for restatement of public registrants' previously filed financial statements.

Attachment A to this declaration includes a copy of my professional biography and a list of my recent expert testimony.  My hourly rate for this engagement is $700.  My compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this declaration.

##### C.        Basis for Opinions and Information Considered

My analyses, opinions, and conclusions are based on the work performed by me and those under my supervision through the date of this declaration.  In order to develop my opinions in this matter, various procedures were performed, including the review of aforementioned documents, as well as independent research described herein. A complete list of information considered in forming my opinion is included in Attachment B to this declaration.

I have not been asked to express any opinions related to the June 2014 Settlement Terms' value in this matter.  For purposes of forming my opinion, I have relied upon the opinions in the Analysis Document regarding the value of the June 2014 Settlement Terms.  All of my opinions are expressed to a reasonable degree of certainty in my field.

Should further documentation be produced after the date of this declaration and/or should I be asked or permitted to respond to any expert opinions that may be submitted in this Litigation, I reserve the right to supplement my opinion, and therefore, this declaration is subject to change or modification should additional relevant information become available which bears on the analyses, opinions, or conclusions contained herein.

As a CPA, my services are subject to the AICPA Code of Professional Conduct and the AICPA's Statements on Standards for Consulting Services.

###### D.      Summary of Opinion

Based on the procedures and analyses described herein, the amounts represented by Objectors' Counsel as the Added Value of Improvements to the June 2014 Settlement Terms are fairly stated and reasonably reflect the added value arising out of the Final Settlement Terms.

In preparing their calculations, Objectors' Counsel applied the generally accepted valuation and finance methodology commonly referred to as "before and after" when estimating the Added Value of Improvements.   In my opinion, the "before and after" methodology is the appropriate approach to apply to estimate the Added Value of Improvements.

In the Valuation Analysis section of my declaration, I describe each component of the Added Value of Improvements including: 1) Uncapping the BAP Fund to Guarantee a Baseline Assessment for Every Eligible Class Member, 2) Eligible-Season Credit for Seasons Played in NFL Europe, 3) the Expanded Scope of the Death with CTE Qualifying Diagnosis, and 4) Elimination of the $1,000 Appeal Fee in Cases of Financial Hardship.   Importantly, for each, I summarize the June 2014 Settlement Terms' valuation methodology, the Added Value of Improvements' valuation methodology and estimates, and present my Independent Valuation Assessment. I have recalculated the amounts presented by Objectors' Counsel, analyzed the estimates assumed by Objectors' Counsel, and evaluated the reasonableness of all assumptions used by Objectors' Counsel.  As described in my declaration, I did identify certain adjustments to Objectors' Counsel's calculations; some lower the result and others increase the result, with the net adjustment being an increase in the Added Value of Improvements created by the Final Settlement Terms.

The following table summarizes the Independent Valuation Assessment amounts from my declaration, including my adjustments made to Objectors' Counsel's calculations.

| $ (in millions) | | Independent Valuation Assessment | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Fund | Original Value | Uncapping the BAP Fund | NFL Europe Eligible-Season Credit | Expanded Qualifying Diagnosis for Death with CTE | Elimination of Appeal Fee | Total Added Value | Total Adjusted Value |
| **Baseline Assessment Program** | $75.0 | $29.6 | $13.2 | $      - | $      - | $42.8 | $117.8 |
| Administrative Costs | 7.5 | - | - | - | - | - | 7.5 |
| Baseline Examinations | 41.3 | 18.1 * | 8.1 | - | - | 26.2 | 67.5 |
| Supplemental Benefits | 26.2 | 11.5 * | 5.1 * | - | - | 16.6 | 42.8 |
| **Monetary Award** | 675.0 | - | 22.1 * | 44.6 | 10.9 | 77.6 | 752.6 |
| **Total Value** | $750.0 | $29.6 | $35.3 | $44.6 | $10.9 | $120.4 | $870.4 |

*Amounts are different than the Objectors' Counsel's Added Value of Improvements as they include items I identified that Objectors' Counsel did not consider. In the Valuation Analysis section of my declaration I have provided detailed explanations of the differences.

_____

## II.     BACKGROUND

### A.     Key Events

A review of the key events in the Litigation that are material to my analysis are as follows:

- In August 2013, the parties in this case announced that they signed a term sheet for a global settlement of the concussion claims against the NFL.[4]
- On January 6, 2014, Class Counsel and the NFL filed the Initial Settlement and a class action personal-injury complaint, along with a motion for preliminary approval of the settlement.[5]
- The NFL and Class Counsel announced a Revised Settlement on June 25, 2014.[6]
- On February 2, 2015, the Court issued an Order identifying changes that the Court believed would enhance the fairness of the Revised Settlement. The settling parties adopted all of the Court's recommendations, resulting in the Final Settlement.[7]
- On April 22, 2015, the Court issued its order certifying the class for settlement purposes and giving final approval to the Final Settlement.[8]

## III.     ANALYSIS

### A.     June 2014 Settlement Terms and Added Value of Improvements

The June 2014 Settlement Terms' value includes two major categories, the Baseline Assessment Program ("BAP") Fund, and the Monetary Award Fund ("MAF"). Each category uses assumptions to analyze the number of NFL players eligible to receive a benefit and the associated payment ("Eligible Class Members").

Attached as Exhibit A is a summary of the June 2014 Settlement Terms and Added Value of Improvements, which include:

1. Uncapping the BAP Fund to Guarantee a Baseline Assessment for Every Eligible Class Member
2. Eligible-Season Credit for Seasons Played in NFL Europe
3. The Expanded Scope of the Death with CTE Qualifying Diagnosis
4. Elimination of the $1,000 Appeal Fee in Cases of Financial Hardship

---

[4] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 3.
[5] *Ibid.*, pg. 4.
[6] *Ibid.*, pg. 6.
[7] *Ibid.*, pg. 14-15.
[8] *Ibid.*, pg. 16.

In the Valuation Analysis section of my declaration I will:

- Summarize the June 2014 Settlement Terms' valuation methodology
- Summarize the Added Value of Improvements' valuation methodology and estimates
- Create an Independent Valuation Assessment

### B.    Valuation Analysis

Objectors' Counsel applied the generally accepted valuation and finance methodology commonly referred to as "before and after" when estimating the components of the Added Value of Improvements.  This methodology is applied in situations when a base amount or calculation exists, and an increment is to be deducted or added to determine an adjusted financial result.  Important to a proper "before and after" calculation is a thorough assessment of the assumptions and information in the base amount or calculation, and consideration of how new information or assumptions may impact or alter these assumptions.

The "before and after" methodology is often used in performing business damage calculations such as when a breach of contract occurs or a business experiences an interruption to expected results.  The methodology is also often used to make business decisions such as assessing the profitability of a new product line expansion or other business organizational changes.  When preparing a financial estimation model, the methodology may determine the value of any "what if" scenario that a financial analyst is asked to perform.[9] In my opinion, the "before and after" methodology is the appropriate approach to apply to estimate the components of the Added Value of Improvements.

