Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: NATIONAL FOOTBALL** | § | |
| **LEAGUE PLAYERS' CONCUSSION** | § | |
| **LITIGATION** | § | |
| _____ | § | **No. 12-md-2323 (AB)** |
| | § | |
| **KEVIN TURNER & SHAWN WOODEN** | § | **MDL No. 2323** |
| on behalf of themselves and others similarly | § | |
| situated | § | **Civ. Action No. 14-00029-AB** |
| | § | |
| **v.** | § | |
| | § | |
| **National Football League and** | § | |
| **NFL Properties LLC,** | § | |
| **successor-in-interest to NFL Properties, Inc.** | § | |
| | § | |
| _____ | § | |
| | § | |
| **THIS DOCUMENT RELATES TO:** | § | |
| **ALL ACTIONS** | § | |

**ARMSTRONG OBJECTORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
PETITION FOR AN AWARD OF ATTORNEYS' FEES**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................2

PROCEDURAL HISTORY...........................................................................................4

    A. The Initial Settlement was rejected by the Court *sua sponte*. .........................4

    B. The Armstrong Objectors file their Objection, Amended Objection,
       and Supplemental Objection suggesting improvements to the
       Revised Settlement..............................................................................6

    C. The Court approved the Final Settlement after Class Counsel and the NFL adopted
       improvements suggested by the Armstrong Objectors.....................................7

       1.   After the Revised Settlement, final fairness hearing, the Court suggested
           several improvements mirroring improvements suggested by the Armstrong
           Objectors. .....................................................................................7

       2.   The Parties adopted the settlement improvements suggested by the
           Armstrong Objectors and echoed by the Court. The resulting Final
           Settlement was approved. ..................................................................7

    D. The Armstrong Objectors' Third Circuit and Supreme Court Appeals .........................8

THE ARMSTRONG OBJECTORS INCREASED THE VALUE OF THE
SETTLEMENT AND DELIVERED THE COLLATERAL TIME BENEFIT ..............................9

    A. The Armstrong Objectors' efforts resulted in guaranteed BAP
       examinations for all eligible Class Members. .............................................10

    B. The Armstrong Objectors' efforts also resulted in an expanded
       eligibility period for Death with CTE benefits............................................11

    C. The Armstrong Objectors' efforts also resulted in the $1,000 appeal
       fee being waived for good cause. ..........................................................12

    D. The Armstrong Objectors' efforts also resulted in the Collateral Time Benefit...........13

THE ARMSTRONG OBJECTORS' REQUESTED FEE AWARD ..........................................15

ARGUMENTS AND AUTHORITIES..............................................................................17

A. The Armstrong Objectors' productive work merits the requested fee award. ..............18

  1.    The direct benefit derived from the Armstrong Objectors' challenges
to the Revised Settlement and Final Settlement supports the requested
fee award. ..................................................................................................18

  2.    The direct benefits of the up to $63.65 million increase in the value
of the Final Settlement and the Collateral Time Benefit support
the requested fee award ...............................................................................20

  3.    The requested fee award is reasonable ........................................................20

     a.   The requested fee award is a reasonable percentage
of the benefits conferred. ......................................................................20

     b.   The Gunter/Prudential factors support the requested fee award ...................21

       i.    The size of the fund created by the Armstrong Objectors'
Counsel's efforts supports the requested fee award ...................................22

       ii.   The number of beneficiaries supports the requested fee award. ...............22

       iii.  The value of benefits attributable to the Armstrong
Objectors' Counsel's efforts relative to the efforts of other
objectors supports the requested fee award ................................................23

       iv.  The complexity and duration of the litigation support
the requested fee award...............................................................................23

       v.   The Armstrong Objectors' Counsel's skill, efficiency,
and amount of time devoted to the case supports the
requested fee award......................................................................................24

       vi.  The risk of non-payment supports the requested fee award ....................24

       vii.  Fee awards in similar cases support the requested fee award...................24

       viii. The percentage fee that would have been negotiated in a
private contingent fee arrangement supports the requested
fee award ......................................................................................................25

       ix.  The innovative terms of the settlement improvements
secured by the Armstrong Objectors' Counsel support the
requested fee award......................................................................................26

B. The requested fee award should be paid from the
Attorneys' Fees Qualified Settlement Fund ................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
    No. 07-MD-01871, 2012 WL 6923367 (E.D. Pa. Oct. 19, 2012)............................................25

*In re Cardinal Health, Inc. Sec. Litig.*,
    550 F. Supp.2d 751 (S.D. Ohio 2008) .....................................................................................18

*In re Cendant Corp. PRIDES Litig.*,
    243 F.3d 722 (3d Cir. 2001).............................................................................................1, 17, 20

*Dewey v. Volkswagen of Am.*,
    909 F. Supp.2d 373 (D.N.J. 2012) ..........................................................................3, 21, 25

*In re Diet Drugs Prods. Liab. Litig.*,
    582 F.3d 524 (3d Cir. 2009).........................................................................................22

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993).................................................................................16, 18

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ....................................................................................18

*Frankenstein v. McCrory Corp.*,
    425 F. Supp. 762 (S.D.N.Y. 1977)...............................................................................19

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995).......................................................................................18, 23

*Great Neck Capital Appreciation Inv. P'ship, LP v. PricewaterhouseCoopers, LLP*
    212 F.R.D. 400 (E.D. Wis. 2002) ..............................................................................17, 27

*Howes v. Atkins*,
    668 F. Supp. 1021 (E.D. Ky. 1987) ............................................................................19

*In re Ikon Office Sols., Inc., Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000)..........................................................................18, 22, 25, 27

*In re Ins. Brokerage Antitrust Litig.*,
   297 F.R.D. 136 (D.N.J. 2013)...................................................................................26

*Kirchoff v. Flynn*,
   786 F.2d 320 (7th Cir. 1986) ..................................................................................25

*Lan v. Ludrof*,
   No. 1:06-cv-114, 2008 WL 763763 (W.D. Pa. 2008) .............................................21

*In re Linerboard Antitrust Litig.*,
   No. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ......................................26

*McDonough v. Toys "R" Us, Inc.*,
   80 F. Supp.3d 626 (E.D. Pa. 2015) ................................................................20, 22, 24

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016)....................................................................................20

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   961 F. Supp.2d 708 (E.D. Pa. 2014) .....................................................................9, 20

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   273 F. Supp.2d 563 (D.N.J. 2003).............................................................................5

*In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ...................................................................................22

*In re Shell Oil Refinery*,
   155 F.R.D. 552 (E.D. La. 1993)...............................................................................27

*White v. Auerbach*,
   500 F.2d 822 (2d Cir. 1974) ................................................................................1, 20

## Rules of Civil Procedure

FED. R. CIV. P. 23(a)(4) .................................................................................................19, 23

FED. R. CIV. P. 23(E) ..........................................................................................................19

FED. R. CIV. P. 23(H) ...........................................................................................................1

v

**Other Authorities**

7B CHARLES A. WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE
§ 1803 (3d ed. 2004) ................................................................................................17

Pursuant to Fed. R. Civ. P. 23(h), Objectors Raymond Armstrong, Larry Barnes, Larry Brown, Drew Coleman, Kenneth Davis, William B. Duff, Kelvin Mack Edwards, Sr., Phillip E. Epps, Gregory Evans, Charles L. Haley, Sr., Mary Hughes, James Garth Jax, Ernest Jones, Michael Kiselak, Dwayne Levels, Darryl Gerard Lewis, Gary Wayne Lewis, Jeremy Loyd, Lorenzo Lynch, Tim McKyer, David Mims, Clifton L. Odom, Evan Ogelsby, Solomon Page, Hurles Scales, Jr., Barbara Scheer, Kevin Rey Smith, Willie T. Taylor, George Teague, and Curtis Bernard Wilson (collectively, the "Armstrong Objectors") respectfully move for an award of attorneys' fees, stating the following:

## **INTRODUCTION**

"'[I]t is well settled that objectors have a valuable and important role to perform in preventing . . . unfavorable settlements, and . . . they are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts.'" *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 743 (3d Cir. 2001) (quoting *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974)).

