# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>　　　　Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CO-LEAD CLASS COUNSEL'S OMNIBUS REPLY MEMORANDUM IN FURTHER SUPPORT OF PETITION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, ADOPTION OF SET-ASIDE FROM MONETARY AND DERIVATIVE CLAIMANT AWRDS, AND CASE CONTRIBUTION AWARDS FOR CLASS REPRESENTATIVES, AND IN OPPOSITION TO OBJECTORS' CROSS-PETITIONS FOR AWARDS OF ATTORNEYS' FEES AND EXPENSES**

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................................ 1

II. THE OBJECTIONS TO THE FEE PETITION ARE MERITLESS ........................................ 4

   A. Class Counsel's Request for Attorneys' Fees Is Not Premature ............................ 4

   B. The Settlement Is Reliably Valued ................................................................ 5

   C. The Percentage of Recovery Method Is the Proper First Analysis ....................... 8

   D. Nothing Prevented the Alexander Objectors from Filing a Cross-Petition ......................... 11

   E. The Alexander Objectors' Evidentiary Complaints Are Specious ....................... 12

   F. The Proposed Lodestar Multiplier Is Eminently Reasonable ............................... 14

   G. The "Mega-Fund" or Declining Percentage Theory Should Not Apply Here ..................... 16

III. THE REQUESTED FIVE PERCENT SET-ASIDE IS APPROPRIATE
   AND NECESSARY TO COMPENSATE COUNSEL WHO PERFORM
   COMMON BENEFIT WORK RELATED TO SETTLEMENT IMPLEMENTATION
   OVER THE SETTLEMENT'S 65-YEAR TERM ................................................................ 18

   A. Creation of the Separate 5% Set-Aside Fund ................................................. 18

   B. Future Petitions for Awards to Reimburse Counsel for Post-Effective Date Common
     Benefit Work from the Set-Aside Fund .......................................................... 23

   C. Post-Effective Date Common Benefit Work and Expenses to Be Covered
     by the Set-Aside Fund ................................................................................ 24

      1. Drafting and Dissemination of Supplemental Notices .................................. 25

      2. Implementation Paperwork and Retention of Key Officers ........................... 26

      3. Work to Ensure Class Member-Friendly Registration and Claims Processes .................. 26

      4. Efforts to Widely Spread Information to Class Members ............................... 28

      5. Efforts to Combat the Dissemination of  Misinformation to Class Members ................. 29

      6. Selection of Advisory Panel Members and Appeals Advisory Panel Consultants .......... 29

7. Selection and Orientation of Hundreds of Individuals to Serve as Qualified BAP Providers and Qualified MAF Physicians and Maintenance of These Physician Networks.......................................................................... 30

8. Participation on Class Members' Behalf in the Appeals Process ..................................... 31

9. Monitoring the NFL Parties' Funding of and Targeted Reserves for the Settlement ....... 32

10. Establishing Procedures for and Participation in Periodic Audits of All Aspects of the Program, Including Medical Providers and Administrators ........... 32

11. Replacing the Qualified BAP Providers and Qualified MAF Physicians, Appeals Advisory Panel Members, and Appeals Advisory Panel Consultants............................ 32

12. Revisiting of the Science Every Ten Years ................................................................... 32

D. Certain Objectors' Suggestion That the Attorneys' Fees Qualified Settlement Fund Is Sufficient to Compensate Counsel for All Post-Effective Date Common Benefit Work......................................................................................................... 33

E. Certain Objectors' Suggestion That They Should Not Have to Pay for Post-Effective Date Common Benefit Work at All ...................................................................... 34

IV. THE THREE OBJECTOR PETITIONS FOR ATTORNEY'S FEES .................................. 36

   A. The High Standards for Awarding Fees to Objectors ........................................... 36

   B. The Three Objector Cross-Petitions ....................................................................... 38

      1. The Faneca Objectors' Petition.......................................................................... 38

         a. The Faneca Objectors Wrongly Take Credit for the Post-Hearing Modifications to the Settlement ........................................................... 40

         b. The Faneca Objectors Overvalue the Post-Fairness Hearing Changes to the Settlement........................................................................... 42

         c. The Fee Request Is Excessive ....................................................................... 44

            (1) Most of the Faneca Objectors' Work Should Not Be Compensated Because It Did Not Benefit the Class.................................................. 47

            (2) The Requested $20 Million Award Would Result in More Favorable Treatment of the Faneca Objectors Than of Class Counsel ..................... 53

      2. The Armstrong Objectors' Petition..................................................................... 56

a. The Armstrong Objectors' Role Was Not Constructive ................................................ 57

b. Causing Nearly Two Years of Delay Conferred No Benefit on the Class.................... 59

c. The Armstrong Objectors Wrongly Take Credit for Three Post-Fairness Hearing Modifications to the Settlement ...................................................................................... 61

3. The Jones Objectors' Petition ........................................................................................... 63

V. CONCLUSION .................................................................................................................... 65

# TABLE OF AUTHORITIES

**Cases**

*Alco Indus., Inc. v. Wachovia Corp.*,
  527 F. Supp. 2d 399 (E.D. Pa. 2007) ........................................................................ 6

*Allapattah Servs., Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) .................................................................... 17

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................. 48

*Armstrong v. Nat'l Football League*,
  137 S. Ct. 607 (2016) ............................................................................................... 40

*Arnett v. Bank of Am., N.A.*,
  No. 3:11-CV-1372-SI, 2014 WL 5419125 (D. Or. Oct. 22, 2014) .......................... 38

*Azizian v. Federated Dep't Stores, Inc.*,
  No. C-03-3359 SBA, 2006 WL 4037549 (N.D. Cal. Sept. 29, 2006) .......... 42, 47, 55

*City of Burlington v. Dague*,
  505 U.S. 557 (1992) ................................................................................................. 15

*Daubert v. Merrill Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................... 1, 6

*Decibus v. Woodbridge Twp. Police Dep't*,
  Civ. A. No. 88-2926, 1991 WL 59428 (D.N.J. Apr. 15, 1991) ............................... 56

*Dewey v. Volkswagen Aktiengesellschaft*,
  558 F. App'x 191 (3d Cir. 2014) .............................................................................. 8

*Dewey v. Volkswagen of Am.*,
  909 F. Supp. 2d 373 (D.N.J. 2012), *aff'd*, 558 F. App'x 191 (3d Cir. 2014) ..................... 37, 54

*Dungee v. Davison Design & Development*, No. 16-1486,
  __ F. App'x __, 2017 WL 65549 (3d Cir. Jan. 6, 2017) ............................... 10, 14, 15

*Faught v. Am. Home Shield Corp.*,
  444 F. App'x 445 (11th Cir. 2011) .......................................................................... 37

*Finch v. Hercules Inc.*,
  941 F. Supp. 1395 (D. Del. 1996) ............................................................................ 56

*Fraley v. Facebook, Inc.,* No. C 11-1726 RS,
  2014 WL 806072 (N.D. Cal. Feb. 27, 2014) ........................................................... 38

*Great Neck Capital Appreciation Inv. P'ship, LP v. PricewaterhouseCoopers, LLP*,
212 F.R.D. 400 (E.D. Wis. 2002) ................................................................ 54

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ............................................................................ 24, 56

*In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
No. 03 MDL 1529, 2006 WL 3378705 (S.D.N.Y.  Nov. 16, 2006) ......................................... 17

*In re AOL Time Warner ERISA Litig.*,
No. 02 CV. 8853 (SWK), 2007 WL 4225486 (S.D.N.Y. Nov. 28, 2007) ............................... 47

*In re AT&T Corp. Sec. Litig.*,
No. 00-5364 (GEB), 2006 WL 2786945 (D.N.J. Sept. 26, 2006) .................................... 51, 63

*In re Baby Products Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) ....................................................................... 10

*In re Cardinal Health, Inc. Secs. Litig.*,
550 F. Supp. 2d 751 (S.D. Ohio 2008) .......................................................... 42

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
MDL No. 1917, 2016 WL 6909680 (N.D. Cal. Oct. 24, 2016) ................................... 46

*In re Cendant Corp. PRIDES Litig.*,
243 F.3d 722 (3d Cir. 2001) ............................................................... 8, 15, 37

*In re Cendant Corp. Sec. Litig.*,
404 F.3d 173 (3d Cir. 2005) ................................................................. 37, 38

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
No. 3:08-MD-01998, 2010 WL 3328249 (W.D. Ky. Aug. 24, 2010) ............................... 41

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009) ............................................................... 41

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
No. 1203, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002) ................................ 20, 37, 63

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
MDL No. 1203, 2011 WL 2174611 (E.D. Pa. June 2, 2011) ................................... 20

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
582 F.3d 524 (3d Cir. 2009) ................................................................. 22, 58

*In re Domestic Air Transp. Antitrust Litig.*,
144 F.R.D. 421 (N.D. Ga. 1992) ............................................................... 50

*In re Domestic Air Transp. Antitrust Litig.*,
148 F.R.D. 297 (N.D. Ga. 1993)....................................................... 45

*In re Excess Value Ins. Coverage Litig.*,
598 F. Supp. 2d 380 (S.D.N.Y. 2005)............................................... 41

*In re Fine Paper Antitrust Litig.*,
751 F.2d 562 (3d Cir. 1984).............................................................. 55

*In re Freddie Mac Sec. Litig.*,
No. 03-CV-4261 (JES) (S.D.N.Y. Oct. 27, 2006) ........................... 17

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)............................................................ 5, 9

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................. 8

*In re Ikon Office Solutions, Inc., Secs. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)................................................. 16, 54

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009).............................................................. 15

*In re Linerboard Antitrust Litig.*,
No. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004).................. 16

*In re MetLife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) .............................................. 46

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................... 18

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
842 F. Supp. 2d 346 (D. Me. 2012) .................................................. 42

*In re Nat'l Football League Players' Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016)..................................................... passim

*In re Nat'l Football League Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015)............................................... passim

*In re Nat'l Football League Players' Concussion Injury Litig.*,
775 F.3d 570 (3d Cir. 2014).............................................................. 50

*In re Penn Cent. Secs. Litig.*,
560 F.2d 1138 (3d Cir. 1977)............................................................ 33

*In re Polyurethane Foam Antitrust Litig.*,
   169 F. Supp. 3d 719 (N.D. Ohio 2016) ................................................................. 41

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ...................................................................... passim

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   273 F. Supp. 2d 563 (D.N.J. 2003), *aff'd*, 103 F. App'x 695(3d Cir. 2004) ...... 45, 46

*In re Puerto Rican Cabotage Antitrust Litig.*,
   815 F. Supp. 2d 448 (D.P.R. 2011) ......................................................................... 45

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
   No. 01-CV-01451-REB-CBS, 2007 WL 2087536 (D. Colo. July 17, 2007) .......... 38

*In re Rite Aid Corp. Secs. Litig.*,
   362 F. Supp. 2d 587 (E.D. Pa. 2005) ...................................................................... 17

*In re Rite Aid Corp. Secs. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ............................................................................ 12, 16

*In re Riverstone Networks, Inc.*,
   256 F. App'x 168 (9th Cir. 2007) ........................................................................... 45

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   461 F. Supp. 2d 383 (D. Md. 2006) ........................................................................ 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013), *appeal dismissed*,
   No. 13-16216 (9th Cir. June 12, 2014) ............................................................. 17, 37

*In re Tyco Int'l, Ltd. Multidist. Litig.*,
   535 F. Supp. 2d 249 (D.N.H. 2007) ........................................................................ 17

*Institutionalized Juveniles v. Sec'y of Pub. Welfare*,
   758 F.2d 897 (3d Cir. 1985) ................................................................................... 55

*Jackson v. Wells Fargo Bank, N.A.*,
   136 F. Supp. 3d 687 (W.D. Pa. 2015) ...................................................................... 8

*King Drug Co. of Florence v. Cephalon*,
   No. 06-cv-01797-MSP, 2015 WL 12843830 (E.D. Pa. Oct. 15, 2015) ................... 17

*Lan v. Ludrof*,
   No. 1:06CV114-SJM, 2008 WL 763763 (W.D. Pa. Mar. 21, 2008) ........................ 54

*Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*,
   639 F. App'x 880 (3d Cir. 2016) .............................................................................. 5

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
    No. 02-C05893 (N.D. Ill. Nov. 10, 2016) ............................................ 17

*Lobur v. Parker*,
    378 F. App'x 63 (2d Cir. 2010) ............................................ 46

*Lonardo v. Travelers Indem. Co.*,
    706 F. Supp. 2d 766 (N.D. Ohio 2010) ............................................ 53

*MacFarland v. U.S. Fid. & Guar. Co.*,
    818 F. Supp. 108 (E.D. Pa. 1993) ............................................ 6

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*,
    834 F.2d 677 (7th Cir. 1987) ............................................ 50

*Martin v. Foster Wheeler Energy Corp.*,
    No. 3:06-CV-0878, 2008 WL 906472 (M.D. Pa. Mar. 31, 2008) ............................................ 38

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007) ............................................ 5

*McDonough v. Toys R Us, Inc.*,
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ............................................ 36, 37

*Milligan v. Toyota Motor Sales, U.S.A., Inc.*,
    No. C 09-05418 RS, 2012 WL 10277179 (N.D. Cal. Jan. 6, 2012) ............................................ 48

*Mirfasihi v. Fleet Mortg. Corp.*,
    551 F.3d 682 (7th Cir. 2008) ............................................ 51

*Mirfasihi v. Fleet Mortg. Corp.*,
    No. 01 C722, 2007 WL 2608778 (N.D. Ill. Sept. 6, 2007) ............................................ 38, 46

*Newman v. Stein*,
    58 F.R.D. 540 (S.D.N.Y. 1973) ............................................ 36

*Park v. Thomson Corp.*,
    633 F. Supp. 2d 8 (S.D.N.Y. 2009) ............................................ 46, 54

*Parker v. Time Warner Entm't Co.*,
    631 F. Supp. 2d 242 (E.D.N.Y. 2009) ............................................ 46

*Patriot Party of Pa. v. Mitchell*,
    No. CIV. A. 93-2257, 1993 WL 313667 (E.D. Pa. Aug. 16, 1993) ............................................ 56

*Pawlak v. Greenwalt*,
    713 F.2d 972 (3d Cir. 1983) ............................................ 12

*Pennsylvania v. Del. Valley Citizen's Counsel for Clean Air*,
   478 U.S. 546 (1992) ................................................................................... 15

*Perdue v. Kenny A. ex. Rel. Winn*,
   559 U.S. 543 (2010) ................................................................................... 15

*Priceline.com, Inc. v. Silberman*,
   405 F. App'x 532 (2d Cir. 2010) ................................................................ 41

*Radcliffe v. Experian Info. Sols. Inc.*,
   715 F.3d 1157 (9th Cir. 2013) .................................................................... 33

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ..................................................................................... 3

*Reynolds v. Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ...................................................................... 38

*Sch. Dist. of Philadelphia v. Deborah A.*,
   No. 08-2924, 2011 WL 2681234 (E.D. Pa. July 8, 2011) ......................... 56

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ......................................................... 18

*Sobel v. Hertz Corp.*,
   53 F. Supp. 3d 1319 (D. Nev. 2014) .......................................................... 47

*Spark v. MBNA Corp.*,
   289 F. Supp. 2d 510 (D. Del. 2003) ............................................... 38, 45, 63

*Spencer v. Wal-Mart Stores, Inc.*,
   No. 03-104-KAJ, 2005 WL 3654381 (D. Del. June 24, 2005), *aff'd*, 469 F.3d 311
   (3d Cir. 2006) ............................................................................................. 56

*Student Pub. Interest Research Grp. of N.J., Inc. v. AT&T Bell Labs*,
   842 F.2d 1436 (3d Cir. 1988) ..................................................................... 15

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ....................................................................... 49

*Vasquez v. S.S. Pennock Co.*, Civ. A.,
   No. 86-2288, 1987 WL 9781 (E.D. Pa. Apr. 21, 1987) ............................. 56

*Waters v. Int'l Precious Metals Corp.*,
   190 F.3d 1291 (11th Cir. 1999) .................................................................... 5

*Williams v. MGM-Pathe Commc'ns Co.*,
   129 F.3d 1026 (9th Cir. 1997) ...................................................................... 5

*Zawikowski v. Beneficial Nat'l Bank*,
   No. 98 C 2178, 2001 WL 290402 (N.D. Ill. Mar. 22, 2001) ................................................... 41

**Statutes**

28 U.S.C. § 2101(c) ........................................................................................................ 60

42 U.S.C. § 1988 ............................................................................................................ 15

**Rules**

Fed. R. App. P. 42(b) ...................................................................................................... 51

Fed. R. Civ. P. 23(e) ............................................................................................ 7, 49, 50, 64

Fed. R. Civ. P. 23(e)(2) ................................................................................................... 39

Fed. R. Civ. P. 23(f) .................................................................................................... 7, 50

**Other Authorities**

*Annotated Manual for Complex Litigation, Fourth* (rev. ed. 2016) ....................................... 38, 50

5 William B. Rubenstein, Alba Conte, and Herbert Newberg,
   *Newberg on Class Actions* (5th ed. 2015) ................................................................ 19, 22, 52

## I.  <u>INTRODUCTION</u>

In accordance with the Court's March 8, 2017 Order (ECF No. 7261), Co-Lead Class Counsel respectfully submit this omnibus memorandum (1) in reply to the objections raised in opposition to their petition for an award of common benefit attorneys' fees and reimbursement of common benefit expenses and for adoption of a five-percent set-aside from Monetary and Derivative Claimant Awards for purposes of creating available funds to compensate Class Counsel for work performed in implementing the Settlement[1]; and (2) in opposition to cross-petitions for awards of attorneys' fees and expenses that were filed by three groups of objectors who had unsuccessfully battled the Settlement.

