# Exhibit CC

**Nos. 15-2272, 15-2294**

# In the United States Court of Appeals for the Third Circuit

_____

## IN RE NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION INJURY LITIGATION

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

_____

**CORRECTED OPENING BRIEF OF APPELLANTS RAYMOND ARMSTRONG, LARRY BARNES, LARRY BROWN, DREW COLEMAN, KENNETH DAVIS, DENNIS DEVAUGHN, WILLIAM B. DUFF, KELVIN MACK EDWARDS, SR., PHILLIP E. EPPS, GREGORY EVANS, CHARLES L. HALEY, SR., ALVIN HARPER, MARY HUGHES, JAMES GARTH JAX, ERNEST JONES, MICHAEL KISELAK, DWAYNE LEVELS, DARRYL GERARD LEWIS, GARY WAYNE LEWIS, JEREMY LOYD, LORENZO LYNCH, MICHAEL McGRUDER, TIM McKYER, DAVID MIMS, NATHANIEL NEWTON, JR., CLIFTON L. ODOM, EVAN OGELSBY, SOLOMON PAGE, HURLES SCALES, JR., BARBARA SCHEER, KEVIN REY SMITH, WILLIE T. TAYLOR, GEORGE TEAGUE, AND CURTIS BERNARD WILSON**

_____

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans Street, Suite 505
Beaumont, TX 77701

Mitchell A. Toups
WELLER, GREEN, TOUPS & TERRELL
2615 Calder Street, Suite 400
Beaumont, TX 77704

Jason C. Webster
THE WEBSTER LAW FIRM
6200 Savoy, Suite 640
Houston, TX 77036

Deepak Gupta
Matthew W.H. Wessler
Jonathan E. Taylor
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com

Counsel for Appellants Armstrong et al.

# TABLE OF CONTENTS

Table of authorities ....................................................................................... iii

Introduction ..................................................................................................... 1

Jurisdictional statement ................................................................................. 4

Statement of the issues .................................................................................. 4

Statement of related cases and proceedings ............................................... 5

Statement of the case ..................................................................................... 5

   1.   Chronic traumatic encephalopathy (CTE) is discovered in former professional football players. .................................................... 6

   2.   The NFL goes to great lengths to hide the effects of concussions—both before and after the discovery of CTE. ............................................ 7

   3.   The evolving research on CTE confirms its prevalence in football players and its association with behavioral and mood disorders. ........... 10

   4.   Responding to CTE's discovery, injured football players seek compensation and their lawsuits are consolidated. ............................... 12

   5.   Only one month after appointment of a mediator, the plaintiffs' lawyers ink a tentative deal with the NFL and ultimately propose a global settment. ..................................................................................... 15

   6.   The parties propose a revised settlement that would globally release both present and future claims. ................................................. 16

   7.   Over many objections, the district court gives final approval to the settlement. .................................................................................. 21

Summary of argument .................................................................................. 26

Standard of review ........................................................................................ 28

Argument ....................................................................................................... 29

   I.   Because the settlement's terms and the structure of the negotiations both make clear that future-injury plaintiffs were inadequately represented, approval of this settlement must be reversed. ..................................................................................... 29

       A.   The settlement's disparate treatment of present and future claimants cannot be justified. ..................................... 31

       B.   The settlement's unjustified disparate treatment is the result of negotiations that lacked sufficient structural protections for future claimants. .................................................. 40

II.   The attorney-fee-deferral procedure, which insulates any fee request from meaningful scrutiny, is unlawful and provides an independent ground for reversal under this Court's precedent. ............ 46

III.  Alternatives are available on remand. ..................................................... 54

Conclusion ................................................................................................ 57

Combined certifications ............................................................................ 59

Appendix: biographies of the appellants (Armstrong Objectors)

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) ...................................................................*passim*

*Bowling v. Pfizer, Inc.,*
  143 F.R.D. 141 (S.D. Ohio 1992) ............................................... 39, 56

*Contrast Silverman v. Motorola, Inc.,*
  739 F.3d 956 (7th Cir. 2013) .............................................................. 51

*Dewey v. Volkswagen Aktiengesellschaft,*
  681 F.3d 170 (3d Cir. 2012) ........................................... 44, 45, 46, 55

*Drimmer v. WD-40 Co.,*
  No. 06-cv-900, 2007 WL 2456003 (S.D. Cal. 2007) ......................... 44

*General Motors Corp. v. Bloyed,*
  916 S.W.2d 949 (Tex. 1996) ............................................................... 49

*Georgine v. Amchem Products, Inc.,*
  83 F.3d 610 (3d Cir. 1996) ........................................................*passim*

*Glasser v. Volkswagen of America, Inc.,*
  645 F.3d 1084 (9th Cir. 2011) ........................................................... 51

*In re Asbestos Litigation,*
  90 F.3d 963 (5th Cir. 1996) ............................................................... 56

*In re Blood Reagents Antitrust Litigation,*
  783 F.3d 183 (3d Cir. 2015) ............................................................... 28

*In re Bluetooth Headset Products Liability Litigation,*
  654 F.3d 935 (9th Cir. 2011) ............................................................. 51

*In re Community Bank of Northern Virginia,*
  418 F.3d 277 (3d Cir. 2005) ............................................................... 28

*In re Constar International Inc. Securities Litigation,*
  585 F.3d 774 (3d Cir. 2009) ............................................................... 28

*In re GM Corp. Engine Interchange Litigation,*
 594 F.2d 1106 (7th Cir. 1979)................................................................. 38, 49, 51

*In re GM Pick-Up Truck Fuel Tank Products Liability Litigation,*
 55 F.3d 768 (3d Cir. 1995)...........................................................................*passim*

*In re Joint Eastern & Southern District Asbestos Litigation,*
 982 F.2d 721 (2d Cir. 1992).................................................................................. 42

*In re Literary Works in Electronic Databases Copyright Litigation,*
 654 F.3d 242 (2d Cir. 2011).................................................................................. 44

*In re MBTE Products Liability Litigation,*
 209 F.R.D. 323 (S.D.N.Y. 2002) ......................................................................... 44

*In re Mercury Interactive Corp. Securities Litigation,*
 618 F.3d 988 (9th Cir. 2010)................................................................... 27, 48, 49

*In re Oil Spill by Oil Rig Deepwater Horizon,*
 295 F.R.D. 112 (E.D. La. 2013)..................................................................... 56, 57

*In re Southwest Airlines Voucher Litigation,*
 — F.3d —, 2015 WL 4939676 (7th Cir. Aug. 20, 2015)................................... 50

*Logan v. Zimmerman Brush Co.,*
 455 U.S. 422 (1982) .............................................................................................. 37

*McDonnell Douglas Corp. v. Green,*
 411 U.S. 792 (1973) .............................................................................................. 39

*McNair v. Synapse Group,*
 672 F.3d 213 (3d Cir. 2012).................................................................................. 28

*National Super Spuds v. New York Mercantile Exchange,*
 660 F.2d 9 (2d Cir. 1981)................................................................... 31, 37, 38, 55

*Ortiz v. Fibreboard Corp.,*
 527 U.S. 815 (1999) ....................................................................... 29, 53, 54, 55

*Piambino v. Bailey,*
 610 F.2d 1306 (5th Cir. 1980)............................................................................. 47

*Prandini v. National Tea Co.*,
  557 F.2d 1015 (3d Cir. 1977) ............................................................. 48

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) ........................................................ *passim*

*TBK Partners, Ltd. v. Western Union Corp.*,
  675 F.2d 456 (2d Cir. 1982) ............................................................. 37

*Thompson v. American Tobacco Co.*,
  189 F.R.D. 544 (D. Minn. 1999) ....................................................... 44

*Walker v. Liggett Group, Inc.*,
  175 F.R.D. 226 (S.D. W. Va. 1997) .................................................... 43

*Weinberger v. Great Northern Nekoosa Corp.*,
  925 F.2d 518 (1st Cir. 1991) ............................................................ 50

**Statutes**

28 U.S.C. § 1291 ................................................................................. 4

28 U.S.C. § 1332(d)(11) ...................................................................... 4

**Rules**

Federal Rule of Civil Procedure 23(a)(4) ............................................. 4

Federal Rule of Civil Procedure 23(b)(3) ........................................... 23

Federal Rule of Civil Procedure 23(e)(2) ............................................. 4

Federal Rule of Civil Procedure 23(h) ..................................... 4, 25, 48

Federal Rule of Civil Procedure 23(h), 2003 advisory committee's note ............... 54

Federal Rule of Civil Procedure 23(h)(1), 2003 advisory committee's note............ 49

Federal Rule of Civil Procedure 54(d)(2)(B)(iv) ................................. 54

**Articles**

Paul D. Anderson, *Stabler's Death is a Stark Reminder About the Settlement's Deficiencies*, NFL Concussion Litigation, July 10, 2015 ...................... 18

John C. Coffee, Jr., *Class Action Accountability*,
100 Colum. L. Rev. 370 (2000) .......................................................... 56

John C. Coffee, Jr., *Class Wars*, 95 Colum. L. Rev. 1343 (1995) ............................ 56

Steve Fainaru & Mark Fainaru-Wada, *UCLA study finds signs of CTE in living former NFL players*, ESPN, Jan. 22, 2013 ...................................................... 12

Mark Fainaru-Wada & Steve Fainaru, *League of Denial* (2013) ...........................*passim*

*Forrest Gregg fighting Parkinson's*, Associated Press, Nov. 16, 2011 ............................ 17

David Geier, *Will football players one day take medicine to prevent brain damage?*, The Post and Courier, Aug. 5, 2015 ............................................................ 11, 34

Geoffrey Hazard, *The Futures Problem*, 148 U. Pa. L. Rev. 1901 (2000) ................. 29

William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 Tulane L. Rev. 813 (2003) .......................................... 50

Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649 (2008) .......................................................... 45

*Manual for Complex Litigation* (4th ed. 2007) ............................................. 54

Richard A. Nagareda, *Autonomy, Peace, and Put Options in the Mass Tort Class Action*, 115 Harv. L. Rev. 747 (2002) .................................................. 56

Joe Nocera, *NFL's Bogus Settlement for Brain-Damaged Former Players*, N.Y. Times, Aug. 11, 2015 ........................................................................ 11

Alan Schwarz, *A Suicide, a Last Request, a Family's Questions*, N.Y. Times, Feb. 22, 2011 ................................................................................. 12

Charles Silver, *Due Process and the Lodestar Method*, 74 Tulane L. Rev. 1809 (2000) .................................................................................... 51

Brian Wolfman & Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. Rev. 439 (1996) .......................... 42, 55

# INTRODUCTION

By the summer of 2013, the NFL's executives faced a crisis. Despite the League's campaign to obscure the effects of concussions in pro football, the autopsy of a beloved former player had led to the discovery several years earlier of chronic traumatic encephalopathy. Characterized by mood and behavioral problems, and even suicide, CTE is a neurodegenerative condition caused only by repeated head trauma. Of 91 former NFL players' brains examined, CTE has been found in 87.

The discovery of CTE set off a wave of lawsuits by over 5,000 players—a legal and public-relations nightmare for the NFL. But those in the NFL's boardroom that summer were even more alarmed by what they saw on the horizon, and what the rapidly evolving science foretold: a tsunami of claims by the far larger number of players who would be diagnosed with CTE in the decades to come.

So the NFL wanted an end game: It would pay those with present injuries, including families of players who had already died with CTE. In exchange, the NFL would secure a sweeping global release of *all* former players' future CTE claims, without paying any of them.

This bargain would result in a stark disparity: The family of a player who dies with CTE *before* the class-action settlement's approval gets up to $4 million. But an identically situated player who dies a day *after* the settlement's approval releases his claim and gets paid nothing—for the exact same diagnosis.

