# Exhibit DD

**Nos. 15-2272, 15-2294**

# In the United States Court of Appeals for the Third Circuit

————————————————

**IN RE NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION INJURY LITIGATION**

————————————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

————————————————

**REPLY BRIEF OF APPELLANTS RAYMOND ARMSTRONG, LARRY BARNES, LARRY BROWN, DREW COLEMAN, KENNETH DAVIS, DENNIS DEVAUGHN, WILLIAM B. DUFF, KELVIN MACK EDWARDS, SR., PHILLIP E. EPPS, GREGORY EVANS, CHARLES L. HALEY, SR., ALVIN HARPER, MARY HUGHES, JAMES GARTH JAX, ERNEST JONES, MICHAEL KISELAK, DWAYNE LEVELS, DARRYL GERARD LEWIS, GARY WAYNE LEWIS, JEREMY LOYD, LORENZO LYNCH, MICHAEL MCGRUDER, TIM MCKYER, DAVID MIMS, NATHANIEL NEWTON, JR., CLIFTON L. ODOM, EVAN OGELSBY, SOLOMON PAGE, HURLES SCALES, JR., BARBARA SCHEER, KEVIN REY SMITH, WILLIE T. TAYLOR, GEORGE TEAGUE, AND CURTIS BERNARD WILSON**

————————————————

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans Street, Suite 505
Beaumont, TX 77701

Mitchell A. Toups
WELLER, GREEN, TOUPS & TERRELL
2615 Calder Street, Suite 400
Beaumont, TX 77704

Jason C. Webster
THE WEBSTER LAW FIRM
6200 Savoy, Suite 640
Houston, TX 77036

Deepak Gupta
Matthew W.H. Wessler
Jonathan E. Taylor
Neil K. Sawhney
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com

*Counsel for Appellants Armstrong et al.*

Case: 2:12-md-02323-AB    Document: 7464-6    Filed: 04/10/17    Page: 3 of 29

# TABLE OF CONTENTS

Table of authorities ..................................................................................... ii

Introduction ................................................................................................ 1

Argument ..................................................................................................... 5

    I.    Because class counsel have not affirmatively demonstrated that the settlement's terms and negotiation structure establish adequate representation, reversal is required. ........................................................ 5

    II.    The settlement's unlawful fee-deferral procedure deprives this Court of a critical tool for assessing the adequacy of class counsel's representation of the future-injury claimants, independently warranting reversal. ............................................................................. 13

Conclusion ................................................................................................. 23

Combined certifications

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................*passim*

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ............................................................................... 6

*Georgine v. Amchem Products, Inc.*,
  83 F.3d 610 (3d Cir. 1996) ....................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ............................................................................... 6

*In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*,
  795 F.3d 380 (3d Cir. 2015) .................................................................... 7, 8

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ................................................................... 20

*In re Diet Drugs Products Liability Litigation*,
  282 F.3d 220 (3d Cir. 2002) ....................................................................... 8

*In re Diet Drugs Products Liability Litigation*,
  369 F.3d 293 (3d Cir. 2004) .................................................................... 7, 8

*In re Diet Drugs Products Liability Litigation*,
  No. 1203, 99–20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) .................... 8

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*,
  55 F.3d 768 (3d Cir. 1995) ....................................................................*passim*

*In re Insurance Brokerage Antitrust Litigation*,
  No. 04-5184, 2007 WL 1652303 (D.N.J. June 5, 2007) .................................. 19

*In re Literary Works in Electronic Databases Copyright Litigation*,
  654 F.3d 242 (2d Cir. 2011) ..................................................................*passim*

*In re Southwest Airlines Voucher Litigation*,
  — F.3d —, 2015 WL 4939676 (7th Cir. Aug. 20, 2015) .............................. 11

*Juris v. Inamed Corp.*,
  685 F.3d 1294 (11th Cir. 2012).................................................................. 8

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ................................................................... 6, 22

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014)........................................... 4, 18, 20

*Tennille v. Western Union Co.*,
  No. 09-cv-00938, 2014 WL 5394624 (D. Colo. Oct. 15, 2014) ........................ 19

*Wal–Mart, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................. 6, 7, 8

**Rules**

Federal Rule of Civil Procedure 23(a) ...................................................... 6

Federal Rule of Civil Procedure 23(a)(4).................................................. 11

Federal Rule of Civil Procedure 23(h)(1) .................................................. 20

**Miscellaneous**

*Newberg on Class Actions* § 8.24 (5th ed.) ............................................. 20

Case 2:12-md-02323-AB   Document 5464-6   Filed 04/10/17   Page 6 of 29

# INTRODUCTION

These appeals present the most difficult problem in the law of class actions: When may a global settlement release both present- and future-injury claims? Because of the fundamental divergence of interests between these two groups, courts must ensure that the deal was not achieved at the expense of future claimants—meaning, at a minimum, that those claimants had a truly independent, uncompromised voice at the negotiating table.

