# Exhibit GG

No. ____

# In the Supreme Court of the United States

RAYMOND ARMSTRONG, et al.,

*Petitioners.*

v.

NATIONAL FOOTBALL LEAGUE and NFL Properties LLC,

*Respondents,*

KEVIN TURNER and SHAWN WOODEN,
on behalf of themselves and all others similarly situated,

*Respondents.*

*On Petition for a Writ of Certiorari to the United States
Court of Appeals for the Third Circuit*

## PETITION FOR A WRIT OF CERTIORARI

RICHARD L. COFFMAN
The Coffman Law Firm
First City Building
505 Orleans Street, Suite 505
Beaumont, TX 77701
(409) 833-7700

MITCHELL A. TOUPS
Weller, Green, Toups & Terrell
2615 Calder Street, Suite 400
Beaumont, TX 77704

JASON C. WEBSTER
The Webster Law Firm
6200 Savoy, Suite 640
Houston, TX 77036

September 26, 2016

DEEPAK GUPTA
  *Counsel of Record*
MATTHEW W.H. WESSLER
JONATHAN E. TAYLOR
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Petitioners*

-i-

## QUESTION PRESENTED

In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 597, 620 (1997), this Court held that Rule 23's adequacy-of-representation requirement demands "heightened" rigor for settlement classes, and reversed a "class-action certification [that] sought to achieve global settlement of current and future asbestos-related claims." Because the settlement's "essential allocation decisions" favored some claimants over others, class members' interests were "not aligned," and the Court could find no assurance—"either in the terms of the settlement or in the structure of the negotiations—that the future claimants were adequately represented." *Id.* at 626-27.

In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999), the Court again invalidated a global settlement that lacked structural protections "at the precertification stage." The Court stressed that "the District Court took no steps at the outset" to guard against potential conflicts, "relying instead on its post-hoc findings at the fairness hearing." *Id.* at 831-32. A class of "present and future claims," the Court held, "requires division into homogeneous subclasses" with "separate representation to eliminate conflicting interests of counsel." *Id.* at 856.

The Third Circuit in this case approved a global class-action settlement of claims against the NFL stemming from current and future brain injuries. The deal was negotiated by lawyers representing clients with current injuries, and produced a stark disparity as to the disease that animated this litigation in the first place, Chronic Traumatic Encephalopathy: a pre-settlement diagnosis of CTE is worth up to $4 million; a post-settlement diagnosis is worth nothing.

The question presented is whether approval of such a settlement is consistent with Rule 23's adequacy-of-representation requirement and due process.

-ii-

## PARTIES TO THE PROCEEDINGS

Petitioners Raymond Armstrong, Larry Barnes, Larry Brown, Drew Coleman, Kenneth Davis, Dennis DeVaughn, William B. Duff, Kelvin Mack Edwards, Sr., Phillip E. Epps, Gregory Evans, Charles L. Haley, Sr., Mary Hughes, James Garth Jax, Ernest Jones, Michael Kiselak, Dwayne Levels, Darryl Gerard Lewis, Gary Wayne Lewis, Jeremy Loyd, Lorenzo Lynch, Tim McKyer, David Mims, Clifton L. Odom, Evan Ogelsby, Solomon Page, Hurles Scales, Jr., Barbara Scheer, Kevin Rey Smith, George Teague, and Curtis Bernard Wilson, were objectors in the district court and appellants in 15-2272 below. Petitioner Willie T. Taylor was an objector in the district court and appellant in 15-2294 below.

Respondents National Football League and NFL Properties LLC were defendants in the district court and appellees in the proceedings below. Respondents Kevin Turner and Shawn Wooden were class representatives in the district court, and were plaintiffs-appellees below.

Other objectors in the district court and appellants in the consolidated proceedings below were: Craig Heimburger and Dawn Heimburger (15-2206); Cleo Miller, Judson Flint, Elmer Underwood, Vincent Clark, Sr., Ken Jones, Fred Smerlas, Jim Rourke, Lou Piccone, and James David Wilkins, II (15-2217); Curtis L. Anderson (15-2230); Darren R. Carrington (15-2234); Liyongo Patrise Alexander, Charlie Anderson, Charles E. Arbuckle, Cassandra Bailey (as Representative of the Estate of Johnny Bailey), Ben Bronson, Curtis Ceaser, Jr., Larry Centers, Darrell Colbert, Harry Colon, Christopher Crooms, Jerry W. Davis, Tim Denton, Michael Dumas, Corris Ervin, Doak Field, Baldwin Malcolm Frank, Derrick Frazier, Murray E. Garrett, Clyde P. Glosson, Roderick W. Harris, Wilmer K. Hicks, Jr.,

-iii-

Patrick Jackson, Gary Jones, Ryan McCoy, Jerry James Moses, Jr., Anthony E. Newsom, Rance Olison, John Owens, Robert Pollard, Derrick Pope, Glenell Sanders, Thomas Sanders, Dwight A. Scales, Todd Scott, Frankie Smith, Jermaine Smith, Tyrone Smith, and James A. Young, Sr. (15-2273); Scott Gilchrist, individually and on behalf of the Estate of Carlton Chester "Cookie" Gilchrist (15-2290); Jimmie H. Jones, Ricky Ray, and Jesse Solomon (15-2291); Andrew Stewart (15-2292); Alan Faneca, Roderick "Rock" Cartwright, Jeff Rohrer, and Sean Considine (15-2294); and James Mayberry (15-2305). Alvin Harper, Michael McGruder, and Nathaniel Newton, Jr., were also objectors in the district court and appellants in 15-2272 below, but are not petitioners here.

-iv-

## TABLE OF CONTENTS

Question presented ................................................................i

Parties to the proceedings .................................................. ii

Table of contents ................................................................iv

Table of authorities ...........................................................vi

Introduction .......................................................................1

Opinions below....................................................................3

Jurisdiction .........................................................................3

Rule involved .....................................................................3

Statement ............................................................................3

    I.   Nearly every former NFL player who
has been examined has been diagnosed
with CTE. ................................................................3

    II.  Responding to the connection between
CTE and football, retired players sue
the NFL in droves....................................................4

    III. Shortly after the appointment of a mediator,
the parties agree to a global settlement. ..............6

    IV.  The district court approves the settlement........10

    V.  The Third Circuit affirms. ..................................12

Reasons for granting the petition ....................................14

    I.   The Third Circuit's crabbed view of this
Court's landmark decisions in *Amchem*
and *Ortiz* cannot be reconciled with
other circuits' cases. ............................................14

    II.  The Third Circuit's decision contradicts
*Amchem* and *Ortiz* and delivers a dangerously
flawed blueprint for future class cases. ..............26

Conclusion ........................................................................30

-v-

Appendix A  Opinion of the United States Court
           of Appeals for the Third Circuit
           (April 18, 2016) ................................. App. 2a

Appendix B  Opinion of the United States
           District Court for the Eastern
           District of Pennsylvania
           (April 22, 2015) ............................... App. 60a

Appendix C  Amended Final Order and
           Judgment by the United States
           District Court for the Eastern
           District of Pennsylvania
           (May 8, 2015).................................. App. 213a

