# Exhibit HH

No. 16-413

# In the Supreme Court of the United States

RAYMOND ARMSTRONG, et al.,

*Petitioners,*

v.

NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC,
*Respondents,*

KEVIN TURNER and SHAWN WOODEN,
on behalf of themselves and all others similarly situated,

*Respondents.*

*On Petition for a Writ of Certiorari to the United States
Court of Appeals for the Third Circuit*

## REPLY BRIEF FOR PETITIONERS

RICHARD L. COFFMAN
The Coffman Law Firm
First City Building
505 Orleans Street, Suite 505
Beaumont, TX 77701
(409) 833-7700

MITCHELL A. TOUPS
Weller, Green, Toups & Terrell
2615 Calder Street, Suite 400
Beaumont, TX 77704

JASON C. WEBSTER
The Webster Law Firm
6200 Savoy, Suite 640
Houston, TX 77036

November 21, 2016

DEEPAK GUPTA
  *Counsel of Record*
MATTHEW W.H. WESSLER
JONATHAN E. TAYLOR
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

*Counsel for Petitioners*

-i-

## TABLE OF CONTENTS

Table of authorities ............................................................. ii

Reply brief .............................................................................1

   I.   The circuit split and the prospect of a
collateral attack based on that split are
undeniable, and respondents barely attempt
to show otherwise. ...................................................1

   II.  Recent developments underscore the need
for this Court's immediate review. ........................5

   III. Because the settlement releases the future
claims of thousands of absentees for nothing
—without providing the requisite structural
protections—it violates *Amchem* and *Ortiz*.........6

Conclusion .........................................................................11

-ii-

# TABLE OF AUTHORITIES

### Cases

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997).................................................*passim*

*In re Literary Works in Electronic Databases
    Copyright Litigation,*
    654 F.3d 242 (2d Cir. 2011)..............................................2

*In re Payment Card Interchange Fee &
    Merchant Discount Antitrust Litigation,*
    827 F.3d 223 (2d Cir. 2016)....................................2, 3, 4

*Ortiz v. Fibreboard, Corp.,*
    527 U.S. 815 (1999)..................................................1, 7, 8

*Stephenson v. Dow Chemical Co.,*
    273 F.3d 249 (2d Cir. 2001)............................................2

*Wal–Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).......................................................10

### Other authorities

Ken Belson, *Judge Tells N.F.L. to Reveal Some
    Secrets About Concussions*, N.Y. Times,
    Oct. 31, 2016 ................................................................6

Ken Belson, *Researchers Make Progress
    Toward Identifying C.T.E. in the Living*,
    N.Y. Times, Sept. 26, 2016 ............................................6

Bob Hohler, *Former Patriot Kevin Turner died
    from CTE, not ALS*, Boston Globe,
    Nov. 3, 2016...................................................................5

Joe Nocera, *Is the N.F.L.'s Concussion
    Settlement Broken?*, N.Y. Times, Oct. 7, 2016 ............6

-1-

## REPLY BRIEF FOR PETITIONERS

Only twice in its history has this Court addressed the governance of class-action settlements. Two decades ago, the Court held that when a global settlement makes "essential allocation decisions" among competing class members—like current and future claimants—the court must scrutinize "the terms of the settlement" and "the structure of the negotiations" for "assurance of fair and adequate representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627 (1997). At the very least, "intraclass conflicts" require "division into homogeneous subclasses"—with "separate representation"—to guard "against inequity and potential inequity at the precertification stage." *Ortiz v. Fibreboard, Corp.*, 527 U.S. 815, 856-58, 864 (1999).

Lacking further guidance, lower courts have divided over the meaning of these landmark cases, with the Second and Third Circuits adopting directly conflicting approaches. *See* 135 Former Players Br. 5 ("[T]here is a divergence among the circuits in applying [*Amchem* and *Ortiz*]."); Public Citizen Br. 14 ("The Second Circuit's approach . . . would require a different outcome."). This Court's intervention is urgently needed—not only to resolve that split for the sake of future cases but also to prevent it from unraveling this very settlement.

**I.   The circuit split and the prospect of a collateral attack based on that split are undeniable, and respondents barely attempt to show otherwise.**

**A.** Respondent NFL neither discusses nor cites any of the Second Circuit cases that comprise the split. The closest it comes is an oblique reference to "petitioners' efforts to conjure a circuit split"—a carefully crafted sentence that stops short of denying the split's existence—and an unexplained assertion that "there is no reason to believe that the Second Circuit would have

reached a different conclusion." NFL BIO 24. Yet neither the NFL nor class counsel even attempt to run the facts of this case through the Second Circuit's legal framework, which holds that settlement classes must be decertified "when categories of claims have different settlement values," yet lack subclasses and "separate counsel." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250-51, 253, 256-57 (2d Cir. 2011). The Second Circuit's approach also demands decertification when the settlement trades away the "future claims" of some class members "without affording them any recovery," for they "could not have been adequately represented." *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 827 F.3d 223, 237 (2d Cir. 2016), *application for extension of time to file cert. petition granted*, No. 16A280 (due Nov. 23).

