IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL §<br>LEAGUE PLAYERS' CONCUSSION §<br>LITIGATION §<br>_____ § | No. 12-md-2323 (AB) |
| §<br>§ | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: §<br>ALL ACTIONS § | |

**Alexander Objectors' Response and Objection to Supplemental Evidence Offered in Co-Lead Class Counsel's Omnibus Reply in Opposition to Co-Lead Class Counsel's Petition for an Award of Attorneys' Fees Reimbursement of Costs and Expenses, Adoption of a Set-Aside of Each Monetary Award Derivative Claimant Award, and Case <u>Contribution Awards for Class Representatives</u>**

Co-Lead Class Counsel, in its Omnibus Reply, submitted supplemental evidence in support of its Petition for an Award of Fees. The Alexander Objectors object to the new evidence as follows:

**A.    Dr. Vasquez' April 10, 2017 Updated Analysis of the NFL Concussion Settlement (Exhibit JJ) Still has Analytic Gaps and Provides No Basis to Value the Monetary Award Fund**

In his new report, Dr. Vasquez states that he has now "been asked by Co-Lead Class Counsel to value the Settlement, as implemented."[1] Dr. Vasquez

---

[1] It appears from this statement in Dr. Vasquez' April, 2017 report that Co-Lead Class Counsel had not previously asked Dr. Vasquez to apply his methodology to value the Settlement, as implemented. As such, and for this additional reason, Co-Lead Class Counsel's initial Petition for Fees rested upon no foundation as Dr. Vasquez' 2014 report did not even undertake to value the Settlement proposed and no other witness with any qualification offered an opinion on the subject.

presents his methodology as: The life cycle forecasting mode. He further states the methodology is based upon "disease incidence rates." Thus, this new analysis suffers the same insurmountable flaw as Dr. Vasquez' initial declaration: There is not and could not be disease incidence rates for Level 1.5 and Level 2 Qualifying Diagnoses. Neither Dr. Vasquez nor Co-Lead Class Counsel even address this flaw in methodology in the new report or Omnibus Reply.

Once again, Dr. Vasquez claims to be able to compute the probability that a former NFL player will contract "each one of the compensable injuries through an epidemiological risk equation." But, we know that Dr. Vasquez has not actually performed an "epidemiological risk equation" for Level 1.5 or Level 2 because, as his first report acknowledges, there is no epidemiological data for Level 1.5 or Level 2 Qualifying Diagnoses. These Qualifying Diagnoses are creations exclusively of and defined entirely by the Settlement. Neither a Level 1.5 nor a Level 2 neurocognitive disorder appear in published literature, research or even a medical textbook. Yet, almost one-half of the NFL players Dr. Vasquez projected as eligible fall within the Qualifying Diagnosis of Level 2. *See* Table 2-1 (Doc. 6167, 6/71).

The Court will recall that in Dr. Vasquez' 2014 report, upon which he still relies for incidence, Dr. Vasquez stated that he drew his incidence data from published literature and research as set forth in Exhibit A to that report. But, his

Exhibit A contained no published literature or research on the non-terminal neurocognitive disorders Level 1.5 and Level 2; that is because these Qualifying Diagnoses are not recognized diseases. Thus, the glaring analytical gap is this: Dr. Vasquez uses dementia studies as a surrogate or a "proxy" to Level 1.5 and Level 2 without supplying any analysis or basis for doing so. It is not clear that Dr. Vasquez has the qualifications to fill the gap, but Dr. Vasquez simply skips this step altogether.

The gap renders the opinion unreliable. More importantly, either gap causes the opinion to grossly over estimate the number of likely participants in the Settlement. Specifically, not only are the diagnosing criteria for dementia and Level 1.5 or Level 2 "materially different," but also the dementia diagnosing criteria—those specifically used in the studies relied upon by Dr. Vasquez—are satisfied by "subjective impairment in social or occupational functioning." *See* Declaration of Jamshid Lotfi, Md., attached hereto as Exhibit A. As Dr. Lotfi explains, unlike the lower requirements for a dementia diagnosis, the diagnosing criteria for Level 1.5 and Level 2 include a "neuropsychological battery testing protocol" established by Exhibit 2 to the Settlement; "quantification of the standard deviations below the person's expected level of premorbid functioning." *See* Declaration of Jamshid Lotfi, Md., attached hereto as Exhibit A. In short, it is wholly unreliable to rely upon the incidence data for dementia diagnosis for

3

extrapolating incidence for Settlement diseases that require satisfaction of multiple forms of different, objective criteria and evidence to support it.[2]

