# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

## FANECA OBJECTORS' REPLY IN SUPPORT OF THEIR
## PETITION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

The Faneca Objectors submit this Reply in Support of Their Petition for an Award of Attorneys' Fees and Expenses to address issues relevant to their petition.[1]

---

[1] The Faneca Objectors submit this reply pursuant to this Court's Policies and Procedures, General Motion Practices ¶2. This reply responds to Co-Lead Class Counsel's Omnibus Reply Memorandum in Further Support of Petition for Award of Attorneys' Fees and Reimbursement of Expenses, Adoption of Set-Aside from Monetary and Derivative Claimant Awards, and Case Contribution Awards for Class Representatives, and in Opposition to Objectors' Cross-Petitions for Awards of Attorneys' Fees and Expenses, Dkt. 7464; Petition of Objectors Preston and Katherine Jones for Award of Attorneys' Fees for Successful Efforts To Improve the Settlement for NFL Europe League Players, Dkt. 7364; and Curtis L. Anderson's Second Supplemental Objection to Class Counsel's Fee Petition, Dkt. 7370.

## ARGUMENT

I. **The Faneca Objectors Worked To Improve the Settlement, Not To Derail It**

"I just want to be absolutely clear up front, we want a settlement. There's no question we want a settlement." Dkt. 6463 at 69:8-10. So began the fairness hearing argument of counsel for the Faneca Objectors.

This sentiment was conveyed in the words and the actions of the Faneca Objectors throughout these proceedings. In their very first filing, they sought to **strengthen the settlement**, requesting intervention "for purposes of participating in settlement negotiations." Dkt. 6019-1 at 27-28 (emphasis added). They reaffirmed their commitment to settlement in the opening line of their objection, "agree[ing] that 'the interests of all parties would be best served by a negotiated resolution.'" Dkt. 6201 at 1. They did so again at the fairness hearing, Dkt. 6463 at 69:8-10, and also on appeal, Faneca CA3 Br. 62 ("The Faneca Objectors believe all parties would benefit from a settlement of this case."). The Faneca Objectors did not attempt to "torpedo" or "block the Settlement." Dkt. 7464 at 40. Rather, they aimed only to do what they ultimately did – improve the settlement and ensure its fairness, adequacy, and reasonableness through adversarial litigation.

The Faneca Objectors pursued that goal with deliberate speed, raising deficiencies early on and joining requests for expedited briefing. *See* Dkt. 7366 at 7 & n.5. Still, Co-Lead Class Counsel accuse the Faneca Objectors of delay, faulting them for appealing: "Nor were [the Faneca Objectors] content with improvements that they *now* extol and robustly value at anywhere from $102.5 to $120.4 million but, instead, appealed this Court's final approval decision to the Third Circuit." Dkt. 7464 at 40.[2] That attack is misplaced. Before appealing, the

---

[2] To the extent Co-Lead Class Counsel suggest that the Faneca Objectors downplayed the value of their enhancements on appeal, that is false. The Faneca Objectors showed complete

Faneca Objectors negotiated directly with the NFL, hoping to secure further benefits for individuals with CTE and avoid appeal altogether. Dkt. 7070-1 at 18-19. Only when that effort did not succeed did they appeal. Those appellate proceedings – combined with the Faneca Objectors' independent negotiations with the NFL – ensured that the Final Settlement was both fair, adequate, and reasonable under the law and the most generous settlement that could be had. Indeed, courts have found it "vital" that "unnamed class members who object to proposed settlements" have the opportunity "to appeal" to address issues that may be of benefit to the class. *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 881 (7th Cir. 2000). Denying the Faneca Objectors credit for the settlement enhancements they secured simply because they advocated for *further* improvements on appeal undermines that principle.

## II.     The Efforts of the Faneca Objectors Increased the Value of the Settlement by More Than $100 Million

Co-Lead Class Counsel oddly argue that the improvements did not result from the Faneca Objectors' efforts. But this Court's order suggesting those improvements shows otherwise. Co-Lead Class Counsel also attack the value of the Faneca Objectors' improvements. But that challenge ignores evidence – much of it their own – and relies on faulty assumptions.

### A.     The Faneca Objectors Are Responsible for the Improvements to the Settlement

As it was preliminarily approved, the Revised Settlement negotiated by Co-Lead Class Counsel did not guarantee a baseline assessment examination for every class member, did not provide Eligible Season credit for NFL Europe, limited Death with CTE payments to class members who died before preliminary approval, and charged financially needy class members a

---

transparency. They acknowledged that the Final Settlement brought "[m]uch benefit . . . to the class." Faneca CA3 Br. 1. They also stated that the improvements "substantially enhanced the benefits to the class" and could "exceed $100 million" in value. *Id.* at 22. Tellingly, Co-Lead Class Counsel did not dispute that valuation before the Third Circuit.

