# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civil Action No. 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**REBUTTAL EXPERT DECLARATION OF**
**Joseph J. Floyd**
**April 25, 2017**

FLOYD ADVISORY LLC
155 FEDERAL ST, 14TH FLOOR
BOSTON, MA 02110

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................................1

II.  EXPERT QUALIFICATIONS ...............................................................................................1

III. ANALYSIS OF THE VASQUEZ REPORT ........................................................................2

    A.  Effect of Increased Participation Rates ........................................................................2

    B.  Uncapping the BAP Fund .............................................................................................3

    C.  NFL Europe Eligible-Season Credit ............................................................................3

    D.  Expanded Qualifying Diagnosis for Death with CTE ...................................................3

    E.  Elimination of Appeal Fee ............................................................................................4

I, Joseph J. Floyd, declare as follows pursuant to 28 U.S.C. § 1746:

## I. INTRODUCTION

I have been engaged by MoloLamken LLP ("Objectors' Counsel") as an accounting and finance expert. In that capacity, I have assessed the reasonableness of MoloLamken LLP's estimated value of the improvements to the June 25, 2014 Settlement Terms ("Added Value of Improvements"). I have also conducted independent valuation analyses to test the assumptions and judgments made by MoloLamken LLP.

On March 27, 2017, I submitted the Expert Declaration of Joseph J. Floyd ("Floyd March 27 Report"). I have been asked by Objectors' Counsel to evaluate and respond to certain analyses and opinions contained in the April 10, 2017 Updated Analysis of the NFL Concussion Settlement prepared by Thomas Vasquez, Ph.D. ("Vasquez Report").[1]

## II. EXPERT QUALIFICATIONS

Class Counsel has described their reliance on the Vasquez Report as follows: "In this respect, Class Counsel rely on the accompanying valuation performed by Dr. Vasquez, an economist with longstanding expertise in this field who has engaged in developing economic models for U.S. and foreign governments, and who has been consulted in numerous litigations and whose Declaration accompanies this memorandum. Earlier, Dr. Vasquez had prepared a valuation of the Settlement that Class Counsel filed with the Court in support of Final Approval. See ECF No. 6423-21. By contrast, the valuation that the Faneca Objectors have submitted is from a CPA having no demonstrable experience in the specific realm of settlement valuations. See ECF No. 7366, at 5-6."[2]

Settlement valuations are analogous to damage calculation analyses. As stated in the Floyd March 27 Report, "[d]uring my approximately thirty-four-year career in the accounting and consulting profession, I have worked on numerous financial analysis engagements, valuation assignments, financial reporting projects, and other similar assignments, including intellectual property valuations and damages calculations."[3] A settlement valuation analysis is performed in the same way as a damage calculation: quantifying the harm, and probability of occurrence to determine the value attributable to the settlement terms. The methodology and estimates used need to be analyzed and evaluated in the same way to ensure the analyses are reasonable and appropriate. Therefore, my experience in damage calculation analyses qualifies me to opine on the value of the settlement in this case.

---

[1] This report is limited to my opinions set forth herein and was not intended to address every analysis or opinion presented in the Vasquez Report. Therefore, the lack of discussion in this report related to specific analyses and opinions set forth in the Vasquez Report does not constitute my agreement with such analysis or opinion.
[2] ECF No. 7464 at pg. 43, FN 36.
[3] Floyd March 27 Report at pg. 2.

1

## III. ANALYSIS OF THE VASQUEZ REPORT

### A. Effect of Increased Participation Rates

According to the Vasquez Report, the increase in participation rates estimated in 2014, due to the trend in the registration patterns in the first eight weeks, results in added value of approximately $41.1 million to the Monetary Award Fund ("MAF").[4]

The Vasquez Report's updated participation rate calculation impacts my Floyd March 27 Report calculation for any added value items which use an estimate based on an average from the November 2014 Vasquez Declaration, attached as an exhibit in the Vasquez Report. The added value items that rely on such estimates are the Elimination of Appeal Fee and the NFL Europe Eligible-Season Credit. The increase in the participation rate has a relative value increase for each average. In other words, as more people will participate, the respective averages will increase, leading to a total increase of $2.2 million. With this update, the total added value of improvements from my Independent Valuation Assessment increases to $122.6 million, calculated by taking the added value from the Floyd March 27 Report of $120.4 million[5] and adding the increase of $2.2 million.

