# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE RETIRED PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>*Plaintiffs' Second Amended Master Administrative Long-Form Complaint*, and:<br><br>_____ *v. National Football League, et al.* (Plaintiffs _____ and _____ ONLY)<br><br>Court File No. _____ | Hon. Anita B. Brody |

**SECOND AMENDED MASTER LONG-FORM COMPLAINT**
**PURSUANT TO COURT ORDER DATED _____**

## I.   <u>**INTRODUCTION**</u>

1.       Plaintiffs are retired professional football players who played in and as part of the

National Football League and have opted out of the class action settlement in *In Re: National*

*Football League Retired Players' Concussion Injury Litigation*, 30 F.R.D. 357 (E.D. Pa. 2015).

Plaintiffs and Plaintiff Spouses bring these individual claims against  Defendants the National

Football League (the "NFL"),  NFL Properties, LLC , individually and as successor in interest to

National Football League Properties, Inc. (hereafter and interchangeably "NFL P"), and

RIDDELL, Inc., RIDDELL SPORTS GROUP, INC., ALL AMERICAN SPORTS CORP., BRG

SPORTS, INC. f/k/a EASTON-BELL SPORTS, INC., BRG SPORTS, LLC f/k/a EASTON

BELL SPORTS, LLC, EB SPORTS CORP., and BRG SPORTS HOLDINGS CORP. f/k/a BRG

HOLDINGS CORP. ("RIDDELL") in their individual capacities as well as their respective

successor-in-interest capacities (hereinafter the "NFL", "NFL P", and "RIDDELL" and

collectively as the "Defendants"), for equitable relief, compensatory damages and punitive

damages.  Plaintiffs make the following allegations based upon personal information and

knowledge as to their own acts and upon information, belief and investigative efforts as to

Defendants' long-term actions and misconduct.

2.       Hundreds of individual and class actions were filed in state and federal courts on

behalf of thousands of retired professional football players who had suffered concussions and the

impact of long term repetitive head trauma.  The retired professional football players were

deceived by Defendants and never told that the repetitive blows to the head caused during play

and practice could and would cause long term injuries, and in some instances, deaths.

3.       By Order entered on January 31, 2012, the Multi-District Litigation Panel (the

"MDL Panel") transferred all such actions then pending to this Court.  *See* Transfer Order, *In Re:*

*National Football League Players Concussion Injury Litigation*, MDL No. 2323, Dkt. 1.  By

Order of this Court, a class action settlement was reached with many of the claimants and finally approved on May 8, 2015.

4.      Plaintiffs and their spouses herein have opted out of the Class Action (collectively referred to herein as "Opt Out Plaintiffs").

5.      On April 12, 2017, this Court entered an Order, wherein it directed the filing of a Long Form Master Complaint on behalf of the.

6.      This Second Amended Master Complaint is a filed pursuant to CMO __, and is a to serve the administrative functions of efficiency and economy as described by the Court more fully in *In Re: Propulsid Product Liability Litigation*, 208 F.R.D. 133, 141 (E.D. La. 2002), and to present certain common claims and common facts for appropriate action by this Court in the context of this Multidistrict proceeding.  This Master Complaint does not include all claims asserted in all actions that have been transferred to this Court under 28 U.S.C. § 1407 and/or in all actions brought by and on behalf of the "Opt Out Plaintiffs."  Those matters are set forth in the individual Short-Form Complaints filed by Plaintiffs and served against these Defendants. This Master Complaint does not constitute a waiver or dismissal of any actions or claims that are or will be asserted in the Short-Form Complaints.

## II.      SUMMARY OF DEFENDANTS' MISCONDUCT AND RESULTING DANGERS, DAMAGES, INJURIES, DEATHS AND CLAIMS

7.      This Master Complaint filed on behalf of the Opt Out Plaintiffs, their Spouses, and/or their Representatives summarizes and sets forth an unparalleled story in American sports history that has been on the front pages of the nations' newspapers for nearly five years.  As even recognized by some of the doctors the Defendants impaneled to review its actions, the NFL, NFL P and RIDDELL have viewed the human beings touted as the champions of football as mere statistics and used and deceived them in order to monetize the violence and continue professional

1346553.5

play.  Defendants consistently believed and acted in concert and fundamentally, by agreement, to meet their primary goals: to maximize profits and attain maximum market share through the continuous deception that professional football was not potentially lethal, that the professional players were not putting themselves at constant risk as a result of the repetitive head trauma, and that the RIDDELL helmets selected by Defendants were intended to protect them at all.  As set forth herein, since the 1960s, Defendants[1] the NFL, NFL P, and RIDDELL have possessed actual knowledge connecting concussive and subconcussive blows to latent brain disease.

8.      Defendants, as alleged herein, agreed to engage in tortious and injurious conduct and to conceal material facts regarding the connection between blows to the head and latent brain disease from these Plaintiffs, victims in football's chronic-brain-disease concealment-fraud: the football-community stakeholders the families, the children, and players at all levels.  Every impact to the brain is dangerous.  Both concussive and subconcussive events can cause permanent brain damage.  Plaintiffs have sustained physical injuries, pain and suffering, economic losses, and (in certain instances) gruesome wrongful deaths for which their survivors continue to experience anguish.

9.      As yet, the full NFL/RIDDELL story remains unknown, as discovery has not yet commenced.  Nonetheless, there is ample evidence supporting that Defendants acted in concert and that their actions demonstrate a profound and endemic disregard for the basic medical, ethical and societal standards.  The egregiousness of Defendants' long term scheme of deception, omission and misconduct is underscored by the fact that the players relied upon Defendants and

---

[1] The corporate entities sued by Plaintiffs in this case have been held, over the fifty-plus-year time-span at issue in this case, in a number of corporate forms: the "NFL"; "NFL P"; and "RIDDELL."  This is particularly true with respect to RIDDELL.  Nevertheless, it is Plaintiffs' understanding the present defendants in this case would—if established—have liability for the sum of the conduct, acts, omissions, misrepresentations, and concealments alleged.

trusted them.  Defendants' deliberate disregard for medical, ethical and societal norms led to actions that breached a wide array of legal norms, such that punitive damages present a necessary corollary and part of this litigation.  The claims set forth below sound in tort and in equity.

10.     Without the players ever knowing, scientific evidence has linked brain trauma to long-term neurological problems for decades.

11.     Although Defendants knew or should have known of this growing body of scientific evidence concerning concussions, subconcussive impacts and brain disease, Defendants never told Plaintiffs or their families of the dangers of repeated brain trauma resulting in long-term brain damage.

12.     Defendants developed sham-science and spent decades engaging in a scheme of silence and duplicity.   Defendants developed, licensed, and marketed the game without disclosing the truth about the real risks and dangers.  Defendants knowingly developed, licensed and marketed ineffective harm-reduction technology in the form of football helmets incapable of protecting the players from subconcussive and concussive traumas, which resulted in latent disease, about which the players had no knowledge or suspicion.

13.     These entities have engaged in deceptive-marketing, licensing, and sham-science, even funneling millions of dollars to 501(c)(3) entity NFL Charities to gain financial benefit in this process.

14.     Defendants were not merely negligent in warning the world-wide football community, but were motivated to protect their profits over the risk of disclosure of truth. Plaintiffs are entitled, for the reasons set forth below—and for the supplemental and additional reasons described in their Short Form Complaints and which will be uncovered through discovery – to prevail in substantial measure on an individual basis.

-4-

15.     This "playbook" is *well-analogized* to "Big Tobacco;" overlapping leadership in the NFL, NFL P and RIDDELL advanced and actually funded the advertisement and promotional campaign of deception in marketing this most dangerous, deadly game[2].

16.     Defendants, and each of them, breached their common law duties to Plaintiffs, the athletic community, the medical community and all members of society, as referenced in the tables below:

### NEGLIGENCE SUMMARY TABLE

| DEFENDANT(S) | DUTY OF CARE OWED OUTSIDE 29 U.S.C. § 185(a) |
|---|---|
| All Defendants | Undertook, as stated in the second published paper in *Neurosurgery*, to "scientifically investigate concussion" and to "reduce injury risks in football" with "neither the authority nor the inclination to impose outside medical decision-making on the medical staffs of the individual teams." |
| NFL | Undertook a duty to the football community to act non-negligently with respect to supervising NFL Charities and its use of "MTBI Grants" as a means of funneling money toward *de facto* defense expert witnesses.<br><br>Undertook a duty to the football community from the early 1960s on.<br><br>Negligently created, supervised, entrusted, and retained the "MILD TRAUMATIC BRAIN INJURY COMMITTEE" and enlisted members in **this non-clinical capacity** to opine on the effects of mild and moderate head impacts. |

---

[2] Pellman, EJ, Concussion in Professional Football: Repeat Injuries Part 4 *Neurosugery* October 2004 860-876.  The members of the Board of the major tobacco companies were also the members of the Boards of Defendants here.  The lawyers that advised both sets of entities were the same.  The public relations companies and advertising companies were also the same.  Interestingly, if not predictably, their marketing decisions were analogous to one another.  The stated purpose was the same:  to promote and market their deadly products without disclosure of the true risks and dangers.

| DEFENDANT(S) | DUTY OF CARE OWED OUTSIDE 29 U.S.C. § 185(a) |
|---|---|
| NFL P | Negligently licensed protective equipment as the official helmet of the NFL with the knowledge these helmets could not protect against subclinical or MTBIs.<br><br>RIDDELL/NFL P had a joint employee paid to ensure all licensed equipment was safe, knowing that this was a literal impossibility; this was a business deal. |

### RULE 9(b) SUMMARY TABLE OF DEFENDANTS' FRAUDULENT CONDUCT

| WHO? | WHAT? | WHEN? |
|---|---|---|
| Defendant NFL | Knew that MTBI caused latent brain disease from its clinical studies with U.S. Dept. of Defense and outside studies; | **1960s** |
| | Knew helmet technology did work with a softer-shell alternative proposed capable of mitigating significant harms; | **1969** |
| | Buried proposal to create a computerized injury surveillance system for eight years until football-helmet crisis began being managed; | **1972** |
| | Provided direct financial incentives to self-governing protective-equipment body responsible for "regulatory" measures over football helmets (keeping testing standards and warning labels in place for 40 years with actual knowledge such standards are useless); | **1972-Present** |
| | Researched the link between subclinical head trauma and amyotrophic lateral sclerosis ("ALS") with money funneled by NFL Charities, concealing results; | **1987** |

| **WHO?** | **WHAT?** | **WHEN?** |
|---|---|---|
|  | Funneled money to NFL Charities for "MTBI grants," which would fund the sham-science geared toward litigation avoidance including giving direct financial incentives to NOCSAE and to scientists; | **1997-2011** |
| Defendants NFL P and NFL | Agreed with RIDDELL to an exclusive agreement making the "official helmet of the NFL" the RIDDELL-branded helmet, and requiring as part of this deal, that an individual would ensure all equipment under the deal to be the safest possible; this individual was to have been a joint-employee of RIDDELL and an NFL subsidiary entity or the NFL. RIDDELL promises the NFL free helmets for any club where more than 80% of players wear RIDDELL. | **1988 or Spring 1989-2013** (conflicting date appears in the published Court opinion of *RIDDELL, Inc. v. Schutt;*[3] Plaintiff's good-faith research suggests the agreement to have occurred at one of these two times) |
|  | Agreed with NOCSAE (the National Operating Committee on Standards for Athletic Equipment) to control the research into helmets. | **1968** NOCSAE established to insulate liability and create arms-length appearance for NFL, NCAA, and helmet manufacturers. |
| Defendant RIDDELL | Agreed with NFL P to an exclusive agreement making the "official helmet of the NFL" the RIDDELL-branded helmet, and requiring as part of this deal, that an individual would ensure all equipment under the deal to be the safest possible; this individual was to have been a joint-employee of | **1988 or Spring 1989-2013** (conflicting date appears in the published Court opinion of *RIDDELL, Inc. v. Schutt;*[4] |

---

[3] 724 F. Supp. 2d 981 (W.D. Wis. 2010)

[4] *Id.* (Plaintiff's good-faith research suggests the agreement to have occurred at one of these two times)

| **WHO?** | **WHAT?** | **WHEN?** |
|---|---|---|
|  | RIDDELL and an NFL subsidiary entity or the NFL. RIDDELL promises the NFL free helmets for any club where more than 80% of players wear RIDDELL. |  |

## III.    JURISDICTION AND VENUE

17.    This Court has previously determined it has subject matter jurisdiction in certifying a Settlement Class pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act or "CAFA") and retains subject matter jurisdiction because this is a "Mass Action" and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  In addition, this Court has supplemental jurisdiction over the opt-out claims under 28 U.S.C. § 1367.

18.    Venue properly lies in this district pursuant to 28 U.S.C. §§1391(a) and (b) and pursuant to 28 U.S.C. §1407 because the Judicial Panel on Multi-District Litigation decided to transfer these cases to this forum; because a substantial part of these events or omissions that give rise to the claims occurred within the transferor forum, and because the Defendants conduct a substantial part of their business within the transferor forum.

## IV.    EQUITABLE ESTOPPEL – TIME-BASED DEFENSES

19.    As specifically alleged herein, this action sets forth a fifty-plus-year conspiracy with particularity that lulled Plaintiffs into inaction and/or intentionally hid these causes of action from Plaintiffs.

20.    Consequently, the Defendants are estopped from asserting time-based defenses where Plaintiffs did not discover nor reasonably could not, at any earlier time, discovered that their manifested injuries (distinguished from on-field football-blows) had a causal connection to on-football blows, or to the Defendants' fraud.

21.     Defendants are further estopped from asserting a time based defense since one set of the Plaintiffs are either opt outs or ineligible under the class settlement yet, during the pendency of the class action, those individuals were unable to prosecute their claims.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     FRAUDULENT CONCEALMENT

22.     Defendants had decades' worth of science and research linking concussions and subconcussive blows to latent brain disease.   Defendants have known or should have known of the risks and dangers of these latent brain diseases, including dementia, Alzheimer's, ALS or Lou Gehrig's disease, Parkinson's, and Chronic Traumatic Encephalopathy.  Defendants knew or should have known of the science and research well before Plaintiffs ever played even Pop Warner and high school football and have known well after Plaintiffs stopped playing. Defendants have concealed from or failed to notify Plaintiffs, their families and the public of the full and complete nature of true risks, symptoms and dangers of these latent brain diseases.

23.     Although Defendants have now recently acknowledged the risks and dangers, Defendants did not fully disclose the seriousness of the issue and in fact, downplayed the widespread prevalence of the problem.

24.     Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.     FRAUDULENT ESTOPPEL

25.     Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions and subconcussive blows as well as latent diseases caused by these blows to the head.  They actively concealed the true character, quality, and nature of the risks and dangers and knowingly made misrepresentations about the characteristics, risks, and dangers.  Plaintiffs and reasonably relied

-9-

upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

### C.     DISCOVERY RULE

26.     The causes of action alleged herein did not accrue until Plaintiffs and their families discovered the latent diseases and/or diagnosed the terrible symptoms that Plaintiffs suffered without any knowledge of the cause.  Plaintiffs, however, had no realistic ability to discern that the symptoms they were experiencing were linked to latent brain disease, linked to the blows to the head they suffered during play until – at the earliest – after either the symptoms were finally recognized or after they learned of the Class Action lawsuit.  And even then, Plaintiffs had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the risks and dangers.

### VI.    ESTOPPEL – DEFENDANT NFL IS ESTOPPED FROM ASSERTING PREEMPTION UNDER SECTION 301(a) OF THE LABOR MANAGEMENT STANDARDS ACT

27.     Defendant NFL has had prior opportunity to litigate Section 301 preemption in the arbitral forum.  *See Henderson v. Dolphins* (Jan. 1988 – Kasher) and *Sampson v. Oilers* (Jul. 1988 – Kagel).

28.     Defendant NFL's prior opportunity resulted in a judgment on the merits in the arbitral forum in both *Henderson* and also in *Sampson*.

29.     The NFL was in privity with the National Football League Management Council in the prior actions.

30.     The NFL had a full and fair opportunity to litigate the jurisdictional issue of whether the tort claims should be arbitrated.  The NFL prevailed when taking the position that state law tort claims, tort damages, and punitive damages could *not* be arbitrated.

-10-

31.     Accordingly, Defendant NFL is estopped from seeking to take the opposite position in this litigation.

## VII.   THE PARTIES

### A.     THE OPT OUT PLAINTIFFS

32.     Allegations supporting the residency, the citizenship, exposures to repetitive head trauma, the years of play, the manifestation of latent disease, and damages of each individual opt-out plaintiff are intended to be set forth in the attached Amended Short-Form Complaints, Ex. "B".  In addition, where applicable, information pertaining to spouses and/or estates and/or personal representatives shall be set forth in the Amended Short-Form Complaints.

33.     Plaintiffs seek damages related to *all* exposures to repetitive head trauma and not merely those exposures sustained during the time Plaintiffs played as professional football players for Member Teams in the NFL.  Plaintiffs allege that Defendants undertook duties that apply in this case based upon Plaintiffs' time spent as youth players, high school players, collegiate players in addition the time spent during their former NFL careers.

34.     Further, Plaintiffs seek damages for the latent diseases to which they suffer, and about which they formerly had no knowledge or even familiarity.  Plaintiffs were unaware of even a potential risk of the latent diseases being a result of repetitive head trauma.

### B.     DEFENDANTS

35.     Defendant NFL is an unincorporated trade association and 501(c)(6) entity headquartered at 345 Park Avenue, New York, New York.

36.     Defendant NFL is a wholly separate entity from: "member-club" franchise-holders, or 32 NFL teams; Defendant NFL P; the NFL Foundation (as successor in interest to NFL Charities); NFL Ventures, LP; and the NFL Management Council.

-11-

37.     Defendant NFL's business has been and continues to be the promotion and organization of professional football.

38.     Defendant NFL does not engage in labor negotiations of any sort whatsoever with NFL football players nor their union, the NFL Player's Association (the "NFLPA").

39.     Defendant NFL P, or NFL P, individually and as successor in interest to NFL P, is a Delaware limited liability corporation headquartered in New York at the same address as Defendant NFL.

40.     Defendant NFL P is the licensing arm of the NFL and agreed to ensure that the equipment and materials it licensed and approved were of the highest possible quality and sufficient to protect the players from the risk of injury.

41.     Defendant NFL P does not engage in labor negotiations of any sort whatsoever with NFL football players nor their union, the NFL Player's Association (the "NFLPA").

42.     Defendant EASTON-BELL SPORTS, LLC is a Delaware corporation with its principal place of business in Van Nuys, California.

43.     Defendant EB SPORTS CORP. is a Delaware corporation with its principal place of business in Van Nuys, California, and is wholly owned by Easton-Bell Sports, LLC.

44.     Defendant EASTON-BELL SPORTS, INC. is a Delaware corporation with its principal place of business in Van Nuys, California, and is wholly owned by BRG HOLDINGS CORP.

45.     Defendant RIDDELL SPORTS GROUP, INC. is a Delaware corporation with its principal place of business in Texas, and is wholly owned by EASTON-BELL SPORTS, INC.

46. Defendant RIDDELL, INC. ("RIDDELL") is an Illinois corporation, headquartered in Rosemont, Illinois, with its principal place of business in Chicago, Illinois, and is wholly owned by RIDDELL Sports Group, Inc.

