**SEEGERWEISS**LLP

1515 Market Street, Suite 1380, Philadelphia, PA 19102   P 215.564.2300   F 215.851.8029   www.seegerweiss.com

May 5, 2017

**By Email**
Richard L. Scheff
Montgomery McCracken
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109

Re:   *In Re: National Football League Players' Concussion Injury Litig.*,
      No. 2:12-md-02323-AB
      NFL Case Consulting, LLC and Jim McCabe

Dear Richard:

    I am writing to you in follow-up to the conference call we had on Thursday, April 27, 2017, and in anticipation of the joint status report due to be filed next Friday, May 12, 2017. Co-Lead Class Counsel intend to decide by next Friday whether the issues we have been discussing, related both to our original motion for injunction and to facts that have come to light since we filed that motion, can be amicably resolved. That is, we do not intend to delay further by suggesting to the Court that we submit another status report after May 12th. Should we not be able to reach agreement with your clients, we expect to file a new motion shortly after May 12th, which motion will include the incorporation of recent factual developments.

    This letter is not designed to address any issues between your clients and the NFL Parties relating to trademark and other intellectual property issues. We leave those issues for you to discuss with counsel for the NFL Parties.

*Outstanding Issues*

    In response to my requests, you indicated that you would check with your clients to determine whether they would be willing to provide certain documents and other information.

    Specifically, I am waiting to hear back from you as to whether your clients will allow me to come to your office and listen to the audiotapes of the calls between NFL Case Consulting (and/or its successor entity) and Class Members with whom it contracted, including the six Class Members identified in my email of April 21, 2017, as having been registered for Settlement Benefits by your clients, and a subset of others, as further described below. (A copy of my April

21 email is attached hereto.) In the alternative, please let me know if your clients would be amenable to my calling these six Class Members, and a subset of others who have contracted with your clients, to inquire about the agreements with your clients and any verbal or written communications made in connection therewith.

I am also waiting for you to advise me as to whether your clients will provide the current agreement they use with Class Members. (You confirmed that the initial form agreement they had been using, a copy of which is attached, has been revised.)

*Actions Your Clients Are Willing To Take*

You have represented that your clients would be willing to agree to certain measures in an attempt to resolve this matter.

Specifically, your clients are willing to send a letter, but, *only to the six Class Members I had identified as having been registered by your clients*. That letter would affirmatively identify any possible misrepresentations that might have been communicated about the Settlement and/or about your clients' identities, affiliations and endorsements, which we have been discussing and give those six Class Members the opportunity to void their agreements with your clients. Please advise as to whether your clients would reconsider and agree to extend the scope of recipients of the letter to all of those Class Members with whom your clients have contracted.

You will listen to a significant subset (you did not identify the number) of the audiotapes of calls between your clients and the Class Members with whom your clients have contracted to determine whether any misrepresentations were made. If problems are detected, further discussions will ensue in order to determine whether the subset should be increased or all calls should be screened. Please advise if this process has begun yet. Please also advise as to whether your clients would agree to also allow me to listen to that subset of audiotapes.

Finally, you indicated that your clients were in the process of revising their website content to address issues discussed during our prior calls, as outlined in my email of April 18, 2017, a copy of which is also attached, and concerns of the NFL Parties as to trademark and intellectual property issues. You further stated that the new website would provide a link to the FAQs on the official NFL Concussion Litigation Settlement Website. Please advise as to when you expect us to be able to review your clients' new website content.

*Actions Your Clients Are Unwilling To Take*

On behalf of your clients, you have represented that they are unwilling to do certain things.

Specifically, your clients are unwilling to review the audiotapes of communications between NFL Case Consulting (and/or its successor entity) for each and every Class Member with whom your clients have entered into agreements because, in their view, it would be too burdensome. You did not provide the total number comprising the "not insignificant" subset of

calls for which your clients would agree to have the audiotapes screened. Please advise as to whether your clients have reconsidered on the issue of allowing the review of the audiotapes for *all* calls involving Class Members who entered into contracts.

I asked for a list of all of those Class Members with whom your clients have entered into an agreement and you stated that you were not authorized to provide those Class Members' identities or even the number of Class Members with whom your clients have contracted. Please advise as to whether your clients have reconsidered on this point.

