# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE RETIRED PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>*Plaintiffs' Second Amended Master Administrative Long-Form Complaint Against* RIDDELL, INC.; ALL AMERICAN SPORTS CORP.; RIDDELL SPORTS GROUP, INC.; BRG SPORTS, INC. f/k/a EASTON-BELL SPORTS, INC.; BRG SPORTS HOLDINGS CORP. f/k/a BRG HOLDINGS CORP.; EASTON-BELL SPORTS, LLC; EB SPORTS CORP.; and BRG SPORTS, LLC | Hon. Anita B. Brody |

## <u>SECOND AMENDED MASTER ADMINISTRATIVE LONG-FORM COMPLAINT AGAINST RIDDELL DEFENDANTS</u>

1348053.1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF DEFENDANTS' MISCONDUCT AND RESULTING
      DANGERS, DAMAGES, INJURIES, DEATHS AND CLAIMS .................................. 3

III.  JURISDICTION AND VENUE ............................................................................. 9

IV.   EQUITABLE ESTOPPEL – TIME-BASED DEFENSES ............................................ 9

V.    TOLLING OF THE STATUTE OF LIMITATIONS .................................................. 10

      A.    FRAUDULENT CONCEALMENT .............................................................. 10

      B.    FRAUDULENT ESTOPPEL ...................................................................... 11

      C.    DISCOVERY RULE ................................................................................ 11

VI.   THE PARTIES .................................................................................................. 11

      A.    THE PLAINTIFFS .................................................................................. 11

      B.    THE DEFENDANTS ............................................................................... 12

VII.  SUMMARY OF THE CONSPIRACY .................................................................... 15

VIII. FACTUAL BACKGROUND ................................................................................ 19

      A.    THE NFL'S INFLUENCE ........................................................................ 23

      B.    DEFENDANTS AND THEIR CO-CONSPIRATORS HAVE
            MYTHOLOGIZED VIOLENCE THROUGH THE MEDIA. ........................... 24

      C.    DEFENDANTS KNEW OF THE DANGERS ASSOCIATED WITH
            REPETITIVE HEAD IMPACTS AND CONCUSSIONS FOR
            DECADES. ............................................................................................ 27

      D.    DEFENDANTS HAD A SELF-IMPOSED DUTY TO PROTECT
            HEALTH AND SAFETY OF THE ENTIRE FOOTBALL
            COMMUNITY, PAST AND PRESENT. ....................................................... 31

      E.    DEFENDANTS VOLUNTARILY UNDERTOOK THE
            RESPONSIBILITY OF STUDYING HEAD IMPACTS IN FOOTBALL
            AND FRAUDULENTLY CONCEALED THEIR LONG-TERM
            EFFECTS. .............................................................................................. 33

            1.    Co-conspirator NFL Sponsored the Football Injuries Symposia in
                  1969, which Focused on Head Injuries. .......................................... 33

            2.    NOCSAE ....................................................................................... 36

            3.    The NFL P and RIDDELL Agreement ............................................. 43

      F.    THE MTBI COMMITTEE ....................................................................... 44

## TABLE OF CONTENTS
### (continued)

Page

G.     MTBI COMMITTEE'S WORK WAS CRITICIZED AS BIASED AND UNFOUNDED ................................................................................... 62

H.     RIDDELL RELEASED ITS REVOLUTION HELMET BASED ON FLAWED STUDIES. ................................................................... 67

I.      U.S. CONGRESS INVESTIGATED THE INJURIES SUFFERED ON THE FOOTBALL FIELD AND CO-CONSPIRATOR NFL FINALLY ACKNOWLEDGED ITS OWN FLAWED RESEARCH. ................................ 71

J.      IN 2013, RIDDELL ENDED ITS PARTNERSHIP WITH THE NFL AND THE NFL P. ............................................................................ 77

IX.   CAUSES OF ACTION ............................................................................ 78

COUNT I NEGLIGENCE ................................................................... 78

COUNT II NEGLIGENT MARKETING ............................................ 82

COUNT III NEGLIGENT MISREPRESENTATION ........................ 84

COUNT IV FRAUD ............................................................................ 86

COUNT V STRICT LIABILITY/DESIGN DEFECT .......................... 89

COUNT VI FAILURE TO WARN ....................................................... 91

COUNT VII BREACH OF IMPLIED WARRANTY .......................... 92

COUNT VIII CIVIL CONSPIRACY .................................................. 93

COUNT IX FRAUDULENT CONCEALMENT ................................. 95

COUNT X WRONGFUL DEATH ....................................................... 96

COUNT XI SURVIVAL ACTION ...................................................... 97

COUNT XII LOSS OF CONSORTIUM ............................................. 98

COUNT XIII PUNITIVE DAMAGES UNDER ALL CLAIMS ....................... 99

COUNT XIV DECLARATORY RELIEF:  PUNITIVE DAMAGES .............. 101

PRAYER FOR RELIEF ............................................................................................ 101

JURY TRIAL DEMANDED ................................................................................... 102

## I.   __INTRODUCTION__

1.       Plaintiffs are retired professional football players who played in and as part of the National Football League (the "NFL") while using RIDDELL helmets and have remaining claims against the RIDDELL Defendants in *In Re: National Football League Retired Players' Concussion Injury Litigation*, 30 F.R.D. 357 (E.D. Pa. 2015).  Plaintiffs and Plaintiff Spouses bring these individual claims against  Defendants RIDDELL, INC.; ALL AMERICAN SPORTS CORP.; RIDDELL SPORTS GROUP, INC.; BRG SPORTS, INC. f/k/a EASTON-BELL SPORTS, INC.; BRG SPORTS HOLDINGS CORP. f/k/a BRG HOLDINGS CORP.; EASTON-BELL SPORTS, LLC; EB SPORTS CORP.; and BRG SPORTS, LLC ( hereinafter "Defendants, "RIDDELL" or the "RIDDELL Defendants") in their individual capacities as well as their respective successor-in-interest capacities, for equitable relief, compensatory damages and punitive damages.  Plaintiffs make the following allegations based upon personal information and knowledge as to their own acts and upon information, belief and investigative efforts as to Defendants' long-term actions and misconduct.

2.       Upon information and belief, Defendants acted in concert with the NATIONAL FOOTBALL LEAGUE ("NFL") and NFL PROPERTIES, LLC/ NATIONAL FOOTBALL LEAGUE PROPERTIES, INC. ("NFL P") (referred to sometimes as "co-conspirators").[1]

3.       Hundreds of individual and class actions were filed in state and federal courts on behalf of thousands of retired professional football players who had suffered concussions and the impact of long term repetitive head trauma.  The retired professional football players were

---

[1] By Order of the Court, a separate Complaint is to be filed to govern remaining claims against the NFL and NFL P Defendants of Plaintiffs who opted out of the Class Action Settlement Agreement with NFL and NFL P Defendants.  As of the filing of this Complaint, exclusive of the Opt Out Plaintiffs, any other plaintiffs' claims that remain against the NFL and NFL P Defendants are still governed by the Plaintiffs' Amended Master Administrative Long-Form Complaint, ECF No. 2642.

deceived by Defendants and never told that the repetitive blows to the head caused during play and practice could and would cause long term injuries, and in some instances, deaths.

4.      By Order entered on January 31, 2012, the Judicial Panel of Multi-District Litigation (the "JPML") transferred all such actions then pending to this Court.  *See* Transfer Order, *In Re: National Football League Players Concussion Injury Litigation*, MDL No. 2323, ECF No. 1.  By Order of this Court, a class action settlement was reached with the NFL and NFL P Defendants and many of the claimants, and that settlement was finally approved on May 8, 2015.

5.      Plaintiffs and their spouses herein have remaining claims in this litigation against the RIDDELL Defendants.

6.      This Second Amended Master Administrative Long-Form Complaint Against the Riddell Defendants ("SAMLC-RIDDELL") is a filed pursuant to the Court's Order dated May 18, 2017, ECF No. 7709, and is to serve the administrative functions of efficiency and economy as described by the Court more fully in *In Re: Propulsid Product Liability Litigation*, 208 F.R.D. 133, 141 (E.D. La. 2002), and to present certain common claims and common facts for appropriate action by this Court in the context of this Multi-District Litigation.  This SAMLC-RIDDELL does not include all claims asserted in all actions that have been transferred to this Court under 28 U.S.C. § 1407 and/or in all actions brought by and on behalf of the Plaintiffs. Those matters are set forth in the individual Short-Form Complaints filed by Plaintiffs and served against these Defendants.  This SAMLC-RIDDELL does not constitute a waiver or dismissal of any actions or claims that are or will be asserted in the Amended Short-Form Complaints.

## II. SUMMARY OF DEFENDANTS' MISCONDUCT AND RESULTING DANGERS, DAMAGES, INJURIES, DEATHS AND CLAIMS

7.     This SAMLC-RIDDELL filed on behalf of the Plaintiffs, their Spouses, and/or their Representatives against the Riddell Defendants summarizes and sets forth an unparalleled story in American sports history that has been on the front pages of the nations' newspapers for nearly five years.  As even recognized by some of the doctors the Defendants impaneled to review its actions, the NFL, NFL P and RIDDELL have viewed the human beings touted as the champions of football as mere statistics and used and deceived them in order to profit from and to continue to market professional play.  Defendants consistently acted in concert and fundamentally, by agreement, to meet their primary goals: to maximize profits and attain maximum market share through the continuous deception that professional football was not potentially lethal, that the professional players were not putting themselves at constant risk as a result of the repetitive head trauma, and that the RIDDELL helmets selected by the NFL and the NFL P were intended to protect them at all.  As set forth herein, since the 1960s, Defendants, the NFL, NFL P have possessed actual knowledge connecting concussive and subconcussive blows to latent brain disease. [2]

8.     Defendants, as alleged herein, acted in concert with the NFL and NFL P and subsequently agreed to engage in tortious and injurious conduct and to conceal material facts regarding the connection between blows to the head and latent brain disease from these Plaintiffs, their families and children, and players at all levels.  Every impact to the brain is dangerous.  Both concussive and subconcussive events can cause permanent brain damage. Plaintiffs have sustained physical injuries, pain and suffering, economic losses, and (in certain

---

[2] The corporate entities sued by Plaintiffs in this case have been held, over the fifty-plus-year time-span at issue in this case, in a number of corporate forms. Nevertheless, it is Plaintiffs' understanding the present defendants in this case would—if established—have liability for the sum of the conduct, acts, omissions, misrepresentations, and concealments alleged.

instances) gruesome wrongful deaths for which their survivors continue to experience anguish, pain, and loss.

9.     As yet, the full NFL/RIDDELL story remains unknown, as discovery has not yet commenced.  Nonetheless, there is ample evidence supporting that Defendants acted in concert and that their actions demonstrate a profound and endemic disregard for the basic medical, ethical and societal standards.  The egregiousness of Defendants' long term scheme of deception, omission and misconduct is underscored by the fact that the players relied upon Defendants and trusted them.  Defendants' deliberate disregard for medical, ethical and societal norms led to actions that breached a wide array of legal norms, such that punitive damages present a necessary corollary and part of this litigation.  The claims set forth below sound in tort and in equity.

10.     Without the players ever knowing, scientific evidence has linked brain trauma to long-term neurological problems for decades.

11.     Although Defendants knew or should have known of this growing body of scientific evidence concerning concussions, subconcussive impacts and brain disease, Defendants never told Plaintiffs or their families of the dangers of repeated brain trauma resulting in long-term brain damage.

12.     Defendants worked together with the NFL to develop "sham-science" and spent decades engaging in a scheme of silence and duplicity.  Defendants developed, licensed, and marketed the game without disclosing the truth about the real risks and dangers.  Defendants knowingly developed, licensed and marketed ineffective harm-reduction technology in the form of football helmets incapable of protecting the players from subconcussive and concussive traumas, which resulted in latent disease, about which the players had no knowledge or suspicion.

13.     These entities have engaged in deceptive-marketing, licensing, and sham-science, to gain financial benefit in this process.

14.     Defendants were not merely negligent in warning the world-wide football community, but were motivated to protect their profits over the risk of disclosure of truth. Plaintiffs are entitled, for the reasons set forth below—and for the supplemental and additional reasons described in their Short Form Complaints and that which will be uncovered through discovery – to prevail in substantial measure on an individual basis.

15.     This "playbook" is *well-analogized* to "Big Tobacco;" overlapping leadership in the NFL, NFL P and RIDDELL advanced and actually funded the advertisement and promotional campaign of deception in marketing this most dangerous, deadly game[3].

16.     The RIDDELL Defendants, and each of them, breached their common law duties to Plaintiffs, the athletic community, the medical community and all members of society, as referenced in the tables below:

---

[3] Pellman, EJ, Concussion in Professional Football: Repeat Injuries Part 4 *Neurosugery* October 2004 860-876.  The members of the boards of the major tobacco companies were also the members of the boards of co-conspirators here.  The lawyers that advised both sets of entities were the same.  The public relations companies and advertising companies were also the same. Interestingly, if not predictably, their marketing decisions were analogous to one another.  The stated purpose was the same: to promote and market their deadly products without disclosure of the true risks and dangers.

## NEGLIGENCE SUMMARY TABLE

| DEFENDANT/CO-CONSPIRATOR | DUTY OF CARE OWED OUTSIDE 29 U.S.C. § 185(a) |
|---|---|
| RIDDELL Defendants | Negligently developed, designed, tested,  manufactured and marketed protective equipment as the official helmet of the NFL with the knowledge these helmets could not protect against subclinical or mild traumatic brain injuries.<br><br>Negligently participated in the "MILD TRAUMATIC BRAIN INJURY COMMITTEE" and enlisted members in **this non-clinical capacity** to opine on the effects of mild and moderate head impacts.<br>RIDDELL/NFL P had a joint employee paid to ensure all licensed equipment was safe, knowing that this was a literal impossibility; this was a business deal. |
| RIDDELL Defendants and their Co-conspirators | Undertook, as stated in the second published paper in *Neurosurgery*, to "scientifically investigate concussion" and to "reduce injury risks in football" with "neither the authority nor the inclination to impose outside medical decision-making on the medical staffs of the individual teams."  See Pellman, EJ, Concussion in Professional Football:  Epidemiological Features of Game Injuries and Review of the Literature – Part 3, *Neurosurgery* January 2004, 54:81-96 at 83 |

## RULE 9(b) SUMMARY TABLE OF DEFENDANTS' FRAUDULENT CONDUCT – THE RIDDELL DEFENDANTS ACTED IN CONCERT WITH THEIR CO-CONSPIRATORS

| WHO? | WHAT? | WHEN? |
|---|---|---|
| Co-conspirator NFL | Knew that MTBI caused latent brain disease from its clinical studies with U.S. Dept. of Defense and outside studies; | **1960s** |
| | Knew helmet technology with a softer-shell provided an alternative capable of mitigating significant harms; | **1969** |
| | Buried proposal to create a computerized injury surveillance system for eight years until football-helmet crisis began being managed; | **1972** |

| WHO? | WHAT? | WHEN? |
|---|---|---|
| | Provided direct financial incentives to self-governing protective-equipment body responsible for "regulatory" measures over football helmets (keeping testing standards and warning labels in place for 40 years with actual knowledge such standards are useless); | **1972-Present** |
| | Researched the link between subclinical head trauma and amyotrophic lateral sclerosis ("ALS") with money funneled by NFL Charities, concealing results; | **1987** |
| | Funneled money to NFL Charities for "MTBI grants," which would fund the sham-science geared toward litigation avoidance including giving direct financial incentives to NOCSAE and to scientists. | **1997-2011** |
| Co-conspirators NFL P and NFL | Agreed with RIDDELL to an exclusive agreement making the "official helmet of the NFL" the RIDDELL-branded helmet, and requiring as part of this deal, that an individual would ensure all equipment under the deal to be the safest possible; this individual was to have been a joint-employee of RIDDELL and an NFL subsidiary entity or the NFL. RIDDELL promises the NFL free helmets for any club where more than 80% of | **1988 or Spring 1989-2013** (conflicting date appears in the published Court opinion of *RIDDELL, Inc. v. Schutt.*[4] Plaintiff's good-faith research suggests the agreement to have occurred at one of these two times) |

---

[4] 724 F. Supp. 2d 981 (W.D. Wis. 2010).

| **WHO?** | **WHAT?** | **WHEN?** |
|---|---|---|
| | players wear RIDDELL;<br><br>Agreed with NOCSAE (the National Operating Committee on Standards for Athletic Equipment) to control the research into helmets. | **1968**<br>NOCSAE established to insulate liability and create arms-length appearance for NFL, NCAA, and helmet manufacturers. |
| RIDDELL Defendants | Agreed with NFL P to an exclusive agreement making the "official helmet of the NFL" the RIDDELL-branded helmet, and requiring as part of this deal, that an individual would ensure all equipment under the deal to be the safest possible; this individual was to have been a joint-employee of RIDDELL and an NFL subsidiary entity or the NFL. RIDDELL promises the NFL free helmets for any club where more than 80% of players wear RIDDELL; | **1988 or Spring 1989-2013** (conflicting date appears in the published Court opinion of *RIDDELL, Inc. v. Schutt*)[5] |
| | Agreed with NFL and NFL P to participate in and fund the MTBI Committee which proliferated misleading information and false science with regard to MTBIs; | **1994** |
| | Marketed defective Revolution helmet and made knowingly false claims regarding the RIDDELL helmet's ability to reduce incidence of concussions. | **2002** |

---

[5] *Id.* (Plaintiff's good-faith research suggests the agreement to have occurred at one of these two times).

III.    **JURISDICTION AND VENUE**

17.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(11), because there are one hundred (100) or more persons whose individual claims are being brought herein and the amount in controversy for each Plaintiff exceeds $75,000.00 dollars, exclusive of costs, interest, and attorneys' fees. The overall amount in controversy exceeds $5,000,000, exclusive of interest, costs, and attorney's fees. Those claims can be tried jointly in that they involve common questions of law and fact. In addition, the Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over the claims of individual Plaintiffs who are citizens of a state different from the states of citizenship of all Defendants they name in their Short-Form Complaints.

