# Exhibit A

ARBITRATION OPINION AND AWARD
RICHARD R. KASHER, ARBITRATOR
January 22, 1988

```
***********************************************************
                                                          *
     In The Matter Of An Arbitration Between              *
                                                          *
   NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL            *
           AND THE MIAMI DOLPHINS                         *
                                                          *
                  -and-                                   *
                                                          *
   NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION           *
              AND THOMAS HENDERSON                        *
                                                          *
                                                          *
***********************************************************
```

| | |
|---|---|
| HEARING LOCATION: | Miami, Florida |
| HEARING DATE: | January 14, 1986 |
| APPEARANCES: | Richard Berthelsen, Esquire<br>General Counsel<br>NFL Players Association<br>2021 L Street, N.W.<br>Washington, D.C.  20036 |
| | Dennis L. Curran, Esquire<br>Director of Operations<br>NFL Management Council<br>410 Park Avenue<br>New York, N.Y. 10022 |
| NATURE OF DISPUTE: | Injury Protection Benefit |

NFLPA & NFLMC
Henderson v. Miami Dolphins

INTRODUCTION

The National Football League Players Association (hereinafter the Association) and Mr. Thomas Henderson (hereinafter the Grievant or Henderson) are parties respectively to a collective bargaining agreement and an employment contract with the National Football League Management Council (hereinafter the Management Council) and the Miami Dolphins (hereinafter the Dolphins or the Club).

When the Dolphins refused to pay Henderson an injury protection benefit under Article X of the collective bargaining agreement, a grievance was filed on behalf of Henderson with the Management Council on July 14, 1982. The Management Council denied the grievance on behalf of the Dolphins on July 22, 1982. When the matter could not be resolved directly between the parties, the claim was presented to arbitration ripe for resolution on its merits. An arbitration hearing was conducted in Miami, Florida. Arrangements were made at this hearing for the taking of the depositions of the Grievant and Dr. David K. Selby. These depositions were made a part of the record. At the arbitration hearing both the Association and the Management Council were represented by counsel and they were afforded a full opportunity to present all relevant evidence through the testimony of witnesses and in documentary proofs. A broad

range of cross-examination was permitted, and counsel raised all points and contentions in support of their respective positions in post-hearing briefs.

## Background Facts

Thomas Henderson was a first round draft choice of the Dallas Cowboys in 1975. After playing right linebacker for the Cowboys for four seasons and twelve games of a fifth season, he was traded to the San Francisco Forty-Niners in May of 1980. He was waived by the Forty-Niners in September, 1980, whereupon he signed a contract for the remainder of the 1980 season with the Houston Oilers. The Oilers declined to enter into a contract with the Grievant for the 1981 season, and he signed a one year contract with the Miami Dolphins in July, 1981. During the course of his career Henderson participated in three Super Bowls and was selected to appear in the Pro Bowl once.

During the final game of the 1981 preseason, on August 28, 1981, the Grievant sustained an injury while tackling running back Joe Delaney of the Kansas City Chiefs. Henderson described the sensation resulting from the impact of the tackle as one in which his neck "snapped." He testified that he experienced pain and a burning sensation in his head and neck, as well as some degree of disorientation.

3

He was removed from the game and taken to the locker room where the Club physician, Dr. Herbert W. Virgin, Jr., M.D. applied ice and a cervical collar. An analgesic was prescribed to alleviate the pain.

Henderson spent that night in his motel room at the Dolphins' training facility. Henderson testified that during the night his pain increased and he began to experience partial paralysis. As a result of this worsening of his condition, he was transported to Miami's Mercy Hospital the following morning. Henderson was placed in traction and was attended by Dr. Virgin. Cervical x-rays and tomograms revealed evidence of old injuries, but no evidence of acute fracture pathology; however, another radiological procedure known as a computerized tomogram disclosed an acute fracture of the anterior and posterior arch of the first cervical vertebra.

