# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323<br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br>        Plaintiffs,<br>v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>        Defendants. | CIVIL ACTION NO: 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF MATTHEW L. GARRETSON

I, Matthew L. Garretson, hereby declare as follows:

1.      I am an adult over twenty-one years of age and am competent to testify to all matters contained herein. I am the Founder and Chief Executive Officer of The Garretson Resolution Group, Inc. ("GRG") and an attorney licensed to practice law in the State of Ohio. I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2.      GRG serves as the BAP Administrator and Lien Resolution Administrator for the Settlement program in the above-captioned action.[1] Since its appointment to serve in those roles, GRG has worked diligently with the Parties to discharge its responsibilities under the Settlement

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

Agreement. I submit this declaration to provide an update to the Court on the status of GRG's work.

**BASELINE ASSESSMENT PROGRAM**

3. As the BAP Administrator, GRG is responsible for establishing and maintaining a network of Qualified BAP Providers to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. (ECF No. 6481-1, Settlement Agreement § 5.7(a)(i).) GRG must establish this network of Qualified BAP Providers within ninety days after the Effective Date.

4. Under the Settlement Agreement, the BAP Administrator must select Qualified BAP Providers based on the following criteria:

   a. Education, training, licensing, credentialing, board certification, and insurance coverage;

   b. Ability to provide the specified baseline assessment examinations under the BAP;

   c. Ability to provide medical services under the BAP Supplemental Benefits;

   d. Ability to provide all required examinations and services in a timely manner;

   e. Geographic proximity to Retired NFL Football Players; and

   f. Rate structure and payments terms.

5. The BAP Administrator's selection of all Qualified BAP Providers is subject to written approval of Co-Lead Class Counsel and Counsel for the NFL Parties, each of which has the unconditional right to veto the selection of twenty Qualified BAP Providers, in addition to the unconditional right to veto the selection of any Qualified BAP Provider who has served or is serving as a litigation expert consultant or expert witness for a party or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint since July 1, 2011.

6. In order to ensure that the network of Qualified BAP Providers was established in sufficient time to administer the BAP by the June 6, 2017 commencement date, GRG established an enrollment process that consisted of the following steps:

   a. Identification of suitable Qualified BAP Provider candidates, based on the criteria listed above;

   b. Initial contact with key decision makers in key provider organizations employing such Qualified BAP Provider candidates;

   c. Securing applications from Qualified BAP Provider candidates;

   d. Reviewing the credentials of Qualified BAP Provider candidates who have applied for participation in the BAP, including verification of state licensing and board certification, criminal and civil background checks, and review of Qualified BAP Provider candidates' answers to questions related to work as an expert witness and medical consultant;

   e. Submitting Qualified BAP Provider candidates to Co-Lead Class Counsel and Counsel for the NFL Parties for approval or veto in accordance with Section 5.7(a)(i) of the Settlement Agreement; and

   f. Contracting with approved Qualified BAP Provider candidates for enrollment in the Qualified BAP Provider network.

7. GRG has made significant progress in creating a robust, nationwide provider network. In order to plan for appropriate coverage, GRG analyzed preliminary ZIP-code-level data provided by the Claims Administrator to estimate the relative distribution of Retired NFL Football Players across the country. This analysis showed that by targeting its efforts toward fifty-three cities (comprising the fifty largest metropolitan statistical areas in the United States, plus Anchorage, Alaska; Honolulu, Hawaii; and Green Bay, Wisconsin), GRG would be able to effect coverage of seventy-eight percent of potential Settlement Class Members within fifty miles of one of the fifty-three target cities, eighty-five percent within 100 miles, and ninety-seven percent within 200 miles. This analysis also has enabled GRG to estimate the relative number of Qualified BAP Providers needed in each city.

8. GRG has identified key provider organizations with board-certified neurologists and ABPP- and ABCN-certified clinical neuropsychologists meeting the above criteria to serve as Qualified BAP Providers in each of the fifty-three target cities. GRG also has identified additional Qualified BAP Provider candidates outside the key provider organizations in order to ensure adequate network capacity for the forecasted level of participation in the BAP. As of June 5, 2017, GRG had secured applications for participation in the BAP from 485 board-certified neurologists and ABPP- or ABCN-certified clinical neuropsychologists, including clinical neuropsychologists in all fifty-three target cities and neurologists in fifty-two of fifty-three target cities (GRG is still pursuing a neurologist for participation in Anchorage, Alaska). Furthermore, as of June 5, 2017, GRG had engaged in contract negotiations with 371 potential Qualified BAP Providers and had contracted with 141 Qualified BAP Providers, including in 42 of the 53 target cities in or near where the majority of the living Retired NFL Football Players reside. GRG is continuing its efforts to enroll Qualified BAP Providers in the remaining target cities.

