IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | : | **No. 2:12-md-02323-AB** **MDL No. 2323** |
| | : | |
| | : | **Hon. Anita B. Brody** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | : | |
| | : | |
| **2:17-cv-02736-AB** **Adrian L. Robinson Sr. and Terry J. Robinson as Personal Representatives and Co-Administrators of the Estate of Adrian Robinson, Jr. DECEASED et al** | : | |
| **Plaintiffs,** | : | |
| **v.** | : | |
| **NATIONAL FOOTBALL LEAGUE; THE NATIONAL FOOTBALL LEAGUE FOUNDATION (individually and as successor in interest to NFL CHARITIES); NFL PROPERTIES, LLC (individually and as successor in interest to NFL PROPERTIES, INC.); RIDDELL, INC., RIDDELL SPORTS GROUP, INC.; ALL AMERICAN SPORTS CORP f/k/a Easton-Bell Sports, Inc.; BRG SPORTS, LLC f/k/a Easton Bell Sports, LLC; BRG SPORTS HOLDINGS CORP. f/k/a RBG Holdings Corp.,** | : | |
| **Defendants.** | : | |

## PLAINTFFS' MOTION TO REMAND OR IN THE ALTERNATIVE TO RE-DESIGNATE THE CASE "UNRELATED"

| | |
|---|---|
| Bradford R. Sohn, Esquire | Benjamin Andreozzi, Esquire |
| (FL 98788) | PA ID No. 89271 |
| THE BRAD SOHN LAW FIRM, PLLC | ANDREOZZI & ASSOCIATES, PC |
| 2600 S. Douglas Road, Suite 1007 | 111 N. Front Street |
| Coral Gables, Florida 33134 | Harrisburg, Pennsylvania 17101 |
| (786) 708.9750 | (717) 525-9124 |
| Brad@Sohn.com | ben@victimscivilattorneys.com |
| *Lead Plaintiffs' Counsel* | *Plaintiffs' Local Counsel* |

The Robinson Plaintiffs, who have sued a unique combination of Defendants, whose claims concern a deceased non-settlement class member, whose case has never been designated as a tag-along action, who anticipate Defendants' interest in trying these issues, and whose claims concern decedent's *lifetime* of football blows (*not* what the MDL constricts itself to), move for expedited remand of their case under 28 U.S.C. § 1447(c), and Local Rule 7.1(c).  In the alternative, the Robinsons very respectfully move under Court 40.1(c)(1) to have their case re-designated as "unrelated".  Pursuant to Local Rule 7.1(d), Plaintiffs note their request for oral argument and ask that this Motion be heard on a separate and expedited schedule from the separate briefing schedule involving the MDL opt-out cases. In support of their Motion, Plaintiffs rely on and incorporate the following Memorandum in Support which they incorporate by reference.

Respectfully submitted this 12th day of July 2017,

/s/ Bradford R. Sohn, Esq.
 Bradford R. Sohn, Esquire
 (FL 98788)
 THE BRAD SOHN LAW FIRM, PLLC
 2600 S. Douglas Road, Suite 1007
 Coral Gables, Florida 33134
 (786) 708.9750
 Brad@Sohn.com
 *Lead Plaintiffs' Counsel*

 Benjamin Andreozzi, Esquire
 PA ID No. 89271
 ANDREOZZI & ASSOCIATES, PC
 111 N. Front Street
 Harrisburg, Pennsylvania 17101
 (717) 525-9124
 ben@victimscivilattorneys.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | No. 2:12-md-02323-AB |
| IN RE NATIONAL FOOTBALL LEAGUE | : | MDL No. 2323 |
| PLAYERS' CONCUSSION INJURY LITIGATION | : | |
| | : | Hon. Anita B. Brody |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |
| | : | |
| 2:17-cv-02736-AB | : | |
| Adrian L. Robinson Sr. and Terry J. Robinson as | : | |
| Personal Representatives and Co-Administrators of | : | |
| the Estate of Adrian Robinson, Jr. DECEASED et al | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL FOOTBALL LEAGUE; THE | : | |
| NATIONAL FOOTBALL LEAGUE FOUNDATION | : | |
| (individually and as successor in interest to NFL | : | |
| CHARITIES); NFL PROPERTIES, LLC | : | |
| (individually and as successor in interest to NFL | : | |
| PROPERTIES, INC.); RIDDELL, INC., RIDDELL | : | |
| SPORTS GROUP, INC.; ALL AMERICAN | : | |
| SPORTS CORP f/k/a Easton-Bell Sports, Inc.; BRG | : | |
| SPORTS, LLC f/k/a Easton Bell Sports, LLC; BRG | : | |
| SPORTS HOLDINGS CORP. f/k/a RBG | : | |
| Holdings Corp., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

**AND NOW,** this ____ day of _____ 2017, upon consideration of Plaintiffs' Motion to

Remand or in the Alternative to Re-Designate the Case "Unrelated" ("Plaintiffs Motion") and

any response thereto, it is hereby **ORDERED** and **DECREED** as follows:

1.    Plaintiffs' Motion to Remand is **GRANTED**.

2.    The instant case is **REMANDED** to the Philadelphia Court of Common Pleas.

3.       Plaintiffs' Motion in the alternative is **DENIED AS MOOT**.

**BY THE COURT:**

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____ :
                                        :   No. 2:12-md-02323-AB
IN RE NATIONAL FOOTBALL LEAGUE          :   MDL No. 2323
PLAYERS' CONCUSSION INJURY LITIGATION   :
_____ :   Hon. Anita B. Brody
                                        :
THIS DOCUMENT RELATES TO:               :
ALL ACTIONS                             :
                                        :
2:17-cv-02736-AB                        :
Adrian L. Robinson Sr. and Terry J. Robinson as :
Personal Representatives and Co-Administrators of :
the Estate of Adrian Robinson, Jr. DECEASED et al :
                                        :
                           Plaintiffs,  :
                                        :
v.                                      :
                                        :
NATIONAL FOOTBALL LEAGUE; THE           :
NATIONAL FOOTBALL LEAGUE FOUNDATION     :
(individually and as successor in interest to NFL :
CHARITIES); NFL PROPERTIES, LLC         :
(individually and as successor in interest to NFL :
PROPERTIES, INC.); RIDDELL, INC., RIDDELL :
SPORTS GROUP, INC.; ALL AMERICAN        :
SPORTS CORP f/k/a Easton-Bell Sports, Inc.; BRG :
SPORTS, LLC f/k/a Easton Bell Sports, LLC; BRG :
SPORTS HOLDINGS CORP. f/k/a RBG         :
Holdings Corp.,                         :
                                        :
                           Defendants.  :
_____ :

## ORDER

**AND NOW,** this ____ day of _____ 2017, upon consideration of Plaintiffs' Motion to

Remand or in the Alternative to Re-Designate the Case "Unrelated" ("Plaintiffs Motion") and any

response thereto, it is hereby **ORDERED** and **DECREED** that this case is hereby remanded to

the Clerk for random assignment, at which time the Court will hold an evidentiary hearing in aid of remand.

