**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB) |
| | MDL No. 2323 |
| | **JURY TRIAL DEMANDED** |
| Second Amended Master Administrative Long-Form Complaint Against ~~NFL Defendants~~ Kansas City Chiefs Football Club, Inc. | |
| THIS DOCUMENT RELATES TO: | |
| *KENNEY et al., v. KANSAS CITY CHIEFS FOOTBALL CLUB, INC.*, No. 14-04779-AB | |

**OPT OUT PLAINTIFF SHORT FORM COMPLAINT AGAINST ~~NFL DEFENDANTS~~ KANSAS CITY CHIEFS FOOTBALL CLUB, INC.**

1. Plaintiff, <u>Thomas Baugh</u>, and Plaintiff's Spouse <u>Jean Baugh</u> bring this civil action as a related action in the matter entitled IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, MDL NO. 2323.

2. Plaintiff(s) are filing this Short Form Complaint against ~~NFL Defendants~~ Kansas City Chiefs Football Club, Inc. as required by this Court's Case Management Order, filed, July 18, 2017 (Doc. 8030).

3. Plaintiff and Plaintiff's Spouse opted-out of the Class Action Settlement approved by the Court on May 8, 2015.

4. Plaintiff and Plaintiff's Spouse incorporate by reference the allegations (as designated below) of the ~~Second Amended Master Administrative Long-Form Complaint Against NFL Defendants~~ state court Petition filed in the Circuit Court of Jackson County,

1

Missouri, Case No. 1416-CV00047, and attached hereto as Attachment A, as is fully set forth at length in this Short Form Complaint.

5.      [Fill in if applicable] Plaintiff is filing this case in a representative capacity as the _____ of _____, having been duly appointed as the _____ by the Court of _____. (Cross out sentence below if not applicable.) ~~Copies of the Letter of Administration/Letters of Testamentary for a wrongful death claim are annexed hereto if such letters are required for the commencement of such a claim by the Probate, Surrogate or other appropriate court of the jurisdiction of the decedent.~~

6.      Plaintiff Thomas Baugh is a resident and citizen of Missouri, and claims damages as set forth below.

7.      Plaintiff's Spouse, Jean Baugh, is a resident and citizen of Missouri, and claims damages as a result of loss of consortium proximately caused by the harm suffered by her Plaintiff husband.

8.      Upon information and belief, the Plaintiff sustained repetitive, traumatic sub-concussive and/or concussive head impacts during NFL games and/or practices. Upon information and belief, Plaintiff suffers from symptoms of brain injury caused by the repetitive, traumatic sub-concussive and/or concussive head impacts that Plaintiff sustained during NFL games and/or practices. Upon information and belief, the Plaintiff's symptoms arise from injuries that are latent and have developed and continue to develop over time.

9.      The original complaint by Plaintiff(s) in this matter was file in the 16th Circuit Court of Jackson County, Missouri. If the case is remanded, it should be remanded to the 16th Circuit Court of Jackson County, Missouri.

10.      Plaintiff(s) claim damages as a result of [check all that apply]:

2

☑    Injury to Herself/Himself

☐    Injury to the Person Represented

☐    Wrongful Death

☐    Survivorship Action

☑    Economic Loss

☑    Loss of Services

☑    Loss of Consortium

11.    [Fill in if applicable] As a result of the injuries to Plaintiff, Plaintiff's Spouse suffers from a loss of consortium, including the following injuries:

☑    Loss of marital services

☑    Loss of companionship, affection or society

☑    Loss of support

☑    Monetary losses in the form of unreimbursed costs expended for the health care and personal care of Plaintiff

12.    [Check if applicable] ☑ Plaintiff and Plaintiff's Spouse reserve the right to object to federal jurisdiction.

13.    Plaintiff and Plaintiff's Spouse bring this case against the following Defendants in this action [check all that apply]:

☐    National Football League

☐    NFL Properties, LLC

☑    Kansas City Chiefs Football Club, Inc.

14.    Plaintiff played in [check if applicable] ☑ the National Football League ("NFL") and/or in [check if applicable] ☐ the American Football League ("AFL") during the following

3

period of time <u>1986 - 1990</u> for the following teams: <u>Kansas City Chiefs, Miami Dolphins,</u>

<u>Washington Redskins and Detroit Lions.</u>

15.    Plaintiff retired from playing professional football after the <u>1990</u> season.

## CAUSES OF ACTION

16.    ~~Plaintiffs herein adopt by reference the following Counts of the Master~~

~~Administrative Long-Form Complaint, along with the factual allegations incorporate by~~

~~reference in those Counts [check all that apply]:~~

☐      Count I (Declaratory Relief (Against Defendant NFL))

