## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF
## PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323(AB)<br><br>MDL No. 2323 |
| **Second Amended Master Administrative Long-Form Complaint against** ~~NFL Defendants~~ **Kansas City Chiefs Football Club, Inc.**<br><br>THIS DOCUMENT RELATES TO:<br>*Martin* v. *Kansas City Chiefs Football Club, Inc.*<br>No. 14-cv-03381 | **SHORT FORM COMPLAINT**<br><br>**IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION**<br><br>**JURY TRIAL DEMANDED** |

## OPT OUT PLAINTIFF SHORT FORM COMPLAINT AGAINST ~~NFL DEFENDANTS~~ KANSAS CITY CHIEFS FOOTBALL CLUB, INC.

1.      Plaintiff Anita Martin is the former spouse of Christopher Martin and bring this civil action as a related action in the matter entitled IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, MDL No. 2323.

2.      Plaintiffs are filing this Short Form Complaint against ~~NFL Defendants~~ Kansas City Chiefs Football Club, Inc. as required by this Court's Case Management Order, filed July 18, 2017 (Doc. 8030).

3.      Plaintiff's Former Spouse opted-out of the Class Action Settlement approved by the Court on May 8, 2015.

4.      Plaintiff and Plaintiff's Former Spouse incorporate by reference the allegations (as designated below) of the ~~Second Amended Master Administrative Long-Form Complaint~~ state Court Petition filed in the Circuit Court of Jackson County, Missouri, Case No. 1316-CV31813, and attached hereto as Attachment A, as is fully set forth at length in this Short Form Complaint.

5.      [Fill in if applicable] Plaintiff is filing this case in a representative capacity as the _____ of ___, having been duly appointed as the __ by the Court of

_____. (Cross out sentence below if not applicable.) ~~Copies of the Letters of Administration/Letters Testamentary for a wrongful death claim are annexed hereto if such letters are required for the commencement of such a claim by the Probate, Surrogate or other appropriate court of the jurisdiction of the decedent.~~

6.      Plaintiff Anita Martin is a resident and citizen of Missouri, and claims damages as set forth below.

7.      Plaintiff Anita Martin's former spouse, Christopher Martin, has different counsel and has filed separate claims.

8.      Upon information and belief, the Plaintiff sustained repetitive, traumatic sub-concussive and/or concussive head impacts during NFL games and/or practices. Upon information and belief, Plaintiff suffers from symptoms of brain injury caused by the repetitive, traumatic sub-concussive and/or concussive head impacts the Plaintiff sustained during NFL games and/or practices. Upon information and belief, the Plaintiff's symptoms arise from injuries that are latent and have developed and continue to develop over time.

9.      The original complaint by Plaintiffs in this matter was filed in the 16th Circuit Court of Jackson County, Missouri. If the case is remanded, it should be remanded to the 16th Circuit Court of Jackson County, Missouri.

10.     Plaintiffs claim damages as a result of [check all that apply]:

    ☐    Injury to Herself/Himself

    ☐    Injury to the Person Represented

    ☐    Wrongful Death

    ☐    Survivorship Action

    ☐    Economic Loss

    ☐    Loss of Services

    ☒    Loss of Consortium

11.     [Fill in if applicable] As a result of the injuries to her former husband Plaintiff suffers from a loss of consortium, including the following injuries:

    ☒    Loss of marital services

    ☒    Loss of companionship, affection or society

    ☒    Loss of support

☒ Monetary losses in the form of unreimbursed costs she has had to expend for the health care and personal care of her former husband.

12. [Check if applicable] ☒ Plaintiff and Plaintiff's Spouse reserve the right to object to federal jurisdiction.

13. Plaintiff and Plaintiff's Spouse bring this case against the following Defendants in this action [check all that apply]:

☐ National Football League

☐ NFL Properties, LLC

☒ Kansas City Chiefs Football Club, Inc.

14. Plaintiff's former spouse played in [check if applicable] ☒ the National Football League ("NFL") and/or in [check if applicable] ☐ the American Football League ("AFL") during 1983 through 1994 for the following teams: Kansas City Chiefs, New Orleans Saints, Minnesota Vikings and Los Angeles Rams

15. Plaintiff's former spouse retired from playing professional football after the 1994 season.


## CAUSES OF ACTION

16. Plaintiffs herein adopt by reference the following Counts of the Master Administrative Long-Form Complaint, along with the factual allegations incorporated by reference in those Counts [check all that apply]:

☐ Count I (Action for Declaratory Relief- Liability (Against Defendant NFL))

☐ Count II (Negligence (Against Defendant NFL and Riddell Defendants))

☐ Count III (Negligent Marketing (Against all Defendants))

☐ Count IV (Negligence (Against Defendant NFL P and Riddell Defendants))

☐ Count V (Negligent Misrepresentation (Against Defendant NFL and Riddell Defendants))

☐ Count VI (Negligent Hiring (Against Defendant NFL))

☐ Count VII (Negligent Retention/Supervision (Against Defendant NFL))

☐ Count VIII (Fraud (Against all Defendants))

☐ Count IX (Strict Liability/Design Defect (Against the Riddell Defendants))

☐    Count X (Failure to Warn (Against the Riddell Defendants))

☐    Count XI (Negligence (Against the Riddell Defendants))

☐    Count XII (Breach of Implied Warranty (Against the Riddell Defendants))

☐    Count XIII (Negligent Misrepresentation (Against the Riddell Defendants))

