# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>　　　　Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## CO-LEAD CLASS COUNSEL'S MEMORANDUM IN SUPPORT OF (1) MOTION TO COMPEL CORRECTIVE DISCLOSURES BY PHILLIP TIMOTHY HOWARD, ESQUIRE (A/K/A DR. TIM HOWARD, J.D., PH.D.) AND HOWARD & ASSOCIATES, P.A.; (2) MOTION TO COMPEL MR. HOWARD, HOWARD & ASSOCIATES, P.A.; AND CAMBRIDGE CAPITAL GROUP, LLC, GAIL MILON, MR. HOWARD, AND JEFF KAHN TO RESPOND TO RESPECTIVE DISCOVERY REQUESTS PROPOUNDED UPON THEM; AND (3) NOTICE TO THE COURT OF CERTAIN CONDUCT BY MR. HOWARD AND HIS RELATED ENTITIES

# **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................................ 1

II.    FACTS ........................................................................................................................... 3

    A.    Background of Howard & Associates ................................................................ 3

    B.    Background of Cambridge ................................................................................. 3

    C.    Discovery Propounded upon the Howard Respondents and the Cambridge
        Respondents ...................................................................................................... 4

    D.    Mr. Howard's Communications to Class Members, Both as a Lawyer with
        Howard & Associates and as a Principal of the Cambridge Entities ...................... 6

    E.    Respondents' Communications Specifically to Class Member, Mr. Doe ........... 11

        1.    Retainer Agreement Between Mr. Doe and Howard Respondents........... 11

        2.    Assignments/Asset Purchases Between Mr. Doe and Cambridge
            Respondents ............................................................................................ 11

        3.    Howard Respondents' Misrepresentations Concerning BAP
            Providers ................................................................................................ 14

III.    ARGUMENT ................................................................................................................ 15

    A.    The Court Has Broad Authority to Regulate Communications to Class
        Members Pursuant to Federal Rule of Civil Procedure 23(d) and the All
        Writs Act and Should Exercise that Jurisdiction to Order the Howard
        Respondents to Make Corrective Disclosures Concerning BAP Providers.......... 15

    B.    The Court Has Broad Authority to Order Discovery Pursuant to the MDL
        Statute, 28 U.S.C. § 1407, Federal Rule of Civil Procedure 23(d), and the
        All Writs Act, 28 U.S.C. § 1651 – Subpoenas Are Not Necessary and the
        Respondents Should Be Ordered to Respond ...................................................... 20

    C.    Respondents Have Not Demonstrated that the Discovery Sought Is Subject
        to the Attorney-Client or Other Privilege or Protection ...................................... 22

        1.    Howard Respondents ............................................................................... 22

        2.    Cambridge Respondents .......................................................................... 24

IV.    CONCLUSION............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cent. Hudson Gas Co. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) ................................................................................ 16

*Gulf Oil Co. v. Bernard,*
  452 U.S. 89 (1981) ........................................................................... 15, 16

*Hoffman-LaRoche Inc. v. Sperling*,
  493 U.S. 165 (1989) ............................................................................ 15

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litigation)*,
  770 F.2d 328 (2d Cir. 1985) ................................................................ 17

*In re Grand Jury Empanelled Feb. 14, 1978 (Markowitz),*
  603 F.2d 469 (3d Cir. 1979) .......................................................... 22, 23

*In re Grand Jury Investigation (Tinari),*
  631 F.2d 17 (3d Cir. 1980) ............................................................ 22, 23

*In re Michaelson*,
  511 F.2d 882 (9th Cir. 1975) ............................................................... 23

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,*
  No. 05-MD-1720, 2014 WL 4966072 (E.D.N.Y. Oct. 3, 2014) ..................... 16, 17

*In re Sch. Asbestos Litig.*,
  842 F.2d 671 (3d Cir. 1988) .......................................................... 15, 16

*In re Visa Check/Mastermoney Antitrust Litig.*,
  No. CV-96-5238 (JG), 2006 WL 1025588 (E.D.N.Y. Mar. 31, 2006) .............. 17, 18

*Jack Faucett Assocs., Inc. v. AT&T,*
  Civ. A. No. 81-1804, 1985 WL 25746 (D.D.C. Oct. 18, 1985) ...................... 19

*Kaiser v. Stewart*,
  No. 96-6643, 1996 WL 730533 (E.D. Pa. Dec. 10, 1996) ......................... 22

*Kleiner v. First Nat'l Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) ............................................................ 16

*Mauch v. Comm'r of Internal Revenue*,
  113 F.2d 555 (3d Cir. 1940) ............................................................... 23

*McWilliams v. Advanced Recovery Sys., Inc.*,
  176 F. Supp. 3d 635 (S.D. Miss. 2016) ................................................ 19

*Prousi v. Cruisers Division of KCS Int'l, Inc.*,
   No. 95-6652, 1997 WL 135692 (E.D. Pa. Mar. 13, 1997) ....................................................... 23

*Rossini v. Ogilvy & Mather, Inc.*,
   798 F.2d 590 (2d Cir. 1986) ......................................................................................................... 15

*United States v. New York Tel. Co.*,
   434 U.S. 159 (1977) ...................................................................................................................... 18

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ...................................................................................................................... 16

*Waldo v. Lakeshore Estates, Inc.*,
   433 F. Supp. 783 (E.D. La. 1977), *appeal dismissed*,
   579 F.2d 642 (5th Cir. 1978) ....................................................................................................... 16

**Statutes**

28 U.S.C. § 1407 ............................................................................................................................... 17

28 U.S.C. § 1651 ............................................................................................................................... 17

**Rules**

Fed. R. Civ. R. 23 .............................................................................................................................. 19

Fed. R. Civ. P. 23(d) ......................................................................................................................... 15, 17

Fed. R. Civ. P. 23(d)(1)(B)(i) ........................................................................................................... 15

Fed. R. Civ. P. 26(b)(1) ..................................................................................................................... 2, 5, 21

Fed. R. Civ. P. 45 .............................................................................................................................. 2, 5, 20, 21

Fed. R. Civ. P. 45(a)-(c) .................................................................................................................... 21

**Other Authorities**

David F. Herr, *Annotated Manual for Complex Litigation, Fourth* (rev. ed. 2017) ............... 16, 17

## I.    __INTRODUCTION__

A Class Member, whose identity is being revealed only to the Court at this juncture (referred to herein as "John Doe"), who had retained Phillip Timothy Howard (a/k/a Tim Howard, J.D., Ph.D. or Dr. Tim Howard) of Howard & Associates, P.A. ("Mr. Howard" or collectively, the "Howard Respondents") to represent him individually, and who also had entered into agreements for loans or advances, termed as "purchases of proceeds," with companies in which Mr. Howard is a principal – namely, Cambridge Capital Group, LLC ("CCG"), Cambridge Capital Group Equity Option Opportunities, LP ("EOO"), or Cambridge Capital Partners ("CCP") (collectively referred to herein as "Cambridge" or the "Cambridge Entities," unless otherwise indicated) – contacted Co-Lead Class Counsel ("Class Counsel") in August, pursuant to the Court's Notice & Order, dated July 19, 2017 [ECF No. 8037] ("July 19 Order").

