# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: ALL OPT OUT ACTIONS PENDING AGAINST DEFENDANTS NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC | Hon. Anita B. Brody |

**MEMORANDUM OF LAW OF DEFENDANTS NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED MASTER ADMINISTRATIVE LONG-FORM COMPLAINT ON <u>PREEMPTION GROUNDS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................II

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...............................................................................................................5

    A.    The Parties ..........................................................................................................5

    B.    The NFL Collective Bargaining Agreements ......................................................6

        1.    Player Medical Care Provisions....................................................................7

        2.    Rule-Making and Player Safety Rule Provisions ......................................10

        3.    Grievance Procedures ................................................................................11

        4.    Player Benefits Provisions .........................................................................12

    C.    Procedural Background........................................................................................12

    D.    The Second Amended Complaint ........................................................................15

ARGUMENT ....................................................................................................................18

I.    SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS' CLAIMS AGAINST THE NFL ...................................................................................................................18

    A.    Resolution of Plaintiffs' Claims Against the NFL Would  Substantially Depend Upon Interpretation of the Terms of the CBAs .......................................21

        1.    Resolution of Plaintiffs' Negligence-Based Claims Would Require Interpretation of the Terms of the CBAs ....................................................22

        2.    Resolution of Plaintiffs' Wrongful Death, Survival, and Loss of Consortium Claims Would Require Interpretation of the Terms of the CBAs.........................................................................................................31

        3.    Resolution of Plaintiffs' Fraud-Based Claims Would Require Interpretation of the Terms of the CBAs ....................................................32

    B.    Plaintiffs' Claims Against the NFL Arise Under the CBAs.................................37

II.    SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS AGAINST NFLP .......................41

III.    PLAINTIFFS' ESTOPPEL ALLEGATIONS ARE BASELESS .................................43

CONCLUSION.................................................................................................................47

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Allis-Chalmers Corp.* v. *Lueck,*
    471 U.S. 202 (1985)..................................................................................18, 19, 20, 37

*Althaus ex rel. Althaus* v. *Cohen,*
    756 A.2d 1166 (Pa. 2000) .....................................................................................22

*Angst* v. *Mack Trucks, Inc.,*
    969 F.2d 1530 (3d Cir. 1992).................................................................................20

*Antol* v. *Esposto,*
    100 F.3d 1111 (3d Cir. 1996).....................................................................19, 20, 37

*Atwater* v. *Nat'l Football League Players' Ass'n,*
    626 F.3d 1170 (11th Cir. 2010) ..................................................................... passim

*Aubrey* v. *Sanders,*
    No. 07-cv-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008)......................32, 33

*Ballard* v. *Nat'l Football League Players' Ass'n,*
    123 F. Supp. 3d 1161 (E.D. Mo. 2015)...............................................28, 29, 36, 40

*Barnes* v. *Nat'l Football League,*
    No. 11-cv-08396, Order (C.D. Cal. Dec. 8, 2011), ECF No. 61 ...........................13

*Barton* v. *House of Raeford Farms, Inc.,*
    745 F.3d 95 (4th Cir. 2014) ..................................................................................19

*Beidleman* v. *Stroh Brewery Co.,*
    182 F.3d 225 (3d Cir. 1999)............................................................................19, 20

*Boogaard* v. *Nat'l Hockey League,*
    126 F. Supp. 3d 1010 (N.D. Ill. 2015) ..................................................................30

*Bortz* v. *Noon,*
    729 A.2d 555 (Pa. 1999) .......................................................................................32

*Brown* v. *Nat'l Football League,*
    219 F. Supp. 2d 372 (S.D.N.Y. 2002)...........................................................5, 7, 39

*Buck* v. *Hampton Twp. Sch. Dist.,*
    452 F.3d 256 (3d Cir. 2006).....................................................................................5

*Caterpillar Inc.* v. *Williams,*
    482 U.S. 386 (1987)...............................................................................................45

*Chipman* v. *Nelson*,
    No. 11-cv-2770, 2016 WL 4943843 (E.D. Cal. Sept. 15, 2016) ............................................32

*Clarett* v. *Nat'l Football League*,
    369 F.3d 124 (2d Cir. 2004)...............................................................................................7

*Corazzini* v. *Litton Loan Servicing LLP*,
    No. 09-cv-0199, 2010 WL 1132683 (N.D.N.Y. Mar. 23, 2010) ....................................22

*Davis* v. *Bell Atl.-W. Virginia, Inc.*,
    110 F.3d 245 (4th Cir. 1997) .............................................................................................7

*Duerson* v. *Nat'l Football League*,
    No. 12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012)..................................... passim

*Givens* v. *Tenn. Football, Inc.*,
    684 F. Supp. 2d 985 (M.D. Tenn. 2010)....................................................4–5, 20, 21, 29

*Harper* v. *Am. Red Cross Blood Servs.*,
    153 F. Supp. 2d 719 (E.D. Pa. 2001) ...............................................................................19

*Henderson* v. *Merck & Co.*,
    998 F. Supp. 532 (E.D. Pa. 1998) ...........................................................................19–20, 20

*Holmes* v. *Nat'l Football League*,
    939 F. Supp. 517 (N.D. Tex. 1996) ............................................................................5–6, 30

*Howard Hess Dental Labs. Inc.* v. *Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010)..............................................................................................46

*Hughes* v. *BCI Int'l Holdings, Inc.*,
    452 F. Supp. 2d 290 (S.D.N.Y. 2006)..............................................................................22

*Hyles* v. *Mensing*,
    849 F.2d 1213 (9th Cir. 1988) ..........................................................................................19

*Int'l Bhd. of Elec. Workers* v. *Hechler*,
    481 U.S. 851 (1987)...........................................................................................................19

*Jeffers* v. *D'Allessandro*,
    681 S.E.2d 405 (N.C. Ct. App. 2009) ......................................................................5, 21, 30

*Joseph M.* v. *Ne. Educ. Intermediate Unit 19*,
    516 F. Supp. 2d 424 (M.D. Pa. 2007)..............................................................................22

*Khalil* v. *Rohm & Haas Co.*,
    No. 05-cv-3396, 2008 WL 383322 (E.D. Pa. Feb. 11, 2008).........................................47

*Kurns* v. *A.W. Chesterton, Inc.*,
   620 F.3d 392 (3d Cir. 2010)...........................................................................19

*Lance* v. *Wyeth*,
   85 A.3d 434 (Pa. 2014) ..................................................................................22

*Laskowski* v. *U.S. Dep't of Veterans Affairs*,
   918 F. Supp. 2d 301 (M.D. Pa. 2013) ...........................................................31

*Lingle* v. *Norge Div. of Magic Chef, Inc.*,
   486 U.S. 399 ..................................................................................................18

*Manti's Transp., Inc.* v. *C.T. Lines, Inc.*,
   68 A.D.3d 937 (N.Y. App. Div. 2009) ...........................................................32

*Martin* v. *Watkins*,
   No. 10-cv-0423, 2010 WL 5371341 (W.D. Va. Dec. 22, 2010)....................41

*MatlinPatterson ATA Holdings LLC* v. *Fed. Express Corp.*,
   87 A.D.3d 836 (N.Y. App. Div. 2011) ...........................................................32

*Maxwell* v. *Nat'l Football League*,
   No. 11-cv-08394, Order (C.D. Cal. Dec. 8, 2011), ECF No. 58 ................. passim

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   307 F.R.D. 351 (E.D. Pa. 2015), *amended* No. 2:12-MD-02323-AB, 2015 WL
   12827803 (E.D. Pa. May 8, 2015) ...............................................................2, 13

*O'Leary* v. *Liberty Mut. Ins. Co.*,
   923 F.2d 1062 (3d Cir. 1991)........................................................................46

*Ostella* v. *IRBSearch, LLC*,
   No. 12-cv-7002, 2013 WL 5777291 (E.D. Pa. Oct. 24, 2013) .....................43

*Pear* v. *Nat'l Football League*,
   No. 11-cv-08395, Order (C.D. Cal. Dec. 8, 2011), ECF No. 61 ..................13

*Peek* v. *Phila. Coca-Cola Bottling Co.*,
   No. 97-cv-3372, 1997 WL 399379 (E.D. Pa. July 10, 1997) ...................28, 39–40

*Ryan Operations G.P.* v. *Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996)............................................................................43

*Schnell* v. *Bank of N.Y. Mellon*,
   828 F. Supp. 2d 798 (E.D. Pa. 2011) ............................................................22

*Sherwin* v. *Indianapolis Colts, Inc.*,
   752 F. Supp. 1172 (N.D.N.Y. 1990)........................................................ passim

*Smith* v. *Houston Oilers, Inc.*,
  87 F.3d 717 (5th Cir. 1996) ...................................................................30

*Smith* v. *Nat'l Football League Players' Ass'n*,
  No. 14-cv-01559, 2014 WL 6776306 (E.D. Mo. Dec. 2, 2014) .............................36

*Stringer* v. *Nat'l Football League*,
  474 F. Supp. 2d 894 (S.D. Ohio 2007) ........................................................ passim

*Sullivan* v. *Warminster Twp.*,
  No. 07-cv-4447, 2010 WL 2164520 (E.D. Pa. May 27, 2010)...............................31

*Suppan* v. *Dadonna*,
  203 F.3d 228 (3d Cir. 2000)....................................................................44

*Tran* v. *Metro. Life Ins. Co.*,
  408 F.3d 130 (3d Cir. 2005).............................................................33–34, 44

*United Ass'n of Journeymen* v. *Local 334*,
  452 U.S. 615 (1981)...............................................................................7

*United Steelworkers of Am.* v. *Rawson*,
  495 U.S. 362 (1990).........................................................................32, 39

*Williams* v. *Nat'l Football League*,
  582 F.3d 863 (8th Cir. 2009) ........................................................4, 30, 33, 34

*Witkowski* v. *Welch*,
  173 F.3d 192 (3d Cir. 1999).....................................................................43

*Young* v. *Anthony's Fish Grottos, Inc.*,
  830 F.2d 993 (9th Cir. 1987) ...................................................................46

*Zinman* v. *Prudential Ins. Co. of Am.*,
  909 F. Supp. 279 (E.D. Pa. 1995) ..........................................................43, 46

## STATUTES

29 U.S.C. § 185(a) .........................................................................18, 19

Labor Management Relations Act, § 301 ............................................... passim

Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP" and, together with the NFL, the "NFL Defendants") respectfully submit this memorandum in support of their motion to dismiss, on preemption grounds, the Second Amended Master Administrative Long-Form Complaint (the "Second Amended Complaint" or "SAC"). The Second Amended Complaint is brought by former professional football players whose terms and conditions of NFL employment were defined by collective bargaining agreements (the "CBAs"), representatives of the estates of such former players, and family members of such former players with pending claims in this multi-district litigation (the "MDL") who are not part of the Settlement Class covered by the February 13, 2015 Class Action Settlement Agreement (the "Settlement Agreement"), including those who have opted out of the Settlement Agreement ("Plaintiffs").[1]

## PRELIMINARY STATEMENT

This action—brought by retired NFL players unhappy with the generous concussion settlement benefits approved by this Court and endorsed by the vast majority of players—should be dismissed under settled labor preemption law.

After several years of litigation—including a Court-ordered mediation—in this MDL proceeding, the NFL Defendants and Class Counsel reached a landmark class action settlement. The Settlement, now final and effective, was accepted by over 99% of the Settlement Class, with ultimately over half of the opt-outs revoking their opt-out status and choosing to be eligible for the Settlement's many significant benefits. Plaintiffs here instead opted to gamble on

---

[1]  Although the term "Plaintiffs" as used herein technically includes in some cases the representatives or family members of former NFL players, for ease of reference the NFL Defendants will use the term "Plaintiffs" as though it refers to former players only, such as references to "Plaintiffs' NFL careers" or "Plaintiffs' retirement."

litigation, despite this Court's caution that they faced a risky path forward because, among other reasons, the NFL Defendants' preemption arguments present a "stiff challenge."[2]

Plaintiffs' newly filed complaint—alleging that the NFL failed to fulfill a duty to ensure the safety of NFL players—presents precisely the type of labor dispute this Court cautioned would be subject to immediate dismissal under preemption law because resolution of Plaintiffs' claims depends upon an interpretation of the terms of numerous health and safety provisions of the CBAs.

