# Exhibit 2

# AGREEMENT

733

THIS AGREEMENT is made and entered into by and between THE NATIONAL FOOTBALL LEAGUE PLAYERS' ASSOCIATION, hereinafter referred to as the "Association", and THE NATIONAL FOOTBALL LEAGUE, hereinafter referred to as the "League" or the "NFL".

### PREAMBLE

WHEREAS, the Association is an unincorporated organization and the duly authorized collective bargaining representative of the professional football players employed by each of the Clubs constituting the members of the League, hereinafter referred to as the "Member Clubs"; and

WHEREAS, the League is an organization composed of Member Clubs owned by employers who employ members of the Association; and

WHEREAS, the Association has undertaken to negotiate on behalf of all of the players employed by the Member Clubs of the League with respect to the terms and conditions of their employment, except that it is specifically understood that regular season pay, including any form of deferred compensation, shall be negotiated by the individual players with their respective Clubs, and not by the Association; and

WHEREAS, it is further specifically understood that upon the expiration of this Agreement pre-season pay shall not be negotiated by the Association, but thereafter shall be the amount for pre-season set forth herein.

NOW, THEREFORE, for the mutual covenants and promises herein contained, it is hereby agreed as follows:

ARTICLE I 734

RECOGNITION--CHECK-OFF

Section 1.  Recognition:  The League recognizes
the Association as the sole and exclusive collective bargaining
representative of all the professional football players employed
by the Member Clubs with respect to all terms and conditions
of their employment, except as otherwise specified in this
Agreement.  It is hereby expressly agreed that the Association
shall at no time negotiate regular season pay for its members,
and that upon the expiration of this Agreement, the Association
shall no longer negotiate for its members pre-season pay as
fixed by this Agreement.  However, the Association shall have
the right to bargain with the League to establish a single
minimum salary applicable to all players or more than one
minimum salary based solely upon the length of time players
have played in the League.

Section 2.  Scope of Agreement:  The League, the
Member Clubs and the Association hereby agree that this Agree-
ment represents a complete full and final understanding on
all bargainable subjects of negotiation among the parties
during the term of this Agreement, except as specifically
excluded hereunder..

The parties agree that they will use their respective
best efforts to assure that all terms and conditions of Standard
Player Contracts signed by individual players will be given
full force and effect for the term of this Agreement.

Section 3.  Check-Off:  In the event a player signs
a voluntary Check-Off Authorization Card, the Member Club
shall check off the annual dues to the Association.  The Check-
Off Authorization Cards shall be in a form as set forth in
Appendix "A" of this Agreement.  The foregoing deduction shall

-2-

be made on the first payroll period after the player has signed 735
said Authorization Dues Check-Off Card.  The amount so collected
shall be forwarded to the Association office at 1100 North
Woodward Avenue, Birmingham, Michigan 48011, or to any other
office designated by the Association.

## ARTICLE II
### MANAGEMENT RIGHTS

Nothing in this Agreement shall be construed to
restrict the rights of the Member Clubs to manage and direct
their operations in any manner whatsoever except as specifically
limited by the terms of this Agreement.

## ARTICLE III
### STANDARD PLAYER CONTRACT

Section 1.  Governing Agreement:  The provisions
of the Constitution and By-Laws for professional football
operations as conducted by the National Football League and
the American Football League (the "Joint Constitution" herein),
the NFL Constitution and By-Laws, Standard Player Contracts,
and the Bert Bell NFL Player Retirement Plan and Trust Agree-
ment, shall remain in full force and effect and may from time
to time be amended pursuant to the terms thereof.  However,
to the extent that any of these agreements are inconsistent
with, or by amendment become inconsistent with this Agreement,
the provisions of this Agreement shall govern.

## ARTICLE IV
### COMPENSATION FOR PLAYERS

Section 1.  Regular Season Pay:  The individual
player's regular season pay shall be that salary, excluding any
plan of deferred compensation, set forth in the individual
player's contract and shall be the total amount of compensation
paid to a player for an entire regular season.

-3-

736

Section 2.  Pre-Season Pay:

(a)  An individual player's pre-season pay shall
be the amount of compensation to be paid to a player on the
active roster in each pre-season game (or to a player removed
from the active roster by reason of injury), plus the amount
of per diem to be paid to that player for expenses incurred
by him while in training camp or if required by the Club to
be available in camp.

