# Exhibit 5



# NFL MANAGEMENT COUNCIL

# 1982 COLLECTIVE BARGAINING AGREEMENT



# Table of Contents

|  |  | Page |
|---|---|---|
| PREAMBLE | .................................................. | 9 |
| Article I. | GOVERNING AGREEMENT ................... | 9 |
| Section 1. | Conflicts ............................................ | 9 |
| Section 2. | Full Force and Effect ......................... | 9 |
| Section 3. | Implementation .................................. | 10 |
| Section 4. | Management Rights ............................ | 10 |
| Article II. | SCOPE OF AGREEMENT ....................... | 10 |
| Section 1. | Scope .................................................. | 10 |
| Section 2. | Arbitration ......................................... | 10 |
| Article III. | NO STRIKE/LOCKOUT/SUIT .............. | 11 |
| Section 1. | No Strike/Lockout ............................. | 11 |
| Section 2. | No Suit ............................................... | 11 |
| Article IV. | UNION SECURITY ................................ | 12 |
| Section 1. | Union Security ................................... | 12 |
| Section 2. | Check-off ........................................... | 12 |
| Section 3. | NFLPA Meetings ................................ | 12 |
| Section 4. | Disputes ............................................. | 12 |
| Section 5. | Other Check-off ................................. | 13 |
| Section 6. | Procedure for Enforcement ................. | 13 |
| Article V. | PLAYER SECURITY ............................... | 13 |
| Section 1. | No Discrimination .............................. | 13 |
| Section 2. | Personal Appearance .......................... | 13 |
| Article VI. | CLUB DISCIPLINE ............................... | 13 |
| Section 1. | Maximum Discipline .......................... | 13 |
| Section 2. | Published Lists ................................... | 14 |
| Section 3. | Uniformity ......................................... | 14 |
| Section 4. | Disputes ............................................. | 15 |
| Section 5. | Deductions ......................................... | 15 |
| Article VII. | NON-INJURY GRIEVANCE ................... | 15 |
| Section 1. | Definition .......................................... | 15 |
| Section 2. | Initiation ............................................ | 15 |
| Section 3. | Filing ................................................. | 16 |
| Section 4. | Joint Fact Finding ............................. | 16 |
| Section 5. | Joint Fact Finding Report .................. | 16 |
| Section 6. | Player-Club Relations Committee ....... | 16 |
| Section 7. | Appeal ............................................... | 17 |
| Section 8. | Arbitrators ......................................... | 17 |
| Section 9. | Hearing .............................................. | 18 |
| Section 10. | Arbitrator's Decision and Award ....... | 19 |
| Section 11. | Integrity and Public Confidence ......... | 19 |
| Section 12. | Time Limits ....................................... | 19 |
| Section 13. | Representation ................................... | 20 |
| Section 14. | Costs ................................................. | 20 |

| | | | |
|---|---|---|---|
| Article VIII. | | COMMISSIONER DISCIPLINE | 20 |
| Section | 1. | Commissioner Discipline | 20 |
| Section | 2. | Time Limits | 21 |
| Section | 3. | Representation | 21 |
| Section | 4. | Costs | 21 |
| Section | 5. | One Penalty | 21 |
| Section | 6. | Fine Money | 21 |
| Article IX. | | INJURY GRIEVANCE | 21 |
| Section | 1. | Definition | 21 |
| Section | 2. | Filing | 21 |
| Section | 3. | Answer | 22 |
| Section | 4. | Neutral Physician | 22 |
| Section | 5. | List | 23 |
| Section | 6. | Appeal | 23 |
| Section | 7. | Hearing | 23 |
| Section | 8. | Miscellaneous | 24 |
| Section | 9. | Expenses | 24 |
| Section | 10. | Pension Credit | 25 |
| Section | 11. | Payment | 25 |
| Article X. | | INJURY PROTECTION | 25 |
| Section | 1. | Qualification | 25 |
| Section | 2. | Benefit | 26 |
| Section | 3. | Disputes | 26 |
| Article XI. | | COMMITTEE ON SAFETY AND WELFARE | 26 |
| Section | 1. | Composition | 26 |
| Section | 2. | Meetings | 26 |
| Section | 3. | Powers | 27 |
| Section | 4. | Scope | 27 |
| Section | 5. | Consultants | 27 |
| Section | 6. | Appointments | 27 |
| Section | 7. | Initial Tasks | 27 |
| Section | 8. | Competition Committee | 27 |
| Section | 9. | Playing Rules | 27 |
| Article XII. | | NFL PLAYER CONTRACT | 28 |
| Section | 1. | Form | 28 |
| Section | 2. | Changes | 28 |
| Article XIII. | | COLLEGE DRAFT | 29 |
| Section | 1. | Time of Draft | 29 |
| Section | 2. | Number of Choices | 29 |
| Section | 3. | Exclusive Right | 29 |
| Section | 4. | Subsequent Draft | 29 |
| Section | 5. | No Subsequent Draft | 30 |
| Section | 6. | Other Professional Team | 30 |
| Section | 7. | Return to NFL | 30 |
| Section | 8. | Pre-1983 | 31 |
| Section | 9. | Assignment | 31 |

4

Article XIV.    OPTION CLAUSE  ...................................... 31
    Section   1.   Vested Players  ........................................ 31
    Section   2.   Rookies and Non-Vested Players  ........ 31
    Section   3.   Compensation  ...................................... 31
Article XV.     RIGHT OF FIRST REFUSAL/
                COMPENSATION  ..................................... 32
    Section   1.   Applicability  ........................................ 32
    Section   2.   Contract Expiration Date  ................... 32
    Section   3.   Offer Sheet  .......................................... 32
    Section   4.   First Refusal Exercise Notice  ............. 32
    Section   5.   No First Refusal Exercise Notice  ........ 32
    Section   6.   One Offer Sheet  .................................. 33
    Section   7.   Principal Terms  .................................. 33
    Section   8.   Non-Principal Terms  ........................... 33
    Section   9.   Qualifying Offer  ................................. 34
    Section  10.   Qualification for First Refusal  ........... 34
    Section  11.   Qualification for Compensation  ......... 34
    Section  12.   Amount of Compensation  ................... 35
    Section  13.   Absences of Choice  ............................. 37
    Section  14.   Copies  .................................................. 37
    Section  15.   Circulation of Veteran Free
                Agent List  ........................................... 37
    Section  16.   Notice  .................................................. 37
    Section  17.   Re-Signing  .......................................... 38
    Section  18.   Extreme Personal Hardship  ................ 38
First Refusal Offer Sheet  ............................................. 40
First Refusal Exercise Notice  ...................................... 41
First Refusal/Compensation Charts  ....................... 42, 43
Article XVI.    WAIVER SYSTEM  ................................... 44
    Section   1.   Release  ................................................. 44
    Section   2.   Contact  ................................................ 44
    Section   3.   Ineligibility  ......................................... 44
    Section   4.   Notice of Termination  ......................... 44
Notice of Termination  .................................................. 45
Article XVII.   EXPANSION  ............................................ 46
    Section   1.   Veteran Allocation  .............................. 46
    Section   2.   Future Expansion  ................................ 46
Article XVIII.  OTHER PROVISIONS  .............................. 46
    Section   1.   CFL Rule  .............................................. 46
    Section   2.   Physically Unable to Perform  ............. 46
    Section   3.   Non-Football Injury  ............................ 46
Article XIX.    SQUAD SIZE  ............................................ 47
    Section   1.   Active List  ........................................... 47
    Section   2.   Pre-Season  .......................................... 47
    Section   3.   Inactive List  ........................................ 47

| | | | |
|---|---|---|---|
| Article XX. | | OFF-SEASON TRAINING CAMPS | 47 |
| Section | 1. | Number | 47 |
| Section | 2. | Length | 47 |
| Section | 3. | Expenses | 48 |
| Section | 4. | Contact | 48 |
| Section | 5. | Injuries | 48 |
| Article XXI. | | PRE-SEASON TRAINING CAMPS | 48 |
| Section | 1. | Definition | 48 |
| Section | 2. | Room and Board | 48 |
| Section | 3. | Rookie Per Diem | 48 |
| Section | 4. | Veteran Per Diem | 48 |
| Section | 5. | Reporting | 49 |
| Section | 6. | Telephones | 49 |
| Section | 7. | Expenses | 49 |
| Article XXII. | | SALARIES | 50 |
| Section | 1. | Salary | 50 |
| Section | 2. | Other Compensation | 51 |
| Section | 3. | Arbitration | 51 |
| Section | 4. | Payment | 51 |
| Section | 5. | Re-opener | 51 |
| Section | 6. | Length of Regular Season | 52 |
| Article XXIII. | | MONEY NOW | 53 |
| Section | 1. | Amount | 53 |
| Section | 2. | Payment | 53 |
| Section | 3. | Game Pay | 53 |
| Article XXIV. | | SEVERANCE PAY | 53 |
| Section | 1. | Amount | 53 |
| Section | 2. | Payment | 54 |
| Article XXV. | | MEAL ALLOWANCE | 55 |
| Section | 1. | Reimbursement | 55 |
| Section | 2. | Travel Day | 55 |
| Article XXVI. | | DAYS OFF | 55 |
| Section | 1. | Rate | 55 |
| Section | 2. | Requirements | 55 |
| Article XXVII. | | MOVING AND TRAVEL EXPENSES | 55 |
| Section | 1. | Qualification | 55 |
| Section | 2. | Moving Expenses | 56 |
| Section | 3. | Travel Expenses | 56 |
| Section | 4. | Transportation | 56 |
| Article XXVIII. | | POST-SEASON PAY | 57 |
| Section | 1. | System | 57 |
| Section | 2. | Compensation | 57 |
| Section | 3. | Wild Card Game; Division Play-off Game | 57 |
| Section | 4. | Conference Championship; Super Bowl Game | 57 |
| Section | 5. | Payment | 58 |

Article XXIX. Pro Bowl Game ............................... 59
Section 1. Compensation ...................................... 59
Section 2. Selection ............................................. 59
Section 3. Wives ................................................. 59
Section 4. Injury ................................................ 59
Section 5. Payment ............................................. 59
Article XXX. Retention of Benefits .................... 59
Article XXXI. Players' Rights to Medical
              Care and Treatment .................. 59
Section 1. Club Physician .................................... 59
Section 2. Club Trainers ...................................... 60
Section 3. Players' Right to a Second Medical
           Opinion ............................................. 60
Section 4. Players' Right to a Surgeon of
           His Choice ........................................ 60
Section 5. Standard Minimum Pre-Season
           Physical ............................................. 60
Section 6. Chemical Dependency Program .......... 60
Section 7. Testing .............................................. 61
Section 8. Confidentiality ................................... 61
Article XXXII. Access to Personnel and
               Medical Records ........................... 61
Section 1. Personnel Records .............................. 61
Section 2. Medical Records ................................. 62
Article XXXIII. Group Insurance ........................ 62
Section 1. Life .................................................. 62
Section 2. Major Medical ................................... 62
Section 3. Dental ............................................... 62
Section 4. Other Benefits ................................... 62
Section 5. Carrier .............................................. 62
Article XXXIV. Retirement Plan ....................... 63
Section 1. Maintenance ...................................... 63
Section 2. Contributions .................................... 63
Section 3. 1974 and 1975 .................................. 64
Section 4. Number of Clubs ............................... 64
Section 5. Obligations ........................................ 64
Section 6. Retirement Board ............................... 64
Section 7. Actuaries .......................................... 64
Section 8. Amendments ...................................... 65
Section 9. Conformance ..................................... 66
Article XXXV. Termination Pay ........................ 66
Section 1. Payment ............................................. 66
Section 2. One Week .......................................... 66
Article XXXVI. Worker's Compensation ............ 67
Section 1. Benefits ............................................ 67
Section 2. Rejection of Coverage ........................ 67
Section 3. Arbitration ........................................ 67

7

Article XXXVII. MISCELLANEOUS ................................. 67
    Section   1.   Endorsements   ............................... 67
    Section   2.   Appearances   ............................... 67
    Section   3.   Promotion   ............................... 67
    Section   4.   Deductions   ............................... 68
    Section   5.   Public Statements   ............................... 68
    Section   6.   Addresses   ............................... 68
    Section   7.   NFLPA Tickets   ............................... 68
    Section   8.   Player Tickets   ............................... 68
    Section   9.   Tests   ............................... 68
    Section  10.   League Security   ............................... 69
Article XXXVIII. DURATION OF AGREEMENT   ............ 69
    Section   1.   Effective Date   ............................... 69
    Section   2.   Termination Date   ............................... 69
    Section   3.   Termination   ............................... 69
    Section   4.   Ratification   ............................... 69
Appendix A      CHECK-OFF AUTHORIZATION   ............ 71
Appendix C      ENFORCEMENT OF UNION
                SECURITY   ............................... 72
Appendix D      STANDARD MINIMUM PRE-SEASON
                PHYSICAL EXAMINATION   ................ 74
Appendix E      ............................... 77
Appendix F      ............................... 78
Appendix G      ............................... 79
Appendix H      ............................... 81
Appendix I      ............................... 82
Appendix J      ............................... 84
Appendix K      ............................... 85
Appendix L      ............................... 86
Appendix M      ............................... 87

## PREAMBLE

This Agreement, which is the product of bona fide, arms-length collective bargaining, is made and entered into on the 11th day of December, 1982, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council"), which is recognized as the sole and exclusive bargaining representative of present and future employer member clubs of the National Football League, and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL and as set forth in NLRB Certification #18-RC-8308, dated January 22, 1971.

