# Exhibit 6-A



# NFL

# COLLECTIVE

# BARGAINING

# AGREEMENT

# 1993-2000



# TABLE OF CONTENTS

PAGE

**PREAMBLE** ....................................................................................1

**ARTICLE I DEFINITIONS** ............................................................2
    Section 1. General Definitions ..............................................2
    Section 2. Free Agency Definitions ......................................3
    Section 3. Salary Cap Definitions..........................................5

**ARTICLE II GOVERNING AGREEMENT** ...................................7
    Section 1. Conflicts ................................................................7
    Section 2. Implementation ....................................................7
    Section 3. Management Rights ..............................................7
    Section 4. Rounding................................................................7

**ARTICLE III SCOPE OF AGREEMENT** .......................................8
    Section 1. Scope .....................................................................8
    Section 2. Arbitration ............................................................8

**ARTICLE IV NO STRIKE/LOCKOUT/SUIT**.................................9
    Section 1. No Strike/Lockout ...............................................9
    Section 2. No Suit..................................................................9
    Section 3. Releases ..............................................................10

**ARTICLE V UNION SECURITY** ...............................................11
    Section 1. Union Security.....................................................11
    Section 2. Check-off.............................................................11
    Section 3. NFLPA Meetings.................................................11
    Section 4. NFLPA Player Group Licensing Program......................11
    Section 5. Disputes ..............................................................12
    Section 6. Procedure for Enforcement...........................................12
    Section 7. NFLPA Responsibility ........................................13
    Section 8. Orientations ........................................................13

**ARTICLE VI NFLPA AGENT CERTIFICATION** .................................14
    Section 1. Exclusive Representation ..............................................14
    Section 2. Enforcement........................................................14
    Section 3. Penalty................................................................14

**ARTICLE VII PLAYER SECURITY** .............................................15
    Section 1. No Discrimination .........................................15
    Section 2. Personal Appearance ..........................................15

**ARTICLE VIII CLUB DISCIPLINE** ............................................16
    Section 1. Maximum Discipline...........................................16

i

Section 2. Published Lists ..................................................17
Section 3. Uniformity ........................................................17
Section 4. Disputes ...........................................................17
Section 5. Deduction .........................................................17

**ARTICLE IX NON-INJURY GRIEVANCE** ..............................**18**
Section 1. Definition .........................................................18
Section 2. Initiation...........................................................18
Section 3. Filing ...............................................................18
Section 4. Appeal ..............................................................18
Section 5. Discovery ..........................................................19
Section 6. Arbitration Panel ...............................................19
Section 7. Hearing ............................................................20
Section 8. Arbitrator's Decision and Award .........................21
Section 9. Time Limits .......................................................21
Section 10. Representation ..................................................21
Section 11. Costs ...............................................................21
Section 12. Payment ..........................................................22
Section 13. Grievance Settlement Committee .........................22

**ARTICLE X INJURY GRIEVANCE** .......................................**23**
Section 1. Definition .........................................................23
Section 2. Filing ...............................................................23
Section 3. Answer .............................................................23
Section 4. Neutral Physician ...............................................24
Section 5. Neutral Physician List .........................................24
Section 6. Appeal ..............................................................25
Section 7. Arbitration Panel ...............................................25
Section 8. Hearing ............................................................25
Section 9. Miscellaneous ...................................................26
Section 10. Expenses .........................................................27
Section 11. Pension Credit ..................................................27
Section 12. Payment ..........................................................27
Section 13. Presumption of Fitness ......................................27
Section 14. Playoff Money ..................................................28
Section 15. Information Exchange ........................................28
Section 16. Discovery ........................................................28

**ARTICLE XI COMMISSIONER DISCIPLINE**.........................**29**
Section 1. League Discipline...............................................29
Section 2. Time Limits .......................................................29
Section 3. Representation ...................................................29
Section 4. Costs ...............................................................30
Section 5. One Penalty ......................................................30
Section 6. Fine Money .......................................................30

ii

**ARTICLE XII INJURY PROTECTION** ...............................................**31**
    Section 1. Qualification.........................................................31
    Section 2. Benefit.................................................................31
    Section 3. Disputes ..............................................................32

**ARTICLE XIII COMMITTEES** .........................................................**33**
    Section 1. Joint Committee ...................................................33
    Section 2. Competition Committee .........................................34
    Section 3. Player/Club Operations Committee ..........................34

**ARTICLE XIV NFL PLAYER CONTRACT** .......................................**35**
    Section 1. Form ...................................................................35
    Section 2. Term ...................................................................35
    Section 3. Changes ..............................................................35
    Section 4. Conformity ..........................................................35
    Section 5. General................................................................35
    Section 6. Commissioner Disapproval .....................................36
    Section 7. NFLPA Group Licensing Program..............................36
    Section 8. Good Faith Negotiation ..........................................37

**ARTICLE XV OPTION CLAUSE**.......................................................**38**
    Section 1. Prohibition ..........................................................38
    Section 2. Existing Option Clauses..........................................38

**ARTICLE XVI COLLEGE DRAFT** ....................................................**39**
    Section 1. Time of Draft .......................................................39
    Section 2. Number of Choices................................................39
    Section 3. Required Tender....................................................39
    Section 4. Signing of Drafted Rookies .....................................39
    Section 5. Other Professional Teams .......................................40
    Section 6. Return to College ..................................................41
    Section 7. Assignment of Draft Rights......................................42
    Section 8. Subsequent Draft ..................................................42
    Section 9. No Subsequent Draft .............................................42
    Section 10. Compensatory Draft Selections ...............................42
    Section 11. Undrafted Rookies ...............................................43
    Section 12. Notice of Signing .................................................43

**ARTICLE XVII ENTERING PLAYER POOL**.......................................**44**
    Section 1. Definition ............................................................44
    Section 2. Covered League Years.............................................44
    Section 3. Calculation ..........................................................44
    Section 4. Operation ............................................................45

iii

**ARTICLE XVIII VETERANS WITH LESS THAN**
**THREE ACCRUED SEASONS** .................................................47
    Section 1. Accrued Seasons Calculation .........................................47
    Section 2. Negotiating Rights of Players With Less
                Than Three Accrued Seasons...................................47
    Section 3. Minimum Salaries ....................................................47
    Section 4. Notice of Signing .......................................................48

**ARTICLE XIX VETERAN FREE AGENCY** ........................................49
    Section 1. Unrestricted Free Agents..............................................49
    Section 2. Restricted Free Agents.................................................50
    Section 3. Offer Sheet and First Refusal Procedures.......................54
    Section 4. Expedited Arbitration.................................................57
    Section 5. Individually Negotiated Limitations on
                Player Movement ..................................................57
    Section 6. Notices, Etc .............................................................58

**ARTICLE XX FRANCHISE AND TRANSITION PLAYERS**.................60
    Section 1. Franchise Player Designations .....................................60
    Section 2. Required Tender for Franchise Players...........................60
    Section 3. Transition Player Designations .....................................62
    Section 4. Required Tender for Transition Players .........................62
    Section 5. Right of First Refusal for Transition Players...................63
    Section 6. Lists ........................................................................63
    Section 7. Salary Information ....................................................63
    Section 8. No Assignment.........................................................64
    Section 9. Duration of Designation ............................................64
    Section 10. Franchise Player Designation Period ...........................65
    Section 11. Transition Player Designation Period ..........................65
    Section 12. Prospective Designation ...........................................66
    Section 13. Right to Decline......................................................66
    Section 14. Other Terms...........................................................67
    Section 15. Compensatory Draft Selection....................................67
    Section 16. Signing Period for Transition Players ..........................67
    Section 17. Signing Period for Franchise Players ...........................68

**ARTICLE XXI FINAL EIGHT PLAN**................................................69
    Section 1. Application...............................................................69
    Section 2. Top Four Teams.......................................................69
    Section 3. Next Four Teams .....................................................69
    Section 4. Replacement of Free Agents Signed by Other Club .......69
    Section 5. Increases..................................................................70
    Section 6. Salary Definition ......................................................70
    Section 7. Trade Limitation ......................................................70

iv

**ARTICLE XXII WAIVER SYSTEM** ....................................................**71**
 Section 1. Release ....................................................71
 Section 2. Contact ....................................................71
 Section 3. Ineligibility ....................................................71
 Section 4. Notice of Termination ....................................................71
 Section 5. NFLPA's Right to Personnel Information ......................72
 Section 6. Rosters ....................................................72

