# Exhibit 8-C

*Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.*

**Section 3. Eligibility and Allocation:**

(a)      **Points:** *Players who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive points for each such Credited Season depending on their total Credited Seasons as follows:*

| Total Credited Seasons | Points for 1998 and 1999 Years | Points for 2000 and later Years |
|---|---|---|
| 4, 5, and 6 | 1 | 1 |
| 7 through 10 | 2 | 1 |
| 11 or more | 3 | 1 |

(b)      **Individual Allocations:** *The amount allocated to an individual player who receives one or more points in an Annuity Year will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. Each player's actual allocation will be determined by (1) taking the total estimated available contributions as described above, (2) dividing by the estimate of the total points expected to be earned by all players, and (3) multiplying the result by the number of points actually earned by that player according to the above schedule. In the Annuity Year beginning on April 1, 2000 only, the above formula will be adjusted so that players with 7 to 10 Credited Seasons will receive $12,000 more than players with 4 to 6 Credited Seasons, and players with 11 or more Credited Seasons will receive $24,000 more than players with 4 to 6 Credited Seasons.*

(c)      **Timing:** *Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.*

**Section 4. Distributions:** *A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at*

Article XLVIII-A, Player Annuity Program

any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.

**Section 5. Structure:** The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. To expedite the creation of the Program and to reduce costs, the parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.

**Section 6. Insurance Company:** The parties intend to establish as soon as possible an insurance company to hold and invest the assets of the Player Annuity Program. It is intended that such insurance company would be owned by the Player Annuity Program, and would issue either a group annuity contract to the Player Annuity Program or individual annuity contracts to player participants. The parties will review as soon as possible the steps involved and the feasibility of establishing such an insurance company, and retain the right to jointly decide to contract with outside entities for the provision of services in this area. To the extent that the approval or acquiescence of the Department of Labor or any other federal or state agency is deemed necessary or desirable with respect to any feature of the Player Annuity Program, counsel for the Program will seek such approval or acquiescence with the involvement and cooperation of the parties and their designated representatives.

*Extension Agreement 2/25/98

# ARTICLE XLIX
# GROUP INSURANCE

**Section 1. Group Insurance Benefits:** Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)    Life Insurance: For the 1993-99 League Years, a rookie player will be entitled to $100,000 in coverage, and a veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage. For the 2000-02 League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.

(b)    Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual *per plan year and* $400 per family per plan year, with a maximum out-of-pocket expense of $800 per *plan* year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $2 million.

(c)    Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

1)    Preventive care paid at 100% of UCR,
2)    General services paid at 85% of UCR, and
3)    Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual *per plan year.*

*\*Extension Agreement 2/25/98*

(d)    **Insurance Benefits for Vested Players:** Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

Article XLIX, Group Insurance

*Section 2.* **Extended Post-Career Medical And Dental Insurance:** The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)        Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during the period from January 1, 1996 through May 1, 1996 will continue to receive the benefits described in Subsections 1(b) and 1(c) above until the first regular season game of the 1997 season.

(b)        Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1996 season, *and before the first regular season game of the 1998 season, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for twenty-four (24) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

*(c)        Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1998 season or at any time thereafter prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for thirty-six (36) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.*

*(d)        All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described in Subsections 2(a), 2(b), and 2(c) above are provided, as if such additional benefits had not been provided.*

*\*Extension Agreement 2/25/98*

*Section 3.* **Limitations And Rules For Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)        The benefits described in Subsections 2(a), 2(b), and 2(c) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)        The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

(c)        The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

**202**

(d)      The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to: (i) in the 1998 League Year, the costs for such benefits up to $250,000 multiplied by the number of Clubs in the League that League Year; and (ii) in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

***Section 4.* Financing For Extended Insurance:**

(a)      The cost for the benefits described in Subsection 2(a) above will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(b)      The cost for the benefits described in Subsection 2(b) above for those players who are released or otherwise sever employment after the first game of the 1996 regular season through the 1997 League Year will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(c)      The NFL will reimburse the NFLPA for costs paid pursuant to Subsections 4(a) and 4(b) above, when and to the extent that such costs are charged against the Salary Cap in accordance with Subsections 4(d) and 4(e) below, and as follows:

(i)      in the 1998 League Year, only to the extent that, in the aggregate, the Clubs' costs for that League Year for Section 2 benefits is less than $250,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount; and

(ii)      in the 1999 and subsequent League Years, only to the extent that, in the aggregate, the Clubs' costs for that League Year for Section 2 benefits is less than $500,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount.

Reimbursement by the NFL will end when the costs paid by the NFLPA pursuant to Subsections 4(a) and 4(b) above have been fully reimbursed or such earlier date when this Agreement shall expire. Notwithstanding the foregoing, if the NFL cancels any extensions of this Agreement pursuant to Article LXI (Extension of Agreement), any costs paid by the NFLPA pursuant to Subsections 4(a) or 4(b) above, and which have not been charged against the Salary Cap, shall be reimbursed by the NFL in the first month of the Final League Year of this Agreement.

(d)      The costs for the benefits described in Section 2 above during the 1998 and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(e)      The amounts reimbursed to the NFLPA in the 1998 and subsequent League Years for the costs described in Subsections 4(a) and 4(b) above will be charged against the Salary Cap in the League Year in which the reimbursements are to be made, prior to the issuance of the Ini-

203

tial Special Purpose Letter, based upon a projection pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 10(c), of the amount of such reimbursements to be made for that League Year, subject to the following rules:

(i)        In the 1998 League Year, the amount shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,000,000 more than the amount of the 1997 Salary Cap. Any amount that is not charged in the 1998 League Year, pursuant to the preceding sentence, may be carried over to be charged in the 1999 and future League Years, pursuant to and subject to subsections (ii) and (iii) below.

(ii)        In the 1999 and future League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,500,000 more than the amount of the Salary Cap in the prior League Year. Any remaining amount that is not charged in such a League Year may be carried over to be charged in subsequent League Year(s), subject to subsection (iii) below.

(iii)        Beginning in the first League Year in which at any time the Salary Cap Bank has a balance of zero, and in all subsequent League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(iv)        To the extent that the projection of the amount of reimbursements for a League Year made pursuant to this Subsection 4(e) are later determined to be incorrect, a reconciliation shall be made the following League Year.

**Section 5. Administration**: The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

# ARTICLE L
## SEVERANCE PAY

*Section 1*. **Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through 2004, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

*Section 2*. **Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; and (c) $12,500 per Credited Season for each of the seasons 2000 through 2002.

*Section 3*. **Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

*Section 4*. **Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 Through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

Article L, Severance Pay

***Section 5. Failure to Apply***: A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

***Section 6. Only One Payment***: Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

***Section 7. Payable to Survivor***: In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

***Section 8. Prior Severance Pay***: Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

***Section 9. Nonassignability***: The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

# ARTICLE LI
# SUPPLEMENTAL DISABILITY BENEFITS

*Section 1*. **Maintenance**: The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2*. **Contributions**: For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*Section 3*. **Extension**: For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend Section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

# ARTICLE LII
# BENEFIT ARBITRATOR

**Section 1. Selection:** The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

**Section 2. Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

**Section 3. Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

# ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
# WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study:** The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5. Moratorium:** The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes: *(a)* beginning as of the execution of this Agreement and ending December 31, 1994; and *(b) beginning as agreed to by the parties in the transition rules for the 1998 League Year and ending June 1, 1999.* During such *periods*, the NFLMC,

Article LIV, Workers' Compensation

the NFL, any Club, the NFLPA, and/or their respective agents are prohibited from making or supporting any attempt, directly or indirectly, to change state laws affecting players' workers' compensation coverage.

*Extension Agreement 2/25/98*

**Section 6. Preservation of Rights**: The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

**Section 7. Reopener**: If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

# ARTICLE LV
# MISCELLANEOUS

*Section 1*. **Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product.

*Section 2*. **On-Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

*Section 3*. **Appearances:** No Club may unreasonably require a player to appear on radio or television.

