# Exhibit 10-B

ing directly generated by the renovation.

(xi)(4) If the calculations set forth in (x)(3) above result in an exclusion of premium seat revenues from TR that is less than the Non-Shared Amount, the Accountants shall report the amount not excluded from TR as a "Carryover Premium Seat Credit." Such Carryover Premium Seat Credits, if any, shall be deducted from a Team's TR in the first future League Year in which the amount of TR directly generated by the new stadium or the renovated facilities exceeds the Non-Shared Amount (the "Premium Seat Excess"), but only up to the amount of the Premium Seat Excess. Each Carryover Premium Seat Credit may be deducted from a Team's TR only once, and only to the extent of any Premium Seat Excess existing at the time of such deduction.

(xi)(5) Any applicable deduction from TR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by premium seat revenues excluded from TR pursuant to Subsection (x)(1) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total premium seat Non-Shared Amount dedicated to funding the project during the allocation period, and (2) the denominator of which is the total costs for construction of the new stadium or renovations.

(xi)(6) For purposes of this paragraph, the term "Premium Seat Revenue" shall include revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(xi)(7) Notwithstanding the above or anything else in this Agreement, any exclusions of Premium Seat Revenue from TR in respect of premium seat products first sold after the 2005 League Year shall be subject to approval by the NFLPA on a case-by-case basis.

(xi-a) Exclusions from TR of Premium Seat Revenue, and of PSL revenue as described in Subsection (x) above, in respect of funding for stadium projects approved after the 2005 League Year will terminate upon sale of the recipient franchise.

(xii)    The parties may agree to allocate TR received or to be received on an accrual basis in a particular League Year over one or more other League Years.

(xiii)   If, one or more weeks of any NFL season are cancelled or TR for any League Year substantially decreases, in either case due to a terrorist or military action, natural disaster, or similar event, the parties shall engage in good faith negotiations to adjust the provisions of this Agreement with re-

91

spect to the projection of TR and the Salary Cap for the following League Year so that TR for the following League Year is projected in a fair manner consistent with the changed revenue projection caused by such action. In such circumstances, the parties agree to discuss in good faith the possibility of suspending the application of Article XXIV, Section 4(c).

(xiv) Expense Deductions

(1)    The only expense deductions permitted to be taken in calculating Total Revenue are:

(A) a set deduction of five percent (5%) of TR (which set deduction is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below) which includes Youth Football, NFL Europe, Players Inc. payments, NFL Charities, all team operating and day-of-game expenses, and any other category of expenses not previously netted against specific revenues). Set 5% percentage for TR Cost Deduction (i.e., both ceiling and floor);

(B) the set deduction of one and eight-tenths percent (1.8%) of TR described in Section 4(e) below (which set deduction is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below, and is intended to account for private contributions to stadium construction qualifying for support under the G-3 program or any similar successor program, as well as for stadium security expenses), the amount of which set deduction may be increased with the express approval of the NFLPA to up to two and three-tenths percent (2.3%) of TR if private contributions to stadium construction that are approved by the NFLPA shall so justify (i.e., up to an additional one-half of one percent (.5%) of TR may be deducted from the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below, if approved by the NFLPA, as provided in Section 4(e) below);

(C) expense deductions allowed to be netted against related revenues before inclusion of such revenues in TR, as follows:

(i) with respect to Club revenue items set forth in Section 1(a)(i)(3) above, the deduction of only those direct expenses allowed by the NFLPA to be netted against specific revenues of the foregoing types prior to the 2006 League Year (see Appendix H-3 for a non-exclusive list of such deductions, and Section F of Appendix H-3 for the list of deductions applicable to Club Internet operations (including merchandise sales)) and any other deductions specifically approved by the NFLPA after the date hereof; and

(ii) with respect to NFL Ventures and/or its subsidiaries, only those expenses of NFL Ventures and/or its subsidiaries previously allowed by the NFLPA to be netted against specific revenue items of such entities prior to the 2006 League Year (see Appendix H-3 for a non-exclusive list of such deductions and Section F of Appendix H-3 for the list of deductions applicable to NFL Ventures Internet operations (including merchandise sales)), and any other deductions specifically approved by the NFLPA after

92

the date hereof;

(D) expense deductions not referenced in Section 1(a)(xiv)(1)(C) above that were allowed by the NFLPA to be netted against related revenues before inclusion of such revenues in DGR or EDGR prior to the 2006 League Year, including but not limited to such deductions and exclusions relating to PSLs and premium seats as described in Subsections 1(a)(x)-(xi) above, for qualifying projects prior to the 2006 League Year (see Appendix M for examples as to the treatment of such PSLs), and such deductions as are set forth in Appendix H-3 (which provides a non-exclusive list and descriptions of other deductions allowed by the NFLPA prior to the 2006 League Year);

(E) deductions for expenses on additional "new nets" subject to NFLPA approval; and

(F) any other deductions specifically approved by the NFLPA after the 2005 League Year

(2)    Otherwise allowable expenses may only be deducted against the revenues to which they directly relate, and only up to the amount of such directly related revenues. If the result of expense netting with respect to a particular revenue item is a negative number, the TR count for such revenue item shall be zero and such negative number may not be used for any purpose.

(b)    **Benefits.** "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

(i)    Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII);

(ii)    Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii)    Injury protection (as described in Article XII);

(iv)    Workers' compensation, payroll, unemployment compensation, social security taxes, and contributions to the fund described in Article LIV, Section 4 below;

(v)    Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(vi)    Expenses for travel, board and lodging for a player participating in an off-season workout program in accordance with Section 7(e)(iv)(3) below;

(vii)    Payments or reimbursements made to players participating in a Club's Rookie Orientation Program (as described in Section 4(n) of Article XVII);

(viii)    Moving and travel expenses (as described in Sections 2, 3, and 4

93

of Article XLI, and Section 8 of Article XXXVII);

(ix)     Postseason pay (as described in Article XLII and Article XLIII); and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary.

(x)     Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year). Subject to the foregoing, Player medical costs shall include one-third of each Club's expenses for tape used on players and one-third of each Club's player physical examination costs for signed players (player physical examination costs relating to the Combine or for Free Agents whom the Club does not sign are not included in Player Benefit Costs);

(xi)     Severance pay (as described in Article L);

(xii)    The Player Annuity Program (as described in Article XLVIII-A);

(xiii)   The Minimum Salary Benefit (as described in Article XXXVIII-A);

(xiv)   The Performance Based Pool (as described in Article XXXVIII-B);

(xv)    The Tuition Assistance Plan (as described in Article XLVIII-B);

(xvi)   The NFL Players Health Reimbursement Account (as described in Article XLVIII-C);

(xvii)  The "88 Benefit" for former players suffering from dementia (as described in Article XLVIII-D); and

(xviii) The NFL Player Benefits Committee (as described in Article XLVIII-E).

Without limitation on any other provision of this Agreement, Benefits will not include (1) salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII; (2) any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (3) attorneys' fees, costs, or other legal expenses incurred by Clubs in connection with workers' compensation claims of players. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

(c)     **Salary.**

(i)     "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including

Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(ii)     A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such nonfootball services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar nonfootball playing services from an independent third party; and (2) the percentage of total compensation for nonfootball services received from third parties versus the Team or Team Affiliate.

(iii)     For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

**Section 2. Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:**

(a)     If in any League Year the total Player Costs for all NFL Teams equals or exceeds 56.074% of actual Total Revenues, there shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 2(b) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap, or Minimum Team Salary in the Final League Year.

(b)     If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below 46.868% of actual Total Revenues (before taking into account, and exclusive of, any Guaranteed League-wide Salary makeup payments pursuant to Section 3 below), then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2(a) above.

**Section 3. Guaranteed League-wide Salary:** In any League Year in which a Salary Cap is in effect, there shall be a Guaranteed League-wide Salary of 50% of Total Revenues. In the event that the Player Costs for all NFL Teams during any League Year in which a Salary Cap is in effect are less than 50% of actual TR for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to play-

95

ers who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

*Section 4.* **Salary Cap Amounts:**

(a)     Subject to the adjustments and credits set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be (1) in the 2006 League Year, $102 million; (2) in the 2007 League Year, $109 million; (3) in the 2008 League Year, 57.5% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (4) in the 2009 League Year, 57.5% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (5) in the 2010 League Year, 58% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; and (6) in the 2011 League Year, 58% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year. Notwithstanding the preceding sentence or anything else in this Agreement, there shall be no Salary Cap in the Final League Year.

(b)(i)   In the event that the Salary Cap amount for the 2006 League Year or the 2007 League Year differs from 57% of Total Revenues, less League-wide Benefits, divided by the number of Teams playing in the NFL during such year, the difference for the 2006 League Year shall be credited or adjusted, as the case may be, in the calculation of the Salary Cap for the 2008 League Year, and the difference for the 2007 League Year shall be credited or adjusted, as the case may be, in the calculation of the Salary Cap for the 2009 League Year.

(ii)     Upon receipt of the information set forth in Section 10(a)(i)(B) below, at the end of the League Year, the parties shall agree upon the amount of the Salary Cap, subject to the adjustments and credits set forth below, for each NFL Team for the Capped League Year, if any, following the next League Year. For example, the parties shall agree at the end of the 2006 League Year on the Salary Cap for the 2008 League Year.

(iii)    Wherever the parties have agreed that a difference in the Salary Cap is to be carried over into a future League Year (e.g., Article XXIV, Section 10(a)(ii)), if the number of Clubs in the NFL changes from the League Year in which the Salary Cap difference originated to the League Year in which it will be applied, the amount of the difference will be adjusted to reflect the different number of Clubs in the NFL.

(c)     The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year, provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 61.68% of Projected TR. See Appendix O.

(d)     **Adjustment Mechanism**

(i)     An Adjustment ("Adjustment") will be triggered if, during any Capped League Year, League-wide Cash Player Costs exceed or fall below the TR Trigger Percentage for that League Year multiplied by Total Revenues for that League Year (the "Trigger"). The differences shall be defined as the "League Excess" and "League Shortfall," respectively.

(ii)    At the end of each League Year, a determination shall be made as to whether an Adjustment with respect to that League Year has been triggered, and if so, its amount and allocation into future League Years.

(iii)   The "TR Trigger Percentage" shall be 59% in the 2006 and 2007 League Years, 59.5% in the 2008 and 2009 League Years, and 60% in the 2010 and 2011 League Years.

(iv)    "Cash Player Costs" for purposes of this Subsection is the sum of Cash Salary (as defined by Section 4(d)(ix) below), Performance Based Pay, Minimum Salary Benefit, and all costs committed to be spent in that League Year for other Player Benefits.

(v)     "Club Excess" is the amount by which a Club's Cash Player Costs exceed the TR Trigger Percentage multiplied by TR divided by the number of Clubs in the League during the year in which such excess occurs.

(vi)    "Accrued League Excess" is the total of all League Excesses from prior League Years that have not been offset by a League Shortfall.

(vii)   If an Adjustment is triggered by a League Shortfall in any League Year, such amount shall first be reduced by any remaining Accrued League Excess and any remaining balance shall result in a pro rata deduction from each Club's Team Salary, allocated equally among the remaining League Years that may be Capped Years under this Agreement.

(viii)  If an Adjustment is triggered by a League Excess in any League Year, a pro rata share of the League Excess for that League Year shall first be applied to each Club to offset any remaining Team Salary "deductions" that previously arose from any League Shortfall (with such deductions applied first to earlier Capped Years if the amount of Excess to be applied is less than the remaining "deductions" from prior League Years); if after all such Club offsets have been deducted from the League Excess, there remains a positive number in the League Excess on a League-wide basis, such number shall become the Accrued League Excess for that League Year. The League Excess (not the Accrued League Excess) shall also be a "charge" to the Team Salary of the Clubs with a Club Excess for that League Year. Each such Club will bear its proportionate share of the League Excess, the proportion to be determined by reference to each Club's share of the sum of the Club Excesses of the affected Clubs, with such proportionate share allocated equally among the remaining League Years that may be Capped Years under this Agreement; such charge to Clubs with such a Club Excess for that League Year shall be in addition to, and not in lieu of, the League-wide Shortfall adjustment.

97

(ix)    "Cash Salary" for purposes of this subparagraph is the sum of to-
tal Paragraph 5 amounts earned by players (applying the valuation rules
which apply to deferred salary specified in Section 7(a)(ii)), signing bonus
amounts paid or committed (including amounts treated as signing bonus
pursuant to this Agreement) (applying to signing bonuses the valuation
rules that apply to deferred salary specified in Section 7(a)(ii) below), in-
centives that have been earned and paid, or earned and committed to be
paid to players (applying the valuation rules which apply to deferred salary
specified in Section 7(a)(ii)), grievances settled, termination pay for which
a player is eligible, injury settlements, Salary advances that were not in-
cluded in Paragraph 5, and anything else paid or provided to players dur-
ing that League Year that would be valued under the Salary Cap (e.g., the
fair market value of automobiles gifted to players).

(x)    An illustration of the operation of the Adjustment Mechanism
described in this Section 4(d) is set forth in Appendix P.

(xi)    If this Agreement is terminated early, there shall be no accelera-
tion of outstanding credits or charges.

(e)    **Stadium Credit**

(i)    A Stadium Credit of 1.8% of TR is already reflected in the
amounts defining and percentages prescribing the Salary Cap in Section
4(a) above (i.e., $102 million in the 2006 League Year, $109 million in the
2007 League Year, 57.5% of TR in the 2008 and 2009 League Years, and
58% of TR in the 2010 and 2011 League Years). If a Stadium Credit greater
than 1.8% of TR in a League Year results from the sum of (a) Project Cred-
its in respect of new G-3 stadium projects and amounts approved by the
NFLPA after the 2005 League Year, (b) combined Project Credits in respect
of previously approved G-3 stadium projects, (c) any banked credits that
may be applied in that League Year as provided below, and (d) the Security
Credit, then the excess over 1.8% of TR, up to a maximum of an addition-
al one-half of one percent (0.5%) of TR (i.e., up to a maximum of 2.3% of
TR), will be deducted from the calculation of the Salary Cap.

