# Exhibit 11-B

nation of whether the incentive is "likely to be earned" will be made pursuant to Section 6(c)(i). The calculation of these playtime requirements shall exclude special teams plays.

(xix)     Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year.

(xx)     Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned."

(xxi)     Any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except: (1) as provided in Subsection (xix) above in regards to per play or per game occurrences; (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid; (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately; or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

(xxii)     Any incentive bonus which a player and a Club agree to that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

(xxiii)     Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Preseason roster bonuses are automatically deemed "likely to be earned."

(xxiv)     Any incentive bonus (or portion thereof) that is earned during the Final League Year, but which had not been deemed likely to be earned during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the Final League Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the Final League Year, become impossible for the player to attain.

(xxv)     To determine the value of an incentive clause for Salary Cap purposes, under either Subsection (xxi) or (xxiv) above, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had 1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

103

(xxvi)   Other than in the Final League Year, if more than eight different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight incentives with the lowest dollar value automatically will be deemed "likely to be earned." See Subsection (xxviii) regarding the calculation of the number of team performance categories.

(xxvii)   Subsection (xxvi) above does not supersede the terms of any other provisions or other agreements between the parties that automatically deem certain performance incentives to be "likely to be earned" depending upon whether the incentive fulfills other specified criteria.

(xxviii)   For purposes of determining the number of team performance incentives, any reference to a performance category listed in Exhibit A as a criterion (whole or partial) for an incentive shall count as a separate team performance incentive (e.g., a Player Contract for an offensive lineman that provides for an incentive if the team leads the Conference in average net yards gained per rushing play, or if the team improves its Conference ranking in average net yards gained per rushing play, or if the team leads the Division in average net yards gained per rushing play counts as having three team performance incentives); provided, however, that purely conjunctive combinations of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X" shall be counted as one performance category). (For the avoidance of doubt, and without limitation, each of the following examples (1) and (2) would be counted as having three team performance incentives: (1) Player has 35% defensive playtime and team: (a) has one more sack than it had in the prior season; or (b) improves its ranking in sacks in the conference; or (c) improves its ranking in sacks in the league; (2) If team has one more sack than it had in the prior season, then player will earn the following on a cumulative basis: (a) $100,000 for 35% defensive playtime; (b) $200,000 for 50% defensive playtime; and (c) $300,000 for 70% defensive playtime.)

(d)      **Guaranteed Contracts.** Any portion of Salary for which a Team guarantees payment for all of skill, injury, and, if applicable, Salary Cap-related termination shall be included in Team Salary during the year earned, except that:

(i)      Salary that is guaranteed for both skill and injury-related termination in any year after the Final League Year shall be reallocated into the remaining League Years of the contract that are within the express term of this Agreement in a proportion to be determined by the Club if payment of the player's entire Salary for the Final League Year is not guaranteed for all of skill, injury, and Salary Cap-related termination. For example, without limitation on any other applicable example, if a player enters into a four-year Player Contract in the 2019 League Year, and if the Salary for the 2020 League Year is not guaranteed for all of skill, injury, and Salary Cap-related termination, then the full amount of any Salary for the 2021 or 2022 seasons that is guaranteed for both skill and injury-related termination shall be included in Salary and Team Salary for the 2019 and 2020 League Years in a proportion to be determined by the Club.

(ii)      Fifty percent (50%) of any Salary for a season more than three years after the Final League Year that is guaranteed for both skill and injury-related termination shall be reallocated into Salary and Team Salary into the remaining League Years of the contract within the express term of this Agreement in any manner the Club chooses.

(iii)     If any Player Contract provides for yearly Salary in a sequence that, in the Final League Year or later, is guaranteed for both skill and injury-related termination, then unguaranteed for either such termination, and then guaranteed again for both such termination, the amount guaranteed after the first such unguaranteed year will be allocated into Salary and Team Salary over the League Years of the contract within the express term of this Agreement in any manner the Club chooses.

(iv)     Any portion of Salary guaranteed for any period after a player is released for a reason covered by the guarantee (e.g., future years' guaranteed Salary, when the player is released for a reason covered by the guarantee) shall be immediately included in Team Salary at the time of his release at its present value rate calculated using the Discount Rate. To the extent that such inclusion puts the Team over the Salary Cap, the rule set forth in Subsection 5(c)(ii) above, shall apply.

(e)     **Other Amounts.**

(i)     **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

(ii)     A fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), constitutes an improper circumvention of the Salary Cap in violation of Subsection 6(e)(i) above.

(iii)     **Salary Advances.** Except as provided in Subsection 6(b)(iii) above, the full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

(iv)     **Non-Cash Provisions.**

(1)     The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(2)     Any tangible item of value provided to unsigned players (or their affiliates) recruited by Clubs will be included in Salary. Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits. Miscellaneous costs associated with recruiting unsigned players but not paid to players (or their affiliates) are not included as part of Salary or Benefits, except as set forth above.

(3)     Expenses for travel, board and lodging for a player participating in an offseason workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.

(4)     The voluntary provision to all players on a Club of meals, team apparel, or one team trip for celebrations in each League Year (plus any trips to the White House for the Super Bowl Champions) will not be included in Team Salary or Player Costs. This Subsection does not affect the treatment of consideration paid to a player for services other than football playing services, as provided in Section 4(b) above.

(5)     Except as provided in Subsections 6(e)(iv)(2)–(4) above, and Article 7 (concerning Rookie Orientation Programs), if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to this Agreement or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This Subsection does not apply to consideration paid to a player (or his affiliate) for nonfootball playing services, which are subject to Section 4(b) above.

(6)     Compensation to players for participation in the offseason workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article 21 shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article 21, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. At the conclusion of a club's offseason workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

(7)     If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three or more seasons, the fair market value of such gifts up to $15,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. Notwithstanding the previous sentence, if the player has been under contract with the Club in less than three seasons, the entire fair market value of any such gifts shall be counted as Salary.

(v)     **Annuities.** The cost to the Team of any annuity provided to any player (but not including any annuity provided pursuant to the Player Annuity Plan described in Article 55), computed at the one-year Treasury Note rate on February 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)     **Traded Contracts.**

(i)     In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(ii)     A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.

(g)     **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as

106

part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

### Section 7. 30% Rules:

(a)     No NFL Player Contract extending into a season beyond the Final League Year may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 6(b)(iii) above, of more than 30% of the Salary provided for in the Final League Year, per year, either in the season after the Final League Year or in any subsequent season covered by the Player Contract.

(b)     Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 30% Rule, set forth above. (The parties acknowledge a disagreement as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this Subsection (b), the terms of this Subsection may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this parenthetical.).

(c)     Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 30% Rule, set forth above, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

### Section 8. Renegotiations and Extensions:

(a)     Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

(i)     The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(ii)     No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(iii)     No contract renegotiations may be done for a current season after the last regular season game of that season

(iv)     A Player Contract signed by a Rookie may not be renegotiated except as provided in Article 7.

(b)     No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

(c)     Any agreement to compensate a player at the minimum amount set forth in Article 21 for participation in an offseason workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

(d)     Any salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Rookie Compensation Pool shall not be treated as a renegotiation.

(e)     An amendment to a Player Contract that changes the terms under which signing bonus is paid is a renegotiation.

## ARTICLE 14
## ENFORCEMENT OF THE SALARY CAP
## AND ROOKIE COMPENSATION POOL

*Section 1.* **Undisclosed Terms:** A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time, enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; and/or (b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

*Section 2.* **Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this Section.

*Section 3.* **System Arbitrator Proceeding:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring a proceeding before the System Arbitrator alleging a violation of Article 7, Article 12, Article 13 or Article 14, Section 2 of this Agreement. Issues of relief and liability shall be determined in the same proceeding. Other than as set forth in Article 7, the complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of such Article.

*Section 4.* **Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article 7, Article 9, Article 10, or Article 13, he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

*Section 5.* **System Arbitrator Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the System Arbitrator to determine whether such contract is in violation of this Agreement. The System Arbitrator shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event

the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The System Arbitrator does not have the authority to impose any revisions to such Player Contract on the player or the Club.

*Section 6.* Sanctions:

(a)    **Players and Agents.** In the event that the System Arbitrator finds a violation of Subsections 1(a) or 1(b) of this Article, for each such violation: (i) (1) the System Arbitrator may impose a fine of up to $500,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

(b)    **Clubs.** In the event that the System Arbitrator finds a violation of Subsection 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $6,500,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $500,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the System Arbitrator finds a violation of Subsection 1(b) of this Article, for each such violation, the System Arbitrator may: (i) impose a fine of up to $6,500,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $500,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the System Arbitrator finds a violation of Subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two Draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall, unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of Subsection 1(a), taking into account the sanctions, if any, imposed by the System Arbitrator. In agreeing to the two preceding sentences, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have the authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and the preceding two sentences shall not be considered in any resolution of that issue. For purposes of this Subsection 6(b), the term "Club personnel" shall not include players.

(c)    Subject to the next to last sentence of Subsection 6(b) above, the sanctions set forth in Subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1–3 of Article

110

18, and each of the sanctions set forth in Subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Section 1 of this Article and Sections 1–3 of Article 18. All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article 46, Section 5(c). For each League Year after the 2011 League Year, each of the maximum fines set forth in this Section 6 shall be adjusted by the same percentage as the change in Projected AR for that League Year as compared to the Projected AR for the prior League Year (up to a maximum of ten percent (10%) per League Year).

(d)     The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.

*Section 7.* **Revenue Circumvention:** In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports AR or non-AR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to such revenues, the NFLPA and/or the NFL shall have the right to initiate a proceeding before the System Arbitrator to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the System Arbitrator finds a violation of this Section 7, the System Arbitrator may impose a fine upon the Club of up to $5,000,000, payable to the NFL for donation to charitable funds as agreed to by the parties. For each League Year after the 2011 League Year, the maximum fine set forth in this Section shall be adjusted by the same percentage as the change in Projected AR for that League Year as compared to the Projected AR for the prior League Year (up to a maximum of ten percent (10%) per League Year).

### *Section 8.* NFL Audit Rights:

(a)     The NFL shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article.

(b)     In agreeing to this Section, the parties have not waived or affected their respective positions as to whether the NFL may conduct any Club-related audits beyond those set forth in the preceding sentence, and this Section shall not be considered in any resolution of that issue.

**Section 9. Prior Consultation:** Reasonably prior to the initiation of a proceeding alleging a violation of Subsection 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the NFL, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This Section shall not require the disclosure of any attorney-client communication, or any work product created by or

111

at the request of an attorney. In addition, any attempt by the League, the NFL, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Subsection 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.

# ARTICLE 15
## SYSTEM ARBITRATOR

*Section 1.* **Appointment:** The parties agree that the System Arbitrator shall have exclusive jurisdiction to enforce the terms of Articles 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator, the Accountants, or another arbitrator).

*Section 2.* **Scope of Authority:**

    (a)    The System Arbitrator shall make findings of fact and determinations of relief including, without limitation, damages (including damages referred to in Article 17, Section 9), injunctive relief, fines, and specific performance.

    (b)    The Appeals Panel shall accept the System Arbitrator's findings of fact unless clearly erroneous and the System Arbitrator's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion, except that, as to any finding concerning Article 17, any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo.

    (c)    Subject to Subsections (a) and (b) above, the Appeals Panel shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, injunctive relief, fines, and specific performance.

    (d)    Except for any matters for which the Appeals Panel has de novo review of the System Arbitrator's determinations, rulings of the System Arbitrator shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Appeals Panel. In entertaining a request for a stay of a ruling of the System Arbitrator, the Appeals Panel shall apply the standard that the United States Court of Appeals for the Second Circuit would apply to a request for a stay of a ruling of a district court within that Circuit. If and when a decision of the System Arbitrator is reversed or modified, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the ruling of the System Arbitrator.

    (e)    The System Arbitrator's and Appeals Panel's authority shall be limited to the terms of 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator, the Accountants, or another arbitrator).

    (f)    **Statute of Limitations.** Unless otherwise specified in this Agreement, a three year statute of limitations shall apply to the initiation of proceedings before the System Arbitrator, which statute begins to apply on the date upon which the facts giving rise to the proceeding are known or reasonably should have been known to the party bringing the proceeding.

*Section 3.* **Discovery:** In any of the disputes described in this Agreement over which the System Arbitrator has authority, the System Arbitrator shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties,

in any proceeding to review any alleged violation of Article 12 of this Agreement regarding any AR issue, the System Arbitrator shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article 13 and/or Article 7 of this Agreement regarding any Salary paid to any player(s), the System Arbitrator shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the System Arbitrator shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

*Section 4.* **Compensation:** The compensation and costs of retaining the System Arbitrator and the Appeals Panel shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article 17.

*Section 5.* **Procedures:** All matters in enforcement proceedings before the System Arbitrator shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the System Arbitrator) served upon the party against whom the enforcement proceeding is brought and filed with the System Arbitrator. All such notices and all orders and notices issued and directed by the System Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance. Unless otherwise agreed, all hearings will be transcribed.

*Section 6.* **Selection of System Arbitrator:**

(a)     In the event that the NFL and NFLPA cannot agree on the identity of a System Arbitrator, the parties agree to ask the CPR Institute (or such other organization(s) as the parties may agree) for a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the System Arbitrator from among the names on such list, they shall alternately strike names from said list, until only three names remain, at which point the parties shall make reasonable efforts to interview the remaining candidates. After those interviews, and if the parties cannot agree on the selection, the striking process shall resume until only one name remains, and that person shall

be the System Arbitrator. The first strike shall be determined by a coin flip. Upon selection, the System Arbitrator shall serve for an initial eighteen-month term commencing on the date of entry of the order of appointment. Thereafter, the System Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the System Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new System Arbitrator shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the System Arbitrator at any time and for any reason upon their mutual consent. Unless the parties otherwise agree, a discharged System Arbitrator shall retain jurisdiction for any proceeding which has been commenced prior to such discharge.

(b)    In the event of the absence (or vacancy) of the System Arbitrator, one of the members of the Appeals Panel (to be chosen by the parties, confidentially using the strike system) shall serve as the System Arbitrator until a new System Arbitrator is chosen pursuant to Subsection (a) above.

*Section 7.* **Selection of Appeals Panel:**

(a)    There shall be a three-member Appeals Panel, at least one of whom must be a former judge. In the event the NFL and NFLPA cannot agree upon the members of such a panel, the parties will jointly ask the CPR Institute (or such other organization(s) as the parties may agree) to submit to the parties a list of fifteen (15) attorneys (none of whom shall have, nor whose firm shall have, represented within the past five (5) years any professional athletes; agents or other representatives of professional athletes; labor organizations representing athletes; sports leagues, governing bodies, or their affiliates; sports teams or their affiliates; or owners in any professional sport). If the parties cannot within fifteen (15) days from the receipt of such list agree to the identity of the Appeals Panel from among the names on such list, they shall meet and alternate striking one (1) name at a time from the list until three (3) names on the list remain. The first strike will be assigned to the party that received the second strike in the selection of the System Arbitrator, or a coin flip, if striking was not used in selecting the System Arbitrator. The three (3) remaining names on the list shall comprise the Appeals Panel. The compensation of the members of the Appeals Panel and the costs of proceedings before the Appeals Panel shall be borne equally by the parties to this Agreement; provided, however, that each participant in an Appeals Panel proceeding shall bear its own attorneys' fees and litigation costs.

(b)    In the event that there is a vacancy on the Appeals Panel, or in the event that an appeal is taken from a decision of a member of the Appeals Panel serving as the System Arbitrator pursuant to Subsection 6(b) above, the parties shall select another member to the Panel, using the procedures set forth in Subsection 7(a) above.

*Section 8.* **Procedure for Appeals:**

(a)     Any party seeking to appeal (in whole or in part) an award of the System Arbitrator must serve on the other party and file with the System Arbitrator a notice of appeal within ten (10) days of the date of the award appealed from.

(b)     Following the timely service and filing of a notice of appeal, the NFLPA and NFL shall attempt to agree upon a briefing schedule. In the absence of such agreement, and subject to Subsection (d) below, the briefing schedule shall be set by the Appeals Panel; provided, however, that any party seeking to appeal (in whole or in part) from an award of the System Arbitrator shall be afforded no less than fifteen (15) and no more than twenty-five (25) days from the date of the issuance of such award, or the date of the issuance of the System Arbitrator's written opinion, whichever is latest, to serve on the opposing party and file with the Appeals Panel its brief in support thereof; and provided further that the responding party or parties shall be afforded the same aggregate amount of time to serve and file its or their responding brief(s).

(c)     The Appeals Panel shall schedule oral argument on the appeal(s) no less than five (5) and no more than ten (10) days following the service and filing of the responding brief(s), and shall issue a written decision within thirty (30) days from the date of argument. The Appeals Panel shall have the discretion to permit a reply brief.

(d)     For good cause, either party may seek to accelerate the briefing, hearing, and decision schedule set forth in Subsections (b) and (c) above.

(e)     The decision of the Appeals Panel shall constitute full, final, and complete disposition of the dispute. If there is no timely appeal of a decision of the System Arbitrator, the System Arbitrator's decision shall constitute the full, final and complete disposition of the dispute.

*Section 9.* **Decision:** Any decision issued by the System Arbitrator or the Appeals Panel may be enforced only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the System Arbitrator or Appeals Panel order relief, or assess any monetary award, against an individual Club owner, officer, or non-player employee.

*Section 10.* **Confidentiality:** Unless the parties agree otherwise, proceedings before the System Arbitrator and Appeals Panel, other than their decisions, shall be confidential, and may not be disclosed to persons other than counsel, senior executives of the NFL and any involved Club, senior executives of the NFLPA, the NFLPA Executive Committee, NFLPA Player Representatives, and any involved player(s), player agent(s), or Club or League personnel. The foregoing does not prejudice the right of any party to seek any additional confidentiality restrictions (including as to the decision) from the System Arbitrator or Appeals Panel, if such party demonstrates just cause.

## ARTICLE 16
## IMPARTIAL ARBITRATOR

**Section 1. Selection:** The parties shall select one of the Non-Injury Grievance Arbitrators who shall concurrently serve as the Impartial Arbitrator, who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees or litigation costs incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. Unless otherwise specified in this Agreement, a proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 7. Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree that the Impartial Arbitrator shall be selected using the same method set forth in Article 15, Sec-

117

tion 6. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent. Unless the parties otherwise agree, a discharged Impartial Arbitrator shall retain jurisdiction for any proceeding which has been commenced prior to such discharge.

## ARTICLE 17
## ANTI-COLLUSION

***Section 1.*** **Prohibited Conduct:**

(a)    No Club, its employees or agents shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents to restrict or limit individual Club decision-making as follows:

(i)    whether to negotiate or not to negotiate with any player;

(ii)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(iii)    whether to offer or not to offer a Player Contract to any player;

(iv)    whether to exercise or not to exercise a Right of First Refusal; or

(v)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

(b)    Any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA cannot be the basis of any claim of collusion. The NFLPA or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the System Arbitrator, pursuant to Article 15 and Article 14.

***Section 2.*** **Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

(b)    that the player has refused or failed to enter into a Player Contract for a prior season containing a Right of First Refusal or an option clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term);

(c)    that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

(d)    that the player is or has been subject to any Right of First Refusal.

***Section 3.*** **Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

***Section 4.*** **League Disclosures:** Neither the NFL nor the Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless

and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this Section may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 5.* **Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the System Arbitrator alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 9 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

*Section 6.* **Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

*Section 7.* **Summary Judgment:** The System Arbitrator may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the System Arbitrator determines that complainant's evidence is not so sufficient, he shall dismiss the action.

