# Exhibit 16

In the Matter of an Arbitration          ]
                                         ]
    between                               ]
                                         ]   OPINION AND DECISION
THE NATIONAL FOOTBALL LEAGUE             ]
PLAYERS ASSOCIATION, on behalf of        ]       OF
GREGORY SAMPSON,                         ]
                                         ]     SAM KAGEL,
    and                                  ]     Arbitrator
                                         ]
THE NATIONAL FOOTBALL LEAGUE             ]
MANAGEMENT COUNCIL, on behalf of         ]
THE HOUSTON OILERS.                      ]  San Francisco, California
_____]     July 28, 1988

ISSUE:

The issue in this case, as stated by Sampson, arises out of a letter dated February 19, 1980, from Counsel for Sampson to the Houston Oilers, which reads as follows:

> "Mr. A. P. Peppler
> Assistant General Manager
> HOUSTON OILERS FOOTBALL CLUB
> 6910 Fannin
> P.O. Box 1516
> Houston, Texas   77001
>
>     "Re:   GREG SAMPSON
>
> "Dear Pat:
>
>     "After a somewhat lengthy investigation
> of the facts surrounding the injury to
> Greg, we are prepared to proceed with a
> discussion of the responsibility for the
> damages sustained in this action.   It is
> our position that the Houston Oilers and
> the doctors who treated Greg were grossly
> negligent and in breach of the 1979 con-
> tract between the player and the club.   The
> joint and several negligence and contract
> breach proximately caused damages to Greg
> that brought about the end of his football

1

career after 8 years in the National Foot-
ball League. In addition, there has been
extensive and serious medical damage from
the subdural hematoma sustained on or about
July 22, 1979. Dr. Floyd Robinson, the
neurosurgeon who operated on Greg August 2,
1979, cannot give a prognosis at this time,
but has expressed serious concern about the
disability to the patient. Accordingly, it
seems an appropriate time for us to meet in
an effort to settle the matter without the
necessity of legal proceedings. I am pre-
pared to come to Houston at your conve-
nience in the month of March this year.
Would you kindly advise a convenient time
and place of a meeting.

"There is some question whether the
facts surrounding Greg's injury constitute
a grievance within the scope of the Collec-
tive Bargaining Agreement between the NFLPA
and the Management Council of the National
Football League. In order to cover that
likelihood, this letter will operate as the
initiation and filing of a grievance pur-
suant to Article VII, Sections 2 and 3 of
the hereinabove-described Collective Bar-
gaining Agreement. The serious injury to
the player, Greg Sampson, arose from the
gross negligence and breach of the 1979
contract by the Houston Oilers Football
Club in causing, caring and treating his
injury.

"Very truly yours,

"WAYNE M. HOOPER" (Jt. Ex. 2).

At the arbitration hearing of January 12, 1988, Mr. Wayne M.
Hooper, Counsel for Sampson, stated the specific issue in this
case as follows:

"... that the Oilers breached the contract
by not providing him (Sampson) the neces-
sary medical attention, causing a short

2

> life, cutting his career short, and there-
> fore preventing him from finishing out his
> career as a professional football player
> with a loss of salaries for the contracts
> the following years."  (Tr. 17).

Sampson had a contract with the Oilers for the years 1979,
1980, 1981, and 1982.

The Club, at the conclusion of the arbitration hearing on
May 9, 1988, made a motion for "a summary judgment or dismissal"
of Sampson's grievance.

NFL PLAYER CONTRACT:

Sampson's player contract for each of the years included
paragraph 9, as follows:

> "9.  INJURY.  If Player is injured in the
> performance of his services under this con-
> tract and promptly reports such injury to
> the Club physician or trainer, then Player
> will receive such medical and hospital care
> during the term of this contract as the
> Club physician may deem necessary, and, in
> accordance with Club's practice, will con-
> tinue to receive his yearly salary for so
> long, during the season of injury only and
> for no subsequent period, as Player is
> physically unable to perform the services
> required of him by this contract because of
> such injury.  If Player's injury in the
> performance of his services under this con-
> tract results in his death, the unpaid bal-
> ance of his yearly salary for the season of
> injury will be paid to his stated benefi-
> ciary or, in the absence of a stated bene-
> ficiary, to his estate."  (Jt. Ex. 15).

3

BACKGROUND:

In July of 1979 Sampson sustained a subdural hematoma while in the performance of his services for the Houston Oilers. Sampson was paid the remainder of his 1979 contract and the Injury Protection Benefit under Article X of the 1977 Collective Bargaining Agreement for the 1980 season. Sampson now seeks to recover salary compensation and punitive damages for the remaining three years, 1980 through 1982, that Sampson was under contract with the Oilers and "beyond."

