## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | Hon. Anita B. Brody |
| *Lewis, et al. v. Kansas City Chiefs Football Club, Inc.*<br><br>and | No. 14-cv-01995-AB |
| *Smith, et al. v. Kansas City Chiefs Football Club, Inc.*<br><br>and | No. 14-cv-03383-AB |
| *Kenney, et al. v. Kansas City Chiefs Football Club, Inc.*<br><br>and | No. 14-cv-04779-AB |
| *Smith, et al. v. Arizona Cardinals Football Club, LLC* | No. 16-cv-01704-AB |

## KANSAS CITY CHIEFS FOOTBALL CLUB, INC.
## AND ARIZONA CARDINALS FOOTBALL CLUB LLC'S
## <u>JOINT OPPOSITION TO PLAINTIFFS' MOTIONS TO REMAND</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 5

      A.       The NFL Collective Bargaining Agreements ............................... 5

            1.      Player Medical Care Provisions .................................... 7

            2.      Rule-Making and Player Safety Rule Provisions ........... 9

            3.      Grievance Procedures .................................................. 10

            4.      Player Benefits Provisions ........................................... 10

      B.       The Chiefs Actions ................................................................... 11

      C.       The Cardinals Action ............................................................... 13

ARGUMENT ................................................................................................... 16

I. THIS CASE IS PROPERLY IN FEDERAL COURT BECAUSE SECTION
   301 OF THE LMRA COMPLETELY PREEMPTS PLAINTIFFS'
   CLAIMS ...................................................................................................... 16

      A.       Resolution of Plaintiffs' Negligence Claims  Substantially
              Depends Upon Interpretation of the Terms of the CBAs ......... 19

      B.       Resolution of Plaintiffs' Negligent Misrepresentation  and
              Fraudulent Concealment/Misrepresentation Claims  Substantially
              Depends Upon Interpretation of the Terms of the CBAs ......... 26

      C.       Plaintiffs' Claims Arise Under the CBAs ................................. 29

II. PLAINTIFFS' ARGUMENTS TO THE CONTRARY ARE WITHOUT
    MERIT ...................................................................................................... 31

      A.       The *Green* Remand Decision Is Wrong and Inapplicable ......... 31

      B.       Plaintiffs' Other Authority Is Inapposite .................................. 36

      C.       Plaintiffs Also Misstate the Relevant Legal Standard for
              Preemption ............................................................................... 39

      D.       Plaintiffs' Actions Are Removable Irrespective of 28 U.S.C.
              1445(c) .................................................................................... 40

      E.       Plaintiffs' Claims Are Not Limited to a Specific Gap Period .... 41

III. THE CARDINALS PLAINTIFFS ARE NOT ENTITLED TO COSTS OR
     ATTORNEYS' FEES .................................................................................. 44

CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams* v. *Am. Family Mut. Ins. Co.*,
　981 F. Supp. 2d 837, 842 (S.D. Iowa 2013) .........................................................36, 45

*Allis-Chalmers Corp.* v. *Lueck*,
　471 U.S 202 (1985).........................................................................................17, 29

*Anderson* v. *Ford Motor Co.*,
　803 F.2d 953 (8th Cir. 1986) .................................................................................36

*Antol* v. *Esposto*,
　100 F.3d 1111 (3d Cir. 1996) .................................................................................17

*Atchley* v. *Heritage Cable Vision Assocs.*,
　101 F.3d 495 (7th Cir. 1996) .................................................................................34

*Atwater* v. *Nat'l Football League Players Ass'n*,
　626 F.3d 1170 (11th Cir. 2010)........................................................................passim

*Ballard* v. *Nat'l Football League Players Ass'n*,
　123 F. Supp. 3d 1161 (E.D. Mo. 2015) .................................................25, 26, 27, 36

*Beidleman* v. *Stroh Brewery Co.*,
　182 F.3d 225 (3d Cir. 1999) ...................................................................................17

*Brown* v. *Jevic*,
　575 F.3d 322 (3d Cir. 2009) ...................................................................................35

*Brown* v. *Nat'l Football League*,
　219 F. Supp. 2d 372 (S.D.N.Y. 2002) ......................................................................6

*Buck* v. *Hampton Twp. Sch. Dist.*,
　452 F.3d 256 (3d Cir. 2006) .....................................................................................6

*Care v. Reading Hosp. & Med. Ctr.*,
　No. 03-cv-04121, 2004 WL 728532 (E.D. Pa. Mar. 31, 2004) ................................41

*Carman* v. *Wieland*,
　406 S.W.3d 70 (Mo. Ct. App. 2013) .......................................................................23

*Carter* v. *Ford Motor Co.*,
　121 F.3d 1146 (8th Cir. 1997) ...............................................................................36

*Caterpillar Inc.* v. *Williams*,
　482 U.S. 386 (1987).................................................................................................18

**Page(s)**

*Cipriano* v. *Phila. Newspaper, Inc.*,
No. 98-cv-4751, 1999 WL 135111 (E.D. Pa. Mar. 12, 1999) ............................. 18-19

*Clarett* v. *Nat'l Football League*,
369 F.3d 124 (2d Cir. 2004) ........................................................................6

*Clark* v. *Ameritas Inv. Corp.*,
408 F. Supp. 2d 819 (D. Neb. 2005) ............................................................6

*Davis* v. *Bell Atl.-W. Va., Inc.*,
110 F.3d 245 (4th Cir. 1997) ......................................................................6

*Dent* v. *Nat'l Football League*,
No. 14-cv-02324, 2014 WL 7205048 (N.D. Cal. Dec. 17, 2014) .............................39

*DiPilato* v. *Commonwealth Ass'n of Sch. Adm'rs, Local 502*,
588 F. Supp. 2d 631 (E.D. Pa. 2008) ........................................................44

*Duerson* v. *Nat'l Football League*,
No. 12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012) ........................passim

*Espinoza* v. *Cargill Meat Sols. Corp.*,
622 F.3d 432 (5th Cir. 2010) ................................................................ 38-39

*Givens* v. *Tenn. Football, Inc.*,
684 F. Supp. 2d 985 (M.D. Tenn. 2010).......................................................passim

*Gore* v. *Trans World Airlines*,
210 F.3d 944 (8th Cir. 2000) ..................................................................passim

*Green* v. *Arizona Cardinals Football Club LLC*,
21 F. Supp. 3d 1020 (E.D. Mo. 2014) .......................................................passim

*Hendy* v. *Losse*,
925 F.2d 1470 (9th Cir. 1991) ....................................................................39

*Hess* v. *Chase Manhattan Bank, USA, N.A.*,
220 S.W.3d 758 (Mo. 2007) (en banc) ........................................................26

*Holmes* v. *Nat'l Football League*,
939 F. Supp. 517 (N.D. Tex. 1996) ......................................................6, 25

*Hughes* v. *Mylan Inc.*,
Nos. 11-cv-5543-60, 11-cv-5617, 2011 WL 5075133 (E.D. Pa.
Oct. 25, 2011) ..............................................................................................35

*Humphrey* v. *Sequentia, Inc.*,
58 F.3d 1238 (8th Cir. 1995) ......................................................................40

**Page(s)**

*Int'l Bhd. of Elec. Workers* v. *Hechler*,
    481 U.S. 851 (1987)..............................................................................17

*Jeffers* v. *D'Alessandro*,
    681 S.E.2d 405 (N.C. Ct. App. 2009)................................................19, 24

*Johnson* v. *Heublein Inc.*,
    227 F.3d 236 (5th Cir. 2000) .......................................................35, 36, 45

*Kline* v. *Security Guards, Inc.*,
    386 F.3d 246 (3d Cir. 2004) ................................................................36, 37

*Laber* v. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied*
    *Indus. & Serv. Workers Int'l Union*,
    No. 15-cv-55, 2015 WL 5085774 (N.D. Ohio Aug. 27, 2015) ...................45

*Lingle* v. *Norge Div. of Magic Chef, Inc.*,
    486 U.S. 399 (1988)............................................................................17, 33

*LRI Holdings Co., LLC* v. *Bower*,
    No. 09-cv-0007, 2009 WL 974783 (D. Neb. Apr. 9, 2009) ..........................6

*Martin* v. *Franklin Capital Corp.*,
    546 U.S. 132 (2005)..................................................................................44

*Maxwell* v. *Nat'l Football League*,
    No. 11-cv-08394, Order (C.D. Cal. Dec. 8, 2011), ECF No. 58 ........passim

*McKnight* v. *Dresser, Inc.*,
    676 F.3d 426 (5th Cir. 2012) ...............................................................38, 39

*McNeal* v. *ArcelorMittal USA, Inc.*,
    143 F. Supp. 3d 241 (E.D. Pa. 2015).......................................................37

*McNeal* v. *Arcelormittal USA, Inc.*,
    No. 15-cv-03517, 2015 WL 9489590 (E.D. Pa. Dec. 29, 2015) ...............37

*Meisinger* v. *Specialty Risk Servs.*,
    10-cv-0866, 2010 WL 8354692 (W.D. Mo. Nov. 19, 2010)......................40

*Mounger Constr., LLC* v. *Fiber Vision Cable Servs., LLC*,
    No. 11-cv-00081, 2012 WL 3201925 (E.D. Mo. Aug. 3, 2012) ...............26

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    307 F.R.D. 351 (E.D. Pa. 2015), *amended* No. 12-MD-02323, 2015
    WL 12827803 (E.D. Pa. May 8, 2015)................................................12, 31

**Page(s)**

*Negron* v. *Oxford Airport Tech. Servs.*,
 No. 08-cv-4326, 2009 WL 50158 (E.D. Pa. Jan. 7, 2009) ........................................32

*O'Bryan* v. *Chandler*,
 496 F.2d 403 (10th Cir. 1974) ........................................45

*Premier Bank* v. *Tierney*,
 114 F. Supp. 2d 877 (W.D. Mo. 2000) ........................................26

*Pryzbowski* v. *U.S. Healthcare, Inc.*,
 245 F.3d 266 (3d Cir. 2001) ........................................17

*Radcliff* v. *El Paso Corp.*,
 377 F. Supp. 2d 558 (S.D.W. Va. 2005) ........................................40

*Reece* v. *Houston Lighting & Power Co.*,
 79 F.3d 485 (5th Cir. 1996) ........................................34

*Rescuecom Corp.* v. *Chumley*,
 522 F. Supp. 2d 429 (N.D.N.Y. 2007) ........................................6

*Sherwin* v. *Indianapolis Colts, Inc.*,
 752 F. Supp. 1172 (N.D.N.Y. 1990) ........................................passim

*Smith* v. *Houston Oilers*,
 87 F.3d 717 (5th Cir. 1996) ........................................25

*Smith* v. *Nat'l Football League Players Ass'n*,
 No. 14-cv-01559, 2014 WL 6776306 (E.D. Mo. Dec. 2, 2014) ........................................36

*Spearman* v. *Exxon Coal USA, Inc.*,
 16 F.3d 722 (7th Cir. 1994) ........................................41

*Stellar* v. *Allied Signal, Inc.*,
 98 F. Supp. 3d 790 (E.D. Pa. 2015) ........................................37, 37-38

*Stringer* v. *Nat'l Football League*,
 474 F. Supp. 2d 894 (S.D. Ohio 2007) ........................................21-22, 24, 25

*Suder* v. *Blue Circle, Inc.*,
 116 F.3d 1351 (10th Cir. 1997) ........................................40

*United Ass'n of Journeymen* v. *Local 334*,
 452 U.S. 615 (1981) ........................................6

*White* v. *United States*,
 No. 05-cv-101, 2007 WL 209916 (E.D. Mo. Jan. 24, 2007) ........................................19

**Page(s)**

*Williams* v. *Chrysler Corp.*,
　163 F.3d 183 (3d Cir. 1998) ...............................................................................passim

**STATUTES**

28 U.S.C. § 1331 ...........................................................................................................5

28 U.S.C. § 1367 ...............................................................................................5, 17, 31

28 U.S.C. § 1441 ...........................................................................................................5

28 U.S.C. § 1445(c) ..............................................................................................40, 41

28 U.S.C. § 1446(b)(3) ..............................................................................................45

28 U.S.C. § 1447(c) ....................................................................................................44

29 U.S.C. § 185(a) ................................................................................................16, 17

Labor Management Relations Act, § 301 ...............................................................passim

