# Exhibit 5-B

Article XXIV, Section 7 (c) Veteran, Rookie Incentives

## ENTERING PLAYER POOL INCENTIVES

*Team Leaders

a) If the incentive is written for leading the Club in any official League statistical category [assuming it is on Exhibit A or B], 0% will be counted.

b) If the incentive is written for any ranking other than first on the Club in any official League statistical category, 100% will be counted.

*Side Letter 4/27/93: Sec. 7

c) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, the following percentages shall be counted:

| | |
|---|---|
| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33% |
| ROUNDS 6 - 8 | 10% |
| ALL OTHERS | 0% |

*Side Letter 6/30/93: Sec. 16

* Each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a 1st-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

*Side Letter 4/27/93: Sec. 8

The following shall count at 100%:
* Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance).

*Side Letter 4/27/93: Sec. 9

* Incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.).

*Side Letter 4/27/93: Sec. 10

*Any relocation or completion bonus.

*Side Letter 4/27/93: Sec. 11

**115**

*Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards.
*Side Letter 4/27/93: Sec. 12

* Any guaranteed salary or bonus.
*Side Letter 4/27/93: Sec. 13

* Any pre-season or off-season statistics.
*Side Letter 4/27/93: Sec. 14

* Any incentive based upon another player's performance.
*Side Letter 4/27/93: Sec. 15

* Incentives based on leading the team in punting/kicking will be counted at 100%.
*Side Letter 6/30/93: Sec. 18

* If a rookie player has an incentive bonus for touchdowns, we will apply the rushing and receiving touchdowns likely to be earned rule and if a rookie non-kicker has a Total Points incentive, we will apply the total point likely to be earned levels for a rookie kicker to value the incentives.
*Side Letter 7/26/94

## *HONORS AND RECOGNIZED MEDIA

**VETERAN HONORS**
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP-NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

**VETERAN MEDIA**
ASSOCIATED PRESS
UNITED PRESS INTERNATIONAL
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
NEWSPAPER ENTERPRISE ASSOCIATION
FOOTBALL DIGEST

Article XXIV, Section 7 (c) Veteran, Rookie Incentives

USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

**ROOKIE HONORS (FIRST OR SECOND TEAM)**
### ROUNDS 1-2
| | |
|---|---|
| ALL ROOKIE | 100% |
| ALL NFL, PRO BOWL | 5% |
| ALL CONFERENCE | 10% |

### ALL OTHERS
| | |
|---|---|
| ALL-ROOKIE | 15% |
| ALL CONFERENCE | 5% |

### ALL
| | |
|---|---|
| ROOKIE OF YEAR — NFL OR CONF | 0% |
| ROOKIE OF YEAR — OFFENSE — NFL | 0% |
| ROOKIE OF YEAR — DEFENSE — NFL | 0% |

**ROOKIE MEDIA**
ASSOCIATED PRESS
UNITED PRESS INTERNATIONAL
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
NEWSPAPER ENTERPRISE ASSOCIATION
SPORTING NEWS
*Side Letter 9/25/95 & 4/27/93*

## ADDITIONAL INCENTIVE RULES FOR VETERANS, ROOKIES, INDIVIDUALS AND TEAMS

\* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be re-valued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.
*Side Letter 9/21/93: Sec. 1*

\* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be re-valued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a pre-existing contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.
*Side Letter 9/21/93: Sec. 2*

**117**

* *Other than as set forth in [the paragraph immediately following,] for purposes of the Salary Cap and Entering Player Pool, any incentive bonus to an offensive player that is based upon the defensive team's or special team's performance automatically will be deemed "likely to be earned." Conversely, any incentive bonus to a defensive player that is based upon the offensive team's or special team's performance automatically will be deemed "likely to be earned." Any incentive bonus based upon another player's performance automatically will be deemed "likely to be earned."*

*Side Letter 9/21/93: Sec. 3*

* *For purposes of the Salary Cap and Entering Player Pool, any incentive bonus in a contract signed by a Rookie that is based upon special team performance automatically will be deemed "likely to be earned", except for an incentive bonus to a Rookie kicker or Rookie punter that is based upon improvement in the performance of the kicking or punting team. Any incentive bonus to a player who is not a Rookie that is based upon special team performance automatically will be deemed "likely to be earned" unless the player played in at least 50% of his team's special team plays in the previous season.*

*Side Letter 9/21/93: Sec. 4*

* *For purposes of the Salary Cap and Entering Player Pool, any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by determining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.*

*Side Letter 9/21/93: Sec. 5*

* *Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to oth-*

Article XXIV, Section 7 (c) Veteran, Rookie Incentives

er teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 24th in the League in total offense will be deemed "likely to be earned" in a League consisting of 28 teams; similarly, an incentive bonus based on a team finishing 12th in its Conference will be deemed "likely to be earned" in a Conference consisting of 14 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

*Side Letter 9/21/93: Sec. 6


* Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

*Side Letter 9/21/93: Sec. 7


* In any Player Contract signed by a Rookie, if more than three different team performance categories are included as incentives, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contacts signed by Rookies selected in rounds one and two of the NFL draft, any team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override [Paragraph 9] of the parties' letter of agreement of April 27, 1993. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 9

Article XXIV, Section 7 (c) Veteran, Rookie Incentives

*In any Player Contract signed by a player other than a Rookie, if more than three different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned."  In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article X, Paragraph G.3.(a) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(c)(i) of the Collective Bargaining Agreement. The calculation of these playtime requirements shall exclude special teams plays.*

*Side Letter 9/21/93: Sec. 10

*Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted immediately towards the Salary Cap and Entering Player Pool when they are earned.*

*Side Letter 9/21/93: Sec. 12

*Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned."  In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned."  In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding [Paragraph 7] of the parties' letter agreement of April 27, 1993.*

*Side Letter 9/21/93: Sec. 13

120

Article XXIV, Section 7 (c) Veteran, Rookie Incentives

\* For purposes of the Salary Cap, any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except (1) as provided [two paragraphs] above [in regards to per play or per game occurrences,] (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid, (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately, or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

*Side Letter 9/21/93: Sec. 14*

\*Any incentive bonus which a player and a Club agreed to prior to the 1993 League Year that depends upon performance in any category not identified in Exhibit A or Exhibit B will be determined to be likely or unlikely to be earned based upon the player's and/or team's performance in such category during the League Year prior to the League Year in which the incentive may be earned. Any incentive bonus which a player and a Club agreed to in the 1993 League Year or thereafter that depends upon performance in any category not identified in Exhibit A or Exhibit B automatically will be deemed "Likely to be earned."

*Side Letter 5/24/95: Sec. 6*

\* Any incentive bonus which a player and a Club agree to in the 1994 League Year, or in any future League Year during the term of the CBA, that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

*Side Letter 5/24/95: Sec. 7*

\* Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Pre-season roster bonuses are automatically deemed "likely to be earned."

*Side Letter 5/24/95: Sec. 8*

121

\* *For purposes of the Salary Cap, any incentive bonus (or portion thereof) that is earned during the [Final Capped] Year, but which had not been deemed likely to be earned at 100 percent of its value during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the [Final Capped] Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the [Final Capped] Year, become impossible for the player to attain.*

*Side Letter 11/11/93: Sec. 1*

\* *To determine the value of an incentive clause for Salary Cap purposes, either under the specific circumstances set forth in the paragraph  above, or under the specific circumstances set forth in paragraph 14 of the letter from Jeffrey L. Kessler to Harold R. Henderson dated September 21, 1993, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus,  for example, if a Club had 1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.*

*Side Letter 11/11/93: Sec. 2*

\* *If more than eight different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories*

*shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X", shall be counted as three performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).*
*Side Letter 2/22/96: Sec. 2*

*\* [The above paragraph] does not supersede the terms of any other letter agreement between the parties that automatically deem certain performance incentives to be "likely to be earned" or " not likely to be earned" depending upon whether the incentive fulfills other specified criteria (e.g., Paragraphs 3-10 of the September 21, 1993 letter agreement).*
*Side Letter 2/22/96: Sec. 3*

*\* [The two preceding paragraphs do] not apply and the parties reserve their rights with respect to multi-year contracts containing team performance incentives.*
*Side Letter 2/22/96: Sec. 4*

(d)     **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)     In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the *Final Capped Year* will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, **if** payment of the player's entire Salary for the *Final Capped Year* is not fully guaranteed. For example, *without limitation on any other applicable example, if neither party exercises any right to cancel extension of this Agreement, and if the Salary Cap is in effect during the 2000 and 2001 League Years,* and the player enters a series of four one-year contracts which are not fully guaranteed for the *2000 and 2001* League Years, but are fully guaranteed for the *2002 and 2003* League Years, the full amount of the guaranteed Salary for the *2002 and 2003* League Years will be included in Team Salary for the *2000 and 2001* League Years in a proportion determined by the Team.
*\* Extension Agreement 6/6/96*

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year *beyond three years after the Final Capped Year* will be included in Team Salary during the League Year or Years

**123**

Article XXIV, Section 7 (d) (iii)

of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

*Extension Agreement 6/6/96*

(iii)    Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the Treasury Bill rate published in The Wall Street Journal of March 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Section 7(b)(ii)(1) above, shall apply.

(iv)    If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the *Final Capped Year* or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

*Extension Agreement 6/6/96*

> *For the purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Article XXIV, Section 7 (d) (i)-(iv).*
>
> *Side Letter 6/23/93: Sec. 2*

(e)    **Other Amounts.**

(i)    **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

> *For purposes of the Salary Cap and Entering Player Pool, in the event that a player and Club enter into a fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), the parties agree that such a fraudulent agreement would constitute an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of the Stipulation and Settlement Agreement, Ar-*

124

ticle X, Part G, Paragraph 5 (a), and the Collective Bargaining Agreement, Article XXIV, Section 7 (e) (i).
*Side Letter 11/11/93: Sec. 3

(ii)    **Salary Advances.** The full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

*For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to re-pay shall be treated as a Signing Bonus.
*Side Letter 6/23/94: Sec. 4

(iii)   **Non-Cash Provisions.** The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

* Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits.
*Side Letter 5/24/95: Sec. 5

* Expenses for travel, board and lodging for a player participating in an off-season workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.
*Side Letter 5/24/95: Sec. 1

* Except as set forth in the two preceding  paragraphs, in Issue No. 30, and in the letter aggreement between us dated August 4, 1993 regarding Rookie Orientation Camps, if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for non-football playing services, which continues to be subject to Article XXIV, Section 1(c)(ii) of the CBA.
*Side Letter 5/24/95: Sec. 4

125

*Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV of the CBA shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having an nine-week workout program in the 1994 League Year for sixty players to be paid at the minimum amount will include $108,000 in its Team Salary on the first day of such program ($50 per day x four workout days per week  x nine weeks  x  sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.*

*Side Letter 5/24/95: Sec. 3

*If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three or more seasons, the fair market value of such gifts up to $10,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. If such gifts have a value between $10,000 and $15,000, the parties reserve their rights with respect to the treatment of the excess fair market value above $10,000; in the absence of agreement between the parties on such treatment, the Impartial Arbitrator shall decide. If the player has been under contract with the Club in less than three seasons, the entire fair market value of any such gifts shall be counted as Salary.*

*Side Letter 4/16/96

(iv)   **Annuities.** The cost to the Team of any annuity provided to any player, computed at the Treasury Bill rate on March 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)   **Traded Contracts.** In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

> *\* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be re-valued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.*
>
> *\*Side Letter 9/21/93: Sec. 1*

> *\* A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.*
>
> *\*Side Letter 5/24/95: Sec. 11*

   (g)      **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

**Section 8.** **30% Rules:**

   (a)      No NFL Player Contract entered into in an Uncapped Year prior to the *Final* League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the Contract per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the contract.

