# Exhibit 7



# NFL
# COLLECTIVE
# BARGAINING
# AGREEMENT
## 2002-2008

COLLECTIVE BARGAINING AGREEMENT
BETWEEN
THE NFL MANAGEMENT COUNCIL
AND
THE NFL PLAYERS ASSOCIATION
As Amended January 8, 2002



# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

ARTICLE I DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
    Section 1. General Definitions . . . . . . . . . . . . . . . . . . . . . . .4
    Section 2. Free Agency Definitions . . . . . . . . . . . . . . . . . . . . . . .5
    Section 3. Salary Cap Definitions . . . . . . . . . . . . . . . . . . . .6
    Section 4. Further Definitions . . . . . . . . . . . . . . . . . . . . . .7

ARTICLE II GOVERNING AGREEMENT . . . . . . . . . . . . . . . . . . .9
    Section 1. Conflicts . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    Section 2. Implementation . . . . . . . . . . . . . . . . . . . . . . . .9
    Section 3. Management Rights . . . . . . . . . . . . . . . . . . . . . .9
    Section 4. Rounding . . . . . . . . . . . . . . . . . . . . . . . . . . .9

ARTICLE III SCOPE OF AGREEMENT . . . . . . . . . . . . . . . . . . . .10
    Section 1. Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
    Section 2. Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . .10

ARTICLE IV NO STRIKE/LOCKOUT/SUIT . . . . . . . . . . . . . . . . .11
    Section 1. No Strike/Lockout . . . . . . . . . . . . . . . . . . . . . .11
    Section 2. No Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
    Section 3. Releases . . . . . . . . . . . . . . . . . . . . . . . . . . .12

ARTICLE V UNION SECURITY . . . . . . . . . . . . . . . . . . . . . . . .13
    Section 1. Union Security . . . . . . . . . . . . . . . . . . . . . . . .13
    Section 2. Check-off . . . . . . . . . . . . . . . . . . . . . . . . . . .13
    Section 3. NFLPA Meetings . . . . . . . . . . . . . . . . . . . . . . .13
    Section 4. NFLPA Player Group Licensing Program . . . . . . . . . .13
    Section 5. Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    Section 6. Procedures for Enforcement . . . . . . . . . . . . . . . . .14
    Section 7. NFLPA Responsibility . . . . . . . . . . . . . . . . . . . .15
    Section 8. Orientations . . . . . . . . . . . . . . . . . . . . . . . . .15

ARTICLE VI NFLPA AGENT CERTIFICATION . . . . . . . . . . . . . .17
    Section 1. Exclusive Representation . . . . . . . . . . . . . . . . . .17
    Section 2. Enforcement . . . . . . . . . . . . . . . . . . . . . . . . .17
    Section 3. Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

ARTICLE VII PLAYER SECURITY . . . . . . . . . . . . . . . . . . . . . .19
    Section 1. No Discrimination . . . . . . . . . . . . . . . . . . . . . .19
    Section 2. Personal Appearance . . . . . . . . . . . . . . . . . . . . .19

**ARTICLE VIII CLUB DISCIPLINE** . . . . . . . . . . . . . . . . . . . . . . . . . .**20**
    Section 1.  Maximum Discipline . . . . . . . . . . . . . . . . . . . . .20
    Section 2.  Published Lists . . . . . . . . . . . . . . . . . . . . . . . . .21
    Section 3.  Uniformity . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
    Section 4.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
    Section 5.  Deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

**ARTICLE IX NON-INJURY GRIEVANCE** . . . . . . . . . . . . . . . . . . . . . .**22**
    Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
    Section 2.  Initiation . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
    Section 3.  Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
    Section 4.  Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
    Section 5.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
    Section 6.  Arbitration Panel . . . . . . . . . . . . . . . . . . . . . . .23
    Section 7.  Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
    Section 8.  Arbitrator's Decision and Award . . . . . . . . . . . . . .25
    Section 9.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . .25
    Section 10.  Representation . . . . . . . . . . . . . . . . . . . . . . . .25
    Section 11.  Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
    Section 12.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
    Section 13.  Grievance Settlement Committee . . . . . . . . . . . . .26

**ARTICLE X INJURY GRIEVANCE** . . . . . . . . . . . . . . . . . . . . . . . . . .**27**
    Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
    Section 2.  Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
    Section 3.  Answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
    Section 4.  Neutral Physician . . . . . . . . . . . . . . . . . . . . . . .28
    Section 5.  Neutral Physician List . . . . . . . . . . . . . . . . . . . .28
    Section 6.  Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
    Section 7.  Arbitration Panel . . . . . . . . . . . . . . . . . . . . . . .29
    Section 8.  Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
    Section 9.  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . .30
    Section 10.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    Section 11.  Pension Credit . . . . . . . . . . . . . . . . . . . . . . . .31
    Section 12.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    Section 13.  Presumption of Fitness . . . . . . . . . . . . . . . . . . .31
    Section 14.  Playoff Money . . . . . . . . . . . . . . . . . . . . . . . .32
    Section 15.  Information Exchange . . . . . . . . . . . . . . . . . . . .32
    Section 16.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

**ARTICLE XI COMMISSIONER DISCIPLINE** . . . . . . . . . . . . . . . . . . .**33**
    Section 1.  League Discipline . . . . . . . . . . . . . . . . . . . . . . .33
    Section 2.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . .33
    Section 3.  Representation . . . . . . . . . . . . . . . . . . . . . . . . .33
    Section 4.  Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Section 5.  One Penalty  . . . . . . . . . . . . . . . . . . . . . . . . . .34
Section 6.  Fine Money . . . . . . . . . . . . . . . . . . . . . . . . . . .34

**ARTICLE XII INJURY PROTECTION**  . . . . . . . . . . . . . . . . . .**35**
Section 1.  Qualification  . . . . . . . . . . . . . . . . . . . . . . . . .35
Section 2.  Benefit  . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
Section 3.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

**ARTICLE XIII COMMITTEES**  . . . . . . . . . . . . . . . . . . . . . .**37**
Section 1.  Joint Committee  . . . . . . . . . . . . . . . . . . . . . . .37
Section 2.  Competition Committee  . . . . . . . . . . . . . . . . . .38
Section 3.  Player/Club Operations Committee  . . . . . . . . . . . .38

**ARTICLE XIV NFL PLAYER CONTRACT**  . . . . . . . . . . . . . . .**39**
Section 1.  Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Section 2.  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Section 3.  Changes  . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
Section 4.  Conformity  . . . . . . . . . . . . . . . . . . . . . . . . . .40
Section 5.  General  . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
Section 6.  Commissioner Disapproval  . . . . . . . . . . . . . . . . .43
Section 7.  NFLPA Group Licensing Program  . . . . . . . . . . . . .44
Section 8.  Good Faith Negotiation  . . . . . . . . . . . . . . . . . . .44

**ARTICLE XV OPTION CLAUSE**  . . . . . . . . . . . . . . . . . . . .**45**
Section 1.  Prohibition  . . . . . . . . . . . . . . . . . . . . . . . . . .45
Section 2.  Existing Option Clauses  . . . . . . . . . . . . . . . . . . .45

**ARTICLE XVI COLLEGE DRAFT** . . . . . . . . . . . . . . . . . . . .**46**
Section 1.  Time of Draft  . . . . . . . . . . . . . . . . . . . . . . . . .46
Section 2.  Number of Choices . . . . . . . . . . . . . . . . . . . . . .46
Section 3.  Required Tender  . . . . . . . . . . . . . . . . . . . . . . .46
Section 4.  Signing of Drafted Rookies  . . . . . . . . . . . . . . . . .46
Section 5.  Other Professional Teams  . . . . . . . . . . . . . . . . . .47
Section 6.  Return to College  . . . . . . . . . . . . . . . . . . . . . .48
Section 7.  Assignment of  Draft Rights . . . . . . . . . . . . . . . . .48
Section 8.  Subsequent Draft  . . . . . . . . . . . . . . . . . . . . . . .48
Section 9.  No Subsequent Draft  . . . . . . . . . . . . . . . . . . . . .49
Section 10.  Compensatory Draft Selections . . . . . . . . . . . . . . .49
Section 11.  Undrafted Rookies  . . . . . . . . . . . . . . . . . . . . .49
Section 12.  Notice of Signing  . . . . . . . . . . . . . . . . . . . . . .49
Section 13.  Workouts of Draft-Eligible Players  . . . . . . . . . . . .49

**ARTICLE XVII ENTERING PLAYER POOL** . . . . . . . . . . . . . .**51**
Section 1.  Definition  . . . . . . . . . . . . . . . . . . . . . . . . . . .51
Section 2.  Covered League Years  . . . . . . . . . . . . . . . . . . . .51

Section 3.  Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . .51
Section 4.  Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

**ARTICLE XVIII VETERANS WITH LESS THAN
THREE ACCRUED SEASONS** . . . . . . . . . . . . . . . . . . . . .57
Section 1.  Accrued Seasons Calculation . . . . . . . . . . . . . .57
Section 2.  Negotiating Rights of Players With Less
Than Three Accrued Seasons . . . . . . . . . . . . . . .57
Section 3.  Notice of Signing . . . . . . . . . . . . . . . . . . . . . .57

**ARTICLE XIX VETERAN FREE AGENCY** . . . . . . . . . . . . . . . .59
Section 1.  Unrestricted Free Agents . . . . . . . . . . . . . . . . .59
Section 2.  Restricted Free Agents . . . . . . . . . . . . . . . . . . .60
Section 3.  Offer Sheet and First Refusal Procedures . . . . . . . .64
Section 4.  Expedited Arbitration . . . . . . . . . . . . . . . . . . .67
Section 5.  Individually Negotiated Limitations
on Player Movement . . . . . . . . . . . . . . . . . . . .67
Section 6.  Notices, Etc. . . . . . . . . . . . . . . . . . . . . . . . . .68

**ARTICLE XX FRANCHISE AND TRANSITION PLAYERS** . . . . . . . .70
Section 1.  Franchise Player Designations . . . . . . . . . . . . . .70
Section 2.  Required Tender for Franchise Players . . . . . . . . . .70
Section 3.  Transition Player Designations . . . . . . . . . . . . . .72
Section 4.  Required Tender for Transition Players . . . . . . . . . .73
Section 5.  Right of First Refusal for Transition Players . . . . . . .73
Section 6.  Lists . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
Section 7.  Salary Information . . . . . . . . . . . . . . . . . . . . .74
Section 8.  No Assignment . . . . . . . . . . . . . . . . . . . . . . .74
Section 9.  Duration of Designation . . . . . . . . . . . . . . . . .75
Section 10.  Franchise Player Designation Period . . . . . . . . . .77
Section 11.  Transition Player Designation Period . . . . . . . . . .77
Section 12.  Prospective Designation *[no longer applicable]* . . . . .78
Section 13.  Right to Decline *[no longer applicable]* . . . . . . . . .78
Section 14.  Other Terms . . . . . . . . . . . . . . . . . . . . . . . .78
Section 15.  Compensatory Draft Selection . . . . . . . . . . . . . .78
Section 16.  Signing Period for Transition Players . . . . . . . . . .78
Section 17.  Signing Period for Franchise Players . . . . . . . . . .79

**ARTICLE XXI FINAL EIGHT PLAN** . . . . . . . . . . . . . . . . . . .81
Section 1.  Application . . . . . . . . . . . . . . . . . . . . . . . . .81
Section 2.  Top Four Teams . . . . . . . . . . . . . . . . . . . . . . .81
Section 3.  Next Four Teams . . . . . . . . . . . . . . . . . . . . . .81
Section 4.  Replacement of Free Agents Signed by Other Club . . .81
Section 5.  Increases . . . . . . . . . . . . . . . . . . . . . . . . . .82
Section 6.  Salary Definition . . . . . . . . . . . . . . . . . . . . . .82

iv

Section 7.  Trade Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82

**ARTICLE XXII WAIVER SYSTEM** . . . . . . . . . . . . . . . . . . . . . . . . . . . .**83**
Section 1.  Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section 2.  Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section 3.  Ineligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Section 4.  Notice of Termination . . . . . . . . . . . . . . . . . . . . . . . . .83
Section 5.  NFLPA's Right to Personnel Information . . . . . . . . . . . .84
Section 6.  Rosters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

**ARTICLE XXIII TERMINATION PAY** . . . . . . . . . . . . . . . . . . . . . . . .**85**
Section 1.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85
Section 2.  Regular Season Signings . . . . . . . . . . . . . . . . . . . . . .85
Section 3.  Ineligibility for Termination Pay . . . . . . . . . . . . . . . . .85

**ARTICLE XXIV GUARANTEED LEAGUE-WIDE SALARY,**
**SALARY CAP, & MINIMUM TEAM SALARY** . . . . . . . . . . . . . .**86**
Section 1.  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86
Section 2.  Trigger For Guaranteed League-wide Salary,
            Salary Cap, and Minimum Team Salary . . . . . . . . . .94
Section 3.  Guaranteed League-wide Salary . . . . . . . . . . . . . . . . .95
Section 4.  Salary Cap Amounts . . . . . . . . . . . . . . . . . . . . . . . . .95
Section 5.  Minimum Team Salary . . . . . . . . . . . . . . . . . . . . . . .97
Section 6.  Computation of Team Salary . . . . . . . . . . . . . . . . . . .98
Section 7.  Valuation of Player Contracts . . . . . . . . . . . . . . . . . .99
Section 8.  30% Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .134
Section 9.  Renegotiations and Extensions . . . . . . . . . . . . . . . .135
Section 10.  Accounting Procedures . . . . . . . . . . . . . . . . . . . . .137

**ARTICLE XXV ENFORCEMENT OF THE SALARY**
**CAP AND ENTERING PLAYER POOL** . . . . . . . . . . . . . . . . .**142**
Section 1.  Undisclosed Terms . . . . . . . . . . . . . . . . . . . . . . . . .142
Section 2.  Circumvention . . . . . . . . . . . . . . . . . . . . . . . . . . . .142
Section 3.  Special Master Action . . . . . . . . . . . . . . . . . . . . . . .142
Section 4.  Commissioner Disapproval . . . . . . . . . . . . . . . . . . .142
Section 5.  Special Master Review . . . . . . . . . . . . . . . . . . . . . . .143
Section 6.  Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .143
Section 7.  DGR Circumvention . . . . . . . . . . . . . . . . . . . . . . . .144
Section 8.  Management Council Audit Rights . . . . . . . . . . . . . .145
Section 9.  Prior Consultation . . . . . . . . . . . . . . . . . . . . . . . . .145

**ARTICLE XXVI SPECIAL MASTER** . . . . . . . . . . . . . . . . . . . . . . .**146**
Section 1.  Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .146
Section 2.  Scope of Authority . . . . . . . . . . . . . . . . . . . . . . . . .146
Section 3.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .147

Section 4.  Compensation  . . . . . . . . . . . . . . . . . . . . . . . . . . . .147
Section 5.  Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .147
Section 6.  Selection of Special Masters . . . . . . . . . . . . . . . . . . .148
Section 7.  Penalties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .148

**ARTICLE XXVII IMPARTIAL ARBITRATOR** . . . . . . . . . . . . . . . . . . .**149**
Section 1.  Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .149
Section 2.  Scope of Authority  . . . . . . . . . . . . . . . . . . . . . . . . .149
Section 3.  Effect of Rulings  . . . . . . . . . . . . . . . . . . . . . . . . . . .149
Section 4.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .149
Section 5.  Compensation of Impartial Arbitrator  . . . . . . . . . . . .149
Section 6.  Procedures  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .149
Section 7.  Selection of Impartial Arbitrator . . . . . . . . . . . . . . . .150

**ARTICLE XXVIII ANTI-COLLUSION**  . . . . . . . . . . . . . . . . . . . . . . .**151**
Section 1.  Prohibited Conduct  . . . . . . . . . . . . . . . . . . . . . . . . .151
Section 2.  Other Club Conduct . . . . . . . . . . . . . . . . . . . . . . . . .151
Section 3.  Club Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . .152
Section 4.  League Disclosures  . . . . . . . . . . . . . . . . . . . . . . . . .152
Section 5.  Enforcement of Anti-Collusion Provisions . . . . . . . . . .152
Section 6.  Burden of Proof  . . . . . . . . . . . . . . . . . . . . . . . . . . .152
Section 7.  Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . .153
Section 8.  Remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .153
Section 9.  Computation of Damages . . . . . . . . . . . . . . . . . . . . .154
Section 10.  Player Election . . . . . . . . . . . . . . . . . . . . . . . . . . . .154
Section 11.  Payment of Damages . . . . . . . . . . . . . . . . . . . . . . . .155
Section 12.  Effect of Cap Computations  . . . . . . . . . . . . . . . . . .155
Section 13.  Effect of Salary Cap . . . . . . . . . . . . . . . . . . . . . . . .155
Section 14.  No Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . .155
Section 15.  Costs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .155
Section 16.  Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .156
Section 17.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .156
Section 18.  Prior Conference . . . . . . . . . . . . . . . . . . . . . . . . . .156

**ARTICLE XXIX CERTIFICATIONS**  . . . . . . . . . . . . . . . . . . . . . . . .**157**
Section 1.  Contract Certification  . . . . . . . . . . . . . . . . . . . . . . .157
Section 2.  End of League Year Certification  . . . . . . . . . . . . . . .157
Section 3.  False Certification  . . . . . . . . . . . . . . . . . . . . . . . . . .158

**ARTICLE XXX CONSULTATION AND INFORMATION SHARING** .**160**
Section 1.  Consultation and Communications . . . . . . . . . . . . . .160
Section 2.  Salary Summaries  . . . . . . . . . . . . . . . . . . . . . . . . . .160
Section 3.  Notice of Invalid Contract . . . . . . . . . . . . . . . . . . . .160
Section 4.  Neutral Verifier  . . . . . . . . . . . . . . . . . . . . . . . . . . .160
Section 5.  Copies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .161

Section 6.  Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .161

**ARTICLE XXXI EXPANSION** . . . . . . . . . . . . . . . . . . . . . . . .162
Section 1.  Veteran Allocation . . . . . . . . . . . . . . . . . . . . . . . .162
Section 2.  Additional Compensatory Picks . . . . . . . . . . . . . . .162
Section 3.  Entering Player Pool Adjustment . . . . . . . . . . . . .162
Section 4.  Relocation Bonus . . . . . . . . . . . . . . . . . . . . . . . .162

**ARTICLE XXXII OTHER PROVISIONS** . . . . . . . . . . . . . . . . . .163
Section 1.  CFL Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .163
Section 2.  Physically Unable to Perform . . . . . . . . . . . . . . . .163
Section 3.  Non-Football Injury . . . . . . . . . . . . . . . . . . . . . .163
Section 4.  Roster Exemption . . . . . . . . . . . . . . . . . . . . . . . .163

**ARTICLE XXXIII SQUAD SIZE** . . . . . . . . . . . . . . . . . . . . . . .165
Section 1.  Active List . . . . . . . . . . . . . . . . . . . . . . . . . . . . .165
Section 2.  Pre-Season . . . . . . . . . . . . . . . . . . . . . . . . . . . . .165
Section 3.  Inactive List . . . . . . . . . . . . . . . . . . . . . . . . . . . .165
Section 4.  Active and Inactive List Limit . . . . . . . . . . . . . . .165

**ARTICLE XXIV PRACTICE SQUADS** . . . . . . . . . . . . . . . . . . .166
Section 1.  Practice Squads . . . . . . . . . . . . . . . . . . . . . . . . .166
Section 2.  Signing With Other Clubs . . . . . . . . . . . . . . . . . .166
Section 3.  Salary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .166
Section 4.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . .166

**ARTICLE XXXV OFF-SEASON WORKOUTS** . . . . . . . . . . . . .168
Section 1.  Voluntary Workouts . . . . . . . . . . . . . . . . . . . . . .168
Section 2.  Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . .168
Section 3.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .168
Section 4.  Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .169
Section 5.  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . .169
Section 6.  Pre-Training Camp Period . . . . . . . . . . . . . . . . .169
Section 7.  Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . .170

**ARTICLE XXXVI MINICAMPS** . . . . . . . . . . . . . . . . . . . . . . .172
Section 1.  Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
Section 2.  Length . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
Section 3.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
Section 4.  Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
Section 5.  Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172

**ARTICLE XXXVII PRE-SEASON TRAINING CAMPS** . . . . . . . . .173
Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . .173
Section 2.  Room and Board . . . . . . . . . . . . . . . . . . . . . . . .173

Section 3. Rookie Per Diem . . . . . . . . . . . . . . . . . . . . . . . . . . . .173
Section 4. Veteran Per Diem  . . . . . . . . . . . . . . . . . . . . . . . . . . .173
Section 5. Reporting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .173
Section 6. Number of Pre-Season Games . . . . . . . . . . . . . . . . .173
Section 7. Telephones  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .174
Section 8. Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .174

**ARTICLE XXXVIII SALARIES** . . . . . . . . . . . . . . . . . . . . . . . . .**175**
Section 1. 1993 Minimum Salaries *[no longer applicable]* . . . . . . .175
Section 2. Minimum Salaries For 1994-1998 League Years
            *[no longer applicable]* . . . . . . . . . . . . . . . . . . . . . . .175
Section 3. Credited Season *[no longer applicable]* . . . . . . . . . . . .175
Section 4. Other Compensation *[no longer applicable]* . . . . . . . .175
Section 5. Arbitration *[no longer applicable]* . . . . . . . . . . . . . . . .175
Section 6. Minimum Salaries After the 2001 League Year . . . . . .175
Section 7. Credited Season  . . . . . . . . . . . . . . . . . . . . . . . . . . . .175
Section 8. Other Compensation . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 9. Arbitration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 10. Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 11. Deferred Paragraph 5 . . . . . . . . . . . . . . . . . . . . . . . .176
Section 12. Number of Regular Season Games . . . . . . . . . . . . . .176
Section 13. Copies of Contracts . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 14. Split Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 15. Funding of Deferred and Guaranteed Contracts . . . .177

**ARTICLE XXXVIII—A MINIMUM SALARY BENEFIT** . . . . . . . . . .**178**
Section 1. Qualifying Players . . . . . . . . . . . . . . . . . . . . . . . . . . .178
Section 2. Qualifying Contracts . . . . . . . . . . . . . . . . . . . . . . . . .178
Section 3. Transition Rules  . . . . . . . . . . . . . . . . . . . . . . . . . . . .178
Section 4. Payments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .178
Section 5. Reduced Salary Cap Count . . . . . . . . . . . . . . . . . . . .179
Section 6. Minimum Salary Benefit Calculation . . . . . . . . . . . . .179
Section 7. League-wide Salary Cap Treatment  . . . . . . . . . . . . . .179
Section 8. League-wide Cash Treatment . . . . . . . . . . . . . . . . . . .179
Section 9. Terminated Qualifying Players . . . . . . . . . . . . . . . . . .179
Section 10. Players Moving to a New Club . . . . . . . . . . . . . . . . . .179
Section 11. Player Returning to Old Club  . . . . . . . . . . . . . . . . . .180
Section 12. Players with Expired Contract . . . . . . . . . . . . . . . . . .180
Section 13. Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .180
Section 14. Termination Pay  . . . . . . . . . . . . . . . . . . . . . . . . . . . .181
Section 15. No Benefit for Non-Qualifying Contracts . . . . . . . . .181

**ARTICLE XXXVIII—B PERFORMANCE-BASED POOL** . . . . . . . . .**183**
Section 1. Creation of Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . .183
Section 2. Annual Projection . . . . . . . . . . . . . . . . . . . . . . . . . . .183

Section 3. Mandatory Distribution Each Year . . . . . . . . . . . . . . .183
Section 4. Qualifying Players . . . . . . . . . . . . . . . . . . . . . . . . . .183
Section 5. Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .183

**ARTICLE XXXIX MEAL ALLOWANCE** . . . . . . . . . . . . . . . . . . . . . .**184**
Section 1. Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . .184
Section 2. Travel Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .184

**ARTICLE XL DAYS OFF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**185**
Section 1. Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .185
Section 2. Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . .185

**ARTICLE XLI MOVING AND TRAVEL EXPENSES** . . . . . . . . . . . .**186**
Section 1. Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .186
Section 2. Moving Expenses . . . . . . . . . . . . . . . . . . . . . . . . . .186
Section 3. Travel Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . .186
Section 4. Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . .187

**ARTICLE XLII POST-SEASON PAY** . . . . . . . . . . . . . . . . . . . . . . . .**188**
Section 1. System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .188
Section 2. Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . .188
Section 3. Wild Card Game; Division Play-off Game . . . . . . . . .188
Section 4. Conference Championship; Super Bowl Game . . . . .188
Section 5. Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

**ARTICLE XLIII PRO BOWL GAME** . . . . . . . . . . . . . . . . . . . . . . . .**190**
Section 1. Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . .190
Section 2. Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .190
Section 3. Wives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .190
Section 4. Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .190
Section 5. Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .190

**ARTICLE XLIV PLAYERS' RIGHTS TO MEDICAL
CARE AND TREATMENT** . . . . . . . . . . . . . . . . . . . . . . . . . .**191**
Section 1. Club Physician . . . . . . . . . . . . . . . . . . . . . . . . . . . .191
Section 2. Club Trainers . . . . . . . . . . . . . . . . . . . . . . . . . . . . .191
Section 3. Players' Right to a Second Medical Opinion . . . . . . .191
Section 4. Players' Right to a Surgeon of His Choice . . . . . . . . .191
Section 5. Standard Minimum Pre-Season Physical . . . . . . . . . .191
Section 6. Substance Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . .192

**ARTICLE XLV ACCESS TO PERSONNEL AND
MEDICAL RECORDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**193**
Section 1. Personnel Records . . . . . . . . . . . . . . . . . . . . . . . . .193
Section 2. Medical Records . . . . . . . . . . . . . . . . . . . . . . . . . . .193

**ARTICLE XLVI PLAYER BENEFIT COSTS** . . . . . . . . . . . . . . . . . . .**194**
Section 1.  Right of Reduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .194
Section 2.  Right of Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . .195
Section 3.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .195
Section 4.  Resolution of Disputes  . . . . . . . . . . . . . . . . . . . . . . . . .196
Section 5.  1998 Amendment Benefits  . . . . . . . . . . . . . . . . . . . . . .197
Section 6.  Limitations on Contributions  . . . . . . . . . . . . . . . . . . .197

**ARTICLE XLVII RETIREMENT PLAN**  . . . . . . . . . . . . . . . . . . . . . . .**199**
Section 1.  Maintenance and Definitions . . . . . . . . . . . . . . . . . . . .199
Section 2.  Additional Credited Seasons *[no longer applicable]*  . . .199
Section 3.  Contributions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .199
Section 4.  Benefit Credits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .199
Section 5.  Decrease in Vesting Requirement . . . . . . . . . . . . . . . .200
Section 6.  Medical Standards for Line-of-Duty Disability Benefits .200
Section 7.  Practice Squad Credited Season . . . . . . . . . . . . . . . . .201
Section 8.  Increase in Past Service Credit . . . . . . . . . . . . . . . . . . .201

**ARTICLE XLVIII SECOND CAREER SAVINGS PLAN** . . . . . . . . . . .**202**
Section 1.  Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .202
Section 2.  Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .202
Section 3.  Expansion of Eligible Employees . . . . . . . . . . . . . . . .203

**ARTICLE XLVIII - A PLAYER ANNUITY PROGRAM**
Section 1.  Establishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .204
Section 2.  Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .204
Section 3.  Eligibility and Allocation . . . . . . . . . . . . . . . . . . . . . . .204
Section 4.  Distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .205
Section 5.  Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .206

**ARTICLE XLVIII - B TUITION ASSISTANCE PLAN**
Section 1.  Establishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .207
Section 2.  Eligibility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .207
Section 3.  Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .207

**ARTICLE XLIX GROUP INSURANCE** . . . . . . . . . . . . . . . . . . . . . .**208**
Section 1.  Group Insurance Benefits  . . . . . . . . . . . . . . . . . . . . . .208
Section 2.  Extended Post-Career Medical and Dental Insurance .209
Section 3.  Limitations and Rules For Extended Insurance  . . . . .210
Section 4.  Financing For Extended Insurance
            *[no longer applicable]*  . . . . . . . . . . . . . . . . . . . . . .210
Section 5.  Administration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .210

**ARTICLE L SEVERANCE PAY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **211**
    Section 1.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . .211
    Section 2.  Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . .211
    Section 3.  Application . . . . . . . . . . . . . . . . . . . . . . . .211
    Section 4.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . .211
    Section 5.  Failure to Apply . . . . . . . . . . . . . . . . . . .212
    Section 6.  Only One Payment . . . . . . . . . . . . . . . . . .212
    Section 7.  Payable to Survivor . . . . . . . . . . . . . . . . .212
    Section 8.  Prior Severance Pay . . . . . . . . . . . . . . . . .212
    Section 9.  Nonassignability . . . . . . . . . . . . . . . . . . .212

**ARTICLE LI SUPPLEMENTAL DISABILITY BENEFITS** . . . . . . . . **213**
    Section 1.  Maintenance . . . . . . . . . . . . . . . . . . . . . . .213
    Section 2.  Contributions . . . . . . . . . . . . . . . . . . . . . .213
    Section 3.  Extension . . . . . . . . . . . . . . . . . . . . . . . . .213
    Section 4.  Automatic Payment and Waiver . . . . . . . . . . . . .213

**ARTICLE LII BENEFIT ARBITRATOR** . . . . . . . . . . . . . . . . . . . **214**
    Section 1.  Selection . . . . . . . . . . . . . . . . . . . . . . . . .214
    Section 2.  Compensation . . . . . . . . . . . . . . . . . . . . . .214
    Section 3.  Role . . . . . . . . . . . . . . . . . . . . . . . . . . . . .214

**ARTICLE LIII RETENTION OF BENEFITS** . . . . . . . . . . . . . . . . **216**

**ARTICLE LIV WORKERS' COMPENSATION** . . . . . . . . . . . . . . . **217**
    Section 1.  Benefits . . . . . . . . . . . . . . . . . . . . . . . . . .217
    Section 2.  Rejection of Coverage . . . . . . . . . . . . . . . .217
    Section 3.  Arbitration . . . . . . . . . . . . . . . . . . . . . . . .217
    Section 4.  Joint Study . . . . . . . . . . . . . . . . . . . . . . . .217
    Section 5.  Moratorium *[no longer applicable]* . . . . . . . . . . . . . .217
    Section 6.  Preservation of Rights . . . . . . . . . . . . . . . .217
    Section 7.  Reopener . . . . . . . . . . . . . . . . . . . . . . . . .218

**ARTICLE LV MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . **219**
    Section 1.  Endorsements . . . . . . . . . . . . . . . . . . . . . .219
    Section 2.  On-Field Attire . . . . . . . . . . . . . . . . . . . . .219
    Section 3.  Appearances . . . . . . . . . . . . . . . . . . . . . . .219
    Section 4.  Promotion . . . . . . . . . . . . . . . . . . . . . . . . .219
    Section 5.  Deduction . . . . . . . . . . . . . . . . . . . . . . . . .219
    Section 6.  Public Statements . . . . . . . . . . . . . . . . . . .219
    Section 7.  Address . . . . . . . . . . . . . . . . . . . . . . . . . .219
    Section 8.  NFLPA Tickets . . . . . . . . . . . . . . . . . . . . .219
    Section 9.  Player Tickets . . . . . . . . . . . . . . . . . . . . . .220
    Section 10.  Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . .220
    Section 11.  League Security . . . . . . . . . . . . . . . . . . . . .220

Section 12.  Career Planning Program . . . . . . . . . . . . . . . .220
Section 13.  Delivery of Documents . . . . . . . . . . . . . . . . . .220
Section 14.  Binding Effect . . . . . . . . . . . . . . . . . . . . . . . .220
Section 15.  Authorization . . . . . . . . . . . . . . . . . . . . . . . .220
Section 16.  Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . .221
Section 17.  Time Periods . . . . . . . . . . . . . . . . . . . . . . . .221
Section 18.  Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . .221
Section 19.  Parol Evidence . . . . . . . . . . . . . . . . . . . . . . .221

**ARTICLE LVI FINAL LEAGUE YEAR** . . . . . . . . . . . . . . . . . .**222**
Section 1.  No Salary Cap . . . . . . . . . . . . . . . . . . . . . . . .222
Section 2.  Free Agency If Salary Cap In League
            Year Prior to Final League Year . . . . . . . . . . . . . . .222
Section 3.  Free Agency If No Salary Cap In League
            Year Prior To Final League Year . . . . . . . . . . . . . .222
Section 4.  Franchise and Transition Players . . . . . . . . . . . . . . .222

**ARTICLE LVII MUTUAL RESERVATION OF RIGHTS:**
**LABOR EXEMPTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . .**223**
Section 1.  Rights Under Law . . . . . . . . . . . . . . . . . . . . . . .223
Section 2.  Labor Exemption . . . . . . . . . . . . . . . . . . . . . . .223
Section 3.  CBA Expiration . . . . . . . . . . . . . . . . . . . . . . . .223

**ARTICLE LVIII DURATION OF AGREEMENT** . . . . . . . . . . . . . .**224**
Section 1.  Effective Date . . . . . . . . . . . . . . . . . . . . . . . .224
Section 2.  Expiration Date . . . . . . . . . . . . . . . . . . . . . . .224
Section 3.  Termination Prior to Expiration Date . . . . . . . . . . . .224
Section 4.  Ratification . . . . . . . . . . . . . . . . . . . . . . . . . .225

**ARTICLE LIX GOVERNING LAW** . . . . . . . . . . . . . . . . . . . . .**226**

**ARTICLE LX NOTICES** . . . . . . . . . . . . . . . . . . . . . . . . . . .**227**

**APPENDIX A—CHECK-OFF AUTHORIZATION FOR NATIONAL**
**FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS** .**228**

**APPENDIX B—INJURY PROTECTION/EARLY WAIVER** . . . . . . .**230**

**APPENDIX C—NFL PLAYER CONTRACT** . . . . . . . . . . . . . . . .**231**

**APPENDIX D—FIRST REFUSAL OFFER SHEET** . . . . . . . . . . . .**240**

**APPENDIX E—FIRST REFUSAL EXERCISE NOTICE** . . . . . . . . . .**241**

**APPENDIX F—WAIVER OF FREE AGENT RIGHTS** . . . . . . . . . . . .242

**APPENDIX G—NOTICE OF TERMINATION** . . . . . . . . . . . . . . . .243

**APPENDIX H—ACCOUNTANTS' REVIEW PROCEDURES** . . . . .244

**APPENDIX I—STANDARD MINIMUM PRE-SEASON
      PHYSICAL EXAMINATION** . . . . . . . . . . . . . . . . . . . . . . . .252

**APPENDIX J—ACTUARIAL ASSUMPTIONS AND
      ACTUARIAL COST METHOD** . . . . . . . . . . . . . . . . . . . . .255

**APPENDIX K—EXTENSION CHART** . . . . . . . . . . . . . . . . . . . . . .257

**APPENDIX L—OFF-SEASON WORKOUT RULES** . . . . . . . . . . . .258

**APPENDIX M—PSL EXAMPLES** . . . . . . . . . . . . . . . . . . . . . . . .259

**APPENDIX N—WRITTEN WARNING GOOD FAITH EFFORT** . . .266

**APPENDIX O—CALCULATION EXAMPLE** . . . . . . . . . . . . . . . . .267

# INTRODUCTION

On January 8, 2002, the National Football League Management Council ("Management Council" or "NFLMC") and the National Football League Players Association ("NFLPA") agreed to extend, with certain modifications, the 1993 NFL Collective Bargaining Agreement ("CBA"), which was previously amended June 6, 1996, February 25, 1998, and December 4, 2000. This booklet incorporates the 1998, 2000, and 2002 amendment agreements into the text of the CBA and omits provisions relating exclusively to past seasons (although any such omitted terms, if subsequently determined to be applicable, have the same force and effect as the terms set forth herein. Any persons with questions about provisions concerning seasons before 2002 should refer to prior printed versions of the CBA). The 2000 and 2002 amendment language is set forth in italic copy with applicable notations to the extension agreements. In addition, side letter agreements between the NFLMC and the NFLPA setting forth the parties' interpretation of various provisions of the CBA are reprinted and indented within the appropriate articles. Relevant side letters that were agreed to after the 1998 extension are added to this booklet, and are set forth in italics. For easy reference, the article names can be found at the top of each two-page set of this booklet.

# PREAMBLE

This Agreement, which is the product of bona fide, arm's length collective bargaining, is made and entered into on the 6th day of May, 1993, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:

1.    All professional football players employed by a member club of the National Football League;

2.    All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;

3.    All rookie players once they are selected in the current year's NFL College Draft; and

4.    All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

Article I, Definitions

# ARTICLE I
# DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

*Section 1.* **General Definitions:**

(a)   "Agreement" means this Collective Bargaining Agreement, dated May 6, 1993.

(b)   "Class Counsel" means the law firm of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, and the law firm of Lindquist & Vennum, 4200 IDS Center, Minneapolis, Minnesota 55402.

(c)   "Club" or "Team" or "Member," used interchangeably herein, means any entity that is a member of the NFL or operates a franchise in the NFL at any time during the term of this Agreement.

(d)   "Club Affiliate" or "Team Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a Club or any owner of a Club.

(e)   "Commissioner" means the Commissioner of the NFL.

(f)   "Impartial Arbitrator" means the person authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

(g)   "League Year" means the period from February 20 of one year through and including February 19 of the following year, or such other one year period to which the NFL and the NFLPA may agree.

(h)   "NFL Player Contract" means the form of Player Contract utilized in the NFL.

(i)   "NFL Rules" means the Constitution and By-Laws, rules, and regulations of the NFL and/or the Management Council.

(j)   "Player Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a player.

(k)   "Salary" means any compensation of money, property, investments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player or Player Affiliate, or is paid to a third party at the request of and for the benefit of a player or Player Affiliate, during a League Year, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(l)   "Settlement Agreement" means the Stipulation and Settlement Agreement, dated February 26, 1993.

(m)   "Special Master" means the special master appointed and authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

4

**Section 2. Free Agency Definitions:**

(n)     "Accrued Season" means any playing season for which a player received credit with respect to his qualifications for Unrestricted Free Agency or Restricted Free Agency, as described in Article XIX (Veteran Free Agency).

(o)     "Compensatory Draft Selection" means an additional Draft choice awarded to a Club as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players).

(p)     "Draft" or "College Draft" means the NFL's annual draft of Rookie football players as described in Article XVI (College Draft).

(q)     "Draft Choice Compensation" means the right of any Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players), to receive draft pick(s) from any other Club.

(r)     "Drafted Rookie" means a person who is selected in the current League Year's Draft or whose Draft rights are held, or continue to be held, consistent with this Agreement, by an NFL Club that selected the Rookie in a prior Draft.

(s)     "Final Eight Plan" means the rules whereby signings of Unrestricted Free Agents are limited in Uncapped Years for the final eight play-off Clubs, under the limited circumstances described in Article XXI (Final Eight Plan).

(t)     "Free Agent" means a player who is not under contract and is free to negotiate and sign a Player Contract with any NFL Club, without Draft Choice Compensation or any Right of First Refusal.

(u)     "Minimum Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player not on any Active list, and not on the Inactive list, pursuant to this Agreement.

(v)     "Minimum Active/Inactive List Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player on any Active list, or on the Inactive list, pursuant to this Agreement.

(w)     "Negotiate" means, with respect to a player or his representatives on the one hand, and an NFL Club or its representatives on the other hand, to engage in any written or oral communication relating to efforts to reach agreement on employment and/or terms of employment between such player and such Club.

(x)     "New Club" means any Club except the Prior Club (as defined below).

(y)     "Player Contract" means a written agreement or series of such agreements executed at or about the same time between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player.

(z)     "Prior Club" means the Club that contracted with or otherwise held the NFL playing rights for the player for the previous NFL League Year.

(aa)     "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, pro-rata portion of signing bonus, and other

Article I, Definitions

payments to a player in compensation for the playing of professional football for the last League Year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Prior Year Salary shall also include any unrepaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(ab)    "Renegotiate" means any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract.

(ac)    "Required Tender" means a Player Contract tender that a Club is required to make to a player pursuant to this Agreement, either as a matter of right with respect to the player, or to receive Rights of First Refusal, Draft Choice Compensation and/or other rights with respect to the player, as specified in this Agreement.

(ad)    "Restricted Free Agent" means a Veteran who has three or more Accrued Seasons and who completes performance of his Player Contract, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club.

(ae)    "Right of First Refusal" means the right of an NFL Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players) to retain the services of certain Veteran players by matching offers made to those players.

(af)    "Rookie" means a person who has never signed a Player Contract with an NFL Club.

(ag)    "Undrafted Rookie" means a Rookie who was eligible for but not selected in a College Draft.

(ah)    "Unrestricted Free Agent" means a Veteran who completes performance of his Player Contract, and who is no longer subject to any exclusive negotiating rights, Right of First Refusal, or Draft Choice Compensation in favor of his Prior Club.

(ai)    "Veteran" means a player who has signed at least one Player Contract with an NFL Club.

### Section 3. Salary Cap Definitions:

(aj)    "Benefits" or "Player Benefit Costs" means the specific benefits paid to players set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ak)    "Capped Year" means any League Year for which a Salary Cap is in effect.

(al)    "Defined Gross Revenues" or "DGR" means all of the League and Team revenues that are included within the definition of Defined Gross Revenues, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(am)    "Guaranteed League-wide Salary" means the minimum amount that the Teams in the NFL must pay in Player Costs during a League Year, if

6

applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(an)   "Minimum Team Salary" means the minimum amount that each Team must pay in Salaries during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 5.

(ao)   "Paragraph 5 Salary" means the compensation set forth in paragraph 5 of the NFL Player Contract, or in any amendments thereto.

(ap)   "Player Costs" means the total Salaries and Benefits attributable to a League Year for all NFL Teams under all of the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), but not including loans, loan guarantees, unpaid grievances attributions, and unearned incentives.

(aq)   "Projected Benefits" means the amount of Benefits projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ar)   "Projected Defined Gross Revenues" means the amount of Defined Gross Revenues projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(as)   "Room" means the extent to which a Team's then-current Team Salary is less than either the Salary Cap or Entering Player Pool, as applicable.

(at)   "Salary Cap" means the absolute maximum amount of Salary that each Club may pay or be obligated to pay or provide to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), if applicable.

(au)   "Team Salary" means the Team's aggregate Salary for Salary Cap purposes, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(av)   "Uncapped Year" means any League Year for which a Salary Cap is not in effect.

***Section 4*. Further Definitions:**

(aw)   "Final League Year" means the League Year which is scheduled prior to its commencement to be the final League Year of this Agreement. As of the date hereof, the Final League Year is the *2007* League Year. The Final League Year shall always be an Uncapped Year.

*\* Extension Agreement 1/8/02*

(ax)   "Final Capped Year" means the League Year immediately prior to the Final League Year. The Final Capped Year shall be Capped unless the

Article I, Definitions

Salary Cap is removed pursuant to Article XXIV (Guaranteed League-wide
Salary, Salary Cap & Minimum Team Salary), Section 4(b)(ii)(4).

# ARTICLE II
# GOVERNING AGREEMENT

**Section 1. Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the NFL Player Contract, the NFL Constitution and Bylaws, or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. The provisions of the Stipulation and Settlement Agreement, *as amended*, in <u>White</u> v. <u>NFL</u>, No. 4-92-906 (D. Minn.) ("Settlement Agreement"), shall supersede any conflicting provisions of this Agreement.

**Section 2. Implementation:** The NFLPA and the Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFLPA will use its best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

**Section 3. Management Rights:** The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement and the Settlement Agreement.

**Section 4. Rounding:** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, or Salary, such amounts shall be rounded to the nearest $1,000.

Article III, Scope of Agreement

# ARTICLE III
# SCOPE OF AGREEMENT

**Section 1. Scope:** This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article V (Union Security), Section 6, on Union Security, and on Article LIV (Workers' Compensation), Section 7, on Workers' Compensation, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Management Council will give the NFLPA notice of and negotiate the proposed change in good faith.

**Section 2. Arbitration:** The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance), which shall be the exclusive method for resolving disputes arising out of this Section 2. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.

10

# ARTICLE IV
## NO STRIKE/LOCKOUT/SUIT

**Section 1. No Strike/Lockout:** Except as otherwise provided in Article V (Union Security), Section 6, or Article LIV (Workers' Compensation), Section 7, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim by the Management Council that the NFLPA has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the Management Council will have the right to submit such claim directly to the courts.

**Section 2. No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against, the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, the Settlement Agreement, or any term of this Agreement or the Settlement Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Entering Player Pool, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, the Final Eight Plan, Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the Management Council, has: (1) breached the terms of this Agreement, the NFL Player Contract, the revised NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article IX (Non-Injury Grievance) or asserting any claim before the Special Master or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the Settlement Agreement and from asserting such a claim before the Special Master, Impartial Arbitrator, or the Federal District Court, as provided for in the Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered (except any provisions relating to the 1982 CBA, which have been superseded by this Agreement); provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any

Article IV, No Strike/Lockout/Suit

rights they may have under the federal labor laws or under this Agreement or the Settlement Agreement.

**Section 3. Releases:** The releases and covenants not to sue contained in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement are hereby incorporated by reference.

12

Case 2:12-md-02323-AB   Document 6405-11   Filed 09/25/17   Page 27 of 317

# ARTICLE V
# UNION SECURITY

**Section 1. Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

**Section 2. Check-off:** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix A and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

**Section 3. NFLPA Meetings:** The NFLPA will have the right to conduct three meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule.

**Section 4. NFLPA Player Group Licensing Program:** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA and the NFL. Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to

13

Article V, Union Security

Article IX (Non-Injury Grievance). For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on *or in conjunction with* products *(including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.): (a)* in any one product category, as defined by industry standards; or (b) in different categories if a total of six or more players are used and (i) the products all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items.

*\* Extension Agreement 1/8/02*

**Section 5. Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article, except any dispute concerning Section 4 of this Article, will be processed pursuant to Article IX (Non-Injury Grievance). Any decision of an outside arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

**Section 6. Procedure for Enforcement:**

(a)     Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article V (Union Security), the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article V (Union Security). The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

(b)     It is further agreed that the term "member in good standing" as used in this Article V (Union Security) applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

(c)     It is further agreed that notwithstanding Article III (Scope of Agreement), Article IV (No Strike/Lockout/Suit), and Article LVIII (Dura-

tion of Agreement), that if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of Article V (Union Security) relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

**Section 7. NFLPA Responsibility**: It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

**Section 8. Orientations**: During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine. The NFLPA and the NFL will also sponsor an orientation with an agreed-upon agenda for all rookies on a Club-by-Club basis during the first half of the NFL regular season, which meetings may take place on the players' day off if no other mutually acceptable day is agreed upon.

> *Attendance at the annual Rookie Symposium shall be mandatory for all Rookies invited to the Symposium. A material failure to attend the entire Symposium (e.g., missing more than one presentation) that is unexcused by the NFLMC will result in a fine of $11,000 for the 2002-04 League Years and $12,000 for the 2005-07 League Years. The NFLPA and the NFLMC shall each use its best efforts to encourage players to participate fully in all symposium activities and to abide by all symposium rules (e.g., dress code, curfew, etc.). Being late for or missing curfew will result in a fine at the then applicable amount under Article VIII of the CBA. Other lateness for meetings or similar Article VIII violations*

Article V, Union Security

> will be disciplined at the applicable fine amounts. Discipline shall be imposed, if appropriate, by the NFLMC, not by any Club.
>
> * Side Letter 1/25/99, as modified by Extension Agreement 1/8/02

# ARTICLE VI
## NFLPA AGENT CERTIFICATION

**Section 1. Exclusive Representation:** The NFLMC and the Clubs recognize that the NFLPA regulates the conduct of agents who represent players in individual contract negotiations with Clubs. The NFLMC and the Clubs agree that the Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFLMC and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion to a neutral arbitrator pursuant to its agent regulation system, *except: (i) where an agent has failed to pass a written examination given to agents by the NFLPA or (ii) in extraordinary circumstances where the NFLPA's investigation discloses that the agent's conduct is of such a serious nature as to justify immediately invalidating the agent's certification.* The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs.

*\* Side Letter 8/1/00*

**Section 2. Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

**Section 3. Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $10,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotiations, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted

**17**

Article VI, NFLPA Agent Certification

from) the most recently published list of agents certified by the NFLPA to represent players.

# ARTICLE VII
# PLAYER SECURITY

***Section 1*. No Discrimination:** There will be no discrimination in any form against any player by the Management Council, any Club or by the NFLPA because of race, religion, national origin or activity or lack of activity on behalf of the NFLPA.

***Section 2*. Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

# ARTICLE VIII
# CLUB DISCIPLINE

**Section 1. Maximum Discipline:**

(a)      For the 1993 League Year, the following maximum discipline schedule will be applicable:

Overweight—maximum fine of $50 per lb./per day.

Unexcused late reporting for mandatory off-season training camp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity—maximum fine of $200.

Failure to promptly report injury to Club physician or trainer—maximum fine of $200.

Losing, damaging or altering Club-provided equipment—maximum fine of $200 and replacement cost, if any.

Throwing football into stands—maximum fine of $200.

Unexcused late reporting for or absence from pre-season training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)—maximum fine of $4,000 per day for the 1993-95 League years, $5,000 per day for the *1996-2004 League Years and $6,000 per day for the 2005-07* League Years.

Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)—maximum fine of $4,000 per day for the 1993-95 League years, $5,000 per day for the *1996-2004 League Years and $6,000 per day for the 2005-07* League Years, plus one week's regular season salary for each pre-season game missed.

Unexcused missed mandatory off-season training camp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity—maximum fine of $1,000.

Material failure to follow rehabilitation program prescribed by Club physician or trainer—maximum fine of $1,000.

Unexcused missed team transportation—maximum fine of $1,000 and transportation expense, if any.

Loss of all or part of playbook, scouting report or game plan—maximum fine of $1,000.

Ejection from game—maximum fine of $2,000.

Conduct detrimental to Club—maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks.

The Club will promptly notify the player of any discipline; notice of any Club fine in the $4,000/$5,000/*$6,000* maximum category and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

*\* Extension Agreement 1/8/02*

(b)     The amounts set forth in Section 1(a) above shall be in effect for the 1993-95 League Years. Such fines shall be increased by 25% each for the 1996 League Year and each year thereafter during the term of this Agreement, except for those fines for which the specific increase is set forth in Section 1(a) above.

**Section 2. Published Lists**: All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule referred to in Section 1 above.

**Section 3. Uniformity**: Discipline will be imposed uniformly within a Club on all players for the same offense; however, the Club may specify the events which create an escalation of the discipline, provided the formula for escalation is uniform in its application. Any disciplinary action imposed upon a player by the Commissioner pursuant to Article XI (Commissioner Discipline) will preclude or supersede disciplinary action by the Club for the same act or conduct.

**Section 4. Disputes**: Any dispute involved in Club discipline may be made the subject of a non-injury grievance under Article IX (Non-Injury Grievance).

**Section 5. Deduction**: Any Club fine will be deducted at the rate of no more than $1,000 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. This will not apply to a suspension.

# ARTICLE IX
# NON-INJURY GRIEVANCE

**Section 1. Definition:** Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement, and except wherever the Settlement Agreement provides that the Special Master, Impartial Arbitrator, the Federal District Court or the Accountants shall resolve a dispute.

**Section 2. Initiation:** A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within forty-five (45) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within forty-five (45) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

**Section 3. Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail or fax with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail or fax with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA. The party to whom a non-injury grievance has been presented will answer in writing by certified mail or fax within seven (7) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable.

**Section 4. Appeal:** If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or

22

Case 2:12-md-02323-AB   Document 8405-11   Filed 09/25/17   Page 37 of 317

the Management Council as may be appropriate. If the grievance involves a suspension of a player by a Club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within seven (7) days of the filing of the grievance. In addition, the NFLPA and the Management Council will each have the right of immediate appeal and hearing within seven (7) days with respect to four (4) grievances of their respective choice each calendar year. The arbitrator(s) designated to hear such grievances will issue their decision(s) within five (5) days of the completion of the hearing. Prehearing briefs may be filed by either party and, if filed, will be exchanged prior to hearing.

**Section 5. Discovery:** No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the dispute. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing will be admissible provided that the proffering party and the custodian(s) of the documents made a good faith effort to obtain (or discover the existence of) said documents or that the document's relevance was not discovered until the hearing date. In the case of an expedited grievance pursuant to Section 4, such documentary evidence shall be exchanged on or before two (2) days prior to the hearing unless the arbitrator indicates otherwise.

**Section 6. Arbitration Panel:** There will be a panel of four (4) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties will designate the Notice Arbitrator within ten (10) days of the execution of this Agreement. In the event of a vacancy in the position of Notice Arbitrator, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If the parties are unable to agree on a new arbitrator within thirty (30) days of any vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. With-

Article IX, Non-Injury Grievance

in fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

*Section 7.* **Hearing**: Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 15 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests post-

24

hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted. Briefs must be submitted to the arbitrator postmarked no later than sixty (60) days after receipt of the last transcript.

**Section 8. Arbitrator's Decision and Award**: The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement; provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance, with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article XIII (Committees), Section 1(c). In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of the grievance. The interest shall be calculated at the one-year Treasury *Note* rate published in the Wall Street Journal as of *February* 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

*\*Extension Agreement 1/8/02*

**Section 9. Time Limits**: Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player, the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

**Section 10. Representation**: In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

Article IX, Non-Injury Grievance

**Section 11. Costs:** All costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury *Note* rate published in the Wall Street Journal as of *February* 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each subsequent twelve (12) month period in lieu of continuation of any pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

*\*Extension Agreement 1/8/02*

**Section 13. Grievance Settlement Committee:** A grievance settlement committee consisting of the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL shall have the authority to resolve any grievance filed under this Article. This committee shall meet periodically to discuss and consider pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of the two members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement. Consideration of any grievance by this committee shall not in any way delay its processing through the non-injury grievance procedure described in this Article, and no grievance may be resolved pursuant to this Section once an arbitration hearing has been convened pursuant to Section 7 hereof.

# ARTICLE X
## INJURY GRIEVANCE

**Section 1. Definition**: An "injury grievance" is a claim or complaint that, at the time a player's NFL Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

**Section 2. Filing**: Any player and/or the NFLPA must present an injury grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

**Section 3. Answer**: The Club to which an injury grievance has been presented will answer in writing within seven (7) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

    (a)     That the player did not pass the physical examination administered by the Club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any preseason or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

    (b)     That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

    (c)     That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

    (d)     That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;

    (e)     That subsequent to the physical examination the player suffered no new football-related injury;

    (f)     That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical ca-

Article X, Injury Grievance

pacity below the level existing at the time of his physical examination as contemporaneously recorded by the Club physician.

**Section 4. Neutral Physician:** The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The player will notify the Club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may review any objective medical tests which all parties mutually agree to provide. The neutral physician is further authorized to perform any necessary diagnostic tests after consultation with the parties. The neutral physician is required to submit to the parties a detailed typewritten medical report of his examination. In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file injury grievances.

**Section 5. Neutral Physician List:** The NFLPA and the Management Council will maintain a jointly approved list of neutral physicians, including at least two orthopedic physicians in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) orthopedic physicians to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral physician for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the nominees on its list, and the other party will be bound by such selection. The next vacancy occurring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

28

*Section 6.* **Appeal**: A grievance may be appealed to an arbitrator by filing of written notice of appeal with the chairman of the arbitration panel within thirty (30) days from the date of receipt of the neutral physician's written report.

*Section 7.* **Arbitration Panel**: There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties have designated Arthur Stark as the Chairman of the panel. In the event of a vacancy in the position of the Chairman of the panel, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Chairman of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty (30) days of the occurrence of the vacancy, the Chairman of the panel shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

*Section 8.* **Hearing**: Each arbitrator shall designate a minimum of twelve hearing dates per year, exclusive of the period July 15 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairman, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the

Article X, Injury Grievance

postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

Post-hearing briefs must be submitted to the arbitrator postmarked no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of injury. The interest shall be calculated at the one-year Treasury *Note* rate published in The Wall Street Journal as of *February* 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

*Extension Agreement 1/8/02*

**Section 9. Miscellaneous:** The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The Club or the Management Council must advise the grievant and

the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

**Section 10. Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in travelling to and from his residence to the Club city and one night's lodging.

**Section 11. Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell/Pete Rozelle NFL Player Retirement Plan as determined by the Retirement Board.

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury *Note* rate published in The Wall Street Journal as of *February* 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each such subsequent twelve (12) month period in lieu of continuation of pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

*\*Extension Agreement 1/8/02*

**Section 13. Presumption of Fitness:** If the player passes the physical examination of the Club prior to the pre-season training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

Article X, Injury Grievance

**Section 14. Playoff Money**: If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though he had been on the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article XLII (Postseason Pay).

**Section 15. Information Exchange**: The NFLPA and the Management Council must confer on a regular basis concerning the status of pending injury grievances and the attribution of any injury grievance exposure to Team Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). Any communications pursuant to this Section are inadmissible in any grievance hearing.

**Section 16. Discovery**: No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the injury grievance hearing. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

32

# ARTICLE XI
# COMMISSIONER DISCIPLINE

**Section 1. League Discipline:** Notwithstanding anything stated in Article IX (Non-Injury Grievance):

    (a)    All disputes involving a fine or suspension imposed upon a player for conduct on the playing field other than as described in subsection (b) below, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within twenty (20) days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

    (b)    Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within ten (10) days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

    (c)    On receipt of a notice of appeal under subsection (a) or (b) above, the Commissioner will designate a time and place for a hearing to be commenced within ten (10) days thereafter, at which he or his designee (other than the person appointed in (b) above) will preside. *The Commissioner will consult with the Executive Director of the NFLPA concerning the person to serve each season as the Commissioner's designee.* The hearing may be by telephone conference call, if the player so requests. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to subparagraph (b) above may only be affirmed, reduced, or vacated by the Commissioner in such decision, and may not be increased.

*\* Side Letter 12/1/00*

**Section 2. Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the Club(s) involved.

**Section 3. Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of

Article XI, Commissioner Discipline

the NFLPA may also participate in such hearing and represent the player. In any such hearing, a Club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such hearing and represent the Club. The NFLPA and Management Council have the right to attend all hearings provided for in this Article. At the hearing, the player, the NFLPA and the Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the hearing. All hearings shall be transcribed.

**Section 4. Costs:** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

**Section 5. One Penalty:** The Commissioner and a Club will not discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

**Section 6. Fine Money:** Any fine money collected pursuant to this Article will be contributed to the Brian Piccolo Cancer Fund, the Vincent T. Lombardi Cancer Research Center, ALS Neuromuscular Research Foundation, and the NFLPA Players Assistance Trust ("P.A.T."). Any such fine money shall be allocated equally among the four (4) organizations mentioned in the preceding sentence.

# ARTICLE XII
# INJURY PROTECTION

*Section 1.* **Qualification**: A player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

(a)     The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

(b)     The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

(c)     The player must have failed the pre-season physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This pre-season physical may be given by the Club physician prior to the beginning of pre-season camp, so long as such fact is clearly communicated to the player at the time of the physical exam. The past understanding of the parties concerning a Club releasing a player who otherwise qualifies under (a) and (b) above prior to the pre-season physical examination will apply during the term of this Agreement (see Appendix B).

*Section 2.* **Benefit**: Effective after the execution of this Agreement, a player qualifying under Section 1 above will receive an amount equal to 50% of his contract salary for the season following the season of injury, up to a maximum payment of *$225,000 for the 2002 League Year, $250,000 for the 2003-05 League Years, and $275,000 for the 2006-07 League Years.* A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated injury protection into that contract. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

*\* Extension Agreement 1/8/02*

*Section 3.* **Disputes**: Any dispute under this Article will be processed under Article IX (Non-Injury Grievance). In any grievance in which the NFLPA or a player is claiming an injury protection benefit, the NFLPA or the play-

Article XII, Injury Protection

er may contend that the player should not have passed the preseason physical examination given by a Club following the season of a player's injury. In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the Club's preseason physical exam, provided that such physician conducted his examination of the player within fourteen days of the player's contract termination, but no later than the date of the first preseason cutdown. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 1(c) above shall be deemed to have been satisfied.

# ARTICLE XIII
# COMMITTEES

**Section 1. Joint Committee:**

(a)      A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee. The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

(b)      The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement. The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters.

(c)      Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article IX (Non-Injury Grievance). A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and the arbitrator must render his decision within one (1) week of the hearing.

37

Article XIII, Committees

No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

(d)     *The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety. Within 60 days of the initiation of an investigation, two or more neutral physicians will be selected to investigate and report to the Joint Committee on the situation. The neutral physicians shall issue a written report within 60 days of their selection, and their recommendations as to what steps shall be taken to address and correct any issues shall be acted upon by the Joint Committee.*
                                                          * *Extension Agreement 1/8/02*

**Section 2. Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

**Section 3. Player/Club Operations Committee:**
(a)     A Player/Club Operations Committee (hereinafter the "Operations Committee") shall be established for the purpose of examining issues arising with respect to the implementation of this Agreement. The Operations Committee may discuss and examine, and jointly decide, any such issues; provided, however, that any consideration by the Operations Committee shall not delay any grievance or other procedure under this Agreement, unless the Committee jointly decides otherwise.

(b)     The Operations Committee will consist of up to six (6) members: the Executive Vice President for Labor Relations of the NFL and a maximum of two (2) Club representatives (plus advisors), and the Executive Director of the NFLPA and a maximum of two (2) NFLPA representatives (plus advisors). The respective additional members of the Operations Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original additional members on the Operations Committee will be selected within thirty (30) days following the execution of this Agreement. An equal number on each side shall sit on all matters, and the Committee shall jointly decide whether the Committee shall sit with two (2), four (4) or six (6) members on any given matter. The Operations Committee will hold meetings on dates and at sites mutually agreeable to the Committee members.

38

# ARTICLE XIV
# NFL PLAYER CONTRACT

**Section 1. Form:** The NFL Player Contract form attached hereto as Appendix C will be used for all player signings. This form cannot be amended without the approval of the Management Council and the NFLPA.

> * [U]se [of] one contract form for a multiyear deal between a player and a club (as opposed to using a series of one-year contract forms as in the past) does not expand the period of time for which a club is obligated to provide an injured player with medical and hospital care...[W]e agree that Paragraph 9 of the new NFL Player Contract gives the same coverage in this respect as Paragraph 9 of the old form.
>
> *Side Letter 8/4/93

**Section 2. Term:** The NFL Player Contract shall be modified to expire on the last day of the last League Year subject to such Contract.

**Section 3. Changes:**

(a)      Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract or contracts consistent with the provisions of this Agreement and the Settlement Agreement.

(b)      The NFL Player Contract shall be modified to provide that, other than any rights the player may have as a member of the class in White v. NFL, No. 4-92-906 (D. Minn.) to object to the Settlement Agreement during its review by the District Court, the player waives and releases any claims: (i) arising out of, related to, or asserted in that action; and (ii) for conduct engaged in pursuant to the Settlement Agreement during the express term of the Settlement Agreement.

(c)      Any waiver and release included in the NFL Player Contract pursuant to this Article does not supersede and is subject to the provisions set forth in Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, and Article LVIII (Duration of Agreement) of this Agreement. Specifically, in the event that the Settlement Agreement is terminated, not approved or invalidated on appeal, pursuant to Article XXVI (Termination Prior to Expiration Date) of the Settlement Agreement, any such waiver and release shall remain or not remain in effect to the extent that the releases and covenants not to sue set forth in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement remain or do not remain in effect. Except in the circumstances described in the preceding sentence, this subparagraph shall not affect the validity or enforceability of any release and waiver contained in a Player Contract.

Article XIV, NFL Player Contract

**Section 4. Conformity**: All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement and the Settlement Agreement.

*With respect to any League Year subsequent to the 2001 League Year, if an incentive or Roster Bonus is earnable on a specific date, or if a voidable, buyback, or Club option is conditioned upon the player's being on the Club's roster on a specified date (or sets forth a specified date upon which, or before which, the player or Club is required to provide notice of an intent to exercise, or to exercise, the voidable, buyback, or Club option), it shall be treated as follows:*

*(a) The NFLPA and the Management Council shall determine a date that is not less than sixty days before the Monday preceding that year's College Draft (the "Measuring Date").*

*(b) The specified date shall be moved so that it falls on, before or after the commencement date of that League Year by the same number of days that the specified date falls on, before or after the Measuring Date described in (a) above.*

*If such an "event" is scheduled for a specified date between the Super Bowl and the day preceding the Measuring Date, it shall be moved so that it falls the same number of days before the start of the League Year that the specified date falls before the Measuring Date. If such an "event" is scheduled for a specified date between April 2 and the day preceding the subsequent Super Bowl, the specified date shall not be moved.*

*If any NFL Player Contract sets forth a specific date (e.g., "February 14, 2002") or describes a specific day (e.g. "last day of the 2001 League Year") upon which, or before which, the Player is required to provide notice of an intent to exercise, or to exercise, a voidable affecting the following League Year or upon which an NFL Player Contract affecting the following League Year shall void automatically, and if such date or day would, as a result of this agreement, otherwise be moved to a date or day falling on or after the last day of the period for designation of Franchise and Transition Players, then such date or day shall be moved to the twelfth day of the designation period (e.g. February 18 in the 2002 League Year). If any voidable is moved in accordance with this paragraph, then any corresponding buyback affecting the following League Year shall also be moved so that it falls the same number of days on, before or after the twelfth day of the designation period that it fell on, before or after the date or day specified for the*

*voidable in the original Player Contract. Not later than February 8 of each League Year, the Management Council shall provide the NFLPA with a list setting forth the name of each player who has a right affecting the following League Year if such right is to be moved in accordance with this paragraph. No player's right shall be moved in accordance with this paragraph unless such player's name is set forth in said list; however, the Club may designate any such player as a Franchise or Transition Player on a conditional basis within the prescribed designation period notwithstanding any failure by the Management Council to include the player's name on the above-described February 8 list. In the event such an omitted player elects to exercise his right of termination affecting the following League Year on the date prescribed in his contract, no further action need be taken by the designating Club to perfect its designation right, and the Club's conditional designation shall be deemed effective on an unconditional basis as of the date and time it was originally made.*

*The preceding paragraphs apply only to Player Contracts executed before March 2, 2001 and do not apply to Player Contracts executed on or after that date. The NFLPA and the Management Council will reach an agreement as to the appropriate treatment of all other contractual rights in Player Contacts executed before March 2, 2001, to ensure that such rights remain exercisable in the League Year intended by the parties to the relevant NFL Player Contract. If the parties fail to reach agreement, the Special Master shall decide the League Year intended by the parties to the NFL Player Contract.*

*\* Side Letter 1/22/01*

**Section 5. General:**

(a)      Any agreement between any player and any Club concerning terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. The League shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. The League shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), within two business days following the NFL's receipt of such information.

\* In order to assist the efficient operation of the Salary Cap, with respect to each Player Contract executed after

the date of this letter: (i) each Club shall provide to the NFL Management Council ("NFLMC") a copy of each such Player Contract within two days of the execution of such contract by the player and the Club; (ii) notwithstanding Article XIV, Section 5(a) of the CBA, the NFLMC shall provide a copy of each such Player Contract to the NFLPA within two days of its receipt by the NFLMC; and (iii) the NFLMC shall provide to the NFLPA as soon as reasonably practicable a copy of any page of each such Player Contract that has on it the signature of the player's representative if such copy has not already been provided to the NFLPA by the NFLMC. It is anticipated that each Club will send a copy of each such Player Contract to the NFLMC by overnight mail the day it is so executed, and the NFLMC will send a copy of such copy to the NFLPA by overnight mail the day it [is] so received.

*Side Letter 5/24/95: Sec. 13

* In the event that an Unrestricted Free Agent signs a Player Contract with a Club other than his prior Club between July 5 and July 15, the Player or his Agent shall promptly notify the Players Association, which will promptly notify the NFL Management Council in writing, and the New Club shall promptly notify the NFL Management Council, in writing, of such signing. If neither the NFL Management Council nor the Players Association has received any such written notice prior to midnight on July 15, such Player Contract shall be deemed not to have been signed within the signing period prescribed by Article XIX, Section 1(b)(i) of the CBA.

*Side Letter 3/3/97: Sec. 2

(b)     Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for non-football-related services shall be set forth in writing and disclosed and provided to the League within five business days of the execution or making of the agreement. The NFL shall provide such information to the NFLPA within two business days of the receipt of such information.

(c)     No Club shall pay or be obligated to pay any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract or a contract for non-football related services as described in Section 5(b) above. Nothing contained in the immediately

preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)     During the period any Salary Cap is in effect, in addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This paragraph shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

**Section 6. Commissioner Disapproval:** If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefore by noon on the date following such disapproval.

> \*[I]n the event the Commissioner disapproves any Player Contract as being in violation of the Salary Cap or Entering Player Pool, or any other provision of the Settlement Agreement or corresponding provision of the CBA, the filing of an appeal of such disapproval pursuant to Article XV, Paragraph 5 or Article XXII, Paragraph 1 of the Settlement Agreement, or Article XXV, Section 5 or Article XXVI, Section 1 of the CBA, shall automatically stay the Commissioner's disapproval, and the player shall continue to be free to practice and play for the Club, until the Special Master (or the District Court acting in lieu of the Special Master) issues its ruling. Provided, however, that in the event such Special Master appeal is filed within one week of or after the first scheduled regular season game of the Club: (i) the appeal shall be conducted in an expedited manner and shall be concluded within five days of the filing date of such appeal; and (ii) the Special Master shall issue his ruling by the end of such five day period. Provided, further, that, in the event the appeal is filed after the Club's first preseason game, but before the date one week before the Club's first scheduled regular season game: (i) the appeal shall be conducted in an expedited manner and shall be concluded within ten days of the filing date of such appeal; and (ii) the Special Master shall issue his ruling by the end of such ten day period. If there is no ruling by the end of the periods prescribed in the preceding two sentences, or, for earlier filed appeals, by the day following the Club's third preseason game, the automatic stay

shall be dissolved. If the Commissioner disapproves a Player Contract for any of the reasons stated above on a second occasion for the same player during a given League Year, and determines that such player should not be able to play, there shall be no stay of such disapproval pursuant to this agreement, unless it is determined that the Commissioner's second disapproval is arbitrary or capricious. This agreement shall not prejudice or affect in any way, or constitute a waiver with respect to, any rights of class members to seek a stay or injunctive relief before the District Court, pursuant to the Federal Rules of Civil Procedure; nor shall it prejudice or affect in any way the rights of the NFL to oppose, or the arguments of the NFL in opposition, to such a stay.

*Side Letter 1/18/94: Sec. 2

**Section 7. NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in paragraph 4(b) of Appendix C, regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision.

**Section 8. Good Faith Negotiation:** In addition to complying with specific provisions in this Agreement, any Club or player engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

* The parties hereby agree that pursuant to Article 14, Section 8 of the Collective Bargaining Agreement, a Club extending a Required Tender must, for so long as that Tender is extended, have a good faith intention to employ the player receiving the Tender at the Tender compensation level during the upcoming season. It shall be deemed to be a violation of this provision if, while the tender is outstanding, a Club insists that such a player agree to a Player Contract at a compensation level during the upcoming season below that of the Required Tender amount. The foregoing shall not affect any rights that a Club may have under the Player Contract, under the CBA, or under the Stipulation and Settlement Agreement, including but not limited to the right to terminate the contract, renegotiate the contract, or to trade the player if such termination, renegotiation, or trade is otherwise permitted by the Player Contract, CBA, or Stipulation and Settlement Agreement.

*Side Letter 3/3/97: Sec. 1

# ARTICLE XV
# OPTION CLAUSE

*Section 1.* **Prohibition:** Commencing with the execution of this Agreement, the option clause contained in the NFL Player Contract shall be discontinued. Any option clause must be negotiated as a separate addendum to the revised NFL Player Contract form. Any negotiated option clause must state the dollar amount(s) to be paid to the player during the option year.

*Section 2.* **Existing Option Clauses:** If any option clause contained in an NFL Player Contract in existence at the time of the execution of this Agreement is exercised by the Club, it shall be at the rate of salary specified. The player will also receive 100% of performance bonus provisions where the bonus is earned in the option year.

Article XVI, College Draft

# ARTICLE XVI
# COLLEGE DRAFT

**Section 1. Time of Draft:** Commencing with the 1993 Annual Selection Meeting (the "College Draft" or "Draft"), and with respect to the Draft to be held each League Year thereafter during the term of this Agreement, as well as the Draft to be held in the League Year immediately following the expiration or termination of this Agreement, and the subsequent implementation of each such Draft during the applicable League Year, the following rules shall apply:

**Section 2. Number of Choices:** The Draft shall consist of seven rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. Each Draft shall be held between February 14 and May 2, on a date which shall be determined by the Commissioner.

**Section 3. Required Tender:** A Club that drafts a player shall be deemed to have automatically tendered the player a one year NFL Player Contract for the Minimum Active/Inactive List Salary then applicable to the player pursuant to the terms of this Agreement. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

**Section 4. Signing of Drafted Rookies:**

(a)     A drafted player may accept the Required Tender at any time up to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00 p.m. New York time. In the event the exclusive negotiating rights to the drafted player are assigned to another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If released through waivers, the player shall be treated as an Undrafted Rookie Free Agent, with the right to sign an NFL Player Contract with any Club. If the Club that drafted the player signs the player after he is waived and becomes a Rookie Free Agent, the player's entire salary shall be counted against the Entering Player Pool, in the manner described in Article XVII (Entering Player Pool).

(b)     If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the beginning of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the play-

46

er's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s)).

(c)     If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

### Section 5. Other Professional Teams:

(a)     Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for or is employed by a professional football team not in the NFL during all or any part of the 12 month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three League Years after the initial Draft, and shall thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club, and of the date on which the player will be free of his other contractual obligations of employment, if any. Within thirty days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a one year written Player Contract to the player in order to retain its rights to that player, as detailed below.

(b)     For a player to whom the drafting Club retains the exclusive NFL rights to negotiate pursuant to Section 4(a) above, the Club must tender a one year Player Contract with salary of at least the Minimum Active/Inactive List Salary for players with less than one credited season, as defined in Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 3, within the thirty day period specified in subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall be subject to the Entering Player Pool, as set forth in Article XVII (Entering Player Pool). If the player is released through waivers, the player immediately becomes a Free Agent, with the right to sign an NFL Player Contract with any Club, and any Club is then free to negotiate for and sign a Player

Article XVI, College Draft

Contract with such player, without any Draft Choice Compensation be-
tween Clubs or First Refusal Rights of any kind, or any signing period.

(c)        For players with respect to whom the drafting Club retains a
Right of First Refusal pursuant to this Section 5, during each League Year
the player shall be treated as if he were a Restricted Free Agent not subject
to Draft Choice Compensation, as described in Article XIX (Veteran Free
Agency), Section 2, except as otherwise set forth in this Section 5. For such
players subject to a Right of First Refusal, the Club must tender a one year
Player Contract with at least the Minimum Active/Inactive List Salary for
players with two or more Credited Seasons, as defined in Article XVIII (Vet-
erans With Less Than Three Accrued Seasons), Section 3, within the thirty
day period specified in subsection (a) above. The amount of such tender
and/or any Player Contract entered into with the player shall not be subject
to the Entering Player Pool. If the Club does not make or withdraws the Re-
quired Tender, the player immediately becomes a Rookie Free Agent, with
the right to negotiate and sign a Player Contract with any Club, and any
Club is then free to negotiate for and sign a Player Contract with such play-
er, without any Draft Choice Compensation between Clubs or First Refusal
Rights of any kind, or any signing period.

(d)        *[no longer applicable]*

**Section 6. Return to College**: If any college football player who becomes
eligible for the Draft prior to exhausting his college football eligibility
through participation is drafted by an NFL Club, and returns to college, the
drafting Club's exclusive right to negotiate and sign a Player Contract with
such player shall continue through the date of the Draft that follows the last
season in which the player was eligible to participate in college football, and
thereafter the player shall be treated and the Club shall have such exclusive
rights as if he were drafted in such Draft by such Club (or assignee Club).

**Section 7. Assignment of Draft Rights**: In the event that the exclusive right
to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned
from one Club to another Club, the Club to which such right has been as-
signed shall have the same, but no greater, right to such player, including
the Right of First Refusal described in Section 5, as would the Club assign-
ing such right, and such player shall have the same, but no greater, obliga-
tion to the NFL Club to which such right has been assigned as he had to
the Club assigning such right.

**Section 8. Subsequent Draft**: A Club that, in a subsequent Draft, drafts a
player who (a) was selected in an initial Draft, and (b) did not sign a con-
tract with the NFL Club that drafted him or with any assignee Club during
the signing period set forth in Sections 4 through 6 above, shall, during the
period from the date of the subsequent Draft to the date of the Draft held
the subsequent League Year, be the only NFL Club that may negotiate with

or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 9. No Subsequent Draft:** If a player is drafted by a Club in an initial Draft and (a) does not sign a contract with a Club during the signing period set forth in Sections 4 through 6 above, and (b) is not drafted by any Club in the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 10. Compensatory Draft Selections:** The rules and procedures regarding Compensatory Draft Selections set forth in Section 2 above shall be as agreed upon by the NFL and the NFLPA.

**Section 11. Undrafted Rookies:** Any person who has not been selected by a Club in a College Draft shall be free, after the completion of a College Draft for which he is eligible, to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such person after such date, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind.

**Section 12. Notice of Signing:** Promptly following but no later than two business days after receipt of notice of the signing of any Drafted or Undrafted Rookie, the NFL shall notify the NFLPA of such signing.

**Section 13. Workouts of Draft-Eligible Players:** In order to encourage fair competition among all Draft-eligible players who were invited to the NFL Scouting Combine, and to discourage any unfair advantages from individual workouts of such players, Clubs are prohibited from attending or conducting, directly or indirectly, any workouts of any Draft-eligible player(s)

Article XVI, College Draft

who were invited to, and were not excused from (because of medical or other reasons) attending or participating fully in workouts at, the NFL Scouting Combine.

# ARTICLE XVII
# ENTERING PLAYER POOL

**Section 1. Definition**: For purposes of this Article XVII of this Agreement, the following terms shall have the meanings set forth below:

(a)      "Entering Player Pool" means the League-wide limit on the total amount of Salary to which all of the NFL Clubs may contract for in signing Drafted Rookies (and certain amounts contracted to be paid to Undrafted Rookies as described below) during each League Year of this Agreement, as set forth below.

(b)      Salary shall be defined and calculated in the same manner as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). In the event a Rookie who is subject to the Entering Player Pool signs a Player Contract after the commencement of the regular season, the Club must have Room under its Rookie Allocation for the entire Paragraph 5 amount of the contract.

**Section 2. Covered League Years**: The Entering Player Pool will be in effect in all League Years, except as set forth below. The NFL may remove the Entering Player Pool at its option in any Uncapped Year, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year. Further, in any Capped Year, the NFL may remove the Pool, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year, but to the extent that any Club spends more than its Rookie Allocation in that League Year, the Club will pay an equivalent number of dollars to its Veteran players pursuant to reasonable allocation instructions by the NFLPA.

**Section 3. Calculation**:

(a)      *For the 2002-03 League Years, the Entering Player Pool shall consist on a League-wide basis of the amount of the Entering Player Pool for the immediately preceding League Year (excluding any formula allotments attributable to any Compensatory Draft Selections). For the 2004-07 League Years,* the Entering Player Pool shall consist on a League-wide basis of the amount of the Entering Player Pool for the immediately preceding League Year (excluding any formula allotments attributable to any Compensatory Draft Selections), increased by the same percentage as the increase in Projected DGR for that League Year over the prior year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of *five* percent (5%) per season, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, to the extent there are Compensatory Draft Selections as a result of Article XVI (College Draft), Section 2 and/or Article XX (Franchise and Transition Players), Section 13, the Entering Player Pool shall be in-

creased in accordance with subsection (c) below and as otherwise agreed upon by the NFL and the NFLPA.

*Extension Agreement 1/8/02*

(b)     For each League Year of this Agreement, each Club shall have a Rookie Allocation, which shall be its proportional share of the Entering Player Pool, calculated based on the number, round, and position of the Club's selection choices in the Draft. The Rookie Allocation formula shall be agreed upon by the NFL and the NFLPA and shall remain in effect for the duration of the Agreement, unless the NFL and the NFLPA otherwise agree.

(c)     If, pursuant to Article XVI (College Draft), Section 2 and/or Article XX (Franchise and Transition Players), Section 13, a Club has one or more Compensatory Draft Selections, an amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding subsection (b) above), based upon the amount allotted to selection choices of that round and position in calculating the Rookie Allocation (the "Formula Allotment"). In the event that a Club signs a Player Contract with a Drafted Rookie who was drafted in a prior League Year, an additional amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding subsection (b) above), equal to the lower of the Club's original Formula Allotment for such draft choice or the amount of unused Room under the Club's Rookie Allocation during the League Year in which the player was originally drafted.

(d)     Notwithstanding the above, nothing shall prevent the Club from signing a player for an amount in excess of the player's Formula Allotment, if the Club has Room available under its Rookie Allocation.

(e)     In the event that the NFL holds a supplemental draft in addition to its annual Draft in advance of the next League Year's Draft, adjustments shall be made to the Entering Player Pool and Rookie Allocation in a manner to be agreed upon by the NFL and the NFLPA.

(f)     *In any League Year in which one or more expansion Teams enter the League, the amount of the Entering Player Pool shall be increased to account for the draft selections of any such expansion Teams. This additional amount shall not be deducted from the calculation of the Performance-Based Pool provided for in Article XXXVIII-B, Section 1(b).*

*Extension Agreement 1/8/02*

*In the event the NFL holds a supplemental draft in addition to its annual College Draft in advance of the following League Year's College Draft, there shall be added to each selecting Club's Rookie Allocation, and (cumulatively, if more than one selecting Club) to the Entering Player Pool for that League Year, an amount equal to the Formula Allotment for the corresponding choice(s) in

Case 2:12-md-02323-AB Document 8405-11 Filed 09/25/17 Page 67 of 317

that League Year's College Draft. In the subsequent League Year, after Formula Allotments have been established for each selection position in the College Draft, the amount of the Formula Allotment(s) for the selections used in the prior year's supplemental draft shall be deducted from the Club's Rookie Allocation. See Article XVII, Sec. 3 (e) of the CBA.

Example: If Team A selects a player in a supplemental draft with the first choice in the third round, Team A's Rookie Allocation for that League Year shall be increased by an amount equal to the Formula Allotment for the first choice in the third round of that year's College Draft. An amount equal to the Formula Allotment for the first choice in the third round of the prior League Year's Draft shall be eliminated from the subsequent League Year's Entering Player Pool, in that Club's Rookie Allocation, but all other Rookie Allocations remain the same.

*Side Letter 5/24/95

**Section 4. Operation:**

(a)     No Club may enter into Player Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Salaries in the first League Year of such Player contracts that would exceed the Club's Rookie Allocation for that year.

(b)     For the purposes of this Article XVII, the Salary of any Undrafted Rookie shall count toward the Club's Rookie Allocation only to the extent that it exceeds the then applicable Minimum Active/Inactive List Salary for that player.

(c)     In the event that a Draft selection is assigned to another Club prior to completion of the Draft, the amount of the Formula Allotment for such selection shall be assigned to the Club receiving the selection under the assignment. A Club may not assign the exclusive negotiating rights to a Drafted Player to another Club if such New Club does not have Room under its Rookie Allocation equal to at least the original Formula Allotment for the player, unless the player consents to such assignment.

(d) (i)     If a Drafted Player is placed on waivers, the player's Formula Allotment remains with the Club that requested waivers on him, and the assignee Club must have Room or make Room under its Rookie Allocation to make the Required Tender to the player.

(ii)     If a Club requests waivers on a Drafted Rookie and that player is released via waivers, the requesting Club can sign that player to a Player Contract during that League Year only if the Club has Room under its Rookie Allocation equal to the full Salary contracted for in that League Year.

(e)     No Player Contract signed by a Rookie may provide for an annual increase in Salary of more than 25% of the contract's first League Year

Article XVII, Entering Player Pool

Salary, unless such Player Contract provides for Salary which is equal to the then applicable Minimum Salary for each League Year of the contract. For the purposes of the calculation in this section only, any amount of a signing bonus attributed to the player's Salary shall not be counted.

* If a Rookie contracts with a Club for the minimum workout payments set forth in Article XXXV, for his second or subsequent season, such payments shall not be included for the purposes of the 25% calculation under Article XVII, Section 4(e). If a Rookie contracts with a Club for a workout payment in excess of the minimum, such excess amount shall be included for the purposes of the 25% calculation under Article XVII, Section 4(e). In all cases, a workout payment shall count toward Team Salary and a Team's Rookie Allocation.

*Side Letter 6/23/93: Sec. 1

* Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA.

*Side Letter 10/21/96: Sec. 3(a)

* The parties acknowledge that Class Counsel together with the NFLPA, and the NFL Management Council, disagree as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this paragraph [and the one preceding], the terms of [both these] paragraph[s]...may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all of their rights with respect to the subject of this paragraph.

54

Article XVII, Entering Player Pool

*Side Letter 10/21/96: Sec. 3(b)

* Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Side Letter 10/21/96: Sec. 4

(f)     The Player Contract of a Drafted Rookie or Undrafted Rookie may not be renegotiated for a one (1) year period following the date of the initial signing of such Player Contract, or until August 1 of the following League Year, whichever is later.

(g)     Nothing in this Agreement is intended to or shall be construed to mean that any Rookie's Salary is predetermined by any Allocation or Formula Allotment.

(h)     The list of each Formula Allotment attributed to each draft selection shall be agreed to by the NFL and the NFLPA, and shall not be disclosed to Clubs, Players, Player Agents or the public.

* For purposes of the Entering Player Pool and a Team's Rookie Allocation, amounts contracted to be paid to Drafted Rookies, and amounts in excess of the applicable Minimum Active/Inactive List Salary contracted to be paid to Undrafted Rookies pursuant to Article XVII, Section 4, shall be counted against the Entering Player Pool and a Team's Rookie Allocation, whether or not the amounts are actually paid, in the manner otherwise specified in the CBA.

*Side Letter 6/23/93: Sec. 7

55

Article XVII, Entering Player Pool

\* [I]n League Years for which no Salary Cap is in effect, 85% of any amount contracted by a Team to be paid from the Team's Rookie Allocation to a Rookie, but not actually paid by the Team to that player, either as a rookie, or as a re-signed first year player or practice squad player, which amount was not paid because that player was released, will be distributed to all rookies on such Team promptly after the end of the season on a pro rata basis based upon the number of downs played.

*Side Letter 6/23/93

\* [I]f a Club has a Rookie Orientation Program apart from its allowable mini camp(s) and prior to its training camp, the following categories of per player reimbursements or payments will not be counted against the Entering Player Pool:
(1) One Round Trip Airline Ticket or its cash equivalent from the player's place of residence to the Club city and back, not to exceed $750.
(2) Room and Board of up to $100 per day or its equivalent, up to a maximum of 60 days.
(3) Ground transportation to and from the player's place of residence in the club's city to the club's facility.
Any amounts in excess of the above reimbursements or payments will count against the Entering Player Pool.

*Side Letter 8/4/93: Sec. 1 as amended, Side Letter 5/13/99

\* The above reimbursements or payments for Rookie Orientation Programs will not be considered Player Costs during the term of this Agreement. The parties reserve their respective rights and arguments with respect to whether any amounts in excess of the above reimbursements or payments do or do not qualify as Player Costs under the Agreement.

*Side Letter 8/4/93: Sec. 2

\* Costs associated with the Rookie Orientation Programs will be evaluated by the NFLPA, Class Counsel, and the NFLMC each year to determine if adjustment, with respect to the Entering Player Pool, is appropriate.

*Side Letter 8/4/93: Sec. 3

**See Pages 110-129 for Rookie "Likely To Be Earned" Incentives. Article XXIV, Section 7(c).

56

# ARTICLE XVIII
# VETERANS WITH LESS THAN THREE
# ACCRUED SEASONS

*Section 1.* **Accrued Seasons Calculation:**

(a)     For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for each season during which he was on, or should have been on, full pay status for a total of six or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a non-football injury, or (iii) a Club's Practice or Development Squad.

(b)     For the purposes of calculating Accrued Seasons under this Agreement, for any League Year during the term of this Agreement, a player shall not receive an Accrued Season for any League Year in which the player is under contract to a Club and in which he failed to report to such Club at least thirty days prior to the first regular season game of that season, or in which the player thereafter failed to perform his contract services for the Club for a material period of time, unless he demonstrates to the Impartial Arbitrator extreme personal hardship causing such failure to report or perform, such as severe illness or death in the family. The determination of the Impartial Arbitrator shall be made within thirty days of the application by the player, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

*Section 2.* **Negotiating Rights of Players with Less Than Three Accrued Seasons:** Any Veteran with less than three Accrued Seasons whose contract has expired may negotiate or sign a Player Contract only with his Prior Club, if on or before March 1 his Prior Club tenders the player a one year Player Contract with a Paragraph 5 Salary of at least the Minimum Active/Inactive List Salary applicable to that player. If the Prior Club has not by that date made the Required Tender or later withdraws such tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 3.* **Notice of Signing:** Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

Article XVIII, Veterans With Less Than Three Accrued Seasons

** See Pages 41-42, Article XIV, Section 5(a) for Side Letter of 5/24/95, Section 13 and Side Letter of 3/3/97, Section 2 re: Notice of Signing.

** See Page 44, Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

# ARTICLE XIX
# VETERAN FREE AGENCY

**Section 1. Unrestricted Free Agents:**

(a)    Subject to the provisions of Article XX (Franchise and Transition Players), any player with five or more Accrued Seasons, or with four or more Accrued Seasons in any Capped Year, shall, at the expiration of his Player Contract, become an Unrestricted Free Agent. Such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, subject to the signing period set forth below.

(b)    Signing Period.

(i)    In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by July 22 or the first scheduled day of the first NFL training camp, whichever is later, in the League Year following the expiration of his last Player Contract, he may negotiate or sign a Player Contract from July 22 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, only with his Prior Club, provided that the Prior Club by June 1 has tendered to the player a one year Player Contract of at least 110% of either (a) his Prior Year Salary (if his expiring Player Contract is not a Player Contract he entered into as a Rookie), or (b) his Paragraph 5 Salary (if his expiring Player Contract is a Player Contract he entered into as a Rookie, without renegotiation), in each case with all other terms of his contract identical to his prior year's contract. For the purposes of this subsection, "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the last year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Prior Year Salary shall also include any unrepaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

*\* Side Letter 1/22/01*

(ii)    If an Unrestricted Free Agent described in subparagraph (b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

**59**

(iii)     If an Unrestricted Free Agent does not play in the NFL for the remainder of a League Year pursuant to subparagraph (b)(ii) above, commencing the first day of the following League Year, the player shall be free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by June 1 of the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date tendered to the player a one year Player Contract in accordance with the requirements of subparagraph (b)(i) above, or has withdrawn the tender, the player shall continue to be an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)     An Unrestricted Free Agent shall not be subject to any limitations on the period of time before which he may qualify as an Unrestricted Free Agent again, or to any limitations on the number of times he may be an Unrestricted Free Agent.

(e)     Promptly upon but no later than two business days after the signing of any Unrestricted Free Agent to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

**See Pages 41-42, Article XIV, Section 5(a) for Side Letter of 5/24/95, Section 13 and Side Letter of 3/3/97, Section 2 re: Notice of Signing.

**See Page 44, Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

### Section 2. Restricted Free Agents:

(a)     Any Veteran player with three or more Accrued Seasons, but less than five Accrued Seasons (or less than four Accrued Seasons in any Capped Year), shall, at the expiration of his last Player Contract during such period, become a Restricted Free Agent. Any such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, subject to the restrictions set forth in this Article.

(b)     In order to receive the following specified Rights of First Refusal and/or Draft Choice Compensation with respect to a Restricted Free Agent, the Prior Club of a Restricted Free Agent must tender the player a Qualifying Offer on or before the first date of the Restricted Free Agent Signing Period,

as follows:

(i)    For Restricted Free Agents with three Accrued Seasons:

(1)    <u>Right of First Refusal</u>: one year Player Contract with Paragraph 5 Salary of at least $275,000;

(2)    <u>Right of First Refusal and Draft Selection at Player's Original Draft Round</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $275,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

(3)    <u>Right of First Refusal and One First Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $600,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(4)    <u>Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $800,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(ii)    For Restricted Free Agents with four Accrued Seasons (in Uncapped Years):

(1)    <u>Right of First Refusal</u>: one year Player Contract with Paragraph 5 Salary of at least $325,000;

(2)    <u>Right of First Refusal and Draft Selection at Player's Original Draft Round</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $325,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this subsection is subject to the rules of subsection (c) below);

(3)    <u>Right of First Refusal and One First Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $700,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

(4)    <u>Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection</u>: one year Player Contract with Paragraph 5 Salary of at least (a) $900,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

(c)    Notwithstanding subparagraphs 2(b)(i) and 2(b)(ii) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the first round a Qualifying Offer

Article XIX, Veteran Free Agency

that requires Draft Choice Compensation of one first round selection (the "Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one second round selection for any of its Restricted Free Agents originally selected in the first round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the Upgraded Tender.

(d)     Notwithstanding subsections 2(b)(i) and 2(b)(ii) above, in the event that the player was originally selected in a draft round after the seventh round, a Qualifying Offer in the amount required to obtain a Right of First Refusal and Draft Choice Compensation at the Player's original Draft Round shall entitle a Club only to a Right of First Refusal for such player.

(e)     The amounts of the Qualifying Offers specified in this paragraph ($275,000, $325,000, $600,000, $700,000, $800,000 and $900,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall Qualifying Offer amounts increase if the projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

(f)     A Restricted Free Agent shall have the option of accepting a one year NFL Player Contract for 110% of his Prior Year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) in lieu of a Player Contract for the applicable alternative amount specified in this paragraph, if he so wishes, regardless of which Player Contract is for a greater amount.

(g)     In the event a Prior Club withdraws its Qualifying Offer, the Restricted Free Agent shall immediately become an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without being subject to First Refusal, Draft Choice Compensation, Signing Period, or any other limitation of any kind.

\*\* See Page 44, Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

(h)     **Signing Period.** *The dates of the period in which Restricted Free Agents shall be free to negotiate and sign a Player Contract with any Club (the "Signing Period") shall be agreed upon by the NFL and the NFLPA by the previous September 1, but in no event may such Signing Period be less than a period of forty-five days, unless the parties agree otherwise.*

                                                                    *\* Side Letter 1/22/01*

62

(i) (i)   In the event that a Restricted Free Agent has not signed a Player Contract with a Club within the Signing Period in the League Year following the expiration of his last Player Contract, and if the Prior Club by June 1 tenders to the Restricted Free Agent a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) or extends the player's Qualifying Offer, whichever is greater (the "June 1 Tender"), the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from June 1 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time. If the player's Qualifying Offer is greater than 110% of the player's Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged), the Club may withdraw the Qualifying Offer on June 15 and retain its rights under the preceding sentence, so long as the Club immediately tenders the player a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) (the "June 15 Tender").

(ii)   If a Restricted Free Agent described in subsection (i)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall not play football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(iii)   If a Restricted Free Agent does not play in the NFL in a League Year, his Prior Team shall have the right to tender such player any Qualifying Offer consistent with Section 2(b) prior to the next League Year's Restricted Free Agent Signing Period. In the event such a Qualifying Offer is tendered, the Prior Team shall have the applicable rights regarding such player according to such tender, and such player shall have the same rights regarding negotiations with other Clubs as he had the previous League Year.

(j)   In the event that a Restricted Free Agent has not signed a Player Contract with a Club by June 1 in the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date made the applicable June 1 Tender to such player, or withdraws the tender, or in the event the Club has withdrawn the applicable June 15 Tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club may negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(k)   Promptly upon but no later than two business days after the signing of any Restricted Free Agent to a Player Contract, or the extending

63

to any Restricted Free Agent of a Qualifying Offer, the signing or extending Club shall notify the NFL, which shall notify the NFLPA of such signing or offer.

\*\* See Pages 41-42, Article XIV, Section 5(a) for Side Letter of 5/24/95, Section 13 and Side Letter 3/3/97, Section 2 re: Notice of Signing.

(l)      Draft Choice Compensation under this Article shall be due in that League Year's Draft unless the Offer Sheet is received by the Prior Club later than two days before that League Year's Draft, in which case Draft Choice Compensation shall be due in the following League Year's Draft.

(m)      Notwithstanding the foregoing, in the event that the Prior Club of a Restricted Free Agent has tendered the player a Qualifying Offer pursuant to this Article XIX, Section 2(m) in an amount at least $500,000 greater than that specified by Sections 2(b)(i)(4) or 2(b)(ii)(4) above, as applicable depending upon whether the League Year is a Capped Year or an Uncapped Year, or by Article LVI, Section 2(b), if applicable, then the Club shall have a Right of First Refusal and Draft Choice Compensation of only One First Round Selection, but any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet).

**Section 3. Offer Sheet and First Refusal Procedures:**
(a)      Offer Sheets. When a Restricted Free Agent receives an offer to sign a Player Contract from any Club (the "New Club") other than the Prior Club, which offer the player desires to accept, he shall give to the Prior Club a completed certificate substantially in the form of Appendix D, attached hereto (the "Offer Sheet"), signed by the Restricted Free Agent and the New Club, which shall contain the "Principal Terms" (as defined below) of the New Club's offer. The Prior Club, within seven days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth below.
(b)      First Refusal Exercise Notice. If the Prior Club gives the Restricted Free Agent a "First Refusal Exercise Notice" substantially in the form of Appendix E, attached hereto, within seven days from the date the Prior Club receives an Offer Sheet, but not later than four days before the Draft, such Restricted Free Agent and the Prior Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms (subject to subsection (e) below); (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favor-

able to the player than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the Prior Club.

(c)     No First Refusal Exercise Notice. If the Prior Club does not give the Restricted Free Agent the First Refusal Exercise Notice within the applicable period, the player and the New Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms; (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the Restricted Free Agent than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the New Club (subject to Section 5 below), and the Restricted Free Agent's Prior Club shall receive from the New Club the Draft Choice Compensation, if any, specified in Section 2 above of this Article. Any Club that does not have available, in the upcoming Draft, the selection choice or choices (its own or better choices in the applicable rounds) needed to provide Draft Choice Compensation in the event of a timely First Refusal Exercise Notice may not sign an Offer Sheet in such circumstances. The player and the New Club may not renegotiate such Player Contract to reduce the Salary in such contract until the date after the trading deadline in that League Year.

> * Neither the Player nor the New Club may exercise an option in such Player Contract that reduces Salary in the first League Year of such contract until the date after the trading deadline in that League Year.
> *Side Letter 4/16/98

(d)     One Offer Sheet. There may be only one Offer Sheet signed by a Restricted Free Agent outstanding at any one time, provided that the Offer Sheet has also been signed by a Club. An Offer Sheet, before or after it is given to the Prior Club, may be revoked or withdrawn only by the Clubs upon the written consent of the Restricted Free Agent. In either of such events, the Restricted Free Agent shall again be free to negotiate and sign a Player Contract with any Club, and any Club shall again be free to negotiate and sign a Player Contract with such Restricted Free Agent, subject to the Prior Club's continued Right of First Refusal and/or Draft Choice Compensation as described in this section.

(e)     Principal Terms. For the purposes of this section, the Principal Terms of an Offer Sheet are only:

(i)     Salary, which shall consist only of: (a) the fixed and specified dollar amounts the New Club will pay, guarantee or lend to the Restricted Free Agent and/or his designees (currently and/or as deferred compensation in specified installments on specified dates) in consideration for his services as a football player under the Player Contract (i.e., signing bonus, Paragraph 5 Salary, and reporting and roster bonuses); and (b) Salary that is

Article XIX, Veteran Free Agency

variable and/or is subject to calculation only upon the following bases: (i) based upon performance of the Club extending the Offer Sheet (only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to subsection (c) above, must be matched by the Prior Club for the purpose of exercising a Right of First Refusal, and such incentives may not exceed fifteen percent (15%) of the Salary in the Offer Sheet); and (ii) generally recognized league honors to be agreed upon by the parties; and

    (ii)    Any modifications of and additions to the terms contained in the NFL Player Contract requested by the Restricted Free Agent and acceptable to the New Club, that relate to non-compensation terms (including guarantees, no-cut, and no-trade provisions) of the Restricted Free Agent's employment as a football player (which shall be evidenced either by a copy of the NFL Player Contract, marked to show changes, or by a brief written summary contained in or attached to the Offer Sheet).

    (f)    No Property or Investments. A Club may not offer any item of property or investments other than Salary as part of the Principal Terms contained in an Offer Sheet.

    (g)    Incentives. For those incentives which are based on Club performance, only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to subsection (c) above, must be matched by the Old Club for the purpose of exercising a Right of First Refusal.

    (h)    No Consideration Between Clubs. There may be no consideration of any kind given by one Club to another Club in exchange for a Club's decision to exercise or not to exercise its Right of First Refusal, or in exchange for a Club's decision to submit or not to submit an Offer Sheet to a Restricted Free Agent or to make or not to make an offer to enter into a Player Contract with a Restricted Free Agent. If a Club exercises its Right of First Refusal and matches an Offer Sheet, that Club may not trade that player to the Club that submitted the Offer Sheet for at least one calendar year, unless the player consents to such trade.

    (i)    NFL Only. No Right of First Refusal rule, practice, policy, regulation, or agreement, including any Right of First Refusal applicable to any Restricted Free Agent or Transition Player pursuant to Article XX (Franchise and Transition Players) below, may apply to the signing of a Player Contract with, or the playing with, any club in any professional football league other than the NFL by any Restricted Free Agent (except as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below).

    (j)    No Assignment. No Right of First Refusal may be assigned to any other Club (except as provided in Article XVI (College Draft), Section 7 or as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this

66

Agreement (except as described in Section 5 below), including any Right of First Refusal with respect to Restricted Free Agents, Transition Players, or Drafted Rookies described in Article XVI (College Draft), Section 5.

(k)     Copies. Promptly upon but no later than two business days after the giving of an Offer Sheet to the Prior Club, the Restricted Free Agent shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. Promptly upon but no later than two business days after the giving of a First Refusal Exercise Notice to the Restricted Free Agent, the Prior Club shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. At any time after the giving of an Offer Sheet to a Prior Club, the NFL may require the New Club to cause a copy thereof to be given to the NFL and the NFLPA by telecopy.

**Section 4. Expedited Arbitration:** An expedited arbitration before the Impartial Arbitrator, whose decision shall be final and binding upon all parties, shall be the exclusive method for resolving the disputes set forth in this Section. If a dispute arises between the player and either the Prior Club or the New Club, as the case may be, relating to their respective obligations to formalize their binding agreements created under sections 3(b) or (c) above, or as to whether the binding agreement is between the Restricted Free Agent and the New Club or the Restricted Free Agent and the Prior Club, such dispute shall immediately be submitted to the Impartial Arbitrator, who shall resolve such dispute within ten days but in no event later than two (2) days before the Draft. The Impartial Arbitrator shall not have the power to terminate any such binding agreement; he shall have the power only to direct the parties to formalize such binding agreement into a Player Contract in accordance with the Principal Terms of the applicable Offer Sheet, as interpreted by the Impartial Arbitrator.

**Section 5. Individually Negotiated Limitations on Player Movement:**
(a)     All individually negotiated limitations on player movement are prohibited, except as specifically provided as follows:

(i)     If a Restricted Free Agent has been tendered a Qualifying Offer of (a) Paragraph 5 Salary of at least $275,000 for a player with three Accrued Seasons, or (b) at least $325,000 for a player with four Accrued Seasons, or (c) at least 110% of his prior year's Paragraph 5 Salary, whichever is greater (in each case with all other terms of his prior year contract carried forward), and the Qualifying Offer is fully guaranteed for skill and injury, the Restricted Free Agent and his Prior Club may negotiate and contract for an individual Right of First Refusal with respect to the services of such player.

(ii)     Any Unrestricted Free Agent shall be permitted to negotiate and contract for an individual Right of First Refusal with any Club with respect to the services of such player so long as the player is not a Franchise Player or Transition Player at the time of such negotiation and contract.

Article XIX, Veteran Free Agency

(b)       Any player (other than a Free Agent) with less than three Accrued Seasons is prohibited from negotiating any individual limitations on his movement in his Player Contract or otherwise, and all Clubs are prohibited from negotiating any such limitations with such players.

(c)       Any individual Right of First Refusal that is negotiated and contracted for pursuant to subsection (a) or (b) above shall be void and unenforceable unless it is specified in a separate document signed by such player in the form annexed hereto as Appendix F, acknowledging such player's waiver of the express right that Unrestricted Free Agents have under this Agreement to be free of any Right of First Refusal restriction on their freedom of movement.

(d)       Any individually negotiated Rights of First Refusal in any Player Contract existing at the time of the execution of this Agreement shall remain in effect only if written to supersede any litigation settlement agreement or any collective bargaining agreement ("CBA"). Existing individually negotiated Rights of First Refusal that provide that a CBA will govern shall be deemed to be superseded by this Agreement to the extent of any conflict.

(e)       The amounts specified in this section ($275,000 and $325,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), up to a maximum of ten percent (10%) per League Year, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, in no event shall such tender amounts increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

(f)       Rights of First Refusal negotiated pursuant to this Section 5 may be traded or assigned as part of a player's contract.

**Section 6. Notices, Etc.:**

(a)       Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article XIX (Veteran Free Agency), shall be sent either by personal delivery or by overnight mail, or by telecopy (in each case a confirmation copy shall also be sent by certified or registered mail), addressed as follows:

> * The confirmation copy described in Article XIX, Section 6 (a) of the CBA may sent by first class mail, postage prepaid, instead of certified or registered mail.
> *Side Letter 5/24/95: Sec. 12

(i)       To any NFL Club: addressed to that Club at the principal address of such Club as then listed on the records of the NFL or at the Club's principal office, to the attention of the Club's president or general manager;

(ii)     To the NFL, 280 Park Avenue, New York, New York  10017, to the attention of Executive Vice President-Labor Relations;

(iii)     To a Restricted Free Agent: to his address listed on the Offer Sheet and, if the Restricted Free Agent designates a representative on the Offer Sheet and lists such representative's address thereon, a copy shall be sent to such representative at such address; and

(iv)     To the NFLPA, 2021 L Street, N.W., Suite 600, Washington, D.C. 20036.

(b)     An Offer Sheet shall be deemed given only when received by the Prior Club. A First Refusal Exercise Notice, a Qualifying Offer and any other writing required or permitted under Article XIX (Veteran Free Agency) shall be deemed given when sent by the Prior Club.

(c)     Subject to Article XXVIII (Anti-Collusion), Section 1, below, the NFL shall have the right to prepare and circulate to all Clubs two lists containing, respectively, no more than the name, address, Social Security number, telephone number, college, position, Team, Right of First Refusal and/or any Draft Choice Compensation of each and every player who shall or has become (i) an Unrestricted Free Agent; or (ii) a Restricted Free Agent, as of March 1, or as of the first date of the Signing Period, respectively ("Free Agent Lists"), and no other list relating to free agents. Information shall not be selectively withheld for some players but not others. If one or more Free Agent Lists are so circulated, copies thereof shall be sent to the NFLPA.

# ARTICLE XX
# FRANCHISE AND TRANSITION PLAYERS

**Section 1.** Franchise Player Designations: Except as set forth in Sections 3, 9, *and 17* below, each Club shall be permitted to designate one of its players who would otherwise be an Unrestricted Free Agent as a Franchise Player each season during the term of this Agreement. The player so designated may be one who would otherwise be a Restricted Free Agent. Any Club that designates a Franchise Player shall be the only Club with which such Franchise Player may negotiate or sign a Player Contract, during the period the player is so designated, notwithstanding the number of his Accrued Seasons (except as provided in Sections 2(b) and 2(c) below). Any such designation must be made between February 1 and February 15 of each League Year or during such other period as may be agreed on by the Management Council and the NFLPA, with the period ending at 4:00 p.m. New York time.

*\* Extension Agreement 1/8/02*

> *\* The period for Clubs to designate Franchise Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00 p.m. New York time on the eighth day preceding the first day of the new League Year.*
> *\* Side Letter 1/22/01*

**Section 2. Required Tender for Franchise Players:**

(a)-(b)  *[no longer applicable]*

(c)      *Any* Club that designates a Franchise Player shall on the date the designation is made notify the player and the NFLPA which one of the following two potential required tenders the Club has selected:

(i)      A one year NFL Player Contract for the average of the five largest Prior Year Salaries for players at the position at which the Franchise Player played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater; if the Club extends the tender pursuant to this Subsection (c)(i), the player shall be permitted to negotiate a Player Contract with any Club as if he were a player subject to Section 5 below, except that Draft Choice Compensation of two first round draft selections shall be made with respect to such player in the event he signs with the New Club, and the Signing Period for such player shall be determined under Section 17 below; or

(ii)     A one year NFL Player Contract for (1) the average of the five largest Salaries in Player Contracts for that League Year as of the end of the Restricted Free Agent Signing Period that League Year, as set forth in Article XIX (Veteran Free Agency), Section 2(h), for players at the position at which he played the most games during the prior League Year, or (2) the amount of the required tender under subsection (c)(i) above, whichever is greater.

(iii)     If a player subject to a Franchise Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this paragraph only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties under Article X (Injury Grievance), whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, providing such exam takes place within twenty (20) days of the contract termination.

(d)     Any of the required tenders set forth in this Section 2 may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

** See Page 44, Article XIV, Section 8 for Side Letter of 3/3/97, Section 1 re: Good Faith of Required Tender.

(e)     For the purpose of this Article, "Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the applicable year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Salary shall also include any unrepaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate during or after the 1993 League Year.

(f)     The calculation of any five largest Salaries pursuant to this Article shall not include: (i) any Player Contract resulting from an acceptance of a tender extended pursuant to subsection (b)(i)(1) or (c)(ii) above, without any increase in Salary above the tender; or (ii) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date; provided, however, that Player Contract amounts in existence prior to such renegotiations shall be used if otherwise appropriate.

(g)     If a Franchise Player receives a required tender pursuant to Section 2(c)(i) above, any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a re-

Article XX, Franchise and Transition Players

sult of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet). This subsection (g) shall not apply to a player who was designated as a Transition Player in lieu of being designated as a Franchise Player, pursuant to Section 3(a) below, or to any other Transition Player.

* Extension Agreement 2/25/98

> \* [T]he definition of a "Signing Bonus" for purposes of the top 5 and top 10 minimum tenders is the same under the Salary Cap, that the pro-rata portion of such Signing Bonuses includes prorated amounts from prior Player Contracts, and that the Salary Cap acceleration rules for unamortized Signing Bonus amounts do not apply to the calculation of the top 5 and top 10 minimum tenders.
>
> *Side Letter 2/14/94

> \* For purposes of calculating the minimum tenders to Franchise and Transition players under Article XX, if the present value of any deferred Paragraph 5 amount (as defined in Article XXIV, Section 7, Paragraph (a)(ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.
>
> *Side Letter 6/23/93: Sec. 5

**Section 3. Transition Player Designations:**

(a)      Each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15 in the Final League Year, with the period ending at 4:00 p.m. New York time. In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one Unrestricted Free Agent or Restricted Free Agent as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designation permitted by the immediately preceding sentence, during the same designation period as the Franchise Player designation period.

> *\* The period for Clubs to designate Transition Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00 p.m. New York time on the eighth day preceding the first day of the new League Year.*
>
> *\* Side Letter 1/22/01*

(b)      Any Club that designates a Transition Player shall receive the

72

Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last player contract to July 22, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

*Extension Agreement 1/8/02*

**Section 4. Required Tender for Transition Players:**
(a)     Any Club that designates a Transition Player shall be deemed on the first day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

** See Pages 71-72, Article XX, Section 2(g) for Side Letter 6/23/93, Sec. 5 re: Calculation of Minimum Tender to Franchise and Transition Players.

(b)     *[no longer applicable]*
(c)     The calculation of any ten largest Salaries pursuant to this Article shall not include: (i) any Player Contract amount resulting from an acceptance of a tender pursuant to subsection (b)(i) above, without any increase in Salary above the tender; or (ii) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date; provided, however, that Player Contract amounts in existence prior to such renegotiations shall be used if otherwise appropriate.

**Section 5. Right of First Refusal for Transition Players:** Any player designated as a Transition Player shall, at the expiration of his prior year Player Contract, be permitted to negotiate a Player Contract with any Club. When the Transition Player negotiates such an offer with a New Club, which the player desires to accept, he shall give to the Prior Club a completed Offer Sheet, signed by the player and the New Club, which shall contain the Prin-

73

Article XX, Franchise and Transition Players

cipal Terms (as defined in Article XIX (Veteran Free Agency)) of the New
Club's offer. The Prior Club, within seven days from the date it receives the
Offer Sheet, may exercise or not exercise its Right of First Refusal, which
shall have the legal consequences set forth in Sections 3(b)-(h), 4 and 6 of
Article XIX (Veteran Free Agency) above, except that no Draft Choice Com-
pensation shall be made with respect to such player, and, for the purposes
of those provisions, the player and each Club shall otherwise have the same
rights and obligations as for a Restricted Free Agent set forth in those pro-
visions, notwithstanding the number of his Accrued Seasons.

**Section 6. Lists:** On each date following the dates set forth in Sections 1
and 3 above, the NFL shall provide to the NFLPA a list of each Unrestrict-
ed Free Agent designated as a Franchise Player or a Transition Player.

**Section 7. Salary Information:**
    (a)     No later than February 1 of each League Year during the term of
this Agreement, the NFL shall compile and disclose to the NFLPA a list of
each of the ten largest Prior Year Salaries for players at the following positions
which shall be utilized for calculating the average Prior Year Salaries of play-
ers at the positions of Franchise Players and Transition Players: Quarterback,
Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, In-
terior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter.
    (b)     No later than ten days after the last day of the Restricted Free
Agent Signing Period in each League Year during the term of this Agree-
ment, the NFL shall compile and disclose to the NFLPA a list of each of the
ten and five largest Salaries for players at the positions set forth in subpara-
graph (a) above which shall be utilized for calculating the applicable aver-
age Salaries of players at such positions as of the last day of the Restricted
Free Agent Signing Period (including the amount of Salary in any executed
Offer Sheets).
    (c)     Any dispute concerning the identity and Salaries of players in-
cluded within each player position category, or any other matter regarding
these figures, shall be submitted to and resolved by the Impartial Arbitrator
during the period from February 1 to February 15, or within twenty five
days after the last day of the Restricted Free Agent Signing Period, respec-
tively. The Impartial Arbitrator shall make an independent determination in
writing. In arriving at his determination, the Impartial Arbitrator shall con-
sider any relevant information furnished to him, and shall be provided ac-
cess to all relevant Player Contracts. The Impartial Arbitrator's determina-
tion shall be final and binding upon all parties.

**Section 8. No Assignment:** No Club may assign or otherwise transfer to
any other Club the exclusive negotiating rights or any Right of First Refusal
it may have for any Franchise Player, nor any Right of First Refusal it may
have for any Transition Player, nor any designation rights it may have.

74

*Section 9.* **Duration of Designation:**

(a)       Each Club that signs a player it designated as a Franchise Player to a Player Contract shall be deemed each League Year thereafter to have utilized its Franchise Player designation for each League Year for which such player entered into a Player Contract with such Club at the time when such player was subject to such designation (unless the Club exercised a Right of First Refusal with respect to a Franchise Player tendered a Player Contract pursuant to Sections 2(b)(ii) or 2(c)(i) above, in which case the Club shall be deemed to have utilized its Franchise Player designation only in the League Year of the designation). For example, without limitation on any other applicable example, a Franchise Player who signs a Player Contract for two League Years at a time when the player was subject to the designation shall be deemed to be the Club's Franchise Player for both such League Years. However, in the event that the designated player retires or suffers a career-ending injury (or an injury that prevents or will prevent the player from playing in 32 consecutive regular season games) which prevents him from playing a contract year entered into while under such designation (or is unavailable for the season due to non-injury circumstances beyond the control of the Club), such Club shall be permitted to designate another player in lieu of such injured, retired or unavailable player for each remaining League Year covered by the Club's prior designation for such player, provided that the Club designates a new Franchise Player during the designation period prior to the first League Year to be covered by the redesignation. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator. If a Club and a player agree to extend (either separately or as part of a renegotiation) a Player Contract prior to July 15 in the League Year for which the Club designated the player as a Franchise Player, such Club shall also be deemed to have utilized its Franchise Player designation pursuant to this Section 9 for the full period of that extension. If a Club and a player agree to extend (either separately or as part of a renegotiation) a Player Contract on or after July 15 in the League Year for which the Club designated the player as a Franchise Player, such Club shall not be deemed to have utilized its Franchise Player designation pursuant to this Section 9 for the period of the extension, unless there has been a violation of the provisions of Article XXV (Enforcement of The Salary Cap And Entering Player Pool), Sections 1 or 2, with respect to such contract extension.

(b)       *Clubs will have a window, beginning the day after the last day of the Franchise Player designation period and ending 4:00 p.m., New York time, on the fourteenth day following the start of the League Year, during which, if the Club signs its Franchise Player to a multi-year contract or extension, the Club may nonetheless retain its Franchise Player designation rights the following year. (By way of clarification, if the League Year begins on March 1, the window will end at 4:00 p.m., New York time, on March 15.) If a multi-year contract or extension is not signed during the window period, the current rules continue to apply without*

Article XX, Franchise and Transition Players

*prejudice or inference being drawn from the addition of this Section 9(b) in the January 8, 2002 amendments to this Agreement.*

* Extension Agreement 1/8/02

* If a Club withdraws a Franchise Player designation after the last date of the signing period for Unrestricted Free Agents (i.e., July 15 or the first scheduled day of the first NFL training camp, whichever is later), and the Club subsequently signs a Player Contract for that season with the player who was subject to the designation, and does so before the later of (i) 15 days after the withdrawal of the designation, or (ii) the day after the next scheduled NFL preseason game for the Club (not including any game played outside the U.S.), the Club shall be deemed to have signed the player while he was subject to the designation, and, pursuant to Article VIII, Paragraph 9 of the Settlement Agreement, and Article XX, Section 9 of the CBA, the Club shall have utilized its Franchise Player designation for each League Year for which such Player Contract was signed.

If a Club withdraws a Franchise Player designation after the date of its final cutdown to the Active List limit for that season, and the Club subsequently signs a Player Contract for that season with the player who was subject to the designation, and does so before the day after the Club's second regular season game after the withdrawal of the designation, the Club shall be deemed to have signed the player while he was subject to the designation, and, pursuant to Article VIII, Paragraph 9 of the Settlement Agreement, and Article XX, Section 9 of the CBA, the Club shall have utilized its Franchise Player designation for each League Year for which such Player Contract was signed.

*Side Letter 1/18/94: Sec. 1

* If a club executes a multiyear agreement with a player designated as a Franchise Player and trades the player the same day to another NFL club, the assignor club will be deemed to have used its franchise designation for only the League Year in which the contract was executed.

*Side Letter 4/21/95

* If a Club and a player whom the Club had designated as a Franchise Player in a prior League Year agree to ex-

tend a Player Contract that was agreed to when the player was subject to the Franchise Player designation, such Club shall not thereby be deemed to have utilized its Franchise Player designation pursuant to Article XX, Section 9 of the CBA for the period of the extension.
* Side Letter 5/24/95: Sec. 10

**Section 10. Franchise Player Designation Period:** A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the five largest Prior Year Salaries for players at the position category at which he played the most games during the prior League Year, or 120% of the player's Prior-Year Salary, whichever is greater. If a player designated to become the Franchise Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Club shall be entitled to designate a new Franchise Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 11. Transition Player Designation Period:** A Club may designate a Transition Player (or players) only during the periods and in the numbers specified in Section 3 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Transition Player with respect to any first future League Year during the term of this Agreement for which such player becomes an Unrestricted Free Agent; any such future designation exhausts the Club's designation right (and does not move to any other Club) even if the player moves to another Club, as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the ten largest Prior Year Salaries for players at the position that he played the most games during the prior League Year, or 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transi-

Article XX, Franchise and Transition Players

tion Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year.

> * If a Prior Club becomes entitled to designate a new Transition Player pursuant to Article XX, Section 11 (penultimate sentence) of the Collective Bargaining Agreement, the prior Club may designate the new Transition Player for that League Year between February 1 and February 15 of any League Year prior to the League Year in which the player initially designated would have become a Transition Player.
>
> *Side Letter 5/24/95: Sec. 15

Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Sections 12-13.** *[no longer applicable]*

**Section 14. Other Terms**: For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% of the Franchise Player's or Transition Player's Prior Year Salaries shall in addition to the 120% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

**Section 15. Compensatory Draft Selection**: The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**
　　(a)　　In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 22 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign

78

a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.
                                                            * *Side Letter 1/22/01*.

(b)      If a Transition Player described in subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)      If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

## Section 17. Signing Period for Franchise Players:

(a)      If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(b)      If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior year salary. If such a player is redesignated as a Franchise Player for the League Year following the League Year in which he does not play, the player may be designated only under Section 2(c)(i) above, except that Draft Choice Compensation of only one first round draft selection and one third

Article XX, Franchise and Transition Players

round draft selection shall be made with respect to such player in the event he signs with the New Club. If a Franchise Player who has sufficient Accrued Seasons to become an Unrestricted Free Agent is not designated as a Franchise Player or Transition Player for any League Year immediately following a League Year in which he does not play, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

80

# ARTICLE XXI
# FINAL EIGHT PLAN

**Section 1. Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

**Section 2. Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

**Section 3. Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:

(i)     One such player for a Player Contract that has a first year Salary of $1,500,000 or more; and

(ii)     Any number of such players for a Player Contract that has a first year Salary of no more than $1,000,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 4. Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New Club,

Article XXI, Final Eight Plan

and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 5. Increases:** The amounts specified in this Article ($1,500,000 and $1,000,000) shall increase each League Year following the 1993 League Year by the same percentage as the increase in Projected DGR over the prior League Year's DGR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected DGR for the League Year in question is not greater than the highest DGR of any previous League Year.

**Section 6. Salary Definition:** For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, pro-rata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

**Section 7. Trade Limitation:** No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

> \* [R]egarding whether Clubs subject to the Final Eight Plan are permitted to negotiate with and sign Transition Players, and Franchise Players who otherwise are permitted to negotiate and sign with other Clubs ... Final Eight Plan Clubs are permitted under the CBA to negotiate with and sign such players, since these players are not Unrestricted Free Agents.
>
> *Side Letter 8/4/93

> \* For purposes of the Final Eight Plan provisions, each of the eight teams subject to the provisions of Article IX of the Stipulation and Settlement Agreement and Article XXI of the Collective Bargaining Agreement may, after the later of July 15 or the first scheduled day of the first NFL training camp, in any League Year in which the Final Eight Plan is in effect, sign any Unrestricted Free Agent whose team did not make the June 1 Tender or whose team subsequently withdrew that Tender.
>
> *Side Letter 9/21/93: Sec. 20

82

# ARTICLE XXII
# WAIVER SYSTEM

*Section 1.* **Release**:

(a)    Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

(b)    Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

*Section 2.* **Contact**: Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

*Section 3.* **Ineligibility**: Any NFL player who is declared ineligible to compete in a preseason, regular season or postseason game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and Bylaws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

*Section 4.* **Notice of Termination**: The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice

Article XXII, Waiver System

of Termination will be sent to him by certified mail at his last address on file with the Club.

**Section 5. NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

**Section 6. Rosters:** The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

84

# ARTICLE XXIII
# TERMINATION PAY

**Section 1. Eligibility**: Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

    (1)    He is released after his Club's first regular season game; and

    (2)    He has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

Subject to Section 3 below, the amount of termination pay payable to such player shall be the unpaid balance of his Paragraph 5 Salary for that League Year. Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

**Section 2. Regular Season Signings**: The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the unpaid balance of the initial 25% of such player's Paragraph 5 Salary. If such player is released after the eighth regular season game, his termination pay shall be one week's salary, up to a maximum of $20,000.

**Section 3. Ineligibility For Termination Pay**: An otherwise qualified player will not be entitled to termination pay under this Article if the Club can demonstrate that, after receipt of a written warning from his Club in the form attached hereto as Appendix N, the player failed to exhibit the level of good faith effort which can be reasonably expected from NFL players on that Club.

> \* A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination. This paragraph may not be used or referred to in any pending case that was filed prior to the date of this letter, except to enforce the terms of this sentence.

> *Side Letter 3/3/97: Sec. 3

# ARTICLE XXIV
# GUARANTEED LEAGUE-WIDE SALARY,
# SALARY CAP, & MINIMUM TEAM SALARY

*Section 1*. **Definitions**: For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a) **Defined Gross Revenues**.

(i) "Defined Gross Revenues" (also referred to as "DGR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Defined Gross Revenues for each playing season during the term of this Agreement. Defined Gross Revenues shall include, without limitation:

(1) Regular season, preseason, and postseason gate receipts (net of admission taxes, and surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites and premium seating subject to gate receipt sharing among NFL Teams; and

(2) Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL preseason, regular season and playoff games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL preseason, regular season or playoff game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL expenses related to the project; and

(3) Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii) The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "DGR"): proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries, and sales of interests in real estate and other property.

Notwithstanding any other provision of this Agreement, revenues de-

rived from NFL Attractions (a joint venture that formerly included the NFL and St. Joe Corporation) from the operation of indoor NFL entertainment facilities, with entry rights separate from the stadium, which facilities do not permit the users thereof to view the live performance of players in NFL football games except by media available outside the stadium, shall not be included in DGR or Excluded DGR (except to the extent that revenues derived from NFL Attractions are addressed in the second sentence of Section 1(a)(iii) below). This exclusion shall apply so long as the business of NFL Attractions is conducted with a non-NFL third party that holds a non-de minimus interest and participates in the business of NFL Attractions. Each of the parties hereto reserves any positions it may have regarding whether any similar revenues derived from other sources are DGR, non-DGR or Excluded DGR.

Notwithstanding any other provision of this Agreement, the NFLPA and Class Counsel may agree, on a case-by-case basis, with no limitation on their exercise of discretion, not to include in DGR network television revenue to the extent that such revenue is used to fund the construction or renovation of a stadium that results in an increase of DGR and/or Excluded DGR.

(iii)    Notwithstanding subsection 1(a)(i) above, the following shall be considered "Excluded DGR" and not included in Defined Gross Revenues: revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that included in subsection 1(a)(i)(1) above, sales of programs and novelties, and any categories of revenue (other than those listed in subsections 1(a)(i)(1)-(3) above) currently included under NFL Films and NFL Properties, Inc. and its subsidiaries. To the extent that revenues of the NFL, NFL Properties, NFL Films, NFL Enterprises, any other NFL affiliate (other than NFL Attractions), any Club, or any Club affiliate result from any licenses to or other provision of intellectual property or other products or services to NFL Attractions, such revenues will be included in DGR or Excluded DGR, as appropriate, at no less than fair market value (e.g., to the extent that film, video, NFL logos or other intellectual properties or other products or services of such NFL and/or Club entities are utilized by NFL Attractions without the payment of any licensing fees, the fair market value amount shall be imputed). Any dispute over the fair market value shall be resolved in the first instance by the Accountants after consulting and meeting with representatives of both parties. In the event such dispute involves a disputed amount of $10 million or more, each party shall have a right to appeal such resolution to the Special Master, who shall review the dispute de novo, and whose decision shall be subject to appeal pursuant to Article XXVI, Section 2.

(iv)    In calculating Defined Gross Revenues, the amount of Excluded DGR divided by the sum of Excluded DGR plus DGR from all sources except network television revenues shall not exceed the percentage resulting

from dividing 1992 Excluded DGR by the sum of 1992 Excluded DGR plus 1992 DGR from all sources except network television revenues. In the event Excluded DGR for any season exceeds the percentage resulting from the above calculation, any excess Excluded DGR shall be included in DGR. For purposes of the calculations described in this subsection (iv), Excluded DGR shall not include any revenues referred to in subsection 1(a)(ii).

(v)     *[no longer applicable]*

(vi)    It is acknowledged by the parties hereto that for purposes of determining Defined Gross Revenues:

(1)     NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Defined Gross Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Defined Gross Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2)     NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities").

(vii)   The reasonableness and includability in DGR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(viii)  For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to DGR, Excluded DGR, Benefits, Player Costs, Projected DGR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix)*(1)* In calculating Defined Gross Revenues, each League Year up to $5 million per year shall be deducted from DGR to the extent that such sums are received that League Year by the NFLPA pursuant to Paragraphs 5, 12, 29 and 30 of the Stipulation and Settlement Agreement in <u>NFLPA</u> v. <u>NFL Properties, Inc.</u>, No. 90-CV-4244 (MJL) (S.D.N.Y.).

(ix)*(2) In calculating Excluded DGR each League Year, amounts shall be deducted from Excluded DGR to the extent that such sums are received that League Year by any affiliate of the NFLPA, as provided in Paragraph 11 of the Sponsorship Agreement dated January 24, 2001.*

*                                                          * Extension Agreement 1/8/02*

(x)(1)  Without limiting the foregoing, except as specified in subsections (x)(2) through (x)(7) below, DGR shall include all revenues from Personal Seat Licenses ("PSLs") received by, or received by a third party and

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

used, directly or indirectly, for the benefit of, the NFL or any Team or Team Affiliate, without any deduction for taxes or other expenses. Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen years; provided, however, that interest from the League Year the revenues are received until the League Years the revenues are allocated into DGR shall be imputed and included in DGR, in equal portions over such periods, calculated on an annual compounded basis using the Treasury *Note* rate published in The Wall Street Journal of *February 1* during the League Year in which the revenues are received. Each equal portion of PSL revenues allocated into DGR, plus an equal portion of the imputed interest specified above, shall be referred to as the "Maximum Annual Allocation Amount."

(x)(2)  To the extent that PSL revenues are used to pay for the construction of a new stadium or for stadium renovation(s) that increase DGR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), <u>and</u> if such PSL revenues have received a waiver of any League requirement of sharing of "gross receipts," <u>then</u> such PSL revenues will not be included in a particular League Year in DGR or in Excluded DGR. Notwithstanding the foregoing, the maximum exclusion of PSL revenues each League Year from DGR shall be equal to any increase in DGR that directly results from such stadium construction or renovation (including through any spillover from Excluded DGR) as calculated in subsections (x)(3) through (x)(7) below.

(x)(3)  Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of PSL revenues excluded each League Year shall be equal to the Maximum Annual Allocation Amount. If the actual increase in DGR directly resulting from such stadium construction or renovations during the first full League Year in which such stadium or renovations are put into service (the "First Year PSL Increases") is less than any Maximum Annual Allocation Amount for that League Year or any prior League Year (the "PSL Difference"), then the aggregate PSL Difference for every such League Year (assuming for purposes of calculating such PSL Difference, that the First Year PSL Increase had been received in each such League Year) shall be credited to DGR in the immediately following League Year.

(x)(4)  Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a)(ii) below) shall determine the increase in DGR that directly results each League Year from a stadium construction or renovation funded, in whole or in part, by PSL revenues. In the case of a new stadium, such calculation shall be made by comparing the DGR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the DGR directly generated

89

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the DGR directly generated by those specific stadium facilities which are renovated, with the DGR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the DGR directly generated by the facilities prior to their renovation would equal either zero, or the amount of DGR directly generated by any facilities that were replaced by the renovation). If the NFL or the NFLPA agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in DGR throughout the stadium (e.g., increased concession, parking or novelty revenues spilling into DGR) as being directly generated by the renovation.

(x)(5)  If the calculations set forth in (x)(4) above result in an exclusion of PSL revenues from DGR that is less than the Maximum Annual Allocation Amount, the Accountants shall report the amount not excluded from DGR as a "Carryover PSL Credit." Such Carryover PSL Credits, if any, shall be deducted from a Team's DGR in the first future League Year in which the amount of DGR directly generated by the new stadium or the renovated facilities exceeds the Maximum Annual Allocation Amount (the "PSL Excess"), but only up to the amount of the PSL Excess. Each dollar of Carryover PSL Credit may be deducted from a Team's DGR only once, and only to the extent of any PSL Excess existing at the time of such deduction.

(x)(6)  Any applicable deduction from DGR or Excluded DGR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by PSL revenues excluded from DGR and Excluded DGR pursuant to subsection (x)(2) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total PSL revenues described in the first sentence of subsection (x)(2), and the denominator of which is (2) the total costs for construction of the new stadium or renovations.

(x)(7)  For purposes of this paragraph, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options and bonds giving purchasers the right to acquire NFL tickets. PSL revenues shall also include revenues from any other device (e.g., periodic payments such as surcharges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

(xi)(1)  Notwithstanding Section 1(a)(i)-(iv), above, premium seat revenues that otherwise would be included in Excluded DGR shall not be so included in a particular League Year to the extent that such revenues are

90

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

used to pay for, or to pay financing costs for, the construction of a new sta-
dium or for stadium renovation(s) that increase DGR (regardless of whether
the stadium is owned by a public authority or a private entity (including,
but not limited to, the NFL, any Team or any Team Affiliate)), and if such
revenues have received a waiver of any League requirement of sharing of
"gross receipts." The maximum exclusion of premium seat revenue from
Excluded DGR each League Year shall be equal to any increase in DGR that
directly results from such stadium construction or renovation (including
through any spillover from Excluded DGR) as calculated in subsections
(xi)(2) through (xi)(6) below.

(xi)(2) Until the first full League Year the new stadium or the renovated
facilities are put into service, the amount of premium seat revenues excluded
each League Year shall be equal to the amount that receives a waiver of any
League requirement of sharing of gross receipts (the "Non-Shared Amount").
If the actual increase in DGR during the first full League Year in which the new
stadium or the renovated facilities are put into service (the "First Year Premi-
um Seat Increase") is less than any Non-Shared Amount for that League Year
or any prior League Year (the "Premium Seat Difference"), then the aggregate
Premium Seat Difference for every such League Year (assuming for purposes
of calculating such Premium Seat Difference that the First Year Premium Seat
Increase had been received in each such League Year) shall be credited to Ex-
cluded DGR in the immediately following League Year.

(xi)(3) Commencing with the first full League Year the new stadium or
the renovated facilities are put into service, the jointly retained Accountants
(set forth in Article XXIV, Section 10(a)(ii) below) shall determine the in-
crease in DGR that directly results each League Year from the stadium con-
struction or renovation funded, in whole or in part, with premium seat rev-
enues. In the case of a new stadium, such calculation shall be made by
comparing the DGR directly generated by the old stadium during the last
full League Year in which the old stadium was in service with the DGR di-
rectly generated by the new stadium during the League Year in question. In
the case of stadium renovations, such calculation shall be made by com-
paring the DGR directly generated by those specific stadium facilities which
are renovated, with the DGR directly generated by those facilities prior to
their renovation (where new facilities, such as completely new luxury suites
or premium seats, are constructed, the DGR directly generated by the fa-
cilities prior to their renovation would equal either zero, or the amount of
DGR directly generated by any facilities that were replaced by the renova-
tion). If the NFL and the NFLPA agree that a renovation is substantial
enough to increase revenues throughout the stadium (e.g., significant ren-
ovations throughout the stadium which enable the Club to attract more
fans and/or increase ticket prices) then the Accountants shall consider any
increase in DGR throughout the stadium (e.g., increased concession, park-
ing or novelty revenues spilling into DGR) as being directly generated by
the renovation.

91

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(xi)(4)  If the calculations set forth in (xi)(3) above result in an exclusion of premium seat revenues from Excluded DGR that is less than the Non-Shared Amount, the Accountants shall report the amount not excluded from Excluded DGR as a "Carryover Premium Seat Credit." Such Carryover Premium Seat Credits, if any, shall be deducted from a Team's Excluded DGR in the first future League Year in which the amount of DGR directly generated by the new stadium or the renovated facilities exceeds the Non-Shared Amount (the "Premium Seat Excess"), but only up to the amount of the Premium Seat Excess. Each Carryover Premium Seat Credit may be deducted from a Team's DGR only once, and only to the extent of any Premium Seat Excess existing at the time of such deduction.

(xi)(5)  Any applicable deduction from DGR or Excluded DGR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by premium seat revenues excluded from Excluded DGR pursuant to subsection (xi)(1) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total premium seat Non-Shared Amount dedicated to funding the project during the allocation period, and (2) the denominator of which is the total costs for construction of the new stadium or renovations.

(xi)(6)  For purposes of this paragraph, the term "Premium Seat Revenue" shall include revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(xii)    An amount equal to the lesser of (a) *$8 million for each League Year* or (b) the amount contributed to or deposited  with NFL Charities that League Year by or on behalf of NFL Properties or NFL Films, or any of their subsidiaries, *shall be deducted from the calculation of Excluded DGR each such League Year.*

* *Extension Agreement 1/8/02*

(xiii)   Up to the following additional amounts, if committed to youth football programs and contributed by the NFL, its Teams, or their affiliates, in a qualified not-for-profit fund administered by a board jointly appointed by the NFL and the NFLPA, shall also be deducted from the calculation of DGR:

|  |  |
|---|---|
| 2002 League Year: | $20.0 million |
| 2003 League Year: | $22.5 million |
| *2004 League Year:* | *$25.0 million* |
| *2005 League Year:* | *$25.0 million* |
| *2006 League Year:* | *$25.0 million* |

* *Extension Agreement 1/8/02*

92

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(xiv)   The parties may agree to allocate DGR received or to be received on an accrual basis in a particular League Year over one or more other League Years.

(xv)   *If a terrorist or military action occurs after January 8, 2002, with the result that one or more weeks of any NFL season are cancelled or that DGR for any League Year decreases to a catastrophic extent, the parties shall engage in good faith negotiations to adjust the provisions of this Agreement with respect to the projection of DGR and the Salary Cap for the following League Year, so that DGR for the following League Year is projected in a fair manner consistent with the changed revenue projection caused by such action.*

*\* Extension Agreement 1/8/02*

(b)   **Benefits.** "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

(i)   Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII); *provided that all costs associated with the benefit increase, to which the parties agreed in 2002, under Article XLVII, Section 8, shall be allocated for Player Benefit Costs purposes in equal amounts to the 2002-2006 League Years;*

(ii)   Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii)   Injury protection (as described in Article XII);

(iv)   Workers' compensation, payroll, unemployment compensation, and social security taxes;

(v)   Preseason per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(vi)   Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(vii)   Postseason pay (as described in Article XLII and Article XLIII); and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary.

(viii)   Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year);

93

(ix)     Severance pay (as described in Article L);
(x)      The Player Annuity Program (as described in Article *XLVIII-A*);
(xi)     *The Minimum Salary Benefit (as described in Article XXXVIII-A);*
(xii)    *The Performance Based Pool (as described in Article XXXVIII-B); and*
(xiii)   *The Tuition Assistance Plan (as described in Article XLVIII-B).*

*\* Extension Agreement 1/8/02*

Benefits will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII. Benefits also will not include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

(c)      **Salary**.

(i)      "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(ii)     A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such nonfootball services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar nonfootball playing services from an independent third party; and (2) the percentage of total compensation for nonfootball services received from third parties versus the Team or Team Affiliate.

(iii)    For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

***Section 2*. Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:** If in any League Year the total Player Costs for all NFL Teams equals or exceeds 67% of actual Defined Gross Revenues, there

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 4(b)(ii)(4) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap or Minimum Team Salary in the Final League Year.

**Section 3. Guaranteed League-wide Salary**: In any League Year in which a Salary Cap is in effect there shall be a Guaranteed League-wide Salary of 58% of actual Defined Gross Revenues. In the event that the Player Costs for all NFL Teams during any League Year in which a Salary Cap is in effect are less than 58% of actual Defined Gross Revenues for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to players who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

**Section 4. Salary Cap Amounts:**
    (a)    Subject to the adjustments set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be (1) in the 2002 League Year, 64% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (2) in the 2003 League Year, 64.25% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (3) in the 2004 League Year, 64.75% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (4) in the 2005 League Year, 65.5% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; *and* (5) in the *2006* League Year, 64.5% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year. *Notwithstanding the foregoing, the NFLPA or the NFL may, by providing written notice on or before December 1, 2004, move one half of a percentage point from the 2005 League Year to the 2006 League Year so that the Salary Cap in each of the 2005 and 2006 League Years shall be 65% of the Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during that year.*
                                    * *Extension Agreement 1/8/02*

          * *Wherever the parties have agreed that a difference in the Salary Cap is to be carried over into a future League Year (e.g., Article XXIV, Section 10(a)(ii)), if the number of Clubs in the NFL changes from the League Year in which the Salary Cap difference originated to the League Year in which it will*

95

*be applied, the amount of the difference will be adjusted to re-*
*flect the different number of Clubs in the NFL.*

*\* Side Letter 10/20/98*

(b)      The foregoing Salary Cap amounts shall be adjusted as follows:

(i)      The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year; provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 70% of the Projected Defined Gross Revenues.

(ii)     If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below:

(1)      59% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 1% of Projected Defined Gross Revenues;

(2)      58% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 2% of Projected Defined Gross Revenues;

(3)      57% of actual Defined Gross Revenues, then the Salary Cap percentage for the next League Year shall be increased by 3% of Projected Defined Gross Revenues;

(4)      56% of actual Defined Gross Revenues, then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2 of this Article.

(c)      *If, by January 15, 2005, no extension of the term of this Agreement has been agreed to by the parties and the 2006 League Year is then scheduled to be the Final Capped Year, Article XXIV, Section 4(b)(i) shall not apply to the 2006 League Year. If, by January 15, 2005, the parties have agreed to extend the term of this Agreement, so that the 2006 League Year will not be the Final Capped Year, Article XXIV, Section 4(b)(i) shall continue to apply to the 2006 League Year and all Capped Years of any extended term. An example reflecting application of Article XXIV, Section 4(b)(i), if such provision were to apply in the 2006 League Year, is annexed hereto as Exhibit O.*

(d)      *Reasonable security expenses incurred at both the Club and League level the prior League Year, to the extent that they exceed such expenses for the 2000 League Year (plus 5% each year for inflation for such expenses), shall be multiplied by the Salary Cap percentage for the applicable League Year, and the resulting amount shall be deducted from the calculation of the Salary Cap, up to a maximum of $250,000 per Club in any League Year, with no carryover into future League Years. For each such League Year, the Management Council shall present to the NFLPA a reasonable estimate of such incremental expenses, and the parties shall negotiate in good faith to determine the appropriate deduction.*

(e)      *(i) For each Capped Year, if the percentage resulting from the "Cash Salary" paid to players (as defined below) that League Year, divided by DGR for*

96

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

that League Year, averaged for that League Year and the prior two League Years (i.e., three-year rolling average), exceeds 71.5%, the NFL will receive a Salary Cap Credit equal to the difference in these percentages multiplied by the amount of DGR for that League Year. The credit shall be used in the Capped Year immediately following the League Year in which the credit arose (subject to any application of Article XXIV, Section 4(b)(i)), but any unused credit can be carried over to future Capped Years (subject to any application of Article XXIV, Section 4(b)(i)). For example, if the rolling average calculated in a given League Year is 72.5% and DGR for that League Year is $3.2 billion, the amount of the Salary Cap Credit arising from that League Year would be equal to a total of $32 million (i.e., $1 million per team if there are 32 teams in the NFL).

(ii)   "Cash Salary" for purposes of this subparagraph is the sum of total Paragraph 5 amounts earned by players (applying the valuation rules which apply to deferred salary specified in Article XXIV, Section 7(a)(ii)), signing bonus amounts paid or committed (including amounts treated as signing bonus pursuant to this Agreement), incentives that have been earned and paid, or earned and committed to be paid to players (applying the valuation rules which apply to deferred salary specified in Article XXIV, Section 7(a)(ii)), grievances settled, termination pay, injury settlements, Salary advances that were not included in Paragraph 5, and anything else paid or provided to players during that League Year that would be valued under the Salary Cap (e.g., the fair market value of automobiles gifted to players).

(iii)   The Cash Salary percentages shall be deemed to be 71.6% for the 1999 League Year and 68.3% for the 2000 League Year.

* Extension Agreement 1/8/02

**Section 5. Minimum Team Salary:**

(a)   With respect to each League Year for which a Salary Cap is in effect, there shall be a guaranteed Minimum Team Salary of 56% of Projected Defined Gross Revenues, less League-wide Projected Benefits, divided by the then current number of Teams in the NFL. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each League Year.

* Extension Agreement 1/8/02 [prior League Year percentages omitted]

(b)   Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c)   Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d)   If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the

97

Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

*Section 6*. **Computation of Team Salary**: During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)      **Player Contracts**. Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised, options, shall be included in Team Salary.

(b)      **Tenders.**

(i)      Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)      For players with less than three Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)      For players who are Restricted Free Agents, the Qualifying Offer will be included in Team Salary when tendered until the player is signed, the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv)      For players who are Unrestricted Free Agents, the June 1 tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)      For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)      All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)      **Practice Squad Contracts**. Any Practice Squad contract Salaries shall be included in Team Salary.

(d)      **Termination Pay**. Any type of Termination Pay liability will be in-

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

cluded in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)   **Grievances.** When a player salary grievance is filed against a Team, 50% of the amount claimed (*or, for a player whose contract qualifies under Article XXXVIII-A, 50% of the player's Salary Cap count, prorated to reflect the number of weeks remaining in the regular season*) will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made.

*\* Extension Agreement 1/8/02*

(f)   **Expansion Bonuses.** Except as set forth in Article XXXI (Expansion), any expansion bonuses paid to players shall be included in Team Salary.

(g)   **Other Amounts.** Any other Salary not listed above paid to players shall be included in Team Salary.

**Section 7. Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

(a)   **Paragraph 5.**

(i)   The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1)   Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)   Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)   **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be con-

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

sidered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the Treasury *Note* rate published in The Wall Street Journal on *February 1* in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b)     **Signing Bonuses**.

(i)     **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract in determining Team and Player Salary, except that:

(1)     Signing bonuses agreed to in a Capped Year may not be prorated more than three years beyond the Final Capped Year (notwithstanding the foregoing, signing bonuses agreed to in Player Contracts approved by the Commissioner on or after agreement by the parties with respect to transition rules for proration in the 1998 League Year, but prior to court approval, and in no event earlier than June 30, 1998, may not be prorated more than six years, and signing bonuses agreed to in the 1999 or 2000 League Years may not be prorated more than seven years). *Notwithstanding the foregoing, signing bonuses agreed to in the 2002-03 League Years, or in the 2001 League Year after the last game of the regular season, may not be prorated more than seven years; signing bonuses agreed to in the 2001 League Year, prior to the last game of the regular season, may not be prorated more than six years.*

*\* Extension Agreement 1/8/02*

(2)     Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control, such issue shall be resolved by the Impartial Arbitrator.

> \* With respect to the proration of signing bonuses for Player Contracts entered into by Rookie players in which the player has the right to terminate based solely upon reporting, making the roster and/or playtime, such conduct shall automatically be deemed "within his sole control," as set forth in Article X, Paragraph G.2.(a)(ii) of the Stipulation and Settlement Agreement and in Article XXIV, Section 7(b)(i)(2) of the Collective Bargaining Agreement, unless the exercise of the right to terminate is also conditioned upon the following playtime requirements: (1) for players drafted in the first round, at least 35% of the plays if the triggering condition occurs in the first year of the Player Contract, and at least 45% of the plays if in any subsequent year; (2) for all other Rookie players, at least 15% of the plays if the condition occurs in the first

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

year of the Player Contract, and at least 30% of the plays if in any subsequent year. The playtime requirements set forth above do not affect the signing bonus allocation for any contract entered into by players other than Rookies.

*Side Letter 9/21/93: Sec. 15

* [A]ny multiyear Player Contract not unconditionally approved by the Commissioner as of the date hereof, other than any multiyear Player Contract executed in the last Capped Year of this Agreement, that extends from a Capped Year into any Uncapped Year (hereinafter "Subject Contract"). For purposes of determining Team Salary, if (i) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all Capped Years of the Subject Contract (but, if there are fewer than three remaining Capped Years, during the first three years of the Subject Contract) is in the aggregate less than (ii) the portion of the Subject Contract's signing bonus that would be allocated to those League Years if the signing bonus were prorated equally over the term of the Subject Contract, then: the difference between the amounts calculated pursuant to (ii) and (i) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the Uncapped Years (the "Difference"), shall be deducted in equal portions from those Uncapped Years and reallocated in equal portions over the Capped Years of the Subject Contract (or, if there are fewer than three Capped Years within the term of the Subject Contract, over the first three years of the Subject Contract). For purposes of this Paragraph, a renegotiation shall be treated as if it is an entirely new Player Contract.

*Side Letter 11/1/95: Sec. 1

(3)      If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

* For the purposes of the Salary Cap, any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The parties

101

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

agree that, pursuant to the Collective Bargaining Agreement, the player shall always have the right to receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X, Paragraph G.1. (b) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

*Side Letter 9/21/93: Sec. 17

(ii)     **Acceleration.**

(1)     For any player removed from the Team's roster on or before June 1, any unamortized signing bonus amounts will be included in Team Salary for such League Year. If such acceleration puts a Team over the Salary Cap, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)     For any player removed from the Team's roster after June 1, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

> * During any League Year immediately preceding an Uncapped Year, the provisions relating to acceleration of unamortized signing bonuses applicable on or before June 1 of that League Year shall apply during that League Year after June 1.

*Side Letter 11/1/95: Sec. 2

(3)     In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, then such signing bonus shall be accelerated as in subsection (ii)(1) above and the assignee Team's Team Salary will not include any portion of the signing bonus.

(4)     Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary. To the extent that such acceleration puts the Team over its Salary Cap, the difference shall be deducted from its Salary Cap for the following year.

> * With respect to a Player Contract in which the player

102

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

> has one or more rights to terminate based upon one or more not "likely to be earned" incentives <u>and</u> the player also being on the roster at a subsequent time, no acceleration shall occur pursuant to Article XXIV, Section 7(b)(ii)(4) of the CBA until both the incentive(s) and the roster precondition(s) have been satisfied.
>
> *Side Letter 10/21/96: Sec. 5

(5)     The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)     *[no longer applicable]*

(iv)     **Amounts Treated as Signing Bonuses**. For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)     Any amount specifically described in a Player Contract as a signing bonus;

(2)     Any guaranteed reporting bonus;

(3)     Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)     Any option buyout amount, when paid or guaranteed; and

(5)     In the event that a Player Contract calls for a Salary in the second year of such Contract that is less than half the Salary called for in the first year of such Contract, the difference between the Salary in the second contract year and the first contract year shall be treated as a signing bonus.

> * In a contract signed after the start of training camp, a reporting bonus for that season will be counted as a signing bonus. In a contract signed after the last preseason game, a roster bonus for that season will be counted as a signing bonus.
>
> *Side Letter 9/21/93: Sec. 18

> * Any salary advance paid on a guaranteed basis will be counted as a signing bonus.
>
> *Side Letter 9/21/93: Sec. 19

> * For purposes of the Salary Cap and Entering Player Pool, any guaranteed bonus tied to workouts shall be treated as a Signing Bonus.
>
> *Side Letter 6/23/93: Sec. 3

103

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

* For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to repay shall be treated as a Signing Bonus.

*Side Letter 6/23/93: Sec. 4

* For purposes of the Salary Cap and Entering Player Pool, any roster or reporting bonus which is earned or paid before the start of the Club's preseason training camp shall be treated as a signing bonus.

*Side Letter 6/23/93: Sec. 6

* Except as set forth in [the] Paragraph [to follow], the full non-guaranteed amount of any Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus shall be included in Team Salary only in the League Year in which it is earned by the player, without any proration. For purposes of this paragraph only, "guaranteed" means Salary that is fully guaranteed, prior to being earned, for skill, for injury, and regardless of any termination of the contract by the Club. The definition of "guaranteed" set forth above shall not affect Salary Cap accounting for any other purpose.

*Side Letter 10/21/96: Sec. 1

* With respect to any Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final Capped Year, each of the following shall be treated as a signing bonus, at the time of execution, if it is to be earned or paid to the player in the Final League Year (which is an Uncapped Year): (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any off-season workout bonus that is contingent upon the player's participation in less than 32 days of the Club's off-season workout program; (c) any off-season roster bonus; and (d) any off-season reporting bonus.

*Side Letter 10/21/96: Sec. 2

* [A]ny bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, shall be considered to be a "signing bonus" under Article X of the Settlement Agreement and Article XXIV of the CBA, except that the amount of any such completion bonus shall be calculat-

ed at its present value, computed at the Treasury *Note* rate published in The Wall Street Journal on *February* 1 of the League Year in which the Player Contract is executed. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Team's Salary Cap for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

*Side Letter 1/18/94: Sec. 3

* Any relocation bonus which is individually negotiated between a player and a Club shall be treated as a signing bonus.
*Side Letter 5/24/95: Sec. 9

* For each League Year prior to the Final Capped Year, if a Club and a player renegotiate or extend a contract and increase the player's Salary for the current League Year, the increase will be counted as Salary for that League Year if the NFL Management Council receives, prior to 4:00 p.m. (New York Time) on the Monday of the tenth week of the regular season, notice of the salary terms of such an executed extended or renegotiated contract. In any other circumstance prior to the Final Capped Year, the increase in Salary will be treated as a signing bonus that is allocated over the remaining years of the Player Contract (including the "current" year of that contract) to the extent that such allocation is permitted by the Settlement Agreement and the CBA. The then-existing provisions of the CBA will govern the Salary Cap valuation of such a renegotiation or extension in the Final Capped Year. The parties have reserved their respective positions regarding the CBA's requirements for any such renegotiation or extension in the Final Capped Year.

*Side Letter 5/24/95: Sec. 14, as amended by Side Letter 5/13/99

(v)    **Credit for Signing Bonuses Refunded.** In the event that a Team receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a signing bonus, such amount as has previously been included in Team

105

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

Salary shall be added to the Team's Salary Cap for the next League Year.

(c)     **Incentives.**

(i)     Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)     At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii)     At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equalling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

* Any team performance will be automatically deemed to be "Likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will be automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.
*Side Letter 2/22/96: Sec. 1

* Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto automatically will be deemed "likely to be earned."
*Side Letter 9/21/93: Sec. 8

* Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto automatically will be deemed "likely to be earned." Any incentive bonus that depends on a player's individual performance in categories other than those used to assess performance at the player's primary position automatically will be deemed "likely to be earned."
*Side Letter 9/21/93: Sec. 11

106

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## (EXHIBIT A)
## TEAM INCENTIVES

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by offense | Points allowed by defense | Own punt return average |
| Touchdowns scored by offense | Touchdowns allowed by defense | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| | | Opposition kickoff return average |
| Average net yards gained per rushing play | Average net yards given up per rushing play | |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

**ALL**

| |
|---|
| Wins |
| Playoffs |
| Conference Championship |
| Super Bowl |
| Touchdowns on returns and recoveries |
| Net difference takeaways/giveaways |

*Side Letter 9/21/93: Exhibit A

107

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ( EXHIBIT B)
## INDIVIDUAL INCENTIVES

**RUSHING**
Total yards
Average yards
(100 attempts)
Touchdowns

**PASSING**
Passer rating
(224 attempts)
Completion percentage
(224 attempts)
Interception percent
(224 attempts)
Total yards
Yards per pass
(224 attempts)
Touchdown passes

**RECEIVING**
Total receptions
Total yards
Average yards
(32 receptions)
Touchdowns

**DEFENSE**
Interceptions
Interception return yards
Touchdowns on interception
returns
Opponent fumble recoveries
Opponent fumble return yards
Touchdowns on opponent
fumble returns
Sacks

**PUNT RETURNS**
Total yards
Average (20 returns)
Touchdowns

108

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## (EXHIBIT B)
## INDIVIDUAL INCENTIVES

### KICKOFF RETURNS
Total yards

Average (20 returns)

Touchdowns


### PUNTING
Gross average (40 punts)

Net average (40 punts)

Inside 20-yard line


### PLACE KICKING
Total points

Field goals

Field goal percentage
(16 attempts)

Field goal percentage
0-19 yards (4 attempts)

Field goal percentage
20-29 yards (4 attempts)

Field goal percentage
30-39 yards (4 attempts)

Field goal percentage
40-49 yards (4 attempts)

Field goal percentage
50 yards or longer (3 attempts)


### OTHERS
Roster bonuses

Reporting bonuses

Playtime bonuses
(excluding special teams)

Special teams playtime


*Side Letter 9/21/93: Exhibit B

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| CATEGORY | | PERCENT COUNTED |
|---|---|---|
| ROSTER BONUSES (regular season) | | |
| All Drafted | | 100% |
| Undrafted | | 30% |
| ROSTER BONUSES (preseason) | | |
| All Players | | 100% |
| PLAYING TIME | ROUNDS 1-3 | |
| | Up to 33% | 100% |
| | 34% - 75% | 75% |
| | 76% - 90% | 50% |
| | 91% - 100% | 25% |
| | ROUNDS 4-8 | |
| | Up to 25% | 100% |
| | 26% - 33% | 75% |
| | 34% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | UNDRAFTED | |
| | Up to 15% | 100% |
| | 16% - 25% | 75% |
| | 26% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | All percentages will round to the nearest whole percentage (e.g., .05 is rounded to 1.0) | |
| SPECIAL TEAMS PARTICIPATION | ROUNDS 1 - 3 | 100% |
| | ROUNDS 4 - 8 | 66% |
| | UNDRAFTED | 50% |
| HONORS (First or Second Team)* | ROUNDS 1 - 2 | |
| | All-Rookie | 100% |
| | All NFL, Pro Bowl | 5% |
| | All Conference | 10% |
| | ALL OTHERS | |
| *See Media List on page 122 | All-Rookie | 15% |
| | All Conference | 5% |

110

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### RUSHING

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Rushing | Up to 150 yards | 100% |
| | 151 - 350 yards | 75% |
| | 351 - 500 yards | 66% |
| | 501 - 700 yards | 33% |
| | 701 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 100 yards | 100% |
| | 101 - 350 yards | 66% |
| | 351 - 650 yards | 25% |
| | 651 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (100 attempts) | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 66% |
| | 4.01 - 4.49 | 33% |
| | 4.5 or more | 0% |
| | ALL OTHERS | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 50% |
| | 4.01 - 4.49 | 25% |
| | 4.5 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

111

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
### (REVISED SCHEDULE B)

**PASSING**

| | | |
|---|---|---|
| Passer Rating | ROUNDS 1 - 3 | |
| (224 attempts) | 50 rating or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 50% |
| | 90.00 - 100.00 | 33% |
| | 100.01 or more | 0% |
| | ALL OTHERS | |
| | 50.00 or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 25% |
| | 90.01 or more | 0% |
| Completion Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | Up to 52% | 100% |
| | 52.1 - 56% | 66% |
| | 56.1 - 59% | 33% |
| | 59.01% or more | 0% |
| | ALL OTHERS | |
| | Up to 52% | 100% |
| | 52.1 - 56% | 50% |
| | 56.1 - 59% | 25% |
| | 59.01% or more | 0% |
| Interception Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | 3.0% or more | 100% |
| | 2.7 - 2.9% | 66% |
| | 2.1 - 2.6% | 33% |
| | 2.0% or less | 0% |
| | ALL OTHERS | |
| | 3.0% or more | 100% |
| | 2.7 - 2.9% | 50% |
| | 2.1 - 2.6% | 25% |
| | 2.0% or less | 0% |

112

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
### (REVISED SCHEDULE B)

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Passing | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 25% |
| | 1,201 yards or more | 0% |
| Yards Per Pass | ROUNDS 1 - 3 | |
| (224 attempts) | Under 6 | 100% |
| | 6.0 - 7 | 66% |
| | 7.1 - 8 | 33% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| | ALL OTHERS | |
| | Under 6 | 100% |
| | 6.0 - 7 | 50% |
| | 7.1 - 8 | 25% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| Touchdown Passes | ROUNDS 1 - 3 | |
| | Under 11 | 100% |
| | 12 - 16 | 66% |
| | 17 - 23 | 33% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |
| | ALL OTHERS | |
| | Under 11 | 100% |
| | 12 - 16 | 50% |
| | 17 - 23 | 25% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

# ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

**RECEIVING**

| Total Receptions | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 20 catches | 100% |
| | 21 - 30 catches | 75% |
| | 31 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| | ALL OTHERS | |
| | Up to 10 catches | 100% |
| | 11 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |

| Total Yards Receiving | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 200 yards | 100% |
| | 201 - 300 yards | 75% |
| | 301 - 400 yards | 50% |
| | 401 - 800 yards | 25% |
| | 801 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 150 yards | 100% |
| | 151 - 250 yards | 75% |
| | 251 - 350 yards | 50% |
| | 351 - 700 yards | 25% |
| | 701 yards or more | 0% |

| Average Yards (32 receptions) | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 75% |
| | 14.6 - 16.5 | 50% |
| | 16.6 - 18.5 | 25% |
| | 18.6 or more | 0% |
| | ALL OTHERS | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 66% |
| | 14.6 - 16.5 | 33% |
| | 16.6 - 18.5 | 10% |
| | 18.6 or more | 0% |

114

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| Receiving Touchdowns | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

**TOTAL OFFENSE**

| Total Yards | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 10% |
| | 1,201 yards or more | 0% |
| Scoring | ROUNDS 1 - 3 | |
| | 2 - 28 points | 100% |
| | 29 - 65 points | 50% |
| | 66 - 75 points | 25% |
| | 76 points or more | 0% |
| | ALL OTHERS | |
| | 2 - 28 points | 100% |
| | 29 - 55 points | 50% |
| | 56 - 75 points | 10% |
| | 76 points or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

# ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### DEFENSE

| | | |
|---|---|---|
| Interceptions | ROUNDS 1 - 3 | |
| | 1 - 5 | 100% |
| | 6 - 10 | 50% |
| | 11 or more | 0% |
| | ALL OTHERS | |
| | 1 - 3 | 100% |
| | 4 - 6 | 33% |
| | 7 or more | 0% |
| Interception Return Yards | ROUNDS 1 - 3 | |
| | 0 - 85 | 100% |
| | 86 - 150 | 66% |
| | 151 - 190 | 33% |
| | 191 or more | 0% |
| | ALL OTHERS | |
| | 0 - 65 | 100% |
| | 66 - 85 | 50% |
| | 86 - 110 | 25% |
| | 111 or more | 0% |
| Touchdowns on Interception Returns | ALL | |
| | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Opponent Fumble Recoveries | ALL | |
| | 1 - 2 | 100% |
| | 3 - 4 | 50% |
| | 5 or more | 0% |
| Opponent Fumble Return Yards | ROUNDS 1 - 3 | |
| | 0 - 40 | 100% |
| | 41 - 65 | 66% |
| | 66 - 80 | 33% |
| | 81 or more | 0% |
| | ALL OTHERS | |
| | 0 - 30 | 100% |
| | 31 - 55 | 50% |
| | 56 - 75 | 25% |
| | 76 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| | | |
|---|---|---|
| Touchdowns On Opponent Fumble Returns | ALL | |
| | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Sacks | ROUNDS 1 - 3 | |
| | .5 - 4 sacks | 100% |
| | 4.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| | ALL OTHERS | |
| | .5 - 3 sacks | 100% |
| | 3.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| **PUNT RETURNS** | | |
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 224 | 100% |
| | 225 - 349 | 33% |
| | 350 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 7.9 | 100% |
| | 8.0 - 10.9 | 33% |
| | 11.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

117

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### KICKOFF RETURNS

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 599 | 100% |
| | 600 - 649 | 33% |
| | 650 or more | 0% |
| Average | ROUNDS 1 - 3 | 100% |
| (20 returns) | ALL OTHERS | |
| | 0 - 19.9 | 100% |
| | 20.0 - 21.9 | 33% |
| | 22.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

### PUNTING

| | | |
|---|---|---|
| Gross Average | ROUNDS 1 - 3 | 100% |
| (40 punts) | ALL OTHERS | |
| | 0 - 42.4 | 100% |
| | 42.5 - 43.9 | 33% |
| | 44.0 or more | 0% |
| Net Average | ROUNDS 1 - 3 | 100% |
| (40 punts) | ALL OTHERS | |
| | 0 - 35.9 | 100% |
| | 36.0 - 37.9 | 33% |
| | 38.0 or more | 0% |
| Inside 20-yard line | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 23 | 33% |
| | 24 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

### PLACE KICKING

| | | |
|---|---|---|
| Total Points | ROUNDS 1 - 3 | |
| | Up to 86 points | 100% |
| | 87 - 95 points | 75% |
| | 96 - 104 points | 50% |
| | 105 - 113 points | 10% |
| | 114 points or more | 0% |
| | ALL OTHERS | |
| | Up to 75 points | 100% |
| | 76 - 90 points | 66% |
| | 91 - 99 points | 33% |
| | 100 - 109 points | 10% |
| | 110 points or more | 0% |
| Field Goals | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 26 | 33% |
| | 27 or more | 0% |
| Field Goal Percentage (16 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 75% | 100% |
| | 75.1 - 80% | 33% |
| | 80.1 - 100% | 0% |
| Field Goal Percentage 0-19 yards (4 attempts) | ALL | 100% |
| Field Goal Percentage 20 - 29 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 85% | 100% |
| | 85.1 - 95% | 33% |
| | 95.1 - 100% | 0% |
| Field Goal Percentage 30 - 39 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 70% | 100% |
| | 70.1 - 90% | 33% |
| | 90.1 - 100% | 0% |

119

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ROOKIE "LIKELY TO BE EARNED" INCENTIVES
## (REVISED SCHEDULE B)

| | | |
|---|---|---|
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 40 - 49 yards | ALL OTHER | |
| (4 attempts) | 0 - 55% | 100% |
| | 55.1 - 70% | 33% |
| | 70.1 - 100% | 0% |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 50 yards or longer | ALL OTHERS | |
| (3 attempts) | 0 - 45% | 100% |
| | 45.1 - 60% | 33% |
| | 60.1 - 100% | 0% |

*Side Letters 4/27/93 & 4/27/94

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

## ENTERING PLAYER POOL INCENTIVES

*Team Leaders

a) If the incentive is written for leading the Club in any official League statistical category [assuming it is on Exhibit A or B], 0% will be counted.

b) If the incentive is written for any ranking other than first on the Club in any official League statistical category, 100% will be counted.

*Side Letter 4/27/93: Sec. 7

c) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, the following percentages shall be counted:

| | |
|---|---|
| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33% |
| ROUNDS 6 - 8 | 10% |
| ALL OTHERS | 0% |

*Side Letter 6/30/93: Sec. 16

* Each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a 1st-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

*Side Letter 4/27/93: Sec. 8

The following shall count at 100%:
* Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance).

*Side Letter 4/27/93: Sec. 9

* Incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.).

*Side Letter 4/27/93: Sec. 10

121

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

*Any relocation or completion bonus.
>*Side Letter 4/27/93: Sec. 11

*Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards.
>*Side Letter 4/27/93: Sec. 12

* Any guaranteed salary or bonus.
>*Side Letter 4/27/93: Sec. 13

* Any pre-season or off-season statistics.
>*Side Letter 4/27/93: Sec. 14

* Any incentive based upon another player's performance.
>*Side Letter 4/27/93: Sec. 15

* Incentives based on leading the team in punting/kicking will be counted at 100%.
>*Side Letter 6/30/93: Sec. 18

* If a rookie player has an incentive bonus for touchdowns, we will apply the rushing and receiving touchdowns likely to be earned rule and if a rookie non-kicker has a Total Points incentive, we will apply the total points likely to be earned levels for a rookie kicker to value the incentives.
>*Side Letter 7/26/94

### *HONORS AND RECOGNIZED MEDIA

**VETERAN HONORS**
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP-NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

**VETERAN MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY

122

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
FOOTBALL DIGEST
USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

**ROOKIE HONORS (FIRST OR SECOND TEAM)**
**ROUNDS 1-2**

| | |
|---|---|
| ALL ROOKIE | 100% |
| ALL NFL, PRO BOWL | 5% |
| ALL CONFERENCE | 10% |
| **ALL OTHERS** | |
| ALL-ROOKIE | 15% |
| ALL CONFERENCE | 5% |
| **ALL** | |
| ROOKIE OF YEAR — NFL OR CONF | 0% |
| ROOKIE OF YEAR — OFFENSE — NFL | 0% |
| ROOKIE OF YEAR — DEFENSE — NFL | 0% |

**ROOKIE MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS

*Side Letter 9/25/95 & 4/27/93

## ADDITIONAL INCENTIVE RULES FOR VETERANS, ROOKIES, INDIVIDUALS AND TEAMS

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be revalued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.

*Side Letter 9/21/93: Sec. 1

* In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be revalued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a preexisting contract

123

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

*Side Letter 9/21/93: Sec. 2

* Other than as set forth in [the paragraph immediately following,] for purposes of the Salary Cap and Entering Player Pool, any incentive bonus to an offensive player that is based upon the defensive team's or special team's performance automatically will be deemed "likely to be earned." Conversely, any incentive bonus to a defensive player that is based upon the offensive team's or special team's performance automatically will be deemed "likely to be earned." Any incentive bonus based upon another player's performance automatically will be deemed "likely to be earned."

*Side Letter 9/21/93: Sec. 3

* For purposes of the Salary Cap and Entering Player Pool, any incentive bonus in a contract signed by a Rookie that is based upon special team performance automatically will be deemed "likely to be earned," except for an incentive bonus to a Rookie kicker or Rookie punter that is based upon improvement in the performance of the kicking or punting team. Any incentive bonus to a player who is not a Rookie that is based upon special team performance automatically will be deemed "likely to be earned" unless the player played in at least 50% of his team's special team plays in the previous season.

*Side Letter 9/21/93: Sec. 4

* For purposes of the Salary Cap and Entering Player Pool, any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by determining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the

124

team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

*Side Letter 9/21/93: Sec. 5

* Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 24th in the League in total offense will be deemed "likely to be earned" in a League consisting of 28 teams; similarly, an incentive bonus based on a team finishing 12th in its Conference will be deemed "likely to be earned" in a Conference consisting of 14 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

*Side Letter 9/21/93: Sec. 6

* Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

*Side Letter 9/21/93: Sec. 7

* In any Player Contract signed by a Rookie, if more than three different team performance categories are included as incentives, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contracts signed by Rookies selected in rounds one and two of the NFL draft, any team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at

least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override [Paragraph 9] of the parties' letter of agreement of April 27, 1993. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 9

* In any Player Contract signed by a player other than a Rookie, if more than three different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article X, Paragraph G.3.(a) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(c)(i) of the Collective Bargaining Agreement. The calculation of these playtime requirements shall exclude special teams plays.

*Side Letter 9/21/93: Sec. 10

* Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted immediately towards the Salary Cap and Enter-

ing Player Pool when they are earned.

*Side Letter 9/21/93: Sec. 12

* Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding [Paragraph 7] of the parties' letter agreement of April 27, 1993.

*Side Letter 9/21/93: Sec. 13

* For purposes of the Salary Cap, any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except (1) as provided [two paragraphs] above [in regards to per play or per game occurrences,] (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid, (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately, or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

*Side Letter 9/21/93: Sec. 14

* Any incentive bonus which a player and a Club agreed to that depends upon performance in any category not identified in Exhibit A or Exhibit B automatically will be deemed "Likely to be earned."

*Side Letter 5/24/95: Sec. 6

* Any incentive bonus which a player and a Club agree to that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated

in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

*Side Letter 5/24/95: Sec. 7*

* Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Preseason roster bonuses are automatically deemed "likely to be earned."

*Side Letter 5/24/95: Sec. 8*

* For purposes of the Salary Cap, any incentive bonus (or portion thereof) that is earned during the [Final Capped] Year, but which had not been deemed likely to be earned at 100 percent of its value during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the [Final Capped] Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the [Final Capped] Year, become impossible for the player to attain.

*Side Letter 11/11/93: Sec. 1*

* To determine the value of an incentive clause for Salary Cap purposes, either under the specific circumstances set forth in the paragraph above, or under the specific circumstances set forth in paragraph 14 of the letter from Jeffrey L. Kessler to Harold R. Henderson dated September 21, 1993, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had 1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

*Side Letter 11/11/93: Sec. 2

* If more than eight different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X", shall be counted as three performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).

*Side Letter 2/22/96: Sec. 2

* [The above paragraph] does not supersede the terms of any other letter agreement between the parties that automatically deem certain performance incentives to be "likely to be earned" or "not likely to be earned" depending upon whether the incentive fulfills other specified criteria (e.g., Paragraphs 3-10 of the September 21, 1993 letter agreement).

*Side Letter 2/22/96: Sec. 3

* [The two preceding paragraphs do] not apply and the parties reserve their rights with respect to multiyear contracts containing team performance incentives.

*Side Letter 2/22/96: Sec. 4

129

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(d)     **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)     In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the Final Capped Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the Final Capped Year is not fully guaranteed. For example, without limitation on any other applicable example, and if the Salary Cap is in effect during the 2002 and 2003 League Years, and the player enters into a four-year contract which is not fully guaranteed for the 2002 and 2003 League Years, but is fully guaranteed for the 2004 and 2005 League Years, the full amount of the guaranteed Salary for the 2004 and 2005 League Years will be included in Team Salary for the 2002 and 2003 League Years in a proportion determined by the Team.

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond three years after the Final Capped Year will be included in Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

(iii)     Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the Treasury *Note* rate published in The Wall Street Journal of *February* 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Section 7(b)(ii)(1) above, shall apply.

*Extension Agreement 1/8/02*

(iv)     If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the Final Capped Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

\* For the purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Article XXIV, Section 7(d)(i)-(iv).

*Side Letter 6/23/93: Sec. 2

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(e)     **Other Amounts.**

(i)     **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

> \* For purposes of the Salary Cap and Entering Player Pool, in the event that a player and Club enter into a fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), the parties agree that such a fraudulent agreement would constitute an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of the Stipulation and Settlement Agreement, Article X, Part G, Paragraph 5 (a), and the Collective Bargaining Agreement, Article XXIV, Section 7(e)(i).
>
> \*Side Letter 11/11/93: Sec. 3

(ii)     **Salary Advances.** The full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

> \*For purposes of the Salary Cap and Entering Player Pool, any salary advance which a player is not obligated to repay shall be treated as a Signing Bonus.
>
> \*Side Letter 6/23/93: Sec. 4

(iii)     **Non-Cash Provisions.** The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

> \* Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits.
>
> \*Side Letter 5/24/95: Sec. 5

> \* Expenses for travel, board and lodging for a player par-

131

ticipating in an off-season workout program or class-room instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.

*Side Letter 5/24/95: Sec. 1

* Except as set forth in the two preceding paragraphs, in Issue No. 30, and in the letter agreement between us dated August 4, 1993 regarding Rookie Orientation Camps, if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for nonfootball playing services, which continues to be subject to Article XXIV, Section 1(c)(ii) of the CBA.

*Side Letter 5/24/95: Sec. 4

* Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV of the CBA shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having a nine-week workout program in the 1994 League Year for sixty players to be paid at the minimum amount will include $108,000 in its Team Salary on the first day of such program ($50 per day x four workout days per week x nine weeks x sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

*Side Letter 5/24/95: Sec. 3

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

> \* If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three or more seasons, the fair market value of such gifts up to $10,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. If such gifts have a value between $10,000 and $15,000, the parties reserve their rights with respect to the treatment of the excess fair market value above $10,000; in the absence of agreement between the parties on such treatment, the Impartial Arbitrator shall decide. If the player has been under contract with the Club in less than three seasons, the entire fair market value of any such gifts shall be counted as Salary.
>
> \*Side Letter 4/16/96

(iv)     **Annuities.** The cost to the Team of any annuity provided to any player (but not including any annuity provided pursuant to the player annuity program described in Article XLVIII-A), computed at the Treasury *Note* rate on *February 1* of the applicable League Year, shall be included immediately in Team Salary.

*\*Extension Agreement 1/8/02*

(f)     **Traded Contracts.** In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

> \* In determining the Salary of a Player Contract for purposes of the Salary Cap, any team performance-related incentive will be revalued under the "likely to be earned" rules if the contract is assigned to a new team through trade or waiver.
>
> \*Side Letter 9/21/93: Sec. 1

> \* A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.
>
> \*Side Letter 5/24/95: Sec. 11

133

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(g)      Mid-Season Contracts. In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

**Section 8. 30% Rules:**

(a)      No NFL Player Contract entered into in an Uncapped Year prior to the Final League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the *contract* per year. For example, a four-year Player Contract commencing in the 1993 League Year may not provide for an annual decrease of more than 30% of the Salary, excluding amounts treated as a signing bonus, in the 1993 League Year for each of the four years covered by the contract. *Notwithstanding the foregoing, beginning in the 2002 League Year, this rule shall not apply in any Capped Year to any Player Contract that was signed in the 1993 League Year or earlier.*

(b)      No NFL Player Contract entered into in a Capped Year and extending into the Final League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the Final Capped Year, per year, either in the Final League Year or in any subsequent League Year covered by the Player Contract. For example, without limitation on any other applicable example, a four-year Player Contract signed in the 2006 League Year may not provide for an annual increase of more than 30% of the 2006 League Year Salary, excluding amounts treated as a signing bonus, in each of the three additional League Years covered by the Contract.

*\* Extension Agreement 1/8/02*

> \* Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and pro-rated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA.
>
> *\*Side Letter 10/21/96: Sec. 3(a)*
>
> \* The parties acknowledge that Class Counsel together with the NFLPA, and the NFL Management Council, disagree as to the treatment of allocated signing bonus

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this paragraph [and the one preceding], the terms of [both these paragraphs] may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this paragraph.

*Side Letter 10/21/96: Sec. 3(b)

\* Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies, set forth in Article XVII, Section 4(e) of the CBA, and/or the 30% Rule, set forth in Article XXIV, Section 8 of the CBA, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Side Letter 10/21/96: Sec. 4

**Section 9. Renegotiations and Extensions:** Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

(a)    The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract,

135

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

however, may take place at any time.

(b)     No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(c)     No contract renegotiations may be done for a current season after the last regular season game of that season.

(d)     A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(f).

(e)     As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

> * No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.
>
> *Side Letter 10/21/96: Sec. 6

> * In determining the Salary of a Player Contract for purposes of the Salary Cap, any renegotiated contract will be revalued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a preexisting contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.
>
> *Side Letter 9/21/93: Sec. 2

> * For purposes of the Salary Cap, any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The parties agree that, pursuant to the Collective Bargaining Agreement, the player shall always have the right to receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X, Paragraph G.1.(b) of the Stipulation and Settlement Agreement and Article XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

the contract being extended, in which case the gross
amount of the extension bonus shall be prorated).
*Side Letter 9/21/93: Sec. 17

* Any agreement to compensate a player at the mini-
mum amount set forth in Article XXXV of the CBA for
participation in an off-season workout program or class-
room instruction shall not be treated as a renegotiation
of a Player Contract. Any agreement to compensate a
player for such participation above such amount shall be
treated as a renegotiation. All such agreements shall be
set forth in writing and promptly filed with the League
Office.
*Side Letter 5/24/95: Sec. 2

* [A]ny salary deferral agreed to by club and player
which does not affect the player's Salary for purpose of
the Salary Cap and Entering Player Pool shall not be
treated as a renegotiation.
*Side Letter 11/7/97

* We have discussed whether an amendment to a Play-
er Contract that changes the terms under which Signing
Bonus is paid is or is not a "renegotiation" of the con-
tract under the terms of Article I, Section 2(ab) and Ar-
ticle XXIV, Section 9 of the CBA (and corresponding pro-
visions of the <u>White</u> Settlement Agreement)....We have
agreed that any such agreement is a "renegotiation" un-
der the terms of these provisions...
*Side Letter 5/13/99

**Section 10. Accounting Procedures:**
   (a)      **Special Purpose Letters and DGR Reporting.**
   (i)(A)  At least three days prior to the beginning of each League Year, the
parties will be provided with an "Initial Special Purpose Letter" by an in-
dependent auditor (hereinafter "the Accountants") which compiles the
preliminary reporting of the Defined Gross Revenues, Excluded DGR, Team
Salary, Player Costs and Benefits of each Club and the NFL for the League
Year about to be concluded, utilizing information reported by independent
Club and League auditors. The Accountants shall be a nationally recog-
nized accounting firm jointly appointed by the NFL and the NFLPA. The
parties agree to share equally the cost of the Accountants. The Reporting
Package to be used by the Clubs and the League in providing information
to the Accountants ("DGR Reports") in each of the NFL playing seasons
covered by this Agreement shall be agreed to by the parties. The engage-

137

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

ment of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year.

(B)      The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year, and the extent to which Required Tenders and Qualifying Offers must be increased in a League Year, shall be determined utilizing: (i) the information contained in the Initial Special Purpose Letter for the immediately preceding League Year, and (ii) any adjustments resulting from prior League Years.

(ii)      On or before the May 1 following the conclusion of each of the Capped Years hereunder, the parties will be provided with a "Final Special Purpose Letter" by the Accountants reporting the Defined Gross Revenues, Excluded DGR, Team Salary, Player Costs and Benefits of each NFL Team and the NFL for the League Year just concluded. The review procedures to be performed by the Accountants are set forth in Appendix H attached hereto, or as otherwise agreed between the parties. To the extent that the amounts set forth in the Final Special Purpose Letter are different from those in the Initial Special Purpose Letter, such that the amount of any Salary Cap and/or Minimum Team Salary that League Year would have been different than that utilized as a result of the issuance of the Initial Special Purpose Letter, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to any next Salary Cap and/or Minimum Team Salary (but subject in any case to Section 4(b)(i) above), with interest (using the one year Treasury *Note* rate as published in The Wall Street Journal on *February* 1 of each applicable League Year), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. Notwithstanding the foregoing, in the Final Capped Year, the Final Special Purpose Letter shall be issued no later than March 1, and any such difference shall immediately be credited or deducted, as the case may be, to the Salary Cap and/or Minimum Team Salary for the Final Capped Year (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program) if specified by the NFLPA.

*Extension Agreement 1/8/02*

(iii)      The Accountants shall review the reasonableness of any estimates of revenues or expenses included in any Club's DGR Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made: (a) pursuant to Section 10(a)(ii) above for estimates corrected prior to the issuance of the Final Special Purpose Letter, and (b) in DGR for the following League Year, without interest, for estimates corrected thereafter.

(iv)      With respect to expenses deducted by the NFL or the Clubs

138

from television, cable and radio broadcast revenues or any other revenues, the NFL and the Clubs shall report in the DGR Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i). All categories of expenses deducted from such revenues by the NFL or a Club in a DGR Report completed by the NFL or that Club shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(v)     Reasonably prior to the issuance of the Final Special Purpose Letter, the Accountants shall, as set forth in Appendix H attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Clubs or any other information contained in the DGR Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other information contained in the DGR Reports submitted by the Clubs.

(vi)     In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the DGR Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of subsection (iv), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(vii)     Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a DGR Report, shall be resolved by

139

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(viii)   After receiving the Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in the Final Special Purpose Letter.

(b)   **Projected Defined Gross Revenues**

(i)   For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 45 and 10(a) above, and for any other purpose specifically stated in this Agreement, Defined Gross Revenues shall be projected ("Projected Defined Gross Revenues") utilizing one or more agreed-upon methods for the projection process so that the anticipated growth of Projected DGR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate DGR over particular League Years pursuant to Section 1(a)(xiv) above. Notwithstanding the foregoing, any difference between Projected DGR and DGR for the prior League Year shall be credited or deducted, as the case may be, in the calculation of the Salary Cap and/or Minimum Team Salary for the next League Year using the method set forth in Sections 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. Moreover, if on March 1 of the year, one or more League-wide television or local television and radio contracts are in effect for the next League Year, the actual revenues expected from such source under such contract shall be used in the determination of Projected Defined Gross Revenues, unless another allocation has been or is agreed to by the parties. If, after the initial calculation of Projected DGR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected DGR, and the Salary Cap and Minimum Team Salary shall immediately be adjusted accordingly. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected DGR will include an additional projection of DGR determined in a manner agreed to by the parties. In addition, if, after the initial calculation of Projected DGR for a League Year, the number of scheduled regular season games per Club is increased above the standard of sixteen (16), Projected DGR will include an additional projection of DGR to account for such additional games as agreed upon by the NFLPA and the Management Council.

(ii)   In the event that actual Defined Gross Revenues for any League Year are less than Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the differ-

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

ence shall be deducted from Projected Defined Gross Revenues for the next League Year.

(iii)    In the event that actual Defined Gross Revenues for any League Year exceeded Projected Defined Gross Revenues (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Defined Gross Revenues for the next League Year.

(iv)    Any adjustments pursuant to Section 10(a)(iii) above will be subtracted from or added to Projected DGR as appropriate.

(c)    **Projected Benefits.**

(i)    For purposes of computing the Salary Cap and Minimum Team Salary to be applied in any upcoming League Year in accordance with Sections 4-5 and 10(a) above, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the upcoming League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)    In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year.

(iii)    In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(c)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year.

(iv)    In the event the NFLPA exercises any right to reduce or freeze or increase certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

(v)    In the event the amount of Projected Benefits is adjusted pursuant to (1) subsection (c)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

141

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY
# CAP AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** *A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time,* enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: *(a)* involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either *prior to,* during, *or after* the term of the Player Contract; *and/or (b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.*

*\* Amendment Agreement 12/4/00*

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Defined Gross Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Con-

142

tracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

**Section 5. Special Master Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

**Section 6. Sanctions:** *(a) Players and Agents.* In the event that the Special Master finds a violation of *subsection 1(a) or 1(b) of this Article, for each such violation: (i) (1) the Special Master may impose a fine of up to $250,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.*

*(b) Clubs. In the event that the Special Master finds a violation of Section 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $3,500,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $250,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the Special Master finds a violation of subsection 1(b) of this Article, for each such violation, the Special Master may: (i) impose a fine of up to $3,500,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $250,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the Special Master finds a violation of subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall,*

Article XXV Enforcement of the Salary Cap and Entering Player Pool

*unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of subsection 1(a), taking into account the sanctions, if any, imposed by the Special Master. By amending this Section 6 in December 2000, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and such amendment shall not be considered in any resolution of that issue. For purposes of this subsection 6(b), the term "Club personnel" shall not include players.*

*(c) Subject to the parties' mutual reservation of their respective positions in the last sentence of subsection 6(b) above, the sanctions set forth in subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1-3 of Article XXIX (Certifications), and each of the sanctions set forth in subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Paragraph 1 of this Article and Paragraphs 1-3 of Article XXIX (Certifications). All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article XI (Commissioner Discipline), Section 6. For each League Year after the 2000 League Year, each of the maximum fines set forth in this Paragraph 6 shall increase by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year). The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.*

*\* Amendment Agreement 12/4/00*

**Section 7. DGR Circumvention:** In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports Defined Gross Revenues, Excluded DGR, or non-DGR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to Defined Gross Revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the Special Master finds a violation of this Section 7, the Special Master may impose a fine upon the Club of up to $2 million, which shall be donated as additional contributions to the youth football programs fund described in Article XXIV (Guaranteed League-wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiii) above. *For each League Year after the 2000 League Year, the maximum fine set forth in this Paragraph 7 shall increase by the same percentage as the increase in Projected DGR for that League*

144

Article XXV Enforcement of the Salary Cap and Entering Player Pool

*Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year).*

*\* Amendment Agreement 12/4/00*

**Section 8. Management Council Audit Right:** *The Management Council shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article. By amending this Section 8 in December 2000, the parties have not waived or affected their respective positions as to whether the Management Council may conduct any Club-related audits beyond those set forth in the preceding sentence, and such amendment shall not be considered in any resolution of that issue.*

*\* Amendment Agreement 12/4/00*

**Section 9. Prior Consultation:** *Reasonably prior to the initiation of a proceeding alleging a violation of Section 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the Management Council, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This section shall not require the disclosure of any attorney-client communication, or any work product created by or at the request of an attorney. In addition, any attempt by the League, the Management Council, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Section 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.*

*\* Amendment Agreement 12/4/00*

Article XXVI, Special Master

# ARTICLE XXVI
# SPECIAL MASTER

**Section 1. Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White</u> v. <u>NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, *XXXVIII-A, XXXVIII-B,* and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

*\* Extension Agreement 1/8/02*

**Section 2. Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

    (a)    The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

    (b)    The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

    (c)    Subject to subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

    (d)    Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the rec-

146

ommendation of the Special Master. The parties may seek appropriate relief to effectuate and enforce this provision.

(e)     The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, *XXXVIII-A, XXXVIII-B,* and LVI-LVIII of this Agreement for Special Master review.

                                               * *Extension Agreement 1/8/02*

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement regarding any DGR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed

Article XXVI, Special Master

with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

*Section 6.* **Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

*Section 7.* **Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

148

# ARTICLE XXVII
# IMPARTIAL ARBITRATOR

**Section 1. Selection:** The parties shall agree upon an Impartial Arbitrator who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4. Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

149

Article XXVII, Impartial Arbitrator

***Section 7.* Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree to submit the issue to the President of the ABA who shall submit to the parties a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs, or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the Impartial Arbitrator from among the names on such list, they shall alternatively strike names from said list, until only one name remains, and that person shall be the Impartial Arbitrator. The first strike shall be determined by a coin flip. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

150

# ARTICLE XXVIII
# ANTI-COLLUSION

**Section 1. Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

(a)    whether to negotiate or not to negotiate with any player;

(b)    whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(c)    whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

(d)    whether to exercise or not to exercise a Right of First Refusal; or

(e)    concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

> \* [U]nder Article XIV (NFL Player Contract), paragraph 3 of Article XXX (Consultation and Information Sharing), paragraph 4 of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), and Article XXVIII (Anti-Collusion Provisions) of the Collective Bargaining Agreement, any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA and Class Counsel, cannot be the basis of any claim of collusion. Class Counsel, the NFLPA, or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.
>
> \*Side Letter 5/6/93

**Section 2. Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)    that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

(b)    that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

151

Article XXVIII, Anti-Collusion

    (c)     that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

    (d)     that the player is or has been subject to any Right of First Refusal.

**Section 3. Club Discretion**: Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures**: Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 5. Enforcement of Anti-Collusion Provisions**: Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof**: The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by

itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

*Section 7.* **Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

*Section 8.* **Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a) To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes

Article XXVIII, Anti-Collusion

place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)      To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

**Section 9. Computation of Damages**: Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)      Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)      Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)      Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $2,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $2,000,000. *For each League Year after the 2000 League Year, each of the enumerated fines set forth in this subsection 9(c) shall increase by the same percentage as the increase in Projected DGR for that League Year over the prior League Year's DGR (up to a maximum of ten percent (10%) per League Year).*

*Amendment Agreement 12/4/00*

**Section 10. Player Election**: A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability

154

and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

**Section 11. Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

**Section 12. Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

**Section 13. Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

**Section 14. No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

**Section 15. Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable

Article XXVIII, Anti-Collusion

basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

**Section 16. Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)      Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b)      Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)      Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)      In order to terminate this Agreement:

(i)      The proceeding must be brought by the NFLPA;

(ii)      The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)      The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

156

# ARTICLE XXIX
# CERTIFICATIONS

## *Section 1.* **Contract Certification:**

(a)    Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of *the* player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, *or* promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: *(a)* involving consideration of any kind to be paid, furnished or made available *or guaranteed* to the player, or Player Affiliate, by the Club or Club Affiliate either *prior to,* during, *or after* the term of the Player Contract; *or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.*

(b)    In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)    In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)    No contract will be approved by the Commissioner unless accompanied by the certifications required by subsections (a), (b), and (c) above.

(e)    *Any failure to execute and submit a certification as required under Section 1(a) above may be deemed evidence of a violation of Article XXV (Enforcement Of The Salary Cap And Entering Player Pool), Section 1 of this Agreement. Any failure to execute and submit a certification as required under Section 1(b) above may be deemed evidence of a violation of Article XXVIII (Anti-collusion) of this Agreement. Any failure to execute and submit a certification as required under Section 1(c) above may be deemed evidence of a violation of that provision.*

*\* Amendment Agreement 12/4/00*

## *Section 2.* **End of League Year Certification:**

(a)    At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the *Management Council* a certification confirming that the Club has not, to the

Article XXIX, Certifications

extent of his knowledge after reasonable inquiry of all owners and all em-
ployees with *authority to negotiate Player Contracts, entered into any undis-*
*closed agreements of any kind, express or implied, oral or written, or promises, un-*
*dertakings, representations, commitments, inducements, assurances of intent, or*
*understandings of any kind, as described in Article XXV (Enforcement Of The*
*Salary Cap And Entering Player Pool), Section 1. Upon receipt of such certifica-*
*tion, the Management Council shall forward a copy of the certification to the*
*NFLPA.*

(b)      *At the conclusion of each League Year, each player agent representing*
*a player who was under contract to an NFL Club during that League Year shall*
*submit to the NFLPA a certification confirming, after reasonable inquiry of all per-*
*sonnel in his or her agency with authority to negotiate Player Contracts, that nei-*
*ther he or she nor they has entered into any undisclosed agreements of any kind,*
*express or implied, oral or written, or promises, undertakings, representations,*
*commitments, inducements, assurances of intent, or understandings of any kind,*
*as described in Article XXV (Enforcement Of The Salary Cap And Entering Play-*
*er Pool), Section 1. Upon receipt of such certification,the NFLPA shall forward a*
*copy of the certification to the Management Council.*

(c)      *Any failure to execute and submit a certification as required under Sec-*
*tion 2(a) or 2(b) above, may be deemed evidence of a violation of Article XXV, Sec-*
*tion 1 of this agreement.*

*\*Amended Agreement 12/4/00*

(d)      At the conclusion of each League Year, the executive primarily re-
sponsible for football operations on behalf of each Club shall submit to the
Management Council a certification confirming that the Club has not, to
the extent of his knowledge after reasonable inquiry of all owners and all
employees with authority to negotiate Player Contracts, violated the terms
of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or
the NFL Management Council any communication disclosing that an NFL
Club had negotiated with or is negotiating with any Restricted Free Agent,
unless and until an Offer Sheet has been given to the Prior Club, or any
Unrestricted Free Agent, prior to the execution of a Player Contract with
that *Unrestricted Free Agent, where such communication or disclosure is incon-*
*sistent with Article XXVIII (Anti-Collusion), Section 1.* Upon receipt of each
such certification, the NFL shall forward a copy of the certification to the
NFLPA.

(e)      Any failure to execute a certification as required under Section
2(d) above may be deemed evidence of a violation of Article XXVIII (Anti-
Collusion), Section 1 of this Agreement.

**Section 3. False Certification**: Any person *or Club* who knowingly *executes*
*or files* a false certification required by *Sections* 1(a), 1(b), *2(a), or 2(b)* of this
Article shall be subject to a fine of up to $250,000, upon a finding of such
violation by the Special Master. *Authority to impose such a fine shall rest with*

the *Special Master or* the Commissioner, *consistent with the allocation of authority in Article XXV (Enforcement Of The Salary Cap And Entering Player Pool), Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article XXV, Section 6 above.*

*\* Amendment Agreement 12/4/00*

# ARTICLE XXX
# CONSULTATION AND INFORMATION SHARING

**Section 1. Consultation and Communications:**

    (a)    In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

    (b)    Subject to any claim of attorney-client and/or work product privilege, any communications under this section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

**Section 2. Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected DGR, and a revised estimate on the first day of each month thereafter in any such year.

**Section 3. Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

**Section 4. Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within five (5) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

Article XXXI, Expansion

# ARTICLE XXXI
# EXPANSION

**Section 1. Veteran Allocation**: The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract.

**Section 2. Additional Compensatory Picks**: The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

**Section 3. Entering Player Pool Adjustment**: The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

**Section 4. Relocation Bonus**: Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $20,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $30,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

# ARTICLE XXXII
# OTHER PROVISIONS

*Section 1*. **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

*Section 2*. **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

*Section 3*. **Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off NF/I during the period when such action is allowed by League rules, his contract will not be tolled.

*Section 4*. **Roster Exemption:**

(a)      Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)      Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)      Restricted Players. Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three Accrued Seasons), Section 2, or Article XIX

Article XXXII, Other Provisions

(Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)     If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)     If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

> * [A]ny player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) of the CBA, shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with subsections (i) through (iii) of Article XXXII, Section 4(c) of the CBA. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.
>
> *Side Letter 1/18/94

No player may be placed on roster exempt under this subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with (i) through (iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this subsection, the player shall not be entitled to compensation.

(d)     Except as provided in subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

164

# ARTICLE XXXIII
## SQUAD SIZE

*Section 1.* **Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

# ARTICLE XXXIV
# PRACTICE SQUADS

**Section 1. Practice Squads**: For each regular season, the League may elect in accordance with this Article to establish practice squads not to exceed five (5) players per Club.

**Section 2. Signing With Other Clubs**: Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

**Section 3. Salary**: Minimum salary for a practice squad player shall be $4,000 per week for the 2002 League Year, *$4,350 for the 2003-04* League Years, and *$4,700* for the *2005-07* League Years including postseason weeks in which his Club is in the playoffs.

*\* Extension Agreement 1/8/02*

**Section 4. Eligibility:**

(a)     The practice squad shall consist of the following players, provided that they have not served more than one previous season on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine regular season games during their only Accrued Season(s). No player may be a practice squad player for more than two seasons.

(b)     A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and has been a member of a club's Practice Squad for at least three regular season or postseason games (a bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question).

> \* If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three

166

games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the five-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks salary that he is entitled to receive from Club B.

*Side Letter 8/18/97

# ARTICLE XXXV
# OFF-SEASON WORKOUTS

**Section 1. Voluntary Workouts**: No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be *strictly* voluntary and take place in the manner and time period set forth in this Article.

**Section 2. Time Periods:**

(a)      *Subject to the limitations in subsection (b) below, from* the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than *fourteen* total weeks, and no more than four workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

(b)      *Each year off-season workout programs may not begin, and players may not be asked to voluntarily attend any such program, earlier than a date to be agreed upon by the Management Council and the NFLPA, and announced before the conclusion of the prior regular season; for 2002 only, that date is agreed to be March 25, 2002. Each year on a date to be agreed upon by the parties, each Club shall provide the Management Council and the NFLPA with the Club's schedule for its off-season workout program that year, and shall advise the Management Council and the NFLPA in writing in advance of any changes to that schedule. .*

(c)      *During the off-season program period, except for the fourteen days of organized team practice activity and mini-camps, players may be (1) at the Club facility no more than four hours per day, no more than four days per week, and not during weekends; and (2) on the field no more than ninety minutes per day. In addition, the Club may not specify to any player more than two specific hours a day during which it suggests that the player be at club facilities. Any player participating in an off-season workout program may select the other two hours in which he wishes to attend to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.*

*\* Extension Agreement 1/8/02*

**Section 3. Payment**: Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout re-

quirements: $90 during the 2002 League Year; $100 during the 2003-04 League Years; *$110 for the 2005-06 League Years; and $120 for the 2007 League Year.*

* Extension Agreement 1/8/02

**Section 4. Injuries:** Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous:** No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

**Section 6. Pre-Training Camp Period:** During the ten consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

*\* Invited Rookies will be permitted by their respective Clubs
to attend the NFL Players Rookie Premiere provided that: (i)
such event is scheduled during the month of May; (ii) such*

> *event encompasses a maximum of four consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the Management Council with the dates for the next Rookie Premiere not later than February 1 of each year.*
>
> *\* Side Letter 1/22/01*

**Section 7. Enforcement:**

(a)      The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

(b)(i)   *The Management Council and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules relating to off-season workouts set forth in this Agreement. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with copies of film or other documentation any representative deems relevant to any possible violation.*

(ii)     *Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the Management Council, or sooner if practical, the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to a non-injury grievance arbitrator who will render a decision within forty-eight hours of the submission of the dispute. If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL agree*

**170**

*that a violation has occurred, the next scheduled week of the Club's off-season program shall be cancelled, excluding mini-camps, and no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's off-season program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for off-season workout pay. If the arbitrator finds two separate violations of these rules in the same League Year, the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. No conduct occurring prior to the date upon which any non-injury grievance is filed under these rules may serve as the basis for a finding of a second violation by a Club; a second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed.*

    *(iii)    Except as provided in the fourth preceding sentence, these limitations on off-season workouts shall not preclude any player from working out on his own at any time, including weekends. Except as expressly provided in the 2002 amendments to this Article or in the 2002 amendments to Appendix L hereto, all prior rules in this Agreement concerning off-season workouts will continue to apply. By agreeing to the sanctions in this subsection (b), the parties have not waived or affected their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the Constitution and Bylaws.*

    *\* Extension Agreement 1/8/02*

# ARTICLE XXXVI
# MINICAMPS

**Section 1. Number**: Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

**Section 2. Length**: No minicamp may exceed three days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

**Section 3. Expenses**: Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

**Section 4. Contact**: There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

**Section 5. Injuries**: Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

172

Case 2:12-md-02323-AB  Document 6465-11  Filed 09/25/17  Page 187 of 317

# ARTICLE XXXVII
# PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell or Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** During the term of this Agreement, a rookie player will receive "per diem" payments at the rate of $725 per week in the 2002-03 League Years, $750 per week in the 2004 League Year, *$775 per week in the 2005-06 League Years, and $800 per week in the 2007 League Year,* commencing with the first day of preseason training camp and ending one week prior to the Club's first regular season game.

*\* Extension Agreement 1/8/02*

**Section 4. Veteran Per Diem:** During the term of this Agreement, a veteran player will receive "per diem" payments at the rate of $900 per week in the 2000-03 League Years, $1,000 per week in the 2004 League Year, *and $1,100 per week in the 2005-07 League Years,* commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

*\* Extension Agreement 1/8/02*

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games.

173

Article XXXVII Pre-Season Training Camps

**Section 7. Telephones**: Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

**Section 8. Expenses**: Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

174

# ARTICLE XXXVIII
# SALARIES

**Sections 1-5.** *[no longer applicable]*

**Section 6. Minimum Salaries After The 2001 League Year:**

(a)      After the 2001 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| League Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Less than One Credited Season | 225 | 225 | 230 | 230 | 235 | 235 |
| One Credited Season | 300 | 300 | 305 | 305 | 310 | 310 |
| Two Credited Seasons | 375 | 375 | 380 | 380 | 385 | 385 |
| Three Credited Seasons | 450 | 450 | 455 | 455 | 460 | 460 |
| Four-Six Credited Seasons | 525 | 530 | 535 | 540 | 545 | 545 |
| Seven-Nine Credited Seasons | 650 | 655 | 660 | 665 | 670 | 670 |
| Ten or more Credited Seasons | 750 | 755 | 760 | 765 | 770 | 770 |

(all amounts in thousands of dollars)

(b)      After the 2001 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding practice squad) shall be as follows:

| League Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Less than One Credited Season | 130 | 130 | 135 | 135 | 140 | 140 |
| One Credited Season | 145 | 145 | 150 | 150 | 155 | 155 |
| Two Credited Seasons | 160 | 160 | 165 | 165 | 170 | 170 |
| Three Credited Seasons | 200 | 200 | 205 | 205 | 210 | 210 |
| Four-Six Credited Seasons | 225 | 225 | 230 | 230 | 235 | 235 |
| Seven-Nine Credited Seasons | 250 | 250 | 255 | 255 | 260 | 260 |
| Ten or more Credited Seasons | 275 | 275 | 280 | 280 | 285 | 285 |

(all amounts in thousands of dollars)

*\* Extension Agreement 1/8/02*

**Section 7. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

175

Article XXXVIII, Salaries

**Section 8. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 9. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 10. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 11. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

**Section 12. Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will

176

the regular season be extended during this Agreement to include more than eighteen (18) games per team.

**Section 13. Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players will be provided to the NFLPA within five (5) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

**Section 14. Split Contracts:**
(a)      *[no longer applicable]*
(b)      After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

**Section 15. Funding of Deferred and Guaranteed Contracts:** The NFL may continue to adhere to its existing requirement that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one year Treasury *Note* rate as published in The Wall Street Journal on *February* 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

*Extension Agreement 1/8/02*

# ARTICLE XXXVIII-A
# MINIMUM SALARY BENEFIT

**Section 1. Qualifying Players**: *For purposes of this Article, a "Qualifying Player" shall be defined as a player with four or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.*

**Section 2. Qualifying Contracts**: *For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (a) covers only a single League Year and (b) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $25,000 in additional compensation (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)), and/or (3) a guarantee for salary and/or Salary advance of up to the Minimum Salary for a player with three Credited Seasons (e.g., $450,000 in 2002). Thus, for example, a contract that includes an option year is not a Qualifying Contract. Similarly, a Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than $25,000 in additional compensation less the amount of any additional compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus $25,000 in additional compensation.*

**Section 3. Transition Rules**: *A multi-year contract signed prior to December 1, 2001, shall be a Qualifying Contract if all other requirements (other than the requirement that the player's contract has expired or been terminated) are met, including, but not limited to, the applicable minimum, no more than $25,000 in additional compensation in any League Year of the contract (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)) and/or a guarantee for salary and/or Salary advance of up to the minimum salary for a player with three Credited Seasons (e.g., $450,000 in the 2002 League Year). The total amount specified for each League Year under the contract cannot exceed the applicable minimum for such League Year plus $25,000 in additional compensation for such League Year. For example, a player with 11 Credited Seasons who signed a two-year contract prior to December 1, 2001 containing Paragraph 5 salaries of $477,000 in 2001 and $750,000 in 2002, and no more than $25,000 in additional compensation in either year, would qualify for the benefit. If the same Player Contract had additional compensation in excess of $25,000 in each or either year, the contract would not qualify.*

**Section 4. Payments**: *Players with Qualifying Contracts shall be paid 1/17th of the specified minimum salary on a weekly basis (e.g., 1/17 of $750,000 per week in the 2002 League Year for a player with ten or more Credited Seasons).*

178

Case 2:12-md-02323-AB   Document 8495-11   Filed 09/25/17   Page 193 of 317

**Section 5. Reduced Salary Cap Count:** *Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with three Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with three Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with three Credited Seasons (if the player is not on an Active/Inactive List).*

**Section 6. Minimum Salary Benefit Calculation:** *The difference between the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2002 League Year, a Qualifying Player with five Credited Seasons shall receive a Minimum Salary of $525,000; however, only $450,000 shall count against his Club's Team Salary. The difference of $75,000 shall be counted as a Player Benefit and paid out of a League-wide benefit pool. Similarly, for example, in the 2002 League Year, a Qualifying Player with 12 Credited Seasons shall receive a Minimum Salary of $750,000; however, only $450,000 shall count against his Club's Team Salary. The difference of $300,000 shall be counted as a Player Benefit and paid out of a League-wide benefit pool.*

**Section 7. League-wide Salary Cap Treatment:** *At the start of each League Year, the Minimum Salary Benefit will be projected on a League-wide basis (i.e., the projected total number of Qualifying Contracts in each category multiplied by their respective benefits) and deducted from the calculation of the Salary Cap in the same manner as any other Player Benefit. At the end of each League Year, the projected benefit will be reconciled to the actual benefit and the difference will be added to or subtracted from the following year's Player Benefit projection.*

**Section 8. League-wide Cash Treatment:** *At the end of each League Year, the actual Minimum Salary Benefit spent on a League-wide basis (i.e., the actual total number of Qualifying Contracts in each category multiplied by their respective benefits) and divided by the number of Clubs in the League will be calculated to derive the Average Minimum Salary Benefit. If the total actual Minimum Salary Benefit allocated to a Club exceeds the Average Minimum Salary Benefit, the Club will be responsible to pay the difference. If a Club's total actual Minimum Salary Benefit is below the Average Minimum Salary Benefit, the Club will receive a credit.*

**Section 9. Terminated Qualifying Players:** *If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).*

**Section 10. Players Moving to New Club:** *In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the*

Article XXXVIII-A, Minimum Salary Benefit

"Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 11 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

**Section 11. Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club" (defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase or guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than $25,000 in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multi-year contract for more than the applicable Minimum Salary in any League Year of the contract plus $25,000 in additional compensation in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from signing bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other additional compensation that the player has received or will receive from that terminated contract does not exceed $25,000. For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2002 a player signs a two-year contract for the minimum Paragraph 5 salary in both years and a $50,000 signing bonus, and his contract is terminated on June 2, 2002, the player is not eligible to sign a 2002 Qualifying Contract with his Old Club because the sum of the acceleration of the 2003 prorated portion of the signing bonus ($25,000) that was agreed to in the year of his contract termination and the 2002 prorated portion of signing bonus from that terminated contract ($25,000) resulted in "additional compensation" of more than $25,000 in 2002. However, if the contract was signed on December 1, 2001, and the contract is terminated on June 2, 2002, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other additional compensation.

**Section 12. Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

**Section 13. Guarantees:** If a Qualifying Contract with guarantees is terminat-

180

ed, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Team's Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $750,000 Qualifying Contract, which includes a $450,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $450,000 of the $750,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $450,000.

**Section 14. Termination Pay:** If a Qualifying Player is eligible for termination pay when he is released and subsequently files a claim, he shall receive the charged amount (*e.g.*, $450,000) plus the full benefit amount (*e.g.*, $200,000 for a player with a Paragraph 5 Minimum Salary of $650,000). The player does not receive the benefit amount twice (*i.e.*, $850,000).

**Section 15. No Benefit for Non-Qualifying Contracts:** Contracts for players with four or more Credited Seasons who sign at the applicable minimum for that year plus more than $25,000 in additional compensation (*e.g.*, prorated signing bonus, etc.), or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

*\* Extension Agreement 1/8/02*

*\* Per day off-season workout payments shall not be considered in determining "additional compensation" for purposes of this Article if such payments are at the minimum level prescribed by Article XXXV. For example, without limitation on any other example, if a 2002 Player Contract provides for off-season workout payments of $90 per day for 14 four-day weeks, none of those payments ($5,040) shall be considered "additional compensation." If, however, that Player Contract provides for off-season workout payments of $91 per day, all of the workout payments ($5,096) shall be included in determining "additional compensation." If a Player Contract provides for off-season workout bonus payments on a basis other than a per-day payment, such payments shall count as "additional compensation" but will not affect the treatment of any off-season workout payments at the minimum prescribed level. For example, without limitation on any other example, a player with a 2002 Player Contract that provides for a $25,000 bonus payable to the player for participating in at least ten days of off-season workouts, in addition to the per-day minimum of $90 and no other "additional compensation," has "addition-*

Article XXXVIII-A, Minimum Salary Benefit

al compensation" of $25,000. Similarly, if a player receives from a single club, under a series of contracts, off-season workout payments specified on a per-day basis that average more than $90 per day, all of the off-season workout payments paid on a per-day basis shall count as "additional compensation."

*Side Letter 6/17/02*

* For purposes of determining "additional compensation" under this Article, any incentives with respect to any League Year prior to the 2002 League Year (LTBE or not) shall be counted only to the extent such incentives were earned. For example, without limitation on any other example, if a player's 2001 Player Contract contained an incentive of $30,000 for rushing more than 1,000 yards and an incentive of $15,000 for rushing between 500 and 999 yards, and the player rushed for 900 yards and thus earned $15,000, only $15,000 shall count as "additional compensation" under this Article.

*Side Letter 6/17/02*

# ARTICLE XXXVIII-B
# PERFORMANCE-BASED POOL

**Section 1. Creation Of Fund**: *Beginning in the 2002 League Year and continuing through the 2007 League Year, the NFL shall create a fund with (a) the difference in the minimum salaries negotiated in the January 8, 2002 amendments to this Agreement, and the minimum salaries that would have been calculated in the absence of such amendments, and (b) the difference in the Entering Player Pool negotiated in the January 8, 2002 amendments to this Agreement, and the Entering Player Pool that would have been calculated in the absence of such amendments.*

**Section 2. Annual Projection**: *Prior to each League Year, the fund will be projected on a League-wide basis and deducted from the calculation of the Salary Cap in the same manner as any other player benefit.*

**Section 3. Mandatory Distribution Each Year**: *There shall be mandatory distribution to players of the entire fund each year.*

**Section 4. Qualifying Players**: *The players who qualify for distributions shall be agreed upon by the NFLPA and the Management Council. If no agreement is reached, the fund from the Entering Player Pool difference shall be distributed to all qualifying Rookies, and the fund from the minimum salary difference shall be distributed to all qualifying Veterans.*

**Section 5. Methodology**: *The method of determining payments shall be: calculate total downs played, and award the players money based upon each individual's downs played in relation to the team's total downs (%), or such other rules as agreed upon by the NFLPA and the Management Council. Consideration will be given to awarding additional "points" for continuity with the same Club.*

\* *Extension Agreement 1/8/02*

183

Article XXXIX, Meal Allowance

# ARTICLE XXXIX
# MEAL ALLOWANCE

**Section 1. Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the preseason, regular season and postseason as follows: 2002 League Year-Breakfast $15.00, Lunch $21.00, Dinner $39.00; 2003-04 League Years-Breakfast $16.00, Lunch $23.00, Dinner $41.00; *and 2005-07 League Years-Breakfast $17.00, Lunch $25.00, Dinner $43.00.* For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*\* Extension Agreement 1/8/02*

**Section 2. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

# ARTICLE XL
# DAYS OFF

*Section 1.* **Rate**: All players will be permitted days-off at least at the rate of four days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2.* **Requirements**: During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

# ARTICLE XLI
# MOVING AND TRAVEL EXPENSES

*Section 1.* **Qualification**: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

*Section 2.* **Moving Expenses**: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

*Section 3.* **Travel Expenses**: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such

**186**

Article XLI, Moving and Travel Expenses

payment shall not exceed $5,000 during the 2002 League Year, $5,250 during the 2003-2004 League Years, *$5,500 during the 2005-06 League Years, and $5,750 during the 2007 League Year;* and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

*\* Extension Agreement 1/8/02*

**Section 4. Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

187

# ARTICLE XLII
# POST-SEASON PAY

**Section 1. System:** *A* four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each postseason game played:

| (in $000's) | <u>02</u> | <u>03</u> | <u>04</u> | <u>05</u> | <u>06</u> | <u>07</u> |
|---|---|---|---|---|---|---|
| Wild Card Game | | | | | | |
| (Division Winner) | 17 | 18 | 18 | 19 | 19 | 20 |
| (Other) | 12.5 | 15 | 15 | 17 | 17 | 18 |
| Division Playoff Game | 17 | 18 | 18 | 19 | 19 | 20 |
| Conference Championship Game | 35 | 36.5 | 36.5 | 37 | 37 | 37.5 |
| Super Bowl Game | | | | | | |
| (Winning Team) | 63 | 68 | 68 | 73 | 73 | 78 |
| (Losing Team) | 35 | 36.5 | 36.5 | 38 | 38 | 40 |

*\* Extension Agreement 1/8/02*

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**
    (a)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.
    (b)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.
    (c)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.
    (d)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was

**188**

on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and postseason) will receive one-half the amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)      A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)      A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)      A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one-half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5. Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE XLIII
# PRO BOWL GAME

**Section 1. Compensation:** Each player on the winning Team in the AFC-NFC Pro Bowl game will receive *$30,000* and each player on the losing Team will receive *$15,000*. These amounts shall be increased to $35,000 and $17,500 respectively for the Pro Bowls following the 2003 and 2004 seasons, *and to $40,000 and $20,000 respectively for the Pro Bowls following the 2005 through 2007 seasons.*

*\* Extension Agreement 1/8/02*

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

# ARTICLE XLIV
## PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician. In addition, the League may conduct mandatory urinalysis testing of all players at the beginning of the pre-season in the same manner as past

Article XLIV, Players' Rights to Medical Care and Treatment

seasons. The League may also conduct random testing for steroids as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

**Section 6. Substance Abuse:**

(a)     **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)     **Anabolic Steroids and Related Substances.** The League's existing Policy and Procedure with respect to Anabolic Steroids and Related Substances will remain in effect, except as it may be modified in the future due to scientific advances with respect to testing techniques or other matters. The parties will establish a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)     **Drugs of Abuse and Alcohol.** The League's existing Policy and Procedure with respect to Drugs of Abuse and Alcohol will remain in effect, including annual pre-season testing of all players; provided that the parties will promptly make their best efforts jointly to formulate and implement a modified program with respect to Drugs of Abuse and Alcohol to become effective for the 1993 NFL season.

192

# ARTICLE XLV
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

***Section 1*. Personnel Records**: Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

***Section 2*. Medical Records**: Player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

Article XLVI, Player Benefit Costs

# ARTICLE XLVI
# PLAYER BENEFIT COSTS

*Section 1.* (a) **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, (2) benefits under the Supplemental Disability Plan, and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below seven percent (7%) of Projected Defined Gross Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b) **1998 Amendment Benefits:** During each League Year for which a Salary Cap applies, the NFLPA will have the unilateral right to increase, reduce or freeze each separate and individual Player Benefit Cost relating to 1998 Amendment Benefits that are set forth in Sections 5(c), 5(d) and 5(e) of this Article to the extent permitted by law, to ensure that the total cost of the 1998 Amendment Benefits does not exceed and is not less than the amount set forth below for each such League Year. Any increase shall be for one League Year only and shall not create a continuing obligation for the Clubs. The total cost of the 1998 Amendment Benefits for Capped Years in the 2002 League Year and thereafter *shall be* $100 million, *plus an additional amount, if necessary, sufficient to raise the Allocation under the Player Annuity Program to $65,000 for each player eligible for an Allocation, unless the parties agree otherwise.*

Notwithstanding the foregoing language regarding the total cost of 1998 Amendment Benefits for the 2002 League Year *and thereafter*, Class Counsel and the NFLPA may specify additional amounts to be used for additional increases in the Player Annuity Program described in Article *XLVIII-A* (Player Annuity Program), pursuant to Article XXIV, Section 10(a)(ii) for additional amounts generated from the 2002 League Year *and thereafter*. During each League Year for which a Salary Cap does not apply, the NFL shall be required to contribute with respect to the 1998 Amendment Benefits only the cost of those such benefits that are set forth in Sections 5(a) *and* 5(b). If the NFLPA is notified in writing that the cost of the 1998 Amendment Benefits for a Capped Year is projected to exceed or to be less than the above total for a League Year, and the NFLPA does not specify which benefits are to be increased, reduced or frozen by the later of (1) the beginning of that League Year, and (2) 30 days after the date the NFLPA receives such notice, the Management Council shall have the unilateral right to reduce or increase 1998 Amendment Benefits to the extent permitted by

law, to achieve the above total cost for that League Year. Any reductions or increases in 1998 Amendment Benefits shall be implemented as of the beginning of a League Year by determining projected 1998 Amendment Benefits based on Projected Benefits, as defined in Article XXIV, Section 10(c).

(c) **Adjustment**: If the actual Player Benefit Costs of the 1998 Amendment Benefits exceed the applicable amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be reduced by such excess. If the actual Player Benefit Costs of the 1998 Amendment Benefits are less than the amounts set forth in Section 1(b) above for an applicable League Year (including any adjustments pursuant to this section), then the amount set forth in Section 1(b) for the following League Year shall be increased by such shortfall.

*Section 2.* **Right of Restoration**: Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

*Section 3.* **Definition**: For purposes of this Agreement, the term "Player Benefit Costs," as also set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Clubs for, to or on behalf of present or former NFL players, but only for:

(a)      Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII); *provided that all costs associated with the benefit increase, to which the parties agreed in 2002, under Article XLVII, Section 8, shall be allocated for Player Benefit Costs purposes in equal amounts to the 2002-2006 League Years;*

(b)      Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(c)      Injury protection (as described in Article XII);

(d)      Workers' compensation, payroll, unemployment compensation, and social security taxes;

(e)      Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(f)      Moving and travel expenses (as described in Sections 2, 3, and 4 of Article XLI, and Section 8 of Article XXXVII);

(g)      Postseason pay (as described in Article XLII and Article XLIII);

*and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary;*

(h)     Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Player Benefit Costs may not increase more than ten percent (10%) each League Year, beginning with the 1993 League Year);

(i)     Severance pay (as described in Article L);

(j)     The Player Annuity Program (as described in Article *XLVIII-A*);

(k)     *The Minimum Salary Benefit (as described in Article XXXVIII-A);*

(l)     *The Performance Based Pool (as described in Article XXXVIII-B); and*

(m)     *The Tuition Assistance Plan (as described in Article XLVIII-B).*

* Extension Agreement 1/8/02

Player Benefit Costs will not include salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII, and such salary reduction contributions will not reduce Player Salaries for purposes of Article XXIV. Neither Player Benefit Costs nor Player Salaries will include any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan. Player Benefit Costs for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Player Benefit Costs for pension funding, the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, *and the Tuition Assistance Plan* will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

*Section 4.* **Resolution of Disputes**: In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits for the League Year beginning the previous February 20, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Defined Gross Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a) The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b) Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c) As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5. 1998 Amendment Benefits**: For purposes of this Agreement, the term "1998 Amendment Benefits" means the following:

(a) The increase in 1998 and future Benefit Credits to $425 described in Article XLVII, Section 2 and the increase in Benefit Credits for prior years described in Article XLVII, Section 4;

(b) The decrease in the vesting requirement described in Article XLVII, Section 5;

(c) The increases in the Second Career Savings Plan contributions described in Article XLVIII, Section 2;

(d) The Player Annuity Program (as described in Article XLVIII-A); and

(e) The increases in the Extended Post-Career Medical and Dental Insurance benefits described in Article XLIX, Section 2(c).

**Section 6. Limitations on Contributions:** *Effective March 1, 2002,*
*(a) No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Supplemental Disability Plan, the Player Annuity Program, the Severance Pay Plan, or the Tuition Assistance Plan (individually, a "Player Benefit Plan") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Plan shall be amended to prevent any employer provided benefit from accruing or being otherwise credited, paid, or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Plan in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club. During an Uncapped Year, a payment of benefits under a Player Benefit Plan shall be made only if and to the extent the payment either is funded, or is required by ERISA.*

Article XLVI, Player Benefit Costs

    (b)      *The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be required to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.*

*Extension Agreement 1/8/02*

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bert Bell/Pete Rozelle Plan" or "Merged Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Bert Bell/Pete Rozelle Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term.

**Section 2. Additional Credited Seasons:** *[no longer applicable]*

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Bert Bell Plan, the Pete Rozelle Plan, or the Merged Plan, as appropriate, on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Merged Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Benefit Credits:** Effective for payments on and after *September 1, 2001*, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to *provide* the *following* Benefit *Credits* for *the indicated* Credited *Seasons:*

| Credited Season in Plan Year | Benefit Credit |
|---|---|
| *Before 1982* | $200 |
| 1982 through 1992 | 230 |
| 1993 and 1994 | 240 |
| 1995 and 1996 | 285 |
| 1997 | 330 |
| *1998 through the Plan Year that begins prior to the expiration of the Final League Year* | 425 |

199

Article XLVII, Retirement Plan

**Section 5. Decrease in Vesting Requirement:** Effective for payments on and after June 1, 1998, the parties will amend the Bert Bell/Pete Rozelle Plan to provide that any player who (i) earned his last Credited Season prior to the 1975 Plan Year; (ii) is credited with at least four (4) Credited Seasons; and (iii) is alive on June 1, 1998, shall be fully vested in the right to receive a retirement benefit under the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment shall be entitled to receive any benefit under the Bert Bell/Pete Rozelle Plan other than his Normal, Deferred or Early Retirement Benefit. No player who is vested as a result of this amendment shall be entitled to elect to receive a retirement benefit in the optional form provided by Section 4.4(c)(3) of the Bert Bell/Pete Rozelle Plan. No beneficiary of a player who is vested as a result of this amendment and who dies prior to his Annuity Starting Date (as defined in the Bert Bell/Pete Rozelle Plan) shall be entitled to receive any benefit, except that the surviving spouse of such a player shall be entitled to receive a pre-retirement survivor annuity under rules similar to those in Section 4.9(b) of the Bert Bell/Pete Rozelle Plan. No player who is vested as a result of this amendment who attained his Normal Retirement Age prior to June 1, 1998 shall be entitled to a benefit with respect to any period prior to June 1, 1998. Any Normal Retirement Benefit paid pursuant to this amendment will not be actuarially adjusted to reflect an Annuity Starting Date after the player's Normal Retirement Date, except to the extent the Annuity Starting Date is after June 1, 1998.

**Section 6. *Medical Standards for Line-of-Duty Disability Benefits:*** *The parties agree to amend the Bert Bell/Pete Rozelle Plan to adopt revised medical standards for Line-of-Duty disability benefits based upon the American Medical Association's Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL) ("AMA Guides"). Effective for applications received on and after April 1, 2002, the parties will amend Section 6.4 of the Bert Bell/Pete Rozelle Plan to read substantially as follows:*

*"6.4 Definitions*
*(a) A "substantial disablement" is a "permanent" disability that*
*(1) Results in a 50% or greater loss of speech or sight; or*
*(2) Results in a 55% or greater loss of hearing; or*
*(3) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or*
*(4) For orthopedic impairments, using the Guides to the Evaluation of Permanent Impairment (Fourth Edition, Chicago, IL),is (a) a 55% or greater loss of use of the entire lower extremity; or (b) a 30% or greater loss of use of the entire upper extremity; or (c) an impairment to the spine that results in a 29% or greater whole body impairment. In each case for orthopedic impairments, a maximum of 10 percentage points will be allowed for symptoms of pain."*

*\* Extension Agreement 1/8/02*

200

**Section 7. Practice Squad Credited Season:** *Effective April 1, 2001, the parties will amend Section 1.10 of the Bert Bell/Pete Rozelle Plan to add a new subsection (f) to read substantially as follows:*

"(f) *effective April 1, 2001, has a season with at least eight games on the practice squad in a Plan Year (either before or after April 1, 2001) in which he did not otherwise earn a Credited Season, provided that he is otherwise vested and earns a Credited Season in 2001 or later. A player may earn a maximum of one Credited Season under this Section 1.10 (f) regardless of the number of seasons in which he has at least eight games on the practice squad."*

*\*Extension Agreement 1/8/02*

**Section 8. Increase in Past Service Credit:** *Effective for payments on and after September 1, 2001, the parties will amend Section 4.1 of the Bert Bell/Pete Rozelle Plan to increase the Benefit Credit in effect for each Credited Season prior to 1977 to $200. Payments reflecting this increase will begin with the March 1, 2002 payment. Benefits for affected players in pay status shall be proportionately increased based on the new and prior benefit credits.*

*\*Extension Agreement 1/8/02*

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

*Section 1*. **Maintenance**: The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2*. **Contributions**:

**(a)      Prior to 2001**: For each of the Plan Years 1993 through *1999, a contribution of $215,000 will be made to the Savings Plan on behalf of each NFL Club. For the 2000 Plan Year, a contribution of $250,000 will be made to the Savings Plan on behalf of each Club.* Such contributions will be made in four (4) equal payments, on June 30, September 30, December 31, and March 31 of each such Plan Year.

*\*Extension Agreement 2/25/98, as amended by Extension Agreement 1/8/02*

**(b)      2001 and Later Years**: For each *of the Plan Years 2001 and thereafter in which the Salary Cap applies,* a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)      Matching Contributions. The parties will amend the Savings Plan to require the NFL Clubs in the aggregate to contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two Dollars (up to a maximum of $20,000) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)      by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)      by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)      Minimum Contribution. The NFL Clubs in the aggregate will

202

contribute to the Savings Plan, for each Plan Year *in which a Salary Cap applies,* a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)     Expenses. The NFL Clubs will make contributions to the Savings Plan at least quarterly in an amount sufficient to pay administrative expenses.

(c)     **Future Contributions and Collection**: Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Extension Agreement 1/8/02*


**Section 3. Expansion of Eligible Employees**: *Effective as of April 1, 2002, the parties will amend the Savings Plan so that first year players (not including practice squad players) may participate and contribute to the Savings Plan, but will not receive employer contributions under Sections 3.2, 3.3, 3.4, or 3.6 of the Savings Plan for that Plan Year.*

*Extension Agreement 1/8/02*

# ARTICLE XLVIII-A
## PLAYER ANNUITY PROGRAM

***Section 1*. Establishment:** The parties will jointly establish a new benefit, to be called the NFL Player Annuity Program (hereinafter referred to as "Player Annuity Program"). The Player Annuity Program will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Annuity Year will be the period April 1 to March 31. The Player Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Program will be continued and maintained in full force and effect during the term of this Agreement.

***Section 2*. Contributions:** For each of the Annuity Years 2001 and thereafter in which a Salary Cap applies, a contribution will be made to the Player Annuity Program on behalf of the NFL Clubs unless this figure is changed pursuant to this Agreement, including the rights of the parties under Section 1(b) of Article XLVI of this Agreement, *in the amount of $73 million, but not less than an amount sufficient to fund an Allocation of $65,000 to each player eligible for an Allocation, unless the parties agree otherwise.*
*\* Extension Agreement 1/8/02*

Contributions to the Player Annuity Program for an Annuity Year will be made as follows:
1. Expenses: The NFL Clubs will prepay contributions to the Annuity Program at least quarterly in an amount sufficient to pay administrative expenses. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

2. Allocations: Allocations for the benefit of individual players will be made on and as of December 31 and March 31 of each Annuity Year, as described in Section 3(c) below.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

***Section 3*. Eligibility and Allocation:**
    (a)      **Points:** *For Annuity Year 2001 and each year thereafter for which a*

*Salary Cap applies, players* who earn a Credited Season, as that term is defined in the Bert Bell/Pete Rozelle Plan, in an Annuity Year and who have a total of four or more Credited Seasons as of the end of such Annuity Year will receive *one point* for each such Credited Season.

(b)     **Individual Allocations:** The amount allocated to an individual player who receives *a point* in the 2001 and later Annuity Years will be calculated as follows: In December of each such year a good faith estimate will be made by the Annuity Board of the total contribution expected to be made during such Annuity Year under Section 2 above by all NFL Clubs, minus the estimated administrative expenses for the Annuity Year, and minus any retroactive allocations made to players under rules similar to those in Section 3.4 of the Savings Plan. A good faith estimate will also be made at that time by the Annuity Board of the total points expected to be earned during such Annuity Year by all players. The value of a point will be determined by (1) taking the total estimated available contributions as described above and (2) dividing by the estimate of the total points expected to be earned by all players. *The Allocation to each player eligible for an Allocation will, for each of the 2002 through 2006 Annuity Years, not be less than $65,000, unless the parties agree otherwise.*

*\*Extension Agreement 1/8/02*

(c)     **Timing:** Eligible players who earn a Credited Season by December 1 of an Annuity Year will receive their allocation on December 31 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive their allocation on March 31 of such Annuity Year.

**Section 4. Distributions:** A player may elect to begin receiving distributions under the Player Annuity Program in the form of annuity or installment payments at any time after the later of (a) the player's attainment of age 35, or (b) five years after the end of the Annuity Year containing the player's last Credited Season. Payments must begin no later than age 65. A player who elects to begin receiving annuity or installment payments under the preceding sentences may elect to receive such payments in substantially equal amounts for a period beginning on the date of commencement of such payments and ending upon the player's attainment of age 45, or such later age as he shall specify, or for life. Alternatively, a player may elect to defer his receipt of distributions under the Player Annuity Program. Upon a player's attainment of age 45, such player may elect to receive his benefit under the Player Annuity Program in the form of an annuity or a lump sum payment. If a player dies before making an election to receive benefits, the player's named beneficiary may make an election that otherwise would have been available to the player. A player's rights under the Player Annuity Program may not be transferred, assigned, or alienated.

Article XLVIII-A, Player Annuity Program

**Section 5.** **Structure:** The Player Annuity Program will hold assets for the sole benefit of players and their beneficiaries. The parties agree that the Program will be administered by an Annuity Board, and that prior to the first meeting of the Annuity Board the advisors to the Player Annuity Program will be the same as the advisors to the Savings Plan. The Player Annuity Program is intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity as described in Section 6 below.

206

# ARTICLE XLVIII-B
# TUITION ASSISTANCE PLAN

**Section 1. Establishment:** *Effective April 1, 2002, the parties shall establish a new benefit program to be called the NFL Player Tuition Assistance Plan. The Plan will provide up to $15,000 per League year as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. A written plan that qualifies as an educational assistance program under Section 127 of the Internal Revenue Code will be established, and benefits to a player in any calendar year will be paid through such educational assistance program up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan will begin on April 1.*

**Section 2. Eligibility:** *To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.*

**Section 3. Reimbursement:** *An eligible player will be reimbursed by no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books.*

*\*Extension Agreement 1/8/02*

# ARTICLE XLIX
# GROUP INSURANCE

**Section 1. Group Insurance Benefits:** Players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)     **Life Insurance:** For the *2002-06* League Years, a rookie player will be entitled to $150,000 in coverage, and a veteran player's coverage will be increased by $30,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan) up to a maximum of $300,000 in coverage.

(b)     **Medical:** *Until and including August 31, 2002, each player is required to pay an annual deductible of $200 per individual per plan year and $400 per family per plan year, with a maximum out-of-pocket expense of $800 per plan year (including the deductible) for each covered individual. Effective September 1, 2002, each player is required to pay an annual deductible of $400 per individual per plan year and $800 per family per plan year, with a maximum out-of-pocket expense of $1600 (including the deductible) for each covered individual. Effective March 1, 2002,*

*1)     the co-insurance paid by a covered individual for services rendered by out-of-network providers will change from 20% of covered charges to 30% of covered charges; and*

*2)     the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and*

*3)     a prescription drug card will be provided to covered individuals requiring a $5 co-pay for generic drugs and a $10 co-pay for brand name drugs if the generic or brand name drugs are obtained from participating pharmacies. The availability of participating pharmacies will not be significantly reduced below the level initially provided by CIGNA.*

*4)     Notwithstanding the effective date stated above, the* maximum lifetime benefits paid on behalf of a covered individual will be $2.5 million *effective September 9, 2001.*

(c)     **Dental:** Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

1)     Preventive care paid at 100% of UCR,

2)     General services paid at 85% of UCR, and

3)     Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d)     **Insurance Benefits for Vested Players:** Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment on or before May 1 in a calendar year will continue to receive insurance cov-

erage under this Article until the first regular season game of the season that begins later in that calendar year. Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive insurance coverage under this Article until the first regular season game of the season that begins in the following calendar year. Group insurance benefits are guaranteed during the term of this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

(e)      *Family Medical and Dental Coverage for Deceased Players: A player's enrolled dependents (including a child born to the player's wife within ten months after the player's death) shall be entitled to continuing family medical and dental insurance coverage effective August 1, 2001, as follows:*

1)      *for the dependents of a player on  the Active, Inactive, Reserve/Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;*

2)      *for dependents of a player  who was receiving coverage under Section 1(d) , 2(c), or 2(d) of  this Article at the time of his death, coverage  will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.*

*\*Extension Agreement 1/8/02*

**Section 2. Extended Post-Career Medical And Dental Insurance:** The medical and dental insurance benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)-(b) *[no longer applicable]*

(c)      Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time after the first regular season game in the 1998 season and before the first regular season game of the 2002 season will continue to receive the benefits described in Subsections 1(b) and 1(c) above for thirty-six (36) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Section 1(d) of this Article.

(d)      *Players vested under the Bert Bell/Pete Rozelle Plan who are released or otherwise sever employment at any time during or after the first regular season game in the 2002 season or at any time thereafter prior to the expiration or termination of this Agreement will continue to receive the benefits described in Subsections 1(b) and 1(c)  above for forty-eight (48) months beyond the date the benefits described in Subsections  1(b) and 1(c) above terminate in accordance with Subsection 1(d) of this Article.*

(e)      All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described

Article XLIX, Group Insurance

in Subsections 2(a), 2(b), and 2(c) above are provided, as if such additional benefits had not been provided.

(f)      The costs for the benefits described in this Section during the 2001 and subsequent League Years will be charged as Benefits pursuant to Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(b).

* *Extension Agreement 1/8/02*

**Section 3. Limitations And Rules For Extended Insurance**: Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)      The benefits described in Subsections 2(c) and 2(d) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)      The benefits described in Section 2 above will not be provided to employees of the NFL or an NFL Club who are eligible for group insurance by reason of such employment.

(c)      The benefits described in Section 2 above will be secondary to any other health plan or program for health services (for the player or his spouse and dependents) to the extent permitted by state or federal law.

(d)      The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to, in the 1999 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4**. *[no longer applicable]*

**Section 5. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

# ARTICLE L
## SEVERANCE PAY

**Section 1. Eligibility:** Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle Plan), at least one of which is for a season occurring in 1993 through *2006*, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay.

**Section 2. Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; (c) $12,500 per Credited Season for each of the seasons 2000 through *2006*.

*\* Extension Agreement 1/8/02*

**Section 3. Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

**Section 4. Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
|---|---|---|
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through *the end of the League Year, or earlier* | June 1 | June 30 |
| *The beginning of the League Year* through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

211

Article L, Severance Pay

**Section 5.** **Failure to Apply**: A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6.** **Only One Payment**: Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7.** **Payable to Survivor**: In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8.** **Prior Severance Pay**: Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9.** **Nonassignability**: The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

# ARTICLE LI
# SUPPLEMENTAL DISABILITY BENEFITS

**Section 1. Maintenance**: The NFL Player Supplemental Disability Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such term. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions**: For each Plan *Year in which the Salary Cap applies*, unless modified as described below, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and administrative expenses. Contributions, if any, for later Plan Years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Supplemental Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

*\*Extension Agreement 1/8/02*

**Section 3. Extension**: For each Plan Year in *which the Salary Cap applies*, the parties will amend Section 3.1 of the NFL Player Supplemental Disability Plan at the beginning of such Plan Year to provide that a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

*\*Extension Agreement 1/8/02*

**Section 4. Automatic Payment and Waiver**: *The parties will amend the Supplemental Disability Plan effective February 1, 2002 to provide that payments under the Supplemental Disability Plan will automatically be paid to all players who qualify for such benefits unless the qualifying player waives the right to receive such benefits. A player's waiver may be revoked, but not with respect to benefits that would have been paid prior to the revocation of his waiver.*

*\*Extension Agreement 1/8/02*

# ARTICLE LII
# BENEFIT ARBITRATOR

*Section 1.* **Selection:** The Management Council and the NFLPA will sub-mit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will de-termine which party first strikes a name from the other party's list of can-didates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitra-tor, the procedure in this Section will be followed to fill the vacancy, sub-stituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dis-miss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the em-ployee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagree-ments relating to Articles XLVI through LI of this Agreement. However, dis-agreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibil-ity for disability benefits under the Supplemental Disability Plan will be re-solved in accordance with the procedures that have previously been adopt-ed by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other pro-cedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relat-ing to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Ei-

**214**

ther party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

Article LIII, Retention of Benefits

# ARTICLE LIII
# RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
# WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Joint Study:** The parties agree to establish a joint committee comprised of three NFLPA appointees (plus advisors) and three NFLMC appointees (plus advisors) which will study and make recommendations concerning workers' compensation coverage of NFL players in the various states (and the District of Columbia) where NFL games are played. The committee will seek to find ways in which workers' compensation benefits can be provided to players in the most cost-effective manner possible. Written recommendations shall be provided by the committee to the NFLPA and the NFLMC on or before June 1, 1994. The NFLPA and NFLMC shall thereafter exercise their best efforts to implement the recommendations of the committee.

**Section 5.** *[no longer applicable]*

**Section 6. Preservation of Rights:** The NFLPA and the Clubs preserve their prior positions with regard to the legality of workers' compensation offset provisions under state law, and nothing in this Article shall prevent any player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision is legally binding upon a player. In addition, neither party nor members of the

217

Article LIV, Workers' Compensation

NFLPA's bargaining unit will claim that the other party's agreement to this Article or the revised NFL Player Contract appended hereto affects the rights set forth above.

*Section 7.* **Reopener**: If the parties do not reach agreement concerning future workers' compensation coverage of NFL players within sixty (60) days of the issuance of the committee recommendations pursuant to Section 4 above, then either party may reopen this Article upon the giving of ten (10) days written notice, and both parties will have an obligation to resume negotiations limited to the issue of workers' compensation, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

# ARTICLE LV
# MISCELLANEOUS

**Section 1. Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product.

**Section 2. On-Field Attire:** Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television.

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first preseason cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire

219

Article LV, Miscellaneous

to attend such a game at least three days prior to the date of the game. NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has

been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, *XXXVIII-A, XXXVIII-B,* and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

*Extension Agreement 1/8/02*

Article LVI, Final League Year

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap**: No Salary Cap shall be in effect during the Final League Year.

*Section 2.* **Free Agency If Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five Accrued Seasons in the Final League Year, as if such player had four Accrued Seasons, except that the Qualifying Offers specified in Article XIX (Veteran Free Agency), Section 2(b)(ii) shall be $50,000 greater for the Qualifying Offers originally stated to be $325,000, and $100,000 greater for the Qualifying Offers originally stated to be $700,000 or $900,000, subject to any additional increases in the base amounts in accordance with the rules set forth in Article XIX (Veteran Free Agency), Section 2(e).

*Section 3.* **Free Agency If No Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five Accrued Seasons.

*Section 4.* **Franchise and Transition Players**: As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
# LABOR EXEMPTION

**Section 1. Rights Under Law:** Subject to the provisions of this Article, upon the expiration or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

**Section 2. Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

**Section 3. CBA Expiration:**
   (a)    Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.
   (b)    The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

223

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1. Effective Date**: Except as specifically provided otherwise in this Agreement, this Agreement shall be effective upon ratification by the NFLPA in accordance with its internal procedures. Upon ratification by the NFLPA, Articles I, XIV, XVI-XXI, XXIV-XXX and LVI-LVIII shall be deemed effective as of March 29, 1993. With respect to the 1998 amendments to this Agreement, those amendments shall be effective upon the execution of those amendments, except that: (i) the 1998 amendments with respect to the Entering Player Pool and the amount of the Salary Cap shall be effective as of the first day of the 1998 League Year; and (ii) the parties may agree upon transition rules implementing the terms of the 1998 amendments, which transition rules shall be effective as of such dates as are agreed to by the parties. *With respect to the 2002 amendments to this Agreement, those amendments shall be deemed effective as of the last game of the 2001 regular season, except for the benefits which are specified to go into effect beginning in the 2002 League Year.*

*\* Extension Agreement 1/8/02*

**Section 2. Expiration Date**: Except as provided in Section 3 below, this Agreement shall be effective from the date hereof and shall continue in full force and effect until the last day of the *2007* League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire *in the League Year immediately following the expiration or termination of this Agreement.*

*\* Extension Agreement 1/8/02*

**Section 3. Termination Prior to Expiration Date:**
    (a)-(b) *[no longer applicable]*
    (c)    **Provision Invalidated.** If at any time after Court Approval during the term of this Agreement, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (Final League Year), XXVI-II (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of ter-

224

mination within 30 days of the date of such determination and any appeals relating thereto.

(d)     **Termination Due To Collusion.** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e)     **Termination After Closing Date.** If the Settlement Agreement is terminated after the Closing Date (as defined in the Settlement Agreement), the rules set forth in Article XXVI (Termination Prior to Expiration Date), paragraph 6 of the Settlement Agreement, apply.

(f)     **No Waiver.** Any failure of the NFL, the NFLPA or Class Counsel to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

*Section 4.* **Ratification:** This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal procedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

# ARTICLE LIX
# GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

# ARTICLE LX
# NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a) To the National Football League Management Council:
The National Football League
Management Council
280 Park Avenue
New York, New York 10017
Attention: Executive Vice President—Labor Relations

(b) To an NFL Club:
At the principal address of such Club as then
listed on the records of the NFL or at that Club's
principal office.
Attention: President

(c) To the NFLPA:
National Football League Players Association
2021 L Street, N.W.
Washington, D.C. 20036
Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

BY: _____

BY: _____

Appendix A

# APPENDIX A

## CHECK-OFF AUTHORIZATION FOR NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management

228

Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

Appendix B

# APPENDIX B

## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under subsections (a) and (b) may be waived prior to being given a preseason physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

# APPENDIX C

# NFL PLAYER CONTRACT

THIS CONTRACT is
between_____,
hereinafter "Player," and_____,a
_____
corporation (limited partnership) (partnership), hereinafter "Club," oper-
ating under the name of the _____
as a member of the National Football League, hereinafter "League." In con-
sideration of the promises made by each to the other, Player and Club agree
as follows:

1.     TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

2.     EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory minicamp(s), official preseason training
camp, all Club meetings and practice sessions, and all preseason, regular
season and postseason football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

3.     OTHER ACTIVITIES. Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

231

4.     PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.

(a)     Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)     Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on *or in conjunction with* products (*including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.*) that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire

on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

*Extension Agreement 1/8/02*

5.     COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season;

$_____ for the 20_____ season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.     PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides

233

Appendix C

otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7.     DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.     PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.     INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.     WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in ex-

234

istence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

235

Appendix C

14.    RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.    INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.    EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.    ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his ser-

236

vices under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18.     FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.     DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.     NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.     OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

Appendix C

22.   LAW. This contract is made under and shall be governed by the laws of the State of _____ .

23.   WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, preseason compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.   OTHER PROVISIONS. (a)   Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)   Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)   The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the

238

time the information was provided, true and correct in all material respects.

25.    SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| PLAYER | CLUB |
| Home Address | By |
| Telephone Number | Club Address |
| Date | Date |

PLAYER'S CERTIFIED AGENT

Address

Telephone Number

Date

Copy Distribution:    White-League Office    Yellow-Player
                      Green-Member Club      Blue-Management Council
                      Gold-NFLPA             Pink-Player Agent

Appendix D

# APPENDIX D

## FIRST REFUSAL OFFER SHEET

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                         Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:


   [Supply Information on this Sheet or on Attachment]

   1.    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

   2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

   3.    Other terms (that need not be matched):

Player:                                  New Club:

By: _____            By: _____
                                         Chief Operating Officer


240

# APPENDIX E

# FIRST REFUSAL EXERCISE NOTICE

Name of Player:                          Date:

Address of Player:                       Name of New Team:

Name and Address of                      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                         Address of Prior Team:

   The undersigned member of the NFL hereby exercises its Right of First
Refusal so as to create a binding Agreement with the player named above
containing the Principal Terms set forth in the First Refusal Offer Sheet (a
copy of which is attached hereto), and those terms of the NFL Player Con-
tract not modified by such Principal Terms.

                                         Prior Team:

                                         By: _____
                                         Chief Operating Officer

Appendix F

# APPENDIX F

## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By:_____

WITNESSED BY:

_____

# APPENDIX G

## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

- You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

- You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

- In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

- You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

- In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

243

# APPENDIX H

## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Defined Gross Revenues ("DGR") and Excluded DGR *of the NFL and its* member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions *of* the CBA. The information on the Schedule is to be the responsibility of the *management of the* Clubs and the NFL.

The *Management Council and the NFLPA* are to retain a national accounting firm (the "Accountants") *which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures* shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The *Procedures* shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six members with three representatives designated by each of the Management Council and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the *Procedures* described in the preceding paragraph and again before *May 1st* to review the results of the *Procedures* before issuance of the final report for that playing season.

The procedures detailed below *and/or as otherwise agreed by the parties are and shall be* designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Defined Gross Revenues and Excluded DGR of the NFL *and its Clubs* for such *League Year* in accordance with the *provisions* of the CBA. The Accountants will *perform the Procedures with respect* to the Schedule for each *League Year.*

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), *as agreed upon by the parties,* or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report *upon the Procedures* as referred above.

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Ac-

countants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the *Management Council* and *the NFLPA* to be performed by the Accountants**

**General**
- *The CBA and all relevant side letters* should be reviewed and understood.

- See Exhibit *H.1* for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in DGR where appropriate.

- The Player Compensation and Defined Gross Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule *shall* be made available for review by representatives of the *Management Council* and *the NFLPA* prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the *Management Council* and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with the CBA. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

Appendix H

- Revenue and expense amounts that have been estimated should be re-confirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from DGR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, DGR.

## Procedures provided by the *Management Council* and *the NFLPA* to be performed by the Local Accountants

### General
- *The local accountants shall conduct procedures as agreed upon by the parties.*

- *The CBA and all side letters* should be reviewed and understood by all Local Accountants.

- See Exhibit *H.2* for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

### Team Salaries - Schedule 1
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the CBA.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the CBA.

246

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the CBA.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this CBA.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

**Benefits - Schedule 2**
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**
- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the CBA.

Appendix H

## Defined Gross Revenues - Schedule 4

- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included/excluded in DGR in a manner consistent with the CBA. Amounts included in DGR should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in DGR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in DGR. Test appropriateness of balances where appropriate.

## Excluded DGR - Schedule 5
- Perform procedures provided in Schedule 4 above for amounts of DGR defined in the Agreement as "Excluded DGR" and make any adjustments to DGR as appropriate.

## Questions - Schedule 6
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

248

Appendix H

**DGR Reporting Procedures - Schedule 7 and List of Related Entities - Schedule 8**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

*Extension Agreement 1/8/02*

249

Appendix *H.1*

# EXHIBIT *H.1*

## ACCOUNTANTS' *AGREED-UPON PROCEDURES* REPORT

*We have performed the procedures as described in the accompanying Schedule A,* *which were agreed to by the National Football League Management Council, the* *National Football League Players Association and Class Counsel (collectively, the* *"Parties") with respect to the National Football League Office Reporting Package* *and the Reporting Packages of the Member* Clubs of the National Football League, *for the [insert] League Year, solely to assist the Parties* in *evaluating* *whether the Reporting Packages were prepared* in accordance with the provisions and definitions contained in the *Instructions to the Reporting Package.* *This engagement to apply agreed-upon procedures was performed in accordance* with standards established by the American Institute of Certified Public Accountants. *The sufficiency of these procedures is solely the responsibility of the specified* *users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which* *this report has been requested or for any other purpose.*

*Our findings are set forth in the accompanying Schedule B.*

*We were not engaged to, and will not perform an* audit *or examination, the objective of which would be the expression of an* opinion *on the Reporting Packages.* *Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an* audit *or examination of the Reporting* *Packages, other matters might have come to our attention* that *would have been* *reported to the Parties.*

*This report is intended solely for the use of the National Football League Management Council, the National Football League Players Association and Class* *Counsel and should not be used by those who have not agreed to the procedures* *and taken responsibility for the sufficiency of the procedures for their purposes.*

*\*Extension Agreement 1/8/02*

250

# EXHIBIT H.2

## LOCAL ACCOUNTANTS' *AGREED-UPON PROCEDURES* REPORT

*We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was* prepared in accordance with the provisions and definitions contained in the *Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures* is *solely the re*sponsibility of management *of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A ei*ther for the *purpose for which this* report *has been requested* or for any other purpose.

*Our findings are set forth in the accompanying Schedule B.*

*We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.*

*This report is intended solely for the use of the [Member Club Name], the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.*

*\*Extension Agreement 1/8/02*

Appendix I

# APPENDIX I

# STANDARD MINIMUM PRESEASON PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

## General Medical Examination

1. History
   - player
   - family
   - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
   - head
   - face
   - scalp
   - ears
     - external & drums
   - sinus
   - throat
   - eyes
     - pupils
     - reaction to movement & light
   - lungs
     - palpation
   - chest
   - heart
   - visceral
   - hernia
   - rectal
     - hemorrhoid
     - fistula
     - prostate
   - gastric
   - any unusual body marks, i.e. scars, birthmarks
   - height
   - weight
   - temperature
   - blood pressure
   - pulse
   - heart rate

252

Appendix I

**Orthopedic Examination**
Examination visually, including stress testing and range of motion for all of the following:
- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardio-vascular

**Blood Testing**
Standard grid. Testing for (including but not limited to):
- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*
- Sickle Cell*
- VD*

\*Where applicable. If found, individual counseling necessary.

253

Appendix I

## Urinalysis
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

## Vision Testing
- peripheral vision
- standard eye test

## Hearing Test

## Dental Examination

## Chest X-Ray (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:  Tumor
            T.B.
            Lesions

## X-Ray all previously injured areas (at physician's discretion)

254

# APPENDIX J

## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table |

Nonfootball related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

Football related disability rates:

.08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later.

Withdrawal rates:

| For Players With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

Election of early payment benefit:

35% of all players out of football less than two years will elect the benefit two years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no credited seasons before 1993.

| | |
|---|---|
| Retirement age: | 47, except 55 for players with no credited seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three years younger than player |

255

Appendix J

| | |
|---|---|
| Remarriage rates: | 1971 Railroad Retirement Board rates |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of plan year |
| Actuarial value of assets: | Onetime write-up to market value as of March 31, 1993 followed by restart of the present procedure thereafter. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for Line-of-Duty disability benefits. |
| Amortization period: | 20 years beginning April 1, 1993; 19 years as of April 1, 1994, etc. In years when there is a zero or negative unfunded actuarial accrued liability, the amount which is expected to produce a zero unfunded actuarial accrued liability at the end of the plan year. |

256

# APPENDIX K

## EXTENSION CHART

Salary Cap as Percentage of DGR

|                      | 02 | 03    | 04    | 05   | 06   | 07 |
|----------------------|----|-------|-------|------|------|----|
| If notice given (1)  | 64 | 64.25 | 64.75 | 65   | 65   | U  |
| If no notice given   | 64 | 64.25 | 64.75 | 65.5 | 64.5 | U  |

U  =  Uncapped

*Extension Agreement 1/8/02

(1) Notice may be given by either party.

Appendix L

# APPENDIX L

# OFF-SEASON WORKOUT RULES

The Collective Bargaining Agreement with the NFLPA provides that, except for certain specified mini-camps, any off-season workout programs or classroom instruction shall be *strictly* voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for *fourteen* weeks between the end of the previous season and ten days prior to the start of veteran training camp. The CBA limits such workouts to four days per week; *such workout programs are not permitted on* weekends. Included in the *fourteen* weeks may be no more than fourteen days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council the *schedule* for the program, including designation of any days on which organized team practice activity will take place, *pursuant to the rules set forth in Article XXXV of the CBA*, and any changes *to the schedule for the program*.

The following rules shall also apply to the fourteen days of organized team practice activity:

- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.
- Maximum six hours per day, with a maximum two hours on field, for any player.

*\* Extension Agreement 1/8/02*

258

# APPENDIX M

# PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs):

## 1. Subsection (x)(1) — Maximum Annual Allocation Amount

Year 1 (1996)   PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury *Note* rate at 2/1/96 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount      = $81.456 million - $45 million
                     = $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years = $3.00 million
+ Allocated Interest                 = $2.43 million
Total Year 1 Allocation              = $5.43 million

1996 PSL Maximum Annual Allocation Amount      = $5.43 million

Appendix M

**Year 2 (1997)**   PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury *Note* rate at 2/1/97 - 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129     = $50.258 million
Interest Amount     = $50.258 million - $30 million
     = $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
= PSL Amount=$30 million/15 years  = $2.00 million
+ Allocation Interest     = $1.35 million
Total Year 2 Allocation     = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount     = $5.43 million
Year 2 PSL Allocation Amount     = $3.35 million
1997 PSL Maximum Annual Allocation Amount     = $8.78 million

260

Appendix M

**Year 3 (1998)**  PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury *Note* rate at 2/1/98 - 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $.5 million/year for 14 years

| | |
|---|---|
| = $.5m x 23.366 | = $11.683 million |
| Interest Amount | = $11.683 million - $7 million |
| | = $ 4.683 million |

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount

| | |
|---|---|
| = PSL Amount = $7 million/14 years | = $ .500 million |
| + Allocated Interest | = $ .335 million |
| Total Year 3 Allocation | = $ .835 million |

PSL Maximum Annual Allocation Amount

| | |
|---|---|
| Year 1 PSL Allocation Amount | = $5.430 million |
| Year 2 PSL Allocation Amount | = $3.350 million |
| Year 3 PSL Allocation Amount | = $ .835 million |
| 1998 PSL Maximum Annual Allocation Amount | = $9.615 million |

**2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation**

Assume the Team sells PSLs on the following terms:
- Gross PSL revenues received in 1996 = $45 million
- Income taxes paid on PSL revenues in 1996 = $12 million
- Legal and marketing costs incurred relating to PSL revenues = $6 million
- Stadium renovation costs = $56 million

The PSL revenues included in DGR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m - ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from DGR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

261

Appendix M

## 3. Subsection (x)(2) — Maximum Exclusion Of PSL Revenues Each League Year

For purposes of this subsection, Excluded DGR spillover shall be calculated as follows for each Team:
- Assume that the new stadium's first full year of operation is 1998.
- Assume that the Team's Excluded DGR data is as follows:

|  | 1997 | 1998 |
|---|---|---|
| Excluded DGR | $5 million | $15 million |

If the League, as a whole, is in a spillover situation in 1998, then the increase in DGR due to spillover would be $10 million ($15 million - $5 million).

If the League is not in a spillover situation in 1998, the increase in DGR due to spillover would be zero.

## 4. Subsection (x)(3) — PSL Difference Credited To DGR

a. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:
- Increase in gate receipts      $6 million
- Increase in DGR spill-over      $2 million
     Total DGR increase      $8 million

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|---|---|---|---|
| 1996 | $5.430 million | $8 million (assumed) | 0 |
| 1997 | $8.780 million | $8 million (assumed) | $.780 million |
| 1998 | $9.615 million | $8 million | $1.615 million |
| Cumulative PSL Difference | | | $2.395 million |

For purposes of computing the PSL Difference, we assume that the increase in DGR was the same for 1996 and 1997 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million).

$2.395 million would be credited into DGR in the 1999 League Year.

262

Appendix M

b. Assume that the new stadium is placed in service in June 1998.

1998 increase in DGR directly related to new stadium:
- Increase in gate receipts      $ 9 million
- Increase in DGR spill over      $16 million
-       Total DGR increase      $25 million

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year DGR Increase | PSL Difference |
|------|------|------|------|
| 1996 | $5.430 million | $25 million (assumed) | 0 |
| 1997 | $8.780 million | $25 million (assumed) | 0 |
| 1998 | $9.615 million | $25 million | 0 |
| Cumulative PSL Difference | | | 0 |

**Since the increase in DGR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year.**

No amount would be credited into DGR in the 1999 League Year.

**5. Subsection (x)(5)  Carryover PSL Credit**

Assume the following:
- New Stadium is placed in service in June 1998.
- 1999 - 2002 Maximum Annual Allocation Amount is $9.615 million.
- Increases in DGR directly related to New Stadium are as follows:
  - 1999      $ 8 million
  - 2000      $ 9 million
  - 2001      $14 million

The Carryover PSL credits are calculated as follows:
- 1999      $9.615m - $8m = $1.615m
- 2000      $9.615m - $9m = $ .615m
- 2001      (No carryover PSL credits)

Under this scenario, year 2001 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 1999 and 2000 ($1.615m + $.615m) can be deducted in full from DGR in League Year 2001. There would be no remaining Carryover PSL credits to deduct from DGR in future League years.

263

Appendix M

## 6. Subsection (x)(6)  Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

## 7. PSL Revenues Not Benefitting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i)    PSLs are sold by a Team or by a third party (such as a stadium corporation, a nonprofit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii)   all net proceeds of such PSL sale are used to build a new stadium or construct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and

(iii)  such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or nonprofit entity; and

(iv)   the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and

(v)    neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease;

264

then, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in DGR or Excluded DGR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as DGR, Excluded DGR, or non-DGR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as DGR or Excluded DGR, as appropriate.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

*Extension Agreement 1/8/02*

Appendix N

# APPENDIX N

## WRITTEN WARNING
## GOOD FAITH EFFORT

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article XXIII of the Collective Bargaining Agreement if you are terminated before the end of this season.

[Club Official]

[Club name]

Appendix O

# APPENDIX O

## CALCULATION EXAMPLE

*If 2005 Salary Cap:*        *$81.7 million*

*If 2006 Projected DGR, after DGR adjustments (including the shift of $342 million in television rights fees, plus interest, to 2006), equals $140 million per club:*

*65% = $91 million*
*70% = $98 million*

*less assumed Projected Benefits/salary cap deductions of $19 million per club:*

*65% cap = $72 million*
*70% max = $79 million*

*then, pursuant to Article XXIV, § 4(b)(i), the Salary Cap for 2006 is $79 million*

*\*Extension Agreement 1/8/02*

267

# INDEX

**0 – 9**
25% Rule, 53, 134-135
30% Rule, 54, 134-135
70% Rule, 96

**A**
Acceleration, 72, 102-103, 180; *see also Signing Bonus*.
Access to Personnel and Medical Records, 193
Accrued Season, 6, 11, 47-48, 57-58, 59, 67, 73-74, 98, 151, 163, 166,
    177, 222
    definition, 5
    franchise player, 70-72
    restricted free agent, 60-62
Active
    List, 5, 46, 48, 53, 55, 57, 76, 85, 88, 98-99, 162, 165-167, 175,
        177, 179, 186, 188-189
    Player, 13, 165, 211, 236, 255
Active/Inactive List, 46, 48, 53, 55, 88, 99, 166-167, 175, 179
Actual DGR, *see DGR*.
Additional Compensation, 176-177, 178, 180-182, 233, 242;
    *see also Bonus; Incentives*.
Advisory Committee, *see Committee*.
Agent Certification, *see NFLPA*.
Agent Regulation, *see NFLPA*.
Agreement
    definition, 4
    effective date, 224
    expiration date, 224
    governing, 9
    ratification, 225
    scope of, 10
    settlement, 4, 9, 11, 12, 39-40, 43, 68, 76, 82, 88, 100, 102, 105,
        136, 137, 152, 160, 212, 223, 225, 238
    termination of, 46, 146, 156, 209-210, 223, 224-225
    termination prior to expiration date, 224
    undisclosed, between player and club,
Alcohol Abuse, *see Players' Right to Medical Care and Treatment*.
Answer
    injury grievance, 27; *see also Injury Grievance*.
    non-injury grievance, 22; *see also Non-Injury Grievance*.

Anti-Collusion, 69, 146-147, 151-156, 157-158, 224-225, 238
    burden of proof, 152-153
    computation of damages, 154
    costs, 155
    disclosures, League, 152
    discretion, 152
    effect on computations, 155
    enforcement of provisions, 152
    other Club conduct, 151-152
    payment of damages, 155
    player election, violation proven, 154-155
    prior conference, before filing claim, 156
    prohibited conduct, 151
    reimbursement, 155
    remedies, 153-154
    summary judgment, 153
    termination of Agreement, 156
    time limits, 156
Appeal, 17, 22-23, 29, 151, 153, 224-225
    value of NFL Films and Properties revenues, for DGR purposes, 87, 92
    Commissioner discipline, 33-34
    injury grievance, 29
    NFL player contract, disapproval of, 43-44
    non-injury grievance, 22-23
Appendix
    A, check off authorization for National Football League Players Association deductions, 228-229
    B, injury protection, early waiver, 35-36, 230
    C, NFL player contract, 40, 45, 231-239
    D, first refusal offer sheet, 64, 240
    E, first refusal exercise notice, 64, 241
    F, waiver of free agent rights, 68, 242
    G, notice of termination, 83-84, 243
    H, accountants' review procedures, 138, 244-249
    I, standard minimum preseason physical examination, 252-253
    J, actuarial assumptions and actuarial cost method, 199, 255-256
    K, extension chart, 257
    L, off-season workout rules, 168-171, 258
    M, PSL examples, 259-264
    N, written warning good faith effort, 85, 266
    O, calculation example, 267
Appointment of Special Master, *see Special Master.*

Index

Arbitration, 10, 11, 13, 23, 26, 29, 31, 67, 149, 170, 176, 196, 217, 235, 237
    expedited hearing, 176, 197, 215
Arbitration Panel
    injury grievance, 29
    non-injury grievance, 23
Arbitrator,
    Benefit, 196-197, 214-215
    Chairman, 29-30
    decision, 14, 23, 25-26, 30-31, 37-38, 67
    decision in committees, 37
    extreme personal hardship, 47, 57, 59, 63, 79
    Impartial, 4, 11, 22, 47, 57, 59, 63, 67, 74-75, 77, 78, 79, 94, 100, 106, 131, 133, 149-150, 176, 177
    Injury, 27-32
    injury grievance procedure, 235
    Non-Injury, 22-26
    non-injury grievance procedure, 26
    notice, 22-24, 214
    Senior, 23, 29
Assigned Via Waivers, *see Waiver System.*
Assignee Club, *see Awarding Club.*
Assignor Club, see *Waiving Club.*
Awarding Club, *see Waiver System.*

**B**
Benefits, 6-7, 9, 88, 93-97, 137-139, 141, 162, 165, 194-197, 199-201, 205, 207-210, 213-217, 224, 233, 235-236, 244, 247, 256, 265
    definition, 6-7, 93
    guaranteed benefits, workers compensation, 217-218, 234-235
    injury protection, 35-36, 93, 195, 230
    minimum salary, 94, 178-182, 196
    player benefit, 6, 93, 141, 155, 179, 194-198, 209
    projected, 7, 141
    retention of, 216
Benefit Arbitrator, 214-215
    authority, 214
    compensation, 214
    role, 214-215
    selection, 214
Benefit Credits, 199
Bert Bell Plan, 186, 201; *see also Bert Bell/Pete Rozelle NFL Player Retirement Plan; Merged Plan; Pete Rozelle NFL Player Retirement Plan; Retirement Plans.*
Bert Bell/Pete Rozelle NFL Player Retirement Plan, *see Merged Plan.*

Binding Effect, Agreement on Parties, 220
Bonus
    completion, 104-105, 122
    contract modification, 103
    credit, for signing bonuses refunded, 105
    expansion, 99
    extension, 102, 136
    incentive, 82, 106, 122-128, 136, 176
    option years, 103
    performance, 6, 45, 59, 71, 78, 106, 125-126, 233
    relocation, 105, 162
    reporting, 5-6, 59, 71, 82, 101, 103-104, 106, 121, 176
    roster, 40, 65, 101, 103-104, 109, 128, 240
    salary, 15
    signing, 54, 59, 65, 72, 81-82, 97, 100-105, 131, 134-136, 180, 240, 247
    team performance, 106, 123-126, 129, 133
    weight, 106
    workout, 104, 181
Buyout Clauses, *see Signing Bonus.*

**C**
Calculations , 51-53, 86-141, 175, 177, 179, 183, 205, 240, 261-265, 267
    anti-collusion damages, 154-155
    credited season, for minimum salary, 175
    DGR, 86-94
    entering player pool, 51-53
    EDGR, 86-94
    minimum salary benefit, 179
    performance-based pool payment, 183
    team salary, 98
Canadian Football League (CFL), *see CFL Rule.*
Canton Hall of Fame Game, 164, 173
Capped Year, 6-7, 51, 59, 60, 64, 96-97, 100-101, 104, 105, 126, 128, 130, 134, 138
    definition, 6-7; see also Final Capped Year; Salary Cap.
Career-ending Injury, *see Injury.*
Career Planning Program, 15, 220; *see also Tuition Assistance Program.*
Carryover PSL Credit, *see PSL.*
CBA, 1, 11, 15, 42, 43, 44, 53, 55, 68, 76, 77, 82, 103, 104, 105, 132, 223, 245
    expiration, 223
Certification 144, 146, 208
    agent, 15, 17-18

Index

contract, by club, player and agent, 157-159
    end of League Year, 157-158
    failure to execute and submit, 157
    false, 146, 158-159
CFL Rule, 163
Check-Off Authorization, NFLPA Dues, *see Union Security.*
Chemical Dependency Program, *see Union Security; see also Players' Right to Medical Care and Treatment.*
Circumvention, Salary Cap and DGR, 131, 142, 144
Claiming Club, *see Waiver System.*
Class Counsel, 54, 56, 87, 134, 151, 194, 225, 250, 251
    definition, 4
Club 5
    definition, 4
    discretion, 152
    expansion, 140, 162
    *See Team; Member.*
Club Affiliate, 4
    definition, 4
Club Discipline, 20-21, 25
    deduction, 21
    disputes, 21
    maximum discipline, fines, 20
    published fines list, 21
    uniformity, 21
Club Physician, *see Physician.*
Collective Bargaining Agreement, *see CBA.*
College Draft, 3, 11, 40, 46-50, 51-53, 67, 151, 154, 162, 224
    annual, 46
    assignment of draft rights, 48
    compensatory draft selections, 46, 49, 51, 78
    definition, 5
    drafted rookie, 5, 46, 47, 48, 52, 53, 55, 153, 154
    initial, 47
    next annual, 47
    no subsequent, 49
    notice of player signing, 49
    number of choices, 46
    other professional teams, 47
    required tender, drafted rookie, 46
    returning to college, drafted rookie, 48
    signing, drafted rookie, 46-47
    subsequent, 48-49
    supplemental, 53
    time of draft, 46

undrafted rookies, 6, 49, 51, 55, 99, 151
workouts, draft eligible players, 49-50
*see also Compensatory Draft; Draft Choice Compensation; Draft Rights; Rookie.*
College Players Returning to College, *see College Draft.*
Collusion, *see Anti-Collusion.*
Commissioner, 100, 101, 151, 159, 192, 220, 236
approval of contracts, 142-143, 157
committees' recommendations to, 37
definition, 4
disapproval, 43, 142
fines, 33
*see also Commissioner Discipline.*
Commissioner Discipline, 21, 33-34
fines, 144, 170-171, 234, 236
hearing costs, 34
league discipline, 33
one penalty, 34
representation, during hearing, 33-34
supercedes team discipline, 21
time limits, 33
*see also Commissioner.*
Committees, 25, 37-38
advisory, 192
and the Commissioner, 37
competition, 38
grievance settlement, 26
joint , player safety and welfare, 37-38, 217
player/club operations (operations), 38, 168
Compensation, 4, 5, 7, 37, 43, 44, 48, 49, 57, 82, 83, 94, 132, 143, 144, 147, 149, 163-164, 176, 177, 178, 180-182, 188, 190, 206, 214, 217-218, 219, 233, 236, 240, 242
additional, 176, 178, 180-182, 233, 242
deduction, 219
deferred, 43, 65, 176, 206, 240
draft choice, 5, 6, 48-49, 57, 59-60, 62-65, 69, 70-71, 73, 74, 79, 83, 166
guaranteed, 177, 180
non-guaranteed, 180
other, 83, 176
players, 245
post season, 188-189
Pro-Bowl, 190
Special Master, 147
*see also Bonus; Incentive; Salary.*

Index

Compensatory
    damages, 154-155
    picks, additional, 162
Compensatory Draft, 11
    selection, 5, 46, 49, 51-52, 78
    *see also College Draft.*
Competition Committee, *see Committees.*
Completion Bonus, *see Bonus.*
Computation of Anti-Collusion Damages, *see Anti-Collusion; see also Cal-*
    *culations.*
Computation of a Team's Salary, *see Team Salary; see also Calculations.*
Conduct, 11, 13, 17, 20, 33, 34, 39
    other club, 151
    prohibited, 49, 151
Conformity in NFL Player Contract, 40
Consideration Between Clubs, 66
Consultation and Information Sharing, 151, 157, 160-161
consultation and communication, 161
copies, 161
    meetings, 161
    neutral verifier, player contracts offers, 160-161, 238
    notice of invalid contract, 160
    salary summaries, 160
Contact
    during off season workouts, 169, 258
    during mini camp, 172
Contacting Players on Waivers, 83 *see Waiver System.*
Contingency Clause, 102
Contract
    certification, 157
    deferred, 177
    guaranteed, 130, 177
    mid-season, 134
    multi-year, 75, 178, 180
    player, 4-7, 9, 11, 17, 22, 27, 39-45, 51-55, 57, 59-83, 85-86, 93-94,
        98-105, 123, 125-127, 129-130, 132-137, 142-143, 151-153,
        155, 157-158, 160-163, 166, 169, 176-178, 181-182, 190, 196,
        218, 223, 231-239
    qualifying, 178-181
    renegotiation and extensions, 55, 59, 71, 73, 75, 101, 104, 105, 135-
        137
    rookie, and playtime requirements, 54, 125
    split, 177
    tolled, 14, 163, 236
    traded, 133

Contributions to Retirement Plan, *see Retirement Plan.*
Copies, 22-23, 27, 32, 38, 67, 69, 161, 170, 177, 211
 contracts, 239
 medical records, 193
 personnel records, 193
Costs, 7, 90, 91, 95, 147, 149, 155, 161, 186, 191, 247
 insurance coverage, 93
 Commissioner discipline, 34
 injury grievance, 30
 non-injury grievance 24
 player benefit, 6, 93, 141, 194-198, 209-210
 postponement, 24, 30
 rookie orientation programs, 56
 transcription, 26
 (non-injury grievance); *see also Expenses.*
Covered League Years, Entering Player Pool, 51; *see also Entering Player Pool; League Years.*
Credited, 253
 season, 47-48, 175, 178-179, 181, 199-205, 207-208, 211
 service, 31, 83, 85, 173, 189

**D**
Days Off, 185
Deceased Players, 209
Deferred, 43, 65, 176, 200, 206, 240
 bonuses, 101, 137
 contracts, 177
 salary, 72, 97, 99, 176
Defined Gross Revenues (DGR), *see DGR; see also EDGR; Non- DGR.*
Definitions
 accrued season, 5
 agreement, 4
 benefits, 6
 Class Counsel, 4
 club affiliate (team affiliate), 4
 club/team/member, 4
 Commissioner, 4
 compensatory draft selection, 5
 draft (college draft), 5
 draft choice compensation, 5
 drafted rookie, 5
 final eight plan, 5
 free agent, 5
 Impartial Arbitrator, 4
 league year, 4

Index

  minimum active/inactive list salary, 5
  minimum salary, 5
  minimum team salary, 7
  negotiation, 5
  new club, 5
  NFL player contract, 4
  NFL rules, 4
  paragraph 5 salary, 7
  player affiliate, 4
  player benefit costs/ benefits, 6
  player contract, 5, 7
  player costs, 7
  prior club, 5
  prior year salary, 5-6
  renegotiate, 6
  rookie, 6
  room, 7
  salary, 4
  settlement agreement (stipulation and settlement agreement), 4
  undrafted rookie, 6
Delivery of Documents, by Management Council and NFLPA, 220
Dental Insurance, *see Group Insurance.*
"Deion Rule", *see Signing Bonus.*
Developmental Squad, *see Practice Squad.*
DGR, 9, 51, 62, 68, 82, 86-93, 96-97, 137-141, 144-145, 147, 154,
  160, 244-247, 248-249, 257, 261-263, 265, 267
  definition, 86
  elements, DGR, 86-93
  elements, EDGR, 87-92
  elements, non-DGR, 87
  formulas, 87-88
  report(ing), 137-139, 245
  *see also EDGR; Non-DGR; Projected DGR.*
Disability
  classification rules for total and permanent, 200
  definition, 200; *see also Injury; Supplemental Disability Benefits.*
Disagreements Resolved by Benefit Arbitrator, 196-197, 214 (XLVI-LI)
Discipline,
  club, 20-21, 25
  Commissioner, 21, 33-34, 170-171, 234, 236
  imposed uniformly, 21
  list, 21
  reasons for, 20
Disclosure of Pre-Existing Condition, 27, 29, 234

Discovery,
Impartial Arbitrator proceedings, 149
non-injury grievance, 23
Special Master proceedings, 147, 153
Discrimination, *see Player Security.*
Dispute, 10, 13, 14, 21, 22, 23, 26, 30, 33, 35, 67, 75, 77, 78, 87, 106, 139, 141, 143, 145, 146, 147, 149, 156, 170, 177, 196, 215, 225, 235, 237
career-ending injury, 75-78
club discipline, 21
injury protection, 35-36
resolution, 141, 196, 215
union security, 13
Disputed Adjustments, 139
Distributions of Performance Based Pool Funds, 183, *see Performance-Based Pool.*
Draft, *see College Draft.*
Draft Choice Compensation, 6, 48-49, 57, 59, 60, 62-65, 69-71, 73-74, 79, 83, 166
definition, 5
Franchise and Transition Players, 71-74
Veteran Free Agency, 6, 57, 59-65
Drafted Player, *see College Draft.*
Draft Rights, 5
assignment, 48
of clubs, 153
Draft Selection, *see College Draft.*
Drug Use and Abuse, *see Players' Right to Medical Care and Treatment.*
Duration of Agreement, *see Agreement.*

**E**
EDGR, 9, 87-92, 137-138, 144, 244, 248, 262, 265; *see also Defined Gross Revenues; Non-DGR; Projected DGR.*.
Effect
Impartial Arbitrator ruling, 149
salary cap, 155
End of League Year Certification, 157-158
Endorsements, Player, 219
Enforcement, Anti Collusion Provisions, 152, *see Anti Collusion.*
Enforcement of Salary Cap and Entering Player Pool, 75, 136, 137, 157-159
circumvention, 142
Commissioner disapproval, 142
DGR circumvention, 144-145
management council audit rights, 145

Index

prior consultation, resolution of dispute, 145
sanctions, players, agents and club personnel, 143-144
Special Master, action and review, 142-143
undisclosed terms, in player contracts, 142
Entering Player Pool, 7, 43, 46-48, 51-56
adjustment, 162
calculation, 51-53
covered league years, 51
definition, 51
formula allotment, 51-54
incentives, 121
operation, 53-55
removal of entering player pool, 51
rookie allocation, 52
Excluded DGR, 9, 87-92, 137-138, 144, 244, 248, 262, 265; *see also De-fined Gross Revenues; Non-DGR; Projected DGR.*.
Exclusive Representation and NFLPA Agent Certification, *see NFLPA.*
Exempt Commissioner Permission List, 84, 175; *see also Commissioner.*
Expansion
additional compensatory picks, 162
bonuses, 99
entering player pool adjustment, 162
relocation bonus, 105, 162
veteran allocation, 162
Expedited Arbitration, *see Arbitration.*
Expenses, 37, 86, 90, 138, 139, 199, 203, 205, 208, 213
benefit arbitration, 214-215
club's prepaid contributions to the Annuity Program, 204-205
copies, 161
player, during minicamp, 172
injury grievance, 31
joint committee, 37
medical, 31, 208
moving and travel, 93, 186-187, 195
neutral physician, 31
neutral verifier, 161
non-injury grievance(costs), 26
rookie orientation program, 56
security, 96
witnesses, 31
Extended Post Career Insurance, 197, 209
financing, 210
limitations and rules, 209-210, see Group Insurance.
Extended Post-Career Medical and Dental Insurance Benefits, *see Group Insurance.*

Extension Date in Savings Plan, *see Second Career Savings Plan.*
Extension of Agreement, *see Agreement.*

**F**
Failure to Disclose Pre-Existing Conditions, *see Special Defense.*
False Certification, 146, 158
Fees, 15, 26, 87, 90, 93, 139, 147, 149, 155, 196, 207, 228, 264
    benefit arbitration (arbitrator), 214
    postponement, injury grievance hearing, 30
    postponement, non-injury grievance hearing, 24
Filing, 43, 237
    injury grievance, 27, 29, 31
    non-injury grievance, 22-23
Final Capped Year, 96, 100, 104-105, 126, 128, 130, 134, 138
    definition, 7
Final Eight Plan, 11, 81-82, 136
    definition, 5
    increases, 82
    next four teams, 81
    replacement of free agents signed by other club, 81-82
    salary definition, 82
    top four teams, 81
    trade limitation, 82
Final League Years, 95, 134, 180, 199, 222, 224
    definition, 7; *see also League Years.*
Final Special Purpose Letter, *see Special Purpose Letter.*
Fines, 86, 144, 146, 154-155
    club, 21
    Commissioner, 33
    rookie symposium, 15-16
    Special Masters, 143-144
    uncertified agents, 17
First Refusal Exercise Notice, 65, 67-69, 241
First Refusal Procedure, 64
First Refusal Rights, 48-49, 57, 73, 80, 166
    veteran free agency, 59-60, 63
First Year Premium Seat Increase, 85; *see also PSL.*
Formula Allotment, *see Rookie Allocation; see also Entering Player Pool.*
Franchise Player, 64, 67, 70, 82, 98, 151, 157, 163
    designation, 71
    designation period, 77
    duration of designation, 75-77
    lists, 74
    other terms, 78
    required tender, 71-72

Index

    salary information, 74-75
    signing period, 79-80
Free Agency, 5-6, 20, 59-69, 153, 163-164, 222, 224
Free Agent, 5, 47,
    restricted free agent, 6, 48, 60, 62-70, 72, 74, 77, 152-153, 158, 163
    rookie, 46, 48-49
    unrestricted free agent, 6, 20, 42, 46, 59, 60, 62, 67-73, 77, 80-83,
        98, 152-153, 158, 163, 220, 222; *see also Free Agency.*
Free Agent List, 69; *see also Free Agency; Free Agent.*
Funding Of Deferred And Guaranteed Contracts, 177, *see also Salaries.*

**G**
Good Faith, 58, 60, 62, 71, 85, 86, 170, 205, 234
    effort, 23, 32, 266
    negotiation, 10, 44, 93, 176
Governing Agreement, 9
    conflicts, 9
    implementation, 9
    management rights, 9
    rounding, 9
    *see also Agreement.*
Governing Law, 226
Grievance, 7; *see also Injury Grievance; Non-Injury Grievance; Salary.*
Grievance Settlement Committee, 26; *see also Injury Grievance; Non-Injury
    Grievance; Salary.*
Group Insurance, 93, 195
    administration, 210
    dental insurance, 208
        annual deductible, 208
        coverage, 208
    extended post-career medical and dental insurance, 209-210
    family medical and dental coverage for deceased player, 209
    group insurance benefits, 208
    life insurance, 208
    limitations and rules for extended insurance, 210
    medical, 208
        annual deductible, 208
        insurance co-payment, 208
        prescription drug co-payment, 208
        maximum lifetime benefits paid on covered individuals, 208
    *see also Players' Right to Medical Care and Treatment; Retention of Benefits;
        Supplemental Disability Benefits.*
Guaranteed Contracts, *see Contracts.*

Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary, 7, 51, 82, 224
    30% Rules, 134-135
    accounting procedures, 137-138
    computation of team salary, 98
    definitions, 86-93
        benefits, player benefit costs, 93-94
        defined gross revenues, 86-93
        salary, 94
Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary
    guaranteed league-wide salary, 94-95
    renegotiations and extensions, 135-136
    salary cap amounts, 95
        adjustments, 95-96
        calculation, 97-100
    team salary, 97-100
    trigger, 94
    valuation of player contracts, 99-135
    *see also Contracts; DGR; EDGR; Non-DGR; Salary Cap; Team Salary.*

**H**
Hearings, 23, 31, 37-38, 139, 146, 176, 200, 215, 236
    benefits, 196-197
    injury grievance, 29-32
    league discipline, 33-34
    non-injury grievance, 23-26
    prehearing briefs, 23
    transcribing of, 24, 30, 34

**I**
Impartial Arbitrator, 11, 22, 47, 63, 67, 74, 75, 77, 78, 79, 100, 106, 131, 133, 146
    compensation, 149
    definition, 4
    discovery, 149
    effect of rulings, 149
    personal hardship determination, 47, 57
    procedures, 149
    scope of authority, 149
    selection, 150
    term, 150
Inactive List, 5, 9, 46-48, 53, 55, 57, 88, 99, 162, 165-167, 175, 177, 179, 188-189; *see also Active List; Active/Inactive List.*

Index

Incentive, 40
    additional incentive rules for veterans, rookies, individuals and teams,
        128, 176, 178, 190
    based on another player's performance, 126, 128
    based on club performance, 110, 126
    bonus, 82
    bonus, for rookies, 110, 126
    clause, 126, 130-131, 190
    entering player pool, 126
    honors and recognized media, 122
    individual, 110, 126
    likely to be earned, 106, 110-120
    performance, 129
    per play/game, 126-128
    rookie "likely to be earned",  110-120
    team, 125-126
    team performance-related, 125, 133
    veteran, 129
    see also Bonus; Signing Bonus.
Increases in Salary, Final Eight Plan, 82
Index, 268
Individual Incentives, see Incentive.
Individually Negotiated Limitations on Player Movement, Veteran Free
    Agency, 69
Ineligible to Compete, Club Breach of Waiver Procedures, 83; see also
    Waiver System.
Initial Draft, see College Draft.
Initial Special Purpose Letter, see Special Purpose Letter.
Initiation; see also Fees.
Injured Reserve, see Injury.
Injured Reserve List; see also Active/Inactive List; Injury.
Injury
    career-ending, 75, 77, 78
    during minicamps, 172
    during pro bowl game, 190
    guarantee provision, 177
    non-football (N-F/I), 163, 169, 175
    non-injury circumstances,  75, 77-78
    payment of salary, PUP, 57, 163, 175, 209
    player, 31, 39, 155, 173, 185
    protection, 35-36, 93, 195, 230
    reserve, 74, 207, 209
    settlement, 31, 97

Injury Grievance, 27-32, 71, 235
    answer, 27-28
    appeal, 29
    definition, 27
    discovery, 32
    expenses, 31
    filing, 27
    hearing, 29-30
    information exchange, 32
    neutral physician, 28
    payment, 31
    pension credit, 31
    playoff money, 32
    post-hearing briefs, 30
    presumption of fitness, 31
    special defense, 27-28
Injury Protection, 35, 93, 195, 230
    benefit, 35
    disputes, 35-36
    qualification, 35
Insurance Benefits for Retired/Terminated Players, 208-210, *see Group Insurance.*
Insurance Coverage, 208-210, *see Group Insurance,*
Insurance Programs, 208-210, *see Group Insurance.*

**J**
Joint Committee, 37-38, 217, *see Joint Committee on Player Safety and Welfare*
Joint Committee on Player Safety and Welfare, 37-38
    arbitrator's advisory decision, 37-38
    changing playing rules, 37-38
    inadequate medical care, 38
June 1st Rule, *102, 105, see Acceleration.*
June 1st Tender, 59, 60, 63, 82, 98, *see Tender.,*
June 15th Tender, 63, 98, *see Tender.*

**L**
Labor Exemption, 223-224
League
    discipline, 33
    disclosures, 152
    -wide benefit pool, 179; *see also Minimum Salary Benefit*
League Security, 220

Index

League Years, 4-7, 15, 20-21, 35, 39-41, 44, 46-49, 51-60, 62-65, 68, 70-84, 86, 89-102, 104-106, 120, 132-141, 144-145, 154-155, 157-158, 160-161, 166, 169, 171-173, 175, 178-184, 186-187, 194-196, 199, 207-208, 210-211, 216, 224-225, 244, 250-251, 262-263
    definition, 4
    final, 7, 222
Life Insurance, 208, see Group Insurance
Likely to be Earned, 54, 56, 66, 82, 103, 106, 110-120, 122-129, 133-136, 240; see also Bonus; Incentives.
List
    active, 5, 85, 98, 162, 165-166, 177, 186, 188-189
    active/inactive, 5, 9, 46, 48, 53, 55, 57, 88, 99, 162, 166, 167, 175, 179
    active/inactive limit, 76, 165
    discipline, published, 21
    exempt Commissioner permission, 84, 175
    franchise and transition player, 74
    free agent, 69
    inactive, 5, 162, 165-166, 177, 188-189
    injured reserve, 32, 84, 162, 169, 175, 188, 209
    non-active/inactive, 5, 162, 165-166, 177, 188-189
    reserved/non-football injury or illness, 162, 163, 169, 175
    size active and inactive limit, 76, 164, 165
    size inactive, 164
Loans, to players, 4, 6-7, 59, 71, 94, 131, 240, 245-248, 264
LTBE, see Likely To Be Earned , 178, 182

**M**
Maintenance of Retirement Plans, 199; see also Merged Plan.
Management Council, 1, 3-4, 9-11, 14, 19, 22-24, 27-30, 34, 37-42, 54, 96, 105, 134, 140, 144-145, 152, 157-158, 168, 170, 176-177, 183, 194, 210, 214, 219-220, 225, 227-228, 239, 244-246, 250, 251, 258
Matching Contributions to Savings Plan, 202-203, see Second Career Savings Plan
Maximum Annual Allocation Amount, 89-90, 259-261, 263, see PSL.,
Maximum Discipline, 20, see Club Discipline.
Meal Allowance, 93, 172, 184, 190, 195
Measuring Date, 40
Medical Care, 191-192, see Player's Right to Medical Care and Treatment.,
Member, 3, 4, 11, 13-14, 23-24, 26, 29-30, 37-39, 44, 84, 166, 186, 192, 214, 217, 220-221, 223, 225, 228-229, 231-232, 236, 238-239, 241, 244, 250-251, see Club; Team.
Merged Plan, 199
Mid-Season Contracts, see Contracts., 134

Minicamps, 168, 172
    contact, 172
    expenses, 172
    injuries, 172
    length, 172
    number, 172
Minimum
    active/inactive list salaries, 9, 88, 175
    contributions to savings plan, 202-203
    paragraph 5 salaries, 178, 180
    pre-season physical, 191
    salary, 5, 54, 94, 166, 175, 178, 180-181
    split qualifying salary, 178-179
    team salary, 4, 7, 8, 11, 32, 41, 51, 68, 82, 86-140
    tender, 72-73
Minimum Salary Benefit, 94, 178-182
    calculation, 179
    guarantees, 180
    league-wide cash treatment, 179
    league-wide salary cap treatment, 179
    payments, salary, 178-179
    player moving to new club, 179
    player returning to old club, 180
    player with expired contract, 180
    qualifying contracts, 178
    qualifying players, 178
    reduced salary cap count, 179
    terminated qualifying players, 179
    transition rules, 178
Moving and Travel Expenses, 93, 186-187, 195
    moving, 186
    qualifications for, 186
    transportation, 187
    travel and housing, 186-187
Mutual Reservation of Rights: Labor Exemption, 223
    CBA expiration, 223
    labor exemption, 223

**N**
N-F/I, *see Injury.*
National Football League Players' Association, *see NFLPA.*
National Football League Management Council, *see Management Council.*
National Football League, *see NFL.*

Index

Negotiation, 3, 10, 11, 17, 44, 63, 67, 93, 177, 218, 238
    definition, 5
    unrestricted free agent, 6, 59
    of agreement,
Neutral Physician, *see Physician.*
Neutral Verifier, for Player Contracts Offers,
New Club, 157, 160-161, 238
    definition, 5
Next Annual Draft, *see* Draft.
NFL
    address, 69, 227
    annual meeting, 37-38
    attractions, 87
    constitution and by-laws, 9-11, 15, 171
    Enterprises, 87
    Films, 87
    Properties, 87
NFL Club, 3, 9, 17, 47, 48, 68, 76, 83, 94, 152, 158, 167, 197-198,
    199, 202-203, 210-212, 227, *see Club.*
NFL Competition Committee, *see Committee.*
NFL Draft, *see* Draft.
NFL Player Contract, 7, 9, 11, 17, 22, 27, 39-44, 45, 47, 65, 77-78,
    134, 151, 166, 177, 218, 231-239, 240, 241, 242, 243
    changes, 39
    Commissioner's disapproval, 43-44
    conformity, 40-41
    definition, 4
    determining salary,
    disputes, 107, 139
    general, 41-43
    good faith negotiation, 44
    included in team salary,
    multi-year, 75, 178, 180
NFLPA group licensing program, 44
    not modified by principal terms, 64-65, 241
NFL Player Supplemental Disability Plan, *see Supplemental Disability Bene-
    fits.*
NFL Rules, *see Rules.*
NFL Teams, 7, 86, 88, 93-96, 141; *see also Club.*
NFLMC, *see Management Council.*

NFLPA, 1, 3, 4, 9-11, 13-15, 17-19, 22-44, 47, 49, 51-52, 54-58, 62, 64, 67, 69-70, 74, 78, 84, 87-88, 90-92, 95-98, 100, 106, 134, 137-156, 158, 160-161, 164, 168, 170, 172, 176-177, 183, 190, 192, 194-196, 209-212, 214, 217-220, 223-225, 227, 232-233, 239, 242, 244-246, 258
 address, 69, 227
 agent certification, 15, 17-18
 certified agents, 176
 enforcement, 17
 exclusive representation, 17
 penalty, 17
 Player Group Licensing Program, 13
 rookie orientation, 56
 tickets, 219
 union security, 13
No Assignment of Club Right's to Franchise/Transition Players, 67
No Consideration Between Clubs, 66
No Property or Investments, in Offer Sheets, 66
No Reimbursement Among Clubs, Anti -Collusion Violation, 155
No Strike/Lockout/Suit, 11-12
No Subsequent Draft, *see Draft.*
No Trade Clause, 83, 162
Non-Cash Provisions, 131
Non-Compensation Terms, 66
Non-Defined Gross Revenues, *see Non-DGR.*
Non-DGR, 87, 144, 265
Non-Football Injury (N-F/I), *see Injury.*
Non-Football Injury or Illness List, 163, 169
Non-Football Services, 94
Non-Guaranteed Reporting Bonus, *see Reporting Bonus.*
Non-Injury Grievance, 22
 appeal, 22-23
 arbitration panel, 23-24
 arbitrator's decision and award, 25
 costs, 26
 definition, 22
 discovery, 23
 expedited grievance, 23
 filing, 22
 grievance settlement committee, 26
 grounds for grievance, 22-23
 hearing, 24-25
 initiation, 22
 payment, 26

Index

representation, 25
time limits,  25
Non-Shared Amount, *see PSL.*
Notice, 14, 15, 20, 29, 40, 46, 64-65, 67, 68-69, 147-149, 150, 163,
    170, 214, 218, 235, 237, 241, 243, 257, 266
veteran free agency, 68-69
Arbitrator, 23
invalid contract, 160
notice of signing, 49, 57
signing, by veteran with less than three accrued seasons, 57
signing, drafted rookie, 49
signing, undrafted rookie, 49
termination, in waiver system, 83, 225, 243
personnel, 84
to NFL, NFLMC and NFLPA, 28, 33, 37, 42, 47, 49, 51, 57, 83-84,
    93, 103, 140, 143, 149, 151, 160, 164, 176, 194, 224-225, 227-
    228, 232
Number of Regular Season Games, 164, 176

**O**
Off-Season Reporting Bonus, *see Bonus.*
Off Season Roster Bonus, *see Bonus.*
Off-Season Workouts, 96, 258, 131, 132, 137, 168-171
bonus, 104, 181
enforcement, 170-171
injuries, 169
miscellaneous, 169
payment, 168-169
prohibited Club activity, 169
time period, 168
voluntary, 168
Offer Sheet, 64-69, 71-72, 74, 142, 151-152, 158, 244
first refusal procedure, 64-67
franchise player, 71
one offer sheet, outstanding, 65
principal terms, 65, 66
restricted free agents,
transition player, 71
Old Club, matching incentives, 66, 180
One Offer Sheet, Outstanding, 65, *see Offer Sheet.*
On Field Attire, 219
Operation Committee, *see Committee.*
Operation in Entering Player Pool, *see Entering Player Pool.*
Option Bonus, 45
Option Clause, 11, 45, 151

existing option clauses, 45
   prohibition, 45
Orthopedic Physician, *see Physician*.
Other Provisions, 163
   CFL Rule, 163
   non-football injury, 163
   physically unable to perform (PUP), 163
   roster exemption, 163-164

**P**
Paid Performance Bonus, *see Bonus*.
Paragraph 5 Salary, 5, 7, 57, 61-63, 67, 71, 82, 85, 99, 101, 175, 178,
   180, 240
   definition, 7
   June 1st tender, 59, 60, 63, 82, 98
   June 15th tender, 63, 98
   minimum, 178, 180
   minimum qualifying offer, restricted free agent, 9, 62-64, 67
   minimum qualifying offer, right of first refusal and/or draft choice com-
      pensation, 62, 64-69, 72-74, 151-152
   *see also Deferred Paragraph 5 Salary; Minimum Paragraph 5 Salary;*
      *Salary.*
Parol Evidence, Modifying Agreement, 221
Payment, 6, 14, 26, 31, 35, 54, 56, 59, 71, 82-83, 86-87, 90, 94, 97-99,
   102, 130, 135-136, 155, 198, 172-174, 176-178, 181-183, 186-187,
   189-190, 196-197, 199-201, 203-207211-213, 233-235, 240, 247,
   255, 264-265
   non-injury grievance award, 26
   injury protection benefit, 33
   rookie orientation program, 56
   minimum workout, 54, 171, 181-182
   damages, 155
   performance based pool, 152, 183
   post season, 188-189
   salary, non-football injury or illness,
   salary, PUP,
   salary, waiver system.
   salaries, bonuses, 66, 76, 93, 95, 163, 166, 220
   severance, 94, 196, 211-212
Penalty, 14, 17, 34, 49, 57, 59, 60, 63, 71, 73, 79, 80, 83, 148, 152,
   166,
   and NFLPA Agent Certification, 17
   assessed by Special Master, 148
   in Commissioner discipline, 34
Pension, 31, 93-94, 155, 195-196, 214, 247

Index

Per Diem, *see Pre-Season Training Camp.*
Performance Based Pool, 52, 183
    annual projection, 183
    creation of fund, 183
    mandatory distribution each year, 183
    methodology, 183
    qualifying player, 183
Performance Bonus, *see Bonus.*
Performance Categories, 125, 129
Performance Incentives, *see Incentives.*
Personal, 68, 83, 88, 193, 220, 231, 235, 243, 259
    appearance, 19, 169
    hardship, 47, 57, 59, 63, 79
Personnel Information, NFLPA's Right to, 84
Personal Seat License, *see PSL.*
Pete Rozelle NFL Player Retirement Plan, *see Pete Rozelle Plan.*
Pete Rozelle Plan, 83, 173, 192, 201-204, 208, 209, 211, 213, 214; *see*
    *also Bert Bell NFL Player Retirement Plan; Merged Plan; Retirement Plan*
Physical Examination, 27-28, 31, 35, 172-173, 191, 230, 234-235, 243
Physically Unable to Perform (PUP), 27, 32, 163, 169, 234
Physician
    club, 20, 27, 28, 31, 35-36, 191, 193, 234-235, 243
    neutral, 28, 191
    orthopedic, 28, 191
    treating, 28
Plan Benefit Costs, 194-198
Play Rule Change, 37-38
Player
    appearances, 169, 219
    categories of, deals with rosters, 84, 97
    election, 154
    promotions, 223
    public statements, 219
    tickets, 220
    *see also Rookie; Veterans.*
Player Affiliate, 4, 7, 42, 59, 71, 94, 142, 157
Player Annuity Program, 94, 138, 194, 196-197, 204
    allocation, 204-205
    annuity board, 206
    contributions, 204
    definitions,
    distribution, 205

eligibility, 204-205
    individual allocations, 204-206
    points, 204-206
    timing, 205
    establishment, 204
    insurance company,
        structure, 206
Player's Association, *see NFLPA.*
Player Benefit, 155, 179, 183, 197; *see Player Benefit Costs.*
Player Benefit Costs, 93, 141, 194-198
    1998 amendment benefits, 194, 197
    adjustments, 195
    definition, 6, 195-196
    general right of reduction, 194
    limitation on contributions, 197-198
    resolution of disputes, 196-197
    right of restoration, 195
    *see also Benefit.*
Player Benefit Credits, 197, 199, 201
Player Benefit Plan, *see Player Benefit Costs.*
Player/Club Operations Committee, *see Committee.*
Player Contract, *see Contract; see also Bonuses, Incentives; Salary.*
Player Costs, 6-7, 9, 88, 94-96, 137.139, 162, 244, 247
Player Second Career Savings Plan, *see Second Career Savings Plan.*
Player Security, 19
Players' Right to Medical Care and Treatment, 191-192
    club physician, 191
    club trainer, 191
    drugs of abuse and alcohol, 192
    insurance benefits, 198, 208
    records, 193
    second medical opinion, 191
    standard, 38
    standard minimum pre-season physical, 191-192
    substance abuse, 192
    surgeon of his choice, 191
Playoff Clubs, 5, 81
Playtime Requirement, 100-101, 125-126; *see also Incentives; Player Annuity Program.*
Post-Season Pay, 188-189
    compensation, 188
    payment, 189
    playoff system, 189
Practice Squad, 84, 98, 166, 209
    credited season, 201

Index

    eligibility, 166-167
    player, 56
    salary, 93, 166, 175
    signing with other clubs,  166
    size of, 165
Pre-Season, 164, 219, 228, 230, 231-233, 238
    cut down dates and player limits, 165
    game, 43, 76, 103, 164
    per diem, 173, 195
    physical, 36, 230, 252
    roster bonus, 128
    testing, drugs and alcohol, 253, 192
    training camp, 104, 173-174, 231, 233, 258
    veteran reporting (relocation) bonus, during expansion allocation,
        105, 162
Premium
    seat excess, 92, 265
    seat revenue, 90-93, 265
Previous Player, 81
Principal Term, 64-67, 71, 240, 241
    offer sheet, 64-67
    restricted free agents, 67
Prior Club, 5, 57, 59, 60-67, 69, 72-74, 158
    franchise players, 64
    restricted free agents, 6, 60, 65, 67, 152
    transition players, 71-72, 78
    unrestricted free agents, 42
    signing bonuses, 72, 105
Prior Year Salary, 5, 6, 59, 72, 77-78
Pro-Bowl Game, 190
    compensation, 190
    injury, 190
    payment, 190
    selection, 190
    wives, 190
Pro-Rated Signing Bonus, *see Signing Bonus*.
Procedures, 17, 23, 29, 49, 64, 78, 83, 88, 137, 138, 141, 147, 148-
    150, 190, 208, 214-215, 225, 235, 244-247, 248-251
    changing playing rules, 37-38
    Impartial Arbitrator, 149
    Special Master, 147-148
Professional, 6, 33, 59, 66, 82, 148, 150, 157, 231, 236, 238
    player, 3, 5
    teams, 47
Prohibition of Option Clause, 45

Projected Benefits, 7, 9, 88, 95-97, 141, 195-197, 267
    adjusted, 141
    definition, salary cap and team salary purposes, 96-97
    *see also Benefits*
Projected Defined Gross Revenues, *see Projected DGR..*
Projected DGR, 7, 9, 88; *see also DGR; EDGR; Non-DGR.*
Property or Investments, as Principal Terms of Offer Sheets, 66
PSL,
    carryover PSL credit, 90, 263
    difference, 89, 262-263
    excess, 90, 263
    first-year increases, 89
    funding the construction and renovation of stadiums, 89-91, 261-265
    maximum annual allocation amount, 89-90, 259-263
    non-share amount, 91-92, 265
    revenues, 89-90, 92, 259-262, 265
Physically Unable To Perform, 27, 32, 163, 164, 234
    injury protection, 35-36, 93, 195, 230
    salary,
PUP, *see Physically Unable to Perform.*

**Q**
Qualifying Contract, 179-181; *see also   Bonuses, Contract, Incentives.*
Qualifying Offer, 9, 61-63, 67, 69, 138, 222
    and restricted free agent, 98
Qualifying Player, 178, 179, 181, 183, 213

**R**
Records, 23, 28, 32, 68, 145, 227
    personnel, 192
    medical, 193
Recruitment of an Unsigned Player, 131
Reimbursement, 56, 186, 207, 208, 233, 264
    meal allowance, 184
    no, 155
    travel, 184
Related Entities, definition, 88, 249
Released, in Waiver System, *see Waiver System.*
Releases and Covenants Not to Sue, 12, 39
Relocation Bonus, *see Bonus.*
Remedies, 153, 199, 203, 204, 213
Renegotiation and Extensions, *see Contract.*
Renegotiation of an Existing Player Contract, 71, 73, *see Contract.*
Renovation of Stadiums, 87, 89-92, 261; *see also Stadium.*
Reopener, Workers' Compensation, 218

Index

Reporting Bonus, *see Bonus.*
Representation During Grievance Procedures, *see Grievance, Injury Griev-*
    *ance; Non-Injury Grievance.*
Required Tender, 6, 9, 57, 88, 138, 151, 163,
    franchise players, 70-71
    good faith negotiation, 44
    rookie, 46, 53
    transition players, 73
    *see Tender.*
Reserve Physical Unable to Perform,
    *see also Physically Unable To Perform.*
Reserve PUP, *see Reserved Physically Unable to Perform.*
Restricted Free Agent, 6, 48, 60, 62-67, 69, 70, 72, 74, 77, 152-153,
    158, 163
    offer sheet, 64
    qualifying offer, 61-64, 98
    required tenders, 62
    right of first refusal, 61
    signing period, 62
    *see also Free Agency; Free Agent.*
Restricted Players, 163
Retention of Benefits, 216
Retirement
    Board, 199, 214, 255, 256
    of players, 83, 93, 94, 133, 189, 194-196, 236
Retirement Plan, 189, 194, 199-201
    benefit credits, 197, 199, 201
    contributions, 198
    decrease in vesting requirement, 199
    definition, 198
    maintenance, 198
    medical standard for line-of-duty disability benefit, 199
    psychological/psychiatric disorders,
    *see also Merged Plan.*
Revenues, for DGR Purposes,
    *see also DGR.*
Right of First Refusal, 47-48, 61-69, 73-74, 151-152, 241-242
    definition, 5, 8
    restricted free agents, 60-64
    transition players, 73-74
Right of Restoration, Individual Player Benefits, 195
Rights
    preservation of, 217
    under law, 223

Rookie, 3, 5-6, 15, 46-49, 51-56, 59, 67, 94, 98-101, 106, 110-120,
    122-127, 132, 134-136, 151, 153-154, 162, 169-170, 172-173, 177,
    183, 186-187, 208, 238
    25% rule, 53-55, 110-117, 134-135
    allocation, 51-56, 163
    contract, 46-49, 51, 53, 54, 59, 177
    contract renegotiation, 59, 136
    contract requirements,  46-56
    definition, 5-6, 173
    drafted, 5, 47-49, 52-53, 55, 153
    free agent, 5, 46-49
    incentives, 56, 106, 110-125
    insurance coverage, 208
    minimum workouts payments, 54
    orientation program, 56, 132
    per diem, 173
    premiere, 169, 170
    salary, 55, 94, 98-99, 238
    signing bonus, 9, 59, 100-101
    symposium, 15
    undrafted, 5, 6, 53, 55, 99, 151, 154
    *see also Drafted Rookie; Undrafted Rookie*
Rookie Allocation, 51-56, 163, *see Rookie.*
Rookie Orientation, 56, 132
    during timing and testing sessions, 15
    player reimbursement, 56
        evaluation,
Rookie Salary, 46, 51, 55, 94, 98-99, 238, *see Rookie; see also Contract.*
Room, 174, 187
    and board, 56, 173
    definition, 7
    for salary cap purposes, 43, 52-53, 71, 102, 106, 133, 235, 243
    in rookie allocation, 51-53
Roster Bonus, 40, 103-104, 128, *see Bonus.*
Roster Exemption Status, 163
    contracted player, 163
    players not under contract, 163
    restricted free agent, 163
Rounding, 9
Rules
    25% rule, for Rookies, 54-55, 134-135
    30% rule, 53-54, 134-135
    70% rule, 96
    CFL rule, 163

Index

NFL rules, definition, 4
play rule change, 37-38

**S**
Salaries, 53, 70, 71, 73-74, 77-79, 93, 98, 172, 177, 196, 244, 246
    arbitration, other/additional  compensation, 176-178, 180-182, 233
    credited season, calculation, 47-48, 175-176, 178-179, 181, 199,
    copies of contracts, 177
    definition, 7
    funding of deferred and guaranteed contracts, 177
    minimum salaries, 7, 9, 88, 97, 175, 183
        active/inactive list, 5, 9, 46, 48, 53, 55, 88, 99, 166-167, 175, 179
        non-active/inactive list, 5, 9, 46, 48, 53, 55, 57, 88, 99
    other compensation, 83, 176
    payment, 6, 35, 54, 59, 71, 82, 94, 97-99, 102, 129-130, 134, 136,
        155, 168, 172-173, 176-178, 181, 183, 189-190, 233-234
    split contracts, 177, 178
Salary
    active/inactive list, 5, 9, 46, 48, 53, 55, 88, 99, 166-167, 175, 179
    advance, 97, 103-104, 131, 178
    cash, 96, 97
    deferred, 97, 99-100
    deferred paragraph 72, 176
    definition, 82
    determining player salary, 9, 51, 175
    drafted rookie,  46, 51, 98
    first year, 81
    guaranteed, 122, 130, 178, 181
    grievance, 99
    increase requirements, for rookie, 53, 62, 71, 73, 101, 105, 134-135
    information, 41, 74
    minimum, 5, 54, 94, 166, 175, 178-183, 196,
    minimum active/inactive list, 5, 9, 46, 48, 53, 88, 99
    minimum salary requirements, 54, 166, 175, 178-181, 183
    minimum split 179
    minimum team salary, 4, 6-8, 32, 41, 51, 68, 94, 97-98, 138, 140-
        145, 162, 194-195, 224, 259
    paragraph 5, 7, 43, 51, 57, 59, 61, 63, 66-67, 71-73, 85, 97, 99,
        101, 131, 175, -176, 178, 180-181, 240
    practice squad, 56, 93, 98, 166-167, 175, 196-197
    prior year, 5, 6, 59, 61, 67, 70, 73-74, 77-79
    reduction contributions, 94, 196
    summaries, 160
        restricted free agent, 61-64, 67, 98, 163
        team, 7, 9, 55, 88, 97-99, 102-106, 128-135, 138, 160, 179

Index

*see also* Bonus; Incentive; *Paragraph 5 Salary; Prior Year Salary; Team Salary.*
Salary Cap, 4, 6, 7-8, 11, 32, 43, 51, 55-56, 68, 71-72, 75, 81-82, 93-99, 101-106, 123-124, 126-128, 130-131, 133, 135-137, 138, 140-144, 147, 151, 155, 157-159, 162, 179, 181, 183, 194-195, 202-205, 210, 213, 222, 224, 235, 238, 243-244, 246, 257-259, 267
    adjustment, 95, 138
    amount, 95-96
    credit, 97
    deduction, 267
    definition, 6
    for rookie, 51-53, 98-101
Sanctions, 143-144, 171
Savings Plan, 93-94, 195-197, 202-206, *see Second Savings Career Plan.*
Scope of Authority, 146-147
    Impartial Arbitrator, 4, 11, 22, 47, 57, 59, 63, 67, 74-75, 77-79, 106, 111, 133, 149-150, 176, 177
Special Master, 146-147
Scouting Combine, 15, 49
Season, 1, 5-6, 11, 13, 15, 20-21, 25, 27, 30-33, 35-36, 43-44, 46-49, 51, 54-61, 63, 67-68, 70, 73-80, 83-85, 86, 88, 93, 95, 97-100, 103-106, 110-122, 124-125, 127-128, 132-134, 136-137, 140, 151, 153, 155-156, 160, 162-166, 168-182, 184-196, 199-203, 205, 207-209, 243-247, 252, 255, 258, 266
Second Career Savings Plan, 94, 196-197, 202, 204
    contributions, 197
    establishment, 104
    expansion of eligible employees, 203
    maintenance, 202
Selection, (expand), 214
    Impartial Arbitrator, 150
Special Master, 148
Senior Arbitrator, 23, 29, *see Arbitrator.*
Settlement Agreement, 4, 9, 11, 12, 39-40, 43, 68, 76, 82, 88, 100, 102, 105, 117, 136, 152, 160, 212, 223, 225, 238, 244
Severance Pay, 94, 196-197, 211-212
    amount, 211
    application, 211
    eligibility, 211
    failure to apply for, 212
    nonassignability, 212
    only one payment, 212
    payable to survivor, 212
    payment, 211

Index

plan, 197
prior, 212
Signing Bonus, 5, 54, -55, 59, 65, 72, 81, 92, 97, 100-105, 240, 246-247
amounts treated as, 97, 103, 121, 124-125, 134, 136, 178, 180
at time of buy-out, 54, 134
"Deion Rule", 101
individually negotiated right of first refusal, 68, 103
option buyout, 103
proration, 100, 102, 104, 180
rookie, 100
unrestricted free agents,
see also Bonus.
Signing Period, 42, 48-49, 57, 59-60, 62-63, 69-71, 73-74, 76, 78-80, 83, 153
definition, 62
franchise player, 76, 79, 80
in waiver system, 81, 83
restricted free agents, 62-63, 69, 70, 74,  153
transition players, 72-73
unrestricted free agents, 42, 59-60, 69, 71, 73, 76, 79-80
Special Defenses, 27, 31; see also Injury  Grievance.
Special Master, 4, 11, 22, 41, 43, 87, 139-140, 142-144, 146-148, 151, 153, 155-156, 158-159, 225, 265
action, 142
appointment, 146
compensation, 147
definition, 4
discovery, 147
jurisdiction, 147
penalties, 148
procedures, 147-148
proceeding, 139
review, 143
scope of authority, 146-147
selection of, 148
term, 148
Spillover, Excess EDGR, 89, 91, 262
Split Contracts, 177, 178 see Salaries.
Split Qualifying Contract, 179, see Minimum Salary Benefits.
Squad, 13, 57, 228
active and inactive list limit, 165
practice, 56, 84, 93, 98, 166-167, 175, 196, 201, 203, 209
size inactive list, 165
size pre-season, 12, 165

Standard Minimum Pre-Season Physical, 191, 192
Stadium
    construction, 89, 91, 261, 264-265
    increase in DGR, 89-91, 262-263
    new, 89-92, 140, 262-263
    old, 89, 91
    renovation, 87, 89-92, 261
Steroids, 192, *see Players' Right to Medical Care and Treatment.*
Stipulation and Settlement Agreement, 9, 44, 82, 88, 100, 102, 136, 238
Subsequent Draft, 48-49, *see Draft.*
Substance Abuse, 192
    alcohol, steroids and related substances, 192
    drugs of abuse and alcohol, 192
    general policy, 192
    *see also Players' Right to Medical Care and Treatment.*
Summary Judgment, 153
Supplemental Disability Benefits, 213
    automatic payment and waiver, 213
    contributions, 213
    extension, 213
    maintenance, 213
Supplemental Disability Plan, 194, 196, 197, 213, 214
Supplemental Draft, 52-53, *see Draft.*
Suspension, 14, 20-21, 23, 25, 33


**T**
Team, *see also Club.*
    incentives, 107, 125-126, 240
    performance issues,
    performance-related incentive, 9, 43-44, 46-49, 54-55, 63, 74-75, 77,
        88, 98, 129, 133, 135, 153, 237
Team Affiliate, 4, 6, 59, 71, 91, 94, 131, 264
Team Leaders, Defined, 121
Team Salary, 4, 6-9, 11, 32, 41, 51, 55, 68, 82, 88, 94-95, 97-107, 128,
    130-135, 138, 140-144, 147, 160, 162, 179, 194-195, 210, 224,
    259
    cap, 4, 6-8, 11, 32, 43, 51, 55-56, 68, 71-72, 75, 81-82, 93-106,
        123-124, 126-128, 130-133, 135-138, 140-144, 147, 151, 155,
        157-160, 179, 181, 183, 194-195, 202-204
    computation, 98
    definition, 82
    elements,
    right to exercise option, 40-41, 45, 54-55, 64-69, 74-75, 98, 100,
        134-136, 151, 153, 241
    summaries, 160

Index

Tenders, 63, 71-72, 75, 78, 88, 98-99, 138
    June 1st , 63, 82, 98
    June 15th, 59, 63, 98
    one year, 47-48, 57, 60, 63, 73, 77-79
    minimum, 72
    required, 6, 9, 44, 46, 48, 53, 57-58, 60, 62, 70-71, 73, 78, 88, 138, 151, 163
    upgraded, 61-62
Terminated Via Waivers, Notice, 83-84, 243
Termination of Agreement, 46, 146, 156, 209-210, 223-224
Termination of Drafted Rookie, 53, 153
Termination Pay, 85
    contract signed after the beginning of the season, 85
    eligibility, 85
    ineligibility, 85
Tests, 28, 220, 246-248
    psychological or personality, 220
    steroid, 192
    urinalysis, 191, 254
Tickets, 219-220, see Player.
Time Limits
    Commissioner discipline, 33-34
    designating franchise player, 70
    injury grievances, 27-32
    non-injury grievances, 22-26
    reporting salary information to the NFLPA, 41
Time Off
    days off, 15, 181, 185
    requirements, 185
Time Periods, 168, 221
Top Four Teams, 81, see Final Year Plan.
Traded Contracts, 123; see also Contracts.
Traded Players, 6, 44, 66, 82, 123, 133
Trade Limitations, 82
Training Camp, 20-21, 31, 59, 76, 82, 103, 160, 164, 168-169, 173-174, 231, 233, 258,
    definition, 173
    expenses, 174
    number of games, 173-174
    pre-season, 20-21, 31, 164, 169, 172-174
    reporting, 173
    rookie per diem, 173
    room and board, 173
    telephones, 174
    veteran per diem, 173

Transition Player, 41, 64, 66-67, 71-74, 77-80, 142, 157, 163, 222
    designation, 77, 142, 157
    designation period, 72-73
    duration of designation, 75
    list, 74
    right of first refusal, 73-74
    salary information, 74
    signing period, 78-79
    *see also Franchise Player; Restricted Free Agent.*
Trigger for Guaranteed League-Wide Salary, Salary Cap, and Minimum Team Salary, 94-98, *see Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary.*
Tuition Assistance Program, 207
    establishment, 207
    eligibility, 207
    reimbursement, 207

**U**
Uncapped Year, 7, 51, 64, 101-104, 134, 160, 197
Undisclosed Terms, Player Contracts, 55, 142, 157-158, 238
Undrafted Rookie, 3, 49
    definition, 6
    free agent, 46, 99
    player contract, 55, 151
    salary, 99
    *see also Rookie; Drafted Rookie.*
Union Security, 10-11, 13
    check-off, 13
    disputes, 14
    NFLPA player group licensing program, 13-14
    NFLPA responsibility, 15
    orientation, 15
    procedure for enforcement, 14-15
    *see also NFLPA*
Unrestricted Free Agency, 5; *see also Free Agency; Restricted Free Agent; Unrestricted Free Agents.*
Unrestricted Free Agent, 5-6, 20, 42, 59-60, 62, 69, 71-73, 77, 80-83, 152-153, 158, 220
    definition, 6
    franchise players, 70
    right of first refusal, 67, 71, 73
    transition player, 72, 77, 80, 163, 222
    *see also Free Agency; Free Agent.*
Upgraded Tender, 61-62, *see Tender.*

Index

**V**

Valuation of Player Contracts, 99, *see Contracts; see also Calculations.*
Vested Player, 208
    allocation, 204-205
    contract, 200-201
    definition, 200-201
    insurance benefits, 208-209
    veteran, 200-201
Veteran Free Agency, 5-6, 20, 59, 69, 209
    expedited arbitration, 67
    individually negotiated limitations on player movement, 67-69
    offer sheet and first refusal procedures, 64-67
    one offer sheet, 65
    restricted free agents, 60-64
    signing period for unrestricted free agents, 59-60
    unrestricted free agents, 59-60
    *see Unrestricted Free Agents.*
Veteran Free Agency Notices, 68-69
Veteran Player, 6, 51, 60, 94, 162, 172-173, 186-187, 189, 208
    and expansion draft, 162, 186
    contract, 135-136, 177
    definition, 6, 173
    expenses, 186-187
    insurance coverage, 208
    per diem, 173
    with less than three accrued seasons, 57-58
        accrued seasons calculation, 57
        negotiating rights, 57-58
        notice of signing, 57-58, 60, 64
    with four or more accrued season, 59

**W**

Waiver Procedures, 46-47, 83-84, 98, 102, 133, 167
Waiver System, 83
    awarding club, 83
    claiming club, 83
    contacting players on waivers, 83
    drafted rookie, 46-47
    ineligibility, 83
    NFLPA right to personnel information, 84
    notice of termination, 83-84
    release, 83-84
    rosters, 84
waiving club, 83, 230-231
Weight Bonus, 106; *see also Bonus.*

Wives, Transportation Provided for, 190
Workers' Compensation, 10-11, 93, 195, 217, 234-235, 247
    arbitration, 217
    benefits, 217
    joint study, 217
    preservation of rights, 217-218
    rejection of coverage, 217
    reopener, workers' compensation article, 218

**Y**

Youth Football Program, Deduction, 144