# Exhibit 13

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

**JOHN THOMAS "J.T." SMITH and his wife MONICA SMITH**

**Case No.**

**1422-CC00005-01**

**and**

**EDWARD SCOTT and his wife JADE SCOTT**

**Plaintiffs,**

~~ROY GREEN~~
~~6851 South 27Th Place~~
~~Phoenix, AZ 85042;~~
~~and~~

~~JOHN THOMAS "J.T." SMITH~~
~~and his wife MONICA SMITH~~
~~3464 N. Boulder Ct. 157~~
~~Buckeye, AZ 85396;~~

~~Case No. 1422-CC00005~~

~~and~~

~~Division:~~

~~EDWARD SCOTT and his wife~~
~~JADE SCOTT~~
~~P.O. Box 872766~~
~~New Orleans, LA 70187~~

~~Plaintiffs,~~

~~v.~~

**ARIZONA CARDINALS FOOTBALL CLUB, LLC corporate successor of ST. LOUIS FOOTBALL CARDINALS, INC.**
~~Serve at Registered Agent:~~
~~Thomas J. Guilfoil~~
~~100 North Broadway, Suite 2000~~
~~St. Louis, MO 63102~~

~~C T Corporation System~~
~~2390 E Camelback Rd~~
~~Phoenix, AZ 85016~~

**Defendant.**

## ~~FIRST~~ **SECOND** AMENDED PETITION'

COMES NOW Plaintiffs, and for their claims and causes of action against Defendant,

upon information and belief, state:

### PLAINTIFFS

~~1.    Plaintiff Roy Green is a resident of Arizona. Mr. Green was employed as a professional football player with the St. Louis Football Cardinals between 1979 and 1987.~~

~~2.    Between September 1, 1987 and December 1987, Mr. Green suffered multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome (e.g. mood, behavior and cognitive dysfunction) and traumatic brain injuries, such as Chronic Traumatic Encephalopathy ("CTE").~~

~~3.    Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Green to develop a constellation of neurologic/brain harms, including post-concussion syndrome (e.g. mood, behavior and cognitive dysfunction) and traumatic brain injuries, such as CTE.~~

~~4~~**1**.    Plaintiffs John Thomas "J.T." Smith and his wife Monica Smith are residents of ~~Arizona~~

**Texas**. Mr. Smith was employed as a professional football player with the St. Louis Football

Cardinals between 1985 and 1987.

~~5.    Between September 1, 1987 and December 1987, Mr. Smith suffered multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome (e.g. mood,~~

behavior and cognitive dysfunction) and traumatic brain injuries, such as CTE.

**2.** **During his employment** with the St. Louis Football Cardinals, Mr. Smith

justifiably relied upon the St. Louis Football Cardinals to provide a safe workplace in accordance

with the common law duties owed by employers pursuant to Missouri law, including the duties

[1] In accordance with Rule 55.33(a), Plaintiffs make this amendment with the consent of Defendant.

to maintain a safe working environment, not to expose employees to unreasonable risks of harm, and to warn employees about the existence of concealed dangers.

3.      Mr. Smith justifiably relied on the St. Louis Cardinals to warn about the existence of dangers which he could not reasonably be expected to be aware, including the increased risk of and potential development of neurodegeneration, including the progressive neurodegenerative disease known as Chronic Traumatic Encephalopathy ("CTE") (hereinafter referred to collectively as "neurodegenerative diseases"). Unlike Defendant, Mr. Smith had no familiarity with or reason to access any medical or scientific literature concerning the risks to which he was exposed at work since he relied on Defendant to inform him of and to protect him against such risks and to correct past misstatements and/or omissions that Defendant knew or should have known were made to Mr. Smith during the course of his employment.

4.      During his employment with Defendant, Mr. Smith was exposed to multiple concussive and sub-concussive blows to the head which subsequently caused or contributed to cause an increased risk of developing neurodegenerative diseases and which ultimately resulted in the development of neurodegeneration in Mr. Smith. At the time of his employment, Mr. Smith's exposures did not produce objective symptoms of neurodegenerative diseases. It was not until later that Mr. Smith discovered that his symptoms were a result of repetitive brain trauma he was exposed to during his employment with Defendant.

6<u>5</u>.      Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Smith to <s>develop a constellation of neurologic/brain harms, including post concussion syndrome (e.g. mood, behavior and cognitive dysfunction) and traumatic brain injuries, such as CTE.</s> **suffer an increased risk of developing neurodegenerative diseases and**

4

ultimately resulted in the development of neurodegenerative diseases.

~~7~~6.     Plaintiffs Edward Scott and his wife Jade Scott are residents of Louisiana. Mr. Scott was employed as a professional football player with the St. Louis Football Cardinals in 1987.

