# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO:<br><br>Adrian L. Robinson, Sr. and Terri J. Robinson as Personal Representatives and Co-Administrators of the Estate of Adrian Lynn Robinson, Jr., DECEASED, et al.,<br><br>         Plaintiffs,<br><br>         v.<br><br>NATIONAL FOOTBALL LEAGUE, INC., et al.<br><br>         Defendants. | No. 2:17-cv-2736-AB |

**MEMORANDUM OF LAW OF DEFENDANTS NATIONAL FOOTBALL LEAGUE, THE NATIONAL FOOTBALL LEAGUE FOUNDATION, AND NFL PROPERTIES LLC IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND <u>OR IN THE ALTERNATIVE TO RE-DESIGNATE THE CASE "UNRELATED"</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 5

    A.    The NFL Collective Bargaining Agreements ................................................ 7

        1.    Player Medical Care Provisions ................................................... 8

        2.    Rule-Making and Player Safety Rule Provisions ....................... 10

        3.    Grievance Procedures ................................................................ 11

        4.    Player Benefits Provisions ........................................................ 11

    B.    The Complaint .............................................................................................. 12

ARGUMENT ................................................................................................................... 14

I.    This Case Is Properly in Federal Court Because Section 301 of the LMRA
Preempts Plaintiffs' Claims .......................................................................................... 14

    A.    Resolution of Plaintiffs' Claims Against the NFL Substantially Depends
Upon Interpretation of the Terms of the CBA ............................................ 17

        1.    Resolution of Plaintiffs' Negligence Claims Requires Interpretation
of Numerous Provisions Addressing Player Health and Safety ................. 17

        2.    Resolution of Plaintiffs' Fraud-Based Claims Requires
Interpretation of Numerous Provisions Addressing Player Health
and Safety .................................................................................. 26

    B.    Plaintiffs' Claims Against the NFL Arise Under the CBA ........................... 30

    C.    Section 301 Preempts Plaintiffs Claims Against NFLP and NFLF ............. 32

    D.    Plaintiffs' Arguments In Support of Remand Lack Merit ........................... 34

        1.    The Complaint Is Based on Conduct Occurring During Robinson's
NFL Career ................................................................................ 34

        2.    Plaintiffs' Fraudulent Concealment Claim Requires a Duty to
Disclose ..................................................................................... 37

        3.    Preemption Does Not Require Contractual Privity ..................... 38

        4.    Plaintiffs Also Misstate the Relevant Legal Standard for Preemption ........ 41

        5.    Defendants Are Not Estopped From Arguing Preemption .......... 44

II.    Plaintiffs' Alternative Motion to  Re-designate the Case "Unrelated" Should be
Denied .......................................................................................................................... 46

III.    Plaintiffs Are Not Entitled To Costs or Attorneys' Fees ........................................... 49

CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allis-Chalmers Corp.* v. *Lueck*,
   471 U.S 202 (1985)............................................................................14, 15, 30

*Althaus* v. *Cohen*,
   756 A.2d 1166 (Pa. 2000) ..........................................................................17

*Am. Planned Communities, Inc.* v. *State Farm Ins. Co.*,
   28 F. Supp. 2d 964 (E.D. Pa. 1998) .............................................................37

*Antol* v. *Esposto*,
   100 F.3d 1111 (3d Cir. 1996)..................................................................15, 30

*Atwater* v. *Nat'l Football League Players' Ass'n*,
   626 F.3d 1170 (11th Cir. 2010) ..............................................25, 27, 28, 41, 44

*Aubrey* v. *Sanders*,
   No. 07-cv-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008)............................26

*Ballard* v. *Nat'l Football League Players' Ass'n*,
   123 F. Supp. 3d 1161 (E.D. Mo. 2015)....................................23, 24, 29, 32

*Barton* v. *House of Raeford Farms, Inc.*,
   745 F.3d 95 (4th Cir. 2014) ......................................................................16

*Beidleman* v. *Stroh Brewery Co.*,
   182 F.3d 225 (3d Cir. 1999)..................................................................15, 26

*Boogaard* v. *Nat'l Hockey League*,
   126 F. Supp. 3d 1010 (N.D. Ill. 2015) ..........................................................26

*Brown* v. *Nat'l Football League*,
   219 F. Supp. 2d 372 (S.D.N.Y. 2002)...................................................6, 7, 31, 43

*Buck* v. *Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006).........................................................................6

*Bush* v. *St. Louis Reg'l Convention*,
   No. 16-cv-250, 2016 WL 3125869 (E.D. Mo. June 3, 2016) ..........................34, 43

*Caterpillar Inc.* v. *Williams*,
   482 U.S. 386 (1987)..................................................................................16

*Cipriano* v. *Phila. Newspaper, Inc.*,
No. CIV A. 98-4751, 1999 WL 135111 (E.D. Pa. Mar. 12, 1999)....................................16, 17

*Clarett* v. *Nat'l Football League*,
369 F.3d 124 (2d Cir. 2004)...........................................................................................7

*Corazzini* v. *Litton Loan Servicing LLP*,
No. 09-cv-0199, 2010 WL 1132683 (N.D.N.Y. Mar. 23, 2010) .......................................17

*Davis* v. *Bell Atl.-W. Virginia, Inc.*,
110 F.3d 245 (4th Cir. 1997) ..........................................................................................7

*DiPilato* v. *Commonwealth Ass'n of Sch. Adm'rs, Local 502*,
588 F. Supp. 2d 631 (E.D. Pa. 2008) .............................................................................50

*Duerson* v. *Nat'l Football League*,
No. 12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012)................................... passim

*E.B.* v. *Liberation Publications, Inc.*,
7 A.D.3d 566 (N.Y. App. Div. 2004) .............................................................................26

*Mazzillo ex rel. Estate of Mazzillo* v. *Banks*,
No. 3742-C, 1987 WL 754879 (Pa. Ct. C.P. Feb. 6, 1987) .............................................31

*Foster* v. *Penn Millers Ins. Co.*,
No. 09-cv-492, 2010 WL 2975748 (D.N.J. July 22, 2010) ...............................................6

*In re Gadolinium Contrast Dyes Prods. Liab. Litig.*,
536 F. Supp. 2d 1380 (J.P.M.L. 2008)............................................................................48

*Gaines* v. *Krawczyk*,
354 F. Supp. 2d 573 (W.D. Pa. 2004) .............................................................................37

*Givens* v. *Tenn. Football, Inc.*,
684 F. Supp. 2d 985 (M.D. Tenn. 2010)......................................................................2, 24

*Gnagey Gas & Oil Co.* v. *Pa. Underground Storage Tank Indemnification Fund*,
82 A.3d 485 (Pa. Commw. Ct. 2013) .............................................................................38

*Gosch* v. *Int'l Chapter of Horseshoers & Equine Trades, Local 947*,
200 F. Supp. 3d 484 (M.D. Pa. 2016) ..............................................................................6

*Green* v. *Arizona Cardinals Football Club*,
21 F. Supp. 3d 1020 (E.D. Mo. 2014).............................................................................42

*Green* v. *Pro Football, Inc.*,
31 F. Supp. 3d 714 (D. Md. 2014) .............................................................................26, 43

*Guerrero* v. *Hovensa LLC*,
   259 F. App'x 453 (3d Cir. 2007) ...................................................43

*Hall* v. *Live Nation Worldwide, Inc.*,
   146 F. Supp. 3d 1187 (C.D. Cal. 2015) ............................................6

*Holmes* v. *Nat'l Football League*,
   939 F. Supp. 517 (N.D. Tex. 1996) ............................................6, 25

*Hughes* v. *BCI Int'l Holdings, Inc.*,
   452 F. Supp. 2d 290 (S.D.N.Y. 2006) .............................................17

*Hyles* v. *Mensing*,
   849 F.2d 1213 (9th Cir. 1988) ...................................................17

*Int'l Bhd. of Elec. Workers* v. *Hechler*,
   481 U.S. 851 (1987) .............................................................15

*Jeffers* v. *D'Allessandro*,
   681 S.E.2d 405 (N.C. Ct. App. 2009) .............................................25

*Joseph M.* v. *Ne. Educ. Intermediate Unit 19*,
   516 F. Supp. 2d 424 (M.D. Pa. 2007) .............................................17

*Jurevicius* v. *Cleveland Browns Football Co. LLC*,
   No. 09-cv-1803, 2010 WL 8461220 (N.D. Ohio 2010)................................43

*Kline* v. *Sec. Guards, Inc.*,
   386 F.3d 246 (3d Cir. 2004)......................................................44

*Kurns* v. *A.W. Chesterton, Inc.*,
   620 F.3d 392 (3d Cir. 2010)..................................................16, 42

*Lance* v. *Wyeth*,
   85 A.3d 434 (Pa. 2014)...........................................................17

*Lingle* v. *Norge Div. of Magic Chef, Inc.*,
   486 U.S. 399 (1988)..............................................................14

*Manti's Transp., Inc.* v. *C.T. Lines, Inc.*,
   68 A.D.3d 937 (N.Y. App. Div. 2009) .............................................38

*Martin* v. *Franklin Capital Corp.*,
   546 U.S. 132 (2005)..............................................................50

*Martin* v. *Watkins*,
   No. 10-cv-0423, 2010 WL 5371341 (W.D. Va. Dec. 22, 2010)..........................40

*In re Maxim Integrated Prods., Inc.*,
   MDL No. 2354, 2015 WL 1757779 (W.D. Pa. Apr. 17, 2015).............................................49

*Maxwell* v. *Nat'l Football League*,
   No. 11-cv-08394, Order (C.D. Cal. Dec. 8, 2011), ECF No. 58 ...................................passim

*McPherson* v. *Tenn. Football, Inc.*,
   No. 07-cv-0002, 2007 WL 5445124 (M.D. Tenn. May 31, 2007) ........................................43

*Meijer, Inc.* v. *Biovail Corp.*,
   No. 08-cv-2431, 2008 WL 2944648 (E.D. Pa. July 31, 2008) ........................................46–47

*Moore* v. *Rite Aid Headquarters Corp.*,
   No. 13-cv-1515, 2013 WL 4833854 (E.D. Pa. Sept. 11, 2013)............................................48

*Mullins* v. *Int'l Union of Operating Eng'rs Local No. 77*,
   214 F. Supp. 2d 655 (E.D. Va. 2002) ............................................................................40, 41

*Nat'l Bldg. Leasing, Inc.* v. *Byler*,
   381 A.2d 963 (Pa. Super. Ct. 1977)..............................................................................37–38

*In re Nat'l Football League Players' Concussion Injury Litig.*,
   307 F.R.D. 351 (E.D. Pa. 2015), *amended*, No. 12-md-02323, 2015 WL
   12827803 (E.D. Pa. May 8, 2015) ............................................................................42, 47, 48

*Negron* v. *Oxford Airport Tech. Servs.*,
   No. 08-cv-4326, 2009 WL 50158 (E.D. Pa. Jan. 7, 2009)....................................................40

*Oliver* v. *Riddell, Inc.*,
   No. 16-cv-4760, 2016 WL 7336412 (N.D. Ill. July 19, 2016) .............................................44

*Ostella* v. *IRBSearch, LLC*,
   No. 12-cv-7002, 2013 WL 5777291 (E.D. Pa. Oct. 24, 2013) .............................................45

*Palsgraf* v. *Long Island R.R.*,
   162 N.E. 99 (N.Y. 1928)....................................................................................................31

*Peek* v. *Phila. Coca-Cola Bottling Co.*,
   No. 97-cv-3372, 1997 WL 399379 (E.D. Pa. July 16, 1997) .........................................23, 31

*Phillips* v. *Nw. Reg'l Commc'ns*,
   669 F. Supp. 2d 555 (W.D. Pa. 2009)...............................................................................17, 39

*Pryzbowski* v. *U.S. Healthcare, Inc.*,
   245 F.3d 266 (3d Cir. 2001).................................................................................................15

*Pudlowski* v. *St. Louis Rams, LLC*,
   829 F.3d 963 (8th Cir. 2016) ................................................................................................6

*Royal Park Invs. SA/NV* v. *Bank of Am. Corp.*,
 941 F. Supp. 2d 367 (S.D.N.Y. 2013)....................................................49

*Schnell* v. *Bank of N.Y. Mellon*,
 828 F. Supp. 2d 798 (E.D. Pa. 2011) ...................................................17

*Sellers* v. *Timoney*,
 No. 01-cv-3760, 2002 WL 32348499 (E.D. Pa. Feb. 7, 2002) ...............47

*Sherfey* v. *Johnson & Johnson*,
 No. 12-cv-4162, 2012 WL 3550037 (E.D. Pa. Aug. 17, 2012) ............46

*Sherwin* v. *Indianapolis Colts, Inc.*,
 752 F. Supp. 1172 (N.D.N.Y. 1990).................................................. passim

*Smith* v. *Houston Oilers, Inc.*,
 87 F.3d 717 (5th Cir. 1996) ...................................................................25

*Smith* v. *Nat'l Football League Players' Ass'n*,
 No. 14-cv-10559, 2014 WL 6776306 (E.D. Mo. Dec. 2, 2014) .......29, 36

*Smith* v. *Renaut*,
 564 A.2d 188 (Pa. Super. Ct. 1989).......................................................37

*Stellar* v. *Allied Signal, Inc.*,
 98 F. Supp. 3d 790 (E.D. Pa. 2015) .......................................................44

*Stringer* v. *Nat'l Football League*,
 474 F. Supp. 2d 894 (S.D. Ohio 2007) .............................................. passim

*Sunderland* v. *R.A. Barlow Homebuilders*,
 791 A.2d 384 (Pa. Super. Ct. 2002).......................................................39

*Tran* v. *Metro. Life Ins. Co.*,
 408 F.3d 130 (3d Cir. 2005)....................................................................27

*Tynes* v. *Buccaneers L.P.*,
 134 F. Supp. 3d 1351 (M.D. Fla. 2015)..................................................43

*United Ass'n of Journeymen* v. *Local 334*,
 452 U.S. 615 (1981)..................................................................................7

*United Steelworkers of Am.* v. *Rawson*,
 495 U.S. 362 (1990)............................................................................31, 40

*USX Corp.* v. *Adriatic Ins. Co.*,
 345 F.3d 190 (3d Cir. 2003)......................................................................6

