# Exhibit 1-A



COLLECTIVE
BARGAINING
AGREEMENT

August 4, 2011



# NFL PLAYERS

## ASSOCIATION

## TABLE OF CONTENTS

PREAMBLE ........................................................................................................ xiv

ARTICLE 1 DEFINITIONS .................................................................................. 1

ARTICLE 2 GOVERNING AGREEMENT ......................................................... 5
Section 1. Conflicts: ......................................................................................... 5
Section 2. Implementation: .............................................................................. 5
Section 3. Management Rights: ....................................................................... 5
Section 4. Scope of Agreement ....................................................................... 5
Section 5. Rounding: ....................................................................................... 5

ARTICLE 3 NO STRIKE/LOCKOUT/SUIT ....................................................... 7
Section 1. No Strike/Lockout: ......................................................................... 7
Section 2. No Suit: .......................................................................................... 7
Section 3. Releases and Covenants Not to Sue: .............................................. 7

ARTICLE 4 NFL PLAYER CONTRACT ............................................................ 9
Section 1. Form: .............................................................................................. 9
Section 2. Term: .............................................................................................. 9
Section 3. Changes: ......................................................................................... 9
Section 4. Conformity: .................................................................................... 9
Section 5. Notices, Prohibitions, etc.: ........................................................... 10
Section 6. Commissioner Disapproval: ......................................................... 11
Section 7. NFLPA Group Licensing Program: ............................................. 11
Section 8. Good Faith Negotiation: ............................................................... 12
Section 9. Forfeiture of Salary: ..................................................................... 12
Section 10. Return of Advanced Paragraph 5 Salary: ................................... 15

ARTICLE 5 OPTION CLAUSES ....................................................................... 16
Section 1. Prohibition: .................................................................................. 16

ARTICLE 6 COLLEGE DRAFT ........................................................................ 17
Section 1. Time of Draft: ............................................................................... 17
Section 2. Number of Choices and Eligibility: ............................................. 17
Section 3. Required Tender: ........................................................................... 17
Section 4. Signing of Drafted Rookies: ......................................................... 17
Section 5. Other Professional Teams: ............................................................ 18
Section 6. Return to College: ......................................................................... 19
Section 7. Assignment of Draft Rights: ......................................................... 19
Section 8. Subsequent Draft: ......................................................................... 19
Section 9. No Subsequent Draft ..................................................................... 20
Section 10. Compensatory Draft Selections: ................................................. 20
Section 11. Undrafted Rookies: ..................................................................... 20
Section 12. Notice of Signing: ....................................................................... 20

ARTICLE 7 ROOKIE COMPENSATION AND ROOKIE
COMPENSATION POOL......................................................................21
    Section 1. Definitions: .........................................................................21
    Section 2. Operation: ..........................................................................23
    Section 3. Rookie Contracts: ................................................................24
    Section 4. Proven Performance Escalator: .............................................28
    Section 5. Additional Terms: ................................................................29
    Section 6. Performance Incentives: .......................................................30
    Section 7. Fifth-Year Option for First Round Selections: .......................31
    Section 8. Salary Cap Treatment: .........................................................32
    Section 9. Rookie Redistribution Fund: ................................................32

ARTICLE 8 VETERANS WITH LESS THAN THREE ACCRUED
SEASONS.............................................................................................34
    Section 1. Accrued Seasons Calculation: ..............................................34
    Section 2. Negotiating Rights of Players with Less Than Three Accrued Seasons:.....34

ARTICLE 9 VETERAN FREE AGENCY .............................................35
    Section 1. Unrestricted Free Agents:.....................................................35
    Section 2. Restricted Free Agents:.........................................................36
    Section 3. Offer Sheet and Right of First Refusal Procedures: .................39
    Section 4. Expedited Arbitration: .........................................................41
    Section 5. Individually Negotiated Limitations on Player Movement:.........42
    Section 6. Notices, Etc.: ......................................................................42

ARTICLE 10 FRANCHISE AND TRANSITION PLAYERS....................44
    Section 1. Franchise Player Designations: .............................................44
    Section 2. Required Tender for Franchise Players: .................................44
    Section 3. Transition Player Designations:.............................................47
    Section 4. Required Tender for Transition Players: ................................47
    Section 5. Right of First Refusal for Transition Players: .........................48
    Section 6. Lists:...................................................................................48
    Section 7. Salary Information:...............................................................48
    Section 8. No Assignment:...................................................................49
    Section 9. Franchise Player Designation Period:....................................49
    Section 10. Transition Player Designation Period:..................................49
    Section 11. Other Terms:.....................................................................50
    Section 12. Compensatory Draft Selection:...........................................50
    Section 13. Offer Sheets for Non-Exclusive Franchise and Transition Players:..........50
    Section 14. Signing Period for Transition Players: .................................51
    Section 15. Signing Period for Franchise Players: ..................................51

ARTICLE 11 TRANSITION RULES FOR THE 2011 LEAGUE YEAR......53
    Section 1. Applicability:.......................................................................53
    Section 2. Calendar: ............................................................................53
    Section 3. Free Agency:........................................................................54
    Section 4. Rookies:..............................................................................56

Section 5. Salaries and Salary Cap Accounting: ................................................... 56
ARTICLE 12 REVENUE ACCOUNTING AND CALCULATION OF
THE SALARY CAP ................................................................................................. 61
    Section 1. All Revenues: .................................................................................. 61
    Section 2. Benefits: .......................................................................................... 70
    Section 3. Accounting Reports & Projections: ............................................... 72
    Section 4. Stadium Credit: ............................................................................... 76
    Section 5. Joint Contribution Amount: ........................................................... 78
    Section 6. Calculation of the Player Cost Amount and Salary Cap: ............... 79
    Section 7. Guaranteed Player Cost Percentage: ............................................. 81
    Section 8. Guaranteed League-Wide Cash Spending: .................................... 84
    Section 9. Minimum Team Cash Spending: ..................................................... 84
    Section 10. Additional AR Accounting Rules: ................................................ 85
ARTICLE 13 SALARY CAP ACCOUNTING RULES: ........................................ 90
    Section 1. Calculation of the Salary Cap: ...................................................... 90
    Section 2. Application of the Salary Cap: ....................................................... 90
    Section 3. Calculation of Salary and Team Salary: ......................................... 90
    Section 4. Definition of "Salary": ................................................................... 90
    Section 5. Computation of Team Salary: .......................................................... 90
    Section 6. Valuation of Player Contracts: ....................................................... 92
    Section 7. 30% Rules: ..................................................................................... 107
    Section 8. Renegotiations and Extensions: ..................................................... 107
ARTICLE 14 ENFORCEMENT OF THE SALARY CAP  AND ROOKIE
COMPENSATION POOL ...................................................................................... 109
    Section 1. Undisclosed Terms: ...................................................................... 109
    Section 2. Circumvention: ............................................................................. 109
    Section 3. System Arbitrator Proceeding: ...................................................... 109
    Section 4. Commissioner Disapproval: .......................................................... 109
    Section 5. System Arbitrator Review: ............................................................. 109
    Section 6. Sanctions: ...................................................................................... 110
    Section 7. Revenue Circumvention: ............................................................... 111
    Section 8. NFL Audit Rights: ......................................................................... 111
    Section 9. Prior Consultation: ........................................................................ 111
ARTICLE 15 SYSTEM ARBITRATOR ................................................................ 113
    Section 1. Appointment: .................................................................................. 113
    Section 2. Scope of Authority: ........................................................................ 113
    Section 3. Discovery: ...................................................................................... 113
    Section 4. Compensation: ............................................................................... 114
    Section 5. Procedures: ..................................................................................... 114
    Section 6. Selection of System Arbitrator ...................................................... 114
    Section 7. Selection of Appeals Panel: ........................................................... 115
    Section 8. Procedure for Appeals: .................................................................. 116
    Section 9. Decision: ........................................................................................ 116

Section 10. Confidentiality: ........................................................................................116

ARTICLE 16 IMPARTIAL ARBITRATOR ..............................................................117
Section 1. Selection: .................................................................................................117
Section 2. Scope of Authority: .................................................................................117
Section 3. Effect of Rulings: ....................................................................................117
Section 4. Discovery: ................................................................................................117
Section 5. Compensation of Impartial Arbitrator: ...............................................117
Section 6. Procedures: ..............................................................................................117
Section 7. Selection of Impartial Arbitrator: .........................................................117

ARTICLE 17 ANTI-COLLUSION ............................................................................119
Section 1. Prohibited Conduct: ...............................................................................119
Section 2. Other Club Conduct: ..............................................................................119
Section 3. Club Discretion: ......................................................................................119
Section 4. League Disclosures: ................................................................................119
Section 5. Enforcement of Anti-Collusion Provisions: .......................................120
Section 6. Burden of Proof: .....................................................................................120
Section 7. Summary Judgment: ...............................................................................120
Section 8. Remedies: .................................................................................................121
Section 9. Computation of Damages: .....................................................................121
Section 10. Player Election: ......................................................................................122
Section 11. Payment of Damages: ...........................................................................122
Section 12. Effect on Cap Computations: ..............................................................122
Section 13. Effect of Salary Cap: ............................................................................123
Section 14. No Reimbursement: ..............................................................................123
Section 15. Costs: ......................................................................................................123
Section 16. Termination: ..........................................................................................123
Section 17. Time Limits: ...........................................................................................123
Section 18. Prior Conference: ..................................................................................124

ARTICLE 18 CERTIFICATIONS .............................................................................125
Section 1. Contract Certification: ...........................................................................125
Section 2. End of League Year Certification: ........................................................125
Section 3. False Certification: ..................................................................................126

ARTICLE 19 CONSULTATION AND INFORMATION SHARING ....................127
Section 1. Salary Summaries: ...................................................................................127
Section 2. Consultation and Communications: .....................................................127
Section 3. Notice of Invalid Contract: ...................................................................127
Section 4. Copies: ......................................................................................................127

ARTICLE 20 OTHER PROVISIONS ........................................................................128
Section 1. CFL Rule: .................................................................................................128
Section 2. Physically Unable to Perform: ..............................................................128
Section 3. Nonfootball Injury: ................................................................................128
Section 4. Roster Exemption: ..................................................................................128
Section 5. Arena Football Players: ..........................................................................129

Section 6. Other Professional Leagues: ................................................................130

ARTICLE 21 OFFSEASON WORKOUTS ................................................................131
Section 1. Voluntary Workouts: ................................................................131
Section 2. Time Periods: ................................................................131
Section 3. Payment: ................................................................133
Section 4. Injuries: ................................................................133
Section 5. Miscellaneous: ................................................................133
Section 6. Pre-Training Camp Period: ................................................................134
Section 7. Rookie Premiere: ................................................................135
Section 8. Enforcement: ................................................................135
Section 9. Offseason Participation Contract: ................................................................137

ARTICLE 22 MINICAMPS ................................................................138
Section 1. Number: ................................................................138
Section 2. Mandatory Veteran Minicamp: ................................................................138
Section 3. Voluntary Veteran Minicamp: ................................................................138
Section 4. Expenses: ................................................................138
Section 5. Contact: ................................................................139
Section 6. Injuries: ................................................................139
Section 7. Rookie Football Development Programs and Minicamps: ................................139
Section 8. Films: ................................................................139
Section 9. Enforcement: ................................................................139
Section 10. Participation Agreement: ................................................................139

ARTICLE 23 PRESEASON TRAINING CAMPS ................................................................140
Section 1. Definition: ................................................................140
Section 2. Room and Board: ................................................................140
Section 3. First-year Player Per Diem: ................................................................140
Section 4. Veteran Per Diem: ................................................................140
Section 5. Reporting: ................................................................140
Section 6. Conduct of Practices: ................................................................140
Section 7. Number of Preseason Games: ................................................................141
Section 8. Expenses: ................................................................141
Section 9. Definition of "Preseason Training Camp": ................................................................141
Section 10. Films: ................................................................141
Section 11. Enforcement: ................................................................142

ARTICLE 24 REGULAR SEASON AND POSTSEASON PRACTICES ................................143
Section 1. Practice Rules: ................................................................143
Section 2. Bye Weeks: ................................................................143
Section 3. Enforcement: ................................................................143
Section 4. Films: ................................................................143

ARTICLE 25 SQUAD SIZE ................................................................145
Section 1. Active List: ................................................................145
Section 2. Pre-Season: ................................................................145
Section 3. Inactive List ................................................................145

Section 4. Active and Inactive List Limit: .................................................................145

ARTICLE 26 SALARIES ..........................................................................................146
   Section 1. Minimum Salaries: ...............................................................................146
   Section 2. Credited Season: ...................................................................................146
   Section 3. Other Compensation: ...........................................................................146
   Section 4. Arbitration: ...........................................................................................147
   Section 5. Payment: ...............................................................................................147
   Section 6. Deferred Paragraph 5: ...........................................................................147
   Section 7. Copies of Contracts: .............................................................................147
   Section 8. Split Contracts: .....................................................................................147
   Section 9. Funding of Deferred and Guaranteed Contracts: ................................148

ARTICLE 27 MINIMUM SALARY BENEFIT ........................................................149
   Section 1. Qualifying Players: ...............................................................................149
   Section 2. Qualifying Contracts: ...........................................................................149
   Section 3. Additional Compensation Rules: ..........................................................149
   Section 4. Payments: ..............................................................................................150
   Section 5. Reduced Salary Cap Count: ..................................................................150
   Section 6. Minimum Salary Benefit Calculation: ..................................................150
   Section 7. Extensions of Qualified Contracts: ......................................................150
   Section 8. Terminated Qualifying Players: ............................................................150
   Section 9. Players Moving to New Club: ...............................................................151
   Section 10. Player Returning to Old Club: ............................................................151
   Section 11. Players with Expired Contract: ...........................................................152
   Section 12. Guarantees: .........................................................................................152
   Section 13. Termination Pay: .................................................................................152
   Section 14. No Benefit for Non-Qualifying Contracts: ........................................152

ARTICLE 28 PERFORMANCE-BASED POOL ......................................................153
   Section 1. Creation Of Fund: ................................................................................153
   Section 2. Amount of Fund: ..................................................................................153
   Section 3. Mandatory Distribution Each Year: .....................................................153
   Section 4. Qualifying Players: ...............................................................................153
   Section 5. Methodology: ........................................................................................153
   Section 6. Corrections: ...........................................................................................154

ARTICLE 29 WAIVERS ...........................................................................................155
   Section 1. Release: .................................................................................................155
   Section 2. Contact: .................................................................................................155
   Section 3. Ineligibility: ..........................................................................................155
   Section 4. Notice of Termination: .........................................................................155
   Section 5. NFLPA's Right to Personnel Information: ...........................................155
   Section 6. Rosters: .................................................................................................156
   Section 7. Procedural Recall Waivers: ...................................................................156

ARTICLE 30 TERMINATION PAY .........................................................................157
   Section 1. Eligibility: .............................................................................................157

Section 2. Regular Season Signings: ..................................................................**157**
Section 3. Ineligibility For Termination Pay: .....................................................**157**

ARTICLE 31 ADDITIONAL REGULAR SEASON GAMES ...................................158

ARTICLE 32 EXPANSION..........................................................................................159
Section 1. Veteran Allocation: ..............................................................................159
Section 2. Additional Compensatory Picks: ........................................................159
Section 3. Rookie Compensation Pool Adjustment: ...........................................159
Section 4. Relocation Bonus: ................................................................................159

ARTICLE 33 PRACTICE SQUADS ............................................................................160
Section 1. Practice Squads: ...................................................................................160
Section 2. Signing With Other Clubs: ..................................................................160
Section 3. Salary: ...................................................................................................161
Section 4. Eligibility: .............................................................................................161
Section 5. Active List: ............................................................................................161
Section 6. Contagious Disease Addendum: ..........................................................161

ARTICLE 34 MEAL ALLOWANCE ...........................................................................164
Section 1. Reimbursement: ...................................................................................164
Section 2. Travel Day: ...........................................................................................164

ARTICLE 35 DAYS OFF ..............................................................................................165
Section 1. Preseason: .............................................................................................165
Section 2. Regular Season and Postseason: ..........................................................165
Section 3. Requirements: .......................................................................................165
Section 4. Regular Season Bye Weeks: .................................................................165

ARTICLE 36 MOVING AND TRAVEL EXPENSES ..................................................166
Section 1. Qualification: ........................................................................................166
Section 2. Moving Expenses: ................................................................................166
Section 3. Travel Expenses: ...................................................................................166
Section 4. Transportation: .....................................................................................167

ARTICLE 37 POSTSEASON PAY ...............................................................................168
Section 1. System: ..................................................................................................168
Section 2. Compensation: ......................................................................................168
Section 3. Wild Card Game; Division Play-off Game: .........................................168
Section 4. Conference Championship; Super Bowl Game: ..................................168
Section 5. Payment.................................................................................................169

ARTICLE 38 PRO BOWL GAME ...............................................................................170
Section 1. Compensation: ......................................................................................170
Section 2. Selection: ..............................................................................................170
Section 3. Wives: ...................................................................................................170
Section 4. Injury: ...................................................................................................170
Section 5. Payment: ...............................................................................................170
Section 6. Applicability:.........................................................................................170

ARTICLE 39 PLAYERS' RIGHTS TO MEDICAL CARE AND
TREATMENT.................................................................................171
   Section 1. Club Physician:..........................................................171
   Section 2.  Club Athletic Trainers:.............................................172
   Section 3. Accountability and Care Committee:........................172
   Section 4. Player's Right to a Second Medical Opinion:............173
   Section 5. Player's Right to a Surgeon of His Choice:..............173
   Section 6. Standard Minimum Preseason Physical.....................173
   Section 7. Substance Abuse:.......................................................173
ARTICLE 40 ACCESS TO PERSONNEL AND MEDICAL RECORDS.................175
   Section 1. Personnel Records:....................................................175
   Section 2. Medical Records:.......................................................175
   Section 3. Electronic Medical Record System: ..........................175
ARTICLE 41 WORKERS' COMPENSATION .........................................176
   Section 1. Benefits:....................................................................176
   Section 2. Rejection of Coverage:..............................................176
   Section 3. Arbitration:...............................................................176
   Section 4. Workers' Compensation Offset Provisions:...............176
   Section 5. Carve-Out .................................................................179
   Section 6. Reservation of Rights:..............................................179
ARTICLE 42 CLUB DISCIPLINE ........................................................180
   Section 1. Maximum Discipline:.................................................180
   Section 2. Published Lists:.........................................................181
   Section 3. Uniformity:...............................................................181
   Section 4. Disputes:...................................................................181
   Section 5. Deduction:................................................................181
   Section 6. NFL Drug and Steroid Policies: ...............................182
   Section 7. Cumulative Fines:......................................................182
   Section 8. Offset of Preseason Fine Amounts: ..........................182
   Section 9. Effective Date:...........................................................183
ARTICLE 43 NON-INJURY GRIEVANCE.............................................187
   Section 1. Definition:.................................................................187
   Section 2. Initiation:..................................................................187
   Section 3. Filing:.......................................................................187
   Section 4. Ordinary and Expedited Appeal:...............................187
   Section 5. Discovery and Prehearing Procedures:......................188
   Section 6. Arbitration Panel:......................................................189
   Section 7. Hearing:....................................................................189
   Section 8. Arbitrator's Decision and Award: .............................190
   Section 9. Time Limits: .............................................................190
   Section 10. Representation:.........................................................191
   Section 11. Costs:......................................................................191
   Section 12. Payment:..................................................................191

Section 13. Grievance Settlement Committee: ................................................191
Section 14. Standard Grievance Correspondence: ........................................191
ARTICLE 44 INJURY GRIEVANCE ..................................................................193
Section 1. Definition: ........................................................................................193
Section 2. Filing: ...............................................................................................193
Section 3. Answer: .............................................................................................193
Section 4. Neutral Physician: ...........................................................................194
Section 5. Neutral Physician List: ....................................................................195
Section 6. Appeal: ..............................................................................................195
Section 7. Arbitration Panel: ............................................................................195
Section 8. Hearing: ............................................................................................196
Section 9. Expenses: ..........................................................................................197
Section 10. Pension Credit: ..............................................................................198
Section 11. Payment: .........................................................................................198
Section 12. Presumption of Fitness: ................................................................198
Section 13. Playoff Money: ...............................................................................198
Section 14. Information Exchange: ..................................................................199
Section 15. Discovery: .......................................................................................199
Section 16. Grievance Settlement Committee: ................................................199
Section 17. Settlement Agreements: ................................................................199
Section 18. Standard Grievance Correspondence: .........................................199

ARTICLE 45 INJURY PROTECTION ................................................................200
Section 1. Qualification: ....................................................................................200
Section 2. Benefit: ..............................................................................................200
Section 3. Disputes: ...........................................................................................201
Section 4. Extended Injury Protection Qualification: ....................................201
Section 5. Extended Injury Protection Benefit: ..............................................201
Section 6. Extended Injury Protection Disputes: ...........................................202
Section 7. Workers' Compensation Offset: ......................................................202
Section 8. Filing: ................................................................................................203
Section 9. Costs: .................................................................................................203

ARTICLE 46 COMMISSIONER DISCIPLINE ..................................................204
Section 1. League Discipline: ............................................................................204
Section 2. Hearings: ...........................................................................................204
Section 3. Time Limits: .....................................................................................205
Section 4. One Penalty: .....................................................................................206
Section 5. Fine Money: ......................................................................................206

ARTICLE 47 UNION SECURITY .......................................................................207
Section 1. Union Security: .................................................................................207
Section 2. Check-off: ..........................................................................................207
Section 3. NFLPA Meetings: .............................................................................207
Section 4. NFLPA Player Group Licensing Program: ....................................207
Section 5. Disputes: ...........................................................................................208

Section 6. Procedure for Enforcement: ............................................208
Section 7. NFLPA Responsibility: ..................................................209
Section 8. Orientations: ..................................................................209
Section 9. Rookie Symposium: ......................................................209

ARTICLE 48 NFLPA AGENT CERTIFICATION ..............................210
Section 1. Exclusive Representation: ..............................................210
Section 2. Enforcement ...................................................................210
Section 3. Penalty: ..........................................................................210

ARTICLE 49 PLAYER SECURITY .....................................................212
Section 1. No Discrimination: .........................................................212
Section 2. Personal Appearance: .....................................................212

ARTICLE 50 COMMITTEES ...............................................................213
Section 1. Joint Committee: ............................................................213
Section 2. Competition Committee: ................................................214

ARTICLE 51 MISCELLANEOUS .........................................................215
Section 1. Endorsements: ................................................................215
Section 2. Player Attire: ..................................................................215
Section 3. Appearances: ..................................................................216
Section 4. Promotion: ......................................................................216
Section 5. Deduction: ......................................................................216
Section 6. Public Statements: ..........................................................216
Section 7. Address: ..........................................................................216
Section 8. NFLPA Tickets: ..............................................................216
Section 9. Player Tickets: ................................................................216
Section 10. Tests: .............................................................................217
Section 11. League Security: ...........................................................217
Section 12. Career Planning Program: ............................................217
Section 13. On-Field Microphones and Sensors: ............................217
Section 14. Practice Squad Super Bowl Rings: ...............................218

ARTICLE 52 PLAYER BENEFIT COSTS ............................................219
Section 1. General Right of Reduction: ..........................................219
Section 2. Right of Restoration: ......................................................219
Section 3. Resolution of Disputes: ..................................................219
Section 4. Limitations on Contributions: ........................................219
Section 5. Timing: ...........................................................................220

ARTICLE 53 RETIREMENT PLAN ......................................................221
Section 1. Maintenance and Definitions: ........................................221
Section 2. Contributions: .................................................................221
Section 3. Benefit Credits: ..............................................................221
Section 4. New Arbitration Procedures: ..........................................222
Section 5. Annual Benefit Eligibility Audits: .................................222
Section 6. Vesting Requirements: ....................................................222

x

ARTICLE 54 SECOND CAREER SAVINGS PLAN .................................................223
　Section 1. Maintenance: ...............................................................................223
　Section 2. Contributions: .............................................................................223

ARTICLE 55 PLAYER ANNUITY PLAN .............................................................225
　Section 1. Establishment ..............................................................................225
　Section 2. Contributions: .............................................................................225
　Section 3. Timing: ........................................................................................225
　Section 4. Structure: .....................................................................................225
　Section 5. New Tax-Qualified Portion: .......................................................226
　Section 6. NFL Player Annuity & Insurance Company Net Worth: .............226

ARTICLE 56 TUITION ASSISTANCE PLAN ......................................................227
　Section 1. Maintenance: ...............................................................................227
　Section 2. Eligibility: ...................................................................................227
　Section 3. Reimbursement: ...........................................................................228
　Section 4. Administration: ............................................................................228

ARTICLE 57 LEGACY BENEFIT ........................................................................229
　Section 1. Establishment: .............................................................................229
　Section 2. Benefit: ........................................................................................229
　Section 3. Cost: ............................................................................................229

ARTICLE 58 88 BENEFIT ...................................................................................230
　Section 1. Establishment: .............................................................................230
　Section 2. Dementia Benefits: ......................................................................230
　Section 3. Funding: .......................................................................................231
　Section 4. Term: ...........................................................................................231
　Section 5. Committee: ..................................................................................231

ARTICLE 59 GROUP INSURANCE .....................................................................232
　Section 1. Maintenance: ...............................................................................232
　Section 2. Extended Post-Career Medical And Dental Benefits: .................233
　Section 3. Limitations And Rules For Extended Insurance: .........................234
　Section 4. Administration: ............................................................................234

ARTICLE 60 SEVERANCE PAY ..........................................................................235
　Section 1. Eligibility and Maintenance: .......................................................235
　Section 2. Amount: .......................................................................................235
　Section 3. Payment: ......................................................................................235
　Section 4. Second Payment: .........................................................................235
　Section 5. Payable to Survivor: ....................................................................235
　Section 6. Administration: ............................................................................236
　Section 7. Nonassignability: .........................................................................236

ARTICLE 61 NFL PLAYER DISABILITY PLAN .................................................237
　Section 1. Maintenance: ...............................................................................237
　Section 2. New Disability Benefits: ..............................................................237
　Section 3. Increase in Benefit Amounts: ......................................................239

Section 4. Continuation of Benefits Following Term of Agreement: ................................239
Section 5. Improvements: ................................................................................240

ARTICLE 62 LONG TERM CARE INSURANCE PLAN ................................241
Section 1. Eligibility and Maintenance: ................................................241
Section 2. Benefits: ................................................................................241
Section 3. Limitations: ................................................................................241
Section 4. Plan Benefits Primary: ................................................................241
Section 5. Administration: ................................................................................241

ARTICLE 63 GENE UPSHAW NFL PLAYER HEALTH
REIMBURSEMENT ACCOUNT ................................................................242
Section 1. Establishment: ................................................................................242
Section 2. Contributions: ................................................................................242
Section 3. Eligibility: ................................................................................242
Section 4. Health Reimbursement Accounts: ..........................................242
Section 5. Payments from Health Reimbursement Accounts: ................243
Section 6. Structure: ................................................................................244
Section 7. Plan Operation in Post-Expiration Years: ............................244

ARTICLE 64 FORMER PLAYER LIFE IMPROVEMENT PLAN ................245
Section 1. Eligibility and Maintenance: ................................................245
Section 2. Administration: ................................................................................246
Section 3. NFLPA Review: ................................................................................246

ARTICLE 65 NEURO-COGNITIVE DISABILITY BENEFIT ..................247
Section 1. Establishment: ................................................................................247
Section 2. Eligibility: ................................................................................247
Section 3. Benefit: ................................................................................247
Section 4. Special Committee: ................................................................................248
Section 5. Effect of Eligibility for Subsequent Disability Benefits: ....248

ARTICLE 66 BENEFITS ARBITRATOR ................................................249
Section 1. Selection: ................................................................................249
Section 2. Compensation: ................................................................................249
Section 3. Role: ................................................................................249

ARTICLE 67 RETENTION OF BENEFITS ................................................251

ARTICLE 68 MUTUAL RESERVATION OF RIGHTS: LABOR
EXEMPTION ................................................................................252
Section 1. Rights Under Law: ................................................................................252

ARTICLE 69 DURATION OF AGREEMENT ................................................253
Section 1. Effective Date/Expiration Date: ............................................253

ARTICLE 70 GOVERNING LAW AND PRINCIPLES ................................254
Section 1. Governing Law: ................................................................................254
Section 2. Parol Evidence: ................................................................................254
Section 3. Mutual Drafting: ................................................................................254

Section 4. Headings:.................................................................254
Section 5. Binding Effect:..........................................................254
Section 6. Authorization:...........................................................254
Section 7. Appendices and Exhibits:...........................................254
Section 8. Time Periods:............................................................254
Section 9. Modification:.............................................................254
Section 10. Delivery of Documents:............................................254

APPENDIX A NFL PLAYER CONTRACT..................................256

APPENDIX B FIRST REFUSAL OFFER SHEET ........................265

APPENDIX C FIRST REFUSAL EXERCISE NOTICE ................266

APPENDIX D WAIVER OF FREE AGENT RIGHTS....................267

APPENDIX E EXAMPLES OF CAP PERCENTAGE AVERAGE
FRANCHISE AND TRANSITION TENDER CALCULATIONS ...........268

APPENDIX F ACCOUNTANTS' REVIEW PROCEDURES...................269

APPENDIX G OFFSEASON WORKOUT RULES.........................278

APPENDIX H NOTICE OF TERMINATION.............................279

APPENDIX I WRITTEN WARNING GOOD FAITH EFFORT ...........280

APPENDIX J PRACTICE SQUAD PLAYER CONTRACT ...............281

APPENDIX K STANDARD MINIMUM PRESEASON PHYSICAL
EXAMINATION ...................................................................291

APPENDIX L INJURY SETTLEMENT ....................................294

APPENDIX M CHECK-OFF AUTHORIZATION FOR NFLPA
DEDUCTIONS ....................................................................296

APPENDIX N ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST
METHOD ...........................................................................297

APPENDIX O HEALTH REIMBURSEMENT PLAN ACTUARIAL
ASSUMPTIONS AND FUNDING...............................................300

# PREAMBLE

This Agreement, which is the product of bona fide, arm's length collective bargaining, is made and entered into as of the 4th day of August, 2011 in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:

1.      All professional football players employed by a member club of the National Football League;

2.      All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;

3.      All rookie players once they are selected in the current year's NFL College Draft; and

4.      All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

# ARTICLE 1
## DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings unless expressly stated otherwise:

"Accrued Season" means any playing season for which a player received credit with respect to his qualifications for Unrestricted Free Agency or Restricted Free Agency.

"Agreement" means this Collective Bargaining Agreement.

"All Revenues" or "AR" means all of the League and Team revenues that are included within the definition of All Revenues, as set forth in Article 12.

"Benefits" or "Player Benefit Costs" means the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players as specified in Article 12.

"Club" or "Team" or "Member," used interchangeably herein, means any entity that is a member of the NFL or operates a franchise in the NFL at any time during the term of this Agreement.

"Club Affiliate" or "Team Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a Club or any owner of a Club.

"Commissioner" means the Commissioner of the NFL.

"Compensatory Draft Selection" means an additional Draft choice awarded to a Club in any Draft as described in Article 9 and Article 10.

"Discount rate" means a discount rate calculated using interest on an annual compounded basis using the one-year Treasury yields at constant maturities rate as published in The Wall Street Journal on February 1 (or the next date published) of the League Year in which the amount to be discounted accrues, is awarded, or occurs, as the case may be. If this rate is not published in The Wall Street Journal for any reason, then the website of the Federal Reserve (http://www.federalreserve.gov) shall be used to obtain the interest rate.

"Draft" or "College Draft" means the NFL's annual draft of Rookie football players as described in Article 6. "Supplemental Draft" means the supplemental draft in a given League Year, if held by the League.

"Draft Choice Compensation" means the right of any Club, as described in Article 9 and Article 10, to receive draft pick(s) from any other Club.

"Drafted Rookie" means a person who is selected in the current League Year's Draft or whose Draft rights are held, or continue to be held, consistent with this Agreement, by an NFL Club that selected the Rookie in a prior Draft.

"Exclusive Rights Player" means a player with less than three Accrued Seasons whose contract has expired but who has received the Required Tender described in Article 8.

"Final League Year" means the League Year which is scheduled prior to its commencement to be the final League Year of this Agreement. As of the date hereof, the Final League Year is the 2020 League Year.

1

"Free Agent" means a player who is not under contract and is free to negotiate and sign a Player Contract with any NFL Club, without Draft Choice Compensation or any Right of First Refusal.

"Guaranteed League-Wide Cash Spending" means the amount of cash spending guaranteed as a percentage of the Salary Cap as set forth in Article 12.

"Interest" means interest calculated at an annual compounded basis using the one-year Treasury yields at constant maturities rate as published in The Wall Street Journal on February 1 (or the next date published) of the League Year in which the amount to receive interest accrues, is awarded, or occurs as the case may be. If this rate is not published in The Wall Street Journal for any reason, then the website of the Federal Reserve (http://www.federalreserve.gov) shall be used to obtain the interest rate.

"League-Wide Cash Spending" means the aggregate amount of cash spent or committed to be spent by NFL Clubs on players in a League Year, calculated as set forth in Article 12.

"League Year" means the period from March [___] of one year through and including March [___] of the following year, or such other one year period to which the NFL and the NFLPA may agree.

"Minimum Salary" means the minimum annual Paragraph 5 Salary that can be contracted to be paid to an NFL player not on any Active list, and not on the Inactive list, pursuant to this Agreement.

"Minimum Active/Inactive List Salary" means the minimum annual Paragraph 5 Salary that can be contracted to be paid to an NFL player on any Active list, or on the Inactive list, pursuant to this Agreement.

"Negotiate" means, with respect to a player or his representatives on the one hand, and an NFL Club or its representatives on the other hand, to engage in any written or oral communication relating to efforts to reach agreement on employment and/or terms of employment between such player and such Club.

"New Club" means any Club except the Prior Club (as defined below).

"NFL" means the National Football League, including the NFL Management Council.

"NFL Player Contract" or "Player Contract" means a written agreement using the form attached as Appendix A with any addendum as permissible under Article 4 between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player.

"NFL Rules" means the Constitution and Bylaws, rules and regulations of the NFL and/or the Management Council.

"Paragraph 5 Salary" means the compensation set forth in Paragraph 5 of the NFL Player Contract, or in any amendments thereto.

"Player Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a player.

"Player Cost Amount" means the amount calculated pursuant to the rules set forth in Article 12.

"Practice Squad" means the Practice Squad as described in Article 33. "Practice Squad player" means a player on the Practice Squad.

"Practice Squad Player Contract" or "Practice Squad Contract" means a written agreement between a person and an NFL Club pursuant to which such person is employed by such Club as a Practice Squad player. For purposes of this Agreement, all references to Paragraph 4, 5, 9 or 10 of the NFL Player Contract shall be deemed, where applicable to a Practice Squad Player Contract, to be references to Paragraph 3, 4, 7 or 8, respectively, of the Practice Squad Player Contract.

"Preexisting Contract" means an NFL Player Contract (including any renegotiation or extension) executed before March 12, 2011.

"Prior Agreement" means the Collective Bargaining Agreement in effect during the 2006–10 League Years, as amended.

"Prior Club" means the Club that contracted with or otherwise held the NFL playing rights for the player for the previous League Year.

"Projected AR" means the amount of AR projected in accordance with the rules set forth in Article 12.

"Projected Benefits" means the amount of Benefits projected in accordance with the rules set forth in Article 12.

"Qualifying Offer" means the Required Tender for a Restricted Free Agent, as set forth in Article 9.

"Renegotiate" or "renegotiation" means any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract.

"Required Tender" or "Tender" means a Player Contract tender that a Club is required to make to a player pursuant to this Agreement, either as a matter of right with respect to the player, or to receive Rights of First Refusal, Draft Choice Compensation and/or other rights with respect to the player, as specified in this Agreement.

"Restricted Free Agent" means a Veteran who has three Accrued Seasons and who completes performance of his Player Contract, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club.

"Right of First Refusal" means the right of an NFL Club, as described in Article 9 and Article 10, to retain the services of certain Veteran players by matching offers made to those players.

"Rookie" means a person who has never before signed a Player Contract with an NFL Club. The first Player Contract signed by such person is a "Rookie Contract."

"Room" means the extent to which a Team's then-current Team Salary is less than the Salary Cap (as described in Article 13), and/or the extent to which a Team's Rookie Salary is less than the Year-One Rookie Allocation (as described in Article 7).

