# Exhibit 1-B

ARTICLE 26
SALARIES

*Section 1.* **Minimum Salaries:**

(a)      Beginning in the 2011 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| #CS | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | $375 | $390 | $405 | $420 | $435 | $450 | $465 | $480 | $495 | $510 |
| 1 | $450 | $465 | $480 | $495 | $510 | $525 | $540 | $555 | $570 | $585 |
| 2 | $525 | $540 | $555 | $570 | $585 | $600 | $615 | $630 | $645 | $660 |
| 3 | $600 | $615 | $630 | $645 | $660 | $675 | $690 | $705 | $720 | $735 |
| 4–6 | $685 | $700 | $715 | $730 | $745 | $760 | $775 | $790 | $805 | $820 |
| 7–9 | $810 | $825 | $840 | $855 | $870 | $885 | $900 | $915 | $930 | $945 |
| 10+ | $910 | $925 | $940 | $955 | $970 | $985 | $1000 | $1015 | $1030 | $1045 |

(all amounts in thousands of dollars)
(CS = Credited Seasons)

(b)      Beginning in the 2011 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding Practice Squad) shall be as follows:

| # CS | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | $258 | $273 | $288 | $303 | $318 | $333 | $348 | $363 | $378 | $393 |
| 1 | $273 | $288 | $303 | $318 | $333 | $348 | $363 | $378 | $393 | $408 |
| 2 | $288 | $303 | $318 | $333 | $348 | $363 | $378 | $393 | $408 | $423 |
| 3 | $328 | $343 | $358 | $373 | $388 | $403 | $418 | $433 | $448 | $463 |
| 4–6 | $353 | $368 | $383 | $398 | $413 | $428 | $443 | $458 | $473 | $488 |
| 7–9 | $378 | $393 | $408 | $423 | $438 | $453 | $468 | $483 | $498 | $513 |
| 10+ | $403 | $418 | $433 | $448 | $463 | $478 | $493 | $508 | $523 | $538 |

(all amounts in thousands of dollars)
(CS = Credited Seasons)

*Section 2.* **Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a nonfootball injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

*Section 3.* **Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional Salary payments, incentives, bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his agent in accordance with the terms of his Player Contract. The Club

and the player or his agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his agent on a collective or tandem basis for two or more players on that Club. Nothing in this Section will be affected by Article 2, Section 4.

*Section 4.* **Arbitration:** The question of whether or not the Club, the Management Council, the player or his agent has engaged in good faith negotiations over such other compensation may be the subject of a proceeding before a Non-Injury Grievance Arbitrator. If the Arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

*Section 5.* **Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his agent.

Section 6. Deferred Paragraph 5: A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $2 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $2 million.

*Section 7.* **Copies of Contracts:** It is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement will be provided to the NFLPA within two (2) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

*Section 8.* **Split Contracts:** After the point in the regular season at which a player with four or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

147

*Section 9.* **Funding of Deferred and Guaranteed Contracts:** The NFL may require that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using the Discount Rate, less $2,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

148

# ARTICLE 27
## MINIMUM SALARY BENEFIT

***Section 1.*** **Qualifying Players:** For purposes of this Article, a "Qualifying Player" shall be defined as a player with four or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.

***Section 2.*** **Qualifying Contracts:**

    (a)    For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (i) covers only a single League Year and (ii) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $50,000 in "Additional Compensation" (e.g., signing bonus allocation, roster bonus, reporting bonus, or any incentive ("likely to be earned" or not)), and/or (3) a guarantee for Salary and/or Salary advance of up to the Minimum Salary for a player with two Credited Seasons. A Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. Thus, for example, a contract that includes an option year is not a Qualifying Contract.

    (b)    The maximum amount of Additional Compensation in (2) above shall be increased to $65,000 for the 2012–14 League Years, to $80,000 for the 2015–17 League Years, and $90,000 for the 2018–20 League Years.

    (c)    If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than maximum amount of Additional Compensation less the amount of any Additional Compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus the maximum amount of Additional Compensation.

***Section 3.*** **Additional Compensation Rules:**

    (a)    Per-day offseason workout payments shall not be considered in determining "additional compensation" under Section 2 above, if such payments do not exceed the minimum level prescribed by Article 21.

    (b)    If, however, the Player Contract provides for offseason workout payments above the minimum level, then the total of those payments shall be included in determining Additional Compensation.

    (c)    If the Player Contract provides for offseason workout bonus payments on a basis other than a per-day payment, such amounts shall count as Additional Compensation but will not affect the treatment of any offseason workout payments that do not exceed the minimum prescribed level. For example, without limitation on any other example, a player with a 2011 Player Contract that provides for a $10,000 bonus payable to the player for offseason workouts, in addition to the per-day minimum of $145 (for a total of $1,450) and no other Additional Compensation, has Additional Compensation of $10,000.

(d)     If a player receives from a single Club, under a series of contracts, offseason workout payments specified on a per-day basis that average more than the minimum level prescribed by Article 21, then all of the offseason workout payments paid on a per-day basis shall count as Additional Compensation.

(e)     If a player is eligible to sign a Qualifying Contract with a New Club in accordance with Section 9 below, the full amount of any signing bonus payable to the player under any Player Contract that was executed in the same League Year as the proposed Qualifying Contract shall count against the Additional Compensation that can be earned by such player in accordance with Section 2 above. No other signing bonus amounts from contracts other than the Qualifying Contract shall count as Additional Compensation for such player.

(f)     If a player is eligible to sign a Qualifying Contract with his Old Club in accordance with Section 10 below, the circumstances in which signing bonus from a contract other than the Qualifying Contract may count against the Additional Compensation that can be earned by the player in accordance with Section 2 above, shall be determined exclusively under Section 10 below, the terms of which are not affected by Subsection 3(e) above.

*Section 4.* **Payments:** Players with Qualifying Contracts shall be paid the specified minimum salary on a pro rata basis over the number of weeks of the regular season.

*Section 5.* **Reduced Salary Cap Count:** Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with two Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with two Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with two Credited Seasons (if the player is not on an Active/Inactive List).

*Section 6.* **Minimum Salary Benefit Calculation:** The difference between the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2012 League Year, a Qualifying Player with five Credited Seasons shall receive a Minimum Salary of $700,000; however, only $540,000 shall count against his Club's Team Salary. The difference of $160,000 shall be counted as a Player Benefit.

*Section 7.* **Extensions of Qualified Contracts:** After the Club's last game of a season and prior to the expiration of the Qualifying Contract, the current Club and Player may agree to extend for one year a Qualifying Contract, provided that the terms of the extension comply with Section 2 above.

*Section 8.* **Terminated Qualifying Players:** If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that

did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).

*Section 9.* **Players Moving to New Club:** In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the "Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 10 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

*Section 10.* **Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club"(defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase or guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than the maximum Additional Compensation amount in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multiyear contract for more than the applicable Minimum Salary in any League Year of the contract plus additional Salary above the maximum Additional Compensation amount in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from Signing Bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other Additional Compensation that the player has received or will receive from that terminated contract does not exceed the maximum Additional Compensation amount. For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2012 a player signs a two-year contract for the minimum Paragraph 5 Salary in both years and a $100,000 signing bonus, and his contract is terminated on June 2, 2012, the player is not eligible to sign a 2012 Qualifying Contract with his Old Club because the sum of the acceleration of the 2012 prorated portion of the signing bonus ($50,000) that was agreed to in the year of his contract termination and the 2012 prorated portion of signing bonus from that terminated contract ($50,000) resulted in "additional compensation" of more than $65,000 in 2012. However, if the contract was signed on December 1, 2011, and the contract is terminated on June 2, 2012, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other Additional Compensation.

*Section 11.* **Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

*Section 12.* **Guarantees:** If a Qualifying Contract with guarantees is terminated, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $825,000 Qualifying Contract, which includes a $525,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $525,000 of the $825,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $525,000.

*Section 13.* **Termination Pay:** If a Qualifying Player is eligible for Termination Pay when he is released and subsequently files a claim, he shall receive the charged amount plus the full benefit amount. The player does not receive the benefit amount twice.

*Section 14.* **No Benefit for Non-Qualifying Contracts:** Contracts for players with four or more Credited Seasons who sign at the applicable minimum for that year plus more than the maximum amount of Additional Compensation (e.g., prorated signing bonus, etc.) or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

# ARTICLE 28
# PERFORMANCE-BASED POOL

**Section 1. Creation Of Fund:** In each League Year after the 2011 League Year, the NFL shall create a fund known as the Performance Based Pool that will be deducted from the calculation of the Salary Cap in the same manner as any other Player Benefit.

**Section 2. Amount of Fund:** For the 2012 League Year, the fund shall be $3.46 million per Club. For each League Year after the 2012 League Year, the fund will be adjusted by the percentage change in Projected AR, with a maximum change of 5%, unless otherwise agreed by the parties; provided, however, that the NFLPA has the unilateral right to reduce or freeze the amount of the Performance Based Pool.

**Section 3. Mandatory Distribution Each Year:** There shall be mandatory distribution to players of the entire fund each League Year.

**Section 4. Qualifying Players:** A player shall be eligible for participation in the Performance Based Pool for a League Year if he plays for at least one down in any regular season game. A player may receive multiple distributions if he qualifies for more than one Club in a single League Year.

**Section 5. Methodology:**

(a)     Each player's "Playtime Percentage" shall be calculated by (i) adding the player's total plays on offense or defense, as appropriate, plus special teams and (ii) dividing that number by the team's total plays on offense or defense, as appropriate, plus special teams;

(b)     Each player's "PBP Compensation" shall be calculated by adding his full regular season Paragraph 5 Salary, prorated signing bonus for the current League Year (plus any signing bonus acceleration (without regard to the June 1 rule) due to his having been released during the applicable League Year, unless the player is re-signed by his old Club without having missed a week of the regular season), earned incentives, and other compensation for the current League Year, subject to the following provisions:

(i)     For all players other than those who receive the Minimum Salary Benefit, the full regular season Paragraph 5 Salary shall be used;

(ii)     For players who were released and later resigned by the same Club during the regular season, the Paragraph 5 Salary from the player's initial contract shall be used for the period ending with the player's release, and the Paragraph 5 Salary from the player's subsequent contract shall be used for the period from release through the term of the subsequent contract;

(iii)     For players who receive the Minimum Salary Benefit, the Paragraph 5 Minimum Salary amount for a player with two Credited Seasons, rather than the stated Paragraph 5 Salary, shall be used to calculate the player's PBP Compensation;

(iv)     If a Player Contract is renegotiated after the Monday of the tenth week of the regular season to include an unearned incentive for the current League Year that is

treated as signing bonus, such incentive shall not be counted in the calculation of the PBP Compensation; and

    (v)    If a portion of the player's Paragraph 5 Salary is treated as signing bonus, the full Paragraph 5 Salary (rather than the current year's proration) will be counted; all other amounts treated as signing bonus will be included on a prorated basis except for unearned incentives, as described in Subsection (iv) above.

    (c)    Each player's "PBP Index" shall be calculated by dividing the player's Playtime Percentage by his PBP Compensation;

    (d)    Each player shall receive an allocation from the fund determined by (i) dividing his PBP Index by the sum of the PBP Indices for each player on the Club and then (ii) multiplying that percentage by the Club's total PBP allocation.

    (e)    For PBP purposes, a play is counted towards playtime percentage if the play runs to completion, regardless if the play was nullified by a penalty (e.g., a play that is blown dead by a penalty, due to a false start or encroachment penalties, etc. do not count in this calculation). A play is defined by the personnel on the field. A fake punt or field goal is considered a Special Teams play, and a 2-point conversion attempt is considered an offensive/defensive play.

*Section 6.* **Corrections:** If, after the fund has been distributed to players for any given League Year, a player demonstrates that his payment was miscalculated and should have been greater, he shall promptly be paid the additional Performance-Based Pay to which he is entitled, and said amount shall be deducted from the Club's actual PBP allocation for the following League Year. In the Final League Year, any such amount shall be taken from any unused Benefit money or credited toward future Performance-Based Pay.

# ARTICLE 29
# WAIVERS

*Section 1.* **Release:**

(a)   Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

(b)   Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

*Section 2.* **Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

*Section 3.* **Ineligibility:** Any NFL player who is declared ineligible to compete in a preseason, regular season or postseason game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and Bylaws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

*Section 4.* **Notice of Termination:** The Notice of Termination form attached hereto as Appendix H will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice of Termination will be sent to him by certified mail at his last address on file with the Club.

*Section 5.* **NFLPA's Right to Personnel Information:** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice be-

155

tween the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

*Section 6.* **Rosters:** The NFL shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

*Section 7.* **Procedural Recall Waivers:** A player with four or more Credited Seasons who is subject to procedural recall waivers from the Reserved/Retired or Reserve/Military status, and who opts for Free Agency in lieu of assignment, cannot, during the same season, re-sign or return to the Club that originally requested such waivers.

## ARTICLE 30
## TERMINATION PAY

*Section 1.* Eligibility:

(a)     Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for Termination Pay under this Article if:

(1)     He is released after his Club's first regular season game; and

(2)     He has made the Active/Inactive List of his Club on or after the date of his Club's first regular season game.

(b)     Subject to Section 3 below, the amount of Termination Pay payable to such player shall be the unpaid balance of his Paragraph 5 Salary for that League Year. Termination Pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to Termination Pay more than once during his playing career in the NFL.

*Section 2.* **Regular Season Signings:** The Termination Pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the greater of: (i) the unpaid balance of the initial 25% of such player's Paragraph 5 Salary, or (ii) one week's salary up to a maximum of the Active/Inactive List Paragraph 5 Salary of a player with ten or more Credited Seasons as specified in Article 26, Section 1, notwithstanding the actual number of Credited Seasons the player has earned. For purposes of this 25% calculation only, the term "Paragraph 5 Salary" shall be defined as the proportionate remaining balance to be paid at the time such player is signed by the Club. (For example and without limitation, if a player is signed after the second week of the 2011 regular season to a Contract with a Paragraph 5 Salary of $850,000, his Paragraph 5 Salary for purposes of the 25% calculation shall be $750,000 or 15/17ths of $850,000.)

*Section 3.* **Ineligibility For Termination Pay:**

(a)     An otherwise qualified player will not be entitled to Termination Pay under this Article if the Club can demonstrate that, after receipt of a written warning from his Club in the form attached hereto as Appendix I, the player failed to exhibit the level of good faith effort which can be reasonably expected from NFL players on that Club.

(b)     A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 Salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination, but the amount of Termination Pay for such player shall be the amount he would have received if his previous contract had not been terminated until such subsequent termination.

157

## ARTICLE 31
## ADDITIONAL REGULAR SEASON GAMES

The League and/or Clubs may increase the number of regular season games per Team above the standard of sixteen (16) only with NFLPA approval, which may be withheld at the NFLPA's sole discretion.

# ARTICLE 32
# EXPANSION

**Section 1. Veteran Allocation:** The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of Veteran players, up to an average of three per Club, excluding any player who has a no trade clause in his Player Contract. The methodology employed pursuant to the letter dated December 18, 2001, regarding the Houston Texans Veteran Player Allocation Draft shall apply unless the parties agree otherwise.

**Section 2. Additional Compensatory Picks:** The Clubs may decide the selection position for expansion teams in the Draft, and may allocate to each expansion Club additional special Draft selections in the Drafts held prior to each of the first three seasons in which the expansion Clubs will participate in regular League play, up to a maximum of one additional such special Draft selection for each expansion Club in each round of the Draft in each such year.

**Section 3. Rookie Compensation Pool Adjustment:** The provisions of Article 7, Section 5(c) shall apply to adjust the Rookie Compensation Pool in the event of expansion.

**Section 4. Relocation Bonus:** Any Veteran player selected in any expansion allocation during the 2011–13 League Years will receive a bonus of $50,000 upon reporting to the expansion Club for preseason training camp, and an additional bonus of $75,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article 12 or 13. The bonus amount described in this Section shall increase to $60,000 and $85,000, respectively, for any expansion allocation in the 2014–17 League Years, and to $75,000 and $100,000, respectively, for any expansion allocation in the 2018–20 League Years.

## ARTICLE 33
## PRACTICE SQUADS

*Section 1.* **Practice Squads:**

(a) The League may elect in any League Year in accordance with this Article to establish Practice Squads not to exceed eight (8) players per Club. The League's election in any one season shall not determine or affect its election in any subsequent season.

(b) The League may elect to allow some or all Clubs to add to their Practice Squads one additional player, who shall not count against the limit above, whose citizenship and principal place of residence are outside the United States and its Territories ("International Player"). The League's election in any one season shall not determine or affect its election in any subsequent season. Such International Players shall be subject to the same terms and conditions of employment that apply to other Practice Squad players except that they (1) may not, during the term of their Practice Squad Contract, negotiate or sign an NFL Player Contract with any Club; and (2) may not practice with any Club following the last Conference Championship Game unless both Conference Championship teams have such a player. In addition, notwithstanding the provisions of Section 4 below, such International Player shall be eligible to serve on a Practice Squad for three additional seasons after the completion of the player's year(s) as an International Player. As set forth in Section 3 below, the weekly salary for such International Players shall not be included in the employing Club's Team Salary and shall instead be deducted from the calculation of the Salary Cap in the same manner as any Player Benefit Cost.

(c) The Practice Squad Player Contract form attached hereto as Appendix J will be used for all Practice Squad player signings. This form cannot be amended without the approval of the Management Council and the NFLPA. Notwithstanding the foregoing, changes may be agreed to between a Club and a Practice Squad player consistent with the provisions of this Agreement.

*Section 2.* **Signing With Other Clubs:**

(a) Any player under contract to a Club as a Practice Squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a Practice Squad player while under contract as a Practice Squad player.

(b) Notwithstanding Subsection (a) above, a Practice Squad player may not sign an NFL Player Contract with his Club's next opponent later than 4:00pm, New York time, on the sixth day preceding the game (except in bye weeks, when the prohibition commences on the tenth day preceding the game). When the current employer club has a bye the weekend before the game against the Club signing the Practice Squad player to an NFL Player Contract, such contract must be executed prior to 4:00pm, New York time, on the 10th day preceding the game.

160

*Section 3.* **Salary:** Minimum salary for a Practice Squad player shall be the following per week, including postseason weeks in which his Club is in the playoffs:

| 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------|------|------|------|------|------|------|------|------|------|
| $5700 | $5700 | $6000 | $6300 | $6600 | $6900 | $7200 | $7600 | $8000 | $8400 |

*Section 4.* **Eligibility:**

(a)     The Practice Squad shall consist of the following players, provided that they have not served more than two previous seasons on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine regular season games during their only Accrued Season(s). An otherwise eligible player may be a Practice Squad player for a third season only if the Club by which he is employed that season has at least 53 players on its Active/Inactive List during the entire period of his employment.

(b)     A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and been a member of the club's Practice Squad for at least three regular season or postseason games during his first two Practice Squad seasons, and for at least one regular season or postseason game during his third Practice Squad season. (For purposes of this Section, a bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question.)

*Section 5.* **Active List:** If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three games (a bye week counts as a game) even if he is terminated, traded, or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the eight-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another Club's 53-player roster or Practice Squad, any Salary (as that term is defined in Article 13, Section 4 that he receives from any NFL club applicable to the three-game period shall be an offset against the three weeks' Salary that he is entitled to receive from Club B. If the promotion occurs with fewer than three games remaining in the Club's regular season, the three game requirement for roster count shall not carry over into the next season.

*Section 6.* **Contagious Disease Addendum:**

(a)     All Practice Squad players will execute an addendum to the Practice Player Contract relating to the Contagious Disease Policy (as set forth in Appendix J).

161

(b)      If a player is elevated from Practice Squad to the 53-player Active/Inactive List for a game because a club was given roster exemptions due to confirmed or suspected cases of a contagious disease among its players, then the terms of the addendum in that Player's Practice Player Contract will be in effect. A Practice Squad player who is elevated to the 53-player Active/Inactive List under these circumstances will not be required to sign an NFL Player Contract for that game.

(c)      Any player who is elevated from the Practice Squad to the affected club's 53-player Active/Inactive List for the game will be paid 1/17th of the Paragraph 5 minimum salary for Active/Inactive List players with the same number of credited seasons. Any games for which a player is elevated in this manner to the 53-player Active/Inactive List would count for purposes of earning a Credited Season for both minimum salary and pension credit and an Accrued Season for purposes of free agency, even though player is playing under the aforementioned addendum to his Practice Player Contract.

(d)      At the conclusion of the club's game, any player who was elevated from the Practice Squad to the affected club's 53-player Active/Inactive List for the game will automatically revert to the club's Practice Squad roster without going through waivers.

(e)      In the event a Practice Squad player: (1) sustains a football-related injury (either in a practice prior to the game or in the game itself) after being elevated to the 53-player Active/Inactive List under the circumstances described in Subsection (b) above, and (2) is physically unable to practice or play for the Club due to the injury, then the player's weekly compensation specified in Paragraph 4 of the Practice Squad Player Contract will be adjusted to 1/17th of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of Credited Seasons. Such a player shall receive this weekly "salary continuation" for so long as he remains physically unable to perform the services required of him because of such injury. Once the Practice Squad player is physically able to perform the services required of him by his Practice Squad Player Contract, then his salary will be adjusted to the amount set forth in Paragraph 4 ("Compensation") of that contract for the period of time he remains on the club's Practice Squad.

(f)      If a Practice Squad player sustains a football-related injury during the game in which he was elevated (or during a practice after being elevated but prior to the game) and is subsequently placed on Reserve/Injured, then he will be paid (for so long as he remains physically unable to perform the services required of him because of such injury) the prorated portion of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of Credited Seasons. A Practice Squad player, who is placed on Reserve/Injured under these circumstances, must be signed by his Club to an NFL Player Contract at the time he is placed on that reserve list category.

(g)      If a player receives salary under the circumstances set forth in Subsections (e) or (f) above, then those games shall count toward a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

(h)      If a Club chooses to add the Practice Squad player to its 53-player Active/Inactive List following the game in which exemptions were granted and the player was elevated, then the Club must follow all of the established procedures for signing a

162

Practice Squad player to an NFL Player Contract (including making room for that player on club's 53-player Active/Inactive List).

(j)        Use of these procedures by any Club in any week of the regular or post-season shall be in the sole discretion of the Club subject only to prior approval of the Commissioner and after a showing of confirmed or suspected contagious disease among its players. The NFLPA and its Medical Director shall be informed when such procedures are invoked.

ARTICLE 34
MEAL ALLOWANCE

*Section 1.* **Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the preseason, regular season and postseason as follows:

|           | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|-----------|------|------|------|------|------|------|------|------|------|------|
| Breakfast | $19  | $19  | $22  | $22  | $25  | $25  | $28  | $28  | $31  | $31  |
| Lunch     | $29  | $29  | $32  | $32  | $35  | $35  | $38  | $38  | $41  | $41  |
| Dinner    | $47  | $47  | $50  | $50  | $53  | $53  | $56  | $56  | $59  | $59  |

For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

*Section 2.* **Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00pm on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00am, players will receive breakfast money.

