**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |

# DECLARATION OF ORRAN L. BROWN, SR.

I, ORRAN L. BROWN, SR., hereby declare and state as follows:

### A.     INTRODUCTION

    **1.     *The Declarant.*** My name is Orran L. Brown, Sr. I am the Chairman and a founding partner of BrownGreer PLC, located at 250 Rocketts Way, Richmond, Virginia 23231. I have personal knowledge or information of the facts set forth in this Declaration.

    **2.     *BrownGreer's Role in This Settlement Program.*** The Court appointed BrownGreer as the Claims Administrator under the Class Action Settlement Agreement ("Settlement Agreement") approved by this Court on April 22, 2015, in Document No. 6510. As the Claims Administrator, BrownGreer receives and reviews all Registration Forms under Article IV of the Settlement Agreement and Claim Packages seeking Monetary Awards under Article VI of the Settlement Agreement. Through September 25, 2017, we had received 17,166 timely Registration Forms from Retired NFL Football Players or the Representative Claimants of deceased or incompetent Retired NFL Football Players. We have 1,318 Claim Packages seeking Monetary Awards.

    **3.     *The Purpose of this Declaration.*** I submit this Declaration to: (1) assist the Court in its analysis of the "Motion to Determine Proper Administration of Claims Under the

Settlement Agreement and Incorporated Memorandum of Law" (the "Motion") filed on

August 15, 2017 (Document No. 8267), by XILaw, P.A. ("X1Law"); and (2) to correct

factual misstatements in the "Notice of Joinder and Supplemental Memorandum in Support

of Motions to Determine Proper Administration of Claims Under the Settlement Agreement"

(the "Joinder") filed on September 20, 2017 (Document No. 8397).   Other firms have filed

joinders to the Motion including Smith and Stallworth, P.A., Neurocognitive Football

Lawyers, PLLC and The Yerrid Law Firm, Farrise Law Firm, P.C., and The Law Office of

Hakimi & Shahriari (formerly known as "Top NFL Lawyers").   We have factual explanations

as to all the claims of those firms like those offered here about X1 Law and will submit them

if the Court would find them helpful.

## B. <u>BACKGROUND INFORMATION</u>

4.      ***Input and Approval from the Parties and the Special Masters on Our***

***Procedures to Implement the Settlement Agreement***.   In our role as Claims Administrator,

we have developed many policies and procedures necessary to implement the terms of the

Settlement Agreement.   However, we adopt no procedures on anything, including how we

review Monetary Award claims, until we have presented them to Co-Lead Class Counsel and

Counsel for the NFL Parties (collectively, the "Parties") and they have commented upon and

approved them, to ensure that we implement the Settlement Agreement according to its terms

and the intentions of the Parties who wrote it and agreed to it.   We also present many of our

procedures and related documents for review and approval by the Special Masters appointed by

the Court to oversee the Settlement Program.   We hold policy and operational issues calls with

lawyers for the Parties on a weekly basis, unless an intervening holiday causes us to miss a week.

As of September 25, 2016, we had done 67 such calls with the Parties, starting on April 19,

2016.   We also have held other calls and meetings with the Parties as needed to address

particular interpretation or operational issues.  We hold similar calls with the Special Masters.

This is a best practices approach to claims administration of a class action settlement agreement,

especially one with many elements as the one in this proceeding.  It is common to need the input

of the Parties when fashioning the steps necessary to put into action the terms set out in the

Settlement Agreement.

      **5.**    *Settlement Agreement Requirements for a Monetary Award Claim Package.*

Section 8.2(a) of the Settlement Agreement requires that a Claim Package seeking a Monetary

Award contain:

> (1) a Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form;
>
> (2) a Diagnosing Physician Certification;
>
> (3) Medical records reflecting the Qualifying Diagnosis;
>
> (4) a HIPAA-compliant authorization form; and
>
> (5) records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

The X1 Motion implicates items (2) and (3) in this list of five required elements of a Monetary
Award Claim Package.

