IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : : : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | | |

# DECLARATION OF DAVID E. SMITH

I, DAVID E. SMITH, hereby declare and state as follows:

## A. INTRODUCTION

**1.**     ***The Declarant.***  My name is David E. Smith.  I am a partner at BrownGreer PLC, located at 250 Rocketts Way, Richmond, Virginia 23231.  BrownGreer PLC is the Claims Administrator under the Class Action Settlement Agreement approved by this Court on April 22, 2015, in Document No. 6510.  The matters set forth in this Declaration are based upon my personal knowledge and information.

**2.**     ***The Purpose of this Declaration.***  I submit this Declaration in response to the "Motion to Determine Proper Administration of Claims Under the Settlement Agreement and Incorporated Memorandum of Law" (the "Motion") filed on August 15, 2017 (Document No. 8267), by X1Law, P.A. ("X1Law") on behalf of 16 of X1Law's clients who have submitted Monetary Award claims to the Settlement Program.  In this Declaration, I summarize my conversation with X1Law on August 14, 2017, and address inaccurate quotes attributed to me in the Motion and certain declarations by members of X1Law that were attached to its Response to NFL Parties' and Co-Lead Class Counsel's Joint Motion for Extension of Time to Respond to Motion filed on August 23, 2017.

### B.  CLAIMS PROCESSING QUESTIONS POSED BY THE FIRM

3. *Background Information.*  I participated in a conference call with three members of X1Law (Patrick J. Tighe, Michael G. St. Jacques, and Sharon Seldow) on August 14, 2017, at 2:00 p.m. E.T. to address their questions about the review of Monetary Award claims and the scope of the audit processes.  BrownGreer employee Jennifer Goodwin, who is X1Law's assigned Law Firm Contact, also joined the call.

4. *Audit Notice Issued to X1Law Client.*  Mr. Tighe began the call asking about the Notice of Audit of Claim X1Law received on August 11, 2017, for Settlement Program ID 100006825 ("Player A").  He wanted to know why Player A was selected for audit, stated that he believed only eligible claims could be audited, and asked whether this claim was eligible for compensation.  I informed Mr. Tighe that Player A's claim had not yet been found eligible, the Claims Administrator can audit claims under Section 10.3(b) of the Settlement Agreement at any time, and that he was confusing Section 10.3(b) with the mandatory ten percent audit of payable claims required by Section 10.3(c).  Mr. Tighe asked why Player A's claim was selected for audit.  I responded that I did not know the exact reason at that time but would find out from the audit team.  I reminded X1Law that it must respond to the audit notice or the claim could be denied for non-cooperation under Section 10.3(b)(ii).  The Response Date on the Notice of Audit of Claim was September 11, 2017, and the firm timely responded with the requested materials.

5. *Preliminary Review of Claim Packages.*  The next topic during the August 14, 2017 conference call was a general discussion of BrownGreer's preliminary review of Claim Packages and the completeness criteria and the deficiency processes outlined in Sections 8.4 and 8.5 of the Settlement Agreement.  X1Law wanted to discuss Settlement Program ID 100000978

("Player B") and the Notice of Claim Package Deficiency BrownGreer posted for that claim on July 18, 2017. Player B's notice informed X1Law of three deficiencies in the submitted Claim Package: (1) there were no medical records in the Claim Package from Dr. Suite, who had signed the Diagnosing Physician Certification Form; (2) the Claim Package did not have any corroborating documentary evidence of functional impairment for the Level 2 claim, as required by Exhibit A-1 of the Settlement Agreement; and (3) the medical records from Dr. Morariu in support of the Level 2 claim did not indicate that he had evaluated the claimant for functional impairment in the areas of Community Affairs, Home & Hobbies, and Personal Care.

6. *Incompleteness Criteria for Level 1.5 and 2 Claims.* In response to these questions, I explained to the three representatives of X1Law on the call the requirements in Exhibit A-1 for Level 1.5 or 2 Neurocognitive Impairment claims and noted that Ex. A-1 specifies the diagnostic criteria for players diagnosed *through the BAP*. I told X1Law that the Parties had instructed BrownGreer to review preliminarily all Claim Packages under Section 8.4 using the diagnostic criteria for Level 1.5 and 2 claims set out in Exhibit A-1, regardless of when the Qualifying Diagnosis had been made or who had made it. The Parties had approved procedures and incompleteness notice explanations that required BrownGreer to assess the medical records in every Level 1.5 and Level 2 Claim Package against the BAP diagnostic criteria. Such an assessment was not on the merits of a Claim Package. Rather the assessment and any resulting notice was to identify for Settlement Class Members and their lawyers any of the diagnostic criteria that might not be reflected in a Claim Package and give them a 120-day opportunity to supply the item, to ensure that as complete a picture of the Retired NFL Football Player's health was provided and to enhance the likelihood that the diagnostic criteria used for such diagnoses were "generally consistent" with those BAP criteria as would be required upon a

review of the merits of a Claims Package. I explained to X1Law that the goal of this preliminary review and notice was to indicate the Level 1.5 or 2 diagnostic criteria not addressed specifically in the submitted Claim Package and to provide claimants and firms an opportunity to elect to supplement the Claim Package before proceeding to the AAP or the Claims Administrator for a final review and determination on the merits under the appropriate standard.

