UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*In re National Football League Players' Concussion Injury Litigation*

*No. 2:12-md-02323-AB*

## DECLARATION OF BRIAN T. FITZPATRICK

1. My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee. I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006. I graduated from Harvard Law School in 2000. After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the Supreme Court of the United States. I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1.

2. I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt. In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the Arizona Law Review, and the NYU Journal of Law & Business. My work has been cited by numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today, and Wall Street Journal. I am also frequently invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011, 2016, and 2017, and the ABA Annual Meeting in 2012. Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies. In 2015, I was elected to the membership of the American Law Institute.

3. Lead class counsel in this case has proposed an allocation of any fee awarded among the various firms that worked on the case, and he has asked me to opine on whether the allocation is reasonable. For the reasons I state below, it is my opinion that the allocation is reasonable. In preparing this declaration, I conferred with lead class counsel and reviewed the declarations by the various firms that worked on this case.

4. In deciding how to allocate fees among multiple firms that have worked on behalf of a class, courts have taken a variety of approaches. Some courts do the allocation themselves. *See, e.g., Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1222-39 (S.D. Fla., 2006). Others appoint special masters to recommend an allocation. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2013 WL 1365900, at *7-*14 (N.D. Cal. April 3, 2013). But most courts delegate the responsibility to lead class counsel with review only for abuse of discretion. *See, e.g., Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 88 (2d Cir. 2010); *In re Initial Public Offering Securities Litigation*, 2011 WL 2732563, at *1 (S.D.N.Y. Jul. 8, 2011); *In re Vitamins Antitrust Litigation*, 398 F.Supp.2d 209, 221-222 (D.D.C. 2005) (Facciola, Magistrate J.).

5. No matter who the allocator—court, special master, lead class counsel—the methodology used has tended to be the same: the allocation is based on the relative contribution made by each firm. *See Victor,* 623 F.3d at 88; *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2013 WL 1365900, at *9; *In re Initial Public Offering Securities Litigation*, 2011 WL 2732563, at *7 ("District courts routinely give lead counsel the initial responsibility of devising a fee allocation proposal 'as they deem appropriate, based on their assessments of class counsel's relative contributions.'" (quoting *In re Vitamins Antitrust Litigation*, 398 F.Supp.2d at 224)); *Allapattah Services*, 454 F.Supp.2d at 1227 ("[A]n allocation of fees should be based on the

relative contributions that each law firm provided to the Class."). This relative contribution is usually determined by starting with each firm's lodestar and then adjusting it based on a number of factors. *See Victor,* 623 F.3d at 88 ("[E]xamination of the lodestar is both relevant and useful."); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2013 WL 1365900, at *9 (recounting that special master "applied multipliers to the adjusted lodestar figures based on certain factors"); *In re Initial Public Offering Securities Litigation*, 2011 WL 2732563, at *4 (approving allocation based on "requested lodestars, as well as the roles assumed, contributions made, time and labor expended, magnitude and complexity of assignments executed, relative risks undertaken, and quality of work performed"); *In re Vitamins Antitrust Litigation*, 398 F.Supp.2d at 228.

6. Lead class counsel in this case proposes to follow a similar methodology. In particular, lead class counsel determined the relative contribution made by each firm by starting with each firm's lodestar and then adjusting it based on three factors: 1) the extent to which the firm took on leadership roles in the litigation, 2) how early the firm was meaningfully involved in the litigation, and 3) whether the firm was involved in settlement negotiations or helped defend the settlement once it was consummated—which, lead class counsel told me, were the two most important activities in this litigation. Lead class counsel then allocated the fee award he has sought from the Court to each firm in proportion to its adjusted lodestar. This methodology is reasonable and has been used in other cases.

7. First, lead class counsel adjusted each firm's lodestar based on the extent the firm took on leadership roles in the litigation. In particular, lead class counsel protected the firms appointed to the PEC or PSC with multipliers of at least one and further adjusted upward the lodestars of the firms who served in special capacities, such as Co-lead Counsel, Class Counsel

3

or Subclass Counsel.[1]  These adjustments are reasonable and supported by other cases. *See, e.g., In re Vitamins Antitrust Litigation*, 398 F.Supp.2d at 228 (approving multipliers based on "the [leadership] tier to which the firm belonged"); *In re Initial Public Offering Securities Litigation*, 2011 WL 2732563, at *4 (approving multipliers based on "whether attorneys from the firm were assigned supervisory responsibilities or other leadership roles").

