UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**COUNTER DECLARATION OF CRAIG R. MITNICK IN RESPONSE TO CO-LEAD CLASS COUNSEL, CHRISTOPHER SEEGER'S DECLARATION FOR THE ALLOCATION OF AN AWARD OF COMMON BENEFIT ATTORNEY'S FEES AND <u>REIMBURSEMENT OF COMMON BENEFIT COSTS AND EXPENSES</u>**

<u>In Re National Football League Player's Concussion Injury Litigation</u>

Craig R. Mitnick declares as follows pursuant to 28 U.S.C. § 1746:

   I am the Managing Partner of the law firm of Mitnick Law Office, LLC and submit this Declaration in support of Mitnick Law Office's request for a fair and reasonable share of common benefit fees and in response to co-lead counsel, Christopher Seeger's recommendation set forth in his Declaration under date of October 10, 2017 with regard to those fees. I have

personal knowledge of the matters set forth in this declaration and, if called upon, I could and would testify competently thereto.

*Introduction*

1. My firm was tasked by co-lead counsel with the challenge of developing and executing a *comprehensive and global* campaign that would ensure the endorsement of the negotiated Settlement terms by the global class of retired NFL players. This task was to supplement the work that was to be performed by the communication committee and the public relations firm working on the matter.

2. Mitnick Law Office arranged for formal presentations at NFL Alumni Chapters around the country. I then personally traveled from city to city, over a period of 36 months, to formally educate the retired NFL player community on the terms of the negotiated Settlement Agreement, as well as ensuring global endorsement of those terms by minimizing the number of player opt-outs. I personally drafted comprehensive and compelling presentation materials that were distributed to thousands of retired NFL players and their wives throughout my travels. I prepared and continually updated *frequently asked questions* in regard to the Settlement terms that were distributed in print and published online. I engaged and led mass retired player conference calls with thousands of retired NFL players, focusing on education, awareness and endorsement of the Settlement. I formally gave comprehensive presentations to retired players at the Super bowl XLVIII venue and at the 2014 Hall of Fame induction ceremony venue in Canton, Ohio. Additionally, I ensured that thousands of retired players throughout the country understood the legal obstacles of the concussion litigation in order to understand the tremendous benefits that the negotiated Settlement provided for.

3. Throughout Mr. Seeger's fee application and recommendation for the allocation of common benefit fees, he thoroughly and accurately describes the contributions that his firm, Seeger Weiss brought to this litigation. However, I would suspect that due to his vast involvement in every aspect of the litigation, in addition to the leadership demands that were placed on his firm, I do not believe that Mr. Seeger had the opportunity to thoroughly review my contributions and assess the true value of those contributions to the Settlement Class at the time he submitted his allocation recommendation.

4. Even though I represented more retired NFL players than any other firm involved in the litigation at the time the leadership structure was formed in early 2012, Mr. Seeger was not made aware of the fact that I was promised a position on the steering committee, as well as on various other committees by a current member of the PEC. Given that lack of leadership position, I believe that Mr. Seeger was placed in an untenable situation when it came to his ability to allocate a true multiplier to the contribution by my firm. Mr. Seeger nor the Court can ignore the traditional politics, however unfortunate, involved in these sort of high profile and complex litigation matters.

5. It is clear from Chris Seeger's Declaration to the Court under date of October 10, 2017, that I did not act as a rouge warrior for the common benefit of the Settlement class, but rather was authorized and directed specifically by Co-lead counsel.

   *"Mitnick Law served at the direction of Co-Lead Counsel in the multi-faceted outreach efforts to the Retired NFL Player Community, including in-person events with alumni and other NFL players' associations, which became increasingly important after the Settlement had received Preliminary Approval"*.

6. In early September of 2013, almost immediately after the terms of the initial Settlement Agreement were made public, I met with Chris Seeger in the Northern New Jersey/New York City area to discuss preliminary approval of the Settlement. During the lunch meeting with Mr. Seeger and after authorization and direction from him, I began to spend as much time and energy as was necessary to *educate*, *inform* and ultimately garner the *endorsement* of the Settlement terms by the twenty thousand member global class.

