## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br>                    Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>                    Defendants. | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

### DECLARATION OF BRUCE A. HAGEN IN SUPPORT OF HAGEN, ROSSKOPF & EARLE'S OPPOSITION TO CHRISTOPHER A. SEEGER'S PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES

Bruce A. Hagen declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, the following:

1.    I am *sui juris* and the sole member and owner of the law firm Hagen, Rosskopf & Earle, LLC ("HRE"). I have been involved as part of the group of Plaintiffs' Counsel (as defined in Mr. Seeger's Memorandum of Law in Support of his Petition for Award of Attorney's Fees to include "the law firms that have done important common benefit work for the litigation, approved by Co-Lead Counsel, and are submitting declarations in support of this Petition." ECF No. 7151-

1, P. 2) since before the group was formed.   This Declaration is based upon my personal knowledge.

  2.  Along with Co-Counsel at the Pope McGlamry law firm, my firm got involved in what became known as the NFL Concussion Litigation in early 2011.   We began meeting with and retaining individual clients at that time.   We filed several of the initial lawsuits against the NFL in the Northern District of Georgia, cases that all eventually formed the basis of the case becoming an MDL.

  3.  Prior to the formation of the MDL, I was invited to and attended an organizational meeting among Plaintiffs lawyers who were involved in the NFL Concussion Litigation up to that point.   The meeting was at the Podhurst Orseck law office in Miami and occurred on January 25, 2012, the day before the MDL hearings.   It was at that meeting that I first met Chris Seeger.  I did not know Mr. Seeger before, although I was aware of his reputation as a giant in the field of Class Actions and Mass Tort litigation.   Despite the fact that the case had not yet been consolidated into an MDL proceeding, and despite the fact that no attorney had been elected or appointed to any leadership role, Mr. Seeger told the assembled lawyers at the meeting that he had already engaged in settlement discussions for ALL cases with a lawyer representing the NFL.  I had no idea how or why he was discussing settlement in a case that was barely in it's infancy, or under whose authority he purported to be acting, so I found his statement to be particularly odd.  While I don't recall the exact words that Mr. Seeger used, the gist of his comments were that the NFL lawyer wanted to settle the case for an amount that was less than $100 million and that Mr. Seeger had informed the NFL's lawyer that the case would only settle if the amount were in the hundreds of millions.

4.     After the meeting in Miami, I was asked to sign a Joint Prosecution Agreement in which, along with my fellow Plaintiffs' Counsel, I acknowledged that we shared a mutuality of interest in a joint and coordinated prosecution of the Litigation. I took the terms of the Joint Prosecution Agreement to heart, and thereafter did everything I could to support the joint efforts of counsel to pursue the best result possible for our clients.

5.     I was subsequently invited to attend meetings at the office of Anapol Schwartz in Philadelphia that were to take place on February 21 and 22, 2012. Prior to those meetings, in an exchange of emails with the lawyers who would eventually take on leadership positions as Co-Lead Counsel and on the PEC and PSC, I volunteered to assemble a survey of media coverage regarding the issues in the NFL Concussion Litigation and to present the results at the meetings in Philadelphia, in anticipation of developing a website for dissemination of information.

6.     In advance of the February 21 and 22, 2012 meetings, I prepared an extensive powerpoint presentation that laid out a detailed history of relevant events surrounding the NFL and head injuries. I presented the information at the meetings on February 22, 2012. The work that was done and presented formed the outline of what would become the Communications and Public Relations Committee ("CPRC"), a sub-committee of the Plaintiffs' Steering Committee ("PSC").

7.     At the meeting on February 22, 2012, leadership positions with either confirmed, offered, chosen and/or decided upon. At said meeting, the CPRC was formed. The CPRC was Co-Chaired by Anthony Tarricone and Steven Marks, along with the committee members Bruce Hagen, Mike McGlamry and David Rosen. I immediately went to work on behalf of the CPRC.

8.     Among the first tasks that the CPRC had was to choose a Public Relations firm to assist in our efforts. Along with the other committee members, we identified several candidates,

3

developed a screening process, conducted interviews and vetted the candidates to find the best fit. This process led to the hiring of CLS & Associates, which was one of the most critical decisions that we made in terms of our ongoing efforts to help shape the tone of the dialogue in the media and among the interested parties to the case.

9.      Once we hired CLS, the CPRC had regular weekly meetings via conference call. Co-Lead Counsel Sol Weiss and Chris Seeger occasionally joined in the conference calls.

10.      The efforts of the CPRC, with the assistance that we obtained from CLS, were critical to the success of the case.   From the outset of the litigation, public opinion was squarely against the Plaintiffs.   Plaintiffs, all former NFL players, were negatively portrayed in virtually every media and social media portrayal.   The players were considered greedy, were told that "they knew what they were signing up for", were told that the litigation was frivolous, etc.   The public was squarely against the players.

