# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>                                            Plaintiffs,<br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>                                            Defendants. | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Civ. Action No. 14-00029-AB |

## CO-LEAD CLASS COUNSEL ANAPOL WEISS'S PROPOSED ALTERNATIVE METHODOLOGY FOR THE ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES (ECF NO. 8447)

Anapol Weiss ("Anapol") submits an alternative methodology for the allocation of the $108,035,097.27 available for common benefit legal fees supported by Third Circuit precedent. Co-Lead Counsel Christopher Seeger's ("Seeger") methodology relying on a lodestar and a proposed multiplier is not. At bottom the allocation of legal fees for plaintiffs' counsel must consider a broad spectrum of risk evaluation, efficiency and competency rather than a straight-line mathematical computation.  Anapol respectfully requests that this issue and all the submissions be referred to Magistrate Judge David R. Strawbridge or a Special Master, who can recommend a more equitable allocation, consistent with the applicable facts and law.

I.    **THIRD CIRCUIT PRECEDENT MANDATES A MORE ROBUST METHODOLOGY THAN A SIMPLE MATHEMATICAL FORMULA**

In the Third Circuit, the relevant factors for allocation of common fund attorneys' fees include: 1) the size of the fund created; 2) the skill and efficiency of the attorneys involved; 3) the complexity and duration of the litigation; 4) the risk of non-payment; 5) the amount of time devoted to the case by Plaintiffs' counsel; and 6) and any innovative terms of the settlement.[1] In re: Diet Drugs, 582 F. 3d 524, 541 (3rd Cir. 2009). In deciding how to allocate fees, "[w]hat is important is that the district court evaluate what class counsel actually did and how it benefitted the class." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 342 (3d Cir 1998). A District Court should focus on the benefit to the class and not simply the amount of time expended. Id. For example, the Honorable John R. Padova recently reemphasized the "work-benefit-value" formula, restating that a common benefit fee allocation is obtained by weighing: 1) the risks borne by counsel; 2) counsel's leadership and other roles assumed; 3) the lodestar[2]; 4) the quality of the work performed; 5) contributions made; and 6) the magnitude and complexity of assignments executed, and the time and effort expended, by counsel. Glaberson v. Comcast Corp., Civ. A. No. 03-6604, Dkt. 673, at 9-10. (E.D. Pa. Oct. 26, 2016). The bedrock of any fee allocation is the reasonableness of that award vis-à-vis the efforts

---

[1] While there are additional factors identified for the question of the overall reasonableness of class fees, these six (6) factors are the most relevant concerning the apportionment of fees. See generally In Re: Trans Union Corp. Priv. Litig., 2009 WL 4799954, at *1 (N.D. Ill Dec. 9, 2009) order modified and remanded on other grounds, 629 F. 3d 741 (7th Cir. 2011) (adopting R&R allocating fees in accordance with factors used to determine total fee award).

[2] The Third Circuit, in reviewing an award of attorney's fees in a statutory fee shifting case (which, unlike this case, hinges on lodestar only), has recognized that hours expended are not always a fair measurement of the value of legal services, instead noting that the quality – synonymous with the efficiency – of attorney work is a necessary factor to consider. Prandini v. National Tea Company, 557 F.2d 1015, 1018 (3d Cir. 1977).

of each firm and their contribution to the benefits afforded the Class.  See generally In re: FPI/Agretech Securities Litig., 105 F.3d 469, 474 (9th Cir. 1997).

District Court opinions from other circuits apply similar benchmarks. First, while considering both the time spent by counsel and the nature of counsel's work, courts recognize that "not all types of work are created equal." Turner v. Murphy Oil USA, Inc., 582 F. Supp 2d 797, 810 (E.D. La. 2008). The Turner court recognized, for instance, that attorney time spent administering a settlement, while important, must not be afforded the same weight as attorney time spent negotiating, achieving and defending a settlement. Id. at 810-811 ("[T]he hours spent by counsel after the approval of the settlement agreement did not aid in the creation of the settlement fund, and, as a result, the Court concludes that it cannot treat the hours spent by counsel in administrating the settlement program on a par with the hours spent by counsel who helped create the settlement and Common Benefit Fund."). Attorney work that helped create the settlement and the Common Benefit Fund must be afforded greater weight than attorney work that did not.[3] "Apportionment is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of other counsel." Turner, 582 F. Supp. at 812.

Second, "allocation means proportion" – in other words, "how does the share lead counsel is taking compare to the share others are getting?" In re: Vitamins Antitrust Litig., 398 F. Supp. 2d 209, 234 (D.D.C. 2005). The allocation of fees among counsel must be "rationally related to each other." Id. And, a court's critical review of counsel's recommendations for an apportionment of fees is predicated upon "a fundamental exercise of trust by the Court." Id.

---

[3] Courts also acknowledge the value and need to compensate counsel's efforts even before the inception of the MDL when those efforts have directly provided a common benefit. *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* 2008 U.S. Dist. LEXIS 103736 (D. Minn.)

Accordingly, lead counsel must make a "fair allocation among its group even if that allocation diminished the share lead counsel received." Id.

As discussed infra, the Seeger allocation lumps all attorney work together, without regard to benchmarks in the litigation. Nor does it appear that the proposed apportionment of attorney's fee awards was rationally related to the respective work, rather than hours.[4] In that regard, we propose the Court establish benchmarks for each phase of the litigation (pre-complaint, post-complaint, negotiation of settlement, approval of settlement, defense of settlement, and administration of settlement), and then allocate the fee proportionally based on those benchmarks.

