IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No. 2323<br>No. 2:12-md-2323-AB |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,* | **Hon. Anita B. Brody** |
| Plaintiffs,<br>v. | Civ. Action No. 14-00029-AB |
| National Football League, et al.,<br>Defendants. | |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**COUNTER- DECLARATION OF THOMAS V. GIRARDI IN RESPONSE TO THE DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES**

**COUNTER- DECLARATION OF THOMAS V. GIRARDI IN RESPONSE TO THE DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES**

### DECLARATION OF THOMAS V. GIRARDI

1. I am an attorney at law duly authorized to practice before all the courts of this state, and am a member of the law firm of Girardi|Keese, attorneys of record for Plaintiffs here. I have personal knowledge of the facts as set forth herein and could testify competently thereto if called upon as a witness. I make this declaration in response to the Court's request to respond to the Declaration of Christopher Seeger.

2. As an introduction to my declaration I would like to highlight several facts, which will be expanded on below. Girardi Keese along with two co-counsel firms, represented approximately 550 plaintiffs in this litigation. We were retained in 2010, 2011, and 2012.

3. The cases were vigorously prosecuted and defended. We retained experts to establish causation between helmet impact and brain damage. We had brain scans performed to enable our neurological experts to have the proper basis for their opinion of medical causation. We also retained economic experts to analyze the future loses of the players.

4. Years earlier, our law firm successfully tried a football concussion case. In that litigation, we were able to obtain documents which demonstrated that the NFL knew of these issues for decades. Thousands of hours were dedicated to this case. Hundreds of thousands of dollars have been expended to work up these cases. We believe, and have been informed by others, that our efforts were very important in motivating the parties to settle this case.

5. Furthermore, while we have supported the settlement in this case, it has and continues to raise concerns for the players. The following issues continue to cause concern: (1) The medical criteria required in order to receive a qualifying diagnosis, for example PET scans which are universally accepted in the medical community as a measure of showing brain damage, are not

accepted as part of the criteria for the administrative body; (2) In order to receive a qualifying diagnosis players after January of 2017 players must go to doctors selected by the NFL. These concerns, among others are elaborated upon below.

6. In addition to the information contained above, I would like to more specifically present several issues for the Court's consideration.

7. In determining the appropriate allocation of Common Benefit Funds three factors were considered by Christopher Seeger (1) extent to which the firm took on leadership roles in the litigation (2) how early the firm was meaningfully involved in the litigation and (3) whether the firm was involved in settlement negotiations or helped defend the settlement once it was consummated. Brian Fitzpatrick Declaration ¶ 6. Based upon our firms' early involvement, which is described more fully below, that the multiplier we have received, one, should be increased. Professor Fitzpatrick acknowledges that it is appropriate to adjust "upward the lodestars of the firms that made contributions from the outset of the litigation to its end." He says: "These adjustments are reasonable and supported by other cases. *See, e.g., Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 69009680, at *3 (N.D. Cal. Oct. 24, 2016) (recommending multipliers based on whether firms 'joined the case prior to early settlements or class certification' or whether they 'joined later')." In this case we were the first to file, and the first to brief key motions, as is fully set forth below. Based upon this, we request that we receive a higher multiplier that more accurately reflects our early contributions to this litigation.

8. Our firm represents (along with co-counsel Goldberg Persky and White and Russomanno & Borello) 441 NFL Players. Our law firm also represents an additional 116 players in the NFL litigation. In total our firm represents more than 500 players in this litigation. All of these players signed individual retainers with our firm or our co-counsel's firm.

9. We filed the first complaint against the NFL, Maxwell v. NFL, in Los Angeles Superior Court on July 19, 2011. The complaint was filed on behalf of seventy-three former NFL players and their wives . The Maxwell complaint alleged that the NFL had a "duty to protect the health and safety of its players by implementing rules, policies, and regulations in an attempt to best protect its

players," but breached that duty by failing to "warn and protect NFL players... against the long-term brain injury risks associated with football-related concussions;" "failing to regulate and monitor practices, games, rules, equipment, and medical care so as to minimize the long-term risks associated with concussive brain injury;" "failing to ensure accurate diagnosis and recording of concussive brain injury;" "failing to enact league-wide guidelines and mandatory rules regulating post-concussion medical treatment and return-to-play standards for players who suffer a concussion." (Maxwell Complaint ¶ 114-15, 542, 548).

