# EXHIBIT 1



GOLDBERG
PERSKY
WHITE P.C.
ATTORNEYS AT LAW

DAVID P. CHERVENICK (PA & WV)
LANE A. CLACK (PA & MI)
BRUCE E. MATTOCK (PA & WV)
DAVID B. RODES (PA)
JOSEPH J. CIRILANO (PA, MI, OH & WV)
CHARLES J. McLEIGH (PA, WV & OH)
JASON E. LUCKASEVIC (PA, MI & AZ)
JASON T. SHIPP (PA & MI)
DIANA NICKERSON JACOBS (PA & OH)
CORI J. KAPUSTA (PA)

LEIF J. OCHELTREE (PA & WV)
JOHN N. KELSEY (MI & IN)
JOHN R. POMERVILLE (MI)
HOLLY L. DEIHL (PA & WV)
M. MICHAEL ELMER (PA)
BENJAMIN W. SCHWEERS (PA)
JAMES W. DORING (PA, WV)
JEREMY S. PAPP (PA, WV)
TALLIE R. VAN VUREN (PA)

Retired:
JOEL PERSKY

Of Counsel:
THEODORE GOLDBERG
THOMAS W. WHITE
PETER T. PALADINO, JR
MARK C. MEYER
JAMES J. BEDORTHA
HOWARD M. LOUIK
ROBIN A. BOLEA

PITTSBURGH, PA · DETROIT, MI · SAGINAW, MI · WEIRTON, WV · JOHNSTOWN, PA · GREENSBURG, PA

January 9, 2017

Christopher A. Seeger, Esquire
SEEGER WEISS
77 Water Street
New York, NY 10005

Scott A. George, Esquire
SEEGER WEISS
1515 Market Street
Philadelphia, PA 19102

Dear Chris and Scott:

Per your instructions as lead counsel, we kindly ask that you consider the attached affidavits regarding our efforts in this litigation at the appropriate time, which you advised is not ripe during the filing of the fee petition.

Also, we have attached herewith our fee declarations and supporting exhibits.

Very truly yours,

Jason E. Luckasevic

JEL/kjs

cc:   Thomas V. Girardi, Esquire
      Nicole DeVanon, Esquire
      (w/ enclosures)

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF JASON E. LUCKASEVIC IN SUPPORT OF CO-LEAD CLASS COUNSEL'S PETITION FOR AN AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF COSTS AND EXPENSES

JASON E. LUCKASEVIC declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am Jason E. Luckasevic of the law firm of Goldberg, Persky & White, P.C.  I submit this declaration in support of Co-Lead Class Counsel's Petition for an Award of Attorney's Fees and Reimbursement of Costs and Expenses in connection with and for services rendered and expenses incurred for the common benefit of the Settlement Class in the above-captioned multidistrict litigation ("Action") from the inception of the MDL litigation through July 15, 2016, as well as for the payment of expenses incurred therewith.  Future discussions on

pre MDL will occur at a later date per Co-Lead Counsel. I have personal knowledge of the

matters set forth in this declaration and, if called upon, I could and would testify competently

thereto.

2.      I am a Shareholder of the law firm of Goldberg, Persky & White, P.C. and was

the lawyer who originated the "NFL Concussion Litigation" when I filed the first two cases of its

kind. My firm's efforts were critical to the investigation of groundbreaking facts, creation of

liability against the league and litigating of the case up to and including the arguments on the

NFL's Motions to Dismiss. Our efforts were in conjunction with Executive Committee member,

Tom Girardi, and his law firm of Girardi Keese.

3.      The schedule attached hereto as Exhibit 1 is a detailed summary indicating the

amount of common benefit time spent by the attorneys and professional support staff of my firm

who were involved in, and billed fifty or more hours to, this Action, and the lodestar calculation

for those individuals based on my firm's current billing rates. The schedule was prepared from

firm records, data and attestations regularly prepared and maintained by my firm. Time

expended in preparing this application for attorney's fees and expenses has been excluded.

4.      The hourly rates for the attorneys of my firm included in Exhibit 1 are the same as

they charge for non-contingent work that is paid on an hourly basis, or for rates paid to attorneys

of comparable experience and reputation in the relevant legal market which have been accepted

by Federal Courts related to my law firm.

5.      The total number of hours expended on the common benefit of this Action by my

firm during the time period is 500.6 hours. The total lodestar for my firm is $262,860.00, which

is all attorney time.

2

6.    My firm's lodestar figures are based solely upon my firm's billing rates, which rates do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

7.    As detailed in Exhibit 2 hereto, my firm is seeking reimbursement of a total of $11,823.78 in common benefit expenses incurred in connection with the prosecution of this Action.  These expenses are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records, and other source material, and are an accurate record of the expenses incurred.

8.    With respect to the standing of my firm to share in an award of fees, costs, and expenses, attached hereto as Exhibit 3 is a description of my firm, including the attorneys in my firm who were principally involved in this Action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2017, at Pittsburgh, Pennsylvania.

s/ Jason E. Luckasevic
Jason E. Luckasevic
Goldberg, Persky & White, P.C.
11 Stanwix Street, Suite 1800
Pittsburgh, PA  15222
(412) 471-3980

3

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY
LITIGATION

No. 12-md-2323-AB

GOLDBERG, PERSKY & WHITE, P.C.

EXHIBIT #1

LODESTAR REPORT

MDL Inception through July 15, 2016

| NAME | HOURS | HOURLY RATE | AMOUNT |
|---|---|---|---|
| PARTNERS: | | | |
| Jason E. Luckasevic | 243.5 | $600.00 | $146,100.00 |
| Jason T. Shipp | 74.1 | $600.00 | $44,460.00 |
| Diana N. Jacobs | 87.0 | $500.00 | $43,500.00 |
| | | | |
| ASSOCIATES | | | |
| Mike Elmer | 96.0 | $300.00 | $28,800.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTALS: | 500.6 | See above | $262,860.00 |

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY
LITIGATION

No. 12-md-2323-AB

Goldberg, Persky & White, P.C.

**EXHIBIT #2**

COST AND EXPENSE REPORT

MDL Inception through July 15, 2016

| NUMBER | CATEGORY | AMOUNT |
|--------|----------|--------|
| 1 | Assessments | |
| 2 | Commercial Copies | |
| 3 | Computerized Research | |
| 4 | Court Reporters/Transcripts | |
| 5 | Expert Services | $4,631.26 |
| 6 | Facsimile | |
| 7 | Filing & Service Fees | |
| 8 | In-House Copies | |
| 9 | Long Distance Telephone | |
| 10 | Postage/Express Delivery | |
| 11 | Travel/Meals/Lodging | $7,192.53 |
| 12 | Miscellaneous | |
| TOTAL EXPENSES | | $11,823.78 |

# IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

## No. 12-md-2323-AB

## GOLDBERG, PERSKY & WHITE, P.C.

### EXHIBIT #3

Goldberg, Persky & White, P.C. ("GPW") is a law firm headquartered in Pittsburgh, Pennsylvania that has successfully represented tens of thousands of injury victims in various civil actions for over 30 years. With over 20 lawyers and nearly 100 employees, our firm has offices and practices in the tristate area as well as Michigan.

