## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| IN RE NATIONAL FOOTBALL | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION | : | |
| INJURY LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | **Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, | : | |
| *on behalf of themselves and* | : | |
| *others similarly situated,* | : | Civ. Action No. 14 – 00029 – AB |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| National Football League and | : | |
| NFL Properties LLC, | : | |
| Successor-in-interest to | : | |
| NFL Properties, Inc., | : | |
| | : | |
| Defendants | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO | : | |
| | : | |
| All Actions | : | |
| | : | |

**Declaration of Anthony Tarricone, Esq. in Support of the Opposition to Co-Lead Counsel's Petition for an Award of Common Benefit Attorneys' Fees, Reimbursement of Costs and Expenses, Adoption of a Set-Aside of Five Percent and Certain Incentive Awards**

1.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts and the District of Columbia and a partner with the law firm Kreindler & Kreindler LLP ("Kreindler").  I am a member of the Plaintiff's Steering Committee ("PSC") for the NFL litigation.  I co-chaired the NFL Litigation Communications-Public Relations Committee, which was integral in bringing the NFL to the negotiating table for settlement and encouraging a

settlement that would end the litigation.  My firm filed lawsuits for hundreds of former NFL players that we represent.  I am fully familiar with the facts set forth herein and with the history and procedural background of the NFL concussion injury case.  I submit this declaration in opposition to the proposal for allocation of common benefit attorneys' fees, reimbursement of costs and expenses, adoption of a set-aside of five percent and certain incentive awards submitted by Co-Lead Counsel Christopher Seeger, Esq. on October 10, 2017

2.      For the reasons stated herein, and in the accompanying memorandum of law, my firm joins a larger group of firms in objecting to the proposed fee allocation.   We respectfully submit that the Court should appoint a Special Master to allocate common benefit fees, and allow all interested parties to make detailed submissions in support of their individual common benefit fee applications.

3.      The proposed fee allocation is manifestly unfair, self-serving and contrary to established principles commonly utilized when allocating common benefit fees.  The fact that it was unilaterally proposed with no input from any other lawyers involved in the litigation is obvious on the face of the proposal.  The most important factors in dividing fees are the relative risks undertaken by common benefit attorneys and law firms, as well as the value and quality of their contribution to the success of the litigation.  Measured against this standard, the one-sided lodestar allocation proposed by Mr. Seeger allocates an unfairly large portion to Mr. Seeger's firm and manifestly unfair fees to other PSC firms that contributed substantially to the success of the litigation and assumed most, if not all, of the risk.  Completely ignored in the proposed allocation is any recognition or consideration of: (1) the creative lawyering and advancing of challenging legal theories, and the risks assumed by the lawyers and firms who started the litigation and nurtured it in its infancy; (2) the substantial time commitment and outlay of case costs when the

outcome of the litigation was completely uncertain; and (3) the creative and strategic Communications-PR campaign that influenced the NFL's desire and need to settle the case and put it behind them—after the entire 2012-13 pre-season, season and post-season was dominated by national media coverage of the lawsuit and how the retired players and their families had been affected by the neurological aftermath of repetitive head trauma during their NFL careers. The fee proposal improperly values above all time spent post settlement when the outcome was not in doubt, recovery of fees and expenses was a certainty, and the risks were none.   It is manifestly unfair to the group of lawyers who began this litigation, pushed it forward when everyone doubted its chance of success, and worked tirelessly on behalf of thousands of former NFL players—to move the case into a posture where settlement was not only possible, but necessary.

4.      Although the fee allocation proposal appears to unduly benefit a few firms and treat unfairly many firms, I will focus on the value of my firm's contributions and the time and money that Kreindler risked in representing hundreds of NFL players long before there was even a hint of settlement.

5.      As the Court may recall, when the NFL litigation was in its infancy, the league undertook a public relations campaign designed to discredit the science that drew a connection between concussions and repetitive head trauma and the myriad of illnesses and conditions that plaintiffs claimed in their lawsuits.   The NFL's public relations machine went into overdrive defending itself in the court of public opinion.

