UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE NATIONAL FOOTBALL PLAYERS' CONCUSSION INJURY LITIGATION | : : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| | : | **Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,* | : : : : | Civ. Action No. 14 – 00029 – AB |
| Plaintiffs, | : : | |
| v. | : : | |
| National Football League and NFL Properties LLC, Successor-in-interest to NFL Properties, Inc., | : : : : : | |
| Defendants | : : | |
| THIS DOCUMENT RELATES TO | : : | |
| All Actions | : : | |

**Kreindler & Kreindler LLP Opposition to Co-Lead Counsel's
Petition for an Award of Common Benefit Attorneys' Fees,
Reimbursement of Costs and Expenses, Adoption of a Set-Aside of
Five Percent and Certain Incentive Awards filed October 10, 2017**

Kreindler & Kreindler L.L.P. ("Kreindler") submits this opposition, supported by the declaration of Anthony Tarricone, Esq. filed herewith ("Tarricone Decl."), to the common benefit fee allocation proposal from Co-Lead Counsel Christopher A. Seeger ("Seeger") and urges the Court to appoint a Special Master to consider the respective contributions of Plaintiffs' Steering

1

Committee ("PSC") firms and recommend a fair allocation of fees based on relevant factors and considerations.

Seeger's unilateral proposal—without input from Co-Lead Counsel Sol Weiss, Plaintiffs' Executive Committee ("PEC") members or PSC members—would allocate the vast majority of the common benefit fee fund to Seeger's firm by (1) relying solely on the disfavored lodestar method and (2) unfairly ignoring the important contributions and efforts of other PSC members in influencing the NFL to settle the case. The proposed allocation overemphasizes the work performed by Seeger's firm after settlement was reached. This approach, based solely on lodestar hours and a self-assigned multiplier, completely ignores the substantial efforts and risks undertaken by other PSC members who were responsible for starting this litigation and inducing the National Football League and NFL Properties, Inc. ("Defendants" or "NFL Parties") to engage in settlement discussions, and, ultimately, agree to favorable terms without a single deposition or other discovery. Seeger's proposal fails to recognize the substantial risk assumed by Kreindler and other firms, which is particularly notable in comparison to the little risk, if any, his firm had in this litigation. The overwhelming majority of the lodestar generated by Seeger is for work performed after settlement was assured and the fee fund was established.

For the reasons set forth herein, Kreindler respectfully requests that this Court appoint a Special Master to consider the valuable common benefit contributions of PSC members and plaintiffs' attorneys and to evaluate the relative risks undertaken when the success of the litigation was still in doubt. A Special Master, after weighing all relevant factors and hearing from all other PSC members, will be able to make an informed recommendation for allocation of fees that is fair and appropriate.

**I.      Background**

On April 25, 2012, this Court *sua sponte* appointed Christopher Seeger, Esq. as Plaintiffs' Co-Lead Counsel and as a member of the Plaintiffs' Executive Committee. *See* 12-md-2323 (E.D.Pa.)(AB), Doc. No. 64, Filed 04/26/2012. Prior to his appointment by this Court, Seeger had minimal involvement in the litigation against the NFL Parties. *See* Tarricone Decl., ¶17, fn 2.

Initially, the NFL litigation was seen as having little chance of success. Nevertheless, many of the PSC law firms invested significant time and money in the litigation at great risk. It is widely understood and accepted that settlement of the NFL concussion litigation was strongly influenced by two important factors: (1) the critical mass of cases filed, and the sheer number of individual retired players involved; and (2) the impact of a carefully orchestrated communications and public relations ("PR") strategy that kept the issue of concussions, chronic traumatic encephalopathy ("CTE") and the plight of thousands of retired NFL players and their families front and center in sports and news coverage throughout and beyond the 2012-13 NFL season. *See* Tarricone Decl., ¶¶ 15 – 17. Kreindler, through its partner Anthony Tarricone, Esq. ("Tarricone"), conceived, devised and co-chaired this effort with PEC member Steve Marks both before and after Tarricone's appointment to the PSC on April 26, 2012. *See* Tarricone Decl., ¶¶ 8-14.

