UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>　　　　　　　　　Defendants. | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

### DECLARATION OF MICHAEL L. MCGLAMRY RESPONDING IN OPPOSITION TO CHRISTOPHER A. SEEGER'S PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES

Michael L. McGlamry declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, the following:

　　　　1.　　I am *sui juris* and a shareholder in the law firm Pope, McGlamry, P.C. ("Pope McGlamry"). This Declaration is based upon my personal knowledge as is filed in Response and Opposition to Christopher A. Seeger's Proposed Allocation (ECF No. 8447).

　　　　2.　　I am aware that other members of the Plaintiffs' Executive Committee ("PEC"), including Co-Lead Counsel, and of the Plaintiffs' Steering Committee ("PSC"), also have filed

1

or will file Declarations in opposition to Mr. Seeger's unilateral fee allocation. Among this group are law firms, such as Anapol Weiss, Girardi Keese, Locks Law Firm, Kreindler, Zimmerman Reed, McCorvey Law, LLC, and Hagen, Rosskopf & Earle, which have the overwhelming number of individual former player clients whose individual lawsuits were a – if not the – major factor leading to the settlement of this litigation. That almost all of the Plaintiffs' Leadership counsel appointed by the Court oppose the proposed allocation, its timing, scope and effect, demonstrates how unreasonable it is. This issue deserves scrutiny and should involve a Special Master in lieu of Mr. Seeger's unilateral allocation.

3. Along with Co-Counsel Bruce Hagen at Hagen, Rosskopf & Earle, Pope McGlamry's involvement in what became known as the NFL Concussion Litigation dates from early 2011. We began meeting with and retaining individual clients at that time, and we filed several of the initial lawsuits against the NFL in the Northern District of Georgia, cases that eventually formed the basis for MDL-2323.

4. I have served as a Court-appointed member of the PSC throughout MDL No. 2323. I have further served as co-chair of the Discovery Committee and as a member of the Communications/ Public Relations and Ethics Committees.

5. My firm has participated Trip Tomlinson and Kimberly Johnson, both Pope McGlamry shareholders, served on the Legal Committee, which held weekly teleconferences, conducted substantive legal research, drafted/ edited form complaints and Case Management Orders, and assisted with drafting the response to the key motion to dismiss regarding whether the former NFL players' claims were preempted under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, due to the Collective Bargaining Agreements between the NFL

and players. Such substantive legal work continued throughout the pre-Settlement phase comprising approximately the first year and a half of MDL-2323.

6. M.J. Blakely, another Pope McGlamry shareholder, also served on the Discovery Committee with me. We drafted extensive written discovery requests designed to obtain key information supporting all former NFL players' claims.

7. Some of the most important work my firm contributed to MDL-2323 was my active, substantive participation on the Communications Committee. My work on behalf of the Communications Committee included multiple interviews with national news media, including CNN and ESPN's Outside the Lines, working with former NFL players and their families to prepare for interviews with local and national news media, preparing talking points for media interviews and press conferences for Plaintiffs' counsel and former NFL players to ensure clear communications, and actively participating with the Communications Committee in the work detailed in the Declaration of my co-counsel Bruce Hagen, who also worked tirelessly on that committee.

8. The Communications Committee's efforts were critical to the success of the case. At the outset of the case, public opinion of the Plaintiffs/ former NFL players was highly unfavorable. But, over the next year and a half, the Communications Committee's work brought about a sea change in public opinion, such that when the initial settlement terms were announced in August, 2013, public opinion strongly supported the players. That was due almost entirely to the incredible work done by the Communications Committee, under the direction of Anthony Tarricone and Steven Marks and the ongoing work of David Rosen, Bruce Hagen and me, working in conjunction with a public relations firm to expose the NFL's corrupt conduct that endangered the health and safety of its players. Substantial pressure on the NFL to resolve the

ongoing player safety issues raised in this litigation directly resulted from the media and public relations campaign directed and managed by the Communications Committee.

