UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

MDL No. 2323
Case No. 12-md-2323 (AB)

---

Kevin Turner and Shawn Wooden,
*on behalf of themselves and others
Similarly situated,*

Civil Action No. 14-cv-0029

            Plaintiffs,

    vs.

National Football League and NFL
Properties LLC, successor-in-interest
to NFL Properties, Inc.

            Defendants.

---

THIS DOCUMENT RELATES TO:

ALL ACTIONS

---

**COUNTER-DECLARATION OF CHARLES S. ZIMMERMAN IN RESPONSE
TO PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEY'S FEES,
PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE
CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES.**

I, Charles S. Zimmerman, a Partner at Zimmerman Reed LLP, submit this declaration in

accord with 28 U.S.C. § 1746, based upon my personal knowledge of the matters set forth

herein:

1.      Zimmerman Reed raises five objections to the proposed common benefit fund

allocation: (1) Seeger Weiss subjectively determined the amount of the lodestar multipliers

without compensating law firms who exerted significant effort and incurred substantial risk in the early phases of this case, deeming that Zimmerman Reed should receive no multiplier despite the fact that it took substantial risk, contributed significantly to the litigation, and produced high quality work, (2) Seeger Weiss's proposed multiplier for its own lodestar is disproportionately high, causing a windfall for Seeger Weiss while leaving other contributors undercompensated, (3) the proposed 5% holdback on every Monetary Award is disproportionate and results in double-dipping, (4) the proposed allocation fails to compensate Zimmerman Reed for its post-Effective Date common benefit work authorized by Co-Lead Class Counsel to prevent the spread of misinformation and stop unauthorized solicitations of retained clients, and (5) Professor Issacharoff's lodestar multiplier appears to be unreasonable.

### Zimmerman Reed's Extensive Early Work, PSC Member Efforts, and Measures Taken as the Co-Chair of the Ethics Committee.

2.       My law firm was retained by many former National Football League ("NFL") players before this litigation commenced.  We began our investigation during the litigation of a publicity rights class action against the NFL, *Dryer, et al v. National Football League*, No. 09-CV-2182 (D. Minn. Aug. 20, 2009), during which we noticed unusually high rates of neurological complications amongst former players.  We met with Dr. Bennet Omalu – who, at that time, had only recently discovered the link between NFL football and the development of CTE – and other key figures in the science of NFL head injuries to discuss the long-term effects of head injuries in the NFL.  We also organized early meetings between attorneys looking to assist players in a concerted action against the NFL.  In addition, we met in person and via teleconference, with Jason Luckasevic throughout early 2011 to explore potential legal and factual claims and scientific theories.

3.     By December 2011, we formulated a case theory and filed our first complaints, and filed numerous subsequent complaints thereafter.  By the end of 2012, more than 400 players had retained our firm.  We filed complaints on behalf of nearly 350 former NFL players.  Retired players continued to retain us throughout the course of the litigation against the NFL, as we pursued a coordinated strategy to build a "critical mass" of individual complaints to pressure the NFL to work towards a common solution.

4.     On December 5, 2011, Zimmerman Reed, Hausfeld, PLLC, and Anapol Weiss convened for the first organizational meeting of counsel in this litigation at Hausfeld's Washington DC offices.  There, we agreed upon a strategy of consolidating related cases in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1407.  This strategy was successful with the case being consolidated before this Court.

5.     After the formation of the MDL, I sought and was appointed to the Plaintiffs' Steering Committee ("PSC").  My firm and I worked at the request of Lead Counsel on a variety of matters, including researching and drafting related to the NFL's motion to dismiss on preemption grounds, meeting with experts regarding a medical monitoring protocol, participating in leadership strategy meetings and activities, coordinating the participation of players for public relations and other efforts, and acquiring information necessary for settlement efforts.

6.     Throughout the litigation, and especially in the pre-Settlement stage of this case, Co-Lead Class Counsel, the PSC, and the Plaintiffs Executive Committee ("PEC") worked effectively together to pursue this action against the NFL.  Consistent with our coordinated strategy, the substantial number of individual cases filed against the NFL did reach a critical mass, leading to settlement negotiations and drawing nationwide media attention.  Part of that critical mass included Zimmerman Reed's 337 filed cases and over 400 retained clients.

Zimmerman Reed undertook significant risk in filing these individual claims, hoping to pursue a common solution but prepared to litigate individual cases through trial and appeal.  Eventually, by the work of the PSC, PEC, Co-Lead Counsel, and the leadership of Chris Seeger, the Parties agreed upon a landmark settlement, obtaining a remarkable benefit to former players.

