## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | |
| LEAGUE PLAYERS' CONCUSSION | § | |
| LITIGATION | § | |
| _____ | § | **No. 12-md-2323 (AB)** |
| | § | |
| | § | **MDL No. 2323** |
| **THIS DOCUMENT RELATES TO:** | § | |
| **ALL ACTIONS** | § | **Hon. Anita Brody** |

## DECLARATION OF LANCE H. LUBEL

Pursuant to 28 U.S.C. § 1746, I, Lance H. Lubel, hereby declare and state the following:

1. <u>Introduction</u>.  My name is Lance H. Lubel. I am an attorney licensed to practice in the State of Texas and have been so licensed since 1991.  I am a founding partner of Lubel Voyles LLP and counsel to numerous former NFL players involved in this MDL, including the "Alexander Objectors."

2. <u>Purpose</u>.  I am submitting this Declaration in response to the Court's October 11, 2017, Order regarding counter-declarations to the Declaration of Christopher A. Seeger in Support of Proposed Allocation of Common Benefit Attorneys' Fees ("Seeger Declaration").

3. <u>Pending Motions and Objections</u>. I have filed several motions related to requests for attorneys' fees awardable under the settlement agreement. These motions, which remain pending, include the following:

(i) *Motion for Entry of Case Management Order Governing the Application for Attorneys' Fees, Cost Reimbursement and Set-Aside* (ECF 7176).  This motion was filed February 21, 2017.  The primary purpose of the motion was to obtain an order establishing "the appropriate time [for motions for an award of attorneys fees and reasonably incurred costs] to be determined by the Court", as stated in Section 21.1 of the Settlement Agreement.  In the motion, I noted that applications for fees exceeded the $112.5 million agreed to by the NFL; that Co-Lead Class Counsel was seeking the entirety of the $112.5 million; and that the Court is facing complicated questions in connection with fee applications, *e.g.*, the proper fee-analysis methodology, the proper methodology for establishing the value to the class, the proper method of review by the Court, whether a fee award is premature, and the

propriety of a proposed set-aside (*Id*. at 3-6). Accordingly, I requested the Court establish the Section 21.1 deadline for fee applications and enter a Case Management Order scheduling objections, requests for information among counsel, and briefing. The intent was to establish a process pursuant to which the Court could vet the reasonableness of all fee requests through careful consideration of supportive evidence and in light of any objections (*Id*. at 6). Neither Co-Lead Class Counsel nor any other party filed a response to the motion. The motion remains pending.

(ii)   *Motion for Leave to Serve Fee-Petition Discovery*. (ECF 7534). This motion was filed April 21, 2017. Co-Lead Class Counsel Responded on May 5, 2017 (ECF 7606, p. 15). In the motion, I submitted that the Court has insufficient information to perform the Third Circuit's "thorough review" of Co-Lead Class Counsel's fee application for an award of $112.5 million and an additional 5% from every Class Member. For that reason, I requested leave to serve 19 requests for production under Fed. R. Civ. P. 34 seeking information supporting the requested award. To date, the Court has not ruled on the motion.

(iii)   *Motion to Compel Compliance with Case Management Order No. 5* (ECF 8396). This motion was filed September 20, 2017. Co-Lead Class Counsel Responded on October 4, 2017 (ECF 8440), and a reply was filed October 12, 2017 (ECF 8449). By this motion, I asked the Court to compel counsel who intend to seek attorneys' fees and expense reimbursements to file the Quarterly Reports contemplated by CMO 5, together with the underlying summary time and expense report forms. Through CMO 5, which was entered five (5) years ago, the Court established a fee and expense protocol that set forth compensable categories of fees and expenses, required contemporaneously record-keeping, and quarterly reports be submitted to the Court (ECF 3710). The Court stated the purpose of CMO 5 was to "guide the payment of fees and expenses to attorneys performing common-benefit work" and "help ensure this matter is efficiently prosecuted for the benefit of former-player plaintiffs without unnecessary duplication or undue costs or fees). Now, the Court is faced with Co-Lead Class Counsel's request for millions in fees and expenses, but has no basis upon which to ensure Co-Lead Class Counsel satisfied those objectives because Co-Lead Class Counsel does not want the subject reports and data made public. This motion, too, remains pending.

