UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | . | |
| In RE: | . | Docket #MDL-12-2323 (ABB) |
| | . | |
| National Football League | . | |
| Players' Concussion Injury | . | United States Courthouse |
| Litigation, | . | Philadelphia, PA |
| | . | September 19, 2017 |
| | . | 10:05 a.m. |
| | . | |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For The Plaintiffs:             Christopher Seeger, Esq.
                                Seeger Weiss, LLP
                                77 Water Street
                                New York, NY 10005

                                TerriAnne A. Benedetto, Esq.
                                Seeger Weiss, LLP
                                1515 Market St.-Ste. 1380
                                Philadelphia, PA 19102

                                Sol Weiss, Esq.
                                Anapol Schwartz Weiss Cohen
                                1710 Spruce Street
                                Philadelphia, PA 19103

For The Defendants:             Bruce Birenboim, Esq.
                                Paul Weiss Rifkind Wharton
                                & Garrison, LLP
                                1285 Ave. of the Americas
                                New York, NY 10019

2

|                                              | Brad S. Karp, Esq.<br>Paul Weiss Rifkind Wharton<br>& Garrison, LLP<br>1285 Ave. of the Americas<br>New York, NY 10019 |
|----------------------------------------------|---------------------------------------------------------------------------------|
|                                              | Douglas M. Burns, Esq.<br>Paul Weiss Rifkind Wharton<br>& Garrison, LLP<br>1285 Ave. of the Americas<br>New York, NY 10019 |
| (In-House Counsel For NFL)                   | Anastasia Danias, Esq.<br>NFL Properties, LLC<br>280 Park Ave.<br>New York, NY 10017 |
| Claims Administrator:                        | Orran L. Brown, Esq.<br>Brown Greer, PLC<br>250 Rocketts Way<br>Richmond, VA 23231 |
| For Non Parties RD Legal<br>Funding, LLC, et al.: | David W. Willingham, Esq.<br>Boies Schiller & Flexner, PC<br>31st Fl.<br>725 S. Figueroa St.<br>Los Angeles, CA 90017 |
|                                              | Ellen Brotman, Esq.<br>Brotman Law Firm<br>Ste. F200<br>150 N. Radnor Chester Rd.<br>Radnor, PA 19087 |
| (Via Telephone)                              |                                                                                 |
| For The Plaintiffs:                          | Ashley Torres, Esq.<br>Jaakan Williams, Esq.<br>Enigan Aladejana, Esq.          |

```
Audio Operator                    James F.G. Scheidt

Transcribing Firm:                Writer's Cramp, Inc.
                                  63 Dakota Drive
                                  Hamilton, NJ 08619
                                  609-588-8043
```

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

4

```
1            THE COURT:  We're here in the matter of the National
2    Football League Players' Concussion Injury Litigation, at MDL-
3    2012-2323 -- excuse me.  And I recognize the presence of
4    Mr. Seeger.
5            MR. SEEGER:  Good morning, Your Honor.
6            THE COURT:  And with you is -- Ms. Benedetto?
7            MS. BENEDETTO:  Yes, Your Honor.
8            THE COURT:  Okay.  Okay.  And your partner?  Your
9    co-counsel, Mr. Birenboim.
10           MR. BIRENBOIM:  Good morning, Your Honor.
11           THE COURT:  For the NFL.  And Mr. Karp.
12           MR. KARP:  Good morning, Judge.
13           THE COURT:  Okay.  Anastasia.
14           MS. DANIAS:  Good morning, Your Honor.
15           THE COURT:  I only know you as Anastasia from the
16    NFL.  Sorry about that.  She's a lawyer for the NFL.  Okay.
17    The Court is concerned about reports of deceptive practices
18    targeting settlement class members in the NFL Players
19    Concussion Injury Litigation.  Such practices allegedly
20    involve potentially misleading solicitations, seeking to take
21    advantage of class members.  This is of great concern because
22    many class members may be suffering from significant cognitive
23    impairment.
24           The hearing today will provide co-lead class counsel with
25    an opportunity to raise issues regarding deceptive practices.
```

1  The hearing is exploratory in nature and it is designed to

2  allow me to determine whether it should be -- whether I should

3  pursue further action.  Therefore, there will be no cross

4  examination or rebuttal.  We are here simply to allow co-lead

5  class counsel to raise allegations for the court's further

6  consideration.

7       Okay.  Thank you.  Turn it over to you, Mr. Seeger.

8            MR. SEEGER:  Thank you, Your Honor.  I have just a

9  couple of minutes and then my partner, Terri Benedetto, is

10 going to handle the --

11           THE COURT:  Okay.

12           MR. SEEGER:  -- rest of the presentation.  Your

13 Honor, thank you for your time here.  We think this is an

14 important matter that we want to discuss with you.  Obviously,

15 I recognize that this is a presentation just made by co-lead

16 counsel.  There are people in the courtroom that are here that

17 probably have their view of it, and frankly, we don't know

18 what that is at this point because it's exploratory.

19      So I'm not looking to ruffle feathers or to cast

20 allegations wildly out there about people's conduct or their

21 motives, but we are seeing things that we think we need to at

22 least bring to your attention.  Before I get into that, I'd

23 like to just point out that nothing that's going on in this

24 courtroom is holding up, or preventing, claims from being

25 processed in the settlement.  The settlement is actually

 1    working perfectly, Your Honor.

 2        With every settlement, there are wrinkles in the

 3    beginning, things move a little slowly.  As we work them out

 4    -- as the parties come together and work these things out,

 5    things are beginning to move well.  Just as a reminder, we

 6    have over 20,000 registrations so far.  There are over 1,200

 7    claims that have been submitted to the claim administrator

 8    already.  Over $130 million in claims have been approved for

 9    payment.  And there are 2,200 retired players scheduled for

10    BAP examinations through the end of the year.  So it's up and

11    running.  Things are going well.  And this is not going to

12    hold that back.  And we're not going to let anything that goes

13    on here with this investigation hold back the settlement

14    process.

15        But I do think it's the duty of class counsel to protect

16    the class against sharp practices.  And we believe we've

17    identified some and we're going to make a presentation to you

18    now about that.  This has been a hard fought settlement.  And

19    the last thing I would want to see happen as co-lead counsel,

20    and I know the PSC and Mr. Weiss, who's here, agrees with me

21    on this, is to watch these awards be cannibalized by usurious

22    loans, excessive fees being charged by claim service

23    providers.  I just don't feel like I'm going to stand by and

24    let that happen.  And I know that court, as a fiduciary for

25    the class, feels the same.

