# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**OMNIBUS REPLY DECLARATION OF CHRISTOPHER A. SEEGER AS TO RESPONSES, OBJECTIONS AND COUNTER-DECLARATIONS TO PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES**

CHRISTOPHER A. SEEGER declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information and belief, the following:

1.       I am fully familiar with the matters set forth herein, including the procedural history of this litigation and the class-wide settlement ("Settlement") that this Court approved in April 2015 and which is currently being implemented.  I submit this Omnibus Reply Declaration pursuant to the Court's September 12, 2017 Order directing me to submit a detailed proposal for

the allocation of lawyers' fees among common benefit counsel, including the precise amounts to be awarded [ECF No. 8367], and pursuant to the Court's November 7, 2017 Order [ECF No. 8900], allowing an omnibus reply. This Omnibus Reply Declaration incorporates my opening Declaration on the allocation issue, dated October 10, 2017 [ECF No. 8447] ("Seeger Opening Allocation Decl."), as well as my previous declarations submitted in connection with Co-Lead Class Counsel's Petition for an Award of Attorneys' Fees, Reimbursement of Costs and Expenses, Adoption of a Set-Aside of Five Percent of each Monetary Award and Derivative Claimant Award, and Case Contribution Awards to Class Representatives ("Fee Petition"), dated February 13, 2017 [ECF No. 7151]. *See* ECF No. 7151-2 (Declaration in support of Fee Petition, dated February 13, 2017), and ECF No. 7464-1 (Supplemental Declaration in support of Fee Petition, dated April 10, 2017).

      2.     Herein, I address the seventeen submissions filed by various law firms[1] taking issue with (a) my ability to fairly propose the allocation; (b) the process I used to determine the allocation;

---

[1] The law firms/lawyers representing Class Members who were not objectors, and which firms submitted responses in opposition to my proposed allocation, mostly members of the PEC or PSC, are as follows: Goldberg, Persky & White, P.C. (Jason Lukasevic) [ECF No. 8556]; Rose, Klein & Marias LLP (David A. Rosen) [ECF No. 8576]; Hagen, Rosskopf & Earle, LLC (Bruce A. Hagen) [ECF No. 8687]; Anapol Weiss (Sol Weiss) [ECF No. 8701]; Locks Law Firm (Gene Locks) [ECF No. 8709]; Girardi | Keese (Thomas V. Girardi) [ECF No. 8719]; Kreindler & Kreindler LLP (Anthony Tarricone) [ECF No. 8720]; Pope, McGlamry, P.C. (Michael L. McGlamry) [ECF No. 8721]; Zimmerman Reed LLP (Charles S. Zimmerman) [ECF No. 8722]; McCorvey Law, LLC (Derriel C. McCorvey) [ECF No. 8724]; and Podhurst Orseck, P.A. (Steven C. Marks) [ECF No. 8728]. Craig R. Mitnick of Mitnick Law Office, LLC, initially filed a response to my proposed allocation [ECF No. 8653], but subsequently withdrew that response [ECF No. 8917]; thus, his submission is not addressed herein.

The law firms that represented objectors and which take issue with my proposed allocation are: The Coffman Law Firm; Weller, Green, Toups & Terrell, LLP; The Webster Law Firm; and The Warner Law Firm (collectively, the Armstrong Objectors) [ECF No. 8532]; Lubel Voyles LLP (the Alexander Objectors) [ECF No. 8725]; MoloLamken LLP and Hangley Aronchick Segal Pudlin & Schiller, and Linda S. Mullenix (the Faneca Objectors) [ECF No. 8726]; and Capretz & Associates (the Jones Objectors) [ECF No. 8727].

and (c) the specific amounts that I propose be awarded to the respective firms, as well as lodging various and sundry other complaints.[2]

*Overview*

3.      In arriving at the proposed allocation that the Court asked me to submit, I relied both upon my own intimate knowledge of each law firm's relative contributions to achieving, maintaining, and implementing this historic Settlement and upon the common benefit time and expense data and narratives that my firm collected from the other law firms in connection with filing the Fee Petition.

---

The motion portion of the response to my proposed allocation by Neurocognitive Football Lawyers, PLLC and The Yerrid Law Firm [ECF No. 8723], which was joined in by X1Law, P.A. and Loren & Kean Law [ECF No. 8729], was addressed separately in my firm's Memorandum in Opposition to Neurocognitive Football Lawyers, PLLC's and The Yerrid Law Firm's "Motion to Prioritize," filed on November 9, 2017 [ECF No. 8914] ("Opposition to Motion to Prioritize").

[2]  Although many opposing the allocation that I propose also argue against the requested 5% set-aside for future common benefit work, because the Court will not address that request prior to receiving a report from Prof. William B. Rubenstein, and all parties will have the opportunity to respond to Professor Rubinstein's report, which is due by December 1, 2017, I do not address that issue herein.  *See* ECF No. 8376.  I merely noted in my Opening Allocation Declaration, dated October 10, 2017 [ECF No. 8447], at ¶ 21, that common benefit time expended in implementation of the Settlement was not included in the time related to the present proposed fee allocation.

Some firms opposing my proposed allocation used their responses as platforms to make arguments that the aggregate fee award sought in connection with the Fee Petition filed in February is premature.  Some claim that it should be delayed until more Class Members receive compensation. *See*, *e.g.*, ECF No. 8723.  Others maintain that a decision by the Court relating to their individual retainers must precede the decision on the aggregate fee and expense award and allocation.  *See*, *e.g.*, ECF No. 8721 (McGlamry), at ¶¶ 11-16.  Similarly, I do not address that issue herein.

As noted in our Opposition to the Motion to Prioritize, both the 5% set-aside and the alleged prematurity issues were improperly raised in connection with the proposed *allocation* that the Court asked me to provide.  *See* ECF No. 8914.

4.     Having previously served as lead counsel in many other cases, I am not surprised that some lawyers view the value of their contributions to the overall success of the litigation differently than I do.[3]

5.     In addition, in light of relatively small investments in common benefit work that some of these complaining firms made, it is not surprising that they contend that I took the wrong approach in utilizing a lodestar and multiplier framework to arrive at the proposed allocation.

6.     These detractors claim that I unfairly reserved the majority of work for my own firm and certain select other firms and persons.

7.     This ignores the reality of the common benefit tasks available in the context of a case, like this one, wherein the overwhelming common benefit initiative for the Class—indeed, the initiative that led to the formation of the Class—involved meticulously crafting, negotiating, securing, defending, and, now, implementing the Settlement.  Every case evolves differently, and develops its own points of emphasis and corresponding counsel needs.  Indeed, while large-scale discovery and related motion practice might have been anticipated when the Court appointed the relatively high number of firms to the PEC and PSC in April/May of 2012, *see* CMO Nos. 2, 3 [ECF Nos. 64, 72], it became clear when the Court stayed discovery in August of 2012 [ECF No.

---

[3]  In *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-01827-si, 2012 WL 12918720, at *2 (N.D. Cal. Dec. 18, 2012), the Special Master proposing the allocation, who notably had long been involved in that litigation and was intimately aware of the involved law firms' respective contributions, commented upon the various firms' self-evaluations:

> I say this with amusement not in criticism, each of the objecting firms exhibited the mindset reflected in Garrison Keillor's fictitious town of Lake Wobegon, where "all the children are above average."  Almost every firm told me that its contribution to the effort was "above average" and that it, therefore, deserved a higher-than average multiplier.  Needless to say, it is impossible to rate them all as "above average."

This observation is equally apt here.

3384], followed by the parties' agreement to a Term Sheet in August of 2013 [ECF No. 5235], that this litigation was now on a far different trajectory and that discovery was most likely not going to occur.  Thus, unlike cases involving large productions of documents, with the corresponding witnesses to be deposed, and related discovery motion practice, there were not discrete segments of this litigation or even individual tasks that could be easily or practically parceled out to these firms who claim that they asked for, but were not assigned work.  In discovery-intensive cases, lead counsel necessarily must rely on many other firms to get the discovery completed in a timely manner.  That was not the case here.  *See* Supplemental Declaration of Brian T. Fitzpatrick, dated November 17, 2017 ("Fitzpatrick Supp. Decl."), at ¶ 2.

8.     As the first Court-appointed Co-Lead Counsel, and de facto head of the Plaintiffs' leadership,[4] it was my responsibility to draw from the pool of available counsel in the PEC and PSC, or to go outside of their ranks, in order to ensure that the firm(s) and/or individual(s) best suited for each assignment were selected.

9.     Relying upon my experience from other cases, my knowledge of the specific facts related to this case, and knowing most of the lawyers in the PEC and PSC from other cases, I exercised my judgment throughout the litigation in recruiting the best talent and assigning work, including, *inter alia*, choosing (a) Arnold Levin and Dianne Nast to serve as Subclass Counsel during settlement negotiations; (b) attorneys from my own firm and Levin Sedran & Berman to engage in the further line-by-line negotiations with the NFL's attorneys in order to draft the detailed 100-page Settlement Agreement following the agreement to the general Term Sheet and

---

[4]  I was appointed to serve as Plaintiffs' Co-Lead Counsel by the Court on April 26, 2012, as per CMO No. 2, in which the Court also directed the PEC to "report back to the Court its choice for local Co-Lead Counsel from Philadelphia-based lawyers."  ECF No. 64.  Sol Weiss was selected as a result of that process, and the Court made his appointment on May 11, 2012, in CMO 3 [ECF No. 72].

then to revise the Settlement Agreement, under the auspices of Special Master Perry Golkin, in connection with uncapping the deal; (c) attorneys from my own firm and certain others to assist in drafting the preliminary and final approval papers; (d) Prof. Samuel Issacharoff to provide guidance initially during the settlement negotiations, to strategize on and direct the briefing on preliminary and final approval and the multiple appeals, to present oral argument to the Third Circuit on those appeals, and to strategize and direct the briefing on the certiorari petitions to the United States Supreme Court; and (e) attorneys from my own firm and certain others to assist in the Settlement's implementation.

10.     The assessments of lawyers' relative contributions set forth herein and in my Opening Allocation Declaration are from my perspective, as Co-Lead Class Counsel, which is what the Court sought.  I have now had the benefit of reviewing the most recent submissions voicing disagreement with my assessments.  While I can appreciate these lawyers' perspectives, they have not moved me to change my recommendation to the Court as to the proposed allocation previously submitted.  The final decision on allocation will, of course, be made by the Court.

