#02329    TAD\RAT\WTG\amb    2/23/2012                                    2011N-0155

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

TREGG DUERSON, Personal Representative
of the Estate of DAVID R. DUERSON,
Deceased,

        Plaintiff,

        v.

NATIONAL FOOTBALL LEAGUE, INC., a
corporation ("NFL"); and RIDDELL, INC., a
corporation, f/k/a EN&T ASSOCIATES, INC.,
and RIDDELL SPORTS GROUP, INC., a
corporation, (collectively "RIDDELL"),

        Defendants.

No.

**PLAINTIFF DEMANDS TRIAL BY JURY**



```
2012L002043
CALENDAR/ROOM X
TIME 00:00
PI Other
```

### COMPLAINT AT LAW

Plaintiff, TREGG DUERSON, Personal Representative of the Estate of DAVID R.

DUERSON ("DAVE DUERSON"), Deceased, by and through his attorneys, CORBOY &

DEMETRIO, complaining of defendants, NFL and RIDDELL, states as follows:

### COUNT I:
### NFL's Negligence During Duerson's
### NFL Playing Career Caused Brain Damage and Death

1.     On February 17, 2011, DAVE DUERSON, age 50, died as a result of a self-

inflicted gunshot wound to the chest.

2.     Immediately prior to his death, DAVE DUERSON expressed his desire that his

brain be studied post-mortem, as he believed that "there's something going on" in his brain.

3.     Neuro-pathological review of DAVE DUERSON's brain at Boston University

School of Medicine determined that DAVE DUERSON was, indeed, suffering from progressive,

advanced brain damage, commonly referred to as Chronic Traumatic Encephalopathy ("CTE").

4.      From 2001 to 2011, CTE caused progressive deterioration in DAVE DUERSON's brain, specifically, in the frontal cortex, temporal cortex (areas of the brain that control judgment, inhibition and impulse control), amygdala (an area of the brain that monitors impulse control, mood and behavior) and the hippocampus (an area of the brain responsible for memory).

5.      In the 10 years leading up to his death, as a result of the progressive brain degeneration, CTE, DAVE DUERSON, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision trouble, and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

6.      CTE was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions[1] and/or sub-concussive head injuries.

7.      DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

8.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season games and playing in over one hundred (100) regular season games.

9.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals NFL franchises, participating in four training camps, weekly practices and

---

[1] Concussion is defined as "a traumatically induced alteration in brain function manifested by an alteration of awareness or consciousness."  Pellman, E, Viano, D, Tucker, A, et.al., *Concussion in Professional Football: Reconstruction of Game Impacts and Injuries,* Neurosurgery, Vol. 53(4) (2003).

playing in fifty-eight (58) regular season games.

10.    The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

11.    During his eleven (11) year NFL career, in practice and game situations, DAVE DUERSON sustained at least three (3) documented concussive brain traumas, in 1988, 1990 and 1992, as well as numerous undocumented concussive brain traumas.

12.    The NFL failed to prevent, diagnose and/or properly treat DAVE DUERSON's concussive brain traumas in 1988, 1990 and 1992 and throughout his career.

13.    Following documented concussions in 1988, 1990 and 1992, the NFL never warned DAVE DUERSON that playing through concussions could, and would, cause permanent brain damage.

14.    Prior to and during DAVE DUERSON's NFL career, the NFL knew, or should have known, that the helmets used by NFL players do not adequately protect players from concussions.

15.    Prior to and during DAVE DUERSON's career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

16.    DAVE DUERSON played through the documented and undocumented concussions and their associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

17.    On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged DAVE DUERSON, after suffering concussions, to return to

play in the same game and/or practice.

18.     The NFL did not document DAVE DUERSON's incidents of concussive head trauma.

19.     The cumulative effect of DAVE DUERSON's concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

20.     CTE caused, or contributed to cause, DAVE DUERSON'S death.

21.     The NFL governs and promotes the game of professional football, sets and enforces league guidelines, policies and game rules and promotes, markets and distributes broadcasting rights.