1. Uncapping the BAP Fund to Guarantee a Baseline Assessment for Every Eligible Class Member[10]

It is my understanding that the Court will seek to evaluate the total financial impact of the Added Value of Improvements in establishing an award for attorney's fees.  This is a critical fact when assessing the valuation impact of the Added Value of Improvements for uncapping the original BAP Fund amount of $75 million for baseline examinations.  Importantly, uncapping the BAP Fund amount guarantees that a baseline assessment exam will be available for every Eligible Class Member.[11]

---

[9] Shannon P. Pratt and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th Ed.

[10] The administrative costs are valued at $7.5 million. There is no added value to this section; thus, I did not include an assessment of this section in my declaration.

[11] In this section, as described above, I have calculated the maximum possible estimated pay out of Supplemental Benefits. I have not considered the $75 million cap, which depending on the Court's actions may still be applicable to the Supplemental Benefits. Further, a major variable in assessing the Value Added of Improvements if a cap on Supplemental Benefits remains will be the timing of when exam costs are used as they may absorb a large percentage of the cap.

*June 2014 Settlement Terms' valuation methodology*

To value the June 2014 Settlement Terms, the Analysis Document calculated the Eligible Class Members able to receive an exam, assumed that approximately 70% would actually seek an exam, and applied an estimated cost per exam of $3,500. The calculation resulted in a value for the exam portion of the BAP Fund of $41.3 million.[12]

In addition, to value the Supplemental Benefits portion of the BAP Fund, the Analysis Document estimated the number of Eligible Class Members who will require medical treatment for Level 1 Neurocognitive Impairment, also assuming an approximately 70% participation rate, and then applied an estimated cost per member for the medical treatment. The calculation resulted in a value for the Supplemental Benefit portion of the BAP Fund of approximately $26.2 million.[13]

*Added Value of Improvements' valuation methodology and estimates*

Uncapping the BAP Fund to guarantee an exam for every Eligible Class Member creates an unimpeded opportunity and therefore value for every Eligible Class Member to secure an exam without any restrictions or limitations. To calculate the Added Value of Improvements, Objectors' Counsel assumed a 100% participation rate instead of the approximate 70% participation rate, which is included in the June 2014 Settlement Terms' calculation. The adjusted calculation result is approximately $59.4 million,[14] for an added value of $18.1 million. Of significance, the approximate 70% participation was set with the cap on the exam cost, so presenting the Added Value of Improvements when removing the cap logically should be assessed with the total value now available to the entire Eligible Class Member population.

Objectors' Counsel's calculation underestimated the added value and calculated $11.4 million in this section.[15] The understatement is due to the absence of considering the administrative costs for the BAP Fund when calculating the effect of this update.

*Independent Valuation Assessment*

Based on my understanding that the Court will seek to evaluate the total financial impact of the Added Value of Improvements in establishing an award for attorney's fees, a calculation that measures the aggregate value created by the removal of the cap is appropriate. A player's choice to participate, would not change the value available to them in receiving the $3,500 exam. As such, the added value of removing the BAP Fund cap, is reasonably stated as approximately $18.1 million (refer to Exhibit B).

---

[12] Document 6423-21, Declaration of Thomas Vasquez Ph.D., pg. 9.
[13] *Ibid.*, pg. 9.
[14] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 21.
[15] *Ibid.*, pg. 22. $11.4 million = $59.4 million (Baseline Examination) + $27 million (Supplement Benefits) - $75 million cap. Refer to Footnote 14 for an explanation of this calculation.

Consistent with measuring the total financial impact of the Added Value of Improvements, and a matter not presented by Objectors' Counsel, the value of the Supplemental Benefits available to Eligible Class Members will also increase as a result of removing the cap on the BAP Fund. The number of Eligible Class Members receiving Supplemental Benefits relies on the NFL's calculation of participants when establishing the cap. Thus, measuring the total financial impact of removing the cap requires a similar increase, recognizing value for those members eligible for the benefit without any limitation on the funding. I estimated this added value for removing the cap on the BAP Fund as approximately $11.5 million (refer to Exhibit B).

2.    Eligible-Season Credit for Seasons Played in NFL Europe

The original calculation of Eligible Seasons in the Analysis Document described populations of former players from the NFL League, AFL League, NFL Europe League, NFL Europa League, and World League of American Football. However, the calculation for the June 2014 Settlement Terms reflected a zero credit, or no recognition at all in the calculation for NFL Europe League, NFL Europa League, and World League of American Football (collectively "NFL Europe") seasons. Among the Added Value of Improvements, the Final Settlement Terms now include half an Eligible Season for NFL Europe seasons. This change affects the class members in two ways, related to the BAP Fund[16] and the MAF. First, players with only NFL Europe seasons that previously were not able to participate in the BAP, are now included in that population. Second, former NFL Europe players, including those already in the MAF calculations who also played in the NFL, and those who played only in NFL Europe, will be eligible for additional Eligible Seasons in the MAF calculation.

*June 2014 Settlement Terms' valuation methodology*

To value the June 2014 Settlement Terms, the Analysis Document calculated the seasons played in NFL Europe as zero Eligible Seasons.   This affects both the BAP Fund and MAF calculations.

Under the June 2014 Settlement Terms, participation in the BAP Fund required at least half an Eligible Season. As the June 2014 Settlement Terms included NFL Europe at zero Eligible Seasons, the BAP Fund does not include the NFL-Europe-only players within the population of Eligible Class Members who qualify for an exam. As such, exam and supplemental benefits were not available to these players and the value of any benefit was therefore zero.

In contrast, the MAF calculation includes NFL-Europe-only players but at zero Eligible Seasons.  However, these players did receive some benefit recognition in the original calculation, as zero Eligible Seasons

---

[16] In this section, as described above, I have calculated the maximum possible estimated pay out of Supplemental Benefits. I have not considered the $75 million cap, which depending on the Court's actions may still be applicable to the Supplemental Benefits. Further, a major variable in assessing the Value Added of Improvements if a cap on Supplemental Benefits remains will be the timing of when exam costs are used as they may absorb a large percentage of the cap.

resulted in receiving 2.5% of the payment.  As described in the Analysis Document, the calculation considers 2.5% of the Eligible Class Members payment for NFL-Europe-only players. Unfortunately, the value attributable to the NFL Europe players based on this calculation is not readily available in the Analysis Document.

*Added Value of Improvements' valuation methodology and estimates*

To calculate the added value of making NFL-Europe-only players eligible for exams and supplemental benefits under the BAP Fund, Objectors' Counsel identified the approximately 2,300 NFL-Europe-only players and multiplied this number by the estimated value for the exam of $3,500.  This results in an added value for the BAP Fund of $8.1 million.[17]  Objectors' Counsel next determined the percentage of the players who qualified for Supplemental Benefits in the Analysis Document.  Applying this percentage of 4.4% to the approximately 2,300 players results in approximately 101 players being eligible and receiving Supplemental Benefits.  Based on the average value of $35,000 for the Supplemental Benefits from the Analysis Document, this increase results in added value related to the BAP Fund of $3.5 million.[18]

The MAF increase is based on the added value of including all of the Eligible Seasons played in NFL Europe as half an Eligible Season. Importantly, the value of the Analysis Document's MAF is based on several major variables including age of the player, playing years or tenure and probability factors for contracting the defined diagnoses. Objectors' Counsel calculated the added value of including the NFL Europe seasons by determining the average Eligible Class Member payment for a season, and multiplying this amount of approximately $11,185 to the added Eligible Seasons arising from adding the NFL Europe seasons.  The calculation results in added value of $24.0 million for the MAF.[19]

*Independent Valuation Assessment*

First, I will address the added value calculations for the BAP Fund. My analysis of the Added Value of Improvements for the exam portion of the BAP Fund when including the NFL Europe players is the same as the approach described in the Added Value of Improvements' valuation methodology and estimates section above. Based on my review of adding the approximately 2,300 players and the discussion provided earlier in the Added Value of Improvements' valuation methodology and estimates section, the calculation of added value of $8.1 million for the BAP Fund for the value available to players through receiving the exam appears reasonable (refer to Exhibit B).