The Armstrong Objectors, therefore, respectfully request an award of their Counsel's straight time, hourly attorneys' fees with no multiplier reflecting the role they played in significantly enhancing the Revised Settlement that became the Final Settlement and, in the process, delivering a collateral benefit to Class Members in the form of additional valuable time (over 19 months)[1] to be examined by a board certified neuro-specialist physician of their choice (for purposes of securing a Qualifying Diagnosis for a monetary award), rather than being examined by a physician selected for them by the NFL and Class Counsel.

---

[1] The additional 19-month period hereafter will be referred to as the "Collateral Time Benefit." Securing the Collateral Time Benefit was not the purpose for filing the Armstrong Objectors' appeals. Although lagniappe, it is a Class Member benefit delivered by the Armstrong Objectors just the same.

1

## BACKGROUND

The Armstrong Objectors are thirty-four former NFL players and family members of players with distinguished playing careers. The Armstrong Objectors collectively played an average of over six seasons with over twenty different teams. They include offensive and defensive linemen, linebackers, defensive backs, wide receivers, tight ends and a running back. The Armstrong Objectors include All-Americans, Pro Bowl selections, Super Bowl champions, and a Super Bowl MVP. The oldest Armstrong Objector began his NFL career in 1946. The youngest Armstrong Objector retired after the 2011 season. One played on five Super Bowl Championship teams, three played on three Super Bowl Championship teams, one played on one Super Bowl Championship team, and one played in NFL Europe.The Armstrong Objector group was the second largest objector group.

The central dispute before this Court was whether the ultimate settlement reached by the NFL and Class Counsel was fair, adequate, and reasonable. Class Counsel and counsel for the NFL engaged in preliminary motion practice, briefing and arguing a motion to dismiss on the question of whether federal labor law preempted the action. Then, at the Court's direction, the case was mediated and settled (the "Initial Settlement"). There was no decision on the motion to dismiss, no discovery, no contested class certification, no summary judgment practice, and no bellwether trial. This case, therefore, was all about the negotiated settlement.

However, as this Court recognized *sua sponte*, the Initial Settlement was inadequate. Then came a Revised Settlement, to which the Armstrong Objectors objected by—

(i)     Raising key legal issues, several of which were novel and complex;

(ii)    Leading the objectors' efforts that resulted in revisions to the Revised Settlement giving rise to the Final Settlement, with its value enhanced by as much as $63.65 million;

(iii)    Leading the efforts to test the Final Settlement on appeal at the Third Circuit Court of
Appeals, which also provided the Collateral Time Benefit to Class Members; and

(iv)    When others stopped, testing the Final Settlement further on appeal at the United
States Supreme Court, which provided an additional Collateral Time Benefit to Class
Members.

The Armstrong Objectors' hard work spanned a three year period. All told, the Armstrong
Objectors' Counsel—the Coffman Law Firm, Weller, Green, Toups & Terrell, LLP, the Webster
Law Firm, and the Warner Law Firm—collectively spent more than 1175 hours and advanced
more than $70,000 of out-of-pocket expenses working on this matter. They did so on a 100%
contingency basis, with full risk of non-payment.

In addition to enhancing the overall settlement, the Armstrong Objectors' extensive work
"transform[ed] the settlement hearing into a truly adversarial proceeding." *Dewey v. Volkswagen
of Am.*, 909 F. Supp. 2d 373, 395 (D.N.J. 2012) (quotation marks omitted) (awarding objectors'
counsel fees). The result of that "truly adversarial" fairness hearing is a vastly improved Final
Settlement that provides more relief for a more Class Members than the prior versions of the
settlement advanced by Class Counsel and the NFL. Equally as important, the fairness of the
Final Settlement has been tested through high-level advocacy—allowing the courts, Class
Members, and the public to conclude that the result achieved, while not perfect, is just.

The Armstrong Objectors, therefore, respectfully request a fee award commensurate with
their hard work transforming the process into a truly adversarial proceeding, enhancing the
overall value of the settlement, and delivering the Collateral Time Benefit to Class Members. In
doing so, the Armstrong Objectors do not object to the attorneys' fees and expenses sought by
Class Counsel (Doc. #7151)—provided, of course, that the Armstrong Objectors' Counsel's
requested attorneys' fees also are paid.

## PROCEDURAL HISTORY

**A.  The Initial Settlement was rejected by the Court *sua sponte*.**

In 2011, several retired NFL players and their families sued the NFL, alleging the NFL misled them about the risks of repeated multiple traumatic brain injury ("MTBI") and breached its duty to protect players' health and safety. The cases were consolidated in this Court.

The NFL moved to dismiss the cases on preemption grounds. While the NFL's motion was pending, the Court ordered the Parties to mediation. In August 2013, Class Counsel and the NFL announced the Initial Settlement.

Thereafter, Class Counsel filed a putative Class Action Complaint on behalf of Kevin Turner and Shawn Wooden as representatives of all retired NFL players. Class Counsel simultaneously filed a motion for preliminary approval of the Initial Settlement. Doc. #5634. The Initial Settlement created a Monetary Award Fund ("MAF"), capped at $675 million, to compensate retired players diagnosed with one of five specific Qualifying Diagnoses. Despite the numerous diseases and symptoms linked to MTBI alleged in the Class Action Complaint, the MAF provided awards only for individuals diagnosed with Parkinson's disease, Alzheimer's disease, ALS, and sufficiently severe dementia ("Level 1.5" and "Level 2" neurocognitive impairment).

The Initial Settlement, however, did not provide for an ongoing award for chronic traumatic encephalopathy ("CTE")—even though CTE was the disease at the heart of the Class Action Complaint and many of the precursor lawsuits. Instead, the Initial Settlement provided "Death with CTE" benefits only for players who died and received a post-mortem diagnosis of CTE *before* preliminary approval of the Initial Settlement.