Notably, there are few objections despite the fact that this Settlement was scrutinized by hundreds of lawyers on behalf of thousands of individually-represented Class Members.  The few objections to the requested $112.5 million common benefit fee and expense award are completely without merit.  Many of them are inane evidentiary objections that Class Counsel's expert's valuation of the Settlement's benefits does not pass muster under *Daubert* and the assertion that *partners* who were involved in this litigation and submitted Declarations attesting to their firms' respective common benefit work lack personal knowledge to make such averments.

The litany of makeweight objections is long, including: (1) the argument that the percentage of recovery method is inapplicable, even though this is plainly not a statutory fee-shifting case; (2) backdoor attacks on the Settlement's fairness and adequacy by claiming that the

---

[1] This memorandum adopts the shorthand definitions employed in the Memorandum of Law in Support of Co-Lead Class Counsel's Petition for an Award of Attorneys' Fees, Reimbursement of Costs and Expenses, Adoption of a Set-Aside of Each Monetary Award and Derivative Claimant Award, and Case Contribution Awards for Class Representatives (ECF No. 7151-1).  Certain shorthand terms used in this Introduction are defined below.

class gains are not real; (3) claims that "mega-funds" require a lower fee structure, even though the requested fee is in line with comparable cases; (4) the assertion that the proposed multiplier of 2.6 is too high, even though it is well within Third Circuit norms; (5) a demand that Class Counsel receive compensation on a claims-made basis, despite the fund being uncapped for the 65-year lifetime of the benefits; and (6) the assertion that Class Counsel did little to benefit the Class, notwithstanding this Court's express findings on adequacy of representation.

In all, the meritless objections of a few die-hard objectors who fought the Settlement almost to the very end provide no genuine basis for denying the petition or for reducing the requested award.[2]

Equally meritless are the arguments against the Court's adoption of the proposed 5% set-aside. To begin with, many (if not most) of these objections are simply lawyer-driven. For represented Class Members, the holdback will be deducted *only* from their counsel's fees. Individual counsel simply dread the prospect of surrendering any portion of their fees – which they will earn, in large measure, only as a result of Class Counsel's efforts in achieving and successfully defending the Settlement.

At any rate, as already spelled out in the opening papers and further developed below, a great deal of common benefit work to roll out the Settlement has already been performed and a great deal more will be necessary to ensure the proper implementation and smooth functioning of the Settlement over its lengthy term of 65 years. That work will include not only assisting Class Members (and, where applicable, their individual counsel), but also ongoing input into the composition of the bodies that will play a central role in the Settlement's implementation,

---

[2] No objector has challenged the requested Case Contribution (*i.e.*, incentive or service) Awards for the three Subclass Representatives. Accordingly, that request should be deemed unopposed.

including the MAF and BAP physicians and the Appeals Advisory Panel and its Consultants. Given the Settlement's lengthy term, there will be a regular need to replenish the membership of those bodies.

Besides that, adequate funds will be needed to incentivize lawyers down the road to get up to speed on the history of this litigation, the Settlement's details, and what will by then be the history of the Settlement's effectuation in order to step into the shoes of Class Counsel. Where a settlement will last for nearly seven decades – and pay claims throughout that time – common sense alone should suggest that such transitioning will need to occur multiple times.

Moreover, it is unfair and unreasonable for objectors to maintain that *65 years' worth* of future common benefit work should be paid for out of the common benefit fee award that Class Counsel are seeking from the Attorneys' Fees Qualified Settlement Fund, whose purpose is to compensate Class Counsel for all their work in *securing* the Settlement in the first place.

No more convincing are certain objectors' complaints that it is unfair to ask Class Members who already had Qualifying Diagnoses to contribute a set-aside. To the contrary, it would be unfair not to have those Class Members chip in their fair share to ensure that all Class Members realize the maximum benefits to which they are entitled under the Settlement.

Finally, there are the three objector cross-petitions for fees. Let us be clear. These are objectors who tried to scuttle the Settlement and whose intervention was primarily aimed at having settlement benefits denied to the entire Class. They are entitled to nothing. They chose which side of the "v." to appear on and fees are awarded to parties that prevail, not those that stand in the way of prevailing. As Justice Scalia once colorfully put it, one may not "ride with the cops and cheer for the robbers." *Rankin v. McPherson*, 483 U.S. 378, 394 (1987) (Scalia, J., dissenting). Even on their own terms, these objectors seek wildly inflated awards, claiming

responsibility for settlement modifications that were, in most instances, the initiative of this Court, and claiming compensation for hours spent of trying (unsuccessfully) to derail the deal.

## II. THE OBJECTIONS TO THE FEE PETITION ARE MERITLESS

### A. Class Counsel's Request for Attorneys' Fees Is Not Premature

The Alexander Objectors[3] assert that the final value of the Settlement is "speculative" and "based on unrealistic assumptions" at this point and urge the Court to defer consideration of attorneys' fees until actual payments are drawn from the Settlement Fund.[4] *E.g.*, ECF No. 7355, at 6-10 (Alexander Objectors); ECF No. 7161, at 7-9 (Objector Miller); ECF No. 7370, at 1 (Objector Anderson).[5] This claim is simply an attempt to rehash the arguments, already rejected by this Court and the Third Circuit, that the Settlement is of no benefit to the Class. The record amply supports the value of the Settlement, as determined by this Court. The fact that the payout will continue over 65 years does not prevent attorneys' fees from being paid on the value of the benefits available for the Class to claim, not on the value of benefits already claimed. *E.g.,*

---

[3] The so-called Alexander Objectors purport to be a 16-member remnant (*see* ECF No. 7355-1, at 1) of a group of what were formerly 38 objectors who had unsuccessfully appealed this Court's Final Approval decision to the Third Circuit (*see* ECF No. 6552). The lead objector and namesake of this faction, Liyongo Patrise Alexander, no longer appears to be among their ranks.

[4] The Alexander Objectors complain that attorneys will be paid before players are. ECF No. 7355, at 1-3. Given that the Settlement will run for 65 years, it is inevitable that some attorneys will be compensated before many Class Members are. Unfortunately, major obstacles to an earlier distribution of benefits to Class Members were the multiple (and utterly meritless) objector appeals, which consumed much time while producing no benefit to Class Members. Counsel for the Alexander Objectors should be aware of this, having been in the thick of that wasteful endeavor. *E.g.*, ECF No. 6552 (Alexander Objectors' notice of appeal).

[5] Unless otherwise noted, citations to objections and to Co-Lead Class Counsel's opening memorandum in support of the fee petition (ECF No. 7151-1) are to the pages of the original document, not the ECF pagination.

*Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*, 639 F. App'x 880, 884 (3d Cir. 2016).[6]  In awarding fees under a common fund theory, the Court need not determine the value of the fund with absolute specificity.  Rather, it is enough to make a "reasonable assessment" of the fund's value.  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995); *accord In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 334 (3d Cir. 1998) ("reasonable estimate" suffices).  As further discussed below, because Class Plaintiffs provided a reasonable estimate of the Settlement's value, in the form of their actuarial expert's assessment – which this Court accepted in approving the Settlement – the instant petition is ripe.[7]

### B.  The Settlement Is Reliably Valued

Objectors contend that "[t]here is no non-speculative data to support the computation of the 'size of the fund'" and that "the monetary value of the Monetary Fund Award [sic] is unknown."  ECF No. 7355, at 3, 23; ECF No. 7161, at 2.  These arguments are essentially recycled attacks on the Settlement itself, inasmuch as they question the adequacy of assumptions and calculations made by the Settling Parties in negotiating the Settlement, by this Court in

---

[6] *Accord Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423, 437 (2d Cir. 2007) ("An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not."); *Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1295, 1297-98 (11th Cir. 1999) ("[N]o case has held that a district court must consider only the actual payout in determining attorneys' fees."); *Williams v. MGM-Pathe Commc'ns Co*., 129 F.3d 1026, 1027 (9th Cir. 1997) (per curiam) (""[T]he district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund.") (footnote omitted).

[7] Some objectors argue that attorneys who receive common benefit funds should not be able to receive money from individual Class Member clients under their individual retainer agreements.  *E.g*., ECF No. 7370, at 3 ("The Court should void all individual fee contracts where the attorney representing a class member is also receiving a portion of the common benefit attorney's fees.").  This issue has been addressed in a separate brief filed by The Locks Law Firm (ECF No. 7463).

approving the Settlement, and the Third Circuit in affirming this Court's approval decision. The contention that Class Counsel have not provided this Court with adequate valuation data – after the Court thoroughly reviewed these data, received and evaluated substantial briefing before the Fairness Hearing, conducted an extensive Fairness Hearing, received and evaluated post-Fairness Hearing briefing, and approved the Settlement based upon it – is simply untenable. The Court made its findings with respect to the Settlement's valuation and raising the same issue is an impermissible collateral attack on this Court's earlier rulings.[8]

As the Court stated, "[t]he Settlement value has been the subject of extensive medical and statistical analysis. It was negotiated on the basis of "actuarial data and analyses performed by [the] economic experts" – separate actuarial teams retained by Class Counsel and the NFL – under the supervision of Special Master Golkin. *In re NFL Players' Concussion Injury Litig*., 307 F.R.D. 351, 364 (E.D. Pa. 2015). Thus, the Court *has already acknowledged* that the value

---

[8] The Alexander Objectors challenge the report of Dr. Thomas Vasquez, Plaintiffs' actuarial expert, on *Daubert* grounds. *See* ECF No. 7355, at 25 n.19 (citing *Daubert v. Merrill Dow Pharms., Inc*., 509 U.S. 579 (1993)). Setting aside that they improperly relegate such a significant challenge to a footnote, *cf. MacFarland v. U.S. Fid. & Guar. Co.*, 818 F. Supp. 108, 111 (E.D. Pa. 1993) ("[B]ecause this argument has been relegated to footnote status . . . we do not see the need to address [it]."), any *Daubert* challenge to Dr. Vasquez's report should have been made at the Fairness Hearing. That was not done. In a different context, a *Daubert*-type challenge was belatedly raised to the Third Circuit regarding Plaintiffs' medical experts, after the Fairness Hearing. The Third Circuit rejected it as both waived and as lacking any merit, noting that it "ha[s] never held that district courts considering the fairness of a class action settlement should consider the admissibility of expert evidence under *Daubert*." *In re Nat'l Football League* ["*NFL*"] *Players Concussion Injury Litig.*, 821 F.3d 410, 442, 443 (3d Cir. 2016). The Alexander Objectors do not address why they failed to assert a *Daubert* challenge to Dr. Vasquez's calculations at the Fairness Hearing. Much less do they provide a rationale for why a *Daubert* inquiry is necessary for a court's adjudication of *a fee petition*, which will not be decided by a jury. *Cf. Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 405 (E.D. Pa. 2007) ("In the context of preparing for a bench trial, it is not necessary to apply the *Daubert* standard with full force in advance of trial."). They certainly offer not a scintilla of authority holding that a *Daubert* inquiry is required at the fee petition stage.

of the Settlement has been reasonably estimated.[9]   As previously established, Class Counsel

secured a benefit[10] of nearly $1.2 billion for the Class:

| BENEFIT | AMOUNT/VALUE | SOURCE |
|---|---|---|
| Monetary Award Fund | $950,000,000 | ECF No. 6167, at 4 (NFL Concussion Liability Forecast) |
| Baseline Assessment Program | $75,000,000 | Settlement § 23.1(b) |
| Education Fund | $10,000,000 | Settlement § 23.1(c) |
| Notice Costs | $4,000,000 | Settlement § 14.1(b) |
| Claims Administration | $11,925,000 | Decl. of Orran Brown, Sr. |
| Attorneys' Fees Provision | $112,500,000 | Settlement § 21.1 |
| TOTAL: | $1,163,425,000 | |

With the benefit of actual data from the Claims Administrator, supporting a higher Class

Member participation rate in the Settlement than originally projected, Dr. Thomas Vasquez of

Ankura Consulting, who had previously valued the Settlement during the Rule 23(e) fairness

proceedings (ECF No. 6423-21), has revised his valuation of the Settlement upwards, concluding

that the MAF alone is now worth over $1 billion.  *See* Supplemental Declaration of Christopher

---

[9] The Alexander Objectors also make the completely mystifying argument that Dr. Vasquez's report "does not pertain to the Settlement actually approved by the Court."  ECF No. 7355, at 39.  Dr. Vasquez's projections were used by Class Plaintiffs, the Special Master, and the Court in considering the Settlement's value.  *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 375.

[10] Two objectors argue either against an award under a common fund theory – which factors in risk, *see In re Prudential*, 148 F.3d at 340 – or that the proposed 2.6 multiplier is unwarranted on the ground that Class Counsel had no risk of nonpayment as of August 2013, when the term sheet was announced.  ECF No. 7370, at 3 (Objector Anderson); ECF No. 7161, at 4 (Objector Miller).  Even the most cursory understanding of this litigation reveals this as a fatuous argument.  In January 2014, this Court *rejected* the first formal settlement agreement presented by Class Counsel (ECF No. 5658).  After negotiating a revised agreement, to which this Court granted preliminary approval in July 2014 (ECF Nos. 6083-84), Class Counsel then had to defend it against multiple objectors during the Rule 23(e) proceedings and even against a novel Rule 23(f) challenge in the Third Circuit.  After the November 2014 Fairness Hearing, Class Counsel needed to secure further concessions from the NFL with respect to certain modifications proposed by the Court.  And after final approval in April 2015, the Settlement was the subject of multiple Third Circuit appeals by objectors determined to scuttle the Settlement (including by Objector Anderson) and, thereafter, two *certiorari* petitions in the Supreme Court.

A. Seeger, dated Apr. 10, 2017 ("Seeger Supp. Decl." or "Seeger Supplemental Declaration") (filed contemporaneously herewith), Ex. JJ (An Updated Analysis of the NFL Concussion Settlement), at 3 & Table 1.

## C. <u>The Percentage of Recovery Method Is the Proper First Analysis</u>

Nor is there any basis for the Alexander Objectors' suggestion that a percentage-of-the-recovery method is not warranted here.  ECF No. 7355, at 21-27.  As the Third Circuit has stated, "[t]he percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund "in a manner that rewards counsel for success and penalizes it for failure."  *In re Prudential*, 148 F.3d at 333 (citation and internal quotation marks omitted).  The lodestar method is typically applied only in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the monetary value of the relief is too small to provide adequate compensation.  *Id.* It may also be applied in cases where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method.  *Id.*; *accord In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001) (citing *In re Prudential*, 148 F.3d at 333).

As Class Counsel discussed in their Fee Petition, the principles employed in assessing a percentage-of-the-fund common fund attorneys' fees claim are appropriate here because the different settlement benefits secured by Class Counsel, totaling well over $1 billion in value, are a *constructive* common fund.  *See*, *e.g.*, *Dewey v. Volkswagen Aktiengesellschaft*, 558 F. App'x 191, 197 (3d Cir. 2014); *Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) ("[G]iven that each of these amounts will be paid by defendants, the economic effect essentially is that of a common fund."); *In re Heartland Payment Sys., Inc. Customer Data Sec.*

*Breach Litig.*, 851 F. Supp. 2d 1040, 1072 (S.D. Tex. 2012) ("Having two funds—one for the claimants, one for the attorneys—is a well-recognized variant of a common-fund arrangement."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 821 ("Although . . . the fee was a separate agreement, thus superficially resembling the separate awards in statutory fee cases, private agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case.").  Furthermore, although it is uncapped, there is a clearly delineated fund recovered on behalf of the Class that lends itself to valuation.  In fact, as noted above, the MAF has been valued by both Class Plaintiffs' and the NFL Parties' experts.

Ultimately, the Alexander Objectors' argument against a percentage-of-recovery fee award rests on the already rejected contention that the Settlement does not provide value for the Class.[11]

In a further collateral attack on the Court's earlier rulings, the Alexander Objectors then challenge the valuation of the Settlement.  They suggest that the present value comes to "only" $607,281,000, and then calculate a percentage of this fund using this figure.  *See* Declaration of Kenneth McCoin (ECF No. 7355-1), at ¶ 6.  That argument is unavailing.  Even if the alleged present value of the Settlement benefits were taken into consideration, Class Counsel's request for $106.82 million in fees (the reimbursement of expenses would not be factored in here) would nonetheless amount to only about 17-1/2% of the recovery – still well within the acceptable range in percentage-of-recovery fee class cases.  Even accepting the methodology, the Alexander

---

[11] The Alexander Objectors assert that the inability of Claims Administrator Brown to pinpoint all future administrative costs somehow casts the value of the MAF into doubt.  ECF No. 7355, at 24.  That contention makes no sense; the MAF funds are used to compensate Retired NFL Football Players and Derivative Claimants, not pay administrative costs.  Comparing the methodology of how the Claims Administrator can estimate expenses is an apples-to-oranges comparison with Dr. Vasquez's calculations.

Objectors leave out of their asserted $607,281,000 value the other benefits that Class Counsel secured for the Class.  These were not only the BAP (worth $75 million) and the Education Fund ($10 million), but also various tabs that ordinarily come out of a fund but which will be picked by the NFL, including the cost of notice ($4 million); the cost of claims administration ($11.925 million); and attorneys' fees and expenses for common benefit work ($112.5 million).  Thus, even under their valuation theory, Class Counsel secured a total present value of $719,456,000.  The percentage of the recovery that Class Counsel's fee award would represent would thus be less than 15 percent, which as discussed below, is still well within the reasonable range of fee awards in so-called "mega-fund" cases.