1

Why did the NFL believe it could get the plaintiffs' lawyers to go along with such a lopsided deal? Because, for these lawyers and their injured clients, "the critical goal is generous immediate payments." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997). "That goal," however, "tugs against the interest" of those with future claims, *id.,* who would prefer to reduce payouts now in favor of "sturdy back-end opt-out rights" and a deal that "keep[s] pace with changing science." *Id.* at 610-11.

Why did the NFL and the lawyers think they could disregard the thousands of former players who may be diagnosed with CTE in the future? Because none of the lawyers at the negotiating table independently represented their interests. The personal-injury cases had been consolidated before a single judge in Philadelphia, who appointed a Plaintiffs' Steering Committee and ordered it to mediate with the NFL in July 2013. But the court never appointed independent counsel for the future claimants, whose rights the Committee had every incentive to trade away.

Just a few weeks later, in August 2013, the NFL and the lawyers emerged with a signed term sheet. There had been no formal discovery, and no litigation beyond a motion to dismiss. Yet the plaintiffs' lawyers secured the right to seek a nine-figure fee award. The NFL got the sweeping release it wanted, and the present claimants got their compensation. Meanwhile, thousands of potential future CTE claimants—including the 34 Armstrong Objectors—were left on the sidelines.

Neither "the terms of the settlement" nor "the structure of the negotiations" can provide this Court with any assurance that the interests of future claimants were truly represented during the negotiation process. *Id.* at 627. As to the terms: The settling parties are unable to defend the disparate treatment at the heart of this deal. They cannot explain why a player who dies with CTE tomorrow loses the millions that would go to that same player if he died last year.

As to the structure: The supposedly independent "futures" subclass counsel was not, in fact, independent. He was picked by, and from within, the Plaintiffs' Steering Committee. And the subclass representative was recruited only *after* the deal had already been hashed out by the lawyers. He doesn't even allege a claim based on CTE—either for himself or for the thousands of players he supposedly represents. A "representative" who abandons the most valuable claims of those he represents, for nothing, is no representative at all—certainly not an adequate one.

This inadequacy is underscored by class counsel's refusal to file a fee request until after final approval, leaving many critical questions unanswered. That procedure violates the rule in this circuit that "a thorough judicial review of fee applications is required in all class action settlements." *In re GM Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 819-20 (3d Cir. 1995). "There was no excuse for permitting so irregular, indeed unlawful, a procedure," *Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014)—an independent ground for reversal.

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 12 of 73

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2). It entered a final judgment giving final approval to a class-action settlement on April 22, 2015. All but one of the appellants (known as the Armstrong Objectors) timely filed their notice of appeal on May 20, 2015. The remaining appellant timely filed his notice of appeal on May 21, 2015. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** A class-action settlement may be approved only if it is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and only if "the representative parties [have] fairly and adequately protect[ed] the interests of the class," Fed. R. Civ. P. 23(a)(4). Did the district court err in approving the settlement here without the requisite assurance—"either in the terms of the settlement or in the structure of the negotiations," *Amchem*, 521 U.S. at 627—that former NFL players at risk of CTE were adequately represented by a single player who didn't allege this risk himself but instead abandoned that claim?

**II.** Where attorneys' fees are sought in connection with a class-action settlement, the class must be given notice and an opportunity to object. Fed. R. Civ. P. 23(h). Did the district court err in excusing class counsel's failure to file a fee

motion before final approval, even though this failure deprived class members of important information and effectively insulated counsel's fees from scrutiny?[1]

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The Court previously dismissed an interlocutory appeal for lack of jurisdiction. *See In re NFL Players Concussion Injury Litig.*, 775 F.3d 570 (3d Cir. 2014). These two appeals (15-2272, 15-2294) have been consolidated with ten others.

## STATEMENT OF THE CASE

This brief is filed by the Armstrong Objectors, 34 settlement-class members who played an average of more than six NFL seasons. They include Pro Bowl selectees, All-Pros, Super Bowl champions, a Super Bowl MVP, and a Pro Football Hall of Fame inductee. The oldest began his career in 1960; the youngest retired after 2011. Their biographies are provided in an appendix to this brief.

None of the Armstrong Objectors has a qualifying diagnosis under the proposed settlement. They are united in their concern that, if they are diagnosed with CTE in the future, their claims against the NFL would be extinguished without compensation under the proposed settlement.

---

[1] These issues were definitively ruled upon in the district court's approval order. A.135-147 (fairness of the settlement terms and treatment of death with CTE); A.91-93, 96, 99-103 (fairness and adequacy of future-claimant representative); A.88 (failure to file fee motion). The same issues were also raised in objections filed in the district court: Dkt. No. 6248 at 2; Dkt. No. 6242 at 3-4; Dkt. No. 6241 at 14-28; Dkt. No. 6201 at 33-38; Dkt. No. 6213 at 2-4, 9; Dkt. No. 6230 at 19-20; and Dkt. No. 6201 at 94.

*1. Chronic traumatic encephalopathy (CTE) is discovered in former professional football players.* In September 2002, football legend Mike Webster died of a heart attack. A.5303. A former center for the Pittsburgh Steelers, Webster's career spanned seventeen NFL seasons and four Super Bowl championships, culminating in his induction into the Hall of Fame. Mark Fainaru-Wada & Steve Fainaru, *League of Denial* 20, 23, 47, 57 (2013). Since retiring, however, Webster's health had taken a nosedive. His death followed a decade of decline, marked by depression, impulsive behavior, cognitive slowdown, and severe memory loss. *Id.* at 47-57; A.2619. By age fifty, he was unemployed, intermittently homeless, and frequently unable to recognize friends and family. A.2619. Though it was Webster's heart that failed him, researchers discovered that the deeper damage lay in his brain.

By examining Webster's brain through specialized staining techniques, scientists uncovered an abnormal series of dark patches made up of "tau," a protein that usually transports nutrients to cells. A.3210. In Webster's case, however, the tau had congealed into clumps and strangled his neurons, leading his brain to atrophy. A.2619, 2801, 5260. Doctors were stumped: brains rarely deteriorate so young. A.2619. The only precedent was "dementia pugilistica," first diagnosed in professional boxers who had suffered repeated head trauma and subsequently experienced prolonged confusion and dulled mental capacity,

6

inspiring the term "punch drunk." A.2281, 3210. As an offensive lineman, Webster had sustained repeated blows to the head on numerous occasions, causing damage that prompted one doctor to ask if he'd been in a car accident. "Have you been hit lately? And how often?" the doctor asked. Webster responded, "Oh, probably about 25,000 times or so." *League of Denial* 57.

Only after his death did it become clear that playing football had not just injured Webster's body but caused his brain to degenerate—through a disease that scientists named chronic traumatic encephalopathy, or CTE. A.2287, 2920. For years, players and their families had seen team members develop mood and behavioral problems and wondered whether they related to football. Webster's autopsy confirmed the connection.

***2.  The NFL goes to great lengths to hide the effects of concussions—both before and after CTE's discovery.*** This connection should have come as no surprise to the NFL. Studies have linked head trauma and brain damage since the 1920s. A.2287, 2620. And beginning in the early 1990s, football observers and medical professionals issued warnings that concussions can cause long-term harm and urged NFL officials to treat them as a serious injury.

But the NFL failed to heed this advice. Players reported that "intimidation" to keep playing after a head injury was "common in the NFL." *League of Denial* 214. And although many players "suffered more than one hundred mild traumatic brain

injuries" during their careers, then-NFL Commissioner Paul Tagliabue stated that the number of concussions "is relatively small." A.2237; *League of Denial* 127.

Not only did the NFL disregard evidence showing that concussions and sub-concussions can result in severe behavioral problems and long-term dementia; the League actively sought to refute it. In 1994, the NFL created the Mild Traumatic Brain Injury (MTBI) Committee, ostensibly designed to study the medical effects of brain injuries and institute necessary safety measures. A.2632. Commissioner Tagliabue appointed Elliot Pellman, a rheumatologist, to lead the Committee, even though—as a specialist in bone and joint disorders—Pellman "had not produced a single piece of literature on the subject of concussions." A.5258; *League of Denial* 127. Nearly half the Committee consisted of current NFL team doctors. A.5258.

In 2001, the MTBI Committee began publishing its research. One paper stated that concussions occurred at very low rates, and that it was fine for players who did suffer them to return to the field within a week, never missing a game. A.2660-62, 2799. Another denied that repeat concussions created any risks, citing the fact that medical staff allowed players suffering from head trauma to return to the field shortly after they sustained their injuries. A.2661, 5259. This conclusion "flew in the face not only of previous research but of widely known realities on an NFL sideline," where both players and staff underreported concussions and glorified a gladiator culture that promoted toughness over safety. A.2284; *League of*

8

*Denial* 145. Peer reviewers called the NFL's research "potentially dangerous," describing it as "at odds with virtually all published guidelines and consensus statements," which found that sustaining one concussion left a player predisposed to another. *Id.* at 146-47.

Still, the NFL's research team refused to acknowledge any link. In 2007, HBO's "Real Sports" interviewed Dr. Ira Casson, co-chairman of the MTBI Committee. A.2664. Their exchange captured the extent of the NFL's denial:

> Q. Is there any evidence, as far as you are concerned, that links multiple head injuries among pro football players with depression?
> A. No. ….
> Q. Is there any evidence as of today that links multiple head injuries with any long-term problem[s]?
> A. In NFL players?
> Q. Yeah.
> A. No.

A.2644.

By 2007, however, scientists had in fact documented three cases of CTE among football players—clear evidence of brain damage caused by football. The *New York Times* and *Boston Globe* began to publish stories documenting the severe mental decline of retired NFL players. A.2619. As the outpouring of evidence and voices grew louder, the League scrambled to respond. A.5273. That summer it hosted a Concussion Summit, a conversation about the prevalence and effects of concussions in football, inviting scientists whose work it had previously sought to

9

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 18 of 72

discredit. A.5263. Despite these overtures, the NFL's official position remained that there was no connection between playing football and brain damage.

More than two years passed before the NFL reversed course, officially acknowledging that "concussions can lead to long-term problems." A.2250. By 2010, the old leadership of the MTBI Committee was out. The new guard—two prominent NFL-appointed neurosurgeons—conceded that the Committee's earlier research was "infected" and had misled players. A.2246, 5274.

**3.   *The evolving research on CTE confirms its prevalence in football players and its association with behavioral and mood disorders.*** When researchers started examining what would become known as CTE, they first thought it was a variation of Alzheimer's disease. In Alzheimer's, tau protein forms tangles that strangle neurons from the inside, leading to severe memory loss. In CTE, however, the tangles do not appear in the hippocampus— the site of our memory—but in the cortex, the site of cognition. A.2291.

CTE manifests itself primarily through emotional and cognitive symptoms. A.2287. Early signs include severe headaches and loss of attention and concentration. A.2255. Affected players go on to struggle with depression, anger, and short-term memory loss, followed by motor impairment, aggression, language difficulty, and dementia. A.2237, 2255. In the process, many players develop substance-abuse problems, lose basic functioning abilities, and contemplate suicide.

10

A.2287, 5275. As co-lead class counsel explained, "CTE is believed to be the most serious and harmful disease that results from [the] NFL and concussions." A.2237.

Although research into CTE has advanced significantly over the last decade, at present CTE can be diagnosed definitively only after death, making it difficult to identify its full extent and prevalence among living players. A.2957. The studies that have been conducted, however, suggest that the severity of a CTE diagnosis correlates with the number of NFL seasons played, and that the disease may be widespread. A.2255. Researchers at Boston University's CTE Center—the country's largest brain bank focused on traumatic brain injury—inspected the brains of 91 deceased football players and found at least traces of CTE in 87 of them. A.2370.[2] These results caused Ann McKee, a leading neuropathologist at the CTE Center, to wonder "if every single football player doesn't have this." A.5248.