But throughout their nearly 200 pages of briefing, the settling parties act as if the two most relevant precedents on this problem—*Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996), and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)—do not exist. They do so at their peril. *Amchem*'s core requirement of "fair and adequate representation for the diverse groups," *id.* at 627, may not be satisfied with empty gestures, or limited to its "unique facts." CC Br. 60. The same goes for Judge Becker's landmark opinion in *Georgine*, which zeroes in on the conflict of interest that infects this settlement: "presently injured class representatives cannot adequately represent the futures plaintiffs' interests and vice versa." 83 F.3d at 631.

The parties' failure goes well beyond their refusal to engage with precedent. They also steadfastly refuse to answer the "basic questions" that courts "ask to detect those cases settled" without adequately "protect[ing] the interests of the absentees." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d

768, 806 (3d Cir. 1995) ("*GM Trucks*"). It is these questions—not the *Girsh* factors—that expose inadequate representation. We asked them in our opening brief (at 30–31) and do so again:

- **Do the settlement terms reveal a "disparity between the currently injured and [future-injury] categories," *Amchem*, 521 U.S. at 626, such that the settlement "trad[es] the claims of the latter group away in order to enrich the former group," *GM Trucks*, 55 F.3d at 797?**

The NFL, to its credit, does not deny the disparity at the heart of this deal; it just says that "the line has to be drawn somewhere." NFL Br. 76. But why was the line drawn at precisely the point at which the present- and future-injury claimants' interests diverge? The parties offer no good answers. If this were a discrimination case, the parties would be defending a policy of disparate treatment, not disparate impact. And their failure to provide a non-pretextual explanation would be fatal.

- **"Have major causes of action or types of relief sought in the complaint been omitted by the settlement?" *GM Trucks*, 55 F.3d at 806.**

Nobody denies that this litigation has always been about CTE. And yet class counsel—seeking to downplay the disparate treatment—now claim that the settlement "is not designed to compensate CTE." CC Br. 77. According to class counsel, that is because of the scientific uncertainty surrounding CTE. But scientific uncertainty is a reason to *preserve*, not extinguish, future claims—a central lesson of *Georgine* and *Amchem*. It is precisely because of the "difficulty in forecasting

what their futures hold" that future claimants, if they really had a voice at the table, would have insisted on a deal that "keeps pace with scientific advances," not one that "freezes [the science] in place." *Georgine*, 83 F.3d at 631.

- **Were there insufficient "structural protections to assure that differently situated plaintiffs negotiate[d] for their own unique interests," *Georgine*, 83 F.3d at 631?**

Class counsel contend that the creation of "subclasses" provides the necessary protections. But the parties have made no effort to actually *prove* that the subclass counsel were truly independent. "Far too much turns on the adequacy of representation to accept it on blind faith." *GM Trucks*, 55 F.3d at 797. It is bad enough that the futures subclass counsel (Arnold Levin) was drawn from, and answerable to, the Plaintiffs' Steering Committee. (If this were a separation-of-powers case, would he be deemed independent of the committee?) But the problem here is worse. Levin appears to have represented former players who asserted present-injury claims, even as he had a fiduciary obligation to solely represent the interests of players asserting only future claims. And Levin admitted to having a one-third contingency stake in the recoveries of his current-injury clients. A.667. No matter how you spin it, that is a disabling conflict of interest.

- **"Did the parties achieve the settlement after little or no discovery?" *GM Trucks*, 55 F.3d at 806.**

Class counsel do not dispute that they negotiated a global release of CTE claims without requesting internal NFL documents about the risk of CTE (and that

they did so before any of these claims had been litigated). That is inexcusable. Class counsel's only justification is an unexplained assertion (at 52) that "[t]his was not a case where privately held information by the parties would ultimately tip the litigation." But how can they know without seeking discovery?

- **Is the settlement "accompanied by [the likelihood] of an enormous legal fee," *GM Trucks*, 55 F.3d at 801?**

Despite this lack of discovery, the settlement entitles class counsel to seek $112.5 million, a set-aside worth 5% of each class member's recovery, and additional (unknown) contingency fees (likely 33%). Yet, by withholding their fee motion until after final approval, class counsel have withheld pertinent information—such as whether Mr. Levin had a financial interest in current claimants' recoveries—that should have been disclosed in the motion. Class counsel have provided no reason why this Court should "permit[] so irregular, indeed unlawful, a procedure" in this case. *Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014). That is because there is none. In this Circuit, "a thorough judicial review of fee applications is required in all class action settlements." *GM Trucks*, 55 F.3d at 819–20. Because that did not happen here, the settlement must be reversed for that reason as well.