Appendix D  Clarification to Amended Final
           Order and Judgment by the United
           States District Court for the
           Eastern District of Pennsylvania
           (May 11, 2015)................................ App. 222a

Appendix E  Order Denying Petiton for
           Rehearing by United States Court
           of Appeals for the Third Circuit
           (June 1, 2016)................................ App. 224a

Appendix F  Rule Involved: Federal Rule of
           Civil Procedure 23......................... App. 226a

-vi-

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997).................................................*passim*

*Central States Southeast & Southwest Areas of*
    *Health & Welfare Fund v. Merck–Medco*
    *Managed Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007)...........................................21

*Charron v. Wiener,*
    731 F.3d 241 (2d Cir. 2013)...........................................22

*Georgine v. Amchem Products, Inc.,*
    83 F.3d 610 (3d Cir. 1996)......................................10, 15

*In re Asbestos Litigation,*
    90 F.3d 963 (5th Cir. 1996) ...........................................19

*In re General Motors Corp. Pick-Up Truck Fuel*
    *Tank Products Liability Litigation,*
    55 F.3d 768 (3d Cir. 1995)......................................24, 29

*In re Insurance Brokerage Antitrust Litigation,*
    579 F.3d 241 (3d Cir. 2009)...........................................22

*In re Joint Eastern & Southern District*
    *Asbestos Litigation,*
    982 F.2d 721 (2d Cir. 1992)...........................................21

*In re Joint Eastern & Southern Districts*
    *Asbestos Litigation,*
    878 F. Supp. 473 (S.D.N.Y. 1995) ...............................23

*In re Literary Works in Electronic Databases*
    *Copyright Litigation,*
    654 F.3d 242 (2d Cir. 2011).......................20, 21, 22, 24

-vii-

*In re Payment Card Interchange Fee &*
    *Merchant Discount Antitrust Litigation,*
    827 F.3d 223 (2d Cir. 2016)...................................*passim*

*In re Pet Food Products Liability Litigation,*
    629 F.3d 333 (3d Cir. 2010)............................................22

*Juris v. Inamed Corp.,*
    685 F.3d 1294 (11th Cir. 2012) ...................................23

*National Super Spuds v. New York Mercantile*
    *Exchange,*
    660 F.2d 9 (2d Cir. 1981).............................................29

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)...............................................*passim*

*Smith v. Sprint Communications Co.,*
    387 F.3d 612 (7th Cir. 2004) .......................................20

*Stephenson v. Dow Chemical Co.,*
    273 F.3d 249 (2d Cir. 2001)..........................................23

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011)..........................................19

**Other authorities**

John D. Aldock & Richard M. Wyner, *The Use of*
    *Settlement Class Actions to Resolve Mass*
    *Tort Claims After* Amchem, 33 Tort & Ins.
    L.J. 905 (1998)..............................................................19

John Branch, *Ken Stabler, a Magnetic N.F.L.*
    *Star, Was Sapped of Spirit by C.T.E.*, N.Y.
    Times, Feb. 3, 2016 ........................................................8

Mark Fainaru-Wada & Steve Fainaru, *League*
    *of Denial* (2013) .............................................................3

-viii-

Steve Fainaru & Mark Fainaru-Wada, *UCLA
    study finds signs of CTE in living former
    NFL players*, ESPN, Jan. 22, 2013 .............................4

David Geier, *Will football players one day take
    medicine to prevent brain damage?*, The
    Post and Courier, Aug. 5, 2015 ....................................3

Geoffrey C. Hazard, Jr., *The Futures Problem*,
    148 U. Pa. L. Rev. 1901 (2000)....................................14

Richard A. Nagareda, *The Law of Class Actions
    and Other Aggregate Litigation* (2009)......................20

## INTRODUCTION

Class-action settlements can profoundly reshape the legal landscape: A small number of litigants and lawyers write the rules that bind thousands of strangers to the litigation, extinguishing their potentially valuable claims in exchange for global peace. To ensure that absentees' claims are not sacrificed for others' benefit, class settlements require court approval. Under Rule 23, courts must be satisfied that the absentees have been adequately represented by those who purport to speak for them.

Perhaps surprisingly, given the obvious importance of the law governing class-action settlements, this Court has squarely addressed the topic just twice—in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)—and has not done so again in the nearly two decades since. Lacking guidance, the circuits that most often confront the issue have adopted conflicting interpretations of these two pathmarking decisions. In one camp is the Second Circuit, which has consistently invalidated settlements and required subclasses with "separate counsel" whenever the deal "impacts the 'essential allocation decisions' of plaintiffs' compensation and defendants' liability." *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 827 F.3d 223, 233-34 (2d Cir. 2016). Even in a collateral attack—a case brought by absentees *after* a settlement's approval—the Second Circuit has held that the absentees are not "bound by the settlement release" if "their class representative negotiated a settlement and release that extinguished their claims without affording them any recovery." *Id.* at 237. To hold otherwise would "violate[] due process." *Id.*

Yet the Third Circuit below held just the opposite. It approved a global class-action settlement in a case that began much like *Amchem* and *Ortiz*: as thousands of

personal-injury cases filed against the National Football League in the wake of the discovery of Chronic Traumatic Encephalopathy, or CTE, in 2009. Although as of today, this neurodegenerative disease can be definitively diagnosed only in the deceased, that will likely change in the near future. Seeking to head off a tsunami of future claims, the NFL pushed for a global settlement of all current and future CTE claims—while compensating only *current* CTE claims. Under the settlement, the family of a player who dies with CTE before final approval gets up to $4 million. But an identically situated player who dies after final approval releases his claim and gets nothing—for the exact same diagnosis.

The Third Circuit held that this lopsided settlement satisfies *Amchem* and *Ortiz* and that any intra-class conflict was remedied because, after the architecture of a deal had begun to take shape, the plaintiffs' lawyers (without going to the district court) designated two of their own members to serve as "independent" counsel for two putative "subclasses": one for all players who currently have a "qualifying diagnosis" (as defined by the settlement), and one for all players who do not.

If this Court does not intervene now, the consequences will be severe: not only will lawyers and litigants be handed a blueprint for circumventing *Amchem* and *Ortiz*, but thousands of former football players later diagnosed with CTE may file suit in the Second Circuit—and that circuit's precedent will permit them to collaterally attack the settlement on the ground that it did not provide them any compensation. This is thus the rare case in which a split in the circuits may lead to a different result in the *same litigation*—litigation affecting the lives of thousands of people, hundreds of millions of dollars, and the future of professional football. This Court's intervention is required.

-3-

## OPINIONS BELOW

The Third Circuit's opinion is reported at 821 F.3d 410 and is reproduced in the appendix at App. 2a–59a. The district court's opinion is reported at 307 F.R.D. 351 and is reproduced in the appendix at App. 60a–212a.

## JURISDICTION

The Third Circuit entered judgment on April 18, 2016 (App. 2a) and denied a timely petition for rehearing en banc on June 1, 2016 (App. 224a). Justice Alito granted an order extending the time to file this petition until September 26, 2016 (No. 16-A-186). This Court's jurisdiction rests on 28 U.S.C. § 1254(1).