This settlement has both of these features. It not only "picks winners and losers among the injured class without providing necessary structural protections," Public Citizen Br. 2-3, but also expressly extinguishes potentially thousands of future CTE claims for nothing—while providing up to $4 million to the select few with a current CTE claim as of April 22, 2015 (a category limited to those deceased players whose brains were inspected by Boston University's CTE Center by that date). There is no serious argument that this settlement could be upheld under the Second Circuit's current precedent. That is a classic definition of a split.

**B.** In fact, the conflict is so pronounced that it raises the prospect that hundreds or even thousands of players diagnosed with CTE after the cutoff date will bring collateral attacks in federal court in New York City—where the NFL is headquartered. *See Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260-61 (2d Cir. 2001). On this point, the NFL simply punts: It says nothing—nothing at all—about this scenario. And class counsel, for

-3-

their part, add only a dismissive footnote (at 22 n.5) suggesting that "the Second Circuit has backed away" from *Stephenson*. But, just this past summer, the Second Circuit explicitly reaffirmed *Stephenson*'s holding that absentees cannot be "bound by the settlement release" if "their class representative negotiated a settlement and release that extinguished their claims without affording them any recovery." *Interchange*, 827 F.3d at 237. To hold otherwise would "violate[] due process"—an even stricter standard than adequacy. *Id.* That neither respondent—in 70-plus pages of combined briefing—makes any effort to confront this holding says all there is to say about just how irreconcilable the conflict really is.

The split is therefore not just a matter of theoretical concern. Generally speaking, circuit conflicts are undesirable because they undermine the uniformity of federal law—a concern that is also implicated here. But what makes this conflict truly intolerable is that it could one day lead to different results in this very litigation—threatening to unravel part of the settlement on the back end, or at least to invite additional litigation about whether someone with a potentially valuable tort claim (like a wrongful-death claim) can be bound by a settlement purporting to release that claim for nothing.

If this Court does not intervene, that day might not be far off. To illustrate the point: Ken Stabler, Oakland Raiders legend and recent Hall of Famer, died in July 2015, and "his autopsy revealed severe stage-3 CTE." 135 Former Players Br. 2. But because he died "a mere two and a half months after the cut off" date, "Mr. Stabler and his heirs cannot recover for CTE injuries under the settlement as currently drafted," and indeed "can recover nothing under the current settlement." *Id.* at 3. If so, what is to stop the executor of Mr. Stabler's estate (an amicus in this case) from filing suit in federal court in Manhattan, just a few miles south from the NFL's head-

-4-

quarters? And if that happens, and it is successful under Second Circuit precedent, is there any doubt that this Court will then be asked to step in? Far better to do so now, on direct review.

The NFL's response to the circumstances of people like Mr. Stabler is to assert (at 27) that they are "fortunate" and "asymptomatic." That could not be further from the truth. "Before his death, Mr. Stabler suffered from mood swings and other mental issues that destroyed [his] marriage," while other players who might have CTE (but not a qualifying illness) are "suffer[ing] from severe depression" and "homelessness"; "cannot drive [] or hold a job"; struggle with "bouts of aggression, anxiety, poor impulse control, and anger"; are afflicted with "severe insomnia"; and so on. *Id.* at 2-3.

In a similar vein, class counsel—fiduciaries for these players—say that their pleas "cannot be taken seriously" (at 32), because they lacked the oracular foresight to know whether to opt out of the class based on a diagnosis they can't yet confirm, or to otherwise predict what their futures may hold. But future claimants "may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out." *Amchem*, 521 U.S. at 628. And amici's "grave concerns" should very much be taken seriously. 135 Former Players Br. 1. The possibility of a collateral attack should be taken seriously. The fact that many class members will receive "valueless relief while releasing a host of claims of unknown value," *Interchange*, 827 F.3d at 239—even if "their CTE causes economic ruin, destroys their family, or kills them," 135 Former Players Br. 8—should be taken seriously. A stark "divergence among the circuits" on how to apply "this Court's teachings in *Amchem* and *Ortiz*" should be taken seriously. *Id.* at 5. That this case is "beset by intra-class conflicts and a lack of structural protections for absent class members," and hence "suffers from the

same deficiencies that caused this Court to reject the settlements in *Amchem* and *Ortiz*," should be taken seriously. *Id.* at 5, 13. And the need for clear guidance to courts and litigators alike on a question of profound importance—what structural protections are necessary before a settlement may extinguish the claims of a diverse group of class members, including the not-yet-injured—should likewise be taken seriously.