In fact, Co-Lead Class Counsel supplies the best evidence of this analytical gap on Level 1.5 and Level 2 Qualifying Diagnoses; that is, the new medical manuals published by Co-Lead Class Counsel and the NFL Parties.  Specifically, because the Level 1.5 and Level 2 Qualifying Diagnoses are "settlement diagnoses" that were not taught in medical school, have never been diagnosed by a single physician outside of this Settlement, and have no recognized criteria, the Settlement calls upon the parties to write "medical manuals."  Mr. Seeger reveals in his new declaration that the "manuals that will be used by each of the administrators to train the physicians and providers on the medical aspects of the settlement, including the testing regimen [ ] and what constitutes a Qualifying Diagnosis for the MAF" have only just been completed.  *See* Supplemental Declaration of Christopher A. Seeger, 7464-1, ¶ 30.  Stated differently, if these diagnoses and their incidence was so well recognized, why have the BAP Administrator, the Claims Administrator, the NFL Parties and their experts, and Class Counsel collaborated to write medical manuals to teach doctors how to diagnose under the Settlement.

---

[2] Of course, the Court will recall that the qualifying disease "diagnosing criteria" is a moving target, depending upon whether the diagnosis is made before or after the effective date of the Settlement.  Note, too, that Dr. Vasquez makes no attempt to account for this differential, an additional gap in his analysis.

It is rank speculation at this point how many former NFL Players who present to these newly designated "Qualified MAF Physicians" using their newly published medical manuals will fall within the criteria for Level 1.5 or Level 2. And, certainly Dr. Vasquez gives no indication that he has ever undertaken to review the brand new manual or how it impacts his forecast. Dr. Vasquez' incidence opinion; his prediction about how many "valid claims" will exist; and his resulting valuation of the Settlement, "as implemented" rests upon an analytic gap that renders the opinion completely unreliable and inadmissible. The Alexander Objectors object and ask the Court to strike or disregard that opinion under Rule 702 and *Daubert*.

Further, the Alexander Objectors ask that the Court recognize that this methodology challenge is not a challenge to the Settlement, as Co-Lead Class Counsel attempts to construe it. There is a fundamental difference between reliance upon an optimistic Dr. Vasquez report to ensure that the Settlement funds are sufficient to compensate Class members and relying upon that same optimism to reward above fees actually incurred for a successful Settlement before success is proven, or even a track record of success is established. It will be of absolutely no consequence that the MAF is uncapped if few former players can qualify under the new "medical manual"—referred to as a "user manual" in Exhibit 2 to the Settlement Agreement. And, if the Court has already awarded the entire $112.5

fee fund as a bonus—instead of the $40 million Co-Lead Class Counsel alleges has been reasonably incurred in fees—none of that fee fund can be recovered if the Settlement does not prove as successful as claimed and no portion of that fund can be invested to generate earnings for future fees.[3]

Co-Lead Class Counsel recoils at the suggested application of a lodestar to pay their $40 million in fees to date, urging this case is not a statutory fee shift. But, Co-Lead Class Counsel attempts to obscure that this is not a common-fund settlement, either. Here, the NFL parties are funding attorneys' fees in precisely the same fashion they would if it were a statutory fee shift. But, if Co-Lead Class Counsel succeeds in draining that fund of not just fees earned but also a premature performance bonus, then subsequent fees will come out of the retired NFL players' recovery.

Recall, too, that the Settlement provides the NFL parties every incentive to resist or oppose every Qualifying Diagnoses. But, if Class Counsel is paid all fees and a bonus fee before a single player is declared eligible for Settlement funds,

---

[3] After all, if the Court paid Co-Class Counsel its approximately $40 million lodestar now, the $72.5 million remaining would exceed the sum Co-Class Counsel seeks as a 5% set aside. Moreover, the $72.5 million, conservatively invested, would more than adequately compensate counsel for administration-of-settlement fees. Meanwhile, the Court could simply escrow 5% of every claim payment to insure that the $112.5 million is sufficient. No one is suggesting Co-Lead Class Counsel wait 65 years to be paid or for their success to be objectively measured; they simply should not get a bonus before a single former player has received any money.

Class Counsel has no incentive to advance these players' interests.