$1,000 appeal fee.  The Faneca Objectors challenged each of those deficiencies and suggested revisions to cure them.  Their briefs, oral arguments, and even charts used at the fairness hearing did so in detail.  *See, e.g.*, Dkt. 7070-1 at 36-38; Dkt 6469 at 28, 33, 37.  The Court ultimately agreed, urging the settling parties to address those deficiencies and "enhance the fairness, reasonableness, and adequacy of" the settlement.  Dkt. 6479 at 1.

Co-Lead Class Counsel now claim that "the Court . . . proposed the changes" so the Faneca Objectors are not entitled to attorneys' fees.  Dkt. 7464 at 41.  But the Court explained that it had "reviewed [among other things] . . . the objections to final approval of the Class Action Settlement filed by various objectors and their counsel . . . and the arguments . . . at the November 19, 2014 Fairness Hearing and the post-Hearing submissions."  Dkt. 6479 at 1.  "***After reviewing these submissions and arguments***," the Court continued, "I believe that the following changes would enhance the fairness, reasonableness, and adequacy" of the settlement.  *Id.* (emphasis added); *see also In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 370 (E.D. Pa. 2015) ("*NFL Concussion I*").  The Court thus directly tied its suggested improvements to objectors' submissions.  And it was the Faneca Objectors' submissions that first identified and most fully analyzed four of the five deficiencies highlighted by the Court.  *See* Dkt. 7070-1 at 17.  The Faneca Objectors are entitled to attorneys' fees for that success.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 963 (9th Cir. 2009) (reversing denial of objectors' fees where district court "was not focused on" settlement's deficiencies before objectors raised them but, following objection, addressed the deficiencies).

Co-Lead Class Counsel assert that courts "uniformly decline[ ] to award attorneys' fees to objectors" where the court did not rely on objectors' arguments or where objectors' arguments paralleled the court's.  Dkt. 7464 at 41.  Not so.  It is "unfair to counsel when, seeking to protect

4

his client's interest and guided by facts apparent on the record, he spends time and effort to prepare and advance an argument which is ultimately adopted by the court, but then receives no credit therefor because the court was thinking along that line all the while." *Green v. Transitron Elec. Corp.*, 326 F.2d 492, 498-99 (1st Cir. 1964).  Similarly, a court cannot "den[y] a fee to objectors . . . on the ground that [it] had already decided, without telling anyone," that the settlement was deficient.  *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002). It would be patently unfair to force objectors to "decide whether to object without knowing what objections may be moot because they have already occurred to the judge." *Id.* at 288.[3]  Thus, even if the Court would have urged improvements without the assistance of the Faneca Objectors and the comprehensive evidentiary record they developed, the Faneca Objectors are still entitled to attorneys' fees.[4]

> **B.    The Evidence Supports the Faneca Objectors' Valuation of the Improvements**

As the Faneca Objectors have explained, the changes to the settlement resulting from their advocacy are extremely valuable.  Co-Lead Class Counsel admit that those changes are worth as much as $45.8 million in additional award payouts.  Dkt. 7464-12 at 3 & tbl. 1.  But the

---

[3] *See also Fraley v. Facebook, Inc.*, No. C 11-1726, 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014) (fees appropriate "where an objector advances a point not previously made by other parties or objectors even if the Court would have *sua sponte* reached the same conclusion"); *Park v. Thomson Corp.*, 633 F. Supp. 2d 8, 11 (S.D.N.Y. 2009) (objectors "entitled to an award of fees even where the Court would have likely reached the same result, with or without the objectors' comments"); *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ.6689, 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003) (similar).

[4] None of the cases cited by Co-Lead Class Counsel (at 41-42) justifies denial of the Faneca Objectors' fee request.  Those cases did not involve complex and difficult issues like those the Faneca Objectors addressed here, and the objectors in those cases did not submit the sort of thorough and comprehensive analysis and evidence that the Faneca Objectors submitted.  *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 169 F. Supp. 3d 719, 721 (N.D. Ohio 2016) (rejecting fees for "boilerplate objections"); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 132 (S.D.N.Y. 2009) (rejecting fees for "general and repetitive" objections).

true value ranges from $102.5 million to $122.6 million. Dkt. 7070-1 at 20-28; Dkt. 7366-1 at 7.[5] While Co-Lead Class Counsel call that valuation "pure fantasy," it is rooted in applicable law and evidence, including the opinion of valuation expert Joseph Floyd.[6]

**NFL Europe.** Co-Lead Class Counsel's updated actuarial analysis for this improvement actually yields a ***higher valuation*** than what the Faneca Objectors' expert predicts. Dr. Vasquez, Co-Lead Class Counsel's actuarial expert, projects an additional $41 million in payouts from the Monetary Award Fund to players in NFL Europe. *Compare* Dkt. 7464-12 at 7 (Vasquez Updated Analysis), *with* Dkt. 7366-1 at 10 (Floyd Declaration).[7]