The increase attributable to the Elimination of Appeal Fee is $0.7 million, calculated by increasing the average amount funded per eligible player of $187,709[6] by the relative increase in the participation rate from 59.3% to 63%.[7] The increase in the participation rate yields an increase in the average to $199,421. The new average is then used against the estimated 58 deterred players[8] to calculate the new added value of improvements of $11.6 million. The new added value is compared to the added value calculated in the Floyd March 27 Report of $10.9 million[9] to calculate the increase of $0.7 million.

The increase attributable to the NFL Europe Eligible-Season Credit is $1.5 million, calculated by increasing the average eligible class member funded per season of $11,185[10] by the relative increase in the participation rate from 59.3% to 63%.[11] The increase in the participation rate yields an increase in the average to $11,883. The new average is then used against the additional 2,143 eligible seasons[12] to calculate the new added value of improvements of $23.6 million, after adjusting for the estimated amount funded of

---

[4] Vasquez Report at pg. 3, Table 1, and pg. 6.
[5] Floyd March 27 Report at pg. 3
[6] Floyd March 27 Report at Exhibit C.
[7] Vasquez Report at pg. 5.
[8] Floyd March 27 Report at Exhibit C.
[9] Floyd March 27 Report at Exhibit C.
[10] Floyd March 27 Report at Exhibit C.
[11] Vasquez Report at pg. 5.
[12] Floyd March 27 Report at Exhibit C.

2

NFL Europe only players at zero eligible season of $1.8 million.[13] The new added value is compared to the added value calculated in the Floyd March 27 Report of $22.1 million[14] to calculate the increase of $1.5 million.

### B.  Uncapping the BAP Fund

The Vasquez Report states that "[t]he increase in participation rates and the eligibility of European players is expected to increase the number of baseline exams, and their attendant costs. However, any such increased cost is still well-within the $75 million provisioned in the BAP Program for such exams."[15]

The Vasquez Report does not attempt to quantify the incremental value created. As described in the Floyd March 27 Report, "[i]n this section, as described above, I have calculated the maximum possible estimated pay out of Supplemental Benefits. I have not considered the $75 million cap, which depending on the Court's actions may still be applicable to the Supplemental Benefits. Further, a major variable in assessing the Value Added of Improvements if a cap on Supplemental Benefits remains will be the timing of when exam costs are used as they may absorb a large percentage of the cap."[16]

### C.  NFL Europe Eligible-Season Credit

The Vasquez Report calculates added value of approximately $30 million resulting from the eligibility of NFL Europe seasons. According to the Vasquez Report, "[t]he calculation of additional MAF payments was made by adding the additional seasons to each affected player and recalculating the MAF award. This was done for each affected player and added to a total across all affected players."[17]

The calculation referenced in the Vasquez Report uses a life cycle forecasting model.[18] As discussed in the Floyd March 27 Report, I do not have access to this model as it was not provided to me, nor does it appear to be an easily replicated model. In assessing the calculation in my Floyd March 27 Report, I evaluated the inputs and assumptions that are used in the model to assess the reasonableness of applying an average value from that calculation.