47. Defendant RIDDELL SPORTS GROUP, INC. ("RSG") is the parent of RIDDELL, Inc., incorporated in Delaware, but principally located in Rosemont, Illinois, formerly known as John T. RIDDELL, Inc. and operating as a subsidiary of BRG Sports, Inc. RSG is also the parent to ALL AMERICAN SPORTS CORPORATION, doing business as ALL AMERICAN RIDDELL/ALL AMERICAN ("ALL AMERICAN"), a Delaware Corporation with principal place of business in Irving, Texas.

48. Defendants RSG and ALL AMERICAN, according to SEC filings by RIDDELL Inc., have directly "engaged in the business of the design, reconditioning and direct sale of football and baseball helmets, shoulder pads, practice wear, uniforms and other protective equipment to teams and educational institutions."

49. On April 27, 2001, Defendant RSG, formerly known as RIDDELL Acquisition Sub, Inc. and RIDDELL Sports, Inc. purchased and is therefore the successor in interest of All American Sports Corporation, Equilink Licensing Corporation, Ridmark Corp., RHC Licensing Corp., MacMark Corp., and Proacq. Corp., which collectively, according to SEC documents, engaged in in the business of designing, reconditioning, and the direct sale of football helmets and other protective equipment to NFL teams and educational institutions.

50. Defendant RSG is also understood to be the successor in interest for Illinois Corporate entities R Holdings Corp., RAE Holdings, Inc., RIDDELL Sporting Goods Inc., which are all former RIDDELL entities.

-13-

51.     Defendant RSG, directly, and as successor in interest to its predecessors alleged above, participated in design, manufacture, sale, marketing, and distribution of football equipment, including RIDDELL helmets, to the public and the NFL.

52.     Defendant RSG also directly holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

53.     Defendant ALL AMERICAN employs sales representatives to market and sell RIDDELL football helmets and also reconditioned, sold, marketed, and/or distributed football helmets to the public and the NFL.

54.     Defendant ALL AMERICAN has admitted that its employees also work for Defendant RIDDELL, Inc.

55.     Defendant ALL AMERICAN has, since approximately 1983, placed warning labels onto commercially reconditioned Defendants' helmets.

56.     Defendant ALL AMERICAN holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology used in RIDDELL-branded football helmets.

57.     Defendant RSG is a wholly-owned subsidiary of Defendant BRG Sports, Inc., a Delaware corporation and the successor in interest to Easton-Bell Sports, Inc.

58.     Defendant BRG SPORTS Inc. ("BRG SPORTS"), formerly known as Easton-Bell Sports, Inc., is a Delaware corporation with its principal place of business in California.

59.     Defendant BRG SPORTS, INC., a corporate holding company of leading brands that design, develop and market innovative sports equipment, protective products, including helmets, apparel and related accessories, announced in 2016 that it had appointed Dan Arment to

-14-

President and Chief Executive Officer of BRG Sports.  In addition, Mr. Arment was promoted to CEO of RIDDELL, Inc.  The offices of the President and CEO of BRG SPORTS and RIDDELL, Inc. are in Rosemont, Illinois.

60.     Defendant BRG SPORTS develops football-helmet-related patents and other intellectual used in RIDDELL-branded football helmets, and sold, manufactured, marketed, distributed, and reconditioned in Illinois.

61.     Defendant BRG SPORTS, by and through its predecessor in interest EASTON-BELL, directly marketed and licensed RIDDELL products.

62.     Defendant BRG SPORTS, LLC ("BRG LLC"), formerly known as Easton-Bell Sports[5], LLC was also formerly known as RIDDELL Holdings, LLC.  BRG LLC is a Delaware corporation with its principal place of business in New York that directly participates in the design, development, marketing and distribution of branded athletic equipment and accessories, including RIDDELL football helmets and football protective equipment.

63.     Defendant BRG LLC, itself, and by and through its subsidiaries and affiliates, designs, develops, and tests RIDDELL football helmets intended to be sold, marketed, distributed, purchased, manufactured and/or reconditioned in operations in Illinois.

64.     BRG LLC makes strategic decisions for and with RIDDELL, INC., ALL AMERICAN, and RSG and directly participates in its subsidiaries' operations in Illinois.

65.     Defendant BRG SPORTS HOLDINGS CORP. ("BRG HOLDINGS") formerly known as RBG HOLDINGS CORPORATION is a Delaware corporation with its principal place of business in Van Nuys, California that is doing business in Illinois.

---

[5] In September 2004, Bell Sports merged with RIDDELL Sports to form RIDDELL Bell, and in February 2006, RIDDELL Bell merged with Easton Sports to form Easton-Bell Sports.

66.     BRG HOLDINGS has jointly purchased and contracted for joint indemnity and defense Commercial General Liability coverage with Aspen Specialty Insurance Company alongside all of these related RIDDELL DEFENDANTS, covering both non-products claims and also products liability claims in the State of Illinois.

67.     BRG HOLDINGS holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL-branded football helmets.

68.     BRG HOLDINGS holds and/or held $382,608,333.33 in secured notes, either due, extended, or past-due from its subsidiaries, including BRG LLC, doing business in Illinois.

69.     EB SPORTS CORP. ("EB SPORTS") is a Delaware corporation with its principal place of business in Van Nuys, California and is a wholly owned subsidiary of BRG LLC.

70.     EB SPORTS holds itself out in its media releases as a "designer, developer, and marketer" of football equipment products, including RIDDELL football helmets.

71.     EB SPORTS holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

72.     RIDDELL, INC., RSG, ALL AMERICAN, BRG SPORTS, INC., BRG INC., BRG LLC, BRG HOLDINGS, and EB SPORTS CORP., are collectively referred to herein as "RIDDELL" or, along with their co-Defendants, the "conspirators"  The RIDDELL entities collectively, the combination of actual and/or successor-in-interest entities comprise the chain responsible for RIDDELL's liabilities as alleged in this action for the manufacturing, distributing, reconditioning, selling, marketing, and advertising of RIDDELL football helmets and for the furtherance of the false science as alleged herein, in conjunction with the co-conspirators alleged herein.

-16-

## VIII.   SUMMARY OF THE CONSPIRACY

| WHO? | WHAT? | WHEN | NATURE/SCOPE |
|---|---|---|---|
| • NFL;<br><br>• NFL P (individually and as valid successor in interest entity);<br><br>• RIDDELL Entities as presently constituted where alleged, and as the successors in interest of the predecessor-in-interest entities;<br><br>• NOCSAE;<br><br>• Co-Conspirators NFL and related entities (licensing arm NFL P; 501(c)(3) NFL Charities); | • Agreed to induce reliance;<br><br>• Knew football helmets could not actually reduce harm with respect to injury from repetitive head trauma;<br><br>• Concealed dangers of repetitive head trauma and pushed "false" helmet tech advances as the key to a safer game;<br><br>• Sham research of "Independent" MTBI Committee;<br><br>• MTBI Committee engages paid experts to validate their test metrics and ultimately to publish papers based on knowingly fraudulent data;<br><br>• RIDDELL sponsors pendulum used in Biokinetics testing (flawed data from MTBI testing). | • NFL, NFL P and RIDDELL agree by 1965;<br><br>• RIDDELL participates in formation of NOCSAE in 1969;<br><br>• Funneled money to NFL Charities for "research" on whether a link exists between three cases of ALS on the 49ers to be conducted by Tobacco-industry-friendly neurologist and CTE denier<br><br>• Agree around April 1989 to provide helmets sufficient to protect from the risk of injury;<br><br>• NFL funnels grant money for MTBI to NFL Charities between 1997 and 2011. | • Needed football helmets at arms-length from pro football;<br><br>• RIDDELL faced extinction from skull-fracture/bleed litigation in the 1960s and needed corporate survival, also profits with increased brand recognition.<br><br>• Formal relationship began to legitimize futile safety equipment used not only by players, but also by children idolizing these players;<br><br>• NFL could shift liability and RIDDELL's brand recognition skyrockets after becoming official corporate "safety" device. RIDDELL could sell to schools, children, and also became helmet of USA Football (Youth Marketing Arm of NFL). |

1346553.5

73.     In a letter to The New York Times, a lawyer for the league said, "The N.F.L. is not the tobacco industry; it had no connection to the tobacco industry," which he called "perhaps the most odious industry in American history." www. NYTimes.com, March 24, 2016. https://www.nytimes.com/2016/03/25/sports/football/nfl-concussion-research-tobacco. However, the records show that the two businesses shared lobbyists, lawyers and consultants. Personal correspondence underscored their friendships, including dinner invitations and a request for lobbying advice. Key tobacco industry leaders were of course also key NFL leaders. Among those were the Miami Dolphins owner, Joe Robbie, and New York Giants co-owner Preston R. Tisch, who also partly owned a leading cigarette company, Lorillard, and was a board member of both the Tobacco Institute and the Council for Tobacco Research, the two entities that played a central role in misusing science to hide the risks of cigarettes.

74.     As alleged herein, in the face of growing knowledge of the risks and dangers of latent brain disease caused by repetitive concussions and subconcussive blows in the 1980s and 1990s, Defendants and others agreed to conceal, omit, and misrepresent material information from the general public about this link between repetitive head trauma and chronic brain damage.

75.     Defendants eventually worked with international corporations such as Honda and even with our own federal government in perpetrating a massive fraud that included but was not limited to the following:

- Continuing to conceal a known link between amytrophic lateral sclerosis and repetitive head trauma in NFL players by funneling $125,000 to in 501(c)(3) contributions to tobacco-industry-supported neurologist Dr. Stanley Appel to research the link between ALS and football;

- Funneling "MTBI grant" money to reputed defense-expert firm Exponent Failure Analysis, Inc., which has previously argued that secondhand smoke does not cause cancer, to devise neuropsychological test protocol under Dr. Robert Fijan, PhD;

-18-

- Funneling several hundred thousand dollars per year through the NFL's 501(c)(3) to David C. Viano, a professional defense-side expert in the automotive industry, who spent his entire career testifying for General Motors and other auto manufacturers in product liability lawsuits and has made millions of dollars doing it;

- Awarding payouts into the millions of dollars through the Bert-Bell/Pete Rozelle NFL Disability Plan for Total & Permanent Disability through the 1990s for <u>living</u> NFL football players diagnosed with chronic traumatic encephalopathy and other similar diseases;

- Funneling "MTBI grant" money to NOCSAE to support self-serving research endeavors;

- Publishing a total of 16 papers in the peer-reviewed journal Neurosurgery on "Concussion in Professional Football" premised on knowingly false data sets;

- Agreeing with Defendant RIDDELL to provide the safest possible football helmets licensed as the "official helmet of the NFL" with the RIDDELL name, while knowing that none of these helmets warned against the dangers of latent disease;

- Acknowledging in the 1990s that New York Jet, Al Toon's repetitive concussions had a "cumulative impact;"

- Attempting to create a fraudulent "concussion severity index" in the 1990s;

- Knowingly relying upon false data in concussion "epidemiology" research;

- Funneling money through the NFL's 501(c)(3) arm, NFL Charities to expert-witness firms such as the highly controversial "Exponent Failure Analysis", also infamous for its controversial (and discredited) work for Big Tobacco to create reports so flawed that Defendants largely have not cited them;

- Funneling money through the NFL's 501(c)(3) arm, NFL Charities to the fraudulent "MTBI committee" to support RIDDELL helmet products as superior, through flawed research at Wayne State University;

- Funneling money with fraudulent "MTBI grant" money to expert witness firms such as the highly controversial "Exponent Failure Analysis," also infamous for its controversial (and discredited) work for Big Tobacco;

-19-

- By the 1975 NFL season Nobel-prize-nominated physician Dr. Stephen Reid's ongoing work on football head-injury and helmets specifically observed **cumulative** effects of clinical and subclinical mild traumatic brain injury ("MTBI") occurring in on-field football play in NFL football players and had noted brain damage.

- On October 20, 1992, Lorillard Tobacco General Council Arthur J. Stevens (Chairman of the "Committee of Council" and Vice Chair of the Tobacco Institute's Communications Committee) hand-delivered a letter to NFL Commissioner Paul J. Tagliabue, Andrew Tisch (one of the Tobacco industry executives who lied to Congress), and Preston Tisch (co-owner of the New York Giants and Tobacco Institute Executive Committee member), advising them on the crime-fraud exception as relating to the scope of attorney-client communications in exposure-injury litigations.

76. Indeed, Defendants—all of whom assumed financial responsibility for this undertaking—wrote that their published sham-science journal articles that made notoriously false conclusions on brain injury applied not merely to NFL players but also to teenagers and children; NFL Commissioner Roger Goodell testified to Congress that "[w]e recognize that our example extends to all young athletes who play football" and further bragged in support that they had shared and publicized the controversial, and later-discredited MTBI Committee research.

77. RIDDELL committed tortious conduct in furtherance of its agreement with the Defendants to, at all relevant times, provide football players with a false sense of security that football helmets could protect players' brains from harm, keeping them safe.

## IX.   FACTUAL BACKGROUND

78. This case seeks financial compensation for the chronic injuries, expenses, and intangible losses suffered by Plaintiffs as a result of the Defendants' fraud and negligence.

79. Nearly a century ago, medical studies first revealed that athletes who suffer repeated blows to the head risk long-term brain damage.

80. The evidence since overwhelmingly establishes that the head trauma routinely inflicted in professional football games can cause neurocognitive decline, permanent mental

-20-

disability, and even death.  Concussive and subconcussive impacts cause mild traumatic brain injuries ("MTBI"), which have pathological and debilitating effects.

81.     The NFL -- as the central authority over professional football -- had a longstanding duty to protect players and the public from unreasonable harm.  From its inception in the 1920s, the NFL acted in accordance with that duty: it promulgated equipment standards, implemented rule changes, and created off-the-field programs designed to manage players' lives. Professional players and academic athletes of all ages relied on the NFL to live up to that image, and they trusted the NFL to exercise its enormous influence in a manner reasonably consistent with their health and well-being.

82.     The NFL's unique position at the apex of football, paired with its unmatched resources, afforded it unparalleled access to data reflecting the effects of head impacts on football players.  At all relevant times, the NFL's accumulated knowledge about head injuries to players, and the associated health risks therefrom, was at all times vastly superior to that readily available to the players.  That informational advantage, coupled with the NFL's position as the guardian of player safety, imposed upon the league a duty to inform the Plaintiffs, the athletic community, the medical community and the public at large of the risk of concussions.

83.     Instead the NFL ignored and concealed the information from the players and all others who participated in organized football at all levels.  The NFL breached its duty by failing to impose safety regulations to prevent or mitigate long-term brain damage, and by failing to inform NFL players, athletes at every level, the medical community and the public of the risks associated with MTBIs.

84.     Rather than protecting the players' health, the NFL did the opposite.  It exacerbated the health risk by promoting the violence of the game and lauding players for

returning to play despite being rendered unconscious or disoriented.  The league promoted the players as modern-day gladiators impervious to harm on the field.

85.  The NFL joined forces with NFL P and RIDDELL to conspire and conceal this latent risk from football players, helmet users, brand users, and from the community. Defendants' conspiracy to conceal has substantially contributed to cause the permanent, long term injuries now suffered by Plaintiffs, which were caused to their exposures long ago when they played the game.

86.  From 1994 to 2010, the NFL, NFL P and RIDDELL went a step further.  The Defendants created and/or decided to fund the Mild Traumatic Brain Injury Committee (the "MTBI Committee"), through the vehicle of the NFL Charities and grants funded by industry, ostensibly to research and study how MTBI affects NFL players.  By voluntarily inserting itself into the research and public discourse about MTBI, Defendants undertook a responsibility to make truthful statements; not to advance improper, biased, and falsified industry-generated studies; not to discredit well-researched and credible studies that came to a conclusion that did not comport with the Defendants' financial and political interests; and, to inform all former players, all then- current players, and the general football-playing public of the risks of MTBI in football.

87.  Defendants breached this duty by producing industry-funded research that falsely claimed that concussive and subconcussive head impacts in football do not present serious, life-altering risks.  Also, during this period, Defendants continued to fail to inform current and former players of the true risks associated with MTBI.

88.  For almost sixty years, Defendants actively and continuously denied any link between MTBI sustained by NFL players and other athletes while playing football games and

practices as well as the neurological symptoms and problems (such as headaches, dizziness, loss of memory, Alzheimers, dementia, ALS and Parkinsons) from which they now suffer. Defendants made their biased and falsified position known by way of press releases, publications in scientific literature, and other communications.

89.     During the same time period, Defendants actively sought to suppress the findings of the medical community that showed the link between on-field MTBI and post-career neuro-cognitive damage, illness and neurodegenerative decline.

90.     Consistent with Defendants' historical role as the guardian of player health and safety, the NFL, NFL P and RIDDELL intended for the general public, NFL players, athletes and participants at every level of the game to rely on the misinformation propagated.

91.     The concealment and misrepresentation of the severe neurological risks of repetitive MTBI exposed players to dangers they could have avoided had the Defendants, and each of them, provided Plaintiffs with truthful and accurate information.  Many players, including Plaintiffs in this action, were exposed to repetitive MTBIs while in the NFL and now suffer from latent neurodegenerative disorders and diseases, all of which, in whole or in part, were caused by the Defendants acts and/or omissions.

92.     At the same time, Defendants continued to market, as it had in the past, the ferocity and brutality of the sport that led to the latent and debilitating neuro-cognitive conditions and injuries from which Plaintiffs now suffer and for which are at high risk of developing in the future.

93.     Defendants' motive to ignore for decades the link between MTBIs and neuro-cognitive injury and to conceal and falsify research on that subject, especially during the 1994 to 2010 period that the MTBI Committee was in place, was economic.  Defendants knew or

-23-

suspected that any rule changes that sought to recognize the risks associated with MTBI would impose an economic cost that would significantly and adversely change the profit margins enjoyed by the NFL and its teams, NFL P and RIDDELL.  Defendants also knew that their marketing of the violence of the sport was incompatible with widespread awareness among the players and the general public of the dangers of football.

## A.   THE NFL'S INFLUENCE

94.    The NFL, founded in 1920, generated approximately $13,000,000,000.00 in gross income in 2016.[6]

95.    The organization oversees America's most popular spectator sport, acting as a trade association for the benefit of the thirty-two independently-operated teams.

96.    The NFL generates revenue mostly through NFL P, now a segment of NFL Ventures.  NFL Ventures is engaged in marketing, sponsorships, licensing merchandise, and selling national broadcasting rights to the games. The teams share a percentage of the league's overall revenue.  NFL Ventures, the league's billion-dollar, all-but-the-kitchen-sink wing that oversees sponsorships, marketing, media properties, sales, and satellite rights, saw its operating profit grow by 29 percent from 2009 to 2010.   NFL Ventures, which Roger Goodell ran before becoming the NFL's commissioner, comprises four wholly owned subsidiaries: NFL Enterprises ("advertising, publicizing, promoting, marketing and selling broadcasts of NFL games"), NFL P ("licensing, sponsorship and marketing"), NFL Productions ("produces NFL-related programming for the NFL and its Member Clubs"), and NFL International ("marketing, publicizing, promoting, licensing, distributing and developing the NFL's international

---

[6] https://www.forbes.com/sites/jasonbelzer/2016/02/29/thanks-to-roger-goodell-nfl-revenues-projected-to-surpass-13-billion-in-2016/#35a6fb3a1cb7

business").  These ventures cover everything from the customized replica alternate jersey available to buy at the team store to the old NFL Films propaganda shown on ESPN.