You represented that your clients are not affiliated with a particular law firm, but that your clients do provide a list of eight to ten law firms to Class Members with whom they contract for possible retention of counsel, in addition to your clients' services. You said that were not authorized to identify those firms. Please advise as to whether your clients have reconsidered on this point.

If you disagree with any of the above, please advise me of same.

*Co-Lead Class Counsel's Continuing Concerns*

So that we are clear, Co-Lead Class Counsel remain concerned on several fronts.

As a threshold matter, as Court-appointed Class Counsel, we owe a fiduciary duty to Class Members, which includes protecting them from misinformation about the Settlement that could influence the exercise of their rights under the deal or shortchange the relief to which they are entitled. The Court also owes a fiduciary duty to Class Members. Given the very nature of this case, many Class Members with whom your clients communicated and entered into agreements, or will communicate and enter into agreements in the future, are neurocognitively impaired. The possibility of misinformation influencing Class Members is therefore considerably heightened. As such, it is inappropriate to draw parallels between this case and the BP litigation with respect to communications and messages directed to Class Members.

Unless we listen to the audiotapes, we do not know if those Class Members with whom your clients entered into agreements did so based, in whole or in part, upon verbal misrepresentations – about the Settlement itself, or about who your clients are, their affiliations, or whether they are endorsed by the Court.

Based upon the website that your clients created and content they posted, which was *after* we filed our motion for an injunction (although they have since taken it down), and based upon the attached contract that your clients were employing for a time (although we understand it has since been revised), your clients clearly did not understand the Settlement. Thus, due to that misunderstanding, they likely passed on misinformation (through the website or verbally) to Class Members, some of whom may have entered into agreements with your clients in reliance upon that misinformation.

In my attached email of April 18, 2017, I detailed the misrepresentations contained in your clients' website, as it existed at the time. I will not restate all of the incorrect information contained on that version of the website, but, suffice it to say that it is very problematic if Class Members entered into agreements with your clients based upon the information on that website or verbal recitations of that information by your clients' employees.

According to the attached contract, your clients are taking 15% of a Class Member's gross Monetary Award for doing things like "provid[ing] a calculation of damages." As I noted on our call, this seems applicable to BP, but, not to this case. Further, as I have noted on multiple prior occasions on telephone calls and in emails, the agreement also refers to "medical testing conducted independently of the settlement," the costs of which would be advanced by your clients, despite the fact that Qualifying Diagnoses cannot be obtained outside of the Settlement Program after the January 7, 2017 Effective Date, a salient fact regarding which you and your clients clearly were unaware.

Additionally, as I relayed to you on a call and as is reiterated in my April 21 email, a Class Member with whom I personally spoke said that he was told by your clients' employee that if he signed up with your clients, they would pay for a baseline examination for him, which is deceptive because (a) the BAP is free; and (b) the call was after the Effective Date when Qualifying Diagnoses could not be obtained outside of the Settlement Program.

If your clients refuse to provide the current contract, as requested during our call and reiterated above, please advise me as to what your clients are purporting to do for Class Members with whom they have entered into contracts for 15% of their gross awards. We need to know what services, if any, your clients have rendered to Class Members with whom they have entered into agreements. We also need to know whether your clients sent those Class Members for medical testing after the Effective Date (with costs for same ultimately being borne by the Class Member if and when he receives a monetary award), with the promise that or even the suggestion that a diagnosis arising out of that testing could constitute a Qualifying Diagnosis.

During calls and in your letter to me, dated April 6, 2017, you have referred many times to what your clients did in the BP case. Please advise if your clients would be willing to provide a copy of the agreement(s) they used in that case. Further, please advise whether there were any opinions by the court in BP approving your clients' contracts, services or their rates.

To facilitate internal decision-making as to what our position will be in the joint status report to Judge Brody due on May 12, 2017, I request that you respond to this letter by close of business on Tuesday, May 9, 2017. Thank you.

Very truly yours,

/s/ TerriAnne Benedetto

TerriAnne Benedetto

cc (w/ encls.):
    Lynn B. Bayard, Esq. (via email)
    Douglas M. Burns, Esq. (via email)
    Sol Weiss, Esq. (via email)