18.    This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the Commonwealth of Pennsylvania and/or in the state of the transferee forum identified in the individual Short-Form Complaint (the "transferee forum").

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events or omissions that give rise to the claims occurred within the Commonwealth of Pennsylvania and this district and/or in the transferee forum, because the Defendants conduct a substantial part of their business within this district and/or in the transferee forum, and because the Judicial Panel on Multi District Litigation decided to consolidate and transfer these case to this Court.

IV.    **EQUITABLE ESTOPPEL – TIME-BASED DEFENSES**

20.    As specifically alleged herein, this action sets forth a fifty-plus-year conspiracy with particularity that lulled Plaintiffs into inaction and/or intentionally hid these causes of action from Plaintiffs.

21.    Consequently, the Defendants are estopped from asserting time-based defenses where Plaintiffs did not discover nor reasonably could not, at any earlier time, discovered that

their manifested injuries (distinguished from on-field football-blows) had a causal connection to on-football blows, or to the Defendants' fraud.

22.     Defendants are further estopped from asserting a time based defense since during the pendency of the class action settlement against the NFL and NFL P, those individuals were unable to prosecute their claims against RIDDELL before this Court.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     FRAUDULENT CONCEALMENT

23.     Defendants had access to decades-worth of science and research linking concussions and subconcussive blows to latent brain disease.  Defendants have known or should have known of the risks and dangers of these latent brain diseases, including dementia, Alzheimer's, ALS or Lou Gehrig's disease, Parkinson's, and Chronic Traumatic Encephalopathy.  Defendants knew or should have known of the science and research well before Plaintiffs ever played even Pop Warner and high school football and have known well after Plaintiffs stopped playing.  Defendants have concealed from or failed to notify Plaintiffs, their families and the public of the full and complete nature of the true risks, symptoms and dangers of these latent brain diseases and Defendants' helmets could never have protected Plaintiffs from injuries.

24.     Defendants still do not acknowledge the risks and dangers, Defendants have not fully disclosed the seriousness of the issue and in fact have downplayed the widespread prevalence of the problem.

25.     Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.     FRAUDULENT ESTOPPEL

26.     Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions and subconcussive blows as well as latent diseases caused by these blows to the head.  RIDDELL actively concealed the true character, quality, and nature of the risks and dangers and knowingly made misrepresentations about the characteristics, risks, and dangers.  Plaintiffs reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

### C.     DISCOVERY RULE

27.     The causes of action alleged herein did not accrue until Plaintiffs and their families discovered the latent diseases and/or diagnosed the terrible symptoms that Plaintiffs suffered without any knowledge of the cause.  Plaintiffs, however, had no realistic ability to discern that the symptoms they were experiencing were linked to latent brain disease, linked to the blows to the head they suffered during play until – at the earliest – after either the symptoms were finally recognized or after they learned of the Class Action lawsuit against the NFL.  And even then, Plaintiffs had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the risks and dangers.

## VI.   THE PARTIES

### A.     THE PLAINTIFFS

28.     Allegations supporting the residency, the citizenship, exposures to repetitive head trauma, the years of play, the manifestation of latent disease, and damages of each individual Plaintiff is intended to be set forth in the attached Short-Form Complaint Against Riddell

Defendants, Ex. "B."  In addition, where applicable, information pertaining to spouses and/or estates and/or personal representatives shall be set forth in the Short-Form Complaints.

29.     Plaintiffs seek damages related to *all* exposures to repetitive head trauma and not merely those exposures sustained during the time Plaintiffs played as professional football players.  Plaintiffs allege that RIDDELL undertook duties that apply in this case based upon Plaintiffs' time spent as youth players, high school players, collegiate players in addition the time spent during their former NFL careers.

30.     Further, Plaintiffs seek damages for the latent diseases to which they suffer, and about which they formerly had no knowledge or even familiarity.  Plaintiffs were unaware of even a potential risk of the latent and long term diseases being a result of repetitive head trauma or from playing football.

**B.     THE DEFENDANTS**

31.     Defendant RIDDELL, INC. is an Illinois corporation with its principal place of business in Illinois.  RIDDELL, INC. designed, manufactured, sold, distributed, and/or marketed football equipment, including helmets, to the public and to the NFL.

32.     RIDDELL, INC. is a wholly owned subsidiary of RIDDELL SPORTS GROUP, INC.

33.     Defendant ALL AMERICAN SPORTS CORPORATION ("ALL AMERICAN") is a Delaware corporation with a principal place of business in Ohio.

34.     ALL AMERICAN employs sales representatives to market and sell RIDDELL football helmets and also sold, marketed, and/or distributed football helmets to the public and the NFL.

35.     ALL AMERICAN has, since approximately 1983, placed warning labels onto commercially reconditioned helmets.

36.     ALL AMERICAN holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

37.     ALL AMERICAN is also a wholly owned subsidiary of RIDDELL SPORTS GROUP, INC.

38.     Defendant RIDDELL SPORTS GROUP, INC., ("RSG"), the parent corporation to RIDDELL, INC. and ALL AMERICAN, is a Delaware Corporation with its principal place of business in Irving, Texas.

39.     RSG directly participates in the design, manufacture, sale, marketing, and distribution of football equipment, including RIDDELL helmets, to the public and the NFL.

40.     RSG holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

41.     RSG is a wholly owned subsidiary of BRG SPORTS, INC. a/k/a EASTON-BELL SPORTS, INC.

42.     Defendant BRG SPORTS, INC. ("BRG INC.") is a Delaware Corporation with a principal place of business in Van Nuys, California.

43.     BRG INC. (and its predecessor corporation, EASTON-BELL SPORTS, INC.) directly participates in the design, development, marketing and distribution of branded athletic equipment and accessories, including RIDDELL football helmets.

44.     BRG INC. directly participates in strategic decisions for RIDDELL, INC., ALL AMERICAN, and RSG and directly participates in its subsidiaries operations.

45.     BRG INC. holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

-13-

46. BRG SPORTS HOLDINGS CORP. ("BRG HOLDINGS"), formerly known as RBG HOLDINGS CORPORATION, is a Delaware corporation with its principal place of business in Van Nuys, California.

47. BRG HOLDINGS holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

48. Defendant EASTON-BELL SPORTS, LLC ("EASTON-BELL") is a Delaware Corporation with its principal place of business in Van Nuys, California and is wholly owned by BRG HOLDINGS.

49. EASTON-BELL holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

50. Defendant EB SPORTS CORP. ("EB SPORTS") is a Delaware corporation with its principal place of business in Van Nuys, California.

51. EB SPORTS is a wholly owned subsidiary of EASTON-BELL.

52. EB SPORTS holds itself out as a designer, developer, and marketer of football equipment products, including RIDDELL football helmets.

53. EB SPORTS holds and/or has held and/or developed football-helmet patents and other intellectual property related to the technology employed in RIDDELL football helmets.

54. BRG SPORTS, LLC ("BRG LLC"), formerly known as EASTON-BELL was also formerly known as RIDDELL HOLDINGS, LLC, is a Delaware entity, with a principal place of business in Van Nuys, California.

55. BRG LLC/EASTON-BELL, together, and by and through their subsidiaries and affiliates, designs, develops, and markets sports equipment, including RIDDELL football helmets.

56.     RIDDELL, INC., ALL AMERICAN, RSG, BRG INC., BRG HOLDINGS, EASTON-BELL, EB SPORTS, and BRG LLC, and, are collectively referred to herein as "RIDDELL Defendants."  The RIDDELL Defendants collectively, the combination of actual and/or successor-in-interest entities comprise the chain responsible for RIDDELL's liabilities as alleged in this action for the manufacturing, distributing, reconditioning, selling, marketing, and advertising of RIDDELL football helmets and for the furtherance of the false science as alleged herein, in conjunction with the co-conspirators alleged herein.

57.     The RIDDELL Defendants, along with the NFL and NFL P, who are also named as Defendants in this litigation in a separate Complaint for the same alleged conspiratorial conduct, are collectively referred as "Defendants" and/or "conspirators" or "co-conspirators."

## VII.    SUMMARY OF THE CONSPIRACY

| WHO? | WHAT? | WHEN | NATURE/SCOPE |
|---|---|---|---|
| • NFL; <br><br> • NFL P (individually and as valid successor in interest entity); <br><br> • RIDDELL Entities as presently constituted where alleged, and as the successors in interest of the predecessor-in-interest entities; <br><br> • NOCSAE; <br><br> • Co-Conspirators NFL and related entities (licensing arm NFL P; | • Agreed to induce reliance; <br><br> • Knew football helmets could not actually reduce harm with respect to injury from repetitive head trauma; <br><br> • Concealed dangers of repetitive head trauma and pushed "false" helmet tech advances as the key to a safer game; <br><br> • Sham research of "Independent" MTBI Committee; | • NFL, NFL P and RIDDELL agree by 1965; <br><br> • RIDDELL participates in formation of NOCSAE in 1969; <br><br> • Funneled money to NFL Charities for "research" on whether a link exists between three cases of ALS on the 49ers to be conducted by Tobacco-industry-friendly neurologist and CTE denier; | • Needed football helmets at arms-length from pro football; <br><br> • RIDDELL faced extinction from skull-fracture/bleed litigation in the 1960s and needed corporate survival, also profits with increased brand recognition; <br><br> • Formal relationship began to legitimize futile safety equipment used not only by players, but also by children idolizing these players; <br><br> • NFL could shift liability and RIDDELL's brand recognition skyrockets after becoming official |

| 501(c)(3) NFL Charities). | • MTBI Committee engages paid experts to validate their test metrics and ultimately to publish papers based on knowingly fraudulent data;<br><br>• RIDDELL sponsors pendulum used in Biokinetics testing (flawed data from MTBI testing). | • NFL P and RIDDELL agree around April 1989 to provide helmets sufficient to protect from the risk of injury while knowing the helmets do not do so;<br><br>• NFL, NFL P, and RIDDELL agree to participate in MTBI Committee in 1994;<br><br>• NFL funnels grant money for MTBI to NFL Charities between 1997 and 2011. | corporate "safety" device. RIDDELL could sell to schools, children, and also became helmet of USA Football (Youth Marketing Arm of NFL). |

58.     In a letter to The New York Times, a lawyer for the NFL was quoted as saying, "The N.F.L. is not the tobacco industry; it had no connection to the tobacco industry," which he called "perhaps the most odious industry in American history." www. NYTimes.com, March 24, 2016.  https://www.nytimes.com/2016/03/25/sports/football/nfl-concussion-research-tobacco. However, the records show that the NFL and the tobacco industry shared lobbyists, lawyers and consultants. Personal correspondence underscored their friendships, including dinner invitations and a request for lobbying advice.  Key tobacco industry leaders were of course also key NFL leaders.  Among those were the Miami Dolphins owner, Joe Robbie, and New York Giants co-

owner Preston R. Tisch, who also partly owned a leading cigarette company, Lorillard, and was a

board member of both the Tobacco Institute and the Council for Tobacco Research, the two

entities that played a central role in misusing science to hide the risks of cigarettes.

59.    As alleged herein, in the face of growing knowledge of the risks and dangers of

latent brain disease caused by repetitive concussions and subconcussive blows in the 1980s and

1990s, RIDDELL and others agreed to conceal, omit, and misrepresent material information

from players and the general public about this link between repetitive head trauma and chronic

brain damage.

60.    Defendants and co-conspirators eventually worked with international corporations

such as Honda and even with our own federal government in perpetrating a massive fraud that

included, but was not limited to, the following:

- Continuing to conceal a known link between amyotrophic lateral sclerosis ("ALS") and repetitive head trauma in NFL players by funneling $125,000 to in 501(c)(3) contributions to tobacco-industry-supported neurologist Dr. Stanley Appel to research the link between ALS and football;

- Funneling "MTBI grant" money to reputed defense-expert firm Exponent Failure Analysis, Inc., which has previously argued that secondhand smoke does not cause cancer, to devise neuropsychological test protocol under Dr. Robert Fijan, Ph.D;

- Funneling several hundred thousand dollars per year through the NFL's 501(c)(3) entity ("NFL Charities") to David C. Viano, a professional defense-side expert in the automotive industry, who worked to proliferate junk science and  discredit scientific studies linking head impacts and concussions to neuro-cognitive disorders and disabilities;

- Awarding payouts into the millions of dollars through the Bert-Bell/Pete Rozelle NFL Disability Plan for Total & Permanent Disability through the 1990s for living NFL football players diagnosed with chronic traumatic encephalopathy and other similar diseases;

- Funneling "MTBI grant" money to NOCSAE to support self-serving research endeavors;

- Publishing a total of 16 papers in the peer-reviewed journal Neurosurgery on "Concussion in Professional Football" premised on knowingly false data sets;

- Agreeing to provide the safest possible football helmets licensed as the "official helmet of the NFL" with the RIDDELL name, while knowing that none of these helmets could protect against the dangers of long term impacts and brain injuries;

- Acknowledging in the 1990s that New York Jet, Al Toon's repetitive concussions had a "cumulative impact;"

- Attempting to create a fraudulent "concussion severity index" in the 1990s;

- Knowingly relying upon false data in concussion "epidemiology" research;

- Funneling money through the NFL's 501(c)(3) arm, NFL Charities to expert-witness firms such as the highly controversial "Exponent Failure Analysis;"[6]

- Funneling money through the NFL's 501(c)(3) arm, NFL Charities to the fraudulent "MTBI committee" to support RIDDELL helmet products as superior, through flawed research at Wayne State University;

- By the 1975 NFL season, Nobel-prize-nominated physician Dr. Stephen Reid's ongoing work on football head-injury and helmets specifically observed **cumulative** effects of clinical and subclinical mild traumatic brain injury ("MTBI") occurring in on-field football play in NFL football players and had noted brain damage; and

- On October 20, 1992, Lorillard Tobacco General Council Arthur J. Stevens (Chairman of the "Committee of Council" and Vice Chair of the Tobacco Institute's Communications Committee) hand-delivered a letter to NFL Commissioner Paul J. Tagliabue, Andrew Tisch (one of the Tobacco industry executives who lied to Congress), and Preston Tisch (co-owner of the New York Giants and Tobacco Institute Executive Committee member), advising them on the crime-fraud exception as relating to the scope of attorney-client communications in exposure-injury litigations. Defendants and co-conspirators—all of whom assumed financial responsibility for this undertaking—wrote that their published sham-science journal articles that made notoriously false conclusions on

---

[6] Exponent Failure Analysis is also infamous for its controversial (and discredited) work for Big Tobacco to create reports so flawed that Defendants largely have not cited them.

brain injury applied not merely to NFL players but also to teenagers and children;

- NFL Commissioner Roger Goodell testified to Congress that "[w]e recognize that our example extends to all young athletes who play football" and further bragged in support that they had shared and publicized the controversial, and later-discredited MTBI Committee research.

- RIDDELL committed tortious conduct in furtherance of its agreement with the NFL co-conspirators to, at all relevant times, provide football players with a false sense of security that football helmets could protect players' brains from harm, keeping them safe.

## VIII.   FACTUAL BACKGROUND

61.     This case seeks financial compensation for the chronic injuries, expenses, and intangible losses suffered by Plaintiffs and their families as a result of the Defendants' fraud, deception, conspiracy, and negligence.

62.     Nearly a century ago, medical studies first revealed that athletes who suffer repeated blows to the head risk long-term brain damage.

63.     The growing evidence since that time overwhelmingly establishes that the head trauma routinely inflicted in professional football games can cause neurocognitive decline, permanent mental disability, and even death, among other outcomes.  Concussive and subconcussive impacts cause mild traumatic brain injuries ("MTBI"), which have pathological and debilitating long term effects.

64.     Co-conspirator NFL, as the central authority over professional football, and RIDDELL, as the manufacturer of helmets for the NFL, had longstanding duties to protect players and the public from unreasonable harm.  Defendants and co-conspirators acted in accordance with that duty:  developing athletic protection such as helmets, promulgating equipment standards, implementing rule changes, and creating off-the-field programs designed to manage players' lives.  Professional players and academic athletes of all ages relied on

Defendants and co-conspirators, and they trusted Defendants and co-conspirators to exercise their enormous influence in a manner reasonably consistent with their health and well-being.

65.     Defendants and the NFL's unique position at the apex of football, paired with their unmatched resources, afforded them unparalleled access to data reflecting the effects of head impacts on football players.

66.     At all relevant times, Defendants and the NFL's accumulated knowledge about head injuries to players, and the associated health risks therefrom, was at all times vastly superior to that readily available to the players.  That expertise and informational advantage, coupled with the Defendants and the NFL's position as the guardian of player safety, imposed upon RIDDELL and the NFL a duty to inform the Plaintiffs, the athletic community, the medical community and the public at large of the risk of concussions and long term brain damage.

67.     Instead the Defendants and the NFL ignored and concealed the information from the players and all others who participated in organized football at all levels.  Defendants and the NFL breached their duty by failing to impose safety regulations to prevent or mitigate long-term brain damage, and by failing to inform NFL players, athletes at every level, the medical community and the public of the risks and dangers associated with MTBIs.

68.     Rather than protecting the players' health, Defendants and the NFL did the opposite.  They exacerbated the health risk by promoting the violence of the game and representing that the helmets would keep them safe.

69.     The NFL joined forces with NFL P and RIDDELL to conspire and conceal this latent risk from football players, helmet users, brand users, and from the community. Defendants' conspiracy to conceal has substantially contributed to cause the permanent, long

term injuries now suffered by Plaintiffs, which were caused to their exposures long ago when they played the game.

70.     From 1994 to 2010, the NFL, NFL P and RIDDELL went a step further.  The Defendants and the co-conspirators created and/or decided to fund the Mild Traumatic Brain Injury Committee (the "MTBI Committee"), through the vehicle of the NFL Charities and grants funded by industry, ostensibly to research and study how MTBI affects NFL players.  By voluntarily inserting itself into the research and public discourse about MTBI, Defendants and co-conspirators undertook a responsibility to make truthful statements; not to advance improper, biased, and falsified industry-generated studies; not to discredit well-researched and credible studies that came to a conclusion that did not comport with their financial and political interests; and, to inform all former players, all then-current players, and the general football-playing public of the risks of MTBI in football.