Dr. Virgin prescribed and applied a "Minerva jacket" to treat this fracture. A Minerva jacket is a cast which extends and immobilizes the neck while supporting the chin. It stretches below the shoulders, but is cut away in such a fashion that some degree of arm motion is possible. As with any cast, it is designed to immobilize the affected area in order to promote healing of the fracture. The medical experts agree that immobilization is particularly critical

in the treatment of a fractured cervical vertebra, because any pressure on the spinal cord near the base of the brain can have grave consequences. Henderson was released from the hospital several days later with instructions from Dr. Virgin to leave the cast on, and to return to Miami at some unspecified date in the future for an evaluation of his progress.

Henderson returned to Dallas, where he consulted Dr. David K. Selby, M.D. on September 9, 1981. Dr. Selby is an orthopedic surgeon who specializes in the treatment of the spine. Henderson testified that he solicited Dr. Selby's advice in search of relief from the discomfort he was experiencing due to the Minerva jacket, which hindered his sleeping, driving a car and other activities. During the course of the examination, Dr. Selby noted that the Minerva jacket was misshapen and ragged, and that it no longer was effective in immobilizing Henderson's neck. Dr. Selby removed the cast, and, after consulting an x-ray to ensure that the fracture was properly aligned, replaced the cast with a "Queen Anne's collar." A Queen Anne's collar is a removable plastic brace which is more comfortable and allows greater freedom of movement than the Minerva jacket. Henderson did not appear for a second examination scheduled with Dr. Selby.

On the day following the day on which Dr. Selby replaced the cast with the brace, Henderson returned to Miami to tape an interview which appeared on an ABC Monday night telecast of a Dolphins game. While in Miami he encountered Dr. Virgin in the Dolphins' locker room. Words, that might be described as heated, apparently were exchanged, and Dr. Virgin advised Henderson that in view of Henderson's having had the Minerva jacket removed, he, Dr. Virgin, was discharging Henderson from his care. This was confirmed in a letter from Dr. Virgin to Henderson dated September 21, 1981.

Henderson was scheduled to receive a post-season physical examination on December 18, 1981. He did not appear on that date, but he testified to having a brief interview with Dr. Virgin several days later. Henderson also was scheduled to receive a CAT scan on December 22 and 28, 1981, but failed to keep either appointment. Dr. Virgin stated in a February 9, 1982 letter to the Dolphins' Director of Pro Personnel that Henderson could not have played in the last game of the 1981 season.

Article X, Injury Protection, of the March 1, 1977 collective bargaining agreement between the parties provides in pertinent part as follows:

"Section 1. Qualification: Beginning with the 1977 season, a player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

    (a) The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his club's last game in the season of injury, as certified by the club physician following a physical examination after the last game; or the player must have undergone club-authorized surgery in the off-season following the season of injury; and

    (b) The player must have undergone whatever reasonable and customary rehabilitation treatment his club required of him during the off-season following the season of injury; and

    (c) The player must have failed the physical examination given by the club physician at the start of the pre-season training camp following the season of injury because of such injury and his club must have terminated his contract for the season following the season of injury. A player who qualifies under subsections (a) and (b) above cannot be waived prior to such pre-season physical examination."

The parties disagree as to whether the Grievant fulfilled the criteria set forth in subparagraphs (a) and (b) of the above-quoted Section 1 of Article X, in that they dispute (1) whether Henderson was certified as physically unable to participate in the last game of the season, and (2) whether he complied with the required rehabilitation treatment. The issue that this Arbitrator will decide is whether such criteria were fulfilled, thereby entitling the Grievant to an injury protection benefit for the year 1981, in the amount of $37,500.

7

## Position of the Association

The Association contends that the Grievant was certified as physically unable to participate in the final game of the Dolphin's 1981 season. The Association argues that the interview with Dr. Virgin in December of 1981, to which Henderson testified, was in fact an examination which enabled a certification of physical disability. The Association relies upon Dr. Virgin's February 9, 1982 letter as conclusive proof that the certification was rendered. The Association submits that such letters are ordinarily the means whereby players' physical status as of the last game of the season is memorialized. The Association points out that the February 9, 1982 letter discusses the Grievant and five other Dolphins, and states unequivocally that Henderson "could not have played in the last game." The Association further points out that the letter indicates that Henderson flew to Miami in December, 1981, and the Association argues that Dr. Virgin only could have knowledge of this fact if he had interviewed Henderson at the time.