9. In addition to its efforts to establish the network of Qualified BAP Providers, GRG has worked to ensure the best possible experience for Settlement Class Members as they utilize their BAP benefits. Key elements of these efforts include:

   a. Coordination with the Claims Administrator to ensure Settlement Class Members can access benefits information and interact with the Claims Administrator and BAP Administrator via a simple, uniform, and secure online portal;

   b. Creation of a process for the Claims Administrator to securely transmit the Settlement Class Member identifying information necessary to schedule and administer baseline assessment examinations as soon as the Claims Administrator determines that a given Settlement Class Member is eligible to participate in the BAP;

   c. Development of an easy-to-understand process for requesting scheduling of the two baseline assessment examinations with Qualified BAP

4

    Providers;

  d. Design and configuration of GRG's secure web portal for Settlement Class Members to request baseline assessment examinations and review BAP-related documents; and

  e. Design and configuration of GRG's secure web portal for Qualified BAP Providers to report the results of each baseline assessment examination and upload program-related documentation, including Diagnosing Physician Certifications and supporting medical records.

**HEALTHCARE LIEN RESOLUTION**

  10. The Settlement Agreement charges GRG, as the Lien Resolution Administrator, with the following responsibilities, among others:

  a. Administering the process for the identification and satisfaction of all applicable Liens, as set forth in Section 11.3 (ECF No. 6481-1, Settlement Agreement § 11.1(b)), which includes:

    i. Fulfilling all state and federal reporting obligations (*id.* § 11.3(c)(iii));

    ii. "Satisfy[ing] Lien amounts owed to a Governmental Payor or, to the extent identified by the Class Member pursuant to Section 11.3(a), Medicare Part C or Part D Program sponsor for medical items, services, and/or prescription drugs" (*id.* § 11.3(c)(iv)); and

    iii. "Transmit[ting] all information received from any Governmental Payor or Medicare Part C or Part D Program sponsor pursuant to such authorizations (i) to the NFL Parties, Claims Administrator, and/or Special Master solely for purposes of verifying compliance with the MSP Laws or other similar reporting obligations and for verifying satisfaction and full discharge of all such Liens" (*id.* § 11.3(c)(v)).

  11. As set forth below, GRG has made significant progress in fulfilling its duties and responsibilities under the Settlement Agreement for the benefit of Settlement Class Members. GRG has already reached agreements with the Centers for Medicare and Medicaid Services ("CMS") that establish defined parameters for satisfying and discharging CMS' Medicare Part A and/or Part B fee-for-service Medicare Secondary Payer ("MSP") recovery claims, protect Retired NFL Football Players' future Medicare benefits, and ensure equitable repayment

5

amounts. In addition, GRG is making great strides in establishing uniform and efficient processes to identify and resolve healthcare Liens and reimbursement claims that may be associated with a Settlement Class Member's settlement award through coordination with other entities, such as the individual state Medicaid agencies and other healthcare payors and providers.

### Medicare Part A & Part B Resolution

12. With respect to Medicare Part A and Part B, the Settlement Agreement provides, among other things, that the Lien Resolution Administrator shall undertake to obtain an agreement in writing with CMS that "[e]stablishes a global repayment amount per Qualifying Diagnosis and/or for all or certain Qualifying Diagnoses for Settlement Class Members who are or were beneficiaries of the Medicare Program, or, alternatively, otherwise sets forth a conditional payment resolution process." (*Id.* § 11.3(c)(ii)(1).) To this end, GRG has obtained CMS' agreement to globally resolve its Medicare Part A and/or Part B fee-for-service MSP recovery claims for certain Qualifying Diagnoses, to individually resolve those claims for the rest of the Qualifying Diagnoses, and to not assert a recovery claim against the BAP Fund or the Education Fund.

13. More specifically, CMS has agreed to a global resolution methodology and associated fixed global repayment values to satisfy Medicare's Part A and/or Part B fee-for-service MSP recovery claims associated with Medicare-entitled Settlement Class Members who receive Monetary Awards for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment and/or Level 2 Neurocognitive Impairment. The global repayment values are based on the clinical guidelines for the routine standard of care associated with the applicable Qualifying Diagnosis. Global resolution programs are proven to deliver numerous practical benefits to Settlement Class Members. These benefits include, among others, (1) ensuring similarly situated

Settlement Class Members achieve similar outcomes and fair repayment amounts, (2) ensuring compliance with federal Medicare statutes and regulations, (3) avoiding disbursement delays normally associated with pulling and auditing Medicare's conditional payments on a case-by-case basis, and (4) ensuring that Medicare will not deny Settlement Class Members coverage for any future medical expenses they might incur in connection with the relevant Qualifying Diagnoses.