**BY THE COURT:**

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | **No. 2:12-md-02323-AB** **MDL No. 2323** |
|  | : | **Hon. Anita B. Brody** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | : : : : | |
| **2:17-cv-02736-AB** **Adrian L. Robinson Sr. and Terry J. Robinson as Personal Representatives and Co-Administrators of the Estate of Adrian Robinson, Jr. DECEASED et al** | : : : : : | |
| **Plaintiffs,** | : : | |
| **v.** | : : | |
| **NATIONAL FOOTBALL LEAGUE; THE NATIONAL FOOTBALL LEAGUE FOUNDATION (individually and as successor in interest to NFL CHARITIES); NFL PROPERTIES, LLC (individually and as successor in interest to NFL PROPERTIES, INC.); RIDDELL, INC., RIDDELL SPORTS GROUP, INC.; ALL AMERICAN SPORTS CORP f/k/a Easton-Bell Sports, Inc.; BRG SPORTS, LLC f/k/a Easton Bell Sports, LLC; BRG SPORTS HOLDINGS CORP. f/k/a RBG Holdings Corp.,** | : : : : : : : : : : : : : | |
| **Defendants.** | : : : | |

## MEMORANDUM IN SUPPORT OF REMAND OR IN THE ALTERNATIVE, IN SUPPORT OF RE-DESIGNATING THIS CASE "UNRELATED"

Under 28 U.S.C. § 1447(c), and Local Rules 7.1 and 40.1(c)(1), the Robinsons move to

remand this case to state court because the Court lacks subject-matter jurisdiction over their claims.

Defendants NFL, NFL P, and NFL C have improperly removed the Robinsons' claims, arguing

"complete preemption" under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C.

§ 185 (the "LMRA".)  In other words, they argue Plaintiffs' claims sound in federal law, and have

only been styled as state-law tort claims.   The Robinsons' claims, however, arise purely from

duties to refrain from intentional misconduct, perform voluntary undertakings non-negligently,

and to market and license non-negligently.   Defendants' entire position to the contrary rests on

impermissibly contorting Plaintiffs' allegations and applying them to a CBA not within the

removal record, all in an attempt to force square pegs into the round hole of § 301 preemption.

This is precisely the type of jurisdictional manipulation the Supreme Court has admonished.  The

Court should police its jurisdiction, and remand the case.  Pursuant to Local Rule 7.1(d), Plaintiffs

note their request for oral argument and ask that this Motion be heard on a separate and expedited

schedule.  In the alternative, should the Court require further information, Plaintiffs respectfully

move for the entry of an Order re-designating this case as "un-related" so it can be re-assigned

prior to seeking an evidentiary hearing on remand.

## BACKGROUND

### I.    THE PERTINENT FACTS ALLEGED IN THE COMPLAINT

This case stems from a pathologically-unique neurodegenerative process known for its

dose-response relationship to football: Chronic Traumatic Encephalopathy (or "CTE").  (D.E. 1-

A) (Compl.) ¶¶ 4, 10, 356).  Adrian Robinson Jr. died with CTE, while under contract with a CFL

team, having played football since age six, including NFL-sponsored youth football and three years

of NFL football through September of 2014.  (*Id*. ¶ 358).  Six months after death, his family

discovered his CTE, the substantial factor in his pain and suffering, and in his death.  (*Id*.)

Robinson, Jr. and his parents, "football parents", fell for "Defendant NFL and NFL P's

youth marketing."  (*Id*. ¶¶ 5, 46, 354).  Defendants NFL P and NFL knew children's brains were

vulnerable, yet targeted children and their families in a 1996 campaign called "Play Football" to

gain adult season-ticket holders.  (*Id.* ¶¶ 5, 46, 353-54).  Consequently, before his teens, Robinson Jr. began experiencing a constellation of "neurological and behavioral complaints" and clashing diagnoses.  (*Id.* ¶¶ 361-74).  But no one linked football exposure to Robinson Jr's clinical picture, which was medically reasonable due to the NFL's propagation of sham-science. (*Id.*)  So he kept playing, enduring NFL seasons from 2012-14, before signing with the CFL and dying.  (*Id.*)

These Defendants (the league, its licensing arm, its *charity*, and its official helmet provider) conspired "to insulate them all from litigation *exactly like this*" by neutralizing unfavorable science before it became litigation.  (*Id.* pp. 3, 8-9, 24-25).  They knew CTE existed in boxing and war veterans. (*Id.* ¶¶ 109-288). Fearing this disease could spell football's financial ruin, Defendants NFL, NFL C, and Riddell created a "sham committee" called the Committee on mild-Traumatic Brain Injury ("MTBI"), and undertook to fund this committee's self-serving, sham research, designed to do things, among others, such as: (1) biomechanically distinguishing boxing-blow effects from football-blow effects; and (2) devising a neuropsychological test battery "based upon the observation that … cognitive symptoms associated with mild diffuse brain injury (attention, memory and concentration issues) [was] actually an impairment in information processing)." (*Id.* ¶¶ 229, 215, 135, 225).  Defendants—both directly and through the committee—also provided grant money and were responsible for the group NOCSAE's founding, and for its true purpose: providing industry-friendly research on protective equipment. (*Id.* ¶¶ 145-86).

Defendant NFL C, "a non-profit organization created by the member clubs of the National Football League to enable the clubs to collectively make grants to charitable and worthwhile causes on the national level", that "does not engage in labor negotiations in any sort whatsoever", funneled millions in the 1990s and 2000s at the direction of Defendant NFL's officers, which were in no way legitimate charity and in fact self-serving litigation-avoidance investments (something

Defendants Riddell also did so, as did Defendant NFL directly, albeit to a lesser extent.)  (*Id*. ¶¶ 55, 53, 361-74).  Defendant NFL P, the "sole funding source for the trust that funds NFL C[]" and "the licensing arm of the NFL", and another entity that "does not engage in labor negotiations of any sort whatsoever", created a mutually beneficial licensing deal with Riddell, which required helmets "sufficient to protect the players from the risk of injury", among this deal's many benefits to the parties.  (*Id*. ¶¶ 60, 62).  Of course, Defendants NFL and Riddell have known for a half-century—first receiving data at the end of the 1961-62 NFL season—that football and repetitive head trauma inherently carries the risk of CTE.  (*Id*. ¶¶ 109-240).  Further, knowing "helmets were ineffective to protect [against] the problem", the licensing and product-maker Defendants (NFL P and Riddell) permitted the use of the defective Riddell Revolution helmet (what Robinson Jr. wore in the NCAA and NFL) as one that mitigated harm when it did not. (*Id*. ¶¶ 135, 226, 279-307).

Defendants NFL C, NFL, and to a lesser extent Riddell, paid for self-serving defense-side expert consulting firms totaling well into the millions of dollars such as Exponent, Biokinetics (Canada), and Dr. David Viano (individually and/or through his LLC and/or through a non-profit he established); and NFL C hired a tobacco-industry favorite to "investigate" linkage of three 1980s ALS-deaths from one 1960s San Francisco 49ers roster. (*Id*. ¶¶ 154-156, 211, and 188).