☐      Count II (Negligence (Against Defendant NFL))

☐      Count III (Negligent Marketing (Against all Defendants))

☐      Count IV (Negligence (Against Defendant NFL P))

☐      Count V (Negligent Misrepresentation (Against Defendant NFL))

☐      Count VI Negligent Hiring (Against Defendant NFL))

☐      Count VII (Negligent Retention/Supervision (Against Defendant NFL))

☐      Count VIII (Fraud (Against all Defendants))

☐      Count IX (Civil Conspiracy (Against all Defendants))

☐      Count X (Fraudulent Concealment (Against all Defendants))

☐      Count XI (Wrongful Death (Against all Defendants))

☐      Count XII (Survival Action (Against all Defendants))

☐      Count XIII (Loss of Consortium (Against all Defendants))

☐      Count XIV (Punitive Damages under All Claims (Against all Defendants))

☐      Count XV (Declaratory Relief: Punitive Damages (Against all Defendants))

17.    Plaintiffs assert the following ~~additional~~ causes of action [write in or attach]:

4

Plaintiffs herein adopts by reference the factual allegations and Counts set forth in Plaintiff's Petition, filed in the Circuit Court of Jackson County, Missouri, Case No. 1416-CV00047, and attached hereto as Attachment A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Plaintiff's Spouse pray for judgment as follows:

A.  An award of compensatory damages, the amount of which will be determined at trial;

B.  An award of economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

C.  For loss of consortium as applicable;

D.  For punitive and exemplary damages as applicable;

E.  For all applicable statutory damages of the state whose laws will govern this action;

F.  For an award of attorneys' fees and costs;

G.  An award of prejudgment interest and costs of suit; and

H.  An award of such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 27, 2017                          Respectfully Submitted,

                                              THE KLAMANN LAW FIRM, P.A.

_/s/ Paul D. Anderson_

John M. Klamann, MO    #29335
Andrew Schermerhorn, MO    #62101
Paul D. Anderson, MO    #65354
4435 Main Street, Ste. 150
Kansas City, MO 64111
Telephone: (816) 421-2626
Facsimile: (816) 421-8686
jklamann@klamannlaw.com
ajs@klamannlaw.com
panderson@klamannlaw.com


Kenneth B. McClain, MO    #32430
Lauren E. McClain, MO    #65016
Timothy J. Kingsbury, MO    #64958
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Suite 400
Independence, MO 64051
Telephone: (816) 836-5050
Facsimile: (816) 836-8966
kbm@hfmlegal.com
lem@hfmlegal.com
tjk@hfmlegal.com


Wm. Dirk Vandever, MO    #24463
THE POPHAM LAW FIRM, P.C.
712 Broadway, Suite 100
Kansas City, MO 64105
Telephone: (816) 221-2288
Facsimile: (816) 221-3999
dvandever@pophamlaw.com


William C. Kenney, MO    #63001
Bill Kenney Law Firm, LLC
1101 Walnut Street, Suite 102
Kansas City, Missouri 64108
Telephone: (816) 842-2455
Facsimile: (816) 474-8899
bkenney@billkenneylaw.com
**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of July, 2017, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to all

counsel of record.

<u>/s/ *Paul D. Anderson*  </u>
Paul D. Anderson

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A                    1416-CV00047

**IN THE 16TH JUDICIAL CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | | |
|---|---|---|
| WILLIAM PATRICK KENNEY and his wife | ) | |
| SANDRA LOUISE KENNEY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THOMAS ANTHONY BAUGH and his wife | ) | |
| JEAN M. BAUGH, | ) | Case No.: _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Division: _____ |
| v. | ) | |
| | ) | |
| KANSAS CITY CHIEFS | ) | **JURY TRIAL DEMANDED** |
| FOOTBALL CLUB, INC., | ) | |
| | ) | |
| _Serve Registered Agent_: | ) | |
| SEIGFRIED BINGHAM LEVY | ) | |
| SELZER & GEE, P.C. | ) | |
| 911 Main Street, Suite 2800 | ) | |
| Kansas City, Missouri 64105 | ) | |
| | ) | |
| Defendant. | ) | |

**PETITION FOR DAMAGES**

COME NOW Plaintiffs William Patrick Kenney ("Bill Kenney") and Sandra Louise Kenney,

husband and wife, and Plaintiffs Thomas Anthony Baugh ("Tom Baugh") and Jean M. Baugh,

husband and wife, and for their claims and causes of action against Defendant Kansas City Chiefs

Football Club, Inc. ("Chiefs"), state and allege as follows:

**PARTIES**

1.      Plaintiff Bill Kenney and his wife Sandra Kenney are residents of Jackson County,

Missouri. Bill Kenney was employed as a quarterback for the Kansas City Chiefs during the years of

1980 to 1988.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

# ATTACHMENT A

2.      Between September 1, 1987 and 1988, Bill Kenney suffered multiple concussive and sub-concussive blows to the head, he was sacked 22 times during the 1987 season and 13 times during the 1988 season, which concussive and sub-concussive blows caused or contributed to cause a constellation of neurological damage, including post-concussive syndrome and traumatic brain injuries, such as Chronic Traumatic Encephalopathy ("CTE").