☐    Count XIV (Fraud (Against the Riddell Defendants))

☐    Count XV (Violation of Consumer Protection Laws (Against the Riddell Defendants))

☐    Count XVI (Civil Conspiracy (Against all Defendants))

☐    Count XVII (Fraudulent Concealment (Against all Defendants))

☐    Count XVIII (Wrongful Death (Against all Defendants))

☐    Count XIX (Survival Action (Against all Defendants))

☐    Count XX (Loss of Consortium (Against all Defendants))

☐    Count XXI (Punitive Damages under All Claims (Against all Defendants))

☐    Count XXII (Declaratory Relief: Punitive Damages (Against all Defendants))

17.    Plaintiffs assert the following additional causes of action [write in or attach]:

<u>Plaintiff herein adopts by reference the factual allegations and Counts set forth in the Plaintiffs petition, filed in the Circuit Court of Jackson County, Missouri, Case No. 1316-cv31813, and attached hereto as Attachment A.</u>

## **<u>PRAYER FOR RELIEF</u>**

Plaintiff Anita Martin, as former spouse of Christopher Martin, prays for judgment as follows:

A.  An award of compensatory damages, the amount of which will be determined at trial;

B.  An award of economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

C.  For loss of consortium as applicable;

D.  For punitive and exemplary damages as applicable;

E.  For all applicable statutory damages of the state whose laws will govern this action;

F.  For an award of attorneys' fees and costs;

G.  An award of prejudgment interest and costs of suit; and

H.  An award of such other and further relief as the Court deems just and proper.


## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

on all issues so triable.

Dated: July 27, 2017

Respectfully submitted,

**LANGDON & EMISON**

/s/ J. Kent Emison
J. Kent Emison          Mo Bar #29721
Mark A. Emison          Mo Bar #63479
LANGDON & EMISON
911 Main Street, P.O. Box 220
Lexington, Missouri   64067
Telephone: (660) 259-6175
Facsimile:  (660) 259-4571
Email: kent@lelaw.com
          mark@lelaw.com
COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 27, 2017, a copy of the foregoing was

served on all Counsel of record via the Court's electronic filing system.

**LANGDON & EMISON**
<u>/s/ J. Kent Emison</u>
J. Kent Emison          Mo Bar #29721
Mark A. Emison          Mo Bar #63479
LANGDON & EMISON
911 Main Street, P.O. Box 220
Lexington, Missouri   64067
Telephone: (660) 259-6175
Facsimile:  (660) 259-4571
Email: kent@lelaw.com
          mark@lelaw.com
COUNSEL FOR PLAINTIFF

1316-CV31813

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT INDEPENDENCE**

| | | |
|---|---|---|
| **ANITA MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.:** |
| | ) | |
| **vs.** | ) | **Division:** |
| | ) | |
| **KANSAS CITY CHIEFS** | ) | |
| **FOOTBALL CLUB, INC.** | ) | **JURY TRIAL DEMANDED** |
| **Serve Registered Agent:** | ) | |
| **SIEGFRIED BINGHAM LEVY** | ) | |
| **SELZER & GEE, PC** | ) | |
| **911 Main Street, Suite 2800** | ) | |
| **Kansas City, Missouri 64105** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PETITION FOR DAMAGES

COMES NOW Plaintiff, Anita Martin, by and through her attorneys of record and for her claims and causes of action against Defendant, upon information and belief, state:

1.      Plaintiff Anita Martin is a resident of Missouri.   Ms. Martin's ex-husband, Christopher Martin, was employed as a professional football player with the Kansas City Chiefs between 1988 and 1993 while married to Anita Martin.

2.      Between 1988 and January 1993, Mr. Martin suffered multiple concussive and subconcussive injuries.

3.      Defendant's wrongful conduct, as alleged herein, directly cased or directly contributed to cause Mr. Martin to develop post-concussion syndrome and latent brain disease, including, upon information and belief, Chronic Traumatic Encephalopathy.

4.      As a result of Defendant's wrongful conduct and resulting injuries to Mr. Martin, Plaintiff suffered a loss of consortium.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

5.      Plaintiff's ex-husband, Mr. Martin has filed a separate lawsuit against Defendant, which is attached as Exhibit A.  As support of Plaintiff's ex-husband's underlying claim against Defendant as well as Defendant's fraudulent concealment, Plaintiff incorporates by reference Mr. Martin's allegations contained in the attached Exhibit A against Defendant.  In addition, see the additional factual allegation below.

## DEFENDANT

6.      Defendant Kansas City Chiefs Football Club, Inc. is a Texas corporation with its principal place of business at One Arrowhead Drive, Kansas City, 64129, Jackson County, Missouri.  At all times relevant herein, Defendant Kansas City Chiefs was Plaintiff's ex-husband's employer.  Defendant is a member of the National Football League ("NFL"), which is an unincorporated association consisting of 32 separately owned and independently operated professional football teams.

## JURISDICTION

7.      Jurisdiction is proper in this Court pursuant to R.S.Mo. 506.500 in that the tortious acts alleged herein took place in Missouri.

8.      Plaintiff's claims, and her ex-husband's underlying claim attached as Exhibit A, are actions requesting relief under the common and statutory laws of the State of Missouri.  Between 1988 and January 1993, the relevant time period of Mr. Martin's underlying injuries and claims, there was no collective bargaining agreement (CBA) in effect.  Because federal labor law is not applicable to Mr. Martin's claims, and no interpretation of a CBA is required, section 301 of the Labor Management Relations Act cannot provide a basis for federal jurisdiction for Mr. Martin's underlying claims.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

9.      Mr. Martin's claims do not arise out of an "accident", as that term is defined under Missouri's Workers' Compensation Law.  Mr. Martin's occupational disease-related claims were not caused by a specific event during a single work shift injury.