Through Mr. Doe, Class Counsel have become aware of certain facts and have come into possession of certain documents, described herein and attached in redacted form to the Declaration of Christopher A. Seeger, dated September 12, 2017 ("Seeger Decl." or "Seeger Declaration"), which facts and documents they are obligated to disclose to the Court.  As detailed more specifically below, Mr. Howard's representations and communications to Class Members, while wearing his lawyer hat, his lender hat or both, may have resulted in Class Members taking actions against their self-interest based upon inaccurate information or misunderstandings.  Now, in the wake of the Court's July 19 Order, and the receipt of discovery requests propounded by Class Counsel, Mr. Howard appears to be engaging in revisionist history vis-à-vis Class Members generally, as well as specifically relating to Mr. Doe.[1]

---

[1] Mr. Doe discharged Mr. Howard as his individually retained attorney on August 22, 2017.  *See* Seeger Decl., at ¶5.

Further, the documents obtained from Mr. Doe reveal that Mr. Howard made serious misrepresentations about the Settlement Program to Mr. Doe, which he also may have made to the approximately 221 other Class Members whom he represents individually or to other Class Members he may be soliciting.[2] These misrepresentations, discussed below, constitute a challenge to the fitness of the physicians in the BAP Program and require immediate correction as to Mr. Howard's clients, as well as any other Class Members to whom the inaccurate information may have been disseminated, whether directly by Mr. Howard himself, or indirectly by his clients passing it on.

Additionally, both sets of respondents have refused to respond to discovery requests propounded by Class Counsel in accordance with the Court's July 19 Order. They contend that this Court does not possess the authority to order discovery and that subpoenas are required pursuant to Fed. R. Civ. P. 45; they also contend that the discovery requests are outside the scope of discovery under Fed. R. Civ. P. 26(b)(1). Finally, both sets of respondents contend that certain information sought, even the fact of representation of Class Members, implicates confidential attorney-client communications, work product, or information that is or may be confidential or otherwise protected by any right of privacy, including to other law firms separate from Howard & Associates, *i.e.*, referral counsel.

Class Counsel seek the relief set forth in the proposed Order accompanying this motion. The matters presented to the Court on which Class Counsel do not seek specific relief in the proposed Order are included herein so that the Court is fully informed concerning the facts

---

[2] Given their role in the Settlement's administration, Class Counsel have access to the law firm registration data. These data reveal that Howard & Associates registered 222 putative Class Members, including Mr. Doe. *See* Seeger Decl., at ¶6. In contrast, Class Counsel have no information as to which Class Members entered into contracts with the Cambridge Entities, other than Mr. Doe.

surrounding the relationship between Mr. Howard and Cambridge, and their communications with Class Members, in order that the Court may determine the legality of all agreements into which Class Members have entered with Howard or Cambridge.

## II.   FACTS

### A.   Background of Howard & Associates

Howard & Associates is a law firm with offices in Boston, Massachusetts and in Tallahassee, Fort Lauderdale, and Jacksonville, Florida.  The firm was founded by Mr. Howard. The firm's website contains an NFL page that boasts: "[w]e represent 100s of players."  *See* http://howardjustice.com/nfl/, a copy of which is attached as Exhibit A ("Ex. A") to the Seeger Declaration.

### B.   Background of Cambridge

Cambridge, as per the email from its Manager Vice President Gail Milon, to Cambridge "Clients," dated August 1, 2017, has locations at the same exact four locations as Howard & Associates (the only exception being that the Tallahassee offices of the Cambridge Entities and Howard & Associates are at different suite numbers), as follows:

> 2120 Killarney Way,
> Suite 120 (for Cambridge)
> Suite 125 (for Howard & Associates)
> Tallahassee, FL 32309[3]
>
> Riverplace Tower
> 1301 Riverplace Blvd.
> Jacksonville, FL 32207

---

[3] Mr. Howard is also the President of Cambridge Graduate University International, LLC ("CGUI"), also located at 2120 Killarney Way in Tallahassee, but at Suite 121. *See* http://cguiedu.com/ (last visited on Sept. 6, 2017).  CGUI is a virtual campus institution that is not accredited by the Council for Higher Education Accreditation (CHEA) in the United States.

101 NE Third Avenue
Suite 1500
Fort Lauderdale, FL 33301

8 Museum Way
Suite 2407
Cambridge, MA 02141

*Compare* Aug. 1, 2017 email from Ms. Milon, received by Mr. Doe, attached as Ex. B to Seeger

Decl. *with* letter from Mr. Howard on Howard & Associates letterhead to "Client[s] of Howard &

Associates," dated Aug. 8, 2017, attached, with cover email received by Mr. Doe, as Seeger Decl.,

Ex. C.

According to the website for Cambridge Capital Group, the Managing Vice President is

Gail Milon.   The Partner and Brokerage Vice President is Addys Walker.   The Partner and

Executive Vice President is Jeff Kahn.[4]   The Chair of the seven-member Board of Directors is Mr.

Howard.   *See* http://cambridgecapitalgroup.holdings/our-partners/our-team/, dated August 24,

2017, attached as Seeger Decl., Ex. D.

C.   **Discovery Propounded upon the Howard Respondents and the Cambridge Respondents**

On August 10, 2017, following the receipt of some information from Mr. Doe, Class

Counsel propounded interrogatories upon the Howard Respondents.   They also propounded

requests for production of documents and interrogatories upon Cambridge Capital Group, LLC,

Gail Milon, Timothy Howard, J.D., Ph. D. and Jeff Kahn ("Cambridge Respondents").[5]   *See* the

discovery requests and corresponding cover letters at Seeger Decl., Exs. E and F, respectively.

---

[4] Mr. Kahn was formerly with Atlas Legal Funding, another lender which was also sent discovery requests pursuant to the July 19 Order.   *See* Seeger Decl. at ¶13.