For almost 50 years, professional football players have played under CBAs, painstakingly negotiated by their Union, that set forth the parties' understanding and agreement on how, among many other things, player health and safety will be protected.  Although the CBAs evolved over time, each is a labor agreement that details and comprehensively governs the relationship among the NFL, its Clubs, and the players. As a result of these negotiations, the CBAs to which the players' representatives expressly agreed:

(i)     address the responsibilities of the NFL's Member Clubs and their medical staffs to treat player injuries, including determining injury recovery times, deciding when players may "return to play," and advising the players of the risks of continued performance;

(ii)    set forth procedures for the promulgation and review of rules and regulations that affect and/or relate to player safety;

(iii)   provide for a player's right to compensation and other benefits in the event of injury; and

(iv)    set forth the dispute resolution procedures to be followed in the event of a dispute.

After relying on these agreements for years—and, in many cases, decades— Plaintiffs now seek to sidestep the CBAs and ask this Court to resolve their concussion-related

---

[2]     *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 391–92 (E.D. Pa. 2015), *amended* No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd* 821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016), *cert. denied* 137 S. Ct. 591 (2016), and *cert. denied* 137 S. Ct. 607 (2016) (the "NFL MDL Approval Opinion").

grievances.  The bargained-for CBAs expressly provide otherwise.  Preemption law provides that parties whose terms and conditions of employment are determined by a collective bargaining agreement must grieve their employment-related disputes by the dispute resolution process prescribed by the CBA—not by bringing claims in court.

The CBAs—like all collective bargaining agreements affecting interstate commerce—are governed by section 301 ("Section 301") of the Labor Management Relations Act (the "LMRA").  Section 301 ensures that disputes between parties to a labor agreement are resolved under a uniform body of federal labor law and adjudicated in accordance with the parties' agreed-to grievance procedures.  Thus, Section 301 provides for preemption of all state-law claims—whether based in negligence or fraud—whose resolution is substantially dependent upon or inextricably intertwined with the terms of a CBA, or that arise under the CBA.

That is the case here.  For example, to adjudicate Plaintiffs' negligence claims, alleging that the NFL breached its duties to inform NFL players of the risks associated with concussions and to protect their health and safety, a court would have to determine whether the NFL had the duties that the players allege and whether the NFL acted "reasonably" in carrying out those duties.  The CBAs provide that the Clubs and their physicians have certain responsibilities relating to player medical care, including the responsibility for treating player injuries, making return-to-play decisions, and informing players of medical risks associated with continuing to play.  As two district courts considering claims ultimately transferred to this Court have held, these "physician provisions" of the CBAs "must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  *Maxwell* v. *Nat'l Football League*, No. 11-cv-08394, Order at 1–2 (C.D. Cal. Dec. 8, 2011), ECF No. 58; *see also*

*Duerson* v. *Nat'l Football League*, No. 12-cv-2513, 2012 WL 1658353, at *4 (N.D. Ill. May 11, 2012) (determining that any duty to warn imposed on the Clubs and their physicians under the CBA to protect player health and safety "would be one factor tending to show that the NFL's alleged failure to take action to protect [NFL players] from concussive brain trauma was reasonable").

These provisions on player health and safety are also integral to resolution of Plaintiffs' fraud-based claims. Those claims, too, rest upon the purported breach of the NFL's alleged "duty to advise Plaintiffs of [the] heightened risk" of neurodegenerative diseases—a duty that cannot be assessed without first considering the preexisting obligations regarding player health and safety imposed by the CBAs. Nor can a court determine whether Plaintiffs justifiably relied on information provided by the NFL without first interpreting the CBAs' health and safety provisions that allocate to Club physicians the task of providing injury-related information to players, including information relating to the risks of continuing to play football.

For these reasons, numerous courts, consistent with settled labor preemption precedent, have held that player tort claims against the NFL and/or its Clubs—including fraud claims and certain of the concussion-related claims asserted in this action—are preempted under Section 301. *See, e.g.*, *Duerson*, 2012 WL 1658353, at *6 (negligence claim preempted); *Maxwell*, No. 11-cv-08394, Order at 2 (negligence claim preempted); *see also Atwater* v. *Nat'l Football League Players' Ass'n*, 626 F.3d 1170, 1182–83 (11th Cir. 2010) (negligence and negligent misrepresentation claims preempted); *Williams* v. *Nat'l Football League*, 582 F.3d 863, 881–82 (8th Cir. 2009) (breach of fiduciary duty, negligence, gross negligence, fraud, constructive fraud, negligent misrepresentation, and intentional infliction of emotional distress claims preempted); *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 989–92 (M.D. Tenn.

2010) (outrageous conduct, negligent infliction of emotional distress, and breach of duty of good faith and fair dealing claims preempted); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 908–11 (S.D. Ohio 2007) (wrongful death claim preempted); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178–79 (N.D.N.Y. 1990) (negligence, fraud, negligent misrepresentation, negligent and intentional infliction of emotional distress claims preempted); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009) (negligent retention and intentional misconduct claims preempted).

For these reasons and others, Plaintiffs' claims against the NFL and NFLP are preempted, and thus the Complaint should be dismissed with prejudice.

## BACKGROUND

### A.    The Parties

The NFL is an unincorporated association of 32 Clubs that promotes, organizes, and regulates the sport of professional football in the United States.  (SAC ¶¶ 35–37); *see also Stringer*, 474 F. Supp. 2d at 898.[3]  NFLP is a limited liability company organized under the laws of the State of Delaware and headquartered in New York.  (SAC ¶ 39.)  NFLP "serves as the representative of the [NFL and its Clubs] for the licensing of their trademarks and logos." (*Licensing Pre-Qualification Terms & Conditions* (last visited Sep. 15, 2017), www.nfl.info/NFLConsProd/Welcome/cpAgreement.htm.)   Plaintiffs are former professional football players, the representatives of the estates of former players, and family members of

---

[3]   This summary is based on the allegations of the Second Amended Complaint—the factual averments of which the NFL Defendants assume to be true for purposes of this motion only—and, where applicable, public records and documents integral to Plaintiffs' claims, including the CBAs, attached as exhibits to the accompanying Declaration of Dennis L. Curran, dated September 25, 2017 and cited in the form "Ex. __."  This Court may consider the CBAs in adjudicating this motion under Rule 12(b) because the CBAs are integral to Plaintiffs' claims.  *See Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 383–84, 385–87 (S.D.N.Y. 2002) (considering CBA provisions in order to adjudicate NFL's motion to dismiss); *Holmes* v. *Nat'l Football League*, 939 F. Supp. 517, 520 n.2 (N.D. Tex.

former players with pending claims in this MDL who are not part of the Settlement Class and/or have opted out of the February 13, 2015 Class Action Settlement Agreement as of the date of this filing.  (*See* Order 1 n.1, Apr. 12, 2017, ECF No. 7477 (the "April 12 Order"); Timely Opt Out Requests Containing All Information Required by Section 14.2(a) or Otherwise Approved by the Court, NFL Concussion Settlement (last updated August 24, 2017), https://nflconcussionsettlement.com/Documents.aspx (the "Opt Out List").)[4]

## B.    The NFL Collective Bargaining Agreements

The terms and conditions of Plaintiffs' employment as professional football players are defined by the CBAs that were operative during each Plaintiff's career.[5]  The CBAs are the product of exhaustive arms'-length negotiations between, on the one hand, the NFL, the American Football League ("AFL") or the NFL Management Council (the exclusive bargaining

---

1996) (same); *Duerson*, 2012 WL 1658353, at *4 (considering CBAs in connection with motion to remand); *Maxwell*, No. 11-cv-08394, Order at 1–2 (same).

[4]    The Second Amended Complaint also supersedes the claims of two former players (Danny Gorrer and Adrian Robinson Jr.) and their representatives and family members who, based on their dates of NFL play, were not eligible members of the Settlement Class and therefore did not formally opt out, but who have pending claims against the NFL Defendants in this MDL which, pursuant to this Court's April 12 Order, are superseded by the Second Amended Complaint.  (*See* April 12 Order 1 n.1 & ¶ 6 (providing that SAC supersedes all claims in complaints by all "non-Settlement Class Member plaintiffs with pending claims" in this MDL, including any complaints coordinated or consolidated in this MDL after April 12, 2017); Order 1 n.1 & ¶ 2, July 18, 2017, ECF No. 8030; Notice of Removal, *Robinson* v. *Nat'l Football League, Inc.*, No. 2:17-cv-2736 (E.D. Pa. June 16, 2017), ECF No. 1; Conditional Transfer Order (CTO-97), *Scroggins* v. *Nat'l Football League, Inc.*, No. 16-cv-2058 (E.D. Pa. Apr. 29, 2016), ECF No. 1.)  The *Robinson* plaintiffs have moved to remand their case to Pennsylvania state court, but if that motion is denied, they will remain in this MDL and their claims will be governed by the Second Amended Complaint.  Their claims should be dismissed for the reasons set forth in this memorandum of law and in the NFL Defendants' concurrently filed memorandum of law in support of their motion to dismiss the Second Amended Complaint for failure to state a claim.

[5]    Since 1968, the NFL has operated under a CBA with only two exceptions:  (1) the period between August 31, 1987 and March 29, 1993, when no CBA was in place, following the expiration of the 1982 CBA and prior to the execution of the 1993 CBA; and (2) the period between March 11, 2011 and August 4, 2011.  The 1968 NFL CBA was effective from July 15, 1968 to February 1, 1970.  The 1968 AFL CBA was effective from July 10, 1968 to February 1, 1970.  The 1970 CBA was effective from February 1, 1970 to January 31, 1974.  The 1977 CBA was effective from February 1, 1974 to July 15, 1982.  The 1982 CBA was effective from July 16, 1982 to August 31, 1987.  The 1993 CBA (as amended June 6, 1996, February 25, 1998, December 4, 2000, and January 8, 2002) was effective from March 29, 1993 to March 7, 2006.  The 2006 CBA was effective from March 8, 2006 to March 10, 2011.  The 2011 CBA became effective on August 4, 2011 and expires in 2020.

representative of the NFL Clubs), and, on the other hand, the NFLPA (the exclusive bargaining representative of NFL players) or the AFL Players Association (the exclusive bargaining representative of AFL players).   The CBAs so negotiated "represent[] the complete understanding of the parties on all subjects covered [t]herein."[6]  Through their Union, the players further agreed to be bound by the terms of the NFL Constitution and Bylaws (the "Constitution"), to the extent that such terms do not conflict with the terms of the governing CBA.[7]

The CBAs cover a broad range of subjects affecting the terms and conditions of employment for NFL players, including NFL player contracts and salary provisions, NFL draft rules, and player discipline.   Although the CBAs have changed over time pursuant to the collective bargaining process, every CBA expressly addresses player health and safety and provides grievance procedures for the resolution of disputes under the CBAs.

### 1.   Player Medical Care Provisions

The CBAs address in detail issues relating to assessment, diagnosis, and treatment of player injuries.   For example, multiple CBAs provide that Club physicians have the responsibility for making "return to play" decisions and advising players of the risk of continued

---

[6]   *See* Ex. 4, 1977 CBA Preamble & Art. II § 1; Ex. 5, 1982 CBA Preamble & Art. II § 1; Ex. 6, 1993 CBA Preamble & Art. III § 1; Ex. 10, 2006 CBA Preamble & Art. III § 1; Ex. 11, 2011 CBA Preamble & Art. 2 § 4(a); *see also* Ex. 1, 1968 AFL CBA Preamble & § 16; Ex. 2, 1968 NFL CBA Preamble & Art. I § 2; Ex. 3, 1970 CBA Preamble & Art. II § 4.

[7]   *See, e.g.*, Ex. 4, 1977 CBA Art. I § 2; Ex. 5, 1982 CBA Art. I § 2; *see Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the collective bargaining agreement, the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein[.]"); *Brown*, 219 F. Supp. 2d at 386 (The NFL "Constitution was bargained over and included within the scope of the CBA."); *see also United Ass'n of Journeymen* v. *Local 334*, 452 U.S. 615, 627 (1981) (union constitutions constitute labor contracts under § 301); *Davis* v. *Bell Atl.-W. Virginia, Inc.*, 110 F.3d 245, 248–49 (4th Cir. 1997) (employee's claim preempted because of need to interpret grievance settlement agreement negotiated by union, dependent on CBA, and "fairly characterized as a rider to the [CBA]").

performance; several set forth the qualifications for Club medical staff.  Thus, the CBAs provide,

for example:

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player.  If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity." (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 11, 2011 CBA Art. 39 § 1(c); Ex. 5, 1982 CBA Art. XXXI § 1.)

- "All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards . . . . The prognosis of the player's recovery time should be as precise as possible." (*See, e.g.*, Ex. 13, 1980 Supp. to NFL Constitution Art. XVII.)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ."  (Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9; Ex. 11, 2011 CBA Appx. A § 9.)

- "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians.  The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs."  (Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; Ex. 11, 2011 CBA Art. 39 § 1(a) (also requiring that newly hired physicians be certified in sports medicine).)