(b)  All veteran players on the active roster of
a club 48 hours prior to a pre-season game shall receive pre-
season pay for that game in accordance with the schedule set
forth below; if any player has been waived and has either not
been claimed and waivers have not expired prior to the 48 hours,
the waiving club shall be obligated to pay the waived player
his pre-season pay in accordance with the following schedule:

(1)  Fifth year contract players - $280.00;

(2)  Fourth year contract players - $210.00;

(3)  Third year contract players - $140.00;
and

(4)  Second year contract players - $70.00.

The College All-Star Game shall be exempt from this
schedule.  Individual players of the professional team
playing in said game shall be paid in accordance with
past practice.

In addition, all veteran players shall receive $10.00
per diem while in training camp or if required by the Club
to be available in camp, for expenses until one week
prior to the first Sunday of the regular season schedule,
at which time such per diem payment shall be terminated.

(c)  The term "veteran player" as used in this Agreement
shall apply to any player who has received at least one year

-4-

of credit for pension vesting purposes.  The length of service 737
of a veteran player shall be determined by crediting one year
of veteran status to a player for each year of credit he receives
for pension vesting purposes.  For purposes of determining
eligibility for pay for pre-season games only, credit received
by a player for pension vesting purposes in the American Football
League shall be applied toward determining his veteran status
in the League.

(d)  Upon the expiration of this Agreement pre-
season pay shall no longer be negotiated by the Association,
but shall thereafter be the amount for pre-season set forth
in this Agreement.

Section 3.  Yearly Salary:  The individual yearly
salary of any player shall be the total amount of his "regular
season pay" and "pre-season pay" as those terms are defined
in Sections 1 and 2 of this Article.

Section 4.  Salary Negotiations:  Member Clubs agree
to commence salary negotiations with individual players prior
to May 15 of each year.

Section 5.  Minimum Yearly Salary:  The minimum
yearly salary for veteran contracted service players shall
be twelve thousand dollars ($12,000.00) for such players in
their second contract year, and thirteen thousand dollars
($13,000.00) for such players in their third and subsequent
contract years.

Section 6.  Salary Payment:  Players shall be paid
100% of their regular season pay in equal weekly or semi-
monthly installments over the course of the regular season;
however, this provision shall in no way invalidate or otherwise
affect any deferred compensation arrangement or any other
method of payment an individual player may make with his particular
Club.

-5-

783

**Section 7.  Compensation for Post-Season Games:**

Member Clubs shall make every effort to pay players for any post-season game within 30 days after said game is played.

**Section 8.  Meal Allowance:**  Players will be reimbursed for meals not furnished by Member Clubs on travel days during the regular season in accordance with the following schedule:  breakfast - $2.00; lunch - $2.00; dinner - $6.00. A travel day shall commence at the time a Club leaves its home city and shall terminate when the Club arrives back in its home city.

## ARTICLE V

## MOVING AND TRAVELING EXPENSES

**Section 1.  Who Qualifies and for What Amount:**  Any player under contract who is traded or claimed during the regular season, or any veteran player under contract, who after the start of training camp but before the beginning of the regular season, is traded or claimed and who subsequently makes the active roster of the Club to which he is traded or claimed or any vested player (one with four years and three games of service) who is traded or claimed after the commencement of training camp shall receive reasonable reimbursement for moving and traveling expenses in an amount not to exceed the amounts set forth in the following schedule:

Member Clubs shall be assigned the following zones:

Zone 1 - Philadelphia, New York, Washington, Baltimore, Pittsburgh, Cleveland and Atlanta

Zone 2 - Detroit, Chicago, New Orleans, Minnesota, Green Bay, Dallas and St. Louis

Zone 3 - None

Zone 4 - San Francisco and Los Angeles

-6-

Players who qualify for reasonable reimbursement for moving and travelling expenses shall receive up to a maximum of three hundred dollars ($300.00) if traded to a Member Club in the same zone; up to a maximum of six hundred dollars ($600.00) if traded to a Member Club in an adjacent zone; up to a maximum of nine hundred dollars ($900.00) if traded to a Member Club two zones away; and up to a maximum of twelve hundred dollars ($1,200.00) if traded to a Member Club three zones away.

Section 2. <u>Transportation to be Used</u>: All players who are traded shall report to their new Club by the fastest available means of transportation.