## ARTICLE I
## GOVERNING AGREEMENT

Section 1. **Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the Standard Player Contract, the NFL Player Contract, the NFL Constitution and Bylaws, the Bert Bell NFL Player Retirement Plan and Trust Agreement, or any other document affecting terms and conditions of employment of NFL players and all players, clubs, the NFLPA, the NFL, and the Management Council will be bound hereby.

Section 2. **Full Force and Effect:** Any provisions of the Standard Player Contract, the NFL Player Contract, the NFL Constitution and Bylaws, the Bert Bell NFL Player Retirement Plan and Trust Agreement, or any other document affecting terms and conditions of employment of NFL players, which are not superseded by this Agreement, will remain in full force and effect for the continued duration of this Agreement, and, where applicable, all players, clubs, the NFLPA, the NFL, and the Management Council will be bound thereby. It is recognized that the NFLPA has not participated in the promulgation of the NFL Constitution and Bylaws. However, the provisions of the NFL Constitution and Bylaws will apply to players except where superseded by the provisions of this Agreement.

9

Section 3. **Implementation:** The NFLPA and Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and clubs.

Section 4. **Management Rights:** The NFL clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement.

# ARTICLE II
## SCOPE OF AGREEMENT

Section 1. **Scope:** This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article XXII, Section 5 on Salaries and Appendix C on Union Security, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement; provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Council will give the NFLPA notice of and negotiate the proposed change in good faith.

Section 2. **Arbitration:** The question of whether or not the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a noninjury grievance under Article VII of this Agreement. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this agreement to agree to anything or require the making of a concession by either party in negotiations.

10

# ARTICLE III
## NO STRIKE/LOCKOUT/SUIT

Section 1. **No Strike/Lockout:** Except as otherwise provided in Article XXII, Section 5 on Salaries and Appendix C on Union Security neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any club for the duration of this Agreement, and no club, either individually or in concert with other clubs, will engage in any lockout for the duration of this Agreement. Any claim by the Management Council that the NFLPA has violated this Article III, Section 1, will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the Management Council will have the right to submit such claim directly to the courts.

Section 2. **No Suit:** The NFLPA agrees that neither it nor any of its members nor any member of its bargaining unit will sue, nor support financially or administratively, nor provide testimony or affidavit in, any suit against the NFL or any club with respect to any claim relating to any aspect of the NFL rules, including, without limitation, the Standard Player Contract, the NFL Player Contract, the NFL Constitution and Bylaws, the college draft, the option clause, the right of first refusal or compensation, the waiver system, the trading of players, tampering, and the maintenance of certain reserve lists; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any club, acting individually or in concert with other clubs, or the Management Council has breached the terms of this Agreement, the Standard Player Contract, the NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article VII of this Agreement. The Management Council agrees that neither it nor any of its member clubs will sue any player with regard to his participation in any NFLPA-sponsored "All-Star" game in 1982.

# ARTICLE IV
# **UNION SECURITY**

Section 1. **Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA whose initial employment with an NFL club began or begins subsequent to February 1, 1974 must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

Section 2. **Check-off:** Commencing with the execution of this Agreement, each club will check-off the intiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix A and made a part of this Agreement) has been provided to the club. The club will forward the check-off monies to the NFLPA within seven days of the check-off.

Section 3. **NFLPA Meetings:** The NFLPA will have the right to conduct three meetings on club property each year, provided that the player rep or NFLPA office has given the club at least seven days notice of its desire to hold such a meeting. No meeting will be held at a time which would disrupt a coach's team schedule.

Section 4. **Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article will be processed pursuant to Article VII. Any decision of an outside arbitrator pursuant thereto will constitute full, final

and complete disposition of the dispute, and will be binding on the player(s) and club(s) involved and the parties to this agreement.

Section 5. **Other Check-off:** Commencing with the execution of this Agreement, the clubs will be required to honor any request by an individual player for check-off of: (a) Savings deposits in the Professional Athletes Federal Credit Union; (b) Installment payments on any individual player's loan from the Professional Athletes Federal Credit Union; (c) Contributions to the Professional Athletes Youth Foundation. Check-off of contributions and/or payments for the above purposes will be made pursuant to a written authorization signed by the player in the form prescribed in Appendix B, a copy of which is attached hereto and made a part of this Agreement.

Section 6. **Procedure for Enforcement:** The parties will continue to use the procedure for enforcement of the Union Security Agreement which was attached as Appendix C to the 1977 Collective Bargaining Agreement. Such procedure is attached hereto and incorporated herein by reference and made a part of this Agreement.

# ARTICLE V
# PLAYER SECURITY

Section 1. **No Discrimination:** There will be no discrimination in any form against any player by the Management Council, any club, or by the NFLPA because of race, religion, national origin, or activity or lack of activity on behalf of the NFLPA.

Section 2. **Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

# ARTICLE VI
# CLUB DISCIPLINE

Section 1. **Maximum Discipline:** The following maximum discipline schedule will be applicable for the duration of this Agreement:

13

Overweight—maximum fine of $25 per lb./per day.

Unexcused late reporting for mandatory off-season training camp, team meeting, practice, transportation, curfew, scheduled appointment with club physician or trainer, or scheduled promotional activity—maximum fine of $100.

Failure to promptly report injury to club physician or trainer—maximum fine of $100.

Losing, damaging or altering club-provided equipment—maximum fine of $100 and replacement cost, if any.

Throwing football into stands—maximum fine of $100.

Unexcused late reporting for or absence from pre-season training camp—maximum fine of $1,000 per day.

Unexcused missed mandatory off-season training camp, team meeting, practice, curfew, bed check, scheduled appointment with club physician or trainer, or scheduled promotional activity—maximum fine of $500.

Unexcused missed team transportation—maximum fine of $500 and transportation expense, if any.

Loss of all or part of playbook, scouting report or game plan—maximum fine of $500.

Ejection from game—maximum fine of $500.

Conduct detrimental to club—maximum fine of an amount equal to one week's salary and/or supension without pay for a period not to exceed four (4) weeks.

> Discipline will be imposed uniformly within a club on all players for the same offense; however, the club may specify the events which create an escalation of the discipline, provided the formula for escalation is uniform in its application.

> The club will promptly notify the player of any discipline; notice of any club fine in the $1,000 maximum category and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

Section 2. **Published Lists:** All clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule referred to in Section 1 above.

Section 3. **Uniformity:** Discipline will be imposed uniformly within a club on all players for the same offense; however, the club may specify the events which create an escalation of the

14

discipline, provided the formula for escalation is uniform in its application. Any disciplinary action imposed upon a player by the Commissioner pursuant to Article VIII of this Agreement will preclude or supersede disciplinary action by the club for the same act or conduct.

Section 4. **Disputes:** Any dispute involved in club discipline may be made the subject of a non-injury grievance under Article VII of this Agreement, Non-Injury Grievance.

Section 5. **Deductions:** Any club fine will be deducted at the rate of no more than $250 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. This will not apply to a suspension.

# ARTICLE VII
# NON-INJURY GRIEVANCE

Section 1. **Definition:** Any dispute (hereinafter referred to as a "grievance") involving the interpretation or application of, or compliance with, any provision of this Agreement, the Standard Player Contract, the NFL Player Contract, and any provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article; provided, however, that any dispute involving Section 1 of Article III, Section 11 of Article VII, Article VIII and Article IX of this Agreement, paragraph 8 of the Standard Player Contract and paragraph 3 of the NFL Player Contract will not be resolved under the procedure of this Article.

Section 2. **Initiation:** A grievance may be initiated by a player, a club, the Management Council, or the NFLPA. Except as provided otherwise in Article XV, Section 18, a grievance must be initiated within 45 days from the date of the occurrence or non-occurrence upon which the grievance is based, or within 45 days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to an NFL club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

15

Section 3. **Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail or TELEX with the Management Council and furnishing a copy of such notice to the club(s) involved; and a club or the Management Council may initiate a grievance by filing written notice by certified mail or TELEX with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA. The party to whom a non-injury grievance has been presented will answer in writing by certified mail or TELEX within seven (7) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or club(s) involved and the NFLPA or NFLMC as may be applicable.

Section 4. **Joint Fact Finding:** Within ten days of the receipt of an answer, representatives of the NFLPA and the Management Council will meet in the appropriate team city to mutually determine the relevant facts of the grievance.

Section 5. **Joint Fact Finding Report:** The parties to any grievance will cooperate fully with the fact finding process by providing statements, witness identification, and production of relevant documents, all of which will be incorporated in and appended to a written report setting forth the facts not in dispute and, where appropriate, the facts in dispute. The report must be completed within fifteen (15) days after receipt of the answer and copies of the report will be provided to the grievant, the answering party, the NFLPA, the Management Council and the PCRC. The failure of either party to participate in the fact finding process may be immediately brought to the attention of the Notice Arbitrator who is authorized to issue an order directing prompt participation and cooperation in the fact finding process.

Section 6. **Player-Club Relations Committee:** If a grievance is not resolved after it has been filed and during the fact-finding process, it along with the answer and the fact finding report will

16

be referred for disposition to the next mid-month conference of the Player-Club Relations Committee (PCRC), which will consist of one representative appointed by NFLPA and one representative appointed by the Management Council. The PCRC will confer once each mid-month to discuss and consider all pending grievances. Such conference may be had by telephone if both representatives agree, or otherwise in person. Meetings of the PCRC will alternate between Washington and New York. No evidence will be taken during the conference except by mutual consent. Discussions between the PCRC representatives will be privileged. If the PCRC resolves any grievance by mutual agreement between the NFLPA and Management Council representatives, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and club(s) and the parties to this Agreement.

Section 7. **Appeal:** If the PCRC has not considered a grievance within 30 days after it has been filed, regardless of the reason, or has failed to resolve a grievance within five days of its conference, either the player(s) or club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or the Management Council as may be appropriate. If the grievance involves a suspension of a player by a club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within seven (7) days of the filing of the grievance.

Section 8. **Arbitration:** The parties to this Agreement have designated Sam Kagel as the Notice Arbitrator. Within 30 days after execution of this Agreement, Mr. Kagel will submit to the parties a list of fifteen qualified and experienced arbitrators. Within 10 days thereafter, representatives of the parties will confer by conference call(s) with Mr. Kagel for the purpose of selecting three arbitrators from the list who, along with Mr. Kagel, will constitute the non-injury arbitration panel. If the parties are unable to select three arbitrators from the original list, the selection process outlined in this section will continue until three arbitrators are selected. In the event of a vacancy in

17

the position of Notice Arbitrator, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this section as well as any other vacancies occurring on the panel. The Notice Arbitrator will, so as to equalize the caseload of non-injury grievances between himself and the other arbitrators and without prior consultation with the NFLPA or the Management Council, designate himself or one of the other arbitrators to hear each case. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon him and the other party to this Agreement between December 1 and 10 of each calendar year, but at no time will such discharges result in no arbitrators remaining on the panel.