**ARTICLE XXIII TERMINATION PAY** ....................................................**73**
 Section 1. Eligibility ....................................................73
 Section 2. Regular Season Signings ....................................................73

**ARTICLE XXIV GUARANTEED LEAGUE-WIDE SALARY,**
**SALARY CAP & MINIMUM TEAM SALARY**............................**74**
 Section 1. Definitions....................................................74
 Section 2. Trigger For Guaranteed League-wide Salary,
    Salary Cap, and Minimum Team Salary...................77
 Section 3. Guaranteed League-wide Salary ....................................77
 Section 4. Salary Cap Amounts ....................................................78
 Section 5. Minimum Team Salary ....................................................79
 Section 6. Computation of Team Salary ....................................79
 Section 7. Valuation of Player Contracts....................................81
 Section 8. 30% Rules ....................................................85
 Section 9. Renegotiations and Extensions ....................................85
 Section 10. Accounting Procedures ....................................................85

**ARTICLE XXV ENFORCEMENT OF THE SALARY**
**CAP AND ENTERING PLAYER POOL** ....................................**90**
 Section 1. Undisclosed Terms....................................................90
 Section 2. Circumvention....................................................90
 Section 3. Special Master Action....................................................90
 Section 4. Commissioner Disapproval ....................................................90
 Section 5. Special Master Review ....................................................91
 Section 6. Sanctions....................................................91
 Section 7. Prior Conference....................................................91

**ARTICLE XXVI SPECIAL MASTER**....................................................**92**
 Section 1. Appointment ....................................................92
 Section 2. Scope of Authority ....................................................92
 Section 3. Discovery ....................................................93
 Section 4. Compensation ....................................................93
 Section 5. Procedures....................................................93
 Section 6. Selection of Special Master ....................................................94
 Section 7. Penalties ....................................................94

v

**ARTICLE XXVII IMPARTIAL ARBITRATOR**.....................................**95**
    Section 1. Selection.......................................................95
    Section 2. Scope of Authority ........................................95
    Section 3. Effect of Rulings..........................................95
    Section 4. Discovery .....................................................95
    Section 5. Compensation of Impartial Arbitrator ..........95
    Section 6. Procedures...................................................95
    Section 7. Selection of Impartial Arbitrator...................96

**ARTICLE XXVIII ANTI-COLLUSION** ...........................................**97**
    Section 1. Prohibited Conduct ......................................97
    Section 2. Other Club Conduct.....................................97
    Section 3. Club Discretion ............................................97
    Section 4. League Disclosures .......................................98
    Section 5. Enforcement of Anti-Collusion Provisions ...................98
    Section 6. Burden of Proof ...........................................98
    Section 7. Summary Judgment ......................................99
    Section 8. Remedies .....................................................99
    Section 9. Computation of Damages ..............................99
    Section 10. Player Election .........................................100
    Section 11. Payment of Damages ................................101
    Section 12. Effect on Cap Computations ......................101
    Section 13. Effect of Salary Cap .................................101
    Section 14. No Reimbursement....................................101
    Section 15. Costs........................................................101
    Section 16. Termination ..............................................101
    Section 17. Time Limits ..............................................102
    Section 18. Prior Conference .......................................102

**ARTICLE XXIX CERTIFICATIONS** ...............................................**103**
    Section 1. Contract Certification..................................103
    Section 2. End of League Year Certification .................103
    Section 3. False Certification .......................................104

**ARTICLE XXX CONSULTATION AND INFORMATION SHARING**..**105**
    Section 1. Consultation and Communications.............105
    Section 2. Salary Summaries........................................105
    Section 3. Notice of Invalid Contract ..........................105
    Section 4. Neutral Verifier...........................................105
    Section 5. Copies........................................................106
    Section 6. Meetings....................................................106

**ARTICLE XXXI EXPANSION** .........................................................**107**
    Section 1. Veteran Allocation.......................................107
    Section 2. Additional Compensatory Picks ..................107

vi

Section 3. Entering Player Pool Adjustment ..................................107
Section 4. Relocation Bonus ......................................................107

**ARTICLE XXXII OTHER PROVISIONS** ...................................**108**
Section 1. CFL Rule ..................................................................108
Section 2. Physically Unable to Perform ......................................108
Section 3. Non-Football Injury ...................................................108
Section 4. Roster Exemption ......................................................108

**ARTICLE XXXIII SQUAD SIZE** .............................................**110**
Section 1. Active List.................................................................110
Section 2. Pre-Season ...............................................................110
Section 3. Inactive List ..............................................................110
Section 4. Active and Inactive List Limit .....................................110

**ARTICLE XXXIV PRACTICE SQUADS** ...................................**111**
Section 1. Practice Squads.........................................................111
Section 2. Signing With Other Clubs...........................................111
Section 3. Salary ......................................................................111
Section 4. Eligibility .................................................................111

**ARTICLE XXXV OFF-SEASON WORKOUTS** .............................**112**
Section 1. Voluntary Workouts ...................................................112
Section 2. Time Periods .............................................................112
Section 3. Payment ...................................................................112
Section 4. Injuries ....................................................................112
Section 5. Miscellaneous ...........................................................112

**ARTICLE XXXVI MINICAMPS** ..............................................**113**
Section 1. Number.....................................................................113
Section 2. Length......................................................................113
Section 3. Expenses...................................................................113
Section 4. Contact ....................................................................113
Section 5. Injuries ....................................................................113

**ARTICLE XXXVII PRE-SEASON TRAINING CAMPS** .................**114**
Section 1. Definition .................................................................114
Section 2. Room and Board.........................................................114
Section 3. Rookie Per Diem ........................................................114
Section 4. Veteran Per Diem .......................................................114
Section 5. Reporting..................................................................114
Section 6. Number of Pre-Season Games .....................................114
Section 7. Telephones................................................................115
Section 8. Expenses...................................................................115

vii

**ARTICLE XXXVIII SALARIES** ...........................................**116**
    Section 1. 1993 Minimum Salaries ..............................116
    Section 2. Minimum Salaries For 1994-1998 League Years ..........116
    Section 3. Credited Season...........................................116
    Section 4. Other Compensation ..................................116
    Section 5. Arbitration .................................................117
    Section 6. Payment ....................................................117
    Section 7. Deferred Paragraph 5..................................117
    Section 8. Number of Regular Season Games.................117
    Section 9. Copies of Contracts ..................................117
    Section 10. Split Contracts.........................................118
    Section 11. Funding of Deferred and Guaranteed Contracts........118

**ARTICLE XXXIX MEAL ALLOWANCE** .......................**119**
    Section 1. Reimbursement ........................................119
    Section 2. Travel Day.................................................119

**ARTICLE XL DAYS OFF** ..........................................**120**
    Section 1. Rate ..........................................................120
    Section 2. Requirements ............................................120

viii **ARTICLE XLI MOVING AND TRAVEL EXPENSES** .........................**121**
    Section 1. Qualification.............................................121
    Section 2. Moving Expenses ......................................121
    Section 3. Travel Expenses.........................................121
    Section 4. Transportation ..........................................122

**ARTICLE XLII POST-SEASON PAY**..............................**123**
    Section 1. System.......................................................123
    Section 2. Compensation ...........................................123
    Section 3. Wild Card Game; Division Play-off Game..................123
    Section 4. Conference Championship; Super Bowl Game ..........123
    Section 5. Payment ....................................................124

**ARTICLE XLIII PRO BOWL GAME**.............................**125**
    Section 1. Compensation ...........................................125
    Section 2. Selection....................................................125
    Section 3. Wives ........................................................125
    Section 4. Injury ........................................................125
    Section 5. Payment ....................................................125

**ARTICLE XLIV PLAYERS' RIGHTS TO MEDICAL
CARE AND TREATMENT** ......................................**126**
    Section 1. Club Physician...........................................126
    Section 2. Club Trainers .............................................126

Section 3. Players' Right to a Second Medical Opinion................126
Section 4. Players' Right to a Surgeon of His Choice ..................126
Section 5. Standard Minimum Pre-Season Physical ....................126
Section 6. Substance Abuse........................................................127

**ARTICLE XLV ACCESS TO PERSONNEL AND**
**MEDICAL RECORDS**..............................................................**128**
Section 1. Personnel Records....................................................128
Section 2. Medical Records ......................................................128

**ARTICLE XLVI PLAYER BENEFIT COSTS** ......................................**129**
Section 1. Right of Reduction ..................................................129
Section 2. Right of Restoration ................................................129
Section 3. Definition ................................................................129
Section 4. Resolution of Disputes ............................................130