*Section 4*. **Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

*Section 5*. **Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

*Section 6*. **Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

*Section 7*. **Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

*Section 8*. **NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game.

Article LV, Miscellaneous

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

Article LV, Miscellaneous

*Section 16*. **Headings**: The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

*Section 17*. **Time Periods**: The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

*Section 18*. **Exhibits**: All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

*Section 19*. **Parol Evidence**: The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

215

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap**: No Salary Cap shall be in effect during the Final League Year.

**Section 2. Free Agency If Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the Final League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

**Section 3. Free Agency If No Salary Cap In League Year Prior To Final League Year**: In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five Accrued Seasons.

**Section 4. Franchise and Transition Players**: As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

216

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
# LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

*Section 2.* **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

*Section 3.* **CBA Expiration:**
  (a)     Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.
  (b)     The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is

**217**

Article LVII, Mutual Reservation of Rights: Labor Exemption

or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1. Effective Date**: Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993. *With respect to the 1998 amendments to this Agreement, those amendments shall be effective upon the execution of those amendments, except that: (i) the 1998 amendments with respect to the Entering Player Pool and the amount of the Salary Cap shall be effective as of the first day of the 1998 League Year; and (ii) the parties may agree upon transition rules implementing the terms of the 1998 amendments, which transition rules shall be effective as of such dates as are agreed to by the parties.*

*\*Extension Agreement 2/25/98*

**Section 2. Termination**: Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, *2005 (or March 1, 2004, in the event the extension of this Agreement is cancelled as set forth in Article LXI (Extension of Agreement)),* or thereafter, by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

*\*Extension Agreement 2/25/98*

**Section 3. Expiration Date**: Except as provided in Section 4 below, and in Article LXI (Extension of Agreement) below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the *2004* League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.

*\*Extension Agreement 2/25/98*

**Section 4. Termination Prior to Expiration Date:**
    (a)    **Due to Invalidation of Settlement Agreement.** In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:
    (i)    This Agreement shall terminate immediately;
    (ii)    The <u>White</u> action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;
    (iii)    All pending motions in <u>White</u> and <u>McNeil</u> shall be decided by the Court; and

**219**

(iv)     With respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)     Any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract;

(2)     Within twenty days of the date of such disapproval, any such player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in <u>White</u> and <u>McNeil</u>;

(3)     In the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4)     In the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b)     **Approval of Settlement Agreement Invalidated.** In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

(i)     This Agreement shall terminate immediately;

(ii)     The <u>White</u> action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     All Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv)     A player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

220

(c)    **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement except as referred to in subsections (a) and (b) above, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (1999 League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)    **Termination Due To Collusion.** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)    **Termination After Closing Date.** If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)    **No Waiver.** Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

Article LVIII, Duration of Agreement

*Section 5*. **Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

# ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

# ARTICLE LX
# NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

    (a)  <u>To the National Football League Management Council</u>:
          The National Football League
          Management Council
          280 Park Avenue
          New York, New York  10017
          Attention: Executive Vice President—Labor Relations

    (b)  <u>To an NFL Club</u>:
          At the principal address of such Club as then listed on the records of the NFL or at that Club's principal office.
          Attention: President

    (c)  <u>To the NFLPA</u>:
          National Football League Players Association
          2021 L Street, N.W.
          Washington, D.C. 20036
          Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

# ARTICLE LXI
## EXTENSION OF AGREEMENT

*If* the NFL or the NFLPA has by December 1, *2000* provided written notice to the other party cancelling *the* further extension of this Agreement, then this Agreement shall *continue in full force and effect until the last day of the 2003* League Year, *except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.* The December 1, *2000* deadline *may* be extended by *mutual agreement of the parties.*

*\*Extension Agreement 2/25/98*

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

BY: _____

BY: _____

225

# APPENDIX A

## CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football

**226**

League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.


Date:


Signature


Player's Name—Type or Print

Appendix B

# APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

# APPENDIX C

# NFL PLAYER CONTRACT

THIS CONTRACT is between_____
_____, hereinafter "Player," and_____
_____,
a _____
corporation (limited partnership) (partnership), hereinafter "Club," oper-
ating under the name of the_____
_____ as a member of the National Football
League, hereinafter "League." In consideration of the promises made by
each to the other, Player and Club agree as follows:

1.  TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

2.  EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate ful-
ly in Club's official mandatory mini-camp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and post-season football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

3.  OTHER ACTIVITIES. Without prior written consent of the Club,
Player will not play football or engage in activities related to football other-
wise than for Club or engage in any activity other than football which may
involve a significant risk of personal injury. Player represents that he has
special, exceptional and unique knowledge, skill, ability, and experience as
a football player, the loss of which cannot be estimated with any certainty
and cannot be fairly or adequately compensated by damages. Player there-
fore agrees that Club will have the right, in addition to any other right which
Club may possess, to enjoin Player by appropriate proceedings from play-
ing football or engaging in football-related activities other than for Club or
from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

229

Appendix C

4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)    Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)    Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on products that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Nei-

230

ther Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5.      COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____for the 19_____season;
$_____for the 19_____season;
$_____for the 19_____season;
$_____for the 19_____season;
$_____for the 19_____season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.      PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or bi-weekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly por-

Appendix C

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi- weekly portions of his yearly salary having become due and payable up to the time of termination.

7.    DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.    PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.    INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.    WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

232

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.   SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.   TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.   INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14.   RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

233

Appendix C

are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.    INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.    EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.    ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract

**234**

with Player.

18.     FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.     DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.     NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.     OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22.     LAW. This contract is made under and shall be governed by the laws of the State of _____.

235

Appendix C

23.   WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled <u>White</u> v. <u>National Football League</u>, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in <u>Brown</u> v. <u>Pro Football, Inc</u>. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in <u>White</u> ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the <u>White</u> class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.   OTHER PROVISIONS.
(a)   Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)   Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)   The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

236

5.    SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| _____ | _____ |
| PLAYER | CLUB |
| _____ | _____ |
| Home Address | By |
| _____ | _____ |
| Telephone Number | Club Address |
| _____ | _____ |
| Date | Date |
| _____ | |
| PLAYER'S CERTIFIED AGENT | |
| _____ | |
| Address | |
| _____ | |
| Telephone Number | |
| _____ | |
| Date | |

Copy Distribution:    White-League Office    Yellow-Player
                      Green-Member Club     Blue-Management Council
                      Gold-NFLPA            Pink-Player Agent

# APPENDIX D

# FIRST REFUSAL OFFER SHEET

Name of Player:                                    Date:

Address of Player:                                 Name of New Team:

Name and Address of                               Name of Prior Team:
Player's Representative
Authorized to Act for Player:
                                                   Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

      [Supply Information on this Sheet or on Attachment]

     1.    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized league-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

     2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

     3.    Other terms (that need not be matched):

Player:                                            New Club:

By: _____            By: _____
                                                   Chief Operating Officer

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:
                                         Address of Prior Team:

    The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.

Prior Team

By: _____
      Chief Operating Officer

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By:_____

WITNESSED BY:

_____

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the_____football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

# APPENDIX H

## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR of the member clubs of the NFL (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions and definitions contained in the Settlement Agreement. The information on the Schedule is to be the responsibility of the NFL Member Clubs' and the NFL's managements. The Accountants' responsibility will be to express an opinion on the Schedule based on their audit.

The NFL and Class Counsel or any Players Union are to retain a national accounting firm (the "Accountants"). The Accountants are to conduct an audit of the Schedule (the "Audit") in accordance with generally accepted auditing standards. Those standards require that the Accountants plan and perform the Audit to obtain reasonable assurance about whether the Schedule is free of material misstatement. The Audit shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Audit shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of 6 members with 3 representatives designated by each of the NFL and Class Counsel or any Players Union. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Audit described in the preceding paragraph and again before February 15th to review the results of the Audit before issuance of the final report for that playing season.

The procedures detailed below are designed for the Accountants to determine whether, in their opinion, the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the member clubs of the NFL for such season in accordance with the terms of the Settlement Agreement. The Accountants will audit the Schedule for each playing season.