(ii)    For purposes of calculating the Stadium Credit:

(a)    the Annual League-wide security cost credit (the "Security Cred-
it") shall be the greater of (1) $8 million increased at the rate of five percent
(5%) each League Year subsequent to the 2006 League Year provided that,
if as a result of the increase, the Stadium Credit exceeds 1.8% of TR, the Se-
curity Credit for that League Year shall be reduced to equal the difference
between the sum of 1.8% of TR plus the "bank" then-existing, if any, mi-
nus the Project Credits for that League Year, or (2) any larger amount specif-
ically approved by the NFLPA;

(b)    the term "G-3" shall mean any League stadium construction
support program involving League loans or cash contributions to, or in-
vestments in, stadium construction projects (including but not limited to
the program established by 1999 NFL Resolution G-3 and extended by
2003 NFL Resolution JC-1), but shall not include any League stadium con-

struction support program involving temporary exemptions from NFL sharing rules of particular revenue streams;

(c)      the Salary Cap credit counted towards the Stadium Credit in respect of G-3 projects approved and first funded after the 2005 League Year shall be 50% of the Annual Amortization Amount in respect of such stadium, with no cap on the amount of such Salary Cap credit as long as the amounts have been expressly approved by the NFLPA;

(d)      the Salary Cap credit counted towards the Stadium Credit in respect of G-3 projects approved and first funded in or before the 2005 League Year shall be 50% of the Annual Amortization Amount in respect of up to $300 million (present value) in qualifying private contribution to the construction of such stadium (the credits defined in Subsections (c) and (d) are hereinafter referred to as the "Project Credits");

(e)      the "Annual Amortization Amount" for each G-3 stadium shall be the amortization charge for that year in respect of all qualifying private contributions to construction of such G-3 stadium project, calculated (1) over a 15-year period (or less if a shorter amortization period is used) (the "G-3 Amortization Period"), and (2) with interest at an agreed-upon rate based on the NFL's long-term borrowing cost to fund stadium construction support provided in the first year in which such support was provided to such project.

(iii)      If in any Capped Year prior to the Final Capped Year, the sum of that year's Project Credits and Security Credit (the "Actual Annual Credit") is less than the full base amount of the Stadium Credit (i.e., 1.8%), the difference between such base Stadium Credit and such Actual Annual Credit ("banked credits") will be "banked" and available for use (and shall be the first credits used, before any incremental Stadium Credits in excess of 1.8% that may be granted by the NFLPA are used) to offset future years' Actual Annual Credits to the extent such Actual Annual Credits exceed the 1.8% set deduction in any League Year; provided that such banked credits will not be available without the NFLPA's express approval to offset Actual Annual Credits in excess of 2.3% of TR in any such League Year. To the extent that the "bank" is not fully eliminated by application to subsequent Actual Annual Credits, each Club shall receive a deduction from its Team Salary in the Last Capped Year equal to its pro rata share of the unused portion of the "bank" (which deduction from Team Salary shall create additional Room for each Club).

(iv)      If a franchise that received G-3 funding approval is sold during its G-3 Amortization Period, the Project Credit in respect of that franchise will cease (provided that Project Credits in respect of the year the franchise sale is closed will be pro-rated and will cease only as of the closing date of the sale) and the Actual Annual Credit will accordingly be reduced.

(v)(1)  The termination of future Project Credits will be the only mechanism by which the NFLPA's support for G-3 projects is adjusted in the event of Club sales for so long as the NFL's only repayment requirement/re-

99

capture mechanism in respect of sales of G-3 recipient Clubs is payment to the NFL of the "unamortized balance" of such franchise's G-3 support (calculating such unamortized balance over 15 years on a straight-line basis) plus (a) interest adjustments (if any), (b) any deficiencies in respect of Club guarantees of revenues that are dedicated to and applied to repay League-level borrowings to fund the G-3 support given to the Club, and (c) compensation to other Clubs for stadium credits against the Salary Cap and/or PSL exclusions from TR lost to the League as a result of the sale.

(2)     If the NFL imposes any incremental repayment requirement or recapture mechanism in respect of G-3, PSL, or premium seat support that is applicable when recipient franchises are sold, the NFLMC and the NFLPA will negotiate in good faith an equitable adjustment mechanism in respect of payments made to the NFL in connection with the sale of such recipient franchises, with the objective of providing to the NFLPA recapture or repayment of Project Credits on a basis comparable in nature, as well as proportionate in amount, to the NFL's incremental recapture or receipt of repayment in respect of G-3, PSL, and/or premium seat support. If the parties are unable to agree, the Special Master shall determine the amount or mechanism to be used for an equitable adjustment for the NFLPA.

(vi)     Project Credits in respect of G-3 funding first advanced after the 2005 League Year will begin to count towards the Stadium Credit in the League Year prior to the scheduled opening of the new stadium.

(vii)     There will be no limit on the Project Credit for any individual project approved and first funded after the 2005 League Year, but the qualifying private contributions to the Project Credit, and the resulting Annual Amortization Amount, in respect of each project will be subject to NFLPA approval prior to the initial NFL support funding for such project. Also, in furtherance (and not in limitation) of Section 1(a)(x)(8) above, any proposal for exclusion of PSL or premium seat revenue from TR in respect of PSLs or premium seats to be sold in connection with any stadium receiving G-3 support (and seeking Project Credits in respect of such support) shall be subject to approval by the NFLPA on a case-by-case basis, and all such PSL or premium seat revenue shall be included in TR in the absence of express NFLPA approval.

(viii)     The definition of stadium construction costs used by the NFL as of the end of the 2005 League Year (which has been provided to the NFLPA) to determine the amount of G-3 funds to be advanced to Clubs will be used to calculate the Stadium Credit, except that the capitalized value of rent paid to a third-party (i.e., unaffiliated) landlord in excess of a $2 million annual deductible that is deemed under such NFL definition to be a capital investment will be considered a capital investment for Stadium Credit purposes and will give rise to a Stadium Credit only if (1) a Club commits to pay such excess rent pursuant to documents entered into in connection with, but in advance of commencement of construction on, a stadium construction project; (2) the landlord will be providing bond fund-

100

ing for stadium construction pursuant to such documents; (3) the land-
lord's bond funding is used for costs that are "qualifying project costs" un-
der the G-3 program; and (4) the bond funding is greater than the amount
of the rent deducted. The NFLPA has the right to review stadium project
spending independently to verify that the G-3 stadium construction cost
definition has been properly applied, with any disputes subject to review
by the Special Master pursuant to Article XXVI.

(ix)     Total TR must increase as a result of each G-3 project, after all TR
deductions resulting from the project are counted.

(x)      Notwithstanding anything else in this Agreement, if a Club
and/or Club owner owns a stadium constructed with G-3 funding, then
revenues derived from non-football events/operations at the stadium are
first deemed to be applied to cover non-football operating costs, then to
cover general stadium overhead and operating costs (excluding NFL event
game day costs). The amount of any excess non-football event revenues re-
maining after such subtractions will be applied to reduce the outstanding
"private contribution" towards the stadium project, thus producing a cor-
responding 50% reduction in the Salary Cap deduction in respect of the G-
3 Project. (Example: Team-owned stadium has $10 million in gross concert
income, direct concert costs of $2 million, and stadium overhead of $4 mil-
lion. $4 million in net concert income is applied to reduce the outstanding
"private contribution" in respect of the stadium project, which will result
in a lower Salary Cap deduction amount.) If the amount of the "private con-
tribution" has been fully amortized, revenues from non-football events/op-
erations for such stadium will not constitute Total Revenues.

(xi)     PSL/premium seat deductions from TR are not available for any
G-3 stadium project approved and first funded before the 2006 League
Year. As to any G-3 stadium project (including projects approved and first
funded before the 2006 League Year), (a) no deductions from TR are avail-
able for naming rights revenues (to the extent received by or on behalf of a
Club or Club Affiliate) that are used for the construction or renovation of
such stadiums, but such revenues (if so used) shall constitute private con-
tributions to the project for purposes of calculating the private contribution
thereto (which will give rise to Project Credits to the extent such credits are
approved by the NFLPA); and (b) there shall be no deduction in any League
Year through the 2008 League Year for depreciation as to luxury boxes in
any stadium for which a Stadium Credit is given (the parties reserve their
respective rights and positions with respect to depreciation for luxury box-
es thereafter). As to any G-3 stadium project approved and first funded af-
ter the 2006 League Year, all deductions from Total Revenues or otherwise
in the calculation of the Salary Cap with respect to such stadium will be
subject to approval by the NFLPA, in order for the project to qualify under
this Subsection (e).

101

*Section 5.* **Minimum Team Salary:**

(a)      For the 2006 League Year, there shall be a guaranteed Minimum Team Salary of 84% of the Salary Cap. For each subsequent Capped Year, the percentage set forth in the prior sentence shall increase 1.2%, but in no event shall the percentage be greater than 90%. For example, in the 2008 League Year, there shall be a guaranteed Minimum Team Salary of 86.4% of the Salary Cap. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each Capped Year. There shall be no Minimum Team Salary in the Final League Year.

(b)      Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c)      Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d)      If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

*Section 6.* **Computation of Team Salary:** During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)      **Player Contracts.** Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised, options, shall be included in Team Salary.

(b)      **Tenders.**

(i)      Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)      For players with less than three (3) Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)      For players who are Restricted Free Agents, the Qualifying Offer will be included in Team Salary when tendered until the player is signed,

**102**

the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv)    For players who are Unrestricted Free Agents, the June 1 tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)    For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)    All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)    **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary except to the extent otherwise provided in Article XXXIV, Section 5.

(d)    **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)    **Grievances.** When a player salary grievance is filed against a Team, 50% of the amount claimed (or, for a player whose contract qualifies under Article XXXVIII-A, 50% of the player's Salary Cap count, prorated to reflect the number of weeks remaining in the regular season) will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made.

(f)    **Expansion Bonuses.** Except as set forth in Article XXXI (Expansion), any expansion bonuses paid to players shall be included in Team Salary.

103

(g)     **Other Amounts.** Any other Salary not listed above paid to players shall be included in Team Salary.

*Section 7.* **Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

(a)     **Paragraph 5.**

(i)     The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1)     Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)     Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)    **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the one-year Treasury Note rate published in *The Wall Street Journal* on February 1 in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b)     **Signing Bonuses.**

(i)     **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract (on a straight-line basis, unless subject to acceleration or some other treatment as provided in this Agreement), with a maximum proration of six years, in determining Team and Player Salary, except that:

(1)     Maximum proration shall be five (5) years (a) for contracts entered into during the period after the last regular season game of the 2005 League Year through the last regular season game of the 2006 League Year and (b) for contracts entered into during the period after the last regular season game of the League Year preceding the Final Capped Year through the end of the Final Capped Year. For purposes of this Subsection 7(b)(i)(1) only, a renegotiation or extension of a Player Contract shall be treated as a new Player Contract.

(2)     Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control,

104

such issue shall be resolved by the Impartial Arbitrator.

(3)      With respect to the proration of signing bonuses for Player Contracts entered into by Rookie players in which the player has the right to terminate based solely upon reporting, making the roster and/or playtime, such conduct shall automatically be deemed "within his sole control" unless the exercise of the right to terminate is also conditioned upon the following playtime requirements: (1) for players drafted in the first round, at least 35% of the plays if the triggering condition occurs in the first year of the Player Contract, and at least 45% of the plays if in any subsequent year; (2) for all other Rookie players, at least 15% of the plays if the condition occurs in the first year of the Player Contract, and at least 30% of the plays if in any subsequent year. The playtime requirements set forth above do not affect the signing bonus allocation for any contract entered into by players other than Rookies.

(4)      For any multiyear Player Contract entered into in a Capped Year prior to the last Capped Year that extends into any Uncapped Year, if (i) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all Capped Years of the Contract (but, if there are fewer than three (3) remaining Capped Years, during the first three (3) years of the Contract) is in the aggregate less than (ii) the portion of the Contract's signing bonus that would be allocated to those League Years if the signing bonus were prorated equally over the term of the Contract, then: the difference between the amounts calculated pursuant to (ii) and (i) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the Uncapped Years (the "Difference"), shall be deducted in equal portions from those Uncapped Years and reallocated in equal portions over the Capped Years of the Contract (or, if there are fewer than three (3) Capped Years within the term of the Contract, over the first three (3) years of the Contract). For purposes of this Subsection only, a renegotiation shall be treated as if it is an entirely new Player Contract.

(5)      [Omitted]

(6)      [Omitted]

(7)      If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

(8)      Any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The player shall receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X of the Stipulation and Settlement Agreement and Arti-

105

cle XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

(ii)    **Acceleration.**

(1)    For any player removed from the Team's roster, or whose Contract is assigned to another Club via waivers or trade, on or before June 1 in any League Year prior to the Final Capped Year, or at any time during the Final Capped Year, any unamortized signing bonus amounts will be included in Team Salary for such League Year, except that for each League Year preceding the Final Capped Year, each Club may designate up to two (2) Player Contracts that, if terminated on or prior to June 1 and if not renegotiated after the last regular season game of the prior League Year, shall be treated (except to the extent prescribed by Section 7(d)(iii) below) as if terminated on June 2, i.e., the Salary Cap charge for each such contract will remain in the Club's Team Salary until June 2, at which time its Paragraph 5 Salary and any unearned LTBE incentives will no longer be counted and any unamortized signing bonus will be treated as set forth in Subsection (2) below. If acceleration puts a Team over the Salary Cap, the Team will have seven (7) days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)    For any player removed from the Team's roster or whose Contract is assigned via waivers or trade after June 1, except in the Final Capped Year, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

(3)    In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, the Team Salary of the player's new team will not include any portion of the signing bonus.