***Section 8.*** **Remedies**: In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)    To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the System Arbitrator finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article 9, such player shall immediately become a Restricted Free Agent upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article 9, such player shall immediately become an Unrestricted Free Agent upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In any case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this Subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article 6, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article 6, Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)    To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

***Section 9.*** **Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) shall be awarded. In addition, the System Arbitrator shall award non-compensatory damages (i.e., the amount exceeding compensatory damages) as follows:

(a)    Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)    Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

121

(c)      Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $5,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $5,000,000.

(d)      For each League Year after the 2011 League Year, each of the enumerated fines set forth in this Subsection (c) above shall be adjusted by the same percentage as the change in Projected AR for that League Year as compared to Projected AR for the prior League Year (up to a maximum of ten percent (10%) per League Year).

*Section 10.* **Player Election:** A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the System Arbitrator's determination. In the event the System Arbitrator finds a violation, the player shall make a determination within thirty (30) days of the date the System Arbitrator's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the System Arbitrator, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the System Arbitrator for the purpose of determining his future damages, if any.

*Section 11.* **Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

*Section 12.* **Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article 12 or 13 above. The amount of compensatory damages awarded will be included in such computations.

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the System Arbitrator shall take into account that in any League Year no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the System Arbitrator shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

*Section 16.* **Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Subsection 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)     Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)     In order to terminate this Agreement:

(i)     The proceeding must be brought by the NFLPA;

(ii)    The NFL and the System Arbitrator must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)   The System Arbitrator must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

*Section 17.* **Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an

initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

*Section 18.* **Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

124

## ARTICLE 18
## CERTIFICATIONS

### *Section 1.* Contract Certification:

(a)     Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for his playing of professional football from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

(b)     In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article 17 took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)     No contract will be approved by the Commissioner unless accompanied by the certifications required by Subsections (a) and (b) above.

(d)     Any failure to execute and submit a certification as required under Subsection 1(a) above shall be deemed evidence of a violation of Article 14, Section 1 of this Agreement. Any failure to execute and submit a certification as required under Subsection 1(b) above shall be deemed evidence of a violation of Article 17 of this Agreement.

### *Section 2.* End of League Year Certification:

(a)     Within fourteen (14) days of the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article 14, Section 1. Upon receipt of such certification, the Management Council shall forward a copy of the certification to the NFLPA.

(b)     Within fourteen (14) days of the conclusion of each League Year, each player agent representing a player who was under contract to an NFL Club during that League Year shall submit to the NFLPA a certification confirming, after reasonable inquiry of all personnel in his or her agency with authority to negotiate Player Contracts, that neither he nor she nor they has entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations,

commitments, inducements, assurances of intent, or understandings of any kind, as described in Article 14, Section 1. Upon receipt of such certification, the NFLPA shall forward a copy of the certification to the Management Council.

(c)    Any failure to execute and submit a certification as required under Section 2(a) or 2(b) above, shall be deemed evidence of a violation of Article 14, Section 1 of this Agreement.

(d)    At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article 17, Section 1, nor received from the NFL or the Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, where such communication or disclosure is inconsistent with Article 17, Section 1. Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(e)    Any failure to execute a certification as required under Section 2(d) above shall be deemed evidence of a violation of Article 17, Section 1 of this Agreement.

*Section 3.* **False Certification:** Any person or Club who knowingly executes or files a false certification required by Sections 1(a), 1(b), 2(a), or 2(b) of this Article shall be subject to a fine of up to $375,000, upon a finding of such violation by the System Arbitrator. Authority to impose such a fine shall rest with the System Arbitrator or the Commissioner, consistent with the allocation of authority in Article 14, Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this Section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article 14, Section 6 above. The fine amount set forth in this Section shall be adjusted each year by the percentage change in Projected AR for that League Year as compared to Projected AR for the prior League Year.

## ARTICLE 19
## CONSULTATION AND INFORMATION SHARING

*Section 1.* **Salary Summaries:** During the period between the first day of the League Year and the first day of the regular season of that League Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of the League Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each week).

*Section 2.* **Consultation and Communications:** At either party's request, the parties shall meet in good faith to reconcile any differences with regard to the Salary Cap treatment of any Player Contract, or of the amount of any Required Tender, Franchise Player Tender, Transition Player Tender, or Rookie Fifth-Year Option.

*Section 3.* **Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

*Section 4.* **Copies:** Within two (2) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy (by .pdf, if the Player Contract or Offer Sheet is provided by .pdf to the NFL) of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

## ARTICLE 20
## OTHER PROVISIONS

*Section 1.* **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

*Section 2.* **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full Paragraph 5 Salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

### *Section 3.* **Nonfootball Injury:**

(a)     A player who is placed on a Nonfootball Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

(b)     A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated Paragraph 5 Salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

### *Section 4.* **Roster Exemption:**

(a)     **Certain Players Not Under Contract.** After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)     **Players Under Contract.** If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to preseason or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his Paragraph 5 Salary during his exemption.

(c)     **Restricted Players.** Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article 9, Section 2, and who has been given the Required Tender pursuant to Article 8, Section 2, or Article 9, Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's preseason training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second preseason game, he may be placed on roster exempt until the day following the Club's first regular season game.

128

(ii)    If the player has not reported at least the day before the Club's third preseason game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)    If the player has not reported at least the day before the Club's fourth preseason game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(iv)    Any roster exemption imposed under this Subsection (c) shall commence with the first game immediately after a Restricted Free Agent reports and signs a Player Contract during the pendency of any League-imposed suspension.

(v)    Any roster exemption imposed under this Subsection (c) shall continue for its full duration after any trade of the player to another Club.

(vi)    Any player who is placed on the roster exempt list of his Club pursuant to Section 4(c) shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of Paragraph 5 Salary as a result of being placed on the roster exempt list. This Subsection shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsections (i)–(iii) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(vii)    No player may be placed on roster exempt under this Section 4(c) unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsections (i)–(iii) above.

(viii)    For purposes of this Article, extra preseason games such as the Canton Hall of Fame Game and the American Bowl shall not count.

(ix)    When placed on roster exempt pursuant to this Section, the player shall not be entitled to compensation.

(d)    Except as provided in Subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

**Section 5. Arena Football Players:**

(a)    Players under an NFL Player Contract may not be allocated to a club in the Arena Football League (("AFL") or ("Arena League")), whether or not that Arena League club is commonly owned with an NFL Club.

(b)    Otherwise eligible Arena League players who would be Rookies in the NFL may be drafted by any NFL Club pursuant to current draft procedures even if under contract to an Arena League Club.

(c)    Before a player under contract in the Arena League may be signed to an NFL Player Contract, he must be released by the Arena League club from any preexisting contract obligations in the Arena League, including any residual contract rights relating to negotiation, first refusal, etc., and except for players to whom an NFL Club has Draft rights, will be considered an Unrestricted Free Agent. This provision refers solely to contractual rights between a player and a team in the Arena Football League

129

and does not refer to the terms of any collective bargaining agreement in the Arena League.

(d)     A player whose most recent contract to play professional football was with an AFL team that shares common ownership with an NFL Club (such AFL team being a "Related AFL Team" and such Club being a "Related NFL Club") may not sign a Player Contract with that Related NFL Club until after a period of 72 hours following the termination or expiration of the player's contract with the Related AFL Team. During that 72-hour period, the player shall be completely free to negotiate and sign a Player Contract with any other Club. The terms of this Subsection (d) are subject to any rights that any Club may have under Article 6, and any Club that has drafted such a player consistent with the terms of this Agreement may sign such a player at any time permitted by this Agreement.

(e)     NFL clubs and Arena League clubs may have common practice facilities, but may not participate in common classroom work, film study, drills, scrimmages, or other on- or off-field work.

(f)     Any NFL player suspended for one year or less in the NFL by the Commissioner or his Club may not play for an Arena League team that is commonly-owned with his NFL Club during any term of his suspension that overlaps with the period of time the player is under contract to his NFL Club.

(g)     If an Arena League club that is commonly-owned with an NFL Club engages in conduct that would violate NFL Rules, including but not limited to the NFL's anti-tampering policy, the violation shall be attributed to the NFL Club, so long as any sanctions are imposed consistent with the terms of this Agreement and the NFL Constitution and Bylaws.

*Section 6.* **Other Professional Leagues:** No player who is under contract in another football league is eligible to sign an NFL Player Contract or a Practice Squad Player Contract until the termination or expiration of his contract in the other league.

## ARTICLE 21
## OFFSEASON WORKOUTS

*Section 1.* **Voluntary Workouts:** No player shall be required to attend or participate in any offseason workout program or classroom instruction of a Club other than as provided in Article 22. Any other Club offseason workout programs and classroom instruction sessions shall be strictly voluntary and shall take place in the manner and time period set forth in this Article.

### *Section 2.* **Time Periods:**

(a)     Subject to the limitations in Subsections (b) and (c) below, from the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct offseason workout programs as follows. If a Club hires a new head coach after the end of the prior regular season, that Club may schedule or conduct an offseason workout program for no more than nine total weeks, with eight of the weeks required to be consecutive and subject to Article 22, Section 3, to be completed over a twelve-week period. All other Clubs may schedule or conduct offseason workout programs for no more than nine consecutive total weeks, to be completed over a ten-week period. In either case, Clubs may schedule no more than four workouts per week for any individual player. Such workout programs shall not be permitted on weekends. Nothing herein shall prevent a Club from permitting an individual player to work out on his own prior to the commencement of the Club's official offseason workout program using the Club facilities if the player wishes to do so, except that no club official may indicate to a player that such individual workouts are not voluntary, or that a player's failure to participate in such workouts will result in the player's failure to make the Club (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club or result in any other adverse consequences affecting his working conditions). Prior to the commencement of the Club's official offseason workout program: (i) players may not receive daily workout payments or workout bonuses of any kind, and may not be paid or reimbursed expenses for travel, board or lodging; (ii) players are not permitted to participate in Club-supervised workouts, Club-supervised practices, group or individual meetings with coaches, group or individual film study with coaches, or group or individual playbook study with coaches; (iii) the Club's strength and conditioning coaches may not direct players' individual workouts, but may supervise use of the weight room to prevent injury and to correct misuse of equipment; and (iv) players' activities may not be directed or supervised by any coaches. In addition, nothing herein shall prevent a Club from permitting an individual player to work out on his own on weekends after the Club's official offseason program has commenced, or at any time after the Club's official offseason workout program has ended, using Club facilities if he wishes to do so, subject to the restrictions set forth in the immediately preceding sentence of this Subsection, except that no club official may indicate to a player that such individual workouts are not voluntary, or that a player's failure to participate in such workouts will result in the player's failure to make the Club (or that a player's failure to participate in a workout program or classroom instruction will result in the player's fail-

ure to make the Club or result in any other adverse consequences affecting his working conditions).

(b)     Each Club's official nine-week offseason workout program shall be conducted in three phases, as follows:

(i)     **Phase One.** Phase One shall consist of the first two weeks of the Club's offseason workout program. Subject to the additional rules set forth in Section 5 of this Article, Phase One activities shall be limited to strength and conditioning and physical rehabilitation only. During Phase One, only full-time or part-time strength and conditioning coaches, who have no other coaching responsibilities with the Club, shall be allowed on the field; no other coaches shall be allowed on the field or to otherwise participate in or observe activities. No footballs shall be permitted to be used (only "dead ball" activities), except that quarterbacks may elect to throw to receivers provided they are not covered by any other player. Players cannot wear helmets during Phase One.

(ii)     **Phase Two.** Phase Two shall consist of the next three weeks of the Club's offseason workout program. Subject to the additional rules set forth in Section 5 of this Article, during Phase Two all coaches shall be allowed on the field. On-field workouts may include individual player instruction and drills, as well as "perfect play" drills (e.g., offense or defense only, but not offense vs. defense), or special teams drills on a "separates" basis (e.g., kicking team or return team only, but not kicking team vs. return team). No live contact or team offense vs. team defense drills are permitted. No offense vs. defense drills are permitted (e.g., no one-on-one offensive linemen vs. defensive linemen pass rush or pass protection drills, no wide receivers vs. defensive backs bump-and-run drills, and no one-on-one special teams drills involving both offense and defense are permitted.) Players cannot wear helmets during Phase Two.

(iii)     **Phase Three.** Phase Three shall consist of the next four weeks of the Club's offseason workout program. Subject to the additional rules set forth in Subsections 5(a) and 5(c) of this Article and Appendix G to this Agreement, during Phase Three each Club may conduct a total of ten days of organized team practice activity ("OTAs" or "OTA days"). The restrictions set forth in Subsection 5(b) of this Article shall not apply to OTA days. The Club may conduct a maximum of three days of OTAs during each of the first two weeks of Phase Three. A maximum of four days of OTAs may be conducted during either the third week or the fourth week of Phase Three, with the Mandatory Veteran Minicamp (Article 22, Section 2) to be held during the other week. During weeks in which the Club conducts only three days of OTAs, the Club may also conduct a fourth day of non-OTA workouts, but such activities shall be subject to the rules governing Phase Two workouts, as set forth in Subsection 2(b)(ii) of this Article. During Phase Three, all coaches shall be allowed on the field. No live contact is permitted. No one-on-one offense vs. defense drills are permitted (i.e., no offensive linemen vs. defensive linemen pass rush or pass protection drills, no wide receivers vs. defensive backs bump-and-run drills, and no one-on-one special teams drills involving both offense and defense are permitted). Special teams drills (e.g., kicking team vs. return team) are permitted, provided no live contact occurs. Team offense vs. team defense drills, including all drills listed in Appendix G to this Agreement, are permitted, provided no live contact occurs. Clubs may require players to wear helmets; no shells are permitted during Phase Three of the Club's offseason workout program or any minicamp.

(c)     Each year offseason workout programs cannot begin prior to the first Monday in April for Clubs that have hired a new head coach after the end of the prior regular season, and cannot begin prior to the third Monday in April for all other Clubs. Each year on a date to be agreed upon by the parties, but no later than twenty-one days before the scheduled commencement of a Club's program, each Club shall provide the NFL and the NFLPA with the Club's schedule for its offseason workout program that year, and shall advise the NFL and the NFLPA in writing in advance of any changes to that schedule; if the NFL provides such information to the NFLPA, the Club's obligation under this sentence shall be deemed satisfied.

**Section 3. Payment:** Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary offseason workout program, provided the player fulfills the Club's reasonable offseason workout requirements: $155 (2011–12 League Years), $175 (2013–14 League Years), $195 (2015–16 League Years), $215 (2017–18 League Years), and $235 (2019–20 League Years), respectively. Players are required to complete three out of four scheduled workouts, including any scheduled OTAs, per week in order to be paid for any workout the player completes in that week, except that if there are less than four (4) scheduled workouts in a week the player will be paid for each workout in which he participates. A player can only be paid for offseason workouts pursuant to the terms of an executed offseason workout addendum, which shall be part of the player's NFL Player Contract. The NFL and the NFLPA shall agree upon a standard offseason workout addendum, which shall be incorporated as an Appendix to this Agreement. Any player under contract to a Club at the time of the start of the offseason workout program shall be invited to participate in the Club's program. A player subject to a Required Tender by a Club, but who has not signed a Player Contract, or an Unrestricted Free Agent whose Player Contract with that Club has expired may be invited to participate in that Club's offseason workout program, but must sign an Offseason Workout and Minicamp Participation Agreement prior to his participation in such activities. Players who are under contract or subject to a Required Tender to an NFL Club and who participate in a Club's offseason workout program may also receive expenses for travel, board, and lodging subject to the terms and conditions set forth in Article 13, Section 6(e)(iv)(3).

**Section 4. Injuries:** Any player injured during offseason workouts will be protected in the same manner as if injured during the Club's preseason training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous:**

(a)     No Club official may indicate to a player that the Club's offseason workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club or result in any other adverse consequences affecting his working conditions). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all offseason workouts. All Clubs, coaches and other Club

officials shall follow all of the rules regarding offseason workouts set forth in Appendix G hereto.

(b)     During the offseason program period, except for the ten days of organized team practice activity and minicamps, players may be (1) at the Club facility no more than four hours per day, no more than four days per week, and not during weekends; and (2) on the field no more than ninety minutes per day. In addition, the Club may not specify to any player more than two specific hours a day during which it suggests that the player be at club facilities. Any player participating in an offseason workout program may select the other two hours in which he wishes to attend to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.

(c)     Clubs shall film all three Phases of the on-field workout sessions and shall maintain a copy of such films until thirty days after the start of the regular season. The NFLPA may view such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year of this Agreement) only upon the filing of a complaint alleging a violation of this Article.

*Section 6.* **Pre-Training Camp Period:** During the period beginning with the end of the offseason program and ending with the mandatory reporting date for preseason training camp, no player shall be permitted to participate in any organized workouts or organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or a Club Affiliate. Notwithstanding the preceding sentence, during the five consecutive days immediately prior to the mandatory veteran reporting date for each Club's preseason training camp (as specified in Article 23, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Nonfootball Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or nonfootball-related injury or illness during the offseason; or (4) had surgery during the offseason regarding a football or nonfootball-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. (Except that a player in categories (ii)(1)–(4) above who fully participates in all Phase Three activities and the Mandatory Veteran Minicamp during the club's offseason workout program shall not be permitted to participate during this five day period.) This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League that the player has agreed to.

134

*Section 7.* **Rookie Premiere:** Invited Rookies will be permitted by their respective Clubs to attend the NFL Players Rookie Premiere provided that: (i) such event is scheduled during the month of May; (ii) such event encompasses a maximum of four consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the NFL with the dates for the next Rookie Premiere not later than February 1 of each year.

*Section 8.* **Enforcement:**

(a)     The head coach and the Club, who are jointly responsible for any conduct in violation of Sections 1, 2, 5 or 6 of this Article (including but not limited to the rules in Appendix G), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 1, 2, 5 or 6 of this Article (including but not limited to the rules in Appendix G), through an expedited arbitration proceeding before the Impartial Arbitrator. Any head coach or Club that is the subject of a proceeding under this Section shall have the right to participate in the proceeding and to present a defense.

(b)(i)     The NFL and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules set forth in this Agreement relating to offseason workouts. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with a copy of all tape, film, other recorded evidence, or other documentation any representative deems relevant to any possible violation.

(ii)     Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the NFL, or sooner if practical, the Executive Director of the NFLPA and the NFL Executive Vice President Labor & League Counsel shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to the Impartial Arbitrator who will render a decision within forty-eight hours of the submission of the dispute.

(c)     As soon as practicable after the commencement of any proceeding before the Impartial Arbitrator, the NFLPA shall be provided with a copy of all tape, film, other recorded evidence, or other documentation of any workout that is the subject of the proceeding if such materials have not already been produced to the NFLPA pursuant to Subsection (b)(i). If the Club fails to produce such materials then the Club's next scheduled week of OTAs shall automatically be cancelled pursuant to Subsection (d)(ii) below, unless the Club proves that its failure to produce such materials is due to circumstances beyond the Club's control.

(d)(i)     **Commissioner Fines.** In the event that the Arbitrator finds any violation of Sections 1, 2, 5 or 6 of this Article (including but not limited to the rules in Appendix G), or in the event that the NFL and the NFLPA agree that a violation has occurred as provided under Subsection (d)(ii) below, the head coach shall be subject to a fine in the amount of $100,000 for the first violation, and $250,000 for a second violation, and the Club shall be subject to a fine in the amount of $250,000 for the first

violation and $500,000 for a second violation. If such a violation is found by the Arbitrator, or the NFL and the NFLPA agree that such a violation has occurred, the Commissioner in his sole discretion: (1) may promptly fine the head coach and the Club in the amounts specified above; or (2) after consultation with the Executive Director of the NFLPA, may fine the head coach and the Club some lesser amount, or no amount, if the Commissioner determines that (A) the conduct of the head coach and the Club were based upon a good faith interpretation of Sections 1, 2, 5, 6 or 8 of this Article or the rules set forth in Appendix G; or (B) did not constitute a material violation of such Sections. Any fines assessed by the Commissioner pursuant to this Subsection shall be donated as follows: Fifty percent to the Gene Upshaw Players Assistance Trust, and fifty percent to the Player Care Foundation. The NFL shall promptly provide the NFLPA with written evidence that the fine has been paid and donated in accordance with this Section.