At the January 12, 1988 arbitration hearing Sampson appeared as a witness.

He testified that he went into the Oilers camp on July 20, 1979; that on July 22nd, in an afternoon practice, the following occurred:

> "A.   We were having a half-line drill which is the center on over to the tight end and the offense and defense go against each other.   You have a quarterback and running back.   There was a massive collision.   My man stunted inside, Curly Culp who was in front of the center stunted to the outside which pulled the center Carl Mock to the outside and we all just ended up in a big heap and a big collision, a four-man collision.
>
> "I got stung pretty good on the head and saw stars and was pretty shaken up, but, you know, you learn to play with pain and so you kind of get back to the huddle and hope they don't call your number the next play so that you can kind of gather yourself.

"Q.  [By Mr. Hooper, Sampson's Counsel]:
Were you rendered unconscious by that blow?

"A.  No, I was not.

"Q.  Did you complete the drills for that
afternoon?

"A.  I completed the drills and the prac-
tice.

"Q.  What happened, if anything, that
evening?

"A.  I had a headache that evening and the
rest of that night.

"Q.  Any other symptoms of that evening?

"A.  Not specifically, no.

"Q.  Did you advise anybody, either the
team doctor or the trainer about the
headache or how you felt?

"A.  No, I did not."  (Tr. pp. 35-36).

Sampson then testified that on Monday, July 23, he had a

headache and took some aspirin.  He did not mention his headache

to the trainer until after lunch; that after lunch he had nausea

and vomiting and he then testified:

"A.  Well, I had the extreme headache, I
was getting a little disoriented, I started
having weakness in my left leg in terms of
when I tried to walk to the phone and call
the main secretary in the lobby to get
somebody up there to find out what was
wrong with me.

"Q.  Did you say that was a numbness or a
pain or what was it?

> "A.   It was a weakness.   It was not fully
> strong, just was starting to lose control
> of it, I guess."   (Tr. 38).

Sampson testified that around noon time on July 23, 1979, he
was taken to the San Angelo Hospital which was about 15 minutes
from the training field, and he was given a brain scan.   Sampson
remained in the Hospital until Wednesday, July 25 and had been
given some pain medication; that he did not have any nausea or
vomiting while he was in the Hospital, and that the numbness or
lack of sensitivity in his leg had gone away (Tr. 43).   He
returned to the camp and did not practice on Wednesday, Thursday
or Friday.

On Saturday, July 28, and Sunday, July 29, Sampson testified
that he jogged and on Monday, July 30, Sampson practiced in pads.
He testified that he still had a headache and he testified:

> "A.   In the morning session, I went through
> the warm ups and then I participated in
> approximately four run block collisions
> with another player and was --- it was
> extremely painful and it was almost like I
> didn't want to run into him, but --- it was
> unavoidable.
>
> "But then the real test came when I
> pass blocked against, in pass protection,
> and I took four shots to the head, four
> different pass runs against our defensive
> line.   The pain was so intense that I knew
> I couldn't play a game, let alone a season
> with that kind of pain.   So I took my hel-
> met off and said, 'That's it.   I can't do
> it.'"   (Tr. 50-51).

6

Sampson testified that he was up all Monday night with his headache, that he could not go so sleep; that he contacted the trainer; that they provided him with some medication and that on Tuesday, July 31, he was taken to the San Angelo Hospital. He was in the Hospital Tuesday, July 31st, and Wednesday, August 1st, and on Thursday, August 2nd he was taken to Houston to go to the Houston Methodist Hospital for the purpose of having a CAT scan; that on Friday, August the 3rd he had a CAT scan at approximately 11:00 a.m.; that a Dr. Koop, a neurologist or neurosurgeon told him after the CAT scan, at approximately 2:30 or 2:45 on August 3rd, that Sampson had to go to the emergency room as quickly as possible; that he was told that he had a blood clot on the right side of his head causing his headaches.

Sampson then immediately went into the Hospital; that he saw Dr. Elbert Robinson at 4:00 in the afternoon on Friday, August 3rd; Sampson was operated on between 9:00 p.m. and 9:30 p.m. by Dr. Robinson; that he was hospitalized for seven days.

Sampson, on cross-examination, testified:

> "Q.  [Mr. Curran, Management Counsel]:
> After you reported headaches that day,
> [Tuesday, July 23] isn't it a fact they
> immediately admitted you to the hospital?
>
> "A.  Yes.  when I came back to my room and
> was nauseous and threw up and called to
> have assistance, they did in fact take me
> to the hospital.