The Kansas City Chiefs Football Club, Inc. (the "Chiefs") and the Arizona Cardinals Football Club LLC (the "Cardinals," and together with the Chiefs, "Defendants"), respectfully submit this joint response in opposition to (1) the consolidated Motion to Remand filed by plaintiffs (the "Chiefs Plaintiffs") in *Lewis, et al.* v. *Kansas City Chiefs Football Club, Inc.*, No. 14-cv-01995-AB (E.D. Pa.) ("*Lewis*"), *Smith, et al.* v. *Kansas City Chiefs Football Club, Inc.*, No. 14-cv-03383-AB (E.D. Pa.) ("*Smith* v. *Chiefs*"), and *Kenney, et al.* v. *Kansas City Chiefs Football Club, Inc.*, No. 14-cv-04779-AB (E.D. Pa.) ("*Kenney*," and together with *Lewis* and *Smith* v. *Chiefs*, the "Chiefs Actions")[1]; and (2) the Motion to Remand filed by plaintiffs (the "Cardinals Plaintiffs," and together with the Chiefs Plaintiffs, "Plaintiffs") in *Smith, et al.* v. *Arizona Cardinals Football Club, LLC*, No. 16-cv-01704-AB (E.D. Pa.) ("*Smith* v. *Cardinals*").[2]

## PRELIMINARY STATEMENT

Plaintiffs' motions to remand should be denied because Plaintiffs' claims— contending that the Cardinals and Chiefs breached their duties to minimize the risk of head impacts to Plaintiffs, and to warn Plaintiffs of such risks—are preempted by federal labor law. Thus, this Court has subject matter over them, and removal is proper. *See, e.g., Duerson* v. *Nat'l*

---

[1] The Chiefs Plaintiffs' motion to remand bears a caption that includes not only the *Lewis, Smith* v. *Chiefs*, and *Kenney* actions, but also *Horn* v. *Kansas City Chiefs Football Club, Inc.*, 14-cv-03382 (E.D. Pa.), another action originally brought against the Chiefs in Missouri. This was improper, as one of the two *Horn* plaintiffs voluntarily dismissed his claims against the Chiefs (*see* Notice of Voluntary Dismissal with Prejudice, *Horn*, 14-cv-03382, ECF No. 13 (voluntary dismissal by Tamarick Vanover) and both *Horn* plaintiffs are part of the settlement class covered by the February 13, 2015 Class Action Settlement in MDL 2323, pursuant to which they have released their claims against the Chiefs. (*See* Class Action Settlement Agreement as of June 25, 2014, § 18.1; ECF No. 6481-1; Stipulation and Order, Mar. 20, 2017, ECF No. 7297 (revoking opt-out of Joseph Horn).)

[2] On July 27, 2017, Anita Martin, the former spouse of Christopher Martin, one of the Chiefs Plaintiffs, filed a remand motion with this Court, stating that she "adopts and incorporates by reference the arguments set forth by her former spouse Christopher Martin in [*Lewis*]," and "hereby joins in and requests her case be remanded to state court." Motion for Remand at 1, *Martin* v. *Kansas City Chiefs Football Club, Inc.*, 14-cv-3381 (E.D. Pa.), ECF No. 5. Ms. Martin's action was previously consolidated with *Lewis*. Order, *Martin* v. *Kansas City Chiefs Football Club, Inc.*, 14-cv-00132 (W.D. Mo. Mar. 13, 2014), ECF No. 32. As such, this response is also made in opposition to the Motion for Remand filed by Ms. Martin.

*Football League*, No. 12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Maxwell* v. *Nat'l Football League*, No. 11-cv-08394, Order (C.D. Cal. Dec. 8, 2011), ECF No. 58.

   Plaintiffs are former NFL players (and their wives) who seek relief for injuries sustained during the players' careers, specifically when playing for the Chiefs and Cardinals. Nearly all of Plaintiffs played NFL football under collective bargaining agreements and accompanying NFL Constitutions and Bylaws (together, the "CBAs") that governed the relationship between Plaintiffs, the Cardinals and Chiefs, and the NFL.  The CBAs contain, among numerous other employment terms, terms specifically addressing player health and safety and player medical care.  For example, the CBAs delegate to the NFL's Member Clubs and their medical staff the responsibility for treating player injuries, including making "return to play" decisions, and provide for players' rights to compensation and other benefits in the event of injury.

   The CBAs, like all collective bargaining agreements, are governed by section 301 ("Section 301") of the Labor Management Relations Act ("LMRA").  Section 301 is intended to ensure that labor disputes are resolved under a uniform body of federal labor law and adjudicated in accordance with the grievance procedures set forth in collective bargaining agreements.  Thus, Section 301 completely preempts state law claims—including tort claims—the resolution of which is substantially dependent upon or inextricably intertwined with the terms of, or that arise under, a collective bargaining agreement, such as Plaintiffs' claims here.   Federal courts repeatedly, in denying remand motions, have found that claims against the NFL and its Member Clubs like those asserted here are preempted by Section 301 because their resolution requires interpretation of CBA provisions, including provisions relating to player health and safety.  *See, e.g.*, *Duerson*, 2012 WL 1658353 at *4–5; *Maxwell*, No. 11-cv-08394, Order at 1–2; *Givens* v.

*Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990–91 (M.D. Tenn. 2010).  For the same reasons, federal court jurisdiction is proper here.  Plaintiffs' claims hinge on allegations that the Cardinals and Chiefs had a duty "to maintain a safe working environment," "to notify, inform and educate Plaintiffs . . . of any potential long-term risks of repetitive head trauma," and "to warn [players] about the existence of dangers, including latent neurologic diseases, of which they could not reasonably be expected to be aware."  These claims will require the Court to ascertain what duties, if any, the Cardinals and Chiefs owed to Plaintiffs, and the scope of those duties, to determine whether the Cardinals and Chiefs acted reasonably.  Because the CBAs allocate responsibility—for treating player injuries generally, and making "return to play" decisions specifically—to Member Clubs and their medical staff, a court cannot make such an assessment in a vacuum; it must first consider the scope of such duties, and Plaintiffs' claims therefore are preempted by Section 301.  In addition, Plaintiffs' claims arise out of duties and obligations created by the CBAs, including duties relating to player medical care.

Plaintiffs' arguments to the contrary do not show otherwise.

First, Plaintiffs argue that this Court need not interpret the CBAs at all because Plaintiffs' claims are based on an employer's common law duties that exist apart from the CBAs. In support, Plaintiffs rely on the remand order in *Green* v. *Arizona Cardinals Football Club LLC*, 21 F. Supp. 3d 1020 (E.D. Mo. 2014), a case this Court has previously recognized as an "outlier."  But the *Green* remand order was wrongly decided and in conflict with directly applicable Eighth Circuit precedent (which Plaintiffs fail to cite) providing that, as a matter of settled Missouri substantive law—which governs Plaintiffs' claims—an employer's common law duties are *negotiable*, and when unionized employees and their employer negotiate those duties, preemption is appropriate.  *Gore* v. *Trans World Airlines*, 210 F.3d 944, 950 (8th Cir. 2000).  So

too, here.   To resolve Plaintiffs' claims, brought under *Missouri* law, the Court will need to interpret the CBAs to consider the as-negotiated scope of the Cardinals' and Chiefs' duties (if any) and the reasonableness of their actions.   Nor does *Green*, as Plaintiffs mistakenly argue, constitute the "law of the case," as the Cardinals Plaintiffs have materially altered their petition for damages since the *Green* remand order was issued.   Plaintiffs also cite certain non-binding case law from this Circuit and elsewhere in purported support of their motions, but none of it so much as references—much less purports to apply or interpret—Missouri law concerning the duties of an employer.

Second, Plaintiffs attack the relevance of specific CBA provisions cited by the Cardinals and Chiefs, but in doing so they entirely misapprehend the relevant legal standards—as preemption does not require, as Plaintiffs suggest, that Plaintiffs allege direct violations of specific CBA provisions; the issue is whether resolution of Plaintiffs' claims is substantially dependent upon an interpretation of the CBAs, as is the case here.

Third, Plaintiffs assert that removal is improper because their claims arise under the workers' compensation laws of Missouri.   That argument, too, fails because it ignores relevant precedent holding that complete preemption is a proper ground for removal even in a case that purports to invoke a workers' compensation statute.

Finally, to the extent that any Plaintiffs purport to artificially limit their claims to the so-called "gap period" during which no CBA was in effect, such "artful pleading" is implausible where those Plaintiffs in fact played for the Cardinals and Chiefs outside of that gap period and therefore cannot plausibly claim that the "repetitive" injuries of which they complain arose only during such a limited time.   *See Duerson*, 2012 WL 1658353, at *3 (rejecting plaintiff's effort to artificially limit the time period to which his complaint referred because it

was "exceedingly implausible" to attribute his CTE to head trauma suffered only during that limited period).

In sum, because Plaintiffs' claims are completely preempted, removal was proper under 28 U.S.C. §§ 1331 and 1441. To the extent that any claim is not preempted, it is properly before this Court pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). Accordingly, Plaintiffs' remand motions should be denied.

## BACKGROUND

The Chiefs Plaintiffs are seventeen former professional football players, all of whom played some or all of their careers for the Chiefs, an NFL Member Club, and certain of their wives, who seek relief for injuries allegedly caused by repetitive head trauma suffered while playing NFL football.[3] The Cardinals Plaintiffs are two former professional football players, each of whom played some or all of his career for the Cardinals,[4] and their wives, who bring similar claims.

## A.    The NFL Collective Bargaining Agreements

The terms and conditions of Plaintiffs' employment as professional football players are defined by the CBAs operative during, and in some cases after, Plaintiffs' careers. The CBAs are the product of exhaustive arms'-length negotiations between, on the one hand, the NFL Management Council (the exclusive bargaining representative of the NFL), and, on the other hand, the NFL Players Association ("NFLPA") (the exclusive bargaining representative of NFL players), and, along with the NFL Constitution and Bylaws to which the NFLPA agreed to

---

[3]    At the time they filed their Motion to Remand, the Chiefs Plaintiffs included 19 former professional football players and certain of their wives. Since then, however, two former players have revoked their opt out requests. (*See* Stipulation and Order, July 28, 2017, ECF No. 8191; Stipulation and Order, Aug. 23, 2017, ECF No. 8308.)

[4]    The Cardinals Plaintiffs were employed by the St. Louis Football Cardinals, Inc., which was the corporate predecessor to The Arizona Cardinals Football Club LLC, an NFL Member Club. Hereinafter, both entities are referred to together as the "Cardinals."

be bound, "represent[] the complete understanding of the parties on all subjects covered [t]herein."[5]   (*See* Ex. 2, 1977 CBA Preamble and Art. II § 1; Ex. 3, 1982 CBA Preamble and Art. II § 1; Ex. 4, 1993 CBA Preamble and Art. III § 1.)[6]

The CBAs cover a broad range of subjects affecting the terms and conditions of employment for NFL players.   Although the CBAs have changed over time pursuant to the collective bargaining process, every CBA expressly addresses player health and safety and provides grievance procedures for the resolution of disputes under the CBAs.   Here, Plaintiffs played for the Chiefs and Cardinals between the 1978 and 1998 seasons, thus implicating at least three CBAs: the 1977 CBA, effective from February 1, 1974, to July 15, 1982; the 1982 CBA, effective from July 16, 1982, to August 31, 1987; and the 1993 CBA (as thereafter amended), effective from March 29, 1993, to March 7, 2006.   (*See* Ex. 2, 1977 CBA Art. XXXVI §§ 1–2;

---

[5]   *See Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the [CBA], the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein."); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 386 (S.D.N.Y. 2002) ("[The NFL Constitution and Bylaws were] bargained over and included within the scope of the CBA."); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1177 (N.D.N.Y. 1990) ("The standard player agreement, which is used for every NFL player as required by Article XII, section 1 of the [1982] CBA, is effectively incorporated by reference in that article."); *see also United Ass'n of Journeymen* v. *Local 334*, 452 U.S. 615, 627 (1981) (union constitutions constitute labor contracts under § 301); *Davis* v. *Bell Atl.-W. Va., Inc.*, 110 F.3d 245, 248–49 (4th Cir. 1997) (employee's claim preempted because of need to interpret grievance settlement agreement negotiated by union, dependent on CBA, and "fairly characterized as a rider to the [CBA]").   For ease of reference, the Chiefs and Cardinals refer generally to the "CBAs" throughout this memorandum, but cite, where applicable, to the CBAs, the Constitutions and By-Laws, and the Standard Player Contracts incorporated therein.

[6]   Since 1968, the NFL has operated under a CBA with only two exceptions:  (1) the period between August 31, 1987 and March 29, 1993, when no CBA was in place, following the expiration of the 1982 CBA and prior to the execution of the 1993 CBA; and (2) the period between March 11, 2011 and August 4, 2011.   The relevant CBAs are attached as exhibits to the accompanying Declaration of Dennis L. Curran, dated September 25, 2017 and cited in the form "Ex. __."   The Court may consider the CBAs in adjudicating Plaintiffs' remand motions. *See, e.g.*, *Duerson*, 2012 WL 1658353, at *4 (considering CBAs in connection with motion to remand); *Maxwell*, No. 11-cv-08394, Order at 1-2 (same); *see also LRI Holdings Co., LLC* v. *Bower*, No. 09-cv-0007, 2009 WL 974783, at *2 (D. Neb. Apr. 9, 2009); *Clark* v. *Ameritas Inv. Corp.*, 408 F. Supp. 2d 819, 824 (D. Neb. 2005); *Rescuecom Corp.* v. *Chumley*, 522 F. Supp. 2d 429, 436 (N.D.N.Y. 2007); *see also Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 383–84, 385–87 (S.D.N.Y. 2002) (considering CBA provisions in order to adjudicate NFL's motion to dismiss); *Holmes* v. *Nat'l Football League*, 939 F. Supp. 517, 520 n.2 (N.D. Tex. 1996) (same).