   (b)      No NFL Player Contract entered into in a Capped Year and extending into the *Final* League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the *Final Capped* Year, per year, either in the *Final* League Year or in any subsequent League Year covered by the Player Contract. For example, *without limitation on any other applicable example, if neither party exercises any right to cancel extension of this Agreement, a four-year Player Contract signed in the 2001 League Year (assuming it is a Capped Year) may not provide for an annual increase of more than 30% of the 2001 League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.*

> *Extension Agreement 6/6/96*

> *\* Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the*

127

buy-out is exercised by the Club, and pro-rated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buy-out is based upon one or more incentives that are not "likely to be earned." Such a buy-out amount shall not be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA.

*Side Letter 10/21/96: Sec. 3(a)*

* The parties acknowledge that Class Counsel together with the NFLPA, and the NFL Management Council, disagree as to the treatment of allocated signing bonus and buy-out payments when a player's right to terminate one or more contract years and/or the Club's right to buy-out is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this paragraph [and the one preceding], the terms of [both these paragraphs] may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this paragraph.

*Side Letter 10/21/96: Sec. 3(b)*

* Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, pro-rated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA, pro-rated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Side Letter 10/21/96: Sec. 4*

128

**Section 9. Renegotiations and Extensions**: Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

(a)      The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(b)      No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(c)      No contract renegotiations may be done for a current season after the last regular season game of that season.

(d)      A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(f).

(e)      As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

> *\* No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.*
> *\*Side Letter 10/21/96: Sec. 6*

> *\* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be re-valued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a pre-existing contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.*
> *\*Side Letter 9/21/93: Sec. 2*

> *\* For purposes of the Salary Cap, any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The parties agree that, pursuant to the Collective Bargaining Agreement, the player shall always have the right to receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X, Para-*

**129**

*graph G.1.(b) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).*

*Side Letter 9/21/93: Sec. 17

\* *Any agreement to compensate a player at the minimum amount set forth in Article XXXV of the CBA for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.*

*Side Letter 5/24/95: Sec. 2

**Section 10.** **Accounting Procedures**:

(a)      **Special Purpose Letter and DGR Reporting.**

(i)      On or before the February 7 following the conclusion of each of the years hereunder, the parties will be provided with an "Initial Special Purpose Letter" by the NFL, gathered from independent Team auditors, preliminarily setting forth the Defined Gross Revenues and Excluded DGR of each NFL Team and the NFL for the League Year just concluded, for the purpose of determining the extent to which Required Tenders and Qualifying offers must be increased the next League Year.

(ii)      On or before the March 1 following the conclusion of each of the years hereunder, the parties will be provided with a "Final Special Purpose Letter," by an independent auditor certifying the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The independent auditor (hereinafter "the Accountants") shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The review procedures to be performed by the Accountants are set forth in Appendix H attached hereto. The Reporting Package to be used by the Teams in providing information to the Accountants ("DGR Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The engagement of the Auditor shall be deemed to be renewed annually unless the Auditor is discharged by either party during the period from the submission of the Final Special Purpose Letter up to July 1 of that year.

(iii)      The Accountants shall review the reasonableness of any estimates of revenues or expenses included in any Member Team's DGR Reports in the League Years covered by this Agreement and may make such

adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made in DGR for the following League Year.

(iv)      With respect to expenses deducted by the NFL or the Member Teams from television, cable and radio broadcast revenues or any other revenues, the NFL and the Member Teams shall report in the DGR Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i). All categories of expenses deducted from such revenues by the NFL or a Member Team in a DGR Report completed by the NFL or that Team shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(v)      As set forth in Appendix H attached hereto, the Accountants shall notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Member Teams or any other information contained in the DGR Reports submitted by the Member Teams; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other information contained in the DGR Reports submitted by the Member Teams.

(vi)      In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the DGR Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of subsection (iv), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(vii)      Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Member Teams are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Member Teams are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have

no application to Special Master Proceedings in which the Disputed Adjustments for all Member Teams adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(viii)   After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Teams to further verify the accuracy of the information in the Final Special Purpose Letter.

(b)   **Projected Defined Gross Revenues.**

(i)   For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4 and 5 above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") to be the Defined Gross Revenues for the immediately preceding League Year increased by 4% (or the previous year's increase, whichever is greater) for gate receipt revenues, and 6% (or the previous year's increase, whichever is greater) for other DGR except for League-wide television revenues; provided, however, that if on March 1 of the year, one or more League-wide television or local television and radio contracts are in effect for the next League Year in lieu of using the prior year's DGR for such source, the actual revenues expected from such source under such contract (plus in the 1994 and 1995 League Years, the additional amounts allocated from the 1993 League Year DGR pursuant to Section 1(a)(v) above) shall be used in the determination of Projected Defined Gross Revenues. If, after the initial calculation of Projected DGR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts (plus any adjustment pursuant to Section 1(a)(v) above) shall be substituted for the amount for League-wide television revenues previously included in Projected DGR, and the Salary Cap and Minimum Team Salary shall immediately be adjusted accordingly. In addition, if one or more new NFL Teams is (or are) scheduled to be added to the NFL during the next League Year as an expansion Team(s), Projected DGR will include an additional projection of DGR (excluding DGR from national, network or cable television contracts) equal to the average of the top twenty-one Teams from the prior League Year with the highest DGR. In addition, if, after the initial calculation of Projected DGR for a League Year, the number of scheduled regular season games per team is increased above the standard of sixteen (16), Projected DGR will include an additional projection of DGR to account for such additional games as agreed upon by the NFLPA and the Management Council.

(ii)   In the event that actual Defined Gross Revenues for any League Year are less than Projected Defined Gross Revenues (as calculated in accordance

with Section 10(b)(i) above) for that League Year, then the difference shall be deducted from Projected Defined Gross Revenues for the next League Year.

(iii)     In the event that actual Defined Gross Revenues for any League Year exceeded Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Defined Gross Revenues for the next League Year.

(iv)     Any adjustments pursuant to Section 10(a)(ii) above will be subtracted from or added to Projected DGR as appropriate.

(c)     **Projected Benefits**

(i)     For purposes of computing the Salary Cap and Minimum Team Salary to be applied in any upcoming League Year in accordance with Sections 4 and 5 above, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the upcoming League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)     In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

(iii)     In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

(iv)     In the event the NFLPA exercises its right to reduce or freeze certain Benefits pursuant to Article XLVI (Player Benefit Costs), Section 1, Projected Benefits shall be adjusted immediately to reflect such changes.

(v)     In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY
# CAP AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** At the time a Club and a player enter into any Player Contract, or any renegotiation, extension or amendment of a Player Contract, there shall be no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, between such player and any Club involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

**134**

***Section 5***. **Special Master Review**: In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute <u>de novo</u>, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

***Section 6***. **Sanctions**: In the event that the Special Master finds a violation of this Section 1 of this Article, the Commissioner shall be authorized to impose a fine of up to $2,000,000 payable to the NFL, upon any Club found to have committed such violation, and shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

***Section 7***. **Prior Conference**: Prior to the initiation of a proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

# ARTICLE XXVI
# SPECIAL MASTER

**Section 1. Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White v. NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

**Section 2. Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

(a)     The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

(b)     The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be <u>de</u> <u>novo</u>;

(c)     Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

(d)     Except for any matters for which the Court has <u>de</u> <u>novo</u> review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief

136

to effectuate and enforce this provision.

(e)    The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the

137

NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 6.** **Selection of Special Master**: In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

**Section 7.** **Penalties**: Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

# ARTICLE XXVII
# IMPARTIAL ARBITRATOR

*Section 1.* **Selection:** The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

*Section 2.* **Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

*Section 3.* **Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

*Section 4.* **Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

*Section 5.* **Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

*Section 6.* **Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

139

***Section 7.* Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

# ARTICLE XXVIII
# ANTI-COLLUSION

**Section 1.** **Prohibited Conduct**: No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

(a)      whether to negotiate or not to negotiate with any player;

(b)      whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(c)      whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

(d)      whether to exercise or not to exercise a Right of First Refusal; or

(e)      concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

> \* *[U]nder Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.*
>
> *\*Side Letter 5/6/93*

**Section 2.** **Other Club Conduct**: No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)      that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

(b)      that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

(c)      that the player has become a Restricted Free Agent or an Unre-

141

stricted Free Agent; or

    (d)    that the player is or has been subject to any Right of First Refusal.

**Section 3. Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures:** Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 5. Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the

**142**

player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

**Section 7. Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

**Section 8. Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)     To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject

to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; **and**

(b)      To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

**Section 9. Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)      Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)      Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)      Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $1,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $1,000,000.

**Section 10. Player Election**: A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during

the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

**Section 11. Payment of Damages**: In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

**Section 12. Effect on Cap Computations**: In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

**Section 13. Effect of Salary Cap**: In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

**Section 14. No Reimbursement**: Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

**Section 15. Costs**: In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

**Section 16. Termination**: The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)   Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one

NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)     Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)     In order to terminate this Agreement:

(i)     The proceeding must be brought by the NFLPA;

(ii)    The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)   The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17.** **Time Limits**: Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18.** **Prior Conference**: Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

# ARTICLE XXIX
# CERTIFICATIONS

*Section 1*. **Contract Certification:**

(a)      Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of a player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, and that there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving Salary or other consideration of any kind to be paid, furnished or made available to the player, or Player Affiliate, by the Club or Club Affiliate either during the term of the Player Contract or thereafter.

(b)      In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)      In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)      No contract will be approved by the Commissioner unless accompanied by the certifications required by subsections (a), (b) and (c) above.