~~8.     Between September 1, 1987 and November 1987, Mr. Scott suffered multiple concussive and subconcussive blows to the head which caused or contributed to cause a constellation of neurologic/brain harms, including post-concussion syndrome (e.g. mood, behavior and cognitive dysfunction) and traumatic brain injuries, such as CTE.~~

**7.     During his employment with the St. Louis Football Cardinals, Mr. Scott justifiably relied upon the St. Louis Football Cardinals to provide a safe workplace in accordance with the common law duties owed by employers pursuant to Missouri law, including the duties to maintain a safe working environment, not to expose employees to unreasonable risks of harm, and to warn employees about the existence of concealed dangers.**

**8.     Mr. Scott justifiably relied on the St. Louis Cardinals to warn about the existence of dangers which he could not reasonably be expected to be aware, including the increased risk of and potential development of neurodegeneration, including the progressive neurodegenerative disease known as CTE. Unlike Defendant, Mr. Scott had no familiarity with or reason to access any medical or scientific literature concerning the risks to which he was exposed at work since he relied on Defendant to inform him of and to protect him against such risks and to correct past misstatements and/or omissions that Defendant knew or should have known were made to Mr. Scott during the course of his employment.**

**9.     During his employment with Defendant, Mr. Scott was exposed to multiple concussive and sub-concussive blows to the head which subsequently caused or**

contributed to cause an increased risk of developing neurodegenerative diseases and which ultimately resulted in the development of neurodegeneration in Mr. Scott. At the time of his employment, Mr. Scott's exposures did not produce objective symptoms of neurodegenerative diseases. It was not until later that Mr. Smith discovered that his symptoms were a result of repetitive brain trauma he was exposed to during his employment with Defendant.

9 10.    Defendant's wrongful conduct, as alleged herein, directly caused or directly contributed to cause Mr. Scott to ~~develop a constellation of neurologic/brain harms, including post-concussion syndrome (e.g. mood, behavior and cognitive dysfunction) and traumatic brain injuries, such as CTE.~~ **suffer an increased risk of developing neurodegenerative diseases and ultimately resulted in the development of neurodegeneration.**

### DEFENDANT

10 11.    Defendant Arizona Cardinals Football Club, LLC ("Arizona Cardinals"), previously known and operating in the state of Missouri as the St. Louis Football Cardinals, Inc. ("St. Louis Football Cardinals"), is a company organized under the laws of Delaware with its principal place of business at: P.O. Box 888, Phoenix, Arizona 85001. It has a registered agent in the state of Missouri which can be served at 100 North Broadway, Suite 2000, St. Louis, Missouri, 63102. From 1960 through 1987, the St. Louis Football Cardinals was a Missouri corporation that regularly transacted business in the State of Missouri, City of St. Louis. In 1988,

the St. Louis Football Cardinals moved to Arizona and merged, after a series of name changes, into the Arizona Cardinals. In this transaction: (1) Defendant expressly or impliedly agreed to assume St. Louis Football Cardinals' liabilities and debts, (2) the transaction amounted to a merger of the corporations, and (3) Defendant Arizona Cardinals is merely a continuation of St. Louis Football Cardinals.

11. At all times relevant herein, Defendant was Plaintiffs' employer. Defendant is a member of the National Football League ("NFL"), which is an unincorporated association consisting of 32 separately owned and independently operated professional football teams.

## JURISDICTION

12. Jurisdiction is proper in this Court pursuant to RSMo § 506.500(1) in that the tortious acts alleged herein took place in Missouri. This Court has long-arm jurisdiction over Defendant Arizona Cardinals, by and through its predecessor, because it has significant contacts with the state of Missouri, including the commission of tortious acts, the transaction of business and the making of contracts with Plaintiffs.

13.     This is an action requesting relief **solely** under the common and statutory laws of the State of Missouri. ~~Between September 1, 1987 and March 28, 1993, the relevant time period of Plaintiffs' injuries and claims, there was no collective bargaining agreement (CBA) in effect. Because federal labor law s not applicable to~~ ***See Green v. Arizona Cardinals Football Club LLC, 21 F. Supp. 3d 1020 (E.D. Mo. 2014).*** Plaintiffs' claims~~, and no~~ **are premised upon the common law and do not arise from nor do they require the** interpretation of a CBA ~~is required, section 301 of the Labor Management Relations Act cannot provide a basis for federal jurisdiction~~**.** ***See id***.

14.     Plaintiffs' claims do not arise out of an "accident," as that term is defined under Missouri's Workers' Compensation Law. Plaintiffs' occupational disease-related claims were not caused by a specific event during a single work shift injury~~.~~**; rather, the disease complained of is distinct from the concussive and sub-concussive injuries sustained by Plaintiffs during their employment with Defendant and occurred years after their exposure to repetitive brain trauma. The injury complained of is the increased risk of and the development of neurodegenerative diseases.**

15.     Plaintiffs' claims are not ~~within the scope of workers' compensation and they are~~**subject to the exclusivity provisions of the Workers'** ~~not subject to the exclusivity provisions of workers' compensation.~~

**Compensation Act in effect at the time this action was commenced.**

<u>VENUE</u>

16.     Venue is proper with this Court pursuant to RSMo § 508.010. Upon information and belief, Plaintiffs were first injured by the wrongful acts and negligent conduct alleged herein in St. Louis, Missouri.

**<u>JOINDER OF CLAIMS</u>**

17.     Joinder of Plaintiffs' claims ~~are~~**is** permissible pursuant to Rule 52.05(a) in that the claims alleged herein arise out of the same series of occurrences and involve common questions of law and fact.