*Werner* v. *Werner*,
   267 F.3d 288 (3d Cir. 2001) ..................................................................6

*Williams* v. *Chrysler Corp.*,
   163 F.3d 183 (3d Cir. 1998) ................................................................15

*Williams* v. *Nat'l Football League*,
   582 F.3d 863 (8th Cir. 2009) ..........................................25, 27, 28, 30

*Witkowski* v. *Welch*,
   173 F.3d 192 (3d Cir. 1999) ................................................................45

*Youndt* v. *First Nat. Bank of Port Allegany*,
   868 A.2d 539 (Pa. Super. Ct. 2005) ...................................................37

*Zielke* v. *Int'l Bhd. Of Elec. Workers*,
   No. 95-cv-0618, 1998 WL 102565 (N.D. Ill. Feb. 24, 1998) ..............40

*Zilka* v. *Sanctis Const., Inc.*,
   186 A.2d 897 (Pa. 1962) .....................................................................31

*Zinman* v. *Prudential Ins. Co. of Am.*,
   909 F. Supp. 279 (E.D. Pa. 1995) .......................................................45

**STATUTES**

42 Pa. C.S.A. §§ 8301, 8302 ........................................................................14

28 U.S.C. § 1331 ..............................................................................................5

28 U.S.C. § 1367 ............................................................................................15

28 U.S.C. § 1367(a) ....................................................................................5, 32

28 U.S.C. § 1407(a) .......................................................................................48

28 U.S.C. § 1441 ..............................................................................................5

28 U.S.C. § 1446(a) .........................................................................................6

28 U.S.C. § 1447(c) ........................................................................................49

29 U.S.C. § 185(a) .....................................................................................14, 15

**OTHER AUTHORITIES**

Local Rule 40.1 .........................................................................................46, 48

Restatement (Second) of Torts § 550 (Am. Law Inst. 1977)........................37

Defendants National Football League ("NFL"), the National Football League Foundation ("NFLF"), and NFL Properties LLC ("NFLP," and together with the NFL and NFLF, the "NFL Defendants"), respectfully submit this memorandum of law in opposition to the motion to remand or in the alternative to re-designate the case "unrelated" brought by the estate, representatives, and family members of former NFL player Adrian Robinson, Jr. ("Robinson").

## PRELIMINARY STATEMENT

Plaintiffs' motion to remand should be denied because Plaintiffs' claims—contending that the NFL Defendants breached duties to reduce the risks of head injuries to Robinson, and to warn Robinson about such risks during his NFL playing career—are preempted by federal labor law. Thus, this Court has federal subject matter jurisdiction, and removal was proper. *See, e.g.*, *Duerson* v. *Nat'l Football League*, No. 12-cv-2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Maxwell* v. *Nat'l Football League*, No. 11-cv-08394, Order (C.D. Cal. Dec. 8, 2011), ECF No. 58.

Robinson's relationship with the NFL Defendants was governed by a collective bargaining agreement and accompanying NFL Constitution and Bylaws (together, the "CBA"). The CBA contains, among many other terms, terms specifically addressing player health and safety and player medical care. For example, the CBA delegates to the NFL's Clubs and their medical staff the responsibility for treating player injuries, including making "return to play" decisions, and provides for players' rights to compensation and other benefits in the event of injury.

The CBA, like all collective bargaining agreements, is governed by section 301 ("Section 301") of the Labor Management Relations Act ("LMRA"). Section 301 ensures that labor disputes are resolved under a uniform body of federal labor law and adjudicated in accordance with the grievance procedures set forth in collective bargaining agreements. Thus,

Section 301 completely preempts state law claims—including tort claims based in negligence or fraud—the resolution of which is substantially dependent upon or inextricably intertwined with the terms of, or that arise under, a collective bargaining agreement, such as Plaintiffs' claims here.  Federal courts repeatedly, in denying remand motions, have found that claims against the NFL and its Member Clubs like those asserted here are preempted by Section 301 because their resolution requires interpretation of CBA provisions, including provisions relating to player health and safety.  *See, e.g.*, *Duerson*, 2012 WL 1658353; *Givens* v. *Tenn. Football, Inc.*, 684 F. Supp. 2d 985 (M.D. Tenn. 2010); *Maxwell*, No. 11-cv-08394, Order at 1–2.  For the same reasons, federal court jurisdiction is proper here.

Plaintiffs' claims hinge on allegations that the NFL Defendants had a duty to "reduce injury risks in football" and "to disclose to . . . [Robinson] the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions, and sub-concussive blows as well as latent diseases caused by these blows to the head."  (Notice of Removal, Ex. A: Civil Action Compl. ¶¶ 17, 29, *Robinson* v. *Nat'l Football League, Inc.*, No. 17-cv-2736, ECF No. 1 (the "Complaint").)  These claims will require the Court to ascertain what duties, if any, the NFL Defendants owed to Plaintiffs, and the scope of those duties, to determine whether the NFL Defendants acted reasonably.  Because the CBA allocates responsibility—for treating player injuries generally, and making "return to play" decisions specifically—to Member Clubs and their medical staff, a court cannot make such an assessment in a vacuum; it must first consider the scope of such duties, and Plaintiffs' claims therefore are preempted by Section 301.

As two district courts considering claims ultimately transferred to this Court have held, these "physician provisions" of the CBAs "must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish

guidelines or policies to protect the mental health and safety of its players." *Maxwell*, No. 11-CV-08394, Order at 2; *see Duerson*, 2012 WL 1658353, at *4 (determining that any duty to warn imposed on the Clubs and their physicians under the CBA to protect player health and safety "would be one factor tending to show that the NFL's alleged failure to take action to protect [NFL players] from concussive brain trauma was reasonable").

These provisions on player health and safety likewise are integral to the resolution of Plaintiffs' fraud-based claims. These claims, too, rest upon the purported breach of the NFL's alleged duty to disclose to Robinson the risks of repetitive head injuries—a duty that cannot be measured without first considering the preexisting obligations regarding player health and safety in the CBA. Nor can a court determine whether Robinson justifiably relied on information provided by the NFL without first interpreting the CBA's health and safety provisions that allocate to Club physicians the task of providing injury-related information to players, including the risks of continuing to play football.

Plaintiffs' remand arguments do not show otherwise.

First, Plaintiffs erroneously attempt to skirt Robinson's years as an NFL player, arguing that Plaintiffs' claims relate to alleged misconduct over the entirety of Robinson's life. But this argument mischaracterizes the Complaint, which plainly asserts claims based on alleged misconduct during Robinson's career, based on purported duties that could only have been owed to Robinson in his capacity as an NFL player. Indeed, the workers' compensation claim filed in connection with Robinson's death characterizes the underlying injury (chronic traumatic encephalopathy ("CTE"), the same one asserted here), as an "occupational injury" incurred during his time as an NFL player.

Second, Plaintiffs argue that their fraudulent concealment claim does not require a duty to disclose under Pennsylvania law, but at its core, their claim is premised on the NFL Defendants' alleged silence, not concealment, as they do not allege that the NFL Defendants affirmatively took steps to prevent Robinson from learning of the allegedly undisclosed risks, and Plaintiffs do not and cannot dispute that such a duty is required under many states' laws. And in any event, Plaintiffs do not—and cannot—dispute that they must establish justifiable reliance to prove their fraudulent concealment claim, thus requiring interpretation of the CBA.

Third, Plaintiffs argue that they were not in "contractual privity" with the NFL Defendants and thus can avoid preemption under the CBA. But this argument ignores the relevant legal standard. LMRA preemption does not depend on the status of the parties and whether they were signatories to the CBA, but rather depends on whether the resolution of the claims requires interpretation of the CBA. To prevail on their claims—asserted as wrongful death and survival claims under relevant Pennsylvania statutes—Plaintiffs will have to establish that the NFL Defendants owed duties *to Robinson*, failed to act reasonably in carrying out those duties, and that Robinson reasonably relied on the NFL Defendants' alleged misstatements and omissions. Resolution of all of these elements requires interpretation of the CBA.

Fourth, Plaintiffs' remand motion misapprehends the law governing preemption in numerous other ways. Plaintiffs attack the relevance of specific CBA provisions cited by the NFL Defendants on the basis that they do not allege violations of them, but in doing so they entirely misapprehend the relevant legal standards—as preemption does not require, as Plaintiffs wrongly argue, that Plaintiffs allege direct violations of specific CBA provisions; the issue is whether resolution of Plaintiffs' claims is substantially dependent upon an interpretation of the CBA, as is the case here. Nor is it relevant that Plaintiffs purport to assert state law claims;

preemption still applies to such claims for the very same reason: their resolution substantially depends upon analysis of the terms of the CBA.

Finally, Plaintiffs' alternative motion to "re-designate" this case as "unrelated" to this MDL lacks merit. This Court has been presiding over claims similar to Plaintiffs' for many years now, and there is nothing about Plaintiffs' claims that meaningfully distinguishes them from those of any of the other myriad MDL plaintiffs over time, much less the group of opt-out plaintiffs whose claims remain before this Court.

In sum, because Plaintiffs' claims are completely preempted, removal is proper under 28 U.S.C. §§ 1331 and 1441. To the extent that any claim is not preempted, it is properly before this Court pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). Accordingly, Plaintiffs' remand motion should be denied.

## BACKGROUND

The NFL is an unincorporated association of 32 Member Clubs that promotes, organizes, and regulates the sport of professional football in the United States. *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 898 (S.D. Ohio 2007). NFLP is a limited liability company organized under the laws of the State of Delaware and headquartered in New York. (Compl. ¶ 59.) NFLP "serves as the representative of the [NFL and its Clubs] for the licensing of their trademarks and logos." *Licensing Pre-Qualification Terms & Conditions* (last visited Sep. 19, 2017), www.nfl.info/NFLConsProd/Welcome/cpAgreement.htm. NFLF is a non-profit, 501(c)(3) entity headquartered in New York. (Compl. ¶ 54.) Plaintiffs are the daughter, parents, and partner of, and Personal Representatives and Co-Administrators of the estate of, former NFL player Robinson. (*Id*. ¶¶ 44–49.) Robinson played football in the NFL from 2012 through the

2014–15 season and was diagnosed upon death with CTE allegedly caused by "repetitive subclinical and clinical blows to the head" while playing football.  (*Id.* ¶¶ 3, 4, 358, 376, 418.)[1]

On June 16, 2017, Robinson's father (one of Plaintiffs) submitted a workers' compensation claim to the Pennsylvania Department of Labor & Industry, seeking compensation for Robinson's daughter in connection with Robinson's death.  (Ex. 3, Fatal Claim Petition for Compensation by Dependents of Deceased Employees (the "Workers' Compensation Claim").)[2] The claim form defines the relevant injury as CTE, characterizes it as an "occupational disease," and indicates that the date of the relevant injury was September 9, 2012, while Robinson was employed by the Pittsburgh Steelers.  (*Id.* at 1.)

---

[1]   This summary is based on the allegations of Plaintiffs' May 15, 2017 complaint (the "Complaint")—the factual averments of which the NFL Defendants assume to be true for purposes of this motion only—and, where applicable, public records and documents integral to Plaintiffs' claims, including the 2011 CBA, attached as an exhibit to the accompanying Declaration of Dennis L. Curran, dated September 25, 2017 and cited in the form "Ex. __."  This Court may consider the CBA in adjudicating this motion.  *See Duerson*, 2012 WL 1658353, at *4 (considering CBAs in connection with motion to remand); *Maxwell*, No. 11-CV-08394, Order at 1-2 (same); *see also Buck* v. *Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 383–84, 385–87 (S.D.N.Y. 2002) (considering CBA provisions in order to adjudicate NFL's motion to dismiss); *Holmes* v. *Nat'l Football League*, 939 F. Supp. 517, 520 n.2 (N.D. Tex. 1996) (same).

Plaintiffs appear to argue, without citing any case law on point, that because the NFL Defendants did not attach the CBA to their notice of removal, the Court should not consider it.  (Pls.' Mot. at 16–17, *Robinson* v. *Nat'l Football League, Inc.*, No. 17-cv-2736, ECF No. 3.)  Plaintiffs are mistaken.  All that is required for removal is "*a short and plain statement of the grounds for removal*, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action."  28 U.S.C. § 1446(a) (emphasis added); *see Pudlowski* v. *St. Louis Rams, LLC*, 829 F.3d 963, 964, 965 (8th Cir. 2016) (vacating remand order on ground that lower court improperly refused to consider post-removal affidavits, holding that the notice of removal properly contained a short and plain statement for the grounds for removal and "did not need to be accompanied by a submission of evidence"); *Hall* v. *Live Nation Worldwide, Inc.*, 146 F. Supp. 3d 1187, 1198 n.31 (C.D. Cal. 2015) (allowing unattached CBA to be considered for removal, stating that "in determining whether removal jurisdiction exists, the court is not limited to documents attached to the notice of removal").  "[D]etailed grounds for removal need not be set forth in the notice"; all that is required is for the court to be "provided the facts from which removal jurisdiction can be determined."  *USX Corp.* v. *Adriatic Ins. Co.*, 345 F.3d 190, 205 n.12 (3d Cir. 2003) (quoting 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3733 (3d ed. 1998)).  Moreover, even if the notice of removal were somehow defective in failing to attach the CBA—which it is not—the defect is easily cured by NFL Defendants' submission of the CBA with the Curran Declaration.  *See id.* (holding that later-filed affidavits could be considered on motion to remand).

[2]   This Court may consider the contents of this workers' compensation claim in deciding Plaintiffs' motion.  *See USX Corp.*, 345 F.3d at 205 n.12 (considering affidavits submitted in opposition to remand motion); *Werner* v. *Werner*, 267 F.3d 288 (3d Cir. 2001) ("Federal Rule of Evidence 201 empowers a court to take judicial notice of an *adjudicative fact* if that fact is not subject to reasonable dispute." (emphasis in original)); *Gosch* v. *Int'l Chapter of Horseshoers & Equine Trades, Local 947*, 200 F. Supp. 3d 484, 491 (M.D. Pa. 2016) (courts may consider information outside pleadings in adjudicating motions to remand); *Foster* v. *Penn Millers Ins. Co.*, No. 09-cv-492, 2010 WL 2975748, at *3 n.8 (D.N.J. July 22, 2010) (taking judicial notice of proceedings that occurred in the New Jersey Workers' Compensation Division).