"Salary" means any compensation of money, property, investments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player or Player Affiliate, or is paid to a third party at the request of and for the benefit of a player or Player Affiliate, during a League Year, as calculated in accordance with the rules set forth in Article 13.

"Salary Cap" means the absolute maximum amount of Salary that each Club may pay or be obligated to pay or provide to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player

Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article 13.

"Settlement Agreement" means the agreement dated July 25, 2011 resolving, subject to the fulfillment of certain conditions, the lawsuit styled *Brady v. NFL.*

"System Arbitrator" means the arbitrator authorized by this Agreement to hear and resolve specified disputes as provided in this Agreement.

"Team Salary" means the Team's aggregate Salary for Salary Cap purposes, as calculated in accordance with the rules set forth in Article 13.

"Undrafted Rookie" means a Rookie who was eligible for but not selected in a College Draft for which he was eligible (as further defined in Article 6, Section 11).

"Unrestricted Free Agent" means a Veteran with four or more Accrued Seasons, who has completed performance of his Player Contract, and who is no longer subject to any exclusive negotiating rights, Right of First Refusal, or Draft Choice Compensation in favor of his Prior Club.

"Veteran" means a player who has signed at least one Player Contract with an NFL Club.

# ARTICLE 2
# GOVERNING AGREEMENT

*Section 1.* **Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the Settlement Agreement, NFL Player Contract, the NFL Constitution and Bylaws, the NFL Rules, or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. For the avoidance of doubt, the NFL shall be considered a signatory to this Agreement.

*Section 2.* **Implementation:** The parties will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFL and NFLPA will use their best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

*Section 3.* **Management Rights:** The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement.

*Section 4.* **Scope of Agreement:**
(a) This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article 47, Section 6, on Union Security, the NFLPA and the NFL waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws could significantly affect the terms and conditions of employment of NFL players, then the NFL will give the NFLPA notice of and negotiate the proposed change in good faith.
(b) The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a Non-Injury Grievance under Article 43, which shall be the exclusive method for resolving disputes arising out of this Section 4. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.

*Section 5.* **Rounding:** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, AR, Benefits, Player Costs,

5

Projected AR, Projected Benefits, Salary, Cash Spending, or Minimum Team Salary, such amounts shall be rounded to the nearest $1,000.

# ARTICLE 3
## NO STRIKE/LOCKOUT/SUIT

**Section 1. No Strike/Lockout:** Except as otherwise provided in Article 47 (Union Security), Section 6, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim that a party has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the party will have the right to submit such claim directly to the courts.

**Section 2. No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, or any term of this Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Rookie Compensation System, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, Guaranteed League-wide Cash Spending, the Salary Cap, Minimum Team Cash Spending, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the NFL, has: (1) breached the terms of this Agreement, the NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article 43 or asserting any claim before the System Arbitrator or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the *Brady* Settlement Agreement and from asserting such a claim before the System Arbitrator, Impartial Arbitrator, or the Appeals Panel, as provided for in the *Brady* Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the provisions of the Constitution and Bylaws of the NFL, which are appended to the side letter dated August 4, 2011, as they were operative and administered at the beginning date of the 2011 League Year; provided, however, that nothing herein shall prevent the NFLPA, its members, agents or bargaining unit members from asserting any rights they may have under the federal labor laws or under this Agreement or the *Brady* Settlement Agreement.

**Section 3. Releases and Covenants Not to Sue:**

(a)      The NFLPA on behalf of itself, its members, and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit or proceeding (including any Special Master proceeding brought pursuant to the *White* SSA and/or the

7

Prior Agreement) against the NFL or any NFL Club or any NFL Affiliate with respect to any antitrust or other claim asserted in *White v. NFL* or *Brady v. NFL*, including, without limitation, any claim relating to the 2011 lockout, any restrictions on free agency, any franchise player designations, any transition player designations, the Draft, the Entering Player Pool, the Rookie Compensation Pool, Total Revenues ("TR") or television rights fees with respect to any League Year prior to 2011, collusion with respect to any League Year prior to 2011, or any claim that could have been asserted in *White* or *Brady* related to any other term or condition of employment with respect to conduct occurring prior to the execution of this Agreement.  For purposes of clarity, this release does not cover any claim of any retired player.

      (b)     The NFL, on behalf of itself, the NFL, and the NFL Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns, releases and covenants not to sue, or to support financially or administratively, or voluntarily provide testimony of any kind, including by declaration or affidavit in, any suit (including any Special Master proceeding brought pursuant to the *White* SSA and/or the Prior Agreement) against the NFLPA or any of its members, or agents acting on its behalf, or any member of its bargaining unit, with respect to conduct occurring prior to the execution of this Agreement.

      (c)     Other than as provided in the Settlement Agreement, the releases and covenants not to sue in Subsections (b) and (c) above shall not apply to any Injury or Non-Injury Grievance asserted under the Prior Agreement, or to any proceeding to confirm an Injury or Non-Injury Grievance award under the Prior Agreement.

      (d)     The parties shall take prompt and immediate steps to dismiss the litigation, grievances, and arbitration referenced in Paragraph 4 of the Settlement Agreement and the NLRB proceeding referenced in the side letter to the Settlement Agreement dated July 26, 2011.

# ARTICLE 4
## NFL PLAYER CONTRACT

*Section 1.* Form: The NFL Player Contract form attached hereto as Appendix A will be used for all player signings. This form cannot be amended without the approval of the NFL and the NFLPA.

*Section 2.* Term: The NFL Player Contract shall expire on the last day of the last League Year subject to such Contract.

*Section 3.* Changes:

(a)     Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract consistent with the provisions of this Agreement.

(b)     The NFL Player Contract shall provide that the player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to any collective bargaining agreement during the express term of such agreement.

*Section 4.* Conformity:

(a)     All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement.

(b)     Any reference in a Preexisting Contract or a Contract executed between July 25, 2011 and the effective date of this Agreement to a player being on the Club's 45-man roster shall be deemed amended to refer to the Club's 46-man roster.

(c)     Any reference in a Preexisting Contract or a Contract executed between July 25, 2011 and the effective date of this Agreement to a player participating in a certain number of days of a Club's offseason workout program shall be deemed amended to refer to an equivalent number taking into account the maximum number of workouts in such a program under this Agreement as compared to the maximum number under the Prior Agreement (e.g., if a Preexisting Contract referred to a player participating in at least 40 workouts in an offseason program, it will be deemed amended to require participation in 26 workouts (40 out of a maximum of 56 workouts under the Prior Agreement is equivalent to 26 out of a maximum of 36 workouts in this Agreement).

(d)     The parties reserve their rights with respect to the validity of forfeiture provisions in Preexisting Contracts.

(e)     Any Player Contract signed after July 25, 2011 that uses the form from Appendix C of the Prior Agreement shall be deemed amended to use the form from Appendix A of this Agreement.

(f)     The provisions of Paragraph 4 of the NFL Player Contract (as set forth in Appendix A of this Agreement) shall be deemed to be a part of any Player Contract in effect during the term of this Agreement.

9

(g)     Any reference in a Player Contract signed after July 25, 2011 to "the Agreement" or to the Settlement Agreement shall be deemed amended to refer to the applicable provision of this Agreement.

*Section 5.* Notices, Prohibitions, etc.:

(a)     Any agreement between any player and any Club concerning terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. Each Club shall provide to the NFL a copy of each such Player Contract within two days of the execution of such contract by the player and the Club. The NFL shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. It is anticipated that each Club will send a copy of each such Player Contract to the NFL by overnight mail the day it is so executed, and the NFL will send a copy of such copy to the NFLPA by overnight mail the day it is so received. The NFL shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article 7 and/or Article 13, within two business days following the NFL's receipt of such information. Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

(b)     Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for nonfootball-related services shall be set forth in writing as a separate addendum to the player's Player Contract, which addendum shall state the amount of or otherwise describe such consideration. If such an agreement is executed subsequent to the execution of the player's NFL Player Contract, it must be submitted to the NFL as an addendum to that Player Contract within two days of the execution or making of the agreement. The NFL shall provide a copy of such addendum to the NFLPA within two business days of receipt.

(c)     No Club shall pay or be obligated to pay any money or anything else of value to any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract (or any addendum thereto for nonfootball-related services as described in Subsection 5(b) above). Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)     In addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This Subsection shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

(e)     No Player Contract may contain any individually-negotiated term transferring any player intellectual property rights to any Club or Club Affiliate or any Club sponsor.

10

(f)      No Club or player may agree upon any Player Contract provision concerning the termination of the contract that is inconsistent with the terms of this Agreement (including but not limited to the NFL Player Contract, Appendix A hereto), or the provisions of the NFL Constitution and Bylaws as set forth in the attachment to the letter dated August 4, 2011.

*Section 6.* **Commissioner Disapproval:**

(a)      If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefore by noon on the date following such disapproval.

(b)      In the event the Commissioner disapproves any Player Contract as being in violation of this Article, Article 7, Article 13, or any other provision of the this Agreement, the filing of an appeal of such disapproval pursuant to Article 14, Section 5 or Article 15, Section 1 of this Agreement, shall automatically stay the Commissioner's disapproval, and the player shall continue to be free to practice and play for the Club, until the System Arbitrator issues his or her ruling. Provided, however, that in the event such appeal is filed within one week of or after the first scheduled regular season game of the Club: (i) the appeal shall be conducted in an expedited manner and shall be concluded within five days of the filing date of such appeal; and (ii) the System Arbitrator shall issue his or her ruling by the end of such five day period. Provided, further, that, in the event the appeal is filed after the Club's first preseason game, but before the date one week before the Club's first scheduled regular season game: (i) the appeal shall be conducted in an expedited manner and shall be concluded within ten days of the filing date of such appeal; and (ii) the System Arbitrator shall issue his or her ruling by the end of such ten day period. If there is no ruling by the end of the periods prescribed in the preceding two sentences, or, for earlier filed appeals, by the day following the Club's third preseason game, the automatic stay shall be dissolved. If the Commissioner disapproves a Player Contract for any of the reasons stated above on a second occasion for the same player during a given League Year, and determines that such player should not be able to play, there shall be no stay of such disapproval pursuant to this Agreement, unless it is determined that the Commissioner's second disapproval is arbitrary or capricious.

*Section 7.* **NFLPA Group Licensing Program:** The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in Paragraph 4(b) of the NFL Player Contract (Appendix A hereto), regarding the NFLPA Group Licensing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision. No Club may enter into any agreement with a Player or a Player Affiliate that is inconsistent with any rights granted to the NFLPA pursuant to Paragraph 4(b) of the NFL Player Contract; provided that this sentence is not intended and shall not be construed to override or restrict the rights granted to the Club and the League pursuant to Paragraph 4(a) of the NFL Player Contract.

11

*Section 8.* **Good Faith Negotiation:**

    (a)    In addition to complying with specific provisions in this Agreement, any Club, any player, and any player agent or contract advisor engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

    (b)    A Club extending a Required Tender must, for so long as that Tender is extended, have a good faith intention to employ the player receiving the Tender at the Tender compensation level during the upcoming season. It shall be deemed to be a violation of this provision if, while the tender is outstanding, a Club insists that such a player agree to a Player Contract at a compensation level during the upcoming season below that of the Required Tender amount. The foregoing shall not affect any rights that a Club may have under the Player Contract or this Agreement, including but not limited to the right to terminate the contract, renegotiate the contract, or to trade the player if such termination, renegotiation, or trade is otherwise permitted by the Player Contract or this Agreement.

*Section 9.* **Forfeiture of Salary:** Players and Clubs may not agree upon contract provisions that authorize the Club to obtain a forfeiture of any Salary from a player except to the extent and in the circumstances provided in this Section 9. For the avoidance of doubt, Paragraph 5 Salary already earned may never be forfeited, and other Salary already earned may never be forfeited except as expressly provided herein. The maximum permitted forfeitures described below do not in any way obligate any player or Club to agree to any forfeiture.

    (a)    **Forfeitable Breach.** Any player who (i) willfully fails to report, practice or play with the result that the player's ability to fully participate and contribute to the team is substantially undermined (for example, without limitation, holding out or leaving the squad absent a showing of extreme personal hardship); or (ii) is unavailable to the team due to conduct by him that results in his incarceration; or (iii) is unavailable to the team due to a nonfootball injury that resulted from a material breach of Paragraph 3 of his NFL Player Contract; or (iv) voluntarily retires (collectively, any "Forfeitable Breach") may be required to forfeit signing bonus, roster bonus, option bonus and/or reporting bonus, and no other Salary, for each League Year in which a Forfeitable Breach occurs (collectively, "Forfeitable Salary Allocations"), as set forth below:

    (i)    **Training Camp.** If a player commits a Forfeitable Breach resulting in his absence for six preseason days after the start of training camp, the player may be required to forfeit up to 15% of his Forfeitable Salary Allocations, and up to an additional 1% of his Forfeitable Salary Allocations for each additional preseason day missed after the six days, up to a maximum of 25% of his Forfeitable Salary Allocations. A player who misses five days or less of training camp may not be subject to forfeiture.

    (ii)    **Continuing Violation.** If a player commits a Forfeitable Breach resulting in his absence from training camp and such absence continues into the regular season, in addition to the maximum forfeiture permitted by Subsection (i) above, the player may be required to forfeit an additional 25% of the remaining Forfeitable Salary Allocations upon missing the first regular season game. If such absence continues beyond the fourth week of the regular season, the player may be required to forfeit up to

his remaining Forfeitable Salary Allocations on a proportionate weekly basis (i.e., one-seventeenth for each missed regular season week after the fourth week).

   (iii)   **Regular Season.** If the player is not subject to Subsection (ii) above, and commits a Forfeitable Breach for the first time that League Year during the regular season, the player may be required to forfeit up to twenty-five percent (25%) of his Forfeitable Salary Allocations upon missing his first regular season game. If player's Forfeitable Breach continues beyond four (4) consecutive weeks, then player may be required to forfeit up to his remaining Forfeitable Salary Allocations on a proportionate weekly basis (i.e., one-seventeenth for each missed regular season week after the fourth week).

   (iv)   **Postseason.** For the period following the Club's last regular season game through the Club's last postseason game, a player who commits a Forfeitable Breach during such period may be required to forfeit up to 25% of his Forfeitable Salary Allocations for that League Year, subject to Subsection (d) below.

   (v)   **Second Forfeitable Breach.** If the player commits an initial Forfeitable Breach (including a Forfeitable Breach in training camp) and then commits a second Forfeitable Breach during the regular season or postseason in the same League Year, the player may be required to forfeit immediately the entirety of his remaining Forfeitable Salary Allocations for that League Year.

   (vi)   **Retirement.** Should a Forfeitable Breach occur due to player's retirement, a Club may demand repayment of all Forfeitable Salary Allocations attributable to the proportionate amount, if any, for the present year and the Forfeitable Salary Allocations for future years. If the player fails to repay such amounts, then the Club may seek an award from the System Arbitrator pursuant to Article 15, for repayment of all Forfeitable Salary Allocations attributable to present and future years. Repayment of Forfeitable Salary Allocations attributable to future League Years must be made by June 1st of each League Year for which each Forfeitable Salary Allocation is attributable. If the player returns to play for the Club in the subsequent season, then the Club must either (a) take the player back under his existing contract with no forfeiture of the remaining Forfeitable Salary Allocations, or (b) release the player and seek repayment of any remaining Forfeitable Salary Allocations for future League Years.

   (b)   **Forfeitable Salary Allocations.** For the purposes of this Section, the term "Forfeitable Salary Allocations" means: (i) for signing bonus, the Salary Cap allocation for the player's signing bonus for that League Year; and (ii) for roster, option and reporting bonuses that are earned in the same League Year as the Forfeitable Breach, the allocation of such bonus for that League Year, out of the total amount of such bonus as allocated over that League Year and any remaining League Years in the player's contract, notwithstanding the Salary Cap treatment of such bonuses. For example, without limitation, if a player has a $1 million roster bonus that is earned in the same year the player committed a Forfeitable Breach, then, regardless of when that roster bonus is to be paid, that bonus is attributable to the same year as the Forfeitable Breach; if the player has that year and one additional year remaining on his contract, then $500,000 of the roster bonus will be allocated to each of those years for purposes of any potential forfeiture calculation. If the Forfeitable Breach occurs in the second League Year in this example

13

(i.e., the League Year after the roster bonus in this example is earned), there shall be no forfeiture of any portion of such roster bonus.

(c)　　**Proportionate Forfeiture.** For purposes of this Section, a "proportionate" amount means one-seventeenth of the Forfeitable Salary Allocations for that League Year for each regular season week missed.

(d)　　**Maximum Forfeitable Salary.** Under this Section, and without limitation, under no circumstances may a player be required to forfeit more than 100% of his Forfeitable Salary Allocations for each League Year in which he commits a Forfeitable Breach. With respect to roster bonus, option bonus and reporting bonus, a forfeiture may only occur if the Forfeitable Breach occurs in the same League Year in which the bonus is scheduled to be earned.

(e)　　**Drug or Steroid Policy Violations.** Player Contracts may not contain individually negotiated provisions for forfeiture relating to violations of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or for failing any drug test. A player suspended by the League pursuant to either of those policies for a period encompassing regular season or postseason games shall be required to forfeit any Forfeitable Salary Allocations on a proportionate weekly basis.

(f)　　**Offseason.** Salary may not be subject to forfeiture for missing voluntary offseason programs or voluntary minicamps, provided that the Club may have non-proratable participation bonuses for its offseason workout program.

(g)　　**Voiding of Guarantees.** Notwithstanding any other provision of this Section 9, a Club and player may negotiate the circumstances under which the guarantee of any unearned Salary (including, without limitation, Paragraph 5 Salary and/or future year roster bonuses, option bonuses or reporting bonuses) may be voided. This Subsection (g) only applies to the guarantee aspect of the contract provision, and not to the amount that can be earned, and in no way expands the permissible scope of Forfeitable Salary under this Section.

(h)　　**Deduction/Payment.** Recovery of any forfeiture under this Section may be made from any payments owed to a player under any NFL Player Contract with the Club claiming the forfeiture, from any salary, bonus installments, Performance-Based Pay, Postseason Pay, Severance Pay or Termination Pay otherwise owed by the claiming Club. If the player challenges such recovery by filing a proceeding before the System Arbitrator, the Club shall be required to put the disputed sums in escrow pending receipt of a final award. The assignment and/or termination of a player's contract after events triggering the forfeiture shall not result in any waiver of the assigning or terminating Club's right to seek to recover the full amount of any forfeiture.

(i)　　**2006 CBA.** This Section is intended to supersede Section 9 of Article XIV of the Prior Agreement, and to overrule the decision in the proceeding under that Prior Agreement involving Plaxico Burress to the extent that the provisions in this Section 9 alter that decision with respect to Player Contracts entered into on or after July 25, 2011.

(j)　　**Dispute Resolution.** Any disputes regarding this Section, including any dispute regarding a player's failure to repay Salary pursuant to this Section, shall be resolved exclusively by the System Arbitrator under the provisions of Article 15.

14

(k)     **Club Discretion.** Except as provided in Subsection (e), any attempt to seek or collect a forfeiture from a player shall be solely in the Club's discretion, and any failure by a Club to seek a forfeiture from a player under this Section shall not be deemed a violation of any provision of this Agreement.

(l)     **Contract Provision.** It shall be permissible for a player and Club to agree in a Player Contract as follows: "Player shall be subject to forfeiture of Salary to the maximum extent permitted under Article 4, Section 9 of the Agreement dated July 25, 2011 [or "of the Collective Bargaining Agreement dated August 4, 2011]." A player is not in any way obligated to agree to any such forfeiture clause, or any lesser forfeiture permitted by this Section.

*Section 10.* **Return** of Advanced **Paragraph 5 Salary:** A player and Club may agree to the circumstances in which a player shall have to return any advanced Paragraph 5 Salary, so long as such agreement does not affect the player's ability to eventually earn such Paragraph 5 Salary by performing his services for the regular season week(s) in question. Nothing in this Section shall be construed to address the circumstances in which players are or are not entitled to Paragraph 5 Salary for such week(s).

# ARTICLE 5
## OPTION CLAUSES

*Section 1.* **Prohibition:** Other than as provided for in Article 7, Section 7, any option clause must be negotiated as a separate addendum to the NFL Player Contract form, and any negotiated option clause must state the dollar amount(s) of Salary to be paid to the player during the option year.

# ARTICLE 6
# COLLEGE DRAFT

*Section 1.* **Time of Draft:** There shall be an Annual Selection Meeting (the "College Draft" or "Draft") each League Year during the term of this Agreement and for the year immediately following the expiration or termination of this Agreement, with respect to which the following rules shall apply. In any League Year in which the NFL deems it appropriate, there may also be a Supplemental Draft.

*Section 2.* **Number of Choices and Eligibility:**

    (a)    The Draft shall consist of seven rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. Each Draft shall be held between February 14 and June 2, on a date which shall be determined by the Commissioner.

    (b)    No player shall be permitted to apply for special eligibility for selection in the Draft, or otherwise be eligible for the Draft, until three NFL regular seasons have begun and ended following either his graduation from high school or graduation of the class with which he entered high school, whichever is earlier. For example, if a player graduated from high school in December 2011, he would not be permitted to apply for special eligibility, and would not otherwise be eligible for selection, until the 2015 Draft.

    (c)    If a player who was not eligible for the Draft in any League Year becomes eligible after the date of the Draft, he will be eligible to be selected in a Supplemental Draft, if the League elects to conduct such a Draft, on or before the seventh calendar day prior to the opening of the first training camp that League Year. No player may elect to bypass a Draft for which he is eligible to apply for selection in a Supplemental Draft. Any Club that selects a player in a Supplemental Draft must forfeit a choice in the same round in the next succeeding principal Draft.

    (d)    No player shall be eligible to be employed by an NFL Club until he has been eligible for selection in an NFL Draft.

*Section 3.* **Required Tender:** A Club that drafts a player shall be deemed to have automatically tendered the player a four-year NFL Player Contract for the Minimum Active/Inactive List Salary for such League Years. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

*Section 4.* **Signing of Drafted Rookies:**

    (a)    A drafted player may accept the Required Tender at any time up to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00pm New York time. In the event the exclusive negotiating rights to the drafted player are assigned to another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If

17

released through waivers, the player shall be treated as an Undrafted Rookie, with the right to sign an NFL Player Contract with any Club, subject to the provisions of Article 7.

(b)    If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the first game of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may sign a Player Contract only for future League Year(s)).

(c)    If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

### Section 5. Other Professional Teams:

(a)    Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for, or is employed by a professional football team not in the NFL during all or any part of the 12-month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three League Years after the initial Draft, and shall thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club and of the date on which the player will be free of his other contractual obligations of employment, if any. Within thirty days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a Player Contract as set forth in Section 3 above to the player in order to retain its rights to that player, as detailed below.

(b)    For a player to whom the drafting Club retains the exclusive NFL rights pursuant to Section 4(a) above, the Club must tender a four-year NFL Player Contract for the Minimum Active/Inactive List Salary for such League Years, within the thirty day period specified in Subsection (a) above. If the player is released through waivers, the player immediately becomes an Undrafted Rookie, with the right to sign an NFL Player Contract with any Club, subject to the provisions of Article 7, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     For players with respect to whom the drafting Club retains a Right of First Refusal pursuant to this Section 5, during each League Year the player shall be treated as if he were a Restricted Free Agent not subject to Draft Choice Compensation, as described in Article 9, Section 2, except as otherwise set forth in this Section 5. For such players subject to a Right of First Refusal, the Club must tender a four-year NFL Player Contract for the Minimum Active/Inactive List Salary for such League Years within the thirty day period specified in Subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall not be subject to the Rookie Compensation Pool. If the Club does not make or withdraws the Required Tender, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, subject to the applicable provisions of Article 7, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 6. Return to College:** If any college football player who becomes eligible for the Draft prior to exhausting his college football eligibility through participation is drafted by an NFL Club, and returns to college, the drafting Club's exclusive right to negotiate and sign a Player Contract with such player shall continue through the date of the Draft that follows the last season in which the player was eligible to participate in college football, and thereafter the player shall be treated and the Club shall have such exclusive rights as if he were drafted in such Draft by such Club (or assignee Club).

**Section 7. Assignment of Draft Rights:** In the event that the exclusive right to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned from one Club to another Club, the Club to which such right has been assigned shall have the same, but no greater, right to such player, including the Right of First Refusal described in Section 5, as would the Club assigning such right, and such player shall have the same, but no greater, obligation to the NFL Club to which such right has been assigned as he had to the Club assigning such right.

**Section 8. Subsequent Draft:** A Club that, in a subsequent Draft, drafts a player who (a) was selected in an initial Draft, and (b) did not sign a contract with the NFL Club that drafted him or with any assignee Club during the signing period set forth in Sections 4 through 6 above, shall, during the period from the date of the subsequent Draft to the date of the Draft held the subsequent League Year, be the only NFL Club that may negotiate with or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may sign a Player Contract only for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right

19

to negotiate and sign a Player Contract with any Club, subject to the provisions of Article 7, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 9.* **No Subsequent Draft:** If a player is drafted by a Club in an initial Draft and (a) does not sign a contract with a Club during the signing period set forth in Sections 4 through 6 above, and (b) is not drafted by any Club in the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 10.* **Compensatory Draft Selections:** The rules and procedures regarding Compensatory Draft Selections previously agreed upon by the NFL and the NFLPA shall remain in effect, subsequent to any future changes as to which the parties may agree.

*Section 11.* **Undrafted Rookies:** Any person who has not been selected by a Club in a College Draft shall be an Undrafted Rookie, and shall be free, after the completion of a College Draft for which he is eligible, to negotiate and sign a Player Contract with any Club, subject to the provisions of Article 7, and any Club shall be completely free to negotiate and sign a Player Contract with any such person after such date, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind.

*Section 12.* **Notice of Signing:** Promptly following but no later than two business days after receipt of notice of the signing of any Drafted or Undrafted Rookie, the NFL shall notify the NFLPA of such signing.

# ARTICLE 7
# ROOKIE COMPENSATION AND ROOKIE COMPENSATION POOL

*Section 1.* **Definitions:**

    (a)    **Rookie Salary.**

    (i)    "Rookie Salary" for a Drafted Rookie means the highest amount of earnable compensation for which such player and Club have contracted in each year of his Rookie Contract regardless of whether any or all amounts are earned or considered "likely to be earned" as set forth in Article 13, excluding only (A) the Fifth-Year Option Paragraph 5 Salary described in Section 7 below, (B) the amount by which the player's Paragraph 5 Salary may increase pursuant to the Proven Performance Escalator as described in Section 4 below, (C) minimum offseason workout per diem as set forth in Article 21, and (D) compensation for community relations/sponsor appearances (subject to the maximum amounts permitted in Section 3(b)(iv) below).

    (ii)    "Rookie Salary" for an Undrafted Rookie means the highest amount of earnable compensation for which such player and Club have contracted in each year of his Rookie Contract that exceeds the then-applicable Minimum Active/Inactive Salary for each League Year of the contract regardless of whether any or all amounts are earned or considered "likely to be earned" as set forth in Article 13, excluding only (A) minimum offseason workout per diem, and (B) compensation for community relations/sponsor appearances (subject to the maximum amounts permitted in Section 3(b)(iv) below).

    (iii)    For the purposes of calculating Rookie Salary in each year of a player's Rookie Contract, signing bonus and amounts treated as signing bonus will be prorated on a straight line basis pursuant to Section 3(g) below. By way of example, a Drafted Rookie who has a $1,000,000 Paragraph 5 Salary, $250,000 in signing bonus proration and a $250,000 incentive for 95% offensive playtime in each of the first four years of his contract would have a Rookie Salary in each League Year equal to $1,500,000, and Rookie Salary over the contract's entire term of $6,000,000, regardless of whether he earns any or all of the above amounts or whether any or all of the above amounts are considered "likely to be earned."

    (b)    **Year-One Rookie Salary.**

    (i)    "Year-One Rookie Salary" for a Drafted Rookie means the highest amount of earnable compensation for which such player and Club have contracted in the first year of his Rookie Contract regardless of whether any or all amounts are earned or considered "likely to be earned" as set forth in Article 13, excluding only (A) minimum offseason workout per diem, and (B) compensation for community relations/sponsor appearances (subject to the maximum amounts permitted in Section 3(b)(iv) below).

    (ii)    "Year-One Rookie Salary" for an Undrafted Rookie means the highest amount of earnable compensation for which such player and Club have contracted in the first year of his Rookie Contract that exceeds the then-applicable Minimum Active/Inactive Salary for players with zero credited seasons regardless of whether any or all amounts are earned or considered "likely to be earned" as set forth in Article 13, excluding only (A) minimum offseason workout per diem, and (B) compensation for

21

community relations/sponsor appearances (subject to the maximum amounts permitted in Section 3(b)(iv) below).

(iii)     For the purposes of calculating Year-One Rookie Salary, signing bonus and amounts treated as signing bonus will be prorated on a straight line basis pursuant to Section 3(g) below. By way of example, a Drafted Rookie who has a $1,000,000 Paragraph 5 Salary, $250,000 in signing bonus proration and a $250,000 incentive for 95% offensive playtime in his first season would have Year-One Rookie Salary in that League Year of $1,500,000 regardless of whether he earns any or all of the above amounts in his first season or whether any or all of the above amounts are considered "likely to be earned."

(c)     **Total Rookie Compensation Pool.** "Total Rookie Compensation Pool" means the League-wide limit on the total amount of Rookie Salary for which all Clubs may contract with Drafted and Undrafted Rookies over the entire term of such Rookie Contracts. By way of example, a Drafted Rookie selected in the second round who signs a four-year contract with Rookie Salary of $1,000,000 in year one, $1,100,000 in year two, $1,200,000 in year three, and $1,300,000 in year four would have $4,600,000 count against the Total Rookie Compensation Pool.

(d)     **Year-One Rookie Compensation Pool.** "Year-One Rookie Compensation Pool" means the League-wide limit on the total amount of Year-One Rookie Salary for which all Clubs may contract with Drafted Rookies and Undrafted Rookies in the first year of such Rookie Contracts. By way of example, a Drafted Rookie selected in the second round who signs a four-year contract with Rookie Salary of $1,000,000 in year one, $1,100,000 in year two, $1,200,000 in year three, and $1,300,000 in year four would have $1,000,000 count against the Year-One Rookie Compensation Pool.

(e)     **Total Rookie Allocation.** "Total Rookie Allocation" means, for each Club, its proportional share of the Total Rookie Compensation Pool, calculated based upon the number, round and position of the Club's selection choices in the Draft, plus the Undrafted Rookie Reservation (as defined in Subsection (i) below). The sum of the Total Rookie Allocations for all Clubs shall equal the Total Rookie Compensation Pool.

(f)     **Year-One Rookie Allocation.** "Year-One Rookie Allocation" means, for each Club, its proportional share of the Year-One Rookie Compensation Pool, calculated based upon the number, round and position of the Club's selection choices in the Draft plus one-third of the Undrafted Rookie Reservation (as defined in Subsection (i) below). The sum of the Year-One Rookie Allocations for all Clubs shall equal the Year-One Rookie Compensation Pool.

(g)     **Year-One Formula Allotment.** "Year-One Formula Allotment" means, for each Drafted Rookie, a fraction calculated based upon the player's round and position in the Draft and expressed as a percentage of the Year-One Rookie Compensation Pool (excluding compensatory selections and one-third of the Undrafted Rookie Reservation). The (i) sum of the Year-One Formula Allotments for all of a Club's Drafted Rookies, multiplied by the Year-One Rookie Compensation Pool (excluding compensatory selections), plus (ii) one-third of the Undrafted Rookie Reservation shall equal the Club's Year-One Rookie Allocation. The Year-One Formula Allotment for each selection shall remain in effect for the duration of this Agreement unless the parties agree otherwise. The Year-One Formula Allotment attributed to each draft selection shall be

22

agreed to by the NFL and the NFLPA, and shall not be disclosed to Clubs, Players, Player Agents or the public.

(h) **Year-One Minimum Allotment.** "Year-One Minimum Allotment" means, for each Drafted Rookie, a fraction (or such other amount to which the parties may agree) that shall equal the selection's absolute minimum share of the Year-One Rookie Compensation Pool, calculated based upon the player's round and position in the Draft and expressed as a percentage of the Year-One Rookie Compensation Pool. The methodology for the calculation of the Year-One Minimum Allotment attributed to each draft selection shall be agreed to by the NFL and the NFLPA in a Side Letter between the Parties, which methodology shall not be disclosed to Clubs, Players, Player Agents or the public and shall remain in effect for the duration of the Agreement unless the Parties agree otherwise.

(i) **Undrafted Rookie Reservation.** For the 2011 League Year, a maximum of $75,000 per Club may be paid to Undrafted Rookies as signing bonus or amounts treated as signing bonus. This amount (the "Undrafted Rookie Reservation") shall increase each subsequent League Year by the percentage increase of the Total Rookie Compensation Pool.

*Section 2.* **Operation:**

(a) For the 2011 League Year, the Total Rookie Compensation Pool (excluding compensatory selections and the Undrafted Rookie Reservation) may not exceed $874.5 million. For the 2011 League Year, the Year-One Rookie Compensation Pool (excluding compensatory selections and one-third of the Undrafted Rookie Reservation) shall equal $159 million. Excluding compensatory selections, the Total Rookie Compensation Pool and the Year-One Rookie Compensation Pool shall increase or decrease in each League Year by the same percentage as the change in the Salary Cap, up to a maximum of 5% plus 50% of any increase or decrease over 5%. By way of example, if the Salary Cap increases by 9%, then the Total Rookie Compensation Pool and the Year-One Rookie Compensation Pool shall increase by 7% (i.e., 5% plus 50% of the additional 4%).

(b) All amounts of Rookie Salary contracted for in each and every year of a Club's Rookie Contracts shall count against the Total Rookie Compensation Pool and the Club's Total Rookie Allocation whether or not such amounts are earned by the player or considered "likely to be earned" as set forth in Article 13.

(c) All amounts of Year-One Rookie Salary shall count against the Year-One Rookie Compensation Pool, the Club's Year-One Rookie Allocation and the Total Rookie Compensation Pool, whether or not such amounts are earned by the players or considered "likely to be earned" as set forth in Article 13.

(d) No Club may enter into Rookie Contracts that, standing alone or in the aggregate, provide for Year-One Rookie Salary that would exceed the Club's Year-One Rookie Allocation for that League Year. No Club may enter into Rookie Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Year-One Rookie Salary that would exceed the (i) Club's Year-One Rookie Allocation for that League Year, minus (ii) one-third of the Undrafted Rookie Reservation (i.e., $25,000 in the 2011 League Year).

(e)     No Club may enter into Rookie Contracts that, standing alone or in the aggregate, provide for aggregate Rookie Salary over all years of such Contracts that would exceed the Club's Total Rookie Allocation. No Club may enter into Rookie Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Rookie Salary that would exceed (i) the Club's Total Rookie Allocation for that League Year, minus (ii) the Undrafted Rookie Reservation.

(f)     A Club may not sign a Drafted Rookie for Year-One Rookie Salary that is less than the player's Year-One Minimum Allotment multiplied by the Year-One Rookie Compensation Pool.

(g)     Notwithstanding the above, nothing shall prevent a Club from signing a player for an amount in excess of his Year-One Formula Allotment multiplied by the League-wide Year-One Rookie Compensation Pool, or his Year-One Minimum Allotment multiplied by the Year-One Rookie Compensation Pool, provided that the Club has Room available under its Year-One Rookie Allocation.

(h)     In the event that a Rookie signs his Rookie Contract after the commencement of the regular season, the Club must maintain Room under its Year-One Rookie Allocation of at least the Rookie's Year-One Minimum Allotment multiplied by the Year-One Rookie Compensation Pool.

(i)     All Rookie Contracts entered into by a Club and a Drafted or Undrafted Rookie shall be subject to the provisions of Article 14 of this Agreement.

(j)     Any contract that violates the intent of any provision of this Article shall be disapproved. It is the intent of the parties to set an absolute maximum limit on the total amount of compensation contracted for by Drafted and Undrafted Rookies in each Draft class over the entire term of the players' Rookie Contracts. If a contract signed by a Drafted or Undrafted Rookie is disapproved by the Commissioner as being inconsistent with the provisions of this Article in respect of (i) the mandatory term (length) of the contract; (ii) permissible compensation pursuant to (1) the Year-One Rookie Compensation Pool, (2) the Total Rookie Compensation Pool, (3) the Club's Year-One Rookie Allocation, (4) the Club's Total Rookie Allocation, (5) the 25% Increase Rule, (6) the player's Year-One Minimum Allotment, (7) the Fifth Year Option, (8) the Proven Performance Escalator, or (9) the limit on the player's permissible nonfootball compensation; or (iii) guarantees; the disapproval shall be upheld by the System Arbitrator and the Appeals Panel unless clear and convincing evidence demonstrates that the decision to disapprove the contract was incorrect.