164

# ARTICLE 35
# DAYS OFF

**Section 1. Preseason:** Commencing with the mandatory reporting date for veteran players to an individual Club's preseason training camp, as determined in accordance with Article 23, Section 5 of this Agreement, and continuing until the last weekend of preseason games played by NFL Clubs during the League Year in question, all players will be permitted at least one day-off every seven days, except for clubs that have a game scheduled on the fifth day (or sooner) following their immediately prior game. In no event shall players have less than five days off during the period between the mandatory reporting date for veteran players to an individual Club's preseason training camp and the last weekend of preseason games played by NFL Clubs during the League Year in question. During any preseason day-off players may not be given a curfew at the end of the 24-hour period any sooner than 10:30pm.

**Section 2. Regular Season and Postseason:** Commencing with the first regular season game and continuing until the last regular season or postseason game played by the respective Club, all players will be permitted days off at least at the rate of four days per month (not counting days off during a bye week) as determined by the Club.

**Section 3. Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

**Section 4. Regular Season Bye Weeks:** During any regular season bye week, all players will be permitted days off in accordance with Article 24, Section 2 of this Agreement.

## ARTICLE 36
## MOVING AND TRAVEL EXPENSES

**Section 1.** Qualification: A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)     Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)     Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2.** Moving Expenses: As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3.** Travel Expenses: Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent or mortgage payments for living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to make such rent or mortgage payments and the total of such payments shall not exceed $6350 for the 2011–12 League Years, $6650 for the 2013–14 League Years, $6950 for the 2015–16 League Years, $7250 for the 2017–18 League Years, and $7550 for the 2019–20 League Years; and (c) the room cost of seven days' stay at a hotel of the Club's choice in the new team city for the player.

166

***Section 4.*** **Transportation:** Each player who is traded or claimed during the preseason or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the preseason or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

# ARTICLE 37
# POSTSEASON PAY

**Section 1. System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

**Section 2. Compensation:** A player who qualifies will receive the following amount for each postseason game played:

| (in $000's) | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Wild Card** | | | | | | | | | | |
| (Div. Winner) | $22 | $22 | $23 | $24 | $25 | $27 | $28 | $29 | $31 | $33 |
| (Other) | $20 | $20 | $21 | $22 | $23 | $24 | $26 | $27 | $28 | $30 |
| **Div. Playoff** | $22 | $22 | $23 | $24 | $25 | $27 | $28 | $29 | $31 | $33 |
| **Conf. Champ.** | $40 | $40 | $42 | $44 | $46 | $49 | $51 | $54 | $56 | $59 |
| **Super Bowl** | | | | | | | | | | |
| (Winning Team) | $88 | $88 | $92 | $97 | $102 | $107 | $112 | $118 | $124 | $130 |
| (Losing Team) | $44 | $44 | $46 | $49 | $51 | $53 | $56 | $59 | $62 | $65 |

**Section 3. Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

**Section 4. Conference Championship; Super Bowl Game:**

(a)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)     A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight or more games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)     A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three and not more than seven games (i.e., regular and postseason) will receive one-half the amount designated in Section 2 for such game,

168

provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)     A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)     If a first-year player is injured during the regular season and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive one-half (½) the amount designated in Section 2 above for such game, provided that he is still under contract to the Club at the time of the game and had signed an NFL Player Contract or Practice Squad Contract during a prior League Year.

(g)     If a veteran player who completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan was earned is injured during the preseason and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive the full amount designated in Section 2 for such game provided that he is still under contract to the Club at the time of the game.

(h)     If a veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned is injured during the preseason and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive one-half (½) the amount designated in Section 2 for such game provided that he is still under contract to the Club at the time of the game.

(i)     If a first-year player is injured during the preseason and, as a result, is removed from the Active List or Inactive List of a Club participating in the game in question, he will receive one-quarter (¼) of the amount designated in Section 2 above for such game provided that he is still under contract to the Club at the time of the game and; (A) he was on that Club's Practice Squad for eight or more games in a prior League Year; or (B) he received at least one, but fewer than three, regular season game checks while on that Club's Active or Inactive or Reserve Injured list during a prior League Year.

(j)     The definitions of "veteran player" and "first-year player" set forth in Article 23, Section 1 shall apply to Subsections (e)–(i) above. A player who has not signed an NFL Player Contract or NFL Practice Squad Contract during a previous NFL season is not entitled to postseason pay under Subsections (e)–(i) above.

*Section 5.* **Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

# ARTICLE 38
# PRO BOWL GAME

**Section 1.** Compensation: Players on the teams in any AFC-NFC Pro Bowl game will receive the following amounts:

| (in $000's) | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| (Winning Tm) | $50 | $50 | $53 | $55 | $58 | $61 | $64 | $67 | $70 | $74 |
| (Losing Tm) | $25 | $25 | $26 | $28 | $29 | $30 | $32 | $34 | $35 | $37 |

**Section 2.** Selection: Players will be selected for any Pro Bowl game on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally (33.33% each). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The NFLPA player representative or his alternate will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3.** Wives: Airplane, hotel and meal allowances will be provided for players' wives who attend any Pro Bowl game.

**Section 4.** Injury: In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5.** Payment: Players will be paid for any Pro Bowl game within fifteen (15) days after the game is played.

**Section 6.** Applicability: The NFL shall, in its sole discretion, determine the time and location of any Pro Bowl game, provided that the NFL will consult with the NFLPA prior to making any such determination. If players competing in the Super Bowl cannot feasibly participate in the Pro Bowl because of the timing or location of the Pro Bowl game, they shall nevertheless be compensated in accordance with the letter agreement under the Prior Agreement dated January 28, 2011. In any League Year, the NFL may elect, in its sole discretion, not to hold a Pro Bowl game or to replace the Pro Bowl game with another event that recognizes the accomplishments of outstanding NFL players, provided that the NFL will consult with the NFLPA prior to making its determination, and that players are nonetheless selected for such recognition in accordance with Section 2 above, and paid the Pro Bowl incentive bonus, if any, in their Player Contract, for such selection.

170

# ARTICLE 39
# PLAYERS' RIGHTS TO MEDICAL CARE AND TREATMENT

*Section 1.* **Club Physician:**

(a)     **Medical Credentials.** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians, and all other physicians retained by a club to treat players shall be board-certified in their field of medical expertise. Each Club will also have at least one board-certified internist, family medicine, or emergency medicine physician (non-operative sports medicine specialist). Any Club medical physician (internist, family medicine or emergency medicine) hired after the effective date of this Agreement must also have a Certification of Added Qualification (CAQ) in Sports Medicine; any head team physician (orthopedic or medical) hired after the effective date of this Agreement must have a CAQ in Sports Medicine; and any current team physician promoted to head team physician after the effective date of this Agreement has until February 2013 to obtain a CAQ in Sports Medicine or relinquish the position.

(b)     **Team Consultants.** All Clubs shall have the consultants with the following certifications:

(i)     Neurological (head trauma): Board certification in neurosurgery, neurology, sports medicine, emergency medicine, or psychiatry, with extensive experience in mild and moderate brain trauma;

(ii)    Cardiovascular: Board certified in cardiovascular disease;

(iii)   Nutrition (athletes): licensed;

(iv)    Neuropsychologist: Ph.D and certified/licensed.

(c)     **Doctor/Patient Relationship.** The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs, but each Club physician's primary duty in providing player medical care shall be not to the Club but instead to the player-patient. This duty shall include traditional physician/patient confidentiality requirements. In addition, all Club physicians and medical personnel shall comply with all federal, state, and local requirements, including all ethical rules and standards established by any applicable government and/or other authority that regulates or governs the medical profession in the Club's city. All Club physicians are required to disclose to a player any and all information about the player's physical condition that the physician may from time to time provide to a coach or other Club representative, whether or not such information affects the player's performance or health. If a Club physician advises a coach or other Club representative of a player's serious injury or career threatening physical condition which significantly affects the player's performance or health, the physician will also advise the player in writing. The player, after being advised of such serious injury or career-threatening physical condition, may request a copy of the Club physician's record from the examination in which such physical condition was diagnosed and/or a written explanation from the Club physician of the physical condition.

(d)     **NFLPA Medical Director.** The NFL recognizes that the NFLPA Medical Director has a critical role in advising the NFLPA on health and safety issues. Accordingly, the NFL agrees that the NFLPA Medical Director shall be a voting member of all NFL health and safety committees, including but not limited to the NFL Injury & Safety Panel and its subcommittees and shall have access to all of the same data,

171

records and other information provided to the NFL Medical Advisor and/or any other members of such committees.

(e)      Home Game **Medical Coverage**-Neutral **Physician:** All home teams shall retain at least one RSI physician who is board certified in emergency medicine, anesthesia, pulmonary medicine, or thoracic surgery, and who has documented competence in RSI intubations in the past twelve months. This physician shall be the neutral physician dedicated to game-day medical intervention for on-field or locker room catastrophic emergencies.

*Section 2.* **Club Athletic Trainers:** All athletic trainers employed or retained by Clubs to provide services to players, including any part time athletic trainers, must be certified by the National Athletic Trainers Association and must have a degree from an accredited four-year college or university. Each Club must have at least two full-time athletic trainers. All part-time athletic trainers must work under the direct supervision of a certified athletic trainer. In addition, each Club shall be required to have at least one full time physical therapist who is certified as a specialist in physical therapy to assist players in the care and rehabilitation of their injuries.

*Section 3.* Accountability and Care Committee:

(a)      The parties agree to establish an Accountability and Care Committee, which will provide advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players by all clubs during the term of this Agreement. The Committee shall consist of the NFL Commissioner and the NFLPA Executive Director (or their designees). In addition, the Commissioner and Executive Director shall each appoint three additional members of the Committee, who shall be knowledgeable and experienced in fields relevant to health care for professional athletes.

(b)      The Committee shall meet in person or by conference call at least three times per year, or at such other times as the Commissioner and Executive Director may determine.

(c)      The Committee shall: (i) encourage and support programs to ensure outstanding professional training for team medical staffs, including by recommending credentialing standards and continuing education programs for Team medical personnel; sponsoring educational programs from time to time; advising on the content of scientific and other meetings sponsored by the NFL Physicians Society, the Professional Football Athletic Trainers Association, and other relevant professional institutions; and supporting other professional development programs; (ii) develop a standardized preseason and postseason physical examination and educational protocol to inform players of the primary risks associated with playing professional football and the role of the player and the team medical staff in preventing and treating illness and injury in professional athletes; (iii) conduct research into prevention and treatment of illness and injury commonly experienced by professional athletes, including patient care outcomes from different treatment methods; (iv) conduct a confidential player survey at least once every two years to solicit the players' input and opinion regarding the adequacy of medical care provided by their respective medical and training staffs and commission independent analyses of the results of such surveys; (v) assist in the development and maintenance of injury sur-

veillance and medical records systems; and (vi) undertake such other duties as the Commissioner and Executive Director may assign to the Committee.

(d)    If any player submits a complaint to the Committee regarding Club medical care, the complaint shall be referred to the League and the player's Club, which together shall determine an appropriate response or corrective action if found to be reasonable. The Committee shall be informed of any response or corrective action. Nothing in this Article, or any other Article in this Agreement, shall be deemed to impose or create any duty or obligation upon either the League or NFLPA regarding diagnosis, medical care and/or treatment of any player.

(e)    Each Club shall use its best efforts to ensure that its players are provided with medical care consistent with professional standards for the industry.

*Section 4.* **Player's Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the Club's responsibility for the costs of medical services rendered by the physician furnishing the second opinion, such physician must be board-certified in his field of medical expertise; in addition, (a) the player must consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician. A player shall have the right to follow the reasonable medical advice given to him by his second opinion physician with respect to diagnosis of injury, surgical and treatment decisions, and rehabilitation and treatment protocol, but only after consulting with the club physician and giving due consideration to his recommendations.

*Section 5.* **Player's Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation regarding the need for, the timing of and who should perform the surgery; (b) the player will give due consideration to the Club physician's recommendations; and (c) the surgeon selected by the player shall be board-certified in his field of medical expertise. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

*Section 6.* **Standard Minimum Preseason Physical:** Each player will undergo the standardized minimum preseason physical examination and tests outlined in Appendix K, which will be conducted by the Club physician(s) as scheduled by the Club. No Club may conduct its own individual testing for anabolic steroids and related substances or drugs of abuse or alcohol.

*Section 7.* **Substance Abuse:**

(a)    **General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the

173

parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)     **Policies.** The parties confirm that the Program on Anabolic Steroids and Related Substances will include both annual blood testing and random blood testing for human growth hormone, with discipline for positive tests at the same level as for steroids. Over the next several weeks, the parties will discuss and develop the specific arrangements relating to the safe and secure collection of samples, transportation and testing of samples, the scope of review of the medical science, and the arbitrator review policy, with the goal of beginning testing by the first week of the 2011 regular season. Pending agreement by both parties regarding the implementation of this program of blood testing, and such other policy amendments as the parties may agree upon, the Policy and Program on Substances of Abuse and the Policy on Anabolic Steroids and Related Substances, will remain in full force and effect as each existed during the 2010 season.

174

# ARTICLE 40
## ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file attorney-client privileged material, subjective coaching and scouting reports, or any other subjective material. This Section 1 shall not affect the player's rights under any grievance procedure.

*Section 2.* **Medical Records:**

    (a)    A player may examine his medical and trainers' records in the possession of the Club or Club physician two times each year, once during the preseason and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records without charge upon request during the offseason. A player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to such player's personal physician. Upon request by the player or player's personal physician as described in this Subsection, such records shall be provided as soon as possible, and in no event later than seven (7) business days from the receipt of the request.

    (b)    To the extent that a player's medical or trainer records contain information that is subject to the Health Insurance Portability and Accountability Act of 1996 (as amended and as implemented through regulations) or other applicable laws, nothing in this Section shall be construed to restrict a player's right to access his information under such laws.

*Section 3.* **Electronic Medical Record System:** The NFL shall develop and implement an online, 24-hour electronic medical record system within 24 months of the effective date of this Agreement or such longer period as the parties may agree. Fifty percent (50%) of the costs of developing and implementing such system shall be a Player Benefit Cost. Once implemented and operational, the cost of maintaining the system thereafter shall not be counted as a Player Benefit Cost.

ARTICLE 41
WORKERS' COMPENSATION

The parties shall continue to discuss in good faith appropriate reforms and revisions to the provisions of this Agreement and the Player Contract related to workers' compensation issues. Absent such agreement, the following terms shall apply:

*Section 1.* **Benefits:** In any state where workers' compensation coverage is not compulsory or where a Club is excluded from a state's workers' compensation coverage, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its players. In the event that a player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

*Section 2.* **Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its Players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its Players in the same manner provided in Section 1 above.

*Section 3.* **Arbitration:** In any state where a Club (e.g., Miami Dolphins/Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a player may be entitled under this Article will be determined under the grievance procedure of Article 43 or, where applicable, a separate method of alternative dispute resolution negotiated by the parties (e.g., Miami Dolphins/ Implementation Agreement).

*Section 4.* **Workers' Compensation Offset Provisions:** The parties agree that the following provisions shall exclusively govern any and all rights Clubs have with respect to workers' compensation credits or offsets during the term of this Agreement.
    (i)    **"Dollar-for-Dollar" Credits or Offsets.** No Club shall be entitled to claim or receive any dollar-for-dollar credit or offset, other than as provided for in Article 3 of this Agreement, for salary, benefits, or other compensation paid or payable to a player against any award or settlement of workers' compensation benefits, either pursuant to Paragraph 10 of the NFL Player Contract or any provision of state law.
    (ii)    **"Time" Credits or Offsets.** All Clubs are instead entitled only to a "time" credit or offset under Paragraph 10 of the NFL Player Contract or state law, as set forth more specifically in Subsections (A)–(E) below. This "time" credit or offset shall in all cases be expressed or granted as a reduction in the number of weeks of a player's workers' compensation award or settlement that is attributable to the same period of weeks in which the player is deemed entitled to salary payments described in this Section. The credit or offset shall be at the weekly rate specified under the state workers' compensation law in question. Because the period from the beginning of the regular

176

season to the end of the League Year (25 weeks) is approximately 1.5 times longer than the seventeen week period over which players receive salary, the parties agree that, in calculating the "time" credit or offset as set forth more particularly herein, the Club is entitled to a reduction of 1.5 weeks of a player's workers' compensation award or settlement for each week during the regular season for which a player is awarded or executes a settlement agreement for workers' compensation benefits and for the same period of weeks is paid his full Paragraph 5 Salary.

(A)     In the case of salary payments pursuant to Paragraph 5 or 9 of the NFL Player Contract, the Club shall be entitled to a reduction of 1.5 weeks of a player's workers' compensation award or settlement for each week during the regular season in which the player is physically unable to perform his services under his contract due to an injury he suffers while performing services during that contract year, to a maximum of 25 weeks, provided that the player receives his full salary as set forth in Paragraph 5 of his contract for the period in question. For example, if a player receives 3 weeks of Paragraph 5 Salary subsequent to an injury that rendered him unable to perform for three games (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 4.5 (= 3 × 1.5) weeks of the player's workers' compensation award or settlement. As another example, if a player receives 17 weeks of Paragraph 5 Salary subsequent to an injury that rendered him unable to perform all 16 games of the regular season (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 (= 17 × 1.5) weeks of the player's workers' compensation award or settlement.

(B)     In the event that an Injury Grievance, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, is settled between the player and the Club, or in the event that a Club and player execute an injury-related settlement agreement, the Club shall be entitled to a reduction of 1.5 weeks of a player's workers' compensation award or settlement for each week that the player is deemed entitled to receive his full Paragraph 5 Salary pursuant to the settlement, to a maximum of 25 weeks. The Club and player shall be required to specify in the written settlement agreement the number of weeks for which the player is receiving his full Paragraph 5 Salary under the settlement so that the appropriate number of weeks of the player's workers' compensation award or settlement can be reduced. For example, if a player and a Club settle an Injury Grievance or injury guarantee claim for a specified period of 3 weeks, the Club will be entitled to a reduction of 4.5 (= 3 × 1.5) weeks of the player's workers' compensation award or settlement.

(C)     In the event that an arbitrator awards Paragraph 5 Salary in an Injury Grievance, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, for the same period of weeks for which a player has already been awarded workers' compensation benefits or received a workers' compensation settlement, the Club shall be entitled to a reduction of 1.5 weeks of the player's workers' compensation award or settlement for each week the player is deemed entitled to receive his full Paragraph 5 Salary pursuant to the arbitrator's award. For example, if an arbitrator awards a player 3 weeks of Paragraph 5 Salary pursuant to an Injury Grievance award and the player has already been awarded workers' compensation benefits or received a workers' compensation settlement for that

same period, the arbitrator shall reduce the award by an amount equal to $4.5 (= 3 \times 1.5)$ weeks of workers' compensation benefits.

(D)     Clubs are not entitled to any credit or offset under this Article against any workers' compensation benefits attributable to the period of time after the last League Year for which the player is entitled to receive salary payments from the Club, even if the player's entitlement to such payments is not determined until after the League Year in question. No payment of any of the following may be used by a Club as a basis for claiming any workers' compensation credit or offset under this Article:

(1)     signing bonus;

(2)     option bonus;

(3)     roster bonus;

(4)     incentive bonus;

(5)     Performance-based pay earned prior to the date of injury (unless, for any period of time in which a Club would otherwise be entitled to a credit or offset pursuant to this Section, the player's weekly salary would be less than the amount of weekly workers' compensation benefits payable under state law, in which case the performance-based pay could be added by the Club to the player's Paragraph 5 Salary for those weeks in which the Club would be entitled to a credit or offset under this Section);

(6)     Deferred compensation (except where the deferred compensation is salary attributable to the weeks for which the player has been awarded or has executed a settlement agreement for workers' compensation benefits as described in this Section in which case the Club is permitted a credit or offset in the same manner as if the salary was not deferred and instead was paid during the League Year in which the player was physically unable to perform his services under his NFL Player Contract due to an injury he suffered while performing services during that contract year);

(7)     Severance pay; or

(8)     Any other form of compensation other than Paragraph 5 Salary under the NFL Player Contract.

Nothing in this Subsection shall limit or otherwise restrict the Club's ability to claim or receive the dollar-for-dollar credit or offset for an Injury Protection benefit or Extended Injury Protection benefit provided for in Article 3 of this Agreement.

(E)     Total and Permanent, Line of Duty and Degenerative Disability Benefits paid pursuant to the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents are not subject to any credit or offset for workers' compensation benefits, whether or not those benefits are payable during the same period in which the disability payments are payable. Clubs are not entitled to any credit or offset under this Article for any workers' compensation benefits payable to any player against any payments made to any player under the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents; provided, however, that the receipt of such disability payments by the player shall not affect the Club's right to claim or receive any offsets or credits set forth elsewhere in this Article.

(iii)     **Remedies.** If, despite the terms of this Article, a state court or other competent authority nevertheless renders a decision or other determination with an outcome inconsistent with the terms of this Section 4, then the player shall have a right to immediate payment from the Club for the amount of any difference between such

outcome and the outcome specified in Subsections (i)–(ii) above. A player may initiate a claim under this Section by filing a written notice by certified mail, fax, or electronically via .pdf with the Management Council and furnishing a copy to the Club involved. The claim shall set forth the name of the matter and jurisdiction in which the improper award was made, the amount of payment requested and the basis for the calculation. The claim must be initiated within 45 days of either the date of execution of this Agreement or the date of any adverse order (whichever is later); provided, however, that in the event the player files an appeal of any adverse order, the time for the player to notify the Club will begin to run from the date the appeal is decided.

(iv)   **Time-Offset Fund.** The NFL shall establish a fund which shall bear the cost of additional benefits or associated insurance and related costs (exclusive of professional fees, administrative overhead, penalties or similar costs) incurred by any Club that is unable to obtain a dollar-for-dollar credit or offset for salary, benefits, or other compensation paid or payable to a player against any award or settlement of workers' compensation benefits as a direct result of this Section 4 and/or NFL Arbitration precedent interpreting Paragraph 10 of the NFL Player Contract. For the avoidance of any doubt, the Clubs that were eligible to receive reimbursement under the Prior Agreement shall remain eligible under this Agreement. The parties shall use their best efforts to ensure that all parties involved including the Clubs and their insurance carriers will implement this Subsection (iv) in such a manner as to minimize the costs and expenses associated with this fund.

(v)   **Disputes.** Any dispute concerning the operation of Section 4 and/or any payments to a player under Subsection (iii) will be determined under the grievance procedure of Article 43.

*Section 5.* **Carve-Out:** The parties shall immediately establish a joint committee that will make good faith efforts to negotiate a possible California Workers' compensation alternative dispute resolution program on a trial basis (i.e., carve out).

*Section 6.* **Reservation of Rights:** The parties shall retain the positions they held prior to this Agreement with respect to all existing litigation and arbitration involving workers' compensation issues, including without limitation, the federal and state court cases in California (Titans), Illinois (Bears) and New York (Mawae, Harvey) regarding offset issues or choice of law and forum provisions contained in NFL Player Contracts, and nothing in this Article shall affect positions taken in any such pending litigation.

179

ARTICLE 42
CLUB DISCIPLINE

*Section 1.* **Maximum Discipline:**

(a)     **2011 League Year.** For the 2011 League Year, the following maximum discipline schedule will be applicable:

(i)     Overweight—maximum fine of $470 per lb., which fine may be assessed no more than twice per week, with each week beginning on Monday and ending on Sunday, and with each fine at least three days apart (e.g., Monday–Thursday, Tuesday–Friday, etc.).