      **6.**    *The Original Monetary Award Claims from X1Law.*  As of September 15, 2017,

X1Law had submitted 34 Claim Packages seeking Monetary Awards based on these Qualifying

Diagnoses:  (a) Level 1.5 Neurocognitive Impairment (14 claims);  (b) Level 2 Neurocognitive

Impairment (18 claims); and (c) Alzheimer's Disease (two claims).  All 34 of these claims rest

on a Qualifying Diagnosis made before the January 7, 2017, Effective Date of the Settlement and

contain records of evaluations by either Dr. M. Albin Morariu, Sr. (32 claims) or his son, Dr.

Mircea Morariu (two claims).  Neither of those doctors is a Qualified MAF Physician under

Section 6.5 of the Settlement Agreement.  X1Law initially submitted Pre-Effective Date

Diagnosing Physician Certification Forms signed by Dr. M. Albin Morariu, Sr., for all 34 of its

claims, including the two on which the records indicate his son, Dr. Mircea Morariu, evaluated

the player.  Dr. Morariu, Sr., or his son examined these claimants in the period from October 13,

2016, to January 6, 2017 (the eve of the January 7, 2017 Effective Date of the Settlement

Agreement), with the Diagnosing Physician Certification Forms signed by one of those

neurologists from May 14, 2017, to May 22, 2017.  Section 6.4(a) of the Settlement Agreement

directs that most Qualifying Diagnoses made before the January 7, 2017 Effective Date by

doctors who are not Qualified MAF Physicians must go to a member of the Court-appointed

Appeals Advisory Panel ("AAP") of board-certified neurologists to determine if the medical

records in the file support the diagnoses asserted by the physician who signed the Diagnosing

Physician Certification Form.  As originally submitted, the X1Law claims had to be reviewed by

a physician member of the AAP rather than by BrownGreer.

> **7.**      ***Changes by X1Law to its Claim Packages to Replace the Diagnosing Physician***
> ***Certification Forms.***  On April 7, 2017, we posted to the Settlement Website the first list of the

Qualified MAF Physicians approved by the Parties.  Under Section 6.3 of the Settlement

Agreement, a Qualifying Diagnosis after the January 7, 2017 Effective Date of the Settlement

can be made only by a Qualified MAF Physician or, for Level 1.5 and Level 2 Neurocognitive

Impairment, by either a Qualified MAF Physician or a Qualified BAP Provider.  Diagnoses made

by a Qualified MAF Physician, whose experience and credentials are approved by the Parties

before the physician is designated as authorized to make diagnoses under the Settlement

Agreement, are analyzed by BrownGreer to determine if the medical records in the file reflect

the Qualifying Diagnosis stated by the physician in the Diagnosing Physician Certification Form

on the claim.  On May 16, 2017, we added Dr. Nicholas Suite to the list of Qualified MAF

Physicians.  On June 9, 2017, X1Law asked us to remove from our electronic claim file the

Diagnosing Physician Certification Forms signed by Dr. Morariu on all 34 of the firm's claims.

After we did so, X1Law uploaded new Diagnosing Physician Certification Forms signed by Dr. Suite for each of its claims.  This had Dr. Suite, who by then was a Qualified MAF Physician, attesting to Pre-Effective Date Qualifying Diagnoses.  Because Dr. Suite is a Qualified MAF Physician, such claims would be reviewed by BrownGreer rather than an AAP neurologist.