7. ***Explanation of BAP Diagnostic Criteria and the "Generally Consistent" Standard.*** I have never told X1Law that all Level 1.5 and 2 claims would be reviewed under the "gold standard" of BAP diagnostic criteria, as alleged in paragraph 29 of the Motion. Instead, during the August 14, 2017 call, I explained that BrownGreer's preliminary review of Claim Packages used this "gold standard," but the final determination would be made under the "generally consistent" standard specified in Section 6.4(b) and Exhibit A-1 of the Settlement Agreement for a diagnosis made outside the BAP. We then discussed the "generally consistent" language and how BrownGreer and AAP members must use that standard when reviewing Level 1.5 and 2 claims based on a Qualifying Diagnosis not done in the BAP. I told Mr. Tighe that Player B's Notice of Claim Package Deficiency pointed out areas that did not comply with the BAP standards in Exhibit A-1, but that he potentially could elect to stand pat on his original Claim Package submission and send it to the AAP or to the Claims Administrator for review under the "generally consistent" standard without adding anything more to the file.

8. ***Adjustments to Deficiency Notice Language for Level 1.5 and 2 Claims.*** I also explained to X1Law on the August 14, 2017 call that we had redesigned the Notice of Claim Package Deficiency to explain the "generally consistent" review standard for Pre-Effective Date Level 1.5 and 2 claims more directly, because some lawyers had questioned the need for such deficiency notices on Pre-Effective Date diagnoses when they felt their submitted claims already

4

were "generally consistent" with the BAP criteria in Exhibit A-1. To address such arguments, BrownGreer drafted a new version of the deficiency notice to acknowledge expressly the "generally consistent" review standard for Pre-Effective Date claims and included a new Yes/No column to indicate whether the claimant must cure the incompleteness reason(s) to proceed to a review by the AAP or the Claims Administrator. This new version of the deficiency notice is called the Notice of Preliminary Review.

9. *Re-Issuance of Deficiency Notices for X1Law.* During the August 14, 2017 call, I offered to post new Notices of Preliminary Review for Player B and other similarly situated claimants represented by X1Law that contained the explanatory language about the "generally consistent" review standard. I explained that these new notices would restart the 120-day response deadline. Mr. Tighe seemed receptive to this offer and I told him that I would get back to him about this after determining how many of X1Law's clients needed a new Notice of Preliminary Review.

10. *No Discussion of Amendments to the Settlement Agreement.* I did not say on the call or at any other time that the Claims Administrator or the Parties had made or approved an "amendment" to the Settlement Agreement, as alleged in paragraphs two and 31 of the Motion. Such a statement would be false if I had made it. Instead, during the August 14, 2017 call, I explained to X1Law that BrownGreer and the Parties made changes to the deficiency notice template and specific deficiency reasons to highlight the "generally consistent" review standard for Pre-Effective Date diagnoses for Level 1.5 and 2 claims. These were the "changes" that X1Law references in paragraph ten of the Tighe affidavit, paragraph six of the Seldow affidavit and paragraph 13 of the St. Jacques affidavit.

11. *Responding to the Lack of Corroborating Evidence in the Claim Package.* Also on the August 14, 2017 call, X1Law asked how it could cure the second deficiency in Player B's deficiency notice about the lack of corroborating evidence. I explained to Mr. Tighe that he could upload any corroborating information and documents the diagnosing physician had reviewed to make the Level 2 diagnosis. Mr. Tighe asked why the explanation in the notice for curing this deficiency contained language indicating that the corroborating evidence must have been created at or before the time of the Qualifying Diagnosis. I told him that Exhibit A-1 sets this requirement by requiring that the physician making the Qualifying Diagnosis must determine the sufficiency of the corroborating evidence, and that the Parties approved all the deficiency reasons and curing explanations that appeared in the deficiency notices. Mr. Tighe pressed me to show him where that temporal requirement appeared in Exhibit A-1 for a Level 2 claim. I agreed that Exhibit A-1 did not have any *explicit* temporal language in the clause requiring corroborating evidence for a Player's functional impairment, but I explained why the corroborating documentary evidence must have existed on or before the date of the Qualifying Diagnosis. I referred him to this Section 2(a)(iii) of Ex. A-1 to the Settlement Agreement:

> Such functional impairment shall be corroborated by documentary evidence (*e.g.,* medical records, employment records), *the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.* In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance . . . in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), *the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.*

The italicized language states that the corroborating evidence must be considered by the diagnosing physician to reach the Qualifying Diagnosis, so it had to exist and be in the

6

possession of the diagnosing physician at the time he or she made the Qualifying Diagnosis. If it did not exist, the diagnosing physician could not consider it or determine its "sufficiency" to arrive at his or her medical conclusion.

12. *Directions from the Parties on Policy Issues and Interpretation Questions.* X1Law argued on the August 14, 2017 call that this application of Ex. 1 was too strict and not part of the Settlement Agreement. I responded that BrownGreer discusses all policy issues and interpretation questions with Co-Lead Class Counsel and Counsel for the NFL Parties to make sure BrownGreer, as the Claims Administrator, implements the Settlement Agreement as written. I reiterated that all notice templates and the specific Claim Package incompleteness reasons were considered and approved by the Parties before BrownGreer implemented them into the claims review process.

I, David E. Smith, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 28th day of September, 2017.

_____
David E. Smith