8. Second, lead class counsel adjusted each firm's lodestar based on how early each firm became meaningfully involved in the litigation.  In particular, lead class counsel adjusted upward the lodestars of the firms that made contributions from the outset of the litigation all the way to its end.[2]  Likewise, lead class counsel adjusted downward the lodestars of the firms that performed only discrete tasks here and there.[3]  These adjustments are reasonable and supported by other cases.  *See, e.g., In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6909680, at *3 (N.D. Cal. Oct. 24, 2016) (recommending multipliers based on whether firms "joined the case prior to early settlements or class certification" or whether they "joined later").

9. Third, lead class counsel adjusted upward the lodestars of the firms that worked directly on settlement negotiations or supported the settlement on appeal or otherwise once it was consummated.  In lead class counsel's view, these were the most important activities in this litigation.[4]  These adjustments are reasonable and supported by other cases. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2013 WL 1365900, at *9 (approving adjustments based on "performing higher-skill tasks"); *In re Initial Public Offering Securities Litigation*, 2011 WL

---

[1] These firms included most notably Anapol Weiss, Levin Sedran & Berman, Locks Law Firm, Nastlaw, Podhurst Orseck, and Seeger Weiss.
[2] These firms included most notably Anapol Weiss, Hausfeld, Levin Sedran & Berman, NastLaw, Podhurst Orseck, and Seeger Weiss.
[3] These firms included Mitnik Law Offices, Reinhardt Wendrof, Spector Roseman, and the Law Offices of Brad Sohn.
[4] These firms included most notably Anapol Weiss, Levin Sedran & Berman, Podhurst Orseck, Samuel Issacharoff, and Seeger Weiss.

2732563, at *4 (approving adjustments based on "roles assumed, contributions made, . . . [and] magnitude and complexity of assignments executed").

10. The net result of the adjustments made by lead class counsel in this case left the original lodestars of the firms here with adjustments over a range of multipliers from 0.75 to 3.885. This is a spread of 1:5.2. Not only is this spread reasonable, but it is more equitable than the spreads in the other cases of which I am aware. *See, e.g.*, Exhibit A to Supplemental Report and Recommendation of Special Master in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. 07-md-1827-SI (N.D.Cal. Dec. 18, 2012) (allocating fees over a lodestar multiplier range of 0.1 to 5.45, or a spread of 1:54.5); *In re Vitamins Antitrust Litigation*, 398 F.Supp.2d at 232, 236 n.15 (approving allocation of fees over a lodestar multiplier range of 2.25 to 26, or a spread of 1:11.6); Exhibit A to *In re Initial Public Offering Securities Litigation*, 2011 WL 2732563 (approving allocation of fees over a lodestar multiplier range of 0.1 to 1.01, or a spread of 1:10); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6909680, at *3-5, *15 (recommending allocation of fees over a lodestar multiplier range of 0.5 to 2.98, or a spread of 1:6) (adopted with minor modifications by order of Feb. 28, 2017).

11. For all these reasons, it is my opinion that the proposed allocation of attorneys' fees in this case is reasonable.

12. I have been paid $795 per hour for my work on this matter.

Brian T. Fitzpatrick
Nashville, TN
October 10, 2017

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, 2012-present
- *FedEx Research Professor*, 2014-15; *Associate Professor*, 2010-12; *Assistant Professor*, 2007-10
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC PRESENTATIONS

*The Next Steps for Discovery Reform: Requester Pays,* Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, Florida (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional? Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

4

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

**OTHER PRESENTATIONS**

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

**PROFESSIONAL ASSOCIATIONS**

Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Law Institute
Member, American Bar Association
Fellow, American Bar Foundation
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet; Nashville Talking Library for the Blind, 2008-2009