7. From the time of that meeting with Mr. Seeger, I developed a "*Post Settlement Player Awareness and Education Campaign*" designed to maximize endorsement of the Settlement by the retired NFL player community by minimizing player opt-outs. I spent the vast majority of my time executing that plan from September 2013 until the time the District Court granted final Approval of the Settlement Agreement in April of 2015. I spent in excess of 1300 hours educating retired players on the litigation, addressing many of their concerns, answering their questions and ultimately garnering the approval of the vast majority of retired players throughout the country.

8. Throughout the process, I educated thousands of retired players. I was fully aware of the importance of effectively explaining the legal obstacles that each of the retired players faced with regard to preemption and causation, as many players had to first understand these legal concepts in order to then understand that a negotiation is a give and take and not a one sided process.

*An unprecedented approval rating of 99% of the retired player community*

9. Procuring the endorsement of as many Retired NFL Players within the twenty thousand retired player Class was my primary objective from the date I met with Mr. Seeger in September of 2013. The countless hours of preparation time, travel time, presentation time and time spent on the development and distribution of informational materials was instrumental to the unprecedented approval rate of over 99% of the twenty thousand member Class. This fact cannot be disputed. This unprecedented Class endorsement of 99% was a critical factor in lead counsel's final argument in support of Final Approval at the Final Fairness Hearing on November 19, 2014. Even though there was a communication committee and a public relations firm involved in the litigation, my efforts were far more encompassing and far more personal to the retired players. Co-lead counsel's Declaration in Support of the Final Fairness Hearing that was filed with the Court prior to November 19, 2014 hearing read in pertinent part:

> "The reaction of the Class has been extremely favorable. As the Opt-Out/Objection deadline, fewer than 1% of Retired NFL Players filed requests for exclusion from the Settlement....In a case as highly publicized as this one, where significant claims are at stake, and more than 5,000 individual actions were filed in the MDL alone, this positive response of Class Members should be given great weight". Additionally, Mr. Seeger wrote "For a Class of approximately 20,000 Retired NFL Players, this high level of favorable response is remarkable…." (See Declaration of Christopher Seeger in support of Final Approval of Settlement and Certification of Class and Subclasses, paragraph 71, under date of 11/12/14).

9. At the time of the Final Fairness hearing, Mr. Seeger concluded his oral argument in support of the Settlement becoming final by passionately reiterating to the Court the fact that over 99% of the Player-Class endorsed the Settlement that he had successfully negotiated. After Mr. Seeger's oral argument ended and he turned the floor over to Lead Counsel for the

National Football League Parties, Brad Karp, Mr. Karp opened his remarks to the Court with the same 99% endorsement argument as Mr. Seeger. (*See Court Transcript under date of November 19, 2014*).

*Background*

10. For over three decades, I have developed strong professional and personal relationships with countless retired NFL players. In early December of 2011 after hearing rumblings about the initial litigation against the NFL for concussion related injuries, I spoke with several key influences in the retired player community who contacted me about the litigation. After spending substantial time reviewing the limited pleadings on record at the time, as well as personally researching the science behind the Plaintiff's allegations, I made a decision to become involved in the litigation due to my belief that the correlation between playing football and sustaining unexpected long term cognitive injury was real, with the injuries to players often devastating.

11. I received my BBA in finance from Emory University (Atlanta, Georgia) in May of 1984 and subsequently received my Juris Doctor from the George Washington University School of Law (Washington DC) in May of 1987. Throughout my career I have litigated and/or negotiated hundreds of cases in both State and Federal Court. Additionally, in 2004, given my litigation history and my communication abilities, I was hired as an on-air legal analyst for Fox News channel, CBS television and radio and syndicated radio stations throughout the country. I was able to effectively engage millions of viewers on diverse legal issues, including congressional hearings, United States Supreme Court decisions, matters involving multidistrict and mass tort litigation, including the World Trade Center First Responder litigation, asbestos litigation and various Bellwether trials.

12. My work contribution described in detail below, along with the declarations, presentation materials and other exhibits attached, clearly demonstrate that I contributed immense value to final approval of the Settlement Agreement, as well as to the Settlement Class members.