11.      The success of the CPRC in re-shaping public opinion cannot be overstated.   In a very short period of time, from February, 2012 until the initial terms of the settlement were announced in August, 2013, public opinion had completely shifted.  Thanks to the corrupt conduct of the NFL that was exposed not through litigation, but through the media, public opinion had come around to supporting the players.   In fact, when the initial settlement was announced, the sentiment became "how could you let the NFL off the hook for only $765 Million?"  In less than 2 years, we went from being criticized for bringing a frivolous lawsuit to being criticized for settling for too little money.   That was due almost entirely to the incredible work done by the CPRC under the direction of Anthony Tarricone and Steven Marks and the ongoing work of David Rosen, Mike McGlamry and myself in support of CLS.

12.     One of the many things that the CPRC did to reshape public opinion was to keep a muzzle on the lawyers involved in the case to prevent them from making the case about themselves and to keep the focus on our clients.  To that end, I was asked to help keep fellow counsel under control and from 'going rogue' in media interviews.  I took this job seriously.   In fact, at a press event after the Preemption hearing in Philadelphia, I was told by Co-Lead counsel to follow around a member of the Executive Committee and to keep him away from any and all reporters.

13.     Beyond running interference for Co-Lead Counsel, I was actively involved in many activities, all of which were critical in shaping public opinion and putting pressure on the NFL. These activities included, but were not limited to, the following:

a.     Establishing and nurturing relationships with members of the National media who were following the NFL Concussion Litigation;

b.     Grooming NFL players for media appearances and interviews;

c.     Selecting representative claimants and family members for public relations appearances, interviews and other PR opportunities;

d.     Communicating with influential authors and filmmakers, including one of the authors of the book "League of Denial" which was made into a long form documentary that aired on PBS.  The impact of League of Denial cannot be understated as it exposed in detail the NFL's awful conduct in hiding and lying about the long term dangers of repeated head trauma.   In fact, one of the explosive facts that was uncovered specifically by my work for the CPRC was incorporated into the final version of League of Denial, underscoring the significance and success of my efforts;

e.      Assisting in the preparation of an Op/Ed piece that was signed by multiple NFL Hall of Fame players, all of whom were Plaintiffs in the case before the case was converted to a Class Action;

f.      Helping to craft questions that were spoon fed to CBS for the interview with Roger Goodell that aired mere hours before the Super Bowl on February 3, 2013. In fact, the interviewer, Bob Shiefer, had been provided with letters from 2 widows of former NFL players (that were prepared and drafted as a result of CPRC activities) and Mr. Shiefer asked Commissioner Goodell a question that began "Some widows of former players asked me to ask you..." This came as part of the pre-game show for the largest television event of the year, the Super Bowl;

g.      Working with several widows of former NFL players to ensure that the stories of their late husbands' deaths were accurately told to local and national TV and print media;

h.      Preparing bullet points for media interviews and press conferences for both lawyers and former NFL players to help insure that we put forth a consistent message;

i.      Helping to prepare a slide deck of the effect of the settlement in the NFL Concussion case to take on the road to various meetings of former NFL players around the country in advance of their vote on whether or not to opt out of the proposed settlement;

j.      Engaging with prominent national bloggers who communicate directly with the community of former NFL players to make sure that they had an accurate portrayal of what was happening and didn't skew the facts in communications with their audience;

k.      Engaging with prominent CTE researchers and advocates to help further the work that they were doing in exposing the harms caused by repetitive head trauma and, in turn, helping to tell the story of our clients in a way that resonated with the public;

l.      Helping to establish, promote and enforce a Media Protocol for all media inquiries either to Plaintiffs' Counsel or their individual clients, both in advance of and in connection with the Preemption Hearing on April 9, 2013, which generated the largest amount of media attention of any event in the case;

m.      Coordinating appearances of players, including 2 of my clients, preparing them for same, working with reporters, all in connection with a major press conference that was held in the aftermath of the Preemption Hearing on April 9, 2013;

n.      Coordinating and facilitating media requests from major news outlets including CNN, ABC, CBS, Bloomberg News, New York Times and ESPN, among others;

o.      Communicating the virtues of the proposed settlement to various groups of retired NFL players in an effort to support approval of the Settlement and to minimize opt outs;

p.      On a daily basis, staying informed of all media coverage of developments related in any way to the issues surrounding the NFL Concussion Litigation through reviews of a summary of media reports provided to the CPRC by our media firm, CLS. The daily reports from CLS are so vital that they continue to this day.