## II.    ANAPOL'S WORK BEFORE PRELIMINARY APPROVAL AND ITS WORK AS CO-LEAD SHOULD BE REASONABLY REFLECTED IN THE ALLOCATION

While Anapol's work covered the breadth of this litigation, involving work before and after preliminary approval of the Settlement, Anapol's crucial role in the development of the core elements of this litigation - when the risk for non-payment was greatest - have been substantially undervalued. Given the importance of this work and the substantial risk borne by investing attorney time and money at such an uncertain stage, Anapol deserves a substantially higher allocation of the attorney's fee award.

### A.    Anapol Undertook Substantial Risks and Performed Significant Tasks In The Five Months Prior To Filing The First Lawsuit In This MDL

In 2011, Anapol was the first law firm to file an action in federal court against the NFL ("the Easterling matter"). Easterling v. NFL, 2:11-CV-05209-AB, Dkt. 1 (E.D. Pa.). Anapol's

---

[4] While Seeger and Anapol shared the role of *Co-Lead* Class Counsel, the Seeger firm's proposed apportionment would leave one Co-Lead Class Counsel firm (Seeger) with 65.4% of the attorneys' fees and the other (Anapol) with 4.3% of the attorneys' fees. That is, the Seeger firm requests that this Court award it over 15 times the fees that it allocated to its Co-Lead Class Counsel, Anapol. On its face, Mr. Seeger's proposed apportionment is grossly inequitable given, *inter alia*, Anapol's extensive contributions to the case.

Senior Shareholders, Larry Coben and Sol Weiss, spent more than 1,000 hours on an extensive legal, factual and medical analyses before filing this national class action against the NFL.

Anapol analyzed available medical records and injury histories of approximately a dozen former NFL players whom Anapol was representing. Declaration of Larry Coben at 2 (attached hereto as Ex. 1). Mr. Coben analyzed these players recollections of the head injuries they suffered playing football. Id. In May 2011, Mr. Coben reviewed extensive medical literature to develop causative theories necessary to pursue substantive liability claims against the NFL. Id. at 3. Additionally, through the Summer of 2011, Mr. Coben interviewed former NFL players and their families. Id. at 3-4. These players suffered from varying degrees of dementia, ALS, and other medical conditions addressed by the Settlement. Id. Mr. Coben's unparalleled expertise in football helmet and closed head injury litigation provided pivotal insight and access to world class experts. Id. at 1-3. Anapol then formed a team of experts to explore: 1) the historical knowledge of the dangers of concussive events in sports; 2) the NFL's awareness and response to those dangers; 3) the causative relationship between both what are known as "sub-concussive" and "concussive" injuries in football (and other sports) and long-term neurocognitive medical disorders and behavioral dysfunctions; and 4) the available means to treat these long-term medical conditions. Id. at 3. Several of these experts continued to inform counsel after the MDL was formed and, one, Dr. Grant Iverson, was heavily relied on in creating the BAP Program. Id. at 3, 5, 8, 9. Others helped quantify injuries that later appeared in the Monetary Award Matrix. Id. at 10. These experts provided the primary medical opinions offered to and relied upon by the Court in approving the Settlement. Id. at 9-10.

**B.     Anapol's Efforts In The <u>Easterling</u> Matter Between The Filing Of The Complaint And The Formation Of The MDL**

Anapol filed the <u>Easterling</u> matter on August 17, 2011, which included several former NFL players and their respective families pursuing relief against the NFL.  <u>Id.</u> at 4. Three of these former players had already been diagnosed with neurocognitive disorders while others suffered from post-concussion behavioral problems.  <u>Id.</u>  The <u>Easterling</u> matter was the *first* lawsuit filed against the NFL requesting a nationwide class for concussive injuries and neurocognitive disabilities.  <u>Id.</u> The suit also sought certification of a medical monitoring class. <u>Id.</u>  After the filing of the <u>Easterling</u> matter, Mr. Coben and Mr. Weiss discussed issues including a potential MDL with Beth Wilkinson of Paul, Weiss, Rifkind, Wharton & Garrison.  <u>Id.</u> at 4. Both Mr. Weiss and Mr. Coben appeared before Judge Brody for a Pre-Trial Conference and discussed with the Court issues related to pre-trial discovery, motion practice, and the possibility of MDL litigation. <u>Id.</u> at 5.

On January 26, 2012, Mr. Weiss appeared before the Multi District Litigation Panel and successfully argued that the MDL be assigned to this Court.  <u>Id.</u>

**C.     Anapol's Leadership Role in the MDL Litigation Prior to, and During, the Settlement Negotiations**

**1.  Anapol's Role in the MDL Prior to the Settlement Negotiations**

Shortly after formal consolidation, Anapol convened a two-day meeting of Plaintiffs' counsel. <u>Id.</u> at 5. Anapol presented six (6) retained experts to discuss the range of medical and legal issues facing retired players who stepped forward to tackle the NFL.  <u>Id.</u> These experts included: Professor William Rubenstein and attorney David Fredricks (legal hurdles in certifying a class, causation, preemption and duty); Dr. Thomas Genarelli (biomechanics causing head injuries in contact sports); Dr. Robert Cantu (a leading proponent that concussive and sub-

concussive hits cause TBI), Dr. Grant Iverson (using neuropsychology to quantify cognition deficits); and, Dr. Gregory O'Shanick (Ray Easterling's neurologist ). Id. Anapol proposed, and the entire group agreed to, an organizational structure for the MDL litigation and the counsel to fill the various roles. Id. at 6. Those roles included Lead Counsel, an Executive Committee, and Plaintiffs' Steering Committee. Id. Judge Brody then selected Mr. Seeger as one lead counsel and the remaining lawyers selected Sol Weiss as co-lead counsel, an appointment that Judge Brody then confirmed. Id. Mr. Coben was one of six attorneys designated to serve on the Executive Committee. Id.