10. The Maxwell complaint further alleged that "for decades, Defendants have known that multiple blows to the head can lead to long-term brain injury," but that the NFL "made... material misrepresentations... that there was no link between concussions and later life cognitive/brain injury." (Maxwell Complaint ¶ 524-61; 587-89).

11. On August 3, 2011, we filed our second complaint, Pear v. NFL, in Los Angeles Superior Court. This complaint was filed on behalf of forty-seven former NFL players and their wives. The Pear Complaint contained similar allegations as those set forth in the Maxwell Complaint. The two cases were designated by the Los Angeles Superior Court as related (i.e. had common issues of fact and law and should be handled by the same judge).

12. The Court should note that the allegations set forth in both Maxwell v. NFL and Pear v. NFL were copied by the Master Administrative Class Action Complaint and Amended Master Administrative Long-Form Complaint, the operative pleadings of the MDL.

13. On October 11, 2011, the NFL removed the Maxwell and the Pear cases to United States District Court for the Central District of California on the basis of federal question jurisdiction. Specifically, the NFL sought to establish jurisdiction under section 301 of the Labor Management Relations Act, arguing that plaintiffs' claims arise from or are substantially dependent upon the terms of the collective bargaining agreement and are therefore preempted by section 301. On November 7, 2011, we filed a Motion to Remand the cases claiming that none of the claims should be preempted by section 301 and thus no federal question jurisdiction existed. The NFL filed an opposition on to the Motion to Remand on November 14, 2011. The Motion to Remand was heard on December 5,

2011, before Judge Real in the U.S. District Court for the Central District of California. The Court relying upon *Stringer v. NFL*, 474 F.Supp.2d 894 (E.D. Ohio 2007) denied our Motion to Remand based upon Collective Bargaining Agreement and section 301.

14. All of the efforts on behalf of the Plaintiffs in the opening stages of litigation were handled by Girardi Keese, Goldberg Persky and White and Russomanno & Borello.

15. On November 15, 2011, the NFL filed a Motion to Transfer and Coordination or Consolidation Pursuant to 28 U.S.C.§ 1407 before the Judicial Panel on Multidistrict Litigation. The motion requested that the JPML transfer and consolidate the Maxwell and Pear cases to the Eastern District of Pennsylvania where another action was currently pending. The transfer order was not entered until early 2012, even though it was unopposed by the Maxwell and Pear Plaintiffs.

16. While the NFL's Motion to Transfer and Coordinate was pending, Plaintiffs filed a First Amended Complaint in the Maxwell action on December 9, 2011. On December 20, 2011, the NFL filed a Motion to Dismiss Plaintiffs' First Amended Complaint. The NFL claimed that the case should be dismissed based upon the Collective Bargaining Agreement. On December 27, 2011, Plaintiffs filed an opposition. NFL filed a reply brief on January 23, 2012, and the Motion was set for a hearing in front of Judge Real. Before the Motion could be heard, on January 31, 2012, both the Maxwell and Pear cases were transferred to the Eastern District of Pennsylvania.

17. Although not heard, the Motion to Dismiss was fully briefed by both sides. Plaintiffs argued that the Collective Bargaining Agreement did not apply because: (1) it expressly delegated the duties at issue in the complaint; (2) there was no operative Collective Bargaining Agreement when Plaintiffs' filed their suits; (3) Plaintiffs are all retirees from NFL or spouses; (4) NFL owed a duty to the public at large based upon Brown v. NFL making the Collective Bargaining Agreement in applicable; (5) Plaintiffs' negligence claim is viable based upon Stringer v. NFL, et al; (6) Plaintiffs stated claims for fraud, conspiracy and negligent misrepresentation with sufficient particularly; (7) Plaintiffs' claims are not time barred because the NFL concealed the risks, California's delayed discovery rule and the recent manifestation of Plaintiffs' injuries.