In late 2006, Associate Attorney Jason Luckasevic, licensed in Pennsylvania, Michigan and Arizona, began his investigation of rampant problem of chronic brain injuries and deaths of former National Football League players through his personal relationship with Dr. Bennet Omalu, who uncovered the disease Chronic Traumatic Encephalopathy ("CTE") in former players.

To get this massive case off the ground and into a courtroom took years of time and expense. The work included investigating the science of head injuries, reading and reviewing scientific journals, examining the NFL corporate structure, as well as analyzing rule changes, injury reports and the creation and proceedings of NFL committees. The work of these committees often ran counter to the actual science of brain injuries in athletes. Thereafter, Mr. Luckasevic studied the causation of CTE by speaking with the leading experts in the field of medicine and interviewing hundreds of former players and their families. Next, he and GPW developed the legal analysis that developed the critical claims of negligence and fraud against the NFL. These theories were alleged by Mr. Luckasevic and GPW in the first two lawsuits ever filed in relation to CTE against the NFL and Riddell on behalf of over 120 former players. All of this effort, it is understood, will be considered at a later date per Co-Lead Counsel.

Concerning the MDL litigation, GPW's efforts were critical to supporting Executive Committee member, Tom Girardi and his law firm. Our efforts uncovered the critical "gap years" that were the key argument at the Motion to Dismiss hearing. Further, our efforts were critical to the creation of the master complaint, short form complaint, arguments in the Motion to Dismiss and media relations publicity matters.

Along the way, Jason Luckasevic was promoted to a Shareholder of GPW in 2008 after practicing for 8 years. He was provided assistance from fellow Shareholders Jason Shipp, licensed since 2001, Diana Jacobs, licensed since 1994, and Associate Attorney Mike Elmer.

## AFFIDAVIT OF THOMAS V. GIRARDI

I have over fifty years of experience as a lawyer and am regarded as one of the nation's top trial lawyers. I have obtained numerous multi-million and multi-billion dollar verdicts and settlements including involvement in the Vioxx settlement for $4.85 billion. I was also involved in settling Natural Gas Antitrust cases for $1.9 billion. In addition to these efforts, we have handled hundreds of cases involving brain injured clients, including a prior verdict against Riddell for a football player. My firm is considered one of the preeminent plaintiffs firms not just in California, but in the country. My firm Girardi and Keese, of which I am a named partner, has approximately 25 attorneys, and over 100 support staff.

At the very beginning of 2011, a friend of mine through the International Academy of Trial Lawyers, Herman Russomanno, reached out to me regarding a case against the NFL. I spoke with Herman Russomanno and Jason Luckasevic on several occasions before I decided to finally invest in this case. Ultimately, my firm agreed to lead the litigation and to provide a large portion of the financial capital that would be necessary to pursue such a case. Everyone understood that substantial funds would be necessary in order to take on a beloved defendant with infinite spending power. My firm routinely takes cases against wealthy defendants with unlimited litigation funds.

My firm, along with Jason Luckasevic and Herman Russomanno's firms, filed the first complaint against the NFL, Maxwell v. NFL, in Los Angeles Superior Court on July 19, 2011. On August 3, 2011, we filed our second complaint, Pear v. NFL in the same court totaling over 100 chronically brain injured retired players. After filing the second complaint, the NFL removed the cases to Federal Court. Our firms collectively worked on and filed a Motion to Remand the cases. My firm handled the reply to our Motion to Remand, and appeared at and argued the motion before Judge Real. A senior partner of my firm, argued the Motion to Remand. On December 8, 2011, the Motion was denied.

In addition, the NFL filed several ex parte applications and a Motion for Stay. My office worked on opposing all of these motions. This required substantial work and man power as these motions often occurred on short notice with little turn-around time.

The NFL then filed a Motion to Dismiss based on preemption. Jason Luckasevic's office took lead on drafting of the motion. My firm edited and reviewed the motion. During this time period, we began receiving calls from other lawyers planning to pursue litigation against the NFL based upon the same theories laid out in our cases. These lawyers often proposed teaming up, however we chose not to for various reasons. These lawyers ended up filing their complaints, often relying entirely upon the allegations and language that was contained in our complaints. In many cases our entire complaint was copied and pasted into a new document with a few minor changes. Thus, relying upon our work and research.

We had always seen these as individual cases that would proceed to trial on their own. Throughout this time period, our office coordinated daily with our co-counsel. And, continuously

dealt with the defense attorneys. We had numerous meet and confer conversations and discussions regarding the litigation and pending motions.

During 2011, five attorneys at my firm and two paralegals worked on this case. The attorneys' hourly rates are as follows: Thomas Girardi $1,100; Senior Partner $900; Two Partners at $650 each and one Associate at $350. In addition, two paralegals assisted on the matter, they are billed out at $200 each per hour. In 2011, I spent 900 hours working on this case. The senior partner spent 100 hours . One partner spent 1,400 hours. Another partner spent 400 hours and the associate spent 1600 hours on this case. The paralegals spent 700 hours and 600 hours each.

The work consisted of the above efforts, but also included numerous phone calls and meetings regarding creating a strategy to beat the NFL. The plan was to take these cases to trial. My firm was specifically brought into this case for our trial expertise. We planned to take a central role in these trials. Thus, as a team, we spent hundreds of hours coordinating and coming up with a game plan to the NFL's ever changing steps. This required an insurmountable amount of research to be done with regard to preemption and the other big legal issues we faced. These same issues continued to come up throughout the case.

Further, we consulted with and had discussions with various experts including Dr. Omalu, Dr. Amen, Dr. Merikangas and other leading doctors in this area. We were beginning to put together the team of experts that would be necessary to establish injuries and causation at trial. My firm has tried hundreds of cases involving brain injured clients. Co-counsel relied upon our expertise in handling these unique yet difficult injuries. Further, we have previously sued and been successful against Riddell. This prior experience gave us additional expertise to bring to the table and to help our efforts in this litigation.

As a result of our pre-MDL efforts, Girardi and Keese is making a claim for Common Benefit fees prior to February 2012 in the amount of $3,070,000.

Further Affiant sayeth naught:


_____   8/29/16
THOMAS V. GIRARDI (Date)

## ACKNOWLEDGEMENT BY NOTARY PUBLIC

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA           )

                                       ) ss.

COUNTY OF LOS ANGELES     )

On August 29, 2016, before me Shirleen H. Fujimoto, Notary Public, personally appeared THOMAS V. GIRARDI, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

_Shirleen H. Fujimoto_
[Signature of Officer]

[Officer's Seal]

# AFFIDAVIT

My name is Peter T. Paladino, Jr. I am a licensed attorney in the states of Pennsylvania, Michigan, and New York. Prior to my retirement, I served on the Executive Committee (2007 to 2014) and as the President (2010 to 2014) of Goldberg, Persky, and White, P.C. ("GPW"). Since 1983, GPW's main area of practice has been the representation of victims of asbestos-related disease resulting from their occupational exposure to asbestos. I am providing this affidavit to support a petition for an award of Common Benefit funds from the NFL Concussion litigation settlement to Goldberg, Persky, and White, P.C.