6.      At that time, I had discussions with Sol Weiss, who was at the forefront of the litigation against the NFL and would ultimately be appointed Co-Lead Counsel, to devise a plan to counter the well-funded NFL publicity machine.  At the time, I had recently finished working as the appointed Co-Chair of the Communications for the Plaintiff's Executive Committee in the

BP Deepwater Horizon Oil Spill litigation in Eastern District of Louisiana.  In the BP case, my committee was recognized as playing a critical role in countering BP's extensive multi-million dollar publicity campaign by educating the public about the true extent of damage caused by the oil spill and its impact on residents and business in the Gulf Coast region.  Mr. Weiss was also familiar with my experience working with communications or "PR" professionals to influence public opinion during my tenure as President of the American Association of Justice (Formerly ATLA), in large part to defeat efforts to take away patients' rights as part of the Affordable Care Act.

7.     Early in this litigation, even before the Court's appointment of the Plaintiff's Steering Committee, we worked on devising a coordinated communications strategy that would partner with public relations professionals to vet every media inquiry, push stories of interest to media outlets, develop effective messaging, and work with retired players and their families to help them tell their stories.  The goal, ultimately successful, was to educate the public about the science behind the litigation and the reality that NFL players were suffering Traumatic Brain Injury (TBI) and neurological diseases such as ALS, Parkinson's and Chronic Traumatic Encephalopathy (CTE) because they played NFL football, and the NFL's knowledge of the consequences of repetitive head trauma dating back decades.  The idea was to influence the dynamics of the litigation by educating the public about the effects of TBI on players and their families after their NFL careers ended, countering the NFL's campaign to demonize players who sued the NFL, and to dispel inaccurate information and myths about retired players.

8.     Even before my appointment by the Court to the PSC, I was asked by Sol Weiss to chair the plaintiffs' Communications-Public Relations Committee.  Mr. Weiss announced my appointment at the organizational meeting of plaintiff lawyers in Philadelphia on February 21,

2012.  At that time, I outlined the strategic plan I envisioned, which was based in part on my vast experience  in the BP Deepwater Horizon Oil Spill Litigation.  Also during this meeting, Bruce Hagen and Mike McGlamry expressed interest in and were appointed to serve on the committee. A few weeks later, Mr. Weiss appointed Steve Marks of the Podhurst firm to co-chair the committee with me.  Thereafter, Mr. Marks and I worked closely in all matters concerning the plaintiffs' strategic communications campaign.

9.      Immediately after the organizational meeting on February 21, 2012, I embarked on the task of recruiting an experienced and knowledgeable public relations firm.  This was a matter of some urgency, because the press and media coverage was very negative, and we needed someone to professionally handle media inquiries.  I first reached out to the PR professional who eventually headed the effort on Thursday, February 23, 2012.  At the time he was Director of Communications at the American Association for Justice (AAJ).  I had worked with him extensively while I served as AAJ President during 2009-2010 and very much valued his advice and counsel.   We communicated further over the weekend, and on Monday February 27, 2012 he introduced me to the firm that we eventually retained—CLS—which he was planning to join after his imminent departure from AAJ.

10.      After a formal Request for Proposal (RFP) process that several PR firms participated in, CLS was formally retained in mid-May.  On May 22, 2012, a meeting of our committee leadership and the CLS team, which I arranged and attended, was held at the CLS office in Washington, D.C.  The purpose of the meeting was to refine the plaintiffs' communications strategy and, more specifically, plan for the "rollout" of the campaign when the Master Administrative Complaint was expected to be filed in early June.  This required extensive planning and preparation in a short period of time, though CLS had already been engaged in the project.

11.     Once we had selected CLS as our PR firm, it was our committee's job to control and coordinate all media/press inquiries made to any plaintiff's lawyer in the litigation.  We also began developing cogent, dynamic messaging about the litigation.  We revised and adapted the messaging as needed for different purposes during the life of the case.  We performed background briefings and interviews with media and press professionals who were covering the NFL lawsuit or writing stories about the effect of traumatic brain injury on student and professional athletes. We identified retired NFL players and family members who could effectively tell their stories about the true impact of TBI on the retired players and their families.  Finally, we facilitated press and media opportunities for educating the public about how the lives of retired players and their families had been and continued to be affected by repetitive head trauma playing NFL football. In short, virtually every piece of information given to the media, and every person who provided that information, came through my committee.  Only by carefully regulating the message, and keeping control on the flow of information, were thousands of players and dozens of attorneys able to speak with one voice.  It was a monumental undertaking, the success of which led to the settlement, and which was a direct result of our committee's work.