In late 2011 and early 2012 Tarricone began discussions with Sol Weiss, Esq. ("Weiss") about using a coordinated and sophisticated communications and PR strategy to educate the public about the effects of repetitive head trauma on NFL players and the suffering of the thousands of retired players who sustained neurological injury after their NFL careers ended. These discussions culminated in the appointment of Tarricone as Chair of the Plaintiffs' NFL Litigation Communications/Public Relations Committee at an organizational meeting of plaintiffs' counsel

on February 24, 2012.[1] *See* Tarricone Decl., ¶ 8.  PEC member Steve Marks was later named Co-Chair of the committee. *See* Tarricone Decl., ¶ 8.  Tarricone had overseen a similar strategy in the BP Deepwater Horizon Oil Spill litigation, where a coordinated strategy was employed to counter BP's extensive PR media campaign, which the company had designed to downplay the effects of the oil spill and minimize the role of litigation in redressing the massive losses suffered by Gulf Coast residents and businesses. *See* Tarricone Decl., ¶¶ 6, 8.   Before the Court appointed a PSC in the NFL litigation, Tarricone began discussions with PR firms about working with the plaintiffs to devise and execute a strategic communications plan.  Then, immediately after his appointment to the PSC, Tarricone compiled a list of prospective firms and drafted a Request for Proposal ("RFP"). *See* Tarricone Decl., ¶¶ 9 – 10.  On May 1, 2012, the RFP was sent to several PR firms considered experienced in the kind of work needed for the case. *See* Tarricone Decl., ¶ 12(b). Tarricone then coordinated the scheduling of interviews and, on May 16, 2012, a decision was made to retain CLS and Associates (now CLS Strategies) of Washington DC. *See* Tarricone Decl., ¶ 12(c). Tarricone negotiated the contract terms for CLS's retention.[2] *See* Tarricone Decl., ¶ 12(d).

The Plaintiffs' Communications/PR Committee, under Tarricone's and Marks' direction, thereafter engaged in an organized, intensive and relentless communications campaign designed to overcome negative attitudes about NFL players who filed lawsuits, and the public's misunderstanding and ignorance about the reality of Traumatic Brain Injuries (TBI) suffered by NFL players and the impact on their families. *See* Tarricone Decl., ¶ 12(e) – (h).  The PR

---

[1] For months before the Court's formal appointment of a PEC and PSC in April 2012, the plaintiff firms and lawyers who initiated the litigation and were the driving forces behind it were engaged in an organized and coordinated effort to advance the litigation efficiently and effectively.  While others were involved, the *de facto* leadership consisted of Anapol Weiss, Locks Law Firm, and Hausfeld.LLP.

[2] Tarricone had previously worked with the PR professional who headed the CLS team during his tenure as President of the American Association for Justice (AAJ).

Committee held weekly telephonic meetings and separate weekly meetings were held with a core group that included the PEC leadership to keep them apprised of the PR strategy and its execution. *See* Tarricone Decl., ¶ 12(g). The public rollout of the PR plan began when the plaintiffs filed the Master Administrative Complaint on June 7, 2012. *See* Tarricone Decl., ¶ 12(h). The committee coordinated prominent coverage in virtually every major news and sports media outlet in the nation—including Good Morning America, ABC Evening News, CNN, USA Today, Sports Illustrated, the Washington Post and others. *See* Tarricone Decl., ¶ 12(h). Thereafter, through the continued and sustained efforts of the committee, the effects of head trauma on retired NFL players became a widely covered daily news story. *See* Tarricone Decl., ¶ 14. It was like a relentless drumbeat, satisfying a key goal of the coordinated communications strategy—to be in the news virtually every day. As a direct result of the committee's work, public opinion about TBIs and the suits against the NFL was reversed and the NFL never managed, despite repeated efforts, to overcome the swell of opinion in favor of the plaintiffs. *See* Tarricone Decl., ¶ 15. It was a carefully regulated message which required control of the flow of information from thousands of players and dozens of attorneys. *See* Tarricone Decl., ¶ 11.