9. Mr. Seeger previously recognized the immense value in the regular work undertaken, before and after the Settlement was announced, and continuing to-date, to provide full and complete information to all parties, the broader player community, and the public, regarding all relevant factual, medical and legal issues implicated by MDL-2323. (*See* ECF No. 7151-2 at ¶ 33). But Mr. Seeger's proposed fee allocation minimizes the value contributed by the Communications Committee by awarding a "multiplier" of 1 – in reality no multiplier at all – to the time of my firm and the time of Bruce Hagen's firm.

10. I was also a leading proponent and founder, along with Zimmerman Reed, of the Ethics Committee, which was formed to address ethical and legal issues resulting from the confusion following the settlement. Issues that had to be addressed included withdrawal from representation and lien issues created by the Settlement's and Co-Lead Counsel Chris Seeger's failure to address the enforceability of individual contingency-fee agreements between former NFL players or their families and individual counsel. The lack of leadership on this issue has delayed and undermined the ability of any counsel to obtain payment for the substantial work on behalf of their individual clients.

11. There are two key problems with Mr. Seeger's unilateral fee allocation. One, it is premature, since individual contingent-fee contract issues have not been addressed, and that entirety of time and expense are not accounted for in the proposed allocation, with the exception of Mr. Seeger's work on behalf of individual class members. Second, it is patently unfair, undermines the contributions of the rest of Plaintiffs' leadership and appears to suggest that he alone is responsible for the results here.

**The proposed allocation is premature.**

12.     Despite repeated requests from me and other members of the PSC, Mr. Seeger has utterly failed to address whether individual contingency fee agreements are enforceable in light of the class action Settlement.  Although I have personally questioned Mr. Seeger regarding this issue on multiple occasions, he has stalled, delayed and refused to address this issue.  He failed to address this issue at the preliminary and final approval stages, and yet now seeks to collect $74.5 million in class action "common benefit" fees before counsel for the thousands of injured former NFL players and their families – whose participation created the critical mass necessary to incentivize the NFL to settle – even know whether their contingent fee agreements will be upheld.

13.     For example, the enforceability of individual fee agreements was raised by the Estate of Kevin Turner in December 2016.  (*See* ECF No. 7029).  Some members of the PSC filed briefs supporting the enforceability of such individual contingent fee agreements.  (*E.g.*, ECF Nos. 7073, 7075, 7085).  But, despite requests by other PSC members, including myself, Co-Lead Counsel Mr. Seeger utterly refused to take a position as to the enforcement of individual fee agreements.  Whether individual contingency-fee agreements remain enforceable has not yet been addressed by the Court.

14.     Indeed, although Mr. Seeger had very few individual clients in MDL-2323, he made a point of waiving any claim to fees pursuant to any remaining individual retainer agreements.  (*See* ECF No. 7151-2 at ¶ 98).  This action fanned the flames of frustrated individual clients and their families who, in light of Co-Lead Counsel Mr. Seeger's decision to reach a class settlement of MDL-2323, seek to avoid paying their individual attorneys, despite voluntarily entering into contingent-fee contracts.

15. Mr. Seeger's suggested allocation of common benefit attorneys' fees is premature and inappropriate until this Court addresses the individual contingent fee contract enforceability issue. Indeed, at this point in time, Mr. Seeger seeks to recoup a substantial windfall for himself, while leaving remaining PSC members and other counsel representing individual clients at a substantial risk that they may never recover anything for the many thousands of hours of time and substantial expenses invested for individual client/ class member claims.

16. In addition to the common benefit work that Pope, McGlamry has performed, Pope, McGlamry has invested substantial amounts of attorney time and resources on behalf of their individual clients/ class members to ensure that they receive their claims are properly evaluated and compensated. None of this time or expense will be compensable unless this Court rules that individual client fee agreements are enforceable. Even if the Court were to enforce individual client contingent-fee agreements, Pope, McGlamry would only be compensated for those individual clients/ class members who obtain a recovery.

17. Pope, McGlamry, jointly with Bruce Hagen of Hagen, Rosskopf & Earle, currently represents 404 individual clients – former NFL players or the representatives of the estates of deceased former NFL players – pursuant to individual retainer agreements. Our individual clients are also class members eligible to participate in the settlement of the class action under MDL No. 2323.