7.       Zimmerman Reed's work did not end after the Settlement was announced. Rather, my firm, in conjunction with Pope McGlamry, discovered significant confusion among the class concerning the substance of the Settlement and the relationship between law firms and their clients.    Some attorneys, law firms, and other organizations were apparently misrepresenting the Settlement benefits and misleading former players as to their attorney-client relationships.   Additionally, Zimmerman Reed learned of attempts by some entities to provide unfair pre-Settlement loans and advances.

8.       During a meeting between the PSC and Co-Lead Counsel in late 2013, I raised my concerns about the inappropriate solicitation of retained clients by unscrupulous attorneys, efforts to mislead players as to the benefits of the Settlement, and unconscionable pre-Settlement advanced loans and purported assignments.   To remedy those concerns, Co-Lead counsel requested that Zimmerman Reed form an Ethics Committee and I was appointed Co-Chair by the PSC.   I sought to identify the entities contributing to the confusion, drafted reports and summaries for Co-Lead Counsel, and when authorized by Co-Lead counsel, sent cease and desist letters to wrongdoers.   From 2013 up until early this year, I urged Co-Lead Counsel to address these issues, as former players were growing increasingly confused as to who represented them, the role of PSC attorneys, and the qualifications for and benefits of the Settlement.   Additionally, I raised the growing issues with wrongful terminations of attorney-client relationships based on misleading tactics and unethical conduct by certain law firms attempting to grow their client

base.  In early 2017, Zimmerman Reed prepared a memorandum identifying the law firms and other organizations spearheading efforts to mislead players and solicit retained players.

9.  Zimmerman Reed's memorandum to Co-Lead Counsel included information about the number of client terminations among the PSC firms caused by improper solicitation, misrepresentations, and wrongful guarantees.  Zimmerman Reed alone was terminated by 71 clients - mostly due to what I consider the improper conduct of other attorneys.  Recently, as former players learned the extent of the misrepresentations made to them, Zimmerman Reed and other firms have had several former clients return to their original firm.  Had action been taken sooner, the detriment to former players' claims and our attorney-client relationship, and players' misunderstanding of the Settlement could have been prevented.  Zimmerman Reed, at a minimum, helped identify the growing confusion among players and ensure the merits of the Settlement were better understood.

10.  Eventually, a lawsuit was finally filed against one entity, RD Legal Funding, who offered purportedly unconscionable loans to former players.  That action was brought by the Consumer Finance Protection Bureau and the New York attorney general.  Following that action, a New York Times article highlighted questionable practices by attorneys and lenders in the aftermath of the NFL Concussion Settlement.[1]  The article prompted this Court's September 19, 2017 hearing on the extent of the misleading loan practices.  Seeger Weiss is now taking action against certain entities, some of whom had long been identified by my firm as wrongdoers.

11.  Zimmerman Reed continues to represent a significant number of former players, assisting these players in obtaining necessary medical testing, scheduling and preparing for BAP testing and MAF examinations, and finalizing and submitting claims for Monetary Awards.

---

[1] *See* Ken Belson, *After N.F.L. Concussion Settlement, Feeding Frenzy of Lawyers and Lenders*, NY Times (July 16, 2016).

12.     On March 4, 2016, Zimmerman Reed unilaterally and voluntarily reduced our contingency fee on all our retainers from 33% down to 20%. We made this adjustment in part to reflect that some of our effort on behalf of retired NFL players in the litigation contributed to the common benefit of the class, and would be compensated during allocation of the common benefit fund.

13.     Both entering into individual contingency contracts and contributing to the common benefit are common practices in comparable other cases,[2] and firms are often fairly compensated for both their individual and common benefit efforts. The Ethics Subcommittee, which I co-chaired, repeatedly, and for the past several years, raised the issue of attorneys' fees with Co-Lead Counsel, requesting they raise the issue of the interplay between common benefit fees and retainer contract fees with the Court to give clarity and comfort to the Class. Since Co-Lead Counsel did not seek guidance from the Court to address the interplay between common benefit and retainer contract fees, Zimmerman Reed acted unilaterally to protect and give comfort to its clients by reducing its retainer agreement fees from 33% to 20%.