Prior to the Court ruling on Co-Lead Class Counsels' application for fees or their proposed allocation, I respectfully request the Court rule on the above-referenced motions.

4.   I have also filed responses and objections to Co-Lead Class Counsels' fee application, as well as the evidence offered in support of their thereof:

(i)   *Response in Opposition and Objections to Co-Lead Class Counsel's Petition* (ECF 7354, 7355). This response/objection was filed on March 27, 2017. At that time, I noted that Co-Lead Class Counsels' application—seeking $112.5 million in fees and expenses, a bonus, and future fees—was premature, given that no settlement class member had received any compensation under the settlement (*See, e.g.*, ECF 7355 at 11-12, 15-19). I also objected

2

on the basis that the application is unsupported by evidence and based on speculative data and flawed methodology regarding the "size of the fund" and the "number of persons benefited" (*See id*. at 12-13, 30-36, 47-52). For example, I noted Co-Lead Class Counsel's failure to submit reliable data supporting the forecasted compensable diseases under the settlement, including the fact that there is no published literature or research on the non-terminal neurocognitive disorders "Level 1.5" and "Level 2"—creatures of the settlement—even though those "qualifying diagnoses" make up almost one-half of the projected beneficiaries of the settlement (*Id*. at 35). I also submitted evidence from an economist, Dr. Kenneth G. McCoin, demonstrating that the "percentage of the fund" requested as a fee by Co-Lead Class Counsel is approximately 23% of the present value of the alleged fund, not 9% as claimed by Co-Lead Class Counsel (*Id*. at 38-40). And, I lodged specific objections to the declarations submitted in support of Co-Lead Class Counsels' application, as well as objections to the proposed 5% set-aside (*Id*. at 53-67).

(ii)     *Response and Objection to Supplemental Evidence Offered in Co-Lead Class Counsels' Omnibus Reply* (ECF 7533). This response/objection was filed April 21, 2017 in connection with new evidence offered by Co-Lead Class Counsel in their omnibus reply brief (ECF 7464). In their reply, for example, Co-Lead Class counsel offered a new, revised analysis from Dr. Thomas Vasquez regarding the purported value of the biggest component of the settlement, the Monetary Award Fund, or MAF (*See id*. at 18-19; Ex. JJ ("An Updated Analysis of the NFL Concussion Settlement"). In the response, I noted Dr. Vasquez's revised analysis suffers from several analytical gaps and provides no basis to value the MAF (*See, e.g*., ECF 7533 at 1-4). For example, in his revised analysis Dr. Vasquez claimed to be able to compute the probability that a former NFL player will contract "each one of the compensable injuries through an epidemiological risk equation." Dr. Vasquez, however, has not actually performed an "epidemiological risk equation" for Level 1.5 or Level 2 because there is no epidemiological data for Level 1.5 or Level 2 Qualifying Diagnoses. These diagnoses are creations exclusively of and defined entirely by the settlement. Dr. Vasquez's estimated rates of incidents are based on dementia studies, which he used as a surrogate or a "proxy" to Level 1.5 and Level 2. But, as noted in the Declaration of Jamshid Lotfi, MD., which I attached to the response/objection, the diagnosing criteria for dementia and Level 1.5 or Level 2 are "materially different," and the dementia studies are not reliable sources for predicting how many former players will have Level 1.5 or Level 2 diagnosis (ECF 7533, at Ex. A, ¶¶ 4-5). Finally, I also lodged specific objections to the supplemental and additional declarations submitted by Co-Lead Class Counsel (ECF 7533 at 7-10).