1    And what we've identified, and Terri's going to make this

2    presentation, are really several categories where we're

3    concerned.  One is usurious loans.  Although they have been

4    disguised in some ways as an assignment of a property right,

5    which would be prohibited by the settlement frankly, they're

6    really loans that seem to be designed to return to the lenders

7    30, 40, 100% interest rates.  And Terri has examples of that

8    she'll go into.

9    We've also identified certain claim service providers.

10   These are entities that have come up really after the

11   settlement.  They weren't involved before the settlement that

12   we know of.  They've sprung up after the settlement.  And they

13   are purporting to represent players and to file claims on

14   their behalf and they're charging fees for it.  They also seem

15   to be working with attorneys who are doing that, who also have

16   shown up after the settlement of the case, were not involved

17   earlier, and have done a good job sort of luring clients away

18   from law firms that have been involved in this case for the

19   last six, seven years and longer.

20   But when you look at this as a whole, what we're

21   concerned about is we're seeing 20, 25% in fees being charged

22   and divided between lawyers and non-lawyers.  So there are

23   some concerns there.

24   And then finally, we've seen some evidence that -- and

25   this is one of the most concerning parts, that we've seen some

1   evidence that we will present today that suggest that certain

2   claim service providers might be working with lenders in

3   certain law firms to try to cheat the settlement.  And we've

4   seen a couple of things that concern us.  One is there seems

5   to be an effort to coach players as to how to take the BAP

6   tests or the neuropsychological tests, in a way that would

7   cheat them, defeat them, fail them, however you want to say

8   it, but would get a result that's not accurate.

9        And then we've also seen some evidence that some of these

10   claim service providers are working very closely, and some

11   evidence suggests too closely, with doctors that seem too

12   willing to work with them to help submit claims that may not

13   be totally accurate.

14        Again, these are just suggestions.  You know, we're going

15   to show you what we have on it.  But if any of it turns out to

16   be true, I think we'd all be very concerned about it.  And the

17   last thing I want to say is that if there's anybody listening

18   in on this, that thinks that the lawyers involved who have

19   represented this class for a number of years will lay down on

20   any of these issues, they're making a very big mistake.  I

21   will go after these issues, bring them to Your Honor, and we

22   will continue to stay on top of this until we're sure they're

23   gone.

24             THE COURT:  There's also a companion case in New

25   York City -- I mean, in the Southern District of New York --

1            MR. SEEGER:  Correct.

2            THE COURT:  -- on this -- on some of the same

3    issues.

4            MR. SEEGER:  Correct.

5            THE COURT:  I mean, just -- not specifically geared

6    to the NFL, but geared to whether or not these practices are

7    legal or not legal.

8            MR. SEEGER:  You're right, Your Honor.  And Terri is

9    going to now come up and give you a sampling of what we've

10   seen.  Now, we've done discovery so far, just so you know, on

11   36 different persons and groups.  And there have been about

12   14,000 pages of discovery produced to us.  So many have

13   cooperated, and I think that's a good thing.  And what we'll

14   do is we'll give you a brief look at what we have.

15           THE COURT:  Do you plan to have any of them testify?

16           MR. SEEGER:  No.  Today's presentation is just Ms.

17   Benedetto just showing the court objectively what we have

18   seen.  And then we're going to -- she will ask at the end for

19   where we think this should go next.

20           THE COURT:  Okay.

21           MR. SEEGER:  If that's okay.

22           THE COURT:  All right.  Okay.  Ms. Benedetto?

23           MS. BENEDETTO:  Good morning, Your Honor.

24           THE COURT:  Good morning.

25           MS. BENEDETTO:  I do have hard copies of the

1    PowerPoint.

2              THE COURT:  The problem is that it's hard to hear

3    you.  Jim, what are we going to do?

4              MS. BENEDETTO:  Is that better, Your Honor?

5              THE COURT:  Yes, it is.

6              MS. BENEDETTO:  Okay.  Your Honor, I have hard

7    copies of the PowerPoint to hand up for you and your law

8    clerk.

9              THE COURT:  Okay.  Thank you.  One for you and one

10   for me, I assume.

11         (Pause in the proceedings)

12              THE COURT:  Okay, thank you.

13              MS. BENEDETTO:  Your Honor, I've also handed up a

14   zip drive which I will discuss in a few moments.  So today,

15   Your Honor, we're here because we want to report to the court

16   on what we've been -- basically been doing since the court

17   issued the July 19th order directing co-lead class counsel to

18   conduct discovery.  And as Chris mentioned, we've served

19   discovery upon 36 groups of persons and entities.  And it went

20   out in waves.  Basically, we sent out the initial discovery

21   and then we learned some things from speaking with those

22   respondents' lawyers.  And we learned some things from the

23   documents that those respondents produced.  And then we sent

24   out subsequent waves.

25         We've also learned about additional entities from the

1    latest waves that we sent out of discovery who we have not yet

2    had an opportunity to serve discovery upon.  Also as Chris

3    mentioned, we've received from certain respondents who have

4    provided responses that 14,000 pages of documents, and we've

5    also conducted three depositions.  And we'll report on the

6    information gleaned from those today.  However, some of those

7    upon whom we've propounded discovery have either ignored the

8    discovery requests or they have claimed that they are third

9    parties and that we were required to serve subpoenas.

10           As te court is aware, we've filed motions to compel as to

11   certain of those.  And one of those entities, Case Strategies

12   Group, formerly known as NFL Case Consulting, actually on

13   Friday filed a motion with Your Honor under 1292(b) to seek an

14   interlocutory appeal of Your Honor's order directing that

15   entity to provide co-lead class counsel with the names of

16   those retired players who they've solicited, the names of

17   those retired players, and to whom they've entered into

18   contracts and copies of those contracts.

19           Co-lead class counsel, we're confident that this court is

20   fully authorized to order persons in the shoes of those like

21   Case Strategies Group, who have basically created a business

22   seeking to profit from the settlement rest before Your Honor,

23   and the class members before Your Honor.

24           So the types of entities that we've --

25                   THE COURT:  Do you have some -- do you know -- are

1    you aware of some of the -- excuse me -- of the players that

2    have been approached in this regard?