***Seeger Weiss Collected Common Benefit Fee and Expense Information from the Law Firms and Audited Same***

11.     In anticipation of filing a petition for fees, if and when all appellate challenges to the Settlement were exhausted, on July 25, 2016, my firm reached out to over 130 law firms, including those on the PEC and PSC, those representing individual clients, some of whom I knew had done some common benefit work, and others who I believed might claim that they had, and those who had represented objectors.  We asked them to submit their common benefit time and expenses for the time period from January 2012, when the Multidistrict Litigation ("MDL") was created, through July 15, 2016 time.  *See also* Seeger Opening Allocation Decl. [ECF No. 8447]

at ¶¶ 13-17.  We requested that all submissions be made by August 31, 2016 and utilize a template that my firm had prepared to make our review more efficient.

12.     Once submissions were received and audited, some well past the requested deadline and some ignoring the template that was provided, my firm engaged in active dialogue with the firms regarding challenges that certain time or expenses were not actually attributable to the "common benefit."  We used Case Management Order No. 5 ("CMO-5") to guide our review and dialogue.  *See* ECF No. 3710.  Many law firms included time for activities that were expressly disallowed by CMO-5, such as time spent communicating with or working on behalf of their individual clients, time billed for activities prior to the formation of this MDL, obviously duplicative or excessive billing, and "read/review time" of individuals having no evident responsibility in the litigation.  Similarly, we also flagged entries that lacked sufficient detail to enable us to judge whether a task was for the common benefit, and provided firms with the option to provide missing details.  In all instances, we provided each firm with an opportunity to justify why any challenged time should be deemed "common benefit" time.

13.     Ultimately, in connection with filing the Fee Petition, we asked each non-objector law firm to draft a declaration describing, in their own words,[5] what they viewed as their firm's

---

[5] Mr. Tarricone now complains that my firm asked him to remove certain language from his declaration, namely, that the communications strategy in which he was involved "was a carefully orchestrated effort that influenced the NFL to engage in settlement negotiations that culminated in the class settlement," and that he complied and removed the language.  *See* ECF No. 8720 at ¶ 15 n.1.  He asserts that I had him remove the language for the purpose of watering down and minimizing his contribution.  That is most decidedly *not* why he was asked to remove that language.  Mr. Tarricone was asked to remove that language because it was an inaccurate statement.  The messaging and public relations during the time prior to the Settlement was one factor of many, and by no means a leading factor in bringing about the Settlement.  Rather, litigation risks – such as how the NFL would fare on the preemption issue, the real threat of a trial against experienced trial lawyers, and the uncertainty of jury awards – were far more likely the weightier considerations that the NFL had to take into account.  Furthermore, as I noted in my Opening Allocation Declaration, in describing Mr. Tarricone's contribution, the main thrust of the media campaign

contribution to the Class as a whole, and even provided templates for same to some firms that requested assistance with this simple task.  While some firms described their purported common benefit work in great detail, most spent little time drafting the declarations and were very brief in their descriptions.  *Compare, e.g.,* Declaration of Levin Sedran & Berman [ECF No. 7151-6], at ¶ 2, or Declaration of Samuel Issacharoff [ECF No. 7151-18], at ¶ 2 *with* Declaration of Thomas V. Girardi [ECF No. 7151-16], at ¶ 2, or Declaration of Jason E. Lukasevic [ECF No. 7151-20], at ¶ 2.  In some instances, when detail was lacking, but I knew that the firm had made a notable contribution to the common benefit in an area not mentioned or particularly highlighted in that firm's initially submitted declaration, my firm suggested that additional detail be added.  Like the preparation of the declaration itself, however, we left the addition of further detail to the individual firms.

14.     These declarations were signed by the principals of the law firms, were submitted with the Fee Petition, and purported to set forth all of their common benefit hours and expenses and to describe what they did to merit reimbursement of same from the Attorneys' Fees Qualified Settlement Fund.  Ironically, a number of counsel who sent us rather insubstantial declarations now complain that more time of their time was not included, or that I gave their allegedly key contributions short shrift.

---

and Communications Committee was to ensure accurate information about the Settlement was being disseminated to Class Members, and to counter misinformation.  *See* ECF No. 8447, at ¶ 15.k.  *See also* ECF No. 7151-1 (Fee Petition), at 11 (ECF p. 22) ("communications strategy" was designed to "ensure that the broader player community (and the public at large) was fully apprised of the factual, medical, and legal issues encompassed by Plaintiffs' claims and the litigation, and to counteract any misinformation, from whatever source."); ECF No. 7151-2, at ¶ 33 ("Plaintiffs' Counsel were concerned about the dissemination of incomplete or misleading information to Plaintiffs, the broader player community, and the public at large.").

***The Court Requested That I Submit a Proposed Allocation***

15.     Certain firms disagree with the Court's decision to ask me to submit a proposed allocation, likening me to a "fox" divvying up the chickens, and claiming that I cannot be objective, or worse.  *See, e.g.*, ECF No. 8709 (Locks), at 7 (citing *In re Diet Drugs*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring) (suggesting that it would be inappropriate to give "substantial deference" to MDL leadership in determining how to allocate common benefit fees, because those lawyers have conflicts of interest)).[6]

16.     Notwithstanding the ad hominem attacks on me, the Court's request that I propose an allocation is not unusual or improper.  Rather, it was, and, even after the observations by Judge Ambro in his 2005 concurrence in *Diet Drugs*, it remains the norm that district courts in this Circuit, and elsewhere, ask lead counsel in class action cases for input on allocation, or delegate to them entirely the task of allocation.  "Generally, a district court may rely on lead counsel to distribute attorneys' fees among those involved."  *Milliron v. T-Mobile, USA, Inc*., 423 Fd. App'x 131, 134 (3d Cir. 2011); *Wallace v.* Powell, 301 F.R.D. 144, 168 (M.D. Pa. 2014).[7]  Allocation of fees in

---

[6] In *Diet Drugs*, the Third Circuit dismissed appeals from an interim allocation of fees for want of appellate jurisdiction.  401 F.3d at 156-61.  Judge Ambro agreed, in a concurring opinion, that the appeals should be dismissed and merely expounded on the pros and cons of courts' outright delegation of fee allocations (what he termed "the delegation approach"), as opposed to their obtaining the input of counsel but making the final allocation themselves ("the reexamination approach") and the degree of deference that should be afforded such recommendations.  *Id*. at 168-74 (Ambro, J., concurring).  That discussion is not only non-binding *dicta* (if there can be said to be such a thing in a concurring opinion), but also is immaterial here because the Court did not delegate the allocation of fees to me outright.  Rather, the Court requested my *recommendations*.  Moreover, the Court has received responses to my recommendations from a number of affected counsel.  *See supra* n.1.  Ultimately, the Court will make the allocation.

[7] *See also Victor v. Argent Classic Convertible Arbitrage Fund L.P*., 623 F.3d 82, 90 (2d Cir. 2010) (citing the "fox divvying up the chickens" language from Judge Ambro's concurrence in *In re Diet Drugs*, 401 F.3d at 173, but nevertheless holding that "[s]ince lead counsel is typically well-positioned to weigh the relative merit of other counsel's contributions, it is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation of attorneys['] fees"); *In re*

this manner is rational because lead counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation," and this process "conserves the time and resources of the courts."  *In re Processed Egg Prods. Antitrust Litig.*, No. 08-2002, 2012 WL 5467530, at *7 (E.D. Pa. Nov. 9, 2012); *accord In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 343, 351-52 (E.D. Pa. 2004) (delegating allocation outright to lead counsel because counsel who "has managed the case from its inception," is better able to assess the weight and merit of each firm's contribution); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) (counsel who have directed case from inception "are best able to assess the weight and merit of each counsel's contribution").

17.     Contrary to what some maintain, *see* ECF No. 8723 (Lubel), at 7 n.10, courts have not adopted any practice or rule, formal or informal, whereby large awards of attorneys' fees are to be treated differently in this respect.  Even in such cases, courts often seek or defer altogether to the judgment of lead class counsel.  *E.g.*, *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (lead counsel would have initial responsibility for allocating over $123 million in fees, subject to court's review); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3175924, at *4 (N.D. Cal. July 21, 2017) (awarding $121 million in attorneys' fees, "to be allocated by Plaintiffs' Lead Counsel among the PSC firms and additional counsel performing common-benefit work"); *In re AOL Time Warner,*

---

*Initial Pub. Offering Secs. Litig.*, No. 21 MC 92(SAS), 2011 WL 2732563, at *7 (S.D.N.Y. July 8, 2011) ("Based on lead counsel's familiarity with the underlying litigation, fee allocation proposals are often afforded substantial deference."); *In re Copley Pharm., Inc., Albuterol Prods. Liab. Litig.*, 50 F. Supp. 2d 1141, 1149 (D. Wyo. 1999) (where attorneys could not reach "unanimous stipulation" regarding fee allocation of $150 million attorneys' fees fund, court allocated fees but "necessarily gave substantial deference to Lead Counsel's proposed allocation. In a case of this magnitude, the assistance of Lead Counsel on matters such as this is especially invaluable."), *aff'd and remanded*, 232 F.3d 900 (10th Cir. 2000).

*Inc. Sec.*, No. 02 Civ. 5575 (SWK), 2006 WL 3057232, at *2 (S.D.N.Y. Oct. 25, 2006) ($147.5 million attorneys' fees award to be allocated by lead counsel); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 2750 (DLC), 2005 WL 2293178, at *1 (S.D.N.Y. Sept. 21, 2005) (awarding $187,720,000 in attorneys' fees, to be allocated by lead counsel); *In re Pfizer Sec. Litig.*, No. 04-cv-9866 (LTS)(HBP), ECF No. 727, at ¶ 4 (S.D.N.Y. Dec. 21, 2016) (awarding attorneys' fees of 28% of $486 million settlement and directing lead counsel to allocate attorneys' fees and expenses amongst plaintiffs' counsel).  Again, ultimately, the Court alone will make the final allocation of common benefit fees.

***There Is No Need for the Court to Appoint a Special Master or to Delegate the Allocation of Common Benefit Fees to Magistrate Judge Strawbridge***

18.     Some firms complaining about the Court's intention to consult my proposal in making the final determination on allocation, suggest that a Special Master should be appointed or that the Magistrate Judge should be utilized for this purpose.  *See* ECF Nos. 8697, at ¶ 29 ("neutral" special master), 8701, at 1, 15 (Magistrate Judge David R. Strawbridge or a Special Master), 8720, at ¶ 2, 8720-2, at 2, 10-11, 13 (Special Master), 8721, at ¶ 2 (Special Master), and ECF No. 8723 (Special Master).

19.     These firms ignore the fact that the Court clearly already considered and rejected the idea of appointing someone else to weigh in on or to make either the aggregate award for common benefit fees, or the subsequent allocation of same.