22.     The NFL had a duty to DAVE DUERSON and all NFL players to keep them reasonably safe during their NFL careers and to provide DAVE DUERSON with the most up-to-date medical information on all issues, including brain trauma.

23.     During his playing career, the NFL breached its duty to DAVE DUERSON by:

    a.     Failing to educate players, including DAVE DUERSON, coaches and medical professionals about concussions - what they are, what symptoms to look for, and what to do if a player suspects he or a teammate has had a concussion;

    b.     Failing to warn DAVE DUERSON and other NFL Players of the potential long-term impact of suffering numerous concussive head traumas;

    c.     Failing to warn DAVE DUERSON and other NFL Players of the consequences of playing through the concussions and/or their symptoms;

    d     Failing to ensure rapid, accurate diagnosis of DAVE DUERSON's concussive brain injuries during his playing career;

    e.     Failing to establish sideline concussion assessment protocol to assist team physicians and trainers in their initial assessment of brain trauma;

f.   Failing to implement policies to prevent DAVE DUERSON from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma;

g.   Failing to require that DAVE DUERSON be cleared by both a team physician and by an independent neurological or neuro-physiological consultant prior to resuming football activities after suffering a concussion;

h.   Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by DAVE DUERSON;

i.   Failing to monitor and record DAVE DUERSON's concussive head traumas during his NFL career; and

j.   Failing to protect DAVE DUERSON from suffering devastating concussive head traumas.

24.   As a result of the NFL's acts and omissions, DAVE DUERSON developed CTE and its related symptoms, resulting in his suicide.

25.   If the NFL would have taken the necessary steps to oversee and protect DAVE DUERSON by warning him of the dangers of head traumas, and educating and training all persons involved with the NFL teams in the recognition, prevention and treatment of concussive brain injuries, then DAVE DUERSON would not have suffered dangerous repetitive head trauma, would have recovered more rapidly, and would not have sustained permanent damage to his brain which contributed to cause his death.

26.   As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention, companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

27.    TREGG DUERSON has been appointed Personal Representative of the Estate of

DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death

Act, 740 ILCS 180/1, *et seq.*

28.    During the relevant times when DAVE DUERSON'S documented concussive

brain traumas were improperly handled by the NFL,  the NFL and NFLPA were operating

without a Collective Bargaining Agreement (i.e., 1987 - 1993).

29.    TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories

to any NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by

Federal Labor Law.

30.    Defendant, National Football League, Inc., is a business with its principal offices

at 280 Park Avenue, New York, New York 10017.  The NFL conducts continuous and systematic

business within the State of Illinois.

31.    DAVE DUERSON's permanent brain damage as a result of concussions sustained

during his NFL career was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R.

DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL

LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the

Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II:
### NFL's Fraudulent Concealment of Linkage Between
### Brain Trauma Sustained During NFL Playing Career
### and Permanent Brain Damage Caused Death

1.    DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983

draft, as the 64th pick.

2.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven NFL training camps, weekly practices, starting seventy-six (76) regular season games and playing in over one hundred (100) regular season games.

3.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals NFL franchises, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.      During his eleven (11) year NFL career, in practice and game situations, DAVE DUERSON sustained at least three (3) concussive brain traumas in 1988, 1990 and 1992, numerous undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

5.      DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

6.      The NFL failed to prevent, diagnose and/or properly treat DAVE DUERSON's brain traumas throughout his career.

7.      The NFL never warned DAVE DUERSON that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

8.      On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged DAVE DUERSON, after suffering concussions, to return to play in the same game and/or practice.

9.      The NFL did not document DAVE DUERSON's incidents of concussive or sub-concussive head trauma.

10.     In 1993, DAVE DUERSON retired from the NFL.

11.     Prior to, during, and after DAVE DUERSON's NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma and repetitive brain trauma.

12.     In 1994, through a Committee known as the NFL Committee on Mild Traumatic Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma and repetitive brain trauma.