The second portion of the BAP Fund is for the Supplemental Benefits.  I identified that Objectors' Counsel's calculation underestimated their added value by $1.6 million in this section. When determining the percentage of the players who qualified for Supplemental Benefits in the Analysis Document, Objectors'

---

[17] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 25.
[18] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 26.
[19] *Ibid.*, pg. 23-24.

Counsel should have factored in that the Analysis Document used a different participation rate. Thus, to recalculate the percent of the players who qualified for Supplemental Benefits, the following amounts in the Analysis Document should be used: Total Participating Eligible Class Members, and the Eligible Class Members Estimated to have Level 1 Neurocognitive Impairment. The calculation results in a 6.4% rate (refer to Exhibit B). The increase results in a total added value for the BAP Fund of $5.1 million for this section (refer to Exhibit B).

For the MAF calculation performed by Objectors' Counsel, I evaluated the inputs and assumptions described above that are used in the Analysis Document calculation to assess the reasonableness of applying an average value from this calculation to the added NFL Europe players and seasons. Of significance, the actual calculation model was not provided nor appears to be able to be easily replicated. Age and Eligible Seasons appear to be the major factors that contribute to determining the probability that an Eligible Class Member will have a Qualifying Diagnosis, and thereby be eligible to receive a payment. I assessed the comparability of each of these factors for the NFL population and the NFL Europe population.

Ages for the populations can be estimated by evaluating the inception dates of the Leagues: the NFL Europe began in 1991,[20] and the NFL began in 1920.[21] Thus, it appears reasonable to assume that if the average NFL player began their career at age 25 in NFL Europe, when it began in 1991, they would be only 49 years old at the time of the Final Settlement Terms, and other players who entered the league thereafter would be younger, causing a lower average. As the average NFL player is 51 years old, it is reasonable to assume NFL Europe players are younger and are more likely to receive a payment for a Qualifying Diagnosis (refer to Exhibit D).

With regard to Eligible Seasons, the NFL population has a higher average, at 3.2 years, than the NFL Europe population, at approximately 2.0 years[22] (refer to Exhibit E). It is my understanding that more Eligible Seasons equates to a higher likelihood the player may receive a Qualifying Diagnosis. The difference approximates to just over one season, and in the absence of the detailed model calculations, does not appear to be so significant to negate the usefulness of using the average.

When considering the age and Eligible Seasons comparisons, which if they have differences, they are offsetting, the use of the value for the NFL average season appears to be a fair estimate for the added value to the MAF for the NFL Europe seasons.

---

[20] NFL.com News, "NFL Europa Closes," http://www.nfl.com/news/story/09000d5d801308ec/article/nfl-europa-closes.
[21] Encyclopedia Britannica, "National Football League (NFL)," https://www.britannica.com/topic/National-Football-League.
[22] The average NFL Europe Eligible Seasons population in this comparison was not counted as half an Eligible Season, per the Final Settlement Terms, but rather as a whole season in order to have direct comparability to the total NFL population in terms of the number of seasons played.

In addition, during my review, I identified that Objectors' Counsel did not consider the 2.5% payment for NFL-Europe-only players included in the June 2014 Settlement Terms when calculating added value for the MAF.  To determine a fair measure for this value, I used the average amount funded for each Eligible Class Member and multiplied it by 2.5% to arrive at $1.9 million (refer to Exhibit F).  In the absence of additional information, this amount appears reasonable as the value that should be deducted from Objectors' Counsel's calculation for the added value to the MAF, resulting in a revised amount of $22.1 million (refer to Exhibit C).

### 3.   The Expanded Scope of the Death with CTE Qualifying Diagnosis

The Scope of the Death with CTE Qualifying Diagnosis was extended from July 7, 2014 to April 22, 2015. It is my understanding that the Expanded Scope of the Death with CTE payment will qualify additional Eligible Class Members to receive a payment from the MAF.

*June 2014 Settlement Terms' valuation methodology*
The June 2014 Settlement Terms do not have a value for this population as the Revised Settlement Terms do not pay Death with CTE benefits in the extended timeframe population.

*Added Value of Improvements' valuation methodology and estimates*
Extending the eligibility for diagnoses of Death with CTE creates value for every player that is in the extended population. To calculate the Added Value of Improvement, each NFL player who has died during the extended timeframe is individually assessed. The potential MAF payment for each player is calculated assuming all players qualified for a Death with CTE payment, and considers all significant factors needed to determine the MAF payment described in the June 2014 Settlement Terms and Added Value of Improvements section. An average is then calculated to determine the average MAF payment for Death with CTE in the extended population. The estimated population of the players who died with CTE is then calculated based on the prevalence of CTE in the NFL population as reported in prior studies. The average MAF payment for Death with CTE in the extended population is applied to the estimated population of the players who died with CTE to determine the added value. The adjusted calculation results in an added value of $44.6 million.[23]

*Independent Valuation Assessment*
Based on my understanding that the eligibility for diagnoses of Death with CTE is extended, a calculation that measures the aggregate value created by the extended eligibility is appropriate. Objectors' Counsel researched and provided the data for the NFL players who have died in the extended timeframe, the MAF payment calculated for each player, and the estimated population of players who died with CTE. I

---

[23] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 26-27.

recalculated the amounts and find the estimate reasonable for Objectors' Counsel to use. As such, the added value of the extended eligibility, is reasonably stated as approximately $44.6 million (refer to Exhibit C).

4.   Elimination of the $1,000 Appeal Fee in Cases of Financial Hardship

It is my understanding that, because the appeal fee is eliminated in cases of financial hardship, the fee will no longer deter certain Eligible Class Members from appealing when their claims are denied during the MAF process.

*June 2014 Settlement Terms' valuation methodology*
The June 2014 Settlement Terms do not have a value for this population as it did not consider the appeal fee deterring financially stressed Eligible Class Members from appealing when their claims are denied during the MAF process.