The Initial Settlement also applied several criteria to determine each claimant's award, including a maximum award for each Qualifying Diagnosis, subject to being reduced depending

on the player's age and the number of seasons played in the NFL (with at least five "eligible seasons" being required for a full award). The Initial Settlement "specifically excluded" seasons played in NFL Europe (or the NFL's other European leagues) from eligible-season credit, even though it fully released players' claims for injuries suffered while playing in NFL Europe. The Initial Settlement also reduced awards by 75% for players who suffered a single stroke, or a single instance of traumatic brain injury not related to NFL play and imposed a $1,000 fee on Class Members who appeal adverse determinations of their MAF claims.

The Initial Settlement also created a Baseline Assessment Program ("BAP") Fund (capped at $75 million), which would provide players with an examination to establish a baseline of each player's neurocognitive functioning. But not every Class Member was entitled to such an examination. Only Class Members with at least half of an eligible season could participate in the BAP. The BAP examination also would screen players for dementia or neurocognitive impairment. Players diagnosed with "Level 1" neurocognitive impairment by the examination could receive "supplemental benefits" to cover the cost of treatment.

Slightly over a week after Class Counsel filed their motion for preliminary approval of the Initial Settlement, the Court *sua sponte* denied the motion. *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 716 (E.D. Pa. 2014). Noting its "duty to protect the rights of all potential class members" (*id.* at 710), the Court declined to preliminarily approve the Initial Settlement because the MAF lacked "the necessary funds to pay Monetary Awards for Qualifying Diagnoses." *Id.* at 715.

Six months later, on June 25, 2014, Class Counsel submitted a Revised Settlement with a motion for preliminary approval. Doc. #6073. The Revised Settlement addressed the Court's concerns by eliminating the $675 million cap on the MAF. The Revised Settlement also retained,

among other things, the $75 million cap on the BAP Fund (*id.* at 4), continued to deny any credit for seasons played in NFL Europe (Doc. #6087 § 2.1(kk)), and retained the 75% reductions for stroke or non-NFL TBI (*id.* § 6.7(b)(ii)-(iii)). On July 7, 2014, the Court preliminarily approved the Revised Settlement. Doc. #6084

**B. The Armstrong Objectors file their Objection, Amended Objection, and Supplemental Objection suggesting improvements to the Revised Settlement.**

Rather than wasting the time and resources of the Court, the appellate court, and the Parties by seeking to intervene in the action, opposing preliminary approval of the Revised Settlement, and appealing preliminary approval of the Revised Settlement to the Third Circuit—as other objectors did—the Armstrong Objectors played by the rules and filed their Objection to the Revised Settlement.

Paragraph 4(h) of the preliminary approval order (Doc. #6084) established October 14, 2014 as the deadline to object to the Revised Settlement, referencing the attached Long Form Notice (Doc. #6084-1) for the precise objection procedure. FAQ No. 35 in the Long Form Notice required all objections to be mailed to the Clerk of the Court for the Eastern District of Pennsylvania. So, on September 3, 2014, *more than a month before the objection deadline*, and long before any objections were *filed* on the Court's ECF, the Armstrong Objectors mailed their Objection to the Clerk of the Court as directed by the Court's preliminary approval order. The Court eventually filed the Armstrong Objectors' Objection on the ECF. Doc. #6353.

Later, on October 13, 2014, after additional former NFL players joined the Armstrong Objector group, the Armstrong Objectors overnighted their Amended Objection to the Court. The Court also filed their Amended Objection on the ECF. Doc. #6233. Thereafter, on April 13, 2015, the Armstrong Objectors filed a Supplemental Objection on the ECF. Doc. #6503.

In their comprehensive Objection (Doc. #6353) and Amended Objection (Doc. #6233), the Armstrong Objectors articulated sixteen detailed, multi-part objections to the Revised Settlement, as well as concrete proposals for curing the defects—including, among others, opening up the BAP, extending the Death with CTE benefits eligibility period, and eliminating the $1,000 appeal fee.

**C. The Court approved the Final Settlement after Class Counsel and the NFL adopted improvements suggested by the Armstrong Objectors.**

**1. After the Revised Settlement, final fairness hearing, the Court suggested several improvements mirroring improvements suggested by the Armstrong Objectors.**

On November 19, 2014, the Court conducted the final fairness hearing on the Revised Settlement. Thereafter the Court issued an order suggesting five specific improvements that, in the Court's view, would "enhance the fairness, reasonableness, and adequacy of" the Revised Settlement. Doc. #6479. Among other things, the Court opined that the "settlement should assure that all living Retired NFL Football Players who timely register for the Settlement" receive a BAP baseline examination. *Id.* The Court also urged that the "Qualifying Diagnosis of Death with CTE" should include players who die between the dates of preliminary approval and final approval, thereby extending the eligibility period. *Id.* And the Court recommended that the Revised Settlement provide a hardship provision under which the $1000 appeal fee could be waived. *Id.* Each of these suggestions addressed defects in the Revised Settlement rooted in the objections first lodged by the Armstrong Objectors. *See* Objection (Doc. #6353).

**2. The Parties adopted the settlement improvements suggested by the Armstrong Objectors and echoed by the Court. The resulting Final Settlement was approved.**

On February 13, 2015, Class Counsel and the NFL submitted a Final Settlement containing provisions addressing each of the Court's above suggestions. Doc. #6481. The improvements mirrored those suggested by the Armstrong Objectors.

Among other things, the Final Settlement ensured that every retired player eligible to receive a BAP examination would receive one. *Id.* at 4. It also extended eligibility for Death with CTE benefits to players who died before the final approval date (April 22, 2015), rather than those who died before the preliminary approval date (July 7, 2014)—a nine month *plus* extension. *Id.* at 4-5. And it adopted the Court's suggestion regarding the appeal fee hardship provision. *Id.* at 5. The Court granted final approval to the Final Settlement on April 22, 2015. Doc. #6510.

**D.  The Armstrong Objectors' Third Circuit and Supreme Court Appeals**

In May 2015, twelve groups of objectors (a total of 93 appellants)—led by the Armstrong Objectors—appealed the Court's final approval order. On appeal, the Armstrong Objectors (i) argued that the Final Settlement's substance (terms) and procedure (structure of the negotiations) improperly resulted in Death with CTE benefits being awarded to present claimants at the expense of future claimants (*i.e.*, the disparate treatment between former players diagnosed with CTE before final approval, and those diagnosed after final approval), (ii) argued that the Parties' attempt to delay scrutiny of attorneys' fees until after final approval was a denial of due process, and (iii) offered several solutions for the Final Settlement's structural defects, including appointing independent counsel, excluding future CTE claims from the release, compensating CTE with evolving diagnostic criteria, and providing back-end opt-out rights to protect future claimants. *See* Armstrong Objectors' Corr. Brief (filed Sept. 14, 2015 in the Third Circuit).

Oral argument in the Third Circuit was scheduled for November 19, 2015. Noted appellate advocate, Deepak Gupta ("Gupta"), of Gupta Wessler, PLLC in Washington, D.C., one of the Armstrong Objectors' Counsel, took the lead, organizing counsel for 87 of the 93 appellants. *See* Joint Proposal of Appellants Regarding Oral Argument (filed Oct. 29, 2015 in the Third Circuit)

(noting that "[t]he Faneca Objectors (representing 4 of the 93 objectors) have indicated that they do not consent to our proposal, but have not provided a counterproposal.").