Disregarding immediate benefits also leads the Alexander Objectors to mistakenly invoke *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013).  *Baby Products* was a case in which class counsel ended up with 40 percent of the settlement as fees, and even then more than half the total settlement went to a *cy pres* distribution.  *Id.* at 169-70, 179.  Comparing this case to *Baby Products* is simply another collateral attack on the Settlement – and a highly strained one at that.[12]

---

[12]   The further objection to the 5% set-aside, ECF No. 7355, at 29, ignores the simple fact that the fee petition request is for work done *to date* – as very clearly laid out in the Class Counsel's opening papers – and that the 5% holdback is for the purpose of paying for future work performed on behalf of Class Members.  The Alexander Objectors contend that the 5% holdback would produce $45,470,000.  They base this on "Class Counsel's projected Monetary Award Fund" – *i.e.*, $950 million.  The Alexander Objectors, though, cannot have it both ways – claiming a value of just over $600 million in their effort to minimize the recovery scored by Class Counsel, and then turning around and resorting to the very $950 million value that they elsewhere attack, so as to maximize the fees that all Class Counsel might potentially earn from the set-aside over the 65-year life of the Settlement.

Under both the percentage-of-recovery method, and using a lodestar cross-check, the requested fees are eminently reasonable.[13]

**D.  Nothing Prevented the Alexander Objectors from Filing a Cross-Petition**

The Alexander Objectors complain that they did not have an opportunity to make a fee submission.  That is unpersuasive.  Other objectors filed petitions for fees, which are addressed below in Section IV of this omnibus reply memorandum, and which detail the value they allegedly added to the Settlement.  *See* ECF Nos. 7070 (Faneca Objectors), 7232 (Armstrong Objectors), 7364 (Jones Objectors).  Nothing prevented the Alexander Objectors from doing likewise, especially since they had the example of the Faneca Objectors' fee petition, which was filed as far back as January 11, 2017.

Telling, however, in their copious 69-page opposition to Class Counsel's fee petition, the Alexander Objectors do not describe a *single* common benefit task they performed, or a *single* improvement to the Settlement that they brought about through their objections (and no doubt for good reason, for they added no value to the Settlement).  Rather, they criticize Co-Lead Class Counsel Seeger, stating that he "secretly" determined who would benefit.  But there was no mystery involved.  Class Counsel is supposed to assign common benefit work to prevent unnecessary duplication and waste. Court-appointed counsel for a class typically have to determine which lawyers provided a common benefit to the class.

---

[13] The remaining arguments should not detain the Court.  For example, the Alexander Objectors cite *Dungee v. Davison Design & Development*, No. 16-1486, __ F. App'x __, 2017 WL 65549 (3d Cir. Jan. 6, 2017), "as a great example of a circumstance where lodestar is more appropriate when subjective evaluation would be required to value the fund."  ECF No. 7355, at 22-23.  It is nothing of the kind.  In fact, *Dungee* is nothing more than an unremarkable example of the use of the lodestar method in a fee-shifting case.

**E.  The Alexander Objectors' Evidentiary Complaints Are Specious**

When all else fails, nit-pick.  And so the Objectors "demand a degree of detail . . .  that is not required by law."  *Pawlak v. Greenwalt*, 713 F.2d 972, 978 (3d Cir. 1983).  "The court's focus in assessing the adequacy of submitted documentation," however, "is whether the documentation permits the court to determine if the claimed fees are reasonable."  *Id.*

The Alexander Objectors devote nearly 13 pages of their brief to sundry "evidentiary objections" to the various declarations in Class Counsel's opening papers.  ECF No. 7355, at 44-57.  But this is neither a trial nor a summary judgment motion and this objection begins with the erroneous assumption that the fee cannot be the result of a percentage-of-the-fund award.  The lodestar cross-check "does not trump the primary reliance on the percentage of common fund method."  *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005).  As the Third Circuit has explained, "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. . . . [T]he resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award."  *Id.* at 306-07 (footnotes and citations omitted).  In short, a lodestar cross-check serves merely as a *rough* yardstick to gauge the reasonableness of a common benefit fee request.

Moreover, the objections defy common sense.  The declarations submitted in the opening papers were from partners who supervised their respective firms' participation in this litigation.  The suggestion that these attorneys lack personal knowledge of the tasks performed by their respective firms is absurd.  Moreover, as detailed in Mr. Seeger's master declaration, common benefit work was performed, and common benefit expenses incurred, under his aegis,

and he deemed all work being billed reasonable, necessary, and non-duplicative.  ECF No. 7152-2, at ¶¶ 72-73, 75-76.

The Alexander Objectors further complain that "[t]he Court needs to know what the attorneys were doing."  ECF No. 7355, at 11.  The contention that the Court cannot evaluate how attorneys spent their time on this litigation is puzzling.[14]  The Court took an active interest in the settlement negotiations and mediation, with respect to which it was continually apprised of developments by both Mediator Phillips, and by Special Master Golkin, and it has taken an active role in overseeing the Settlement's implementation.  Past filings – *e.g*., ECF Nos. 5634-4 (Judge Phillips' Declaration in support of preliminary approval), 6423-3 (Mr. Seeger's Declaration in support of final approval) – have further informed the Court of Class Counsel's activity.

Moreover, the various declarations submitted in support of the fee petition are quite sufficient to provide this information.  The opening memorandum provides significant detail over 17 pages, with copious citations to the record.  Co-Lead Class Counsel Seeger's master declaration (ECF No. 7151-2) describes, over nearly 18 pages and in significant detail, the unfolding of the litigation and the critical work done in each phase.  Declarations submitted by other Class and Subclass Counsel also detail the substantial efforts undertaken to achieve the

---

[14]  Objector Anderson makes the conclusory argument that too much work was done by senior attorneys and could have been handled by junior attorneys.  ECF No. 7370, at 2.  This throwaway argument merits little discussion.  It is uninformed second-guessing by lawyers who lack insight into how litigation of this magnitude and complexity was prosecuted, managed, and ultimately resolved.  Class Counsel's opening memorandum and Mr. Seeger's master declaration set forth the complexity of the work undertaken by Class Counsel.  For example, the many mediation and negotiation sessions with senior NFL counsel required the involvement and input of seasoned lawyers.  Developing multiple experts across several fields also required the involvement of experienced attorneys.  This is not a case where senior partners are billing time for having handled document review, and Objector Anderson makes no effort to identify in any way work that could have been done by less-experienced counsel.

outcome here.  *See* Declaration of Steven C. Marks (ECF No. 7151-8), at ¶¶ 3-28; Declaration of

Gene Locks (ECF No. 7151-7), at ¶¶ 3-18; Declaration of Arnold Levin (ECF No. 7156-6), at ¶

2a-r.  Other supporting declarations similarly provide ample detail.  *E.g.*, Declaration of Samuel

Issacharoff (ECF No. 7151-18), at ¶ 2; Declaration of Craig Mitnick (ECF No. 7151-23), at ¶

2(a)-(s).  The Alexander Objectors ignore all of this evidence.

Moreover, Mr. Seeger's master declaration informs the Court of the process followed by

Class Counsel, and provides the necessary assurance that the time and expenses were expended

for the common benefit of the Class.  "Pursuant to the procedures outlined in CMO5, attorneys

and staff working at [his] direction and under [his] supervision collected and reviewed

submissions of common benefit time and reimbursable costs and expenses submitted by the PEC,

PSC and by other firms to which [he] had assigned common benefit work."  ECF No. 7151-2, at

¶ 75.  Only time and expenses that inured to the common benefit of the Class, and that advanced

the claims resolved in the Settlement, have been included in the time presented, and the costs

submitted herein.  *Id.* ¶ 76.

**F.  <u>The Proposed Lodestar Multiplier Is Eminently Reasonable</u>**

Yet another meritless objection is the Alexander Objectors' contention that a lodestar

multiplier is available only in rare and exceptional instances and is unwarranted here.  ECF No.

7355, at 33-34.  Once again, they inappropriately rely on *Dungee*, which is inapposite for the

simple reason that it was a statutory fee-shifting case, not a percentage-of-recovery constructive

common fund case such as this.  *See Dungee*, 2017 WL 65549, at *2 ("When a court applies the

lodestar method to award fees in a class action case *that involves a fee-shifting statute*, there is "a

'strong presumption' that the lodestar represents the 'reasonable' fee," for class counsel's

work.") (emphasis added).[15]   The case law in this Circuit has been eminently clear on the difference between statutory fee-shifting cases and common fund cases.  To cite *Dungee* in this fashion borders on the sanctionable.

The Alexander Objectors take their misguided argument that the Court employ the lodestar method – which is inappropriate in cases that do not involve an application under a fee-shifting statute – further by arguing that "Class Counsel is upwardly enhancing its fee calculations instead of revising them downward as suggested by the Third Circuit."  ECF No. 7355, at 31.  The Third Circuit, however, has held that, for lodestar cross-check purposes, a multiplier of 1-4 is appropriate and frequently awarded, *see In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 742; *In re Prudential*, 148 F.3d at 341, although a lodestar multiplier need not fall within any pre-defined range, provided that a district court's analysis justifies the application of the multiplier, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 280 (3d Cir. 2009).[16]

---

[15] *See also*, *e.g.*, *Student Pub. Interest Research Grp. of N.J., Inc. v. AT&T Bell Labs*, 842 F.2d 1436 (3d Cir. 1988) (pursuant to Clean Water Act's fee-shifting provisions); *Pennsylvania v. Del. Valley Citizen's Counsel for Clean Air*, 478 U.S. 546, 565 (1992) (Clean Air Act case); *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (attorneys' fees provisions of Solid Waste Disposal Act and Clean Water Act); *Perdue v. Kenny A. ex. Rel. Winn*, 559 U.S. 543, 546 (2010) (42 U.S.C. § 1988) ("This case presents the question whether the calculation of an attorney's fee, under federal fee-shifting statutes, based on the "lodestar," *i.e.,* the number of hours worked multiplied by the prevailing hourly rates, may be increased due to superior performance and results.") (footnote omitted).

[16] The Anderson Objectors posit that "[a] more reasonable average hourly rate for this case would be $600."  ECF No. 7370, at 3.  It is unclear from where this number is drawn because there is no supporting citation for this contention.  Class Counsel have demonstrated that their hourly rates are reasonable.  At any rate, even using this arbitrarily-selected rate, the lodestar multiplier would come to 3.56 – still within the 1-4 range that the Third Circuit has endorsed.

**G.  The "Mega-Fund" or Declining Percentage Theory Should Not Apply Here**

The Alexander Objectors point to the "declining percentage" (also known as "mega-fund") theory discussed in *Cendant Corp. PRIDES Litigation*, and urge the Court to apply it here.  ECF No. 7355, at 31.  They misrepresent, though, the Third Circuit's position on this theory.  Although "it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries[,] . . . the declining percentage concept does not trump the fact-intensive *Prudential/Gunter* analysis."[17]  *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d at 302-03.  Indeed, "there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund," *id.*, and decisions from this Court have rejected it.[18]

---

[17] The Alexander Objectors argue that this Settlement was insufficiently complex for the Court to consider the *Gunther/Prudential* factor of "Complexity and Duration of the Litigation" as favorable to Class Counsel's fee petition.  ECF No. 7355, at 35-36.  That argument is also without merit.  As Class Counsel described, the scope of the relief provided by the Settlement, the multiple challenging legal hurdles faced, the sophistication of the Defendants and their counsel, and the complicated medical and actuarial issues, among other factors, made this Settlement quite complex.  *E.g.*, ECF No. 7151-1, at 37-43.  The Alexander Objectors maintain that after the Court ordered the parties to mediation, "no further merits litigation occurred after that point."  ECF No. 7355, at 36.  That is patently false because it disregards the extensive briefing of motions for preliminary and final approval (the former a second time, after the Court rejected the first proposed settlement), spirited opposition to both preliminary and final approval, attempted interlocutory appellate review of this Court's preliminary approval order, the Fairness Hearing and post-hearing briefing, and the long appeals process that ensued afterwards (and in which the Alexander Objectors themselves took part).

[18] *E.g.*, *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *16-17 (E.D. Pa. June 2, 2004) ("The Court rejects [the sliding scale] in this case because the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success.  Moreover, the sliding scale approach is economically unsound."); *In re Ikon Office Solutions, Inc.*, *Secs. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) (mega-fund approach "fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery").

But even under this "mega-fund" approach, an award of approximately nine percent of value of the recovery is still well within the norm in this Circuit for class counsel fees in cases involving recoveries that exceed $100 million.[19]  *E.g.*, *King Drug Co. of Florence v. Cephalon*, No. 06-cv-01797-MSP, 2015 WL 12843830, at *5 (E.D. Pa. Oct. 15, 2015) (awarding 27.5% of $512 million settlement); *In re Rite Aid Corp. Secs. Litig.*, 362 F. Supp. 2d 587, 590 (E.D. Pa. 2005) (25% of $126,641,315 fund).  It is also within the norm of awards made by courts outside this Circuit.[20]  *E.g.*, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-C05893, ECF No. 2265, at 1-2 (N.D. Ill. Nov. 10, 2016) (awarding 24.68% of $1.575 billion settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) (28.5% of $1.1 billion fund); *In re Tyco Int'l, Ltd. Multidist. Litig.*, 535 F. Supp. 2d 249, 266, 272, 274 (D.N.H. 2007) (14.5% of $3.3 billion fund); *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529, 2006 WL 3378705, at *1, *3 (S.D.N.Y.  Nov. 16, 2006) (awarding 21.4% of $455 million fund); *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), slip op. at 1 (S.D.N.Y. Oct. 27, 2006) (20% of $410 million fund); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 387 (D. Md. 2006) (12% of $1.1 billion fund); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1192 (S.D. Fla.

---

[19]  The Alexander Objectors cite *In re Prudential* for the proposition that a fee representing 6.7 percent of the recovery is excessive.  ECF No. 7355, at 29-30.  *In re Prudential*, however, was decided in 1998.  The Alexander Objectors fail to address the nearly two decades of intervening caselaw cited by Class Counsel, as well as Professor Fitzpatrick's empirical study, which show that Plaintiffs' 9% request is well within the range approved by courts.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (copy annexed to Seeger Decl. as Ex. Y (ECF No. 7151-28)).

[20]  The Alexander Objectors maintain that Class Counsel's comparison of the fee award requested here to that of other cases is "legally infirm" because Class Counsel discussed smaller settlements.  ECF No. 7355, at 30.  That ignores the discussion of this issue in Class Counsel's opening memorandum.  *See* ECF No. 7151-1, at 44-47 & n.31.  The award requested by Class Counsel falls comfortably within the parameters of fee awards in large class settlements.

2006) (31.33% of $1.1. billion fund); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) (15% of $1-1.1 billion award); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 485-86 (S.D.N.Y. 1998) (14% of $1.027 billion fund).[21]

## III. THE REQUESTED FIVE PERCENT SET-ASIDE IS APPROPRIATE AND NECESSARY TO COMPENSATE COUNSEL WHO PERFORM COMMON BENEFIT WORK RELATED TO SETTLEMENT IMPLEMENTATION OVER THE SETTLEMENT'S 65-YEAR TERM

### A. Creation of the Separate 5% Set-Aside Fund

At this juncture, Class Counsel are not asking to be paid for any post-Effective Date work, despite some objectors' attempts to mischaracterize the set-aside request.[22] Rather, Class

---

[21] The Alexander Objectors argue that Class Counsel cannot rely on the value of benefits attributable to the efforts of others as a favorable *Gunther/Prudential* factor. They assert that Class Counsel derived "important fruits" from the congressional hearings on head injuries in the NFL. ECF No. 7355, at 36-37. That argument fails to address the caselaw cited by Class Counsel regarding the level to which government assistance must have risen in order to adversely impact a fee petition. *See* ECF No. 7151-1, at 47-48. Government assistance or the benefits that class counsel drew from a government investigation or other legal action must be significant. Any benefit that Class Counsel derived from the congressional hearings falls well short of that level. The Alexander Objectors contend that "Class Counsel supplies no evidence" that "this litigation was not aided by the government investigation." ECF No. 7355, at 37. To the contrary, Mr. Seeger's Declaration lays out in very comprehensive detail how Class Counsel developed their case.

[22] Several objectors describe their objections as being in response to Class Counsel's alleged request for an additional $47.5 million fee, which they calculate by multiplying 5% by the estimated $950 million value of the MAF. *See* ECF No. 7355 (Alexander Objectors), at 58; ECF No. 7355-1 (McCoin Decl.), at ¶7 (suggesting that the 5% set-aside is tantamount to "an additional fee request of $45,470,000, or $25.9 million discounted to present value."); ECF No. 7360 (Hilgenberg and Duranko), at 5 ("Class Counsel's request would result in a $47,500,000 holdback against the individual class members and, given the stage of these proceedings, that amount can hardly be justified."). *See also* ECF No. 7346 (Top NFL Lawyers), at 5 (claiming that Class Counsel is attempting "to collect (with this first Petition for a set-aside) all of the money it claims is necessary to fund the common benefit costs for the entire 65-year life of the Settlement"); ECF No. 7370 (Objector Anderson), at ¶ 6 (referring to Class Counsel's alleged "attempt to collect all of the money purportedly necessary to fund the common benefit costs for the Settlement's 65-year life expectancy[.]"). Objectors absurdly assume that all of these set-aside monies will be paid to the currently appointed Class Counsel. That is plainly not the case. These monies will be paid out over time for the Settlement's 65-year life, as further described in

(Footnote continued . . .)