She may soon find out. Scientists predict that methods to reliably diagnose CTE in living patients may emerge within "the next decade, if not sooner." A.4420, 4597, 4620, 4768, 4953, 5004; *see* Joe Nocera, *NFL's Bogus Settlement for Brain-Damaged Former Players*, N.Y. Times, Aug. 11, 2015, http://nyti.ms/1PvayQ0.

---

[2] The data cited in the record (reflecting a CTE diagnoses in 76 of 79 brains) have since been updated; the ratio has remained roughly the same as the numbers have increased. *See* David Geier, *Will football players one day take medicine to prevent brain damage?*, The Post and Courier, Aug. 5, 2015, http://tinyurl.com/oa39muf.

Already, researchers have made great strides. A.3212-13. UCLA scientists, for example, used brain-imaging tools in 2013 to detect tau protein in five former players—the first time that researchers were able to show signs of CTE in living patients. Steve Fainaru & Mark Fainaru-Wada, *UCLA study finds signs of CTE in living former NFL players*, ESPN, Jan. 22, 2013, http://es.pn/1PkszAu. Researchers are also testing other techniques to detect CTE during life. A.3213. As research continues, these technologies will become "more sensitive, more accurate," and "CTE diagnoses in living people will become more reliable." A.3031.

This effort has been aided by more than a dozen players who have donated their brains to Boston University. A.3181. Before killing himself in 2011, Dave Duerson, a former star for the Chicago Bears, left a note requesting that his family donate his brain to the CTE Center. "Please, see that my brain is given to the NFL's brain bank." Alan Schwarz, *A Suicide, a Last Request, a Family's Questions,* N.Y. Times, Feb. 22, 2011, http://nyti.ms/1L5BA1O.

**4. *Responding to CTE's discovery, injured football players seek compensation and their lawsuits are consolidated.*** Within the past five years, amid mounting evidence that football causes CTE and growing awareness of the NFL's cover-up, many football players have sought redress. At first, hundreds of former players filed claims in California, where workers' compensation laws enabled players who played at least one game in the state to obtain compensation

for on-the-job injuries. *League of Denial* 306. But because the sums awarded were usually insufficient to cover a lifetime of brain damage, players soon turned to the courts. In 2011, 73 former players sued the NFL, alleging that it had failed to take reasonable actions to protect players from the "chronic risks" created by concussions, and had "fraudulently concealed" those risks from players. A.793, 726.

Later that year, a separate group of players sued in Philadelphia district court. The lead plaintiff was Ray Easterling, a former Atlanta Falcons player. Like others who later joined the case, Easterling had spent his career playing in the NFL and, after retirement, had begun exhibiting sharp mood swings, inattentiveness, and erratic behavior. Eight months after filing the suit, Easterling killed himself. Researchers found his brain riddled with CTE. A.5107-08, 5183, 5303.

In January 2012, the lawsuits were consolidated before Judge Anita Brody in Philadelphia. A.62. Following consolidation, an additional 4,500 players filed more than 300 similar suits against the NFL, and all were transferred to Judge Brody. *Id*. Plaintiffs' lawyers proposed the creation of a Plaintiffs' Steering Committee to direct the litigation. The court approved the Committee's structure without appointing anyone to represent the interests of future claimants. A.62.

The plaintiffs filed their collective complaint in July 2012. It alleged fourteen claims, spanning various counts of negligence and fraud. But the core allegation remained the same: that the NFL's conduct had "obfuscated the connection

Case: 2:12-md-02323-AB   Document: 7464-5   Filed: 04/10/17   Page: 22 of 72

between NFL football and long-term brain injury." A.63. The central issue was still CTE. A.867-72, 2511 ("This started out as a CTE case. It is still a CTE case.").

As the litigation spilled into the following year, the district court ordered the parties to mediate, expressing "the hope that a negotiated, mutually beneficial settlement could be reached." A.65. In July 2013, the court appointed retired Judge Layne Phillips as mediator.

After mediation was underway and the contours of an initial deal had begun to take shape, the Steering Committee recognized the conflicting interests within the class and took it upon itself to create putative "subclasses." One "subclass" would consist of retired players who already had been diagnosed with particular neurocognitive impairments (including those who died with CTE) and therefore had present claims against the NFL. The second would consist of retired players who suffered from none of the specified impairments but were—by virtue of having played in the NFL—at risk for CTE, though they had no way of presently knowing whether the disease had begun to develop or would develop in the future.

The Committee designated Kevin Turner, a former player who suffered from ALS, as representative of the present-claims subclass. To represent the future-claims players—the majority of the putative class—the Steering Committee recruited Corey Swinson, a former running back who had played just one NFL season and had not yet been diagnosed with any brain injuries or behavioral or

14

mood disorders. A.3570. Because Swinson had not suffered any current injury from his sole season in the League, he was not one of the 5,000 players who had sued the NFL and thus had no lawyer. So the plaintiffs' lawyers selected an existing member of the Steering Committee to serve as his "independent" counsel. A.3570.

**5. *Only one month after appointment of a mediator, the plaintiffs' lawyers ink a tentative deal with the NFL and ultimately propose a global settlement.*** By the end of August 2013—just one month after the mediator's appointment and before even taking any formal discovery against the NFL—plaintiffs' counsel had signed a term sheet outlining a settlement with the NFL. A.67. One month later, before the parties had inked an actual settlement, Swinson died. According to plaintiffs' counsel, Swinson had provided his assent to drafts of the term sheet before his death. A.3570.

For more than a month after Swinson's death—during a critical period when the contours of the deal outlined in the term sheet were being fleshed out— there was no plaintiff even purporting to represent the future-claims players. Then, in mid-October, plaintiffs' counsel found Shawn Wooden and recruited him to take Swinson's place, explaining to him the terms of the already-negotiated deal. A.3824, 3902. Wooden agreed not only to serve as a representative but to "support[] the settlement." A.3824, 3902. He had sustained repeated traumatic head impacts as a player and experienced neurological symptoms in the years since.

In 2012, he had described himself as "at increased risk of latent brain injuries" generally. A.786. But by the time he was "appointed" the proposed representative of future claimants, Wooden's claim specified that he was at risk for "dementia, Alzheimer's, Parkinson's, or ALS"—but, critically, not CTE. A.1126, 3823.

In January 2014, plaintiffs' counsel asked the district court to certify the class and approve the proposed settlement, which included a capped fund. A.67. Concerned that the fund would dry up prematurely, the court rejected the proposal. *Id*. Five months later, in June, the parties submitted a revised settlement that "retained the same basic structure as the original" but addressed some of the court's concerns (including the cap, which was removed). A.68. In a declaration documenting the negotiations, the mediator stated that plaintiffs' counsel had "passionately advocated" that players be compensated for "dementia, Alzheimer's Disease, Parkinson's Disease, and ALS." A.3807. He did not say the same about CTE. Less than two weeks later, the court preliminarily approved the settlement and conditionally certified the class and two subclasses. A.69, 3824. Thereafter, nearly 200 former NFL players and their family members opted out. A.120.

**6. *The parties propose a revised settlement that would globally release both present and future claims*.** The proposed settlement would release the claims of two subclasses: (1) all retired NFL players diagnosed with a "qualifying diagnosis" before the final settlement date of April 22, 2015, and their

16

spouses and estates, and (2) all retired players not diagnosed with a qualifying diagnosis before the final settlement date and their spouses and estates. A.5714-15. The six qualifying diagnoses are:

- ALS
- Death with CTE (but only if death occurs before April 22, 2015)
- Parkinson's Disease
- Alzheimer's Disease
- Level 2 (moderate) dementia
- Level 1.5 (early) dementia

A.5730.

***a. Compensation Framework***. The settlement awards compensation on a sliding scale, ranging from a maximum of $5 million (for ALS) to a maximum of $1.5 million (for early dementia). A.5740. How much a player receives depends on several factors, including his age at the time of his diagnosis, the number of seasons he played, and whether he was previously diagnosed with a stroke or traumatic brain injury. A.5629. For example, named plaintiff Kevin Turner, who has ALS, will be eligible for compensation. The same is true for players like Forrest Gregg, who has Parkinson's and can claim up to $3.5 million. Dkt. No. 5130; *Forrest Gregg fighting Parkinson's*, Associated Press, Nov. 16, 2011, http://es.pn/1hjK88I.

Players with CTE, however, are entitled to compensation only if they died before the final approval date of April 22, 2015. A.80. So, for example, the family of Dave Duerson—who had CTE and died before April 22, 2015—is eligible for

up to $4 million, the maximum amount paid for a death-with-CTE diagnosis. But the family of Ken Stabler, who died after April 22, 2015 and bore classic signs of CTE, will receive no compensation at all.[3] A.5329. By also foreclosing CTE-based compensation for players who suffer from the disease but have not yet died, and all players who do not yet suffer from it but one day will, the settlement treats future CTE claimants much differently than, say, future ALS claimants.

The only exception to this rule is if the player with CTE also exhibits conditions that trigger one of the other qualifying diagnoses and is able to claim compensation on that basis. But research suggests that these overlaps are only a minority of CTE cases. One study found that CTE was the sole diagnosis in 63% of cases, while Alzheimer's, for example, appeared in about one in ten. A.2255, A.3218. In another study of 33 CTE-infected brains, only 10 also showed signs of dementia. A.2955. Even among those with advanced CTE, a quarter were not considered cognitively impaired. A.2509-10.

As a result, the earliest and most prevalent symptoms of CTE—depression, aggression, chronic headaches, mood swings, and loss of concentration—trigger no compensation at all under the settlement. A.2509, 2955, 2958. The "key symptoms"

---

[3] Stabler's family donated his brain to Boston University's CTE Center to "determine definitely whether Stabler suffered from CTE" and help advance the science around degenerative brain disease in athletes. "If it is determined that Stabler had CTE, his family will receive nothing under the settlement." Paul D. Anderson, *Stabler's Death is a Stark Reminder About the Settlement's Deficiencies*, NFL Concussion Litigation, July 10, 2015, http://bit.ly/1foSBFK.

18

Case: 2:12-md-02323-AB   Document: 7464-5   Filed: 04/10/17   Page: 27 of 73

of CTE, in other words, "are not compensable." A.2958. Conversely, the diseases that are compensated—namely, ALS, Parkinson's, and Alzheimer's—are those for which the incidence among retired NFL players is significantly lower than the incidence of CTE. A.2380. One study, examining NFL retirees who played at least five seasons, recorded just seven cases of ALS, seven of Alzheimer's, and three of Parkinson's—out of 3,439 retired players. A.2379-82, 2400. Even class counsel's own estimates suggest that, of the 21,070-member class, only 31 players will exhibit ALS, 24 Parkinson's, and 2,947 Alzheimer's—14% of the class combined. A.1585. By contrast, expert research suggests that CTE's incidence among NFL players may be as high as 96%, dwarfing the conditions that receive compensation. A.2370.

Based on the parties' own estimates, approximately 15,000 class members (or 72% of the class) will never be compensated. A.1585. Although these players have no way of presently knowing whether they will be diagnosed with CTE, the settlement surrenders their right to assert any future claims based on a future CTE diagnosis, thus ensuring that those who do not also happen to suffer from a triggering neurodegenerative disease will receive no compensation. If, as in the case of Lew Carpenter, the condition leads to its telltale pattern of mood disturbances and memory loss *without* any signs of a qualified diagnosis, a player will have no recourse—even if the disease drives him to suicide. A.2508.

19

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 28 of 72

In addition, the settlement provides "free baseline assessment examinations of [class members'] objective neurological functioning." A.70.

**b. *Reevaluation Subject Only to the NFL's "Good Faith."*** The settlement acknowledges that scientific advances may require adjustments to the compensation framework, but provides no mechanism or rules by which to make adjustments other than leaving it to the parties to "confer in good faith" about potential revisions to the qualifying diagnoses—including, in theory, how to treat CTE. A.136. Although the settlement "requires" the parties "to meet at least every ten years" to consider amending qualifying diagnoses, the NFL holds a complete right to veto any potential modifications. A.147.