## ARGUMENT

### I. Because class counsel have not affirmatively demonstrated that the settlement's terms and negotiation structure establish adequate representation, reversal is required.

The central question in these appeals is whether class counsel provided the necessary "structural assurance of fair and adequate representation." *Amchem*, 521 U.S. at 627. Answering that question entails "a substantive inquiry into the terms of the settlement," as well as "a procedural inquiry into the negotiation process." *GM Trucks*, 55 F.3d at 785. Only by "hom[ing] in" on both substance and procedure, as Judge Becker did in *Georgine* and *GM Trucks*, may this Court assure itself that future claimants' interests were really represented. *Amchem*, 521 U.S. at 619; *see id.* at 627.

Ignoring that approach, the settling parties divorce substance and procedure. They refuse to acknowledge that the settlement's core substantive problem—its disparate treatment of present and future claimants—matters to adequacy because it is "evidence of prejudice to the interests of a subset of plaintiffs." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011). And the parties refuse to provide evidence showing that the negotiation process that created this disparity protected future claimants by ensuring that they had an uncompromised, independent lawyer to vigorously advocate for their interests— interests that are at odds with those of current claimants.

5

That is fatal to the settlement. Because "Rule 23 does not set forth a mere pleading standard," class counsel must "affirmatively demonstrate" that the settlement class complies with the rule. *Wal–Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011). They have not done so. They have not shown, through the structure of the negotiations and terms of the settlement, that there was "*in fact* . . . adequacy of representation, as required by Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

**A.**    Take the structure first. Class counsel offer only one reason why they believe there were sufficient "structural protections" to ensure that current and future claimants "negotiate[d] for their own unique interests." *Georgine*, 83 F.3d at 631. They contend (at 35) that the "structural concerns" identified in *Georgine* and *Amchem* are "directly addressed" by the fact that class counsel created separate "subclasses" during the negotiation process and proposed "a separate representative and counsel" for each group.

But class counsel make no attempt to "actually *prove*" that each subclass was in fact adequately represented, *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014)—that is, that each subclass actually had independent, "separate representation to eliminate conflicting interests of counsel," as Rule 23 requires, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999). Nor did class counsel make this showing below. *See* Dkt. No. 6423-1, at 24–26; No. 6467, at 29–31. And the district

court likewise failed to provide *any* analysis to support its statement (at A.93) that "[e]ach Subclass has its own independent counsel"—much less the "rigorous analysis" required by *Wal–Mart*, 131 S. Ct. at 2551.[1]

These dual failures—class counsel's failure to carry their burden of proving adequacy, and the court's failure to rigorously assess the independence of subclass counsel—are reversible errors under binding precedent from this Court and the Supreme Court. "Far too much turns on the adequacy of representation to accept it on blind faith." *GM Trucks*, 55 F.3d at 797. That is especially true in a class settlement like this one, seeking to bind people "who may not develop compensable injuries for years to come, if ever." A.1117. In this context, Rule 23's requirements demand "heightened" attention, not dilution. *Amchem*, 521 U.S. at 620.

Class counsel cannot make up for these shortcomings on appeal, and do not even try to do so.[2] Our opening brief (at 42–43) posed several questions to help

---

[1] Although class counsel (at 64 n.21) try to characterize the district court's statement of subclass counsel's independence as a "finding[]" supported by "record evidence," whether class counsel have established adequacy is a *legal* question. And the only "record evidence" class counsel identify are two declarations by the mediator that do not in any way show subclass counsel's independence. In any event, "the participation of [an] impartial mediator" cannot "compensate for the absence of independent representation." *In re Literary Works*, 654 F.3d at 253.

[2] Instead, class counsel accuse the objectors (at 59–62) of "violat[ing] [their] ethical obligations" by failing to discuss what class counsel call "this Court's two most relevant decisions" on adequacy: *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380 (3d Cir. 2015), and *In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293 (3d Cir. 2004). But *Community Bank* reaffirms that "fundamental" intra-class conflicts (like the one here) are "serious enough to require separate counsel for

determine whether counsel for the "futures" subclass, Arnold Levin, was actually independent during negotiations. Class counsel offer no response. Far from "affirmative[ly] demonstrat[ing]" that Mr. Levin was unconflicted throughout negotiations, *Wal–Mart*, 131 S. Ct. at 2550, class counsel are unwilling even to *represent* to this Court that he was unconflicted.