## RULE INVOLVED

The full text of Federal Rule of Civil Procedure 23 is set out in the appendix at App. 226a.

## STATEMENT

## I. Nearly every former NFL player who has been examined has been diagnosed with CTE.

For decades, the NFL went to great lengths to conceal evidence of the effects of concussions, both before and after CTE's discovery. *See generally* Mark Fainaru-Wada & Steve Fainaru, *League of Denial* (2013). But when researchers at Boston University's CTE Center began inspecting the brains of deceased NFL players, they found signs of CTE in almost all of them (87 out of 91, as of 2015). David Geier, *Will football players one day take medicine to prevent brain damage?*, The Post and Courier, Aug. 5, 2015, http://tinyurl.com/oa39muf. The results led Dr. Ann McKee, a leading neuropathologist at the CTE Center, the world's largest brain bank focused on traumatic brain injury, to wonder "if every single football player doesn't have this." A.5248.

CTE manifests itself mainly through emotional and cognitive symptoms. A.2287. Early signs include severe headaches and loss of concentration. A.2255. Players go on to struggle with depression, anger, and memory loss, followed by motor impairment, aggression, language difficulty, and dementia. A.2237, 2255. Many players also develop substance-abuse problems, lose basic functioning, and contemplate suicide. A.2287, 5275. As lead class counsel explained, CTE is "the most serious and harmful disease that results from [the] NFL and concussions." A.2237. Although research has advanced significantly in the seven years since the disease was discovered, at present CTE can be diagnosed definitively only after death. A.2957. Scientists, however, predict that methods to reliably diagnose CTE in living patients are imminent. A.4420, 4597, 4620, 4768, 4953, 5004. UCLA researchers, for example, used brain-imaging tools in 2013 to detect signs of CTE in five living former players. Steve Fainaru & Mark Fainaru-Wada, *UCLA study finds signs of CTE in living former NFL players*, ESPN, Jan. 22, 2013, http://es.pn/1PkszAu.

## II.   Responding to the connection between CTE and football, retired players sue the NFL in droves.

Amid mounting evidence that football causes CTE and a growing awareness of the NFL's cover-up, many football players sought legal redress. By 2012, hundreds of personal-injury suits by some 4,500 players nationwide were consolidated before a single district judge in Philadelphia. App. 65a. The plaintiffs' lawyers proposed a Plaintiffs' Steering Committee to direct the litigation, and the judge approved its structure—without appointing anyone to represent the thousands of players who had neither sued nor manifested any injury. *Id.*

The core allegation in the plaintiffs' collective complaint was that the NFL's conduct had "obfuscated the

connection between NFL football and long-term brain injury." App. 66a-67a. The central issue was CTE. A.867-72, 2511 ("This started out as a CTE case. It is a CTE case."). As the litigation spilled into the following year, the district court ordered the parties to mediate. App. 69a.

After mediation was underway, it become clear that the NFL wanted a way to dispose of future CTE claims, not just the claims of players with cases already on file. Weeks of negotiations on the basic framework of a global resolution thus ensued. Only then, after the contours of a proposed class-action settlement had begun to take shape, did the Steering Committee recognize a conflict of interest between present-injury and future-injury claimants. At that point, the Committee took it upon itself to create putative "subclasses" defined by whether a player had already been diagnosed with one of several qualifying diseases negotiated by the parties. One "subclass" would consist of players currently diagnosed with neurocognitive impairments (including those who had died with CTE) and therefore had present claims against the NFL. The second would consist of retired players who suffered from none of the specified impairments but were—by virtue of having played in the NFL—at serious risk for CTE, though they could not know whether the disease had begun to develop or would develop in the future.

The Committee designated Kevin Turner, who suffered from ALS, to represent the present-claims subclass and recruited Corey Swinson, who had played just one NFL season and had not been diagnosed with any brain injuries, to represent the future-claims players—the majority of the putative class. A.3569-70. Because Swinson had not suffered any known injury from his sole season in the league, he was not one of the 5,000 players who had sued the NFL and therefore had no lawyer. So

-6-

the plaintiffs' lawyers selected one of their own—an existing member of the Steering Committee (Arnold Levin) who represented nearly a dozen players with cases on file (and retained a one-third contingency stake in their recoveries)—to serve as his "independent" counsel. A.667, 3570, 3578. The plaintiffs' lawyers selected a different member of the Steering Committee to serve as counsel to the other subclass, even though this lawyer represented a player alleging the same injuries as Levin's currently injured clients—and in fact *was* (and may still be) one of Levin's clients. *See* CA3 ECF No. 003112095536, Exs. A & D. The court had no involvement in this process.

## III.   Shortly after the appointment of a mediator, the parties agree to a global settlement.

By the end of August 2013—just one month after the mediator's appointment and before even taking any formal discovery against the NFL—plaintiffs' counsel had signed a term sheet outlining a global settlement with the NFL. App. 71a. One month later, before the parties inked an actual settlement, Swinson died. For more than a month after his death, as the details of the deal were being fleshed out, there was no plaintiff purporting to represent the future-claims players. Then, in mid-October, plaintiffs' counsel found Shawn Wooden and recruited him to take Swinson's place, explaining to him the terms of the already-negotiated deal. A.3824, 3902. Wooden agreed not only to serve as a representative but also to "support[] the settlement." A.3824, 3902. In 2012, he had described himself as "at increased risk of latent brain injuries" generally. A.786. But by the time he was "appointed" the proposed representative of future claimants, Wooden's claim specified that he was at risk for "dementia, Alzheimer's, Parkinson's, or ALS"— but, critically, not CTE. A.1126, 3823.

In January 2014, plaintiffs' counsel asked the district court to certify the class and approve a proposed settlement. App. 71a. Concerned that the fund would dry up prematurely, the court initially rejected the proposal. App. 71a-72a. Five months later, the parties submitted a revised settlement that "retained the same basic structure as the original," but addressed some of the court's concerns, including removal of the cap. *Id.* In a declaration documenting the negotiations, the mediator stated that plaintiffs' counsel had "passionately advocated" that players be compensated for "dementia, Alzheimer's Disease, Parkinson's Disease, and ALS." A.3807. He did not say the same about CTE. Less than two weeks later, the court preliminarily approved the settlement and conditionally certified the class and two subclasses. App. 73a, A.3824.

The proposed settlement would release the claims of two subclasses: (1) all retired players diagnosed with a "qualifying diagnosis" before the final settlement date (and their spouses and estates), and (2) all retired players not diagnosed with a qualifying diagnosis before the final settlement date (and their spouses and estates). A.5714-15. The six qualifying diagnoses (in descending order of value) are: ALS; Death with CTE (but only if death occurs before April 22, 2015); Parkinson's Disease; Alzheimer's Disease; Level 2 (moderate) dementia and Level 1.5 (early) dementia. A.5730.

***A. Compensation Framework.*** The settlement awards compensation on a sliding scale, from a maximum of $5 million (for ALS) to a maximum of $1.5 million (for early dementia). A.5740. How much a player receives depends on several factors, including age at diagnosis, seasons played, and previous diagnosis. A.5629. The settling parties' estimates show that the average payment for future dementia claims will be $190,000, while the average payment for current CTE claims will be

$1.44 million. A.1573. Named plaintiff Kevin Turner, who has ALS, will be eligible for compensation. The same is true for players with Parkinson's.