## II.   Recent developments underscore the need for this Court's immediate review.

The problems with the settlement, and the need for this Court's review, are highlighted by several recent developments—none of which respondents mention. The first concerns the sole class representative for the present claimants, Kevin Turner. Although Mr. Turner was thought to have ALS when this settlement was negotiated, researchers at Boston University's CTE Center announced earlier this month that he actually had CTE. *See* Hohler, *Former Patriot Kevin Turner died from CTE, not ALS*, Boston Globe, Nov. 3, 2016, http://bit.ly/2g2mi2g ("This is not ALS; this is CTE."). Perhaps this development will affect the compensation provided to his survivors (because he had a *future* CTE claim, valued at $0 by the settlement). Or perhaps it will not (because his survivors may still be able to collect up to $5 million for ALS—the one diagnosis worth more than CTE—which only 31 class members are expected to receive, A.1585). But either way, this startling development only underscores the inadequacy of representation and the artificiality of the lines drawn by the settlement.

It also highlights how quickly the landscape is changing with respect to CTE. Indeed, in a second major development, announced on the same day that this petition was filed, scientific researchers said that they have made progress toward diagnosing CTE in the living. *See*

-6-

Belson, *Researchers Make Progress Toward Identifying C.T.E. in the Living*, N.Y. Times, Sept. 26, 2016, http://nyti.ms/2doVE5D; *see also* Nocera, *Is the N.F.L.'s Concussion Settlement Broken?*, N.Y. Times, Oct. 7, 2016, http://nyti.ms/2dNq4fl ("I really do foresee being able to diagnose C.T.E. pretty accurately while people are alive sometime in the next five to 10 years. . . . Hopefully, even earlier."). The settlement, however, seeks to "freez[e] in place the science" of yesteryear, *Amchem*, 521 U.S. at 611, blocking compensation for anyone but the very earliest diagnosed with the disease.

Finally, in yet another relevant development since this petition was filed, a New York state judge compelled the NFL to respond to discovery about what it knew regarding "the dangers of concussions" and whether it "deliberately concealed them from players." *See* Belson, *Judge Tells N.F.L. to Reveal Some Secrets*, N.Y. Times, Oct. 31, 2016, http://nyti.ms/2erukj0. That issue is central to the strength of the underlying claims in this case, and yet this settlement was reached without even the most rudimentary discovery into what the NFL's executives knew and when they knew it. If this Court does not grant certiorari, the answer will arrive too late for the thousands of former players the settlement seeks to bind.

## III. Because the settlement releases the future claims of thousands of absentees for nothing—without providing the requisite structural protections—it violates *Amchem* and *Ortiz*.

On the merits, the respondents spend most of their time avoiding the question presented and the real reason this settlement runs afoul of *Amchem* and *Ortiz*. The NFL rewrites the question (at i) to focus on something else entirely: whether the settlement "satisfies Rule 23(e)'s requirement that a class-action settlement be 'fair, reasonable, and adequate.'" But "a fairness hearing

under Rule 23(e) is no substitute for rigorous adherence to those provisions of the Rule 'designed to protect absentees.'" *Ortiz*, 527 U.S. at 849; *see id.* at 858 ("[T]he proponents of the settlement are trying to rewrite Rule 23; each ignores the fact that Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense.").

Taking a different tack, class counsel doggedly try to recast the question as a factual dispute. *See* CC BIO 2, 10, 11, 16, 18, 19, 20, 21. That is bewildering. Adequacy of representation and due process are *legal* questions. And the only facts that matter are uncontested—"the structure of the negotiations" and "the terms of the settlement" that it produced. *Amchem*, 521 U.S. at 627.

Start with the structure. If there is an original sin in this case, it is that much of the important early negotiations occurred without *any* structural protections to guard against intraclass conflicts. When class counsel first sat down at the negotiating table, they "sought to act on behalf of a single giant class rather than on behalf of discrete subclasses," even though "the interests of those within the single class [were] not aligned." *Id.* at 626. Those negotiations decided which injuries would be compensable and which would not, and thus who would benefit from the settlement and who would not. The winners were the 28.12% of class members who are expected to qualify for compensation according to class counsel's own estimates; the losers were everyone else— 71.88% of the class. A.1585.

Although class counsel now assert (at 21) that these facts are "invented out of whole cloth," their own declarations say otherwise: Only "*after this structure was*

*agreed to*" were the subclasses created. A.3578 ("[A]fter this structure was agreed to, Arnold Levin was designated to represent the players in Subclass 1 who have not yet received a diagnosis of neuromuscular or neurocognitive impairment, and Dianne Nast was tasked with representing the players in Subclass 2 who have received a qualifying diagnosis."). And logic doesn't allow for any other possibility. Because the subclasses are defined by reference to whether a class member has a "qualifying injury" (a category that includes current but not future CTE claims), the definition of qualifying injury necessarily predated creation of the subclasses themselves.