**B.     Mr. Seeger's Supplemental April, 2017 Declaration, though objectionable for lack of detail, proves the Alexander Objectors' Point: Class Counsel's request for a performance bonus is premature and will unjustly enrich Class Counsel.**

Through his supplemental declaration Mr. Seeger yields to the "objectors demand for more detail" on the legal work that will be required to administer the Settlement for its life expectancy.  A cursory review of the extensive work Mr. Seeger is doing and predicts he will do confirms that— notwithstanding Settlement—the true adversarial process is just about to begin.  As the cliché goes, the devil will be in these details:

- Drafting—<u>with the NFL Parties</u>—of "[m]anuals that will be used by each of the administrators to train the physicians and providers on the medical aspects of the settlement and the unique diagnoses created thereunder;"

- Vetting and creation—<u>with the NFL Parties</u>—of the Appeals Advisory Panel to perform, *i.e.* benefit determinations; and

- Crafting—<u>with the NFL Parties</u>—the "basic form" and "supporting forms that need to be submitted to perfect a claim."

The upcoming adversarial, claims process is probably why Mr. Seeger—alleging that he has "invested over $600,000" to achieve the Settlement—now seeks a 5% set aside[4] from every claimant, represented by counsel or not.  That is,

---

[4] The Alexander Objectors continue to discuss the "set-aside" in the same terms as the Settlement.  The Court should note, however, that Co-Lead Counsel has not actually petitioned for a set aside; they have petitioned for "a 5% set-aside concept" Class Counsel wishes to

by Class Counsel's calculation, an additional $50 million in attorney administration fees. Either the Settlement is already successful and the performance bonus has been earned, or, as Mr. Seeger seems to be saying, he has a lot of work to do to make the Settlement a success.

Nevertheless, the Alexander Objectors object to Mr. Seeger's declaration because, for the lack of tangible data supplied, it is conclusory and lacks foundation. Specifically Mr. Seeger's declaration is offered to support a full 5% set aside[5] but it does not contain any fee data, *i.e.* projected fees on an annual basis. Co-Class Counsel asked the Claims Administrator to project its potential administrative costs "over the 65-year life of the Settlement Program." *See*

---

administer on a plan that Co-Lead Class Counsel has not yet shared with the Court or any other party. *See*, Declaration of Christopher A. Seeger, Doc. 7151-2, paragraph 119. The proposal-to-come sounds much like "the plan" for fees that Co-Lead Class Counsel submitted early in the litigation – Case Management Order No. 5. As none of the data ordered to be accumulated and filed appears in the file of this Court or has been offered as evidence of fees in Co-Lead Class Counsel's request for fees, the promise to create and follow through with a plan for future fees rings hollow.

[5] The alleged need for an immediate 5% set aside is logically defeated by Co-Lead Class Counsel's representations to the Court about prior versions of the Settlement. Specifically, the January, 2014 Settlement proposal capped the MAF at $675 million; provided for an additional $112.5 million in attorneys fees from the NFL parties; and contained **no set aside**. *See* Doc. 5634-2. Co-Lead Class Counsel, in reliance upon Dr. Vasquez' original report, represented that these terms would adequately protect all of the Class Members forecast as eligible. Subsequently, according to Mr. Seeger (ECF 7151-2, paragraph 43), Co-Lead Class Counsel "tightened definitions of key terms" in the Settlement – a revision that reduced the number of eligible participants – negotiated an uncapped MAF; and added a set aside up to 5%. Co-Lead Class Counsel has never explained why $50 million <u>more</u> in fees is necessary to administer fewer eligible claims than provided for in January, 2014.

8

Declaration of Orran L. Brown, Sr., 7151-4, ¶ 10.  And, although it was a speculative projection, Mr. Brown tried.  Co-Class Counsel asked Dr. Vasquez to value the Settlement over its life expectancy.  *See* Updated Analysis of the NFL Concussion Settlement, 7464-12, Exhibit JJ.  And, although it is a speculative projection, Dr. Vasquez tried.

Mr. Seeger, by contrast, sweeps broadly through the categories of extensive work he anticipates without any actual fee projection—and, thus, his declaration is conclusory and without foundation.  Mr. Seeger urges the Court, instead, to simply vest him with the future authority—upon a protocol not even yet submitted—to evaluate and pay fees incurred to administer the settlement.  The Court should reject the supplemental declaration, and the 5% holdback it advances.