**BAP Fund.** Co-Lead Class Counsel assign no value to the Final Settlement's guarantee of a baseline assessment examination for every class member. Dkt. 7464-12 at 8. Dr. Vasquez, their actuary, concedes that the "increase in participation rates and the eligibility of European players is expected to increase the number of baseline exams, and their attendant costs." *Id*. And he acknowledges that under certain "circumstance[s], . . . the combination of BAP exams and Supplemental Benefits [will] exhaust[] the $75 million cap," in which case "***the NFL parties***

---

[5] The Faneca Objectors' expert, Mr. Floyd, originally estimated the value of the improvements at $120.4 million. As explained in the Supplemental Declaration of Mr. Floyd, attached hereto as Exhibit A, the increased participation rates from the Updated Analysis provided by Co-Lead Class Counsel increase that valuation by $2.2 million, to $122.6 million. Floyd Supp. Decl. at 2.

[6] By contrast, the Updated Analysis of Dr. Vasquez is not evidence. Unlike Mr. Floyd, Dr. Vasquez did not submit his expert report under penalty of perjury. Instead, the Updated Analysis was attached to a declaration by Co-Lead Class Counsel. That is not sufficient. *Cf. Fowle v. C&C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (rejecting as evidence in summary judgment proceedings expert report that was not attached to an affidavit or deposition of the expert, but submitted only with declaration of counsel).

[7] The Jones Objectors in their fee petition argue that the NFL Europe enhancements are worth only $20 million. Dkt. 7364-1 at 5-6. They do not say how they arrived at that estimate, nor do they submit any expert or evidentiary support. *Id.* Their valuation is pure guesswork. They also discount the value on the assumption that not all class members from NFL Europe will register for the settlement. Dkt. 7364-1 at 5-6. For the reasons described below, *see* pp. 17-19, *infra*, that is inappropriate. *See* Dkt. 7633 at 10-16.

***will be required to fund a BAP Examination beyond the cap.*** " *Id.* (emphasis added). Then, without explanation, he dismisses that possibility as "speculative." *Id.*

Dr. Vasquez ignores that, in approving the Final Settlement, this Court relied on his earlier analysis in assuming that the "average BAP Supplemental Benefit per Retired Player will range from $35,000 to $52,000." *NFL Concussion I*, 307 F.R.D. at 411. Indeed, that range comes directly from Dr. Vasquez's declaration in support of Co-Lead Class Counsel's motion for final approval. *See* Dkt. 6423-21 ¶28. As the Faneca Objectors explained, if supplemental benefits are maintained at the level this Court contemplated, then providing a baseline examination for every eligible class member ***will inevitably*** push payments from the BAP fund well beyond $75 million. *See* Dkt. 7070-1 at 21-22; Dkt. 7366-1 at 5-7.[8] What Dr. Vasquez dismisses as "speculation" is, in fact, reality supported by evidence introduced by Co-Lead Class Counsel and incorporated in the findings of this Court.

**Death with CTE.** Co-Lead Class Counsel also undervalue the expanded Death with CTE benefit. They call the Faneca Objectors' reliance on a 96% prevalence rate for CTE in the NFL population an "untenable assumption[]." Dkt. 7464 at 43; *see also* Dkt. 7370 at 4. It is not. It is the calculated prevalence rate in retired NFL players for CTE as diagnosed through post-mortem autopsy by neuropathologists at Boston University's Brain Bank.[9] That is precisely

---

[8] Additionally, Dr. Vasquez's assertion that the value of the BAP enhancement is "speculative" is conclusory and unsupported by any analysis. It carries no weight. *See Montgomery v. Mitsubishi Motors Corp.*, 448 F. Supp. 2d 619, 631 (E.D. Pa. 2006) (rejecting expert's "conclusory statement").

[9] *See* McKee *et al.*, *The Spectrum of Disease in Chronic Traumatic Encephalopathy*, 136 Brain 43, 59 (2013) (33 of 34, or 97%, of retired NFL players diagnosed with CTE); Breslow, *76 of 79 Deceased NFL Players Found To Have Brain Disease*, Frontline (Sept. 30, 2014), http://www.pbs.org/wgbh/pages/frontline/sports/concussion-watch/76-of-79-deceased-nfl-players-found-to-have-brain-disease/ (76 of 79, or 96.2%, of retired NFL players diagnosed with CTE); Breslow, *New: 87 Deceased NFL Players Test Positive for Brain Disease*, Frontline (Sept.

what the payment for Death with CTE compensates: a "post-mortem diagnosis of CTE made by a board-certified neuropathologist." Dkt. 6481-1 Ex. 1 ¶5. Thus, the 96% prevalence rate is not an assumption; it is a measure of Death with CTE in the NFL population as *Co-Lead Class Counsel themselves have defined the Qualifying Diagnosis*.