### D.  Expanded Qualifying Diagnosis for Death with CTE

The Vasquez Report states that "[i]t is difficult to precisely estimate the additional payments to players who died and were diagnosed post-mortem with CTE during this period of time. Indeed, the authors of available

---

[13] Floyd March 27 Report at Exhibit C.
[14] Floyd March 27 Report at Exhibit C.
[15] Vasquez Report at pg. 8.
[16] Floyd March 27 Report at pg. 7, FN 16.
[17] Vasquez Report at pg. 7.
[18] Vasquez Report at pg. 4

3

studies of former players concerning CTE admit bias in the cases examined (only players with observed symptoms were studied). However, the reports of post-mortem pathological diagnoses of CTE in former players in recent years provide relevant data for the purpose of approximating potential additional claims. Among the 424 former players who died between 2010 and 2012, 32 or 7.55% reportedly had post-mortem pathological diagnoses characteristic of CTE."[19]

An appropriate method for estimating the number of former NFL players who will be diagnosed with CTE upon death would be based on analyzing all deceased NFL players. The majority of players who have died were not tested for CTE, so this method is not an option. I used the number of NFL players found to have CTE as a percentage of all players who have been tested for CTE, whereas the Vasquez Report appears to use the number of NFL players found to have CTE as a percentage of all deceased NFL players. The flaw in the Vasquez Report's approach lies in the fact that the majority of former NFL players who died were never tested for CTE. The Vasquez Report's estimate thus assumes that all former NFL players who have died and have not been tested for CTE do not have CTE. The only possible bias in my estimate is that the population of players tested for CTE may have had greater concerns of CTE than the population of untested players. I have not seen any evidence that this is true and, therefore, deem my approach reasonable.

### E.     Elimination of Appeal Fee

Per the Vasquez Report, Dr. Vasquez asserts that he is "not able to value the last two changes to the Settlement, because attempting to value those changes, namely, providing a waiver of the $1,000 appeal fee for Class Members demonstrating financial hardship and allowing a reasonable accommodation for Class Members who do not possess medical records in support of a Qualifying Diagnosis due to force majeure type events, would be speculative."[20]

The Vasquez Report does not refute that a benefit exists by the waiver of the fee, and has chosen not to comment upon my analysis.  Rather, the Vasquez Report simply does not offer any opinion as to the value of the waiver of the fee.

Restatement (Second) of Contracts § 352 (1981) states: "Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[21] This statement addresses the notion that reasonable certainty must be proven based on the permitted evidence. Per Restatement (Second) of Contracts § 352 (1981), the reasonable certainty standard does not require an exact calculation, but rather an estimate. By analogy, valuing the benefits of a settlement requires no more than reasonable certainty.

---

[19] Vasquez Report at pg. 8.
[20] Vasquez Report at pg. 2, FN 3
[21] Restatement (Second) of Contracts § 352 (1981)

As described in the Floyd March 27 Report, "I calculated the size of this population relative to the entire Eligible Class Members with a Qualifying Diagnosis. The 58 Eligible Class Members represent less than one quarter of one percent, a relatively de minimis amount. In assessing the reasonableness of this conclusion, I rely on accepted behavioral science theories, notably the loss aversion (prospect theory) and rational choice.[22] Importantly, loss aversion means that people make decisions that value losses far greater than gains. In this case, losing $1,000 can be a deterrent for many in the rejected population. In addition, rational choice means that with nothing to lose, and knowledge of potential upside, the rejected players would be motivated to appeal due to the waiver of the appeal fee if they are in financial stress. Based on the nominal amount of players estimated in the additional population, and these behavioral science theories, the amount calculated by Objectors' Counsel appears reasonable and conservative as a valuation estimate."[23]

---

[22] Encyclopedia Britannica, "Prospect Theory," https://www.britannica.com/topic/prospect-theory.
Encyclopedia Britannica, "Rational Choice Theory," https://www.britannica.com/topic/rational-choice-theory.
[23] Floyd March 27 Report at pgs. 11-12.

*******

I reserve the right to supplement or amend this declaration as additional relevant information becomes available and to address issues raised by other witnesses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 25, 2017 in Boston, MA.

_____
   Joseph J. Floyd