97.     The NFL earns billions of dollars from its telecasting deals with, among other, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

98.     RIDDELL was the Official Helmet of the NFL from 1989 through 2013.  In 1989, NFL entered into a contract with RIDDELL.  As the NFL's profits grew, so did those of the manufacturer and the marketer of the official helmet of the NFL.

99.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the Federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 teams as a single unit.

### B.     DEFENDANTS HAVE MYTHOLOGIZED VIOLENCE THROUGH THE MEDIA

100.    In part because of their financial power, monopoly status, and high visibility, the NFL, NFL P and RIDDELL have had enormous influence over the game of football at all levels.

101.    Over many decades, the NFL's influence has expanded through its use of the media.  Through NFL Films, the NFL Network, www.NFL.com, and NFL P, the NFL has promoted professional football via every available mass communication medium.

102.    Part of the NFL's strategy is to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions, and by propagating the falsehood that "getting your bell rung," "being dinged," and putting big hits on others does not seriously threaten one's health.

103.    In execution of this strategy, Defendants propagated the false myth that collisions of all kinds, including brutal and ferocious collisions, many of which lead to short-term and

-25-

long-term neurological damage to former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of those involved.

104.    A key tool in the execution of this strategy is NFL Films.  NFL Films is an agent and instrumentality of the NFL devoted to producing promotional films. One television critic described NFL Films as "the greatest in-house P.R. machine in pro sports history… an outfit that could make even a tedious stalemate seem as momentous as the battle for the Alamo."

105.    NFL Films   focuses on violence, the football-player-as-gladiator, as one of its greatest selling points.  To that end, NFL Films has created numerous highlight features focusing solely on the hardest hits that take place on the football field. These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

106.    NFL Films strategically uses cinematography and sound to exaggerate and emphasize vicious hits.  The magnitude of the hit is emphasized by slow-motion footage and on-field microphones.  The footage can appear like a car-crash test, with players taking on the role of the dummy.

107.    NFL Films promotes a culture in which playing hurt or with an injury is both expected and acclaimed in the NFL's mythical gladiator world.  Through NFL Films, the NFL and the NFL P have produced videos that praise players who embody the ethos of playing hurt (for example, "Top Ten Gutsiest Performances" (2009, updated 2012)).  This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players play through any injury, including MTBI.

108.    The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: NFL: Moment of Impact (2007); NFL's 100 Greatest Tackles (1995); Big Blocks and King Size Hits (1990); The Best of Thunder and Destruction – NFL's

-26-

Hardest Hits; NFL Films Video: Strike Force (1989); The NFL's Greatest Hits (1989); Crunch

Course; Crunch Course II (1988); Crunch Masters; In the Crunch (1987); NFL Rocks (1992);

and, NFL Rocks: Extreme Football (1993); NFL Rocks on the Edge (1994).

109.    NFL Films created a "Top Ten Most Feared Tacklers" series that was shown on

the NFL Network (2014), and now has its own section on the NFL's website. These features are

comprised of videos highlighting the most vicious tacklers that have played in the NFL.

110.    An explicit example of how the NFL markets and glorifies the violent nature of

the NFL can be found on the back cover of the 2007 film, Moment of Impact.  The cover

advertises the film as follows: "First you hear the breathing, then you feel the wind coming

through your helmet's ear hole.  Suddenly you're down, and you're looking through your

helmet's ear hole.  Pain?  That's for tomorrow morning.  Right now you've gotta focus – focus

on the play and try not to focus on the next moment of impact."   The message deemphasizes the

acute and chronic risks associated with head impacts and glorifies nothing but the violence of the

game and the ferocity of its hero players.

111.    The messages propagated by NFL P through NFL Films are part of the culture of

the NFL, a culture in which NFL players were encouraged to play despite injury.

112.    All of the Defendants have enjoyed enormous profits from that culture.

113.    For example, as recently as October 2010, the NFL fined some players for what it

characterized as "illegal and dangerous hits" and yet, the NFL P profited by selling photos of the

illegal hits on its website for as much as $249.95 per photograph, while the players were sporting

the official helmet of the NFL: the RIDDELL helmets.

-27-

### C. DEFENDANTS KNEW OF THE DANGERS ASSOCIATED WITH REPETITIVE HEAD IMPACTS AND CONCUSSIONS FOR DECADES

114.    Defendants have known or should have known for many years that the American Association of Neurological Surgeons ("AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."   The AANS defines traumatic brain injury as:

> A blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

https://www.aans.org/Patients/Neurosurgical–Conditions–and–Treatment/Concussion

115.    Defendants have known or should have known for many years that  mild traumatic brain injury ("MTBI") generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and unconsciousness.

116.    Defendants have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

117.    Defendants have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one.  Additionally, after a person sustains even a single subconcussive or concussive blow, a future lesser blow may cause MTBI and require more time to recover.

118.     Defendants have known or should have known for many years that published peer-reviewed scientific studies have shown that repeated traumatic head impacts (including subconcussive blows and concussions) cause ongoing and latent brain injury.

119.     Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer latent brain injuries that result in any one or more of the following conditions: early-onset Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, ALS or Lou Gehrig's Disease, Parkinson's and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").  The latter is a progressive degenerative disease of the brain that condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above.  CTE is also associated with an increased risk of suicide.

120.     Defendants have known or should have known for many years that CTE presents in athletes, including football players and boxers, with a history of repetitive head trauma.  The changes in the brain caused by repetitive trauma are thought to begin when the brain is first exposed to the repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or long after the end of active athletic involvement.

121.     Defendants have known for many years of the reported papers and studies documenting the prevalence of other conditions associated with neurological injury in the population of former boxers as well as former NFL players:

-29-

- In the 1960's, NFL's Head of Officiating wrote internally:

  > In 1917, the federal government said that something had to be done about football from the standpoint of rules or it would abolish the game. At about that time, the NCAA rules committee was established, and the first real code of football was instituted.

- Specifically, studies of athletes in 1928 demonstrated a scientifically observable link between repetitive exposures to head trauma and long-term, latent, brain disease. Pathologist Dr. Harrison Martland described the clinical spectrum of abnormalities ("cuckoo", "goofy," etc.) found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study"). Martland, H., Punch Drunk, Vol. 91(15), JAMA p. 1103-1107 (1928).

- The Martland study was the first to specifically link subconcussive blows and "mild concussions" to latent brain disease that the medical community now recognizes as CTE, and to identify the "punch-drunk" syndrome as dementia pugislitica. Martland, H., Punch Drunk, Vol. 91(15), JAMA p. 1103-1107 (1928).

- In 1933, the National Collegiate Athletic Association (the "NCAA") published its Medical Handbook for Schools and Colleges: Prevention and Care of Athletic Injuries. This NCAA publication outlined a specific concussion protocol due to its recognition of neurocognitive and neurobehavioral sequelae linked to these repetitive concussive and/or subconcussive exposures.

- In 1937, the American Football Coaches Association published a warning that concussed players be removed from play.

- In the 1948, the New York State legislature instituted rules related to boxing referred to by the state's Medical Advisory Board, and Dr. Harry A. Kaplan as "traumatic encephalopathy."

- By 1952, the federal government conducted CTE research. Specifically, prominent neuropsychiatrist Dr. Edwin Weinstein was studying CTE in a closed-head-injury cohort of Korean war veterans.

- The Weinstein CTE study defined concussion in step with modern times (in other words, it did not examine severe head-injury only or loss-of-consciousness only): Dr. Weinstein evaluated interruption of brain function.

- The Weinstein's study won legal recognition in Federal District Court in 1966, when one of its participants robbed a bank and was tried in federal court for the robbery. See Nagell v. U.S., 392 Fed.2d 934, 937 (5th Cir. 1968) (The defense asserted that the criminal defendant's CTE vitiated

mens rea; "[h]ere the record is replete with expert testimony regarding … 'chronic traumatic encephalopathy'- a disease of the brain caused by trauma. Its symptoms: paranoid suicidal preoccupations, 'confabulations', tendency toward projection, impaired judgment, lack of contact with reality'");

- In 1952, *The New England Journal of Medicine* recommended a "three-strikes rule" for concussive exposures and football, 246 NEJM ___, 554-556 (1952).  And, *JAMA* published additional findings on repetitive head trauma exposures in boxers, Busse, Ewald W. and Silverman, Albert J., Electroencephalographic Changes in Professional Boxers, Vol. 149:17, *Journal of the American Medical Association*, p. 1522-1525 (1952);

- In the early 1950s, research on pyramidal syndrome in athletes who sustained repetitive blows to the head was first being described in the medical and scientific literature;

- Numerous subsequent peer-reviewed papers appeared in journals such as *JAMA, Neurosurgery, NEJM, Lancet* and others; all strengthened the consensus that exposure to repetitive head trauma in the forms of acute concussion, multiple concussions, and long-term exposures to subconcussive blows had adverse consequences on the brain;

- By 1962, Drs. Serel and Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline. Serel M, Jaros O. The mechanisms of cerebral concussion in boxing and their consequences. *World Neurol* 1962;3:351–8;

- In 1964, German researchers, Drs. Haynal and Regli discovered an association between ALS and repetitive traumatic injury.  Haynal A, Regli F. Zusammenhang der amyotrophischen lateralsclerose mitgehäufter elektrotraumata. *Confinia Neurologica* 1964;24:189–98;

- Also in 1964, the Congress of Neurological Surgeons conducted a symposia series in Miami, Florida, and discussed 35 cases of CTE ("chronic residua of head trauma") related to concussion in athletes that were presented by Dr. Harry A. Kaplan;

- By 1964, Drs. Richard Schneider and Frederick Driss of the University of Michigan observed that a concussion did not require a loss of consciousness". A definition developed by the 1964 Congress of Neurological Surgeons reads: 'brain concussion - a clinical syndrome characterized by immediate and transient impairment of neurofunction, such as alteration of consciousness, disturbance of vision, equilibrium, etc., due to mechanical forces";

-31-

- At this Miami symposia series, football neurosurgeon Dr. Richard Schneider also presented on the significant number of professional football deaths related to the ineffectiveness of the then-current plastic helmet.  Defendants had developed a hard shelled helmet that did not protect against the forces of repetitive blows to the head of the nature sustained on the football field.

122.    By the early 1960s, Defendants were on notice of two problems they could not control: severe (acute) head traumas and subclinical/clinical MTBIs causing latent or chronic disease processes.

### D.    DEFENDANTS HAD A SELF-IMPOSED DUTY TO PROTECT HEALTH AND SAFETY OF THE ENTIRE FOOTBALL COMMUNITY, PAST AND PRESENT

123.    From its inception, Defendants held themselves out and acted as the guardians of the football community's best interests with respect to health and safety.  The NFL unilaterally created for itself the role of protecting players, informing players of safety concerns, and imposing a wide variety of rules to protect players from injuries.

124.    Upon information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and subconcussive injuries.  Such ongoing medical advice and knowledge placed Defendants in a position of ongoing superior knowledge to the entire football community.

125.    As a result, Defendants unilaterally assumed a duty to act in the best interests of the health and safety of the football community including the athletes at every level, to provide truthful information regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of the community.

126.    As the sport's governing entity (with monopolistic power), the NFL has made it known to players and teams alike that the NFL actively and pervasively governs player conduct

-32-

and health and safety both on and off the field.  In public statements since its inception, the NFL

has stated that its goals include taking necessary steps for the safety, health and well-being of

players and their families.

127.    For decades, the NFL voluntarily instituted programs to support player health and

safety on and off the field, and the players and their families looked to the NFL for guidance on

these issues.

128.    For example, in 1959, the NFL unilaterally established medical, life insurance,

and retirement plans, funded the plans, and controlled the nature and extent of each of these

plans without any player involvement.  The NFL made all changes to the plans unilaterally.

129.    Thus, since its inception and continuing into the present, the NFL has been in a

superior position.  Despite its duty and unilateral power to govern player conduct on and off the

field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to

players of repetitive subconcussive and concussive head impacts, which can and do result in

players being knocked unconscious or having "their bell rung" so that they are in a conscious but

disoriented state.

130.    At all relevant times, the NFL's unique position at the apex of the sport of

football, paired with its unmatched resources as the most well-funded organization devoted to the

business of the game, has afforded it unparalleled access to data reflecting the effects of head

impacts on football players and made it an institutional repository of decades of accumulated

knowledge and data about head injuries to players.

131.    The NFL joined with RIDDELL to conceal, deceive and ignore the evidence of

latent neurodegenerative impact to players from repetitive blows to the head.  Defendants'

-33-

accumulated knowledge about head injuries and the associated health risks therefrom was, at all times, vastly superior to that readily available to the Plaintiffs.

132.    For decades, Defendants failed to warn Plaintiffs of the medical risks associated with repetitive head impacts during NFL games and practices.   Instead, Defendants ignored and actively concealed the risks, despite their historic and proactive role as the guardian of player safety.  For that reason, Defendants breached their common law duty of reasonable and ordinary care to the Plaintiffs by failing to provide them with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during NFL games and practices.

### E.    THE NFL VOLUNTARILY UNDERTOOK THE RESPONSIBILITY OF STUDYING HEAD IMPACTS IN FOOTBALL, BUT FRAUDULENTLY CONCEALED THEIR LONG-TERM EFFECTS

#### 1.    Defendant NFL First Participated in Studies after the 1961-62 Season.

133.    Defendants, specifically Defendant NFL, first participated in this helmet efficacy studies that evaluated "brain damage" in professional football players at the conclusion of the 1961-62 NFL season.  Dr. S.A. Reid implanted radio telemetry units, first on a Detroit Lions football player and later on others.   The signal was first sent back to the press box and then to the sidelines.  Dr. Reid furnished Defendants and all helmet manufacturers with regular progress reports. .  In a notable progress report believed to be from 1965, Dr. Reid detailed several key findings: 1) radiofrequency evidence of brain damage; 2) evidence of brain damage in the absence of concussion; and 3) the conclusion that a "cumulative effect" may exist from repeated, subclinical blows.

134.    Since the early 1960s, these Defendants had been working with automotive industry and biomechanics leaders to serve as d*e facto litigation-avoidance consultants*, even-at times-exchanging resources with the United States military.  Defendants and the government

-34-

would explore connections between subconcussive blows and latent disease, gaining the actual knowledge that repetitive blows to the head in football caused long-term consequences, along with the knowledge that helmets were ineffective to protect the problem.  At that time, Commissioner Rozelle's office and the government sponsored a symposia on "Football Injuries" where the overwhelming focus was head injury.  Included in the symposia were researchers from Wayne State University, notably biomechanicist Dr. Voigt Hodgson.

135.    Dr. Hodgson presented research on repetitive blows to the head using testing on the lightly anesthetized stump-tail monkey, finding that force: head-weight ratio predicted concussion.  Hodgson's work focused on predictors of concussion in stump-tailed monkeys and dog brains.  Nevertheless Hodgson's generally Defendant-favorable work-product acknowledged what was a nearly century-old issue, according to papers he cited by German scientists: the effect of subconcussive blows.  Hodgson curiously stated from his own research that there did not appear to be an observable cumulative effect from subconcussive blows in his research, but conceded that the "opposing [published] views are difficult to reconcile."

136.    Defendants continued to work with Dr. Hodgson and other Wayne State disciples, whose backgrounds in crashworthiness and automotive biomechanics led to helmet technology designs and safety standards premised on motorcycle racing helmets which are not intended to diffuse repetitive forces.  Instead, as a result Defendants NFL and RIDDELL developed hard scale technology for the helmets rather than soft form, defeating the very purpose for the helmets on the football field.

### 2.    Defendant NFL Sponsored the Football Injuries Symposia in 1969, which Focused on Head Injuries.

137.    Defendant NFL, having grown its trade association to new heights after acquiring its sole competitor, engaged branches of the United States Military to meet in 1969, with 47

-35-

luminaries from leading medical schools, the United States government, NFL clubs, football

coaches such as legendary Don Shula, NFL team trainers such as Jim Van Deusen, eventual

NOCSAE leaders, Wayne State University biomechanics experts, Harvard psychiatrists,

neurologists, and leading sports medicine doctors to discuss the growing problem of "Football

Injuries," focusing largely on head injuries.  Defendant NFL itself made 27 presentations at the

symposia.  Some of the key presentations were:

a. Dr. Lawrence M. Patrick – "Establishing Human Tolerance Levels for Injury";

b. Col. John P. Stapp – "Human Tolerance of Impact";

c. Drs. Voigt Hodgson, E.S. Gurdjian, and L.M. Thomas (Wayne State University Biomechanics) – "Mechanical and Human Factors Related to Head Impact";

d. Dr. Stephen E. Reid – "Radiotelemetry Study of Head Injuries in Football";

e. Dr. Howard Knuttgen – "Psychological Basis of Performance and Physical Condition Testing";

f. Dr. Thomas Holmes III – "Psychologic Screening";

g. Dr. Chester M. Pierce – "Effect of Fatigue and Mental Stress on Performance";

h. Dr. Austin Henschel – "Effects of Heat on Performance";

i. Coach Don Shula and Eddie Block "Coaching, Game Skills, and Injury";

j. Dr. Allan Ryan – "The Role of Protective Equipment in Injury Control";

k. NY Jets Trainer Jack Rockwell-- –"The Relationship of Turf, Playing Conditions, and Equipment to Injuries";

l. Victor Frankel – "Biomechanical Analysis of Football Injuries"; and,

m. Vergil N. Slee – "Computerization of Injury Data".

138.    At the time of the 1969 Football Injuries Symposia, all of the cadaver studies,

concussion tolerance studies on dog brains, and the helmet telemetry studies had been either

shared with Defendants (or simply sponsored by Defendants in the first place). The presentations focused on the injuries suffered on the field and varied from Dr. Hodgson's presentation described above, ''to Dr. Charles Pierce's presentation, who that upon information and belief had been hired to produce exactly these findings recognized the symptoms of irritability, drug abuse, emotional liability, and sleep problems in the NFL player cohort.  But never even mentioned head injury as a possible co-morbidity; instead, he blamed these symptoms on football players wives' treatment of their husbands but did not address the latent sequelae of brain injuries suffered by repetitive head trauma.  Charles M. Pierce, *Effect of Fatigue and Mental Stress on Football Performance*, National Academy of Sciences, Football Injuries:  Papers Presented at a Workshop, 207-09 (1970).

139.    Presentations from former Jets trainer Jack Rockwell and Jets team physician James Nicholas illustrated the earliest examples of reporting studies with flawed data.  Trainer Rockwell entirely buried unfavorable data regarding injuries on turf surfaces by calling them "too inconclusive"; he referred to equipment studies as "difficult" to assess; instead, his lone recommendation for change pointed to the one thing that was beyond man-made control- the weather

140.    Dr. Nicholas, relied on data stating there were only seven total concussions in the nine years of reporting data in his study.

141.    Dr. Allan Ryan from University of Wisconsin presented on "The Role of Protective Equipment in Injury Control," comparing football players to dinosaurs (with bodies covered by armor yet failure to survive).

142.    In direct contravention to what had been presented to the general public by Dr. Schneider in 1964, Dr. Ryan gushed about plastic helmets, reporting that: "We have a helmet

-37-

that provides extraordinarily good protection compared with models [from the 1940s and 1950s but] … there are many boys who [] suffer brain damage."