71.     Defendants and co-conspirators breached this duty by producing industry-funded research that falsely claimed that concussive and subconcussive head impacts in football do not present serious, life-altering risks.  Also, during this period, Defendants and co-conspirators concealed and downplayed the true risks associated with MTBI.

72.     For almost sixty years, Defendants and co-conspirators actively and continuously denied any link between MTBI sustained by NFL players and other athletes while playing football games and practices as well as the neurological symptoms and problems (such as headaches, dizziness, loss of memory, Alzheimer's, dementia, ALS and Parkinson's) from which they now suffer.  Defendants made their biased and falsified position known by way of press releases, publications in scientific literature, and other communications.

73.     During the same time period, Defendants and co-conspirators actively sought to suppress the findings of the medical community that showed the link between on-field MTBI and post-career neuro-cognitive damage, illness and neurodegenerative decline.

74.     Consistent with Defendants' and co-conspirators historical role as the guardian of player health and safety, the NFL, NFL P and RIDDELL intended for the general public, NFL players, athletes and participants at every level of the game to rely on the misinformation propagated.

75.     The concealment and misrepresentation of the severe neurological risks of repetitive MTBI exposed players to dangers they could have avoided had the Defendants and co-conspirators provided Plaintiffs with truthful and accurate information.  Many players, including Plaintiffs in this action, were exposed to repetitive MTBIs while in the NFL and now suffer from latent neurodegenerative disorders and diseases, all of which, in whole or in part, were caused by the Defendants' and co-conspirators' acts and/or omissions.

76.     At the same time, Defendants and co-conspirators continued to market, as they had in the past, the ferocity and brutality of the sport that led to the latent and debilitating neuro-cognitive conditions and injuries from which Plaintiffs now suffer and for which they are at high risk of developing in the future.

77.     Defendants' and co-conspirators motive to ignore for decades the link between MTBIs and neuro-cognitive injury and to conceal and falsify research on that subject, especially during the 1994 to 2010 period that the MTBI Committee was in place, was economic. Defendants knew or suspected that any rule changes that sought to recognize the risks associated with MTBI would impose an economic cost that would significantly and adversely change the profit margins enjoyed by the NFL and its teams, NFL P and RIDDELL.  Defendants and co-

conspirators also knew that their marketing of the violence of the sport was incompatible with widespread awareness among the players and the general public of the dangers of football.

### A.   THE NFL'S INFLUENCE

78.     The NFL, founded in 1920, generated approximately $13 billion in gross income in 2016.[7]

79.     The organization oversees America's most popular spectator sport, acting as a trade association for the benefit of the thirty-two independently-operated teams.

80.     The NFL generates revenue mostly through NFL P, now a segment of NFL Ventures.  NFL Ventures is engaged in marketing, sponsorships, licensing merchandise, and selling national broadcasting rights to the games. The teams share a percentage of the league's overall revenue.  NFL Ventures, the league's billion-dollar, all-but-the-kitchen-sink wing that oversees sponsorships, marketing, media properties, sales, and satellite rights, saw its operating profit grow by 29 percent from 2009 to 2010.  NFL Ventures, which Roger Goodell ran before becoming the NFL's commissioner, comprises four wholly owned subsidiaries: NFL Enterprises ("advertising, publicizing, promoting, marketing and selling broadcasts of NFL games"), NFL P ("licensing, sponsorship and marketing"), NFL Productions ("produces NFL-related programming for the NFL and its Member Clubs"), and NFL International ("marketing, publicizing, promoting, licensing, distributing and developing the NFL's international business").  These ventures cover everything from the customized replica alternate jersey available to buy at the team store to the old NFL Films propaganda shown on ESPN.

---

[7] https://www.forbes.com/sites/jasonbelzer/2016/02/29/thanks-to-roger-goodell-nfl-revenues-projected-to-surpass-13-billion-in-2016/#35a6fb3a1cb7.

81.     The NFL earns billions of dollars from its telecasting deals with, among others, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

82.     In 1989, the NFL entered into a contract with RIDDELL where RIDDELL became the "Official Helmet of the NFL" from 1989 through 2013.  As the NFL's profits grew, so did those of the manufacturer and the marketer of the official helmet of the NFL.

83.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the Federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 teams as a single unit.  Each player has sported a RIDDELL helmet during that time, demonstrating the NFL's trust of the brand.

### B.     DEFENDANTS AND THEIR CO-CONSPIRATORS HAVE MYTHOLOGIZED VIOLENCE THROUGH THE MEDIA.

84.     In part because of their financial power, monopoly status, and high visibility, the NFL, NFL P and RIDDELL have had enormous influence over the game of football at all levels.

85.     Over many decades, the NFL's influence has expanded through its use of the media.  Through NFL Films, the NFL Network, www.NFL.com, and NFL P, the NFL has promoted professional football via every available mass communication medium.  In turn, the NFL has promoted RIDDELL helmets via every mass communication medium.

86.     Part of the NFL's strategy is to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions, and by propagating the falsehood that "getting your bell rung," "being dinged," and putting big hits on others does not seriously threaten one's health.  The myth is that the players are wearing "protective gear," including RIDDELL helmets.

87.     In execution of this strategy, Defendants propagated the false myth that collisions of all kinds, including brutal and ferocious collisions, many of which lead to short-term and long-term neurological damage to former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of those involved.

88.     A key tool in the execution of this strategy is NFL Films.  NFL Films is an agent and instrumentality of the NFL devoted to producing promotional films. One television critic described NFL Films as "the greatest in-house P.R. machine in pro sports history… an outfit that could make even a tedious stalemate seem as momentous as the battle for the Alamo."

89.     NFL Films focuses on violence, the football-player-as-gladiator, as one of its greatest selling points.  To that end, NFL Films has created numerous highlight features focusing solely on the hardest hits that take place on the football field. These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

90.     NFL Films strategically uses cinematography and sound to exaggerate and emphasize vicious hits.  The magnitude of the hit is emphasized by slow-motion footage and on-field microphones.  The footage can appear like a car-crash test, with players taking on the role of the dummy.

91.     NFL Films promotes a culture in which playing hurt or with an injury is both expected and acclaimed in the NFL's mythical gladiator world.  Through NFL Films, the NFL and the NFL P have produced videos that praise players who embody the ethos of playing hurt (for example, "Top Ten Gutsiest Performances" (2009, updated 2012)).  This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players play through any injury, including MTBI.

92.     The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: NFL: Moment of Impact (2007); NFL's 100 Greatest Tackles (1995); Big Blocks and King Size Hits (1990); The Best of Thunder and Destruction – NFL's Hardest Hits; NFL Films Video: Strike Force (1989); The NFL's Greatest Hits (1989); Crunch Course; Crunch Course II (1988); Crunch Masters; In the Crunch (1987); NFL Rocks (1992); and, NFL Rocks: Extreme Football (1993); NFL Rocks on the Edge (1994).

93.     NFL Films created a "Top Ten Most Feared Tacklers" series that was shown on the NFL Network (2014), and now has its own section on the NFL's website. These features are comprised of videos highlighting the most vicious tacklers that have played in the NFL.

94.     An explicit example of how the NFL markets and glorifies the violent nature of the NFL can be found on the back cover of the 2007 film, Moment of Impact.  The cover advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole.  Suddenly you're down, and you're looking through your helmet's ear hole.  Pain?  That's for tomorrow morning.  Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact."  The message deemphasizes the acute and chronic risks associated with head impacts and glorifies nothing but the violence of the game and the ferocity of its hero players.

95.     The messages propagated by NFL P through NFL Films are part of the culture of the NFL, a culture in which NFL players were encouraged to play despite injury and which disregarded the results of violent head impacts; a culture in which the players wore RIDDELL helmets.

96.     All of the Defendants have enjoyed enormous profits from that culture.

97.     For example, as recently as October 2010, the NFL fined some players for what it characterized as "illegal and dangerous hits" and yet, the NFL P profited by selling photos of the illegal hits on its website for as much as $249.95 per photograph, while the players were sporting the official helmet of the NFL: the RIDDELL helmets.

C.     **DEFENDANTS KNEW OF THE DANGERS ASSOCIATED WITH REPETITIVE HEAD IMPACTS AND CONCUSSIONS FOR DECADES.**

98.     Defendants have known or should have known for many years that the American Association of Neurological Surgeons ("AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury as:

> as a blow or jolt to the head or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases (mild traumatic brain injury, or MTBI) may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

https://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Sports-related-Head-Injury.

99.     Defendants have known or should have known for many years that mild traumatic brain injury ("MTBI") generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and unconsciousness.

100.     Defendants have known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

101.    Defendants have known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one.  Additionally, after a person sustains even a single subconcussive or concussive blow, a future lesser blow may cause MTBI and require more time to recover.

102.    Defendants have known or should have known for many years that published peer-reviewed scientific studies have shown that repeated traumatic head impacts (including subconcussive blows and concussions) cause ongoing and latent brain injury.

103.    Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer latent brain injuries that result in any one or more of the following conditions: early-onset Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, ALS or Lou Gehrig's Disease, Parkinson's and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").  The latter is a progressive degenerative disease of the brain that condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above.  CTE is also associated with an increased risk of suicide.

104.    Defendants have known or should have known for many years that CTE presents in athletes, including football players and boxers, with a history of repetitive head trauma.  The changes in the brain caused by repetitive trauma are thought to begin when the brain is first

exposed to the repetitive trauma, but symptoms may not appear until months, years, or even

decades after the last traumatic impact or long after the end of active athletic involvement.

105.    Defendants have known for many years of the reported papers and studies

documenting the prevalence of other conditions associated with neurological injury in the

population of former boxers as well as former NFL players:

- In the 1960's, NFL's Head of Officiating wrote internally that "[i]n 1917, the federal government said that something had to be done about football from the standpoint of rules or it would abolish the game.  At about that time, the NCAA rules committee was established, and the first real code of football was instituted."  Mark Duncan, *The Relationship of Game Rules to Injuries*, National Academy of Sciences, Football Injuries:  Papers Presented at a Workshop, 207-09 (1970);

- Specifically, studies of athletes in 1928 demonstrated a scientifically observable link between repetitive exposures to head trauma and long-term, latent, brain disease.  Pathologist Dr. Harrison Martland described the clinical spectrum of abnormalities ("cuckoo", "goofy," etc.) found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").  Martland, H., Punch Drunk, Vol. 91(15), JAMA p. 1103-1107 (1928);

- The Martland study was the first to specifically link subconcussive blows and "mild concussions" to latent brain disease that the medical community now recognizes as CTE, and to identify the "punch-drunk" syndrome as dementia pugislitica.  Martland, H., Punch Drunk, Vol. 91(15), JAMA p. 1103-1107 (1928);

- In 1933, the National Collegiate Athletic Association (the "NCAA") published its Medical Handbook for Schools and Colleges: Prevention and Care of Athletic Injuries.  This NCAA publication outlined a specific concussion protocol due to its recognition of neurocognitive and neurobehavioral sequelae linked to these repetitive concussive and/or subconcussive exposures;

- In 1937, the American Football Coaches Association published a warning that concussed players be removed from play;

- In the 1948, the New York State legislature instituted rules related to boxing referred to by the state's Medical Advisory Board, and Dr. Harry A. Kaplan as "traumatic encephalopathy;"

- By 1952, the federal government conducted CTE research.  Specifically, prominent neuropsychiatrist Dr. Edwin Weinstein was studying CTE in a closed-head-injury cohort of Korean war veterans;

- The Weinstein CTE study defined concussion in step with modern times (in other words, it did not examine severe head-injury only or loss-of-consciousness only): Dr. Weinstein evaluated interruption of brain function;

- The Weinstein's study won legal recognition in Federal District Court in 1966, when one of its participants robbed a bank and was tried in federal court for the robbery.  *See Nagell v. U.S.*, 392 Fed.2d  934, 937 (5th Cir. 1968) (The defense asserted that the criminal defendant's CTE vitiated mens rea; "[h]ere the record is replete with expert testimony regarding … 'chronic traumatic encephalopathy'- a disease of the brain caused by trauma. Its symptoms: paranoid suicidal preoccupations, 'confabulations', tendency toward projection, impaired judgment, lack of contact with reality");

- In 1952, *The New England Journal of Medicine* recommended a "three-strikes rule" for concussive exposures and football, Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 NEW ENG. J. MED. 554, 555 (1952). And, *JAMA* published additional findings on repetitive head trauma exposures in boxers, Busse, Ewald W. and Silverman, Albert J., Electroencephalographic Changes in Professional Boxers, Vol. 149:17, *Journal of the American Medical Association*, p. 1522-1525 (1952);

- In the early 1950s, research on pyramidal syndrome in athletes who sustained repetitive blows to the head was first being described in the medical and scientific literature;

- Numerous subsequent peer-reviewed papers appeared in journals such as *JAMA, Neurosurgery, NEJM, Lancet* and others; all strengthened the consensus that exposure to repetitive head trauma in the forms of acute concussion, multiple concussions, and long-term exposures to subconcussive blows had adverse consequences on the brain;

- By 1962, Drs. Serel and Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline. Serel M, Jaros O., *The mechanisms of cerebral concussion in boxing and their consequences. World Neurol.* 3:351–8 (1962);

- In 1964, German researchers, Drs. Haynal and Regli discovered an association between ALS and repetitive traumatic injury.  Haynal A, Regli

F. Zusammenhang der amyotrophischen lateralsclerose mitgehäufter elektrotraumata. *Confinia Neurologica* 1964;24:189–98;

- Also in 1964, the Congress of Neurological Surgeons conducted a symposia series in Miami, Florida, and discussed 35 cases of CTE ("chronic residua of head trauma") related to concussion in athletes that were presented by Dr. Harry A. Kaplan;

- By 1964, Drs. Richard Schneider and Frederick Driss of the University of Michigan observed that a concussion did not require a loss of consciousness". A definition developed by the 1964 Congress of Neurological Surgeons reads: 'brain concussion - a clinical syndrome characterized by immediate and transient impairment of neurofunction, such as alteration of consciousness, disturbance of vision, equilibrium, etc., due to mechanical forces;" and

- At this Miami symposia series, football neurosurgeon Dr. Richard Schneider also presented on the significant number of professional football deaths related to the ineffectiveness of the then-current plastic helmet. Defendants had developed a hard shelled helmet that did not protect against the forces of repetitive blows to the head of the nature sustained on the football field.

106. By the early 1960s, Defendants were on notice of two problems they could not control: severe (acute) head traumas and subclinical/clinical MTBIs causing latent or chronic disease processes.

**D. DEFENDANTS HAD A SELF-IMPOSED DUTY TO PROTECT HEALTH AND SAFETY OF THE ENTIRE FOOTBALL COMMUNITY, PAST AND PRESENT.**

107. From the inception, Defendants held themselves out and acted as the guardians of the football community's best interests with respect to health and safety. RIDDELL unilaterally created for itself the role of protecting players.

108. Upon information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and subconcussive injuries. Such ongoing

medical advice and knowledge was shared with RIDDELL and placed Defendants in a position of ongoing superior knowledge to the entire football community.

109.    As a result, Defendants and the NFL and NFL P assumed a duty to act in the best interests of the health and safety of the football community including the athletes at every level, to provide truthful information regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of the community.

110.    As the sport's governing entity (with monopolistic power), the NFL has made it known to players and teams alike that the NFL actively and pervasively governs player conduct and health and safety both on and off the field.  In public statements since its inception, the NFL has stated that its goals include taking necessary steps for the safety, health and well-being of players and their families.

111.    For decades, the NFL voluntarily instituted programs to support player health and safety on and off the field, and the players and their families trusted and looked to the NFL for guidance on these issues.

112.    Since each of their inceptions and continuing into the present, the NFL and RIDDELL have been in superior positions.  Despite their duties and power to protect players from harm, these co-conspirators actively concealed the risks to players of repetitive subconcussive and concussive head impacts, which can and does result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

113.    At all relevant times, the NFL's unique positions at the apex of the sport of football, along with RIDDELL's position as the official helmet-maker, paired with their unmatched resources afforded them unparalleled access to data reflecting the effects of head

impacts on football players and made it an institutional repository of decades of accumulated knowledge and data about head injuries to players.

114.    The NFL joined with RIDDELL to conceal, deceive and ignore the evidence of latent neurodegenerative impact to players from repetitive blows to the head.  Defendants' accumulated knowledge about head injuries and the associated health risks therefrom was, at all times, vastly superior to that readily available to the Plaintiffs.

115.    For decades, RIDDELL and co-conspirators failed to warn Plaintiffs of the medical risks associated with repetitive head impacts during NFL games and practices.  Instead, Defendants and co-conspirators ignored and actively concealed the risks, despite their historic and proactive role as the guardian of player safety.  For that reason, RIDDELL and co-conspirators breached their common law duty of reasonable and ordinary care to the Plaintiffs by failing to provide them with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during NFL games and practices.

### E.    DEFENDANTS VOLUNTARILY UNDERTOOK THE RESPONSIBILITY OF STUDYING HEAD IMPACTS IN FOOTBALL AND FRAUDULENTLY CONCEALED THEIR LONG-TERM EFFECTS.