The Association also points to the undisputed severity of Henderson's injury as constituting compliance with the criterion of subsection (a) of Article X, Section 1. As both Dr. Virgin and Dr. Selby testified to the gravity of a vertebral fracture, particularly one involving the first

cervical vertebra, and given this unanimity of medical opinion, the Association views compliance with subsection (a) as a foregone conclusion.

Finally, the Grievant alleges that Dr. Virgin advised him during his August, 1981 hospitalization that his football career was at an end, and that he was fortunate that he was not paralyzed. The Association views this alleged oral advice as constituting the necessary certification.

The Association also disputes any assertion that the Grievant failed to undergo the "reasonable and customary rehabilitation treatment" required by subsection (b) of Article X, Section 1 quoted above. The Association first argues that no treatment was prescribed during the off-season following the season of the injury, because Dr. Virgin formally discharged the Grievant from his care prior to the off-season via his September 21, 1981 letter. The Association views the mere requirement to wear a cast as falling short of the "rehabilitation treatment" contemplated by the subsection. Even if the cast is deemed to be such, the Association considers the substitution of the Queen Anne's collar, which is arguably equally effective a brace as the Minerva jacket, as constituting adherence to the prescribed course of treatment.

NFLPA & NFLMC<br>Henderson v. Miami Dolphins

The Association contends that the Dolphins acted improperly in discharging Henderson from the Club physician's care, and argues that condoning such action would nullify the injury protection provisions of the collective bargaining agreement. The Association submits that a warning to Henderson concerning the substitution of the brace for the cast was a more appropriate course of action, and that recourse to the discipline provisions of the collective bargaining agreement could have been pursued if necessary.

The Association points to arbitral precedent as supporting its contention that the Grievant complied with the requirements of subsection (b). <u>Vaughn Lusby v. Chicago Bears</u> (June 5, 1984) is cited, wherein this Arbitrator concluded that substantial compliance with subsection (b) was sufficient, in the absence of notice from the Club of failure to adhere to the rehabilitation program. The Association argues that Henderson demonstrated such substantial compliance, and that even if such were not the case, the Dolphins had a duty to notify Henderson of his failure to comply.

The Association also cites the case of <u>William Stanfill v. Miami Dolphins</u> (September 21, 1977), in which Arbitrator James F. Scearce adjudicated a grievance wherein Dr. Virgin considered William Stanfill physically capable of playing

football following rehabilitation for an injury, and outside physicians did not. The Association points out that Arbitrator Scearce found that the determination of the outside physicians was germane to the case, and ruled in favor of William Stanfill. The Association views <u>Stanfill</u> as establishing Henderson's right to consult the physician of his choice, and to adopt the treatment prescribed by that physician as the rehabilitation required by subsection (b).

The Association's final argument is that Dr. Virgin's conduct in abruptly discharging the Grievant from his care was so egregious as to constitute negligence warranting damages under the provisions of Florida law.

## Position of the Management Council

The Management Council argues that the Grievant's conduct manifested a total disregard for the medical advice he received following his injury, in violation of Article X of the collective bargaining agreement and Paragraphs 8 and 9 of his Player Contract. The Management Council views the substitution of the Queen Anne's collar for the Minerva jacket as an unwarranted deviation from the "reasonable and customary rehabilitation treatment" which had been prescribed by the Club physician. The Management Council views compliance with the prescribed treatment as consisting simply

of the wearing of the Minerva jacket until receipt of permission to remove it from Dr. Virgin. Because it is undisputed that Henderson removed the Minerva jacket without Dr. Virgin's permission, the Management Council argues that Henderson has failed to make a *prima facie* case that he followed the required treatment.