14. With respect to Medicare-entitled Settlement Class Members who receive a Monetary Award in connection with a Qualifying Diagnosis of Alzheimer's Disease, Parkinson's disease, Death with Chronic Traumatic Encephalopathy, or Amyotrophic Lateral Sclerosis (also known as Lou Gehrig's Disease), CMS has agreed to resolve its MSP recovery claims through an individual expenditure-based process.  Under this process, GRG will secure claims from the Medicare Program on an individual basis to identify the exact amounts the Medicare Program has paid on behalf of a Settlement Class Member.  GRG will then audit each claim to ensure that only medical expenses related to the compensable injury from the date of injury through the date of settlement are included in the repayment obligation.  In an effort to optimize the outcome for Settlement Class Members whose Medicare reimbursement obligations GRG will resolve through this expenditure-based process, GRG has established procedures designed to reduce time delays to the extent possible and to ensure a detailed review of all cases to achieve reductions where appropriate.

15. Finally, GRG has secured CMS' agreement to not assert an MSP recovery claim in connection with Monetary Awards of Retired NFL Football Players where the Retired NFL Football Player's last Eligible Season ended prior to December 5, 1980.[2]  CMS has further

---

[2] This determination was made in consideration of CMS' August 19, 2014 policy memo.

agreed to not separately assert an MSP recovery claim against Medicare-entitled Derivative Claimants who receive a Derivative Claimant Award so long as the amount of the Derivative Claimant Award is still included in the gross Monetary Award amount for purposes of resolving CMS' MSP recovery claim for the associated Retired NFL Football Player.

**Medicaid Resolution**

16. With respect to state Medicaid reimbursement obligations, GRG has reached standard protocol agreements with forty-five of the fifty-two Medicaid agencies it asked to enter into such agreements. The purpose of these agreements is to establish a framework for resolving the agencies' recovery claims through an expenditure-based review process with terms designed to deliver significant advantages to Settlement Class Members that will maximize Settlement Class Members' net recovery.[3] GRG's standard protocol agreements include a term providing that the amount of each Medicaid agency's recovery claim against a Settlement Class Member will not exceed a specified percentage of the Settlement Class Member's gross settlement award (the "Holdback Amount"). In addition, GRG's protocol agreements include a term providing that each Medicaid agency will automatically reduce the agency's final recovery claim by a specified percentage (the "Offset").

17. Pursuant to its protocol agreement, GRG will first verify whether a Settlement Class Member was a beneficiary of the Medicaid Program in a given state. If the Settlement Class Member was not a beneficiary of that state's Medicaid Program, GRG will inform the Claims Administrator that no amount needs to be withheld from the Settlement Class Member's gross settlement award to satisfy a reimbursement obligation to that state's Medicaid agency. If

---

[3] The Lien Resolution Administrator pursued standard protocol agreements with only fifty-two of the fifty-four Medicaid agencies based on historical claim volumes. If any Settlement Class Members are recipients of Medicaid benefits in Guam or the Virgin Islands, resolution of any Lien obligations will be performed on an individual basis.

the Settlement Class Member was a beneficiary, then GRG will ask the Claims Administrator to withhold the Holdback Amount.  Since the Holdback Amount is the maximum amount a Medicaid agency can recover, funds in excess of the Holdback Amount can be disbursed to the Settlement Class Member (subject to holdback amounts established for other Lien types, if applicable to the Settlement Class Member) before the Medicaid lien resolution process is finished, allowing the Settlement Class Member to receive his or her funds earlier than he or she would if GRG's protocol agreement were not in place.

18. For those Settlement Class Members who received Medicaid benefits, the Medicaid agency will provide GRG with the itemized claims for which the Medicaid agency is seeking repayment.  GRG will then conduct an audit of those claims to ensure that only medical expenses related to the applicable Qualifying Diagnosis or Qualifying Diagnoses are included in the Medicaid agency's recovery claim.  Once a final claim amount is established, GRG will apply the Offset to that amount and will compare the result with the Holdback Amount.  A Settlement Class Member's final reimbursement amount will be the lesser of the Holdback Amount or the final claim amount after applying the Offset.  GRG will facilitate the satisfaction of the Medicaid agency's interest by ensuring that payment of the final reimbursement amount for the Settlement Class Member is made from the Settlement Class Member's gross settlement award.

19. In addition to the forty-five Medicaid agencies with whom GRG has protocol agreements in place to date, two other Medicaid agencies are subject to statutory limits on their recovery.  Thus, at present, there are forty-seven Medicaid agencies with established caps on their recovery claims.

20. Finally, GRG has secured an agreement with twenty-two Medicaid agencies to not assert a recovery claim against Derivative Claimant Awards.  Three Medicaid agencies

rejected the agreement, and GRG is continuing its discussions with the remaining twenty-seven Medicaid agencies.

THE DECLARANT SAYS NOTHING FURTHER.

I, Matthew L. Garretson, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 14th day of June, 2017.

_____
Matthew L. Garretson