Defendants NFL P, NFL, and Riddell knew about this link (between football and brain damage) for decades.  (*Id*. ¶ 192).  CTE had been studied by the government since the 1950s.  (*Id*. ¶ 116).  The neuropsychiatrist working on the government CTE study frequently presented with NFL neurosurgeons cited in the symposia series.  (*Id*. ¶ 126).  NFL helmet-maker Riddell also shared these concerns; it knew that its current helmet technology simply was not sufficient back in the 1960s and (directly and through NOCSAE) even explored so-called "soft-shell" helmets. (*Id*. ¶¶ 127-28).  Yet its warning labels ignored CTE, neurodegeneration, or suicidality.  (*Id*.)

By the time that Adrian Robinson Jr. was 12 years old (2002), Riddell had begun selling its "Revolution" helmet- the first helmet designed with the intent to reduce brain injury.  (*Id*. ¶ 279).  Defendants NFL and Riddell worked in concert on the research behind this helmet.  (*Id*.)  In fact, the NFL had been working for the entirety of Robinson Jr.'s football lifetime (if not his entire lifetime) to engage defense-friendly, self-serving consultants on research into topics such as neuropsychological testing, return-to-play, chronic brain damage, biomechanics of head injury, biomechanical differences of football head injury and boxing head injury, and Riddell helmet efficacy versus Bike.  (*Id*. ¶ 218).

Since 1989 and through 2014, NFL teams able to convince more than 80% of players to wear Riddell benefitted from free Riddell equipment.  (*Id*. ¶ 68).  Riddell, obligated to approve helmets for play that were sufficiently safe to prevent injury, nevertheless knew that its protective equipment did little to prevent or mitigate against MTBI, and nothing to prevent against sub-clinical MTBI and/or CTE.  (*Id*. ¶¶ 67-69, 127-307).  Riddell marketed its helmet—worn by the decedent—as a game-changer, literally naming it the "Revolution" and featuring the fact that it worked with the NFL on research related to it in order specifically design a helmet intended to reduce concussion.  (*Id*. ¶¶ 290-307).  Its claims were scientifically unsupportable, even by its own scientists such as those at UPMC, paid by Riddell and the NFL.  (*Id*. ¶ 431).

## II.   THE CLAIMS ASSERTED AGAINST DEFENDANTS NFL, NFL P, NFL C, AND RIDDELL

The operative pleading, cited above (D.E. 1-A), is the Complaint filed in the First Judicial District of Common Pleas of Philadelphia.  It asserts seven counts against Defendants NFL, NFL P, NFL C, and the seven entities "responsible for RIDDELL's [present and successor] liabilities" (D.E. 1-A, ¶ 108).  Only Defendant NFL claims any role relating to labor or management.

Plaintiffs bring the first two counts against all Defendants.   These claims, Counts I and II, ("conspiracy" and "fraud – concealment", respectively) allege Defendants (Defendant NFL and the ten entities lacking any labor-management relationships) agreed to conceal material information regarding football's link to CTE, acting in concert with each other.

The remaining claims are each asserted as to differing defendant-sets.   Count III, ("negligence voluntary undertaking"), alleges[1] (*see* table *infra*) "Riddell", NFL, and NFL C (*not* NFL P) negligently performed voluntarily undertaken duties pertaining to the MTBI-Committee. Count IV ("negligence – marketing") states that NFL and "Riddell", negligently marketed football and the Revolution helmet, pursuant to Pennsylvania common law.   Count V, ("negligence – licensing") asserts that NFL P (*not* NFL; *not* NFL C) and "Riddell" breached respective duties to license in non-negligent fashion and to provide equipment sufficient to prevent injury.   Count VI ("negligent hiring/retention/supervision") asserts that Defendants NFL and Riddell hired, retained, and supervised Dr. Viano for the purpose of performing non-clinical research; and that they each failed to vet and/or supervise him as he propagated injurious false science.   Count VII is a defective helmet-label warning claim as to Riddell for omitting CTE, suicidality, and neurodegeneration.

The Robinsons do not make any allegation or claim about clinical medical care from NFL Club physicians or trainers (*e.g.*, standard of care, credentialing, licensing, supervision, concealment of the decedent's medical condition, etc.)  Nor do any of their claims concern NFL rules or regulations (*e.g.*, changing, penalizing, or fining game-play, or enacting protocol or sufficient protocol to mitigate in-game *concussion*.)  That would only confuse what the Complaint

---

[1] D.E. 1-A, ¶ 395 (citing ¶ 17).  The *heading* of Count III confusingly reads "All Defendants", however, the table only alleges a "voluntary undertaking" as to Riddell, NFL, and NFL C (*id*).  The Court can ignore the erroneous heading, *e.g. Hambric Sports Mgmt., LLC v. Team AK, Inc.*, No. 09-cv-1662, 2010 WL 1962691 (N.D. Tex. May 14, 2010) (looking to substance of allegations).

asserts: conduct by four entities (*i.e.*, a 501(c)(3), a licenser, a helmet-maker, and the NFL) sued

by the Robinsons irrespective of his NFL football career, as this chart confirms. (D.E. 1-A, ¶ 17).

### NEGLIGENCE SUMMARY TABLE

| DEFENDANT(S) | DUTY OF CARE OWED OUTSIDE 29 U.S.C. § 185(a) |
|---|---|
| NFL<br><br>NFL C<br><br>Riddell | Undertook, as stated in the second published paper in *Neurosurgery*, to "scientifically investigate concussion" and to "reduce injury risks in football" with "neither the authority nor the inclination to impose outside medical decision-making on the medical staffs of the individual teams." |
| NFL<br><br>NFL C | Undertook a duty to the football community to engage in non-negligent scientific study, and to non-negligently fund and oversee 501(c)(3) NFL and its use of "MTBI Grants" as a means of funneling money toward *de facto* defense expert witnesses.<br><br>Supervised, entrusted, and retained the "MILD TRAUMATIC BRAIN INJURY COMMITTEE" in an expressly **non-clinical capacity** to opine on the effects of mild and moderate head impacts. |
| NFL | Supervised, entrusted, and retained the "MILD TRAUMATIC BRAIN INJURY COMMITTEE" in an expressly **non-clinical capacity** to opine on the effects of mild and moderate head impacts. |
| NFL P<br><br>Riddell | Negligently licensed protective equipment as the official helmet of the NFL with the knowledge these helmets could not protect against subclinical or MTBIs.<br><br>RIDDELL/NFL P had a joint employee paid to ensure all licensed equipment was safe, knowing that this was a literal impossibility; this was a business deal. |
| NFL<br><br>Riddell | Negligently marketed football, known to contain links to catastrophic and latent neurological illness, as safe for children like Adrian Robinson. |

## ARGUMENT

## I.   THE REMOVAL NOTICE IMPROPERLY FRAMES THE COURT'S INQUIRY.

Defendants invite the Court to commit two errors with respect to the facts and allegations

relied on in its LMRA preemption analysis.  First, they mischaracterize and misstate allegations

within the Complaint itself.  (D.E. 1-A).  Second, they impermissibly ask the Court to determine

subject matter jurisdiction based on matters extrinsic to the record at the time of removal.  Upon

correcting for these errors, the Court can proceed from the proper starting point.