3.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Bill Kenney to develop, post-concussion syndrome and latent brain disease, including, upon information and belief, CTE.

4.      Plaintiff Tom Baugh and his wife Jean Baugh are residents of Jackson County, Missouri. Tom Baugh was employed as a professional football player with the Kansas City Chiefs during the years of 1986 to 1988.

5.      Between September 1, 1987 and 1988, Tom Baugh suffered multiple concussive and sub-concussive blows to the head, which caused or contributed to cause a constellation of neurological damage, including post-concussive syndrome and traumatic brain injuries, such as CTE.

6.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Tom Baugh to develop post-concussion syndrome and latent brain disease, including, upon information and belief, CTE.

7.      Defendant Kansas City Chiefs Football Club, Inc. is a Texas corporation with its principal place of business at One Arrowhead Drive, Kansas City, Jackson County, Missouri 64129. At all times relevant to the claims alleged herein, the Chiefs employed Plaintiffs Bill Kenney and Tom Baugh.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court pursuant to RSMo § 506.500 in that the tortious acts alleged herein took place in the State of Missouri.

9.      The actions alleged herein are brought under the common and statutory laws of the State of Missouri. Between September 1, 1987 and March 28, 1993, the relevant time period of the Plaintiffs' injuries as alleged herein, there was no collective bargaining agreement ("CBA") in effect. Because the Plaintiff's claims are limited to this period, and no interpretation of the terms of any CBA are required to decide these claims, section 301 of the Labor Management Relations Act cannot provide a basis for federal jurisdiction.

10.      Plaintiffs' occupational disease-related claims were not caused by a specific event during a single work shift injury, and the claims do not arise out of an "accident" as that term is defined under RSMo § 287.020.2.

11.      Plaintiffs' claims are not within the scope of workers' compensation as they are not subject to the exclusivity provisions of workers' compensation. *See State ex rel. Cook*, No. WD73462 (Mo. App. W.D. 2011) (holding that the exclusivity provisions of RSMo § 287.120 do not apply to occupational disease claims).

12.      Venue is proper in this court pursuant to RSMo § 508.010 as Plaintiffs were first injured by the wrongful acts and/or negligent conduct alleged herein.

## JOINDER OF CLAIMS

13.      Joinder of Plaintiffs' claims are permissible pursuant to Rule 52.05(a) in that the claims alleged herein arise out of the same series of occurrences and involve common questions of law and fact.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

**TOLLING**

14.     Plaintiffs' membership in the putative class action currently pending in the Eastern District of Pennsylvania tolled the running of the applicable statute of limitations[1]. In addition, Defendant's fraudulent concealment as alleged herein prevented Plaintiffs from ascertaining the existence of their latent injuries and causes of action, including a diagnosis of post-concussive syndrome and CTE.

**GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

15.     The Defendant has known or should have known for many years that the Congress of Neurological Surgeons in 1966 defined a concussion as a "clinical syndrome characterized by immediate and transient impairment of neural functions, such as alteration of consciousness, disturbance of vision, equilibrium, etc. due to mechanical forces."

16.     The Defendant has known or should have known for many years that the American Association of Neurological Surgeons ("AANS") defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

17.     The Defendant has known or should have known for many years that there is scientifically observed and documented link between repetitive blows to the head and neuro-cognitive problems found in athletes, including football players and boxers. Published papers dating as far back as 1928, and, upon information and belief, independent sources of information and research of which Defendant was in a superior position to access, have shown that this condition is

---

[1] *In re NFL Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB, Doc. 75-1.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

prevalent in boxers and retired professional football players. The earliest studies focused on boxers, but by the 1950s and 1960s, a substantial body of medical and scientific evidence had been developed specifically relating to neuro-cognitive injuries in the sport of football. The changes in the brain begin when the brain is subjected to repetitive trauma, however, symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of athletic involvement.

18.     Since the Chiefs inception in 1960, it has been aware of the growing body of scientific evidence and its compelling conclusions that professional football players who sustain repetitive sub-concussive and concussive blows to the head during their careers are at greater risk for chronic neuro-cognitive illness and disabilities both during their football careers and later in life.