10.     Mr. Martin's claims are not within the scope of workers' compensation and they are not subject to the exclusivity provisions of workers' compensation.

## VENUE

11.     Venue is proper with this Court pursuant to § 508.010. Upon information and belief, Plaintiff and Mr. Martin were first injured by the wrongful acts and negligent conduct alleged herein in Jackson County, Missouri.

## TOLLING

12.     Mr. Martin's underlying claim against Defendant membership in the putative class action currently pending in the Eastern District of Pennsylvania [1] tolled the running of the applicable statute of limitations of the underlying claim.  This, in turn, tolled the running of the applicable statute of limitations of Plaintiff's claim of loss of consortium included in this Petition.

13.     With reasonable diligence, Plaintiff could not have discovered Defendant's negligence and bad acts as the cause of Mr. Martin and her injuries.

14.     At all relevant times, Defendant was in a position of superior knowledge, which was not within the fair and reasonable reach of Plaintiff, nor would it have been discovered through the exercise of Plaintiff's ordinary diligence.

15.     In addition, Defendant's improper acts as alleged herein prevented Plaintiff and Mr. Martin from ascertaining Mr. Martin's latent injuries, including a diagnosis of CTE.

---

[1] *In re NFL Players' Concussion Injury Litigation,* No. 2:12-md-02323-AB; *See also, Charles Ray Easterling, et al. v. NFL,* No. 11-cv-0509 (filed August 17, 2011).

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

16.     Between 1988 and 1993 when Mr. Martin suffered concussions and head injuries as an NFL player, Defendant was aware of, knew and understood, as discussed below, the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive head trauma in football, to with Mr. Martin was exposed.

17.     Between 1988 and 1993, Defendant had the duty to disclose and inform Mr. Martin and Plaintiff about these risks.

18.     Defendant knew such information was material to Plaintiff, and knew that Plaintiff would rely upon it for accurate information.

19.     Defendant knowingly and fraudulently concealed the risks of repetitive head trauma from Mr. Martin and Plaintiff, including the risk of latent brain disease, intending that Plaintiff and Mr. Martin would rely upon such concealment.

20.     At all relevant times, Plaintiff and Mr. Martin did rely on Defendants inaccurate and misleading information.

21.     Defendant's fraudulent concealment, and negligent bad acts, directly caused Mr. Martin to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.  In addition, as a direct and proximate result of Defendant's bad conduct and negligence, Plaintiff suffered a loss of consortium.

## GENERAL ALLEGATIONS

22.     Defendant has known or should have known since 1966 the Congress of Neurological Surgeons defined a concussion as a "clinical syndrome characterized by immediate and transient impairment of neural functions, such as alteration of consciousness, disturbance of

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

vision, equilibrium, etc. due to mechanical forces." Defendant marginalized the risks of brain injuries and regularly referred to concussions as "getting your bell rung" or a "ding."

23.    Defendant has known or should have known for many years that post-concussion syndrome (PCS) and cognitive impairment occurs in football players. PCS is defined by the fourth edition of the *Diagnostic and Statistics Manual* as (1) cognitive deficits in attention or memory and (2) at least 3 or more of the following symptoms: fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, apathy, or personality change. Similarly, the World Health Organization's International Classification of Diseases (ICD-10) defines PCS as involving 3 or more of the following symptoms: headaches, dizziness, fatigue, irritability, insomnia, concentration difficulty, or memory difficulty.

24.    For decades, the scientific community has known that repetitive head trauma can lead to permanent and debilitating neurological impairments, including Chronic Traumatic Encephalopathy ("CTE").

25.    Defendant has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers, easily accessible to Defendant, have shown that this condition is prevalent in boxers and retired professional football players who have a history of head injuries. The changes in the brain begin when the brain is subjected to repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of athletic involvement.

26.    In 1928, pathologist Harrison Martland first described the link between repetitive head trauma and degenerative brain disease as the "punch drunk syndrome" in the *Journal of the American Medical Association.*

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

27.     In 1934, Dr. Harry Parker published a study confirming Martland's findings and argued that neurological degeneration in boxers was based on the volume of brain trauma sustained. He further opined, "the frequency of occurrence of conditions of this kind as reported by...people who followed the profession of pugilism makes it seem very likely that [the patients'] profession led to their ultimate disablement...."

28.     On December 29, 1937, at the Seventeenth Annual Meeting of the American Football Coaches Association, the football community acknowledged its keen awareness of the serious risks of concussions, and the necessity of removing an individual from play if they have suffered a concussion:

> During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion.  Again this year this is true....Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

29.     In 1937, J.A. Millspaugh introduced the term dementia pugilistica to describe the syndrome characterized by motor deficits and mental confusion in boxers.  Millspaugh also noted that the disease is likely not limited to boxers but could extend to other sports where repetitive brain trauma is present: "The mental unbalance more commonly encountered among pugilists is also observed among other sports representatives who sustain considerable head trauma."  He further opined, "[r]epeat and frequent concussions...are, to say the least, not conducive to stabilized mental equilibrium."