[5] When the discovery requests were propounded upon the Cambridge Respondents, Class Counsel had not yet received certain documents from Mr. Doe.   As such, they were not aware of the involvement of the Cambridge Entities in addition to Cambridge Capital Group, LLC, namely,

The Howard Respondents provided responses to the Interrogatories on August 25, 2017, which included minimal substantive information (noting contingent fee agreements with clients in the range of 12.5% to 25%), and instead consisted of a threshold objection related to the lack of service of subpoenas pursuant to Fed. R. Civ. P. 45, plus other sundry objections based upon, *inter alia*, "confidential attorney-client communications, or work product documents, or information that is or may be confidential or otherwise might be protected by any right of privacy, to another law firm." *See* Mr. Howard's cover letter, dated August 25, 2017, and the Howard Respondents' responses at Seeger Decl., Ex. G, at Interrog. Resp. No. 1.  The Howard Respondents also assert that the discovery sought is not relevant to any party's claim or defense and is thus outside of the scope of Fed. R. Civ. P. 26(b)(1), and is overly broad and unduly burdensome.  Finally, the Howard Respondents declare that they will not provide the information responsive to the interrogatories unless and until their clients sign authorizations relating to same.  *See generally* Seeger Decl., Ex. G.[6]

The Cambridge Respondents also provided a "response" on August 25, 2017, stating that they were declining to provide responsive documents or information because Class Counsel had not complied with Fed. R. Civ. P. 45 and served them with subpoenas, and because the requests were outside of the scope of discovery pursuant to Fed. R. Civ. P. 26(b)(1).  *See* Cambridge's

---

they were unaware that Cambridge Capital Group Equity Option Opportunities, LP and Cambridge Capital Partners were also parties to certain agreements with Class Members.

[6] On Howard & Associates' letterhead, Mr. Howard sent letters to his clients, dated August 29, 2017, notifying them of the law firm's receipt of the discovery requests, and that he viewed the information sought as subject to attorney-client or work product privileges.  Mr. Howard advised the clients that Howard & Associates will continue to assert attorney-client privilege unless they write back and advise the firm that they desire to waive the privilege and allow "NFL Concussion Settlement counsel … access to this privileged information in your respective file."  Seeger Decl., Ex. Y.

response at Seeger Decl., Ex. H.  The Cambridge Respondents further contend, *inter alia*, that any dispute concerning their contracts with Class Members must be submitted to arbitration and may not be adjudicated by this Court.  *Id.* at Gen. Obj. No. 4.  They also asserted objections based upon attorney-client privilege and the work product doctrine for some requests.  *See* Seeger Decl., Ex. H.[7]

### D.   Mr. Howard's Communications to Class Members, Both as a Lawyer with Howard & Associates and as a Principal of the Cambridge Entities

On June 23, 2017, Mr. Doe received the email blast from Howard & Associates that was sent to "all retired NFL players" under the guise of reminding them to register before August 7, 2017.  *See* Seeger Decl., Ex. I.  Because the email makes reference to Class Members who may be unrepresented or represented by others, it clearly was not directed exclusively to Mr. Howard's existing clients.  (The recipients list is not visible.)  The email provides, in pertinent part:

> If you have not registered please call us now and we can assist you with that process.  If you have not been tested by a qualified NFL neurologist, we can become your legal representatives, and we will pay for you to travel to a NFL qualified neurologist, and we will pay for your hotel, food, and travel expenses while you are being evaluated.  It does not matter where in the world you live.

> If you have already retained another law firm and you are not happy with how they are handling your claim we can easily bring you on board to join the hundreds of other retired NFL players that have already retained Howard & Associates.  Just call us, and we will handle the move for you.

---

[7]   The cover letter from counsel for the Cambridge Respondents represents that "Cambridge Capital Group, LLC, a Florida company was sold many months ago, and was officially dissolved in early May of 2017. … [P]ursuant to a confidential sale and dissolution agreement entered into earlier this year[,] [t]he company was sold to Mr. Addys Walker, and he is the corporate representative and is the individual that discovery demands should be directed towards.  Please note that neither Mr. Howard nor Ms. Milon or Jeff Kahn were owners or partners in Cambridge Capital Group LLC."  He also referred to the attached State of Florida Corporate Dissolution document attached thereto.  *See* Seeger Decl., Ex. H.  However, these representations stand in contrast to the communications from Mr. Howard and Ms. Milon on behalf of Cambridge Capital Group, LLC well after May 2017.  *See generally* Seeger Decl., Exs. B, D, I, J, and Z.

> Lastly, if you do qualify for the NFL Concussion Settlement we can refer you to independent cash advance programs that may offer immediate cash based upon your proposed settlement.

*Id.*

This email is notable in several respects:  (1) it ignores the availability of *free* BAP exams by BAP Providers located across the country, including near a Retired NFL Football Player's home; (2) it fails to mention that the Class Member will have to reimburse Howard & Associates for the travel costs and the costs of the examination (which is likely the case), if and when the Class Member receives a monetary award; (3) it suggests that represented Class Members fire their current lawyer and retain Howard & Associates; and (4) it suggests that Class Members get cash advances and refers to the programs providing such advances as "independent," when, in fact, undoubtedly the entity the Class Member will be referred to is a Cambridge Entity and, given that Mr. Howard is a principal of the Cambridge Entities, they are *not* independent.

Less than six weeks after Howard & Associates proposed that Class Members may want to obtain cash advances, on August 1, 2017, Cambridge, via its Manager and Vice President, Gail Milon, sent out an email blast, advising Class Members that cash advances "are *not* suitable or prudent to your financial future."  *See* Seeger Decl., Ex. B.  The timing of this email is obvious – it was sent less than two weeks after the Court's July 19 Order expressing concern regarding lenders.  The email provides as follows:

> CCG's fiduciary duty is to ensure your maximum returns on investments and maximum recoveries for your financial security.  Going forward, as you have been previously informed via e-mail or in private conversations, for most of you, the current amounts of the monthly advance contracts are not suitable or prudent to your financial future.  This debt is not advantageous to your long-term security.

> The initial purpose of the advance was not to be used as an income, but for supplemental short-term emergencies.  To end this expensive cost, CCG is offering to stop these agreements after 6 months from your contract origination date, and limit the charges to only those funds advanced to date.

Starting at the end of July of 2017 and in August of 2017, the current contracts will be modified with a reduction in monthly payments or to discontinue payments, in order to preserve your financial security.

Claims are now being finalized by both 1.) the NFL Concussion Settlement approved and MAFS qualified neurologist, and 2.)  the board-certified neuro-psychologists.  Claims will start to be paid within the next 3 or 4 months and because you're in an emergency status, we've asked the law firm to advance and prioritize the submission of your claim so that you are one of the first to be paid.