- "All full-time head trainers and assistant trainers . . . will be certified by the National Athletic Trainers Association.  All part-time trainers must work under the direct supervision of a certified trainer."  (Ex. 5, 1982 CBA Art. XXXI § 2; Ex. 6, 1993 CBA Art. XLIV § 2; Ex. 10, 2006 CBA Art. XLIV § 2; *see also* Ex. 11, 2011 CBA Art. 39 § 2 (also requiring at least two full-time certified trainers and at least one certified physical therapist).)

- "The home team shall provide a physician and an ambulance at each game available to both teams; said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams."  (*See, e.g.*, Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5.)

- "[A]ll Club physicians and medical personnel shall comply with all federal, state, and local requirements, including all ethical rules and standards established by any applicable government and/or other authority that regulates or governs the medical profession in the Club's city."  (Ex. 11, 2011 CBA Art. 39 § 1(c).)

- "The NFL shall develop and implement an online, 24-hour electronic medical record system within 24 months of the effective date of this Agreement or such longer period as the parties may agree." (Ex. 11, 2011 CBA Art. 40 § 3.)

- "The parties agree to establish an Accountability and Care Committee, which will provide advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players by all clubs." (Ex. 11, 2011 CBA Art. 39 § 3(a).) "The Committee shall . . . develop a standardized preseason and postseason physical examination and educational protocol to inform players of the primary risks associated with playing professional football and the role of the player and the team medical staff in preventing and treating illness and injury in professional athletes; . . . conduct research into prevention and treatment of illness and injury commonly experienced by professional athletes . . . [and] assist in the development and maintenance of injury surveillance and medical records systems . . . ." (*Id.* § 3(c).)

- "If any player submits a complaint to the [Accountability and Care] Committee regarding Club medical care, the complaint shall be referred to the league and the player's Club, which together shall determine an appropriate response or corrective action if found to be reasonable." (*Id.* § 3(d).)

- "Each Club shall use its best efforts to ensure that its players are provided with medical care consistent with professional standards for the industry." (*Id.* § 3(e).)

Multiple CBAs also set forth player rights and obligations related to medical care.

Thus, the CBAs provide:

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d); Ex. 11, 2011 CBA, Art. 50 § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the costs of [these] medical services." (Ex. 5, 1982 CBA Art. XXXI § 3; Ex. 6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3; Ex. 11, 2011 CBA Art. 39 § 4.)

- "A player will have the right to choose the surgeon who will perform surgery . . . . Any such surgery will be at Club expense[.]" (Ex. 5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 4; Ex. 11, 2011 CBA Art. 39 § 5.)

- "[E]ach player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and will further undergo a "post-season physical examination" at the request of the player or Club.

(Ex. 5, 1982 CBA Art. XXXI § 5; *see also* Ex. 6, 1993 CBA Art. XLIV § 5; Ex. 10, 2006 CBA Art. XLIV § 5; Ex. 11, 2011 CBA Art. 39 § 6.)

- "Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract . . . ." (Ex. 6, 1993 CBA Appx. C § 8; Ex. 10, 2006 CBA Appx. C § 8; Ex. 11, 2011 CBA Appx. A § 8.)

- "Player may examine his medical and trainers' records in the possession of the Club or Club physician two (2) times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him . . . ." (Ex. 10, 2006 CBA Art. XLV § 2; *see also* Ex. 5, 1982 CBA Art. XXXII § 2; Ex. 6, 1993 CBA Art. XLV § 2; Ex. 11, 2011 CBA Art. 40 § 2.)

## 2.    Rule-Making and Player Safety Rule Provisions

The CBAs also set forth the manner in which playing rules addressing or affecting player safety are promulgated and enforced. For example, all playing rule changes must be "presented to the [NFL]" or unanimously approved by a "standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes" (Ex. 14, 1984 NFL Constitution Art. XI § 11.2), and consisting of members appointed by the Clubs and the NFLPA. The CBAs also provide that the Clubs, the NFLPA, and the NFL all have responsibility for reviewing player safety aspects of playing rules. Thus, the CBAs provide:

- "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects." (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(a), (c); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)

- "The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly . . . is a review of all current materials on the player safety aspects of player equipment, playing surfaces, and other safety

matters . . . ."  (Ex. 5, 1982 CBA Art. XI § 7; *see also* Ex. 6, 1993 CBA Art. XIII § 1(b); Ex. 10, 2006 CBA Art. XIII § 1(b).)

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex.11, 2011 CBA Art. 50 § 1(c).)

- "The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules.  One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules."  (Ex. 6, 1993 CBA Art. XIII § 2; Ex. 10, 2006 CBA Art. XIII § 2; Ex. 11, 2011 CBA Art. 50 § 2; *see also* Ex. 4, 1977 CBA Art. XI § 9; Ex. 5, 1982 CBA Art. XI § 8.)

### 3.     Grievance Procedures

Since 1977, all CBAs have contained a broad arbitration clause providing that all disputes involving "the interpretation of, application of, or compliance with, any provision of" the CBAs, player contracts, or any applicable provision of the Constitution "pertaining to terms and conditions of employment of NFL players," will be resolved exclusively in accordance with agreed-to arbitration procedures.  Moreover, since 1970, "injury grievances" have been subject to arbitration.  (*See* Ex. 6, 1993 CBA Art. IX § 1, Art. X § 6; Ex. 10, 2006 CBA Art. IX § 1, Art. X § 6; Ex. 11, 2011 CBA Art. 43 § 1, Art. 44 § 6; *see also* Ex. 3, 1970 CBA Art. XI § 6 & Appx. B; Ex. 4, 1977 CBA Art. VII § 1, Art. IX § 6; Ex. 5, 1982 CBA Art. VII § 1, Art. IX § 6.) Certain CBAs also expressly forbid players from bringing "any suit against . . . the NFL or any Club with respect to any claim relating to any conduct permitted by [the CBAs] . . . or any term of [the CBAs]" or "the Constitution and Bylaws of the NFL."  (Ex. 6, 1993 CBA Art. IV § 2; Ex. 10, 2006 CBA Art. IV § 2; Ex. 11, 2011 CBA Art. 3 § 2; *see also* Ex. 4, 1977 CBA Art. III § 2; Ex. 5, 1982 CBA Art. III § 2.)

### 4.   Player Benefits Provisions

Finally, the CBAs also include numerous provisions regarding the rights of players and former players to compensation and benefits in the event of injuries, including the right to workers' compensation and supplemental disability benefits,[8] as well as certain rights and benefits for eligible retirees, including the establishment of a plan to provide medical benefits to eligible retirees determined to have dementia.  For example:

- "[A] player . . . will receive an injury protection benefit . . . [when the] player . . . [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician . . . ."  (Ex. 4, 1977 CBA Art. X § 1; Ex. 5, 1982 CBA Art. X § 1; *see also* Ex. 6, 1993 CBA Art. XII § 1; Ex. 10, 2006 CBA Art. XII § 1; Ex. 11, 2011 CBA Art. 45 § 1.)

- "The parties agree to design and establish a new plan . . . to provide medical benefits to former Players who are . . . determined . . . to have 'dementia.'"  (Ex. 10, 2006 CBA Art. XLVIII-D § 1; *see also* Ex. 11, 2011 CBA Art. 58 § 1; 2011 CBA Art. 65 § 1 ("[T]he Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have permanent, neuro-cognitive impairment . . . .").)

## C.   <u>Procedural Background</u>

Notwithstanding the CBA provisions that require that all disputes involving the interpretation of, application of, or compliance with the CBAs be resolved through grievance procedures, in July and August 2011, former NFL players began filing actions against the NFL Defendants seeking relief for alleged concussion-related injuries sustained during their playing careers.

This MDL was established on January 31, 2012; since that time, over 300 additional cases, brought on behalf of approximately 5,000 former NFL players, have been

---

[8]   (*See, e.g.*, Ex. 2, 1968 NFL CBA Art. XI § 4; Ex. 3, 1970 CBA Art. XV § 7; Ex. 4, 1977 CBA Art. XXXIII; Ex. 5, 1982 CBA Art. XXIV, Art. XXXVI; Ex. 6, 1993 CBA Art. L, Art. LI, Art. LIV; Ex. 10, 2006 CBA Art. L, Art. LI, Art. LIV; Ex. 11, 2011 CBA Art. 41, Art. 60, Art. 61, Art. 62.)

included in the MDL.  *See* NFL MDL Approval Opinion, 307 F.R.D. at 361.  To date, federal district courts have denied concussion-related remand motions on preemption grounds.  *See Duerson*, 2012 WL 1658353, at *6; *Maxwell*, No. 11-cv-08394, Order at 2; *Pear* v. *Nat'l Football League*, No. 11-cv-08395, Order at 2 (C.D. Cal. Dec. 8, 2011), ECF No. 61; *Barnes* v. *Nat'l Football League*, No. 11-cv-08396 Order at 2 (C.D. Cal. Dec. 8, 2011), ECF No. 58.

Plaintiffs with then-pending claims filed a superseding Master Administrative Long-Form Complaint on June 7, 2012 (Pls.' Master Admin. Long-Form Compl., ECF No. 83), and an Amended Master Administrative Long-Form Complaint on July 17, 2012 (the "First Amended Complaint").  (Pls.' Am. Master Admin. Long-Form Compl., ECF No. 2642.)  On August 30, 2012, the NFL Defendants moved to dismiss the First Amended Complaint on the ground that the claims were preempted under Section 301.  (Defs. NFL & NFLP's Mot. to Dismiss the Am. Master Admin. Long-Form Compl. on Preemption Grounds, ECF No. 3589.) The Court received full briefing on the NFL Defendants' motion and heard oral argument on April 9, 2013, and then ordered Lead Counsel for Plaintiffs and the NFL Defendants to mediation on July 8, 2013.  (Order, ECF No. 4596; Order, ECF No. 5128.)

On June 25, 2014, the Parties filed for approval of a class action settlement agreement, which was subsequently amended on February 13, 2015 and became final and effective on January 7, 2017.  (Settlement Agreement § 2.1(jj), ECF No. 6481-1.)  Pursuant to the terms of the Settlement Agreement, certain members of the Settlement Class—approximately 1% of retired players—requested to opt out of the Settlement Class.  *See* NFL MDL Approval Opinion, 307 F.R.D. at 369.  Since November 2014, 115 Settlement Class members—some as recently as August 2017—revoked their prior election to opt out and rejoined the Settlement Class.  (*See* Decl. of Orran L. Brown, Sr. ¶ 5, Aug. 17, 2017, ECF No. 8286-1; Timely Opt Out

Requests, Apr. 21, 2015, ECF No. 6507-1; Untimely Opt Out Requests, Apr. 21, 2015, ECF No. 6507-2; Timely Opt Out Requests, Nov. 3, 2014, ECF No. 6340-1; Untimely Opt Out Requests, Nov. 3, 2014, ECF No. 6340-2; Opt Out List, https://nflconcussionsettlement.com/Documents.aspx.)  Currently, there are 95 opt-outs, only 44 of whom are party to pending lawsuits against the NFL Defendants in this MDL.  *See* Opt Out List, https://nflconcussionsettlement.com/Documents.aspx.

Following an Organizational Meeting of the Opt Out Plaintiffs on March 27, 2017 and the parties' subsequent meet-and-confer, the Court entered an order on April 12, 2017 (the "April 12 Order") providing, among other things, that Lead Counsel for the Opt Out Plaintiffs could file a motion for leave to file a Second Amended Master Administrative Long-Form Complaint, and setting forth a briefing schedule for that motion and the NFL Defendants' motions to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b).  (April 12 Order.)

Following briefing of Opt Out Plaintiffs' motion for leave to file a Second Amended Master Administrative Long-Form Complaint—in response to which the NFL Defendants filed an opposition to certain of the proposed amendments as futile—the Court granted Plaintiffs' motion, acknowledging but declining to rule on the NFL Defendants' argument in opposition and allowing the NFL Defendants to reassert that argument in subsequent motion practice.  (Order, ECF No. 7852; *see* Mem. of Law of Defs. NFL & NFLP in Opp'n to Pls.' Mot. for Leave to File Second Am. Master Admin. Long-Form Compl., ECF No. 7767 (the "NFL Defendants' Leave Opposition").)  On July 11, 2017, Plaintiffs filed the Second Amended Complaint, which supersedes the allegations, claims, theories of recovery and/or prayers for

relief contained in Plaintiffs' previous complaints.  (April 12 Order ¶ 6.)[9]  In addition, 39 opt-outs have filed individual Short Form Complaints ("SFCs") purporting to assert claims against the NFL Defendants.[10]

### D.    The Second Amended Complaint

The Second Amended Complaint—spanning 432 paragraphs and 100 pages—alleges a widespread (and far-fetched) conspiracy that purportedly took place "[f]or almost sixty years" (SAC ¶ 58) in which the NFL, NFLP, and various Riddell entities, the tobacco industry, and even the U.S. government all allegedly conspired together to conceal information about head injuries and mislead NFL players into believing that it was safe to return to play following a concussion.