<u>ARTICLE VI</u>

<u>TERMINATION PAY</u>

Termination pay shall be granted to any vested active contracted service player released from the active roster of his club after commencement of the regular season schedule in an amount equal to 25% of his regular season pay, exclusive of deferred compensation, but in no event shall such player be entitled to more than 100% of his regular season pay exclusive of deferred compensation, for that year or more than one such payment during his playing career.

<u>ARTICLE VII</u>

<u>PENSION PLAN - INSURANCE POLICY</u>

Section 1. <u>Pension Plan</u>: The parties to this Agreement have established a pension plan known as the "Bert Bell NFL Player Retirement Plan and Trust Agreement" (hereinafter referred to as the "Pension Plan" or "Plan"). The Pension Plan has been approved and is on file with the Internal Revenue Service. Except as otherwise expressly provided in this Agreement, it is understood and agreed that the Pension Plan, and all

740

amendments thereto, shall be continued and maintained in full force and effect during the life of this Agreement.

Section 2.   Contributions to the Pension Plan:

(a)   It is understood that the NFL and AFL Pension Plans shall be merged by 1970 and bargaining on pensions will be conducted in 1970 on the basis of the merged plan.

(b)   It is clearly understood that the Member Clubs have no express or implied commitment regarding any contribution to the Pension Plan beyond 1969.

(c)   For the next two Plan years ending March 31, 1969 and March 31, 1970 respectively the Member Clubs will contribute a total of three million dollars ($3,000,000.00) to the Pension Plan for pension benefits, administrative costs and the costs of the study described in sub-paragraph (g) of this Section.

(d)   It is clearly understood that the guarantee of the Member Clubs applies only to the amount of the contribution to the Pension Plan.  Clubs do not guarantee any benefits under the Pension Plan.

(e)   It is also understood and agreed that it shall be exclusively within the control of the Member Clubs to determine the sources of revenue that shall be used to satisfy their guarantee.

(f)   The Member Clubs guarantee to take out and maintain an insurance policy that will provide the existing benefits under a Group Insurance policy presently in effect plus an increase in major medical benefits to fifty thousand dollars (50,000.00) for each active player and the members of his immediate family (wife and children).

(g)   A study of all aspects of the Pension Plan shall be commenced under the auspices of the Retirement Board

-8-

741

as soon as is feasible for the purpose of assisting the Board
in the determination of benefits in this plan for years ending
March 31, 1969 and March 31, 1970 respectively, and for the
further purpose of assisting the parties in the 1970 negotiations
involving the merged plan.

    Section 3.  The Retirement Board:

    (a)  The Pension Plan shall provide that the Retirement
Board under the Plan shall be composed as follows:

        (1)  One active player and one inactive vested
    player selected by the Association;

        (2)  Two (2) members selected by the Member
    Clubs;

    The Board shall act by majority vote.  Alternates
for each member may be designated.

    (b)  The powers granted to the Retirement Board
under the Pension Plan shall be expanded to include all powers
concerning

        (1)  Administration of the Plan;

        (2)  Determination and design of the projected
    benefits of the Plan;

        (3)  Determination of amounts to be allocated,
    out of contributions and other income, to the funding
    of prior and current service benefits;

        (4)  Hiring of all professional and staff per-
    sonnel including the administrator and advisors;

        (5)  Consideration of Player grievances relating
    to the rights of players under the NFL Retirement Plan; and

        (6)  All other necessary powers incident to
    the above powers or to the normal operation of the Plan,
    including but not limited to the power to amend the Plan,
    to construe the Plan and to reconcile inconsistencies
    in the Plan.

(c)  However, no action of the Retirement Board shall:

(1)  Alter the amount of the contributions otherwise payable to the Plan;

(2)  Cause the Plan to fail to qualify under Sections 401(a) and 501(a), or cause any portion of contributions to the Plan to fail to be deductible to the Member Clubs under Section 404(a), of the Internal Revenue Code;

(3)  Reduce, as a direct result of an amendment, the value of any benefit already earned and otherwise payable under the Plan;

(4)  Amend the Plan in a manner that will render the Plan unsound on an actuarial basis.