Section 9. **Hearing:** Each arbitrator will designate a minimum of one hearing date each month for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing 12 months, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator 30 days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date and, after consultation with the parties, designate a convenient place for hearing such grievance. If a grievance is set for hearing and the hearing date is then cancelled by a party within 30 days of the hearing date, the cancellation fee of the arbitrator will be borne by the cancelling party unless the arbitrator determines that the cancellation was for good cause. Should good cause be found, the parties will share any cancellation costs equally. If the arbitrator in question cannot reschedule the hearing within 30 days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the 30 days period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. All hearings will be transcribed. In cases which require one full hearing day or less, the transcript will be prepared on an expedited, daily copy basis. In such cases, if either party

requests post-hearing briefs, the parties will prepare and simultaneously submit briefs to the arbitrator postmarked no later than twenty (20) days after receipt of the transcript. In cases requiring more than one full hearing day, the transcript may be prepared by ordinary means and the post-hearing briefs must be submitted to the arbitrator, postmarked no later than thirty (30) days after receipt of the last day's transcript.

Section 10. **Arbitrator's Decision and Award:** The arbitrator will, if at all possible considering the arbitrator's schedule and other commitments, issue a written decision within 30 days of the submission of briefs. The arbitrator may issue the decision after 30 days have passed from the date of receipt of the last day's transcript regardless of the failure of either party to submit a brief. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and club(s) involved and the parties to this Agreement; provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy whatsoever other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell NFL Player Retirement Plan, an order of compliance with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article XI, Section 9.

Section 11. **Integrity and Public Confidence:** In the event a matter filed as a grievance in accordance with the provisions of Section 3 above gives rise to issues involving the integrity of, or public confidence in, the game of professional football, the Commissioner may, at any stage of its processing, after consultation with the PCRC, order that the matter be withdrawn from such processing and thereafter be processed in accordance with the procedure provided in Article VIII of this Agreement on Commissioner Discipline.

Section 12. **Time Limits:** Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed

19

upon in writing, either the player, the NFLPA, the club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

Section 13. **Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

Section 14. **Costs:** All costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the parties. When the arbitrator grants a money award, it will be paid within ten (10) days. Unless the arbitrator determines otherwise, each party will bear the cost of its own witnesses, counsel, and the like.

# ARTICLE VIII
## COMMISSIONER DISCIPLINE

Section 1. **Commissioner Discipline:** Notwithstanding anything stated in Article VII of this Agreement, Non-Injury Grievance, all disputes involving a fine or suspension imposed upon a player by the Commissioner for conduct on the playing field, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: The Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within 20 days following written notification of the Commissioner's action, the player affected thereby or the NFLPA, with the approval of the player involved, may appeal in writing to the Commissioner. The Commissioner will designate a time and place for hearing, which will be commenced within 10 days following his receipt of the notice of appeal. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision, which decision will constitute full, final, and complete disposition of the dispute, and will be binding upon the player(s) and club(s) involved and the parties to this Agreement with respect to that dispute.

20

Section 2. **Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the club(s) involved.

Section 3. **Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of the NFLPA may also participate in such hearing and represent the player. In any such hearing, a club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such hearing and represent the club.

Section 4. **Costs:** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

Section 5. **One Penalty:** The Commissioner and a Club will not discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any club for the same act or conduct.

Section 6. **Fine Money:** Any fine money collected pursuant to this Article will be contributed to the Brian Piccolo Cancer Fund or the Vincent T. Lombardi Cancer Research Center, as the player shall choose.

# ARTICLE IX
## INJURY GRIEVANCE

Section 1. **Definition:** An "injury grievance" is a claim or complaint that, at the time a NFL player's Standard Player Contract or NFL Player Contract was terminated by a club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

Section 2. **Filing:** Any NFL player and/or the NFLPA must present an injury grievance in writing to a club, with a copy to the Management Council, within 20 days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If the player passes the physical examination of the club

21

at the beginning of the pre-season training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date he reported.

Section 3. **Answer:** The club to which an injury grievance has been presented will answer in writing within five days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

(a) That the player did not pass the physical examination administered by the club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game; provided, however, that the club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

(b) That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

(c) That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

(d) That the player's injury arose solely from a non-football related cause subsequent to the physical examination;

(e) That subsequent to the physical examination the player suffered no new football-related injury;

(f) That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical capacity below the level existing at the time of his physical examination as contemporaneously recorded by the club physician.

Section 4. **Neutral Physician:** The player must present himself for examination by a neutral physician within 20 days from the date of the grievance. This time period may be

extended by mutual consent if the neutral physician is not available. Neither club nor player may submit any medical records to the neutral physician, nor may the club physician or player's physician communicate with the neutral physician. The player will notify the club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council.

Section 5. **List:** The NFLPA and the Management Council will maintain a jointly-approved list of neutral physicians, including at least two orthopedic physicians in each city in which an NFL club is located. The list will be subject to review and modification every 12 months, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. Each physician should be willing and able to examine NFL players promptly.

Section 6. **Appeal:** A grievance may be appealed to an arbitrator by filing of written notice of appeal with the chairman of the arbitration panel within 30 days from the date of receipt of the neutral physician's written report. There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties have designated Pat Fisher as the chairman of the panel. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel.

Section 7. **Hearing:** Each arbitrator shall designate a minimum of one hearing date each month for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairman, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing 12 months, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator 30 days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date and, after

23

consultation with the parties, designate a convenient place for hearing such grievance. If a grievance is set for hearing and the hearing date is then cancelled by a party within 30 days of the hearing date, the cancellation fee of the arbitrator will be borne by the cancelling party unless the arbitrator determines that the cancellation was for good cause. Should good cause be found, the parties will share any cancellation costs equally. If the arbitrator in question cannot reschedule the hearing within 30 days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the 30 day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. All hearings shall be transcribed. Post-hearing briefs must be submitted to the arbitrator postmarked no later than thirty (30) days after receipt of the last day's transcript. The arbitrator will, if at all possible considering the arbitrator's schedule and other commitments, issue a written decision within 30 days of the submission of briefs. The arbitrator may issue the decision after 30 days have passed from the date of receipt of the last day's transcript regardless of the failure of either party to submit a brief. His decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document.

Section 8. **Miscellaneous:** The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The club or the Management Council must advise the grievant and the NFLPA in writing no later than seven days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

Section 9. **Expenses:** Expenses charged by a neutral physician will be shared equally by the club and the player. All travel expenses incurred by the player in connection with his examina-

24

tion by a neutral physician of his choice will be borne by the player. The parties will share equally in the expense of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses.

Section 10. **Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell NFL Player Retirement Plan as determined by the Retirement Board.

Section 11. **Payment:** If an award is made by the arbitrator, payment will be made within twenty (20) days of the receipt of the award to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator.

# ARTICLE X
## INJURY PROTECTION

Section 1. **Qualification:** A player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

(a) The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his club's last game of the season of injury, as certified by the club physician following a physical examination after the last game; or the player must have undergone club-authorized surgery in the off-season following the the season of injury; and

(b) The player must have undergone whatever reasonable and customary rehabilitation treatment his club required of him during the off-season following the season of injury; and

(c) The player must have failed the pre-season physical examination given by the club physician for the season following the season of injury because of such injury and as a result his club must have terminated his contract for the season

25

following the season of injury. The past understanding of the parties concerning a club releasing a player who otherwise qualifies under (a) and (b) above prior to the pre-season physical examination, will be continued during the term of this Agreement.

Section 2. **Benefit:** Effective after the execution of this Agreement, a player qualifying under Section 1 above will receive an amount equal to 50% of his contract salary for the season following the season of injury, up to a maximum payment of $65,000, unless he has individually negotiated more injury protection into that contract. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated injury protection into that contract. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another NFL club. A player will not be entitled to such benefit more than once during his playing career in the NFL.

Section 3. **Disputes:** Any dispute under this Article will be processed under Article VII of this Agreement, Non-Injury Grievance.

# ARTICLE XI
# COMMITTEE ON SAFETY AND WELFARE

A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects.

Section 1. **Composition:** The Joint Committee will consist of six members: three club representatives (plus advisors) and three NFLPA representatives (plus advisors).

Section 2. **Meetings:** The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee.

26

Section 3. **Powers:** The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue.

Section 4. **Scope:** The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner of the NFL, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

Section 5. **Consultants:** The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides.

Section 6. **Appointments:** The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within 30 days following the execution of this Agreement.

Section 7. **Initial Tasks:** The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces and other safety matters, and a determination of whether a moratorium on further installation of artificial turf in NFL stadia is desirable.

Section 8. **Competition Committee:** Two players appointed by the NFLPA will have the right to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules in a non-voting capacity to represent the players' viewpoint on such rules. The player-appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

Section 9. **Playing Rules:** Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing

rule change would adversely affect player safety, the NFLPA may call for a meeting of the Joint Committee within two weeks to discuss such proposed rule change. After such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article VII of this Agreement. A hearing before such arbitrator must be held within two weeks of the Joint Committee meeting and the arbitrator must render his decision within two weeks of the hearing. No such playing rule change will be made by the clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within two weeks of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the clubs to make any playing rule change whatsoever.

## ARTICLE XII
## NFL PLAYER CONTRACT

Section 1. **Form:** The NFL Player Contract form will be used for all player signings. This form cannot be amended without NFLPA approval. In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL clubs under Article XXII, Section 2 of this Agreement on Salaries, it is agreed and understood that: (a) copies of all individual player contracts signed by rookie and veteran players before the date of execution of this Agreement covering the 1982 and future seasons will be provided to the NFLPA within 30 days of the execution of this Agreement; (b) copies of all contracts signed by rookie and veteran players after the date of execution of this Agreement covering the 1982 and future seasons will be provided to the NFLPA within 10 days of their execution; and (c) all information in such contracts will be made available to all clubs by the Management Council.

Section 2. **Changes:** Notwithstanding Section 1 above, changes may be made in a player's contract or contracts consistent with the provisions of this Agreement and with the provisions of the NFL Constitution and Bylaws not in conflict with this Agreement.

28

# ARTICLE XIII
# COLLEGE DRAFT

**Section 1. Time of Draft:** Commencing with the college draft to be held on or about May 1, 1983, and with respect to the college draft to be held on or about May 1 each year thereafter, through at least 1992, the following principles will apply; provided, however, that commencing in 1984 the clubs will have the right during the term of this Agreement to move the date of the draft from on or about May 1 to on or about February 1 of the same year, but no later than six days after the Pro Bowl game or, in the absence of a Pro Bowl game, ten days after the Super Bowl game.

**Section 2. Number of Choices:** There will be no more than 336 selection choices in any college draft (in the event of NFL expansion, there will be an additional 12 selection choices per expansion club, except in the first year of expansion, when the expansion clubs may be given additional choices). Subject to such maximum, the clubs may determine the number of choices alloted to a club in any given round, so long as such allotment does not diminish the number of choices available for compensation under Article XV of this Agreement or any successor agreement.

**Section 3. Exclusive Right:** A club which drafts a player will, during the period from the date of such college draft (hereinafter "initial draft") to the date of the next college draft (hereinafter "subsequent draft"), be the only NFL club which may negotiate for or sign a contract with such player. If, within the period between the initial and subsequent draft, such player has not signed a contract with the club which drafted him in the initial draft, such club loses the exclusive right, which it obtained in the initial draft, to negotiate for a contract with the player and the player is then eligible to be drafted by another NFL club in the subsequent draft.

**Section 4. Subsequent Draft:** A club which, in the subsequent draft drafts a player who (a) was drafted in the initial draft, and (b) did not sign a contract with such first NFL club prior to the subsequent draft, will, during the period from the date of the college draft held in the following year, be the only NFL club which may negotiate for or sign a contract with such player. If such player has not signed a contract within the period between

29

the subsequent draft and the next college draft with the club which drafted him in the subsequent draft, that club loses its exclusive right, which it obtained in the subsequent draft, to negotiate for a contract with the player, and the player is free to sign a contract at any time thereafter with any NFL club, and any NFL club is then free to negotiate for and sign a contract with such player, without any compensation between clubs or first refusal rights of any kind.

Section 5. **No Subsequent Draft:** If a player is drafted by an NFL club in an initial draft and (a) does not sign a contract with an NFL club prior to the subsequent draft and (b) is not drafted by any NFL club in such subsequent draft, the player is free to sign a contract at any time thereafter with any NFL club, and any NFL club is then free to negotiate for and sign a contract with such player, without any compensation between clubs or first refusal rights of any kind.