**ARTICLE XLVII RETIREMENT PLAN** ...........................................**132**
Section 1. Maintenance and Definitions....................................132
Section 2. Amendment by Bargaining Parties ............................132
Section 3. Contributions ..........................................................132
Section 4. Amendment of Bert Bell and Pete Rozelle Plans ..........133
Section 5. Plan Merger and Further Amendments ......................136
Section 6. Benefits for Pre-1959 Seasons..................................137

**ARTICLE XLVIII SECOND CAREER SAVINGS PLAN** ....................**139**
Section 1. Establishment..........................................................139
Section 2. Contributions ..........................................................139
Section 3. Allocation ................................................................139
Section 4. Salary Reduction Contributions................................139
Section 5. Benefit Options ........................................................139
Section 6. Death Benefits .........................................................140
Section 7. Investment ..............................................................140

**ARTICLE XLIX GROUP INSURANCE**.............................................**141**
Section 1. Group Insurance Benefits..........................................141
Section 2. Administration..........................................................141

**ARTICLE L SEVERANCE PAY** .......................................................**143**
Section 1. Eligibility ................................................................143
Section 2. Amount....................................................................143
Section 3. Application ..............................................................143
Section 4. Payment ..................................................................143
Section 5. Failure to Apply .......................................................144
Section 6. Only One Payment ...................................................144
Section 7. Payable to Survivor...................................................144

ix

Section 8. Prior Severance Pay ...................................................144
Section 9. Nonassignability ........................................................144

**ARTICLE LI SUPPLEMENTAL DISABILITY BENEFITS**..................**145**
Section 1. Establishment ............................................................145
Section 2. Contributions .............................................................145
Section 3. Disability Benefits ......................................................145
Section 4. Retirement Ignored ....................................................146

**ARTICLE LII BENEFIT ARBITRATOR**...........................................**147**
Section 1. Selection.....................................................................147
Section 2. Compensation ............................................................147
Section 3. Role............................................................................147

**ARTICLE LIII RETENTION OF BENEFITS** ...................................**149**

**ARTICLE LIV WORKERS' COMPENSATION** ...............................**150**
Section 1. Benefits ......................................................................150
Section 2. Rejection of Coverage.................................................150
Section 3. Arbitration..................................................................150
Section 4. Joint Study..................................................................150
Section 5. Moratorium ................................................................150
Section 6. Preservation of Rights.................................................151
Section 7. Reopener ....................................................................151

**ARTICLE LV MISCELLANEOUS** ....................................................**152**
Section 1. Endorsements.............................................................152
Section 2. On-Field Attire............................................................152
Section 3. Appearances...............................................................152
Section 4. Promotion ..................................................................152
Section 5. Deduction ..................................................................152
Section 6. Public Statements.......................................................152
Section 7. Address.......................................................................152
Section 8. NFLPA Tickets.............................................................152
Section 9. Player Tickets .............................................................153
Section 10. Tests .........................................................................153
Section 11. League Security.........................................................153
Section 12. Career Planning Program..........................................153
Section 13. Delivery of Documents .............................................153
Section 14. Binding Effect ...........................................................153
Section 15. Authorization............................................................153
Section 16. Headings ..................................................................154
Section 17. Time Periods.............................................................154
Section 18. Exhibits ....................................................................154
Section 19. Parol Evidence ..........................................................154

x

**ARTICLE LVI 1999 LEAGUE YEAR**....................................................**155**
    Section 1. No Salary Cap................................................155
    Section 2. Free Agency If Salary Cap in 1998.............................155
    Section 3. Free Agency If No Salary Cap in 1998 .......................155
    Section 4. Franchise and Transition Players................................155

**ARTICLE LVII MUTUAL RESERVATION OF RIGHTS:**
**LABOR EXEMPTION** ...............................................................**156**
    Section 1. Rights Under Law .......................................156
    Section 2. Labor Exemption .......................................156
    Section 3. CBA Expiration ..........................................156

**ARTICLE LVIII DURATION OF AGREEMENT**..............................**157**
    Section 1. Effective Date...............................................157
    Section 2. Termination ................................................157
    Section 3. Termination Date ........................................157
    Section 4. Termination Prior to Expiration Date ........................157
    Section 5. Ratification ................................................159

**ARTICLE LIX GOVERNING LAW** ...............................................**160**

**ARTICLE LX NOTICES** ............................................................**161**

**APPENDIX A  CHECK-OFF AUTHORIZATION** ............................**162**

**APPENDIX B  INJURY PROTECTION/EARLY WAIVER** ................**164**

**APPENDIX C  NFL PLAYER CONTRACT** .......................................**165**

**APPENDIX D  FIRST REFUSAL OFFER SHEET** ...........................**174**

**APPENDIX E  FIRST REFUSAL EXERCISE NOTICE**......................**175**

**APPENDIX F  WAIVER OF FREE AGENT RIGHTS** ......................**176**

**APPENDIX G  NOTICE OF TERMINATION** ................................**177**

**APPENDIX H  ACCOUNTANTS REVIEW PROCEDURES** ............**178**

**APPENDIX I  MINIMUM PRE-SEASON PHYSICAL**......................**186**

**APPENDIX J  ACTUARIAL ASSUMPTIONS** ...............................**189**

**LETTER AGREEMENT DATED MAY 6, 1993**
    **(SALARY SUMMARIES)** ......................................**191**

xi

LETTER AGREEMENT DATED MAY 6, 1993
(COMMISSIONER CONTRACT REVIEW) ..................................192

LETTER AGREEMENT DATED JUNE 23, 1993
(MISCELLANEOUS SUBJECTS)...................................................193

LETTER AGREEMENT DATED AUGUST 4, 1993
(ROOKIE ORIENTATION)............................................................195

LETTER AGREEMENT DATED AUGUST 4, 1993
(FINAL EIGHT PLAN) .................................................................197

LETTER AGREEMENT DATED AUGUST 4, 1993
(PLAYER MEDICAL) ...................................................................198

INDEX.....................................................................................................199

xii

# PREAMBLE

This Agreement, which is the product of bona fide, arm's-length collective bargaining, is made and entered into on the 6th day of May, 1993, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:

1. All professional football players employed by a member club of the National Football League;

2. All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;

3. All rookie players once they are selected in the current year's NFL College Draft; and

4. All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

1

# ARTICLE I
# DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

**Section 1. General Definitions:**

(a)     "Agreement" means this Collective Bargaining Agreement, dated May 6, 1993.

(b)     "Class Counsel" means the law firm of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, and the law firm of Lindquist & Vennum, 4200 IDS Center, Minneapolis, Minnesota 55402.

(c)     "Club" or "Team" or "Member," used interchangeably herein, means any entity that is a member of the NFL or operates a franchise in the NFL at any time during the term of this Agreement.

(d)     "Club Affiliate" or "Team Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a Club or any owner of a Club.

2

(e)     "Commissioner" means the Commissioner of the NFL.

(f)     "Impartial Arbitrator" means the person authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

(g)     "League Year" means the period from February 20 of one year through and including February 19 of the following year, or such other one year period to which the NFL and the NFLPA may agree. For 1993, the League Year shall begin on March 1 and end on the date on which all 1993 League Year contracts terminate, as agreed between the NFL and the NFLPA.

(h)     "NFL Player Contract" means the form of Player Contract utilized in the NFL.

(i)     "NFL Rules" means the Constitution and Bylaws, rules, and regulations of the NFL and/or the Management Council.

(j)     "Player Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a player.

(k)     "Salary" means any compensation of money, property, invest-

ments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player or Player Affiliate, or is paid to a third party at the request of and for the benefit of a player or Player Affiliate, during a League Year, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(l)     "Settlement Agreement" means the Stipulation and Settlement Agreement, dated February 26, 1993.

(m)     "Special Master" means the special master appointed and authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

**Section 2. Free Agency Definitions:**

(n)     "Accrued Season" means any playing season for which a player received credit with respect to his qualifications for Unrestricted Free Agency or Restricted Free Agency, as described in Article XIX (Veteran Free Agency).

(o)     "Compensatory Draft Selection" means an additional Draft choice awarded to a Club as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players).

(p)     "Draft" or "College Draft" means the NFL's annual draft of Rookie football players as described in Article XVI (College Draft).

(q)     "Draft Choice Compensation" means the right of any Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players), to receive draft pick(s) from any other Club.