The Accountants may rely on the auditing procedures performed by each member club's local accounting firm ("Local Accountants") or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to express an overall opinion on the Schedule as referred above.

242

The Accountants will have access to the Local Accountants' audit workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the NFL and Class Counsel to be performed by the Accountants**

**General**
- The Settlement Agreement should be reviewed and understood.

- See Exhibit I for the form of the Accountants' Audit Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All audit workpapers of the Accountants relative to its report on the Schedule should be made available for review by representatives of the NFL and Class Counsel or any Players Union prior to issuance of the report.

- A summary of all Audit findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised during the Audit should be resolved by the Committee.

- Estimates should be reviewed in accordance with the Settlement Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

243

Appendix H

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

## Procedures provided by the NFL and Class Counsel to be performed by the Local Accountants

### General

- Each NFL member club shall be audited in accordance with the Settlement Agreement. The Settlement Agreement should be reviewed and understood by all Local Accountants.

- See Exhibit II for the form of the Local Accoutants' Audit Report.

- Special rules for Cap Counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

### Team Salaries - Schedule 1

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the Settlement Agreement.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the Settlement Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

244

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the Settlement Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA - Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the Agreement.

Appendix H

### Defined Gross Revenues - Schedule 4

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the DGR Settlement Agreement. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

### Excluded DGR - Schedule 5

- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

### Questions - Schedule 6

- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

246

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

- Review supporting details of any changes.

# EXHIBIT I

## ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of the Member Clubs and the NFL's management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the NFL or any Member Club taken as a whole.

248

# EXHIBIT II

## LOCAL ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ a Member Club of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of _____ management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the _____ taken as a whole.

# APPENDIX I

## STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**
1. History
    - player
    - family
    - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
    - head
    - face
    - scalp
    - ears
        - external & drums
    - sinus
    - throat
    - eyes
        - pupils
        - reaction to movement & light
    - lungs
        - palpation
    - chest
    - heart
    - visceral
    - hernia
    - rectal
        - hemorrhoid
        - fistula
        - prostate
    - gastric
    - any unusual body marks, i.e. scars, birthmarks
    - height
    - weight
    - temperature
    - blood pressure
    - pulse
    - heart rate

**Orthopedic Examination**
Examination visually, including stress testing and range of motion for all
of the following:
- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardio-
vascular

**Blood Testing**
Standard grid. Testing for (including but not limited to):
- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*       } *Where applicable. If found,
- Sickle Cell*          individual counseling necessary.
- VD*

Appendix I

## Urinalysis

Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing
- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

## Chest X-Ray (at appropriate intervals)

(Only as recommended by AMA standard)

Check for:   Tumor

T.B.

Lesions

## X-Ray all previously injured areas (at physician's discretion)

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

Non-football related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. |

Withdrawal rates:

| For Players With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993. |
| Retirement age: | 47, except 55 for players with no credited seasons before 1993 |
| Percent married: | Social Security awards in 1972 |

Appendix J

| | |
|---|---|
| Age of Player's wife: | Three years younger than player |
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | One-time write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

# APPENDIX K

## EXTENSION CHART

*Salary Cap as Percentage of DGR*

|                   | 98 | 99 | 00 | 01 | 02   | 03 | 04 |
|-------------------|----|----|----|----|------|----|----|
| *Notice to Cancel* | 63 | 63 | 63 | 63 | 64   | U  |    |
| *No Notice to Cancel* | 63 | 63 | 63 | 63 | 63.5 | 64 | U  |

*U  =  Uncapped*

# APPENDIX L

## OFF-SEASON WORKOUT RULES

The 1993 Collective Bargaining Agreement with the NFLPA provides that, except for certain specified minicamps, any off-season workout programs or classroom instruction shall be voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for sixteen weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week, except weekends. Included in the sixteen weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council, at least fifteen days prior to the start of its off-season workout program, the time frame for the program including designation of any days on which organized team practice activity will take place. Prompt notification of any schedule changes must be provided to the Management Council, which will provide the NFLPA with prompt notification of both the original schedule and any changes.

The following rules shall also apply to the fourteen days of organized team practice activity:

- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.
- Maximum six hours per day, with a maximum two hours on field, for any player.

# APPENDIX M

## PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):

## 1. Subsection (x)(1) — Maximum Annual Allocation Amount

**Year 1 (1996) -**   PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury Bill rate at 2/1/96 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount   = $81.456 million - $45 million
= $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years   = $3.00 million
+ Allocated Interest                            = $2.43 million
Total Year 1 Allocation                        = $5.43 million

1996 PSL Maximum Annual Allocation Amount        = $5.43 million

Appendix M

**Year 2 (1997)-** PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury Bill rate at 2/1/97 - 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129    = $50.258 million
Interest Amount    = $50.258 million - $30 million
                   = $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
=PSL Amount=$30 million/15 years    = $2.00 million
+ Allocation Interest               = $1.35 million
Total Year 2 Allocation             = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount        = $5.43 million
Year 2 PSL Allocation Amount        = $3.35 million

1997 PSL Maximum Annual Allocation Amount    = $8.78 million

**258**

Appendix M

**Year 3 (1998)**- PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury Bill rate at 2/1/98 - 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $.5 million/year for 14 years
= $.5m x 23.366    = $11.683 million
Interest Amount    = $11.683 million - $7 million
                   = $ 4.683 million

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount
= PSL Amount = $7 million/14 years  = $ .500 million
+ Allocated Interest                = $ .335 million
Total Year 3 Allocation             = $ .835 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount        = $5.430 million
Year 2 PSL Allocation Amount        = $3.350 million
Year 3 PSL Allocation Amount        = $ .835 million

1998 PSL Maximum Annual Allocation Amount    = $9.615 million

## 2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
- Gross PSL revenues received in 1996 = $45 million
- Income taxes paid on PSL revenues in 1996 = $12 million
- Legal and marketing costs incurred relating to PSL
  revenues=$6 million
- Stadium renovation costs = $56 million

The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m - ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from DGR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

**259**

Appendix M

## 3. Subsection (x)(2) — Maximum Exclusion Of PSL Revenues Each League Year

For purposes of this subsection, Excluded DGR spillover shall be calculated as follows for each Team:

 -Assume that the new stadium's first full year of operation is 1998.

 -Assume that the Team's Excluded DGR data is as follows:

|  | 1997 | 1998 |
|---|---|---|
| Excluded DGR | $5 million | $15 million |

If the League, as a whole, is in a spillover situation in 1998, then the increase in DGR due to spillover would be $10 million ($15 million - $5 million).

If the League is not in a spillover situation in 1998, the increase in DGR due to spillover would be zero.

## 4. Subsection (x)(3) — PSL Difference Credited To DGR

 a. Assume that the new stadium is placed in service in June 1998.

 1998 increase in DGR directly related to new stadium:

| | |
|---|---|
| - Increase in gate receipts | $6 million |
| - Increase in DGR spill-over | $2 million |
|  Total DGR increase | $8 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|---|---|---|---|
| 1996 | $5.430 million | $8 million (assumed) | $ 0 |
| 1997 | $8.780 million | $8 million (assumed) | $.780 million |
| 1998 | $9.615 million | $8 million | $1.615 million |
| Cumulative PSL Difference | | | $2.395 million |

 For purposes of computing the PSL Difference, we assume that the increase in DGR was the same for 1996 and 1997 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million).

 $2.395 million would be credited into DGR in the 1999 League Year.

260

b. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:

| | |
|---|---|
| - Increase in gate receipts | $ 9 million |
| - Increase in DGR spill over | $16 million |
| Total DGR increase | $25 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|---|---|---|---|
| 1996 | $5.430 million | $25 million (assumed) | 0 |
| 1997 | $8.780 million | $25 million (assumed) | 0 |
| 1998 | $9.615 million | $25 million | 0 |

Cumulative PSL Difference                                          0

**Since the increase in DGR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year.**

No amount would be credited into DGR in the 1999 League Year.