(4)    Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary (notwithstanding the foregoing, if the player has one or more rights to terminate based upon one or more not "likely to be earned" incentives and the player also being on the roster at a subsequent time, no acceleration shall occur until both the incentive(s) and the roster precondition(s) have been satisfied). To the extent that such acceleration puts the Team over its Salary Cap in a League Year prior to the Final Capped Year, the difference shall be deducted from its Salary Cap for the following year; to the extent that such acceleration puts the Team over the Salary Cap in the Final Capped Year, the Team will have seven (7) days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

106

(5)     The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)     [*Omitted*]

(iv)     **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)     Any amount specifically described in a Player Contract as a signing bonus;

(2)     Any guaranteed reporting bonus;

(3)     Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)     Any option buyout amount, when paid or guaranteed;

(5)     The difference between the Salary in the second contract year and the first contract year when Salary in the second contract year is less than half the Salary called for in the first year of such Contract;

(6)     Any reporting bonus in the season of signing when a contract is signed after the start of training camp;

(7)     Any roster bonus in the season of signing when a contract is signed after the last pre-season game;

(8)     Any salary advance paid on a guaranteed basis;

(9)     Any guaranteed bonus tied to workouts;

(10)     Any salary advance which a player is not obligated to repay;

(11)     In a Player Contract executed after September 28, 2005, any amount of a Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, on a non-contingent basis for all of the guarantees. (Notwithstanding Subsections (8)-(9) above, a Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, but on a contingent basis for any of the potential guarantees, shall be included in Team Salary only in the League Year in which the bonus is earned by the player; e.g., in the case of an off-season roster bonus, in the League Year in which the player is required to be on the roster to earn the bonus. The rules set forth in this Subsection (11) shall not affect Salary Cap accounting for any other purpose.);

(12)     In a Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final Capped Year, each of the following, if it is to be earned or paid to the player in the Final League Year (which is an Uncapped Year): (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any off-season workout bonus that is contingent upon the player's participation in less than 32 days of the Club's off-season workout program; (c) any off-season roster bonus; and (d) any

107

off-season reporting bonus;

(13)   In a Player Contract executed on or before September 28, 2005, any Paragraph 5 Salary which was guaranteed for 2006 or earlier and treated as a signing bonus on or before September 28, 2005;

(14)   In a Player Contract executed on or before September 28, 2005, any Paragraph 5 Salary which was guaranteed for 2007 or later and treated as a signing bonus on or before September 28, 2005, in which case any allocation to 2005 or earlier shall remain as is, and any allocation to 2006 or later shall be reallocated to occur entirely in the year(s) of the guarantee(s);

(15)   In a Player Contract executed on or before September 28, 2005, any roster bonus or Paragraph 5 Salary that the Club had the right to guarantee for skill, when the Club subsequently exercises the right to guarantee such bonus or Paragraph 5 Salary for skill;

(16)   Any bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, _except_ that the amount of any such completion bonus shall be calculated at its present value, computed at the one-year Treasury Note rate published in _The Wall Street Journal_ on February 1 of the League Year in which the Player Contract is executed. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Team's Salary Cap for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

(17)   Any relocation bonus which is individually negotiated between a player and a Club; and

(18)   Any increase in a player's Salary for the current League Year that occurs as a result of the renegotiation or extension of the player's Contract in that League Year, if the NFL Management Council does not receive notice of the salary terms of such an executed extended or renegotiated contract prior to 4:00 p.m. (New York Time) on the Monday of the tenth week of the regular season. The then-existing provisions of the CBA will govern the Salary Cap valuation of such a renegotiation or extension in the Final Capped Year. The parties have reserved their respective positions regarding the CBA's requirements for any such renegotiation or extension in the Final Capped Year.

Notwithstanding the above provisions or anything else in this Agreement, but subject to Section 7(d) below, any guaranteed Paragraph 5 Salary in a Player Contract executed after September 28, 2005, including but not limited to renegotiations or extensions of pre-existing Player Contracts, will not be treated as a signing bonus solely on the basis of the guarantee.

(v)   **Credit for Signing Bonuses Refunded.** In the event that a Team

receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year. For purposes of this Subsection, to the extent that they constitute reimbursement for previously paid signing bonus, insurance proceeds received by a Team as beneficiary to cover the player's inability to perform services required by his Player Contract shall be deemed a "refund from the player" if (a) the Club or the player purchased the policy (b) the amounts covered by the policy are so specified in the Player Contract; and (c) the policy is made available for inspection upon request by the Management Council or the NFLPA.

(c)    **Incentives.**

(i)    Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)    At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii)    At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equaling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

(iv)    Any team performance will be automatically deemed to be "likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will be automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.

(v)    Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto automatically will be deemed "likely to be earned."

(vi)    Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto automatically will be deemed "likely to be earned." Any incentive bonus that depends on

109

a player's individual performance in categories other than those used to as-sess performance at the player's primary position automatically will be deemed "likely to be earned."

(vii)    Any incentives "likely to be earned" by Rookies shall be valued at the percentages set forth in Exhibit C hereto.

(viii)   Any incentives based on a player receiving Honors or Media Recognition not listed on Exhibit D hereto shall automatically be deemed "likely to be earned."

110

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT A)
TEAM INCENTIVES

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by offense | Points allowed by defense | Own punt return average |
| Touchdowns scored by offense | Touchdowns allowed by defense | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| | | Opposition kickoff return average |
| Average net yards gained per rushing play | Average net yards given up per rushing play | |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

| ALL |
|---|
| Wins |
| Playoffs |
| Conference Championship |
| Super Bowl |
| Touchdowns on returns and recoveries |
| Net difference takeaways/giveaways |

111

(EXHIBIT B)
## INDIVIDUAL INCENTIVES

### RUSHING

Total yards

Average yards
(100 attempts)

Touchdowns

### PASSING

Passer rating
(224 attempts)

Completion percentage
(224 attempts)

Interception percent
(224 attempts)

Total yards

Yards per pass
(224 attempts)

Touchdown passes

### RECEIVING

Total receptions

Total yards

Average yards
(32 receptions)

Touchdowns

### DEFENSE

Interceptions

Interception return yards

Touchdowns on interception
returns

Opponent fumble recoveries

Opponent fumble return yards

Touchdowns on opponent
fumble returns

Sacks

### PUNT RETURNS

Total yards

Average (20 returns)

Touchdowns

112

(EXHIBIT B)
## INDIVIDUAL INCENTIVES

### KICKOFF RETURNS

Total yards

Average (20 returns)

Touchdowns

### PUNTING

Gross average (40 punts)

Net average (40 punts)

Inside 20-yard line

### PLACEKICKING

Total points

Field goals

Field goal percentage
(16 attempts)

Field goal percentage
0-19 yards (4 attempts)

Field goal percentage
20-29 yards (4 attempts)

Field goal percentage
30-39 yards (4 attempts)

Field goal percentage
40-49 yards (4 attempts)

Field goal percentage
50 yards or longer (3 attempts)

### OTHERS

Roster bonuses

Reporting bonuses

Playtime bonuses
(excluding special teams)

Special teams playtime

113

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| CATEGORY | | PERCENT COUNTED |
|---|---|---|
| ROSTER BONUSES | | |
| (regular season) | | |
| All Drafted | | 100% |
| Undrafted | | 30% |
| ROSTER BONUSES | | |
| (pre-season) | | |
| All Players | | 100% |
| PLAYING TIME | ROUNDS 1-3 | |
| | Up to 33% | 100% |
| | 34% - 75% | 75% |
| | 76% - 90% | 50% |
| | 91% - 100% | 25% |
| | ROUNDS 4-8 | |
| | Up to 25% | 100% |
| | 26% - 33% | 75% |
| | 34% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | UNDRAFTED | |
| | Up to 15% | 100% |
| | 16% - 25% | 75% |
| | 26% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | All percentages will round to the nearest whole percentage (e.g., .05 is rounded to 1.0) | |
| SPECIAL TEAMS | ROUNDS 1 - 3 | 100% |
| PARTICIPATION | ROUNDS 4 - 8 | 66% |
| | UNDRAFTED | 50% |
| HONORS | ROUNDS 1 - 2 | |
| (First or Second Team) | All-Rookie | 100% |
| | All NFL, Pro Bowl | 5% |
| | All Conference | 10% |
| | ALL OTHERS | |
| | All-Rookie | 15% |
| | All Conference | 5% |
| | ALL | |
| | Rookie of Year ("ROY") | 0% |
| | NFL or Conf. ROY | 0% |
| | ROY - Offense - NFL | 0% |
| | ROY - Defense - NFL | 0% |

114

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

### RUSHING

| | | |
|---|---|---|
| Total Yards Rushing | ROUNDS 1 - 3 | |
| | Up to 150 yards | 100% |
| | 151 - 350 yards | 75% |
| | 351 - 500 yards | 66% |
| | 501 - 700 yards | 33% |
| | 701 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 100 yards | 100% |
| | 101 - 350 yards | 66% |
| | 351 - 650 yards | 25% |
| | 651 yards or more | 0% |
| Average Yards (100 attempts) | ROUNDS 1 - 3 | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 66% |
| | 4.01 - 4.49 | 33% |
| | 4.5 or more | 0% |
| | ALL OTHERS | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 50% |
| | 4.01 - 4.49 | 25% |
| | 4.5 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

115

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

**PASSING**

| | | |
|---|---|---|
| Passer Rating | ROUNDS 1 - 3 | |
| (224 attempts) | 50 rating or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 50% |
| | 90.00 - 100.00 | 33% |
| | 100.01 or more | 0% |
| | ALL OTHERS | |
| | 50.00 or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 25% |
| | 90.01 or more | 0% |
| Completion Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | Up to 52% | 100% |
| | 52.1 - 56% | 66% |
| | 56.1 - 59% | 33% |
| | 59.01% or more | 0% |
| | ALL OTHERS | |
| | Up to 52% | 100% |
| | 52.1 - 56% | 50% |
| | 56.1 - 59% | 25% |
| | 59.01% or more | 0% |
| Interception Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | 3.0% or more | 100% |
| | 2.7 - 2.9% | 66% |
| | 2.1 - 2.6% | 33% |
| | 2.0% or less | 0% |
| | ALL OTHERS | |
| | 3.0% or more | 100% |
| | 2.7 - 2.9% | 50% |
| | 2.1 - 2.6% | 25% |
| | 2.0% or less | 0% |

116

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Passing | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 25% |
| | 1,201 yards or more | 0% |
| Yards Per Pass | ROUNDS 1 - 3 | |
| (224 attempts) | Under 6 | 100% |
| | 6.0 - 7 | 66% |
| | 7.1 - 8 | 33% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| | ALL OTHERS | |
| | Under 6 | 100% |
| | 6.0 - 7 | 50% |
| | 7.1 - 8 | 25% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| Touchdown Passes | ROUNDS 1 - 3 | |
| | Under 11 | 100% |
| | 12 - 16 | 66% |
| | 17 - 23 | 33% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |
| | ALL OTHERS | |
| | Under 11 | 100% |
| | 12 - 16 | 50% |
| | 17 - 23 | 25% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |

117

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

RECEIVING

| Total Receptions | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 20 catches | 100% |
| | 21 - 30 catches | 75% |
| | 31 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| | ALL OTHERS | |
| | Up to 10 catches | 100% |
| | 11 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| Total Yards Receiving | ROUNDS 1 - 3 | |
| | Up to 200 yards | 100% |
| | 201 - 300 yards | 75% |
| | 301 - 400 yards | 50% |
| | 401 - 800 yards | 25% |
| | 801 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 150 yards | 100% |
| | 151 - 250 yards | 75% |
| | 251 - 350 yards | 50% |
| | 351 - 700 yards | 25% |
| | 701 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (32 receptions) | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 75% |
| | 14.6 - 16.5 | 50% |
| | 16.6 - 18.5 | 25% |
| | 18.6 or more | 0% |
| | ALL OTHERS | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 66% |
| | 14.6 - 16.5 | 33% |
| | 16.6 - 18.5 | 10% |
| | 18.6 or more | 0% |

118

(EXHIBIT C)

### ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Receiving Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

**TOTAL OFFENSE**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 10% |
| | 1,201 yards or more | 0% |
| Scoring | ROUNDS 1 - 3 | |
| | 2 - 28 points | 100% |
| | 29 - 65 points | 50% |
| | 66 - 75 points | 25% |
| | 76 points or more | 0% |
| | ALL OTHERS | |
| | 2 - 28 points | 100% |
| | 29 - 55 points | 50% |
| | 56 - 75 points | 10% |
| | 76 points or more | 0% |

119

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

DEFENSE

| Interceptions | ROUNDS 1 - 3 | |
|---|---|---|
| | 1 - 5 | 100% |
| | 6 - 10 | 50% |
| | 11 or more | 0% |
| | ALL OTHERS | |
| | 1 - 3 | 100% |
| | 4 - 6 | 33% |
| | 7 or more | 0% |
| Interception Return Yards | ROUNDS 1 - 3 | |
| | 0 - 85 | 100% |
| | 86 - 150 | 66% |
| | 151 - 190 | 33% |
| | 191 or more | 0% |
| | ALL OTHERS | |
| | 0 - 65 | 100% |
| | 66 - 85 | 50% |
| | 86 - 110 | 25% |
| | 111 or more | 0% |
| Touchdowns on Interception Returns | ALL | |
| | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Opponent Fumble Recoveries | ALL | |
| | 1 - 2 | 100% |
| | 3 - 4 | 50% |
| | 5 or more | 0% |
| Opponent Fumble Return Yards | ROUNDS 1 - 3 | |
| | 0 - 40 | 100% |
| | 41 - 65 | 66% |
| | 66 - 80 | 33% |
| | 81 or more | 0% |
| | ALL OTHERS | |
| | 0 - 30 | 100% |
| | 31 - 55 | 50% |
| | 56 - 75 | 25% |
| | 76 or more | 0% |