(ii) **Other Penalties.** If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the NFL Executive Vice President Labor & League Counsel agree that a violation has occurred, the Club's next scheduled week of OTAs shall be cancelled, excluding minicamps. If the arbitrator finds, or the Executive Director of the NFLPA and the NFL Executive Vice President Labor and League Counsel agree, that two separate violations of these rules occurred in the same League Year, the Club's next scheduled week of OTAs shall also be cancelled, excluding minicamps, and the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. The penalties described in the immediately preceding two sentences shall be imposed whether or not the Commissioner imposes a fine under Subsection 8(d)(i) of this Article.

(iii) For each League Year after the 2011 League Year, the fine amounts described in Subsection (i) above shall be adjusted by the same percentage as the change in Projected AR for that League Year compared to the Projected AR for the prior League Year up to a maximum of ten percent (10%) per League Year.

(e) In the event any week of the Club's offseason workout program, excluding minicamps, is cancelled, no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's offseason program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for offseason workout pay or any workout bonuses. No conduct occurring prior to the date upon which any arbitration proceeding is filed before the Impartial Arbitrator under these rules may serve as the basis for a finding of a second violation by a Club. A second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed. Any violation that occurs in the last week of the Club's offseason workout program will result in a loss of the Club's first week of OTAs (3 OTAs) in the next offseason; provided, however, this carry-over cancellation will not constitute an independent violation in the next offseason. If the Club hires a new head coach after the offseason in which the violation occurs, the cancellation will not carry over for that Club; however, if the terminated head coach is hired by another NFL Club as a head coach, the carry-over cancellation will be assessed against the hiring Club in that offseason.

136

(f)     Except as provided above, these limitations on offseason workouts shall not preclude any player from working out on his own at any time, including weekends. By agreeing to the sanctions in this Section, the parties have not waived or affected in any way their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the NFL Constitution and Bylaws.

(g)     The NFLPA may designate representatives who can make unannounced visits to Teams to investigate compliance with the provisions of this Article, Articles 22–24, and Appendix G. Such representatives may make no more than five total such visits per Club in a League Year. The Club will provide access to a location near the practice field where each segment of the Club's practice is visible to such representative(s).

*Section 9.* **Offseason Participation Contract:** A player subject to a Required Tender by a Club, but who has not signed a Player Contract, or an Unrestricted Free Agent whose Player Contract with that Club has expired, may enter into an Offseason Workout Program and Minicamp Participation Agreement in order to participate in the offseason workout program and minicamp(s) of that Club. The NFL and the NFLPA shall agree upon a standard such Participation Agreement, which shall be incorporated as an Appendix to this Agreement. For such players, this Participation Agreement shall also serve as the offseason workout addendum required by Section 3 of this Article. A copy of all Participation Agreements shall be submitted to the NFL, which shall provide a copy to the NFLPA.

## ARTICLE 22
## MINICAMPS

*Section 1.* **Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the prior regular season, that Club may hold one additional voluntary minicamp for veteran players. Any mandatory minicamp for veteran players shall count as one of the nine weeks of the Club's official offseason workout program under Article 21, Section 2(a) of this Agreement. There is no limitation on the number of minicamps a Club may hold for Rookie players during the seven weeks of the Club's Rookie Football Development Program.

*Section 2.* **Mandatory Veteran Minicamp:** No mandatory veteran minicamp may exceed three days in length, plus one day for physical examinations. The minicamp must be conducted during the week (Monday through Friday), with physicals taking place on Monday but no practice or workouts on that day, practices on Tuesday through Thursday and a day off on Friday. The minicamp must be conducted during week three or week four of Phase Three of the Club's offseason workout program. The Phase Three rules set forth in Article 21, Section 2(b)(iii) of this Agreement shall apply to all minicamp activities. Two-a-day practices shall be permitted at two of the three practice days of the Club's one mandatory minicamp, subject to the following rules: (i) players may be on the field for a total of no more than three and one-half hours per day; (ii) players may participate in one practice for no more than two and one-half hours of on-field activities under Phase Three rules; (iii) the second practice may only be for the remaining portion of the players' daily three and one-half hour on-field activities and shall be limited to walk-through instruction only; (iv) no organized team activities (including treatment and taping) may begin prior to 7:00am local time or end after 8:30pm local time, and players shall be given at least one hour for lunch and dinner each; (v) players may only be asked to participate in Club activities for a maximum of ten hours per day including taping and treatment but excluding meal time. The on-field time limits described above shall begin as soon as position coaches begin to coach players on the field.

*Section 3.* **Voluntary Veteran Minicamp:** Any voluntary minicamp for veteran players must be conducted prior to the College Draft, but no earlier than week three of the Club's offseason workout program and after at least one week of the two weeks of Phase One activities that the Clubs may hold pursuant to Article 21. In the event the NFL elects to move the College Draft to a date that would require the Club to schedule its voluntary minicamp for veteran players during a week that is earlier than week three of the Club's offseason workout program, the NFLPA and NFL shall agree to a change in such rule. Voluntary minicamps for veteran players shall be subject to the rules set forth in Section 2 above.

*Section 4.* **Expenses:**

(a)     Any veteran player who attends a minicamp will receive meal allowances in accordance with Article 34, Section 1 of this Agreement, plus all travel expenses to

and from the camp, plus "per diem" payments at the rate provided in Article 23, Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

(b)     If a "first-year player" (as defined as in Article 23, Section 1) signed a Player Contract with any Club for the prior League Year, he shall receive, for each day that he attends minicamp, the following compensation, but no other compensation: (i) the prorated portion of the weekly per diem specified for the current League Year (as set forth in Article 23, Section 3); (ii) the meal allowance specified for the current League Year (as set forth in Article 34, Section 1); and (iii) all travel expenses to and from the camp, plus housing (for players coming from out-of-town).

(c)     Any "rookie player" (defined as a person who has never signed a Player Contact with an NFL Club in a prior League Year) shall not be entitled to compensation for his participation in any minicamp, other than the reimbursements or payments permitted under the Club's Rookie Orientation Program.

***Section 5.*** **Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

***Section 6.*** **Injuries:** Any player injured in a Club's minicamp shall be protected in the same manner as if injured during the Club's preseason training camp.

***Section 7.*** **Rookie Football Development Programs and Minicamps:** Each Club may hold a Rookie football development program for a period of seven weeks, commencing on or about May 16. During this period, no mandatory or voluntary activities can be held on weekends, with the exception of the Club's one post-Draft Rookie Minicamp, which at the Club's election may be conducted on either the first or second weekend following the College Draft. Players may only participate in Club activities for a maximum of ten hours per day.

***Section 8.*** **Films:** Clubs shall film all on-field activities from any minicamp, and shall maintain a copy of such films until thirty days after the start of the regular season. The NFLPA may view such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year) only upon the filing of a complaint alleging a violation of this Article.

***Section 9.*** **Enforcement:** Any alleged violation of Sections 1, 2, 3, 5 or 7 of this Article shall be governed by the same procedures, and shall be subject to the same fines and fine procedures, as set forth in Article 21, Section 8, except that the "Other Penalties" set forth in Article 21, Section 8(d)(ii) shall not apply to any violation of this Article.

***Section 10.*** **Participation Agreement:** The requirements of Article 22, Section 3 or Article 22, Section 9 (as applicable), apply to players participating in a Club's minicamp.

## ARTICLE 23
## PRESEASON TRAINING CAMPS

*Section 1.* **Definition:** For purposes of this Article, a "first-year player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell/Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

*Section 2.* **Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

*Section 3.* **First-year Player Per Diem:** A first-year player will receive "per diem" payments, commencing with the first day of Preseason Training Camp and ending one week prior to the Club's first regular season game, at the following weekly rates for the respective League Years: $850 (2011–12 League Years), $925 (2013–14 League Years), $1,000 (2015–16 League Years), $1,075 (2017–18 League Years), $1,150 (2019–20 League Years).

*Section 4.* **Veteran Per Diem:** A veteran player will receive "per diem" payments, commencing with the first day of Preseason Training Camp and ending one week prior to the Club's first regular season game, at the following weekly rates for the respective League Years: $1,600 (2011–12 League Years), $1,700 (2013–14 League Years), $1,800 (2015–16 League Years), $1,900 (2017–18 League Years), $2,000 (2019–20 League Years).

*Section 5.* **Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official preseason training camp earlier than fifteen days (including one day for physical examinations, meetings, classroom instruction, running, and conditioning) prior to his Club's first scheduled preseason game or July 15, whichever is later. The July 15 date shall not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date. For purposes of this Section, an "injured player" shall not include a player who fully participates in all Phase Three activities and the Mandatory Veteran Minicamp during the club's offseason workout program during the League Year in question.

### *Section 6.* **Conduct of Practices:**

(a)        The first day of a Club's preseason training camp shall be limited to physical examinations, meetings, and classroom instruction; no on-field activities shall be permitted other than running and conditioning. No contact shall be permitted and no pads shall be worn during the second and third days of Preseason Training Camp. Thereafter, two-a-day practices shall be permitted, subject to the following rules: (i) players

140

may be on the field for a total of no more than four hours per day; (ii) players may participate in no more than one padded practice per day, which shall be no longer than three hours of on-field activities; (iii) there must be at least a three hour break after the practice; and (iv) the second practice on the same day may only be for a maximum of the remaining available on-field time, and shall be limited to only "walk-through" instruction (i.e., no helmets, full-speed pre-snap, and walking pace after the snap). The three-hour limit on padded practices shall begin as soon as position coaches begin to coach players on the field. The definition of a "padded practice" under this Article shall be the same as the definition used for regular season practices in Article 24, Section 1(c) of this Agreement. In the event that a Club begins a padded practice but such practice is cancelled within sixty minutes of its commencement due to inclement weather or for any other reason beyond the Club's control, such practice shall not count as a padded practice under this Article or Article 24.

(b)     Notwithstanding the foregoing, or anything in Article 24, it shall not be a violation of any provision of this Agreement pertaining to the prohibition or limitation on wearing of helmets or shoulder pads, nor shall it constitute a "padded practice," if: (i) quarterbacks, kickers, punters, and/or long-snappers only wear helmets and/or shoulder pads during practice at the option of the player; (ii) a player who, because of a head injury, is directed by the Club physician to wear a helmet as a precautionary measure at all practices; or (iii)  the quarterback and/or the defensive player who receives signals from the coaching staff via helmet communication wear helmets during the team period in which helmets are used for such communication.

*Section 7.* **Number of Preseason Games:** The NFL shall hold no more than four preseason games per Club per year during the term of this Agreement except that there may be a fifth preseason game for the two Clubs competing in the annual Hall of Fame Game or any American Bowl game scheduled around the Hall of Fame Game date.

*Section 8.* **Expenses:** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching Preseason Training Camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

*Section 9.* **Definition of "Preseason Training Camp":** For purposes of this Article, the term "Preseason Training Camp" shall be deemed to include the entire period from the beginning of training camp for any player through the last weekend of preseason games played by clubs during the league year in question.

*Section 10.* **Films:** Clubs shall film all on-field activities from preseason training camp, and shall maintain a copy of such films until thirty days after the start of the regular season. The NFLPA may view such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year) only upon the filing of a complaint alleging a violation of this Article.

*Section 11.* **Enforcement:**

(a) Any alleged violation of Sections 5 or 6 of this Article shall be governed by the same procedures, and shall be subject to the same fines and fine procedures, as set forth in Article 21, Section 8, except that the "Other Penalties" set forth in Article 21, Section 8(d)(ii) shall not apply to any violation of this Article.

(b) In the event the NFLPA or any player files a complaint with the NFL alleging a Club's violation of Subsection 6(ii) and/or 6(iii) of this Article, pertaining to "padded practices" or "walk-throughs," (i) within forty-eight hours of the filing of the complaint, the NFLPA shall be provided with a copy of all film of any practice that is the subject of the complaint; (ii) within seventy-two hours, the Executive Director of the NFLPA and the NFL Executive Vice President Labor & League Counsel (or their designees) shall attempt to determine if a violation of such Subsection has occurred; (iii) if the parties are unable to agree, the matter will be immediately referred to the Impartial Arbitrator who will render a decision within twenty-four hours; (iv) if the parties agree, or if the Impartial Arbitrator determines, that a violation has occurred, the Club's next scheduled preseason or regular season padded practice shall be cancelled, whether or not the Commissioner imposes a fine under Subsection 11(a) of this Article.

## ARTICLE 24
## REGULAR SEASON AND POSTSEASON PRACTICES

*Section 1.* **Practice Rules:**

(a)     During the regular season, padded practices for all players shall be limited to a total of fourteen, eleven of which must be held during the first eleven weeks of the regular season, and three of which must be held during the remaining six weeks of the regular season. The Club may choose the days of the week on which such practices shall be held. Subject to the foregoing rules, each Club may hold two padded practices during the same week during one week of the regular season, provided that such week falls within the first eleven weeks of the regular season.

(b)     Clubs participating in the postseason may hold one padded practice per week, on a day of the Club's choosing, commencing with the week following the Club's last regular season game.

(c)     For purposes of this Article and Article 23, a "padded practice" shall be defined as a practice in which players are required to wear helmets and shoulder pads, in addition to any other equipment required by the Club, subject to the exceptions set forth in Article 23, Section 6(b).

(d)     On days when padded practices are permitted under Subsection (a) above, on-field Team activity for all players shall be limited to a maximum of three hours per day, including "first period" (i.e., stretching and calisthenics), provided that (i) players may participate in on-field activities with their position coaches for a period not to exceed thirty minutes, prior to the three-hour maximum on-field period; and (ii) any walk-through of reasonable and customary duration (for purposes of this Subsection, such walk-through to be no helmets and walking pace) that is conducted prior to or after the three-hour maximum on-field period shall not count against that limit. The three-hour time limit described above shall begin as soon as position coaches begin to coach players on the field, subject to provisos (i)–(ii) in this Subsection.

*Section 2.* **Bye Weeks:** During any regular season bye week period occurring during the term of this Agreement, players will be given a minimum of four consecutive days off. Such four-day period must include a Saturday and a Sunday unless the Club is scheduled to play a game on the Thursday following the bye week, in which case players may be required to report to the Club on the Sunday preceding the Thursday game. In such an event, the four-day period shall be Wednesday through Saturday. Any injured player may be required to undergo medical or rehabilitation treatment during such four-day period provided that such treatment is deemed reasonably necessary by the Club's medical staff.

*Section 3.* **Enforcement:** Any violation of Section 1 of this Article shall be governed by the same procedures, and shall be subject to the same fines and fine procedures, as set forth in Article 21, Section 8, except that the "Other Penalties" set forth in Article 21, Section 8(d)(ii) shall not apply to any violation of this Article.

*Section 4.* **Films:** Clubs shall film all regular and postseason practices shall maintain a copy of such films until thirty days after the end of their season. The NFLPA may view

143

such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year) only upon the filing of a complaint alleging a violation of this Article.

## ARTICLE 25
## SQUAD SIZE

*Section 1.* **Active List:** Beginning with the 2011 regular season, the Active List limit shall be increased from forty-five players per club to forty-six players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided however, that individual Clubs may carry less than forty-six players on their Active List during the regular season, but no less than forty-three players.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

## ARTICLE 26
## SALARIES

*Section 1.* **Minimum Salaries:**

(a)     Beginning in the 2011 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| #CS | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|------|------|
| 0 | $375 | $390 | $405 | $420 | $435 | $450 | $465 | $480 | $495 | $510 |
| 1 | $450 | $465 | $480 | $495 | $510 | $525 | $540 | $555 | $570 | $585 |
| 2 | $525 | $540 | $555 | $570 | $585 | $600 | $615 | $630 | $645 | $660 |
| 3 | $600 | $615 | $630 | $645 | $660 | $675 | $690 | $705 | $720 | $735 |
| 4–6 | $685 | $700 | $715 | $730 | $745 | $760 | $775 | $790 | $805 | $820 |
| 7–9 | $810 | $825 | $840 | $855 | $870 | $885 | $900 | $915 | $930 | $945 |
| 10+ | $910 | $925 | $940 | $955 | $970 | $985 | $1000 | $1015 | $1030 | $1045 |

(all amounts in thousands of dollars)

(CS = Credited Seasons)

(b)     Beginning in the 2011 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding Practice Squad) shall be as follows:

| # CS | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|------|------|
| 0 | $258 | $273 | $288 | $303 | $318 | $333 | $348 | $363 | $378 | $393 |
| 1 | $273 | $288 | $303 | $318 | $333 | $348 | $363 | $378 | $393 | $408 |
| 2 | $288 | $303 | $318 | $333 | $348 | $363 | $378 | $393 | $408 | $423 |
| 3 | $328 | $343 | $358 | $373 | $388 | $403 | $418 | $433 | $448 | $463 |
| 4–6 | $353 | $368 | $383 | $398 | $413 | $428 | $443 | $458 | $473 | $488 |
| 7–9 | $378 | $393 | $408 | $423 | $438 | $453 | $468 | $483 | $498 | $513 |
| 10+ | $403 | $418 | $433 | $448 | $463 | $478 | $493 | $508 | $523 | $538 |

(all amounts in thousands of dollars)

(CS = Credited Seasons)

*Section 2.* **Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a nonfootball injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

*Section 3.* **Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional Salary payments, incentives, bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his agent in accordance with the terms of his Player Contract. The Club

146

and the player or his agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article 2, Section 4.

*Section 4.* **Arbitration:** The question of whether or not the Club, the Management Council, the player or his agent has engaged in good faith negotiations over such other compensation may be the subject of a proceeding before a Non-Injury Grievance Arbitrator. If the Arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

*Section 5.* **Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his agent.

**Section 6. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $2 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $2 million.

*Section 7.* **Copies of Contracts:** It is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement will be provided to the NFLPA within two (2) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

*Section 8.* **Split Contracts:** After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 9.* **Funding of Deferred and Guaranteed Contracts:** The NFL may require that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using the Discount Rate, less $2,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

## ARTICLE 27
## MINIMUM SALARY BENEFIT

*Section 1.* **Qualifying Players:** For purposes of this Article, a "Qualifying Player" shall be defined as a player with four or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.

*Section 2.* **Qualifying Contracts:**

(a)      For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (i) covers only a single League Year and (ii) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $50,000 in "Additional Compensation" (e.g., signing bonus allocation, roster bonus, reporting bonus, or any incentive ("likely to be earned" or not)), and/or (3) a guarantee for Salary and/or Salary advance of up to the Minimum Salary for a player with two Credited Seasons. A Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. Thus, for example, a contract that includes an option year is not a Qualifying Contract.

(b)      The maximum amount of Additional Compensation in (2) above shall be increased to $65,000 for the 2012–14 League Years, to $80,000 for the 2015–17 League Years, and $90,000 for the 2018–20 League Years.

(c)      If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than maximum amount of Additional Compensation less the amount of any Additional Compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus the maximum amount of Additional Compensation.

*Section 3.* **Additional Compensation Rules:**

(a)      Per-day offseason workout payments shall not be considered in determining "additional compensation" under Section 2 above, if such payments do not exceed the minimum level prescribed by Article 21.

(b)      If, however, the Player Contract provides for offseason workout payments above the minimum level, then the total of those payments shall be included in determining Additional Compensation.

(c)      If the Player Contract provides for offseason workout bonus payments on a basis other than a per-day payment, such amounts shall count as Additional Compensation but will not affect the treatment of any offseason workout payments that do not exceed the minimum prescribed level. For example, without limitation on any other example, a player with a 2011 Player Contract that provides for a $10,000 bonus payable to the player for offseason workouts, in addition to the per-day minimum of $145 (for a total of $1,450) and no other Additional Compensation, has Additional Compensation of $10,000.