"Q.  And they gave you a series of tests,
as you testified, including an EEG and
brain scan?

"A.   Correct.

"Q.  You were told at that time that you
were probably suffering from a concussion?

"A.  The doctor that saw me after the tests
were done and after we were asking, after-
wards asking questions, I was told that I
probably suffered a real good concussion.

"Q.  And they kept you the next day for
observations, did they not, Tuesday, the
24th?

"A.  Tuesday, I stayed in Tuesday, yes.

"Q.  They kept you there and they monitored
your condition, correct?

"A.  Yes, they did.

"Q.  On Wednesday morning, you were
released from the hospital?

"A.  Wednesday morning, yes.

"Q.  The physicians told you not to go back
to practice until the headaches subsided?

"A.  The neuro man, whoever he was, said
that he advised me that I should not go
back to practice and participate until the
headaches subsided, correct.

"Q.  So for the next several days, as I
understand your testimony, you watched
practice and jogged but did not participate
in practice, is that correct?

"A.  Correct.

"Q.  That's because you were following the
doctor's instructions because you were
still having headaches?

>"A.   I was following the doctor's instruc-
>tions, amid the encouragement of the Oiler
>personnel to return back on to the field as
>soon as possible."  (Tr. 72-73).

Sampson, on further cross-examination, testified that he

knew that he had to report his physical disabilities to the team

trainers and he stated that he did so.

Sampson, on cross-examination, testified:

>"Q.   (Mr. Curran, Counsel for Houston
>Oilers):  Early that next morning when you
>complained to the training staff that your
>headaches are severe, they took you to the
>hospital immediately, did they not?
>
>"A.   They took me within one to two hours.
>
>    "I called at four, approximately, and
>it was approximately six or seven when I
>finally got to the hospital.
>
>    "The first time, they came and gave me
>pain medication, hoping that that would
>alleviate the pain.  But by the time six
>o'clock rolled around, it was obvious that
>nothing was going to alleviate the pain.
>
>"Q.   So as I distill that, you were taken
>to the hospital within several hours of
>your complaint and you were admitted and
>seen by a neurosurgeon again or seen by a
>doctor, whatever he might have been?
>
>"A.   Yes.
>
>"Q.   So you stayed in a hospital that night
>and for observation or whatever while you
>continued to have the problems?
>
>"A.   Yes.

"Q.   That would take you to Wednesday, the
1st?

"A.   Yes."   (Tr. 79-80).

As previously testified, Sampson stated that on Wednesday,
August the 1st he was told he was going to get a CAT scan; that
he understood there was no CAT scan equipment at the San Angelo
Hospital at the time.  He could not have a CAT scan on Thursday,
August 2nd because the hospital was filled up with reference to
CAT scans and so it was given to him on Friday, August 3.  A CAT
scan was given at 11:00 a.m. and at 9:30 p.m. he was operated on.
After staying in the hospital for 7 days he was then released and
for the remainder of the year was placed on Injured Reserve.  He
testified on cross-examination that he received his complete
salary for the 1979 contract year and that he received payment
for the Injury Protection.  He further testified that he filed a
Workers' Comp claim against the Oilers and that he filed a law-
suit against the helmet company, which was settled out of court.
He filed a claim for line-of-duty disability with the Bert Bell
Retirement Plan and he qualified for a payment of $800 a month
for about a year and a-half.  That payment was discontinued after
that year and a-half because it was found that he was able to
work.

Dr. Robinson testified, explaining what a subdural hematoma
was and the specific form of the operation that he performed on

10

Sampson. He testified that he performed a "flap" operation. (Houston Tr., p. 13).

Dr. Robinson testified that when asked if he had any records from San Angelo Hospital stated, "I don't believe I did. If I did, I don't see them in my records." (Houston Tr., p. 17). And, he testified that he didn't believe that he was aware that a brain scan had been given to Sampson on July 23, 1979 in San Angelo.

On direct examination, Dr. Robinson testified:

> "Q. (Mr. Hooper, Counsel for Sampson]: If Greg Sampson had a CAT scan some two weeks prior to August 3, 1979, in your opinion, would that have revealed the subdural hematoma?
>
> "A. I think it probably would, yes.
>
> "Q. Did the delay from the time of the trauma to August 3rd cause the subdural hematoma to enlarge?
>
> "A. I can't say." (Houston Tr. 18).