Ex. 3, 1982 CBA Art. XXXVIII §§ 1–2; Ex. 4, 1993 CBA Art. LVIII §§ 1–2; Ex. 7, 2002

Amendment to 1993 CBA Intro.; Ex. 8, 2006 CBA Intro.)

     **1.**     **Player Medical Care Provisions**

     The relevant CBAs address, in detail, issues relating to assessment, diagnosis, and

treatment of player injuries.  For example, multiple CBAs provide that Club physicians have the

responsibility for making "return to play" decisions and advising players of the risk of continued

performance, and several set forth the qualifications for Club medical staff.  Thus, the CBAs

provide:

- "If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player.  If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity."  (Ex. 4, 1993 CBA Art. XLIV § 1; *see also* Ex. 3, 1982 CBA Art. XXXI § 1.)

- "All determinations of recovery time for major and minor injuries must be by the Club's medical staff and in accordance with the club's medical standards" for players categorized as "Reserve/Injured" on the Reserve List"  (Ex. 11, 1982 Supp. to NFL Constitution & Bylaws Art. XVII; Ex. 12, 1984 Supp. to NFL Constitution & Bylaws Art. XVII.)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ."  (Ex. 4, 1993 CBA, Appx. C, Standard Player Contract ¶ 9.)

- "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians.  The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs."  (Ex. 3, 1982 CBA Art. XXXI § 1; Ex. 4, 1993 CBA Art. XLIV § 1.)

- "All full-time head trainers and assistant trainers . . . will be certified by the National Athletic Trainers Association.  All part-time trainers must work under the direct supervision of a certified trainer."  (Ex. 3, 1982 CBA Art. XXXI § 2; Ex. 4, 1993 CBA Art. XLIV § 2.)

- "The home team shall provide a physician and an ambulance at each game available to both teams; said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams." (*See, e.g.*, Ex. 10, 1976 NFL Constitution Art. XIX § 19.5.)

Multiple CBAs also set forth player rights and obligations related to medical care.

Thus, the CBAs provide:

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (Ex. 7, 2002 Am. to 1993 CBA Art. XIII § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the costs of [these] medical services." (Ex. 3, 1982 CBA Art. XXXI § 3; Ex. 4, 1993 CBA Art. XLIV § 3.)

- "A player will have the right to choose the surgeon who will perform surgery . . . . Any such surgery will be at Club expense[.]" (Ex. 3, 1982 CBA Art. XXXI § 4; Ex. 4, 1993 CBA Art. XLIV § 4.)

- "[E]ach player will undergo a standardized minimum pre-season physical examination . . . which will be conducted by the Club physician," and will further undergo a "post-season physical examination" at the request of the player or Club. (Ex. 3, 1982 CBA Art. XXXI § 5; *see also* Ex. 4, 1993 CBA Art. XLIV § 5.)

- "Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract . . . ." (Ex. 4, 1993 CBA Appx. C § 8.)

- "Player may examine his medical and trainers' records in the possession of the club or the club physician two times each year, once during the pre-season and again after the regular season. Player's personal physician may, upon presentation to the club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the club physician or have copies of such medical and trainers' records forwarded to him . . . ." (Ex. 3, 1982 CBA Art. XXXII § 2; *see also* Ex. 4, 1993 CBA Art. XLV § 2.)

### 2.      Rule-Making and Player Safety Rule Provisions

The CBAs also set forth the manner in which playing rules addressing or affecting

player safety are promulgated and enforced.  For example, all playing rule changes must be

"presented to the [NFL]" or unanimously approved by a "standing committee of the League

vested with the authority to make a recommendation on proposed playing rules changes" (Ex. 12,

1984 NFL Constitution Art. XI § 11.2), and consisting of members appointed by the Clubs and

the NFLPA.   The CBAs also provide that the Clubs, the NFLPA, and the NFL all have

responsibility for reviewing player safety aspects of playing rules.  Thus, the CBAs provide:

- "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee') will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects."  (Ex. 3, 1982 CBA Art. XI; Ex. 4, 1993 CBA Art. XIII § 1(a); *see also* Ex. 2, 1977 CBA Art. XI.)

- "The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly . . . is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters."  (Ex. 3, 1982 CBA Art. XI § 7; Ex. 4, 1993 CBA Art. XIII § 1(b).)

- "Two players appointed by the NFLPA will have the right to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules in a non-voting capacity to represent the players' viewpoint on such rules.  The player-appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members."  (Ex. 3, 1982 CBA Art. XI § 8; *see also* Ex. 2, 1977 CBA Art. XI § 8; Ex. 4, 1993 CBA Art. XIII § 2.)

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change. (Ex. 3, 1982 CBA Art. XI § 9; Ex. 4, 1993 CBA Art. XIII § 1(c).)

- "The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the

9

meeting which relate to playing rules."  (Ex. 4, 1993 CBA Art. XIII § 2; *see also* Ex. 2, 1977 CBA Art. XI § 9; Ex. 3, 1982 CBA Art. XI § 8.)

**3.    Grievance Procedures**

Since 1977, all CBAs have contained a broad arbitration clause providing that all disputes involving "the interpretation of, application of, or compliance with, any provision of" the CBAs, player contracts, or any applicable provision of the Constitution "pertaining to terms and conditions of employment of NFL players," will be resolved exclusively in accordance with agreed-to arbitration procedures.  Moreover, since 1970, "injury grievances" have been subject to arbitration.  (*See* Ex. 4, 1993 CBA Art. IX § 1, Art. X § 6; *see also* Ex. 1, 1970 CBA Art. XI § 6 & Appx. B; Ex. 2, 1977 CBA Art. VII § 1, Art. IX § 6; Ex. 3, 1982 CBA Art. VII § 1, Art. IX § 6.)  Certain CBAs also expressly forbid players from bringing "any suit against . . . the NFL or any Club with respect to any claim relating to any conduct permitted by [the CBAs] . . . or any term of [the CBAs]" or "the Constitution and Bylaws of the NFL."  (Ex. 4, 1993 CBA Art. IV § 2; *see also* Ex. 2, 1977 CBA Art. III § 2; Ex. 3, 1982 CBA Art. III § 2.)

**4.    Player Benefits Provisions**

The CBAs also include provisions regarding the rights of players *and former players* to compensation and benefits in the event of injuries, including the right to workers' compensation and supplemental disability benefits.  (*See, e.g.*, Ex. 2, 1977 CBA Art. XXXIII; Ex. 3, 1982 CBA Art. XXIV, Art. XXXVI; Ex. 4, 1993 CBA Art. L, Art. LI, Art. LIV; *see also* Ex. 8, 2006 CBA Art. XLVIII-D § 1 ("The parties agree to . . . establish a . . . plan . . . to provide medical benefits to former Players who are . . . determined . . . to have 'dementia'"); Ex. 4, 1993 CBA Art. XLVII § 4(C), Art. LI.)  For example, "a player . . . will receive an injury protection benefit . . . [when the] player . . . [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his club's last game in the season of

10

injury, as certified by the club physician . . . ."  (Ex. 2, 1977 CBA Art. X § 1; Ex. 3, 1982 CBA Art. X § 1; *see also* Ex. 4, 1993 CBA Art. XII § 1.)

**B.      The Chiefs Actions**

The Chiefs Plaintiffs assert causes of action for negligence, negligent misrepresentation, fraudulent concealment, and loss of consortium against the Chiefs.  (*See* First Am. Pet. ¶¶ 75–105, *Lewis*, ECF No. 1-1; Pet. ¶¶ 58–88, *Smith* v. *Chiefs*, ECF No. 1-2; Pet. ¶¶ 44-107, *Kenney*, ECF No. 1-2.)  They allege that the Chiefs failed to "maintain a safe working environment," failed to "warn employees about the existence of dangers . . . of which they could not reasonably be expected to be aware," and "knowingly and fraudulently concealed from Plaintiffs the risks of repetitive head trauma."  (*See, e.g.*, Pet. ¶¶ 46, 53–59, 67, *Kenney*, ECF No. 1-2.)  They also allege that the Chiefs erred in returning concussed players to play and that the installation of "AstroTurf significantly increased the risk of exposure to head trauma."  (*See, e.g.*, *id.* ¶¶ 23–24.)  This "wrongful conduct" allegedly caused plaintiffs to develop "post-concussion syndrome" and chronic traumatic encephalopathy ("CTE").  (*See, e.g.*, *id.* ¶¶ 3, 6.)[7]  In most cases, the Chiefs Plaintiffs identify the relevant period of their claims as "[b]etween September 1, 1987 and March 28, 1993."  (*See, e.g.*, *id.* ¶¶ 47–48, 54–55, 57, 63–68.)  The plaintiffs in *Kenney*, however, also bring a second cause of action for fraudulent concealment covering the period of "1994 through current."  (*Id.* ¶¶ 98–107.)

---

[7]     These cases are substantially similar to numerous others brought by former NFL players asserting allegations similar to those alleged here that have been removed to federal court and consolidated as part of MDL 2323. Indeed, many of the Chiefs Plaintiffs filed separate complaints in MDL 2323 alleging the same common law causes of action against the NFL and others as those alleged here, arising out of the same purported injuries allegedly sustained during their playing careers in the NFL, though they later voluntarily dismissed their claims against the NFL.  (*See, e.g.*, Short Form Complaints, ECF Nos. 1902, 3810, 5380; *see, e.g.*, Short Form Complaint, *Smith* v. *Nat'l Football League*, 13-cv-00300 (E.D. Pa.), ECF No. 2; Notice of Voluntary Dismissal Without Prejudice, *Kenney* v. *Nat'l Football League*, 13-cv-00473 (E.D. Pa. 2015), ECF No. 7; Notice of Voluntary Dismissal Without Prejudice, *Smith* v. *Nat'l Football League*, 13-cv-00300 (E.D. Pa. 2015), ECF No. 5.)

The Chiefs Plaintiffs originally brought their claims in three separate actions in the Circuit Court of Jackson County, Missouri, but the Chiefs removed those actions to the United States District Court for the Western District of Missouri on the ground that the causes of action are completely preempted by Section 301 of the LMRA.  (*See* Notice of Removal, *Lewis*, No. 14-cv-00004 (W.D. Mo.), ECF No. 1; Notice of Removal, *Smith* v. *Chiefs*, No. 14-cv-00195 (W.D. Mo.), ECF No. 1; Notice of Removal, *Kenney*, No. 14-cv-00255 (W.D. Mo.), ECF No. 1). The Chiefs argued that the claims are preempted by Section 301 because "the resolution of those claims is 'inextricably intertwined with consideration of the terms of the CBAs' or 'substantially dependent' on an analysis of the relevant provisions of the CBAs, and because they arise under the CBAs."  (*See, e.g.*, Notice of Removal ¶ 11, *Kenney*, No. 14-cv-00255 (W.D. Mo.), ECF No. 1.)

The Chiefs Plaintiffs filed motions to remand, arguing, as they do here, that their causes of action are based solely on Missouri common law duties arising from the establishment of an employer-employee relationship.  (*See, e.g.*, Pls.' Mot. to Remand, *Kenney*, No. 14-cv-00255 (W.D. Mo.), ECF No. 20.)   While their motions—based on substantially the same arguments as the instant motions, and, in some cases, fully briefed—were pending, the Judicial Panel on Multidistrict Litigation (the "JPML") transferred the actions to this Court for coordinated or consolidated pretrial proceedings with the numerous similar cases pending against the NFL in *In re: National Football League Players' Concussion Injury Litigation*, 12-md-2323 (E.D. Pa.) ("MDL 2323").  (*See, e.g.*, Transfer Order, *Kenney*, No. 14-cv-00255 (W.D. Mo.), ECF No. 28.)   Following transfer, the Chiefs Plaintiffs filed a new, consolidated motion to remand with this Court, generally making the same arguments as before but adding case law from the Third Circuit.  (Mot. to Remand, ECF No. 6660.)

Pursuant to this Court's orders (ECF Nos. 7477, 8030) coordinating briefing of various motions in this MDL, the Chiefs Plaintiffs filed the instant motion to remand.  (ECF No. 7966.)