*Section 2*. **End of League Year Certification:**

(a)      At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the NFL a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that player. Upon receipt of each such certification, the NFL shall forward a copy of the

**147**

Article XXIX, Section 2(b)

certification to the NFLPA.

(b)     Any failure to execute a certification as required under Section 2(a) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

***Section 3*. False Certification:** Any person who knowingly files a false certification required by Section 1(a) or 1(b) of this Article shall be subject to a fine of up to $250,000, upon a finding of such violation by the Special Master. The amount of such fine as to a Club or non-player Club employee shall be determined by the Commissioner.

# ARTICLE XXX
# CONSULTATION AND INFORMATION SHARING

**Section 1. Consultation and Communications:**

(a)     In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)     Subject to any claim of attorney-client and/or work product privilege, any communications under this section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

**Section 2. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected DGR, and a revised estimate on the first day of each month thereafter in any such year.

**Section 3. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

**Section 4. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

*Section 5*. **Copies**: Within five (5) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

*Section 6*. **Meetings**: During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

# ARTICLE XXXI
# EXPANSION

*Section 1*. **Veteran Allocation**: The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract.

*Section 2*. **Additional Compensatory Picks**: The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

*Section 3*. **Entering Player Pool Adjustment**: The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

*Section 4*. **Relocation Bonus**: Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $10,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $15,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

# ARTICLE XXXII
# OTHER PROVISIONS

**Section 1.** **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or post-season, whichever is applicable).

**Section 2.** **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

**Section 3.** **Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

**Section 4.** **Roster Exemption:**

(a)     **Certain Players Not Under Contract.** After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)     **Players Under Contract.** If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)     **Restricted Players.** Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 2, or Article XIX

(Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)     If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)     If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

> * *[A]ny player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) of the CBA, shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with subsections (i) through (iii) of Article XXXII, Section 4(c) of the CBA. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.*
>
> *\*Side Letter 1/18/94: Exempt List*

No player may be placed on roster exempt under this subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with (i) through (iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this subsection, the player shall not be entitled to compensation.

(d)     Except as provided in subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

# ARTICLE XXXIII
# SQUAD SIZE

*Section 1.* **Active List**: For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

*Section 2.* **Pre-Season**: The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

*Section 3.* **Inactive List**: Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit**: In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

154

# ARTICLE XXXIV
# PRACTICE SQUADS

**Section 1. Practice Squads:** For each regular season commencing with the 1993 League Year, the League may elect in accordance with this Article to establish practice squads not to exceed five (5) players per Club.

**Section 2. Signing With Other Clubs:** Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

**Section 3. Salary:** Minimum salary for a practice squad player shall be $3,300 per week *for the 1993-99 League Years, and $4,000 per week for the 2000-02 League Years*, including post-season weeks in which his Club is in the playoffs, provided however, that no player who was on a practice squad in the 1992 season shall be paid less than the minimum practice squad salary for that season.

*\*Extension Agreement 6/6/96*

**Section 4. Eligibility:** The practice squad shall consist of players who do not have an Accrued Season of NFL experience. No player may be a practice squad player for more than two seasons.

> \* *The following players are eligible to be signed to Practice Squads, provided that they have not served more than one previous season on a Practice Squad:*
>
> (1)  *free agent players who do not have an Accrued Season of NFL Experience; and*
>
> (2)  *free agent players who were on the Active/Inactive List for less than six regular season games during their only Accrued Season(s)*
>
> *A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and has been a member of a club's Practice Squad for at least one regular season or post-season game (a bye week counts as a game*

155

Article XXXIV, Section 4

*provided that the player is not terminated until after the regular season or post-season weekend in question).*

*If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the five-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks salary that he is entitled to receive from Club B.*

*Side Letter 8/18/97

# ARTICLE XXXV
# OFF-SEASON WORKOUTS

*Section 1.* **Voluntary Workouts:** No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be voluntary and take place in the manner and time period set forth in this Article.

*Section 2.* **Time Periods:** From the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than sixteen total weeks, and no more than four workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

*Section 3.* **Payment:** Beginning with the off-season following the 1993 NFL season, each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $50 during the 1994-95 League Years; $60 during the 1996-97 League Years; *$70 during the 1998-99 League Years; $80 during the 2000-01 League Years; and $90 during the 2002 League Year.*

*\*Extension Agreement 6/6/96*

*Section 4.* **Injuries:** Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

*Section 5.* **Miscellaneous:** No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. *All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.*

*\*Extension Agreement 6/6/96*

**Section 6. Pre-Training Camp Period**: *During the ten consecutive days imme-diately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (oth-er than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Sec-tion shall prohibit organized player activity in personal appearances or promo-tional activities on behalf of the Club or the League which have been agreed to by the player.*

*\*Extension Agreement 6/6/96*

**Section 7. Enforcement**: *The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Ap-pendix L), through an expedited non-injury grievance arbitration proceeding con-ducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Ar-ticle. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith inter-pretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L*

*\*Extension Agreement 6/6/96*

**158**

# ARTICLE XXXVI
# MINICAMPS

***Section 1*. Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

***Section 2*. Length:** No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

***Section 3*. Expenses:** Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

***Section 4*. Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

***Section 5*. Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

# ARTICLE XXXVII
# PRE-SEASON TRAINING CAMPS

**Section 1. Definition**: For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board**: All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem**: During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $500 per week in the 1993-94 League Years, $550 per week in the 1995 League Year, $600 per week in the 1996 League Year, $650 per week in the 1997 League Year, $675 per week in the 1998-99 League Years, *$700 per week in the 2000-01 League Years, and $725 per week in the 2002 League Year,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 6/6/96*

**Section 4. Veteran Per Diem**: During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $600 per week in the 1993-94 League Years, $700 per week in the 1995-96 League Years, $800 per week in the 1997-99 League Years, *and $900 per week in the 2000-02 League Years,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

*\*Extension Agreement 6/6/96*

**Section 5. Reporting**: No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games**: The NFL will use its best efforts to hold no more than four pre-season games beginning in the 1995 League Year.

**Section 7. Telephones**: Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

**Section 8. Expenses**: Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

# ARTICLE XXXVIII
# SALARIES

**Section 1.** **1993 Minimum Salaries:** For the 1993 League Year, the Salary of players not on a Club's Active/Inactive List (excluding Practice Squad players), and of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| Length of Service | Minimum Salary For Players Not on Club's Active/Inactive (Excluding Practice Squad) | For Players On Active/Inactive List |
|---|---|---|
| Less than One Credited Season | $60,000 | $100,000 |
| One Credited Season | $70,000 | $125,000 |
| Two or More Credited Seasons | $80,000 | $150,000 |

**Section 2.** **Minimum Salaries For League Years After 1993:** For the League Years after the 1993 League Year, the Minimum Salaries set forth in Section 1 above shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such Minimum Salaries increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

> *\* For the 1996 League Year, the Minimum Active/Inactive List Salary for players with five or more Credited Seasons (as defined in Article XXXVIII of the CBA), who have an allocated portion of signing bonus, reporting bonus, and roster bonus for that League Year of less than $25,000, shall be at least $250,000 plus a sum equal to $250,000 multiplied by the same percentage as the increase in Projected DGR for the 1996 League Year over DGR for the 1995 League Year (up to a maximum of ten percent (10%)). Thereafter, such Minimum Active/Inactive List Salary for such players shall increase each League Year by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR, up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. For all other players with five or*

*more Credited Seasons, the Minimum Active/Inactive List Salary shall be the same as for players with two or more Credited Seasons, except that any player who has received with respect to that League Year (i) Salary (not including performance incentives but including roster bonuses, reporting bonuses and the allocated portion of any signing bonus) less than (ii) the amount of the Minimum Active/Inactive List Salary set forth in the first two sentences of this paragraph (as appropriate) adjusted to reflect the number of weeks that the player was on the Club's Active or Inactive List, shall receive at the end of the League Year an additional payment from his Club(s) equal to the difference between (ii) and (i) (on a pro rata basis between or among the Clubs, if applicable).*

*Side Letter 11/1/95: Sec. 3

**Section 3. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 4. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 5. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 6. Payment:** Unless agreed upon otherwise between the Club and

the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 7. Deferred Paragraph 5**: A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 8. Number of Regular Season Games**: The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 9. Copies of Contracts**: In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement covering the 1993 and future League Years will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 10. Split Contracts**:
    (a)      After the point in the regular season at which a player who signed

Article XXXVIII, Section 11

his Player Contract prior to the 1993 League Year has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

(b)    After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent and during the 1993 League Year or thereafter has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 11*. **Funding of Deferred and Guaranteed Contracts**: The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury Bill rate as published in The Wall Street Journal on March 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

# ARTICLE XXXIX
# MEAL ALLOWANCE

**Section 1. Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and post-season as follows: 1993-94 League Years-Breakfast $12.00, Lunch $15.00, Dinner $33.00; 1995-96 League Years-Breakfast $13.00, Lunch $17.00, Dinner $35.00; 1997-1999 League Years-Breakfast $14.00, Lunch $19.00, Dinner $37.00; *2000-02 League Years-Breakfast $15.00, Lunch $21.00, Dinner $39.00.* For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*\*Extension Agreement 6/6/96*

**Section 2. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 P.M. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 A.M., players will receive breakfast money.