## TOLLING

18.     Plaintiffs' membership in the putative class action ~~currently pending~~ **previously filed** in the Eastern District of Pennsylvania[2] tolled the running of ~~the applicable~~ **any** statute of limitations. In addition, Defendant's improper acts **and omissions,** as alleged herein **,** prevented **the ascertainment of** Plaintiffs ~~from ascertaining their latent injuries, including a diagnosis of CTE.~~**' neurodegenerative diseases and related damages and Defendant is therefore equitably estopped from pleading the statute of limitations and/or the statute of repose as a defense.**

## GENERAL ALLEGATIONS

~~19.     Defendant's efforts to minimize the relationship between head trauma and resulting health conditions is analogous to the tactics used by the tobacco industry. Just as the tobacco industry proposed alternative causes for the health conditions of its consumers, Defendant has suggested that Plaintiffs' health conditions and abnormal behaviors were caused by: alcohol, steroids, depression, and aggressive personality traits.~~

**19.     For decades, the Defendant has known or should have known that repetitive brain trauma can lead to permanent and debilitating neurological impairments and neurodegenerative diseases, including CTE.**

**20.     Neurodegenerative diseases are caused by repetitive brain trauma. The clinical manifestations of neurodegenerative diseases often do not occur until several years after the final exposure.**

**21.     As a result of its relationship with Plaintiffs, Defendant was obligated to inform itself of those matters of scientific knowledge that relate to the hazards of the business and to correspondingly relay that knowledge to Plaintiffs, including the risk of**

developing permanent and debilitating neurodegenerative diseases, such as CTE, and their associated symptoms and manifestations. Instead, Defendant, its management, medical and coaching staff, concealed or otherwiSe withheld this information from Plaintiffs.

22.    Indeed, as their employer, Defendant owed Plaintiffs a continuous duty to keep abreast of the scientific developments relating to brain trauma which its employees were regularly exposed, and to notify, inform and educate Plaintiffs of the potential risks and diseases

---

¹ *In re NFL Players' Concussion Injury Litigation,* No. 2:12-md-02323-AB; *See also, Charles Ray Easterling, et al v. NFL,* No. 11-cv-0509 (filed August 17, 2011).

20. Defendant has known or should have known that since 1966 the Congress of Neurological Surgeons defined a concussion as a "clinical syndrome characterized by immediate and transient impairment of neural functions, such as alteration of consciousness, disturbance of vision, equilibrium, etc. due to mechanical forces." Defendant marginalized the risks of brain injuries and regularly referred to concussions as "getting your bell rung" or a "ding."

21. Defendant exacerbated Plaintiffs' risk of exposure to brain trauma by regularly returning concussed players to play. Defendant fostered a draconian working environment where Plaintiffs were forced to play through brain injuries. On multiple occasions, Defendant increased the dangers of the working environment by giving Plaintiffs ammonia inhalants, caffeine cocktails and/or Toradol to abbreviate the need for concussed employees to miss work due to a brain injury.

22. Similarly, in order to reduce operating expenses, Defendant increased the risk of exposure to head trauma by installing AstroTurf (i.e. carpeted concrete). Multiple studies have concluded that there is a "statistically significant difference" between the injury rates on AstroTurf and grass.[2]

23. AstroTurf significantly increased the risk of exposure to head trauma in the following ways. First, AstroTurf increases the speed of play, which in turn reduces a player's chance to prepare for a violent hit to the head or body. On grass, the game is slower which allows a player to absorb hits by tensing up his muscles prior to a collision. Second, when a player's body slams down on concrete-like AstroTurf, the hard ground is incapable of absorbing the shock. Instead, the shock takes place in a player's head, causing the brain to violently rattle

---

[2] See, e.g. Powell JW, Schootman M: A multivariate risk analysis of selected playing surfaces in the National Football League: 1980 to 1989. American Journal of Sports Medicine 6:686-694, 1992.

against the skull. On grass, however, the organic padding of the grass and soil provides for natural shock absorption.

24. Despite there being a clear and much safer alternative (i.e. grass), Defendant provided a working environment that it knew was unreasonably dangerous and unnecessarily increased the risk of exposure. The primary reasons being: (1) it was cheaper and (2) the speed of the game was faster, which heightened the violence of the game, which in turn, increased the fans' attraction, and thereby significantly boosted the Defendant's revenue.

25. Defendant has known or should have known for many years that post-concussion syndrome (PCS) and cognitive impairment occurs in football players. PCS is widely known throughout the medical community and it can include, but not limited to the following symptoms: cognitive deficits in attention or memory, fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, apathy, or personality changes.

26. For decades, the scientific community has known that repetitive head trauma can lead to permanent and debilitating neurological impairments, including Chronic Traumatic Encephalopathy ("CTE").

27. Defendant has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers, easily accessible to Defendant, have shown that this condition is prevalent in boxers and retired professional football players who have a history of head injuries. The changes in the brain begin when the brain is subjected to repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of athletic involvement.

28.     In 1928, pathologist Harrison Martland first described the link between repetitive

head trauma and degenerative brain disease as the "punch drunk syndrome" in the *Journal of the*

*American Medical Association*.