A.      **The NFL Collective Bargaining Agreements**

The relationship between the NFL Defendants and Robinson is principally defined by the 2011 CBA, the accompanying NFL Constitution and Bylaws, and the Standard Player Contract, which were operative during Robinson's NFL career.[3]  The CBA is the product of exhaustive arm's-length negotiations between the NFL Management Council ("NFLMC"), the exclusive bargaining representative of the NFL, on the one hand, and the NFLPA, the exclusive bargaining representative of NFL players, on the other hand.  As "the union for professional football players," the NFLPA "[r]epresents all players in matters concerning . . . working conditions and protects their rights as professional football players."  *About the NFLPA*, NFL Players Association (last visited Sept. 19, 2017), https://www.nflplayers.com/about.  The CBA negotiated by the NFLPA and NFLMC, along with the NFL Constitution and Bylaws to which the NFLPA agreed to be bound, "represent[] the complete understanding of the parties on all subjects covered [t]herein."  (Ex. 1, CBA Art. 2 § 4(a).)[4]

---

[3]     Since 1968, the NFL has operated under a CBA with only two exceptions, neither of which is relevant for this matter:  (1) the period between August 31, 1987 and March 29, 1993, when no CBA was in place, following the expiration of the 1982 CBA and prior to the execution of the 1993 CBA; and (2) the period between March 11, 2011 and August 4, 2011.  The 2011 CBA, which governs Robinson's NFL career, became effective on August 4, 2011 and expires in 2020.  (Ex. 1, CBA Preamble & Art. 1.)  In their motion, Plaintiffs question the applicability of the 2010 version of the Constitution and Bylaws to Robinson.  (Pls.' Mot. at 28.)  However, the NFL Constitution and Bylaws became effective on February 1, 1970 and have been revised over time, including the revision as of June 1, 2010, which was the version referenced in the NFL Defendants' Notice of Removal and which was operative throughout Robinson's NFL career (indeed, it was not revised further until 2016).  (*See* Curran Declaration ¶ 3.)  For ease of reference, the NFL Defendants generally refer to the "CBA" throughout this memorandum, but cite, where applicable, to the CBA, the Constitution and Bylaws, and the Standard Player Contract incorporated therein.

[4]     *See* (Ex. 1, CBA Art. 4 § 1); *Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the [CBA], the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein[.]"); *Brown*, 219 F. Supp. 2d at 386 (The NFL "Constitution was bargained over and included within the scope of the CBA."); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1177 (N.D.N.Y. 1990) ("The standard player agreement, which is used for every NFL player as required by Article XII, section 1 of the [1982] CBA, is effectively incorporated by reference in that article."); *see also United Ass'n of Journeymen* v. *Local 334*, 452 U.S. 615, 627 (1981) (union constitutions constitute labor contracts under § 301); *Davis* v. *Bell Atl.-W. Virginia, Inc.*, 110 F.3d 245, 248–49 (4th Cir. 1997) (employee's claim preempted because of need to interpret grievance settlement agreement negotiated by union, dependent on CBA, and "fairly characterized as a rider to the [CBA]").

The CBA covers a broad range of subjects affecting the terms and conditions of employment for NFL players and defines the existence and scope of any purported duties owed to Robinson by the NFL Defendants.  The CBA includes, among other terms, provisions relating to player medical care and safety, rule-making, protective equipment, and dispute resolution.

### 1.      Player Medical Care Provisions

The CBA addresses, in detail, issues relating to assessment, diagnosis, and treatment of player injuries.  For example, the CBA provides that Club physicians have the responsibility for making "return to play" decisions and advising players of the risk of continued performance, and sets forth the qualifications for Club medical staff.  Thus, the CBA provides:

- "If a Club physician advises a coach or other Club representative of a player's serious injury or career threatening physical condition which significantly affects the player's performance or health, the physician will . . . advise the player in writing."  (Ex. 1, CBA Art. 39 § 1(c).)

- "All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards" for players categorized as "Reserve/Injured" on the Reserve List.  (Ex. 2, 2010 NFL Constitution and Bylaws Art. XVII § 17.16(E).)

- "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary . . . ."  (Ex 1, CBA App'x A, Standard Player Contract ¶ 9.)

- "[A]ll other physicians retained by a club to treat players shall be board-certified in their field of medical expertise. . . . Any Club medical physician . . . hired after the effective date of this agreement must also have a Certification of Added Qualification . . . in Sports Medicine."  (*Id.* Art. 39 § 1(a).)

- "[A]ll Club physicians and medical personnel shall comply with all federal, state, and local requirements, including all ethical rules and standards established by any applicable government and/or other authority that regulates or governs the medical profession in the Club's city." (*Id.* Art. 39 § 1(c).)

- "All athletic trainers employed or retained by Clubs . . . must be certified by the National Athletic Trainers Association . . . .  Each Club must have at least two

full-time athletic trainers.  All part-time athletic trainers must work under the direct supervision of a certified athletic trainer." (*Id.* Art. 39 § 2.)

- "The home team shall provide a physician and an ambulance at each game available to both teams.  Said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams." (Ex. 2, 2010 NFL Constitution and Bylaws Art. XIX § 19.5.)

- "The NFL shall develop and implement an online, 24-hour electronic medical record system within 24 months of the effective date of this Agreement or such longer period as the parties may agree." (Ex. 1, CBA Art. 40 § 3.)

- "The parties agree to establish an Accountability and Care Committee, which will provide advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players by all clubs.  The Committee shall consist of the NFL Commissioner and the NFLPA Executive Director (or their designees).  In addition, the Commissioner and Executive Director shall each appoint three additional members of the Committee, who shall be knowledgeable and experienced in fields relevant to health care for professional athletes." (*Id.* Art. 39 § 3(a).)

- "The [Accountability and Care] Committee shall . . . develop a standardized preseason and postseason physical examination and educational protocol to inform players of the primary risks associated with playing professional football and the role of the player and the team medical staff in preventing and treating illness and injury in professional athletes; . . . conduct research into prevention and treatment of illness and injury commonly experienced by professional athletes . . . [and] assist in the development and maintenance of injury surveillance and medical records systems . . . ." (*Id.* Art. 40 § 3(c).)

- "If any player submits a complaint to the [Accountability and Care] Committee regarding Club medical care, the complaint shall be referred to the League and the player's Club, which together shall determine an appropriate response or corrective action if found to be reasonable." (*Id.* Art. 39 § 3(d).)

- "Each Club shall use its best efforts to ensure that its players are provided with medical care consistent with professional standards for the industry." (*Id.* Art. 39 § 3(e).)

The CBA also sets forth player rights and obligations related to medical care.

Thus, the CBA provides:

- "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (*Id.* Art. 50 § 1(d).)

- "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility for the costs of [these] medical services." (*Id.* Art. 39 § 4.)

- "A player will have the right to choose the surgeon who will perform surgery . . . . Any such surgery will be at Club expense . . . ." (*Id.* Art. 39 § 5.)

- "Each player will undergo the standardized minimum pre-season physical examination . . . which will be conducted by the Club physician(s) . . . ." (*Id.* Art. 39 § 6.)

- "Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract . . . ." (*Id.* App'x A ¶ 8.)

- "A player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the preseason and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records without charge upon request during the offseason. A player's personal physician may . . . inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to such player's personal physician." (*Id.* Art. 40 § 2(a).)

### 2. Rule-Making and Player Safety Rule Provisions

The CBA also sets forth the manner in which rules, including rules concerning player safety, are promulgated and enforced. For example, all playing rule changes must be "presented to the [NFL]" or unanimously approved by a "standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes" (Ex. 2, 2010 NFL Constitution and Bylaws Art. XI § 11.2), and consisting of members appointed by the Clubs and the NFLPA. The CBA also provides that the Clubs, the NFLPA, and the NFL all have responsibility for reviewing player safety aspects of playing rules. Thus, the CBA provides:

- "A Joint Committee on Player Safety and Welfare . . . will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects." (Ex. 1, CBA Art. 50 § 1(a).)

10

- "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change.  (*Id.* Art. 50 § 1(c).)

- "The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules.  One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules."  (*Id.* Art. 50 § 2.)

### 3.    Grievance Procedures

The CBA contains a broad arbitration clause providing that all disputes involving "the interpretation of, application of, or compliance with, any provision of" the CBA, player contract, or any applicable provision of the Constitution "pertaining to terms and conditions of employment of NFL players," will be resolved exclusively in accordance with agreed-to arbitration procedures.  Moreover, "injury grievances" are subject to arbitration.  (*Id.* Art. 43 § 1, Art. 44 §§ 1, 6.)  The CBA also expressly forbids players from bringing "any suit against the NFL or any Club with respect to any claim relating to any conduct permitted by [the CBA], or any term of [the CBA]" or "the Constitution and Bylaws of the NFL."  (*Id.* Art. 3 § 2.)

### 4.    Player Benefits Provisions

The CBA also includes provisions regarding the rights of players and former players to compensation and benefits in the event of injuries, including the right to workers' compensation and supplemental disability benefits, as well as certain rights and benefits for eligible retirees.  (*See, e.g.*, *id.* Art. 41, Art. 60, Art. 61, Art. 62.)  For example:

- "A player . . . will receive an Injury Protection benefit . . . [when the] player . . . [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician . . . ."  (*Id.* Art. 45 § 1.)

- "[T]he Disability Plan will be amended to provide a benefit for those eligible Players . . . who have a permanent, neuro-cognitive impairment . . . ."  (*Id.* Art. 65 § 1.)

B.      **The Complaint**

Plaintiffs filed this action in the Court of Common Pleas, Philadelphia Civil Division on May 15, 2017.  The NFL Defendants timely removed Plaintiffs' action to this Court on June 16, 2017, where it was designated as related to, and consolidated with, this MDL.  (*See* Docket Entry re: XYZ CASES ENTERED, dated July 7, 2017, *In re: Nat'l Football League Players' Concussion Injury Litig.*, MDL No. 2323 (J.P.M.L.).)[5]  Plaintiffs' motion to remand followed.

The Complaint—spanning 438 paragraphs and 91 pages—alleges a widespread (and far-fetched) conspiracy that purportedly took place for "decades" (Compl. ¶ 3) in which the NFL, NFLP, NFLF, and various Riddell entities (collectively, "Riddell"), the tobacco industry, and even the U.S. government all allegedly conspired together to conceal information about head injuries and mislead players into believing it was safe to return to play following a concussion.

Specifically, Plaintiffs allege that the NFL Defendants and various Riddell entities somehow fraudulently concealed "decades' worth of science and research" that purportedly "link[ed] concussions and sub-concussive blows to latent brain disease," despite the fact that much of the research cited by Plaintiffs in support of this theory—none of which purports to establish a causal relationship between football and these deficits—was long in the public domain.  (*Id.* ¶¶ 24, 109–26.)  Plaintiffs allege that this conspiracy involved not only the named defendants, but also "international corporations such as Honda" and even "our own federal government."  (*Id.* ¶ 234.)  As purported support, Plaintiffs cite, among other things, the 1969

---

[5]     This Court's April 12, 2017 Order explicitly provided that the Second Amended Master Administrative Long-Form Complaint filed on July 11, 2017 in this MDL ("MDL Complaint") supersedes all claims in complaints by all "non-Settlement Class Member plaintiffs with pending claims" in this MDL, *including* any complaints coordinated or consolidated in this MDL after April 12, 2017.  (Order, 1 n.1 & ¶ 6, Apr. 12, 2017, ECF No. 7477; *see also* Order 1 n.1 & ¶ 2, July 18. 2017, ECF No. 8030.)  If the instant motion is denied, Plaintiffs will remain in this MDL and their claims will be governed by the MDL Complaint.  Their claims therefore should be dismissed for the reasons set forth in the NFL and NFLP's two motions to dismiss that complaint, filed concurrently with this brief.

"Football Injuries Symposia" involving "branches of the United States Military" and various government and academic "luminaries," and other research.  (*Id.* ¶¶ 134, 136.)  Plaintiffs also allege that the NFL supposedly worked with the tobacco industry to perpetuate this scheme.  (*See id.* ¶¶ 16, 17, 191, 199.)

The Complaint alleges that the NFL Defendants owed a duty to "reduce injury risks in football" (*id.* ¶ 17) and to disclose to Robinson "the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions and sub-concussive blows as well as latent diseases caused by these blows to the head."  (*Id.* ¶ 29.)  The Complaint alleges that the NFL Defendants breached these duties by, among other things, negligently or fraudulently failing to "warn" of "substantial risks to the brain from [football]" (*id.* ¶ 7) and "conclud[ing] that it was appropriate for players who suffered a concussion to return to play in the same game or practice in which the concussion occurred" (*id.* ¶ 272), and that concussed players who return to the same game "were at no increased risk of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation." (*Id.* ¶ 236(d).)

The Complaint also alleges that all or some of the NFL Defendants breached their duties to Robinson by "agree[ing] to engage in a long-term plan to conceal material information about football's link to CTE and other neurological/neurobehavioral conditions" (*id.* ¶ 192), failing to adequately track and report head injuries (*id.* ¶¶ 242–44, 346–48), negligently marketing football or "their products" "by presenting [them] as safe" (*id.* ¶¶ 405–06), negligently hiring, retaining and supervising David Viano and thus allowing the MTBI Committee to "mislead the medical community and the general public on the risks associated with repetitive head impacts" (*id.* ¶¶ 423, 425), "brand[ing] (and legitimiz[ing]) knowingly unsafe protective equipment for the purpose of mitigating against MTBI" (*id.* ¶ 15), instituting only "minimal rule

changes" (*id.* ¶ 181) and "fundamentally by failing to actually seek to reduce injury risks in football." (*Id.* ¶ 397.)  At bottom, the fundamental theory behind Plaintiffs' claims is that the NFL breached a duty to protect players from returning to play prematurely post-injury by, among other things, engaging in "sham science" to conceal the risks of long-term head injuries.

Plaintiffs claim that the NFL Defendants' alleged actions caused Robinson to experience neurological and emotional issues, and ultimately to take his own life in 2015, after which he was posthumously diagnosed with CTE.  (*Id.* ¶¶ 375–77.)