(k)     None of the provisions of this Article shall affect a Club's need for Room under the Salary Cap to sign a Rookie Contract or the accounting rules governing the Salary Cap set forth in Article 13.

*Section 3.* **Rookie Contracts:**

(a)     **Contract Length.** Every Rookie Contract shall have a fixed and unalterable contract length: (i) four years for Rookies selected in the first round of the Draft, with a Club option for a fifth year as described in Section 7 below; (ii) four years for Rookies selected in rounds two through seven of the Draft (including any compensatory draft selections); and (iii) three years for Undrafted Rookies.

(b)     **Compensation Terms.**

24

(i)     Subject to Subsection (iv) below, Rookies drafted in the first round may contract for only the following types of compensation: (1) Rookie Salary, (2) minimum offseason workout per diem commencing in the contract's second season; and (3) the Fifth-Year Option as described in Section 7 below. Rookies drafted in the second round may contract for only the following types of compensation: (1) Rookie Salary; and (2) minimum offseason workout per diem commencing in the contract's second season. Rookies drafted in the third through seventh round may contract for only the following types of compensation: (1) Rookie Salary, (2) minimum offseason workout per diem commencing in the contract's second season; and (3) the Proven Performance Escalator as described in Section 4 below.

(ii)    Subject to Subsection (iv) below, Undrafted Rookies may contract for only the following types of compensation: (1) Rookie Salary, (2) minimum offseason workout per diem commencing in the contract's second season, and (3) the applicable Minimum Salary for players on the Club's Active/Inactive List Salary and/or the applicable Minimum Salary for players not on the Club's Active/Inactive List.

(iii)   Rookie Salary shall include only: (1) traditional signing bonus, defined as signing bonus committed to the player by the Club upon execution of the contract (subject to the player reporting to the Club and passing the physical examination), subject to any forfeiture provisions to which the player and Club may agree to the extent permitted in Article 4; (2) offseason workout bonus; (3) Paragraph 5 Salary (including any agreed-upon provisions adjusting the player's Paragraph 5 Salary based upon his roster status and/or his number of Credited Seasons ("split contract provisions") or deferring payment of his earned Paragraph 5 Salary or advancing payment of non-guaranteed year-one Paragraph 5 Salary); (4) Paragraph 5 Salary guarantees (subject to the rules set forth in Subsection (h) below); (5) the permitted performance incentives set forth in Section 6 below; (6) roster bonus; and (7) reporting bonus.

(iv)    Aside from the terms outlined in Subsections (i) through (iii), above, no cash or non-cash financial or economic consideration of any kind (e.g., suites, automobiles, loans, etc.) may be paid or promised to the player for any reason whatsoever including, but not limited to, the player's performance of nonfootball-related services with the exception of an agreement that the player will make up to, but no more than, five community relations/sponsor appearances or promotional activities per year on the Club's behalf in exchange for cash compensation at prevailing commercial rates not to exceed $5,000 per appearance. Clubs may not contract for, or require the player to make more than five community relations/sponsor appearances or promotional activities per year.

(c)     **Other Permissible Terms.** All Rookie Contracts shall use the standard-form Player Contract described in Article 4 and set forth in Appendix A of this Agreement and may contain minimum offseason workout per diem commencing in the contract's second season. Rookie Contracts for players drafted in round one shall contain the Fifth-Year Option described in Section 7 below. Rookie Contracts for players drafted in rounds three through seven shall contain the Proven Performance Escalator described in Section 4 below. A Rookie Contract may also contain non-compensation terms relating to: (1) player appearances/promotions; (2) workers' compensation issues; (3) waivers of Club liability for preexisting injuries/physical conditions; (4) forfeiture of

25

compensation and/or of guarantees to the extent permitted in Article 4; (5) deduction or repayment of advanced non-guaranteed year-one Paragraph 5 Salary; (6) insurance policies; (7) tax implications; (8) confidentiality (subject to Article 26); (9) the severability of unenforceable contract terms; (10) legal/contractual interpretation issues; (11) representations and warranties that at the time the contract is executed, no circumstances exist that would prevent the player's continuing availability to the Club for the duration of the contract; (12) waiver of a Club's right to enforce any of the terms of Paragraph 3 of the NFL Player Contract; and (13) waiver of a Club's rights regarding the designations of, or the Required Tender amounts for, Franchise or Transition Players. With the sole exception of the compensation terms that appear in Subsection (b) above, the other permissible terms that appear in this Subsection, and, if applicable, the Proven Performance Escalator in Section 4 and the Fifth-Year Option in Section 7 of this Article, any other contract terms will be deemed null and void ab initio unless the parties to this Agreement agree otherwise.

(d)     **Prohibited Terms.** The following contract provisions are prohibited in a Rookie Contract: option bonuses, option exercise fees, option nonexercise fees, Salary advances (other than advances of non-guaranteed year-one Paragraph 5 Salary as described in Subsection (b)(iii)(3) above), voidable year(s) provisions, buybacks of voidable year(s) provisions, and any "contract within the contract" (i.e., terms and conditions of a contemplated superseding contract within the Rookie Contract).

(e)     **25% Increase Rule.** No Rookie Contract may provide for an annual increase of more than 25% of the player's Year-One Rookie Salary unless such contract provides only for Paragraph 5 Salary equal to the then-applicable Minimum Active/Inactive Salary for each League Year of the Contract. By way of example, if a player drafted in the second round signs a four-year contract with a $400,000 signing bonus, a $500,000 Paragraph 5 Salary, and no performance incentives in his first season, the player's Year-One Rookie Salary will equal $600,000, i.e., the prorated portion of his signing bonus ($100,000) plus his Paragraph 5 Salary ($500,000). Accordingly, the player's maximum annual increase in Rookie Salary may not exceed $150,000 ($600,000 × 25%).

(f)     **All Salary Included in Calculations.** All Rookie Salary shall count toward the Total Rookie Compensation Pool, the Year-One Rookie Compensation Pool, the Club's Year-One Rookie Allocation, the Club's Total Rookie Allocation, and the 25% Increase Rule.

(g)     **Signing Bonus Proration.** The total amount of any signing bonus, or amount treated as signing bonus, shall be prorated over the term of the Rookie Contract, with a maximum proration of four years, on a straight-line basis beginning in the first year of the player's contract, such that each contract year (excluding year five for players selected in round one of the draft) shall have an equal prorated amount, and such equal prorated amount shall count in the calculation of Rookie Salary and against the Total Rookie Compensation Pool for that Draft class and the Club's Total Rookie Allocation in each League Year of the contract. The amount prorated in the player's first contract year shall count in the calculation of Year-One Rookie Salary and against the Year-One Rookie Compensation Pool for that Draft class and the Club's Year-One Rookie Allocation.

(h)     **Guaranteed Rookie Salary.** Rookie Salary (excluding the performance incentives described in Section 6 below) may be guaranteed for skill, football-related injury and/or Salary Cap-related contract terminations, provided that no player's Rookie Salary (excluding performance incentives) in his third League Year or fourth League Year (for Drafted Rookies) may be guaranteed for skill, football-related injury or Salary Cap-related contract termination unless the player's entire Rookie Salary (excluding performance incentives) has been similarly guaranteed (i.e., for the same type(s) of contract termination) in the immediately preceding year of the contract. By way of example, if a Drafted Rookie signs a four-year contract with Rookie Salary (excluding performance incentives) of $1,000,000 in year one, $1,250,000 in year two, $1,500,000 in year three, and $1,750,000 in year four, no portion of his year-four Rookie Salary may be guaranteed for skill and injury unless the player's full Rookie Salary (excluding performance incentives) for year two ($1,250,000) and year three ($1,500,000) is also guaranteed for skill and injury. For the avoidance of doubt, and by way of further example, a Club may guarantee year-four Rookie Salary for injury only when the Club also guarantees years two and three either just for injury, or for injury, skill, and Salary Cap-related termination.

(i)     **No Contingencies.** A player's Rookie Salary, as well as all other mandatory or permissible contract terms (including, but not limited to, length of the contract and Salary guarantees), may not change based upon any contingency (e.g., without limitation, roster condition, offseason workout participation, playtime, honors, team or individual performance, the player's earning or not earning specific compensation, or the Club's decision to forgo the exercise of any contract rights). By way of example, if the player fails to earn a $100,000 incentive applicable to the second year of his contract, the unearned amount cannot be added to a $100,000 incentive applicable to the third year of his contract, thereby resulting in a $200,000 incentive.

(j)     **Release or Trade of Drafted Rookies.** (i) If a Drafted Rookie is released prior to signing a Player Contract (i.e., the Club withdraws its Tender), the Club's Year-One Rookie Allocation will be reduced by the released player's Year-One Minimum Allotment multiplied by the Rookie Compensation Pool. In the event that a Draft selection (i.e., a draft slot) is assigned to another Club prior to completion of the Draft, the amount of the Year-One Formula Allotment for such selection shall be assigned to the Club receiving the selection. A Club may not assign the exclusive negotiating rights to a Drafted Rookie to another Club if such new Club does not have Room under its Year-One Rookie Allocation equal to at least the original Year-One Minimum Allotment for the player multiplied by the Total Rookie Compensation Pool. The New Club will not receive any additional Room in its Year-One Rookie Allocation or Total Rookie Allocation.

(ii)     If a Drafted Rookie is released by the drafting Club after signing his initial contract and such player re-signs with the same Club at any point during the League Year in which he was drafted, the signing Club may not enter into a contract with the player for more than the Year-One Rookie Salary set forth in the first year of the player's initial contract with the Club, less any amounts the player earned under his initial contract before his release, and the player's Contract cannot provide for an annual increase in Salary (as defined in Article 13) of more than 25% of the Year-One Rookie Salary in his initial Rookie Contract.

27

(k)     **Renegotiations.**

(i)     A Rookie Contract for a Drafted Rookie may not be renegotiated, amended or altered in any way until after the final regular season game of the player's third contract year.

(ii)     A Rookie Contract for an Undrafted Rookie may not be renegotiated, amended or altered in any way until after the final regular season game of the player's second contract year.

(iii)     For the avoidance of doubt, any permissible renegotiated or extended Player Contract shall not be considered a Rookie Contract, and shall not be subject to the rules that limit Rookie Contracts.

*Section 4.* **Proven Performance Escalator:**

(a)     The Proven Performance Escalator is mandatory for Rookies drafted in the third through seventh rounds. Rookies drafted in the first or second rounds and Undrafted Rookies are not eligible to earn the Proven Performance Escalator.

(b)     The Proven Performance Escalator is a non-negotiable amount by which an eligible player's year-four Paragraph 5 Salary may escalate provided the player achieves at least one of the two qualifiers set forth in Subsection (c) below. The Proven Performance Escalator shall be deemed a part of every Rookie Contract of a player selected in the third through seventh round by virtue of this Agreement and may not be separately attached to such Rookie Contract.

(c)     **Qualifiers.** An eligible player will qualify for the Proven Performance Escalator in his fourth League Year if: (1) he participated in a minimum of 35% of his Club's offensive or defensive plays in any two of his previous three regular seasons; or (2) he participated in a "cumulative average" of at least 35% of his Club's offensive or defensive plays over his previous three regular seasons. "Cumulative average" means the sum of the total number of offensive or defensive plays in which the player participated over the applicable seasons, divided by the sum of the Club's offensive or defensive plays during the same seasons. (By way of example, if a player participates in 600 of the Club's 1,000 offensive plays in his first season, 290 of the Club's 1,000 plays in his second season, and 310 of the Club's 1,000 plays in his third season for a total of 1,200 plays out of a possible 3,000, the cumulative average would equal 40%).

(d)     **Amount.** The Proven Performance Escalator shall equal the difference between (i) the amount of the Restricted Free Agent Qualifying Offer for a Right of First Refusal Only as set forth in, or as calculated in accordance with, Article 9 for the League Year in such player's fourth season and (ii) the player's year-four Rookie Salary (excluding signing bonus and amounts treated as signing bonus). The resulting amount shall be added to the stated amount of the player's year-four Paragraph 5 Salary. By way of example, if a rookie drafted in round three of the 2011 Draft has a year-four Rookie Salary of $1,000,000 (consisting of $700,000 in Paragraph 5 Salary, $150,000 in signing bonus proration, $100,000 in an incentive, and a $50,000 roster bonus), and the 2014 Restricted Free Agent Qualifying Offer for a Right of First Refusal Only equals $1,400,000, then, upon achieving the qualifier, the player's stated Paragraph 5 Salary ($700,000) shall increase by $550,000 (i.e., $1,400,000 minus (1) the $700,000 Paragraph 5 Salary, (2) the $100,000 incentive, and (3) the $50,000 roster bonus). As a result, the

player's total earnable Salary in the 2014 League Year (minus his signing bonus prora-
tion) shall be $1,400,000, consisting of the player's $1,250,000 Paragraph 5 Salary (as
escalated), his $100,000 incentive, and his $50,000 roster bonus.

(e)     The amount by which a player's Paragraph 5 Salary may increase pur-
suant to this section shall not be considered Rookie Salary and shall not count toward
the Total Rookie Compensation Pool, the Club's Total Rookie Allocation, or the 25%
Increase Rule.

(f)     No portion of the Proven Performance Escalator may be guaranteed for
skill, football-related injury or Salary Cap-related contract termination either before or
after the player has achieved the qualifiers for the Escalator.

*Section 5.* **Additional Terms:**
(a)·     If, pursuant to Article 6, Section 2 and/or Article 10, Section 15, a Club
has one or more Compensatory Draft Selections, an amount shall be added to the Club's
Year-One Rookie Allocation, the Club's Total Rookie Allocation, the Total Rookie
Compensation Pool, and the Year-One Rookie Compensation Pool, based upon a Year-
One Formula Allotment to be agreed upon by the NFL and the NFLPA. In the event
that a Club signs a Player Contract with a Drafted Rookie who was drafted in a prior
League Year, an additional amount shall be added to that Club's Year-One Rookie Allo-
cation, and to the Year-One Rookie Compensation Pool, equal to the lower of (i) the
Player's Year-One Formula Allotment multiplied by the Year-One Rookie Compensa-
tion Pool in the League Year in which the player was drafted or (ii) the amount of
unused Room under the Club's Year-One Rookie Allocation for the League Year in
which the player was drafted. A corresponding amount shall also be added to that Club's
Total Rookie Allocation and to the Total Rookie Compensation Pool, based upon the
amount described above. Notwithstanding the above, the Drafted Rookie's Year-One
Minimum Allotment multiplied by the Year-One Rookie Compensation Pool will con-
tinue to count against the Club's Year-One Rookie Allocation in the year the player was
drafted.

(b)     In the event that the NFL holds a Supplemental Draft in addition to its
annual Draft, adjustments shall be made to the Total Rookie Compensation Pool, Year-
One Rookie Compensation Pool, the Club's Total Rookie Allocation and the Club's
Year-One Rookie Allocation in a manner to be agreed upon by the NFL and the
NFLPA.

(c)     In any League Year in which one or more expansion Teams enter the
League, the amount of the Total Rookie Compensation Pool and the Year-One Rookie
Compensation Pool shall be increased proportionally (e.g., by 1/32 for every Expansion
Team added to a 32 Team League) to account for the additional Draft selections of any
such expansion Teams.

(d)     If a Club has a Rookie football development program apart from its
allowable minicamp(s) prior to its training camp, the following categories of per player
reimbursements or payments will not be counted against the Year-One Rookie Compen-
sation Pool or the Total Rookie Compensation Pool: (1) one round trip airline ticket or
its cash equivalent from the player's place of residence to the Club city and back, not to
exceed $1,500; (2) room and board or its equivalent of up to $145 per day, up to a max-

imum of sixty days; and (3) ground transportation to and from the player's place of residence in the Club's city to the Club's facility.

(e)     Until a Drafted Rookie signs a Rookie Contract, the Year-One Minimum Allotment for that player multiplied by the Year-One Rookie Compensation Pool shall count against the Club's Year-One Rookie Allocation. If a Drafted Rookie accepts the Required Tender described in Article 6, Section 3, then the player must be paid in his first season at the rate of the Minimum Allotment multiplied by the Year-One Rookie Compensation Pool.

### Section 6. Performance Incentives:

(a)     Rookie Contracts for players selected in rounds one and two may contain performance incentives based upon achievement of an agreed-upon offensive or defensive regular season playtime percentage (calculated by dividing the player's total regular season plays (offensive or defensive) by the Club's total regular season plays) of at least (i) 35% in the first year of his initial contract or (ii) 45% in any subsequent year of such a contract. Rookie Contracts for players selected in rounds three through seven and Undrafted Rookies may contain performance incentives based upon achievement of an agreed-upon offensive or defensive regular season playtime percentage (calculated by dividing the player's total regular season plays (offensive or defensive) by the Club's total regular season plays) of at least (i) 15% in the first year of his initial contract or (ii) 30% in any subsequent year of such a contract. Any performance incentive for less than the offensive or defensive playtime percentages described above or based upon the achievement of any other statistic or honor is prohibited.

(b)     All performance incentives shall be considered Rookie Salary, shall count at the highest possible earnable amount for each League Year the incentive is applicable, and will be included in the 25% Increase Rule, Year-One Rookie Salary (if applicable), the Total Rookie Compensation Pool, the Year-One Rookie Compensation Pool (if applicable), the Club's Total Rookie Allocation, and the Club's Year-One Rookie Allocation (if applicable).

(c)     Performance incentives may be earned only based upon playtime in the current League Year and may not be guaranteed for skill, injury or Salary Cap-related contract terminations.

(d)     Performance incentives may not be modified, nullified, or created by achievement of or failure to achieve other incentives.

(e)     Unearned performance incentives in a current year may not be carried forward into future years. Earned performance incentives may not negate future year performance incentives or create additional incentives.

(f)     A player's achievement of an incentive may not determine or affect whether he will or may achieve any performance incentive in a subsequent season.

(g)     Performance incentives based upon individual performance for ranking on the Club or in the League, Division or Conference (e.g., leading the Club in offensive playtime) are prohibited.

(h)     A performance incentive must be based only upon a specific numerical playtime amount. For example, an incentive may provide for a player to receive a bonus if he participates in 40% of his Club's offensive plays, but it may not provide for the

player to receive the performance incentive if he improves in playtime over a prior season.

*Section 7.* Fifth-Year Option for First Round Selections:

(a)   **Exercise Period.** A Club has the unilateral right to extend from four years to five years the term of any Rookie Contract of a player selected in the first round of the Draft (the "Fifth-Year Option"). To do so, the Club must give written notice to the player after the final regular season game of the player's third season but prior to May 3 of the following League Year (i.e., year four of the contract).

(b)   **Compensation Terms.** The Fifth-Year Option is a non-negotiable, standard fixed Paragraph 5 Salary calculated pursuant to Subsections (e) and (f) below. Any compensation terms other than the player's Paragraph 5 Salary described in Subsections (e) and (f) below are prohibited.

(c)   **Automatic Inclusion.** The terms and conditions of the Fifth-Year Option shall, if exercised, be as set forth below. The Fifth-Year Option shall also contain all permissible non-compensation terms from the player's year-four contract carried forward unchanged. The Fifth-Year Option shall be deemed a part of every Rookie Contract of a player selected in the first round by virtue of this Agreement and may not be separately attached to such Rookie Contract.

(d)   **Prohibited Terms Related to the Option.** In a Rookie Contract, there may be no option bonuses, option exercise fees, nonexercise fees, option buyout amounts or any other form of payment that vests as a result of the Club either (i) exercising the Fifth-Year Option, or (ii) declining to exercise the Fifth Year Option. For example, no amount contracted for or paid to the player for years one through four of his Rookie Contract may be contingent upon the exercise or nonexercise of the Fifth-Year Option. The Club may not waive its unilateral right to exercise or not to exercise the Fifth Year Option.

(e)   **Fifth-Year Option for First Ten Selections in Round One.**

(i)   For a Drafted Rookie selected with one of the first ten overall picks in the Draft, the Paragraph 5 Salary for the player's Fifth-Year Option shall equal the Transition Tender that applies in the League Year that is the fourth year of the Rookie's Contract (as calculated pursuant to Article 10, Section 4) for players at the same position (using the categories in Article 10, Section 7(a)) at which the Rookie participated in the most plays during his third League Year. No other Salary (other than the minimum off-season workout per diem and compensation for community relations/sponsor appearances or promotional activities (subject to the maximum amounts permitted in Section 3(b)(iv) above)) is permitted for the Fifth-Year Option.

(ii)   The entire Paragraph 5 Salary for the Fifth-Year Option shall be guaranteed for injury-related termination only, effective upon the Club's exercise of the Option. The entire Paragraph 5 Salary for the Fifth-Year Option shall be guaranteed for skill, injury, and Salary Cap-related termination if the player is on his Club's Active/Inactive roster at the start of the player's fifth League Year (i.e., the option year).

(iii)   The Fifth-Year Option Paragraph 5 Salary shall not be considered Rookie Salary and will not count against the Total Rookie Compensation Pool, or against the Club's Total Rookie Allocation, or for purposes of the 25% Increase Rule.

31

(f) **Fifth-Year Option for All Other Selections in Round One.**

(i) For any other Drafted Rookie selected in round one, the Paragraph 5 Salary for the player's Fifth-Year Option shall equal an amount that would apply in the fourth League Year of the Rookie Contract if one calculated the Transition Tender for that League Year by using the same methodology as set forth in Article 10, Section 4, but using the applicable third through twenty-fifth highest Salaries (as "Salary" is defined in Article 10) (as opposed to the ten highest Salaries) for players at the position at which the Rookie participated in the most plays during his third League Year. No other Salary (other than the minimum offseason workout per diem and compensation for community relations/sponsor appearances or promotional activities (subject to the maximum amounts permitted in Section 3(b)(iv) above)) is permitted for the Fifth-Year Option.

(ii) The entire Paragraph 5 Salary for the Fifth-Year Option shall be guaranteed for injury-related termination only, effective upon the Club's exercise of the Option. The entire Paragraph 5 Salary for the Fifth-Year Option shall be guaranteed for skill, injury, and Salary Cap-related termination if the player is on his Club's roster at the start of the player's fifth League Year (i.e., the option year).

(iii) The Fifth-Year Option Paragraph 5 Salary shall not be considered Rookie Salary and will not count against the Total Rookie Compensation Pool, or against the Club's Total Rookie Allocation, or for purposes of the 25% Increase Rule.

(g) **Breach.** (i) Notwithstanding anything to the contrary in Article 42 or Article 4, after the Club has exercised its Fifth-Year Option, any unexcused late reporting to or absence from preseason training camp by a player in the fifth League Year of his contract (the option year) shall subject the player to a fine of $30,000 per day, plus one week's regular season salary for each preseason game missed.

(ii) Nothing in this Section shall preclude a player and a Club from agreeing to contract provisions relating to the forfeiture of Salary earnable in any League Year prior to the player's option year, subject to the restrictions set forth in Article 4, Section 9.

*Section 8.* **Salary Cap Treatment:** For purposes of Team Salary under the Salary Cap, Rookie Contracts shall be valued pursuant to Article 13, Section 7, provided that any performance incentives (as described in Section 6 of this Article) in year one of the Rookie Contract shall be deemed "likely to be earned."

*Section 9.* **Rookie Redistribution Fund:**

(a) In each League Year of this Agreement other than the 2011 League Year, the NFL and the NFLPA shall create a fund known as the Rookie Redistribution Fund (the "Fund") that will be treated in the same manner as any other Player Benefit Cost, provided that the NFLPA provides the NFL with notice prior to the issuance of the Initial Special Purpose Letter that the NFLPA desires to have the Fund and indicates the amount of the Fund. The maximum amount of this Fund shall be $25 million for the 2012 League Year, $50 million for the 2013 League Year and $100 million for the 2014 League Year. The maximum amount of the Fund shall increase in each subsequent League Year by the annual rate of growth of the Year-One Rookie Compensation Pool. In each League Year in which there is a Fund, the total amount of the Fund shall be

distributed in a proportion to be determined by the NFLPA: (i) to offset against the portion of the Legacy Benefit that is allocated as a Player Benefit Cost in such League Year; (ii) to fund a Veteran Player performance-based compensation pool as agreed upon by the parties; or (iii) for any other new Benefit for current or retired players as agreed upon by the parties. Set forth in the table below are examples, without limitation to any other examples, of the effect that various distributions would have upon the calculation of the Salary Cap under a hypothetical Player Cost Amount of $145 million assuming (i) the maximum Fund amount equals $25 million; and (ii) that projected Player Benefit Costs other than the Fund equal $23 million per Club:

| Scenario | Declared Fund | Required Distribution (per-Club) | Player Benefit Costs (per-Club) | Salary Cap | Player Cost Amount |
|---|---|---|---|---|---|
| A | $0 | $0 | $23,000,000 | $122,000,000 | $145,000,000 |
| B | $12,500,000 | $390,625 | $23,390,625 | $121,609,375 | $145,000,000 |
| C | $25,000,000 | $781,250 | $23,781,250 | $121,218,375 | $145,000,000 |

# ARTICLE 8
## VETERANS WITH LESS THAN THREE ACCRUED SEASONS

*Section 1.* **Accrued Seasons Calculation:**

(a)     For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for each season during which he was on, or should have been on, full pay status for a total of six or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a nonfootball injury, or (iii) a Club's Practice Squad.

(b)     A player shall not receive an Accrued Season for any League Year in which the player is under contract to a Club and in which he failed to report to such Club at least thirty days prior to the first regular season game of that season, or in which the player thereafter failed to perform his contract services for the Club for a material period of time unless he demonstrates to the Impartial Arbitrator extreme personal hardship causing such failure to report or perform, such as severe illness or death in the family. The determination of the Impartial Arbitrator shall be made within thirty days of the application by the player, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

*Section 2.* **Negotiating Rights of Players with Less Than Three Accrued Seasons:** Any Veteran with less than three Accrued Seasons whose contract has expired may negotiate or sign a Player Contract only with his Prior Club, if before the first day of the League Year after the expiration of his contract, his Prior Club tenders the player a one year Player Contract with a Paragraph 5 Salary of at least the Minimum Active/Inactive List Salary applicable to that player. A player receiving such a Tender shall be known as an "Exclusive Rights Player." If the Prior Club has not by that date made the Required Tender or later withdraws such Tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

# ARTICLE 9
## VETERAN FREE AGENCY

*Section 1.* **Unrestricted Free Agents:**

(a)     Subject to the provisions of Section 5 below and of Article 10, any player with four or more Accrued Seasons shall, at the expiration of his Player Contract, become an Unrestricted Free Agent. Such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, subject to the signing period set forth below.

(b)     **Signing Period.**  (i) In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by July 22 or the first scheduled day of the first NFL training camp, whichever is later, in the League Year following the expiration of his last Player Contract, he may negotiate or sign a Player Contract from July 22 until the Tuesday following the tenth week of the regular season, at 4:00pm New York time, only with his Prior Club, provided that the Prior Club by June 1 has tendered to the player a one year Player Contract of at least 110% of either (a) his Prior Year Salary (if his expiring Player Contract is not a Player Contract he entered into as a Rookie), or (b) his Paragraph 5 Salary (if his expiring Player Contract is a Player Contract he entered into as a Rookie, without renegotiation), in each case with all other terms of his contract identical to his prior year's contract. For the purposes of this Subsection, "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the last year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Prior Year Salary shall also include any unrepaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate.

(ii)     If an Unrestricted Free Agent described in Subsection 1(b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(iii)     If an Unrestricted Free Agent does not play in the NFL for the remainder of a League Year pursuant to Subsection 1(b)(ii) above, commencing the first day of the following League Year, the player shall be free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by June 1 of the League Year following the expiration of his last

35

Player Contract, and if his Prior Club has not by that date tendered to the player a one year Player Contract in accordance with the requirements of Subsection 1(b)(i) above, or has withdrawn the Tender, the player shall continue to be an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)     An Unrestricted Free Agent shall not be subject to any limitations on the period of time before which he may qualify as an Unrestricted Free Agent again, or to any limitations on the number of times he may be an Unrestricted Free Agent.

(e)     Promptly upon but no later than two business days after the signing of any Unrestricted Free Agent to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

*Section 2.* Restricted Free Agents:

(a)     Definition. Any Veteran player with three Accrued Seasons, but less than four Accrued Seasons shall, at the expiration of his last Player Contract during such period, become a Restricted Free Agent. Any such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, subject to the restrictions set forth in this Article.

(b)     Qualifying Offers. (i) In order to receive the following specified Rights of First Refusal and/or Draft Choice Compensation with respect to a Restricted Free Agent, the Prior Club of a Restricted Free Agent must tender the player a Qualifying Offer on or before the first date of the Restricted Free Agent Signing Period, as follows (all amounts applicable for the 2011 League Year only):

(1)     Right of First Refusal Only: one year Player Contract with Paragraph 5 Salary of at least $1,200,000;

(2)     Right of First Refusal and Draft Selection at Player's Original Draft Round: one year Player Contract with a Paragraph 5 Salary of at least (a) the amount set forth in Subsection (b)(i)(1) above, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this Subsection is subject to the rules of Subsection (c) below);

(3)     Right of First Refusal, One Second Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $1,835,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

(4)     Right of First Refusal and One First Round Draft Selection: one year Player Contract with a Paragraph 5 Salary of at least (a) $2,611,000, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

(ii)    Beginning in the 2012 League Year, the dollar amounts specified in Subsection (i) above shall increase annually by the percentage increase (if any) in the Salary

36

Cap over the prior League Year, subject to a minimum increase of 5% and a maximum increase of 10%.

(c)(i)     Notwithstanding Subsection 2(b)(i) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the first round a Qualifying Offer that requires Draft Choice Compensation of one first round selection (the "(c)(i) Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one second round selection for any of its Restricted Free Agents originally selected in the first round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the (c)(i) Upgraded Tender.·

(ii)     Notwithstanding Subsection 2(b)(i) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the second round a Qualifying Offer that requires Draft Choice Compensation of one second round selection (the "(c)(ii) Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one third round selection for any of its Restricted Free Agents originally selected in the second round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the (c)(ii) Upgraded Tender.

(d)     In the event a Prior Club withdraws its Qualifying Offer, the Restricted Free Agent shall immediately become a Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without being subject to First Refusal, Draft Choice Compensation, Signing Period, or any other limitation of any kind.

(e)     **Signing Period.** The dates of the period in which Restricted Free Agents shall be free to negotiate and sign a Player Contract with any Club (the "Signing Period") shall be agreed upon by the NFL and the NFLPA by the previous September 1, but in no event may such Signing Period be less than thirty-five days, nor may it end later than five days before the Draft for that League Year, unless the parties agree otherwise.

(f)(i)     In the event that a Restricted Free Agent has not signed a Player Contract with a Club within the Signing Period in the League Year following the expiration of his last Player Contract, and if the Prior Club has not withdrawn the Qualifying Offer, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract for that League Year. If the player's Qualifying Offer is greater than 110% of the player's prior-year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged), the Club may withdraw the Qualifying Offer on June 15 and retain its rights under the preceding sentence, so long as the Club immediately tenders the player a one year Player Contract of at least 110% of his prior-year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) (the "June 15 Tender"). Notwithstanding the foregoing, for any Restricted Free Agent subject to the Right of First Refusal Only Tender under Subsection 2(b)(i)(1) above who has not signed a Player Contract with a Club within the Signing Period, in order to be subject to the June 15 Tender, the Prior Club must by June 1 tender to such Restricted Free Agent a one-year Player Contract of at least 110% of his prior-year Paragraph 5 Salary

(with all other terms of his prior-year contract carried forward unchanged) or extend the Subsection 2(b)(i)(1) Tender, whichever is greater (the "June 1 Tender").

    (iii)    If a Restricted Free Agent described in Subsection 2(b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall not play football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

    (iii)    If a Restricted Free Agent does not play in the NFL in a League Year, his Prior Team shall have the right to tender such player any Qualifying Offer consistent with Section 2(b) prior to the next League Year's Restricted Free Agent Signing Period. In the event such a Qualifying Offer is tendered, the Prior Team shall have the applicable rights regarding such player according to such Tender, and such player shall have the same rights regarding negotiations with other Clubs as he had the previous League Year.

    (g)    A Restricted Free Agent receiving the Tender provided for in Sections 2(b)(i)(2)–(4) shall have the option of accepting a one-year NFL Player Contract for 110% of his Prior Year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) in lieu of a Player Contract for the applicable alternative amount specified in the aforementioned Sections, if he so wishes, regardless of which Player Contract is for a greater amount.

    (h)    In the event that a Restricted Free Agent has not signed a Player Contract with a Club, and if his Prior Club withdraws the Qualifying Offer or June 1 or June 15 Tender, as applicable, such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club may negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

    (i)    Promptly upon but no later than two business days after the signing of any Restricted Free Agent to a Player Contract, or the extending to any Restricted Free Agent of a Qualifying Offer, the signing or extending Club shall notify the NFL, which shall notify the NFLPA of such signing or offer.

    (j)    Draft Choice Compensation under this Article shall be due in that League Year's Draft unless the Offer Sheet is received by the Prior Club later than two days before that League Year's Draft, in which case Draft Choice Compensation shall be due in the following League Year's Draft.

    (k)    Notwithstanding the foregoing, in the event that the Prior Club of a Restricted Free Agent has tendered the player a Qualifying Offer in an amount at least $500,000 greater than that required by Subsection 2(b)(i)(4) above, then the Club shall have a Right of First Refusal and Draft Choice Compensation of One First Round Selection and any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such Offer Sheet (but shall be in-

cluded in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet).

**Section 3. Offer Sheet and Right of First Refusal Procedures:**

(a)      **Offer Sheets.** When a Restricted Free Agent receives an offer to sign a Player Contract from any Club (the "New Club") other than the Prior Club, which offer the player desires to accept, he shall give to the Prior Club a completed certificate substantially in the form of Appendix B, attached hereto (the "Offer Sheet"), signed by the Restricted Free Agent and the New Club, which shall contain the "Principal Terms" (as defined below) of the New Club's offer. The New Club and the player must specifically identify in the Offer Sheet those provisions they believe are Principal Terms. The Prior Club, within five days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth below.

(b)      **First Refusal Exercise Notice.** If the Prior Club gives the Restricted Free Agent a "First Refusal Exercise Notice" substantially in the form of Appendix C, attached hereto, within five days from the date the Prior Club receives an Offer Sheet, but not later than one day before the Draft (unless the parties agree otherwise), such Restricted Free Agent and the Prior Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms (subject to Subsection (e) below); (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the player than those contained in the Offer Sheet as may be agreed upon between the Restricted Free Agent and the Prior Club.

(c)      **No First Refusal Exercise Notice.** If the Prior Club does not give the Restricted Free Agent the First Refusal Exercise Notice within the applicable period, the player and the New Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms; (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the Restricted Free Agent than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the New Club (subject to Section 5 below), and the Restricted Free Agent's Prior Club shall receive from the New Club the Draft Choice Compensation, if any, specified in Section 2 above of this Article. Any Club that does not have available, in the upcoming Draft, the selection choice or choices (its own or better choices in the applicable rounds) needed to provide Draft Choice Compensation in the event of a timely First Refusal Exercise Notice may not sign an Offer Sheet in such circumstances. The player and the New Club may not renegotiate such Player Contract to reduce the Salary in such contract until after the end of the first regular season covered by the Contract. Neither the player nor the New Club may exercise an option in such Player Contract that reduces Salary in the first League Year of such contract until after the end of the first regular season covered by the Contract.

(d)      **One Offer Sheet.** There may be only one Offer Sheet signed by a Restricted Free Agent outstanding at any one time, provided that the Offer Sheet has also been signed by a Club. An Offer Sheet, before or after it is given to the Prior Club, may

be revoked or withdrawn only by the Clubs upon the written consent of the Restricted Free Agent. In either of such events, the Restricted Free Agent shall again be free to negotiate and sign a Player Contract with any Club, and any Club shall again be free to negotiate and sign a Player Contract with such Restricted Free Agent, subject to the Prior Club's continued Right of First Refusal and/or Draft Choice Compensation as described in this section.