(ii)     Unexcused late reporting for mandatory off-season minicamp, meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, scheduled promotional activity, scheduled workout, weigh-in, or meal—maximum fine of $1,770.

(iii)     Failure to promptly report injury to Club physician or trainer—maximum fine of $1,770.

(iv)     Losing, damaging or altering Club-provided equipment—maximum fine of $1,770, and replacement cost, if any.

(v)     Throwing football into stands—maximum fine of $1,770.

(vi)     Unexcused late reporting for or absence from preseason training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article 9—fine of $30,000 per day. For this Subsection and Subsection (vii) below, pre-season training camp shall be defined as the period beginning with the first day of a Club's training camp through the final preseason roster reduction date.

(vii)     Unexcused late reporting for or absence from preseason training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article 9—fine of $30,000 per day, plus one week's Paragraph 5 Salary for each preseason game missed.

(viii)     Unexcused missed mandatory meeting, practice, curfew, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, scheduled promotional activity, scheduled workout, weigh-in, or meal—maximum fine of $9,440.

(ix)     Unexcused failure to report to or unexcused departure from mandatory offseason minicamp—maximum fine of $10,000 for the first missed day, which amount shall increase by $10,000 per day for each day of the player's absence or departure (e.g., a player who misses all three days of minicamp may be fined up to $60,000).

(x)     Material failure to follow rehabilitation program prescribed by Club physician or trainer—maximum fine of $9,440.

(xi)     Unexcused missed team transportation—maximum fine of $9,440 and transportation expense, if any.

(xii)     Loss of all or part of playbook, scouting report or game plan—maximum fine of $9,440.

(xiii)     Ejection from game—maximum fine of $25,000.

(xiv)     Any material curfew violation the night prior to the Club's game may be considered conduct detrimental to the Club.

180

(xv)     Conduct detrimental to Club—maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks. This maximum applies without limitation to any deactivation of a player in response to player conduct (other than a deactivation in response to a player's on-field playing ability), and any such deactivation, even with pay, shall be considered discipline subject to the limits set forth in this section. The Non-Injury Grievance Arbitrator's decision in *Terrell Owens* (Nov. 23, 2005) is thus expressly overruled as to any Club decision to deactivate a player in response to the player's conduct.

(b)     **Maximum Discipline in Other League Years.** The amounts set forth in Section 1(a) above and Section 7 below are for the 2011 League Year. The amounts for the 2012–2020 League Years shall be as set forth in Exhibit A to this Article.

## *Section 2.* Published Lists:

(a)     All Clubs must publish and make available to all players at the commencement of preseason training camp a complete list of the discipline that can be imposed for both designated offenses within the limits set by the maximum schedule referred to in Section 1 above and for other violations of reasonable Club rules. A Club may notify a player of a violation by providing written notice to the player at the Club or at any address where the Club reasonably expects the player to be located.

(b)     The Club will promptly notify the player of any discipline; notice of any Club fine under Subsection 1(a)(vi) or 1(a)(vii) and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

## *Section 3.* Uniformity:

(a)     Discipline will be imposed uniformly within a Club on all players for the same offense; however, if the Club's published list of discipline imposes fines for designated offenses that are less than the limits set by the maximum schedule set forth in Section 1 above, the Club may specify the events which create an escalation of the discipline, not to exceed such maximum limits, provided the formula for escalation is uniform in its application. Nothing in this Section 3 shall preclude any Club from imposing a fine and/or a suspension without pay for conduct detrimental to the Club, as set forth in Section 1(a) above, in any case in which the same player has committed repeated offenses in the same League Year, whether or not the fines imposed for the player's prior offenses were escalated as described in the immediately preceding sentence of this Section; provided, however, that the NFLPA expressly reserves the right to challenge the imposition of such discipline for conduct detrimental to the Club based upon the absence of just cause and/or any other allowable bases for opposing discipline.

(b)     Any disciplinary action imposed upon a player by the Commissioner pursuant to Article 46 will preclude or supersede disciplinary action by the Club for the same act or conduct.

## *Section 4.* Disputes: Any dispute involving Club discipline must be processed exclusively under Article 43.

## *Section 5.* Deduction:

(a) Any Club fine will be deducted at the rate of no more than $2,500 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. For the 2016–2020 League Years, the amount will increase from a rate of $2,500 to $3,500 from each pay period. Nothing in this Subsection (a) will apply to a suspension or for a fine under Subsection 1(a)(vi) or 1(a)(vii).

(b)     A fine under Subsection 1(a)(vi) or 1(a)(vii) may be deducted from any payments owed to a player under any NFL Player Contract with the Club, or from any salary, bonus installments, Performance-Based Pay, Postseason Pay, Severance Pay or Termination Pay otherwise owed by the Club. The assignment and/or termination of a player's contract after events triggering a fine under Subsection 1(a)(vi) or 1(a)(vii) shall not result in any waiver of the assigning or terminating Club's right to seek to recover the full amount of the fines.

**Section 6.** **NFL Drug and Steroid Policies:** No Club may impose any discipline against a player, including but not limited to terminating the player's Player Contract, as a result of that Player's violation of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or for failing any drug test, provided, however, that the fact that a player has violated the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program on Substances of Abuse, or has failed a drug test will not preclude the termination of his Player Contract if such termination is otherwise expressly permissible under this Agreement or the player's Player Contract.

**Section 7.** **Cumulative Fines:** Any player who commits multiple offenses on the same day (e.g., missed mandatory team meeting, late for practice and missed scheduled appointment with trainer) shall be subject to a separate fine for each such offense, within the limits set by the maximum schedule set forth in Section 1 above; provided, however, that the cumulative amount for all such fines on a given day during preseason training camp shall not exceed $20,000, and that the cumulative amount for all such fines on a given day during the regular season or postseason shall not exceed $27,000. The cumulative fine limits set forth in this Section shall not apply to any violation as to which a player may be fined one week's regular season salary or to conduct detrimental to the Club. Nothing in this Section shall preclude the Club from denying payment of the Player's weekly salary or from seeking reimbursement from the Player under any forfeiture provision in the Player's Contract if such denial of payment or forfeiture is otherwise permissible under both the Player's Contract and this Agreement. Nor shall anything in this Section preclude a Club from imposing a fine and/or suspension without pay for conduct detrimental to the Club, as set forth in Section 1(a) above, in any case in which the same player has committed repeated offenses in the same League Year, as described in Section 3 above; provided, however, that the NFLPA expressly reserves the right to challenge the imposition of such discipline for conduct detrimental to the Club based upon the absence of just cause and/or any other allowable bases for opposing discipline.

**Section 8.** **Offset of Preseason Fine Amounts:** In the event that a player under con-

tract is fined under Subsection 1(a)(vi) or 1(a)(vii) for unexcused late reporting for or absence from pre-season training camp and, as the result of such late reporting or absence, the Club also withholds payment, or claims reimbursement, under any forfeiture provision in a Player Contract executed prior to March 8, 2006, then there shall be an offset of the cumulative amount of such daily fines against the amount claimed by the Club under the forfeiture provision, or vice versa. In the 2011 League Year, the offset shall be $13,477 per day for each day the player has been fined, representing the difference between the Prior Agreement's fine for this category of offense ($16,523 per day) and this Agreement's fine for this category of offense ($30,000 per day, or $40,000 per day for the 2016–2020 League Years) effective on August 4, 2011. The amount of such offset shall be increased for the 2012 League Year and each League Year thereafter during the term of this Agreement at the rate of 5% per year. Other than as specifically set forth in this Section, there shall be no offset of fines imposed under this Agreement against claims made by a Club under any permissible forfeiture provision in a Player Contract.

*Section 9.* **Effective Date:** The maximum discipline rules set forth above apply to all discipline imposed on or after August 4, 2011.

**EXHIBIT A**
**MAXIMUM FINE AMOUNTS FOR 2012–2020 LEAGUE YEARS**

| Maximum Discipline for: | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Overweight / lbs per day | $495 | $520 | $545 | $575 | $600 | $630 | $665 | $695 | $730 |
| Unexcused late reporting for an activity that has been listed in Article 42, Section 1(a)(ii), e.g., missed meal | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Failure to promptly report injury | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Losing, damaging or altering Club-provided equipment | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Throwing football into stands | $1,855 | $1,950 | $2,050 | $2,150 | $2,260 | $2,370 | $2,490 | $2,615 | $2,745 |
| Unexcused late reporting for or absence from preseason training camp by a player under contract, except for those signed as an Unrestricted Free Agent pursuant to Article 9 (Veteran Free Agency); Maximum fine for each day of player's absence | $30,000 | $30,000 | $30,000 | $30,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |

184

| Maximum Discipline for: | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article 9 (Veteran Free Agency); Maximum fine for each day of player's absence, plus one week's regular season salary for each preseason game missed | | $30,000 | $30,000 | $30,000 | $30,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| Unexcused failure to report to or unexcused departure from mandatory off-season minicamp – maximum fine per day for each day thereafter of player's absence | 1st Day | $10,500 | $11,025 | $11,575 | $12,155 | $12,765 | $13,400 | $14,070 | $14,775 | $15,515 |
| | 2nd Day | $21,000 | $22,050 | $23,150 | $24,300 | $25,525 | $26,800 | $28,150 | $29,550 | $31,030 |
| | 3rd Day | $31,500 | $33,075 | $34,730 | $36,465 | $38,290 | $40,205 | $42,215 | $44,325 | $46,540 |
| Cumulative fine amounts for preseason training camp | | $21,000 | $22,050 | $23,150 | $24,310 | $25,525 | $26,800 | $28,140 | $29,550 | $31,025 |
| Cumulative fine amounts for regular season or postseason | | $28,350 | $29,770 | $31,255 | $32,820 | $34,460 | $36,185 | $37,990 | $39,890 | $41,885 |
| Material failure to follow rehabilitation program prescribed by Club physician | | $9,915 | $10,410 | $10,930 | $11,475 | $12,050 | $12,655 | $13,285 | $13,950 | $14,650 |
| Unexcused missed activity that has been listed in Article 42, Section 1(a)(viii), e.g., missed meal | | $9,915 | $10,410 | $10,930 | $11,475 | $12,050 | $12,655 | $13,285 | $13,950 | $14,650 |

185

| Maximum Discipline for: | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| Unexcused missed team transportation (transportation expenses not included) | $9,915 | $10,410 | $10,930 | $11,480 | $12,050 | $12,655 | $13,300 | $13,950 | $14,650 |
| Loss of all or part of playbook, scouting report or game plan | $9,915 | $10,410 | $10,930 | $11,475 | $12,050 | $12,655 | $13,285 | $13,950 | $14,650 |
| Ejection from game | $26,250 | $27,565 | $28,940 | $30,390 | $31,910 | $33,500 | $35,180 | $36,935 | $38,785 |

186

# ARTICLE 43
# NON-INJURY GRIEVANCE

***Section 1.* Definition:** Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, the Practice Squad Player Contract, or any applicable provision of the NFL Constitution and Bylaws or NFL Rules pertaining to the terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement.

***Section 2.* Initiation:** A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within fifty (50) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within fifty (50) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

***Section 3.* Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail, fax, or electronically via .pdf with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail, fax, or electronically via .pdf with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and answer to the NFLPA. The party to whom a Non-Injury Grievance has been presented will answer in writing by certified mail, fax, or electronically via .pdf within ten (10) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable. See also Section 14 below regarding electronic exchange of Standard Grievance Correspondence.

***Section 4.* Ordinary and Expedited Appeal:** If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken, and either the NFLPA or the Management Council as may be appropriate. If the grievance involves a suspension of a player by a Club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within

seven (7) days of the filing of the grievance. The NFLPA and the NFL will engage in good faith efforts to schedule grievances involving suspension of a player by a Club prior to the Club's next scheduled game. In addition, the NFLPA and the Management Council will each have the right of immediate appeal and hearing within seven (7) days with respect to four (4) grievances of their respective choice each calendar year. The arbitrator(s) designated to hear such grievances will issue their decision(s) within five (5) days of the completion of the hearing. Pre-hearing briefs may be filed by either party and, if filed, will be exchanged prior to hearing.

*Section 5.* **Discovery and Prehearing Procedures:**

(a)(i)    Any party may seek bifurcation of a grievance to assert a claim of untimeliness. Bifurcation motions shall be presented in writing to the other party and the arbitrator in the moving party's answer or at any time no later than seven (7) days prior to the scheduled hearing on the merits of the grievance. If an arbitrator has not yet been assigned to hear the grievance then the moving party shall file the motion with the Notice Arbitrator, who will decide the motion or assign it to a member of the Non-Injury Grievance Arbitration panel. A party's decision to pursue a bifurcated hearing may not delay the processing of a hearing scheduled on the merits of the grievance. For any motions made at least thirty (30) days before a hearing on the merits of the grievance, the parties will use their best efforts to schedule the bifurcated hearing at least ten (10) days before the scheduled hearing on the merits of the grievance. In any case where a timely motion for bifurcation is made, but a bifurcated hearing is not held, the arbitrator shall decide the issue of timeliness during the hearing on the merits.

(ii)    If a defense of untimeliness is not raised at least seven (7) days before the scheduled hearing on the merits of the grievance, the parties will be precluded from arguing that defense. However, where a party learns of facts supporting the defense fewer than seven days prior to the hearing, during the hearing, or in a post-hearing deposition, the party must present the defense to the opposing party and arbitrator within seven (7) days of when the facts supporting the defense became known or reasonably should have been known to the party. An assertion at the hearing, or subsequent to the hearing, of a newly-discovered untimeliness defense will enable either party to present additional testimony, including the opportunity to recall witnesses or call new witnesses.

(iii)    If a grievance is ultimately dismissed based on a finding of untimeliness, the arbitrator shall issue a written decision limited to that issue, and such ruling shall be final.

(b)    No later than fourteen (14) days prior to the date set for any hearing, each party will submit to the other copies of all documents, reports and records relevant to the dispute. Failure to submit such documents, reports and records no later than fourteen (14) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it desires into evidence, except that relevant documents submitted to the opposing party less than fourteen (14) days before the hearing will be admissible provided that the proffering party and the custodian(s) of the documents made a good faith effort to obtain (or discover the existence of) said documents or that

the document's relevance was not discovered until the hearing date. In the case of an expedited grievance pursuant to Section 4, such documentary evidence shall be exchanged on or before two (2) days prior to the date set for the hearing unless the arbitrator indicates otherwise.

*Section 6.* **Arbitration Panel:** There will be a panel of four (4) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties will designate the Notice Arbitrator within ten (10) days of the execution of this Agreement. In the event of a vacancy in the position of Notice Arbitrator, the senior arbitrator in terms of service as a Non-Injury Grievance Arbitrator will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement from July 10 through July 20 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If an arbitrator has been discharged, he or she shall retain jurisdiction for any case in which the hearing has commenced. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If the parties are unable to agree on a new arbitrator within thirty (30) days of any vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

*Section 7.* Hearing:

(a)     Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 1 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on a regular basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will bear any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty

189

(30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

(b)   If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the parties will agree upon dates to take testimony of unavailable witnesses, which dates will be within forty-five (45) days of the parties' receipt of the hearing transcript. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to attend the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In instances in which the parties agree that the material facts giving rise to the grievance are not in dispute, the arbitrator shall have the authority to decide the merits of the case solely on the written submissions of the parties. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests post-hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted, unless requested by the arbitrator.

(c)   In each instance in which briefs are not submitted, within fourteen (14) days of the closing of the record, either party may submit to the Arbitrator prior opinions for the arbitrator's consideration in issuing the decision. Briefs must be submitted to the arbitrator no later than sixty (60) days after receipt of the last transcript.

*Section 8.* **Arbitrator's Decision and Award:** The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he or she consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement, provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article 50, Section 1(c). In the event the arbitrator finds liability on the part of any party, he or she shall award Interest beginning one year from the date of the last regular season game of the season of the grievance.

*Section 9.* **Time Limits:** Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player,

the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

*Section 10.* **Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

*Section 11.* **Costs:** Subject to Section 7, all costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city, lodging, and meal expenses in accordance with Article 34.

*Section 12.* **Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the NFL or Club, to the player, or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, double Interest will be assessed from the date of the decision. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

*Section 13.* **Grievance Settlement Committee:** A grievance settlement committee consisting of representatives of the NFLPA and representatives of the Management Council shall meet annually between the end of the regular season and the annual arbitration scheduling conference. The committee shall engage in good faith efforts to settle or bifurcate any pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of its members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement.

*Section 14.* **Standard Grievance Correspondence:**
      (a)    Standard Grievance Correspondence is defined as and includes the following documents: Injury and Non-Injury Grievance filings; answers; appeals; arbitration selection letters; hearing setup letters; discovery letters and documents; correspondence regarding neutral physician examination(s), including requests by the neutral physician for tests, films or other documents; hearing, deposition, or other general scheduling letters; withdrawal letters; pre- and post-hearing briefs; and settlement and release agreements.

191

(b)     Standard Grievance Correspondence may be sent via .pdf e-mail; all parties shall use their best efforts to send Standard Grievance Correspondence via e-mail.

(c)     The NFL and NFLPA will provide each other with a list of designated e-mail addresses for the receipt of Standard Grievance Correspondence. The subject line of any Standard Grievance Correspondence sent via e-mail shall include the full name of the player(s), the name of the Club(s) involved and the date of filing.

(d)     The parties shall agree to additional procedures to govern the electronic transmission of Standard Grievance Correspondence, as may be warranted.

192

# ARTICLE 44
# INJURY GRIEVANCE

*Section 1.* Definition: An "Injury Grievance" is a claim or complaint that, at the time a player's NFL Player Contract or Practice Squad Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

*Section 2.* Filing: Any player and/or the NFLPA must present an Injury Grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

*Section 3.* Answer:
    (a)    The Club to which an Injury Grievance has been presented will answer in writing within ten (10) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:
    (1)    That the player did not pass the physical examination administered by the Club physician at the beginning of the preseason training camp for the year in question. This defense will not be available if: (i) the Player was injured during offseason workouts at the club facility under the direction of a club official prior to not passing the physical examination or (ii) the player participated in any team drills following his physical examination or in any preseason or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;
    (2)    That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during a physical examination by the Club;
    (3)    That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;
    (4)    That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;
    (5)    That subsequent to the physical examination the player suffered no new football-related injury;
    (6)    That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical capacity below the level

193

existing at the time of his physical examination as contemporaneously recorded by the Club physician.

(b)    The Club or the Management Council must advise the grievant and the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. Failure to provide such notice will preclude the Club and Management Council from arguing that defense. However, where the Club and Management Council learn of facts supporting a special defense fewer than seven days prior to the hearing, during the hearing or in a post-hearing deposition, the Club and the Management Council must present notice of that special defense to the arbitrator and opposing party within seven (7) days of when the facts supporting that defense became known or reasonably should have become known to the Club and/or Management Council. An assertion at the hearing, or subsequent to the hearing, of a newly-discovered special defense will enable either party to present additional testimony, including the opportunity to recall witnesses or call new witnesses.

***Section 4.*** **Neutral Physician:**

(a)    The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the filing of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may not review any objective medical tests unless all parties mutually agree to provide such results. The neutral physician may not perform any diagnostic tests unless all parties consent. The neutral physician is required to submit to the parties a detailed medical report of his examination.

(b)    In cases in which the player alleges that he suffered a closed head injury or concussion with resulting cognitive deficit, somatic symptoms and/or other concussion symptoms, the player must present himself for cognitive functioning testing and/or other appropriate testing and examination by a neutral neuropsychologist in either the city nearest the player's residence or the Club city. Absent medical limitations, the unavailability of the neuropsychologist or the unavailability of medical records, such testing and examination must occur within thirty (30) days from the date of the filing of the grievance. The neutral neuropsychologist will be provided with all medical records of closed head trauma and/or concussions including baseline testing, within the possession of Club and player. All other requirements and limitations set forth in this Article regarding the neutral physician process shall apply to such testing and examination except that if a neutral neuropsychologist's examination spans multiple days, it will be considered one office visit. The neutral neuropsychologist must prepare and submit a detailed report regarding his examination and the player's cognitive functioning and other symptoms, if any, of concussion or closed head injury affecting the player's ability to return to play at the date of the examination. If the neutral neuropsychologist in his sole discretion determines that the player should be examined by another physician of appropriate

194

specialization in order to complete his neutral physician report, the neuropsychologist shall have the authority to refer such player for such additional examination. In such circumstances, the report of the neutral neuropsychologist shall be designated as the neutral physician report and may incorporate any findings or opinion of the referral doctor.

(c)     In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file Injury Grievances.

(d)     The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. In cases in which the player is alleging that he suffered a closed head injury or concussion with resulting cognitive deficit, somatic symptoms and/or other concussion symptoms the report of the neutral neuropsychologist shall be considered conclusive with regard to the player's cognitive functioning and other objective findings as well as the extent of the injury at the time of the examination.

### Section 5. Neutral Physician List:

The NFLPA and the Management Council will maintain a jointly-approved list of neutral physicians, including at least two orthopedic physicians and two neuropsychologists in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) replacements to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the nominees on its list, and the other party will be bound by such selection. The next vacancy occurring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

### Section 6. Appeal: 
An Injury Grievance may be appealed to an arbitrator by filing of written notice of appeal with the Chairperson of the arbitration panel at least seven (7) days prior to the Settlement Committee meeting, but no later than the Injury Grievance scheduling meeting.

### Section 7. Arbitration Panel: 
There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council.

The parties shall designate the Chairperson of the panel. In the event of a vacancy in the position of the Chairperson of the panel, the senior Injury Grievance Arbitrator will succeed to the position of Chairperson of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement from July 10 through July 20 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If an arbitrator has been discharged he or she shall retain jurisdiction for any case in which the hearing has commenced. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty (30) days of the occurrence of the vacancy, the Chairperson of the panel shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

### Section 8. Hearing:

(a)     Each arbitrator shall designate a minimum of twelve hearing dates per year, exclusive of the period July 1 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairperson, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing, the postponement fee of the arbitrator will be borne by the postponing party, unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will bear any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairperson to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

(b)     If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offer-

ing the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

(c)(i)    Any party may seek bifurcation of a grievance to assert a claim of untimeliness. Bifurcation motions shall be presented in writing to the other party and the arbitrator in the moving party's answer or at any time no later than seven (7) days prior to the scheduled hearing on the merits of the grievance. If an arbitrator has not yet been assigned to hear the grievance then the moving party shall file the motion with the Chairperson of the Arbitration panel, who will decide the motion or assign it to a member of the Injury Grievance Arbitration panel. A party's decision to pursue a bifurcated hearing may not delay the processing of a hearing scheduled on the merits of the grievance. For any motions made at least thirty (30) days before a hearing on the merits of the grievance, the parties will use their best efforts to schedule the bifurcated hearing at least ten (10) days before the scheduled hearing on the merits of the grievance. In any case where a timely motion for bifurcation is made, but a bifurcated hearing is not held, the arbitrator shall decide the issue of timeliness during the hearing on the merits.

(ii)    If a defense of untimeliness is not raised at least seven (7) days before the scheduled hearing on the merits of the grievance, the parties will be precluded from arguing that defense. However, where a party learns of facts supporting the defense less than seven days prior to the hearing, during the hearing, or in a post-hearing deposition, the party must present the defense to the opposing party and arbitrator within seven (7) days of when the facts supporting the defense became known or reasonably should have been known to the party.