8.     ***Investigation of Dr. Suite's Methodology.***   We could not find in the X1Law Claim Packages any medical records from Dr. Suite or his practice.  On August 21, 2017, a BrownGreer representative spoke with Dr. Suite to determine whether he had personally examined the 34 Retired NFL Football Players for whom X1Law had submitted Claim Packages. Dr. Suite told us that he had not.  Instead, he based all 34 diagnoses and his attestation under oath in the Pre-Effective Date Diagnosing Physician Certification Forms on his review of records of the evaluations actually done by one of the two Drs. Morariu, as well as his familiarity with the work of Dr. M. Albin Morariu, Sr.  One of the many claims review procedures approved by the Parties for us to follow requires that the physician who signs the Diagnosing Physician Certification Form must have personally examined the Retired NFL Football Player and observed his cognitive and physical performance first hand to be able to make a Qualifying Diagnosis under the Settlement Agreement.  Because Dr. Suite had never met with or examined these players, the claims are incomplete until X1Law submits Diagnosing Physician Certification Forms from Dr. M. Albin Morariu, Sr., or Dr. Mircea Morariu, the physicians who did in fact examine and diagnose the players, or until they have Dr. Suite examine the players in person and give us Diagnosing Physician Certification Forms and medical records based on and dated after those exams, assuming he continues to find a Qualifying Diagnosis condition in the player after he sees him.

9.     ***Course of Action on Complete Monetary Award Claims.***  If X1Law corrects these deficiencies by re-filing the Diagnosing Physician Certification Forms signed by the Dr.

Morariu who saw the player, these X1Law claims will go to the AAP for review of the

Qualifying Diagnoses asserted.  The Parties have instructed us that we must ensure Claim

Packages are complete on all required parts of a Claim Package before we send them to the AAP

for analysis.  All 34 of the X1Law Claim Packages are incomplete because of the Dr. Suite issue.

The Level 1.5 and Level 2 claims, however, have other potential issues, as they also are missing

other materials contemplated by Ex. A-1 of the Settlement Agreement: (a) the files on the 32

Level 1.5 and Level 2 claims do not show that the diagnosing physician considered corroborating

evidence of functional impairment; (b) 18 of the 32 Level 1.5 and 2 claims do not include

neuropsychological testing for evidence of cognitive decline from a previous level of

performance; and (c) 27 of the 32 Level 1.5 and 2 claims do not show that the diagnosing

physician evaluated functional impairment under standards like those set forth in National

Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale.  By the time X1Law

filed the Motion on August 15, 2017, we had notified the firm of these potential problems for 23

of its 34 claims.  We had decided not to send the firm notices listing these defects its other 11

claims, thinking that because the X1 Motion challenges the basis on which we issue these

notices, we would await the Court's ruling and direction before sending additional notices that

would only raise the same issues X1 Law already raised in the Motion.  However, on September

22, 2017, Patrick Tighe of the XI Law firm called Jennifer Goodwin at BrownGreer, demanding

to know where these notices were.  It was an abusive call during which Mr. Tighe repeatedly

used the f-word on our employee.  Mr. Tighe behaved in that manner over these notices, so on

September 23, 2017, we went ahead and issued notices on his 11 other claims with submitted

Claim Packages, recognizing that while demanding them he also disputes our authority to issue

them.

6

## C.  ACCUSATIONS IN THE MOTION

10.  ***Alleged "Amendment" to the Settlement Agreement.***  The Motion challenges as

an "amendment" to the Settlement Agreement requirements we are applying as approved by Co-

Lead Class Counsel and Counsel for the NFL Parties to make a Claim Package complete,

regarding:

(a)   The diagnostic criteria for Qualifying Diagnoses of neurocognitive impairment made before the January 7, 2017 Effective Date of the Settlement Agreement;

(b)   Whether the diagnosing physician who signed the Diagnosing Physician Certification Form personally examined the Retired NFL Football Player;

(c)   The corroborating evidence of functional impairment required for Level 1.5 and Level 2 claims; and

(d)   The use of a third-party affidavit in place of corroborating documentary evidence of functional impairment.

## D.   EXPLANATION OF THE DEFICIENCIES IN THE X1LAW CLAIMS

11.  ***The Diagnostic Criteria for Qualifying Diagnoses of Neurocognitive Impairment Before the January 7, 2017 Effective Date of the Settlement Agreement.***

(a)   Applicable Settlement Agreement Provisions.