*Execution of the strategic educational and awareness campaign*

13. From the time that the first Settlement Agreement was announced in August of 2013 through the time that the Settlement received final approval from the Court in April of 2015, I personally met with individual key decision makers and influencers within the NFL Alumni

Community in order to gain their support for the Settlement and then introduced many of these key influencers to Co-lead counsel, as well as to the public relations team working on the matter. A sample listing of of those key influencers included:

> *Ron Jaworski* (Member NFL Alumni Association Board of Directors), *Bart Oates* (President New York/New Jersey NFL Alumni Chapter member NFL Alumni Association Board of Directors), *Al Smith* (President Tennessee NFL Alumni Chapter member NFL Alumni Association Board of Directors), *Joseph Pisarcik (former president of the NFL Alumni Association); John Haines* (President Austin, Texas Alumni Chapter and member of the NFL Alumni Association Board of Directors); *Bill Schultz* (President Indianapolis, Indiana Alumni chapter; Co-Chair NFL Alumni Association Board of Directors), *Ron Rice* (President Detroit, Michigan Alumni Chapter; member NFL Alumni Association Board of Directors); *Jim Karsatos* (President Columbus, Ohio NFL Alumni Chapter); *Steve Thurlow* (President Connecticut NFL Alumni Chapter); *Beasley Reece* (President Philadelphia, Pennsylvania NFL Alumni Chapter), *Raul Allegre*, (Former member of the NFL Alumni Association Board of Directors and ESPN Analysis), and *Jeffery Nixon*, (NFL retired player influencer and most prominent blogger within the retired player community).

14. In a Declaration, prepared and executed by the NFL Alumni Association Board of Directors, the Board, described my contribution to the Settlement Class. That Declaration states in pertinent part:

    > *"Almost four (4) years ago many of us, along with our NFL Alumni Chapter members, began to hear rumblings that concussions may possibly lead to longer-term health issues. We learned that several of our teammates had filed lawsuits against the NFL for their lack of honesty when it came to the League's knowledge in regard to any correlation between concussions and their relationship to our longer-term health.*
    >
    > *The litigation was very confined at the time and based on our own conversations with many of our Chapter Presidents and members, we believe that the lawsuits would have remained confined, or in the very least would have moved at a much slower pace if not for the efforts and passion of a few individuals involved in the litigation, including Craig Mitnick.*

*Many retired players initially were extremely cautious to get involved in the lawsuits, given the fear of being labeled incompetent and the fear of being labeled greedy. Craig Mitnick kept our Board of Directors, executive staff, and most importantly our members informed and up to date during the initial filings of the lawsuits and then educated us with regard to the Settlement terms and why they were so beneficial to all of us.*

*Craig personally convinced many of our Chapter leaders and members around the Country to get involved with the litigation and as Chris Seeger worked so diligently to find a favorable settlement for us, Craig continued to keep us educated, informed and reduced the uncertainty that many of us felt. It was not the money that he spoke about, or a sales pitch to become a client of his firm, rather his passion was grounded upon the awareness of the consequences that concussions could have on our long-term health, as well as on our children and grandchildren's health.*

*Craig continually made sure that retired players in our Chapters had literature that they could take home to their wives and to show other players the benefits of joining the litigation and remaining in the litigation. Whether Craig spoke at the Super bowl, the Hall of Fame, or at NFLAA Chapter meeting, the information received was so critical to many retired players' endorsement of the case, as we were able to understand the obstacles we faced and the benefits of the ultimate Settlement.*

*We feel that the hard work, passion, and personal interaction by Craig Mitnick, with hundreds, if not thousands of our members was a driving factor in how quickly the case picked up momentum and how quickly the matter was ultimately endorsed by ninety-nine (99%) percent of our player community…*

*We are fully aware that Attorneys involved in the case took on different roles at different times and all of them should be commended. However, specifically Chris Seeger's efforts in getting the deal done and Craig Mitnick's efforts in solidifying the Settlement with former players by educating us, keeping us informed and explaining the legalities and benefits of the deal were unmatched. We thank both of them immensely" (See NFL Alumni Association Board of Directors Declaration attached hereto and marked as Exhibit A).*