14.      The above detailed tasks, along with countless other actions, were all done in an effort to support the overall effort of trying to bring pressure on the NFL in the Court of Public Opinion, knowing that as an entity that's subject to the whims of its fans and advertisers, the NFL

could not afford to lose that fight, and that the efforts would help bring about a resolution of the case.

15.    In fact, Mr. Seeger acknowledged the importance of the CPRC in his Petition for Award of Attorneys Fees: "Early on in this high-profile litigation, Plaintiffs' Counsel conceived, organized, and directed a communications strategy, so as to ensure that the broader player community (and the public at large) was fully apprised of the factual, medical, and legal issues encompassed by Plaintiffs' claims and the litigation, and to counteract any misinformation from whatever source. Plaintiffs' Counsel worked closely with one another to implement the Plaintiffs' communications strategy, which involved consistent and committed efforts both before and after the Settlement was announced." (See ECF No. 7151-2 at ¶ 33).

16.    It was clear to me and acknowledged by Co-Lead Counsel that, in the absence of any Discovery, which had been stayed by the Court, the best way for us to uncover and disseminate information that was damaging to the NFL was through the media. I worked consistently on establishing and maintaining excellent media connections so that we had a direct pipeline to help get information out into the public realm, all in an effort to bring public opinion around to the side of our clients and to pressure the NFL. There can be no argument that this strategy wasn't 100% successful.

17.    In fact, there's no doubt in my mind that more than any other lawyers who were part of the group comprising Plaintiffs' Counsel, (with the exclusion of Co-Lead Counsel, of course), the members of the CPRC made the most significant impact to the overall success of the NFL Concussion Litigation. The pressure that was put on the league to resolve the ongoing issues related to player safety were all the direct result of the media and PR campaign that the CPRC directed and managed. No other work performed by other committees, subcommittees or law firms

8

added as much value to the overall success of the case as did the work of the CPRC, which included the efforts of Anthony Tarricone, Steven Marks, Mike McGlamry, David Rosen and myself. Further, the contributions made by the attorneys who comprised the CPRC were of far more value to the success of the case than any of the contributions made by the counsel who were given the ceremonial titles of sub-class counsel (in their roles as such) when the case was converted from an MDL to a Class Action settlement.

18.     Mr. Seeger's proposed fee allocation appears to minimize the value contributed by the attorney members of the CPRC, even though he has previously recognized the immense value added to the success of the case by the CPRC.  (*See* ECF No. 7151-2 at ¶ 33).

19.     Despite the significant work that I performed and the value that was added for the common benefit of the Plaintiffs, Mr. Seeger has proposed that the undersigned receive a multiplier of 1.0 on top of the time billed on the file.  That's not a multiplier at all.   In comparison to the entire $112.5 million in legal fees that the NFL has paid, Mr. Seeger is saying that my contributions amount to a value of $324,480, which is approximately 0.0029 of the total amount of attorney's fees being paid by the NFL.  To say that my contribution to the case represents less than 1% of the total amount of attorney's fees being awarded is unfair and arbitrary, as well as an inaccurate reflection of the value that I added to the overall success of the case and the risks that I undertook in the process.

20.     From the outset of my involvement in this case, I took on substantial risk of non-payment.  My co-counsel at the Pope McGlamry law firm and I represented a substantial number of individual clients, at one time close to 500, all of whom were retained on a contingent fee basis. I took on a role in the leadership of the case by subscribing to a Joint Prosecution Agreement and then becoming a member of the CPRC, all at substantial risk to me personally.  In contrast, Mr.

9

Seeger, who seemed to have no individual clients on contingent fees, took on no risk, as was apparent from the initial meeting in Miami when he stated that he had already begun settlement discussions with the NFL.   After being hand-picked by the Court to be Co-Lead counsel, Mr. Seeger's risk was all but eliminated.

21.   In fact, Mr. Seeger's comfortable position, knowing that he had no risk of non-payment, became painfully evident when he was publicly called out for having retained a couple of clients on a contingent fee basis.   Rather than stand in support of the many lawyers working on contingent fee basis on behalf of former NFL players, Mr. Seeger boastfully proclaimed that he would charge no fees to any players that had retained his firm.   Mr. Seeger's statement and actions completely undermined the vital work of the many lawyers who brought roughly 4500 former players to the table to fight the NFL.   Mr. Seeger took these actions because he had no concern for attorney's fees on individual cases once he stood to dictate the allocation of the $112,500,000 in fees to be paid by the NFL.