The Plaintiffs' attorneys in attendance at this organizational meeting also created a number of committees to perform common benefit work in the following areas: (1) Legal and Briefs Committee; (2) Discovery/Document responsibility Committee; (3) Third Party Discovery and Privilege Committee; (4) Expert/Science Committee; (5) Communications and Privilege Committee; (6) Riddell/Helmet Committee; (7) Lien Subrogation and Client Resolution Committee; and (8) State/Federal Counsel and Fact Sheet Committee. Id. Later in the MDL, a Negotiation Committee was also formed. Id.

Mr. Coben was designated as Co-Chair of both the Legal and Briefing Committees and the Expert/Science Committee. Id. On April 25, 2012, the Court adopted the Plaintiffs' proposed organizational structure. Id. The Court also set a deadline for the Master Administrative Complaint. Over the next 30 days, Mr. Coben and two other members of the Legal and Briefing Committee developed the factual and legal theories of liability that were integral to the ninety page Master Administrative Complaint. Id. After the Master Administrative Complaint was filed, Mr. Coben continued his work on the scientific and medical aspect of the claims against the NFL. Id. at 7. This work required Mr. Coben to expend hundreds of hours in meetings with

several of the key experts.  Id.  Mr. Coben identified and retained additional experts to assist with the litigation, including, nationally renowned brain injury experts Dr. David Hovda and Dr. Christopher Giza, who among other professional activities, served as the Director of Brain Injury Research Center, Department of Neurosurgery, David Geffen School of Medicine at UCLA and the Co-Chair of American Academy of Neurology Committee which published the Evidence-based Guidelines for Assessment and Acute Management of Sports Concussion in Children and Adults, respectively.  Id. at 3, 7-8.  Throughout the summer of 2012, Mr. Coben dedicated approximately one third of his working hours to develop scientific predicates for compensable injuries and to quantify neurocognitive loss.  Id. at 7. Over the course of 2 years (2013 and 2014), Mr. Coben worked with Drs. Hovda and Giza, as well as two prominent brain injury experts in Florida (Drs. Hamilton and Fischer), who were referred to Coben by the Podhurst Firm to prepare their respective declarations for submission to the Court.  Id. at 7-8.  The declarations of Hovda, Hamilton, Fisher, and Giza aided the Court in finding that repetitive mild brain injury is associated with the Qualifying Diagnoses for levels 1.5 and 2 set out in the Settlement Agreement.  Id. at 9; see also Final Order of Judgment at 69-70. These Declarations directly refuted the Objectors' claims that CTE can be diagnosed in a living person.  Declaration of Larry Coben, at 9; see also Final Order of Judgment at 80-82.

Anapol also worked extensively with Dr. Grant Iverson in developing the neurocognitive definitions and the testing methods that would be employed to fairly verify a player's neurocognitive injury.  Declaration of Larry Coben, at 8-10.  As Dr. Iverson is a leading neuropsychologist on concussion injury his significant involvement helped shape the BAP Protocol. Id. at 8-9.  Dr. Iverson interacted with Co-Lead Counsel's retained expert consultant, Dr. Kelip, on the efficacy of the overall plan for testing and evaluation of the players.  Id. at 9.

Further, Mr. Coben was instrumental in working with Dr. Iverson and the other experts during the negotiation process, which was particularly useful in responding to the NFL's positions on scientific and medical matters. Id. at 8.

Additionally, Anapol (through Mr. Weiss) interviewed and hired CLS Strategies, a public relations firm, to assist Plaintiffs as the case progressed. Plaintiffs' public relations campaign overcame initial negative public sentiment toward the lawsuit.  Declaration of Sol Weiss, at 1. (attached as Exhibit 2).  Initially, surveys showed that the public believed that NFL players had received more than ample money during their careers such that they should not complain about their injuries. The Public Relations Committee (with Mr. Weiss co-leading this effort), focused on the devastation to retired players and their families who were previously unaware of the dangers of concussive and subconcussive hits in contact sports. Id. at 1-2.  This resulted in a sea change in public sentiment providing additional leverage to militate against serious liability defenses. Id.

Anapol (through Mr. Weiss) also took the lead in developing a database of factual and medical information on over 2000 Retired NFL Players ("Retired NFL Players' Database"). Id. at 2.  Anapol employees, with assistance from other law firms, conducted the numerous client interviews and medical records reviews which provided the information used to populate the database.  Id. This database was shared with the actuaries and economists who created the parameters for the inception points and solvency of the original capped Monetary Award Fund. Id.