18. The NFL filed substantially the same Motion in the MDL on August 30, 2012, again relying

upon the Collective Bargaining Agreement and § 301 of the Labor Management Relations Act. The parties completed briefing the motions to dismiss on January 28, 2013, and oral argument was heard on April 9, 2013. The opposition filed by the Plaintiffs in the MDL contained arguments identical to those advanced by us in the Maxwell and Pear filings. On July 8, 2013, the Court ordered the parties to mediation and withheld her ruling while settlement discussions took place. A settlement was ultimately reached and a ruling was never issued by the Court.

19. The work undertaken by Girardi Keese, Goldberg Perksy and White, Russomanno & Borello during the litigation of the Maxwell and Pear cases directly benefited the Plaintiffs in the MDL. The legal arguments and theories that we created provided the framework for the Plaintiffs in the MDL litigation. Our firm's early efforts prior to the creation of the MDL were substantial and of lasting value.

20. Our firms submitted declarations that detailed our involvement Pre-MDL to Christopher Seeger for his consideration. Christopher Seeger's Declaration makes it clear that we were not awarded any compensation our Pre-MDL hours. We respectfully request that this court review our submission which is attached hereto as **Exhibit "1"** to my declaration. Since these hours were accumulated prior to the creation of MDL we were not keeping track of our hours. Rather, our fee was based upon our contingency fee agreements with our individual clients. We have submitted reasonable estimates of the time spent in the Pre-MDL time period based upon our knowledge of the litigation and our involvement in the efforts in state and federal court. But, since we do not have documentation of those hours, we are simply requesting a multiplier of our approved hours – a multiplier that will reflect our substantial contribution to the initiation and advancement of this case.

21. In addition to the Pre-MDL work our firms were intimately involved in fielding questions from players and media requests. Our three law firms handled literally hundreds of phone calls from the players or their families. Although an MDL was eventually formed and class counsel appointed, the players and their families continued to seek our assistance as we had been their primary point of communication since the beginning. Once the first cases were filed, we received numerous calls from media outlets wanting to cover the story. The publicity that was generated was

a significant favor in the NFL's interest in resolving the class action.

22. In addition to consideration of our Pre-MDL time, we would like to point this Court's attention to some of the issues that have arisen throughout the administrative process with the NFL settlement.

23. The process has experienced significant delays, far greater than what was originally proposed under the settlement agreement. It is my understanding that Brown Greer, the administrative body, has hired five part-time neurologists to review all of the claims. These part-time neurologists see their own patients during the day and spend their evenings and presumably weekends reviewing the NFL claims. As a result, there have been significant delays in receiving final determinations.

24. Additionally, players have been unable to get timely appointments through the Baseline Assessment Program. For example, players in Arizona must wait until Spring of 2018, for an appointment. The current administrative structure of the claims process is flawed, cumbersome, and moves at a glacial pace.

25. After years of litigation, these delays are very frustrating and disheartening for the many clients we represent. Further, while this process has been represented by some counsel to be easy, and to not require the assistance of a lawyer, the reality very different. The process is slow, confusing, and ripe with delays. It is difficult for the attorneys to navigate and would be nearly impossible for clients to navigate on their own. We continue to advocate for our clients in this process in order to ensure the best possible outcome.

26. Further, while the Court has not yet heard the parties' objections to the five percent holdback, I would like to make a proposal for this Court's consideration: allocating some of the attorney's fees that are requested in Christopher Seeger's declaration to a separate fund that would then be used to fund future common benefit work. This would ultimately reduce the five percent holdback to a lower, more appropriate percentage. This would have the net result of giving more money to the injured clients who have been patiently waiting for so many years for resolution of their case.

27. In conclusion, we believe a fair allocation of these fees should be made. The allocation of these fees to our three law firms would treated against the contingent fee that will be charged to the

players that we represent.

       I declare under penalty of perjury that the foregoing is true and correct.

       Executed this 27th day of October, 2017 in Los Angeles, California.

<u>s/Thomas V. Girardi</u>
THOMAS V. GIRARDI

## CERTIFICATE OF SERVICE

I hereby certify that I have, this day, electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all counsel of record on this 27th Day of October, 2017.

/s/ Thomas V. Girardi
GIRARDI | KEESE