In 2000, GPW hired Jason E. Luckasevic as an associate attorney in its Pittsburgh office. Jason began representing our clients at depositions, conducting discovery, and arguing motions for summary judgment and quickly took on a role managing a caseload that involved him taking responsibility for the litigation of cases from inquiry through discovery to trial or eventual resolution.

In approximately 2007, Jason approached the GPW shareholders with his idea of a lawsuit against the NFL on behalf of retired football players for long-term injuries sustained after years of repeated sub-concussive and concussive head trauma. Jason presented the shareholders with a comprehensive understanding of the medical literature regarding brain injuries associated with football, as well as his legal analysis for the basis for causes of action against the NFL. Understanding the breadth of resources and pervasive influence of the NFL, we anticipated that any legal action against the NFL with such potential wide-ranging consequences would be vigorously defended and very costly in terms of money and manpower. While we encouraged his inquiries and continued study of a potential area of litigation, we explained that our firm would not be willing to take the financial risk and expend the significant personnel resources such an undertaking would require. After that meeting Jason began to seek out firms with which to associate on potential litigation in order to consolidate resources, but without immediate success due to similar concerns of other firms.

In April 2010, Jason (who had been elevated to shareholder status as of January 1, 2009) updated the firm's Executive Committee with the developments that had taken place since he first began researching and pursuing his ideas about a lawsuit against the NFL, including his speaking engagement on the medical and legal issues related to repetitive head trauma in football at a retired players' seminar in Las Vegas, NV. At this time the Executive Committee agreed to assign another attorney to assist Jason in his efforts to develop a viable case against the NFL. Indeed, Jason ultimately secured litigation partners by cultivating associations with Russomanno & Borrello and Tom Girardi, and on July 19, 2011, the Complaint in *Maxwell v. NFL* was filed in Los Angeles County Superior Court, California -- the first case against the NFL seeking damages for injuries sustained by retired football players resulting from years of sub-concussive and concussive head trauma.

Jason's commitment to researching and understanding the facts surrounding the medicine, the players, and the NFL in order to develop the legal theories that resulted in the NFL Concussion litigation ultimately resulted in a significant shifting of firm resources, including hiring of new personnel, to accommodate and encourage Jason's pursuit and development of a new area of litigation. In dedicating himself to this objective, Jason risked both his reputation and the trajectory of his income, eventually choosing to step away from the firm's lucrative asbestos practice in order to spend the majority of his time developing the case against the NFL. Without the dedication of Jason and GPW there would be no NFL Concussion litigation and no Common Benefit fund. I believe that the facts as set forth above and in Jason Luckasevic's affidavit amply support an award of Common Benefit funds from the NFL Concussion litigation settlement.

_____
Peter R. Paladino, Jr., Esquire

Sworn to and subscribed before me
this 30 of August, 2016

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kimberly J. Siebert, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires June 27, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

RPF/klc: 08/03/16

# AFFIDAVIT

On this date personally appeared Robert P. Fitzsimmons, who after having first been duly sworn and deposed, does state as follows:

1.     I have been an attorney-at-law since 1978.  I am licensed to practice in the States of Ohio, West Virginia and Pennsylvania;

2.     I have practiced law on a full-time basis and principally have been involved in litigation.

3.     In 1997, I was retained to represent Mike Webster on his disability claim with the National Football League.  I perfected his claim alleging that Mr. Webster was permanently and totally disabled because of brain injury caused and contributed to by football-related activities.

4.     In 2000, the Bert Bell/Pete Rozelle Pension Board found Mike Webster was totally disabled as a result of brain injuries sustained in football-related activities.

5.     The NFL Pension Board refused to make Mr. Webster's disability finding retroactive to the date of his retirement in 1991; therefore, I filed a lawsuit in United States District Court in Baltimore where summary judgment was granted on behalf of Mr. Webster, making his award retroactive to 1991.  The NFL appealed this decision to the Fourth Circuit Court of Appeals who affirmed the District Court's ruling.  The final decision for the Fourth Circuit was in approximately 2005.

6.     In September of 2002, Mike Webster died and on behalf of the Webster family, I granted consent to a pathologist, Dr. Bennet Omalu, to perform an autopsy on the brain of Mike Webster.  As a result of that autopsy, Dr. Omalu published his findings in a medical journal in 2005, confirming that Mike Webster had chronic traumatic encephalopathy ("CTE").  Dr.

{00190595-1}

Omalu's findings confirmed five (5) doctors' opinions rendered in the disability claim that Mike Webster had traumatic encephalopathy.

7.     I have maintained my friendship with Dr. Omalu since he performed the autopsy on Mike Webster and he and I are co-directors of the Brain Injury Research Institute, which performs autopsies on individuals to determine whether they have CTE.  Dr. Omalu and I are also partners in a business which owns the patent rights to a drug called FDDNP which is utilized in conducting PET scans on individuals in order to determine whether CTE can be diagnosed in a living individual.

8.     I became acquainted with Attorney Jason Luckasevic sometime around 2006 in that Attorney Luckasevic was interested in determining whether causes of action could be filed against responsible entities for the devastating injuries and disabilities caused from CTE which was believed to have been caused from repetitive trauma to the head and which was prevalent in contact sports such as football.

9.     Prior to meeting Mr. Luckasevic, I had discussions with several attorneys and groups of attorneys who were exploring and attempting to analyze whether there were responsible entities for these significant injuries.

10.     From my discussions with several highly respected attorneys, they struggled to articulate any meaningful theories against any legal entities.

11.     I recall speaking with Attorney Luckasevic, who was very enthused about several theories that were innovative and unique, including a fraud theory against the NFL and products theories against helmet manufacturers.  He was also passionate and knowledgeable about the disease and symptoms after having spent time getting to know players and their families.

12.     Because of my position as a director of the Brain Injury Research Institute, I remained interested in the legal theories, but decided not to participate in any litigation because I believed it would have affected our credibility as brain researchers.  Nonetheless, I attempted to keep myself apprised of the ongoing litigation, specifically including claims brought by Attorney Luckasevic.

13.     During the NFL litigation, I have had several conversations with Attorney Luckasevic who has contacted me for information and/or confirmation about some of the science we have addressed in medical journals and through our research.  I am also aware that Attorney Luckasevic has a close relationship with Dr. Omalu and the two of them have spoken about the science of brain injury from repetitive trauma on numerous occasions.

14.     Based on my recollection, Attorney Luckasevic put together a team of lawyers that were capable based upon skill, knowledge, experience and financial capabilities to take on the National Football League, which is a most formidable opponent because of their resources and popularity.  In the Webster disability claim, I had to appeal decisions on at least four occasions before ultimately obtaining a decision that could be appealed through a direct action in United States District Court in Baltimore.  That experience alone led me to believe that any civil claim would be fiercely contested.