12.     A brief timeline of some of my work and the work of our committee, under the direction of Steve Marks and myself, in devising, orchestrating and overseeing the plaintiffs' PR strategy includes:

   a.  I Personally recruited the public relations firm that was eventually retained and continued to serve throughout the litigation and settlement process, a process that began immediately after the plaintiffs' organizational meeting on February 21, 2012.

b.  I drafted the Request for Proposal on April 26, 2012, cleared it with Mr. Weiss and others, and sent it to a select group of qualified PR firms on May 1, 2012.

c.  I coordinated the scheduling of interviews for all of the firms that submitted proposals; the interviews were held in early May, and CLS was selected on May 16th as the front-runner to serve as our PR professional.

d.  I then negotiated the contract terms with CLS and a contract was prepared and eventually executed.

e.  On May 31, 2012 we sent a formal Media Protocol to all PSC/PEC members, which set forth mandatory procedures for handling all media/press inquiries. We established a special email address for media inquiries and required all inquiries to be submitted to the committee and CLS for vetting and handling. This purpose and terms of the protocol were consistent with what was announced at the organizational meeting, and they were reinforced on multiple occasions in the ensuing months.  Key among the purposes of the protocol was to minimize the interaction of lawyers with the media/press and to focus on the real life stories of the plaintiff football players and their families.

f.  In the first days after CLS was formally retained, we began working on a strategic plan, with a focus on using the anticipated filing of the Master Administrative Complaint as a "newsworthy" event to engage interest on the part of the national sports and news media—and educating the public about the concussion litigation through the stories of retired players and their families.

g.  We arranged for and held weekly meetings of the Communications-PR Committee and a second weekly meeting of a smaller core group that consisted

primarily of Mr. Weiss, Mr. Marks, Mr. Seeger, myself and the CLS team.  It was in these smaller meetings that important decisions were made concerning our strategic plan.

h.  The Master Administrative Complaint was filed on June 7, 2012.  On that day and in the days following, through the work of our committee and the professionals at CLS—the NFL concussion lawsuit, featuring in large part the real life stories of retired NFL players and their families, was prominently in the national news, including, among the highlights:

   i.  Kevin Turner on Good Morning America;

   ii.  Mary Ann Easterling (widow of Ray Easterling) on CNN;

   iii.  ABC Evening News with Dianne Sawyer;

   iv.  Teleconference featuring Kevin Turner and Mary Ann Easterling, attended by reporters from CBS, ABC, NBC, ESPN, Fox, CNN, Bloomberg, Reuters, New York Times, Atlanta Journal Constitution, Philadelphia Inquirer, HBO Sports, Sports Illustrated, LA Times, Minneapolis Star Tribune, Richmond Times, Milwaukee Journal Sentinel, among others; and

   v.  Prominent coverage in/by USA Today, LA Times, Washington Post, AP, Reuters, Sports Illustrated, Chicago Tribune, NPR, Atlanta Journal Constitution, and many more.

13.   The success of our PR rollout on June 7, 2012 was due in large part to careful, extensive and intensive planning and coordination, in which I played a leading role throughout. I was involved in preparation of the Talking Points and other briefing materials to be used by all

persons who would interact with the press/media.  On June 6, 2012, in preparation for the rollout on June 7th, I personally helped coordinate the assignments of committee members and lead counsel to handle "pre-briefings" for key, trusted news and sports media.  I, along with Mr. Weiss, Mr. Marks and Mr. Seeger, conducted the "pre-briefings", which included USA Today, LA Times, Bloomberg, Wall Street Journal, AP, Washington Post, ESPN, and Sports Illustrated. Additionally, our committee was involved in coordinating and preparing the players and family members who would speak on the record—most notably Kevin Turner and Mary Ann Easterling, with respect to whom the Podhurst firm and Anapol Weiss played a major role in facilitating their television and media appearances.

14.     Our strategic media plan, which publically began with coverage of the Master Administrative Complaint filing, continued with virtually daily coverage nationally right up until the start of the NFL season, and then daily throughout the season,  post-season, and thereafter.  It included numerous Op-Eds placed in influential papers, dozens of stories in both the sports and news press and media, and continued appearances by Mr. Turner, Mrs. Easterling, and others.  All of the work was overseen by Mr. Marks and myself.  The other members of our committee remained engaged throughout and participated as well, especially Mr. Hagen and Mr. McGlamry. Throughout the entire process, we kept leadership informed and engaged.