In addition to Kreindler's central role in the Plaintiffs' Communications/PR strategy, the firm played a significant role in building the critical mass of cases that raised the profile of the litigation and raised the stakes for the NFL. Beginning in early 2012, Kreindler began meeting with and being retained by scores of retired NFL players to represent them in claims against the NFL for concussion and neurological injuries suffered during their NFL careers. *See* Tarricone Decl., ¶ 18. By July 23, 2012, Kreindler had filed lawsuits on behalf of over 135 former NFL players and their families. *See* Tarricone Decl., ¶ 18. Currently, Kreindler represents 200 former

NFL players and their families. *See* Tarricone Decl., ¶ 20.[3]  During much of the time that Tarricone and others at Kreindler performed work on behalf of the Communications/Public Relations Committee and for individual clients, the prospect of settlement was remote.  The NFL Parties were vigorously litigating various legal and factual defenses such as preemption under the National Labor Relations Act, statutes of limitation, causation and others.  Given the procedural and factual posture of the case, Kreindler accepted a substantial risk that it would not recover fees or expenses, both on the hundreds of their individual cases and/or the work performed to benefit all non-Kreindler plaintiffs.  Ultimately, in no small part due to the dogged and creative work of the Communications/Public Relations Committee, the NFL Parties were engaged in meaningful efforts to resolve the litigation, ultimately leading to the Class Action Settlement.

After the substantial pre-settlement efforts of Kreindler and other firms, this Court approved an amended Class Action Settlement on April 22, 2015. *See* 12-md-2323-AB (E.D.Pa.) (AB), Doc. No. 6510, Filed 04/22/15.  Under the terms of that amended Class Action Settlement between the plaintiff class and the NFL Parties, an application for an award of attorneys' fees and reasonably incurred costs, "as contemplated by the Parties in Section 21.1 of the Settlement Agreement," was to be filed after the Effective Date of the Settlement Agreement. *See id.*, p. 6. Section 21.1 of the Settlement Agreement provided that the NFL Parties were to "pay attorneys' fees and reasonable costs" and that "Class Counsel shall be entitled … to petition the Court *on behalf of all entitled attorneys* for an award of class attorneys' fees and reasonable costs." *See* 12-md-2323-AB (E.D.Pa.) (AB), Doc. No. 6481-1, Filed 02/13/15, ECF p. 82.  So long as the total

---

[3] At one point in time, the Kreindler firm represented over 250 retired players.  The firm has preserved its remaining 200 clients despite being beset by unscrupulous law firms and case management services unethically contacting our clients directly, spreading misinformation about the terms of the settlement and making false promises to lure away our clients away and get fees from any potential monetary award from the settlement.

amount requested in the petition did not exceed $112,500,000.00, the NFL Parties agreed not to object to the application. *Id.* While the terms of the Settlement Agreement provide for attorneys' fees, the actual allocation (or division) of fees and reimbursement for reasonable costs was ultimately a judicial matter and thus was "subject to the approval of the Court." *Id.* As for a set-aside, while the Settlement Agreement contemplated that Co-Lead Class Counsel might petition for a maximum of five percent of each award, that proposed set aside was understood to be "strictly a matter between and among Settlement Class Members, Class Counsel, and individual counsel for Settlement Class Members" and was, like an award of and allocation of attorneys' fees, subject to judicial review and Court approval. *Id.*

## II.     Relevant Law

Kreindler opposes the allocation of common benefit fees that Seeger has proposed, which ignores the substantial role that Kreindler and other plaintiffs' firms played in persuading the NFL Parties to participate in settlement negotiations. The proposal ignores the substantial risk Kreindler faced of not recovering fees or expenses for both its common benefit work and/or its large number of individual cases, and relies solely on a lodestar calculation for its proposed fee allocation, thereby ignoring relevant case law from the Third Circuit and elsewhere regarding the allocation of common benefit attorneys' fees.

Even when a court has appointed various plaintiffs' attorneys to class-wide positions, including class counsel, "the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and are divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008), citing *inter alia* Manual for Complex Litigation, Fourth, § 14.11 ("The court must distribute the [fee award] among the various plaintiffs' attorneys,

7

which may include class counsel, court-designated lead and liaison counsel, and individual plaintiff's counsel."); *see also* William B. Rubenstein, *Newberg on Class Actions* § 15:23 (5th ed. 2013) ("[I]t is the court that has the final authority on how the fee is allocated among counsel."). This equitable review function is especially important when the fees will be extracted from a common benefit fund. *See, e.g., Camden I. Cond. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991.)