18. Pope, McGlamry's work on behalf of individual class members/ clients has included, without limitation, the following:

    a. Investigating individual client cases factually and legally;

    b. Preparing and filing of two Complaints for most individual clients;

    c. Correspondence and individual communications with the individual clients;

d. Assisting individual clients in filing complaints; discussing opting in, objections, pleadings, motions and orders; addressing settlement discussions and documents; discussing scheduling, appeals, appeal timelines, etc.;

e. Reviewing and following up on individual client Questionnaires;

f. Meeting in person with most individual clients;

g. Identifying physicians and hospitals and collecting records from same for each individual client;

h. Assisting individual clients with medical appointments;

i. Helping individual clients determine and prove their number of eligible seasons;

j. Reviewing medical records to determine any individual diagnoses and the timing of same;

k. Assisting individual clients with estate issues, including, but not limited to, establishing personal estates, guardianships, etc.;

l. Assisting individual clients in bankruptcy instances;

m. Assisting individual clients with medical and claim issues under the Collective Bargaining Agreement, including workers' compensation and disability claims;

n. Assisting individual clients with inquiries from media sources, including television, internet, radio and newspapers;

o. Preparing for and holding teleconferences to update clients on at least ten (10) occasions, throughout the course of the litigation;

p. Drafting and providing client email updates on nearly 40 occasions throughout the course of the litigation; and

q. Coordinating the May 20, 2014 *Your Brain's Health* event at Emory University Hospital, with Emory physicians, including preparing for the presentation and coordinating the recording of the event.

19. Pope, McGlamry has invested thousands of hours of attorney, paralegal and administrative time performing these tasks for its individual clients who are Settlement class members.

20. In conducting the work for individual clients/ class members described in paragraph 18 above, Pope, McGlamry has also paid substantial sums to prosecute individual cases, including, among others, the costs for:

   a. Medical Records;

   b. Freight/Shipping costs;

   c. Filing Fees (including filing fees for probate cases where applicable);

   d. Travel expenses for client meetings and the JPML hearing to commence the MDL;

   e. Research expenses (Westlaw, Pacer, etc.);

   f. Conference calls; and

   g. Expert consultation expenses.

21. Pope, McGlamry remains committed to representing its clients throughout the settlement process to ensure that they obtain the maximum benefits to which they are entitled under the settlement. This work will also require a substantial investment of time, resources and expenses in the future.

22. The Settlement, which began as a Term Sheet dated August 29, 2013, included the NFL Defendants' agreement not to oppose up to $112.5 million in common-benefit attorneys' fees, payable by the NFL Defendants. *See In re Nat'l Football League Players' Concussion Injury Lit.*, 307 F.R.D. 351, 374 (E.D. Pa. 2015). But the Settlement and Co-Lead

Counsel Mr. Seeger, were, and have remained, silent as to whether individual contingency-fee contracts between clients and counsel are enforceable, other than specifying that the requested 5% holdback from all awards be taken out of the amount of legal fees otherwise owed.

23. In addition to his requested allocation of $70 million of common-benefit fees and expenses, Mr. Seeger has double-dipped by obtaining a holdback of 5% of all awards made pursuant to the Settlement. This holdback amount further reduces the amount otherwise payable in attorneys' fees to individual clients' counsel. His request of an additional $4.7 million from the holdback further demonstrates his demeaning and minimization of the efforts of other counsel. (*See* ECF No. 8447-1 at page 2 of 2 (reporting Seeger Weiss' lodestar as $18,124,869.10, requesting a 3.885 multiplier, taking this amount to $70,425,116.45 of the $107.7 million fees to be allocated, and further requesting $4,100,280 of the $4.7 million "part II lodestar" from the 5% holdbacks).

24. My firm formerly represented many more than our current 404 former NFL players and players' families in MDL-2323. But more than eighty (80) of our clients were either improperly "poached" by other counsel or fired us in an attempt to avoid paying attorneys' fees, since the Settlement framework created an environment that encouraged former NFL players to shop for lower contingent fees or try to avoid them altogether.