### The Common Benefit Fund Fee Allocation

14.     On October 12, 2017, Seeger Weiss submitted a declaration proposing an allocation of the Common Benefit Fund of $107,735,097.27 among twenty-three law firms, two objector firms, and one expert contributing to the common benefit of the class of former NFL players. The proposed allocation compensates participating law firms by applying a proposed multiplier against the firms' adjusted lodestar to determine the total compensable amount allocated to each firm from the common benefit fund. The multipliers range from 0.75 to 3.885.

---

[2] *See, e.g.*, *In re Vioxx*, 760 F.Supp.2d 640, 658 (E.D. La. 2010); *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, No. MDL 05-1708 DWF/AJB, 2008 WL 682174, at *15 (D. Minn. Mar. 7, 2008).

15.     According to Seeger Weiss's report to the Court, the entire adjusted lodestar necessary to bring this action, settle the case, and implement the Settlement is $39,223,974.85. The average lodestar per contributing firm (including Professor Issacharoff) is approximately $1.5 million.   That number is significantly skewed by Seeger Weiss's lodestar, which, at $18,124,869.10, accounts for almost half of the entire total lodestar.   Nineteen law firms and Professor Issacharoff submitted lodestar for less than $1 million each.   The remaining five firms submitted lodestars between $1 million and $5 million.   Anapol Weiss, the other Court-appointed Co-Lead Counsel along with Seeger Weiss, had a total lodestar of $1,857,436.00, barely ten percent of Seeger Weiss's total lodestar.   This striking lodestar is but one example demonstrating Seeger Weiss reserved the work in this case for itself, while excluding other Lead Counsel, PSC and PEC members who were eager to participate.

16.     The multipliers Seeger Weiss proposes are similarly disproportionate.   Seeger Weiss proposes it receive a lodestar multiplier of 3.885.   By contrast, the remaining firms would receive an average multiplier of 1.2068.   Seeger Weiss has proposed nineteen of the twenty-four contributors receive a multiplier of 1.5 or less.   Only three other firms would receive a multiplier above 2.0.   The only other entity to receive a multiplier greater than 3.0 is Professor Issacharoff, whose role in this case began later.   when the case posed lessrisk.   Seeger Weiss has proposed that Zimmerman Reed, despite its substantial effort and risk undertaken even before this litigation commenced, should receive only a 1.0 multiplier, which, of course, is no multiplier at all.

### The Criteria Seeger Weiss Used to Calculate Proposed Multipliers Does Not Adequately Compensate Contributors for Their Efforts and Risk Undertaken, Pre-Settlement.

17.     Seeger Weiss's proposed multipliers are based on its own subjective view of each firm's contribution, and plainly do not recognize the contributions of the firms appointed to

7

leadership positions, and includes absolutely no consideration of pre-Settlement efforts. According to Mr. Seeger's Declaration, he determined each firm's lodestar multiplier "[b]ased on [his] assessment of the relative value of each of the firms' contributions."  Declaration of Christopher A. Seeger at ¶ 5, Oct. 10, 2017, ECF 8447 ("Seeger Decl.")  Mr. Seeger's allocation purportedly considered only three factors: (1) Roles in leadership, (2), the point at which a firm's claimed common benefit contributions were made, and (3) contributions to the Settlement.  *Id.* at ¶ 14.

18.    Under Mr. Seeger's proposed allocation, the pioneers of this case whose early efforts and representation of large numbers of players provided the critical mass and laid the groundwork for the landmark Settlement are not recognized for that effort.  Firms, including Zimmerman Reed, undertook substantial risk when they filed the first cases, investing significant time and effort on behalf of both their individual clients and the Class as a whole, in spite of serious risk and uncertainty.  The early concerted effort obtained a critical mass of plaintiffs, pursuant to our coordinated strategy, that legitimized the lawsuit, brought national media attention, and paved the path towards the Settlement.  *See e.g. In re Diet Drugs*, 582 F.3d 524, 547 (3d Cir. 2009) ("the number and cumulative size of the massed cases created a penumbra of class-type interest on the part of all litigants and of public interest on the part of the court and the world at large.").

19.    Risk taken at the outset of a case is a critical factor in determining any fee allocation.  *See id.* at 542 ("The court should "evaluat[e] the risk of nonpayment as of the inception of the action and not through the rosy lens of hindsight." (internal quotations removed));  *In re Vioxx*, 760 F.Supp.2d 640, 658 (E.D. La. 2010) ([T]hese factors primarily deal with the expectation of plaintiffs' attorneys at the *outset of the case* when measuring the risks

involved and deciding whether to accept the case.  In effect, these factors seek to reward the attorney for accepting the risk and achieving successful results." (internal quotations removed) (emphasis added)).