(iii)     *First Supplement in Support of the Alexander Objectors' Objections to and in Opposition to Co-Lead Class Counsel's Petition* (ECF 8395). This supplemental objection adopted by reference the June 15, 2017 Status Report (ECF 7827)—the most recent such report stating only two (2) claims had been approved (but not funded)—as evidence that the guess about the size of the MAF is both premature and unreliable. Co-Lead Class Counsel's response

was filed October 4, 2017 (ECF 8440, at 6),[1] and a reply was filed on October 12, 2017 (ECF 8449).

Prior to the Court ruling on either Co-Lead Class Counsels' application for fees or their proposed allocation, I respectfully request the Court rule on the above-referenced objections.

5.    Propriety of the Requested Fee Award and Allocation.  In short, and for the reasons briefed in detail in the above-referenced pleadings, which are incorporated herein by reference, it is my opinion that it is premature for the Court to determine either the total amount of attorneys' fees to be awarded or the proper allocation thereof, given Co-Lead Class Counsels' failure to (i) establish the total value of the settlement, (ii) demonstrate with reasonably particularity the total number of the class members that will benefit from the settlement, and (iii) demonstrate that the fee requested—$108,035,097[2] *plus* 5% of every class member's settlement (or approximately $45,000,000 using Co-Lead Class Counsels' math)[3]—is reasonable.[4]   The forecasts and projections regarding the size of the MAF provided by Co-Lead Class Counsel and the NFL Parties are speculative and unreliable (*See, e.g.*, ECF 7533 and Ex. A).  The percentage of fees relative to the total value advanced by Co-Lead Class Counsel is approximately 23% rather than the 9% claimed by Co-Lead Class Counsel (*See, e.g.*, ECF 7355 and Ex. A).[5]  And, if the Court approves

---

[1] In their response, Co-Lead Class Counsel complained I was relying on a "three month old" report. That report, however, was the only report Co-Lead Class Counsel filed.  In fact, I requested updated claims processing information by email from Chris Seeger and Sol Weiss on September 20, 2017 and October 19, 2017, but received no response. *See* Exhibit A.

[2] ECF 8447 at 5.

[3] ECF 7355.  That is, $45 million for relatively risk-free post-settlement administrative work.

[4] Reasonableness is the touchstone of a fee award.  Reasonableness applies to both the size of fund, as well as the allocation therefrom.  *In re Agent Orange Prods. Liab. Lit*., 818 F.2d 216, 223 (2d Cir. 1987).

[5] 23% is clearly excessive in comparison to other fee awards.  For example, Brian T. Fitzpatrick, who submitted a declaration in support of Co-Lead Class Counsels' proposed allocation in this

Co-Lead Class Counsels' fee application, the fee award would be almost double what the Class Members have been paid as of October 4, 2017 (ECF 8440, at 7 and Ex. 1).[6]  *See e.g. Int'l Metals Corp. v. Waters*, 530 U.S. 1223, 1224 (2000) (O'Connor, J., concurring in denial of petition for certiorari) (noting that once the claims were ultimately paid from the reversionary fund, the fee award approved by the District Court was more than twice the amount of the class' actual recovery but, because the issue was waived, the Court could not reach the question whether there must at least be some rational connection between the fee award and the amount of the actual distribution to the class).

6.      As I have stated in various filings referenced above, Co-Lead Class Counsel are rushing the Court to rubber-stamp an enormous fee—aggregately, more than $150 million—before a track record of success has been established.  The "degree of success," however, is "*the most critical factor* in determining the reasonableness of a fee award."  *See In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, on April 20, 2010, 2016 WL 6215974, *1086 (E.D. La. Oct. 25, 2016) ("*Deepwater Horizon*"), citing, *e.g.*, *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). "Success," in this context, is not determined solely by the gross amount of the recovery, but also "by the number of individuals who benefit from the class settlement" and "the degree to which it provides them full compensation for their injuries."  *Id.*, citing, *e.g.*, *In re Vioxx*, 760 F. Supp. 2d

---

case, testified in *Deepwater Horizon* that the average and median fee awards in "super-mega-fund" cases (those with a recovery exceeding $1 billion) were 9.92% and 7.4%, respectively. *See In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, on April 20, 2010, 2016 WL 6215974, *1083 (E.D. La. Oct. 25, 2016) ("*Deepwater Horizon*"); *see also In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 662 (E.D. La. 2010) (concluding 6.5% of $4.85 billion settlement was reasonable); Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 385 (2014) ("[I]n settlements between $190 million and $900 million, fees between 10% and 12% have been allowed").