3            MS. BENEDETTO:  With respect to Case Strategies

4    Group, Your Honor --

5            THE COURT:  Yes.

6            MR. BENEDETTO:  -- we are, because we also served

7    discovery upon the law firms that Case Strategies Group would

8    refer its clients to.  So we do know the names.  Those -- most

9    of those law firms have actually provided us with a list of

10   their clients.  So we do know the relationship that there was

11   certain of those clients who both are retained by those five

12   law firms and also have contingent fee agreements with Case

13   Strategies Group.

14           THE COURT:  And have you endeavored to take

15   depositions of any of those of your own clients, if you will?

16   Not your own clients, because you're class counsel.  Of any of

17   the players that are involved?

18           MR. BENEDETTO:  The only retired play who we've

19   deposed is Mr. Joe Pisarcik and that was in connection with

20   two law firms that had returned Mr. Pisarcik to basically

21   solicit fellow players.  They sent out e-mails and letters

22   under Mr. Pisarcik's name.  I -- that's actually -- toward the

23   end of the presentation, I do have some documents.

24           THE COURT:  Okay.  All right.  Good.

25           MR. BENEDETTO:  So there are basically four types of

1    entities that we've sought discovery from.  These funders or

2    lenders, the claim service providers, law firms, and retired

3    players.  Some of these entities have been using the retired

4    players to actually solicit fellow retired players to contract

5    with the entities and are paying them commissions.  So that's

6    troubling in that, you know, a retired player would certainly

7    trust one of his brethren to not lead him astray.  And so

8    that's a further concern that we have.

9        And a real troubling fact that we've learned from this

10   discovery effort is that some class members are going to have

11   agreements with a claim service provider, a funder, and a law

12   firm.  So we're concerned that after paying all of these other

13   entities that these sick, retired players and their families

14   are going to be left with little money from their monetary

15   award.  We have prepared for Your Honor, and I have a zip

16   drive.  It contains the names of 958 retired players who have

17   contracted either with a claim service provider and a funder,

18   and also a law firm, so that Your Honor can appreciate.  And

19   we did it for our own purposes as well, to basically see how

20   many of these retired players are actually having their

21   monetary awards usurped by various factions.

22            THE COURT:  You're close to 1,000, is that what

23   you're saying?

24            MS. BENEDETTO:  It is, Your Honor.  And we provide

25   that to you.  Some of the entities who have provided us with

1    documents have done so contingent upon keeping the names of

2    the class members confidential.  So it was not our intention

3    to file this Excel spreadsheet publicly.  We could certainly

4    do so and redact their names.  But we have provided it to Your

5    Honor.

6              THE COURT:  Okay, thank you.

7              MS. BENEDETTO:  So this is a list of the funders and

8    brokers who we have served discovery upon.  We learned that

9    there are different types of these entities.  Certain funders

10   both actively solicit and lend the monies.  Then there are

11   some who only lend the monies, and some who only provide leads

12   or they're called brokers.  So the brokers are lead

13   generators.  They're actually the ones who solicit actively.

14   And then once they know of a player who would like to borrow

15   money, they refer that player to an actual funder.

16       It was interesting because some of these entities, you

17   know, the broker points the finger at the funder and the

18   funder points the finger at the broker.  So the broker says,

19   you know, we didn't actually lend any money to the players.

20   All we did was provide leads to the people who did.  And then

21   the funder says, well, we didn't actually solicit players.  We

22   just provided the funds.  So to the -- they claimed.  So to

23   the extent there was any impropriety in the solicitation, they

24   sort of are absolved from that.

25       So we did receive documents from several of these brokers

1    and the -- a large benefit of that was that they identified

2    additional lenders that we hadn't previously been aware of.

3    And one of those is Case 4 Cases.  And they actually -- this

4    particular player, he received $84,812 from the funder.  And

5    he will owe back $161,000.  So that's an interest rate of

6    almost 100%.

7         So ultimately our focus became the actual funders as

8    opposed to these brokers.  So many of these contracts are just

9    of inordinately high interest rates.  But as Chris mentioned,

10   what they've done is they've couched them as assignments as

11   opposed to loans.  So it's likely their belief that they can,

12   in that way, avoid the usury laws.

13        So as the Court is well aware, there's a provision in the

14   settlement agreement which states that there can be no

15   assignment of claims and that if an attempt to do so, that

16   that alleged assignment will be void, invalid, and of no force

17   and effect.  And despite that, we know of at least 200 class

18   members who have entered into these {quote}{unquote}

19   "assignments with funders."

20        As Your Honor previously referenced, RD Legal has 7 of

21   those, Thrivest has 42, Atlas has 38, 25 of which they sold to

22   another funder, Peachtree has 32, Global Financial has 47.

23   And as yet, we haven't received discovery from some of the

24   other funders that we've learned about through these brokers

25   and through class members, frankly, who have contacted us in

1    conjunction with these discovery efforts.

2         So these are the particular funders we would like follow

3    up from.  Pravati and Top Notch Funding simply ignored the

4    discovery requests.  As Your Honor is aware, Justice Funds,

5    which is -- Justice Funds is represented by the same counsel

6    as Case Strategies Group and is also of the mind set that Your

7    Honor doesn't have the authority to order discovery from that

8    entity without a subpoena.  And Cambridge Capital is -- I'll

9    get to that later.  That is the funding entity that is

10   associated with Mr. Tim Howard, attorney Tim Howard at Howard

11   and Associates.

12        And then these other funders that we've just learned

13   about recently that we haven't served discovery upon yet: Cash

14   4 Cases, Universal Funding, we believe is the funder that

15   Atlas sold its -- some of its contracts to, Krunchcash, Prime

16   Cash Funding, and Multi Funding USA.com.  So if given the

17   opportunity, we would like to also propound discovery requests

18   upon those entities.

19             THE COURT:  What do you think it's going to show?  I

20   mean, I know that you've asked me for it but you have to have

21   some idea what you expect to receive.  What kind of

22   information do you expect to receive?

23             MS. BENEDETTO:  We expect that those funding

24   arrangements were of similar character as the ones that I'm

25   going to show Your Honor that are similar to this Cash 4

1    Cases, in that they are couched as assignments, which we

2    submit are prohibited by the settlement agreement.  And that

3    if they are somehow deemed to not be assignments, that they

4    are at interest rates that are of the level of being usurious.

5         THE COURT:  Well, were these transactions -- did

6    these transactions occur before the settlement was reached or

7    after a settlement was reached?

8         MS. BENEDETTO:  Most of these assignments occurred

9    in the timeframe of the 2016-ish time period.  So that would

10   be certainly after Your Honor granted final approval.  Most of

11   them, it seems, required some sort of medical records before

12   they would give loans.  And they assumed -- they were assuming

13   that a player would obtain a qualifying diagnosis of a 1.5 or

14   a level 2 before they would lend these monies.