20.     On April 4, 2017, the Court issued an Order referring the issue of individual attorney liens to Magistrate Judge Strawbridge and specifically reserving for itself the "Petition for Award of Attorneys' Fees (ECF No. 7151), any objections to that Petition, and *all similar filings related to fees associated with the Settlement Class as a whole*."  ECF No. 7446 (emphasis added).

21.     On September 14, 2017, the Court issued an Order appointing Professor Rubenstein as an expert to assist the Court in determining whether the Court has the authority, and if so, whether it should cap the percentage on individual retainer agreements, and whether it is appropriate to set aside a percentage of each Class Member's monetary award for the purpose of compensating Class Counsel for future common benefit work, and if so, whether 5% is the appropriate percentage.   ECF No. 8376.   The Court specifically reserved for itself the "reasonableness of Class Counsel's request for $112.5 million," noting that the Court was not asking Professor Rubenstein to address that issue in his report.  *Id.*

22.     Only two days earlier, on September 12, 2017, the Court had directed me to "submit a detailed submission as a proposal for the allocation of lawyers' fees among class counsel including the precise amounts to be awarded along with a justification of those amounts based on an analysis of the work performed."  ECF No. 8367.

23.     Presumably, had the Court desired to appoint a Special Master or to assign the allocation to Magistrate Judge Strawbridge, the Court would have done so already in connection with one of these orders.

24.     In many of the reported cases in which a special master was used, the special master had been involved in the litigation for a significant period of time prior to the fee allocation and thus, had an opportunity to observe the lawyers' work.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2016 WL 6909680, at *2 (N.D. Cal. Oct. 24, 2016) ("The Special Master has also had an opportunity to observe first-hand the work of some of IPP counsel during the motion for class certification and the *Daubert* motion and during the earlier motions for approval of the settlement and for attorneys['] fees."); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2013 WL 1365900, at *3 n.3 (N.D. Cal. Apr. 3, 2013) (Special

Master had long been involved in litigation and thus "had an opportunity personally to deal with, observe and evaluate the work of many of the [Indirect Purchaser Plaintiff] counsel who [were] seek[ing] attorneys' fees and costs").

25.     Such was not the case here.  Only the Court, itself had the opportunity to personally deal with and to evaluate the work of counsel.  The Court was intimately involved at all stages of the proceedings and, no doubt, has substantial first-hand familiarity with the roles and involvement of counsel in yielding the benefits to the Class.  As such, there is no need to involve a special master or Magistrate Judge Strawbridge at this stage to advise the Court as to how to allocate the Attorneys' Fees Qualified Settlement Fund.  The Court is fully informed and capable of being neutral.

***The Method I Used for Arriving at the Proposed Allocation – Lodestar with Multiplier – Was Appropriate***

26.     Many detractors take issue with my process for arriving at the proposed allocation. I used each firm's lodestar and applied a multiplier.

27.     Some firms contend that the multiplier that I propose for their firm is simply not large enough – Anapol Weiss (2.5), Kreindler & Kreindler (1.25), Locks Law Firm (1.25),[8] and Podhurst Orseck (2.25) fall into this category.  Others take issue that I recommend only a multiplier of "1" (meaning no enhancement of their lodestar) – Girardi | Keese, Goldberg Persky & White, Hagen Rosskopf & Earle, McCorvey Law, Pope, McGlamry, Rose, Klein & Marias, and Zimmerman Reed all fall into this group.[9]  Additionally, because these firms have relatively low

---

[8]  Locks Law Firm does not object to use of a lodestar and multiplier, but wants a committee to come up with a proposed allocation.  ECF No. 8709, at 2.

[9]  Only Rose Klein and Zimmerman Reed suggest what their multipliers should be, namely, 1.5 and 2.0 or greater, respectively.  ECF No. 8576, at ¶ 5 and ECF No. 8722, at ¶ 40.

lodestars, either due to a low number of hours, or low hourly rates, or both, they complain that the methodology is incorrect.  *See*, *e.g.*, ECF No. 8701 (Anapol Weiss), at 1-3, 14-15.[10]

28.     Allocations of attorneys' fees in class cases, as distinct from aggregate awards of attorney's fees,[11] are often accomplished through the lodestar with multiplier method.  *E.g.*, *In re Cathode Ray*, 2016 WL 6909680, at *3 (finding, as to "Lead Counsel['s] proposed multipliers on the various lodestars ranging from 0.5 to 2.98," that Lead Counsel's proposed allocation of $158.6 million fee was fair and reasonable, except for adjustments to four firms' fees in total amount of approximately $1.4 million); *In re Initial Pub. Offering Sec. Litig.*, 2011 WL 2732563, at *5 (approving use of adjusted lodestar with multiplier to arrive at allocation); *In re Vitamins Antitrust*

---

[10]  Anapol Weiss takes issue with Seeger Weiss' hourly rates as compared to its own.  ECF No. 8701, at 14, 14 n.7.  First, Seeger Weiss' hourly rates of $895 and $985 for partners have previously been approved.  *See*, *e.g.*, *In re Pfizer Sec. Litig.*, No. 04-cv-9866 (LTS) (HBP) (S.D.N.Y.), at ECF Nos. 713-13, at 6 (Nov. 11, 2016) and 727 (Dec. 21, 2016) (Seeger Weiss submitted hourly partner rates ranging from $850 to $985 in case in which court approved attorneys' fee award requested, which was 28% of $486 million settlement).  Also, our rates are well within the range of rates for partners at New York and Philadelphia complex litigation firms, especially as compared with the hourly rates of some others who participated in this litigation.  *See*, *e.g.*, ECF No. 7151-6 (Levin), at 11 (hourly rates over $1,000), ECF No. 7151-7 (Locks), at 9 (hourly rate of $900), ECF No. 7151-9 (Nast), at 8 (hourly rate of $800), and ECF No. 7151-16 (Girardi), at 6 (hourly rate of $1,100).  (As noted in my Opening Allocation Declaration, the hourly rates of Levin and Girardi were capped at $990 for this purpose.  *See* ECF No. 8447, at nn.3 & 4.)  Finally, in referring to the lower hourly rates that Seeger Weiss submitted in *McDonough v. Toys R Us, Inc.*, No. 06-cv-00242 (E.D. Pa.), Anapol does not mention that the rates were for time that Seeger Weiss attorneys spent on that case *ten years ago*, in 2007, which fees were initially submitted in 2011, and then resubmitted in 2014.  *See also* ECF 8720-2 (Tarricone), at 11 (making same misleading reference to *McDonough* case as Anapol).

[11]  As detailed in the Fee Petition, in the Third Circuit the proper analysis as to the aggregate award of attorneys' fees is to use the percentage-of-recovery method, with a lodestar cross-check.  *See* Fee Petition [ECF No. 7151-1], at IV.A, IV.C; *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) ("it is sensible for district courts to 'cross-check' the percentage fee award against the 'lodestar' method") (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 333 (3d Cir. 1998)).  The allocation, however, is separate from the aggregate award.

*Litig.*, 398 F. Supp. 2d at 236 (condoning use of multipliers applied to lodestar to allocate common benefit fees).

29.     Some complain that my allocation is subjective, but, multipliers applied to lodestar figures are, by their very nature, unavoidably subjective. The Court asked for my opinion as to the law firms' and lawyers' relative contributions, and the assignment of specific multipliers to each firm's lodestar was the most suitable method available to factor in my assessment. *See* Fitzpatrick Supp. Decl., at ¶ 3.

30.     Overlaid upon the quantitative lodestars, the multipliers that I propose reflect my impressions as to what these lawyers did, qualitatively, to help bring about this historic Settlement, to obtain final approval, and to ensure that the Settlement survived multiple appeals by objectors. *See In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) ("[o]bviously, the needs of large class litigation may at times require class counsel, in assessing the relative value of an individual attorney's contribution, to turn to factors more subjective than a mere hourly fee analysis [but] … the distribution of fees must bear some relationship to the services rendered"). The best way to reflect firms' relative contributions is by applying a multiplier to their respective lodestars. *Cf. In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 600 (3d Cir. 1984) (quality multipliers are in the nature of a bonus or penalty).

31.     I recognize that in deciding how to allocate fees, "[w]hat is important is that the district court evaluate what class counsel actually did and how it benefitted the class." *In re Prudential Ins. Co.*, 148 F.3d at 342. As such, in applying the multipliers to arrive at the suggested allocations, my focus was on what these lawyers did and how that work benefitted the Class.

32.     Prof. Brian Fitzpatrick noted in his initial Declaration, dated October 10, 2017, submitted in support of my proposed allocation that the range of multipliers I suggest, from 0.75

to 3.885, a spread of 1:1.52, is not only a reasonable spread, but "is more equitable than the spreads in the other cases of which [he is] aware."  ECF No. 8447-2, at ¶ 10.

33.     Some contend that Professor Fitzpatrick's declaration submitted in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 15-md-2672-CRB (N.D. Cal.), is at odds with the declaration that he submitted here in support of my proposed allocation because, in that case, he observed that the "'lodestar approach [has fallen] out of favor in common fund class actions" and in his "opinion, it does more harm than good to consider class counsel's lodestar when awarding fees under the percent method.'"  *See* ECF No. 8701 (Anapol), at 14 n.8; ECF No. 8720-2 (Tarricone), at 10 n.6.

34.     Such a criticism, however, compares apples to oranges.  In *In re VW "Clean Diesel,"* Professor Fitzpatrick was called upon to opine in the context of the *aggregate* fee award.  Here, he was asked to weigh in on my proposed *allocation* among those counsel allegedly conferring a common benefit.  As such, Professor Fitzpatrick's opinion in *In re VW "Clean Diesel"* is not at all inconsistent with that offered in connection with allocation and the use of lodestars with multipliers here.[12]  *See* Fitzpatrick Supp. Decl., at ¶ 3.

35.     One can look at numerous cases over decades as to percentages of common funds that were awarded in order to gauge what would be fair and reasonable to compensate the lawyers in the aggregate for fees and expenses in class action cases.  For 2006 and 2007, most mean and median aggregate attorneys' fee and expense awards were between 25% and 30% of the common

---

[12]  Notably, the allocation in *In re VW "Clean Diesel"* was delegated to lead counsel and was not publicly disclosed.  *See* 2017 WL 3175924, at *4 (awarding $121 million in attorneys' fees, "to be allocated by Plaintiffs' Lead Counsel among the PSC firms and additional counsel performing common-benefit work").

fund.  *See* ECF No. 7151-28 (Prof. Fitzpatrick's article submitted with Fee Petition at Ex. Y), at 25.

36.     In contrast, there are no similar data to guide subjective allocations as among various counsel contributing to the ultimate result of a class action settlement or award in connection with particularized common benefit work done by each of numerous law firms.  That is why courts look to lead counsel.[13]  *See supra* at ¶¶ 16-17 (citing cases).