13.     The NFL's MTBI Committee was supposedly charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.[2]

14.     The NFL, through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists **"no evidence of worsening injury or chronic cumulative effects"** from multiple concussions.[3]

15.     The NFL, through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

16.     The NFL, by publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by

---

[2] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

[3] MTBI Committee Report (2004).

8

stating definitively that "**there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players.**"[4]

17.     Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

18.     In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a 16 year NFL career (1974 - 1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

19.     Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

20.     The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery*.

21.     The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery,* requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

22.     In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football.  This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage.  The NFL's denial of a linkage between brain trauma during an NFL career and

---

[4] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery*, vol. 55, no. 6, Dec. 2004, p. 1299.

long-term brain damage was knowingly and fraudulently disingenuous.

23.     In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine-year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

24.     Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

25.     In 2005, Terry Long died at age forty-five (45) after an eight-year NFL career (1984 - 1991), as a result of drinking anti-freeze.

26.     Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

27.     In 2005, leading health professionals published a study of thousands of retired NFL players.[5] The study revealed that retired NFL players with three (3) or more concussions have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-times (3x) higher prevalence of reported significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

28.     In 2006, Andre Waters died at age forty-four (44) after a twelve-year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

29.     Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

---

[5] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C, Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, *Neurosurgery*, 2005 Oct., 57(5); 719-26.

30.     In October 2006, <u>Head Games - The NFL's Concussion Crisis</u>, written by Chris

Nowinski, was published.  This book contained numerous accounts of retired NFL players

suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

31.     Also in October 2006, the NFL, by and through its MTBI Committee members,

Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI

Committee's efforts that surveyed 12 years of data collection.  The NFL reported that its MTBI

Committee had analyzed and collected "data on mild TBIs sustained between 1996 and 2001"

and concluded that:

> Because a significant percentage of players returned to play
> in the same game [as they suffered a mild traumatic brain
> injury] and the overwhelming majority of players with
> concussions were kept out of football-related activities for
> less than one week, **it can be concluded that mild TBIs in
> professional football are not serious injuries.**[6]
> (Emphasis added).

32.     In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr.

Julian Bailes presented the neuro-pathological findings of the above-noted NFL players.  Dr.

Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused

CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters,

contributing to their untimely deaths.

33.     Also in 2007, researchers from the University of North Carolina's Center for

Retired Players recorded results of a survey of retired NFL football players.[7]  Their findings

---

[6] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

[7] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, <u>39 Med. Sci. Sports Exercise</u> 903 (2007).

showed that players who had multiple concussions were more likely to experience depression.  In fact, more than twenty-four percent (24%) of former NFL players who had sustained three or more concussions reported that they were suffering from depression.

34.   On August 14, 2007, the NFL stated in a press release[8] that:

> **Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems** *if each injury is managed properly.*  It is important to understand that there is no magic number for how many concussions is too many. [Players] should not be at greater risk of further injury *once [they] receive proper medical care for a concussion and are free of symptoms.* (Emphasis added)

35.   The NFL knew that DAVE DUERSON's NFL concussions were never "managed properly" and that he was never provided "proper medical care for a concussion" during his NFL career.

36.   In 2008, John Grimsley died at age forty-five (45) after a ten-year NFL career (1984 - 1993), as a result of a self-inflicted gunshot wound.  During the final 15 years of his life, John Grimsley's family began to notice impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities.  These symptoms gradually increased and became pronounced by the time of his death.

37.   Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

38.   In 2008, Thomas McHale died at age forty-five (45) after a nine-year NFL career

---

[8] Press Release, National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*, (Aug. 14, 2007).

(1987 - 1995), as the result of an apparent drug overdose.

39.     Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

40.     In 2009, doctors from Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

41.     The NFL responded to the Center for the Study of Traumatic Encephalopathy findings as "isolated incidents" from which no conclusion could be drawn.

42.     From 1994 until DAVE DUERSON's death, the NFL closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

43.     During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[9]

44.     Despite knowledge of the above incidents and extensive literature, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.

45.     The NFL refused to acknowledge that brain damage in former NFL players is an epidemic that constitutes a national health crisis.