*Added Value of Improvements' valuation methodology and estimates*
The elimination of the appeal fee creates value for those Eligible Class Members under financial stress, who are deterred from the appeal process due to the fee, and who would have been successful on appeal. To calculate the Added Value of Improvement, Objectors' Counsel used data from the NFL disability claim process, which is used to estimate how many claims are originally denied, then approved during the appeal process. The percent of the total is used to determine how many of the Eligible Class Members during the appeal process, when their claims are originally denied, would be accepted. An estimate is then made to calculate how much of this population would be under financial stress and deterred from appealing due to the appeal fee. Objectors' Counsel used data as reported in prior studies to form this estimate based on the number of NFL players under financial stress when they retire, and how many file for bankruptcy, to determine a reasonable and conservative estimate. These estimates are applied to the average amount funded per Eligible Class Member to calculate the added value. The adjusted calculation results in an added value of $10.9 million.[24]

*Independent Valuation Assessment*
Based on my understanding of the elimination of the appeal fee, a calculation that measures the aggregate value created by elimination of the appeal fee is appropriate. Objectors' Counsel researched and provided the data for the NFL disability claim, financial stress, and bankruptcy. I recalculated the amounts and find the estimate reasonable for Objectors' Counsel to use. The result is 58 Eligible Class Members who are assumed to be denied, who would not appeal due to the appeal fee, and whose claims would have been accepted on appeal. To test this result, I calculated the size of this population relative to the entire Eligible Class Members with a Qualifying Diagnosis. The 58 Eligible Class Members represent less than one quarter of one percent, a relatively de minimis amount. In assessing the reasonableness of this conclusion, I rely on

---

[24] *Ibid.*, pg. 27-28.

accepted behavioral science theories, notably the loss aversion (prospect theory) and rational choice.[25] Importantly, loss aversion means that people make decisions that value losses far greater than gains. In this case, losing $1,000 can be a deterrent for many in the rejected population. In addition rational choice means that with nothing to lose, and knowledge of potential upside, the rejected players would be motivated to appeal due to the waiver of the appeal fee if they are in financial stress. Based on the nominal amount of players estimated in the additional population, and these behavioral science theories, the amount calculated by Objectors' Counsel appears reasonable and conservative as a valuation estimate (refer to Exhibit C).

---

[25] Encyclopedia Britannica, "Prospect Theory," https://www.britannica.com/topic/prospect-theory.
 Encyclopedia Britannica, "Rational Choice Theory," https://www.britannica.com/topic/rational-choice-theory.

*******

I reserve the right to supplement or amend this declaration as additional relevant information becomes available and to address issues raised by other witnesses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2017 in Boston, MA.

_____

Joseph J. Floyd

**Attachment A**

**Professional Biography of Joseph J. Floyd**



# JOSEPH J. FLOYD, CPA, JD, CFE, CGMA, ABV



### Education and Certifications

- Bachelor's degree in Accounting, University of Massachusetts at Amherst
- Juris Doctor, Suffolk University Law School
- Certified Public Accountant, New York
- Certified Fraud Examiner
- Certified in Financial Forensics
- AICPA Certificate in International Financial Reporting Standards
- Chartered Global Management Accountant (CGMA)
- AICPA Accreditation in Business Valuation (ABV)

### Affiliations

- American Institute of Certified Public Accountants
- Association of Certified Fraud Examiners
- Massachusetts Bar, Retirement Status

**Joseph J. Floyd** is the founder and President of Floyd Advisory. Mr. Floyd, for whom the company is named, has worked with a prestigious, varied list of clients including Global 1000 companies, major law offices, private equity firms and others in need of expert advice and solutions for complex financial reporting, accounting and strategic business matters.

Mr. Floyd has served as an expert witness and testified on accounting and financial issues in the United States District Court and the United States Bankruptcy Court in several states and in the trial courts of various states. He has appeared before the Securities and Exchange Commission to outline and analyze facts, practices and principles related to public company financial statement changes.

Prior to forming Floyd Advisory, Mr. Floyd was one of the Founding Managing Directors of Huron Consulting Group. Before his tenure at Huron Consulting Group, he was the Partner in charge of Arthur Andersen's Financial Consulting practice in New England and an active member of the firm's regional leadership group.

Mr. Floyd's professional experience includes a combination of strategy and valuation assignments, projects involving SEC reporting and transaction analyses as well as providing financial expertise. Examples include:

- Advising boards of directors, audit committees and special committees related to the accounting investigation results, complex financial reporting decisions and related matters.
- Providing testimony as an expert on accounting, auditing, and financial reporting standards, business damages, intellection property matters, and other financial analyses.
- Providing expert advice on business decisions, strategies, accounting policies and practices and financial analyses to entrepreneurs, investors, executives and private equity firms.
- Serving as the accounting arbitrator, consultant and expert in post-acquisition disputes.
- Performing valuation engagements including valuations of closely held corporation interests purchase price allocations and impairment tests.

## Testimony

*Trial and Deposition Testimony, 2013 to date*

- Acushnet Company v. Beam Inc. f/k/a Fortune Brands, Inc. Superior Court Department, Commonwealth of Massachusetts, Accounting for VAT in a Post Acquisition Dispute (Deposition, January 2015; Testimony, May 2016)

- EJK Realty, et al. v. Alfred Carpionato, et al., American Arbitration Association, Damages Analysis for a Contractual Dispute (Testimony, April 2016)

- Andy H. Sassine v. Fidelity Management & Research Company, Suffolk Superior Court, Commonwealth of Massachusetts, Rebuttal of Damages Analysis (Deposition, February 2016; Testimony, April 2016)

- Matthew J. Szulik, et. al. v. State Street Bank and Trust Company, United States District Court, District of Massachusetts, Analysis of Custodial Transactions and Business Damages (Deposition, March 2015)

- Michele LeComte Chambers, et al.  v.  Gold Medal Bakery, Inc., Bakery Products Corp., Roland S. LeComte, and Brian R. LeComte, American Arbitration Association Panel, Independent Valuation of a Closely-Held Business (Deposition, March 2014; Testimony, May 2014)

- Justin M. Scott v. Putnam, LLC, PUTNAM, LLC D/B/A Putnam Investments, Putman Investments, Inc., Putnam Investment Management, LLC, Marsh & McLennan Companies, Inc., John Doe Plan Administrators 1-12, Rebuttal of Damages Analysis (Deposition, April 2014)

- Securities and Exchange Commission vs. Larry A. Goldstone, Clarence G. Simmons, III, and Jane E. Starrett, United States District Court for the District of New Mexico, Auditors' Responsibilities Under Generally Accepted Auditing Standards / Financial Statement Restatements (Deposition, March 2014)

- Northeastern University v. Jarg Corporation, American Arbitration Panel, Application of GAAP to a Multiple- Element Litigation Settlement (Testimony, February 2013)

- Origami Partners III L.P. v. Pursuit Capital Partners (Cayman) Ltd., Pursuit Capital Partners Master (Cayman) Ltd., and Pursuit Investment Management LLC, FSD Cause No. 36 of 2011 (PCJ), Grand Court of Cayman Islands Financial Services Division, Accounting for Contingencies  (Testimony, January 2013)

**Attachment B – Documents and Information Considered**

In forming my opinions and observations, I have considered the information and documents referenced in my report and/or listed below:

***Court Filings***

Document 6073-5, Memorandum of Law In Support of Motion of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Class Action Settlement Agreement; (2) Conditionally Certifying a Settlement Class and Subclasses; (3) Appointing Co-Lead Class Counsel, Class Counsel, and Subclass Counsel; (4) Approving the Dissemination of Class Notice; (5) Scheduling a Fairness Heading; and (6) Staying Matters as to the Released Parties and Enjoining Proposed Settlement Class Members from Pursuing Related Lawsuits, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, June 25, 2014.