When the Joint Proposal was denied by the Third Circuit, Gupta again organized appellants' counsel and submitted a Revised Joint Proposal on Division of Argument Time (filed Nov. 13, 2015 in the Third Circuit). This time, the Faneca Objectors got on board. *Id.*

Gupta took the lead at oral argument, addressing the inadequate representation of future injury claimants in the Final Settlement, addressing the attorneys' fee deferral issue, and handled a portion of the rebuttal. *See* Transcript of the November 19, 2015 Third Circuit oral argument at 29:20-52:13; 114:1-124:9. Indeed, the justices were most interested in the topics presented by Gupta as he addressed them longer than any other appellant's lawyer. *Id.*

On April 18, 2016 (amended May 2, 2016), the Third Circuit, in a 70-page opinion, affirmed the Court's order granting final approval of the Final Settlement. *See In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016). And even though as a direct result of the Armstrong Objectors' efforts, the Final Settlement was improved substantially and its fairness tested, their job was not yet finished.

When others gave up, the Armstrong Objectors pressed on. Believing in their position—their courage never wavering—they filed a petition for writ of *certiorari* with the United States Supreme Court. Although the Supreme Court ultimately denied their petition on December 12, 2016, they never gave up fighting to improve the Final Settlement for their fellow Class Members, securing for the Class Members the critical Collateral Time Benefit in the process.

**THE ARMSTRONG OBJECTORS INCREASED THE VALUE OF THE SETTLEMENT AND DELIVERED THE COLLATERAL TIME BENEFIT**

The improvements to the Revised Settlement that became the Final Settlement—all of which are the direct result of the Armstrong Objectors' efforts—can fairly be valued at up to $63.65

9

million. Based on the Armstrong Objectors' Objections, the Court encouraged the settling Parties to ensure that every eligible Class Member receives a BAP examination, expand the Death with CTE benefits eligibility period, and waive the $1,000 appeal fee in cases of financial hardship. Class Members will benefit enormously from these settlement enhancements. But there's more. The Armstrong Objectors' also provided Class Members with the Collateral Time Benefit.

**A.  The Armstrong Objectors' efforts resulted in guaranteed BAP examinations for all eligible Class Members.**

The Final Settlement entitles many Class Members to receive a BAP baseline examination when, under the Revised Settlement, they would not have received one. Thanks to the Armstrong Objectors' efforts, players who might not have otherwise been able to have their health evaluated and a course of treatment charted will now be able to do so. The benefits to the quality of life for these former players and their families exceed any monetary value that could be place on this settlement benefit. But a monetary value can be assigned to this benefit nonetheless.

The Revised Settlement capped the BAP Fund at $75 million. Doc. #6087 § 23.3(d). Under the Final Settlement, however, every eligible Class Member will receive a BAP examination due to the Armstrong Objectors' efforts. Doc. #6481-1 §§ 23.1(b), 23.3(d). The NFL's actuary estimated that $27 million in supplemental benefits would be paid from the BAP Fund. Doc. #6168 ¶ 54. Separately, the total cost of baseline examinations—each worth $3500 (Doc. #6423-21 ¶ 24)—for the 16,962 living Class Members[2] eligible for an examination could reach $59.4 million (*i.e.*, 16,962 eligible Class Members times $3500). *See* Doc. #6167 at 18 (Table 4-3);

---

[2]  According to Class Counsel's actuary, 15,227 Class Members have not yet filed a complaint, while 4207 Class Members have. Doc. #6167 at 18 (Table 4-3). Of the 4207 Class Members who have filed a complaint, however, 76 are deceased and will not participate in the BAP. *Id.* at 14 (Table 4-1 n.1). Another 96 have already received a qualifying diagnosis and will also not participate. *See* Doc. #6423-21 ¶ 23. Since according to Faneca Objectors' counsel, approximately 2300 Class Members played only in NFL Europe, 16,962 Class Members remain to participate in the BAP.

#6423-21 ¶24. The total cost of these two benefits exceeds the original $75-million cap by $11.4 million. Thus, eliminating the cap and opening up the BAP could yield an additional benefit to Class Members up to $11.4 million.

**B.   The Armstrong Objectors' efforts also resulted in an expanded eligibility period for Death with CTE benefits.**

The Final Settlement also offers additional relief to Class Members who suffered with CTE by expanding the eligibility period for Death with CTE benefits. Under the Revised Settlement, Class Members who died and were diagnosed with CTE post-mortem after the preliminary approval date would have received nothing. Doc. #6087 Ex. B-1 ¶ 5. Thanks to the Armstrong Objectors' efforts, the Final Settlement extends the time frame for securing a Death with CTE Qualifying Diagnosis—which carries up to a $4 million award—by over nine months (*i.e.*, from July 7, 2014 to April 22, 2015). Doc. #6481-1 Ex. B-1 ¶ 5.

Between July 7, 2014 and April 22, 2015, 111 Class Members passed away.[3] According to recent Boston University research, CTE was present in the brains of 96% of all deceased NFL players whose brains were examined in an autopsy.[4] Thus, of these 111 deceased Class Members, 106 can be reasonably expected to have CTE and qualify for Death with CTE benefits in an average amount of approximately $421,000 (accounting for their age at death and number of eligible seasons per player data on NFL.com). Thus, due to the Armstrong Objectors' hard work, the value of the Final Settlement was increased by up to $44.6-million (*i.e.*, $421,000 *times* 106 deceased Class Members who can be reasonably expected to have CTE).

---

[3]    *See Oldest Living Pro Football Players, 2016-2010 Pro Football Necrology List,* http://www.oldestlivingprofootball.com/present2010necrology.htm (last visited Feb. 18, 2017).

[4]    Jason M. Breslow, *New: 87 Deceased NFL Players Test Positive for Brain Disease,* FRONTLINE (Sept. 18, 2015), http://www.pbs.org/wgbh/frontline/article/new-87-deceased-nfl-players-test-positive-for-brain-disease/ (last visited Feb. 18, 2017).

**C.  The Armstrong Objectors' efforts also resulted in the $1,000 appeal fee being waived for good cause.**

To receive a monetary award under the Final Settlement, Class Members must submit a Claim Package to the Claims Administrator, who may approve or deny the claim. Doc. #6481-1 § 9.3. When a claim is denied, the Class Member may appeal to the Court (in consultation with the Appeals Advisory Panel and/or Appeals Advisory Panel Consultant). *Id*. § 9.8. But to do so, the Class Member must pay a $1,000 appeal fee that will be refunded only if the appeal is successful. *Id*. § 9.6(a).

The Revised Settlement required the appeal fee to be paid regardless of a Class Member's financial circumstances. Doc. #6087 § 9.6(a). Thanks to the Armstrong Objectors' efforts, under the Final Settlement, the appeal fee will be waived "for good cause" (Doc. #6481-1 § 9.6(a)(i))—thereby paving the way for denied claims to be appealed that otherwise would not be appealed and adding significant value to the Final Settlement.