Counsel are asking the Court to acknowledge that it is fair, reasonable, and necessary to compensate counsel for common benefit work performed after the Settlement's Effective Date, and to direct that the post-Effective Date common benefit work compensation be funded through set-asides from Class Members' individual Monetary Awards and Derivative Claimant Awards. As noted in the leading treatise on class actions, it "is evident [that] a court makes two distinct calculations in assessing common benefit fees: *first*, a holdback assessment, and *second*, an award assessment." 5 William B. Rubenstein, Alba Conte, and Herbert Newberg, *Newberg on Class Actions* ("*Newberg*"), § 15:116, at 432 (5th ed. 2015) (emphasis in original). Presently, Co-Lead Class Counsel request that the Court perform only the first calculation and order the holdbacks or set-asides.

Assuming that the Court permits its creation, the separate set-aside fund ("Set-Aside Fund") would be a pool of funds distinct from the Attorneys' Fees Qualified Settlement Fund funded by the NFL, *see* Settlement Agreement §§ 21.2 & 23.7 (ECF No. 6481-1), at 82, 90; ECF No. 7246 (Mar. 7, 2017) (Order establishing  Attorneys' Fees Qualified Settlement Fund and appointing Garretson Resolution Group, Inc. as Fund Administrator), and will be funded gradually as claims are paid over the 65-year life of the Settlement, and it will be overseen by the Court on an ongoing basis. Over time, petitions will be filed by counsel performing post-Effective Date common benefit work, seeking reimbursement for fees and expenses, and the Court will consider the petitions and rule upon them accordingly. *See* Section III.B, *infra* (discussing anticipated petitions). While Class Counsel expect that they will seek reimbursement for fees and expenses related to common benefit work performed by Court-appointed Class Counsel after the Effective Date, it is not solely their own compensation that is at issue.

Section III below, and thus to generations of attorneys performing work on behalf of the Class long after Co-Lead Class Counsel are gone from the scene.

Additionally, it is vital to recognize the need to create an incentive for the multiple groups of lawyers who will be entrusted with shepherding the Settlement in the future to ensure that benefits continue to be provided to Class Members over the next 65 years.

Indeed, the need to incentivize lawyers in the future to act as replacement class counsel arises from the fact that this Settlement is unprecedented in the length of time over which claims can be submitted, thus requiring a "changing of the guard" (if anything, almost certainly multiple changes).[23]   In addition to the Settlement's long lifespan, the large amounts of the monetary awards and other unique aspects of the Settlement prevent it from simply being handed over to administrators to receive claims and issue benefit payments for the next 65 years.   There are detailed qualification and claims processes that Class Members must navigate that may best be handled with the assistance of, or explanation by, current or future class counsel.   More importantly, the appeals process will involve counsel on behalf of the NFL Parties and, as such, Class Members will need class counsel to advocate on their behalf.   Finally, medical providers and other administrators will be replaced over time through a vetting process engaged in by both counsel for the NFL Parties and class counsel.[24]   *See* Section III.C *infra* (further discussing post-Effective Date common benefit work).

---

[23]   Although there have been other personal injury class action cases with settlement funds that have been administered over many years (due to the latency of the disease manifestation), none, except perhaps *In re Diet Drugs Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation* ("*Diet Drugs*"), will have to be administered for close to the 65-year period covered by this case, and there, the district court made several fee awards for common benefit work.  *Diet Drugs*, MDL No. 1203, 2011 WL 2174611, at *1, *6, *9, *11 (E.D. Pa. June 2, 2011) (awarding further common benefit fees, noting there had been prior common benefit fee awards, namely, 2002 Interim Fee Award, April 2008 Final Fee Award and 2010 further fee award, and noting that matrix payments will be made through the year 2063).

[24] Some objectors suggest that individually retained counsel could perform this work in the future.  *See* ECF No. 7282 (Blizzard Objectors), at 7-8 (asserting that Co-Lead Class Counsel
(Footnote continued . . .)

Assuming the Court agrees that the creation of a Set-Aside Fund is necessary to provide compensation and incentive related to post-Effective Date common benefit work, the percentage of the holdback should be set now, before the Claims Administrator pays out the first monetary awards to Class Members and Derivative Claimants.  Determination of a set-aside amount now will allow the Claims Administrator to hold back these amounts from the awards and place them in the Set-Aside Fund.

Certain objectors contend that the request for a set-aside is premature because the post-Effective Date costs are not yet known.  *See* ECF No. 7370 (Objector Anderson), at ¶ 6 ("the request is premature because the true administrative costs are not yet known").  As noted in Class Counsel's opening papers, and as set forth again below in Section III.C, Class Counsel know and are able to enumerate the types of common benefit work that most certainly lie ahead (some of which already have been accomplished) to be performed by current Class Counsel and in the future by those lawyers who will take over these responsibilities.  Thus, as detailed further below, Class Counsel expect that as the claims and common benefit work proceeds, historical data and perspective will be developed, and the lodestar and expense investment required for common benefit work on a monthly or annual basis can be forecast.  But, clearly, if the Court agrees that post-Effective Date common benefit work should be compensated via a Set-Aside Fund, the set-aside must be in place before any Claims are paid.  The request is not premature.  Further, consistent with the Settlement Agreement and other cases, a 5% set-aside on monetary

---

"will necessarily . . . rely on individual representation to ensure the most successful result possible for individual claimants"); *see also* ECF No. 7346 (Top NFL Lawyers), at 6-8.  If so, then the Court may adjust the compensation in the future.  Some parts of settlement administration, such as selection of Qualified MAF Physicians over time, cannot be performed by individually retained counsel.  At this point, however, the sole issue is the creation of a fund from which compensation can be awarded, as necessary.

awards is reasonable to ensure that this compensation and incentive is provided going forward.[25] Obviously, the Court can reevaluate the set-aside at any point.

Unsurprisingly, several individually-retained lawyers, who have not performed any common benefit work in the past (and who likely will not perform any common benefit work in the future), have objected to the 5% set-aside. These objecting counsel know that for represented Class Members, as per the Settlement Agreement, any set-aside from a Monetary Award or Derivative Claimant Award will reduce the attorney's fee payable to that counsel by the amount of the set-aside. Settlement Agreement § 21.1 (ECF No. 6481-1), at 82. With very few exceptions, though, the objections to the 5% set-aside were filed by lawyers who did not acknowledge the fact that the 5% set-aside will come out of the lawyers' contingent fee portion,[26] rather than out of the Class Member's share. *E.g.*, ECF No. 7364-1 (Jones Objectors)

---

[25] Although some authorities consider the initial calculation of a holdback amount to be "purely arbitrary in nature," 5 *Newberg* § 15:116, at 432, that is because a holdback percentage is often adopted at an early stage in multidistrict cases, before settlements have been reached. Similarly, the cases cited by Class Counsel in their opening papers for the proposition that a 5% set-aside is reasonable were in such a posture. *See* ECF No. 7151-1, at 71 n.38. Neurocognitive Football Lawyers criticize Co-Lead Class Counsel for relying upon these cases. *See* ECF No. 7350, at 1-2. This Settlement's 65-year lifespan is so unique, however, that there are really no other cases in exact parallel. Nevertheless, it is helpful to highlight other cases wherein percentage set-asides in and around 5% were established. *But see In re Diet Drugs*, 582 F.3d 524, 533 (3d Cir. 2009) (noting that common benefit fees were awarded first in an interim fee award and then later in a final fee award). *See also* Section III.D, *infra* (further response to Neurocognitive Football Lawyers' argument that it is inappropriate to compensate Class Counsel for common benefit work done prior to and after Settlement's Effective Date).

[26] One of the exceptions, Top NFL Lawyers, acknowledged that the 5% holdback would come out of the individually retained attorneys' fees. *See* ECF No. 7346. Top NFL Lawyers assumed that lawyers are not yet individually retained and would be "increase[ing] the cost of their service by between 20-50% in most cases to their future clients," should the 5% set-aside be ordered. *Id.* at 10. These Objectors also suggested that the set-aside might cause individually retained lawyers "to reduce the time and effort on each individual claim to make up for the dramatically lower, projected revenues even a 2% set aside would cause. This is due to the simple economics of the business of a law practice." *Id.* One hopes that the market, and an

(Footnote continued . . .)

22

at 9 ("The Jones Objectors do not believe taxing the benefits payable to retired players or their families is either appropriate or necessary, particularly in light of the very large and fully funded Attorneys' Fees Qualified Settlement Fund.").  These counsel simply ignore the fact that it is they, and not their clients, who will have their compensation reduced by the set-aside.[27]

**B.** **Future Petitions for Awards to Reimburse Counsel for Post-Effective Date Common Benefit Work from the Set-Aside Fund**

Assuming that the Court determines that a Set-Aside Fund to pay for post-Effective Date common benefit work ought to be created and adopts the proposed 5% holdback, at some point in the future Class Counsel will be petitioning (at appropriate intervals) the Court for awards of fees and expenses from that fund.  Of course, before doing so, as noted in Co-Lead Class Counsel's opening papers, "Plaintiffs' counsel will submit, within thirty days of the Court's Order, a detailed plan of administration, including how the funds created from the holdbacks will be pooled and maintained, and how any attorney will apply for compensation for post-Settlement work performed."  ECF No. 7151-1, at 64.  Class Counsel expect that it will be about twelve months before they will file such a petition, consistent with the aforementioned plan of administration or whatever plan of administration the Court determines is appropriate.

---

abiding sense of ethics, will keep lawyers not yet retained from hiking their rates for work that, at this point, bears no contingency risk.

[27]  The only lawyers objecting to the 5% set-aside who have represented to this Court that they are not taking a contingent fee are the attorneys from Polsinelli PC, who represent Kevin Turner's estate against Podhurst Orseck P.A.  ECF No. 7029, at ¶ 2 (noting they are representing the estate of Kevin Turner on a pro bono basis).  Additionally, one pro se Class Member, Ronald Sabal, filed an objection to the holdback.  ECF No. 7351.  The impact of the requested set-aside upon a Class Member's portion of a monetary award is addressed in Section III.E, *infra.*

Accordingly, any ruling on the reasonableness of the amount or the timing of future compensation requests is not ripe.[28]

**C. Post-Effective Date Common Benefit Work and Expenses to Be Covered by the Set-Aside Fund**

At bottom, the objections to a common benefit set-aside reflect lack of knowledge of what is involved in this complex Settlement, largely due to the fact that most objecting counsel have done nothing on the case. None of these lawyers has lifted a finger to aid in the launch and the maintenance over time of the Claims Administration program, the BAP, and the Lien Resolution Program.[29] Nevertheless, because several objectors demand more detail, it is provided below.

As an initial matter, it should be noted that each one of the below tasks involved coordination between many varying parties through ongoing conference calls, meetings and emails, between Co-Lead Class Counsel, counsel for the NFL Parties, the Claims Administration team, the BAP Administration team, the Lien Resolution Administration team, and the Special Masters. Each of the below tasks that involved the drafting of a document included multiple

---

[28] Many objectors seem to think that the detail that will be provided when these petitions are filed needs to be furnished now. *See* ECF No. 7350 (Neurocognitive Football Lawyers), at 11; ECF No. 7373 (Merriweather Objectors), at 4-5. That is not the case. The Neurocognitive Football Lawyers even suggest that there should be discovery. ECF No. 7350, at 4, 8, 12. Such a suggestion would invite the kind of "second major litigation" that the Supreme Court has counseled against in fee application matters. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

[29] Class Counsel endeavor herein to state in painstaking detail the post-Effective Date common benefit work already completed and to be accomplished in the future because some objectors claim to not understand how the common benefit work performed and to be performed post-Effective Date that would be paid for by distributions over time from the proposed Set-Aside Fund, is distinct from the common benefit work (and the corresponding expenses) that was completed prior to the Effective Date, for which compensation is being sought from the $112.5 million paid by the NFL Parties. *See* ECF No. 7282 (Blizzard Objectors), at 6 (asserting that Class Counsel have not shown how the pre-Effective Date labor is different from the post-Effective Date labor).

rounds of review and editing by an individual or individuals from each camp, oftentimes requiring weeks of such iterative and collaborative work to prepare a final document or procedure. Similarly, each of the below tasks that involved the selection of individuals to serve in the Settlement, such as individual medical providers who will serve on the medical networks, demanded development of a process to solicit applications and then to vet and review each of the candidates, including wider investigation and credentialing, finally arriving at mutual approvals by the Parties for each of the selected providers.

By way of example and based upon the limited data available thus far, in the first quarter of 2017 alone, Seeger Weiss LLP already has invested over $600,000 in lodestar devoted to the below-described tasks. *See* Seeger Supp. Decl., at ¶ 15. Two high-level lawyers at Seeger Weiss, including a partner, have been working virtually full-time, and another lawyer as well as a paralegal have been working part-time on these common benefit implementation-related tasks since even before the January 7, 2017 Effective Date. *Id.* The work that they, Co-Lead Class Counsel, and other Class Counsel firms have been doing (and will do in the future) is set forth in paragraphs 14 to 38 of the accompanying Seeger Supplemental Declaration, and enumerated below. It captures only the major tasks that have been undertaken and can be anticipated to launch and maintain the Settlement Program

1. Drafting and Dissemination of Supplemental Notices

Class Counsel recognized, as did the Court, the importance of ensuring that all Class Members received clear and concise notice of the Effective Date for the Settlement and the need to register by August 7, 2017. To maximize participation, Class Counsel drafted and had the Claims Administrator disseminate via mail, email, and on the Settlement Website, the Pre-Registration Notice, and once the Registration opened on February 6, 2017, the formal

Supplemental Notice advising that Registration was open was drafted and disseminated.  In addition, Class Counsel is engaged in ongoing efforts, including further mailings, to inform Class Members of the need for registration to enjoy the benefits of the Settlement, and the ease with which registration can be accomplished.

　　　　2.　Implementation Paperwork and Retention of Key Officers

Class Counsel expended efforts to retain the administrators and Special Masters, conferring with them and with counsel for the NFL Parties to execute all necessary documentation for formal retention as well as developing documents that establish the fundamental operation of each of the Administrators, including Conflict of Interest plans and operational procedures.  Similarly, Class Counsel worked expeditiously to retain the Settlement Trustee and execute all necessary documentation to ensure that the Settlement Trust was established and would continue funding Settlement Benefits throughout the 65-year term of the Settlement.  In addition, Class Counsel have worked quickly with counsel for the NFL Parties, the Administrators, and the Special Masters to ensure that all forms required for the various medical providers were created in time to review the documents and vet the medical providers so as to have selections of providers agreed to by the Settling Parties well in advance of the dates of launch of the BAP and MAF.

　　　　3.　Work to Ensure Class Member-Friendly Registration and Claims Processes

As registration is the door through which each and every Class Member must pass before he/she can enjoy the benefits of the Settlement, Class Counsel dedicated many hundreds of hours with the Claims Administrator, the NFL Parties, and the Special Masters to the negotiation and development of the registration forms and procedures to ensure that the process was efficient and accessible so that no eligible Class Member would be denied entry.  Besides the creation of the

hard-copy forms, Class Counsel worked alongside the other parties to launch the on-line registration portal that can be used by Class Members to complete registration in a matter of minutes.  Underlying the registration process are hundreds of pages of procedures and other guidance documents that were created through the collaborative process discussed above.

In this respect, Class Counsel have worked and will continue to work with the Claims Administrator to continually update the Settlement Website, including its "Frequently Asked Questions" section.  This work was particularly demanding during several watershed moments in the Settlement's life thus far, including the passage of the Effective Date, the launch of Registration, and the commencement of the period to file claims.  This platform is particularly valuable to ensuring that Class Members have easy access to the most up-to-date information and clear guidance on the Settlement Program.  Class Counsel continue to work on revisions to the Settlement Website as new phases begin and additional forms and other documents become available for the Class Members, such as those relating to the BAP Program and the appeals process.  Additionally, Class Counsel worked with the Claims Administrator to assist in the transition of the handling of Class Member calls from the Call Center to the Claims Administrator, once the Effective Date was triggered.

Moreover, Class Counsel worked with counsel for the NFL Parties, the Administrators, and the Special Masters to ensure that all forms needed to submit a claim were prepared, and that they were all-inclusive and easily understood.  These forms covered not only the basic claim form, but also the supporting forms that need to be submitted to perfect a claim, including all of the Diagnosing Physician Certification Forms, beginning with the Pre-Effective Date Diagnosing Physician Certification Form, so that the claims by those Class Members who received Qualifying Diagnoses prior to the Effective Date can be processed as quickly as possible.

Additionally, Class Counsel worked with the Claims Administrator, the NFL Parties and the Special Masters to launch an on-line claims portal, where Class Members are guided through the claims submission process.   Underlying the entire claims process are hundreds of pages of procedures and other guidance documents that were created through the collaborative process discussed above.

       4.   Efforts to Widely Spread Information to Class Members

      As requested by the Court, and as part of its wider efforts to reach out to the Class about the Settlement Program, Co-Lead Class Counsel prepared a presentation for Class Members for the February 8, 2017 status conference (which the Court convened to address the status of the Settlement's implementation) and arranged for the conference to be live-streamed on the internet.   The presentation was designed to explain to Class Members watching and listening to the internet broadcast the next steps they needed to take, to inform them of the efforts being expended by all involved to get the Settlement programs up and running, to answer questions, and most of all to encourage registration.   In addition, Co-Lead Class Counsel also has held several webinars to speak to Class Members through the internet, to encourage registration and to answer questions about the Settlement, its benefits and how to obtain the benefits.   These webinars, like the wider outreach efforts, will be ongoing.   It appears that these efforts to encourage registration are bearing fruit and are likely to result in a participation rate that is higher than had been projected.   *See* Seeger Supp. Decl., Ex. JJ, at 6 (Dr. Vasquez' original projection for the participation rate of 59% has now increased to 63%, based upon the registration rates for the first eight weeks of the registration period).