**c. *Attorneys' Fees***. The settlement also includes what courts call a "clear-sailing clause," under which class counsel may seek up to $112.5 million in fees without the NFL contesting the request. A.88-89, 1082.

On top of this uncontested fee of up to $112.5 million, which—unlike the players' compensation—will be paid immediately, class counsel can also claim a set-aside worth 5% of the benefits paid to each class member (which the NFL also agrees not to contest), as well as contingency fees arising out of payments to class members whom class counsel represent on an individual basis. A.5671.

Based on their own damages estimates, the 5%-set-aside provision means that class counsel could secure potentially $46.7 million in addition to the $112.5

million already guaranteed. A.1599. Because class counsel has not released public information about its separate contingency-fee arrangements, it is impossible to estimate the additional compensation through such arrangements. Record evidence suggests, however, that the contingency agreements here mirror those in typical personal-injury cases, where counsel takes around 33%. *See* Letter from Mrs. Daniel Brabham, Nov. 5, 2014, Dkt. No. 6356 ("My attorney . . . is also entitled to 1/3 of what may be awarded to me and my three children.").

Although class counsel must ordinarily seek fees contemporaneously with the approval process so that courts and class members may evaluate the overall contours of the deal and counsel's efforts, the district court allowed counsel to seek fees separately, following final approval. A.88, A.5671. It is known that class counsel took no depositions and conducted no formal discovery, and engaged in only minimal motions practice followed by month-long negotiations. A.5405, 5433. Applying a $600 average hourly rate for every partner, associate, and paralegal who worked on the case, $112.5 million in fees would equate to 187,500 hours of time—the equivalent of 21.4 years (even without accounting for the additional fees through the 5% set-aside and contingency fees).

**7. *Over many objections, the district court gives final approval to the settlement.*** Class members began filing objections to the settlement shortly after preliminary approval and, last November, the court held a fairness hearing.

21

The Armstrong Objectors, appellants here, took aim at the central problem: "CTE is the disease that made football brain damage a national issue and a public health concern," they explained. "Without it, neither this litigation, nor the [settlement itself] would likely exist. Yet the [settlement] forecloses every NFL retiree who has yet to die and be diagnosed with CTE from receiving a 'Death by CTE' award as if there will never be another case." Dkt. No. 6233, at 18.

In April 2015—six months after the opt-out deadline had expired, and without class counsel having submitted a fee petition—the district court certified the class and two subclasses and approved the settlement. A.58-189.

***a. Class Certification and Adequacy***. The court began its analysis with class certification. It acknowledged that Rule 23's certification requirements, including the requirement that absent class members be adequately represented, "demand[] undiluted, even heightened, attention in the settlement context." A.80 (quoting *Amchem*, 521 U.S. at 620). It also recognized that the adequacy-of-representation requirement guards against conflicts of interest by "'assur[ing] that differently situated plaintiffs negotiate for their own unique interests'"—a concern that is particularly acute in settlement classes seeking to bind both "those with present injuries and those who have not yet manifested injury." A.92 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996)).

Nevertheless, the court determined that the adequacy requirement was satisfied. A.99. The court reasoned that any conflict between class members with present injuries and those with possible future injuries was eliminated because class counsel, after "[r]ecognizing this problem" during settlement negotiations, "subdivided the Class into two Subclasses," added a representative for the newly created future-injury subclass, and then designated a lawyer on the Plaintiffs' Steering Committee to serve as his "independent counsel." A.92-93.

The court found Mr. Wooden to be an adequate representative of the future-injury subclass because he "does not know which, if any, condition he will develop" in the future, and thus "has an interest in ensuring that the Settlement compensates as many conditions as possible." A.93. The court did not attempt to square that statement with the fact that Wooden did not pursue compensation for CTE or specifically allege that he is at risk of developing the disease.

After addressing adequacy, the district court concluded that the other class-certification requirements were met, including Rule 23(a)(3)'s requirement that Mr. Wooden's claim be typical of the subclass's claims, and Rule 23(b)(3)'s requirement that common questions predominate over individual issues. A.83-85, 99-103.

**b. *Settlement Fairness and Due Process*.** Having certified the subclasses, the court then turned to the settlement agreement. The court determined that it satisfied due process and is fair, reasonable, and adequate even

though it does not compensate any living class members for CTE and forces them to relinquish their right to bring any future "claims relating to CTE" against the NFL. A.77. The court explained that the parties had resolved the court's "primar[y] concern[]"—the possibility that "the capped fund would exhaust before the 65-year life of the Settlement," thereby creating the risk that some class members would receive nothing for their claims simply because their injuries were discovered too late. A.67. The court was unconcerned, however, that this same problem exists for CTE, given the disparity in the settlement's treatment of present and future CTE claims.

The court attempted to justify this disparity in two ways. *First*, it speculated that providing a "prospective Death with CTE benefit would incentivize suicide because CTE can only be diagnosed after death." A.144. *Second*, it believed that a living class member "does not need a death benefit because he can still go to a physician and receive a Qualifying Diagnosis" while living. *Id.* The court pointed to studies showing that many players who died with CTE "would have received compensation under the Settlement if they were still alive" because the disease, in its advanced stages, likely "inflicts symptoms compensated by Levels 1.5 and 2 Neurocognitive Impairment and is strongly associated with the other Qualifying Diagnoses in the Settlement." A.136, 142. Based on that possible partial overlap,

the court determined that these diagnoses are adequate "prox[ies]" for CTE, so CTE need not be compensated for any living class members. A.145.

The court appeared to understand that potentially thousands of settlement class members will receive no compensation under the settlement and yet later be diagnosed with CTE. But the court took the view that the settlement "reasonably does not compensate Retired Players with the mood and behavioral symptoms allegedly associated with CTE." A.140. The court did so without insisting on any mechanism to ensure that the settlement will be adjusted, if necessary, to reflect future scientific developments regarding CTE. A.136. It required only that the parties "confer in good faith about possible revisions to the definitions of Qualifying Diagnoses based on scientific developments." *Id.*

*c. Attorneys' Fees.* As to attorneys' fees, the court found that the clear-sailing provision is "not problematic" and that "the uncontested fee award is not disproportionate." A.89-90. Despite Rule 23(h), the court also excused class counsel's refusal to file a fee petition, reasoning that any fee award will "not reduce the recovery available to the Class." A.88. Although the court assured class members that they "will have an opportunity to submit objections to the proposed fee award," it did not explain why anyone would have an incentive to do so after the settlement itself has been approved. A.134.

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 34 of 73

# SUMMARY OF ARGUMENT

**I.** If *Amchem Products v. Windsor* teaches us anything, it is that courts must police both substance ("the terms of the settlement") and procedure ("the structure of the negotiations") in tandem, to prevent compensation for the presently injured from being won at the expense of future claimants. 521 U.S. at 627. Courts must make sure that future claimants, before being bound, truly had a seat at the table.

**A.** The settlement terms here are proof that that did not happen. The settling parties have been unable to justify the mismatch at the heart of the deal: the disparate treatment between those diagnosed with CTE before, and those diagnosed after, the date of approval. The parties' "proxy" theory—that other, rarer conditions may stand in for CTE—offers no justification for this disparity, and fails to account for the fact that many with CTE will get nothing. The same is true for scientific uncertainty, which is a reason to preserve, not extinguish, future claims. The only credible explanation for the disparity is also the simplest: the deal was achieved by sacrificing future claimants' interests to the winds.

**B.** The negotiations' structure also explains why this lopsided deal came to pass: The future claimants never had a truly independent voice. A committee of plaintiffs' lawyers "appointed" subclass counsel from among their own ranks—with no court involvement—after the negotiations had begun. The early failure to bring in unconflicted counsel was never rectified. Instead, the lone plaintiff who gave his

consent to the settlement on behalf of thousands of future claimants was recruited by the same counsel—after the deal was worked out—and failed even to allege a future risk of CTE. A "representative" who abandons his most valuable claim in exchange for nothing is no representative at all.

**II.** If further confirmation were needed that the deal is a product of inadequate representation, it can be found in the parties' attempt to delay scrutiny of attorneys' fees until after final approval. "There was no excuse for permitting so irregular, indeed unlawful, a procedure." *Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014). It not only violates Rule 23(h) but "borders on a denial of due process because it deprives objecting class members of a full and fair opportunity to contest class counsel's fee motion." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010). The lawyers apparently plan to wait until after final approval to seek their nine-figure fee, at which point class members would lack an incentive (and perhaps even the right) to challenge it.

**III.** The "futures problem" presents considerable challenges. On remand, the parties and the court may consider a variety of solutions, such as the appointment of independent counsel, back-end opt-out rights, modification of the global release, and the creation of a fund for future CTE claims.

## STANDARD OF REVIEW

The district court's certification of the class and approval of the settlement—including its "failure to follow the procedures required before approving a settlement-only class action"—is reviewed for abuse of discretion. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 298 (3d Cir. 2005).

The Court's review "is plenary, however, to the extent a threshold question of law . . . bears on [its] review." *McNair v. Synapse Grp.*, 672 F.3d 213, 222 (3d Cir. 2012). "Whether an incorrect legal standard has been used" in granting class certification is likewise "an issue of law to be reviewed de novo." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 185 (3d Cir. 2015). Because "each requirement of Rule 23 must be met"—including adequacy of representation—"a district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 779 (3d Cir. 2009).

Indeed, Rule 23's certification requirements "demand undiluted, even heightened, attention in the settlement context," *Amchem*, 521 U.S. at 620, because the court "acts as a fiduciary" for absent class members. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) ("*GM Trucks*"). Courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified." *Id.* at 805.

# ARGUMENT

## I. Because the settlement's terms and the structure of the negotiations both make clear that future-injury plaintiffs were inadequately represented, approval of this settlement must be reversed.

This case implicates "the most difficult problem" in class-action settlements involving mass torts: How can a court ensure that any deal seeking to bind those "who do not now have claims, because injury has not been sufficiently manifested, but who may well have claims in the future," complies with Rule 23, the Constitution, and fundamental notions of fairness? Geoffrey Hazard, *The Futures Problem*, 148 U. Pa. L. Rev. 1901, 1901 (2000). This problem is at the heart of the two leading Supreme Court cases on class-action settlements—*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), which affirmed this Court in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). In both cases, the Supreme Court decertified settlement classes constructed to release the rights of "holders of present and future claims." *Id.* at 856.

The Court did so because the distinct interests of these two kinds of groups not only diverge but conflict: "for the currently injured, the critical goal is generous immediate payments," but "[t]hat goal tugs against the interest of [future-injury] plaintiffs," who may not "realize the extent of the harm they may incur," and thus can't know how much their future claims might be worth. *Amchem*, 521 U.S. at 626, 628. To guard against conflict, the Court has insisted on structural safeguards,

including adequate, independent representation of future-injury class members. In testing whether the necessary safeguards are in place, a court must assure itself—based on "a substantive inquiry into the terms of the settlement" and "a procedural inquiry into the negotiation process"—that the interests of all class members were truly represented. *GM Trucks*, 55 F.3d at 796. Only by "hom[ing] in on the settlement['s] terms" and negotiation structure, as Judge Becker did in *Georgine* and *GM Trucks*, may a court assess whether class counsel and the named plaintiffs provided "fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 619, 627.