Given this record, it is not hard to see why. When Levin was selected by class counsel to represent all future-injury plaintiffs, he had a fiduciary obligation "to represent solely" those plaintiffs. *Georgine*, 83 F.3d at 631; *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012). Just as "presently injured class representatives cannot adequately represent the futures plaintiffs' interests and vice versa," *Georgine*, 83 F.3d at 631, a lawyer cannot adequately represent plaintiffs in both of these "mutually exclusive camps," *In re Literary Works*, 654 F.3d at 251.

Yet that appears to be exactly what Levin did. The record shows that he represents class members who have asserted present claims based on present

each subclass." 795 F.3d at 393–94. And *Diet Dugs* is neither "squarely on point" nor "controlling." CC Br. 37. The decision class counsel cite addresses the Anti-Injunction Act, *Younger* abstention, and the settlement's punitive damages provision. 369 F.3d at 303–05. It does not mention Rule 23. To the extent class counsel meant to cite the district court's earlier unpublished decision, that too is off-point. *In re Diet Drugs*, No. 1203, 99–20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000). The district court explained that there was no "futures" problem there, and class members whose existing injuries might progress over time were afforded substantial "structural protections," including "meaningful" back-end opt-out rights. *Id.* at \*46, \*49; *see also In re Diet Drugs*, 282 F.3d 220, 231 (3d Cir. 2002) (upholding district court's findings that "there were no trade-offs between the classes" and "no conflict between those seeking future benefits and those seeking them immediately").

injuries. He is counsel of record in two cases brought by nine plaintiffs, and his law partner is counsel of record in a third case brought by eleven plaintiffs. A.667. For the Court's convenience, we are providing copies of the complaints in these cases, all of which were consolidated in this case, along with a motion for judicial notice. *See* Mot. for Judicial Notice, Exs. A–C; *see also* Dkt. No. 2480 (Shoals short-form complaint), 2484 (Henesey short-form complaint). Mr. Levin's clients in these cases alleged a variety of present neurocognitive injuries, "including but not limited to Dysphasia, problems with retrieving words and organizing speech, difficulty with mental organization, memory dysfunction," and other "cognitive problems." *See, e.g.*, Mot. for Judicial Notice, Ex. C, at 21-26. And Levin disclosed in his application for appointment to the Plaintiffs' Steering Committee that he "has agreed to fees in these cases on a 1/3 contingency fee." A.667.

We do not know for sure whether Levin continues to represent these clients, or whether he retains a financial interest in their cases, because class counsel have refused to file their fee petition (an independent ground for reversal, as discussed in Part II). But Levin has not notified the district court that he has withdrawn from his representation of these individuals, at least not to our knowledge, nor has he relinquished his financial stake in their recoveries. And even if he had done so, class counsel have not produced any evidence showing that he obtained the necessary informed consent from each individual to undertake an adverse representation.

9

Absent such evidence, this conflict disqualifies Mr. Levin under *Georgine*. A lawyer cannot simultaneously represent people with current injuries, asserting current claims, while purporting to represent a class of people with no current injuries, asserting only future claims.[3]

The depth of this conflict is illustrated by the fact that subclass counsel for the current-injury plaintiffs, Dianne Nast, also represents a client (class member Andrew Glover) who alleged the same injuries as Levin's clients—and in fact *was* one of Levin's clients, and may still be one of his clients. *See* Mot. for Judicial Notice, Ex. A, at 21–22 (complaint filed by Levin alleging that Glover and other plaintiffs have "suffered memory loss and headaches"); Ex. D, at 4 (complaint filed by Nast alleging that "Glover suffers from memory loss, depressions, motor skill impairment, and sleep loss"); *see also* Dkt. No. 587 (Glover short-form complaint). Although Glover voluntarily dismissed his claim in the action brought by Levin, class counsel have provided no evidence showing that Levin has extinguished his attorney-client relationship and fee agreement with Glover, let alone evidence that Glover provided informed consent sufficient to allow Levin to represent class members with adverse interests. *See In re Sw. Airlines Voucher Litig.*, — F.3d —, 2015 WL

---

[3] To the extent that Levin might later seek to disavow his financial stake in the claims of currently injured plaintiffs, or that he disavowed his stake at some point after the negotiations were complete, that disavowal cannot cure a conflict that existed when the substance of the deal was being negotiated.

Case 2:12-md-02323-AB   Document 7464-6   Filed 04/10/17   Page 16 of 29

4939676, *12–13 (7th Cir. Aug. 20, 2015).[4] Quite the contrary: By taking the extraordinary step of withholding their fee petition until after the settlement is approved and appeals are exhausted, class counsel have thwarted this Court's ability to review evidence bearing on potential conflicts in determining adequacy.