Players with CTE, however, are entitled to compensation only if they died before the final approval date. App. 77a. So, for example, the family of Dave Duerson—who had CTE and died before approval—is eligible for up to $4 million, the maximum amount paid for a death-with-CTE diagnosis. But the family of Ken Stabler, who died after approval has since been diagnosed with CTE, will receive no compensation for that diagnosis. John Branch, *Ken Stabler, a Magnetic N.F.L. Star, Was Sapped of Spirit by C.T.E.*, N.Y. Times, Feb. 3, 2016, http://nyti.ms/1SKlJYp. By foreclosing CTE-based compensation for players who suffer from the disease but have not yet died, and all players who do not yet suffer from it but one day will, the settlement treats future CTE claimants much differently than, say, future ALS claimants.

The only exception to this rule is if the player with CTE also exhibits conditions that trigger one of the other qualifying diagnoses and is able to claim compensation on that basis. But research suggests that these overlaps are only a minority of CTE cases. One study found that CTE was the sole diagnosis in 63% of cases, while Alzheimer's, for example, appeared in about one in ten. A.2255, A.3218. In another study of 33 CTE-infected brains, only 10 also showed signs of dementia. A.2509-10. Even among those with advanced CTE, a quarter were not considered cognitively impaired. *Id.*

As a result, the earliest and most prevalent symptoms of CTE—depression, aggression, chronic headaches, mood swings, and loss of concentration—trigger no compensation at all under the settlement. A.2509, 2955, 2958. The "key symptoms" of CTE, in other words,

"are not compensable." A.2958. Conversely, the diseases that are compensated—ALS, Parkinson's, and Alzheimer's—are those for which the incidence among retired NFL players is significantly lower than the incidence of CTE. A.2380. One study, examining NFL retirees who played at least five seasons, recorded just seven cases of ALS, seven of Alzheimer's, and three of Parkinson's—out of 3,439 retired players. A.2379-82, 2400. By contrast, expert research suggests that CTE's incidence among NFL players may be as high as 96%, dwarfing the conditions that receive compensation. A.2370.

Based on the parties' own estimates, approximately 15,000 class members (or 72% of the class) will never be compensated. A.1585. Although these players have no way of presently knowing whether they will be diagnosed with CTE, the settlement expressly surrenders their right to assert any future claims based on a future CTE diagnosis, thus ensuring that those who do not also happen to suffer from a triggering neurodegenerative disease will receive no compensation.

**B. Attorneys' Fees.** Under a "clear-sailing clause," the settlement allows class counsel to seek up to $112.5 million in attorneys' fees without objection from the NFL. App. 95a-96a, A.1082. Unlike the players' compensation, the fees would be paid immediately. Class counsel can also claim a set-aside worth 5% of all benefits paid, plus contingency fees for class members that they represent individually. A.5671. Based on class counsel's own damages estimates, the 5% set-aside alone could be worth $46 million, in addition to the $112.5 million already guaranteed. A.1599. Because class counsel has not released any information about separate contingency arrangements—including any information that would shed light on whether counsel for either subclass was conflicted—it is impossible to estimate this compensation. The record suggests, however, that the arrange-

-10-

ments here mirror those in typical personal-injury cases, where counsel takes 33%. *See* Dist. Ct. Dkt. No. 6356. Although Rule 23 contemplates that class counsel will seek fees contemporaneously with the settlement approval process, so that courts and class members may evaluate the overall deal and counsel's efforts, the district court here allowed counsel to seek these fees separately—following final approval and appeals. App. 95a, A.5671.

## IV.  The district court approves the settlement.

The district court certified the class and two subclasses and approved the settlement. App. 60a-212a. The court acknowledged that Rule 23's adequacy requirement "demand[s] undiluted, even heightened, attention in the settlement context." App. 87a (quoting *Amchem*, 521 U.S. at 620). It also recognized that the requirement guards against conflicts of interest by "'assur[ing] that differently situated plaintiffs negotiate for their own unique interests'"—a special concern with settlement classes that, as here, would bind both "those with present injuries and those who have not yet manifested injury." App. 99a-100a (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996)).

Nevertheless, the court determined that the adequacy requirement was satisfied here. App. 108a. It reasoned that any conflict was eliminated because class counsel, after "[r]ecognizing this problem" during negotiations, "subdivided the Class into two Subclasses," added a representative for the newly created futures subclass, and then designated a lawyer on the Steering Committee to serve as his "independent counsel." App. 100a. The court also found Wooden to be an adequate "futures" representative because he "does not know which, if any, condition he will develop" in the future, and thus "has an interest in ensuring that the Settlement

compensates as many conditions as possible." *Id.* The court did not attempt to square that statement with the fact that Wooden did not pursue compensation for CTE or specifically allege that he is at risk of developing the disease.

Having certified the subclasses, the court determined that the settlement is fair and does not violate due process—even though it does not compensate any living class members for CTE and forces them to relinquish their right to bring any future "claims relating to CTE" against the NFL. App. 82a-83a. The court explained that the parties had resolved the court's "primar[y] concern[]"—the possibility that "the capped fund would exhaust before the 65-year life of the Settlement," thereby creating the risk that some class members would receive nothing simply because their injuries were discovered too late. App. 71a-72a. The court was unconcerned, however, that this same problem exists for CTE, given the disparity in the settlement's treatment of present and future CTE claims.

The court attempted to justify this disparity in two ways. First, it speculated that providing a "prospective Death with CTE benefit would incentivize suicide because CTE can only be diagnosed after death." App. 160a. Second, it believed that a living class member "does not need a death benefit because he can still go to a physician and receive a Qualifying Diagnosis" while living. *Id.* The court pointed to studies showing that many players who died with CTE "would have received compensation under the Settlement if they were still alive" because the disease, in its advanced stages, likely "inflicts symptoms compensated by Levels 1.5 and 2 Neurocognitive Impairment and is strongly associated with the other Qualifying Diagnoses in the Settlement." App. 149a, 157a. Based on that possible partial overlap, the court determined that these diagnoses are adequate

-12-

"prox[ies]" for CTE—even though they are worth far less under the settlement—so CTE need not be compensated for any living class members. App. 160a.

The court appeared to understand that potentially thousands of settlement class members will receive no compensation under the settlement and yet later be diagnosed with CTE. But the court took the view that the settlement "reasonably does not compensate Retired Players with the mood and behavioral symptoms allegedly associated with CTE." App. 155a. The court did so without insisting on any mechanism to ensure that the settlement will be adjusted, if necessary, to reflect future scientific developments regarding CTE. App. 150a. It required only that the parties "confer in good faith about possible revisions to the definitions of Qualifying Diagnoses based on scientific developments." *Id.*

## V.    The Third Circuit affirms.

The Third Circuit affirmed the settlement approval. With respect to adequacy of representation, the court first considered the class lawyers' mid-negotiation decision to "creat[e] two separate subclasses" and designate "lawyers from the Steering Committee" to serve as subclass counsel for the future-injured subclass. App. 22a. The court rejected the objectors' argument that this "appointment" failed to ensure adequate representation, in violation of *Amchem*, by depriving the subclass of truly independent counsel. The Third Circuit "agree[d]" that "class counsel could have gone to the District Court and asked it to appoint counsel from the outside," but found "no precedent requiring such a procedure." App. 22a-23a.