That is no small thing. Class counsel concede (at 5) that negotiations over the compensable categories were "contentious," and that, "[u]ltimately, the NFL was willing to compensate only objectively verifiable and serious neurocognitive and neuromuscular injuries, *i.e.*, dementia, Alzheimer's Disease, Parkinson's Disease, and ALS," as well as current CTE claims. CC BIO 5. By contrast, "[t]he NFL would not agree to compensate less objectively verifiable and multifactorial conditions"— including many serious injuries that the plaintiffs themselves pleaded in the master complaint—or to compensate for future CTE claims. *Id.* at 5-6. But that just points up the structural problems. Although this kind of give-and-take raises no concerns in bilateral litigation, a settlement-only class action is different—particularly a conflicted one. It requires structural protection for the absentees whose rights are being resolved. And here, "the District Court took no steps at the outset to ensure that the potentially conflicting interests" of different class members "were protected by provisional certification of subclasses." *Ortiz*, 527 U.S. at 831-32. Instead, by the time subclass counsel assumed their roles—having been selected by (and from) the steering committee, without court involvement—nobody was looking out for

-9-

the vast majority of class members whose claims had already been bargained away, including people who will one day be diagnosed with CTE and suffer immeasurably as a result.

To make matters worse, the subclasses were not "homogenous," but included class members with "more valuable claims than" others. *Id.* at 856-57. And both counsel selected to represent the two subclasses also represented clients alleging similar injuries in cases already on file—and even represented the same client— while retaining a financial stake in their recoveries. *See* Pet. 12-13, 28.[1]

The substance of the deal confirms its inadequacy. As in *Amchem* and *Ortiz*, this settlement is a zero-sum game, entailing "essential allocation decisions designed to confine compensation and to limit defendants' liability." *Amchem*, 521 at 626-27. It does not account for changing science, no one can "opt out at the back end," and future CTE claims are expressly "extinguished with no compensation," while present CTE claims are valued at up to $4 million. *Id.* The settlement also contains a clear-sailing clause for up to $112.5 million in attorneys' fees (though a fee motion has not yet been filed), plus a

---

[1] Despite class counsel's suggestions (at 15, 20), petitioners have never asserted that futures-subclass counsel represents clients with qualifying *diagnoses*. Petitioners have said only that he "represented nine players who alleged current *symptoms*"—many of the same symptoms alleged by clients of the other subclass counsel, with whom he "shared a client"—and that he "agreed to fees in these cases on a one-third contingency basis." Pet. 12-13, 28. Class counsel never deny these facts. And petitioners' arguments were presented to and passed on below, so there is no impediment to this Court's review. Pet. App. 21a-31a.

5% set-aside that could be worth another $46 million based on damages estimates.

Respondents do not deny any of these facts. And although they attempt to explain away the settlement's compensation for current CTE claims as just a "proxy" for other diseases (*see* NFL BIO 28), that argument withers under even the most modest scrutiny—much less the kind of "rigorous analysis" that Rule 23(a) requires, *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011), and still less the "heightened" version applicable in the settlement context, *Amchem*, 521 U.S. at 620. According to the respondents' own estimates, the average payment for a CTE claim will be $1.44 million, while the average payment for dementia claims will be $190,000—almost eight times less. A.1573. Neither respondent even tries to defend this gaping disparity. Like the NFL, class counsel (at 25) characterize CTE compensation as simply an "accommodation" for those "whose deaths preceded the ability to get the medical proofs required under the settlement." But the settlement makes no similar accommodation for any class member who died before the settlement but was not inspected for CTE. The settlement's compensation for CTE is thus exactly what it purports to be—compensation for CTE.

A final point: Nobody contends that class counsel are anything other than skilled, well-intentioned lawyers who have achieved what they believe is a fair deal. But settlements can create skewed incentives, and the rules of the road are unclear. Nearly twenty years ago, this Court laid down guideposts, identifying the need for structural protections. But just what those protections must look like, and how far they extend, are questions that remain. This Court should answer them.

-11-

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

DEEPAK GUPTA
   *Counsel of Record*
MATTHEW W.H. WESSLER
JONATHAN E. TAYLOR
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

RICHARD L. COFFMAN
The Coffman Law Firm
First City Building
505 Orleans Street, Suite 505
Beaumont, TX 77701
(409) 833-7700

MITCHELL A. TOUPS
Weller, Green, Toups & Terrell
2615 Calder Street, Suite 400
Beaumont, TX 77704

JASON C. WEBSTER
The Webster Law Firm
6200 Savoy, Suite 640
Houston, TX 77036

November 21, 2016