**C.     The Declaration of Bradford R. Sohn, 7464-2, Exhibit Z**

The Alexander Objectors, obliged to object when proffered evidence is infirm, again complain of a substandard fee declaration:

| Declaration of Bradford R. Sohn ECF No. 7464-2 | Fed. R. Civ. P. 23(h) authorizes the award of "reasonable attorney fees."  Mr. Sohn's declaration seeks an award of attorney fees in reliance upon 50 hours alleged worked for a total lodestar fee of $26,250.00.  Mr. Sohn does not testify that these hours billed are reasonable or necessary or non-duplicative. |
|---|---|

The Court still needs to know what this attorney and all of the other were

working on in order to satisfy Rule 23(h).  Co-Lead Class Counsel knew that when it asked the Court to enter Case Management No. 5.  Now, having failed to submit its substantiating data, Co-Lead Class Counsel asks that the Court rely upon its recollection of the services rendered since the inception of this litigation; and trust Mr. Seeger for the rest – for a new grand total of 50,962.39 hours approved by Mr. Seeger because "he deemed[6] all work being billed reasonably, necessary, and non-duplicative." [7] *See* ECF No. 7152-2 at ¶¶ 72-73, 75-76 and repeated in the Omnibus Reply.  Co-Lead Class Counsel cannot, by deeming these hours reasonable, necessary, and non-duplicative, substitute his conclusory opinion for evidence or his judgment for that of this Court.

## PRAYER

---

[6] Mr. Seeger also apparently "deemed" that common-benefit work he requested be (a) performed by and (b) submitted by counsel for the Alexander Objectors not to be worthy of submission.  Specifically, Class Counsel solicited Lance Lubel to meet in Florida and in New York to assist on behalf of all objectors to discuss options in an attempt to avert appeal.  Counsel incurred time and expense responding to these requests.  Counsel submitted reports of, *inter alia*, this time and expense in response to Mr. Seeger's July 25, 2016 request for common benefit submissions.  Mr. Seeger did not submit those materials to the Court.  Additionally, he fails to address discussions between Co-Lead Class Counsel and the Alexander Objectors' lawyer regarding ambiguities in the initial settlement agreement, which were later rectified in a subsequent agreement.

[7]  The Alexander Objectors contemporaneously seek leave of this Court to conduct limited discovery on the conclusory matters within Co-Lead Class Counsel's Petition for Fees to (a) aid the Court in conducting a meaningful review of the submission and (b) to provide the Alexander Objectors with a meaningful opportunity to object to the submission.  As previously outlined in the Alexander Objectors' Motion for Entry of Case Management Order Governing Applications for Attorneys Fee (ECF 7176) and the Alexander Objectors' Objections to the Petition (ECF 7355), there is no possibility that the Court can find or the Alexander Objectors can determine whether the hours billed are duplicative or in accordance with Case Management Order No. 5 in the absence of this discovery.

For the reasons set forth herein, and in their Alexander Objectors' objections and response in Opposition to Co-Lead Class Counsel's Petition, the Alexander Objectors ask the Court to deny or defer Class Counsel's Petition and enter a Case Management Order establishing filing deadlines and a schedule for submission of data in support of common-benefit fee petitions in accordance with Article XXI Of the Settlement.

Date: April 21, 2017

Respectfully Submitted,

*/s/ Lance H. Lubel*

Mickey Washington
Texas State Bar No.: 24039233
WASHINGTON & ASSOCIATES, PLLC
1314 Texas Ave., Suite 811
Houston, Texas 77002
Telephone: (713) 225-1838
Facsimile: (713) 225-1866
Email: mw@mickeywashington.com

James Carlos Canady
Texas State Bar No.: 24034357
THE CANADY LAW FIRM
5020 Montrose Blvd., Suite 800
Houston, TX 77006
Telephone: (713) 284-5204
Facsimile: (713) 284-5250
Email: ccanady@canadylawfirm.com

Lance H. Lubel
Texas State Bar No.: 12651125
Adam Voyles
Texas State Bar No.: 24003121
Justin R. Goodman
Texas State Bar No.: 24036660
LUBEL VOYLES LLP
Montrose Blvd., Suite 800
Houston, TX 77006
Telephone: (713) 284-5200
Facsimile: (713) 284-5250
Email: lance@lubelvoyles.com
adam@lubelvoyles.com
jgoodman@lubelvoyles.com

Attorneys for Melvin Aldridge, Trevor Cobb, Jerry W. Davis, Michael Dumas, Corris Ervin, Robert Evans, Anthony Guillory, Wilmer K. Hicks, Jr., Richard Johnson, Ryan McCoy, Emanuel McNeil, Robert Pollard, Frankie Smith, Tyrone Smith, James A. Young Sr., and Baldwin Malcom Frank

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record via the Court's ECF system on April 21, 2017.

*/s/ Justin R. Goodman*