Indeed, it is Dr. Vasquez's assumptions that are unrealistic. Dkt. 7464-12 at 8. He declares the prevalence rate of CTE in NFL retirees who died between 2010 and 2012 to be 7.55%. He calculates that rate by dividing the number of players who died and were later diagnosed with CTE, 32, by the total number of players who died, 424. But Dr. Vasquez's calculation rests on two untenable assumptions: (1) He assumes that *every player with CTE* had his brain submitted for testing, and (2) he assumes that *every player* whose brain was not submitted was free of CTE. In fact, during the period 2010-2012, testing of players' brains was just gaining momentum, and as testing has continued, the vast majority of them have tested positive for CTE.[10]

Co-Lead Class Counsel further assert that the Faneca Objectors have overvalued the Death with CTE benefit by failing to account for Qualifying Diagnoses that individuals who died with CTE may have received years earlier. Dkt. 7464 at 43 n.37; Dkt. 7464-12 at 8 n.6. But the purpose of the Death with CTE payment was to compensate "Retired Players who died prior to final approval [and who] *did not have sufficient notice that they had to obtain Qualifying Diagnoses*." *NFL Concussion I*, 307 F.R.D. at 397 (emphasis added); *cf.* Dkt. 6423-1 at 59-60.

---

18, 2015), http://www.pbs.org/wgbh/frontline/article/new-87-deceased-nfl-players-test-positive-for-brain-disease/ (87 of 91, or 95.6%, of retired NFL players diagnosed with CTE).

[10] Dr. Vasquez does not disclose the source of his data, but the time frame he selected (2010-2012) and the number of NFL players diagnosed with CTE (32) suggests that Dr. Vasquez is relying on Professor Ann McKee's benchmark study *The Spectrum of Disease in Chronic Traumatic Encephalopathy*. McKee 2013, *supra* n.9. That study actually *supports* the Faneca Objectors' 96% prevalence rate: Prof. McKee examined the brains of 34 former NFL football players and determined that 33 had CTE. *Id.* at 49-51, 59 & tbl. 2.

The individuals who pre-deceased approval of the Final Settlement thus had no reason to seek out a Qualifying Diagnosis.[11]

**Hardship Waiver of Appeal Fee.**  Finally, Co-Lead Class Counsel assign no value to the appeal-fee hardship waiver.  They assert that the Faneca Objectors' $10.9-million valuation rests on an "apples-to-oranges comparison" between the appeals process under the Final Settlement and the appeals process for the NFL disability program.[12]  According to Co-Lead Class Counsel, the two are not comparable because the settlement will be run by an independent Court-appointed Administrator, and Class Counsel will have a "role in overseeing the Settlement's implementation and ensuring fair treatment."  Dkt. 7464 at 44.  But the NFL disability program is also independently run and subject to court supervision.  "[A]ll claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision," 29 C.F.R. § 2560.503-1(b)(7), and disability decisions "may be appealed to federal courts," L. Elaine Halchin, Cong. Research Serv., RL34439, Former NFL Players: Disabilities, Benefits, and Related Issues 82 (2008).[13]

Thus, nothing suggests the rate of successful appeals will differ between the Final Settlement and the disability benefits program.  If anything, the settlement may see *more* successful appeals.  Under the Final Settlement, Co-Lead Class Counsel may appeal claim determinations on behalf of a class member or may file in support of a class member's appeal. Dkt. 6481-1 §§ 9.5, 9.7(c).  Co-Lead Class Counsel's participation in the appeal process no doubt

---

[11] Co-Lead Class Counsel also give no indication that any class member who died between preliminary and final approval actually received a diagnosis that could be deemed a Qualifying Diagnosis.

[12] Dr. Vasquez calls this effort "speculative" but gives no explanation or analysis why.  Dkt. 7464-12 at 2 n.3.  That conclusory assertion is not entitled to any weight.  *See* p. 7 n.8, *supra*.

[13] *Available at* http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1530&context=key_workplace.

will ensure that most (if not all) questionable claim determinations are appealed and will likely lead to greater success on appeal. Thus, reliance on NFL disability benefits data therefore probably *understates* the number of successful appeals under the Final Settlement – and the value of eliminating the appeal fee in cases of financial hardship.

### III.  The Faneca Objectors' Fee Request Is Reasonable

The Faneca Objectors performed two valuable services for this Court and the class. They tested, through three years of hard-fought litigation, the fairness of a historic settlement of tremendous public interest. *See* Dkt. 7070-1 at 33-36. And they conferred between $102.5 and $122.6 million in additional monetary benefit to the class, without any guarantee of payment for their work. *Id*. at 36-39; Floyd Supp. Decl. at 2. The award they seek, between 16.3% and 19.5% of the benefit conferred, is eminently reasonable. Dkt. 7070-1 at 39-47.[14]

#### A.  The Faneca Objectors' Litigation Efforts Were Extensive, Were Justified, and Should Not Be Devalued

The improvements did not – and could not have – come easily. A settlement was negotiated early in the proceedings, after filing of the complaint and argument on a motion to dismiss raising one issue. The resulting Initial Settlement reflected an intricate set of trade-offs over complex legal and scientific issues – and yielded a substantial settlement valued at $760 million. It was defended by some of the nation's finest corporate defense lawyers and a team of highly experienced, highly credentialed plaintiffs' lawyers. Any objector hoping to improve the settlement faced enormous challenges.