143.    Dr. Ryan, however, acknowledged some poor outcomes (deaths, brain injuries, etc.) given that the advent of this helmet had led to its unintended and inappropriate use by players.  In other words, at this 1969 NFL symposia, the groundwork for a defense was being laid:  any head injuries were the fault of the players themselves (or their wives).

144.    Dr. Ryan made a series of critical recommendations, the most critical of which was to establish (what would ultimately become) the NOCSAE.  And, within months of this 1969 symposia series, following recommendations made at the meetings, the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") was formed.  NOCSAE is a non-profit organization intended to self-regulate football helmet safety standards, however approximately 1972 measures remain materially unchanged through the present day.

145.    NOCSAE's purported efforts included the development of performance standards for football helmets as well as research to better understand the mechanism and tolerance of head and neck injuries and the design and structure of football helmets.

146.    In reality, NOCSAE advanced a constituency-serving agenda, specifically that of the protective equipment industry that controls its funding and that has traditionally controlled the votes of its board of directors, and equally important, those athletic organizations dependent upon these protective equipment manufacturers for equipment certification seals.

147.    NOCSAE was, and remains, self-regulating, and establishes voluntary equipment safety standards, with manufacturers testing their own equipment and then reporting results to NOCSAE to receive their certification seal.  Upon information and belief, doing so serves multiple purposes: a) it buttresses a built-in defense to liability on the part of a manufacturer; b)

it attempts to create a built-in defense to liability on the part of a league such as Defendant NFL or sporting organization for allowing the usage of a specific brand or product; and, c) it serves as a preemptive strike against governmental regulation.

148. Indeed, despite its government-agency-styled name, NOCSAE receives no oversight from any bureaucratic or other independent federal or state-sanctioned agency, such as the Federal Trade Commission, Consumer Product Safety Commission, or the Occupational Safety and Health Administration. Instead, NOCSAE has strictly voluntary standards for compliance, available for adoption by any equipment manufacturer, user group, or athletic regulatory body.

149. Upon information and belief, the NOCSAE standards have remained unchanged because the RIDDELL Defendants have desired this, having substantial voting power on the NOCSAE Board of Directors, and have financially incentivized NOCSAE accordingly.

150. The divergence between NOCSAE's stated mission and underlying agendas appears clearest in the composition of those NOCSAE Board members and top advisors with ties to the protective equipment industry:

    a.     RIDDELL/All-American President Don Gleisner served on the Board of NOCSAE during the time-period of the NFL's MTBI Committee's creation while working in the Chicago, Illinois headquarters;

    b.     At all material times, including, but not limited to, the time period of the MTBI Committee's creation, at least two board votes were controlled by the Sporting Goods Manufacturing Association, now known as the Sports & Fitness Industry Association;

    c.     At all material times, including, but not limited to, the time period of the MTBI Committee's creation, at least one board vote was controlled by a representative from the American Football Coaches Association or the College Football Association;

    d.     At all material times, including, but not limited to, the time period of the MTBI Committee's creation, at least two board votes were controlled by the Athletic Equipment Managers Association;

e. At all times material, including, but not limited to, the time period of the MTBI Committee's creation, NOCSAE's research director was J.J. "Trey" Crisco, whose research on helmet telemetry for Simbex, LLC was purchased and acquired by RIDDELL; and,

f. At all times material, including, but not limited to, the time period of the MTBI Committee's creation, the NOCSAE's technical advisor has been and remains frequent RIDDELL/NFL expert witness and paid consultant Peter David R. Halstead.

151. The conspiratorial nature of the relationship between RIDDELL, NFL and NOCSAE was described in the deposition testimony of RIDDELL's paid expert Dr. Halstead, who stated that "the NFL and NOCSAE try pretty hard to work together," which Halstead explained in deposition while testifying that "I work with the NFL Committee on Mild Traumatic Brain Injury … typically through NOCSAE."  Deposition of Peter David Halstead, *Estate of Swinger v. NFL*, Case C2-03-665 (SDOH).

152. NOCSAE's certification testing methodology and systemic bias belie its independence and value as providing any services in the way of safety or indicia of reliability to its end-users (those who wear helmets and other equipment).

153. Through 2009, NOCSAE's Newsletter notes that "NOCSAE cannot answer [] and probably should not" answer the question "which helmets provide the best protection from concussion?"

154. The NOCSAE Newsletter once again completes the circle, by saying "the conclusion as to which helmet does a better job in reducing or preventing concussions is better addressed by the manufacturers."  In fact, NOCSAE prohibits licensees from even releasing the qualitative data point on certification that would indicate relative quality.

155. As a result, consumers and end users can never understand their relative risks so long as they wear helmets made by makers abiding by these NOCSAE rules, including RIDDELL because no quality information is made available to the public.

-40-

### 3. NOCSAE Rubber Stamps Industry Research and Creates Its Own.

156. NOCSAE first began research efforts regarding head protection equipment in or about 1969, establishing standards by the early 1970s that remain materially unchanged and in place to this very day.

157. Its stated goal has been to improve athletic equipment, and to reduce injuries through creating standards for athletic equipment.

158. NOCSAE has received significant grant funding from helmet manufacturers, Defendant NFL, and NFL Charities (by and through Defendant NFL).

159. Specifically, NOCSAE received NFL Charities grants, and "MTBI grant" money amounting to a substantial portion of its overall grant money. In 1997 alone, NOCSAE received a $50,000 grant to assist in the performance and underwriting of further research in the areas of football helmet protection and helmet safety performance.

160. NOCSAE had multiple members of Defendant NFL's MTBI committee (John Powell and David Viano) to oversee its grant dissemination. Both Powell and Viano, upon information and belief, have received financial compensation from RIDDELL.

161. In 1999, NOCSAE-funded-research began investigating brain injury, specifically MTBI, subconcussive trauma, and return-to-play ("RTP") protocols and procedures. All of this work was non-clinical research.

162. NOCSAE has paid for research, by itself and with co-conspirators, to the Southern Impact Research Center (the "SIRC"), which is owned, at least in part, and operated by frequent RIDDELL/MTBI Committee expert consultant Peter David Halstead; both NOCSAE and SIRC have directly employed Halstead, who also lists the NFL Players' Association on his C.V.

-41-

163.   In 2000, NOCSAE announced that it had formally contracted with SIRC and Halstead to provide its licensees with resources for testing, responding to inquiries, equipment set-up, and update training.

164.   In its 2003 Newsletter, NOCSAE announced that "[w]e are working on the details of a new cooperation with the National Football League for research into football concussions and related standards."

165.   One year later, in another NOCSAE Newsletter in the Spring of 2004, NOCSAE lauded the work of the conspirators' sham committee.[7]

166.   In the same Spring 2004 Newsletter, the delay in updating helmet standards was again addressed but remained unexplained.

167.   Notwithstanding NOCSAE's research grants to outside sources, the scientific consensus, and representations like its statement regarding additional research with the NFL, NOCSAE has not instituted more modernized helmet certification guidelines.  It finally moved the April 2004 Football Helmet Test Methodology (ND081-04m04) into "proposed" status as of January of 2006, referring all questions to David Halstead.

168.   Upon information and belief, NOCSAE Football Helmet Test Methodology remains unchanged today.

### 4.   The NFL P and RIDDELL Agreement.

169.   In 1969, co-conspirator NFL, concerned about its own liability, commissioned the Stanford Research Institute ("SRI") to study concussions and other injuries, as sustained on grass

---

[7] NOCSAE wrote: "The NFL's Committee on Mild Traumatic Brain Injuries recently published its results assessing the impact type and injury biomechanics of concussions in professional football … The committee claims that the variance of concussive impact data by location could form the basis for future performance standards … Concussions were primarily related to translational acceleration and consistently detectable by conventional measures of head injury risk … A strong correlation existed between rotational and translational acceleration leading the committee to conclude that translational values remain sufficient for detection and standards."

-42-

versus Astroturf.  *See*, Cooper Rollow, "NFL Takes Steps To Curb Injuries", Chicago Tribune, June 28, 1973, Sec. 3 at 2.

170.    The NFLPA exposed what it discovered of this largely concealed study as self-serving and false.  *See*, Garvey, Study Totally Inadequate Players Group Criticizes Turf Report, (AP) June 29, 1973.  Later discovered by Sports Illustrated, the Stanford Research Institute study found 9.4% of injuries had been caused by helmets. Underwood, John, An Unfolding Tragedy, Sports Illustrated, August 14, 1978

171.    Some minimal rule changes to the professional game were made subsequent to the SRI/NFL study, but co-conspirator NFL never acted on the issues of mild-traumatic brain-injury ("MTBI"), concussive exposure, or simply repeated blows to the head ("subconcussive" blows or exposure) based on the study's results.  This was true, even with what was nearly a half-century of scholarship and research having been conducted by this time-period, both on repetitive blows to the brain, and also on football helmet technology.

172.    By the late 1970s, only three helmet manufacturers remained in business, with the RIDDELL Defendants' then-president openly worrying that litigation could end football.

173.    In or around 1982, the RIDDELL Defendants' president publicly proposed the formation of a player compensation pool.  He called this the "Sports Rehabilitation Foundation," proposing it be funded by the NFL, to provide support payments to high school, collegiate, and professional football players permanently injured during football play.  In return for this compensation, players would waive their rights to sue helmet manufacturers.  *See* Appelson, G., *Helmet Maker Proposes Football Injury Pool*, 68 A.B.A.J. 136 (1982).  An NFL committee was tasked with studying financing for the proposed pool, including ticket surcharges, network contributions, or charges to the players.  *Id.*

174.    By 1983, upon information and belief, at least some helmet's warnings were

amended to state the following:

> Do Not Use This Helmet To Butt, Ram, or Spear an Opposing Player.  This Is In
> Violation Of Football Rules And Can Result In Severe Head, Brain, or Neck
> Injury, Paralysis Or Death to You and Possible Injury to Your Opponent.  There
> Is A Risk These Injuries May Occur As A Result Of Accidental Contact Without
> Intent To Butt, Ram, Or Spear.   NO HELMET CAN PREVENT SUCH
> INJURIES."

175.    Still, following NOCSAE guidelines, the RIDDELL Defendants were only

warning against traumatic brain injury, not about MTBI, concussions, subconcussive blows, nor

long term latent brain diseases including CTE, or other related repetitive-exposure injuries.

176.    Rather than seek to solve football's safety problems for its players, RIDDELL and

the NFL, and NFL P leaders of the football community in revenue and stature, opted for a self-

serving, deliberate, and forward-thinking approach: enlisting the help of other corporate entities

and individuals.

177.    In or before 1989, RIDDELL agreed with NFL P, as predecessor in interest to

NFL P to form a joint-venture in helmets, that would preserve RIDDELL's financial health and

where RIDDELL would provide assistance to NFL football in the form of assistance with

liability-limiting junk-science and propaganda, all minimizing the risks of repetitive head injury

and concealing the risks of CTE from those playing the game.

178.    The workers-compensation-like scheme proposed by the RIDDELL Defendants

did not materialize[8].

---

[8]  The proposal coincided with a time during which the NFL co-conspirators faced a series of
unique, first-of-their-kind challenges: significant forced changes to the insuring and re-insuring
of its workers' compensation scheme, after the winding up and eventual liquidation of an
underfunded, off-shore, captive mutual insurance carrier (NFL Insurance Limited) left open
questions on work-related-injury liabilities; labor unrest with the NFLPA and the absence of a
collective bargaining agreement between ownership and players; and, a bizarre cluster of football
players, Matt Hazeltine, Gary Lewis, and Bobby Waters, all diagnosed in the same window of

-44-

179.    In this 1980s time period, through co-conspirator NFL Charities, at least one neurologist, Dr. Stanley Appel, M.D., received a sum, believed to be $125,000, to research linkage between the three incidences of ALS (or CTEM) on the same NFL team.

180.    Upon information and belief, Dr. Appel received this grant money not to undertake good-faith scientific study, but instead, to support Defendants self-serving and pre-determined conclusion that no such link existed.

181.    Dr. Appel had, according to tobacco industry memoranda, agreed to perform favorable tobacco-industry research during the same time-period as his NFL research.  He has since become an outspoken critic of the generally accepted scientific connection between trauma and ALS-like symptoms.

182.    Beginning at latest by the spring of 1990, Defendants engaged in the multi-decade conspiracy to limit their own tort liability by concealing and/or misrepresenting and/or omitting information about the link between latent brain disease and head trauma as a result of playing football from the football community; along with its co-conspirators, including but not limited to: NFL, NFL P, P, NFL Charities and RIDDELL.  Defendants agreed to engage in a long-term plan to conceal material information about football's link to CTE and other neurological/neurobehavioral conditions, while doing so in the name of solving safety problems for its game's players.

183.    Upon information and belief, on April 11, 1988, RIDDELL and co-conspirator NFL P, the licensing arm of the NFL, embarked on the aforementioned joint venture.  In 1989, RIDDELL agreed to serve as exclusive helmet provider to the NFL co-conspirators:

---

time (the early 1980s) with Amytrophic Lateral Sclerosis ("ALS" or "Lou Gerhig's Disease"), all of whom played together on the San Francisco 49ers; and, all of whom died by 1987.

184.    In return for providing free helmets, pads and jerseys to each NFL team,

RIDDELL received the exclusive right to display its logo during NFL games on the helmets of

those players who choose to wear the RIDDELL brand. The trade name - the word 'RIDDELL' -

can be seen in the front of the helmet on the 'nose bumper', on the side of the helmet on the chin

strap, and in the back of the helmet at the helmet's base. While NFL players remain free to wear

the helmet of their choice, the Agreement stipulates that "manufacturers' logos other than

RIDDELL's must remain covered during league play … in order for an NFL to be eligible for all

the free and discounted equipment from RIDDELL, at least 90% of its players must use

RIDDELL helmets." *Kelci Stringer v. NFL, et al.*, 2:03-cv-00665-MHN-MRA.  (SDOH)

185.    So powerful was this agreement that RIDDELL's chief competitor made it the

subject of antitrust litigation.  *Schutt Athlet. Sales Co. v. RIDDELL, INC*., 727 F. Supp. 1220,

1222 (N.D. Ill. 1989).

186.    Former RIDDELL President J.C. Wingo stated in 2013 that the purpose of the

RIDDELL-NFL exclusivity deal was "to ensure a viable survivor in the helmet industry."  *See*

Helyar, John "Helmets Preventing Concussion Seen Quashed By NFL-RIDDELL", Mar. 18,

2013, Bloomberg Business.

187.    As further consideration for RIDDELL's exclusivity agreement with the NFL,

RIDDELL was permitted to sell NFL-branded mini replica helmets as souvenir items, upon

information and belief, a multi-million-dollar market over which the NFL had now given

RIDDELL an exclusive market-share, in exchange for RIDDELL's participation in its

conspiracy.

F.      THE MTBI COMMITTEE

188.    The MTBI Committee was a joint enterprise by Defendants and undertaken for

the following purposes: a) to create a body of self-serving non-clinical science on MTBI and

1346553.5

blows to the head; b) to provide a scientific basis for the underlying test metrics used in safety-equipment design; c) to provide a scientific basis for the underlying test metrics used in safety-equipment research; d) to provide non-clinical (e.g., scientific research) to interested parties making decisions with football players who could be accused of legally causing these players' chronic brain damage and/or latent brain disease(s); and e) to develop and validate a neuropsychological test battery which, in conjunction with football players' purported subjective symptoms, could justify otherwise unjustifiable decisions by clinicians to clear such players to play football.

189.    In this way, the MTBI Committee's creation served to: a) drag the fact-finding process out; b) cast doubt on football-related causation altogether by blaming co-morbidities; c) attempt to distinguish NFL-causation from pre-NFL causation; and d) conduct bad-faith harm-reduction research in the form of exploring improvements to equipment changes and game conditions that conspirators, committee members, behind-the-scenes scientists and attorneys knew would not actually result in material health benefits for players, but did create a false sense of security  in Plaintiffs and others.

190.    The MTBI Committee first met collectively in February of 1995 in Indianapolis, where they arrived at a consensus definition for "concussion."

191.    Committee Member Albert Burstein had worked largely as a consultant for numerous pharmaceutical and biomedical corporations prior to his working on the NFL's MTBI Committee.  Most importantly, Burstein worked regularly as a defense expert witness for RIDDELL on numerous personal injury/product liability litigation matters concurrent with his time as a member of the purportedly "independent" MTBI Committee.

-47-

192.     In just one of the numerous instances that Committee Member Burstein provided

paid-for trial testimony on RIDDELL's behalf while serving on the conspirators' sham

committee, in *Arnold v. RIDDELL, INC.*, 882 F.Supp. 979 (D. Kan. 1995), Burstein opined that

the cause of a football player's paralysis would have remained unchanged regardless of the

specific helmet type he had worn.

193.     Under Burstein's guidance, Pellman and the Committee agreed to drive out any

potentially successful competitor products to the RIDDELL products, even ones that were

scientifically tested and believed to provide players with substantial benefit.  The MTBI was first

composed of the following members:

> a.     Committee Chair Dr. Elliot Pellman, MD, served as team doctor for the
> New York Jets concurrently in his role as chair of this independent, non-
> conflicted committee; Committee Chair Dr. Elliot Pellman had been
> disclosed by defense counsel as an expert witness in a concussion-based,
> return-to-play, malpractice trial against fellow NFL team physician,
> Chicago Bears John Munsell, MD; NFL lead spokesman Greg Aiello has
> acknowledged that Commissioner Paul Tagliabue received personal
> medical care on an ongoing basis from Dr. Pellman over the course of a
> decade.
>
> b.     Committee Member David Viano, PhD, offered purportedly for his
> background on biomechanics and helmet safety was primarily an
> employee of General Motors at the time of his appointment and not a
> professor at Wayne State University as represented;
>
> c.     Committee Member Dr. Viano left GM in 2002, and has received the bulk
> of his income over the course of his life as a defense-side expert witness in
> product-liability actions, primarily testifying on issues of crashworthiness
> in automotive industry; Committee Member Dr. Viano and his shell
> corporation received approximately $200,000 per year from NFL Charities
> in "MTBI Grant" money; Michigan State University's department of
> kinesiology, where MTBI Committee member John Powell, PhD (athletic
> trainer) was employed, received upwards of $50,000 per year; University
> of Pittsburgh Medical Center, where MTBI Committee member and
> Pittsburgh Steelers' neurologist Dr. Joseph Maroon practiced, received
> upwards of $50,000 per year MTBI grant money.
>
> d.     Committee Member Mark Lovell, PhD, a business partner of Steelers team
> neurologist and fellow MTBI Committee-member Joseph Maroon, M.D.,

-48-

had a significant corporate interest in selling his controversial product "imPACT! Sideline concussion assessment tool" to the NFL.

194.    From 1994 until 2010, Defendants propagated their own industry-funded and falsified research to support their position, despite their historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusions.

195.    In 1994, the NFL voluntarily formed and funded a committee, the Mild Traumatic Brain Injury Committee ("MTBI Committee"), to study the issue of head injuries in the NFL. NFL funded the MTBI Committee through the NFL Charities, among other grants.

### G.    WHAT PROMPTED THE NFL TO CREATE THE MTBI?

196.    By the early 1990s, the emerging scientific consensus forced Defendants to take a different approach to the growing problem of MTBI-caused acute injury and latent disease in existing and former football players, respectively.