#### 1.    Co-conspirator NFL Sponsored the Football Injuries Symposia in 1969, which Focused on Head Injuries.

116.    In 1969, Co-conspirator NFL engaged branches of the United States Military to meet with 47 luminaries from leading medical schools, football coaches, such as legendary Don Shula, NFL team trainers, such as Jim Van Deusen, eventual NOCSAE leaders, Wayne State University biomechanics experts, Harvard psychiatrists, neurologists, and leading sports medicine doctors to discuss the growing problem of "Football Injuries," focusing largely on head

injuries.  Co-conspirator NFL itself made 27 presentations at the symposium.  Some of the key

presentations were:

a.      Dr. Lawrence M. Patrick – "Establishing Human Tolerance Levels for
        Injury;"

b.      Col. John P. Stapp – "Human Tolerance of Impact;"

c.      Drs. Voigt Hodgson, E.S. Gurdjian, and L.M. Thomas (Wayne State
        University Biomechanics) – "Mechanical and Human Factors Related to
        Head Impact;"

d.      Dr. Stephen E. Reid – "Radiotelemetry Study of Head Injuries in
        Football;"

e.      Dr. Howard Knuttgen – "Psychological Basis of Performance and Physical
        Condition Testing;"

f.      Dr. Thomas Holmes III – "Psychologic Screening;"; Dr. Chester M. Pierce
        – "Effect of Fatigue and Mental Stress on Performance;"

g.      Dr. Austin Henschel – "Effects of Heat on Performance;"

h.      Coach Don Shula and Eddie Block "Coaching, Game Skills, and Injury;"

i.      Dr. Allan Ryan – "The Role of Protective Equipment in Injury Control;"

j.      NY Jets Trainer Jack Rockwell-- –"The Relationship of Turf, Playing
        Conditions, and Equipment to Injuries;"

k.      Victor Frankel – "Biomechanical Analysis of Football Injuries"; and

l.      Vergil N. Slee – "Computerization of Injury Data."

117.    At the time of the 1969 Football Injuries Symposia, all of the cadaver studies,

concussion tolerance studies on dog brains, and the helmet telemetry studies either shared among

the Riddell Defendants and the co-conspirators (or simply sponsored by Defendants in the first

place).

118.    Dr.  Hodgson presented research on repetitive blows to the head using testing on

the lightly anesthetized stump-tail monkey, finding that force: head-weight ratio predicted

concussion.  Hodgson's work focused on predictors of concussion in stump-tailed monkeys and

dog brains.  Hodgson's work cited papers by German scientists recognizing a nearly century-old issue:  the cumulative effect of subconcussive blows.  Hodgson curiously stated from his own research that there did not appear to be an observable cumulative effect from subconcussive blows in his research, but conceded that the "opposing [published] views are difficult to reconcile" and that "intensity of blow … "[is] undoubtedly important in any cumulative effect."

119.    Defendants continued to work with Dr. Hodgson and other Wayne State disciples, whose backgrounds in crashworthiness and automotive biomechanics led to helmet technology designs and safety standards premised on motorcycle racing helmets, which are not intended to diffuse repetitive forces.  Using these designs, Defendants developed hard scale technology for the helmets, rather than soft form technology, which defeated the purpose for the helmets on the football field.

120.    Other presentations at the symposia focused on the injuries suffered on the field.  Upon information and belief, Dr. Charles Pierce's presentation, who had been hired to blame symptoms of irritability, drug abuse, emotional liability, and sleep problems in the NFL player on issues of pride and football players wives' treatment of their husbands, did not address the latent sequelae of brain injuries suffered by repetitive head trauma.  Charles M. Pierce, *Effect of Fatigue and Mental Stress on Football Performance*, National Academy of Sciences, Football Injuries:  Papers Presented at a Workshop, 207-09 (1970).

121.    Presentations from former Jets trainer Jack Rockwell and Jets team physician James Nicholas, M.D., illustrated the earliest examples of reporting studies with flawed data.  Rockwell entirely buried unfavorable data regarding injuries on turf surfaces by calling them "too inconclusive," referred to equipment studies as "difficult" to assess.  Dr. Nicholas reported

on the relationship between position and injury while relying on data identifying only seven total concussions in the nine years of his study.

122.    Dr. Allan Ryan from University of Wisconsin presented on "The Role of Protective Equipment in Injury Control," comparing football players with equipment to dinosaurs (with bodies covered by armor and yet, failed to survive).

123.    In direct contravention to what had been presented to the general public by Dr. Schneider in 1964, Dr. Ryan gushed about plastic helmets, reporting that: "[w]e have a helmet that provides extraordinarily good protection compared with models [from the 1940s and 1950s] but … there are many boys who … suffer irreparable brain damage."

124.    Dr. Ryan, however, acknowledged some poor outcomes (deaths, brain injuries, etc.) given that the advent of this helmet, but that injuries were caused by unintended and inappropriate use by players.  In other words, at this 1969 NFL symposia, the groundwork for a defense was being laid:  any head injuries were the fault of the players themselves (or their wives).

125.    Dr. Ryan made a series of critical recommendations, the most critical of which was to establish (what would ultimately become) the National Operating Committee on Standards for Athletic Equipment ("NOCSAE").  Within months of this 1969 symposia series, following recommendations made at the meetings, NOCSAE was formed.

## 2.    NOCSAE

126.    NOCSAE is a non-profit organization whose stated goal is to improve athletic equipment, and to reduce injuries through creating standards for athletic equipment.

127.    NOCSAE's purported purpose included the development of performance standards for football helmets as well as research to better understand the mechanism and tolerance of head and neck injuries and the design and structure of football helmets.

128.    In reality, NOCSAE advanced a constituency-serving agenda, specifically composed of members of the protective equipment industry, who in turn controlled the NOCSAE funding.  The protective equipment industry members, including Riddell, controlled the votes of its board of directors, and equally important, controlled the message to those athletic organizations dependent upon these protective equipment manufacturers for equipment certification seals.

129.    NOCSAE was self-regulating, and established voluntary equipment safety standards, with manufacturers testing their own equipment and then reporting results to NOCSAE to receive their certification seal.  NOCSAE received no oversight from any governmental agency.  Instead, NOCSAE had strictly voluntary standards for compliance, available for adoption by any equipment manufacturer, user group, or athletic regulatory body.

130.    Upon information and belief, the NOCSAE standards have remained unchanged because of RIDDELL's influence over and, substantial voting power on the NOCSAE Board of Directors.

131.    The divergence between NOCSAE's stated mission and the underlying agendas appears clearest in the composition of those NOCSAE Board members and top advisors with ties to the protective equipment industry:

    a.    RIDDELL/All-American President Don Gleisner served on the Board of NOCSAE during the time-period of the NFL's MTBI Committee's creation while working in the Riddell Chicago, Illinois headquarters;

    b.    At all material times, including, but not limited to, the time period of the MTBI Committee's creation, at least two board votes were controlled by the Sporting Goods Manufacturing Association, now known as the Sports & Fitness Industry Association;

    c.    At all material times, including, but not limited to, the time period of the MTBI Committee's creation, at least one board vote was controlled by a representative from the American Football Coaches Association or the College Football Association;

d.      At all material times, including, but not limited to, the time period of the MTBI Committee's creation, at least two board votes were controlled by the Athletic Equipment Managers Association;

e.      At all times material, including, but not limited to, the time period of the MTBI Committee's creation, NOCSAE's research director was J.J. "Trey" Crisco, whose research on helmet telemetry for Simbex, LLC was purchased and acquired by RIDDELL; and

f.      At all times material, including, but not limited to, the time period of the MTBI Committee's creation, the NOCSAE's technical advisor was and remains frequent RIDDELL/NFL expert witness and paid consultant, Peter David R. Halstead.

132.    NOCSAE has received significant grant funding from helmet manufacturers, co-conspirator NFL, and NFL Charities (by and through co-conspirator NFL) which comprised a substantial portion of its overall grant money.

133.    NOCSAE had multiple members of co-conspirator NFL's MTBI committee (John Powell and David Viano) to oversee its grant dissemination.  Upon information and belief, Both Powell and Viano have received financial compensation from RIDDELL.

134.    The conspiratorial nature of the relationship between RIDDELL, NFL and NOCSAE was described in the deposition testimony of RIDDELL's paid expert Dr. Halstead, who stated that "the NFL and NOCSAE try pretty hard to work together."  Halstead explained that "I work with the NFL Committee on Mild Traumatic Brain Injury … typically through NOCSAE."  Deposition of Peter David Halstead, *Estate of Stringer v. NFL*, Case C2-03-665 (S.D. Ohio)

135.    NOCSAE first began research efforts regarding head protection equipment in or about 1969, establishing standards by the early 1970s that remain materially unchanged and in place to this very day.

136.     NOCSAE's certification testing methodology and systemic bias belie its independence and value as providing any services in the way of safety or indicia of reliability to its end-users (those who wear helmets and other equipment).

137.     In 1999, NOCSAE-funded-research began investigating brain injury, specifically MTBI, subconcussive trauma, and return-to-play ("RTP") protocols and procedures.  All of this work was non-clinical research.

138.     NOCSAE has paid for research, by itself and with co-conspirators, to the Southern Impact Research Center (the "SIRC"), which is owned, at least in part, and operated by frequent RIDDELL/MTBI Committee expert consultant Peter David Halstead.  Both NOCSAE and SIRC have directly employed Halstead.

139.     In 2000, NOCSAE announced that it had formally contracted with SIRC and Halstead to provide its licensees with resources for testing, responding to inquiries, equipment set-up, and update training.

140.     In its 2003 Newsletter, NOCSAE announced that "[w]e are working on the details of a new cooperation with the National Football League for research into football concussions and related standards."

141.     One year later, in another NOCSAE Newsletter in the Spring of 2004, NOCSAE lauded the work of the conspirators' sham committee, however the delay in updating the helmet standards remained unexplained. [8]

---

[8] NOCSAE wrote: "The NFL's Committee on Mild Traumatic Brain Injuries recently published its results assessing the impact type and injury biomechanics of concussions in professional football … The committee claims that the variance of concussive impact data by location could form the basis for future performance standards … Concussions were primarily related to translational acceleration and consistently detectable by conventional measures of head injury risk … A strong correlation existed between rotational and translational acceleration leading the

142.    Notwithstanding NOCSAE's research grants to outside sources, the scientific consensus, and its proclaimed cooperative research with the NFL, NOCSAE has not instituted more modernized helmet certification guidelines.  It finally moved the April 2004 Football Helmet Test Methodology (ND081-04m04) into "proposed" status as of January of 2006, referring all questions to David Halstead.

143.    Upon information and belief, NOCSAE Football Helmet Test Methodology remains unchanged today.

144.    Through 2009, NOCSAE's Newsletter noted that "NOCSAE cannot answer and probably should not" answer the question: "Which helmets provide the best protection from concussion?"  It goes on to say that "the conclusion as to which helmet does a better job in reducing or preventing concussions is better addressed by the manufacturers."  At the same time, NOCSAE prohibited licensees from even releasing the qualitative data points on certification that would indicate relative quality.

145.    As a result, consumers and end users can never get information from NOCSAE about the risks, so long as they wear helmets from manufacturers like RIDDELL, who use NOCSAE standards and who are not releasing their information to the public.

146.    In 1969, co-conspirator NFL, concerned about its own liability, commissioned the Stanford Research Institute ("SRI") to study concussions and other injuries, as sustained on grass versus astroturf.  *See*, Cooper Rollow, "*NFL Takes Steps To Curb Injuries*," Chicago Tribune, June 28, 1973, Sec. 3 at 2.

147.    The NFLPA exposed what it discovered of this largely concealed study as self-serving and false.  *See*, Garvey, Study Totally Inadequate, Players Group Criticizes Turf Report,

committee to conclude that translational values remain sufficient for detection and standards." http://nocsae.org/wp-content/uploads/2011/11/NewLetterSpring2004.pdf.

(AP) June 29, 1973.  As later discovered by Sports Illustrated, the SRI study found that 9.4% of injuries were actually caused by helmets but blamed on the turf surface instead.  Underwood, John, *An Unfolding Tragedy*, Sports Illustrated, August 14, 1978.

148.     Some minimal rule changes to the professional game were made subsequent to the SRI/NFL study, but RIDDELL never acted on the issues of mild-traumatic brain-injury ("MTBI"), concussive exposure, or simply repeated blows to the head ("subconcussive" blows or exposure) based on the study's results.  This was true, even with what was nearly a half-century of scholarship and research having been conducted by this time-period, both on repetitive blows to the brain, and also on football helmet technology.

149.     By the late 1970s, only three helmet manufacturers remained in business, and the RIDDELL Defendants' then-president openly worried that litigation could end football.

150.     In or around 1982, the RIDDELL Defendants' president publicly proposed the formation of a player compensation pool.  He called this the "Sports Rehabilitation Foundation," proposing it be funded by the NFL to provide support payments to high school, collegiate, and professional football players permanently injured during football play.  In return for this compensation, players would waive their rights to sue helmet manufacturers.  *See* Appelson, G., *Helmet Maker Proposes Football Injury Pool*, 68 A.B.A.J. 136 (1982).  An NFL committee was tasked with studying financing for the proposed pool, including ticket surcharges, network contributions, or charges to the players.  *Id.*

151.     Rather than seek to solve football's safety problems for players, RIDDELL and the NFL, and NFL P leaders of the football community in revenue and stature, opted for a self-serving, deliberate, and forward-thinking approach: enlisting the help of other corporate entities

and individuals. The workers-compensation-like scheme proposed by the RIDDELL Defendants did not ultimately materialize.[9]

152.    By 1983, upon information and belief, at least some helmets' warnings were amended to state the following:

> Do Not Use This Helmet To Butt, Ram, or Spear an Opposing Player.  This Is In Violation Of Football Rules And Can Result In Severe Head, Brain, or Neck Injury, Paralysis Or Death to You and Possible Injury to Your Opponent.  There Is A Risk These Injuries May Occur As A Result Of Accidental Contact Without Intent To Butt, Ram, Or Spear.  NO HELMET CAN PREVENT SUCH INJURIES.

153.    Still, following NOCSAE guidelines, the RIDDELL Defendants at the time were only warning against traumatic severe injury, not about MTBI, concussions, subconcussive blows, nor long term latent brain diseases including CTE, or other related repetitive-exposure injuries.

154.    In addition, during this 1980s time period, through co-conspirator NFL Charities, at least one neurologist, Dr. Stanley Appel, M.D., received a sum, believed to be $125,000, to research linkage between the three incidences of ALS (or CTEM) on the same NFL team.

155.    Upon information and belief, Dr. Appel received this grant money not to undertake good-faith scientific study, but instead, to support Defendants' and co-conspirators' self-serving and pre-determined conclusion that no such link existed.

---

[9]  The proposal coincided with a time during which the NFL co-conspirators faced a series of unique, first-of-their-kind challenges: significant forced changes to the insuring and re-insuring of its workers' compensation scheme, after the winding up and eventual liquidation of an underfunded, off-shore, captive mutual insurance carrier (NFL Insurance Limited) left open questions on work-related-injury liabilities; labor unrest with the NFLPA and the absence of a collective bargaining agreement between ownership and players; and, a bizarre cluster of football players, Matt Hazeltine, Gary Lewis, and Bobby Waters, all diagnosed in the same window of time (the early 1980s) with Amytrophic Lateral Sclerosis ("ALS" or "Lou Gehrig's Disease"), all of whom played together on the San Francisco 49ers; and, all of whom died by 1987.

156.    Dr. Appel had, according to tobacco industry memoranda, agreed to perform favorable tobacco-industry research during the same time-period as his ALS research.  He has since become an outspoken critic of the generally accepted scientific connection between trauma and ALS-like symptoms.

### 3.    The NFL P and RIDDELL Agreement

157.    Upon information and belief, on April 11, 1988, RIDDELL and co-conspirator NFL P, the licensing arm of the NFL, embarked on a joint venture. Further, in 1989, RIDDELL agreed to serve as exclusive helmet provider to the NFL co-conspirators.  The joint-venture served to preserve RIDDELL's financial health and RIDDELL, in turn, provided assistance to NFL football in proliferating junk-science and propaganda that minimized the risks of repetitive head injury and concealed the risks of CTE from those playing the game.

158.    These agreements began a multi-decade conspiracy to limit each of their own tort liability by concealing and/or misrepresenting and/or omitting information about the link between latent brain disease and head trauma as a result of playing football from the football community; along with its co-conspirators, including but not limited to: NFL, NFL P, NFL Charities and RIDDELL.  Defendants agreed to engage in a long-term plan to conceal material information about football's link to CTE and other neurodegenerative conditions, while doing so in the name of solving safety problems for its game's players.

159.    In return for providing free and discounted helmets, pads and jerseys to each NFL team, RIDDELL received the exclusive right to display its logo during NFL games on the helmets of those players who choose to wear the RIDDELL brand.  The trade name - "RIDDELL" - can be seen in the front of the helmet on the "nose bumper," on the side of the helmet on the chin strap, and in the back of the helmet at the helmet's base. While NFL players remain free to wear the helmet of their choice, the Agreement stipulates that "manufacturers'

logos other than RIDDELL's must remain covered during league play … in order for an NFL to be eligible for all the free and discounted equipment from RIDDELL, at least 90% of its players must use RIDDELL helmets."  *Kelci Stringer v. NFL, et al.*, 2:03-cv-00665-MHN-MRA.  (S.D. Ohio).

160.    This agreement was so powerful that RIDDELL's chief competitor made it the subject of antitrust litigation.  *Schutt Athlet. Sales Co. v. Riddell, Inc*., 727 F. Supp. 1220, 1222 (N.D. Ill. 1989).

161.    Among other things, the agreement included NFL P and RIDDELL jointly employing a person obligated to ensure that equipment used in the NFL was the "safest possible."  Upon information and belief, the joint employee never warned about CTE, latent injuries, or neurodegenerative injuries caused by use of RIDDELL helmets while being subjected to repetitive head trauma.

162.    Former RIDDELL President, J.C. Wingo, stated in 2013 that the purpose of the RIDDELL-NFL exclusivity deal was "to ensure a viable survivor in the helmet industry."  *See* John Helyar, *Helmets Preventing Concussion Seen Quashed By NFL-Riddell*, Bloomberg Business, Mar. 18, 2013.

163.    As further consideration for RIDDELL's exclusive agreement, RIDDELL was permitted to sell NFL-branded mini replica helmets as souvenir items.  Most significantly, RIDDELL was also provided an exclusive multi-million-dollar market to sell NFL-branded products in exchange for RIDDELL's participation in its conspiracy.

## F.    THE MTBI COMMITTEE

164.    By the early 1990s, the emerging scientific consensus forced Defendants to take a different approach to the growing problem of MTBI-caused acute injury and latent disease in existing and former football players, respectively.