The Management Council also contends that other conduct on the Grievant's part was indicative of his unwillingness to adhere to the rehabilitation program. In the opinion of the Management Council, this conduct includes whatever actions resulted in the damaged condition of the cast prior to its removal by Dr. Selby, Henderson's failure to appear for a second examination scheduled with Dr. Selby, and Henderson's allegedly abusive and defiant comments to Dr. Virgin during Henderson's visit to the Dolphins' locker room.

The Management Council disputes the Association's contention that Henderson's conduct prior to the off-season is irrelevant. The Management Council argues that common sense compels a determination that actions taken by a player at any time which are detrimental to his physical condition are relevant when construing the injury protection provisions of the collective bargaining agreement.

The Management Council also disputes the Association's contention that the Dolphins' failure to impose disciplinary

sanctions precludes a contesting of the injury protection claim. The Management Council argues that such sanctions could not have restored Henderson's neck to the hypothetical condition it would have attained if Henderson had complied strictly with Dr. Virgin's instructions. The Management Council contends that when a player defies medical instructions, it is he who is precluded from asserting a right to a benefit under the injury protection provisions of the collective bargaining agreement.

The Management Council further argues that Henderson's conduct rendered meaningless the certification requirement of subparagraph (a) of Article X, Section 1. The Management Council points out that the Dolphins mailed Henderson an airline ticket to enable him to appear in Miami for a post-season physical examination, and that Henderson admitted that he did not report for the physical on the appointed day. The Management Council submits that Henderson's recollection of a brief interview with Dr. Virgin several days later is not corroborated by Dr. Virgin's records. The Management Council contends that Henderson failed to submit to the required examination, and that his intentional frustration of the procedural requirements of Article X render him ineligible for benefits thereunder.

### Findings and Opinion

Both parties have presented cogent arguments in support of their respective positions concerning whether the Grievant fulfilled the criterion set forth in Subsection (a) of Article X, Section 1. As the Management Council points out, Henderson admits that he failed to appear on the date appointed for his post-season examination. His recollection of a later interview with Dr. Virgin is imperfect at best, and is not supported by Dr. Virgin's medical records. This Arbitrator is inclined to resolve any question of credibility involving the post-season physical examination in Dr. Virgin's favor.

Additionally, Henderson's description of the interview, even if taken at face value, does not establish that a post-season examination was conducted. It seems clear that any examination of a severe cervical injury worthy of the name would include x-rays, tomograms, and/or CAT scans, as indispensable aids in determining a player's fitness or inability to play.

We do not believe that the evidence of record supports an argument that Dr. Virgin's discharging of the Grievant from his care constitutes an abuse of the Article X procedures sufficiently grave to warrant an automatic certification under subsection (a). The record shows that

NFLPA & NFLMC
Henderson v. Miami Dolphins

the Dolphins mailed Henderson an airline ticket for the express purpose of conducting the post-season physical examination. This examination, which was to have included the appropriate radiological diagnostic tests, did not occur solely because of the Grievant's absence.

Notwithstanding all of the above, we find, given the facts of this case, that the Association has met its burden of proving that the Grievant fulfilled the criterion of subsection (a) of Article X, Section 1. The physical examination and certification requirement of the subsection is designed to afford the Club a mechanism whereby it may be assured that an injury is sufficiently serious to merit coverage under the Article. In this case, such assurance would have been wholly redundant. Dr. Virgin testified in depth to the gravity of Henderson's injury, and to the potentially adverse effect of the substitution of the brace for the cast. There is no credible suggestion in the record that Henderson could have played in the final game of the 1981 season.

This certainty with respect to Henderson's physical condition undoubtedly is the reason for the advice contained in Dr. Virgin's February 9, 1982 letter to the Dolphins' Director of Pro Personnel. In view of the peculiar facts in this case, we find that this letter alone constitutes the

certification required by subsection (a) of Article X, Section 1.