In commencing substantive preemption analysis, it is critical to define the inquiry's scope. The Court cabins its inquiry to the facts alleged in the Plaintiffs' Complaint along with Plaintiffs' legal characterization of them; a defendant may not

> attempt to create the prerequisites to removal by ignoring the set of facts . . . presented by the [plaintiffs], along with their legal characterization of those facts, and arguing that there are different facts that [plaintiff] might have alleged that would have constituted a federal claim.

*Caterpillar, Inc. v. Williams*, 482 U.S 386, 397 (1987).  Stated differently, a defendant cannot "attempt to manufacture grounds for removal"[2] based on federal claims a plaintiff could have plead but did not.  Defendants must show federal jurisdiction to stem from Plaintiffs' own allegations.

The Court resolves jurisdictional disputes by comparing Plaintiffs' claims to those CBA sections (omitted, *see* I(B), *infra*) contended to be the source of the parties' legal relationships, as opposed to state law.  It exercises LMRA jurisdiction if it deems a CBA gives rise to an obligation merely styled as a state law tort claim.  The Seventh Circuit explains this unusual preemption:

> When federal law occupies a field, state rules are preempted.  But preemption is just a defense, and federal defenses to claims based on state law are adjudicated in state court. There is no general right of federal-defense removal. When national law is so pervasive that is impossible to even state a claim based under state law, though, a court treats the attempt to do the impossible as equivalent to a spelling error, which does not affect the body of law invoked by the complaint.

*Matter of Amoco Petroleum Additives Co.*, 964 F.2d 706, 709 (7th Cir. 1992).  Cogently articulated in *Brown v. National Football League*, courts execute this task by asking if the "duties asserted by Plaintiffs are duties owed to the general public [or] creatures of contract."[3]  Thus the specific legal duties Plaintiffs allege and the relevant CBA sections encompass this analysis.

### A.   DEFENDANTS' REMOVAL NOTICE AGGRESSIVELY SHIFTS FOCUS AWAY FROM THE ALLEGATIONS WITHIN PLAINTIFFS' COMPLAINT.

---

[2] *Bar J Sand & Gravel, Inc. v. W. Mobile New Mexico, Inc.*, No. CIV. 05-800JBWPL, 2005 WL 3663689, at *10 (D.N.M. Sept. 29, 2005) (*citing Caterpillar*, at 396-97).

[3] 219 F.Supp. 2d 379, 380 (S.D.N.Y. 2002).

Defendants cite *Caterpillar* (D.E. 1, ¶ 9), but brazenly violate its clear prohibition against trying to conjure LMRA jurisdiction up from beyond the Complaint.  Notwithstanding their "background" and "grounds for removal" sections, Defendants devote barely more than a paragraph to their sole task on removal: pointing to duties implicating CBA interpretation.  They cite a handful of half-sentences, doused inside self-serving spin and amidst inaccuracy, *i.e.* that the

> Complaint further alleges the **NFL Defendants owed** a 'duty to reduce injury risks in football' …

(*Id.* ¶ 2, *citing* D.E. 1-A, ¶ 17) (*emphasis added*).  Plaintiffs' Complaint never alleges *self-described* "NFL Defendants" to have done *anything*.  It never so much as implies a 501(c)(3) or a brand-licenser, owed free-standing duties related to football injuries.  Instead, it alleges breached performance of a jointly-undertaken duty by Riddell, NFL, and NFL C. *Plainly not* NFL P.  Their joint-participation in the sham MTBI-Committee included the publishing of these words:

| DEFENDANT(S) | DUTY OF CARE OWED OUTSIDE 29 U.S.C. § 185(a) |
|---|---|
| NFL<br><br>NFL C<br><br>Riddell | Undertook, as stated in the second published paper in *Neurosurgery*[3], to "scientifically investigate concussion" and to "reduce injury risks in football" with "neither the authority nor the inclination to impose outside medical decision-making on the medical staffs of the individual teams." |

[3] Pellman, EJ, Viano DC *et al*, Concussion in Professional Football.  16-part series and separate introduction funded by Defendants NFL, NFL C, Riddell, Honda R&D Co. Ltd., and federal grants.

(D.E. 1-A ¶ 17).  The removal notice omits the first and third quotations (which essentially distance the MTBI Committee from the CBA), mischaracterizes the legal duty as *owed*, and states that the *entire* "NFL Defendants" owed it to make it sound both inherent and also focused on "the NFL."  Applying this misdirection, Defendants shift focus off of the Complaint and onto the NFL's (2012 to 2014-15) relationship with Robinson Jr. *as an NFL player*, even where the MTBI Committee disbanded after 2011!

Defendants apply (D.E. 1, ¶2, *citing* D.E. 1-A, ¶ 29, *supra*) similarly healthy spin to the following allegation, suggesting it pertains to a legal duty in Plaintiffs' Complaint:

> … to disclose to Robinson "the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions, and sub-concussive blows as well as latent diseases caused by these blows to the head. ([D.E. 1-A] ¶ 29)

This alchemy also fails upon an inspection in context.  While the language *seemingly* points to a "duty to disclose", one possibly tethered to the CBA, the devil here lies in the details.  Plucked from a heading styled "Fraudulent Concealment *of the Cause of Action*", this allegation—as labeled—advances the application of equitable estoppel of Defendants' limitations defense.  That analysis is separate, unrelated, and premature to LMRA/preemption analysis.  Defendants seize on this language to conflate the duties alleged in the Complaint, especially where Pennsylvania law very clearly requires no affirmative duties for conspiracy and concealment claims (*see infra*.)

Defendants best and only arguments for complete preemption come on the backs of these straw-men.

### B.   DEFENDANTS OPT AGAINST ATTACHING THE CBA TO THE REMOVAL NOTICE, RENDERING THE COMPLAINT UNCONTROVERTED.

In accordance with "a Congressional policy to restrict the right of removal", these rights are to be "strictly construed" with the "propriety of removal determined according to plaintiff's pleading at the time of the petition for removal …" *In re Auerbacher*, 616 F.Supp. 532, 533 (E.D. Pa. 1985).  While the Court constrains its remand inquiry to Plaintiffs' Complaint, obviously, Defendants retain their burden to show express CBA language supposedly conferring jurisdiction. *Id*.  Yet their removal notice—which also, oddly fails to specify even the statutory subpart of the removal statute they invoke—fails to include their CBA, meaning their burden falls short.

Defendants' decision not to include their CBA, or even a declaration verifying their argument requires the Court simply *take their word for it* regarding their CBA.[4]   Defendants provide only unsupported attorney argument to contravene Plaintiffs' Complaint, doing so fatally, given that: (1) the face of Plaintiffs' Complaint—accepted as true for the purposes of this analysis—alleges that Defendant NFL is estopped from asserting the 301/LMRA jurisdictional defense; and (2) Defendant NFL offers nothing in the way of an objectively reasonable basis to controvert this allegation other than a self-serving "they're wrong" (D.E. 1, ¶ 14).