19.     Despite this knowledge, the Defendant marginalized the risks of brain injuries and regularly referred to concussions as a "ding" or "getting your bell rung".

20.     Defendant exacerbated Plaintiffs' risks of exposure to brain trauma by regularly returning concussed players to the game, and by fostering a draconian work environment in which the Plaintiffs were forced to play through brain injuries.

21.     On multiple occasions, Defendant increased the dangers of the work environment by giving Plaintiffs ammonia inhalants, caffeine cocktails and/or Toradol to abbreviate the need for concussed employees to miss working time due to concussions and/or brain injuries.

22.     Despite multiple studies that have concluded that there is a "statistically significant difference" between the injury rates on AstroTurf (i.e. carpeted concrete) and grass[2], Defendant installed AstroTurf in order to reduce operating expenses and increase profits.

---

[2] See, e.g. Powell JW, Schootman M: A multivariate risk analysis of selected playing surfaces in the National Football League: 1980 to 1989. American Journal of Sports Medicine 6:686-694, 1992.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

23.    AstroTurf significantly increased the risk of exposure to head trauma as follows: (1) AstroTurf increases the speed of play, which in turn reduces a player's chance to prepare for a violent hit to the head or body. On grass, the game is slower which allows a player to absorb hits by tensing up his muscles prior to a collision. (2) When a player's body slams down on concrete-like AstroTurf, the hard ground is incapable of absorbing the shock. Instead, the shock takes place in a player's head, causing the brain to violently rattle against the skull. On grass, however, the organic padding of the grass and soil provides for natural shock absorption.

24.    Despite the existence of a much safer alternative (i.e. grass), Defendant provided a working environment that it knew was unreasonably dangerous and unnecessarily increased the risk of exposure. The primary reasons being that it was cheaper and the speed of the game was faster, which heightened the violence of the game, in turn, increasing fans' attraction to the game and significantly boosting the Defendant's revenue.

25.    Defendant has known or should have known for many years that post-concussion syndrome (PCS) and cognitive impairment occurs in football players. PCS is defined by the fourth edition of the *Diagnostic and Statistics Manual* as (1) cognitive deficits in attention or memory and (2) at least 3 or more of the following symptoms: fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, apathy, or personality change. Similarly, the World Health Organization's International Classification of Diseases (ICD-10) defines PCS as involving 3 or more of the following symptoms: headaches, dizziness, fatigue, irritability, insomnia, concentration difficulty, or memory difficulty.

26.    For decades, the scientific community has known that repetitive head trauma can lead to permanent and debilitating neurological impairments, including Chronic Traumatic Encephalopathy ("CTE").

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

27.     Defendant has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers, easily accessible to Defendant, have shown that this condition is prevalent in boxers and retired professional football players who have a history of head injuries. The changes in the brain begin when the brain is subjected to repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of athletic involvement.

28.     In 1928, pathologist Harrison Martland first described the link between repetitive head trauma and degenerative brain disease as the "punch drunk syndrome" in the *Journal of the American Medical Association*.

29.     In 1934, Dr. Harry Parker published a study confirming Martland's findings and argued that neurological degeneration in boxers was based on the volume of brain trauma sustained. He further opined, "the frequency of occurrence of conditions of this kind as reported by…people who followed the profession of pugilism makes it seem very likely that [the patients'] profession led to their ultimate disablement…."

30.     On December 29, 1937, at the Seventeenth Annual Meeting of the American Football Coaches Association, the football community acknowledged its keen awareness of the serious risks of concussions, and the necessity of removing an individual from play if they have suffered a concussion:

> During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true….Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

31.     In 1937, J.A. Millspaugh introduced the term dementia pugilistica to describe the syndrome characterized by motor deficits and mental confusion in boxers. Millspaugh also noted

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

that the disease is likely not limited to boxers but could extend to other sports where repetitive brain trauma is present: "The mental unbalance more commonly encountered among pugilists is also observed among other sports representatives who sustain considerable head trauma." He further opined, "[r]epeat and frequent concussions…are, to say the least, not conducive to stabilized mental equilibrium."

32.      In 1949, British neurologist Macdonald Critchley published the first of two important studies on head trauma in boxers. In *Punch Drunk Syndrome: The Chronic Traumatic Encephalophathy of Boxers*, Critchley described the latent effects of repetitive brain trauma, explaining that the condition was generally not observable until a number of years had passed since the onset of boxing. In 1957, Critchley published an article in the *British Medical Journal* and described the symptoms of "chronic progressive traumatic encephalopathy" to include "progressive slowing of speech and thoughts…slowness of movement, and tremors." Critchley further noted that brain damage produced by repetitive trauma could lead to personality changes, and that the effects of chronic head trauma are dependent on the volume of impacts as well as the magnitude of those events.