30.     In 1949, British neurologist Macdonald Critchley published the first of two important studies on head trauma in boxers. In *Punch Drunk Syndrome: The Chronic Traumatic Encephalophathy of Boxers*, Critchley described the latent effects of repetitive brain trauma, explaining that the condition was generally not observable until a number of years had passed since the onset of boxing. In 1957, Critchley published an article in the *British Medical Journal* and

6

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

described the symptoms of "chronic progressive traumatic encephalopathy" to include "progressive slowing of speech and thoughts...slowness of movement, and tremors." Critchley further noted that brain damage produced by repetitive trauma could lead to personality changes, and that the effects of chronic head trauma are dependent on the volume of impacts as well as the magnitude of those events.

31.    Over the next several decades, the evidence of the link between repetitive head trauma and neurological diseases was overwhelmingly clear. Numerous studies were published in medical journals including the *Journal of the American Medical Association, Neurology, Lancet, the New England Journal of Medicine* and *Physician and Sports Medicine* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collective established:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;
>
> encephalopathy is caused in boxers, steeplechasers and football players by repeated sub-concussive and concussive blows to the head;
>
> acceleration and rapid decelerations of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;
>
> immediate retrograde amnesia occurs following concussions;
>
> mild head injury requires recovery time without risk of subjection to further injury;
>
> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,
>
> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

32.    Although CTE has been discussed widely in the medical literature for more than eight decades, it was not until 2002 that CTE was officially diagnosed post-mortem in professional football players. Upon information and belief, this late finding was due to the Defendant's and its agents' concerted effort to conceal the link between repetitive head trauma in football and neurological diseases. Since 2002, more than 90% of all former players that have been examined post-mortem exhibited pathological symptoms consistent with CTE. The leading neuropathologist studying CTE, Dr. Ann McKee, believes that it is more likely than not that every single NFL player has some level of CTE.

33.    The first professional football player to be diagnosed with CTE was a former Kansas City Chiefs player, Mike Webster.  Webster played 17 years-his final two (1989 and 1990) with the Chiefs-in the NFL and tragically died only 12 years after retirement at the age of 50. During the latter part of his life, and while serving on Defendant's coaching staff, Webster manifested progressive symptoms and signs of cognitive and neuropsychiatric impairment consistent with CTE.

34.     Research suggests that CTE may have been the true primary cause of death for a majority of professional football players that died as a result of neurodegenerative diseases. Accordingly, it is likely that the rate of CTE in professional football players is significantly higher than once believed.

35.    The clinical manifestations of CTE are quite variable but can include a number of stages. In the first stage, former players experience headaches, short-term memory difficulties, aggressive tendencies, depression and impulse control. In the second stage, as the disease progresses, the symptoms include depression, mode lability, explosivity, poor judgment, loss of attention and concentration, executive dysfunction, impulsivity, language difficulties and suicidal ideations. In the

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

third stage, cognitive impairment becomes much more rampant, depression worsens and mood swings become more violent, severe memory loss occurs, and motor neuron disease may develop. Finally, in the fourth stage, full-blown encephalopathy sets in, causing severe memory loss with dementia, executive dysfunction, language difficulties, explosivity, paranoia, gait and increased suicidal ideations. In the latter stages of CTE, the symptoms are consistent with Parkinsonism and end-stage dementia.

36.     The National Institute for Occupational Safety and Health recently issued a warning letter-since the Defendant failed to do so-to all former NFL players that played at least five seasons during 1959 to 1988, stating due to the exposure of repetitive mild traumatic brain injuries the "risk of dying with a brain or nervous system disorder was more than 3 times higher among players." The warning letter went on to conclude that this study confirms a similar study that was done **"years"** ago. Further evidencing the campaign of deception and concealment, prior to the dissemination of this warning letter, a member of the NFL's Head, Neck and Spine Committee sought to remove any mention of CTE.

37.     To date, more than fifty-two former NFL players have been diagnosed post-mortem with CTE. In addition, at least eight living players have been diagnosed with CTE based on clinical evaluations and radioactive markers.'

38.     Despite the substantial body of independent scientific studies directly linking repetitive head trauma in football and neurological diseases, including CTE, Defendant never warned Mr. Martin and instead willfully misrepresented and/or concealed the risks.

39.     As the purveyor of football in America, and as the leading expert in the field, Defendant owed a continuous duty to keep abreast of the scientific developments relating to brain

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

trauma which its employees were regularly exposed, and it was required to notify, inform and educate Mr. Martin and the public of any potential long-term risks of repetitive head trauma.

40.     The Defendant's duty to warn was commensurate not only with its actual knowledge gained from its "research" and published studies but also with its constructive knowledge as measured by scientific literature and other available means of communication.

41.     Upon information and belief, Defendant knew or should have known of the devastating nature and long-term effects of concussive and sub-concussive injuries long before Mr. Martin was exposed to repetitive brain trauma. Defendant had or should have had knowledge of studies that demonstrated a positive link between repetitive head trauma and neurological diseases in the 1920s, 1930s, 1940s, 1950s, 1960s, 1970s, 1980s, and 1990s. During those decades, Defendant's knowledge about the hazards of repetitive head trauma continued to accumulate, yet Defendant failed to warn Mr. Martin about those hazards.

**COUNT I**
**LOSS OF CONSORTIUM**

42.     Plaintiff incorporates by reference the allegations set forth in all other paragraphs of her Petition as if fully set forth herein.

43.     Plaintiff and Mr. Christopher Martin were lawfully married from 1986 to 2006.

44.     During Plaintiff and Mr. Martin's marriage, Defendant's negligence and wrongful acts led Mr. Martin to suffer multiple concussive and subconcussive head injuries.