We are looking forward to hearing from you.  Please respond to Regina McHardy via email … to verify and confirm whether you've chosen to end these advancements or reduce your current amount to 25% or 30% of what you are currently receiving.

This is especially appropriate given that your lump sum settlement proceeds, which are for your long-term security, will be arriving within 90 to 120 days.  We don't want you to waste your resources

*Id.*

In a similar back-pedaling tack, on August 8, 2017, Mr. Howard, on Howard & Associates letterhead, sent his clients a letter stating "[a]s previously recommended, advances on your claims are not advised as they are very expensive."  *See* Seeger Decl., Ex. C.

After the Howard Respondents and the Cambridge Respondents were served with discovery requests on August 10, 2017, the Cambridge Respondents reached out to its "Retired NFL Client[s]" on August 16, 2017 to advise them that "[a]dvances have been put on hold due to the NFL investigation of advances in the industry by Chris Seeger Esq. of SeegerWeiss."  *See* August 16th email from Ms. Milon with corresponding August 16th letter from Mr. Addys Walker at Seeger Decl., Ex. J.  Mr. Walker's letter seeks the "client's" signature, attesting to "[c]onfirmation of personal review, opportunity for attorney review, and acceptance of advance contract terms."  This begs the question as to the sufficiency of the documents that Cambridge had its clients sign in the first instance to obtain the advances on their potential future monetary awards.

In the wake of the investigation by Class Counsel, Cambridge seeks now to have its clients verify that "you will not be challenging [Cambridge's] equity purchase contract returns, and will accept payment from your settlement consistent with the [Cambridge] equity purchase contracts," and that the "funds were for supplemental income, not for personal survival income." *Id.* at Walker letter.  Mr. Walker also suggests, incredibly, that the Cambridge client review with "*your lawyer*," the advance agreement in connection with determining whether to sign the verification of acceptance, so that Cambridge can continue to make further advancements – knowing that Mr. Howard is both each client's lawyer *and* a principal in Cambridge.  *Id.* (emphasis added).  Class Counsel seek to ensure that the Court will be able to view any signed verifications that Cambridge obtained through this exercise in context.

Mr. Howard astonishingly claims, in response to Interrogatory No. 5 that "[i]n general, the law firm advises all clients not to take equity advances on their claims in any fashion due to being very expensive.  Some clients deal with third-party equity advance sources regardless of the advice from the law firm."  *See* Seeger Decl., Ex. G, at Interrog. Resp. No. 5.  These communications with the Class Members after the July 19 Order stand in sharp contrast to the earlier communications from Mr. Howard, his law firm, and the Cambridge Entities of which Mr. Howard is a principal, which had encouraged these loan arrangements.

In addition to profiting from contracting to provide legal services and loans to Class Members, Mr. Howard, through Cambridge, seeks to profit or has already profited from providing Class Members with life insurance and tax services.  On December 18, 2016, just after the Supreme Court declined to grant the petition for writ of certiorari, Cambridge sent an email to Mr. Doe, and likely other clients, urging them to quickly obtain a life insurance policy through the firm with which Cambridge had partnered, namely, ELE Wealth Management, as follows:

As we discussed, Dr. Howard and I and our team continue to develop Cambridge Capital Group to provide an unmatched model of services which includes investment management, wealth planning, estate planning, wills, trust creation, life insurance, supplemental health insurance, and loans to meet the unique needs of retired professional athletes.  Additionally, ancillary legal services for little or no additional costs via our direct association with Howard & Associates PA makes our creative model unmatched.

… However, recent conversations with life insurance experts and the pending legal effective date of the settlement requires that we address the very important need for life insurance as a death benefit, a living benefit, and a financial planning tool due to your expected future wealth immediately.

Because life insurance applications require you to disclose medical problems and you potential diagnosis of symptoms of "living" CTE, which will become a legal claim in approximately 30 – 60 days, it is possible that you will become un-insurable for the remainder of your life.  Again, due to your expected future wealth and the need to plan accordingly for future estate tax requirements as well as a very important living & death benefit for your family, it is critical that we address this now so you can never be denied in the future.
*   *   *

Additionally, getting an initial term life insurance policy as opposed to a whole/permanent file insurance policy is a much less expensive strategy to achieve our goal with a monthly premium expense of approximately $380.00.  We will initially advance the first year premium and plan on paying the future premiums from investment earnings thereby not effecting your current cash flow.

On Monday, Romona from ELE Wealth Management, who [sic] we have partnered with to quickly achieve this important goal, will contact you … to complete the application as time is of the essence to successfully assure [sic] that the policy is issued prior to the filing of your legal claim.

*See* email from Cambridge, dated Dec. 18, 2016, attached as Seeger Decl., Ex. K.   Cambridge also "selected a very good 'technical' CPA to work with our team. … As we come to the end of the year, please let me know if you want us to handle your 2016 income tax filing which will allow our CPA to build an important profile for you and your family so he can successfully work with us on all aspects of your financial future."   *See* email, dated Dec. 23, 2016 from Cambridge, attached as Seeger Decl.. Ex. L.  Class Counsel do not know the potential additional revenues that Cambridge will reap as a result of these other "services" provided to Class Members, but the Court

should be made aware of the sundry avenues through which the Mr. Howard and his affiliated entities appear to be profiting from Class Members and the Settlement.

### E.   Respondents' Communications Specifically to Class Member, Mr. Doe

#### 1.   Retainer Agreement Between Mr. Doe and Howard Respondents

Mr. Doe entered into a retainer agreement with Mr. Howard and Howard & Associates, on January 19, 2016.  It provided for a contingent fee of 20% for payments obtained from the filing of a Claims Packet in connection with the Settlement (and 33-1/3% for payments obtained from the filing of civil suit).  *See* Retainer Agreement & Power of Attorney at Seeger Decl., Ex. M.   In connection with Mr. Doe's termination of the retention, Mr. Howard initially acknowledged in an August 22, 2017 email that his firm's retainer agreement provided for a 20% fee.  *See* Seeger Decl., Ex. N.  The next day, August 23, 2017, Mr. Howard sent another email, stating that Mr. Doe's retainer purportedly was for 15%, and also forwarding a version of the retainer that had been modified with handwritten notations to reflect a contingent fee of 15%, instead of 20%, with only Mr. Howard's initials (not Mr. Doe's) and the date of 1/19/16, also handwritten by Mr. Howard.