Specifically, Plaintiffs allege that the NFL Defendants and various Riddell entities fraudulently concealed "the decades long scientific research" that purportedly "linked concussions, subconcussive impacts and repetitive head trauma to emotional distress, cognitive impairment, intellectual deficits and latent brain disease and neurodegenerative brain disease,"

---

[9]   Footnote 1 of the Second Amended Complaint cryptically states that "any other plaintiffs' claims that remain against the NFL and NFL P Defendants are still governed by" the previous administrative long-form complaint, ECF No. 2642, and the class settlement approved on May 8, 2015.  (SAC ¶ 1 n.1.)  While the import of this footnote is unclear, the April 12 Order did not grant leave for any claims under that prior complaint to proceed against the NFL Defendants, and the NFL Defendants dispute any suggestion that any claims thereunder remain pending.  The April 12 Order also was clear that the Second Amended Complaint is not merely administrative, but in fact supersedes "all allegations, claims, theories of recovery and/or prayers for relief contained in complaints" previously or subsequently filed by Plaintiffs in cases coordinated and/or consolidated in this MDL, and that it "shall remain the controlling pleading," along with an individual Plaintiff's Short Form Complaint, if any individual Plaintiff's action is not terminated during MDL pretrial proceedings, including if such action is transferred or remanded back to the court from which it was transferred.  (April 12 Order ¶ 6.)

[10]   This figure does not include SFCs filed by individuals who have since revoked their opt-out elections (4 of whom who have failed to withdraw their SFCs) or by one individual whose opt-out request is deficient.  And 11 Plaintiffs failed to file SFCs altogether, despite having pending claims against the NFL Defendants.  The NFL Defendants reserve all rights and defenses with respect to these individuals and their purported claims.

The NFL Defendants have attached as Appendix A to the Declaration of Douglas M. Burns (filed in support of this motion) a chart listing all opt-outs and certain relevant information, including dates of play, operative CBA(s) and whether they filed SFCs against the NFL Defendants.

despite the fact that much of the research cited by Plaintiffs in support of this theory—none of which purports to establish a causal relationship between football and these deficits—has long been in the public domain.  (*Id.* ¶¶ 88, 91, 398.)  Plaintiffs allege that this conspiracy involved not only the named defendants, but also "international corporations such as Honda" and even "our own federal government."  (*Id.* ¶ 45.)  As purported support, Plaintiffs cite, among other things, the 1969 "Football Injuries Symposia" involving "branches of the United States Military" and various government and academic "luminaries," and other research, including by a Nobel-prize-nominated physician.  (*Id.* ¶¶ 45, 104, 107.)  Plaintiffs also allege that the NFL supposedly worked with the tobacco industry to perpetuate this scheme; their allegations rely on baseless snippets from newspaper articles that establish no such connection and were hotly contested in the press by the NFL.  (*See id.* ¶¶ 43, 45, 190–91.)

Although now styled as a conspiracy drama, Plaintiffs' "amended" claims remain fundamentally unchanged.  Like the First Amended Complaint, Plaintiffs' claims allege that the NFL had "a longstanding duty to protect players and the public from unreasonable harm," a duty to "reduce injury risks in football," "a duty to disclose to Plaintiffs the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions, and subconcussive blows as well as latent diseases caused by these blows to the head," and "a duty to act in the best interests of the health and safety of the football community . . . to provide truthful information regarding risks to their health, and to take all reasonable steps to ensure the safety of the community."  (*Id.* ¶¶ 16, 25, 51, 95.)  Plaintiffs allege that the NFL breached its purported duties by, among other things, negligently or fraudulently "failing to impose safety regulations to prevent or mitigate long-term brain damage, and by failing to inform NFL players, athletes at every level, the medical community and the public of the risks associated with MTBIs."  (*Id.* ¶

53.)  Plaintiffs also allege that the NFL Defendants "concluded that it was appropriate for players who suffered a concussion to return to play in the same game or practice in which the concussion occurred" (*id.* ¶ 235) and that concussed players who return to the same game "were at no increased risk of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation" (*id.* ¶ 306(d)), and justified "inappropriate return to play decisions with respect to concussed players."  (*Id.* ¶ 206; *see also id.* ¶ 237.)  Plaintiffs further allege that the NFL Defendants negligently or fraudulently "failed to warn Plaintiffs of the medical risks associated with repetitive head impacts during NFL games and practices," and breached a purported "duty of reasonable and ordinary care to the Plaintiffs."  (*Id.* ¶ 102; *see also id.* ¶¶ 334, 345, 390.)

The Second Amended Complaint also alleges that one or both of the NFL Defendants breached their duties to Plaintiffs by "agree[ing] to engage in a long-term plan to conceal material information about football's link to CTE and other neurological/neurobehavioral conditions" (*id.* ¶ 153), "[n]egligently licens[ing] protective equipment . . . with the knowledge these helmets could not protect against subclinical or MTBIs" (*id.* ¶ 16), negligently marketing "the game and their products as safe" (*id.* ¶ 354(a)), and negligently hiring and retaining unqualified persons for a Mild Traumatic Brain Injury Committee ("MTBI Committee") who "[misled] the Plaintiffs" about "the risks associated with repetitive head impacts."  (*Id.* ¶ 377.)  At bottom, the fundamental theory behind Plaintiffs' claims is that the NFL, in its purported capacity as "the guardian of player safety," breached a duty to protect players from prematurely returning to play post-injury by, among other things, engaging in "sham science" to conceal the risks of long-term head injuries.

Based on their allegations, Plaintiffs purport to assert claims against the NFL Defendants for negligent marketing, fraud, civil conspiracy, fraudulent concealment, wrongful death and survival, loss of consortium, and punitive damages.  In addition, Plaintiffs purport to assert claims for declaratory relief, negligence, negligent misrepresentation, negligent hiring, and negligent retention/supervision against the NFL, and a separate claim for negligence against NFLP.  (*Id.* ¶¶ 332–432.)  Plaintiffs seek declaratory relief, "the full measure of damages allowed under applicable law," and punitive damages.  (*Id.* ¶¶ 332–35, 371, 379, 387, 396, 403, 409, 414, 419, 424–32.)

Because the resolution of Plaintiffs' claims will require interpretation of the CBAs that define the terms and conditions of NFL employment, including player safety issues, and because those claims are founded on duties that arise under those CBAs, they are preempted under Section 301, as described below.

## ARGUMENT

### I.
### SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS' CLAIMS AGAINST THE NFL

Section 301 of the LMRA governs "[s]uits for violation of contracts between an employer and a labor organization[.]"  29 U.S.C. § 185(a).  The Supreme Court has interpreted this statute to "mandate[] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable consistent resolution of labor-management disputes."  *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 & 404 n.3 (1988); *see Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. at 210–11 (allowing CBA terms to be given "different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements").

Accordingly, Section 301 preempts all state law claims, the resolution of which is "substantially dependent" upon or "inextricably intertwined" with an interpretation of the terms of a collective bargaining agreement, or that arise under a collective bargaining agreement. 29 U.S.C. § 185(a) (codifying section 301(a)); *Allis-Chalmers Corp.*, 471 U.S. at 213, 220; *Beidleman* v. *Stroh Brewery Co.*, 182 F.3d 225, 231–32 (3d Cir. 1999); *Antol* v. *Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996). It makes no difference that the claim is pled as a tort because a plaintiff is "precluded from evading the pre-emptive force of § 301 by casting her claim as a state-law tort action." *Int'l Bhd. of Elec. Workers* v. *Hechler*, 481 U.S. 851, 862 (1987). Thus, one "may not merely rebrand a claim in order to avoid preemption." *Kurns* v. *A.W. Chesterton, Inc.*, 620 F.3d 392, 398 n.8 (3d Cir. 2010). What matters is the true gravamen of Plaintiffs' action. *See Barton* v. *House of Raeford Farms, Inc.*, 745 F.3d 95, 107 (4th Cir. 2014) (a plaintiff "may not 'evade the requirements of § 301' through artful pleading" (quoting *Allis-Chalmers*, 471 U.S. at 2011)); *Hyles* v. *Mensing*, 849 F.2d 1213, 1215 (9th Cir. 1988) ("To determine whether section 301 preempts a state tort claim, we do not look to how the complaint is cast.").[11]

Applying these basic principles, courts have found a wide range of labor-related claims to be preempted. *See, e.g.*, *Allis-Chalmers*, 471 U.S. at 220–21 (employee's suit for bad faith in handling of disability claim preempted); *Beidleman*, 182 F.3d at 234, 236 (fraudulent misrepresentation and civil conspiracy claims preempted); *Harper* v. *Am. Red Cross Blood Servs.*, 153 F. Supp. 2d 719, 721–22 (E.D. Pa. 2001) ("[c]laims of retaliatory discharge for filing a workers' compensation claim" preempted); *Henderson* v. *Merck & Co.*, 998 F. Supp. 532,

---

[11]  The NFL Defendants seek dismissal, on preemption grounds, of the Second Amended Complaint in its entirety. To the extent Plaintiffs' claims are preempted, this Court need not consider the NFL Defendants' additional arguments set forth in their concurrently filed memorandum of law in support of their motion to dismiss for failure to state a claim. To the extent, however, that any claim is found not to be preempted, the NFL Defendants also argue that such claims should be dismissed for failure to state a claim and because they are time-barred, as set forth in the NFL Defendants' memorandum of law in support of their motion to dismiss for failure to state a claim. (*See* April 12 Order ¶ 7, ECF No. 7477.)

539–41 (E.D. Pa. 1998) (claims for breach of an implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and wrongful termination preempted).

Moreover, "a central tenet of federal labor-contract law under § 301 [is] that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." *Allis-Chalmers*, 471 U.S. at 219–20 (section 301 preemption "preserves the central role of arbitration in our system of industrial self-government"). Thus, "because preempted claims must first be presented through the arbitration procedure established in a collective bargaining agreement, those claims should be dismissed." *Givens*, 684 F. Supp. 2d at 991–92. To the extent that Plaintiffs have a claim addressing workplace injuries incurred during their NFL careers, that claim may only proceed pursuant to the grievance procedures set forth in the CBAs, and thus it should be dismissed. *See supra* Background Section B.3; *see also Allis-Chalmers*, 471 U.S. at 220–21 (tort claims "should have been dismissed for failure to make use of the grievance procedure established in the collective bargaining agreement or dismissed as pre-empted by § 301" (internal citation omitted)); *Angst* v. *Mack Trucks, Inc.*, 969 F.2d 1530, 1538 (3d Cir. 1992) (because the employees "ignored and failed to resort to their CBA's dispute-resolution process, the district court was obliged to dismiss their suit"). The "preemptive force of § 301 is so powerful," *Antol*, 100 F.3d at 1115, because of "the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective bargaining agreements." *Beidleman*, 182 F.3d at 234 (quoting *Antol*, 100 F.3d at 1115); *see also Henderson*, 998 F. Supp. at 536–37. That is precisely the case here, where numerous provisions of decades' worth of CBAs are integral to the resolution of Plaintiffs' claims.

**A.      Resolution of Plaintiffs' Claims Against the NFL Would
Substantially Depend Upon Interpretation of the Terms of the CBAs**

The resolution of Plaintiffs' claims—whether based on negligence or fraud—would substantially depend upon interpretations of numerous health and safety provisions in the applicable CBAs. Indeed, several federal courts have determined that NFL player injury negligence and fraud claims are preempted for that very reason. *See, e.g.*, *Stringer*, 474 F. Supp. 2d at 903–04, 909–11 (resolution of plaintiff's claims regarding the NFL's alleged failure "to minimize the risk of heat-related illness" and "establish regulations" was "'inextricably intertwined and substantially dependent' upon an analysis of certain CBA provisions imposing duties on the clubs with respect to medical care and treatment of NFL players"); *see also Givens*, 684 F. Supp. 2d at 989–92; *Sherwin*, 752 F. Supp. at 1177–79; *Jeffers*, 681 S.E.2d at 412.