(d)  The Retirement Board shall also:

(1)  See to the payment of all reasonable and necessary expenses of the Plan and cause the same to be paid currently out of the income of the Plan before allocations are made out of income for the funding of benefits; and

(2)  Allocate an annual amount (out of available contribution income) to the funding of unfunded accrued liabilities so as to fully fund such liabilities on an actuarially sound basis.

Section 4.  In the event the parties agree that an expert is necessary in any action taken pursuant to this Article, the parties shall seek to reach agreement on such expert.  In the event the parties fail to reach agreement on the expert, the provisions of Article VII, Section 5 herein shall apply.

Section 5.  Any issue arising under any of the provisions of this Article or any provisions of the Pension Plan on which the Board is deadlocked, shall be referred for determination pursuant to Step 3 of the grievance procedure set forth in Article IX herein.

Section 6. Miscellaneous: It is expressly under- 743
stood that the Plan as previously constituted together with
this Agreement and all amendments to said Plan, will not render
said Plan ineligible or prevent the deductibility of contributions
to same under Sections 401(a) and 501(a) and other applicable
Provisions of the Internal Revenue Code. To this extent,
the parties shall file all amendments to said Plan, with said
Internal Revenue Service so as to maintain the Plan's eligibility
and preserve the deductibility of said contributions.

### ARTICLE VIII
### OPTION CLAUSE

The provisions of the Standard Player Contract,
Joint Constitution, NFL Constitution and By-Laws pertaining
to options and free agent rules shall not be amended during
the life of this Agreement. A joint committee consisting of
two representatives of the Association and two representatives
of the League shall be established to study these provisions
and to make such recommendations to the parties as the committee
may decide upon.

### ARTICLE IX
### GRIEVANCE PROCEDURE

For the purpose of providing an orderly and expedi-
tious procedure for the handling and resolving of grievances
the following shall apply:

Section 1. Definitions:

(a) "Grievance" shall mean a request or complaint
by a player, the Association or a Member Club against any
of the contracting parties to this Agreement relating to any
matter involving the interpretation or application of any

"11"

provision of this governing Agreement or the Standard Player
Contract.

(b)  "Player", for purposes of this Article, shall
mean a player under contract for the current calendar year.
The term "player" shall also include former players who have
grievances arising during the time they were players as de-
fined in the preceding sentence.

Section 2.  Procedure:

STEP 1.  Any player who believes that he has a justi-
fiable grievance shall discuss the matter with a representative
of his Club designated to handle such matters in an attempt
to solve same.  Should the player so desire, his Player Repre-
sentative may be present during such discussions and may participate
in such discussions.

In the event the matter is not resolved as a result
of such discussion, the grievance in written form shall be
presented to the Club's designated representative; provided,
however, that for a grievance to be considered beyond STEP
1, such grievance must be presented within sixty (60) days
from the date of the occurrence of the grievance or within
sixty (60) days of the date on which the facts of the matter
became known or reasonably should have become known to the
player, whichever is later.  Within ten (10) days following
the receipt of such grievance, the Club's designated represent-
ative shall advise the player in writing of the Club's decision
and shall furnish a copy of same to the Association's designated
representative.

STEP 2.  In the event the player or the Association
is dissatisfied with the decision of the Club, the grievance
may be appealed by the filing of a written notice of appeal
to the League President or his representative or a represent-

743

ative designated by the League within twenty (20) days following
the grievant's receipt of the Club's written decision.

In the event a grievance concerns more than one
(1) Club, or is instituted by a Member Club, the parties may
initiate the grievance procedure at STEP 2 herein.  In such
cases, the time limitations regarding submission within sixty
(60) days from the date of the occurrence or sixty (60) days
from the date upon which the facts of the matter became known,
or reasonably should have become known, shall apply.

The representative designated by the League shall,
within ten (10) days after receipt of the appeal or written
grievance, meet with the representatives of the Association
or other parties involved in an attempt to resolve the dispute.
Within ten (10) days following such discussion, the League
representative shall render his decision in writing to the
parties to the dispute.

STEP 3.  In the event the Association or any member
Club is dissatisfied with the written decision of the repre-
sentative of the League, the Association or Member Club may
appeal said decision in writing, within twenty (20) days from
receipt of such decision, directly to the Commissioner's office.
The Commissioner may direct the parties to attend a conference
over which he or his representative shall preside in order
to settle the grievance.  In any event, the Commissioner must,
within thirty (30) days from the written appeal from STEP
2 of the Grievance Procedure, render a written decision on
said matter.  Any decision so rendered by the Commissioner
shall be final and binding upon all parties herein.