Section 6. **Other Professional Team:** If a player is hereafter drafted by an NFL club in an initial draft and, during the period in which he may sign a contract with only the club which drafted him, plays for a professional football team not in the NFL under a contract that covers all or part of at least the season immediately following said initial draft, then such NFL club will retain the exclusive NFL rights to negotiate for and sign a contract with the player for the period ending four years from the date of the initial draft, following which four-year period the player is free to sign a contract with any NFL club, and any NFL club is free to negotiate for and sign a contract with such player, subject to Section 7 below.

Section 7. **Return to NFL:** If a player who hereafter signs a contract with a professional football team not in the NFL desires to return to the NFL four or more years following the date of his initial draft, the NFL club which had drafted the player will have no right of compensation under Article XV, but will have a right of first refusal under the applicable terms and conditions of that Article. The returning player will notify the NFLPA and the NFL of his desire to sign a contract with an NFL club, which notice will advise of the date on which he will be free of contractual obligations, if any. Within 30 days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL club which had drafted the player must tender a written contract offer to the

30

player in order to retain the right of first refusal under this Section.

Section 8. **Pre-1983**: A player drafted by an NFL club in 1980, 1981 or 1982 who signed a contract in another professional football league and desires to return to the NFL in 1983 or thereafter will be governed by the provisions set forth in Article XIII, Sections 8 and 9 of the 1977 Agreement.

Section 9. **Assignment**: In the event that the exclusive right to negotiate for a player or the right of first refusal under Section 7 above is assigned by an NFL club to another NFL club, the NFL club to which such right has been assigned will have the same, but no greater, right to negotiate for such player or to exercise the right of first refusal as is enjoyed by the club assigning such right, and such player will have the same, but no greater, obligation to the NFL club to which such right has been assigned as he had to the club assigning such right.

# ARTICLE XIV
# OPTION CLAUSE

Section 1. **Vested Players**: Any contract or series of contracts signed by a veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned will not include an option year, unless an option clause has been negotiated for the player for a specific consideration other than compensation for the player's services.

Section 2. **Rookies and Non-Vested Players**: Any one-year contract signed by a rookie player must include an option year; any other contract or series of contracts signed by a rookie player may include an option year; and any contract or series of contracts signed by a veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned may include an option year.

Section 3. **Compensation**: The option will be exercised by the club at no less than 110% of the player's salary provided in his contract for the previous year, excluding any signing or reporting bonus. Player will receive 100% of performance bonus provisions where the bonus is earned in the option year.

31

# ARTICLE XV
## RIGHT OF FIRST REFUSAL/COMPENSATION

Section 1. **Applicability:** For players who play out the option in their contracts or whose contracts otherwise expire (hereinafter referred to as "Veteran Free Agents") the following principles will apply; provided, however, that in the event the clubs make a determination during the term of this Agreement to move the date of the draft from on or about May 1 to on or about February 1 of the same year, any compensation under Section 12 of this Article XV will be in the next subsequent college draft.

Section 2. **Contract Expiration Date:** The expiration date of all player contracts will be February 1. After February 1, any NFL club will be free to negotiate for a contract with a veteran free agent.

Section 3. **Offer Sheet:** When the NFLPA receives an offer from a new club to sign a contract or contracts, which is acceptable, the NFLPA will on or before April 15 give to the player's old club a completed Offer Sheet substantially in the form of Exhibit A attached hereto, signed by the player and by the chief operating officer of the new club, which will contain the "principal terms" (as defined in Section 7 below) of the new club's offer. Subject to Section 10 below, the player's old club, upon receipt of the Offer Sheet, may exercise its "right of first refusal", which will have the legal consequences set forth in Section 4 below.

Section 4. **First Refusal Exercise Notice:** Subject to Section 18 below, if, within seven days from the date it receives an Offer Sheet, the veteran free agent's old club gives to the NFLPA a First Refusal Exercise Notice substantially in the form of Exhibit B attached hereto, such player and his old club will be deemed to have entered into a binding agreement, which will be promptly formalized in an NFL Player Contract(s); containing all the "principal terms" of the Offer Sheet and those terms of the NFL Player Contract(s) not modified by the "principal terms."

Section 5. **No First Refusal Exercise Notice:** Subject to Sections 6 and 10 below, if, within seven days from the date it receives an Offer Sheet, the veteran free agent's old club does

not give the NFLPA a First Refusal Exercise Notice, the player and the new club will be deemed to have entered into a binding agreement, which will be promptly formalized in an NFL Player Contract(s), containing all the "principal terms" of the Offer Sheet, those terms of the NFL Player Contract(s) not modified by the "principal terms", and the non-principal terms offered by the new club.

Section 6. **One Offer Sheet:** There may be only one Offer Sheet signed by both a club and a veteran free agent outstanding at any one time. An Offer Sheet, before it is given to the veteran free agent's old club, may be revoked or withdrawn only upon the written consent of the new club and the NFLPA. An Offer Sheet, after it is given to a veteran free agent's old club, may be revoked or withdrawn only upon the written consent of the old club, the new club and the NFLPA. In either of such events, any NFL club will be free to negotiate for a contract with such player, subject only to his old club's renewed right of first refusal.

Section 7. **Principal Terms:** For purposes of this Article, the "principal terms" will include the following: (a) the salary the new club will pay to the veteran free agent and/or his designees, currently and/or as deferred compensation in specified installments on specified dates, in consideration for his services as a football player under the contract or contracts; (b) any signing or reporting bonus the new club will pay to the veteran free agent and/or his designees, currently and/or deferred, and the terms thereof; and (c) any modification of and/or addition to the terms contained in the NFL Player Contract form requested for the veteran free agent and acceptable to the new club, which relate to terms of the player's employment as a football player (which will be evidenced by a copy of the NFL Player Contract form, marked to show changes).

Section 8. **Non-Principal Terms:** For purposes of this Article, the "principal terms" will not include any of the following: (a) any loan the new club will make to the veteran free agent and/or his designees under the contract or contracts, and the terms thereof and security therefor, if any; (b) any performance bonus the new team will pay to the veteran free agent under the contract or contracts; (c) a description of any property other than money which the new club will provide or make available to the veteran free agent and/or his designees under the

33

contract or contracts; (d) any investment opportunity which the new club will provide or make available to the veteran free agent and/or his designees; (e) any money and/or property the new club will pay, provide or make available to the veteran free agent and/or his designees in consideration for services by him or others; (f) any intangible benefits or advantages that might accrue to the veteran free agent as a consequence of living and playing in the geographic area of the new club; (g) any promise by the new club of a try-out, audition or introduction for the possibility of performing services or earning income other than that as a football player; and (h) any other terms not included within the "principal terms" set forth in Section 7 above.

Section 9. **Qualifying Offer:** For purposes of Sections 10, 11, and 12 of this Article, a "qualifying offer" will include the sum of: (a) the total amount of salary to be paid under the contract or contracts, averaged over the full number of years of the contract or contracts, but no more than five years; and (b) any signing or reporting bonus to be paid under the contract or contracts, prorated over the full number of years of the contract or contracts, but no more than five years.

Section 10. **Qualification for First Refusal:** Anything above in this Article to the contrary notwithstanding, in order for a veteran free agent's old club to be entitled to a right of first refusal, the old club must have given a "qualifying offer" in writing to the NFLPA on or before February 1 in the following amounts: (a) $60,000 ($75,000 in 1985 through 1987) or more if the player has not yet completed the season in which his 3rd year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned; (b) $70,000 ($85,000 in 1985 through 1987) or more if the player has not yet completed the season in which his 4th year of Credited Service has been earned; (c) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto.

Section 11. **Qualification for Compensation:** In order for a veteran free agent's old club to be entitled to a right of compensation, the old club must have qualified for a right of first refusal under Section 10 above and the new club must have given a "qualifying offer" in writing to the NFLPA on or before April 15, to be represented by an Offer Sheet, in the following amounts: (a) $80,000 ($100,000 in 1985 through 1987)

34

or more if the player has not yet completed the season in which his 3rd year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned; (b) $90,000 ($110,000 in 1985 through 1987) or more if the player has not yet completed the season in which his 4th year of Credited Service has been earned; and (c) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto. Anything in Subsections (a) through (c) to the contrary notwithstanding, the "qualifying offer" with respect to veteran free agent quarterbacks will increase by $5,000 for each year of Credited Service if the player has not yet completed the season in which his 8th year of Credited Service has been earned and thereafter.

Section 12. **Amount of Compensation:** Subject to Section 10 above, if, within seven days from the date it receives an Offer Sheet, a veteran free agent's old club, which is entitled to a right of first refusal or a right of compensation, chooses not to exercise its right of first refusal, then the player and the new club will be deemed to have entered into a binding agreement as provided in Section 5 above, and the player's old club will receive the following compensation: (a) the new club's 3rd round selection choice or a better 3rd round choice obtained by assignment from another NFL club, in the next immediate college draft: (i) if the player has not completed the season in which 3rd year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned and if the "qualifying offer" is $80,000 or more but less than $95,000 ($100,000 and $120,000 in 1985 through 1987); (ii) if the player has not completed the season in which his 4th year of Credited Service has been earned and if the "qualifying offer" is $90,000 or more but less than $105,000 ($110,000 and $130,000 in 1985 through 1987); and (iii) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto; (b) the new club's 2nd round selection choice or a better 2nd round choice obtained by assignment from another NFL club, in the next immediate college draft: (i) if the player has not completed the season in which his 3rd year of Credited Service has been earned and if the "qualifying offer" is $95,000 or more but less than $110,000 ($120,000 and $140,000 in 1985 through 1987); (ii) if the player has not completed the season in which his 4th year of Credited

Service has been earned and if the "qualifying offer" is $105,000 or more but less than $120,000 ($130,000 and $150,000 in 1985 through 1987); and (iii) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto; (c) the new club's 1st round selection choice or a better 1st round choice obtained by assignment from another NFL club in the next immediate college draft: (i) if the player has not completed the season in which his 3rd year of Credited Service has been earned and if the "qualifying offer" is $110,000 or more but less than $150,000 ($140,000 and $180,000 in 1985 through 1987); (ii) if the player has not completed the season in which his 4th year of Credited Service has been earned and if the "qualifying offer" is $120,000 or more but less than $160,000 ($150,000 and $190,000 in 1985 through 1987); and (iii) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto; (d) the new club's 1st and 3rd round selection choices, or better 1st and 3rd round choices obtained by assignment from other NFL clubs in the next immediate college draft: (i) if the player has not completed the season in which his 3rd year of Credited Service has been earned and if the "qualifying offer" is $150,000 or more but less than $200,000 ($180,000 and $230,000 in 1985 through 1987); (ii) if the player has not completed the season in which his 4th year of Credited Service has been earned and if the "qualifying offer" is $160,000 or more but less than $210,000 ($190,000 and $240,000 in 1985 through 1987); and (iii) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto; (e) the new club's 1st round and 2nd round selection choices or better 1st and 2nd round choices obtained by assignment from other NFL clubs in the next immediate college draft: (i) if the player has not completed the season in which his 3rd year of Credited Service has been earned and if the "qualifying offer" is $200,000 or more but less than $250,000 ($230,000 and $280,000 in 1985 through 1987); (ii) if the player has not completed the season in which his 4th year of Credited Service has been earned and if the "qualifying offer" is $210,000 or more but less than $260,000 ($240,000 and $290,000 in 1985 through 1987); and (iii) an increase of $10,000 for each year of

36

Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto; (f) the new club's 1st round selection choices or better 1st round choices obtained by assignment from other NFL clubs, in the next immediate two college drafts: (i) if the player has not completed the season in which his 3rd year of Credited Service has been earned and if the qualifying offer is $250,000 or more ($280,000 in 1985 through 1987); (ii) if the player has not completed the season in which his 4th year of Credited Service has been earned and if the "qualifying offer" is $260,000 or more ($290,000 in 1985 through 1987); and (iii) an increase of $10,000 for each year of Credited Service thereafter, in accordance with the graphs portrayed in Exhibits C and D attached hereto. Anything in Subsections (a) through (f) to the contrary notwithstanding, the "qualifying offer" with respect to veteran free agent quarterbacks will increase by $5,000 for each year of Credited Service if the player has not yet completed the season in which his 8th year of Credited Service has been earned and thereafter.

Section 13. **Absences of Choice:** A club not having the future selection choice or choices necessary to provide compensation in the event the veteran free agent's old club chooses to exercise its right of compensation, if any, may not sign an Offer Sheet as provided in Section 3 above.