(r)     "Drafted Rookie" means a person who is selected in the current League Year's Draft or whose Draft rights are held, or continue to be held, consistent with this Agreement, by an NFL Club that selected the Rookie in a prior Draft.

(s)     "Final Eight Plan" means the rules whereby signings of Unrestricted Free Agents are limited in Uncapped Years for the final eight playoff Clubs, under the limited circumstances described in Article XXI (Final Eight Plan).

(t)     "Free Agent" means a player who is not under contract and is free to negotiate and sign a Player Contract with any NFL Club, without Draft Choice Compensation or any Right of First Refusal.

3

(u)     "Minimum Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player not on any Active list, and not on the Inactive list, pursuant to this Agreement.

(v)     "Minimum Active/Inactive List Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player on any Active list, or on the Inactive list, pursuant to this Agreement.

(w)     "Negotiate" means, with respect to a player or his representatives on the one hand, and an NFL Club or its representatives on the other hand, to engage in any written or oral communication relating to efforts to reach agreement on employment and/or terms of employment between such player and such Club.

(x)     "New Club" means any Club except the Prior Club (as defined below).

(y)     "Player Contract" means a written agreement or series of such agreements executed at or about the same time between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player.

4

(z)     "Prior Club" means the Club that contracted with or otherwise held the NFL playing rights for the player for the previous NFL League Year.

(aa)    "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other payments to a player in compensation for the playing of professional football for the last League Year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Prior Year Salary shall also include any un-repaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ab)    "Renegotiate" means any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract.

(ac)    "Required Tender" means a Player Contract tender that a Club is required to make to a player pursuant to this Agreement, either as a matter of right with respect to the player, or to receive Rights of First Refusal, Draft Choice Compensation and/or other rights with respect to the player, as specified in this Agreement.

(ad)    "Restricted Free Agent" means a Veteran who has three or more Accrued Seasons and who completes performance of his Player Contract, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club.

(ae)    "Right of First Refusal" means the right of an NFL Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players) to retain the services of certain Veteran players by matching offers made to those players.

(af)    "Rookie" means a person who has never signed a Player Contract with an NFL Club.

(ag)    "Undrafted Rookie" means a Rookie who was eligible for but not selected in a College Draft.

(ah)    "Unrestricted Free Agent" means a Veteran who completes performance of his Player Contract, and who is no longer subject to any exclusive negotiating rights, Right of First Refusal, or Draft Choice Compensation in favor of his Prior Club.

(ai)    "Veteran" means a player who has signed at least one Player Contract with an NFL Club.

**Section 3. Salary Cap Definitions:**
(aj)    "Benefits" or "Player Benefit Costs" means the specific benefits paid to players set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ak)    "Capped Year" means any League Year for which a Salary Cap is in effect.

(al)    "Defined Gross Revenues" or "DGR" means all of the League and Team revenues that are included within the definition of Defined Gross Revenues, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(am)    "Guaranteed League-wide Salary" means the minimum amount that the Teams in the NFL must pay in Player Costs during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(an)    "Minimum Team Salary" means the minimum amount that each Team must pay in Salaries during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum

5

Team Salary), Section 5.

(ao)    "Paragraph 5 Salary" means the compensation set forth in paragraph 5 of the NFL Player Contract, or in any amendments thereto.

(ap)    "Player Costs" means the total Salaries and Benefits attributable to a League Year for all NFL Teams under all of the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), but not including loans, loan guarantees, unpaid grievances attributions, and unearned incentives.

(aq)    "Projected Benefits" means the amount of Benefits projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ar)    "Projected Defined Gross Revenues" means the amount of Defined Gross Revenues projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**6**    (as)    "Room" means the extent to which a Team's then-current Team Salary is less than either the Salary Cap or Entering Player Pool, as applicable.

(at)    "Salary Cap" means the absolute maximum amount of Salary that each Club may pay or be obligated to pay or provide to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), if applicable.

(au)    "Team Salary" means the Team's aggregate Salary for Salary Cap purposes, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(av)    "Uncapped Year" means any League Year for which a Salary Cap is not in effect.

# ARTICLE II
# GOVERNING AGREEMENT

**Section 1. Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the NFL Player Contract, the NFL Constitution and Bylaws, the Bert Bell/Pete Rozelle NFL Player Retirement Plan and Trust Agreement, the Pete Rozelle Plan or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. The provisions of the Stipulation and Settlement Agreement in White v. NFL, No. 4-92-906 (D. Minn.) ("Settlement Agreement"), shall supersede any conflicting provisions of this Agreement.

**Section 2. Implementation:** The NFLPA and the Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFLPA will use its best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

**Section 3. Management Rights:** The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement and the Settlement Agreement.

7

**Section 4. Rounding:** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, or Salary, such amounts shall be rounded to the nearest $1,000.

# ARTICLE III
# SCOPE OF AGREEMENT

**Section 1. Scope:** This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article V (Union Security), Section 6, on Union Security, and on Article LIV (Workers' Compensation), Section 7, on Workers' Compensation, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Management Council will give the NFLPA notice of and negotiate the proposed change in good faith.

**Section 2. Arbitration:** The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance), which shall be the exclusive method for resolving disputes arising out of this Section 2. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.

8

## ARTICLE IV
## NO STRIKE/LOCKOUT/SUIT

**Section 1. No Strike/Lockout:** Except as otherwise provided in Article V (Union Security), Section 6, or Article LIV (Workers' Compensation), Section 7, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim by the Management Council that the NFLPA has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the Management Council will have the right to submit such claim directly to the courts.

**Section 2. No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against, the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, the Settlement Agreement, or any term of this Agreement or the Settlement Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Entering Player Pool, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, the Final Eight Plan, Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the Management Council, has: (1) breached the terms of this Agreement, the NFL Player Contract, the revised NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article IX (Non-Injury Grievance) or asserting any claim before the Special Master or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the Settlement Agreement and from asserting such a claim before the Special Master, Impartial Arbitrator, or the Federal District Court, as provided for in the Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered (except any provisions relating to the 1982 CBA, which have been superseded by this Agreement); provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any

9

rights they may have under the federal labor laws or under this Agreement or the Settlement Agreement.

**Section 3. Releases**: The releases and covenants not to sue contained in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement are hereby incorporated by reference.

10

# ARTICLE V
# UNION SECURITY

**Section 1. Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

**Section 2. Check-off:** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix A and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

**Section 3. NFLPA Meetings:** The NFLPA will have the right to conduct three meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule.

**Section 4. NFLPA Player Group Licensing Program:** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA and the NFL. Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to

11

Article IX (Non-Injury Grievance). For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on: (a) products in any one product category, as defined by industry standards; or (b) products in different categories if a total of six or more players are used and (i) the products all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items.

**Section 5. Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article, except any dispute concerning Section 4 of this Article, will be processed pursuant to Article IX (Non-Injury Grievance). Any decision of an outside arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

**Section 6. Procedure for Enforcement:**

12    (a)    Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article V (Union Security), the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article V (Union Security). The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

(b)    It is further agreed that the term "member in good standing" as used in this Article V (Union Security) applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

(c)    It is further agreed that notwithstanding Article III (Scope of Agreement), Article IV (No Strike/Lockout/ Suit), and Article LVIII (Duration of Agreement), that if at any time in the term of the Agreement, any

court or agency shall wholly or partially invalidate the provisions of Article V (Union Security) relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

*Section 7.* **NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

*Section 8.* **Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine. The NFLPA and the NFL will also sponsor an orientation with an agreed-upon agenda for all rookies on a Club-by-Club basis during the first half of the NFL regular season, which meetings may take place on the players' day off if no other mutually acceptable day is agreed upon.

13

# ARTICLE VI
## NFLPA AGENT CERTIFICATION

**Section 1. Exclusive Representation:** The NFLMC and the Clubs recognize that the NFLPA regulates the conduct of agents who represent players in individual contract negotiations with Clubs. The NFLMC and the Clubs agree that the Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFLMC and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion to a neutral arbitrator pursuant to its agent regulation system. The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs.

**14**   **Section 2. Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

**Section 3. Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $10,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotiations, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted from) the most recently published list of agents certified by the NFLPA to represent players.

# ARTICLE VII
# PLAYER SECURITY

*Section 1.* **No Discrimination**: There will be no discrimination in any form against any player by the Management Council, any Club or by the NFLPA because of race, religion, national origin or activity or lack of activity on behalf of the NFLPA.

*Section 2.* **Personal Appearance**: Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

15

# ARTICLE VIII
# CLUB DISCIPLINE

*Section 1.* **Maximum Discipline:**

(a)     For the 1993 League Year, the following maximum discipline schedule will be applicable:

Overweight — maximum fine of $50 per lb./per day.