## 5. Subsection (x)(5) - Carryover PSL Credit

Assume the following:
- New Stadium is placed in service in June 1998.
- 1999 - 2002 Maximum Annual Allocation Amount is $9.615 million.
- Increases in DGR directly related to New Stadium are as follows:

| | |
|---|---|
| 1999 | $ 8 million |
| 2000 | $ 9 million |
| 2001 | $14 million |

The Carryover PSL credits are calculated as follows:

| | |
|---|---|
| 1999 | $9.615m - $8m = $1.615m |
| 2000 | $9.615m - $9m = $ .615m |
| 2001 | (No carryover PSL credits) |

Under this scenario, year 2001 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 1999 and 2000 ($1.615m + $.615m) can be deducted in full from DGR in League Year 2001. There would be no remaining Carryover PSL credits to deduct from DGR in future League years.

**261**

Appendix M

## 6. Subsection (x)(6) - Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

## 7. PSL Revenues Not Benefitting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i)   PSLs are sold by a Team or by a third party (such as a stadium corporation, a non-profit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii)   all net proceeds of such PSL sale are used to build a new stadium or construct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and

(iii)   such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or non-profit entity; and

(iv)   the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and

(v)   neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant

262

to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease;

then, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in DGR or Excluded DGR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as DGR, Excluded DGR, or non-DGR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as DGR or Excluded DGR, as appropriate.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

Appendix N

# APPENDIX N

## WRITTEN WARNING
## GOOD FAITH EFFORT

*[date]*

*Dear [player]:*

*The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article XXIII of the Collective Bargaining Agreement if you are terminated before the end of this season.*

*[Club Official]*
*[Club name]*

*\*Extension Agreement 2/25/98*

# INDEX

**A**

Acceleration, 102

Access
    to medical records, 186
    to personnel records, 186

Accrued Season, 55, 57, 68, 150, 164
    definition, 5
    for franchise player, 79
    for restricted free agent, 58–59

Active
    List, 75, 85, 164, 176
    Player, 193, 205

Active/Inactive List, 164, 171–172

Advisory Committee, 185

Agent regulation system, 16

Agents  regulated by NFLPA, 16. *See also* NFLPA

Agreement
    definition, 4
    effective date, 219
    expiration date, 219
    extension, 7–8, 43, 95, 203, 219, 225
    negotiation of, 10
    ratification, 221–222
    scope and arbitration, 10
    termination, 154–155, 219

Alcohol and substance abuse, 194–195. *See also* Chemical Dependency;
    Drugs; Substance abuse

Annual, *See* Draft, annual
    Selection meeting, 1993, 43

Annuity, *See* Player Annuity

Answer
    injury grievance, 25. *See also* Injury grievance, non-injury grievance

Anti-Collusion, 67, 145–146, 156, 221
    burden of proof, 151–152
    computation of damages, 153
    costs, 154
    disclosures, 151
    discretion, 151
    effect on computations, 154
    enforcement of provisions, 151
    on remedies, 152–153
    on summary judgment, 152
    other Club conduct, 150–151

Anti-Collusion (*continued*)
    payment of damages, 154
    player election, 153–154
    prior conference, 155
    prohibited conduct, 150
    reimbursement, 154
    termination, 154–155
    time limits, 155
Appeal, 20–21,
    Commissioner discipline, 31
Appearances, 213
Application, 78, 205
    for disputes, 175
    for Final Eight Plan, 80
    for signing period, 78–79
    for total disability benefits, 195
Appointment
    of Special Master, 145
Arbitration, 10, 11, 174, 211
    expedited, 65
Arbitration Panel
    and injury grievance, 27
    involved in non-injury grievance, 21–22
Arbitrator, 29
    decision in committees, 36
    injury grievance procedure, 26
    notice, 20–22
    senior, 21, 27
Arbitrators decision
    of non-injury grievance, 22–23
Attire
    on field, 213
Authorization, 214

**B**
Benefit Arbitrator, 190
    compensation, 208
    role, 208–209
    selection, 208
Benefit Credits, 190–192
Benefits, 9, 88, 142, 160, 211
    definition, 6, 93
    injury protection, 33
    maximum lifetime, 201

Benefits (*continued*)
    projected, 96, 141–142
    retention of, 210
Bert Bell Plan, 93, 94, 169, 189, 191. *See also* Bert Bell/Pete Rozelle NFL Player Retirement Plan; Pete Rozelle NFL Player Retirement Plan; Retirement Plans
Bert Bell/Pete Rozelle NFL Player Plan (Merged Plan), 23, 29, 83, 85, 93, 94, 187, 189, 191, 192, 193, 194, 199, 201–202, 205, 207
Bonus
    amounts treated as signing, 103
    completion, 104, 122
    credit for signing bonuses refunded, 105
    expansion, 98
    extension, 101, 137
    incentive, 106, 124, 125, 126–128, 127
    non-guaranteed reporting, 105, 121
    off-season reporting, 104
    off-season roster, 104
    off-season workout, 105
    paid performance, 106
    performance, 70, 105
    pre-season roster, 128
    prior signing, 102–103
    pro-rated signing, 172
    relocation, 105, 122, 160
    reporting, 64
    roster, 64, 70, 172
    salary, 70
    signing, 51, 64, 70, 99, 101, 102, 105, 134–135, 137
    weight, 105
Buyouts and signing bonus, 51

**C**
Canton Hall of Fame game, 162
Capped Year, 57
    definition, 6. *See also* League Year
Career Planning Program, 15, 214
Career-ending injury, 76
Carryover Premium Seat Credit, 90, 92. *See also* PSL
Certification
    contract, 156
    end of League Years, 156–157
    exclusive representation and NFLPA agent certification, 16
    false, 157
    NFLPA agent certification penalty, 16

Check-Off
    authorization, 13
    union security, 13
Chemical Dependency Program, 15. *See also* Alcohol and substance
    abuse; Drugs; Substance abuse
Circumvention, 143
Claim filing, 155
Class Counsel, 51, 87, 135, 150, 187
    definition, 4
Club affiliate, 39, 143, 146, 156, 167
    definition, 4. *See also* Team affiliate
Club discipline
    deduction, 19
    disputes, 19
    maximum discipline, 18–19
    published list, 19
    uniformity, 19
Club physician, 18, 184, 186
    injury grievance, 25, 29
    injury protection, 33, 34
College draft, 5, 11, 29, 64–65, 150, 153, 221
    assignment of draft rights, 46
    compensatory draft selections, 46–47
    definition, 5
    no subsequent draft, 46
    notice of signing, 47
    number of choices, 43
    other professional themes, 44–45
    required tender, 43
    return to college, 45–46
    signing of drafted rookies, 43–44
    subsequent draft, 46
    time of draft, 43
    undrafted rookies, 47
    workouts draft eligible players, 47. *See also* Compensatory Draft; Draft
Commissioner, 16, 99, 167, 185
    and committees, 35
    approval of contract, 156
    definition, 4
    determination by, 157
    disapproval, 39, 143–144. *See also* Exempt Commissioner Permission
    List
Commissioner discipline
    costs, 32
    fine money, 32

Commissioner discipline (*continued*)
    league discipline, 31
    one penalty, 32
    representation, 31–32
    time limits, 31
Committee Player/Club Operations, 166
Committees, 23
    Advisory, 185
    and Commissioner, 35
    Competition Committee, 36
    Grievance Settlement Committee, 24
    Joint Committee, 35–36
    Player/Club Operations Committee, 36
Compensation, 169, 208
    Benefit Arbitration, 208
    draft choice, 164
    of Special Master, 146
    pre-season training camp, 169
    other, 174
    to players, 162. *See also* Bonus; Incentive; Meal allowance; Salary
Compensatory
    damages, 153
    picks, additional, 160
Compensatory Draft, 11
    definition, 5
    selection, 43, 48, 49, 77, 78. *See also* College Draft; Draft
Competition Committee, 36
Completion
    bonus, 104, 122. *See also* Bonus
Conduct
    other club, 150–151
    prohibited, 150
Conformity
    NFL Player Contract, 38
Consideration between clubs, 64
Consultation and Information Sharing, 150, 156
    consultation and communication, 158
    copies, 159
    meetings, 159
    neutral verifier, 158–159
    notice of invalid contract, 158
    salary summaries, 158
Contact
    waiver system, 83
    work, 166