120

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
### ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Touchdowns On | ALL | |
| Opponent Fumble | 1 | 100% |
| Returns | 2 | 50% |
| | 3 or more | 0% |
| Sacks | ROUNDS 1 - 3 | |
| | .5 - 4 sacks | 100% |
| | 4.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| | ALL OTHERS | |
| | .5 - 3 sacks | 100% |
| | 3.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |

**PUNT RETURNS**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 224 | 100% |
| | 225 - 349 | 33% |
| | 350 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 7.9 | 100% |
| | 8.0 - 10.9 | 33% |
| | 11.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

121

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

### KICKOFF RETURNS

| Total Yards | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 599 | 100% |
| | 600 - 649 | 33% |
| | 650 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19.9 | 100% |
| | 20.0 - 21.9 | 33% |
| | 22.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

### PUNTING

| Gross Average (40 punts) | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 42.4 | 100% |
| | 42.5 - 43.9 | 33% |
| | 44.0 or more | 0% |
| Net Average (40 punts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 35.9 | 100% |
| | 36.0 - 37.9 | 33% |
| | 38.0 or more | 0% |
| Inside 20-yard line | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 23 | 33% |
| | 24 or more | 0% |

122

## (EXHIBIT C)
## <u>ROOKIE "LIKELY TO BE EARNED" INCENTIVES</u>

### <u>PLACEKICKING</u>

| | | |
|---|---|---|
| Total Points | ROUNDS 1 - 3 | 100% |
| | Up to 86 points | 100% |
| | 87 - 95 points | 75% |
| | 96 - 104 points | 50% |
| | 105 - 113 points | 10% |
| | 114 points or more | 0% |
| | ALL OTHERS | |
| | Up to 75 points | 100% |
| | 76 - 90 points | 66% |
| | 91 - 99 points | 33% |
| | 100 - 109 points | 10% |
| | 110 points or more | 0% |
| Field Goals | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 26 | 33% |
| | 27 or more | 0% |
| Field Goal Percentage (16 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 75% | 100% |
| | 75.1 - 80% | 33% |
| | 80.1 - 100% | 0% |
| Field Goal Percentage 0-19 yards (4 attempts) | ALL | 100% |
| Field Goal Percentage 20 - 29 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 85% | 100% |
| | 85.1 - 95% | 33% |
| | 95.1 - 100% | 0% |
| Field Goal Percentage 30 - 39 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 70% | 100% |
| | 70.1 - 90% | 33% |
| | 90.1 - 100% | 0% |

(EXHIBIT C)
<u>ROOKIE "LIKELY TO BE EARNED" INCENTIVES</u>

| | | |
|---|---|---|
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 40 - 49 yards | ALL OTHER | |
| (4 attempts) | 0 - 55% | 100% |
| | 55.1 - 70% | 33% |
| | 70.1 - 100% | 0% |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 50 yards or longer | ALL OTHERS | |
| (3 attempts) | 0 - 45% | 100% |
| | 45.1 - 60% | 33% |
| | 60.1 - 100% | 0% |

124

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT D)
## HONORS AND RECOGNIZED MEDIA

**VETERAN HONORS**
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP — NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

**VETERAN MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
FOOTBALL DIGEST
USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

**ROOKIE HONORS (FIRST OR SECOND TEAM)\***
**ROUNDS 1-2**
ALL ROOKIE
ALL NFL, PRO BOWL
ALL CONFERENCE
**ALL OTHERS**
ALL-ROOKIE
ALL CONFERENCE
**ALL**
ROOKIE OF YEAR — NFL OR CONF
ROOKIE OF YEAR — OFFENSE — NFL
ROOKIE OF YEAR — DEFENSE — NFL

**ROOKIE MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS

\* *See* Exhibit C for Rookie Honors percentages

125

(ix)    The following is a non-exclusive list of rules that apply to incentives for Rookies:

(1) If the incentive is written for leading the Club in any official League statistical category (assuming it is on Exhibit A or B), it shall be valued at 0%;

(2) Rookie incentives shall be valued at 100%, for:

(A)    Any incentive written for any ranking other than first on the Club in any official League statistical category;

(B)    Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance);

(C)    Any incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.);

(D)    Any relocation or completion bonus;

(E)    Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards;

(F)    Any guaranteed salary or bonus;

(G)    Any pre-season or off-season statistics;

(H)    Any incentive based upon another player's performance; and

(I)    Any incentives based on leading the team in punting/kicking.

(3) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, then the following percentages shall be counted:

|             |      |
|-------------|------|
| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33%  |
| ROUNDS 6 - 8 | 10%  |
| ALL OTHERS   | 0%   |

(4) If a Rookie has an incentive bonus for touchdowns, the rushing and receiving touchdowns likely to be earned levels will apply to value the incentive;

(5) If a Rookie non-kicker has a Total Points incentive, the total points likely to be earned levels for a rookie kicker will apply to value the incentive.

(6) For Rookies, each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a first-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

(x)    [*Omitted*]

(xi)    Any team performance-related incentive will be revalued under

126

the "likely to be earned" rules if the contract is assigned to a new Team through trade or waiver.

(xii)   Any renegotiated contract will be revalued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a preexisting contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

(xiii)   Other than as set forth in Subsection (xiv) below, any incentive bonus to an offensive player that is based upon the defensive team's or special team's performance automatically will be deemed "likely to be earned." Conversely, any incentive bonus to a defensive player that is based upon the offensive team's or special team's performance automatically will be deemed "likely to be earned." Any incentive bonus based upon another player's performance automatically will be deemed "likely to be earned."

(xiv)   Any incentive bonus in a contract signed by a Rookie that is based upon special team performance automatically will be deemed "likely to be earned," except for an incentive bonus to a Rookie kicker or Rookie punter that is based upon improvement in the performance of the kicking or punting team. Any incentive bonus to a player who is not a Rookie that is based upon special team performance automatically will be deemed "likely to be earned" unless the player played in at least 50% of his team's special team plays in the previous season.

(xv)   Any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by determining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

(xvi)   Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 28th in the League in total offense will be deemed "likely to be earned" in a League consisting of 32 teams; similarly, an incentive bonus based on

127

a team finishing 14th in its Conference will be deemed "likely to be earned" in a Conference consisting of 16 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

(xvii)   Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

(xviii)  In any Player Contract signed by a Rookie, if more than three (3) different team performance categories are included as incentives, all but the three (3) incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contracts signed by Rookies selected in rounds one and two of the NFL draft, any team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override Subsection (ix)(2)(B) above. The calculation of these playtime requirements shall exclude special teams plays.

(xix)   In any Player Contract signed by a player other than a Rookie, if more than three (3) different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three (3) incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article XXIV, Section 7(c)(i). The calculation of these playtime requirements shall exclude special teams plays.

(xx)   Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted imme-

diately towards the Salary Cap and Entering Player Pool when they are earned.

(xxi)   Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding Subsections (ix)(1) and (ix)(2)(A) above.

(xxii)   Any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except: (1) as provided in Subsection (xx) above in regards to per play or per game occurrences; (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid; (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately; or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

(xxiii)   Any incentive bonus which a player and a Club agree to that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

(xxiv)   Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Pre-season roster bonuses are automatically deemed "likely to be earned."

(xxv)   Any incentive bonus (or portion thereof) that is earned during the Final Capped Year, but which had not been deemed likely to be earned at 100 percent of its value during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the Final Capped Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the Final Capped Year, become impossible for the player to attain.

(xxvi)   To determine the value of an incentive clause for Salary Cap purposes, under either Subsection (xxii) or (xxv) above, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had

1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

(xxvii)  If more than eight (8) different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight (8) incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X", shall be counted as three (3) performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).

(xxviii) Subsection (xxvii) above, does not supersede the terms of any other provisions or other agreements between the parties that automatically deem certain performance incentives to be "likely to be earned" or "not likely to be earned" depending upon whether the incentive fulfills other specified criteria.

(xxix) Subsections (xxvii) and (xxviii) above, do not apply and the parties reserve their rights with respect to multiyear contracts containing team performance incentives in more than one year.

(d)      **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)      In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the Final Capped Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the Final Capped Year is not fully guaranteed. For example, without limitation on any other applicable example, and if the Salary Cap is in effect during the 2010 and 2011 League Years, and the player enters into a

130

four-year contract which is not fully guaranteed for the 2011 League Year, which is the Final Capped Year, but is fully guaranteed for the 2012 and 2013 League Years, which are Uncapped Years, then the full amount of the guaranteed Salary for the 2012 and 2013 League Years will be included in Salary and Team Salary for the 2010 and 2011 League Years in a proportion determined by the Team.

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond three (3) years after the Final Capped Year will be included in Salary and Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

(iii)    Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Subsection 7(b)(ii)(1) above, shall apply.

(iv)    If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the Final Capped Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

(v)     For purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Subsections 7(d)(i)-(iv) above.

(e)     **Other Amounts.**

(i)     **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

(ii)    A fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), constitutes an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of Subsection 7(e)(i) above.

(iii)   **Salary Advances.** Except as provided in Subsection 7(b)(iv) above, the full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

131

(iv)     **Non-Cash Provisions.**

(1)     The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(2)     Any tangible item of value provided to unsigned players (or their affiliates) recruited by Clubs will be included in Team Salary. Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits. Miscellaneous costs associated with recruiting unsigned players but not paid to players (or their affiliates) are not included as part of Salary or Benefits, except as set forth above.

(3)     Expenses for travel, board and lodging for a player participating in an off-season workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. *See* Section 1(b)(vi) above (including such expenses in Player Costs as Benefits). Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.

(4)     The voluntary provision to all players on a Club of meals, team apparel, or one team trip for celebrations in each League Year (plus any trips to the White House for the Super Bowl Champions) will not be included in Team Salary or Player Costs. This Subsection does not affect the treatment of consideration paid to a player for services other than football playing services, as provided in Section 1(c)(ii) above.

(5)     Except as provided in Subsections 7(e)(iv)(2)-(4) above, and Article XVII, Section 4(n) (concerning Rookie Orientation Programs), if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for nonfootball playing services, which are subject to Section 1(c)(ii) above.

(6)     Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having a fourteen-week workout

132

program in the 2006 League Year for 60 players to be paid at the minimum amount will include $369,600 in its Team Salary on the first day of such program ($110 per day x four workout days per week x fourteen weeks x sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

(7)     If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three (3) or more seasons, the fair market value of such gifts up to $15,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. Notwithstanding the previous sentence, if the player has been under contract with the Club in less than three (3) seasons, the entire fair market value of any such gifts shall be counted as Salary.

(v)     **Annuities.** The cost to the Team of any annuity provided to any player (but not including any annuity provided pursuant to the player annuity program described in Article XLVIII-A), computed at the one-year Treasury Note rate on February 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)     **Traded Contracts.**

(i)     In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(ii)     A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.

(g)     **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

**Section 8. 30% Rules:**

(a)     No NFL Player Contract entered into in an Uncapped Year prior to the Final League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the contract per year. This rule shall not apply in any Capped Year to any Player Contract that was signed in the 1993 League Year or earlier.

(b)     No NFL Player Contract entered into in a Capped Year and ex-

133

tending into the Final League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the Final Capped Year, per year, either in the Final League Year or in any subsequent League Year covered by the Player Contract. For example, without limitation on any other applicable example, a four-year Player Contract signed in the 2011 League Year, assuming that it is Capped, may not provide for an annual increase of more than 30% of the 2011 League Year Salary, excluding amounts treated as a signing bonus, in any of the three (3) additional League Years covered by the Contract.

(c)       Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 30% Rule, set forth above. (The parties acknowledge a disagreement as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this Subsection (c), the terms of this Subsection may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this parenthetical.).

(d)       Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 30% Rule, set forth above, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Section 9.* **Renegotiations and Extensions:**

(a)       Provided that all Salary Cap requirements are met, Player Con-

134

tracts for current and future years may be renegotiated and/or extended except as follows:

(i)     The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve (12) months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(ii)     No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(iii)     No contract renegotiations may be done for a current season after the last regular season game of that season.

(iv)     A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(i).

(v)     As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

(b)     No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

(c)     Any agreement to compensate a player at the minimum amount set forth in Article XXXV for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

(d)     Any salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Entering Player Pool shall not be treated as a renegotiation.

(e)     An amendment to a Player Contract that changes the terms under which Signing Bonus is paid is a renegotiation.

***Section 10.*** **Accounting Procedures:**

(a)     **Special Purpose Letters and TR Reporting.**

(i)(A)     As provided below, each League Year the parties will be provided with one or more "Special Purpose Letters" by an independent accounting firm (hereinafter "the Accountants") which report the Total Revenues, Team Salary, Cash Player Costs, Player Costs and Benefits of each Club and the NFL for that League Year, utilizing information reported by independent Club and League accounting firms, and information obtained by the Accountants through its review procedures. The Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the Clubs and the League in providing information to the Accountants ("Revenue Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The

135

basic review procedures to be performed by the Accountants are set forth in Appendix H hereto, and may be modified and/or supplemented by mutual agreement of the parties. The engagement of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year. Each Special Purpose Letter shall be based upon the best available information at the time of its issuance, and shall include a report of adjustments and new information obtained with respect to amounts previously reported for prior League Years.

(B)     The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year shall be determined at the times and utilizing the Special Purpose Letters and other information described in Section 10(e) below, subject to adjustments at the times and in the manners described in Subsections (ii) and (iii) of this Section 10(a).