149

(d)     If a player receives from a single Club, under a series of contracts, offseason workout payments specified on a per-day basis that average more than the minimum level prescribed by Article 21, then all of the offseason workout payments paid on a per-day basis shall count as Additional Compensation.

(e)     If a player is eligible to sign a Qualifying Contract with a New Club in accordance with Section 9 below, the full amount of any signing bonus payable to the player under any Player Contract that was executed in the same League Year as the proposed Qualifying Contract shall count against the Additional Compensation that can be earned by such player in accordance with Section 2 above. No other signing bonus amounts from contracts other than the Qualifying Contract shall count as Additional Compensation for such player.

(f)     If a player is eligible to sign a Qualifying Contract with his Old Club in accordance with Section 10 below, the circumstances in which signing bonus from a contract other than the Qualifying Contract may count against the Additional Compensation that can be earned by the player in accordance with Section 2 above, shall be determined exclusively under Section 10 below, the terms of which are not affected by Subsection 3(e) above.

*Section 4.* **Payments:** Players with Qualifying Contracts shall be paid the specified minimum salary on a pro rata basis over the number of weeks of the regular season.

*Section 5.* **Reduced Salary Cap Count:** Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with two Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with two Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with two Credited Seasons (if the player is not on an Active/Inactive List).

*Section 6.* **Minimum Salary Benefit Calculation:** The difference between the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2012 League Year, a Qualifying Player with five Credited Seasons shall receive a Minimum Salary of $700,000; however, only $540,000 shall count against his Club's Team Salary. The difference of $160,000 shall be counted as a Player Benefit.

*Section 7.* **Extensions of Qualified Contracts:** After the Club's last game of a season and prior to the expiration of the Qualifying Contract, the current Club and Player may agree to extend for one year a Qualifying Contract, provided that the terms of the extension comply with Section 2 above.

*Section 8.* **Terminated Qualifying Players:** If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that

did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).

*Section 9.* **Players Moving to New Club:** In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the "Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 10 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

*Section 10.* **Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club" (defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase or guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than the maximum Additional Compensation amount in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multiyear contract for more than the applicable Minimum Salary in any League Year of the contract plus additional Salary above the maximum Additional Compensation amount in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from Signing Bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other Additional Compensation that the player has received or will receive from that terminated contract does not exceed the maximum Additional Compensation amount. For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2012 a player signs a two-year contract for the minimum Paragraph 5 Salary in both years and a $100,000 signing bonus, and his contract is terminated on June 2, 2012, the player is not eligible to sign a 2012 Qualifying Contract with his Old Club because the sum of the acceleration of the 2012 prorated portion of the signing bonus ($50,000) that was agreed to in the year of his contract termination and the 2012 prorated portion of signing bonus from that terminated contract ($50,000) resulted in "additional compensation" of more than $65,000 in 2012. However, if the contract was signed on December 1, 2011, and the contract is terminated on June 2, 2012, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other Additional Compensation.

*Section 11.* **Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

*Section 12.* **Guarantees:** If a Qualifying Contract with guarantees is terminated, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $825,000 Qualifying Contract, which includes a $525,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $525,000 of the $825,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $525,000.

*Section 13.* **Termination Pay:** If a Qualifying Player is eligible for Termination Pay when he is released and subsequently files a claim, he shall receive the charged amount plus the full benefit amount. The player does not receive the benefit amount twice.

*Section 14.* **No Benefit for Non-Qualifying Contracts:** Contracts for players with four or more Credited Seasons who sign at the applicable minimum for that year plus more than the maximum amount of Additional Compensation (e.g., prorated signing bonus, etc.) or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

### ARTICLE 28
### PERFORMANCE-BASED POOL

**Section 1. Creation Of Fund:** In each League Year after the 2011 League Year, the NFL shall create a fund known as the Performance Based Pool that will be deducted from the calculation of the Salary Cap in the same manner as any other Player Benefit.

**Section 2. Amount of Fund:** For the 2012 League Year, the fund shall be $3.46 million per Club. For each League Year after the 2012 League Year, the fund will be adjusted by the percentage change in Projected AR, with a maximum change of 5%, unless otherwise agreed by the parties; provided, however, that the NFLPA has the unilateral right to reduce or freeze the amount of the Performance Based Pool.

**Section 3. Mandatory Distribution Each Year:** There shall be mandatory distribution to players of the entire fund each League Year.

**Section 4. Qualifying Players:** A player shall be eligible for participation in the Performance Based Pool for a League Year if he plays for at least one down in any regular season game. A player may receive multiple distributions if he qualifies for more than one Club in a single League Year.

**Section 5. Methodology:**
  (a)  Each player's "Playtime Percentage" shall be calculated by (i) adding the player's total plays on offense or defense, as appropriate, plus special teams and (ii) dividing that number by the team's total plays on offense or defense, as appropriate, plus special teams;

  (b)  Each player's "PBP Compensation" shall be calculated by adding his full regular season Paragraph 5 Salary, prorated signing bonus for the current League Year (plus any signing bonus acceleration (without regard to the June 1 rule) due to his having been released during the applicable League Year, unless the player is re-signed by his old Club without having missed a week of the regular season), earned incentives, and other compensation for the current League Year, subject to the following provisions:

  (i)  For all players other than those who receive the Minimum Salary Benefit, the full regular season Paragraph 5 Salary shall be used;

  (ii)  For players who were released and later resigned by the same Club during the regular season, the Paragraph 5 Salary from the player's initial contract shall be used for the period ending with the player's release, and the Paragraph 5 Salary from the player's subsequent contract shall be used for the period from release through the term of the subsequent contract;

  (iii)  For players who receive the Minimum Salary Benefit, the Paragraph 5 Minimum Salary amount for a player with two Credited Seasons, rather than the stated Paragraph 5 Salary, shall be used to calculate the player's PBP Compensation;

  (iv)  If a Player Contract is renegotiated after the Monday of the tenth week of the regular season to include an unearned incentive for the current League Year that is

153

treated as signing bonus, such incentive shall not be counted in the calculation of the PBP Compensation; and

(v)     If a portion of the player's Paragraph 5 Salary is treated as signing bonus, the full Paragraph 5 Salary (rather than the current year's proration) will be counted; all other amounts treated as signing bonus will be included on a prorated basis except for unearned incentives, as described in Subsection (iv) above.

(c)     Each player's "PBP Index" shall be calculated by dividing the player's Playtime Percentage by his PBP Compensation;

(d)     Each player shall receive an allocation from the fund determined by (i) dividing his PBP Index by the sum of the PBP Indices for each player on the Club and then (ii) multiplying that percentage by the Club's total PBP allocation.

(e)     For PBP purposes, a play is counted towards playtime percentage if the play runs to completion, regardless if the play was nullified by a penalty (e.g., a play that is blown dead by a penalty, due to a false start or encroachment penalties, etc. do not count in this calculation). A play is defined by the personnel on the field. A fake punt or field goal is considered a Special Teams play, and a 2-point conversion attempt is considered an offensive/defensive play.

*Section 6.* **Corrections:** If, after the fund has been distributed to players for any given League Year, a player demonstrates that his payment was miscalculated and should have been greater, he shall promptly be paid the additional Performance-Based Pay to which he is entitled, and said amount shall be deducted from the Club's actual PBP allocation for the following League Year. In the Final League Year, any such amount shall be taken from any unused Benefit money or credited toward future Performance-Based Pay.

## ARTICLE 29
## WAIVERS

### *Section 1.* Release:

(a)    Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

(b)    Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

*Section 2.* **Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

*Section 3.* **Ineligibility:** Any NFL player who is declared ineligible to compete in a preseason, regular season or postseason game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and Bylaws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

*Section 4.* **Notice of Termination:** The Notice of Termination form attached hereto as Appendix H will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice of Termination will be sent to him by certified mail at his last address on file with the Club.

*Section 5.* **NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice be-

tween the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

*Section 6.* **Rosters:** The NFL shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

*Section 7.* **Procedural Recall Waivers:** A player with four or more Credited Seasons who is subject to procedural recall waivers from the Reserved/Retired or Reserve/Military status, and who opts for Free Agency in lieu of assignment, cannot, during the same season, re-sign or return to the Club that originally requested such waivers.

## ARTICLE 30
## TERMINATION PAY

*Section 1.* **Eligibility:**

(a)    Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for Termination Pay under this Article if:

(1)    He is released after his Club's first regular season game; and

(2)    He has made the Active/Inactive List of his Club on or after the date of his Club's first regular season game.

(b)    Subject to Section 3 below, the amount of Termination Pay payable to such player shall be the unpaid balance of his Paragraph 5 Salary for that League Year. Termination Pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to Termination Pay more than once during his playing career in the NFL.

*Section 2.* **Regular Season Signings:** The Termination Pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the greater of: (i) the unpaid balance of the initial 25% of such player's Paragraph 5 Salary, or (ii) one week's salary up to a maximum of the Active/Inactive List Paragraph 5 Salary of a player with ten or more Credited Seasons as specified in Article 26, Section 1, notwithstanding the actual number of Credited Seasons the player has earned. For purposes of this 25% calculation only, the term "Paragraph 5 Salary" shall be defined as the proportionate remaining balance to be paid at the time such player is signed by the Club. (For example and without limitation, if a player is signed after the second week of the 2011 regular season to a Contract with a Paragraph 5 Salary of $850,000, his Paragraph 5 Salary for purposes of the 25% calculation shall be $750,000 or 15/17ths of $850,000.)

*Section 3.* **Ineligibility For Termination Pay:**

(a)    An otherwise qualified player will not be entitled to Termination Pay under this Article if the Club can demonstrate that, after receipt of a written warning from his Club in the form attached hereto as Appendix I, the player failed to exhibit the level of good faith effort which can be reasonably expected from NFL players on that Club.

(b)    A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 Salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination, but the amount of Termination Pay for such player shall be the amount he would have received if his previous contract had not been terminated until such subsequent termination.

157

## ARTICLE 31
## ADDITIONAL REGULAR SEASON GAMES

The League and/or Clubs may increase the number of regular season games per Team above the standard of sixteen (16) only with NFLPA approval, which may be withheld at the NFLPA's sole discretion.

# ARTICLE 32
# EXPANSION

*Section 1.* **Veteran Allocation:** The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of Veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract. The methodology employed pursuant to the letter dated December 18, 2001, regarding the Houston Texans Veteran Player Allocation Draft shall apply unless the parties agree otherwise.

*Section 2.* **Additional Compensatory Picks:** The Clubs may decide the selection position for expansion teams in the Draft, and may allocate to each expansion Club additional special Draft selections in the Drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular League play, up to a maximum of one additional such special Draft selection for each expansion Club in each round of the Draft in each such year.

*Section 3.* **Rookie Compensation Pool Adjustment:** The provisions of Article 7, Section 5(c) shall apply to adjust the Rookie Compensation Pool in the event of expansion.

*Section 4.* **Relocation Bonus:** Any Veteran player selected in any expansion allocation during the 2011–13 League Years will receive a bonus of $50,000 upon reporting to the expansion Club for preseason training camp, and an additional bonus of $75,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article 12 or 13. The bonus amount described in this Section shall increase to $60,000 and $85,000, respectively, for any expansion allocation in the 2014–17 League Years, and to $75,000 and $100,000, respectively, for any expansion allocation in the 2018–20 League Years.

159

## ARTICLE 33
## PRACTICE SQUADS

**_Section 1._ Practice Squads:**

(a)      The League may elect in any League Year in accordance with this Article to establish Practice Squads not to exceed eight (8) players per Club. The League's election in any one season shall not determine or affect its election in any subsequent season.

(b)      The League may elect to allow some or all Clubs to add to their Practice Squads one additional player, who shall not count against the limit above, whose citizenship and principal place of residence are outside the United States and its Territories ("International Player"). The League's election in any one season shall not determine or affect its election in any subsequent season. Such International Players shall be subject to the same terms and conditions of employment that apply to other Practice Squad players except that they (1) may not, during the term of their Practice Squad Contract, negotiate or sign an NFL Player Contract with any Club; and (2) may not practice with any Club following the last Conference Championship Game unless both Conference Championship teams have such a player. In addition, notwithstanding the provisions of Section 4 below, such International Player shall be eligible to serve on a Practice Squad for three additional seasons after the completion of the player's year(s) as an International Player. As set forth in Section 3 below, the weekly salary for such International Players shall not be included in the employing Club's Team Salary and shall instead be deducted from the calculation of the Salary Cap in the same manner as any Player Benefit Cost.

(c)      The Practice Squad Player Contract form attached hereto as Appendix J will be used for all Practice Squad player signings. This form cannot be amended without the approval of the Management Council and the NFLPA. Notwithstanding the foregoing, changes may be agreed to between a Club and a Practice Squad player consistent with the provisions of this Agreement.

**_Section 2._ Signing With Other Clubs:**

(a)      Any player under contract to a Club as a Practice Squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a Practice Squad player while under contract as a Practice Squad player.

(b)      Notwithstanding Subsection (a) above, a Practice Squad player may not sign an NFL Player Contract with his Club's next opponent later than 4:00pm, New York time, on the sixth day preceding the game (except in bye weeks, when the prohibition commences on the tenth day preceding the game). When the current employer club has a bye the weekend before the game against the Club signing the Practice Squad player to an NFL Player Contract, such contract must be executed prior to 4:00pm, New York time, on the 10th day preceding the game.

*Section 3.* **Salary:** Minimum salary for a Practice Squad player shall be the following per week, including postseason weeks in which his Club is in the playoffs:

| 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|------|
| $5700 | $5700 | $6000 | $6300 | $6600 | $6900 | $7200 | $7600 | $8000 | $8400 |

### *Section 4.* **Eligibility:**

(a)     The Practice Squad shall consist of the following players, provided that they have not served more than two previous seasons on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine regular season games during their only Accrued Season(s). An otherwise eligible player may be a Practice Squad player for a third season only if the Club by which he is employed that season has at least 53 players on its Active/Inactive List during the entire period of his employment.

(b)     A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and been a member of the club's Practice Squad for at least three regular season or postseason games during his first two Practice Squad seasons, and for at least one regular season or postseason game during his third Practice Squad season. (For purposes of this Section, a bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question.)

### *Section 5.* **Active List:** If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three games (a bye week counts as a game) even if he is terminated, traded, or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the eight-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another Club's 53-player roster or Practice Squad, any Salary (as that term is defined in Article 13, Section 4 that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks' Salary that he is entitled to receive from Club B. If the promotion occurs with fewer than three games remaining in the Club's regular season, the three game requirement for roster count shall not carry over into the next season.

### *Section 6.* **Contagious Disease Addendum:**

(a)     All Practice Squad players will execute an addendum to the Practice Player Contract relating to the Contagious Disease Policy (as set forth in Appendix J).

(b)  If a player is elevated from Practice Squad to the 53-player Active/Inactive List for a game because a club was given roster exemptions due to confirmed or suspected cases of a contagious disease among its players, then the terms of the addendum in that Player's Practice Player Contract will be in effect. A Practice Squad player who is elevated to the 53-player Active/Inactive List under these circumstances will not be required to sign an NFL Player Contract for that game.

(c)  Any player who is elevated from the Practice Squad to the affected club's 53-player Active/Inactive List for the game will be paid 1/17th of the Paragraph 5 minimum salary for Active/Inactive List players with the same number of credited seasons. Any games for which a player is elevated in this manner to the 53-player Active/Inactive List would count for purposes of earning a Credited Season for both minimum salary and pension credit and an Accrued Season for purposes of free agency, even though player is playing under the aforementioned addendum to his Practice Player Contract.

(d)  At the conclusion of the club's game, any player who was elevated from the Practice Squad to the affected club's 53-player Active/Inactive List for the game will automatically revert to the club's Practice Squad roster without going through waivers.

(e)  In the event a Practice Squad player: (1) sustains a football-related injury (either in a practice prior to the game or in the game itself) after being elevated to the 53-player Active/Inactive List under the circumstances described in Subsection (b) above, and (2) is physically unable to practice or play for the Club due to the injury, then the player's weekly compensation specified in Paragraph 4 of the Practice Squad Player Contract will be adjusted to 1/17th of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of Credited Seasons. Such a player shall receive this weekly "salary continuation" for so long as he remains physically unable to perform the services required of him because of such injury. Once the Practice Squad player is physically able to perform the services required of him by his Practice Squad Player Contract, then his salary will be adjusted to the amount set forth in Paragraph 4 ("Compensation") of that contract for the period of time he remains on the club's Practice Squad.

(f)  If a Practice Squad player sustains a football-related injury during the game in which he was elevated (or during a practice after being elevated but prior to the game) and is subsequently placed on Reserve/Injured, then he will be paid (for so long as he remains physically unable to perform the services required of him because of such injury) the prorated portion of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of Credited Seasons. A Practice Squad player, who is placed on Reserve/Injured under these circumstances, must be signed by his Club to an NFL Player Contract at the time he is placed on that reserve list category.

(g)  If a player receives salary under the circumstances set forth in Subsections (e) or (f) above, then those games shall count toward a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

(h)  If a Club chooses to add the Practice Squad player to its 53-player Active/Inactive List following the game in which exemptions were granted and the player was elevated, then the Club must follow all of the established procedures for signing a

Practice Squad player to an NFL Player Contract (including making room for that player on club's 53-player Active/Inactive List).

(j)      Use of these procedures by any Club in any week of the regular or post-season shall be in the sole discretion of the Club subject only to prior approval of the Commissioner and after a showing of confirmed or suspected contagious disease among its players. The NFLPA and its Medical Director shall be informed when such procedures are invoked.

## ARTICLE 34
## MEAL ALLOWANCE

*Section 1.* **Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the preseason, regular season and postseason as follows:

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Breakfast | $19 | $19 | $22 | $22 | $25 | $25 | $28 | $28 | $31 | $31 |
| Lunch | $29 | $29 | $32 | $32 | $35 | $35 | $38 | $38 | $41 | $41 |
| Dinner | $47 | $47 | $50 | $50 | $53 | $53 | $56 | $56 | $59 | $59 |

For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*Section 2.* **Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00pm on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00am, players will receive breakfast money.

## ARTICLE 35
## DAYS OFF

*Section 1.* **Preseason:** Commencing with the mandatory reporting date for veteran players to an individual Club's preseason training camp, as determined in accordance with Article 23, Section 5 of this Agreement, and continuing until the last weekend of preseason games played by NFL Clubs during the League Year in question, all players will be permitted at least one day-off every seven days, except for clubs that have a game scheduled on the fifth day (or sooner) following their immediately prior game. In no event shall players have less than five days off during the period between the mandatory reporting date for veteran players to an individual Club's preseason training camp and the last weekend of preseason games played by NFL Clubs during the League Year in question. During any preseason day-off players may not be given a curfew at the end of the 24-hour period any sooner than 10:30pm.

*Section 2.* **Regular Season and Postseason:** Commencing with the first regular season game and continuing until the last regular season or postseason game played by the respective Club, all players will be permitted days off at least at the rate of four days per month (not counting days off during a bye week) as determined by the Club.

*Section 3.* **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

*Section 4.* **Regular Season Bye Weeks:** During any regular season bye week, all players will be permitted days off in accordance with Article 24, Section 2 of this Agreement.