On cross-examination, Dr. Robinson testified:

> Q. (Mr. Huyghue, Counsel for Club): Isn't it true, Doctor, that a person who has a concussion would exhibit very similar symptoms to a person who has a subdural hematoma?
>
> "A. He might initially.
>
> "Q. Did you know that the diagnosis in San Angelo showed Mr. Sampson did not have any significant neurological findings other than dizziness and nausea and some headache?

"A.   That's what I understood, yes."
(Houston Tr. 25).

He further testified on cross-examination:

"Q.   Assuming a CAT scan was done on July
23rd, 1979, isn't it possible Doctor, that
the subdural had not even developed at that
point?

"A.   It's possible, yes."   (Houston Tr.
28).

Dr. Robinson further testified on cross-examination:

"Q.   Is this the first time you've testi-
fied on behalf of Mr. Sampson?

"A.   I think a long time ago we did a depo-
sition.   Several years ago.

"Q.   What was that in regards to?

"A.   Same injury.

"Q.   And do you know the basis upon which
you testified then?

"A.   I guess the same I'm testifying now.

"Q.   Was that pertaining to the Bike helmet
lawsuit that Mr. Sampson had filed?

"A.   Yes.

"Q.   Were you paid a fee to appear at that
time as well?

"A.   I'm sure I was.

"Q.   You didn't indicate at that time that
you'd felt that there was any impropriety
done on the part of the San Angelo doctors
or anyone else at that time, did you?

"A.   I don't think I did.

"Q.  You don't have any documentation with
you today, do you, that shows a CAT scan
should have been done a week earlier, any
written correspondence that you might have
given to Mr. Sampson or to his attorney?

"A.  I don't think so.

"Q.  I take it in 1979 there weren't a lot
of CAT scans around at that time, were
there?

"A.  Not to my knowledge, no."  (Houston
Tr. 30-31).

And, on further cross-examination, Dr. Robinson testified:

"Q.  Isn't it also possible, Doctor, or
probable that had surgery been done ear-
lier, say a week or two earlier, that you
still would have had to do this same surgi-
cal procedure that you did on August 3rd?

"A.  Still possible, yes."  (Houston Tr.
32)

HOUSTON OILERS MOTION TO DISMISS:

At the conclusion of the hearing and testimony of Dr.

Robinson on May 9, 1988, Counsel for the Houston Oilers made the

above motion.

Houston Oilers states that issue as follows:

"Whether an interim decision of summary
judgment in favor of Defendant's is appro-
priate as a matter of law on the arbitra-
bility of Greg Sampson's February 19, 1980
non-injury grievance against the Houston
Oilers alleging gross negligence for the
treatment and diagnosis of a career-ending
head injury he sustained on or about July
22, 1979."

13

The Houston Oilers contend that Article VII of the Collective Bargaining Agreement is unambiguous and clear in that the grievance must pertain either to the standard player contract or the Collective Bargaining Agreement; that a reading of the grievance filed by Sampson evidences that the non-injury grievance system is not the proper forum for this dispute; that in Joint Exhibit 2, which was the filing of the grievance on behalf of Sampson, it is stated:

> "There is some question whether the facts surrounding Greg's injury constitute a grievance within the scope of the Collective Bargaining Agreement between the NFLPA and the Management Council of the National Football League.  In order to cover that likelihood, this letter will operate as the initiation and filing of a grievance pursuant to Article VII, Sections 2 and 3 of the hereinabove described Collective Bargaining Agreement.  The serious injury to the player, Greg Sampson, arose from the gross negligence and breach of the 1979 contract by the Houston Oilers Football Club in causing, caring and treating his injury."  (Jt. Ex. 2).

The Houston Oilers point out that there is no breach of Sampson's contract for the 1979 season; that he agrees that he received his full contractual salary for that season; that he also received his injury protection benefit; therefore, there is no basis for awarding salary compensation beyond the 1980 season.

It is further contended by the Houston Oilers that paragraph 9 of Sampson's contract states that the Player "... will continue

14

to receive his yearly salary so long, during the season of injury only, and no subsequent period ..."

With reference to the question of a physician's duty of care to a player, the Oilers quote a case from Arbitrator Richard Kasher as follows:

> "In <u>Thomas 'Hollywood' Henderson v. Miami Dolphins</u>, (Richard Kasher, Jan. 1988) Arbitrator Kasher held:
>
> "We also do not believe that Dr. Virgin's discharge of the Grievant from his care is the crucial issue in this case. The record shows that Dr. Virgin's treatment of Henderson's injury was thoroughly professional. His discharge of Henderson from his care occurred only after Henderson defiantly rejected that treatment within two weeks of its institution, and without prior notice to Dr. Virgin. Given the circumstances, this Arbitrator finds that the discharge was warranted and probably prudent. <u>The Association's contention that the discharge constituted negligence warranting damages under Florida law is, of course, a question not properly addressed in this forum.</u> (<u>Id</u>. at 17). [Emphasis in original].