## C.      The Cardinals Action

The Cardinals Plaintiffs similarly assert causes of action for negligence, negligent misrepresentation, fraudulent misrepresentation, and loss of consortium in their case against the Cardinals.  (*See* Second Am. Pet. ¶¶ 26–54, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72.)  Much like the Chiefs Plaintiffs, the Cardinals Plaintiffs generally allege that the Cardinals failed to fulfill their duties to "maintain a safe working environment, not to expose Plaintiffs to unreasonable and/or increased risks of harm, to warn Plaintiffs about the existence of dangers of which Plaintiffs could not reasonably be expected to be aware in light of their reasonable reliance upon [the Cardinals], . . . to exercise reasonable care so as not to unnecessarily expose Plaintiffs to conditions which it knew or should have known ultimately results in the development of neurodegenerative diseases," and "to correct any material misinformation which it knew or should have known was given to Plaintiffs during their employment."  (*Id.* ¶¶ 27, 34.) The Cardinals Plaintiffs allege that as a result of these failures, they were "exposed to multiple concussive and sub-concussive blows to the head which subsequently caused or contributed to cause an increased risk of developing neurodegenerative diseases and which ultimately resulted in the development of neurodegeneration."  (*Id.* ¶¶ 4, 9.)

The Cardinals Plaintiffs filed their First Amended Petition in the Circuit Court of the City of St. Louis on January 10, 2014.  (*See* First Am. Pet., *Smith* v. *Cardinals*, ECF No. 1-4 pp. 31–48.)  That petition contended that the Cardinals Plaintiffs suffered head trauma in the fall of 1987 and identified the relevant period of their injuries and claims as "[b]etween September 1,

1987 and March 28, 1993," during which time the Cardinals Plaintiffs were employed as professional football players with the Cardinals.  (*Id.* ¶ 13.)

On March 13, 2014, the Cardinals removed the action to the United States District Court for the Eastern District of Missouri on the ground that the claims were preempted by Section 301 of the LMRA.  On May 14, 2014, however, the Honorable Catherine D. Perry remanded the action, finding that the Cardinals Plaintiffs' claims alleged a violation of duties arising under Missouri state law—namely, the duty of care an employer owes to an employee. *See Green*, 21 F. Supp. 3d at 1028.

Back in state court, the Cardinals moved to dismiss Plaintiffs' claims on multiple grounds, including the applicable statutes of limitation, on July 3, 2014.  Though the Cardinals Plaintiffs represent to this Court that they amended the First Amended Petition "[r]ather than fil[ing] an opposition to the motion [to dismiss]," (Cardinals Pls.' Mot. at 4 n.16, ECF No. 7963), they in fact *did* file an opposition to the Cardinals' motion to dismiss on June 9, 2015. (*See* Notice of Removal Ex. A at 110, *Smith* v. *Cardinals*, 15-cv-01903 (E.D. Mo.), ECF No. 1-4.)  That opposition tried to defeat the Cardinals' statute-of-limitations argument by relying on authority that had been abrogated by the Missouri Supreme Court.  (*See* Def.'s Reply Mem. in Support of Mot. to Dismiss at 3–4, *Smith* v. *Cardinals*, 15-cv-01903 (E.D. Mo.), ECF No. 31.) After the Cardinals pointed out on reply that this authority was no longer good law (and that Plaintiffs' arguments were otherwise meritless), the Cardinals Plaintiffs abruptly sought an opportunity to amend their First Amended Petition, just one day before the scheduled hearing on the motion to dismiss.[8]

---

[8]    The Cardinals' consent to that amendment had nothing to do with Judge Perry's remand order, as Plaintiffs wrongfully suggest.  (Cardinals Pls.' Mot. at 4.)

14

Plaintiffs then waited a month and a half before filing their Second Amended Petition on December 10, 2015, which contained substantial changes that, among other things, vastly expanded the relevant period of the Cardinals Plaintiffs' claims and injuries all the way "to the present," and therefore covered *decades of time when no employer-employee relationship existed*.  (*See* Second Am. Pet. ¶¶ 34, 46, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72; Ex. 13 (computer-generated redline comparison showing more than 200 additions and 300 deletions in Second Amended Petition).)   Unlike the allegations in the First Amended Petition, based on which Judge Perry found a potential employer-employee relationship under state law, *Green*, 21 F. Supp. 3d at 1028, the Cardinals Plaintiffs' new claims reach decades beyond that relationship and therefore can only arise, if at all, out of the terms of a CBA.   In addition, the Second Amended Petition adds new allegations about specific people associated with the Cardinals, including team medical staff, who supposedly misrepresented to Plaintiffs the risks of repetitive head trauma.  (*See* Second Am. Pet. ¶¶ 37, 46, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72.)   Those allegations put directly at issue CBA provisions governing medical staff-player interactions.

On December 21, 2015, the Cardinals again removed the action to federal court. (*See* Notice of Removal, *Smith* v. *Cardinals*, No. 15-cv-01903 (E.D. Mo.), ECF No. 1.)   The Cardinals reiterated their earlier arguments, emphasizing that remand was improper because, as established by the Eighth Circuit in *Gore*, the rights asserted by the Cardinals Plaintiffs were "*not* nonnegotiable, independent state-law rights."   (*See id.* ¶ 15 (emphasis added) (quoting *Gore*, 210 F.3d at 949–50).)   The Cardinals also noted that the claims in the Second Amended Petition differ from those in the First Amended Petition in several material respects: (1) the Second Amended Petition covers *decades* of time when no employer-employee relationship

existed (meaning that to the extent the Cardinals owed a duty to the Cardinals Plaintiffs during that newly pled period, it *must* have arisen out of the CBAs rather than state law); (2) in contrast to the First Amended Petition, which was based on purported claims for a period during which no CBA was in effect, the Second Amended Petition spans more than two decades when a CBA was in effect, and (3) the Second Amended Petition attributes alleged misconduct to the Cardinals' owner and "team physicians and medical staff."  (*See id.* ¶¶ 16–17.)[9]

The Cardinals Plaintiffs once again moved to remand, making many of the same arguments as before but also asserting, as they do here, that the case must be remanded under the "law of the case doctrine."  (*See* Mot. to Remand at v, *Smith* v. *Cardinals*, No. 15-cv-01903 (E.D. Mo.), ECF No. 17.)  While that motion was pending, however, the JPML transferred the Cardinals Action to this Court.  (*See* Transfer Order, *Smith* v. *Cardinals*, No. 15-cv-01903 (E.D. Mo.), ECF No. 38.)  Following transfer, the Cardinals Plaintiffs filed a new motion to remand (ECF No. 6799), and then, as with the Chiefs Actions, the Cardinals Plaintiffs filed the instant motion to remand (ECF No. 7963) pursuant to the Court's orders coordinating briefing of various motions in the MDL.  (ECF Nos. 7477, 8030.)

## ARGUMENT

### I.
### THIS CASE IS PROPERLY IN FEDERAL COURT BECAUSE SECTION 301 OF THE LMRA COMPLETELY PREEMPTS PLAINTIFFS' CLAIMS

Section 301 of the LMRA governs "[s]uits for violation of contracts between an employer and a labor organization[.]"  29 U.S.C. § 185(a). The Supreme Court has interpreted this statute to "mandate[] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable consistent resolution of

---

[9]    As the Cardinals argued in their previous motion to dismiss the Cardinals' Plaintiffs' claims, filed in Missouri federal court—and as they intend to argue again in their anticipated motion to dismiss before this Court—the Cardinals Plaintiffs' amendments fail to cure their statute-of-limitations issue; their claims remain time-barred.

labor-management disputes." *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 & 404 n.3 (1988); *see Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. at 210–11 (allowing CBA terms to be given "different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements").

Accordingly, Section 301 preempts all state law claims, the resolution of which is "substantially dependent" upon or "inextricably intertwined" with an interpretation of the terms of a collective bargaining agreement, or that arise under a collective bargaining agreement. 29 U.S.C. § 185(a) (codifying section 301(a)); *Allis-Chalmers Corp.*, 471 U.S. at 213, 220; *Beidleman* v. *Stroh Brewery Co.*, 182 F.3d 225, 231–32 (3d Cir. 1999); *Antol* v. *Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996).  It makes no difference that the claim is pled as a tort because a plaintiff is "precluded from evading the pre-emptive force of § 301 by casting her claim as a state-law tort action." *Int'l Bhd. of Elec. Workers* v. *Hechler*, 481 U.S. 851, 862 (1987).  If the resolution of *any one* of Plaintiffs' claims substantially depends upon an interpretation of the terms of (or a claim arises under) the CBAs, federal subject matter jurisdiction exists, and removal was proper.  *See, e.g., Duerson*, 2012 WL 1658353, at *6.

Moreover, as long as at least one federal claim—of at least one plaintiff—is present, this Court can exercise supplemental jurisdiction over any remaining claims pursuant to 28 U.S.C. § 1367.  *See Pryzbowski* v. *U.S. Healthcare, Inc.*, 245 F.3d 266, 275 (3d Cir. 2001) (holding that the district court had the authority to exercise supplemental jurisdiction over claims against pendent parties because "[section 1367(a)] authorizes a district court to exercise supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *Williams* v. *Chrysler Corp.*, 163 F.3d 183, 185 (3d Cir. 1998)

17

("The district court had federal question jurisdiction over [plaintiff's] claims under . . . section 301 of LMRA . . . [and] supplemental jurisdiction over the state contract claims under 28 U.S.C. § 1367."); *see also Duerson*, 2012 WL 1658353, at *6 ("Federal jurisdiction thus exists over [Duerson's negligence] claim, and the court can exercise supplemental jurisdiction over the rest of Duerson's claims.").

In an attempt to evade these basic principles, Plaintiffs argue that under the "well-pleaded complaint rule," a federal question must be present on the face of the complaint to confer a basis for removal. (Chiefs Pls.' Mot. at 4, ECF No. 7966; Cardinals Pls. Mot. at 8–9, ECF No. 7963.) Plaintiffs also argue that their claims are not preempted because they have not explicitly alleged breaches of duties contained in the CBAs, and that the Cardinals and Chiefs are asserting preemption as a defense, which they allege is insufficient for federal question jurisdiction. (Chiefs Pls.' Mot. at 4–5; Cardinals Pls. Mot. at 8–9.)

Plaintiffs' arguments misrepresent the law and the Cardinals and Chiefs' basis for removal. Complete preemption under the LMRA is "an 'independent corollary' to the well-pleaded complaint rule . . . that [ ] 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc.* v. *Williams*, 482 U.S. 386, 393 (1987) (quoting *Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 22 (1983) and *Metro. Life Ins. Co*. v. *Taylor*, 481 U.S. 58, 65 (1987)). Section 301 of the LMRA has complete preemptive force. And under the "artful pleading" doctrine, the Court may "look beyond the plaintiff's allegations to the substance of the plaintiff's complaint because a plaintiff 'may not defeat removal by failing to plead necessary federal questions.'" *Cipriano* v. *Phila. Newspaper, Inc.*, No. 98-cv-4751, 1999 WL 135111, at

18

*3 (E.D. Pa. Mar. 12, 1999) (quoting *Meier v. Hamilton Standard Elec. Sys., Inc*., 748 F. Supp. 296, 299 (E.D. Pa. 1990) and citing *Franchise Tax Bd*., 463 U.S. at 22).

Here, consistent with a long line of cases holding that player tort claims against the NFL and/or its Clubs are preempted under Section 301, the resolution of Plaintiffs' claims substantially depends upon interpretation of provisions in the CBAs and their incorporated documents, or the claims arise out of the CBAs. Accordingly, Plaintiffs' claims are completely preempted.

**A.      Resolution of Plaintiffs' Negligence Claims
Substantially Depends Upon Interpretation of the Terms of the CBAs**

Plaintiffs' claims are completely preempted by Section 301 because their resolution is substantially dependent upon an interpretation of numerous health and safety provisions in the applicable NFL CBAs. Plaintiffs' negligence claims require Plaintiffs to establish that the Cardinals and Chiefs assumed, and then breached, a duty of care.[10] As other district courts have held with regard to player injury claims against NFL Member Clubs, many terms of the CBAs must necessarily be interpreted to determine whether the Cardinals and Chiefs in fact owed a duty to Plaintiffs, assess the scope of any such duty, and decide whether the Cardinals and Chiefs acted reasonably in discharging any such duty. *See*, *e.g.*, *Givens*, 684 F. Supp. 2d at 989–92; *Sherwin* v. *Indianapolis Colts, Inc*., 752 F. Supp. 1172, 1177–78 (N.D.N.Y. 1990); *Jeffers* v. *D'Alessandro*, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009).