# ARTICLE XL
# DAYS OFF

*Section 1*. **Rate:** All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2*. **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

# ARTICLE XLI
## MOVING AND TRAVEL EXPENSES

**Section 1. Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

**168**

not exceed $4,000 during the 1993-95 League Years, $4,750 during the 1996-98 League Years, *and $5,000 during the 1999-2002 League Years;* and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*\*Extension Agreement 6/6/96*

**Section 4.** **Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System**: Beginning with the post-season following the 1993 regular season, a four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation**: A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 |
|---|---|---|---|---|---|---|---|---|---|---|
| Wild Card Game (Div. Winner) | $12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 |
| (Other) | 7.5 | 7.5 | 7.5 | 10 | 10 | 10 | 10 | 12.5 | 12.5 | 12.5 |
| Division Playoff Game | 12 | 12 | 13 | 14 | 15 | 15 | 16 | 16 | 17 | 17 |
| Conference Championship Game | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 |
| Super Bowl Game (Winning Team) | 38 | 42 | 42 | 48 | 48 | 53 | 58 | 58 | 63 | 63 |
| (Losing Team) | 23.5 | 26 | 27 | 29 | 30 | 32.5 | 33 | 34.5 | 34.5 | 35 |

*Extension Agreement 6/6/96

**Section 3. Wild Card Game; Division Play-off Game**: A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**
(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game.
(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or post-season) will receive one-half the amount designated in Section 2 for such game.
(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

**170**

(d)      A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and post-season) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)      A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)      A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)      A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/ Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5.** **Payment**: Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation**: Each player on the winning Team in the AFC-NFC Pro Bowl game will receive $20,000 and each player on the losing Team will receive $10,000. These amounts shall be increased to $25,000 and $12,500 respectively for the Pro Bowls following the 1997 through 1999 seasons *and to $30,000 and $15,000 respectively for the Pro Bowls following the 2000 through 2002 seasons.*

*\*Extension Agreement 6/6/96*

**Section 2. Selection**: Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives**: Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury**: In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment**: Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

172

# ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

*Section 1*. **Club Physician**: Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

*Section 2*. **Club Trainers**: All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

*Section 3*. **Players' Right to a Second Medical Opinion**: A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

*Section 4*. **Players' Right to a Surgeon of His Choice**: A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 5*. **Standard Minimum Pre-Season Physical**: Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6.* **Substance Abuse:**

    (a)    **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

    (b)    **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

    (c)    **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

# ARTICLE XLV
## ACCESS TO PERSONNEL AND
## MEDICAL RECORDS

*Section 1.* **Personnel Records**: Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records**: Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

# ARTICLE XLVI
# PLAYER BENEFIT COSTS

**Section 1.** **Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) post-season pay (although the NFLPA will have the unilateral right to direct that post-season pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action can not reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

**Section 2.** **Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3.** **Definition:** For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)     Pension funding, including the Bert Bell NFL Player Retirement Plan (as described in Article XLVII), the Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII), the National Football League Pre-59er Special Benefit Program, and the Second Career Savings Plan (as described in Article XLVIII);

(b)     Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)     Injury protection (as described in Article XII);

(d)     Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)     Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)     Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

**176**

(g)      Post-season pay (as described in Article XLII and Article XLIII);

(h)      Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year beginning with the 1993 League Year, which may not increase more than ten percent (10%) over the 1992 League Year); and

(i)      Severance pay (as described in Article L).

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell NFL Player Retirement Plan, the Pete Rozelle NFL Player Retirement Plan, and/or the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, and the Supplemental Disability Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to projected Player Benefit Costs for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)      The parties will submit in writing to the Benefit Arbitrator their respective calculations of projected Player Benefit Costs for the forthcoming year. Such submissions to the Benefits Arbitrator will be made by each party by March 15.

(b)      Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. Prior to such merger, the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan") and the Pete Rozelle NFL Player Retirement Plan (the "Pete Rozelle Plan") will each be continued and maintained in full force and effect. When used in other Articles in this Agreement, the terms "Bert Bell/Pete Rozelle Plan" and "Merged Plan" will also refer to each of the Bert Bell Plan and the Pete Rozelle Plan for the periods prior to such merger, as appropriate depending on the context in which such term is used. *The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.*

*\*Extension Agreement 6/6/96*

**Section 2. Additional Credited Seasons**: *For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan at the beginning of such Plan Year to provide a Benefit Credit of $320 for players who earn a Credited Season in that Plan Year.*

*\*Extension Agreement 6/6/96*

**Section 3. Contributions:** *For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.*

*\*Extension Agreement 6/6/96*

179

# ARTICLE XLVIII
## SECOND CAREER SAVINGS PLAN

**Section 1. Maintenance:** *The NFL Player Second Career Savings Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.*

*\*Extension Agreement 6/6/96*

**Section 2. Contributions:** For each of the Plan Years 1993 to 1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club, unless this figure is changed pursuant to this Agreement. *For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend the Savings Plan at the beginning of such Plan Year to require each NFL Club to contribute $250,000 to the Savings Plan for such Plan Year, unless this figure is changed pursuant to this Agreement. For each Plan Year that contributions to the Savings Plan are required to be made pursuant to this Agreement, contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.* Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*\*Extension Agreement 6/6/96*

# ARTICLE XLIX
# GROUP INSURANCE

*Section 1.* **Group Insurance Benefits**: Effective after the ratification of this Agreement, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)  Life Insurance: *For the 1993-99 League Years,* a rookie player will be entitled to $100,000 in coverage, and a veteran player's coverage will be increased by $20,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $200,000 in coverage. *For the 2000-02 League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.*

*\*Extension Agreement 6/6/96*

(b)  Medical: Subject to the deductible, 80% of the first $3,000, and 100% thereafter, of qualifying expenses (as defined in existing insurance contract provisions) for all players and their eligible dependents are covered. Each player is required to pay an annual deductible of $200 per individual, $400 per family per plan year, with a maximum out-of-pocket expense of $800 per year (including the deductible) for each covered individual. The maximum lifetime benefits paid on behalf of a covered individual will be $1 million.

(c)  Dental: Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)  Preventive care paid at 100% of UCR,

(2)  General services paid at 85% of UCR, and

(3)  Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum annual benefit payable is $2,000 per covered individual.

(d)  *Insurance Benefits for Vested Players: Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance coverage under this until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.*

**Section 2. Extended Post-Career Medical And Dental Insurance:** The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during the period from January 1, 1996 through May 1, 1996 will continue to receive the benefits described in Subsections 1(b) and 1(c) above until the first regular season game of the 1997 season.

(b)     Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1996 season, or at any time thereafter prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above for twenty-four (24) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.

(c)     All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described in Subsections 2(a) and 2(b) above are provided, as if such additional benefits had not been provided.

**Section 3.  Limitations And Rules For Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)     The benefits described in Subsections 2(a) and 2(b) above will terminate immediately upon the expiration or termination of this Agreement for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)     The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

(c)     The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

(d)     The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to: (i) in the 1998 League Year, the costs for such benefits up to $250,000 multiplied by the number of Clubs in the League that League Year; and (ii) in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4. Financing For Extended Insurance:**

(a)     The cost for the benefits described in Subsection 2(a) above will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

**182**

(b)      The cost for the benefits described in Subsection 2(b) above for those players who are released or otherwise sever employment after the first game of the 1996 regular season through the 1997 League Year will be paid promptly and in full by the NFLPA to the NFL upon receipt of each itemized invoice from the insurance provider.

(c)      The NFL will reimburse the NFLPA for costs paid pursuant to Subsections 4(a) and 4(b) above, when and to the extent that such costs are charged against the Salary Cap in accordance with Subsections 4(d) and 4(e) below, and as follows:

(i)      In the 1998 League Year, only to the extent that, in the aggregate, the Clubs' costs that League Year for Section 2 benefits is less than $250,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount; and

(ii)      In the 1999 and subsequent League Years, only to the extent that, in the aggregate, the Clubs' costs that League Year for Section 2 benefits is less than $500,000 multiplied by the number of Clubs in the League that League Year, up to that aggregate amount.

Reimbursement by the NFL will end when the costs paid by the NFLPA pursuant to Subsections 4(a) and 4(b) above have been fully reimbursed or such earlier date when this Agreement shall expire. Notwithstanding the foregoing, if the NFL cancels any extensions of this Agreement pursuant to Article LXI (Extension of Agreement), any costs paid by the NFLPA pursuant to Subsections 4(a) or 4(b) above, and which have not been charged against the Salary Cap, shall be reimbursed by the NFL in the first month of the Final League Year of this Agreement.

(d)      The costs for the benefits described in Section 2 above during the 1998 and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(e)      The amounts reimbursed to the NFLPA in the 1998 and subsequent League Years for the costs described in Subsections 4(a) and 4(b) above will be charged against the Salary Cap in the League Year in which the reimbursements are to be made, prior to the issuance of the Initial Special Purpose Letter, based upon a projection pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 10(c), of the amount of such reimbursements to be made for that League Year, subject to the following rules:

(i)      In the 1998 League Year, the amount shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank created by the Settlement Agreement between the parties dated June 6, 1996, is $1,000,000 more than the amount of the 1997 Salary Cap. Any amount that is not charged in the 1998 League Year, pursuant to the preceding sentence, may be carried over to be charged in the 1999 and future League Years, pursuant to and subject to subsections (ii) and (iii) below.

(ii)      In the 1999 and future League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged only after the Salary Cap, following any adjustments due to the Salary Cap Bank

created by the Settlement Agreement between the parties dated June 6, 1996, is $1,500,000 more than the amount of the Salary Cap in the prior League Year. Any remaining amount that is not charged in such a League Year may be carried over to be charged in subsequent League Year(s), subject to subsection (iii) below.

(iii)     Beginning in the first League Year in which at any time the Salary Cap Bank has a balance of zero, and in all subsequent League Years, any carryover amounts from prior League Years, and any original reimbursement amounts, shall be charged as Benefits pursuant to Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

(iv)     To the extent that the projection of the amount of reimbursements for a League Year made pursuant to this Subsection 4(e) are later determined to be incorrect, a reconciliation shall be made the following League Year.

*Extension Agreement 6/6/96*

**Section 5. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

# ARTICLE L
# SEVERANCE PAY

**Section 1. Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through *2002,* will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

*Extension Agreement 6/6/96*

**Section 2. Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992;(b) $10,000 per Credited Season for each of the seasons 1993 through 1999; *and (c) $12,500 per Credited Season for each of the seasons 2000 through 2002.*

*Extension Agreement 6/6/96*

**Section 3. Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4. Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through February 19, or earlier | June 1 | June 30 |
| February 20 through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

**Section 5. Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in

NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment**: Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor**: In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay**: Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability**: The right to receive payment hereunder shall not be assignable, transferrable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

# ARTICLE LI
## SUPPLEMENTAL DISABILITY BENEFITS

**Section 1. Maintenance:** *The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.*

*\*Extension Agreement 6/6/96*

**Section 2. Contributions:** *For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year,* unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*\*Extension Agreement 6/6/96*

**Section 3. Extension:** *For each Plan Year that begins both (1) on or after April 1, 2000 and (2) prior to the expiration of the Final League Year, the parties will amend section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.*

*\*Extension Agreement 6/6/96*

# ARTICLE LII
# BENEFIT ARBITRATOR

*Section 1.* **Selection:** The Management Council and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either

**188**

party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
# WORKERS' COMPENSATION

*Section 1*. **Benefits**: In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

*Section 2*. **Rejection of Coverage**: Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

*Section 3*. **Arbitration**: In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

*Section 4*. **Joint Study**: The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (Plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

*Section 5*. **Moratorium**: The NFLMC, the NFL, all of the Clubs and the NFLPA agree to a moratorium on any and all efforts to change state laws concerning workers' compensation coverage of professional athletes, beginning as of the execution of this Agreement and ending December 31, 1994. During such period, the NFLMC, the NFL, any Club, the NFLPA, and/or their respective agents are prohibited from making or supporting any attempt, directly or indirectly, to change state laws affecting players' workers' compensation coverage.