29.     In 1934, Dr. Harry Parker published a study confirming Martland's findings and

argued that neurological degeneration in boxers was based on the volume of brain trauma

sustained. He further opined, "the frequency of occurrence of conditions of this kind as reported

by...people who followed the profession of pugilism makes it seem very likely that [the

patients'] profession led to their ultimate disablement...."

30.     On December 29, 1937, at the Seventeenth Annual Meeting of the American

Football Coaches Association, the football community acknowledged its keen awareness of the

serious risks of concussions, and the necessity of removing an individual from play if they have

suffered a concussion:

> During the past seven years the practice has been too prevalent of allowing players to continue playing after a concussion. Again this year this is true...Sports demanding personal contact should be eliminated after an individual has suffered one concussion.

31.     In 1937, J.A. Millspaugh introduced the term dementia pugilistica to describe the

syndrome characterized by motor deficits and mental confusion in boxers. Millspaugh also noted

that the disease is likely not limited to boxers but could extend to other sports where repetitive

brain trauma is present: "The mental unbalance more commonly encountered among pugilists is

also observed among other sports representatives who sustain considerable head trauma." He

further opined, "[r]epeat and frequent concussions...are, to say the least, not conducive

to

stabilized mental equilibrium."

32. In 1949, British neurologist Macdonald Critchley published the first of two

important studies on head trauma in boxers. In *Punch Drunk Syndrome: The Chronic Traumatic*

*Encephalophathy of Boxers,* Critchley described the latent effects of repetitive brain trauma,

explaining that the condition was generally not observable until a number of years had passed

since the onset of boxing. In 1957, Critchley published an article in the *British Medical Journal*

and described the symptoms of "chronic progressive traumatic encephalopathy" to include

"progressive slowing of speech and thoughts...slowness of movement, and tremors." Critchley

further noted that brain damage produced by repetitive trauma could lead to personality changes,

and that the effects of chronic head trauma are dependent on the volume of impacts as well as the

magnitude of those events.

33. Over the next several decades, the evidence of the link between repetitive head

trauma and neurological diseases was overwhelmingly clear. Numerous studies were published

in medical journals including the *Journal of the American Medical Association, Neurology,*

*Lancet,* the *New England Journal of Medicine* and *Physician and Sports Medicine* warning of the

dangers of single concussions, multiple concussions, and/or football-related head trauma from

multiple concussions. These studies collectively established:

- repetitive head trauma in contact sports, including boxing and football, has potential dangerous long term effects on brain function;

- encephalopathy is caused in boxers, steeplechasers and football players by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid decelerations of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

- immediate retrograde amnesia occurs following concussions;

- mild head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

18

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

34. Although CTE has been discussed widely in the medical literature for more than

eight decades, it was not until 2002 that CTE was officially diagnosed post-mortem in

professional football players. Upon information and belief, this late finding was due to the

Defendant's and its agents' concerted effort to conceal the link between repetitive head trauma in

football and neurological diseases. Since 2002, more than 90% of all former players that have

been examined post-mortem exhibited pathological symptoms consistent with CTE. The leading

neuropathologist studying CTE, Dr. Ann McKee, believes that it is more likely than not that

every single NFL player has some level of CTE.

35. The first professional football player to be diagnosed with CTE was a former

Kansas City Chiefs player, Mike Webster. Webster played 17 years—his final two (1989 and

1990) with the Chiefs—in the NFL and tragically died only 12 years after retirement at the age

of 50. During the latter part of his life, and while serving on Defendant's coaching staff Webster

manifested progressive symptoms and signs of cognitive and neuropsychiatric impairment

consistent with CTE.

36. Research suggests that CTE may have been the true primary cause of death for a

majority of professional football players that died as a result of neurodegenerative diseases.

Accordingly, it is likely that the rate of CTE in professional football players is significantly

higher than once believed.

37. The clinical manifestations/neurological dysfunction such as CTE are quite

variable but can include a number of signs and symptoms including: headaches, short-term

19

memory difficulties, aggressive tendencies, depression, impulse control, mood lability,

explosivity, poor judgment, loss of attention and concentration, executive dysfunction, impulsivity, language difficulties, suicidal ideations and ultimately cognitive impairment. All such earlier symptoms can then worsen, leading to more severe depression, mood swings become more violent, severe memory loss, and motor neuron disease may develop. End stage encephalopathy can then set in, with severe memory loss, dementia, executive dysfunction, language difficulties, explosivity, paranoia, gait and increased suicidal ideations and violence toward others.

38.    The National Institute for Occupational Safety and Health (NIOSH) recently issued a warning letter – since the Defendant failed to do so – to all former NFL players that played at least five seasons during 1959 to 1988, stating: due to the exposure of repetitive mild traumatic brain injuries the "risk of dying with a brain or nervous system disorder was more than three times higher among players." The warning letter went on to conclude that this study confirms a similar study that was done *"years"* ago. Further evidencing the campaign of deception and concealment, prior to the dissemination of this warning letter, a member of the NFL's Head, Neck and Spine Committee sought to remove any mention of CTE.

39.    To date, more than 52 former NFL players have been diagnosed post-mortem with CTE.

40.    Despite the substantial body of independent scientific studies directly linking repetitive head trauma in football and neurological diseases, including CTE, Defendant never warned Plaintiffs and instead willfully misrepresented and/or concealed the risks.