Based on their allegations, Plaintiffs purport to assert, pursuant to both the Pennsylvania Wrongful Death Act and the Pennsylvania Survivor Acts (42 Pa. C.S.A. § § 8301, 8302; *see* Compl. ¶¶ 17, 378), claims for conspiracy, fraudulent concealment, and negligence against the NFL Defendants and various Riddell entities; "negligence—marketing" and "negligent hiring/retention/supervision" against the NFL and Riddell; "negligence—licensing" against NFLP and Riddell; and failure to warn against Riddell.  (Compl. ¶¶ 378–438.)  Plaintiffs seek recovery for all available damages arising out of Robinson's alleged cognitive injuries that purportedly were a substantial factor in his death.  (*Id.* ¶¶ 377, 378, 384.)

## **ARGUMENT**

### I.
### THIS CASE IS PROPERLY IN FEDERAL COURT BECAUSE SECTION 301 OF THE LMRA PREEMPTS PLAINTIFFS' CLAIMS

Section 301 of the LMRA governs "[s]uits for violation of contracts between an employer and a labor organization[.]"  29 U.S.C. § 185(a).  The Supreme Court has interpreted this statute to "mandate[] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable consistent resolution of labor-management disputes."  *Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 & 404 n.3 (1988); *see Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 210–11 (1985) (allowing CBA

terms to be given "different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements").

Accordingly, Section 301 preempts all state law claims, the resolution of which is "substantially dependent" upon or "inextricably intertwined" with an interpretation of the terms of a collective bargaining agreement, or that arise under a collective bargaining agreement.  29 U.S.C. § 185(a) (codifying section 301(a)); *Allis-Chalmers*, 471 U.S. at 213, 220; *Beidleman* v. *Stroh Brewery Co.*, 182 F.3d 225, 231–32 (3d Cir. 1999); *Antol* v. *Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996).  It makes no difference that the claim is pled as a tort because a plaintiff is "precluded from evading the pre-emptive force of § 301 by casting her claim as a state-law tort action."  *Int'l Bhd. of Elec. Workers* v. *Hechler*, 481 U.S. 851, 862 (1987).  If the resolution of *any one* of Plaintiffs' claims substantially depends upon an interpretation of the terms of (or a claim arises under) the CBA, federal subject matter jurisdiction exists, and removal was proper. *See, e.g.*, *Duerson*, 2012 WL 1658353, at *6.

Moreover, as long as at least one federal claim is present, this Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.  *See Pryzbowski* v. *U.S. Healthcare, Inc.*, 245 F.3d 266, 275–76 (3d Cir. 2001) (holding that district court had authority to exercise supplemental jurisdiction over claims against pendent parties because "[section 1367(a)] authorizes a district court to exercise supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *Williams* v. *Chrysler Corp.*, 163 F.3d 183, 185 (3d Cir. 1998) ("The district court had federal question jurisdiction under . . . section 301 of LMRA . . . [and] supplemental jurisdiction over the state contract claims under 28 U.S.C. § 1367."); *see also Duerson*, 2012 WL

1658353, at *6 ("Federal jurisdiction thus exists over [Duerson's negligence] claim, and the court can exercise supplemental jurisdiction over the rest of Duerson's claims.").

In an attempt to evade these basic principles, Plaintiffs argue that their claims are not preempted because they have not explicitly alleged breaches of duties contained in the CBA and their claims arise under Pennsylvania law, and that their claims cover "the entirety of decedent's life—a period of 25 years involving less than three full years of professional NFL football." (Pls.' Mot. at 20, 24–29.)

Plaintiffs' arguments misrepresent the law and the NFL Defendants' basis for removal. Complete preemption under the LMRA is "an 'independent corollary' to the well-pleaded complaint rule . . . that [ ] 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc.* v. *Williams*, 482 U.S. 386, 393 (1987) (quoting *Franchise Tax Bd. of Cal.* v. *Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 22 (1983) and *Metropolitan Life Ins. Co.* v. *Taylor*, 481 U.S. 58, 65 (1987)). Section 301 has complete preemptive force. And under the "artful pleading" doctrine, the Court may "look beyond the plaintiff's allegations to the substance of the plaintiff's complaint because a plaintiff 'may not defeat removal by failing to plead necessary federal questions.'" *Cipriano* v. *Phila. Newspaper, Inc.*, No. CIV A. 98-4751, 1999 WL 135111, at *3 (E.D. Pa. Mar. 12, 1999) (quoting *Meier* v. *Hamilton Standard Elec. Sys., Inc.*, 748 F. Supp. 296, 299 (E.D. Pa. 1990) and citing *Franchise Tax Bd.*, 463 U.S. at 22). One "may not merely rebrand a claim in order to avoid preemption." *Kurns* v. *A.W. Chesterton, Inc.*, 620 F.3d 392, 398 n.8 (3d Cir. 2010). What matters is the true gravamen of Plaintiffs' action. *See Barton* v. *House of Raeford Farms, Inc.*, 745 F.3d 95, 107 (4th Cir. 2014) (stating that a plaintiff "may not 'evade the requirements of § 301' through artful pleading" (quoting *Allis-Chalmers*, 471 U.S.

16

at 211)); *Hyles* v. *Mensing*, 849 F.2d 1213, 1216 (9th Cir. 1988) ("To determine whether section 301 preempts a state tort claim, we do not look to how the complaint is cast.").

Here, consistent with a long line of cases holding that player tort claims against the NFL and/or its Clubs are preempted under Section 301, the "substance of the . . . complaint" makes clear that the resolution of Plaintiffs' claims substantially depends upon interpretation of provisions in the CBA, or the claims arise out of the CBA. *See Cipriano*, 1999 WL 135111, at *3. Accordingly, Plaintiffs' claims are completely preempted, and federal jurisdiction is proper.

A.    **Resolution of Plaintiffs' Claims Against the NFL**
      **Substantially Depends Upon Interpretation of the Terms of the CBA**

      1.    **Resolution of Plaintiffs' Negligence Claims Requires Interpretation**
            **of Numerous CBA Provisions Addressing Player Health and Safety**

      Plaintiffs'    claims    against    the    NFL    for    negligence    and    negligent hiring/retention/supervision all require Plaintiffs to establish that the NFL assumed, and then breached, a duty of care.[6]  Such claims are premised, at their core, on purported duties to "reduce injury risks in football" (Compl. ¶ 17) and "to disclose to . . . decedent the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions and sub-concussive blows as well as latent diseases caused by these blows to the head" (*id.* ¶ 29).   Each claim is thus preempted because determining whether the NFL in fact owed any such duties to Plaintiffs,

---

[6]    "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Althaus* v. *Cohen*, 756 A.2d 1166, 1168 (Pa. 2000).  "Negligence" is an element of Plaintiffs' negligent hiring/retention/supervision claims.  *See Schnell* v. *Bank of N.Y. Mellon*, 828 F. Supp. 2d 798, 806 (E.D. Pa. 2011); *Corazzini* v. *Litton Loan Servicing LLP*, No. 09-cv-0199, 2010 WL 1132683, at *8 (N.D.N.Y. Mar. 23, 2010); *Joseph M.* v. *Ne. Educ. Intermediate Unit 19*, 516 F. Supp. 2d 424, 447 (M.D. Pa. 2007); *Hughes* v. *BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 303 (S.D.N.Y. 2006); *Lance* v. *Wyeth*, 85 A.3d 434, 458 (Pa. 2014).  Similarly, to the extent that Plaintiffs assert their negligence claims as wrongful death and survival claims (Compl. ¶ 378), such claims sound in negligence, and they, too, require proof of a breach of duty.  *Phillips* v. *Nw. Reg'l Commc'ns*, 669 F. Supp. 2d 555, 578, 582 (W.D. Pa. 2009), *aff'd*, 391 F. App'x 160 (3d Cir. 2010).  Because choice of law is "largely irrelevant" to the question of LMRA preemption, *see Duerson*, 2012 WL 1658353, at *3, this Court need not conduct a choice of law analysis at this stage.  The NFL Defendants primarily cite to the substantive law of Pennsylvania, the forum state and alleged place of decedent's death, and New York, the NFL Defendants' domiciliary.  By citing to such law for illustrative purposes, however, the NFL Defendants do not take a position on which jurisdiction's laws apply to the underlying claims at issue here, and reserve all arguments and defenses with respect to choice of law issues.

assessing the scope of any such duties, and deciding whether the NFL acted reasonably in discharging any such duties would substantially depend upon an interpretation of the health and safety provisions of the CBA that address the conduct about which Plaintiffs complain. To the extent that Plaintiffs are arguing that the NFL's arguments are in the nature of a defense (Pls.' Mot. at 24)—and their argument is far from coherent—they are mistaken. As part of their affirmative case, Plaintiffs will need to establish the existence and scope of the alleged duties and standard of care, as well as a failure by the NFL to carry out such duties with reasonable care, all of which require interpretation of the CBA. *See Duerson*, 2012 WL 1658353, at *5 ("Establishing the standard of care that a defendant must meet to avoid liability is an element of a negligence claim that the plaintiff must establish, not a defense. Accordingly, the CBA provisions are relevant to [plaintiff's] claim, not to an affirmative defense.").

First, regarding the NFL's alleged duties to "reduce injury risks in football" and disclose to Robinson the risks of repetitive head injuries, its alleged failure to warn of such risks, its alleged conclusions about the appropriateness of concussed players returning to play in the same game in which the concussion occurred, and its alleged failure to adequately track and report head injuries (Compl. ¶¶ 7, 17, 29, 236(d); 272, 242–44, 346–48), the CBA attributes to the Clubs responsibility for treating player injuries, determining recovery times, making return-to-play decisions, and warning players of the risks of continued performance. Accordingly, a determination of whether the NFL failed to exercise reasonable care, which depends first on the assessment of what, if any, duty was owed, cannot be made without first determining the scope of the duties placed on Club medical staff by the CBA. For example, if Robinson's alleged medical conditions were ones that could "significantly affect[] [his] performance or health" (Ex. 1, CBA Art. 39 § 1(c)), the Clubs' medical staff may have had a duty to warn him before he

18

returned to play, which "would be one factor tending to show that the NFL's alleged failure to take action to protect [Robinson] from concussive brain trauma was reasonable." *Duerson*, 2012 WL 1658353, at *4.

   For the same reasons, the Court would also first need to interpret the scope of the duty imposed by the CBA provisions charging Club medical staff with primary responsibility over player injuries and return-to-play decisions, including provisions stating that "[a]ll determinations of recovery time for . . . injuries" are to be made "by the club's medical staff and in accordance with the club's medical standards" and that give Club physicians discretion to determine the medical care appropriate for player injuries.  (Ex. 2, 2010 NFL Constitution and Bylaws Art. XVII § 17.16(E); Ex. 1, CBA Appx. A § 9.)  *See Maxwell*, No. 11-cv-08394, Order at 1–2 ("The CBA places primary responsibility for identifying . . . physical conditions on the team physicians . . . .   The physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players.").  Or if the Clubs and their medical staff had a duty to accurately diagnose, record, and track data on player injuries, that necessarily would impact the extent to which the NFL's alleged failure to do so (*see* Compl. ¶¶ 242–44, 346–48) was reasonable.  *See Maxwell*, No. 11-cv-08394, Order at 1–2 (premised in part on allegations that the NFL failed "to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner," concussion-related negligence claims were preempted because of need to take physician and trainer provisions of CBA into account).

   Moreover, the CBA provisions requiring Clubs to provide physicians and ambulances at all games and pay the costs of certain medical care for their players, and requiring

Club physicians to perform a pre-season physical examination could be interpreted "to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could reasonably rely on the clubs to notice and diagnose player health problems arising from playing in the NFL." *Duerson*, 2012 WL 1658353, at *4.

Another provision that must be interpreted in assessing the scope of the NFL's alleged duties includes the certification requirements imposed by the CBA on the Club medical staff, including provisions requiring that head trainers be certified by the National Athletic Trainers Association and that Club physicians be certified in sports medicine. (Ex. 1, CBA Art. 39 § 1–2.) If, as part of these certifications—and attendant education, training, and experience—Club trainers and physicians received instruction on the risks of repetitive head impacts, then the degree of care owed by the NFL in warning players about these issues necessarily would be diminished. *See Maxwell*, No. 11-cv-08394, Order at 1–2 ("CBA provisions relating to the teams' athletic trainers" would need to be taken into account in resolving plaintiff's concussion-related claims); *Stringer*, 474 F. Supp. 2d at 910 ("If, by virtue of the certification process, the trainers are fully prepared to handle heat-related illnesses, the degree of care owed by the NFL in publishing the Hot Weather Guidelines is diminished."). The same is true with respect to the CBA provisions requiring Club medical staff to comply with federal, state, and local requirements, including ethical rules and standards, and requiring Clubs to provide medical care consistent with professional standards. (*See* Ex. 1, CBA Art. 39 § 1(c), § 3(d).) To the extent such requirements, rules, and standards provide guidance on treatment and risks related to repetitive head impacts, that would shape the duty of care, if any, owed by the NFL Defendants.

Simply put, "the degree of care owed cannot be considered in a vacuum," but "must be considered in light of pre-existing contractual duties imposed by the CBA on the

individual NFL clubs concerning the general health and safety of the NFL players." *Stringer*, 474 F. Supp. 2d at 910.

Second, regarding Plaintiffs' allegation that the NFL breached its alleged duties by instituting only "minimal rule changes" (Compl. ¶ 181) and "fundamentally by failing to actually seek to reduce injury risks in football" (*id.* ¶ 397), including with respect to the safety of playing equipment, a court must also consider the scope of any duties owed by the players' union in order to measure the scope of the NFL's alleged duties.  Thus, the CBA establishes the "Joint Committee on Player Safety and Welfare," comprised of three Club representatives and three NFLPA representatives, "for the purpose of discussing the player safety and welfare aspects of playing equipment, . . . playing rules, and any other relevant subjects."  (Ex. 1, CBA Art. 50 § 1(a).)  The CBA further mandates that "[i]f the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate, and to "request an advisory decision" by an arbitrator regarding the proposed change.  (Ex. 1, CBA Art. 50 § 1(c).) Because the CBA expressly addresses responsibility for promulgating, reviewing, and investigating playing rules affecting player health and safety, the provisions of the CBA must first be interpreted to determine the scope of the duties imposed on the NFL.