(e)   **Principal Terms.** For the purposes of this Article (and Article 10), the Principal Terms of an Offer Sheet shall include only:

(i)   Salary, which shall consist only of (a) the fixed and specified dollar amounts the New Club will pay, guarantee or lend to the Restricted Free Agent and/or his designees (currently and/or as deferred compensation in specified installments on specified dates) in consideration for his services as a football player under the Player Contract (i.e., signing bonus, Paragraph 5 Salary, and reporting and roster bonuses); and (b) Salary that is variable and/or is subject to calculation only upon the following bases: (1) based upon the performance of the Club extending the Offer Sheet (only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to Subsection (c) above, must be matched by the Prior Club for the purpose of exercising a Right of First Refusal, and such incentives may not exceed 15% of the Salary in the Offer Sheet); and (2) League honors listed in Exhibit C to Article 13; and

(ii)   Any modifications of and additions to the terms contained in the NFL Player Contract requested by the Restricted Free Agent and acceptable to the New Club, that relate to non-compensation terms (including guarantees, no-cut, and no-trade provisions) of the Restricted Free Agent's employment as a football player (which shall be evidenced either by a copy of the NFL Player Contract, marked to show changes, or by a written brief summary contained in or attached to the Offer Sheet).

(iii)   Notwithstanding Subsections (i) and (ii) above, no Offer Sheet may contain a Principal Term that would create rights or obligations for the Old Club that differ in any way (including but not limited to the amount of compensation that would be paid, the circumstances in which compensation would be guaranteed, or the circumstances in which other contractual rights would or would not vest) from the rights or obligations that such Principal Term would create for the Club extending the Offer Sheet (i.e., no "poison pills").

(f)   **No Property or Investments.** A Club may not offer any item of property or investments other than Salary as part of the Principal Terms contained in an Offer Sheet.

(g)   **Incentives.** For those incentives which are based on Club performance, only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to Subsection (c) above, must be matched by the Old Club for the purpose of exercising a Right of First Refusal.

(h)   **No Consideration Between Clubs.** There may be no consideration of any kind given by one Club to another Club in exchange for a Club's decision to exercise or not to exercise its Right of First Refusal, or in exchange for a Club's decision to submit or not to submit an Offer Sheet to a Restricted Free Agent or to make or not to make an offer to enter into a Player Contract with a Restricted Free Agent. Nothing in

this Subsection shall preclude a Prior Club from entering into a Player Contract with a player subject to a Tender, and subsequently trading that player under that Player Contract to another Club, provided that the player and the NFLPA must approve in advance any such trade that takes place during the Signing Period. If a Club exercises its Right of First Refusal and matches an Offer Sheet, that Club may not trade that player to the Club that submitted the Offer Sheet for at least one calendar year, unless the player consents to such trade.

(i)    **NFL Only.** No Right of First Refusal rule, practice, policy, regulation, or agreement, including any Right of First Refusal applicable to any Restricted Free Agent or Transition Player pursuant to Article 10 below, may apply to the signing of a Player Contract with, or the playing with, any club in any professional football league other than the NFL by any Restricted Free Agent (except as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below).

(j)    **No Assignment.** No Right of First Refusal may be assigned to any other Club (except as provided in Article 6, Section 7 or as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below), including any Right of First Refusal with respect to Restricted Free Agents, Transition Players, or Drafted Rookies described in Article 6, Section 5.

(k)    **Copies.** Promptly upon but no later than two business days after the giving of an Offer Sheet to the Prior Club, the Restricted Free Agent shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. Promptly upon but no later than two business days after the giving of a First Refusal Exercise Notice to the Restricted Free Agent, the Prior Club shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. At any time after the giving of an Offer Sheet to a Prior Club, the NFL may require the New Club to cause a copy thereof to be given to the NFL and the NFLPA.

(j)    **Disputed Offer Sheet.** In the event of any dispute regarding whether a term in an Offer Sheet is or is not a Principal Term that must be matched, including any dispute regarding whether a term is an impermissible poison pill designed to discourage or prohibit the Prior Club from exercising a Right of First Refusal, the dispute shall be presented to the Impartial Arbitrator for expedited resolution under Section 4 below. The Impartial Arbitrator shall identify all of the terms that would have to be matched by the Prior Club, and the Prior Club shall have two days after such decision in which to exercise its Right of First Refusal.

*Section 4.* **Expedited Arbitration:** An expedited arbitration before the Impartial Arbitrator, whose decision shall be final and binding upon all parties, shall be the exclusive method for resolving the disputes set forth in this Section. If a dispute arises between the player and either the Prior Club or the New Club, as the case may be, relating to their respective obligations to formalize their binding agreements created under Subsections 3(b) or (c) above, or as to whether the binding agreement is between the Restricted Free Agent and the New Club or the Restricted Free Agent and the Prior Club, such dispute shall immediately be submitted to the Impartial Arbitrator, who shall resolve such dis-

pute within ten (10) days but in no event later than two (2) days before the Draft. The Impartial Arbitrator shall not have the power to terminate any such binding agreement; he shall have the power only to direct the parties to formalize such binding agreement into a Player Contract in accordance with the Principal Terms of the applicable Offer Sheet, as interpreted by the Impartial Arbitrator.

*Section 5.* **Individually Negotiated Limitations on Player Movement:**

 (a) All individually negotiated limitations on player movement are prohibited, except as specifically provided as follows:

 (i) If a Restricted Free Agent has been tendered a Qualifying Offer of (a) Paragraph 5 Salary of at least the applicable amount stated in Section 2(b)(i)(1) above or (b) at least 110% of his prior year's Paragraph 5 Salary, whichever is greater (in each case with all other terms of his prior year contract carried forward), and the Qualifying Offer is fully guaranteed for skill and injury, the Restricted Free Agent and his Prior Club may negotiate and contract for an individual Right of First Refusal with respect to the services of such player.

 (ii) Any Unrestricted Free Agent shall be permitted to negotiate and contract for an individual Right of First Refusal with any Club with respect to the services of such player.

 (iii) Any player (other than a Free Agent) with less than three Accrued Seasons is prohibited from negotiating any individual limitations on his movement in his Player Contract or otherwise, and all Clubs are prohibited from negotiating any such limitations with such players.

 (iv) Any player that is designated a Franchise Player or a Transition Player may not negotiate and contract for an individual Right of First Refusal with any Club.

 (v) Any individual Right of First Refusal that is negotiated and contracted for pursuant to Subsections (i)–(iii) above shall be void and unenforceable unless it is specified in a separate document signed by such player in the form annexed hereto as Appendix D, acknowledging such player's waiver of the express right that Free Agents have under this Agreement to be free of any Right of First Refusal restriction on their freedom of movement.

 (b) Rights of First Refusal negotiated pursuant to this Section 5 may be traded or assigned as part of a player's contract.

*Section 6.* **Notices, Etc.:**

 (a) Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article 9 or Article 10, shall be sent either by personal delivery or by overnight mail, or by electronic mail in .pdf form, in each case a confirmation copy shall also be sent by first class mail, addressed as follows:

 (i) To any NFL Club: addressed to that Club at the principal address of such Club as then listed on the records of the NFL or at the Club's principal office, to the attention of the Club's president or general manager;

 (ii) To the NFL: 280 Park Avenue, New York, New York 10017 (after August 2011: 345 Park Avenue), to the attention of the Executive Vice President Labor & League Counsel;

(iii)     To a Restricted Free Agent: to his address listed on the Offer Sheet and, if the Restricted Free Agent designates a representative on the Offer Sheet and lists such representative's address thereon, a copy shall be sent to such representative at such address; and

(iv)     To the NFLPA: 63 Gene Upshaw Place, 1133 20th Street, NW, Washington, DC 20036.

(b)     An Offer Sheet shall be deemed given only when received by the Prior Club. A First Refusal Exercise Notice, a Qualifying Offer and any other writing required or permitted under Article 9 or Article 10 shall be deemed given when sent by the Prior Club.

(c)     Subject to Article 17, Section 1, the NFL shall have the right to prepare and circulate to all Clubs two lists containing, respectively, no more than the name, address, Social Security number, telephone number, college, position, Team, Right of First Refusal and/or any Draft Choice Compensation of each and every player who shall or has become (i) an Unrestricted Free Agent; (ii) a Restricted Free Agent, as of the end of the League Year, or as of the first date of the Signing Period, respectively, and no other list relating to Free Agents ("Free Agent Lists"). The NFL shall also have the right to prepare lists with the same information identifying players who are subject to a Franchise or Transition Tender, or who were eligible for but did not receive a Restricted Free Agent of Exclusive Rights Player Qualifying Offer. Information shall not be selectively withheld for some players but not others. If one or more Free Agent Lists are so circulated, copies thereof shall be sent to the NFLPA.

# ARTICLE 10
## FRANCHISE AND TRANSITION PLAYERS

*Section 1.* **Franchise Player Designations:** Except as set forth in Section 9 below, each Club shall be permitted to designate one of its players who would otherwise be an Unrestricted Free Agent as a Franchise Player each season during the term of this Agreement. The player so designated may be one who would otherwise be a Restricted Free Agent. Except as set forth in Section 2(a)(i) below, any Club that designates a Franchise Player shall be the only Club with which such Franchise Player may negotiate or sign a Player Contract during the period the player is so designated, notwithstanding the number of his Accrued Seasons. The period for Clubs to designate Franchise Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00pm New York time on the eighth day preceding the first day of the new League Year.

*Section 2.* **Required Tender for Franchise Players:**

        (a)      Except as provided in Subsection (b) below, any Club that designates a Franchise Player shall on the date the designation is made notify the player and the NFLPA which one of the following two potential required tenders the Club has selected:

        (i)      **Nonexclusive Franchise Tender.** The Nonexclusive Franchise Tender shall be a one year NFL Player Contract for (A) the average of the five largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) below) at which the Franchise Player participated in the most plays during the prior League Year, which average shall be calculated by: (1) summing the amounts of the Franchise Tags for players at that position for the five preceding League Years; (2) dividing the resulting amount by the sum of the Salary Caps for the five preceding League Years (using the average of the amounts of the 2009 and 2011 Salary Caps as the Salary Cap amount for the 2010 League Year); and (3) multiplying the resulting percentage by the Salary Cap for the upcoming League Year (e.g., when calculating the Tender for the 2012 League Year, dividing the aggregate sum of the Franchise Tags for players at that position for the 2007–2011 League Years by the aggregate sum of the Salary Caps for the 2007–2011 League Years and multiplying the result by the amount of the Salary Cap for the 2012 League Year) (the "Cap Percentage Average") (See Appendix E for an illustrative example); or (B) 120% of his Prior Year Salary, whichever is greater; if the Club extends the Tender pursuant to this Subsection (a)(i), the player shall be permitted to negotiate a Player Contract with any Club as if he were a player subject to Section 5 below, except that Draft Choice Compensation of two first round draft selections shall be made with respect to such player in the event he signs with the New Club, and the Signing Period for such player shall be determined under Section 14 below. For purposes of this Subsection, the "Franchise Tag" is the average of the five largest Prior Year Salaries (e.g., the Franchise Tag for the 2010 League Year equals the average of the five largest Salaries for the 2009 League Year for players at that position); or

        (ii)      **Exclusive Franchise Tender.** The Exclusive Franchise Tender shall be a one year NFL Player Contract for (A) the average of the five largest Salaries in Player Contracts for that League Year as of the end of the Restricted Free Agent Signing Period

44

that League Year, as set forth in Article 9, Section 2(e), for players at the position (within the categories set forth in Section 7(a) below) at which he participated in the most plays during the prior League Year, or (B) the amount of the Required Tender under Subsection (a)(i) above, whichever is greater.

(b)      Any Club that designates a player as a Franchise Player for the third time shall, on the date the third such designation is made, be deemed to have tendered the player a one-year NFL Player Contract for the greater of: (A) the average of the five largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) below) with the highest such average; (B) 120% of the average of the five largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) below) at which the player participated in the most plays during the prior League Year; or (C) 144% of his Prior Year Salary. (By way of example, a kicker designated as a Franchise Player for the third time in the 2014 League Year would have a Required Tender equal to the greater of: (i) the average of the five largest 2013 Salaries for quarterbacks; (ii) 120% of the average of the five largest 2013 Salaries for kickers; or (iii) 144% of the player's own 2013 Salary.) If the Club designates the player as a Franchise Player for the third time, the designating Club shall be the only Club with which the player may negotiate or sign a Player Contract. In lieu of designating such a player as a Franchise Player for the third time, any Club may designate such player as a Transition Player pursuant to Section 3 below.

(c)      If a player subject to a Franchise Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this Subsection only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties, whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, provided that such exam takes place within twenty (20) days of the contract termination.

(d)      Any of the Required Tenders set forth in this Section 2 may be withdrawn at any time, but if such Tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(e)      For the purposes of this Article, "Salary" means the total of the Paragraph 5 Salary (reduced proportionately if the contract is entered into after the first regular season game), roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the applicable year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Salary shall also include any unpaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate. "Prior Year Salary" means the Salary (as defined

45

in this Subsection) for the last League Year of the player's most recently negotiated Player Contract.

(f)     The calculation of any five largest Prior Year Salaries shall include any Player Contract resulting from acceptance of a Tender for the Prior Year pursuant to Section 2(a)(i) or (a)(ii) above, provided that the player played during the Prior League Year pursuant to the Tender, but shall not include the amount of any term of a Player Contract renegotiated after the Monday of the tenth week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as signing bonus.

(g)     The calculation of any five largest Salaries for the current League Year as of the end of the Restricted Free Agent signing period pursuant to Section 2(a)(ii) above shall include any Player Contract resulting from acceptance of any Tender for the Prior League Year pursuant to Section 2(a)(i) or (a)(ii) above, provided that the player played during the Prior League Year pursuant to the Tender, but shall not include (i) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date or (ii) the amount of any term of a Player Contract renegotiated after the Monday of the tenth week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as signing bonus.

(h)     If a Franchise Player receives a Nonexclusive Franchise Player Tender pursuant to Section 2(a)(i) above, any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet). This Subsection (h) shall not apply to a player who was designated as a Transition Player in lieu of designated as a Franchise Player, pursuant to Section 3(a) below, or to any other Transition Player.

(i)     The definition of a "signing bonus" for this Article is the same as that in Article 13. The pro rata portion of such signing bonuses includes prorated amounts from prior Player Contracts; the Salary Cap acceleration rules for unamortized signing bonus amounts do not apply to the calculation of the Franchise and Transition Tenders.

(j)     For purposes of calculating the minimum Tenders to Franchise and Transition players under this Article, if the present value of any deferred Paragraph 5 amount (as defined in Article 12, Section 6(a)(ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.

(k)     Any Club designating a Franchise Player shall have until 4:00 p.m., New York time, on July 15 of the League Year (or, if July 15 falls on a Saturday or Sunday, the first Monday thereafter) for which the designation takes effect to sign the player to a multiyear contract or extension. After that date, the player may sign only a one-year Player Contract with his Prior Club for that season, and such Player Contract may not be extended until after the Club's last regular season game of that League Year.

*Section 3.* **Transition Player Designations:**

(a)     Each Club shall be permitted to designate one player who would otherwise be an Unrestricted Free Agent as a Transition Player in the Final League Year. In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one player who would otherwise be an Unrestricted Free Agent or Restricted Free Agent as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designation permitted by the immediately preceding sentence, during the same designation period as the Franchise Player designation period. The period for Clubs to designate Transition Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00 p.m. New York time on the eighth day preceding the first day of the new League Year.

(b)     Any Club that designates a Transition Player shall receive the Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last player contract to July 22, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

*Section 4.* **Required Tender for Transition Players:**

(a)     Any Club that designates a Transition Player shall be deemed on the first day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player Contract for (A) the Cap Percentage Average of the ten largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) below) at which the Transition Player participated in the most plays during the prior League Year, which Average shall be calculated using the methodology as in Section 2(a)(i)(A) above; or (B) 120% of his Prior Year Salary, whichever is greater. The Tender may be withdrawn at any time, but if such Tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. For purposes of this Subsection, the "Transition Tag" for any League Year is the average of the ten largest Prior Year Salaries for players at that position (e.g., the Transition Tag for the 2010 League Year equals the average of the ten largest Salaries for the 2009 League Year for players at that position).

(b)     The calculation of any ten largest Prior Year Salaries pursuant to Section 4(a) above shall include any Player Contract amount resulting from acceptance of a Tender for the Prior Year pursuant to Section 2(a)(i), 2(a)(ii) or 4(a) above, provided that the player played the Prior League Year pursuant to such Tender, but shall not include the amount of any term of a Player Contract renegotiated after the Monday of the tenth

week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as signing bonus.

(c)     If a player subject to a Transition Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this Subsection only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties, whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, provided that such exam takes place within twenty (20) days of the contract termination.

*Section 5.* **Right of First Refusal for Transition Players:** Any player designated as a Transition Player shall, at the expiration of his prior year Player Contract, be permitted to negotiate a Player Contract with any Club. When the Transition Player negotiates such an offer with a New Club, which the player desires to accept, he shall give to the Prior Club a completed Offer Sheet, signed by the player and the New Club, which shall contain the Principal Terms (as defined in Article 9) of the New Club's offer. The Prior Club, within five (5) days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the consequences set forth in Sections 3(b)-(h), 4 and 6 of Article 9 above, except that no Draft Choice Compensation shall be made with respect to such player, and, for the purposes of those provisions, the player and each Club shall otherwise have the same rights and obligations as for a Restricted Free Agent.

*Section 6.* **Lists:** On each date following the dates set forth in Sections 1 and 3 above, the NFL shall provide to the NFLPA a list of each Unrestricted Free Agent designated as a Franchise Player or a Transition Player.

*Section 7.* **Salary Information:**

(a)     No later than February 1 of each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the five and ten largest Prior Year Salaries for players at the following positions which shall be utilized for calculating the average Prior Year Salaries of players at the positions of Franchise Players and Transition Players: Quarterback, Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, Interior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter.

(b)     No later than ten days after the last day of the Restricted Free Agent Signing Period in each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten and five largest Salaries for players at the positions set forth in Subsection (a) above which shall be utilized for calculating the applicable average Salaries of players at such positions as of the last day of the Restricted Free Agent Signing Period (including the amount of Salary in any executed Offer Sheets).

48

(c)     Any dispute concerning the identity and Salaries of players included within each player position category, or any other matter regarding these figures, shall be submitted to and resolved by the Impartial Arbitrator during the period from February 1 to February 15, or within twenty-five days after the last day of the Restricted Free Agent Signing Period, respectively. The Impartial Arbitrator shall make an independent determination in writing. In arriving at his determination, the Impartial Arbitrator shall consider any relevant information furnished to him, and shall be provided access to all relevant Player Contracts. The Impartial Arbitrator's determination shall be final and binding upon all parties.

**Section 8.** **No Assignment:** No Club may assign or otherwise transfer to any other Club the exclusive negotiating rights or any Right of First Refusal it may have for any Franchise Player, nor any Right of First Refusal it may have for any Transition Player, nor any designation rights it may have.

**Section 9.** **Franchise Player Designation Period:** A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for (A) the applicable Cap Percentage Average of the five largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) above at which he participated in the most plays during the prior League Year), calculated using the methodology set forth in Section 2(a)(i)(A) above or (B) 120% of the player's Prior-Year Salary, whichever is greater, except as provided in Section 2(b) above. If a Club designates a player pursuant to this Section 9, the Club shall be deemed to have used the Franchise Player designation in Section 1 above for the year in which the designation takes effect; provided, however, that if a player designated to become the Franchise Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Club shall be entitled to designate a new Franchise Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 10.** **Transition Player Designation Period:** A Club may designate a Transition Player (or players) only during the periods and in the numbers specified in Section 3 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Transition Player with respect to any first future League Year during the term of this Agreement for which such player becomes an Unrestricted Free Agent; any such future designation exhausts the Club's

designation right (and does not move to any other Club) even if the player moves to another Club, as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for (A) the applicable Cap Percentage Average of the ten largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) above at which he participated in the most plays during the prior League Year)) using the methodology set forth in Section 2(a)(i)(A) above; or (B) 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transition Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year. If a Prior Club becomes entitled to designate a new Transition Player pursuant to this Section 10, the prior Club may designate the new Transition Player for that League Year during the period prescribed by Section 3(a) above, in the League Year prior to the League Year in which the player initially designated would have become a Transition Player. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

*Section 11.* **Other Terms:** For the purposes of this Article, the Required Tenders of a one-year Player Contract for at least 120% (or 144%, if the player is eligible to receive such a Tender) of the Franchise Player's or 120% of the Transition Player's Prior Year Salaries shall in addition to the 120% or 144% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% (or 144%, if the player is eligible to receive such a Tender) of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (or ten, as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

*Section 12.* **Compensatory Draft Selection:** The rules and procedures for awarding Compensatory Draft Selections previously agreed upon by the NFL and the NFLPA shall remain in effect, subsequent to any future changes as to which the parties may agree.

*Section 13.* **Offer Sheets for Non-Exclusive Franchise and Transition Players:** The procedures and rules of Article 9, Section 3 shall apply to Non-Exclusive Franchise or Transition Players.

*Section 14.* **Signing Period for Transition Players:**

(a)     In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 22 in the League Year following the expiration of his last Player Contract, the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00pm New York time.

(b)     If a Transition Player described in Subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)     If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten largest Salaries for the prior League Year for players at the player's specified position calculated as in Section 4(a) above, or 120% of his Prior Year Salary, whichever is greater. The Tender may be withdrawn at any time, but if such Tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 15.* **Signing Period for Franchise Players:**

(a)     In the event that a player who is designated and tendered as a Franchise Player has not signed a Player Contract with a Club by the Tuesday following the tenth week of the regular season, at 4:00pm New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)     If any Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable Tender must be made and any 120% Tender shall be measured from the Player's Prior Year Salary. If such a player is redesignated as a Franchise Player for the League Year following the League Year in which he does not play, the player may be designated only under Section 2(a)(i) above, except that Draft Choice Compensation of only one first round draft selection and one third round draft selection

51

shall be made with respect to such player in the event he signs with the New Club. If such a player is designated as a Franchise Player for a third time, the terms of Section 2(b) above shall apply. If a Franchise Player who has sufficient Accrued Seasons to become an Unrestricted Free Agent is not designated as a Franchise Player or Transition Player for any League Year immediately following a League Year in which he does not play, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

# ARTICLE 11
# TRANSITION RULES FOR THE 2011 LEAGUE YEAR

*Section 1.* **Applicability:**

(a)     Notwithstanding any other provisions of this Agreement, the following rules shall apply to the 2011 League Year. In the event of any conflict between the provisions of this Article and the provisions of any other Article in this Agreement, the provisions of this Article shall take precedence.

(b)     All of the provisions of this Article are subject to the provisions of the Settlement Agreement (i.e., all of the transactions described below are conditional and subject to being declared void if the recertification and ratification requirements set forth in Paragraph 1 of the Settlement Agreement are not met within the specified time periods).

*Section 2.* **Calendar:**

(a)     Beginning on July 25, 2011:

(i)     The NFL will publish the 2011 Free Agency List (as described in Article 9), which will become effective July 29, 2011 at 6:00pm New York time.

(b)     Beginning at 10:00am on July 26, 2011:

(i)     Club facilities will be open for voluntary training, conditioning, and classroom instruction.

(ii)     Trading begins for the 2011 League Year.

(iii)     Subject to Subsection 2(e) below, commencing at 10:00am, New York time, Clubs may:

(1)     Sign their Drafted Rookies (subject to the applicable rules set forth in Article 7); and

(2)     Sign Undrafted Rookies (subject to the applicable rules set forth in Article 7).

(iv)     Negotiate with, but not sign, their own: (1) Unrestricted Free Agents (i.e., an Unrestricted Free Agent who was under contract to that Club on the last day of the 2010 League Year); (2) Restricted Free Agents; (3) Exclusive Rights players; and (4) Franchise Players.

(v)     Negotiate with, but not sign or give Offer Sheets to (1) other Clubs' Restricted Free Agents, or Franchise Players eligible to receive Offer Sheets pursuant to Articles 9-10 and Section 3 below; (2) Unrestricted Free Agents who were under contract to other Clubs on the last day of the 2010 League Year; or (3) Free Agents.

(c)     Commencing at 4:01pm New York time on July 28, 2011, Clubs may waive or terminate Player Contracts.

(d)     Beginning on July 29, 2011:

(i)     Subject to Subsection 2(e) below, commencing at 6:00pm, New York time, Clubs may:

(1)     Renegotiate the contracts of players under contract (subject to the applicable rules on renegotiation set forth in Article 13);

(2)      Sign their own: (A) Unrestricted Free Agents (i.e., an Unrestricted Free Agent who was under contract to that Club on the last day of the 2010 League Year); (B) Restricted Free Agents; (C) Exclusive Rights players; and (D) Franchise Players;

(3)      Sign, or extend Offer Sheets to, (1) other Clubs' Restricted Free Agents, or Franchise Players eligible to receive Offer Sheets pursuant to Articles 9–10 and Section 3 below; (2) Unrestricted Free Agents who were under contract to other Clubs on the last day of the 2010 League Year; or (3) Free Agents.

(e)      Notwithstanding Subsections 2(b)(iii) and 2(d)(i) above, no payments of any kind may be made to any player signing a new contract until after ratification of this Agreement, as described in Paragraphs 1(b) and 6 of the Settlement Agreement.

(f)      Preseason training camps may open for all NFL players under contract fifteen days (including one day for physical examinations, meetings, classroom instruction, running and conditioning and two days for non-contact activity) prior to the first scheduled preseason game for each player's Club.

(g)      Veteran players who sign Player Contracts on or after 6:00pm, New York time, on July 29, 2011 shall be required to report to, and remain with, their Clubs in accordance with Subsection (f) above, except that, prior to the start of the 2011 League Year, such players may not participate in on-field activities, workouts, weight training or other physical activities, but shall be required to attend meetings, classroom instruction and any other non-physical activities scheduled during the Club's preseason training camp.

(h)      The restrictions set forth in Subsection 2(g) above shall not apply to Drafted or Undrafted Rookies who are under contract regardless of the date upon which such players signed their Player Contracts. If any such player is injured as a result of participating in training camp activities, the terms of such player's contract shall cover such injury regardless of ratification.

(i)      The 2011 League Year shall begin at 4:00pm New York time on August 4, 2011 or upon ratification of this Agreement, whichever is later, and further provided that the Salary Cap and Top 51 rule shall not apply until 4:00pm New York time on August 5, 2011.

*Section 3.* Free Agency:

(a)      **Exclusive Rights Players.** Any player with fewer than three Accrued Seasons as of the end of the 2010 League Year who received an Exclusive Rights Minimum Salary Tender prior to the end of the 2010 League Year shall be an Exclusive Rights player.

(b)      **Restricted Free Agents.**

(i)      Any player with three Accrued Seasons but fewer than four Accrued Seasons as of the end of the 2010 League Year who received a Restricted Free Agent Qualifying Offer prior to the end of the 2010 League Year shall be a Restricted Free Agent ("RFA"). The provisions of Article 9, as modified in this Article, shall apply to such players. All Qualifying Offers extended to such RFAs prior to the end of the 2010 League Year shall be deemed valid and effective under this Agreement, and shall be at the Qualifying Offer amount and the Draft Choice Compensation level afforded such Qualifying Offer by the provisions of Article XIX of the Prior Agreement, provided that

any RFA who received a Qualifying Offer entitling the Prior Club to one first and one third round Draft Selection shall be deemed to have received a Qualifying Offer entitling the Prior Club to one first round Draft Selection at the amount applicable to such first round Qualifying Offer under Article XIX of the Prior Agreement. Any Restricted Free Agent Qualifying Offer tendered to a player who had more than three Accrued Seasons as of the end of the 2010 League Year shall be void.

     (ii)     The signing period for RFAs shall be from 6:00pm, New York time, on July 29, 2011 to August 20, 2011.

     (iii)     If an RFA receives an Offer Sheet, the Prior Club shall have four days in which to exercise any applicable Right of First Refusal.

     (iv)     In order to maintain exclusive negotiating rights to an RFA who has not signed a Player Contract within the RFA signing period set forth in Subsection (ii) above, the Prior Club is not required to send such RFA a "June 1 Tender," unless the RFA received a Qualifying Offer for a Right of First Refusal Only, in which case any "June 1 Tender" to such an RFA must be sent by August 25, 2011.

     (v)     The deadline for the "June 15 Tender" to RFAs shall be September 5, 2011.

     (vi)     There shall be no payments of any kind made to any RFA until after ratification of this Agreement, as described in Paragraphs 1 and 6 of the Settlement Agreement.

     (c)     **Franchise Players and Transition Players.**

     (i)     Any player whose Player Contract had expired as of the beginning of the 2011 League Year and who had received a Franchise Player Tender from his Prior Club prior to the end of the 2010 League Year shall be considered a Franchise Player subject to that Tender. The amount of such Tender shall be determined using Article XX of the Prior Agreement.

     (ii)     The deadline for any Franchise Player to sign a multiyear contract or extension with his Prior Club shall be 4:00pm New York time on September 20, 2011.

     (iii)     Any Transition Player designation made for the 2011 League Year shall be void.

     (d)     **Unrestricted Free Agents.** The "June 1 Tender" date for Unrestricted Free Agents shall be August 20, 2011.

     (e)     **Signing Period for Unrestricted Free Agents.** In the event that an Unrestricted Free Agent who received the "June 1 Tender" described in Subsection (d) above has not signed a Player Contract with a Club by September 3, 2011, he may negotiate or sign a Player Contract from that date until the Tuesday following the tenth week of the regular season at 4:00pm New York time only with his Prior Club.

     (f)     **Accrued Seasons.** The deadline for any player under contract to report to his Club shall be August 9, 2011. If he has not reported by that date, he shall not be eligible to earn an Accrued Season for the 2011 League Year, subject to a demonstration of extreme personal hardship as set forth in Article 8, Section 1(b).

     (g)     **90-man Rosters.** The NFL has determined in its sole discretion that for the 2011 League Year, offseason rosters shall be expanded to a ninety-man limit beginning July 26, 2011.

**Section 4. Rookies:**

    (a)     Each Club shall be deemed to have given each of its 2011 Drafted Rookies the Tender described in Article 6, Section 3 of this Agreement.

    (b)     There will be no separate Club Rookie Orientations.

**Section 5. Salaries and Salary Cap Accounting:**

    (a)     **Top 51 Rule.** The Top 51 Rule applies beginning at 4:00pm on August 5, 2011. All Clubs must be within the Salary Cap at that time.

    (b)     **Proration from Preexisting Contracts.** For Preexisting Contracts, any proration under the Salary Cap rules under the Prior Agreement (including amounts treated as signing bonus) to any League Year covered by this Agreement shall continue to be charged to Team Salary for those League Years, provided that (i) no signing bonus proration to the League Years of this Agreement shall apply for any Preexisting Contract that was terminated, traded, or assigned via waivers prior to March 11, 2011, and (ii) any Preexisting Player Contract entered into in the 2010 League Year shall have maximum proration of six years (including the 2010 League Year). Notwithstanding the foregoing, any Preexisting Contract that was traded or assigned via waivers and then renegotiated or extended prior to March 11, 2011 to include any signing bonus or amount treated as signing bonus shall have such bonus prorated as if the renegotiation or extension were a new Player Contract, unless such second Player Contract was terminated, traded or assigned via waivers prior to March 11, 2011.

    (c)     **Preexisting Contract Measuring Dates.**

    (i)     If a Preexisting Contract contains a measuring date related to Salary and/or the exercise or nonexercise of any option, which measuring date was expressed as (A) a calendar date that fell between March 4, 2011 and May 2, 2011 (e.g., a calendar date certain on which player had to be on the roster to earn a bonus such as "April 15, 2011" or "April 15 of the next League Year [now the 2011 League Year]") or (B) solely as being related to a certain number of days that is 50 days or fewer from the start of the 2011 League Year (e.g., "on or before the 10th day of the 2011 League Year"), such measuring date shall be deemed amended to be 4:00pm, New York time on July 29, 2011. Any measuring date that was expressed as (A) a calendar date that fell between May 3, 2011 and July 29, 2011 or (B) solely as being related to a certain number of days that is greater than 50 days from the start of the 2011 League Year (e.g., "on or before the 60th day of the 2011 League Year") shall be deemed amended to be the eighth day of the 2011 League Year. Notwithstanding the foregoing, any such measuring date related to a player's weight shall be deemed amended to be on or before twenty days after the start of preseason training camp, and further provided that if a player satisfies any weight condition on an earlier date than 20 days after the start of training camp, he will be deemed to have fulfilled that criteria (or earned that bonus, if the bonus were tied solely to his weight) on that day. (For example, if a Preexisting Contract provided that a player would earn a bonus if he were on the Club's roster on the "5th day of the 2011 League Year," or on "April 23, 2011," or on "April 24 of the 2011 League Year," such Contract shall be deemed amended to provide that the player would earn the bonus if he is on the Club's roster at 4:00pm, New York time, on July 29, 2011, and if the player's Contract had not been waived or terminated prior to 4:00pm, New York time, on July 29, 2011,

the player would earn the bonus (assuming all other conditions are met).) The foregoing shall not affect the payment dates for any earned bonus set forth in such Preexisting Contracts, provided that such payment date did not occur prior to the effective date of this Agreement. If the payment date has occurred, payment shall be made not later than five business days after the third day of the 2011 League Year. This Subsection also shall not adjust any measuring date linked to the occurrence of a specific event during the 2011 League Year which has not already occurred as of the effective date of this Agreement, including, without limitation, the end of preseason training camp, the day after a Club's first regular season game, etc.

(ii)     A Club may require any player whose contract has any bonus with a measuring date affected by Subsection (i) above to report to the Club for a physical examination on either July 26, 2011 or July 27, 2011. If a Club requires a player to report for a physical examination, the measuring date described in Subsection (i) above shall be tolled until such time as the player reports for the physical (e.g., if a Club required a player with a bonus for being on the roster on the 8th day of the 2011 League Year to report for a physical on July 26 and the player did not report until July 27, the measuring date shall be 4:00pm, New York time, on July 30, 2011 (original measuring date, plus one day for tolling)).

(iii)    If a player is traded or assigned via waivers such that any measuring date adjusted pursuant to Subsection (c)(i) above falls after the date on which the player was traded or waived, the acquiring Club shall pay the bonus. (E.g., if a player with a Preexisting Contract providing for a $100,000 roster bonus if the player is on the Club's roster on the 7th day of the 2011 League Year is traded to another Club prior to 4:00pm on the 1st day of the 2011 League Year, the acquiring Club, and not the trading Club, shall pay the bonus).

(iv)     Any Preexisting Contract with any condition tied to reporting to training camp for the 2011 League Year shall be deemed amended to replace such condition with being on the Club's roster on the 8th day of the 2011 League Year.

(d)     **Preexisting Contract Offseason Workout Bonuses.**

(i)      Players with a Preexisting Contract containing terms for a bonus solely contingent on the player's participation in offseason workouts for the 2011 League Year shall be paid such bonuses in the following amount if the player is released prior to 4:00pm, New York time, on July 29, 2011: (A) if the bonus in the Preexisting Contract was for $50,000 or less, player shall be paid the full amount of the bonus; (B) if the bonus was for over $50,000 to $100,000, the player shall be paid $50,000; (C) if the bonus was for over $100,000, the player shall be paid 50% of the bonus, up to a maximum payment of $100,000. If a player with such a bonus is on his Club's roster on or after 4:00pm, New York time, on July 29, 2011, the player shall earn the full amount of the bonus. Payment shall be made within five business days of that date, or on the payment date specified in the contract, whichever is later, provided that no payment of any kind shall be made until after ratification of this Agreement, as described in Paragraphs 1 and 6 of the Settlement Agreement.

(ii)     For any Preexisting Contract containing terms for a bonus contingent on the player's participation in offseason workouts for the 2011 League Year, which bonus is also subject to additional conditions (such as the player being on the Club's roster on a

57

certain day after the start of the 2011 League Year, or the player meeting a certain weight requirement), the player must fulfill all of the other conditions in order to be entitled to payment of the bonus. If earned, payment shall be made within five business days of fulfillment of all of the other conditions specified in the Contract, or on the payment date specified in the Player Contract, whichever is later, provided that no payments of any kind may be made until after ratification of this Agreement, as described in Paragraphs 1 and 6 of the Settlement Agreement.