(iii)    If a grievance is ultimately dismissed based on a finding of untimeliness, the arbitrator shall issue a written decision limited to that issue, and such ruling shall be final and binding.

(d)    Post-hearing briefs must be submitted to the arbitrator no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he or she shall award Interest beginning one year from the date of the last regular season game of the season of injury.

*Section 9.* Expenses: Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties

will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city, lodging and meal expenses in accordance with Article 34. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with that injury.

**Section 10. Pension Credit:** Any player who receives payment for three or more regular season games (or such other minimum number of regular season games required by the Bert Bell/Pete Rozelle NFL Retirement Plan for a year of Credited Service) during any year as a result of filing an Injury Grievance or settlement of a potential Injury Grievance will be credited with one year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan for the year in which he was injured.

**Section 11. Payment:**
    (a)    If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, double Interest will be assessed against the Club from the date of the decision. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.
    (b)    Any player who does not qualify for group health insurance coverage in a given Plan Year under the NFL Player Insurance Plan as a result of being terminated while physically unable to perform and who receives payment for at least one (1) regular or post-season game via an injury grievance award or injury settlement for that Plan Year shall receive a payment in an amount determined by multiplying the number of months in that Plan Year for which he would have been eligible for coverage had he qualified for group health insurance coverage in that Plan Year by the premium the Player Insurance Plan charged for COBRA coverage during that period.

**Section 12. Presumption of Fitness:** If the player passes the physical examination of the Club prior to the preseason training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

**Section 13. Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though

ing the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

(c)(i)    Any party may seek bifurcation of a grievance to assert a claim of untimeliness. Bifurcation motions shall be presented in writing to the other party and the arbitrator in the moving party's answer or at any time no later than seven (7) days prior to the scheduled hearing on the merits of the grievance. If an arbitrator has not yet been assigned to hear the grievance then the moving party shall file the motion with the Chairperson of the Arbitration panel, who will decide the motion or assign it to a member of the Injury Grievance Arbitration panel. A party's decision to pursue a bifurcated hearing may not delay the processing of a hearing scheduled on the merits of the grievance. For any motions made at least thirty (30) days before a hearing on the merits of the grievance, the parties will use their best efforts to schedule the bifurcated hearing at least ten (10) days before the scheduled hearing on the merits of the grievance. In any case where a timely motion for bifurcation is made, but a bifurcated hearing is not held, the arbitrator shall decide the issue of timeliness during the hearing on the merits.

(ii)    If a defense of untimeliness is not raised at least seven (7) days before the scheduled hearing on the merits of the grievance, the parties will be precluded from arguing that defense. However, where a party learns of facts supporting the defense less than seven days prior to the hearing, during the hearing, or in a post-hearing deposition, the party must present the defense to the opposing party and arbitrator within seven (7) days of when the facts supporting the defense became known or reasonably should have been known to the party.

(iii)    If a grievance is ultimately dismissed based on a finding of untimeliness, the arbitrator shall issue a written decision limited to that issue, and such ruling shall be final and binding.

(d)    Post-hearing briefs must be submitted to the arbitrator no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he or she shall award Interest beginning one year from the date of the last regular season game of the season of injury.

*Section 9.* **Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties

will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city, lodging and meal expenses in accordance with Article 34. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with that injury.

*Section 10.* **Pension Credit:** Any player who receives payment for three or more regular season games (or such other minimum number of regular season games required by the Bert Bell/Pete Rozelle NFL Retirement Plan for a year of Credited Service) during any year as a result of filing an Injury Grievance or settlement of a potential Injury Grievance will be credited with one year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan for the year in which he was injured.

*Section 11.* **Payment:**
      (a)    If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, double Interest will be assessed against the Club from the date of the decision. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.
      (b)    Any player who does not qualify for group health insurance coverage in a given Plan Year under the NFL Player Insurance Plan as a result of being terminated while physically unable to perform and who receives payment for at least one (1) regular or post-season game via an injury grievance award or injury settlement for that Plan Year shall receive a payment in an amount determined by multiplying the number of months in that Plan Year for which he would have been eligible for coverage had he qualified for group health insurance coverage in that Plan Year by the premium the Player Insurance Plan charged for COBRA coverage during that period.

*Section 12.* **Presumption of Fitness:** If the player passes the physical examination of the Club prior to the preseason training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

*Section 13.* **Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though

198

he had been on the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article 37.

**Section 14. Information Exchange:** The NFLPA and the Management Council must confer on a regular basis concerning the status of pending Injury Grievances and the attribution of any Injury Grievance exposure to Team Salary under Article 13. Any communications pursuant to this Section are inadmissible in any grievance hearing.

**Section 15. Discovery:** No later than fourteen (14) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the Injury Grievance hearing. Failure to submit such documents, reports and records no later than fourteen (14) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

**Section 16. Grievance Settlement Committee:** A grievance settlement committee consisting of representatives of the NFLPA and representatives of the NFL shall meet annually between the end of the regular season and the annual arbitration scheduling conference. The committee shall engage in good faith efforts to settle or bifurcate any pending Injury Grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of its members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement.

**Section 17. Settlement Agreements:** Grievances settled prior to the issuance of an arbitration award will be memorialized in the standard Settlement and Release Agreement, which may include a notification of grievant's right to file a Workers' Compensation Claim, if applicable, as set forth in Appendix L. This form may be amended and/or supplemented if the parties agree and/or if required by state law.

**Section 18. Standard Grievance Correspondence:** The provisions of Article 43, Section 14 shall apply to Injury Grievances.

199

# ARTICLE 45
# INJURY PROTECTION

***Section 1.*** **Qualification:** A player qualifying under the following criteria will receive an Injury Protection benefit in accordance with Section 2 below:

      (a)    The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

      (b)    The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

      (c)    The player must have failed the preseason physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This preseason physical may be given by the Club physician prior to the beginning of preseason camp, so long as such fact is clearly communicated in writing to the player at the time of the physical exam. The preseason physical examination given for qualification need not be the entire Standard Minimum Preseason Physical Examination, but shall be that necessary and appropriate to evaluate the injury for which the benefit is sought.

      It is agreed that a player who qualifies for Injury Protection under Subsections 1(a) and 1(b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain Injury Protection liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade Injury Protection liability by early waiving.

***Section 2.*** **Benefit:** A player qualifying under Section 1 above will receive an amount equal to 50% of his Paragraph 5 Salary for the season following the season of injury, up to a maximum payment of: $1,000,000, in the 2011–12 League Years; $1,050,000, in the 2013–14 League Years; $1,100,000, in the 2015–16 League Years; $1,150,000, in the 2017–18 League Years; and $1,200,000, in the 2019–2020 League Years; in each case unless he has individually negotiated more injury protection or a larger guaranteed salary in his contract. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated more injury protection or a larger guaranteed salary in that contract for the affected year in question or if he qualifies for the Extended Injury Protection benefit described below. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

200

*Section 3.* **Disputes:** Any dispute under this Article will be processed under Article 43. In any grievance in which the NFLPA or a player is claiming an Injury Protection benefit, the NFLPA or the player may contend that the player should not have passed the preseason physical examination given by a Club following the season of a player's injury. In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the Club's preseason physical exam, provided that such physician conducted his examination of the player within fourteen days of the player's contract termination, but no later than the date of the first preseason cutdown. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 1(c) above shall be deemed to have been satisfied.

*Section 4.* **Extended Injury Protection Qualification:** A player who has qualified for and received the Injury Protection benefit set forth in Sections 1 and 2 above, and has a Player Contract for the second season following the season of injury (for the first five seasons of this Agreement, at the time he sustained such injury), shall qualify for the Extended Injury Protection Benefit if he satisfies all of the criteria below:

    (a)    The player must have remained physically unable, because of the same severe football injury or Club-authorized surgery for which he qualified for the Injury Protection benefit, to play football as certified by the Club physician following a physical examination within sixty (60) days of his former Club's last regular season game of the season following the season of injury, if such examination is requested by the player's former Club;

    (b)    The player must have continued to undergo whatever reasonable and customary rehabilitation treatment his former Club required of him. Following the physical examination referenced in Section 4(a) above, the Club may require Player to submit to a reasonable number of physical examinations. Such examinations directed by the Club may take place in the Club city or in another location designated by the Club; and

    (c)    The player must have failed a physical examination given by his former Club prior to June 1st of the season for which he is seeking the Extended Injury Protection benefit. This physical must be given by either the Club physician or a physician designated by his former Club so long as the fact that the examination is being given for the purpose of determining the player's eligibility for the Extended Injury Protection benefit is clearly communicated in writing to the player at the time of the physical exam. A Club cannot avoid Injury Protection liability by failing or refusing to perform the exam in a timely manner, provided that the player cooperates in the administration of the physical examination.

*Section 5.* **Extended Injury Protection Benefit:** A player qualifying under Section 4 above will receive an amount equal to 30% of his Paragraph 5 Salary for the second season following the season of injury, up to a maximum payment of: $500,000, for the 2012–14 League Years; $525,000, for the 2015–16 League Years; $550,000, for the 2017–18 League Years; and $575,000, for the 2019–20 League Years; in each case unless he has

individually negotiated more injury protection or a larger guaranteed salary in his contract for the affected year in question. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the second season following the season of injury.

*Section 6.* **Extended Injury Protection Disputes:** Any dispute under this Article will be processed under Article 43. In any grievance in which the NFLPA or a player is claiming an Extended Injury Protection benefit, the NFLPA or the player may contend that the player should not have passed the physical examination referenced in Subsection 4(c). In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the physical exam, provided that such physician conducted his examination of the player within fourteen days of the examination. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 4(c) above shall be deemed to have been satisfied.

*Section 7.* **Workers' Compensation Offset:** If a player elects to receive benefits under this Article, it is agreed that for the term of this Agreement fifty percent (50%) of all Injury Protection and Extended Injury Protection benefits are of the same character as, and are the functional equivalent of, a workers' compensation indemnity benefit, and the Club paying this benefit and/or its insurer shall be entitled to a dollar-for-dollar offset in an amount equal to fifty percent (50%) of the Injury Protection payments, including Injury Protection and Extended Injury Protection grievance settlements and awards, against any state workers' compensation indemnity award to which the player is or may become entitled to, including, but not limited to, temporary disability, wage loss, impaired earning capacity and permanent disability benefits, provided that there shall be no offset against a workers' compensation award of any medical coverage. For example, and without limitation, if a player qualifies to receive $200,000 in Injury Protection benefits pursuant to Section 2 and $150,000 in Extended Injury Protection benefits pursuant to Section 5, it is agreed that $100,000 of the Section 2 amount and $75,000 of the Section 5 amount (or $175,000 cumulatively) when paid, shall be the offset under this Section as described in the first sentence of this Section. This offset applies with regard to workers' compensation claims arising out of any injury with the Club whether such injury is acute or cumulative in nature provided that the injury that is the subject of the player's Injury Protection payment (and, if applicable, his Extended Injury Protection payment) is the principal basis for the player's workers' compensation award. The parties further agree that if, despite the terms of this Section and the parties' clear intent to treat fifty-percent (50%) of Injury Protection and Extended Injury Protection benefits as a payment of workers' compensation, a state court or other competent authority nevertheless renders a decision or other determination resulting in an outcome inconsistent with the full coor-

202

dination of Injury Protection, Extended Injury Protection, and workers' compensation benefits pursuant to this Section 7, then the Non-Injury Grievance Arbitrator shall have authority to immediately remedy any over-payment that results from said decision.

*Section 8.* **Filing:** Any player filing a claim for the Injury Protection benefit must follow the procedure set forth in Article 43. For purposes of this Article only, a grievance must be initiated by October 15th of the League Year in which the Injury Protection benefit is being claimed. A player requesting the Extended Injury Protection benefit must notify his former Club and the NFL in writing by January 31 (following his former Club's last regular season game of the season following the season of injury) that he believes he remains physically unable to play football. By submitting such written affirmation of his continued injury, the player will be deemed to have filed a claim for the Extended Injury Protection benefit provided for in this Article. If the claim is contested by the Club in writing, Player's written affirmation will automatically be deemed to constitute a non-injury grievance. Club's written notice denying the claim will be deemed the answer to the grievance and the Club may then order Player to submit to a physical examination as set forth in Section 4(a) above. By December 15 of each season covered under this Agreement, the NFL agrees to provide the NFLPA with a list of players who received, or filed a grievance for, Injury Protection for that season.

*Section 9.* **Costs:** Any reasonable costs associated with a player's travel to and from any medical examination performed at the Club's request as provided for in this Article shall be paid for by the Club.

# ARTICLE 46
## COMMISSIONER DISCIPLINE

*Section 1.* **League Discipline:** Notwithstanding anything stated in Article 43:

(a)     All disputes involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b)     Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within three (3) business days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c)     The Commissioner (under Subsection (a)), or the person appointed by the Commissioner under Subsection (b), shall consult with the Executive Director of the NFLPA prior to issuing, for on-field conduct, any suspension or fine in excess of $50,000.

(d)     The schedule of fines for on-field conduct will be provided to the NFLPA prior to the start of training camp in each season covered under this Agreement. The 2011 schedule of fines, which has been provided to and accepted by the NFLPA, shall serve as the basis of discipline for the infractions indentified on that schedule. The designated minimum fine amounts will increase by 5% for the 2012 League Year, and each League Year thereafter during the term of this Agreement. Where circumstances warrant, including, but not limited to, infractions that were flagrant and gratuitous, larger fines, suspension or other discipline may be imposed. On appeal, a player may assert, among other defenses, that any fine should be reduced because it is excessive when compared to the player's expected earnings for the season in question. However, a fine may be reduced on this basis only if it exceeds 25 percent of one week of a player's salary for a first offense, and 50 percent of one week of a player's salary for a second offense. A player may also argue on appeal that the circumstances do not warrant his receiving a fine above the amount stated in the schedule of fines.

*Section 2.* **Hearings:**

(a)     **Hearing Officers.** For appeals under Section 1(a) above, the Commissioner shall, after consultation with the Executive Director of the NFLPA, appoint one or more designees to serve as hearing officers. For appeals under Section 1(b) above, the parties shall, on an annual basis, jointly select two (2) or more designees to serve as hearing officers. The salary and reasonable expenses for the designees' services shall be

204

shared equally by the NFL and the NFLPA. Notwithstanding the foregoing, the Commissioner may serve as hearing officer in any appeal under Section 1(a) of this Article at his discretion.

(b)     **Representation.** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. The NFLPA and NFL have the right to attend all hearings provided for in this Article and to present, by testimony or otherwise, any evidence relevant to the hearing.

(c)     **Telephone Hearings.** Upon agreement of the parties, hearings under this Article may be conducted by telephone conference call or videoconference.

(d)     **Decision.** As soon as practicable following the conclusion of the hearing, the hearing officer will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s), Club(s) and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to Section 1(b) may only be affirmed, reduced, or vacated by the hearing officer, and may not be increased.

(e)     **Costs.** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and other expenses associated with the appeal.

(f)     **Additional Procedures for Appeals Under Section 1(a).**

(i)     **Scheduling.** Appeal hearings under Section 1(a) will be scheduled to commence within ten (10) days following receipt of the notice of appeal, except that hearings on suspensions issued during the playing season (defined for this Section as the first preseason game through the Super Bowl) will be scheduled for the second Tuesday following the receipt of the notice of appeal, with the intent that the appeal shall be heard no fewer than eight (8) days and no more than thirteen (13) days following the suspension, absent mutual agreement of the parties or a finding by the hearing officer of extenuating circumstances. If unavailability of counsel is the basis for a continuance, a new hearing shall be scheduled on or before the Tuesday following the orignal hearing date, without exception.

(ii)     **Discovery.** In appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing. Failure to timely provide any intended exhibit shall preclude its introduction at the hearing.

(iii)     **Record; Posthearing Briefs.** Unless the parties agree otherwise, all hearings conducted under Section 1(a) of this Article shall be transcribed. Posthearing briefs will not be permitted absent agreement of the NFL and NFLPA or the request of the hearing officer. If permitted, such briefs shall be limited to five pages (single-spaced) and must be filed no later than three (3) business days following the conclusion of the hearing.

***Section 3.* Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the parties or by the hearing officer upon appropriate motion.

*Section 4.* **One Penalty:** The Commissioner and a Club will not both discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

*Section 5.* **Fine Money:**

      (a)    Fines will be deducted at the rate of no more than $2,500 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. For the 2016–2020 League Years, the amount will increase from a rate of $2,500 to $3,500 from each pay period.

      (b)    For any fine imposed upon a player under Section 1(b), no amount of the fine will be withheld from the player's pay pending the outcome of the appeal, except that if: (i) the fine is imposed on or after the thirteenth (13th) week of the regular season; (ii) the player or the NFLPA does not timely appeal; or (iii) the hearing on a fine imposed for conduct occurring through the thirteenth (13th) week of the regular season is delayed by the player or the NFLPA for any reason beyond the time provided for in Section 2(b) of this Article, the full amount of the fine shall be promptly collected.

      (c)    Unless otherwise agreed by the parties., fine money collected pursuant to this Article shall be allocated as follows: 50% to the Players Assistance Trust and 50% to charitable organizations jointly determined by the NFL and the NFLPA. In the absence of said joint determination, the NFL and the NFLPA shall each determine a charitable organization or organizations to which half of the second 50% shall be allocated.

## ARTICLE 47
## UNION SECURITY

**Section 1. Union Security:** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

**Section 2. Check-off:** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix M and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

**Section 3. NFLPA Meetings:** The NFLPA will have the right to conduct four meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule. The visits described in Article 21, Section 8(g) shall not apply toward the limit set forth in this Section.

**Section 4. NFLPA Player Group Licensing Program:** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA (or any of its affiliates) and the NFL (or any of its affiliates). Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to Article 43. The first such grievance in any calendar year shall be treated on an expedited basis without counting against the number of grievances the NFLPA may expedite pursuant to Article 43, Section 4; all subsequent such grievances in that calendar year shall count against the number of grievances the NFLPA may expedite

207

pursuant to Article 43, Section 4. For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six (6) or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.), marketing, advertising and promotional programs: (a) in any one product and/or sponsorship category, as defined by industry standards; or (b) in different categories if a total of six or more players are used and (i) the products, marketing, advertising or promotional programs all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items. Group Player Licensing shall not include "non-consumer facing" appearances by NFL players at any individual corporate hospitality and/or other similar events by fewer than six (6) active NFL players. Nothing in this definition of Group Player Licensing shall be construed to limit the rights of the NFL or any NFL Club under applicable law, or any other provision of this Agreement.

**Section 5. Disputes:** Any dispute over compliance with, or the interpretation, application or administration of this Article will be processed pursuant to Article 43. Any decision of an arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

**Section 6. Procedure for Enforcement:**

(a)     Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article, the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article. The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

(b)     It is further agreed that the term "member in good standing" as used in this Article applies only to payment of dues or initiation fee and not any other factors involved in union discipline.

(c)     It is further agreed that notwithstanding anything else in this Agreement, if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of this Article relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely

to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

*Section 7.* **NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

*Section 8.* **Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to reasonable space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine.

*Section 9.* **Rookie Symposium:** The parties will discuss the timing, structure, and content of one or more annual Rookie orientation programs.

209

## ARTICLE 48
## NFLPA AGENT CERTIFICATION

*Section 1.* **Exclusive Representation:** The NFL and the Clubs recognize that, pursuant to federal labor law, the NFLPA will regulate the conduct of agents who represent players in individual contract negotiations with Clubs. On or after the date on which the NFLPA notifies the NFL that an agent regulation system is in effect and provides the NFL with a list of the NFLPA-certified agents, Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFL and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA shall submit an updated list to the NFL monthly. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion pursuant to the NFLPA's agent regulation system, except: (i) where an agent has failed to pass a written examination given to agents by the NFLPA; (ii) in extraordinary circumstances where the NFLPA's investigation discloses that the agent's conduct is of such a serious nature as to justify immediately invalidating the agent's certification; (iii) where the agent has failed to pay his or her annual fee; (iv) where the agent has failed to attend an annual seminar required by the NFLPA; (v) where the agent's certification has expired due to the agent's inactivity in individual contract negotiations; (vi) where the agent has made improper contact with a college football player in violation of any applicable NFLPA rules governing contact with players related to NCAA or NFL Draft eligibility; and (vii) where the agent has failed to sign the end of year certification required by Article 18, Section 2(b) of this Agreement. The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs. This Section shall not limit the NFLPA's ability to discipline agents for malfeasance or for violation of state or federal law.

*Section 2.* **Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

*Section 3.* **Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $30,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotia-

tions, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted from) the most recently published list of agents certified by the NFLPA to represent players. The fine amount set forth in this Section shall increase by 5% each League Year beginning in the 2012 League Year.

211

## ARTICLE 49
## PLAYER SECURITY

*Section 1.* **No Discrimination:** There will be no discrimination in any form against any player by the NFL, the Management Council, any Club or by the NFLPA because of race, religion, national origin, sexual orientation, or activity or lack of activity on behalf of the NFLPA.

*Section 2.* **Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

212

# ARTICLE 50
## COMMITTEES

*Section 1.* **Joint Committee:**

(a)    A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

(b)    The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement.

(c)    Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article 43. A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

(d)    The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety. Within 60 days of the initiation of an investigation, two or more neutral physicians will be selected to investigate and report to the Joint Committee on the situation. The neutral physicians shall issue a written report within 60

213

days of their selection, and their recommendations as to what steps shall be taken to address and correct any issues shall be acted upon by the Joint Committee.

*Section 2.* **Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

ARTICLE 51
MISCELLANEOUS

**Section 1. Endorsements:**

    (a)    No Club may unreasonably refuse to permit a player to endorse a product. Notwithstanding the foregoing, and without affecting interpretation of the preceding sentence, no player will be permitted to be a party to any endorsement arrangement of any kind with a company associated with the production, manufacture, or distribution of a substance that has been banned by the Policy on Anabolic Steroids and Related Substances. The NFL and the NFLPA will agree each year on a list of such companies.

    (b)    The placement of a sponsor's logo on a jersey does not constitute endorsement by any player of that sponsor. Players shall not challenge or refuse to wear jerseys with sponsor logos.

*Section 2.* Player Attire:

    (a)    Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are based on safety or competitive considerations as determined by the NFL; the parties reserve their respective positions on whether the NFL or any of the Clubs may have any such rule relating solely to image considerations. The foregoing notwithstanding, the NFL and Clubs shall have the right to regulate any third party branding or other commercial identification that may appear on any footwear or gloves worn by players on the field or its environs on game days and/or at any Club's official mandatory minicamp(s), official preseason training camp, and all Club practice sessions.

    (b)    On game days, prior to the game and continuing until 90 minutes after the whistle ending each game (preseason or regular season), as well as at any Club's official mandatory minicamp(s), official preseason training camp, and all Club practice sessions, players: (i) shall wear any uniforms and/or related items (e.g., practice jerseys) required by the NFL or Club (regardless of any third party branding that may appear on such uniforms and/or related items as may be determined by the NFL or Club), provided that no individual player and/or discrete group of players will be required to wear attire with third-party branding that is different from the branding on the attire of other players and further provided that no third-party sponsor will depict any player in advertising or promotional materials in a manner that constitutes an "Endorsement" as defined in Paragraph 4(a) of the Player Contract absent consent from the player; and (ii) will be prohibited from wearing, displaying, or orally promoting equipment, apparel, or other items that carry commercial names or logos of companies in any televised interview on Club premises, unless such commercial identification has been approved in advance by the League office.