Sections 1(a)(i)-(iv) of Ex. A-1 to the Settlement Agreement set out the diagnostic criteria

for Retired NFL Football Players diagnosed through the BAP with Level 1.5 Neurocognitive

Impairment.  Section 1(b) of Ex. A-1 covers Level 1.5 claims diagnosed outside the BAP:

(b)   For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement

Similarly, sections 2(a)(i)-(iv) of Ex. A-1 prescribe the criteria for diagnoses made in the BAP of

Level 2 Neurocognitive Impairment, while Section 2(b) of Ex. A-1 applies to a Level 2

Qualifying Diagnosis done outside the BAP:

(c)    For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

In addition to these provisions in Ex. A-1, Section 6.4(b) of the Settlement Agreement defines how an AAP member is to review a Pre-Effective Date Qualifying Diagnosis:

The Appeals Advisory Panel member shall review the Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions), including consideration of, without limitation, the qualifications of the diagnosing physician, the supporting medical records and the year and state of medicine in which the Qualifying Diagnosis was made. The Appeals Advisory Panel member also shall confirm that the Qualifying Diagnosis was made by an appropriate physician as set forth in Section 6.3. For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements.

This reminder that a review of whether a Qualifying Diagnosis is based on principles "generally consistent" with the diagnostic criteria set forth in Ex. A-1 does not require the identical diagnostic criteria as a BAP diagnosis made under Ex. A-1 and applies to the medical review being done by an AAP member of a Pre-Effective Date diagnosis.

(d)    <u>Directions from the Parties on Diagnoses Outside the BAP</u>.

Because a Monetary Award Claim Package based on a Pre-Effective Date Level 1.5 or Level 2 diagnosis involves a diagnosis outside the BAP, the diagnostic criteria applicable to such claims must be "based on evaluation and evidence generally consistent" with the detailed criteria listed for such diagnoses by Qualified BAP Providers in Exhibit A-1 and an AAP member assesses the claim "based on principles generally consistent with the diagnostic criteria" in

Exhibit A-.  As we planned for our review of such Claim Packages, we reviewed these

provisions with the Parties, who approved procedures and deficiency notice explanations that

required us to assess the medical records in every Level 1.5 and Level 2 Claim Package against

the BAP diagnostic criteria, point out to Settlement Class Members and their lawyers if their

Claim Package were missing one of the diagnostic criteria and give them a 120-day opportunity

to supply the item, including those resting on Pre-Effective Date diagnoses made outside the

BAP, to enhance the likelihood that the diagnostic criteria used for such diagnoses were "based

on evaluation and evidence generally consistent" with those BAP criteria and ensure approval.

Following these directions, the Notices of Claim Package Deficiency we began sending to

Settlement Class Members on May 8, 2017, enumerated the aspects in which the Claim Package

lacked elements of the BAP diagnostic criteria.  These were not notices of determination on the

merits.

        (e)      <u>First Adjustment to Deficiency Notices to Reiterate that the BAP Diagnostic<br>Criteria Were Not Mandatory for Diagnoses Made Outside the BAP</u>.

In this as in any settlement program, we adjust all processes in reaction to experience

gained in the handling of actual claims.  Here, we found that some lawyers for Settlement Class

Members questioned the need for deficiency notices on Pre-Effective Date diagnoses to specify

all missing diagnostic criteria when they felt their claims were "generally consistent" with those

criteria without them.  These lawyers also felt such notices could influence the AAP members to

think the claims were in fact incomplete and not "generally consistent" because we had pointed

out something was not present in the file.