15. Further endorsement from additional high profile and influential alumni from different retired players organizations that I was personally responsible for included: Super Bowl Champion and long-time Cornerback - *Isaac Holt;* Fullback and well known Broadcaster - *Keith Byers*; Hall of Fame Inductee- *Leroy Kelly*; four time Pro-Bowl Offensive Lineman and television star - *Alex Karras*; Veteran Cornerback and National Sports Broadcaster - *Eric Allen*; Renown Super Bowl Champion and Pro-Bowl Quarterback - *Mark Rypien*; Super Bowl champion and Veteran Defensive-End - *Carl Hairston*; Long time Strong Safety - *Rich Miano*; two time Super Bowl Champion and Pro-Bowl Quarterback - *Jeff Hostetler*; six time Pro-Bowl Offensive lineman - *Grady Alderman*; two time Pro-Bowl running back- *Marion Butts*; All American and two time Pro-Bowl quarterback - *John Brody*; long time Veteran Running Back-*Theron Sapp*; four time Pro-Bowl Champion and two time All American Linebacker - *Jeremiah Trotter*; three time Pro-Bowler, Super Bowl Champion and Sports Illustrated NFL Defensive Player of the year - *Seth Joyner*; two time Super Bowl Champion Defensive Tackle - *Jethro Pugh*; five time Pro-Bowl and four time All-Pro Running Back - *Chuck Forman*; Pro-Bowl champion Offensive Tackle - *Ron Solt*; and seventeen year Veteran Linebacker - *Ray Lewis*. These high-profile influencers, in addition to others unnamed, fostered thousands of additional endorsements throughout the retired player community, minimizing opt outs to less than 1%.

16. Additionally, as outlined in detail in my common benefit billing statement, a substantial amount of time was spent exclusively on obtaining print and video endorsements, from some of the most noticeable retired players within the country in order to foster further endorsement of the Settlement Agreement. Many of these endorsements were so strong that they were included in Class Counsel's brief that was filed with the Court in support of Final Settlement approval. (*See Billing statement attached hereto and marked as exhibit B) (See retired NFL player quotes attached hereto and marked as Exhibit C) (See exhibit 12 that was attached to Class Counsel's final brief in support of final approval marked as Exhibit D).*

17. In addition to garnering the endorsement of key influencers and high profile retired players, I spent countless hours of my professional time from September 2013 through August 2016, personally traveling and speaking with alumni chapters members throughout the country. I traveled, engaging thousands of retired players at organized NFL events and NFL Alumni

8

chapter meetings. These in-person presentations were highly publicized by Alumni chapter presidents in order to ensure heavy turnouts by their respective retired player members. Educational, informational and question/answer sessions were held in cities that included:

   a. XLVIII Super Bowl venue in New York, New York on January 29, 2014
   b. 2014 Hall of Fame ceremony in Canton, Ohio on August 1, 2014
   c. Austin, Texas Alumni chapter special session on October 30, 2013;
   d. New York, New Jersey Alumni chapter special session on October 2, 2013, June 7, 2014 and June 6, 2014;
   e. Greenwich, Connecticut Alumni chapter special session on May 5, 2014;
   f. Indianapolis, Indiana Alumni chapter special session on December 17, 2013;
   g. retired player special session at Giant Stadium, Meadowlands, New Jersey on October 1, 2013,
   h. special video session in Fargo, North Dakota on October 21, 2014;
   i. NFLPA convention in Orlando, Florida on March 21, 2014;
   j. Cincinnati, Ohio Alumni chapter special session on December 18, 2013;
   k. Denver, Colorado Alumni chapter special session on October 25, 2014;
   l. Franklin, Tennessee Alumni chapter special session on February 5, 2015;
   m. Birmingham, Alabama session on October 23, 2014;
   n. NFLAA annual convention in Phoenix, Arizona on April 14, 2015;
   o. NFLAA special session in Las Vegas, Nevada on April 25, 2014;
   p. player gathering Chicago, Illinois on May 27, 2014;
   q. San Diego, California Alumni chapter special session on August 10, 2016.

   *(See NFL Alumni Chapter concussion litigation presentation photographs attached hereto and marked as exhibit E) (See Super Bowl presentation materials attached as Exhibit F) (See Hall of Fame presentation materials attached as Exhibit G).*

18. At each one of the above listed presentations, without exception, high quality brochures and informational materials, detailing the terms of the final Settlement Agreement were distributed to each attendee. (*See retired NFL player endorsement brochures and printed handouts attached hereto and marked as Exhibit H)*. Printed materials always reflected the most up-to-date relevant information on the Settlement. Copies of the informational materials were also distributed to attending spouses, as the players' spouses are often times the main decision makers in the household. Additionally, in order to educate and garner the endorsement of players in areas of the country where no formal presentation took place,

literature was sent directly to chapter members and chapter presidents. (*See Declaration of Tina Williams attached hereto and marked as exhibit I*).