22.   Since the announcement of the settlement, there has been a tremendous amount of activity by Plaintiffs in the case firing their lawyers and hiring new counsel.   Whether done at the urging of "poachers" who came in to undercut existing attorney-client relationships or for other reasons, the fact is that Mr. Seeger created the environment that led to this enormous amount of conflict by refusing to address the enforceability of individual attorney's fees contracts in the terms of the settlement itself.   Mr. Seeger did this in a tactical manner to both preserve his stake in the common benefit fees and as a reflection of the fact that he had no interest in the fee arrangements of the players and lawyers who brought the case in the first place.

23.   After the settlement had been announced and initially approved by the Court, the need for continuing public relations and communications efforts continued, and were as important

10

as ever. By this time, however, Mr. Seeger had essentially shut out all outside involvement of the other lawyers who had actively participated in the leadership of the case, reserving for himself and his firm practically exclusive control of every drop of work to be done, all in a concerted effort to inflate hours and increase his ability to inflate his self-serving Lodestar.

24. Beyond the sheer greed of assigning himself over $70,000,000 of the $112,500,000 in fees paid by the NFL, Mr. Seeger's boundless ego and hubris have compelled him to reach into the pockets of every lawyer and claimant to extort an additional 5% from the monetary awards of the select few players who are "lucky" (realistically, unlucky) enough to have diagnoses that qualify them for payment under the terms of the settlement. There is no basis in reality for Mr. Seeger and his co-conspirators to recover one dime of money that has been awarded to deserving former NFL players or the lawyers who assisted them in bringing their claims. Mr. Seeger's insatiable greed seems to know no bounds.

25. Mr. Seeger has proposed that he receive approximately 2/3 of the total amount of fees paid by the NFL. He has also arbitrarily favored some of his close circle of friends, presumably as a way of scratching their backs so that they will scratch his when the roles of Dictator of Common Benefit Fees are reversed in other MDLs and class actions. Mr. Seeger ignores the work that was done on behalf of the roughly 4500 former NFL players and their lawyers who boldly took on the risk of suing the NFL. Does Mr. Seeger think that the case settled merely because of his charisma, talent and skills? His proposed fee allocation demeans the efforts of the many lawyers, myself included, who all worked collectively to bring about the result in the case. While there is no doubt that Mr. Seeger led the charge and was the face of the NFL Plaintiffs' Counsel, to say that his contribution eclipsed the collective efforts of everyone else combined in a 2/3-1/3 ratio is ludicrous.

26.     Along with co-counsel at the Pope, McGlamry law firm, I performed a significant amount of work in support of the Settlement. We identified, prepared and accompanied select individual clients, including well-respected former NFL players and family members of deceased, well-respected former NFL players, to Philadelphia to participate in the approval hearings and the ensuing media outreach effort. The driving force behind the settlement of this case was the collective might of former NFL players who individually stepped up against the NFL, and the lawyers who took on the risk of representing them. We represented close to 500 players at one time, and were placed into positions of leadership as a result. The disrespect that Mr. Seeger is now showing in his proposed fee allocation is reflective of his disdain for the very lawyers who built the case that put him in position to lead a group effort. Now, the group effort has been marginalized by Mr. Seeger, who fails to acknowledge the contributions of anyone outside his very small circle of friends and insiders.

27.     From the onset of this litigation, I have taken on substantial risk of non-payment. Mr. Seeger, however, thanks to his manufacturing of the fee structure of the settlement and his appointed position as co-lead counsel, not to mention his settlement discussions with the NFL prior to the MDL having even being formed, has taken on no risk whatsoever, or minimal at best.

28.     Mr. Seeger's disregard for the lawyers who brought this case was never more apparent than in his lack of leadership in response to the attack on the contingent fee contract between the Estate of Kevin Turner and its lawyers. Mr. Seeger was urged by many people to step into the dispute and make known his support for the idea that the attorneys who brought the individual cases, which formed the underlying basis for his appointment as Co-Lead Counsel, would be entitled to enforce the terms of their contracts if and when their clients became eligible for payment. Instead, Mr. Seeger remained silent, failing to support attorneys working on

12

contingent fee contracts (since he had none) and creating the atmosphere of uncertainty and chaos over fees that now exists.  He should not be allowed to profit from this now by unilaterally declaring himself winner of the $70,000,000 attorney's fees lottery.

29.    For the reasons stated herein, the appropriate course of action for the Court would be to deny Mr. Seeger's fee application and appoint a neutral special master to consider the relevant contributions, risks and value that each committee firm provided and assumed, weigh the common benefit provided to all plaintiffs of those contributions, risks and value and propose a fair, just and equitable allocation of attorneys' fees after considering the evidence presented by all parties.

This the 26th day of October, 2017.

Hagen, Rosskopf & Earle, LLC

Bruce Hagen
Georgia State Bar No. 316678

119 N. McDonough Street
Decatur, GA 30030
(404) 522-7553
(404) 522-7744 – fax
Bruce@Hagen-Law.com

13