Anapol was instrumental in hiring David Frederick and his firm, Kellog Huber, to assist the committee on briefing and arguing against federal preemption, a seminal defense in this litigation. Id.  Mr. Weiss worked directly with Kellogg Huber attorneys in reviewing briefs and

attending mock oral arguments.  Id. Prior to retaining Kellogg Huber, Anapol worked with the Legal Briefing Committee, which developed various drafts in response to the NFL's Motion to Dismiss.  Declaration of Larry Coben, at 7.

Respectfully, as detailed below, each of these litigation activites must be reflected in any fee allocation.  In re: Diet Drugs, 582 F. 3d at 541 (a court may look to the duration of the litigation, the time expended by counsel, and the risk of non-payment in adjudicating fee petitions); Comcast, Civ. A. No. 03-6604, Dkt. 673, at 9-10. (in adjudicating fee allocations, courts may consider, inter alia, the risks borne by counsel, counsel's contributions, the time expended, and "the magnitude and complexity of assignments executed").

### 2.  Anapol's Efforts During Settlement Negotiations

Mr. Seeger, in both his Declaration and in the Petition for Approval of Fees, emphasized the following aspects of the Settlement: (1) the BAP Program; (2) the innovativeness of the Monetary Award Matrix (primarily as it awards different amounts to different injuries in the retired NFL Players); and (3) the extensive retired NFL Player Database (in essence an epidemiological study of the Class Members and their myriad ailments).   Anapol played a pivotal  role in all three of these essential drivers of the settlement.

By taking a leading role in the scientific and medical issues on causation, and a primary role in developing the legal theories of liability, on Public Relations and in generating the NFL Retired Player database, Anapol was at the forefront on setting the settlement table.  This work took place when the contingent risk was the greatest. The BAP and the Monetary Award Fund undergirded the settlement.

The settlement negotiations, which began in January 2013, were lengthy and complex, and ultimately assisted by Judge Layne Phillips at the instruction of this Court. Mr. Weiss was a

member of the Negotiating Committee, spending considerable time and effort. As Mr. Seeger acknowledges, the negotiation team – including Mr. Weiss – worked at a grueling pace, collectively expended thousands of hours on the settlement, and often worked around the clock to negotiate this historic settlement. Declaration of Christopher Seeger, Dkt. 7151-2, at 10. Mr. Weiss played a pivotal role, as Co-Lead Class Counsel, in the negotiations and in reviewing the numerous drafts of the Settlement Agreement. Mr. Weiss, along with the other members of the negotiating team, finally agreed on a settlement for the class and a settlement agreement that appropriately memorialized it. Relatedly, Mr. Coben, along with Mr. Weiss and Mr. Buchanan (the latter of the Seeger firm) took the lead in negotiating the tests incorporated into the BAP.

Mr. Seeger, in his Declaration, lists a number of tasks that were instrumental in the negotiating process, for which Anapol was either heavily engaged. These tasks included:

1) Researching the medical and scientific issues implicated by Plaintiffs' claims, including:

    a.    the science of concussions and subconcussive head trauma and the medical conditions associated with such injuries;

    b.    the neurocognitive and neuromuscular injuries and progression of disease associated with such brain injuries;

    c.    the epidemiology of the Qualifying Diagnoses and the methods of diagnosing and treating the Qualifying Diagnoses;

    d.    guidance by medical and scientific experts in conducting a comprehensive review of peer reviewed medical literature; and

2) Creating the Retired NFL Players database, which Mr. Seeger acknowledges "required extensive professional work" and was "vitally important to the entire negotiation process."

Declaration of Christopher Seeger, Dkt. 7151-2, at 11.

In addition, Anapol – through the efforts of Mr. Weiss and Mr. Coben - worked extensively with Mr. Seeger and other members of the negotiating team through the execution of

11

the Settlement Agreement.  As discussed earlier, Mr. Coben worked with the experts to respond to the NFL's various legal, medical and scientific negotiation points during settlement, and relayed those responses to the negotiating team through Mr. Weiss.  The innovative and fundamental elements of the settlement agreement – the BAP and the Monetary Award Matrix – involved substantial input from Anapol lawyers, support staff and the experts it hired for the Class.

Anapol thus took an outsized role in the MDL both before and during the settlement negotiations.  Anapol's leadership efforts and extensive work with respect to the BAP, Award Matrix, and Player Database were highly demanding and played a critical role in the settlement discussions and the ultimate relief afforded the class.  Meanwhile, Mr. Weiss's and Mr. Coben's roles in the negotiation discussions themselves were critically important.  Consistent with <u>Diet Drugs</u> and <u>Comcast</u>, the fee allocation should accurately reflect Anapol's work on the MDL both before and during settlement negotiations, namely by weighing: (1) the extensive time expended by Anapol; (2) the legal and scientifically complex nature of Anapol's work both during the negotiations themselves (e.g., attending settlement discussions) and in support thereof (e.g., creating the scientific and legal bases for the Settlement and Anapol's leadership roles in the MDL more generally); and (3) the manner in which those efforts led to and were reflected in the ultimate settlement, a settlement which in large part incorporates Anapol's ground-breaking legal/scientific work with their panel of top tier experts.  <u>See</u> <u>In re: Diet Drugs</u>, 582 F. 3d at 541; <u>Comcast</u>, Civ. A. No. 03-6604, Dkt. 673, at 9-10.