15.     To my knowledge, the actual theories upon which the class action settlement came about was based on Attorney Luckasevic's.

16.     From my understanding, after Attorney Luckasevic's lawsuit was filed on behalf of his clients, there was no discovery or legal actions that progressed the case other than the settlement discussions which I believe were premised upon theories initiated by Attorney Luckasevic.

17.    Although I was not in any way involved in the actual lawsuit and did not represent any individuals in the lawsuit, it is my belief that the efforts of Attorney Luckasevic were the initiating and driving force that enabled a settlement to take place. But for Attorney Luckasevic's efforts, I do not believe there would have been a lawsuit against the NFL with the ultimate settlement monies.

Further this Affiant sayeth naught.

_____
ROBERT P. FITZSIMMONS

STATE OF WEST VIRGINIA,

COUNTY OF OHIO, to-wit:

Taken, sworn to and subscribed before me this _3rd_ day of August, 2016

_____
Notary Public

My Commission Expires: ___10|20|19___



## AFFIDAVIT

My name is Robert Cohen and I am the founder of the Law Offices of Robert M. Cohen in Beverly Hills, California. My practice involves complex and high asset property distribution, child custody and divorce matters. I am a mediator and have served as a family law expert and taught as a law professor at Pepperdine Law School. I have also served as a Judge Pro Tem in both the Beverly Hills and Los Angeles Municipal Courts. I received my A.B. from Boston University and L.L.B from Boston University. I am licensed to practice law in California.

I met Vernon Maxell when he was in the 12th grade of High School at Verbum Dei High School in Los Angeles in the late 1970s. He was an exceptional football talent, receiving an athletic scholarship to Arizona State University, where he excelled as a linebacker. During his time at Arizona State, Vernon Maxwell set school records for sacks which ultimately led him to be drafted as the first pick in the second round by the Baltimore Colts in the 1983 draft.

I was Vernon Maxwell's agent and advisor throughout his seven years in the NFL. His talent was recognized through the award of the NFL Defensive Rookie of the year. Vernon Maxwell was a leader on and off the football field through his actions and words.

I have remained a close adviser and friend of Vernon Maxwell over the years. Along with his former teammate, Broderick "Rick" Jones, they became intimately involved as advocates in the fight against the NFL relating to head trauma. They were both communicating with Alan Schwartz of the NY Times for years while he was investigating the NFL's hidden brain injury controversy.

They both educated themselves with the research surrounding the NFL's cover-up of concussions. They learned of other players' struggles with symptoms including memory loss, depression and anxiety which they shared in common. Over time, I became very impressed with Vernon Maxwell's understanding of the medical issues regarding causation of concussions and symptoms therefrom, and his concern regarding the number of players that appeared to have concussion symptoms.

They came to me around 2010 seeking advice on how to explore a legal case on their behalf involving the NFL's mismanagement of their long-term health when they played. On their behalf, I spoke with some prominent class action lawyers around the country. All of the lawyers advised me that they had reservations about the legal theories and the individually distinct nature of the injuries, claiming that the cases could not be brought as a class action.

In early 2011, Vernon Maxwell told me that he and Rick Jones were introduced to Jason Luckasevic, a young and highly skilled attorney, by Dr. Bennet Omalu. I was soon thereafter introduced to Jason Luckasevic by Vernon Maxwell. I learned of Jason Luckasevic's plans to

file a lawsuit on behalf of dozens of former players for the NFL's fraud and negligence to the former players on handling head injuries. No one was able to quite capture how football was causative of their later life cognitive and functional problems. But, Jason Luckasevic was able to do that based on his experience of having handled asbestos disease cases with similar latent injuries. I later learned that Jason Luckasevic had formed a team of powerful litigators, including Tom Girardi, with whom I am very familiar, as his office is in Los Angeles. Tom Girardi is a senior partner at one of Southern California's premier Plaintiff's Attorney law firms, and is one of the foremost trial attorneys not only in Southern California, but in the United States.

During those months, I worked with Jason Luckasevic, Vernon Maxwell and Rick Jones in the investigation of similarly injured former players whose claims were added to the Complaint drafted by Jason Luckasevic.

On July 19, 2011, they filed the first lawsuit seeking individual benefits for personal chronic brain injuries suffered by former players against the NFL and Riddell. That August, a second lawsuit was filed on behalf of many more dozens of players claiming similar injuries.

I can personally attest that during 2011, I spent between 300 and 500 hours working with Jason Luckasevic, Vernon Maxwell and Rick Jones to make this lawsuit a success reviewing the claims of injured former NFL players. I believe that after filing the first two lawsuits, it gained momentum due to the large number of former players filing suit and Jason Luckasevic's formidable litigation team.

///

///

///

///

///

///

///

///

///

///

///

Ultimately, many lawyers copied Jason Luckasevic's Complaints to file lawsuit for their clients using his work. As I understand it from keeping track of the litigation, there have been no new legal claims or factual allegations advanced since the efforts of Jason Luckasevic and his original Complaints. Jason Luckasevic is a young litigator with a passion, idea, imagination and an undeterred effort to make this case a reality for the struggling former players. Most importantly, based upon my many conversations with Jason, Vernon and others, I believe that Mr. Luckasevic has integrity and is credible. But for Jason's efforts, there would never have been the "NFL Concussion Litigation."

Further this Affiant sayeth naught.

Robert M. Cohen

Aug. 15th 2c

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Los Angeles_                )

On _August 15, 2016_ before me, _DEBORAH Anne KLinger, a Notary_
                      (insert name and title of the officer) _Public_

personally appeared _Robert M. Cohen_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


DEBORAH ANNE KLINGER
Commission #2137466
Notary Public - California
Los Angeles County
My Comm. Expires Dec. 18, 2019

Signature _Deborah Anne Klinger_     **(Seal)**

## AFFIDAVIT

My name is Jason Luckasevic and I have been a lawyer since 2000. I am 40 years old and am licensed to practice law in Pennsylvania, Arizona and Michigan. I am also admitted to practice before the Eastern and Western Districts of Pennsylvania and the United States Supreme Court. I have been employed by Goldberg Persky & White, P.C. in Pittsburgh, PA my entire legal career, initially concentrating my practice on asbestos-related litigation as well as personal injury suits. I am frequently asked to speak and be interviewed by national and international media outlets on the topic of sports-related head injuries and the origination of the lawsuit against the NFL.

A decade ago, I began researching the case that has become commonly known as the NFL Concussion litigation. I initiated the first lawsuits against the NFL for harm caused to retired players from chronic brain injuries that developed years after their careers ended as a result of years of repeated blows to the head. My firm and I, along with our co-counsel, were the first to file a lawsuit for damages on behalf of individual players. The legal strategies I developed, in consultation with lawyers at my firm in Pittsburgh and lawyers in Miami and Los Angeles that joined with me on this case, became the basis for MDL 2323 before Judge Anita Brody in the U.S. District Court for the Eastern District of Pennsylvania.