15.     By all accounts, our work was extremely effective and was instrumental in bringing the NFL to the settlement table.[1]  A substantial amount of Kreindler's common benefit time was

---

[1] The fee allocation submission to the Court was manipulated to diminish the value of my contribution to the case.  When initially provided to Seeger's office, I was told to remove the language from my declaration (in bold) that underscored its value:  "Partner Anthony Tarricone conceived, organized and directed the communications strategy for the litigation**, which was a carefully orchestrated effort that influenced the NFL to engage in settlement negotiations that culminated in the class settlement."**  Exhibit 1.  The watered down version of my

spent pre-settlement, when we had no idea if we would ever be compensated.  Thus, the time I and my firm spent moving the case toward settlement was both extremely valuable to the resolution of the case and was at risk of being uncompensated if the case was not successful.

16.     After submission of my signed Declaration that was appended to Seeger's Petition, I was directed to delete 73.7 hours of partner and associate time and 6.7 hours of paralegal time, because the people who worked these hours did not each record at least 50 hours of time.  The work represented by these hours was accurately recorded time for common benefit work that was approved by leadership—as was all time submitted.  The value of this work is not included in the lodestar that was used in Seeger's proposed division of fees.

17.     The proposed fee allocation also fails to account for the monumental risk that law firms took in starting the litigation against the NFL, both in terms of hours spent on uncertain cases and time spent developing the facts and medical history of each player's case.  Without lawyers and law firms willing to risk tens of thousands of hours meeting with clients, being retained, cultivating the attorney client relationship, getting records, hiring experts, etc., there would have been no NFL Concussion Litigation, let alone a settlement.  Seeger Weiss came into the litigation with minimal clients, had nothing to do with starting the litigation, and is requesting more than $70 million or 66% of the common benefit fees to the virtual relative exclusion of eleven other PSC firms that were directly responsible, to varying degrees, of fostering and furthering this litigation.[2]  No doubt shepherding the settlement agreement was important, but without lawyers

---

declaration was unfairly used to justify minimizing my contribution and lowering the allocation to my firm.

[2] In fact, prior to his appointment by this Court, Seeger had minimal involvement in the litigation against the NFL Parties.

willing to risk millions of dollars in time and money bringing individual cases, the litigation would have gone nowhere.  The allocation proposal places no value on those efforts and risks.

18.     Beginning in early 2012, my office began meeting with and being retained by retired NFL players to represent them in claims against the NFL relating to concussion injuries that they suffered during their playing careers.  By July 23, 2012, my firm had filed lawsuits on behalf of over 135 retired NFL players and their families.  Ultimately, we represented over 250 players, but the numbers have diminished because of poaching by other law firms post-settlement and comments by Co-Lead Counsel and the NFL that players don't necessarily need a lawyer.

19.     After being retained by NFL clients, my firm undertook the necessary steps to file lawsuits and prosecute their claims.  We investigated each case and obtained the information relating to each client's individual claim, including gathering documents and information concerning each player's NFL participation, gathering medical records concerning the player's medical condition, and, for deceased players, getting a family member appointed as the personal representative of their estate.  In addition, we regularly communicated updates to our clients to keep them notified regarding the developments in the litigation, settlement, settlement approval process, appeals process, and implementation of the settlement program.

20.     As of today, my firm represents 200 clients participating in the NFL Concussion Settlement Program.

21.     At one point in time, the Kreindler firm represented over 250 retired players.  We have preserved these 200 clients despite being beset by unscrupulous law firms and case management services unethically contacting our clients directly, spreading misinformation about the terms of the settlement and making false promises to lure away our clients away and get fees from any potential monetary award from the settlement.  This pervasive client poaching has greatly

11

threatened our ability to not only recover our expenses, but also to receive the contracted fees from clients for whom we did the lion's share of the work relating to their claims.

22.     To date, apart from the expenses incurred on behalf of the Plaintiff's Steering Committee, the Kreindler firm has incurred $175,792 in expenses, which we have risked never actually recovering if the case did not settle, was dismissed on one of the many legal defenses, or if our clients do not qualify for compensation under the settlement agreement.  This is in addition to Kreindler's contribution of $120,832 to the common expenses of the litigation.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of October, 2017 in New York, New York.

Anthony Tarricone (MA BBO# 492480)
Kreindler & Kreindler LLP
855 Boylston Street
Boston, MA 02116
617-413-5565
atarricone@kreindler.com