The "[h]istorical[]… rationale entitling counsel to a percentage of the common fund derives" in part "from the … doctrine[] of quantum meruit." *Id.* As the Third Circuit has stated, "[t]he award of fees under the equitable fund doctrine is analogous to an action in quantum meruit: the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed." *Silberman v. Bogle,* 683 F.2d 62, 64 (3d Cir.1982) (quoting *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 165 (3d Cir.1973)("*Lindy I*"); *see also In re Cont'l Bank/Sheldon Somerman & Entities Bank Loan Litig.*, 1989 WL 63235, at *3 (E.D. Pa. June 9, 1989) ("The award of fees under the common fund doctrine has been analogized to an action in quantum meruit; that is, the individual seeking compensation has benefitted another and seeks payment for the value of the services performed."), *citing Lindy I*, 487 F.2d at 165 *and Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Thus, where, as here, counsel has made an application for the allocation of common benefit attorneys' fees, "the court's equitable review function" is implicated and the proposal must satisfy the court that it is fair to all participants in the litigation, not merely that it fairly compensates the applicant. *Stanford Glaberson et al. v. Comcast Corporation et al.*, 2016 WL 6276233, *5 (E.D.Pa. October 26, 2016), citing *Camden I Cond. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir.

1991).[4] This is especially true in the unusual situation where plaintiffs' counsel disagree amongst themselves over the method of allocating the fees to various attorneys.[5]

When determining if a fee application is justified and appropriate, and when the attorneys' fees will not be paid pursuant to a fee-shifting statute, there is no presumption in favor of allocating fees based on a lodestar method. *In re Diet Drugs*, 582 F.3d 524, 539 (3d Cir. 2009) (affirming district court's rejection of lodestar calculation for fees in favor of percentage-of-recovery). Rather, the factors that are to be considered when allocating common benefit fees include the "risk of nonpayment" each attorney faced had the litigation not been successful and the "quality of performance", as well as the numbers of hours of work performed. *Glaberson*, 2016 WL 6276233, *5. That is, the lodestar – number of hours – is but one of several factors that a court, when exercising its equitable review function and assessing a fee application, must take into account when looking that the final question, which is the value of each firm's "contribution" to the "ultimate success of the case." *In re Trans Union Corp. Privacy Litig.*, 2009 WL 4799954, *23 (N.D. Ill. Dec. 9, 2009); *see also In re Vitamins Antitrust Litigation*, 398 F.Supp.2d at 225, 236 (approving of reduction of fee award from attorney fee pool when "billable hours and lodestar were out of proportion to the value [an applicant firm] added to the case," and because "[w]hat matters, in the contest of this fee dispute, is … how [the case] did proceed, and what the firms' contributions were, as the case proceeded with their involvement.") For while "[t]he value of time

---

[4] Lead counsel making a proposed fee allocation must "apply a universally fair standard of allocation to all participants," and cannot merely consider its own role. *In re Vitamins Antitrust Litigation*, 398 F.Supp.2d 209, 234 (D.D.C. 2005).

[5] The Ninth Circuit has observed that "there is very little case law concerning the allocation of attorney's fees among co-counsel." *In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 473 (9th Cir. 1997). *See also* William B. Rubenstein, *Newberg on Class Actions*, § 15:23 (5th ed. 2013) ("As it is typical that multiple counsel can agree among themselves on the allocation of an aggregate fee, the case law outlining fee allocation procedures is relatively sparse.")

9

expended with appropriate adjustments may provide *a rough starting point* for assessing the respective roles of counsel, … it should not be used rigidly as a precise measure to the exclusion of other intangible factors." 1 Alba Conte, *Attorney Fee Awards* § 2.17 at 71 – 72 (2d ed. 1993) (emphasis added).)[6] In addition to the rough approximation of value attributed to time expended, a factor that must be considered is whether an attorney making a fee application had become involved in the case after most of the risk of litigation had been eliminated. *See In re Copley Pharmaceutical, Inc., Albuterol Products Liability Litigation*, 50 F.Supp.2d 1141, 1155 (D.Wyoming 1999), *aff'd and remanded*, 232 F.3d 900 (10th Cir. 2000) (applicant "became involved after the Court certified the class and shortly before trial" and thus "did not share the significant risks of other trial counsel who had been involved in this case since its inception.")