25. In the course of working with our hundreds of individual clients, Pope McGlamry has incurred thousands of hours in additional attorney and administrative time, none of which was permitted to be included in the common-benefit fee application. Mr. Seeger has acknowledged that Plaintiffs' Counsel, other than Co-Lead Class Counsel, "have devoted hundreds of hours to communicating with Retired NFL Football Players and family members."

(ECF No. 7151-2 at ¶ 51). Yet Plaintiffs' leadership counsel were specifically instructed to omit such time from their common-benefit fee and expense applications.

26. Mr. Seeger contends that he, like us, "hosts frequent telephone conference calls with retired players and family members to provide updates on the Settlement," (ECF No. 7151-2 at ¶ 52), and that he, again like Pope, McGlamry, "continues to respond to hundreds of calls each month from Retired NFL Football Players and their families about the Settlement and its Claims Process." (ECF No. 8447 at ¶ 20a.) Indeed, Mr. Seeger has included the time spent communicating with individual Retired NFL Players and their families in his common-benefit time and sought reimbursement of that time as part of his lodestar (and multiplied by 3.885 as an incentive reward). (*See id.*; ECF No. 8447-1 at p. 2 of 2; ECF No. 7151-2 at ¶ 89 ("Seeger Weiss prepared updates for Class Members and fielded phone calls to provide further information on the updates to Class Members.").

27. Our work with individual former NFL players and their families began in 2011. We personally spoke with each former player (or their surviving family members) when they first contacted us, and completed a lengthy survey addressing myriad health issues. That work has continued through today, including, without limitation, items listed in paragraph 18, *supra*, and will continue until every client's claim has been completed.

28. Members of the PEC and PSC, however, were specifically instructed **not** to include any work on behalf of any individual class member, including communications with such individual class members, in their time detail submitted in support of the common-benefit fee application. Accordingly, Pope McGlamry, and presumably no member of the PSC or PEC – with the notable exception of Mr. Seeger – submitted their time for their many thousands of

hours communicating and working with individual former NFL players or their families as part of the common-benefit fee and expenses application.

29. Similar to Mr. Seeger's statement of the work his firm has done in responding to "hundreds of calls each month from Retired NFL Football Players and their families about the Settlement and its Claims Process," Pope McGlamry has fielded many thousands of similar calls, from the 404 players that we currently represent, as well as with former clients, many of whom were "poached" by other counsel or terminated our representation in seeking to avoid paying any contingency fees. We have also communicated extensively with all of our clients via email, conference call, and in-person meetings.

30. Since the Settlement became effective in January 2017, Pope McGlamry attorneys have spent hundreds of hours every month working with former players and their families on the registration process by: researching evidence of play, gathering employment, and registering former NFL players, their representatives and their family members for the settlement; working with former players to submit BAP appointment requests to Garretson, working on a daily basis with Garretson on issues involving the scheduling process; and gathering medical records and documentation from clients who received a Qualifying Diagnosis prior to the Effective Date to submit claim packages on their behalf, and respond to myriad deficiency notices received regarding same.

31. This work performed by Pope McGlamry is the same work being performed by Seeger Weiss in the implementation and support of the Registration and BAP process. But Pope McGlamry will not be reimbursed for this work through common-benefit fees or through the 5% set-side from any of their clients' awards that Mr. Seeger has requested. (*See* ECF No. 8447 at ¶ 20a (explaining that Seeger Weiss has been "responding to hundreds of calls from Retired NFL

Football Players and their families" and that it "continues to respond to hundreds" of such calls every month "about the Settlement and its Claims Process.")

32. In stark contrast, Pope McGlamry and other leadership counsel who are members of the PSC or PEC, save Mr. Seeger, are not receiving any common-benefit fees for any of this work. Attorney's fees for the few Pope, McGlamry clients whose claims have been approved – and only a few handfuls of claims have yet been approved in the entire Settlement – are being held pending resolution of whether individual contingency-fee agreements will be enforced and lien issues relating to the poaching and firing-to-avoid-fees problems.