20.    Seeger Weiss was not materially involved in this case until after it was already consolidated before this Court by the Judicial Panel for Multidistrict Litigation.  Because of its limited involvement in the early stages of this case, Seeger Weiss cannot adequately gauge those early efforts and risk.  And, in fact, Mr. Seeger did not consider those efforts at all.  For that reason, those firms involved early in this litigation almost exclusively received multipliers less than 2.0, and many, including Zimmerman Reed, received no multiplier.  The early pioneers of this case are therefore significantly undercompensated for laying the groundwork for the litigation overall, for the risk involved in bringing and organizing the first cases, for building the critical mass that created an interest on the part of all litigants eventually leading to this settlement, and for raising national awareness of the CTE epidemic.

21.    Zimmerman Reed did not ask, and is not asking here, for compensation for its work on any of its individual cases, which will be compensated, if at all, through individual contracts if and when its individual clients qualify for monetary compensation in the Settlement. Rather, Zimmerman Reed is requesting consideration of the risk it incurred and common benefit it provided by filing a sizable number of individual cases as part of a common strategy designed to pursue a common remedy for the entire class of former players.  These efforts warrant a reasonable multiplier on Zimmerman Reed's common benefit time, which Seeger Weiss has deemed to be reasonably expended and compensable on behalf of the Class as a whole.

### *Seeger Weiss's Multiplier is Unreasonably High.*

22.    Mr. Seeger's Declaration proposes a 3.885 multiplier for his firm, swelling an already sizable $18,124,869.10 lodestar into $70,415,116.45.   By comparison, the average multiplier for the remaining twenty-two contributing firms (excluding Professor Issacharoff) is 1.2068, resulting in a combined total compensation of $34,478,161.44.  That is over a 2:1 ratio in favor of Seeger Weiss.

23.    Seeger Weiss, and Chris Seeger specifically, undoubtedly made important contributions to this litigation and to the ultimate Settlement, as is reflected in its substantial lodestar.  However, "any given attorney should receive neither too little nor too much of an award as compensation."  *In re Sulzer*, 268 F. Supp. 2d 907, 922 (N.D. Ohio 2003).  Even with Seeger Weiss's important contributions to this litigation, the significant portion of the fund it would receive under its proposal results in an unwarranted windfall.   More importantly, overcompensating Seeger Weiss for its role undercompensates and undervalues the work of other contributors.

24.    When a party has an already large lodestar, applying a large multiplier, especially one several times larger than any other law firm, creates the risk of inappropriate compensation. As one court noted, "[w]here there are large economies of scale to consider . . . a slight multiplier is justified; however, anything more than a slight multiplier would result in an unreasonable large attorney fee and/or would promote providing windfalls."  *In re Guidant Corp.*, , 2008 WL 682174, at *15.  Mr. Seeger's proposal raises the same concern.  Due to his multiplier, Seeger Weiss receives over $50 million more than its already significant lodestar, while other contributors to this action receive minimal, or zero, multipliers.

25.     Again, Seeger Weiss' lodestar is at least four times greater than every other applicant; and, under its own proposal, it would receive the highest multiplier by far.  The next highest multiplier for any law firm is 2.5 for Anapol Weiss, who was Co-Lead Counsel with Seeger Weiss.  If accepted, Seeger Weiss would receive over sixty-five percent of the total common benefit fund despite having less than fifty-percent of the lodestar.  In fact, it would receive almost double the amount of all other applicants combined.  To put things in further perspective, Mr. Seeger's proposal requests a total of $68,358,989.93 as risk compensation or multiplier surplus (*i.e.* fees awarded above the lodestar expended), and of this, Seeger Weiss seeks $52,290,274.35 or more than 75% of the total multiplier surplus requested.  This, when the overwhelming majority of all work done by Seeger Weiss was done after Settlement during a time when the action posed significantly reduced risk.

26.     Seeger Weiss deserves to be well compensated for its outstanding work on this case and in obtaining a Settlement that provides significant benefits to Class members. However, its compensation should not so significantly undermine the value that other firms contributed to this case, especially when Seeger Weiss's lodestar is built upon a disproportional distribution of workload.