[6] The $75 million Seeger seeks for his firm alone exceeds the amount paid to the class members as of October 4, 2017.

at 657-58.  While the alleged "$1+ billion" settlement in this case might look good on paper to some, the number of class members who will actually benefit from the settlement remains to be seen. Setting aside the flaws in Co-Lead Class Counsels' estimates and projections, according to the Claims Administrator, of the 20,000+ registrations, only 104 Notices of Monetary Awards have been issued (ECF 8440-1).[7]  To put that and Co-Lead Class Counsels' fee application in context, Class Counsel in *Deepwater Horizon* waited more than four (4) years after settlement— and after $9 billion (on 133,000+ claims) of a $13+ billion recovery had been paid—before applying for their $555 million fee (4.3%). *See Deepwater Horizon*, 2016 WL 6215974 at *1051, 1081-82, 1086.[8]  Similarly, in *Vioxx*, the issue of common benefit fees was decided *after* Merck

---

[7] The NFL data submitted to Special Master Golkin forecasted 665 *paid* claims in year 1. *See* 6168-6 at 2, 6168-7 at 4. Thus, less than 15% of the number of claims the NFL forecasted would be paid in year 1 have been approved.  Three of my firm's clients filed claim packages almost four (4) months ago.  Although no deficiencies in their claims packages, none have received a determination other than "eligible" for a monetary award.  One has been waiting assignment to a panel member of the AAP for over 105 days, one was recently assigned to a panel member after waiting approximately 90 days, and another has been awaiting assignment for about 45 days.  It is conceivable these three (3) claims will take more than six months to process after filing complete claim packages.

[8] Unlike this case, where no depositions were taken, no formal discovery was completed, and no substantive issue had been ruled upon at the time of settlement's announcement, *Deepwater Horizon* involved an "immense amount of work," including extensive discovery involving hundreds of deposition and the review of millions of pages of documents; trials; appeals, *etc*. Indeed, in that case, counsel expended approximately 527,000 hours of common benefit work in connection with hundreds of fact and expert depositions; reviewing over 90 million pages of documents, housed in 15,500 square foot depository with 70 dedicated computer workstations; two trials and 90 appeals to the 5th circuit; and numerous other matters completed for the common benefit of the class.  *See id*. at *1055-58, 1078, 1085. "Many common benefit attorneys … move[d] to New Orleans and devote[d] their entire practice to [the] MDL for years."  *Id*. at *1085.

Moreover, in that case, the more than $20,000,000 in "hold-backs" (like the requested 5% set-aside requested here) were ultimately returned such that no business, individual, or local governmental authority (nor their own individually-retained attorneys) were required to make any common-benefit cost contribution or pay any common benefit fee. *Id*. at *1060.

had paid out more than \$4.3 billion to over 32,000 claimants. *In re Vioxx*, 760 F. Supp. 2d at 646, 658.[9]

7.      Even if the Court is inclined to award some fee at this time, the process by which the attorneys' fee application process is currently proceeding places the cart before the horse.  The Court should first determine the appropriate aggregate award and then determine the appropriate allocation.  *See, e.g. Deepwater Horizon*, 2016 WL 6215974, at \*1052-53, 1080; *see also* Fallon, 74 La. L. Rev. at 387 ("*After* the total common benefit fund is established, a mechanism or procedure must be devised to determine the proper distribution of the fund…").  But here, Co-Lead Class Counsel has already allocated the entirety of the \$112.5 million available under the settlement—dedicating at least \$75 million to allocator[10]—before the Court has (i) determined the value of the benefit to the class, (ii) determined a benchmark percentage to be applied, if appropriate, and/or (iii) applied a lodestar analysis or cross-check on the reasonableness of the percentage method.