15        THE COURT:  Okay.

16        MS. BENEDETTO:  So moving to RD Legal.  They have

17   seven class members that they have contracted with.  And as

18   Your Honor knows, they titled their instruments as

19   assignments.  And in one particular contract, the class member

20   purports to assign $425,000 of his potential future monetary

21   award in exchange for receiving less than half of that amount,

22   $202,000.

23        And although RD Legal didn't formally respond to any

24   discovery requests concerning solicitations, we did already

25   have their agreements by virtue of the fact that they had

1    publicly filed them in the case pending before Judge Preska in

2    SDN -- in the Southern District of New York, the Consumer

3    Financial Protection Bureau and New York Attorney case against

4    RD Legal.  So we did have those seven contracts.

5           However, the Consumer Financial Protection Bureau did

6    provide co-lead class counsel with a deposition transcript for

7    one of the class members who contracted with RD Legal that the

8    government took.  And that particular class member testified

9    that he learned about RD Legal as a result of receiving a call

10   from a fellow player, someone who he had no prior relationship

11   with but who was a fellow retired player.  And this gentleman

12   was endorsing RD Legal.  And the deponent testified that five

13   minutes after he hung up with the former -- the fellow retired

14   player, Mr. Roni Dersovitz of RD Legal called him on the phone

15   and he told him he could beat any rate out there.  That he had

16   -- that this particular deponent had a loan with Peach Tree.

17   He could beat Peach Tree's rate.  He said if this particular

18   deponent referred other retired players to RD Legal, that he

19   would pay him a percentage of whatever amount he loaned to

20   those players.  And he wanted him to sign with a lawyer that

21   day.

22          Now, this particular deponent already had a lawyer, so he

23   didn't need to sign with a lawyer.  But Mr. Dersovitz wanted

24   him to do that because in order for these loans to have force

25   and effect, a lawyer for the client has to sign off.  So this

1    gentleman is 51 years old.  He has Parkinson's disease.  And

2    he has stage 4 throat cancer.  And he did contract with RD

3    Legal.  And he -- in exchange for receiving $343,000, he's

4    going to be giving up $665,000 of his future monetary award.

5         And in addition to his testimony concerning the manner in

6    which he was solicited, there was also testimony at his

7    deposition as to certain irregularities both he and his lawyer

8    actually gave testimony at the deposition as to certain

9    irregularities with how the contract was signed.  So that's RD

10   Legal.

11        And, Your Honor, we will obviously be consistent with

12   what was filed on -- the joint letter that was filed on

13   Friday.  We will be participating in the briefing on that --

14   on the issue that Judge Preska has referred to Your Honor.

15        I'll move on to Atlas, and they have --

16             THE COURT:  You have no relationship with the action

17   that's in -- before Judge Preska, do you?

18             MS. BENEDETTO:  Only to the extent, Your Honor, that

19   we have filed before -- we had filed before Judge Preska a

20   Motion to File an amicus brief there.  And we also had

21   suggested to Judge Preska, you know, in the alternative that

22   perhaps with respect to those that RD Legal -- with respect to

23   the NFL players that RD Legal had lent to, as distinguished

24   from Zadroga claimants that RD Legal lent to in the case

25   before Judge Preska, that as to any interpretation of the

1   settlement agreement in the <u>NFL Concussion</u> litigation which is

2   before Your Honor, we suggested that Judge Preska refer the

3   issue -- that limited issue as to whether assignments are

4   permitted under the settlement agreement before Your Honor and

5   that she -- Judge Preska agreed to do so.  And that's why we

6   filed the joint letter concerning how the -- how we proposed

7   the briefing will be conducted before Your Honor on that

8   issue.

9          THE COURT:  All right.  I'll have to discuss that

10  with you at -- perhaps after the hearing.

11         MS. BENEDETTO:  Certainly, Your Honor.

12         THE COURT:  Whether or not -- if she rules that the

13  loans or assignments are illegal, then there's really not much

14  for me to do, is there?

15         MS. BENEDETTO:  I believe she referred that issue to

16  Your Honor.

17         THE COURT:  No, she's going to decide in general, is

18  she not, whether they -- these are valid assignments or loans.

19  She's going to -- in that lawsuit, isn't she going to decide

20  -- nothing to do with my case.

21         MS. BENEDETTO:  Her lawsuit in the first instance,

22  the lawsuit before her, I believe there's currently a Motion

23  to Dismiss filed -- that was filed by RD Legal concerning the

24  Constitutionality of the Consumer Financial Protection Bureau.

25  And that's, I believe, what's currently before Judge Preska.

1   And my understanding is that what Judge Preska had referred to

2   Your Honor was the very discreet issue as to whether the NFL

3   Concussion litigation settlement precludes assignments and

4   that such assignments --

5             THE COURT:  Okay.

6             MS. BENEDETTO:  -- pursuant to Section 30.1, whether

7   they would be void.

8             THE COURT:  You can just go on.

9             MS. BENEDETTO:  Okay.

10            THE COURT:  We'll discuss that.  Okay.

11            MS. BENEDETTO:  With regard to Atlas, Your Honor,

12  they have assignments with 38 players.  One particular player,

13  for an advance of $10,000 will ultimately owe Atlas back over

14  $17,000.  They claim a monthly -- it's a monthly interest rate

15  of 2.75%, but that's actually an annual interest rate of 33%.

16  This is just an internet calculator as to the compounded

17  interest percentage and it reflects that that would be

18  actually a 33% interest rate.  But if you look on the

19  contract, it's stated as -- it's 2.75%.

20      Now, I think certain -- in particular, someone who maybe

21  have neurocognitive impairment might not understand the level

22  of an interest rate that they're paying when they see that

23  2.79 and not appreciate that that's a monthly rate, not an

24  annual rate.

25      The next is Global Financial.  47 class members have

1   contracted for an assignment with that entity.  And this

2   particular class member received $2,000 and will owe Global

3   Financial, if and when he receives a monetary award, over

4   $3,500.  They also charged a fee of $575 on a loan of 2,000.