***Several Firms Lay Claim to Credit for the Same Roles/Same Work – Identification of the NFL's Wrongdoing and Scope of Players' Injuries and Early Case Filings; and Responsibility for the Public Relations Upswing in Sympathy for NFL Players' Plight***

37.     Numerous firms assert that they were involved early, doing the groundwork in researching the medicine and the NFL's conduct, and/or that they filed the first cases.  *See* ECF No. 8556 at ¶¶ 2, 16 (Lukasevic) (claiming to have begun researching the case a decade ago and filing the first lawsuits with co-counsel in 2011, following 2010 publication of compelling scientific research); ECF No. 8697 (Hagen), at ¶ 2 (becoming involved with co-counsel in early 2011 and filing several of the initial lawsuits); ECF No. 8701 (Anapol), at 4-6 (filed first case in federal court and seeking nationwide class); ECF No. 8719 (Girardi), at ¶¶ 9, 19 (filed first complaint against NFL in July 2011); ECF No. 8720 (Tarricone), at ¶ 18 (claiming to have begun being retained by clients in early 2012 and having 135 lawsuits on file as of July 2012); ECF No. 8721 (McGlamry), at ¶ 3 (claiming involvement since early 2011 and to have filed several of initial

---

[13] Anapol suggests some type of benchmark analysis, factoring in the type and the quality of work done by each firm.  ECF No. 8701, at 2-4.  I considered those factors in reaching the multipliers. That is why I propose a robust 2.5 multiplier for Anapol.  Conducting a different subjective analysis would not change my recommendation that, in my estimation, considering the contributions of others, Anapol should receive approximately $4.6 million in fees of the approximately $107.7 million available to compensate for common benefit time.  As noted elsewhere in this Declaration, this is my opinion.  The Court will decide upon the ultimate allocation.

lawsuits); and ECF No. 8722 (Zimmerman), at ¶¶ 2-3 (beginning in early 2011, attended organizational meetings, including with Jason Lukasevic, and filed first complaints by December 2011).

38.     It is not possible that all of these firms were first.  Nor is it reasonable to give them all higher multipliers solely for allegedly winning the race to the courthouse.

39.     Numerous firms also maintain that they were instrumental in the public relations campaign, including finding the public relations firm (CLS) that was ultimately hired.  ECF No. 8576 (Rose Klein), at ¶ 4 (averring active participation in selection of and consultation with CLS, as a member of Communications Committee); ECF No. 8697 (Hagen), at ¶¶ 6, 8 (prepared PowerPoint presentation outlining what would be purpose of Communications and Public Relations Committee ("CPRC") and participated in process that led to hiring of CLS); and ECF No. 8720 (Tarricone), at ¶¶ 12.a, 13 ("I Personally recruited the public relations firm that was eventually retained"; "[t]he success of our PR rollout on June 7, 2012 was due in large part to careful, extensive and intensive planning and coordination, in which I played a leading role throughout").

40.     Putting aside the work of the paid media expert, CLS, these firms further contend that the Communications Committee's efforts drove the re-shaping of public opinion, which they claim "cannot be overstated."  *See also* ECF No. 8697 (Hagen), at ¶¶ 10-11, 17 (mentioning CLS's efforts almost as an aside, and claiming responsibility, along with Tarricone, Marks, Rosen and McGlamry, for change in public perception of NFL players, from being "greedy" and having brought "frivolous" litigation, to being entitled to more than NFL was willing to pay; asserting that "[n]o other work performed by other committees, subcommittees or law firms added as much value to the overall success of the case as did the work of the CPRC");  ECF No. 8720 (Tarricone), at ¶

15 ("By all accounts, [the committee's] work was extremely effective and was instrumental in bringing the NFL to the settlement table."); and ECF No. 8721 (McGlamry), at ¶ 8 (contending that "Communications Committee's work brought about a sea [of] change in public opinion" and that "was due almost entirely to the incredible work done by the Communications Committee, under the direction of Anthony Tarricone and Steve Marks and the ongoing work of David Rosen, Bruce Hagen and me, working in conjunction with a public relations firm," bringing "[s]ubstantial pressure on the NFL to resolve" the litigation).

41.    Actually, the importance of public relations *can* be overstated – in fact, it is being greatly overstated by these very members of the CPRC.  *See supra* at n.5 (pointing out that communications efforts were meant to ensure that accurate information reached Class Members and inaccurate information was dispelled, not to drive public opinion).

42.    With so many firms all laying claim to being the "pioneers" of this litigation and to spearheading the public relations campaign that supposedly brought the NFL to its knees, the inevitable result is a dilution of all of their relative contributions as to each of these factors.

43.    Furthermore, while being first to bring a lawsuit is important, it certainly does not support a large common benefit fee award when others performed virtually all of the *post*-filing work to bring about the Settlement, obtain final approval, and defend the Settlement through multiple appeals.

44.    To be sure, it cannot be denied that public opinion is a consideration that must be addressed in litigation of this magnitude, with a defendant as consumer-driven as the NFL, such that it was important enough to retain a firm, like CLS.  This litigation, though, was not about "spin," as these counsel who object to my proposed allocation believe.  Rather, it was

predominantly about good lawyering – negotiating and structuring a settlement that would provide real benefits to Class Members and pass muster in the courts.

45. The firms that make much of being the "first to file" and being active on the PRPC did little else to warrant an award of common benefit fees.

46. In reality, there was no other work to give these law firms, particularly once the Term Sheet was signed.[14]  I assigned the available work to my own firm, and others, like Professor Issacharoff, the Levin firm, and certain other Court-appointed "Class Counsel" and "Subclass Counsel," who were better suited to and experienced in the kind of work that was required: detailed negotiations on the fine points of the deal; high-level briefing before this Court, the Third Circuit, and the Supreme Court; and appellate advocacy.

---

[14] Mr. McGlamry complains that since 2013, in contrast to the time period prior to the signing of the Term Sheet, I failed to hold leadership meetings or convene conference calls.  ECF No. 8721, at ¶ 39.  *See also* ECF No. 8724 (McCorvey), at ¶ 16.  Contrasting the assigned duties in this case with the duties of the PSC in *In re Zyprexa Prod. Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006), including "initiating, coordinating and conducting all pretrial discovery," Mr. McGlamry laments, "[t]his is simply not how a[n] MDL coordination is supposed to operate."  ECF No. 8721, at ¶ 40 (typographical error in original).  He ignores the realities of this case.  Mr. McCorvey incredibly notes, in support of his contention that he is entitled to more common benefit fees, that he was appointed to the Discovery/Document Repository Committee and the Third Party Discover[y]/Privilege (NFL teams and colleges) Committee.  ECF No. 8724, at ¶ 28 (typographical error in original).  But there was no formal discovery in this case – the Court *stayed* discovery.  Although I spent not insignificant time and effort to keep the PSC informed, holding leadership meetings with lawyers who were not going to be assigned work would not have been a productive use of time and certainly would not have inured to the common benefit of Class Members.  Nevertheless, to be clear, I kept PSC members in the loop as to what was going on.  My efforts to do so included email communications with all members of the PEC and PSC, and regular telephone communications with any plaintiff's counsel wanting information from me or to provide me with information.  Indeed, at times I spoke with Mr. McGlamry on a weekly basis and with Mr. Zimmerman on a monthly basis.  I was always available to those who desired to speak with me.

***Criticisms That I Abided by CMO-5's Directive that Time Spent Prior to the Formation of the MDL Was Not "Common Benefit Time" Are Unavailing***

47.    Several firms argue that I should have allowed them to submit and be given credit for time spent prior to the creation of the MDL.  *See*, *e.g.*, ECF No. 8719 (Girardi), at ¶ 20 (noting that his firm, as well as Goldberg Persky (Lukasevic) submitted pre-MDL time to me for my consideration, but that my Declaration makes clear that pre-MDL time was not being included; even admitting that they failed to keep track of their hours accumulated prior to the creation of an MDL, but that they "submitted reasonable estimates"); ECF No. 8709 (Locks), at ¶ 37 ("Seeger unilaterally disregarded and disallowed all of the LLF pre-MDL and pre-negotiation work").

48.    In his prior Declaration, Jason Lukasevic (Goldberg Persky) claims to have accumulated over $5.8 million in common benefit fees prior to February 2012.  ECF No. 8719-1, at 26-27.  Notably, except for Seeger Weiss, that is more than any other firm billed in common benefit fees since the creation of the MDL.

49.    Girardi | Keese claims to have accumulated over $3 million in common benefit fees prior to February 2012.  ECF No. 8719-1, at 10.

50.    Similarly, Anapol claims to have spent more than 1,000 hours on medical, factual and legal analyses in 2011.  ECF No. 8701, at 4-5.  Seemingly, Anapol also wants some credit for this work in their allocation.

51.    These firms all ignore the plain language of CMO-5, which sets forth the "Non-Compensable Time Categories" and includes thereunder "time billed for activities prior to the formation of this MDL, January 27, 2012, except that all time expended for briefing, preparation and oral argument before the Judicial Panel on Multi-District Litigation ('JPML') is compensable." ECF No. 3710, at 4.

52.     As such, I did not arbitrarily exclude this time when collecting the time for the Fee Petition, or in terms of allocation.  Rather, I simply followed the Court's directive, one that is also fairly typical in the context of MDLs.  Pre-MDL time is ordinarily considered to be spent in furtherance of the interests of a firm's individual clients, not for the common benefit.

53.     Should the Court determine that this pre-MDL time, or some portion thereof, should be compensable as common benefit time, I suspect that other firms – including my own, inasmuch as Seeger Weiss also logged considerable pre-MDL time going back to 2010, *see infra* n.22 – will want the opportunity to supplement their submissions to account for such time.[15]

***Complaints That Time Spent Communicating with Individual Clients Was Not Credited as Common Benefit Time Are Unfounded***

54.     Similarly, as is also typical in MDL cases, CMO-5 includes in the "Non-Compensable Time Categories," "time related to litigating the claims of individual clients."  ECF No. 3710, at 4.  *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 197 (3d Cir. 2005) (noting that "[o]nly work that actually confers a benefit on the class will be compensable").