46.     The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy

---

[9] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

13

that associates with football."[10]

47.     In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

48.     From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

49.     Despite its publications and propaganda to the contrary, the NFL knew that former NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE and may be prone to suicide or other tragic death.[11]

50.     On February 17, 2011, DAVE DUERSON, age 50, died as a result of a self-inflicted gunshot wound to the chest.

51.     In the 10 years leading up to his death, as a result of the progressive brain degeneration, DAVE DUERSON, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision trouble and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

---

[10] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

[11] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

52.     Immediately prior to his death, DAVE DUERSON expressed wishes that his brain be studied post-mortem as he believed that "there's something going on" in his brain.

53.     Post-mortem, neuro-pathological review of DAVE DUERSON's brain revealed that DAVE DUERSON was suffering from progressive, advanced brain damage, commonly referred to as CTE.

54.     From 2001 to 2011, CTE had caused progressive deterioration in the frontal cortex, temporal cortex (areas of the brain that control judgment, inhibition and impulse control), amygdala (an area of the brain that monitors impulse control, mood and behavior) and the hippocampus (an area of the brain responsible for memory) of DAVE DUERSON's brain.

55.     The cumulative effect of DAVE DUERSON's concussive and sub-concussive brain trauma, and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

56.     The NFL has known for decades of the harmful effects on a player's brain of concussions; however, it concealed these facts from DAVE DUERSON, other players, retirees, NFL coaches, trainers, players and fans.

57.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during DAVE DUERSON's playing career and retirement caused an increased risk of debilitating injury which did, in fact, occur.

58.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during DAVE DUERSON's playing career caused him to remain ignorant to the harmful effects of playing through concussion symptoms, which was a cause of him developing CTE and committing suicide.

59.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information after DAVE DUERSON retired from football caused DAVE DUERSON to experience a seemingly inexplicable decline in mental health.

60.     The NFL knew that its misrepresentations, material omissions and/or concealment of relevant medical information were false and/or made the statements in reckless disregard of whether the statements were true or false.

61.     The NFL made the misrepresentations, material omissions and/or concealment of relevant medical information with the intent to induce DAVE DUERSON and others to refrain from pursuing medical care and treatment, benefits and claims available to him, and against the NFL, due to permanent brain injury sustained during his playing career.

62.     DAVE DUERSON reasonably believed that the misrepresentations, material omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

63.     As a result of DAVE DUERSON's reliance upon the NFL's misrepresentations, he failed to pursue necessary counseling and medical care and treatment that would have prevented his death.

64.     As a result of DAVE DUERSON's reliance upon the NFL's misrepresentations, he experienced a seemingly inexplicable reversal of life's fortunes and committed suicide.

65.     As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson, and Tayler Duerson have lost the love, affection, care, attention,

companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

66.     TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

67.     Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017.  The NFL conducts continuous and systematic business within the State of Illinois.

68.     TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories to the NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

69.     Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017.  The NFL conducts continuous and systematic business within the State of Illinois.

70.     DAVE DUERSON's permanent brain damage was not discovered until May 2, 2011.

WHEREFORE,  TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT III:
## NFL League Officers and Members of its MTBI Committee Conspire to Publish and Profess False Information to Its Players and Retirees

1.      Plaintiff re-alleges paragraphs 1 through 59 of Count II and incorporates each allegation herein.

60.     In 1994, the League Officers of the NFL and the members of the NFL's MTBI Committee agreed to publish false statements in its reporting of medical research and findings regarding the linkage between repeated brain trauma experienced during an NFL career and permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to create confusion and uncertainty on this subject.

61.     Creating ambiguity and/or making false statements regarding this critical medical information was unlawful, unethical and blatantly misleading.

62.     DAVE DUERSON reasonably believed that the statements made by the NFL were true and refrained from pursuing medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

63.     As a result of DAVE DUERSON's reliance upon the NFL's conspiracy, he failed to pursue necessary counseling and medical care and treatment that would have prevented his death.

64.     As a result of DAVE DUERSON's reliance upon the NFL's conspiracy, he experienced a seemingly inexplicable reversal of life's fortunes and committed suicide.