Document 6087, Class Action Settlement Agreement as of June 25, 2014, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, June 25, 2014.

Document 6167, Material Provided by Counsel to the Plaintiffs, Seeger Weiss LLP, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, September 12, 2014.

Document 6168, Material Provided by Counsel to the NFL, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, September 12, 2014.

Document 6423-21, Declaration of Thomas Vasquez Ph.D, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, November 12, 2014.

Document 6479, Order, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, February 2, 2015.

Document 6481, Class Counsel and the NFL Parties' Joint Submission in Response to the February 2, 2015 Order of the Court, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, February 13, 2015.

Document 6481-1, Exhibit A, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, February 13, 2015.

Document 6481-2, Exhibit B, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, February 13, 2015.

Final Approval Order, 307 F.R.D. 351, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, April 22, 2015.

Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, January 11, 2017.

Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Case 2:12-md-02323-AB, United States District Court for the Eastern District of Pennsylvania, January 11, 2017.

**Attachment B – Documents and Information Considered**

### *Other*

Encyclopedia Britannica, "National Football League (NFL)," https://www.britannica.com/topic/National-Football-League (accessed March 22, 2017).

Encyclopedia Britannica, "Prospect Theory," https://www.britannica.com/topic/prospect-theory (accessed March 22, 2017).

Encyclopedia Britannica, "Rational Choice Theory," https://www.britannica.com/topic/rational-choice-theory (accessed March 22, 2017).

NFL.com News, "NFL Europa Closes," http://www.nfl.com/news/story/09000d5d801308ec/article/nfl-europa-closes (accessed March 22, 2017).

Shannon P. Pratt and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th ed. (New York, NY: The McGraw-Hill Companies, Inc.).

**Exhibit A: June 2014 Settlement Terms and Added Value of Improvements**

The information included in the "June 2014 Settlement Terms" column below is cited from Document 6087, Class Action Settlement Agreement as of June 25, 2014.

The information included in the "Added Value of Improvements" column below is cited from Document 6481-1, Exhibit A (Class Action Settlement Agreement as Amended on February 13, 2015).

| June 2014 Settlement Terms | Added Value of Improvements |
|---|---|
| **Settlement Class**<br><br>Retired NFL Football Players: Prior to July 7, 2014, all living NFL Football players who (1) have retired, formally or informally, from playing professional football with the NFL or any Member Club, including AFL, World League of American Football, NFL Europe League, and NFL Europa League players, or (2) were formerly on any roster, including preseason, regular season, or postseason, of any such Member Club or league and no longer are under contract to a Member Club and are not seeking active employment as a player with any Member Club, whether signed to a roster or signed to any practice squad, developmental squad, or taxi squad of a Member Club.<br><br>The Settlement Class does not include: (a) current NFL players, and (b) people who tried out for NFL or AFL Member Clubs, or World League of American Football, NFL Europe League or NFL Europa League teams, but did not make it onto preseason, regular season or postseason rosters, or practice squads, developmental squads or taxi squads. | |
| **Baseline Assessment Program (BAP)**<br><br>All living retired players who have earned at least one-half of an Eligible Season (see definition below), who do not exclude themselves from the Settlement (see definition below), and who timely register to participate in the Settlement (see definition below) may participate in the Baseline Assessment Program ("BAP").<br><br>Eligible Season: The Settlement uses the term "Eligible Season" to count the seasons in which a retired player played or practiced in the NFL or AFL. A retired player earns an Eligible Season for:<br>• Each season where he was on an NFL or AFL Member Club's "Active List" (see definition below) for either three or more regular season or postseason games, or<br>• Where he was on an Active List for one or more regular or postseason games and then spent two regular or postseason games on an injured reserve list or inactive list due to a concussion or head injury. | *Eligible-Season Credit for Seasons Played in NFL Europe - "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a* |

1

**Exhibit A: June 2014 Settlement Terms and Added Value of Improvements**

| June 2014 Settlement Terms | Added Value of Improvements |
|---|---|
| • A retired player also earns one-half of an Eligible Season for each season where he was on an NFL or AFL Member Club's practice, developmental, or taxi squad for at least eight games, but did not otherwise earn an Eligible Season.<br>• *Time spent playing or practicing in the World League of American Football, NFL Europe League, and NFL Europa League does not count towards an Eligible Season.*<br><u>Active List</u>: The "Active List" means the list of all players physically present, eligible and under contract to play for an NFL or AFL Member Club on a particular game day within any applicable roster or squad limits in the applicable NFL or AFL Constitution and Bylaws.<br><br><u>Exclude themselves from the Settlement</u>: To be excluded from the Settlement, Class Members must mail a letter or other written document to the Claims Administrator.<br><br><u>Timely register to participate in the Settlement</u>: To get benefits, Class Members will need to register. This is true for all Settlement Class Members, including Representative and Derivative Claimants. Registration for benefits will not begin until after Final Settlement Approval. To receive any Settlement benefits, Class Members must register on or before 180 days from the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com.<br><br>The BAP will provide baseline neuropsychological and neurological assessment examinations to determine whether retired players are currently suffering from cognitive impairment. Retired players will have from two to ten years, depending on their age as of the date the Settlement is finally approved and any appeals are fully resolved ("Final Settlement Approval"), to have a baseline examination conducted through a nationwide network of qualified and independent medical providers.<br>• Retired players 43 or older as of the date the Settlement goes into effect will need to have a baseline examination within two years of the start of the BAP.<br>• Retired players under the age of 43 as of the date the Settlement goes into effect will need to have a baseline examination within 10 years of the start of the BAP, or before they turn 45, whichever comes sooner.<br><br>Retired players who are diagnosed with Level 1 Neurocognitive Impairment (i.e., moderate cognitive impairment) are eligible to receive further medical testing and/or treatment (including counseling | *Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury. A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games; or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.* |