In the NFL's disability-claims process, approximately 16.2% of all claims paid are initially denied, but ultimately paid after appeal.[5] Class Counsel's actuary calculated that 3596 Class Members will be entitled to receive an award under the Final Settlement. Doc. #6167 at 5 (Table 2-1). Assuming the claims process here resembles the NFL disability claims process, about 582 awards will be initially denied, but approved on appeal. If the $1,000 appeal fee deterred only 5% of those appeals,[6] about 29 Class Members would not receive monetary awards that they

---

[5]    *See* L. Elaine Halchin, *Former NFL Players: Disabilities, Benefits, and Related Issues*, Congressional Research Service (April 8, 2008), http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1530&context=key_workplace (last visited Feb. 18, 2017). From July 1, 1993 to June 26, 2007, 1052 applications for disability benefits were filed. *Id*. Of these applications, 358 were initially approved; another 69 were initially denied, but approved on appeal. *Id*. Thus of the 427 total approvals, 16.2% (69 divided by 427) were approved on appeal.

[6]    This is a conservative estimate of the number of Class Members who could not afford the $1,000 appeal fee. For example, after two years of retirement, 78% of former NFL players are

12

otherwise would have received under the actuary's calculation. As a result of the Armstrong Objectors' efforts, these anticipated denials will be appealed and the awards paid, adding additional value to Class Members of up to $7.65 million.[7]

**D. The Armstrong Objectors' efforts also resulted in the Collateral Time Benefit.**

Article VI of the Final Settlement (Doc. #6481-1) provides monetary awards for the Qualifying Diagnoses defined in § 6.3(a). Pursuant to § 6.3(b), *after* the Effective Date of the Final Settlement,[8] Qualifying Diagnoses (other than Death with CTE) may only be made by a Qualified MAF Physician or Qualified BAP Provider approved by Class Counsel and the NFL. *See* §§ 2.1(www) (referencing § 6.5(a)) for the Qualified MAF Physician selection process; 2.1(vvv) (referencing § 5.7(a)) for the Qualified BAP Provider selection process.

Conversely, pursuant to § 6.3(c), between the preliminary approval date and the Effective Date, Qualifying Diagnoses (other than Death with CTE) may be made by a board certified neurologist, neurosurgeon, or other neuro-specialist physician chosen by a Class Member.

This is litigation wherein the Class Members and the NFL are adversaries. It arose out of Class Members' distrust of the NFL's billionaire owners who allegedly put profits before safety

---

under financial stress. Pablo S. Torre, *How (and Why) Athletes Go Broke*, Sports Illustrated (Mar. 23, 2009), http://www.si.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke (last visited Feb. 18, 2017). And, in fact, 15.7% of players file for bankruptcy after twelve years of retirement. *See* Kyle Carlson et al., *Bankruptcy Rates among NFL Players with Short-Lived Income Spikes*, 105 American Economic Review 5 (April 2, 2015). Indeed, the NFL Player Care Foundation has made charitable grants to 956 former players (5% of the Class) since 2007. *See* http://www.nflplayercare.com (last visited Feb. 18, 2017).

[7]   Class Counsel's economic expert estimates there will be 3600 monetary awards totaling $950 million over the life of the Final Settlement (Doc. #6167 at 3), or an average of $263,889 per award. The value of 29 additional awards totals over $7.65 million.

[8]   Pursuant to Section 2.1(jj) of the Final Settlement, its Effective Date was January 7, 2017, twenty-five days after the date the Supreme Court denied the Armstrong Objectors' petition for *writ of certiorari*. Absent the Armstrong Objectors' appeals, its Effective Date would have been May 23, 2015 (*i.e.*, thirty days after the Final Settlement was finally approved by the Court on April 22, 2015).

and defrauded Class Members out of their health and well-being. Just because there is a

settlement, however, does not mean that Class Members' distrust of the NFL no longer exists.

Their mistrust of the NFL is deep-seated and long-standing. It will carry over to the

administration of the Final Settlement—especially pertaining to making the Qualifying

Diagnoses foundational to Class Members' monetary awards. Whether rightly or wrongly, Class

Members fervently believe that they will stand a better chance of receiving a Qualified Diagnosis

from a physician they choose, rather than one thrust upon them by Class Counsel and the NFL. If

for no other reason, there is value in the additional peace of mind they will have for themselves

and their families that they did everything possible to enhance their chances of receiving a

monetary award under the Final Settlement.

    Although the intent of the Armstrong Objectors' appeals was not to extend the time period in

which a Class Member could secure a Qualified Diagnosis from a board certified neuro-

specialist physician of his choosing, the fact of the matter is that this collateral benefit was

conferred upon Class Members by the Armstrong Objectors' efforts. Appealing the Final

Settlement all the way to the Supreme Court provided Class Members with over nineteen months

of additional time to be examined by a board certified neuro-specialist physician of their own

choosing (*i.e.*, from May 23, 2015, the Effective Date of the Final Settlement with no appeals,

through January 7, 2017, the actual Effective Date taking into account the appeals).

    In light of the inherent desire to choose one's own doctor and the shortage of board certified

neuro-specialist physicians in the United States,[9] the additional nineteen months to locate one,

---

    [9]    For example, as of December 19, 2012, there were "approximately 3689 practicing board
certified neurosurgeons for over 5700 hospitals in the U.S., serving a population of more than
311 million people"—or a ratio of 1 board certified neurosurgeon for every 84,305 people in the
United States. *See Ensuring an Adequate Neurosurgical Workforce for the 21st Century*, at 2
https://www.cns.org/sites/default/files/legislative/NeurosurgeryIOMGMEPaper121912.pdf (last
visited Feb. 18, 2017). The situation was not predicted to improve—especially since the current

secure an appointment, and have the examination constitutes a Collateral Time Benefit with real value—on many levels—to Class Members who otherwise would not have had time to do so. Absent the Collateral Time Benefit, there would not have been enough time for even a fraction of the 19,000+ Class Members to complete their examinations in the ten month period between July 7, 2014 (the preliminarily approval date) and May 23, 2015 (the Effective Date of the Final Settlement absent the Armstrong Objectors' appeal to the Third Circuit).

That said, the Armstrong Objectors know of no accurate way to quantify the value of the nineteen month Collateral Time Benefit and concurrent peace of mind to Class Members. They defer to the Court to appropriately consider these benefits when determining their fee award.

## THE ARMSTRONG OBJECTORS' REQUESTED FEE AWARD

Like Counsel for the NFL and Class Counsel, the Armstrong Objectors' Counsel are experienced, creative, hardworking lawyers with national practices who are battle tested in class action litigation. Unlike other objectors' counsel, the Armstrong Objectors' Counsel ran a lean attorney team, stayed focused, played by the procedural rules, did not make unnecessary filings, and advanced the Armstrong Objectors' objections in an efficient and effective manner. Their vigorous advocacy "sharpen[ed] the issues and debate on the fairness of the settlement." *In re*

---

population of the United States is now over 324 million people. *Id.* ("As the population ages and more of our citizens face debilitating and life threatening neurological problems such as stroke, degenerative spine disease, and Parkinson's and other movement disorders, this supply-demand mismatch will become even more acute."). *See also* the U.S. Population Clock, https://www.census.gov/popclock/ (last visited Feb. 18, 2017).