5. <u>Efforts to Combat the Dissemination of Misinformation to Class Members</u>

Conversely, Class Counsel have had to battle the spreading of *mis*information to Class Members.  Class Counsel have received numerous reports of written and oral communications with Class Members, containing inaccurate or misleading information about the Settlement, by those seeking to profit from Class Members by charging fees or securing portions of Class Members' anticipated monetary awards.  In furtherance of their fiduciary duty, Class Counsel have made every effort to investigate these reports and, where warranted, bring matters to the Court's attention in order to protect Class Members.  *See* ECF Nos. 7175, 7347 (motions to enjoin improper communications and solicitations of Class Members).

6. <u>Selection of Advisory Panel Members and Appeals Advisory Panel Consultants</u>

The Appeals Advisory Panel is a panel of physicians, composed of, in any combination, five board-certified neurologists, board-certified neurosurgeons, or other board-certified neuro-specialist physicians, and the Appeals Advisory Panel Consultants is composed of three neuropsychologists.  It was not easy to agree with the counsel for the NFL Parties upon these eight individuals to recommend to the Court for appointment, but Co-Lead Class Counsel worked tirelessly for months so that the April 7, 2017 deadline was met.  These physicians will be advising the Special Masters and the Court.  *See* Settlement Agreement § 2.1(g)-(h), 5.13, 6.4, 9.8 (ECF No. 6481-1), at 9, 34, 37-38, 52.  Most immediately, however, these physicians will be reviewing certain claims where the diagnoses were made prior to the Effective Date to determine whether they are satisfactory Qualifying Diagnoses under the Settlement and will, in some instances, resolve disputes between BAP Providers as to the existence (or not) of a Qualifying Diagnosis.

7. <u>Selection and Orientation of Hundreds of Individuals to Serve as Qualified BAP Providers and Qualified MAF Physicians and Maintenance of These Physician Networks</u>

The time-consuming vetting process associated with the selection of those who will serve as Qualified BAP Providers and Qualified MAF Physicians has led to the initial launch of the MAF network and preliminary establishment of the BAP Provider network while Class Counsel and the other relevant parties continue to recruit and contract with additional physicians and providers.  Class Counsel have been participating in this work on virtually a daily basis since the Effective Date and fully expect that the BAP Administrator will remain on track to begin scheduling BAP examinations as of May 7, 2017, with the BAP opening on June 6, 2017.  On April 7, 2017, the list of Qualified MAF Physicians who are authorized to make post-Effective Date Qualifying Diagnoses was made available on the Settlement Website.  These were daunting tasks, but they have been accomplished.

Working with the BAP Administrator, the Claims Administrator, the NFL Parties and its own experts, Class Counsel have developed the services agreement that each physician and provider will need to sign to serve in the networks.  Through this same process, the parties have prepared the manuals that will be used by each of the administrators to train the physicians and providers on the medical aspects of the settlement, including the testing regimen at the heart of the BAP Program and what constitutes a Qualifying Diagnosis for the MAF.

Maintaining these networks over the life of the Settlement will require the same kind of engagement in recruiting new physicians and providers as the Settlement, like the Retired NFL Players and the original physicians and providers, age.

Moreover, Class Counsel will be actively monitoring and reviewing of these networks to ensure that the Retired NFL Football Players are receiving the care and services that they deserve under the Settlement.

8.   Participation on Class Members' Behalf in the Appeals Process

Given the Settlement's 65-year term and the volume of claims that will be submitted, appeals of Monetary and Derivative Claimant Award determinations will inevitably be filed, be they disputes of benefit denials or about the amount of an award, and there will likely be appeals of registration denials as well.  Besides Class Members themselves, Co-Lead Class Counsel have standing under the Settlement to appeal monetary award determinations.  Settlement Agreement § 9.5 (ECF No. 6481-1), at 51.  Class Counsel will be called upon to provide assistance to unrepresented Class Members and to represented Class Members' individually-retained counsel.  Because Class Counsel will gain experience in the appeal process over time, their assistance will be essential to Class Members who will face counsel for the NFL Parties on the opposing side.  Co-Lead Class Counsel also have the authority to make formal submissions in support of appeals taken by Class Members.  Settlement § 9.7(c) (ECF No. 6481-1), at 52.  As with their authority to file appeals, exercise of this authority will help to establish a decisional body that will facilitate the delivery of benefits to the Class.  Conversely, Co-Lead Class Counsel also have the authority to oppose appeals of awards made to Class Members that the NFL Parties may take, which is as important to protecting the rights of Class Members as the appeals taken on their behalf.

9.   Monitoring the NFL Parties' Funding of and Targeted Reserves for the Settlement

Class Counsel must continue to monitor the funds and insure that the NFL Parties comply with the funding and maintenance of targeted reserves for the MAF and BAP, as well as monitoring the Settlement Trust and the Trustee, under Article 23 of the Settlement.

10.   Establishing Procedures for and Participation in Periodic Audits of All Aspects of the Program, Including Medical Providers and Administrators

As with any program of this magnitude and duration, auditing procedures will need to be established to insure that all work done by the various parties engaged in the Settlement Program for the benefit of the Class Members is being done with efficiency and professionalism.  The sheer scope of the activities and participants, including each member of the physician networks, will demand significant time to perform the auditing functions.  Because it is anticipated that the NFL Parties will be engaging in such audits, it is important also to have Class Counsel involved.

11.   Replacing the Qualified BAP Providers and Qualified MAF Physicians,  Appeals Advisory Panel Members, and Appeals Advisory Panel Consultants

Inevitably, in light of the Settlement's 65-year term, physicians who have been selected to serve in the various roles will need to be replaced, whether for reasons of retirement, disability, death, or simply because they decide they no longer wish to participate in the Settlement Program.  The vetting and selection of replacement physicians is common benefit work that will need to be repeated hundreds of times over the 65-year life of the Settlement. Class Counsel already have gained experience in this process, which will allow physicians to be replaced quickly as they exit the Program.

12.   Revisiting of the Science Every Ten Years

The Settlement requires that the Settling Parties revisit the science every ten years to discuss in good faith the possible prospective modifications to the definitions of the Qualifying

Diagnoses or the protocols for making Qualifying Diagnoses (or both), in light of generally accepted advances in medical science.  Settlement Agreement § 6.6 (ECF No. 6481-1), at 35. Necessarily, this will require Class Counsel to independently consult with medical and scientific experts to keep abreast of developments in these areas over time.

* * * * *

In light of all of the common benefit work that already has been done post-Effective Date and that will undeniably need to be accomplished in the future, it is eminently reasonable to establish the Set-Aside Fund now.

### D. Certain Objectors' Suggestion That the Attorneys' Fees Qualified Settlement Fund Is Sufficient to Compensate Counsel for All Post-Effective Date Common Benefit Work

Certain objectors maintain that the $112.5 million[30] that the NFL Parties agreed to pay to Class Counsel for common benefit work performed prior to the Effective Date should also cover the fees and expenses for the common benefit work that has been and will be performed since the Effective Date.  *E.g.*, ECF No. 7161 (Objector Miller), at 7 (claiming that the $112.5 million is "more than sufficient . . . to cover all reasonable fees that Class Counsel may incur, whether for

---

[30] Some objectors improperly inflate the Class Counsel's potential compensation from funds paid by the NFL Parties to $128.5 million by disingenuously adding the Notice Costs and Administrative Costs to be paid by the NFL Parties to the $112.5 million for Class Counsel compensation funded by the NFL.  *See* ECF No. 7282 (Blizzard Objectors), at 2, 5-6; ECF No. 7344 (55 Players), at 3, 5.  They likely do this so that they can represent that the total amount potentially to be paid to Class Counsel for pre-Effective Date common benefit work represents a higher multiplier of their lodestar than the 2.6 multiplier represented in Class Counsel's opening papers.  ECF No. 7151-1, at 67.  Notice Costs and Administrative Costs, however, are plainly not part of the compensation to Class Counsel for common benefit work.  The benefit of those costs being separately paid by the NFL Parties (a benefit that Class Counsel negotiated) inures to the benefit of *Class Members*, who would otherwise be taxed with such costs from the recovery. *E.g.*, *In re Penn Cent. Secs. Litig.*, 560 F.2d 1138, 1146 (3d Cir. 1977) (unless class plaintiffs bargain with defendants to pay costs of notice, proper to assess cost against settlement fund); *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1162 (9th Cir. 2013) (settlement fund proceeds would be distributed to class members after costs of settlement administration were deducted).  It clearly does not inure to *Class Counsel's* benefit.

common benefit work, or for clerical work on their individual client's claims, for the next 65 years"); ECF No. 7350 (Neurocognitive Football Lawyers, PLLC), at 2 (taking issue with the fact that this case involves an "immediate and fully paid defined fee benefit and a subsequent substantial fee set aside")   Such a suggestion is not realistic, reasonable, or fair.

The pre-Effective Date common benefit work was very different than, and thus should be compensated differently and separately from, the post-Effective Date common benefit work. *See* Section III.C, *supra* (detailed description of post-Effective Date common benefit work).   Any comparison by objectors to cases in which post-effective date "common benefit work" consisted of a mere hand-off to a claims administrator are inapposite.   As described above, Class Counsel will necessarily play a very active role and there will be vital and time-consuming work to be done for the next 65 years to keep the Settlement Program functioning

Class Counsel's opening papers and the foregoing discussion provide ample justification for the Court's award of the $112.5 million in fees and expenses that the NFL Parties will pay related to common benefit work performed and expenses incurred prior to the Effective Date. The lodestar and expenses submitted in support of the requested $112.5 million common benefit fee and expense award were through December 28, 2016 only.  *See* Seeger Decl., dated Feb. 13, 2017 (ECF No. 7151-2), at Addenda 1-2 and Exs. C-X.   Therefore, the only fees and expenses that will be used as the bases for petitions for reimbursement from the Set-Aside Fund in the future will be expenses incurred and work performed after December 28, 2016.   There is simply no danger of "double-dipping."

**E.   Certain Objectors' Suggestion That They Should Not Have to Pay for Post-Effective Date Common Benefit Work at All**

Class Counsel recognize that for unrepresented Class Members and for those Class Members whose individually-retained counsel have elected to waive their contingent fees, the

5% set-aside will come out of the Class Member's share.  It is nonetheless fair, however, that they too contribute to the post-Effective common benefit work being done to benefit the Class.

Those who already have Qualifying Diagnoses contend that they have not reaped and will not reap the benefit of any common benefit work done after the Effective Date.  *See, e.g.,* ECF No. 7351 (Objector Sabal), at ¶¶ 7-9 (pro se Class Member with alleged Alzheimer's diagnosis asserting that post-Effective Date work does not benefit him); ECF No. 7205 (Turner), at 5 (claiming no further work required for Turner's claim to be paid); ECF No. 7360 (Hilgenberg and Duranko Estates), at 5 (estates of deceased Retired NFL Football Players who take issue with holdback because they purport to have obtained ALS diagnoses prior to their deaths).  That is not true.  Without the common benefit work performed to facilitate registration and claims processing, as well as the establishment of the Appeals Advisory Panel, even those with a diagnosis obtained prior to the Effective Date could not reap the Settlement's benefits.  Indeed, the Appeals Advisory Panel must evaluate such diagnoses in order to determine whether they are truly Qualifying Diagnoses in accordance with the Settlement.  Furthermore, the contention of a lack of benefit to these Class Members presupposes that they will not need to avail themselves of the appeals process, which would involve additional common benefit work.

Finally, the concept that those who purportedly already have Qualifying Diagnoses (a fact not established until the Appeals Advisory Panel declares the diagnosis as such) should not have to contribute towards the future operation of the Settlement ignores the concept and construct of a class action settlement, particularly this one.  The NFL Parties wanted global peace, both as to those who already manifested a neurocognitive or neuromuscular impairment and those who had not.  Without the resolution of Subclass 1 claims, there would have been no settlement.  The need to resolve the claims of those Class Members in Subclass 1 (*i.e.*, those

Class Members without a Qualifying Diagnosis prior to the Preliminary Approval date) required a program to address them.  Thus, it is fair that all Class Members contribute their fair share towards the common benefit work required to implement and maintain a Settlement that provides benefits to the members of both Subclasses.

## IV.  THE THREE OBJECTOR PETITIONS FOR ATTORNEY'S FEES

### A.  The High Standards for Awarding Fees to Objectors

There is something outlandish about parties who fought to scuttle the Settlement now asking to be paid for acting *to the detriment of the Class.*  These objectors delayed compensation to the Class by objecting in this Court, appealing, seeking en banc review, and seeking *certiorari.*  The key to an award of attorneys' fees is that the lawyers delivered benefit to the class.  Here, these attorneys hurt Class Members.  If they truly believe that they had improved the deal, then they should have supported it on appeal.  But they objected and lost.  In the words of an old pop song, "Did you ever have to make up your mind?  And pick up on one and leave the other behind?"  Objectors should get nothing.

Not surprisingly, there is no body of law supporting money for losing objectors, though they are often found reaching, palms outstretched.  Objectors to a class action settlement are "'not generally entitled to an award of counsel fees.'"  *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 658 (E.D. Pa. 2015) ("[C]ourts rarely award attorneys' fees to objectors."), *appeals dismissed*, Nos. 15-1456 (3d Cir. June 12, 2015), 15-1532 (Oct. 29, 2015), 15-1455 (Nov. 2, 2015); *accord id*. at 661 ("[C]ourts rarely award attorneys' fees to objectors."); *Newman v. Stein*, 58 F.R.D. 540, 543-44 (S.D.N.Y. 1973) ("[C]ounsel fees for an objector's counsel when the objections are overruled are granted only in exceptional circumstances.").

The limited exception is that objectors may be "entitled to compensation for attorneys' fees and expenses *if* the settlement was improved as a result of their efforts." *McDonough*, 80 F. Supp. 3d at 658 (emphasis added); *accord id*. at 660 n.35 ("District courts within the Circuit have generally considered the value added to the settlement, if any, by the objectors.") (citing cases); *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 395 (D.N.J. 2012) ("[O]bjectors must have economically benefitted the class or, at the very least, shown that a court adopted their objection."), *aff'd*, 558 F. App'x 191 (3d Cir. 2014).

The burden is on the objector to so demonstrate. *Faught v. Am. Home Shield Corp.*, 444 F. App'x 445, 446 (11th Cir. 2011); *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *15 (N.D. Cal. Apr. 3, 2013) (objector "ha[d] not met her burden in establishing that she conferred a substantial benefit to the class"), *appeal dismissed*, No. 13-16216 (9th Cir. June 12, 2014); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. 1203, 2002 WL 32154197, at *15 (E.D. Pa. Oct. 3, 2002) (objectors' counsel not entitled to fee award where they "failed to show that their supplemental objections actually conferred a benefit on the settlement class"). The objector must offer specific proof as to "what its efforts were, how they created a benefit, and why that benefit would not have been created absent its efforts." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 200 (3d Cir. 2005).

The Third Circuit has noted that district courts enjoy "broad discretion" in determining whether objectors should be awarded fees. *In re Cendant Corp. Sec. Litig.*, 404 F.3d at 201 n.17; *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 743 (3d Cir. 2001). Because an objector "makes his objection to the court, rather than merely negotiating with lead counsel, the court can easily evaluate not only the quality of the objector's work but also the impact it had on the

court's ultimate decision," and it is thus "able to measure the dollar value of the objector's contribution to the class's net recovery." *In re Cendant Corp. Sec. Litig.*, 404 F.3d at 201 n.17.

Importantly, objectors must produce an improvement in the settlement "worth more than the fee they are seeking; otherwise they have rendered no benefit to the class." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (citing cases); *accord Arnett v. Bank of Am., N.A.*, No. 3:11-CV-1372-SI, 2014 WL 5419125, at *2 (D. Or. Oct. 22, 2014); *Fraley v. Facebook, Inc.,* 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014), *aff'd*, 638 F. App'x 594 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 68 (2016); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 01-CV-01451-REB-CBS, 2007 WL 2087536, at *2 (D. Colo. July 17, 2007); *see also* David F. Herr, *Annotated Manual for Complex Litigation, Fourth* § 21.643, at 437 (rev. ed. 2016) (cautioning that "[f]ee awards made on the basis of insignificant or cosmetic changes in the settlement serve to condone and encourage improper use of the objection process").

In all, "[c]ases in which objectors are awarded attorney's fees are few and far between." *Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 513 (D. Del. 2003); *Martin v. Foster Wheeler Energy Corp.*, No. 3:06-CV-0878, 2008 WL 906472, at *10 (M.D. Pa. Mar. 31, 2008); *Mirfasihi v. Fleet Mortg. Corp.*, No. 01 C 722, 2007 WL 2608778, at *5 (N.D. Ill. Sept. 6, 2007), *aff'd*, 551 F.3d 682 (7th Cir. 2008).

## B. The Three Objector Cross-Petitions

### 1. The Faneca Objectors' Petition

Not long ago, the Faneca Objectors[31] castigated the class-wide Settlement as "a capitulation" and "a sell-out."  ECF No. 6201, at 16, 84.[32]  Among the many accusations they

---

[31] The Faneca Objectors (formerly known as the Morey Objectors) are Class Members Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine, who unsuccessfully sought to formally intervene in this litigation (ECF Nos. 6019,

(Footnote continued . . .)

levelled was that, motivated by the desire for pecuniary gain, Class Counsel had conducted a misleading "propaganda" campaign in support of final approval. *See id.* at 63 (asserting that "Class Counsel – *who stand to receive a huge payday* upon approval – have falsely described the Settlement to the media.") (emphasis added); *id.* at 16 (complaining that the NFL "gets a near-absolute release without providing adequate and reasonable compensation in return," while "Class Counsel . . . get an extraordinary fee"). Moreover, before the Third Circuit they accused Class Counsel of having done "very little work." Seeger Supp. Decl., Ex. AA, at 18 (Third Circuit 23(f) Petition).