This Court has identified several "basic questions" (focusing on both substance and procedure) "that courts can ask to detect those cases settled" without adequately "protect[ing] the interests of the absentees." *GM Trucks*, 55 F.3d at 806. On substance: Do the settlement terms reveal a "disparity between the currently injured and [future-injury] categories," *Amchem*, 521 U.S. at 626, such that the settlement "trad[es] the claims of the latter group away in order to enrich the former group," *GM Trucks*, 55 F.3d at 797? "Have major causes of action or types of relief sought in the complaint been omitted by the settlement?" *Id.* at 806. Is the settlement "accompanied by [the likelihood] of an enormous legal fee"? *Id.* at 801. On procedure: Were there insufficient "structural protections to assure that differently situated plaintiffs negotiate[d] for their own unique interests"? *Georgine*,

83 F.3d at 631. "Did the parties achieve the settlement after little or no discovery?" *GM Trucks*, 55 F.3d at 806.

Because the answer to each question is yes, this settlement cannot stand. Neither "the terms of the settlement" nor "the structure of the negotiations" provides this Court with any assurance that the interests of future-injury plaintiffs were really represented at the negotiating table. *Amchem*, 521 U.S. at 627.

### A. The settlement's disparate treatment of present and future claimants cannot be justified.

"The inadequacy of the representation" here "is apparent from examination of the settlement itself." *Nat'l Super Spuds v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981). This settlement creates a massive "disparity between the currently injured and [future-injury] categories of plaintiffs," *Amchem*, 521 U.S. at 626—the class's "most salient conflict," *Georgine*, 83 F.3d at 630. Under the settlement's terms, if a class member died with CTE before April 22, 2015—that is, if he had a *current* CTE claim on the day of approval—his estate will receive up to $4 million. But if a class member dies after April 22, 2015—that is, if he has a *future* CTE claim—his estate will "get no monetary award at all" for the very same injury. *Id.* Future-injury plaintiffs, in other words, are forced to release all "claims relating to CTE," A.77, yet they "will never enjoy the [CTE] benefits of the settlement"—benefits that were obtained at their expense. *GM Trucks*, 55 F.3d at 797.

31

It is hard to think of more "conspicuous evidence" of "an intra-class conflict." *Id.* When a "settlement treats [one group] quite differently from [another]," it has "serious implications for the fairness of the settlement and the adequacy of representation of the class." *Id.* at 777. That is especially true here, where the disparate treatment concerns the one injury that triggered this flood of litigation in the first place: death with CTE—the "industrial disease" of the NFL. A.5410.

What explains this eye-popping disparity if not a conflict of interest? Why would class counsel, who previously called CTE "the most serious and harmful disease that results from NFL and concussions," A.2237, insist on up to $4 million in CTE compensation for those who have already died, but forever foreclose the possibility of CTE compensation for everyone else? Whose interest does that serve? How can we be sure that future CTE claims were not bargaining chips to benefit others?

The district court posited two justifications for the disparity. The lead justification was that "[a] prospective Death with CTE benefit would incentivize suicide because CTE can only be diagnosed after death." A.144. Put differently, the court's concern was that CTE claims are so valuable—and the settlement's compensation for those who will be diagnosed with CTE in the future is so inadequate—that some class members will *kill themselves* for a chance to obtain the benefits. That justification is as perverse as it is fanciful. (It is also ignores the fact

that increased risk of suicide is a *symptom* of CTE.) The size of the disparity cannot justify the disparity itself. And a court, even if motivated by paternalism, may not force someone to relinquish a right worth millions of dollars for nothing in return.

The district court's second justification was that "a living Retired Player does not need a death benefit because he can still go to a physician and receive a Qualifying Diagnosis." A.144. That justification, of course, conflicts with the first: A player who "does not need" CTE compensation would not need to kill himself for it. Logical contradictions aside, the court's "proxy" theory fails even on its own terms. A.145. The court claimed that CTE's symptoms (though currently "unknown," A.136) are compensated by the other qualifying diagnoses: ALS, Alzheimer's, dementia, and Parkinson's. But, under the parties' own actuarial estimates, only about 5,879 out of 21,070 total estimated class members (or less than 28%) will be compensated by the settlement for those diseases. A.1585. Here is the predicted breakdown (at *id.*):

| Disease | Estimated Number of Incidences | Percentage of Class |
|---|---|---|
| ALS | 31 | 0.15% |
| Parkinson's | 24 | 0.11% |
| Level 1.5 dementia | 0[4] | 0.00% |
| Level 2 dementia | 2,878 | 13.66% |
| Alzheimer's | 2,946 | 13.98% |

---

[4] The estimated numbers include no one in the Level 1.5 dementia category because everyone with dementia is "assumed to progress to Level 2." A.1585.

33

By sharp contrast, researchers have identified CTE in roughly 96% of the former players whose brains they have examined (87 out of 91). Geier, *Will football players one day take medicine to prevent brain damage?*; *see also* A.2370. This means that more people have *already* been diagnosed with CTE than the total number expected to be compensated for ALS, Parkinson's, and Level 1.5 dementia *combined*. Those diseases, it goes without saying, are not "proxies" for CTE.

Nor is Level 2 dementia or Alzheimer's. Even if many people with CTE eventually advance to the most severe stage of the disease—at which point they are expected to suffer dementia and can presumably obtain Level 2 compensation— those people will receive only a fraction of the amount given to class members with current CTE claims. Indeed, although the district court believed that "the benefits for Death with CTE are not more generous than the benefits for those who received Qualifying Diagnoses while alive," the settling parties' own estimates show otherwise. A.145. The average payment for future dementia claims is $190,000, while the average payment for current CTE claims is $1.44 million. A.1573.

To explain this eightfold disparity, the district court reasoned that it is "because the alleged symptoms Death with CTE compensates did not begin when Retired Players died." A.145-46. That is true. But the same could be said of *anyone* with a current qualifying disease. Someone with ALS, Alzheimer's, Level 2 dementia, or Parkinson's did not begin suffering on the day of final approval. Yet

the settlement provides a uniform pay structure for each of those diseases (including dementia), with no supplemental compensation for those who have suffered in the past. Why? If CTE were really intended as a proxy for dementia, it should be treated the same as dementia. It is not. That internal contradiction exposes the "proxy" theory for what it is: a pretext designed to mask a glaring disparity between class members with current CTE claims and class members with future CTE claims.

Even the lopsided numbers listed above fail to capture the full extent of the disparity because they assume that (a) everyone with CTE will make it to the disease's final stages, and (b) the scientific understanding of CTE will not evolve in a way that casts doubt on the extent of the overlap between CTE and Level 2 dementia. In truth, however, hundreds if not thousands of class members will likely die with CTE before qualifying for Level 2 dementia—perhaps by killing themselves as a result of the disease. Based on current estimates, anywhere from 11% (if you believe the NFL's expert) to 67% (if you believe the CTE experts) of class members eventually diagnosed with CTE will receive no compensation. A.3498, 2956. Yet these people will suffer some of the most pervasive and debilitating CTE-related symptoms, involving "behavioral and mood disorders" that are "as serious" as any of the covered diagnoses. A.2956. In many cases—one study put it at two-thirds—behavioral and mood disorders are the *sole* presenting

symptom of CTE, meaning that most former players who died with CTE could not have obtained a qualifying diagnosis before death. A.2955-56. And some, like Hall of Famer Junior Seau, who committed suicide in 2012, take their lives before they deteriorate any further. A.2919.

Why should someone in that situation—whose disease caused him to commit suicide—get nothing if he died on April 22, 2015, but up to $4 million if he died the day before? The district court's principal answer is that his injury should not be compensated because of the causation problems associated with mood and behavioral symptoms. A.143. Fair enough. But a CTE diagnosis changes that. And this still doesn't explain why the settlement compensates behavioral injuries for those who died before April 22, 2015 (and at a higher rate than dementia, no less). So the district court put forth another answer: because those "who died before final approval would not have had sufficient notice of the need to obtain Qualifying Diagnosis." A.145. But why can't a player's family obtain a qualifying diagnosis after death? And if they do, or if the player obtained a qualifying diagnosis before death (say, dementia or Alzheimer's), why does he get *more* than the maximum amounts for those diseases if the behavioral injuries CTE causes have no value?

Far from establishing a fair compensation regime for CTE-related claims, the settlement's framework eliminates recovery for the vast majority of them. Class members who suffer from debilitating mood and behavioral conditions related to

CTE (possibly for years) but who do not advance further up the scale will receive nothing. The same goes for those who ultimately die from CTE without having dementia.

That outcome is impermissible under Rule 23 and due process. Claims held by absent class members are a form of "property" under the Due Process Clause, and hence may not be arbitrarily extinguished. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). And courts have long recognized that the release of a claim "not shared alike by all class members" will render a settlement defective under Rule 23. *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982). In *Amchem*, for instance, the Court refused to endorse a global settlement that "extinguished" certain types of future claims, including family members' "loss-of-consortium claims" and exposed "enhanced risk of disease," for "no compensation." 521 U.S. at 603, 627. The Court determined that the settlement's uncompensated sacrifice of these claims could not satisfy Rule 23's requirements—regardless of whether the class representatives "may well have thought that the [s]ettlement serves the aggregate interests of the entire class." *Id.* at 627; *see also Super Spuds*, 660 F.2d at 19 ("An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members.").

This case is no different. Although the district court suggested that allowing future-injury plaintiffs to bring CTE claims would "pose[] a serious practical

problem" given the scientific uncertainties, A.85, "convenience and expediency cannot justify the disregard of the individual rights of even a fraction of the class," *In re GM Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1133-35 (7th Cir. 1979). Here, the settlement "throw[s] to the winds" the claims of a huge percentage of the class. *Super Spuds*, 660 F.2d at 17 n.6. And it does so to reach a global resolution that benefits everyone else: the currently injured, the NFL, and class counsel.

Worse, these class members will "become bound to the settlement" even though they "lack adequate information to properly evaluate" it. *Georgine*, 83 F.3d at 633. The wide variation of CTE estimates in this case attests to that. Because any absent class member would have great "difficulty in forecasting what their futures hold," *id.* at 631, any rational future-injury representative would insist on "an agreement that keeps pace with scientific advances," as the district court explained. A.93. But this deal doesn't do that. Instead, it "freez[es] in place the science of [2014]," *Georgine*, 83 F.3d at 631, by requiring only that the settling parties "meet at least every ten years and confer in good faith about possible modifications," while giving the NFL veto power over "any prospective changes." A.147.

Worse still, the uncertainty of the future creates especially "serious problems in the fairness" of this settlement, *Georgine*, 83 F.3d at 633, because it does not involve the small-dollar claims that Rule 23's drafters had "dominantly in mind,"

*Amchem*, 521 U.S. at 617. Rather, this case "involves claims for personal injury and death—claims that have a significant impact on the lives of the plaintiffs and [could one day] receive huge awards in the tort system." *Georgine*, 83 F.3d at 633. Each plaintiff thus "'has a significant interest in individually controlling the prosecution of [his case]'; each 'ha[s] a substantial stake in making individual decisions on whether and when to settle.'" *Amchem*, 521 U.S. at 616 (quoting *Georgine*, 83 F.3d at 633). Future-injury class members would thus "probably desire a delayed opt out like the one employed in *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 150 (S.D. Ohio 1992)." *Georgine*, 83 F.3d at 631. But here, too, class counsel came up short, instead bargaining for "an enormous legal fee," *GM Trucks*, 55 F.3d at 801—further evidence that this settlement was beset with conflict, as discussed in Part II.

In short, the substance of this settlement should put this Court on high alert that future-injury class members did not receive fair and adequate representation. The settlement facially discriminates against them as to the one injury at the heart of this litigation—an injury the settlement itself values at up to $4 million. The parties' failure to justify the disparity leaves only one explanation: inadequate representation. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

**B.    The settlement's unjustified disparate treatment is the result of negotiations that lacked sufficient structural protections for future claimants.**

A "procedural inquiry into the negotiation process" confirms the inadequate representation here. *GM Trucks*, 55 F.3d at 796. This inquiry asks whether "the lawyers actually negotiating really were doing so on behalf of the *entire* class." *Id.* at 797. It seeks "to ensure that absentees' interests"—*all* absentees' interests—were "fully pursued" during the negotiation process. *Georgine*, 83 F.3d at 630. This Court can find no such assurance in this case. Simply put, the settling parties "achieved a global compromise with no structural assurance of fair and adequate representation" for future-injury plaintiffs. *Amchem*, 521 U.S. at 627.