Even if class counsel could prove that Levin and Nast were unconflicted during the negotiation process, class counsel still could not establish adequacy under Rule 23(a)(4). That is true for at least three reasons. *First*, as we explained in our opening brief (at 40–42), there is no evidence showing that Levin was actually independent from the Plaintiffs' Steering Committee of which he was a part. Because he was handpicked by class counsel without court oversight, there is no reason to think that he could not have also been removed by class counsel during the negotiation process if he were to threaten the deal by insisting on any of the protections that a rational future claimant would want: (1) equal compensation for

---

[4] It is theoretically possible, of course, that Levin withdrew from his representation, disclaimed his financial interest, and obtained informed consent at the very moment he was selected to represent future-injury plaintiffs. It is also theoretically possible that none of his clients currently have qualifying diagnoses, even though they have asserted present claims. But class counsel has not even attempted to establish that this is so, and it seems particularly unlikely here: If the interests of Levin's clients were actually aligned with the interests of future-injury class members (rather than currently injured members), why didn't he select one of *those* clients to serve as subclass representative after Corey Swinson died, instead of conducting a month-long search to find a replacement? And how, in any event, could Ms. Nast—who had a fiduciary obligation to represent *only* current claimants—also represent Glover if he had not obtained a qualifying diagnosis by the time Nast was selected as "subclass" counsel?

CTE, rather than "no monetary award at all," *Georgine*, 83 F.3d at 630; (2) a deal that "keep[s] pace with changing science and medicine, rather than freezing in place the science," *id.* at 631; and (3) "sturdy back-end opt-out rights," rather than binding future claimants before they have the necessary information to make an informed decision. *Amchem*, 521 U.S. at 610.

*Second*, the sole class representative for the future-injury subclass, Shawn Wooden, played no part in the negotiations and came in only after it was clear that he would support the deal as it stood. A.3824, 3902. Like Levin, Wooden did not insist on future CTE compensation or a deal that takes account of future scientific developments, nor did he insist on back-end opt-out rights. To the contrary, Wooden expressly omitted his CTE-related future claims—a clear sign of inadequacy. *See* Opening Br. 43–44. Class counsel's only response (at 64) is to hide behind the district court's determination (which they characterize as a "finding[]") that Wooden adequately raised an implicit CTE claim, even though he did not mention CTE by name and did not seek compensation for it. But that does not undermine our point; it is an indicator of inadequacy.[5]

---

[5] Class counsel also mischaracterizes our argument (at 63–70) as a "demand for a subclass for CTE," akin to "requir[ing] dozens (and perhaps hundreds) of subclasses." Nonsense. Although *amicus curiae* Public Citizen has sensibly called for an approach that would eliminate potential intra-class allocative conflicts by requiring a modest number of subclasses to represent people with different diseases, *see also In re Literary Works*, 654 F.3d at 249–57, that is not our argument. Our argument is that Wooden's failure to seek compensation for future CTE—while

*Finally*, if more confirmation of inadequacy were needed, a declaration submitted by co-lead counsel Christopher Seeger makes clear that class counsel did not "designate[]" Levin and Nast as subclass counsel until "*after* [a negotiation] structure was agreed to" that defined each "qualifying injury"—including the exclusion of future CTE claims and recovery for mood and behavioral symptoms associated with CTE. A.3578 (emphasis added).[6] In other words, class counsel did not create the proposed "subclasses" until after the key substantive disparity between current and future claimants had already been negotiated by conflicted class counsel. This only confirms what was already clear: The creation of separate "subclasses" was a device to circumvent *Georgine* and *Amchem*, not a meaningful attempt to comply with them.

**B.** These "structural flaw[s]" would preclude a finding of adequacy here "[e]ven in the absence of any evidence that the Settlement disfavors [future-injury]-only plaintiffs." *In re Literary Works*, 654 F.3d at 253. But there is no absence of evidence. "[T]he Settlement itself contains terms that illustrate a lack of adequate representation of [future-injury]-only plaintiffs." *Id.*

---

waiving all future claims for CTE—further demonstrates the inadequacy of representation of future-injury plaintiffs that lies at the heart of this appeal.

[6] Perhaps this is not surprising. Were it otherwise, Levin and Nast would have been subclass counsel *before* the proposed subclass definitions had even been established, meaning that they could not have known whose precise interests they were purporting to represent during negotiations, and thus could not have adequately represented those interests and guarded against a potential conflict.