The court next turned to the adequacy of Arnold Levin—the class lawyers' choice to represent the future claimants. App. 23a. Levin "represented nine players who alleged current symptoms in two lawsuits against

the NFL" and had "agreed to fees in these cases on a one-third contingency basis." *Id.* Nevertheless, the court could "not see how" this representation might create a "conflict of interest" and defeat adequacy because Levin "disclosed his representation to the District Court" before the case was converted to a class action, and was nonetheless appointed to the Steering Committee. App. 24a. And, after finding that the record contained "no evidence" that Levin's individual clients had a qualifying diagnosis under the settlement's terms, the court concluded that "this is not a situation where subclass counsel has clients in both subclasses." App. 24a-25a.

Having endorsed the representation structure, the court turned to the class representatives. The court first rejected the objectors' argument that the futures-subclass representative (Wooden) was inadequate because he had not alleged a claim for future risk of CTE. Although Wooden did not actually plead this claim (unlike others in the future-injured subclass), the court concluded that it was sufficient that his complaint stated that he was at "an increased risk of latent brain injuries" generally, reasoning that "[t]his allegation covers the risk of CTE." App. 25a. In the court's view, "what matters more than the words Wooden used" in his complaint "are the interests he would have in representing the subclass." *Id.* Because "Wooden, and all retired NFL players for that matter, are at risk of developing the disease," any one "would have an interest in compensation for CTE in the settlement." *Id.*

Finally, the court turned to the potential *Amchem* conflict that dogged the class from the start. The court described as "on point" the district court's conclusion that "no fundamental conflict" existed: "[S]imply put, this case is not *Amchem*." App. 28a-29a. "The most important distinction," the panel explained, "is that class counsel here took *Amchem* into account by using the

-14-

subclass structure to protect the sometimes divergent interests of the retired players." App. 29a. According to the panel, the subclasses were "represented in the negotiations by separate class representatives with separate counsel, and, as discussed, each was an adequate representative." *Id.* In the court's view, "[t]his alone," was a "significant structural protection for the class that weighs in favor of finding adequacy." *Id.*

### REASONS FOR GRANTING THE PETITION

**I.     The Third Circuit's crabbed view of this Court's landmark decisions in *Amchem* and *Ortiz* cannot be reconciled with other circuits' cases.**

**A.** This Court has twice waded into the law of class-action settlements—and both times it addressed "the most difficult problem" in class-action jurisprudence: the problem of "future claimants" in classes designed for settlement. Geoffrey C. Hazard, Jr., *The Futures Problem*, 148 U. Pa. L. Rev. 1901, 1901 (2000). In both cases, the Court confronted the question of what "structural assurance[s]" are necessary to guarantee that a settlement-only class of all claimants who may one day hold a particular claim—the currently injured, as well as those not yet manifesting injury—reflects "fair and adequate representation for the diverse groups and individuals." *Amchem*, 521 U.S. at 627; *see Ortiz*, 527 U.S. 815. And in both cases, the Court held that the settlements fell well short of the mark. Taken together, *Amchem* and *Ortiz* "wrote the ground rules for adequate representation in the settlement-only class context." *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 827 F.3d 223, 232 (2d Cir. 2016).

**1.** *Amchem* came first. Like this case, it began as multidistrict mass-tort litigation, and was converted into a class action only "to achieve global settlement of current and future asbestos-related claims." 521 U.S. at 597.

-15-

Because the defendant made clear that "it would resist settlement of [pending] cases absent some kind of protection for the future," the Plaintiffs' Steering Committee—all of whom represented clients with pending claims—tried to craft a deal that would provide that protection. *Id.* at 601. The future claimants were thus added to the case strictly for settlement purposes; the class "was not intended to be litigated." *Id.* at 600-01.

Although the settlement-only class was united in that each member had been exposed to asbestos at one time or another, the similarities ended there. Class members had been "exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods." *Id.* at 624. And the extent of their injuries was just as varied. Some were critically ill with lung cancer or mesothelioma. Others had no symptoms at all. Still others lay in the vast expanse between the two, suffering from a range of ailments related to asbestosis. And still more were spouses who had endured a loss of consortium.

Affirming "a long, heavily detailed opinion by Judge Becker," this Court decertified the class and invalidated the settlement. *Id.* at 608; *see Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996). In doing so, the Court discussed how Rule 23's procedural "safeguards" work to protect absent class members "in the settlement-class context." 621 U.S. at 621. The Court held that those safeguards—under Rule 23(a) and (b)—must "preexist any settlement," and "demand undiluted, even heightened, attention in the settlement context." *Id.* at 620, 623. An after-the-fact fairness hearing is no surrogate for steadfast adherence to "the standards set for the protection of absent class members," which "serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judg-

-16-

ment or overarching impression of the settlement's fairness." *Id.* at 621.

Rule 23(a)(4), in particular, focuses on the adequacy of the class representatives and the "competency and conflicts of class counsel." *Id.* at 626 n.20. It requires that each representative "be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 625-26. A fatal feature of the *Amchem* class was that "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses," and yet the settlement matrix was zero-sum-game: It entailed "essential allocation decisions designed to confine compensation and to limit defendants' liability." *Id.* at 626-27. And those decisions tended to benefit certain present claimants at the expense of everyone else: The settlement did not account for changing science or inflation, "only a few claimants per year [could] opt out at the back end," and "loss-of-consortium claims [were] extinguished with no compensation." *Id.*

As a result, the Court held, "the interests of those within the single class [we]re not aligned." *Id.* at 626. The Court zeroed in on the "most salient[]" intra-class conflict (the present/future divide), explaining that, "for the currently injured, the critical goal is generous immediate payments," but "[t]hat goal tugs against the interest of [future-injury] plaintiffs," who may not "realize the extent of the harm they may incur," and thus would "seek sturdy back-end opt-out rights and 'causation provisions that keep pace with changing science and medicine, rather than freezing in place the science.'" *Id.* at 610-11, 626, 628. By not accounting for this fundamental conflict at the threshold, the parties' "global compromise" provided "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id.* at 627. Neither "the terms of the set-

-17-

tlement" nor "the structure of the negotiations" could assure the Court that the absentees had been adequately represented. *Id.*

**2.** Two years later, the Court revisited Rule 23's adequacy requirement in *Ortiz*, another case involving the "elephantine mass of asbestos cases." 527 U.S. at 821. *Ortiz* began much like *Amchem* (and this case) did, with the filing of thousands of individual personal-injury cases. One of the main defendants in those cases then "approached a group of leading asbestos plaintiffs lawyers" to discuss a possible "global settlement" of its "asbestos personal-injury liability." *Id.* at 823-24. At "about midnight" in "a coffee shop in Tyler, Texas," on the eve of a key oral argument in one of the cases, the lawyers agreed on the dollar amount for complete peace: $1.535 billion. *Id.*

Days later, a lawsuit was filed seeking certification of a settlement-only class that would comprise three categories: those with present claims not yet brought or settled, those with future claims, and all beneficiaries "past, present and future." *Id.* at 825-26. The named plaintiffs had not been designated as putative representatives until "after the agreement in principle was reached,'" and simply "relied on class counsel in subsequent settlement negotiations." *Id.* at 856 n.31.