---

[14] Where an objector's efforts result in an increase in settlement value, courts routinely apply the percentage-of-recovery method to calculate objector fees. *See, e.g.*, *McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 660 (E.D. Pa. 2015) (applying percentage-of-recovery method to calculate objector's fee); *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 396 (D.N.J. 2012) ("[T]he Court concludes that a percentage-of-recovery analysis applies here to assess the objectors' fee request.").

Thus, the Faneca Objectors recognized that achieving real benefits for the class would require litigating the case as if they were parties. They had to understand the complex scientific and legal issues involved, build a record, and present arguments holding the settling parties to their burden of proof to justify the settlement's "line drawing."

With those considerations in mind, the Faneca Objectors moved to intervene, Dkt. 7070-1 at 8-9, opposed preliminary approval of the Revised Settlement, *id.* at 9-10, and petitioned the Third Circuit for early review of the preliminary-approval order, *id.* at 10-11. With those considerations in mind, the Faneca Objectors filed an extensive objection and supplemental briefing, *id.* at 11-14, recruited eleven leading neuroscientists to file declarations in support of their objection, *id.* at 12-13, 15-16, and filed motions seeking discovery, *id.* at 13-14. With those considerations in mind, they negotiated directly with the NFL, and when that failed, appealed to the Third Circuit. *Id.* at 18-20. When the Third Circuit affirmed, and it became apparent that they had achieved all they could, the Faneca Objectors stopped. They did not seek *en banc* review, nor did they file a petition for a writ of certiorari. *Id.* at 20.

Co-Lead Class Counsel try to devalue that effort, painting the Faneca Objectors as the sort of gadfly objectors who are heavily criticized by courts and commentators alike. *See, e.g.*, Wright & Miller, 7B Fed. Prac. & Proc. Civ. § 1797.4 (3d ed. 2017). They assert that the Faneca Objectors' fee award should be reduced to exclude time spent on filings that did not succeed or contentions that the Court did not ultimately adopt. But that is wrong for two reasons.

***First, Co-Lead Class Counsel are wrong on the facts***. As the Third Circuit explained, the Faneca Objectors made "well-intentioned [and] thoughtful arguments against certification of the class and approval of this settlement," with the "aim [of] ensur[ing] that the claims of retired players are not given up in exchange for anything less than a generous settlement agreement

11

negotiated by very able representatives." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 447 (3d Cir. 2016) ("*NFL Concussion II*").  Throughout the litigation, the Faneca Objectors focused on a few key issues: the treatment of CTE, the treatment of NFL Europe, the 75% reductions, and the procedural hurdles impeding recovery under the settlement. Dkt. 7070-1 at 9-10.  The Final Settlement contained at least some improvement in three of those four areas.  Co-Lead Class Counsel's assertion that the Faneca Objectors spent their time "losing," Dkt. 7464 at 44, makes no sense.  Indeed, the Faneca Objectors won for the class benefits that Class Counsel could not achieve.

Moreover, the Faneca Objectors held the settling parties to ***their*** burden.  While Co-Lead Class Counsel may have preferred to have the Faneca Objectors simply accept their bald assertions about CTE, the class was entitled to have that issue evaluated by the Court based on all the evidence and the views of all the experts – not just those selected by Co-Lead Class Counsel and the NFL.  *See, e.g.*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 743-44 (3d Cir. 2001) (noting objector can make "substantial" contribution "by providing an adversarial context in which the district court could evaluate . . . fairness").[15]  Indeed, both the Third Circuit and this Court devoted substantial portions of their decisions to arguments raised by the Faneca Objectors.  *NFL Concussion II*, 821 F.3d at 428-33; *NFL Concussion I*, 307 F.R.D. at 374, 376-

---

[15] *See also UFCW Local 880–Retail Food Emp'rs Joint Pension Fund v. Newmont Mining Corp.*, 352 F. App'x 232, 236 (10th Cir. 2009) (noting objectors add value through "transforming the fairness hearing into a truly adversarial proceeding" or "supplying the Court with both precedent and argument to gauge the reasonableness of the settlement"); *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1227 (8th Cir. 1982) (similar); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 367-68 (E.D.N.Y. 2010) (awarding fees although objector did not change terms of settlement); *Park*, 633 F. Supp. 2d at 11 (awarding fees despite inviting settlement amendments on own initiative); *In re Visa Check/MasterMoney Antitrust Litiig.*, No. CV-96-5238, 2005 WL 2077286, at *11 n.5 (E.D.N.Y. Aug. 25, 2005) (noting courts have granted objector fee requests despite overruling objections); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 353-54 (S.D.N.Y. 2005) (awarding objector fees despite unsuccessful objections); *Newberg on Class Actions* § 15.60 (5th ed. 2016).