197.    On October 20, 1992, Commissioner Paul Tagliabue received a hand-written letter from Arthur J. Stevens, General Counsel for Lorillard Tobacco company, Tobacco Institute Executive Committee member, and head of the industry's "committee of counsel." The letter copied Lorillard co-owners then-New York Giants co-owner P.R. Tisch and Andrew Tisch. It advised on updates regarding the crime-fraud exception to the attorney-client privilege in the context of exposure-injury litigation.

198.    Upon information and belief, it was at this time that Defendant NFL had begun recognizing large numbers of its players were developing chronic brain damage from football, and paying disability money and workers' compensation money for this. In addition, the Giants had recently borne witness to a high-profile concussion, when, on September 7, 1992, 49ers quarterback Steve Young was knocked out of the Giants' game due to a concussion.

199.     Covington and Burling litigator Paul Tagliabue, recently named NFL Commissioner, publicly dismissed the league's concussion issues as "pack journalism", saying that the number of concussions was very small[9], that the NFL experienced "one concussion every three or four games," though privately, he had begun implementing a long-term, litigation-defense strategy

200.     Commissioner Tagliabue established the "independent" MTBI Committee to create the appearance of progress on concussion research and protective-equipment advancement.

201.     At the time the MTBI Committee began, the Chair, then-Jets team doctor Elliott Pellman, MD, learned or should have learned through treating his own player/patient, Jets Pro Bowl receiver Al Toon, that Toon had developed a series of acute brain injuries and lingering sequelae, such as chronic severe headaches, malaise, intolerance of loud noises, depression, and emotional lability as a result of repetitive head trauma.

202.     The original roster comprising this Committee, purportedly independent and composed to research the issues of concussion in football in good-faith, revealed this group to be the opposite: it was in fact a biased and/or ill-qualified who's-who list of NFL and RIDDELL insiders and professional expert witnesses.

203.     The original Committee contained Elliott Pellman (Jets Doctor); Andy Tucker (Browns Doctor); Jay Brunetti (Redskins equipment manager); Ira Casson (New York neurologist / defense expert witness); Doug Robertson (Colts doctor); Mark Lovell (Steelers neuropsychologist); Henry Feuer (Colts doctor); Albert Burstein (RIDDELL affiliate - biomechanics); John Powell (NFL injury database proprietor); Joseph Waeckerle (Chiefs

---

[9] www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/timeline-the-nfls-concussion-crisis/

doctor); Ronnie Barnes (Giants trainer); Bob Reese (Jets trainer); Dean Blandino (NFL referee); and former Tobacco Institute turned NFL attorney, Dorothy Mitchell.

204.    In addition, the MTBI Committee funneled money to a number of outside consultants it knew would provide favorable conclusions.

205.    It worked closely during early years with Dr. Lawrence Thibault, a notable biomechanics expert in Philadelphia who had opined that the so-called "shaken-baby" syndrome did not actually exist.  He opined that babies did not suffer from such repetitive-type trauma, but instead only suffered from acute and specific blunt-force traumatic events.

206.    The committee also retained Dr. Cynthia Bir.  Dr. Bir was a biomechanics expert who had significant experiences working in boxing, which the MTBI committee worked hard to distinguish from the sport of football.

207.    The MTBI Committee funneled significant money to Peter David Halstead, a football-helmet tester who worked at his own lab in Tennessee (the Southern Impact Research Center or "SIRC") and at the University of Tennessee Knoxville Biomechanics Laboratory to validate and test helmets pursuant to NOCSAE standards.  Halstead has no college degree and has lied on that point multiple times in federal-court depositions and on his resume that is posted on his website, www.soimpact.com.

208.    As alleged elsewhere, the MTBI Committee spent significant dollars on General Motors' expert witness and biomechanics expert Dr. David Viano.  Viano came up with many of the principal theories advanced by the committee: that football injuries are biomechanically different than boxing (where chronic brain injury was clinically proven); and that the MTBI testing metrics and standards were valid.  The nature of Burstein's opinion (that the brand of helmet would not influence an injury) also was the shared opinion advanced by paid consultants

-51-

Dr. Joseph Torg and Dr. John Powell, both of whom were also corporate-friendly consultants and expert witnesses. Joseph Torg had testified for RIDDELL at trials many times in the 1970s, and he had participated in injury-tracking data with Burstein during the 1970s.  Powell had been in charge, not merely of tracking injury data for the NFL but also devising the tracking system for the NFL from the time he received his PhD in 1980.  Prior to that, the NFL had no injury tracking system whatsoever. Powell had also received income during the 1970s performing similar work for the NCAA, and had also performed helmet/concussion studies involving Defendant RIDDELL's helmets.

209.    The Committee members disclaimed any "financial or business interest that poses a conflict" to the MTBI Committee's research in *Neurosurgery* notwithstanding the numerous league ties and salaried positions such as NFL Medical Director / Jets Doctor / Chaired NFL Physician's society, NFL Injury and Safety Panel, and a personal physician to Commissioner Tagliabue.

210.    The Committee commingled MTBI grant funds funneled from NFL Charities, with RIDDELL money and used it on sham helmet-safety research between 1997-2000, the purpose of which was to develop a product that the MTBI Committee knew was tested through ineffective means for the NFL's and RIDDELL's mutual commercial benefit after misrepresenting study results;

211.    Elliot Pellman, Chairman of MTBI, represented in a meeting on May of 2009, on CTE pathology and helmet safety, between MTBI Committee members, NFLPA medical and player representatives, NFL league officials and attorneys, experts, and scientists from BU, that "[t]he sponsorship of Riddell should have nothing to do with making decisions … we want [Riddell] to help in terms of fitting, but we would prefer the data come [from elsewhere] … So

-52-

we in fact do coach people how to speak in terms of liability, particularly when it comes to your history or history of concussions".

212.    The Committee acknowledged, in *Neurosurgery* papers, the legal contributions to the MTBI Committee's work, including that of NFL general counsel Jeff Pash and Covington/former NFL counsel Dorothy C. Mitchell, who had "worked tirelessly to initiate the research … her efforts paved the way for successful completion …."  By creating the MTBI Committee, Defendants affirmatively assumed a duty to use reasonable care in the study of concussion and post-concussion syndrome in NFL players, including the publication of data and statements from the MTBI Committee.

213.    Rather than exercising reasonable care, Defendants engaged in a concerted effort of deception and denial designed:  (a) to dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and, (b) to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

214.    Defendants reasonably expected that NFL players and the football community at large, including Plaintiffs, would rely on its research and pronouncements, in part because of the historic special relationship between the NFL and the players and, in part because the NFL knew that the vast majority of NFL players played under non-guaranteed contracts and student athlete's played for non-guaranteed scholarships and would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.

215.    Defendants' unparalleled status in the world of football (and historical status as the guardian of player safety) imbued its MTBI Committee's pronouncements on concussions with a unique authority as a source of information to players.  Plaintiffs therefore reasonably relied on the Defendants' pronouncements on these vital health issues.

216.    The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the NFL and to outline solutions.  The MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

217.    By 1994, when the MTBI Committee was formed, independent scientists and neurologists alike were convinced that all concussions—even seemingly mild ones—are serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

218.    Then-Commissioner Paul Tagliabue stated that "[i]n the early 1990s, as we looked more deeply into the specific area of concussions, we realized that there were more questions than answers," despite the fact that independent science had already come to an definitive, but harmful conclusion a decade earlier.

219.    The NFL benefitted from and orchestrated NFL Charities' propagation of self-serving, industry-funded and falsified research through the MTBI Committee to support its often ridiculed positions on exposure to repetitive head-trauma.

220.    The NFL's ties to the Tobacco Institute have dated back at least to 1984, when then-Commissioner Pete Rozelle invited Tobacco Institute President Sam Chilcotte to the NFL's Spring Meetings as his personal guest.  NFL Government Relations Director Joe Browne met

-54-

with the Tobacco Institute on a regular basis in the 1980s, offering counsel on lobbying and key strategy issues.

221.    Dorothy Mitchell, who had just left her prior Covington position along with NFL General Counsel Jeff Pash, where she worked on the controversial defense of the Tobacco Institute, played a supervisory role in the re-allocation of $134,000 in MTBI grant money in connection with the attempted medical malpractice defense of member-club physician Dr. John Munsell.

222.    Indeed, the entirety of the MTBI Committee was comprised of individuals with football industry ties or an agenda that was compatible with the Defendants liability-limiting goals.

223.    The MTBI Committee began by publishing a number of technical papers in the 1990s presented at the International Research Council on the Biomechanics of Injury ("IRCOBI").  The "IRCOBI Papers" were the fruits of early "MTBI Grant" money funneled from Defendant NFL and RIDDELL either through NFL Charities or directly to a series of expert consultants, who were effectively pre-litigation defense-side expert witnesses:

- Exponent Failure Associates (Drs. Robert Fijan and Reid Miller);

- Biokinetics, Ltd. Canada (James Newman et al);

- Dr. David C. Viano;

- Alleghany University

- Wayne State University's Biomechanics Lab (Dr. A.I. King et al)

- Duke University's Dr. James McElhaney;

- Dr. Lawrence Thibault

224.    One of these early, principal IRCOBI papers sponsored by the MTBI Committee validated the RIDDELL VSR-4 helmet over the rival Bike technology in order, upon information

-55-

and belief, to validate the agreement between NFL/NFLP and RIDDELL which otherwise would have been fraudulent on its face.

225.     The early IRCOBI papers in the 1990s also studied mouth-guard research for concussion, concluding falsely that proper use of a mouth-guard could impact MTBI.

226.     In the 1990s, this work principally, with the MTBI Committee's financial backing, laid the groundwork to advance Defendants' bottom line, introduced computerized neuropsychological testing protocol into the NFL, and published a series of otherwise (even more) highly suspect research in peer-review journal *Neurosurgery* during the 2000s.

227.     These papers validated the "Hybrid-III" testing dummies as the means to test concussion and forces to the head and neck in football players, which was-on its face-a questionable if not nonsensical approach given that these dummies were stiff and unlife-like when compared to the human head/neck, which bent and torqued.

228.     The early papers also validated the "viscous criterion VC" injury model advanced by Viano in his research to justify the otherwise unjustifiable NOCSAE standards.

229.     More early work was used to advance and/or validate neuropsychological testing protocol.  This specifically included the computerized neuropsychological testing research done by Alleghany University, designed to create a "concussion severity index" and supervised by Exponent Failure Analysis expert consultants Drs. Robert Fijan and Reid Miller as creators of the neuropsychological testing protocol.[10]

230.     This computerized neuropsychological testing protocol admittedly proceeded from the underlying assumption that football players were not injured (i.e., they had NOT

---

[10] Exponent Failure Analysis has drawn criticism for its reports claiming second-hand smoke did not cause cancer, and for its other work on behalf of the NFL, most recently in the "Deflategate" scandal.

suffered a diffuse brain injury) but instead, simply had many of the frequent comorbidities associated with diffuse brain injuries: attention deficit, memory loss, concentration difficulties, and impaired information processing.

231. Upon information and belief, the Allegeny protocol involved only five teams and tested only one of five injured players yet, it became the underlying basis for the scientific justification for ImPACT Concussion Assessment Tool, used to validate the RIDDELL Revolution Helmet and in multiple papers published in *Neurosurgery* by the MTBI Committee.

232. The MTBI Committee knowingly published papers in peer-reviewed journals basing conclusions on factually unsupportable claims (based upon the data they had), or cherry-pick data in order to support the conclusions that the committee sought. It was also this committee that would test, sponsor, and verify with neuropsychological testing, what would become the RIDDELL revolution helmet.

233. Former General Counsel Richard Lester's testimony in *Stringer v. NFL*[11] suggests that MTBI Committee head Dr. Viano may have served in a joint-employment capacity by RIDDELL and NFL pursuant to the licensing agreement and conspiratorial agreement while also serving as the Chair of NFL's MTBI Committee; his testimony makes clear, regardless that this agreement provides for a joint employee of RIDDELL and NFL.

234. In one example, the Committee conspired to keep non-RIDDELL helmet, the Bike Pro Edition helmet, which NFLPA President Trace Armstrong had worked to develop as a technological advancement, out of the League. www.bloomberg.com/news/articles/2013-03-18/helmets.

---

[11] *Stringer*, 2:03-cv-00665-MHW-MRA.

235.    The Committee also scuttled the use of the ProCap product (a soft outer shell for helmets intended to reduce MTBIs), reportedly without regard to its potential benefits. *Id.*

236.    Through MTBI Grant money from co-conspirator NFL Charities, Steelers/UPMC Neuropsychologist Mark Lovell was charged with developing the subsequent neuropsychological testing protocol for the NFL.  Upon information and belief, these tests were intended to serve as a supposed objective basis to justify team physicians' and coaches' otherwise inappropriate return to play decisions with respect to concussed players.  As long as the teams could match a player's lack of subjective complaints with testing data (which had alarmingly inaccurate false positive AND false negative rates), the club or team or college would then not be to blame for injuries suffered by the players.

237.    The other major study occurring at this time by the conspirators was the Brain Injury Surveillance Study.[12]  Pellman ordered all 30 teams to keep accurate records of their concussed players each week, and to submit this data to John Powell's registry for logging.

238.    Yet, during a later presentation, then-Jets neuropsychologist William Barr made clear that a substantial portion of reported neuropsychological testing data sets had never been used (if not entirely discarded).

239.    Upon information and belief, the conspirators had published articles in a leading peer-reviewed journal premised on vastly underrepresented, skewed, and self-serving data. According to Dr. Barr, when he confronted Dr. Pellman with this concern, Pellman informed Barr he would be relieved of his duties as Jets neuropsychologist if he persisted.  Less than a year after Dr. Burstein's testimony in *Arnold*, in 1996, the conspirators' purportedly independent committee agreed to jointly engage the services of the Canadian consulting firm, Biokinetics and

---

[12] Pellman, E., et al, Concussion in Professional Football: Reconstruction of Game Impacts and Injuries, *Neurosurgery*: October 2003 – Volume 53 – Issue 4 – pp. 799-814.

Associates, Ltd., to conduct research into helmet safety standards along with Defendant

RIDDELL, which paid for the pendulum used in the testing.

240.     This study, that NOCSAE denied was funded jointly by RIDDELL and the NFL

charities, using MTBI grant money, was in fact funded by these entities, according to the internal

work-product deliverables from the study itself.

241.     The MTBI Committee studied and recreated videotaped concussive impacts from

real NFL play at Biokinetics' lab, using a new pendulum technology and "Hybrid-3 dummies,"

which were reportedly innovations used to evaluate human tolerance to MTBI under a metric

called "Head Impact Power" Index (HIP).  This began in 1995 and occurred in two parts within a

five year period.

242.     In part one of the study, Biokinetics, on behalf of and/or in concert with

Defendants, evaluated how helmets responded to "potentially concussive" hits.  As was known

then by the conspirators, concussions occur through both linear-force injuries and also through

rotational injuries.  The proposed HIP metric provided a preliminary means through which to

evaluate rotational injury.

243.     Biokinetics reviewed video of approximately 100 concussive hits to determine

which hits to study and attempt to reproduce them.

244.     The lab then focused on reproducing 12 impacts for the test, 9 hits were

concussive in nature.

245.     Specifically, helmets were evaluated for concussion using NOCSAE metrics

designed for death/skull fracture/brain bleed/paralysis injuries (TBI injuries.)  The metric that

NOCSAE relied on for evaluation had been developed at Wayne State University in the context

of automotive crashes and was called Severity Index ("SI").

-59-

246.     In part one of the two-part study at Biokinetics, the SI metric was acknowledged as not being a concussion metric.  Specifically, the authors wrote "the reader is reminded that the NOCSAE and ATSM failure criteria are intended to reflect serious head injury, rather than concussion." Withnall, C., *A New Performance Standard For Mild Traumatic Brain Injury (MTBI)*, Nov. 15, 2000, *RR00-22* Memorandum to RIDDELL, Inc. at 10 (Part One).

247.     Part one concluded that "maximum power could remain a strong predictor of concussion even in the absence of complex rotational acceleration recordings." Withnall, C., *A New Performance Standard For Mild Traumatic Brain Injury (MTBI)*, Nov. 15, 2000, *RR00-22* Memorandum to RIDDELL, Inc. at 11 (Part One).  Stated differently, the report concluded that being hit extremely hard head-on was a strong measure of concussion, even if there was not an adequate way to measure the sheering, angular –type injuries consistent with many football concussions.

248.     In part two of the two-part study at Biokinetics, the helmets were knowingly tested under insufficient temperature conditions to properly evaluate energy attenuation of the helmet's liner system.  This was even acknowledged in the study.  *See* Withnall, C., *A New Performance Standard For Mild Traumatic Brain Injury (MTBI)*, Nov. 15, 2000, *RR00-23*, Memorandum to RIDDELL, Inc. at 10 (Part Two).

249.     The Biokinetics study also revealed concussive impact for helmets to be 95% likely at an SI value less than half (559) of the NOCSAE minimum for certification (1200); and concussive impact was still 50% likely at less than one quarter (291) of the NOCSAE minimum for certification (1200).

250.     Yet, the Biokinetics memorandum did *not* conclude that the SI test was inappropriate as a metric for concussion, saying "maximum power could remain a strong

predictor of concussion …"  Because rotational injuries were still not possible to entirely to test, the conspirators reached the self-serving conclusion that the old car-crash test (SI) metric might still be the best test.   The SI metric was also the only test that could be empirically captured.

251.    Defendants' testing contemplated a head impact power index, a parameter combining linear and rotational acceleration, and measured that index on each hit with the help of tiny accelerometers inside the dummies' heads.

252.    The HIP index still could not fully capture rotational injury, a fact acknowledged by the study's authors, and subsequently by David Viano and Elliott Pellman, among others.

253.    In layman's terms, Viano and Pellman concluded the test was still effective to evaluate concussions based upon how fast and hard people collided, which meant that the old way of doing things (SI) was not obsolete, even where they acknowledged the possibilities of concussive traumas coming at far lesser impacts.

254.    Part two of the study concluded, in layman's terms, that even though the new HIP metric was ineffective, insufficient, and subject to change, a helmet meeting this standard was better than a helmet not meeting this standard.

255.    The study also acknowledged importantly, and accurately a conclusion properly imputed to the conspirators:  NO HELMET CAN PREVENT A CONCUSSION.

256.    The conspirators, along with NOCSAE, then engaged long-time RIDDELL expert witness P. David Halstead at the Southern Impact Research Center in Tennessee to perform additional research on helmet safety testing.[13]  The MTBI conspirators engaged NOCSAE to study possible new safety standards for concussion-related helmet testing.  These standards were not utilized and have still not been utilized today.

---

[13] As described above, Halstead also authored MTBI Committee papers and has been paid by the NFLPA and RIDDELL as an expert.

257.     Then RIDDELL engineer Thad Ide had left RIDDELL in the early to mid-1990s and worked briefly at the SIRC for the first two years that it opened under this corporate name, beginning in 1995 when it was testing the helmets.  He then left SIRC and returned to RIDDELL, whereupon he became a Senior VP of RIDDELL.

258.     Halstead remained at SIRC claiming to conduct "research" and product testing, but in reality, operated the organization as a source of defense expert consulting for the NFL, NCAA, and protective-equipment manufacturers.

259.     Halstead was and is, at all relative times, a career expert witness.  Halstead has represented to have a masters and bachelors of science degree from SUNY, and to have taken post-graduate-level course work in biomechanics.  In reality, Halstead's post-secondary education consists almost entirely of online coursework from an unaccredited university.  He has more recently conceded in deposition testimony and on his posted resume that he only possesses "non-traditional" education credentials.