165.   On October 20, 1992, Commissioner Paul Tagliabue received a hand-written letter from Arthur J. Stevens, General Counsel for Lorillard Tobacco company, Tobacco Institute Executive Committee member, and head of the Tobacco industry's "Committee of Counsel." The letter copied Lorillard co-owners then-New York Giants co-owners, P.R. Tisch and Andrew Tisch.  It advised on updates regarding the crime-fraud exception to the attorney-client privilege in the context of exposure-injury litigation.

166.   Upon information and belief, it was at this time that co-conspirator NFL began to recognize large numbers of its players were developing chronic brain damage from football, and paying disability money and workers' compensation money for these injuries.  In addition, the Giants had recently borne witness to a high-profile concussion, when, on September 7, 1992, 49ers quarterback Steve Young was knocked out of the Giants' game due to a concussion.

167.   Covington and Burling LLP's senior litigator Paul Tagliabue named NFL Commissioner, in 1989, publicly dismissed the League's concussion issues as "pack journalism," saying that the number of concussions was very small,[10] that the NFL experienced "one concussion every three or four games."  Upon information and belief, Tagliabue began implementing a long-term, litigation-defense strategy.

168.   Commissioner Tagliabue decided to establish an "independent" Committee to create the appearance of progress on concussion research and protective-equipment advancement.

169.   In 1994, the NFL co-conspirators and Defendants voluntarily formed and funded a committee, the Mild Traumatic Brain Injury Committee ("MTBI Committee"), to study the

---

[10] www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/timeline-the-nfls-concussion-crisis.

issue of head injuries in the NFL.  The MTBI Committee was funded through the NFL Charities, among other grants.

170.    The MTBI Committee was a joint enterprise between the NFL co-conspirators and RIDDELL and undertaken for the following purposes:

    a.    to create a body of self-serving non-clinical science on MTBI and blows to the head;

    b.    to provide a scientific basis for the underlying test metrics used in safety-equipment design;

    c.    to provide a scientific basis for the underlying test metrics used in safety-equipment research;

    d.    to provide non-clinical (e.g., scientific research) to interested parties making decisions with football players who could be accused of legally causing these players' chronic brain damage and/or latent brain disease(s); and,

    e.    to develop and validate a neuropsychological test battery which, in conjunction with football players' purported subjective symptoms, could justify otherwise unjustifiable decisions by clinicians to clear such players to play football.

171.    In this way, the MTBI Committee's creation served to:

    a.    drag the fact-finding process out;

    b.    cast doubt on football-related head injury causation altogether by blaming co-morbidities;

    c.    attempt to distinguish NFL-causation from pre-NFL causation; and

    d.    conduct bad-faith harm-reduction research in the form of exploring improvements to equipment changes and game conditions that conspirators, committee members, behind-the-scenes scientists and attorneys knew would not actually result in material health benefits for players, but would create a false sense of security  in Plaintiffs and others.

172.    The MTBI Committee first met collectively in February of 1995 in Indianapolis, where they arrived at a consensus definition for "concussion."

173.    At the time the MTBI Committee began, the Chair, then-Jets team doctor, Elliott, learned or should have learned through treating his own player/patient, Jets Pro Bowl receiver Al Toon, that players developed a series of acute brain injuries and lingering sequelae, such as chronic severe headaches, malaise, intolerance of loud noises, depression, and emotional liability as a result of repetitive head trauma.

174.    Committee Member Albert Burstein had worked largely as a consultant for numerous pharmaceutical and biomedical corporations prior to his working on the NFL's MTBI Committee.  Most importantly, Burstein worked regularly as a defense expert witness for RIDDELL on numerous personal injury/product liability litigation matters concurrent with his time as a member of the purportedly "independent" MTBI Committee.

175.    In an example of the numerous instances that Committee Member Burstein provided paid-for trial testimony on RIDDELL's behalf while serving on the conspirators' sham committee, in *Arnold v. Riddell, Inc.*, 882 F.Supp. 979 (D. Kan. 1995), Burstein opined that the cause of a football player's paralysis would have remained unchanged regardless of the specific helmet type he had worn.

176.    Under Burstein's guidance, along with Committee Chair Dr. Elliot Pellman, the Committee agreed to drive out any potentially successful competitor products to secure the market position of the RIDDELL products.  That was true even of products that were scientifically tested and believed to provide players with substantial benefit.

177.    The original roster comprising this Committee was purportedly independent and composed to research the issues of concussion in football in good-faith.  In fact, the opposite was true:  it was comprised of biased and/or ill-qualified who's-who list of NFL and RIDDELL insiders and professional expert witnesses.

178.    The MTBI was first composed of the following members:

    a.    Committee Chair Dr. Elliot Pellman, MD, served as team doctor for the New York Jets concurrently in his role as chair of the Committee. Committee Chair Dr. Elliot Pellman had been disclosed by defense counsel as an expert witness in a concussion-based, return-to-play, malpractice trial against fellow NFL team physician, Chicago Bears John Munsell, MD.  NFL lead spokesman Greg Aiello has acknowledged that Commissioner Paul Tagliabue received personal medical care on an ongoing basis from Dr. Pellman over the course of a decade;

    b.    Committee Member David Viano, PhD, offered purportedly for his background on biomechanics and helmet safety was primarily an employee of General Motors at the time of his appointment and not a professor at Wayne State University as represented;

    c.    Committee Member Dr. Viano left GM in 2002, and has received the bulk of his income over the course of his life as a defense-side expert witness in product-liability actions, primarily testifying on issues of crashworthiness in automotive industry.  Committee Member Viano and his shell corporation received approximately $200,000 per year from NFL Charities in "MTBI Grant" money;

    d.    Michigan State University's department of kinesiology, where MTBI Committee member John Powell, PhD (athletic trainer) was employed, received upwards of $50,000 per year;

    e.    University of Pittsburgh Medical Center, where MTBI Committee member and Pittsburgh Steelers' neurologist Dr. Joseph Maroon practiced, received upwards of $50,000 per year MTBI grant money; and

    f.    Committee Member Mark Lovell, PhD, a business partner of Steelers team neurologist and fellow MTBI Committee-member Joseph Maroon, M.D., had a significant corporate interest in selling his controversial product "imPACT! Sideline concussion assessment tool" to the NFL.

179.    From 1994 until 2010, Defendants and co-conspirators propagated their own industry-funded and falsified research to mitigate the harm caused by the game and their products, despite their historic roles as the guardians of player safety, and despite the fact that independent medical scientists had already identified the significant threat posed.

180.    In addition, the MTBI Committee funneled money to a number of outside consultants it knew would provide favorable conclusions.

181.    The Committee worked closely during early years with Dr. Lawrence Thibault, a notable biomechanics expert in Philadelphia who had opined that the so-called "shaken-baby" syndrome did not actually exist.  Thibault opined that babies did not suffer from such repetitive-type trauma, but instead only suffered from acute and specific blunt-force traumatic events.

182.    The Committee retained Dr. Cynthia Bir.  Dr. Bir was a biomechanics expert who had significant experience working in boxing, which the MTBI committee worked hard to distinguish from the sport of football.

183.    The MTBI Committee funneled significant money to Peter David Halstead, the football-helmet tester who worked at his own lab in Tennessee (the Southern Impact Research Center or "SIRC") and at the University of Tennessee Knoxville Biomechanics Laboratory to validate and test helmets pursuant to NOCSAE standards.  Halstead had no college degree and has lied about his education multiple times in federal-court depositions and on his resume that is posted on his website, www.soimpact.com.

184.    As alleged elsewhere, the MTBI Committee spent a significant amount of money on General Motors' expert witness and biomechanics expert Dr. David Viano.  Dr. Viano came up with many of the principal theories advanced by the Committee: that football injuries are biomechanically different than boxing (where chronic brain injury was clinically proven); and that the MTBI testing metrics and standards were valid.

185.    The nature of Burstein's opinion (that the brand of helmet would not influence an injury) also was the shared opinion advanced by paid consultants Dr. Joseph Torg and Dr. John Powell, both of whom were also corporate-friendly consultants and expert witnesses. Joseph Torg had testified for RIDDELL at trials many times in the 1970s, and had participated in injury-tracking data with Burstein during the 1970s.  Powell had been in charge, not merely of tracking

injury data for the NFL but also devising the tracking system for the NFL from the time he received his PhD in 1980.  Prior to that, the NFL had no injury tracking system whatsoever. Powell had also received income during the 1970s performing similar work for the NCAA, and performed helmet/concussion studies involving Defendant RIDDELL's helmets.

186.    The Committee members disclaimed any "financial or business interest that poses a conflict" to the MTBI Committee's research in *Neurosurgery* notwithstanding the numerous league ties and salaried positions such as RIDDELL expert, NFL Medical Director / Jets Doctor / Chaired NFL Physician's society, NFL Injury and Safety Panel, and a personal physician to Commissioner Tagliabue.

187.    The Committee commingled MTBI grant funds funneled from NFL Charities with RIDDELL money for use on sham helmet-safety research between 1997-2000, the purpose of which was to develop a product that the MTBI Committee knew was tested through ineffective means for the NFL's and RIDDELL's mutual commercial benefit after misrepresenting study results.

188.    Pellman, Chairman of MTBI, represented in a May 2009 meeting on CTE pathology and helmet safety between MTBI Committee members, NFLPA medical and player representatives, NFL league officials and attorneys, experts, and scientists from BU, that: "[t]he sponsorship of Riddell should have nothing to do with making decisions … we want [Riddell] to help in terms of fitting, but we would prefer the data come [from elsewhere] … So we in fact do coach people how to speak in terms of liability, particularly when it comes to your history or history of concussions."

189.    The Committee acknowledged in *Neurosurgery* papers that the legal contributions to the MTBI Committee's work, included work by NFL general counsel Jeff Pash and

Covington/former NFL counsel Dorothy C. Mitchell.  By creating the MTBI Committee, Defendants affirmatively assumed a duty to use reasonable care in the study of concussion and post-concussion syndrome in NFL players, including the truthful and accurate publication of data and statements from the MTBI Committee.

190.    Rather than exercising reasonable care, Defendants engaged in a concerted effort of deception and denial designed: to dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and to create a falsified body of research which the NFL could cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

191.    RIDDELL and the co-conspirators reasonably expected that NFL players and the football community at large, including Plaintiffs, would rely on its research and pronouncements, in part because of the historic special relationship between the NFL and the players and, in part because the NFL knew that the vast majority of NFL players played under non-guaranteed contracts and student athlete's played for non-guaranteed scholarships and would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.

192.    NFL's and RIDDELL's unparalleled status in the world of football (and historical status as the guardian of player safety) imbued its MTBI Committee's pronouncements on concussions with a unique authority as a source of information to players.  Plaintiffs therefore reasonably relied on the Defendants' pronouncements on these vital health issues.

193.    The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the NFL and to outline solutions.  The MTBI

Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

194.    By 1994, when the MTBI Committee was formed, independent scientists and neurologists alike wrote that all concussions—even seemingly mild ones—are serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

195.    Then-Commissioner Paul Tagliabue stated that "[i]n the early 1990s, as we looked more deeply into the specific area of concussions, we realized that there were more questions than answers," despite the fact that independent science had already come to a definitive, but harmful conclusion a decade earlier.

196.    RIDDELL benefitted from and orchestrated NFL Charities' propagation of self-serving, industry-funded and falsified research through the MTBI Committee to support its often ridiculed positions on exposure to repetitive head-trauma.

197.    The MTBI Committee began by publishing a number of technical papers in the 1990s presented at the International Research Council on the Biomechanics of Injury ("IRCOBI"). The "IRCOBI Papers" were the fruits of early "MTBI Grant" money funneled from co-conspirator NFL and RIDDELL either through NFL Charities or directly to a series of expert consultants, who were effectively pre-litigation defense-side expert witnesses:

- Exponent Failure Associates (Drs. Robert Fijan and Reid Miller);

- Biokinetics, Ltd. Canada (James Newman, et al);

- Dr. David C. Viano;

- Alleghany University;

- Wayne State University's Biomechanics Lab (Dr. A.I. King, et al);

- Duke University's Dr. James McElhaney; and

- Dr. Lawrence Thibault.

198.    One of these early, principal IRCOBI papers sponsored by the MTBI Committee validated the RIDDELL VSR-4 helmet over the rival Bike technology in order, upon information and belief, to validate the agreement between NFL/NFL P and RIDDELL, which otherwise would have been fraudulent on its face.

199.    The early IRCOBI papers in the 1990s also studied mouth-guard research for concussion, concluding falsely that proper use of a mouth-guard could impact MTBI.

200.    In the 1990s, this work principally, with the MTBI Committee's financial backing, laid the groundwork to advance Defendants' bottom line, introduced computerized neuropsychological testing protocol into the NFL, and published a series of otherwise (even more) highly suspect research in peer-review journal *Neurosurgery* during the 2000s.

201.    These papers validated the "Hybrid-III" testing dummies as the means to test concussion and forces to the head and neck in football players, which was-on its face-a questionable if not nonsensical approach given that these dummies were stiff and un-lifelike when compared to the human head/neck, which bent and torqued.

202.    The early papers also validated the "viscous criterion VC" injury model advanced by Viano in his research to justify the otherwise unjustifiable NOCSAE standards.

203.    More early work was used to advance and/or validate neuropsychological testing protocol.  This specifically included the computerized neuropsychological testing research done by Alleghany University, designed to create a "concussion severity index" and supervised by

Exponent Failure Analysis expert consultants Drs. Robert Fijan and Reid Miller as creators of the neuropsychological testing protocol.[11]

204.    This computerized neuropsychological testing protocol admittedly proceeded from the underlying assumption that football players were not injured (i.e., they had NOT suffered a diffuse brain injury) but instead, simply had many of the frequent comorbidities associated with diffuse brain injuries: attention deficit, memory loss, concentration difficulties, and impaired information processing.

205.    Upon information and belief, the Allegeny protocol involved only five teams and tested only one of five injured players.  Yet, it became the underlying basis for the scientific justification for ImPACT Concussion Assessment Tool, used to validate the RIDDELL Revolution Helmet and in multiple papers published in *Neurosurgery* by the MTBI Committee.

206.    The MTBI Committee knowingly published papers in peer-reviewed journals basing conclusions on factually unsupportable claims (based upon the data they had), or cherry-pick data in order to support the conclusions that the committee sought.  It was also this committee that would test, sponsor, and verify with neuropsychological testing, what would become the RIDDELL revolution helmet.

207.    Former General Counsel Richard Lester's testimony in *Stringer v. NFL*[12] suggests that MTBI Committee member Dr. Viano may have served in a joint-employment capacity by RIDDELL and NFL pursuant to the licensing agreement and conspiratorial agreement while also serving as the Chair of NFL's MTBI Committee.

---

[11] Exponent Failure Analysis has drawn criticism for its reports claiming second-hand smoke did not cause cancer, and for its other work on behalf of the NFL, most recently in the "Deflategate" scandal.

[12] *Stringer v. National Football League*, 2:03-cv-00665-MHW-MRA (S.D. Ohio).

208.    In one example, the Committee conspired to keep non-RIDDELL helmet, the Bike Pro Edition helmet, which NFLPA President Trace Armstrong had worked to develop as a technological advancement, out of the League. www.bloomberg.com/news/articles/2013-03-18/helmets.

209.    The Committee also scuttled the use of the ProCap product (a soft outer shell for helmets intended to reduce MTBIs), reportedly without regard to its potential benefits.  *Id.*; www.bloomberg.com/news/articles/2013-03-18/helmets-preventing-concussion-seen-quashed-by-nfl-RIDDELL.

210.    Through MTBI Grant money from co-conspirator NFL Charities, Steelers/UPMC Neuropsychologist Mark Lovell was charged with developing the subsequent neuropsychological testing protocol for the NFL.  Upon information and belief, these tests were intended to serve as a supposed objective basis to justify team physicians' and coaches' otherwise inappropriate return to play decisions with respect to concussed players.  As long as the teams could match a player's lack of subjective complaints with testing data (which had alarmingly inaccurate false positive AND false negative rates), the club or team or college would then not be to blame for injuries suffered by the players.

211.    The other major study the conspirators conducted at this time was the Brain Injury Surveillance Study.[13]  Pellman ordered all 30 teams to keep accurate records of their concussed players each week, and to submit this data to John Powell's registry for logging.

212.    Yet, during a later presentation, then-Jets neuropsychologist William Barr made clear that a substantial portion of reported neuropsychological testing data sets had never been used (if not entirely discarded).

---

[13] Pellman, E., et al, *Concussion in Professional Football: Reconstruction of Game Impacts and Injuries*, Neurosurgery: October 2003 – Volume 53 – Issue 4 – pp. 799-814.

213.    Upon information and belief, the conspirators had published articles in a leading peer-reviewed journal premised on vastly underrepresented, skewed, and self-serving data. According to Dr. Barr, when he confronted Dr. Pellman with this concern, Pellman informed Barr he would be relieved of his duties as Jets neuropsychologist if he persisted.

214.    Less than a year after Dr. Burstein's testimony in *Arnold*, in 1996, the conspirators' purportedly independent committee agreed to jointly engage the services of the Canadian consulting firm, Biokinetics and Associates, Ltd., to conduct research into helmet safety standards along with Defendant RIDDELL, which paid for the pendulum used in the testing.  This study, that NOCSAE denied, was funded jointly by RIDDELL and the NFL charities, using MTBI grant money, was in fact funded by these entities, according to the internal work-product deliverables from the study itself.

215.    The MTBI Committee studied and recreated videotaped concussive impacts from real NFL play at Biokinetics' lab, using a new pendulum technology and "Hybrid-3 dummies," which were reportedly innovations used to evaluate human tolerance to MTBI under a metric called "Head Impact Power" Index (HIP).  This began in 1995 and occurred in two parts within a five year period.

216.    In part one of the study, Biokinetics, on behalf of and/or in concert with Defendants, evaluated how helmets responded to "potentially concussive" hits.  As was known then by the co-conspirators, concussions occur through both linear-force injuries and also through rotational injuries.  The proposed HIP metric provided a preliminary means through which to evaluate rotational injury.