We also find, however, that the Grievant did not undergo the "reasonable and customary rehabilitation treatment" required by subsection (b) of Article X, Section 1, and accordingly we will deny the grievance.

The Association's argument that the Dolphins did not require any treatment during the off-season following the season of the injury, due to Dr. Virgin's prior discharge of the Grievant from his care, may be appealing initially; however, following a closer examination of subsection (b), this argument is seen to be sophistic and based upon an overly narrow and literal reading of the language. There can be no doubt that the parties intended that players would strive conscientiously to rehabilitate themselves following an injury, consistent with the medical instructions and regimens established by their clubs. In the treatment of a fracture especially, adherence to medical instructions may well be most critical during the early stages of treatment. If this Arbitrator were to find that the parties wrote a provision which places no limits upon an injured player's conduct during the season, but only requires compliance with the club's rehabilitation program thereafter, we would be reaching an absurd result totally inconsistent with the

underlying and obvious meaning of Article X; that is, to have the player examined, treated and rehabilitated from the time of his injury until he is able to resume playing, or until he is certified as being unable to resume playing and thereby entitled to the monetary benefit prescribed by Article X.

We also do not believe that Dr. Virgin's discharge of the Grievant from his care is the crucial issue in this case. The record shows that Dr. Virgin's treatment of Henderson's injury was thoroughly professional. His discharge of Henderson from his care occurred only after Henderson defiantly rejected that treatment within two weeks of its institution, and without prior notice to Dr. Virgin. Given the circumstances, this Arbitrator finds that the discharge was warranted and probably prudent. The Association's contention that the discharge constituted negligence warranting damages under Florida law is, of course, a question not properly addressed in this forum.

The Association urges us to consider this Arbitrator's opinion in <u>Lusby</u> as establishing a basis upon which to conclude that Henderson complied with the requirement of subsection (b). We believe that the circumstances of that Award are clearly distinguishable from the facts of this case. Vaughn Lusby was a first year player who complied substantially with the Bears' rehabilitation program, as the

17

Bears' management acknowledged. We sustained Lusby's grievance because of that substantial compliance, coupled with the Club's failure to place Lusby on notice regarding certain deficiencies in his rehabilitation efforts. In the instant case, we are considering a grievance progressed by a veteran player, who did not demonstrate any such substantial compliance. Additionally, in Lusby, we articulated the right of each Club to promulgate its own reasonable and customary rehabilitation requirements; and it is clear that the Dolphins required the wearing of a Minerva jacket for the treatment of Henderson's fracture, treatment which Henderson knowingly and defiantly rejected. Vaughn Lusby engaged in no such conduct.

The Association also has cited Stanfill as establishing the right of a player to receive benefits pursuant to Article X, when Club rehabilitation advice has been disregarded upon the authority of an outside physician. We believe that Stanfill is also distinguishable from the present case, because there the Arbitrator was called upon to construe a provision of the Player Contract rather than Article X of the collective bargaining agreement. Additionally, and more importantly, in Stanfill, the outside physicians were consulted following receipt of permission to do so from the Dolphins' management.

The Association also argues that Dr. Selby's testimony provides support for the proposition that Dr. Virgin's prescribed treatment was not a "reasonable" form of rehabilitation as required by subsection (b). The Management Council has objected to the consideration of Dr. Selby's testimony on procedural grounds. Without prejudice to the Management Council's procedural objections, we would observe that, in our opinion, Dr. Selby's testimony essentially endorses Dr. Virgin's treatment of Henderson's injury.

In conclusion, we find that as serious as Henderson's injury was, and as unlikely as it was that he could have played in the 1982 season, it was incumbent upon him to follow the Dolphins' rehabilitation instructions. It would be improper for us to sustain this grievance based upon speculation that adherence to such instructions would have been futile because such adherence also would have resulted in an inability on Henderson's part to resume his career.

AWARD: The grievance is denied in accordance with the above findings.

This Award was signed this 22nd day of January, 1988, in Bryn Mawr, Pennsylvania.

*Richard R. Kasher*
Richard R. Kasher, Arbitrator