Rather than point to the origins of each tort claim and link even one to their CBA, Defendants impermissibly stew *all claims* in the Complaint as to *all defendants* together with *all CBA portions*.   This disorganizes the analytical approach and increases the chance of error while violating the framework of this Circuit and the Supreme Court.   Properly viewed, the Robinsons' claims do not (and indeed cannot, given the barren record) implicate the CBA provisions cited by the NFL.   We now turn to that analysis.

## II.   THE CASE SHOULD BE REMANDED FOR LACK OF SUBJECT-MATTER JURISDICTION.

This motion to remand implicates several general legal rules.   Remand is mandatory if the court determines it lacks federal subject matter jurisdiction.   *Kimmel v. DeGasperi*, No. 00-143, 2000 WL 420639 at *1 (*citing* 28 U.S.C. § 1447(c)).   The burden of establishing the existence of federal subject-matter jurisdiction falls on the party invoking it, with any doubts about its existence resolved in favor of remand, keeping with the strict construction of removal statutes.[5]

---

[4] *Compare Pyle v. NFL*  2012 WL 4341937 at *5 (not "even bothering to attach" a CBA where the NFL egregiously removed a pre-CBA player early in the MDL) *with* D.E. 3589-1 at 10-11 (citing to portions of CBA that Defendants NFL and NFL P attached with a sworn declaration from Dennis L. Curran).

[5] *Lumbermans Mut. Cas. Co. v. Fishman*, No. 99-0929, 1999 WL 744016, at *1 (E.D.Pa. Sept.22, 1999)* at *1 (citing *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir.1992).

A.   **COMPLETE PREEMPTION UNDER § 301 OF THE LMRA.**

Under the well-pleaded complaint rule, "federal jurisdiction only exists when there is a federal question on the face of the complaint." *Caterpillar Inc.*, 482 U.S. at 392–93 "… A case may not be removed on the basis of a federal defense, including the defense of preemption. *Id.* at 393.   "The 'complete pre-emption doctrine,' a corollary to the well-pleaded complaint rule, provides that a court can decide that a statute's pre-emptive force is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.' *Id.* (*citations omitted*).   Depending on the circumstances, section 301 can confer federal question jurisdiction under the 'complete preemption doctrine.'" *DiPilato v. Commonwealth Ass'n of Sch. Administrators, Local 502*, 588 F. Supp. 2d 631, 634 (E.D. Pa. 2008) (Brody, J.)

The LMRA is an exceptional statute, in which Congress expressed such a strong policy in favor of the development of a uniform body of federal law to govern labor disputes that even state-law claims implicating this federal policy are deemed to arise under federal law, making them subject to removal.   *Caterpillar*, 482 U.S. at 393-94; *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210-11; *DiPilato*, 502 F.Supp. 2d at 634; *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 228 (3d Cir. 1995).[6]   To protect this interest in interpretive uniformity and arbitration of labor disputes, the LMRA preempts state-law claims "founded directly on rights created by collective-bargaining agreement," *Caterpillar*, 482 U.S. at 395, and claims whose resolution is "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis-*

---

[6]   Section 301 of the LMRA provides:  "Suits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court having jurisdiction over the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).

*Chalmers*, 471 U.S. at 220 – that is, claims which "require[] the interpretation of a collective bargaining agreement," *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408 (1988).

The Supreme Court has cautioned, however, that preemption is required only when the policies animating § 301 would be frustrated, *Livadas v. Bradshaw*, 512 U.S. 107, 122-23 (1994), so that not "every dispute . . . tangentially involving a provision of a [CBA]" is preempted, *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962).  The Court "stressed that it is the legal character of the claim, as 'independent' of rights under the [CBA] (and not whether a grievance arising from 'precisely the same set of facts' could be pursued), that decides whether a state cause of action can go forward."  *Livadas*, 512 U.S. at 123-24 (citations omitted).

The Third Circuit frames the inquiry as follows: whether any of Plaintiffs claims require the Court to interpret a provision of a CBA.  *See Kline v. Security Guards, Inc.*, 386 F.3d 246, 255-56 (3d Cir. 2004) (*citing Trans Penn Wax*, 50 F.3d at 217 (*citing Berda v. CBS, Inc.*, 881 F.2d 20, 27 (3d Cir. 1989))).  As *Kline* instructs

> a plaintiff may bring a state law tort action against an employer, **even where he could have brought a similar claim based on a provision in his collective bargaining agreement**, so long as the state claim does not require interpretation of the collective bargaining agreement.

*Id*. at 256.  The Court restricts its inquiry to whether it "[has] to interpret any of the clauses in the CBA[] in order for Plaintiffs to establish the scope of the duty."  *Stellar v. Allied Signal, Inc.*, 98 F.Supp. 3d 790, 802 (E.D. Pa. 2015).

Applying this analytical framework to the claims alleged in here, it becomes apparent that the Defendants cannot meet their burden to establish § 301 preemption and the existence of federal subject-matter jurisdiction.  The case must, therefore, be remanded.

### B.  THE ROBINSONS' CLAIMS ARISE FROM PENNSYLVANIA LAW.

As the third Paragraph in Defendants Removal Notice puzzlingly (correctly) states (D.E. 1, ¶ 3), Plaintiffs' claims in the Complaint assert duties arising from Pennsylvania law.  These duties flow from the living Plaintiffs (who at no time ever had a contractual relationship with the NFL or an NFL Member Club) and from the Pennsylvania wrongful death and survival statutes. The CBA neither creates nor shapes the scope of any of these duties, all of which involve breaches alleged as ongoing for the entirety of decedent's life—a period of 25 years involving less than three full years of professional NFL football.

Defendants barely try to argue otherwise.  The section styled "Grounds for Removal" in Defendants' notice spends nearly the entirety of the section citing to separate complaints (*Duerson*; *Maxwell*; *Pear*; and *Barnes*, which as the Court likely has not forgotten to be all essentially the same complaint) to litigate remand against case law, rather than a live complaint.  And inapposite cases law, that speaks to fundamentally different allegations of fact, causes of action, and even defendants.  Finally, in the penultimate paragraph, Defendants present the Court with *five factual allegations*, (including those referenced above) that supposedly justify why Plaintiffs' claims

> at their core, fundamentally turn on duties the NFL Defendants allegedly owed to professional football players, such as Robinson, to implement adequate safety rules, regulations, and guidelines regarding player health and safety.

(D.E. 1, ¶ 13) (*citing* D.E. 1-A, ¶¶ 17, 29, 234, 237, 389).  None of these paragraphs concerns safety rules, regulations, or guidelines, much less reveal the Complaint's *essence* as such:

- ¶ 17 (alleging Defendants breached state law duties of care, *supra*);

- ¶ 29: (estoppel allegation, *supra*);

- ¶ 234: (allegation that NFL, NFL C, NFL P, and Riddell, *through* the MTBI Committee, funneled money and conspired with others including Honda and the government on the subject of brain injury);

- ¶ 237 (allegation that fraudulent poster intentionally conflated brain injuries and concealed CTE); and

- ¶ 389 (allegation in chart that Defendants possessed superior knowledge of football's risks).