33.      Over the next several decades, the evidence of the link between repetitive head trauma and neurological diseases was overwhelmingly clear. Numerous studies were published in medical journals including the *Journal of the American Medical Association, Neurology, Lancet,* the *New England Journal of Medicine* and *Physician and Sports Medicine* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established:

    repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

    encephalopathy is caused in boxers, steeplechasers and football players by

8

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

repeated sub-concussive and concussive blows to the head;

acceleration and rapid decelerations of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

immediate retrograde amnesia occurs following concussions;

mild head injury requires recovery time without risk of subjection to further injury;

a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

34.     Although the condition now known as CTE has been discussed widely in the medical literature for more than eight decades, it was not until 2002 that CTE was officially diagnosed post-mortem in professional football players. Upon information and belief, this late finding was due to the Defendant's and its agents' concerted effort to conceal the link between repetitive head trauma in football and neurological diseases. Since 2002, more than 90% of all former players that have been examined post-mortem exhibited pathological symptoms consistent with CTE. The leading neuropathologist studying CTE, Dr. Ann McKee, believes that it is more likely than not that every single NFL player has some level of CTE.

35.     The first professional football player to be diagnosed with CTE was a former Kansas City Chiefs player, Mike Webster. Webster played 17 years – his final two (1989 and 1990) with the Chiefs – in the NFL and tragically died only 12 years after retirement at the age of 50. During the latter part of his life, and while serving on Defendant's coaching staff, Webster manifested progressive symptoms and signs of cognitive and neuropsychiatric impairment consistent with CTE.

9

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

36.     Research suggests that CTE may have been the true primary cause of death for a majority of professional football players that died as a result of neurodegenerative diseases. Accordingly, it is likely that the rate of CTE in professional football players is significantly higher than once believed.

37.     The clinical manifestations of CTE are quite variable but can include a number of stages. In the first stage, former players experience headaches, short-term memory difficulties, aggressive tendencies, depression and impulse control. In the second stage, as the disease progresses, the symptoms include depression, mode lability, explosivity, poor judgment, loss of attention and concentration, executive dysfunction, impulsivity, language difficulties and suicidal ideations. In the third stage, cognitive impairment becomes much more rampant, depression worsens and mood swings become more violent, severe memory loss occurs, and motor neuron disease may develop. Finally, in the fourth stage, full-blown encephalopathy sets in, causing severe memory loss with dementia, executive dysfunction, language difficulties, explosivity, paranoia, gait and increased suicidal ideations. In the latter stages of CTE, the symptoms are consistent with Parkinsonism and end-stage dementia.

38.     The National Institute for Occupational Safety and Health recently issued a warning letter – since the Defendant failed to do so – to all former NFL players that played at least five seasons during 1959 to 1988, stating: due to the exposure of repetitive mild traumatic brain injuries the "risk of dying with a brain or nervous system disorder was more than 3 times higher among players." The warning letter went on to conclude that this study confirms a similar study that was done **_years_**" ago. Further evidencing the campaign of deception and concealment, prior to the dissemination of this warning letter, a member of the NFL's Head, Neck and Spine Committee sought to remove any mention of CTE.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

39.     To date, more than fifty-two former NFL players have been diagnosed post-mortem with CTE. In addition, at least eight living players have been diagnosed with CTE based on clinical evaluations and radioactive markers.

40.     Despite the substantial body of independent scientific studies directly linking repetitive head trauma in football and neurological diseases, including CTE, Defendant never warned Plaintiffs and instead willfully misrepresented and/or concealed the risks.

41.     As the purveyor of football in America, and as the leading expert in the field, Defendant owed a continuous duty to keep abreast of the scientific developments relating to brain trauma which its employees were regularly exposed, and it was required to notify, inform and educate Plaintiffs and the public of any potential long-term risks of repetitive head trauma.

42.     The Defendant's duty to warn was commensurate not only with its actual knowledge gained from its "research" and published studies but also with its constructive knowledge as measured by scientific literature and other available means of communication.

43.     Upon information and belief, Defendant knew or should have known of the devastating nature and long-term effects of concussive and sub-concussive injuries long before Plaintiffs were exposed to repetitive brain trauma. Defendant had or should have had knowledge of studies that demonstrated a positive link between repetitive head trauma and neurological diseases in the 1920s, 1930s, 1940s, 1950s, 1960s, 1970s, 1980s, and 1990s. During those decades, Defendant's knowledge about the hazards of repetitive head trauma continued to accumulate, yet Defendant failed to warn Plaintiffs about those hazards.