45.     As a result of Defendant's negligence and misconduct as alleged herein, Defendant is liable to Mr. Martin and Plaintiff.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

46.     As a direct and proximate result of the carelessness, negligence, and recklessness of Defendant and of the aforesaid injuries to her ex-husband, the Plaintiff has been damaged as follows:

    a.  She was deprived of the services, support, maintenance, guidance, companionship and comfort of her ex-husband during the marriage;

    b.  She was required to spend money for medical care and household care for the treatment of her ex-husband;

    c.  She was deprived of the earnings of her ex-husband.

47.     The conduct of the Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed against Defendant.  As alleged above, Defendant showed a conscious disregard for Mr. Martin's health and well-being, and for Plaintiff.  Defendant knew or should have known the devastating long-term effects of concussive and subconcussive injuries long before Mr. Martin and Plaintiff were injured.  In addition, upon information and belief, Defendant concealed the link between repetitive head trauma in football and neurological diseases.

WHEREFORE, Plaintiff prays for judgment against Defendant in excess of Twenty-Five Thousand Dollars ($25,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues in this matter.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

Respectfully Submitted,

/s/ J. Kent Emison

J. Kent Emison          Mo Bar #29721
Mark A. Emison          Mo Bar #63479
LANGDON & EMISON
911 Main Street, P.O. Box 220
Lexington, Missouri   64067
Telephone: (660) 259-6175
Facsimile:  (660) 259-4571
Email: kent@lelaw.com
            mark@lelaw.com

ATTACHMENT A

**1316-CV31813**

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT INDEPENDENCE**

| | |
|---|---|
| ALEXANDER LOUIS COOPER,<br>705 Powers Ferry Road #111<br>Marietta, Georgia 30067 | )<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| LEONARD GRIFFIN and his wife<br>DAWN SAVITRA GRIFFIN,<br>799 Highway 144<br>Calhoun, Louisiana 71225 | )<br>)<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| CHRISTOPHER MARTIN and his wife<br>YOLANDA THOMPSON-MARTIN,<br>1711 East 60th Street<br>Kansas City, Missouri 64110 | )<br>)<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| JOSEPH PHILLIPS,<br>425 Barker Avenue<br>Oregon City, Oregon 97045 | )<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| KEVIN PORTER and his wife<br>ANNJELA HYNES-PORTER,<br>20 Savannah Drive<br>Senoia, Georgia 30276 | )<br>)<br>)<br>) |
| | ) |
| Plaintiffs. | ) |
| | ) |
| v. | ) |
| | ) |
| KANSAS CITY CHIEFS<br>FOOTBALL CLUB, INC.,<br>Serve Registered Agent:<br>    SEIGFRIED BINGHAM LEVY<br>    SELZER & GEE, PC<br>    911 Main Street, Suite 2800<br>    Kansas City, Missouri 64105 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendant. | ) |

Case No. _____

Division _____

**JURY TRIAL DEMANDED**



ATT

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

## PETITION FOR DAMAGES

COMES NOW Plaintiffs, and for their claims and causes of action against Defendant, upon information and belief, state:

## PLAINTIFFS

1.      Plaintiff Alexander Louis Cooper is a resident of Georgia. Mr. Cooper was employed as a professional football player with the Kansas City Chiefs between 1985 and 1991.

2.      Between August 31, 1987 and January 1991, Mr. Cooper suffered multiple concussive and subconcussive injuries.

3.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Cooper to develop post-concussion syndrome and latent brain disease, including, upon information and belief, Chronic Traumatic Encephalopathy.

4.      Plaintiff Leonard Griffin and his wife Dawn Savitra Griffin are residents of Louisiana. Mr. Griffin was employed as a professional football player with the Kansas City Chiefs between 1986 and 1993.

5.      Between August 31, 1987 and January 1993, Mr. Griffin suffered multiple concussive and subconcussive injuries.

6.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Griffin to develop post-concussion syndrome and latent brain disease, including, upon information and belief, Chronic Traumatic Encephalopathy.

7.      Plaintiffs Christopher Martin and his wife Yolanda Thompson-Martin are residents of Missouri. Mr. Martin was employed as a professional football player with the Kansas City Chiefs between 1988 and 1993.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

8.      Between 1988 and January 1993, Mr. Martin suffered multiple concussive and subconcussive injuries.

9.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Martin to develop post-concussion syndrome and latent brain disease, including, upon information and belief, Chronic Traumatic Encephalopathy.

10.     Plaintiff Joseph Phillips is a resident of Oregon. Mr. Phillips was employed as a professional football player with the Kansas City Chiefs between 1992 and 1998.

11.     Between October 1992 and January 1993, Mr. Phillips suffered multiple concussive and subconcussive injuries.

12.     Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Phillips to develop post-concussion syndrome and latent brain disease, including, upon information and belief, Chronic Traumatic Encephalopathy.

13.     Plaintiff Kevin Porter and his wife Annjela Hynes-Porter are residents of Georgia. Mr. Porter was employed as a professional football player with the Kansas City Chiefs between 1988 and 1993.

14.     Between July 1988 and January 1993, Mr. Porter suffered multiple concussive and subconcussive injuries.

15.     Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Porter to develop post-concussion syndrome and latent brain disease, including, upon information and belief, Chronic Traumatic Encephalopathy.