#### 2.   Assignments/Asset Purchases Between Mr. Doe and Cambridge Respondents

Mr. Doe signed an Assignment, Sale, Springing Assignment & Equitable Lien Agreement on April 9, 2016, which provided for him to receive monthly disbursements of $2,100 from Cambridge Capital Partners, LP.  *See* Assignment, Sale, Springing Assignment & Equitable Lien Agreement, dated Apr. 9, 2016 with cover email dated Apr. 11, 2016, at Seeger Decl., Ex. P. Under the terms of that agreement, Mr. Doe was the "Seller" of the "Proceeds," *i.e.*, his future monetary award, and Cambridge was the "Purchaser."  The Seller agreed to sell and the Purchaser agreed to purchase a portion of the Proceeds, defined as the "Purchased Property."  The Pay-Off

Amounts due to Cambridge were $36,720 at the six-month anniversary of the putative assignment and $145,320 at the thirty-month anniversary.  In contrast, Mr. Doe would have received $12,600 at the six-month mark and $63,000 at the thirty-month mark.  The email from Don Reinhard of Cambridge, also signed by Mr. Howard, represented that "[o]ver the long run since the settlement claim may not be paid for 2 or 3 years, if you qualify, this source of advanced funds is far cheaper at approximately 21% per year as opposed to the future lump sum advances that will approximate 50% - 80% per year." *Id.*  This stands in stark contrast to Mr. Howard's email to Mr. Doe sent on August 8, 2017.  *See* Seeger Decl. Ex. C (letter from Mr. Howard on Howard & Associates letterhead, noting that "advances on your claims are not advised as they are very expensive").

Mr. Doe entered into additional Assignment, Sale, Springing Assignment & Equitable Lien Agreements with Cambridge on April 9, 2016, one for a monthly disbursement of $5,000 and one for a monthly disbursement of $7,000, with payoff amounts on the one year anniversary of $110,000 and $136,600, respectively.  *See* Seeger Decl., Exs. Q & R.  On April 8, 2016, Mr. Doe entered into an Assignment, Sale, Springing Assignment & Equitable Lien Agreements with Cambridge Capital Group Equity Option Opportunities, LP ("EOO") for a one-time $1,500 advance related to Medical Management Fees.  *See* Seeger Decl., Ex. S.

On September 6, 2016, Cambridge sent Mr. Doe an email providing a further agreement "that rolls all three loans together."  *See* Seeger Decl., Ex. T.  Thereafter, on January 13, 2017, Mr. Doe's monthly disbursement was increased to $9,000.  *See* Seeger Decl., Ex. U.  In advance of the monthly disbursement agreement expiring in April 2017, on February 15, 2017, Mr. Doe was sent a renewal agreement, continuing the $9,000 monthly disbursement, as per an Assignment, Sale, Springing Assignment & Equitable Lien Agreement, dated April 1, 2017.  *See* Seeger Decl., Ex. V.  In connection therewith, Mr. Doe was sent an Acknowledgement of Authorization to be signed

by Howard in his capacity as Doe's lawyer and to be initialed by Mr. Doe, as the client, whereby Mr. Howard, on behalf of Howard & Associates, "acknowledge[d] receipt of a Pre-Settlement Finance Agreement dated April 1, 2017 between our client [Mr. Doe] and Cambridge Capital Partners, LP.…  I therefore agree that so long as I represent the client, the funds due to CCP will be paid directly though my office[.]"  *See* Seeger Decl., Ex. W.  As such, portions of Mr. Doe's potential future monetary award were to be paid from Mr. Howard, the lawyer, to his company, Cambridge.

Apparently, Mr. Howard himself interchangeably donned his lawyer and lender hats.  On March 3, 2017, following Mr. Doe's email inquiry to Ms. Milon at Cambridge concerning his monthly disbursement, which had been temporarily halted at the time, Mr. Howard responded in an email using a Howard & Associates' signature line.  *See* Seeger Decl., Ex. X ("Your account has been reviewed and is clear.  Your wire will go out this afternoon.  We apologize for the delay.").

Additionally, on August 1, 2017, the same day that Ms. Milon had sent the email blast discussed above, advising Cambridge clients that the monthly advance contracts were not advantageous to the clients' long-term financial security, *see* Seeger Decl., Ex. B, Mr. Howard communicated with Mr. Doe via text message regarding the fact that CCG was notifying its clients that the "advances are too expensive" and that for "every $10K [advanced] will mean that you have to pay back $26K for the year."  *See* Seeger Decl., Ex. Z.  Mr. Doe responded that "nowhere in my paper work nor did we discuss these numbers.  Also I on July 17 I requested an itemized spreadsheet of my cost to CCG which I haven't received."  *Id.*  Howard, as "Cambridge Capital Tim Howard," continued to text with Mr. Doe concerning issues related to Mr. Doe's agreements with Cambridge and regarding the submission of his claim by the law firm, as follows: "You will

be contacted for your final testing on NFL claims submission in order to see if you have decompensated to a 2.0 since it has been a year and your 1.5 was close to a 2.0 back then. This will double your recovery if confirmed." *Id*. He also advised that he expected the claim to be paid 60 days from the "clinical update and filing with NFL at the end of August. Late October or November." *Id*. As of August 31, 2017, Mr. Howard had not completed the submission of any claim packages for his clients. *See* Seeger Decl., ¶6.

### 3.   Howard Respondents' Misrepresentations Concerning BAP Providers

In an obvious attempt to convince Mr. Doe to reverse his decision to discharge him, Mr. Howard made several glaring misrepresentations in an August 22, 2017 email to Mr. Doe with the subject line of "Termination of legal relationship & attorney/client contract." Specifically, Mr. Howard represented as follows:

> Please be advised that the "preliminary" neuropsychological reports will not be sufficient for submission to the NFL for a recovery. A distinct NFL-MAFS approved physician and board certified neurologist that works with our firm will be required for "final" reports, and only the NFL-MAFS qualified physician can submit these records to the NFL.

> If NFL BAP physicians are used, the NFL estimates that only about 2.8 out of 10 applicants will receive a recovery, and the BAP physicians are grossly underpaid for any significant analysis and will likely be back-logged for a year[.]

*See* Seeger Decl., Ex. N. The statement that the BAP physicians are "grossly underpaid" is false. The implication that any MAF Physician is "work[ing] with" a law firm is also false. The MAF Physicians are independent and were selected jointly by Class Counsel and counsel for the NFL Parties. Records are not being submitted "to the NFL" – they are being submitted *to the Claims Administrator*. The implication that a Class Member's odds of obtaining a Qualifying Diagnosis from a BAP Provider are only 28% and that Class Members will be much more likely to obtain Qualifying Diagnoses if they see MAF Physician(s) (chosen by Howard) is also similarly deceptive

14

and incorrect.  These statements are clearly designed to dissuade Mr. Doe (and perhaps other Class

Members) from obtaining a free BAP exam and to, instead, convince him to go through Mr.