Two additional federal district courts, each refusing to remand concussion-related claims that became part of this MDL, also have so held.  In *Duerson*, the court held that resolution of plaintiff's concussion-related negligence claim would require interpretation of several of the CBAs' provisions concerning player health and safety.  Because one could "plausibly interpret those provisions to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could then reasonably exercise a lower standard of care in that area itself," the court concluded that the claims were preempted.  *Duerson*, 2012 WL 1658353, at *4.  In *Maxwell*, the court held that because the "CBA places primary responsibility for identifying . . . physical conditions on the team physicians," the "physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  *Maxwell*, No. 11-cv-08394, Order at 1–2.

1.      **Resolution of Plaintiffs' Negligence-Based Claims
Would Require Interpretation of the Terms of the CBAs**

Plaintiffs' claims for negligence, negligent misrepresentation, negligent hiring, negligent retention/supervision, negligent marketing, and wrongful death and survival all require Plaintiffs to establish that the NFL assumed, and then breached, a duty of care.[12]  (SAC ¶¶ 16, 25, 51, 95, 102 (premising claims on purported duties "to protect players and the public from unreasonable harm," to "reduce injury risks in football," "to disclose to Plaintiffs the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions, and subconcussive blows as well as latent diseases caused by these blows to the head," "to act in the best interests of the health and safety of the football community . . . to provide truthful information regarding risks to their health, and to take all reasonable steps to ensure the safety of the community").)  Each claim is thus preempted because determining whether the NFL in fact owed any such duties to Plaintiffs, assessing the scope of any such duties, and deciding whether the NFL acted reasonably in discharging any such duties would substantially depend upon an interpretation of the health and safety provisions of the CBAs that address the conduct about which Plaintiffs complain.

---

[12]   "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff."  *Althaus ex rel. Althaus* v. *Cohen*, 756 A.2d 1166, 1168 (Pa. 2000); *see also Duerson*, 2012 WL 1658353, at *3.  "Negligence" is an element of plaintiffs' negligent misrepresentation, negligent hiring, "negligent marketing," and negligent retention/supervision claims.  *See Schnell* v. *Bank of N.Y. Mellon*, 828 F. Supp. 2d 798, 806 (E.D. Pa. 2011); *Hughes* v. *BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 303 (S.D.N.Y. 2006); *Corazzini* v. *Litton Loan Servicing LLP*, No. 09-cv-0199, 2010 WL 1132683, at *8 (N.D.N.Y. Mar. 23, 2010); *Joseph M.* v. *Ne. Educ. Intermediate Unit 19*, 516 F. Supp. 2d 424, 447 (M.D. Pa. 2007), *on reconsideration*, No. 06-cv-01903, 2007 WL 2845004 (M.D. Pa. Sept. 26, 2007); *Lance* v. *Wyeth*, 85 A.3d 434, 458 (Pa. 2014).  Although the underlying suits were brought in many different jurisdictions, the elements of Plaintiffs' claims are sufficiently similar across the various states that, for preemption purposes, the Court need not conduct a choice of law analysis at this stage.  *See Duerson*, 2012 WL 1658353, at *3 (explaining that choice of law inquiry was "largely irrelevant" to preemption question). The NFL here cites primarily the substantive law of Pennsylvania, the forum, and of New York, where the NFL Defendants are headquartered. (SAC ¶¶ 35, 39.)  By citing such law for illustrative purposes, however, the NFL Defendants do not take a position on which jurisdiction's laws apply to the underlying claims at issue here and reserve all rights and arguments with respect to choice of law.

*First*, regarding the NFL's alleged duties to advise or warn Plaintiffs of the risks associated with repetitive impacts, its alleged failure to impose safety regulations to mitigate such risks, its alleged conclusions about the appropriateness of concussed players returning to play in the same game in which the concussion occurred, and its alleged failure to adequately track and report head injuries (*id*. ¶¶ 53, 63, 102, 143, 206, 237, 314–15, 320–22, 334, 343; *see also id.* ¶¶ 22, 25, 99), the CBAs attribute to the Clubs responsibility for treating player injuries, determining recovery times, making return-to-play decisions, and warning players of the risks of continued performance.

Accordingly, a determination of whether the NFL failed to exercise reasonable care, which depends first on the assessment of what, if any, duty was owed, cannot be made without first determining the scope of the duties placed on Club medical staff by the CBAs.  For example, if Plaintiffs' alleged medical conditions were ones that "could be significantly aggravated by continued performance" (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; Ex. 11, 2011 CBA Art. 39 § 1(c)), the Clubs' medical staff may have had a duty to warn players before returning to play, which "would be one factor tending to show that the NFL's alleged failure to take action to protect [them] from concussive brain trauma was reasonable." *Duerson*, 2012 WL 1658353, at *4.

For the same reasons, the Court would also first need to interpret the scope of the duty imposed by the CBA provisions charging Club medical staff with primary responsibility over player injuries and return-to-play decisions, including provisions that "[a]ll determinations of recovery time for . . . injuries" are to be made "by the Club's medical staff and in accordance with the Club's medical standards" and that give Club physicians discretion to determine the medical care appropriate for player injuries.  (Ex. 13, 1980 Supp. to NFL Constitution Art. XVII;

Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 6, 1993 CBA Appx. C § 9; Ex. 10, 2006 CBA Appx. C § 9; Ex. 11, 2011 CBA Appx. A § 9.)  *See Maxwell*, No. 11-cv-08394, Order at 1–2 ("The CBA places primary responsibility for identifying . . . physical conditions on the team physicians . . . . The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players.").  Or if the Clubs and their medical staff had a duty to accurately diagnose, record, and track data on player injuries, that necessarily would impact the extent to which the NFL's alleged failure to do so (*see* SAC ¶¶ 320–22) was reasonable.  *See Maxwell*, No. 11-cv-08394, Order at 1–2 (premised in part on allegations that the NFL "fail[ed] to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner," concussion-related negligence claims were preempted because of need to take physician and trainer provisions of CBA into account).

Moreover, the CBAs' provisions requiring Clubs to provide physicians and ambulances at all games, requiring that the Clubs pay the costs of certain medical care for its players, and requiring that the Club physician perform a pre-season, and in some cases a post-season, physical examination could be interpreted "to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could reasonably rely on the clubs to notice and diagnose player health problems arising from playing in the NFL." *Duerson*, 2012 WL 1658353, at *4.

Another provision that must be interpreted in assessing the scope of the NFL's alleged duties includes the certification requirements imposed by the CBAs on the Club medical staff, including provisions requiring that head trainers be certified by the National Athletic

Trainers Association.  If, as part of these certifications—and attendant education, training, and experience—Club trainers received instruction on the risks of repetitive head impacts, then the degree of care owed by the NFL in warning players about these issues necessarily would be diminished.  *See Maxwell*, No. 11-cv-08394, Order at 1–2 (finding that "CBA provisions relating to the teams' athletic trainers" would need to be taken into account in resolving plaintiff's concussion-related claims); *Stringer*, 474 F. Supp. 2d at 910 ("If, by virtue of the certification process, the trainers are fully prepared to handle heat-related illnesses, the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished.").  The same is true with respect to the CBA provisions requiring Club medical staff to comply with federal, state, and local requirements, including ethical rules and standards and requiring Clubs to provide medical care consistent with professional standards.  (Ex. 11, 2011 CBA Art. 39 § 1(c), § 3(d).)  To the extent that such requirements, rules, and standards provide guidance on treatment and risks related to repetitive head impacts, that would shape the duty of care, if any, owed by the NFL Defendants.

Simply put, "the degree of care owed cannot be considered in a vacuum," but "must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning the general health and safety of the NFL players."  *Stringer*, 474 F. Supp. 2d at 910.

*Second*, regarding Plaintiffs' allegation that the NFL failed to protect players or enact "any rule changes that sought to recognize the risks associated with MTBI" (SAC ¶ 63; *see also id.* ¶¶ 53, 93, 143, 186) despite purportedly serving as "the guardian of player safety" (*id.* ¶¶ 52, 60, 102, 173, 185) with the "duty and unilateral power to govern player conduct on and off the field" (*id.* ¶ 99), a court must also consider the scope of any duties owed by the players'

union in order to measure the scope of the NFL's alleged duties.  Thus, the CBAs establish the "Joint Committee on Player Safety and Welfare," comprised of three Club representatives and three representatives of the NFLPA, the players' union, "for the purpose of discussing the player safety and welfare aspects of . . . playing rules" and specifically tasked to review "all current materials on the player safety aspects of player equipment, playing surfaces, and other safety matters."  (Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a)-(b); Ex. 11, 2011 CBA Art. 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI.)

The CBAs further mandate that "[i]f the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate, and "request an advisory decision" by an arbitrator regarding the proposed change.  (Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c).)  Because the CBAs expressly address responsibility for promulgating, reviewing, and investigating playing rules affecting player health and safety, the provisions of the CBAs must first be interpreted to determine the scope of the duties imposed on the NFL.

The CBAs also provide NFL players and the NFLPA with additional rights relating to health and safety issues, including rights over their own individualized medical treatment and rights to investigate broader issues of player safety.  (*See, e.g.*, Ex. 9, 2002 Am. to 1993 CBA Art. XIII § 1(d); Ex. 10, 2006 CBA Art. XIII § 1(d); Ex. 11, 2011 CBA Art. 50 § 1(d) (empowering the NFLPA "to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety"); Ex. 11, 2011 CBA Art. 39 § 3 (giving players the right to submit complaints regarding Club medical care to the Accountability and Care Committee); Ex. 5, 1982 CBA Art. XXXI § 3; Ex.

6, 1993 CBA Art. XLIV § 3; Ex. 10, 2006 CBA Art. XLIV § 3; Ex. 11, 2011 CBA Art. 39 § 4

("A player will have the opportunity to obtain a second medical opinion" at Club expense); Ex.

5, 1982 CBA Art. XXXI § 4; Ex. 6, 1993 CBA Art. XLIV § 4; Ex. 10, 2006 CBA Art. XLIV § 4

(guaranteeing a player's "right to choose the surgeon who will perform surgery" on the player);

Ex. 5, 1982 CBA Art. XXXII § 2; Ex. 6, 1993 CBA Art. XLV § 2; Ex. 10, 2006 CBA Art. XLV

§ 2; Ex. 11, 2011 CBA Art. 40 § 2 (providing current and former players, and their personal

physicians, access to their medical and trainers' records); Ex. 11, 2011 CBA Art. 50 § 2

(permitting the NFLPA to appoint two attendees, one with voting rights, to attend annual

Competition Committee meeting regarding playing rules).)

   *Third*, the 2011 CBA created a joint Accountability and Care Committee,

consisting of the NFL Commissioner and NFLPA Executive Director (or their designees) and

their appointees, to provide guidance regarding player medical care, including developing a

physical examination and education protocol to inform players of risks associated with

professional football and treatment of injuries, conducting "research into prevention and

treatment of illness and injury commonly experienced by professional athletes," and "assist[ing]

in the development and maintenance of injury surveillance and medical records systems."  (Ex.

11, 2011 CBA Art. 39 § 3.)  To the extent that this Committee has certain duties to research

player injuries and improve player medical care, it bears directly on the scope of the NFL's

alleged duties.[13]

---

[13] Certain individual Plaintiffs, through the Short Form Complaint process, purport to bring additional claims
beyond those alleged in the Second Amended Complaint.  (*See* Appendix A.)  These claims find no support in
the factual allegations of the Second Amended Complaint itself, and, for that reason, the NFL Defendants are
simultaneously moving to dismiss them for failure to state a claim, among other grounds.  In any event, the
additional claims are also preempted.  For example, certain Plaintiffs purport to bring a claim for "negligence-
monopolist" against the NFL, styled as a "negligence" claim and premised on duties allegedly owed by the NFL
"to invoke rules that protect the health and safety of its players."  (*See, e.g.*, Gayle Opt Out Pl. Short Form
Compl. Against NFL Defs., Attach. "A," ¶¶ 1–7, July 24, 2017, ECF No. 8072.)  Like the negligence claims
contained in the Second Amended Complaint, this claim is preempted because the Court would be required to

*Finally*, a court cannot determine whether the NFL breached its purported duty to properly staff the MTBI Committee, or acted unreasonably in purportedly hiring and retaining the members of that committee, without interpreting CBA provisions addressing the duty to warn and creating committees responsible for player safety issues.  (*See, e.g.*, Ex. 10, 2006 CBA Art. XLIV § 1 (designating Club physicians with primary responsibility to warn players of risks of continued performance); Ex. 6, 1993 CBA Art. XIII § 1(a) (establishing Joint Committee on Player Safety and Welfare, to include three NFLPA representatives); Ex. 11, 2011 CBA Art. 39 § 3 (establishing Accountability and Care Committee).)  If Club medical staff, the NFLPA, or a CBA-created committee were tasked to provide information regarding, or to examine, "the permanent brain injury risks associated with repetitive head impacts" (SAC ¶ 385), then the duties owed by the NFL in hiring and retaining members of the MTBI Committee could be diminished.  *See Peek* v. *Phila. Coca-Cola Bottling Co.*, No. 97-cv-3372, 1997 WL 399379, at *1, *6 (E.D. Pa. July 10, 1997) (claim of negligent hiring of third-party investigator preempted under Section 301); *see also Ballard* v. *Nat'l Football League Players' Ass'n*, 123 F. Supp. 3d 1161, 1172 (E.D. Mo. 2015) (because alleged duty to properly staff MTBI Committee was "derived from the CBAs and not owed to the public at large," resolution of negligent hiring and retention claims concerning MTBI Committee "necessarily depend[s] upon an analysis of [CBA] provisions to determine whether the CBAs impose such a duty [to properly staff the MTBI Committee] and whether they specify a standard of care").