Section 3.  In the case of injury grievances only,
the grievance procedure set forth below shall be followed:

-13-

746

(a)  A player must give notice to his Club of his alleged injury within thirty-six (36) hours of its occurrence.

(b)  A player must, within seventy-two (72) hours after his examination by his Club Physician, submit at his own expense to a physical examination by a physician of his own choice.

(c)  The purpose of the time limits for physical examinations set forth in (a) and (b) above is to obtain evidence of an injury as quickly as possible.  It is recognized that there may be exceptional cases where the precise time limits must be waived.

(d)  In the event of a dispute between the two physicians with respect to the player's physical ability to render the services required of him by his Standard Player Contract, the grievance shall be submitted to a disinterested third party physician selected by the Club Physician and the player's physician.  If the two physicians are unable to agree on the selection of a third party physician, he shall be selected from a list prepared by an agreement of the parties from a panel which is mutually acceptable.

(e)  The opinion of such disinterested physician shall be conclusive and binding upon the player and his club on the medical question.  In the event there is any disagreement as to the scope or meaning of the third party physician's report relating to aspects other than the precise medical question, the player may refer the matter to the Association; the Association shall have the right at its request, to have the matter considered by the League or its nominee; if such matter cannot be resolved by

-14-

747

mutual agreement, the matter shall be submitted to the Commissioner for final determination.

(f)  In no event may any grievance concerning an injury be considered which is not presented as a grievance within one year from the date on which such injury occurred except that whenever a player is terminated as a player, he shall have one year from the date of said termination within which to claim a grievance arising under the contract in existence at the time of the termination.

Section 4.  Each party shall bear his own costs incident to the settlement of disputes under this Article.

Section 5.  All time limitations contained herein may be waived by mutual agreement of the parties.

Section 6.  In the event the Commissioner acts directly pursuant to the powers granted him under the Joint Constitution, NFL Constitution, or By-Laws or Paragraph 4 of the Standard Player Contract, such action shall not be considered a grievance, but the following procedure shall apply:

The Commissioner shall give notice and conduct a hearing before taking any action against a player under Section 8.13(A) of the NFL Constitution.  In connection with any action or decision by the Commissioner pursuant to any other provision of the Joint Constitution, NFL Constitution or Paragraph 4 of the Standard Player Contract, any player or the Association or a club affected by such action or decision shall have the right upon request to a hearing before the Commissioner or his nominee for reconsideration of such action or decision.  The Commissioner's decision upon any such rehearing shall be

-15-

745

final and binding.  In any event, no action or decision
by the Commissioner shall contravene this Agreement.

Section 7.  In making his decision, if any, pursuant
to STEP 3 of the Grievance Procedure set forth herein, the
Commissioner shall be limited to an interpretation and appli-
cation of the applicable agreement and shall have no power
to add to, subtract from, or in any way modify the terms of
the applicable agreement.

## ARTICLE X

## ENDORSEMENTS - LICENSING - TV APPEARANCES

Section 1.  Endorsements:  No Member Club shall
arbitrarily refuse to permit a player to endorse a product.

Section 2.  Licensing:

(a)  A joint committee consisting of two (2) repre-
sentatives of the League and two (2) representatives of the
Association shall be established to study licensing and to
make recommendations to the parties.

(b)  The Association agrees to give full force and
effect to all licensing agreements entered into by the Commissioner
in 1967 or in 1968 with third parties on behalf of the Players,
including existing options, with the understanding that in
no event shall any of these agreements be extended into the
1970 football season.  All such revenues derived therefrom
shall be committed to the Pension Plan as set forth herein
for the years ending March 31, 1969 and March 31, 1970, respectively
and credited as part of the League's contribution for those
years.

Section 3.  TV Appearances:  No Club shall unreasonably
require a player to appear on radio or TV.

- 16 -

749

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 1. No Discrimination: There shall be no discrimination in any form against any athlete or a Member Club by any party to this Agreement because of race, religion, national origin, or activity on behalf of the National Football League Players' Association.

Section 2. No Reduction of Financial Benefits: No direct financial benefit currently being granted by any Club to its team shall be reduced during the term of this Agreement. Nothing herein contained shall be deemed to affect the power of the Commissioner or a club to fine or suspend a player pursuant to the Constitution, By-Laws, Rules and Regulations of the League.