Section 14. **Copies:** Within seven days after an Offer Sheet is signed by a player and a new club, that club will cause a copy thereof to be given to the NFL; and within seven days after the giving of a First Refusal Exercise Notice to the veteran free agent, the old club will cause a copy thereof to be given to the NFL.

Section 15. **Circulation of Veteran Free Agent List:** The NFL will prepare and circulate to all NFL clubs and the NFLPA a list containing the names of all players who will become veteran free agents as of February 1. The list will be circulated between January 1 and February 1 of each year.

Section 16. **Notice:** Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article will be hand delivered or sent by prepaid certified or registered mail addressed as follows: (a) To any club: addressed to that club at the principal address of such club as then listed on the records of the NFL or at that club's

37

principal office, to the attention of the club president; (b) To the NFL: addressed to the NFL at 410 Park Avenue, New York, New York 10022, to the attention of the Commissioner; (c) To the NFLPA: addressed to the NFLPA at 1300 Connecticut Avenue, N.W., Washington, D.C. 20036, to the attention of the Executive Director; and (d) To a veteran free agent: to his address listed on the Offer Sheet. An Offer Sheet will be deemed given only when actually received by the player's old club. A First Refusal Exercise Notice will be deemed given when sent by the player's old club. Other writings required or permitted to be given under this Article (including a "qualifying offer") will be deemed given when hand delivered or sent by prepaid certified or registered mail addressed as above required.

Section 17. **Re-Signing:** If no offer to sign a contract or contracts with a new NFL club pursuant to this Article is received by a player, and his old club advises the NFLPA in writing by June 1 that it desires to re-sign him, the player may, at his option within 15 days sign either (a) a contract or contracts with his old club at its last best written offer given on or before February 1 of that year, or (b) a one-year contract (with no option year) with his old club at 110% of the salary provided in his contract for the last preceding year (if the player has just played out the option year, the rate will be 120%). If the player's old club does not advise the NFLPA in writing by June 1 that it desires to re-sign the player, he will be free on June 2 to sign a contract or contracts with any NFL club, and any NFL club will be free to negotiate for and sign a contract or contracts with such player, without any compensation between clubs or first refusal rights of any kind.

Section 18. **Extreme Personal Hardship:** In the event of alleged extreme personal hardship or an alleged violation of Article V, Section 1, of this Agreement, a veteran free agent may, within seven days after the February 1 expiration date of his contract, unless the condition arises after that date, file a non-injury grievance pursuant to Article VII of this Agreement. If the PCRC is unable to resolve the grievance, and should the outside arbitrator conclude that such extreme personal hardship objectively exists or that there has been a substantive violation of Article V, Section 1, then he may deny to the

38

player's old club its right of first refusal. In the event a club's first refusal rights are denied under this Section because of extreme personal hardship, the club's last written contract offer for the player to the NFLPA will constitute a "qualifying offer" for compensation pursuant to Section 11 of Article XV.

**EXHIBIT A**

## FIRST REFUSAL OFFER SHEET

Name of Player:                    Date:


Address of Player:                 Name of New Club:


National Football League           Name of Old Club:
Players Association
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

### Principal Terms of NFL Player Contract or Contracts With New Club

(Supply Information on this Sheet or on Attachment)

(a) Salary, including deferred compensation:


(b) Signing or reporting bonus, if any:


(c) Modifications and additions to NFL Player Contract(s):
    [attached marked-up copy of NFL Player Contract(s)]


Player:                    New Club:


By ................................... By ...................................
                                       Chief Operating Officer

40

**EXHIBIT B**

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                              Date:


Address of Player:                           Name of Old Club:


National Football League                     Name of New Club:
Players Association
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036




   The undersigned member club of the NFL hereby exercises
its Right of First Refusal under the Collective Bargaining
Agreement dated December 11, 1982, so as to create a binding
agreement with the player named above containing the "princi-
pal terms" set forth in the First Refusal Offer Sheet, a copy of
which is attached hereto, and those terms of the NFL Player
Contract(s) not modified by such "principal terms."




                         Old Club




            By  ...........................................
                   Chief Operating Officer


41

**EXHIBIT C**

## FIRST REFUSAL/COMPENSATION — 1983-1984



### EXHIBIT D
## FIRST REFUSAL/COMPENSATION — 1985-1986-1987



43

# ARTICLE XVI
## WAIVER SYSTEM

**Section 1. Release:** Whenever a player who has completed the season in which his fourth year or more of Credited Service under the provisions of the Bert Bell NFL Player Retirement Plan has been earned is placed on waivers, claimed and would be awarded, the club having requested waivers will immediately advise the player of such fact, provided the waiver request has taken place within the time period of February 1 to the end of the NFL trading period. Within 24 hours after receipt of such information, the player may, at his option, given written notice to the club having requested waivers that he desires to terminate his contract or contracts and obtain his unconditional release. However, should the player fail to give such notice within the 24-hour period, his contract will be awarded to the claiming club in accordance with the rules prescribed in the NFL Constitution and Bylaws. In the event the player requests his unconditional release, the player and the NFLPA will be advised promptly by the NFL which clubs claimed the player.

**Section 2. Contact:** Coaches or any other persons connected with another NFL club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving club.

**Section 3. Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or post-season game because of a breach of waiver procedures and regulations or any other provision of the NFL Constitution and Bylaws by any NFL club by whom he is employed will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

**Section 4. Notice of Termination:** The Notice of Termination form attached as Exhibit E will be used by all clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice of Termination will be sent to him by certified mail at his last address on file with the club.

44

**EXHIBIT E**

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the_____ football season(s) has(have) been terminated for the reason(s) checked below:

☐ You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

☐ You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

☐ In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

☐ You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

.......................................................
Club


By:   ...........................................

# ARTICLE XVII
## EXPANSION

Section 1. **Veteran Allocation:** In the event the clubs make a determination after the execution of this Agreement to expand the number of clubs, it is agreed upon that an expansion allocation of veteran players may be held on the terms decided by the clubs.

Section 2. **Future Expansion:** Any veteran player selected in any expansion allocation subsequent to the execution of this Agreement will receive a bonus of $6,000 upon making the expansion club's Active List at any time during the club's first regular season.

# ARTICLE XVIII
## OTHER PROVISIONS

Section 1. **CFL Rule:** A player who has practiced and/or played in the CFL may be employed by an NFL club in the same season so long as he is signed by the NFL club on or before July 15 of the year in question.

Section 2. **Physically Unable to Perform:** Any player placed on Reserve as Physically Unable to Perform under the terms and conditions of the NFL Constitution and Bylaws will be paid at the rate of his full contract salary while on such Reserve. His contract will not be tolled for the period he is on Reserve as PUP except for the option year or, in the absence of an option year, the last year of a player's contract, when the player's contract will be tolled.

Section 3. **Non-Football Injury:** The contract of a player placed on Reserve as Non-Football Injury or Illness (N-F/I) under the terms and conditions of the NFL Constitution and Bylaws will not be tolled for the period of his failure to perform his services under the contract and will continue to run as if the player were performing, but he will not be entitled to any compensation under his contract during that period. This modification will not apply to the option year of a player's contract or, in the absence of an option year, to the last year of a player's contract.

# ARTICLE XIX
## SQUAD SIZE

Section 1. **Active List:** For each regular season, the Active List limit will be 45 players per club. This limit may not be reduced by the clubs for the duration of this Agreement; provided, however, that individual clubs may occasionally carry less than 45 players on their Active Lists during the regular season, but at no time less than 40.

Section 2. **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the clubs. In the event the clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

Section 3. **Inactive List:** For the 1982 regular and post-season, there will be an Inactive List of 4 players per club. For the 1983, 1984, 1985 or 1986 regular season, the clubs may determine to have an Inactive List limit of any number of players per club. Inactive List players will receive the same benefits and protections as Active List players.

# ARTICLE XX
## OFF-SEASON TRAINING CAMPS

Section 1. **Number:** Each club may hold a maximum of one mandatory off-season training camp for veteran players. If a club hires a new head coach after the end of the regular season, that club may hold two additional voluntary off-season training camps for veteran players. There is no limitation on the number of off-season training camps a club may hold for rookie players.

Section 2. **Length:** No off-season training camp may exceed three days in length, plus one day for physical examinations. If possible, off-season training camps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

Section 3. **Expenses:** Any veteran player who attends an off-season training camp will receive meal allowances in accordance with Article XXVI, Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXI, Section 4 of this Agreement. In addition, the club will provide housing at off-season training camps for players coming from out-of-town.

Section 4. **Contact:** There will be no contact work or use of pads (helmets permitted) at off-season training camps.

Section 5. **Injuries:** Any player injured in a club's off-season training camp will be protected in the same manner as if injured during the club's pre-season training camp.

# ARTICLE XXI
## PRE-SEASON TRAINING CAMPS

Section 1. **Definition:** For purposes of this Agreement, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan.

Section 2. **Room and Board:** All players will receive room and board during the pre-season training camp.

Section 3. **Rookie Per Diem:** Effective after the execution of this Agreement, a rookie player will receive "per diem" payments at the rate of $375 per week in 1983, $400 per week in 1984, $425 per week in 1985, and $450 per week in 1986, commencing with the first day of pre-season training camp and ending one week prior to the club's first regular season game.

Section 4. **Veteran Per Diem:** Effective after the execution of this Agreement, a veteran player will receive "per diem" payments at the rate of $425 per week in 1983, $450 per week in 1984, $475 per week in 1985, and $500 per week in 1986, commencing with the first day of pre-season training camp and ending one week prior to the club's first regular season game, and an additional $200 per week in each year of this Agreement

commencing with the club's first pre-season game (exclusive of the Canton Hall-of-Fame Game) and ending one week prior to the club's first regular season game (four weeks).

Section 5. **Reporting:** No veteran player, other than quarterbacks and injured players, will be required to report to a club's official pre-season training camp earlier than 15 days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to clubs participating in the Canton Hall-of-Fame Game.

Section 6. **Telephones:** Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

Section 7. **Expenses:** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the clubs for these payments. Players who are released by club will be reimbursed for their return trips to their residences, upon submission of vouchers.

# ARTICLE XXII
## SALARIES

Section 1. **Salaries:** Effective after the execution of this Agreement, the salary of a rookie player will be not less than $20,000 and the salary of any player who makes a club's Active List at any time during the regular season will be not less than the following:

| Length of Service | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|
| Rookie | $ 30,000 | $ 40,000 | $ 40,000 | $ 50,000 | $ 50,000 |
| 2nd Year | 40,000 | 50,000 | 50,000 | 60,000 | 60,000 |
| 3nd Year | 50,000 | 60,000 | 60,000 | 70,000 | 70,000 |
| 4th Year | 60,000 | 70,000 | 70,000 | 80,000 | 80,000 |
| 5th Year | 70,000 | 80,000 | 80,000 | 90,000 | 90,000 |
| 6th Year | 80,000 | 90,000 | 90,000 | 100,000 | 100,000 |
| 7th Year | 90,000 | 100,000 | 100,000 | 110,000 | 110,000 |
| 8th Year | 100,000 | 110,000 | 110,000 | 120,000 | 120,000 |
| 9th Year | 110,000 | 120,000 | 120,000 | 130,000 | 130,000 |
| 10th Year | 120,000 | 130,000 | 130,000 | 140,000 | 140,000 |
| 11th Year | 130,000 | 140,000 | 140,000 | 150,000 | 150,000 |
| 12th Year | 140,000 | 150,000 | 150,000 | 160,000 | 160,000 |
| 13th Year | 150,000 | 160,000 | 160,000 | 170,000 | 170,000 |
| 14th Year | 160,000 | 170,000 | 170,000 | 180,000 | 180,000 |
| 15th Year | 170,000 | 180,000 | 180,000 | 190,000 | 190,000 |
| 16th Year | 180,000 | 190,000 | 190,000 | 200,000 | 200,000 |
| 17th Year | 190,000 | 200,000 | 200,000 | 200,000 | 200,000 |
| 18th Year and above | 200,000 | 200,000 | 200,000 | 200,000 | 200,000 |

For purposes of this Article, a player's salary under any contract in existence at the time of execution of this Agreement will include the amount of any signing or reporting bonus, prorated over the full number of years of the contract or contracts executed on the same date (including any option year). A player's salary under any contract executed after the time of execution of this Agreement will not include the

prorated amount of any signing or reporting bonus. No other type of incentive bonus will be included at any time in the computation of a player's salary under this Article. The length of service of a player will be determined by crediting one year of service for each year the player has been on the Active List of a club for at least three regular season games.