Unexcused late reporting for mandatory off-season training camp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity — maximum fine of $200.

Failure to promptly report injury to Club physician or trainer — maximum fine of $200.

Losing, damaging or altering Club-provided equipment — maximum fine of $200 and replacement cost, if any.

Throwing football into stands — maximum fine of $200.

16

Unexcused late reporting for or absence from pre-season training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency) — maximum fine of $4,000 per day for the 1993-95 League Years and $5,000 per day for the 1996-99 League Years.

Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency) — maximum fine of $4,000 per day for the 1993-95 League Years and $5,000 per day for the 1996-99 League Years, plus one week's regular season salary for each pre-season game missed.

Unexcused missed mandatory off-season training camp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity — maximum fine of $1,000.

Material failure to follow rehabilitation program prescribed by Club physician or trainer — maximum fine of $1,000.

Unexcused missed team transportation — maximum fine of $1,000 and transportation expense, if any.

Loss of all or part of playbook, scouting report or game plan — maximum fine of $1,000.

Ejection from game — maximum fine of $2,000.

Conduct detrimental to Club — maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks.

The Club will promptly notify the player of any discipline; notice of any Club fine in the $4,000/$5,000 maximum category and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

(b)     The amounts set forth in Section 1(a) above shall be in effect for the 1993, 1994 and 1995 League Years. Such fines shall be increased by 25% each for the 1996 League Year and each year thereafter during the term of this Agreement, except for those fines for which the specific increase is set forth in Section 1(a) above.

**Section 2. Published Lists:** All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule referred to in Section 1 above.

17

**Section 3. Uniformity:** Discipline will be imposed uniformly within a Club on all players for the same offense; however, the Club may specify the events which create an escalation of the discipline, provided the formula for escalation is uniform in its application. Any disciplinary action imposed upon a player by the Commissioner pursuant to Article XI (Commissioner Discipline) will preclude or supersede disciplinary action by the Club for the same act or conduct.

**Section 4. Disputes:** Any dispute involved in Club discipline may be made the subject of a non-injury grievance under Article IX (Non-Injury Grievance).

**Section 5. Deduction:** Any Club fine will be deducted at the rate of no more than $1,000 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. This will not apply to a suspension.

# ARTICLE IX
# NON-INJURY GRIEVANCE

***Section 1. Definition***: Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement, and except wherever the Settlement Agreement provides that the Special Master, Impartial Arbitrator, the Federal District Court or the Accountants shall resolve a dispute.

***Section 2. Initiation***: A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within forty-five (45) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within forty-five (45) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

18

***Section 3. Filing***: Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail or fax with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail or fax with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA. The party to whom a non-injury grievance has been presented will answer in writing by certified mail or fax within seven (7) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable.

***Section 4. Appeal***: If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or

the Management Council as may be appropriate. If the grievance involves a suspension of a player by a Club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within seven (7) days of the filing of the grievance. In addition, the NFLPA and the Management Council will each have the right of immediate appeal and hearing within seven days with respect to four (4) grievances of their respective choice each calendar year. The arbitrator(s) designated to hear such grievances will issue their decision(s) within five (5) days of the completion of the hearing. Pre-hearing briefs may be filed by either party and, if filed, will be exchanged prior to hearing.

**Section 5. Discovery:** No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the dispute. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing will be admissible provided that the proffering party and the custodian(s) of the documents made a good faith effort to obtain (or discover the existence of) said documents or that the document's relevance was not discovered until the hearing date. In the case of an expedited grievance pursuant to Section 4, such documentary evidence shall be exchanged on or before two (2) days prior to the hearing unless the arbitrator indicates otherwise.

**Section 6. Arbitration Panel:** There will be a panel of four (4) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties will designate the Notice Arbitrator within ten (10) days of the execution of this Agreement. In the event of a vacancy in the position of Notice Arbitrator, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If the parties are unable to agree on a new arbitrator within thirty (30) days of any vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. With-

19

in fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

**Section 7. Hearing:** Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 15 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

20

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests post-

hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted. Briefs must be submitted to the arbitrator postmarked no later than sixty (60) days after receipt of the last transcript.

*Section 8*. **Arbitrator's Decision and Award**: The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement; provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance, with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article XIII (Committees), Section 1(c). In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of the grievance. The interest shall be calculated at the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

21

*Section 9*. **Time Limits**: Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player, the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

*Section 10*. **Representation**: In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

*Section 11*. **Costs**: All costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the

parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

*Section 12*. **Payment**: If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each subsequent twelve (12) month period in lieu of continuation of any pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

*Section 13*. **Grievance Settlement Committee**: A grievance settlement committee consisting of the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL shall have the authority to resolve any grievance filed under this Article. This committee shall meet periodically to discuss and consider pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of the two members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement. Consideration of any grievance by this committee shall not in any way delay its processing through the non-injury grievance procedure described in this Article, and no grievance may be resolved pursuant to this Section once an arbitration hearing has been convened pursuant to Section 7 hereof.

22

# ARTICLE X
# INJURY GRIEVANCE

**Section 1. Definition:** An "injury grievance" is a claim or complaint that, at the time a player's NFL Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

**Section 2. Filing:** Any player and/or the NFLPA must present an injury grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

**Section 3. Answer:** The Club to which an injury grievance has been presented will answer in writing within seven (7) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

    (a)    That the player did not pass the physical examination administered by the Club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

    (b)    That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

    (c)    That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

    (d)    That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;

**23**

(e)     That subsequent to the physical examination the player suffered no new football-related injury;

(f)     That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical capacity below the level existing at the time of his physical examination as contemporaneously recorded by the Club physician.

**Section 4. Neutral Physician:** The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The player will notify the Club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may review any objective medical tests which all parties mutually agree to provide. The neutral physician is further authorized to perform any necessary diagnostic tests after consultation with the parties. The neutral physician is required to submit to the parties a detailed typewritten medical report of his examination. In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file injury grievances.

**Section 5. Neutral Physician List:** The NFLPA and the Management Council will maintain a jointly approved list of neutral physicians, including at least two orthopedic physicians in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) orthopedic physicians to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral physician for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the

24

nominees on its list, and the other party will be bound by such selection. The next vacancy occurring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

**Section 6. Appeal:** A grievance may be appealed to an arbitrator by filing of written notice of appeal with the chairman of the arbitration panel within thirty (30) days from the date of receipt of the neutral physician's written report.

**Section 7. Arbitration Panel:** There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties have designated Arthur Stark as the Chairman of the panel. In the event of a vacancy in the position of the Chairman of the panel, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Chairman of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty (30) days of the occurrence of the vacancy, the Chairman of the panel shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

**Section 8. Hearing:** Each arbitrator shall designate a minimum of twelve hearing dates per year, exclusive of the period July 15 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairman, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of

25

which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

Post-hearing briefs must be submitted to the arbitrator postmarked no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of injury. The interest shall be calculated at the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

**Section 9. Miscellaneous:** The arbitrator will consider the neutral physi-

cian's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The Club or the Management Council must advise the grievant and the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

**Section 10. Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in travelling to and from his residence to the Club city and one night's lodging.

**Section 11. Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell/Pete Rozelle NFL Player Retirement Plan as determined by the Retirement Board.

27

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Bill rate published in The Wall Street Journal as of March 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each such subsequent twelve (12) month period in lieu of continuation of pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Presumption of Fitness:** If the player passes the physical examination of the Club prior to the pre-season training camp for the year in

question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

**Section 14. Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL post-season playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though he had been on the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article XLII (Post-Season Pay).

**Section 15. Information Exchange:** The NFLPA and the Management Council must confer on a regular basis concerning the status of pending injury grievances and the attribution of any injury grievance exposure to Team Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). Any communications pursuant to this Section are inadmissible in any grievance hearing.

28   **Section 16. Discovery:** No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the injury grievance hearing. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

# ARTICLE XI
## COMMISSIONER DISCIPLINE

**Section 1. League Discipline:** Notwithstanding anything stated in Article IX (Non-Injury Grievance):

(a)    All disputes involving a fine or suspension imposed upon a player for conduct on the playing field other than as described in subsection (b) below, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within twenty (20) days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b)    Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within ten (10) days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c)    On receipt of a notice of appeal under subsection (a) or (b) above, the Commissioner will designate a time and place for a hearing to be commenced within ten (10) days thereafter, at which he or his designee (other than the person appointed in (b) above) will preside. The hearing may be by telephone conference call, if the player so requests. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to subsection (b) above may only be affirmed, reduced, or vacated by the Commissioner in such decision, and may not be increased.