Contract
    certification, 156
    deferred, 176
    guaranteed, 176
    mid-season, 134
    multi-year, 130
    player's contract, during suspension, 14
    renegotiation and extensions, 136–140
    renegotiation, definition, 6
    split, 175–176
    traded, 133–134. *See also* NFL Player's Contract
Contributions to Savings Plan, 196–197. *See also* specific retirement
    plans; savings plans
Copies, 159
    of contracts, 175
    of medical records, 186
    of personnel records, 186
    requirements for processing, 65
Costs, 154
    and non-injury grievance, 23–24
    Commissioner discipline, 32
    for insurance coverage, 203–204
    injury grievance[Expenses], 29
    of arbitration, 23–24
    of arbitrator, 23–24
    player benefit, 142
    player costs in Rookie Orientation Programs, 53
    postponement, 27
    transcription, 23–24. *See also* Expenses
Credited
    season, 172, 174, 199–200, 201, 205
    service, 169

**D**
Deduction 213
Deferred
    contracts, 176
    salary, 99
Deferred Paragraph 5 Salary, 175. *See also* Salaries
Defined Gross Revenues, 86–94, 141
    definition, 6. *See also* DGR; Excluded DGR; Projected DGR
Definition
    accrued season, 5
    agreement, 4
    annuity starting date, 192

Definition (*continued*)
 benefits, 6
 Class Council, 4
 Club Affiliate, 39
 Commissioner, 4
 compensatory draft, 5
 disability, 192–193
 draft, 5
 draft choice compensation, 5
 drafted rookie, 5
 entering player pool, 48
 final eight plan, 5
 free agent, 5
 guaranteed, 104
 guaranteed league-wide salary, salary cap & minimum team salary,
  6–7
 Impartial Arbitrator, 4
 injury grievance, 25
 league football activity, defined, 193
 league year, 4
 minimum salary, 5
 minimum team salary, 7
 negotiation, 5
 new club, 5
 NFL player contract, 4
 NFL Rules, 4
 NFLPA Player, Group Licensing Program, 13–14
 non-injury grievance, 20
 paragraph 5 salary, 7
 player benefit costs, 93
 player contract, 5
 player costs, 7
 prior club, 5
 Retirement Plan, 191
 Rookie player, definition, 169
 room, 7
 undrafted rookie, 6
"Deion Rule"[Signing Bonus], 100-101
Dental insurance
 group insurance benefit, 201
 insurance benefits, 202
 insurance extended post-career, 202. *See also* specific insurance
  programs
Designated franchise player, 73
Developmental squad, 173. *See also* Practice squad

DGR, 60, 86–94. *See also* Defined Gross Revenue, Excluded DGR;
  Projected DGR
Disability
  classification rules for total and permanent, 193
  definition, 192–193. *See also* Injuries
Disability benefits
  supplemental contributions, 207
  supplemental extension, 207
  supplemental maintenance, 207
Disagreements
  resolved by Benefit Arbitrator, 208–209
Discipline list
  published, 19
Discovery, 21
  of Impartial Arbitrator, 148
  of Special Master, 146
Dispute, 18, 87, 1148
  and injury protection, 34
  attempt to negotiate, 155
  club discipline, 19
  resolution, 189–190, 209
  with career-ending injury, 76–77
Disputed Adjustments, 139–149
Distributions, 199–200
Documents
  delivery of, 214
Draft, 126
  annual, 49
  between clubs, 55
  definition, 5
  eligible players, 47
  first round, 68
  initial, 44
  next annual, 44
  no subsequent, 46
  picks, 5
  requirements, 48
  rights, 154
  selection, 160
  selections, 69
  subsequent, 46
  supplemental, 49. *See also* College Draft; Compensatory Draft; Draft
    Choice Compensation
Draft Choice Compensation, 6, 45, 46, 47, 49, 55, 57, 59–63, 68–69,
  71, 78–79, 83, 164

Draft Choice Compensation (*continued*)
    between clubs, 58
    definition, 5
Draft rights
    assignment, 46
    of clubs, 152
Draft Selection
    and player's original draft round, 59
Drafted
    player, 43
    player on waivers, 50
Drafted Rookie, 44, 46, 65, 152–153
    definition, 5
    Player Contract, 49, 52
    signing, 43–44, 48
Drugs
    illegal, 195. *See also* Alcohol and Substance Abuse; Chemical
    Dependency; Substance abuse
Duration of Agreement, 14, 37
    effective date, 219
    expiration date, 219
    ratification, 221–222
    termination, 219
    termination prior to expiration date, 219–221. *See also* Agreement

**E**
Early Retirement Benefit, 192
Effect
    of rulings of Impartial Arbitrator  148, 148
    of Salary Cap, 154
    on computations, 154
Eligibility, 205
    waiver system, 83. *See also* Waiver system
End of League Years
    certification, 156–157. *See also* League Years
Enforcement of Salary Cap and Entering Player Pool, 74, 150
    circumvention, 143
    Commissioner disapproval, 143
    DGR circumvention, 144
    sanctions, 144
    Special Master action, 143
    Special Master review, 144
    undisclosed terms, 143
Entering Player Pool, 11, 38, 44, 45, 103, 124, 131, 136–137, 143, 219
    adjustment, 160

Entering Player Pool (*continued*)
    calculation, 48–50
    covered league years, 48
    definition, 48
    formula allotment, 48–50, 52
    incentives, 121–122
    operation, 50–54
Excluded DGR, 9, 87–88, 91–92. *See also* DGR; Defined Gross Revenue;
      Projected DGR
Exclusive Representation and NFLPA Agent Certification, 16. *See also*
      NFLPA
Exempt Commissioner Permission List, 55, 174. *See also* List
Expansion
    additional compensatory picks, 160
    bonuses, 98
    clubs, 160
    entering player pool adjustment, 160
    relocation bonus, 160
    teams, 160
    veteran allocation, 160
Expedited Arbitration, 65
Expense, 86, 132
    administrative, 198
    awarded by arbitrator, 24
    deducted from revenues, 139
    for players attending minicamps, 168
    injury grievance, 29
    medical, 9, 93, 189
    moving and travel, 93, 189
    non-injury grievance[Costs], 23–24
    of copies, 159
    of neutral physician, 29
    Rookie Orientation Program, 53
    traveling, 170
Extended insurance
    financing for, 203–204
    limitations and rules for, 202–203. *See also* specific insurance pro-
      grams
Extended Post-Career Medical and Dental Insurance benefits, 190. *See al-
    so* specific Benefits; Insurance programs
Extension of Agreement, 7–8, 43, 95, 203. *See also* Agreement

**F**
False certification, 157

Fees
  initiation, 13
  maintenance, 90
  postponement, 27
  postponement on hearing, 22
Filing, 20
  claim, 155
  in injury grievance, 25
  of non-injury grievance, 22
Final Capped Year, 104, 105, 126, 128, 130–131
  definition, 8
Final Eight Plan, 11, 136
  application, 80
  definition, 5
  increases, 81
  next four teams, 80
  replacement of free agents signed by other club, 80–81
  salary definition, 81
  top four teams, 80
  trade limitation, 81–82
Final League Years, 8, 71, 134
  definition, 7–8. *See also* League Years
Final Special Purpose Letter, 96, 139
Fines
  club discipline, 19
  Commissioner discipline, 32
First Game, 169
First Refusal
  Exercise Notice, 65–66
  Exercise Notice For Restricted Free Agents, 62–63
  Exercise Notice, No and Veteran Free Agency, 63
  Procedures For Restricted Free Agents, 62–63
  Rights, 45, 57, 61, 79, 83, 164
Franchise and transition player, 5, 6, 43, 49
  compensatory draft selection, 77–78
  designations, 68
  duration of designation, 73–75
  franchise player designation, 73–74
  franchise player designation period, 74–75
  lists, 72
  other terms, 77
  prospective designation, 77
  required tender for franchise players, 68–72
  right to decline, 77
  rights of first refusal for transition players, 72