(ii)     Subject to Subsection 10(a)(iii) below, in the event than any error is found in (1) DGR, EDGR, or Player Costs in respect of the 2005 League Year or any earlier League Year; or (2) in Total Revenues or Player Costs in respect of any League Year subsequent to the 2005 League Year, which, if it had not occurred, would have resulted in any increase or decrease in any Salary Cap in one or more prior League Years, the total amount of any such Salary Cap shortfall or overage, as the case may be, shall be added or subtracted, as the case may be, the next time the Salary Cap is calculated. An inaccuracy in an estimate that was made in a prior League Year shall not be considered an error for purposes of this Subsection, and such estimates shall be reconciled by the Accountants each League Year. In the event that an inaccuracy in an estimate is not reconciled, the failure to do so shall be considered an error for purposes of this Subsection. Any individual errors proposed for correction pursuant to this Subsection that are greater than $25,000 must be substantiated by evidence and be reviewed with the Management Council, the NFLPA, and the Accountants prior to the correction being made. Any dispute regarding such corrections shall be subject to the procedures that apply under Subsections 10(a)(ix)-(x) below.

(iii)     To the extent that the amounts and information set forth in a Special Purpose Letter indicate that the amount of any Salary Cap and/or Minimum Team Salary in any prior League Year should have been different from the amount actually utilized, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to the next Salary Cap and/or Minimum Team Salary to be set, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of each applicable League Year) (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. In the case of any updated Special Purpose Letter issued in the Final Capped Year, such adjustment shall be immediate.

(iv)     The Accountants shall review the reasonableness of any esti-

136

mates of revenues or expenses included in any Club's Revenue Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made as provided in Section 10(a)(ii) above.

(v)     With respect to expenses deducted by the NFL or the Clubs from television, cable and radio broadcast revenues or any other revenues, the NFL and the Clubs shall report in the Revenue Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i) above. All categories of expenses deducted from such revenues by the NFL or a Club in a Revenue Report completed by the NFL or that Club shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(vi)     The Accountants shall receive, in connection with their duties: (1) access to and copies of the local accountant workpapers with respect to the Schedule described in Appendix H; and (2) access to the financial audit workpapers of the local accountants or League Office (to the extent necessary), provided that any information derived from the access described in this clause (2) will be held in confidence and will not be part of any file subject to NFLPA review.

(vii)     The NFL will use its best efforts to ensure that any contract between the League, any Club, or any Club Affiliate, and any third party in connection with the sale or marketing of any source of TR shall include terms that provide to the Accountants and the NFLPA access to any and all financial and contractual information and documents in the possession, custody, or control of such third party to which the Club, Club Affiliate, or any other entity controlled by the owner of the Club has any right to any access, relating to such revenue source or any other financial or contractual relationship or transaction between such third party and the League, the Club involved in the sale or marketing of such revenue source, any Affiliate of that Club, or any of that Club's owners. In each case such access shall be subject to and limited by the rules set forth in this Agreement or otherwise agreed to by the parties regarding the dissemination of information provided to the Accountants and the NFLPA pursuant to the audit process. If the NFL, despite its best efforts, cannot ensure such access, the NFLPA shall have the right to obtain an order against the Club or Club Affiliate from a court or the Special Master requiring that such access be allowed.

(viii)     Reasonably prior to the issuance of a Special Purpose Letter, the Accountants shall, as set forth in Appendix H attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Clubs or any other information contained in the Revenue Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other infor-

137

mation contained in the Revenue Reports submitted by the Clubs.

(ix)     In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the Revenue Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of Subsection (iv) or Subsection (v), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(x)     Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a Revenue Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(xi)     After receiving a Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in such Special Purpose Letter. Bennett Hutt & Co. or another auditing firm replacing Bennett Hutt & Co. (subject to notification to and approval by the NFLMC, not to be unreasonably withheld, of such replacement for Bennett Hutt & Co.) (Bennett Hutt & Co. or such replacement firm hereinafter being referred to as the "NFLPA Auditor") may copy documents it reviews in the course of its audits and maintain copies of documents reviewed in its office. Other than as set forth in this Subsection, the NFLPA Auditor may not show any such copies to anyone other than its partners, employees, and agents. The documentation made available and

the information contained therein shall be held in strict confidence and may be discussed only with individuals authorized in this Subsection, or as jointly authorized by the NFL Management Council and the NFLPA. The NFLPA Auditor may prepare one or more written or oral reports for the use of the NFLPA in connection with this Agreement, which may refer to and discuss the contents of documents reviewed, but which may not include copies of any such documents. Any such report shall not be referred to or distributed to anyone outside of the NFLPA or the NFLPA Auditor for any other purpose. If the NFLPA determines in the exercise of its judgment that matters discussed in the NFLPA Auditor's report may indicate a violation of this Agreement, then the NFLPA Auditor may show a copy of such documents that it considers in the exercise of its judgment to be relevant to such potential violation to counsel for the NFLPA (who as of the date hereof are also serving as Class Counsel), the Executive Director and General Counsel of the NFLPA, up to three (3) NFLPA staff personnel (whose authority to receive such information shall be disclosed in advance to the NFLMC) and up to three (3) members of the NFLPA Executive Committee (whose authority to receive such information shall be disclosed in advance to the NFL Management Council). In addition, a copy of such documents may be presented to the Special Master and/or a court in any proceeding to enforce this Agreement. At least four (4) business days prior to commencing any such proceeding based upon such documents, the NFLPA will advise the NFL Management Council of the alleged violation upon which the proceeding would be based; the parties shall stipulate to reasonable protective order terms and conditions to protect the confidentiality of such information. Except in connection with a proceeding as described in the preceding sentence, the NFLPA, its representatives and agents shall not refer to or distribute such copies to anyone outside of their organizations for any other purpose.

(b)   **Projected Total Revenues**

(i)   For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4-5, and 10(a) above and Section 10(e) below, and for any other purpose specifically stated in this Agreement, Total Revenues for the applicable League Year(s) shall be projected ("Projected Total Revenues") utilizing one or more agreed-upon methods for the projection process so that the anticipated growth of Projected TR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate TR over particular League Years pursuant to Section 1(a)(xii) above. Notwithstanding the foregoing, any difference between Projected TR and TR for a prior League Year shall be credited or deducted, as the case may be, in the calculation of the next Salary Cap and/or Minimum Team Salary to be set using the method set forth in Sec-

139

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

tions 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. In the Final Capped Year, all such differences and other adjustments from prior League Years shall be made first in the initial calculation of the Salary Cap and Minimum Team Salary, and then shall be updated, with any other differences and adjustments discovered or agreed to subsequent to the initial calculation of the Salary Cap and Minimum Team Salary (a) on or before the third day prior to the beginning of the Final Capped Year, if and only if the Final Capped Year is determined on the basis of an election by either the NFL Management Council or the NFLPA to terminate one or more Capped Years hereunder, and (b) in all cases, on or before May 1 in such Final Capped Year. Moreover, if one or more League-wide television or local television and radio contracts are in effect for the League Year in respect of which the Salary Cap and Minimum Team Salary are being calculated, the actual revenues expected from such source under such contract shall be used in the determination of Projected TR, unless another allocation has been or is agreed to by the parties. Notwithstanding the foregoing or anything else in this Agreement, if, after the initial calculation of the Salary Cap, Minimum Team Salary, and Projected TR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected TR, and the Salary Cap and Minimum Team Salary calculated for that League Year shall immediately be adjusted accordingly. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected TR will include an additional projection of TR determined in a manner agreed to by the parties. In addition, if, after the initial calculation of Projected TR for a League Year, the number of scheduled regular season games per Club is increased above the standard of sixteen (16), Projected TR will include an additional projection of TR to account for such additional games as agreed upon by the NFLPA and the Management Council.

(ii)     In the event that actual Total Revenues for any League Year are less than Projected TR (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the difference shall be deducted from Projected Total Revenues for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iii)     In the event that actual Total Revenues for any League Year exceeded Projected TR (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Total Revenues for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made), ex-

140

cept that if, in respect of the 2008 League Year or any subsequent Capped Year, on the basis of the final Reporting Packages for the most recently completed League Year it is determined by the May 1 subsequent to the setting of the Salary Cap and Minimum Team Salary for the subsequent League Year (e.g., by May 1, 2007, in respect of the 2008 League Year, the Salary Cap and Minimum Team Salary for which were set three (3) days prior to the beginning of the 2007 League Year) that actual Total Revenues for the most recently completed League Year exceeded Projected TR for such League Year, the amount of such deficiency shall be set forth in an updated Special Purpose Letter to be issued on such May 1 and shall be taken into account in calculating the Projected Total Revenues for such subsequent League Year, and the Salary Cap and Minimum Team Salary for such subsequent League Year shall be appropriately increased to reflect such addition.

(iv)     Any adjustments pursuant to Section 10(a)(iv) above will be subtracted from or added to Projected TR as appropriate.

(c)     **Timetable and Procedures**

(i)     On or before the date of the Super Bowl in each League Year prior to the Final Capped Year, the parties will meet for the purposes of agreeing upon projections to be used in the calculation for the next Salary Cap and Minimum Team Salary to be set, including:

(A) incremental stadium-related revenues from the opening of any new stadium, any major renovation of an existing stadium, or any known major modification of an existing stadium lease;

(B) percentage increases to be used in the projections of the following categories of revenue (except to the extent addressed by Subsection (c)(i)(A) above): (1) gate receipts; (2) all other Club TR; and (3) all other League TR.

(ii)     In the absence of agreement within ten (10) business days after such meeting, such increases shall be projected on the basis of:

(A) for stadium-related revenues pursuant to Subsection (c)(i)(A) above, (1) the most recent projections used to secure financing of the stadium construction or renovation costs or to secure the lease modifications or, (2) in the absence of such projections, a determination by the Accountants, after consultation with both parties, subject to review by the Special Master pursuant to Article XXVI.

(B) for other projections described in Subsection (c)(i)(B) above, assuming a percentage increase at the annual percentage increase for that category of revenues over the prior four (4) League Years (on a per-Club basis for Club revenues and on a League-wide basis for revenues of the League, NFL Ventures, and other League affiliates). In the event of any dispute over such average annual percentage increases, the percentages shall be determined by the Accountants, after consultation with both parties, subject to review by the Special Master pursuant to Article XXVI.

(iii)     Notwithstanding Subsections 10(c)(i)-(ii) above, in the event that the NFL expands in the future by the addition of one or more Teams,

141

the parties will meet on or before October 15 of the League Year prior to the first League Year in which the expansion Club will play NFL games to agree upon a methodology for revenue projections for the following League Year attributable to the expansion Team. In the absence of agreement prior to December 15, such revenues shall be projected on the basis prescribed by Section 10(b)(i) above and Paragraph 10 of the settlement agreement of the parties on this subject dated June 6, 1996.

(d)    **Projected Benefits.**

(i)    For purposes of computing the Salary Cap and Minimum Team Salary to be applied in a League Year in accordance with Sections 4-5 above and Section 10(e) below, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the applicable League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)    In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(d)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iii)    In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(d)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iv)    In the event the NFLPA exercises any right to reduce or freeze or increase certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

(v)    In the event the amount of Projected Benefits is adjusted pursuant to (1) Subsection (d)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, then the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

(e)    **Setting the Salary Cap.**

(i)    **2008 and Subsequent Capped Years.** The Salary Cap and Minimum Team Salary for the 2008 League Year and each subsequent Capped

142

Year shall be set at least three (3) days before the beginning of the League Year immediately preceding the relevant Capped Year, based upon Projected Total Revenues and Projected Benefits for the relevant Capped Year, as provided in Subsections 10(b)-(c) above, utilizing the information contained in a Special Purpose Letter which the Accountants shall issue on or before the date on which such Salary Cap and Minimum Team Salary are to be set, and shall be subject to adjustment upwards, but not downwards, on the May 1 immediately following the setting of such Salary Cap and Minimum Team Salary in accordance with Section 10(b)(iii) above, based on an updated Special Purpose Letter to be issued on or before such date (if issuance of such an updated Special Purpose Letter is appropriate in light of the Total Revenues reflected in the final Reporting Packages for the then-most recently completed League Year).

(ii)     **2011 League Year.** If neither of the parties terminates either of the final two Capped Years of this Agreement pursuant to Article LVIII, Section 3(a), the Salary Cap and Minimum Team Salary for the 2011 League Year (the Final Capped Year) shall be initially set at the time specified in Subsection 10(e)(i) above, and shall be finally determined within five (5) business days after May 1, 2011, utilizing information contained in a final Special Purpose Letter issued by the Accountants on or before May 1, 2011.

(iii)     **Early Termination Provisions.** If either of the parties terminates one or both of the final two Capped Years of this Agreement pursuant to Article LVIII, Section 3(a), with the result that a League Year earlier than the 2011 League Year becomes the Final Capped Year, then the Salary Cap and Minimum Team Salary for the League Year that has become the Final Capped Year as the result of such termination (a) shall be updated on or before the third day prior to the beginning of such Final Capped Year, utilizing information contained in a Special Purpose Letter which the Accountants shall issue on or before such date, and (b) shall be finally determined within five (5) business days after May 1 in such Final Capped Year, utilizing information contained in a final Special Purpose Letter issued by the Accountants on or before May 1 in such Final Capped Year.

(iv)     **Adjustments in Final Capped Year.** In setting the Salary Cap and Minimum Team Salary for the Final Capped Year, all differences and other adjustments shall be implemented in an updated Salary Cap and Minimum Team Salary, within five (5) business days of the issuance of the May 1 final Special Purpose Letter.

*Section 11.* **Revenue Sharing:** For each season during the term of this Agreement, there shall be a program of revenue or cost sharing among the NFL Clubs which shall (a) be based on the Resolution adopted by the NFLMC on March 9, 2006 (2006 Resolution MC-1), approving this Agreement (including "qualifiers" established under Paragraph 5 of that Resolution), (b) provide for incremental revenue sharing as compared to the

143

arrangements created by 1995 Resolution G-6, and (c) be reasonably satis-
factory to the NFLPA. The revenue sharing program described to the
NFLPA by memorandum dated March 10, 2006, has been determined by
the NFLPA to be satisfactory. Any material modification to that program
must also be reasonably satisfactory to the NFLPA.