## ARTICLE 36
## MOVING AND TRAVEL EXPENSES

*Section 1.* **Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

*Section 2.* **Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

*Section 3.* **Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent or mortgage payments for living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to make such rent or mortgage payments and the total of such payments shall not exceed $6350 for the 2011–12 League Years, $6650 for the 2013–14 League Years, $6950 for the 2015–16 League Years, $7250 for the 2017–18 League Years, and $7550 for the 2019–20 League Years; and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

166

*Section 4.* **Transportation:** Each player who is traded or claimed during the preseason or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the preseason or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

## ARTICLE 37
## POSTSEASON PAY

*Section 1.* **System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

*Section 2.* **Compensation:** A player who qualifies will receive the following amount for each postseason game played:

| (in $000's) | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Wild Card** | | | | | | | | | | |
| (Div. Winner) | $22 | $22 | $23 | $24 | $25 | $27 | $28 | $29 | $31 | $33 |
| (Other) | $20 | $20 | $21 | $22 | $23 | $24 | $26 | $27 | $28 | $30 |
| **Div. Playoff** | $22 | $22 | $23 | $24 | $25 | $27 | $28 | $29 | $31 | $33 |
| **Conf. Champ.** | $40 | $40 | $42 | $44 | $46 | $49 | $51 | $54 | $56 | $59 |
| **Super Bowl** | | | | | | | | | | |
| (Winning Team) | $88 | $88 | $92 | $97 | $102 | $107 | $112 | $118 | $124 | $130 |
| (Losing Team) | $44 | $44 | $46 | $49 | $51 | $53 | $56 | $59 | $62 | $65 |

*Section 3.* **Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

### *Section 4.* **Conference Championship; Super Bowl Game:**

(a)   A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)   A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)   A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)   A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and postseason) will receive one-half the amount designated in Section 2 for such game,

168

provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)    A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)    If a first-year player is injured during the regular season and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive one-half (½) the amount designated in Section 2 above for such game, provided that he is still under contract to the Club at the time of the game and had signed an NFL Player Contract or Practice Squad Contract during a prior League Year.

(g)    If a veteran player who completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan was earned is injured during the preseason and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive the full amount designated in Section 2 for such game provided that he is still under contract to the Club at the time of the game.

(h)    If a veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned is injured during the preseason and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive one-half (½) the amount designated in Section 2 for such game provided that he is still under contract to the Club at the time of the game.

(i)    If a first-year player is injured during the preseason and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive one-quarter (¼) of the amount designated in Section 2 above for such game provided that he is still under contract to the Club at the time of the game and; (A) he was on that Club's Practice Squad for eight or more games in a prior League Year; or (B) he received at least one, but fewer than three, regular season game checks while on that Club's Active or Inactive or Reserve Injured list during a prior League Year.

(j)    The definitions of "veteran player" and "first-year player" set forth in Article 23, Section 1 shall apply to Subsections (e)–(i) above. A player who has not signed an NFL Player Contract or NFL Practice Squad Contract during a previous NFL season is not entitled to postseason pay under Subsections (e)–(i) above.

*Section 5.* **Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

## ARTICLE 38
## PRO BOWL GAME

*Section 1.* **Compensation:** Players on the teams in any AFC-NFC Pro Bowl game will receive the following amounts:

| (in $000's) | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| (Winning Tm) | $50 | $50 | $53 | $55 | $58 | $61 | $64 | $67 | $70 | $74 |
| (Losing Tm) | $25 | $25 | $26 | $28 | $29 | $30 | $32 | $34 | $35 | $37 |

*Section 2.* **Selection:** Players will be selected for any Pro Bowl game on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally (33.33% each). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The NFLPA player representative or his alternate will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

*Section 3.* **Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend any Pro Bowl game.

*Section 4.* **Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

*Section 5.* **Payment:** Players will be paid for any Pro Bowl game within fifteen (15) days after the game is played.

*Section 6.* **Applicability:** The NFL shall, in its sole discretion, determine the time and location of any Pro Bowl game, provided that the NFL will consult with the NFLPA prior to making any such determination. If players competing in the Super Bowl cannot feasibly participate in the Pro Bowl because of the timing or location of the Pro Bowl game, they shall nevertheless be compensated in accordance with the letter agreement under the Prior Agreement dated January 28, 2011. In any League Year, the NFL may elect, in its sole discretion, not to hold a Pro Bowl game or to replace the Pro Bowl game with another event that recognizes the accomplishments of outstanding NFL players, provided that the NFL will consult with the NFLPA prior to making its determination, and that players are nonetheless selected for such recognition in accordance with Section 2 above, and paid the Pro Bowl incentive bonus, if any, in their Player Contract, for such selection.

170

## ARTICLE 39
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:**

(a) **Medical Credentials.** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians, and all other physicians retained by a club to treat players shall be board-certified in their field of medical expertise. Each Club will also have at least one board-certified internist, family medicine, or emergency medicine physician (non-operative sports medicine specialist). Any Club medical physician (internist, family medicine or emergency medicine) hired after the effective date of this Agreement must also have a Certification of Added Qualification (CAQ) in Sports Medicine; any head team physician (orthopedic or medical) hired after the effective date of this Agreement must have a CAQ in Sports Medicine; and any current team physician promoted to head team physician after the effective date of this Agreement has until February 2013 to obtain a CAQ in Sports Medicine or relinquish the position.

(b) **Team Consultants.** All Clubs shall have the consultants with the following certifications:

(i) Neurological (head trauma): Board certification in neurosurgery, neurology, sports medicine, emergency medicine, or psychiatry, with extensive experience in mild and moderate brain trauma;

(ii) Cardiovascular: Board certified in cardiovascular disease;

(iii) Nutrition (athletes): licensed;

(iv) Neuropsychologist: Ph.D and certified/licensed.

(c) **Doctor/Patient Relationship.** The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs, but each Club physician's primary duty in providing player medical care shall be not to the Club but instead to the player-patient. This duty shall include traditional physician/patient confidentiality requirements. In addition, all Club physicians and medical personnel shall comply with all federal, state, and local requirements, including all ethical rules and standards established by any applicable government and/or other authority that regulates or governs the medical profession in the Club's city. All Club physicians are required to disclose to a player any and all information about the player's physical condition that the physician may from time to time provide to a coach or other Club representative, whether or not such information affects the player's performance or health. If a Club physician advises a coach or other Club representative of a player's serious injury or career threatening physical condition which significantly affects the player's performance or health, the physician will also advise the player in writing. The player, after being advised of such serious injury or career-threatening physical condition, may request a copy of the Club physician's record from the examination in which such physical condition was diagnosed and/or a written explanation from the Club physician of the physical condition.

(d) **NFLPA Medical Director.** The NFL recognizes that the NFLPA Medical Director has a critical role in advising the NFLPA on health and safety issues. Accordingly, the NFL agrees that the NFLPA Medical Director shall be a voting member of all NFL health and safety committees, including but not limited to the NFL Injury & Safety Panel and its subcommittees and shall have access to all of the same data,

171

records and other information provided to the NFL Medical Advisor and/or any other members of such committees.

(e)      **Home Game Medical Coverage-Neutral Physician:** All home teams shall retain at least one RSI physician who is board certified in emergency medicine, anesthesia, pulmonary medicine, or thoracic surgery, and who has documented competence in RSI intubations in the past twelve months. This physician shall be the neutral physician dedicated to game-day medical intervention for on-field or locker room catastrophic emergencies.

*Section 2.* **Club Athletic Trainers:** All athletic trainers employed or retained by Clubs to provide services to players, including any part time athletic trainers, must be certified by the National Athletic Trainers Association and must have a degree from an accredited four-year college or university. Each Club must have at least two full-time athletic trainers. All part-time athletic trainers must work under the direct supervision of a certified athletic trainer. In addition, each Club shall be required to have at least one full time physical therapist who is certified as a specialist in physical therapy to assist players in the care and rehabilitation of their injuries.

*Section 3.* **Accountability and Care Committee:**

(a)      The parties agree to establish an Accountability and Care Committee, which will provide advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players by all clubs during the term of this Agreement. The Committee shall consist of the NFL Commissioner and the NFLPA Executive Director (or their designees). In addition, the Commissioner and Executive Director shall each appoint three additional members of the Committee, who shall be knowledgeable and experienced in fields relevant to health care for professional athletes.

(b)      The Committee shall meet in person or by conference call at least three times per year, or at such other times as the Commissioner and Executive Director may determine.

(c)      The Committee shall: (i) encourage and support programs to ensure outstanding professional training for team medical staffs, including by recommending credentialing standards and continuing education programs for Team medical personnel; sponsoring educational programs from time to time; advising on the content of scientific and other meetings sponsored by the NFL Physicians Society, the Professional Football Athletic Trainers Association, and other relevant professional institutions; and supporting other professional development programs; (ii) develop a standardized preseason and postseason physical examination and educational protocol to inform players of the primary risks associated with playing professional football and the role of the player and the team medical staff in preventing and treating illness and injury in professional athletes; (iii) conduct research into prevention and treatment of illness and injury commonly experienced by professional athletes, including patient care outcomes from different treatment methods; (iv) conduct a confidential player survey at least once every two years to solicit the players' input and opinion regarding the adequacy of medical care provided by their respective medical and training staffs and commission independent analyses of the results of such surveys; (v) assist in the development and maintenance of injury sur-

172

veillance and medical records systems; and (vi) undertake such other duties as the Commissioner and Executive Director may assign to the Committee.

(d)     If any player submits a complaint to the Committee regarding Club medical care, the complaint shall be referred to the League and the player's Club, which together shall determine an appropriate response or corrective action if found to be reasonable. The Committee shall be informed of any response or corrective action. Nothing in this Article, or any other Article in this Agreement, shall be deemed to impose or create any duty or obligation upon either the League or NFLPA regarding diagnosis, medical care and/or treatment of any player.

(e)     Each Club shall use its best efforts to ensure that its players are provided with medical care consistent with professional standards for the industry.

*Section 4.* **Player's Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the Club's responsibility for the costs of medical services rendered by the physician furnishing the second opinion, such physician must be board-certified in his field of medical expertise; in addition, (a) the player must consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician. A player shall have the right to follow the reasonable medical advice given to him by his second opinion physician with respect to diagnosis of injury, surgical and treatment decisions, and rehabilitation and treatment protocol, but only after consulting with the club physician and giving due consideration to his recommendations.

*Section 5.* **Player's Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation regarding the need for, the timing of and who should perform the surgery; (b) the player will give due consideration to the Club physician's recommendations; and (c) the surgeon selected by the player shall be board-certified in his field of medical expertise. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 6.* **Standard Minimum Preseason Physical:** Each player will undergo the standardized minimum preseason physical examination and tests outlined in Appendix K, which will be conducted by the Club physician(s) as scheduled by the Club. No Club may conduct its own individual testing for anabolic steroids and related substances or drugs of abuse or alcohol.

*Section 7.* **Substance Abuse:**

(a)     **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the

parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)     **Policies.** The parties confirm that the Program on Anabolic Steroids and Related Substances will include both annual blood testing and random blood testing for human growth hormone, with discipline for positive tests at the same level as for steroids. Over the next several weeks, the parties will discuss and develop the specific arrangements relating to the safe and secure collection of samples, transportation and testing of samples, the scope of review of the medical science, and the arbitrator review policy, with the goal of beginning testing by the first week of the 2011 regular season. Pending agreement by both parties regarding the implementation of this program of blood testing, and such other policy amendments as the parties may agree upon, the Policy and Program on Substances of Abuse and the Policy on Anabolic Steroids and Related Substances, will remain in full force and effect as each existed during the 2010 season.

174

## ARTICLE 40
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file attorney-client privileged material, subjective coaching and scouting reports, or any other subjective material. This Section 1 shall not affect the player's rights under any grievance procedure.

*Section 2.* **Medical Records:**

     (a)     A player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the preseason and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records without charge upon request during the offseason. A player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to such player's personal physician. Upon request by the player or player's personal physician as described in this Subsection, such records shall be provided as soon as possible, and in no event later than seven (7) business days from the receipt of the request.

     (b)     To the extent that a player's medical or trainer records contain information that is subject to the Health Insurance Portability and Accountability Act of 1996 (as amended and as implemented through regulations) or other applicable laws, nothing in this Section shall be construed to restrict a player's right to access his information under such laws.

*Section 3.* **Electronic Medical Record System:** The NFL shall develop and implement an online, 24-hour electronic medical record system within 24 months of the effective date of this Agreement or such longer period as the parties may agree. Fifty percent (50%) of the costs of developing and implementing such system shall be a Player Benefit Cost. Once implemented and operational, the cost of maintaining the system thereafter shall not be counted as a Player Benefit Cost.

## ARTICLE 41
## WORKERS' COMPENSATION

The parties shall continue to discuss in good faith appropriate reforms and revisions to the provisions of this Agreement and the Player Contract related to workers' compensation issues. Absent such agreement, the following terms shall apply:

*Section 1.* **Benefits:** In any state where workers' compensation coverage is not compulsory or where a Club is excluded from a state's workers' compensation coverage, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

*Section 2.* **Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its Players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its Players in the same manner provided in Section 1 above.

*Section 3.* **Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article 43 or, where applicable, a separate method of alternative dispute resolution negotiated by the parties (e.g., Miami Dolphins/ Implementation Agreement).

*Section 4.* **Workers' Compensation Offset Provisions:** The parties agree that the following provisions shall exclusively govern any and all rights Clubs have with respect to workers' compensation credits or offsets during the term of this Agreement.

(i) **"Dollar-for-Dollar" Credits or Offsets.** No Club shall be entitled to claim or receive any dollar-for-dollar credit or offset, other than as provided for in Article 3 of this Agreement, for salary, benefits, or other compensation paid or payable to a player against any award or settlement of workers' compensation benefits, either pursuant to Paragraph 10 of the NFL Player Contract or any provision of state law.

(ii) **"Time" Credits or Offsets.** All Clubs are instead entitled only to a "time" credit or offset under Paragraph 10 of the NFL Player Contract or state law, as set forth more specifically in Subsections (A)–(E) below. This "time" credit or offset shall in all cases be expressed or granted as a reduction in the number of weeks of a player's workers' compensation award or settlement that is attributable to the same period of weeks in which the player is deemed entitled to salary payments described in this Section. The credit or offset shall be at the weekly rate specified under the state workers' compensation law in question. Because the period from the beginning of the regular

176

season to the end of the League Year (25 weeks) is approximately 1.5 times longer than the seventeen week period over which players receive salary, the parties agree that, in calculating the "time" credit or offset as set forth more particularly herein, the Club is entitled to a reduction of 1.5 weeks of a player's workers' compensation award or settlement for each week during the regular season for which a player is awarded or executes a settlement agreement for workers' compensation benefits and for the same period of weeks is paid his full Paragraph 5 Salary.

(A)     In the case of salary payments pursuant to Paragraph 5 or 9 of the NFL Player Contract, the Club shall be entitled to a reduction of 1.5 weeks of a player's workers' compensation award or settlement for each week during the regular season in which the player is physically unable to perform his services under his contract due to an injury he suffers while performing services during that contract year, to a maximum of 25 weeks, provided that the player receives his full salary as set forth in Paragraph 5 of his contract for the period in question. For example, if a player receives 3 weeks of Paragraph 5 Salary subsequent to an injury that rendered him unable to perform for three games (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 4.5 (= 3 × 1.5) weeks of the player's workers' compensation award or settlement. As another example, if a player receives 17 weeks of Paragraph 5 Salary subsequent to an injury that rendered him unable to perform all 16 games of the regular season (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 (= 17 × 1.5) weeks of the player's workers' compensation award or settlement.

(B)     In the event that an Injury Grievance, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, is settled between the player and the Club, or in the event that a Club and player execute an injury-related settlement agreement, the Club shall be entitled to a reduction of 1.5 weeks of a player's workers' compensation award or settlement for each week that the player is deemed entitled to receive his full Paragraph 5 Salary pursuant to the settlement, to a maximum of 25 weeks. The Club and player shall be required to specify in the written settlement agreement the number of weeks for which the player is receiving his full Paragraph 5 Salary under the settlement so that the appropriate number of weeks of the player's workers' compensation award or settlement can be reduced. For example, if a player and a Club settle an Injury Grievance or injury guarantee claim for a specified period of 3 weeks, the Club will be entitled to a reduction of 4.5 (= 3 × 1.5) weeks of the player's workers' compensation award or settlement.

(C)     In the event that an arbitrator awards Paragraph 5 Salary in an Injury Grievance, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, for the same period of weeks for which a player has already been awarded workers' compensation benefits or received a workers' compensation settlement, the Club shall be entitled to a reduction of 1.5 weeks of the player's workers' compensation award or settlement for each week the player is deemed entitled to receive his full Paragraph 5 Salary pursuant to the arbitrator's award. For example, if an arbitrator awards a player 3 weeks of Paragraph 5 Salary pursuant to an Injury Grievance award and the player has already been awarded workers' compensation benefits or received a workers' compensation settlement for that

177

same period, the arbitrator shall reduce the award by an amount equal to 4.5 (= 3 × 1.5) weeks of workers' compensation benefits.

(D)     Clubs are not entitled to any credit or offset under this Article against any workers' compensation benefits attributable to the period of time after the last League Year for which the player is entitled to receive salary payments from the Club, even if the player's entitlement to such payments is not determined until after the League Year in question. No payment of any of the following may be used by a Club as a basis for claiming any workers' compensation credit or offset under this Article:

(1)     signing bonus;

(2)     option bonus;

(3)     roster bonus;

(4)     incentive bonus;

(5)     Performance-based pay earned prior to the date of injury (unless, for any period of time in which a Club would otherwise be entitled to a credit or offset pursuant to this Section, the player's weekly salary would be less than the amount of weekly workers' compensation benefits payable under state law, in which case the performance-based pay could be added by the Club to the player's Paragraph 5 Salary for those weeks in which the Club would be entitled to a credit or offset under this Section);

(6)     Deferred compensation (except where the deferred compensation is salary attributable to the weeks for which the player has been awarded or has executed a settlement agreement for workers' compensation benefits as described in this Section in which case the Club is permitted a credit or offset in the same manner as if the salary was not deferred and instead was paid during the League Year in which the player was physically unable to perform his services under his NFL Player Contract due to an injury he suffered while performing services during that contract year);

(7)     Severance pay; or

(8)     Any other form of compensation other than Paragraph 5 Salary under the NFL Player Contract.

Nothing in this Subsection shall limit or otherwise restrict the Club's ability to claim or receive the dollar-for-dollar credit or offset for an Injury Protection benefit or Extended Injury Protection benefit provided for in Article 3 of this Agreement.

(E)     Total and Permanent, Line of Duty and Degenerative Disability Benefits paid pursuant to the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents are not subject to any credit or offset for workers' compensation benefits, whether or not those benefits are payable during the same period in which the disability payments are payable. Clubs are not entitled to any credit or offset under this Article for any workers' compensation benefits payable to any player against any payments made to any player under the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents; provided, however, that the receipt of such disability payments by the player shall not affect the Club's right to claim or receive any offsets or credits set forth elsewhere in this Article.

(iii)     **Remedies.** If, despite the terms of this Article, a state court or other competent authority nevertheless renders a decision or other determination with an outcome inconsistent with the terms of this Section 4, then the player shall have a right to immediate payment from the Club for the amount of any difference between such

178

outcome and the outcome specified in Subsections (i)–(ii) above. A player may initiate a claim under this Section by filing a written notice by certified mail, fax, or electronically via .pdf with the Management Council and furnishing a copy to the Club involved. The claim shall set forth the name of the matter and jurisdiction in which the improper award was made, the amount of payment requested and the basis for the calculation. The claim must be initiated within 45 days of either the date of execution of this Agreement or the date of any adverse order (whichever is later); provided, however, that in the event the player files an appeal of any adverse order, the time for the player to notify the Club will begin to run from the date the appeal is decided.

(iv)     **Time-Offset Fund.** The NFL shall establish a fund which shall bear the cost of additional benefits or associated insurance and related costs (exclusive of professional fees, administrative overhead, penalties or similar costs) incurred by any Club that is unable to obtain a dollar-for-dollar credit or offset for salary, benefits, or other compensation paid or payable to a player against any award or settlement of workers' compensation benefits as a direct result of this Section 4 and/or NFL Arbitration precedent interpreting Paragraph 10 of the NFL Player Contract. For the avoidance of any doubt, the Clubs that were eligible to receive reimbursement under the Prior Agreement shall remain eligible under this Agreement. The parties shall use their best efforts to ensure that all parties involved including the Clubs and their insurance carriers will implement this Subsection (iv) in such a manner as to minimize the costs and expenses associated with this fund.