The Oilers take the position that "even assuming arguendo that this dispute is arbitrable, dismissal is proper because Plaintiffs have failed to establish their burden of proof."

It is the further contention of the Houston Oilers that Dr. Robinson, in his testimony, at no time used the terms "misdiagnosis or malpractice." And, that the record in fact indicates that neither of those events took place.

Further, the Houston Oilers contend that it "... employs physicians in San Angelo, Texas as independent contractors and as such no liability attaches to the Club under Respondeat Superior for their alleged negligent acts." It is contended that the physicians who treated Sampson in San Angelo provided their own facilities and supplies; that the Club does not have any control over those physicians, Dr. Burdin and Dr. LeGrand; that the Club had no notice that those physicians were anything other than competent medical professionals and no evidence has been introduced which would tend to prove otherwise; that there is no other duty that the Club has in selecting physicians to treat its employees and the Club points out in its brief:

> "In McKelvy v. Barger, 381 SW 2d 59 (Tex. 1964) the Supreme Court of Texas addressed the issue of master-servant relationships between an employer and a medical practitioner and held:
>
> "In the ordinary case . . . where an industrial employer or its compensation carrier arranges for and pays a particular physician or surgeon to care for employees injured in the course of their employment, the parties do not contemplate that the relation of master and servant will arise between the employer or carrier on the one hand, and the physician or surgeon on the other. The doctor is generally expected to exercise and rely entirely upon his own professional knowledge and skill without interference from either the employer or the insurance carrier. There is no presumption then of a master-servant relationship where the proof merely shows that an ordinary employer or insurance company has

16

arranged for a doctor to treat another per-
son." (Oilers Brief, pp. 14-15).

Dr. Thomas Cain is the Team Physician and the only doctor
affiliated with the Oilers. He has not been mentioned by Sampson
in this case.

Finally, the Oilers contend that Sampson failed to timely
file a civil action in the state of Texas for medical malpractice
against the San Angelo physicians and he should now be precluded
from using these arbitration procedures to revive his timebarred
claim; that the statute of limitations for medical malpractice is
two years.

Sampson argues that the proposed motion for summary judgment
"is not appropriate in this arbitration; but if applicable there
are issues and material facts that should be resolved as a matter
of law"; "that Texas law holds that a summary judgment denies the
right of an adverse party to a full hearing and any doubts as to
propriety of granting such motion should be resolved against the
moving party"; "that summary judgment is proper only if the
counter declarations do not supply evidence to create a triable
issue of facts."

SUMMARY:

Sampson contended that the Oilers breached his contract by
"... failing to provide medical and hospital care and/or medical

17

and hospital care that was not up to the minimum standard
required."

Of this contention, there is no evidence produced by Sampson
that the Oilers failed to provide medical and hospital care
and/or medical and hospital care that was not up to "the minimum
standard required." The record is complete as to the care that
was taken so far as Sampson was concerned based upon his injury
and his notice to the Club of his injury and to his complaints.
And, if there was a contention on the part of Sampson that the
Doctors in San Angelo hospital did not perform according to some
"standard," the action clearly must be against them, not against
the Oilers. The record again is uncontradicted that those doc-
tors are not Employees or in an agency relationship with the
Houston Oilers, but are in fact independent contractors.

Dr. Robinson, when asked whether he said there was any "...
impropriety done on the part of the San Angelo doctors or anyone
else at that time ... " responded, "I don't think I did." And,
he testified that he did not have any documentation that shows a
CAT scan should have been done a week earlier, or any written
correspondence that he might have given to Sampson or to his
attorney (Houston Tr. 31).

Whatever complaint Sampson has with reference to the medical
treatment relates exclusively to his contentions with reference
to the doctors at San Angelo hospital and to Dr. Robinson who

performed the operation.  In short, whether such an action would involve misdiagnosis or malpractice, the fact remains that the claim is not in this case properly within the scope of the Collective Bargaining Agreement.  As pointed out by Arbitrator Kasher, such a claim as is being made by Sampson in this case is not properly addressed in the forum of this Collective Bargaining Agreement.

DECISION:

Based upon the entire record of this case the Houston Oilers' motion to declare this case not arbitrable under the terms of the Collective Bargaining Agreement is granted and, therefore, the claim filed by Greg Sampson on February 18, 1980 is dismissed in its entirety.

_Sam l Cagel_
Arbitrator

19