Plaintiffs here allege that the Cardinals and Chiefs had a duty "to maintain a safe working environment," "to notify, inform and educate Plaintiffs and the public of any potential long-term risks of repetitive head trauma," "to warn [players] about the existence of dangers, including latent neurologic diseases, of which they could not reasonably be expected to be

---

[10]    *White* v. *United States*, No. 05-cv-101, 2007 WL 209916, at *2 (E.D. Mo. Jan. 24, 2007).

aware," and to exercise reasonable care so as not to expose Plaintiffs to unreasonable injury. (*E.g.*, Pet. ¶¶ 41, 46, *Kenney*, ECF No. 1-2; *see also* Second Am. Pet. ¶¶ 22, 27, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72.)  The CBAs, however, attribute to the Clubs responsibility for treating player injuries, determining recovery times, making return-to-play decisions, and warning players of the risks of continued performance.  The CBAs further require Clubs to provide medical and hospital care as deemed necessary by their physicians in the event that a player is injured.  (*See, e.g.,* Ex 4, 1993 CBA, Appx. C, Standard Player Contract ¶ 9.)  For instance, where a player's physical condition "could adversely affect the player's performance or health," the physician is required to advise the player.  (Ex. 3, 1982 CBA Art. XXXI § 1.)

Accordingly, the Court will need to determine the scope of the duties expressly placed on the Cardinals' and the Chiefs' physicians by the CBAs, which duties necessarily will inform the scope of the Cardinals' and Chiefs' duties and thus the reasonableness of their actions.  If Plaintiffs' alleged medical conditions were ones that "could be significantly aggravated by continued performance," the Court could find that the physicians had a duty to warn players before allowing them to play, thereby reducing or perhaps replacing such an alleged duty by the Clubs themselves.  (*See* Ex. 4, 1993 CBA Art. XLIV § 1.)

Similarly, before the fact finder could assess whether the Cardinals and Chiefs acted reasonably by allegedly "returning concussed players to the game" and/or giving them "ammonia inhalants, caffeine cocktails and/or Toradol" (*see, e.g.*, Pet. ¶¶ 20–21, *Kenney*, ECF No. 1-2), the Court first would need to interpret the scope of the duty imposed by the CBA provisions that "[a]ll determinations of recovery time for . . . injuries" are to be made "by the club's medical staff and in accordance with the club's medical standards."  (*See* Ex. 11, 1982 Supp. to the NFL Const. & Bylaws Art. XVII; and Ex. 12, 1984 NFL Const. & Bylaws Art.

XVII; *see also Maxwell*, No. 11-cv-08394, Order at 1–2 ("The CBA places primary responsibility for identifying . . . physical conditions on the team physicians . . . . The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players.").)  In sum, to resolve Plaintiffs' claims, the Court would need to consider whether the Clubs have duties, independent of their medical staff, to warn or advise players of the risks of continued play or of medical conditions, the relative scope of those duties vis-à-vis the duties of the medical staff, and whether failure by Club medical staff to warn players of risks of continued play or advise them of medical conditions should be imputed to the Clubs themselves.  All of these questions are "inextricably intertwined" with the CBA provisions assigning Club medical staff certain responsibilities regarding player health and safety.  *See Givens*, 684 F. Supp. 2d at 990–91 (holding that resolving question of Club's alleged failure to advise plaintiff of medical condition "would require consultation and interpretation of the terms of the CBA governing the relationship among the club, the player and the physician").

Another CBA provision that must be interpreted requires that a Member Club's head trainer be certified by the National Athletic Trainers Association ("NATA").  (*See* Ex. 3, 1982 CBA Art. XXXI § 2.)  If, as part of NATA certification, the Cardinals' and Chiefs' head trainers received instruction on the risks of repetitive head impacts, such instruction would impact the Club's knowledge of those risks and the reasonableness of their purported failure to warn players of those risks, and thus would shape the standard of care owed by Cardinals' and Chiefs' medical staff, or the Clubs themselves, to players.  *C.f., Maxwell*, No. 11-cv-08394, Order at 1–2 (finding that "CBA provisions relating to the teams' athletic trainers" would need to be taken into account in resolving plaintiff's concussion-related claims); *Stringer* v. *Nat'l*

*Football League*, 474 F. Supp. 2d 894, 910 (S.D. Ohio 2007) ("If, by virtue of the certification process, the trainers are fully prepared to handle heat-related illnesses, the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished.").

In addition, regarding Plaintiffs' allegation that the Cardinals and Chiefs had a duty to "make [the] work environment reasonably safe" (*e.g.*, Pet. ¶ 45, *Kenney*, ECF No. 1-2; *see also* Second Am. Pet. ¶ 27, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72) by, for example, not installing AstroTurf (Pet. ¶¶ 22–24, *Kenney*, ECF No. 1-2), and that the Cardinals and Chiefs had a duty to warn employees about the existence of dangers of which the employees could not reasonably be expected to be aware (*id*. ¶ 46), the CBAs establish the "Joint Committee on Player Safety and Welfare," comprised of three Club representatives and three player union representatives, for the purpose of discussing "any subject related to player safety and welfare." (*See* Ex. 4, 1993 CBA Art. XIII; *see also* Ex. 3, 1982 CBA Art. XI; Ex. 2, 1977 CBA Art. XI.) The CBAs also provide NFL players with certain rights relating to health and safety issues. (*See, e.g.*, Ex. 3, 1982 CBA Art. XXXI § 3 ("A player will have the opportunity to obtain a second medical opinion" at the Club's expense); *id.* Art. XXXI § 4 (discussing a player's "right to choose the surgeon who will perform surgery"); *id.* Art. XXXII § 2 (discussing a player's right to examine his medical and trainers' records).) Thus, to the extent that the players, or their union, have certain rights and/or duties, the scope of the Cardinals' and Chiefs' duties may be reduced, either because such duties were negotiated or, even if not, because the CBAs inform the reasonable expectations of the player-employees, such as any duty on the part of the Cardinals and Chiefs "to warn employees about the existence of dangers . . . *of which they could not reasonably be expected to be aware*." (*E.g.*, Pet. ¶ 46, *Kenney*, ECF No. 1-2 (emphasis added); *see also* Second Am. Pet. ¶ 27, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72.)

Finally, the resolution of certain Plaintiffs' claims would substantially depend upon an interpretation of the terms of the CBAs in effect subsequent to their retirement from professional football.   The Cardinals Plaintiffs, for example, allege that "from 1985 *to the present*," the Cardinals purportedly "failed to disclose and/or misrepresented the risks of repetitive head trauma, yet the Cardinals Plaintiffs allege that they were employed by the Cardinals only until 1987.[11]   (Second Am. Pet. ¶¶ 1, 6, 37, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72 (emphasis added).)   Plaintiffs in *Kenney* similarly bring claims for fraudulent concealment for the period of 1994 through the present day.   (*See* Pet. ¶¶ 98–107, *Kenney*, ECF No. 1-2.)   In other words, these Plaintiffs contend that the Cardinals and Chiefs owed them a duty of disclosure not only *during* their employment, but also for decades *after* their employment ended.   There is a stark difference between the scope of a common-law duty that may exist between an employer and employee and the existence of a duty between an employer and a *former* employee.   It is only through the CBAs that post-employment duties between the Cardinals and Chiefs and their former players could even conceivably exist.   *See, e.g.*, *Carman* v. *Wieland*, 406 S.W.3d 70, 76–77 (Mo. Ct. App. 2013) (listing employer's non-delegable duties, which do not extend after end of employment).   Plaintiffs cite no authority suggesting that an employer's obligations continue after the employer-employee relationship has ended.   Therefore, the CBAs in place during and after Plaintiffs' employment must be interpreted to determine whether the Cardinals and Chiefs in fact owed a post-employment duty to Plaintiffs; to assess the scope of any such duty; and to decide whether the Cardinals and Chiefs acted reasonably in discharging any such duty.   For example, Plaintiffs' post-employment negligent misrepresentation claims require interpretation of CBAs to determine whether the post-

---

[11]   In fact, while the Cardinals Plaintiffs were employed by the *St. Louis* Cardinals only until 1987, one of the Cardinals Plaintiffs, John Thomas ("J.T.") Smith, continued to be employed by the Phoenix Cardinals, later renamed the Arizona Cardinals, until 1990.

employment duties alleged arose from or require interpretation of provisions governing retired player benefits. (*See, e.g.*, Ex. 9, 2011 NFL CBA Art. 65 § 1 ("[T]he Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have permanent, neuro-cognitive impairment . . . ."); *id.* at Art. 59, § 2 (describing post-career medical and dental benefits); Ex. 8, 2006 NFL CBA Art. XLVIII-D (establishing plan to provide medical benefits to eligible former players)); *see also Atwater* v. *Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1185 n.18 (11th Cir. 2010) (noting that CBAs provide "a number of benefits" to "former players" including "post-career medical and dental insurance").

In short, "the degree of care owed cannot be considered in a vacuum." *Stringer*, 474 F. Supp. 2d at 910; *see also Maxwell*, No. 11-cv-08394, Order at 2; *Duerson*, 2012 WL 1658353, at *4. As stated above, a long line of NFL-related preemption cases have held that resolution of player injury claims substantially depends upon interpretation of CBA terms addressing player health and safety. These cases confirm that Plaintiffs' claims are preempted here. For example, the court in *Givens* held that a player's tort claim against another Member Club, the Tennessee Titans—premised on the club's alleged failure to notify the plaintiff of a medical condition—was preempted and dismissed because "whether a physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA." 684 F. Supp. 2d at 990–91; *see Sherwin*, 752 F. Supp. at 1177–78 (former player's claim against Member Club—that Club withheld information about his injuries and negligently failed to provide appropriate medical care—was preempted because resolution of the claim was substantially dependent upon interpretation of CBA provisions regarding medical care); *Jeffers*, 681 S.E.2d at 412 (former player claim against

Member Club—that team physician performed unauthorized procedures during knee surgery—
was preempted because resolution of the claim was substantially dependent upon an analysis of
CBA provisions setting forth Club's and player's rights and duties in connection with medical
care); *see also Atwater*, 626 F.3d at 1182 (former players' negligence and negligent
misrepresentation claims preempted because court "would . . . have to consult the CBA to
determine the scope of the legal relationship between Plaintiffs and the NFL and their
expectations based upon that relationship"); *Williams*, 582 F.3d at 881 (negligence claim against
the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a
warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be
determined without examining the parties' legal relationship and expectations as established by
the CBA and the Policy"); *Smith* v. *Houston Oilers*, 87 F.3d 717, 719–21 (5th Cir. 1996)
(players' claims for coercion, duress, extortion, and assault and battery preempted); *Ballard* v.
*Nat'l Football League Players Ass'n*, 123 F. Supp. 3d 1161, 1170 (E.D. Mo. 2015) (negligent
misrepresentation claim preempted because the question of players' justifiable reliance on
NFLPA's statements about the risks of head impacts is dependent upon an interpretation of the
CBAs); *Duerson*, 2012 WL 1658353, at *4 (concussion-related negligence claim preempted
because of need to interpret CBA provisions regarding health and safety); *Maxwell*, No. 11-cv-
08394, Order at 1–2 (concussion-related tort claims preempted because of need to interpret
"physician provisions" of CBA); *Stringer*, 474 F. Supp. 2d at 909–11 (wrongful death claim
concerning alleged negligence regarding care of players suffering from heat-related illness
preempted); *Holmes v. Nat'l Football League*, 939 F. Supp. 517, 527–28 (N.D. Tex. 1996)
(player's claims for fraudulent inducement, intentional infliction of emotional distress, breach of

implied covenant of good faith and fair dealing, and invasion of privacy preempted).  So, too, here.

**B.      Resolution of Plaintiffs' Negligent Misrepresentation
and Fraudulent Concealment/Misrepresentation Claims
<u>Substantially Depends Upon Interpretation of the Terms of the CBAs</u>**

Plaintiffs' claims for negligent misrepresentation and fraudulent concealment/misrepresentation also are preempted for the same reasons.  A duty to disclose is an essential element of a fraudulent concealment or negligent misrepresentation claim.  *Ballard*, 123 F. Supp. 3d at 1170; *Premier Bank* v. *Tierney*, 114 F. Supp. 2d 877, 886 (W.D. Mo. 2000).  Such fraud-based claims also require a showing of justifiable reliance.  *See, e.g.*, *Williams*, 582 F.3d at 881–82, 881 n.14; *Hess* v. *Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007) (en banc).  Because resolution of both elements would substantially depend upon an interpretation of the CBA provisions discussed above, these claims, too, are preempted.

First, because these claims, like Plaintiffs' claims for negligence, are founded on an alleged duty to warn or disclose (*see, e.g.*, Pet. ¶¶ 53, 65, 99, *Kenney*, ECF No. 1-2; Second Am. Pet. ¶¶ 34, 36-37, 46, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72), the analysis above also applies equally to these claims.  *See Atwater*, 626 F.3d at 1182–83 (11th Cir. 2010) (negligent misrepresentation claim preempted because interpretation of CBA was necessary to determine scope of any duty to provide information).  *See supra* Section I.A.