Article LIV, Section 6

**Section 6. Preservation of Rights**: The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

**Section 7. Reopener**: If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

192

# ARTICLE LV
# MISCELLANEOUS

**Section 1. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product.

**Section 2. On-Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three days prior to the date of the game.

193

NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its 28 members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

**194**

***Section 16.*** **Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

***Section 17.*** **Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

***Section 18.*** **Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

***Section 19.*** **Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

# ARTICLE LVI
# *FINAL LEAGUE YEAR*

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap:** No Salary Cap shall be in effect during the *Final* League Year.

*\*Extension Agreement 6/6/96*

**Section 2. Free Agency If Salary Cap *In League Year Prior To Final League Year:*** In the event that a Salary Cap is in effect in the *League Year prior to the Final League Year:* (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the *Final* League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the *Final* League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

*\*Extension Agreement 6/6/96*

**Section 3. Free Agency If No Salary Cap *In League Year Prior To Final League Year:*** In the event that a Salary Cap is not in effect in the League Year prior to the *Final* League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the *Final* League Year shall be five Accrued Seasons.

*\*Extension Agreement 6/6/96*

**Section 4. Franchise and Transition Players:** As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, *in the Final League Year*, notwithstanding that Transition Players may not be designated in *the League Years after the 1994 League Year* (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

*\*Extension Agreement 6/6/96*

**196**

# ARTICLE LVII
## MUTUAL RESERVATION OF RIGHTS:
## LABOR EXEMPTION

**Section 1. Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**Section 2. Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

**Section 3. CBA Expiration:**

    (a)    Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

    (b)    The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

197

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1.** **Effective Date**: Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993.

**Section 2.** **Termination**: Except as specifically provided otherwise in this Agreement, either the NFLPA or the Management Council may terminate this Agreement on March 1, 2000, or thereafter by giving sixty (60) days prior written notice to the other party. Except as specifically provided otherwise in this Agreement, all the terms and conditions of this Agreement will be continued in full force and effect for a period of 60 days after such notice is given or until the expiration date of this Agreement, whichever occurs later.

**Section 3.** **Termination Date**: *Except as provided in Section 4 below, and in Article LXI (Extension of Agreement) below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the 2000 League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire as prescribed in Article XVI, Section 1.*

*\*Extension Agreement 6/6/96*

**Section 4.** **Termination Prior to Expiration Date:**

(a)     **Due to Invalidation of Settlement Agreement**. In the event that the Settlement Agreement does not receive Court Approval or is otherwise invalidated by any appellate court prior to September 1, 1993:

(i)     This Agreement shall terminate immediately;

(ii)     The <u>White</u> action and the Related Litigation (as defined in Article I of the Settlement Agreement) shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     All pending motions in <u>White</u> and <u>McNeil</u> shall be decided by the Court; and

(iv)     With respect to all Player Contracts entered into by Unrestricted Free Agents during the period from March 1 to the date of such disapproval, and by Restricted Free Agents during the period from March 1 to the date of such disapproval:

(1)     Any Club that had rights to the services of any such player on January 31, 1993 shall have the right to assume any such Player Contract by notice to the player, the New Club, the NFLPA and Class Counsel within ten days of the date of such disapproval, and in such event such Prior Club shall have the same rights to the services of such player that the New Club would have had under such Player Contract;

**198**

(2)     Within twenty days of the date of such disapproval, any such player shall have the right to void any such Player Contract, whether such contract was assumed by the Prior Club or not, by notice to the Prior Club or New Club, which clubs shall notify the NFLPA and Class Counsel of such election as soon as possible but in no event later than one day after receiving such notice (in the event the player voids such Player Contract, the player shall return to the Team any compensation received thereunder); and any such player shall have such further relief as determined by the Court pursuant to the pending motions in <u>White</u> and <u>McNeil</u>;

(3)     In the event that a player voids a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract after the date of such election; and

(4)     In the event that a player elects not to void a Player Contract pursuant to section 4(a)(iv)(2) above, such player shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement, that arise out of such Player Contract.

(b)     **Approval of Settlement Agreement Invalidated.** In the event that the Settlement Agreement receives Court Approval but such approval is invalidated by any appellate court on or after September 1, 1993:

(i)     This Agreement shall terminate immediately;

(ii)     The <u>White</u> action and the Related Litigations shall be reinstated to the status quo ante that existed in such actions prior to January 6, 1993;

(iii)     All Player Contracts entered into prior to such date of such disapproval shall remain in full force and effect and shall be binding on all Parties;

(iv)     A player with a Player Contract referred to in Section 4(b)(iii) above shall not be entitled to assert any claim covered by the releases and covenants not to sue, set forth in Article XIX (Releases And Covenants Not to Sue) of the Settlement Agreement, that arises out of such Player Contract, for conduct prior to such disapproval consistent with the express terms of this Agreement.

(c)     **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement except as referred to in subsections (a) and (b) above, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwith-standing anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft),

XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (1999 League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

    (d)    **Termination Due To Collusion**. If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

    (e)    **Termination After Closing Date**. If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

    (f)    **No Waiver**. Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

*Section 5*. **Ratification**: This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a) <u>To the National Football League Management Council</u>:
The National Football League
Management Council
280 Park Avenue
New York, New York  10017
Attention: Executive Vice President—Labor Relations

(b) <u>To an NFL Club</u>:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c) <u>To the NFLPA</u>:
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

# ARTICLE LXI
## EXTENSION OF AGREEMENT

1.      Unless the NFL or the NFLPA has by December 1, 1997 provided written notice to the other party cancelling any further extension of this Agreement, then, as of the first date of the 1998 League Year, the term of this Agreement shall be extended by an additional League Year, until the end of the 2001 League Year. The December 1, 1997 deadline will be extended until five business days after the revenue terms of the new or extended NFL network television contracts (broadcast and cable) are provided in writing to the NFLPA, if such revenue terms have not been so provided at least five business days prior to December 1, 1997.

2.      Unless the NFL or the NFLPA has by December 1, 1998 provided written notice to the other party cancelling any further extension of this Agreement, then, as of the first date of the 1999 League Year, the term of this Agreement shall be extended by an additional League Year, until the end of the 2002 League Year.

*Extension Agreement 6/6/96

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

BY: _____

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

BY: _____

203

# APPENDIX A

## CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football

204

Appendix A

League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature


Player's Name—Type or Print

# APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

# APPENDIX C

## NFL PLAYER CONTRACT

THIS CONTRACT is between _____ _____, hereinafter "Player," and_____ _____, a _____ corporation (limited partnership) (partnership), hereinafter "Club," oper- ating under the name of the _____ _____ as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

1.  TERM. This contract covers _____ football season(s), and will begin on the date of execution or March 1, _____, whichever is later, and end on February 28 or 29, _____, unless extended, termi- nated, or renewed as specified elsewhere in this contract.

2.  EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of profes- sional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory mini-camp(s), official pre-season training camp, all Club meetings and practice sessions, and all pre-season, regular season and post-season football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

3.  OTHER ACTIVITIES. Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experi- ence as a football player, the loss of which cannot be estimated with any cer- tainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a sig- nificant risk of personal injury.

Appendix C

### 4.   PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)   Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)   Player hereby assigns to the NFLPA and its licensing affiliates, if any, the **exclusive** right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on products that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract

**208**

expires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5.    COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____ for the 19_____ season;

$_____ for the 19_____ season;

$_____ for the 19_____ season;

$_____ for the 19_____ season;

$_____ for the 19_____ season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.    PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or bi-weekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning

Appendix C

of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary having become due and payable up to the time of termination.

7.    DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.    PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.    INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.  WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is

210

entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.   SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.   TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.   INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14.   RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.   INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.   EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.   ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this

212

contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22. LAW. This contract is made under and shall be governed by the laws of the State of _____.

213

23.   WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled <u>White</u> v. <u>National Football League</u>, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in <u>Brown</u> v. <u>Pro Football, Inc</u>. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in <u>White</u> ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the <u>White</u> class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.   OTHER PROVISIONS.

(a)   Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)   Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)   The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

214

Appendix C

### 25.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

PLAYER _____   CLUB _____

Home Address _____   By _____

_____   Club Address _____

Telephone Number _____   _____

Date _____   Date _____

PLAYER'S CERTIFIED AGENT _____

Address _____

_____

Telephone number _____

Date _____

Copy Distribution:   White–League Office   Yellow–Player
                     Green–Member Club     Blue–Management Council
                     Gold–NFLPA            Pink–Player Agent

215

# APPENDIX D

# FIRST REFUSAL OFFER SHEET

Name of Player:                                    Date:

Address of Player:                                 Name of New Team:

Name and Address of                                Name of Prior Team:
Player's Representative
Authorized to Act for Player:                      Address of Prior Team:


Principal Terms of NFL Player Contract With New Team:

     [Supply Information on this Sheet or on Attachment]

     1.   Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized league-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

     2.   Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

     3.   Other terms (that need not be matched):

Player:                                            New Club:

By _____                         By _____
                                                      Chief Operating Officer

216

# APPENDIX E

## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                              Date:

Address of Player:                           Name of New Team:

Name and Address of                          Name of Prior Team:
Player's Representative
Authorized to Act for Player:                Address of Prior Team:


   The undersigned member of the NFL hereby exercises its Right of
First Refusal so as to create a binding Agreement with the player named
above containing the Principal Terms set forth in the First Refusal Offer
Sheet (a copy of which is attached hereto), and those terms of the NFL
Player Contract not modified by such Principal Terms.


                              Prior Team

                              By _____
                                 Chief Operating Officer

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By _____

WITNESSED BY:

_____

218

# APPENDIX G

# NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or already on the roster of the Club, and for whom the Club needs Room.

# APPENDIX H

# ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR of the member clubs of the NFL (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions and definitions contained in the Settlement Agreement. The information on the Schedule is to be the responsibility of the NFL Member Clubs' and the NFL's managements. The Accountants' responsibility will be to express an opinion on the Schedule based on their audit.

The NFL and Class Counsel or any Players Union are to retain a national accounting firm (the "Accountants"). The Accountants are to conduct an audit of the Schedule (the "Audit") in accordance with generally accepted auditing standards. Those standards require that the Accountants plan and perform the Audit to obtain reasonable assurance about whether the Schedule is free of material misstatement. The Audit shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Audit shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of 6 members with 3 representatives designated by each of the NFL and Class Counsel or any Players Union. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Audit described in the preceding paragraph and again before February 15th to review the results of the Audit before issuance of the final report for that playing season.

The procedures detailed below are designed for the Accountants to determine whether, in their opinion, the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the member clubs of the NFL for such season in accordance with the terms of the Settlement Agreement. The Accountants will audit the Schedule for each playing season.