41.    As the purveyor of football in America, and as the leading expert in the field,

Defendant owed a continuous duty to keep abreast of the scientific developments relating to

11

22

brain trauma which its employees were regularly exposed, and it was required to notify, inform and educate Plaintiffs and the public of any potential long-term risks of **resulting from** repetitive head trauma**, including those manifestations relating to neurodegenerative diseases, including CTE**.

42.   The Defendant's duty to warn was commensurate not only with its actual

knowledge gained from its "research" and published studies but also with its constructive

knowledge as measured by scientific literature and other available means of communication.

43.   Upon information and belief, Defendant knew or should have known of the

**23.   Defendant knew or should have known of the** devastating nature and long-term effects of concussive and sub-concussive injuries long before

Plaintiffs were exposed to repetitive brain trauma. Defendant had or should have had

knowledge of studies that demonstrated a positive link between repetitive head trauma and

neurological diseases in the 1920s, 1930s, 1940s, 1950s, 1960s, 1970s, 1980s, and 1990s.

During those decades, Defendant's knowledge about the hazards **and symptoms** of repetitive

head trauma continued to **accumulate. However, during their employment, Defendant**

**denied, concealed and/or failed to disclose to Plaintiffs the existence of and the risk of**

**developing neurodegenerative diseases, including CTE, and their associated symptoms**

**and manifestations, and thereafter failed to correct any material misinformation which**

**it knew or should have known was given to Plaintiffs during their employment.**

accumulate, yet Defendant failed to warn Plaintiffs about those hazards.

**24.   As its employees, Plaintiffs relied upon Defendant to inform itself of**

**those matters of scientific knowledge that relate to the hazards of its business and**

**to relay that knowledge to Plaintiffs and not to remain silent as to the true state of**

**affairs or to material facts relating to the hazards of its business which it knew or**

**should have known were not understood by Plaintiffs. Plaintiffs also relied upon**

23

Defendant to correct any material misinformation which it knew or should have known was given to Plaintiffs during their employment.

25. Defendant's failure to warn about the dangers of neurodegenerative diseases was a tacit assurance by Defendant that no unusual dangers existed. Plaintiffs rightfully relied upon Defendant's silence as an affirmation that they would not develop neurodegenerative diseases

**later in life and thus Plaintiffs had no reason to know that the symptoms they experienced were**

**related to the repetitive brain trauma they sustained during their employment.**

**COUNT I**
**NEGLIGENCE**

44**26**. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1

through 46**25** as if fully set forth herein.

45.    Defendant had a common law duty, separate and independent of any CBA, to use

ordinary care to make its work environment reasonably safe.

46**27**. **During the period of their employment,** Defendant owed a non-delegable and non-negotiable duty**non-**

**negotiable duty, which arise from and can be adjudged in accordance with the common law of**

**Missouri,** to maintain a safe working environment, a duty not to expose Plaintiffs to unreasonable risks of harm, a duty to

**and/or increased risks of harm, to** warn employees**Plaintiffs** about the existence of dangers, including latent neurologic diseases, of which

**Plaintiffs could not reasonably be expected to be aware in light of their reasonable reliance upon**

they could not reasonably be expected to be aware**Defendant**, and a duty to exercise reasonable care so as **not to unnecessarily expose Plaintiffs to**

**conditions which it knew or should have known ultimately results in the development of**

not to expose its employees, including Plaintiffs, to unreasonable risk of injury**neurodegenerative diseases**.

47**28**.  Between September 1, 1987 and March 28, 1993, Defendant failed to use due care **under the circumstances and** **failed to warn**

**Plaintiffs about the existence of dangers of which** **they could not reasonably be expected to be**

**aware in light of their reasonable reliance upon Defendant and,** **as a result, was negligent in the**

under the circumstances, and was thereby negligent in the performance of its non-delegable and non-negotiable duties.

48.    Between September 1, 1987 and March 28, 1993, Defendant by its respective

**29.** **Defendant, by its** active and passive negligence**,** failed to exercise the standard of

care and skill it was obligated to exercise by reason of its relationship with Plaintiffs, undertakings and assumption of a duty **thereby**

thereby causing, creating or permitting an increased risk of exposure to repetitive brain trauma, **and an**

**increased risk of developing neurodegenerative diseases and thus failed to properly safeguard**

and thereby failing to properly safeguard and warn Plaintiffs.

26

49**30**.  Such negligence directly caused or directly contributed to cause Plaintiffs to

~~suffer from severe and persistent headaches, PCS (e.g. mood, behavior and cognitive~~

~~dysfunction), depression, mood swings, explosivity, and other neurologic/brain harms.~~

**develop neurodegenerative diseases.**

**31.    Since the true and developing nature of the Plaintiffs injuries were fraudulently**

**concealed by Defendants, and since Plaintiffs justifiably relied on Defendants to disclose the true**

**nature of their injuries, Plaintiffs' injuries were not capable of ascertainment until the evidence**

**was such as to place a reasonably prudent person in Plaintiffs' position on notice of a potentially**

**actionable injury.**

50**32**.  The conduct of Defendant as alleged herein was willful, wanton and/or in reckless

disregard for the rights of Plaintiffs and punitive and exemplary damages should be assessed

against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen

Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action,

and for such relief as the Court deems fair and reasonable.