The CBA also provides NFL players and the NFLPA with additional rights relating to health and safety issues, including rights over their own individualized medical treatment and rights to investigate broader issues of player safety.  (*See, e.g.*, Ex. 1, CBA Art. 50 § 1(d) (empowering the NFLPA "to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety"); *id.* Art. 39 § 3 (giving players the right to submit complaints regarding Club medical care to Accountability and Care Committee); *id.* Art. 39 § 4 (providing that "[a] player will have

the opportunity to obtain a second medical opinion" at Club expense); *id.* Art. 39 § 5 (guaranteeing a player's "right to choose the surgeon who will perform surgery" on player); *id.* Art. 40 § 2 (providing current and former players, and their personal physicians, access to their medical and trainers' records); *id.* Art. 50 § 2 (permitting NFLPA to appoint two attendees, one with voting rights, to attend annual Competition Committee meeting regarding playing rules).)

Third, the CBA created a joint Accountability and Care Committee, consisting of the NFL Commissioner and NFLPA Executive Director (or their designees) and their appointees, to provide guidance regarding player medical care, including developing a physical examination and education protocol to inform players of risks associated with professional football and treatment of injuries, conducting "research into prevention and treatment of illness and injury commonly experienced by professional athletes," and "assist[ing] in the development and maintenance of injury surveillance and medical records systems."  (Ex. 1, CBA Art. 39 § 3.)  To the extent that this Committee has certain duties to research player injuries and improve player medical care, it bears directly on the scope of the NFL's alleged duties.

Finally, a court cannot determine whether the NFL breached its purported duty to properly staff the MTBI Committee, or acted unreasonably in purportedly hiring and retaining Dr. David Viano or any other member of that Committee, without interpreting CBA provisions addressing the duty to warn and creating committees responsible for player safety issues.  (*See, e.g.*, Ex. 1, CBA Art. 39 § 1(c) (designating Club physicians with primary responsibility to warn players of risks of continued performance); *id.* Art. 50 § 1(a), (c) (establishing Joint Committee on Player Safety and Welfare, to include three NFLPA representatives); *id.* Art. 39 § 3 (establishing Accountability and Care Committee).  If Club medical staff, the NFLPA, or a CBA-created committee were tasked to provide information regarding, or to examine, "repetitive

22

subclinical and clinical blows to the head (or MTBI)" (Compl. ¶ 398), then the duties owed by the NFL in hiring and retaining members of the MTBI Committee would be diminished. *See Peek* v. *Phila. Coca-Cola Bottling Co.*, No. 97-cv-3372, 1997 WL 399379, at *1, *6 (E.D. Pa. July 16, 1997) (claim of negligent hiring of third-party investigator preempted under Section 301); *see also Ballard* v. *Nat'l Football League Players' Ass'n*, 123 F. Supp. 3d 1161, 1172 (E.D. Mo. 2015) (because alleged duty to properly staff MTBI Committee was "derived from the CBAs and not owed to the public at large," resolution of negligent hiring and retention claims concerning MTBI Committee "necessarily depend[s] upon an analysis of [CBA] provisions to determine whether the CBAs impose such a duty [to properly staff the MTBI Committee] and whether they specify a standard of care").

Consistent with settled labor law precedent, a long line of NFL preemption cases have held that resolution of player-injury claims substantially depends on CBA terms addressing player safety, thereby confirming that Plaintiffs' claims are preempted here.  For example, in *Duerson*, a wrongful death suit, plaintiff alleged, similar to Plaintiffs here, that the NFL assumed a duty to its players "to ensure [their] safety," and breached this duty by, among other things "failing to educate players about the risks of concussions and the dangers of continuing to play after suffering head trauma . . . , and failing to implement policies to prevent [plaintiff] from returning to play with his injuries."  2012 WL 1658353, at *1, *3; (*cf.* Compl. ¶¶ 17, 29, 272, 397.)  Rejecting plaintiff's arguments, the court held that resolution of plaintiff's negligence claim would require interpretation of several CBA provisions concerning player health and safety.  Because one could "plausibly interpret those provisions to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football," such that the "NFL could then reasonably exercise a lower standard of care in that area itself," the court concluded

that the claims were preempted.  2012 WL 1658353, at *4.  In *Maxwell* v. *Nat'l Football League*, the court considered similar claims and held that because the "CBA places primary responsibility for identifying . . . physical conditions on the team physicians," the "physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."  *Maxwell*, No. 11-cv-08394, Order at 1–2.

Further, in *Stringer* v. *National Football League*, the court held that a wrongful death claim against the NFL—premised on the NFL's alleged failure to ensure "adequate care and monitoring of players suffering from heat-related illness" and "regulation of . . . return to practice"—was preempted because the "CBA places primary responsibility for identifying [certain] physical conditions on the team physicians," and those provisions "must . . . be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances."  *Stringer*, 474 F. Supp. 2d at 903–04, 910–11.  And in a recent case brought by players against the NFLPA concerning the union's alleged concealment and misrepresentation of risks associated with head impacts, the court found preempted by Section 301 negligent misrepresentation, negligence, and negligent hiring and retention claims.  *See Ballard*, 123 F. Supp. 3d at 1170–72 (NFLPA's alleged duty to disclose purported links between football injuries and neurocognitive problems would "necessarily require an analysis of the various CBAs," as would any determination of justifiable reliance by the players).

*Duerson*, *Maxwell*, *Stringer*, and *Ballard* are all consistent with numerous other decisions holding that NFL player claims against the NFL or its Clubs relating to duties imposed by the CBAs are preempted because their resolution would require interpretation of CBA terms.  *See, e.g.*, *Givens*, 684 F. Supp. 2d at 990–91 ("The questions raised by the Complaint, such as

whether a physician's failure to advise a player of his medical condition should be imputed to the club or whether the club has a duty independent of the physician to advise a player of his medical condition, are 'inextricably intertwined' with the provisions of the CBA."); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. at 1177–78 (former player's claims that Club provided negligent medical treatment and fraudulently concealed the extent of player's injury were preempted because Club "did not owe a duty to provide medical care to the plaintiff independent of the relationship established in the" CBAs); *Jeffers* v. *D'Allessandro*, 681 S.E.2d 405, 412 (N.C. Ct. App. 2009) (former NFL player's negligent retention and intentional misconduct claims against Club concerning knee surgery preempted because resolution of the claims was substantially dependent upon an analysis of CBA provisions setting forth Clubs' and players' rights and duties in connection with medical care); *see also Atwater* v. *Nat'l Football League Players' Ass'n*, 626 F.3d 1170, 1182 (11th Cir. 2010) (former players' negligence and negligent misrepresentation claims preempted because court "would . . . have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship"); *Williams* v. *Nat'l Football League*, 582 F.3d 863, 881 (8th Cir. 2009) (negligence claim against the NFL preempted because "whether the NFL . . . owed the Players a duty to provide . . . a warning [that a supplement contained a banned substance under the NFL Drug Policy] cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy"); *Smith* v. *Houston Oilers, Inc.*, 87 F.3d 717, 719–21 (5th Cir. 1996) (players' claims for coercion, duress, extortion, and assault and battery preempted); *Holmes* v. *Nat'l Football League*, 939 F. Supp. 517, 527–28 (N.D. Tex. 1996) (player's claims for fraudulent inducement, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and invasion of privacy

preempted); *cf. Boogaard* v. *Nat'l Hockey League*, 126 F. Supp. 3d 1010, 1019 (N.D. Ill. 2015) (plaintiff's claims that NHL breached duty to keep players safe, including from brain trauma, preempted because scope of any duty on NHL's part depended on interpretation of CBA).

In sum, the adjudication of Plaintiffs' claims necessarily and substantially would depend on an interpretation of the terms of the CBA because a court cannot evaluate the purported duties owed by the NFL, the scope of the NFL's purported duties, or whether the NFL acted "reasonably" without first considering the obligations regarding player health and safety imposed by the CBA.

> **2.    Resolution of Plaintiffs' Fraud-Based Claims Requires Interpretation of Numerous CBA Provisions Addressing Player Health and Safety**

Plaintiffs' claims for fraudulent concealment and civil conspiracy are also preempted, as resolution of each would require interpretation of the same CBA provisions. A duty to disclose is an essential element of a fraudulent concealment claim. *See Aubrey* v. *Sanders*, No. 07-cv-0137, 2008 WL 4443826, at *5–6 (W.D. Pa. Sept. 26, 2008); *E.B.* v. *Liberation Publications, Inc.*, 7 A.D.3d 566, 567 (N.Y. App. Div. 2004). Because Plaintiffs' civil conspiracy claim is premised on fraudulent concealment, it, too, thus requires proof of a duty to disclose.[7] In addition, Plaintiffs' fraud-based claims require a showing of justifiable reliance. *Aubrey*, 2008 WL 4443826, at *5–6. Because resolution of both elements would substantially depend upon an interpretation of the CBA provisions discussed above, these claims, too, are preempted.

---

[7]    Plaintiffs' citation to *Green* v. *Pro Football, Inc.*, 31 F. Supp. 3d 714 (D. Md. 2014) (Pls.' Mot. at 21) is of no moment; a holding that a conspiracy claim based on an illegal "bounty" program was not preempted does not stand for the proposition that conspiracy claims—which are always based on agreements to commit unlawful acts—can never be preempted. *See Beidleman*, 182 F.3d at 236 (conspiracy claim preempted under Section 301).

First, because these fraud-based claims are founded on the same alleged duty as Plaintiffs' negligence claims, the same analysis applies here.  Plaintiffs allege that the NFL had a "duty to disclose to [Robinson] the true character, quality, and nature of risks and dangers of repetitive head injuries, concussions and sub-concussive blows as well as latent diseases caused by these blows to the head" (Compl. ¶ 29) yet intentionally concealed such information regarding "cognitive and behavioral risks" in football that, had he known such information, would have caused Robinson to "ma[ke] different decisions regarding exposures" to head impacts.  (*Id.* ¶¶ 389–91.)  Because a court cannot evaluate the scope of the NFL's purported duties without first considering the obligations regarding player health and safety imposed by the CBA, resolution of these claims, too, substantially depends upon an interpretation of the terms of the CBA.  See *Atwater*, 626 F.3d at 1182–83 (negligent misrepresentation claim preempted because interpretation of CBA was necessary to determine scope of any duty to provide information); *see supra* Section I.A.1.

Second, Plaintiffs' fraud-based claims require a showing of justifiable reliance, but the Court cannot determine whether Robinson justifiably relied on information provided by the NFL (or alleged concealment of information) without first interpreting the CBA's health and safety provisions.  *See, e.g.*, *Williams*, 582 F.3d at 881 ("The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation) are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy.").  In adjudicating a fraud claim, courts must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable."  *Tran* v. *Metro. Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005)

(citations omitted).  Numerous provisions, discussed above, delineate that relationship here and thus must be considered to resolve the question of justifiable reliance.

For example, a court cannot determine whether Robinson justifiably relied on the NFL's alleged misrepresentations and omissions without first interpreting the CBA provisions addressing responsibility for treating player injuries and informing players about such injuries, including decisions regarding "recovery time" for injuries (*see, e.g.*, Ex. 2, 2010 NFL Constitution and Bylaws Art. XVII § 17.16(E) ("All determinations of recovery time for . . . injuries must be by the Club's medical staff and in accordance with the Club's medical standards."); Ex. 1, CBA Art. 39 § 1(c)), and provisions entitling players "to obtain a second medical opinion" or to "examine . . . medical and trainers' records in the possession of the Club or Club physician" (*see, e.g.*, Ex. 1, CBA Art. 39 § 4 (allowing for second medical opinions at Club expense); *id.* Art. 40 § 2 (providing for player access to medical records, including copies to players' personal physicians)).

Similarly, the CBA provides that when a player's "physical condition . . . significantly affects the player's performance or health, the physician will . . . advise the player in writing."  (Ex. 1, CBA Art. 39 § 1(c).)  A court could reasonably determine that Robinson's purported reliance on the NFL to provide generic warnings regarding brain injuries was not reasonable if the parties to the CBA had already determined that warnings were to be provided by the Club physician.  *See, e.g.*, *Williams*, 582 F.3d at 881 (players' fraud claim—that NFL knew a supplement contained a banned substance but failed to warn players—was "preempted because the Players cannot demonstrate the requisite reasonable reliance . . . without resorting to the CBA," which tasked players with responsibility for knowing the contents of supplements); *see also Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim preempted

because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language"); *Sherwin*, 752 F. Supp. at 1178 (fraud claim against Club preempted because "the court cannot resolve plaintiff's fraud and negligent misrepresentation claims without reference to" provisions of the CBA establishing "the duty of a club physician, and arguably the club," to inform player of adverse physical conditions).

Similar provisions that may require interpretation to resolve such claims include those establishing the "Joint Committee on Player Safety and Welfare" "for the purpose of discussing the player safety and welfare aspects of playing equipment [and] playing rules," and those establishing the Accountability & Care Committee, tasked with providing "advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players." (Ex. 1, CBA Art. 39 § 3 & Art. 50 § 1(a), (c).) To the extent that these joint committees, which include Robinson's union representatives, were specifically charged with responsibility in the area of player safety, his reliance on the NFL in the same area may not have been reasonable. Indeed, in two recent cases brought by players against the NFLPA concerning the union's alleged concealment and misrepresentation of risks associated with head impacts, the court found players' negligent misrepresentation claims preempted by Section 301 because the determination of players' justifiable reliance would "substantially depend on interpretation of the CBA," including provisions relating to the Accountability and Care Committee. *Ballard*, 123 F. Supp. 3d at 1170 (negligent misrepresentation claim preempted because question of players' justifiable reliance on NFLPA's statements about risks of head impacts depended upon interpretation of the CBAs); *Smith* v. *Nat'l Football League Players' Ass'n*, No. 14-cv-10559, 2014 WL 6776306, at *8 (E.D. Mo. Dec. 2, 2014) ("The justification [for players' reliance] may exist, but it will substantially depend upon interpretation of the CBA.").

In sum, resolution of Plaintiffs' fraud-based claims substantially depends on an interpretation of the CBA's terms.