(iii)     The condition of participation in offseason workouts for the 2011 League Year shall be deemed satisfied in any Preexisting Contract (e.g., if a player had a Preexisting Contract with a Paragraph 5 Salary escalator for the 2011 League Year that depended, in part, on the player participating in offseason workouts in the 2011 League Year, that condition shall be deemed satisfied and the player shall be eligible to earn the escalator if all other conditions for it are also met).

(e)     **Additional Salary Cap Room.**

(i)     For the 2011 League Year, each Club may designate up to three players who, as of July 25, 2011, have five or more Accrued Seasons and are under contract to the Club with a Salary of at least $1,000,000 over the Minimum Active/Inactive List Salary for such player, for each of whom the Club will receive a credit to Team Salary for the 2011 League Year of $1,000,000 provided that the player remains on the Active/Inactive Roster, Reserve/Injured List, or Physically Unable to Perform List of the Club throughout the 2011 League Year regular season. The amount of the credit shall be reduced proportionally for each week of the regular season such player is not on the Club's Roster as described in the immediately preceding sentence. The amount of any such credit to Team Salary in the 2011 League Year shall be offset by an equivalent charge to Team Salary, spread over the 2014–17 League Years in a manner to be determined by the Club. (By way of example, if Club A identifies two players with five or more Accrued Seasons who are under contract as of the effective date of this Agreement, Club A will receive a "credit" to Team Salary for the 2011 League Year of $2,000,000 (i.e., an additional $2,000,000 of Room). If one of those players is released after the eighth week of the regular season, the "credit" to Team Salary shall be immediately reduced by $529,000 (9/17ths of $1,000,000). Club A shall be charged $1,471,000 (i.e., ($2,000,000-$529,000) to its Team Salary across the 2014–17 League Years in a manner to be designated by Club A to offset the 2011 League Year Team Salary credit.) Each Club's designations of such players, if any, shall be made by written notice to the NFL no later than the first regular season game of the 2011 League Year. Additional Room shall become effective upon receipt by the NFL of such notice. The NFL shall promptly forward such notices to the NFLPA.

(ii)     For the 2012 League Year, each Club may designate up to three players who, as of July 25, 2011, have five or more Accrued Seasons and are under contract to the Club on the first day of the 2012 League Year with a Salary of at least $500,000 over the Minimum Active/Inactive List Salary for such player, for each of whom the Club will receive a credit to Team Salary for the 2012 League Year of $500,000 provided that the player is on the Active/Inactive Roster, Reserve/Injured List, or Physically Unable to Perform List of the Club throughout the 2012 League Year regular season. The amount of the credit shall be reduced proportionally for each week of the regular season such

player is not on the Club's Roster as described in the immediately preceding sentence in the same manner described in Subsection (i) above. The amount of any such credit to Team Salary in the 2012 League Year shall be offset by an equivalent charge to Team Salary, spread over the 2014–17 League Years in a manner to be determined by the Club. Each Club's designations of such players, if any, shall be made by written notice to the NFL no later than the first regular season game of that League Year. Additional Room shall become effective upon receipt by the NFL of such notice. The NFL shall promptly forward such notices to the NFLPA.

(iii)   Clubs shall identify in writing to the NFL prior to the beginning of each of the 2014–17 League Years, the amount of any offset described in Subsections (i) and (ii) above that shall apply for such League Year. If a Club has not identified its entire offset as of the first day of the 2016 League Year, then the remaining offset balance shall apply in the 2017 League Year.

(f)   **Acceleration.** For Preexisting Contracts and Player Contracts entered into after July 25, 2011 and before the end of the 2011 League Year, any required signing bonus acceleration after the effective date of this Agreement and before the end of the 2011 League Year shall be charged to Team Salary for the 2012 League Year.

(g)   **Performance-Based Pool.** There shall be no Performance-Based Pool in the 2011 League Year.

(h)   **End of 2011 League Year.** Unless the parties agree otherwise, the 2011 League Year shall end no later than March 11, 2012.

(i)   **Time Periods.** All time periods set forth in this Article shall be determined without regard to the provisions of Article 34, Section 7.

(j)   **Transactions under the Settlement Agreement.** Any player transactions (e.g., signings, waivers, terminations) occuring during the period between July 25, 2011 and the effective date of this Agreement shall be deemed to have taken place during the 2011 League Year for Team Salary and Cash Spending purposes.

**Section 6. Roster Exemption:** Any player whose contract had expired as of the end of the 2010 League Year, and at that time either (i) had two but less than three Accrued Seasons or (ii) was a Restricted Free Agent pursuant to Article XIX, Section 2 of the Prior Agreement, and who had been given the Required Tender pursuant to Article XVIII, Section 2, or Article XIX, Sections 2(b)(i) or (ii) of the Prior Agreement, as applicable, which player has not signed a contract and has not reported to his Club's preseason training camp, may be placed on the roster exempt list of his Club under the following conditions:

(a)   If the player has not reported at least the day before the Club's fourth preseason game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(b)   Any roster exemption imposed under this Section shall commence with the first game immediately after a Restricted Free Agent reports and signs a Player Contract during the pendency of any League-imposed suspension.

(c)   Any roster exemption imposed under this Section shall continue for its full duration after any trade of the player to another Club.

(d)     Any player who is placed on the roster exempt list of his Club pursuant to this Section shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of Paragraph 5 Salary as a result of being placed on the roster exempt list. This Subsection shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsection (i)) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(e)     No player may be placed on roster exempt under this Section unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's fourth preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsection (a) above.

(f)     For purposes of this Section, the Canton Hall of Fame Game shall not count.

(g)     When placed on roster exempt pursuant to this Section, the player shall not be entitled to compensation.

60

# ARTICLE 12
# REVENUE ACCOUNTING AND CALCULATION OF THE SALARY CAP

**Section 1. All Revenues:** For purposes of this Article, and anywhere else stated in this Agreement, revenues shall be accounted for in the manner set forth below.

    (a)    **AR.**

    (i)    All Revenues ("AR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Clubs (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. AR shall include, without limitation:

    (1)    Regular season, preseason, and postseason gate receipts including ticket revenue from "luxury boxes," suites, and premium seating among NFL Clubs in all cases net of (A) admission taxes, (B) taxes on tickets regularly paid to governmental authorities by Clubs or Club Affiliates, provided such taxes are deducted for purposes of calculating gate receipts subject to revenue sharing and (C) surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing. For purposes of this Subsection, unless otherwise expressly agreed to by the parties, the portion of ticket revenue attributable to luxury boxes, suites and premium seating shall be the face value of the ticket, or any additional amounts which are subject to gate receipt sharing among NFL Clubs. Revenues from premium charges on ticket sales in excess of the face value of the ticket (e.g., rebates from ticketing sources) shall be included in AR. Credit card charges related to ticket sales are not considered a deductible "surcharge" and will not be offset against gate receipts. If a Club charges a service fee on the tickets it sells in excess of the face value of the ticket, on a ticket account basis and not on a per-ticket basis (up to a reasonable maximum amount prescribed by League policy, which as of the effective date of this Agreement is $4 per ticket account), such service fee will not be AR;

    (2)    Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL preseason, regular season and playoff games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts, and all other means of distribution;

    (3)    Revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that described in Section 1(a)(i)(1) above (with "Super suites" (i.e., suites substantially larger in size than the largest suite regularly available for sale in the stadium) to have no additional value imputed in respect of them by virtue of such status), Internet operations (including merchandise sales), and sales of programs and novelties;

    (4)    The consolidated revenue generated by NFL Ventures L.P. ("NFL Ventures") (including but not limited to those categories of revenue currently or formerly generated by NFL Ventures' subsidiaries, NFL Properties LLC, NFL Enterprises LLC, and NFL Productions LLC d/b/a NFL Films, but excluding from NFL Ventures' reve-

nue any revenues otherwise included in AR pursuant to Subsections (a)(i)(1)–(3) above or Subsection (a)(i)(5) below). AR from NFL Properties LLC and NFL Productions LLC shall be calculated on a one-year lag, consistent with the parties' past practice under the Prior Agreement.

(5)     Barter income, which shall be valued at 90% of the fair market value of the goods or services received;

(6)     The value of equity instruments unconditionally received from third parties by the NFL or member Clubs (i.e., not equity instruments in business entities formed and owned exclusively by the NFL, NFL Ventures L.P. or any of its affiliates, or the member Clubs) derived from, relating to or arising out of the performance of players in NFL football games shall be included in AR beginning in the League Year in which the equity instrument vests at the fair value of such instrument on the date of such vesting, amortized over ten years. In subsequent League Years within the amortization period, the amortized amount shall be adjusted pursuant to the Black Sholes option pricing model methodology or as otherwise agreed. After the amortization period ends, the full amount of the Black Sholes (or other agreed) methodology shall be included in AR. In the event that the equity instrument is sold, AR for that League Year shall be the proceeds less the AR previously recognized.

(7)     Revenues received by a Club or Club Affiliate pursuant to a stadium lease or directly related stadium-use agreement with an unaffiliated third party, where the amount of such revenues is determined based upon activities that are unrelated to NFL football, in circumstances where the involved Club or Club Affiliate is not required to make a non-de minimis investment of capital or cash to receive such revenue (provided that the provisions of this Subsection (1)(a)(i)(7) shall not be retroactively applied to include in AR revenues generated from nonfootball business opportunities arising out of leases or other stadium use agreements entered into prior to January 1, 1993, the financial terms of which have not been amended since such date);

(8)     Recoveries under business interruption insurance policies that are received by any League- or Club-related entity, to the extent that such recoveries compensate such entity for lost revenues that would have been included in AR. The amount of such recoveries shall be included in AR net of (1) premiums paid for the policy/policies recovered under in the League Year(s) that include the events and the recoveries; and (2) deductible and unreimbursed expenses arising out of or related to the events giving rise to the insurance claim/recovery. Any lump sum payments will be allocated under the method separately agreed to by the parties;

(9)     Any expense reimbursements received by a Club or Club Affiliate from a governmental entity in connection with a stadium lease or a directly related stadium-use agreement, except as provided in Subsections 1(a)(ii)(2)(E)–(F) below; and

(10)     Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii)     **Non-AR.**

(1)     The following items are excluded from AR:

(A)     "Taxes/surcharges" on regular season, preseason, and postseason gate receipts (including ticket revenue from "luxury boxes," suites, and premium seating) which are comprised of (A) admission taxes, (B) taxes on tickets regularly paid to go-

62

vernmental authorities by Clubs or Club Affiliates, provided such taxes are deducted for purposes of calculating gate receipts subject to revenue sharing and (C) surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing (which amounts approximated in the aggregate $119,666,000 for the 2010 League Year);

(B)    Revenues derived from wholesale merchandising opportunities (i.e., the manufacture and distribution of merchandise to third-party retailers) conducted by Dallas Cowboys Merchandising ("DCM") other than any related royalty payments to any League entity, Club or Club Affiliate (which amounts are projected as of the effective date of this Agreement to be approximately $80 million for the 2011 League Year); and

(C)    Revenues from the PSLs sold by the New York Jets and New York Giants that are dedicated to the construction of New Meadowlands Stadium, including the amortization to League Years during the term of this Agreement of such previously-sold PSLs (which amounts are projected as of the effective date of this Agreement to be approximately $43 million for the 2011 League Year).

(D)    Any PSLs that were excluded from the calculation of Total Revenues under the Prior Agreement, to the extent that the amortization schedule has not expired.

(2)    The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Clubs which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "AR"):

(A)    Proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, franchise relocation fees, dues or capital contributions received by the NFL, fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries (other than those net business interruption insurance recoveries that are described in Section 1(a)(i)(8) above), sales of interests in real estate and non-AR-related property, and Club cheerleader revenues (provided that, if such cheerleader revenue is provided by an entity with which the Club has another commercial relationship, the Accountants will review the transactions and determine the appropriateness of any revenue allocations);

(B)    Revenues generated from stadium events unrelated to NFL football (e.g., concerts, soccer games) in which the Club or a Club Affiliate makes a non-de minimis investment of capital or cash, and the value of, and revenues generated from, stadium-related businesses and/or opportunities unrelated to NFL football in which the Club or an affiliate must invest a non-de minimis amount of capital, cash, or effort to generate revenue (other than real estate development opportunities, which are subject to Subsection 1(a)(ii)(I) below);

(C)    The value of promotional spots (e.g., television or radio spots) that are received from time to time by the NFL under national media contracts solely for its own use (either to promote the NFL's own football related businesses (and not the businesses of any other party), or for charitable purposes) and not for resale (although for clarity, the NFL's promotional spots may include references to or depict logos or marks of third party sponsors or providers (e.g., an advertisement promoting the NFL Shop may show merchandise with NFL sponsor logos) as long as the third-party does not provide consideration to be referenced or depicted in such spots);

63

(D)   The value of complimentary or other no-charge tickets distributed by a Club, up to 320,000 League-wide across all preseason games (i.e., an average of 5,000 tickets per preseason game), and up to 17,000 tickets per-Club across all home regular season games (i.e., an average of 2,125 tickets per regular season game) allocated at the Club's discretion, provided that such tickets are excluded from visiting team sharing requirements. NFLPA approval is required for any exclusion from AR of such tickets above the levels set forth in this Subsection.

(E)   Specifically designated day-of-game expense reimbursements received by a Club or Club Affiliate from a governmental entity, where such reimbursements are for legitimate expenses that the Club or Club Affiliate has incurred that the governmental entity previously incurred (including in connection with the Club's occupancy of a prior stadium, if the reimbursements arise out of the construction of a new stadium). This exclusion shall not apply to expense reimbursements received in connection with con-cession sales, operation of parking facilities, signage or advertising sales, or any other revenue generating activity at the stadium other than the conduct of the game itself (e.g., expense reimbursements for game-day security previously provided by the police, and post-game stadium clean-up previously provided by a municipality, are not treated as AR, if such reimbursement otherwise qualifies). All claims for this exclusion shall be supported by appropriate documentation evidencing the extent to which the Club or Club Affiliate incurred the designated day-of-game expense and the extent to which the governmental entity previously incurred the expense;

(F)   In addition to the amounts described in Subsection (E) above, 65% of other (i.e., non-day of game) operating or maintenance expense reimbursements only for the specific Teams and agreements as per Paragraph 3 of the letter agreement under the Prior Agreement dated November 21, 2007. If a Club has reimbursements under both Subsection (E) above and this Subsection (F), the allocation as between the two catego-ries shall be consistent with how the parties treated such reimbursements under the Prior Agreement.

(G)   Investments in or contributions toward the purchase of concession equipment by concessionaires on behalf of a Club or a Club's Stadium, and the value of provided elements related to the operation and maintenance of the soft drink equipment in the Club's Stadium (i.e., dispensing/vending equipment, service); and

(H)   The value of luxury boxes that are (1) used by a Club owner for personal purposes or to promote the Club or the owner's other business interests; or (2) provided to stadium authorities, municipalities, and/or governmental officials, or (3) used or made available for use by the owner(s) of the visiting Club, or (4) provided for the use of a Club head coach; in each case where no revenue is actually received by the Club or a Club Affiliate, except that the value of such luxury boxes will be imputed as AR unless at least one luxury box in the stadium is available and unsold; provided that, in no event shall revenue be imputed for one luxury box that is used by the owner(s) of the Club, and one luxury box that is used or made available for use by the owner(s) of the Visiting Club. Without limiting the foregoing, the value of any luxury box that is provided to a former Club owner in connection with the sale of a Club shall be imputed into AR un-less the prior owner is obliged to pay the club periodic consideration (i.e., annual rent) in

64

connection with such use, in which case such consideration will be included as revenue in AR.

(I)    Revenues derived from real estate development opportunities in conjunction with or related to any stadium lease, land purchase agreement or other arrangement, provided that such revenues are not substitutions for revenues that would otherwise be included in AR.

(iii)    **Television Revenue Used To Fund Stadium Construction/Renovation.** Notwithstanding any other provision of this Agreement, the NFLPA and the NFL may agree, on a case-by-case basis, with no limitation on their exercise of discretion, not to include in AR network television revenue to the extent that such revenue is used to fund the construction or renovation of a stadium that results in an increase in AR.

(iv)    **Related Entities.** The parties hereto acknowledge that for purposes of determining AR:

(1)    NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in AR) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in AR), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a);

(2)    NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities"); and

(3)    The reasonableness and includability in AR of such allocations and transactions between Related Entities shall be determined by the Accountants, in accordance with the procedures described below.

(4)    Any entity which has the same ownership as a Club, or is controlled by the same persons or entities which own or control a Club, and is engaged in AR-related transactions with the Club will be treated as the same entity as the Club for the purposes of the AR Reporting Package and any audit with respect thereto.

(5)    For any entity which does not fit the rule set forth in Subsection (4) above, but which has partial common ownership with a Club, and which is engaged in AR-related transactions with the Club (a "Non-Controlled Related Entity"), if a Club contracts with such a Non-Controlled Related Entity for the right to provide goods or services (other than ticket or broadcast rights), revenues from the sale of which would be included in AR if sold directly by the Club, only the amount paid by the Non-Controlled Related Entity to the Club for the right to provide such goods or services (which amount must be negotiated in good faith and should reflect the amount that an independent third party would pay for the right to provide such goods or services) shall be included in AR. (For example, if a Club contracts with a Non-Controlled Related Entity when it could have contracted with an independent third party to be the concessionaire at a stadium, AR shall include the concessionaire fee, but not the revenues received by the Non-Controlled Related Entity for the sale of concessions.) The Local Accountants and Accountants shall have access to the payment terms of any such contracts to confirm

that the amount paid reflects fair market value. If there is a dispute about whether the amount reflects fair market value, the issue shall be resolved by a jointly-appointed arbitrator who has experience in the line of business in question, and the fair market value shall be included in AR.

(6)    In the event of a question whether a business or enterprise owned (wholly or in part) by a Club, Club Affiliate, or Club owner is or is not involved in AR-related transactions, the NFLPA agrees to accept the written certification from the certified accountant of such business or enterprise, that such business or enterprise is not involved in AR-related transactions. Notwithstanding the foregoing, the NFLPA may seek an order from the System Arbitrator granting access to the records of such business or enterprise if it demonstrates that there is a reasonable basis for asserting that such business or enterprise is involved in AR-related activity.

(v)    **Rounding.** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to AR, Projected AR, Benefits, Projected Benefits, the Player Cost Amount, Cash Spending, and the Stadium Credit, such amounts shall be rounded to the nearest $1,000. For purposes of any percentage to be calculated or used pursuant to this Agreement, unless otherwise specifically provided, such percentages shall be rounded to the nearest one-one hundredth of one percent (e.g., 47.00%).

(vi)    **PSLs.**

(1)    Subject to Subsection 1(a)(vi)(6) and Subsection 4(f) below, AR shall not include PSL proceeds that are segregated and unequivocally dedicated to stadium construction or stadium renovation projects commenced after the date of this Agreement, and that have received a waiver of any applicable League requirement of sharing of "gross receipts";

(2)    Except as set forth in Subsection (1) above, AR shall include all revenues from PSLs received by, or received by a third party and used, directly or indirectly, for the benefit of, the NFL or any Team or Team Affiliate, subject to any deduction for taxes as provided in Section 1(a)(i) above and the provisions of Subsection (3) below with respect to PSL refunds. Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen years; provided, however, that Interest from the League Year the revenues are received until the League Years the revenues are allocated into AR shall be imputed and included in AR, in equal portions over such periods.

(3)    For purposes of this Agreement, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options; seat bonds; and suite bonds or long-term conveyances of suite occupancy rights where proceeds are segregated and unequivocally dedicated to stadium construction (e.g., Founders' Suite Programs) that directly or indirectly give purchasers the right to acquire NFL tickets. PSL revenues shall also include revenues from any other device (e.g., periodic payments such as surcharges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

(4)    PSL revenues shall be reported net of actual refunds made in the year for which such revenues are reported. If an amount has been refunded, then the refunded amount shall be deducted from PSL revenues used in the calculation of AR. If there is a

66

non-contingent contractual commitment to refund, but the refund is to be made at a later date, then the only amount included is the Interest on the refund. Otherwise, all amounts are included regardless of any refund contingencies. If a refund contingency occurs and money previously included as PSL revenue is refunded, the NFL shall receive a credit against AR (i.e., League-wide AR shall be reduced) in the amount of the refund the next League Year.

(5)     In the event of a payment default and/or forfeiture of PSL revenue being received on an installment payment plan, the unamortized portion of such revenue, in excess of cash received, shall no longer be included in AR upon the date, and to the extent, of default/forfeiture. In the event that cash received at the time of the default/forfeiture exceeds life-to-date amortization of PSL revenue, amortization will continue as scheduled until equaling the amount of cash received. In the event that any such PSLs are re-sold, and the re-sale does not meet the criteria of Subsection 1(a)(vi)(1) above, the re-sale will be included in AR and amortized over the life of the PSL up to a maximum of fifteen years.

(6)     Exclusions from AR of PSL revenue in respect of funding for stadium projects initiated after the 2005 League Year will terminate upon sale of the recipient franchise if the waiver from revenue sharing also terminates.

(vii)     **Premium Seat Revenues ("PSRs").**

(1)     Subject to Subsection 1(a)(vii)(3) and Subsection 4(f) below, AR shall not include PSR proceeds that are dedicated to and used for stadium construction or stadium renovation projects commenced after the date of this Agreement, and that have received a waiver of any applicable League requirement of sharing of "gross receipts."

(2)     Except as provided in Subsection (1) above, AR shall include all PSRs net of amounts described in Subsection 1(a)(i)(1).

(3)     For purposes of this Agreement, the term "PSR" shall mean the revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(4)     Exclusions from AR of PSR revenue in respect of funding for stadium projects initiated after the 2005 League Year will terminate upon sale of the recipient franchise if the waiver from revenue sharing also terminates.

(viii)     **Naming Rights/Cornerstone Sponsorships.**

(1)     Subject to Subsection 1(a)(viii)(3) and Subsection 4(f) below, AR shall not include naming rights and cornerstone sponsorship proceeds that are dedicated to and used for stadium construction or stadium renovation projects commenced after the date of this Agreement, and that have received a waiver of any applicable League requirement of sharing of "gross receipts."

(2)     Except as provided in Subsection (1) above, AR shall include all naming rights and cornerstone sponsorship proceeds.

(3)     Exclusions from AR of naming rights revenue in respect of funding for stadium projects initiated after the 2005 League Year will terminate upon sale of the recipient franchise if the waiver from revenue sharing also terminates.

67

(ix)(1)   Notwithstanding Subsections (vi)–(viii) above, for any AR exclusions subject to the Cap Effect Guarantee described in Subsection 4(f) below: there shall be no requirement of a waiver from sharing of "gross receipts" provided that there is an economically-equivalent method of League support for such project (e.g., relief from payment of a League assessment). The NFL shall provide the NFLPA with prior notice of any such economically-equivalent method used with respect to such exclusions.

(2)   Notwithstanding Subsections (vi)–(viii) above, the NFL shall have the right to include in AR any revenues that would otherwise qualify for exclusion from AR under those Subsections.

(x)   **Allocations Over League Years.** The parties may agree to allocate AR received or to be received on an accrual basis in a particular League Year over one or more other League Years.

(xi)   **Cancelled Games.** If one or more weeks of any NFL season are cancelled or AR for any League Year substantially decreases, in either case due to a terrorist or military action, natural disaster, or similar event, the parties shall engage in good faith negotiations to adjust the provisions of this Agreement with respect to the projection of AR and the Salary Cap for the following League Year so that AR for the following League Year is projected in a fair manner consistent with the changed revenue projection caused by such action. In such circumstances, the parties agree to discuss in good faith the possibility of suspending the application of the Player Cost Amount floor for the 2012 or 2013 League Year as described in Section 5(c)(v) below.

(xii)   **Expense Deductions.**

(1)   No expense deductions shall be permitted to be taken in calculating AR, and all expense deductions that were previously permitted in the calculation of "Total Revenues" or "Defined Gross Revenues" or "Excluded Defined Gross Revenues" shall not be used in calculating AR, except as expressly provided herein.

(2)   An expense deduction for the reasonable and customary direct costs and initial investment (collectively, "direct costs") for projects in new lines of business of NFL Ventures may be taken, subject to the following rules:

(A)   Absent NFLPA approval, there may be no more than three projects in new lines of business to receive deductions in any League Year (i.e., for the 2012 League Year, there can be three projects in new lines of business receiving deductions; for the 2013 League Year, there could be six projects in new lines of business (three that began in 2012 and three that began in 2013).

(B)   Absent NFLPA approval, a project in a new line of business shall not qualify for this deduction if it has more than $10 million in direct costs in a League Year. This limit shall increase in each League Year after the 2012 League Year by the percentage change in AR.

(C)   Absent NFLPA approval, there may be no more than $120 million in direct costs across all projects that qualify for the deduction in the 2012 League Year (i.e., a maximum deduction of $60 million). For the avoidance of doubt, this Subsection (C) is subject to the requirements of Subsections (A) and (B) above. This maximum deduction amount shall increase each subsequent League Year by the same percentage increase (if any) of AR;

68

(D)     The expense deduction for the first three years of any qualifying new line of business project shall be 50% of the direct costs in each such League Year;

(E)     The expense deduction for years four through five of any qualifying new line of business project shall be 25% of the direct costs in each such League Year;

(F)     Unless the parties agree otherwise, after five years no further deductions shall be taken for any such project (and revenues from such projects shall be included in AR in the 45% bucket as described below);

(G)     The NFL shall provide the NFLPA with notice of the projects for which it will take the expense deduction, including the provision of business plans and budgets (subject to reasonable confidentiality and non-compete terms);

(H)     Pursuant to the provisions of Section 3 below, the Accountants shall review, and the NFLPA shall have audit rights regarding, such deductions to ensure their accuracy and reasonableness;

(I)     Deductions allowed shall be netted against related revenues, and the netting of expenses cannot result in a negative number (e.g., if 50% of the direct costs for a project exceed its revenues, the AR count for such project shall be zero).

(J)     For purposes of this Subsection 1(a)(xii)(2), if the NFL adds additional International Series regular season games (i.e., more than one International Series regular season game in any given League Year), each additional International Series game shall constitute a new line of business project, and further provided that the payment made by the NFL to reimburse the participating Clubs for lost revenue (which payment is included in AR) shall not be included in determining whether such Series is subject to either of the direct cost limits referenced in Subsection (B) or (C) above.

(xiii)     **Interest.** Unless otherwise specified, as used in this Article, "Interest" means interest calculated on an annual compounded basis using the one-year Treasury yields at constant maturities rate as published in The Wall Street Journal on February 1 (or the next date published) of the League Year in which the amount to receive interest accrues, is awarded, or occurs, as the case may be. If this rate is not published in The Wall Street Journal for any reason, the website of the Federal Reserve (http://www.federalreserve.gov) shall be used to obtain the interest rate.

(xiv)     **No Double-Counting.** No revenue may be included in AR more than once. All intra-company transactions between or among the NFL, any NFL Affiliate, Clubs, and Club Affiliates shall be eliminated in accordance with GAAP (treating all such transactions on a pro forma consolidated basis) (except as provided in Subsection 1(a)(xii)(J) above) for purposes of calculating AR. For any joint venture, if AR rights are granted to the venture, which in turn pays the NFL or the Clubs for the rights granted, the value of the rights shall only be included in AR once.

(xv)     Subject to their reasonable business judgment, the NFL and each NFL Team shall act in good faith and use commercially reasonable efforts to increase AR for each playing season during the term of this Agreement and not shift revenues attributable to League Years within the term of this Agreement to League Years after the term. There shall be no obligation to accelerate into League Years within the term of this Agreement revenues attributable to League Years following expiration of this Agreement. In evaluating compliance with this Subsection, the parties and the System Arbitrator shall consider and give substantial weight to the reasonable business judgment

of the NFL or the NFL Team but no deference will be applied where the NFL is alleged to have deferred or forgone revenues of $1 billion or more for the purpose of securing leverage in collective bargaining, in which case any finding of non-compliance shall require proof by a clear preponderance of the evidence. The following is a list of decisions in respect of which the business judgment of the NFL or an NFL Team shall conclusively be deemed reasonable: franchise location; stadium capacity or configuration; ticket or suite prices; number and location of games played; whether to outsource or operate a line of business; and whether to accept or decline a sponsorship, advertising or naming rights opportunity. The foregoing list shall not limit in any manner the circumstances in which the business judgment of the NFL or an NFL Team may be deemed reasonable.

(b)     **Additional Accounting Rules.** The calculation of AR shall be further subject to the rules set forth in Section 10 below.

(c)     **Revenue-related Arbitrators.** Wherever this Article provides for a jointly-retained arbitrator to resolve a revenue-related dispute, and if the parties cannot agree on the identity of such arbitrator, the parties shall use the procedures set forth in Article 15, Section 6 to select the arbitrator.

*Section 2.* **Benefits:**

(a)     "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

(i)     Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article 53) and the Second Career Savings Plan (as described in Article 54);

(ii)     Group insurance programs, including, life, medical, and dental coverage (as described in Article 59 or as required by law), and the Disability Plan (as described in Article 61);

(iii)     Injury Protection (for the 2011–2015 League Years only);

(iv)     Workers' compensation, payroll, unemployment compensation, social security taxes, and contributions to the fund described in Article 30, Section 4;

(v)     Preseason per diem amounts (as described in Sections 3 and 4 of Article 23) and regular season meal allowances (as described in Article 34);

(vi)     Expenses for travel, board and lodging for a player participating in an offseason workout program in accordance with Article 13, Section 6(e)(iv)(3);

(vii)     Payments or reimbursements made to players participating in a Club's Rookie Orientation Program (as described in Article 7);

(viii)     Moving and travel expenses (as described in Article 36);

(ix)     Postseason pay (as described in Articles 37 and 38) and salary paid to Practice Squad players pursuant to a Practice Squad Contract during the postseason, unless the Practice Squad Player Contract is executed or renegotiated after December 1 for more than the minimum Practice Squad salary, in which case all salary paid to such a Practice Squad player during the postseason will be counted as Salary.

(x)     Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player

70

injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year). Subject to the foregoing, player medical costs shall include one-third of each Club's expenses for tape used on players and one-third of each Club's player physical examination costs for signed players (player physical examination costs relating to the Combine or for Free Agents whom the Club does not sign are not included in Player Benefit Costs);

      (xi)     Severance pay (as described in Article 60);

      (xii)    The Player Annuity Program (as described in Article 55);

      (xiii)   The Minimum Salary Benefit (as described in Article 27);

      (xiv)   The Performance Based Pool (as described in Article 24), and further provided that there shall be no Performance Based Pool for the 2011 League Year;

      (xv)    The Tuition Assistance Plan (as described in Article 56);

      (xvi)   The Gene Upshaw NFL Players Health Reimbursement Account (as described in Article 63);

      (xvii)  The "88 Benefit" for former players suffering from dementia (as described in Article 58);

      (xviii) The Rookie Redistribution Fund (as described in Article 7), to the extent that any portion of that Fund is not being used to offset the allocated Benefit Cost of the Legacy Benefit (as described further in Subsection (xix) below), and further provided that there shall be no Rookie Redistribution Fund for the 2011 League Year;

      (xix)   The Legacy Benefit (as described in Article 57) and further provided that of the $620 million aggregate contribution to the Legacy Benefit over the term of this Agreement, only 49% shall count as a Player Benefit Cost, and that the parties shall agree on the allocation of this Player Benefit Cost across the League Years covered by this Agreement, and further provided that the parties may not allocate any portion of this Player Benefit Cost to the 2011 League Year;

      (xx)    The Neuro-Cognitive Disability Benefit (as described in Article 65); and

      (xxi)   Beginning in the 2015 League Year, the Long-Term Care Insurance Program (as described in Article 63).

      (b)     If Benefits that are not currently taxed are subject to a new or materially different federal or state excise tax, the parties will negotiate in good faith about the appropriate adjustment, if any, in Benefits to account for such additional tax. In agreeing to this Section, neither party waives any right to contend that such tax amounts would meet or would not meet the definition of a Player Benefit Cost set forth in this Agreement, and this Section shall not be referred to in any dispute regarding such issue.

      (c)     Without limitation on any other provision of this Agreement, Benefits will not include (1) salary reduction contributions elected by a player to the Second Career Savings Plan described in Article 54; (2) any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (3) attorneys' fees, costs, or other legal expenses incurred by Clubs in connection with workers' compensation claims of players. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes

during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

*Section 3.* Accounting Reports & Projections:

    (a)    **Special Purpose Letters and AR Reporting.**

    (i)(A)  As provided below, each League Year the parties will be provided with one or more "Special Purpose Letters" by an independent accounting firm (hereinafter "the Accountants") which report the AR, Player Cost Amount, Team Salary, Cash Spending, and Benefits of each Club and the NFL for that League Year, utilizing information reported by independent Club and League accounting firms, and information obtained by the Accountants through its review procedures. The Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the Clubs and the League in providing information to the Accountants ("Revenue Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties, and shall be reported on a March 31 year-end basis unless otherwise agreed by the parties. The basic review procedures to be performed by the Accountants are set forth below, and may be modified and/or supplemented by mutual agreement of the parties. The engagement of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year. Each Special Purpose Letter shall be based upon the best available information at the time of its issuance, and shall include a report of adjustments and new information obtained with respect to amounts previously reported for prior League Years.

    (B)    The amount of any Salary Cap and League-Wide Cash Spending that may apply in a League Year shall be determined at the times and utilizing the Special Purpose Letters and other information described below.

    (ii)    In the event than any error is found in AR, Benefits, or Player Cost Amount in respect of any League Year subsequent to the 2010 League Year, which, if it had not occurred, would have resulted in any increase or decrease in any Salary Cap in one or more prior League Years, the total amount of any such Salary Cap shortfall or overage, as the case may be, shall be added or subtracted, as the case may be, the next time the Salary Cap is calculated. An inaccuracy in an estimate that was made in a prior League Year shall not be considered an error for purposes of this Subsection, and such estimates shall be reconciled by the Accountants each League Year. In the event that an inaccuracy in an estimate is not reconciled, the failure to do so shall be considered an error for purposes of this Subsection. Any individual errors proposed for correction pursuant to this Subsection that are greater than $25,000 must be substantiated by evidence and be reviewed with the NFL, the NFLPA, and the Accountants prior to the correction being made. Any dispute regarding such corrections shall be subject to the procedures that apply under Subsections (ix)–(x) below.

    (iii)    To the extent that the amounts and information set forth in a Special Purpose Letter indicates that the amount of any Salary Cap for any prior League Year

within the term of this Agreement should have been different from the amount actually utilized, any such difference shall be credited or deducted, as the case may be, to the next Salary Cap to be set, with Interest. Any such adjustment in the Final League Year shall be immediate.

      (iv)    The Accountants shall review the reasonableness of any estimates included in any Club's Revenue Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made as provided in Subsection (ii) above.

      (v)    The Accountants shall receive, in connection with their duties: (1) access to and copies of the Local Accountant workpapers with respect to the Schedule described in Appendix F; and (2) access to the financial audit workpapers of the Local Accountants or League Office (to the extent necessary), provided that any information derived from the access described in this clause (2) will be held in confidence and will not be part of any file subject to NFLPA review.

      (vi)    The NFL will use its best efforts to ensure that any contract between the League, any Club, or any Club Affiliate, and any third party in connection with the sale or marketing of any source of AR shall include terms that provide to the Accountants and the NFLPA access to any and all financial and contractual information and documents in the possession, custody, or control of such third party to which the Club, Club Affiliate, or any other entity controlled by the owner of the Club has any right to any access, relating to such revenue source or any other financial or contractual relationship or transaction between such third party and the League, the Club involved in the sale or marketing of such revenue source, any Affiliate of that Club, or any of that Club's owners. In each case such access shall be subject to and limited by the rules set forth in this Agreement or otherwise agreed to by the parties regarding the dissemination of information provided to the Accountants and the NFLPA pursuant to the audit process. If the NFL, despite its best efforts, cannot ensure such access, the NFLPA shall have the right to obtain an order against the Club or Club Affiliate requiring that such access be allowed.

      (vii)    Reasonably prior to the issuance of a Special Purpose Letter, the Accountants shall, as set forth in Appendix F attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues reported by the Clubs or any other information contained in the Revenue Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue item or any other information contained in the Revenue Reports submitted by the Clubs.

      (viii)    In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) to be included in the Revenue Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants related to Subsection 1(a)(xii)(2) above that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties. Notwithstanding the foregoing, either party shall have the right to contest, by commencing a System Arbitrator proceeding pursuant to

this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to System Arbitrator Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a Revenue Report, shall be resolved by the System Arbitrator appointed pursuant to this Agreement, as set forth in Article 15.