    (c)    Notwithstanding Subsection (b) above, players will be permitted to wear apparel bearing the logo "Players Inc." and/or the logo "NFLPA" during televised interviews in the locker room following preseason and regular season games, provided that such apparel does not display the names, logos, or other identifying marks of any other entity or product that is licensed by or associated with Players Inc. or the NFLPA, in-

215

cluding, but not limited to, the manufacturer of the apparel or any sponsor or licensee of Players Inc., the NFLPA, or any individual player. The parties reserve their respective positions on the applicability of this provision to apparel bearing the logo "NFL Players."

      (d)      The provisions in Subsections (a)–(c) above shall not be used or referred to in any dispute between the parties over prohibition by the League and/or any Club of the wearing of unapproved commercial items in circumstances other than as expressly addressed in those Subsections.

**Section 3. Appearances:** No Club may unreasonably require a player to appear on radio or television or other news media (including internet and print).

**Section 4. Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media (including television, radio, internet, print) in reasonable promotional activities on behalf of the Clubs and the NFL.

**Section 5. Deduction:** The involuntary deduction of amounts from any compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use reasonable efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for offseason information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first preseason cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available four (4) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized representatives who may purchase tickets to the NFL. The NFLPA must notify the home Club of its desire to attend such a game at least five days prior to the date of the game. Such representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club for personal use and not for resale. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club (for personal use and not for resale) from the best tickets available for public

sale immediately prior to the public sale for each game. For purposes of this Section as it applies to preseason or regular season games, the word "player" shall be defined as any player on the Club's Active/Inactive List, Practice Squad, PUP or N-F/I List, or Injured Reserve List. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets. Clubs are not required to provide Practice Squad players with the opportunity to purchase Super Bowl tickets.

*Section 10.* **Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. This restriction does not apply to the League mandate regarding neuropsychological testing. A Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

*Section 11.* **League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing that Commissioner discipline might result from the interview.

*Section 12.* **Career Planning Program:** The parties will continue their programs to provide information to current and former players concerning financial advisors and financial advisory firms and shall jointly (at the Annual Rookie Symposia and otherwise) and separately develop new methods to educate such players concerning the risks of various investment strategies and products, as well as the provision of any background investigation services. Neither the NFL, nor any Club, nor the NFLPA shall be responsible for any investment decisions made by players; players and any advisors who they select will bear sole responsibility for any investment or financial decisions that are made.

*Section 13.* **On-Field Microphones and Sensors:**

    (a)    During NFL games and for the express purpose of creating NFL programming, NFL Films will be permitted to put microphones on any players that NFL Films selects. During the regular season each starting quarterback will be required to wear a microphone at least once, and no player will be required to wear a microphone for this purpose more than four times during the course of any regular season. There will be no limitation with respect to the number of times a player can be required to wear a microphone during the preseason or postseason. None of the sound captured for this purpose can be used during the game in which the player is mic'd without the player's prior permission, and, unless such prior permission is given, none of the captured sound can be used until viewed and approved by the player or his selected team representative who will have the right to embargo any material he deems to be extremely sensitive or inappropriate. Players may also embargo for a limited time material deemed to be confidential or that might place the player or team at a competitive disadvantage. Players or their selected team representative must advise NFL Films of any material they wish to have embargoed within 24 hours of receiving the material.

(b)    For the television broadcast of all NFL preseason, regular season and postseason games NFL Broadcasting, on behalf of the League's network television partners, can require offensive linemen to wear microphones embedded in shoulder pads in order to capture ambient sound from the playing field. The pads will be wired by NFL Films-trained technicians. Microphones will be opened after the offense breaks the huddle and will be closed a few seconds after the snap of the ball. At no time will the microphones be open when the players are in the locker room, the huddle or the team bench areas and all transmissions will be encrypted. Audio captured in accordance with this provision will be used only in the live ambient audio mix of that particular game. The NFL will require its television partners to agree to use best efforts to refrain from broadcasting any captured audio that contains inappropriate or sensitive content, and that their failure to do so shall result in a loss of the right to broadcast such audio in the future.

(c)    The NFL may require all NFL players to wear during games and practices equipment that contains sensors or other nonobtrusive tracking devices for purposes of collecting information regarding the performance of NFL games, including players' performances and movements, as well as medical and other player safety-related data. Sensors shall not be placed on helmets without the NFLPA's consent. Before using sensors for health or medical purposes, the NFL shall obtain the NFLPA's consent.

*Section 14.* **Practice Squad Super Bowl Rings:** Practice Squad players on a Club that wins the Super Bowl at the time of the Super Bowl will be entitled to a ring similar in appearance to the one provided to players on the Active/Inactive List but the Club, in its sole discretion, may provide any Practice Squad player with a ring of lesser value.

## ARTICLE 52
## PLAYER BENEFIT COSTS

*Section 1.* **General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 5% of Projected AR, as defined in Article 12 and Player Benefit Costs required by law cannot be reduced.

*Section 2.* **Right of Restoration:** Each separate and individual Benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each Benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

*Section 3.* **Resolution of Disputes:** In the event the NFLPA and the NFL are unable to agree to Projected Benefits for the League Year for which the Salary Cap is being set, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved in time for the timely issuance of the Special Purpose Letter for that League Year. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

    (a)    The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year.

    (b)    Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

    (c)    As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than five (5) days prior to the scheduled issuance of the Special Purpose Letter.

*Section 4.* **Limitations on Contributions:**

    (a)    No NFL Club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Disability Plan (except that portion of the Disability Plan refe-

219

renced in Section 4 of Article 61), the Gene Upshaw Health Reimbursement Account, the Neuro-Cognitive Disability Benefit, the Workers' Compensation Time Offset Fund, the Performance Based Pool, the Tuition Assistance Plan, the NFL Player Insurance Plan, the Player Long-Term Care Insurance Plan, or Legacy Benefit (individually, a "Player Benefit Arrangement") with respect to any year following expiration of this Agreement except to the extent required by the Internal Revenue Code or other applicable laws except to the extent preempted by ERISA. Each Player Benefit Arrangement shall be amended to prevent any employer-provided benefit from accruing or being otherwise credited or earned thereunder with respect to any year following the expiration of this Agreement, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in a year following the expiration of this Agreement shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

      (b)     The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be required to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

*Section 5.* **Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Gene Upshaw Health Reimbursement Account, the 88 Benefit, and the Player Long Term Insurance Plan, Neuro-Cognitive Disability Plan, and the Legacy Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

220

# ARTICLE 53
## RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan") will be continued and maintained in full force and effect during the term of this Agreement, but no further benefits will accrue except as provided in Section 3. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

**Section 2. Contributions:** For the 2011 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix N. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 3. Benefit Credits:** Effective for payments on and after September 1, 2011, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
| --- | --- |
| Before 1982 | $ 250 |
| 1982 through 1992 | $ 255 |
| 1993 and 1994 | $ 265 |
| 1995 and 1996 | $ 315 |
| 1997 | $ 365 |
| 1998 through 2011 | $ 470 |
| 2012 through 2014 | $ 560 |
| 2015 through 2017 | $ 660 |
| 2018 through 2020 | $ 760 |

221

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits.

*Section 4.* **New Arbitration Procedures:** Effective for benefit disputes arising under Retirement Plan Section 8.3(c) on and after September 1, 2011, the parties will amend the Retirement Plan to provide that the arbitrator selected to resolve the dispute must base his decision solely on the administrative record that was before the Retirement Board, as it may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator. In addition, each side shall be permitted to take depositions of any expert relied on by the other side based on the administrative record, supplemented as provided above.

*Section 5.* **Annual Benefit Eligibility Audits:** The Retirement Board shall engage an independent firm mutually selected by the NFL and the NFLPA to examine annually a representative sample of persons receiving benefits under the Retirement Plan to ensure that each such person is eligible to receive the benefits being provided.

*Section 6.* **Vesting Requirements:** Effective March 31, 2012, for players who first earn an hour of service thereafter, a player who does not have three Credited Seasons shall vest only if he has earned five (5) Years of Service.

Section 7. Death Benefits: Effective for payments on or after September 1, 2011, the parties will amend Section 7.2 of the Retirement Plan to insert after "$3,600," the following: "($4,000 (effective January 1, 2014) and $4,400 (effective January 1, 2018))."

# ARTICLE 54
## SECOND CAREER SAVINGS PLAN

*Section 1.* **Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:**

(a)    For each of the Plan Years 2011 and thereafter, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)    **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of: $24,000, for the 2011–14 Plan Years; $26,000, for the 2015–2018 Plan Years; and $28,000, for the 2019–2020 Plan Years) for each of the Plan Years 2011 through 2020 for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(A)    by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(B)    by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)    **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan a contribution each League Year in the amount of (1) at least $3,600 for each player who earned a Credited Season during such Plan Year and who has at least three or more Credited Seasons after earning such Credited Season, (2) at least $7,200 for each player who earns a Credited Season during such Plan Year and who has exactly two Credited Seasons after earning such Credited Season, plus (3) to the extent necessary to support the combined tax deductions for both the Second Career Savings Plan and the qualified portions of the Player Annuity Program, at least $1,000 for each player who earns a Credited Season during such Plan Year and who has exactly one Credited Season after earning such season. Any Matching Contribution made on behalf of a player will reduce his Minimum Contribution on a dollar-for-dollar basis (but not below zero). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (a)(i) above shall be made by and as of the last day of the Plan Year.

223

(iii)     **Expenses.** The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board.

(b)     **Future Contributions and Collection.** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Savings Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

224

# ARTICLE 55
## PLAYER ANNUITY PLAN

*Section 1.* **Establishment:** The NFL Player Annuity Program ("Annuity Program") will be continued and maintained in full force and effect during the term of this Agreement, except that the structure of the Program will be amended to include both a taxable portion ("Taxable Portion"), a tax-qualified portion ("Qualified Portion"), and, to the extent that contributions to such new tax-qualified portion would be deductible as business expenses in the year contributed, a second tax-qualified portion. The Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For each League Year of this Agreement, a contribution will be made to the Annuity Program on behalf of the NFL Clubs as follows (unless changed by the NFLPA pursuant to Article 52 of this Agreement):

    (a)    **Expenses.** The NFL Clubs will make advance contributions to the Annuity Program in an amount sufficient to pay all administrative expenses approved by the Annuity Board. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

    (b)    **Allocation.** In the 2011–2020 League Years, an Allocation will be made for each eligible Player who earns a Credited Season (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan) in an Annuity Year and who has a total of four or more Credited Seasons as of the end of such Annuity Year. The amount of the Allocation will be: $65,000, for each of the Annuity Years 2011 through 2013; $80,000, for each of the Annuity Years 2014 through 2017; and $95,000, for each of the Annuity Years 2018 through 2020.

    (c)    **Future Contributions.** Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Section 3.* **Timing:** An eligible player who earns a Credited Season through the sixth week of the regular season of an Annuity Year will receive an allocation on December 1 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive an allocation on March 31 of such Annuity Year.

*Section 4.* **Structure:** The Annuity Program will hold assets for the sole benefit of players and their beneficiaries and to pay all expenses of the Annuity Program approved by the Annuity Board. The Annuity Program is intended, except the tax qualified portions described below, to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will

225

be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual taxable allocation remaining after withholding taxes will be used to purchase an annuity.

*Section 5.* **New Tax-Qualified Portion:**

(a)      The parties agree, to the extent that contributions to such new tax-qualified portion would be deductible as business expenses in the year contributed, to amend the Player Annuity Program so that a portion of the Allocations will be contributed to a second Qualified Portion. The remaining portion of the Allocations, if any, will continue to be credited to the Taxable Portion. The portion of the Allocations to be contributed to the Qualified Portions will be the largest multiple of $1,000 that does not exceed (1) the amount that is currently deductible by the NFL Clubs under Section 404 of the Internal Revenue Code, and (2) the maximum amount permitted by Section 415 of the Internal Revenue Code.

(b)      The parties agree that a player who earns his second or third Credited Season will receive one allocation of $5,000 for that year in the Qualified Portion, subject to a vesting schedule. Forfeitures will be used to reduce employer contributions. Allocations in later years for a player will be reduced to the extent such player receives an allocation for his second or third Credited Season.

*Section 6.* **NFL Player Annuity & Insurance Company Net Worth:** Unless unusual circumstances exist that warrant a greater Net Worth, the estimated Net Worth of the NFL Player Annuity & Insurance Company ("Company") at the end of each calendar year shall not be less than the greater of (1) one percent (1%) of the total Segregated Accounts, or (2) $3.5 million. For purposes of this calculation, Net Worth is defined as the net worth of the Company as shown in the pro forma financial statements. At its last meeting in each calendar year, the Company's Board of Directors shall determine:

(a)      Whether or not unusual circumstances exist that warrant a greater estimated Net Worth;

(b)      The amount of any payment to the player Segregated Accounts from the Company General Account for the current year, such that the estimated Net Worth for the current year does not unreasonably exceed the above limits; and

(c)      The amount, if any, by which the Company charge to the player Segregated Accounts for the upcoming calendar year should be changed, such that the estimated Net Worth at the end of the following calendar year is not expected to unreasonably exceed or be less than the above limits.

# ARTICLE 56
# TUITION ASSISTANCE PLAN

**Section 1.** Maintenance: The NFL Player Tuition Assistance Plan will provide up to $15,000 per League Year ($20,000 per League Year for the 2015–2020 League Years) as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. The NFL Player Tuition Assistance Plan is a written plan that is intended to qualify as an educational assistance program under Section 127 of the Internal Revenue Code that provides benefits to a player in any calendar year up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan begins on April 1. The Plan and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Plan will be continued and maintained in full force and effect during the term of this Agreement and must at all times comply with the terms of this Article.

**Section 2.** Eligibility:

(a)    To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.

(b)    A player, who (i) is not eligible for benefits under 2(a) above, (ii) has at least one Credited Season after the 2005 Season, and (iii) has at least five (5) Credited Seasons under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, shall be eligible to be reimbursed for up to $45,000 (up to $60,000 in the 2015–2020 League Years) of his expenses incurred for qualifying tuition, fees and books, provided such expenses are incurred within 48 months of the first day of the League Year immediately following the player's last regular or post season game and otherwise satisfy the conditions of the plan.

(c)    A player who has just completed his first Credited Season will be eligible to be reimbursed for a course that begins after his Club's final game of that season and prior to the next following season provided that:

(i)    if, on the day the course begins, the player is under contract with a Club; and

(ii)      if any portion of the course is taught after the start of his Club's offseason workout program, that the player does not have to travel more than 100 miles from that Club's main practice facility to take the course, provided that

(iii)      the Parties may waive the 100 mile limitation in any individual case, based upon a showing of unreasonable hardship.

*Section 3.* **Reimbursement:** An eligible player will be reimbursed no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books, but only if his completed application is received by the Plan Administrator within six (6) months of the date he completes the course.

*Section 4.* **Administration:** The NFL shall administer the Tuition Assistance Plan.

228

## ARTICLE 57
## LEGACY BENEFIT

***Section 1.*** **Establishment:** Effective August 4, 2011, the NFL shall establish a benefit known as the "Legacy Benefit." The Legacy Benefit will be provided from the Retirement Plan to vested players who had Credited Seasons prior to 1993.

***Section 2.*** **Benefit:** The parties will jointly determine no later than fourteen days after the effective date of this Agreement, the amount of the additional benefit to be provided under the Legacy Benefit and to whom it will be provided (e.g., to players who have no Credited Seasons after 1992, to players who had Credited Seasons before 1993 but no Credited Seasons after a specified season, or to all vested players with any Credited Seasons prior to 1993).

***Section 3.*** **Cost:** The NFL and its Clubs shall make an aggregate contribution of approximately $620 million to the Legacy Benefit over the term of this Agreement, 49% of which shall count as a Player Benefit Cost.

229

# ARTICLE 58
## 88 BENEFIT

*Section 1.* **Establishment:** The parties established the "88 Plan," to provide medical benefits to former Players who are (1) vested due to their Credited Seasons or their total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (2) determined by the governing Board of the 88 Plan (the "88 Board") to have "dementia," amyotrophic lateral sclerosis (ALS), and/or Parkinson's disease as defined by the parties. The 88 Plan is jointly administered, pursuant to the requirements of the Taft-Hartley Act, in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The 88 Plan, and any and all future amendments thereto, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Plan Year begins on April 1.

*Section 2.* **Dementia Benefits:**

(a)     The Plan will reimburse, or pay for, certain costs related to dementia, ALS, and/or Parkinson's disease, upon the diagnosis made by a physician with experience in the field of treating dementia, ALS, and/or Parkinson's disease. In no event will the total payments to or on behalf of an eligible player exceed $100,000 in any year ($130,000 beginning in the 2016 League Year), but in no event will benefits be paid for any month or other period of time that precedes the date the 88 Board first receives a written application or similar letter requesting the benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit. The costs to be paid for an eligible player include:

(1)     For any month in which an eligible player was admitted as an in-patient at an eligible institution for all or part of the month, institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $100,000 (1/12 of $130,000 beginning in the 2016 League Year); and

(2)     For any month in which an eligible player was not admitted as an in-patient at an eligible institution for all or part of the month, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $88,000 (1/12 of $118,000 beginning in the 2016 League Year).

(b)     The maximum benefit payable for any month shall be reduced, but not below zero, by the amount of any total and permanent disability benefits paid by the NFL Player Disability Plan. However, the maximum benefit payable for any month shall not be reduced by those total and permanent disability benefits paid to players who are receiving the Inactive "B" total and permanent disability benefit described in the Disability Plan. In the case of a Player who has reached his normal retirement date under the Bert Bell/Pete Rozelle Plan and who is receiving total and disability benefits under the Disability Plan in the Active Football, Active Nonfootball, or Inactive "A" categories, (including a player who has converted to retirement benefits under Section 5.4 of the

230

Bert Bell/Pete Rozelle NFL Player Retirement Plan), the maximum benefit payable for any month shall be reduced, but not below zero, by the excess of (1) the monthly benefit the player would receive from both the Bert Bell/Pete Rozelle Plan and the Disability Plan if he elected a Life Only form beginning on his normal retirement date, over (2) the monthly benefit the player would have received from the Bert Bell/Pete Rozelle Plan in a Life Only form beginning on his normal retirement date based solely on his Credited Seasons, as if he were not disabled. The parties will structure the benefits payable for or to eligible players to reduce or eliminate taxes on such benefits, to the extent deemed possible. At the discretion of the 88 Board, payments for durable medical equipment and prescription medication may be made directly to the player.

*Section 3.* **Funding:** The NFL Clubs will make advance contributions to the 88 Plan in an amount sufficient to pay benefits and all administrative expenses approved by the 88 Board.

*Section 4.* **Term:** This Plan will continue to provide benefits as above after the Final League Year and after the expiration of this Agreement, but only to a former player who qualified during the term of this Agreement and who remains qualified.

*Section 5.* **Committee:** The Parties shall establish a committee to develop guidelines for determining the reimbursement of covered expenses.

231

# ARTICLE 59
## GROUP INSURANCE

**Section 1.** Maintenance: The NFL Player Insurance Plan ("Insurance Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Plan will be continued and maintained in full force and effect during the term of this Agreement and must at all time comply with the terms of this Article. Under the Plan, players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)   **Life Insurance.** Effective September 3, 2011, a rookie player will be entitled to $600,000 in coverage, and a veteran player's coverage will be increased by $200,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan NFL Player Retirement Plan ("Retirement Plan")) up to a maximum of $1,600,000 in coverage.

(b)   **Medical.** Each player is required to pay an annual deductible of $600 per individual per plan year ($850 per plan year for the 2016–2020 League Years) and $1200 per family per plan year ($1700 per plan year for the 2016–2020 League Years), with maximum out-of-pocket expenses of $2000 (including the deductible) for each covered individual. In addition:

(1)   the co-insurance paid by a covered individual for services rendered by out-of-network providers will be 30% of covered charges; and

(2)   the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and

(3)   a prescription drug card will be provided to covered individuals with a three-tier, $15/$25/$50 co-pay.

(4)   One physical per year for the covered player and his spouse will be covered.

(5)   The maximum lifetime infertility benefit shall be $25,000.

(c)   **Dental.** Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)   Preventive care paid at 100% of UCR,

(2)   General services paid at 85% of UCR, and

(3)   Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d)   **Period of Benefits.** Subject to the extension provided in Section 2, Players will continue to receive the benefits provided in this Article through the end of the Plan Year in which they are released or otherwise sever employment. Players vested due to their Credited Seasons under the Retirement Plan who are released or otherwise

232

sever employment after May 1 in a calendar year will continue to receive the benefits provided under this section until the first regular season game of the season that begins in the following calendar year. Group benefits are guaranteed during the term of this Agreement unless required to be modified by law.

(e)     **Family Medical and Dental Coverage for Deceased Players.** A player's enrolled dependents (including a child born to the player's wife within ten months after the player's death) shall be entitled to continuing family medical and dental coverage, as follows:

(1)     for the dependents of a player on the Active, Inactive, Reserve/Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;

(2)     for dependents of a player who was receiving coverage under this Article at the time of his death, coverage will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.

(f)     **Coverage for Players Receiving Injury Settlements.** Effective September 1, 2011, Section 2.1 of the Plan shall be amended to provide that a Player who was on a Qualifying List at any time during the preseason shall be eligible for Comprehensive Medical and Dental Benefits in the immediately following season if he is paid all or part of his salary for such season pursuant to an Injury Settlement Waiver or an Injury Grievance, as such terms are defined in the CBA, and shall be regarded as being released in that season for purposes of determining the date his eligibility terminates under Section 2.3 and his right to extended coverage, if any, begins, provided, however, that coverage under the Plan will not be provided retroactively for any period of time it was not then available. In addition, the definition of "Continuing Veteran" shall be amended to require that a player be regarded as a vested player only if he has earned three or more Credited Seasons.

*Section 2.* **Extended Post-Career Medical And Dental Benefits:**

(a)     The medical and dental benefits described in Section 1 of this Article are continued, subject to limitations described in Section 3 below, as follows:

(i)     Players vested due to their Credited Seasons under the Retirement Plan who are released or otherwise sever employment at any time on or after the first regular season game, and prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above through the end of the Plan Year in which such release or severance occurs and for the following sixty (60) month period.

(ii)     All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described above are provided, as if such additional benefits had not been provided.

(iii)     Players vested due to their Credited Seasons under the Retirement Plan and who have a Credited Season in 2011 or thereafter who have completed their eligibility under this Section and under COBRA shall have the option, at the expiration of COBRA, to continue insurance coverage on the same terms as if COBRA had not ex-

pired (at their own expense) for the duration of this Agreement provided that no break in coverage occurs after the player's last Player Contract is terminated or expires. Each such player also will have the right to waive coverage under COBRA and elect coverage instead under a lower cost option mutually agreed to by the NFL and NFLPA.

*Section 3.* **Limitations And Rules For Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a)     The benefits described in Subsections 2(e) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including, without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)     Players eligible for coverage under Section 2 above are not obligated to enroll in any other health plan or program for health services offered by an employer.