As a result, we recommended to the Parties that we modify our incompleteness process

for Claim Packages resting on Pre-Effective Date diagnoses that were subject to review by the

AAP to continue to alert Settlement Class Members and their lawyers to any diagnostic items not

found in the claim submissions, but make it clear that the Settlement Class Member could stand

on what he had submitted and immediately tell us to send the claim to the AAP for analysis

without the player or firm adding any of the items to the claim file, unless the missing item was

so fundamental that we must deny the claim without it, such as the HIPAA Form, the Settlement

Class Member's signature on the Claim Form, or having a Diagnosing Physician Certification

Form signed by the physician who personally examined the player and provided the diagnosis.

The new notices featured a column next to the enumerated deficiency reasons that indicated with

a Yes or No whether the identified issue had to be resolved before the claim could be sent to the

AAP for review under the generally consistent standard.  We also ensured that the AAP members

were blinded to any of our incompleteness notices, so there was no possibility of them being

influenced by any such notice.  We implemented these modified notices on June 26, 2017, and

also undertook a program to re-issue notices done under the original approach and replace them

with the revised version and a fresh 120-day period for the Settlement Class Member to supply

the item or tell us to send the claim to the AAP for review without it.

      (f)     <u>Second Adjustment to Deficiency Notices for Level 1.5 and 2 Claims</u>.

      Some recipients of the new Pre-Effective Date deficiency notice continued to be

dissatisfied, contending that their submitted Claim Packages were not incomplete under the

"generally consistent" standard and felt that calling the claims "deficient" disparaged them

unfairly.  So we worked with the Parties to further revise the Pre-Effective Date deficiency

notice for claims subject to AAP review to: (1) change the title to "Notice of Preliminary

Review" rather than "Notice of Claim Package Deficiency;" (2) remove all references to

"deficiencies" to soften the message in the notice; and (3) call the 120-day response deadline a

"Response Deadline" instead of a "Cure Deadline" to eliminate any negative inferences from the

wording in the notice.  In addition, we proposed a similar version of the new Notice of

Preliminary Review for Level 1.5 and 2 claims based on diagnoses made outside the BAP that

are subject to review by BrownGreer.  The Parties and the Special Masters approved these

updates to the deficiency notice on July 18, 2017, and we began sending these notices on July 20,

2017, on all claims based on Qualifying Diagnoses of Level 1.5 and 2 made outside of the BAP.

Similarly, on August 17, 2017, we started using these re-designed notices for claims that remain

with BrownGreer for review on the merits.  These adjustments have allowed the incompleteness

process to run smoothly.

(g)     Claims Administrator Assistance to Answer Questions About Notices.

We include a standard section in all notices a "How to Contact Us With Questions or For Help"

section providing our toll-free number and information on how to reach us to answer questions

about the notice content and deadlines:

> If you are represented by a lawyer, consult with your lawyer if you have questions
> or need assistance. If you are unrepresented and have any questions about this
> Notice or need help, contact us at 1-855-887-3485 or send an email to
> ClaimsAdministrator@NFLConcussionSettlement.com.  If you are a lawyer, call
> or email your designated Firm Contact for assistance. For more information about
> the Settlement program, visit the official website at
> www.NFLConcussionSettlement.com to read the Frequently Asked Questions or
> download a copy of the complete Settlement Agreement.

We have a dedicated staff of Call Center Agents for unrepresented callers and Law Firm

Contacts assigned to each law firm to answer questions about the Settlement Program and help

them with all aspects of Registration and Claims Package submission.  We have a Law Firm

Contact responsible for X1 Law's needs.

(h)     Reissued Notices of Preliminary Review to X1Law.

On August 24, 2017, we issued replacement notices on the 23 X1Law claims for which

we had already issued Notices of Claim Package Deficiency.  That firm, and any others with

such notices, must address any issues identified on the notice as required, but they have the

option of instructing us to proceed with the review of their claims without waiting for them to

submit any additional materials for those issues identified as optional.  The Parties have

instructed us that the Diagnosing Physician Certification Form problem described in paragraph 8 of this Declaration, which is present on all 23 of its notices, must be cured before a Claim Package can be reviewed for eligibility for a Monetary Award by BrownGreer or the AAP. X1Law has not yet responded to any of these notices and has until the Response Deadline of December 22, 2017, to do so.