19. In addition to these in-person group presentations, thousands of Retired Players were engaged through telephonic and video conference calls that focused primarily on questions and answers with regard to the Settlement Agreement. An example of a typical conference call took place on March 12, 2014. The conference call included operator assisted services and took place from the National Football League Alumni Association's corporate office in Mount Laurel, New Jersey. Participation during the call exceeded 1,700 Retired NFL Alumni members and the call lasted over an hour and a half. Members were asked to submit their questions or concerns prior to the call by emailing them directly to the Alumni Association, at which time the most commonly asked questions were identified and subsequently answered during the conference call Additionally, Retired Players from around the Country, as well as from Canada were able to ask live questions utilizing the operator assistance service during the latter part of the call. Additional conference calls, similar to the call described above took place from October of 2013 through the time the Settlement received final approval in April of 2015. These calls varied from mass attendee participation to far more intimate calls where retired players within the NFL Player Community listened to status updates and then participated in open discussions. During the time period between March of 2012 and May of 2015, multiple calls took place with the NFL Alumni Association Board of Directors and the NFL Alumni Chapter Presidents, as well as with key influencers and decision makers within the NFLPA. (*See Conference Call materials attached hereto and marked as Exhibit J*).

20. To further solidify existing endorsements of the Settlement Agreement and garner new ones, in-person presentations were also conducted at the NFLAA annual meetings in April of 2014, April of 2015 and April of 2016, as well as at the NFLPA 2014 annual conference that took place during the week of March 20, 2014 in Orlando, Florida These larger alumni venues were utilized to inform and educate attending players on Settlement details and to provide one-on-one informational sessions to those who requested more information, or who had specific concerns regarding the Settlement. (*See statement of former NFLPA Board of Director Derrick Frost attached and marked as Exhibit K). (See statement of Joseph Pisarcik, former NFLAA President) (See Statement of Bart Oates, New York/New Jersey*

*NFLAA chapter president); (See Statement of John Haines, Austin, Texas NFLAA chapter president attached hereto and marked as exhibit L.)*

*National media exposure complemented PR campaign*

21. I utilized my media background to further influence press coverage of the litigation. Timely and relevant press releases utilizing persuasive quotes that were personally obtained from influential retired players were created and distributed through national newswire services, such as PR Newswire and the Associated Press. This path of distribution permitted each release to be distributed to media outlets locally, regionally and nationally. Many, if not all of the press releases that were created and distributed were prominently published in print, as well as appearing online on the websites of top level media organizations including, ABC News, The Washington Post, USA Today, NBC News, Associated Press, local and regional newspaper groups, online media groups, Fox News National and Syndicated Media Outlets, CBS News, as well as Business and Sports Journals throughout the top 50 media markets in the country. Quotes from high profile retired players were used in each release. Releases included, but were not limited to the following:

   a. More former NFL players file suit in Philadelphia (February 10, 2012).
   b. NFL concussion case alleges fraud & negligence against the League (January 2012)
   c. Super-bowl XXVI MVP and two-time Pro Bowler, Mark Rypien joins the concussion battle (March 28, 2012).
   d. Alex Karras, former NFL player and Webster television star joins fight against the NFL. (April 12, 2012)
   e. NFL concussion lawsuits keep adding former players (March 20, 2013).
   f. Detailing the concussion litigation against the NFL", "More NFL lawsuits filed as players begin to take a stance (February 6, 2012).
   g. As NFL training camp begins, lawsuits continue to be filed (July 24, 2014).
   h. Judge's Decision to Deny NFL Proposed Concussion Settlement Encourages Players (January 14, 2014)
   i.