## D. <u>Anapol Should Be Credited For the Efficiency And Effectiveness of Its Work</u>

Not only did the Anapol firm provide instrumental work on the case and the ultimate Settlement, but the work performed by its attorneys was done with the utmost efficiency and

effectiveness.    Anapol billed 4,241.22 hours.    In comparison, Mr. Seeger's firm billed 21,044.06 hours[5] for its role as Co-Lead Class Counsel.    While Anapol acknowledges that the Seeger firm provided substantial benefits to the Class, the Anapol firm took and maintained a lead role in this litigation from the very start and billed but a fraction of the hours of the Seeger firm.

Mr. Seeger's decision to use the lodestar as the lynchpin of his analysis therefore rewards his firm for expending prodigious hours on the case while marginalizing those firms like Anapol that took a more measured and efficient approach to the litigation.  See, e.g. Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1268 (D.C. Cir. 1993) (noting the lodestar in common fund cases "encourages significant elements of inefficiency" as "attorneys are given [an] incentive to spend as many hours as possible, billable to a firm's most expensive attorneys").  As the Third Circuit has made clear, any fee allocation should reward not punish firms for their efficiency.  In re: Diet Drugs, 582 F. 3d at 541 (considering "the skill and *efficiency* of the attorneys involved") (emphasis added).[6]

As a final note, Anapol has represented over 350 different retired NFL players during the course of this litigation.  Anapol encouraged other firms to file claims.  Nearly 5,000 retired players filed suit before negotiations began in earnest.  The Seeger allocation does not address this critical facet of Anapol's contribution.

---

[5] Mr. Seeger and his two colleagues Mr. Buchanan and Ms. Benedetto billed over 14,000 hours collectively.
[6] Further, Mr. Seeger's approach may disproportionately credit the firm for the percentage of hours worked on post-settlement administrative matters; however, there is no way to determine how much of the Seeger lodestar applies to post-settlement work.

## III.    THE FLAWED LODESTAR ANALYSIS: GROSS DISPARITIES IN HOURLY RATES LEAD TO GROSS DISPARITIES IN ALLOCATION

The lodestar factor becomes a secondary and non-essential element in the "what counsel did and how it benefitted the class" analysis.  Not all attorney work built into the lodestar is created equally, which is why the lodestar is only one of a number of factors considered when allocating fees among counsel.

Mr. Seeger's recommended allocation is flawed in that there exists a superficially large delta between Anapol's lodestar and that of firms, like the Seeger firm, that assert high billing rates.  Sol Weiss and Larry Coben, both partners at the Anapol firm with decades of personal injury and mass tort experience, submitted billing rates of $650 an hour.  The Seeger firm's rates range from $500 and $600 for a *contract attorney and an associate*, respectively, to between $895[7] and $985 for the Seeger firm's most active partners in this litigation.  This large delta, which reflects neither the skill, efficiency, quality of work, nor risk taken on by each law firm, fundamentally skews Mr. Seeger's analysis.[8]  There is no equitable or legal reason that the delta between the proposed allocation to Anapol and that to the Seeger firm should be related to the superficially large difference between these firms' nominal billing rates.

---

[7] Ms. Benedetto, a Seeger partner, seeks an hourly rate of $895 here. Three years ago, before this Court, Ms. Benedetto requested an hourly rate of $465.  McDonough v. Toys R Us, Inc., 2:06-cv-00242, E.D. Pa., Dkt. 863-2, at 25.  Fellow Seeger partner Jonathan Shub requests a rate of $750 here.  In the Toys R Us case, his hourly rate was said to be $495 per hour.  Id.

[8] As Mr. Seeger noted in Class Counsel's Fee Petition of February 23, 2017, a percentage of the fund approach is appropriate in common fund cases such as this. Fee Petition Brief, Dkt. No. 7151, p. 27-29; see also, e.g, In re: Diet Drugs, 1203, 2002 WL 32154197, at *10 (E.D. Pa. Oct. 3, 2002) (subsequent history omitted) ("The day of the lodestar has passed in class actions such as this, save for perhaps its use as a cross-check in some cases. It is now clear that in the Third Circuit the percentage of recovery method should be utilized in common fund.") (internal citations omitted).

In fact, Professor Brian Fitzpatrick, who provides a Declaration in support of Mr. Seeger's fee, petition has taken the position that the lodestar framework has no place in cases involving a percentage of the fund award.  In Re: Volkswagen, 3:15-md-02672-CRB, N.D. Cal., Dkt. 2175-2, at p. 7-17.  ("[T]he lodestar approach [has fallen] out of favor in common fund class actions. . . .[I]n my opinion, it does more harm than good to consider class counsel's lodestar when awarding fees under the percent method.").

To the extent a lodestar crosscheck must be employed, this Court should employ a uniform hourly rate scale applicable to all Class Counsel firms, reflecting the years of experience of each associate, partner, of counsel, or contract attorney who has worked on the case. This approach is mandated by the objectively reasonable standard employed by the Third Circuit to determine an hourly rate, which hinges on *reasonable geographic market rates for comparable work, not the attorneys' personal claimed rate.* See Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 199 (3d Cir. 2000) ("[A] court determines the lodestar by multiplying the number of hours counsel reasonably worked on a client's case by a reasonable hourly billing rate for such services in a given geographical area provided by a lawyer of comparable experience.").[9] In that respect, the Court can level the playing field and ensure that superficial disparities in hourly rates do not lead to an inequitable distribution of the fee award. To hold otherwise would violate Gunter and reward law firms, not for the quality of their work or contribution to the Settlement, but for their ability to demand high hourly rates.