My pioneering role in the NFL litigation regarding brain injuries has been well-documented in the media. It was highlighted by award-winning journalists Mark Fainaru-Wada and Steve Fainaru in the book *League of Denial,* and in their related Frontline documentary of the same name, which won the industry's highest honor, a Peabody Award. I was also the subject of Michael Sokolove's November 2014 cover story in the New York Times Magazine ("How One Lawyer's Crusade Could Change Football Forever"). Jeanne Marie Laskas, in her book *Concussion*, wrote that the family of Junior Seau, an NFL Hall of Famer, "joined the consolidated lawsuits against the NFL that had started with Luckasevic's initial filing."

I mention the above only to help establish that my firm and I should be fairly compensated for our leading role in this important case. That role was acknowledged by co-lead class counsel, Christopher Seeger who, when asked about me by Michael Sokolove, said: "Being the first to file is incredibly important. He took a risk." An examination of the facts leads to the conclusion that my firm and I are entitled to substantial Common Benefit funds. The battle over the Common Benefit funds in the Vioxx litigation in the Eastern District of Louisiana acknowledged the need to compensate firms for taking risks in the origination of significant class action litigation, and the Third Circuit has also recognized this necessity. *In re Cendant Corp. Securities Litigation*, 404 F.3d 173, 195 (3d Cir. 2005).

Set forth below are the facts that support the claim by Goldberg, Persky & White, P.C. and me for compensation from the Common Benefit Fund:

Dr. Bennet Omalu, a neuropathologist, had served as an expert in my cases since the beginning of my legal career. Over the years, we gained a mutual respect for each other professionally and thereupon developed a friendship. In late 2006, Dr. Omalu came to my office in Pittsburgh to discuss an expert report that he had prepared for one of my cases as well as to pick up some pathology materials on the next case that he was going to analyze. Coincidentally, there was an article in that morning's Pittsburgh Post-

Gazette concerning Dr. Omalu's findings of chronic traumatic encephalopathy ("CTE") in the brain of Terry Long, a former player for the Pittsburgh Steelers.

Dr. Omalu was harshly criticized in the article by Dr. Elliot Pellman, the head of the NFL's Mild Traumatic Brain Injury Committee, as well as by Dr. Joseph Maroon, the team physician for the Pittsburgh Steelers. Their criticism included words such as "unscientific" and "speculative" when describing Dr. Omalu's findings of CTE in Terry Long's autopsy. I was surprised and shocked by such harsh criticism of a friend whose work I greatly respected, and whose groundbreaking research, in time, would be proven correct.

I told Dr. Omalu to fight back. I was concerned that the criticism could ruin his career, and the NFL players and their families deserved to know the truth. It was then that he suggested that I investigate filing a lawsuit against the NFL, and this is where the fight began. The very next day Dr. Omalu began introducing me to well-respected members of the scientific community who were not only aware of his opinions, but supported them. He also introduced me to many former players and families who had reached out to him after reading some of the articles on his groundbreaking neuropathology discovery. My passion quickly extended to these players, dozens of whom later became my clients.

I began my own investigation into the science of head injuries and spoke with leaders in the field, including two doctors, Robert Cantu, M.D. and Julian Bailes, M.D., who, with Dr. Omalu, are considered pioneers in the field. I briefed myself on the research that led Dr. Omalu to conclude that football had first disabled, and then killed, Pittsburgh football legends Terry Long and Mike Webster. I conferred with Bob Fitzsimmons, a West Virginia lawyer and co-founder of the Brain Injury Research Institute, who was one of the first to contemplate the legal ramifications of football and brain injuries. My investigation involved reading and reviewing scientific journals. I did a literature search of medical articles concerning sports and concussions and CTE-like conditions. I discovered nearly one hundred journal articles, many of which were cited in my original Complaint and then recopied into the Master Class Action Complaint filed by the Plaintiff's Steering Committee.

I reviewed the history of the NFL over its decades of existence, the formation of the league and its corporate structure, myriad injury reports, as well as rule changes and new penalties that may have been intended to reduce the occurrence of brain injuries, but failed to do so. I learned about the NFL's Mild Traumatic Brain Injury Committee, and read the articles dozens of articles it published contesting Dr. Omalu's findings.

I read about retired players' struggles in media reports. I studied other sports leagues, particularly the NHL and its management of concussions. I researched return-to-play guidelines that had been in existence for decades in published literature. I spoke to players, families, and widows. I ordered medical records and reviewed family histories. I even investigated other causes and sources of the neurocognitive impairments in an effort to understand all aspects of the disease.

I studied the issue of neurocognitive impairments intensely and became intimately familiar with the unique cognitive and behavioral symptoms surrounding CTE. I explored the issue of causation. It was always the biggest question: How can it be proven that the disease was caused from football? I also spent countless hours discussing that very issue with Dr. Omalu. All of this research had become more than a lawsuit; it had become my life.

I then turned to conducting a legal analysis. I explored past lawsuits against the NFL. There were over 35 published cases where the NFL was sued. Most were anti-trust cases, but there were three cases that analyzed legal issues of negligence and personal injury. I reviewed the materials on the dockets of those cases, reading the pleadings and orders and reviewed the evidence. I learned for the first time that the NFL routinely escaped liability due to labor preemption under the Labor Management Relations Act ("LMRA") based on its collective bargaining agreement with the players. I spent hundreds of hours determining whether there were any legal theories that would circumvent the preemption under the LMRA. I read and studied many of the past voluminous NFL collective bargaining agreements. I studied the NFL disability plan. I researched the Mike Webster case against the disability plan. I analyzed workers compensation cases to rule out the NFL as an employer.

I estimate that I spent 2100 hours performing the above tasks in 2006 and 2007 which became the backdrop of the draft Complaint that I prepared. This Complaint included all the factual allegations and legal theories of fraud and negligence advanced in *Maxwell v. NFL*. At the time, I was an Associate with a billable hourly rate of $400.00 per hour.

During this same time period, I brought the case to the Shareholders of my firm, which for 30 years had primarily litigated asbestos cases. The Shareholders expressed hesitancy about the substantial commitment of financial and personnel resources such an undertaking would involve. Hence, the members of my firm refused to take on the NFL on their own. Therefore, I made efforts to associate with other law firms in an effort to consolidate resources, however, I was met time after time with uncertainty and doubt about the massive undertaking of such a lawsuit.

In 2008 and 2009, there were Congressional hearings, more media scrutiny, concussion posters created by the NFL for locker rooms and a general optimism in the retired players that the League would soon give them the disability and additional pensions to cover their concussion-related damages. I reviewed case law on legal theories. Between 2008 and 2009, I estimate that I completed 2400 hours of work preparing this case. In 2009, I became a partner and my rate increased to $600 per hour.

Significant developments occurred in 2010. Additional compelling scientific research was published which supported Dr. Omalu's discovery. Also more deceased players were confirmed to have CTE in their brains at autopsy. In April 2010, I was invited to speak at the retired players' seminar in Las Vegas about the developing science surrounding traumatic brain injuries and the NFL's potential liability for such injuries. There, I met over 50 former players.