Should various plaintiffs' counsel disagree about a proposed fee allocation, a special master or magistrate "may be asked by a district court to oversee an attorneys' fee allocation," in which case "all interested parties present their data to the deciding officer; have limited if any right to engage in *ex parte* contacts; and may, on a fully developed record," seek judicial review of the allocation. *In re High Sulfur Content*, 517 F.2d at 232, n. 18. *See also In re Genetically Modified Rice Litigation*, 764 F.3d 864, 872 (8th Cir. 2014), *cert. denied*, 135 S.Ct. 1455 (2015) (noting appointment of special master in common benefit case); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 534 (N.D. Miss. 2003) ("The award of attorneys' fees in this case is in an aggregate amount, with distribution among the various firms and attorneys to be made by agreement among class counsel. In the event that class counsel cannot agree to an equitable distribution between

---

[6] As Seeger's declarant Professor Brian Fitzpatrick has said in other litigation, "the lodestar approach [has fallen] out of favor in common fund class actions" and in his "opinion, it does more harm than good to consider class counsel's lodestar when awarding feeds under the percent method." <u>In Re: Volkswagen</u>, 3:15-md-02672-CRB, N.D. Cal., Dkt. 2175-2, at p. 7-17

themselves, the court can then appoint a Special Master, paid from the corpus of the attorneys' fees award, to make both a report to the court and recommendation as to how the funds should be distributed." (citation omitted)).

An opportunity for all counsel to present evidence and arguments is necessary to "comport with due process considerations." *In re Copley*, 50 F.Supp.2d at 1150. Accepting the unilateral and self-serving representations of one of two Co-Lead Counsel, and denying the other attorneys who contributed to the common benefit here a chance to demonstrate their entitlement to a proportion of the fees different than Co-Lead Counsel's proposal, would unfairly deny the other common benefit attorneys due process.[7]

On its face, the allocation of fees and methodology unilaterally employed by Seeger is manifestly unfair. For example, Kreindler was instructed that it had to delete over 80 hours of work because it was accumulated by several lawyers and staff who, individually, did not work more than 50 hours each—without any consideration of the value of the work. Additionally, Seeger has calculated his firm's lodestar using extremely generous, if not questionable, hourly rates. Indeed, Seeger's application seeks an hourly rate for one of its partners (TeriAnne Benedetto) of $895 and another (Jonathan Shub) of $750, compared to rates of $465 and $495 per hour for those same attorneys, respectively, that the Seeger firm sought three years ago in another litigation before this Court. *See* McDonough v. Toys R Us, Inc., 2:06-cv-00242, E.D. Pa., Dkt. 863-2, at 25. It is difficult to imagine how Seeger calculated such a massive increase in rates in just a three-year period, let alone how it can justify assigning lower rates for work performed by the non-Seeger firms. Here, where there is a common benefit fee recovered as part of the settlement, there is no justification

---

[7] Unlike other cases involving common benefit fees, here there was no committee appointed to recommend the fee allocation and no opportunity for participating counsel to have input—other than the submission of time.

for calculating lodestars differently for each firm.  This allows one firm's lodestar to be inflated over others without any consideration of the value of work performed.

### III. Conclusion

Seeger's proposed fee allocation is manifestly unfair, self-serving and contrary to established principles for dividing common benefit fees.  The most important factors in dividing fees are the relative risks undertaken by common benefit attorneys and law firms, and the value and quality of their respective contributions to the success of the litigation.  In short – who started the litigation and nurtured it in its infancy?  Who spent time and money when the outcome of the litigation was completely uncertain?  Whose work and efforts brought the NFL to the negotiating table?  The fee proposal submitted in this case improperly values above all time expended when the outcome was not in doubt, a fee paid by the NFL was virtually certain, and the risks were none.  It is fundamentally unfair to the lawyers who began this litigation and pushed it forward when everyone doubted its chance of success, and worked tirelessly on behalf of thousands of former NFL players to put the case in a posture where settlement was not only possible, but essential to the NFL's business interests.

[*Remainder of Page Intentionally Left Blank*]

For the reasons set forth herein and in the declaration of Anthony Tarricone, Esq., Kreindler respectfully asks that this Court deny Seeger's fee application and appoint a Special Master or referee to consider the relevant contributions, risks assumed and value that each committee firm provided to the common benefit of all plaintiffs. It is the risks and value that ultimately determine a fair, just and equitable allocation of attorneys' fees after considering the evidence presented by all parties.

Dated: New York, New York
October 27, 2017

      /s/ Anthony Tarricone
Anthony Tarricone (MA BBO# 492480)
KREINDLER & KREINDLER, LLP
855 Boylston Street
Boston, MA 02116
(617) 424-9100
atarricone@kreindler.com

AND

Noah H. Kushlefsky (6272)
KREINDLER & KREINDLER, LLP
750 Third Avenue
New York, New York 10017
(212) 687-8181
nkushlefsky@kreindler.com

*Attorneys for Plaintiffs*