33. Indeed, it remains uncertain as to whether Pope, McGlamry (or any other firm or counsel representing individual Former NFL Players or their families) will ever be paid for their work on behalf of individual clients/ class members. As such, Mr. Seeger's proposed allocation is premature and gives him credit for individual class member work that was excluded from the time submitted by all other counsel. An award or allocation of common-benefit fees is premature until the individual contingency-fee agreement issue has been resolved.

**The proposed allocation is also unfair, particularly in light of the low risk to Mr. Seeger.**

34. Pre-Settlement, PSC, PEC and Co-Lead Counsel worked effectively and efficiently as a team, all with substantive roles, toward the resolution of our clients' head-injury claims. But, as negotiations continued, and in particular, once the August 2013 Term Sheet, providing up to $112.5 million in common-benefit fees and expenses was executed, Mr. Seeger excluded leadership and assigned more and more work to his own firm, to build its lodestar, to the exclusion of others.

35. Since 2013, Co-Lead Plaintiffs' Counsel Christopher Seeger has dictated and strictly controlled the work that could be done in this case, which few counsel could actively

participate in the mediation and settlement process, what each firm and their respective attorneys was permitted to do in furtherance of the common benefit, and whether work on behalf of individual claimants, even in furtherance of the Settlement, could be included as part of the common-benefit expenses. Despite repeated requests for work and to more actively participate by other Court-appointed Plaintiffs' leadership, Mr. Seeger attempted to marginalize and minimize the involvement of all other members of the Plaintiffs' leadership, including my firm, while maximizing his (and his firm's) role in all MDL-2323 work.

36. Mr. Seeger bypassed his own Co-Lead Plaintiffs' Counsel, Sol Weiss of Anapol Weiss, and the Court-appointed PSC and PEC. As is demonstrated by the $18 million-plus lodestar amount submitted by his firm, Mr. Seeger reserved the vast majority of work for himself and his firm, largely excluding even his Court-appointed Co-Lead Plaintiffs' Counsel Sol Weiss. (*See* ECF No. 8447-1 at p. 2 (listing a lodestar of $1,857,436.00 for Anapol Weiss, the firm of Co-Lead Plaintiffs' Counsel, compared to $18,124,869.10 for Seeger Weiss. Mr. Seeger's firm's lodestar, based on the work that he created and controlled, was 9.76 times that of his Court-appointed Co-Lead counsel's).

37. These skewed numbers vividly demonstrate why the lodestar methodology has come under fire, including its encouragement unjustified work and inefficiencies on the part of attorneys, and imposition of a substantial burden on the courts to review fee applications. *See, e.g., In re Boesky Secs. Lit.*, 888 F. Supp. 551, 561 (S.D.N.Y. 1995) (citing, among other authorities, the Court Awarded Attorney Fees: Report of the Third Circuit Task Force, Oct. 8, 1985, 108 F.R.D. 237, 242 (1985) (Arthur R. Miller, Reporter)).

38. In fact, much of the work that Seeger Weiss has completed relates to issues that Mr. Seeger himself created by omitting the enforceability of individual contingency-fee

agreements from the Settlement and by failing to address the issue since the final Settlement was reached in 2014.

39. Indeed, Mr. Seeger has failed to hold or participate in substantive discussions with MDL-2323's PSC and PEC since 2013. There have been no leadership meetings, no leadership conference calls, and literally no leadership discussions. Mr. Seeger effectively became a solitary dictator over MDL-2323. He has worked to ensure that his application for substantial, inflated common-benefit fees will be determined before the serious questions of individual attorneys' fees and poaching are addressed. Mr. Seeger has instigated an unseemly public fight over fees, undermining the public's (not to mention individual clients') perception of plaintiffs' counsel and the civil justice system.