27.     Because of Seeger Weiss's disproportionate multiplier, the remaining contributors receive a slight average lodestar multiplier of 1.2068, which includes fourteen firms who would receive a multiplier of 1.0 or less.  Some of those firms, like Zimmerman Reed, bore significant risk in bringing this litigation and the individual cases against the NFL.  A 1.0 multiplier does nothing to compensate the firms who absorbed the early risk of this case when the novelty and facts of the case made any Settlement far from certain.  Simply put, saying these firms deserve no multiplier diminishes the role the firms played in achieving the great result in this case.

Seeger Weiss is not solely responsible for the successful outcome here.  Rather, the PSC and PEC, in conjunction with Co-Lead Counsel, collaborated, fought together, and risked capital, time, and effort to achieve this benefit for former players.  These law firms each deserve reasoned and appropriate compensation for shouldering the risk of this case.  However, Seeger Weiss's unreasonably high requested multiplier – more than triple the average multiplier for every other contributing firm – precludes other contributors from adequate compensation.

### *The 5% Fee Withholding Is Unreasonable.*

28.     In addition to seeking 65% of the Common Benefit fund, Seeger Weiss also requests a 5% holdback on every single player's Monetary Award, purportedly to cover expenses and lodestar related to the Settlement Administration after January 7, 2017.  Zimmerman Reed raises three objections to the holdback: (1) the size of the holdback is disproportionate to the projected future work, (2) the holdback creates a fund with no mechanism of returning unused portions, and (3) former players with a pre-Effective Date diagnosis should not be required to contribute to the fund because they receive little or no benefits from post-Effective Date Settlement Administration efforts.

29.     The purpose of the 5% holdback is purportedly to fund future common benefit work related to the administration of the Settlement.  If the estimated value of the Settlement holds true, the total holdback fund will likely equal approximately $50 million.  This holdback fund will be nearly half of the entire common benefit fund available for litigating the case.  Such a massive fund needs to be justified by transparent accounting showing an absolute need for the significant amount of additional money, which Mr. Seeger seeks to take directly from players and their individual lawyers.  Indeed, the Seeger Declaration lists the post-Effective Date lodestar, including 6830.00 hours resulting in $4,692,414.50.  This amount includes costs and

12

hours expended in initiating the BAP and MAF processes, providing class notices, and ensuring class members are fully registered.  Many of those efforts should not need much repetition.  The result is a potentially significant disproportion between the lodestar and the value of the holdback fund.

30.     Because the value of the proposed holdback fund is likely to be greater than the amount necessary to ensure the continued administration of the Settlement, a system must be put in place to ensure that money from the holdback fund is properly allocated and any unspent money is returned to those who contributed to the fund.  The unused amount of holdback funds is regularly reimbursed to the beneficiaries who initially gave it up as part of their claim.  *See In re Zyprexa Prod. Liab. Litig.,* 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006) ("Any amount remaining in the common benefit fund after all claims on it have been settled will be returned on a pro rata basis to the individual attorneys who paid a portion of their fees into the account.").  Mr. Seeger has proposed no mechanism for pro-ration and return of the unused portions of the 5% holdback.  Without any mechanism to return unspent holdback funds, Seeger Weiss will inappropriately receive most or all of the excess amount of the holdback fund without making any contribution to the common benefit, or anyone's benefit.  That is the definition of a windfall.

31.     Accordingly, Zimmerman Reed requests that a system be established to refund all unspent holdback amounts on a pro-rated basis.  The returned portion of the fund should be pro-rated according to the proportion each law firm paid into the fund through its attorney's fees, and to players without attorneys who paid into the fund through their monetary awards.  This process should be overseen by the Special Master, or this Court, who should review and approve all requests for compensation from the holdback fund.  Independent oversight will ensure all

expenses funded from the holdbacks were necessary for the Settlement's administration, and that any unearned portions are returned to those from whom the funds were originally taken.

32.     Finally, Zimmerman Reed requests that there be no 5% holdbacks on any claims until January 7, 2019.  A majority of former players receiving approval for a Monetary Award within the first two years of the Settlement are those who received a Qualifying Diagnosis prior to the Effective Date, or otherwise during a time that attorneys seeking to capture the 5% holdback are already being compensated for their time from the common benefit fund.  As such, they did not and will not benefit from any of the post-Effective Date "common benefit" work. For example, players with pre-Effective Date diagnosis will not benefit from the effort to select Qualified MAF physicians and BAP clinics, and any BAP oversight.  Therefore, those players should not be required to contribute to the holdback fund.