---

[9] Again, unlike this case, the *Vioxx* litigation involved extensive pre-trial litigation, including document discovery, expert discovery, depositions, motion practice, trials, etc. *Id*. at 643-44; *see also* Charles L. Becker, *How Not to Manage A Common Benefit Fund: Allocating Attorneys' Fees in Vioxx Litigation*, 9 Drexel L. Rev. 1, 5 (2016).

[10] Here, Seeger alone is deciding which attorneys/firms get paid and how much.  In other words, it is "the fox who (is) recommend[ing] how to divvy up the chickens."  *In re: Diet Drugs*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring) (analyzing the "procedure by which allocation [is] rendered").  In other "super-mega-fund" cases, however, allocations have been determined by committee, with special master oversight.  For example, in *Deepwater Horizon*, allocation of fees was subject to a committee made up of several law firms.  Then, a special master made recommendations to be considered by the trial court.  And even then, "the appointment of a committee does not relieve the trial court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *In re High Sulfur Content Gasoline Prods. Liab. Lit*., 517 F.3d 220, 227 (5th Cir. 2008).

8.     With respect to the lodestar analysis, whether it should be used to calculate the fee or as a cross-check, I have repeatedly sought from Co-Lead Class Counsel the data underlying the 50,000+ hours claimed to have been spent for the benefit of the class.  "Such records are an important factor in determining the appropriate total amount of common benefit fee, as well as the proper distribution of the common benefit fee among those who actually performed the work that produced the result achieved."  Fallon, 74 La. L. Rev. at 387.  Co-Lead Class counsel has at least acknowledged that a loadstar cross-check of the percentage-of-the-fund method is "sensible" (ECF 7151, at 52).  At the same time, however, they have refused to produce the reports and time and expense summaries ordered to be contemporaneous maintained by CMO 5 (ECF 3710).[11]  Nor have they produced the submissions by other counsel seeking fees that they solicited prior to their fee application. But this is information the Court should have in conducting its "thorough review" of an application for more than $100 million in fees.  Indeed, courts should closely supervise the actions of court-appointed counsel to ensure that decisions around the size and distribution of common-benefit fees are transparent, jurisprudentially sound, and fundamentally fair.  Charles L. Becker, *How Not to Manage A Common Benefit Fund: Allocating Attorneys' Fees in Vioxx Litigation*, 9 Drexel L. Rev. 1, 3 (2016).

9.     With respect to the percentage-of-the-recovery method, if the Court believes it is appropriate, a reasonable benchmark percentage should not exceed the percentage approved in *Deepwater Horizon* (4.3%) or *Vioxx* (6.5%) as the effort and risk undertaken in this matter is a far

---

[11] Compare this to *Deepwater Horizon* where common benefit attorneys tracked time/expense data on a monthly basis and submitted said data to a court-appointed CPA and a fee committee for auditing. *Deepwater Horizon*, 2016 WL 6215974, at *1077-78; *see also* Fallon 74 La. L. Rev. at 382 ("Those attorneys who are seeking or plan to seek common benefit fees are expected to contemporaneously report their hours, the nature of the work performed, and the expenses incurred for common benefit work to the court-appointed CPA").

cry from what the record shows in those matters.  In order to adequately align common benefit attorneys' with the class membership their fees should be entirely based on claims paid.  And, the percentage approved by the Court should not exceed 6.5%.

10.     The 5% set-aside fee, which Co-Lead Class Counsel seek to recover from every monetary award even after receiving $112.5 million, should be rejected.  Notably, the 5% set-aside was not part of the attorneys' fee provisions in the January 6, 2014 settlement agreement executed by Class Counsel and the NFL Parties.  It popped into the agreement for the first time in the June 25, 2014 revised agreement.  Neither Class Counsel nor the NFL Parties provided any explanation for why up to $112.5 million in attorneys' fees was satisfactory in January but considered approximately $45,000,000 light a mere six months later.  Even based on the speculative projections of the claims to be paid under the settlement, the $112.5 million attorneys' fee fund or some portion thereof, if conservatively invested, will be more than sufficient to pay reasonable fees over the lifetime of the settlement.  The Court, therefore, should reject any set-aside.