5        We come to Justice Funds.  So this is the entity that is

6   similar to Case Strategies Group, refusing to provide us with

7   any information absent a subpoena.  However, one of the

8   brokers did provide one of the -- this particular broker, when

9   it refers to the funder for a loan obtains a copy of the

10  funding agreement.  So we do have a copy of a Justice Funds

11  funding agreement.  In this particular instance, the class

12  member received $25,000 and after one year, he will owe

13  Justice Funds over $37,000.  And they charged a fee of $4,400.

14       Moving on to Thrivest.  They have funding arrangements

15  with 42 class members.  One of those has an assignment to pay

16  back Thrivest $567,000 for an advance of $312,000.  They

17  actually charged fees of over $8,200.

18       Peachtree, we haven't obtained discovery from yet.  HMR

19  Funding, this is -- it's a different type of relationship.

20  This entity purchases medical receivables.  So instead of the

21  law firm advancing the client whatever costs to have the

22  medical evaluation done, and these were all done before the

23  BAP opened.  So all of these class members were tested prior

24  to the effective date of the settlement.  So the funding

25  company pays the doctor for the evaluation and then they

1    obtain a lien.  And the -- suffice it to say, the amounts that

2    they were paying these doctors were thousands of dollars more

3    than what the BAP exams cost or even advanced.

4            THE COURT:  And these will be submitted?  These will

5    be legitimately submitted for reimbursement?  I mean, will the

6    conclusions of these doctors be used to interpret the -- to

7    interpret whether or not the players will receive benefits?

8            MS. BENEDETTO:  Presumably.  That was the law firm's

9    intent.  There's a few law firms that have used this HMR

10   Funding.

11           THE COURT:  Well, did it happen before the cutoff

12   date or after the cutoff date?

13           MS. BENEDETTO:  Before the cutoff date.  So

14   presumably, these are the doctors' opinions who will be

15   submitted as the qualifying diagnosis for these particular

16   players.

17           THE COURT:  Okay.  Do you know who they are?

18           MS. BENEDETTO:  Yes.

19           THE COURT:  Who the doctors are?

20           MS. BENEDETTO:  Yes, we do.

21           THE COURT:  Okay.  I assume that the NFL will have

22   something to say about that.  Okay.

23           MS. BENEDETTO:  Trial Funder is an entity that was

24   affiliated with the lawyers who are now calling themselves the

25   sports concussion lawyers.  They were formally known as Top

1    NFL Lawyers.  And they represent 221 class members as per the
2    claims administrator registration data.  And they've -- we
3    propounded discovery upon them and they've basically said that
4    they have released the one player who they had loaned money
5    to.  And the other two players, they forwarded to another
6    lender and refunded the broker fee.  So it's their position
7    that they are not in any type of a conflict situation at that
8    point.  But we present it to Your Honor for what it's worth.
9         The next funder is Cambridge Capital.  As Your Honor may
10   recall from the Motion to Compel that we filed against Mr.
11   Howard and his firm, Howard & Associates, and also against
12   Cambridge Capital because they had, similar to Case Strategies
13   Group, taken the position that absent a subpoena, Your Honor
14   could not order them to provide discovery responses.  So we
15   did present to Your Honor in our Motion to Compel one of the
16   class members, we called him John Doe for purposes of the
17   Motion to Compel, his lending arrangement with Cambridge
18   Capital.  And they, as RD Legal, couched their instrument as
19   an assignment.
20        In this particular instance of Mr. Doe, he was assigning
21   $110,000 for an advance of $60,000.  The difference between
22   all of the other funders and Cambridge Capital is the fact
23   that Cambridge Capital doled out monies on month -- in monthly
24   disbursements to the class members to whom it gave funding.
25   We don't have any idea how many class members got funding

1    arrangements with Cambridge Capital.  We noted in our papers

2    on the Motion to Compel that Mr. Howard's law firm and the

3    Cambridge Capital company have identical locations.  And

4    Cambridge actually touted its -- this is Mr. Doe's funding

5    arrangement.  Cambridge actually touted itself as -- that

6    players could benefit from its ancillary legal services for

7    little or no additional cost via our direct association with

8    Howard & Associates.

9         The Howard law firm actually sent out an e-mail to

10   retired players, encouraging them to retain Howard and also

11   advising them that you may qualify -- if you qualify for the

12   NFL settlement, we can refer you to an independent cash

13   advance program that may offer immediate cash based upon your

14   proposed settlement.  And this is from the law firm.

15        And then -- so that was in -- that was on June 23rd of

16   2017.  And following Your Honor's issuing the order in July,

17   in August of 2017, the law firm backpedals and says, "As

18   previously recommended, advances on your claims are not

19   advised" -- here we go -- "advances on your claims are not

20   advised as they are very expensive."  So we felt this was

21   something that should be presented to Your Honor for your

22   consideration.  Now I come to the claim service providers and

23   we initially learned of three of them but the third one,

24   Concussion Case Management, who we did serve with discovery,

25   it appears that they actually didn't -- weren't retained by

1    any clients.  So the two that actively retained class members

2    were Legacy Pro Sports and Case Strategies Group.  We've

3    talked about Case Strategies Group, they're the one with the

4    1292(b) motion before Your Honor.  They were formerly known as

5    NFL Case Consulting.  And the similarities between the two

6    entities are that they both charge 10 to 15% of potential

7    future monetary awards.  They refer their clients to specific

8    law firms for another percentage fee from the law firm

9    obviously, and they stand to make million of dollars from what

10   is basically little effort.

11        And on the left hand side of this slide are the law firms

12   we've served discovery with, who are affiliated with Legacy

13   Pro Sports and Case Strategies Group.  Those law firms, and in

14   addition the law firms that are associated with the

15   solicitations using Mr. Pisarcik, for the most part it's

16   important to note that those law firms came on the scene

17   after, for the most part, though maybe a couple of retentions

18   prior -- but for the most part after the Supreme Court denied

19   the petition for certiorari in January of 2017.  So we think

20   that's an important fact to keep in mind.  And just as an

21   example, so these claims services providers, for a class

22   member who's under 45, you know, with a level 2 qualifying

23   diagnosis and no set-offs, the claim service provider would be

24   paid $300,000, for basically getting some documentation

25   together and pointing them toward a lawyer.  The first entity,

1    Legacy Pro Sports, they were -- it was founded by a retired
2    player, Mr. Brandon Siler and a college friend of his, Mr.
3    Ryan Sherry.  They actually did respond to the discovery
4    requests.  They provided thousands of pages of documents,
5    emails, text messages, other documents, and Mr. Siler and Mr.
6    Sherry also gave their depositions.  This business basically
7    began with somewhat of a noble purpose in that they initially,
8    for a fee, but they would help players get disability benefits
9    and grants from the NFL, but once the concussion settlement
10   came into being it morphed into more of a concussion
11   settlement driven business.  At the time they responded to
12   discovery they represented 316 class member clients, and they
13   don't charge an hourly fee, they don't charge a flat fee, they
14   charge a percentage like a law firm.  They also actively
15   recruited players who became clients to then serve as
16   independent contractors to recruit other players to sign up
17   with Legacy Pro Sports.  And they would pay them $200 per
18   contract they closed, plus 1% of whatever that other retired
19   player's potential future monetary award is.  So in other
20   words, they would pay the independent contractor 10% of the
21   10% that Legacy Pro Sports would be receiving.  And so they
22   initially referred their clients to Dolan, Dobrinsky,
23   Rosenblum and Kushner & Kushner.  Those two firms were on one
24   retainer agreement.  It was 15% up to a million, and then 10%
25   anything over a million, and then later on they also began