55.     Despite this clear provision, certain firms question why time spent communicating with their clients is not credited as common benefit time.  *See*, *e.g.*, ECF No. 8724 (McCorvey), at ¶ 25 ("Members of the PEC and PSC, however, were specifically instructed ***NOT*** to include any work on behalf of any individual class member, including communications with such individual

---

[15] It should be noted that all of these firms that will share in any distribution of funds from the Attorneys' Fees Qualified Settlement Fund are benefiting from the work of Seeger Weiss lawyers in (1) conducting the audit of time and expenses to support the request that the Court make an award of fees and expenses, and (2) handling all of the fee petition briefing requesting the aggregate fee and expense award.  Seeger Weiss assumed the responsibility to do this work as the Court-appointed Co-Lead Class Counsel and, importantly, is not seeking to be reimbursed for this time.

class members, in their time detail in support of the common-benefit fee application.") (emphasis in original).[16]

56.      Complaining of allegedly disparate treatment, some firms contrast that while I claim common benefit time for my and my firm's communications with Class Members, we did not permit them to include this time as common benefit time.  *See*, *e.g.*, ECF No. 8721, at ¶¶ 25-26 (Mr. McGlamry complains that he was instructed to remove time pertaining to communications with individual clients from his common benefit time submission, while I included that time as part of my firm's common benefit time).

57.      This criticism is unavailing.   The time that Seeger Weiss lawyers spent communicating with Class Members was not in furtherance of my firm's individual cases but, rather, for the common benefit of the Class.  My firm had relatively few individually-retained clients and has waived contingent fees as to those.  As such, when Seeger Weiss lawyers have spoken with Class Members, the communications are common benefit time.  The majority of those Class Members were pro se, although some reached out to Seeger Weiss for information when their individually-retained counsel were non-responsive.

58.      In contrast, lawyers individually retained by large numbers of clients, who communicated with those clients in connection with their individual cases, did so for their clients' benefit and not for the common benefit of the Class.  It is a bedrock principle of class action practice that time spent on individual clients' cases, including communicating with those clients

---

[16] In certain instances, law firms defended my firm's challenges to submitted time reflecting communications with individual clients by arguing that the time was spent convincing those Class Members to support the settlement and to not opt-out or object.  In those limited instances (and not in an across-the-board manner), my firm ultimately allowed some of this time to be submitted as common benefit time, because limiting opt-outs, objections, and appeals was in the interest of the Class as a whole.

about the status of the case, is not compensable as common benefit time.  That anyone even makes the argument that time spent communicating with one's own clients should be compensated as common benefit time highlights a lack of understanding as to what constitutes common benefit tasks.

59.    As the Third Circuit has noted:

> Nor is there any reason for the class as a whole to compensate large numbers of lawyers for individual class members for keeping abreast of the case on behalf of their individual clients, keeping their individual clients informed, or duplicating the efforts of lead counsel.  If individual class members wished to have the services of additional counsel in addition to class counsel, they should bear the expense themselves.

*In re Cendant Corp.* 404 F.3d at 201-02 (citing *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 WL 210697, at *4 (S.D.N.Y. Feb. 26, 2001)).  Besides, lawyers who spent time communicating with their own clients or rendering other services to them *will* be compensated for that work – through the fees they receive on their individual retainers.  They are not, however, entitled to double-dip by *also* being paid common benefit fees for such services.[17]

***Detractors Claim Entitlement to Higher Multipliers Due to the Fact That They Have Many Individually-Retained Clients – According to Them, More Clients Resulted in Greater Risk and Also "Critical Mass" to Bring the NFL to the Settlement Table***

60.    Many contend that they have large numbers of clients and that, therefore, their risk of not getting paid, should plaintiffs ultimately have failed to prevail, was much greater.  *See* ECF No. 8697 (Hagen), at ¶¶ 20, 26-27 (having represented 500 clients at one time with substantial risk of non-payment); and ECF No. 8709 (Locks), at ¶¶ 2.D n.1, 43-44 (taking on "immense risk" in

---

[17]  For instance, in one of Mr. McGlamry's Notices of Attorney's Lien, he claims that he is entitled to be compensated under his retainer agreement with the former client for three dozen teleconferences  with the client to provide updates, and he specifically sets forth the dates of these calls.  *See* ECF No. 8291-1, at ¶ 5.  Under Mr. McGlamry's flawed logic, he should also be paid for these calls as common benefit time.

having represented 1,400 Class Members at outset of case and during settlement negotiations in 2013, and now 1,100, in contrast with Seeger and Levin representing no more than a dozen clients).

61.     Similarly, some of those objecting declare that their having taken this risk has benefited the Class as a whole because it helped achieve the "critical mass" to bring the NFL to the Settlement table.  ECF No. 8722 (Zimmerman), at ¶ 3 (speaking of "coordinated strategy to build a 'critical mass' of individual complaints to pressure the NFL to work towards a common solution"); ECF No. 8724 (McCorvey), at ¶¶ 30, 31 ("[h]ad it not been for firms like ours, there would not have been a critical mass to cause sufficient pressure on the NFL to reach a settlement"; a grandiose statement given that Mr. McCorvey claims to represent only 50 Class Members).  *See also* ECF No. 8720 (Tarricone), at ¶¶ 17-20 (representing over 250 Class Members at one point, but, now representing 200 and claiming that "without lawyers willing to risk millions of dollars in time and money bringing individual cases, the litigation would have gone nowhere"); ECF No. 8721 (McGlamry), at ¶¶ 2, 17, 45 (representing 404 clients, along with co-counsel, and claiming that the "individual lawsuits were a – if not the – major factor leading to the settlement" and "[h]ad it not been for firms like ours, there would not have been sufficient pressure on the NFL to reach a settlement"); ECF No. 8709 (Locks), at ¶¶ 37, 43 ("LLF filed a vast number of individual claims and class cases in state and federal courts for the purposes of putting maximum pressure on the NFL;" and "LLF took on immense risk by representing and managing effectively 1400 retired players at the outset of this case.").

62.     As such, these objecting counsel criticize me for not rewarding with higher multipliers that asserted risk and pressure their large inventories allegedly brought to bear.

63.     The simple answer to this critique is that the risk of amassing large numbers of clients has its own obvious reward – payment for services rendered under the corresponding

individual retainer agreements.  But to reward out of common benefit funds the mere amassing of clients, no matter how prodigious the results, would be patent double-dipping.  Further, none of these counsel cite objective proof that this purported critical mass is what drove the NFL to settle.

64.    Moreover, under these lawyers' theory, counsel with large inventories should always reap the biggest common benefit allocations – no matter the contributions of others who steered the litigation or the developments in a case – because, they contend large numbers of lawsuits create pressure on any defendant to settle.  Surely, though, that is not the test.  *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, No. MDL 05-1708(DWF/AJB), 2008 WL 5382338, at *22 (D. Minn. Dec. 23, 2008) ("A large case inventory in itself does not result in common benefit time."), *vacated in part on other grounds*, 2010 WL 145278 (Jan. 8, 2010).

65.    Finally, it is not to say that large numbers of individually-filed cases may not have been a factor in bringing about the Settlement.  Objecting counsel, though, do not point to any authority suggesting that merely amassing large case inventories mandates a premium on one's lodestar for common benefit fee purposes – and, as noted above, merely signing up lots of clients simply does not equate to common benefit work.

***In Criticizing Me for Not Doing More to Combat "Poaching," Allegedly Further Increasing Their Risk of Non-Payment, These Critics Misunderstand That My Duty Is to the Class Members, Not to Ensuring that Individually-Retained Lawyers Maintain Their Rights to Contingent Fees***

66.    A few firms criticize me for not undertaking efforts to prevent other lawyers from soliciting their clients, allegedly resulting in their being discharged and former clients retaining these "poachers."  ECF No. 8724 (McCorvey), at ¶ 30 ("My firm formerly represented many more than our current 50 [clients].  Many of our clients were 'poached' by other counsel, who, given the Settlement agreement and Mr. Seeger's failure to support enforcement of individual contingency

fee agreements, apparently told our (now former) clients that they would handle their claims for a lower contingency fee."); ECF No. 8697 (Hagen), at ¶ 22 (averring that I "created the environment" whereby "poaching" could occur because I refused "to address the enforceability of individual attorneys' fees contracts in the terms of the settlement itself"); ECF No. 8721 (McGlamry), at ¶ 10 (claiming that my "failure to address the enforceability of individual contingency-fee agreements" created an environment wherein law firms were discharged, necessitating filing of liens); ECF No. 8722 (Zimmerman), at ¶¶ 7-9 (intimating that if I had taken action, Zimmerman firm would not have had 71 clients poached by other firms' improper solicitations). They conclude that their increased risk in this regard is partially my fault.

67.    One firm condemns me for having *truthfully* stated that Class Members need not retain individual counsel to participate in the Settlement, [18] claiming that this accurate representation caused him to be fired by clients who then retained other lawyers.  ECF No. 8720 (Tarricone), at ¶¶ 18, 21.  Another claims that "the Settlement framework created an environment that encouraged former NFL players to shop for lower contingent fees or try to avoid them altogether."  ECF No. 8721 (McGlamry), at ¶ 24.

68.    These criticisms are astonishing.  My duty was and is to Class Members, not to individually-retained lawyers.  My focus was in attempting to prevent Class Members from being misled and to further that goal I directed the creation of the Ethics Committee.  I thus allowed for time spent combatting misinformation being spread by lawyers attempting to "poach" others'

---

[18] When speaking publicly about the Settlement (and in individual communications with Class Members), although I have said "you don't need a lawyer," that was in the context of Class Members participating in the Settlement.  In other words, one did not need an attorney merely to register and to participate in the Settlement program.  At the same time, I have also expressed my personal opinion that if a Class Member is working with a lawyer, he should continue to do so.

existing clients to be counted as common benefit time.  To be clear, however, in creating the Ethics Committee, the priority was the protection of Class Members—not the backend protection of fees for counsel terminated by their former clients.[19]

69.     Moreover, the record in this MDL demonstrates that I have taken very seriously the matter of what information is being fed to Class Members by third parties (lenders/asset purchasers, claims services providers, and lawyers looking to poach clients).  My firm has undertaken significant efforts, both before and after the Effective Date of the Settlement to stem misinformation about the Settlement being disseminated by law firms and others for the sole purpose of recruiting clients or otherwise profiting from the Settlement.[20]  *E.g.*, ECF Nos. 7175, 7347, 7811, 8392, 8470.

70.     My advice to these counsel was that, in order to help combat poaching of their clients, they should ensure that their clients were well informed and that they kept in contact with them – the corollary being that they should have made sure that they had sufficient staff to handle the number of clients who retained their firms.  Seeger Weiss has fielded dozens of calls wherein Class Members contacted my firm seeking advice because they were unable to get their

---

[19] Some claim entitlement to larger common benefit fees based upon membership on the Ethics Committee, whose task was supposed to be preventing the spread of misinformation about the Settlement by unscrupulous lawyers.  In these responses to my proposed allocation, however, it seems that the mindset of the Committee Members was that the actual goal was preserving individual retainer fees, rather than ensuring that Class Members were not deceived, which is the reason why I created the committee.  ECF No. 8721 (McGlamry), at ¶ 10 (suggesting that Ethics Committee was focused on poaching itself and the resultant lien issues, *i.e.*, the lawyers' contingent fees, rather than on clearing up confusion and disseminating accurate information to the Class Members on issues other than individual representation); *see also* ECF No. 8722 (Zimmerman), at ¶¶ 8-9.