65.     As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention,

companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

66.     TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

67.     TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories to the NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

68.     Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017.  The NFL conducts continuous and systematic business within the State of Illinois.

69.     DAVE DUERSON's permanent brain damage was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT IV:
### NFL's Negligence in Protecting and/or Warning its Retiree Caused Death

1.     DAVE DUERSON was drafted by the Chicago Bears National Football League franchise in the 1983 draft.

2.     From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season

19

games and playing in over one hundred (100) regular season games.

3.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals, both of the National Football League, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.      During his eleven (11) year NFL career, from 1983 - 1993, in practice and game situations, DAVE DUERSON sustained at least three (3) documented concussive brain traumas, numerous undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

5.      DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

6.      The NFL never warned DAVE DUERSON of the consequences of playing through the concussions, sub-concussive brain traumas and/or their symptoms.

7.      The NFL never warned DAVE DUERSON of the potential long-term impact of suffering numerous head traumas.

8.      On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged DAVE DUERSON, after suffering concussions, to return to play in the same game and/or practice.

9.      The NFL did not document DAVE DUERSON's incidents of concussive or sub-concussive head trauma.

10.     In 1993, DAVE DUERSON retired from the NFL.

11.     In 1994, through a Committee known as the "NFL Committee on Mild Traumatic

Brain Injury," the NFL voluntarily undertook a duty of care to its retired players to identify the long-term risks of brain damage as a result of playing professional football through research studies.  This committee was charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.

12.     From the inception of its MTBI Committee, the NFL misinformed its players and retirees that there exists "no evidence of worsening injury or chronic cumulative effects" from multiple concussions, found "many NFL players can be safely allowed to return to play" on the day of a concussion, and continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by stating definitively that "there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players."

13.     In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a 16 year NFL career (1974 - 1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

14.     Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

15.     The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical Journal, *Neurosurgery*.  The MTBI Committee of the NFL immediately wrote a letter to the journal *Neurosurgery* requesting that they retract Mike Webster's CTE paper.

16.     In 2003, the MTBI Committee began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in

21

professional football. The NFL funded this study. The study ultimately refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage.

17.     In 2004, Justin Strzelczyk died at age thirty-six (36), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase, after a nine-year NFL career (1990 - 1998).

18.     Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

19.     In 2005, Terry Long died at age forty-five (45), after an eight-year NFL career (1984 - 1991), as a result of drinking anti-freeze.

20.     Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

21.     In 2005, leading health professionals published a study of thousands of retired NFL players. The study revealed that retired NFL players with three (3) or more concussions had a five-fold prevalence of mild cognitive impairment diagnosis and a three-fold prevalence of significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

22.     In 2006, Andre Waters died at age forty-four (44), after a twelve-year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

23.     Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

24.     In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris Nowinski, was published. This book contained numerous accounts of retired NFL players

22

suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

The book contained the following passage:

> The organization with the most money to study concussions and
> the biggest stage from which to speak the message at this point
> hasn't shown the ability to publicize the truth about these
> devastating injuries...Instead of promoting the proper information
> on safety, it uses its bully pulpit only to protect its business
> interests.  The organization?  The National Football League.

25.     In October of 2006, Pellman and Viano published an interim report in

*Neurological Focus* on the MTBI Committee's efforts that surveyed 12 years of data collection.

The authors analyzed collected "data on mild TBIs sustained between 1996 and 2001" and

concluded that:

> Because a significant percentage of players returned to play
> in the same game [as they suffered a mild traumatic brain
> injury] and the overwhelming majority of players with
> concussions were kept out of football-related activities for
> less than one week, **it can be concluded that mild TBIs in
> professional football are not serious injuries.**  (Emphasis
> added).

26.     In June 2007, at the "NFL's Concussion Summit" in Rosemont, Illinois, Dr.

Julian Bailes presented the neuro-pathological findings of the above-noted NFL players.  Dr.

Bailes again informed the NFL that multiple NFL concussions caused CTE in the brains of Mike

Webster, Justin Strzelczyk, Terry Long and Andre Waters' brains, contributing to their untimely

deaths.