**Exhibit A: June 2014 Settlement Terms and Added Value of Improvements**

| June 2014 Settlement Terms | Added Value of Improvements |
|---|---|
| and pharmaceuticals) for that condition during the ten year term of the BAP or within five years from diagnosis, whichever is later.<br><br>Participation in a baseline assessment exam: Although all retired players are encouraged to take advantage of the BAP and receive a baseline examination, they do not need to participate in the BAP to receive a monetary award. There is a 10% reduction to the monetary award if the retired player does not participate in the BAP and:<br>• Did not receive a Qualifying Diagnosis prior to July 7, 2014, and<br>• Receives a Qualifying Diagnosis (other than ALS) after his deadline to receive a BAP baseline assessment examination. | |
| *In order to ensure sufficient funds to pay for a baseline assessment examination for each eligible Retired NFL Football Player, as set forth in Section 5.2 and subject to Sections 5.14(a), 23.1(b) and 23.3(d) of this Agreement, the maximum per player BAP Supplemental Benefit payable under this Section, taking into account such factors as the number of Retired NFL Football Players using the BAP and diagnosed with Level 1 Neurocognitive Impairment, shall be determined on the one-year anniversary of the commencement of the BAP by Co-Lead Class Counsel and Counsel for the NFL Parties, in consultation with the BAP Administrator, and with the approval of the Court. The maximum per player benefit will be set at a sufficient level to ensure that there will be sufficient funds, without exceeding the Seventy-Five Million United States Dollars (U.S. $75,000,000) cap on the BAP Fund, to pay for every eligible Retired NFL Football Player to receive one baseline assessment examination. At the conclusion of the term of the BAP, and at such other times as the Court may direct or as may be requested by Co-Lead Class Counsel or Counsel for the NFL Parties, Co-Lead Class Counsel and Counsel for the NFL Parties will review and adjust, if necessary, this maximum benefit, in consultation with the BAP Administrator and with the approval of the Court, to ensure that there are sufficient funds to pay for all baseline assessment examinations without exceeding the Seventy-Five Million United States Dollar (U.S. $75,000,000) cap on the BAP Fund.* | *Uncapping the BAP Fund to Guarantee a Baseline Assessment for Every Eligible Class Member - The amount of money, up to a maximum of Seventy-Five Million United States dollars (U.S. $75,000,000), sufficient to make all payments set forth in Section 23.3(d), except that every qualified Retired NFL Football Player, as set forth in Section 5.1, is entitled to one baseline assessment examination. For the avoidance of any doubt, if the Seventy-Five Million United States dollars (U.S. $75,000,000) is insufficient to cover the costs of one baseline assessment examination for every qualified Retired NFL Football Player electing to receive an examination by the deadline set forth in Section 5.3, the NFL Parties agree to pay the amount of money necessary to provide the examinations in accordance with this Settlement Agreement.* |

**Exhibit A: June 2014 Settlement Terms and Added Value of Improvements**

| June 2014 Settlement Terms | Added Value of Improvements |
|---|---|
| **Monetary Awards Fund (MAF)**<br><br>Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (i.e., moderate Dementia), Level 1.5 Neurocognitive Impairment (i.e., early Dementia), or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65 year term of the Monetary Award Fund.<br><br>Retired NFL Football Players and Representative Claimants for retired players who are diagnosed by the date of Final Settlement Approval must submit claims for monetary awards within two years of the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com. Retired NFL Football Players and Representative Claimants for retired players who are diagnosed after the date of Final Settlement Approval have two years from the date of diagnosis to file claims. This deadline may be extended to within four years of the Qualifying Diagnosis or the date that further notice about the registration process and deadlines is posted on www.NFLConcussionSettlement.com, whichever is later, if the Retired NFL Football Player or Representative Claimant can show substantial hardship beyond the Qualifying Diagnosis. Derivative Claimants must submit claims no later than 30 days after the Retired NFL Football Player through whom the close relationship is the basis for the claim (or the Representative Claimant of that retired player) receives a notice that he is entitled to a monetary award. All claims must be submitted by the end of the 65-year term of the Monetary Award Fund.<br><br>*Any Settlement Class Member taking an appeal will be charged a fee of One Thousand United States dollars (U.S. $1,000) by the Claims Administrator that must be paid before the appeal may proceed, which fee will be refunded if the Settlement Class Member's appeal is successful. If the appeal is unsuccessful, the fee will be paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.*<br><br>If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.<br><br>Qualifying Diagnoses must be made by approved qualified specialists. If and when Final Settlement Approval is obtained, the Claims Administrator will create and maintain a list of specialists who may make an authorized Qualifying Diagnoses if no such | *The Expanded Scope of the Death with CTE Qualifying Diagnosis - A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date (April 22, 2015), provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date (April 22, 2015) shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.*<br><br><br>*Elimination of the $1,000 Appeal Fee in Cases of Financial Hardship - Settlement Class Members may make a hardship request to the Claims Administrator and ask that the fee of One Thousand United States dollars (U.S. $1,000) be waived for good cause. The Claims Administrator will require that the Settlement Class Member provide such financial information as may be necessary to decide the request to waive the fee, which request shall be approved or denied in the Claims Administrator's sole discretion.* |

4

**Exhibit A: June 2014 Settlement Terms and Added Value of Improvements**

| June 2014 Settlement Terms | Added Value of Improvements |
|---|---|
| diagnosis has already been made by a qualified specialist before the Settlement is effective.<br><br>The amount of money Class Members will receive depends on the retired player's:<br>• Specific Qualifying Diagnosis (see definition above),<br>• Age at the time of diagnosis (see definition below),<br>• *Number of seasons played or practiced in the NFL or the AFL (see Eligible Seasons definition above in the BAP section) (see table below listing reductions to monetary award if the retired player has less than five Eligible Seasons),*<br>• Diagnosis of a prior stroke or traumatic brain injury (see definition below), and<br>• Participation in a baseline assessment exam (see Participation in a baseline assessment exam definition above in the BAP section).<br>The amount of money you will receive also depends on whether:<br>• There are any legally enforceable liens on the award,<br>• Any retainer agreement with an attorney, and<br>• The Court makes any further assessments.<br><br>Age at the time of diagnosis: Awards are reduced for retired players who were 45 or older when diagnosed. The younger a retired player is at the time of diagnosis, the greater the award he will receive. Setting aside the other downward adjustments to monetary awards (all are described above), the table below provides:<br>• The average award for people diagnosed between the ages of 45-79; and<br>• The amount of the award for those under age 45 and over 79.<br>The actual amount will be determined based on each retired player's actual age at the time of diagnosis and on other potential adjustments. | *Eligible-Season Credit for Seasons Played in NFL Europe - "Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's Active List on the date of three (3) or more regular season or postseason games; or (ii) on a Member Club's Active List on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on a Member Club's injured reserve list or inactive list due to a concussion or head injury. A "half of an Eligible Season" means a season in which a Retired NFL Football Player or deceased Retired NFL Football Player was: (i) on a Member Club's practice, developmental, or taxi squad roster for at least eight (8) regular or postseason games; or (ii) on a World League of American Football, NFL Europe League, or NFL Europa League team's active roster on the date of three (3) or more regular season or postseason games or on the active roster on the date of one (1) or more regular or postseason games, and then spent at least two (2) regular or postseason games on the World League of American Football, NFL Europe League, or NFL Europa League injured reserve list or team inactive list due to a concussion or head injury.* |

| AGE AT DIAGNOSIS | ALS | DEATH w/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45 - 49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50 - 54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55 - 59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60 - 64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65 - 69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70 - 74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75 - 79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