Similarly, as of April 2016, there were only 14,268 actively practicing board certified neurologists in the United States—or a ratio of 1 board certified neurologist for every 22,708 people in the United States (*i.e.*, 324 million people divided by 14,268 board certified neurologists) *See* American Board of Psychiatry and Neurology, Inc. Facts and Statistics (APBN Total and Active Certifications), https://www.abpn.com/wp-content/uploads/2016/08/ABPN-Total-and-Active-Certifications.pdf (last visited Feb. 18, 2017).

*Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 358 (N.D. Ga. 1993) (awarding objector fees). Their efforts secured additional benefits to Class Members fairly valued up to $63.65 million.

Armstrong Objectors' Counsel spent 1179.75 hours and advanced over $70,000 of out-of-pocket expenses working on this matter on behalf of Class Members:

| Law Firm | Total Hours | Fees | Expenses | Supporting Declaration Exhibit |
|---|---|---|---|---|
| The Coffman Law Firm | 411.50 | $233,630.00 | $32,031.40 | A |
| Weller, Green, Toups & Terrell | 328.00 | $236,600.00 | $38,346.83 | B |
| The Webster Law Firm | 262.50 | $77,460.00 | - | C |
| The Warner Law Firm | 177.75 | $52,009.80 | - | D |
| **Total** | **1179.75** | **$599,699.80** | **$70,378.23** | **-** |

That said, the Armstrong Objectors seek only an award of their straight time hourly attorneys' fees ($599,700) with no multiplier and no expense reimbursement.

The Armstrong Objectors' requested fee award is .049% of the overall $1.227 billion value of the Final Settlement (assuming a Final Settlement value of $1.163 billion per Class Counsel (*e.g.*, Doc. #7151-1 at 34) plus the $63.65 million increase secured by the Armstrong Objectors' efforts). The Armstrong Objectors' requested fee award is .942% of the $63.65 million increase in the value of the Final Settlement, and .533% of the $112.5 million of attorneys' fees to be paid by the NFL. Should the Court grant the Armstrong Objectors' fee request, Class Counsel will still receive over $111.9 million in attorneys' fees *plus* the 5% set-aside (Doc. #6481-1 § 21.1) in a case in which there was no discovery, no contested class certification hearing, no summary judgment practice, and no trial.

The Armstrong Objectors' requested fee award will not diminish Class Members' financial benefits under the Final Settlement, which requires the NFL to pay attorneys' fees and expenses, subject to approval by the Court, over and above payments to Class Members. *Id.* (Doc. #6481-

16

1) § 21.1. The NFL has agreed not to oppose any fee request exceeding $112.5 million (*id.* § 21.20,* which Class Counsel has requested. Doc. #7151-1. Awarding the full $112.5 million to Class Counsel without compensating Armstrong Objectors' Counsel for significantly improving the Final Settlement and delivering the Collateral Time Benefit, however, would be inequitable.

## ARGUMENTS AND AUTHORITIES

**A.  The Armstrong Objectors' productive work merits the requested fee award.**

Objectors who confer a material benefit on a class are entitled to a fee award. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 744 (3d Cir. 2001); *see also* 7B CHARLES A. WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 1803 n.6 (3d ed. 2004) (collecting cases awarding objector fees). Objectors "serve as a highly useful vehicle for class members, for the court and for the public generally" to bring adversarial scrutiny to proposed class action settlements. *Great Neck Capital Appreciation Inv. Partnership, LP v. PricewaterhouseCoopers, LLP*, 212 F.R.D. 400, 412 (E.D. Wis. 2002). "Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, *intended or unintended*, of a proposed settlement renders an important service." *Id.* at 413 (emphasis added).

Objectors play a valuable role given the awkward dynamic inherent in class action settlements; to wit, a defendant is motivated to settle as cheaply as possible and, as a practical matter, does not care whether its settlement payment primarily benefits the class or class counsel so long as it gets a release; class counsel may have an opportunity to maximize fees at the expense of maximum relief to the class; and the court, of course, must scrutinize the proposed settlement acting in its role as a fiduciary to the class. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("*GM Trucks*").

This necessarily imposes an extraordinary burden on the court. As Judge Posner explained,

"American judges are accustomed to presiding over adversary proceedings. They expect the clash of the adversaries to generate the information that the judge needs to decide the case." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (reversing approval of class action settlement based on objectors' arguments). Thus, vigorous, articulate objections by competent counsel acting for individual class members allow a judge to overcome a "disadvantage in evaluating the fairness of the settlement to the class." *Id.*

The Armstrong Objectors performed a valuable service to the Court and Class Members in three ways—*first*, by turning this matter into a true adversarial process, *second*, by substantially enhancing the Final Settlement, and *third*, by delivering the Collateral Time Benefit.

1.  **The direct benefit derived from the Armstrong Objectors' challenges to the Revised Settlement and Final Settlement supports the requested fee award.**

"If objectors' appearance sharpens the issues and debate on the fairness of the settlement, their performance of the role of devil's advocate warrants a fee award." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 358; *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (awarding objector fees for "sharpen[ing] debate" in proceeding). Courts recognize that even where their efforts do not directly increase the size of the settlement fund, "objectors add value to the class-action settlement process" by "transforming the fairness hearing into a truly adversarial proceeding" and "supplying the Court with both precedent and argument to gauge the reasonableness of the settlement." *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008). Thus, even objections that are "ultimately overruled" may merit a fee award if "the presence of an objector represented by competent counsel transformed the settlement into a truly adversary proceeding." *Frankenstein v. McCrory Corp.*, 425 F. Supp. 762, 767 (S.D.N.Y. 1977).

Likewise, in *Howes v. Atkins*, 668 F. Supp. 1021 (E.D. Ky. 1987), objectors challenged a

18

settlement where the parties settled for an amount that was low relative to the optimistic initial views of plaintiffs' counsel. *Id*. at 1027. Objectors "made a vigorous attack on the settlement and pursued extensive discovery," but were unable to find "any reason for the modest settlement except that the evidence had not developed as plaintiffs' counsel had first anticipated." *Id*. The district court, nevertheless, awarded objectors' counsel 10% of the settlement fund, holding that "even though the settlement was not improved," objectors' counsel were entitled to fees for "ably perform[ing] the role of devil's advocate" and "ma[king] the court much more comfortable in approving the settlement." *Id*.

Similarly, here, and as set forth above, the Armstrong Objectors' Counsel's advocacy fleshed out complex issues important to a determination of the fairness of both the Revised Settlement and Final Settlement, as well as delivered the Collateral Time Benefit. The Armstrong Objectors took the lead in addressing the key fairness question in this case: whether the settlement's CTE compromise—providing compensation only to the family members of Class Members who died with CTE by a certain date—was "fair, reasonable, and adequate" under Rule 23(a)(4); (e). The CTE question was highly complex and hotly contested—particularly given the prominence Class Counsel gave CTE in their early pleadings and statements about the case. Approving the settlement without a full airing of the CTE issue would have been a grave injustice.