Twenty-seven months after hurling these accusations, the Faneca Objectors were back in this Court. Only now, however, their tune had changed. They had reinvented themselves as virtual co-architects of the Settlement, and their pitch was that a number of modest adjustments to and clarifications of the Settlement to which the Settling Parties agreed after the Rule 23(e)(2) Fairness Hearing – *all of which were proposed by the Court* (ECF No. 6479) – merit an outsized reward of $20 million, which is almost one-fifth of the Attorneys' Fees Qualified Settlement Fund established under the Settlement to compensate Class Counsel, and of the approximately $106.82 million in fees requested by Class Counsel.[33] *Compare* Faneca Objectors' Mem. of

---

6107), and who filed objections to the Settlement on October 6, 2014 (ECF No. 6201; *see also* ECF Nos. 6232, 6455, 6469-70). Three of their cohorts, including the former lead objector in this faction (Sean Morey), dropped out as objectors in favor of opting out of the Class. *See* ECF No. 7070-1, at 14 n.11; *see also* ECF No. 6507-1, at 2, 4 (Claims Administrator's Eighth Opt-Out Report, noting timely opt-outs of Sean Morey, Ben Hamilton, and Robert Royal).

[32] Except where otherwise noted, where documents filed on the Court's ECF system are cited, page number references thereof are to the ECF pagination rather than the pagination at the bottom of the original document.

[33] *See* Settlement Agreement §§ 21.2, 23.7 (ECF No. 6481-1), at 82, 90 82 (providing, *inter alia*, that "the NFL Parties' obligation to pay class attorneys' fees and reasonable costs is

(Footnote continued . . .)

Law in Support of Pet. for an Award of Attorneys' Fees and Expenses [ECF No. 7070-1] ("Faneca Br.") at 31, 37, 39, 47-48 *with* ECF No. 7151, at 3, 56.[34]  This is simply ludicrous.

> ### a. The Faneca Objectors Wrongly Take Credit for the Post-Hearing Modifications to the Settlement

As an initial matter, in both their petition and their preliminary response to both other objections and the Armstrong Objectors' cross-petition for a fee award,[35] the Faneca Objectors gloss over the salient fact that they were not out to improve the Settlement but to torpedo it. They challenged it at the preliminary approval stage (including by trying to take an interlocutory appeal via a Rule 23(f) petition), as well as at the final approval stage.  Nor were they content with the improvements that they *now* extol and robustly value at anywhere from $102.5 to $120.4 million but, instead, appealed this Court's final approval decision to the Third Circuit.  In short, they sought to block the Settlement, vigorously asserting alleged intra-class conflicts and dismissing the deal as a "sell-out."  They do not deserve to be compensated for their aggressive – and fortunately unsuccessful – campaign.  As one court aptly put it, "it is difficult to perceive

---

limited to those attorneys' fees and reasonable costs ordered by the Court as a result of the initial petition *by Class Counsel*") (emphasis added); Order filed Mar. 7, 2017 (ECF No. 7246).

[34]   Citations to the Faneca Objectors' brief in support of their fee petition are to the page numbers of the original document, not the ECF pagination.

[35]  The "Armstrong Objectors" are Class Members Raymond Armstrong, Larry Barnes, Larry Brown, Drew Coleman, Kenneth Davis, William B. Duff, Kelvin Mack Edwards, Sr., Phillip E. Epps, Gregory Evans, Charles L. Haley, Sr., Mary Hughes, James Garth Jax, Ernest Jones, Michael Kiselak, Dwayne Levels, Darryl Gerard Lewis, Gary Wayne Lewis, Jeremy Loyd, Lorenzo Lynch, Tim McKyer, David Mims, Clifton L. Odom, Evan Ogelsby, Solomon Page, Hurles Scales, Jr., Barbara Scheer, Kevin Rey Smith, Willie T. Taylor, George Teague, and Curtis Bernard Wilson, who filed objections to final approval of the Settlement (ECF Nos. 6233 [am. initial objections], 6503 [supplemental objections]); unsuccessfully appealed this Court's Final Approval decision to the Third Circuit (ECF No. 6551 [notice of appeal]); and then unsuccessfully petitioned the Supreme Court to review the Third Circuit's decision affirming this Court, *Armstrong v. NFL*, 137 S. Ct. 607 (2016) (No. 16-413) (denying *certiorari*).

why a lawyer should be awarded fees for a settlement that he or she is trying their best to see is never paid to the class members." *Zawikowski v. Beneficial Nat'l Bank*, No. 98 C 2178, 2001 WL 290402, at *1 (N.D. Ill. Mar. 22, 2001).

At any rate, as noted above, it was the Court that proposed the changes for which the Faneca Objectors want $20 million. *See* Section IV.B.1, *supra*. Not surprisingly, courts have uniformly declined to award attorneys' fees to objectors where they did not rely on the objectors' arguments or where an objector's suggestions merely coincided with the court's. *See In re Polyurethane Foam Antitrust Litig.*, 169 F. Supp. 3d 719, 721, 723 (N.D. Ohio 2016) (denying fees to objector where court "decided these issues on its own"; "[t]his Court's analysis was not substantially enhanced *because of* [the] Objection, nor was the fee reduction ordered by this Court *attributable to* [objector's] arguments") (emphasis in original); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3328249, at *2 (W.D. Ky. Aug. 24, 2010) ("There was no cause and effect between the decisions of this case and the action of the [objector], even if at times it coincided with some of the [objector's] suggestions"); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 132 (S.D.N.Y. 2009) (denying objectors' counsels' request for fees because modifications to notice program "were entirely on the Court's initiative and devised by the Special Master and the parties"), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 393 (S.D.N.Y. 2005) (denying objectors' fee application where "[f]undamentally, the Court needed little or no assistance from the Objectors" in determining changes to class counsel's fee application).

At a minimum, where a court itself contemplated the same points raised by objectors "the significance of [the objectors'] efforts is sharply reduced under the circumstances" and warrants

reduced compensation.   *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 842 F. Supp. 2d 346, 351 (D. Me. 2012) (reducing award by almost one-half that requested by objector; although objector "must decide whether to object without knowing what objections may be moot because they have already occurred to the judge," where court had already been disposed towards change urged by objector "the significance of his efforts is sharply reduced under the circumstances") (citation and internal quotation marks omitted).

Simply stated, the Faneca Objectors "have vastly overstated the role they played in this case." *Azizian v. Federated Dep't Stores, Inc.*, No. C-03-3359 SBA, 2006 WL 4037549, at *2 (N.D. Cal. Sept. 29, 2006) (internal quotation marks omitted); *accord In re Cardinal Health, Inc. Secs. Litig.*, 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008) (objectors "drastically overestimated their value").   Accordingly, the Court should deny their petition or, at most, grant a *de minimis* award consistent with a *de minimis* contribution to the Class.

### b.   The Faneca Objectors Overvalue the Post-Fairness Hearing Changes to the Settlement

Time and again, the Faneca Objectors' contentions cry out for a reality check.   The assertion that the modifications for which they seek credit (leaving aside whether they are in fact entitled to any credit) added anywhere from $102.5 to $120.4 million in value to the Settlement is pure fantasy.   *See* Faneca Br. (ECF No. 7070-1), at 20-28; ECF No. 7366-1, at 7 (Decl. of CPA Joseph J. Floyd).

As demonstrated by the accompanying Updated Analysis of Dr. Vasquez, *see* Seeger Supp. Decl., Ex. JJ, the change of the Death with CTE Monetary award date, the crediting of NFL Europe playing time towards Eligible Seasons (*see* Settlement Agreement § 2(kk), ECF No. 6481-1, at 13), and the assurance of funding to provide BAP examinations to all Class Members (*see* Settlement Agreement § 23.3(d), ECF No. 6481-1, at 87), were cumulatively worth

approximately less than half the value that the Faneca Objectors and their putative expert have

ascribed to those changes.  Vasquez Updated Analysis at 3 (Table 1).[36]  The Faneca Objectors'

valuation arguments rest on untenable assumptions, such as their speculation that 96% of the

former NFL Football Players who died between July 2014 and April 2015 would have had CTE

so as to qualify for a "Death with CTE" award, Faneca Br. at 32-33, even though no medical

evidence had been adduced relating to those Class Members.  The argument is simply a rehash of

the objectors' arguments prior to Final Approval that CTE should in and of itself be compensated

because most players have it allegedly have it, an unproven contention resting on shaky scientific

evidence.[37]

The Faneca Objectors' contention that the appeal fee waiver for hardship added almost

$11 million in value to the Settlement is based on even flimsier speculation.  *See* ECF No. 7070-

1, at 27-28.  Their putative expert merely parrots this same speculation.  *See* ECF No. 7366-1, at

15-16 (CPA Floyd's assumption of same appeal rate as for NFL's disability program).  There is

simply *no* way to tell how many Class Members will need to appeal Monetary or Derivative

Claimant Award determinations, let alone how many will have financial circumstances that

necessitate recourse to the hardship waiver.  In this respect, the Faneca Objectors' drawing of

---

[36]   In this respect, Class Counsel rely on the accompanying valuation performed by Dr. Vasquez, an economist with longstanding expertise in this field who has engaged in developing economic models for U.S. and foreign governments, and who has been consulted in numerous litigations and whose Declaration accompanies this memorandum.  Earlier, Dr. Vasquez had prepared a valuation of the Settlement that Class Counsel filed with the Court in support of Final Approval.  *See* ECF No. 6423-21.  By contrast, the valuation that the Faneca Objectors have submitted is from a CPA having no demonstrable experience in the specific realm of settlement valuations.  *See* ECF No. 7366, at 5-6.

[37]   This argument also ignores that a Class Member who died between July 2014 and April 2015 and received a post-mortem CTE diagnosis also might have been diagnosed years prior, while younger, with another Qualifying Diagnosis, like ALS or Parkinson's Disease.  *See* Updated Analysis of Dr. Vasquez (Seeger Supp. Decl., Ex. JJ), at 8 n.6.

parallels between the NFL's disability program and the claims process for MAF benefits is a proverbial apples-to-oranges comparison.  The Monetary and Derivative Awards programs will not be run under the NFL's auspices but, rather, by an independent Court-appointed Administrator (ECF No. 6534, at ¶ 13 [confirming appointment of BrownGreer PLC as Claims Administrator]), and Class Counsel's role in overseeing the Settlement's implementation and ensuring fair treatment of Class Members need not be discussed again here.  The Court is well aware of it.  Any suggestion that the appeal rate will be the same as for the NFL's disability program is pure conjecture.

Finally, the provision relieving Representative Claimants from having to submit medical records where a deceased NFL Football Player had received a Qualifying Diagnosis while he was still alive but his medical records are unavailable due to a *force majeure* type of event (Settlement Agreement § 8.2(a)(ii), ECF No. 6481-1, at 43-44) simply cannot be valued because there is no way to predict the number of instances where recourse to this provision will be necessary, let alone to estimate the value of the benefits at issue for those claims.  In any event, even the Faneca Objectors do not claim credit for this modification.

### c.  The Fee Request Is Excessive

The Faneca Objectors contend that the $20 million award that they seek is reasonable given their $4,312,565 lodestar.  Faneca Br. (ECF No. 7070-1), at 39-48.  In other words, they seek a lodestar enhancement double that of Class Counsel, even though the bulk of their time was spent on ***losing***.

Because objectors play a much more limited role in class action litigation than do class counsel, courts do not treat their fee petitions as if they were class counsel and award them fees for all of their work conducted in the course of the litigation.  Instead, any fees must be limited to

that work which reflects the value the objectors conferred upon the class. *Spark*, 289 F. Supp. 2d at 513; *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563, 565 (D.N.J. 2003) (objectors "played a different role in this litigation from that of Class Counsel"; hence court would not treat objectors' fee petition "as if they were class counsel" and objectors would "not be awarded fees for all of their work conducted in the course of this matter"), *aff'd*, 103 F. App'x 695 (3d Cir. 2004); *see In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 467-68 (D.P.R. 2011) (denying as "clearly excessive" objectors' request for same percentage share of increased recovery for class as 23% of common fund granted to lead counsel because "[o]bjectors['] substantive participation in this litigation was for a much more limited scope and duration than Lead Counsel's" and they "did not have the responsibility of organizing the Class or defending against motions to dismiss or a host of Lead Counsel's other obligations"); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 359 (N.D. Ga. 1993) ("An appropriate fee award for objectors . . . would compensate counsel for the reasonable fees and expenses actually accrued in pursuit of their objections, nothing more" where objectors' counsel "did not work over the course of three years against a vigorous defense in pursuit of complex and unique claims, nor did counsel shoulder the financial burden of pursuing the action.  Instead, objectors argued the nuances of the settlement during the twilight of this litigation.").

Indeed, courts, including in this Circuit, typically have either reduced the claimed lodestars of objectors' counsel, refused to award them multipliers altogether (or applied multipliers substantially less than the factor sought), or both in order to account for unsuccessful endeavors or for the shorter time span of their involvement in the litigation. *E.g.*, *In re Riverstone Networks, Inc.*, 256 F. App'x 168, 170 (9th Cir. 2007) (district court acted within its discretion "when it discounted hours [claimed by objector's counsel] that did not benefit the

class"); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 368 (E.D.N.Y. 2010) (reducing objector's lodestar to account for time expended on issues that produced no benefit to the class); *Park v. Thomson Corp.*, 633 F. Supp. 2d 8, 13 (S.D.N.Y. 2009) (declining to award multiplier because, unlike "class counsel's involvement with this action since filing the complaint . . . and the significant risks attendant to the litigation," objector "did not appear in this action until three years later and the time that he devoted to this matter spanned a far shorter interval"); *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 278-79 (E.D.N.Y. 2009) (reducing objectors' counsel's lodestar by one-half and declining to award multiplier given "immodesty of . . . Counsel's fee petition" that was "astonishing" and counsel's "exaggerated" conception of scope of changes attributable to objection); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563, 565 (D.N.J. 2003) ("Objectors will not be awarded fees for all of their work conducted in the course of this matter.  Instead, the Court will follow precedent and award fees which reflect the value the Objectors conferred upon the class."), *aff'd*, 103 F. App'x 695 (3d Cir. 2004); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 6909680, at *8 (N.D. Cal. Oct. 24, 2016) (rejecting objector's request for 3.0 lodestar multiplier, and weighing his contributions – his raising of "colorable criticisms" of certain features of settlement and "the potential assistance his experience and skill might have brought to the Class had Lead Counsel welcomed it – against his "lack of meaningful involvement in the case, his running antagonism with Lead Counsel, and his ultimate filing of unmeritorious and potentially harmful objections," and applying lodestar multiplier of 1.15); *Mirfasihi*, 2007 WL 2608778, at *6-7 (noting that objectors had "burdened the court at least as much as they ha[d] helped it" and reducing award "to account for the burden that the objectors ha[d] placed on all parties involved"); *see also Lobur v. Parker*, 378 F. App'x 63, 64-65 (2d Cir. 2010) (district

court acted within its discretion in reducing objectors' lodestar and refusing to award multiplier "as a reasonable means of tailoring the fee award so as to more accurately reflect a reasonable value of the time and effort contributed by [their] counsel with respect to the class settlement"); *Sobel v. Hertz Corp.*, 53 F. Supp. 3d 1319, 1333-35 (D. Nev. 2014) (awarding fees to objectors based only on their lodestar, with no multiplier); *Azizian*, 2006 WL 4037549, at *10 (recommending application of negative multiplier of .3 to objectors' lodestar "based upon the limited extent of their contributions"); *see also In re AOL Time Warner ERISA Litig.*, No. 02 CV. 8853 (SWK), 2007 WL 4225486, at *3 (S.D.N.Y. Nov. 28, 2007) (denying fees to objectors' counsel where "the Objection contained arguments counterproductive to the resolution of the litigation").

### (1) Most of the Faneca Objectors' Work Should Not Be Compensated Because It Did Not Benefit the Class

Thus, even assuming that the Faneca Objectors were *both* (a) indeed the catalyst for several of the post-Fairness Hearing amendments to the Settlement *and* (b) correct about the value of those changes, they are still not entitled to the huge award they seek because most of what they did – including *all three* of their appeals or putative appeals (among which were their highly irregular Rule 23(f) petition, which the Third Circuit denied for lack of appellate jurisdiction), their motion to intervene (ECF No. 6019), and their motion to take discovery of Class Counsel (ECF No. 6169) – fell flat and achieved nothing for the Class, as the rival Armstrong Objectors note. Armstrong Objectors' Mem. of Law in Support of Their Pet. for an Award of Attorneys' Fees (ECF No. 7232) ("Armstrong Br.") at 13.[38]

---

[38]   Citations to this filing are to the ECF pagination.

Among the Faneca Objectors' many rejected contentions and unsuccessful filings were the following:

- The Class was not adequately represented, including the contention that despite the separate Subclasses, each having its own counsel, the Class did not pass muster under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  Fan. Obj.[39] at 35-51.[40]

- The failure to compensate CTE as such and the "arbitrary" limitation of "Death with CTE" monetary awards to Class members who deceased prior to the date of preliminary approval of the Settlement (later modified to final approval).  Fan. Obj. at 36-47.[41]

- The Settlement's 75% offset for non-NFL experienced traumatic brain injury or stroke.  Fan. Obj. at 47-49.[42]

---

[39]  "Fan. Obj." refers to pages of the Objection of Sean Morey, Alan Faneca, Ben Hamilton, Robert Royal, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine to Class Action Settlement, filed Oct. 6, 2014 (ECF No. 6201).  Page references thereto are to the ECF pagination.

[40]  The Court rejected this argument in a detailed discussion of the adequacy of both the Subclass Representatives and Class Counsel.  *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 373-79.