The trouble began almost immediately. When this case first went to mediation—and throughout the nearly two months of actual negotiation—the Plaintiffs' Steering Committee pursued settlement without any judicially appointed subclass representatives or truly independent subclass counsel. Instead, the Committee negotiated with the NFL as a single bloc, purporting to represent the entire undifferentiated class. A.3578.

Eventually, however, the plaintiffs' lawyers realized the flaw in their approach: it violated *Amchem* and *Georgine*, which hold that "presently injured class representatives cannot adequately represent the futures plaintiffs' interests and vice versa." *Georgine*, 83 F.3d at 631. So the lawyers devised a strategy to sidestep these

precedents. After the basic settlement terms had been reached, the lawyers self-designated one of their own members to purportedly represent future-injury plaintiffs. A.1116-17. And they named Corey Swinson, a former player with one season of NFL experience, to serve as the representative of these plaintiffs. A.3569. The district court played no role in these choices, and there is no suggestion in the record that the court was even asked to appoint outside counsel.

After Swinson died, the plaintiffs' lawyers forged ahead with the settlement for a month without any representative of the future-injury plaintiffs. A.3569. Then they brought Shawn Wooden to their offices, disclosed the settlement terms to him, assured themselves that he would "support[] the settlement," and named him as the proposed representative of all future-injury plaintiffs. A.3902.

There is no indication that this process contained the necessary safeguards to protect the interests of future-injury absentees—particularly in light of the deal's substantive unfairness toward those absentees (as discussed earlier). "[T]he fact that plaintiffs of different types were among the named plaintiffs does not rectify the conflict." *Georgine*, 83 F.3d at 631. What is necessary is that there be sufficient "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests." *Id.* As the Supreme Court explained in *Amchem*, if future-injury class members are to be "bound to a settlement," the court must ensure itself—at the very minimum—that they are represented by truly independent

41

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 50 of 73

counsel and a named plaintiff who can provide meaningful "consent" and "who understand[s] that [his] role is to represent solely the members of [his] respective subgroup[]." 521 U.S. at 627 (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992)).

That did not happen here. As in *Amchem*, the district court "did not appoint additional class counsel, nor did it take any other procedural steps to protect the rights of the future class members in the settlement negotiation process or during the process leading up to the fairness hearing." Brian Wolfman & Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. Rev. 439, 479 (1996). Nor did the court even question after-the-fact that "[e]ach Subclass ha[d] its own independent counsel" during the negotiations, devoting only that one sentence to the topic. A.93.

"Far too much turns on the adequacy of representation to accept it on blind faith." *GM Trucks*, 55 F.3d at 797. On this record, there is simply no way to verify that the interests of Wooden's lawyer were really independent of the interests of the Steering Committee of which he was a part. To take just a few questions: Does the lawyer plan to seek compensation for the time he previously spent as counsel for presently injured plaintiffs? If so, how much? How much time did he spend working on the case after the Steering Committee appointed him as "futures" counsel? What work did he do? What portion of the potential $112.5 million fee

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 51 of 73

award will he seek? We don't know any of these answers, however, because the plaintiffs' lawyers have withheld their fee petition until *after* final approval of the settlement—an independent ground for reversal, as discussed in the next section.

Then there are the class representatives. As the representative of the proposed future-injury subclass, Wooden played no part in the negotiations and, given the timing, could not possibly have "underst[ood]" that his "role [was] to represent solely the members of [his] respective subgroup" *during* negotiations. *Amchem*, 521 U.S. 627. He thus could not have consented to this deal under *Amchem*, and he failed to "negotiate for [his] unique interests." *Georgine*, 83 F.3d at 631.

Nor does it matter that the lawyers tried to satisfy *Amchem* through Mr. Swinson. Installing him only after negotiations began (and after the architecture of the settlement had begun to take shape) is "equivalent to closing the barn door after the horses have escaped." *Walker v. Liggett Group, Inc.*, 175 F.R.D. 226, 233 n.12 (S.D. W. Va. 1997). For subclasses to be effective in assuring structural fairness and protecting unnamed class members, they must be established "prior to settlement." *Id.* That way, class members and courts can be confident that a "global resolution" fairly and adequately addresses "the interest of each subclass." *Id.* Future claimants require this safeguard because "those without current afflictions may not have the information or foresight needed to decide, intelligently,

whether to stay in or opt out." *Amchem*, 521 U.S. at 628; *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250-53 (2d Cir. 2011).

The timing of the subclass and named representative designations are not the only problem. When Wooden was designated, he omitted his CTE-related future claims. A.1126, 3823. That decision is not, as the district court thought, a mere technical omission. *See* A.94. A named plaintiff who, in effect, "waive[s] or abandon[s]" certain claims held by absent class members is categorically "inadequate as [a] class representative." *In re MBTE Prods. Liability Litig.*, 209 F.R.D. 323, 339-40 (S.D.N.Y. 2002). By the same token, "[a] class representative is not an adequate representative when [he] abandons particular remedies to the detriment of the class." *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999). A named plaintiff "cannot maintain a class action without seeking all available remedies for the class members," when "he refuses to seek all available remedies even for himself." *Drimmer v. WD-40 Co.*, No. 06-cv-900, 2007 WL 2456003, at *3 (S.D. Cal. 2007).

This flaw is fatal to the settlement because the "linchpin of the adequacy requirement" is the "alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). For intra-class conflicts that are allocative in nature, the key concern is that the representative plaintiffs will have an incentive

"to shift the dividing line" between claims "to maximize their own recovery, at the expense of other members of the class who lacked a representative to protect their interests." *Id.* at 187 n.15. In *Dewey*, this Court rejected a proposed class subdivision where none of the "representative plaintiffs" protected the interests of a distinct group of class members. *Id.* at 187-89. "The problem" with a proposed settlement class that includes no named plaintiff to represent a distinct group of class members, the Court explained, "is that the interests of the representative plaintiffs and the interests of the [unrepresented] group" will be "align[ed] in opposite directions." *Id.* at 188. "Representative plaintiffs" will have an incentive "to draw the [compensation] line just beneath" their claims, while feeling free to release those claims of unrepresented class members. *Id.* "This is precisely the type of allocative conflict of interest that" *Amchem* seeks to avoid. *Id.*[5]

The "structure of the settlement agreement" here illustrates the point. *Id.* at 187. The named class representatives—one of whom has the only injury worth more than CTE (Turner, with ALS) and thus had no incentive to seek future CTE compensation, and the other of whom declined to press future CTE-related claims—"drew a line delineating the boundaries between" those claims that could

---

[5] *See also* Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649, 1684 (2008) (explaining that intra-class conflicts "that matter" are "those that give rise to a significant potential for negotiation on behalf of an undifferentiated class to skew in some predictable way the design of class-settlement terms in favor of one or another subgroup for reasons unrelated to evaluation of the relevant claims").

trigger recovery and those that could not. *Id.* As in *Dewey*, "[i]t was this line-drawing exercise that exacerbated the adequacy problem here" because the named representatives "had an incentive to draw the dividing line" so that their potential claims would be compensated even if other absent members' claims were not. *Id.* at 188. As a result, this settlement fails Rule 23's adequacy and fairness requirements.

## II.   The attorney-fee-deferral procedure, which insulates any fee request from meaningful scrutiny, is unlawful and provides an independent ground for reversal under this Court's precedent.

The unusual fee arrangements here—which include procedures designed to insulate class counsel's nine-figure fees from any meaningful scrutiny—further confirm the inadequate representation of the class, and alone warrant reversal.

Counsel's failure to file a fee petition leaves many questions unanswered. Among them: How much time did class counsel spend on this litigation? How much effort was put into investigating the case? To what extent would counsel's fees represent a windfall, heightening concerns about inadequate representation? Do the fee arrangements reveal additional conflicts of interest—for example, will counsel for the futures subclass seek fees for previously representing present-injury claimants? How compromised is class counsel by generous contingency-fee arrangements with only present-injury claimants? No settlement may be lawfully approved when such critical questions remain unanswered.

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 55 of 73

**A.** ***The unlawful attorney-fee deferral procedure.*** The attorney-fee-deferral procedure here violates a clear rule of this Court's precedent: "[A] thorough judicial review of fee applications is required in *all* class action settlements." *GM Trucks*, 55 F.3d at 819 (emphasis added). Despite that categorical rule, the district court approved the settlement here without requiring class counsel to first file a fee motion. Instead, counsel was permitted to defer the motion—and any disclosure of the rationale or support for their eventual fee request—until after objections, final approval by the district court, and a decision by this Court. In so doing, "the District Court abdicated its responsibility to assess the reasonableness of attorneys' fees proposed under a settlement of a class action, and its approval of the settlement must be reversed on this ground alone." *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980).

"There was no excuse for permitting so irregular, indeed unlawful, a procedure." *Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014). The district court apparently believed it was acceptable to approve the settlement without judicial review of fees because the class members "will be free to contest" any fee request at a later date, and because the award would "not reduce the recovery available to the Class." A.87-88. But the latter rationale is the very one this Court rejected in *GM Trucks*; there, too, the district court had tried to "rationaliz[e] its initial refusal to review the fee" motion before final approval on

the theory that reductions to the fee "will in no way reduce the recovery to any of the settlement class members." 55 F.3d at 819. That is wrong as a matter of both economics and circuit precedent. As this Court recognized long ago, "a defendant is interested only in disposing of the total claim asserted against it; . . . the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Id.* at 819-20 (quoting *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020 (3d Cir. 1977)). Judge Posner recently made the same point in condemning the deferral procedure. Fees, he explained, "represent an integral part of the overall amount that the settling party is willing to pay." *Redman*, 768 F.3d at 958. When counsel refuses to file a motion, "class members cannot determine the possible influence of attorneys' fees on the settlement in considering whether to object to it." *Id.*

The deferral procedure also runs afoul of the federal rules. For any fee motion in a class-action settlement, Rule 23(h) mandates that "[n]otice of the motion must be . . . directed to class members" and that that "[a]ny class member may object to the proposal." Fed. R. Civ. P. 23(h). "The plain text of the rule requires that any class member be allowed an opportunity to object to the fee 'motion' itself." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-94 (9th Cir. 2010). When a settlement is proposed, the rule contemplates that "notice of class counsel's fees motion should be combined with notice of the proposed settlement."

Fed. R. Civ. P. 23(h)(1), 2003 advisory committee's note. The drafters emphasized that "it would be important to require the filing of at least the initial motion in time" for the class to receive notice and have the opportunity to object along with the proposed settlement. *Id.* These requirements were violated here. *See Redman*, 768 F.3d at 637 (rule violated where "[c]lass counsel did not file the attorneys' fee motion until after the deadline set by the court for objections to the settlement had expired").

Deferral of the fee motion also violates due process "because it deprives objecting class members of a full and fair opportunity" to object. *Mercury Interactive*, 618 F.3d at 993. Even where the total potential fee request is disclosed, class members are "handicapped in objecting" to the settlement without knowing "the details of class counsel's hours and expenses" and "the rationale that would be offered for the fee request." *Redman*, 768 F.3d at 638. To avoid this problem, courts require that "class action settlement notices must contain the maximum amount of attorney's fees sought by class counsel and specify the proposed method of calculating the award" *before* any settlement can be approved. *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 957 (Tex. 1996); *see also GM Interchange Litig.*, 594 F.2d at 1130 ("All amounts to be paid by the defendant(s) are properly part of the settlement funds and should be known and disclosed at the time the fairness of the settlement is considered."). That didn't happen here either.