The most "conspicuous evidence" of inadequacy is the settlement's disparate treatment of CTE—the disease that prompted this litigation in the first place. *GM Trucks*, 55 F.3d at 797. Under the settlement's terms, if a class member died with CTE *before* April 22, 2015, his estate will receive up to $4 million. But if a class member dies *after* April 22, 2015, his estate will "get no monetary award at all." *Georgine*, 83 F.3d at 630. And the settlement forces future claimants to release all "claims relating to CTE," A.77—a release that the NFL says (at 76) is "a critical component of any settlement" because of the tremendous value of those claims.

What justifies this disparity? The NFL's answer (at 75) is the "comprehensive benefits of the settlement agreement, including the [Baseline Assessment Program]" and the potential future compensation for other qualifying diagnoses, such as dementia. But baseline testing and the possibility of a smaller award in the future are not substitutes for millions of dollars in CTE compensation. If they were, the NFL would not have refused to pay future CTE claims.

Although the NFL hypothesizes (at 69) that "the financial benefits provided by the settlement may," in some rare instances, "prove more substantial than those provided for Death with CTE," the one example the NFL gives shows otherwise. It identifies one class member whose spouse (former Pittsburgh Steelers lineman Ralph Wenzel) was "allegedly diagnosed with early dementia 13 years prior" to his death at age 69 in 2012, at which point he was diagnosed with CTE. NFL Br. 69.

14

Because of his CTE diagnosis, the NFL says he is eligible to receive up to $828,000 in compensation. But if he had died *without* a CTE diagnosis, he might not be eligible to receive any award. And if he had died with CTE *after* final approval, or if he were still living, he would be eligible to receive an award of at most $210,000 (roughly one quarter of the value of his CTE claim). A.5741. In other words, it is his current CTE claim that is responsible for the increased award—nothing else.

Unable to justify the disparity, the NFL candidly admits (at 76) that "the line has to be drawn somewhere and a logical place to draw a line" is to "distinguish[] between prospective and retrospective benefits." That is precisely our point. Drawing a line at the "most salient conflict" in this case—providing a lucrative benefit to current claimants, but not future claimants—does not somehow demonstrate adequacy; it confirms *in*adequacy. *Georgine*, 83 F.3d at 630.

Class counsel's attempts fare no better. After asserting that the settlement's "omission" of future CTE claims was "deliberate," counsel explain how they "fought hard in the negotiations to make sure that [those class members with current CTE claims] would be compensated." CC Br. 77, 85. And indeed they did. That is why current CTE claimants can receive up to $4 million in compensation. The problem, however, is that counsel did not fight equally hard to obtain *any* compensation for future CTE claims, despite their value.

Class counsel provide no justification for this disparity beyond what the district court said in its opinion: that compensating current CTE claims is not the result of an intra-class conflict, but is intended only to serve as a proxy for compensating qualifying diagnoses that class members could not have obtained while living. *See id.* at 77–80, 84–86. Our opening brief (at 32–36) explains the many flaws in that justification, and class counsel have no response. They seize on the same example given by the NFL, *see id.* at 85–86, but ignore the fact that the settlement treats Wenzel differently because he was diagnosed with CTE and died before final approval. Had that not been the case, his compensation would be far less (and perhaps nothing). The additional amount he receives is not a "proxy" for anything—it is compensation for CTE.

The settlement's facial discrimination against future claimants with respect to CTE is not the only substantive indicator that those claimants were inadequately represented. The settlement also fails to include any assurance that the deal will "keep pace with changing science and medicine," including developments in the scientific understanding of CTE, as future claimants would naturally "desire." *Georgine*, 83 F.3d at 631. Class counsel claim that they did seek such assurance because "that can hardly be a meaningful position for the more than 5,200 players who filed suit in the here and now." CC Br. 47. "Reality," they say, "dictates that

Case 2:12-md-02323-AB   Document 7464-6   Filed 04/10/17   Page 22 of 29

the science be viewed as it stands today." *Id.* at 83. But the only "reality" that dictates that result is the intra-class conflict identified in *Georgine* and *Amchem*.

Class counsel ask this Court to overlook that conflict because absent class members had the right to opt out of the class. *Id.* But class members can *always* opt out of a class before final approval. If that were enough to overcome inadequacy, *Georgine* and *Amchem* would have been decided differently. The same is true of class counsel's related argument that class members' "silence" signals "overwhelming support" for this deal. CC Br. 42, 98. As Judge Becker explained, future-injury class members often "lack adequate information to properly evaluate whether to opt out of the settlement" because of "the difficulty in forecasting what their futures hold." *Georgine*, 83 F.3d at 633. That difficulty is compounded in this case because of the difficulty of predicting how the CTE science will evolve and whether further evidence (like the kind that might have been obtained had there been discovery) will strengthen the link between brain injuries and pro football.