As in *Amchem*, this Court decertified the class and wiped out the deal, finding that it lacked the requisite "procedural protections." *Id.* at 847. The Court reiterated that these protections must "preexist any settlement," and take on heightened importance in settlement classes, because certification "effectively concludes the proceeding save for the final fairness hearing." *Id.* at 858, 849. And "a fairness hearing under Rule 23(e) is no substitute for rigorous adherence" to Rule 23(a). *Id.* at 849. Unlike *Amchem*, however, which "concentrated on

the adequacy of [the] named plaintiffs" (or lack thereof), this time the Court trained its attention on class counsel. *Id.* at 856 n.31.

The Court pointed to "two instances of conflict" that were "well within the requirement of structural protection recognized in *Amchem*." *Id.* at 857. The first was the divide between present and future claimants. The Court found it "obvious after *Amchem*" that this conflict "requires division into homogeneous subclasses" with "separate representation to eliminate conflicting interests of counsel." *Id.* at 856. Yet the plaintiffs' lawyers who negotiated the agreement included "at least some of the same lawyers" who had reached side deals in other asbestos cases that were "contingent on a successful" global resolution. *Id.* at 852. This created a serious risk of skewed incentives, because "with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant." *Id.* at 852 n.30. In the Court's view, this was an "egregious example of the conflict noted in *Amchem*." *Id.* at 853.

The "second instance of disparate interest within the certified class" was that some class members had "more valuable claims" than others because they had been exposed to asbestos products before expiration of the defendant's insurance coverage. *Id.* at 857. The settlement, however, treated these claims equally. *Id.*

In light of these "intraclass conflicts," the Court held that it was "essential" that they be "addressed by recognizing independently represented subclasses"— something that had not happened. *Id.* at 864. And the Court strongly suggested that a district court was required to ensure that these mandatory structural protections were in place "at the precertification stage." *Id.* at 858. Echoing Judge Smith's dissent in the Fifth Circuit, the Court faulted the district court for failing to heed

this obligation: It "took no steps at the outset to ensure that the potentially conflicting interests of easily identifiable categories of claimants [would] be protected" in negotiations, "relying instead on its post-hoc findings at the fairness hearing" to conclude that the various interests "in fact had been adequately represented." *Id.* at 831-32; *see In re Asbestos Litig.*, 90 F.3d 963, 1026 (5th Cir. 1996) (Smith, J., dissenting) ("[A]n after-the-fact substantive review is far too little, far too late," for the court cannot "turn back the clock and appoint different counsel to renegotiate the settlement fairly."). By failing to rigorously analyze the structural shortcomings, the Fifth Circuit (like the district court) had "disregarded *Amchem*." 527 U.S. at 831.

The Court also refused to allow these shortcomings to be "mitigated" based on the settlement's substance, or because "separate counsel" could "not to be had in the short time that a settlement agreement was possible." *Id.* at 863. The Court was firm on this point: a court may not "lower the structural requirements of Rule 23(a) as declared in *Amchem*" just because "the clock is about to strike midnight." *Id.* If "an allowance for exigency" could "make a substantial difference in the level of Rule 23 scrutiny, the economic temptations at work on counsel in class actions [would] guarantee enough exigencies to take the law back before *Amchem*." *Id.* at 864.

**B.** The "landmark decisions" in *Amchem* and *Ortiz* "set down important standards and guidelines" for courts and litigants. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) (en banc) (Scirica, J., concurring). But they provide "relatively little solid guidance" and leave many questions unanswered. John D. Aldock & Richard M. Wyner, *The Use of Settlement Class Actions to Resolve Mass Tort Claims After* Amchem, 33 Tort & Ins. L.J. 905, 913-14 (1998). "[A]mong the most vexing [questions] to arise in the aftermath of *Amchem*"

concerns "the outer limits on the insistence in *Amchem* upon subclassing"—a question on which *Ortiz* may have "just add[ed] to the confusion." Richard A. Nagareda, *The Law of Class Actions and Other Aggregate Litigation* 117, 119 (2009). And even if a court is asked to certify subclasses after the fact, what procedural protections must exist so that the court can be sure that the interests of each divergent group—especially those not yet manifesting injury—were truly represented at the negotiating table? The circuits (primarily the Second and Third, where these issues most often arise) have given vastly different answers to these questions, applying varying degrees of rigor in carrying out the dictates of *Amchem* and *Ortiz*.

The Second Circuit, unlike the Third Circuit below, has repeatedly enforced Rule 23's procedural protections with "added solicitude" in the settlement context, standing guard against the "imperatives of the settlement process." *Interchange*, 827 F.3d at 235. Recognizing that a settlement *itself* "can influence the definition of the classes and the allocation of relief," the Second Circuit has vigorously policed settlements to ensure that safeguards were in place *before* the deal was inked—especially when "[c]lass counsel stood to gain enormously if they got the deal done." *Id.* at 234, 236; *accord Smith v. Sprint Comm'ns Co.*, 387 F.3d 612, 614 (7th Cir. 2004) ("Rule 23 demands" protection "prior to the settlement itself.").

The Second Circuit has therefore consistently decertified settlement classes "when categories of claims have different settlement values" and lack subclasses and "separate counsel." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250-51, 253 (2d Cir. 2011); *see Interchange*, 827 F.3d at 232-36; *Cent. States Se. & Sw. Areas of Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir.

2007); *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992) (quoted with approval by *Amchem*). As the Second Circuit explained just this past summer, "divergent interests require separate counsel when it impacts the 'essential allocation decisions' of plaintiffs' compensation and defendants' liability." *Interchange*, 827 F.3d at 233-34 (stressing need for "separate representation" when one group's interests are "antagonistic to the others on a matter of critical importance— how the money would be distributed"). "The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?" *Literary Works*, 654 F.3d at 253.

The Second Circuit has held firm and fast to this view even in cases where the risks of divergent interests were less obvious than in *Amchem*, *Ortiz*, and this case. In *Literary Works*, for example—unlike here (and *Amchem*)—the named plaintiffs held "a variety of claims across the spectrum" (including all compensation categories), "the attorneys conducting the negotiations . . . represented holders of all three species of claims from the outset," and "[n]o claims unique to a portion of the class [we]re forfeited without compensation." *Id.* at 261-62 (Straub, J., dissenting). And "unlike *Amchem*" (and this case), "where one defendant refused to settle present claims until future claims were included"—creating a strong "incentive" for the "plaintiffs' representatives" to "bargain away exposure-only claimants' rights in order to ensure a generous settlement for their original, currently-injured clients"—"[n]o such incentive existed" in *Literary Works. Id.* at 263. Still, the Second Circuit invalidated the settlement and required subclasses.