79, 383-85, 388-95, 397-406, 408-09, 411-14, 419-20.  Courts do not do that for frivolous or wasteful arguments.

***Second, Co-Lead Class Counsel are wrong on the law*.**  Co-Lead Class Counsel contend that "objectors play a much more limited role in class action litigation than do class counsel" and thus the Court should not "award them fees for all of their work conducted in the course of the litigation."  Dkt. 7464 at 44.  In fact, "objectors' entitlement to a fee rests upon the same common fund principles as class counsel's, and hence there is no reason 'to create a distinction between class and objector's counsel on fee calculation.'"  *Newberg on Class Actions* § 15.94 (5th ed. 2016) (quoting *Rodriguez v. W. Publ'g Corp.*, 602 F. App'x 385, 386 n.1 (9th Cir. 2015)).  In a case like this, where almost the entire proceeding revolved around the settlement, objectors and class counsel are on nearly equal footing in terms of their participation in the case and the role that each played.

Co-Lead Class Counsel are also wrong to assert that objectors' fees must be discounted for arguments that ultimately are unsuccessful.  "Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning probably is not serving his clients vigorously enough; losing is part of winning."  *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1053 (9th Cir. 1991) (declining to "scalpel out attorney's fees" for unsuccessful arguments).  A party that "won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."  *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983).  Indeed, the Supreme Court has cautioned district courts not "to apportion the fee award mechanically on the basis of [the party's] success or failure on particular issues."  *Id*. at 438.  Thus, "[w]here a [litigant] has obtained excellent results" – as the Faneca Objectors have – "his attorney should recover a fully compensatory fee."  *Id.* at 435.

Nothing in the cases cited by Co-Lead Class Counsel suggests otherwise. Those cases mainly stand for the unremarkable proposition that awarding objectors' fees using a lodestar approach (without a multiplier) is appropriate where the objector achieved no measurable improvement in settlement value.[16] Other cases cited by Co-Lead Class Counsel reduced fees where an objector's arguments were duplicative, where the objector's total investment was vastly disproportionate to the requested fee, or where the objector engaged in vexatious litigation conduct.[17] None of those concerns are present here.

### B. The Faneca Objectors' Lodestar Multiplier Is Reasonable

Co-Lead Class Counsel complain that the Faneca Objectors seek "more favorable" treatment than Class Counsel. That is not true. The Faneca Objectors' proposal would leave more than 82% of the Attorney's Fees Qualified Settlement Fund for Class Counsel. While Class Counsel deserve – and likely will receive – a large reward for their efforts in this case, their attempt to characterize this as a typical case where an objector shows up at the eleventh hour

---

[16] *See Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 513 (D. Del. 2003) (denying fees where objector achieved no improvement in settlement value and did no more than cite a single relevant case); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 359 (N.D. Ga. 1993) (awarding objectors almost 5% of class counsel's fees "even though their objections did not prevail"); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at 367-68 (awarding objector half his lodestar when efforts merely "served to clarify the proposed Settlement"); *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 278 (E.D.N.Y. 2009) (applying lodestar method where objectors' estimate of settlement improvement was vastly higher than the court's estimate of total settlement value); *Lobur v. Parker*, 378 F. App'x 63, 65 (2d Cir. 2010) (affirming use of lodestar method where "objections arguably resulted in no increase in the class settlement's value").

[17] *See In re Riverstone Networks, Inc.*, 256 F. App'x 168, 170 (9th Cir. 2007) (using lodestar method where "objections [were] similar to those already raised by another objector"); *Sobel v. Hertz Corp.*, 53 F. Supp. 3d 1319, 1333 (D. Nev. 2014) (applying lodestar method where objector's "investment was minimal in relation to the award"); *Mirfasihi v. Fleet Mortg. Corp.*, No. 01-cv-722, 2007 WL 2608778, at *7 (N.D. Ill. Sept. 6, 2007) (reducing objector's fee by half for vexatious litigation conduct); *Azizian v. Federated Dep't Stores, Inc.*, No. C-03-3359 SBA, 2006 WL 4037549, at *9 (N.D. Cal. Sept. 29, 2006) (recommending denial of fees where objectors "did not increase or protect the value of the settlement or otherwise substantially benefit the Class").

after substantial effort by class counsel, *see* Dkt. 7464 at 53-54, falls flat.  Class Counsel request an award of the full $112.5 million that the Final Settlement earmarks for attorneys' fees, plus 5% of the settlement awards of individual class members – ***without having taken any discovery***.  There was limited motions practice, no contested class certification, no summary judgment practice, and no trial.  The litigation was about whether the settlement was fair, reasonable, and adequate – pitting the Faneca Objectors against Co-Lead Class Counsel and the NFL.