260.     During the time of the subject NFL/NOCSAE testing at SIRC, Halstead had not received all of this online education.  He had, however, testified repeatedly as an expert witness for Defendant RIDDELL sued related to catastrophic protective-equipment malfunctions.  In each instance, Halstead testified that the helmet at issue (or occasionally other equipment) was not to blame.

261.     In turn, co-conspirator NFL uses NOCSAE certifications as the basis for the helmets that it allows players to wear.  Regardless of how poorly the NFL may rate a helmet's technology, it will allow players to continue wearing the helmet, so long as NOCSAE certifies the helmet.

-62-

262.     From its inception in 1994, the MTBI Committee claimed to be conducting studies to determine the effects of concussions on the long-term health of NFL players.  Instead of publishing truthful information about the MTBI crisis in the NFL, the MTBI committee spearheaded a disinformation campaign.

263.     Dr. Elliot Pellman, chairman of the Committee, and two other Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies linking head impacts and concussions to neuro-cognitive disorders and disabilities.

264.     The MTBI Committee published its findings in a series of sixteen papers between 2003 and 2009.  According to those papers, the MTBI Committee's findings supported a conclusion that there are no long-term negative health consequences associated with concussions or subconcussive injuries sustained by NFL players.  These findings contradicted decades of independent research and the experiences of neurologists and players.

265.     The MTBI Committee concluded that it was appropriate for players who suffered a concussion to return to play in the same game or practice in which the concussion occurred.  In 2004, the MTBI Committee claimed that its research found that players who suffered a concussion were not at greater risk of suffering future concussions.   The Committee also claimed that such players did not have increased susceptibility in the seven-to-ten day window after suffering a concussion.

266.     The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data collection techniques.  They received significant criticism in scientific media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

-63-

267.     As another example, in 2005, the MTBI Committee stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

268.     Yet, a 2003 NCAA study of 2,905 college football players found just the opposite. "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

269.     A 2003 study reported depression after traumatic brain injury.  Seel, R.T., J.S. Kreutzer, et al., Depression after traumatic brain injury: National Institute on Disability, et al. Arch. Phys. Med. Rehabil. 83:177-184, 2003.

270.     A 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina found a link between multiple concussions and depression among former professional players with histories of concussions.  A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

271.     Other erroneous conclusions that the MTBI Committee published included the following:

•       as Drs. Pellman and Viano stated, **because** a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football- related activities for less than 1 week, it can be concluded that [MTBIs] in professional football are not serious injuries;"

•       that NFL players did not show a decline in brain function after a concussion;

•       that there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;

•       that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions;"  and,

-64-

• that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

**H.      RIDDELL RELEASED ITS REVOLUTION HELMET BASED ON FLAWED STUDIES.**

272.      In 2002, following the Biokinetics study, RIDDELL released its Revolution helmet, purportedly specifically manufactured and designed to "reduce the incidence of concussions."

273.      The Revolution helmet was born out of the *concept* that rotational injuries were causative of concussion and warranted protection, but without tests capable of gauging rotational forces in a meaningful way, it has lacked sufficient proof that its design functioned to perform in this manner.

274.      Defendant RIDDELL claimed that its Revolution helmet could reduce the incidence of concussion by 31%, which fueled sales of the helmet model.  Its media campaign surrounding the rollout of this "first of its kind" helmet included a video news release that created "over 60 million media impressions, nearly 150 television placements, over 100 newspaper clips, over 250 on-line placements and 6 live sports radio interviews."

275.      In fact, the Revolution contains the same defective vinyl nitrate front liner system as RIDDELL's antiquated VSR-4 series helmet.

276.      Materials such as thermoplastic polyurethane ("TPU") have been shown to help reduce head impact acceleration by absorbing energy more effectively throughout a wider range of temperatures thus reducing force on the brain.

277.      Defendants knew or should have known that materials such as thermoplastic polyurethane ("TPU") are better at absorbing energy throughout a wider range of temperatures and provide better protection against head impacts when used throughout liner systems of football helmets.

-65-

278.     Defendants have continued to utilize substandard liner materials such as vinyl nitrile foam that are less effective at reducing head impact acceleration by absorbing energy. Vinyl nitrile foam padding used in Defendants' helmets degrades over time and provides less protection against lower-level impacts that result in concussions.

279.     The Cleveland Clinic found that modern football helmets are no better at protecting against concussions than vintage "leatherhead" football helmets. *See Vintage Leatherhead Football Helmets Often as Protective As Modern Helmets In Common Game-like Hits Cleveland Clinic Researchers Find*, Cleveland Clinic, November 4, 2011, http://my.clevelandclinic.org/about-cleveland-clinic/newsroom/releases-videos-newsletters/2011-11-04-vintage-leatherhead-football-helmets-often-as-protective-as-modern-helmets-in-common-game-like-hits (last visited March 11, 2016).

280.     Defendants knew, have known, and/or should have known that helmets are effective in eliminating skull fractures and reducing linear forces, but they are ineffective in reducing the rotational forces that result in MTBI and/or subclinical MTBI and/or diffuse brain injury.

281.     Nevertheless, in 2002, Defendant RIDDELL released the Revolution helmet, a helmet specifically designed to "reduce the incidence of concussions" and they marketed it as "a first-of-its-kind helmet."  Defendants NFL and NFL P allowed, encouraged, purveyed, and promoted the false marketing of these products to football players at every level over its possession and control.

282.     The NFL, a $9B/year revenue entity, funding youth-marketing arms such as USA Football and formerly the NFL Youth Football Fund, has allowed and encouraged and even— through Defendant NFL P—licensed Defendant RIDDELL's noxious campaigns.  But, the NFL

-66-

has done nothing to dissuade its players from hearing these messages, all the while allowing its clubs to profit from the tremendous discounts they received for 80%-or-greater brand-usage.

283.    In its 2003 fact-sheet on the RIDDELL website, RIDDELL represented its Revolution helmet to have been born out of research from "an independent engineering consulting firm in Canada …" and being the first helmet ever designed with the intent of reducing MTBI occurrence.

284.    Defendant RIDDELL eventually placed a warning on its Revolution line.  Yet this warning made no mention of repetitive exposure to subconcussive traumas, latent disease, nor CTE; and, despite clear indications from the NOCSAE that indicate substantial if not overwhelming *probability* of concussive blows in football, this misleading warning suggests merely that contact in football "may" result in concussion and "brain injury", without specifying the nature of such injury.  Its specific references only warn against TBI and *possible* risk of concussive trauma, making it, for these reasons among others, inadequate.

285.    Following the release of the Revolution helmet, RIDDELL funded research at UPMC to study the new helmet with Drs. Michael "Mickey" Collins, Mark Lovell, and Joe Maroon.  The UPMC/RIDDELL study compared new Revolution helmets to old, refurbished, VSR-4 helmets—the oldest performing technology on the marketplace.

286.    In this limited context, RIDDELL's Revolution eked out a victory in performance by approximately 2%: 7.6% to 5.3%, a relative difference of 2.3%.  This number lacks statistical significance and becomes even more compromised when one considers that its evaluation metric was eviscerated: studies revealed the neuropsychological evaluations used to test the Revolution helmets produced 20% to 40% false negative <u>AND</u> positive rates according to peer-reviewed

testing.  In other words, baseline testing and/or follow up exams could have been and likely were wrong, making the results of this study entirely useless to show a 2.3% relative difference.

287.    Upon information and belief, Defendant RIDDELL applied its muscle to UPMC, and attempted to force these fraudulent marketing claims further than UPMC even felt willing to allow.

288.    Mickey Collins later agreed that the study had serious problems and that RIDDELL was shopping for research that would support its claim that the Revolution reduced concussions.

> "I needed money to fund my salary," he said.  "I was going to get my ass fired, you know?  So I'm looking for any kind of funding to do this research.  Any struggling academic is looking for that.  So that was part of it … I'm not an idiot; **I know Riddell wanted the results to look good, okay?  I mean obviously.  I understand that**.  But I am one of the leading experts in concussion … there were serious flaws with the study, okay?  I understand that."

Fainaru-Wada, M. and Fanairu, S., *League of Denial,* Three Rivers Press (2014).

289.    Based on the 2003 UPMC study funded by RIDDELL, RIDDELL marketed the Revolution helmet in 2006 as reducing concussions by 31%—a figure criticized as an exaggeration by leading experts on head injuries.

290.    Upon information and belief, UPMC attempted to make multiple, material changes to RIDDELL's media releases regarding the 31% claim, and the claim that the Revolution provided better protection against concussions, prior to the press release's dissemination.

291.    Specifically, even some of the actual authors of the study took issue with how RIDDELL was characterizing the findings.

292.    By focusing solely on the larger number, which referred to a relative decrease in risk, this exaggerated any benefits of the types of products eventually worn by players wearing these helmets.

293.    Dr. Robert Cantu, a neurosurgeon and leader in the field of sports-related concussion research, wrote a comment published in *Journal of Neurosurgery* that the study contained a "serious, if not fatal methodological flaw."  The study was flawed because it discounted low impact hits and in turn proved that the Revolution did not reduce the risk of concussions.

294.    Upon information and belief, the RIDDELL and NFL P Defendants have knowingly failed to utilize the safest materials available in the construction of football helmets, which has resulted in an increased risk of brain injury in football players, and in fact have marketed the Revolution helmet as a panacea when it contains the same defective liner system as its VSR-4 series predecessor.

295.    In fact, RIDDELL and NFL P have consistently marketed their helmets as having "concussion reduction technology" thus promoting a false sense of security to helmet users and the public.  RIDDELL has continued to utilize substandard liner materials and padding that are less effective at and reducing head impact acceleration by absorbing energy and despite their superior knowledge about the risks associated with concussions and repetitive head impacts.

**I.    MTBI COMMITTEE'S WORK WAS CRITICIZED AS BIASED AND UNFOUNDED.**

296.    Dr. Robert Cantu observed that the small sample size and voluntary participation in the MTBI study discussed by Drs. Pellman and Viano suggested bias in the study design.  As a result, he concluded, no conclusions should be drawn from the study.

297.     A different scientist who reviewed the MTBI Committee's work stated that the NFL's primary goal appeared to be preparing a defense for when injured players eventually sued, and that the league seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

298.     Dr. Kevin Guskiewicz, referring to the MTBI Committee, has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

299.     The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

300.     For example, in a paper published in *Neurosurgery* in December 2004, Dr. Pellman and other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing.  The authors concluded that NFL players did not show a decline in brain function after suffering concussions.  Their analysis also found no ill effects among those who sustained three or more concussions or who sustained a concussion that prevented them from playing football for a week or more.  The paper selectively excluded at least 850 baseline tests, but did not explain why.

301.     The NFL and the MTBI Committee, in addition to promoting false and misleading information, sought to discredit and deny the findings of other researchers confirming the link between football head injuries and long-term brain damage.

302.     Pellman fired William Barr, a neuropsychologist who served on the MTBI Committee as a consultant, after Barr presented NCAA study findings that called into question certain NFL practices.

-70-

303.    Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.  All of these individuals suffered multiple concussions during their NFL careers. Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression. Dr. Omalu concluded that the players had suffered from CTE.  In July 2005, nearly three years after he first saw the body of former Pittsburgh Steelers center Mike Webster, Dr. Omalu's paper about Webster's brain was finally published in *Neurosurgery*: "Chronic Traumatic Encephalopathy in a National Football League Player."

304.    After Dr. Omalu's findings were first published in *Neurosurgery*, the MTBI Committee wrote a letter to the editor of the publication asking that Dr. Omalu's article be retracted.

305.    The MTBI Committee also attacked a study authored by Dr. Kevin M. Guskiewicz.  That study analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression. The study also found that sustaining three or four concussions was associated with twice the risk of depression as never- concussed players and five or more concussions was associated with a nearly threefold risk. [14]

306.    In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.  Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program.  On the program, Dr. Pellman stated unequivocally that he did not believe the results of the study [what year was this study?  The one discussed above?] led by Dr. Guskiewicz.

---

[14] Kevin M. Guskiewicz, PhD, et al. *Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players*, JAMA 2003; 290 (19): 2549-2555.

307.     In 2005, Guskiewicz performed a clinical follow-up study of more than 2,550 former NFL players, and found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions.

308.     The MBTI Committee attacked the study.

309.     In August 2007, the NFL issued a concussion pamphlet to players.  The pamphlet stated:

> Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly.  It is important to understand that there is no magic number for how many concussions is too many.  Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes.

310.     In a statement made around the time that the concussion pamphlet was released, NFL Commissioner Roger Goodell said, "We want to make sure all NFL players . . . are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."  The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline.

311.     Commissioner Goodell also stated: "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

312.     In 2005, the MTBI Committee published a paper that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season."

313.     Facing media scrutiny over the MTBI Committee's questionable studies, Dr. Pellman resigned as the head of the Committee in February 2007.  He was replaced as head by Dr. Ira Casson and Dr. David Viano, but remained a member of the Committee.

314.     Dr. Guskiewicz said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

315.     Regarding Dr. Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

316.     Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.  In 2007, in a televised interview on HBO's Real Sports, Dr. Casson unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

317.     In June 2007, the NFL convened a concussion summit for team doctors and trainers.  Independent scientists, including Drs. Cantu and Guskiewicz, presented their research to the NFL.

318.     Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline. Dr. Bailes recalled that the MTBI's Committee's reaction to his presentation was adversarial: "The Committee got mad . . . we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding?  Alienate the scientist who found it? Refuse to accept the science coming from him?"

-73-

319.     At the summit, Dr. Casson told team doctors and trainers that CTE had never been scientifically documented in football players.

320.     In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale.  Dr. McKee stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions." Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

321.     A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal.  When Dr. McKee's research was published in 2009, Dr. Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]term brain damage."

322.     In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players. Over 1,000 former NFL players took part in the study. The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population— including a rate of 19 times the normal rate for men ages 30 through 49."

323.     The NFL, which commissioned the study, responded to these results by claiming that the study was incomplete, and that further findings would be needed. NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia.  Dr. Casson implied that the Michigan study was inconclusive and stated that further

-74-

work was required.  Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

**J.     AFTER CONGRESS INVESTIGATED, THE NFL FINALLY ACKNOWLEDGED THE CONCUSSION CRISIS IN FOOTBALL**

324.    In 2009 and 2010, the House of Representatives Judiciary Committee held hearings on the impact of head injuries sustained by NFL players.

325.    Representative Linda Sanchez asked NFL Commissioner Roger Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias. Goodell evaded answering the questions.

326.    Rep. Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

327.    In 2010, Dr. Casson testified and denied the validity of independent studies and stated that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

328.    The members of the MTBI Committee knew differently.  Dr. Casson testified that he was "the lead author of a landmark paper on brain damage in modern boxers" published in the Journal of the American Medical Association in 1984.  That paper studied eighteen former and active boxers and found evidence of brain damage in 87% of them.  Clausen H, McCrory P, Anderson V The risk of chronic traumatic brain injury in professional boxing: change in exposure variables over the past century British Journal of Sports Medicine 2005;39:661-664.

329.    In that same vein, Casson's written statement said that he had "been concerned about the possibility of long term effects on the brain related to football for close to 3- years."

-75-

He explained that he "was asked to be on the NFL MTBI committee . . . because of his [his] knowledge of and experience treating boxers with [CTE]."

330.    This testimony contradicted Casson's testimony that "there is not enough valid, reliable, or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

331.    Shortly after a May 2010 hearing, Dr. Batjer was quoted as admitting, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

332.    In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that Dr. Pellman would no longer be a member of the panel.  Drs. Batjer and Ellenbogen were selected to replace Casson and Viano.  The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

333.    Under its new leadership, the Medical Committee admitted that data collected by the previous leadership was "infected" and formally asked Dr. Pellman not to appear at a Committee conference.

334.    In October 2011, Dr. Berger announced that a new study was in the planning process. He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that." Dr. Berger further stated that data from the previous study would not be used. "We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

-76-

### K.    IN 2014, RIDDELL AGREED TO STOP MAKING ITS FALSE CLAIM ABOUT THE REVOLUTION HELMET

335.    Ultimately, in March of 2014, Defendant RIDDELL agreed to stop making its claim regarding the 31% claim after the Federal Trade Commission's division of advertising practices determined "significant limitations" in its study.

336.    Through the years, the Conspirators' MTBI Committee made a series of unsupportable claims in their peer-reviewed papers in *Neurosurgery*, which took significant criticisms including, but not limited to, the following:

a.    Drs. Pellman and Viano stated, that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football- related activities for less than 1 week, it can be concluded that [MTBIs] in professional football are not serious injuries";

b.    Players who suffered a concussion were not at greater risk of suffering future concussions (2004).  One independent doctor wrote that "[t]he article sends a message that it is acceptance to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days,";

c.    "Players who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

d.    Therefore "these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

e.    There was "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players."

f.    NFL players did not show a decline in brain function after a concussion;

g.    Neuropsychological testing was not helpful for evaluating MTBI in NFL players (in a paper written by Dr. Lovell, who developed the imPACT test);

> h.      There were no ill effects among those who had three (3) or more concussions, or who took hits to the head that sidelined them for a week or more;
>
> i.      "No NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions;" and
>
> j.      NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

337.    Indeed, a substantial portion of this liability-limiting conspiracy has entailed shifting blame from those entities with superior knowledge and control —namely the conspirators—onto football's employees/end-users, and creating public opinion and science that would support personal-choice and/or causation defenses in the guise of good-faith research.

338.    As NFL General Counsel Jeff Pash stated on Christmas of 2009, following the release of updated helmet memorandum, "the Commissioner believes if *players* are given the proper information, *they* can make good choices about their equipment and safety."

339.    By way of another example, many conclusions of the MTBI Committee's research have, including but not limited to the jointly sponsored helmet research, focused repeatedly on distinctions between *NFL* football play as compared with *pre-NFL* football play, or versus youth-football play, when the scientists themselves and their peer-reviewers have known such distinctions' only worth lay in tort defense.

340.    Not coincidentally, the Defendants have attempted to establish exactly this sort of 'science', using the research of the MTBI Committee.  The committee posed as a scientific research organization when in fact it was not; the RIDDELL/NFL conspiracy sought to redevelop litigation science on legal causation by drawing a distinction between NFL-football-play and head-trauma suffered in youth-football and/or high school or college football to defend itself.  They began collecting data for a study to prove exactly such a conclusion during the time-period when Defendants played football, instead of providing him with truthful information

-78-

about repetitive head trauma.  The result of this fraudulent research was the February 16, 2016

paper from Casson, Viano and Lovell referenced *infra*.  *See* Solomon, Kuhn, Zuckerman,

Casson, Viano, Lovell, Sills, *Participation in Pre–High School Football and Neurological,*

*Neuroradiological, and Neuropsychological Findings in Later Life: A Study of 45 Retired*

*National Football League Players*, 44 Am. J. Sports. Med. 3 (Mar. 2016).

341.    The conduct alleged herein on the part of NFL and NFL P (directly, by and

through co-conspirator conduct, and by and through their agents/servants) represented a forward-

thinking attempt to shield themselves from tort liability where the NFL and NFL P were at least

generally aware that repetitive head-trauma exposures may have been inherently injurious and/or

deadly with respect to latent, long-term disease and/or illness since the 1987 ALS cluster.

342.    Nevertheless, the conspirators made contrary representations, such as their

concealment and/or misrepresentation and/or omission about any such link to NIOSH amidst an

employment safety health survey.