217.    Biokinetics reviewed video of approximately 100 concussive hits to determine which hits to study and attempt to reproduce them.

218.    The lab then focused on reproducing 12 impacts for the test, 9 hits were concussive in nature.

219.    Specifically, helmets were evaluated for concussion using NOCSAE metrics designed for death/skull fracture/brain bleed/paralysis injuries (TBI injuries).  The metric that NOCSAE relied on for evaluation had been developed at Wayne State University in the context of automotive crashes and was called Severity Index ("SI").

220.    In part one of the two-part study at Biokinetics, the authors acknowledged that the SI metric was not a concussion metric.  Specifically, the authors wrote "the reader is reminded that the NOCSAE and ATSM failure criteria are intended to reflect serious head injury, rather than concussion." Withnall, C., *A New Performance Standard For Mild Traumatic Brain Injury (MTBI)*, Nov. 15, 2000, *RR00-22* Memorandum to RIDDELL, Inc. at 10 (Part One).

221.    Part one concluded that "maximum power could remain a strong predictor of concussion even in the absence of complex rotational acceleration recordings." Withnall, C., *A New Performance Standard For Mild Traumatic Brain Injury (MTBI)*, Nov. 15, 2000, *RR00-22* Memorandum to Riddell, Inc. at 11 (Part One).  Stated differently, the report concluded that being hit extremely hard head-on was a strong measure of concussion, even if there was not an adequate way to measure the sheering, angular –type injuries consistent with many football concussions.

222.    In part two of the two-part study at Biokinetics, the helmets were knowingly tested under insufficient temperature conditions to properly evaluate energy attenuation of the helmet's liner system.  This was even acknowledged in the study.  *See* Withnall, C., *A New Performance Standard For Mild Traumatic Brain Injury (MTBI)*, Nov. 15, 2000, *RR00-23*, Memorandum to Riddell, Inc. at 10 (Part Two).

223.    The Biokinetics study also revealed concussive impact for helmets to be 95% likely at an SI value less than half (559) of the NOCSAE minimum for certification (1200); and concussive impact was still 50% likely at less than one quarter (291) of the NOCSAE minimum for certification (1200).

224.    Yet, the Biokinetics memorandum did *not* conclude that the SI test was inappropriate as a metric for concussion, saying "maximum power could remain a strong predictor of concussion …"  Because rotational injuries were still not possible to entirely to test, the conspirators reached the self-serving conclusion that the old car-crash test (SI) metric might still be the best test.  The SI metric was also the only test that could be empirically captured.

225.    Defendants' testing contemplated a head impact power (HIP) index, a parameter combining linear and rotational acceleration, and measured that index on each hit with the help of tiny accelerometers inside the dummies' heads.

226.    The HIP index still could not fully capture rotational injury, a fact acknowledged by the study's authors, and subsequently by David Viano and Elliott Pellman, among others.

227.    In layman's terms, Viano and Pellman concluded the test was still effective to evaluate concussions based upon how fast and hard people collided, which meant that the SI test was not obsolete, even though they acknowledged the possibilities of concussive traumas coming at far lesser impacts.

228.    Part two of the study concluded, in layman's terms, that even though the new HIP metric was ineffective, insufficient, and subject to change, a helmet meeting this standard was better than a helmet not meeting this standard.

229.    The study also acknowledged importantly, and accurately a conclusion properly imputed to the conspirators:  <u>NO HELMET CAN PREVENT A CONCUSSION</u>.

230.    The conspirators, along with NOCSAE, then engaged long-time RIDDELL expert witness P. David Halstead at the Southern Impact Research Center in Tennessee to perform additional research on helmet safety testing.[14]  The MTBI conspirators engaged NOCSAE to study possible new safety standards for concussion-related helmet testing.  These standards were not utilized and have still not been utilized today.

231.    Then in 1995 RIDDELL engineer Thad Ide began testing helmets.  (Ide had left RIDDELL in the early to mid-1990s and worked briefly at the SIRC for the first two years that it opened under this corporate name.)  He then left SIRC and returned to RIDDELL, whereupon he became a Senior VP of RIDDELL.

232.    Halstead remained at SIRC claiming to conduct "research" and product testing, but in reality, operated the organization as a source of defense expert consulting for the NFL, NCAA, and protective-equipment manufacturers.

233.    Halstead was and is, at all relative times, a career expert witness.  Halstead has represented to have a masters and bachelors of science degree from SUNY, and to have taken post-graduate-level course work in biomechanics.  In reality, Halstead's post-secondary education consists almost entirely of online coursework from an unaccredited university.  He has more recently conceded in deposition testimony and on his posted resume that he only possesses "non-traditional" education credentials.

234.    Halstead testified repeatedly as an expert witness for Defendant RIDDELL, who had been sued for catastrophic protective-equipment malfunctions.  In each instance, Halstead testified that the helmet at issue (or occasionally other equipment) was not to blame.

---

[14] As described above, Halstead also authored MTBI Committee papers and has been paid by the NFLPA and RIDDELL as an expert.

235.    From its inception in 1994, the MTBI Committee claimed to be conducting studies to determine the effects of concussions on the long-term health of NFL players.  Instead of publishing truthful information about the MTBI crisis in the NFL, the MTBI committee spearheaded a disinformation campaign.

236.    Dr. Elliot Pellman, chairman of the Committee, and two other Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies linking head impacts and concussions to neuro-cognitive disorders and disabilities.

237.    The MTBI Committee published its findings in a series of sixteen papers between 2003 and 2009.  According to those papers, the MTBI Committee's findings supported a conclusion that there are no long-term negative health consequences associated with concussions or subconcussive injuries sustained by NFL players.  These findings contradicted decades of independent research and the experiences of neurologists and players.

238.    The MTBI Committee concluded that it was appropriate for players who suffered a concussion to return to play in the same game or practice in which the concussion occurred.  In 2004, the MTBI Committee claimed that its research found that players who suffered a concussion were not at greater risk of suffering future concussions.  The Committee also claimed that such players did not have increased susceptibility in the seven-to-ten day window after suffering a concussion.

239.    The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data collection techniques.  They received significant criticism in scientific media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

240.    As another example, in 2005, the MTBI Committee stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

241.    Yet, a 2003 NCAA study of 2,905 college football players found just the opposite:  "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

242.    A different 2003 study reported depression after traumatic brain injury.  Seel, R.T., J.S. Kreutzer, et al., Depression after traumatic brain injury: National Institute on Disability, et al. Arch. Phys. Med. Rehabil. 83:177-184, 2003.

243.    Another 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina found a link between multiple concussions and depression among former professional players with histories of concussions.  A 2005 follow-up study by the Center showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

244.    Other erroneous conclusions that the MTBI Committee published included the following:

- As Drs. Pellman and Viano stated, *because* a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that [MTBIs] in professional football are not serious injuries;"

- That NFL players did not show a decline in brain function after a concussion;

- That there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;

- That "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions;" and

- That NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

## G. MTBI COMMITTEE'S WORK WAS CRITICIZED AS BIASED AND UNFOUNDED.

245.    Dr. Robert Cantu observed that the small sample size and voluntary participation in the MTBI study discussed by Drs. Pellman and Viano suggested bias in the study design.  As a result, Cantu found that no conclusions should be drawn from the study.

246.    A different scientist who reviewed the MTBI Committee's work stated that the primary goal appeared to be preparing a defense for when injured players eventually sued the NFL and RIDDELL, and that the League seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

247.    Dr. Kevin Guskiewicz, referring to the MTBI Committee, has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

248.    The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

249.    For example, in a paper published in *Neurosurgery* in December 2004, Dr. Pellman and other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing.  The authors concluded that NFL players did not show a decline in brain function after suffering concussions.  Their analysis also found no ill effects among those who sustained three or more concussions or who sustained a concussion that prevented them from playing football for a week or more.  The paper selectively excluded at least 850 baseline tests, but did not explain why.

250.    The NFL and the MTBI Committee, in addition to promoting false and misleading information, sought to discredit and deny the findings of other researchers confirming the link between football head injuries and long-term brain damage.

251.    Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.  All of these individuals suffered multiple concussions during their NFL careers. Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression. Dr. Omalu concluded that the players had suffered from CTE.  In July 2005, nearly three years after he first saw the body of former Pittsburgh Steelers center Mike Webster, Dr. Omalu's paper about Webster's brain was finally published in *Neurosurgery*: "Chronic Traumatic Encephalopathy in a National Football League Player."

252.    After Dr. Omalu's findings were first published in *Neurosurgery*, the MTBI Committee wrote a letter to the editor of the publication asking that Dr. Omalu's article be retracted.

253.    The MTBI Committee also attacked a study authored by Dr. Kevin M. Guskiewicz.  That study analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression. The study also found that sustaining three or four concussions was associated with twice the risk of depression as never- concussed players and five or more concussions was associated with a nearly threefold risk.[15]

254.    In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research.  Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program.  On the program,

_____

[15] Kevin M. Guskiewicz, PhD, et al. *Cumulative Effects Associated with Recurrent Concussion in Collegiate Football Players*, JAMA 2003; 290 (19): 2549-2555.

Dr. Pellman stated unequivocally that he did not believe the results of the study led by

Dr. Guskiewicz.

255.    In 2005, Guskiewicz performed a clinical follow-up study of more than 2,550

former NFL players, and found that retired players who sustained three or more concussions in

the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees

without a history of concussions.  The MTBI Committee attacked the study.

256.    In August 2007, the NFL issued a concussion pamphlet to players.  The pamphlet

stated:

> Current research with professional athletes has not shown that having more than
> one or two concussions leads to permanent problems if each injury is managed
> properly.  It is important to understand that there is no magic number for how
> many concussions is too many.  Research is currently underway to determine if
> there are any long-term effects of concussion[s] in NFL athletes.

257.    In a statement made around the time that the concussion pamphlet was released,

NFL Commissioner Roger Goodell said, "We want to make sure all NFL players . . . are fully

informed and take advantage of the most up to date information and resources as we continue to

study the long-term impact on concussions."  The NFL decided that the "most up to date

information" did not include the various independent studies indicating a causal link between

multiple concussions and cognitive decline.

258.    Commissioner Goodell also stated: "[b]ecause of the unique and complex nature

of the brain, our goal is to continue to have concussions managed conservatively by outstanding

medical personnel in a way that clearly emphasizes player safety over competitive concerns."

259.    In 2005, the MTBI Committee published a paper that stated "[p]layers who are

concussed and return to the same game have fewer initial signs and symptoms than those

removed from play. Return to play does not involve a significant risk of a second injury either in

the same game or during the season."

260.     Facing media scrutiny over the MTBI Committee's questionable studies, Pellman resigned as the head of the Committee in February 2007.  He was replaced as head by Dr. Ira Casson and Dr. David Viano, but Pellman remained a member of the Committee.[16]

261.     Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries.  In 2007, in a televised interview on HBO's Real Sports, Dr. Casson unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

262.     In June 2007, the NFL convened a concussion summit for team doctors and trainers.  Independent scientists, including Drs. Cantu and Guskiewicz, presented their research to the NFL.

263.     Dr. Julian Bailes, the founding member of the Brain Injury Research Institute and Professor and Chairman of Neurosurgery at West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline.  In 2002, Dr. Bailes in conjunction with Dr. Bennett Omalu helped to identify the first clinical evidence of CTE.  Dr. Bailes recalled that the MTBI's Committee's reaction to his presentation in 2007, was adversarial:  "The Committee got mad . . . we got into it.  And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding?  Alienate the scientist who found it? Refuse to accept the science coming from him?"

---

[16] Dr. Guskiewicz said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective." Regarding Dr. Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

264.    At the summit, Dr. Casson told team doctors and trainers that CTE had never been scientifically documented in football players.

265.    In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale.  Dr. McKee stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions." Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

266.    A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal.  When Dr. McKee's research was published in 2009, Dr. Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]term brain damage."

267.    In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players. Over 1,000 former NFL players took part in the study. The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population— including a rate of 19 times the normal rate for men ages 30 through 49."

268.    The NFL, which commissioned the study, responded to these results by claiming that the study was incomplete, and that further findings would be needed. NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia.  Dr. Casson implied that the Michigan study was inconclusive and stated that further

work was required.  Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

### H.   RIDDELL RELEASED ITS REVOLUTION HELMET BASED ON FLAWED STUDIES.

269.     In 2002, following the above mentioned Biokinetics study, RIDDELL released its Revolution helmet, purportedly specifically manufactured and designed to "reduce the incidence of concussions."

270.     The Revolution helmet was born out of the *concept* that rotational injuries were causative of concussion and warranted protection, but without tests capable of gauging rotational forces in a meaningful way, it has lacked sufficient proof that its design functioned to perform in this manner.

271.     Defendant RIDDELL claimed that its Revolution helmet could reduce the incidence of concussion by 31%, which fueled sales of the helmet model.

272.     Riddell's media campaign surrounding the rollout of this "first of its kind" helmet included a video news release that created "over 60 million media impressions, nearly 150 television placements, over 100 newspaper clips, over 250 on-line placements and 6 live sports radio interviews."

273.     In 2002, Defendant RIDDELL released the Revolution helmet, a helmet it marketed as specifically designed to "reduce the incidence of concussions," and RIDDELL marketed it as "a first-of-its-kind helmet."  Defendants NFL and NFL P allowed, encouraged, purveyed, and promoted the false marketing of these products to football players at every level over its possession and control.

274.     The Cleveland Clinic found that modern football helmets are no better at protecting against concussions than vintage "leatherhead" football helmets.  *See Vintage*

*Leatherhead Football Helmets Often as Protective As Modern Helmets In Common Game-like*
*Hits Cleveland Clinic Researchers Find*, Cleveland Clinic, November 4, 2011,
http://my.clevelandclinic.org/about-cleveland-clinic/newsroom/releases-videos-
newsletters/2011-11-04-vintage-leatherhead-football-helmets-often-as-protective-as-modern-
helmets-in-common-game-like-hits (last visited March 11, 2016).

275.    Defendants knew, have known, and/or should have known that although helmets
help reduce skull fractures and bleeding caused by linear forces, they are ineffective in
decreasing the rotational forces that result in MTBI and/or subclinical MTBI and/or diffuse brain
injury.

276.    Defendant knew or should have known that this claim was false.  Because, there
was no study that demonstrated the superiority of the Riddell Revolution over all other helmets.

277.    Defendants have continued to utilize substandard liner materials such as vinyl
nitrile foam that are less effective at reducing head impact acceleration by absorbing energy.
Vinyl nitrile foam padding used in Defendants' helmets degrades over time and provides less
protection against lower-level impacts that result in concussions.

278.    The NFL, a $9B/year revenue entity, funding youth-marketing arms such as USA
Football and formerly the NFL Youth Football Fund, has allowed and encouraged a the use of
these helmets through co-conspirator NFL P and Defendant RIDDELL's noxious advertising
campaigns.

279.    In its 2003 fact-sheet on the RIDDELL website, RIDDELL represented its
Revolution helmet to have been born out of research from "an independent engineering
consulting firm in Canada …" and being the first helmet ever designed with the intent of
reducing MTBI occurrence.

280.   Defendant RIDDELL eventually placed a warning on its Revolution line.  Yet this warning made no mention of repetitive exposure to subconcussive traumas, latent disease, nor CTE; and, despite clear indications from the NOCSAE that indicate substantial if not overwhelming *probability* of concussive blows in football, this misleading warning suggests merely that contact in football "may" result in concussion and "brain injury", without specifying the nature of such injury.  Its specific references only warn against TBI and *possible* risk of concussive trauma, making it, for these reasons among others, inadequate.

281.   Following the release of the Revolution helmet, RIDDELL funded research at UPMC to study the new helmet with Drs. Michael "Mickey" Collins, Mark Lovell, and Joe Maroon.  The UPMC/RIDDELL study compared new Revolution helmets to old, refurbished, VSR-4 helmets—the oldest performing technology on the marketplace.

282.   In this limited context, RIDDELL's Revolution eked out a victory in performance by approximately 2%: 7.6% to 5.3%, a relative difference of 2.3%.  This number lacks statistical significance and becomes even more compromised when one considers that its evaluation metric was eviscerated: studies revealed the neuropsychological evaluations used to test the Revolution helmets produced 20% to 40% false negative <u>AND</u> positive rates according to peer-reviewed testing.  In other words, baseline testing and/or follow up exams could have been and likely were wrong, making the results of this study entirely useless to show a 2.3% relative difference.

283.   Mickey Collins later agreed that the study had serious problems and that RIDDELL was shopping for research that would support its claim that the Revolution reduced concussions, stating:

> "I needed money to fund my salary," he said.  "I was going to get my ass fired, you know?  So I'm looking for any kind of funding to do this research.  Any struggling academic is looking for that.  So that was part of it … I'm not an idiot; **I know Riddell wanted the results to look good, okay?  I mean obviously.  I**

**understand that**.  But I am one of the leading experts in concussion … there were serious flaws with the study, okay?  I understand that."

Fainaru-Wada, M. and Fanairu, S., *League of Denial,* Three Rivers Press (2014).

284.    Based on the 2003 UPMC study funded by RIDDELL, RIDDELL marketed the Revolution helmet in 2006 as reducing concussions by 31%—a figure criticized as an exaggeration by leading experts on head injuries.

285.    Upon information and belief, UPMC attempted to make multiple, material changes to RIDDELL's media releases regarding the 31% claim, and the claim that the Revolution provided better protection against concussions, prior to the press release's dissemination.  Specifically, even some of the actual authors of the study took issue with how RIDDELL was characterizing the findings.

286.    By focusing solely on the larger number, which referred to a relative decrease in risk, this exaggerated any benefits of the types of products eventually worn by players wearing these helmets.

287.    Dr. Robert Cantu, a neurosurgeon and leader in the field of sports-related concussion research, wrote a comment published in *Journal of Neurosurgery* that the study contained a "serious, if not fatal methodological flaw."  The study was flawed because it discounted low impact hits and in turn proved that the Revolution did not reduce the risk of concussions.