    1.    **NONE OF THE CLAIMS ARISE FROM THE CBA.**

Although Defendants have not raised each Count within Plaintiffs' Complaint, we address each count.  We begin noting that near-identical conspiracy and concealment claims defeated this argument in a Complaint also drafted by undersigned counsel, in the Northern District of Illinois:

> the only conceivable connection between the complaint and the CBAs lays with the conspiracy and fraudulent concealment/omission claims … [a] jury would not even need to glance at the CBAs to determine these facts.

*Oliver v. Riddell*, No. 4760, 2016 WL 7336412 at *3-4 (N.D. Ill. Jul. 19, 2016).

Pennsylvania law remains consistent and offers even more clarity counseling against preempting these state claims.  As a threshold matter, all of these claims are either asserted through living individuals who never played NFL football (therefore entirely independent of the CBA), or, they flow through one of two Pennsylvania state statutes: 42 Pa. C.S.A. §§ 8301, 8302.

With respect to the intentional tort claims, Pennsylvania law imposes no "duty" for either conspiracy or concealment.  The <u>conspiracy claim</u> requires only a "combination of two or more persons to do an unlawful act or criminal act or to do a lawful act by unlawful means or for an unlawful purpose."  *Stellar*, F.Supp. 3d at 807.  Faced with an NFL Club's argument that the CBA immunized its alleged civil conspiracy to commit an underlying illegal act, the Court in *Green v. Pro Football Incorporated* decried the notion as "ludicrous."  31. F.Supp. 3d 714 (D. Md. 2014).

The <u>concealment claim</u> literally requires no duty to disclose because "Pennsylvania law recognizes a difference between active concealment and mere silence in the context of common law fraud." *Gnagey Gas & Oil Co. v. Pa. Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 500 (Pa. Commw. Ct. 2013) (*citing Wilson v. Donegal Mut. Ins. Co.*, 598 A.2d 1310, 1315-16 (Pa. Super. Ct. 1991); *Smith v. Renaut*, 564 A.2d 188, 192 (Pa. Super. Ct. 1989)); *see Am.*

*Planned Cmty., Inc. v. State Farm Ins. Co.*, 28 F. Supp. 2d 964, 968 (E.D. Pa. 1998) (*citing Wilson*) (acknowledging that "[c]oncealment alone may create a sufficient basis for finding that a party engaged in fraud so long as the other elements of fraud are present"). Pennsylvania common law subsumes and recognizes the tort of fraudulent concealment as stated in the Restatement (Second) of Torts § 550 ("Restatement § 550"), which imposes liability for intentional concealment of material information **<u>regardless of any duty to disclose</u>**. *Am. Planned*, 28 F. Supp. 2d. at 968 (*citing Roberts v. Estate of Barbagallo*, 531 A.2d 1125 (Pa. Super. Ct. 1987)) (*emphasis added*).

Counts III-VI comprise the remaining claims where these Defendants can argue preemption: negligent-performance of a voluntary undertaking claim as to NFL, NFL C and Riddell; negligent marketing as to NFL and Riddell; negligent licensing as to NFL P and Riddell; and negligent hiring/retention/supervision as to NFL and Riddell. Once again, Defendants— saddled with the burden of establishing jurisdiction to a certainty—offer literally zero specifics as to how any of these counts confer federal subject matter jurisdiction. We address each out of caution only. Defendants have never even singled out these claims as such.

Count III has received ample treatment from Plaintiffs (*see* I(A), *supra*) who point to Defendants' poorly-advanced argument to support federal jurisdiction over this claim. (D.E. 1, ¶ 2-4). Defendants seemingly argue—taking terrific poetic license on the Complaint—that the allegations require interpretation of the medical care provision, because this article delegates responsibility to the clubs (therefore shaping the NFL's duty albeit not imposing a duty on the NFL.) Notwithstanding that Plaintiffs *never allege* a problem with medical care, this argument fails for an added reason: this duty is "nondelegable" and remains the NFL's. *See Green v. Arizona Cardinals Football Club*, 21 F.Supp. 3d 1020, 1030 (E.D. Mo. 2014) ("the duty to warn is nondelegable … contractual terms that alter [] common law rights would take the form of a defense

and could not serve as the basis for removal.")  Much more simply, the NFL cannot remove because it wants to defend with comparative negligence of its Member Club's at trial.

The analysis in Counts IV and VI mirror each other, so we address these in tandem. These claims—negligent marketing and hiring/supervision/retention—both involve Defendants NFL and Riddell.  These claims—like count III—arise from a factual nucleus occurring over the *entirety* of Adrian Robinson Jr.'s life; in other words, these Defendants owed the Robinsons (including the family) the identical duty of care long before any contractual relationship attached.  In fact, the negligent marketing claim as to the NFL asserts that the NFL negligently *youth* marketed its game to Robinson and his family.  Identically with both claims, if Robinson Jr. never played NFL football, he could assert them.  The hiring/retention/supervision claim involves professional expert witness Dr. David Viano, to whom the NFL and NFL C funneled millions of dollars over Robinson Jr.'s entire lifetime.  He rendered no clinical care to Robinson and—according to deposition testimony and his c.v.—appears to have been jointly employed by Riddell and the NFL.  Again, no relationship with this claim seems to flow from professional football.  Rather, this is a question of state-law agency concepts.

The final claim asserted ought to pose the greatest challenge for these "NFL Defendants": the negligent licensing claim as to NFL P and Riddell (perhaps why it is nearly ignored.)  While Defendants insistently try to re-write *Stringer v. National Football League*, which *denied* the NFL and NFL P's 301 motion after discovery, and on summary judgment, identical claims survived:

> Plaintiff generally alleges that the NFL and NFL Properties breached their duty to ensure that the players had safe equipment. For preemption purposes, the only relevant questions are whether this claim arose out of the CBA and, if not, whether its resolution is substantially dependent on an interpretation of any provisions of the CBA.  Plaintiff's claim does not arise out of the CBA. Neither the NFL nor NFL Properties is a party to the CBA. While both NFL Defendants are mentioned in the CBA, the CBA imposes no duty on either of them to ensure that the equipment used

by NFL players adequately protects from risk of injury or illness. Any such duty, if
it exists, clearly has its source in the common law.

474 F.Supp. 2d 894, 912 (N.D. Ohio 2007).  Largely, citation to prior case law is merely instructive

given the case-by-case analysis of state-law claims as each relate to CBAs, as required in LMRA

preemption analysis, *e.g. In re Benz Metal Prods.*, 253 F.3d 283, 289 (7th Cir. 2001).  Given these

*identical* allegations, however, Plaintiffs submit this authority to be highly persuasive.

>2.    THE CBA PROVISIONS DO NOT RELATE TO PLAINTIFFS' CLAIMS NOR
>      ALTER DUTIES UNDERLYING THEM.