**COUNT I NEGLIGENCE**
(for the period of September 1, 1987 through March 28, 1993)

44.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 43 as if fully set forth herein.

11

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

45.    Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

46.    Defendant owed a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurologic diseases, of which they could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose its employees, including Plaintiffs, to unreasonable risk of injury.

47.    Between September 1, 1987 and March 28, 1993, Defendant failed to use due care under the circumstances, and was thereby negligent in the performance of its non-delegable and non-negotiable duties.

48.    Between September 1, 1987 and March 28, 1993, Defendant by its respective active and passive negligence failed to exercise the standard of care and skill it was obligated to exercise by reason of its relationship with Plaintiffs, undertakings and assumption of a duty thereby causing, creating or permitting an increased risk of exposure to repetitive brain trauma, and thereby failing to properly safeguard and warn Plaintiffs.

49.    Such negligence directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

50.    The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs and punitive and exemplary damages should be assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action,

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

and for such relief as the Court deems fair and reasonable.

**COUNT II NEGLIGENT MISREPRESENTATION**
(for the period of September 1, 1987 through March 28, 1993)

51.     To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 50 as if fully set forth herein.

52.     Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

53.     Defendant owed a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurologic diseases, of which employees could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose Plaintiffs to unreasonable risk of injury.

54.     Between September 1, 1987 and March 28, 1993, Defendant and its agents represented to Plaintiffs that concussions are not a serious injury.

55.     Between September 1, 1987 and March 28, 1993, Defendant and its agents represented to Plaintiffs that there are no long-term effects of concussions in NFL athletes.

56.     When Defendant and its agents made these representations to Plaintiffs, the representations were driven by profit motives so that Plaintiffs would continue to play unimpeded by the risks of latent neurological diseases.

57.     Between September 1, 1987 and March 28, 1993, Defendant failed to exercise reasonable care and competence when communicating this information, and as a result, the information presented to Plaintiffs was false and misleading.

58.     Plaintiffs justifiably relied upon this information since Defendant was in a

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

superior position of knowledge and Defendant could foresee that Plaintiffs would rely and intended that they do so.

59.    Defendant's negligent misrepresentations directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

60.    The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed against the Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

### COUNT III FRAUDULENT CONCEALMENT
(for the period of September 1, 1987 through March 28, 1993)

61.    To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 60 as if fully set forth herein.

62.    At all relevant times hereto, Defendant was in a position of superior knowledge, which was not within the fair and reasonable reach of the Plaintiffs, nor would it have been discovered through the exercise of Plaintiffs' ordinary diligence.

63.    Between September 1, 1987 and March 28, 1993, Defendant knew that repetitive head trauma in football created a risk of neurological diseases.

64.    Between September 1, 1987 and March 28, 1993, Defendant was aware of, knew and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with

14

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

repetitive head trauma in football, to which Plaintiffs were exposed.

65.    Between September 1, 1987 and March 28, 1993, Defendant had a duty, separate and independent of any CBA, to disclose and/or inform Plaintiffs about these risks.

66.    Between September 1, 1987 and March 28, 1993, Defendant knew that such information was material to Plaintiffs, and knew that Plaintiffs would rely upon it for accurate information.

67.    Between September 1, 1987 and March 28, 1993, Defendant knowingly and fraudulently concealed from Plaintiffs the risks of repetitive head trauma, including the risk of latent brain disease, intending that Plaintiffs would rely upon such concealment.

68.    Between September 1, 1987 and March 28, 1993, Plaintiffs relied upon the Defendant's inaccurate and misleading information.

69.    Defendant's fraudulent concealment directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

70.    The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## COUNT IV LOSS OF CONSORTIUM

71.    To the extent they are not inconsistent with the allegations in this Count, Plaintiffs-Spouses incorporate by reference the allegations set forth in Paragraphs 1 through 70

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

as if fully set forth herein.

72.     As a result of Defendant's misconduct as alleged herein, Defendant is liable to the Plaintiffs-Spouses.

73.     As a direct and proximate result of the carelessness, negligence, and recklessness of Defendant and of the aforesaid injuries to their husbands, the Plaintiffs-Spouses have been damaged as follows:

> a.     They have been and will continue to be deprived of the services, support, maintenance, guidance, companionship and comfort of their husbands;
>
> b.     They have been and will continue to be required to spend money for medical care and household care for the treatment of their husbands; and
>
> c.     They have been and will continue to be deprived of the earnings of their husbands.

74.     The conduct of the Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs-Spouses and punitive and exemplary damages should be assessed against Defendant.