## **DEFENDANT**

16.     Defendant Kansas City Chiefs Football Club, Inc. is a Texas corporation with its principal place of business at One Arrowhead Drive, Kansas City, 64129, Jackson County, Missouri.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

At all times relevant herein, Defendant Kansas City Chiefs was Plaintiffs' employer. Defendant is a member of the National Football League ("NFL"), which is an unincorporated association consisting of 32 separately owned and independently operated professional football teams.

## JURISDICTION

17.     Jurisdiction is proper in this Court pursuant to R.S. Mo. 506.500 in that the tortious acts alleged herein took place in Missouri.

18.     This is an action requesting relief under the common and statutory laws of the State of Missouri. Between August 31, 1987 and March 29, 1993, the relevant time period of Plaintiffs' injuries and claims, there was no collective bargaining agreement (CBA) in effect. Because federal labor law is not applicable to Plaintiffs' claims, and no interpretation of a CBA is required, section 301 of the Labor Management Relations Act cannot provide a basis for federal jurisdiction.

19.     Plaintiffs' claims do not arise out of an "accident," as that term is defined under Missouri's Workers' Compensation Law. Plaintiffs' occupational disease-related claims were not caused by a specific event during a single work shift injury.

20.     Plaintiffs' claims are not within the scope of workers' compensation and they are not subject to the exclusivity provisions of workers' compensation.

## VENUE

21.     Venue is proper with this Court pursuant to § 508.010. Upon information and belief, Plaintiffs were first injured by the wrongful acts and negligent conduct alleged herein in Jackson County, Missouri.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

## JOINDER OF CLAIMS

22.     Joinder of Plaintiffs' claims are permissible pursuant to Rule 52.05(a) in that the claims alleged herein arise out of the same series of occurrences and involve common questions of law and fact.

## TOLLING

23.     Plaintiffs' membership in the putative class action currently pending in the Eastern District of Pennsylvania[1] tolled the running of the applicable statute of limitations. In addition, Defendant's improper acts as alleged herein prevented Plaintiffs from ascertaining their latent injuries, including a diagnosis of CTE.

## GENERAL ALLEGATIONS

24.     Defendant has known or should have known that since 1966 the Congress of Neurological Surgeons defined a concussion as a "clinical syndrome characterized by immediate and transient impairment of neural functions, such as alteration of consciousness, disturbance of vision, equilibrium, etc. due to mechanical forces." Defendant marginalized the risks of brain injuries and regularly referred to concussions as "getting your bell rung" or a "ding."

25.     Defendant has known or should have known for many years that post-concussion syndrome (PCS) and cognitive impairment occurs in football players. PCS is defined by the fourth edition of the *Diagnostic and Statistics Manual* as (1) cognitive deficits in attention or memory and (2) at least 3 or more of the following symptoms: fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, apathy, or personality change. Similarly, the World Health Organization's International Classification of Diseases (ICD-10) defines PCS as involving 3 or more

---

[1] *In re NFL Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB; *See also, Charles Ray Easterling, et al. v. NFL*, No. 11-cv-0509 (filed August 17, 2011).

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

of the following symptoms: headaches, dizziness, fatigue, irritability, insomnia, concentration difficulty, or memory difficulty.

26.    For decades, the scientific community has known that repetitive head trauma can lead to permanent and debilitating neurological impairments, including Chronic Traumatic Encephalopathy ("CTE").

27.    Defendant has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers, easily accessible to Defendant, have shown that this condition is prevalent in boxers and retired professional football players who have a history of head injuries. The changes in the brain begin when the brain is subjected to repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of athletic involvement.

28.    In 1928, pathologist Harrison Martland first described the link between repetitive head trauma and degenerative brain disease as the "punch drunk syndrome" in the *Journal of the American Medical Association.*

29.    In 1934, Dr. Harry Parker published a study confirming Martland's findings and argued that neurological degeneration in boxers was based on the volume of brain trauma sustained. He further opined, "the frequency of occurrence of conditions of this kind as reported by…people who followed the profession of pugilism makes it seem very likely that [the patients'] profession led to their ultimate disablement…."

30.    On December 29, 1937, at the Seventeenth Annual Meeting of the American Football Coaches Association, the football community acknowledged its keen awareness of the serious risks of concussions, and the necessity of removing an individual from play if they have suffered a concussion:

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true….Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

31.     In 1937, J.A. Millspaugh introduced the term dementia pugilistica to describe the syndrome characterized by motor deficits and mental confusion in boxers. Millspaugh also noted that the disease is likely not limited to boxers but could extend to other sports where repetitive brain trauma is present: "The mental unbalance more commonly encountered among pugilists is also observed among other sports representatives who sustain considerable head trauma." He further opined, "[r]epeat and frequent concussions…are, to say the least, not conducive to stabilized mental equilibrium."

32.     In 1949, British neurologist Macdonald Critchley published the first of two important studies on head trauma in boxers. In *Punch Drunk Syndrome: The Chronic Traumatic Encephalophathy of Boxers*, Critchley described the latent effects of repetitive brain trauma, explaining that the condition was generally not observable until a number of years had passed since the onset of boxing. In 1957, Critchley published an article in the *British Medical Journal* and described the symptoms of "chronic progressive traumatic encephalopathy" to include "progressive slowing of speech and thoughts…slowness of movement, and tremors." Critchley further noted that brain damage produced by repetitive trauma could lead to personality changes, and that the effects of chronic head trauma are dependent on the volume of impacts as well as the magnitude of those events.