Howard's firm to obtain "preliminary" neuropsychological reports (in all likelihood, ultimately

out of his own pocket should he receive a monetary award) from physicians who are likely outside

of the Settlement Program, and thus are unable to provide a Qualifying Diagnosis at this juncture,

followed by evaluations by an MAF Physician(s) of Mr. Howard's choosing.  Whatever his

motivations are for disseminating this misinformation and endorsing this "strategy," Mr. Howard

and his law firm should be ordered to make corrective disclosures regarding these

misrepresentations.

## III.   <u>ARGUMENT</u>

### A.   **The Court Has Broad Authority to Regulate Communications to Class Members Pursuant to Federal Rule of Civil Procedure 23(d) and the All Writs Act and Should Exercise that Jurisdiction to Order the Howard Respondents to Make Corrective Disclosures Concerning BAP Providers**

District courts have broad discretionary powers under Fed. R. Civ. P. 23(d) to supervise

communications with class members.  Rule 23(d), in relevant part, states:

> **Conducting the Actions.**
> (1) ***In General.***  In conducting an action under this rule, the court may issue orders
> that:
> . . .
>> (B) require – to protect class members and fairly conduct the action – giving
>> appropriate notice to some or all class members of:
>>> (i)   any step in the action …

Fed. R. Civ. P. 23(d)(1)(B)(i); *see Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 171 (1989);

*Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100-01 (1981).

Courts have long recognized the potential for abuse that may occur when a party or its

counsel communicate with members of a class or proposed class.  *See Gulf Oil Co.*, 452 U.S. at

99-100; *In re Sch. Asbestos Litig.*, 842 F.2d 671, 679-80 (3d Cir. 1988); *Rossini v. Ogilvy &*

*Mather, Inc.*, 798 F.2d 590, 601-02 (2d Cir. 1986); *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1201-03 (11th Cir. 1985).[8]   Specifically, misleading communications to class members regarding the litigation pose a significant threat to the fairness of the proceedings, the fundamental rights of parties, the adequacy of representation and the general administration of justice generally. *In re Sch. Asbestos Litig.*, 842 F.2d at 680; *see also Waldo v. Lakeshore Estates, Inc.*, 433 F. Supp. 783, 790-91 (E.D. La. 1977) ("Unapproved communications to class members that misrepresent the status or effect of the pending action also have an obvious potential for confusion and/or adversely affecting the administration of justice."), *appeal dismissed*, 579 F.2d 642 (5th Cir. 1978).

Because of the potential for abuse, many courts have found that this power to regulate communications to class members is adjunct to the authority of the courts themselves.   District courts have "both the duty and the broad authority to . . . enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co.*, 452 U.S. at 100; *In re Sch. Asbestos Litig.*, 842 F.2d at 679-80.  "The judge has ultimate control over communications among the parties, third parties, or their agents and class members on the subject matter of the litigation to ensure the integrity of the proceedings and the protection of the class."  David F. Herr, *Annotated Manual for Complex Litigation, Fourth* § 21.33, at 355 & n.917 (rev. ed. 2017) (hereafter "MCL"); *accord In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-MD-1720, 2014 WL 4966072, at *31 (E.D.N.Y. Oct. 3, 2014) (same).  "The court may take curative action – such as requiring the distribution of corrective notices or entering injunctive relief – where misleading or

---

[8]  As the Eleventh Circuit noted in *Kleiner*, commercial speech that is "untruthful or misleading ... has no claim on first amendment immunity.…   Commercial speech merits constitutional safeguards only to the extent it is accurate, in keeping with its purpose of insuring the free flow of reliable information crucial to independent decisionmaking." *Kleiner*, 751 F.2d at 1204 (citing *Cent. Hudson Gas Co. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980), and *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)).

false statements are made to class members." *In re Payment Card*, 2014 WL 4966072, at *31; *see also* MCL § 21.33 at 355 n.917 ("Corrective or prophylactic notice to potential class members may be ordered at any stage of the proceedings[.]").

Class Counsel do not know for a fact that the Howard Respondents made the assertions that the BAP Providers are underpaid, backlogged for up to a year, and unlikely to provide a Class Member with a Qualifying Diagnosis, to anyone other than Mr. Doe. *See* Seeger Decl., Ex. N. Because, however, this tactic evidently is designed to persuade Class Members that they should decline to take advantage of the free BAP examinations in favor of an evaluation by an MAF Physician of Howard's choosing, one can reasonably infer that Mr. Howard has taken and continues to take this approach with his other Class Member clients and Class Members whom he is soliciting. As such, the Howard Respondents should be ordered to make corrective disclosures.

There can be no genuine dispute that the Court has the authority to do so. MDL judges possess authority over parties and non-parties, as related to the Settlement and the administration thereof, over which they preside, under the MDL statute, 28 U.S.C. § 1407, Fed. R. Civ. P. 23(d), and the All Writs Act, 28 U.S.C. § 1651. "Where, as here, a district court retains exclusive jurisdiction over settlement agreements and distribution of settlement funds pursuant to those agreements, it may issue orders necessary to protect the settlement from threats by both parties *and non-parties*." *In re Visa Check/Mastermoney Antitrust Litig.*, No. CV-96-5238 (JG), 2006 WL 1025588, at *4 (E.D.N.Y. Mar. 31, 2006) (citing *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litigation)*, 770 F.2d 328, 336 (2d Cir. 1985) (emphasis added)); *In re Payment Card*, 2014 WL 4966072, at *31 (same).

Indeed, in *Visa Check*, the court held that because the non-parties' "contracts with class members plainly affect the administration of the settlements and the distribution of the settlement

funds, the All Writs Act authorize[d] the relief sought by Lead Counsel." 2006 WL 1025588, at *5. In that case, the third party was Spectrum, a claim-filing and fund recovery service for commercial class actions, which sought to "entice class members to retain Spectrum to administer their claims and … to purchase their claims outright." *Id.* at *1. Similarly, here, the Cambridge Respondents purported, pursuant to its contracts with Class Members to "purchase from [the Class Member] Seller a portion of the Proceeds (the 'Purchased Property') for monetary consideration (the 'Purchase Price')." *E.g.*, Seeger Decl., Ex. Q. In *Visa Check*, the court ordered that class notice be sent to all class members who had entered into contracts with Spectrum in order to notify the class members that the contracts could be voided without legal ramifications within a specified time period if class members submitted affidavits indicating they had relied upon Spectrum's misleading marketing materials in entering into the contracts. Quoting the Supreme Court, the *Visa Check* Court held that "'[t]he power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though *not parties to the original action* or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *Id.* at *5 (quoting *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977)) (emphasis added).