Consistent with settled labor law precedent, a long line of NFL preemption cases—in addition to *Duerson* and *Maxwell* discussed above—have held that resolution of player-injury claims substantially depends on CBA terms addressing player safety, thereby

---

interpret the health and safety provisions of the CBAs to determine the scope of any such duty and to assess whether the NFL acted reasonably.

confirming that Plaintiffs' claims are preempted here.   For example, in *Stringer* v. *National Football League*, the court held that a wrongful death claim against the NFL—premised on the NFL's alleged failure "to establish regulations" to ensure "adequate care and monitoring of players suffering from heat-related illness" and "regulation of . . . return to practice"—was preempted because "the degree of care owed by the NFL" must "be considered in light of the contractual duties imposed on the team physicians."   474 F. Supp. 2d at 903–04, 910.   Because the "CBA places primary responsibility for identifying [certain] physical conditions on the team physicians," those provisions "must . . . be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances."   *Id.* at 910–11.   And in a recent case brought by players against the NFLPA concerning the union's alleged concealment and misrepresentation of risks associated with head impacts, the court found preempted by Section 301 negligent misrepresentation, negligence, and negligent hiring and retention claims.   In *Ballard*, the court reasoned that any alleged duty on the part of the NFLPA to disclose purported links between football injuries and neurocognitive problems would "necessarily require an analysis of the various CBAs," as would any determination of justifiable reliance by the players, and that "any duty . . . to properly staff the MTBI Committee" was one "derived from the CBAs and not owed to the public at large," thus necessitating analysis of provisions of the CBAs, including those relating to the Joint Committee on Player Safety and Welfare and the Accountability and Care Committee.   123 F. Supp. 3d at 1170–72.

*Duerson*, *Maxwell*, *Stringer*, and *Ballard* are all consistent with numerous other decisions holding that NFL player claims against the NFL or its Clubs relating to duties that are imposed by the CBAs are preempted because their resolution would require interpretation of CBA terms.   *See*, *e.g.*, *Givens*, 684 F. Supp. 2d at 990–91 ("The questions raised by the

Complaint, such as whether a physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA."); *Sherwin*, 752 F. Supp. at 1177–78 (former player's claims that the Club provided negligent medical treatment and fraudulently concealed the extent of player's injury were preempted because the Club "did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the [CBAs]"); *Jeffers*, 681 S.E.2d at 412 (former player's negligent retention and intentional misconduct claims against Club—that team physician performed unauthorized procedures during knee surgery—preempted because resolution of the claims was substantially dependent upon an analysis of CBA provisions setting forth the Clubs' and players' rights and duties in connection with medical care); *see also Atwater*, 626 F.3d at 1182–83 (former players' negligence and negligent misrepresentation claims preempted because the court "would . . . have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship"); *Williams*, 582 F.3d at 881 (negligence claim against the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy"); *Smith* v. *Houston Oilers, Inc.*, 87 F.3d 717, 719–21 (5th Cir. 1996) (players' claims for coercion, duress, extortion, and assault and battery preempted); *Holmes*, 939 F. Supp. at 527–28 (player's claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy preempted); *cf. Boogaard* v. *Nat'l Hockey League*, 126 F. Supp. 3d 1010, 1019 (N.D. Ill. 2015) (plaintiff's claims that NHL breached duty

30

to keep players safe, including from brain trauma, preempted because scope of any duty on NHL's part depended on interpretation of CBA).

In sum, the adjudication of Plaintiffs' claims necessarily and substantially would depend on an interpretation of the terms of the CBAs because a court cannot evaluate the purported duties owed by the NFL, the scope of the NFL's purported duties, or whether the NFL acted "reasonably" without first considering the obligations regarding player health and safety imposed by the CBAs.

### 2. Resolution of Plaintiffs' Wrongful Death, Survival, and Loss of Consortium Claims Would Require Interpretation of the Terms of the CBAs

Similarly, because Plaintiffs' wrongful death, survival, and loss of consortium claims are premised on allegations sounding in negligence, they, too, require proof of a duty owed to the decedent and a breach of that duty. *See Sullivan* v. *Warminster Twp.*, No. 07-cv-4447, 2010 WL 2164520, at *6 (E.D. Pa. May 27, 2010) ("Wrongful death and survival act claims are not substantive causes of action; rather, they provide a means of recovery for unlawful conduct that results in death."); *Laskowski* v. *U.S. Dep't of Veterans Affairs*, 918 F. Supp. 2d 301, 331 (M.D. Pa. 2013) (loss of consortium claims are derivative claims that can only survive if the injured spouse's claim survives).

Plaintiffs' wrongful death, survival, and loss of consortium claims therefore are preempted for the same reasons that their negligence claims are preempted: resolution of the scope of the NFL Defendants' alleged duties will require interpretation of the CBAs. For any Plaintiffs that purport to assert "independent" wrongful death claims under California or any other state's law, the status of such claims as "independent" does not preclude preemption under Section 301, as such Plaintiffs nonetheless would need to establish that the NFL Defendants owed a duty to the decedent, which would require interpretation of the CBAs for all of the

reasons discussed above. *See Chipman* v. *Nelson*, No. 11-cv-2770, 2016 WL 4943843, at *13 (E.D. Cal. Sept. 15, 2016*), report and recommendation adopted*, 2016 WL 5870765 (E.D. Cal. Oct. 7, 2016) (To succeed on their wrongful death claims, Plaintiffs "must establish that defendants owed a legal duty to the decedent and that their breach of that duty was the proximate cause and cause in fact of the decedent's death."); *see also United Steelworkers of Am.* v. *Rawson*, 495 U.S. 362 (1990) (Idaho wrongful death action brought by miners' survivors preempted by LMRA because union's duty to inspect mine arose from CBA).

### 3.   Resolution of Plaintiffs' Fraud-Based Claims Would Require Interpretation of the Terms of the CBAs

Plaintiffs' claims for fraud, fraudulent concealment, civil conspiracy, and declaratory relief are also preempted, as each would require an interpretation of the same CBA provisions. A duty to disclose is an essential element of a fraudulent concealment claim, and a negligent misrepresentation claim requires a duty to provide accurate information. *See Aubrey* v. *Sanders*, No. 07-cv-0137, 2008 WL 4443826, at *5–6 (W.D. Pa. Sept. 26, 2008); *MatlinPatterson ATA Holdings LLC* v. *Fed. Express Corp.*, 87 A.D.3d 836, 840 (N.Y. App. Div. 2011); *Manti's Transp., Inc.* v. *C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (N.Y. App. Div. 2009); *Bortz* v. *Noon*, 729 A.2d 555, 561 (Pa. 1999). To the extent that Plaintiffs' claims for fraud, civil conspiracy, and declaratory relief are premised on fraudulent concealment, they, too, thus require proof of a duty to disclose. Such fraud-based claims also require a showing of justifiable reliance. *See, e.g.*, *Aubrey*, 2008 WL 4443826, at *5–6. Because resolution of both elements would substantially depend upon an interpretation of the CBA provisions discussed above, these claims, too, are preempted.

*First*, because these fraud-based claims (and Plaintiffs' negligent misrepresentation claim) are founded on the same alleged duty as Plaintiffs' negligence claims,

the same analysis applies here.  Plaintiffs allege that the NFL "had a duty to advise Plaintiffs" of the "heightened risk" of "neurodegenerative diseases or conditions," which the NFL purportedly breached by "willfully and intentionally" misleading Plaintiffs and concealing the risk from Plaintiffs (SAC ¶¶ 334(a)-(c)).  This is akin to Plaintiffs' allegation that the NFL breached its "duty of reasonable and ordinary care to the Plaintiffs by failing to provide them with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive impacts during NFL games and practices."  (*Id.* ¶ 132.)  Because a court cannot evaluate the scope of the NFL's purported duties without first considering the obligations regarding player health and safety imposed by the CBAs, resolution of these claims, too, substantially depends upon an interpretation of the terms of the CBAs.  *See Atwater*, 626 F.3d 1170 at 1182–83 (11th Cir. 2010) (negligent misrepresentation claim preempted because interpretation of CBA was necessary to determine scope of any duty to provide information).  *See supra* Section I.A.1.

      *Second*, Plaintiffs' fraud-based claims (as well as their negligent misrepresentation claim) require a showing of justifiable reliance, *see, e.g.*, *Aubrey*, 2008 WL 4443826, at *5–6, but a court cannot determine whether Plaintiffs justifiably relied on information provided by the NFL, as Plaintiffs allege (*see, e.g.*, SAC ¶¶ 25, 97, 185, 392), without interpreting the CBAs' health and safety provisions.  *See Williams*, 582 F.3d at 881 ("The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation) are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy.").  In adjudicating a fraud claim, courts must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable." *Tran*

v. *Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005).   Numerous provisions, discussed above, delineate that relationship here and thus must be considered to resolve the question of justifiable reliance.

For example, a court cannot determine whether Plaintiffs "justifiably relied on [the NFL] Defendants' fraudulent omissions and misrepresentations" (SAC ¶ 392) regarding "the likely risks of brain injuries caused by concussive and subconcussive impacts" (*id.* ¶ 390) without first interpreting the CBAs' provisions addressing responsibility for treating player injuries and informing players about such injuries, including decisions regarding "recovery time" for injuries (*see, e.g.*, Ex. 13, 1980 Supp. to NFL Constitution Art. XVII ("All determinations of recovery time for . . . injuries must be by the club's medical staff and in accordance with the club's medical standards."); Ex. 6, 1993 CBA Art. XLIV § 1) and provisions entitling players "to obtain a second medical opinion" or to "examine . . . medical and trainers' records in the possession of the Club or Club physician."  (*See, e.g.*, Ex. 6, 1993 CBA Art. XLIV § 3 (allowing for second medical opinions at Club expense); Ex. 10, 2006 CBA Art. XLV § 2 (providing for player access to medical records, including provision of copies to players' personal physicians).)

Similarly, certain CBAs provide that when a "player's physical condition . . . could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity."  (Ex. 6, 1993 CBA Art. XLIV § 1; Ex. 10, 2006 CBA Art. XLIV § 1; *see also* Ex. 5, 1982 CBA Art. XXXI § 1; Ex. 11, 2011 CBA Art. 39 § 1(c).)   A court could reasonably determine that Plaintiffs' purported reliance on the NFL to provide generic warnings regarding brain injuries was not reasonable if the parties to the CBA had already determined that warnings were to be provided by the Club physician.  *See, e.g.*, *Williams*, 582 F.3d at 881 (players' fraud claim—that

the NFL knew that a supplement contained a banned substance but failed to warn the players—
was "preempted because the Players cannot demonstrate the requisite reasonable reliance . . .
without resorting to the CBA," which tasked players with responsibility for knowing the contents
of supplements); *see also Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation
claim preempted because "whether Plaintiffs reasonably relied on Defendants' alleged
misrepresentations is substantially dependent on the CBA's language"); *Sherwin*, 752 F. Supp. at
1178 (fraud claim against Club preempted because "the court cannot resolve plaintiff's fraud and
negligent misrepresentation claims without reference to" provisions of the CBA establishing
"duty of a club physician, and arguably the club," to inform player of adverse physical
conditions).