Section 3. Tickets for Away Games: Each player will be afforded the opportunity to purchase two tickets from the best tickets available for public sale immediately prior to the public sale for each away game.

Section 4. Workmen's Compensation Benefits:

(a) In any state where workmen's compensation coverage is not compulsory, a Club shall either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this Section, such benefits shall be equivalent to those benefits paid under the workmen's compensation law of the state in which his Club is located.

(b) Nothing herein stated shall be interpreted as preventing a Club, which has the legal right to do so, from rejecting coverage under the workmen's compensation law of

-17-

its state. However, if it selects to reject coverage under    750

the workmen's compensation law of its state, it must neverthe-

less guarantee benefits to its players in the manner previously

prescribed in this Section.  Moreover, any Club that is excluded,

for any reason, from coverage under the workmen's compensation

laws of its state shall remain excluded from those laws if it

selects to do so.  However, such a Club shall be obligated to

guarantee benefits to its players in the manner previously pre-

scribed in this Section.

Section 5.  _Players Injured Prior to Signing New

Contracts_:  Players who are removed from the active roster by

reason of injury between the beginning of the training camp

period and the first regular season game and who have not signed

new contracts, shall be guaranteed 100% of their salaries as

stated on the front side of their contracts for the contract

year immediately preceding the year in which they are injured.

Section 6.  _Right to Legal Counsel_:  An individual

player shall have the right to have legal counsel represent

him in his individual salary negotiations.  However, it is

understood that collective bargaining on salary negotiations

on behalf of more than one player shall not be permitted unless

expressly agreed to by the Member Club.

## ARTICLE XII

## DURATION OF AGREEMENT

Section 1.  _Effective Date_:  This Agreement shall

be deemed effective as of July 15, 1968.

Section 2.  _Expiration Date_:  This Agreement shall

remain in full force and effect until February 1, 1970, and

then shall automatically renew itself from year to year there-

after, unless the League or the Association gives written

-18-

751

notice to the other party to amend, modify or terminate within not less than sixty (60) days prior to any expiration date. The parties may, by written agreement, modify or amend this Agreement at any time hereafter.

This Agreement may be executed in counterpart.

WHEREFORE, the parties have witnessed this AGREEMENT this 20 day of November, 1968.

NATIONAL FOOTBALL LEAGUE

NATIONAL FOOTBALL LEAGUE
PLAYERS' ASSOCIATION

-19-

752

**VOLUNTARY CHECK-OFF**

**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION**

_____                    _____
            (CLUB)                                                 (DATE)

Pursuant to this Authorization and Assignment, please deduct from my annual salary on the first payroll period following the first League game after receipt of this voluntary Authorization and Assignment, and while I am in employment within the Collective Bargaining Unit in the League, my annual dues (if covered by me) as designated by the Secretary of the Association, as membership dues in this Association. The current designation (Dues) is One Hundred ($100.00) Dollars annually.

The deducted membership dues shall be remitted promptly by you, to the National Football League Players Association offices at 1100 North Woodward, Birmingham, Michigan, or at any other office designated by the Association.

This authorization and assignment shall be effective and cannot be cancelled for a period of one (1) year from the date appearing above or until the termination date of the current Collective Bargaining Agreement between the League and the Association, whichever occurs sooner.

I hereby voluntarily authorize you to continue the above Authorization and Assignment in effect after the expiration of the shorter of the periods above specified, for further successive periods of one (1) year, from each date. I agree that this Authorization and Assignment shall become effective and cannot be cancelled (1) not during any of such years, but that I may cancel and revoke by giving to the appropriate club in which I am then employed, an individual written notice signed by me and which shall be postmarked or received by the Club within fifteen (15) days following the expiration of any such year, or within the fifteen (15) days following the termination date of any Collective Bargaining Agreement between the League and the Association covering me, if such date shall occur within one of such annual periods. Such notice of revocation shall become effective upon receipt by the Club. A copy of any such notice will be given by me to the Secretary of the Association.

The undersigned has affixed his signature voluntarily and after having read the foregoing.

National Football League Players Association                  _____
_____                                    (Player Signature)

WITNESS: _____                    _____
                                                                             (Club)