Section 2. **Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his club (with the assistance of the Management Council) and the NFLPA or its agent. The club and the NFLPA or its agent will negotiate in good faith over such other compensation; provided, however, that a club will not be required to deal with the NFLPA or its agent on a collective or tandem basis for two or more players on that club. Nothing in this Section will be affected by Article II, Section 1 of this Agreement.

Section 3. **Arbitration:** The question of whether or not the club, the Management Council, the NFLPA or its agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article VII of this Agreement. If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

Section 4. **Payment:** Unless agreed upon otherwise between the club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a club and a player or which after the execution of this Agreement may be negotiated between a club and the NFLPA or its agent.

Section 5. **Re-opener:** In the event that the NFL enters into any contract covering any playing season from 1982 through 1986 for the sale of television rights such as, but not limited to, cable, pay cable, satellite, closed circuit broadcasts, or any form of pay television, or in the event that the NFL enters into any

new or renegotiated contract with CBS, NBC or ABC covering any season from 1982 through 1986 and providing for total revenues over and above those contracted for by the NFL as of the date of execution of this Agreement covering the 1982 through 1986 playing seasons, the Management Council will provide immediate written notice of same and information as to the amount of additional revenue to the NFLPA, and, upon receipt of such notice, the NFLPA may re-open this Agreement upon the giving of ten days' written notice to the Management Council. After re-opening, the parties will have an obligation to resume negotiations limited to the issue of player compensation reflecting solely the application of the additional revenue or portion thereof, and both parties will be free to engage in whatever concerted action may be permitted by law in support of their respective positions. This re-opener will not give the NFLPA the right to examine any contract between the NFL and any party; provided, however, that the NFLPA will have the right to choose a senior accountant from any of the "Big Eight" accounting firms who will have the right to examine any such contract to confirm the accuracy of any information regarding any such contract given to the NFLPA by the Management Council in the operation of this Section.

Section 6. **Length of Regular Season:** The NFL clubs cannot increase the number of regular season games from the standard of sixteen (16) for the duration of this Agreement without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to an arbitrator under Article VII of this Agreement for an expedited hearing and a final and binding decision. Notwithstanding the limitations on the arbitrator's powers contained in Article VII, Section 10, the arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended for the duration of this Agreement to include more than eighteen (18) games.

# ARTICLE XXIII
# MONEY NOW

**Section 1. Amount:** Any player who was on a club's Active, Inactive, Injured Reserve or Physically Unable to Perform list on September 20, 1982, will receive a payment based on the number of Credited Seasons earned under the Bert Bell NFL Player Retirement Plan as of that date in accordance with the following schedule:

| Credited Seasons | Amount |
|---|---|
| None | $10,000 |
| One | 20,000 |
| Two | 30,000 |
| Three or more | 60,000 |

**Section 2. Payment:** The amount specified in Section 1 above will be paid to each player who qualifies for such payment on January 3, 1983, or 15 days following the date of execution of this Agreement, whichever occurs later.

**Section 3. Game Pay:** In consideration of payment of the amounts provided for in this Article, the NFLPA agrees that neither it nor any of its members nor any member of its bargaining unit will file any grievance, suit or any other type of action in any forum claiming that any NFL player is entitled to be paid any salary for the 1982 regular season in excess of the sum arrived at by dividing the yearly salary stated in paragraph 5 of his 1982 NFL Player Contract, or paragraph 3 of his 1982 Standard Player Contract (or 110% of the 1982 paragraph 5 or paragraph 3 salary, as may be the case, if player is in his option year) by 16, and multiplying the dividend by the total number of 1982 regular season games played on the dates of which the player was on a club's Active, Inactive, Injured Reserve or Physically Unable to Perform list. This Section does not apply to injury grievances under Article IX of this Agreement.

# ARTICLE XXIV
# SEVERANCE PAY

**Section 1. Amount:** Effective November 16, 1982, any player who has earned two (2) or more Credited Seasons under the

Bert Bell NFL Player Retirement Plan and leaves the National Football League, will be entitled to receive from the last NFL club to which he was under contract a severance payment in accordance with the following schedule:

| Credited Seasons | Last NFL Season 1982, 1983 or 1984 | Last NFL Season 1985 or 1986 |
|---|---|---|
| Two | $ 5,000 | $ 10,000 |
| Three | 20,000 | 30,000 |
| Four | 60,000 | 70,000 |
| Five | 70,000 | 80,000 |
| Six | 80,000 | 90,000 |
| Seven | 90,000 | 100,000 |
| Eight | 100,000 | 110,000 |
| Nine | 110,000 | 120,000 |
| Ten | 120,000 | 130,000 |
| Eleven | 130,000 | 140,000 |
| Twelve or more | 140,000 | 150,000 |

For the 1982 season only, a player who was on any club's Active, Inactive, Injured Reserve or Physically Unable to Perform list on the dates of a club's first two regular season games will be deemed to have earned a Credited Season for purposes of this Article only and for no other purpose, including pension plan purposes.

Section 2. **Payment:** The foregoing severance payment will be paid to the player immediately following the third game of the NFL regular season next following the player's leaving the National Football League or any other professional football league, whichever occurs later. The amount of the severance payment will be prorated among all clubs to which a player was under contract during his NFL career, except in the case of a player who left the NFL prior to September 20, 1982 and returns to a club after the execution of this Agreement, in which case the player will be entitled to only one-half of his accrued severance benefit and the club to which the player returns will be responsible for one-quarter of his accrued severance benefit as well as any full severance benefit earned following his return. A player may not qualify for more than one severance payment under this provision.

# ARTICLE XXV
## MEAL ALLOWANCE

Section 1. **Reimbursement:** Effective after the execution of this Agreement, a player will be reimbursed for meals not furnished by his club on travel days during the pre-season, regular season and post-season as follows: 1982 through 1984—Breakfast $7.00; Lunch $8.00; Dinner $20.00; 1985 and 1986—Breakfast $8.00; Lunch $9.00; Dinner $21.00.

Section 2. **Travel Day:** Each travel day will commence at the time a team leaves its home city and will terminate at the time the team arrives back at its home city. If a team is travelling for a day game and leaves its home city after 2:00 P.M. on the day prior to the game, players will receive dinner money if the team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 A.M., players will receive breakfast money.

# ARTICLE XXVI
## DAYS OFF

Section 1. **Rate:** All players will be permitted days-off at least at the rate of four days per month as determined by the clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective clubs.

Section 2. **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

# ARTICLE XXVII
## MOVING AND TRAVEL EXPENSES

Section 1. **Qualification:** Effective after the execution of this Agreement, a player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2:

55

(a) Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a club which relocates to a different home city, and before the first regular season game of the subsequent season, takes up permanent residence in the city of the club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b) Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

Section 2. **Moving Expenses:** A player who qualifies for reimbursement pursuant to Section 1 above will receive, immediately upon presentation of vouchers, reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family, provided he has notified his club prior to the move of at least two estimates of the cost of the move and his club approves one of the estimates, in writing, which approval will not be unreasonably withheld.

Section 3. **Travel Expenses:** Effective after the execution of this Agreement, any veteran player who is traded or claimed at any time during the calendar year or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the club to which he is traded or by which he is claimed will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and such payment shall not exceed $1,000; and (c) the room cost of seven days' stay at a hotel of the club's choice in the new team city for the player.

Section 4. **Transportation:** Each player who is traded or claimed during the pre-season or regular season will report to the club to which he is traded or by which he is claimed by the fastest available means of transportation. Any veteran player who is traded or claimed during the pre-season or regular

season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

## ARTICLE XXVIII
## POST-SEASON PAY

Section 1. **System:** Beginning with the post-season following the 1982 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be continued throughout the term of this Agreement.

Section 2. **Compensation:** Effective after the execution of this Agreement, a player who qualifies will receive the following amount for each post-season game played:

| | |
|---|---|
| Wild Card Game | $6,000 |
| Division Playoff Game | $10,000 |
| Conference Championship Game | $18,000 |
| Super Bowl Game | $18,000 |
| | (Losing Team) |
| | $36,000 |
| | (Winning Team) |

Section 3. **Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a club at the time of the game in question will be paid the full amount designated in Section 2 for that game.

Section 4. **Conference Championship; Super Bowl Game:**

(a) A player who at the time of the game in question is and has been on the Active List or Inactive List of a club participating in the game for at least three games (i.e. regular or post-season) will receive the full amount designated in Section 2 for such game.

(b) A player who at the time of the game in question is and has been on the Active List or Inactive List of a club participating in the game for less than three games (i.e. regular or post-season) will receive one-fourth the amount designated in Section 2 for such game.

(c) A player who at the time of the game in question is not on the Active List or Inactive List of a club participating in the

57

game but was on the Active or Inactive List for eight or more games (i.e. regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another NFL club at the time of the game in question.

(d) A player who at the time of the game in question is not on the Active List or Inactive List of a club participating in the game, but was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e. regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another NFL club at the time of the game in question.

(e) A veteran player injured during the regular season and removed from the Active List or Inactive List of a club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the club at the time of the game.

(f) A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the club at the time of the game.

(g) A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the club at the time of the game.

Section 5. **Payment:** Players will be paid under this Article within 15 days after the game in question has been played.

# ARTICLE XXIX
## PRO BOWL GAME

Section 1. **Compensation:** Effective after the execution of this Agreement, each player on the winning team in the AFC-NFC Pro Bowl game will receive $10,000 and each player on the losing team will receive $5,000.

Section 2. **Selection:** Pro Bowl game players will be chosen on the basis of two votes per club, one by the coaches and one by the players. The player rep will conduct the balloting of the players in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to insure participation in the game and prompt reporting by players selected.

Section 3. **Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

Section 4. **Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediate following season, the player will be paid by his club the weekly installments of his salary covering the games missed.

Section 5. **Payment:** Players will be paid for the Pro Bowl game within 15 days after the game is played.

# ARTICLE XXX
## RETENTION OF BENEFITS

No financial benefit granted by any club to its players as a group during the life of, but apart from, any previous collective bargaining agreement between the parties may be reduced or eliminated during the term of this Agreement.

# ARTICLE XXXI
## PLAYERS' RIGHTS TO MEDICAL CARE
## AND TREATMENT

Section 1. **Club Physician:** Each club will have a board certified orthopedic surgeon as one of its club physicians. The cost of medical services rendered by Club physicians will be the

responsibility of the respective clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which could adversely affect the player's performance or health, the physician will also advise the player.

Section 2. **Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

Section 3. **Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

Section 4. **Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult with the club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the club physician, the Club trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

Section 5. **Standard Minimum Pre-Season Physical:** Beginning in 1983, each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix D, which will be conducted by the Club physician. If either the Club or the player requests a post-season physical examination, the Club will provide such an examination and player will cooperate in such examination.

Section 6. **Chemical Dependency Program:** The parties agree that it is the responsibility of everyone in the industry to treat, care for and eliminate chemical dependency problems of

players. Accordingly, the parties agree to jointly designate Hazelden Foundation, Center City, Minnesota or its successor if such becomes necessary, to evaluate existing facilities to assure the highest degree of care and treatment and to assure the strictest observance of confidentiality. Any treatment facility which does not meet standards of adequacy will be eliminated and a successor facility in the same metropolitan area chosen solely by Hazelden. Hazelden will be responsible for conducting an ongoing educational program for all players and Club personnel regarding the detection, treatment and after-care of chemically dependent persons. The cost of retaining Hazelden will be paid by the clubs.

Section 7. **Testing:** The club physician may, upon reasonable cause, direct a player to Hazelden for testing for chemical abuse or dependency problems. There will not be any spot checking for chemical abuse or dependency by the club or club physician.

Section 8. **Confidentiality:** All medical bills incurred by any player at a local treatment facility will be processed exclusively through Hazelden which will eliminate all information identifying the patient before forwarding the bills to any insurance carrier for payment. Details concerning treatment any player receives will remain confidential within Hazelden and the local chemical dependency facility. After consultation with Hazelden and the player, the facility will advise the club of the player's treatment and such advice will not in and of itself be the basis for any disciplinary action. No information regarding a player's treatment will be publicly disclosed by Hazelden, the facility or the club.