**Section 2. Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the Club(s) involved.

**Section 3. Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of the NFLPA may also participate in such hearing and represent the player.

29

In any such hearing, a Club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such hearing and represent the Club. The NFLPA and Management Council have the right to attend all hearings provided for in this Article. At the hearing, the player, the NFLPA and the Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the hearing. All hearings shall be transcribed.

**Section 4. Costs:** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

**Section 5. One Penalty:** The Commissioner and a Club will not discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

**Section 6. Fine Money:** Any fine money collected pursuant to this Article will be contributed to the Brian Piccolo Cancer Fund, the Vincent T. Lombardi Cancer Research Center, ALS Neuromuscular Research Foundation, and the NFLPA Players Assistance Trust ("P.A.T."). Any such fine money shall be allocated equally among the four (4) organizations mentioned in the preceding sentence.

30

# ARTICLE XII
# INJURY PROTECTION

*Section 1.* **Qualification**: A player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

(a)      The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

(b)      The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

(c)      The player must have failed the pre-season physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This pre-season physical may be given by the Club physician prior to the beginning of pre-season camp, so long as such fact is clearly communicated to the player at the time of the physical exam. The past understanding of the parties concerning a Club releasing a player who otherwise qualifies under (a) and (b) above prior to the pre-season physical examination will apply during the term of this Agreement (see Appendix B).

**31**

*Section 2.* **Benefit**: Effective after the execution of this Agreement, a player qualifying under Section 1 above will receive an amount equal to 50% of his contract salary for the season following the season of injury, up to a maximum payment of $150,000 for players released pursuant to Section 1(c) above in League Year 1993, unless he has individually negotiated more injury protection or a larger guaranteed salary into that contract. This amount shall be increased to $175,000 in the 1994-96 League Years, and to $200,000 for the 1997-99 League Years. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated injury protection into that contract. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

**Section 3. Disputes**: Any dispute under this Article will be processed under Article IX (Non-Injury Grievance).

32

# ARTICLE XIII
# COMMITTEES

**Section 1. Joint Committee:**

(a)     A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee. The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

33

(b)     The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement. The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters.

(c)     Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators desig-

nated in Article IX (Non-Injury Grievance). A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

**Section 2. Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

**Section 3. Player/Club Operations Committee:**

(a)     A Player/Club Operations Committee (hereinafter the "Operations Committee") shall be established for the purpose of examining issues arising with respect to the implementation of this Agreement. The Operations Committee may discuss and examine, and jointly decide, any such issues; provided, however, that any consideration by the Operations Committee shall not delay any grievance or other procedure under this Agreement, unless the Committee jointly decides otherwise.

(b)     The Operations Committee will consist of up to six (6) members: the Executive Vice President for Labor Relations of the NFL and a maximum of two (2) Club representatives (plus advisors), and the Executive Director of the NFLPA and a maximum of two (2) NFLPA representatives (plus advisors). The respective additional members of the Operations Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original additional members on the Operations Committee will be selected within thirty (30) days following the execution of this Agreement. An equal number on each side shall sit on all matters, and the Committee shall jointly decide whether the Committee shall sit with two (2), four (4) or six (6) members on any given matter. The Operations Committee will hold meetings on dates and at sites mutually agreeable to the Committee members.

34

# ARTICLE XIV
# NFL PLAYER CONTRACT

**Section 1. Form**: The NFL Player Contract form attached hereto as Appendix C will be used for all player signings. This form cannot be amended without the approval of the Management Council and the NFLPA.

**Section 2. Term**: The NFL Player Contract shall be modified to expire on the last day of the last League Year subject to such Contract.

**Section 3. Changes**:

(a)      Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract or contracts consistent with the provisions of this Agreement and the Settlement Agreement.

(b)      The NFL Player Contract shall be modified to provide that, other than any rights the player may have as a member of the class in <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) to object to the Settlement Agreement during its review by the District Court, the player waives and releases any claims: (i) arising out of, related to, or asserted in that action; and (ii) for conduct engaged in pursuant to the Settlement Agreement during the express term of the Settlement Agreement.

35

(c)      Any waiver and release included in the NFL Player Contract pursuant to this Article does not supersede and is subject to the provisions set forth in Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, and Article LVIII (Duration of Agreement) of this Agreement. Specifically, in the event that the Settlement Agreement is terminated, not approved or invalidated on appeal, pursuant to Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, any such waiver and release shall remain or not remain in effect to the extent that the releases and covenants not to sue set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement remain or do not remain in effect. Except in the circumstances described in the preceding sentence, this subsection shall not affect the validity or enforceability of any release and waiver contained in a Player Contract executed on or after March 1, 1993.

**Section 4. Conformity**: All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement and the Settlement Agreement.

**Section 5. General**:

(a)      Any agreement between any player and any Club concerning

terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. The League shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. The League shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), within two business days following the NFL's receipt of such information.

(b)      Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for non-football-related services shall be set forth in writing and disclosed and provided to the League within five business days of the execution or making of the agreement. The NFL shall provide such information to the NFLPA within two business days of the receipt of such information.

(c)      No Club shall pay or be obligated to pay any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract or a contract for non-football related services as described in Section 5(b) above. Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)      During the period any Salary Cap is in effect, in addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This subsection shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

**Section 6. Commissioner Disapproval:** If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefor by noon on the date following such disapproval.

**Section 7. NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in paragraph 4a of Appendix C, regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision.

36

***Section 8.* Good Faith Negotiation:** In addition to complying with specific provisions in this Agreement, any Club or player engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

37

# ARTICLE XV
## OPTION CLAUSE

*Section 1*. **Prohibition:** Commencing with the execution of this Agreement, the option clause contained in the NFL Player Contract shall be discontinued. Any option clause must be negotiated as a separate addendum to the revised NFL Player Contract form. Any negotiated option clause must state the dollar amount(s) to be paid to the player during the option year.

*Section 2*. **Existing Option Clauses:** If any option clause contained in an NFL Player Contract in existence at the time of the execution of this Agreement is exercised by the Club, it shall be at the rate of salary specified. The player will also receive 100% of performance bonus provisions where the bonus is earned in the option year.

38

# ARTICLE XVI
# COLLEGE DRAFT

***Section 1. Time of Draft:*** Commencing with the 1993 Annual Selection Meeting (the "College Draft" or "Draft"), and with respect to the Draft to be held each League Year thereafter during the term of this Agreement, as well as the Draft to be held in the League Year commencing on or about February 20, 2000, and the subsequent implementation of each such Draft during the applicable League Year, the following rules shall apply:

***Section 2. Number of Choices:*** With the exception of the 1993 Draft, the Draft shall consist of seven rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. For the 1993 League Year only, the Draft shall consist of eight rounds without any additional Compensatory Draft Selections, except any additional selections as provided in Article XX (Franchise and Transition Players), Section 13. To the extent that the Compensatory Draft Selections referred to in Article XX (Franchise and Transition Players), Section 13 are not all awarded for use in the 1993 League Year Draft, such remaining selections are reserved for the Drafts in subsequent League Years under this Agreement in addition to the maximum number of selections set forth in the first sentence of this Section 2. Each Draft to be held after the 1993 League Year shall be held on or about February 15 or May 1, on a date which shall be determined by the Commissioner.

**39**

***Section 3. Required Tender:*** A Club that drafts a player shall be deemed to have automatically tendered the player a one year NFL Player Contract for the Minimum Active/Inactive List Salary then applicable to the player pursuant to the terms of this Agreement. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

***Section 4. Signing of Drafted Rookies:***

(a)      A drafted player may accept the Required Tender at any time up to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00 p.m. New York time. In the event the exclusive negotiating rights to the drafted player are assigned to another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If released through waivers, the player shall be treated as an Undrafted Rookie Free Agent, with the right to sign an NFL Player Contract with any Club. If the Club that drafted the player signs the player after he is waived and becomes

a Rookie Free Agent, the player's entire salary shall be counted against the Entering Player Pool, in the manner described in Article XVII (Entering Player Pool).

(b)      If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the beginning of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s)).

(c)      If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

**Section 5. Other Professional Teams:**
(a)      Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for or is employed by a professional football team not in the NFL during all or any part of the 12-month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three League Years after the initial Draft, and shall thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club, and of the date on which the player will be free of his other contractual obligations of employment, if any. Within thirty days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a one year written Player Contract to the player in order to retain its rights to that player, as detailed below.