Franchise and transition player (*continued*)
    salary information, 72–73
    signing period for franchise players, 78–79
    signing period for transition players, 78
    transition player designation period, 74–75
Free Agent, 45, 153
    definition, 5
Free Agent List, 67. *See also* List
Funding
    of deferred and guaranteed contracts, 176

**G**
Good faith
    negotiation, 40–41
    of required tender, 58
Governing Agreement
    conflicts, 9
    implementation, 9
    management rights, 9
    rounding, 9
Governing law, 223
Grievance
    initiated, 20
    procedure, 11
    received, 20
    resolving, 20–21
Grievance. *See also* Injury grievance; Non-injury grievance
Grievance Settlement Committee, 24
Group Insurance
    administration, 204
    financing for extended insurance, 203–204
    group insurance benefits, 201–202
    programs, 93, 189. *See also* specific insurance programs
Guaranteed
    contracts, 176
    definition, 104
Guaranteed League-Wide Salary & Minimum Team Salary, 4, 95
Guaranteed League-Wide Salary, Salary & Minimum Team Salary, 8, 11
    definition, 6–7
Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary,
    144
    30% Rules, 134–135
    accounting procedures, 138–142
    compensation of team salary, 97
    definitions, 86–93

Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary
  (*continued*)
    guaranteed league-wide salary, 95
    minimum team salary, 96
    renegotiations and extensions, 136–137
    salary cap amounts, 95
    trigger, 94–95
    valuation of player contracts, 98–133

**H**
Hearings, 140, 209
    injury grievance, 27, 29
    of non-injury grievance, 22–23
    prehearing briefs, 21
    transcribing of, 27
Honors
    and recognized media, 122–123

**I**
Impartial Arbitrator, 3, 44, 55, 57, 61, 65, 73, 74, 76, 78, 94, 99, 105,
        132–133, 175
    compensation of, 148
    definition, 4
    effect of rulings, 148
    procedures, 148
    scope of authority, 148
    selection, 148–149
Inactive List, 85, 163, 176. *See also* List
Incentive
    additional incentive rules for veterans, rookies, individuals and teams,
        123–130
    and Veteran Free Agency, 64
    based on another player's performance, 122
    based on Club performance, 64
    bonus, 106, 124, 125, 126–127, 127–128
    bonus for rookie, 122
    clause, 128–129
    entering player pool incentives, 121–122
    for rookie, 54
    individual incentives, 108–109
    likely to be earned, 54, 64
    performance, 130
    rookie "likely to be earned" incentives, 110–120
    team incentives, 107
    team performance-related, 134. *See also* Bonus

Individually negotiated limitations on player movement and veteran free
    agency, 65–66
Initial Special Purpose Letter, 204
Injured Reserve List, 30. *See also* Active/Inactive List
Injury, 166
    as an Active Player, 194–195
    career-ending, 76
    during minicamps, 168
    non-football, 174
    non-injury circumstances, 76
    protection, 93, 189
Injury grievance, 69
    answer, 25
    appeal, 26–27
    arbitration channel, 27
    definition, 25
    discovery, 30
    expenses, 29
    filing, 25
    hearing, 27–28
    information exchange, 30
    miscellaneous issuers, 28
    neutral physician, 26
    payment, 29
    pension credit, 29
    playoff money, 29–30
    presumption of fitness, 29. *See also* Non–injury grievance
Injury protection
    benefit, 33
    disputes, 34
    qualification, 33
Insurance coverage. *See* COBRA coverage; Dental insurance; Extended in-
    surance coverage; Medical insurance
Insurance programs. *See* specific insurance programs

**J**
Joint Committee, 35–36. *See also* Committee

**L**
Labor
    exemption, 217
Labor Relations, 158–159
League
    discipline, 31
    disclosures, 151

League Security, 214
League Year,
    definition, 4
    Final, 216
Life insurance
    group insurance benefit, 201. *See also* specific insurance programs
"Likely to be Earned." *See* Incentives
Limits
    of active players, 163
List
    Active, 75, 85
    Active/Inactive List, 164
    Active/Inactive List Limit, 163, 165
    Discipline List, Published, 19
    Exempt Commissioner Permission List, 55, 174
    Free Agent List, 67
    Inactive List, 85, 163, 176
    Injured Reserve List, 30
    Minimum Active/Inactive List Salaries, 5, 9
    Non- Football Injury or Illness List, 167
    Size Active and Inactive List Limit, 163
    Size Inactive List, 163
Loans, 131
LTBE, *See* Incentives

**M**
Maintenance of Retirement Plans, 191. *See also* specific retirement plans
Management Council, 1, 9, 14–17, 20–22, 25, 27, 28, 30–32, 35, 36,
    38, 39, 51, 84, 105, 135, 174, 204, 208, 211, 213, 214, 219,
    221
Matching Contributions to Savings Plan, 197–198
Maximum Annual Allocation Amount, 89–90
Meal allowance reimbursement, 177
Medical insurance
    benefits, 202
    extended post-career, 202
    group insurance benefit, 201. *See also* specific insurance programs
Merged Plan. *See* Bert Bell/Pete Rozelle Plan
Mid-season contracts, 134. *See also* Contracts
Minicamps, 166
    contact, 168
    expenses, 168
    injuries, 168
    length, 168
    number, 168

Minimum
    Active/Inactive List Salaries, 5, 9, 43, 45, 55
    Contributions to Savings Plan, 197–198
    Paragraph 5 Salaries, 174
    salaries, 9, 164
    after 1999, 174
    increase, 174
    salaries, definition, 5. *See also* Salaries
Minimum Team Salary, 96–97, 142, 143
    definition, 7
Mutual reservation of rights: labor exemption
    CBA expiration, 217–218
    labor exemption, 217
    rights under law, 217

**N**
National Football League Players Association. *See* NFLPA
National Football League Management Council. *See* Management Council
Negotiation, 150
    Club's rights, 151
    definition, 5
    for Unrestricted Free Agent, 57
    of Agreement, 10
    rights, exclusive, 134. *See also* Good faith negotiation
Neutral Physician
    injury grievance, 25, 28–29
Neutral verifier, 158–159
New Club, 62, 64, 70, 72
    definition, 5. *See also* Old Club; Prior Club
NFL Competition Committee. *See* Competition Committee
NFL Constitution and By-Laws, 11, 20
    definition, 4
NFL Draft. *See* Draft.
NFL Player Contract, 6, 7, 9, 11, 16, 20, 25, 37, 41, 42, 43, 44, 46, 52,
    58, 61, 63, 69, 72, 74, 75, 76, 77, 78, 80, 94, 97–99, 102, 104, 123,
    125, 126, 132, 133, 134, 135, 136, 150, 152, 156, 164–165, 170
    and non-injury grievance, 20
    changes, 37
    Commissioners disapproval, 39–40, 143–144
    conformity, 38
    definition, 4, 5
    determining the salary, 136
    expiration of, 61
    for franchise Players, 68
    form, 37