144

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY CAP
# AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time, enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; and/or (b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Total Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Con-

145

tracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

*Section 5.* **Special Master Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

*Section 6.* **Sanctions:**

    (a)    **Players and Agents.** In the event that the Special Master finds a violation of Subsection 1(a) or 1(b) of this Article, for each such violation: (i) (1) the Special Master may impose a fine of up to $375,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

    (b)    **Clubs.** In the event that the Special Master finds a violation of Section 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $5,250,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two (2) draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $375,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the Special Master finds a violation of Subsection 1(b) of this Article, for each such violation, the Special Master may: (i) impose a fine of up to $5,250,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $375,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the Special

146

Master finds a violation of Subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two (2) draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall, unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of Subsection 1(a), taking into account the sanctions, if any, imposed by the Special Master. In amending the prior version of this Section in December 2000 and incorporating those amendments into this Section, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and those amendments shall not be considered in any resolution of that issue. For purposes of this Subsection 6(b), the term "Club personnel" shall not include players.

(c)     Subject to the parties' mutual reservation of their respective positions in the next to last sentence of Subsection 6(b) above, the sanctions set forth in Subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1-3 of Article XXIX (Certifications), and each of the sanctions set forth in Subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Paragraph 1 of this Article and Paragraphs 1-3 of Article XXIX (Certifications). All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article XI (Commissioner Discipline), Section 6. For each League Year after the 2006 League Year, each of the maximum fines set forth in this Paragraph 6 shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year). The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.

***Section 7. Revenue Circumvention:*** In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports Total Revenue ("TR") or non-TR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to such revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the Special Master finds a viola-

147

tion of this Section 7, the Special Master may impose a fine upon the Club of up to $3 million, which shall be donated as additional contributions to the youth football programs fund referenced in Article XXIV (Guaranteed League-wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiv)(1)(A) above. For each League Year after the 2006 League Year, the maximum fine set forth in this Paragraph 7 shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year).

*Section 8.* **Management Council Audit Rights.** The Management Council shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article. In agreeing to this Section, the parties have not waived or affected their respective positions as to whether the Management Council may conduct any Club-related audits beyond those set forth in the preceding sentence, and such amendment shall not be considered in any resolution of that issue.

*Section 9.* **Prior Consultation.** Reasonably prior to the initiation of a proceeding alleging a violation of Section 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the Management Council, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This section shall not require the disclosure of any attorney-client communication, or any work product created by or at the request of an attorney. In addition, any attempt by the League, the Management Council, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Section 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.

148

# ARTICLE XXVI
## SPECIAL MASTER

***Section 1. Appointment:*** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White</u> v. <u>NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

***Section 2. Scope of Authority:*** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

(a)      The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

(b)      The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

(c)      Subject to Subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

(d)      Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief

149

to effectuate and enforce this provision.

(e)     The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement regarding any TR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the

150

NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

*Section 6.* **Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven (11) attorneys (none of whom shall have nor whose firm shall have represented within the past five (5) years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty (30) days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety (90) days preceding the end of any term, but no later than thirty (30) days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

*Section 7.* **Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

151

# ARTICLE XXVII
# IMPARTIAL ARBITRATOR

*Section 1.* **Selection:** The parties shall select one of the Non-Injury Griev-ance Arbitrators who shall concurrently serve as the Impartial Arbitrator, who shall have exclusive jurisdiction to determine disputes that are specif-ically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

*Section 2.* **Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitra-tor pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

*Section 3.* **Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

*Section 4.* **Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery up-on the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period pro-vided for his determination. Such discovery may include the production of documents and the taking of depositions.

*Section 5.* **Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

*Section 6.* **Procedures:** All matters in proceedings before the Impartial Ar-bitrator shall be heard and determined in an expedited manner. A pro-ceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the sec-ond business day after such notice was given. All such notices and all or-ders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appear-ing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who

152

has given authority for such appearance.

***Section 7.*** **Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree that the Impartial Arbitrator shall be randomly selected from the then-currently serving Non-Injury Grievance Arbitrators. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety (90) days preceding the end of any term, but no later than thirty (30) days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

# ARTICLE XXVIII
# ANTI-COLLUSION

***Section 1.* Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

(a)      whether to negotiate or not to negotiate with any player;

(b)      whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(c)      whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

(d)      whether to exercise or not to exercise a Right of First Refusal; or

(e)      concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

***Section 1a.* Commissioner Approvals:** Any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA cannot be the basis of any claim of collusion. The NFLPA or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.

***Section 2.* Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)      that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three (3) Accrued Seasons, or a Franchise Player designation; or

(b)      that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

(c)      that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

(d)      that the player is or has been subject to any Right of First Refusal.

***Section 3.* Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in

154

Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

***Section 4. League Disclosures:*** Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

***Section 5. Enforcement of Anti-Collusion Provisions:*** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

***Section 6. Burden of Proof:*** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any

155

evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

***Section 7. Summary Judgment:*** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

***Section 8. Remedies:*** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)     To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three (3) sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this Subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)     To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

***Section 9. Computation of Damages:*** Upon any finding of a violation of

156

Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)  Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)  Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)  Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $3,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $3,000,000. For each League Year after the 2006 League Year, each of the enumerated fines set forth in this Subsection 9(c) shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year).

**Section 10. Player Election:** A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future dam-

157

Article XXVIII, Anti-Collusion

ages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

*Section 11.* **Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

*Section 12.* **Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

*Section 16.* **Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five (5) or more Clubs and caused injury to 20 or more players; or

(b)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two (2)

158

consecutive NFL seasons which, either individually or in total, involved seven (7) or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two (2) consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)    Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)    In order to terminate this Agreement:

(i)    The proceeding must be brought by the NFLPA;

(ii)    The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)    The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

159

## ARTICLE XXIX
## CERTIFICATIONS

*Section 1.* **Contract Certification:**

(a)     Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of the player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

(b)     In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)     In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)     No contract will be approved by the Commissioner unless accompanied by the certifications required by Subsections (a), (b), and (c) above.

(e)     Any failure to execute and submit a certification as required under Section 1(a) above may be deemed evidence of a violation of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1 of this Agreement. Any failure to execute and submit a certification as required under Section 1(b) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion) of this Agreement. Any failure to execute and submit a certification as required under Section 1(c) above may be deemed evidence of a violation of that provision.

*Section 2.* **End of League Year Certification:**

(a)     At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the

160

Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1. Upon receipt of such certification, the Management Council shall forward a copy of the certification to the NFLPA.

(b)    At the conclusion of each League Year, each player agent representing a player who was under contract to an NFL Club during that League Year shall submit to the NFLPA a certification confirming, after reasonable inquiry of all personnel in his or her agency with authority to negotiate Player Contracts, that neither he or she nor they has entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1. Upon receipt of such certification, the NFLPA shall forward a copy of the certification to the Management Council.

(c)    Any failure to execute and submit a certification as required under Section 2(a) or 2(b) above, may be deemed evidence of a violation of Article XXV, Section 1 of this Agreement.

(d)    At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, where such communication or disclosure is inconsistent with Article XXVIII (Anti-Collusion), Section 1. Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(e)    Any failure to execute a certification as required under Section 2(d) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

**Section 3. False Certification:** Any person or Club who knowingly executes or files a false certification required by Sections 1(a), 1(b), 2(a), or 2(b) of this Article shall be subject to a fine of up to $375,000, upon a finding of such violation by the Special Master. Authority to impose such a fine

161

shall rest with the Special Master or the Commissioner, consistent with the allocation of authority in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article XXV, Section 6 above.

162

# ARTICLE XXX
# CONSULTATION AND INFORMATION SHARING

*Section 1.* **Consultation and Communications:**

(a)      In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)      Subject to any claim of attorney-client and/or work product privilege, any communications under this Section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this Section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

*Section 2.* **Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected TR, and a revised estimate on the first day of each month thereafter in any such year.

*Section 3.* **Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

*Section 4.* **Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

163

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within two (2) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

164

# ARTICLE XXXI
# EXPANSION

*Section 1.* **Veteran Allocation:** The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three (3) per Club, excluding any player who has a no trade clause in his Player Contract.

*Section 2.* **Additional Compensatory Picks:** The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three (3) seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

*Section 3.* **Entering Player Pool Adjustment:** The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

*Section 4.* **Relocation Bonus:** Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $30,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $40,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

165

# ARTICLE XXXII
# OTHER PROVISIONS

*Section 1.* **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

*Section 2.* **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

*Section 3.* **Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

*Section 4.* **Roster Exemption:**

(a)    Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)    Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)    Restricted Players. Any player whose contract has expired and who either (i) has two (2) but less than three (3) Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three (3) Accrued Seasons), Section 2, or

166

Article XXXII, Other Provisions

Article XIX (Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)    If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)   If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(iv)    Any player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three (3) weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsections (i)-(iii) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(v)     No player may be placed on roster exempt under this Subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five (5) days prior to the Club's second pre-season game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsections (i)-(iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this Subsection, the player shall not be entitled to compensation.

(d)     Except as provided in Subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two (2) weeks of the regular season.

**Section 5. Arena Football Players:**

(a)     Players under an NFL Player Contract may not be allocated to a club in the Arena League, whether or not that Arena League club is commonly owned with an NFL Club.

(b)     Otherwise eligible Arena League players who would be Rookies in the NFL may be drafted by any NFL Club pursuant to current draft procedures, even if under contract to an Arena League Club.

167

Article XXXII, Other Provisions

(c)     Before a player under contract in the Arena League may be signed to an NFL Player Contract, he must be released by the Arena League club from any pre-existing contract obligations in the Arena League, including any residual contract rights relating to negotiation, first refusal, etc., and except for players to whom an NFL Club has draft rights, will be considered an Unrestricted Free Agent. This provision refers solely to contractual rights between a player and a team in the Arena Football League and does not refer to the terms of any collective bargaining agreement in the Arena League.

(d)     A player whose most recent contract to play professional football was with an AFL team ("Related AFL Team") that shares common ownership with an NFL Club ("Related NFL Club") may not sign a Player Contract with that Related NFL Club until after a period of 72 hours following the termination or expiration of the player's contract with the Related AFL Team. During that 72-hour period, the player shall be completely free to negotiate and sign a Player Contract with any other Club. The terms of this Subsection (d) are subject to any rights that any Club may have under Article XVI (College Draft), and any Club that has drafted such a player consistent with the terms of this Agreement may sign such a player at any time permitted by this Agreement.

(e)     NFL clubs and Arena League clubs may have common practice facilities, but may not participate in common classroom work, film study, drills, scrimmages, or other on- or off-field work.

(f)     Any NFL player suspended for one year or less in the NFL by the Commissioner or his Club may not play for an Arena League team that is commonly-owned with his NFL Club during any term of his suspension that overlaps with the period of time the player is under contract to his NFL Club.

(g)     If an Arena League club that is commonly-owned with an NFL Club engages in conduct that would violate NFL Rules, including but not limited to the NFL's anti-tampering policy, the violation shall be attributed to the NFL Club, so long as any sanctions are imposed consistent with the terms of this Agreement and the NFL Constitution and Bylaws.

168

# ARTICLE XXXIII
## SQUAD SIZE

*Section 1.* **Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

169

# ARTICLE XXXIV
# PRACTICE SQUADS

**Section 1. Practice Squads:**

(a)      The League may elect in any League Year in accordance with this Article to establish practice squads not to exceed eight (8) players per Club. The League's election in any one season shall not determine or affect its election in any subsequent season.

(b)      The League may elect to allow some or all Clubs to add to their practice squads one additional player, who shall not count against the limit above, whose citizenship and principal place of residence are outside the United States and its Territories ("International Player"). The League's election in any one season shall not determine or affect its election in any subsequent season. Such International Players shall be subject to the same terms and conditions of employment that apply to other practice players except that they (1) may not, during the term of their practice player contract, negotiate or sign an NFL Player Contract with any Club; and (2) may not practice with any Club following the last Conference Championship Game unless both Conference Championship teams have such a player. In addition, notwithstanding the provisions of Section 4 below, such International Player shall be eligible to serve on a Practice Squad for three (3) additional seasons after the completion of the player's year(s) as an International Player. As set forth in Article XXXIV, Section 3, the weekly salary for such international players shall not be included in the employing Club's Team Salary and shall be deducted from the calculation of the Salary Cap in the same manner as any Player Benefit.

**Section 2. Signing With Other Clubs:**

(a)      Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

(b)      Notwithstanding Subsection (a) above, a practice squad player may not sign an NFL Player Contract with his Club's next opponent later than 4:00 p.m., New York time, on the sixth day preceding the game (except in bye weeks, when the prohibition commences on the tenth day preceding the game).

**Section 3. Salary:** Minimum salary for a practice squad player shall be

170

$4,700 per week for the 2006-07 League Years, $5,200 per week for the 2008-10 League Years and the 2011 League Year if it is an Uncapped Year, and $5,700 per week for the 2011 League Year if it is a Capped Year and the 2012 League Year, including postseason weeks in which his Club is in the playoffs.

**Section 4. Eligibility:**

(a)      The practice squad shall consist of the following players, provided that they have not served more than two (2) previous seasons on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine (9) regular season games during their only Accrued Season(s). An otherwise eligible player may be a practice squad player for a third season only if the Club by which he is employed that season has at least 53 players on its Active/Inactive List during the entire period of his employment.

(b)      A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and been a member of the club's Practice Squad for at least three (3) regular season or postseason games during his first two (2) Practice Squad seasons, and for at least one regular season or postseason game during his third Practice Squad season. (A bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question.)

**Section 5. Active List:** If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three (3) weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three (3) games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the eight-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three (3) weeks salary that he is entitled to receive from Club B.

171

# ARTICLE XXXV
# OFF-SEASON WORKOUTS

**Section 1. Voluntary Workouts:** No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be strictly voluntary and take place in the manner and time period set forth in this Article.