(v)     **Disputes.** Any dispute concerning the operation of Section 4 and/or any payments to a player under Subsection (iii) will be determined under the grievance procedure of Article 43.

*Section 5.* **Carve-Out:** The parties shall immediately establish a joint committee that will make good faith efforts to negotiate a possible California Workers' compensation alternative dispute resolution program on a trial basis (i.e., carve out).

*Section 6.* **Reservation of Rights:** The parties shall retain the positions they held prior to this Agreement with respect to all existing litigation and arbitration involving workers' compensation issues, including without limitation, the federal and state court cases in California (Titans), Illinois (Bears) and New York (Mawae, Harvey) regarding offset issues or choice of law and forum provisions contained in NFL Player Contracts, and nothing in this Article shall affect positions taken in any such pending litigation.

## ARTICLE 42
## CLUB DISCIPLINE

*Section 1.* **Maximum Discipline:**

    (a)    **2011 League Year.** For the 2011 League Year, the following maximum discipline schedule will be applicable:

    (i)    Overweight—maximum fine of $470 per lb., which fine may be assessed no more than twice per week, with each week beginning on Monday and ending on Sunday, and with each fine at least three days apart (e.g., Monday–Thursday, Tuesday–Friday, etc.).

    (ii)    Unexcused late reporting for mandatory off-season minicamp, meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, scheduled promotional activity, scheduled workout, weigh-in, or meal—maximum fine of $1,770.

    (iii)    Failure to promptly report injury to Club physician or trainer—maximum fine of $1,770.

    (iv)    Losing, damaging or altering Club-provided equipment—maximum fine of $1,770, and replacement cost, if any.

    (v)    Throwing football into stands—maximum fine of $1,770.

    (vi)    Unexcused late reporting for or absence from preseason training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article 9—fine of $30,000 per day. For this Subsection and Subsection (vii) below, preseason training camp shall be defined as the period beginning with the first day of a Club's training camp through the final preseason roster reduction date.

    (vii)    Unexcused late reporting for or absence from preseason training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article 9—fine of $30,000 per day, plus one week's Paragraph 5 Salary for each preseason game missed.

    (viii)    Unexcused missed mandatory meeting, practice, curfew, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, scheduled promotional activity, scheduled workout, weigh-in, or meal—maximum fine of $9,440.

    (ix)    Unexcused failure to report to or unexcused departure from mandatory offseason minicamp—maximum fine of $10,000 for the first missed day, which amount shall increase by $10,000 per day for each day of the player's absence or departure (e.g., a player who misses all three days of minicamp may be fined up to $60,000).

    (x)    Material failure to follow rehabilitation program prescribed by Club physician or trainer—maximum fine of $9,440.

    (xi)    Unexcused missed team transportation—maximum fine of $9,440 and transportation expense, if any.

    (xii)    Loss of all or part of playbook, scouting report or game plan—maximum fine of $9,440.

    (xiii)    Ejection from game—maximum fine of $25,000.

    (xiv)    Any material curfew violation the night prior to the Club's game may be considered conduct detrimental to the Club.

180

(xv)    Conduct detrimental to Club—maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks. This maximum applies without limitation to any deactivation of a player in response to player conduct (other than a deactivation in response to a player's on-field playing ability), and any such deactivation, even with pay, shall be considered discipline subject to the limits set forth in this section. The Non-Injury Grievance Arbitrator's decision in *Terrell Owens* (Nov. 23, 2005) is thus expressly overruled as to any Club decision to deactivate a player in response to the player's conduct.

(b)    **Maximum Discipline in Other League Years.** The amounts set forth in Section 1(a) above and Section 7 below are for the 2011 League Year. The amounts for the 2012–2020 League Years shall be as set forth in Exhibit A to this Article.

### *Section 2.* Published Lists:

(a)    All Clubs must publish and make available to all players at the commencement of preseason training camp a complete list of the discipline that can be imposed for both designated offenses within the limits set by the maximum schedule referred to in Section 1 above and for other violations of reasonable Club rules. A Club may notify a player of a violation by providing written notice to the player at the Club or at any address where the Club reasonably expects the player to be located.

(b)    The Club will promptly notify the player of any discipline; notice of any Club fine under Subsection 1(a)(vi) or 1(a)(vii) and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

### *Section 3.* Uniformity:

(a)    Discipline will be imposed uniformly within a Club on all players for the same offense; however, if the Club's published list of discipline imposes fines for designated offenses that are less than the limits set by the maximum schedule set forth in Section 1 above, the Club may specify the events which create an escalation of the discipline, not to exceed such maximum limits, provided the formula for escalation is uniform in its application. Nothing in this Section 3 shall preclude any Club from imposing a fine and/or a suspension without pay for conduct detrimental to the Club, as set forth in Section 1(a) above, in any case in which the same player has committed repeated offenses in the same League Year, whether or not the fines imposed for the player's prior offenses were escalated as described in the immediately preceding sentence of this Section; provided, however, that the NFLPA expressly reserves the right to challenge the imposition of such discipline for conduct detrimental to the Club based upon the absence of just cause and/or any other allowable bases for opposing discipline.

(b)    Any disciplinary action imposed upon a player by the Commissioner pursuant to Article 46 will preclude or supersede disciplinary action by the Club for the same act or conduct.

### *Section 4.* Disputes: Any dispute involving Club discipline must be processed exclusively under Article 43.

### *Section 5.* Deduction:

(a) Any Club fine will be deducted at the rate of no more than $2,500 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. For the 2016–2020 League Years, the amount will increase from a rate of $2,500 to $3,500 from each pay period. Nothing in this Subsection (a) will apply to a suspension or for a fine under Subsection 1(a)(vi) or 1(a)(vii).

(b) A fine under Subsection 1(a)(vi) or 1(a)(vii) may be deducted from any payments owed to a player under any NFL Player Contract with the Club, or from any salary, bonus installments, Performance-Based Pay, Postseason Pay, Severance Pay or Termination Pay otherwise owed by the Club. The assignment and/or termination of a player's contract after events triggering a fine under Subsection 1(a)(vi) or 1(a)(vii) shall not result in any waiver of the assigning or terminating Club's right to seek to recover the full amount of the fines.

*Section 6.* **NFL Drug and Steroid Policies:** No Club may impose any discipline against a player, including but not limited to terminating the player's Player Contract, as a result of that Player's violation of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or for failing any drug test, provided, however, that the fact that a player has violated the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or has failed a drug test will not preclude the termination of his Player Contract if such termination is otherwise expressly permissible under this Agreement or the player's Player Contract.

*Section 7.* **Cumulative Fines:** Any player who commits multiple offenses on the same day (e.g., missed mandatory team meeting, late for practice and missed scheduled appointment with trainer) shall be subject to a separate fine for each such offense, within the limits set by the maximum schedule set forth in Section 1 above; provided, however, that the cumulative amount for all such fines on a given day during preseason training camp shall not exceed $20,000, and that the cumulative amount for all such fines on a given day during the regular season or postseason shall not exceed $27,000. The cumulative fine limits set forth in this Section shall not apply to any violation as to which a player may be fined one week's regular season salary or to conduct detrimental to the Club. Nothing in this Section shall preclude the Club from denying payment of the Player's weekly salary or from seeking reimbursement from the Player under any forfeiture provision in the Player's Contract if such denial of payment or forfeiture is otherwise permissible under both the Player's Contract and this Agreement. Nor shall anything in this Section preclude a Club from imposing a fine and/or suspension without pay for conduct detrimental to the Club, as set forth in Section 1(a) above, in any case in which the same player has committed repeated offenses in the same League Year, as described in Section 3 above; provided, however, that the NFLPA expressly reserves the right to challenge the imposition of such discipline for conduct detrimental to the Club based upon the absence of just cause and/or any other allowable bases for opposing discipline.

*Section 8.* **Offset of Preseason Fine Amounts:** In the event that a player under con-

tract is fined under Subsection 1(a)(vi) or 1(a)(vii) for unexcused late reporting for or absence from pre-season training camp and, as the result of such late reporting or absence, the Club also withholds payment, or claims reimbursement, under any forfeiture provision in a Player Contract executed prior to March 8, 2006, then there shall be an offset of the cumulative amount of such daily fines against the amount claimed by the Club under the forfeiture provision, or vice versa. In the 2011 League Year, the offset shall be $13,477 per day for each day the player has been fined, representing the difference between the Prior Agreement's fine for this category of offense ($16,523 per day) and this Agreement's fine for this category of offense ($30,000 per day, or $40,000 per day for the 2016–2020 League Years) effective on August 4, 2011. The amount of such offset shall be increased for the 2012 League Year and each League Year thereafter during the term of this Agreement at the rate of 5% per year. Other than as specifically set forth in this Section, there shall be no offset of fines imposed under this Agreement against claims made by a Club under any permissible forfeiture provision in a Player Contract.

*Section 9.* **Effective Date:** The maximum discipline rules set forth above apply to all discipline imposed on or after August 4, 2011.

**EXHIBIT A**
**MAXIMUM FINE AMOUNTS FOR 2012–2020 LEAGUE YEARS**

| Maximum Discipline for: | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Overweight / lbs per day | $495 | $520 | $545 | $575 | $600 | $630 | $665 | $695 | $730 |
| Unexcused late reporting for an activity that has been listed in Article 42, Section 1(a)(ii), e.g., missed meal | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Failure to promptly report injury | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Losing, damaging or altering Club-provided equipment | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Throwing football into stands | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Unexcused late reporting for or absence from preseason training camp by a player under contract, except for those signed as an Un-restricted Free Agent pursuant to Article 9 (Veteran Free Agency); Maximum fine for each day of player's absence | $30,000 | $30,000 | $30,000 | $30,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |

184

| Maximum Discipline for: | | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|---|---|---|---|---|
| Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article 9 (Veteran Free Agency); Maximum fine for each day of player's absence, plus one week's regular season salary for each preseason game missed | | $30,000 | $30,000 | $30,000 | $30,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| Unexcused failure to report to or unexcused departure from mandatory off-season minicamp – maximum fine per day for each day thereafter of player's absence | 1st Day | $10,500 | $11,025 | $11,575 | $12,155 | $12,765 | $13,400 | $14,070 | $14,775 | $15,515 |
| | 2nd Day | $21,000 | $22,050 | $23,150 | $24,300 | $25,525 | $26,800 | $28,150 | $29,550 | $31,030 |
| | 3rd Day | $31,500 | $33,075 | $34,730 | $36,465 | $38,290 | $40,205 | $42,215 | $44,325 | $46,540 |
| Cumulative fine amounts for prseason training camp | | $21,000 | $22,050 | $23,150 | $24,310 | $25,525 | $26,800 | $28,140 | $29,550 | $31,025 |
| Cumulative fine amounts for regular season or postseason | | $28,350 | $29,770 | $31,255 | $32,820 | $34,460 | $36,185 | $37,990 | $39,890 | $41,885 |
| Material failure to follow rehabilitation program prescribed by Club physician | | $9,915 | $10,410 | $10,930 | $11,475 | $12,050 | $12,655 | $13,285 | $13,950 | $14,650 |
| Unexcused missed activity that has been listed in Article 42, Section 1(a)(viii), e.g., missed meal | | $9,915 | $10,410 | $10,930 | $11,475 | $12,050 | $12,655 | $13,285 | $13,950 | $14,650 |

185

| Maximum Discipline for: | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Unexcused missed team transportation (transportation expenses not included) | $9,915 | $10,410 | $10,930 | $11,480 | $12,050 | $12,655 | $13,300 | $13,950 | $14,650 |
| Loss of all or part of playbook, scouting report or game plan | $9,915 | $10,410 | $10,930 | $11,475 | $12,050 | $12,655 | $13,285 | $13,950 | $14,650 |
| Ejection from game | $26,250 | $27,565 | $28,940 | $30,390 | $31,910 | $33,500 | $35,180 | $36,935 | $38,785 |

## ARTICLE 43
## NON-INJURY GRIEVANCE

*Section 1.* **Definition:** Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, the Practice Squad Player Contract, or any applicable provision of the NFL Constitution and Bylaws or NFL Rules pertaining to the terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement.

*Section 2.* **Initiation:** A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within fifty (50) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within fifty (50) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

*Section 3.* **Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail, fax, or electronically via .pdf with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail, fax, or electronically via .pdf with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and answer to the NFLPA. The party to whom a Non-Injury Grievance has been presented will answer in writing by certified mail, fax, or electronically via .pdf within ten (10) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable. See also Section 14 below regarding electronic exchange of Standard Grievance Correspondence.

*Section 4.* **Ordinary and Expedited Appeal:** If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or the Management Council as may be appropriate. If the grievance involves a suspension of a player by a Club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within

187

seven (7) days of the filing of the grievance. The NFLPA and the NFL will engage in good faith efforts to schedule grievances involving suspension of a player by a Club prior to the Club's next scheduled game. In addition, the NFLPA and the Management Council will each have the right of immediate appeal and hearing within seven (7) days with respect to four (4) grievances of their respective choice each calendar year. The arbitrator(s) designated to hear such grievances will issue their decision(s) within five (5) days of the completion of the hearing. Pre-hearing briefs may be filed by either party and, if filed, will be exchanged prior to hearing.

*Section 5*. **Discovery and Prehearing Procedures:**

(a)(i)   Any party may seek bifurcation of a grievance to assert a claim of untimeliness. Bifurcation motions shall be presented in writing to the other party and the arbitrator in the moving party's answer or at any time no later than seven (7) days prior to the scheduled hearing on the merits of the grievance. If an arbitrator has not yet been assigned to hear the grievance then the moving party shall file the motion with the Notice Arbitrator, who will decide the motion or assign it to a member of the Non-Injury Grievance Arbitration panel. A party's decision to pursue a bifurcated hearing may not delay the processing of a hearing scheduled on the merits of the grievance. For any motions made at least thirty (30) days before a hearing on the merits of the grievance, the parties will use their best efforts to schedule the bifurcated hearing at least ten (10) days before the scheduled hearing on the merits of the grievance. In any case where a timely motion for bifurcation is made, but a bifurcated hearing is not held, the arbitrator shall decide the issue of timeliness during the hearing on the merits.

(ii)   If a defense of untimeliness is not raised at least seven (7) days before the scheduled hearing on the merits of the grievance, the parties will be precluded from arguing that defense. However, where a party learns of facts supporting the defense fewer than seven days prior to the hearing, during the hearing, or in a post-hearing deposition, the party must present the defense to the opposing party and arbitrator within seven (7) days of when the facts supporting the defense became known or reasonably should have been known to the party. An assertion at the hearing, or subsequent to the hearing, of a newly-discovered untimeliness defense will enable either party to present additional testimony, including the opportunity to recall witnesses or call new witnesses.

(iii)   If a grievance is ultimately dismissed based on a finding of untimeliness, the arbitrator shall issue a written decision limited to that issue, and such ruling shall be final.

(b)   No later than fourteen (14) days prior to the date set for any hearing, each party will submit to the other copies of all documents, reports and records relevant to the dispute. Failure to submit such documents, reports and records no later than fourteen (14) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it desires into evidence, except that relevant documents submitted to the opposing party less than fourteen (14) days before the hearing will be admissible provided that the proffering party and the custodian(s) of the documents made a good faith effort to obtain (or discover the existence of) said documents or that

188

the document's relevance was not discovered until the hearing date. In the case of an expedited grievance pursuant to Section 4, such documentary evidence shall be exchanged on or before two (2) days prior to the date set for the hearing unless the arbitrator indicates otherwise.

*Section 6.* **Arbitration Panel:** There will be a panel of four (4) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties will designate the Notice Arbitrator within ten (10) days of the execution of this Agreement. In the event of a vacancy in the position of Notice Arbitrator, the senior arbitrator in terms of service as a Non-Injury Grievance Arbitrator will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement from July 10 through July 20 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If an arbitrator has been discharged, he or she shall retain jurisdiction for any case in which the hearing has commenced. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If the parties are unable to agree on a new arbitrator within thirty (30) days of any vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

*Section 7.* Hearing:

(a)     Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 1 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on a regular basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will bear any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty

189

(30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

      (b)    If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the parties will agree upon dates to take testimony of unavailable witnesses, which dates will be within forty-five (45) days of the parties' receipt of the hearing transcript. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to attend the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In instances in which the parties agree that the material facts giving rise to the grievance are not in dispute, the arbitrator shall have the authority to decide the merits of the case solely on the written submissions of the parties. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests post-hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted, unless requested by the arbitrator.

      (c)    In each instance in which briefs are not submitted, within fourteen (14) days of the closing of the record, either party may submit to the Arbitrator prior opinions for the arbitrator's consideration in issuing the decision. Briefs must be submitted to the arbitrator no later than sixty (60) days after receipt of the last transcript.

*Section 8.* Arbitrator's Decision and Award: The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he or she consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement, provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article 50, Section 1(c). In the event the arbitrator finds liability on the part of any party, he or she shall award Interest beginning one year from the date of the last regular season game of the season of the grievance.

*Section 9.* Time Limits: Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player,

the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

*Section 10.* **Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

*Section 11.* **Costs:** Subject to Section 7, all costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city, lodging, and meal expenses in accordance with Article 34.

*Section 12.* **Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the NFL or Club, to the player, or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, double Interest will be assessed from the date of the decision. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

*Section 13.* **Grievance Settlement Committee:** A grievance settlement committee consisting of representatives of the NFLPA and representatives of the Management Council shall meet annually between the end of the regular season and the annual arbitration scheduling conference. The committee shall engage in good faith efforts to settle or bifurcate any pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of its members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement.

*Section 14.* **Standard Grievance Correspondence:**
      (a)     Standard Grievance Correspondence is defined as and includes the following documents: Injury and Non-Injury Grievance filings; answers; appeals; arbitration selection letters; hearing setup letters; discovery letters and documents; correspondence regarding neutral physician examination(s), including requests by the neutral physician for tests, films or other documents; hearing, deposition, or other general scheduling letters; withdrawal letters; pre- and post-hearing briefs; and settlement and release agreements.

(b)      Standard Grievance Correspondence may be sent via .pdf e-mail; all parties shall use their best efforts to send Standard Grievance Correspondence via e-mail.

(c)      The NFL and NFLPA will provide each other with a list of designated e-mail addresses for the receipt of Standard Grievance Correspondence. The subject line of any Standard Grievance Correspondence sent via e-mail shall include the full name of the player(s), the name of the Club(s) involved and the date of filing.

(d)      The parties shall agree to additional procedures to govern the electronic transmission of Standard Grievance Correspondence, as may be warranted.

192

## ARTICLE 44
## INJURY GRIEVANCE

*Section 1.* **Definition:** An "Injury Grievance" is a claim or complaint that, at the time a player's NFL Player Contract or Practice Squad Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

*Section 2.* **Filing:** Any player and/or the NFLPA must present an Injury Grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

### *Section 3.* **Answer:**

(a)     The Club to which an Injury Grievance has been presented will answer in writing within ten (10) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

(1)     That the player did not pass the physical examination administered by the Club physician at the beginning of the preseason training camp for the year in question. This defense will not be available if: (i) the Player was injured during offseason workouts at the club facility under the direction of a club official prior to not passing the physical examination or (ii) the player participated in any team drills following his physical examination or in any preseason or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

(2)     That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during a physical examination by the Club;

(3)     That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

(4)     That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;

(5)     That subsequent to the physical examination the player suffered no new football-related injury;

(6)     That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical capacity below the level

existing at the time of his physical examination as contemporaneously recorded by the Club physician.