Second, Plaintiffs' negligent misrepresentation and fraudulent concealment/ misrepresentation claims require a showing of justifiable reliance.  *See, e.g.*, *Williams*, 582 F.3d at 881–82; *Hess*, 220 S.W.3d at 765.  In adjudicating these claims and assessing whether one party's reliance is justifiable, courts consider the relationship of the parties.  *See Mounger Constr., LLC* v. *Fiber Vision Cable Servs., LLC*, No. 11-cv-00081, 2012 WL 3201925, at *4–5 (E.D. Mo. Aug. 3, 2012).  Thus, a court cannot determine whether Plaintiffs had a right to rely

on information allegedly concealed by the Cardinals and Chiefs without interpreting the CBAs' health and safety provisions and the relationships delineated between the parties therein, including specifically the relationship among the Clubs, their physicians, and the players and their representatives.  *See, e.g.*, *Williams*, 582 F.3d at 881 ("The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation) are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy."); *Ballard*, 123 F. Supp. 3d at 1169–70 (holding that negligent misrepresentation claim was preempted because the question of players' justifiable reliance on NFLPA's statements about the risks of head impacts is dependent upon an interpretation of the CBAs).

   For example, the CBAs provide that where a player's physical condition "could adversely affect the player's performance or health," the physician is also required to advise the player.  (*See, e.g.*, Ex. 3, 1982 CBA Art. XXXI § 1.)  A court could reasonably determine that Plaintiffs' purported reliance on the Cardinals and Chiefs to provide warnings about the risks of repetitive head trauma was not reasonable if the parties to the CBA had determined that the appropriate method for informing players was through the physician.  In addition, a court's analysis of Plaintiffs' "right to rely" requires the interpretation of the CBA provisions that provide players with rights to medical care and access to player safety and welfare information, beyond that provided by the Member Club.  *See, e.g.*, *Williams*, 582 F.3d at 881.  (*See* Ex. 3, 1982 CBA Art. XXXI § 3 (providing player "opportunity to obtain a second medical opinion" at Club expense); *see also* Ex. 2, 1977 CBA Art. XI; Ex. 3, 1982 CBA Art. XI (establishing Joint Committee on Player Safety and Welfare); Ex. 3, 1982 Art. XXXII § 2 (discussing a player's right to examine his medical and trainers' records); Ex. 4, 1993 CBA Art. XLV § 2 (same).)

Plaintiffs also allege in part that, following Plaintiffs' retirement from professional football, the Cardinals and Chiefs purportedly concealed risks to which Plaintiffs "had been exposed on the playing field[,] delay[ing] the Plaintiffs' ability . . . to seek appropriate treatment for their latent neurodegenerative conditions." (*See, e.g.*, Pet. ¶ 103, *Kenney*, ECF No. 1-2.)   As discussed above, *see supra* Section I.A, resolution of these allegations would substantially depend on an interpretation of the terms of CBAs in effect following Plaintiffs' retirement from professional football.   Where, as here, the union and employer negotiated benefits for retirees, retirees can pursue claims related to those benefits in accordance with the applicable grievance procedures set forth in the CBAs.   Correspondingly, such claims are preempted if "the court will be required to interpret or apply the CBA to resolve the retirees' claims."   *Atwater*, 626 F.3d at 1185.

That is precisely the case here because Plaintiffs' claims hinge on a duty to disclose, and the assessment of any such duty on the part of the Cardinals and Chiefs would require an interpretation of the CBAs' numerous post-retirement benefits provisions, which were collectively bargained.   These benefits cover a wide range of subjects, including medical care and compensation for such medical care for eligible retirees, including, for example, in the case of dementia.   *See, e.g.*, Ex. 8, 2006 CBA Art. XLVIII-D § 1 ("The parties agree to . . . establish a . . . plan . . . to provide medical benefits to former Players who are . . . determined . . . to have 'dementia.'"); *see also* Ex. 4, 1993 CBA Art. XLVII § 4(C), Art. LI.   These provisions place responsibility on the players themselves for seeking medical care during retirement.   To resolve Plaintiffs' claims, a court first must interpret these provisions to determine whether the Cardinals and Chiefs had any duty to disclose, and, if so, the scope of that duty, and whether, as Plaintiffs allege, they "in fact did reasonably rely" on information provided by the Cardinals and Chiefs

after Plaintiffs' professional football careers.  (*See e.g.*, Pet. ¶ 104, *Kenney*, ECF No. 1-2; *see also* Second Am. Pet ¶ 48, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72.)  *See Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim was preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language," which placed responsibility for player finances on players themselves); *Sherwin*, 752 F. Supp. at 1178 (fraud claim against Club preempted because "the court cannot resolve plaintiff's fraud and negligent misrepresentation claims without reference to" provisions of the CBA establishing "the duty of a club physician, and arguably the club," to inform a player of adverse physical conditions).

In sum, Plaintiffs' negligent misrepresentation and fraudulent concealment/ misrepresentation claims depend on an interpretation of the CBAs' terms.

## C.   Plaintiffs' Claims Arise Under the CBAs

Plaintiffs' claims also are preempted by Section 301 because they are premised on rights and obligations that arise out of the CBAs.  *See Allis-Chalmers*, 471 U.S. at 213; *Williams*, 582 F.3d at 874.  As stated above, the CBAs define the *negotiated* relationship among the Member Clubs (including the Chiefs and the Cardinals), the NFL, and the players, and establish the duties of various parties, including the Member Clubs and their medical staff, to provide medical care to players and investigate player safety.  (*See* Ex. 2, 1977 CBA Art. II § 1; Ex. 3, 1982 CBA Art. II § 1; Ex. 4, 1993 CBA Art. III § 1; *see supra* Section I.A.)  The Court must interpret the CBAs because they are the agreements between each Member Club and its player-employees regarding how that Member Club will execute aspects of workplace safety.  *See Gore*, 210 F.3d at 949–50.  Thus, the particular duty pled by Plaintiffs—the Cardinals' and Chiefs' alleged failure to warn players of the "devastating nature and long-term effects of concussive and sub-concussive injuries" from "repetitive head trauma" (*See, e.g.*, Pet. ¶ 43, *Kenney*, ECF No. 1-

2; *see also* Second Am. Pet. ¶ 23, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72)—arises under the CBAs.  *See Sherwin*, 752 F. Supp. at 1178 (former player claim against NFL Member Club and its doctors for failure to provide adequate medical care and withholding of information regarding injury preempted because the claim "arose out of" the CBA); *see also Givens*, 684 F. Supp. 2d at 991.  Moreover, provisions requiring that the Clubs pay the costs of certain medical care for their players and requiring that the Club's physician perform a pre-season and, in some cases, a post-season, physical examination could be "plausibly interpret[ed] . . . to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," a duty that arises from the CBAs.  *See Duerson*, 2012 WL 1658353, at *4.  (*See also* Ex. 3, 1982 CBA Art. XXXI §§ 1–5.)

Moreover, as noted above, *see supra* Background Section C, the Cardinals Plaintiffs allege that the Cardinals' owner and certain members of its medical team owed Plaintiffs a duty to disclose risks from 1985 *to the present day*, yet those Plaintiffs were employed by the Cardinals only until 1987.[12]  (Second Am. Pet. ¶¶ 1, 6, 37, 46, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72.)  Similarly, the plaintiffs in *Kenney* bring claims for fraudulent concealment for a period from 1994 to the present, even though they allege that they were employed by the Chiefs only until 1988.  (Pet. ¶¶ 1, 4, 98–107, *Kenney*, ECF No. 1-2.)  As discussed above, such post-employment claims lack any basis in Missouri common law and therefore necessarily arise, if at all, out of the terms of the CBAs in effect during and after Plaintiffs' employment.  *See supra* Section I.A.  Federal law preempts these claims.

*          *          *

---

[12]   As noted above, while the Cardinals Plaintiffs were employed by the *St. Louis* Cardinals only until 1987, one of the Cardinals Plaintiffs, John Thomas ("J.T.") Smith, continued to be employed by the Phoenix Cardinals, later renamed the Arizona Cardinals, until 1990.

In sum, Plaintiff's claims substantially depend upon an interpretation of the terms of, or arise under, the CBAs, and are thus preempted.[13]  To the extent, however, that any claim is not preempted, it "form[s] part of the same case or controversy."  28 U.S.C. § 1367(a).  This Court thus has jurisdiction over all parties and claims.

## II.
## PLAINTIFFS' ARGUMENTS TO THE CONTRARY ARE WITHOUT MERIT

Ignoring the settled law that establishes that Plaintiffs' claims are preempted by Section 301, Plaintiffs instead rely on a number of arguments that lack merit.

### A.     The *Green* Remand Decision Is Wrong and Inapplicable

Recognizing that established Eighth Circuit law—specifically, that federal appellate court's decision in *Gore*—rejects their arguments for remand, Plaintiffs (in particular, the Cardinals Plaintiffs) simply avoid *Gore entirely* and instead rely on the remand decision in *Green*, 21 F. Supp. 3d 1020.  (*See* Chiefs Pls.' Mot. at 20–21; Cardinals Pls.' Mot. at 7–34.)  But as the Cardinals and Chiefs have previously demonstrated, *Green*—referred to by this Court as "an outlier"—was wrongly decided and conflicts with *Gore*.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 392 n.46 (E.D. Pa. 2015), *amended* No. 12-MD-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd* 821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016), *cert. denied* 137 S. Ct. 591 (2016), and *cert. denied* 137 S. Ct. 607 (2016).

To that end, Plaintiff, citing *Green* and other cases, argue that their claims are not preempted because they are "based on . . . independent, non-negotiable [Missouri] state law

---

[13]     As noted by Plaintiffs, their loss of consortium claims are derivative of the underlying claims, and thus rise or fall based on those underlying claims.  (*See* Chiefs Pls.' Mot. at 26; Cardinals Pls.' Mot. at 30.)  Given that, for the reasons stated above, Plaintiffs' other claims are preempted, so too are their claims for loss of consortium.

rights and obligations which the Supreme Court excepted from § 301 preemption." (Chiefs Pls.'
Mot. at 18, 21–26; Cardinals Pls.' Mot at 22, 24–29.)

Plaintiffs are wrong.  First, Missouri common law does *not* hold that an
employer's common law duties to its employees are "non-negotiable" with the employees.  To
the contrary, in *Gore*, the Eighth Circuit stated that, under Missouri law, "[e]mployers and
employees are free to negotiate what actions an employer may take to preserve the safety and
security of the workplace and the safety of other employees."  210 F.3d at 950.  Gore, a union
member whose employment was subject to a CBA, sued Trans World Airlines ("TWA")
purporting to assert Missouri common law claims, including claims for negligence.  *Id*. at 947–
48.  After TWA removed the action to federal court on the ground of complete preemption under
the Railway Labor Act (which has a "virtually identical" complete preemption analysis to
Section 301 of the LMRA, *Negron* v. *Oxford Airport Tech. Servs.*, No. 08-cv-4326, 2009 WL
50158, at *4 n.4 (E.D. Pa. Jan. 7, 2009)), Gore moved to remand, asserting that his state-law
claims existed independent of the CBA and were not preempted.  *Id*. at 949.  The district court
disagreed, holding "that [plaintiff's] state-law claims [we]re preempted because they [we]re
inextricably intertwined with a consideration or interpretation of the collective bargaining
agreement."  *Id*.

On appeal, the Eighth Circuit affirmed dismissal of the case on preemption
grounds.  *Id*. at 947.  After reviewing Missouri law, the court held "that the rights asserted in
Gore's tort suit are *not* nonnegotiable, independent state-law rights," *id*. at 949 (emphasis added),
and that because "[e]mployers and employees are free to negotiate what actions an employer
may take to preserve the safety and security of the workplace and the safety of other employees,"
Gore's claim "necessarily require[d] an interpretation of the collective bargaining agreement to

determine whether the defendants acted contrary to their duties under the agreement." *Id.* at 949–50. "While state law ha[d] created these tort actions, the collective bargaining agreement [wa]s the defining source of the duties specifically owed by the defendants for each claim asserted." *Id.* at 949. The Eighth Circuit explained that even though "Gore's complaint avoids mention of the collective bargaining agreement," he could not "establish liability on his tort claims without demonstrating that the defendants' actions were wrongful under a proper interpretation of the relevant rights and duties bargained for in the collective bargaining agreement" because his cause of action clearly arose in the course and scope of his employment with TWA, which was governed by a CBA. *Id.* at 950, 952.

The same is true of Plaintiffs' claims here. As discussed above, in order to resolve Plaintiffs' claims, the Court will need to interpret the various CBA provisions that set forth and define certain duties regarding workplace safety, warning players of the existence of dangers of continued play, and other player health and safety-related issues, to consider the scope of the Cardinals' and Chiefs' duties (if any), whether they acted reasonably, and whether Plaintiffs justifiably relied on any alleged misstatements or omissions.