The Accountants may rely on the auditing procedures performed by each member club's local accounting firm ("Local Accountants") or may test the procedures on a scope basis so as to permit the Accountants to ob-

tain a reasonable basis to express an overall opinion on the Schedule as referred above.

The Accountants will have access to the Local Accountants' audit workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the NFL and Class Counsel to be performed by the Accountants**

**General**

- The Settlement Agreement should be reviewed and understood.

- See Exhibit I for the form of the Accountants' Audit Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All audit workpapers of the Accountants relative to its report on the Schedule should be made available for review by representatives of the NFL and Class Counsel or any Players Union prior to issuance of the report.

- A summary of all Audit findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised during the Audit should be resolved by the Committee.

221

Appendix H

- Estimates should be reviewed in accordance with the Settlement Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be re-confirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

**Procedures provided by the NFL and Class Counsel to be performed by the Local Accountants**

**General**
- Each NFL member club shall be audited in accordance with the Settlement Agreement. The Settlement Agreement should be reviewed and understood by all Local Accountants.

- See Exhibit II for the form of the Local Accoutants' Audit Report.

- Special rules for Cap Counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

**Team Salaries - Schedule 1**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the Settlement Agreement.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the Settlement Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the Settlement Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA - Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

Appendix H

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the Agreement.

**Defined Gross Revenues - Schedule 4**
- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the DGR Settlement Agreement. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

**Excluded DGR - Schedule 5**
- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

**Questions - Schedule 6**
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

224

- Prepare a summary of all changes.

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

- Review supporting details of any changes.

# EXHIBIT I

## ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of the Member Clubs and the NFL's management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the Member Clubs of the National Football League ("NFL") for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the NFL or any Member Club taken as a whole.

226

# EXHIBIT II

## LOCAL ACCOUNTANTS' AUDIT REPORT

We have audited the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ a Member Club of the National Football League ("NFL") for the _____ playing season (the "Schedule"). This information, which is not intended to be a presentation in accordance with generally accepted accounting principles, was prepared in accordance with the provisions and definitions contained in the Stipulation and Settlement Agreement dated February 26, 1993, <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) (the "Settlement Agreement"). The information on this schedule is the responsibility of _____ management. Our responsibility is to express an opinion on this Schedule based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurances about whether the Schedule is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. An audit also includes assessing the significant estimates made by management, as well as evaluating the overall Schedule presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the Schedule referred to above presents fairly, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded Defined Gross Revenues of the _____ for the _____ playing season in accordance with the applicable terms of the Settlement Agreement.

This report is for your use in connection with the Settlement Agreement and should not be referred to or distributed to anyone outside of your organization for any other purpose, nor should it be related to the financial statements of the _____ taken as a whole.

# APPENDIX I

## STANDARD MINIMUM PRE-SEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**

1.  History
    - player
    - family
    - thorough review of all team physicians and trainer reports for preceding seasons

2.  Examination
    - head
    - face
    - scalp
    - ears
      - external & drums
    - sinus
    - throat
    - eyes
      - pupils
      - reaction to movement & light
    - lungs
      - palpation
    - chest
    - heart
    - visceral
    - hernia
    - rectal
      - hemorrhoid
      - fistula
      - prostate
    - gastric
    - any unusual body marks, i.e. scars, birthmarks
    - height
    - weight
    - temperature
    - blood pressure
    - pulse
    - heart rate

## Orthopedic Examination

Examination visually, including stress testing and range of motion for all of the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees—also knee jerk
- ankle—check Achilles tendon for abnormalities and by jerk test
- toes

## Flexibility

Testing of hamstrings and neck

## EKG

Heart Abnormalities

## Stress Testing (at physician's discretion) (Treadmill or bicycle) for cardio-vascular

## Blood Testing

Standard grid. Testing for (including but not limited to):

- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen
- Tay Sachs
- Sickle Cell
- VD

} Where applicable. If found, individual counseling necessary.

**229**

Appendix I

## Urinalysis

Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing
- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

## Chest X-Ray (at appropriate intervals)

(Only as recommended by AMA standard)

Check for:  Tumor
            T.B.
            Lesions

## X-Ray all previously injured areas (at physician's discretion)

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

| Non-football related disability rates before retirement: | Age | Rate |
|---|---|---|
| | 22 | .04 |
| | 27 | .04 |
| | 32 | .04 |
| | 37 | .05 |
| | 42 | .09 |
| | 47 | .18 |
| | 52 | .41 |

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. |

| Withdrawal rates: | For Players With Service of | Rate |
|---|---|---|
| | 1 year | 29.1% |
| | 2 years | 19.7% |
| | 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993. |
| Retirement age: | 47, except 55 for players with no credited seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three years younger than player |

231

Appendix J

| | |
|---|---|
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | One-time write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

232

# APPENDIX K

## EXTENSION CHART

*Salary Cap as Percentage of DGR*

|                     | 96 | 97 | 98 | 99 | 00 | 01 | 02 |
|---------------------|----|----|----|----|----|----|----|
| Immediately         | 63 | 62 | 62 | 62 | U  |    |    |
| No Notice to Cancel | 63 | 62 | 63 | 63 | 63 | 63 | U  |
| 12/1/97 PA Notice   | 63 | 62 | 62 | 62 | U  |    |    |
| 12/1/97 MC Notice   | 63 | 62 | 62 | 63 | U  |    |    |
| 12/1/98 PA Notice   | 63 | 62 | 63 | 63 | 62 | U  |    |
| 12/1/98 MC Notice   | 63 | 62 | 63 | 62 | 63 | U  |    |

U  =  Uncapped
PA = Players
MC = NFL Management Council

*Extension Agreement 6/6/96

# APPENDIX L

# OFF-SEASON WORKOUT RULES

*The 1993 Collective Bargaining Agreement with the NFLPA provides that, except for certain specified minicamps, any off-season workout programs or classroom instruction shall be voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for sixteen weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week, except weekends. Included in the sixteen weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.*

*Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.*

*Teams are to provide their players and the Management Council, at least fifteen days prior to the start of its off-season workout program, the time frame for the program including designation of any days on which organized team practice activity will take place. Prompt notification of any schedule changes must be provided to the Management Council, which will provide the NFLPA with prompt notification of both the original schedule and any changes.*

*The following rules shall also apply to the fourteen days of organized team practice activity:*

- *No pads except protective knee or elbow pads. Helmets are permitted.*
- *No live contact; no live contact drills between offensive and defensive linemen.*
- *7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.*
- *The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.*
- *Maximum six hours per day, with a maximum two hours on field, for any player.*

*\*Extension Agreement 6/6/96*

234

# APPENDIX M

## PSL EXAMPLES

*Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-Wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):*

### 1. Subsection (x)(1)— Maximum Annual Allocation Amount

**Year 1 (1996)-**  *PSL revenues received = $ 45 million*
*Remaining life of PSL = 16 years*
*WSJ Treasury Bill rate at 2/1/96 - 8%*
*Factor-Future Value of 8% annuity 15 years (maximum) = 27.152 (annual compounding)*
*Future Value of $3 million/year for 15 years = $3 million x 27.152 = $81.456 million*
*Interest Amount = $81.456 million - $45 million = $36.456 million*

*Year 1 Annual Interest Allocation = $36.456 million/15 years = $2.43 million/year*

*Year 1 PSL Allocation Amount = PSL Amount = $45 million/15 years = $3.00 million + Allocated Interest = $2.43 million Total Year 1 Allocation = $5.43 million*

*1996 PSL Maximum Annual Allocation Amount = $5.43 million*

235

Appendix M

**Year 2 (1997)-** PSL revenues received = $ 30 million
Remaining life of PSL  = 15 years
WSJ Treasury Bill rate at 2/1/97 - 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129    = $50.258 million
Interest Amount    = $50.258 million - $30 million
= $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
= PSL Amount = $30 million/15 years = $2.00 million
+ Allocation Interest        = $1.35 million
Total Year 2 Allocation      = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount    = $5.43 million
Year 2 PSL Allocation Amount    = $3.35 million

1997 PSL Maximum Annual Allocation Amount    = $8.78 million

236

Appendix M

**Year 3 (1998)-**  PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury Bill rate at 2/1/98 - 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $.5 million/year for 14 years
= $.5m x 23.366      = $11.683 million
Interest Amount       = $11.683 million - $7 million
                      = $  4.683 million

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount
= PSL Amount = $7 million/14 years = $  .500 million
+ Allocated Interest              = $  .335 million
Total Year 3 Allocation           = $  .835 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount       = $5.430 million
Year 2 PSL Allocation Amount       = $3.350 million
Year 3 PSL Allocation Amount       = $  .835 million

1998 PSL Maximum Annual Allocation Amount       = $9.615 million

2. Subsection (x)(2)— PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
- Gross PSL revenues received in 1996 = $45 million
- Income taxes paid on PSL revenues in 1996 = $12 million
- Legal and marketing costs incurred relating to PSL
  revenues=$6 million
- Stadium renovation costs = $56 million

The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m - ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from DGR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

237

Appendix M

3.  *Subsection (x)(2)— Maximum Exclusion Of PSL Revenues Each League Year*

    *For purposes of this subsection, Excluded DGR spillover shall be calculated as follows for each Team:*
        -*Assume that the new stadium's first full year of operation is 1998.*
        -*Assume that the Team's Excluded DGR data is as follows:*

    |              | *1997* | *1998* |
    |--------------|--------|--------|
    | *Excluded DGR* | *$5 million* | *$15 million* |

    *If the League, as a whole, is in a spillover situation in 1998, then the increase in DGR due to spillover would be $10 million ($15 million - $5 million).*

    *If the League is not in a spillover situation in 1998, the increase in DGR due to spillover would be zero.*

4.  *Subsection (x)(3)— PSL Difference Credited To DGR*

    *a. Assume that the new stadium is placed in service in June 1998.*

    *1998 increase in DGR directly related to new stadium:*
        *- Increase in gate receipts*          *$6 million*
        *- Increase in DGR spill-over*          *$2 million*
          *Total DGR increase*                *$8 million*

    *Cumulative PSL Difference:*

    | *Year* | *PSL Maximum Annual Allocation Amount* | *First Year DGR Increase* | *PSL Difference* |
    |--------|----------------------------------------|---------------------------|------------------|
    | *1996* | *$5.430 million* | *$8 million (assumed)* | *$   0* |
    | *1997* | *$8.780 million* | *$8 million (assumed)* | *$ .780 million* |
    | *1998* | *$9.615 million* | *$8 million* | *$1.615 million* |

    *Cumulative PSL Difference*                          *$2.395 million*

    *For purposes of computing the PSL Difference, we assume that the increase in DGR was the same for 1996 and 1997 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million).*