## COUNT II
## NEGLIGENT MISREPRESENTATION (NONDISCLOSURE1

51**33**.  To the extent they are not inconsistent with the allegations in this Count, Plaintiffs

incorporate by reference the allegations set forth in Paragraphs 1 through 53**32** as if fully set forth

herein.

52. Defendant had a common law duty, separate and independent of any CBA, to use ordinary care to make its work environment reasonably safe.

5334. **During the period of their employment,** Defendant owed ~~a non-delegable and non-negotiable duty to maintain a safe working environment, a duty not to expose~~ Plaintiffs ~~to unreasonable risks of harm,~~ a duty to warn ~~employees~~

about the existence of dangers~~, including latent neurologic diseases, of which employees~~ **which Plaintiffs** could not reasonably be expected to be aware~~, and a duty to exercise reasonable care so as not to expose Plaintiffs to unreasonable risk of injury~~ **in**

~~54.      Between September 1, 1987 and March 28, 1993, Defendant and its agents~~

~~represented to Plaintiffs that concussions are not a serious injury.~~

~~55.      Between September 1, 1987 and March 28, 1993, Defendant and its agents~~

~~represented to Plaintiffs that there are no long-term effects of concussions in NFL athletes.~~

~~56.      When Defendant and its agents made these representations to Plaintiffs, the~~

~~representations were driven by profit motives so that Plaintiffs would continue to play unimpeded~~

~~by the risks of latent neurological diseases.~~

~~57.      Between September 1, 1987 and March 28, 1993, Defendant failed to exercise~~

~~reasonable care and competence when communicating this information, and as a result, the~~

~~information presented to Plaintiffs was false and misleading.~~

~~58.      Plaintiffs justifiably relied upon this information since Defendant was in a~~

~~superior position of knowledge and Defendant could foresee that Plaintiffs would rely and~~

~~intended that they do so.~~

~~59.      Defendant's negligent misrepresentations directly caused or directly contributed to~~

~~cause Plaintiffs to suffer from severe and persistent headaches, PCS (e.g. mood, behavior and~~

~~cognitive dysfunction), depression, mood swings, explosivity, and other neurologic/brain harms.~~

**light of their reasonable reliance upon Defendant and, during the period after their employment,**

**Defendant owed Plaintiffs the duty to correct any material misinformation which it knew or**

**should have known was given to Plaintiffs during their employment.**

35. During the relevant period, Defendant was in a position of superior knowledge with regard to the increased risk of neurodegenerative diseases and their onset and symptoms, which was not within the fair and reasonable reach of the Plaintiffs, nor would it have been discovered through the exercise of Plaintiffs' ordinary diligence since Plaintiffs justifiably relied on Defendant to provide material information regarding the risk of developing neurodegenerative diseases and to warn about their onset and symptoms and to correct any material misinformation which it knew or should have known was given to Plaintiffs during their employment.

36. Defendant failed to disclose to Plaintiffs the increased risk of neurodegenerative diseases and their onset and symptoms and failed to exercise reasonable care and competence when communicating, or failing to communicate, information regarding the dangers of repetitive brain trauma.

37. During the period from 1985 to the present, Defendant, including, in particular, William "Bill" Bidwill (the principal owner of Defendant), as well as the team physicians and medical staff, knowingly failed to disclose and/or misrepresented to Plaintiffs the risks of repetitive head trauma, including the risk of developing neurodegenerative diseases, intending that Plaintiffs would rely upon such misrepresentations and/or omissions

38. The risk of developing permanent and debilitating neurodegenerative diseases, such as CTE, and their associated symptoms and manifestations are material facts which Plaintiffs could not reasonably be expected to be aware in light of their reasonable reliance upon Defendant.

39. Plaintiffs' reliance upon Defendant to warn and otherwise provide accurate information regarding the dangers of concussion and sub-concussive injuries and to warn

of the development of neurodegenerative diseases was justified since Defendant was

Plaintiffs'

**employer and therefore owed to Plaintiffs the duty to correct any material misinformation which**

**it knew or should have known was given to Plaintiffs during their employment.**

**40.** **Defendant's negligent misrepresentations** directly caused or directly contributed

to cause Plaintiffs to develop neurodegenerative diseases.

**41.** **Since the true and developing nature of the Plaintiffs' injuries were fraudulently**

**concealed by Defendants, and since Plaintiffs justifiably relied on Defendant to disclose the true**

**nature of their injuries, their injuries were not capable of ascertainment until the evidence was**

**such to place a reasonably prudent person in Plaintiffs' position on notice of a potentially**

**actionable injury.2011, when Plaintiffs were made aware of the risks of** repetitive head trauma.

~~60~~42.  The conduct of Defendant as alleged herein was willful, wanton and/or in reckless

disregard for the rights of Plaintiff and punitive and exemplary damages should be assessed

against the Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen

Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action,

and for such relief as the Court deems fair and reasonable.