**B.   Plaintiffs' Claims Against the NFL Arise Under the CBA**

Plaintiffs' claims against the NFL also are preempted by Section 301 because they are premised on rights and obligations that arise under the CBA. *See Allis-Chalmers*, 471 U.S. at 213 ("state-law rights and obligations that do not exist independently of [collective bargaining] agreements" are preempted); *Williams*, 582 F.3d at 874; *Antol*, 100 F.3d at 1117 ("[C]laims based squarely on a collective bargaining agreement or requiring analysis of its terms are preempted . . . ."). Plaintiffs argue that their claims "assert duties arising from Pennsylvania law" and do not arise out of the CBA (Pls.' Mot. at 20–28), but Plaintiffs are incorrect.

The CBA establishes the duties of the NFL and its Clubs to provide medical care to NFL players. (*See* Ex. 1, CBA Art. 39 §§ 1–2.) Similarly, the CBA acknowledges the role of the NFL and its Clubs in implementing and enforcing rules regarding professional football generally, and health and safety-related rules in particular. Indeed, the CBA provides that the NFL and its Clubs have the obligation to "amend[] or change[]" all NFL "[p]laying rules" and to address safety issues relating to playing equipment. (*See* Ex. 2, 2010 NFL Constitution and Bylaws Art. XI § 11.2; Ex. 1, CBA Art. 50 § 1(a) (forming the "Joint Committee on Player Safety and Welfare," which is tasked with addressing "the player safety and welfare aspects of playing equipment . . . [and] playing rules"); *id.* Art. 50 § 1(b), (c) (empowering the NFLPA to investigate potentially hazardous rules and mandating procedures for review, investigation and resolution of disputes involving proposed rule changes that "would adversely affect player safety").) The CBA also provides that the NFL will establish an electronic medical records system. (Ex. 1, CBA Art. 40 § 3.) Thus, the NFL's alleged duty "to "reduce injury risks in football" (Compl. ¶ 17) would expressly arise under the CBA.

That this purported function arises under the CBA is confirmed by the fact that no such duty exists independent of the CBA:  the NFL does not owe duties to promulgate rules regarding player health and safety to "every person in society."  *See United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 371 (1990) (holding a state law right arises outside of a CBA where defendant is "accused of acting in a way that might violate the duty of reasonable care owed to every person in society"); *Brown* v. *Nat'l Football League*, 219 F. Supp. 2d at 380 (citing *Rawson*, 495 U.S. at 362) (distinguishing between duties owed only to employees covered by CBA and duties owed to members of the public); *Peek*, 1997 WL 399379, at *6 (holding that plaintiff's negligence and gross negligence claims did not derive from a general duty of care owed to all persons); *Sherwin*, 752 F. Supp. at 1178 (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society" (quoting *Rawson*, 495 U.S. at 371)); *but see Stringer*, 474 F. Supp. 2d at 908 (suggesting *Brown*'s reading of *Rawson* is "too broad" and holding that plaintiff's claims did not arise under the CBAs).  Indeed, negligence-based duties are strictly limited to a determinate person or class of persons to whom injury is the foreseeable result of defendant's actions.  *See Palsgraf* v. *Long Island R.R.*, 162 N.E. 99, 100 (N.Y. 1928); *see also Zilka* v. *Sanctis Constr., Inc.*, 186 A.2d 897, 901 (Pa. 1962) (*citing Palsgraf*); *see Mazzillo ex rel. Estate of Mazzillo* v. *Banks*, No. 3742-C, 1987 WL 754879, at *2 (Pa. Ct. C.P. Feb. 6, 1987) ("Duties do not extend to the world at large, but are defined and limited by considerations such as the relationship between the parties.").

Although the Complaint conclusorily alleges in some places that there is a duty owed "to all members of society" (Compl. ¶ 396), Plaintiffs' factual allegations belie that

assertion.   For example, Plaintiffs repeatedly allege that the ultimate goal of the alleged fraudulent conspiracy was to "maximize profits."  (*Id.* ¶ 5.)  And Plaintiffs refer to the activities of "*the NFL's* MTBI Committee" (*id.* ¶ 10 (emphasis added)), which allegedly described itself and its work as "conducting studies to determine the effects of concussions on the long-term health *of NFL players*."  (*Id.* ¶ 269 (emphasis added).)  Despite Plaintiffs' attempts to downplay Robinson's years of play in the NFL, Plaintiffs' claims against the NFL, at their core, fundamentally turn on duties the NFL could only have owed to professional football players such as Robinson—namely, to implement adequate rules, regulations, and guidelines regarding player health and safety.  (*See id.* ¶¶ 17, 29, 234, 374, 389.)  Robinson is a former NFL player and his alleged injuries were sustained in his capacity as such.  It is clear that Plaintiffs' claims hinge on a purported duty to protect Robinson in his capacity as an NFL player that arises out of the CBA, and thus they are preempted.  *Ballard*, 123 F. Supp. 3d at 1171 (noting that "the pleadings allege that the MTBI Committee produced findings that were deceptive to the NFL players *and the public at large*, [but] they repeatedly state that the MTBI was focused on undermining studies relating to *NFL players'* response to concussions" and so are preempted (emphasis added)).

*     *     *     *

In sum, Plaintiffs' claims substantially depend upon an interpretation of the terms of, or arise under, the CBA, and thus are preempted.  To the extent, however, that any claim is not preempted, it "form[s] part of the same case or controversy."  28 U.S.C. § 1367(a).  This Court thus has jurisdiction over all parties and claims.  *See Duerson*, 2012 WL 1658353, at *6.

**C.     Section 301 Preempts Plaintiffs Claims Against NFLP and NFLF**

Plaintiffs' claims against NFLP and NFLF for negligence, fraudulent concealment, and civil conspiracy are preempted for the same reason that Plaintiffs' claims against the NFL are preempted:  their resolution, too, requires interpretation of the CBA.

32

With respect to their claims against NFLP and NFLF, Plaintiffs rely primarily on conclusory allegations of duties purportedly owed by two or more of the NFL Defendants (as well as Riddell) generally (*see, e.g.*, Compl. ¶¶ 17, 396) that fail to specify any duty independently owed by NFLP or NFLF (or breach of such duty), as opposed to a duty owed by the NFL (or breach purportedly made by the NFL).   In fact, there are very few factual substantive allegations in the Complaint specific to NFLP or NFLF.   Thus, to adjudicate Plaintiffs' claims against NFLP or NFLF (to the extent they even exist), a court first would need to assess the scope of any alleged duty on the part of NFLP or NFLF—an assessment that must be measured according to the scope of the preexisting duties in the CBA.  *See supra* Section I.A.

The sole exception to Plaintiffs' blunderbuss pleading approach is their purported claim for negligence against NFLP based an alleged "duty to ensure that the equipment and materials it licensed and approved was of the highest possible quality and sufficient to protect Plaintiffs from the risk of injury." (Compl. ¶ 414.)[8]  That claim, however (assuming it can even be pled against NFLP in the absence of any specific, non-conclusory factual allegations), is also preempted, because it will require the Court to interpret the terms of the CBA that allocate responsibility for treating player injuries and implementing safety-related rules and regulations among the NFL, its Member Clubs, and the NFLPA.  *See supra* Section I.A.1.  In addition, the CBA establishes the Joint Committee on Player Safety and Welfare specifically to address and review, among other issues, "playing equipment" such as helmets and other protective equipment.  (Ex. 1, CBA Art. 50 § 1(a).)  Thus, the scope of any duty on NFLP's part to license or market equipment that adequately protects players can be assessed only by reviewing and

---

[8]    To the extent that Plaintiffs' "negligent marketing" claim against the NFL Defendants, which vaguely refers to "products" (Compl. ¶¶ 405, 408), includes helmets, that claim is preempted for the same reasons.

interpreting the Joint Committee's concomitant duty to discuss "playing equipment."[9]   Thus, these claims, too, should be dismissed as preempted.

**D.   Plaintiffs' Arguments In Support of Remand Lack Merit**

Ignoring the settled law that establishes that Plaintiffs' claims are preempted by Section 301, Plaintiffs instead rely on scattershot arguments in an attempt to avoid preemption of their claims.   But Plaintiffs' arguments—mischaracterizing their claims and misstating the relevant legal standards—widely miss the mark.

**1.   The Complaint Is Based on Conduct
Occurring During Robinson's NFL Career**

Plaintiffs' principal argument in support of remand is that their claims are not preempted because the Complaint alleges "breaches . . . ongoing for the entirety of decedent's life—a period of 25 years involving less than three full years of professional football."   (Pls.' Mot. at 20.)   Plaintiffs' argument, however, mischaracterizes both the Complaint and the basis for federal jurisdiction here, and is in stark contrast to the characterization of Robinson's injuries set forth in the workers' compensation claim filed by Robinson's father.   (*See* Ex. 3, Workers'

---

[9]   Plaintiffs cite *Stringer* in support of their argument that their negligence claim against NFLP and Riddell is not preempted.   (Pls.' Mot. at 23–24.)   However, although the *Stringer* court held that a negligence claim based on the NFL Defendants' purported duty "to ensure that the players had safe equipment" was not preempted, its decision was predicated on two faulty premises.   474 F. Supp. 2d at 912.   First, the court found the claim was not inextricably intertwined with the CBA because—although the CBA plainly establishes the "Joint Committee" for the "'purpose of discussing the player safety and welfare aspects of playing equipment'"—the "NFL Defendants are not members of that committee and are not required to adopt [its] recommendations."   *Id.* (quoting CBA).   But, as discussed, regardless of whether the NFL Defendants are members of the Committee, it is impossible to determine the scope of the NFL Defendants' purported duty—or whether they acted "reasonably" with regard to playing equipment—without first considering the express "purpose" of the Committee and the equipment-related duties imposed on its members.   Second, the *Stringer* court determined that "the CBA imposes no duty on [the NFL Defendants] to ensure that the equipment . . . adequately protects from . . . injury."   *Id.* at 912.   But, as noted, numerous CBA provisions in fact do delegate responsibility to the NFL, its Clubs, and the NFLPA for reviewing, investigating, and implementing equipment-related rules and regulations.   (*See, e.g.*, Ex. 2, NFL 2010 Constitution and Bylaws Art. XI § 11.2 (delegating to the NFL and its Clubs the responsibility for "amend[ing] or chang[ing]" playing rules); Ex. 1, CBA Art. 50 § 1(c) (authorizing the NFLPA to investigate and seek an advisory decision by an arbitrator regarding any playing rule change that it believes "would adversely affect player safety").)   Nor is *Bush* v. *St. Louis Reg'l Convention*, No. 16-cv-250, 2016 WL 3125869 (E.D. Mo. June 3, 2016), a slip-and-fall case concerning a Club's invitee liability, relevant here (and that court similarly relied on the irrelevant premise that the Joint Committee does not bind the CBA signatories).

Compensation Claim.)  Although they seek to downplay Robinson's time in the NFL, Plaintiffs never dispute—because they cannot—that Robinson *was* an NFL player and their claims arise from alleged misconduct, concealment, and injury occurring during the time that he was in the NFL.  That is all that is required to confer federal court jurisdiction.

Indeed, the workers' compensation claim filed in connection with Robinson's death expressly identifies the underlying injury, CTE, as an "occupational injury" occurring on September 9, 2012, while Robinson was employed by the Pittsburgh Steelers and while the terms and conditions of his employment were governed by the CBA.  (Ex. 3, Workers' Compensation Claim 1.)  And as the Complaint demonstrates, Plaintiffs' claims are predicated on "two decades of football exposures" and injuries sustained by Robinson (Compl. ¶¶ 3, 4, 19), a time period that necessarily includes Robinson's NFL career, when the CBA was in effect and governed his relationship to the NFL Defendants.  (*See also id.* ¶¶ 387, 393, 402, 412, 429 (alleging "damages experienced by Robinson in life"); *id.* ¶¶ 385, 391 (alleging that Robinson "in life would have made different decisions regarding exposures to repetitive subclinical and clinical MTBI").)  And Plaintiffs allege wrongful conduct by, and duties owed by, the NFL Defendants during Robinson's career.  (*See id.* ¶ 306 (allegations regarding marketing of helmets "until 2013"); *id.* ¶ 338 (alleging wrongdoing by "re-named 'Head Neck and Spine Committee'" continuing "[u]nder its new leadership"); *id.* ¶ 339 (allegedly misleading marketing practices in effect until March 2014); *id.* ¶ 343 (allegations of "fraudulent research" over time and data collection "during the time period when Defendants [*sic*, presumably "decedent"] played football, instead of providing him with truthful information," culminating in a 2016 research paper); *id.* ¶ 349 (alleging that "conspirators continue to . . . advance and fund pseudo-scientific studies"); *id.* ¶ 368 (referring to alleged omissions in liability releases provided to Robinson "when playing

football professionally"); *id.* ¶ 373 (alleging "[NFL] Defendants opted to continue the denial and concealment and misrepresentations" regarding CTE into Robinson's NFL career); *id.* ¶ 374 (alleging that NFL locker room poster on concussions "intentionally conflat[ed] *serious brain injury* with MTBI, and entirely omitt[ed] reference to subclinical MTBI" (emphasis in original)); *id.* ¶ 396 (alleging duty of care to Robinson "for the entirety of decedents [*sic*] lifetime").)

As Chief Judge James F. Holderman of the United States District Court for the Northern District of Illinois held in refusing to allow an NFL player to plead around the CBA provisions by artificially limiting his claims to a time period when no CBA was in effect, it would be "exceedingly implausible" for Plaintiffs to contend—and their own allegations refute—that their claims are limited to the period preceding Robinson's NFL career.  *Duerson*, 2012 WL 1658353, at *3.  "Because "the CBA[] [was] in effect during at least some of the events alleged in the complaint," and because, as shown above, resolution of Plaintiffs' claims substantially depends upon an interpretation of the terms of, or their claims arise under, the CBA, their claims are preempted*.  Duerson*, 2012 WL 1658353, at *3 (rejecting plaintiff's effort to artificially limit the time period to which his complaint referred because it was "exceedingly implausible" to attribute his CTE to head trauma suffered only during that limited period); *see Smith*, 2014 WL 6776306, at *7 (finding Section 301 preempted plaintiffs' claims because "the relevant events occurred at least at some point during each of Plaintiffs' careers" and so "[t]he fact Plaintiffs are now retirees does not preclude preemption of claims based on events which occurred while Plaintiffs were members of the bargaining unit").