(ix)    After receiving a Final Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in such Final Special Purpose Letter through an auditor hired by the NFLPA (subject to notification and approval by the NFL, not to be unreasonably withheld) (the "NFLPA Auditor"). A representative of the NFL shall accompany the NFLPA Auditor on any site visits during any such audit, but shall not interfere with the conduct of the audit. The NFLPA Auditor shall make diligent efforts to complete its report no later than sixty (60) days prior to the scheduled issuance of the next Final Special Purpose Letter so that the Accountants and the parties may address any issues in advance of such next Final Special Purpose Letter. The Clubs shall provide reasonable cooperation in the audit process. The NFLPA Auditor may copy documents it reviews in the course of its audits and maintain copies of documents reviewed in its office. Other than as set forth in this Subsection, the NFLPA Auditor may not show any such copies to anyone other than its partners, employees, and agents. The documentation made available and the information contained therein shall be held in strict confidence and may be discussed only with individuals authorized in this Subsection, or as jointly authorized by the NFL and the NFLPA. The NFLPA Auditor may prepare one or more written or oral reports for the use of the NFLPA in connection with this Agreement, which may refer to and discuss the contents of documents reviewed, but which may not include copies of any such documents. Any such report shall not be referred to or distributed to anyone outside of the NFLPA or the NFLPA Auditor for any other purpose. If the NFLPA determines in the exercise of its judgment that matters discussed in the NFLPA Auditor's report may indicate a violation of this Agreement, then the NFLPA Auditor may show (but not provide) a copy of such documents (or portions thereof) that it considers in the exercise of its judgment to be relevant to such potential violation to counsel for the NFLPA, the Executive Director and General Counsel of the NFLPA, up to three NFLPA staff personnel (whose authority to

receive such information shall be disclosed in advance to the NFL) and up to three members of the NFLPA Executive Committee (whose authority to receive such information shall be disclosed in advance to the NFL). In addition, a copy of such documents may be presented to the System Arbitrator and/or a court in any proceeding to enforce this Agreement. At least four (4) business days prior to commencing any such proceeding based upon such documents, the NFLPA will advise the NFL of the alleged violation upon which the proceeding would be based; the parties shall stipulate to reasonable protective order terms and conditions to protect the confidentiality of such information. Except in connection with a proceeding as described in the preceding sentence, the NFLPA, its representatives and agents shall not refer to or distribute such copies to anyone outside of their organizations for any other purpose.

(b)     **Projected AR, Projected Benefits, True-Ups, and Timetable.**

(i)     Prior to the start of each League Year (other than the 2011 League Year), the parties will meet for the purpose of agreeing upon the projections to be used to determine Projected AR and Projected Benefits, including incremental stadium-related revenues from the opening or any new stadium or major renovation of an existing stadium, or any known modifications of an existing stadium lease, and contracted revenues and/or percentage adjustments to be used for League Media, NFL Ventures/Postseason, and Local AR from the prior League Year. In the absence of agreement of the parties otherwise, Projected AR shall be projected on the basis of: (A) for League Media AR, on the basis of the League Media contracts; (B) for NFL Ventures/Postseason AR, on the basis of League-level contracts and year-over-year growth rates for such AR not specified in a League-level contract; and (C) for Local AR, (1) for gate, on the basis of the average prior-year ticket price (taking into account any announced price increases or decreases for the upcoming season) multiplied by the actual prior-year attendance (adjusted to account for any new or significantly renovated stadiums, relocations, or expansions); and (2) for all other Local AR, on the basis of the year-over-year growth rates, or, in the absence of agreement on the growth rate, on the basis of the annual percentage increase for such revenues over the prior four League Years (using a compound annual growth rate), in either case adjusted to account for any new or significantly renovated stadiums, new revenue streams, relocations, or expansions. Projected Benefits shall be any Benefits projected to be paid (or properly accrued) in the applicable League Year pursuant to this Agreement, provided that if the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)     Based on the meeting described in Subsection (i), the Accountants shall prepare an Initial Special Purpose Letter based on the Clubs' January reporting submissions that will set forth Projected AR and Projected Benefits for the upcoming League Year and an initial calculation of actual AR and actual Benefits from the prior League Year. Following the method set forth in Section 6 below, any difference between the Salary Cap from the prior League Year and the Salary Cap that would have applied in that League Year had the updated AR and Benefits information been used as Projected AR and Projected Benefits when that Salary Cap was set shall be a "True-Up," to be

75

credited or deducted, as the case may be, in the calculation of the Salary Cap for the upcoming League Year using the method set forth in Section 6. Any such True-Up shall include Interest.

(iii)  No later than August 30 of each League Year (other than the 2011 League Year), the Accountants shall prepare a Final Special Purpose Letter based on the final reporting packages from the League and the Clubs from the prior League Year, that shall set forth (A) the final calculation of actual AR for the prior League Year, (B) the final calculation of actual Benefits for the prior League Year, and (C) the League-Wide Cash Spending for the prior League Year. Following the method set forth in Section 6 below, any difference between: (1) the Salary Cap from the prior League Year as adjusted by any True-Up made after the Initial Special Purpose Letter pursuant to Subsection (ii) above; and (2) the Salary Cap that would have applied if the AR and Benefits from the Final Special Purpose Letter had been used as Projected AR and Projected Benefits when that Salary Cap was set, shall be a further "True-Up," to be credited or deducted, as the case may be, in the calculation of the Salary Cap for the upcoming League Year using the method set forth in Section 6. Any such further True-Up shall include Interest.

(iv)  In the Final League Year, the Accountants shall issue the Final Special Purpose Letter by May 1st of the Final League Year, and any True-Up related to the Final League Year shall be implemented immediately.

(v)  Notwithstanding the foregoing or anything else in this Agreement, if, after the initial calculation of Projected AR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected AR. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected AR will include an additional projection of AR determined in a manner agreed to by the parties. In all of the events described in this Subsection, the Accountants shall calculate a revised Projected AR, Projected Benefits, and Projected Player Cost Amount within fourteen (14) days of the triggering event, and the Salary Cap shall immediately be adjusted accordingly, utilizing the method set forth in Section 5.

(vi)  In the event that the NFLPA exercises any right to reduce or freeze or increase certain Benefits, Projected Benefits (and the Salary Cap) shall be adjusted immediately to reflect such changes.

(vii)  In the event the amount of Projected Benefits is adjusted pursuant to: (1) Subsection (vi) above; (2) the dispute resolution procedures of Article 52, Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, then the Salary Cap shall be immediately recalculated to reflect the adjustment in Projected Benefits.

*Section 4.* **Stadium Credit:**

(a)  For each League-approved stadium project beginning on or after the effective date of this Agreement, there shall be a credit of fifty percent (50%) of the private cost (whether incurred by a Club, Club Affiliate, or the League) to construct or renovate the stadium, or seventy-five percent (75%) of such cost for stadium construction or renovation in California, which cost shall include financing costs, amortized over a maximum of 15 years using an agreed-upon rate based on the NFL's long-term bor-

76

rowing cost to fund or support stadium construction, beginning in the League Year before such new stadium opens. The aggregate credit for all such approved projects for each League Year shall be part of the "Stadium Credit." For purposes of this Subsection, the private cost shall not include any revenues that are excluded from AR related to the project pursuant to Section 1(a)(vi)(1), 1(a)(vii)(1) or 1(a)(viii)(1) above.

(b)     In each League Year, the Stadium Credit shall also include an amount equal to 70% of:

(i)     Any PSL revenues excluded from AR pursuant to Subsection 1(a)(vi)(1) above, net of amounts specified in Subsection 1(a)(i)(1) above, and amortized over a maximum of 15 years with Interest, beginning in the League Year before the new stadium opens or the renovation is completed;

(ii)     Any PSR revenues excluded from AR pursuant to Subsection 1(a)(vii)(1) above, net of amounts specified in Subsection 1(a)(i)(1) above, beginning in the League Year in which the new stadium opens or the renovation is completed;

(iii)     Any naming/cornerstone revenues excluded from AR pursuant to Subsection 1(a)(viii)(1) above, with any lump-sum payments amortized over the life of the naming/cornerstone rights agreement up to a maximum of 15 years, beginning in the League Year the new stadium opens or the renovation is completed.

(c)     The Stadium Credit shall also include 50% of the cost of capital expenditures incurred during such League Year in any stadium that relate in any way to the fan experience at such stadium (regardless of when the stadium was constructed or renovated), amortized over five years (except for video boards, which shall be amortized over seven years), with Interest, such costs to be verified as capital expenditures by the Local Accountants and the Accountants using GAAP.

(d)     Notwithstanding the foregoing, absent NFLPA approval, the Stadium Credit may not equal an amount greater than 1.5% of Projected AR or AR for that League Year (the "Stadium Credit Threshold").

(e)     If the sum of the amounts described in Subsections (a)–(c) above would result in a Stadium Credit that would exceed the Stadium Credit Threshold, then the Stadium Credit shall be an amount equal to the Stadium Credit Threshold, unless the parties have agreed otherwise.

(f)     **Cap Effect Guarantee.** (i) In the event that the Stadium Credit was initially calculated to exceed the Stadium Credit Threshold, then for any individual stadium for which PSL, PSR, naming/cornerstone revenues were excluded from AR for that League Year, and to the extent that such revenues were excluded, and which excluded revenues were not included in the calculation determining that the Stadium Threshold had been reached, the "Incremental Cap Effect" from such stadium shall exceed the "Exclusion Cap Effect" by 125%. In the event that the Incremental Cap Effect does not exceed the Exclusion Cap Effect by 125% (a "Shortfall"), then an additional amount shall be imputed into AR sufficient to eliminate the Shortfall in the Salary Cap.

(ii)     For purposes of this Subsection, "Exclusion Cap Effect" equals 40% of the amount of revenue excluded from AR. "Incremental Cap Effect" equals 40% of the "Incremental AR" from the stadium in question. "Incremental AR" means the difference between the AR generated from the stadium in question as compared to the "Base AR."

"Base AR" means the AR generated from such stadium or its predecessor in the year prior to the completion of the construction or renovation (the "Base Year"); if PSR revenues are being excluded from AR for such stadium, Base AR shall not include any PSR revenues from the Base Year.

(iii)      For example, if in the 2018 League Year the Stadium Credit is calculated initially to be more than 1.5% of AR (i.e., to have reached the Stadium Credit Threshold), and if Stadium A had an amortized PSL exclusion of $20 million that was not part of the Stadium Credit Threshold, then the Exclusion Cap Effect of Stadium A would be $8 million (40% of $20 million). Under this Subsection, for this League Year, the League would "guarantee" that the Incremental Cap Effect from Stadium A would not be less than $10 million (e.g., 125% of $8 million). If the actual Incremental AR from Stadium A resulted in an Incremental Cap Effect of $8 million, then $5 million in additional AR would need to be imputed for the 2018 League Year to resolve the $2 million Shortfall so that the net Cap Effect from Stadium A would be $10 million. (If, on the other hand, the $20 million PSL exclusion was included in the Stadium Credit (that is, if 70% of $20 million is part of the 1.5% Stadium Credit being taken for the 2018 League Year), then Stadium A is not subject to the Cap Effect Guarantee, but any PSL exclusions for other stadiums not included in the Stadium Credit would be subject to the Cap Effect Guarantee. For the avoidance of doubt, this calculation will be done every year such excluded revenues are subject to the Cap Effect Guarantee.)

(g)      For purposes of this Section, for any PSR revenues subject to the Cap Effect Guarantee the amortization period for the exclusion shall begin in the League Year in which the new or renovated stadium opens.

(h)      For purposes of this Section, amounts shall count toward the Stadium Credit Threshold on a chronological basis (e.g., the portion of the Stadium Credit associated with the first League-approved project after the effective date of this Agreement shall be the first amounts included in the calculation of the Stadium Credit Threshold). Within each project, first the amount pursuant to Subsection (a) above shall be calculated, followed by any amount attributable to an AR exclusion as described in Subsection (b).

(i)      Notwithstanding the foregoing, with respect to any stadium project for Los Angeles (or the immediately surrounding area), the NFL has the right to elect not to include such project in the calculation of the Stadium Credit. If the NFL exercises this right, the parties shall negotiate in good faith the appropriate amount of any credit related to such project separate and apart from the provisions of this Section.

*Section 5.* Joint Contribution Amount: For each League Year beginning in the 2012 League Year, there shall be a Joint Contribution Amount that shall be taken into account when calculating the Player Cost Amount. The Joint Contribution Amount shall be $55 million for the 2012 League Year, of which $22 million shall be dedicated to healthcare or other benefits, funds, or programs for retired players (including the Former Player Life Improvement Plan as described in Article 64) as determined by the NFLPA, $11 million shall be dedicated to medical research, as agreed to by the parties, and $22 million shall be dedicated to charities as determined by the NFL, including NFL Charities and/or Youth Football or successor organizations. The Joint Contribution Amount shall

increase by 5% each subsequent League Year, and the allocation described in the preceding sentence shall be adjusted pro rata to reflect such increase.

*Section 6.* **Calculation of the Player Cost Amount and Salary Cap:**

    (a)    **Revenue Buckets.** AR shall be subdivided into three categories for purposes of calculating the Player Cost Amount and Salary Cap: (1) League Media AR; (2) NFL Ventures/Postseason AR, and (3) Local AR.

    (i)    **League Media.** League Media AR shall consist of the revenues arising from (1) television rights sold or licensed either nationally or packaged on a regional basis for the telecast or broadcast of live or near-live transmission of entire or near-entire NFL games (but not highlights) on broadcast, cable, satellite, internet, or other media (but not for up to sixteen regular season games telecast or broadcast by the NFL Network); (2) international television rights for live and delayed games; (3) national terrestrial, satellite, and internet radio; and (4) Copyright Royalty Tribunal. For the avoidance of doubt, as of the 2011 League Year the only revenues that would fall into category (1) are the rights fees paid by FOX (for the NFC afternoon package), CBS (for the AFC afternoon package), ESPN (for the Monday Night Football package, but not for the separate digital and international rights agreement, which shall be in the Ventures bucket), NBC (for the Sunday Night Football package), DIRECTV (for the Sunday Ticket package, but not for the separate NFL Network carriage agreement); the only revenues that would fall into category (3) are the rights fees paid by Westwood One (for the national radio package) and Sirius (for the national satellite radio package).

    (ii)    **NFL Ventures/Postseason.** NFL Ventures/Postseason AR shall consist of (A) revenues (other than those described in Subsection (i) above) arising from the operation of postseason NFL games received or to be received by the NFL or NFL affiliates (as opposed to by Club or Club Affiliates); and (B) revenues (other than those described in Subsection (i) above) arising from operation of NFL-affiliated entities (including without limitation NFL Ventures, NFL Network, NFL Properties, NFL Enterprises, NFL Productions, and NFL Digital (including NFL.com and NFL Mobile). For the avoidance of doubt, revenues in this category include without limitation: (1) all revenues of NFL Network, including those related to the broadcast, telecast or distribution of live NFL games and the RedZone channel; and (2) the revenues of NFL Ventures/NFL Digital from the agreement with Verizon; the revenues of NFL Ventures/NFL Digital from Game Pass (to the extent that it only distributes out-of-market games); the revenues of NFL Ventures/NFL.Com from Preseason Online; and the revenues from NFL Ventures/NFL Films from the NFL Films agreement with ESPN; in each of the cases listed after (2) above, as such agreements exist as of the 2011 League Year.

    (iii)    **Local.** Local AR shall consist of all AR received or to be received by the Clubs or Club Affiliates and not included in League Media AR or NFL Ventures/Postseason AR. For the avoidance of doubt, Local AR shall include revenues from the sale or license by Clubs of preseason game television rights.

    (iv)    **Bundled Rights.** If, in future League Years, League Media rights are bundled and sold or licensed with other rights that would be within the Ventures or Local AR "bucket," the parties will discuss in good faith the appropriate bucket alloca-

tion of the revenues for such rights. In the absence of agreement, the issue shall be resolved by an "Allocation Arbitrator," who shall be jointly selected by the parties. The parties shall each propose an allocation to the Allocation Arbitrator, who will decide which proposed allocation to adopt (i.e., a "baseball-style" arbitration). This Subsection shall not apply to any of the current contracts specified in Subsections (i) and (ii) above.

     (v)    **No Migration.** No AR may be included in more than one of these categories, and all AR must be included in one of these categories. Revenue for substantially similar rights, services, sales, etc. as for the 2011 League Year shall not migrate into another revenue bucket in subsequent League Years regardless of the entity which receives or generates the AR in such subsequent League Years.

     (b)    **2011 League Year Player Cost Amount.** The Player Cost Amount for the 2011 League Year shall be $4,556,800,000 ($142.4 million per Club) (i.e., the Player Cost Amount is "pegged"). The Salary Cap for the 2011 League Year shall be $120.375 million. If the amount of actual Benefits for the 2011 League Year is determined to be greater than $704,800,000 ($22.025 million per Club), then the contribution to the Player Annuity Plan or such other Benefits as determined by the NFLPA for the 2011 League Year shall be reduced by the difference so that the total Benefits cost for the 2011 League Year does not exceed $704,800,000. For the avoidance of doubt, Benefits for the 2011 League Year do not and shall not include any Performance-Based Pay Pool (because there is no Pool for the 2011 League Year), nor any of the NFLPA's required allocation to the Legacy Benefit as described in Subsection 2(a)(i)(xx) above (because the NFLPA may not allocate to the 2011 League Year), nor any of the Rookie Redistribution Fund referenced in Subsection 2(a)(i)(xix) above (because there is no such Fund for the 2011 League Year).

     (c)    **Other League Year Player Cost Amounts.** For all other League Years, the Player Cost Amount and Salary Cap shall be calculated using the information from the Special Purpose Letters in the following manner:

     (i)    **Calculation of the Projected Player Cost Amount.** The Player Cost Amount shall be calculated as the sum of (1) 55% of projected League Media AR; (2) 45% of projected NFL Ventures/Postseason AR (other than AR from new line of business projects pursuant to Subsection 1(a)(xii)(2) above); (3) 40% of projected Local AR; and (4), if applicable, 50% of the net AR for new line of business projects pursuant to Subsection 1(a)(xii)(2) above; less (5) 47.5% of the Joint Contribution Amount.

     (ii)    **Bands.** If, in any of the 2012–14 League Years, the Player Cost Amount before application of the Stadium Credit is greater than 48% of Projected AR then the Player Cost Amount shall be reduced to 48% of Projected AR. If, in any of the 2015–20 League Years, the Player Cost Amount before application of the Stadium Credit is greater than 48.5% of Projected AR then the Player Cost Amount shall be reduced to 48.5% of Projected AR. If, in any of these League Years, the Player Cost Amount is less than 47% of Projected AR, the Player Cost Amount shall be increased to 47% of Projected AR.

     (iii)    **Application of Stadium Credit.** The Player Cost Amount shall be reduced by the Stadium Credit, provided that the Player Cost Amount shall not be below: 47% of Projected AR for each of the 2012–14 League Years; 46.5% of Projected AR for

each of the 2015–16 League Years; or 46% of Projected AR for each of the 2017–20 League Years.

(iv)    **Floors.** If, in the 2012 or 2013 League Year, the Player Cost Amount calculated pursuant to this Section is less than $142.4 million per Club, then the Player Cost Amount shall be increased to $142.4 million per Club (i.e., there is a Player Cost "floor" of $142.4 million per Club for those League Years).

(v)    **Salary Cap.** The Salary Cap for a League Year shall be the Player Cost Amount for that League Year less Projected Benefits for that League Year, divided by the number of Clubs in the League in that League Year, adjusted by any applicable True Up, provided further that there shall be no True-Up related to the 2011 League Year, and there shall be no "negative" True Up related to either the 2012 or 2013 League Year.

*Section 7.* **Guaranteed Player Cost Percentage:**

(a)    In each League Year, the average of the current League Year's Player Cost Amount expressed as a percentage of AR and all prior League Year Player Cost Amounts expressed as a percentage of AR for each such prior League Year (the "Overall Average") must be at least 47% (the "Guaranteed Player Cost Percentage"). For purposes of this calculation, the percentages for each League Year other than the 2011 League Year shall be calculated as the Player Cost Amount calculated pursuant to the Final Special Purpose Letter for such League Year divided by AR for that League Year as determined in such Final Special Purpose Letter, and for the 2011 League Year the percentage shall be $4,556,800,000 (i.e., $142.4 million per Club) divided by AR for the 2011 League Year as determined by the Final Special Purpose Letter for the 2012 League Year.

(b)    In the event that, at the end of a given League Year, the Overall Average is less than the Guaranteed Player Cost Percentage, there shall be an "Adjustment." The Adjustment shall consist of additional Room under the next Salary Cap to be set (in the form of a pro rata credit to Team Salary for each Club) in an aggregate amount equal to the amount that would have to be added to the Player Cost Amount for such given League Year so that the Overall Average would equal the Guaranteed Cost Percentage. The Player Cost Amount for such League Year shall be deemed to be increased by the Adjustment for purposes of the Guaranteed Player Cost Percentage calculation for subsequent League Years.

(c)    In the event that an Adjustment is made under Subsection (b), then, if at the conclusion of any subsequent League Year the Overall Average is greater than the Guaranteed Player Cost Percentage, there shall be a "Recapture." The "Recapture" shall consist of a reduction in Room under the next Salary Cap to be set (in the form of a pro rata "charge" to Team Salary for each Club) in an aggregate amount equal to the amount that would have to be subtracted from the Player Cost Amount for such subsequent League Year so that the Overall Average would equal the Guaranteed Cost Percentage, provided that the dollar amount of the Recapture may not exceed the dollar amount of any prior Adjustments that have not previously been offset by a Recapture. (For example, if prior Adjustments resulted in $10 million of additional Room, a Recapture could not exceed $10 million in Room.) The Player Cost Amount for such League Year shall

be deemed to be decreased by the Recapture for purposes of the Guaranteed Player Cost Percentage calculation for subsequent League Years.

(d)     An illustrative example of this Guaranteed Player Cost Percentage provision is set forth in Exhibit A.

**Exhibit A: Illustration of Guaranteed Player Cost Percentage**

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Player Cost as a % of AR (after application of the "bands" and Stadium Credit) | 48.1% | 47.8% | 47.0% | 47.0% | 46.5% | 46.5% | 46.0% | 46.0% | 47.6% | 48.0% |
| Overall Average (pre-Adjustment) | 48.1% | 48.0% | 47.6% | 47.5% | 47.3% | 47.2% | 47.0% | 46.9% | 47.0% | 47.1% |
| Adjustment (additional Cap Room, as a % of AR) | | | | | | | | 0.7% | | |
| Recapture (reduction in Cap Room, as a % of AR) | | | | | | | | | | (0.1%)* |
| Overall Average (after Adjustments and Re-captures) | 48.1% | 48.0% | 47.6% | 47.5% | 47.3% | 47.2% | 47.0% | 47.0% | 47.0% | 47.0% |

\* - The dollar amount of the Recapture(s) cannot exceed the dollar amount of the Adjustment(s).

*Section 8.* **Guaranteed League-Wide Cash Spending:**

(a)     In each of the 2011–12 League Years, there shall be Guaranteed League-Wide Cash Spending of 99% of the Salary Cap multiplied by the number of Clubs in the League during such League Year.

(b)     For each of the four-League-Year periods from 2013–16 and 2017–20, there shall be Guaranteed League-Wide Cash Spending of 95% of the Salary Caps for such League Years for each such four-year period multiplied by the number of Clubs in the League during each such period. (Appropriate adjustments will be made if the number of Clubs in the League increases during each such a four-year period.) (For example, if the Salary Caps for the 2013–16 League Years were $100, 120, 130, and 150 million, respectively, the Guaranteed League-Wide Cash Spending over that four-year period would be $15.2 billion (95% of $500 million total Caps times 32 Clubs)).

(c)     Cash Spending in a League Year shall consist of the sum of: (1) total Paragraph 5 Salary amounts earned or paid or committed to be paid to players; (2) signing bonus amounts earned or paid or committed to be paid to players (including amounts treated as signing bonus) without regard to proration and applying the valuation rules that apply to deferred Salary specified in Article 13, Subsections 6(a)(ii) and 6(d)(iii); and (3) any other non-Benefit amounts earned or paid or committed to be paid to players in that League Year (applying the valuation rules that apply to deferred Salary specified in Article 13, Subsections 6(a)(ii) and 6(d)(iv)) including, but not limited to, incentives, roster bonuses, reporting bonuses, offseason workout bonuses, weight bonuses, grievances settled, grievance awards, injury settlements or Paragraph 5 Salary advances. League-Wide Cash Spending shall consist of the aggregate of all Cash Spending in a League Year. Team Cash Spending, for each respective Club, shall consist of all Cash Spending by such Club.

(d)     Any shortfall in the League-Wide Cash Spending at the end of a period in which it applies (e.g., at the end of the 2011, 2012, 2016 or 2020 League Years) shall be paid on or before the first September 15 after the end of such League Year directly to the players who were on a Club roster at any time during the season(s), pursuant to reasonable allocation instructions of the NFLPA. Any shortfall shall be reduced by any Minimum Team Cash Spending shortfall payments made for such League Years pursuant to Section 9 below.

*Section 9.* **Minimum Team Cash Spending:**

(a)     For each of the following four-League Year periods, 2013–2016 and 2017–2020, there shall be a guaranteed Minimum Team Cash Spending of 89% of the Salary Caps for such periods (e.g., if the Salary Caps for the 2013–16 and 2017–2020 are $100, 120, 130, and 150 million, respectively, each Club shall have a Minimum Team Cash Spending for that period of $445 million (89% of $500 million))

(b)     Any shortfall in the Minimum Team Cash Spending at the end of a League Year in which it is applicable (i.e., the 2016 and 2020 League Years) shall be paid, on or before the next September 15, by the Team having such shortfall, directly to the players who were on such a Team's roster at any time during the applicable seasons, pursuant to the reasonable allocation instructions of the NFLPA.

84

(c)     Nothing contained herein shall preclude a Team from having Cash Spending in excess of the Minimum Team Cash Spending, provided that the Team complies with the accounting rules of the Salary Cap set forth in Article 13.

(d)     If the NFL agrees, or a final judgment or award is entered by the System Arbitrator, that a Team has failed by the end of an applicable League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Cash Spending required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocations of the NFLPA).

*Section 10.* **Additional AR Accounting Rules:** The following accounting rules apply in addition to those set forth above. Absent an express provision to the contrary, all accounting rules applied prior to the 2011 League Year continue in effect, regardless of whether or not they are set forth or referenced in this Agreement.

(a)     **Multiyear Contracts/Lump-Sum Payments.**

(i)     In the event that a Club or Club Affiliate receives or has received a lump sum payment for sponsorship or other rights for or with respect to multiple years, which revenues would otherwise constitute AR, such revenues shall be allocated among such years according to one of the following methods which the NFL may elect prior to the initial allocation of each respective lump sum payment: (A) in equal annual portions over a period of five (5) years or the duration of the rights, whichever is shorter; or (B) in equal annual portions over a period of ten (10) years or the duration of rights, whichever is shorter; provided that Interest from the League Year the revenues are received until the League Years the revenues are allocated into AR shall be imputed and included in AR in equal portions over such periods.

(ii)     If a Club enters into a multiyear contract pursuant to which revenues are to be received in different League Years, the contract's attribution of revenues to specific years shall not control the allocation of the revenues if the allocation is inconsistent with the schedule for receipt of such revenues. In that case, such revenues shall be allocated to the League Years in which they are received or to be received, unless the amount received or to be received in any League Year is grossly disproportionate to the pro rata portion of the total amount to be paid, in which case the rule set forth in Subsection (i) above shall apply.

(iii)     Notwithstanding Subsections (i)–(ii) above, any remaining allocation of TR from lump sum payments under the Prior Agreement to the League Years of this Agreement shall be included as AR.

(b)     **Sponsorship Revenues.**

(i)     In the event that a Club provides tickets to any individual or entity having a sponsorship relationship with the Club (including tickets provided pursuant to any sponsorship contract), the face value of such tickets may be excluded from AR only if the tickets are excluded from AR under Section 1(a)(ii)(2)(D). In any case, all sponsorship revenue from sponsors (whether cash or barter) less only the face value of any tickets provided by the Club which are otherwise included in AR shall be included in AR

85

(i.e., a revenue amount that a Club receives from a sponsor in connection with the sponsor receiving tickets shall not be counted more than once).

(ii)     In the event that a Club provides tickets to any individual or entity not having a sponsorship relationship with the Club, and the Club receives anything of value from such individual or entity, then the fair market value of the consideration received by the Club (whether cash or barter), less only the face value of any tickets provided by the Club which would otherwise included in AR, shall be included in AR.

(iii)     Charitable contributions made by sponsors or other entities that have a commercial relationship with a Club, to charitable entities affiliated with or designated by a Club (e.g., charitable foundations), pursuant to a contract with the Club, are Club revenues, and shall be classified as AR or non-AR, as appropriate, except if the commercial relationship is a relationship between a Club and a player.

(iv)     If a national sponsor is obligated under the terms of the national contract to activate on the local level, and so long as the obligation in the national contract is not either (A) to all Clubs in the League, or (B) required to be activated with 20 or more Clubs, such activation revenues shall be included in the Local AR category. (For example, if the national contract requires the sponsor to activate $10 million of Club-level sponsorship but does not specify a specific number of Clubs for which activation must occur, then such activations shall be included in AR in the Local AR category.)

(c)     **Advertising-Barter Transactions.** (i) Subject to Subsections (ii)–(iv) below, the value assigned to revenue from barter transactions associated with advertising is to be based on the rate cards, and all other non-ticket barter transactions are to be valued at the fair market value of the goods or services received.

(ii)     For local radio and television promotions that are non-guaranteed (i.e., the station has the unilateral discretion to extinguish the Club's right to the promotion), the value assigned to revenues associated with such promotions will be zero, unless (a) such promotions have a stated value in the contract, in which case the assigned value will be twenty-five percent (25%) of the stated value, or (b) the lack of a stated value is grossly disproportionate to the actual value. Any promotion that a Club may sell or otherwise transfer to a third party is agreed to be guaranteed, notwithstanding any other terms of the contract.

(iii)     For local radio and television promotions that are guaranteed, the value assigned to revenue associated with such promotions will be one hundred percent (100%) of rate card, or the stated amount in the contract where the contract specifies a stated dollar amount of advertising which the Club may draw against.

(iv)     Where the total revenue value provided by a Club in a barter transaction associated with advertising is greater, using rate card valuation, than the revenue value received by the Club, and where the Club is transferring to an unrelated party its rights to advertising, and where the goods and services received by the Club in the barter transaction have been valued at fair market value, the assigned value for the advertising provided by the Club may be reduced by the Accountants from the rate card valuation on a pro rata basis, where such reduction is needed to make the value of the goods and services provided by the Club equal to the value of the goods and services it received.

(d)     **In-Kind Provisions.** The value of in kind provisions to the League office under contracts made by NFL Ventures or its subsidiaries (e.g., airline tickets) will

not be included in AR. The value of in kind provisions distributed or provided to Clubs under such contracts will be included in AR; the value of such provisions will be based upon actual usage or consumption by each Club (the Clubs will be responsible for tracking such usage or consumption).

(e) **Luxury Boxes, Suites and Premium Seating.** Any revenues derived from or to be derived from any sale or conveyance of any right to revenue from luxury boxes, suites or premium seating that the NFL and NFLPA do not agree to treat as a PSL will be included in AR on a straight line amortized basis over the period of time covered by the sale or conveyance of such rights, up to the maximum useful life of the luxury boxes, suites or premium seating. Any revenues derived from or to be derived from the multiyear lease or sale of luxury boxes, suites or premium seating, as a prepayment or otherwise, will be included in AR on a straight-line amortized basis over the period of time covered by the multiyear lease or sale of such seating. If the Club or Club owner is required as part of the transaction to provide to the other party to the transaction with tickets to nonfootball events, the face value or fair market value of such tickets, whichever is lower, will not be included in the allocation.

(f) **Naming Rights/Pouring Rights.**

(i) If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to pouring rights, such revenues shall be included in AR except to the extent set forth below.

(ii) If a Club or Club Affiliate receives revenues in cash or barter for or in respect to pouring rights at a stadium that serves as a venue for both the Club and Major League Baseball or Soccer, the proportion of such revenues to be included in AR shall be limited to: (A) for a Club or Club Affiliate that does not own or operate the stadium, any such revenues received by the Club or Club Affiliate from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such pouring rights revenues (for example, if, in connection with a pouring rights transaction, the Club receives $500,000 from an unrelated third party which owns and operates the stadium, transfers $300,000 in revenue to the MLB tenant, and receives real estate to be used as a parking lot with a value of $150,000 from the MLB tenant, $350,000 shall be included in AR); and (B) for a Club or Club Affiliate that owns or operates the stadium, any such revenues received by the Club or Club Affiliate multiplied by a fraction, the numerator of which shall be the total attendance for all NFL games in the facility during the League Year in question (the "NFL Attendance") and the denominator of which shall be the sum of the NFL Attendance in the League Year in question plus the total attendance at all MLB games, if any, in the facility during the League Year in question. In no case shall there be any double-counting of revenue.

(iii) If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to naming rights, such revenues shall be included in AR except to the extent set forth in Subsection (ii) above or (iv) below.

(iv) If a Club or Club Affiliate receives revenues in cash or barter for or in respect to naming rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues otherwise eligible for inclusion in AR (the "eligible revenues") shall be limited to: (A) for a Club or Club Affiliate that does not

87

own or operate the stadium, any eligible revenues received from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such naming rights revenues (see above); and (B) for a Club or Club Affiliate that owns or operates the stadium, sixty percent of eligible revenues received by the Club or Club Affiliate. In no case shall there be any double-counting of revenue.

(v)     The parties agree that to "operate" a stadium for purposes of this Subsection (f) means that the Club or Club Affiliate has the right to receive all naming and pouring rights revenues.

(g)     **Multi-Use Stadiums.**

(i)     When a Club plays its home games in a multi-use stadium (e.g., the stadium is used for both NFL games and Major League Baseball or Soccer games) that is owned, operated, or leased by the Club or Club Affiliate, signage revenues which are received by the Club or a Club Affiliate in consideration for the right to display such signage during both NFL games and Major League Baseball games shall be allocated based on the total attendance in the stadium during the baseball and NFL seasons beginning in the same year (e.g., the 2015 baseball season and the 2015–16 NFL season). If a multi-use stadium is not used for Major League Baseball games or the revenues are received from an unrelated third party which owns, operates or leases the stadium, no allocation shall be made between the various sports and the entire amount of signage revenues received by the Club and/or Club Affiliate shall be included in the appropriate year(s).

(ii)     Clubs may receive luxury box or PSR revenues in excess of ticket revenues subject to gate receipt sharing among NFL Clubs, when such revenue might also be attributable in part to the purchaser's right to use the luxury box to attend nonfootball events, such as baseball, if such right is included in the purchase of the box from the Club. When a Club receives revenues in excess of ticket revenue subject to gate receipt sharing among NFL Clubs from the sale of luxury box rights which also permit the purchaser to attend Major League Baseball (or, in the case of the New England Patriots only, Major League Soccer) games, a weighted allocation shall be made of such revenue between AR and baseball- or soccer-related revenue, pursuant to the allocation method the parties agreed upon on October 20, 1994, based upon the respective ticket prices of the football and baseball (or, for the New England Patriots only, soccer) tickets. No allocation shall be made, and the full amount of the revenues will be included in AR, to the extent that the purchaser also has the right to use the box to attend nonfootball events other than Major League Baseball (or, for the New England Patriots only, Major League Soccer). The allocation method agreed to by the parties will not affect the inclusion in AR of the ticket revenue subject to gate receipt sharing among NFL Clubs.

(h)     **Off-Site Games.** AR shall not include reimbursed travel expenses for Clubs playing in offsite games (non American-Bowl). Home Team travel expenses incurred by the League Office for the International Series game shall be netted against the revenue from such game prior to its inclusion in AR except to the extent that such deduction has already occurred pursuant to Subsection 1(a)(xii)(2).

(i)     **Scrimmages/Training Camp/Coach's Show.** Revenue from scrimmages and training camps; and broadcast revenue from a Coach's show or pre-game and

88

post-game show received by a Club will be included in AR. However, revenue from scrimmages or training camps that are donated to charities will not be included in AR.