(c)     The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

*Section 4.* **Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The parties each shall have the right to appoint two (2) trustees for the NFL Players Insurance Plan. In the event of a tie vote by the trustees in any appeal, the matter will be referred to the Benefits Arbitrator under Article 66. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Medical, dental, and prescription drug benefits may be provided on a self-insured basis not subject to state insurance law mandates. The list of state mandates will be reviewed to determine which, if any, shall be continued. and the conversion procedure will be ended. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

**ARTICLE 60**
**SEVERANCE PAY**

*Section 1.* **Eligibility and Maintenance:** The NFL Player Severance Pay Plan ("Severance Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Severance Plan will be continued and maintained in full force and effect during the term of this Agreement and at all times comply with the terms of this Article. Only players with two or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan), at least one of which is for a season occurring in 1993 through 2020, will be eligible for severance pay under this Plan. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay. Determinations of the Retirement Board with respect to Credited Seasons will be final and binding for purposes of determining severance pay.

*Section 2.* **Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; and (c) $12,500 per Credited Season for each of the seasons 2000 through 2008; (d) $15,000 for a Credited Season for the 2009 season, or for a Credited Season for the 2011 season; (e) $17,500 per Credited Season for each of the seasons 2012 through 2013; (f) $20,000 per Credited Season for each of the seasons 2014 through 2016; and (g) $22,500 per Credited Season for each of the seasons 2017 through 2020.

*Section 3.* **Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season. The payment will be made automatically on the last day of the calendar quarter in which the eligible player's "separation from service," within the meaning of Internal Revenue Code Section 409A, occurs, unless his separation from service occurs within twenty (20) days of such date, in which case his severance pay will be paid on the last day of the next following calendar quarter.

*Section 4.* **Second Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will be entitled to further severance pay based solely on his subsequent Credited Seasons.

*Section 5.* **Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

235

*Section 6.* **Administration:** The NFL shall continue to administer the Severance Plan.

*Section 7.* **Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player. Notwithstanding the preceding, (1) a player's severance pay will be assigned and paid to an "alternate payee," under a court order that satisfies the essential requirements to be a "qualified domestic relations order" within the meaning of Internal Revenue Code Section 414(p); and (2) a Club may offset against severance pay, at the time of payment, amounts to the extent permitted by Internal Revenue Code Section 409A and the regulations thereunder.

## ARTICLE 61
## NFL PLAYER DISABILITY PLAN

*Section 1.* **Maintenance:** The parties agree to create a new Taft-Hartley, welfare benefit plan for the payment of disability benefits to former players who are eligible and qualify. This new disability plan will combine the provisions of the Retirement Plan that deal with the payment of disability benefits, including but not limited to eligibility, criteria for qualifying for the benefit, and amounts of benefits and the provisions of the NFL Supplemental Disability Plan into one separate plan to be known as the NFL Player Disability Plan (the "Disability Plan"). Upon creation of this Disability Plan, the Retirement Plan shall be amended to eliminate its provisions relating to disability benefits that are incorporated into this new Disability Plan and the Supplemental Disability Plan shall terminate. The benefits payable under this new Disability Plan shall be reduced beginning at the player's normal retirement age by the monthly benefit the player is entitled to receive under the Retirement Plan beginning at the player's normal retirement age in the form of a life annuity. The benefits payable under this Disability Plan shall be reduced by the amount which would have resulted due to the application of Section 4.5 of the Retirement Plan due to the player electing an Early Payment Benefit. Subject to Section 4 below, this new Disability Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **New Disability Benefits:** All substantive provisions regarding the payment of disability benefits in the Retirement Plan and the Supplemental Disability Plan will be incorporated into this new Disability Plan so as not to change the current methodology or amount of the benefit except as follows:

    (a)    **New Disability Terms.**

    (i)    The Disability Plan will change the definition of "Total and Permanent Disability" to permit a player to receive up to $30,000 per year of earned income and to clarify that an applicant's educational level and prior training are not factors taken into account in determining whether he is "unable to engage in any occupation or employment for remuneration or profit." The new definition will define "permanent" for this purpose as follows: "A disability will be deemed to be "permanent" if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period."

    (ii)    The Disability Plan will provide that applications for benefits in the categories of Football Degenerative Total and Permanent Disability and Inactive Total and Permanent Disability shall no longer be accepted and such categories of benefits shall be eliminated. These disability benefits shall be replaced by two new Total and Permanent Disability Benefits referred to as Inactive A Disability Benefits and Inactive B Disability Benefits. Neither of these disabilities shall require the Total and Permanent Disability to have arisen out of football activities. Effective for applications received on or after September 1, 2011, players who file for Total and Permanent Disability Benefits within 15 years after their last Credited Season shall receive an Inactive A Disability Benefit in the amount specified in Section 3 below, if qualified, and players who file for Total and

237

Permanent Disability Benefits after 15 years of their last Credited Season shall receive an Inactive B Disability Benefit in the amount specified in Section 3 below, if qualified.

(iii)     Players whose Total and Permanent Disability is caused by the use of, addiction to, or dependence upon any controlled substance as defined in 21 USC Sec. 802(b), alcohol, or illegal drugs, shall only be eligible for Inactive B Disability Benefits. Notwithstanding the foregoing, a player may, if otherwise qualified, receive Total and Permanent Disability Benefits in any category if his Total and Permanent Disability is caused by the use of, addiction to, or dependence upon any controlled substance as defined in 21 USC Sec. 802(b) and (a) such use of, addiction to, or dependence upon results from the substantially continuous use of a controlled substance that was prescribed for League football activities or for any injury (or injuries) or illness arising out of League football activities of the applicant while he was an active player, and (b) an application for Total and Permanent Disability Benefits is received based on such use of, addiction to, or dependence upon a controlled substance no later than eight years after the end of the player's last Credited Season.

(iv)     Effective for applications received on or after September 1, 2011, to provide that the Line of Duty Benefit shall be no less than $2,000 per month (which such amount shall be increased in $500 increments every other year, beginning in 2013).

(b)     The Disability Plan will permit players who elected to retire under the Retirement Plan prior to the Normal Retirement date and who subsequently receive a Social Security Disability award prior to attaining the age of 55 to receive a Total and Permanent disability benefit for which they qualify.

(c)     The Disability Plan will contain a provision that reads substantially as follows: "Any person receiving total and permanent disability benefits may be required to submit to periodic physical examinations for the purpose of re-examining his condition. The examinations will occur not more often than once every five (5) years, except that upon request of three or more voting members of the Retirement Board, examinations may occur as frequently as once every six months. For each calendar year in which a person receives total and permanent disability benefits, he must submit an executed copy of IRS Form 4506-T by July 1 of the subsequent calendar year. A person who has not filed his annual federal income tax return by July 1 also must either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year. If the Disability Plan Board or the Disability Initial Claims Committee determines that such person is no longer totally and permanently disabled, the total and permanent disability benefits will terminate. The total and permanent disability benefits of any person refusing to submit to a required physical examination or to submit an IRS Form 4506-T annually will be suspended until such refusal is resolved to the satisfaction of the Disability Plan Board. If such refusal is not resolved to the satisfaction of the Disability Plan Board within one year after such person is notified of the consequences of his refusal, his total and permanent disability benefits will be terminated.  In that event, such person must submit a new application to be eligible to receive any further total and permanent disability benefits, but the rules classifying the type of T&P benefit will not apply."

238

(d)     The Disability Plan shall contain the same provisions as the Retirement Plan for resolving benefit disputes, including the following new provision: "Effective for benefit disputes arising under the Disability Plan on and after September 1, 2011, the arbitrator selected to resolve the dispute must base his decision solely on the administrative record that was before the Disability Board, as it may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator. In addition, each side shall be permitted to take depositions of any expert relied on by the other side based on the administrative record, supplemented as provided above."

(e)     The Disability Board shall engage an independent firm mutually selected by the NFL and the NFLPA to examine annually a representative sample of persons receiving benefits under the Disability Plan to ensure that each such person is eligible to receive the benefits being provided.

(f)     A healthcare professional designated by the parties shall become a member of the Disability Initial Claims Committee ("DICC"). He or she shall cast the deciding vote only on those cases that are preliminarily "deemed denials" because of a disagreement between the other two members of the DICC over a medical aspect of the case. Notwithstanding the foregoing, in situations where the designated healthcare professional determines that the medical evidence is either inconclusive or insufficient, he or she will abstain from voting resulting in the "deemed denial" becoming the final decision of the DICC.

*Section 3.* **Increase in Benefit Amounts:** Effective September 1, 2011, the minimum benefit amounts shall be increased as set forth below, both for future applications and for players currently in pay status. For this purpose, players currently receiving Football Degenerative Benefits shall be switched to Inactive A and players currently receiving Inactive Benefits shall be switched to Inactive B. Any player who was awarded a disability benefit prior to September 1, 2011 (including any player whose application for a disability benefit was received by the Disability Plan prior to September 1, 2011, that leads to an award of a benefit) will not be eligible for a benefit under the rules governing the award of disability benefits that go into effect on September 1, 2011, unless based on an impairment other than the one that originally qualified him for a disability benefit. Furthermore, the rules in effect prior to September 1, 2011, will govern all appeals and reclassifications of disability benefits that were awarded prior to September 1, 2011 (including any player whose application for a disability benefit was received by the Disability Plan prior to September 1, 2011, that leads to an award of a benefit):

| | |
|---|---|
| Active Football | $250,000 (increased to $265,000 effective January 1, 2016) |
| Active Nonfootball | $150,000 (increased to $165,000 effective January 1, 2016) |
| Inactive A | $120,000 (increased to $135,000 effective January 1, 2016) |
| Inactive B | $50,000 (increased to $60,000 effective January 1, 2016) |

*Section 4.* **Continuation of Benefits Following Term of Agreement:** After the term of the Agreement, the portion of the disability benefit that would have been paid under the Retirement Plan but for the changes made pursuant to this Article shall continue to

be paid from the Disability Plan, provided that the player continues to qualify for the benefit

*Section 5.* **Improvements:** The parties shall appoint designated representatives no later than October 31, 2011, to discuss in good faith additional improvements to the disability benefits provided under this Agreement including, but not limited to, expediting processing of applications, streamlining medical evaluation procedures, and maximizing benefits payable to the players. Among other things, the parties will discuss modifying the Disability Plan's benefit structure to make benefits hereunder tax-free to players.

# ARTICLE 62
# LONG TERM CARE INSURANCE PLAN

*Section 1.* **Eligibility and Maintenance:** The Long Term Care Insurance Plan ("LTC Plan") in effect as of the date hereof, and all future amendments thereto, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in the LTC Plan and the definitions of such terms are applicable only to the LTC Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The LTC Plan will be continued and maintained in full force and effect during the term of this Agreement; provided, however, that if the Management Council determines that it would be more efficient and economical to administer the LTC Plan under the Former Player Life Improvement Plan, the LTC Plan may be terminated and the benefits provided hereunder be provided under the Former Player Life Improvement Plan, subject to approval by the NFLPA. Only players who have permanently ceased playing professional football; who are vested under the Retirement Plan based on Credited Seasons; who have attained the age of 50 and not yet attained the age of 76; and who satisfy the underwriting requirements of the insurer are eligible for insurance under the LTC Plan.

*Section 2.* **Benefits:** All eligible players will be entitled to receive benefits under a long-term care insurance contract provided by a national insurer in the event the player is certified by a licensed health care provider as (i) requiring critical supervision, or (ii) requiring the presence of another person within arm's reach due to inability to perform a required number of defined activities of daily living. The long-term care insurance contract is renewable for life and entitles the player to receive a maximum daily benefit of $150 for a maximum of four years.

*Section 3.* **Limitations:** Benefits will not be paid for confinement, treatment, services or care: (i) resulting from alcoholism, drug addiction, or chemical dependency, unless as a result of medication prescribed by a physician; (ii) arising out of suicide (while sane or insane), attempted suicide, or intentionally self-inflicted injury; (iii) provided in a government facility (unless otherwise required by law), services for which benefits are payable under Medicare, or would be payable except for application of a deductible or coinsurance amount, or other governmental programs (except Medicaid), and services for which no charge is normally made in the absence of insurance; (iv) received outside the United States; (v) for which benefits are payable under any state or federal workers' compensation, employer's liability of occupational disease law; (vi) that are not included in a participant's plan of care; or (vii) that are prohibited by federal law.

*Section 4.* **Plan Benefits Primary:** Any player who is entitled to any payment or benefit under any other Article of this Agreement that would be eligible for payment or reimbursement under the LTC Plan will have such payment or benefit offset by the amount eligible for payment or reimbursement under the LTC Plan.

*Section 5.* **Administration:** The NFL shall administer the LTC Plan.

## ARTICLE 63
## GENE UPSHAW NFL PLAYER HEALTH REIMBURSEMENT ACCOUNT

*Section 1.* **Establishment:** The parties will jointly administer the Gene Upshaw NFL Player Health Reimbursement Account Plan (hereinafter referred to as "Health Reimbursement Plan" or "Plan") pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Plan Year begins on April 1. The Health Reimbursement Plan, and any and all future amendments thereto as adopted in accordance with the terms of that Plan, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For each of the Plan Years 2011 and thereafter, a contribution will be made to the Health Reimbursement Plan on behalf of the NFL Clubs based on the actuarial assumptions and methods contained in Appendix O. The unfunded present value of accrued nominal accounts shall be funded at a time or times selected by the NFL in an amount sufficient to pay reimbursements when they become due. All such contributions will be held for the exclusive benefit of Participants and their beneficiaries, and under no circumstances will any assets of the Plan ever revert to, or be used by, a Club, the League, or the NFLPA. Notwithstanding the above, any contribution made by or on behalf of a Club to the Plan due to a mistake of fact or law will be returned to such Club within six months of the determination that such contribution was in error. The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact or law. A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution. It will be the duty of the fiduciaries of the Health Reimbursement Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. No participant or beneficiary is required to or permitted to contribute, except as may be required by law. The present value of accrued nominal accounts will be determined based on the actuarial assumptions and methods contained in Appendix O.

*Section 3.* **Eligibility:** A Player participates in this Plan if (a) he earns a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan") for 2006 or for any later Plan Year for which a Salary Cap applies and has a total of three or more Credited Seasons as of the end of such Plan Year, or (b) his last Credited Season under the Retirement Plan is either 2004 or 2005 and he had a total of eight or more Credited Seasons as of the end of the such Plan Year.

*Section 4.* **Health Reimbursement Accounts:** A nominal account will be established to account for the interest of each eligible player. No interest, other investment earnings, or losses will be credited to any nominal account, except as described under Section 7(b)

242

below. Reimbursement payments from the Plan to eligible players, their spouses, and dependents will reduce the health reimbursement accounts dollar-for-dollar. Credits to the nominal accounts of eligible Players are determined as of March 31 of each Plan Year as follows:

(a)      The nominal account of an eligible Player who earns a Credited Season in a Plan Year, beginning with the 2011 Plan Year, will be credited with $25,000 ($30,000 for the 2016–2020 League Years); and

(b)      The nominal account of a Player who first becomes eligible in a Plan Year, beginning with the 2011 Plan Year, because it is his third Credited Season, or who earns his fourth Credited Season in the 2011 Plan Year and did not previously receive the enhanced credit pursuant to this Subsection, will be credited with an additional $50,000 for that year only.

(c)      The determination by the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan of a Player's Credited Seasons will be binding on the Plan. A player who is awarded Credited Seasons by the Retirement Board (other than a Credited Season for the 2010 Plan Year) and who thereby (1) becomes eligible to participate in the Plan or (2) becomes eligible for additional credits, will receive retroactive credits to his nominal account as of the end of the Plan Year in which the Retirement Board's Credited Season determination is made. The amount of the retroactive allocation will be $25,000 times the number of Credited Seasons not already counted under the Plan.

(d)      Total credits to an eligible player's nominal account for Credited Seasons before the 2011 League Year shall not exceed $300,000. Total credits to an eligible player's nominal account, including Credited Seasons after the 2010 League Year shall not exceed $350,000.

*Section 5.* **Payments from Health Reimbursement Accounts:** The Plan will reimburse medical care expenses (within the meaning of Internal Revenue Code section 213(d), and including, without limitation, direct medical expenses, medical insurance premiums, and medical insurance co-pays and deductibles to the extent provided in such Internal Revenue Code section) incurred by eligible players and their spouses and dependents without regard to section 152(b)(1), (b)(2) and (d)(1)(B)). The Plan will be established and administered to use the broadest allowable definition of "dependent" permitted by law and any individual who qualifies as a dependent in the plan year with respect to which the player receives a credit shall retain that status until that credit is exhausted.  Payments will be made only to the extent that the player or the player's spouse or dependents have not been reimbursed for the expense from any other plan. No player will have the right to receive cash or any taxable or nontaxable benefit other than the reimbursement of medical care expenses incurred by the player and his spouse and dependents. No reimbursement will be made to the extent that it would reduce the Player's Health Reimbursement Account below zero. A player's rights under this Health Reimbursement Plan may not be transferred, assigned, or alienated, except pursuant to a qualified medical child support order as defined in Section 609(a)(2) of ERISA.

Upon the death of a player, any remaining account balance may be used only to reimburse the medical care expenses of his surviving spouse and dependents. Upon the

death of such surviving spouse and last dependent, or upon the death of the player if there is no surviving spouse or dependents, any unused remaining balance is cancelled.

A player may receive a reimbursement from this Plan only for expenses incurred during a period of time during which he is not covered by (a) the Group Insurance provided in Section 1 of Article 59 and (b) the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article 59; except that a player who is covered by the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article 59 by reason of COBRA may receive a reimbursement from this Plan.

Effective September 1, 2011, the Plan shall be amended to provide that, notwithstanding any provision of the Plan, the credit standing to the account of a player found by the Trustees of the Insurance Plan to have defrauded the Insurance Plan shall be reduced by the lesser of (i) the amount of the fraud, or (ii) the remaining credit; and the Plan shall pay that amount to the Insurance Plan.

*Section 6.* Structure: The Health Reimbursement Plan will hold assets for the exclusive benefit of players and their beneficiaries. The parties agree that the Plan will be administered by a Health Board, and that prior to the first meeting of the Health Board the advisors to the Health Reimbursement Plan will be the same as the advisors to the Savings Plan. The Health Reimbursement Plan is intended to be a health care reimbursement arrangement as described in IRS Notice 2002-45, 2002-28 IRB 93; Rev. Rul. 2002-41, 2002-28 IRB 75; and Situation 1 of IRS Revenue Ruling 2005-24.

*Section 7.* Plan Operation in Post-Expiration Years:

(a)     After the expiration of this Agreement, the Plan will continue in existence until all nominal accounts have been paid out or forfeited.

(b)     The nominal accounts will not be credited with any earnings or interest except to the extent that, in the sole discretion of the Health Board, accumulated Plan earnings exceed current expenses and an appropriate reserve.

## ARTICLE 64
## FORMER PLAYER LIFE IMPROVEMENT PLAN

*Section 1.* Eligibility and Maintenance:

(a)     The Former Player Life Improvement Plan ("FPLI Plan"), previously known as the NFL Player Care Plan, was created, effective October 1, 2007, by amending the NFL Vested Inactive Players Life Insurance Plan to provide new benefits for eligible former players and a uniform administrative framework. The FPLI Plan, and all past and future amendments thereto as adopted in accordance with the terms of the FPLI Plan, are incorporated by reference and made a part of this Agreement, provided, however, that the terms used in the FPLI Plan and definitions of such terms are applicable only to the FPLI Plan and shall have no applicability to the Agreement unless the context of this Agreement specifically mandates the use of such terms. The FPLI Plan will be continued and maintained in full force and effect during the term of this Agreement.

(b)     A retired player must be vested in the Retirement Plan based on Credited Seasons in order to meet the basic requirements to be eligible for benefits under the FPLI Plan; however, some benefits require additional criteria to be eligible.

(c)     Under the FPLI Plan, eligible former players may receive benefits consisting of life insurance and assistance with obtaining joint replacements, prescription drugs, assisted living, Medicare supplemental insurance, spinal treatment, and neurological treatment as follows:

(i)     **Joint Replacements.** Different levels of benefits are provided to eligible former players depending on whether they are covered by medical insurance.

(A)     Former players covered by medical insurance will be entitled to the lesser of $5,250 ($10,500 in the case of a bilateral procedure) or the former player's co-insurance for health care items and services related to the joint replacement surgery, provided the expense was incurred within one year of the former player's surgery and would be eligible for payment under the NFL Player Insurance Plan.

(B)     If a former player is not covered by insurance and qualifies to receive charitable care from the NFL Player Care Foundation under the charitable care standards established and interpreted by the NFL Player Care Foundation's board of directors (to the extent the NFL Player Care Foundation continues to provide such charitable care to former NFL players), the former player will be treated at a participating healthcare facility qualified to perform the joint replacement. The FPLI Plan will pay 20% of a pre-negotiated rate. In addition, if such former player experiences complications from joint replacement surgery, the FPLI Plan will pay 100% of the reasonable and customary amount charged for the treatment of the complications up to a maximum of $250,000, provided the expense is incurred within one year of surgery.

(C)     **Limitations.** No benefits will be paid for revisions of prior procedures that replaced a joint. Bilateral procedures will not be available for former players who qualify for payment pursuant to Subsection 1(b) of this Article.

(ii)     **Discount Prescription Drug Benefits.**

(A)     Eligible former players and their dependents who are not eligible for coverage under the NFL Player Insurance Plan are eligible for a discount prescription

245

drug benefit. Eligible former players and their dependents will be issued a card that provides immediate discounts for prescription drugs at participating retail pharmacies in the United States.

      (B)    **Limitations.** There is no discount for over-the-counter or non-prescription medication. The discount card benefit may not be used in conjunction with any other plan or program, including Medicare, that provides similar benefits.

      (iii)    **Assisted Living Benefits.** All eligible former players will be entitled to certain discounts and preferred access at participating assisted living providers.

      (iv)    **Medicare Supplement Benefit.** All eligible former players who are at least age 65 and who have both Medicare Parts A and B coverage will be offered a range of Medicare supplement insurance plans provided by a Medicare supplement insurer. If an eligible former player enrolls in one of these options, the FPLI Plan will contribute $100 each month towards the applicable premium for this insurance; that monthly amount will increase to $120 for 2012–13, $140 for 2014–16, and $160 for 2017–2020, on March 31 of each of those years.

      (v)    **Spine Treatment Benefit.** Eligible former players will receive facilitated access and comprehensive, coordinated evaluation at participating medical centers. Each facility will designate one orthopedic surgeon as a point of contact to coordinate and oversee all aspects of an eligible former player's evaluation.

      (vi)    **Neurological Benefit.** Eligible former players will receive facilitated access and comprehensive, coordinated evaluation at participating medical centers. Each facility will designate one of its neurologists or neurosurgeons as a point of contact to coordinate and oversee all aspects of an eligible former player's evaluation.

      (vii)    **Life Insurance Benefit.** Eligible former players who (i) have neither reached their normal retirement age nor actually retired under the Retirement Plan and (ii) are not eligible for Life Insurance benefits under the NFL Player Insurance Plan, will be covered by a term life insurance policy in any amount equal to $20,000, plus $2,000 for each Credited Season in excess of a player's required number of seasons to vest under the Retirement Plan, up to a maximum of $50,000.