      **12.**     ***Personal Examination of the Retired NFL Football Player.***   Section 8.2(a)(iii) of the Settlement Agreement allows a physician to make a Qualifying Diagnosis for a living player relying on the records and work done by a prior physician and to use that earlier date as the Qualifying Diagnosis date only if that prior physician is deceased or incompetent and only if the new physician independently examines the player.  In all other instances, the Settlement Agreement requires a Qualifying Diagnosis of a living player to be made by a physician based on his or her own examination and records, rather than the examination and records of someone else.  The Parties have directed us that:

    (1)     The diagnosing physician cannot base a Qualifying Diagnosis solely on a review of test results or the medical records of another physician; and

    (2)     The diagnosing physician must have met with the player in person, rather than communicating with him by email, texts, letters, or on the phone.

The Claim Package must include records from the diagnosing physician who examined the living player in person and rendered the Qualifying Diagnosis, and that diagnosing physician must be the one who signs the Diagnosing Physician Certification Form.  Otherwise, the claim is and will remain incomplete.  All 34 of X1Law's claims are incomplete for this reason because the physician who signed the Diagnosing Physician Certification Form, Dr. Suite, told us he did not personally examine any of these players.

**13.**    *The Corroborating Evidence of Functional Impairment Required for Level 1.5 and Level 2 Claims.*

(a)    Applicable Settlement Agreement Provisions.

Section 1(a)(iii) of Ex. A-1 to the Settlement Agreement mandates that a Qualifying

Diagnosis of Level 1.5 Neurocognitive Impairment must meet these criteria:

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis… In the event that no documentary evidence of functional impairment exists or is available, then … (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

Section 2(a)(iii) of Ex. A-1 imposes the same requirement for Level 2 Qualifying Diagnoses:

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care.  Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis… In the event that no documentary evidence of functional impairment exists or is available, then … (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(b)    Directions from the Parties on the Corroborating Evidence of Functional Impairment Required.

This too was a Settlement Agreement provision we reviewed with the Parties before

implementing.  We have followed their instructions that the documentary evidence the

diagnosing physician relies upon to evaluate whether the Retired NFL Football Player exhibits

functional impairment under the benchmark guidelines, whether medical records, employment

records or other materials, must be something the diagnosing physician actually considers when formulating his or her diagnosis.  Information obtained after the date of the diagnosis could not have been considered in reaching the proper diagnosis, though such supplemental material in some instances may confirm other evidence of functional impairment in the physician's possession at the time he or she made the diagnosis.  The 32 Level 1.5 and Level 2 claims from X1Law do not contain any such documentary evidence, which made them incomplete.  This issue is one for which the firm may tell us to proceed with the review based on the record as submitted, but X1Law has not yet done that for any of the notices we have sent them on their Level 1.5 and 2 claims with this issue.

**14.** *Use of a Third-Party Sworn Affidavit in Place of Corroborating Documentary Evidence.*

(a)   <u>Settlement Agreement Requirements</u>.

Settlement Agreement Ex. A-1 explains four main requirements for all Level 1.5 and 2 claims diagnosed through the BAP:

(1) Concern of severe decline in cognitive function.

(2) Evidence of cognitive decline from a previous level of performance, as determined by standardized neuropsychological testing, in two or more cognitive domains, one of which must be (a) executive function, (b) learning and memory, or (c) complex attention.

(3) Functional impairment, which must be corroborated by documentary evidence or a third-party sworn affidavit.  If a third-party affidavit is used to corroborate functional impairment, then the cognitive decline demonstrated in (2) must be in either executive function or learning and memory, plus at least one other cognitive domain.