*Playerinjury.com and real-time communication*

22. Given the fact that Retired NFL Players throughout the country had no readily available online resource to help educate them on the details of the Settlement, PlayerInjury.com was

revamped from a personal website owned by Mitnick Law Office to a website for educating the retired NFL player community. The site contained up-to-date status reports for retired players; Court documents as they were filed with the Court; Orders as they were released; frequently asked questions regarding the terms of the settlement agreement, as well as a live blog where retired players could opine on the Settlement and appeals. Additionally, the website provided informational materials for download for all retired players. (*See Playerinjury.com documentation attached as Exhibit M)*.

23. With the ever-changing information needs and the rapidly growing interest in the Settlement terms, players needed a readily available website that they could access from their cell phones, as well as their computers that would provide each of them and their families with one centralized location to keep up with developments in the litigation; become educated about the litigation; read the opinions of other former players who posted on the blog and ask questions or have their concerns addressed. The formal website for the litigation, nflconcussionsettlement.com did not exist at the time.

24. Between September 1, 2013 and May 30, 2016, the site had 71,916 unique visitors and provided the personal opinions from over 120 Retired NFL Players. The Settlement information, news and player opinions that were published on playerinjury.com became an invaluable tool for the global Class. Many of the opinions and comments published by retired players were so instrumental that them were included as an Exhibit to Class Counsel's brief filed with the Court in support of the Settlement's final approval. (*See Class Counsel's brief in support of final Settlement approval*).

*Conclusion*

25. From the onset of the multidistrict litigation through the appellate process, I gave up most of my practice of law, as that time was necessary to accomplish the goals set forth in this Declaration. Prior to the litigation, I was personally responsible for generating hundreds of thousands of dollars in revenues to my firm each year. The large majority of those revenues were forgone during the course of the concussion litigation given the risk that I incurred to become involved and the degree of that involvement. To offset the burden of foregoing my regular revenue generating activity and to fund my office and the costs involved in pursuing the goals described in this Declaration, I was required to secure financing in excess of $2,500,000 during the period from December 2013 until the present.

26. I do not know of any other direct communications, or similar efforts from attorneys involved in the litigation, that were able to distill the influx of misinformation that was spreading within the tight-knit retired player community. Misinformation was corrected with accurate information through the preparation and distribution of hard-copy literature, in-person presentations at large and small alumni chapter venues, as well as, personal one-on-one interactions with thousands of players. Correcting misinformation with accurate information curtailed the frustration that much of the player community was exhibiting.

27. Throughout my travels, I was not only forced to dispel much of the misinformation that was spreading among retired players, I found that hundreds of retired players and their spouses, some of who had filed suit and others that had not, had received no information at all with regard to the litigation, causing serious doubt about the proposed Settlement. Additionally, many players and their spouses were so uninformed that they believed that by endorsing the litigation, they would be perceived within their community as greedy. The stigma that existed early on in the litigation by the public "that no real correlation existed between concussions and long-term injury" and that "those retired players who were filing suit against the NFL were in it for a money grab" was still resonating with many players and their wives. It was apparent that educating these former players and their spouses about the history of the litigation was extremely important. Additionally, the validity of the entire subject matter, as well as having the retired players and their wives understand the legal obstacles that they faced including pre-emption, causation and the statute of limitations was critical to their endorsement of the Settlement and to the Settlement receiving final approval by the District Court.

28. My efforts throughout the litigation on behalf of the global Class of Plaintiffs have resulted in tremendous value to the plaintiff Class, their spouses and class counsel. Additionally, these efforts in large part, greatly helped catapult the unexpected passion within the Retired NFL Player Community in promoting concussion awareness. Retired NFL Players of all ages and backgrounds spoke out to the media, as well as to members of their own communities about the importance of player safety. This new-found passion by retired players was a major contributing factor in the fundamental change that has occurred in how the world now views the correlation between concussions and long-term injury. Children and athletes of all ages and skill sets are protected now more than even before. The

significant changes in medicine, science and law that have come about could not have materialized without the mass support of the Retired Player Community.

29. I respectfully ask the Court for an allocation of my time with a 3.55 multiplier

I declare under penalty of perjury, that the foregoing is true and correct.


          By:  /s/ *Craig R. Mitnick*
                Craig R. Mitnick, Esquire
                Mitnick Law Office, LLC

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing and supporting documents were served on all counsel of record via the Court's ECF system on October 27, 2017.

                                      /s/ Craig R. Mitnick
                                        Mitnick Law Office, LLC