## IV.   **CONCLUSION**

For the reasons set forth above, Anapol requests that this Court decline to accept Mr. Seeger's proposed fee allocation and refer the matter to a Magistrate Judge or Special Master to employ a more equitable and appropriate value-added method of fee allocation, in accordance with Third Circuit precedent.

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP


By: /s/ Gaetan J. Alfano, Esquire
    GAETAN J. ALFANO, ESQUIRE
    I.D. No. 32971
    1818 Market Street

---

[9] That is, a mass tort attorney with the same years of experience in this litigation should, to the extent the lodestar is considered, be provided an identical hourly rate in computing the lodestar.

Suite 3402
Philadelphia, PA 19103
(215) 320-6200

Dated: October 27, 2017                    *Attorney for Anapol Weiss*

3478668v1

# EXHIBIT 1

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB

MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,              Plaintiffs, v. National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,              Defendants. | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Civ. Action No. 14-00029-AB |

## Declaration of Larry E. Coben, Esq.

I, Larry E. Coben, Esquire, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am an attorney at law, admitted to practice in the Commonwealth of Pennsylvania, the State of Arizona and the associated Federal Courts in those Circuits. I have also been admitted to the United States Supreme Court and Pro Hac in many states across the country.

2. Over the course of my career, I have litigated hundreds of sports head and spinal cord injury cases for players and their families.

3. I have published in legal peer review journals dozens of papers regarding head and spinal cord injury in sports activities and I have lectured on these topics at legal seminars and law school programs across the country.

1

4. I was appointed and served as a member and Chair Person of a subcommittee of the ANSI Z90.1 Helmet Standard Committee.

5. I have published articles in engineering journals including the Proceedings of the Society of Automotive Engineers regarding head and spinal cord injury and helmet design.

6. A significant part of my litigation work has involved representing high school and college football players who have suffered catastrophic head and neck injury. This work has spanned the past 4 decades and included litigation in Pennsylvania, Texas, New Jersey, and California. This work allowed me to develop expertise in this area of the law and to become associated with some of the world's foremost scientific experts in the fields of medicine, brain and spinal cord injury and bio-mechanics.

7. In the Spring of 2011, a member of my firm — who then represented NFL players in both workers' compensation claims and benefit claims — discussed with me the recurring cognitive problems these clients were having as the result of their history playing in the NFL.

8. As a result of this conversation, I undertook a study of the available medical records and injury histories of about a dozen former football players that our Firm was currently representing in connection with benefit claims. I began by studying the current symptomatology and then I reviewed notes of their recollections of the head injuries/concussions they suffered playing football. This review led to phone conversations with former players and led me to consider the viability of a class action for former players.

9.  As a result of this analysis, I initiated conversations with members of my Firm to discuss the legal viability of a class action for former NFL players. These discussions took place in April and May of 2011.

10. In May, 2011, my Firm began planning for the filing of a national class action against the NFL via the representation of a number of former players or their families. At the same time, I began a review of extensive medical literature to develop causative theories needed to pursue substantive liability claims against the NFL.

11. In May, 2011, I began reaching out to some of the foremost experts in the country regarding this lawsuit. Obviously, it was necessary to develop a team of experts to address topics including the (1) historical knowledge of the dangers of concussive events in sports; (2) the NFL's awareness and response to these dangers; (3) the causative relationship between both what are known as "sub-concussive" and "concussive" injuries in football (and other sports) and long-term neurocognitive medical disorders and behavioral dysfunction; (4) the available means to treat these long-term problems.

12. In this regard, I spoke to and retained as consultants a number of highly regarded experts including but not limited to Dr. Robert Cantu, Dr. Thomas Genarelli, Dr. David Hovda, Dr. Christopher Giza, and Dr. Grant Iverson.

13. In the summer months of 2011, I personally met with many former players and their families to discuss their respective experiences with the NFL, their injuries while playing, and their health following their NFL careers. These players were respectively suffering from various levels of dementia, ALS, and other conditions addressed by the Settlement. These players and their family members had filed claims for

compensation vis a vis the NFL Player Benefit Plans but had all been rejected. Fee agreements were signed and many of these players were included in the first lawsuit we filed in this Court in August 2011.

14.  On August 17, 2011, as the result of the work that I and members of my Firm did over the proceeding four and half months, which probably involved more than 1,000 hours of work with former players, nationally renowned experts and detailed fact and legal analyses, we filed the case captioned <u>Easterling, et al v. National Football League, Inc.</u>

15.  The <u>Easterling</u> case included seven former NFL players and their respective families. Three of these former players had already been diagnosed with neurocognitive disorders and others were suffering with post-concussion behavior problems. Because this lawsuit included former MVP Jim McMahon who led the Chicago Bears to the Super Bowl, the lawsuit generated significant publicity.

16.  The Easterling case was the ***first*** lawsuit filed by former players and their families against the NFL seeking ***national*** Class Action status related to concussive injuries and their neuro-cognitive disabilities. This lawsuit also sought the establishment of a Medical Monitoring class.

17.  The <u>Easterling</u> case was assigned to the Honorable Anita B. Brody, who then first scheduled a Pre-Trial Conference for November 8, 2011.

18.  Before the scheduled Conference, I and my partner Sol Weiss began discussions with counsel for the NFL, Beth Wilkinson of Paul, Weiss, Rifkind, Wharton & Garrison, and we entered into a Stipulation to postpone certain filings until shortly before the Conference date.