With the momentum from this retired players' conference, I was given internal support from my law firm and continued to update the Executive Committee with respect to my continued factual and legal investigation. Attorney John T. Tierney was assigned to assist me and spent his time researching case law and working on legal theories. He ultimately developed an additional theory of the NFL's negligence as a monopolist that was added to the draft Complaint.

Attorney Tierney and I logged more than 2400 hours of combined work investigating and creating the litigation in 2010. Attorney Tierney's rate was $450 per hour as a Senior Associate with over 30 years of litigation experience.

By the end of 2010, we finally became associated with the law firm Russomanno & Borrello from Miami, Florida as a litigation partner in this matter. They brought extensive litigation experience and financial support to our team. In early 2011, our team added California lawyer Tom Girardi, and we decided to file the first lawsuit against the NFL in California state court.

However, before we could file the lawsuit, the NFL locked out its players in February of 2011. We realized that any lawsuit filed during this period would be an opportunity for the owners to maintain the lockout and blame the retired players for a lack of football. Instead of filing, we continued to work on the draft Complaint and researched the issue of suing an entity when there was no active collective bargaining agreement and the players' union had been disbanded. Ultimately, we decided it was to our client's benefit to file the Complaint during the period of the lockout and while the union was disbanded. By July 19th, we had 75 clients and filed the Complaint against the NFL in *Maxwell v. NFL* in Los Angeles County Superior Court, California. *This case has repeatedly been referenced by Judge Brody and the Third Circuit Court of Appeals as the case which originated the NFL Concussion litigation.*

Word of the lawsuit against the NFL spread quickly as national media outlets reported on the filing and continued bringing attention to the "concussion in sports crisis." By August 3rd, our team filed suit on behalf of another 47 players, *Pear vs. NFL.*

Shortly thereafter, as anticipated, the NFL removed the case to Federal Court, arguing LMRA preemption. It was assigned to Judge Manuel Real, of the United States District Court of California. Our Motion to Remand was prepared by Attorney John Tierney and me, reviewed by our co-counsel, and argued by Tom Girardi's office. On December 8, 2011, Judge Real denied Plaintiffs' Motion to Remand. Even though the claim as to negligence may involve preemption, the Court offered no opinion as to the additional claims including negligence as a monopolist, fraud, and negligence for licensing the Riddell helmet. In fact, Judge Real compared the claims to those in *Stringer v. NFL.* In *Stringer vs. NFL,* the Court dismissed the negligence claims as to the NFL, but litigated the claim as to negligence for licensing the Riddell helmet. As an aside, the *Stringer* plaintiffs did not allege claims of fraud or negligence as a monopolist.

Shortly after Judge Real's decision, a scheduling order was issued on the briefing of the Motions to Dismiss based on preemption filed by the NFL. My office took the lead on preparing the responses with input from our co-counsel. Our cases were scheduled for argument on the issue of legal preemption until law firms from around the country started copying our Complaints and filed claims for other retired NFL players. This resulted in the NFL requesting the creation of an MDL before the Judicial Panel on Multidistrict Litigation. Ultimately, all present and future cases were assigned to Judge Brody.

Through 2011 and into January of 2012, almost all of my time was spent working on this case. I estimate that I spent 2400 hours working on the case during this time frame. Attorney Tierney spent 1500 hours of his time on this matter during this time.

Two significant events occurred after this MDL was created in 2012 in furtherance of our leading role and key participation. In February, an organizational meeting was held at the offices of Anapol Swartz. During this meeting, Attorney David Fredericks discussed preemption. At the end of his presentation, he asked for questions. I asked if there would be preemption during the years the league had no collective bargaining agreement in place due to strikes and whether there would be preemption in our

cases when we filed the Complaint while the players were locked out. It was clear from Attorney Fredericks' response and the silence in the room of more than 50 attorneys that these facts had not been previously considered. Indeed, at the argument in April 2013, this "gap year" argument was the basis for the opening argument made by Attorney Frederick on behalf of the former players.

Also in 2012 my firm executed an exclusive retainer agreement with Dr. Omalu. Without Dr. Omalu's research, expertise, and consultation, the issue of causation would be difficult to prove.

Finally, all of this work did not come without the helpful assistance of my two legal assistants, who have been with the firm for decades. Both Kim Siebert and Cindy DeUnger were responsible for creating outlines, deposition summaries, pulling documents, summarizing them, creating time lines of critical events and putting them into presentation form. This work that they devoted from their regular routine from 2006 to January 2012 consumed a combined 2500 hours of their time which would be billed at $150 per hour.

For the above reasons, on behalf of my law firm I make a claim of Common Benefit fees prior to February 2012 in the amount of $5,805,000 as calculated below. We therefore petition for an award of Common Benefit fund, plus $3,883.80 in expenses.

Below is a summary of my law firm's fees and expenses prior to February 2012:

Attorneys:

2006/2007

Jason Luckasevic—2100 hours at $400 per hour: $840,000.

2008

Jason Luckasevic—1200 hours at $400 per hour: $480,000.

2009

Jason Luckasevic—1200 hours at $600 per hour: $720,000.

2010

Jason Luckasevic—1200 hours at $600 per hour: $720,000.

John T. Tierney—1200 hours at $450 per hour: $540,000.

2011 to January 2012

Jason Luckasevic—2400 hours at $600 per hour: $1,440,000.

John T. Tierney—1500 hours at $450 per hour: $675,000.

Legal Assistants:

Kim Siebert and Cindy DeUnger—2600 hours at $150 per hour: $390,000.

TOTAL HOURLY FEES:                                          $5,805,000


Expenses:

Pro Hace Motion for J. Luckasevic in *Maxwell v. NFL*--          $275.00

Pro Hace Motion for J. Luckasevic in *Pear v. NFL*--            $275.00

Travel and expenses for Las Vegas seminar for J. Luckasevic--   $3,333.80

TOTAL=                                                      $3,883.80


Further Affiant sayeth naught:

Jason E. Luckasevic, Esquire
Goldberg, Persky & White, P.C.


Sworn to and subscribed before me
this 2⏁ day of August, 2016.

Notary Public

Joel-Ann Donnelly
Notary Public, Beaufort County, SC
Commission Expires: Feb. 24, 2024

## AFFIDAVIT OF HERMAN J. RUSSOMANNO

My name is Herman J. Russomanno. I am an attorney licensed to practice law in the State of Florida and I am the senior partner in the law firm of Russomanno & Borrello, P.A. Since 1986, I have been a Board Certified Civil Trial Lawyer in the State of Florida as well as Board Certified by the National Board of Trial Advocacy, I served as past chair of the Florida Bar's Civil Trial Certification Committee and I have been re-certified as a specialist in civil trial law in 1991, 1996, 2001, 2006 and 2011. In addition to being admitted to practice in the State of Florida since 1977, I am also admitted in the State of Alabama as well as the United States Supreme Court; United States Court of Appeal for the Eleventh Circuit; United States Court of Appeal for the Fifth Circuit; United States District Courts for the Southern; Middle and Northern Districts of Florida; United States District Court for the Southern District of Alabama.