40. This is simply not how am MDL coordination is supposed to operate. For example, in *In re Zyprexa Prod. Liab. Lit.*, the court noted that the PSCs' responsibilities included initiating, coordinating, and conducting all pretrial discovery on behalf of plaintiffs; acting as a spokesperson for plaintiffs during pretrial proceedings; negotiating and entering into stipulations with defendant; developing and pursuing settlement options with defendant; creating a method for reimbursement for costs and fees for services; and dealing with liens on a national basis. 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006). Such joint efforts – like those reflected by the PSC's pre-Settlement joint work in this case – can justify a holdback for common-benefit fees and expenses. *See id.*

41. Here, Mr. Seeger has obtained not only a holdback, but an additional $112.5 million set aside for fees and costs as part of the Settlement, 65% of which he has unilaterally allocated to himself and his firm. Accordingly, even the class aspect of this case is not the traditional "common fund" analysis that considers what percentage of the total amount awarded

to the class can properly be paid to class counsel to compensate for their work for the common benefit.

42. Given all of these issues, it would be unfair and inappropriate to allow Mr. Seeger to arbitrarily allocate common-benefit fees by selecting a multiplier applicable to each firm's lodestar calculation, including his purported decision to "adjust upward the lodestars of the firms that made contributions from the outset of the litigation all the way to its end" or "downward the lodestars of the firms that performed only discrete tasks here and there." (ECF 8447-2 ¶ 8).

43. Mr. Seeger not only decided who would be permitted to perform tasks, he then decided that those he selected would be awarded above and beyond by his application of a multiplier. Likewise, he penalized those firms that he did not select to work through the negotiations and settlement by awarding them only their lodestar, in the case of Pope, McGlamry and nine other firms (and even reducing the lodestar via a multiplier lower than 1 for four firms). *Cf. In re Actos (Pioglitazone) Prod. Liab. Lit.,* No. 6:11-MD-2299, 2017 WL 3033134, at *34 (W.D. La. July 17, 2017) (explaining that, "[h]istorically, courts in MDLs have utilized a Plaintiff's Fee Committee to provide portions, if not all, of the information to be considered and to provide the recommendations to be used by the Court to make individual allotments . . . ." and providing for Special Master review).

44. Pope, McGlamry undertook significant work throughout MDL-2323 and in support of the Settlement. Pope McGlamry brought individual clients/ class members, including well-respected former NFL players and family members of deceased, well-respected former NFL players, to Philadelphia to participate in the approval hearings.

45. Additionally, the real force behind the settlement of this case was the large number of former NFL players who individually stepped up against the NFL. The firms with the

largest number of clients seem to be overlooked in Mr. Seeger's proposed fee process. Had it not been for firms like ours, there would not have been sufficient pressure on the NFL to reach a settlement. We were instrumental at that time but are apparently forgotten now.

46. Despite Pope, McGlamry's significant, continuous contributions to MDL-2323's prosecution, Mr. Seeger has proposed a so-called "multiplier" of 1 -- effectively no multiplier at all -- to Pope, McGlamry's efficient common-benefit lodestar ($829,030.00), in his apportionment of common-benefit fees.

47. Mr. Seeger has provided no explanation in his declaration as to the reasoning or justification supporting the various multipliers he used in determining the total appropriate fees to be awarded to each participating law firm, including the use of a 0.75 "multiplier" to four firms' lodestar, reducing (instead of multiplying) their actual fees and costs below the amount of time and expenses that they invested in the case. Of the remaining twenty (20) firms, ten (10) firms, including Pope, McGlamry, were assigned a "multiplier" of one (1) – suggesting allocation to cover only their time and expenses, with no increase whatsoever for the risks undertaken, quality of work performed, or extra effort incurred to support the Settlement. Ten (10) firms received multipliers varying from 1.25 all the way up to Mr. Seeger's own self-assigned, highest multiplier of 3.885, which raises his $18 million dollar lodestar to a $70 million windfall. Mr. Seeger undertook this allocation despite acknowledging that the originally submitted lodestar of $40,559,978.60, representing 50,912.39 hours of time, subject to an overall 2.6 multiplier, for all firms' lodestars, resulted in a total fee request of $106,817,220.62. (*See* ECF No. 7151-2 at ¶ 78).