### *Zimmerman Reed Was Not Compensated For Its Post-Settlement Efforts.*

33.     Mr. Seeger, in his declaration, recognized that hours spent "to combat the dissemination of misinformation to class members and other forms of exploitation of class members" were compensable.  Seeger Decl., at ¶ 20(h).

34.     Zimmerman Reed not only contributed to this effort, it created this effort *ab initio*.  Before any action was taken by Seeger Weiss, Zimmerman Reed, as founder and Co-Chair of the Ethics Committee, frequently raised its concerns to Co-Lead Counsel about misinformation and confusing communications being directed to former players.  Zimmerman Reed collected information from other PSC and PEC members in order to identify the source of misleading communications.   Where necessary, and when authorized by Co-Lead Counsel, Zimmerman Reed sent cease and desist letters to the wrongdoers.  Zimmerman Reed also drafted a memorandum for Co-Lead Counsel detailing the information it collected.  This information

14

was provided to Co-Lead Counsel prior to Seeger Weiss's own efforts to prevent the spread of misleading information.

35.    The issues Zimmerman Reed first raised in 2013 and continued to raise after have ballooned into a significant problem in the Settlement's administration, as evidenced by a separate lawsuit against RD Legal Funds and this Court's hearing on the matter.  Players have been exploited and mislead.  Zimmerman Reed helped identify the wrongdoers and participated in the *only* effort, at the time, to remedy player confusion and stop misleading information.  Fortunately, the issues Zimmerman Reed first raised and worked to remedy are now being addressed by this Court.

36.    Zimmerman Reed submitted its post-Effective Date lodestar to Seeger Weiss, at Seeger Weiss's request, on September 15, 2017.  This time included 160.30 hours amounting to $128,209.50 of work.  After requesting this time be submitted, Mr. Seeger did not include Zimmerman Reed's time in his declaration, nor did he provide any reason for excluding it.  Zimmerman Reed requests this time be compensated from the common benefit fund, or alternatively, from the holdback fund.

### *The Proposed Multiplier for Professor Issacharoff Is Unreasonable.*

37.    Zimmerman Reed objects to the substantial multiplier Seeger Weiss proposes be awarded to Professor Issacharoff.  Professor Issacharoff is an expert with knowledge in "appellate advocacy and . . . class action jurisprudence."  Seeger Decl. at ¶ 15(j).  He assisted Seeger Weiss during the Settlement Appeal process before the Third Circuit and U.S. Supreme Court.  Under Seeger Weiss's proposal, Professor Issacharoff would receive a multiplier of 3.55, multiples higher than any of the contributing law firms other than Seeger Weiss.

15

38.     Professor Issacharoff does not appear to have a contingent relationship with Co-Lead Counsel for its work on this case.  In his fee petition, Professor Issacharoff indicated he was submitting "lodestar calculations . . . based on current billing rates for non-contingent work."  Samuel Issacharoff Decl. at ¶ 4, February 13, 2017, ECF 7151 Ex. O.  If Professor Issacharoff's work was not done on a contingency basis, he should receive no multiplier because he bore absolutely no risk: he would have been paid regardless of the result

39.     Even if his fee was contingent, however, Professor Issacharoff carried far less risk than those firms involved in this case since its inception.  Professor Issacharoff did not contribute to this matter until after Settlement negotiations and appeal.  The point of Settlement, where the Parties are actively attempting to reach and defend an agreement, presents far less risk than the start of litigation where the possibility of Settlement is speculative at best.  As such, an attorney facing low – or no – risk should not receive a multiplier before a founding law firm in this litigation, who undertook substantial risk.

40.     In conclusion, Zimmerman Reed respectfully requests that this Court:

- Reduce the lodestar multipliers of Seeger Weiss and eliminate, or reduce, the multiplier of Professor Issacharoff;

- Provide fair multipliers to firms who contributed to this litigation from its inception;

- Limit the amount of any holdback fees to cover only the reasonably expended and earned fees and expenses;

- Create a mechanism to return unearned portions of any holdback fund to those from whom they were taken;

- Order that holdback funds only be taken from monetary awards after January 7, 2019;

- Order that Zimmerman Reed receive a lodestar multiplier of 2.0 or greater;

- Compensate Zimmerman Reed for its post-Effective Date efforts.

16

I swear under penalty of perjury that the foregoing is true and correct.


October 27, 2017                          s/ Charles S. Zimmerman
                                          Charles S. Zimmerman