11.     While an award of attorney fees is premature at this time, if the Court is inclined to award some portion or all of the $112.5 million available under the settlement, then my firm's contribution to the class, although ignored in Co-Lead Class Counsels' application and the Seeger Declaration, should be compensated.  On or about July 25, 2016, Seeger sent me a letter asking for our common benefit time and expense information to prepare petition to be filed with the Court. He required more information from submitting lawyers than he has supplied to the Court. Although the letter stated that he would follow up if he needed anything else, I never heard back from him after providing his office with the requested information.   In fact he left my law firm out of the fee application and subsequent allocation despite his request for the information and the efforts and results we helped achieve.   Our law firm has devoted well over 1,000 hours attempting to

improve the terms of the settlement and resolve differences between class counsel and objectors,

and advocating for a common benefit fee system that would be aligned with the class members

best interest.  My firm's contributions to the class include but are not limited to the following:

(i)     At the request of Class Counsel, I attended meetings in Florida (February, 2015) and New York City (April 22, 2015) in an effort to resolve objections to the settlement.  Prior to attending such meetings, I communicated with most if not all of the counsel representing objectors in an effort to prioritize the objections and secure authority to negotiate with Class Counsel.

(ii)    I had communications with Co-Lead Class Counsel about the January 6, 2014 version of the settlement concerning the injury definitions for Level 1.5 and 2.0 Neurocognitive Impairment.

(iii)   Following the first meeting in New York on January 20, 2014, I began a concerted press with Co-Lead Class counsel on the need to address my observations about the Settlement diagnostic criteria.

(iv)    Specifically, I pointed out that the first version of the settlement signed by the parties and submitted to the Court on January 6, 2014 arguably required class members diagnosed outside the BAP, including those diagnosed before the settlement had even been announced, to adhere to the diagnostic criteria for Level 1.5 or 2 including the neuropsychological protocol annexed in Exhibit 2.

(v)     Co-lead Class Counsel advised a group of lawyers that the intent of the settlement would not require those class members diagnosed before the settlement including diagnoses before the effective date to be retested or re-examined under the specific diagnostic criteria referenced in the settlement.  However, that intent was not reflected in the plain language of the Settlement.

(vi)    I committed to an in-depth study of the Settlement provisions pertaining to monetary awards for Qualifying Diagnosis for Level 1.5 and Level 2.0 in an effort to ensure that this ambiguity would not be a detriment to class members.

(vii)   The need for clarity was important for two principal reasons:  First, Co-Lead Class Counsel Claimed that the majority of class members were expected to be in these categories, a expectation borne out by subsequent forecasts of participation.  Indeed, according to the data submitted by Co-Lead Class Counsel, almost half of the former NFL Players' claims are not ALS or CTE or Parkinson's or Alzheimer's diagnosis.  Instead, they are Level 1.5/Level 2.  See 6167, Table 2-1.

(viii)  Second, Level 1.5 and 2.0 Neurocognitive Impairment are not medical diagnoses known or used by the medical community before this settlement.  Therefore, Exhibit 2 to the

10

January Settlement setting forth a settlement-neuropsychological protocol was not generally used by the relevant medical community.

(ix)     As such and as I explained to Co-Lead Class Counsel, the Level 1.5 and 2.0 qualifying diagnosis would never appear on any medical record of a former NFL Player because it does not appear in any medical textbook or medical school curriculum – these diagnoses are creatures of and defined by the Settlement alone.  Therefore, because a former NFL Player could only qualify for compensation by submitting a diagnosis "in accordance with the testing protocol annexed in Exhibit 2" or "diagnosis outside the BAP consistent with the diagnostic criteria for level 1.5," the plain language of the Settlement criteria was virtually self-defeating.