1    referring their clients to a Kagan Law.  They obtained a

2    contacts list of 15,000 retired players and they began cold

3    calling them, using their independent contractors.  Initially

4    they had attempted to have an arrangement with the law firms

5    whereby they would basically share fees with the law firms.

6    They were told they couldn't do that, so then they basically

7    had their own agreement for 10%, and then the law firm's

8    agreement for 15%/10%, and Legacy Pro Sports would send out

9    both agreements together to the client and say here you go,

10   sign our agreement and sign an agreement with this lawyer.  In

11   March of 2017, LPS began referring clients to -- this Kagan

12   Law, and based upon documents produced in discovery,

13   apparently Ms. Kagan agreed to give Legacy Pro Sports $50,000

14   to pay for two women employed at Legacy Pro Sport's salaries,

15   conditioned upon Legacy Pro Sports referring any clients they

16   closed contracts with to Kagan Law.  Based on the testimony at

17   the deposition, and one of the deponents, Mr. Sherry, actually

18   was untruthful at the deposition which his lawyer told me

19   immediately thereafter, and he had Mr. Sherry sign a

20   declaration.  During the deposition he had attempted to

21   explain away this Kagan Law $50,000 agreement, but after the

22   deposition he told his lawyer that he had been untruthful, and

23   then he signed a declaration basically clearing up that it was

24   a quid pro quo.  Kagan Law paid them $18,000 to -- as long as

25   they would refer any clients closed by these two particular

1    employees to Kagan Law.  There's also evidence based upon text

2    messages produced by this entity that it would tout itself to

3    players as able to enable them to beat the test, basically to

4    appear to be neurocognitively impaired when the player was

5    not.  And so these are just some of the emails back and forth

6    between the law firm and Legacy Pro Sports, where Legacy Pro

7    Sports is basically negotiating with the law firm as to what

8    the law firm will charge its clients so that Legacy Pro Sports

9    could basically package it up as a 20% fee, 10% going to

10   Legacy Pro Sports and 10% going to the lawyer.  In fact,

11   initially they had suggested that their clients go to a

12   different law firm other than the DDR and Kushner Law Firm,

13   but then they decided to go with this other law firm so they

14   -- so that they were switching their clients to a different

15   law firm.  And the one law firm, DDR, did advise Legacy Pro

16   Sports that it should not cold call, that it should only reach

17   out to players with whom it had a pre-existing relationship,

18   but obviously once Legacy Pro Sports obtained the contact list

19   for these 15,000 players they began a robust campaign to

20   enlist more clients.  And there's also evidence in the

21   documents produced that Kagan Law also assisted in this

22   coaching of retired players.  Ms. Kagan's husband is

23   apparently a doctor and is affiliated with a neurologist, and

24   they studied, apparently, other players' testing results and

25   used that as a teaching tool basically to help players ensure

1   that they got a qualifying diagnosis whether in fact that was

2   appropriate or not.  And Kagan Law has 163 class member

3   clients and no retentions prior to March of 2017, most after

4   April of 2017.  This is the other law firm, the Dolan,

5   Dobrinsky, Rosenblum and Kushner & Kushner.  They're together

6   on the same retainment agreement and they have 132 class

7   member clients.

8        Now we come to Case Strategies Group, the entity formerly

9   known as NFL Case Consulting.  We've discussed this a few

10  times that this entity has sought for the 1292(b)

11  interlocutory appeal.  As I believe Chris mentioned, you know,

12  we're -- should the court certify the order for interlocutory

13  appeal --

14       THE COURT:  You don't have to.  You don't have to

15  discuss that.

16       MS. BENEDETTO:  Okay.  So they have approximately

17  -- we believe they have approximately 140 clients based upon

18  the law firms to whom they referred clients, and there are

19  several of those, Reich & Binstock has 48 class member

20  clients; no retentions prior to April of 2017.  Farrell &

21  Patel, 39 class member clients.  They didn't produce

22  discovery, they refused.  They said that they're a third party

23  and that we're required to serve them with a subpoena.  Jesse

24  Dean-Kluger, PA, 28 class member clients.  They didn't provide

25  information as to the date of retention, and Ronald T. Bevans

1    has 15 clients.  MCCall Atten has 10 class member clients.

2    This is an interesting language inclusion in their retainer

3    agreement.  As the court's aware, there's -- in the settlement

4    agreement reference to a 5% holdback, which is supposed to

5    come out of a represented class member's lawyer's piece.

6    Well, they structured their retainer agreement such that is

7    the court does order a 5% holdback, that then the law firm is

8    entitled to 5% more, so -- such that basically the class

9    member is paying for the 5% holdback, not the retained lawyer.

10   And finally we come to the law firms using Mr. Pisarcik.  We

11   were aware of the email and letters that were sent out and

12   that they were included as part of the evidence in the motion

13   that we had filed back in June, but what we didn't know was

14   the fee arrangements with Mr. Pisarcik.  These particular law

15   firms together have represented 333 class members, they have

16   retainers of between 33 1/3 to 40%, and they had no retentions

17   prior to November of 2016.  In May of 2017, they signed an

18   agreement to pay Mr. Pisarcik $200,000 in monthly

19   installments, and they also signed agreements to pay Mr.

20   Pisarcik bonuses, $50,000 for the first 25 clients with

21   qualifying diagnoses, and $75,000 for each subsequent set of

22   25 clients who receive qualifying diagnosis.  These firms had

23   92 clients before the Pisarcik campaign and were retained by

24   an additional 241 clients after the Pisarcik campaign.  Mr.