[20] Incredibly, Zimmerman Reed attempts to take credit for my firm's efforts to combat deceptive practices, and seemingly, for the filing of a lawsuit against RD Legal by the federal and state governments.  ECF No. 8722, at ¶¶ 10, 35.

individually-retained lawyer to return their call, or simply noting that they had not heard from their attorney in months, if not years.

***Accusations That I Overstated the Contributions of Seeger Weiss LLP and Certain Other Firms and Persons Because We Allegedly Had Little Risk Are Unsupported and Meritless***

71.    Several firms contend that I have recommended excessive compensation for my firm, Levin, Sedran & Berman, and Professor Issacharoff.  *See* ECF No. 8709 (Locks), at ¶2.D, 20, 42; ECF No. 8721 (McGlamry), at ¶ 48; ECF No. 8697 (Hagen), at ¶ 25.

72.    With few exceptions, these objecting counsel do not take issue with the quality of the work,[21] but, rather, they contend that the proposed multipliers are too high because, they allege, the risk of non-payment was low.  *See*, *e.g.*, ECF No. 8722 (Zimmerman), at ¶ 26 ("Seeger Weiss deserves to be well compensated for its outstanding work on this case and in obtaining a Settlement that provides significant benefits to Class members.").

73.    Addressing the criticism of the multipliers I assigned to others first, beginning with Professor Issacharoff, the detractors are wrong on the facts.

74.    They claim that Professor Issacharoff's "role in this case began later. when the case posed less risk."  ECF No. 8722 (Zimmerman), at ¶ 16 (typographical errors in original); *accord*

---

[21] Mr. Locks claims that I made three errors.  ECF No. 8709, at ¶¶ 22-25.  He contends that I erred in agreeing to a capped monetary award fund in the first settlement presented to the Court, that I should not have allowed deferral of claims processing until after final approval, and that I should not have agreed to release amateur leagues and teams in the first settlement presented.  The first and third criticisms are puzzling because they have been moot for well over three years.  Those aspects were not included in the preliminary settlement that this Court approved in July 2014. Additionally, Mr. Locks was one of the lawyers who signed the initial Settlement Agreement presented in January 2014.  *See* ECF No. 5634-2, at 93.

The second criticism, that claims processing should have gone forward without waiting for final approval, is vacuous.  Had the Settlement not received final approval, or had final approval been overturned or the Settlement ordered modified on appeal, then a great deal of time, resources, and money would have been needlessly squandered.  At any rate, it should be noted that Seeger Weiss did begin, along with Brown Greer and Garretson Resolution Group, to gear up for implementation well before the Effective Date.

ECF No. 8709 (Locks), at ¶ 42 (claiming that Professor Issacharoff was not involved at the start of the litigation).  That contention is uninformed because Professor Issacharoff's involvement, though, began much earlier than at the appellate stage.  At the onset of settlement negotiations, I sought Professor Issacharoff's guidance, as a recognized authority in, among other areas, aggregate litigation, and he was involved in every aspect of structuring the legal issues in the Settlement. *See* Issacharoff Decl. [ECF No. 7151-18], at ¶ 2 ("I have been consulted by lead attorneys for the plaintiffs since the inception of the consolidated litigation in the MDL … my central work on this case began during the period of intensive settlement negotiations.  My primary role was to serve as a legal advisor to lead counsel Chris Seeger on matters relating to class resolution of this case.").

75.     Mr. Zimmerman questions whether Professor Issacharoff's work was done on a contingency fee basis, merely because Professor Issacharoff noted that the hourly rate used to calculate his lodestar was based upon current rates for non-contingent fee work.  ECF No. 8722, at ¶ 38.  Most certainly, Professor Issacharoff, like the rest of us who performed common benefit work, has yet to be paid.

76.     Mr. Locks contends that because Professor Issacharoff represented no clients and invested no money, his risk was low, and therefore his multiplier was too high, as compared to that of Locks Law Firm.  ECF No. 8709, at ¶¶ 20, 42; *accord* ECF No. 8721 (McGlamry), at ¶ 50 (noting that Professor Issacharoff did not have clients).  That assertion is specious.  Because Professor Issacharoff has no clients, *all* of his work was for the common benefit of the Class and no one can accuse him of double-dipping.  Furthermore, had the Settlement failed, Professor Issacharoff would have no individual cases to prosecute – all of his considerable work, done for the benefit of the Class alone, would have been for naught.  Thus, to say that he incurred little risk is sheer nonsense.  Moreover, he carried his own expenses, which remain unreimbursed.

77.     What is more, none of these detractors could have provided the essential guidance on the settlement negotiations so as to ensure that the case was properly postured to survive inevitable appeals, nor could they have directed the briefing and handled the appellate arguments in the manner that Professor Issacharoff did.  Indeed, their begrudging him the multiplier that I propose simply highlights the fact that these critics are ignorant as to the drivers that not only resulted in the Settlement, but also which protected it from being overturned by the small but determined bands of objectors.

78.     As to complaints that I treated the Levin firm too favorably, I can personally attest to the fact that Mr. Levin and his partners were "in the trenches" with Seeger Weiss.  In addition to Mr. Levin's involvement as Subclass Counsel in the negotiation of the Term Sheet, lawyers from his firm worked alongside of lawyers from my firm and myself on countless occasions, until the wee hours of the morning, on weekends, and on holidays, to negotiate with the NFL's lawyers and pen the painstakingly detailed Settlement Agreement and to assist in drafting and/or researching the countless briefs that were filed in this Court in connection with obtaining final approval of the Settlement.  Other than Mr. Levin's firm, I cannot imagine to whom I would have turned for the level of assistance that was required, both in terms of intellect and experience and in terms of being available on short notice and for extended periods of time.

79.     Several objecting counsel maintain that I myself incurred little risk.  *See* ECF No. 8697 (Hagen) at ¶¶ 20, 27 ("Mr. Seeger, who seemed to have no individual clients on contingent fees, took on no risk … [a]fter being hand-picked by the Court to be Co-Lead counsel, Mr. Seeger's risk was all but eliminated. … Mr. Seeger, however, thanks to his manufacturing of the fee structure of the settlement and his appointed position as co-lead counsel, not to mention his

settlement discussions with the NFL prior to the MDL having even been formed,[22] has taken on no risk whatsoever, or minimal at best.").

80.     Similar to Mr. Hagen, Messrs. McGlamry, Tarricone and McCorvey, contend that "Mr. Seeger's risk, if any, of non-payment, has been minimal since the inception of MDL-2323…. Moreover, at least since the late-August 2013 Term Sheet included $112.5 million in common-benefit attorneys' fees, Mr. Seeger's risk has been practically extinguished."  ECF No. 8721 (McGlamry), at ¶ 49; *accord* ECF No. 8720-2 (Tarricone), at 2 ("Seeger's proposal fails to recognize the substantial risk assumed by Kreindler and other firms, which is particularly notable in comparison to the little risk, if any, his firm had in this litigation.  The overwhelming majority of the lodestar generated by Seeger is for work performed after settlement was assured and the fee fund was established."); ECF No. 8724 (McCorvey), at ¶ 10 ("any risk of Mr. Seeger not being paid was effectively extinguished when the NFL Parties agreed not to oppose or object to a petition of attorneys' fees and costs up to $112.5 million as part of the Settlement in summer 2013").

81.     These contentions by the detractors accentuate the level of their naivety.  They failed, and clearly still fail, to appreciate that this Settlement could have been undone in the Third Circuit (where it was attacked at two different phases) or in the United States Supreme Court.  As

---

[22] Never having raised this issue before, Mr. Hagen now points to comments that I made at a meeting in January 2012, to the effect that I had had discussions with the counsel for the NFL regarding a possible settlement.  Disregarding that he improperly discloses information by flouting the work product doctrine and Fed. R. Evid. 408, Mr. Hagen tries to paint those early settlement discussions as sinister because there was no MDL structure at the time.  To be clear, I and other lawyers from my firm had brought a yet-to-be-filed complaint into a meeting with counsel for the NFL in 2010 and we had settlement discussions regarding a case we intended to bring on behalf of a group of retired players.  A players' strike occurred, however, and the NFL then incorporated the neurocognitive benefit into 2011 Collective Bargaining Agreement, assuming that would ward off any future litigation.  I merely passed on to the group of plaintiffs' lawyers with pending cases at that meeting in January 2012 the insights I had gleaned from the 2010 discussions.  There was nothing inappropriate in my having had those discussions almost two years earlier.

such, they not only underestimate what was achieved, they underestimate my efforts, as well as the efforts and commitment by the lawyers at my firm, as well as Professor Issacharoff and the lawyers at the Levin firm.

82.     A similar argument was made, and rejected, in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig*., 582 F.3d 524, 543 (3d Cir. 2009), where one of those who objected to the attorneys' fees awarded claimed that the risk "dissipated after the Settlement Agreement was reached and, pursuant to its terms, Wyeth agreed to fund escrow accounts from which Class Counsel would be compensated." The Third Circuit disagreed, determining that the district court had analyzed the risk of non-payment, not only at the outset, but, also after the approval of the settlement agreement, and found that the risk continued.

83.     Here, the risk continued even after the Settlement Agreement was reached, because the Settlement was attacked as early as immediately after preliminary approval (by the Faneca Objectors, through their July 2014 Rule 23(f) petition to the Third Circuit), and then during the Rule 23(e) final approval proceedings (which were spiritedly contested), in a dozen Third Circuit appeals filed after final approval, and two certiorari petitions. In short, to suggest that I and my firm faced little risk of non-payment for our work once the ink was dry on the Settlement is simply absurd.

84.     Incredibly, these objecting counsel assert that while my risk was allegedly eliminated, *their* risk remained because they had individual clients, because many of the clients discharged them, or because their ability to ultimately collect the percentage contingent fee that their clients had agreed to at the outset was coming under scrutiny. They seem to ignore the fact that had the Settlement not survived the Third Circuit appeals and the certiorari petitions, Seeger Weiss would have been without any remuneration for the 21,000 hours and $1.5 million in

expenses we spent, while those lawyers with individual clients would still have had cases to litigate and the potential to recover fees and expenses.

85.   As to the differential in the multipliers between my firm, the Levin firm and Professor Issacharoff and the other law firms, as noted by Brian Fitzpatrick in his Declaration, the multipliers used herein represent one of the tightest spreads on record.  *See* ECF No. 8447-2, at ¶ 10.