27.     In 2007, researchers from the University of North Carolina's Center for Retired

Players recorded results of a survey of retired NFL football players.  Their findings showed that

players who had multiple concussions were more likely to experience depression.  In fact, more

than twenty-percent (20%) of former NFL players who had sustained three or more concussions

reported they were suffering from depression.

28.     In 2008, John Grimsley died at age forty-five (45), as a result of a self-inflicted gunshot wound, after a ten-year NFL career (1984 - 1993).  During the final 15 years of his life, John Grimsley's family began to notice impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities.  These symptoms gradually increased and became pronounced by the time of his death.

29.     Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

30.     In 2008, Thomas McHale died at age forty-five (45), after a nine-year NFL career (1987 - 1995), as the result of an apparent drug overdose.

31.     Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

32.     In 2009, doctors from Boston University's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains Mr. Grimsley and Mr. McHale.  The NFL responded that these findings were merely an "isolated incident" from which no conclusion could be drawn.

33.     From the time of its inception until DAVE DUERSON's death, the NFL's MTBI Committee closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

34.     During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.

24

35.     Despite knowledge of the above incidents and extensive literature, the NFL refused to acknowledge that chronic brain damage in former NFL football players was an epidemic that constituted a national health crisis. Instead, the NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy that associates with football."

36.     In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

37.     The NFL never warned its retirees that they may be experiencing long-term effects from the brain trauma they sustained during their NFL careers.

38.     From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

39.     Despite its publications and propaganda to the contrary, the NFL knew, or should have known, that former NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE and may be prone to suicide or other tragic death.[12]

40.     On October 28, 2009, the House of Representatives Committee on the Judiciary convened hearings to discuss the issues of long-term brain disease resulting from playing in the

---

[12] McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, Journal of Neuropathology, Vol. 68 Number 7, July 2009.

NFL. During these proceedings, in the presence of NFL Commissioner Roger Goodell, the Honorable John Conyers, Jr. (Michigan) stated that the issues of long-term brain disease resulting from playing in the NFL "are life and death issues."

41.     During those hearings, Dr. Robert Cantu testified that there exists "a serious public health problem today resulting from repetitive head trauma too often experienced by NFL players."

42.     At that hearing, Commissioner Roger Goodell acknowledged, on behalf of the NFL, for the first time, that "it is fair to assume that head trauma may play a role" in the cause of CTE and that "more can be done for the retired players."

43.     Also at that hearing, Commissioner Roger Goodell agreed that the NFL must "assist retired players and help identify not only those in need, but to determine what those needs are." After these acknowledgments, nothing was done to assist DAVE DUERSON.

44.     On December 20, 2009, NFL Spokesman, Greg Aiello, told the New York Times, "[i]t's quite obvious from the medical research that's been done that concussions can have lasting consequences."

45.     Following these acknowledgments, after years of denial, the NFL did nothing to determine whether DAVE DUERSON had medical needs regarding his developing CTE that originated as a result of his NFL career.

46.     The NFL never counseled DAVE DUERSON and/or provided mandatory medical care or treatment for his symptoms of CTE.

47.     On February 17, 2011, DAVE DUERSON, age 50, died as a result of a self-inflicted gunshot wound to the chest.

48.     Immediately prior to his death, DAVE DUERSON expressed wishes that his brain be studied post-mortem, as he believed that "there's something going on" in his brain.

49.     Post-mortem, neuro-pathological review of DAVE DUERSON's brain revealed that DAVE DUERSON was suffering from progressive, advanced brain damage, commonly referred to as Chronic Traumatic Encephalopathy ("CTE").

50.     From 2001 to 2011, CTE had caused progressive deterioration in the frontal cortex, temporal cortex (areas of the brain that control judgment, inhibition and impulse control), amygdala (an area of the brain that monitors impulse control, mood and behavior), and the hippocampus (an area of the brain responsible for memory) of DAVE DUERSON's brain.