5

**Exhibit A: June 2014 Settlement Terms and Added Value of Improvements**

| June 2014 Settlement Terms | Added Value of Improvements |
|---|---|
| Note: The age of the retired player at diagnosis (not the age when applying for a monetary award) is used to determine the monetary amount awarded. <br><br> Diagnosis of a prior stroke or traumatic brain injury: A retired player's monetary award (or his Representative Claimant monetary award) will be reduced by 75% if he experienced: (1) a medically diagnosed stroke that occurred before or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis; or (2) a severe traumatic brain injury unrelated to NFL football that occurred during or after the time the retired player played NFL football, but before he received a Qualifying Diagnosis. The award will not be reduced if the retired player (or his Representative Claimant) can show by clear and convincing evidence that the stroke or traumatic brain injury is not related to the Qualifying Diagnosis. <br><br> Table listing reductions to monetary award if the retired player has less than five Eligible Seasons: The table below lists the reductions to a retired player's (or his Representative Claimant's) monetary award if the retired player has less than five Eligible Seasons. To determine the total number of Eligible Seasons credited to a retired player, add together all of the earned Eligible Seasons and half Eligible Seasons. For example, if a retired player earned two Eligible Seasons and three half Eligible Seasons, he will be credited with 3.5 Eligible Seasons. | |

| NUMBER OF ELIGIBLE SEASONS | PERCENTAGE OF REDUCTION |
|---|---|
| 4.5 | 10% |
| 4 | 20% |
| 3.5 | 30% |
| 3 | 40% |
| 2.5 | 50% |
| 2 | 60% |
| 1.5 | 70% |
| 1 | 80% |
| .5 | 90% |
| 0 | 97.5% |

**Exhibit B: Baseline Assessment Program Fund Calculation**

| Category | June 2014 Settlement Terms | Added Value of Improvements | | | | | |
|---|---|---|---|---|---|---|---|
| | | Uncapping the BAP Fund | Difference | NFL Europe Eligible Season Credit | Difference | Total Difference | |
| **Administrative costs** | $ 7,500,000 | $ 7,500,000 | $        - | $ 7,500,000 | $        - | $          - | [1] |
| **Cost of Baseline Assessment Examination** | | | | | | | |
| Total Former Players Potentially Eligible for Compensation | 21,070 | 21,070 | | 21,070 | | | [2] |
| Total NFL Europe Players Eligible for Compensation | (2,302) | (2,302) | | - | | | [3] |
| Claims already submitted with a Diagnosed Disease | (96) | (96) | | (96) | | | [4] |
| Deceased, 2000-2013 - filed complaint | (76) | (76) | | (76) | | | [2] |
| Deceased, 2000-2013 - did not file complaint | (1,636) | (1,636) | | (1,636) | | | [2] |
| Total Class Members Eligible for Compensation | 16,960 | 16,960 | | 19,262 | | | |
| Settlement Participation Rate | 70% | 100% | | 100% | | | [5] |
| Total Settlement Participating Eligible Players | 11,790 | 16,960 | | 19,262 | | | [4] |
| Of Eligible Class Members - BAP Participation Rate | 100% | 100% | | 100% | | | [6] |
| Total BAP Participating Eligible Class Members | 11,790 | 16,960 | | 19,262 | | | |
| Estimated cost per exam | $ 3,500 | $ 3,500 | | $ 3,500 | | | [4] |
| **Cost of Baseline Assessment Examination** | $ 41,265,000 | $ 59,360,000 | $ 18,095,000 | $ 67,417,000 | $ 8,057,000 | $ 26,152,000 | |
| **Amount available for Supplemental Benefits** | | | | | | | |
| Eligible Class Members estimated to have Level 1 Neurocognitive Impairment | 750 | 1,079 | 329 | 1,225 | 146 | 475 | [7] |
| Percent of Eligible Class Members who will require medical treatment for Level 1 Neurocognitive Impairment | 6.4% | 6.4% | | 6.4% | | | |
| Average Value of Supplemental Benefit | $ 35,000 | $ 35,000 | | $ 35,000 | | | [7] |
| **Amount available for Supplemental Benefits** | $ 26,250,000 | $ 37,760,814 | $ 11,510,814 | $ 42,886,132 | $ 5,125,318 | $ 16,636,132 | [4] |
| **Total BAP Funds** | $ 75,015,000 | $ 104,620,814 | $ 29,605,814 | $ 117,803,132 | $ 13,182,318 | $ 42,788,132 | |

**Notes:**

[1] Document 6423-21, Declaration of Thomas Vasquez Ph.D., pg. 9.

[2] Document 6167, Material Provided by Counsel to the Plaintiffs, Seeger Weiss LLP, pg. 14.

[3] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Exhibit 11 pg. 81.

[4] Document 6423-21, Declaration of Thomas Vasquez Ph.D., pg. 8.

[5] Calculating total benefit added by removing the cap (Due to the removed cap the added value assumes all members eligible and alive are going to participate).

[6] Document 6423-21, Declaration of Thomas Vasquez Ph.D., Exhibit B pg. 38.

[7] Document 6168, Material Provided by Counsel to the NFL, Paul, Weiss, Rifkind, Wharton & Garrison LLP, pg. 43.

**Exhibit C: Monetary Award Fund Calculation**

| Category | June 2014 Settlement Terms | | | Added Value of Improvements | |
|---|---|---|---|---|---|
| | Count | Amount | Funding [2] | Amount | Difference |
| **Qualifying Diagnoses** | | | | | |
| ALS | 18 | $ 49,400,000 | $ 35,724,234 | $ 35,724,234 | [1] |
| Death with CTE through 7/7/2014 | 46 | 64,900,000 | $ 46,933,255 | 46,933,255 | [1] |
| Parkinson's | 14 | 3,200,000 | $ 2,314,120 | 2,314,120 | [1] |
| Alzheimer's | 1,757 | 474,900,000 | $ 343,429,934 | 343,429,934 | [1] |
| Level 2 | 1,761 | 341,000,000 | $ 246,598,457 | 246,598,457 | [1] |
| Level 1.5 | - | - | $ - | - | [1] |
| **Total MAF** | **3,596** | **$ 933,400,000** | **$ 675,000,000** | **$ 675,000,000** | |

| Expanded Scope of Death with CTE Qualifying Diagnosis | | |
|---|---|---|
| Average MAF for Death with CTE | $ 421,000 | [3] |
| Population of Players who Died with CTE in the Extended Timeframe | 111 | [3] |
| Percent of CTE in NFL Population as Reported in Prior Studies | 96% | [4] |
| Total Estimated to have CTE in the Extended Timeframe | 106 | |
| **Estimated Added Value** | **$ 44,626,000** | |

| Elimination of Appeal Fee | | |
|---|---|---|
| NFL Disability Claim Applicants | 1,052 | [5] |
| NFL Disability Claim Applicants Originally Accepted | 358 | [5] |
| NFL Disability Claim Applicants Originally Denied, then Accepted during Appeal Process | 69 | [5] |
| Total Accepted NFL Disability Claim Applicants | 427 | [5] |
| Percent of NFL Disability Claim Applicants Originally Denied, then Accepted during Appeal Process | 16% | [5] |
| Total Accepted NFL MAF Qualifying Diagnosis Applicants | 3,596 | [1] |
| Estimated NFL Population Originally Denied, then Accepted During Appeal Process | 581 | [6] |
| Percent Deterred from Appealing when Claims are Originally Denied | 10% | [6] |
| NFL Population Deterred from Appealing when Claims are Originally Denied | 58 | [6] |
| Average Amount Funded per Eligible Player | $ 187,709 | |
| **Estimated Added Value** | **$ 10,907,494** | |

**Exhibit C: Monetary Award Fund Calculation**

| Category | June 2014 Settlement Terms | | | Added Value of Improvements | |
| --- | --- | --- | --- | --- | --- |
| | Count | Amount | Funding [2] | Amount | Difference |
| **NFL Europe Eligible Seasons Credit** | | | | | |
| Total NFL Eligible Seasons | | | | 60,350 [7] | |
| Total Monetary Award Fund | | | | $ 675,000,000 [8] | |
| Average Eligible Class Member Award for a Season | | | | 11,185 | |
| NFL Europe Total Eligible Seasons | | | | 2,143 [9] | |
| Subtotal | | | | $ 23,968,931 | |
| NFL Europe Only Players at Zero Eligible Seasons | | | | 1,843,676 [10] | |
| **Estimated Added Value** | | | | $ 22,125,255 | $ 22,125,255 |
| **Total** | **3,596** | **$ 933,400,000** | **$ 675,000,000** | **$ 752,658,750** | **$ 77,658,750** |

**Notes:**

[1] Document 6423-21, Declaration of Thomas Vasquez Ph.D., Exhibit B pg. 5.