The Armstrong Objectors Counsel addressed this and other essential issues through (i) their Objection, Amended Objection, and Supplemental Objection, (ii) extensive briefing and argument to the Third Circuit, including organizing appellants' counsels' presentation of the argument, and (iii) extensive briefing to the Supreme Court in support of their petition for writ of *certiorari*. The Armstrong Objectors also significantly contributed to the record—a particularly important service here since the Final Settlement was reached without formal discovery.

19

2. **The direct benefits of the up to $63.65 million increase in the value of the Final Settlement and the Collateral Time Benefit support the requested fee award.**

Because "objectors have a valuable and important role to perform in preventing . . . unfavorable settlements, … they are entitled to an allowance as compensation for attorneys' fees and expenses where … *the settlement was improved* as a result of their efforts." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 743 (quoting *White*, 500 F.2d at 828) (emphasis added) (vacating and remanding order denying objector fee request).

Here, there can be no doubt that the Final Settlement was improved by the Armstrong Objectors' Counsel's efforts. Even the Third Circuit recognized the changes made to the Revised Settlement that resulted in the Final Settlement "benefit[ed] class members." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d at 423. Indeed, the changes made to the BAP, Death with CTE benefits, and the appeal fee provisions added up to $63.65 million of value to the Final Settlement. And that's not counting the Collateral Time Benefit.

The Armstrong Objectors were the leaders here. Instead of simply identifying the flaws in the Revised Settlement, they offered concrete ways to improve it. In fact, as set forth above, the improvements in the Final Settlement with the greatest value to Class Members had their roots in the Armstrong Objectors' suggestions.

3. **The requested fee award is reasonable.**

   a. **The requested fee award is a reasonable percentage of the benefits conferred.**

When the efforts of counsel result in a large recovery for the class, under common-fund principles, an award of a percentage of the benefit conferred is appropriate. *See McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015). The "percentage-of-recovery method is designed to reward attorneys for" "adding value to the class settlement." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563, 566 (D.N.J. 2003).

The $599,700 straight time hourly fee award requested sought by the Armstrong Objectors represents .049% of the total $1.227 billion worth of financial benefits Class Members will receive through the vigorously litigated settlement. And this does not include the Collateral Time Benefit. The requested fee award also is just .942% of the estimated maximum $63.65 million increase in the value of the Final Settlement.[10] Courts in this Circuit have approved similar awards (as a percentage of the improvement achieved by objectors) in other cases. *See, e.g.*, *Dewey*, 909 F. Supp.2d at 397 (objectors' counsel awarded "13.4% of the benefit conferred," which was "within the range of acceptable percentages-of-recovery."); *Lan v. Ludrof*, No. 1:06-cv-114, 2008 WL 763763, at *30 (W.D. Pa. 2008) (awarding objector's counsel 25% of the increased settlement value).

    b.  **The *Gunter/Prudential* factors support the requested fee award.**

The reasonableness of the Armstrong Objectors' requested fee award is further confirmed by analyzing it through the lens of the *Gunter/Prudential* factors: (1) "the size of the fund created and the number of beneficiaries," (2) "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel," (3) "the skill and efficiency of the attorneys involved," (4) "the complexity and duration of the litigation," (5) "the risk of nonpayment," (6) "the amount of time devoted to the case by plaintiffs' counsel," (7) "the awards in similar cases," (8) "the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations," (9) "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained," and (10) "any innovative terms of

---

[10]  This, of course, is only the financial benefit generated by the Armstrong Objectors' efforts. It does not account for the Collateral Time Benefit and the benefit of the adversarial challenge to the overall fairness of the Revised Settlement and Final Settlement.

settlement." *See In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009); *In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 336 (3d Cir. 1998).

These *Gunter/Prudential* factors are used to evaluate fee requests by both plaintiffs' counsel and objectors' counsel. *See McDonough*, 80 F. Supp. 3d at 660. The applicable factors all weigh in favor of the requested fee award.[11]

   i. **The size of the fund created by the Armstrong Objectors' Counsel's efforts supports the requested fee award.**

The $63.65 million increase here would be a large recovery in its own right. Indeed, it dwarfs the entire $35.5 million settlement in *McDonough. Id.,* 80 F. Supp.3d at 651. Courts routinely award class counsel large percentages as attorneys' fees in cases involving settlements in the neighborhood of $100 million. *See, e.g., In re Ikon Office Sols., Inc.*, 194 F.R.D. at 196-97 (awarding 30% fee in case involving $111 million settlement). The magnitude of the additional value conferred by the Armstrong Objectors' efforts—more than an 8.8% increase over the $760-million valuation of the Revised Settlement—supports the requested fee award. And that does not count the value of the Collateral Time Benefit and enhancing the adversarial process.

   ii. **The number of beneficiaries supports the requested fee award.**

The Armstrong Objectors' efforts benefited all Class Members. Any eligible Class Member may now receive benefits from the unlimited BAP Fund. Any Class Member may qualify for a waiver of the appeal fee if he demonstrates financial hardship. The estates of all Class Members who died between the preliminary approval date and the final approval date benefited from the expanded eligibility period for Death with CTE benefits. And all Class Members desiring to use the board certified neuro-specialist physician of their choosing benefited from the nineteen

---

  11 The *Gunter/Prudential* factor pertaining to the number of objections is inapplicable here. Courts have construed this factor to reference only the number of objections to class counsel's fee petition, which is unknown at this time. *See McDonough*, 80 F. Supp.3d at 660.

month Collateral Time Benefit. The number of Class Members benefiting from the Armstrong Objectors' efforts supports the requested fee award.

      iii.  **The value of benefits attributable to the Armstrong Objectors' Counsel's efforts relative to the efforts of other objectors supports the requested fee award**.

The Armstrong Objectors were the driving force behind improvements to the Revised Settlement. The Revised Settlement was the best deal Class Counsel were able to extract from the NFL. But as a result of the intense pressure created by the Armstrong Objectors—and this Court's scrupulous efforts to "play[] the important role of protector of the absentees' interests, in a sort of fiduciary capacity" (*GM Trucks*, 55 F.3d at 785)—the Revised Settlement was enhanced to become the Final Settlement.

The Armstrong Objectors were the first to raise the key issues underlying the Final Settlement's improvements—uncapping the BAP Fund, expanding the CTE with Death benefits eligibility period, and eliminating the appeal fee on a showing financial hardship—as well as deliver the Collateral Time Benefit. Other objectors repeated the Armstrong Objectors' arguments or adopted them wholesale. The value of the benefits attributable to the Armstrong Objectors' efforts relative to the efforts of other objectors supports the requested fee award.

      iv.  **The complexity and duration of the litigation support the requested fee award**.

It is indisputable that this litigation, the Revised Settlement, and the Final Settlement involved complex legal issues—in particular, Rule 23(a)(4) adequacy of representation pertaining to the Death with CTE benefits. *See, e.g.*, the above discussion of the lead role on this issue taken at the Third Circuit by Armstrong Objectors' Counsel, Deepak Gupta. Nor did the Armstrong Objectors give up after the Third Circuit issued its opinion, taking their case to the Supreme Court. The complexity and duration of the litigation—and the Armstrong Objectors'

23

key role in it—support the requested fee award.