[41]  This argument ignored the consensus that the science of CTE is undeveloped, as this Court found.  *See In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 397-98.  As for the cutoff date for "Death with CTE" awards being the date of final settlement approval, that reflected the plain reality that the NFL was adamant throughout negotiations that it was not willing to compensate for anything other than certain manifestations of neurocognitive and neuromuscular diseases, but ultimately was willing to make an exception to allow CTE to serve as a proxy for the manifestation for players who deceased prior to final approval, because those players' families were not similarly situated to living players, who could be tested and could obtain a Qualifying Diagnosis under the Settlement.  The Court discussed this reality at length.  *Id.* at 397.

[42]  This argument overlooked the fundamental principle that class-action settlements often involve line-drawing among class members.  *See Milligan v. Toyota Motor Sales, U.S.A., Inc.*, No. C 09-05418 RS, 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012) ("Of course, settlement involves some line-drawing, and full compensation is not a prerequisite for a fair settlement.") (citation and internal quotation marks omitted).  More to the point, it disregarded the fact that strokes and brain traumas occur in the general population and cause harms regardless of whether the individual ever played football, and that there are predictable neurocognitive impairments that afflict an older population.  As this Court found, these offsets were reasonable in light of the

(Footnote continued . . .)

- The Class Notice was misleading, and inconsistent with both Rule 23(e) and Due Process requirements. Fan. Obj. at 52-63, 67-68. The Faneca Objectors characterized the Class Notice as "outright false." *Id.* at 17.[43]

- The lack of formal discovery weighed against final approval. Fan. Obj. at 70-72.[44]

- The NFL's ability to withstand a judgment far greater than the value of the Settlement militated against approval. Fan. Obj. at 72-73; *see also* ECF No. 6420, at 3-9.[45]

- The allegedly negative reaction of Class members to the Settlement warranted its rejection. Fan. Obj. at 74-75.[46]

---

undisputed scientific evidence that there are independent factors that could break the causal link between such impairments and football play. *See In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 379.

[43] The Court also rejected these arguments, finding that the Class Notice was neither confusing nor misleading and that it comported with both Rule 23 and due process requirements. *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 382-86. The Third Circuit agreed. *In re NFL Players Concussion Injury Litig.*, 821 F.3d at 435-56.

[44] This argument was oblivious to both the Court's stay of formal discovery pending resolution of the NFL's motion to dismiss on federal preemption grounds (ECF No. 3384) and the fulsome informal discovery that had taken place during the course of settlement discussions and the formal mediation.

[45] The Court determined this consideration to be no worse than neutral given the NFL's agreement to uncap the Monetary Award Fund. *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 394. This not being a case in which the ability to pay was invoked as a limitation on the settlement recovery, the Faneca Objectors' argument was far from convincing. "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining [*Girsh*] factors, this fact alone does not undermine the reasonableness of [a] settlement." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 323 (3d Cir. 2011) (en banc) (citation and internal quotation marks omitted).

[46] This contention bordered on the frivolous given that fewer than 1% of all Class members lodged objections, and only another 1% opted out. *See In re NFL Players Concussion Injury Litig.*, 821 F.3d at 438. Many of the latter have since rescinded their opt-outs. *See* ECF Nos. 7340-1 (at ¶¶ 5-6), 7374.

- The prospects of establishing the NFL's liability and the Class's entitlement to damages – including the relative strengths and weaknesses of both Plaintiffs' claims and the NFL's defenses – also weighed against approval.  Fan. Obj. at 76-83.[47]

- Motions for leave to take discovery, including depositions of Co-Lead Class Counsel Christopher Seeger and the two Subclass Counsel, Arnold Levin and Dianne Nast, pertaining to the settlement negotiations.  ECF Nos. 6169, 6211, 6461.[48]

- A petition pursuant to Fed. R. Civ. P. 23(f) to obtain interlocutory review of the Court's preliminary approval of the Settlement.[49]

---

[47]  This argument pooh-poohed the NFL's formidable defenses, which included federal preemption, assumption of risk, statutes of limitations, statutory employer, and lack of general or specific causation, the first of which it has successfully asserted in a number of lawsuits.  *See* ECF No. 7151-1, at 41 n.27 (citing cases).

[48]  The Court denied that motion before the Rule 23(e)(2) Fairness Hearing.  ECF No. 6245.  Discovery of class counsel by objectors is disfavored, and the Faneca Objectors demonstrated nothing to warrant it.  *See Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987) (discovery of class counsel "is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive"); *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D. Ga. 1992) ("Objectors are not entitled to discovery concerning settlement negotiations between the parties in the absence of evidence indicating that there was collusion between plaintiffs and defendants in the negotiating process."); Herr, *Annotated Manual for Complex Litigation, Fourth* § 21.643, at 438 ("A court should not allow discovery into the settlement-negotiation process unless the objector makes a preliminary showing of collusion or other improper behavior.") (footnote omitted).

[49]  The Third Circuit denied the 23(f) petition on September 11, 2014.  ECF No. 6166.  In a subsequent opinion explaining the denial, the Court of Appeals' majority held that the court lacked appellate jurisdiction because this Court had "yet to issue 'an order granting or denying class certification,'" *In re NFL Players' Concussion Injury Litig.*, 775 F.3d 570, 588-89 (3d Cir. 2014), and even the dissenting judge agreed that the petition should be denied because the Faneca Objectors were creating "inefficient (indeed, chaotic) piecemeal litigation that would interfere with the formal fairness hearing on the settlement."  *Id.* at 589.  Neither in their 23(f) petition nor the reply in support thereof did the Faneca Objectors cite a *single* case in which a circuit court had *ever* granted 23(f) review of a preliminary settlement approval order that provisionally certified a settlement class.  *See* Seeger Supp. Decl., Exs. AA-BB *passim*.  Nor, in the course of their attacking in their 23(f) petition the Class Notice that this Court had approved, did they cite a single case in which a circuit court insinuated itself in the middle of the Rule 23(e) final approval process and required a district court to redo class notice after preliminary approval.  *See id.*, Exs. AA (petition) at 17, BB (reply) at 8.  Indeed, the Faneca Objectors'

(Footnote continued . . .)

- Their motion to intervene (ECF No. 6019).[50]

- An appeal (ECF No. 6136) of this Court's denial of their motion to intervene.[51]

- An unsuccessful appeal (ECF No. 6568) that challenged this Court's decision granting final approval to the Settlement. *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016), *aff'g* 307 F.R.D. 351 (E.D. Pa. 2015).

To award the Faneca Objectors $20 million on the basis of a $4.3+ million lodestar built up through so many failed arguments and filings would give them a huge windfall, unfairly rewarding them for inundating this Court and the Third Circuit with this meritless barrage that yielded no benefit to the Class. *See Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 688 (7th Cir. 2008) (in determining whether to award fees to objectors, court must balance improvements they produced "minus the detriment caused by their courtroom antics"); *In re AT&T Corp. Sec. Litig.*, No. 00-5364 (GEB), 2006 WL 2786945, at *2 (D.N.J. Sept. 26, 2006) (denying fees where

---

misguided effort to have the Third Circuit order this Court to reissue notice would only have sown immeasurable confusion among Class Members. In all, had the Faneca Objectors' interlocutory review gambit succeeded, it would have unnecessarily prolonged this litigation by years and delayed compensation for Class Members so desperately in need of relief. As it is, Subclass 2 representative Kevin Turner would not live to see the resolution of the slew of meritless appeals and *certiorari* petitions filed by the Faneca and Armstrong Objectors and others that attacked the Settlement.

[50] The Court denied this motion on July 29, 2014.  ECF No. 6107.

[51] The Faneca Objectors withdrew this appeal just one week after the Third Circuit's rebuff of their 23(f) petition.  *In re NFL Players' Concussion Injury Litig.*, No. 14-3693 (3d Cir. Order granting Fed. R. App. P. 42(b) mot. filed Sept. 18, 2014).

"objections and subsequent appeal resulted in wasteful litigation and delayed the distribution of funds to the Class").[52]

It is because the Faneca Objectors' claimed 6,300 hours, *see* Faneca Br. (ECF No. 7070-1), at 5, 44, invariably reflect so much work on fruitless endeavors that, even accepting the inflated value they place on those improvements, the hefty percentage of the asserted improvements or of the total potential fee pool that they seek as a fee is plainly excessive.[53]  As the leading class action treatise notes, "[c]ourts are not very sympathetic" to awarding objectors a percentage of what they have generated for a class "for the simple reason that a lodestar cross-check tends to reveal that the objectors' lawyers did not spend (*or should not have spent*) huge amounts of time on the objection and hence that a percentage award would generate too high a multiplier, or a windfall," or "since most objections are litigated quickly, a percentage approach is often likely to embody a windfall."  5 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 15.94, at 370 (5th ed. 2015) (emphasis added).

---

[52]  Although the Faneca Objectors have not broken down their time submissions by specific tasks or projects, their counsel's supporting papers implicitly acknowledge that a huge chunk of the claimed 6,300 hours were invested in these failed endeavors.  *See, e.g.*, Molo Decl. at ¶¶ 14-18, 24, 35-41 (ECF No. 7070-2, at 5-7, 9, 15-17) (acknowledging his firm's work on unsuccessful intervention motion, opposition to preliminary approval, Third Circuit appeals, motion to take discovery of Class Counsel, and negotiations with NFL); Declaration of William T. Hangley, dated Jan. 9, 2017 (ECF No. 7070-2, at 59-60), at ¶¶ 6, 9 (acknowledging assistance on unsuccessful intervention motion, opposition to preliminary approval, and Third Circuit appeals); Declaration of Linda S. Mullenix, dated Jan. 9, 2017 (ECF No. 7070-2, at 80), at ¶¶ 6, 8 (same).  At any rate, this conclusion is inescapable given the plethora of unsuccessful filings and arguments catalogued above.

[53]  Co-Lead Class Counsel wish to be clear here that they are *not* suggesting that the hours claimed by the Faneca Objectors' counsel were not genuinely expended.  Nor are they calling into question the reasonableness of the time it took to put together various filings, the quality of their work, or the reasonableness of counsel's hourly rates.  Rather, the point here is that the Faneca Objectors cannot be compensated for so much unsuccessful work because objector counsel simply do not stand on an equal footing with court-appointed attorneys for a class in matters of compensation.

Consequently, if the Court determines that some award to the Faneca Objectors is in order, the Court should steeply reduce their counsels' lodestar.  Alternatively, or in addition, the Court should apply a negative multiplier to their lodestar.  *See* Section IV.B.1.c(2), *infra*.

>    **(2)  The Requested $20 Million Award Would Result in More Favorable Treatment of the Faneca Objectors Than of Class Counsel**

Not only was so much of the Faneca Objectors' time invested in futile efforts and arguments that did not benefit the Class, but also even accepting the value that they place on the post-Fairness Hearing modifications to the Settlement, the Faneca Objectors' request for nearly one-fifth of the Attorney's Fees Qualified Settlement Fund represents more than *twice* the roughly 9% of the Settlement's benefit value that the NFL has agreed to pay in fees and which Class Counsel are seeking for all of their work in the case, which spanned some five years. *Compare* Faneca Br. at 31, 39 *with* ECF No. 7151-1, at 14, 50.  Indeed, it is deceptive for the Faneca Objectors to argue that they are seeking "a reasonable percentage" (Faneca Br. at 31) when they know (or ought to know) full well that any fee award to the team of lawyers who litigated this case, secured the Settlement, and defended it is effectively capped *at less than half* that percentage by the very terms of the Settlement.  Likewise, the Faneca Objectors' requested award represents a 4.6 multiplier on their lodestar, which is almost 1.8 times the 2.6 multiplier that Class Counsel would receive on their lodestar if the Court grants the full award that the latter seek. *Compare* Faneca Br. at 48 *with* ECF No. 7151-1 at 14, 50, 67.

It would be inequitable for objector counsel – who had a much more limited role in the litigation overall and most of whose work was for naught – to receive a higher multiplier on their lodestar and an award amounting to a much more generous fraction of their alleged contributions than would Class Counsel. *See Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 815-16 (N.D. Ohio 2010) (where objector sought higher multiplier than that granted to class counsel,

court held multiplier unwarranted given objector's and his counsel's "very limited role in th[e] litigation"); *Park v. Thomson Corp.*, 633 F. Supp. 2d 8, 13 (S.D.N.Y. 2009) (denying multiplier to objector's counsel John Pentz (who is also counsel for objector Cleo Miller here (*see* ECF No. 7161); noting that class counsel's multiplier "was based, *inter alia,* on class counsel's involvement with this action since filing the complaint . . . and the significant risks attendant to the litigation," whereas Pentz "did not appear in this action until three years later and the time that he devoted to this matter spanned a far shorter interval").

Notably, the Faneca Objectors cite no case in which a court handed an award of fees to objector counsel of the magnitude that they seek.  To the contrary, their own cases undermine their request.  In *In re Ikon Office Solutions, Inc., Securities Litigation*, 194 F.R.D. 166 (E.D. Pa. 2000) (Faneca Br. at 48), this Court awarded a modest fee of $10,000 to the objectors out of more than $32.4 million awarded to class counsel.  *Id.* at 197.  In *Great Neck Capital Appreciation Inv. P'ship, LP v. PricewaterhouseCoopers, LLP*, 212 F.R.D. 400 (E.D. Wis. 2002) (Faneca Br. at 48), the court awarded class counsel $3,045,000 out of a settlement fund of $10,150,000, and rejected as excessive the objector's request for a 10% cut of that fee award (about half of the percentage the Faneca Objectors seek here), awarding them instead 5 percent (or $152,500).  *Id.* at 412, 416.  In *Dewey* (Faneca Br. at 39-40), the 13.4% of the value added by the objectors (again, a substantially lower percentage than what the Faneca Objectors seek here) amounted to a modest award of under $105,000.  *Dewey*, 909 F. Supp. 2d at 397.  Finally, the Faneca Objectors' reliance on *Lan v. Ludrof*, No. 1:06CV114-SJM, 2008 WL 763763 (W.D. Pa. Mar. 21, 2008) (Faneca Br. at 40), misfires because the 25% of the increased value that the court awarded there was one-fourth of the $157,028.31 reduction of class counsel's fees that resulted when class counsel unilaterally lowered his fee request from 28% of the settlement fund

to 25% in response to the objector's arguments.  Thus, the court there gave the objector a small slice of the total fee pot, amounting to just over $39,000.  2008 WL 763763, at **8, 30 & n.15.

In short, if the Court determines that the Faneca Objectors should be granted some measure of compensation for having added value to the Fairness Proceedings, any award must be dramatically less than the $20 million they seek.  They should be compensated, in an amount to be determined by the Court in the exercise of its discretion, only for the responsibility that the Court entrusted to them – to serve as liaison and coordinate the objectors' presentations at the Fairness Hearing, *see* Notice dated Nov. 4, 2014 (ECF No. 6344) – and their lodestar markedly reduced to account for their many unsuccessful arguments and filings.  *See generally Institutionalized Juveniles v. Sec'y of Pub. Welfare*, 758 F.2d 897, 925 (3d Cir. 1985) ("A court has discretion to decide whether it is proper to adjust the lodestar by a general reduction of the lodestar, by the complete disallowance of hours spent litigating wholly unsuccessful claims, or by use of both methods.").

Moreover, no multiplier should be applied to the Faneca Objectors' lodestar – and certainly not the robust 4.6 multiplier they seek.  As an alternative to (or even in addition to) sharply reducing the number of hours in the Faneca Objectors' lodestar, the Court should apply a *negative* multiplier so as to adjust their lodestar for their many unsuccessful filings and arguments.  *See In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 600 (3d Cir. 1984) (district court entitled to apply negative quality multiplier even after properly "eliminate[ing] from the lodestar . . . so many hours for activities deemed not beneficial to the class"); *Azizian*, 2006 WL 4037549,

at \*10 (recommending negative multiplier of .3 to objectors' lodestar "based upon the limited extent of their contributions").[54]

### 2. **The Armstrong Objectors' Petition**

The Armstrong Objectors' fee request is seemingly more modest.  They seek just under $600,000, in contrast to the $20 million requested by the Faneca Objectors, based on a smaller lodestar and a renunciation of any claim to a multiplier.  Armstrong Br. (ECF No. 7232), at 23, 28, 34; *see also* ECF Nos. 7232-1 to 7232-4 (declarations of counsel, setting forth lodestars). Notwithstanding how they try to rewrite history and spin their role in the Final Approval proceedings, however, the Armstrong Objectors have no claim whatsoever.  Indeed, their fee request (which, as the Faneca Objectors point out, is in large measure a knockoff of the latter's fee petition, *see* ECF No. 7366, at 2, 5) is shameless, for the path they blazed was destructive, not constructive.  Their only role was to try to derail the Settlement, a goal they pursued with zeal.  Importantly, their assertion that three of the five February 2015 modifications to the Settlement stemmed from their arguments is bereft of merit.