**B.** ***The deferral procedure, coupled with the clear-sailing clause,*** ***effectively insulates the fees from future review.*** To make matters worse, the settlement also contains a "clear-sailing" clause barring the NFL from ever contesting class counsel's fees—including the up-front award of up to $112.5 million, an additional 5% of class members' recoveries, and an undisclosed amount of contingency fees (typically, at least 33% of the total recovery). This clause, together with the deferral procedure, results in even greater insulation of the fees.

For starters, "the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class," and "should put a court on its guard." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991); *see* William Henderson, *Clear Sailing Agreements: A Special Form of Collusion*, 77 Tulane L. Rev. 813 (2003). As this Court has explained, such a clause highlights the "danger . . . that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *GM Trucks*, 55 F.3d at 820. Such clauses "weigh substantially against the fairness of a settlement and call for intense critical scrutiny" by reviewing courts. *In re Sw. Airlines Voucher Litig.*, — F.3d —, 2015 WL 4939676, *10 (7th Cir. Aug. 20, 2015).

But the settlement here makes that "intense critical scrutiny" unlikely, thwarting judicial review by design. The NFL will be contractually bound not to

challenge any fee claim. Because the fees would no longer affect their recoveries, class members would lose the incentive to challenge the fees after final approval. And, even if a class member were to mount such a challenge, the parties might argue that the class member lacks standing to appeal.[6] As a result, the class would likely be deprived of the benefits of both objector participation and judicial review while class counsel is guaranteed hundreds of millions of dollars. There's only one reason for such an arrangement: "to insulate a fee award from attack." Charles Silver, *Due Process and the Lodestar Method*, 74 Tulane L. Rev. 1809, 1839 (2000).

Three decades ago, the Seventh Circuit and the Federal Judicial Center's Manual for Complex Litigation both condemned arrangements under which the fee is to be set "after the class settlement has been approved," warning that they "neutralize the court's power and ability to pass upon the reasonableness of the amounts to be paid to plaintiffs' counsel." *GM Interchange Litig.*, 594 F.2d at 1130-31 (quoting Manual). Under such an arrangement, there is "little incentive for the judge to reduce the agreed upon fees" and no incentive for anyone to challenge them. *Id.* at 1131.

---

[6] *Compare Silverman v. Motorola, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) (no standing for objector who only challenges attorneys' fees without challenging settlement when objector cannot benefit from fee reduction) *and Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084 (9th Cir. 2011) (same) *with In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 949 n.9 (9th Cir. 2011) (objectors who challenge fee as part of challenge to Rule 23(e) approval of $0 settlement have appellate standing).

**C.** ***What is known about the fee arrangements heightens concerns about adequacy of representation.*** Class counsel's efforts to eliminate meaningful judicial review is all the more troubling given the astronomical nature of the likely fee request compared to the amount of work done. Assuming a generous average rate of $600 per hour (for all work by partners, associates, and paralegals), $112.5 million in fees would equate to 187,500 hours of time—the equivalent of 21.4 years. That is a surprising recovery for litigation that entailed briefing on a motion to dismiss, no formal discovery, and a few months of mediation. Given the lack of fee records, there is a very real possibility that "class counsel effected a settlement that would yield very substantial rewards to them after what, in comparison to the [$112] million fee, was little work." *GM Trucks*, 55 F.3d at 803.

These numbers do not even account for the additional fees counsel stand to gain. In addition to the free pass on $112.5 million, the lawyers may also obtain 5% of each class members' recovery—potentially resulting in yet another windfall. That 5% is ostensibly for ongoing administrative costs, to be spent at counsel's discretion. But, as Judge Posner has noted, "the invocation of administrative costs as a factor warranting increased fees" makes the absence of information "a matter of particular significance." *Redman*, 768 F.3d at 638. Without this information, how

Case 2:12-md-02323-AB   Document 6464-5   Filed 04/10/17   Page 61 of 73

can any class member assess whether this is a wise expense or merely a slush fund for the lawyers?

Finally, the settlement allows the lawyers to enforce any contingency-fee contracts they have with class members who are able to recover on the grid—on top of the $112.5 million and the 5% setoff. It is difficult to estimate how much more this will add to the lawyers' pockets because the agreements have not been disclosed. But the amounts are likely substantial. Contingency fees in injury cases are typically 33% of damages after expenses, and that appears to be the case for at least some of the class members here. *See, e.g.*, Letter from Mrs. Daniel Brabham, Nov. 5, 2014, Dkt. No. 6356 (complaining that counsel "is also entitled to 1/3 of what may be awarded to me and my three children.").

Although there is no per se bar on such arrangements, they may indicate a conflict of interest and, in turn, inadequate representation. *Cf. Ortiz*, 527 U.S. at 852-53. The arrangements here are presumably with present-injury claimants, not future claimants. Thus, class counsel stands to gain far more from payouts for present-injury claims than for future-injury claims. The existence of this compensation source may undermine "any assumption that plaintiffs' counsel could be of a mind to do their simple best in bargaining for the benefit of the settlement class." *Id.* Such "side settlements suggest that class counsel has been laboring under an impermissible conflict of interest and that it may have preferred

the interests of current clients to those of the future claimants in the settlement class." *Id.* At a minimum, counsel should disclose the details. *See* Fed. R. Civ. P. 23(h), 2003 advisory committee's note (noting that "individual fee agreements between class counsel and class members might have provisions inconsistent with" the goal of fairness to the class); Fed. R. Civ. P. 54(d)(2)(B)(iv) (authorizing required disclosure of "the terms of any agreement about fees for the services for which the claim is made"); *Manual for Complex Litigation* § 13.23 (4th ed. 2007) ("In presenting settlement agreements for judicial approval . . . the parties are obliged to make full disclosure of all terms and understandings, including any side agreements.").

Taken together, these defects expose this settlement for what it is: a device designed to eliminate liability for the single biggest threat to the NFL—future accountability for an impending tsunami of CTE-related claims. Everyone wins but the future-injury class members. No court may approve a class settlement if the named class representatives and their counsel do not "possess the same interest . . . as the class members." *Amchem*, 521 U.S. at 594. Yet that is exactly what happened here.

## III.  **Alternatives are available on remand.**

As the defects in this settlement illustrate, the quest to bind future claimants to a class-action settlement along with present-injury claimants presents many

challenges. On remand, the parties and the district court should consider several alternatives to address this problem:

**_Appoint independent counsel:_** To prevent conflicts of interest among counsel and ensure adequate representation, the district court could appoint truly independent counsel to represent the future-injury subclass in any settlement negotiations—at a minimum, "someone who represents no presently injured claimants." Wolfman & Morrison, _Representing the Unrepresented in Class Actions Seeking Monetary Relief_, 71 N.Y.U. L. Rev. at 477. This "separate representation" requirement should prohibit "an attorney who represents another class against the same defendant" from "serv[ing] as class counsel." _Ortiz_, 527 U.S. at 856; _see Dewey_, 681 F.3d at 190 (suggesting that, on remand, adequacy problems could be resolved through separate representation of subclasses).

**_Exclude future claims from the release._** The parties might also narrow the terms of the release to permit class members who develop CTE-related injuries in the future to press their claims and seek compensation. In _Super Spuds_, Judge Friendly refused to endorse a view of Rule 23 or due process that would allow named plaintiffs to give up different claims of absent class members. 660 F.2d at 17. Here, because the named "futures" representative declined to press a CTE claim, the scope of any release of future claims could be so limited, and future CTE claims could be excluded. _See In re Oil Spill by Oil Rig Deepwater Horizon_, 295 F.R.D. 112,

125 (E.D. La. 2013) (approving release that would not cover later-manifested physical conditions arising from exposure).

**_Compensate CTE with evolving diagnostic criteria._** A third option would be to create a CTE qualifying diagnosis. This would allow players who are later diagnosed with CTE to get compensation. To account for the changing science, the settlement could establish a framework for constant reevaluation of the diagnostic criteria related to CTE. And unlike the current settlement—which gives the NFL a unilateral veto—the settlement could authorize an objective committee of scientists to approve changes and "keep pace with the changing science and medicine." _Georgine_, 83 F.3d at 630-31.

**_Provide back-end opt-out rights._** Finally, the use of "sturdy back-end opt out rights" has been recognized as a "rational[]" means for future-only class members to protect "distant recoveries," _Amchem_, 521 U.S. at 610, and "safeguard their ultimate right to resort to the tort system," _In re Asbestos Litig._, 90 F.3d 963, 972-73 (5th Cir. 1996); _see, e.g._, _Bowling v. Pfizer, Inc._, 143 F.R.D. 141, 150 (S.D. Ohio 1992).[7] In the recent BP/Deepwater Horizon Medical Settlement, for example, all class members had the right to a back-end opt-out regardless of

---

[7] This mechanism has been embraced by several scholars. _See_ John C. Coffee, Jr., _Class Action Accountability_, 100 Colum. L. Rev. 370, 433 (2000); Richard A. Nagareda, _Autonomy, Peace, and Put Options in the Mass Tort Class Action_, 115 Harv. L. Rev. 747, 800-01 (2002); Samuel Issacharoff, _Governance and Legitimacy in the Law of Class Actions_, 1999 Sup. Ct. Rev. 337, 368-70 (1999); John C. Coffee, Jr., _Class Wars_, 95 Colum. L. Rev. 1343, 1448-53 (1995).

Case 2:12-md-02323-AB    Document 7464-5    Filed 04/10/17    Page 65 of 73

whether they recovered in the present. There was "no 'future' injury released by the Settlement"—and hence no concern that absent class members' undeveloped claims would be extinguished. *See In re Oil Spill*, 295 F.R.D. at 140. Because all class members retained the opt-out right, even those with current claims had "every incentive to protect the interests" of futures-only claimants—a point with which Dean Klonoff (who was also an expert there) agreed. *Id.*

The settlement in this case failed to follow any of these, or any other, blueprints to address the problem of future injuries. On remand, the parties and the district court should study how courts and parties in other cases have handled this crucial issue.

## CONCLUSION

The district court's approval of the settlement should be reversed.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Matthew W.H. Wessler
Jonathan E. Taylor
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans Street, Suite 505
Beaumont, TX 77701

Mitchell A. Toups
WELLER, GREEN, TOUPS &
TERRELL LLP
2615 Calder Street, Suite 400
Beaumont, TX 77704

Jason C. Webster
THE WEBSTER LAW FIRM
6200 Savoy, Suite 640
Houston, TX 77036

September 14, 2015                    *Counsel for Appellants Armstrong et al.*

# COMBINED CERTIFICATIONS

**1. BAR MEMBERSHIP**: I certify that I am a member of this Court's bar.

**2. WORD COUNT, TYPEFACE, AND TYPE STYLE.** I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure of 32(a)(7)(B) because the brief (as indicated by my word processing program, Microsoft Word) contains 13,676 words, excluding those portions excluded under Rule 32(a)(7)(B)(iii). I also certify that this brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type style requirements because this brief has been prepared in the proportionally spaced typeface of 14-point Baskerville.

**3. SERVICE:** I certify that on September 14, 2015, I am causing this brief to be filed electronically with this Court's CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

**4. PAPER COPIES:** I certify that the text of the electronic version of this brief is identical to the text in the paper copies that will be delivered to the Court.

**5. VIRUS CHECK:** I certify that I have performed a virus check using Sophos antivirus, and that no virus was detected.

/s/ Deepak Gupta

September 14, 2015                    Deepak Gupta

# Appendix—Biographies of the Appellants (Armstrong Objectors)

**RAYMOND ARMSTRONG** played one season as a defensive tackle with the Oakland Raiders. He began his professional football career after playing for Texas Christian University. Mr. Armstrong retired from the old AFL after the 1960 season.

**LARRY E. BARNES** played two seasons for the San Francisco 49ers and Oakland Raiders as a running back and kicker. He began his professional football career in 1957 after playing for Colorado State University. Mr. Barnes retired from the old AFL after the 1960 season.