That is why future-injury class members—given the potential value of their claims and their "substantial stake in making individual decisions on whether and when to settle"—"would also seek sturdy back-end opt-out rights." *Amchem*, 521 U.S. at 610, 616. But that too did not happen here—yet another substantive indicator of inadequacy. Class counsel do not say why they did not seek back-end opt-out rights, but this Court has already provided the answer: because current

17

claimants' interests (to say nothing of the lawyers' interests) "are against such an opt out as the more people locked into the settlement, the more likely it is to survive." *Georgine*, 83 F.3d at 631.

## II.   The settlement's unlawful fee-deferral procedure deprives this Court of a critical tool for assessing the adequacy of class counsel's representation of the future-injury claimants, independently warranting reversal.

Our opening brief (at 46–54) raised an independent ground for reversal: this settlement's unusual fee-deferral procedure, under which class counsel have refused to file a fee motion until *after* final approval (and, presumably, until after this Court rules). As our opening brief explained (at 54), counsel are obliged to disclose in their fee motion all terms and understandings underlying the fee arrangements, including any "side agreements" between counsel and class members. Deferring submission of the fee motion thus deprives class members and the Court of information essential to a thorough evaluation of the settlement. Yet class counsel offer "no excuse for permitting so irregular, indeed unlawful, a procedure," *Redman*, 768 F.3d at 638, let alone any authority to support it.

Despite the lack of discovery or litigation beyond a motion to dismiss, the settlement entitles class counsel to seek up to $112.5 million in uncontested attorneys' fees—the equivalent of roughly 187,500 hours (or 21.4 years) of time— plus a set-aside worth up to 5% of the benefits paid to each class member, A.5671, plus additional unknown, substantial contingency-fee payments, A.1553. Yet the

Case 2:12-md-02323-AB    Document 7464-6    Filed 04/10/17    Page 24 of 29

deferral procedure hides basic information that goes to the heart of counsel's adequacy, and thus the settlement's fairness, including:

- Do the fee arrangements indicate that class or futures subclass counsel will seek fees for previously representing present-injury claimants?

- To what extent does *futures* subclass counsel's entitlement to contingency fee payments for representing *present* claimants constitute a conflict of interest?

- How much will futures subclass counsel receive in total fees and on what basis?

- How much will class counsel receive in side contingency fees?

- How much time did class counsel spend investigating and litigating the case?

- How will the 5% set-aside for "facilitating the settlement program and Class Counsel's efforts in connection with it" be spent? CC Br. 93.

Class counsel give no good reason why this Court should approve the proposed settlement with these questions unanswered—all as a direct result of the fee-deferral procedure. Not only is that procedure unjustified and unexplained; it also lacks legal support. Stating in a footnote that "[n]umerous courts have bifurcated final approval and adjudicated of fees," class counsel cite just three district court decisions. CC Br. 94 n.30. But in two of those cases, the fee motion was filed *before* final approval of the settlement, thus permitting the court to assess the proposed settlement and the fee application together. *See Tennille v. W. Union Co.*, No. 09-cv-00938, 2014 WL 5394624, at *1 (D. Colo. Oct. 15, 2014); *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2007 WL 1652303, at *2 (D.N.J. June 5, 2007).

19

And in the third—class counsel's lone example of anything resembling what occurred here—Judge Barbier appears to have approved a similarly unusual procedure in the BP oil spill litigation, but that procedure went unchallenged in (and was not passed on by) the Fifth Circuit. *See In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014).[7]

Conversely, the Seventh Circuit has held that "fil[ing] the attorneys' fee motion . . . after the deadline set by the court for objections to the settlement had expired" is "unlawful." *Redman*, 768 F.3d at 637–38. Were a court to excuse such a delay, Judge Posner explained, it would "handicap" objectors to the settlement "because the details of class counsel's hours and expenses" would only be "submitted later," depriving objectors of "all the information they needed to justify their objections." *Id.* Counsel describe our reliance on *Redman* as "bizarre" and "frivolous," CC Br. 94 n.31, but cannot articulate (aside from irrelevant factual distinctions) why this Court should reject *Redman*'s reasoning and create a direct conflict with the Seventh Circuit.

---

[7] Citing the advisory committee's note, class counsel suggest that Rule 23(h) reflects no preference for simultaneous adjudication of the fee motion and settlement. But class counsel ignore other language in the same note that stresses the importance of "requir[ing] the filing of at least the initial [fee] motion in time" for the class to evaluate that information as part of the proposed settlement. Fed. R. Civ. P. 23(h)(1), 2003 advisory committee note; *see also Newberg on Class Actions* § 8.24 (5th ed.) (noting that Rule 23 envisions "linking together settlement notice and objections with fee notices and objections").