In doing so, the court acknowledged that "[t]he Third Circuit"—even before this case—has taken a different approach, approving a settlement that "allocat-

-22-

ed the recovery among three distinct classes of plaintiffs without creating subclasses." *Literary Works*, 654 F.3d at 256 n.10 (discussing *In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)); *see also Literary Works*, 654 F.3d at 261 (Straub, J., dissenting) (quoting another Third Circuit case holding that settlement's unequal allocation "does not demonstrate a conflict between groups," just "the relative value of the different claims," *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 347 (3d Cir. 2010)). But the Second Circuit "hesistate[d] to conclude" the same. *Literary Works*, 654 F.3d at 256 n.10. Instead, it probed the "settlement's substance for evidence of prejudice to the interests of a subset of plaintiffs," and found some. *Id.* at 252. Because the disparate treatment of that subset lacked "credible justification," it "strongly suggest[ed] a lack of adequate representation for those class members." *Id.* at 254.

Even when the Second Circuit has approved settlement classes, it has "explicitly distinguished" the settlement from "those in *Amchem*, *Ortiz*, and *Literary Works* on the ground that it did not extinguish claims other than those that were the subject of relief in the settlement." *Interchange*, 827 F.3d at 240 (discussing *Charron v. Wiener*, 731 F.3d 241, 252 (2d Cir. 2013)). But when the release is *broader* than the relief provided, such that some people could receive "valueless relief while releasing a host of claims of unknown value," the court has not hesitated to strike down the deal. *Interchange*, 827 F.3d at 239.

In fact, the Second Circuit's procedural protections are so robust that it has allowed a *collateral attack* on a global settlement (in the Agent Orange litigation), holding that "the plaintiffs could not be bound by the settlement release" because "their class representative negotiated a settlement and release that extinguished their claims without affording them any recovery." *Id.* at 237

-23-

(discussing *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260-61 (2d Cir. 2001), *aff'd in relevant part by an equally divided court*, 539 U.S. 111 (2003)). Even though Rule 23 did not apply (because it was not a direct appeal), the court held that enforcing the settlement's release would violate due process. *Id.*

The Eleventh Circuit, in another collateral attack, was similarly attentive to procedural concerns while weighing whether a decade-old settlement had provided adequate representation sufficient to satisfy due process. *Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012). Although the court ultimately enforced the settlement's release, it did so only after taking pains to assure itself that the settlement had provided due process through a "combination" of two things. *Id.* at 1324. First, "well before" negotiations implicating a conflict had begun, the district court appointed six representatives reflecting the "full spectrum" of claimants, including "a representative with no manifested injury, one with minor to moderate injuries, and one who was totally disabled." *Id.* at 1324 & n.26. Second, after the district court appointed class counsel, it "specifically brought in" separate counsel "for the sole purpose of representing those plaintiffs with only potential, future injuries." *Id.* And this lawyer—as "the parties agreed, and [the court] was aware"— "represented solely future claimants with no current manifestations of injury." *Id.* at 1326.[1]

---

[1] Consistent with this approach, when the Second Circuit has required subclasses, that protection was put in place on remand *before* a new deal was negotiated. *See, e.g., In re Joint E. & S. Dists. Asbestos Litig.*, 878 F. Supp. 473, 481 (S.D.N.Y. 1995), *aff'd in relevant part*, 78 F.3d 764 (2d Cir. 1996) (explaining that new settlement was submitted on remand only *after* "designation of new subclasses and strenuous negotiation among them"); *In re Literary*

(continued …)

**C.** The Third Circuit's decision below cannot be reconciled with these cases. In many ways, it marks the culmination of that circuit's gradual drift away from Judge Becker's opinions in *Georgine* and *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ("*GM Trucks*")—the first circuit opinion to explore the issues raised by settlement classes in depth—toward a far more permissive approach. The panel in this case approved a global settlement with two named plaintiffs: one for the entire present-claimant "subclass" (a class member with ALS, the rarest and most highly compensated disease under the settlement, who thus had "no incentive to maximize the recovery" for others, *Literary Works*, 654 F.3d at 254), and one for the entire future-claimant "subclass." In stark contrast with the Second Circuit, the Third Circuit thought that ensuring representation for class members with other compensable diseases was unnecessary because it "risked slowing or even halting the settlement negotiations." App. 28a.

More importantly, separate counsel for the future claimants was not "brought in" after certification, as in *Juris*; instead, "class counsel designated lawyers from the Steering Committee to serve as subclass counsel," and the district court signed off on this designation only afterward. App. 22a. The Third Circuit was not troubled

---

*Works in Elec. Databases Copyright Litig.*, No. M-21-90 (MDL No. 1379), ECF No. 7, at 1 (S.D.N.Y., filed Nov. 22, 2013) (explaining that new counsel was brought in to represent new subclass on remand, *after which* the parties "embarked on months of negotiations"); *In re Medco Health Solutions, Inc., Pharmacy Benefits Mgmt. Litig.*, No. 03-MDL-1508, ECF No. 192 (S.D.N.Y. June 26, 2009) (approving new settlement on remand that was negotiated by subclass counsel appointed *before* negotiations).

-25-

by the fact that the lawyer for the future claimants simultaneously "represented nine players who alleged current symptoms," and "agreed to fees in these cases on a one-third contingency basis," because the district court (post hoc) was "satisfied that he was an adequate representative." App. 23a-24a. And the Third Circuit signaled that it agreed with the district court that there was "no fundamental conflict" between future and current claimants, saying that the court's "analysis was on point." App. 28a-29a.

As for substance, the Third Circuit was again in serious tension with the Second Circuit, where any substantive divergence on a "fault line[] along which [a] conflict runs" is strong evidence of inadequate representation absent "credible justification." *Literary Works*, 654 F.3d at 254, 257. The Third Circuit, however, did not provide *any* justification for why the deal expressly extinguishes future CTE claims, yet does not compensate for them, nor why current CTE claims are valued so highly if the settlement was not designed to compensate CTE even for those already diagnosed with the disease. The court found that the settlement's disparate treatment of CTE claims—up to $4 million for a pre-settlement diagnosis, but nothing for a post-settlement diagnosis—was "not evidence of a debilitating conflict of interest." App. 31a. In addition, the court demonstrated no awareness of how "the potential for gigantic fees" can skew incentives, and cited "the presence of a mediator and special master" as a key "structural protection[]," App. 29a, even though the Second Circuit has held that these features "emphatically cannot remedy the inadequate representation." *Interchange*, 827 F.3d at 234.

If this litigation had been consolidated in the Second Circuit, there is little doubt it would have come out differently. Indeed, the conflict between the Second and Third Circuits is so pronounced that, if this Court does

not step in, then any player who later develops CTE but does not qualify for compensation under the settlement will be able to bring a successful *collateral attack* in New York under binding Second Circuit precedent because "their class representative negotiated a settlement and release that extinguished their claims without affording them any recovery." *Id.* at 237. This Court should not tolerate such a fundamental disagreement between two circuits that routinely handle complex nationwide class-action settlements. It should grant certiorari to resolve the uncertainty, reassert and clarify the meaning of its seminal settlement cases, and reverse the Third Circuit.