Co-Lead Class Counsel spent over half of their five-year involvement in this case litigating the fairness of the settlement against the Faneca Objectors.  Dkt. 7151-2 ¶¶53-62.  The Faneca Objectors stood toe-to-toe with Co-Lead Class Counsel – and the NFL.  Under those circumstances, it is reasonable to allocate a substantial portion of the attorneys' fees to the Faneca Objectors, who successfully fought for more than two years to extract more than $100 million more from the NFL.

Co-Lead Class Counsel's authorities only prove that the Faneca Objectors' participation cannot be compared to that of objectors in typical cases.  Co-Lead Class Counsel cite two cases where objectors invested under 100 hours complaining of the allocation of attorneys' fees or a reversion provision in the settlement.  *See Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 815-16 (N.D. Ohio 2010); *Park v. Thomson Corp.*, 633 F. Supp. 2d 8, 13 (S.D.N.Y. 2009).  Those cases say nothing about the appropriate objector fees in a case where the objector vigorously litigated the substance of the settlement with the parties, and obtained major improvements as a result.

Co-Lead Class Counsel's complaint that the Faneca Objectors' proposed fee award would result in a higher multiplier for the Faneca Objectors than for Class Counsel likewise

fails.[18]  First, the Faneca Objectors bore far more risk than Class Counsel, making a higher multiplier appropriate.  The NFL agreed to settle quite early in this case, and thereafter Class Counsel faced relatively little risk of nonpayment.  The Faneca Objectors, meanwhile, were faced with trying to secure further improvements to a settlement that was the product of two months of intense negotiations, and which had already been improved once as a result of this Court's actions.

Second, Class Counsel's asserted lodestar is inordinately large.  Class Counsel billed 50,962.39 hours, which they value at $40,586,228.60.  Dkt. 7464-1 ¶2; Dkt. 7464-2 ¶6.  They do not break up that lodestar by task, as the Faneca Objectors did, making it impossible to assess the efficiency of their efforts.  However, assuming that Class Counsel spent approximately as much time defending the settlement as the Faneca Objectors spent testing it – a reasonable assumption given the comparable scope and quality of the parties' filings in this case – that leaves over ***$36 million*** of professional time spent on: pre-suit investigation, preparation of the long-form, short-form, and class-action complaints, briefing and argument of the limited motion to dismiss, settlement negotiations, and preparation of the notice.  *Id.* ¶¶ 12-52.  That is not reasonable.  It results in an artificially high lodestar and an artificially low lodestar multiplier.

Moreover, twenty-four law firms or individual lawyers are included in Class Counsel's fee petition, but the negotiating team apparently consisted of just six individuals and their firms: Mr. Seeger, Mr. Weiss, Mr. Levin, Ms. Nast, Mr. Locks, and Mr. Marks.  Dkt. 7151-2 ¶25.  Of those, Mr. Levin and Ms. Nast joined in the negotiations late in the game.[19]  Excluding those

---

[18] Co-Lead Class Counsel do not dispute that the multiplier sought by the Faneca Objectors falls within the range considered reasonable by this and other courts.  Dkt. 7070-1 at 47-48.

[19] Negotiations began in January 2013, Dkt. 7151-2 ¶24, but Mr. Levin was not recruited as Subclass 1 Counsel until July 2013, Dkt. 7151-6 ¶2f.  Ms. Nast, meanwhile, first met with Mr. Turner about representing Subclass 2 in August 2013.  Dkt. 7151-2 ¶129.

attorneys' firms and appellate counsel, Mr. Issacharoff, the remaining attorneys billed almost *$9 million* – over twice the Faneca Objectors' lodestar – despite the early resolution of this case. For example, Mr. Gibbs's firm billed approximately $280,000 for activities such as drafting portions of the motion for final approval, preparing for and attending the fairness hearing, and drafting portions of the appellate brief. Dkt. 7151-15 ¶¶2, 5. Mr. Girardi's firm billed approximately $472,000 for unspecified efforts that were "critical to the investigation of groundbreaking facts, creation of liability against the [NFL] and litigating the case up to and including the arguments on the NFL's Motions to Dismiss." Dkt. 7151-16 ¶2. All of these efforts may be justifiable standing alone. But Class Counsel cannot accuse the Faneca Objectors of litigating this case inefficiently where their own petition provides little detail and raises substantial concerns about duplication of effort or unnecessary work.