343.    Overall, since 1980, co-conspirator NFL has collected and maintained an "injury

database."

344.    As admitted in an article published in leading peer-review journal *Neurosurgery*,

jointly attributed to Dr. Ira Casson, MD, Dr. David Viano, PhD, Dr. John Powell, PhD / Certified

Athletic Trainer, and Dr. Elliott Pellman, MD, it was not until the year 1995, despite its actual

and/or constructive knowledge prior to that point, that the NFL added clinical information on

concussions to the existing information regarding the circumstances at the time of injury.

345.    Until approximately 2006, each member-clubs' self-reported and self-serving

information would be logged into one spreadsheet.

346.    Deposition testimony in *Stringer v. NFL* revealed no consistency pointing toward consistency as to how any individual person entering data decides how to characterize a given injury or illness.  Nor was there a system in place to monitor the consistency of reporting across teams during the era that the spreadsheet-entry format was utilized.  *See* No. 2:03-cv-00665-MHW (D.E. 113 at 4).

347.    Since approximately 2006, the NFL began using outside agent, publicly traded health-care company Quintiles, based in North Carolina, to manage this data-entry/report and to correlate this data to various aspects of the game.

348.    Committee Chair Dr. Pellman was quoted in the Winter 1997 edition of co-conspirator Pro Football Athletic Trainer's Society's quarterly trade publication, distinguishing his MTBI Committee as independent in nature by claiming that "athletic trainers are the most important link in head injury treatment."

349.    Dr. Pellman further stated in this same article that "[w]e are in the process of setting safety standards the NFL can look to when a mild traumatic brain injury occurs."  Indeed, this would not occur for 10 years.  Moreover, in making this concession, Pellman attempted to distribute responsibility onto others: "players, coaches, athletic trainers and physicians should all be able to recognize an [MTBI], know what the correct safety standards are and be able to determine at what point a player should return to the field after sustaining mild brain trauma. The standard doesn't exist in the medical community right now, and we in the NFL are attempting to set the standard."  He said, nearly a decade after an international return-to-play protocol had been established by the global medical community, and two to three years after the MTBI Committee's consensus on its own working definition for a concussion: "traumatically

induced alteration of brain function."  Notably, the American Association of Neurosurgeons'
definition captures alteration of brain function "resulting from mechanical force or trauma."

350.    Notwithstanding the NFL's actual/constructive knowledge of the link between
exposures to head-trauma and long-term neurological disease/illness, at *all* times material to the
Complaint, with respect to its injury database, the NFL knowingly permitted the alleged systemic
failures by its member-clubs with respect to providing the data for this database.

351.    The NFL has underreported and/or misreported head injuries, and/or mis-
categorized head-injuries as other injuries (chest/neck/shoulder/muscular/unspecified) in order to
manipulate its own data.  This custom and practice has existed, upon information and belief, for
the duration of this injury database, purportedly created to solve these sorts of problems, but in
fact used to paint skewed statistical pictures favorable to the conspirators.

352.    The MTBI Committee failed to include hundreds of neuropsychological tests
done on NFL players in the results of the Committee's studies on the effects of concussions and
was selective in its use of injury reports.

353.    Between 2002 and 2007, forensic pathologist Dr. Bennet Omalu examined the
brain tissue of deceased NFL players, including Mike Webster (to whom co-conspirator NFL
famously was forced to admit that football caused his brain damage), Terry Long, Andre Waters,
and Justin Strzelczyk.  All of these individuals suffered multiple concussions during their NFL
careers. Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia,
panic attacks, and depression.  Dr. Omalu concluded that the players suffered from CTE.

354.    After Dr. Omalu's findings were published in *Neurosurgery*, the MTBI
Committee wrote a letter to the editor of the publication asking that Dr. Omalu's article be
retracted.

355.     The conspirators' MTBI Committee took similar action against dissenter Kevin Guskiewiecz, a prominent UNC who made criticisms against the committee's composition and opinions.

356.     Representative Linda Sanchez asked NFL Commissioner Roger Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias. Goodell evaded answering the questions.

357.     Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

358.     The gravamen of Goodell's opaque response was that the unclear scientific issues required research, that football-safety always required an ongoing commitment to better equipment (including helmets), and that the game's players needed to better perceive the risks (as opposed to those with the power and knowledge accepting responsibility for explaining those risks.)

359.     The conspirators continue to:

     a.     deny a causal link between CTE and neurological and/or neurobehavioral sequelae;

     b.     fund subversive scientific efforts geared toward litigation defense, and framed as charitable, humanitarian efforts;

     c.     associate with the discredited prior members such as Dr. Pellman in substantive, leadership capacities to address league issues relating to MTBI and/or head trauma;

     d.     employ and hire biased and pseudo "independent" game-day neurologists responsible for spotting concussive impacts and removing injured players from play; and employ Dr. Pellman to serve as in a lead liaison capacity between important channels of football's bureaucracy.

360.     In 2013, Defendants supposedly ended their partnership with RIDDELL as the official helmet of pro football.  While the NFL's sources leaked news that it needed "quite a bit of leverage" to get itself out of the RIDDELL deal early, almost concurrently with the end of this deal, USA Football and RIDDELL agreed to a near-identical deal.

361.     USA Football is a supposedly independent body from the NFL, however, its founding Board of Directors consisted of the NFL's Commissioner of Football, the NFLPA's Executive Director, NFL Government Relations Director Joe Browne, and NFLPA attorney Douglas Allen.  And upon information and belief, a substantial portion of funding for USA Football is driven by the conspirators.

362.     Indeed, as Defendants have believed for decades, developing early interest in football fans leads to adult season-ticket holders is critical for brand-survival and for long-term profits.

363.     Defendants instituted entire marketing campaigns around this premise, specifically trying to: "make soccer moms the coaches of tackle football" and to promote "heads up" tackle football even with the knowledge that such a style of football makes absolutely no difference whatsoever when it comes to preventing injury.

## X.     CAUSES OF ACTION

### COUNT I
### ACTION FOR DECLARATORY RELIEF – LIABILITY
### (Against Defendant NFL)

364.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

365.     There is a case and controversy among Plaintiffs on the one hand and the NFL on the other.

366.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seeks a declaration as to the following:

-83-

a.     That Defendant NFL knew or reasonably should have known, at all material times, that the repeated concussive or subconcussive impacts that the Plaintiffs endured likely put them at substantially-increased risks of developing one or more latent neurodegenerative diseases or conditions, including, but not limited to, dementia, ALS, CTE, Alzheimer's disease, and Parkinson's disease, and any cognitive, mood, or behavioral conditions resulting from of any of them, including depression, cognitive deficitis, impaired thinking and suicidal ideation and deaths;

b.     That, based on the NFL's conduct, *inter alia*, voluntary undertaking to study the issue of MTBI and concussions, subconcussive impacts, neurodegenerative diseases and latent brain diseases and assuming a duty to protect the health and safety of the Plaintiffs, the NFL had a duty to advise Plaintiffs of that heightened risk and dangers of the latent impacts of these blows to the head and subconcussive impacts;

c.     That the NFL willfully and intentionally concealed from and misled the Plaintiffs concerning that risk and dangers; and,

d.     That the NFL recklessly endangered Plaintiffs and caused them to suffer harm and losses.

367.    Plaintiffs are at an increased risk of developing, or have already developed, latent neurodegenerative diseases or conditions including, but not limited, to dementia, ALS, CTE, Alzheimer's disease, and Parkinson's disease, and their debilitating symptoms, as well as any cognitive, mood, or behavioral conditions. As such, a declaratory judgment is warranted to prevent future harm to Plaintiffs.

## COUNT II
## NEGLIGENCE
### (Against NFL and RIDDELL Defendants)

368.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

369.    In the early 1990s, the NFL and RIDDELL voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

370.    In 1994, in connection with that voluntary undertaking, the NFL and RIDDELL created the aforementioned MTBI Committee.

-84-

371.    The NFL and RIDDELL recognized that its voluntary undertaking to study and report information about the effect of head impacts would not just be for the benefit of then-present and former NFL players alone, but also for the football community, the medical community and the general public. Since the NFL is the most prominent and influential entity in the sport of football, the Defendants knew or should have known that its MTBI Committee's statements would have a broad public impact and would be relied upon by all members of the football community and the public.

372.    By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, Defendants assumed a duty to exercise reasonable care in the MTBI Committee's work and these Defendants' agents' public statements about the substance and results of the research and other work of the Committee.

373.    Notwithstanding that Defendants stated that the MTBI Committee would be independent scientists, Defendants filled the seats of the MTBI Committee with inadequately trained members who had strong ties to Defendants and conflicted personal interests in the outcome of the research.

374.    The MTBI Committee negligently performed the NFL and RIDDELL's voluntarily undertaken research mission.

375.    The MTBI Committee knew or should have known that repetitive blows to the head, concussions and subconcussive impacts would result in both an immediate impact as well as latent diseases that could occur within a few days, weeks, months and many years as a result of these strikes to the brain. Instead, Defendants, acting through the MTBI Committee concealed, downplayed and absolutely misrepresented the studies and research performed; manipulated and hid the actual and accurate the data and the study outcomes, and

-85-

misrepresented, concealed or entirely omitted the accurate results of the studies and research performed.

376.    Defendants undertook the duty of research of these important medical and scientific issues concerning the impact of the concussions, but failed to perform their duties properly and as a reasonable person would expect.

377.    In addition, from 1994 through June of 2010, Defendants and their MTBI Committee made material misrepresentations to Plaintiffs, the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms, despite knowing that these representations were false.

378.    Defendants' failure to exercise reasonable care in its voluntarily assumed duty increased the risk that the Plaintiffs would suffer long-term neurocognitive injuries.

379.    The Plaintiffs reasonably relied to their detriment on the Defendants' actions and omissions on the subject.

380.    Under all of the above circumstances, it was foreseeable that Defendants' failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the personal injuries suffered by the Plaintiffs by:

      a.      Failing to use their superior knowledge and information;

      b.      Failing to seat honest and well educated and trained scientists on the MTBI Committee;

      c.      Filling the Committee seats with individuals who were not adequately trained or knowledgeable about the subject matter of the research;

      d.      Filling the Committee seats with individuals who had conflicts ad judgment, and who acted in their own self-interest;

      e.      Failing to select investigators and Committee members who would fairly and honestly undertake the investigations;

f.      Failing to allow the Committee to function independently of Defendants and their industries and interests;

g.      Failing to conduct adequate research;

h.      Failing to conduct accurate research;

i.      Failing to retain investigators who were not biased and self-interested in the study outcomes to the extent that they had an interest in skewing the outcomes to their own favor;

j.      Failing to undertake appropriate research in a scientific manner;

k.      Failing to report accurate findings from the research undertaken;

l.      Failing to disclose accurate information about the research;

m.      Failing to disclose truthful and accurate data to the scientific community;

n.      Failing to act without bias and self-interest, which clouded and tainted the outcomes of their studies;

381.    Failed to accurately undertake and report upon the research that was the subject and the purpose of the Committee in the first place.

382.    Defendants' failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to Plaintiffs' injuries and damages.

383.    As a result of the Defendants' negligence, Defendants are liable to Plaintiffs, and the Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

**COUNT III**
**NEGLIGENT MARKETING**
**(Against All Defendants)**

384.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein

-87-

385.     Defendants had a duty to exercise reasonably care in the marketing of their products, including a duty to ensure that the marketing of the products would not cause unreasonable harm.

386.     Defendants failed to exercise ordinary care in the marketing of their products in that Defendants knew or should have known that their products created the risk of unreasonable and dangerous harm.

387.     Defendants were negligent in marketing their products in that they:

      a.     Unreasonably marketed the game and their products as safe when defendants knew or should have known the risks and negative health effects of brain trauma caused by the game and their products; and

      b.     failed to inform about the scientific research on the negative health effects of brain trauma and about anecdotal evidence from the negative health effects of brain trauma;

      c.     failed to warn of the potential negative effects of brain injuries caused by the game and their products, including but not limited to, that the increased risk for developing one or more serious, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them;

      d.     failed to adequately address the continuing health risks associated with concussive events, subconcussive events, or brain injuries caused by the game and their products; and

      e.     failed to make any statements of substance about concussions, MTBI or other brain injuries;

388.     Despite the fact that the defendants knew or should have known that the game and their products caused unreasonable and dangerous injuries to the brain, defendants continued to promote and market the game and their products without adequately informing of the risks.

389.     As a result of the Defendants' negligence, Defendants are liable to Plaintiffs, and the  Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

## COUNT IV
## NEGLIGENCE
### (Against Defendant NFL P and RIDDELL Defendants)

390.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

391.    As the licensing arm of the NFL, Defendant NFL P had a duty to ensure that the equipment and materials it licensed and approved was of the highest possible quality and sufficient to protect Plaintiffs from the risk of injury, including, but not limited to, the unnecessarily increased of traumatic brain injuries.

392.    Defendant RIDDELL also had a duty to ensure that the equipment and materials they manufactured and had licensed was of the highest possible quality and sufficient to protect Plaintiffs from the risk of injury, including, but not limited to, the unnecessarily increased risk of brain injuries.

393.    Defendants NFL P and RIDDELL breached these duties by licensing defective RIDDELL helmets for use while knowing or having reason to know that these products were negligently and defectively designed and manufactured.

394.    Defendants NFL P and RIDDELL knew or had reason to know that these products not only did not protect Plaintiffs from MTBI or minimize the risk of such harm, but actually increased that risk and contributed to such harm.

395.    As a result of the Defendants' negligence, Defendants are liable to Plaintiffs, and the Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

1346553.5

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(Against the NFL and RIDDELL Defendants)**

396.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

397.     Defendants had a duty to disclose accurate information to the public about the risks of traumatic brain injuries.  This duty arose because:

    a.     Defendants had superior special knowledge of material medical information that Plaintiffs did not have access to, and was not readily available to Plaintiffs;

    b.     Defendants voluntarily and gratuitously inserted themselves into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury.

    c.     Defendants communicated with Plaintiffs, the medical community, and the public while completely omitting material information about the true risks of brain trauma, or providing partial or ambiguous statements regarding safety and brain injuries, and the context of those communications shows that the NFL needed to complete or clarify those statements with all material information.

398.     Despite their knowledge of such material facts, and generally speaking about concussions and brain injuries, Defendants negligently omitted to disclose material information to Plaintiffs, the medical community, and the public regarding the link between brain injuries and the resulting negative neurological effects and conditions.

399.     Defendants actively omitted true information at a time when they knew, or should have known, because of their superior position of knowledge,

400.     Plaintiffs justifiably relied on the Defendants' negligent misrepresentations by omission to their detriment, relying on what the Defendants' said to them and the general public while the Defendants omitted material information about concussions and other brain injuries.

-90-

401.     Plaintiffs' reliance on the Defendants' negligent misrepresentations by omission were reasonable, given the NFL's superior and unique vantage point on these issues.

402.     Had Plaintiffs been aware of such information, they would have taken protective measures or sought the diagnosis and treatment they needed had they been told the truth.

403.     Defendants failed to act with reasonable care by negligently omitting to disclose material information to Plaintiffs and the public regarding the link between concussions and brain injury and resulting negative effects and cognition-impairing conditions.

404.     As a direct and proximate result of the Defendants negligent misrepresentation by omission, Plaintiffs have suffered or are at an increased risk of suffering serious injuries, including, but not limited to, long-term neurological damage, and the serious symptoms, disorders, and diseases resulting from that damage.

405.     As a direct and proximate result of the Defendants' negligence, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law.

## COUNT VI
## NEGLIGENT HIRING
### (Against the NFL Defendant)

406.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

407.     Defendant hired Elliot Pellman and David Viano and the other members of the MTBI Committee for non-clinical care and a purported effort to provide good-faith non-negligent research that would assist in patient management for the public at large.

408.     Defendant voluntarily and gratuitously inserted themselves into the business of studying  (and subsequently rendering expert opinions about) the relationship between repetitive head  impacts and brain injury.

-91-

409.    In doing so, Defendant assumed a duty to the Plaintiffs and the general public to retain and employ persons within the MTBI Committee who were professionally competent to  study and render opinions on the relationship between repetitive head impacts in football and brain  injury and to ensure that those whom it hired had no conflict of interest and that each had the  professional and personal qualifications to conduct those studies and render opinions that were  scientifically rigorous, valid, defensible, and honest.

410.    Defendant breached a duty to the Plaintiffs and the general public by hiring persons who:

      a.      were unqualified;

      b.      were not competent to engage in rigorous and defensible scientific research;

      c.      were not competent to render valid and defensible opinions;

      d.      created fraudulent industry-funded research; and/or

      e.      attacked as not credible the valid and defensible research and opinions generated by neuro-scientists who were unconnected to and not paid by the  NFL and/or RIDDELL.

411.    Defendant's negligence in this regard resulted in a body of falsified industry-funded  research that purposefully and/or negligently contested and suppressed valid and truthful  bio-medical science. The NFL's negligence allowed the MTBI Committee to use falsified  industry-funded research to mislead the Plaintiffs, the medical community, and the general public  regarding the risks associated with repetitive head impacts.

412.    As a result of the Defendant's negligence, the Plaintiffs have sustained brain injuries that  are progressive and latent and did not take protective measures or seek the diagnosis and treatment  they would have sought had they been told the truth.

413.    As a direct and proximate result of the Defendant's negligence, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law.

**COUNT VII**
**NEGLIGENT RETENTION/SUPERVISION**
**(Against the NFL Defendant)**

414.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

415.    Defendant knew or should have known that the controlling members of the MTBI Committee demonstrated an ongoing lack of competence, objectivity and inadequate judgment to study and render expert opinions on the issue of the relationship between repetitive head impacts and brain injury.

416.    Defendant voluntarily assumed a duty to the Plaintiffs as members of the general public not to allow those incompetent persons it had hired within the MTBI Committee to continue to conduct incompetent and falsified studies and render incompetent opinions on the relationship between repetitive head impacts and brain injury.

417.    During the time period when the MTBI Committee was conducting its purported research and rendering its purported opinions, Defendant knew or should have known that the purported research and opinions of the MTBI Committee were false and indefensible.

418.    Defendant breached a duty to the Plaintiffs and the general public by allowing these incompetent and unqualified persons, under the auspices and with the imprimatur of the NFL:

        a.      to continue to create incompetent and indefensible research,

        b.      to continue to render invalid and indefensible opinions, and

-93-

      c.      to continue to attack the credible and defensible research and opinions of neuro-scientists not connected to or paid by the NFL.

419.    Defendant's negligence allowed the incompetent members of the MTBI Committee to continue to advance their false and incompetent research and opinions in an attempt to suppress valid bio-medical science. The Defendants' negligence allowed the MTBI Committee members to mislead the Plaintiffs and the general public regarding the permanent brain injury risks associated with repetitive head impacts.

420.    As a result of Defendant's failure, the Plaintiffs have sustained brain injuries that are progressive and latent and did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth.

421.    As a direct and proximate result of the Defendant's negligence, Defendant is liable to Plaintiffs for the full measure of damages allowed under applicable law.