288.    Upon information and belief, the RIDDELL and NFL P Defendants have knowingly failed to utilize the safest materials available in the construction of football helmets, which has resulted in an increased risk of brain injury in football players, and in fact have marketed the Revolution helmet as a panacea when it contains the same defective liner system as its VSR-4 series predecessor.

289.     In fact, RIDDELL and NFL P have consistently marketed their helmets as having "concussion reduction technology" thus promoting a false sense of security to helmet users and the public.  RIDDELL has continued to utilize substandard liner materials and padding that are less effective at and reducing head impact acceleration by absorbing energy and despite their superior knowledge about the risks associated with concussions and repetitive head impacts.

290.     In fact, the Revolution contains the same defective vinyl nitrate front liner system as RIDDELL's antiquated VSR-4 series helmet.

291.     Materials such as thermoplastic polyurethane ("TPU") have been shown to help reduce head impact acceleration by absorbing energy more effectively throughout a wider range of temperatures thus reducing force on the brain.

292.     Defendants knew or should have known that materials such as thermoplastic polyurethane ("TPU") are better at absorbing energy throughout a wider range of temperatures and provide better protection against head impacts when used throughout liner systems of football helmets.

I.     **U.S. CONGRESS INVESTIGATED THE INJURIES SUFFERED ON THE FOOTBALL FIELD AND CO-CONSPIRATOR NFL FINALLY ACKNOWLEDGED ITS OWN FLAWED RESEARCH.**

293.     In 2009 and 2010, the House of Representatives Judiciary Committee held hearings on the impact of head injuries sustained by NFL players.

294.     Representative Linda Sanchez asked NFL Commissioner Roger Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias. Goodell evaded answering the questions.

295.     Rep. Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

296.     The gravamen of Goodell's opaque response was that the unclear scientific issues required research.  Football-safety always required an ongoing commitment to better equipment (including helmets).  The game's players needed to better perceive the risks (as opposed to those with the power and knowledge accepting responsibility for explaining those risks).

297.     In 2010, Dr. Ira Casson, a neurologist, testified and denied the validity of independent studies.  He stated that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

298.     Dr. Casson testified that he was "the lead author of a landmark paper on brain damage in modern boxers" published in the Journal of the American Medical Association in 1984.  That paper studied eighteen former and active boxers and found evidence of brain damage in 87% of them.  Ira R. Casson, MD; Ozzie Siegel, PhD; Raj Sham, MD; et al, *Brain Damage in Modern Boxers*, 1984;251(20):2663-2667.

299.     In that same vein, Casson's written statement said that he had "been concerned about the possibility of long term effects on the brain related to football for close to 3- years." He explained that he "was asked to be on the NFL MTBI committee . . . because of his [his] knowledge of and experience treating boxers with [CTE]."

300.     This testimony contradicted Casson's testimony that "there is not enough valid, reliable, or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

301.     Shortly after a May 2010 hearing, Dr. Batjer was quoted as admitting that the MTBI Committee's work was flawed:  "We all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable

by any modern standards or not acceptable to us.  I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

302.    In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that Dr. Pellman would no longer be a member of the panel.  Dr. Ira Casson was asked to step off the Committee.  Drs. Batjer and Ellenbogen were selected to replace Casson and Viano.  The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

303.    Under its new leadership, the Medical Committee admitted that data collected by the previous leadership was "infected" and formally asked Dr. Pellman not to appear at a Committee conference.

304.    In October 2011, Dr. Berger announced that a new study was in the planning process. He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that." Dr. Berger further stated that data from the previous study would not be used. "We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

305.    Through the years, RIDDELL and the Co-Conspirators' MTBI Committee made a series of unsupportable claims in their peer-reviewed papers in *Neurosurgery*, which took significant criticisms.  The unsupported claims were as follows:

      a.      Drs. Pellman and Viano stated, that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football- related activities for less than 1 week, it can be concluded that [MTBIs] in professional football are not serious injuries;"

      b.      Players who suffered a concussion were not at greater risk of suffering future concussions (2004).  One independent doctor

wrote that "[t]he article sends a message that it is acceptance to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days;"

c.     "Players who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season;"

d.     Therefore "these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation;

e.     There was "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players;"

f.     NFL players did not show a decline in brain function after a concussion;

g.     Neuropsychological testing was not helpful for evaluating MTBI in NFL players (in a paper written by Dr. Lovell, who developed the imPACT test);

h.     There were no ill effects among those who had three (3) or more concussions, or who took hits to the head that sidelined them for a week or more;

i.     "No NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions;" and,

j.     NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

306.    Indeed, a substantial portion of this liability-limiting conspiracy has entailed shifting blame from those entities with superior knowledge and control —namely the conspirators—onto football's employees/end-users, and creating public opinion and science that would support personal-choice and/or causation defenses in the guise of good-faith research.

307.    As NFL General Counsel Jeff Pash stated on Christmas of 2009, following the release of updated helmet memorandum, "the Commissioner believes if *players* are given the proper information, *they* can make good choices about their equipment and safety."

308.     By way of another example, many conclusions of the MTBI Committee's research have, including but not limited to the jointly sponsored helmet research, focused repeatedly on distinctions between *NFL* football play as compared with *pre-NFL* football play, or versus youth-football play, when the scientists themselves and their peer-reviewers have known that was untrue.

309.     Not coincidentally, the Defendants and the co-conspirators have attempted to establish exactly this sort of "science," using the research of the MTBI Committee.  The committee posed as a scientific research organization when in fact it was not.  The RIDDELL/NFL conspiracy sought to redevelop litigation science on legal causation by drawing a distinction between NFL-football-play and head-trauma suffered in youth-football and/or high school or college football to defend itself.  They began collecting data for a study to prove exactly such a conclusion during the time-period when Defendants played football, instead of providing him with truthful information about repetitive head trauma.  The result of this fraudulent research was the February 16, 2016 paper from Casson, Viano and Lovell referenced *infra.  See* Solomon, Kuhn, Zuckerman, Casson, Viano, Lovell, Sills, *Participation in Pre–High School Football and Neurological, Neuroradiological, and Neuropsychological Findings in Later Life: A Study of 45 Retired National Football League Players*, 44 Am. J. Sports. Med. 3 (Mar. 2016).

310.     Until approximately 2006, each member-clubs' self-reported and self-serving information would be logged into one spreadsheet.

311.     Deposition testimony in *Stringer v. NFL* revealed there was no consistent database maintenance regarding head injuries.  Nor was there a system in place to monitor the

consistency of reporting across teams during the era that the spreadsheet-entry format was utilized.  *See* No. 2:03-cv-00665-MHW (S.D. Ohio) (ECF No. 113 at 4).

312.    Since approximately 2006, the NFL began using outside agent, publicly traded health-care company Quintiles, based in North Carolina, to manage this data-entry/report and to correlate this data to various aspects of the game.

313.    Pellman was quoted in the Winter 1997 edition of co-conspirator Pro Football Athletic Trainer's Society's quarterly trade publication, distinguishing his MTBI Committee as independent in nature by claiming that "athletic trainers are the most important link in head injury treatment."

314.    Dr. Pellman further stated in this same article that "[w]e are in the process of setting safety standards the NFL can look to when a mild traumatic brain injury occurs."  Indeed, this would not occur for 10 years.  Moreover, in making this concession, Pellman attempted to distribute responsibility onto others: "players, coaches, athletic trainers and physicians should all be able to recognize an [MTBI], know what the correct safety standards are and be able to determine at what point a player should return to the field after sustaining mild brain trauma. The standard doesn't exist in the medical community right now, and we in the NFL are attempting to set the standard."  He said, nearly a decade after an international return-to-play protocol had been established by the global medical community, and two to three years after the MTBI Committee's consensus on its own working definition for a concussion: "traumatically induced alteration of brain function."  Notably, the American Association of Neurosurgeons' definition captures alteration of brain function "resulting from mechanical force or trauma."

315.    Notwithstanding the RIDDELL and the NFL's actual/constructive knowledge of the link between exposures to head-trauma and long-term neurological disease/illness, at *all*

times material to the Complaint, with respect to its injury database, the NFL knowingly permitted the alleged systemic failures by its member-clubs with respect to providing the data for this database.

316.    The NFL has underreported and/or misreported head injuries, and/or mis-categorized head-injuries as other injuries (chest / neck / shoulder / muscular / unspecified) in order to manipulate its own data.  This custom and practice has existed, upon information and belief, for the duration of this injury database, purportedly created to solve these sorts of problems, but in fact used to paint skewed statistical pictures favorable to the conspirators.

317.    The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports, further undermining the reliability and accuracy of the studies.

**J.    IN 2013, RIDDELL ENDED ITS PARTNERSHIP WITH THE NFL AND THE NFL P.**

318.    In 2013, Defendants supposedly ended their partnership with RIDDELL as the official helmet of pro football.  While the NFL's sources leaked news that it needed "quite a bit of leverage" to get itself out of the RIDDELL deal early, almost concurrently with the end of this deal, USA Football and RIDDELL agreed to a near-identical deal.

319.    Ultimately, in March of 2014, Defendant RIDDELL agreed to stop making its claim regarding the 31% claim after the Federal Trade Commission's division of advertising practices determined "significant limitations" in its study.

320.    USA Football is a supposedly independent body from the NFL, however, its founding Board of Directors consisted of the NFL's Commissioner of Football, the NFLPA's Executive Director, NFL Government Relations Director Joe Browne, and NFLPA attorney

Douglas Allen.  And upon information and belief, a substantial portion of funding for USA Football is driven by the conspirators.

321.    Indeed, as Defendants and the Co-Conspirators have believed for decades, developing early interest in football fans leads to adult season-ticket holders is critical for brand-survival and for long-term profits.

322.    Entire marketing campaigns were instituted around this premise, specifically trying to: "make soccer moms the coaches of tackle football" and to promote "heads up" tackle football even with the knowledge that such a style of football makes absolutely no difference whatsoever when it comes to preventing injury.

## IX.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

323.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

324.    In the early 1990s, the NFL and RIDDELL Defendants voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

325.    In 1994, in connection with that voluntary undertaking, the NFL and Defendant RIDDELL created the aforementioned MTBI Committee.

326.    The NFL and RIDDELL Defendants recognized that their voluntary undertaking to study and report information about the effect of head impacts would not just be for the benefit of then-present and former NFL players alone, but also for the football community, the medical community and the general public. Defendants knew or should have known that its MTBI Committee's statements would have a broad public impact and would be relied upon by all members of the football community and the public.

327.    By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, Defendant assumed a duty to exercise reasonable care in the MTBI Committee's work and these Defendant's agents' public statements about the substance and results of the research and other work of the Committee.

328.    Notwithstanding that the NFL and Defendant RIDDELL stated that the MTBI Committee would be independent scientists, Defendants filled the seats of the MTBI Committee with inadequately trained members who had strong ties to Defendants and conflicted personal interests in the outcome of the research.

329.    The MTBI Committee negligently performed the NFL and RIDDELL Defendants' voluntarily undertaken research mission.

330.    The MTBI Committee knew or should have known that repetitive blows to the head, concussions and subconcussive impacts would result in both an immediate impact as well as latent diseases that could occur within a few days, weeks, months and many years as a result of these strikes to the brain. Instead, Defendants, acting through the MTBI Committee concealed, downplayed and absolutely misrepresented the studies and research performed; manipulated and hid the actual and accurate the data and the study outcomes, and misrepresented, concealed or entirely omitted the accurate results of the studies and research performed.

331.    The NFL and RIDDELL Defendants undertook the duty of research of these important medical and scientific issues concerning the impact of the concussions, but failed to perform their duties properly and as a reasonable person would expect.

332.    In addition, from 1994 through June of 2010, the NFL and RIDDELL Defendants and their MTBI Committee made material misrepresentations to Plaintiffs, the

United States Congress, and the  public at large that there was no scientifically valid link between repetitive traumatic head impacts  and later-in-life cognitive/brain injury, including CTE and its related symptoms, despite knowing that these representations were false.

333.    RIDDELL Defendants' failure to exercise reasonable care in its voluntarily assumed duty  increased the risk that the Plaintiffs would suffer long-term neurocognitive injuries.

334.    The Plaintiffs reasonably relied to their detriment on the RIDDELL Defendants' actions and  omissions on the subject.

335.    Under all of the above circumstances, it was foreseeable that the  RIDDELL Defendants' failure to exercise  reasonable  care  in the  execution of  its  voluntarily  undertaken duties would cause  or  substantially contribute to the personal injuries suffered by the Plaintiffs by:

  a.    Failing to use their superior knowledge and information;

  b.    Failing to seat honest and well educated and trained scientists on the MTBI Committee;

  c.    Filling the Committee seats with individuals who were not adequately trained or knowledgeable about the subject matter of the research;

  d.    Filling the Committee seats with individuals who had conflicts ad judgment, and who acted in their own self-interest;

  e.    Failing to select investigators and Committee members who would fairly and honestly undertake the investigations;

  f.    Failing to allow the Committee to function independently of Defendants and their industries and interests;

  g.    Failing to conduct adequate research;

  h.    Failing to conduct accurate research;

  i.    Failing to retain investigators who were not biased and self-interested in the study outcomes to the extent that they had an interest in skewing the outcomes to their own favor;

j.      Failing to undertake appropriate research in a scientific manner;

k.      Failing to report accurate findings from the research undertaken;

l.      Failing to disclose accurate information about the research;

m.      Failing to disclose truthful and accurate data to the scientific community;

n.      Failing to act without bias and self-interest, which clouded and tainted the outcomes of their studies; and

o.      Failing to accurately undertake and report upon the research that was the subject and the purpose of the Committee in the first place.

336.    RIDDELL Defendants' failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to Plaintiffs' injuries and damages.

337.    RIDDELL Defendants were additionally negligent in their design, testing, assembly, manufacture, marketing, and engineering of the helmets as described herein.

338.    RIDDELL Defendants owed a duty of care to the Plaintiffs in their design, testing, manufacture, assembly, marketing and sale of the helmets and all components and sub-assemblies of the helmets.

339.    RIDDELL Defendants should have been well aware that since 1928 repeated blows to the head can lead to CTE, commonly known as "punch-drunk syndrome."

340.    RIDDELL Defendants breached their duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while using their helmets.

341.    In licensing the helmets with NFL P, RIDDELL Defendants also had a duty to ensure that the equipment and materials they manufactured and had licensed was of the highest

possible quality and sufficient to protect Plaintiffs from the risk of injury, including, but not limited to, the unnecessarily increased risk of brain injuries.

342.    NFL P and RIDDELL Defendants breached these duties by licensing defective RIDDELL helmets for use while knowing or having reason to know that these products were negligently and defectively designed and manufactured.

343.    RIDDELL Defendants knew or had reason to know that these products not only did not protect Plaintiffs from MTBI or minimize the risk of such harm, but actually increased that risk and contributed to such harm.

344.    As a result of RIDDELL Defendants' negligence, Plaintiffs suffered injuries and damages and losses and Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT II
## NEGLIGENT MARKETING

345.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein

346.    RIDDELL Defendants had a duty to exercise reasonably care in the marketing of their products, including a duty to ensure that the marketing of the products would not cause unreasonable harm.

347.    RIDDELL Defendants failed to exercise ordinary care in the marketing of their products in that Defendants knew or should have known that their products created the risk of unreasonable and dangerous harm.

348.    RIDDELL Defendants were negligent in marketing their products in that they:

a.    Unreasonably marketed the game and their products as safe when defendants knew or should have known the risks and negative health effects of brain trauma caused by the game and their products; and

b.    Failed to inform about the scientific research on the negative health effects of brain trauma and about anecdotal evidence from the negative health effects of brain trauma;

c.    Failed to warn of the potential negative effects of brain injuries caused by the game and their products, including but not limited to, that the increased risk for developing one or more serious, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them;

d.    Failed to adequately address the continuing health risks associated with concussive events, subconcussive events, or brain injuries caused by the game and their products; and

e.    Failed to make any statements of substance about concussions, MTBI or other brain injuries;

349.    Despite the fact that the defendants knew or should have known that the game and their products caused unreasonable and dangerous injuries to the brain, defendants continued to promote and market the game and their products without adequately informing of the risks.

350.    As a result of the Defendants' negligence, Defendants are liable to Plaintiffs, and the  Plaintiffs are entitled to, and seek, all damages allowed by applicable law.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are

entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT III
## NEGLIGENT MISREPRESENTATION

351.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

352.    From the time the RIDDELL helmets were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, Defendants made misrepresentations that the RIDDELL helmets were safe and fit for its intended purpose of protecting users from harm.  At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of RIDDELL helmets and willfully deceived Plaintiffs as to the health risks and consequences of using RIDDELL helmets.

353.    RIDDELL Defendants made the forgoing representations without reasonable ground for believing them to be true.  These representations were made by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and advertising directed to the public.

354.    The representations by Defendants were false in that the RIDDELL helmets were not safe and fit for its intended purpose as using the RIDDELL helmets has a serious propensity to cause brain injuries like those suffered by Plaintiffs.

355.    RIDDELL Defendants and co-conspirator NFL additionally had a duty to disclose accurate information to the public about the risks of traumatic brain injuries.  This duty arose because:

       a.    RIDDELL Defendants had superior special knowledge of material medical information that Plaintiffs did not have access to, and was not readily available to Plaintiffs;

b.     RIDDELL Defendants voluntarily and gratuitously inserted themselves into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury; and

c.     RIDDELL Defendants communicated with Plaintiffs, the medical community, and the public while completely omitting material information about the true risks of brain trauma, or providing partial or ambiguous statements regarding safety and brain injuries, and the context of those communications shows that the NFL needed to complete or clarify those statements with all material information.

356.    Despite their knowledge of such material facts, and generally speaking about concussions and brain injuries, Defendant and the NFL negligently omitted to disclose material information to Plaintiffs, the medical community, and the public regarding the link between brain injuries and the resulting negative neurological effects and conditions.

357.    RIDDELL Defendants actively omitted true information at a time when they knew, or should have known, because of their superior position of knowledge.

358.    RIDDELL Defendants failed to act with reasonable care by negligently omitting to disclose material information to Plaintiffs and the public regarding the link between concussions and brain injury and resulting negative effects and cognition-impairing conditions.