Absent the CBA itself or any sworn declaration, the "NFL Defendants" reference language

from several provisions claimed to originate the relationship between the Robinsons and

Defendants.  To the extent that the Court finds the material proper for consideration, it still fails

substantively.  Preliminarily as to NFL C and NFL P, these Defendants make zero allegations of

contractual privity with Robinson Jr.  They hide within their moniker the "NFL Defendants", even

though the record (not to mention their corporate disclosure statements) problematizes this.  Thus,

NFL P and NFL C's defenses must be deemed waived.  Therefore, Plaintiffs focus on Defendant

NFL's CBA duties, since *this is the only defendant that can or does allege any such duties.*

The CBA is silent with respect to the NFL's duty to perform non-negligent scientific

research, and market/license its brand.  *See, e.g.*, *Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL

7336412 at *3 (N.D. Ill. Jul. 16, 2016) (non-negligent scientific research and product

development); *Stringer v. Nat'l Football League*, 474, F.Supp. 2d 894, 905-06 (S.D. Ohio 2007)

(market/license brand).  Moreover, the *defense* that a contractual CBA provision between two

parties "shapes" or somehow alters separate tort duties **never confers removal jurisdiction**.

*Kline*, 386 F.3d at 256; *see also Green v. Arizona Cardinals Football Club*, 21 F.Supp. 3d 1020,

1030 (E.D. Mo. 2014).  This is Defendant NFL's strongest position (weak as it may be.)

None of the CBA provisions or purportedly related documents that Defendant NFL points to in the removal notice (DE 1 ¶¶ 11, 13) – Articles 39, 50, the NFL Constitution and Bylaws, or the Player Contract – suggest the existence of any legal duties raised *by the Complaint* and within the CBA, or raised *by the Complaint* and implied by the CBA.   We examine the provisions Defendant NFL cites, in turn.

 **a**. *Article 39*.   At least eleven courts have allows state claims to proceed in the face of challenges under this article[7], (denominated "Player's Right to Medical Care and Treatment") Section One ("Doctor/Patient Relationship"), which reads as follows:

> If a club physician advises a coach or other Club representative of a player's serious injury or career threatening physical condition which significantly effects affects the player's performance or health, the physician will also advise the player in writing.

*See e.g. Tynes v. Buccaneers Limited Partnership*, 134 F.Supp. 3d 1351 (M.D. Fla. 2015).   In *Tynes*, where a player sued his team alleging he negligent staph infection following a toe procedure, the Court remanded the case.   The Court rejected Defendants' argument that negligence claims required interpretation of article 39 simply because these claims were "related to the medical care he received" (*id*, *citing Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-cv-1803, 2010 WL 8461220 at *12-14 (N.D. Ohio Mar. 31, 2010).

---

[7] *Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 at *3 (N.D. Ill. Jul. 16, 2016); *Bush v. St. Louis Reg. Conv. Ctr.*, No. 250, 2016 WL 3125869 at *3 (E.D. Mo. Jun. 3, 2016); *Tynes v. Buccaneers Ltd. P'ship*, 134 F.Supp. 3d 1351 (M.D. Fla. 2015); *Green v. Pro Football, Inc.*, 31 F.Supp. 3d 714 (D. Md. 2014); *Green v. Arizona Cardinals Football Club*, 21 F.Supp. 3d 1020, 1030 (E.D. Mo. 2014); *Bentley v. Cleveland Browns Football Co., LLC*, 958 N.E.2d 585 (Ohio App.3d 2011); *Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-cv-1803, 2010 WL 8461220 at *12-14 (N.D. Ohio Mar. 31, 2010); *Stringer v. Nat'l Football League*, 474, F.Supp. 2d 894, 905-06 (S.D. Ohio 2007); *McPherson v. Tennessee Football, Inc.*, No. 0002-D.E. 16-1, 2007 WL 5445124 at *5; *Brown v. Nat'l Football League*, 219 F.Supp.2d 372 (S.D.N.Y. 2002); *Hendy v. Losse and San Diego Chargers Football Co.*, 925 F.2d 1470, 1991 WL 17230 at *2 (9th Cir. 1991) (unpub).

Here, clinical medical care, is a subject alien to the Robinsons' claims.  The very idea is that the conspiracy between these defendants existed to make a "med mal claim" essentially impossible.

In full, this article discusses the cost, duties, nature and scope of medical care supplied to NFL football players.  Nowhere, even indirectly, is a to engage in scientific (and entirely non-clinical) research.  More foreign would be duties to license or market.  Assessing the scope of this research fraud simply does not touch Robinson Jr's *clinical* care (much less anything else.)  Put differently, Defendant NFL's MTBI Committee had no doctor-patient relationship with *anyone*.  Instead, Defendants, through the MTBI Committee's non-professional negligence—their breach of ordinary care—came into play when they voluntarily undertook to study and publish in mainstream journals on medical issues.

The NFL's claims fare no better when they offer up Article 39, Section 2 of the CBA, which applies to athletic trainers but fails for identical reasons:

> All athletic trainers employed or retained by Clubs … must be certified by the National Athletic Trainers Association.

Here again, this fails to cover the Robinsons' claims.  Aptly analogized to the difference between malpractice claims and drug-defect claims, the Robinsons' case concerns medically-*related* misconduct, but not medical negligence.

**b**.    *Article 50*.    Defendant NFL invokes the "Joint Committee on Player Safety", selecting out only the two words "playing equipment" from Section One of this Article, an article other courts have observed "will not have the power to commit or bind …" *Bush v. St. Louis Reg. Convention and St. Louis Rams, LLC*, No. 16-cv-250, 2016 WL 3125869 at *3 (E.D. Mo. Jun. 3, 2016) (remanding personal injury claims because the NFL club citing Articles 50 and 39, among others "[did] not show how this is essential to their case") (*citing Williams v. NFL*, 528 F.3d 863,

876 (8th Cir. 2009)[8]. This provision plainly does not give rise to any binding duties, *Stringer v. Nat'l Football League*, 474, F.Supp. 2d 894, 905-06 (S.D. Ohio 2007) (denying preemption of identical claim as asserted here in part because Article 50 carried no preemptive weight).

    **c.**    *Article 50 § 1(b)-(c) and 2.* Defendant NFL delves deeper into this Article, characterizing this portion as mandating procedures for review and rule changes. It parses out the words "would adversely affect player safety" and "to represent the players' viewpoint on rules." Civil disposition of this case would leave the NFL-NFLPA rulebook-bargain untouched. The Robinsons neither allege nor imply a such breach of duty. This very notion is offensive, given the Robinsons' case: Plaintiffs claim the NFL knew football kills dose-proportionate to exposure. Changing the kickoffs feels like a grotesque straw-man. Allegations touching these articles only do so because they tread near the hidden and inherent risk.

    **e.**    *Article 50 § 1(d).* The NFL represents that, *in part*, this article states the following:

> The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety.