75.     WHEREFORE, Plaintiffs-Spouses pray for judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## GENERAL ALLEGATIONS APPLICABLE TO COUNT V

76.     The NFL is not, and has not been, the employer of Plaintiffs Bill Kenney and Tom Baugh, who were employed during their respective careers in professional football by independent clubs, namely the Chiefs, during the time periods in which they suffered their injuries as alleged herein.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

77.    "[A] member of a voluntary association may be personally liable if [it] has participated in, authorized, or ratified the conduct in issue." *Boes v. Deschu*, 768 S.w.2d 205 (Mo. App. E.D. 1989); *State ex rel. Ashcroft v. Kansas City Firefighters Local 42*, 672 S.W.2d 99, 124 (Mo. App. W.D. 1984) ("A voluntary association is governed by the principles of agency…members of a…voluntary association, are liable for the acts of its agents when done within the scope of authority…").

78.    At all times relevant to the following counts, Defendant was a member of the NFL, shared in the profits generated by the NFL and its subsidiaries, partners and affiliates, and participated in, authorized and ratified the conduct (as alleged herein) of the NFL and its subsidiaries, partners and affiliates.

79.    In part because of its financial power and high visibility, the Defendant has had enormous influence over the game of football at all levels of the game.

80.    For many decades, the Defendant has expanded its influence through media. The Defendant has promoted the sport of professional football via every mass communication medium available.

81.    Part of the Defendant's strategy to promote football is: (a) to mythologize players and teams; (b) to glorify the accomplishments of football players; and (c) to glorify the brutality and ferocity of football, by lauding and mythologizing the most brutal and ferocious players and collisions, and simultaneously propagating the fraudulent representation that "getting your bell rung," "being dinged," and putting big hits on others is a badge of courage and does not seriously threaten one's health.

82.    At all times relevant to the following counts, the Defendant was in a unique position at the vantage point at the apex of the sport of football. Paired with its unmatched resources, it has

17

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

been afforded unparalleled access to data relating the effect of head impacts on football players at all levels of the game and made it an institutional repository of accumulated knowledge about head injuries to players.

83. The accumulated knowledge of the Defendant about head injuries to football players at all levels of the game, and the associated health risks therefrom, was and is at all times vastly superior to that available to the Plaintiffs and the general public.

84. On October 28, 2009, in his testimony before the House Committee on the Judiciary, current NFL Commissioner Roger Goodell acknowledged that the NFL and its member teams owes a duty to the public at large to educate them as to the risks of concussion due to the unique position of influence of the NFL and its member teams:

> We are fortunate to be the most popular spectator sport in America. In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well. **We must act in their best interests** even if these young men never play professional football. We know that the playing rule changes the NFL makes in the interest of safety will be copied at the lower levels of play.
>
> …
>
> We educate youth coaches about concussions through our endowment of USA Football, the leading, non-profit youth football organization in the country.

85. On or about August 2012, the Defendant, through its agents and affiliates USA Football[3] and the national initiative termed "Heads Up Football", released an educational fact sheet to be distributed to youth throughout the country, which outlined the dangers of concussions.

---

[3] USA Football's "About" page states that it was "[e]ndowed by the NFL and NFLPA in 2002…is the official youth football development partner of the NFL, its 32 teams and the NFL Players Association…[and] leads the development of the game through educational programs and innovative resources…" http://www.usafootball.com/about?context=about.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

86.     The Defendant, through its agents and affiliates USA Football, the NFL, the National Football League Players' Association ("NFLPA") and the National Football League Physicians Society ("NFLPS"), in a joint undertaking with the Centers for Disease Control and Prevention ("CDC") and a number of other professional sports organizations, in the words of CDC's Dr. Julie Gilchrist, "worked together to get concussion educational materials into the hands of coaches, parents, kids and teens, and school and health care professionals nationwide."[4] One such example of this educational material is a fact sheet and poster titled "Concussion: A Must Read for Young Athletes | Let's Take Brain Injuries Out of Play"[5], of which over 1 million copies had reportedly been distributed as of October 3, 2013.

87.     During the period of 1994 to the current date, the Defendant has voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game. As a result, the Defendant affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome; the study of any kind of brain trauma relevant to the sport of football; the use of the information developed; and the publication of any data and/or pronouncements on the subject.

88.     In 2003, the Defendant and its agents began to publish purported scientific findings that contradicted years of independent scientific findings, which represented to the public at large that there were no long-term negative health consequences associated with concussions.

89.     The Defendant was responsible, at least in part, for numerous publications concerning concussions since 2003, all of which supported a conclusion that there were no long term negative health consequences associated with concussions or sub-concussive injuries.