33.     Over the next several decades, the evidence of the link between repetitive head trauma and neurological diseases was overwhelmingly clear. Numerous studies were published in medical journals including the *Journal of the American Medical Association, Neurology, Lancet, the New*

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

*England Journal of Medicine* and *Physician and Sports Medicine* warning of the dangers of single

concussions, multiple concussions, and/or football-related head trauma from multiple concussions.

These studies collectively established:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

> encephalopathy is caused in boxers, steeplechasers and football players by repeated sub-concussive and concussive blows to the head;

> acceleration and rapid decelerations of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

> immediate retrograde amnesia occurs following concussions;

> mild head injury requires recovery time without risk of subjection to further injury;

> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

> minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

34.     Although CTE has been discussed widely in the medical literature for more than eight

decades, it was not until 2002 that CTE was officially diagnosed post-mortem in professional

football players. Upon information and belief, this late finding was due to the Defendant's and its

agents' concerted effort to conceal the link between repetitive head trauma in football and

neurological diseases. Since 2002, more than 90% of all former players that have been examined

post-mortem exhibited pathological symptoms consistent with CTE. The leading neuropathologist

studying CTE, Dr. Ann McKee, believes that it is more likely than not that every single NFL player

has some level of CTE.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

35.     The first professional football player to be diagnosed with CTE was a former Kansas City Chiefs player, Mike Webster. Webster played 17 years-his final two (1989 and 1990) with the Chiefs-in the NFL and tragically died only 12 years after retirement at the age of 50. During the latter part of his life, and while serving on Defendant's coaching staff, Webster manifested progressive symptoms and signs of cognitive and neuropsychiatric impairment consistent with CTE.

36.     Research suggests that CTE may have been the true primary cause of death for a majority of professional football players that died as a result of neurodegenerative diseases. Accordingly, it is likely that the rate of CTE in professional football players is significantly higher than once believed.

37.     The clinical manifestations of CTE are quite variable but can include a number of stages. In the first stage, former players experience headaches, short-term memory difficulties, aggressive tendencies, depression and impulse control. In the second stage, as the disease progresses, the symptoms include depression, mode lability, explosivity, poor judgment, loss of attention and concentration, executive dysfunction, impulsivity, language difficulties and suicidal ideations. In the third stage, cognitive impairment becomes much more rampant, depression worsens and mood swings become more violent, severe memory loss occurs, and motor neuron disease may develop. Finally, in the fourth stage, full-blown encephalopathy sets in, causing severe memory loss with dementia, executive dysfunction, language difficulties, explosivity, paranoia, gait and increased suicidal ideations. In the latter stages of CTE, the symptoms are consistent with Parkinsonism and end-stage dementia.

38.     The National Institute for Occupational Safety and Health recently issued a warning letter-since the Defendant failed to do so-to all former NFL players that played at least five seasons during 1959 to 1988, stating: due to the exposure of repetitive mild traumatic brain injuries the "risk

9

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

of dying with a brain or nervous system disorder was more than 3 times higher among players." The warning letter went on to conclude that this study confirms a similar study that was done **"years"** ago. Further evidencing the campaign of deception and concealment, prior to the dissemination of this warning letter, a member of the NFL's Head, Neck and Spine Committee sought to remove any mention of CTE.

39.     To date, more than fifty-two former NFL players have been diagnosed post-mortem with CTE. In addition, at least eight living players have been diagnosed with CTE based on clinical evaluations and radioactive markers.

40.     Despite the substantial body of independent scientific studies directly linking repetitive head trauma in football and neurological diseases, including CTE, Defendant never warned Plaintiffs and instead willfully misrepresented and/or concealed the risks.

41.     As the purveyor of football in America, and as the leading expert in the field, Defendant owed a continuous duty to keep abreast of the scientific developments relating to brain trauma which its employees were regularly exposed, and it was required to notify, inform and educate Plaintiffs and the public of any potential long-term risks of repetitive head trauma.

42.     The Defendant's duty to warn was commensurate not only with its actual knowledge gained from its "research" and published studies but also with its constructive knowledge as measured by scientific literature and other available means of communication.

43.     Upon information and belief, Defendant knew or should have known of the devastating nature and long-term effects of concussive and sub-concussive injuries long before Plaintiffs were exposed to repetitive brain trauma. Defendant had or should have had knowledge of studies that demonstrated a positive link between repetitive head trauma and neurological diseases in the 1920s, 1930s, 1940s, 1950s, 1960s, 1970s, 1980s, and 1990s. During those decades,

10

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

Defendant's knowledge about the hazards of repetitive head trauma continued to accumulate, yet Defendant failed to warn Plaintiffs about those hazards.

**COUNT I**
**<u>NEGLIGENCE</u>**

44.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 43 as if fully set forth herein.

45.     Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

46.     Defendant owed a non-delegable duty to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurologic diseases, of which they could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose its employees, including Plaintiffs, to unreasonable risk of injury.

47.     Between August 31, 1987 and March 29, 1993, Defendant failed to use due care under the circumstances, and was thereby negligent in the performance of its non-delegable duties.

48.     Between August 31, 1987 and March 29, 1993, Defendant by its respective active and passive negligence failed to exercise the standard of care and skill it was obligated to exercise by reason of its relationship with Plaintiffs, undertakings and assumption of a duty thereby causing, creating or permitting an increased risk of exposure to repetitive brain trauma, and thereby failing to properly safeguard and warn Plaintiffs.