The *Visa Check* court emphasized its intimate involvement with the litigation, the settlement and the administration of the settlement, and recognized its power to be proactive vis-à-vis third parties seeking to involve themselves with class members in order to profit from the settlement funds.

> I have presided over this action since 1996. With the express consent of all parties, I played an active role in the settlement discussions and have maintained an active role in the administration of the settlement.… The settlement of a long, hard-fought case has given those class members a tangible interest in settlement funds. I have an affirmative obligation to protect those interests. If a merchant chooses to sell its claim or pay someone else to process its claim, that is fine with the Court. It is also

> fine for firms like Spectrum to solicit merchants to use their claim processing or claim purchasing services.  The nature of the Court's interest is as simple as it is strong: the class members must not be misled.   Where false or misleading statements are used to solicit business from them, I have no intention to sit by and relegate them to a cause of action for breach of contract or fraud.  To do otherwise- that is, *to say that I am powerless to take steps, both proactive and reactive, to protect each class member's interest in the settlement funds, even when I know they are being misled-would be an abdication of responsibility. It would also erode the class members' and the public's respect for the settlements themselves, and for the process that produced them.*

*Id.* at \*4 (emphasis added).  This Court has been similarly proactive throughout this litigation and is likewise far from powerless to take steps to protect Class Members from conduct by third parties. This Court is fully empowered to exercise jurisdiction over respondents and order them to participate in discovery.  *See Jack Faucett Assocs., Inc. v. AT&T*, Civ. A. No. 81-1804, 1985 WL 25746, at \*8 (D.D.C. Oct. 18, 1985) (ordering third party claims processing companies to produce copies of agreements and assignments with class members, solicitation letters and other communications and lists).

Recently, a court presiding over a settlement class addressed the issue of its jurisdiction over third parties who enmesh themselves in class action litigation:

> Rule 23 and Supreme Court precedent give this Court jurisdiction to protect class members and impose appropriate conditions on intervenors.…   McHale and Falgout invaded this class action by sending solicitation letters to members of a certified class.  They were not invited.  In fact, they acted like vultures.  They capitalized on the work that had been done by class counsel and hunted for eligible class members by scouring the state court records.  They did not have to expend effort in creating the theory of recovery; they merely had to find those who had been sued by ARS and YWW. They brought themselves within the scope of Rule 23 and this Court's jurisdiction.

*McWilliams v. Advanced Recovery Sys., Inc.*, 176 F. Supp. 3d 635, 642 (S.D. Miss. 2016) (third-party attorneys who attempted to "poach" members of certified class by sending solicitation letters were subject to court's jurisdiction); *see* Seeger Decl., Ex. I (solicitation email, dated June 23,

19

2017, from Mr. Howard suggesting that Class Members fire current attorneys and hire Howard & Associates).

Similarly, the Howard Respondents have embroiled themselves in the effectuation and implementation of the settlement through their sundry overtures to Class Members.  Consequently, the Court has the authority to direct them to make corrective disclosures as to:

- Howard's assertion that the BAP Providers are grossly underpaid;

- Howard's assertion that the BAP Providers will be back-logged for a year;

- Howard's assertion that he and/or his firm is "working with" MAF Physicians;

- Howard's assertion that Class Members will be more likely to obtain Qualifying Diagnoses from MAF Physicians than BAP Providers (with regard to Level 1.5 and Level 2 QDs);[9] and

- Howard's omission that the BAP is free, while evaluations by MAF Physicians are not.

Following the receipt of discovery responses from respondents, it may become apparent that additional corrective disclosures are appropriate.

> **B.     The Court Has Broad Authority to Order Discovery Pursuant to the MDL Statute, 28 U.S.C. § 1407, Federal Rule of Civil Procedure 23(d), and the All Writs Act, 28 U.S.C. § 1651 – Subpoenas Are Not Necessary and the Respondents Should Be Ordered to Respond**

The Howard Respondents and Cambridge Respondents contend that Class Counsel was required to serve subpoenas pursuant to Fed. R. Civ. P. 45 in order to obtain discovery from them, because they are non-parties, and that, at any rate, even if subpoenas were served, they need not

---

[9] Qualifying Diagnoses of Parkinson's Disease, Alzheimer's Disease and ALS cannot be made by BAP Providers.

respond to discovery because, under Fed. R. Civ. P. 26(b)(1), the areas of inquiry are outside of the scope of discovery in that they do not relate to claims in the lawsuit.

Specifically, the Howard Respondents' claim that "the discovery requests do not comply with Federal Rule of Civil Procedure 45, which governs the discovery of information from non-parties such as this law firm, including a valid subpoena in accordance with Rule 45(a)-(c). The request seeks information that is not relevant to any party's claim or defense in this litigation and thus is outside the scope of discovery under Federal Rule of Civil Procedure 26(b)(1)." Seeger Decl., Ex. G, Interrog. Resp. No. 1. The Cambridge Respondents "object to the Discovery Requests in their entirety because they do not comply with Federal Rule of Civil Procedure 45, which governs the discovery of information from non-parties …, in particular, the Discovery Requests were not made pursuant to a valid subpoena in accordance with Rule 45(a)-(c)"; "the Federal Rules of Civil Procedure do not authorize propounding interrogatories on non-parties"; and the Discovery Requests allegedly "seek the production of information relating to contracts that are not 'relevant to any party's claim or defense' in the above-referenced lawsuit, Fed. R. Civ. P. 26(b)(1) and thus are outside the scope of discovery." Seeger Decl., Ex. H, at Gen. Objs. Nos. 1 - 3. These objections are unavailing.

This Court's Order[10] authorized Class Counsel to conduct the discovery of those who, like the Howard Respondents and Cambridge Respondents, voluntarily subjected themselves to this Court's jurisdiction by entering into agreements with Class Members related to their monetary awards, to be paid out of the res over which this Court presides – the Monetary Award Fund. This Court finally approved the Settlement and has plenary jurisdiction over the settlement corpus and

---

[10]  It is notable that the Court's Order specifically anticipated that interrogatories would be served. ECF No. 8037, at 2.  Fed. R. Civ. P. 45 plainly does not address interrogatories.

payments made therefrom.  The issue of the legality of the arrangements between the Cambridge

Entities and the Class Members is before the Court and, as such, so too are the Cambridge Entities,

the third-party beneficiaries of the monetary awards to the Class Members with whom they have

contracted.  Unquestionably, lawyers who represent individual Class Members, such as the

Howard Respondents, are before the Court.  *See* Section III.A, *supra*.