   Similar provisions that may require interpretation to resolve such claims include
those establishing the "Joint Committee on Player Safety and Welfare" "for the purpose of
discussing the player safety and welfare aspects of . . . playing rules," and those establishing the
Accountability & Care Committee, tasked with providing "advice and guidance regarding the
provision of preventive, medical, surgical, and rehabilitative care for players."  (Ex. 5, 1982
CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11,
2011 CBA Arts. 39 § 3(a) & 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art.
XI.)  To the extent that these joint committees, which include players' representatives, were
specifically charged with responsibility in the area of player safety, the players' reliance on the
NFL in the same area may not be reasonable.  Indeed, in two recent cases brought by players
against the NFLPA concerning the union's alleged concealment and misrepresentation of risks
associated with head impacts, the court found players' negligent misrepresentation claims
preempted by Section 301 because the determination of players' justifiable reliance would

"substantially depend on interpretation of the CBA," including provisions relating to the Accountability and Care Committee. *Smith* v. *Nat'l Football League Players' Ass'n*, No. 14-cv-01559, 2014 WL 6776306, at *8 (E.D. Mo. Dec. 2, 2014) ("The justification [for players' reliance] may exist, but it will substantially depend upon interpretation of the CBA.  Therefore, the claim of negligent misrepresentation is preempted by section 301 of the LMRA."); *Ballard*, 123 F. Supp. 3d at 1169–70 (negligent misrepresentation claim preempted because the question of players' justifiable reliance on NFLPA's statements about the risks of head impacts is dependent upon an interpretation of the CBAs).

   The result is no different with respect to Plaintiffs' fraudulent concealment and negligent misrepresentation claims insofar as they potentially pertain to the post-retirement period.  First, to the extent that Plaintiffs' claims are based on "events which occurred while Plaintiffs were members of the bargaining unit," such as claims based on injuries suffered during NFL play, they are preempted.  *Smith*, 2014 WL 6776306, at *7.

   Second, where the union and employer negotiated benefits for retirees, retirees can pursue claims related to those benefits in accordance with the applicable grievance procedures set forth in the CBAs.  Correspondingly, such claims are preempted if "the court will be required to interpret or apply the CBA to resolve the retirees' claims."  *Atwater*, 626 F.3d at 1185.  That is precisely the case here, because Plaintiffs' fraudulent concealment and negligent misrepresentation claims hinge on a duty to disclose, and the assessment of any such duty on the part of the NFL requires an interpretation of the CBAs' numerous post-retirement benefits provisions, which address medical care and benefits for eligible retirees, including, for example, in the case of "dementia."  (*See* Ex. 10, 2006 CBA Art. XLVIII-D § 1 ("The parties agree to . . . establish a . . . plan . . . to provide medical benefits to former Players who are . . . determined . . .

to have 'dementia.'"); *see also* Ex. 11, 2011 CBA Art. 58 § 1; Ex. 11, 2011 CBA Art. 65 § 1 ("[T]he Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have permanent, neuro-cognitive impairment . . . .").)

Among other things, these provisions place responsibility on the players themselves for seeking medical care during retirement, while the NFL is tasked solely with paying the costs of certain such care for eligible retirees. Thus, to resolve Plaintiffs' claims, a court first must assess these provisions to determine whether the NFL had any duty to disclose, and, if so, the scope of that duty, and whether, as Plaintiffs allege, they "reasonably relied" on information provided by the NFL "after their careers" (SAC ¶ 406). *See Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim—that the NFL provided inaccurate background information regarding investment advisors for the players—was preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language," which placed responsibility for player finances on players themselves).

**B.      Plaintiffs' Claims Against the NFL Arise Under the CBAs**

Plaintiffs' claims against the NFL are preempted by Section 301 also because they are premised on rights and obligations that arise under the CBAs. *See Allis-Chalmers*, 471 U.S. at 213 ("state-law rights and obligations that do not exist independently of [collective bargaining] agreements" are preempted); *Antol*, 100 F.3d at 1117 ("[C]laims based squarely on a collective bargaining agreement or requiring analysis of its terms are preempted . . . .")

The CBAs define the relationship among the NFL, its Clubs, and the players. (*See* Ex. 4, 1977 CBA Art. II § 1; Ex. 5, 1982 CBA Art. II § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1; Ex. 11, 2011 CBA Art. 2 § 4(a); *see also* Ex. 1, 1968 AFL CBA § 16; Ex. 2, 1968 NFL CBA Art I § 2; Ex. 3, 1970 CBA Art. II § 4 (CBAs "represent[] a complete and

final understanding on all bargainable subjects"); Ex. 1, 1968 AFL CBA § 2; Ex. 2, 1968 NFL

CBA Art. III § 1; Ex. 3, 1970 CBA Art. II § 2; Ex. 4, 1977 CBA Art. I § 1; Ex. 5, 1982 CBA Art.

II § 1; Ex. 6, 1993 CBA Art. III § 1; Ex. 10, 2006 CBA Art. III § 1; Ex. 11, 2011 CBA Art. 2 § 1

(incorporating by reference the NFL Constitution).)

Plaintiffs' claims allege that the NFL, as "the guardian of player safety,"

purportedly failed "to impose safety regulations to prevent or mitigate long-term brain damage,"

"never acted on the issues of mild-traumatic brain-injury ('MTBI'), concussive exposure, or

simply repeated blows to the head," and failed adequately to track player injuries.  (SAC ¶¶ 52,

53, 93, 14, 320–22; *see also id.* ¶ 63 (alleging that "[d]efendants knew or suspected that any rule

changes that sought to recognize the risks associated with MTBI would impose an economic cost

that would significantly and adversely change the profit margins enjoyed by the NFL and its

teams"); *id.* ¶ 186 (alleging that MTBI Committee's studies "were supposed to be geared toward

'improving player safety' and for the purpose of instituting 'rule changes aimed at reducing head

injuries'").)  Despite the Second Amended Complaint's efforts to downplay Plaintiffs' years of

play in the NFL by alleging vaguely that the NFL "undertook duties . . . based upon Plaintiffs'

time spent as youth players, high school players, [and] collegiate players" (SAC ¶ 33), Plaintiffs'

claims against the NFL Defendants, at their core, fundamentally turn on duties the NFL

Defendants could only have owed to professional football players such as Plaintiffs—namely,

duties to implement adequate rules, regulations, and guidelines regarding player health and

safety.  The CBAs establish the duties of the NFL and its Clubs to provide medical care to NFL

players.  (*See* Ex. 12, 1968 NFL and AFL Constitution Art. XIX § 19.5; Ex. 5, 1982 CBA Art.

XXXI §§ 1–2; Ex. 6, 1993 CBA Art. XLIV §§ 1–2; Ex. 10, 2006 CBA Art. XLIV §§ 1–2; Ex.

11, 2011 CBA Art. 39 §§ 1–2.)

Similarly, the CBAs acknowledge the role of the NFL and its Clubs in implementing and enforcing rules regarding professional football generally, and health and safety-related rules in particular.  Indeed, the CBAs provide that the NFL and its Clubs have the authority to "amend[] or change[]" all NFL "[p]laying rules." (*See, e.g.*, Ex. 14, 1984 NFL Constitution Art. XI § 11.2; *see also* Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V; Ex. 4, 1977 CBA Art. XI (forming the "Joint Committee on Player Safety and Welfare," which is tasked with addressing "the player safety and welfare aspects of . . . playing rules"); Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c) (empowering the NFLPA to investigate potentially hazardous rules and mandating procedures for review, investigation and resolution of disputes involving proposed rule changes that "would adversely affect player safety").  The CBAs also provide that the NFL will establish an electronic medical records system.  (Ex. 11, 2011 CBA Art. 40 § 3.) Thus, the NFL's alleged duty—to "protect players," who are the Plaintiffs in this litigation, and purportedly serve as "the guardian of player safety"—would expressly arise under the CBAs. (SAC ¶¶ 51, 52.)

That this function arises under the CBAs is confirmed by the fact that no such duty exists independent of the CBAs:  the NFL does not owe duties to promulgate rules regarding player health and safety to "every person in society."  *See Rawson*, 495 U.S. at 371 (holding a state law right arises outside of a CBA where defendant is "accused of acting in a way that might violate the duty of reasonable care owed to every person in society"); *Brown*, 219 F. Supp. 2d at 380 (distinguishing between duties owed only to employees covered by CBA and duties owed to members of the public (citing *Rawson*, 495 U.S. at 362)); *Peek*, 1997 WL

399379, at *6 (holding that plaintiff's negligence and gross negligence claims did not derive from a general duty of care owed to all persons); *Sherwin*, 752 F. Supp. at 1178 (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society" (quoting *Rawson*, 495 U.S. at 371)); *but see Stringer*, 474 F. Supp. 2d at 908 (suggesting *Brown*'s reading of *Rawson* is "too broad" and holding that plaintiff's claims did not arise under the CBAs).

Although the Second Amended Complaint conclusorily alleges in some places that there is a duty owed to NFL players *and* the "general public," Plaintiffs' factual allegations belie that assertion.  For example, Plaintiffs repeatedly allege that the ultimate goal of the alleged fraudulent conspiracy was to ensure that professional football continued to be violent, and thus profitable.  (*See, e.g.*, SAC ¶ 63.)  And Plaintiffs refer to the activities of the MTBI Committee, which they themselves allege was formed in order "to study the issue of head injuries *in the NFL*."  (*Id.* ¶ 163 (emphasis added).)  Plaintiffs are all former NFL players, and their alleged injuries were sustained in their capacity as such.  It is clear that Plaintiffs' claims hinge on a purported duty to protect NFL players that arises out of the CBAs, and thus they are preempted. *See Ballard*, 123 F. Supp. 3d at 1171 (noting that "the pleadings allege that the MTBI Committee produced findings that were deceptive to the NFL players *and the public at large*, [but] they repeatedly state that the MTBI was focused on undermining studies relating to *NFL players'* response to concussions" and so are preempted) (emphasis added)).

**II.**
**SECTION 301 PREEMPTS PLAINTIFFS' CLAIMS AGAINST NFLP**

Plaintiffs' claims against NFLP for negligent marketing, negligence, fraud, fraudulent concealment, and civil conspiracy are preempted for the same reason that Plaintiffs' claims against the NFL are preempted:  their resolution, too, requires interpretation of the CBAs.

With respect to their claims against NFLP, Plaintiffs rely primarily on conclusory allegations of duties purportedly owed by the "[NFL] Defendants" generally (*see, e.g.* SAC ¶¶ 352, 389) that fail to specify any duty owed by NFLP (or breach of such duty), as opposed to a duty owed by the NFL (or breach purportedly made by the NFL).  In fact, there are very few factual substantive allegations in the Complaint specific to NFLP.  Thus, to adjudicate Plaintiffs' claims against NFLP (to the extent they even exist), a court first would need to assess the scope of any alleged duty on the part of NFLP—an assessment that must be measured according to the scope of the preexisting duties in the CBAs.  *See supra* Section I.A.  That NFLP is not a signatory to the CBAs "is not dispositive" because the "relevant question for preemption purposes is . . . whether Plaintiffs' state-law claims . . . would require the court to apply or interpret the CBA."  *Atwater*, 626 F.3d at 1177–78 (noting that "courts have governed their determinations on  . . . preemption by the necessity of referring to a CBA for resolution of the claim rather than by the individual status of the defendant").[14]

The sole exception to Plaintiffs' blunderbuss pleading approach is their purported claim for negligence against NFLP based on an alleged "duty to ensure that the equipment and

---

[14]   Nor is it relevant—as some Plaintiffs have alleged (*see* Seau Opt Out Pl. Short Form Compl. Against NFL Defs., Attach. A, July 27, 2017, ECF No. 8166)—whether non-player Plaintiffs are signatories.  "The individual status of the plaintiff or defendant as signatory does not inform the Court's [Section 301 preemption] inquiry."  *Martin* v. *Watkins*, No. 10-cv-0423, 2010 WL 5371341, at *4 n.2 (W.D. Va. Dec. 22, 2010) (finding non-signatory plaintiff's claims preempted because their resolution would require interpretation of the CBA).  For the reasons set forth above, resolution of Plaintiffs' claims plainly depends upon an interpretation of the terms of the CBAs.

materials it licensed and approved was of the highest possible quality and sufficient to protect Plaintiffs from the risk of injury." (SAC ¶ 358.)[15]  That claim, however (assuming it can even be pled against NFLP in the absence of any specific, non-conclusory factual allegations), is preempted, because it will require the Court to interpret the terms of the CBAs that allocate responsibility for treating player injuries and implementing safety-related rules and regulations among the NFL, its Member Clubs, and the NFLPA.  *See supra* Section I.A.1.  In addition, the CBAs established the Joint Committee on Player Safety and Welfare specifically to address and review, among other issues, "playing equipment" such as helmets and other protective equipment.  (Ex. 4, 1977 CBA Art. XI; Ex. 5, 1982 CBA Art. XI; Ex. 6, 1993 CBA Art. XIII § 1(a); Ex. 10, 2006 CBA Art. XIII § 1(a); Ex. 11, 2011 CBA Art. 50 § 1(a); *see also* Ex. 3, 1970 CBA Art. V.)  Thus, the scope of any duty on NFLP's part to license or market equipment that adequately protects players can be assessed only by reviewing and interpreting the Joint Committee's concomitant duty to discuss "playing equipment."[16]  Thus, these claims, too, should be dismissed as preempted.