# ARTICLE XXXII
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

Section 1. **Personnel Records:** Each club will within 7 days after a written request of any player, permit the player to inspect and copy his individual personnel file or any other document which objectively relates to his performance and which in turn relates to any grievance. Each club may, at its discretion, exclude from an individual player's personnel file

61

coaching and scouting reports, attorney-client privileged material or any other subjective material.

Section 2. **Medical Records:** Player may examine his medical and trainers' records in the possession of the club or club physician two times each year, once during the pre-season and again after the regular season. Player's personal physician may, upon presentation to the club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to the player or any other person.

# ARTICLE XXXIII
## GROUP INSURANCE

Section 1. **Life:** Effective after the execution of this Agreement, group insurance coverage will be increased to $50,000 for a rookie player, and a veteran's player's coverage will be increased by $10,000 for each Credited Season under the Bert Bell NFL Player Retirement Plan to a maximum of $100,000.

Section 2. **Major Medical:** Effective after the execution of this Agreement, the group major medical maximum for a player and his family will be increased to $1,000,000, and, subject to the $25 deductible, 80% of the first $3,000 and 100% of the excess eligible medical expenses for a player will be reimbursed.

Section 3. **Dental:** Effective after the execution of this Agreement, there will be a 75% increase, not to exceed reasonable and customary charges, in the dental benefit schedule; the dental maximum will be increased to $2,000 per year per person subject to the $25 deductible.

Section 4. **Other Benefits:** All other group insurance benefits effective during the 1981 season will be continued in effect during the term of this Agreement.

Section 5. **Carrier:** Following the execution of this Agreement, the parties will jointly shop the group insurance benefits provided for in this Article with insurance carriers, including the current one, and will thereafter jointly select a carrier or

carriers to provide such coverage. In order to qualify to be selected under this Article, a carrier must agree in writing as a part of any bid submitted to the parties that it will provide the coverage provided for in this Article at an average annual cost over the four years from September 1, 1983 to August 31, 1987 of no more than $3.8 million per year. In designing and shopping the insurance benefits the parties will provide insurance coverage for vested veteran players who are released after May 1 for a period ending with the first game of the next subsequent regular season.

## ARTICLE XXXIV
## RETIREMENT PLAN

Section 1. **Maintenance:** The Bert Bell NFL Player Retirement Plan and Trust Agreement (hereinafter referred to as the "Plan" and "Trust") will be continued and maintained in full force and effect during the term of this Agreement.

Section 2. **Contributions:** Contributions under the Plan will be made in the five Plan Years beginning April 1, 1982, and ending March 31, 1987, in accordance with the following schedule:

| Plan Year Beginning April 1 | Contributions Subject to §3 | Contributions Subject to §4 | Total Contributions |
|---|---|---|---|
| 1982 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1983 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1984 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1985 | $1,160,000 | $11,340,000 | $12,500,000 |
| 1986 | $1,160,000 | $11,340,000 | $12,500,000 |

Contributions will be used exclusively to provide the benefits of the Plan and to pay for its investment management and administration costs. Contributions will be paid into the Trust on or before the last day of each Plan Year, provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code. Any contribution not received by the Trustee on or before the date it is due will bear interest from the due date to the date of receipt by the Trustee at an annual rate of 6% interest. It will be the duty of the

63

Retirement Board to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. Contributions in future years will be as provided in the Collective Bargaining Agreement effective during such years, subject to Section 3 below.

Section 3. **1974 and 1975:** The then-26 clubs guarantee that contributions for the two Plan Years beginning April 1, 1974 and April 1, 1975, respectively, of $5,200,000 and $6,250,000 will be paid at the rate of $515,000 and $645,000, respectively, or a total of $1,160,000 annually, to March 31, 1990, provided that such contributions are allowable as deductions under the applicable provisions of the Internal Revenue Code. Any decrease in the number of NFL clubs after the conclusion of the Plan Year ending March 31, 1983, will decrease the above-stated contributions to the Trust in the ratio that the number of clubs at such time bears to 26.

Section 4. **Number of Clubs:** Any increase or decrease in the number of NFL clubs after the conclusion of the Plan Year ending March 31, 1982, will increase or decrease the contributions to the Trust stated in Section 2 above, less the portions stated in Section 3 above, in the ratio that the number of clubs at such time bears to 28.

Section 5. **Obligations:** The obligations of the clubs hereunder will apply only to the amount of contributions to be made by the clubs to the Plan. The clubs do not guarantee any benefits under the Plan, except as provided under the applicable law. Furthermore, it is agreed that the determination of the sources of revenue that will be used to satisfy the contribution obligation of the clubs will be exclusively within the control of the clubs.

Section 6. **Retirement Board:** The parties agree that it is in the best interests of the Plan and the Plan Beneficiaries that the members of the Board be divorced from the collective bargaining process to the extent possible.

Section 7. **Actuaries:** There shall be co-actuaries to advise the Board, one designated by the NFLPA and the other designated by the Management Council. The interest assumption used under the Plan will be 6% per annum unless otherwise determined by a vote of a majority of voting members of the Board.

Section 8. **Amendments:** Subject to the limitations of ERISA, the Retirement Board will, by a vote of a majority (four) of the voting members, promptly amend the Plan (subject to the restrictions contained in Article 8.5(A)(B)(C) and (E) of the Plan) to provide the following:

(a) Benefits: The Benefit Credit for each Credited Season will be as follows:

| Credited Season | Benefit Credit |
|---|---|
| 1965 and prior | 60 |
| 1966 and 1967 | 65 |
| 1968 and 1969 | 85 |
| 1970 | 110 |
| 1971 | 115 |
| 1972 through 1976 | 120 |
| 1977 through 1981 | 130 |
| 1982 through 1986 | 150 |

(b) Total and Permanent Disability: Effective with the amendment of the Plan, in the event of Total and Permanent Disability, the benefit will be the benefit earned to the date of disability, subject to a minimum of $4,000 per month if the disability results from a football injury incurred while an active player or $750 per month if the disability results from other than a football injury. In addition, $50 per month for each dependent child will be payable during the period of both types of disability.

(c) Widow's and Survivor Benefits: Effective with the amendment of the Plan, in the event of death or remarriage of a widow, present Widow's Benefit payments subject to a minimum of $600 per month will continue to any surviving children until one of the children last reaches age 19 (or, age 23 if in college), or continuously if any child is mentally or physically incapacitated. Players active in the 1982 season and thereafter will be entitled to a minimum Widow's Benefit of $1,500 per month payable for 48 months following the date of death; thereafter, survivor benefits will be payable as stated above.

(d) Line-of-Duty: Effective with the amendment of the Plan, the Line-of-Duty Disability Benefit will be subject to a minimum of $500 per month.

65

(e) Early Retirement Reduction Factor: The early retirement reduction factor currently in use under the Plan may not be increased.

(f) Other Amendments: The Plan will be amended to set up a Medical Advisory Board to make final determinations whether applicants for disability benefits have qualifying disabilities and will be amended to provide that Retirement Board disputes related to interpretation or application of benefit, eligibility and other administrative provisions of the Plan may be submitted to arbitration under Article VII of this Agreement, upon motion approved by at least three (3) Board members.

Section 9. **Conformance:** The Plan and Trust will be amended to conform to the provisions of this Agreement and any requirements of ERISA. All other provisions of the Plan and Trust will remain unchanged, unless duly amended by the Retirement Board.

# ARTICLE XXXV
## TERMINATION PAY

Section 1. **Payment:** Effective after the execution of this Agreement, any player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and is released from the Active List, Inactive List or Injured Reserve List of his club after the commencement of the regular season schedule, but prior to the Thursday before the eighth regular season game, is entitled to claim and receive, after the end of the regular season schedule, termination pay in an amount equal to the unpaid balance of the initial 50% of his salary, exclusive of deferred compensation, but not less than an amount equal to one week's salary, up to a maximum of $6,000; provided, however, that (a) the player will not be entitled to such termination pay if he has signed a contract with another club for that same season; and (b) a player will not be entitled to such termination pay more than once during his playing career in the NFL.

Section 2. **One Week:** Any player who otherwise qualifies for termination pay under Section 1 above, but is released during the regular season after the time he would be entitled to

66

the unpaid balance of the initial 50% of his salary, will receive termination pay in an amount equal to one week's salary, up to a maximum of $6,000.

# ARTICLE XXXVI
## WORKER'S COMPENSATION

Section 1. **Benefits:** In any state where Worker's Compensation coverage is not compulsory, a club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his club is located.

Section 2. **Rejection of Coverage:** Nothing herein stated is to be interpreted as preventing a club, which has the legal right to do so, from rejecting coverage under the worker's compensation law of its state. However, if a club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner previously prescribed in Section 1 above. Moreover, any club may be excluded from those laws if it elects to do so. However, such a club will be obligated to guarantee benefits to its players in the same manner previously prescribed in Section 1 above.

Section 3. **Arbitration:** In any state where a club (e.g. Miami Dolphins/Florida) has legally elected not to be covered by the worker's compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article VII of this Agreement.

# ARTICLE XXXVII
## MISCELLANEOUS

Section 1. **Endorsements:** No club may arbitrarily refuse to permit a player to endorse a product.

Section 2. **Appearances:** No club may unreasonably require a player to appear on radio or television.

Section 3. **Promotion:** The NFLPA will use its best efforts to see that the players cooperate with the clubs and the news

media in reasonable promotional activities on behalf of the clubs and the NFL.

Section 4. **Deductions:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any clubhouse personnel or any other club attache is prohibited.

Section 5. **Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by club personnel or players which express criticism of any club, its coach or its operation and policy, or which tend to cast discredit upon a club, a player or any other person involved in the operation of a club, the NFL, the Management Council, or the NFLPA.

Section 6. **Addresses:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists clubs have covering all players who are under contract to the clubs as of October 1 for in-season and January 1 for off-season. The Management Council will not divulge player telephone numbers to the media. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the clubs.

Section 7. **NFLPA Tickets:** Two complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home club of its desire to attend such a game at least three days prior to the date of the game. NFLPA representatives must possess appropriate identification.

Section 8. **Player Tickets:** Two complimentary tickets will be made available to each player for each home game of his club. Each player will be afforded the opportunity to purchase two tickets for each away game of his club from the best tickets available for public sale immediately prior to the public sale for each game. Whatever practice a club had with respect to providing players the opportunity to purchase tickets to the 1982 Super Bowl game will be continued for the duration of this Agreement.

Section 9. **Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an

68

NFL club. A player is entitled to review the results of his psychological or personality tests upon request.

Section 10. **League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has reasonable basis for believing that Commissioner discipline might result from the interview.

# ARTICLE XXXVIII
## DURATION OF AGREEMENT

Section 1. **Effective Date:** This Agreement will be effective as of July 16, 1982, except as specifically provided otherwise in this Agreement.

Section 2. **Termination Date:** Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on August 31, 1987, or thereafter by giving 60 days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

Section 3. **Termination:** If the continued operation of Article XIII or XV of this Collective Bargaining Agreement is effectively enjoined by a court of competent jurisdiction, or if any portion of Article III of this Agreement is effectively held invalid by a court of competent jurisdiction, then this Agreement, at the option of either party hereto, may be terminated upon the giving of written notice of termination. It is understood between the parties that, upon such termination, all rights, duties, obligations, and privileges of the parties provided for hereunder will cease to be effective; provided, however, that employment practices and procedures already followed pursuant to this Agreement and benefits already paid pursuant to this Agreement will be accepted as fully effective and agreed to between the parties for the period preceding such termination.

Section 4. **Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in ac-

69

cordance with their internal procedures before it becomes effective. In the event of failure of ratification by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION | NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL |

BY EDWARD R. GARVEY

Executive Director

BY J.M. DONLAN

Executive Director

BY EUGENE UPSHAW

President

BY CHARLES W. SULLIVAN

Chairman

70

# APPENDIX A

# CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fee, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

☐ I direct that the initiation fee and the annual dues be deducted beginning on either the 30th day following the beginning of my employment as a player in the National Football League, or the commencement of the 1977 pre-season training camp, whichever is later.

☐ I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on either the 30th day following the beginning of my employment as a player in the National Football League, or the commencement of the 1977 pre-season training camp, whichever is later.

The foregoing authorized deductions are to be checked-off annually in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 1300 Connecticut Avenue, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and

direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each, or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.