40

(b)     For a player to whom the drafting Club retains the exclusive NFL rights to negotiate pursuant to Section 4(a) above, the Club must tender a one year Player Contract with salary of at least the Minimum Active/Inactive List Salary for players with less than one credited season, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall be subject to the Entering Player Pool, as set forth in Article XVII (Entering Player Pool). If the player is released through waivers, the player immediately becomes a Free Agent, with the right to sign an NFL Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     For players with respect to whom the drafting Club retains a Right of First Refusal pursuant to this Section 5, during each League Year the player shall be treated as if he were a Restricted Free Agent not subject to Draft Choice Compensation, as described in Article XIX (Veteran Free Agency), Section 2, except as otherwise set forth in this Section 5. For such players subject to a Right of First Refusal, the Club must tender a one year Player Contract with at least the Minimum Active/Inactive List Salary for players with two or more Credited Seasons, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall not be subject to the Entering Player Pool. If the Club does not make or withdraws the Required Tender, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)     This Section 5 shall apply to any player drafted in the 1990 League Year or thereafter, except that tenders to and Player Contracts entered into with players drafted in the 1990, 1991 and 1992 League Years shall not be subject to the Entering Player Pool. Any player drafted prior to the 1990 League Year shall be governed by rules identical to the provisions set forth in Article XIII of the 1982 Collective Bargaining Agreement.

**Section 6. Return to College:** If any college football player who becomes eligible for the Draft prior to exhausting his college football eligibility through participation is drafted by an NFL Club, and returns to college, the drafting Club's exclusive right to negotiate and sign a Player Contract with such player shall continue through the date of the Draft that follows the last season in which the player was eligible to participate in college football, and

41

thereafter the player shall be treated and the Club shall have such exclusive rights as if he were drafted in such Draft by such Club (or assignee Club).

**Section 7. Assignment of Draft Rights:** In the event that the exclusive right to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned from one Club to another Club, the Club to which such right has been assigned shall have the same, but no greater, right to such player, including the Right of First Refusal described in Section 5, as would the Club assigning such right, and such player shall have the same, but no greater, obligation to the NFL Club to which such right has been assigned as he had to the Club assigning such right.

**Section 8. Subsequent Draft:** A Club that, in a subsequent Draft, drafts a player who (a) was selected in an initial Draft, and (b) did not sign a contract with the NFL Club that drafted him or with any assignee Club during the signing period set forth in Sections 4 through 6 above, shall, during the period from the date of the subsequent Draft to the date of the Draft held the subsequent League Year, be the only NFL Club that may negotiate with or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 9. No Subsequent Draft:** If a player is drafted by a Club in an initial Draft and (a) does not sign a contract with a Club during the signing period set forth in Sections 4 through 6 above, and (b) is not drafted by any Club in the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 10. Compensatory Draft Selections:** The rules and procedures regarding Compensatory Draft Selections set forth in Section 2 above shall be as agreed upon by the NFL and the NFLPA.

42

**Section 11. Undrafted Rookies:** Any person who has not been selected by a Club in a College Draft shall be free, after the completion of a College Draft for which he is eligible, to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such person after such date, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind.

**Section 12. Notice of Signing:** Promptly following but no later than two business days after receipt of notice of the signing of any Drafted or Undrafted Rookie, the NFL shall notify the NFLPA of such signing.

43

# ARTICLE XVII
# ENTERING PLAYER POOL

**Section 1. Definition:** For purposes of this Article XVII of this Agreement, the following terms shall have the meanings set forth below:

(a)      "Entering Player Pool" means the League-wide limit on the total amount of Salary to which all of the NFL Clubs may contract for in signing Drafted Rookies (and certain amounts contracted to be paid to Undrafted Rookies as described below) during each League Year of this Agreement, as set forth below.

(b)      Salary shall be defined and calculated in the same manner as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). In the event a Rookie who is subject to the Entering Player Pool signs a Player Contract after the commencement of the regular season, the Club must have Room under its Rookie Allocation for the entire Paragraph 5 amount of the contract.

**Section 2. Covered League Years:** The Entering Player Pool will be in effect in the 1993 League Year and in all subsequent League Years, except as set forth below. Beginning with the 1994 League Year, the NFL may remove the Entering Player Pool at its option in any Uncapped Year, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year. Further, in any Capped Year, the NFL may remove the Pool, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year, but to the extent that any Club spends more than its Rookie Allocation in that League Year, the Club will pay an equivalent number of dollars to its Veteran players pursuant to reasonable allocation instructions by the NFLPA.

**Section 3. Calculation:**

(a)      For the 1993 League Year, the Entering Player Pool shall be $56 million, i.e., an average of $2 million per Club. For each applicable succeeding League Year of this Agreement, the Entering Player Pool shall consist on a League-wide basis of the greater of: (i) $2 million multiplied by the number of Clubs in the NFL at the time of the Draft; (ii) 3.5% of Projected DGR; or (iii) the aggregate amount, in actual dollars, of the Entering Player Pool in the previous League Year; provided, however, that to the extent there are greater than 28 compensatory picks as a result of Article XX (Franchise and Transition Players), Section 13, the Entering Player Pool shall be increased in accordance with subsection (c) below, and to the extent there are fewer than 28 compensatory picks in any League Year, the amount of the Entering Player Pool shall be reduced in a manner agreed upon by the NFL and the NFLPA.

(b)     For each League Year of this Agreement, each Club shall have a Rookie Allocation, which shall be its proportional share of the Entering Player Pool, calculated based on the number, round, and position of the Club's selection choices in the Draft. The Rookie Allocation formula shall be agreed upon by the NFL and the NFLPA and shall remain in effect for the duration of the Agreement, unless the NFL and the NFLPA otherwise agree.

(c)     If, pursuant to Article XX (Franchise and Transition Players), Section 13, a Club has one or more Compensatory Draft Selections resulting from the loss of any players specified in such section, an amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding subsection (b) above), based upon the amount allotted to selection choices of that round and position in calculating the Rookie Allocation (the "Formula Allotment"). In the event that a Club signs a Player Contract with a Drafted Rookie who was drafted in a prior League Year, an additional amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding subsection (b) above), equal to the lower of the Club's original Formula Allotment for such draft choice or the amount of unused Room under the Club's Rookie Allocation during the League Year in which the player was originally drafted.

(d)     Notwithstanding the above, nothing shall prevent the Club from signing a player for an amount in excess of the player's Formula Allotment, if the Club has Room available under its Rookie Allocation.

(e)     In the event that the NFL holds a supplemental draft in addition to its annual Draft in advance of the next League Year's Draft, adjustments shall be made to the Entering Player Pool and Rookie Allocation in a manner to be agreed upon by the NFL and the NFLPA.

**Section 4. Operation:**

(a)     No Club may enter into Player Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Salaries in the first League Year of such Player Contracts that would exceed the Club's Rookie Allocation for that year.

(b)     For the purposes of this Article XVII, the Salary of any Undrafted Rookie shall count toward the Club's Rookie Allocation only to the extent that it exceeds the then-applicable Minimum Active/Inactive List Salary for that player.

(c)     In the event that a Draft selection is assigned to another Club prior to completion of the Draft, the amount of the Formula Allotment for such selection shall be assigned to the Club receiving the selection under

45

the assignment. A Club may not assign the exclusive negotiating rights to a Drafted Player to another Club if such New Club does not have Room under its Rookie Allocation equal to at least the original Formula Allotment for the player, unless the player consents to such assignment.

(d)      (i)      If a Drafted Player is placed on waivers, the player's Formula Allotment remains with the Club that requested waivers on him, and the assignee Club must have Room or make Room under its Rookie Allocation to make the Required Tender to the player.

(ii)      If a Club requests waivers on a Drafted Rookie and that player is released via waivers, the requesting Club can sign that player to a Player Contract during that League Year only if the Club has Room under its Rookie Allocation equal to the full Salary contracted for in that League Year.

(e)      No Player Contract signed by a Rookie may provide for an annual increase in Salary of more than 25% of the contract's first League Year Salary. For the purposes of the calculation in this section only, any amount of a signing bonus attributed to the player's Salary shall not be counted.

**46**   (f)      The Player Contract of a Drafted Rookie or Undrafted Rookie may not be renegotiated for a one (1) year period following the date of the initial signing of such Player Contract, or until August 1 of the following League Year, whichever is later.