NFL Player Contract (*continued*)
    general, 37
    good faith negotiation, 40–41
    injury grievance, 23
    included in team salary, 97
    multi-year, 100
    NFLPA Group Licensing Program, 40
    not modified by Principal Terms, 63
    requirements for rookie, 50–51
    term, 37
    variation, 98
    See also Contracts
NFLMC. *See* Management Council
NFLPA, 3, 9, 10, 11, 13, 14, 15, 20, 22, 23, 26, 27, 28, 29, 31, 32, 34,
        35, 38, 46, 55, 58, 72, 84, 90, 91, 96, 97, 140, 143, 144, 146,
        147, 148, 151, 154, 155, 157, 158, 167, 168, 183, 185, 201,
        205, 221, 224
    address, 67
    agent certification enforcement, 16
    agent certification exclusive representation, 16
    certified agents, 174–175
    enforcement, 16
    exclusive representation, 16
    Group Licensing Program, 40
    meetings and union security, 13
    penalty, 16
    responsibility in union security, 15
    sponsoring orientation, 15
    tickets, 213
    union security and NFLPA requirements, 13
    union security and NFLPA responsibility, 15
No-trade clause, 83
Non
    cash provisions, 131–133
    football injury, 55, 161, 174
    football injury or illness list, 167
    guaranteed reporting bonus, 105, 121
Non-injury grievance, 10, 11, 14, 35, 167, 174, 211
    appeal, 20–21
    arbitration panel, 21–22
    arbitrator's decision and award, 23
    costs, 23–24
    definition, 20
    discovery, 21
    filing, 20

Non-injury grievance (*continued*)
 Grievance Settlement Committee, 24
 hearing, 22–23
 initiation, 20
 payment, 24
 representation, 23
 time limits, 23. *See also* Injury grievance
Notice
 and Veteran Free Agency, 66–67
 Arbitrator, 20–22
 hand delivered, 224
 notice of invalid contract, 158
 of invalid contract, 158
 of signing, 58
 of signing by veteran with less than three accrued seasons, 55
 of signing drafted rookie, 47
 of signing undrafted rookie, 47
 of termination  in waiver system, 83
 Personnel, 84
Number
 of regular season games, 175

**O**
Off-Season Workouts
 bonus, 105
 enforcement, 167
 injuries, 166
 miscellaneous, 166
 payment, 166
 pre-training camp, 166–167
 time period, 166
 voluntary workouts, 166
Offer Sheet, 62, 63, 64, 66, 67, 70, 98, 150, 156
 and Principal Terms, 63–64
 for Restricted Free Agents, 62–63
Old Club
 and incentives, 64. *See also* New Club; Prior Club
Option Clause, 11
 existing option clauses, 42
 prohibition, 42
Orientation
 during timing and testing sessions, 15
 Rookie Orientation Program, player reimbursement, 53
 Rookie Orientation Program, evaluation, 53–54

**P**

Paragraph 5 Salary, 57, 59, 61, 64, 65, 70, 81, 85, 99, 100
    definition, 7
Parol Evidence, 214
Payment, 70, 166, 174–175
    and non-injury grievance, 24
    calculation, 51
    minimum workout payments, 51
    Rookie Orientation Program, 53
    of damages, 154
    of injury grievance, 29
    of salaries, 174–175. *See also* Bonus; Benefits; Compensation
Penalty
    and NFLPA Agent Certification, 16
    assessed by Special Master, 147
    Commissioner discipline, 32
    negotiating rights of players, 55
Performance
    bonus, 70, 105
    categories, 125–126, 129
    incentives, 130
    issuers, 129
    physically unable, 161
Personal Seat Licenses. *See* PSL
Personnel information
    NFLPA's right to, 84
Pete Rozelle NFL Player Retirement Plan (Peter Rozelle Plan), 93, 94, 169,
    189. *See also* Bert Bell NFL Player Retirement Plan; Bert Bell/Pete NFL
    Player Retirement Plan; Retirement Plan
Physical examination, 29, 167
    in injury protection, 33
Physically unable to perform. *See* PUP
Physician
    club, 26, 29
    neutral, 26, 28–29, 29
    orthopedic, 26
    treating, 26
Player Affiliate, 1, 39, 57, 70, 94, 143, 146, 156
    definition, 4
Player Annuity Program, 94, 133, 187, 189–190
    contributions, 198–199
    definitions, 198
    eligibility, 199–200
    establishment, 198

Player Benefit Costs, 142
    1998 Amendment benefits, 187–188, 190
    definition, 93, 188–189
    general right of reduction, 187
    resolution of disputes, 189–190
    right of restoration, 188. *See also* Benefit; Incentive; Salary
Player Costs, 9, 88, 139, 160
    definition, 7. *See also* Costs
Player Second Career Savings Plan. *See* Savings Plan
Player security
    no discrimination, 17
    personal appearance, 17
Players Association. *See* NFLPA
Player's Contract
    during suspension, 14. *See also* Contract
Player/Club Operations Committee, 36, 166
Post-season pay, 30, 187
Practice squad, 174
    eligibility, 164–165
    or development squad, 55
    player, 164
    restriction in size, 164
    salary, 164
    signing with other clubs, 164. *See also* Developmental Squad
Pre-season, 163
    game, 40, 169–170
    per diem, 189
    per diem amounts, 93
    physical, 184–185
    roster bonus, 128
Principal Term, 62, 65, 70
    and Veteran Free Agency, 63–64
    of Offer Sheet, 63–64
Prior
    Club, 6, 55, 58, 60, 62, 64, 65, 70, 72, 76, 78, 151, 220, 256
    Club and Restricted Free Agents, 58
    conference, 143, 155
    signing bonuses, 102–103
    team, 61, 78
Prior Year Salaries, 57, 68–69, 71, 73, 75, 76, 77
    definition 5-6
Pro-rated
    signing bonus, 172

Procedures
    of Impartial Arbitrator, 148
    of Special Master, 146–147
Projected benefits, 9, 96, 141–142
    adjusted, 142
    definition, 7. *See also* Benefits
Projected Defined Gross Revenues, 95, 187, 190
Projected DGR, 48, 81, 140–141, 171, 174
    definition, 7. *See also* DGR; Excluded DGR
Proration
    of signing bonuses, 99
PSL
    difference, 89
    excess, 90
    first-year increases, 89
    revenues, 89–90, 92
PUP, 161, 167, 174

**Q**
Qualifying Offer, 9, 60, 61–62, 67, 88, 97, 216
    and Restricted Free Agent, 65
    for Restricted Free Agents, 58

**R**
Recruitment
    of an unsigned player, 132
Refusal Exercise Notice. *See* First Refusal Exercise Notice
Related Entities, 88
Release
    waiver system, 83. *See also* Waiver system
Releases and Covenants Not to Sue, 11, 37, 220
Relocation
    bonus, 105, 122, 160
Remedies, 152–153
Renegotiation
    and extensions, 136–140
    and Rookie, 57
    contract, 123–124
    definition, 6
    during the term of Player Contract, 6
    of a Player Contract, 74
    of an existing Player Contract, 70
Reporting bonus
    off-season, 104
    under the Player Contract, 64. *See also* Bonus; Incentive

Representation, 31–32
    and non-injury grievance, 23
Required tender, 9, 43, 44, 69, 77, 88
    and Rookie Allocation, 50
    definition, 6
    for Franchise Players, 68–70
    for Transition Players, 71–72
    good faith negotiation, 41. *See also* Tender
Reserve PUP List, 55. *See also* PUP
Restricted Free Agency
    definition, 6
    player qualifications, 6
Restricted Free Agent, 65, 71, 72, 151–152, 156, 176
    and Qualifying Offer, 65
    definition, 6
    signing period, 73
Retirement
    Board, 193
    of players, 133
Retirement Plan
    additional credited seasons, 191
    alcohol and substance abuse, 194–195
    classification rules for total and permanent disability, 193
    contributions, 191
    decrease investing requirement, 192
    definition, 191
    increase in past service credit, 192
    limits on retroactive benefits and claims, 194
    line-of-duty disability benefit, 192–193
    maintenance, 191
    psychological/psychiatric disorders, 195. *See also* Bert Bell NFL Player
        Retirement Plan; Bert Bell/Pete Rozelle Retirement Plan; Pete
        Rozelle NFL Player Retirement Plan; specific savings plans
Right of First Refusal, 44, 46, 60, 62, 63, 65, 73, 150–151
    definition, 6
    for Restricted Free Agents, 58–59
    for transition players, 72. *See also* No Right of First Refusal
Rights
    preservation of, 212
    under law, 217
Rookie, 99, 100
    25% rule for rookies, 51
    allocation, 48, 49–50, 160
    and Contract requirements, 50–51
    and minimum workouts payments, 51