**Section 2. Time Periods:**

(a)     Subject to the limitations in Subsection (b) below, from the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than fourteen (14) total weeks, and no more than four (4) workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

(b)     Each year off-season workout programs may not begin, and players may not be asked to voluntarily attend any such program, earlier than a date to be agreed upon by the Management Council and the NFLPA, and announced before the conclusion of the prior regular season. Each year on a date to be agreed upon by the parties, each Club shall provide the Management Council and the NFLPA with the Club's schedule for its off-season workout program that year, and shall advise the Management Council and the NFLPA in writing in advance of any changes to that schedule; if the Management Council provides such information to the NFLPA, the Club's obligation under this sentence shall be deemed satisfied. Notwithstanding the foregoing, any player who (1) is under contract or tender to an NFL Club; and (2) has been officially allocated by that Club to the NFL Europe League may commence voluntary off-season workouts with his NFL Club on the day following the NFL Europe League's prescribed yearly deadline for allocation of NFL players.

**Section 3. Payment:** Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $110 for the 2006 League Year; $120 for the 2007-08 League Years; $130 for the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $145 for the 2011 League Year if it is a Capped Year and the 2012 League Year. Players who (1) are under contract or tender to

**172**

an NFL Club; and (2) have been officially allocated by that Club to the NFL Europe League who participate in a Club's off-season workout program may also receive expenses for travel, board, and lodging subject to the terms and conditions set forth in Article XXIV, Section 7(e)(iv)(3).

**Section 4. Injuries:** Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous:**

(a)      No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

(b)      During the off season program period, except for the fourteen (14) days of organized team practice activity and mini-camps, players may be (1) at the Club facility no more than four (4) hours per day, no more than four (4) days per week, and not during weekends; and (2) on the field no more than ninety (90) minutes per day. In addition, the Club may not specify to any player more than two (2) specific hours a day during which it suggests that the player be at club facilities. Any player participating in an off-season workout program may select the other two (2) hours in which he wishes to attend to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.

**Section 6. Pre-Training Camp Period:** During the ten (10) consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or

173

any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

**Section 7. Rookie Premiere:** Invited Rookies will be permitted by their respective Clubs to attend the NFL Players Rookie Premiere provided that: (i) such event is scheduled during the month of May; (ii) such event encompasses a maximum of four (4) consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the Management Council with the dates for the next Rookie Premiere not later than February 1 of each year.

**Section 8. Enforcement:**

(a)    The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

(b)(i)   The Management Council and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules relating to off-season workouts set forth in this Agreement. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with copies of film or other documentation any repre-

174

sentative deems relevant to any possible violation.

(ii)    Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the Management Council, or sooner if practical, the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to a non-injury grievance arbitrator who will render a decision within forty-eight (48) hours of the submission of the dispute. If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL agree that a violation has occurred, the next scheduled week of the Club's off-season program shall be cancelled, excluding mini-camps, and no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's off-season program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for off-season workout pay. If the arbitrator finds two (2) separate violations of these rules in the same League Year, the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. No conduct occurring prior to the date upon which any non-injury grievance is filed under these rules may serve as the basis for a finding of a second violation by a Club; a second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed.

(iii)    Except as provided in the fourth preceding sentence, these limitations on off-season workouts shall not preclude any player from working out on his own at any time, including weekends. By agreeing to the sanctions in this Subsection (b), the parties have not waived or affected their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the Constitution and Bylaws.

175

# ARTICLE XXXVI
# MINICAMPS

**Section 1. Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two (2) additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

**Section 2. Length:** No minicamp may exceed three (3) days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

**Section 3. Expenses:**

(a)     Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

(b)     If a rookie player (defined as in Article XXXVIII, Section 1) signed a Player Contract with any Club for the prior League Year, he shall receive, for each day that he attends minicamp, the following compensation, but no other compensation: (i) the prorated portion of the weekly per diem specified for the current League Year (as set forth in Article XXXVII, Section 3); (ii) the meal allowance specified for the current League Year (as set forth in Article XXXIX, Section 1); and (iii) all travel expenses to and from the camp, plus housing (for players coming from out-of-town).

**Section 4. Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

**Section 5. Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

176

# ARTICLE XXXVII
# PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell/Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** A rookie player will receive "per diem" payments at the rate of $775 per week in the 2006 League Year, $800 per week in the 2007-08 League Years, $825 per week in the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year, and $850 per week in the 2011 League Year if it is a Capped Year and the 2012 League Year, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

**Section 4. Veteran Per Diem:** A veteran player will receive "per diem" payments at the rate of $1,100 per week in the 2006-07 League Years, $1,225 per week in the 2008-10 League Years and the 2011 League Year if it is an Uncapped Year, and $1,375 per week in the 2011 League Year if it is a Capped Year and the 2012 League Year, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games.

177

***Section 7. Telephones:*** Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

***Section 8. Expenses:*** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

# ARTICLE XXXVIII
## SALARIES

**Sections 1-5.** [Omitted]

**Section 6.** Minimum Salaries:

(a)    Beginning in the 2006 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| League Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Zero Credited Seasons | 275 | 285 | 295 | 310 | 325 | 340 | 355 |
| One Credited Season | 350 | 360 | 370 | 385 | 400 | 415 | 430 |
| Two Credited Seasons | 425 | 435 | 445 | 460 | 475 | 490 | 505 |
| Three Credited Seasons | 500 | 510 | 520 | 535 | 550 | 565 | 580 |
| Four-Six Credited Seasons | 585 | 595 | 605 | 620 | 635 | 650 | 665 |
| Seven-Nine Credited Seasons | 710 | 720 | 730 | 745 | 760 | 775 | 790 |
| Ten or more Credited Seasons | 810 | 820 | 830 | 845 | 860 | 875 | 890 |

(all amounts in thousands of dollars)

provided, however, that if any League Year other than the 2012 League Year is an Uncapped Year, then the minimum Paragraph 5 Salary for each such Uncapped Year shall only increase $10,000 from the prior League Year (e.g., if the 2010 League Year is Uncapped, then the minimum Paragraph 5 Salary for a player with zero Credited Seasons for 2010 shall be $320,000 instead of $325,000).

(b)    Beginning in the 2006 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding practice squad) shall be as follows:

| League Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Zero Credited Seasons | 180 | 190 | 200 | 215 | 230 | 245 | 260 |
| One Credited Season | 195 | 205 | 215 | 230 | 245 | 260 | 275 |
| Two Credited Seasons | 210 | 220 | 230 | 245 | 260 | 275 | 290 |
| Three Credited Seasons | 250 | 260 | 270 | 285 | 300 | 315 | 330 |
| Four-Six Credited Seasons | 275 | 285 | 295 | 310 | 325 | 340 | 355 |
| Seven-Nine Credited Seasons | 300 | 310 | 320 | 335 | 350 | 365 | 380 |
| Ten or more Credited Seasons | 325 | 335 | 345 | 360 | 375 | 390 | 405 |

(all amounts in thousands of dollars)

provided, however, that if any League Year other than the 2012 League Year is an Uncapped Year, then the minimum Paragraph 5 Salary for each such Uncapped Year shall only increase $10,000 from the prior League Year (e.g., if the 2010 League Year is Uncapped, then the minimum Paragraph 5 Salary

179

for a player with zero Credited Seasons for 2010 shall be $225,000 instead of $230,000).

*Section 7.* **Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three (3) or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

*Section 8.* **Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two (2) or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

*Section 9.* **Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

*Section 10.* **Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

*Section 11.* **Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

180

*Section 12.* **Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

*Section 13.* **Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement will be provided to the NFLPA within two (2) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

*Section 14.* **Split Contracts:**
    (a)      *[Omitted]*
    (b)      After the point in the regular season at which a player with four (4) or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 15.* **Funding of Deferred and Guaranteed Contracts:** The NFL may require that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club

181

funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

182

## ARTICLE XXXVIII-A
## MINIMUM SALARY BENEFIT

*Section 1.* **Qualifying Players:** For purposes of this Article, a "Qualifying Player" shall be defined as a player with four (4) or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.

*Section 2.* **Qualifying Contracts:** For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (a) covers only a single League Year and (b) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $40,000 in additional compensation for the 2006-08 League Years, or up to $50,000 in additional compensation for the 2009-11 League Years (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)), and/or (3) a guarantee for salary and/or Salary advance of up to the Minimum Salary for a player with two (2) Credited Seasons (e.g., $425,000 in the 2006 League Year). Thus, for example, a contract that includes an option year is not a Qualifying Contract. Similarly, a Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than $40,000 (2006-08 League Years) or $50,000 (for the 2009-2011 League Years) in additional compensation less the amount of any additional compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in additional compensation.

*Section 3.* **Additional Compensation Rules:**

(a)     Per-day off-season workout payments shall not be considered in determining "additional compensation" under Section 2 above, if such payments do not exceed the minimum level prescribed by Article XXXV (e.g., $110 per day for fourteen (14) four-day weeks ($6,160) during the 2006 League Year).

(b)     If, however, the Player Contract provides for off-season workout payments above the minimum level, (e.g., $111 per day for fourteen (14) four-day weeks during the 2006 League Year), then the total of those payments (e.g., $6,216 in the prior example) shall be included in determining "additional compensation."

(c)     If the Player Contract provides for off-season workout bonus payments on a basis other than a per-day payment, such amounts shall count as "additional compensation" but will not affect the treatment of any off-

183

season workout payments that do not exceed the minimum prescribed level. For example, without limitation on any other example, a player with a 2006 Player Contract that provides for a $40,000 bonus payable to the player for participating in at least ten (10) days of off-season workouts, in addition to the per-day minimum of $110 and no other "additional compensation," has "additional compensation" of $40,000.

(d)     If a player receives from a single Club, under a series of contracts, off-season workout payments specified on a per-day basis that average more than the minimum level prescribed by Article XXXV (e.g., more than $110 per day during the 2006 League Year), then all of the off-season workout payments paid on a per-day basis shall count as "additional compensation."

(e)     If a player is eligible to sign a Qualifying Contract with a New Club in accordance with Section 9 below, the full amount of any signing bonus payable to the player under any Player Contract that was executed in the same League Year as the proposed Qualifying Contract shall count against the "additional compensation" that can be earned by such player in accordance with Section 2 above. No other signing bonus amounts from contracts other than the Qualifying Contract shall count as "additional compensation" for such player.

(f)     If a player is eligible to sign a Qualifying Contract with his Old Club in accordance with Section 11 below, the circumstances in which signing bonus from a contract other than the Qualifying Contract may count against the $40,000 (or $50,000 during the 2009-2011 League Years) in additional compensation that can be earned by the player in accordance with Section 2 above, shall be determined exclusively under Section 11 below, the terms of which are not affected by Subsection 3(e) above.

**Section 4. Payments:** Players with Qualifying Contracts shall be paid 1/17th of the specified minimum salary on a weekly basis (e.g., 1/17 of $810,000 per week in the 2006 League Year for a player with ten (10) or more Credited Seasons).

**Section 5. Reduced Salary Cap Count:** Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with two (2) Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with two (2) Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with two (2) Credited Seasons (if the player is not on an Active/Inactive List).

**Section 6. Minimum Salary Benefit Calculation:** The difference between

184

the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2006 League Year, a Qualifying Player with five (5) Credited Seasons shall receive a Minimum Salary of $585,000; however, only $425,000 shall count against his Club's Team Salary. The difference of $160,000 shall be counted as a Player Benefit. Similarly, for example, in the 2006 League Year, a Qualifying Player with 12 Credited Seasons shall receive a Minimum Salary of $810,000; however, only $425,000 shall count against his Club's Team Salary. The difference of $385,000 shall be counted as a Player Benefit.

**Section 7. Extensions of Qualified Contracts:** After the Club's last game of a season and prior to the expiration of the Qualifying Contract, the current Club and Player may agree to extend for one year a Qualifying Contract, provided that the terms of the extension comply with Section 2 above.

**Section 8.** [*Omitted*]

**Section 9. Terminated Qualifying Players:** If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).

**Section 10. Players Moving to New Club:** In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the "Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 11 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

**Section 11. Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club"(defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase and guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multi-

185

year contract for more than the applicable Minimum Salary in any League Year of the contract plus $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in additional compensation in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from signing bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other additional compensation that the player has received or will receive from that terminated contract does not exceed $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years). For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2006 a player signs a two-year contract for the minimum Paragraph 5 salary in both years and a $80,000 signing bonus, and his contract is terminated on June 2, 2006, the player is not eligible to sign a 2006 Qualifying Contract with his Old Club because the sum of the acceleration of the 2006 prorated portion of the signing bonus ($40,000) that was agreed to in the year of his contract termination and the 2006 prorated portion of signing bonus from that terminated contract ($40,000) resulted in "additional compensation" of more than $40,000 in 2006. However, if the contract was signed on December 1, 2005, and the contract is terminated on June 2, 2006, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other additional compensation.

**Section 12. Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

**Section 13. Guarantees:** If a Qualifying Contract with guarantees is terminated, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Team's Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $710,000 Qualifying Contract, which includes a $425,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $425,000 of the $710,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $425,000.

**Section 14. Termination Pay:** If a Qualifying Player is eligible for termination pay when he is released and subsequently files a claim, he shall receive the charged amount (e.g., $425,000) plus the full benefit amount (e.g.,

186

$285,000 for a player with a Paragraph 5 Minimum Salary of $710,000). The player does not receive the benefit amount twice (i.e., $995,000).

*Section 15.* **No Benefit for Non-Qualifying Contracts:** Contracts for players with four (4) or more Credited Seasons who sign at the applicable minimum for that year plus more than $40,000 in additional compensation (e.g., prorated signing bonus, etc.) in any of the 2006-08 League Years, or more than $50,000 in additional compensation in any of the 2009-11 League Years, or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

187

# ARTICLE XXXVIII-B
## PERFORMANCE-BASED POOL

*Section 1.* **Creation of Fund:** In each Capped Year, the NFL shall create a fund known as the Performance Based Pool that will be deducted from the calculation of the Salary Cap in the same manner as any other player benefit.