(b)     The Club or the Management Council must advise the grievant and the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. Failure to provide such notice will preclude the Club and Management Council from arguing that defense. However, where the Club and Management Council learn of facts supporting a special defense fewer than seven days prior to the hearing, during the hearing or in a post-hearing deposition, the Club and the Management Council must present notice of that special defense to the arbitrator and opposing party within seven (7) days of when the facts supporting that defense became known or reasonably should have become known to the Club and/or Management Council. An assertion at the hearing, or subsequent to the hearing, of a newly-discovered special defense will enable either party to present additional testimony, including the opportunity to recall witnesses or call new witnesses.

*Section 4.* **Neutral Physician:**

(a)     The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the filing of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may not review any objective medical tests unless all parties mutually agree to provide such results. The neutral physician may not perform any diagnostic tests unless all parties consent. The neutral physician is required to submit to the parties a detailed medical report of his examination.

(b)     In cases in which the player alleges that he suffered a closed head injury or concussion with resulting cognitive deficit, somatic symptoms and/or other concussion symptoms, the player must present himself for cognitive functioning testing and/or other appropriate testing and examination by a neutral neuropsychologist in either the city nearest the player's residence or the Club city. Absent medical limitations, the unavailability of the neuropsychologist or the unavailability of medical records, such testing and examination must occur within thirty (30) days from the date of the filing of the grievance. The neutral neuropsychologist will be provided with all medical records of closed head trauma and/or concussions including baseline testing, within the possession of Club and player. All other requirements and limitations set forth in this Article regarding the neutral physician process shall apply to such testing and examination except that if a neutral neuropsychologist's examination spans multiple days, it will be considered one office visit. The neutral neuropsychologist must prepare and submit a detailed report regarding his examination and the player's cognitive functioning and other symptoms, if any, of concussion or closed head injury affecting the player's ability to return to play at the date of the examination. If the neutral neuropsychologist in his sole discretion determines that the player should be examined by another physician of appropriate

194

specialization in order to complete his neutral physician report, the neuropsychologist shall have the authority to refer such player for such additional examination.  In such circumstances, the report of the neutral neuropsychologist shall be designated as the neutral physician report and may incorporate any findings or opinion of the referral doctor.

(c)     In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file Injury Grievances.

(d)     The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. In cases in which the player is alleging that he suffered a closed head injury or concussion with resulting cognitive deficit, somatic symptoms and/or other concussion symptoms the report of the neutral neuropsychologist shall be considered conclusive with regard to the player's cognitive functioning and other objective findings as well as the extent of the injury at the time of the examination.

*Section 5.* **Neutral Physician List:**

The NFLPA and the Management Council will maintain a jointly-approved list of neutral physicians, including at least two orthopedic physicians and two neuropsychologists in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) replacements to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral  for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the nominees on its list, and the other party will be bound by such selection. The next vacancy occurring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

*Section 6.* **Appeal:** An Injury Grievance may be appealed to an arbitrator by filing of written notice of appeal with the Chairperson of the arbitration panel at least seven (7) days prior to the Settlement Committee meeting, but no later than the Injury Grievance scheduling meeting.

*Section 7.* **Arbitration Panel:** There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council.

The parties shall designate the Chairperson of the panel. In the event of a vacancy in the position of the Chairperson of the panel, the senior Injury Grievance Arbitrator will succeed to the position of Chairperson of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement from July 10 through July 20 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If an arbitrator has been discharged he or she shall retain jurisdiction for any case in which the hearing has commenced. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty (30) days of the occurrence of the vacancy, the Chairperson of the panel shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

### Section 8. Hearing:

(a)    Each arbitrator shall designate a minimum of twelve hearing dates per year, exclusive of the period July 1 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairperson, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing, the postponement fee of the arbitrator will be borne by the postponing party, unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will bear any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairperson to another panel member who has a hearing available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

(b)    If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offer-

196

ing the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

(c)(i)   Any party may seek bifurcation of a grievance to assert a claim of untimeliness. Bifurcation motions shall be presented in writing to the other party and the arbitrator in the moving party's answer or at any time no later than seven (7) days prior to the scheduled hearing on the merits of the grievance. If an arbitrator has not yet been assigned to hear the grievance then the moving party shall file the motion with the Chairperson of the Arbitration panel, who will decide the motion or assign it to a member of the Injury Grievance Arbitration panel. A party's decision to pursue a bifurcated hearing may not delay the processing of a hearing scheduled on the merits of the grievance. For any motions made at least thirty (30) days before a hearing on the merits of the grievance, the parties will use their best efforts to schedule the bifurcated hearing at least ten (10) days before the scheduled hearing on the merits of the grievance. In any case where a timely motion for bifurcation is made, but a bifurcated hearing is not held, the arbitrator shall decide the issue of timeliness during the hearing on the merits.

(ii)   If a defense of untimeliness is not raised at least seven (7) days before the scheduled hearing on the merits of the grievance, the parties will be precluded from arguing that defense. However, where a party learns of facts supporting the defense less than seven days prior to the hearing, during the hearing, or in a post-hearing deposition, the party must present the defense to the opposing party and arbitrator within seven (7) days of when the facts supporting the defense became known or reasonably should have been known to the party.

(iii)   If a grievance is ultimately dismissed based on a finding of untimeliness, the arbitrator shall issue a written decision limited to that issue, and such ruling shall be final and binding.

(d)   Post-hearing briefs must be submitted to the arbitrator no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he or she shall award Interest beginning one year from the date of the last regular season game of the season of injury.

*Section 9.* **Expenses**: Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties

will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city, lodging and meal expenses in accordance with Article 34. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with that injury.

*Section 10.* **Pension Credit:** Any player who receives payment for three or more regular season games (or such other minimum number of regular season games required by the Bert Bell/Pete Rozelle NFL Retirement Plan for a year of Credited Service) during any year as a result of filing an Injury Grievance or settlement of a potential Injury Grievance will be credited with one year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan for the year in which he was injured.

### *Section 11.* **Payment:**

(a)     If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, double Interest will be assessed against the Club from the date of the decision. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

(b)     Any player who does not qualify for group health insurance coverage in a given Plan Year under the NFL Player Insurance Plan as a result of being terminated while physically unable to perform and who receives payment for at least one (1) regular or post-season game via an injury grievance award or injury settlement for that Plan Year shall receive a payment in an amount determined by multiplying the number of months in that Plan Year for which he would have been eligible for coverage had he qualified for group health insurance coverage in that Plan Year by the premium the Player Insurance Plan charged for COBRA coverage during that period.

*Section 12.* **Presumption of Fitness:** If the player passes the physical examination of the Club prior to the preseason training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

*Section 13.* **Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though

ing the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

(c)(i)   Any party may seek bifurcation of a grievance to assert a claim of untimeliness. Bifurcation motions shall be presented in writing to the other party and the arbitrator in the moving party's answer or at any time no later than seven (7) days prior to the scheduled hearing on the merits of the grievance. If an arbitrator has not yet been assigned to hear the grievance then the moving party shall file the motion with the Chairperson of the Arbitration panel, who will decide the motion or assign it to a member of the Injury Grievance Arbitration panel. A party's decision to pursue a bifurcated hearing may not delay the processing of a hearing scheduled on the merits of the grievance. For any motions made at least thirty (30) days before a hearing on the merits of the grievance, the parties will use their best efforts to schedule the bifurcated hearing at least ten (10) days before the scheduled hearing on the merits of the grievance. In any case where a timely motion for bifurcation is made, but a bifurcated hearing is not held, the arbitrator shall decide the issue of timeliness during the hearing on the merits.

(ii)   If a defense of untimeliness is not raised at least seven (7) days before the scheduled hearing on the merits of the grievance, the parties will be precluded from arguing that defense. However, where a party learns of facts supporting the defense less than seven days prior to the hearing, during the hearing, or in a post-hearing deposition, the party must present the defense to the opposing party and arbitrator within seven (7) days of when the facts supporting the defense became known or reasonably should have been known to the party.

(iii)   If a grievance is ultimately dismissed based on a finding of untimeliness, the arbitrator shall issue a written decision limited to that issue, and such ruling shall be final and binding.

(d)   Post-hearing briefs must be submitted to the arbitrator no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he or she shall award Interest beginning one year from the date of the last regular season game of the season of injury.

*Section 9.* **Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties

will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city, lodging and meal expenses in accordance with Article 34. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with that injury.

*Section 10.* **Pension Credit:** Any player who receives payment for three or more regular season games (or such other minimum number of regular season games required by the Bert Bell/Pete Rozelle NFL Retirement Plan for a year of Credited Service) during any year as a result of filing an Injury Grievance or settlement of a potential Injury Grievance will be credited with one year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan for the year in which he was injured.

### *Section 11.* **Payment:**

(a)     If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, double Interest will be assessed against the Club from the date of the decision. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

(b)     Any player who does not qualify for group health insurance coverage in a given Plan Year under the NFL Player Insurance Plan as a result of being terminated while physically unable to perform and who receives payment for at least one (1) regular or post-season game via an injury grievance award or injury settlement for that Plan Year shall receive a payment in an amount determined by multiplying the number of months in that Plan Year for which he would have been eligible for coverage had he qualified for group health insurance coverage in that Plan Year by the premium the Player Insurance Plan charged for COBRA coverage during that period.

*Section 12.* **Presumption of Fitness:** If the player passes the physical examination of the Club prior to the preseason training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

*Section 13.* **Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though

he had been on the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article 37.

*Section 14.* **Information Exchange:** The NFLPA and the Management Council must confer on a regular basis concerning the status of pending Injury Grievances and the attribution of any Injury Grievance exposure to Team Salary under Article 13. Any communications pursuant to this Section are inadmissible in any grievance hearing.

*Section 15.* **Discovery:** No later than fourteen (14) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the Injury Grievance hearing. Failure to submit such documents, reports and records no later than fourteen (14) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

*Section 16.* **Grievance Settlement Committee:** A grievance settlement committee consisting of representatives of the NFLPA and representatives of the NFL shall meet annually between the end of the regular season and the annual arbitration scheduling conference. The committee shall engage in good faith efforts to settle or bifurcate any pending Injury Grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of its members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement.

*Section 17.* **Settlement Agreements:** Grievances settled prior to the issuance of an arbitration award will be memorialized in the standard Settlement and Release Agreement, which may include a notification of grievant's right to file a Workers' Compensation Claim, if applicable, as set forth in Appendix L. This form may be amended and/or supplemented if the parties agree and/or if required by state law.

*Section 18.* **Standard Grievance Correspondence:** The provisions of Article 43, Section 14 shall apply to Injury Grievances.

## ARTICLE 45
## INJURY PROTECTION

*Section 1.* **Qualification**: A player qualifying under the following criteria will receive an Injury Protection benefit in accordance with Section 2 below:

(a) The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

(b) The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

(c) The player must have failed the preseason physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This preseason physical may be given by the Club physician prior to the beginning of preseason camp, so long as such fact is clearly communicated in writing to the player at the time of the physical exam. The preseason physical examination given for qualification need not be the entire Standard Minimum Preseason Physical Examination, but shall be that necessary and appropriate to evaluate the injury for which the benefit is sought.

It is agreed that a player who qualifies for Injury Protection under Subsections 1(a) and 1(b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain Injury Protection liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade Injury Protection liability by early waiving.

*Section 2.* **Benefit**: A player qualifying under Section 1 above will receive an amount equal to 50% of his Paragraph 5 Salary for the season following the season of injury, up to a maximum payment of: $1,000,000, in the 2011–12 League Years; $1,050,000, in the 2013–14 League Years; $1,100,000, in the 2015–16 League Years; $1,150,000, in the 2017–18 League Years; and $1,200,000, in the 2019–2020 League Years; in each case unless he has individually negotiated more injury protection or a larger guaranteed salary in his contract. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated more injury protection or a larger guaranteed salary in that contract for the affected year in question or if he qualifies for the Extended Injury Protection benefit described below. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

*Section 3.* **Disputes:** Any dispute under this Article will be processed under Article 43. In any grievance in which the NFLPA or a player is claiming an Injury Protection benefit, the NFLPA or the player may contend that the player should not have passed the preseason physical examination given by a Club following the season of a player's injury. In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the Club's preseason physical exam, provided that such physician conducted his examination of the player within fourteen days of the player's contract termination, but no later than the date of the first preseason cutdown. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 1(c) above shall be deemed to have been satisfied.

*Section 4.* **Extended Injury Protection Qualification:** A player who has qualified for and received the Injury Protection benefit set forth in Sections 1 and 2 above, and has a Player Contract for the second season following the season of injury (for the first five seasons of this Agreement, at the time he sustained such injury), shall qualify for the Extended Injury Protection Benefit if he satisfies all of the criteria below:

(a)    The player must have remained physically unable, because of the same severe football injury or Club-authorized surgery for which he qualified for the Injury Protection benefit, to play football as certified by the Club physician following a physical examination within sixty (60) days of his former Club's last regular season game of the season following the season of injury, if such examination is requested by the player's former Club;

(b)    The player must have continued to undergo whatever reasonable and customary rehabilitation treatment his former Club required of him. Following the physical examination referenced in Section 4(a) above, the Club may require Player to submit to a reasonable number of physical examinations. Such examinations directed by the Club may take place in the Club city or in another location designated by the Club; and

(c)    The player must have failed a physical examination given by his former Club prior to June 1st of the season for which he is seeking the Extended Injury Protection benefit. This physical must be given by either the Club physician or a physician designated by his former Club so long as the fact that the examination is being given for the purpose of determining the player's eligibility for the Extended Injury Protection benefit is clearly communicated in writing to the player at the time of the physical exam. A Club cannot avoid Injury Protection liability by failing or refusing to perform the exam in a timely manner, provided that the player cooperates in the administration of the physical examination.

*Section 5.* **Extended Injury Protection Benefit:** A player qualifying under Section 4 above will receive an amount equal to 30% of his Paragraph 5 Salary for the second season following the season of injury, up to a maximum payment of: $500,000, for the 2012–14 League Years; $525,000, for the 2015–16 League Years; $550,000, for the 2017–18 League Years; and $575,000, for the 2019–20 League Years; in each case unless he has

individually negotiated more injury protection or a larger guaranteed salary in his contract for the affected year in question. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the second season following the season of injury.

*Section 6.* **Extended Injury Protection Disputes:** Any dispute under this Article will be processed under Article 43. In any grievance in which the NFLPA or a player is claiming an Extended Injury Protection benefit, the NFLPA or the player may contend that the player should not have passed the physical examination referenced in Subsection 4(c). In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the physical exam, provided that such physician conducted his examination of the player within fourteen days of the examination. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 4(c) above shall be deemed to have been satisfied.

*Section 7.* **Workers' Compensation Offset:** If a player elects to receive benefits under this Article, it is agreed that for the term of this Agreement fifty percent (50%) of all Injury Protection and Extended Injury Protection benefits are of the same character as, and are the functional equivalent of, a workers' compensation indemnity benefit, and the Club paying this benefit and/or its insurer shall be entitled to a dollar-for-dollar offset in an amount equal to fifty percent (50%) of the Injury Protection payments, including Injury Protection and Extended Injury Protection grievance settlements and awards, against any state workers' compensation indemnity award to which the player is or may become entitled to, including, but not limited to, temporary disability, wage loss, impaired earning capacity and permanent disability benefits, provided that there shall be no offset against a workers' compensation award of any medical coverage. For example, and without limitation, if a player qualifies to receive $200,000 in Injury Protection benefits pursuant to Section 2 and $150,000 in Extended Injury Protection benefits pursuant to Section 5, it is agreed that $100,000 of the Section 2 amount and $75,000 of the Section 5 amount (or $175,000 cumulatively) when paid, shall be the offset under this Section as described in the first sentence of this Section. This offset applies with regard to workers' compensation claims arising out of any injury with the Club whether such injury is acute or cumulative in nature provided that the injury that is the subject of the player's Injury Protection payment (and, if applicable, his Extended Injury Protection payment) is the principal basis for the player's workers' compensation award. The parties further agree that if, despite the terms of this Section and the parties' clear intent to treat fifty-percent (50%) of Injury Protection and Extended Injury Protection benefits as a payment of workers' compensation, a state court or other competent authority nevertheless renders a decision or other determination resulting in an outcome inconsistent with the full coor-

dination of Injury Protection, Extended Injury Protection, and workers' compensation benefits pursuant to this Section 7, then the Non-Injury Grievance Arbitrator shall have authority to immediately remedy any over-payment that results from said decision.

*Section 8.* **Filing:** Any player filing a claim for the Injury Protection benefit must follow the procedure set forth in Article 43. For purposes of this Article only, a grievance must be initiated by October 15th of the League Year in which the Injury Protection benefit is being claimed. A player requesting the Extended Injury Protection benefit must notify his former Club and the NFL in writing by January 31 (following his former Club's last regular season game of the season following the season of injury) that he believes he remains physically unable to play football. By submitting such written affirmation of his continued injury, the player will be deemed to have filed a claim for the Extended Injury Protection benefit provided for in this Article. If the claim is contested by the Club in writing, Player's written affirmation will automatically be deemed to constitute a non-injury grievance. Club's written notice denying the claim will be deemed the answer to the grievance and the Club may then order Player to submit to a physical examination as set forth in Section 4(a) above. By December 15 of each season covered under this Agreement, the NFL agrees to provide the NFLPA with a list of players who received, or filed a grievance for, Injury Protection for that season.

*Section 9.* **Costs:** Any reasonable costs associated with a player's travel to and from any medical examination performed at the Club's request as provided for in this Article shall be paid for by the Club.

## ARTICLE 46
## COMMISSIONER DISCIPLINE

*Section 1.* **League Discipline:** Notwithstanding anything stated in Article 43:

(a)     All disputes involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b)     Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c)     The Commissioner (under Subsection (a)), or the person appointed by the Commissioner under Subsection (b), shall consult with the Executive Director of the NFLPA prior to issuing, for on-field conduct, any suspension or fine in excess of $50,000.

(d)     The schedule of fines for on-field conduct will be provided to the NFLPA prior to the start of training camp in each season covered under this Agreement. The 2011 schedule of fines, which has been provided to and accepted by the NFLPA, shall serve as the basis of discipline for the infractions indentified on that schedule. The designated minimum fine amounts will increase by 5% for the 2012 League Year, and each League Year thereafter during the term of this Agreement. Where circumstances warrant, including, but not limited to, infractions that were flagrant and gratuitous, larger fines, suspension or other discipline may be imposed. On appeal, a player may assert, among other defenses, that any fine should be reduced because it is excessive when compared to the player's expected earnings for the season in question. However, a fine may be reduced on this basis only if it exceeds 25 percent of one week of a player's salary for a first offense, and 50 percent of one week of a player's salary for a second offense. A player may also argue on appeal that the circumstances do not warrant his receiving a fine above the amount stated in the schedule of fines.

*Section 2.* **Hearings:**

(a)     **Hearing Officers.** For appeals under Section 1(a) above, the Commissioner shall, after consultation with the Executive Director of the NFLPA, appoint one or more designees to serve as hearing officers. For appeals under Section 1(b) above, the parties shall, on an annual basis, jointly select two (2) or more designees to serve as hearing officers. The salary and reasonable expenses for the designees' services shall be

shared equally by the NFL and the NFLPA. Notwithstanding the foregoing, the Commissioner may serve as hearing officer in any appeal under Section 1(a) of this Article at his discretion.

(b)    **Representation.** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. The NFLPA and NFL have the right to attend all hearings provided for in this Article and to present, by testimony or otherwise, any evidence relevant to the hearing.

(c)    **Telephone Hearings.** Upon agreement of the parties, hearings under this Article may be conducted by telephone conference call or videoconference.