Second, even if—contrary to the direct holding of the Eighth Circuit—the asserted Missouri common law duties were not negotiable, that would not end the analysis. In that event, this Court still would need to interpret the CBA provisions discussed in detail above in order to determine the reasonableness of the Cardinals' and Chiefs' actions as part of the analysis of the standard of care that their conduct must meet. *See Lingle*, 486 U.S. at 407 n.7 ("It is conceivable that a State could create a remedy that, although nonnegotiable, nonetheless turned on the interpretation of a collective-bargaining agreement for its application" and "[s]uch a remedy would be pre-empted by § 301."); *Duerson*, 2012 WL 1658353, at *4 (even if plaintiff

33

"can establish the existence of the NFL's duty to keep NFL players reasonably safe without reference to the CBAs, . . . the necessity of interpreting the CBAs to determine the standard of care still leads to preemption"); *see also Atchley* v. *Heritage Cable Vision Assocs.*, 101 F.3d 495, 499–500 (7th Cir. 1996) (finding Section 301 preemption despite state statute that conferred non-negotiable state-law rights on employers and/or employees); *Reece* v. *Houston Lighting & Power Co.*, 79 F.3d 485, 487–88 (5th Cir. 1996) (same).

Third, the holding of *Green* was erroneous.  Although the *Green* Court accurately and approvingly cited *Gore* for the proposition that Missouri employees may "enter[] a CBA that include[s] contractual provisions . . . requiring the [employer] to protect the safety of its employees," thereby preempting claims premised on a duty to "maintain a safe working environment" and conferring federal jurisdiction, in deciding to remand *Green*, the court erroneously conflated the claims of one plaintiff who never played under a CBA with the two plaintiffs who did.  *Green*, 21 F. Supp. 3d at 1027; *see also Gore*, 210 F.3d at 950.  Thus, the court found that because the duties applicable to the plaintiff who never played under a CBA arise out of the common law, it "stands to reason" that "the duties owed [to the two plaintiffs who played under CBAs] and the standards applied to their claims derive from the same source"—the common law.  *Green*, 21 F. Supp. 3d at 1028–29.  This finding ignores the very holding of the Eighth Circuit in *Gore* that—regardless of otherwise existing Missouri common law duties of employers to employees regarding workplace safety—where the employees worked pursuant to negotiated CBAs that set forth workplace health and safety related duties, the resolution of those employee plaintiffs' claims substantially depends upon an interpretation of those provisions regarding the source and scope of the duties owed by the employer (here, the Cardinals and Chiefs).

Finally, the Cardinals Plaintiffs are incorrect that the *Green* remand ruling is law of the case vis-à-vis the Cardinals.   That ruling concerned the Cardinals Plaintiffs' First Amended Petition, which did not allege post-employment wrongdoing.   Plaintiffs' voluntary decision to add decades' worth of post-employment claims in their Second Amended Petition significantly changed their case.

Where, as here, plaintiffs file an amended complaint that includes new and different factual allegations, a second removal is eminently appropriate.   *See, e.g.*, *Brown* v. *Jevic*, 575 F.3d 322, 328 (3d Cir. 2009) ("If subsequent pleadings or conduct by the parties or various other circumstances brings a case that was not previously removable within the removal jurisdiction of the federal courts, a second notice of removal is permissible." (quoting 14C Wright & Miller, *Federal Practice and Procedure* § 3739, (3d ed. 2008))); *see also Johnson* v. *Heublein Inc.*, 227 F.3d 236, 239–40 (5th Cir. 2000) (noting that district court allowed removal where plaintiff's amended complaint stated an entirely new cause of action different from that stated by the original complaint).

The law of the case doctrine thus has no bearing on the Court's decision of whether to remand this case.   As stated in a case cited by Plaintiffs, that doctrine comes into play only where "nothing of significance has changed since the prior removal," and thus removal is improper.   *Hughes* v. *Mylan Inc.*, Nos. 11-cv-5543-60, 11-cv-5617, 2011 WL 5075133, at *6 (E.D. Pa. Oct. 25, 2011) (recognizing that a "successive removal petition following remand is permissible . . . if subsequent pleadings . . . bring[] a once unremovable case within the grasp of the removal jurisdiction of the federal courts.").   Contrary to the Cardinals Plaintiffs' statement that the Second Amended Petition contains the "very same claims" as those alleged in the First Amended Petition (Cardinals Pls.' Mot. at 4), the Cardinals Plaintiffs voluntarily made numerous

significant changes between their First and Second Amended Petitions that substantively affect the case, vastly expanding the scope of their claims and rendering the law of the case doctrine inapplicable.  *See id.*; *Johnson*, 227 F.3d at 239–40; *Adams* v. *Am. Family Mut. Ins. Co.*, 981 F. Supp. 2d 837, 842 (S.D. Iowa 2013) (removing case where plaintiffs' amended petition added class claims subject to CAFA).  (*See supra* Background Section C; *see also* Ex. 13 (computer-generated redline).)

## B.    Plaintiffs' Other Authority Is Inapposite

Plaintiffs' other authority is no more persuasive than *Green*.  Those cases do not so much as reference—much less apply or interpret—*Missouri* law concerning the fundamental issue of the duties of an employer, and none bars preemption here.[14]

First, Plaintiffs invoke dicta from *Kline* v. *Security Guards, Inc.*, 386 F.3d 246, 257 (3d Cir. 2004), and fault the Cardinals and Chiefs for failing to identify a "substantial dispute over the meaning" of a CBA provision.  (Chiefs Pls.' Mot. at 10; Cardinals Pls.' Mot. at 21.)  But *Kline* held that claims stemming from an employer's allegedly unreasonable electronic surveillance were not preempted because defendants there had failed to point to a specific CBA provision requiring interpretation.  That holding is not surprising and hardly assists Plaintiffs.  It will be the rare CBA that addresses a subject as far removed from the terms and conditions of employment as surreptitious electronic surveillance.  Perhaps a CBA involving unionized spies

---

[14]    In addition to the cases discussed in this Section, Plaintiffs also cite *Anderson* v. *Ford Motor Co.*, 803 F.2d 953, 959 (8th Cir. 1986), and three cases from outside the Third and Eighth Circuits, in support of their assertion that Section 301 does not preempt their negligent misrepresentation and fraudulent concealment/misrepresentation claims.  (*See* Chiefs Pls.' Mot. at 25–26; Cardinals Pls.' Mot. at 29.)  None of the cited cases, however—like the other cases discussed in this Section—purport to apply or interpret Missouri law, and all of them pre-date *Gore*.  Moreover, federal courts analyzing putative Missouri common-law claims for negligent misrepresentation or fraud have repeatedly found such claims to be preempted by Section 301.  *See Ballard*, 123 F. Supp. 3d at 1170 (holding Missouri negligent misrepresentation claim based on alleged misrepresentations regarding the risks of traumatic head impacts preempted by Section 301); *Smith* v. *Nat'l Football League Players Ass'n*, No. 14-cv-01559, 2014 WL 6776306, at *8 (E.D. Mo. Dec. 2, 2014) (same); *Carter* v. *Ford Motor Co.*, 121 F.3d 1146, 1149 (8th Cir. 1997) (affirming district court's holding that Missouri state law claims including fraudulent/negligent misrepresentation were preempted by Section 301).

might touch on such a subject, but not the CBA in *Kline.*  Workplace safety, by contrast, is a common subject for CBAs, especially in an industry like professional football where the players face safety issues that are integrally related to the basic conditions of employment, not to mention the basic rules of the game.  Thus, while the CBA in *Kline* "ma[de] no mention of the use of video cameras, microphones, or other surveillance of any kind," 386 F.3d at 256, here, by contrast, the CBAs expressly address the duties at issue in this case, and will need to be interpreted in order to resolve Plaintiffs' claims.

Second, Plaintiffs rely on two non-binding remand decisions from this district concerning *Pennsylvania* law on the duties of an employer—*Stellar* v. *Allied Signal, Inc.*, 98 F. Supp. 3d 790 (E.D. Pa. 2015), and *McNeal* v. *ArcelorMittal USA, Inc.*, 143 F. Supp. 3d 241 (E.D. Pa. 2015)[15]—but neither case addresses the key issue here (and in *Gore*): whether common law duties of employers *pursuant to Missouri law* are negotiable, such that determining the scope of an employer's duties thus requires interpretation of a CBA.  Moreover, these decisions concede that "[w]hen an independent common law duty exists, a court *may still find* Section 301 preemption if the collective-bargaining agreement modifies that duty in any way."  *McNeal*, 143 F. Supp. 3d at 250 (emphasis added) (citing *Stellar*, 98 F. Supp. 3d at 801 ("Defendant has not pointed to any portion of the CBAs that somehow modifies—either by enlarging, diminishing or even refining—the duty imposed by the common law.")).  As discussed above, numerous CBA provisions modify and define the Cardinals' and Chiefs' duties alleged in these cases.  Moreover, the court in *Stellar* acknowledged that Section 301 can preempt a plaintiff's common law claims where plaintiff has "explicitly waived his common law right to assert a negligence cause of action against his employer" or agreed to submit such claims to arbitration.  *See Stellar*, 98

---

[15]   Plaintiffs also cite a third decision, *McNeal* v. *Arcelormittal USA, Inc.*, No. 15-cv-03517, 2015 WL 9489590 (E.D. Pa. Dec. 29, 2015), in which the court merely denied a motion to reconsider its earlier ruling.

F. Supp. 3d at 801.  Here, Plaintiffs have done precisely that.  Since 1970, the CBAs have provided that "injury grievances" are subject to arbitration; since 1977, the CBAs have provided that disputes involving "any provision" in the CBAs "pertaining to terms and conditions of employment of NFL players" will be resolved exclusively in accordance with agreed-to arbitration procedures; and since 1993, the CBAs have expressly forbidden players from bringing "any suit against . . . the NFL or any Club with respect to any claim relating to any conduct permitted by [the CBAs] . . . or any term of [the CBAs]" or "the Constitution and Bylaws of the NFL."  *See supra* Background Section A.3.

Finally, Plaintiffs rely on two non-binding decisions from outside this circuit. First, Plaintiffs cite *McKnight* v. *Dresser, Inc.*, 676 F.3d 426 (5th Cir. 2012), in arguing that their claims are based on "wholly independent" state law rights.   But *McKnight* is entirely distinguishable from this case.  Most notably, the court in *McKnight* remanded the case because it found that the defendant there owed plaintiffs "*non-negotiable*, independent duties under Louisiana tort law."  *Id.* at 434.  As discussed at length above, *see supra* Section II.A, the Eighth Circuit has explicitly held that the duties at issue here *are negotiable*—a critical distinction Plaintiffs fail to address.  Moreover, whereas plaintiffs in *McKnight* had not waived their state law claims, a key fact the court took note of, *see McKnight*, 676 F.3d at 432, here, as noted above, Plaintiffs have indeed waived numerous state law claims and agreed to proceed exclusively through arbitration.  Finally, while the court in *McKnight* based its decision in part on the fact that Louisiana law provides, separate and apart from the CBA, an objective standard by which to evaluate the defendant's conduct, *see McKnight*, 676 F.3d at 432–33, Plaintiffs here have cited no authority providing an equivalent objective standard under Missouri law.  This action is more like *Espinoza* v. *Cargill Meat Sols. Corp.*, 622 F.3d 432 (5th Cir. 2010), a case

cited extensively in *McKnight*, in which the court held that it would need to interpret CBA provisions related to workplace safety to determine the scope of the employer's duty in resolving a negligence claim, regardless of whether the duty arose from state law or a contract. *Id.* at 444. Given the similarity of the claims and necessary analysis of CBA provisions, *Espinoza* is on point and supports the Cardinals and Chiefs' argument that resolution of Plaintiffs' claims is inextricably intertwined with various CBA provisions.

Second, Plaintiffs rely on *Hendy* v. *Losse*, 925 F.2d 1470 (9th Cir. 1991), an unreported case with no precedential value. *See Dent* v. *Nat'l Football League*, No. 14-cv-02324, 2014 WL 7205048, at *8 (N.D. Cal. Dec. 17, 2014) ("*Hendy* . . . may not be considered, since it is a pre-2007 decision . . . .   Counsel should not have cited it."). In any event, unlike here, *Hendy* arose out of purported tortious conduct that was unrelated to plaintiff's status as an NFL player. The court held that plaintiff's negligent hiring claim against the NFL Member Club was not preempted because the claim "does not depend in any way on [Hendy's] status [as a football player]. The identical claim could be asserted by anyone [the team physician] treated in connection with his employment." *Hendy*, 925 F.2d 1470, 1991 WL 17230, at *2. Here, by contrast, Plaintiffs' status as football players is central to Plaintiffs' claims.