    *$2.395 million would be credited into DGR in the 1999 League Year.*

238

Appendix M

*b. Assume that the new stadium is placed in service in June 1998.*

*1998 increase in DGR directly related to new stadium:*

| | |
|---|---|
| - Increase in gate receipts | $ 9 million |
| - Increase in DGR spill-over | $16 million |
| Total DGR increase | $25 million |

*Cumulative PSL Difference:*

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|---|---|---|---|
| 1996 | $5.430 million | $25 million (assumed) | 0 |
| 1997 | $8.780 million | $25 million (assumed) | 0 |
| 1998 | $9.615 million | $25 million | 0 |

*Cumulative PSL Difference*                                                    *0*

**Since the increase in DGR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year.**

*No amount would be credited into DGR in the 1999 League Year.*

5. *Subsection (x)(5) - Carryover PSL Credit*

*Assume the following:*
- *New Stadium is placed in service in June 1998.*
- *1999 - 2002 Maximum Annual Allocation Amount is $9.615 million.*
- *Increases in DGR directly related to New Stadium are as follows:*

| | |
|---|---|
| 1999 | $ 8 million |
| 2000 | $ 9 million |
| 2001 | $14 million |

*The Carryover PSL credits are calculated as follows:*

| | |
|---|---|
| 1999 | $9.615m - $8m = $1.615m |
| 2000 | $9.615m - $9m = $ .615m |
| 2001 | (No carryover PSL credits) |

*Under this scenario, year 2001 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 1999 and 2000 ($1.615m + $.615m) can be deducted in full from DGR in League Year 2001. There would be no remaining Carryover PSL credits to deduct from DGR in*

239

Appendix M

*future League years.*

6. *Subsection (x)(6) - Reduction In Premium Seat And Luxury Box Expenses*

*Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.*

7. *PSL Revenues Not Benefitting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium*

*In any case where:*

(i)     *PSLs are sold by a Team or by a third party (such as a stadium corporation, a non-profit private sector entity, or a governmental entity) pursuant to Team authorization; and*

(ii)    *all net proceeds of such PSL sale are used to build a new stadium or construct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and*

(iii)   *such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or non-profit entity; and*

(iv)    *the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and*

(v)     *neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease;*

240

Appendix M

_then_, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in DGR or Excluded DGR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as DGR, Excluded DGR, or non-DGR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as DGR or Excluded DGR, as appropriate.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

*Extension Agreement 6/6/96

241

# INDEX

## ACCOUNTING PROCEDURES
Accountants' Review Procedures - 220-227 (Appendix H)
Disputed Adjustments - 132
Final Special Purpose Letter - 130-132
Initial Special Purpose Letter - 130, 183
Projected Benefits - 133-134
Projected DGR - 132

## ACCRUED SEASON
Calculation and Reporting Requirement - 53
Free Agency Requirement in Final League Year - 196
Practice Squad Eligibility - 155
Roster Exemptions (5-day preseason letter) - 152
Unrestricted Free Agents, Restricted Free Agents - 55-56
Veterans With Less Than 3 Accrued Seasons - 53-54

## AGENT CERTIFICATION
16 (Article VI)

## AMERICAN BOWL
Reporting Date - 160

## ANTI-COLLUSION
141-146 (Article XXVIII)

## ARBITRATION
Accrued Seasons Reporting Hardship - 53
Benefit Arbitrator - 177-178, 188-189
Club or Player Signing Hardship - 43, 55, 59, 75
Expedited Arbitration: 13 (Group Licensing), 62-63 (UFA, RFA), 87-89
    Benefits
Franchise, Transition Player Tender Disputes - 70, 73
Good Faith Negotiations Dispute - 163
Impartial Arbitrator - 139-140
Injury Grievance Panel - 27
Likely To Be Earned Dispute - 99
NFL Player Contract Issue Dispute - 213
Non-Cash Provisions or Player Gift Dispute - 125, 126
Non-Injury Grievance Panel - 21-22
Player Safety Rules Dispute - 34
Preseason 10-day pre-camp violation - 158
Union Security Dispute - 14
Workers' Compensation (equivalent benefits) - 191

## BENEFITS
Description - 87- 88
Group Insurance - 181-184 (Medical, Dental)
Injury Protection - 33
Player Benefit Costs - 176-178
Post-Career Medical - 182
Post-Season Pay - 170-171
Projected Benefits - 133
Retirement Plan - 179 (Article XLVII) (Bert Bell/Pete Rozelle Plan)
Second Career Savings Plan - 180 (Article XLVIII)
Severance Pay - 185-186 (Article L)
Supplemental Disability Benefits - 187 (Article LI)

## BERT BELL/PETE ROZELLE PLAN
See: Benefits: Retirement Plan

## CAREER PLANNING PROGRAM
15, 194

## CERTIFICATIONS
147-148 (Article XXIX)

## CLUB DISCIPLINE
Conduct Detrimental to Club - 18
Deduction - 19
Fine Schedule - 18
Published Lists - 19
Uniformity - 19

## COLLEGE DRAFT
Compensatory Draft Selections - 45, 48, 74
Number of Choices - 42
Other Professional Teams - 43
Required Tender - 42
Return to College - 44
Signing of Drafted Rookies - 42-43
Subsequent Draft - 45
Time of Draft - 42
Trading Deadline - 43
Workouts of Draft-Eligible Players - 46

## COMMISSIONER DISCIPLINE
Fine Money - 32
League Discipline - 31
One Penalty - 32

Index

**COMMITTEES**
34-35 (Article XIII)

**CREDITED SEASON**
Benefits - 179, 181, 185
Definition: Minimum Salary - 53-54, 163

**DAYS OFF**
167 (Article XL)

**DEFERRED AMOUNTS**
Deferred Paragraph 5 Limitation - 164
Deferred Salary and Present Value Rate - 93-94
Deferred Signing Bonus With Extension - 129-130
Funding of Deferred and Guaranteed Contracts - 165

**DEFINITIONS**
4-8 (Article I)

**DEFINED GROSS REVENUES (DGR)**
Broadcast - 82
Disputed Adjustments - 131-132
Excluded DGR - 82-83
Gate Receipts - 82
Inclusion in DGR (1992 Base Year Ratio) - 83
Not DGR - 82
Payments to NFLPA - 84
Personal Seat Licenses - 84, 235-241 (Appendix M)
Projected DGR - 132-133
Reporting DGR - 130-133

**DRAFT CHOICE COMPENSATION**
Franchise Player - 66
Restricted Free Agents - 56-61

**DRUGS OF ABUSE**
See: Medical (Substance Abuse)

**DURATION OF AGREEMENT**
198-200 (Article LVIII)

**ENFORCEMENT OF SALARY CAP AND ENTERING
    PLAYER POOL**
134-135 (Article XXV)
Fraudulent Loan - 124-125

244

## ENTERING PLAYER POOL

47-52 (Article XVII)
25% rule - 49
Assignment - 49
Buyout of Termination Right - 50
Calculation - 47-48
Incentives - 115-123
LTBE Incentive Levels - 104-114
Renegotiation Limitation - 51
Rookie Allocation - 47-48
Rookie Orientation Camp Costs - 51-52
Waivers - 49
Workout Payments in Future Years - 49

## EXCLUDED DGR

See: Defined Gross Revenues (DGR)

## EXCLUSIVE RIGHTS PLAYERS

See: Veterans With Less Than 3 Accrued Seasons

## EXHIBIT A, EXHIBIT B INCENTIVES

101-103 (Team and Individual Incentives)

## EXPANSION

151 (Article XXXI)

## EXTENSION OF AGREEMENT (LANGUAGE INSERTS)

7, 33, 42, 46, 60, 87, 89-91, 94, 123-124,
157-159, 160, 166, 172, 179-184, 185, 187, 233, 234, 241, 263

## FALSE CERTIFICATION

148

## FINAL CAPPED YEAR

30% Rule - 127-128
Signing Bonus Acceleration Post-June 1 - 96
Signing Bonus Proration Limitation - 94
Team Incentives Valuation and Playtime Requirements - 120
Treatment of Guaranteed Contracts - 123-124

## FINAL EIGHT PLAN

77-78 (Article XXI)

Index

## FINAL LEAGUE YEAR
Benefits Contributions - 179-180, 183, 187
Free Agency Eligibility - 196
No Salary Cap - 196
Qualifying Offers - 196
Transition Player Designation - 68

## FINAL SPECIAL PURPOSE LETTER
See: Accounting Procedures

## FINE SCHEDULE
See: Club Discipline

## FIRST REFUSAL PROCEDURES
60-62
First Refusal Offer Sheet (Appendix D) - 216
First Refusal Exercise Notice (Appendix E) - 217

## FRANCHISE PLAYER
Designations - 66
Draft Choice Compensation - 66
Duration of Designation and Period - 71-73
Required Tender - 66-68
Right To Decline (Named Plaintiffs) - 74
Signing Period - 75-76
Withdrawal of Designation - 71-72

## GOVERNING AGREEMENT
9 (Article II)

## GOVERNING LAW
201 (Article LIX)

## GROUP INSURANCE
See: Benefits

## HALL OF FAME GAME
Reporting Date - 160

## HONORS, RECOGNIZED MEDIA
Rookie LTBE Honors - 104
Media (Veterans, Rookies) - 116-117

## IMPARTIAL ARBITRATOR
139-140 (Article XXVII)
Club or Player Signing Hardship - 43, 55, 59, 75
Franchise or Transition Player Tender Amount Disputes - 70-71
LTBE Performance Bonus Disputes - 99
Non-Football Services and Non-Cash Provision Dipsutes - 89, 125-126
Player Reporting Hardship - 53
Player Sole Control Disputes - 94
RFA, First Refusal Disputes - 62-63

## INCENTIVES
See: Entering Player Pool 115-123 (Incentives), LTBE 104-114 (Incentives
     Levels)
See: Salary Cap (Incentives)

## INDIVIDUAL RIGHT OF FIRST REFUSAL
63
Required Form (Waiver of Free Agent Rights (Appendix F)) - 218

## INITIAL SPECIAL PURPOSE LETTER
See: Accounting Procedures

## INJURED RESERVE
Credited Season - 163
Minimum Salaries - 54

## INJURY GRIEVANCES
25-30 (Article X)
Appeal - 26
Discovery - 30
Filing - 25
Hearing - 27
Neutral Physician List - 26
Payment - 29

## INJURY PROTECTION
33 (Article XII)

## KEY DATES - JUNE 1
RFA Qualifying Offer Extension Deadline - 59
Severance Pay Applications - 185
Sigining Bonus Acceleration - 96
Treatment of Completion Bonuses - 98
UFA Tender Deadline - 55