### COUNT III
### FRAUDULENT ~~CONCEALMENT~~**MISREPRESENTATION (NONDISCLOSURE)**

~~61~~**43**.  To the extent they are not inconsistent with the allegations in this Count, Plaintiffs

incorporate by reference the allegations set forth in Paragraphs 1 through ~~63~~**42** as if fully set

forth

herein.

62 **44**.  At all relevant times hereto, Defendant was in a position of superior knowledge,

which was not within the fair and reasonable reach of the Plaintiffs, nor would it have been

discovered through the exercise of Plaintiffs' ordinary diligence. **since Plaintiffs justifiably relied**

63.    Between September 1, 1987 and March 28, 1993, Defendant knew that repetitive head trauma in football created a risk of neurological diseases.

64.    Between September 1, 1987 and March 28, 1993, Defendant was aware of, knew and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short term and long term brain injury associated with repetitive head trauma in football, to which Plaintiffs were exposed.

65.    Between September 1, 1987 and March 28, 1993, Defendant had a duty, separate and independent of any CBA, to disclose and/or inform Plaintiffs about these risks.

66.   Between September 1, 1987 and March 28, 1993, Defendant knew that such **on Defendant to provide material information regarding the risk of developing neurodegenerative diseases and warning about its onset and symptoms.**

**45.** **Defendant knew that such** information was material to Plaintiffs, and knew that Plaintiffs would rely upon it for accurate **to inform itself of those matters of scientific knowledge that relate to the hazards of its business and to relay that knowledge to Plaintiffs and to correct any material misinformation which it knew or should have known was given to Plaintiffs during their employment**information.

67.   Between September 1, 1987 and March 28, 1993, Defendant knowingly and **46.** **During the period from 1985 to the present, Defendant, including, in particular, Mr. Bidwill, as well as the team physicians and medical staff, knowingly and** fraudulently concealed from Plaintiffs the risks of repetitive head trauma, including the risk of **developing neurocognitive diseases**latent brain disease, intending that Plaintiffs would rely upon such concealment.

**47.** **Defendant's concealment was effectuated by its refusal to inform Plaintiffs of the dangers known to be associated with repetitive head trauma and by refusing to correct misinformation which it knew or should have known was provided to Plaintiffs.**

**48. Plaintiffs justifiably relied upon the Defendant's concealment and/or nondisclosure of material information until the evidence was such to place a reasonably prudent person in Plaintiffs' position on notice of a potentially actionable injury.**

68.   Between September 1, 1987 and March 28, 1993, Plaintiffs relied upon the Defendant's inaccurate and misleading information.
69**49**.  Defendant's fraudulent concealment directly caused or directly contributed to **cause Plaintiffs to develop neurodegenerative diseases.**

cause Plaintiffs to suffer from severe and persistent headaches, PCS (e.g. mood, behavior and

cognitive dysfunction), depression, mood swings, explosivity, and other neurologic/brain harms.

70**50**.  The conduct of Defendant as alleged herein was willful, wanton and/or in reckless

 disregard for the rights of Plaintiff and punitive and exemplary damages should be

assessed against Defendant.

WHEREFORE, Plaintiffs pray judgment against Defendant in excess of Fifteen

Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action,

and for such relief as the Court deems fair and reasonable.

## COUNT IV
## LOSS OF CONSORTIUM

~~71~~**51**.  To the extent they are not inconsistent with the allegations in this Count,

Plaintiffs-Spouses incorporate by reference the allegations set forth in Paragraphs 1 through ~~73~~**46**

as if fully set forth herein.

~~72~~**52**.  As a result of Defendant's misconduct as alleged herein, Defendant is liable to the

Plaintiffs-Spouses.

~~73~~**53**.   As a direct and proximate result of the carelessness, negligence, and recklessness

of Defendant and of the aforesaid injuries to their husbands, Plaintiffs-Spouses have been

damaged as follows:

    a. They have been and will continue to be deprived of the services, support,

        maintenance, guidance, companionship and comfort of their husbands;

    b. They have been and will continue to be required to spend money for medical care

        and household care for the treatment of their husbands; and

    c. They have been and will continue to be deprived of the earnings of their

        husbands.

    ~~74~~**54**.   The conduct of the Defendant as alleged herein was willful, wanton and/or in

reckless disregard for the rights of Plaintiffs-Spouses and punitive and exemplary damages

should be assessed against Defendant.

WHEREFORE, Plaintiffs-Spouses pray for judgment against Defendant in excess of Fifteen Thousand Dollars ($15,000.00) for actual damages, punitive damages, for the costs of this action, and for such relief as the Court deems fair and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all ~~issues~~**issues** in this matter.

HUMPHREY, FARRINGTON & McCLAIN, P.C.

Kenneth B. McClain,                    #32430

Lauren E. McClain                      #65016

Timothy J. Kingsbury                   #64958

221 West Lexington, Suite 400

Independence, MO 64051

Telephone: (816) 836-5050

Facsimile: (816) 836-8966

kbm@hfmlegal.com


**A/t**

THE KLAMANN LAW
John M. Klamann, MO
Andrew Schermerhorn
Paul D. Anderson, MO
The Klamann Law Firm
Street, Suite 800
**4435 Main St., Suite**
Kansas City, MO 6410
Telephone: (816) 421-
Facsimile: (816) 421-8
**jklamann**@klamannlaw
aschermerhorn

_____                                    /s/ Kenneth B.


ROY GREEN, et al.