In sum, Plaintiffs' attempts to artificially limit their claims to the time period before Robinson played in the NFL are no more than artful pleading and should be rejected.

### 2.       Plaintiffs' Fraudulent Concealment Claim Requires a Duty to Disclose

In their motion to remand, Plaintiffs attempt to reframe their fraudulent concealment claim as a claim for "concealment," arguing that such a claim does not require a duty to disclose under Pennsylvania law (without demonstrating that Pennsylvania law even applies).   (Pls.' Mot. at 21–22.)[10]   Although some authority in Pennsylvania distinguishes between claims of active concealment and claims based on fraudulent omissions and holds that active concealment claims do not require a duty to disclose, such claims only apply where defendants affirmatively deceive or obstruct plaintiffs, such as where defendant "paints over and so conceals a defect in a chattel or a building that he is endeavoring to sell to the plaintiff, and thus induces the plaintiff to buy it in ignorance of its defective character."   Restatement (Second) of Torts § 550, cmt. a-b (Am. Law Inst. 1977) (defining liability "for pecuniary loss" where "[o]ne party to a transaction . . .   intentionally prevents the other from acquiring material information"); *see Gaines* v. *Krawczyk*, 354 F. Supp. 2d 573, 587 (W.D. Pa. 2004) ("A cause of action for fraudulent concealment based on Pennsylvania's common law and/or [Restatement (Second) of Torts § 550] is limited to contracts and other forms of contractual relationships between specific parties . . . [a]nd even in such settings a duty to speak does not normally arise between the parties in the absence of a confidential or fiduciary relationship." (internal citations omitted)); *see also Youndt* v. *First Nat. Bank of Port Allegany*, 868 A.2d 539, 549–50 (Pa. Super. Ct. 2005) (quoting Restatement (Second) of Torts § 550, cmt. a, and dismissing fraudulent concealment claim for failure to allege that defendant "made any attempt to conceal the condition of the sewer system" it sold to plaintiff); *Nat'l Bldg. Leasing, Inc.* v. *Byler*, 381 A.2d

---

[10]     Neither *Smith* v. *Renaut*, 564 A.2d 188 (Pa. Super. Ct. 1989) nor *Am. Planned Communities, Inc.* v. *State Farm Ins. Co.*, 28 F. Supp. 2d 964 (E.D. Pa. 1998), cited by Plaintiffs, held that defendants were liable for concealment in the absence of a duty to disclose: in *State Farm* such a duty was expressly alleged, 28 F. Supp. 2d at 969, and in *Smith* the duty to disclose was owed as a matter of law.   564 A.2d at 192.

963, 964–65, 966 (Pa. Super. Ct. 1977) (finding active concealment where prior to a pre-purchase property inspection, defendant demolished several buildings, put waste materials in a hole, and planted vegetation over the hole).

Plaintiffs' "active concealment" theory is inapplicable to their claims here, which do not arise out of any transaction between Robinson and the NFL Defendants, and further which fail to allege in any non-conclusory fashion that the NFL Defendants affirmatively and in bad faith "intentionally prevent[ed] [Robinson] from acquiring material information" concerning the purported link between MTBI and CTE or engaged in "deceptive acts or contrivances" to prevent him from making an investigation into that issue.  *Gnagey Gas & Oil Co.* v. *Pa. Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 500–01 (Pa. Commw. Ct. 2013).  At most, Plaintiffs' factual allegations sound in nondisclosure, which requires a legal duty, *see id.*; indeed, Plaintiffs purport to allege that the NFL Defendants owed Robinson a duty of disclosure. (Compl. ¶ 29.)  Plaintiffs also cannot dispute that, under many states' laws, fraudulent concealment claims require a duty to disclose.  *See, e.g.*, *Manti's Transp., Inc.* v. *C.T. Lines, Inc.*, 68 A.D.3d 937, 940 (N.Y. App. Div. 2009).

And in any event, Plaintiffs do not dispute that they must establish Robinson's justifiable reliance as an additional element of their fraudulent concealment claim, or that, as discussed above (*see supra* Section I.A.2) such reliance is substantially dependent on an interpretation of the CBA, and so Plaintiffs' fraudulent concealment claim is preempted.

### 3.    Preemption Does Not Require Contractual Privity

Plaintiffs next argue that they have never had a contractual relationship with the NFL Defendants and never played NFL football, and so their claims arise from Pennsylvania law and are not preempted (Pls. Mot. at 20, 23), and that because NFLP and NFLF "make zero allegations of contractual privity with Robinson," their "defenses must be deemed waived."  (*Id.*

at 24.)  Neither argument has merit:  Plaintiffs need not have any contractual relationship with

the NFL Defendants, whether as signatories to the CBA or otherwise, for their claims to be

preempted, nor is contractual privity between Robinson and any defendant, including NFLP and

NFLF, a prerequisite for preemption.

First, Plaintiffs assert their claims by and through the Pennsylvania Wrongful

Death Act and the Pennsylvania Survivor Act.  (Compl. ¶ 378.)  To prevail on their claims—

grounded in negligence and fraud and premised upon injuries suffered by Robinson—Plaintiffs

will need to establish, among other things, (i) that the NFL Defendants owed Robinson a duty to

protect him from certain injuries and advise him of certain risks, (ii) the scope of that duty, (iii)

that the NFL Defendants failed to discharge that duty reasonably, (iv) that such failure

proximately caused injury to Robinson, and (v) that he was justified in relying on the NFL

Defendants' purported omissions.  *Phillips* v. *Nw. Reg'l Commc'ns*, 669 F. Supp. 2d 555, 578,

582 (W.D. Pa. 2009), *aff'd*, 391 F. App'x 160 (3d Cir. 2010); *Sunderland* v. *R.A. Barlow*

*Homebuilders*, 791 A.2d 384, 390–91 (Pa. Super. Ct. 2002), *aff'd*, 838 A.2d 662 (Pa. 2003).  (*See*

*also* Compl. ¶ 390 ("Defendants concealed the information intentionally *from decedent* and from

his family." (emphasis added)); ¶ 391 ("[Decedent] in life would have made different decisions

regarding exposures."); ¶¶ 393, 412, 421, 429 (seeking damages "including those damages

experienced by [decedent] in life"); ¶ 398 ("Defendants' breach caused the decedent to become

exposed to repetitive subclinical and clinical blows to the head (or MTBI) which proximately

caused decedent's CTE.").)   As discussed above, resolution of those elements requires

interpretation of numerous CBA provisions allocating responsibilities to NFL Clubs, the

NFLPA, and the players themselves regarding player health and safety, including treatment of

player injuries and making return-to-play decisions.  *See supra* Section I.A.

Moreover, "[t]he individual status of the plaintiff or defendant as signatory does not inform the Court's [Section 301 preemption] inquiry." *Martin* v. *Watkins*, No. 10-cv-0423, 2010 WL 5371341, at \*4 n.2 (W.D. Va. Dec. 22, 2010) (non-signatory plaintiff's claims preempted because their resolution required interpretation of CBA). In other words, it is not the status of the parties that matters, but the nature of the claims asserted, namely whether "interpretation of the [CBA] is required for [their] resolution" or whether they arise from the CBA, regardless of whether plaintiff was a signatory. *Mullins* v. *Int'l Union of Operating Eng'rs Local No. 77*, 214 F. Supp. 2d 655, 668 (E.D. Va. 2002), *aff'd* 60 F. App'x 510 (4th Cir. 2003).

It is well settled that where, as here, the relationships between decedents and defendants are governed by CBAs, Section 301 preempts wrongful death claims brought by estate representatives or next-of-kin—indeed, courts have found preemption of claims virtually identical to Plaintiffs' brought against the NFL. *See Duerson*, 2012 WL 1658353, at \*1, \*6 (wrongful death claims brought by decedent's estate against NFL preempted because claims were "substantially dependent on the interpretation of CBA provisions"); *Stringer*, 474 F. Supp. 2d at 898, 909–10 (wrongful death claim brought by decedent's widow against the NFL preempted because the claim was "inextricably intertwined and substantially dependent upon an analysis of certain CBA provisions imposing duties on the clubs with respect to medical care and treatment of NFL players"); *see also Rawson*, 495 U.S. at 364, 370–72 (wrongful death claims brought by the survivors of four deceased minors preempted); *Negron* v. *Oxford Airport Tech. Servs.*, No. 08-cv-4326, 2009 WL 50158, at \*3–5, \*4 n.4 (E.D. Pa. Jan. 7, 2009) (Pennsylvania wrongful death claim preempted by Railway Labor Act which has "virtually identical" preemption standard as LMRA); *Zielke* v. *Int'l Bhd. Of Elec. Workers*, No. 95-cv-0618, 1998 WL 102565, at \*4 (N.D. Ill. Feb. 24, 1998) (wrongful death claim brought by decedent's widow

against union preempted by LMRA because "[r]egardless of how [plaintiff] parses her claim, it is clear that [the union] was connected to [the decedent's] unfortunate death due to the relationship between them, which was founded on the [CBA]").

Likewise, courts have found preemption of claims brought against defendants that, like NFLP and NFLF, were not signatories to a CBA. *See, e.g.*, *Atwater*, 626 F.3d at 1177–78 (defendant's status as non-signatory "not dispositive" of preemption analysis because the "relevant question for preemption purposes is . . . whether Plaintiffs' state-law claims . . . would require the court to apply or interpret the CBA"); *Mullins*, 214 F. Supp. 2d at 668 ("Section 301 not only preempts state law claims against parties to a collective bargaining agreement, but also preempts state law claims against non-signatories where interpretation of the agreement is required for resolution.").

In sum, a lack of contractual privity between any of the parties is irrelevant to the preemption analysis.

### 4.    Plaintiffs Also Misstate the Relevant Legal Standard for Preemption

In a misguided attempt to avoid removal, Plaintiffs attack, one by one, various CBA provisions referenced in the NFL Defendants' notice of removal, arguing that "[n]one" of those provisions "suggest the existence of any legal duties raised *by the Complaint* and within the CBA, or raised *by the Complaint* and implied by the CBA." (Pls.' Mot. at 25 (emphasis in original).) That argument lacks merit. Preemption does not require that Plaintiffs explicitly allege direct violations of specific CBA provisions. Rather, all that is required is that the resolution of Plaintiffs' claims is substantially dependent upon or inextricably intertwined with an interpretation of the terms of, or that their claims arise out of, the CBA. That is precisely the case here, as explained above. *See supra* Section I.A.

With respect to several of the provisions of Article 39 of the CBA relating to medical care, Plaintiffs argue that they "*never allege* a problem with medical care" (Pls.' Mot. at 22, 26 (emphasis in original)), but that is merely artful pleading:  the true gravamen of Plaintiffs' claim is that the NFL Defendants failed to protect Robinson from, and failed to disclose to Robinson, the risks of repetitive head injuries; as discussed above, resolution of this claim requires interpretation of the myriad CBA provisions governing player medical care.  Plaintiffs' attempted "rebrand[ing]" of their claims to omit explicit reference to medical care *per se* cannot defeat preemption.  *Kurns*, 620 F.3d at 398 n.8.  Plaintiffs perplexingly cite *Green* v. *Arizona Cardinals Football Club*, 21 F. Supp. 3d 1020, 1030 (E.D. Mo. 2014) in arguing that a duty regarding medical care "is 'nondelegable' and remains the NFL's" (Pls.' Mot. at 22–23), but that is beside the point:  the NFL is not arguing that its purported duties are or are not delegable, the point is that the scope of any purported duty requires interpretation of the CBA.  Moreover, *Green*—which this Court characterized as "an outlier"—is inapposite and was wrongly decided.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 392 n.46 (E.D. Pa. 2015), *amended*, No. 12-md-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and *aff'd*, 821 F.3d 410 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 591 (2016), and *cert. denied*, 137 S. Ct. 607, 196 L. Ed. 2d 473 (2016).  *Green* concerned claims against a Club, *not* the NFL, involved an interpretation of Missouri common law regarding the duty of an employer (there, a Club) that is not at issue in this case and that squarely conflicts with Eighth Circuit precedent.  (*See* Kan. City Chiefs Football Club, Inc. and Ariz. Cardinals Football Club, LLC's Joint Opp'n to Pls.' Mot. to Remand, 12-md-2323, Sept. 25, 2017, ECF No.8405, Section II.A.)

Plaintiffs also claim that "[a]t least eleven courts have allows [*sic*] state claims to proceed in the face of challenges under" Article 39 of the CBA (Pls.' Mot. at 25), but most of the

cited cases do not even reference that article or the specific provision quoted by Plaintiffs. Moreover, most of the cases cited in footnote 7 of Plaintiffs' motion involved claims bearing no resemblance to Plaintiffs' claims here, such as premises liability claims related to conditions at Club facilities, such as unsanitary conditions leading to staph infections.  *See, e.g.*, *Bush* v. *St. Louis Reg'l Convention*, No. 16-cv-250, 2016 WL 3125869 (E.D. Mo. June 3, 2016) (claims relating to conditions of playing facility); *Tynes* v. *Buccaneers L.P.*, 134 F. Supp. 3d 1351 (M.D. Fla. 2015) (claims relating to outbreak of MRSA at training facility); *Green* v. *Pro Football, Inc.*, 31 F. Supp. 3d 714 (D. Md. 2014) (claims relating to bounty program); *Jurevicius* v. *Cleveland Browns Football Co. LLC*, No. 09-cv-1803, 2010 WL 8461220 (N.D. Ohio 2010) (claims relating to staph infection contracted at training facility); *McPherson* v. *Tenn. Football, Inc.*, No. 07-cv-0002, 2007 WL 5445124 (M.D. Tenn. May 31, 2007) (claims relating to negligent supervision of opposing team's mascot); *Brown*, 219 F.Supp.2d 372 (claims relating to weighted penalty flag thrown by referee).  Such situations are distinguishable from Plaintiffs' claims here, which concern the alleged undisclosed risks of head impacts and are thus closely tied to CBA provisions regarding treatment, diagnosis, and monitoring of player injuries, such as Article 39, which many courts have agreed forms a basis for LMRA preemption.  *See, e.g.*, *Sherwin*, 752 F. Supp. at 1177–78.