(j)      **Player Fines.** If a player fine is a deduction from a player's salary which is never paid (and thus not included in a W-2), it is not included in Salary or AR. If a fine is paid by the player, either as a deduction from gross salary or in a separate payment, it is counted as Salary. If the Club gives a fine to charity, it is not included in AR. If the Club spends a fine on behalf of all players for specific purposes that it (or any other Club) had previously earmarked as being paid by fine money for the benefit of all players (such as player parties), and the players were (and are) expressly notified of such specific earmarking, the fine is not included in AR. If the Club keeps a fine, it is included in AR. Any fine assessed by and paid to the League is not included in AR.

(k)      **In-House Media Pro Rata Allocations.** If a Club operates a media business in-house and receives revenues, some of which would be AR and some of which would not be AR, the parties shall agree upon allocation of such revenues for inclusion in AR. If the parties cannot agree, the issue shall be resolved by a jointly-retained arbitrator who has experience in the media business. The current methodology utilized by the Washington Redskins to allocate the percentage of Red Zebra revenues that are NFL football-related shall continue for Red Zebra absent agreement of the parties otherwise.

(l)      **Charitable Auction Proceeds.** Any auction proceeds that are dedicated to charities not affiliated with any Club or Club Affiliate shall not be included in AR.

(m)      **Revenue Sharing.** Revenues in any revenue sharing pool established by the League, shall, for AR accounting purposes be included only once.

# ARTICLE 13
## SALARY CAP ACCOUNTING RULES

**Section 1. Calculation of the Salary Cap:** The amount of the Salary Cap for any League Year shall be determined in accordance with Article 12. The Salary Cap is the same amount for each Club.

**Section 2. Application of the Salary Cap:** No Club may have a Team Salary that exceeds the Salary Cap.

**Section 3. Calculation of Salary and Team Salary:**

(a)     Subject to Subsection (b) below, Salary and Team Salary shall be determined in accordance with the rules set forth in Sections 5–8 below.

(b)     For Preexisting Contracts, Salary and Team Salary shall be determined in accordance with the rules set forth in Article XXIV of the Prior Agreement; provided that if any Preexisting Contract is renegotiated or extended after July 25, 2011, it shall immediately be treated as a new Player Contract, subject to the rules set forth in Sections 5–8 below. (For the avoidance of doubt, if a Preexisting Contract is renegotiated or extended after July 25, 2011, the renegotiated or extended contract is not subject to the 30% Rule set forth in the Prior Agreement, but may be subject to the 30% Rule set forth in this Agreement).

**Section 4. Definition of "Salary":**

(a)     "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(b)     A player's Salary shall also include any and all consideration received by the player or his Player Affiliate from a Club or Club Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such nonfootball services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar nonfootball playing services from an independent third party; and (2) the percentage of total compensation for nonfootball services received from third parties versus the Team or Team Affiliate.

**Section 5. Computation of Team Salary:** During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)     **Player Contracts.** Subject to the rules below in Section 6 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised options, shall be included in Team Salary.

(b)     **Tenders.**

(i)     Drafted Rookies' Salaries shall be included in Team Salary automatically as of the day of the Draft at the Minimum Active List Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)     For Exclusive Rights players, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)     For players who are Restricted Free Agents, the Qualifying Offer will be included in Team Salary when tendered until the player is signed, the Qualifying Offer is withdrawn, or a "June 1 Tender" (if applicable) is made. If the player is unsigned and the Team makes a June 1 Tender (if applicable) or June 15 Tender, such Tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv)     For players who are Unrestricted Free Agents, the June 1 Tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the Tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)     For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the Tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)     All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)     **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary except to the extent otherwise provided in Article 33, Section 5.

(d)     **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)     **Grievances.** When a player salary grievance is filed against a Club, 40% of the amount claimed (or, for a player whose contract qualifies under Article 27, 40% of the player's Salary Cap count, prorated to reflect the number of weeks remaining in the regular season) will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Club are more than the original 40% attributions and put the Club over the Salary Cap, the excess will be deducted from the Club's Team Salary in the following League Year; if the net total grievance amounts paid are less than the original 40% attributions and the Club finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Club's Team Salary for the following League Year. If an award or settlement is

91

made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 40% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 40% attribution, the difference shall be deducted from Team Salary when the award is made.

(f)     **Expansion Bonuses.** Except as set forth in Article 32, any expansion bonuses paid to players shall be included in Team Salary.

(g)     **Offseason Workouts.** Beginning on the first day of the League Year, each Club's Team Salary will be charged an amount that is calculated as follows: multiply the minimum daily amount set forth in Article 21, Section 3 ($155 for the 2011 League Year) by 2,880 (80 players × 4 days/week × 9 weeks = 2,880). At the conclusion of the program, this charge will be adjusted based upon the amounts actually paid to players who participated in the offseason program. At that time, the amount paid to each player will be charged to Salary and Team Salary, and the original charge set forth in the first sentence of this Subsection shall be removed from Team Salary. In addition to these amounts, any incentives in Player Contracts related to offseason workouts shall be included in Team Salary pursuant to Section 6(c)(iii) below.

(h)     **Injury Protection.** Beginning in the 2016 League Year, any type of Injury Protection liability shall be included in Team Salary for the League Year for which such Injury Protection applies, or the League Year in which such Injury Protection is paid, agreed to be paid by settlement, or awarded, whichever is later.

(i)     **Other Amounts.** Any other Salary not listed above paid to players shall be included in Team Salary.

*Section 6.* **Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

(a)     **Paragraph 5.**

(i)     The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between the start of the League Year and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 6):

(1)     Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)     Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)     **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the Discount Rate. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b)     **Signing Bonuses.**

(i)      **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract (on a straight-line basis, unless subject to acceleration or some other treatment as provided in this Agreement), with a maximum proration of five years, in determining Team Salary and Salary, except that:

(1)      Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control, such issue shall be resolved by the Impartial Arbitrator.

(2)      **"Deion Rule."** For any multiyear Player Contract that extends into any year beyond the expiration of the express term of this Agreement, if (1) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all League Years of the contract within the express term of this Agreement (but, if there are fewer than three such remaining League Years, during the first three years of the contract) is in the aggregate less than (2) the portion of the contract's signing bonus that would be allocated to those years if the signing bonus were prorated equally over the term of the contract, then: the difference between the amounts calculated pursuant to (2) and (1) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the years after expiration of the express term of this Agreement (the "Difference"), shall be deducted in equal portions from those years and reallocated in equal portions over the League Years of the contract within the express term of this Agreement (or, if there are fewer than three such League Years, within the first three years of the contract). For purposes of this Subsection only, a renegotiation shall be treated as if it is an entirely new Player Contract. The rule in this Subsection shall not apply to a Rookie Contract.

(3)      If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

(4)      Any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The player shall receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated using the Discount Rate, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

(ii)      **Acceleration.**

(1)      For any player removed from the Team's roster, or whose Contract is assigned to another Club via waivers or trade, on or before June 1 in any League Year prior to the Final League Year, or at any time during the Final League Year, any unamortized signing bonus amounts will be included in Team Salary for such League Year, except that for each League Year preceding the Final League Year, each Club may designate up to two Player Contracts that, if terminated on or prior to June 1 and if not

93

renegotiated after the last regular season game of the prior League Year, shall be treated (except to the extent prescribed by Section 6(d)(iv) below) as if terminated on June 2, i.e., the Salary Cap charge for each such contract will remain in the Club's Team Salary until June 2, at which time its Paragraph 5 Salary and any unearned LTBE incentives will no longer be counted and any unamortized signing bonus will be treated as set forth in Subsection (2) below. If acceleration puts a Team over the Salary Cap, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)     For any player removed from the Team's roster or whose Contract is assigned via waivers or trade after June 1, except in the Final League Year, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

(3)     In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, the Team Salary of the player's new team will not include any portion of the signing bonus.

(4)     Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary (notwithstanding the foregoing, if the player has one or more rights to terminate based upon one or more not "likely to be earned" incentives and the player also being on the roster at a subsequent time, no acceleration shall occur until both the incentive(s) and the roster precondition(s) have been satisfied). To the extent that such acceleration puts the Team over its Salary Cap in a League Year prior to the Final League Year, the difference shall be charged to its Team Salary for the following year; to the extent that such acceleration puts the Team over the Salary Cap in the Final League Year, the Team will have seven days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(5)     The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)     **Amounts Treated as Signing Bonuses**. For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)     Any amount specifically described in a Player Contract as a signing bonus;

(2)     Any guaranteed reporting bonus;

(3)     Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)     Any option exercise fee or bonus, subject to the rule set forth in Section 7(c) below, and any option buyout amount, when paid or guaranteed;

(5)     The difference between the Salary in the second contract year and the first contract year when Salary in the second contract year is less than half the Salary called for in the first year of such Contract;

94

(6)     Any reporting bonus in the season of signing when a contract is signed after the start of training camp;

(7)     Any roster bonus in the season of signing when a contract is signed after the last preseason game;

(8)     Any salary advance paid on a guaranteed basis;

(9)     Any guaranteed bonus tied to workouts;

(10)    Any salary advance which a player is not obligated to repay;

(11)    Any amount of a Salary advance, offseason workout bonus, offseason roster bonus, or offseason reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, on a non-contingent basis for all of the guarantees. (Notwithstanding Subsections (8)–(9) above, a Salary advance, offseason workout bonus, offseason roster bonus, or offseason reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, but on a contingent basis for any of the potential guarantees, shall be included in Team Salary only in the League Year in which the bonus is earned by the player; e.g., in the case of an offseason roster bonus, in the League Year in which the player is required to be on the roster to earn the bonus. The rules set forth in this Subsection (11) shall not affect Salary Cap accounting for any other purpose.);

(12)    In a Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final League Year, each of the following, if it is to be earned or paid to the player in the season following the Final League Year: (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any offseason workout bonus that is contingent upon the player's participation in less than half of the Club's offseason workout program; (c) any offseason roster bonus; and (d) any offseason reporting bonus;

(13)    Any bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, except that the amount of any such completion bonus shall be calculated at its present value, computed using the Discount Rate. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Club's Team Salary for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

(14)    Any relocation bonus which is individually negotiated between a player and a Club; and

(15)    Any increase in a player's Salary for the current League Year that occurs as a result of the renegotiation or extension of the player's Contract in that League Year, if the NFL does not receive notice of the salary terms of such an executed extended or renegotiated contract prior to 4:00pm (New York Time) on the Monday of the tenth week of the regular season.

Notwithstanding the above provisions or anything else in this Agreement, but subject to Section 6(d) below, any guaranteed Paragraph 5 Salary in a Player Contract, including but not limited to renegotiations or extensions of pre-existing Player Contracts, will not be treated as a signing bonus solely on the basis of the guarantee.

95

(iv)     **Credit for Salary Forfeited or Refunded.** In the event that a Club receives a refund from the player of any previously-paid Salary, or the Club fails to pay any previously allocated portion of a signing bonus (including any amount treated as signing bonus), such amount as has previously been included in Team Salary shall be credited to the Club's Team Salary for the next League Year. For purposes of this Sub-section, to the extent that they constitute reimbursement for previously paid Salary, insurance proceeds received by a Team as beneficiary to cover the player's inability to perform services required by his Player Contract shall be deemed a "refund from the player" if (a) the Club or the player purchased the policy (b) the amounts covered by the policy are so specified in the Player Contract; and (c) the policy is made available for inspection upon request by the NFL or the NFLPA.

(v)     **Carrying Over Room.** A Club may "carry over" Room from one League Year to the following League Year by submitting notice in writing signed by the owner to the NFL no later than fourteen (14) days prior to the start of the next League Year indicating the maximum amount of Room that the Club wishes to carry over. The NFL shall promptly provide a copy of any such notice to the NFLPA. The amount of Room carried over will be adjusted downward based on the final Room available after the year-end reconciliation

(c)     **Incentives.**

(i)     Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive in year one of a Rookie Contract (as described in Article 7, Section 6) shall be deemed "likely to be earned." Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, offseason workout and weight bonuses) shall be deemed "likely to be earned."

(ii)     At the end of a season, if performance bonuses actually earned resulted in a Club paying Salary in excess of the Salary Cap, then the amount by which the Club exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Club's Team Salary for the next League Year.

(iii)     At the end of a season, if performance bonuses previously included in a Club's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Club's Team Salary for the next League Year equaling the amount, if any, by which such over-age exceeds the Team's Room under the Salary Cap at the end of a season.

(iv)     Any team performance will be automatically deemed to be "Likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will be automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.

(v)     Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto is prohibited.

96

(vi)     Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto is prohibited.

(vii)    Any incentive bonus that depends on a player's individual performance in categories other than those used to assess performance at the player's primary position is prohibited.

(viii)   Any incentive bonus based on a player receiving Honors or Media Recognition not listed in Exhibit C hereto is prohibited.

(ix)     Any incentive bonus for special teams playtime is prohibited unless the player participated in at least 50% of the Club's special teams plays in the immediately prior regular season.

(x)      Any player whose primary position is on offense cannot have an incentive bonus that depends on team performance on defense (or special teams), unless such player played in 15% or more of the Club's defensive (or special teams) in the prior season (pro rating participation in the event of games missed due to injury). Any player whose primary position is on defense cannot have an incentive bonus that depends on team performance on offense (or special teams), unless such player played in 15% or more of the Club's offensive (or special teams) plays in the prior season (pro rating participation in the event of games missed due to injury).

(xi)     Official National Football League statistics as provided by the NFL shall be utilized in determining whether a player has earned any incentive described in Exhibit A or B. All such statistics are final and their validity is not subject to challenge. Copies of such statistics, and the methodology upon which they are calculated shall be provided to the NFLPA promptly after receipt. If the NFL discontinues using an outside entity to provide official NFL statistics, the parties shall revisit this issue.

**(EXHIBIT A)**
**TEAM INCENTIVES**

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by Team | Points allowed by Team | Own punt return average |
| Touchdowns scored by Team | Touchdowns allowed by Team | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| Average net yards gained per rushing play | Average net yards allowed per rushing play | Opposition kickoff return average |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

**ALL**
Wins
Playoffs
Conference Championship
Super Bowl
Touchdowns on returns and recoveries
Net difference takeaways/giveaways

98

(EXHIBIT B)
<u>INDIVIDUAL INCENTIVES</u>

**RUSHING**
Total yards
Average yards (100 attempts)
Touchdowns

**PASSING**
Passer rating (224 attempts)
Completion percentage (224 attempts)
Interception percent (224 attempts)
Total yards
Yards per pass (224 attempts)
Touchdown passes

**RECEIVING**
Total receptions
Total yards
Average yards (32 receptions)
Touchdowns

**DEFENSE**
Interceptions
Interception return yards
Touchdowns on interception
returns
Opponent fumble recoveries
Opponent fumble return yards
Touchdowns on opponent
fumble returns
Sacks

**PUNT RETURNS**
Total yards
Average (20 returns)
Touchdowns

(EXHIBIT B)
<u>INDIVIDUAL INCENTIVES</u>

**KICKOFF RETURNS**
Total yards
Average (20 returns)
Touchdowns

**PUNTING**
Gross average (40 punts)
Net average (40 punts)
Inside 20-yard line

**PLACE KICKING**
Total points
Field goals
Field goal percentage (16 attempts)
Field goal percentage
0-19 yards (4 attempts)
Field goal percentage
20-29 yards (4 attempts)
Field goal percentage
30-39 yards (4 attempts)
Field goal percentage
40-49 yards (4 attempts)
Field goal percentage
50 yards or longer (3 attempts)

**OTHERS**
Roster bonuses
Reporting bonuses
Playtime bonuses
(excluding special teams)
Special teams playtime

100

(EXHIBIT C)
**HONORS AND RECOGNIZED MEDIA**

**VETERAN HONORS**
PRO BOWL
ALL NFL (First and Second Team)
ALL CONFERENCE (First and Second Team)
SUPER BOWL MVP (ROZELLE TROPHY)
NFL MVP
OFFENSIVE PLAYER OF YEAR — NFL OR CONFERENCE
DEFENSIVE PLAYER OF YEAR — NFL OR CONFERENCE
PLAYER OF YEAR — NFL OR CONFERENCE

**VETERAN MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
SPORTS ILLUSTRATED

(xii)    Any team performance-related incentive will be revalued under the "likely to be earned" rules if the contract is assigned to a new Team through trade or waiver.

(xiii)    Any renegotiated contract will be revalued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a preexisting contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

(xiv)    Any incentive bonus based upon another player's performance is prohibited.

(xv)    Any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by determining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

(xvi)    Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 28th in the League in total offense will be deemed "likely to be earned" in a League consisting of 32 teams; similarly, an incentive bonus based on a team finishing 14th in its Conference will be deemed "likely to be earned" in a Conference consisting of 16 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

(xvii)    Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

(xviii)    In any Player Contract signed by a player other than a Rookie, if more than three different team performance categories are included as incentives, covering the Final League Year or thereafter, all but the three incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final League Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determi-

102

nation of whether the incentive is "likely to be earned" will be made pursuant to Section 6(c)(i). The calculation of these playtime requirements shall exclude special teams plays.

(xix)   Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year.

(xx)   Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned."

(xxi)   Any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except: (1) as provided in Subsection (xix) above in regards to per play or per game occurrences; (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid; (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately; or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

(xxii)   Any incentive bonus which a player and a Club agree to that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

(xxiii)   Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Preseason roster bonuses are automatically deemed "likely to be earned."

(xxiv)   Any incentive bonus (or portion thereof) that is earned during the Final League Year, but which had not been deemed likely to be earned during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the Final League Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the Final League Year, become impossible for the player to attain.

(xxv)   To determine the value of an incentive clause for Salary Cap purposes, under either Subsection (xxi) or (xxiv) above, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had 1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

(xxvi)  Other than in the Final League Year, if more than eight different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight incentives with the lowest dollar value automatically will be deemed "likely to be earned." See Subsection (xxviii) regarding the calculation of the number of team performance categories.

(xxvii)  Subsection (xxvi) above does not supersede the terms of any other provisions or other agreements between the parties that automatically deem certain performance incentives to be "likely to be earned" depending upon whether the incentive fulfills other specified criteria.

(xxviii)  For purposes of determining the number of team performance incentives, any reference to a performance category listed in Exhibit A as a criterion (whole or partial) for an incentive shall count as a separate team performance incentive (e.g., a Player Contract for an offensive lineman that provides for an incentive if the team leads the Conference in average net yards gained per rushing play, or if the team improves its Conference ranking in average net yards gained per rushing play, or if the team leads the Division in average net yards gained per rushing play counts as having three team performance incentives); provided, however, that purely conjunctive combinations of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X" shall be counted as one performance category). (For the avoidance of doubt, and without limitation, each of the following examples (1) and (2) would be counted as having three team performance incentives: (1) Player has 35% defensive playtime and team: (a) has one more sack than it had in the prior season; or (b) improves its ranking in sacks in the conference; or (c) improves its ranking in sacks in the league; (2) If team has one more sack than it had in the prior season, then player will earn the following on a cumulative basis: (a) $100,000 for 35% defensive playtime; (b) $200,000 for 50% defensive playtime; and (c) $300,000 for 70% defensive playtime.)

(d)     **Guaranteed Contracts.**  Any portion of Salary for which a Team guarantees payment for all of skill, injury, and, if applicable, Salary Cap-related termination shall be included in Team Salary during the year earned, except that:

(i)     Salary that is guaranteed for both skill and injury-related termination in any year after the Final League Year shall be reallocated into the remaining League Years of the contract that are within the express term of this Agreement in a proportion to be determined by the Club if payment of the player's entire Salary for the Final League Year is not guaranteed for all of skill, injury, and Salary Cap-related termination. For example, without limitation on any other applicable example, if a player enters into a four-year Player Contract in the 2019 League Year, and if the Salary for the 2020 League Year is not guaranteed for all of skill, injury, and Salary Cap-related termination, then the full amount of any Salary for the 2021 or 2022 seasons that is guaranteed for both skill and injury-related termination shall be included in Salary and Team Salary for the 2019 and 2020 League Years in a proportion to be determined by the Club.

(ii)     Fifty percent (50%) of any Salary for a season more than three years after the Final League Year that is guaranteed for both skill and injury-related termination shall be reallocated into Salary and Team Salary into the remaining League Years of the contract within the express term of this Agreement in any manner the Club chooses.

104

(iii)    If any Player Contract provides for yearly Salary in a sequence that, in the Final League Year or later, is guaranteed for both skill and injury-related termination, then unguaranteed for either such termination, and then guaranteed again for both such termination, the amount guaranteed after the first such unguaranteed year will be allocated into Salary and Team Salary over the League Years of the contract within the express term of this Agreement in any manner the Club chooses.

(iv)    Any portion of Salary guaranteed for any period after a player is released for a reason covered by the guarantee (e.g., future years' guaranteed Salary, when the player is released for a reason covered by the guarantee) shall be immediately included in Team Salary at the time of his release at its present value rate calculated using the Discount Rate. To the extent that such inclusion puts the Team over the Salary Cap, the rule set forth in Subsection 5(c)(ii) above, shall apply.

(e)    **Other Amounts.**

(i)    **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

(ii)    A fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), constitutes an improper circumvention of the Salary Cap in violation of Subsection 6(e)(i) above.

(iii)    **Salary Advances.** Except as provided in Subsection 6(b)(iii) above, the full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

(iv)    **Non-Cash Provisions.**

(1)    The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(2)    Any tangible item of value provided to unsigned players (or their affiliates) recruited by Clubs will be included in Salary. Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits. Miscellaneous costs associated with recruiting unsigned players but not paid to players (or their affiliates) are not included as part of Salary or Benefits, except as set forth above.

(3)    Expenses for travel, board and lodging for a player participating in an offseason workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.

105

(4)     The voluntary provision to all players on a Club of meals, team apparel, or one team trip for celebrations in each League Year (plus any trips to the White House for the Super Bowl Champions) will not be included in Team Salary or Player Costs. This Subsection does not affect the treatment of consideration paid to a player for services other than football playing services, as provided in Section 4(b) above.

(5)     Except as provided in Subsections 6(e)(iv)(2)–(4) above, and Article 7 (concerning Rookie Orientation Programs), if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to this Agreement or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This Subsection does not apply to consideration paid to a player (or his affiliate) for nonfootball playing services, which are subject to Section 4(b) above.

(6)     Compensation to players for participation in the offseason workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article 21 shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article 21, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. At the conclusion of a club's offseason workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

(7)     If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three or more seasons, the fair market value of such gifts up to $15,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. Notwithstanding the previous sentence, if the player has been under contract with the Club in less than three seasons, the entire fair market value of any such gifts shall be counted as Salary.

(v)     **Annuities.** The cost to the Team of any annuity provided to any player (but not including any annuity provided pursuant to the Player Annuity Plan described in Article 55), computed at the one-year Treasury Note rate on February 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)     **Traded Contracts.**

(i)     In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(ii)     A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.

(g)     **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as

106

part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

*Section 7.* **30% Rules:**

(a) No NFL Player Contract extending into a season beyond the Final League Year may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 6(b)(iii) above, of more than 30% of the Salary provided for in the Final League Year, per year, either in the season after the Final League Year or in any subsequent season covered by the Player Contract.

(b) Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 30% Rule, set forth above. (The parties acknowledge a disagreement as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this Subsection (b), the terms of this Subsection may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this parenthetical.).

(c) Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 30% Rule, set forth above, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Section 8.* **Renegotiations and Extensions:**

(a) Provided that all Salary Cap requirements are met, Player Contracts for current and future years may be renegotiated and/or extended except as follows:

(i) The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

107

(ii)     No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(iii)    No contract renegotiations may be done for a current season after the last regular season game of that season

(iv)    A Player Contract signed by a Rookie may not be renegotiated except as provided in Article 7.

(b)     No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

(c)     Any agreement to compensate a player at the minimum amount set forth in Article 21 for participation in an offseason workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

(d)     Any salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Rookie Compensation Pool shall not be treated as a renegotiation.

(e)     An amendment to a Player Contract that changes the terms under which signing bonus is paid is a renegotiation.

# ARTICLE 14
## ENFORCEMENT OF THE SALARY CAP
## AND ROOKIE COMPENSATION POOL

*Section 1.* **Undisclosed Terms:** A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time, enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; and/or (b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

*Section 2.* **Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this Section.

*Section 3.* **System Arbitrator Proceeding:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring a proceeding before the System Arbitrator alleging a violation of Article 7, Article 12, Article 13 or Article 14, Section 2 of this Agreement. Issues of relief and liability shall be determined in the same proceeding. Other than as set forth in Article 7, the complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of such Article.

*Section 4.* **Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article 7, Article 9, Article 10, or Article 13, he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Contracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

*Section 5.* **System Arbitrator Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the System Arbitrator to determine whether such contract is in violation of this Agreement. The System Arbitrator shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event

109

the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The System Arbitrator does not have the authority to impose any revisions to such Player Contract on the player or the Club.

***Section 6.*** Sanctions:

(a)      **Players and Agents**. In the event that the System Arbitrator finds a violation of Subsections 1(a) or 1(b) of this Article, for each such violation: (i) (1) the System Arbitrator may impose a fine of up to $500,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

(b)      **Clubs**. In the event that the System Arbitrator finds a violation of Subsection 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $6,500,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $500,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the System Arbitrator finds a violation of Subsection 1(b) of this Article, for each such violation, the System Arbitrator may: (i) impose a fine of up to $6,500,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $500,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the System Arbitrator finds a violation of Subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two Draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall, unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of Subsection 1(a), taking into account the sanctions, if any, imposed by the System Arbitrator. In agreeing to the two preceding sentences, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have the authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and the preceding two sentences shall not be considered in any resolution of that issue. For purposes of this Subsection 6(b), the term "Club personnel" shall not include players.

(c)      Subject to the next to last sentence of Subsection 6(b) above, the sanctions set forth in Subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1–3 of Article

18, and each of the sanctions set forth in Subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Section 1 of this Article and Sections 1–3 of Article 18. All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article 46, Section 5(c). For each League Year after the 2011 League Year, each of the maximum fines set forth in this Section 6 shall be adjusted by the same percentage as the change in Projected AR for that League Year as compared to the Projected AR for the prior League Year (up to a maximum of ten percent (10%) per League Year).

      (d)     The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.

*Section 7.* **Revenue Circumvention:** In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports AR or non-AR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to such revenues, the NFLPA and/or the NFL shall have the right to initiate a proceeding before the System Arbitrator to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the System Arbitrator finds a violation of this Section 7, the System Arbitrator may impose a fine upon the Club of up to $5,000,000, payable to the NFL for donation to charitable funds as agreed to by the parties. For each League Year after the 2011 League Year, the maximum fine set forth in this Section shall be adjusted by the same percentage as the change in Projected AR for that League Year as compared to the Projected AR for the prior League Year (up to a maximum of ten percent (10%) per League Year).

*Section 8.* **NFL Audit Rights:**
      (a)     The NFL shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article.
      (b)     In agreeing to this Section, the parties have not waived or affected their respective positions as to whether the NFL may conduct any Club-related audits beyond those set forth in the preceding sentence, and this Section shall not be considered in any resolution of that issue.

**Section 9. Prior Consultation:** Reasonably prior to the initiation of a proceeding alleging a violation of Subsection 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the NFL, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This Section shall not require the disclosure of any attorney-client communication, or any work product created by or

111

at the request of an attorney. In addition, any attempt by the League, the NFL, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Subsection 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.

112

## ARTICLE 15
## SYSTEM ARBITRATOR

*Section 1.* **Appointment:** The parties agree that the System Arbitrator shall have exclusive jurisdiction to enforce the terms of Articles 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator, the Accountants, or another arbitrator).

*Section 2.* **Scope of Authority:**

    (a)    The System Arbitrator shall make findings of fact and determinations of relief including, without limitation, damages (including damages referred to in Article 17, Section 9), injunctive relief, fines, and specific performance.

    (b)    The Appeals Panel shall accept the System Arbitrator's findings of fact unless clearly erroneous and the System Arbitrator's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion, except that, as to any finding concerning Article 17, any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo.

    (c)    Subject to Subsections (a) and (b) above, the Appeals Panel shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, injunctive relief, fines, and specific performance.

    (d)    Except for any matters for which the Appeals Panel has de novo review of the System Arbitrator's determinations, rulings of the System Arbitrator shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Appeals Panel. In entertaining a request for a stay of a ruling of the System Arbitrator, the Appeals Panel shall apply the standard that the United States Court of Appeals for the Second Circuit would apply to a request for a stay of a ruling of a district court within that Circuit. If and when a decision of the System Arbitrator is reversed or modified, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the ruling of the System Arbitrator.

    (e)    The System Arbitrator's and Appeals Panel's authority shall be limited to the terms of 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator, the Accountants, or another arbitrator).

    (f)    **Statute of Limitations.** Unless otherwise specified in this Agreement, a three year statute of limitations shall apply to the initiation of proceedings before the System Arbitrator, which statute begins to apply on the date upon which the facts giving rise to the proceeding are known or reasonably should have been known to the party bringing the proceeding.

*Section 3.* **Discovery:** In any of the disputes described in this Agreement over which the System Arbitrator has authority, the System Arbitrator shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties,

in any proceeding to review any alleged violation of Article 12 of this Agreement regarding any AR issue, the System Arbitrator shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article 13 and/or Article 7 of this Agreement regarding any Salary paid to any player(s), the System Arbitrator shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the System Arbitrator shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

*Section 4.* **Compensation:** The compensation and costs of retaining the System Arbitrator and the Appeals Panel shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article 17.

*Section 5.* **Procedures:** All matters in enforcement proceedings before the System Arbitrator shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the System Arbitrator) served upon the party against whom the enforcement proceeding is brought and filed with the System Arbitrator. All such notices and all orders and notices issued and directed by the System Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance. Unless otherwise agreed, all hearings will be transcribed.

*Section 6.* **Selection of System Arbitrator:**
    (a)    In the event that the NFL and NFLPA cannot agree on the identity of a System Arbitrator, the parties agree to ask the CPR Institute (or such other organization(s) as the parties may agree) for a list of eleven attorneys (none of whom shall have nor whose firm shall have represented within the past five years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty days of receipt of such list agree to the identity of the System Arbitrator from among the names on such list, they shall alternately strike names from said list, until only three names remain, at which point the parties shall make reasonable efforts to interview the remaining candidates. After those interviews, and if the parties cannot agree on the selection, the striking process shall resume until only one name remains, and that person shall

be the System Arbitrator. The first strike shall be determined by a coin flip. Upon selection, the System Arbitrator shall serve for an initial eighteen-month term commencing on the date of entry of the order of appointment. Thereafter, the System Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the System Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. Following the giving of such notice, a new System Arbitrator shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the System Arbitrator at any time and for any reason upon their mutual consent. Unless the parties otherwise agree, a discharged System Arbitrator shall retain jurisdiction for any proceeding which has been commenced prior to such discharge.

(b)     In the event of the absence (or vacancy) of the System Arbitrator, one of the members of the Appeals Panel (to be chosen by the parties, confidentially using the strike system) shall serve as the System Arbitrator until a new System Arbitrator is chosen pursuant to Subsection (a) above.

***Section 7.*** **Selection of Appeals Panel:**

(a)     There shall be a three-member Appeals Panel, at least one of whom must be a former judge. In the event the NFL and NFLPA cannot agree upon the members of such a panel, the parties will jointly ask the CPR Institute (or such other organization(s) as the parties may agree) to submit to the parties a list of fifteen (15) attorneys (none of whom shall have, nor whose firm shall have, represented within the past five (5) years any professional athletes; agents or other representatives of professional athletes; labor organizations representing athletes; sports leagues, governing bodies, or their affiliates; sports teams or their affiliates; or owners in any professional sport). If the parties cannot within fifteen (15) days from the receipt of such list agree to the identity of the Appeals Panel from among the names on such list, they shall meet and alternate striking one (1) name at a time from the list until three (3) names on the list remain. The first strike will be assigned to the party that received the second strike in the selection of the System Arbitrator, or a coin flip, if striking was not used in selecting the System Arbitrator. The three (3) remaining names on the list shall comprise the Appeals Panel. The compensation of the members of the Appeals Panel and the costs of proceedings before the Appeals Panel shall be borne equally by the parties to this Agreement; provided, however, that each participant in an Appeals Panel proceeding shall bear its own attorneys' fees and litigation costs.

(b)     In the event that there is a vacancy on the Appeals Panel, or in the event that an appeal is taken from a decision of a member of the Appeals Panel serving as the System Arbitrator pursuant to Subsection 6(b) above, the parties shall select another member to the Panel, using the procedures set forth in Subsection 7(a) above.

115

*Section 8.* **Procedure for Appeals:**

    (a)    Any party seeking to appeal (in whole or in part) an award of the System Arbitrator must serve on the other party and file with the System Arbitrator a notice of appeal within ten (10) days of the date of the award appealed from.

    (b)    Following the timely service and filing of a notice of appeal, the NFLPA and NFL shall attempt to agree upon a briefing schedule. In the absence of such agreement, and subject to Subsection (d) below, the briefing schedule shall be set by the Appeals Panel; provided, however, that any party seeking to appeal (in whole or in part) from an award of the System Arbitrator shall be afforded no less than fifteen (15) and no more than twenty-five (25) days from the date of the issuance of such award, or the date of the issuance of the System Arbitrator's written opinion, whichever is latest, to serve on the opposing party and file with the Appeals Panel its brief in support thereof; and provided further that the responding party or parties shall be afforded the same aggregate amount of time to serve and file its or their responding brief(s).

    (c)    The Appeals Panel shall schedule oral argument on the appeal(s) no less than five (5) and no more than ten (10) days following the service and filing of the responding brief(s), and shall issue a written decision within thirty (30) days from the date of argument. The Appeals Panel shall have the discretion to permit a reply brief.

    (d)    For good cause, either party may seek to accelerate the briefing, hearing, and decision schedule set forth in Subsections (b) and (c) above.

    (e)    The decision of the Appeals Panel shall constitute full, final, and complete disposition of the dispute. If there is no timely appeal of a decision of the System Arbitrator, the System Arbitrator's decision shall constitute the full, final and complete disposition of the dispute.

*Section 9.* **Decision:** Any decision issued by the System Arbitrator or the Appeals Panel may be enforced only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the System Arbitrator or Appeals Panel order relief, or assess any monetary award, against an individual Club owner, officer, or non-player employee.

*Section 10.* **Confidentiality:** Unless the parties agree otherwise, proceedings before the System Arbitrator and Appeals Panel, other than their decisions, shall be confidential, and may not be disclosed to persons other than counsel, senior executives of the NFL and any involved Club, senior executives of the NFLPA, the NFLPA Executive Committee, NFLPA Player Representatives, and any involved player(s), player agent(s), or Club or League personnel. The foregoing does not prejudice the right of any party to seek any additional confidentiality restrictions (including as to the decision) from the System Arbitrator or Appeals Panel, if such party demonstrates just cause.

## ARTICLE 16
## IMPARTIAL ARBITRATOR

**Section 1.** Selection: The parties shall select one of the Non-Injury Grievance Arbitrators who shall concurrently serve as the Impartial Arbitrator, who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

**Section 2. Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

**Section 3. Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

**Section 4.** Discovery: In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

**Section 5. Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees or litigation costs incurred in any such proceeding by any other party.

**Section 6. Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. Unless otherwise specified in this Agreement, a proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 7. Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree that the Impartial Arbitrator shall be selected using the same method set forth in Article 15, Sec-

tion 6. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety days preceding the end of any term, but no later than thirty days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent. Unless the parties otherwise agree, a discharged Impartial Arbitrator shall retain jurisdiction for any proceeding which has been commenced prior to such discharge.

## ARTICLE 17
## ANTI-COLLUSION

*Section 1.* **Prohibited Conduct:**

(a)     No Club, its employees or agents shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents to restrict or limit individual Club decision-making as follows:

(i)     whether to negotiate or not to negotiate with any player;

(ii)     whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

(iii)     whether to offer or not to offer a Player Contract to any player;

(iv)     whether to exercise or not to exercise a Right of First Refusal; or

(v)     concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

(b)     Any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA cannot be the basis of any claim of collusion. The NFLPA or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the System Arbitrator, pursuant to Article 15 and Article 14.

*Section 2.* **Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

(a)     that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three Accrued Seasons, or a Franchise Player designation; or

(b)     that the player has refused or failed to enter into a Player Contract for a prior season containing a Right of First Refusal or an option clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term);

(c)     that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

(d)     that the player is or has been subject to any Right of First Refusal.