*Section 2.* **Administration:** The NFL shall administer the FPLI Plan.

*Section 3.* **NFLPA Review:** The NFLPA shall have the right to review and approve all programs and any changes made to the programs that are or have been implemented pursuant to the FPLI Plan.

246

# ARTICLE 65
## NEURO-COGNITIVE DISABILITY BENEFIT

*Section 1.* **Establishment:** Effective as of the first day of the month following the parties' approval of the standards to be established pursuant to this Article, and in all events no later than April 1, 2012, the Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have a permanent, neuro-cognitive impairment but are not receiving Line of Duty or Total & Permanent Benefits under the Disability Plan or Pension Benefits under the Retirement Plan. The medical standards for qualifying for this benefit will be proposed to the parties by a Special Committee made up of three healthcare professionals with expertise in neuro-cognitive disorders. One healthcare professional shall be selected by the NFLPA, one healthcare professional shall be selected by the Management Council, and a third healthcare professional by the other two healthcare professionals. This Special Committee shall recommend standards no later than December 1, 2011. The parties intend that the Special Committee shall recommend standards to qualify for the two benefits set forth in Paragraph 3 below. In making its recommendations, the Special Committee shall consider whether, and if so to what extent, evidence of behavior may be utilized in setting appropriate standards. An applicant will not be required to establish that the neuro-cognitive impairment arose out of football.

*Section 2.* **Eligibility:** Players shall be eligible for benefits under this Article where they (i) satisfy the standards set forth in Section 1; (ii) are under the age of 55; (iii) are vested under the Retirement Plan due to their Credited Seasons; (iv) have at least one Credited Season after 1994; and (v) have executed a release of claims and covenants not to sue in a form agreed upon by the parties to this Agreement. The parties agree that a player's right to receive benefits under this Article shall be contingent on the player's agreement to and execution of the release and covenant not to sue referenced above. The parties acknowledge and agree that the provision of the benefit under this Article shall not be construed as an admission or concession by the NFL Releasees or any of them that NFL football caused or causes, in whole or in part, the medical conditions covered by the benefit, or as an admission of liability or wrongdoing by the NFL Releasees or any of them, and the NFL Releasees expressly deny any such admission, concession, liability or wrongdoing.

*Section 3.* **Benefit:**

    (a)    Players who satisfy the standards established under Sections 1 and 2 shall be entitled to the following neuro-cognitive disability benefits which shall be payable for no more than 180 months beginning on the first day of the month following a qualifying exam; provided, however, no monthly neuro-cognitive benefits will be paid for any month after the month in which the player's 55th birthday occurs:

    (i)    **Moderately Impaired Benefit.** Players who qualify for a Moderately Impaired Benefit shall receive a monthly benefit equal to the sum of the Player's Benefit Credits, but no less than $3,000 (which such amount shall be increased in $500 increments every other year, beginning in 2013).

247

(ii)     **Mildly Impaired Benefit.** Players who qualify for a Mildly Impaired Benefit shall receive a monthly benefit equal to 50% of the sum of a Player's Benefit Credits, but no less than $1,500 (which such amount shall be increased in $375 increments every other year, beginning in 2013).

(b)     In addition to the monthly benefit, players shall be reimbursed for medical expenses related to the treatment of the player's neuro-cognitive disorder, but only if described in Section 213(d) of the Internal Revenue Code not to exceed $10,000 in any Plan Year. For purposes of reimbursing medical expenses under this Paragraph, the Plan in all cases will be the "secondary payor" to all other forms of insurance or reimbursement arrangements that the player may be eligible for including but not limited to the Gene Upshaw NFL Players Health Reimbursement Account Plan and the 88 Plan.

(c)     Players who are awarded benefits under Subsection 3(a)(ii) may voluntarily submit to additional evaluations after benefits under the Plan have begun, but not more often than once every 3 years, to determine if they qualify for benefits under Subsection 3(a)(i). Additionally, three members of the Plan's Board may also require a player to submit to an evaluation not more often than once every two years.

*Section 4.* **Special Committee:** Recognizing that advancements in neuro-cognitive testing and evaluation are occurring at a rapid pace, a special committee, the members of which shall be chosen in the same manner set forth in Section 1, shall review the Plan's standards every 2 years to determine if changes should be recommended to the parties.

*Section 5.* **Effect of Eligibility for Subsequent Disability Benefits:** If a player qualifies for the Moderately Impaired Benefit within 15 years of the player's last Credited Season and the player subsequently becomes eligible for Inactive B level Total and Permanent disability benefits, the benefit under this Article will cease and the player will begin to receive an additional benefit of $20,000 per year for the duration of his eligibility for the Inactive B benefit (e.g., $70,000 as the minimum Inactive B benefit prior to January 1, 2016), but this additional $20,000 benefit will not be paid for any month after the month in which the player's 55th birthday occurs.

# ARTICLE 66
## BENEFITS ARBITRATOR

*Section 1.* **Selection:**

(a)     The NFL and the NFLPA will submit five candidates for Benefit Arbitrator to each other within two weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten candidates submitted, a flip of the coin, no later than three weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article 43, will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

(b)     In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation:** To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role:** The Benefit Arbitrator will resolve any and all disagreements relating to Articles 52 through 65 of this Agreement, except to the extent provided for in ERISA plans. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either party may refer a matter to the Benefit Arbitrator by so notifying the Benefit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party,

249

the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Posthearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any posthearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that posthearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

## ARTICLE 67
## RETENTION OF BENEFITS

None of the following benefits, if provided by a Club free of charge to its players in each of the 2008–2010 seasons, may be reduced or eliminated by that Club during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable: meals, massage therapy services, nutritional services, and supplements provided by trainers or Club medical staff (subject to applicable League policies governing dietary and sports nutritional products).

251

## ARTICLE 68
## MUTUAL RESERVATION OF RIGHTS: LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Upon the expiration or termination of this Agreement, no party shall be deemed to have waived, by reason of this Agreement, or the settlement of any action, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Upon the expiration or termination of this Agreement, the Parties shall be free to make any available argument that any conduct occurring after the expiration or termination of this Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

252

## ARTICLE 69
## DURATION OF AGREEMENT

*Section 1.* **Effective Date/Expiration Date:** This Agreement shall be effective from August 4, 2011 until the last day of the 2020 League Year, except for the provisions relating to the Draft (Article 6), which shall remain in effect for the year immediately following the expiration or termination of this Agreement.

*Section 2.* **Termination Due To Collusion:**

    (a)    If at any time the conditions of Article 17, Section 16(a), (b), or (c) are satisfied, the NFLPA shall have the right to terminate this Agreement. To execute such termination, the NFLPA shall serve upon the NFL written notice of termination within thirty days after the System Arbitrator's decision finding the requisite conditions becomes final. The parties agree, however, that such termination shall be stayed if any party appeals such finding to the Appeals Panel, and to seek expedited review from the Appeals Panel.

    (b)    Any failure of the NFLPA to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of the NFLPA, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

253

# ARTICLE 70
## GOVERNING LAW AND PRINCIPLES

*Section 1.* **Governing Law:** To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

*Section 2.* **Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation of Articles 1, 4, 6–19, 26–28, 31, or 68–70 of this Agreement.

*Section 3.* **Mutual Drafting:** This Agreement shall be deemed to have been mutually drafted and shall be construed in accord with its terms. No party shall be entitled to any presumption or construction in such party's favor as a result of any party having assumed the primary burden of drafting any part of this Agreement.

*Section 4.* **Headings:** The headings in this Agreement are solely for the convenience of the parties, and shall not be deemed part of, or considered in construing, this Agreement.

*Section 5.* **Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

*Section 6.* **Authorization:** The NFL represents that it has been duly authorized to enter into and execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

*Section 7.* **Appendices and Exhibits:** All of the Appendices and Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

*Section 8.* **Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

*Section 9.* **Modification:** This Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties.

*Section 10.* **Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA, shall, upon the request of any party hereto, execute and deliver such further documents and instruments to take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

## ARTICLE 71
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)   To the NFL:
      The National Football League Management Council
      280 Park Avenue (after August 2011: 345 Park Avenue)
      New York, New York 10017
      Attention: Executive Vice President Labor & League Counsel

(b)   To an NFL Club:
      At the principal address of such Club as then
      listed on the records of the NFL or at that Club's
      principal office.
      Attention: President

(c)   To the NFLPA:
      National Football League Players Association
      63 Gene Upshaw Place
      1133 20th Street, NW
      Washington, D.C. 20036
      Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

By: _____

NATIONAL FOOTBALL
LEAGUE

By: _____

255

# APPENDIX A
## NFL PLAYER CONTRACT

THIS CONTRACT is between_____, hereinafter "Player," and _____, a _____corporation (limited partnership) (partnership), hereinafter "Club," operating under the name of the _____ as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

1. TERM. This contract covers _____ football season(s), and will begin on the date of execution or March 1, _____, whichever is later, and end on February 28 or 29, _____, unless extended, terminated, or renewed as specified elsewhere in this contract.

2. EMPLOYMENT AND SERVICES. Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory minicamp(s), official preseason training camp, all Club meetings and practice sessions, and all preseason, regular season and postseason football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

3. OTHER ACTIVITIES. Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury.

4. PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
    (a)    Player hereby grants to Club and the League, separately and together, the right and authority to use, and to authorize others to use solely as described below, his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph/signature (including facsimiles thereof), voice, biographical information and/or any and all other identifying characteristics (collectively, "Publicity Rights"), for any and all uses or purposes that publicize and promote NFL Football, the League or any of its

256

member clubs in any way in any and all media or formats, whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms. Without limiting the foregoing, this grant includes the right to use Player's Publicity Rights for the purpose of publicizing and promoting the following aspects of NFL Football, the League and/or any of its member clubs: brands, games, ticket sales, game broadcasts and telecasts, programming focused on the NFL, one or more NFL clubs and/or their games and events (e.g., coaches shows, highlight based shows such as *Inside the NFL*, behind-the-scenes programming such as *Hard Knocks*), other NFL-related media offerings (e.g., branded content segments featuring NFL game footage and other programming enhancements), media distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned awards programs (e.g., Rookie of the Year), and public service or community oriented initiatives (e.g., Play60). For purposes of clarity, the foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the term of this Agreement any Publicity Rights fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of this Agreement solely for the purposes described herein. Notwithstanding anything to the contrary, the foregoing grant does not confer, during or after the term of this Agreement, any right or authority to use Player's Publicity Rights in a manner that constitutes any endorsement by Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in third party advertising and promotional materials, footage and photographs of Player's participation in NFL games or other NFL events that does not unduly focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or promoter of, a third-party commercial product or service.

Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League.

Player and National Football League Players Association, including any of its affiliates ("NFLPA") do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media.

Nothing herein shall be construed to grant any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than such products that constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

(b)     Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form, media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product.

The Rights may also be used for the promotion of the NFLPA, its affiliated entities and/or its designees (the "NFLPA Entities"), provided such promotion does not constitute an endorsement by Player of a commercial product not a part of a group licensing program. Player agrees to participate, upon request of the NFLPA and without additional compensation, in reasonable activities to promote the NFLPA Entities, which shall include (i) up to three (3) personal appearances per year or (ii) up to fifteen (15) minutes per week dedicated to promoting the NFLPA Entities. Player retains the right to grant permission to others to utilize his Rights if that individual or entity is not concurrently utilizing the Rights of five (5) or more other NFL players for any commercial purpose whatsoever. If Player's inclusion in an NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with immediate written notice of that preclusion, the NFLPA agrees to exclude Player from that particular program. Should Player fail to perform any of his obligations hereunder, the NFLPA may withhold payments owed to Player, if any, in connection with this Group Licensing Assignment.

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

The assignment in this paragraph shall expire on December 31 of the latter of (i) the third year following the execution of this contract, or (ii) the year after this contract expires, and may not be revoked, terminated or otherwise assigned in any manner by Player until such date. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA.

Nothing in Paragraph 4b shall be construed or deemed to modify in any way the rights set forth in Paragraph 4a, and the fact that Paragraph 4b (or any of the terms thereof) appears in the Player Contract shall not be referred to, relied upon, or otherwise cited by Player and/or the NFLPA or any of its affiliates in any dispute or legal proceeding as evidence that the NFL, any NFL entity, any Club or Club Affiliate, or any licensee of any of the foregoing has consented, agreed, acknowledged, or does not contest the applicability or interpretation of Paragraph 4b.

5. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

| | | |
|---|---|---|
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season; |
| $ | /* | for the 20_____season. |

(* - designates the compensation Club will pay player if the player is not on Club's Active/Inactive List)

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during preseason training and in connection with playing preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from preseason, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6. PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

259

7. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any proper-
ly levied Club fine or Commissioner fine against Player will be paid, in cash on demand
or by means of deductions from payments coming due to the Player under this contract,
the amount of such deductions to be determined by Club unless this contract or any
collective bargaining agreement in existence during the term of this contract specifically
provides otherwise.

8. PHYSICAL CONDITION. Player represents to Club that he is and will maintain
himself in excellent physical condition. Player will undergo a complete physical examina-
tion by the Club physician upon Club request, during which physical examination Player
agrees to make full and complete disclosure of any physical or mental condition known
to him which might impair his performance under this contract and to respond fully and
in good faith when questioned by the Club physician about such condition. If Player fails
to establish or maintain his excellent physical condition to the satisfaction of the Club
physician, or make the required full and complete disclosure and good faith responses to
the Club physician, then Club may terminate this contract.

9. INJURY. Unless this contract specifically provides otherwise, if Player is injured in
the performance of his services under this contract and promptly reports such injury to
the Club physician or trainer, then Player will receive such medical and hospital care
during the term of this contract as the Club physician may deem necessary, and will
continue to receive his yearly salary for so long, during the season of injury only and for
no subsequent period covered by this contract, as Player is physically unable to perform
the services required of him by this contract because of such injury. If Player's injury in
the performance of his services under this contract results in his death, the unpaid bal-
ance of his yearly salary for the season of injury will be paid to his stated beneficiary, or
in the absence of a stated beneficiary, to his estate.

10. WORKERS' COMPENSATION. Any compensation paid to Player under this
contract or under any collective bargaining agreement in existence during the term of
this contract for a period during which he is entitled to workers' compensation benefits
by reason of temporary total, permanent total, temporary partial, or permanent partial
disability will be deemed an advance payment of workers' compensation benefits due
Player, and Club will be entitled to be reimbursed the amount of such payment out of
any award of workers' compensation.

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is com-
peting with other players for a position on Club's roster within the applicable player
limits. If at any time, in the sole judgment of Club, Player's skill or performance has been
unsatisfactory as compared with that of other players competing for positions on Club's
roster, or if Player has engaged in personal conduct reasonably judged by Club to ad-
versely affect or reflect on Club, then Club may terminate this contract. In addition,
during the period any salary cap is legally in effect, this contract may be terminated if, in
Club's opinion, Player is anticipated to make less of a contribution to Club's ability to

260

compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to

261

fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16. EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17. ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office. the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by

one party to the other at the address set forth in this contract or to such other address as
the recipient may subsequently have furnished in writing to the sender.

21. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth
the entire agreement between Player and Club and cannot be modified or supplemented
orally. Player and Club represent that no other agreement, oral or written, except as
attached to or specifically incorporated in this contract, exists between them. The provi-
sions of this contract will govern the relationship between Player and Club unless there
are conflicting provisions in any collective bargaining agreement in existence during the
term of this contract, in which case the provisions of the collective bargaining agreement
will take precedence over conflicting provisions of this contract relating to the rights or
obligations of either party.

22. LAW. This contract is made under and shall be governed by the laws of the State of

_____

23. WAIVER AND RELEASE. Player waives and releases: (i) any claims relating to the
2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency,
franchise player designations, transition player designations, the Entering Player Pool,
the Rookie Compensation Pool, or any other term or condition of employment relating
to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to
conduct engaged in pursuant to the express terms of any collective bargaining agreement
during the term of any such agreement. This waiver and release also extends to any con-
duct engaged in pursuant to the express terms of the Stipulation and Settlement
Agreement in *White*. This waiver and release does not waive any rights player may have
to commence a grievance under the 2006 CBA or to commence a grievance or other
arbitration under the 2011 CBA.

24. OTHER PROVISIONS.
      (a)     Each of the undersigned hereby confirms that (i) this contract, renegotia-
tion, extension or amendment sets forth all components of the player's remuneration for
playing professional football (whether such compensation is being furnished directly by
the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements
of any kind, whether express or implied, oral or written, and there are no promises,
undertakings, representations, commitments, inducements, assurances of intent, or un-
derstandings of any kind that have not been disclosed to the NFL involving
consideration of any kind to be paid, furnished or made available to Player or any entity
or person owned or controlled by, affiliated with, or related to Player, either during the
term of this contract or thereafter.
      (b)     Each of the undersigned further confirms that, except insofar as any of
the undersigned may describe in an addendum to this contract, to the best of their know-
ledge, no conduct in violation of the Anti-Collusion rules took place with respect to this
contract. Each of the undersigned further confirms that nothing in this contract is de-
signed or intended to defeat or circumvent any provisions of the collective bargaining
agreement dated August 4, 2011, including but not limited to the Rookie Compensation

Pool and Salary Cap provisions; however, any conduct permitted by that Agreement shall not be considered a violation of this confirmation.

(c)      PERFORMANCE-BASED PAY. Player's attention is called to the fact that he may be entitled to Performance-Based Pay in accordance with the procedures outlined in Article 28, and that his eligibility for such pay is based on a formula that takes into account his playtime percentage and compensation

25. SPECIAL PROVISIONS. THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

| | |
|---|---|
| _____ | _____ |
| PLAYER | CLUB |
| _____ | _____ |
| Home Address | By |
| _____ | _____ |
| Telephone Number | Club Address |
| _____ | _____ |
| Date | Date |
| _____ | |
| PLAYER'S AGENT | |
| _____ | |
| Address | |
| _____ | |
| Telephone Number | |
| _____ | |
| Date | |

Copy Distribution:

| | |
|---|---|
| White-League Office | Yellow-Player |
| Green-Member Club | Blue-Management Council |
| Gold-NFLPA | Pink-Player Agent |

264

## APPENDIX B
## FIRST REFUSAL OFFER SHEET

Name of Player:      Date:

Address of Player:      Name of New Team:

Name and Address of      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

[Supply Information on this Sheet or on Attachment]

1. Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide Honors [listed in Exhibit C to Article 13 of this Agreement]: [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

2. Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

3. Other terms (that need not be matched):

Player:      New Club:

By: _____      By: _____
                                                    Chief Operating Officer

**APPENDIX C**
**FIRST REFUSAL EXERCISE NOTICE**

Name of Player:      Date:

Address of Player:      Name of New Team:

Name and Address of      Name of Prior Team:
Player's Representative
Authorized to Act for Player:

Address of Prior Team:

 The undersigned member of the NFL hereby exercises its Right of First Refusal so as to
create a binding Agreement with the player named above containing the Principal Terms
set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those
terms of the NFL Player Contract not modified by such Principal Terms.

 Prior Team

By:

_____
Chief Operating Officer

266

## APPENDIX D
## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in doing so, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

Witnessed by:

_____

267

**APPENDIX E**
**EXAMPLES OF CAP PERCENTAGE AVERAGE FRANCHISE AND TRANSITION TENDER CALCULATIONS**

Set forth below are hypothetical examples for illustrative purposes only.

**Example 1:** Calculation of the Non-Exclusive Franchise Tender for a linebacker for the 2012 League Year:

|  | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | '11–'07 Sum |
|---|---|---|---|---|---|---|---|
| Franchise Tag* | N/A | $10.091 | $9.68 | $8.304 | $8.065 | $7.206 | $43.346 |
| Salary Cap | $125.0 | $120.375 | $121.6875 | $123.0 | $116.0 | $109.0 | $590.0625 |

*Note: the "Franchise Tag" for 2011 equals the average of the five largest Salaries (as defined in Article 10) for linebackers from the 2010 League Year; the "Franchise Tag" for 2010 equals the average of the five largest Salaries (as defined in Article 10) for linebackers from the 2009 League Year, and so on.

$\Sigma$ (Franchise Tags 2007–2011) $\div$ $\Sigma$ (Salary Caps 2007–2011) = 7.346% ($43.346 $\div$ $590.0625). If the 2012 Salary Cap was $125 million, then the 2012 Non-Exclusive Franchise Tender for a linebacker would be $9.183 million (7.346% of $125 million), or 120% of the player's 2011 Salary (as defined in Article 10), whichever is greater.

**Example 2:** Calculation of the Transition Tender for a linebacker for the 2012 League Year:

|  | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | '11–'07 Sum |
|---|---|---|---|---|---|---|---|
| Transition Tag | N/A | $8.894 | $8.373 | $7.48 | $7.335 | $6.493 | $38.575 |
| Salary Cap | $125.0 | $120.375 | $121.6875 | $123.0 | $116.0 | $109.0 | $590.0625 |

*Note: the "Transition Tag" for 2011 equals the average of the ten largest Salaries (as defined in Article 10) for Linebackers from the 2010 League Year; the "Transition Tag" for 2010 equals the average of the ten largest Salaries (as defined in Article 10) for linebackers from the 2009 League Year, and so on.

$\Sigma$ (Transition Tags 2007–2011) $\div$ $\Sigma$ (Salary Caps 2007–2011) = 6.5374% ($38.575 $\div$ $590.0625). If the 2012 Salary Cap was $125 million, then the 2012 Transition Tender for a Linebacker would be $8.172 million (6.5374% of $125 million).

268

## APPENDIX F
## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Cash Player Costs, and All Revenues ("AR") of the NFL and its member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions of this Agreement. The information on the Schedule is to be the responsibility of the management of the Clubs and the NFL.

The NFL and the NFLPA are to retain a national accounting firm (the "Accountants") which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Procedures shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six members with three representatives designated by each of the NFL and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Procedures described in the preceding paragraph and again to review the results of the Procedures reasonably before issuance of any Special Purpose Letter for that playing season.

The procedures detailed below and/or as otherwise agreed by the parties are and shall be designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Cash Player Costs and All Revenues of the NFL and its Clubs for such League Year in accordance with the provisions of this Agreement. The Accountants will perform the Procedures with respect to the Schedule for each League Year.

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), as agreed upon by the parties, or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report upon the Procedures as referred above.

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

**Procedures provided by the NFL and the NFLPA to be performed by the Accountants**

**General**

- This Agreement and all relevant side letters should be reviewed and understood.

- See Exhibit 6.1 for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in AR where appropriate.

- The Player Compensation and Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule shall be made available for review by representatives of the NFL and the NFLPA prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the NFL and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with this Agreement. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

- Revenue and expense amounts that have been estimated should be reconfirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from AR. All revenues excluded by the teams or League Office should be reviewed to determine proper

270

exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, AR.

**Procedures provided by the NFL and the NFLPA to be performed by the Local Accountants**

**General**

- The Local Accountants shall conduct procedures as agreed upon by the parties.

- This Agreement and all side letters should be reviewed and understood by all Local Accountants.

- See Exhibit 6.2 for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

**Team Salaries - Schedule 1**

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in this Agreement.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in this Agreement.

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with this Agreement.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this Agreement.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

273

**Benefits - Schedule 2**

• Trace amounts to the team's general ledger or other supporting documentation for agreement.

• Foot all schedules and perform other clerical tests.

• Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

• Review each team's insurance expenses for premium credits (refunds) received from carriers.

• Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

**Player Costs - Schedule 3**

• Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in this Agreement.

**Cash Spending - Schedule 3A**

• Perform procedures provided in Schedules 1 and 2 above and calculate Club's "Cash Spending" and amounts committed to be spent by Club in the year under review for Player Benefits, to determine the Club's contribution to Cash Spending (as defined in Article 12, Section 7) for such year.

**Revenues - Schedule 4**

• Trace amounts to team's general ledger or other supporting documentation for agreement.

• Foot all schedules and perform other clerical tests.

• Trace gate receipts to general ledger and test supporting documentation where appropriate.

• Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

274

- Luxury box revenues should be included in AR in a manner consistent with this Agreement. Amounts included in AR, and any deductions against such revenues should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in AR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in AR. Test appropriateness of balances where appropriate.

**Questions**

- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

**Revenue Reporting Procedures and List of Related Entities**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

275

**EXHIBIT F.1**
**ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT**

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages of the Member Clubs of the National Football League, for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an opinion on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an audit or examination of the Reporting Packages, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the National Football League, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

**EXHIBIT F.2**
**LOCAL ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT**

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of management of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the [Member Club Name], the National Football League, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

# APPENDIX G
## OFFSEASON WORKOUT RULES

Except for certain specified minicamps, any offseason workout programs or classroom instruction shall be strictly voluntary. No Club official shall indicate to a player that the Club's offseason workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club or any other adverse consequences). Offseason programs may take place for nine weeks. Workouts shall be limited to four days per week; such workout programs are not permitted on weekends. The nine weeks may include no more than ten days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all offseason workouts.

Voluntary offseason workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the NFL the schedule for the program, including designation of any days on which organized team practice activity will take place, pursuant to the rules set forth in Article 21 and any changes to the schedule for the program.

The following rules shall also apply to the ten days of organized team practice activity:

- No pads except protective knee or elbow pads. Helmets are permitted.
- All organized team practice activity shall be conducted pursuant to the rules for Phase Three activities, which are set forth in Article 21, Section 2(b)(iii) of this Agreement.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the offseason to ensure player safety and adherence to live contact guidelines.
- Maximum six hours per day, with a maximum two hours on field, for any player.

## APPENDIX H
## NOTICE OF TERMINATION

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

◻ You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

◻ You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

◻ In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

◻ You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

◻ In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

## APPENDIX I
## WRITTEN WARNING GOOD FAITH EFFORT

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article 30 of the Collective Bargaining Agreement if you are terminated before the end of this season.

[Club Official]
[Club name]

APPENDIX J
PRACTICE SQUAD PLAYER CONTRACT

PRACTICE PLAYER CONTRACT

THIS                CONTRACT                is                between
_____, hereinafter    "Player,"    and
_____, a _____ corporation (limited partnership)
(partnership), hereinafter "Club," operating under the name of the _____
as a member of the National Football League, hereinafter "League." In consideration of
the promises made by each to the other, Player and Club agree as follows:

1. TERM. This contract covers the 20_ football season, and will begin on the
date of execution and end one week after the date of the Club's last regular season or
postseason game, unless terminated by Player pursuant to Paragraph 10 or by Club pur-
suant to Paragraph 6 or Paragraph 9.

2. EMPLOYMENT AND SERVICES. Club employs Player as a member of its
Practice Squad. Player accepts such employment. Player agrees to give his best efforts
and loyalty to the Club, and to conduct himself on and off the field with appropriate
recognition of the fact that the success of professional football depends largely on public
respect for and approval of those associated with the game. Player will report promptly
for and participate fully in all Club meetings and practice sessions, and all other football
activities as directed by Club. Player will not participate in any football game not spon-
sored by the League unless the game is first approved by the League. Nor, while this
contract is in effect, will Player play football or engage in activities related to football
other than for Club or engage in any activity other than football which may involve a
significant risk of personal injury without first obtaining Club's prior written consent.

3. PUBLICITY.
(a)      Player hereby grants to Club and the League, separately and together, the
right and authority to use, and to authorize others to use solely as described below, his
name, nickname, initials, likeness, image, picture, photograph, animation, persona, auto-
graph/signature (including facsimiles thereof), voice, biographical information and/or
any and all other identifying characteristics (collectively, "Publicity Rights"), for any and
all uses or purposes that publicize and promote NFL Football, the League or any of its
member clubs in any way in any and all media or formats, whether analog, digital or
other, now known or hereafter developed, including, but not limited to, print, tape, disc,
computer file, radio, television, motion pictures, other audio-visual and audio works,
Internet, broadband platforms, mobile platforms, applications, and other distribution
platforms. Without limiting the foregoing, this grant includes the right to use Player's
Publicity Rights for the purpose of publicizing and promoting the following aspects of
NFL Football, the League and/or any of its member clubs: brands, games, ticket sales,
game broadcasts and telecasts, programming focused on the NFL, one or more NFL
clubs and/or their games and events (e.g., coaches shows, highlight based shows such as

281

*Inside the NFL*, behind-the-scenes programming such as *Hard Knocks*), other NFL-related media offerings (e.g., branded content segments featuring NFL game footage and other programming enhancements), media distribution platforms (e.g., NFL.com, NFL Mobile, NFL Network), official events (e.g., NFL Kickoff, NFL Draft), officially sanctioned awards programs (e.g., Rookie of the Year), and public service or community oriented initiatives (e.g., Play60). For purposes of clarity, the foregoing grant of rights includes the right and authority to use, and to authorize affiliates or business partners to use, after the term of this Agreement any Publicity Rights fixed in a tangible medium (e.g., filmed, photographed, recorded or otherwise captured) during the term of this Agreement solely for the purposes described herein. Notwithstanding anything to the contrary, the foregoing grant does not confer, during or after the term of this Agreement, any right or authority to use Player's Publicity Rights in a manner that constitutes any endorsement by Player of a third-party brand, product or service ("Endorsement"). For purposes of clarity, and without limitation, it shall not be an Endorsement for Club or the League to use, or authorize others to use, including, without limitation, in third party advertising and promotional materials, footage and photographs of Player's participation in NFL games or other NFL events that does not unduly focus on, feature, or highlight, Player in a manner that leads the reasonable consumer to believe that Player is a spokesperson for, or promoter of, a third-party commercial product or service.

Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League.

Player and National Football League Players Association, including any of its affiliates ("NFLPA") do not and will not contest during or after the term of this agreement, and this hereby confirms their acknowledgment of, the exclusive rights of the League, Club and any NFL member club (i) to telecast, broadcast, or otherwise distribute, transmit or perform, on a live, delayed, or archived basis, in any and all media now known or hereafter developed, any NFL games or any excerpts thereof and (ii) to produce, license, offer for sale, sell, market, or otherwise distribute or perform (or authorize a third party to do any of the foregoing), on a live, delayed, or archived basis, any NFL games or any excerpts thereof, in any and all media now known or hereafter developed, including, but not limited to, packaged or other electronic or digital media.

Nothing herein shall be construed to grant any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than such products that constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings).

(b)     Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data, copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form,

media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product.

The Rights may also be used for the promotion of the NFLPA, its affiliated entities and/or its designees (the "NFLPA Entities"), provided such promotion does not constitute an endorsement by Player of a commercial product not a part of a group licensing program. Player agrees to participate, upon request of the NFLPA and without additional compensation, in reasonable activities to promote the NFLPA Entities, which shall include (i) up to three (3) personal appearances per year or (ii) up to fifteen (15) minutes per week dedicated to promoting the NFLPA Entities. Player retains the right to grant permission to others to utilize his Rights if that individual or entity is not concurrently utilizing the Rights of five (5) or more other NFL players for any commercial purpose whatsoever. If Player's inclusion in an NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with immediate written notice of that preclusion, the NFLPA agrees to exclude Player from that particular program. Should Player fail to perform any of his obligations hereunder, the NFLPA may withhold payments owed to Player, if any, in connection with this Group Licensing Assignment.

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

The assignment in this paragraph shall expire on December 31 of the latter of (i) the third year following the execution of this contract, or (ii) the year after this contract expires, and may not be revoked, terminated or otherwise assigned in any manner by Player until such date. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA.

Nothing in Paragraph 3b shall be construed or deemed to modify in any way the rights set forth in Paragraph 3a, and the fact that Paragraph 3b (or any of the terms thereof) appears in the Player Contract shall not be referred to, relied upon, or otherwise cited by Player and/or the NFLPA or any of its affiliates in any dispute or legal proceeding as evidence that the NFL, any NFL entity, any Club or Club Affiliate, or any licensee of any of the foregoing has consented, agreed, acknowledged, or does not contest the applicability or interpretation of Paragraph 3b.

4. COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a weekly salary of $_____ for each week

during the Regular Season and each week that the Club is in the Postseason so long as Player is a member of Club's Practice Squad during the week preceding the game in question. Such salary will be payable on a weekly or bi-weekly basis as Club shall choose. In addition, Club will pay Player's necessary traveling expenses from his residence to Club's home city or other location to which the Player is directed to report; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses, if any, to which Practice Squad members are entitled pursuant to any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term and during any period for which the parties to that agreement agree to extend it.) In the event this Contract is terminated by the Club prior to 4:00 p.m., New York time, Tuesday, the Club shall not be obligated to pay Player for that week. If Player terminates this contract at any time, he will have no further right to receive any further compensation under this contract.

5. DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or a collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

6. PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player will make full and complete disclosure of any physical or mental condition known to him which might impair his performance under the contract and will respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

7. INJURY. If player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his weekly salary for so long, during the season of injury only and for no subsequent period, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his salary for the season of injury will be paid to his stated beneficiary or, in the absence of a stated beneficiary, to his estate.

8. WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term

284

of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

9. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's Practice Squad within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's Practice Squad, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or to attempt to sign, or another player or players who is or are already on Club's roster or Practice Squad, and for whom Club needs room.

10. TERMINATION BY PLAYER. Player may terminate this contract to sign an NFL Player Contract with another NFL club, except that Player may not sign an NFL Player Contract with Club's next opponent later than 4:00 p.m., New York time, on the sixth day preceding the game (except in bye-weeks, when the prohibition commences on the tenth day preceding the game). Player may not terminate this contract in order to sign a contract with another club to serve as a Practice Squad Player.

11. TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon either Player or Club giving written notice to the other, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate his contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

12. INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following Injury Grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance

285

with the procedures of the American Arbitration Association on application by either party.

13. RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

14. INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount, to suspend Player for a period certain or indefinitely, and/or to terminate this contract.

15. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, conflict between the terms of this contract and any collective bargaining agreement then in existence, or upon any ground allowed in such collective bargaining agreement. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

16. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of the NFL collective bargaining agreement or this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective

bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

17. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

18. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

19. LAW. This contract shall be governed by the laws of the State   of _____.

20. WAIVER AND RELEASE. Player waives and releases: (i) any claims relating to the 2011 lockout; (ii) any antitrust claims relating to the Draft, restrictions on free agency, franchise player designations, transition player designations, the Entering Player Pool, the Rookie Compensation Pool, or any other term or condition of employment relating to conduct engaged in prior to the date of this Agreement; and (iii) any claims relating to conduct engaged in pursuant to the express terms of any collective bargaining agreement during the term of any such agreement. This waiver and release also extends to any conduct engaged in pursuant to the express terms of the Stipulation and Settlement Agreement in *White*. This waiver and release does not waive any rights player may have to commence a grievance under the 2006 CBA or to commence a grievance or other arbitration under the 2011 CBA.

21. OTHER PROVISIONS.
   (a)    Each of the undersigned hereby confirms that (i) this contract sets forth all components of the player's remuneration for playing professional football or serving as a Practice Player (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are no undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

287

(b)     Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Collective Bargaining Agreement took place with respect to this contract.

THIS CONTRACT is executed in six copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection with respect to this contract.

_____               _____
PLAYER                                 CLUB

_____               _____
Home Address                           By

                                       Club Address
_____               _____
Telephone Number (including area code)

_____               _____
Date                                   Date

_____
PLAYER'S AGENT

_____
Date

288

# STANDARD CONTAGIOUS DISEASE ADDENDUM

_____ ("Practice Squad Player") and _____ ("Club") agree to the following terms:

1. The terms of this addendum, and the other terms set forth in the side letter dated June 24, 2010, will take effect if Practice Squad Player is elevated from Practice Squad to the 53-player Active/Inactive List for a game because the Club was given roster exemptions due to confirmed or suspected cases of a Contagious Disease among its players.

2. If Practice Squad Player is elevated to the Club's 53-player Active/Inactive List under these special circumstances, then Practice Squad Player's weekly compensation specified in Paragraph 4 of the Practice Player Contract will be adjusted for that game to $1/17^{th}$ of the Paragraph 5 minimum salary for Active/Inactive List players with the same number of credited seasons. Unless otherwise provided for below in Paragraphs 3 and 4, Practice Squad Player will be paid the weekly compensation set forth in Paragraph 4 ("Compensation") of the Practice Player Contract after he automatically reverts to the Practice Squad.

3. In the event Practice Squad player: (1) sustains a football-related injury (either in a practice prior to the game or in the game itself) after being elevated to the 53-player Active/Inactive List under the circumstances described in Paragraph 1 above, and (2) is physically unable to practice or play for the club due to the injury, then the player's weekly compensation specified in Paragraph 4 of the Practice Player Contract will be adjusted to $1/17^{th}$ of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of credited seasons. Player shall receive this weekly "salary continuation" for so long as he remains physically unable to perform the services required of him because of such injury. Once Practice Squad player is physically able to perform the services required of him by his Practice Player Contract, then his salary will be adjusted to the amount set forth in Paragraph 4 ("Compensation") of that contract for the period of time he remains on the club's Practice Squad.

4. If Practice Squad player sustains a football-related injury during the game in which he was elevated (or during a practice after being elevated but prior to the game) and is subsequently placed on Reserve/Injured, then he will be paid (for so long as he remains physically unable to perform the services required of him because of such injury) the prorated portion of the Paragraph 5 minimum salary for players not on a Club's Active/Inactive List (i.e., the "down" amount) with the same number of credited seasons. A Practice Squad player, who is placed on Reserve/Injured under these circumstances, must be signed by his club to an NFL Player Contract at the time he is placed on that reserve list category.

289

_____                    _____
Practice Squad Player                        Club

_____                    _____
Date                                         Date

_____
Player's Certified Agent

_____
Date

**APPENDIX K**
**STANDARD MINIMUM PRESEASON PHYSICAL EXAMINATION**

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**
1. History
- player
- family
- thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
- head
- face
- scalp
- ears
  - external & drums
- sinus
- throat
- eyes
  - pupils
  - reaction to movement & light
- lungs
  - palpation
- chest
- heart
- visceral
- hernia
- rectal
  - hemorrhoid
  - fistula
  - prostate
- gastric
- any unusual body marks, i.e. scars, birthmarks
- height
- weight
- temperature
- blood pressure
- pulse
- heart rate

**Orthopedic Examination**

291

Examination visually, including stress testing and range of motion for all of
the following:

- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck
**EKG**
Heart Abnormalities
ECG with interpretation
**Echocardiography**
Stress testing available and performed when clinically-indicated
**Blood Testing**
Standard grid. Testing for (including but not limited to):

- CBC diff platelets
- Complete chemistry profile including but not limited to electrolytes, BUN/Creatinine, LFTs, glucose
- Lipid profile
- T4, TSH
- U/A
- Sickle Cell (only if not previously tested)
- G6PD (only if not previously tested)

**Neuropsychological Testing (Baseline)**
**Urinalysis**
Check for (including but not limited to):

- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**

- peripheral vision
- standard eye test

**Hearing Test**
**Dental Examination**

**Chest X-Ray** (initial screening only, and then based on past history and complaints)
Check for: Tumor
  T.B.
  Lesions
**X-Ray all previously injured areas** (at physician's discretion)

APPENDIX L
INJURY SETTLEMENT

SETTLEMENT AND RELEASE

Upon receipt of and in consideration for the sum of _____ ($   ), minus applicable taxes, _____ ("Player"), for himself and his heirs, executors, administrators, successors, and assigns, does hereby release and discharge the_____ ("Club"), its officers, directors, stockholders, employees, agents, and representatives, the NFL Management Council, and the National Football League, and their members, employees, agents, and representatives, from any and all liability relating to the Injury Grievance filed by Player and the NFL Players Association on _____ pursuant to Article 44 of the 2011 NFL Collective Bargaining Agreement. [Include IP and Extended IP release as appropriate]

By their signatures hereto, the parties acknowledge and affirm that this is a compromise settlement of a disputed claim, and that payment of the consideration for this release shall not be deemed or construed as an admission of liability by the Club.  Under this Settlement and Release, the Player and the Club specifically reserve any and all rights they may have under federal and state law.

Player acknowledges that he has hereby been given notice that he may have rights under the applicable Workers' Compensation laws in _____ and jurisdictions other than _____, as a result of any claimed injuries in the scope of his employment with the Club, whether on a specific or cumulative trauma basis.  [OPTIONAL]

The parties agree that the above-referenced $_____ represents payment to Player for _____ (__) regular season games of Paragraph 5 salary for the purposes of Article 41, Section 4 [and entitles the player to a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (if applicable)]

By their signatures hereto, the parties certify that they have read this Settlement and Release, that they understand its meaning and content, and that they have executed it as a free and voluntary act.


_____            _____
For the CLUB                         Player


_____
Title:

Subscribed and sworn to before        Subscribed and sworn to before
me this ___ day of _____, 2011.    me this ___ day of _____, 2011.

294

_____
Notary Public

_____
Notary Public

## APPENDIX M
## CHECK-OFF AUTHORIZATION FOR NFLPA
## DEDUCTIONS

I hereby authorize and direct my present club, or any other NFL club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the NFL.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each preseason and regular season pay check, beginning with the first pay check after the date of the first preseason squad cutdown. The club will forward such deductions within seven days of each check-off to the National Football League Players Association, 63 Gene Upshaw Place, 1133 20th Street, NW, Washington, DC 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the NFL and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the NFL and the Member Clubs of the NFL, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the NFL and the Member Clubs of the NFL, whichever occurs sooner.

Date:

Signature

Player's Name—Type or Print

296

## APPENDIX N
## ACTUARIAL ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | RP-2000 Table projected to 2020 |
| Disability mortality before age 65: | RP-2000 Table, disabled mortality |

Nonfootball related disability
rates before retirement:

Sample Rates

| Age | Rate* |
|---|---|
| 22 | .19% |
| 27 | .19% |
| 32 | .19% |
| 37 | .26% |
| 42 | .45% |
| 47 | .90% |
| 52 | 2.06% |
| 57 | 4.28% |
| 62 | 12.19% |

*Rounded

Football related disability rates:   35% per year for active players and 28% per year for inactive players up to 15 years after the player's last Credited Season.

Line-of Duty rates:

| Age | Rate |
|---|---|
| 25–29 | 1.25% |
| 30–39 | 5.00% |
| 40–44 | 2.50% |
| 45+ | 0.00% |

Withdrawal rates:

For players

| w/service of: | Rate |
|---|---|
| 1 year | 19.5% |
| 2 years | 11.0% |
| 3 years | 16.5% |
| 4 years | 15.8% |
| 5 years | 17.4% |
| 6 years | 18.4% |
| 7 years | 19.9% |
| 8 years | 21.4% |
| 9 years | 24.6% |
| 10 years | 26.2% |
| 11 years | 28.2% |
| 12 years | 30.5% |

|  |  |
|---|---|
| 13 years | 35.6% |
| 14 years | 37.2% |
| 15 years | 42.5% |
| 16 years | 55.8% |
| 17 years | 68.7% |
| 18 years | 78.6% |
| 19 years | 90.6% |
| 20 years | 100.0% |

Election of early payment benefit: 35% of all players elect the benefit at termination. No assumption for players with no Credited Seasons before 1993.

Retirement age:

| Age | Player with Pre-93 Season Rate | Player without Pre-93 Season Rate |
|---|---|---|
| 45 | 15% | 0% |
| 46–49 | 3% | 0% |
| 50–54 | 2% | 0% |
| 55 | 25% | 50% |
| 56–59 | 5% | 5% |
| 60 | 10% | 10% |
| 61 | 5% | 5% |
| 62–63 | 10% | 10% |
| 64 | 25% | 25% |
| 65 | 100% | 100% |

Percent married: Social Security awards in 1972

Age of Player's wife: Three years younger than player

Remarriage and mortality rates for widows benefit: 1980 Railroad Retirement Board rates

Net investment return: 7.25%

Administration expenses: Actual for prior year

Valuation date: First day of Plan Year

Actuarial value of assets: Five-year asset smoothing method

Funding method: Unit credit cost method

Amortization period: The Plan's unfunded actuarial accrued liability as of April 1, 2011 will be amortized in level amounts over 7 years, beginning with the contribution for the 2011 Plan Year. Notwithstanding the above, the increased liability, if any, attributable to an amendment covering only pre-1993 players will be amortized over 10 years. In each Plan Year after the 2011 Plan Year, a new level 7-year amortization period will be established for the net change in the Plan's unfunded liability during the preceding Plan Year. In no event shall the contribution for a year exceed an amount which is expected to produce a negative unfunded actuarial liability at the end of the plan year; nor shall the contribution be less than the minimum required under ERISA.

## APPENDIX O
## HEALTH REIMBURSEMENT PLAN ACTUARIAL ASSUMPTIONS AND FUNDING

| | |
|---|---|
| **Valuation Date:** | April 1 |
| **Value of Assets:** | Market value |
| **Mortality Assumptions:** | None |
| **Players Included in Valuation:** | Players for whom a nominal balance has been established |
| **Player's Last Season:** | Each active player is assumed to have three future Credited Seasons |
| **Date When Benefits Will Begin to be Paid:** | Each player with a nominal balance is assumed to begin distributions five years after his expected last Credited Season |
| **Annual Distributions:** | Annual distributions will equal the estimated cost of a year's coverage for an active player under the Player Group Insurance Plan for the years in which a reimbursement is expected to be made |
| **Discount Rate:** | 60 basis points greater than the average yield of money market funds as published in The Wall Street Journal on each April 1 nearest the Valuation Date |
| **Expenses:** | The actual expenses for the prior year |
| **Contributions and Amortization Period:** | As of April 1, 2011, a valuation will be prepared based on the value of nominal balances as of April 1, 2011 ("past service liability"), and the expected value of nominal balances to be earned during the 2011 Season and the estimated expenses for the year ("normal cost"). The value of plan assets as of April 1, 2011 shall be subtracted from the past service liability to determine the unfunded past service liability. A contribution will be made as of March 31, 2012 of at least the sum of (1) the normal cost, (2) an amortization of the unfunded past service liability over ten years, and (3) interest to March 31, 2012. |

300

A valuation will be performed each subsequent year. Each year a new liability base will be established equal to the Plan's unfunded past service liability less the unamortized amount of the bases for the past service liability as of April 1, 2011 and each of the bases established after 2011. Each year, a contribution will be made equal to the sum of (1) the normal cost for the year, (2) the amount for each amortization base amortized over seven years (until each base is fully amortized), and (3) interest to the end of the year. The contribution, however, will be reduced, but will not be less than zero, to the extent the assets exceed the Plan's liability. If this last sentence applies, all bases will be considered fully amortized.