(4) The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

For Level 1.5 and 2 claims diagnosed outside of the BAP, the diagnosis must be based on evaluation and evidence generally consistent with these four elements.  If the Claim Package does not contain any corroborating documentary evidence or a third-party affidavit, we send a notice containing language approved by the Parties to state what Exhibit A-1 requires:

14

Your medical records indicate that the diagnosing physician did not consider documentary evidence of functional impairment for a Qualifying Diagnosis of Level 1.5 or 2 Neurocognitive Impairment. The Settlement Agreement requires that pre-Effective Date Qualifying Diagnoses of Level 1.5 or 2 Neurocognitive Impairment be based on evidence and evaluation generally consistent with Exhibit A-1, subsections 1(a)(iii) and 2(a)(iii). These sections contemplate that the Retired NFL Football Player's functional impairment be corroborated by documentary evidence, such as medical records or employment records from before the date of the Qualifying Diagnosis, the sufficiency of which will be determined by the physician making the Qualifying Diagnosis. If no such corroborating documentary evidence exists, the Settlement Agreement contemplates that functional impairment be corroborated by a sworn statement from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members).

(b)      Role of Neuropsychological Testing in Level 1.5 and 2 Claims.

X1Law cites Section 2(a)(iii) of Ex. A-1, which states:

In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

X1Law contends that the deficiency language in the notice, which it refers to as "Alleged Deficiency No. 3" in Paragraph 16(c) of the Motion, did not address the requirement in 2(a)(iii)(a), which it argues "basically amounts to a neuro psych test."  However, neuropsychological testing is one of the "diagnostic criteria" set forth in Ex. A-1 for Level 1.5 and 2 claims, regardless of additional reliance on documentary evidence or a third-party sworn affidavit to corroborate functional impairment.  "Alleged Deficiency No. 2," which X1Law cites in Paragraph 16(b) of the Motion, is the incompleteness language we send for claims that lack such neuropsychological testing:

Your medical records did not show any neuropsychological testing for evidence of cognitive decline from a previous level of performance in the required number and type

of cognitive domains (complex attention, executive function, learning and memory, language, and perceptual-spatial).

We have issued 34 notices for X1Law's claims.  Two of those were for a Qualifying Diagnosis of Alzheimer's Disease.  The other 32 notices were for Level 1.5 and Level 2 claims.  We sent X1Law the "Alleged Deficiency No. 2" for nine of the firm's Level 1.5 claims and three of the Level 2 claims on which we had issued notices, telling the firm it had to give us neuropsychological testing for evidence of cognitive decline from a previous level of performance in the required number and type of cognitive domains.  We issued five notices for Level 1.5 claims with this language.  We did not include it in the other 15 notices we issued for X1Law's Level 2 claims because the diagnosing physician for those claims indicated on the Diagnosing Physician Certification Form that certain testing was medically unnecessary due to the severity of the player's dementia.  That is an exception to the neuropsychological testing requirement permitted by Section 2(b) of Ex. A-1:

> For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

As a result, on those 15 Level 2 claims, we did not send the "Alleged Deficiency No. 2" asking for neuropsychological testing.  We did, however, notify X1Law about the requirement of neuropsychological testing it claims is missing from the notices we issued on the 17 Level 1.5 and Level 2 claims to which that requirement applied.

## E.  FACTUAL INACCURACIES IN THE X1 MOTION

15.  ***Declaration of David E. Smith.***  The Motion inaccurately describes information we provided to X1Law.  We address these inaccuracies specifically in the Declaration of David

E. Smith.  Mr. Smith's Declaration recounts the call he participated in on August 14, 2017, with various members of X1Law and refutes inaccurate statements attributed to him in the Motion and certain declarations by members of the Firm that were attached to its Response to NFL Parties' and Co-Lead Class Counsel's Joint Motion for Extension of Time to Respond to Motion filed on August 23, 2017 (Document No. 8309).

I, Orran L. Brown, Sr., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 28th day of September, 2017.

_____

Orran L. Brown, Sr.