19.  This Honorable Court held a Pre-Trial Conference on the Easterling case on November 21, 2011.  Both I and my partner Sol Weiss appeared for our clients. The NFL was represented by several attorneys including Ms. Wilkinson and Brad Karp, also of Paul, Weiss, Rifkind, Wharton & Garrison.

20.  During this Conference, the parties proposed a case schedule and then discussed with the Court issues related to: pre-trial discovery, motion practice to challenge the propriety of the lawsuit and the possibility that this case would lead to filing a request for Multi-District litigation because of a number of "copy-cat" lawsuits filed during the months of September through November. The parties inquired and the Court agreed that the Court would be willing to accept an MDL assignment of this litigation.

21.  On January 26, 2012, my partner Sol Weiss and I appeared and argued for the assignment of this case as an MDL to this Honorable Court. That assignment was made.

22.  After the assignment of this case as an MDL to this Honorable Court, I and my partner Sol Weiss organized a meeting of the primary attorneys from across the United States in an effort to coordinate the MDL activities of the Plaintiffs.

23.  A meeting of plaintiffs' counsel was held for two days in our offices in Philadelphia. We arranged for 6 experts to attend and lay out a host of medical and legal issues that we expected to face in this lawsuit. Those experts included Professor William Rubenstein, David Fredrick, Esquire, Dr. Thomas Genarelli, Dr. Robert Cantu, Dr. Grant Iverson, and Dr. Gregory O'Shanick.

24. At the meeting, as the organizer of plaintiffs' counsel, we proposed and the entire group agreed to an organizational structure—to propose to the Court—for lead counsel, an Executive Committee and a Plaintiffs' Steering Committee.  Sol Weiss was designated as lead counsel and I was designated as one of six attorneys to serve on the Executive Committee.

25.  The plaintiffs' attorneys at this same meeting created a host of committees to perform common benefit work in the following areas of interest and concern: (a) Legal and Briefing Committee, (b) Discovery/Document Repository Committee, (c) Third Party Discovery and Privilege Committee, (d) Experts/Science Committee, (e) Communications and Ethics Committee, (f) Riddell/Helmet Committee, (g) Lien Subrogation and Client Resolution Committee, and (h) State/Federal Counsel and Fact Sheet Committee.  A Negotiation Committee was formed later in the litigation.

26.  I was designated as Co-Chair of the Legal and Briefing Committee and the Experts/Science Committee.

27.  On April 25, 2012, this Honorable Court held an Organizational Conference, at which time the Court approved of Plaintiffs' attorneys' requested leadership committees.

28. During this same Hearing, the Court set a deadline to file the Master Administrative Complaint.

29.  Over the next 30 days, I and two other members of the Legal and Briefing Committee developed the facts and legal theories of liability that were then constructed into the 90 page Master Administrative Complaint.

30.  Once the Master Complaint was filed, I began working further on the scientific and medical aspects of the claims against the NFL. This work involved hundreds of hours of meetings with several of the key experts who would ultimately prepare separate Declarations used to support the Plaintiffs' Motion to approve the Settlement of this case.

31.  During the months of September and October, the Legal Briefing Committee under my leadership worked on draft briefs in response to the NFL's Motion for Dismissal based on federal preemption. This legal work was then used and/or incorporated into the Plaintiffs' Brief in Opposition to the NFL's Motion to Dismiss.

32.  After oral argument on the issue of preemption, the Court directed the litigants to explore the settlement of this case.

33.  Over the next few months, I personally attended many of these meetings and provided input into these discussions. However, more of my time was spent working with the nationally renowned experts we hired to develop proposed damage models which were used by Lead Counsel in their discussions with the NFL over the terms of the settlement and the value of these cases.

34.  During the summer of 2012, I spent about one-third of my working hours either on a plane traveling to meet with our key experts or sitting in their respective offices developing the scope of the supportive opinions which became the product of their Declarations and/or the Medical Monitoring Platform adopted as the BAP.

35.  During calendar years 2012 through the first part of 2014, I personally met and/or worked by phone with these four experts and helped draft the Declarations submitted by each to the Court: (1) Dr. David Hovda (who has been the Director of the UCLA

7

Brain Injury Research Center — he was misidentified by Mr. Seeger in his filing as a

neurosurgeon, which he is not), (2) Dr. Christopher Giza (misidentified by Mr. Seeger

as a neuropsychiatrist) who is a Board Certified Neurologist and the Co-Chair of the

American Academy of Neurology's Committee on Assessment and Acute

Management of Sports Concussions in Children and Adults, (3) Dr. Kenneth C.

Fischer (Board Certified in Psychiatry and Neurology) and (4) Dr. Richard Hamilton

(Neuropsychologist).

36.  In the development of the Medical Monitoring and Testing Plan proposed and

adopted as the BAP, I hired and met with and spoke with Dr. Grant Iverson for more

than 100 hours.  I flew to his home in Vancover, Canada and worked with him in the

development of the neuro-cognitive definitions and the testing methods to be

employed to fairly verify a player's neurocognitive injury. While Dr. Iverson did not

provide a Declaration, if it were not for Dr. Iverson's stature and input, it is unlikely

the BAP protocol would have been acceptable to the NFL. He is one of the leading

neuro-psychologists on concussion injury currently working in the United States. Dr.