I graduated from Rutgers University, Magna Cum Laude and Phi Beta Kappa. I graduated from Samford University - Cumberland School of Law in Birmingham, Alabama, in 1975. Following graduation, I was a Law Clerk for the Honorable Daniel H. Thomas of the U.S. District Court in Mobile, Alabama. From 1976 to 1977, I was a Law Clerk for Associate Justice Hugh Maddox of the Alabama Supreme Court. I am a Fellow of the American College of Trial Lawyers, the International Academy of Trial Lawyers, and the International Society of Barristers, I am the immediate past President of the Roscoe Pound Civil Justice Institute and the Immediate Past President of the International Academy of Trial Lawyers. In 2000, I served as President of the Florida Bar and have also served on the Board of Governors of the Florida Bar. I serve on the Board of Governors for the American Association for Justice and I serve on the Board of Directors for the Florida Justice Association. I am a member of the ABA House of Delegates and have served on the ABA Committee on Professionalism and served on the ABA Ethics Commission 20/20.

From 1983 to 1984, I was the President of the Dade County Bar Association, Young Lawyers Section. From 1990 to 1991, I was the Dade County Trial Lawyers Association President and from 1993 to 1994, I was the President of the Dade County Bar Association. In 2001, I was the President of the American Board of Trial Advocates - Miami Chapter, I served as the President of The Florida Board of Trial Advocates (FLABOTA). I am a past President of The Florida Supreme Court Historical Society. I was recognized by FLABOTA as the outstanding trial lawyer in 2001 in the state of Florida. I received the Pursuit of Justice Award from the ABA Tort and Insurance Practice Section, the B.J. Masterson Award for Professionalism from the Academy of Florida Trial Lawyers, and the Chief Justice Harry Lee Anstead Professionalism Award from the Dade County Trial Lawyers Association. In 2004, I received the David Dyer Professionalism Award. Additionally, I have worked as in-house counsel for Southern Bell Telephone from 1977 to 1980. Thereafter, I was a named partner in the law firm of Floyd, Pearson, Richman, Greer, Weil, Brumbaugh & Russomanno, P.A. In August of 1996, I established the firm of Russomanno & Borrello, P.A.

I have lectured to attorneys and corporations on a variety of insurance related subjects throughout the United States before groups such as the Association of Trial Lawyers of America, the American Bar Association, the National Business Institute, the Academy of Florida Trial

Lawyers, The Florida Bar, the Dade County Bar Association, the Dade County Trial Lawyers Association, and the American Board of Trial Advocates. I have also been an adjunct law faculty member at St. Thomas University School of Law teaching trial advocacy since 1987.

I have almost 40 years of experience as a trial lawyer and have handled hundreds of cases involving catastrophically injured plaintiffs, including brain injured clients.

In May, 2010, we obtained an $11.5 million verdict in Miami-Dade County, Florida, on behalf of a former Miami Dolphins Wide Receiver, Otis J. McDuffie, against the Miami Dolphins' former team physician arising from the alleged failure of the team physician to properly diagnose and treat a toe injury that lead to the player's premature ending of his NFL career.[1]  In the course of that representation, my firm, including my partner, Robert J. Borrello, became familiar with issues of preemption and the NFL's collective bargaining agreement.

My partner, Robert J. Borrello, was admitted to the Florida Bar in 1988 and has been practicing in all areas of civil litigation in federal and state courts, including personal injury, medical malpractice, and complex commercial litigation and appeals for 28 years.  He graduated from University of Miami law school in 1988 cum laude, was an editor of the law review, and an honors graduate from Georgetown University in 1985.  In addition to being admitted to the Florida Bar, he is admitted to the United States Court of Appeal for the Eleventh Circuit; United States District Courts for the Southern, Middle and Northern Districts of Florida.

In the wake of this result, my firm was contacted by Jason Luckasevic and Jack Tierney of Goldberg, Persky & White in October 2010 to discuss our firm's involvement in litigation against the NFL.  Robert Borrello and I spent significant legal time reviewing and analyzing the potential claims against the NFL, including performing literature and article searches pertaining to helmet injuries and safety and concussions, conferring with Mr. Luckasevic and Mr. Tierney about the claims, reviewing draft lawsuits setting forth the claims, researching the issues of preemption and reviewing the CBA, researching the statutes of limitations and conflict of laws related thereto, and analyzing potential legal forums in which the claims could and should be filed.  In the course of our analysis, it became apparent that California may provide a venue. Therefore, in March of 2011, I contacted my friend and fellow in the International Academy of Trial Lawyers, Tom Girardi, a California lawyer, to discuss his becoming part of the team with our firm and Jason Luckasevic's firm regarding the case against the NFL.

We then began the process of communicating to Mr. Girardi and his firm the analysis that had already been performed on the potential claims and the legal issues related to them.

Tom Girardi's firm, along with Jason Luckasevic and my firms, filed the first complaint against the NFL, Maxwell v. NFL, in Los Angeles Superior Court on July 19, 2011. On August 3, 2011, our team filed the second complaint, Pear v. NFL in the same court totaling over 100 chronically brain injured retired players. After filing the second complaint, the NFL removed the cases to Federal Court. Our firms collectively worked on and filed a Motion to Remand the cases. My firm assisted in reviewing and editing the briefing filed on the remand issues.

---

[1] The verdict was later set aside by the trial judge and his decision affirmed by the appellate court. The case is pending re-trial.

The NFL then filed a Motion to Dismiss based on preemption. Jason Luckasevic's office took the lead on drafting of the response to the motion. My firm also edited and reviewed the response.

From October 2010 through January 2012, three attorneys at my firm worked on this case. The attorneys' hourly rates are as follows: Herman J. Russomanno $800; Robert J. Borrello $600; Herman J. Russomanno III $450.  During this time, I spent approximately 350 hours working on this case; Robert Borrello spent 800 hours; and Herman J. Russomanno III spent 100 hours.

The work consisted of the above efforts, but also included numerous phone calls and meetings regarding creating a strategy to beat the NFL. Thus, as a team, we spent hundreds of hours coordinating and coming up with a game plan to the NFL's ever changing steps.

My firm's efforts for the period of 16 months prior to Feb 2012 involved taking a huge risk in suing the entire NFL, exerting substantial amount of time to understand the case, review papers, research laws, etc. amounts to $805,000.

Further Affiant sayeth naught.

Herman J. Russomanno, Esq.
Russomanno & Borrello, P.A.

**ACKNOWLEDGMENT**

STATE OF FLORIDA         )
                                 ) ss

COUNTY OF MIAMI-DADE    )

SWORN TO AND SUBSCRIBED before me this 30th day of August, 2016.

> ANDREA BIRNHAK
> Notary Public · State of Florida
> Commission # FF 201077
> My Comm. Expires May 10, 2019
> Bonded through National Notary Assn.