48. Courts have reduced the differentials between multipliers applied to lead counsel and other leadership counsel based on questions of equity and fairness. *See, e.g., In re Gould*

*Secs. Lit.,* 727 F. Supp. 1201, 1207 (N.D. Ill. 1989). Indeed, the requested 3.885 multipliers for Mr. Seeger's firm and 3.55 for Professor Issacharoff are excessive, as "[o]nly in the most exceptional circumstances would this court award a multiplier of 3 or greater." *In re Unisys Corp. Retiree Med. Benefits ERISA Lit.*, 886 F. Supp. 445, 482 (E.D. Pa. 1995). *See also Brytus v. Spang & Co.,* 203 F.3d 238, 243 (3d Cir. 2000) (although multipliers for risk or counsel's expertise can be appropriate in the lodestar cross-check in common fund cases, "they require particular scrutiny and justification") (quoting *In re Prudential Ins. Co. Am. Sales Practice Lit. Agent Actions*, 148 F.3d 283, 341 n. 121 (3d Cir. 1998)).

49.    Mr. Seeger's risk, if any, of non-payment, has been minimal since the inception of MDL-2323. First, MDL-2323 has always involved many highly regarded Plaintiffs' firms, all of which were available to contribute to common-benefit expenses and to share in the risk of non-payment. This was not a typical class action in which a single firm bears substantial risk all alone or with a small number of co-counsel. Moreover, at least since the late-August 2013 Term Sheet included $112.5 million in common-benefit attorneys' fees, Mr. Seeger's risk has been practicallly extinguished. *See In re Diet Drugs (Phentermine/ Fenfluramine/Dexfenfluramine) Prod. Liab. Lit.,* No. 99-20593, 2016 WL 8732314, at *4 (E.D. Pa. May 6, 2016) (although the "risk of non-payment must be judged as of the inception of the action and not through the rosy lens of hindsight," courts "reassess the risk" throughout the litigation).

50.    In contrast, the risk of non-payment for counsel with substantial numbers of individual clients has continued to-date. Moreover, law firms bearing the most risk in this litigation and settlement process – those firms representing large numbers of former NFL players and their families pursuant to individual contingent-fee agreements whose individual contracts are presently in limbo – are being further penalized by the 5% set-aside Mr. Seeger has

requested. As co-lead counsel, Mr. Seeger unanimously determined that this set-aside would be taken out of any existing individual attorney's fee (should such attorney's fee agreement be upheld). (ECF No. 7151-2 at ¶¶ 101-103). Mr. Seeger, whose firm only ever represented a handful of former players, has withdrawn from representing most all clients. (*See, e.g.,* ECF No. 16 (Mr. Seeger's voluntary dismissal of individual case); 5765, 6138, 6629 (three withdrawals from representation of individual plaintiffs by Mr. Seeger). And it does not appear that Prof. Issacharoff has ever had any clients in MDL-2323.

51. Additionally, the Court has now Ordered the Settlement administrator to hold back all fee amounts, pending resolution of individual contingency-fee agreement enforceability issues and the further complication of liens as to NFL Players (and their families) who have hired and fired different counsel through the course of MDL-2323. Thus, the very real risk of non-payment continues for counsel representing individual retired NFL Players and their families, even nearly a year after the effective date of the Settlement.

52. Finally, Mr. Seeger has provided no explanation for why every PSC member firm was not designated as class counsel to administer the settlement in the future. There is no logical explanation for Mr. Seeger's actions in only selecting six (6) PSC member firms to the exclusion of the remaining seventeen (17) PSC member firms. *Cf In re Silicone Gel Breast Implant Prod. Liab. Lit.,* No. CV 92-P-10000-S, 1993 WL 795477, at *9 (N.D. Ala. June 2, 1993) (notice from silicone gel breast implant litigation, explaining that, "[f]or purposes of this settlement, . . . Class members are automatically represented by the members of the Plaintiffs' Steering Committee previously appointed by the Court in MDL No. 926, who are designated to serve as class counsel for the . . . Settlement Class.").

53.     In sum, Mr. Seeger's proposed fee and expense allocation is premature and fundamentally unfair. It should be rejected in favor of the appointment of an independent Special Master to review and address the pending fee issues.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2017, in Atlanta Georgia.

_____
Michael L. McGlamry