(x)      On several occasions, I asked Co-lead Class Counsel to point me to any provisions in the agreement that would unambiguously protect the class members from this strict application of the terms of the Settlement.  He could not do it.

(xi)     The June, 2014 Settlement included revised language directed specifically to my plain language concerns.  First, it was broadened to include "evaluation and evidence generally consistent with the diagnostic criteria." Second, the revised Settlement included 6.4(b): "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements."

(xii)    Finally, the revised Settlement, pp. 31 – 32, includes a significantly expanded section on Qualifying Diagnoses that acknowledges different categories regarding who can issue a qualifying diagnosis for Level 1.5 and 2.0 based upon the timing of the diagnosis.   These changes are responsive to--though not wholly curative of--the Level 1.5 and Level 2.0 concerns that I raised.

(xiii)   The Court then scheduled a Fairness Hearing, directed final submissions for October, 2014 and argument in November, 2014.  The Court directed counsel for the Faneca Objectors, Steven Molo, to coordinate Objectors arguments.  My firm filed objections to the revised Settlement (ECF 6237) pointing out the many concerns with the settlement, including the refusal of the NFL or Co-Lead Class Counsel to supply the Class Members with any of the underlying and supporting documents    And, at the request of Steven Molo, I made a presentation at the Fairness Hearing.

(xiv)    When the Court approved the Settlement, my firm and Kline & Spector filed an appeal on behalf of the Alexander Objectors.  Chip Becker on behalf of our clients coordinated the argument between the appellants counsel and argued part of the appeal.

(xv)     Since the Effective Date of the settlement, my law firm has filed motions and responsive pleadings to assist the Court in its duty to award reasonable fees and expenses to the attorneys seeking common benefit fees only after it has information necessary to evaluate the requests including the degree of success of the settlement.

(xvi)   In summary, then, from the time of the August, 2013 Term Sheet to the present, my firm has expended many hours of effort on behalf of the former NFL Players and incurred expenses in the course of furthering the business of the class.  Our efforts in that regard were commensurate with, if not greater than, those recognized by Co-Lead Counsel with respect to Corboy Demetrio (ECF 8447 at 13).  On many fronts, my firm worked together with Corboy & Demetrio on objections, the fairness hearing, and efforts to resolve objections both before and after the fairness hearing and before the appeal.

(xvii)  Using the blended fee average of about $450/hour approved in *Deepwater Horizon*, my firm's common benefit fee to date would be at least $450,000 plus expense reimbursements of $10,936.19 mostly consisting of meetings to NYC, Miami and Chicago at the request or suggestion of Class Counsel.  Based upon my experience, $450/hour is consistent with the rates charged by law firms engaged in the type of litigation that my law firm does and is reasonable for the services performed.  That rate is far below the rates charged by others seeking fees in this litigation. Should the Court require further detail for a lodestar cross-check, I am pleased to provide it.  *See In re Rite Aid Corp. Sec. Litig*. 396 F.3d 294, 306-07 (3d Cir. 2005).

12.     Finally, although he is claiming entitlement to $70+ million plus 5% of each monetary award, Seeger has taken positions that are unfavorable to the class.  Based on recent filings, the Claims Administrator, at the recommendation of Seeger, is requiring corroborating documentation of functional impairment prior to the qualifying diagnosis examination.  In other words, the claims office is requiring proof that the functional-impairment records or third-party affidavit was provided to the qualified physician "before" the subject exam.  This is against the express provisions of the settlement for a number of obvious reasons: (i) "corroborated" as used in 1(a)(iii) means "after" the player has exhibited functional impairment; (ii) there is no timing element (before or after) in the criteria; (iii) claims office documentation provided to MAF and BAP doctors allow for this information within 14 days of the exam; and (iv) for players diagnosed outside the BAP, section 6.4(b) does not require "identical diagnostic criteria," the same "testing protocols," or "documentation requirements."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of October, 2017.                    */s/ Lance H. Lubel*
Lance H. Lubel,
Counsel for the Alexander Objectors