25   Pisarcik did sit for his deposition and he testified that he

1   did not approve of the email solicitations or the letters

2   before they went out.  In fact, there's back and forth emails

3   that were produced by Mr. Pisarcik and the law firms where Mr.

4   Pisarcik was actively involved in the language which he would

5   approve would be in the emails and letters, and then those

6   mailings and emails went out without his prior approval and

7   language that Mr. Pisarcik testified even he viewed as

8   misleading.  So in conclusion, Your Honor, we would like to

9   continue these discovery efforts.  If given the opportunity we

10   would send out additional discovery requests, file motions to

11   compel.  Certain counsel for the respondents have asked us,

12   you know, "what can our clients do to rectify this and maybe

13   we would be willing to lower our contingent fee."  You know,

14   "maybe we might be willing to charge on a different basis.

15   Maybe we might be willing to charge hourly instead of on a

16   percentage basis," and we -- our response has basically been

17   that we need to present all the facts to the court so that the

18   court is fully aware and that we, you know -- we didn't feel

19   authorized to engage in sort of blessing a fix.

20        THE COURT:  What do you expect the court to do?

21        MS. BENEDETTO:  We would hope, Your Honor, that

22   perhaps these entities could work, maybe with a special

23   masters to try to come up with a --

24        THE COURT:  I'm not talking about settlement.  What

25   -- right now you've come -- you know, I've asked you to

1    present this.  Assuming that I accept what you've said, and

2    I'm not so sure that that's going to happen, but what would

3    you expect from me and what would you like me to do?  What

4    kind of -- would you want me to do an order, do you want me to

5    refer this to the U.S. Attorney?  What do you want me to do?

6            MS. BENEDETTO:  I think we'd like to continue the

7    discovery efforts, Your Honor, and package everything up and,

8    you know, perhaps make recommendations based upon a full

9    record.

10           THE COURT:  Well, there's no question but when you

11   start this you must have some idea -- or maybe Mr. Seeger

12   would like to address this.  I know that you're doing the --

13   just the presentation --

14           MS. BENEDETTO:  Yes, Your Honor.

15           THE COURT:  --  maybe he would like to address that.

16   Okay?  All right.

17           MR. SEEGER:  Yes.  So, Your Honor, I mean so what

18   we're seeing from this brief presentation, and in fairness to

19   people sitting in the courtroom and reading this, this is our

20   -- this is what we are seeing.  There may be another side to,

21   and in fact, I really hope there is to be honest with -- it's

22   the last thing I want to do is spend my time going after this

23   kind of stuff.  But at the end of the day, I think we are

24   going to seek to come to Your Honor, ask for specific relief.

25   Some if it may involve reference for criminal investigation

1    because if in fact there's a falsification of documents,

2    testimony is being tampered with, claim forms are being

3    falsified, that's a very serious issue because it threatens to

4    bog down the settlement in things that the settlement

5    shouldn't be involved in.  Right now we need to be prosecuting

6    -- I'm sorry -- you know, processing claims for the people who

7    started this lawsuit for.  It was started for the people who

8    were the most -- the sickest ones who needed help now.  Now,

9    right now this isn't interfering with the settlement process

10   but if claims are coming through that are fraudulent, that's

11   going to tie up our time and the NFL time and we -- and Orran

12   Brown's time on -- from BrownGreer.  We don't want that to

13   happen.  So there are going to be -- there could possibly be

14   reference for criminal investigation.  There may be sanctions.

15   If we have to investigate this for many months and spend a lot

16   of lawyer time on this, and it turns out that somebody's doing

17   something inappropriate we may ask Your Honor to reimburse

18   both sides for attorney's fees related to that.

19            THE COURT:  Well what do you want me to do?  Do you

20   want me to sign an injunction --

21            MR. SEEGER:  I -- yes.

22            THE COURT:  What do you want me to do?  Do you want

23   me to direct BrownGreer to -- not to pay these?  I mean what

24   is your --

25            MR. SEEGER:  I don't think --

1          THE COURT:  Where's your end point?  That's what I'd

2     like to know.

3          MR. SEEGER:  Okay.  The end point may be there.  I

4     don't think we're there right now.  I think right now what we

5     would like Your Honor to do is to extend her order, which I --

6     you know, to allow us a little bit more discovery, a little

7     bit more time to build a record and to make a formal

8     submission to Your Honor.  The parties can respond to it who

9     are involved, the ones that we think are involved in some of

10    the -- this conduct, and then have another hearing shortly

11    down the road.  So I'm probably going to be talking about a

12    scheduling order and, you know, we're going to have to deal

13    with -- I mean, obviously we've got some entities that are not

14    responding to discovery.  I don't think they understand that

15    Your Honor has the authority to order discovery.

16         THE COURT:  Well the thing that concerns me is that

17    I have no problem -- would have no problem in directing

18    BrownGreer not to pay certain things.  That should not be a

19    big problem.

20         MR. SEEGER:  Right.

21         THE COURT:  But then after the parties get their

22    reward -- awards if they're entitled to it, then what happens?

23    I mean is that what I'm supposed to be adjudicating or am I

24    just supposed to be adjudicating what BrownGreer does?

25         MR. SEEGER:  No, I think you have the ability to

1   adjudicate all these issues, which would be if necessary, I'm

2   not there yet.  I don't -- look, I don't want to –

3           THE COURT:  Okay.  I'm not -- I want to know what

4   you're thinking.

5           MR. SEEGER:  What the end game is here?

6           THE COURT:  Yes.

7           MR. SEEGER:  The end game will ultimately be if we

8   find wrongdoing, we will ask you to approve obviously the

9   payment of claims to the NFL retired players, but to hold all

10  these other funds in abeyance while we litigate over it.  That

11  would include the fees of claim service providers, attorneys

12  that are associated with this, and not to allow disbursements

13  from awards to lenders who we think have been involved in some

14  of this conduct.

15          THE COURT:  Well do -- have any of those lenders

16  asked for reimbursement?

17          MR. SEEGER:  Well, I would imagine that they -- I

18  mean, that's a good a question --

19          THE COURT:  I don't what the answer --

20          MR. SEEGER:  -- for BrownGreer.  I don't know if

21  Orran Brown is here in the courtroom but I'll find out.  It's

22  my understanding that lenders have reached out to BrownGreer

23  to make them aware of an interest and an award, okay?  Whether

24  any of those have been paid to date, I doubt they have but

25  I'll -- I will double-check that.

1          THE COURT:  Okay.  All right.

2          MR. SEEGER:  And if they have we'd obviously -- we'd

3    look to claw that money back until we resolve this.