86.   Finally, in terms of real money at risk, as opposed to unreimbursed time, my firm has the highest unreimbursed expenses at almost $1.5 million, with the next closest firm being Anapol with a little over $1 million in common benefit expenses.  The most vociferous detractors opposing my proposed allocation, for the most part, had less than $130,000 in common benefit expenses at risk.  *See* ECF Nos. 7151-26, at 8 (Tarricone - $120,832); 7151-22, at 9 (McGlamry - $125,137); 7151-21, at 8 (McCorvey - $104,156).   Some had even less than $20,000 in hard costs.  ECF Nos. 7151-16, at 8 (Girardi - $5,509); 7151-20, at 8 (Lukasevic - $11,824); 7151-17, at 9 (Hagen - $16,998).

***In Summary, My Previous Assessments, as to the Complaining PEC and PSC Firms' Respective Contributions for the Common Benefit, Remain Unchanged***

87.   To recapitulate, nothing that any of these firms had to say in their counter-declarations or responses has caused me to rethink my recommended allocations as to them.  I now turn to issues specific to each firm.

88.   Girardi | Keese (Thomas V. Girardi) [ECF No. 8719] - My assessment that the firm should receive no multiplier stands.   The firm's submission in opposition to my proposed allocation focuses predominantly on the desire to submit pre-MDL time and time spent on individual cases as common benefit time and to be credited for filing early cases.  I followed CMO-5 and I do not believe this firm should receive a multiplier.

89.     Goldberg, Persky & White, P.C. (Jason Lukasevic) [ECF No. 8556] - I am not persuaded that this firm deserves anything more than to be reimbursed for its lodestar and expenses. Notably, unlike other firms opposing my proposed allocation, neither Mr. Lukasevic, nor his firm had a court-appointed position on either the PEC or PSC.  While the firm may have had a leading role in bringing cases initially, emphasizing in its submission that Mr. Lukasevic was mentioned in the books *Concussion* and *League of Denial*, the fact of the matter is that Mr. Lukasevic and his firm did little common benefit work.  My assessment that the firm should receive no multiplier stands.

90.     Hagen, Rosskopf & Earle, LLC (Bruce A. Hagen) [ECF No. 8687] – Nothing in the vitriolic submission by this firm has persuaded me that it deserves a multiplier.  Putting aside that the submission is predominantly about criticizing me, rather than seeking to elevate work done by the firm, it places inordinate weight upon public opinion in bringing about the Settlement. Notably, the submission speaks to no actual legal work done by the firm for the common benefit of the Class, except for a PowerPoint presentation created for a meeting in 2012.  The emphasis on the firm's risk related to being engaged by some 500 individual clients is unavailing. My recommendation for no multiplier stands.

91.     McCorvey Law, LLC (Derriel C. McCorvey) [ECF No. 8724] - My assessment that the firm should receive no multiplier stands.  Even in the firm's response in opposition to my proposed allocation, the firm did little more in the way of affirmative support for a higher multiplier than mention that Mr. McCorvey was a member of the PSC, on the Communications Committee, the Discovery/Document Repository Committee and the Third Party Discovery /Privilege Committee; that he communicated with his clients and certain other Class Members; and that his firm worked to get his clients registered and set up for BAP exams.  ECF No. 8724, at

¶¶ 2, 21-22, 27-29.  The submission focused largely on criticizing me for not "address[ing] whether individual fee agreements are enforceable."  *Id.*, at ¶¶ 5-7, 11, 33.  No multiplier is warranted for this work.

92.     Pope McGlamry, P.C. (Michael L. McGlamry) [ECF No. 8721] - My assessment that the firm should receive no multiplier stands.  The firm's submission, like many others, touts early involvement and alleged concomitant risk, the importance of purportedly being responsible for a change of public opinion and alleged that the "critical mass" associated with having many clients brought the NFL to the Settlement table.  Like Messrs. McCorvey and Zimmerman, Mr. McGlamry was very focused, as evidenced by this submission, on individual contingent fee issues, which are not related to the common benefit of the Class.  The firm deserves to be compensated for its work, but deserves no multiplier in my opinion.

93.     Rose, Klein & Marias LLP (David A. Rosen) [ECF No. 8576] - My assessment that the firm should receive no multiplier stands.  In its submission in response to my proposed allocation, the firm touts having researched and prepared a memorandum on workers' compensation issues.  While the memorandum was helpful and the firm did a workmanlike job on it, one legal assignment out of the countless legal research projects that went into obtaining and defending the Settlement, does not warrant a multiplier.

94.     Zimmerman Reed LLP (Charles S. Zimmerman) [ECF No. 8722] - My assessment that the firm should receive no multiplier stands.  The firm, like others, makes the arguments that it should be elevated for early involvement, and for having been retained by many clients and thereby providing the "critical mass" to induce the NFL to settle.  As evidenced by its submission in opposition to my proposed allocation, the firm was very focused on protecting its individual

retainer agreements rather than anything that inures to the common benefit of the Class.  I maintain that no multiplier is warranted for this firm.

95.     Kreindler & Kreindler LLP (Anthony Tarricone) [ECF No. 8720] - My assessment that the firm should receive a multiplier of 1.25 stands.  Like many others, this firm's submission in opposition to my proposed allocation focuses on early involvement, having been retained by many clients, and the importance of the public relations campaign.  I did recognize already that this firm's contributions were worthy of a multiplier.  I am not persuaded that their level of contribution to the common benefit was worth more than a 1.25 multiplier, nor am I persuaded to use a method other than the lodestar with multiplier method or that appointment of a third party is warranted.

96.     Locks Law Firm (Gene Locks) [ECF No. 8709] - My assessment that the firm should receive a multiplier of 1.25 stands.  The firm contributed little following the negotiation of the Term Sheet, aside from allegedly persuading its clients to support the Settlement and to not opt out or object.[23]  The firm did not assist with any of the briefing.  The submission in opposition to my proposed allocation has not persuaded me to suggest that the Court allow Class Counsel to work out the allocation amongst ourselves or that the Court should appoint a third party.

97.     Podhurst Orseck, P.A. (Steven C. Marks) [ECF No. 8728] - My assessment that the firm should receive a robust 2.25 multiplier stands.  The firm's work was described in my prior Opening Allocation Declaration.  The responsive submission by the firm was not substantive, so there is no need for me to address it herein.

---

[23] It is important to note that, during confidential settlement negotiations, Mr. Locks gave an interview to *Businessweek*, which jeopardized settlement negotiations and caused him to be removed from the negotiating team.

98.     Anapol Weiss (Sol Weiss) [ECF No. 8701] - My assessment that the firm should receive a 2.5 multiplier stands.  This was the third highest multiplier, behind the multipliers I suggested for my firm and Professor Issacharoff.  To be sure, Messrs. Weiss and Coben did good work, particularly Mr. Coben's work with the medical experts and on the BAP testing protocol. When he contends, however, that he "worked at a grueling pace" and "around the clock," ECF No. 8701, at 11, in connection with negotiating the Term Sheet, Mr. Weiss forgets that I was there, too, and more importantly, that I, lawyers at my firm, lawyers at the Levin firm, and Professor Issacharoff all worked at this pace often and for longer periods of time, during the detailed negotiations of the actual Settlement Agreements and on the dozens of briefs that were filed at three judicial levels.  Aside from reviewing finished products and occasionally commenting thereon, Mr. Weiss was not involved during these times.  His explanation that he worked more efficiently and thus billed less time, is belied by the fact that his firm handled precious little of the drafting.  The submission has not persuaded me to suggest a higher multiplier for Anapol or to propose a different methodology to the Court for allocation.  A 2.5 multiplier is more than generous.

***Objectors' Counsel's Claims to Entitlement to Common Benefit Fees and Expenses Lack Merit***

99.     As to the claims for entitlement of common benefit fees by, in particular, counsel for the Armstrong Objectors, Alexander Objectors, and the Faneca Objectors, it is noteworthy that they made kitchen-sink objections to virtually every facet of the Settlement, hoping one or more would "stick" and be credited to them.  Their vehement opposition on numerous fronts to the proposed Settlement delayed the distribution of benefits to the Class.  They cannot claim to have earned fees for allegedly "'contributing' to a type of settlement that [they] declared [they] would

'never, ever' entertain.  Rhetoric has consequences." *Drazin v. Horizon Blue Cross Blue Shield of N.J., Inc.*, 832 F. Supp. 2d 432, 445 (D.N.J. 2011).[24]

***Armstrong Objectors' Counsel's Response***

100.    The Armstrong Objectors complain that my proposed allocation did not address or analyze their fee petition.  ECF No. 8532, at 2 (¶ 3).  There was no need for me, however, to address their petition de novo and explain why they are not deserving of any fees.  The Armstrong Objectors performed no common benefit work.  Their only claim to fees is as objectors, but for the reasons set forth in detail at pages 56-63 of the April 10, 2017 omnibus reply memorandum in further support of the Fee Petition [ECF No. 7464, at 67-74], the Armstrong Objectors' role in the final approval proceedings and appeals from the Court's final approval decision was not at all constructive and they achieved nothing for the benefit of the Class.  Their meritless objections, Third Circuit appeal, and Supreme Court certiorari petition managed only to inflict unconscionable delay on many suffering Class Members by postponing the implementation of the Settlement Agreement for nearly twenty-one months.  Hence, they deserve no award for the reasons fully

---

[24] *E.g*., ECF Nos. 6201 [*passim*] (Faneca Objectors' attacking Settlement as "a capitulation" and "a sell out," including for failure to compensate "death with CTE" after preliminary approval date, alleged under-inclusiveness of BAP, unreasonableness of monetary award offsets, "false and misleading" class notice, and allegedly complex and ambiguous claims process that Class Members must navigate), 6233 [at 10-35] (Armstrong Objectors' objections, arguing, *inter alia*, that numerous ailments were not compensated, the monetary awards were insufficient, that award offsets were flawed, the "Death with CTE" cutoff date was irrational, the BAP participation requirements were onerous, the creation of a designated pool of BAP physicians was unfair, the Settlement wrongly allowed the NFL unlimited appeals, the Settlement's funding was inadequate, the Settlement did not take scientific advances into consideration, the release of the NFL Parties was too broad, and the Education Fund was an improper *cy pres* fund), 6237 [*passim*] (Alexander Objectors' objection, attacking Settlement as not fair, adequate, or reasonable on sundry grounds, including due to alleged insufficiency of monetary awards; monetary award offsets; failure to compensate death with CTE after date of preliminary approval; failure to provide for future scientific advances, allegedly vague, ambiguous, or undisclosed provisions; and withholding of underlying analyses and supporting documents).

explained in the Fee Petition reply memorandum.   That discussion is incorporated herein by reference.   Any further discussion in my opening allocation declaration of the Armstrong Objectors' claim to fees would have been redundant.