51.     The cumulative affect of DAVE DUERSON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

52.     In the 10 years leading up to his death, as a result of CTE, DAVE DUERSON, a man with no prior history of depression or psychological issues, complained of intense headaches, worsening short-term memory, language difficulties, vision problems and a growing problem with impulse control.  Additionally, he experienced a reversal of fortune in his professional life, and his marriage dissolved.

53.     After DAVE DUERSON retired from the NFL, the NFL breached its duty to DAVE DUERSON by:

    a.     Failing to adequately warn its retired players, including DAVE DUERSON, of the health risk associated with concussive injury;

    b.     Failing to warn DAVE DUERSON of the harm of the repetitive concussions/injuries he sustained during his NFL playing career;

c.   Failing to provide adequate, accurate medical care for DAVE DUERSON when it knew he likely suffered from CTE and was at risk of suicide; and

d.   Failing to fund, endorse, support and or generate advances in medical research in order to detect, treat and/or cure CTE in DAVE DUERSON's brain.

54.   If the NFL would have taken the necessary steps to warn DAVE DUERSON of the critical, life-threatening nature of CTE caused by multiple head traumas during his NFL career, DAVE DUERSON would have received adequate and appropriate medical care, treatment, and counseling for the symptoms associated with CTE.

55.   The NFL's failures contributed to cause the death of DAVE DUERSON.

56.   As a result of the NFL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention, companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

57.   TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

58.   Defendant, National Football League, Inc., is a business with its principal offices at 280 Park Avenue, New York, New York 10017.  The NFL conducts continuous and systematic business within Cook County, Illinois.

59.   DAVE DUERSON's CTE was not discovered until May 2, 2011.

60.   NFL retired players were not the subject of or a party to Collective Bargaining.

61.   TREGG DUERSON and the next-of-kin of DAVE DUERSON are not signatories

to the NFL/NFLPA Collective Bargaining Agreement, and their claims are not preempted by Federal Labor Law.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

**COUNT V:**
**Riddell's Strict Liability for Failing to Warn that its**
**Helmet Design Would Not Prevent Concussion Caused CTE and Death**

1.      DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

2.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season games and playing in over one hundred (100) regular season games.

3.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals, both of the National Football League, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.      During his eleven (11) year NFL career, from 1983 - 1993, in practice and game situations, DAVE DUERSON sustained at least three (3) documented concussive brain traumas, numerous un-documented concussive brain traumas and thousands of sub-concussive brain traumas that caused CTE.

5.      During DAVE DUERSON's NFL career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided

29

warnings for helmets used by NFL players.

6. During his NFL career, DAVE DUERSON used a RIDDELL helmet in NFL practices and games. The NFL has estimated that 75% of the helmets used in the league are manufactured by RIDDELL; RIDDELL estimated that the figure was 77%.

7. Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

8. Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

9. Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

10. Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that its helmets used by NFL players do not adequately protect players from concussions and/or sub-concussive head injury.

11. RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

12. RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

13. RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

30

14.     DAVE DUERSON neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

15.     DAVE DUERSON was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

16.     RIDDELL owed a duty to warn DAVE DUERSON of the risks of substantial harm associated with the foreseeable use of their products.

17.     RIDDELL never warned DAVE DUERSON that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

18.     DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

19.     The cumulative effect of DAVE DUERSON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

20.     At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

      a.     That its helmets would not protect against concussive brain injury;

      b.     That its helmet did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the

31

forces and energy directed to the player's head;

    c.     That its helmet did not include a safely configured shock attenuating system; and

    d.     That it had not properly and adequately tested the helmet model.

21.    RIDDELL's failure to warn caused DAVE DUERSON's head injuries.

22.    The failure to warn of an unreasonably dangerous condition was a proximate cause of the wrongful death suffered by DAVE DUERSON.

23.    As a result of RIDDELL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention, companionship, comfort, guidance and protection their father provided, and each has experienced grief and sorrow due to his passing.

24.    TREGG DUERSON has been appointed Personal Representative of the Estate of DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, *et seq.*

25.    RIDDELL is a business with its principal place of business in Illinois.

26.    DAVE DUERSON's permanent brain damage as a result of concussions sustained during his NFL career was not discovered until May 2, 2011.