[2] The percent of the total June 2014 Settlement Terms Amount associated with each Qualifying Diagnosis was used to estimate the Funding for each Qualifying Diagnosis given the total MAF is $675 million. Refer to Note 8 below for support for the total MAF.

[3] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Exhibit 12 pgs. 1-5.

[4] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 26.

[5] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 27.

[6] Document 7070-1, Faneca Objectors' Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Expenses, pg. 28.

[7] See Exhibit E - Eligible Seasons per Player Analysis.

[8] Document 6423-21, Declaration of Thomas Vasquez Ph.D., Exhibit B pg. 6.

[9] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Exhibit 11 pg. 81.

[10] See Exhibit F - NFL Europe Eligible Seasons included in the June 2014 Settlement Terms Analysis.

**Exhibit D: Profile of Former NFL Players by Age**

| Age [1] | All Players | | Living/Not Yet Filed | | Already Filed | | Deceased/Not Yet Filed | |
|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Under 45 | 8,354 | 40% | 6,744 | 44% | 1,502 | 36% | 108 | 7% |
| 45-49 | 2,368 | 11% | 1,831 | 12% | 487 | 12% | 50 | 3% |
| 50-54 | 2,802 | 13% | 2,095 | 14% | 657 | 16% | 50 | 3% |
| 55-59 | 1,794 | 9% | 1,261 | 8% | 458 | 11% | 75 | 5% |
| 60-64 | 1,514 | 7% | 1,026 | 7% | 371 | 9% | 117 | 7% |
| 65 - 69 | 1,291 | 6% | 824 | 5% | 330 | 8% | 137 | 8% |
| 70 - 74 | 1,007 | 5% | 604 | 4% | 220 | 5% | 183 | 11% |
| 75-79 | 769 | 4% | 419 | 3% | 129 | 3% | 221 | 14% |
| 80+ | 1,171 | 6% | 423 | 3% | 53 | 1% | 695 | 42% |
| **Total:** | **21,070** | **100%** | **15,227** | **100%** | **4,207** | **100%** | **1,636** | **100%** |
| **Average Age:** | **50.5** | **-** | **47.9** | **-** | **51.0** | **-** | **73.3** | **-** |

**Notes:**

[1]  Document 6167, Material Provided by Counsel to the Plaintiffs, Seeger Weiss LLP, pg. 16.

**Exhibit E: Eligible Seasons per Player Analysis**

| NFL Seasons per NFL Player | | | |
|---|---|---|---|
| Seasons Played | NFL Eligible Seasons | Player Count | Total Seasons [1] |
| 0 | 0 | 2,247 | - |
| 1 | 1 | 5,041 | 5,041 |
| 2 | 2 | 2,719 | 5,438 |
| 3 | 3 | 1,940 | 5,820 |
| 4 | 4 | 1,564 | 6,256 |
| 5 | 5 | 1,366 | 6,830 |
| 6 | 5 | 1,232 | 6,160 |
| 7 | 5 | 965 | 4,825 |
| 8 | 5 | 889 | 4,445 |
| 9 | 5 | 802 | 4,010 |
| 10 | 5 | 679 | 3,395 |
| >10 | 5 | 1,626 | 8,130 |
| | Total: | 21,070 | 60,350 [2] |
| | NFL Europe Only Players | 2,302 | - [3] |
| | Grand Total: | 18,768 | 60,350 |

Eligible Seasons per NFL Player without NFL Europe Only Players:  3.2 [4]

| Total NFL Europe Seasons per Player [5][6] | | | |
|---|---|---|---|
| Seasons Played | Player Count - NFL Europe Seasons | Player Count - NFL Seasons | Total Seasons [7] |
| 1 | 2,416 | 497 | 2,913 |
| 2 | 638 | 221 | 1,718 |
| 3 | 111 | 100 | 633 |
| 4 | 36 | 32 | 272 |
| 5 | 13 | 20 | 165 |
| 6 | 5 | 20 | 150 |
| 7 | 6 | 18 | 168 |
| 8 | 6 | 6 | 96 |
| 9 | 2 | 7 | 81 |
| 10 | - | 9 | 90 |
| 11 | 1 | - | 11 |
| 12 | - | 1 | 12 |
| 13 | - | 1 | 13 |
| Grand Total: | 3,234 | 932 | 6,322 |

Eligible Seasons per NFL Europe Player:  1.95 [4]

Exhibit E: Eligible Seasons per Player Analysis

**Notes:**

[1] Total Seasons is calculated by multiplying NFL Eligible Seasons by Player Count.

[2] Document 6167, Material Provided by Counsel to the Plaintiffs, Seeger Weiss LLP, pg. 17.

[3] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Exhibit 11 pg. 81.

[4] Eligible Seasons per Player is calculated by dividing Total Seasons by Player Count.

[5] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Exhibit 11 pg. 81.

[6] This table was created to summarize Exhibit 11 (Document 7070-2) and include both the NFL Seasons and NFL Europe Seasons of players who played in NFL Europe.

[7] Total seasons is calculated by multiplying seasons played by the sum of NFL Seasons and NFL Europe Seasons.

**Exhibit F: NFL Europe Eligible Seasons included in the June 2014 Settlement Terms Analysis**

| Category | Amount | |
|---|---|---|
| Total MAF Amount Funded | $ 675,000,000 | [1] |
| Total NFL Players | 21,070 | [2] |
| Average Amount Funded per NFL Player | $ 32,036 | |
| NFL Europe Only Players | 2,302 | [3] |
| Total Estimated Amount to be paid to NFL Europe Only Players | $ 73,747,034 | |
| Percentage Multiple for Zero Eligible Seasons | 2.5% | |
| **Total Impact** | **$ 1,843,676** | |

**Notes:**

[1] Document 6423-21, Declaration of Thomas Vasquez Ph.D., Exhibit B pg. 6.

[2] Document 6167, Material Provided by Counsel to the Plaintiffs, Seeger Weiss LLP, pg. 17.

[3] Document 7070-2, Declaration of Steven F. Molo in Support of Petition for an Award of Attorneys' Fees and Expenses, Exhibit 11 pg. 81.