> **v.  The Armstrong Objectors' Counsel's skill, efficiency, and amount of time devoted to the case supports the requested fee award.**

The Armstrong Objectors' Counsel invested three years and over 1175 billable hours on this litigation working hard to improve—and improving—the Revised Settlement that became the Final Settlement. They litigated the issues with skill and efficiency. Their results speak volumes—additional value up to $63.65 million was obtained for Class Members.  The Armstrong Objectors' Counsel also delivered the Collateral Time Benefit and enhanced the adversarial process. Their skill, efficiency, and amount of time devoted to the case supports the requested fee award.

> **vi.  The risk of non-payment supports the requested fee award.**

The Armstrong Objectors' Counsel's extensive time investment is particularly significant given that counsel accepted the case on a 100% contingency fee basis, advancing all out-of-pocket expenses on behalf of their clients. The risk of non-payment was high, and, indeed, the Armstrong Objectors' Counsel do not seek reimbursement of their litigation expenses. Had the Armstrong Objectors been unsuccessful in improving the Revised Settlement, their Counsel might not have received any compensation. *See, e.g., McDonough*, 80 F. Supp.3d at 26. But they were. And they delivered the Collateral Time Benefit, too. The Armstrong Objectors' Counsel's risk of non-payment supports the requested fee award.

> **vii.  Fee awards in similar cases support the requested fee award.**

Although the Court has recognized that fee awards for objectors are infrequent (*McDonough*, 80 F. Supp.3d at 661), courts have awarded attorneys' fees to objectors' counsel equal to 13-25% of the increased settlement value they obtained. *See, e.g., Dewey*, 909 F. Supp.2d at 397 (awarding 13.4% of the increased settlement value); *Lan*, 2008 WL 763763, at *28 (awarding

25% of the increased settlement value). Here, the Armstrong Objectors' straight time hourly rate fee request is only .942% of the $63.65 million increased settlement value (not including the Collateral Time Benefit) they obtained for Class Members. Fee awards in similar cases, coupled with the Armstrong Objectors hard—and fruitful—work improving the Revised Settlement and testing its fairness, support the requested fee award.

>        **viii. The percentage fee that would have been negotiated in a private contingent fee arrangement supports the requested fee award.**

The Armstrong Objectors' straight time hourly rate fee request is only .942% of the $63.65 million increased settlement value (not including the Collateral Time Benefit) they obtained for Class Members. This amount, on a percentage basis, is far less than contingency fees of 30-40% of a total recovery that are "routinely negotiate[d]" in tort cases like this one. *See, e.g., In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 07-MD-01871, 2012 WL 6923367, at *8 (E.D. Pa. Oct. 19, 2012) (quoting *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. at 194); *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986) ("40% is the customary fee in tort litigation"); *In re Shell Oil Refinery*, 155 F.R.D. 552, 571 (E.D. La. 1993) ("customary contingency fee" in personal injury case "is between 33⅓% and 40%").

The requested fee award, on a percentage basis, also is significantly lower than routine percentage fees in typical contingent fee cases. The requested fee award, on a percentage basis, also is much less than what some counsel representing individual players in this action have negotiated with their clients. For example, counsel for the Estate of Kevin Turner negotiated a contingency fee of up to 45% (Doc. #7029 ¶ 6), which is more than the $599,700 fee award, on a percentage basis, requested by the Armstrong Objectors. This *Gunter/Prudential* factor supports the requested fee award.

ix. **The innovative terms of the settlement improvements** secured by the Armstrong Objectors' Counsel support **the requested fee** award.

The improvements to the Revised Settlement secured by the Armstrong Objectors are innovative. They do not focus on adding a fixed amount of money to the settlement, but rather, ensure that all Class Members receive a fair recovery for their injuries. For example, opening up the BAP Fund ensures that all eligible Class Members will receive the benefits of a baseline examination; to wit, securing an early diagnosis of any issues caused by their injuries and establishing a treatment plan that best addresses the issues. Extending the Death with CTE benefits eligibility period and opening up the appeal process will result in even more Class Members (and their families) receiving a fair recovery. And delivering the Collateral Time Benefit will further ensure each Class Member's recovery (and concurrent peace of mind) by allowing him to use a board certified neuro-specialist physician of his choice, rather than one assigned by the NFL and Class Counsel.

The Armstrong Objectors' suggested innovative improvements incorporated into the Final Settlement, as well as the Collateral Time Benefit, support the requested fee award.

\*\*\*

Where the *Gunter/Prudential* factors weigh heavily in favor of a fee award—as they do here—courts in this circuit regularly award attorneys' fees equal to 15-33% of the amount of the total class benefit. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 155 (D.N.J. 2013) (collecting cases); *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at \*14 (E.D. Pa. June 2, 2004) (noting Federal Judicial Center study finding median fee award to be 27-30% and approving 30% fee award after applying *Gunter* factors).

An award of the Armstrong Objectors' Counsel's straight time hourly fees, which, on a percentage basis, are approximately .942% of the up to $63.65 million of additional benefits

26

conferred on Class Members (excluding the Collateral Time Benefit) are *below* the lower end of the acceptable fee range. Given the magnitude of the additional Class Member benefits secured by the Armstrong Objectors, their Counsel's requested fee award is more than reasonable.

**B.  The requested fee award should be paid from the Attorneys' Fees Qualified Settlement Fund.**

The Armstrong Objectors' requested fee award should be paid from the $112.5 million the NFL is required to contribute to the Attorneys' Fees Qualified Settlement Fund, or, alternatively, paid by the NFL and/or Class Counsel. It is well within this Court's discretion to require objectors' fees to be paid from Class Counsel's award or by the defendant to "avoid dilution of the settlement fund." *See In re Ikon Office Sols., Inc., Secs. Litig.*, 194 F.R.D. at 197; *Great Neck Capital Appreciation Inv. P'ship, L.P.*, 212 F.R.D. at 417.

***

**WHEREFORE**, the Armstrong Objectors respectfully request the Court to award them (i) attorneys' fees of $599,700, and (ii) such other and further relief to which they are justly entitled.

Date: March 1, 2017

Respectfully submitted,

*/s/ Richard L. Coffman*
Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans, Fifth Floor
Beaumont, Texas  77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups
WELLER, GREEN, TOUPS &TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

Jason C. Webster
**THE WEBSTER LAW FIRM**
6200 Savoy, Suite 150
Houston, TX 77036
Telephone: (713)581-3900
Facsimile: (713) 581-3907
Email: jwebster@thewebsterlawfirm.com

Mike Warner
**THE WARNER LAW FIRM**
101 Southeast 11th Suite 301
Amarillo, TX 79101
Telephone: (806) 372-2595
Email: mike@thewarnerlawfirm.com

**COUNSEL FOR THE ARMSTRONG OBJECTORS**

## CERTIFICATE OF SERVICE

I certify that a true copy of the Armstrong Objectors' Memorandum of Law in Support of their Petition for an Award of Attorneys' Fees was served on all counsel of record, via the Court's ECF system, on March 1, 2017.

/s/ *Richard L. Coffman*
Richard L. Coffman

**COUNSEL FOR THE ARMSTRONG OBJECTORS**

28