---

[54]   Indeed, in non-class cases, this and other courts in this Circuit often apply a negative multiplier where a litigant has achieved only limited success.  *E.g.*, *Finch v. Hercules Inc.*, 941 F. Supp. 1395, 1427 (D. Del. 1996) (reducing lodestar by 35% where plaintiff "did not obtain excellent results in this case"); *Sch. Dist. of Philadelphia v. Deborah A.*, No. 08-2924, 2011 WL 2681234, at \*2, \*4-5 (E.D. Pa. July 8, 2011) (reducing lodestar by 30% given limited success); *Spencer v. Wal-Mart Stores, Inc.*, No. 03-104-KAJ, 2005 WL 3654381, at \*4 (D. Del. June 24, 2005) (negative multiplier of 75% given limited success), *aff'd*, 469 F.3d 311 (3d Cir. 2006); *Patriot Party of Pa. v. Mitchell*, No. CIV. A. 93-2257, 1993 WL 313667, at \*4 (E.D. Pa. Aug. 16, 1993) (applying .30 negative multiplier in light of "very limited" success); *Decibus v. Woodbridge Twp. Police Dep't*, Civ. A. No. 88-2926, 1991 WL 59428, at \*6 & n.6 (D.N.J. Apr. 15, 1991) (negative multiplier of 0.5 to account "for limited success"); *Vasquez v. S.S. Pennock Co.*, Civ. A. No. 86-2288, 1987 WL 9781, at \*2 (E.D. Pa. Apr. 21, 1987) (same); *see generally Hensley*, 461 U.S. at 436 ("If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.").

### a.   The Armstrong Objectors' Role Was Not Constructive

Before this Court, the Armstrong Objectors raised a multitude of alleged shortcomings to the Settlement.   Among other things, they complained that numerous ailments are not compensated, the Monetary Awards are insufficient, the Monetary Award offsets are flawed, the "Death with CTE" cutoff date is irrational, the BAP participation requirements are onerous, the creation of a designated pool of BAP physicians is unfair, the Settlement wrongly allows the NFL unlimited appeals, the Settlement's funding is inadequate, the Settlement does not take scientific advances into consideration, the release of the NFL Parties is too broad, and the Education Fund is an improper *cy pres* fund.   ECF No. 6233, at 10-35.   They threw the proverbial plate of spaghetti against the wall, no doubt hoping that something might stick.

When this kitchen sink strategy did not work and the Court overruled their objections – which was not surprising given their lack of merit[55] – the Armstrong Objectors took a different tack on appeal.   Before the Third Circuit, they challenged the deal as structurally infirm and inadequate by making *Class Counsel* the focus of their wrath, arguing that Class Counsel had sacrificed the best interests of the Class by engaging in self-dealing.

Specifically, the Armstrong Objectors contended that Class Counsel were "compromised," having "bargained away" Class Members' claims by securing a "sub-optimal"

---

[55]   By way of example, the Armstrong Objectors asserted that the Monetary Awards are insufficient by dividing Class Counsel's projected *payout* of the MAF by the number of Class Members who will likely receive Monetary Awards in order to come up with an estimated Monetary Award of $135,000-$225,000 per Class Member.   *See* ECF No. 6233, at 14-15.   That was a dubious exercise because (a) the MAF is *uncapped* and therefore there is no dividend to be divided so as to arrive at a quotient (*i.e.*, a "typical" award), and (b) it lumped together Monetary Awards as one-size-fits-all compensation, ignoring the matrix that individually calibrates awards by degree of neurological impairment, age, and time played in the NFL and affiliates, and, applies offsets such as a stroke suffered prior to a Qualifying Diagnosis.   *See* Settlement Agreement § 6.7(b)-(e) & Ex. A-3, ECF No. 6481-1, at 40-41, 122.

deal in return for a "windfall," "red-carpet treatment," and a "free pass" on their fees, thus "effectively insulat[ing] [their] fees from scrutiny" and "thwarting judicial review by design" – and proving that the Class had been inadequately represented and denied due process.  *See* Seeger Supp. Decl., Ex. CC, at 21, 25, 27, 46-52 (Armstrong Objectors' corrected opening Third Circuit brief; internal quotation marks omitted); *see also id.* at 21, 52 (innuendo that Class Counsel could not plausibly have done enough work to justify a $112.5 million award).  Almost at the eleventh hour, the Armstrong Objectors sandbagged Class Plaintiffs with an attack on Subclass Counsel Arnold Levin, which they sprung for the first time in their reply brief, insinuating that Mr. Levin had a foot in both Subclass camps and therefore a fatal conflict of interest.  *See id.*, Ex. CC, at 4; *see also id.*, Ex. EE (Class Counsel's response to Third Circuit motion seeking to take judicial notice of complaints already in the record, noting that alleged conflict had never been raised during Final Approval proceedings and was, in any case, unavailing).  The Third Circuit rejected this eleventh-hour attack as meritless.  *See In re NFL Players' Concussion Injury Litig.*, 821 F.3d at 430.

Despite ample precedent supporting it,[56] the Armstrong Objectors maintained that the bifurcation of the Final Approval and fee petition proceedings was per se reversible error, and they accused this Court of having "abdicated its responsibility" in permitting bifurcation.  Seeger Supp. Decl., Ex. CC at 3, 25, 47-51.[57]

---

[56]  *See In re NFL Players Concussion Injury Litig.*, 821 F.3d at 445 ("[T]he practice of deferring consideration of a fee award is not so irregular.") (citing treatise and cases, including *In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 534-35 (3d Cir. 2009)).

[57]  Amusingly, one of the arguments that they advanced against the bifurcation of Final Approval and attorneys' fees proceedings was that, if the two are cleaved, class members have no incentive to challenge a fee petition.  *See id.*, Ex. CC at 25, 51.  The filing of over a dozen objections to Class Counsel's February 2017 fee petition exposes that contention for what it was:

(Footnote continued . . .)

### b.  Causing Nearly Two Years of Delay Conferred No Benefit on the Class

Moreover, unlike the Faneca Objectors – who at least were sensible enough to recognize (and have acknowledged here) that there was no issue worthy of a petition for *certiorari*, and delayed relief to the Class by only a year, comprehending that an attempt at Supreme Court review would only further delay Class Members' receipt of Settlement benefits, *see* Faneca Br. at 20 & n.23 – the Armstrong Objectors showed no such insight or concern and, far from bowing out, dug in their heels further and prolonged their dubious challenges no matter the adverse consequences to Class Members.

In the Third Circuit, the Armstrong Objectors *opposed* Class Counsel's efforts to expedite the objector appeals.  *See* Seeger Supp. Decl., Ex. FF at 2 (Armstrong Objectors' opposition to motion to expedite appeals, asserting that Class Plaintiffs "have not presented any reasons justifying expediting the briefing in this case"); *see also* ECF No. 7366, at 7 n.5 (Faneca Objectors' preliminary response to other objector fee petitions, pointing out Armstrong Objectors' resistance).  After the Third Circuit affirmed this Court's Final Approval of the Settlement, they then delayed the Settlement's Effective Date by almost five additional months through their pursuit of a baseless Supreme Court appeal.[58]  The Armstrong Objectors sought no

---

just another objection for the sake of raising objections.  That, of course, begs the question of what the ultimate aim might have been.

[58] The Armstrong Objectors' *certiorari* petition and reply in support thereof merely rehashed the same vitriol that had fallen flat in the Third Circuit.  They attacked the Settlement as "lopsided" and "a zero-sum game, entailing essential allocation decisions designed to confine compensation"; repeated their accusations against Mr. Levin and the bifurcation of the Final Approval and fee petition proceedings; maintained "that the rights of future claimants had been used as bargaining chips to benefit current claimants and their lawyers"; and asserted that "the plaintiffs' lawyers . . . [had] paper[ed] over" a fatal intra-class conflict by devising the separate Subclasses only after the Settling Parties had agreed upon the framework of the Settlement. Seeger Supp. Decl., Ex. GG, at 2, 5-6, 9-10, 25-30 (*certiorari* petition); *id.*, Ex. HH, at 9 (reply in support of *certiorari* petition) (internal quotation marks omitted).

fewer than *two* extensions (on top of the generous 90 days provided by statute, *see* 28 U.S.C. § 2101(c)) to file their *certiorari* petition.  *See id.*, Ex. II (Supreme Court docket entries noting Justice Alito's Orders granting extension requests).

Far from acknowledging any harm (or even inconvenience) that they inflicted on Class Members (many of whom are ill and in financial straits) – who, on account of the Armstrong Objectors' groundless appeals, had to wait almost two years after this Court's Final Approval determination to see the start of the Settlement's effectuation – the Armstrong Objectors add insult to injury by proclaiming that Class Members *benefitted* from this long delay in that they reaped a "Collateral Time Benefit" that allowed them to go out and obtain allegedly unbiased medical evidence to support their Monetary Award claims.  Armstrong Br. at 1, 3, 9-10, 13-15.

This remarkable and condescending assertion that Class Members actually owe the Armstrong Objectors a round of thanks for having hindered the Settlement's effectuation for nearly two years rests on the unfounded assumption that the pool of MAF physicians will be under the thumb of the NFL and predisposed to reject claims.  The Armstrong Objectors offer not a scintilla of evidence to support this attack on the integrity of the MAF physicians, save a vaporous statement that Class Members "distrust" the NFL.  *See id.* at 14.  It is the *Claims Administrator*, however, not the NFL, who will select the Qualified MAF Physicians, and if Class Counsel have reasonable grounds, they may withhold approval of physicians whom the Claims Administrator selects.  *See* Settlement Agreement § 6.5(a), ECF No, 6481-1, at 38.  The Armstrong Objectors' suggestion that Class Counsel will collude with the NFL to "thrust" untrustworthy physicians upon Class Members (Armstrong Br. at 14) is vacuous.

In sum, the Armstrong Objectors' "Collateral Time Benefit" argument is a poor smokescreen that fails to mask the many months of delays that they needlessly inflicted on Class

Members through their unrelenting meritless assaults on the Settlement.  Perhaps the Armstrong Objectors should have asked Plaintiff Kevin Turner, who died from ALS in March 2016, during the pendency of the meritless Third Circuit appeals, how *he* felt about this "Collateral Time Benefit."  Or perhaps they should ask Class Member Rickey Dixon – who suffers from ALS (ECF No. 7299, at 2, 5) and whose financial distress necessitated his obtaining a loan against his anticipated recovery from a third-party litigation funding company, which accrues interest at a usurious rate (*see* ECF No. 7306-2, at 7) – how much *he* appreciates it.  Simply stated, this argument is as offensive as it is astounding, and deserves short shrift.

### c.  The Armstrong Objectors Wrongly Take Credit for Three Post-Fairness Hearing Modifications to the Settlement

Nor is there any merit to the Armstrong Objectors' assertion that the three modifications "mirror[ed]" improvements that they had suggested.  Armstrong Br. at 7.

To begin with, the Armstrong Objectors claim credit for several of the *same* post-hearing modifications for which the Faneca Objectors maintain that they were the impetus, but they do not even bother to address the Faneca Objectors' contentions, even though the latter's fee petition was filed a good seven weeks before their own.  *Compare* Faneca Br. (filed Jan. 11, 2017) at 21-22, 26-28 (taking credit for "uncapping" of BAP, later "Death with CTE" cutoff date, and appeal fee hardship waiver) *with* Armstrong Br. (filed Mar. 1, 2017) at 10-13 (same).

Setting that aside, the record plainly belies the Armstrong Objectors' argument.  Indeed, it is ironic that the Armstrong Objections now tout the three modifications.  In their supplemental objections, they had scoffed at them as insignificant, sneering that the Settling Parties had once again "fumbled the ball," and that "[t]he only relief granted by the amendments . . . [wa]s for the benefit of the NFL Parties."  ECF No. 6503, at 2.

Turning to each of the three modifications, the Armstrong Objectors take credit for the change to the cutoff date for Death with CTE awards from the date of preliminary to that of final approval, Armstrong Br. at 11, but in their objections they had argued that the Settlement should "be revised to delete the date parameters" altogether, not that the cutoff date be pushed back. *See* ECF No. 6233, at 20.  In their supplemental objections, they argued that *none* of their Death with CTE arguments *had even been addressed* by the February 2015 amendments (ECF No. 6503, at 3).  Thus, despite their own past statements, they now divine a causal link between their arguments and this change to the Settlement Agreement.

As for the appeal fee hardship waiver provision, here, too, the Armstrong Objectors again grab credit (Armstrong Br. at 8) for a change they never even sought, much less brought about. *They had never argued for such a hardship waiver.*  Rather, they had argued more broadly that there should be no fee at all.  *See* ECF No. 6233, at 25.  In their supplemental objections, they dismissed the hardship waiver in the amended Settlement, arguing that "requiring a $1000 appellate fee for *any* reason is mean spirited."  *Id.* at 3 (emphasis added).[59]

Similarly, the Armstrong Objectors now declare that their objections produced the revision to the Settlement relating to the guaranteed funding of BAP examinations (Armstrong Br. at 10), but in their objections they had never expressed concern that there would not be sufficient funding so that every eligible Class Member receives a BAP examination.  *See* ECF No. 6533, at 20-21.  Even if their objections were liberally construed as expressing concern about BAP funding limitations, the Armstrong Objectors themselves saw the lifting of the

---

[59]  It is not.  As Class Counsel have previously explained, the appeal fee is reasonable and designed to discourage injudicious appeals.  ECF No. 6423-1, at 27.  Besides, the appeal fee is refunded to the Class Member if his appeal is successful.  Settlement Agreement § 9.6(a), ECF No. 6481-1, at 51.

funding cap as a modification without any significance, declaring that the BAP "essentially remain[ed] unchanged," and maintained that it continued to be flawed for the reasons they had previously expressed.  ECF No. 6503, at 3.

Because the Armstrong Objectors have failed to demonstrate that they brought about the improvements to the Settlement in question, the Court should deny their fee request.  *See Spark*, 289 F. Supp. 2d at 514 (denying fees "[g]iven the absence of evidence that objectors' actions conferred a benefit upon the class"); *In re Diet Drugs*, 2002 WL 32154197, at *15 (denying fees where objectors submitted no proof that their objections caused the parties to negotiate amendment to settlement); *In re AT&T Corp. Sec. Litig.*, No. 00-5364 (GEB), 2006 WL 2786945, at *2 (D.N.J. Sept. 26, 2006) (objectors' counsel failed "to show that they improved the Class's recovery in any way").

In short, the Armstrong Objectors contributed nothing – and deserve nothing.

### 3.  <u>The Jones Objectors' Petition</u>

Finally, two minor objectors, Preston and Katherine Jones ("the Jones Objectors"[60]), represented by James T. Capretz, also filed a petition for an award of attorneys' fees (ECF No. 7364) ("Jones Br.").  They claim to have spurred the post-Fairness Hearing amendment to the Settlement that credited Class Members' time spent playing in NFL Europe towards Eligible Seasons.  Jones Br. at 1-4, 6-8.  They ascribe a value of $20 million to this modification, out of which they seek 1.5%, or an award of $300,000.  *Id*. at 4-6, 11.

---

[60]   These objectors should not be confused with the faction known as the Jimmie Jones Objectors, which consisted of 16 objectors in this Court represented by the law firm of Zuckerman Spaeder LLP (*see* ECF No. 6242), three of whom filed one of the twelve unsuccessful Third Circuit Appeals challenging this Court's Final Approval decision.  *See* ECF No. 6559; *In re NFL Players' Concussion Injury Litig.*, 821 F.3d at 410, 418.

To their credit, the Jones Objectors did not prolong Class Members' misery by pursuing meritless appeals of the Court's Final Approval decision.  Nor did they take the low road and resort to the desperate strategy of sullying Class Counsel.  Nevertheless, they, too, engage in a certain measure of historical revisionism by implying that their only objection to the Settlement was the concern that Class Members be credited for time playing in NFL Europe, *see* Jones Br. at 2, when the fact is that they joined in other objections (*see* ECF No. 6235, at 2).

In any event, a great deal of ink need not be spilled here.  Although the Jones Objectors take credit for the February 2015 amendment to the Settlement to include NFL Europe playing time towards Eligible Seasons, at least four other objectors, including the Faneca Objectors, raised that issue, and the latter did so a full week before the Jones Objectors.  *See In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. at 410 n.76 (enumerating objectors who raised this issue).[61]  Thus, the Jones Objectors contributed nothing unique to the Rule 23(e) proceedings.  The Jones Objectors are not entitled to fees for presenting an objection also made by several others.  *See* Section IV.B.1.b, *supra* (citing cases).  A $300,000 award for an unoriginal 4-1/2 page objection (ECF No. 6235 *passim*) is unwarranted and would be unreasonable.  Accordingly, the Court should also deny the Jones Objectors' petition.

---

[61]   The Faneca Objectors filed their objections on October 6, 2014.  ECF No. 6201. (They subsequently supplemented them.  ECF No. 6232).   Both the Armstrong and the Jones Objectors filed theirs eight days later, on October 14, 2014.  ECF Nos. 6233, 6235.

## V. <u>CONCLUSION</u>

For the foregoing reasons and those set forth in Co-Lead Class Counsel's opening memorandum, the Court should grant Class Counsel the requested $112.5 million in attorneys' fees and reimbursement of costs and expenses; (2) adopt a 5% set-aside on all Monetary and Derivative Claimant Awards; (3) grant the requested Case Contribution Awards to the three Subclass Representatives (or, as appropriate, to their estates); and (4) deny the Faneca, Armstrong, and Jones Objectors' fee petitions or, in the alternative, make an award solely to the Faneca Objectors, and then only for their work as liaison on behalf of all objectors, in an amount to be determined by the Court.

Date:  April 10, 2017

Respectfully submitted,

<u>/s/ Christopher A. Seeger</u>
Christopher A. Seeger
Seeger Weiss LLP
77 Water Street
New York, NY 10005
cseeger@seegerweiss.com
(T) 212-584-0700
(F) 212-584-0799

*CO-LEAD CLASS COUNSEL*

Sol Weiss
ANAPOL WEISS
One Logan Square
130 N. 18th St. Ste. 1600
Philadelphia, PA 19103
(T) 215- 735-1130
(F) 215-735-2024
sweiss@anapolweiss.com

*CO-LEAD CLASS COUNSEL*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record via the

Court's ECF system on April 10, 2017.


<u>/s/ Christopher A. Seeger</u>
Christopher A. Seeger