**LARRY BROWN** played eight seasons as a defensive back with the Dallas Cowboys and Oakland Raiders. He played on three Super Bowl Championship teams with the Dallas Cowboys (XXVII, XXVIII, and XXX), and was named MVP of Super Bowl XXX. He was also named to the NFL all-rookie team. Mr. Brown began his professional football career in 1991 after playing for Texas Christian University. Mr. Brown retired from the NFL after the 1998 season. He is a cohost of the Dallas Cowboys Radio Network Pregame and Postgame Shows on the Dallas Cowboys Radio Network.

**DREW COLEMAN** began his professional football career in 2006 after playing cornerback for the Texas Christian University Mountain West Conference Championship team. He played four seasons with the New York Jets and one season with the Jacksonville Jaguars. Mr. Coleman retired from the NFL after the 2011 season.

**KENNETH DAVIS** played nine seasons as a running back with the Green Bay Packers and Buffalo Bills. He played in four consecutive Super Bowls (XXV, XXVI, XXVII and XXVIII) with the Buffalo Bills. Mr. Davis began his professional football career in 1986 after playing for Texas Christian University, where he was first team All-American and had the fifth most votes of all candidates for the Heisman Trophy as a junior. Mr. Davis retired from the NFL after the 1994 season. He is the Athletic Director and former head football coach at Bishop Dunne Catholic School in Dallas, Texas.

**DENNIS DEVAUGHN** was captain of the Bishop College football team and named MVP of the 1981 Sheridan Black College All-Star game. He played defensive back for the Philadelphia Eagles for two years (1982-1983). After retiring from professional football, Mr. DeVaughn helped found, and became President of,

Athletes for Change, an organization that provides treatment services to youth with emotional or behavioral disorders.

**WILLIAM B. "BILL" DUFF** played one season as a defensive tackle with the Cleveland Browns, and one season with the Berlin Thunder of NFL Europe. He began his professional football career in 1999 after playing for the University of Tennessee—where he was co-captain in 1997. After retiring from professional football, Mr. Duff hosted the television show "Human Weapon" on the History Channel. He is currently an executive with the Hard Rock Rocksino in Northfield Park, Ohio.

**WILLIAM E. "WILD BILL" DUTTON** (deceased, by his daughters, Appellants Mary Hughes and Barbara Scheer) played one season as a halfback for the Pittsburgh Steelers. He played college football at the University of Pittsburgh where he was third in the nation in rushing in 1942. Mr. Dutton was drafted in the third round by the Washington Redskins in 1943, but went into the service before he played a down. After World War II, Mr. Dutton played the 1946 season for the Pittsburgh Steelers. He was released by the Steelers in 1947 and, after a brief stint with the NFL New York Yankees, retired from professional football in 1947.

**KELVIN MACK EDWARDS, SR.** was a wide receiver for the New Orleans Saints and Dallas Cowboys from 1986 through 1988. He played college football at Liberty University.

**PHILLIP E. EPPS** was a wide receiver for the Green Bay Packers (1982-1988) and New York Jets (1989). He played college football at Texas Christian University. He retired from the NFL after the 1989 season.

**GREGORY EVANS**, a safety, played two seasons with the Buffalo Bills (1994-1995) and one season with the Washington Redskins (1998). He retired from the NFL after the 1998 season. Mr. Evans is an Emergency Medical Services Lieutenant with the City of Dallas Fire and Rescue Department. He also holds certifications as a state certified firefighter and paramedic.

**CHARLES LEWIS HALEY, SR.** played college football at James Madison University where he was a defensive starter and twice earned All-American honors. Mr. Haley, a linebacker and defensive end, played for five Super Bowl Championship teams. He played for the San Francisco 49ers from 1986-1991 and 1998-1999, winning two Super Bowls (XXIII and XXIV). He also played for the Dallas Cowboys from 1992-1996, where he won three Super Bowls (XXVII, XXVIII, and XXX). Mr.

Haley was named to the Pro Bowl five times and was an All-Pro selection twice. He retired after the 1999 season. For his accomplishments, Mr. Haley was inducted into the Pro Football Hall of Fame in 2015. He was also inducted into the College Football Hall of Fame in 2011 and the Virginia Sports Hall of Fame in 2006, and was enshrined into the Dallas Cowboys Ring of Honor in 2011.

**ALVIN HARPER** played college football at the University of Tennessee. He was a first round draft pick of the Dallas Cowboys in 1991 after earning All-Southeastern Conference First Team honors in 1990 and being named MVP of the 1991 Hula Bowl. As a wide receiver, Mr. Harper helped lead the Dallas Cowboys to back to back Super Bowl Championships (XXVII and XXVIII). After playing for the Cowboys for four seasons, Mr. Harper played one year each for the Tampa Bay Buccaneers, Washington Redskins, and New Orleans Saints. He returned to Dallas for his final NFL season in 1999.

**JAMES GARTH JAX** played ten seasons as a linebacker and special teams player with the Dallas Cowboys and Arizona Cardinals. He began his professional football career in 1986 after playing for Florida State University. Mr. Jax retired from the NFL after the 1995 season. For three years after his retirement, Mr. Jax served as the Arizona Cardinals coordinator of NFL programs and community outreach. He is currently an executive with Copper State Bolt & Nut Company and a motivational speaker.

**ERNEST JONES** was drafted by the Los Angeles Rams in 1994 and played in the NFL for six seasons. Mr. Jones also was a defensive lineman for the New Orleans Saints, Carolina Panthers, and Denver Broncos on the Super Bowl XXXII Championship team. Since retiring from the NFL in 2000, Mr. Jones has worked as a personal trainer for young athletes in Chandler, Arizona.

**MIKE KISELAK** played one season with the Dallas Cowboys as an offensive lineman in 1998. Prior to his NFL career, he played for the University of Maryland, where he was named the Atlantic Coast Conference Offensive Lineman of the Week in October 1989. Mr. Kiselak is a minister and a member of the board of directors for Kids Matters International.

**DWAYNE LEVELS** played college football at Oklahoma State University. He was a linebacker for the Cincinnati Bengals in 2002 and 2003.

**DARRYL GERARD LEWIS** played college football at the University of Texas at Arlington. He played one season as tight end for the Cleveland Browns in 1984.

**GARY WAYNE LEWIS** played college football at the University of Texas at Arlington. A second round draft pick by the Green Bay Packers in 1981, he played four seasons in the NFL as a tight end. Mr. Lewis retired from the NFL after the 1984 season.

**JEREMY LOYD** played college football at Iowa State University. He played two seasons as a linebacker for the St. Louis Rams, retiring from the NFL after the 2005 season.

**LORENZO LYNCH** was a cornerback and safety for the Chicago Bears, Arizona Cardinals, and Oakland Raiders. He played eleven seasons before retiring from the NFL after the 1997 season.

**DAVID MIMS** played college football at Baylor University. He was signed by the Atlanta Falcons in 1993 as an undrafted free agent. Mr. Mims played wide receiver for the Atlanta Falcons in 1993 and 1994, retiring from the NFL after the 1994 season.

**MICHAEL MCGRUDER** played nine seasons as a defensive back with the Green Bay Packers, Miami Dolphins, San Francisco 49ers, Tampa Bay Buccaneers, and the New England Patriots, with whom he played in Super Bowl XXXI. Before his NFL career, he played three seasons in the Canadian Football League with the Saskatchewan Roughriders. Mr. McGruder received the NFL Extra Effort Award and was a finalist for the NFL Bart Starr Award in 1997. He began his NFL professional football career in 1989 after starting four years at Kent State University, where he was captain of the football team his senior year, and a 2-year captain of the track team. Mr. McGruder retired from the NFL after the 1997 season. In 2009, Mr. McGruder founded Platinum Charities, a charitable organization dedicated to motivating at-risk youth and empowering disadvantaged families to reach higher levels of achievement.

**TIM MCKYER** played college football at the University of Texas at Arlington. A cornerback, he was a third-round draft pick of the San Francisco 49ers in 1986. Mr. McKyer played for the 49ers (1986-1989), Miami Dolphins (1990), Atlanta Falcons (1991-1992), Detroit Lions (1993), Pittsburgh Steelers (1994), Carolina Panthers (1995), Atlanta Falcons (1996), and Denver Broncos (1997). He was a member of three Super Bowl Championship teams in 1988 and 1989 (San Francisco), and 1997 (Denver) (XXII, XXIII, and XXXII, respectively). Mr. McKyer, a two-time All Pro, retired from the NFL after the 1997 season.

**NATHANIEL NEWTON, JR.** played fourteen seasons as an offensive lineman with the Dallas Cowboys and Carolina Panthers. Before his NFL career, he played two years for the Tampa Bay Bandits in the United States Football League. Mr. Newton was a six-time Pro Bowl selection, was twice named All-Pro, and played on three Super Bowl Championship teams with the Dallas Cowboys (XXVII, XXVIII, and XXX). He also was named to the USFL All-Time Team. Mr. Newton began his NFL professional football career in 1986 after playing for Florida A&M University, where he was first team All-MEAC as a senior. Mr. Newton retired from the NFL after the 1999 season. He is a radio and television broadcaster in Dallas, Texas.

**CLIFTON L. ODOM** played thirteen seasons as a linebacker with the Cleveland Browns, Baltimore and Indianapolis Colts, and Miami Dolphins. Mr. Odom began his professional football career in 1980 after playing for the University of Texas at Arlington. Mr. Odom retired from the NFL after the 1993 season.

**EVAN OGLESBY** originally signed with the Buffalo Bills in 2005 as an undrafted free agent. Thereafter, Mr. Oglesby played six seasons as a cornerback for the Baltimore Ravens, Dallas Cowboys and Miami Dolphins. Mr. Oglesby retired from the NFL after the 2010 season.

**SOLOMON PAGE** played college football at West Virginia University. Mr. Page, an offensive lineman, was drafted in the second round by the Dallas Cowboys in 1999. During his career with the Dallas Cowboys (1999-2002), he played both right guard and right tackle. Mr. Page played with the San Diego Chargers in 2003, after which he retired from the NFL.

**HURLES SCALES** played two seasons as a defensive back for the St. Louis Cardinals, Chicago Bears and Green Bay Packers. He retired from the NFL after the 1975 season. Mr. Scales previously served as First Vice President of the National Football League Players Association Dallas, Texas Chapter.

**KEVIN REY SMITH** played college football at Texas A&M University where he was a member of two Southwest Conference Championship teams. He was an All-Southwest Conference selection for three years, and a 1991 consensus All-American. Mr. Smith, a first round draft pick, played his entire NFL career as a cornerback with the Dallas Cowboys (1992-2000)—including three Super Bowl Championship teams (XXVII, XXVIII, and XXX). Mr. Smith retired after the 2000 season. He was inducted into the Texas A&M Athletic Hall of Fame in 1997.

Case 2:12-md-02323-AB   Document 7464-5   Filed 04/10/17   Page 73 of 73

**WILLIE T. TAYLOR** played one season as a wide receiver for the Green Bay Packers. He began his professional football career after playing for the University of Pittsburgh. Mr. Taylor retired from the NFL after the 1978 season.

**GEORGE TEAGUE**, a first-round pick in the 1993 NFL Draft, played nine seasons as a defensive back with the Green Bay Packers, Dallas Cowboys, and Miami Dolphins. Mr. Teague retired from the NFL after the 2001 season. e began his professional football career after playing for the University of Alabama. In 2002, he started the George Teague & Friends Foundation, a charitable organization focusing on youth development programs that involves many former University of Alabama football players. He is the Director of Athletics and Physical Education and Head Football Coach for the Shelton School in Dallas, Texas.

**CURTIS BERNARD WILSON** played college football at the University of Houston and Texas A&I University at Kingsville. Mr. Wilson, an undrafted free agent, played defensive back for the San Diego Chargers.