Rather than attempt to justify the unusual procedure here, class counsel evade the issue. Counsel assure this Court that class members will "be afforded an opportunity to object" the *fee request* "in due course." *Id.* at 94. But that misses the point. Counsel do not deny that, as a result of the deferral, class members will be deprived of the opportunity to object to the *settlement* based on information that would be revealed in a fee motion. And although class counsel argues that "any ultimate fee award does not lessen the class recovery," *id.* at 95, that cannot justify refusing to file a motion until after approval; in *GM Trucks*, this Court reversed the district court's "initial refusal to review" a fee motion based on this same rationale. 55 F.3d at 819–20. Counsel, however, say not a word about that precedent.[8]

Nor do class counsel deny that the fees are effectively insulated from judicial review, violating this Circuit's command in *GM Trucks* that "a thorough judicial review of fee applications is required in *all* class action settlements." *Id.* (emphasis added). If the settlement is approved, class members will no longer have any

---

[8] Class counsel's assertion that "there was no discussion of fees until after the parties had agreed to the merits of the settlement," CC Br. 92, is not only legally irrelevant under *GM Trucks*, but also factually inaccurate. To be sure, the total cap on class benefits (later eliminated by the district court) was fixed at the time the term sheet was announced, after which class counsel commenced fee negotiations. A.88, A.956. But the parties' negotiation over the *amount* of the benefits for each qualifying injury—and thus the amount the NFL would ultimately have to pay to the class—continued for the next four months, a period during which class counsel's fee negotiations also took place. A.3586–87 (explaining that both the fees and the "monetary award grid" were negotiated after the term sheet was signed and made public on August 29, 2013).

incentive to challenge the fee petition because it could not affect their recoveries. The settling parties could also argue that class members lack standing to appeal, *see* Armstrong Br. 51, an issue counsel leave unaddressed. Moreover, the settlement agreement's "clear-sailing" clause—which "weigh[s] substantially against the fairness of a settlement" and calls for "intense critical scrutiny," *id.* at 50—bars the NFL from ever challenging class counsel's fees.

Finally, counsel do not deny that the settlement permits the enforcement of contingency fees arising out of retainer agreements with class members. A.1553. This compensation source represents a significant conflict of interest because it creates an incentive to maximize recoveries for present claimants (with whom class counsel had existing agreements) at the expense of future claimants' recoveries. As noted, the futures subclass counsel himself, Arnold Levin, had such a contingency-fee arrangement with several individual class members, A.667, the details of which would further highlight the fact that Levin's interest in obtaining greater recovery for his clients compromised his purported independence as subclass counsel. *See Ortiz*, 527 U.S. at 852–53. Of course, without a fee motion, we cannot know the details. Because class counsel's failure to file the motion prevents a complete inquiry into whether future-injury claimants were adequately represented, the district court's final approval should be reversed.

## CONCLUSION

The district court's approval of the settlement should be reversed.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Matthew W.H. Wessler
Jonathan E. Taylor
Neil K. Sawhney
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans Street, Suite 505
Beaumont, TX 77701

Mitchell A. Toups
WELLER, GREEN, TOUPS &
TERRELL LLP
2615 Calder Street, Suite 400
Beaumont, TX 77704

Jason C. Webster
THE WEBSTER LAW FIRM
6200 Savoy, Suite 640
Houston, TX 77036

October 7, 2015                    *Counsel for Appellants Armstrong et al.*

23

## COMBINED CERTIFICATIONS

**1. BAR MEMBERSHIP**: I certify that I am a member of this Court's bar.

**2. WORD COUNT, TYPEFACE, AND TYPE STYLE.** I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure of 32(a)(7)(B) because the brief (as indicated by my word processing program, Microsoft Word) contains 5,834 words, excluding those portions excluded under Rule 32(a)(7)(B)(iii). I also certify that this brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type style requirements because this brief has been prepared in the proportionally spaced typeface of 14-point Baskerville.

**3. SERVICE:** I certify that on October 7, 2015, I am causing this brief to be filed electronically with this Court's CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

**4. PAPER COPIES:** I certify that the text of the electronic version of this brief is identical to the text in the paper copies that will be delivered to the Court.

**5. VIRUS CHECK:** I certify that I have performed a virus check using Sophos antivirus, and that no virus was detected.

*/s/ Deepak Gupta*

Deepak Gupta

October 7, 2015

i