## II. The Third Circuit's decision contradicts *Amchem* and *Ortiz* and delivers a dangerously flawed blueprint for future class cases.

The Third Circuit's laissez-faire approach is not just incompatible with the decisions of other circuits—it also contravenes this Court's cases. Left to stand, it would "take the law back before *Amchem*," *Ortiz*, 527 U.S. at 864, providing litigants with an all-too-easy template for circumventing Rule 23. Many more mass sports-concussion cases are looming[2]—and now, so are the flawed representation strategies approved here. The Court should take this opportunity to correct course.

**1.** Had the Third Circuit followed this Court's command of "rigorous adherence" to Rule 23(a)(4), it would

---

[2] *See, e.g.*, *Laurinaitis v. World Wrestling Entertainment, Inc.*, No. 16-1209 (D. Conn) (professional wrestling); *Mehr v. Federation International De Football Ass'n*, No. 14-3879 (N.D. Ca.) (professional soccer); *In re Nat'l Hockey League Players' Concussion Injury Litig.*, No. 14-2551 (D. Minn.) (professional hockey); *Archie v. Pop Warner Little Scholars*, No. 16-6603 (C.D. Ca.) (Pop Warner football); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Litig.*, MDL No. 2492 (N.D. Ill.) (NCAA football).

-27-

have reversed the settlement—not deferred to the district court's "post-hoc findings at the fairness hearing" that the absent class members "in fact had been adequately represented." *Id.* at 832, 849.

The parallels between this case and *Amchem/Ortiz* jump off the page. Each of the three cases began as consolidated personal-injury litigation that was converted to a global settlement only because the defendant insisted on extinguishing claims "not yet in litigation." *Amchem*, 521 U.S. at 601. Each involved a settlement negotiated exclusively by members of the Plaintiffs' Steering Committee representing "thousands of plaintiffs with then-pending" claims, "although those lawyers then had no attorney-client relationship with [future] claimants." *Id.* at 600-01. Each involved a tiny number of named plaintiffs seeking to represent a broad spectrum of current and future claimants with potentially compensable injuries. And each involved a settlement that contained clear substantive indicators that the conflict was anything but academic, resulting in serious, unjustifiable disparate treatment, strongly suggesting that the rights of future claimants had been used as bargaining chips to benefit current claimants and their lawyers.

The only difference is that here—*after* the basic framework of the deal had been hashed out in nearly two months of negotiations—the plaintiffs' lawyers devised a strategy to paper over the conflict. Without notifying the district court, they designated one of their own members to serve as counsel to a newly created "subclass" that would encompass every class member who does not qualify for compensation under the terms of the framework that had just been negotiated (whether currently injured or not). A.1116-17. They also named a former player with one season of NFL experience to serve as the lone representative for this subclass, and later re-

placed him with someone only after he agreed to "support[] the settlement." A.3569, 3902.

This cannot possibly be the kind of representation that this Court had in mind when it said that, in cases of this sort, Rule 23 requires "the structural protection of independent representation," *Ortiz*, 527 U.S. at 855, by those "who understand that their role is to represent solely the members of their respective subgroups," *Amchem*, 521 U.S. at 627. As in *Ortiz*, "the District Court took no steps at the outset to ensure that the potentially conflicting interests" of differently situated claimants were protected. 527 U.S. at 831-32. The result was a disabling conflict: The handpicked lawyer for future claimants "represented nine players who alleged *current* symptoms," while retaining a one-third contingency stake in their cases, App. 23a—"an egregious example of the conflict noted in *Amchem*," *Ortiz*, 527 U.S. at 853. In fact, he even shared a client with the lawyer designated as counsel to the *other subclass* (another member of the Steering Committee with similar clients). *See* CA3 ECF No. 003112095536, Exs. A & D.

The Third Circuit could "not see how" these agreements "created a conflict of interest" because subclass counsel "disclosed his representation" in "an application for the Steering Committee." App. 23a-24a. But this disclosure came well before the case was converted to a class action. And why should this matter, in any event, to the legal question whether there was adequate, unconflicted representation during negotiations? The district court did not address that question until after the fact, in its "post-hoc findings at the fairness hearing." *Ortiz*, 527 U.S. at 832. That does not satisfy Rule 23.

**2.** Were there any doubt that the future claimants did not receive adequate representation here, it would be dispelled by "hom[ing] in" on "the terms of the settle-

-29-

ment." *Amchem*, 521 U.S. at 619, 627; *see Nat'l Super Spuds v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981) (Friendly, J.) ("The inadequacy of the representation" is "apparent from examination of the settlement itself."). This settlement creates a massive "disparity between the currently injured and [future-injury] categories of plaintiffs," *Amchem*, 521 U.S. at 626—the class's most salient conflict. Under the settlement's terms, if a class member died with CTE before April 22, 2015—that is, if he had a *current* CTE claim on the day of final approval—his estate will receive up to $4 million. But if a class member dies after April 22, 2015—that is, if he has a *future* CTE claim—his estate will get no monetary award at all. Future-injury plaintiffs, in other words, are forced to release all "claims relating to CTE," App. 82a-83a, yet they "will never enjoy the [CTE] benefits of the settlement." *GM Trucks*, 55 F.3d at 801.

It is hard to think of more "conspicuous evidence" of "an intra-class conflict." *Id.* When a "settlement treats [one group] quite differently from [another]," it has "serious implications for the fairness of the settlement and the adequacy of representation of the class." *Id.* at 777. That is especially true here, where the disparate treatment concerns the one injury that triggered this flood of litigation in the first place: death with CTE. Although the Third Circuit tried to explain away (rather than rigorously scrutinize) the disparate treatment of CTE, it had no explanation for why the settlement "throw[s] to the winds" future CTE claims without compensating them, *Super Spuds*, 660 F.2d at 17 n.6, nor why a current CTE claim is valued so highly if it were really meant as a proxy for other (far less valuable) diagnoses. *See* App. 30a-31a. And the Third Circuit inexplicably believed that a toothless meet-and-confer provision "allows the settlement to keep pace with changing science." App. 29a.

-30-

At bottom, the Third Circuit misunderstood its role as helping facilitate a global resolution of a crisis confronting America's most popular sport—not enforcing Rule 23. "But the benefits of litigation peace do not outweigh class members' due process right to adequate representation." *Interchange*, 827 F.3d at 240. Pro football may enjoy an exemption from the antitrust laws (and paying taxes), but it has no license to achieve a global release of liability by trampling on Rule 23 and due process.

## CONCLUSION

The petition for a writ of certiorari should be granted.

-31-

Respectfully submitted,

DEEPAK GUPTA
   *Counsel of Record*
MATTHEW W.H. WESSLER
JONATHAN E. TAYLOR
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

RICHARD L. COFFMAN
The Coffman Law Firm
First City Building
505 Orleans Street, Suite 505
Beaumont, TX 77701
(409) 833-7700

MITCHELL A. TOUPS
Weller, Green, Toups & Terrell
2615 Calder Street, Suite 400
Beaumont, TX 77704

JASON C. WEBSTER
The Webster Law Firm
6200 Savoy, Suite 640
Houston, TX 77036

September 26, 2016