Moreover, Class Counsel have not identified which of the firms seeking fees will also be paid through contingency fee contracts that will allow them to capture part of any award their clients receive. Counsel for the Faneca Objectors have no such "double dipping arrangements."[20]

### IV. The Faneca Objectors' Response to the Jones Objectors' Fee Petition and the Objection of Curtis Anderson

The Faneca Objectors take no position on whether the Jones Objectors are entitled to a fee award for their objection to the Revised Settlement's treatment of NFL Europe. *See* Dkt. 7364-1 at 10-11. The Faneca Objectors note, however, that they identified and raised the settlement's unfair treatment of NFL Europe before any other objector, and did so more fully and in greater detail. The Faneca Objectors' July 2, 2014 opposition to Co-Lead Class Counsel's

---

[20] For example, counsel for the estate of Kevin Turner may receive up to 45% of any recovery, Dkt. 7029 ¶6, on top of the fees they seek from the attorneys' fees fund, Dkt. 7151-8.

motion for preliminary approval explained that "the Revised Settlement, while releasing all claims of NFL Europe players, does not award class members 'Eligible Season' credit for time spent playing in NFL Europe or its predecessors." Dkt. 6082 at 28. Their October 6, 2014 objection expanded on that point. Dkt. 6201 at 34-36; *see also* Dkt. 7070-1 at 10, 14, 16. Importantly, unlike most other objectors, the Faneca Objectors submitted evidence describing the conditions in NFL Europe and the severity of injury that NFL Europe players sustained. *See* Dkts. 6201-6 Ex. 25, 6201-7 Ex. 26, 6201-17. Others who objected to treatment of NFL Europe simply echoed those arguments. Indeed, some – including the Jones Objectors – expressly joined in the Faneca Objectors' submission. *See* Dkt. 6235 at 2 ("The Jones Objectors share the objections to Class Action Settlement of Sean Morey *et al.*, filed October 6, 2014."); Dkt. 6237 at 2.

For his part, Objector Anderson expressly opposes the Faneca Objectors' fee request, arguing that "any quantification of the benefits produced by the enhancement must await the actual filing, evaluation, and payment of claims." *See* Dkt. 7370 at 4.[21] But as the Faneca Objectors explained, class members' "right to share the harvest of the lawsuit . . ., whether or not they exercise it, is a benefit in the fund created by the efforts of" objectors' counsel. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980); *see also* Dkt. 7366 at 10-16. Thus, contrary to Objector Anderson's suggestion, it is the "maximum possible benefits" available for the class to claim that matters for purposes of determining a fee award. *See, e.g., Gascho v. Glob. Fitness*

---

[21] Elsewhere, Objector Anderson argues that basing attorneys' fees "'on the entire settlement amount . . . creates a potential conflict of interest between absent class members and their counsel.'" Dkt. 7370 at 1 (quoting *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013)). That concern justifies a reduced settlement valuation only where "counsel has not [sought] an award that adequately prioritizes direct benefit to the class." *Baby Prods.*, 708 F.3d at 178. It does not apply to objectors' counsel, who throughout the proceedings maintain an adversarial relationship with both class counsel and defendants. *See* Dkt. 7366 at 11 n.12.

*Holdings, LLC*, 822 F.3d 269, 282-88 (6th Cir. 2016); Dkt. 7366 at 10-16.  That is the value that resulted from the Faneca Objectors' efforts.  That is the value on which attorneys' fees should be based.

## CONCLUSION

For those reasons, the Court should grant the Faneca Objectors' Petition for an Award of Attorneys' Fees and Expenses.

Dated:  April 25, 2017

Respectfully Submitted,

*/s/ Steven F. Molo*

| | |
|---|---|
| William T. Hangley<br>Michele D. Hangley<br>HANGLEY ARONCHICK SEGAL<br>PUDLIN & SCHILLER<br>One Logan Square<br>18th & Cherry Streets<br>27th Floor<br>Philadelphia, PA  19103<br>(215) 496-7001 (telephone)<br>(215) 568-0300 (facsimile)<br>whangley@hangley.com<br>mdh@hangley.com<br><br>Linda S. Mullenix<br>2305 Barton Creek Blvd., Unit 2<br>Austin, TX  78735<br>(512) 263-9330 (telephone)<br>lmullenix@hotmail.com | Steven F. Molo<br>Thomas J. Wiegand<br>MOLOLAMKEN LLP<br>430 Park Ave.<br>New York, NY  10022<br>(212) 607-8160 (telephone)<br>(212) 607-8161 (facsimile)<br>smolo@mololamken.com<br>twiegand@mololamken.com<br><br>Eric R. Nitz<br>MOLOLAMKEN LLP<br>600 New Hampshire Ave., NW<br>Washington, DC  20037<br>(202) 556-2000 (telephone)<br>(202) 556-2001 (facsimile)<br>enitz@mololamken.com |

*Counsel for the Faneca Objectors*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2017, I caused the foregoing Faneca Objectors' Reply in Support of Their Petition for an Award of Attorneys' Fees and Expenses to be filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties.

*/s/ Steven F. Molo*