## COUNT VIII
## FRAUD
### (Against all Defendants)

422.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

423.    Defendants had a duty to promptly disclose and speak the full truth regarding the health risks and dangers caused by concussive and subconcussive impacts and the risk of latent brain disease. This duty arose because:

      a.      Defendants had superior special knowledge, information and access to material scientific research and medical information that Plaintiffs did not have access to, and was not readily available to Plaintiffs and the general public;

      b.      Defendants voluntarily and gratuitously inserted themselves into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury; and,

-94-

c.     Defendants communicated with Plaintiffs and the public while completely omitting material information about the true risks of repetitive  head trauma, concussions and subconcussive impacts, or providing partial or ambiguous statements regarding safety and brain injuries, and the context of those communications shows that the Defendants needed to complete or clarify those statements with all material information.

424.     Defendants breached that duty by fraudulently failing to disclose material information to Plaintiffs and the public regarding the likely risks of brain injuries caused by concussive and subconcussive impacts,  including, but not limited to, the resulting negative neurological effects and conditions, including the increased risk of developing one or more serious, latent, neurodegenerative diseases or conditions including, but not limited to, CTE, and symptoms therefrom including but not limited to, *inter alia*, dementia, ALS, Alzheimer's, and Parkinson's and other neurodegenerative diseases, and the debilitating symptoms from each of them.

425.     Specifically, Defendants concealed material facts and information with the effect of evading the truth, which caused Plaintiffs to become exposed to the harm referenced above.

426.     Plaintiffs justifiably relied on Defendants' fraudulent omissions and misrepresentations as alleged above to their detriment.

427.     Given Defendants' superior and special knowledge and resources, Plaintiffs reasonably relied upon the Defendants' for guidance on concussions and other brain injuries, and reasonably relied upon Defendants' fraudulent omissions of material fact, which concealed and minimized the perceived risks of repetitive brain impacts.

428.     Had Plaintiffs been aware of such information they would have taken protective measures or sought the diagnosis and treatment they would have needed had they been told the truth.

429.     As a direct and proximate result of the Defendants' fraud by omission and failure to warn, Plaintiffs have suffered and continue to suffer serious injuries, including, but not limited, to long-term neurological damage, the serious symptoms resulting from that damage, and the increased risk of developing one or more serious, latent, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them.

430.     As a direct and proximate result of the Defendants' misconduct, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law and medical monitoring for undiagnosed neurological diseases, disorders, or conditions.

### COUNT IX
### STRICT LIABILITY/DESIGN DEFECT
### (Against the RIDDELL Defendants)

431.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

432.     At the time the helmets were designed, manufactured, sold, and distributed by the RIDDELL Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their intended purpose because they did not provide adequate protection against the foreseeable risk of concussive brain injury.  The design defect includes, but is not limited to the following:

a.     Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the head;

b.     Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

c.     Negligently failing to properly and adequately test the helmet model;

d.     Other acts of negligence that may be discovered during the course of this matter;

e.  Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury;

f.  Prior to 2002, the RIDDELL Defendants made no attempt to design a helmet to protect against concussive injuries. The two helmets they marketed, the AF2 (discontinued in 1997) and the VSR4, had insufficient padding to protect against concussive injuries; and

g.  Even the RIDDELL Revolution Helmets (introduced in 2002) were not designed to sufficiently protect against concussions as was shown by the demonstration before a congressional panel, by P. David Halstead, Technical Director of Southern Impact Research Center ("SIRC") on January 4, 2012.

h.  The defective design and unreasonably dangerous condition were a proximate and producing cause of the personal injuries suffered by the Plaintiffs and other damages, including but not limited to, economic damages and non-economic damages.

433.  At all times, the helmets were being used for the purpose for which they were intended.

434.  The RIDDELL Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein. A safer alternative design was economically and technologically feasible at the time the product left the control of the RIDDELL Defendants.

435.  As a result of the RIDDELL Defendants' defective design for the RIDDELL helmets, Plaintiffs have sustained permanent injuries.

## COUNT X
## FAILURE TO WARN
### (Against the RIDDELL Defendants)

436.  Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

-97-

437.     The RIDDELL Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the RIDDELL helmets.

438.     The RIDDELL Defendants failed to provide necessary and adequate safety and  instructional materials and warnings of the risk and means available to reduce and/or minimize the risk  of concussive brain injuries when using their helmets.

439.     The RIDDELL Defendants failed to provide necessary and adequate information,  warnings, and/or instructional materials regarding the fact that other model helmets provided greater   shock attenuation from blows to the head area.

440.     The RIDDELL Defendants ignored 18 years of published literature, read by their general counsel Richard Lester, warning of the dangers of concussive injuries until 2002, when a warning  involving return to play after a concussion was placed on all RIDDELL helmets. The warning was still  defective and inadequate and remains today defective and inadequate because it does not warn about  the later life cognitive effects of concussive injury.

441.     The RIDDELL Defendants knew that these substantial dangers were not readily  recognizable to an ordinary consumer or user and that such person would use these products without  inspection for defects.

442.     Plaintiffs neither knew, nor had reason to know of the existence of the aforementioned  defects, or increased risks of harm.

443.     Plaintiffs were using the helmets in a reasonably foreseeable manner at all times. Plaintiffs' damages were the legal and proximate result of the actions of the RIDDELL Defendants who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the  foreseeable use of their products.

444.     As a result of the RIDDELL Defendants' failure to warn, Plaintiffs have sustained permanent injuries.

**COUNT XI**
**NEGLIGENCE**
**(Against the RIDDELL Defendants)**

445.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

446.     The RIDDELL Defendants were negligent in their design, testing, assembly, manufacture,  marketing, and engineering of the helmets as described herein.

447.     The RIDDELL Defendants owed a duty of care to the Plaintiffs in their design, testing,  manufacture, assembly, marketing and sale of the helmets and all components and sub-assemblies of  the helmets.

448.     The RIDDELL Defendants should have been well aware that since 1928 repeated blows to  the head can lead to CTE, commonly known as "punch-drunk syndrome."

449.     The RIDDELL Defendants breached their duty of reasonable care by failing to provide  necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce  and/or minimize the risk of concussive brain injuries while using their  helmets.

450.     As a result of the RIDDELL Defendants' negligence, Plaintiffs have sustained permanent injuries.

**COUNT XII**
**BREACH OF IMPLIED WARRANTY**
**(Against the RIDDELL Defendants)**

451.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

1346553.5

452.     At the time Defendants marketed, distributed, and sold the RIDDELL helmets, Defendants warranted that the RIDDELL helmets were merchantable and fit for the ordinary purposes in which they were intended.

453.     Users of the helmets like Plaintiffs were the intended beneficiaries of the warranty.

454.     The RIDDELL helmets were not merchantable and fit for their ordinary purpose because the helmets do not protect from brain injury and the cognitive effects of concussive injury.

455.     Plaintiffs reasonably relied on Defendants' representations that the RIDDELL helmets were a safe means of reducing the risk of head injury.

456.     Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

457.     As a result of the RIDDELL Defendants' breach, Plaintiffs have sustained permanent injuries.

## COUNT XIII
## NEGLIGENT MISREPRESENTATION
### (Against the RIDDELL Defendants)

458.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

459.     From the time the RIDDELL helmets were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, Defendants made misrepresentations that the RIDDELL helmets were safe and fit for its intended purpose of protecting users from harm.  At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of RIDDELL helmets and willfully deceived Plaintiffs as to the health risks and consequences of using RIDDELL helmets.

-100-

460.     Defendants made the forgoing representations without reasonable ground for believing them to be true.  These representations were made by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and advertising directed to the public.

461.     The representations by Defendants were false in that the RIDDELL helmets were not safe and fit for its intended purpose as using the RIDDELL helmets has a serious propensity to cause brain injuries like those suffered by Plaintiffs.

462.     The foregoing representations by Defendants were made with the intention of inducing the purchase of RIDDELL helmets.

463.     In reliance on the misrepresentations made by Defendants, Plaintiffs were induced into using the helmets.  Plaintiffs' reliance upon Defendants' misrepresentations were justified because such misrepresentations were made and conducted by individuals and entities that were in a superior position of knowing the facts.

464.     As a result of the RIDDELL Defendants' misrepresentations, Plaintiffs have sustained permanent injuries.

## COUNT XIV
## FRAUD
### (Against the RIDDELL Defendants)

465.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

466.     Prior to Plaintiffs' use of the RIDDELL helmets, Defendants fraudulently suppressed material information regarding the safety of using RIDDELL helmets, including information regarding the serious risk and propensity of brain injuries occurring over time from

-101-

use of RIDDELL helmets.  Plaintiffs believe that the fraudulent misrepresentations described herein were intentional to maintain the sales volume of RIDDELL helmets.

467.    Defendants falsely and fraudulently represented to the public that the RIDDELL helmets had been tested and were found to be safe for its intended use to prevent head injuries.

468.    These representations were made by Defendants with the intent of defrauding and deceiving the Plaintiffs and the public in general and were made with the intent of inducing the public to purchase and/or use the RIDDELL helmets.

469.    At the time Defendants made these representations, Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

470.    In reliance upon Defendants' representations, Plaintiffs were induced to and did use the RIDDELL helmets, thereby sustaining severe and permanent injuries.

471.    Defendants knew and were aware that the RIDDELL helmets were not fit for their intended purpose, were defective in nature, and lacked adequate or sufficient warnings.

472.    Defendants fraudulent concealed the safety issues associated with use of RIDDELL helmets in order to induce the public to purchase and use RIDDELL helmets.

473.    At the time Defendants concealed the fact that RIDDELL helmets were not safe and fit for their intended purpose, Defendants were under a duty to communicate this information to Plaintiffs and the general public in such a manner that they could appreciate the risks associated with using RIDDELL helmets.

474.    As a direct and proximate result of Defendants' malicious and intentional concealment of material life-altering information from Plaintiffs and the general public, Defendants caused or contributed to Plaintiffs' injuries.

475.     As a result of the RIDDELL Defendants' fraud, Plaintiffs have sustained permanent injuries.

## COUNT XV
## <u>VIOLATION OF CONSUMER PROTECTION LAWS</u>
### (Against the RIDDELL Defendants)

476.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

477.     Plaintiffs used the RIDDELL helmets and suffered ascertainable losses as a result of Defendants' actions in violation of consumer protection laws.

478.     Defendants used unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

a.     Representing that goods or services have characteristics, uses, benefits, or qualities that they do not have;

b.     Advertising goods or services with the intent to not sell them as advertised; and

c.     Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

479.     Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of RIDDELL helmets.

480.     Defendants violated consumer protection laws of various states.

481.     Defendants communicated the purported benefits of RIDDELL helmets while failing to disclose the serious and dangerous risk of cognitive injury that occurs over long term use of RIDDELL helmets.  Defendants made these representations to Plaintiffs and the general public in the representations, packaging, marketing and advertising described herein.

482.     Defendants' conduct in connection with RIDDELL helmets was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, and advantages of using RIDDELL helmets.

483.     As a result of these violations of consumer protection laws, Plaintiffs have sustained permanent injuries.

## COUNT XVI
## CIVIL CONSPIRACY
### (Against All Defendants)

484.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

485.     For decades, the named Defendants, along with others who were employed by the Defendants, including those who participated in the NFL MTBI Committee, acted in concert to perpetrate the fraudulent concealment of the decades long scientific research that linked concussions, subconcussive impacts and repetitive head trauma to emotional distress, cognitive impairment, intellectual deficits and latent brain disease and neurodegenerative brain disease.

486.     Defendants engaged in an unlawful agreement to intentional fail to disclose, hide, conceal and misrepresent the truth about the risks and dangers of latent brain disease in athletes, like Plaintiffs who suffered repetitive blows to the head, concussions and subconcussive impacts.

487.     Defendants knew and had reason to know the information that they were hiding, concealing, omitting and failing to disclose to Plaintiffs, among others, was information upon which Plaintiffs would rely.

488.    Defendants entered into the agreement to engage in false misrepresentations intended for the purpose to induce Plaintiffs and others' reliance and to continue to promote Defendants' business interests and profits.

489.    The named Defendants, along with those who participated in the concerted efforts  referenced above, knowingly  failed to disclose and/or  made continuing misrepresentations of  material fact that there  was  an absence  of  any  scientific  basis  to believe  that  repetitive  MTBI  created  any  known  long-term  neuro-cognitive  risks.  That misconduct  by  the  named Defendants exposed Plaintiffs  to an increased risk of brain injury and was the proximate  cause of the Plaintiffs' latent brain injuries, latent brain diseases and neurodegenerative harm suffered and which they will suffer far into the future.

## COUNT XVII
## FRAUDULENT CONCEALMENT
### (Against All Defendants)

490.    Defendants were in a position of superior special knowledge, information and access to material scientific research and medical information and knew or had reason to know that Plaintiffs would rely upon their representations.

491.    Defendants knew, intended to induce and expected that Plaintiffs would reasonably rely on their silence and fraudulent concealment of the risks and long term effects of brain injuries suffered while using RIDDELL helmets.

492.    Plaintiffs reasonably relied on that silence during and after their careers, to their detriment.

493.    This information was material in that had Plaintiffs been aware of such information they would have taken protective measures or sought the diagnosis and treatment they would have needed had they been told the truth.

494.     As a direct and proximate result of the Defendants' fraudulent concealment,

Plaintiffs have suffered and continue to suffer serious injuries, including but not limited to long-

term neurological damage, and the serious symptoms resulting from that damage, and the

increased risk of developing one or more serious, latent, neurodegenerative diseases or

conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and

Parkinson's disease, and the debilitating symptoms from each of them.

495.     As a direct and proximate result of the Defendants' misconduct, Defendants are

liable to Plaintiffs for the full measure of damages allowed under applicable law and for medical

monitoring for undiagnosed neurological diseases, disorders, or conditions.

### COUNT XVIII
### <u>WRONGFUL DEATH</u>
### (Against All Defendants)

496.     Plaintiffs and their respective Executors or equivalent legal representatives

under  applicable state law (hereinafter "Executors") reallege each and every allegation set

forth in all preceding paragraphs as fully set forth herein.

497.     The Plaintiffs' legal representatives bring this action in their representative capacity

of  the decedent's Estate and next of kin and on behalf of the respective survivors of those

Plaintiffs.

498.     As a direct and proximate cause of the conduct alleged herein, Defendants

caused the  Plaintiffs to develop the debilitating brain diseases and conditions set forth above,

which diseases  and conditions caused extreme pain, suffering, and anguish and, ultimately,

the deaths of some  Plaintiffs.

499.     As a direct and proximate result of the untimely deaths of the Plaintiffs, their

respective  survivors and/or surviving distributees have been deprived of the earnings,

maintenance, guidance,  support and comfort that they would have received from for the rest of the respective Plaintiffs' natural  lives, and have suffered commensurate pecuniary and non-pecuniary losses because of the Plaintiffs'  wrongful deaths.

500.    The Plaintiffs' legal representatives claim the full measure of damages allowed under  applicable law.

**COUNT XIX**
**SURVIVAL ACTION**
**(Against All Defendants)**

501.    Plaintiffs and their respective Executors or equivalent legal representatives under  applicable state law (hereinafter "Executors") reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

502.    The Plaintiffs' legal representatives bring this action in their representative capacity of  the decedent's Estate and next of kin and on behalf of the respective survivors of those Plaintiffs.

503.    As a direct and proximate cause of the conduct alleged herein, Defendants caused the  Plaintiffs to develop the debilitating brain diseases and conditions set forth above, which diseases  and conditions caused extreme pain, suffering, and anguish and, ultimately, the deaths of some  Plaintiffs.

504.    The legal representatives of the deceased Plaintiffs' claim damages recoverable under  applicable law for all pecuniary and non-pecuniary losses suffered by the deceased Plaintiffs by reason  of their deaths.

505.    The Plaintiffs' legal representatives claim the full measure of damages allowed under  applicable law.

1346553.5

**COUNT XX**
**LOSS OF CONSORTIUM**
**(Against All Defendants)**

506.    Plaintiffs and Plaintiffs' Spouses incorporate by reference as if fully set forth herein  paragraphs applicable to the Counts they or their spouses have pled in their respective Short Form  Complaints.

507.    As a result of the named Defendants' misconduct, the named Defendants are liable  to Plaintiffs' Spouses.

508.    As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness of the named Defendants (designated in the Short Form Complaints),  the Plaintiffs have sustained the aforesaid injuries, and the Plaintiffs' Spouses have been damaged  as follows:

      a.     They have been and will continue to be deprived of the services,  society and companionship of their respective spouse;

      b.     They have, will be and will continue to be required to spend money for medical care and household care for the treatment of their respective spouse; and

      c.     They have been and will continue to be deprived of the earnings of  their respective spouse.

509.    As a result of the injuries, the Plaintiffs' Spouses are entitled to damages, as alleged  herein or allowed by law.

**COUNT XXI**
**PUNITIVE DAMAGES UNDER ALL CLAIMS**
**(Against All Defendants)**

510.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

511.    Defendants the NFL, NFL P and RIDDELL engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the Plaintiffs

-108-

and the public, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  Plaintiffs and society cannot afford and should never be exposed to the risks of another public display of brutality and the monetization of violence of the magnitude caused by Defendants' misconduct herein.

512.    Defendants' corporate culture caused and allowed it to disregard the lessons they should have learned and applied from previous incidents, from scientific journals and articles and the accumulated medical knowledge that repetitive blows to the head resulted in extensive damage to the Plaintiffs, their families and the community; instead, Defendants continued to place others at risk in the interests of cost-cutting and financial gain.

513.    In addition, after the Plaintiffs injuries from latent diseases manifested, the Defendants were aware of the latent diseases, the medical procedures that would potentially help Plaintiffs and their families, yet Defendants delayed the provision of this potentially life-saving information, thereby increasing the risk of long-term harm to the Plaintiffs and their families.  As such, Defendants increased the magnitude of, and damage caused by, the Defendants conspiracy of silence and deceit, by willfully and/or wantonly and recklessly choosing its profits over the lives of the Plaintiffs and their families.

514.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human health and safety; because it caused devastating damage and loss to the livelihoods and families of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in

-109-

favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

515.     Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT XXII
## <u>DECLARATORY RELIEF: PUNITIVE DAMAGES</u>
### (Against All Defendants)

516.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

517.     Plaintiffs have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.  They are private fines, authorized under applicable states' laws to punish reprehensible conduct and deter its future occurrence.  Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the Defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated.

518.     Accordingly, Plaintiffs seek a judicial declaration against Defendants and in favor of the Plaintiffs that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

1346553.5

Dated:  April 26, 2017

Respectfully Submitted,

By:      */s/ Wendy R. Fleishman*
       Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein
250 Hudson Street
8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com

*Lead Counsel on Behalf of Opt-Outs*

Bradford R. Sohn
The Brad Sohn Law Firm
2600 South Douglas Road
Suite 1007
Coral Gables, Florida 33134
Telephone: (786) 708-9750
Facsimile:  (305) 397-0650
brad@sohn.com

*Plaintiffs' Opt-Out Counsel*

-111-

1346553.5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE RETIRED PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>*Plaintiffs' Master Administrative Long-Form Complaint*, and:<br><br>*Fernando Smith et al. v. National Football League, et al.* (Plaintiffs Fernando Smith and _____ ONLY)<br><br>Court File No. _____ | Hon. Anita B. Brody |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2017, I caused a true and correct copy of the foregoing *Second Amended Master Administrative Long-Form Complaint* to be filed via CM/ECF system, in the United States District Court, Eastern District of Pennsylvania, on all parties registered for CN/ECF in this litigation dated April 26, 2017.

Dated April 26, 2017

Respectfully Submitted,

By:     */s/ Wendy R. Fleishman*_____
        Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein
250 Hudson Street
8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com

1346553.5