359.    Plaintiffs justifiably relied on the Defendants' negligent misrepresentations by omission to their detriment, relying on what the Defendants' said to them and the general public while the Defendants omitted material information about concussions and other brain injuries.

360.    In reliance on the misrepresentations made by Defendants, Plaintiffs were induced into using the helmets.  Plaintiffs' reliance upon Defendants' misrepresentations were justified because such misrepresentations were made and conducted by individuals and entities that were in a superior position of knowing the facts.

361.    Plaintiffs' reliance on the Defendants' negligent misrepresentations by omission were reasonable, given Defendants' superior and unique vantage point on these issues.

362.    Had Plaintiffs been aware of such information, they would have taken protective measures or sought the diagnosis and treatment they needed had they been told the truth.

363.    As a direct and proximate result of the Defendants negligent misrepresentation by omission, Plaintiffs have suffered or are at an increased risk of suffering serious injuries, including, but not limited to, long-term neurological damage, and the serious symptoms, disorders, and diseases resulting from that damage.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT IV
## FRAUD

364.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

365.    RIDDELL Defendants had a duty to promptly disclose and speak the full truth regarding the health risks and dangers caused by concussive and subconcussive impacts and the risk of latent brain disease. This duty arose because:

   a.    RIDDELL Defendants had superior special knowledge, information and access to material scientific research and medical information that Plaintiffs did not have access to, and was not readily available to Plaintiffs and the general public;

   b.    RIDDELL Defendants voluntarily and gratuitously inserted themselves into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury; and,

   c.    RIDDELL Defendants communicated with Plaintiffs and the public while completely omitting material information about the true risks

of repetitive head trauma, concussions and subconcussive impacts, or providing partial or ambiguous statements regarding safety and brain injuries, and the context of those communications shows that the Defendants needed to complete or clarify those statements with all material information.

366. RIDDELL Defendants breached that duty by fraudulently failing to disclose material information to Plaintiffs and the public regarding the likely risks of brain injuries caused by concussive and subconcussive impacts, including, but not limited to, the resulting negative neurological effects and conditions, including the increased risk of developing one or more serious, latent, neurodegenerative diseases or conditions including, but not limited to, CTE, and symptoms therefrom including but not limited to, *inter alia*, dementia, ALS, Alzheimer's, and Parkinson's and other neurodegenerative diseases, and the debilitating symptoms from each of them.

367. Specifically, RIDDELL Defendants concealed material facts and information with the effect of evading the truth, which caused Plaintiffs to become exposed to the harm referenced above.

368. Plaintiffs justifiably relied on RIDDELL Defendants' fraudulent omissions and misrepresentations as alleged above to their detriment.

369. Given RIDDELL Defendants' superior and special knowledge and resources, Plaintiffs reasonably relied upon the Defendants' for guidance on concussions and other brain injuries, and reasonably relied upon Defendants' fraudulent omissions of material fact, which concealed and minimized the perceived risks of repetitive brain impacts.

370. Had Plaintiffs been aware of such information they would have taken protective measures or sought the diagnosis and treatment they would have needed had they been told the truth.

371.    In addition, prior to Plaintiffs' use of the RIDDELL helmets, Defendants fraudulently suppressed material information regarding the safety of using RIDDELL helmets, including information regarding the serious risk and propensity of brain injuries occurring over time from use of RIDDELL helmets.  Plaintiffs believe that the fraudulent misrepresentations described herein were intentional to maintain the sales volume of RIDDELL helmets.

372.    RIDDELL Defendants falsely and fraudulently represented to the public that the RIDDELL helmets had been tested and were found to be safe for its intended use to prevent head injuries.

373.    These representations were made by RIDDELL Defendants with the intent of defrauding and deceiving the Plaintiffs and the public in general and were made with the intent of inducing the public to purchase and/or use the RIDDELL helmets.

374.    RIDDELL Defendants knew and were aware that the RIDDELL helmets were not fit for their intended purpose, were defective in nature, and lacked adequate or sufficient warnings.

375.    RIDDELL Defendants fraudulently concealed the safety issues associated with use of RIDDELL helmets in order to induce the public to purchase and use RIDDELL helmets.

376.    At the time RIDDELL Defendants concealed the fact that RIDDELL helmets were not safe and fit for their intended purpose, Defendants were under a duty to communicate this information to Plaintiffs and the general public in such a manner that they could appreciate the risks associated with using RIDDELL helmets.

377.    At the time RIDDELL Defendants made these representations, Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

378.     In reliance upon RIDDELL Defendants' representations, Plaintiffs were induced to and did use the RIDDELL helmets, thereby sustaining severe and permanent injuries.

379.     As a direct and proximate result of the RIDDELL Defendants' fraud and failure to warn, Plaintiffs have suffered and continue to suffer serious injuries, including, but not limited, to long-term neurological damage, the serious symptoms resulting from that damage, and the increased risk of developing one or more serious, latent, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them.

380.     As a direct and proximate result of the RIDDELL Defendants' misconduct, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law and medical monitoring for undiagnosed neurological diseases, disorders, or conditions.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT V
## STRICT LIABILITY/DESIGN DEFECT

381.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

382.     At the time the helmets were designed, manufactured, sold, and distributed by the RIDDELL Defendants, the helmets were defective in design, unreasonably dangerous, and unsafe for their  intended purpose because they did not provide adequate protection against the

foreseeable risk of concussive brain injury.  The design defect includes, but is not limited to the following:

a.     Negligently failing to design the subject helmet with a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the head;

b.     Negligently designing the subject helmet with a shock attenuating system which was not safely configured;

c.     Negligently failing to properly and adequately test the helmet model;

d.     Other acts of negligence that may be discovered during the course of this matter;

e.     Failing to warn Plaintiffs that their helmets would not protect against the long-term health consequences of concussive brain injury;

f.     Prior to 2002, the RIDDELL Defendants made no attempt to design a helmet to protect against concussive injuries. The two helmets they marketed, the AF2 (discontinued in 1997) and the VSR4, had insufficient padding to protect against concussive injuries; and

g.     Even the RIDDELL Revolution Helmets (introduced in 2002) were not designed to sufficiently protect against concussions as was shown by the demonstration before a congressional panel, by P. David Halstead, Technical Director of Southern Impact Research Center ("SIRC") on January 4, 2012.

383.     At all times, the helmets were being used for the purpose for which they were intended.

384.     RIDDELL Defendants are strictly liable for designing a defective and unreasonably dangerous product and for failing to warn which were proximate and producing causes of the personal injuries and other damages including, but not limited to, economic damage as alleged herein.  A safer alternative design was economically and technologically feasible at the time the product left the control of RIDDELL Defendants.

385.     As a result of the RIDDELL Defendants' defective design for the RIDDELL helmets, Plaintiffs have sustained permanent injuries.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

**COUNT VI**
**FAILURE TO WARN**

386.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

387.    RIDDELL Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the RIDDELL helmets.

388.    RIDDELL Defendants failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk  of concussive brain injuries when using their helmets.

389.    RIDDELL Defendants failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other model helmets provided greater   shock attenuation from blows to the head area.

390.    RIDDELL Defendants ignored 18 years of published literature, read by their general counsel Richard Lester, warning of the dangers of concussive injuries until 2002, when a warning  involving return to play after a concussion was placed on all RIDDELL helmets. The warning was still  defective and inadequate and remains today defective and inadequate because it does not warn about  the later life cognitive effects of concussive injury.

391.     RIDDELL Defendants knew that these substantial dangers were not readily recognizable to an ordinary consumer or user and that such person would use these products without inspection for defects.

392.     Plaintiffs neither knew, nor had reason to know of the existence of the aforementioned defects, or increased risks of harm.

393.     Plaintiffs were using the helmets in a reasonably foreseeable manner at all times. Plaintiffs' damages were the legal and proximate result of the actions of the RIDDELL Defendants who owed a duty to warn Plaintiffs of the risks of substantial harm associated with the foreseeable use of their products.

394.     As a result of the RIDDELL Defendants' failure to warn, Plaintiffs have sustained permanent injuries.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

395.     Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

396.     At the time RIDDELL Defendants marketed, distributed, and sold the RIDDELL helmets, RIDDELL Defendants warranted that the RIDDELL helmets were merchantable and fit for the ordinary purposes in which they were intended.

397.    Users of the helmets like Plaintiffs were the intended beneficiaries of the warranty.

398.    The RIDDELL helmets were not merchantable and fit for their ordinary purpose because the helmets do not protect from brain injury and the cognitive effects of concussive injury.

399.    Plaintiffs reasonably relied on RIDDELL Defendants' representations that the RIDDELL helmets were a safe means of reducing the risk of head injury.

400.    RIDDELL Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

401.    As a result of the RIDDELL Defendants' breach, Plaintiffs have sustained permanent injuries.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT VIII
## CIVIL CONSPIRACY

402.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

403.    For decades, the Defendants RIDDELL and the NFL and NFL P, along with others who were employed by the Defendants, including those who participated in the NFL MTBI Committee, acted in concert to perpetrate the fraudulent concealment of the decades long scientific research that linked concussions, subconcussive impacts and repetitive head trauma to

emotional distress, cognitive impairment, intellectual deficits and latent brain disease and neurodegenerative brain disease.

404.    RIDDELL Defendants engaged in an unlawful agreement to intentional fail to disclose, hide, conceal and misrepresent the truth about the risks and dangers of latent brain disease in athletes, like Plaintiffs who suffered repetitive blows to the head, concussions and subconcussive impacts.

405.    RIDDELL Defendants knew and had reason to know the information that they were hiding, concealing, omitting and failing to disclose to Plaintiffs, among others, was information upon which Plaintiffs would rely.

406.    RIDDELL Defendants entered into the agreement to engage in false misrepresentations intended for the purpose to induce Plaintiffs and others' reliance and to continue to promote RIDDELL Defendants' business interests and profits.

407.    RIDDELL Defendants, along with those who participated in the concerted efforts  referenced above, knowingly  failed to disclose and/or  made continuing misrepresentations of  material  fact  that  there  was  an  absence  of  any  scientific  basis  to believe  that  repetitive  MTBI  created  any  known  long-term  neuro-cognitive  risks.  That misconduct  by  the  named RIDDELL Defendants exposed Plaintiffs to an increased risk of brain  injury  and  was  the  proximate  cause of the Plaintiffs' latent brain injuries, latent brain diseases and neurodegenerative harm suffered and which they will suffer far into the future.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are

entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT IX
## FRAUDULENT CONCEALMENT

408.    RIDDELL Defendants were in a position of superior special knowledge, information and access to material scientific research and medical information and knew or had reason to know that Plaintiffs would rely upon their representations.

409.    RIDDELL Defendants knew, intended to induce and expected that Plaintiffs would reasonably rely on their silence and fraudulent concealment of the risks and long term effects of brain injuries suffered while using RIDDELL helmets.

410.    Plaintiffs reasonably relied on that silence during and after their careers, to their detriment.

411.    This information was material in that had Plaintiffs been aware of such information they would have taken protective measures or sought the diagnosis and treatment they would have needed had they been told the truth.

412.    As a direct and proximate result of the RIDDELL Defendants' fraudulent concealment, Plaintiffs have suffered and continue to suffer serious injuries, including but not limited to long-term neurological damage, and the serious symptoms resulting from that damage, and the increased risk of developing one or more serious, latent, neurodegenerative diseases or conditions including, but not limited to, CTE, dementia, ALS, Alzheimer's disease, and Parkinson's disease, and the debilitating symptoms from each of them.

413.    As a direct and proximate result of the RIDDELL Defendants' misconduct, RIDDELL Defendants are liable to Plaintiffs for the full measure of damages allowed under

applicable law and for medical monitoring for undiagnosed neurological diseases, disorders, or conditions.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT X
## WRONGFUL DEATH

414.    Plaintiffs and their respective Executors or equivalent legal representatives under  applicable state law (hereinafter "Executors") reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

415.    The Plaintiffs' legal representatives bring this action in their representative capacity of  the decedent's Estate and next of kin and on behalf of the respective survivors of those Plaintiffs.

416.    As a direct and proximate cause of the conduct alleged herein, RIDDELL Defendants caused the  Plaintiffs to develop the debilitating brain diseases and conditions set forth above, which diseases  and conditions caused extreme pain, suffering, and anguish and, ultimately, the deaths of some  Plaintiffs.

417.    As a direct and proximate result of the untimely deaths of the Plaintiffs, their respective  survivors and/or surviving distributees have been deprived of the earnings, maintenance, guidance,  support and comfort that they would have received from for the rest of the respective Plaintiffs' natural  lives, and have suffered commensurate pecuniary and non-pecuniary losses because of the Plaintiffs'  wrongful deaths.

418.    The Plaintiffs' legal representatives claim the full measure of damages allowed under applicable law.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT XI
## SURVIVAL ACTION

419.    Plaintiffs and their respective Executors or equivalent legal representatives under applicable state law (hereinafter "Executors") reallege each and every allegation set forth in all preceding paragraphs as fully set forth herein.

420.    The Plaintiffs' legal representatives bring this action in their representative capacity of the decedent's Estate and next of kin and on behalf of the respective survivors of those Plaintiffs.

421.    As a direct and proximate cause of the conduct alleged herein, RIDDELL Defendants caused the Plaintiffs to develop the debilitating brain diseases and conditions set forth above, which diseases and conditions caused extreme pain, suffering, and anguish and, ultimately, the deaths of some Plaintiffs.

422.    The legal representatives of the deceased Plaintiffs' claim damages recoverable under applicable law for all pecuniary and non-pecuniary losses suffered by the deceased Plaintiffs by reason of their deaths.

423.    The Plaintiffs' legal representatives claim the full measure of damages allowed under applicable law.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT XII
## LOSS OF CONSORTIUM

424.    Plaintiffs and Plaintiffs' Spouses incorporate by reference as if fully set forth herein paragraphs applicable to the Counts they or their spouses have pled in their respective Short Form Complaints.

425.    As a result of the named RIDDELL Defendants' misconduct, the named RIDDELL Defendants are liable to Plaintiffs' Spouses.

426.    As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness of the named RIDDELL Defendants (designated in the Short Form Complaints), the Plaintiffs have sustained the aforesaid injuries, and the Plaintiffs' Spouses have been damaged as follows:

      a.    They have been and will continue to be deprived of the services, society and companionship of their respective spouse;

      b.    They have, will be and will continue to be required to spend money for medical care and household care for the treatment of their respective spouse; and

      c.    They have been and will continue to be deprived of the earnings of their respective spouse.

427.    As a result of the injuries, the Plaintiffs' Spouses are entitled to damages, as alleged herein or allowed by law.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT XIII
## PUNITIVE DAMAGES UNDER ALL CLAIMS

428.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

429.   RIDDELL Defendants the NFL, NFL P and RIDDELL engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the Plaintiffs and the public, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  Plaintiffs and society cannot afford and should never be exposed to the risks of another public display of brutality and the monetization of violence of the magnitude caused by RIDDELL Defendants' misconduct herein.

430.   RIDDELL Defendants' corporate culture caused and allowed it to disregard the lessons they should have learned and applied from previous incidents, from scientific journals and articles and the accumulated medical knowledge that repetitive blows to the head resulted in extensive damage to the Plaintiffs, their families and the community; instead, RIDDELL Defendants continued to place others at risk in the interests of cost-cutting and financial gain.

431.   In addition, after the Plaintiffs injuries from latent diseases manifested, the RIDDELL Defendants were aware of the latent diseases, the medical procedures that would potentially help Plaintiffs and their families, yet RIDDELL Defendants delayed the provision of

this potentially life-saving information, thereby increasing the risk of long-term harm to the Plaintiffs and their families.  As such, RIDDELL Defendants increased the magnitude of, and damage caused by, the RIDDELL Defendants conspiracy of silence and deceit, by willfully and/or wantonly and recklessly choosing its profits over the lives of the Plaintiffs and their families.

432.    RIDDELL Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because RIDDELL Defendants' conduct was motivated by financial gain; because it injured and endangered human health and safety; because it caused devastating damage and loss to the livelihoods and families of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to RIDDELL Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish RIDDELL Defendants and deter further repetition by RIDDELL Defendants or others.

433.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT XIV
## DECLARATORY RELIEF:  PUNITIVE DAMAGES

434.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

435.    Plaintiffs have a legitimate and legally protected interest, additional to and independent of the interest or entitlement to compensation, in punishment and deterrence of reprehensible and harmful conduct, and in imposing full and effective punishment and deterrence of such conduct.  Punitive damages do not compensate for injury.  They are private fines, authorized under applicable states' laws to punish reprehensible conduct and deter its future occurrence.  Punitive damages are specifically designed to exact punishment, in excess of actual harm, to make clear that the Defendants' misconduct is especially reprehensible, to embody social outrage and moral condemnation of such misconduct, and to assure that it is not repeated.

436.    Accordingly, Plaintiffs seek a judicial declaration against Defendants and in favor of the Plaintiffs that any settlement provisions that purport, directly or indirectly, to release or to affect the calculation of punitive damages without a judicial determination of fairness, adequacy, and reasonableness are ineffective as contrary to law, equity and public policy.

Wherefore, as a direct and proximate result of Defendants' wrongful, wanton, and reckless conduct, Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

   a.  An award of compensatory damages, the amount of which will be determined at trial;

1348053.1

b.      An award of economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

c.      For loss of consortium as applicable;

d.      For punitive and exemplary damages as applicable;

e.      For all applicable statutory damages of the state whose laws will govern this action;

f.      For an award of attorneys' fees and costs;

g.      An award of prejudgment interest and costs of suit; and

h.      An award of such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

Dated: _____ 2017                          Respectfully Submitted,

*/s/ Wendy R. Fleishman*
Wendy R. Fleishman
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
250 Hudson Street
8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com

Christopher Seeger
**SEEGER WEISS LLP**
77 Water Street
New York, NY 10005
Phone:  (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

*Co-Lead Counsel on Behalf Plaintiffs Against*
*Riddell Defendants*

*Additional Plaintiffs' Counsel to be Added*