The Robinsons, as masters of their Complaint, have sued the NFL, not the NFLPA. While this entire article already veers widely from what the Complaint alleges, it is especially true where Defendant NFL seemingly tries to rope in the NFL Players' Association. This union has absolutely no relevance whatsoever—once again—to the conduct Plaintiffs allege to have taken place prior to his having been an NFL football player. The union has no role in Defendant NFL C's allocation of funds to sham research. Nor NFL P's licensing and marketing. The extent the NFL seeks to assert *fault* on the part of the union, again, this has no bearing on jurisdictional analysis.

---

[8] NFL, NFL P and Member Clubs frequently cite to *Williams* without mentioning that this case appeals tort claims asserted by *active players* contesting CBA-sanctioned drug suspensions.

**g.**     *NFL Const. and Bylaws Article 17 § 16(E) (2010).*   The NFL, without explaining how **a 2010 document** applies to Robinson Jr., who entered the NFL in 2012, the NFL represents that this article states the following guidelines apply to placing active players on roster-designation lists denominated "Reserve/Injured":

> All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards

The mere evidence Plaintiffs offer as partial support for their claims—*e.g.*, that some of the MTBI Committee's work involved fraudulent return-to-play conclusions—supports the contention that the MTBI Committee performed sham-research.  (Assuming indeed that this is Defendants' point.) But this is the directive of *Kline*.  Plaintiffs never allege decedent was negligently returned to play. Nor have they claimed the club medical staff erred in making these clinical judgment-calls.  Maybe they could; maybe not; but these hypotheticals all miss the mark of the Complaint.

**h.**     *NFL Const. and Bylaws Article 19 § 5 (2010).*   The NFL, without explaining how **the 2010 document** applies at all to Robinson Jr., who entered the NFL in 2012, and further, without attaching either the NFL Constitution and Bylaws itself or any sworn declaration, represents this article to require each home team to provide doctors and ambulances.

**i.**     *NFL Player Contract (CBA App'x A) ¶ 9.*   The NFL supplies no language but suggests this portion of the contract provides medical and hospital care as deemed necessary by physicians in the event of injury.  This passage makes some of the least sense of all.

**j.**     *NFL Const. and Bylaws Article 11 § 2 (2010).*   The NFL, without explaining how **the 2010 document** applies at all to Robinson Jr., who entered the NFL in 2012, and further, without attaching either the NFL Constitution and Bylaws itself or any sworn declaration, represents this article to concern "[p]laying rules" and the obligation to "amend[] or change" them.

**III.   NONE OF THE ROBINSONS' CLAIMS REQUIRE INTERPRETATION OF THE CBA.**

Plaintiffs' Complaint alleges no claims requiring any CBA interpretation.  Defendants have muddied the Court's analytical framework, but Plaintiffs have demonstrated, Defendants never even directly attack one of the duties within their Complaint.  Once untangled, the repackaging of themselves as "the NFL Defendants", and the litigating of jurisdiction against an alternate universe only highlights how far NFL, NFL P, and NFL C each stray from meeting their burdens.  They each also further ignore the wrongful death and individual claims, along with baldly concluding that they are not estopped from asserting 301 preemption itself.  For all of these reasons, Defendants arguments fail and they have not met their burden.  Therefore, the Court lacks jurisdiction and should remand the case to state court.

**IV.    IN THE ALTERNATIVE, DEFENDANTS HAVE IMPROPERLY DESIGNATED THIS CASE AS "RELATED" AND IT SHOULD BE RE-DOCKETED.**

"This new suit is not a case 'related' … [i]t is a new chapter."  *Exec. Bd. of Local 234 v. Transp. Workers Union of Am., AFL-CIO*, No. CIV.A. 02-6633, 2002 WL 1900799, at *3 (E.D. Pa. Aug. 9, 2002).  The JPML has not included this case within the MDL, but rather the NFL has tried sneaking it before the Court.  This case is no more related to MDL 2323 than would be all insurance bad-faith cases, or a series of separate Boeing airplane crashes.  It deserves random assignment based on the plain language of Local Rule 40.1(c)(1), which "[c]ourts interpret [] narrowly because the selection of a random judge 'encourages transparency, fairness, and avoiding the appearance of arbitrariness.'" *Sherfey v. Johnson & Johnson,* No. 12–4162, 2012 WL 3550037, *2 (E.D.Pa. Aug.17, 2012).   "[T]he question before the Court is not whether the cases have a logical relationship at some generalized level.  The question is whether they involve the '**same** issue of fact' or arise out of the '**same** transaction.'"  *See Sellers v. Timoney*, No. 01–3804, 2002 WL 32348499, *3 (E.D.Pa. Feb.7, 2002); *Meijer, Inc. v. Biovail Corp.*, No. 08–2431, 2008 WL 2944648, *3 (E.D.Pa. July 31, 2008) (quoting Local Rule 40.1).  As the Riddell Defendants

themselves breathlessly ranted amidst vitriolically objection to the filing of an amended opt-out Complaint (D.E. 7849) this MDL was restricted to *NFL* head injury.

As everyone knows, the Court has devoted massive energy and resources to the 20,000-plus class members it served in MDL No. 2323 for over a half-decade.  By erroneously designating the Robinsons as "related", but not part of the MDL, Defendants are simply seeking to use the Court's busy schedule against Plaintiffs.  Defendants have but one goal: dodge this litigation as long as possible.  They are free to make a reasonable offer in attempt to settle the case.  Otherwise, subject to remand, the Robinsons will be trial ready after unusually prompt but profoundly rigorous discovery.   To Defendants' undoubted delight, crucial witnesses die and age each month, and numerous non-parties document-custodians are likely purging records in the ordinary course, going out of business, or themselves dying.

 This case should be randomly assigned to avoid unfair delays and undue prejudice- not with the Court, which has done an unprecedented job in achieving historic results that possibly only those involved would not take for granted, but simply so these Plaintiffs can advance their case—one way or the other; win or lose.  Notwithstanding the foregoing, and without waiver to Plaintiffs' un-waivable position that subject-matter jurisdiction lacks, Plaintiffs shall begin issuing non-party subpoenas, seek a Rule 16 conference, and wish to receive Defendants' initial disclosures within the next 30 days barring remand.

## **CONCLUSION**

WHEREFORE Plaintiffs' respectfully ask the Court to enter an Order remanding this case, and granting them costs and reasonable attorneys' fees in accordance with 28 U.S.C. § 1447(c).

/s/ Bradford R. Sohn

Bradford R. Sohn, Esquire
(FL 98788)

THE BRAD SOHN LAW FIRM, PLLC
2600 S. Douglas Road, Suite 1007
Coral Gables, Florida 33134
(786) 708.9750
Brad@Sohn.com

Benjamin Andreozzi, Esquire
PA ID No. 89271
ANDREOZZI & ASSOCIATES, PC
111 N. Front Street
Harrisburg, Pennsylvania 17101
(717) 525-9124
ben@victimscivilattorneys.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the

CM/ECF system which will provide electronic notice to all counsel of record.

/s/ Bradford R. Sohn

Bradford R. Sohn, Esquire
*Counsel for Plaintiffs*