---

[4] NFL Health Update: Q&A with CDC's Dr. Julie Gilchrist on injuries, October 3, 2013. http://www.nfl.com/news/story/0ap2000000254494/article/nfl-health-update-qa-with-cdcs-dr-julie-gilchrist-on-injuries.
[5] http://www.cdc.gov/concussion/pdf/concussion_a-must_read_for_young_athletes-a.pdf.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

90.     Rather than exercising reasonable care in these duties, the Defendant engaged in a long-running course of fraudulent concealment regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE.

91.     Throughout the years, the Defendant and its agents regularly attacked and sought to undermine studies and scientific data that reported the effects of concussions, voluntarily inserting its opinions into public discussion.

92.     The Defendant has known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms. Instead, the Defendant misled the public at large, and actively spread disinformation.

93.     Players with the Chiefs relied on the fraudulent concealment of the Defendant, as well as members of the general public and players at every level of the game.

94.     As evidence of the influence of the Defendant and its impact on every level of the sport, the nation's largest youth football program, Pop Warner, reported a decline in participation of 9.5 percent between 2010-2012, from 248,899 players in 2010 to 225,287 players by the 2012 season.

95.     The Defendant owed a duty to football players at the professional level, youngsters ages 6-14, as well as those at the high school and collegiate level, and purport to "act in their best interests even if these young men never play professional football."

96.     For decades the Defendant has breached its duty to the general public, including the duty owed to the Plaintiffs.

97.     As a direct and proximate result of the fraudulent concealment and misrepresentations by the Defendant, former professional football players of the Chiefs, such as Plaintiffs, and members of the general public and football players and their family members at all

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

levels of the sport of football, have for many decades been led to believe that the symptoms of early-onset dementia, ALS, CTE, loss of memory, headaches, confusion, and the inability to function were not caused by events that had occurred in activities while engaged in the sport of football. As a direct and proximate result of this willful and malicious conduct, former players, including Plaintiffs, and upon information and belief, members of the general public and football players and their family members at all levels of the sport of football, in reliance on the false statements and omissions of the Defendant and its agents, have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation, and sustained other damages to be specified.

### COUNT V FRAUDULENT CONCEALMENT
(for the period of 1994 through current)

98.     To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 97 as if fully set forth herein.

99.     At all relevant times hereto, Defendant was in a position of superior knowledge and had an admitted duty to the general public to disclose, and players at every level of the sport, and specifically the Plaintiffs, reasonably looked to the Defendant for guidance on head injuries and concussions. This demonstrably superior knowledge was not within the fair and reasonable reach of the Plaintiffs, nor would it have been discovered through the exercise of Plaintiffs' ordinary diligence.

100.     The Defendant was responsible, at least in part, for the publication of various articles and purported scientific data and/or pronouncements, all of which concealed and minimized the risks of repetitive brain impacts the Defendant knew existed for its then-current players, its former players and players at every level of the sport, who reasonably relied on the pronouncements and/or silence of the Defendant and its agents on this vital health issue.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

ATTACHMENT A

101.    The published articles, purported scientific studies and/or pronouncements created an atmosphere of trust that the Defendant had carefully undertaken its voluntary responsibility to research, test, study, and report accurate findings to the general public and players at every level of the sport.

102.    The Defendant, therefore, concealed material facts and information with the intent to deceive and defraud the general public and players at all levels of the sport, which caused Plaintiffs Bill Kenney and Tom Baugh to become further exposed to the harm referenced above.

103.    The Defendant's concealment of the of the risks to which players at all levels of the sport, and specifically the Plaintiffs, had been exposed on the playing field delayed the Plaintiffs' ability to plan for their respective futures and to seek appropriate treatment for their latent neurodegenerative conditions.

104.    The Defendant knew and expected that the general public and players at all levels of the sport, and specifically Plaintiffs Bill Kenney and Tom Baugh, would rely on the inaccurate information it provided, and Plaintiffs Bill Kenney and Tom Baugh in fact did reasonably rely on the inaccurate information provided by the Defendant and its agents during and after their respective professional football careers.

105.    The fraudulent concealment of the Defendant directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

106.    The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed against Defendant.

Electronically Filed - Jackson - Independence - December 31, 2013 - 11:54 PM

# ATTACHMENT A

107.    WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ William C. Kenney
WILLIAM C. KENNEY, MO # 63001
**BILL KENNEY LAW FIRM, LLC**
1101 Walnut Street, Suite 102
Kansas City, Missouri 64108
Telephone: (816) 842-2455
Facsimile: (816) 474-8899
Email: *bkenney@billkenneylaw.com*
*Attorney for Plaintiffs*