49.     Such negligence directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

11

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

50.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs and punitive and exemplary damages should be assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## COUNT II
## NEGLIGENT MISREPRESENTATION

51.     To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 50 as if fully set forth herein.

52.     Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

53.     Defendant owed a non-delegable duty to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to warn employees about the existence of dangers, including latent neurologic diseases, of which employees could not reasonably be expected to be aware, and a duty to exercise reasonable care so as not to expose Plaintiffs to unreasonable risk of injury.

54.     Between August 31, 1987 and March 29, 1993, Defendant and its agents represented to Plaintiffs that concussions are not a serious injury.

55.     Between August 31, 1987 and March 29, 1993, Defendant and its agents represented to Plaintiffs that there are no long-term effects of concussions in NFL athletes.

12

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

56.     When Defendant and its agents made these representations to Plaintiffs, the representations were driven by profit motives so that Plaintiffs would continue to play unimpeded by the risks of latent neurological diseases.

57.     Between August 31, 1987 and March 29, 1993, Defendant failed to exercise reasonable care and competence when communicating this information, and as a result, the information presented to Plaintiffs was false and misleading.

58.     Plaintiffs justifiably relied upon this information since Defendant was in a superior position of knowledge and Defendant could foresee that Plaintiffs would rely and intended that they do so.

59.     Defendant's negligent misrepresentations directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

60.     The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed against the Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## COUNT III
## <u>FRAUDULENT CONCEALMENT</u>

61.     To the extent they are not inconsistent with the allegations in this Count, Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 60 as if fully set forth herein.

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

62.     At all relevant times hereto, Defendant was in a position of superior knowledge, which was not within the fair and reasonable reach of the Plaintiffs, nor would it have been discovered through the exercise of Plaintiffs' ordinary diligence.

63.     Between August 31, 1987 and March 29, 1993, Defendant knew that repetitive head trauma in football created a risk of neurological diseases.

64.     Between August 31, 1987 and March 29, 1993, Defendant was aware of, knew and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive head trauma in football, to which Plaintiffs were exposed.

65.     Between August 31, 1987 and March 29, 1993, Defendant had a duty, separate and independent of any CBA, to disclose and/or inform Plaintiffs about these risks.

66.     Between August 31, 1987 and March 29, 1993, Defendant knew that such information was material to Plaintiffs, and knew that Plaintiffs would rely upon it for accurate information.

67.     Between August 31, 1987 and March 29, 1993, Defendant knowingly and fraudulently concealed from Plaintiffs the risks of repetitive head trauma, including the risk of latent brain disease, intending that Plaintiffs would rely upon such concealment.

68.     Between August 31, 1987 and March 29, 1993, Plaintiffs relied upon the Defendant's inaccurate and misleading information.

69.     Defendant's fraudulent concealment directly caused or directly contributed to cause Plaintiffs to suffer from severe and persistent headaches, post-concussion syndrome, depression, mood swings, explosivity, suicidal ideations, and, upon information and belief, CTE.

14

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

70.    The conduct of Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

### COUNT IV
### LOSS OF CONSORTIUM

71.    To the extent they are not inconsistent with the allegations in this Count, Plaintiffs-Spouses incorporate by reference the allegations set forth in Paragraphs 1 through 70 as if fully set forth herein.

72.    As a result of Defendant's misconduct as alleged herein, Defendant is liable to the Plaintiffs-Spouses.

73.    As a direct and proximate result of the carelessness, negligence, and recklessness of Defendant and of the aforesaid injuries to their husbands, the Plaintiffs-Spouses have been damaged as follows:

      a.    They have been and will continue to be deprived of the services, support, maintenance, guidance, companionship and comfort of their husbands;

      b.    They have been and will continue to be required to spend money for medical care and household care for the treatment of their husbands; and

      c.    They have been and will continue to be deprived of the earnings of their husbands.

74.    The conduct of the Defendant as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs-Spouses and punitive and exemplary damages should be assessed against Defendant.

15

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

WHEREFORE, Plaintiffs-Spouses pray for judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues in this matter.

Respectfully Submitted,

/s/ Kenneth B. McClain
Kenneth B. McClain                MO #32430
Lauren E. McClain                 MO #65016
Timothy J. Kingsbury              MO #64958
HUMPHREY, FARRINGTON & McCLAIN, P.C.
221 West Lexington, Ste. 400
P.O. Box 900
Independence, MO 64051
Telephone:    (816) 836-5050
Facsimile:     (816) 836-8966
kbm@hfmlegal.com
lem@hfmlegal.com
tjk@hfmlegal.com
and
John M. Klamann                   MO #29335
Andrew Schermerhorn               MO #62101
Paul D. Anderson                  MO #65354
THE KLAMANN LAW FIRM
929 Walnut Street, Suite 800
Kansas City, Missouri 64106
Telephone:    (816) 421-2626
Facsimile:     (816) 421-8686
jklamann@klamannlaw.com
aschermerhorn@klamannlaw.com
panderson@klamannlaw.com
and

ATTACHMENT A

Electronically Filed - Jackson - Independence - December 27, 2013 - 10:13 AM

Wm. Dirk Vandever                    MO #24463
THE POPHAM LAW FIRM, P.C.
712 Broadway, Suite 100
Kansas City, Missouri 64105
Telephone:      (816) 221-2288
Facsimile:      (816) 221-3999
dvandever@pophamlaw.com
**ATTORNEYS FOR PLAINTIFFS**

17

ATTACHMENT A