At this juncture, Class Counsel seek to obtain the discovery from which the Court can

determine whether the Howard Respondents or the Cambridge Respondents misled Class

Members, such that Class Members should be provided the opportunity to void the agreements or

such other relief as the Court deems appropriate.  The Court should not countenance their refusal

to respond to discovery, based upon their insistence that Class Counsel serve them with subpoenas,

because the information is allegedly outside of the parties' claims or defenses in the lawsuit, or

any other excuse.

### C.    Respondents Have Not Demonstrated that the Discovery Sought Is Subject to the Attorney-Client or Other Privilege or Protection

#### 1.    Howard Respondents

In addition to objecting to the discovery requests because subpoenas were not served, the

Howard Respondents have claimed that "[t]he law firm has not received client authorization to

release confidential attorney-client communications, or work product documents, or information

that is or may be confidential or otherwise protected by any right of privacy, to another law firm."

*See* Seeger Decl., Ex. G, Interrog. Resp. No. 1.

The burden of proving that the attorney-client privilege applies to specific information falls

to the party asserting the privilege.  *In re Grand Jury Empanelled Feb. 14, 1978 (Markowitz)*, 603

F.2d 469, 474 (3d Cir. 1979).  Generally, the fee agreement between a client and an attorney is not

privileged.  *In re Grand Jury Investigation (Tinari)*, 631 F.2d 17, 19 (3d Cir. 1980); *Kaiser v.*

*Stewart*, No. 96-6643, 1996 WL 730533, at *2 (E.D. Pa. Dec. 10, 1996) ("Fee arrangements between an attorney and his or her client are generally not protected by the attorney-client privilege.").

Thus, the privilege does not typically shield client identity or the fact of retention. *Tinari*, 631 F.2d at 19 ("Moreover, in the absence of unusual circumstances, the privilege does not shield the fact of retention, the identity of clients, and fee arrangements.") (citing cases). The Third Circuit has explained that the attorney-client privilege exists to protect confidential communications between a lawyer and a client; in most cases, the disclosure of a fee arrangement or a client's identity does not disclose the substance of any confidences. *Markowitz,* 603 F.2d at 473; *see also Mauch v. Comm'r of Internal Revenue*, 113 F.2d 555, 556 (3d Cir. 1940) ("[T]he privilege does not apply to the creation of the relation."). The date of the fee arrangement is also discoverable. *Prousi v. Cruisers Division of KCS Int'l, Inc*., No. 95-6652, 1997 WL 135692, at *1 (E.D. Pa. Mar. 13, 1997).

The Ninth Circuit noted in *In re Michaelson*, 511 F.2d 882 (9th Cir. 1975):

> There are strong policy reasons why the existence of an attorney-client relationship, including the fee arrangement, should not be privileged. … The courts have inherent power to regulate the bar. The courts have the right to inquire into fee arrangements both to protect the client from excessive fees and to assist an attorney in collection of his fee, but more importantly, the court may inquire into fee arrangements to protect against suspected conflicts of interest.

*Id.* at 888.

Save a mention of charging fees of 12.5% to 20%, plus costs (except in referral situations wherein contracts provide for 25% fees, plus costs), the Howard Respondents refused even to respond to Interrogatory No. 1, which sought to discover their clients' identities,[11] dates of the

---

[11] As noted in footnote 2, *supra*, as Court-appointed Class Counsel, the undersigned know the identities of Mr. Howard's 222 clients, by virtue of the Class Members who were registered by the

retainer agreements, fee percentages and existence and arrangement as between each client and the Cambridge Entities.  Clearly, none of this information is subject to the attorney-client privilege.

Additionally, the Howard Respondents have failed to meet their burden that other information sought in the Interrogatories propounded upon them by Class Counsel is privileged.  They have asserted the privilege or confidentiality related to medical providers to whom they sent their clients, whether they paid for travel and related expenses in connection therewith, communications with claims service providers, lenders and others related to clients, financial relationships with third parties related the Settlement, receipt and dissemination of Class Member contact information, and any person or entity involved in client solicitations.  These assertions are baseless.

### 2.    Cambridge Respondents

Like the Howard Respondents, the Cambridge Respondents,[12] assert the attorney-client privilege and confidentiality across the board, as a basis to refuse to answer all discovery requests propounded by Class Counsel upon those entities.  Unless Mr. Howard is blurring the lines between his law practice and his funding entities, there is no legitimate basis for this assertion.

---

firm.

[12] The Cambridge Respondents further contend at General Objection to Discovery Requests No. 4, *see* Seeger Decl., Ex. H, that any dispute regarding contracts between the Cambridge Entities and Class Members must be submitted to arbitration.  That objection is patently frivolous.  The Settling Parties are not parties to those contracts, and certainly did not endorse them, and thus plainly are not subject to any arbitration clause.  Moreover, that groundless objection ignores the fact that the Court may determine that the contracts are void because the Settlement Agreement prohibits assignments.  *See* Settlement Agreement (ECF No. 6481-1), at § 30.1.  This issue already is squarely before the Court in connection with RD Legal's contracts with Class Members.  *See Consumer Fin. Protection Bureau v. RD Legal Funding, LLC,* No. 17-CV-890 (LAP) (S.D.N.Y. Order dated Sept. 8, 2017) (ECF No. 59) (Judge Preska's Order referring discrete issue of assignability of settlement benefits to this Court).  As such, no arbitration clause in the void agreement would be applicable.

Further, unlike the identities of the clients of the Howard Respondents, Class Counsel have no information as to the identities of the Class Members who have contracted with the Cambridge Entities. Therefore, it is vital that Class Counsel learn the identities of these Class Members in order that any misrepresentations affecting their decisions to enter into agreements with the Cambridge Entities can be explored (assuming that the assignments are not void by the terms of the Settlement Agreement).

## IV.   <u>CONCLUSION</u>

For the reasons stated above, the Court should (i) direct that the Howard Respondents and Cambridge Respondents make corrective disclosures (in a form and manner to be approved by Class Counsel and the Court); and (ii) direct the Howard Respondents and Cambridge Respondents to respond to the discovery requests propounded upon them pursuant to the Court's July 19, 2017 Order.

Dated:  September 12, 2017                                 Respectfully submitted,

<u>/s/ Christopher A. Seeger</u>
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
<u>cseeger@seegerweiss.com</u>

***Co-Lead Class Counsel***

Sol Weiss
ANAPOL WEISS
One Logan Square
130 N. 18th St., Suite 1600
Philadelphia, PA 19103
Phone: (215) 735-1130
Fax: (215) 735-2024
sweiss@anapolweiss.com

***Co-Lead Class Counsel***