---

[15]   To the extent that Plaintiffs' "negligent marketing" claim against the NFL Defendants, which vaguely refers to "products" (SAC ¶ 352), includes helmets, and to the extent that certain Plaintiffs purport to assert negligence claims against the NFL relating to licensing (*See, e.g.*, Gayle Opt Out Pl. Short Form Compl. Against NFL Defs., Attach. "A," ¶¶ 1–7, July 24, 2017, ECF No. 8072; Johnson Opt Out Pl. Short Form Compl. Against NFL and NFLP ¶ 17, July 18, 2017, ECF No. 8027 (adding NFL as a defendant to Count IV)), such claims are preempted for the same reasons.

[16]   Although the *Stringer* court held that a negligence claim based on the NFL Defendants' purported duty "to ensure that the players had safe equipment" was not preempted, its decision was predicated on two faulty premises.  474 F. Supp. 2d at 911–13.  First, the court found the claim was not inextricably intertwined with the CBA because—although the CBA plainly establishes the "Joint Committee" for the "'purpose of discussing the player safety and welfare aspects of playing equipment'"—the "NFL Defendants are not members of that committee and are not required to adopt [its] recommendations."  *Id.* at 912 (quoting CBA).  But, as discussed, regardless of whether the NFL Defendants are members of the Committee, it is impossible to determine the scope of the NFL Defendants' purported duty—or whether they acted "reasonably" with regard to playing equipment—without first considering the express "purpose" of the Committee and the equipment-related duties imposed on its members.  Second, the *Stringer* court determined that "the CBA imposes no duty on [the NFL Defendants] to ensure that the equipment . . . adequately protects from . . . injury[.]"  *Id.*  But, as noted above, numerous CBA provisions in fact do delegate responsibility to the NFL, its Clubs, and the NFLPA for reviewing, investigating, and implementing equipment-related rules and regulations.  (*See, e.g.*, Ex. 12, 1968 NFL and AFL Constitution Art. XI § 11.2; Ex. 14, 1984 NFL Constitution Art. XI § 11.2 (delegating to the

## III.
## PLAINTIFFS' ESTOPPEL ALLEGATIONS ARE BASELESS

Recognizing that long-settled law compels preemption of their claims, Plaintiffs remarkably assert that the NFL is somehow "estopped"—apparently on the basis of issue preclusion—from arguing preemption, based on two decades-old arbitration decisions[17] having nothing to do with that issue.  As discussed more fully in the NFL Defendants' Leave Opposition, which the NFL Defendants incorporate by reference here and to which the NFL Defendants respectfully refer the Court, Plaintiffs' estoppel argument is meritless.

Plaintiffs cannot show, as they must to invoke issue preclusion, that the issue of Section 301 preemption is identical to the issues actually litigated and determined in the referenced arbitrations, or that the relevant determinations in those cases were essential to the judgments.  *See Zinman* v. *Prudential Ins. Co. of Am.*, 909 F. Supp. 279, 282 (E.D. Pa. 1995) (Brody, J.) (citation omitted).   (*See* NFL Defs.' Leave Opp., 12–19, ECF No. 7767.)[18] Moreover, Plaintiffs' estoppel allegations are contrary to the wealth of NFL-related preemption case law cited above.  (*See id.* at 19–21.)[19]

---

NFL and its Clubs the responsibility for "amend[ing] or chang[ing]" playing rules); Ex. 5, 1982 CBA Art. XI § 9; Ex. 6, 1993 CBA Art. XIII § 1(c); Ex. 10, 2006 CBA Art. XIII § 1(c); Ex. 11, 2011 CBA Art. 50 § 1(c) (authorizing the NFLPA to investigate and seek an advisory decision by an arbitrator regarding any playing rule change that it believes "would adversely affect player safety").)

[17]   *See* Ex. 15, *Nat'l Football League Mgmt. Council & Miami Dolphins* v. *Nat'l Football League Players' Ass'n & Henderson* (Jan. 22, 1988) ("*Henderson*"); Ex. 16, *Nat'l Football League Players' Ass'n ex rel. Sampson* v. *Nat'l Football League Mgmt. Council ex rel. Houston Oilers* (July 28, 1988) ("*Sampson*").

[18]   Where there is any doubt about the applicability of issue preclusion, the Third Circuit has established a presumption *against* such a finding.  *See Witkowski* v. *Welch*, 173 F.3d 192, 206 (3d Cir. 1999) (finding collateral estoppel in "this unique case," and "caution[ing] against its invocation in most others without extreme care"); *Ostella* v. *IRBSearch, LLC*, No. 12-cv-7002, 2013 WL 5777291, at *12 (E.D. Pa. Oct. 24, 2013) (stating that "any reasonable doubt should be resolved against the use of estoppel" (citation omitted)).

[19]   Nor is there any support for Plaintiffs' estoppel argument as a matter of judicial estoppel.  That doctrine, also known as the "doctrine against the assertion of inconsistent positions," requires a showing of bad faith, or "play[ing] fast and loose with the court," by the party taking the allegedly inconsistent positions.  *Ryan Operations G.P.* v. *Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358, 361–62 (3d Cir. 1996).  Plaintiffs make no allegations, nor could they, that the NFL Defendants have intentionally sought to conceal these two wholly

*First*, there is no identity of issues here.  Not only are arbitration opinions irrelevant to the question of whether Plaintiffs' asserted state law claims are preempted by federal law, but these arbitrators would have had no occasion to—and did not—resolve that federal law preemption question.  While each arbitration opinion included commentary about whether players' potential negligence or malpractice claims against individual doctors (and in one case, third-party doctors independent from the Club) could be arbitrated, that issue arose in a completely different factual context and under different legal standards from—and is therefore not "identical" to—the NFL Defendants' preemption argument.  *See Tran*, 408 F.3d at 138 n.10 (3d Cir. 2005) (despite similar fact situation and legal arguments, prior finding of justifiable reliance in context of tolling of state consumer protection law's statute of limitations was not identical to issue of justifiable reliance under same law); *Suppan* v. *Dadonna*, 203 F.3d 228, 233–34 (3d Cir. 2000) (no identity of issues in Section 1983 retaliation case where prior case involved different retaliatory conduct, even though both involved failure to promote).

In the *Henderson* arbitration, a player sought an injury protection benefit from a Club, and the arbitrator's main focus was on the player's non-compliance with rehabilitation instructions, which, under the CBA, prevented him from receiving the benefit he sought.  (Ex. 15, *Henderson*, at 7, 16–18.)  As an excuse for his non-compliance, the player argued that the Club physician negligently discharged him from his care.  (*Id.* at 11.)  In passing, the arbitrator added that "[t]he Association's contention that the discharge constituted negligence warranting damages under Florida law is, of course, a question not properly addressed in this forum," without any discussion, any indication that the NFL Management Council had even argued that such a claim was not arbitrable, or any mention of Section 301 preemption.  (*Id.* at 17.)

---

irrelevant arbitrations from the Court in order to mislead the Court and gain an unfair advantage; accordingly, Plaintiffs cannot meet the requirements for invoking the "extraordinary remedy" of judicial estoppel.  *Id.* at 365.

In the *Sampson* arbitration, a player claimed breach of contract by his Club for failing to provide adequate medical care, and negligence by the third-party physicians (notably, not the Club physician, who was "the only doctor affiliated with the [Club]") who treated him. (Ex. 16, *Sampson*, at 1–2, 7, 17.)   The arbitrator noted that the Club had cited *Henderson* in connection with the issue of a physician's duty of care, but did not elaborate on the issue or make clear the relevant arguments.  (*Id.* at 15.)   Ultimately, the arbitrator found no evidence that the Club had provided inadequate medical care, and went on to observe that to the extent that Sampson's claim was for alleged misdiagnosis or malpractice on the part of the third-party doctors who treated him, his claim was properly against them, not the Club, and was not within the scope of the CBA.  (*Id.* at 18–19.)  Like *Henderson*, the decision does not reference Section 301 or use the word "preemption."

Neither arbitration decision suggests that the players had asserted any claims against the NFL.  Nor do the awards discuss (a) whether the players' potential claims against the doctors would or would not be preempted by Section 301 or (b) the scope of the NFL's duties to players relative to the duties of the doctors or the Clubs.   Indeed, when confronted with *Henderson* and *Sampson* in connection with a Section 301 preemption motion, a federal court readily distinguished those cases because they concerned negligence of individual doctors, not the teams.  *Sherwin*, 752 F. Supp. at 1178–79 (finding preemption, noting that *Henderson* and *Sampson* were "convincingly distinguished by the Colts").  So, too, here.  Further, an arbitrator's determination that a state law damages claim cannot be arbitrated would be irrelevant to the LMRA preemption analysis, which does not turn on whether plaintiffs could bring the identical claims in arbitration.  *See Caterpillar Inc.* v. *Williams*, 482 U.S. 386, 391 n.4 (1987) (LMRA preempts claims even if "the relief sought by the plaintiff could be obtained only in state court");

45

*Young* v. *Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 998 (9th Cir. 1987) (claims preempted "even if federal law fails to provide the plaintiff with remedies available under state law" (citing *Avco Corp.* v. *Aero Lodge No. 735*, 390 U.S. 557, 560–61 (1968)). The purported issues in *Henderson* and *Sampson* are separate and distinct from the issue of whether Plaintiffs' tort claims against the NFL are preempted by Section 301, barring any application of issue preclusion here.

*Second*, issue preclusion is further unwarranted here because in neither case was the cited "determination" by the arbitrator "critical to the judgment," and thus "essential," as opposed to "mere[] dicta" or "incidental" determinations. *O'Leary* v. *Liberty Mut. Ins. Co.*, 923 F.2d 1062, 1067 (3d Cir. 1991); *see also Howard Hess Dental Labs. Inc.* v. *Dentsply Int'l, Inc.*, 602 F.3d 237, 248 (3d Cir. 2010) (an inference of anticompetitive injury not essential to prior determination that defendant had committed antitrust violation, stating that "[s]imply because such a conclusion may be gleaned from the Government Case does not mean that it was essential to our holding."); *Zinman*, 909 F. Supp. at 282. The statements in *Henderson* and *Sampson* regarding the arbitrability of tort claims against non-party doctors were merely incidental, non-outcome-determinative findings, and therefore were not "essential" to the final judgments in either case.

In *Henderson*, the arbitrator observed that the discharge by the team doctor was not "the crucial issue in this case," then stated, in dicta, that a negligence claim under Florida law was "not properly addressed in this forum." (Ex. 15, *Henderson*, at 17.) That statement was not outcome-determinative, however, and was merely incidental to the primary question of whether Henderson had met the CBA requirements for an injury protection benefit. In *Sampson*, the arbitrator noted that, to the extent that the grievance was based on the performance of

independent third-party doctors, the player's claim was properly against those non-parties, not the team.  (Ex. 16, *Sampson*, at 18–19.)  He added that such a claim was not within the scope of the relevant CBA and therefore not before him (*id.* at 19), but that statement was not essential to his ultimate holding on the key issue in the case—that the *team* had not failed to provide adequate medical care—nor would the issue of arbitrability of a claim against third-party doctors have disposed of Sampson's claims against the team.  Thus, issue preclusion is unwarranted.  *See Khalil* v. *Rohm & Haas Co.*, No. 05-cv-3396, 2008 WL 383322, at \*5–7 (E.D. Pa. Feb. 11, 2008) (issue preclusion inapplicable in employment discrimination suit where reason for employee's discharge was not at issue in prior workers' compensation proceeding and so court's statements about reason for discharge were merely dicta).

*Finally*, as discussed in detail above, subsequent to the *Henderson* and *Sampson* arbitration decisions, a long line of federal courts, including *Sherwin* which expressly considered and rejected those decisions as distinguishable, and many other cases cited above, have squarely held that state law tort claims against the NFL or its Clubs—including concussion-related claims—are preempted by Section 301 because their resolution substantially depends on provisions of the CBAs that define the terms and conditions of employment with the NFL, including terms relating to player safety.  *See supra* Section I.A.1.  Simply put, Plaintiffs' novel issue preclusion argument flies in the face of decades of federal case law to the contrary.

## CONCLUSION

For the foregoing reasons, the NFL Defendants respectfully submit that the Second Amended Complaint should be dismissed with prejudice.

Dated: September 25, 2017

Respectfully submitted,

*/s/ Brad S. Karp*

47

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
Email:  bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:   (215) 981-4000

*Attorneys for Defendants the National Football
League and NFL Properties LLC*