Date


Signature


Player's Name—Type or Print


# APPENDIX C

## PROCEDURE FOR THE ENFORCEMENT OF THE UNION SECURITY AGREEMENT BETWEEN THE NFL MANAGEMENT COUNCIL AND THE NFLPA

On this day, December 11, 1982, the Management Council and the NFLPA have entered into a collective bargaining agreement ("Agreement") which includes Article IV containing a union security clause. To the extent permitted by federal and applicable state laws, the parties hereby agree to enforce the union security clause contained in Article IV, Section 1 of the Agreement according to the following procedure:

Upon written notification to the PCRC by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Article IV, Section 1, the PCRC will within seven days consider the matter. If there is no resolution of the matter within seven days, then the club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the club in writing that the suspended player has satisfied his obligation as contained in Article IV, Section 1 of the Agreement. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

It is further agreed that the term "member in good standing" as used in Article IV of the Agreement applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

It is further agreed that Agreement on Article II relating to Scope of Agreement, Article III relating to No Strike/Lockout/Suit, and Article XXXVII relating to Duration of Agreement notwithstanding that if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of Article IV of the Agreement relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted action may be permitted by law in support of their positions.

# APPENDIX D

# STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1. History
   - —player
   - —family
   - —thorough review of all team physicians and trainer reports for preceding seasons
2. Examination
   - —head
   - —face
   - —scalp
   - —ears
     - —external & drums
   - —sinus
   - —throat
   - —eyes
     - —pupils
     - —reaction to movement & light
   - —lungs
     - —palpatation
   - —chest
   - —heart
   - —visceral
     - —hernia
   - —rectal
     - —hemorrhoid
     - —fistula
     - —prostate
   - —gastric
   - —any unusual body marks, i.e., scars, birthmark
   - —height
   - —weight
   - —temperature
   - —blood pressure

74

—pulse
—heart rate

## Orthopedic Examination

Examination visually, including stress testing and range of motion for all of the following:

—neck and spine
—shoulder
—elbow
—wrist
—fingers
—hips
—knees—also knee jerk
—ankle—check Achilles tendon for abnormalities and by jerk test
—toes

## Flexibility

Testing of hamstrings and neck.

## EKG

Heart Abnormalities.

## Stress Testing (at physician's discretion)

(Treadmill or bicycle) for cardiovascular.

## Blood Testing

Standard grid. Testing for (including but not limited to):

—Chemistry
—Calcium
—Phosphorus
—Glucose
—Uric Acid
—Cholesterol
—Iron
—Triglyceride
—Lipids
—Sodium
—Chlorides
—White Blood Count
—Red Blood Count

75

—Mono-Screen  
—Tay Sachs       } Where applicable. If found,  
—Sickle Cell     } individual counseling necessary.  
—V.D.

## Urinalysis

Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing

- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for: Tumor
             T.B.
             Lesions

**X-Ray all previously injured areas** (at physician's discretion)

# APPENDIX E

December 11, 1982

Mr. Edward R. Garvey
Executive Director
**NFL PLAYERS ASSOCIATION**
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with Article V, Section 1 of our Agreement executed on this date, the reference to "no discrimination" by any party against a player because of "activity or lack of activity on behalf of the NFLPA" is intended to mean that there will be no discrimination against a player for lack of support of the union just as there will be no discrimination for supporting the union, consistent with the National Labor Relations Act; further, the clause is not intended to affect application or enforcement of the *union security* or *check-off* provisions.

Sincerely,

J. M. DONLAN
Executive Director

JMD:db
Accepted:

Edward R. Garvey

77

# APPENDIX F

December 11, 1982

Mr. J. M. Donlan
Executive Director
NFL MANAGEMENT COUNCIL
681 Fifth Avenue
New York, N.Y. 10022

Dear Jack:

This is to confirm our agreement made in bargaining to undertake a joint study of the career and educational counseling needs of NFL players.

The purpose of the study will be to:
   (1) Evaluate what individual clubs are doing in career and education counseling area;
   (2) Develop accurate statistics concerning the educational levels achieved by NFL players prior to entering the league;
   (3) Determine what career and educational counseling assistance can be developed on a league-wide basis;
   (4) Determine what aspects of career and educational counseling assistance can best be implemented on the local club level.

The study will be completed within a year of the execution of the CBA, and both parties will use best efforts to implement the recommendations and findings which result.

Sincerely,

EDWARD R. GARVEY
Executive Director

Accepted:

J. M. Donlan

78

# APPENDIX G

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement executed on this date, we have advised the union that we estimate that total player costs, paid or incurred, will reach or exceed $270 million for the 1983 season, $305 million for the 1984 season, $345 million for the 1985 season and $393 million for the 1986 season, or a total of $1.313 billion for the four seasons. We have said we are willing to guarantee total player costs, paid or incurred, of $1.28 billion of the projected $1.313 billion for the four seasons 1983 through 1986.

You asked if we would annualize our guarantee. We responded that we are willing to annualize the guarantee but not at the projected amounts since there will undoubtedly be fluctuations from projected costs year by year. We said we are willing to annually guarantee portions of the projected figures.

This will confirm that, in accordance with specific language to be agreed upon between the parties or determined by the mediator-arbitrator on the subjects set forth below, the Management Council guarantees that the current 28 member clubs of the NFL will pay or incur total player costs of $240 million for the 1983 season, $260 million for the 1984 season, $290 million for the 1985 season and $320 million for the 1986 season, and a total of $1.28 billion for the four seasons. To the extent that total player costs are less than guaranteed player costs for the 1983, 1984, 1985 and 1986 seasons, and for the four seasons in total, the Management Council will pay the differences to NFL players at times and in accordance with a "downs-played" formula to be agreed upon by the Management Council and the NFLPA.

The subjects on which agreement must be reached between the Management Council and the NFLPA or a determination made by the mediator-arbitrator in order to implement the guarantee include, without limitation: (1) a definition of what will be included in "total player costs" paid or incurred by NFL clubs (which will include the same formulations as utilized by Arthur Andersen & Co. in their reports covering each of the NFL seasons 1970 through 1981); (2) the accounting principles and procedures under which total player costs will be computed (which will be consistent with those utilized by Arthur Andersen & Co. in their reports covering each of the NFL seasons 1970 through 1981); (3) the unanticipated material events or occurrences beyond the reasonable control of the League or clubs which adversely impact upon League or club revenues in a manner so as to require an equitable or reasonable adjustment of the guarantees; (4) the amount of reduction in guaranteed player costs which would result from such material events or occurrences; (5) a method of resolution of disputes between the parties as to the operation of Nos. 3 and 4; and (6) the times and formula in accordance with which NFL players will receive any difference between total player costs and guaranteed player costs for the 1983, 1984, 1985 and 1986 seasons, and for the four-year period of 1983 through 1986.

In the event the parties are unable to agree upon these matters by May 1, 1983, their respective last proposals will be submitted to Sam Kagel for mediation-arbitration, along with briefs in support of their respective positions.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

# APPENDIX H

December 11, 1982

Mr. Edward R. Garvey
Executive Director
**NFL PLAYERS ASSOCIATION**
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement signed this date, we have the following understandings:

1. If any member of the NFLPA Executive Committee, Board of Player Representatives or their Alternates is released by a club prior to the end of the 1982 season, he shall nevertheless receive the remainder of his salary for the unplayed games of the season. If his club participates in any play-off games, he will also receive post-season payments. If such a player signs a 1982 contract with another NFL club, whatever payments he receives from that club will be offset against his former club's payment obligations.

2. With respect to the NLRB cases involving Sam McCullum, Herb Orvis and Mike Kadish, we agreed that (a) unless settled by the parties, McCullum's case will proceed through the Board's processes, and (b) Orvis and Kadish will have the option either of receiving $60,000 each in Money Now and $130,000 each in Severance Pay under the new CBA, in which case the NFLPA will withdraw the pending unfair labor practice charges involving the two players, or of not receiving the Money Now and Severance Pay, with the NFLPA continuing to pursue the two charges through the Board processes.

3. As per NLRB Settlement Agreement signed this date, all other pending unfair labor practice charges, at whatever stage,

will be withdrawn by the NFLPA, or, if NLRB consent to withdrawal is required, the parties will jointly seek such consent.

Sincerely,

J. M. DONLAN
Executive Director

Accepted:

Edward R. Garvey

# APPENDIX I

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

Upon ratification and execution of our Agreement, it is understood and agreed that the following game format will apply for the remainder of the 1982 regular season and the 1982-83 post-season:

Play will resume with games originally scheduled for the November 21-22 weekend, and continue through the remainder of the original regular season schedule. Players will be paid "game checks."

On the weekend of January 2-3, 1983, a "make-up" schedule of games, drawn from games not played because of the strike, will be played by all 28 teams. Players will be paid "game checks."

The top eight teams in each conference, as determined by winning percentage (and tie-breaking procedures, if necessary), will then qualify for the post-season.

On the weekend of January 8-9, four quarter-final playoff games will be played in each conference, with the following pairings:

Top Bracket:             8 at 1, 5 at 4
Lower Bracket:           7 at 2, 6 at 3

Players will be paid "wild card" game payments under the new CBA.

The four winners in each conference will advance to the semi-final playoffs in each conference the weekend of January 15-16 (two games each day), with the highest seeded teams as the home teams. Players will be paid division playoff game payments under the new CBA.

The two winners in the conference semi-finals will play for the conference championships on Saturday and Sunday, January 22-23, and the two winners will advance to the Super Bowl, Sunday, January 30. Players will be paid the new conference championhip and Super Bowl game payments.

Sincerely,

J. M. DONLAN
Executive Director


ACCEPTED:

Edward R. Garvey

83

# APPENDIX J

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

RE: *NFLPA v. NFL, et al*

Dear Ed:

In connection with the Agreement executed today, we have agreed that the above-entitled action will be dismissed in accordance with the following procedure:

(1) The NFLPA and the Defendants will enter into a Stipulation dismissing, with prejudice and without cost, the Complaint, and all claims asserted therein, which is to be "so ordered" by the Court;

(2) All the proposed intervenors have, by praecipe, directed the Court to withdraw the Motion to Intervene, which they shall seek to be "so ordered" by the Court.

We have also agreed that plaintiff NFL clubs and defendant players will enter into stipulations dismissing, with prejudice and without costs, the complaints, and all claims asserted therein, in all state court actions growing out of the NFLPA-sponsored "All-Star" games.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

84

# APPENDIX K

December 11, 1982

Mr. Edward R. Garvey
Executive Director
NFL PLAYERS ASSOCIATION
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement executed this date, this will confirm our understanding that, with respect to Article X of the Agreement on Injury Protection, the issues of (1) whether or not at the time of injury a player must have a contract in existence covering the season following the season of injury to qualify for an injury protection benefit; and (2) in accordance with what schedule a qualifying player must be paid an injury protection benefit, will be determined for purposes of the Agreement by Arbitrator Bert Luskin's decisions in the pending non-injury cases of *John Zook v. St. Louis Cardinals; Levi Johnson v. Detroit Lions;* and *Bobby Moore v. Chicago Bears and Tampa Bay Buccaneers.*

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

# APPENDIX L

December 11, 1982

Edward R. Garvey
Executive Director
NFL Players Association
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

In connection with our Agreement executed this date, this will confirm our understanding that:

1. Dues/service fees will be checked-off from remaining 1982 game checks and, if the player chooses to sign a new xeroxed form giving his permission, from the "Money Now" bonus. The amount checked-off from "Money Now" may, at the option of the union, be more than the amount checked-off by the Clubs from game checks. The NFLPA will notify the Clubs of the amounts to be checked-off, the salary and/or bonus payment from which they are to be deducted, and the players who have authorized such check-offs to be made. The Clubs will rely on the NFLPA's representation in return for the commitment that the NFLPA will indemnify the NFLMC and the Clubs from any liability as a result of litigation brought by a player regarding check-off payments.

2. Players placed on waivers by Clubs on September 20, 1982, qualify for the "Money Now" bonus.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey

# APPENDIX M

December 11, 1982

Edward R. Garvey
Executive Director
NFL Players Association
1300 Connecticut Avenue, N.W.
Washington, D.C. 20036

Dear Ed:

We are executing this Agreement today based on your representation to us that the intervenors have agreed to the dismissal of the suit before Judge Penn and the withdrawal of their motion to intervene.

Sincerely,

J. M. DONLAN
Executive Director

ACCEPTED:

Edward R. Garvey