(g)      Nothing in this Agreement is intended to or shall be construed to mean that any Rookie's Salary is predetermined by any Allocation or Formula Allotment.

(h)      The list of each Formula Allotment attributed to each draft selection shall be agreed to by the NFL and the NFLPA, and shall not be disclosed to Clubs, Players, Player Agents or the public.

# ARTICLE XVIII
## VETERANS WITH LESS THAN THREE ACCRUED SEASONS

**Section 1. Accrued Seasons Calculation:**

(a)    For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for each season during which he was on, or should have been on, full pay status for a total of six or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a non-football injury, or (iii) a Club's Practice or Development Squad.

(b)    For the purposes of calculating Accrued Seasons under this Agreement, for any League Year during the term of this Agreement beginning with the 1993 League Year, a player shall not receive an Accrued Season for any League Year in which the player is under contract to a Club and in which he failed to report to such Club at least thirty days prior to the first regular season game of that season, or in which the player thereafter failed to perform his contract services for the Club for a material period of time, unless he demonstrates to the Impartial Arbitrator extreme personal hardship causing such failure to report or perform, such as severe illness or death in the family. The determination of the Impartial Arbitrator shall be made within thirty days of the application by the player, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

47

**Section 2. Negotiating Rights of Players With Less Than Three Accrued Seasons**: Any Veteran with less than three Accrued Seasons whose contract has expired may negotiate or sign a Player Contract only with his Prior Club, if on or before March 1 his Prior Club tenders the player a one year Player Contract with a Paragraph 5 Salary of at least the Minimum Active/Inactive List Salary applicable to that player. If the Prior Club has not by that date made the Required Tender or later withdraws such tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 3. Minimum Salaries**: For the 1993 League Year, the Minimum Active/Inactive List Salary shall be at least $100,000 for players with less than one Credited Season; $125,000 for players with one Credited Season; and $150,000 for players with two or more Credited Seasons. For the 1993

League Year, the Minimum Salary (excluding practice squad players) shall be at least $60,000 for players with less than one Credited Season, $70,000 for players with one Credited Season, and $80,000 for players with two or more Credited Seasons. Thereafter, such Minimum Salaries and Minimum Active/Inactive List Salaries shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per season, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries and Minimum Active/Inactive List Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year. For the purposes of this section only, the definition of "Credited Season" shall be the same as set forth in Section 1(a) above for Accrued Seasons, except that games on the Injured Reserve list shall not be included, and the number of regular season games required shall be three instead of six.

**Section 4**. **Notice of Signing:** Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

48

# ARTICLE XIX
# VETERAN FREE AGENCY

***Section 1.*** **Unrestricted Free Agents:**

(a)      Subject to the provisions of Article XX (Franchise and Transition Players), any player with five or more Accrued Seasons, or with four or more Accrued Seasons in any Capped Year, shall, at the expiration of his Player Contract, become an Unrestricted Free Agent. Such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, subject to the signing period set forth below.

(b)      **Signing Period.**

(i)      In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by July 15 or the first scheduled day of the first NFL training camp, whichever is later, in the League Year following the expiration of his last Player Contract, he may negotiate or sign a Player Contract from July 15 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, only with his Prior Club, provided that the Prior Club by June 1 has tendered to the player a one year Player Contract of at least 110% of either (a) his Prior Year Salary (if his expiring Player Contract is not a Player Contract he entered into as a Rookie), or (b) his Paragraph 5 Salary (if his expiring Player Contract is a Player Contract he entered into as a Rookie, without renegotiation), in each case with all other terms of his contract identical to his prior year's contract. For the purposes of this subsection, "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, prorata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the last year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Beginning with the 1994 League Year, Prior Year Salary shall also include any un-repaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ii)      If an Unrestricted Free Agent described in subsection (b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all

49

parties.

(iii)     If an Unrestricted Free Agent does not play in the NFL for the re-
mainder of a League Year pursuant to subsection (b)(ii) above, commenc-
ing the first day of the following League Year, the player shall be free to ne-
gotiate and sign a Player Contract with any Club, and any Club shall be
completely free to negotiate and sign a Player Contract with such player,
without penalty or restriction, including, but not limited to, Draft Choice
Compensation between Clubs or First Refusal Rights of any kind, or any
signing period.

(c)     In the event that an Unrestricted Free Agent has not signed a
Player Contract with a Club by June 1 of the League Year following the ex-
piration of his last Player Contract, and if his Prior Club has not by that date
tendered to the player a one year Player Contract in accordance with the re-
quirements of subsection (b)(i) above, or has withdrawn the tender, the
player shall continue to be an Unrestricted Free Agent and shall be com-
pletely free to negotiate and sign a Player Contract with any Club, and any
Club shall be completely free to negotiate and sign a Player Contract with
such player, without any penalty or restriction, including, but not limited
to, Draft Choice Compensation between Clubs or First Refusal Rights of
any kind, or any signing period.

50

(d)     An Unrestricted Free Agent shall not be subject to any limita-
tions on the period of time before which he may qualify as an Unrestricted
Free Agent again, or to any limitations on the number of times he may be
an Unrestricted Free Agent.

(e)     Promptly upon but no later than two business days after the
signing of any Unrestricted Free Agent to a Player Contract, the signing
Club shall notify the NFL, which shall notify the NFLPA of such signing.

**Section 2. Restricted Free Agents:**
(a)     Any Veteran player with three or more Accrued Seasons, but less
than five Accrued Seasons (or less than four Accrued Seasons in any
Capped Year), shall, at the expiration of his last Player Contract during such
period, become a Restricted Free Agent. Any such player shall be com-
pletely free to negotiate and sign a Player Contract with any Club, and any
Club shall be completely free to negotiate and sign a Player Contract with
any such player, subject to the restrictions set forth in this Article.

(b)     In order to receive the following specified Rights of First Refusal
and/or Draft Choice Compensation with respect to a Restricted Free Agent,
the Prior Club of a Restricted Free Agent must tender the player a Qualify-
ing Offer on or before the first date of the Restricted Free Agent Signing Pe-
riod, as follows:

(i)     For Restricted Free Agents with three Accrued Seasons:

(1)     <u>Right of First Refusal</u>: one year Player Contract with Paragraph 5 Salary of at least $275,000;

(2)     <u>Right of First Refusal and Draft Selection at Player's Original Draft Round</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $275,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

(3)     <u>Right of First Refusal and One First Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $600,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(4)     <u>Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $800,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(ii)     For Restricted Free Agents with four Accrued Seasons (in Uncapped Years):

(1)     <u>Right of First Refusal</u>: one year Player Contract with Paragraph 5 Salary of at least $325,000;

(2)     <u>Right of First Refusal and Draft Selection at Player's Original Draft Round</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $325,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

(3)     <u>Right of First Refusal and One First Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $700,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

(4)     <u>Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection</u>: one year Player Contract with Paragraph 5 Salary of at least (a) $900,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

(c)     Notwithstanding subsections 2(b)(i) and 2(b)(ii) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the first round a Qualifying Offer that

requires Draft Choice Compensation of one first round selection (the "Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one second round selection for any of its Restricted Free Agents originally selected in the first round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the Upgraded Tender.

(d)     Notwithstanding subsections 2(b)(i) and 2(b)(ii) above, in the event that the player was originally selected in a draft round after the seventh round (or, for the 1993 League Year only, after the eighth round), a Qualifying Offer in the amount required to obtain a Right of First Refusal and Draft Choice Compensation at the Player's Original Draft Round shall entitle a Club only to a Right of First Refusal for such player.

(e)     The amounts of the Qualifying Offers specified in this section ($275,000, $325,000, $600,000, $700,000, $800,000 and $900,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall Qualifying Offer amounts increase if the projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

(f)     A Restricted Free Agent shall have the option of accepting a one year NFL Player Contract for 110% of his Prior Year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) in lieu of a Player Contract for the applicable alternative amount specified in this section, if he so wishes, regardless of which Player Contract is for a greater amount.

(g)     In the event a Prior Club withdraws its Qualifying Offer, the Restricted Free Agent shall immediately become an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without being subject to First Refusal, Draft Choice Compensation, Signing Period, or any other limitation of any kind.

(h)     **Signing Period**. Notwithstanding anything else in this Agreement, in the 1993 League Year, Restricted Free Agents shall be free to negotiate and sign a Player Contract with any Club during the period commencing on March 1, 1993, and ending at 11:59 p.m. New York time on April 23, 1993 (the "Signing Period"). In future League Years, the dates of

52