Rookie (*continued*)
    and Player Contract requirements, 50–51
    contract, 126
    definition, 6
    Free Agent, 45
    insurance coverage, 201
    likely to be earned incentives, 110–120
    Orientation Camps, 132
    per diem, 169
    player, 3
    player definition, 169
    undrafted, 3
    without renegotiation, 57. *See also* Drafted Rookie; Undrafted Rookie
Rookie Orientation Program
    evaluation of, 53–54
    per player reimbursement, 53
Room
    definition, 7
    in rookie allocation, 50
Roster
    bonus, 70, 172
    bonus under the Player Contract, 64
    bonus, off-season, 104
    categories, 100
    exemption, 161–162
    exemption time limits, 162
    final, 84
    reduction, 161
Rules
    25% Rule for Rookies, 51, 52, 125, 135
    30% Rules, 134–135
    CFL rule, 161
    for classification of total and permanent disability, 193

**S**
Salaries, 171-175
    calculation of ten largest, 72
    of various team positions, 73. *See also* specific salary categories
Salary
    advance, 103–104
    advances, 131
    bonus, 70
    camp, 142
    deferral, 137

Salary (*continued*)
    deferred, 99
    definition, 4, 69–70, 81, 94
    drafted rookie salary, 97
    for Restricted Free Agent, 63–64
    fully guaranteed, 104
    increase requirements for Rookie, 50–51
    Information, 72–73
    information in NFL Player Contract, 38
    minimum, 164
    minimum team salary, 97
    reduction contributions, 189
    requirements minimum salary, 51
    summaries, 158
    team, 99, 100, 101, 102
    team salary, 97. *See also* Bonus; Incentive; Paragraph 5 Salary; Prior Year Salary; Team Salary
Salary Cap, 6–7, 39, 69, 103, 130–131, 154, 158, 203
    definition, 7
    for Rookie, 53
Savings Plan
    contributions, 196–197
    establishment, 199
    maintenance, 196. *See also* Second Career Savings Plan
Scope of authority
    of Impartial Arbitrator, 148
    of Special Master, 145–146
Scouting Combine, 15, 47
Season, 127
Second Career Savings Plan, 93, 94, 188, 189, 190. *See also* Savings Plan
Selection, 208
    of Impartial Arbitrator, 148
    of Special Master, 147
Senior Arbitrator, 21
    arbitration panel, 27
Settlement Agreement, 11, 158
    definition, 4
Severance pay, 94
    amount, 205
    application, 205
    eligibility, 205
    failure to apply, 206
    nonassignability, 206
    only one payment, 206
    payable to survivor, 206

Severance pay (*continued*)
    payment, 205
    prior severance pay, 206
Signing bonus, 5–6, 70, 99, 101, 102–103, 105, 134–135, 137
    amounts treated as, 103
    and time of buy-out, 51
    for Unrestricted Free Agents, 57
    prorata portion, 70
    under the Player Contract, 64. *See also* Bonus
Signing period, 67, 69
    definition, 60–61
    for Restricted Free Agents, 60–62
    for transition players, 78
    for Unrestricted Free Agents, 57–58
    in waiver system, 83
    of Restricted Free Agent, 73
Special Master, 40, 87, 150, 152, 153–155, 157
    action, 143
    appointment, 145
    compensation, 146
    definition, 4
    discovery, 146
    penalties, 147
    procedures, 146–147
    proceeding, 139–140
    review, 143
    scope of authority, 145–146
    selection of, 147
Split contracts, 175–176
"Spillover" (Excess EDGR), 88
Squad
    developmental, 174
    practice, 163–164, 174
    size active and inactive list limit, 163
    size Inactive list, 163
    size pre-season, 163. *See also* Developmental squad; Practice squad
Standard Minimum Pre-Season Physical, 184–185
Stipulation and Settlement Agreement, 81, 99–100, 131, 137
    definition, 4
Subsequent draft. *See* Draft, subsequent
Substance Abuse, 194–195
    alcoholic steroids and related substances, 185
    drugs of abuse and alcohol, 185
    general policy, 185
Summary judgment, 152

Supplemental Disability Plan, 93, 187, 189
Supplemental draft. *See* Draft, supplemental
Suspension, 19

**T**
Team, 91, 98, 131, 141
    incentives, 107
    performance issues, 130
    performance-related incentive, 134
    rights, 98
Team Affiliate, 1, 57, 70, 88, 89, 90, 91, 92, 94, 97, 131
Team Salary, 9, 51, 97, 99, 100, 102, 105–106, 131, 136
    definition, 7
    right to exercise option, 52
    summaries, 158. *See also* Salaries
Tenders, 97–98
Termination, 154–155
    of Agreement, 154–155
    of drafted rookie, 152–155
    pay, 98
    pay eligibility, 85
    pay ineligibility for termination pay, 85
    pay liability, 98
    pay regular season signings, 85
    prior to expiration date, 37
    through waivers, 84
Time limits, 31, 155
    injury grievance [financing], 25
    non-injury grievance [initiation], 20
Time off
    days off, 178
    requirements, 178
Time periods, 166, 214
Traded contracts, 133–134
Training camp, 103, 166–167
    pre-season, 162
    definition, 169
    expenses, 170
    number of games, 170
    reporting, 169
    room and board, 169
    telephones, 170
    veteran per diem, 169

Transition player, 5, 65, 70, 71, 73, 151, 216
  designation, 71
  signing period, 78
Treating Physician
  injury grievance, 25. *See also* Physician
Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum
  Team Salary, 94–95

**U**
Uncapped Year, 48, 62, 95
  definition, 7
Undisclosed terms, 143
Undrafted Rookie, 46, 47, 150
  definition, 6
  Free Agent, 44
  Player Contract, 52
  salary of, 50
Undrafted rookie player. *See also* Drafted Rookie; Drafted Player
Union security, 10, 11, 13–15
  and NFLPA meetings, 13
  and NFLPA requirements, 13
  check-off, 13
  disputes, 14
  NFLPA Player Group Licensing Program, 13–14
  NFLPA responsibility, 15
  orientation, 15
  procedure for enforcement, 14–15. *See also* NFLPA
Unrestricted Free Agency, 5
  player qualifications, 5
Unrestricted Free Agent, 38, 68, 71, 72, 77, 79, 150, 151–152, 156, 216
  definition, 6
Unrestricted Free Agents, 57–58, 71
Upgraded Tender, 60. *See also* Required Tender; Tender

**V**
Veteran
  allocation, 160
  definition, 6
  Player Contract, 135, 136
Veteran Free Agency, 6, 11, 66–67, 69, 77, 152, 161–162, 216, 221
  expedited arbitration, 63
  individually negotiated limitations on player movement, 65–66
  Offer Sheet and First Refusal Procedures, 62–63
  restricted free agents, 58–62

Veteran Free Agency (*continued*)
 signing period for Unrestricted Free Agents, 57–58
 Unrestricted Free Agents, 57–58
Veteran Free Agency Notices, 66–67
Veteran player, 136
 and Player Contract, 129
 contract, 136
 definition, 169
 insurance coverage, 201
Veterans with less than three accrued seasons, 11, 45, 161
 accrued seasons calculation, 53
 negotiating rights, 53
 notice of signing, 53–54
Voluntary workouts, 166

**W**
Waiver
 procedures, 83
Waiver system, 11, 44, 76, 80, 152–153
 contact, 83
 ineligibility, 83
 NFLPA right to personnel information, 84
 notice of termination, 83
 release, 83
 rosters, 84
Weight bonus, 105. *See also* Bonus
Workers' Compensation, 10, 11, 93, 189
 arbitration, 211
 benefits, 211
 joint study, 211
 moratorium, 211–212
 preservation of rights, 212
 rejection of coverage, 211
 reopener, 212