*Section 2.* **Amount of Fund:** For the 2006 League Year, the fund shall be $3 million per Club ($96 million League-wide). The fund will increase in each subsequent Capped Year by 5% unless otherwise agreed by the parties; provided, however, that the NFLPA has the unilateral right to reduce or freeze the amount of the fund pursuant to Article XLVI, Section 1.

*Section 3.* **Mandatory Distribution Each Year:** There shall be mandatory distribution to players of the entire fund each year.

*Section 4.* **Qualifying Players:** A player shall be eligible for participation in the Performance Based Pool for a League Year if he plays for at least one down in any regular season game. A player may receive multiple distributions if he qualifies for more than one Club in a single League Year.

*Section 5.* **Methodology:**

(a)    Each player's "Playtime Percentage" shall be calculated by (i) adding the player's total plays on offense or defense, as appropriate, plus special teams and (ii) dividing that number by the team's total plays on offense or defense, as appropriate, plus special teams;

(b)    Each player's "PBP Compensation" shall be calculated by adding his full regular season Paragraph 5 Salary, prorated signing bonus for the current League Year (plus any signing bonus acceleration (without regard to the June 1 rule) due to his having been released during the applicable League Year, unless the player is re-signed by his old Club without having missed a week of the regular season), earned incentives, and other compensation for the current League Year, subject to the following provisions:

(i)    For all players other than those who receive the Minimum Salary Benefit, the full regular season Paragraph 5 Salary shall be used;

(ii)    For players who were released and later resigned by the same Club during the regular season, the Paragraph 5 Salary from the player's initial contract shall be used for the period ending with the player's release, and the Paragraph 5 Salary from the player's subsequent contract shall be used for the period from release through the term of the subsequent contract;

(iii)    For players who receive the Minimum Salary Benefit, the Paragraph 5 Minimum Salary amount for a player with two (2) Credited Seasons, rather than the stated Paragraph 5 Salary, shall be used to calculate

**188**

the player's PBP Compensation;

(iv)      If a Player Contract is renegotiated after the Monday of the tenth week of the regular season to include an unearned incentive for the current League Year that is treated as signing bonus, such incentive shall not be counted in the calculation of PBP Compensation; and

(v)      If a portion of the Player's Paragraph 5 Salary is treated as a signing bonus, the full Paragraph 5 Salary (rather than the current year's proration) will be counted; all other amounts treated as signing bonus will be included on a prorated basis except for unearned incentives, as described in Subsection (iv) above.

(c)      Each player's "PBP Index" shall be calculated by dividing the player's Playtime Percentage by his PBP Compensation;

(d)      Each player shall receive an allocation from the fund determined by (i) dividing his PBP Index by the sum of the PBP Indices for each player on the Club and then (ii) multiplying that percentage by the Club's total PBP allocation.

**Section 6. Corrections:** If, after the fund has been distributed to players for any given League Year, a player demonstrates that his payment was miscalculated and should have been greater, he shall promptly be paid the additional Performance-Based Pay to which he is entitled, and said amount shall be deducted from the Club's actual PBP allocation for the following League Year.

189

# ARTICLE XXXIX
## MEAL ALLOWANCE

*Section 1.* **Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and postseason as follows: 2006-07 League Years—Breakfast $17.00, Lunch $25.00, Dinner $43.00; 2008-10 League Years and the 2011 League Year if it is an Uncapped Year—Breakfast $18.00, Lunch $27.00, Dinner $45.00; and 2011 League Year if it is a Capped Year and 2012 League Year—Breakfast $19.00, Lunch $29.00, Dinner $47.00. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*Section 2.* **Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

190

## ARTICLE XL
## DAYS OFF

***Section 1.*** **Rate**: All players will be permitted days off at least at the rate of four (4) days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

***Section 2.*** **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

191

## ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

*Section 1.* **Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

*Section 2.* **Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

*Section 3.* **Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

192

not exceed $5,500 during the 2006 League Year, $5,750 during the 2007-08 League Years; $6,100 during the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $6,350 during the 2011 League Year if it is a Capped Year and the 2012 League Year; and (c) the room cost of seven (7) days' stay at a hotel of the Club's choice in the new team city for the player.

***Section 4.* Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

193

# ARTICLE XLII
## POST-SEASON PAY

**Section 1. System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 06 | 07 | 08 | 09 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|
| **Wild Card Game** | | | | | | | |
| (Division Winner) | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| (Other) | 17 | 18 | 18 | 19 | 19 | 20 | 20 |
| **Division Playoff Game** | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| **Conf. Championship Game** | 37 | 37.5 | 37.5 | 38 | 38 | 40 | 40 |
| **Super Bowl Game** | | | | | | | |
| (Winning Team) | 73 | 78 | 78 | 83 | 83 | 88 | 88 |
| (Losing Team) | 38 | 40 | 40 | 42 | 42 | 44 | 44 |

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three (3) previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three (3) previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight (8) or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three (3) and not more than seven (7) games (i.e., regular and postseason) will receive one-half the

194

amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)     A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

195

## ARTICLE XLIII
## PRO BOWL GAME

*Section 1.* **Compensation:** For the 2006 and 2007 seasons, each player on the winning Team in the AFC- NFC Pro Bowl game will receive $40,000 and each player on the losing Team will receive $20,000. These amounts shall be increased to $45,000 and $22,500 respectively for the Pro Bowls following the 2008 through 2010 seasons, and to $50,000 and $25,000 respectively for the Pro Bowls following the 2011 and 2012 seasons.

*Section 2.* **Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

*Section 3.* **Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

*Section 4.* **Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

*Section 5.* **Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

# ARTICLE XLIV
# PLAYERS' RIGHT TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician, provided that no Club may conduct its own individual testing for anabolic steroids and related substances or drugs of abuse or alcohol. In addition, the League may conduct mandatory urinalysis testing of all players

197

at the beginning of the pre-season in the same manner as past seasons. The League may also conduct random testing for steroids and related substances as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6.* **Substance Abuse:**

    (a)    **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

    (b)    **Anabolic Steroids and Related Substances.** The Policy on Anabolic Steroids and Related Substances in effect as of March 8, 2006, shall remain in effect, except as modified by the parties due to scientific advances with respect to testing techniques or other matters, or as otherwise agreed by the parties. There shall be a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

    (c)    **Drugs of Abuse and Alcohol.** The NFL Policy and Program for Substances of Abuse in effect as of March 8, 2006, shall apply with respect to drugs of abuse and alcohol, including annual pre-season testing of all players, except as otherwise amended by the parties.

198

# ARTICLE XLV
# ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records**: Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records**: Player may examine his medical and trainers' records in the possession of the Club or Club physician two (2) times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

199

# ARTICLE XLVI
## PLAYER BENEFIT COSTS

**Section 1. (a) General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Supplemental Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 6% of Projected Total Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b)     **1998 Amendment Benefits:** [*No longer applicable*]

(c)     **NFLPA Right To Increase Certain Benefits:** In 2006 and each League Year thereafter for which a Salary Cap applies, the NFLPA will have the unilateral right to increase benefits under the NFL Player Second Career Savings Plan (as described in Article XLVIII) ("Second Career Savings Plan"), the NFL Player Annuity Program (as described in Article XLVIII-A) ("Player Annuity Program"), and the NFL Players Health Reimbursement Account (as described in Article XLVIII-C) ("Health Reimbursement Plan"), but only if such right is exercised on or before April 15 of such League Year, and only to the extent that the cost of such benefit increases is offset by reductions in other benefits pursuant to Section 1(a) of this Article. For 2010 and each League Year thereafter, the parties will jointly negotiate increases, if any, under the Second Career Savings Plan, the Player Annuity Program, the Health Reimbursement Plan, and/or the Severance Plan, but only if such League Year is a Capped Year. Any increase pursuant to this section shall be for one year only and shall not create a continuing obligation of the Clubs.

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs" shall be the same as defined in Article XXIV, Section 1(b).

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits

200

for the League Year beginning at approximately the previous March 1, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Total Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)      The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)      Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)      As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5.** **1998 Amendment Benefits:** [*No longer applicable*]

**Section 6.** **Limitations on Contributions:**

(a)      No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Supplemental Disability Plan, the Health Reimbursement Account, the NFL Player Benefits Committee, the Workers' Compensation Time Offset Fund, the Performance Based Pool, or the Tuition Assistance Plan (individually, a "Player Benefit Arrangement") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Arrangement shall be amended to prevent any employer provided benefit from accruing or being otherwise credited or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

(b)      The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be re-

201

quired to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

(c)    The parties will amend all Player Benefit Arrangements and the Retirement Plan to the extent necessary to permit any expenses related thereto to be paid by NFL Player Benefits Administration, if established, pursuant to Article XLVIII-E, except for expenses that cannot by law be paid by NFL Player Benefits Administration, or that are not currently deductible under Section 162 of the Internal Revenue Code, notwithstanding any other provision of the plan or this Agreement.

*Section 7.* **Application of Salary Cap to Plan Years:** For purposes of Articles XLVI through LI, a Salary Cap applies to a Plan Year if a Salary Cap is in effect on the first day of that Plan Year.

*Section 8.* **Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Health Reimbursement Account, and the 88 Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

## ARTICLE XLVII
## RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

**Section 2. Additional Credited Seasons:** [*No longer applicable*]

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Benefit Credits:** Effective for payments on and after June 1, 2006, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| Before 1982 | $250 |
| 1982 through 1992 | $255 |
| 1993 and 1994 | $265 |
| 1995 and 1996 | $315 |
| 1997 | $365 |
| 1998 through the Plan Year that begins prior to the expiration of the Final League Year | $470 |

203

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits, except that the minimum increase for any affected Player will be $50 per month.

***Section 5. Disability Benefits:*** The following changes shall be made to the Plan's disability benefits:

(a)    Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will delete the Dependent Children's benefit described in Retirement Plan Section 5.1(e).

(b)    Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will increase the minimum Inactive total and permanent disability benefit from $1,500 to $1,750.

(c)    Effective April 1, 2007, the parties will amend the rules contained in Section 5.3 of the Retirement Plan to read substantially as follows:

> Any person receiving total and permanent disability benefits may be required to submit to periodic physical examinations for the purpose of re-examining his condition. The examinations will occur not more often than once every three (3) years, except that upon request of three (3) or more voting members of the Retirement Board, examinations may occur as frequently as once every six (6) months. For each calendar year in which a person receives total and permanent disability benefits, he must submit a complete copy, with all schedules and attachments, of his annual federal income tax return by July 1 of the following calendar year. A person who has not filed his annual federal income tax return by July 1 must either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year, and provide such federal income tax return promptly after it is filed. If the Retirement Board or the Disability Initial Claims Committee determines that such person is no longer totally and permanently disabled, the total and permanent disability benefits will terminate. The total and permanent disability benefits of any person refusing to submit to a required physical examination or to submit an annual federal income tax return (or equivalent) will be suspended until such refusal is resolved to the satisfaction of the Retirement Board. If such refusal is not resolved to the satisfaction of the Retirement Board within one year after such person is no-

204

tified of the consequences of his refusal, his total and permanent disability benefits will be terminated. In that event, such person must submit a new application to be eligible to receive any further total and permanent disability benefits, but the classification rules of Plan Section 5.6(a) and 5.6(b) will not apply.

**Section 6.** **Joint and Survivor Reset:** Effective for payments on and after April 1, 2006, the parties will amend the Retirement Plan to provide that the monthly benefit of a player who has elected either (1) a qualified joint and survivor annuity pursuant to Plan Section 4.4(c)(2) or (2) a life and contingent annuitant pension pursuant to Plan Section 4.4(c)(4) with his wife as the beneficiary, and who survives or has survived his wife, will increase to the amount that would have been paid if the player had elected a Life Only Pension as of his Annuity Starting Date (including subsequent benefit increases). The increase in benefit under the previous sentence will be paid beginning as of the later of (i) the first day of the month following the date of the wife's death, and (ii) April 1, 2006, and will continue for the life of the Player. However, no increase will be paid for any month that begins more than 42 months before the date upon which the player first notifies the Retirement Plan of his wife's death. The parties will also amend the Retirement Plan to provide a new table in Appendix B of the Retirement Plan to be used for a player with an Annuity Starting Date after March 31, 2007, which will provide the factors used to determine the actuarial equivalent of the benefit when the player's wife is his beneficiary.

**Section 7.** **Death Benefits:** Effective for payments on and after April 1, 2006, the parties will amend Section 7.2 of the Retirement Plan to insert "$3,600" in place of "$1,200"; "$6,000" in place of "2,000"; and "$9,000" in place of "$3,000."

205

## ARTICLE XLVIII
## SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:**

(a)  **Prior to 2006:** [*No longer applicable*]

(b)  **2006 and Later Years:** For each of the Plan Years 2006 and thereafter in which the Salary Cap applies, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)  **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of $20,000 for each of the Plan Years 2006 through 2008, $22,000 for the 2009 Plan Year, $24,000 for the 2010 Plan Year, and $26,000 for the 2011 Plan Year) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)  by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)  by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)  **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan, for each Plan Year in which a Salary Cap applies, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three (3) or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two (2) Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce

206

his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)　**Expenses**. The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E.

(c)　**Future Contributions and Collection:** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

(d)　**Automatic Enrollment:** Effective beginning with the 2007 Plan Year, the Plan will be amended to automatically enroll each eligible player who does not otherwise elect to make, or not to make, salary reduction contributions such that his contribution will be 10% of his eligible compensation each pay period up to the maximum permitted under Section 402(g) of the Internal Revenue Code for the calendar year. Effective beginning with the 2008 Plan Year, the Plan will be further amended to allow permissible withdrawals to the full extent permitted under Section 414(w) of the Internal Revenue Code.