(d)    **Decision.** As soon as practicable following the conclusion of the hearing, the hearing officer will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s), Club(s) and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to Section 1(b) may only be affirmed, reduced, or vacated by the hearing officer, and may not be increased.

(e)    **Costs.** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and other expenses associated with the appeal.

(f)    **Additional Procedures for Appeals Under Section 1(a).**

(i)    **Scheduling.** Appeal hearings under Section 1(a) will be scheduled to commence within ten (10) days following receipt of the notice of appeal, except that hearings on suspensions issued during the playing season (defined for this Section as the first preseason game through the Super Bowl) will be scheduled for the second Tuesday following the receipt of the notice of appeal, with the intent that the appeal shall be heard no fewer than eight (8) days and no more than thirteen (13) days following the suspension, absent mutual agreement of the parties or a finding by the hearing officer of extenuating circumstances. If unavailability of counsel is the basis for a continuance, a new hearing shall be scheduled on or before the Tuesday following the original hearing date, without exception.

(ii)    **Discovery.** In appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing. Failure to timely provide any intended exhibit shall preclude its introduction at the hearing.

(iii)    **Record; Posthearing Briefs.** Unless the parties agree otherwise, all hearings conducted under Section 1(a) of this Article shall be transcribed. Posthearing briefs will not be permitted absent agreement of the NFL and NFLPA or the request of the hearing officer. If permitted, such briefs shall be limited to five pages (single-spaced) and must be filed no later than three (3) business days following the conclusion of the hearing.

*Section 3.* **Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the parties or by the hearing officer upon appropriate motion.

Case 2:12-md-02323-AB   Document 8403-25   Filed 09/25/17   Page 107 of 126

*Section 4.* **One Penalty:** The Commissioner and a Club will not both discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

*Section 5.* **Fine Money:**

(a)     Fines will be deducted at the rate of no more than $2,500 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. For the 2016–2020 League Years, the amount will increase from a rate of $2,500 to $3,500 from each pay period.

(b)     For any fine imposed upon a player under Section 1(b), no amount of the fine will be withheld from the player's pay pending the outcome of the appeal, except that if: (i) the fine is imposed on or after the thirteenth (13th) week of the regular season; (ii) the player or the NFLPA does not timely appeal; or (iii) the hearing on a fine imposed for conduct occurring through the thirteenth (13th) week of the regular season is delayed by the player or the NFLPA for any reason beyond the time provided for in Section 2(b) of this Article, the full amount of the fine shall be promptly collected.

(c)     Unless otherwise agreed by the parties., fine money collected pursuant to this Article shall be allocated as follows: 50% to the Players Assistance Trust and 50% to charitable organizations jointly determined by the NFL and the NFLPA. In the absence of said joint determination, the NFL and the NFLPA shall each determine a charitable organization or organizations to which half of the second 50% shall be allocated.

206

# ARTICLE 47
# UNION SECURITY

*Section 1.* **Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

*Section 2.* **Check-off:** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix M and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

*Section 3.* **NFLPA Meetings:** The NFLPA will have the right to conduct four meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule. The visits described in Article 21, Section 8(g) shall not apply toward the limit set forth in this Section.

*Section 4.* **NFLPA Player Group Licensing Program:** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA (or any of its affiliates) and the NFL (or any of its affiliates). Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to Article 43. The first such grievance in any calendar year shall be treated on an expedited basis without counting against the number of grievances the NFLPA may expedite pursuant to Article 43, Section 4; all subsequent such grievances in that calendar year shall count against the number of grievances the NFLPA may expedite

pursuant to Article 43, Section 4. For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six (6) or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.), marketing, advertising and promotional programs: (a) in any one product and/or sponsorship category, as defined by industry standards; or (b) in different categories if a total of six or more players are used and (i) the products, marketing, advertising or promotional programs all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items. Group Player Licensing shall not include "non-consumer facing" appearances by NFL players at any individual corporate hospitality and/or other similar events by fewer than six (6) active NFL players. Nothing in this definition of Group Player Licensing shall be construed to limit the rights of the NFL or any NFL Club under applicable law, or any other provision of this Agreement.

*Section 5.* **Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article will be processed pursuant to Article 43. Any decision of an arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

*Section 6.* **Procedure for Enforcement:**

(a)     Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article, the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

(b)     It is further agreed that the term "member in good standing" as used in this Article applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

(c)     It is further agreed that notwithstanding anything else in this Agreement, if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of this Article relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely

to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

*Section 7.* **NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

*Section 8.* **Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to reasonable space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine.

*Section 9.* **Rookie Symposium:** The parties will discuss the timing, structure, and content of one or more annual Rookie orientation programs.

# ARTICLE 48
## NFLPA AGENT CERTIFICATION

*Section 1.* **Exclusive Representation:** The NFL and the Clubs recognize that, pursuant to federal labor law, the NFLPA will regulate the conduct of agents who represent players in individual contract negotiations with Clubs. On or after the date on which the NFLPA notifies the NFL that an agent regulation system is in effect and provides the NFL with a list of the NFLPA-certified agents, Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFL and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA shall submit an updated list to the NFL monthly. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion pursuant to the NFLPA's agent regulation system, except: (i) where an agent has failed to pass a written examination given to agents by the NFLPA; (ii) in extraordinary circumstances where the NFLPA's investigation discloses that the agent's conduct is of such a serious nature as to justify immediately invalidating the agent's certification; (iii) where the agent has failed to pay his or her annual fee; (iv) where the agent has failed to attend an annual seminar required by the NFLPA; (v) where the agent's certification has expired due to the agent's inactivity in individual contract negotiations; (vi) where the agent has made improper contact with a college football player in violation of any applicable NFLPA rules governing contact with players related to NCAA or NFL Draft eligibility; and (vii) where the agent has failed to sign the end of year certification required by Article 18, Section 2(b) of this Agreement. The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs. This Section shall not limit the NFLPA's ability to discipline agents for malfeasance or for violation of state or federal law.

*Section 2.* **Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

*Section 3.* **Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $30,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotia-

tions, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted from) the most recently published list of agents certified by the NFLPA to represent players. The fine amount set forth in this Section shall increase by 5% each League Year beginning in the 2012 League Year.

## ARTICLE 49
## PLAYER SECURITY

*Section 1.* **No Discrimination:** There will be no discrimination in any form against any player by the NFL, the Management Council, any Club or by the NFLPA because of race, religion, national origin, sexual orientation, or activity or lack of activity on behalf of the NFLPA.

*Section 2.* **Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

212

## ARTICLE 50
## COMMITTEES

*Section 1.* **Joint Committee:**

(a)      A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

(b)      The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement.

(c)      Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article 43. A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

(d)      The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety. Within 60 days of the initiation of an investigation, two or more neutral physicians will be selected to investigate and report to the Joint Committee on the situation. The neutral physicians shall issue a written report within 60

days of their selection, and their recommendations as to what steps shall be taken to address and correct any issues shall be acted upon by the Joint Committee.

*Section 2.* **Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

## ARTICLE 51
## MISCELLANEOUS

**Section 1. Endorsements:**

(a)     No Club may unreasonably refuse to permit a player to endorse a product. Notwithstanding the foregoing, and without affecting interpretation of the preceding sentence, no player will be permitted to be a party to any endorsement arrangement of any kind with a company associated with the production, manufacture, or distribution of a substance that has been banned by the Policy on Anabolic Steroids and Related Substances. The NFL and the NFLPA will agree each year on a list of such companies.

(b)     The placement of a sponsor's logo on a jersey does not constitute endorsement by any player of that sponsor. Players shall not challenge or refuse to wear jerseys with sponsor logos.

*Section 2.* **Player Attire:**

(a)     Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are based on safety or competitive considerations as determined by the NFL; the parties reserve their respective positions on whether the NFL or any of the Clubs may have any such rule relating solely to image considerations. The foregoing notwithstanding, the NFL and Clubs shall have the right to regulate any third party branding or other commercial identification that may appear on any footwear or gloves worn by players on the field or its environs on game days and/or at any Club's official mandatory minicamp(s), official preseason training camp, and all Club practice sessions.

(b)     On game days, prior to the game and continuing until 90 minutes after the whistle ending each game (preseason or regular season), as well as at any Club's official mandatory minicamp(s), official preseason training camp, and all Club practice sessions, players: (i) shall wear any uniforms and/or related items (e.g., practice jerseys) required by the NFL or Club (regardless of any third party branding that may appear on such uniforms and/or related items as may be determined by the NFL or Club), provided that no individual player and/or discrete group of players will be required to wear attire with third-party branding that is different from the branding on the attire of other players and further provided that no third-party sponsor will depict any player in advertising or promotional materials in a manner that constitutes an "Endorsement" as defined in Paragraph 4(a) of the Player Contract absent consent from the player; and (ii) will be prohibited from wearing, displaying, or orally promoting equipment, apparel, or other items that carry commercial names or logos of companies in any televised interview on Club premises, unless such commercial identification has been approved in advance by the League office.

(c)     Notwithstanding Subsection (b) above, players will be permitted to wear apparel bearing the logo "Players Inc." and/or the logo "NFLPA" during televised interviews in the locker room following preseason and regular season games, provided that such apparel does not display the names, logos, or other identifying marks of any other entity or product that is licensed by or associated with Players Inc. or the NFLPA, in-

215

cluding, but not limited to, the manufacturer of the apparel or any sponsor or licensee of Players Inc., the NFLPA, or any individual player. The parties reserve their respective positions on the applicability of this provision to apparel bearing the logo "NFL Players."

(d)     The provisions in Subsections (a)–(c) above shall not be used or referred to in any dispute between the parties over prohibition by the League and/or any Club of the wearing of unapproved commercial items in circumstances other than as expressly addressed in those Subsections.

*Section 3.* **Appearances:** No Club may unreasonably require a player to appear on radio or television or other news media (including internet and print).

*Section 4.* **Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media (including television, radio, internet, print) in reasonable promotional activities on behalf of the Clubs and the NFL.

*Section 5.* **Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

*Section 6.* **Public Statements:** The NFLPA and the Management Council agree that each will use reasonable efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

*Section 7.* **Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for offseason information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first preseason cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

*Section 8.* **NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available four (4) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized representatives who may purchase tickets to the NFL. The NFLPA must notify the home Club of its desire to attend such a game at least five days prior to the date of the game. Such representatives must possess appropriate identification.

*Section 9.* **Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club for personal use and not for resale. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club (for personal use and not for resale) from the best tickets available for public

sale immediately prior to the public sale for each game. For purposes of this Section as it applies to preseason or regular season games, the word "player" shall be defined as any player on the Club's Active/Inactive List, Practice Squad, PUP or N-F/I List, or Injured Reserve List. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets. Clubs are not required to provide Practice Squad players with the opportunity to purchase Super Bowl tickets.

*Section 10.* **Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. This restriction does not apply to the League mandate regarding neuropsychological testing. A Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

*Section 11.* **League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

*Section 12.* **Career Planning Program:** The parties will continue their programs to provide information to current and former players concerning financial advisors and financial advisory firms and shall jointly (at the Annual Rookie Symposia and otherwise) and separately develop new methods to educate such players concerning the risks of various investment strategies and products, as well as the provision of any background investigation services. Neither the NFL, nor any Club, nor the NFLPA shall be responsible for any investment decisions made by players; players and any advisors who they select will bear sole responsibility for any investment or financial decisions that are made.

*Section 13.* **On-Field Microphones and Sensors:**
    (a)    During NFL games and for the express purpose of creating NFL programming, NFL Films will be permitted to put microphones on any players that NFL Films selects. During the regular season each starting quarterback will be required to wear a microphone at least once, and no player will be required to wear a microphone for this purpose more than four times during the course of any regular season. There will be no limitation with respect to the number of times a player can be required to wear a microphone during the preseason or postseason. None of the sound captured for this purpose can be used during the game in which the player is mic'd without the player's prior permission, and, unless such prior permission is given, none of the captured sound can be used until viewed and approved by the player or his selected team representative who will have the right to embargo any material he deems to be extremely sensitive or inappropriate. Players may also embargo for a limited time material deemed to be confidential or that might place the player or team at a competitive disadvantage. Players or their selected team representative must advise NFL Films of any material they wish to have embargoed within 24 hours of receiving the material.

(b)	For the television broadcast of all NFL preseason, regular season and postseason games NFL Broadcasting, on behalf of the League's network television partners, can require offensive linemen to wear microphones embedded in shoulder pads in order to capture ambient sound from the playing field. The pads will be wired by NFL Films-trained technicians. Microphones will be opened after the offense breaks the huddle and will be closed a few seconds after the snap of the ball. At no time will the microphones be open when the players are in the locker room, the huddle or the team bench areas and all transmissions will be encrypted. Audio captured in accordance with this provision will be used only in the live ambient audio mix of that particular game. The NFL will require its television partners to agree to use best efforts to refrain from broadcasting any captured audio that contains inappropriate or sensitive content, and that their failure to do so shall result in a loss of the right to broadcast such audio in the future.

(c)	The NFL may require all NFL players to wear during games and practices equipment that contains sensors or other nonobtrusive tracking devices for purposes of collecting information regarding the performance of NFL games, including players' performances and movements, as well as medical and other player safety-related data. Sensors shall not be placed on helmets without the NFLPA's consent. Before using sensors for health or medical purposes, the NFL shall obtain the NFLPA's consent.

*Section 14.* **Practice Squad Super Bowl Rings:** Practice Squad players on a Club that wins the Super Bowl at the time of the Super Bowl will be entitled to a ring similar in appearance to the one provided to players on the Active/Inactive List but the Club, in its sole discretion, may provide any Practice Squad player with a ring of lesser value.

# ARTICLE 52
## PLAYER BENEFIT COSTS

*Section 1.* **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 5% of Projected AR, as defined in Article 12 and Player Benefit Costs required by law cannot be reduced.

*Section 2.* **Right of Restoration:** Each separate and individual Benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each Benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

*Section 3.* **Resolution of Disputes:** In the event the NFLPA and the NFL are unable to agree to Projected Benefits for the League Year for which the Salary Cap is being set, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved in time for the timely issuance of the Special Purpose Letter for that League Year. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

    (a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year.

    (b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

    (c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than five (5) days prior to the scheduled issuance of the Special Purpose Letter.

*Section 4.* **Limitations on Contributions:**

    (a)     No NFL Club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Disability Plan (except that portion of the Disability Plan refe-

renced in Section 4 of Article 61), the Gene Upshaw Health Reimbursement Account, the Neuro-Cognitive Disability Benefit, the Workers' Compensation Time Offset Fund, the Performance Based Pool, the Tuition Assistance Plan, the NFL Player Insurance Plan,  the Player Long-Term Care Insurance Plan, or Legacy Benefit (individually, a "Player Benefit Arrangement") with respect to any year following expiration of this Agreement except to the extent required by the Internal Revenue Code or other applicable laws except to the extent preempted by ERISA. Each Player Benefit Arrangement shall be amended to prevent any employer-provided benefit from accruing or being otherwise credited or earned thereunder with respect to any year following the expiration of this Agreement, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in a year following the expiration of this Agreement shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

(b)      The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be required to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

*Section 5.* **Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Gene Upshaw Health Reimbursement Account, the 88 Benefit, and the Player Long Term Insurance Plan, Neuro-Cognitive Disability Plan, and the Legacy Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

## ARTICLE 53
## RETIREMENT PLAN

*Section 1.* **Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan" ) will be continued and maintained in full force and effect during the term of this Agreement, but no further benefits will accrue except as provided in Section 3. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For the 2011 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix N. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

*Section 3.* **Benefit Credits:** Effective for payments on and after September 1, 2011, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| Before 1982 | $ 250 |
| 1982 through 1992 | $ 255 |
| 1993 and 1994 | $ 265 |
| 1995 and 1996 | $ 315 |
| 1997 | $ 365 |
| 1998 through 2011 | $ 470 |
| 2012 through 2014 | $ 560 |
| 2015 through 2017 | $ 660 |
| 2018 through 2020 | $ 760 |

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits.

*Section 4.* **New Arbitration Procedures:** Effective for benefit disputes arising under Retirement Plan Section 8.3(c) on and after September 1, 2011, the parties will amend the Retirement Plan to provide that the arbitrator selected to resolve the dispute must base his decision solely on the administrative record that was before the Retirement Board, as it may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator. In addition, each side shall be permitted to take depositions of any expert relied on by the other side based on the administrative record, supplemented as provided above.

*Section 5.* **Annual Benefit Eligibility Audits:** The Retirement Board shall engage an independent firm mutually selected by the NFL and the NFLPA to examine annually a representative sample of persons receiving benefits under the Retirement Plan to ensure that each such person is eligible to receive the benefits being provided.

*Section 6.* **Vesting Requirements:** Effective March 31, 2012, for players who first earn an hour of service thereafter, a player who does not have three Credited Seasons shall vest only if he has earned five (5) Years of Service.

Section 7. Death Benefits: Effective for payments on or after September 1, 2011, the parties will amend Section 7.2 of the Retirement Plan to insert after "$3,600," the following: "($4,000 (effective January 1, 2014) and $4,400 (effective January 1, 2018))."

# ARTICLE 54
## SECOND CAREER SAVINGS PLAN

*Section 1.* **Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:**

(a)      For each of the Plan Years 2011 and thereafter, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)      **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of: $24,000, for the 2011–14 Plan Years; $26,000, for the 2015–2018 Plan Years; and $28,000, for the 2019–2020 Plan Years) for each of the Plan Years 2011 through 2020 for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(A)      by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(B)      by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)      **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan a contribution each League Year in the amount of (1) at least $3,600 for each player who earned a Credited Season during such Plan Year and who has at least three or more Credited Seasons after earning such Credited Season, (2) at least $7,200 for each player who earns a Credited Season during such Plan Year and who has exactly two Credited Seasons after earning such Credited Season, plus (3) to the extent necessary to support the combined tax deductions for both the Second Career Savings Plan and the qualified portions of the Player Annuity Program, at least $1,000 for each player who earns a Credited Season during such Plan Year and who has exactly one Credited Season after earning such season. Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (a)(i) above shall be made by and as of the last day of the Plan Year.

223

(iii)     **Expenses.** The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board.

(b)     **Future Contributions and Collection.** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

## ARTICLE 55
## PLAYER ANNUITY PLAN

*Section 1.* **Establishment:** The NFL Player Annuity Program ("Annuity Program") will be continued and maintained in full force and effect during the term of this Agreement, except that the structure of the Program will be amended to include both a taxable portion ("Taxable Portion"), a tax-qualified portion ("Qualified Portion"), and, to the extent that contributions to such new tax-qualified portion would be deductible as business expenses in the year contributed, a second tax-qualified portion. The Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For each League Year of this Agreement, a contribution will be made to the Annuity Program on behalf of the NFL Clubs as follows (unless changed by the NFLPA pursuant to Article 52 of this Agreement):

(a)     **Expenses.** The NFL Clubs will make advance contributions to the Annuity Program in an amount sufficient to pay all administrative expenses approved by the Annuity Board. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

(b)     **Allocation.** In the 2011–2020 League Years, an Allocation will be made for each eligible Player who earns a Credited Season (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan) in an Annuity Year and who has a total of four or more Credited Seasons as of the end of such Annuity Year. The amount of the Allocation will be: $65,000, for each of the Annuity Years 2011 through 2013; $80,000, for each of the Annuity Years 2014 through 2017; and $95,000, for each of the Annuity Years 2018 through 2020.

(c)     **Future Contributions.** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Section 3.* **Timing:** An eligible player who earns a Credited Season through the sixth week of the regular season of an Annuity Year will receive an allocation on December 1 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive an allocation on March 31 of such Annuity Year.

*Section 4.* **Structure:** The Annuity Program will hold assets for the sole benefit of players and their beneficiaries and to pay all expenses of the Annuity Program approved by the Annuity Board. The Annuity Program is intended, except the tax qualified portions described below, to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will