**C.      Plaintiffs Also Misstate the Relevant Legal Standard for Preemption**

In a misguided attempt to avoid removal, Plaintiffs attack, one by one, the CBA provisions cited by the Cardinals and Chiefs, arguing that each has "no bearing on Plaintiffs' claims" because Plaintiffs are not suing the Cardinals and Chiefs for failure to meet the requirements of each particular provision. (*See* Chiefs Pls.' Mot. at 26–29; Cardinals Pls.' Mot. at 30–32.) That argument misses the mark. Preemption does not require that Plaintiffs allege direct violations of specific CBA provisions. Rather, all that is required is that the resolution of Plaintiffs' claims is substantially dependent upon or inextricably intertwined with an

interpretation of the terms of, or that their claims arise out of, the CBAs as a whole.  That is precisely the case here, for the reasons explained above.

**D.      Plaintiffs' Actions Are Removable Irrespective of 28 U.S.C. 1445(c)**

    Plaintiffs next ask the Court to remand this action by claiming that this Court's jurisdiction is precluded by 28 U.S.C. § 1445(c) (stating that a state court civil action arising under workmen's compensation laws may not be removed to federal court).  (Chiefs Pls.' Mot. at 30–31; Cardinals Pls.' Mot. at 34–35.)  But federal courts have concluded that Section 1445(c) does *not* apply where removal is based on complete preemption, namely, where the claims are in fact federal in nature.  *See, e.g.*, *Humphrey* v. *Sequentia, Inc.*, 58 F.3d 1238, 1246 n.11 (8th Cir. 1995) (concluding "as a matter of Congressional intent, that § 1445(c) would *not* apply to a claim which is completely preempted by federal law and only facially arises under a state's workers' compensation laws" (emphasis added)); *see also Meisinger* v. *Specialty Risk Servs.*, 10-cv-0866, 2010 WL 8354692, at *3 (W.D. Mo. Nov. 19, 2010) (quoting *Humphrey*'s holding that § 1445(c) applies to civil actions arising under a state's workers' compensation laws "*subject only to the complete preemption doctrine*" (emphasis added)); *Radcliff* v. *El Paso Corp.*, 377 F. Supp. 2d 558, 565–67 (S.D.W. Va. 2005) (because state law claims were completely preempted by ERISA, § 1445(c) did not apply); *see also Suder* v. *Blue Circle, Inc.*, 116 F.3d 1351, 1352 (10th Cir. 1997) (quoting *Humphrey*'s holding regarding inapplicability of § 1445(c) to civil actions where removal is based on complete preemption (emphasis added)).  Accordingly, removal of this action is not barred by Section 1445(c), as the claims are completely preempted by Section 301.

    In any event, Plaintiffs have expressly disavowed the application of workers' compensation laws to their common-law tort claims.  (*See* Chiefs Pls.' Mot. at 12 n.6 (arguing that Missouri's workers' compensation law does not provide the exclusive remedy for

occupational diseases, and that Plaintiffs are permitted to seek common-law remedies instead); Cardinals Pls.' Mot at 15 n.24 (same); Second Am. Pet. ¶ 15, *Smith* v. *Cardinals*, ECF No. 1-7 pp. 58–72; Pet. ¶ 11, *Kenney*, ECF No. 1-2.)   Plaintiffs cannot, for the sole purpose of this Court's Section 1445(c) analysis, simply relabel their tort claims as workers' compensation claims.   *See Spearman* v. *Exxon Coal USA, Inc.*, 16 F.3d 722, 725 (7th Cir. 1994) ("That workers' compensation law is a premise of the tort does not mean that the tort 'arises under' the workers' compensation laws . . . ."); *Care v. Reading Hosp. & Med. Ctr.*, No. 03-cv-04121, 2004 WL 728532, at *11 (E.D. Pa. Mar. 31, 2004) ("Plaintiffs' claims for negligent supervision do not 'arise under' the Pennsylvania Workmen's Compensation Act. Rather, they are negligence claims (which may be precluded by the exclusivity provisions of the Workmen's Compensation Act.)").

**E.**   **Plaintiffs' Claims Are Not Limited to a Specific Gap Period**

Although they do not explicitly argue as such in the instant motions, the Chiefs Plaintiffs purported, in their petitions, to artificially limit many of their claims to the "gap" period from September 1, 1987 to March 28, 1993 when no CBA was in effect.  (*See, e.g.*, First Am. Pet. ¶¶ 45, 78–79, 85–86, 88, 94–99, *Lewis*, ECF No. 1-1.)   It is unclear to what extent Plaintiffs are asserting that argument at this stage—indeed, Plaintiffs in *Kenney* and *Smith* v. *Cardinals* explicitly bring claims concerning a period extending to *present day* and therefore cannot—but, in any event, it lacks merit.

The vast majority of the Chiefs Plaintiffs allege that they were employed by the Chiefs *outside* the gap period, *i.e.* during a time when a CBA was in effect, yet purport to limit their claims to the gap period.  (*See* First Am. Pet. ¶¶ 1, 4, 7, 10, 16, 19, 25, 28, 31, 37, *Lewis*, ECF No. 1-1; Pet. ¶¶ 1, 4, 7, 10, 13, 22, *Smith* v. *Chiefs*, ECF No. 1-2; Pet. ¶¶ 1, 4, *Kenney*, ECF No. 1-2.)   There is no practical explanation for limiting the time period of these Plaintiffs' claims

41

to a small subset of their time in the NFL, other than an improper effort to deprive this Court of proper federal jurisdiction through "artful pleading."  As Chief Judge James F. Holderman of the United States District Court for the Northern District of Illinois held in refusing to allow an NFL football player to plead around the CBA provisions in this way:

> [I]t is not possible for [the player] successfully to limit the time period to which his complaint refers.  To prove the complaint's claims, [the player] must show that the CTE from which [he] suffered was caused by repeated blows to the head during his time as an NFL player.  When making that showing, *it would be exceedingly implausible* to contend that the CTE was caused only by trauma suffered from 1987 through early 1993, and not by trauma from 1983 to 1986 or later in 1993.  Any attempt to exclude head trauma suffered on certain dates from the claim would thus likely fail.  Accordingly, the CBAs were in effect during at least some of the events alleged in the complaint.

*See Duerson*, 2012 WL 1658353 at *3 (emphasis added).

Here, as in *Duerson*, "it [is] exceedingly implausible" to contend that Plaintiffs' claims for latent brain injuries can be adjudicated by artificially limiting the Court's inquiry to a six-year period when no CBA was in effect.  Indeed, Plaintiffs concede that their claimed latent brain injuries are caused by "repetitive head trauma," not a singular "accident."  (*See, e.g.*, First Am. Pet. ¶¶ 46, 57, 64, 74, *Lewis*, No. ECF No. 1-1.)  Indeed, in one of the more egregious examples of cherry-picking, Plaintiff Art Still alleges to have played for the Chiefs for *ten years* (including nine seasons when the 1977 and 1982 CBAs were in effect) but implausibly alleges that his purported brain injuries were caused only during the short *four-month* period when no CBA was in effect.  (*Id.* ¶¶ 4–5.)

The pleadings that some of the Plaintiffs in this case have filed in *other* cases—alleging injuries arising throughout their entire careers—demonstrates the disingenuous and artificial way they have limited their claims here to try to eliminate federal jurisdiction.  (*See, e.g.*, Am. Compl. ¶ 198, *Boyd v. Nat'l Football League*, 12-cv-00092 (E.D. Pa. Apr. 11, 2012), ECF No. 8 (alleging that Plaintiff Art Still "suffered *repeated and chronic* head impacts during

his career in the NFL" that caused cognitive impairments (emphasis added)); Compl. ¶¶ 185–87, *Baker v. Nat'l Football League*, 12-cv-02540 (N.D. Ga. July 23, 2012), ECF No. 1 (alleging that "[*t*]*hroughout his career as a professional football player*, Plaintiff Albert Lewis suffered multiple concussive hits and blows to the head" that caused brain injuries (emphasis added)).) These pleadings make clear that the petitions in this case were intentionally drafted to ignore relevant facts in an effort to avoid federal jurisdiction.   As in *Duerson*, such artificially narrowed allegations are "exceedingly implausible," as alleged latent injuries arising out of repetitive blows to the head cannot possibly be segmented, and necessarily require consideration of the Chiefs' conduct throughout the duration of Plaintiffs employment in order to adjudicate their claims, including the reasonableness of the Chiefs' alleged failure to warn of the risks of head trauma.

Moreover, Plaintiffs allege that the Chiefs' "knowledge about the hazards of repetitive head trauma" "accumulated" from the 1970s to the 1990s, yet they failed to warn Plaintiffs of those risks (First Am. Pet. ¶ 74, *Lewis*, ECF No. 1-1; Pet. ¶ 57, *Smith* v. *Chiefs*, ECF No. 1-2; Pet. ¶ 43, *Kenney*, ECF No. 1-2), and so the reasonableness of the Chiefs' alleged knowledge, duty to obtain such knowledge, and actions (or inactions) requires consideration of the obligations imposed, if any, under the 1977, 1982, and 1993 CBAs in effect when various Plaintiffs played for the Chiefs.   Certain Plaintiffs also allege that they played for the Chiefs during years in which the 1993 CBA was in effect.   (First Am. Pet. ¶¶ 10, 16, 37, *Lewis*, ECF No. 1-1.)   Thus, the Court must interpret the health and safety provisions of the 1993 CBA.   For example, a provision of that CBA requires Member Club physicians to inform players of medical conditions that could be "significantly aggravated" by returning to play.   *See supra* Background Section A.1.   Because Plaintiffs allege injuries resulting from "repetitive head trauma" (*see, e.g.*,

First Am. Pet. ¶¶ 57, 64, 74, *Lewis*, ECF No. 1-1) and the Chiefs' "regularly returning concussed players to play" (*id.* ¶ 52), resolution of their claims depends on an interpretation of the provision regarding aggravation of medical conditions by returning to play to determine whether and to what extent it imposed on the Chiefs a duty to warn players of any risks associated with returning to play after repetitive head trauma.

In short, because the 1977, 1982 and 1993 CBAs were in effect during portions of the years that the vast majority of Plaintiffs played for the Chiefs, the Court's determination of the scope of any duty of the Chiefs to Plaintiffs, and the reasonableness of the Chiefs' actions, requires interpretation of the CBA terms.

**III.**
**THE CARDINALS PLAINTIFFS ARE NOT**
**ENTITLED TO COSTS OR ATTORNEYS' FEES**

The Cardinals Plaintiffs are not entitled to an award of costs or attorneys' fees because the Cardinals have more than an "objectively reasonable basis for seeking removal." *See Martin* v. *Franklin Capital Corp.*, 546 U.S. 132, 132 (2005) ("Absent unusual circumstances, attorney's fees should not be awarded under 28 U.S.C. § 1447(c) when the removing party has an objectively reasonable basis for removal."); *DiPilato* v. *Commonwealth Ass'n of Sch. Adm'rs, Local 502*, 588 F. Supp. 2d 631, 635 (E.D. Pa. 2008) (Brody, J.) (denying request for attorneys' fees under section 1447(c), noting that "[l]itigation involving labor organizations involves a complicated area of law").  As explained in Sections I and II above, removal was entirely proper here.

By removing within thirty days of receiving the Cardinals Plaintiffs' Second Amended Petition, which added decades' worth of allegations that either arise under CBAs or can be evaluated only by interpreting applicable CBAs, the Cardinals have complied with the removal statute, which makes clear that "a notice of removal may be filed within thirty days after

44

receipt by the defendant . . . of a copy of an amended pleading" that makes the case removable. 28 U.S.C. § 1446(b)(3).   Case law confirms that changed circumstances like this justify a successive removal.   *See, e.g.*, *Johnson*, 227 F.3d at 239-40; *O'Bryan* v. *Chandler*, 496 F.2d 403, 411 (10th Cir. 1974); *Adams*, 981 F. Supp. 2d at 842.   And even if the appropriateness of removal were a "close call," costs and attorneys' fees would not be appropriate.   *See, e.g.*, *Laber* v. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, No. 15-cv-55, 2015 WL 5085774, at *9 (N.D. Ohio Aug. 27, 2015) (no fees where "§ 301 preemption remains a close call").   The Cardinals Plaintiffs have failed to substantiate their demand for costs and attorneys' fees, and so the Court should deny that request.

## CONCLUSION

For the foregoing reasons, the Cardinals and Chiefs respectfully submit that Plaintiffs' motions to remand should be denied.

Dated: September 25, 2017

Respectfully submitted,

_____/s/ Brad S. Karp_____

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Email: bkarp@paulweiss.com

*Attorneys for Defendants Kansas City Chiefs*
*Football Club, Inc. and Arizona Cardinals Football*
*Club, LLC*

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing Kansas City Chiefs Football Club, Inc. and Arizona Cardinals Football Club, LLC's Joint Opposition to Plaintiffs' Motions to Remand, the Declaration of Dennis L. Curran, and the associated exhibits were served electronically via the Court's electronic filing system on the 25th day of September, 2017, upon all counsel of record.


Dated:  September 25, 2017                    _____/s/ Brad S. Karp_____
                                                            Brad S. Karp