247

Index

**KEY DATES - JUNE 15**
Reduction of RFA Qualifying Offer - 59

**KEY DATES - JULY 15**
Prior Club Exclusive Rights (if tender made) - 55
Transition Player Offer Sheet Deadline - 68
UFA Contract Reporting Deadline - 37

**LICENSING**
NFLPA Group Player Licensing - 13-14, 39, 208-209

**MANAGEMENT RIGHTS**
9

**MAXIMUM DISCIPLINE SCHEDULE**
See: Club Discipline

**MEAL ALLOWANCE**
166 (Article XXXIX)

**MEDICAL**
Club Physician - 173, 175
Club Trainer - 173
Medical Records - 175 (Article XLV) (Access to Personnel and Medical
    Records)
Player Medical Costs - 88, 177
Players' Rights to Medical Care and Treatment - 173-174 (Article XLIV)
Second Medical Opinion - 173
Standard Minimum Pre-Season Physical - 173-174, 228-230 (Appendix I)
Substance Abuse - 174

**MINICAMPS**
159 (Article XXXVI)

**MINIMUM ACTIVE/INACTIVE LIST SALARY**
53-54, 162-163

**MOVING AND TRAVEL EXPENSES**
168-169 (Article XLI)

**MUTUAL RESERVATION OF RIGHTS**
197 (Article LVII), 200

**NEUTRAL PHYSICIAN**
26, 28-29

248

**NEUTRAL VERIFIER**
147, 149-150

**NFL PLAYER CONTRACT**
36-40 (Article XIV)
Certifications - 147-148
Commissioner Disapproval - 38-39, 134, 141, 213
Filing Requirements - 37-38, 54, 58
Split Contract (Minimum Salary) - 53-54, 164-165
Text of Contract (Appendix C) - 207-215

**NO STRIKE/LOCKOUT/SUIT**
11-12 (Article IV)

**NON-FOOTBALL INJURY OR ILLNESS (NFI)**
Accrued Seasons - 53
Compensation, Tolling - 152
Credited Season - 163
Pre-Training Camp Period - 169

**NON-INJURY GRIEVANCES**
20-24 (Article IX)
Appeal - 20
Discovery - 21
Filing - 20
Hearing - 22
Initiation - 20
Payment - 24

**NOTICE OF SIGNING**
37-38, 46, 54, 56

**NOTICE OF TERMINATION**
79-80, 219 (Form - Appendix G)

**OFFER SHEET AND FIRST REFUSAL PROCEDURES**
60-63 (Principal Terms, Incentives, No Consideration Between Clubs)
First Refusal Exercise Notice - 217 (Appendix E)
First Refusal Offer Sheet - 216 (Appendix D)
Individual Right of First Refusal - 63
Right of First Refusal for Transition Players - 69-70
Waiver of Free Agent Rights (Appendix F) - 218

Index

**OFF-SEASON WORKOUTS**
157-158 (Article XXXV)
Final Capped Year (32 days) - 98
Pre-Training Camp Period - 158
Treatment of Reasonable and Customary Expenses - 125-126
Workout at Minimum Not Treated as Renegotiation - 130

**OPTION**
Buyout - 97
Clause - 41 (Article XV)
Exercise Amount - 50

**PENSION PLAN**
See: Benefits (Retirement Plan)

**PER DIEM**
See: Pre-Season Training Camp (Per Diem)

**PERSONAL SEAT LICENSE (PSL)**
84-87, 235-241

**PHYSICALLY UNABLE TO PERFORM (PUP)**
152, 158

**PLAYER CONTRACT**
See: NFL Player Contract

**PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT**
173-174 (Article XLIV)

**PLAYER SAFETY AND WELFARE**
See: Committees (Player Safety and Welfare)

**PLAYER SECURITY**
17 (Article VII)

**PLAYER TICKETS**
194

**POST-CAREER MEDICAL**
See: Benefits, Post-Career Medical

**POST-SEASON PAY**
170-171 (Article XLII)

250

**PRACTICE SQUAD**
155-156 (Article XXXIV)

**PRE-59ER**
87, 176

**PRE-SEASON PHYSICAL**
173-174, 228-230 (Appendix I)

**PRE-SEASON TRAINING CAMP**
160-161 (Article XXXVII)
Per Diem (Veteran and Rookie) - 160

**PRE-TRAINING CAMP PERIOD**
158

**PREAMBLE**
3

**PRESENT VALUE CALCULATIONS**
Acceleration of Guaranteed Salary - 124
Completion Bonus Calculation - 98
Deferred Salary - 93-94
Franchise and Transition Player Tenders - 68
Funding of Deferred and Guaranteed Contracts - 165
Signing Bonus With Extension - 95-96

**PRINCIPAL TERMS**
See: Offer Sheet and First Refusal Procedures

**PRIOR SIGNING BONUSES**
97

**PRO BOWL GAME**
172 (Article XLIII)

**PROJECTED BENEFITS, DGR**
See: Accounting Procedures

**QUALIFYING OFFERS**
Computation of Team Salary - 92-93
Final League Year - 196
Guarantee for Individual First Refusal Right - 63-64
Restricted Free Agents, 56-60

Index

**RECOGNIZED MEDIA**
116-117

**RELOCATION BONUS**
99, 115, 151

**RENEGOTIATIONS AND EXTENSIONS**
129-130

**REPORTING BONUSES**
Contract Signed After Start of Training Camp  - 97
Expansion Team Training Camp Report - 151
Minimum Salary for Veteran With 5 or More Credited Seasons - 162-163
Treatment of Guaranteed Report - 97

**RESTRICTED FREE AGENTS (RFA)**
56-65

**RIGHT TO DECLINE (NAMED PLAINTIFFS)**
74

**ROOKIE ORIENTATION**
15, 51-52, 126

**ROOM AND BOARD**
Pre-Season Training Camp - 160
Rookie Orientation Camp - 52

**ROSTER BONUSES**
Minimum Salary for Veteran With 5 or More Credited Seasons - 162-163
NLTBE Roster Included in Team Salary When Earned - 121
Rookie LTBE Roster Bonuses - 104
Treatment of Off-Season Roster Bonus - 97-98
Treatment of Roster Bonus After Last Pre-Season game - 97

**ROSTER EXEMPTION**
Pre-Season 5-Day Letter - 152-153

**SALARY ADVANCES**
97, 98, 125

## SALARY CAP
82-133 (Article XXIV)
Computation of Team Salary - 92-93
Guaranteed League-wide Salary - 89
Minimum Team Salary - 91-92
Trigger for Guaranteed League-wide Salary, Salary Cap and Minimum
    Team Salary - 89
Valuation of Player Contracts
    Deferred Salary - 93-94
    Paragraph 5 - 93-94, (Top 51-93)
    Signing Bonuses
        Acceleration in League Year Preceeding Uncapped Year - 96
        Acceleration if NLTBE Termination Right and Roster
        Requirement - 96
        Amounts Treated as - 97-99
        Credit for Refunded - 99
        Proration Allocation From Uncapped Years - 94-95
        Rookie Playtime Requirement (Sole Control Proration) - 94
        With Extension - 95-96

30% Rules - 127-128
Buyout of Termination Right - 50, 127-128
Guaranteed Contracts - 123-124
Incentives
    Additional Incentives for Veterans, Rookies, and Teams - 117-123
    Conjunctive/Disjunctive - 122-123
    Exhibits A and B - 101-103
    Final 8 Salary - 78
    Franchise or Transition Player Tenders - 74
    Offer Sheets - 61-62
    Per Event, Per Play - 120
    Rookie LTBE Incentive Levels - 104-114
Increase of Current Year Salary After 10th Week - 99
Mid-Season Contracts - 127
Other Amounts (Loans, Salary Advances, Non-Cash Provision) - 124-127
Renegotiations and Extensions
    Consideration Treated as Signing Bonus - 97
    Final Capped Year - 98
    Treatment of Option Exercise Amounts - 128

## SCOPE OF AGREEMENT
10 (Article III)

## SCOUTING COMBINE
15, 46

Index

**SECOND CAREER SAVINGS PLAN**
See: Benefits (Second Career Savings Plan)

**SEVERANCE PAY**
See: Benefits (Severance Pay)

**SPECIAL MASTER**
136-138 (Article XXVI)
Anti-Collusion - 141-146
Appeal of Commissioner Disapproval of Entering Player Pool Contract -
    38-39
DGR and Accounting Disputes - 131-132
Enforcement of Salary Cap and Entering Player Pool - 134-135
False Certifications - 148
Minimum Team Salary Dispute - 91-92
PSL Disputes - 241
Termination of CBA Due to Collusion -198-200

**SQUAD SIZE**
154 (Article XXXIII)

**STIPULATION AND SETTLEMENT AGREEMENT**
4, 9, 40, 78, 84, 94, 96, 120, 124-125, 130, 214, 226-227

**SUPER BOWL GAME**
170, 194

**SUPPLEMENTAL DISABILITY PLAN**
See: Benefits (Supplemental Disability Plan)

**SUPPLEMENTAL DRAFT**
48

**TELEVISON**
Accountant Review Procedures (Appendix H) - 220, 224
Accounting Procedures - 130-133
DGR Calculation - 82-83
Extension of Agreement - 203
Player Appearances - 193

**TENDERS**
Computation of Team Salary - 92
Drafted Rookies - 44
Franchise Player - 66-67
Players with Less Than Three Accrued Seasons - 53
Transition Player - 68-69

**TERMINATION PAY**
81 (Article XXIII)

**TICKETS**
NFLPA, Player Tickets - 193-194

**TIME OF DRAFT**
42

**TRAINING CAMP**
See: Pre-Season Training Camp

**TRANSITION PLAYER**
Designation Period - 73
Prospective Designation - 74
Required Tender - 68-69
Right of First Refusal - 69-70
Right to Decline (Named Plaintiffs) - 74
Signing Period - 75-76

**TRAVEL DAY**
166

**UNDISCLOSED TERMS**
See: Enforcement of Salary Cap and Entering Player Pool

**UNION DUES AND MEMBERSHIP**
13-15 (Article V) (Union Security)
Dues Checkoff - 13
Dues Checkoff Authorization Form (Appendix A) - 204-205
NFLPA Meetings - 13

Index

**UNRESTRICTED FREE AGENTS (UFA)**
Definition - 55
Free Agency Eligibility in Final League Year - 196
Individual Right of First Refusal - 63
June 1 Tender - 55
Salary Cap Valuation of June 1 Tender on July 15 - 92
Signing Period - 55-56

**VETERANS WITH LESS THAN THREE ACCRUED SEASONS**
53-54 (Article XVIII)

**WAIVER SYSTEM**
79-80 (Article XXII)

**WORKERS' COMPENSATION**
191-192 (Article LIV)