            Plaintiffs,
                                         Case No.: 1422-CC00005
      v..
                                         Division No.:
ARIZONA CARDINALS
FOOTBALL CLUB, LLC corporate
successor of
ST. LOUIS FOOTBALL
CARDINALS, INC.

            Defendant.

NOTICE OF VOLUNTARY DISMISSAL

   COMES NOW Plaintiffs Derek Kennard and his wife Denise Kennard and dismisses

without prejudice all claims asserted against the Arizona Cardinals Football Club, LLC, only.

This voluntary dismissal does not dismiss any claims pending against the National Football

League, its related entities, and Riddell Helmets and its related entities.


                                  Respectfully submitted,

/s/ Kenneth B.

HUM PHR EY, FAR RING TON & McC LAIN , P.C. Kenn eth B. McCl ain, Laure n E. McCl ain Timot hy J. Kings bury 2 2 1 W e s t L e

/s/ Kenneth B.

xington, Suite 400

Independence, M

/s/ Kenneth B.

O64051 Telephone: (816) 836-5050 Fa

/s/ Kenneth B.

csimile: (816) 836-8966 kbm@hfmleg

/s/ Kenneth B.

**a**
**l**
**.**
**c**
**o**
**m**

Facsimile: (816) 836-8966

kbmhfmlegal.com

THE KLAMANN LAW FIRM, P.A. John M. Klamann, MO
Andrew Schermerhorn, MO
Paul D. Anderson, MO
The Klamann Law Firm 929 Walnut Street, Suite 800 Kansas City,
64106 Telephone: (816) 421-2626 Facsimile: (816) 421-8686
jklamannklamannlaw.com  aschennerhon@klamannlaw.com
panderson@klamannlaw.com

_/s/ Kenneth B._

| ROY GREEN, et al. | ) | |
|---|---|---|
| Plaintiffs, | ) | |
| v. | ) | CASE NO: 1422-CC00005 |
| | ) | |
| | ) | |
| ARIZONA CARDINALS FOOTBALL CLUB, | ) | |
| LLC, et al. | ) | DIVISION: |
| | ) | |
| Defendant. | ) | |

MOTION FOR APPOINTMENT OF PRIVATE PROCESS SERVER

COMES NOW Plaintiffs and request an order appointing HPS Process Service & Investigations, Inc. and/or its Agent, Martin J. Hueckel, PPS14-0283, as Special Process Server(s) to serve the Summons and Petition for Damages to the above named Defendants.

Respectfully submitted,

/s/ Lauren E. McClain
HUMPHREY, FARRINGTON & McCLAIN, P.C.          #32430
Kenneth B. McClain                           #650I6
Lauren E. McClain                            #64958
Timothy J. Kingsbury
221 W. Lexington, Suite 400
Independence, Missouri 64050
Telephone:    (816) 836-5050
Facsimile:    (816) 836-8966
kbm@hfmlegal.com


THE KLAMANN LAW FIRM, P.A.
John M. Klamann, MO                          #29335
Andrew Schermerhorn, MO                      #62101
Paul D. Anderson, MO                         #65354
The Klamann Law Firm 929
Walnut Street, Suite 800 Kansas
City, MO 64106 Telephone:
(816) 421-2626 Facsimile: (816)
421-8686
iklamann@klamannlaw.com
ascherinerhomklamannlaw.com
pandersonklamannlaw.com


THE POPHAM LAW FIRM,
P.C. Wm. Dirk Vandever, MO                    #24463
712 Broadway, Suite 100
Kansas City, MO 64105
Telephone: (816) 221-2288
Facsimile: (816) 221-3999
dvandever@pophamlaw.com


ATTORNEYS FOR PLAINTIFFS

ROY GREEN, et al. v.

                    Plaintiffs,

                                              CASE NO: 1422-
                                              CC00005

ARIZONA CARDINALS
FOOTBALL CLUB                                 DIVISION:

                    Defendant.

_____

ORDER FOR APPOINTMENT OF PRIVATE PROCESS SERVER

It is hereby ordered that Plaintiffs' Motion for Appointment of Private Process Server is sustained and the above named individuals are hereby appointed to serve process in the above captioned matter.

DATE:

                                        Judge or Circuit Clerk

                              **THE JAMES M. DOWD LAW FIRM, P.C.**
                              **Patrick R. Dowd                    #64820**

_____          _____

**15 N. Gore Ave., Ste. 210**
**Telephone: (314) 961-4442**
**Facsimile: (314) 961-4452**
**Patrickg imdowdlaw.com**

**ATTORNEYS FOR PLAINTIFFS**

| Summary report: | |
|---|---|
| **Litéra® Change-Pro 7.5.0.145 Document comparison done on 12/11/2015 11:22:04 AM** | |
| **Style name:** PW Basic | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2014.01.10 First Amended Complaint.pdf | |
| **Modified filename:** Cardinals 2nd Am. Pet..pdf | |
| **Changes:** | |
| **Add** | 227 |
| Delete | 399 |
| Move From | 47 |
| **Move To** | 47 |
| Table Insert | 3 |
| Table Delete | 3 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 726 |