Second, it is irrelevant that Plaintiffs assert state law claims or allege that the NFL Defendants voluntarily assumed a duty if, in fact, resolving those claims requires interpretation of the CBA, or if the claims arise under the CBA, as is the case here.  *See Guerrero* v. *Hovensa LLC*, 259 F. App'x 453, 458 (3d Cir. 2007) (state law claims preempted because their resolution was substantially dependent on analysis of CBA provisions); *Duerson*, 2012 WL 1658353, at *2, *6 (finding preemption "although [plaintiff's action] explicitly rais[ed] only state law claims")

*Atwater*, 626 F.3d at 1183 (negligent misrepresentation claim preempted "[e]ven if Plaintiffs established that Defendants owed them a duty independent of the CBA" because reliance element required interpretation of CBA).  The cases cited by Plaintiffs do not hold otherwise.

For example, Plaintiffs' citation to *Kline* v. *Sec. Guards, Inc.*, 386 F.3d 246 (3d Cir. 2004) and *Stellar* v. *Allied Signal, Inc.*, 98 F. Supp. 3d 790 (E.D. Pa. 2015) is unavailing: both cases recognize the fundamental principle that a state law claim is preempted if its resolution requires interpretation of a CBA, as Plaintiffs' do here.  Further, *Oliver* v. *Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 (N.D. Ill. July 19, 2016) is irrelevant to Plaintiffs' claims against the NFL Defendants, as that court's decision turned on the fact the NFL was *not* a defendant in that case, making clear that the "complaint centers on the duties and obligations of a third party helmet manufacturer—*not the NFL and its players*."  *Id.* at *3 (emphasis added). Here, of course, the claims against the NFL Defendants very much "center[] on the duties and obligations of the NFL and its players," as discussed above, and are qualitatively different from those against Riddell, as the NFL Defendants are not third-party helmet manufacturers.  Indeed, the *Oliver* court observed that "the CBAs contain many provisions pertaining to the NFL's duty to monitor player health and equipment," but declined to find preemption of claims against Riddell because "the relevant question is not whether *the NFL* lived up to its standard of care under the CBAs."  *Id.* (emphasis added).  As discussed above, that is *precisely* the question here, and Plaintiffs' claims are therefore preempted.

### 5.      Defendants Are Not Estopped From Arguing Preemption

Recognizing that long-settled law compels preemption of Plaintiffs' claims, Plaintiffs remarkably assert that the NFL is somehow "estopped"—apparently on the basis of issue preclusion—from arguing Section 301 preemption, based on two decades-old arbitration decisions having nothing to do with preemption.   As discussed in the NFL and NFLP's

memoranda of law in support of their motion in this MDL to dismiss the Second Amended

Master Administrative Long-Form Complaint on preemption grounds (the "MDL Preemption

Brief") and in opposition to the MDL Opt Out Plaintiffs' motion for leave to file the Second

Amended Master Administrative Long-Form Complaint ("Leave Opposition"),[11] which the NFL

Defendants incorporate by reference here, Plaintiffs' estoppel argument is meritless.  The NFL

Defendants respectfully refer the Court to the complete arguments in the MDL Preemption Brief

and Leave Opposition, but summarize them briefly here.

Plaintiffs cannot show, as they must to invoke issue preclusion, that the issue of

Section 301 preemption is identical to the issues actually litigated and determined in the

referenced arbitrations—the only arguably relevant issue in those arbitrations was the

arbitrability of claims against individual doctors, which is irrelevant here, or that the relevant

determinations in those cases were essential to the judgments.  *See Zinman* v. *Prudential Ins. Co.*

*of Am.*, 909 F. Supp. 279, 282 (E.D. Pa. 1995) (Brody, J.) (citing *Burlington N. R.R. Co.* v.

*Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231 (3d Cir. 1995)).[12]  (*See* MDL Preemption

Brief, Section III.)  Nor can Plaintiffs show, as they must, that the relevant "determinations" in

those arbitrations were essential to the judgments—indeed, such "determinations" were merely

incidental statements in dicta.  (*See id.*)  Moreover, Plaintiffs' estoppel allegations are contrary to

the wealth of NFL-related preemption case law cited above, and should be disregarded.

---

[11]   (*See* Mem. of Law of Defs. NFL & NFL Properties LLC in Support of Mot. to Dismiss Pls.' Second Am. Master Admin. Long-Form Compl. on Preemption Grounds, 12-md-2323, Sept. 25, 2017, ECF No. 8403-1; Opp'n to Pls.' Mot. for Leave to File Second Am. Master Admin. Long-Form Compl., 12-md-2323, May 26, 2017, ECF No. 7767.)

[12]   Where there is any doubt about the applicability of issue preclusion, the Third Circuit has established a presumption *against* such a finding.  *See Witkowski* v. *Welch*, 173 F.3d 192, 206 (3d Cir. 1999) (finding collateral estoppel in "this unique case," and "caution[ing] against its invocation in most others without extreme care"); *Ostella* v. *IRBSearch, LLC*, No. 12-cv-7002, 2013 WL 5777291, at *12 (E.D. Pa. Oct. 24, 2013) (stating that "any reasonable doubt should be resolved against the use of estoppel" (citation omitted)).

## II.
## PLAINTIFFS' ALTERNATIVE MOTION TO
## <u>RE-DESIGNATE THE CASE "UNRELATED" SHOULD BE DENIED</u>

Plaintiffs move in the alternative to have the case re-designated, effectively seeking to remove the case from this MDL, of which it currently is part.  (*See* Docket Entry re: "XYZ CASES ENTERED" dated July 7, 2017, *In re: Nat'l Football League Players' Concussion Injury Litig.*, MDL No. 2323 (J.P.M.L.).)

Contrary to Plaintiffs' arguments, this case is properly before this Court, as it plainly is related to the remaining cases before this Court as part of this MDL, which consist of claims brought by a disparate group of plaintiffs who opted out of the settlement class covered by the February 13, 2015 Class Action Settlement Agreement ("Settlement Agreement").  There is nothing about Plaintiffs' claims here that meaningfully distinguishes them from any of those opt-outs, all of whom, like Plaintiffs here, assert similar claims for negligence, fraud, and conspiracy, among others, arising out of the NFL's alleged failure to inform players of the risks of concussions and subconcussive head impacts.

Local Rule 40.1 governs the assignment of related cases in this District, providing that cases "involv[ing] the same issue of fact . . . as another suit" are "related," and committing decisions on relatedness to the receiving judge's discretion.  *See* Local Rule 40.1(b)(3) & (c)(1) ("If the judge receiving the later case is of the opinion that the relationship does not exist, the judge shall refer the case to the assignment clerk for reassignment by random selection in the same manner as if it were a newly filed case.").  Plaintiffs argue that the rule is to be interpreted "narrowly," but the cases they cite involved much more drastic differences between cases than are present here.  *See Sherfey* v. *Johnson & Johnson*, No. 12-cv-4162, 2012 WL 3550037, at *3 (E.D. Pa. Aug. 17, 2012) (case unrelated where plaintiffs' claims concerned different medicine purchased from different retailer and "set forth a categorically different injury"); *Meijer, Inc.* v.

*Biovail Corp.*, No. 08-cv-2431, 2008 WL 2944648, at *3 (E.D. Pa. July 31, 2008) (cases unrelated due to different patents at issue, different time period of relevant events, distinct allegations and claims); *Sellers* v. *Timoney*, No. 01-cv-3760, 2002 WL 32348499, at *3 (E.D. Pa. Feb. 7, 2002) (cases brought by individuals arrested at one location were related even though "hardly identical," while case brought by different individual arrested at different time and location and under different circumstances was not).   Plaintiffs assert purported "unfair delays and undue prejudice," which is difficult to square with their praise for the Court in "achieving historical results" in the MDL to date.   (Pls.' Mot. at 30.)   The only concerns Plaintiffs raise— aging or dying witnesses, "purging" of records (*id.*)—are overblown, but more importantly are no more present in this case than in the other cases consolidated before this Court.

Here, Plaintiffs' case shares myriad factual issues with the rest of the MDL, including but not limited to (i) the state of the science regarding head injuries that Plaintiffs allege that the NFL knew or should have known, (ii) whether the alleged neurocognitive injuries are caused by concussive and subconcussive head impacts in professional football, (iii) the terms of the NFL CBA, (iv) the actions or inactions of the NFL Defendants in educating and/or warning NFL players of the risks of concussions and head injuries, (v) the actions or inactions of Club staff and related policies and/or procedures concerning injuries, and (vi) the actions or inactions of the MTBI Committee.

Indeed, this Court recognized the commonality and predominance of these very "factual questions" and "common and dispositive scientific questions" within the Settlement Class in approving the Settlement Agreement, and that same reasoning applies to Plaintiffs' claims here.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 371–72, 379–81 (holding that Settlement Class Members' fraud and negligence claims would

"depend on establishing that the NFL Parties knew of the dangers of concussive hits, yet failed to modify the rules of NFL Football to mitigate them . . . [and] that the NFL Parties' MTBI Committee repeatedly obfuscated the link between football play and head trauma").  Because "the harm alleged to have been sustained by" Robinson and the other MDL plaintiffs "stems from the same set of facts," this case was properly marked as related to this MDL and assigned to and accepted by this Court as such.  *Moore* v. *Rite Aid Headquarters Corp.*, No. 13-cv-1515, 2013 WL 4833854, at *2–3 (E.D. Pa. Sept. 11, 2013) (class actions with "central core of common facts" and involving same "central legal question" properly designated as related under Rule 40.1, under which "related cases need not be identical"); *see In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 380 ("[T]he NFL Parties' alleged conduct injured Class Members in the same way: . . . Players all returned to play prematurely after head injuries and continued to experience concussive and subconcussive hits.").

Similarly, this MDL was established by the Judicial Panel on Multidistrict Litigation on the basis that the initial actions "share factual issues arising from allegations against the NFL stemming from injuries sustained while playing professional football, including damages resulting from the permanent long-term effects of concussions while playing professional football in the NFL."  *In re: Nat'l Football League Players' Concussion Injury Litig.*, 842 F. Supp. 2d 1378, 1379 (J.P.M.L. 2012).  There is no question that the Panel would have ruled the same way here, as Plaintiffs' claims easily meet the standard for MDL consolidation, which, similar to Local Rule 40.1, requires only that there be "one or more common questions of fact," and "does not require a complete identity or even a majority of common factual or legal issues."  28 U.S.C. § 1407(a); *In re Gadolinium Contrast Dyes Prods. Liab. Litig.*, 536 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008).  Indeed, since the settlement, the Panel

has consolidated claims of non-Settlement Class members into this MDL.  *See, e.g.*, Conditional Transfer Order (CTO-97) and Original Docket, *Scroggins* v. *Nat'l Football League*, No. 16-cv-2058 (E.D.P.A. Apr. 29, 2016), ECF No. 1 (transferring claims of Danny Gorrer to MDL 2323).

This Court has presided over this MDL for many years, expending considerable time and resources to become deeply familiar with the factual and legal issues; requiring a different judge to start from scratch would be an utter waste of judicial resources.  *Royal Park Invs. SA/NV* v. *Bank of Am. Corp.*, 941 F. Supp. 2d 367, 373 (S.D.N.Y. 2013) (finding "compelling efficiencies in allowing [transferee judge] to resolve Plaintiffs' remand motions" where that judge "ha[d] already decided the same legal issues presented by Plaintiffs' remand motions and has familiarity with the remand issues raised in other [similar] cases"); *see In re Maxim Integrated Prods., Inc.*, MDL No. 2354, 2015 WL 1757779, at *5 (W.D. Pa. Apr. 17, 2015) ("[I]t would be detrimental to the 'just and efficient conduct of the litigation' to remand the case, prior to the completion of pretrial proceedings," given that the "court has significant familiarity with th[e] case.").

Finally, Plaintiffs' stated intent to begin immediate discovery is improper and in violation of this Court's stay of discovery in the MDL, of which this case is a part.  (Case Management Order No. 1, ¶ 13, Mar. 6, 2012, ECF No. 4; Order, ¶ 19, Apr. 12, 2017, ECF No. 7477.)  Plaintiffs have provided no persuasive justification for expediting discovery in this case, in advance of the rest of the MDL, and their request to do so should be denied.

### III.
### PLAINTIFFS ARE NOT ENTITLED TO COSTS OR ATTORNEYS' FEES

Plaintiffs request, at the very end of their remand motion, costs and attorneys' fees pursuant to 28 U.S.C. § 1447(c).  (Pls.' Mot. at 30.)  Plaintiffs do not provide any rationale as to why they should receive costs and fees, because there is none.  The NFL Defendants had

more than an "objectively reasonable basis for seeking removal." *See Martin* v. *Franklin Capital Corp.*, 546 U.S. 132, 136 (2005) ("[A]bsent unusual circumstances, attorney's fees should not be awarded [under § 1447(c)] when the removing party has an objectively reasonable basis for removal."); *DiPilato* v. *Commonwealth Ass'n of Sch. Adm'rs, Local 502*, 588 F. Supp. 2d 631, 635 (E.D. Pa. 2008) (Brody, J.) (denying request for attorneys' fees under section 1447(c), noting that "[l]itigation involving labor organizations involves a complicated area of law"). Because removal was proper here, as explained above, the Court should deny Plaintiffs' request.

## **CONCLUSION**

For the reasons set forth above, the NFL Defendants respectfully submit that Plaintiffs' motion to remand or in the alternative to designate the case "unrelated" should be denied.

Dated: September 25, 2017

Respectfully submitted,

_____*/s/ Brad S. Karp*_____
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:    (212) 373-3000
Email:  bkarp@paulweiss.com

PEPPER HAMILTON LLP
Sean P. Fahey
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel:    (215) 981-4000

*Attorneys for Defendants the National Football League, the National Football League Foundation , and NFL Properties LLC*

## **CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing Memorandum of Law of Defendants National Football League, the National Football League Foundation, and NFL Properties LLC in Opposition to Plaintiffs' Motion to Remand or in the Alternative to Re-designate the Case "Unrelated," the Declaration of Dennis L. Curran, and the associated exhibits were served electronically via the Court's electronic filing system on the 25th day of September, 2017, upon all counsel of record.


Dated:  September 25, 2017                         /s/ Brad S. Karp
                                                                    Brad S. Karp