*Section 3.* **Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 4.* **League Disclosures:** Neither the NFL nor the Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless

119

and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this Section may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

*Section 5.* **Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the System Arbitrator alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 9 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

*Section 6.* **Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

*Section 7.* **Summary Judgment:** The System Arbitrator may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the System Arbitrator determines that complainant's evidence is not so sufficient, he shall dismiss the action.

*Section 8.* **Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)     To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the System Arbitrator finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article 9, such player shall immediately become a Restricted Free Agent upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article 9, such player shall immediately become an Unrestricted Free Agent upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In any case described in the preceding three sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this Subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article 6, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article 6, Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)     To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

*Section 9.* **Computation of Damages:** Upon any finding of a violation of Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) shall be awarded. In addition, the System Arbitrator shall award non-compensatory damages (i.e., the amount exceeding compensatory damages) as follows:

(a)     Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)     Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)     Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $5,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $5,000,000.

(d)     For each League Year after the 2011 League Year, each of the enumerated fines set forth in this Subsection (c) above shall be adjusted by the same percentage as the change in Projected AR for that League Year as compared to Projected AR for the prior League Year (up to a maximum of ten percent (10%) per League Year).

**Section 10. Player Election:** A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the System Arbitrator's determination. In the event the System Arbitrator finds a violation, the player shall make a determination within thirty (30) days of the date the System Arbitrator's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the System Arbitrator, for the purpose of determining his future damages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the System Arbitrator for the purpose of determining his future damages, if any.

**Section 11. Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

**Section 12. Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article 12 or 13 above. The amount of compensatory damages awarded will be included in such computations.

122

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the System Arbitrator shall take into account that in any League Year no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the System Arbitrator shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

*Section 16.* **Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five or more Clubs and caused injury to 20 or more players; or

(b)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two consecutive NFL seasons which, either individually or in total, involved seven or more Clubs and caused injury to 28 or more players. For purposes of this Subsection 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)     Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)     In order to terminate this Agreement:

(i)     The proceeding must be brought by the NFLPA;

(ii)     The NFL and the System Arbitrator must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)     The System Arbitrator must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

*Section 17.* **Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an

123

initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

*Section 18.* **Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

# ARTICLE 18
# CERTIFICATIONS

*Section 1.* **Contract Certification:**

(a)     Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for his playing of professional football from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

(b)     In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article 17 took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)     No contract will be approved by the Commissioner unless accompanied by the certifications required by Subsections (a) and (b) above.

(d)     Any failure to execute and submit a certification as required under Subsection 1(a) above shall be deemed evidence of a violation of Article 14, Section 1 of this Agreement. Any failure to execute and submit a certification as required under Subsection 1(b) above shall be deemed evidence of a violation of Article 17 of this Agreement.

*Section 2.* **End of League Year Certification:**

(a)     Within fourteen (14) days of the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article 14, Section 1. Upon receipt of such certification, the Management Council shall forward a copy of the certification to the NFLPA.

(b)     Within fourteen (14) days of the conclusion of each League Year, each player agent representing a player who was under contract to an NFL Club during that League Year shall submit to the NFLPA a certification confirming, after reasonable inquiry of all personnel in his or her agency with authority to negotiate Player Contracts, that neither he nor she nor they has entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations,

125

commitments, inducements, assurances of intent, or understandings of any kind, as described in Article 14, Section 1. Upon receipt of such certification, the NFLPA shall forward a copy of the certification to the Management Council.

(c)   Any failure to execute and submit a certification as required under Section 2(a) or 2(b) above, shall be deemed evidence of a violation of Article 14, Section 1 of this Agreement.

(d)   At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article 17, Section 1, nor received from the NFL or the Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, where such communication or disclosure is inconsistent with Article 17, Section 1. Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(e)   Any failure to execute a certification as required under Section 2(d) above shall be deemed evidence of a violation of Article 17, Section 1 of this Agreement.

**Section 3.** False Certification: Any person or Club who knowingly executes or files a false certification required by Sections 1(a), 1(b), 2(a), or 2(b) of this Article shall be subject to a fine of up to $375,000, upon a finding of such violation by the System Arbitrator. Authority to impose such a fine shall rest with the System Arbitrator or the Commissioner, consistent with the allocation of authority in Article 14, Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this Section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article 14, Section 6 above. The fine amount set forth in this Section shall be adjusted each year by the percentage change in Projected AR for that League Year as compared to Projected AR for the prior League Year.

# ARTICLE 19
## CONSULTATION AND INFORMATION SHARING

*Section 1.* **Salary Summaries:** During the period between the first day of the League Year and the first day of the regular season of that League Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of the League Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each week).

*Section 2.* **Consultation and Communications:** At either party's request, the parties shall meet in good faith to reconcile any differences with regard to the Salary Cap treatment of any Player Contract, or of the amount of any Required Tender, Franchise Player Tender, Transition Player Tender, or Rookie Fifth-Year Option.

*Section 3.* **Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

*Section 4.* **Copies:** Within two (2) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy (by .pdf, if the Player Contract or Offer Sheet is provided by .pdf to the NFL) of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

# ARTICLE 20
## OTHER PROVISIONS

*Section 1.* **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

*Section 2.* **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full Paragraph 5 Salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

*Section 3.* **Nonfootball Injury:**
(a)    A player who is placed on a Nonfootball Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.
(b)    A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated Paragraph 5 Salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

*Section 4.* **Roster Exemption:**
(a)    **Certain Players Not Under Contract.** After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.
(b)    **Players Under Contract.** If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to preseason or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his Paragraph 5 Salary during his exemption.
(c)    **Restricted Players.** Any player whose contract has expired and who either (i) has two but less than three Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article 9, Section 2, and who has been given the Required Tender pursuant to Article 8, Section 2, or Article 9, Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's preseason training camp, may be placed on the roster exempt list of his Club under the following conditions:
(i)    If the player has not reported at least the day before the Club's second preseason game, he may be placed on roster exempt until the day following the Club's first regular season game.

128

(ii)     If the player has not reported at least the day before the Club's third preseason game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)    If the player has not reported at least the day before the Club's fourth preseason game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(iv)    Any roster exemption imposed under this Subsection (c) shall commence with the first game immediately after a Restricted Free Agent reports and signs a Player Contract during the pendency of any League-imposed suspension.

(v)     Any roster exemption imposed under this Subsection (c) shall continue for its full duration after any trade of the player to another Club.

(vi)    Any player who is placed on the roster exempt list of his Club pursuant to Section 4(c) shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three weeks of Paragraph 5 Salary as a result of being placed on the roster exempt list. This Subsection shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsections (i)–(iii) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(vii)   No player may be placed on roster exempt under this Section 4(c) unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five days prior to the Club's second preseason game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsections (i)–(iii) above.

(viii)  For purposes of this Article, extra preseason games such as the Canton Hall of Fame Game and the American Bowl shall not count.

(ix)    When placed on roster exempt pursuant to this Section, the player shall not be entitled to compensation.

(d)     Except as provided in Subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two weeks of the regular season.

### Section 5. Arena Football Players:

(a)     Players under an NFL Player Contract may not be allocated to a club in the Arena Football League (("AFL") or ("Arena League")), whether or not that Arena League club is commonly owned with an NFL Club.

(b)     Otherwise eligible Arena League players who would be Rookies in the NFL may be drafted by any NFL Club pursuant to current draft procedures even if under contract to an Arena League Club.

(c)     Before a player under contract in the Arena League may be signed to an NFL Player Contract, he must be released by the Arena League club from any preexisting contract obligations in the Arena League, including any residual contract rights relating to negotiation, first refusal, etc., and except for players to whom an NFL Club has Draft rights, will be considered an Unrestricted Free Agent. This provision refers solely to contractual rights between a player and a team in the Arena Football League

129

and does not refer to the terms of any collective bargaining agreement in the Arena League.

    (d)    A player whose most recent contract to play professional football was with an AFL team that shares common ownership with an NFL Club (such AFL team being a "Related AFL Team" and such Club being a "Related NFL Club") may not sign a Player Contract with that Related NFL Club until after a period of 72 hours following the termination or expiration of the player's contract with the Related AFL Team. During that 72-hour period, the player shall be completely free to negotiate and sign a Player Contract with any other Club. The terms of this Subsection (d) are subject to any rights that any Club may have under Article 6, and any Club that has drafted such a player consistent with the terms of this Agreement may sign such a player at any time permitted by this Agreement.

    (e)    NFL clubs and Arena League clubs may have common practice facilities, but may not participate in common classroom work, film study, drills, scrimmages, or other on- or off-field work.

    (f)    Any NFL player suspended for one year or less in the NFL by the Commissioner or his Club may not play for an Arena League team that is commonly-owned with his NFL Club during any term of his suspension that overlaps with the period of time the player is under contract to his NFL Club.

    (g)    If an Arena League club that is commonly-owned with an NFL Club engages in conduct that would violate NFL Rules, including but not limited to the NFL's anti-tampering policy, the violation shall be attributed to the NFL Club, so long as any sanctions are imposed consistent with the terms of this Agreement and the NFL Constitution and Bylaws.

*Section 6.* **Other Professional Leagues:** No player who is under contract in another football league is eligible to sign an NFL Player Contract or a Practice Squad Player Contract until the termination or expiration of his contract in the other league.

# ARTICLE 21
## OFFSEASON WORKOUTS

*Section 1.* **Voluntary Workouts:** No player shall be required to attend or participate in any offseason workout program or classroom instruction of a Club other than as provided in Article 22. Any other Club offseason workout programs and classroom instruction sessions shall be strictly voluntary and shall take place in the manner and time period set forth in this Article.

*Section 2.* Time Periods:

(a)       Subject to the limitations in Subsections (b) and (c) below, from the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct offseason workout programs as follows. If a Club hires a new head coach after the end of the prior regular season, that Club may schedule or conduct an offseason workout program for no more than nine total weeks, with eight of the weeks required to be consecutive and subject to Article 22, Section 3, to be completed over a twelve-week period. All other Clubs may schedule or conduct offseason workout programs for no more than nine consecutive total weeks, to be completed over a ten-week period. In either case, Clubs may schedule no more than four workouts per week for any individual player. Such workout programs shall not be permitted on weekends. Nothing herein shall prevent a Club from permitting an individual player to work out on his own prior to the commencement of the Club's official offseason workout program using the Club facilities if the player wishes to do so, except that no club official may indicate to a player that such individual workouts are not voluntary, or that a player's failure to participate in such workouts will result in the player's failure to make the Club (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club or result in any other adverse consequences affecting his working conditions). Prior to the commencement of the Club's official offseason workout program: (i) players may not receive daily workout payments or workout bonuses of any kind, and may not be paid or reimbursed expenses for travel, board or lodging; (ii) players are not permitted to participate in Club-supervised workouts, Club-supervised practices, group or individual meetings with coaches, group or individual film study with coaches, or group or individual playbook study with coaches; (iii) the Club's strength and conditioning coaches may not direct players' individual workouts, but may supervise use of the weight room to prevent injury and to correct misuse of equipment; and (iv) players' activities may not be directed or supervised by any coaches. In addition, nothing herein shall prevent a Club from permitting an individual player to work out on his own on weekends after the Club's official offseason program has commenced, or at any time after the Club's official offseason workout program has ended, using Club facilities if he wishes to do so, subject to the restrictions set forth in the immediately preceding sentence of this Subsection, except that no club official may indicate to a player that such individual workouts are not voluntary, or that a player's failure to participate in such workouts will result in the player's failure to make the Club (or that a player's failure to participate in a workout program or classroom instruction will result in the player's fail-

131

ure to make the Club or result in any other adverse consequences affecting his working conditions).

(b) Each Club's official nine-week offseason workout program shall be conducted in three phases, as follows:

(i) **Phase One.** Phase One shall consist of the first two weeks of the Club's offseason workout program. Subject to the additional rules set forth in Section 5 of this Article, Phase One activities shall be limited to strength and conditioning and physical rehabilitation only. During Phase One, only full-time or part-time strength and conditioning coaches, who have no other coaching responsibilities with the Club, shall be allowed on the field; no other coaches shall be allowed on the field or to otherwise participate in or observe activities. No footballs shall be permitted to be used (only "dead ball" activities), except that quarterbacks may elect to throw to receivers provided they are not covered by any other player. Players cannot wear helmets during Phase One.

(ii) **Phase Two.** Phase Two shall consist of the next three weeks of the Club's offseason workout program. Subject to the additional rules set forth in Section 5 of this Article, during Phase Two all coaches shall be allowed on the field. On-field workouts may include individual player instruction and drills, as well as "perfect play" drills (e.g., offense or defense only, but not offense vs. defense), or special teams drills on a "separates" basis (e.g.., kicking team or return team only, but not kicking team vs. return team). No live contact or team offense vs. team defense drills are permitted. No offense vs. defense drills are permitted (e.g.., no one-on-one offensive linemen vs. defensive linemen pass rush or pass protection drills, no wide receivers vs. defensive backs bump-and-run drills, and no one-on-one special teams drills involving both offense and defense are permitted.) Players cannot wear helmets during Phase Two.

(iii) **Phase Three.** Phase Three shall consist of the next four weeks of the Club's offseason workout program. Subject to the additional rules set forth in Subsections 5(a) and 5(c) of this Article and Appendix G to this Agreement, during Phase Three each Club may conduct a total of ten days of organized team practice activity ("OTAs" or "OTA days"). The restrictions set forth in Subsection 5(b) of this Article shall not apply to OTA days. The Club may conduct a maximum of three days of OTAs during each of the first two weeks of Phase Three. A maximum of four days of OTAs may be conducted during either the third week or the fourth week of Phase Three, with the Mandatory Veteran Minicamp (Article 22, Section 2) to be held during the other week. During weeks in which the Club conducts only three days of OTAs, the Club may also conduct a fourth day of non-OTA workouts, but such activities shall be subject to the rules governing Phase Two workouts, as set forth in Subsection 2(b)(ii) of this Article. During Phase Three, all coaches shall be allowed on the field. No live contact is permitted. No one-on-one offense vs. defense drills are permitted (i.e., no offensive linemen vs. defensive linemen pass rush or pass protection drills, no wide receivers vs. defensive backs bump-and-run drills, and no one-on-one special teams drills involving both offense and defense are permitted). Special teams drills (e.g.. kicking team vs. return team) are permitted, provided no live contact occurs. Team offense vs. team defense drills, including all drills listed in Appendix G to this Agreement, are permitted, provided no live contact occurs. Clubs may require players to wear helmets; no shells are permitted during Phase Three of the Club's offseason workout program or any minicamp.

(c)      Each year offseason workout programs cannot begin prior to the first Monday in April for Clubs that have hired a new head coach after the end of the prior regular season, and cannot begin prior to the third Monday in April for all other Clubs. Each year on a date to be agreed upon by the parties, but no later than twenty-one days before the scheduled commencement of a Club's program, each Club shall provide the NFL and the NFLPA with the Club's schedule for its offseason workout program that year, and shall advise the NFL and the NFLPA in writing in advance of any changes to that schedule; if the NFL provides such information to the NFLPA, the Club's obligation under this sentence shall be deemed satisfied.

*Section 3.* Payment: Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary offseason workout program, provided the player fulfills the Club's reasonable offseason workout requirements: $155 (2011–12 League Years), $175 (2013–14 League Years), $195 (2015–16 League Years), $215 (2017–18 League Years), and $235 (2019–20 League Years), respectively. Players are required to complete three out of four scheduled workouts, including any scheduled OTAs, per week in order to be paid for any workout the player completes in that week, except that if there are less than four (4) scheduled workouts in a week the player will be paid for each workout in which he participates. A player can only be paid for offseason workouts pursuant to the terms of an executed offseason workout addendum, which shall be part of the player's NFL Player Contract. The NFL and the NFLPA shall agree upon a standard offseason workout addendum, which shall be incorporated as an Appendix to this Agreement. Any player under contract to a Club at the time of the start of the offseason workout program shall be invited to participate in the Club's program. A player subject to a Required Tender by a Club, but who has not signed a Player Contract, or an Unrestricted Free Agent whose Player Contract with that Club has expired may be invited to participate in that Club's offseason workout program, but must sign an Offseason Workout and Minicamp Participation Agreement prior to his participation in such activities. Players who are under contract or subject to a Required Tender to an NFL Club and who participate in a Club's offseason workout program may also receive expenses for travel, board, and lodging subject to the terms and conditions set forth in Article 13, Section 6(e)(iv)(3).

*Section 4.* Injuries: Any player injured during offseason workouts will be protected in the same manner as if injured during the Club's preseason training camp, provided he is working out at the Club's facility under the direction of a Club official.

*Section 5.* Miscellaneous:

(a)      No Club official may indicate to a player that the Club's offseason workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club or result in any other adverse consequences affecting his working conditions). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all offseason workouts. All Clubs, coaches and other Club

133

officials shall follow all of the rules regarding offseason workouts set forth in Appendix G hereto.

(b) During the offseason program period, except for the ten days of organized team practice activity and minicamps, players may be (1) at the Club facility no more than four hours per day, no more than four days per week, and not during weekends; and (2) on the field no more than ninety minutes per day. In addition, the Club may not specify to any player more than two specific hours a day during which it suggests that the player be at club facilities. Any player participating in an offseason workout program may select the other two hours in which he wishes to attend to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.

(c) Clubs shall film all three Phases of the on-field workout sessions and shall maintain a copy of such films until thirty days after the start of the regular season. The NFLPA may view such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year of this Agreement) only upon the filing of a complaint alleging a violation of this Article.

*Section 6.* Pre-Training Camp Period: During the period beginning with the end of the offseason program and ending with the mandatory reporting date for preseason training camp, no player shall be permitted to participate in any organized workouts or organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or a Club Affiliate. Notwithstanding the preceding sentence, during the five consecutive days immediately prior to the mandatory veteran reporting date for each Club's preseason training camp (as specified in Article 23, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Nonfootball Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or nonfootball-related injury or illness during the offseason; or (4) had surgery during the offseason regarding a football or nonfootball-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. (Except that a player in categories (ii)(1)–(4) above who fully participates in all Phase Three activities and the Mandatory Veteran Minicamp during the club's offseason workout program shall not be permitted to participate during this five day period.) This prohibition shall apply notwithstanding any other provision of this Agreement, or any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League that the player has agreed to.

134

*Section 7.* **Rookie Premiere:** Invited Rookies will be permitted by their respective Clubs to attend the NFL Players Rookie Premiere provided that: (i) such event is scheduled during the month of May; (ii) such event encompasses a maximum of four consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the NFL with the dates for the next Rookie Premiere not later than February 1 of each year.

*Section 8.* **Enforcement:**

(a)     The head coach and the Club, who are jointly responsible for any conduct in violation of Sections 1, 2, 5 or 6 of this Article (including but not limited to the rules in Appendix G), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 1, 2, 5 or 6 of this Article (including but not limited to the rules in Appendix G), through an expedited arbitration proceeding before the Impartial Arbitrator. Any head coach or Club that is the subject of a proceeding under this Section shall have the right to participate in the proceeding and to present a defense.

(b)(i)   The NFL and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules set forth in this Agreement relating to offseason workouts. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with a copy of all tape, film, other recorded evidence, or other documentation any representative deems relevant to any possible violation.

(ii)    Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the NFL, or sooner if practical, the Executive Director of the NFLPA and the NFL Executive Vice President Labor & League Counsel shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to the Impartial Arbitrator who will render a decision within forty-eight hours of the submission of the dispute.

(c)     As soon as practicable after the commencement of any proceeding before the Impartial Arbitrator, the NFLPA shall be provided with a copy of all tape, film, other recorded evidence, or other documentation of any workout that is the subject of the proceeding if such materials have not already been produced to the NFLPA pursuant to Subsection (b)(i). If the Club fails to produce such materials then the Club's next scheduled week of OTAs shall automatically be cancelled pursuant to Subsection (d)(ii) below, unless the Club proves that its failure to produce such materials is due to circumstances beyond the Club's control.

(d)(i)   **Commissioner Fines.** In the event that the Arbitrator finds any violation of Sections 1, 2, 5 or 6 of this Article (including but not limited to the rules in Appendix G), or in the event that the NFL and the NFLPA agree that a violation has occurred as provided under Subsection (d)(ii) below, the head coach shall be subject to a fine in the amount of $100,000 for the first violation, and $250,000 for a second violation, and the Club shall be subject to a fine in the amount of $250,000 for the first

135

violation and $500,000 for a second violation. If such a violation is found by the Arbitrator, or the NFL and the NFLPA agree that such a violation has occurred, the Commissioner in his sole discretion: (1) may promptly fine the head coach and the Club in the amounts specified above; or (2) after consultation with the Executive Director of the NFLPA, may fine the head coach and the Club some lesser amount, or no amount, if the Commissioner determines that (A) the conduct of the head coach and the Club were based upon a good faith interpretation of Sections 1, 2, 5, 6 or 8 of this Article or the rules set forth in Appendix G; or (B) did not constitute a material violation of such Sections. Any fines assessed by the Commissioner pursuant to this Subsection shall be donated as follows: Fifty percent to the Gene Upshaw Players Assistance Trust, and fifty percent to the Player Care Foundation. The NFL shall promptly provide the NFLPA with written evidence that the fine has been paid and donated in accordance with this Section.

(ii)     **Other Penalties.** If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the NFL Executive Vice President Labor & League Counsel agree that a violation has occurred, the Club's next scheduled week of OTAs shall be cancelled, excluding minicamps. If the arbitrator finds, or the Executive Director of the NFLPA and the NFL Executive Vice President Labor and League Counsel agree, that two separate violations of these rules occurred in the same League Year, the Club's next scheduled week of OTAs shall also be cancelled, excluding minicamps, and the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. The penalties described in the immediately preceding two sentences shall be imposed whether or not the Commissioner imposes a fine under Subsection 8(d)(i) of this Article.

(iii)    For each League Year after the 2011 League Year, the fine amounts described in Subsection (i) above shall be adjusted by the same percentage as the change in Projected AR for that League Year compared to the Projected AR for the prior League Year up to a maximum of ten percent (10%) per League Year.

(e)     In the event any week of the Club's offseason workout program, excluding minicamps, is cancelled, no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's offseason program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for offseason workout pay or any workout bonuses. No conduct occurring prior to the date upon which any arbitration proceeding is filed before the Impartial Arbitrator under these rules may serve as the basis for a finding of a second violation by a Club. A second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed. Any violation that occurs in the last week of the Club's offseason workout program will result in a loss of the Club's first week of OTAs (3 OTAs) in the next offseason; provided, however, this carry-over cancellation will not constitute an independent violation in the next offseason. If the Club hires a new head coach after the offseason in which the violation occurs, the cancellation will not carry over for that Club; however, if the terminated head coach is hired by another NFL Club as a head coach, the carry-over cancellation will be assessed against the hiring Club in that offseason.

(f)      Except as provided above, these limitations on offseason workouts shall not preclude any player from working out on his own at any time, including weekends. By agreeing to the sanctions in this Section, the parties have not waived or affected in any way their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the NFL Constitution and Bylaws.

(g)      The NFLPA may designate representatives who can make unannounced visits to Teams to investigate compliance with the provisions of this Article, Articles 22–24, and Appendix G. Such representatives may make no more than five total such visits per Club in a League Year. The Club will provide access to a location near the practice field where each segment of the Club's practice is visible to such representative(s).

**Section 9. Offseason Participation Contract:** A player subject to a Required Tender by a Club, but who has not signed a Player Contract, or an Unrestricted Free Agent whose Player Contract with that Club has expired, may enter into an Offseason Workout Program and Minicamp Participation Agreement in order to participate in the offseason workout program and minicamp(s) of that Club. The NFL and the NFLPA shall agree upon a standard such Participation Agreement, which shall be incorporated as an Appendix to this Agreement. For such players, this Participation Agreement shall also serve as the offseason workout addendum required by Section 3 of this Article. A copy of all Participation Agreements shall be submitted to the NFL, which shall provide a copy to the NFLPA.

# ARTICLE 22
## MINICAMPS

*Section 1.* **Number:** Each League Year each Club may hold a maximum of one manda-
tory minicamp for veteran players. If a Club hires a new head coach after the end of the
prior regular season, that Club may hold one additional voluntary minicamp for veteran
players. Any mandatory minicamp for veteran players shall count as one of the nine
weeks of the Club's official offseason workout program under Article 21, Section 2(a) of
this Agreement. There is no limitation on the number of minicamps a Club may hold for
Rookie players during the seven weeks of the Club's Rookie Football Development
Program.

*Section 2.* **Mandatory Veteran Minicamp:** No mandatory veteran minicamp may
exceed three days in length, plus one day for physical examinations. The minicamp must
be conducted during the week (Monday through Friday), with physicals taking place on
Monday but no practice or workouts on that day, practices on Tuesday through Thurs-
day and a day off on Friday. The minicamp must be conducted during week three or
week four of Phase Three of the Club's offseason workout program. The Phase Three
rules set forth in Article 21, Section 2(b)(iii) of this Agreement shall apply to all mini-
camp activities. Two-a-day practices shall be permitted at two of the three practice days
of the Club's one mandatory minicamp, subject to the following rules: (i) players may be
on the field for a total of no more than three and one-half hours per day; (ii) players may
participate in one practice for no more than two and one-half hours of on-field activities
under Phase Three rules; (iii) the second practice may only be for the remaining portion
of the players' daily three and one-half hour on-field activities and shall be limited to
walk-through instruction only; (iv) no organized team activities (including treatment and
taping) may begin prior to 7:00am local time or end after 8:30pm local time, and players
shall be given at least one hour for lunch and dinner each; (v) players may only be asked
to participate in Club activities for a maximum of ten hours per day  including taping
and treatment but excluding meal time. The on-field time limits described above shall
begin as soon as position coaches begin to coach players on the field.

*Section 3.* **Voluntary Veteran Minicamp:** Any voluntary minicamp for veteran players
must be conducted prior to the College Draft, but no earlier than week three of the
Club's offseason workout program and after at least one week of the two weeks of
Phase One activities that the Clubs may hold pursuant to Article 21. In the event the
NFL elects to move the College Draft to a date that would require the Club to schedule
its voluntary minicamp for veteran players during a week that is earlier than week three
of the Club's offseason workout program, the NFLPA and NFL shall agree to a change
in such rule. Voluntary minicamps for veteran players shall be subject to the rules set
forth in Section 2 above.

*Section 4.* **Expenses:**
(a)      Any veteran player who attends a minicamp will receive meal allowances
in accordance with Article 34, Section 1 of this Agreement, plus all travel expenses to

138

and from the camp, plus "per diem" payments at the rate provided in Article 23, Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

(b)     If a "first-year player" (as defined as in Article 23, Section 1) signed a Player Contract with any Club for the prior League Year, he shall receive, for each day that he attends minicamp, the following compensation, but no other compensation: (i) the prorated portion of the weekly per diem specified for the current League Year (as set forth in Article 23, Section 3); (ii) the meal allowance specified for the current League Year (as set forth in Article 34, Section 1); and (iii) all travel expenses to and from the camp, plus housing (for players coming from out-of-town).

(c)     Any "rookie player" (defined as a person who has never signed a Player Contact with an NFL Club in a prior League Year) shall not be entitled to compensation for his participation in any minicamp, other than the reimbursements or payments permitted under the Club's Rookie Orientation Program.

*Section 5.* **Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

*Section 6.* **Injuries:** Any player injured in a Club's minicamp shall be protected in the same manner as if injured during the Club's preseason training camp.

*Section 7.* **Rookie Football Development Programs and Minicamps:** Each Club may hold a Rookie football development program for a period of seven weeks, commencing on or about May 16. During this period, no mandatory or voluntary activities can be held on weekends, with the exception of the Club's one post-Draft Rookie Minicamp, which at the Club's election may be conducted on either the first or second weekend following the College Draft. Players may only participate in Club activities for a maximum of ten hours per day.

*Section 8.* **Films:** Clubs shall film all on-field activities from any minicamp, and shall maintain a copy of such films until thirty days after the start of the regular season. The NFLPA may view such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year) only upon the filing of a complaint alleging a violation of this Article.

*Section 9.* **Enforcement:** Any alleged violation of Sections 1, 2, 3, 5 or 7 of this Article shall be governed by the same procedures, and shall be subject to the same fines and fine procedures, as set forth in Article 21, Section 8, except that the "Other Penalties" set forth in Article 21, Section 8(d)(ii) shall not apply to any violation of this Article.

*Section 10.* **Participation Agreement:** The requirements of Article 22, Section 3 or Article 22, Section 9 (as applicable), apply to players participating in a Club's minicamp.

# ARTICLE 23
# PRESEASON TRAINING CAMPS

*Section 1.* **Definition:** For purposes of this Article, a "first-year player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell/Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

*Section 2.* **Room and Board:** All players will receive room and board during the preseason training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

*Section 3.* **First-year Player Per Diem:** A first-year player will receive "per diem" payments, commencing with the first day of Preseason Training Camp and ending one week prior to the Club's first regular season game, at the following weekly rates for the respective League Years: $850 (2011–12 League Years), $925 (2013–14 League Years), $1,000 (2015–16 League Years), $1,075 (2017–18 League Years), $1,150 (2019–20 League Years).

*Section 4.* **Veteran Per Diem:** A veteran player will receive "per diem" payments, commencing with the first day of Preseason Training Camp and ending one week prior to the Club's first regular season game, at the following weekly rates for the respective League Years: $1,600 (2011–12 League Years), $1,700 (2013–14 League Years), $1,800 (2015–16 League Years), $1,900 (2017–18 League Years), $2,000 (2019–20 League Years).

*Section 5.* **Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official preseason training camp earlier than fifteen days (including one day for physical examinations, meetings, classroom instruction, running, and conditioning) prior to his Club's first scheduled preseason game or July 15, whichever is later. The July 15 date shall not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date. For purposes of this Section, an "injured player" shall not include a player who fully participates in all Phase Three activities and the Mandatory Veteran Minicamp during the club's offseason workout program during the League Year in question.

*Section 6.* **Conduct of Practices:**

   (a)     The first day of a Club's preseason training camp shall be limited to physical examinations, meetings, and classroom instruction; no on-field activities shall be permitted other than running and conditioning. No contact shall be permitted and no pads shall be worn during the second and third days of Preseason Training Camp. Thereafter, two-a-day practices shall be permitted, subject to the following rules: (i) players

140

may be on the field for a total of no more than four hours per day; (ii) players may participate in no more than one padded practice per day, which shall be no longer than three hours of on-field activities; (iii) there must be at least a three hour break after the practice; and (iv) the second practice on the same day may only be for a maximum of the remaining available on-field time, and shall be limited to only "walk-through" instruction (i.e., no helmets, full-speed pre-snap, and walking pace after the snap). The three-hour limit on padded practices shall begin as soon as position coaches begin to coach players on the field. The definition of a "padded practice" under this Article shall be the same as the definition used for regular season practices in Article 24, Section 1(c) of this Agreement. In the event that a Club begins a padded practice but such practice is cancelled within sixty minutes of its commencement due to inclement weather or for any other reason beyond the Club's control, such practice shall not count as a padded practice under this Article or Article 24.

(b)     Notwithstanding the foregoing, or anything in Article 24, it shall not be a violation of any provision of this Agreement pertaining to the prohibition or limitation on wearing of helmets or shoulder pads, nor shall it constitute a "padded practice," if: (i) quarterbacks, kickers, punters, and/or long-snappers only wear helmets and/or shoulder pads during practice at the option of the player; (ii) a player who, because of a head injury, is directed by the Club physician to wear a helmet as a precautionary measure at all practices; or (iii)  the quarterback and/or the defensive player who receives signals from the coaching staff via helmet communication wear helmets during the team period in which helmets are used for such communication.

*Section 7.* **Number of Preseason Games:** The NFL shall hold no more than four preseason games per Club per year during the term of this Agreement except that there may be a fifth preseason game for the two Clubs competing in the annual Hall of Fame Game or any American Bowl game scheduled around the Hall of Fame Game date.

*Section 8.* **Expenses:** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching Preseason Training Camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

*Section 9.* **Definition of "Preseason Training Camp":** For purposes of this Article, the term "Preseason Training Camp" shall be deemed to include the entire period from the beginning of training camp for any player through the last weekend of preseason games played by clubs during the league year in question.

*Section 10.* **Films:** Clubs shall film all on-field activities from preseason training camp, and shall maintain a copy of such films until thirty days after the start of the regular season. The NFLPA may view such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year) only upon the filing of a complaint alleging a violation of this Article.

***Section 11.*** **Enforcement:**

    (a)    Any alleged violation of Sections 5 or 6 of this Article shall be governed by the same procedures, and shall be subject to the same fines and fine procedures, as set forth in Article 21, Section 8, except that the "Other Penalties" set forth in Article 21, Section 8(d)(ii) shall not apply to any violation of this Article.

    (b)    In the event the NFLPA or any player files a complaint with the NFL alleging a Club's violation of Subsection 6(ii) and/or 6(iii) of this Article, pertaining to "padded practices" or "walk-throughs," (i) within forty-eight hours of the filing of the complaint, the NFLPA shall be provided with a copy of all film of any practice that is the subject of the complaint; (ii) within seventy-two hours, the Executive Director of the NFLPA and the NFL Executive Vice President Labor & League Counsel (or their designees) shall attempt to determine if a violation of such Subsection has occurred; (iii) if the parties are unable to agree, the matter will be immediately referred to the Impartial Arbitrator who will render a decision within twenty-four hours; (iv) if the parties agree, or if the Impartial Arbitrator determines, that a violation has occurred, the Club's next scheduled preseason or regular season padded practice shall be cancelled, whether or not the Commissioner imposes a fine under Subsection 11(a) of this Article.

# ARTICLE 24
## REGULAR SEASON AND POSTSEASON PRACTICES

*Section 1.* **Practice Rules:**

(a)     During the regular season, padded practices for all players shall be limited to a total of fourteen, eleven of which must be held during the first eleven weeks of the regular season, and three of which must be held during the remaining six weeks of the regular season. The Club may choose the days of the week on which such practices shall be held. Subject to the foregoing rules, each Club may hold two padded practices during the same week during one week of the regular season, provided that such week falls within the first eleven weeks of the regular season.

(b)     Clubs participating in the postseason may hold one padded practice per week, on a day of the Club's choosing, commencing with the week following the Club's last regular season game.

(c)     For purposes of this Article and Article 23, a "padded practice" shall be defined as a practice in which players are required to wear helmets and shoulder pads, in addition to any other equipment required by the Club, subject to the exceptions set forth in Article 23, Section 6(b).

(d)     On days when padded practices are permitted under Subsection (a) above, on-field Team activity for all players shall be limited to a maximum of three hours per day, including "first period" (i.e., stretching and calisthenics), provided that (i) players may participate in on-field activities with their position coaches for a period not to exceed thirty minutes, prior to the three-hour maximum on-field period; and (ii) any walk-through of reasonable and customary duration (for purposes of this Subsection, such walk-through to be no helmets and walking pace) that is conducted prior to or after the three-hour maximum on-field period shall not count against that limit. The three-hour time limit described above shall begin as soon as position coaches begin to coach players on the field, subject to provisos (i)–(ii) in this Subsection.

*Section 2.* **Bye Weeks:** During any regular season bye week period occurring during the term of this Agreement, players will be given a minimum of four consecutive days off. Such four-day period must include a Saturday and a Sunday unless the Club is scheduled to play a game on the Thursday following the bye week, in which case players may be required to report to the Club on the Sunday preceding the Thursday game. In such an event, the four-day period shall be Wednesday through Saturday. Any injured player may be required to undergo medical or rehabilitation treatment during such four-day period provided that such treatment is deemed reasonably necessary by the Club's medical staff.

*Section 3.* **Enforcement:** Any violation of Section 1 of this Article shall be governed by the same procedures, and shall be subject to the same fines and fine procedures, as set forth in Article 21, Section 8, except that the "Other Penalties" set forth in Article 21, Section 8(d)(ii) shall not apply to any violation of this Article.

*Section 4.* **Films:** Clubs shall film all regular and postseason practices shall maintain a copy of such films until thirty days after the end of their season. The NFLPA may view

such films (after signing a confidentiality agreement satisfactory to the NFL at the start of each League Year) only upon the filing of a complaint alleging a violation of this Article.

## ARTICLE 25
## SQUAD SIZE

*Section 1.* **Active List:** Beginning with the 2011 regular season, the Active List limit shall be increased from forty-five players per club to forty-six players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided however, that individual Clubs may carry less than forty-six players on their Active List during the regular season, but no less than forty-three players.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

145