Iverson moved his practice from Vancouver to Boston, Mass., when he took a position

at the Harvard Medical School in late 2012.

37.  During the time spent with Dr. Iverson, he developed several drafts of a "Health

Monitoring Program" which I personally studied and reviewed with my partner Sol

Weiss. These drafts provided significant scientific information pertinent to what

became the BAP test protocol incorporated into the Settlement Agreement. It is my

understanding that this information was used by Mr. Weiss and others on the

Negotiating Team with the NFL.  My work with Dr. Iverson continued until the Fall

of 2014. Sometime before the Plaintiffs submitted their motion to obtain approval of the Settlement, Dr. Iverson began to interact directly with co-lead counsel's hired expert consultant (Dr. Kelip), who then finalized the testing protocol which became the BAP protocol incorporated into the Settlement Agreement.

38.  As drafts and revised drafts of the BAP test protocol were proposed and counter-proposed by the parties during negotiations, I remained involved in discussing these revisions with Dr. Iverson.

39. In the Fall of 2014, leading up to the filing of the Plaintiffs' Brief in support of the Motion for an Order Granting Final Approval of the Settlement and Certification of Class and Subclass, I worked with Drs. Hovda and Giza to address the propriety of the BAP and Monetary Grid and to provide a detailed response to the Declarations submitted by the Objectors' experts. This interaction led to the Declarations of Dr. Hovda and Dr. Giza which were submitted to the Court.

40.  The development and presentation of the Declarations submitted by Drs. Hovda, Giza, Hamilton, and Fischer were the primary scientific predicate for this Court's decision that repetitive mild brain injury is associated with the Qualifying Diagnosis set forth in the Settlement Agreement. [Final Order of Judgment, at 69-70.] These Declarations were also the predicate for the Court's rejection of objector claims that CTE is causative from concussions or diagnosable in a living person. [Final Order of Judgment at 80-82.] The Court also relied upon these Declarations to conclude that concussions and traumatic brain injury with associated sequelae such as dementia, Alzheimer's Disease and Parkinson's Disease. [Final Order of Judgment at 100.]

41. The Opinion of this Court relied heavily on these Declarations which I alone personally assisted Drs. Hovda and Giza prepare. [See, Final Order of Judgment.]

42. I was the only member of the Plaintiffs' team that met with and assisted Dr. Hovda and Dr. Giza to prepare their Declarations.

43. I was the member of the Plaintiffs' team that first spoke with and helped draft Declarations for Drs. Hamilton and Fischer.

44. The insight provided by the various experts described above was used to quantify the injuries that were ultimately included in the Monetary Award Matrix.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26th, 2017 in Scottsdale, Arizona.

Larry E. Coben, Esq.

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br>Plaintiffs,<br>v.<br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Civ. Action No. 14-00029-AB |

### SUPPLEMENTAL DECLARATION OF SOL H. WEISS, ESQUIRE

I, Sol H. Weiss, Esquire, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am President of Anapol Weiss. I submit this supplemental declaration in support of Anapol Weiss's Co-Lead Class Counsel's Petition for an Alternative Allocation of Common Benefit Fees.

2. I took a leading role in the organization of the Plaintiffs' Steering Committee (PSC) and Plaintiffs' Executive Committee (PEC). I organized meetings and initiated communication (conference calls and emails) among PSC and PEC members

3. I was instrumental in creating and participated in the Public Relations and Legal and Briefing Committees. For public relations, I interviewed and retained the firm now known as CLS Strategies that shaped a campaign that featured retired players and their families rather than lawyers. This campaign changed the initial public perception that football players make a lot of money and should not sue the NFL. Sometime thereafter an ESPN Poll, found 70% of

respondents believed retired players were justified in filing lawsuits for closed head injuries. Public opinion created pressure on the NFL to consider settling the case.

4. I prepared and revised Tolling Agreements which facilitated 5,000 players individually suing the NFL. The amount of retired players who actively signed on to the litigation added leverage at the settlement table

5. I was instrumental in engaging David Frederick on the seminal defense Federal Preemption. I along with others worked closely with David and his firm including reviewing briefing and attending mock oral arguments.

6. I led the development of the Retired NFL Players Database which was, at its core, a compilation of the neurocognitive maladies suffered by 2,000 retired NFL players. Anapol, with assistance from other firms, interviewed numerous clients and performed extensive medical records reviews in order to populate the database.

7. This database became an invaluable resource for Plaintiffs as it provided data upon which certain injuries and diseases would be compensated in the settlement. The database was shared with our actuaries and economists who created the parameters for the inception points and solvency of the original capped Monetary Award Fund.

8. I participated in live conferences and telephonic conferences with the Honorable Anita Brody of the United States District Court for the Eastern District of Pennsylvania on a broad range of issues.

9. As a member of the negotiating team I attended many settlement meetings and mediations with the NFL. I, along with David Buchanan from Seeger Weiss and my fellow shareholder Larry Coben, negotiated the eventual battery of tests used for the Baseline Assessment Program. This included the scoring protocols. I met with plaintiffs' neuropsychological

2

experts as well as the NFL's experts. I reviewed and suggested changes to each draft of the various Settlement Agreements. I, along with Larry Coben, met with and prepared scientists and physicians who submitted Declarations on CTE issues and neurocognitive disorders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2017 in Philadelphia, Pennsylvania.

SOL H. WEISS, ESQUIRE

3475916-v1

3