_____
Notary Public, State of Florida

My Commission Expires:

_____ I personally know the Affiant.

__✓__ The Affiant showed _Drivers License_ as personal identification.

## DECLARATION OF BENNET I. OMALU, M.D.

My name is Bennet I. Omalu, MD and I was educated in Nigeria. I completed medical school at the University of Nigeria Medical School in 1990. I completed residency and fellowship training in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology at the College of Physicians and Surgeons of Columbia University at Harlem Hospital Center, New York City, and at the University of Pittsburgh, Pennsylvania. I also completed Masters in Public Health and Masters in Business Administration degree programs at the University of Pittsburgh and the Carnegie Mellon University respectively. I started working at the Allegheny County Coroner's Office in July 1999 under Dr. Cyril Wecht.

In 1999, I met Todd Luckasevic who was interning at the Allegheny County Coroner's office. At that time, Todd Luckasevic was assigned to work and learn under me. I also became social friends with Todd Luckasevic who soon introduced me to his brother, Jason Luckasevic, a young associate lawyer representing asbestos cancer victims. I soon thereafter developed a social and professional relationship with Jason Luckasevic serving as an expert pathologist on some of his medical-legal toxic tort cases.

In 2002, I discovered CTE in the brain of a former NFL player, Mike Webster, a neurodegenerative disease that was similar to what was seen in the brains of boxers over a century earlier. However, my distinct pathological findings identifying the distinctive neuropathology of CTE did not come without great push back from the NFL after I first attempted to publish on my findings in a peer-reviewed medical journal in 2005.

In late 2006, I was at Jason Luckasevic's office meeting on a medical-legal matter. On that very morning, the local newspaper published an article wherein doctors from the Pittsburgh Steelers and the NFL criticized my second autopsy findings of CTE in the brain of Terry Long, a

former Pittsburgh Steeler. Jason Luckasevic vowed at that time to vindicate my findings by investigating the NFL's liability to the players for covering up this chronic brain disease and lying to players that their game was safe.

In these first years, I personally spent hundreds of hours going over the factual issues surrounding the science and research involving chronic brain injury and repetitive trauma with Jason Luckasevic that has been now covered in great detail in print and media.

During 2006 and 2007, I introduced Jason Luckasevic to many significant figures working to spread the truth of CTE including Dr. Robert Cantu, Chris Nowinski, Dr. Julian Bailes, Bob Fitzsimmons, and later on Dr. Daniel Amen. Jason Luckasevic became intimately familiar with the disease CTE and the efforts to discredit my work after confirming this information from these figures.

I then introduced Jason Luckasevic to many players. In my career, I deal with the dead. It was always easier for Jason Luckasevic to speak with widows and players who sought me out with questions. I know I introduced him to the families of Andre Waters, Justin Strzelozyk, Terry Long and many living players, including Vernon Maxwell, Fred and Tia McNeill and Rick Jones, who were first hearing of this disease after reading the GQ article and watching the ESPN Outside the Line's special.

Jason Luckasevic at one point was prepared and ready to file a lawsuit on behalf of some former players in 2007. However, my understanding that fear of the league and hope to fix the irregulatories facing the retirees would be handled during Congressional hearings stalled Jason Luckasevic's lawsuit.

Nonetheless, 2008 and 2009 came with no new benefits or health insurance for the retired players, no lawsuit and my move to California. Nonetheless, I continued my weekly, if not more

frequent, communications with Jason Luckasevic.   We talked and I spent hundreds of hours helping him learn the science and medicine to bring him up to speed with the NFL's attempted mockery of my work.

By 2010, the NFL continued their bad press by overtly hiring purported medical doctors to discredit my work publicly and tout that there was no link between football and brain disease.  In April, Jason Luckasevic spoke at a conference to retired players in Las Vegas at my recommendation.  Jason Luckasevic shared his case with at least 50 former players and spouses in attendance.  He answered all their questions distinguishing his case from worker's compensation and NFL disability claims.  He explained his unique legal theories and how the case would be brought on behalf of individual players who suffered CTE symptoms due to the NFL's Fraud.

By 2011, Jason Luckasevic had his team of experienced trial lawyers ready to file his lawsuit.  In July 2011, Jason Luckasevic came through on his promise to me to take on the NFL and vindicate my name by filing the first lawsuit on players suffering from CTE.

There is no doubt Jason Luckasevic and his team were ready and capable to take the NFL to a jury trial.  In fact, they even retained me as their expert, should the case move forward to trial, in an exclusive rights contract.

I have spoken with a dozen of the Country's best lawyers over the years.  However, no one was quite as brilliant and eager as Jason Luckasevic to pull together this lawsuit against the NFL.

I am prepared to testify to these facts and attest to the thousands of hours I personally know Jason Luckasevic spent developing his case from 2006 to 2012.

Despite media attention and Congressional hearings, it was mainly the lawsuit against the NFL that brought the necessary attention to the public health crisis.

In the end, I strongly attest that this case settled for fear of the truth being told of CTE in football players. But for Jason Luckasevic's significant efforts, the NFL would not have entered into a significant monetary settlement.

Further this Affiant sayeth naught.

I declare under penalty of perjury that the following it true and correct.


Executed on <u>August 27, 2016</u>                     _____

                                                                          Bennet I. Omalu, M.D.

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Declaration of Robert A. Stein | Hon. Anita B. Brody |

1. I, Robert A. Stein, am an attorney representing clients in this litigation.

2. This Declaration is in support of the application of Jason Luckasevic and his firm for legal fees relating to the NFL Concussion Litigation.

3. I was an NFL player and the attorney who conceived the legal theory and generally initiated the class action on behalf of retired NFL players concerning the unauthorized use of their publicity rights, Dryer v. NFL. I believe I consequently have a unique understanding of the challenges to developing legal theories which adequately address complex retired player issues, fulfill technical legal requirements, yet are understood and resonate with large numbers of retired NFL players. Satisfying this combination of requirements is difficult, and requires unusual credibility with the retired player group. In my opinion, Mr. Luckasevic overcame all of these challenges in the initiation of the first lawsuits which led to this class action. Without his efforts, I have serious doubts that a significant class action would have ensued. NFL concussion issues had been publicly known long before he began his labors.

4. Mr. Luckasevic spent significant time and effort prior to July, 2011 looking into the facts and law surrounding possible concussion litigation, as I know personally from direct communications with him at that time. The financial risk undertaken by him and his firm was significant, and, in my opinion, ultimately necessary to the filing of the cases which began this entire litigation.

5. This legal area is unusually complex, requiring an innovative evaluation of unique causation, professional football operation and medical issues. Mr. Luckasevic was a pioneer in these evaluations, a necessary precursor to the eventual class litigation and proposed settlement.

6. I believe Mr. Luckasevic's efforts in originating the NFL concussion litigation are especially worthy of compensation in light of the fact that almost no discovery took place. Compared with the prolonged and expensive discovery that is typical of most class actions, here the filing of the first two complaints by Mr. Luckasevic's firm and co-counsel set off a chain of events eliciting the filing of thousands of cases against the NFL and resulting in the eventual class action settlement.

7. I swear under penalty of perjury that the foregoing is true and correct.


Executed August 22, 2016

Robert A. Stein