4          THE COURT:  I'll explore this issue a little further

5    with you.

6          MR. SEEGER: Yes.

7          THE COURT:  And I'm not going to put you on the spot

8    now --

9          MR. SEEGER:  Yes.

10         THE COURT:  -- but I will -- that's of concern to

11   me --

12         MR. SEEGER:  Yes.

13         THE COURT:  -- about what a judge can do and if

14   there's any precedent for judges doing certain -- taking

15   certain steps to try and prevent some of this --

16         MR. SEEGER:  Yes.

17         THE COURT:  -- if, in fact, they're valid.

18         MR. SEEGER:  Right.  And may I just say this, Your

19   Honor?  I mean, I want to make this really clear.  I mean, we

20   are looking to protect the players, not to make more problems

21   for players.  We believe that if these things have gone on,

22   the players are victims.  They're not involved in it because,

23   you know, some of these players are really -- well, first of

24   all they have neurocognitive problems and they're being taken

25   advantage of.  But there are other players that we have to

1    just recognize are, if not destitute close to it, and all are

2    struggling with medical expenses, bills, and living.  So we

3    don't want to implicate the players in this.  I want to focus

4    on the predatory conduct.

5              THE COURT:  Okay.  Thank you.

6              MR. SEEGER:  Thank you.

7              THE COURT:  All right.  Would the NFL like to be

8    heard?

9              MR. KARP:  Just very, very briefly, Your Honor.  As

10   Your Honor would expect, we fully support the efforts of class

11   counsel to investigate these issues, to dig into these issues.

12   Our goal today is the same as it was at the outset of this

13   process.  We want to see to it that the settlement payments

14   are made to deserving NFL retired players who are members of

15   the settlement class.  To the extent that there are

16   unscrupulous lawyers or lenders out there that are taking

17   money that rightfully belongs to the retired NFL players and

18   putting that money in their pocket, that's something that is

19   anathema to everything that the NFL is seeking to achieve, and

20   frankly everything that Your Honor, as the judge

21   superintending this historic settlement, has tried to achieve.

22   And what's particularly concerning to the NFL is also the

23   suggestion that Chris and Terri raised today that there are

24   lawyers and others out there who appear to be counseling

25   claimants on how to cheat the system.  We don't have detailed

1    evidence of that yet, but we do anticipate returning to Your

2    Honor at a future time and laying out what we have discovered,

3    because nothing is more important to the NFL in the context of

4    this settlement, and nothing is more important to Your Honor

5    in the context of superintending this settlement than making

6    sure that everything is above board, that there is no fraud,

7    that deserving players recover funds, and that any retired

8    players who are members of the class who are trying to cheat

9    the process and cheat the NFL are detected and prosecuted to

10   the fullest extent of the law.  That's in the NFL's interest.

11            THE COURT:  Okay.  Thank you.

12            MR. KARP:  Thank you, Your Honor.

13            THE COURT:  All right.  I don't think there's -- if

14   you wish to respond?

15            MR. SEEGER:  I just want to update what I said

16   because Mr. Brown actually is in the courtroom.  So because

17   these are not recognized as valid liens, these loans that are

18   being made and we don't recognize assignments, it could be

19   that some of the lenders are not notifying Mr. Brown of their

20   interest in the settlement amounts.  So they may be as these

21   claims get paid, looking to seek recovery from the players.

22   So I think that just moved up our timeline.  We need to figure

23   this out really quickly.

24            THE COURT:  Well, that's -- Mr. Brown, that's -- I

25   recognize you, I know who you are.

1           MR. BROWN:  Good morning, Your Honor.

2           THE COURT:  Thank you very much.  First of all,

3    thank you for coming to the hearing.

4           MR. BROWN:  Thank you.

5           THE COURT:  And for your really excellent job that

6    you've done in trying to implement this and move it forward,

7    and I appreciate that very much.  And it's really been -- it's

8    really nice working with you.

9           MR. BROWN:  Thank you, Your Honor.

10           THE COURT:  So I appreciate, and this will work out

11    no matter how I determine it, and you will be involved in any

12    way that you can be helpful.

13           MR. BROWN:  Yes, Your Honor.  We'll certainly help

14    in any way we can, and I was just telling Mr. Seeger we have

15    not paid any liens to any of these funding groups.  When a few

16    had contacted us and asked us to give them information, give

17    them information on their clients, and we told them that's

18    confidential.  We've also told them that the settlement

19    agreement prohibits the assignment of claim recovery, so we're

20    not recognizing liens from the groups.  But as Mr. Seeger

21    said, we don't have full visibility in what they're doing with

22    the players and what are -- if a player gets an award they're

23    going to claim or get some of that money without us knowing

24    about it.

25           THE COURT:  Well that's -- of course.  That's

1   something that I understand and that's basically the question

2   I was asking.

3           MR. BROWN:  Yes, Your Honor.

4           THE COURT:  At what point -- what can I do to be

5   effective?  That's basically --

6           MR. BROWN:  Thank you, Your Honor.  We're ready to

7   help in any way we can.  Thank you.

8           THE COURT:  Okay.  Thank you, Mr. Brown.  Appreciate

9   that.  Okay.  Are the lawyers for RD here?

10          MR. WILLINGHAM:  Yes, Your Honor.

11          THE COURT:  You are?  Okay.  I may see you in the

12  chambers to discuss an issue that came up at the -- at my

13  conference with RD.

14          MR. WILLINGHAM:  We'll be here, Your Honor.

15          THE COURT:  Okay.  So I'll talk to you about that

16  after.  Okay.  Is there anything else?  Okay.  Yes?

17          MR. SEEGER: No, Your Honor.  We're --

18          THE COURT: Okay.  Court is adjourned and I will rule

19  on future --

20          MR. WILLINGHAM:  Did you want to --

21          THE COURT:  -- hearings if necessary.

22          THE COURT:  I want NFL to stay if you don't mind,

23  and Mr. Seeger to stay.  And if you want to stay Mr. Weiss, of

24  course you can stay and Ms. Benedetto you certainly can stay.

25  Okay?  All right.  Why doesn't the lawyer for RD come back

42

1   with me?    And then if you -- I'll -- then I want to take the

2   two of you --

3        (Court adjourned)

4

5                          CERTIFICATION
6   I certify that the foregoing is a correct transcript from the
7   electronic sound recording of the proceedings in the above-
8   entitled matter.
9
10
11
12
13
14  Signature of Transcriber          Date

9/21/17