101.   The Armstrong Objectors take issue with my recommendation that the Court award $150,000 to the Faneca Objectors, whereas I recommended no award for them.   They assert that they did "as much, if not more, meaningful work and achieved as much, if not more for the Class than Faneca Objectors' counsel."   ECF No. 8532, at 3 (¶ 4).   That is completely without merit.   As I previously acknowledged, both at page 55 of the omnibus reply memorandum in support of the Fee Petition [ECF No. 7464, at 66], and in paragraph 16.a of my allocation recommendation declaration [ECF No. 8447, at 13], the Court had appointed counsel for the Faneca Objectors as liaison for the objector groups and to coordinate the presentation of objections as the Rule 23(e)(2) Fairness Hearing [ECF No. 6344].   The Armstrong Objectors simply have no legitimate grounds to contend that they performed as much work or achieved as much for the Class.

***Responses of Neurocognitive Football Lawyers, PLLC and The Yerrid Law Firm***

102.   The Motion to Prioritize [ECF No. 8723], in which the Allen Retired Players joined [ECF No. 8729], was not a genuine response to my allocation recommendations.   Nor could it have been, because the attorneys who filed that submission performed no common benefit work.   Rather, the Motion to Prioritize went beyond the scope of this Court's October 12, 2017 Order [ECF No. 8448] by improperly contending that a fee award ought to be deferred until most Class Members have received their monetary awards and that the Court should deny a holdback or set-aside from monetary awards.   The Motion to Prioritize also requested that the Court appoint a Special Master to handle fee allocations.   All of these arguments are completely without merit.   They were addressed in the separate response to the Motion to Prioritize that was filed on November 9, 2017

[ECF No. 8914], which is incorporated herein by reference.  Repeating the points made in that response here would serve no purpose, especially because, as noted above, the attorneys who made this submission seek no common benefit fee award.

***Response of Alexander Objectors' Counsel***

103.    The arguments set forth in the declaration of attorney Lance Lubel [ECF No. 8725], counsel for the so-called Alexander Objectors, also warrant no separate discussion as to all but two of the arguments presented therein.   Mr. Lubel's declaration mostly references, repeats, or recapitulates sundry arguments and submissions that he has made in the course of his relentless opposition to the Fee Petition, including his request for leave to take discovery in connection therewith; his attacks on the valuation of the Settlement; his opposition to a percentage-of-the-common-fund method for determining a fee award and insistence on a lodestar approach; his alternative argument that any fee award should be equivalent to a smaller percentage than the nine percent that is being requested [*see* ECF No. 7151, at 55]; his attacks on the cumulative lodestar of the attorneys who performed common benefit work; his motion to compel compliance with CMO-5; and his opposition to the adoption of a five-percent set-aside.  *See* ECF No. 8725, at 1-9 (at ¶¶ 2-10).

104.    All of these arguments are improper because they are not in keeping with what the Court invited in its October 12, 2017 Order [ECF No. 8448].  In any case, we have covered or addressed these arguments at pages 27-56 of the opening memorandum in support of the Fee Petition [ECF No. 7151-1, at 38-67] and 4-18 of the omnibus reply memorandum in support of it [ECF No. 7464, at 15-29], in the consolidated memorandum in support of the motion to strike the Alexander Objectors' unauthorized sur-reply to Class Counsel's omnibus reply memorandum and in opposition to their motion take discovery of Class Counsel [ECF No. 7606]; in the reply

memorandum in support of Class Counsel's motion to strike their unauthorized sur-reply [ECF No. 7710], and in the combined response to the Alexander Objectors' motion to compel compliance with CMO-5 and to their unauthorized and misnamed "First Supplement" to their Fee Petition objections [ECF No. 8440]. The aforementioned discussions are incorporated herein by reference.

105.    Mr. Lubel raises some additional arguments in his declaration that are similarly improper, but which I address here for the sake of completeness of the record. He maintains that the allocation of fees is typically performed by a committee [ECF No. 8725, at 7 n.10], but that is not so. As discussed above, courts in the numerous cases did not utilize committees, even when so-called mega-funds were involved. *See supra* at ¶ 17; *see also* ECF No 8914, at 8-9 & n.8 (citing additional cases). Thus, the fact that a committee may have handled the allocation of the combined $600 million in fees and expenses that was awarded in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974, at *20–21 (E.D. La. Oct. 25, 2016), is not particularly instructive, let alone determinative, here.

106.    Mr. Lubel's reliance on Judge Ambro's concurring opinion in *In re Diet Drugs* [ECF No. 8725, at 7 n.10], like Mr. Locks' reliance, is misplaced for the reasons noted above. *See supra* at 9 & n.6. At any rate, because the Court ultimately will make the allocation, Mr. Lubel's assertion that I alone am deciding which attorneys or firms will be paid and how much [ECF No. 8725 at 7 n.10] is demonstrably inaccurate.

107.    No more availing is Mr. Lubel's enumeration of work that he claims to have performed and for which he now seeks an award of $450,000. *See* ECF No. 8725, at 10-12 (¶ 11(i)-(xvi)). This work was not done at my direction or that of anyone else in the appointed Plaintiffs' leadership. In fact, most of it relates to Mr. Lubel's pursuit of *unsuccessful objections*

to the Settlement Agreement, and an equally unsuccessful Third Circuit appeal from this Court's overruling of those objections.  *See*, *e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 383-84, 401-02, 413, 419, 423 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).  That Mr. Lubel's claimed objection-related work was "left out" of the Fee Petition [ECF No. 8725, at 9] was for a sound reason:  it did not benefit the Class.  If Mr. Lubel believed the contrary – that his fruitless endeavors somehow conferred a *measureable* benefit on the Class – he had ample opportunity to cross-petition and make his case for an award of fees, as did certain other objectors (like the Faneca and Armstrong Objectors), but he did not do so.  At this point, the time to do so has long since passed.  The Court should reject his belated fee request.

108.    Finally, Mr. Lubel argues that I have taken positions detrimental to the Class in matters of settlement implementation.  ECF No. 8725, at 12.  His assertion is not only meritless, but inappropriate, for it has nothing to do with a fee *allocation*.  Like the Motion to Prioritize, Mr. Lubel has improperly used the response to my allocation recommendations that the Court permitted in its October 12, 2017 Order [ECF No. 8448] to vent an unrelated grievance – and also to once again denigrate my efforts on behalf of the Class.

***Faneca Objectors' Counsel's Response***

109.    The Faneca Objectors [ECF No. 8726] similarly repeat or recapitulate the arguments that they previously asserted in support of their request for an award of $20 million in fees.  The reasons why they are not entitled to such an outsize award are set forth in detail at pages 42-56 of the omnibus reply memorandum in support of the Fee Petition [ECF No. 7464, at 53-67].  These arguments are incorporated herein by reference.  As discussed in that memorandum, these objectors should not be rewarded for the plethora of unsuccessful arguments and filings that they presented to this Court and to the Third Circuit because those submissions and arguments did not

benefit the Class.  Also, the Faneca Objectors wrongly take credit for the post-Rule 23(e)(2) Fairness Hearing modifications to the Settlement Agreement, and, at any rate, they have overvalued those changes.[25]  Nor has any court ever rendered a fee award to an objector of the enormity that the Faneca Objectors seek.  Class Counsel has already distinguished as inapposite the authorities that they cite in support of the magnitude of their fee request.  Finally, the requested award of $20 million would inequitably yield a more favorable multiplier to the Faneca Objectors on their counsel's lodestar than Class Counsel or any other attorney who performed common benefit work would receive.

***Response of Jones' Objectors' Counsel***

110.    Rather than presenting any specific arguments, James Capretz' counter-declaration is more in the nature of a protective filing in support of his earlier petition for an award of fees [ECF No. 7364].  *See* ECF No. 8727, at 4-6 (¶¶ 5-8).  In that petition, Mr. Capretz sought an award of $300,000, based on an ascribed value of $20 million to the post-Fairness Hearing modification to the Settlement Agreement to include NFL Europe playing time towards Eligible Seasons for purposes of qualifying for monetary awards.  *See* ECF Nos. 6235, 6481-2 (at 13, 41-42 [amending sections 2.1(kk) and 6.7(c), and eliminating section 6.7(c)(i)]).  Mr. Capretz contended that this

---

[25]   To the extent that the Court concludes otherwise and finds that the Faneca Objectors were the driving force behind the post-Fairness Hearing modifications to the Settlement Agreement [ECF No. 6481] and that the value of those modifications is greater than what Class Counsel's expert has opined [ECF Nos. 7464 (at 53-55), 7464-12 (at 4 (Table 1))] and closer to the valuation of the Faneca Objectors' putative expert CPA [ECF Nos. 7366-1 (at 7), 7550-1 (at 5-8)], any award to the Faneca Objectors nonetheless should be markedly less than the enormous $20 million that they have requested.  Such a huge award – amounting to almost *nineteen percent* of the roughly $107 million in the Attorneys' Fees Qualified Settlement Fund that is available for an award of fees (as opposed to reimbursement of common benefit expenses) – is higher than the fee that I recommended for every firm that performed common benefit work, save mine, and would be nearly *twice* as high as the next highest allocation that I recommended, which was for the significant contributions of Subclass Counsel Arnold Levin's firm.  *See* ECF Nos. 8447, at 13-14 (¶ 17), 8447-1.  Such a gross disparity would be unreasonable and unjust.

change had been brought about by his objection to the Settlement.  ECF No. 7364, at 4-8, 11.  Mr. Capretz deserves come commendation for not having inundated the Court wth kitchen-sink objections.  Still, the Court should deny his fee request for the reasons discussed at pages 63-64 of the omnibus reply memorandum in support of the Fee Petition [ECF No. 7464, at 74-75].  That discussion is incorporated herein by reference.  By way of summary, the Court should reject Mr. Capretz' request because several other objectors (including the Faneca Objectors) had raised the same issue concerning NFL Europe playing time.  A $300,000 award for an unoriginal 4-1/2 page objection to the Settlement is unwarranted.[26]

***Conclusion***

111.    In summary, the proposed allocation that I previously presented to the Court continues to be my recommendation.

112.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of November, 2017.

*/s/ Christopher A. Seeger*
_____
CHRISTOPHER A. SEEGER
Co-Lead Class Counsel

---

[26]   To the extent that the Court concludes otherwise and determines that Mr. Capretz deserves some recognition for having raised the issue of credit for NFL Europe playing time, nevertheless, any fee award should be decidedly less than the $300,000 that he requested.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing and a supporting document were served on all counsel of record via the Court's ECF system on November 17, 2017.

*/s/ Christopher A. Seeger*
Christopher A. Seeger