WHEREFORE, TREGG DUERSON, Personal Representative of the Estate of DAVID R. DUERSON, Deceased, demands judgment against defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC. and RIDDELL SPORTS GROUP, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT VI:
### Riddell's Negligence in Failing to Warn that its
### Helmet Design Would Not Prevent Concussion Caused CTE and Death

1.      DAVE DUERSON was drafted by the Chicago Bears NFL franchise in the 1983 draft, as the 64th pick.

2.      From 1983 -1989, DAVE DUERSON was a safety with the Chicago Bears, participating in seven training camps, weekly practices, starting seventy-six (76) regular season games, and playing in over one hundred (100) regular season games.

3.      From 1990 - 1993, DAVE DUERSON played safety for the New York Giants and Arizona Cardinals, both of the National Football League, participating in four training camps, weekly practices and playing in fifty-eight (58) regular season games.

4.      During his eleven (11) year NFL career, from 1983 - 1993, in practice and game situations, DAVE  DUERSON sustained at least three (3) documented concussive brain traumas, numerous un-documented concussive brain traumas and thousands of sub-concussive brain traumas that caused CTE.

5.      During DAVE DUERSON's NFL career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

6.      During his NFL career, DAVE DUERSON used a RIDDELL helmet in NFL practices and games.  The NFL has estimated that 75% of the helmets used in the league are manufactured by RIDDELL; RIDDELL estimated that the figure was 77%.

7.      Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

8. Prior to and during DAVE DUERSON's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

9. Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

10. Prior to and during DAVE DUERSON's NFL career, RIDDELL knew, or should have known, that its helmets used by NFL players do not adequately protect players from concussions and/or sub-concussive head injury.

11. RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

12. RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

13. RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

14. DAVE DUERSON neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

15. DAVE DUERSON was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

16. RIDDELL owed a duty to warn DAVE DUERSON of the risks of substantial harm associated with the foreseeable use of their products.

34

17.     RIDDELL never warned DAVE DUERSON that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

18.     DAVE DUERSON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

19.     The cumulative effect of DAVE DUERSON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused the neuro-degenerative disease, CTE, to develop in his brain.

20.     At the time its helmets were designed, manufactured, sold and/or distributed, RIDDELL was negligent in one or more of the following ways:

a.     Failed to warn DAVE DUERSON that its helmets would not protect against concussive brain injury;

b.     Failed to warn DAVE DUERSON that its helmet did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

c.     Failed to warn DAVE DUERSON that its helmet did not include a safely configured shock attenuating system; and

d.     Failed to warn DAVE DUERSON that it had not properly and adequately tested the helmet model.

21.     RIDDELL's failure to warn was a proximate cause of the wrongful death suffered by DAVE DUERSON.

22.     As a result of RIDDELL's failures, DAVE DUERSON's children, Tregg Duerson, Chase Duerson, Brock Duerson and Tayler Duerson, have lost the love, affection, care, attention,

35

companionship, comfort, guidance and protection their father provided, and each has experienced

grief and sorrow due to his passing.

23.     TREGG DUERSON has been appointed Personal Representative of the Estate of

DAVID R. DUERSON, Deceased, and brings this action pursuant to the Illinois Wrongful Death

Act, 740 ILCS 180/1, *et seq.*

24.     RIDDELL is a business with its principal place of business in Illinois.

25.     DAVE DUERSON's permanent brain damage as a result of concussions sustained

during his NFL career was not discovered until May 2, 2011.

WHEREFORE,  TREGG DUERSON, Personal Representative of the Estate of DAVID

R. DUERSON, Deceased, demands judgment against defendant, RIDDELL, INC., a corporation,

f/k/a EN&T ASSOCIATES, INC. and RIDDELL SPORTS GROUP, INC., a corporation, for a

sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of

Cook County, Illinois.

William T. Gibbs

Thomas A. Demetrio
René A. Torrado, Jr.
William T. Gibbs
Corboy & Demetrio, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No.02329

36