# 02329   WTG\up   10/21/13

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ROBERT ("BOBBY") DOUGLASS and
JOHN J. CORNELL,

                    Plaintiffs,

          v.

NATIONAL FOOTBALL LEAGUE, INC., a
corporation ("NFL"); and RIDDELL, INC., a
corporation, f/k/a EN&T ASSOCIATES, INC.,
RIDDELL SPORTS GROUP, INC., a
corporation; ALL AMERICAN SPORTS, a
corporation; EASTON-BELL SPORTS INC.,
a corporation;  EASTON-BELL SPORTS,
LLC., a Limited Liability Company;  EB
SPORTS, a corporation; and RGB
HOLDINGS, a corporation;  (collectively
"RIDDELL"),

                    Defendants.

2013L012140
CALENDAR/ROOM C
TIME 00:00
PI Other

No.

**PLAINTIFFS DEMAND TRIAL BY JURY**

## COMPLAINT AT LAW

Plaintiffs, ROBERT ("BOBBY") DOUGLASS and JOHN J. CORNELL, by and through

their attorneys, CORBOY & DEMETRIO, P.C., complaining of Defendants, NFL and

RIDDELL, state as follows:

### The Parties

1.      ROBERT ("BOBBY") DOUGLASS is sixty-six (66) years old and resides in

Lake Forest, Illinois.

2.      ROBERT ("BOBBY") DOUGLASS was selected in the second round of the 1969

NFL Draft out of the University of Kansas and played ten (10) seasons (1969 - 1978) as a

Quarterback in the NFL for the Chicago Bears, San Diego Chargers, New Orleans Saints and

Green Bay Packers.   Throughout his NFL career, he participated in numerous NFL training camps and practices, and played in ninety-one (91) NFL games.

3.     ROBERT ("BOBBY") DOUGLASS sustained numerous concussive and sub-concussive brain traumas while playing in the NFL, and as a result, has developed, or is at an increased risk of developing, brain damage and/or Chronic Traumatic Encephalopathy ("CTE") and/or other cognitive or mental health deficits due to brain deterioration.

4.     JOHN J. CORNELL is sixty-six (66) years old and resides in Chicago, Illinois.

5.     JOHN J. CORNELL participated in two NFL training camps after he graduated from Northwestern University in 1969. He participated in training camps for the New Orleans Saints in 1969 and 1970.

6.     JOHN J. CORNELL sustained numerous concussive and sub-concussive brain traumas while playing in the NFL, and as a result, has developed, or is at an increased risk of developing, brain damage and/or Chronic Traumatic Encephalopathy ("CTE") and/or other cognitive or mental health deficits due to brain deterioration.

7.     NATIONAL FOOTBALL LEAGUE, INC. is a multi-billion-dollar business with its principal offices at 280 Park Avenue, New York, New York 10017, and a franchise in Chicago, Illinois.

8.     The NFL conducts continuous and systematic business within the State of Illinois.

9.     RIDDELL is a number of related corporations that conduct continuous and systematic business within the state of Illinois and is engaged in the business of designing, manufacturing, selling and distributing football helmets to the NFL and its players.

2

## COUNT I
## NFL's Negligence During ROBERT ("BOBBY") DOUGLASS' NFL Playing Careers Caused Brain Damage

Plaintiff ROBERT ("BOBBY") DOUGLASS re-alleges paragraphs 1 - 6 and incorporates each allegation herein.

10.     The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

11.     The NFL failed to prevent, diagnose and/or properly treat ROBERT ("BOBBY") DOUGLASS' concussive and sub-concussive brain traumas throughout his career.

12.     Prior to and during ROBERT ("BOBBY") DOUGLASS' NFL career, the NFL knew, or should have known, that the helmets used by NFL players did not adequately protect players from concussions.

13.     Prior to and during ROBERT ("BOBBY") DOUGLASS' career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

14.     ROBERT ("BOBBY") DOUGLASS played through documented and undocumented concussions and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

15.     On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged ROBERT ("BOBBY") DOUGLASS, after suffering concussions, to return to play in the same game and/or practice.

16.     The NFL did not document certain incidents of ROBERT ("BOBBY") DOUGLASS' concussive head trauma.

3

17.     The cumulative effect of ROBERT ("BOBBY") DOUGLASS' concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused permanent brain injury and brain damage.

18.     The NFL governs and promotes the game of professional football; sets and enforces league guidelines, policies and game rules; and promotes, markets and distributes broadcasting rights.

19.     The NFL had a duty to ROBERT ("BOBBY")  DOUGLASS and all NFL players to keep them reasonably safe during their NFL careers and to provide ROBERT ("BOBBY") DOUGLASS with the most up-to-date medical information on all issues, including brain trauma.

20.     During his playing career, the NFL breached its duty to ROBERT ("BOBBY") DOUGLASS by:

      a.     Failing to educate players, including ROBERT ("BOBBY") DOUGLASS, coaches and medical professionals about concussions - what they are, what symptoms to look for, and what to do if a player suspects he or a teammate has had a concussion;

      b.     Failing to warn ROBERT ("BOBBY") DOUGLASS and other NFL players of the potential long-term impact of suffering numerous concussive head traumas;

      c.     Failing to warn ROBERT ("BOBBY") DOUGLASS and other NFL players of the consequences of playing through the concussions and/or their symptoms;

      d      Failing to ensure rapid, accurate diagnosis of ROBERT ("BOBBY") DOUGLASS' concussive brain injuries during his playing career;

      e.     Failing to establish sideline concussion assessment protocol to assist team physicians and trainers in their initial assessment of brain trauma;

      f.     Failing to implement policies to prevent ROBERT ("BOBBY") DOUGLASS from returning to a game or practice in which he sustained a

4

head injury, in order to prevent harmful repetitive brain trauma;

g.   Failing to require that ROBERT ("BOBBY") DOUGLASS be cleared by both a team physician and by an independent neurological or neuro-physiological consultant prior to resuming football activities after suffering a concussion;

h.   Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by ROBERT ("BOBBY") DOUGLASS;

i.   Failing to monitor and record ROBERT ("BOBBY") DOUGLASS' concussive head traumas during his NFL career; and

j.   Failing to protect ROBERT DOUGLASS from suffering devastating concussive head traumas.

21.   As a result of the foregoing acts and omissions by the NFL, ROBERT ("BOBBY") DOUGLASS suffers from brain damage and its related symptoms, which was discovered within the last two years.

22.   If the NFL would have taken the necessary steps to oversee and protect ROBERT ("BOBBY") DOUGLASS by warning him of the dangers of head traumas and by educating and training all persons involved with the NFL teams in the recognition, prevention and treatment of concussive brain injuries, then ROBERT ("BOBBY") DOUGLASS would not have suffered dangerous repetitive head trauma; would have recovered more rapidly; and would not have sustained permanent damage to his brain.

WHEREFORE, ROBERT ("BOBBY") DOUGLASS demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II
### NFL's Negligence During JOHN J. CORNELL'S
### NFL Playing Careers Caused Brain Damage

Plaintiff JOHN J. CORNELL re-alleges paragraphs 1 - 6 and incorporates each allegation herein.

23. The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

24. The NFL failed to prevent, diagnose and/or properly treat JOHN J. CORNELL'S concussive and sub-concussive brain traumas throughout his career.

25. Prior to and during JOHN J. CORNELL'S NFL career, the NFL knew, or should have known, that the helmets used by NFL players did not adequately protect players from concussions.

26. Prior to and during JOHN J. CORNELL'S career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

27. JOHN J. CORNELL played through documented and undocumented concussions and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

28. On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged JOHN J. CORNELL, after suffering concussions, to return to play in the same game and/or practice.

29. The NFL did not document certain incidents of JOHN J. CORNELL'S concussive head trauma.

6

30.     The cumulative effect of JOHN J. CORNELL'S concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused permanent brain injury and brain damage.

31.     The NFL governs and promotes the game of professional football; sets and enforces league guidelines, policies and game rules; and promotes, markets and distributes broadcasting rights.

32.     The NFL had a duty to JOHN J. CORNELL and all NFL players to keep them reasonably safe during their NFL careers and to provide JOHN J. CORNELL with the most up-to-date medical information on all issues, including brain trauma.

33.     During his playing career, the NFL breached its duty to JOHN J. CORNELL by:

    a.     Failing to educate players, including JOHN J. CORNELL, coaches and medical professionals about concussions - what they are, what symptoms to look for, and what to do if a player suspects he or a teammate has had a concussion;

    b.     Failing to warn JOHN J. CORNELL and other NFL players of the potential long-term impact of suffering numerous concussive head traumas;

    c.     Failing to warn JOHN J. CORNELL and other NFL players of the consequences of playing through the concussions and/or their symptoms;

    d     Failing to ensure rapid, accurate diagnosis of JOHN J. CORNELL'S concussive brain injuries during his playing career;

    e.     Failing to establish sideline concussion assessment protocol to assist team physicians and trainers in their initial assessment of brain trauma;

    f.     Failing to implement policies to prevent JOHN J. CORNELL from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma;

    g.     Failing to require that JOHN J. CORNELL be cleared by both a team

7

physician and by an independent neurological or neuro-physiological consultant prior to resuming football activities after suffering a concussion;

h.  Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by JOHN J. CORNELL;

i.  Failing to monitor and record JOHN J. CORNELL'S concussive head traumas during his NFL career; and

j.  Failing to protect JOHN J. CORNELL from suffering devastating concussive head traumas.

34.  As a result of the foregoing acts and omissions by the NFL, JOHN J. CORNELL suffers from brain damage and its related symptoms, which was discovered within the last two years.

35.  If the NFL would have taken the necessary steps to oversee and protect JOHN J. CORNELL by warning him of the dangers of head traumas and by educating and training all persons involved with the NFL teams in the recognition, prevention and treatment of concussive brain injuries, then JOHN J. CORNELL would not have suffered dangerous repetitive head trauma; would have recovered more rapidly; and would not have sustained permanent damage to his brain.

WHEREFORE, JOHN J. CORNELL demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

8

## COUNT III

### DOUGLASS v. NFL:  Fraudulent Misrepresentation regarding Linkage Between Brain Trauma Sustained During NFL Playing Career and Permanent Brain Damage

Plaintiff ROBERT ("BOBBY") DOUGLASS re-alleges paragraphs 1-6 above and incorporates each allegation herein.

36.     The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

37.     The NFL failed to prevent, diagnose and/or properly treat ROBERT ("BOBBY") DOUGLASS' concussive and sub-concussive brain traumas throughout his NFL career.

38.     Prior to and during ROBERT ("BOBBY") DOUGLASS' NFL career, the NFL knew, or should have known, that the helmets used by NFL players did not adequately protect players from concussions.

39.     Prior to and during ROBERT ("BOBBY") DOUGLASS' career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

40.     During his NFL career, in practice and game situations, ROBERT ("BOBBY") DOUGLASS sustained numerous, undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

41.     ROBERT ("BOBBY") DOUGLASS played through the concussions and sub-concussive repetitive brain traumas and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

42.     The NFL failed to prevent, diagnose and/or properly treat ROBERT ("BOBBY")

9

DOUGLASS' brain traumas throughout his career.

43.     The NFL never warned ROBERT ("BOBBY") DOUGLASS that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

44.     On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged ROBERT ("BOBBY") DOUGLASS, after suffering concussions, to return to play in the same game and/or practice.

45.     The NFL did not document ROBERT ("BOBBY") DOUGLASS' incidents of concussive or sub-concussive head trauma.

46.     Prior to, during, and after ROBERT ("BOBBY") DOUGLASS' NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma, and repetitive brain trauma.

47.     In 1994, through a Committee known as the NFL Committee on Mild Traumatic Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma, and repetitive brain trauma.

48.     The NFL's MTBI Committee was supposedly charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.[1]

49.     The NFL, through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists **"no evidence of worsening injury or chronic cumulative effects"**

_____

[1] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

from multiple concussions.[2]

50.     The NFL, through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

51.     The NFL, by publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by stating definitively that "**there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players.**"[3]

52.     Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

53.     In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a sixteen (16) year NFL career (1974-1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

54.     Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

55.     The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery*.

------

[2] MTBI Committee Report (2004).

[3] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery*, vol. 55, no. 6, Dec. 2004, p. 1299.

56.    The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery*, requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

57.    In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football.  This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage.  The NFL's denial of a linkage between brain trauma during an NFL career and long-term brain damage was knowingly and fraudulently disingenuous.

58.    In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine (9) year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

59.    Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

60.    In 2005, Terry Long died at age forty-five (45) after an eight (8) year NFL career (1984 - 1991), as a result of drinking anti-freeze.

61.    Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

62.    In 2005, leading health professionals published a study of thousands of retired NFL players.[4]  The study revealed that retired NFL players with three (3) or more concussions

---

[4] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C, Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players, Neurosurgery*, 2005 Oct., 57(5); 719-26.

have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-times (3x) higher prevalence of reported significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

63.     In 2006, Andre Waters died at age forty-four (44) after a twelve (12) year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

64.     Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

65.     In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris Nowinski, was published. This book contained numerous accounts of retired NFL players suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

66.     Also in October 2006, the NFL, by and through its MTBI Committee members, Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI Committee's efforts that surveyed twelve (12) years of data collection. The NFL reported that its MTBI Committee had analyzed and collected "data on mild TBIs sustained between 1996 and 2001" and concluded that:

> Because a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than one week, **it can be concluded that mild TBIs in professional football are not serious injuries.**[5] (Emphasis added).

67.     In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr.

---

[5] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

Julian Bailes presented the neuro-pathological findings of the above-noted NFL players. Dr.

Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused

CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters,

contributing to their untimely deaths.

68.    Also in 2007, researchers from the University of North Carolina's Center for

Retired Players recorded results of a survey of retired NFL football players.[6]  Their findings

showed that players who had multiple concussions were more likely to experience depression.  In

fact, more than twenty-four percent (24%) of former NFL players who had sustained three or

more concussions reported that they were suffering from depression.

69.    On August 14, 2007, the NFL stated in a press release[7] that:

> **Current research with professional athletes has not shown that
> having more than one or two concussions leads to permanent
> problems** *if each injury is managed properly.*  It is important to
> understand that there is no magic number for how many
> concussions is too many. [Players] should not be at greater risk of
> further injury *once [they] receive proper medical care for a
> concussion and are free of symptoms.* (Emphasis added)

70.    The NFL knew that ROBERT ("BOBBY") DOUGLASS' NFL concussions were

never "managed properly" and that he was never provided "proper medical care for a

concussion" during his NFL career.

71.    In 2008, John Grimsley died at age forty-five (45) after a ten (10) year NFL career

(1984 - 1993), as a result of a self-inflicted gunshot wound.  During the final fifteen (15) years of

---

[6] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired
Professional Football Players*, 39 Med. Sci. Sports Exercise 903 (2007).

[7] Press Release, National Football League, *NFL Outlines for Players Steps Taken to
Address Concussions*, (Aug. 14, 2007).

his life, John Grimsley's family began to notice impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities. These symptoms gradually increased and became pronounced by the time of his death.

72.     Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

73.     In 2008, Thomas McHale died at age forty-five (45) after a nine (9) year NFL career (1987 - 1995), as the result of an apparent drug overdose.

74.     Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

75.     In 2009, doctors from Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

76.     The NFL responded to the Center for the Study of Traumatic Encephalopathy findings as "isolated incidents" from which no conclusion could be drawn.

77.     Since 1994, the NFL has closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

78.     During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[8]

79.     Despite knowledge of the above incidents and extensive literature, the NFL

---

[8] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

15

continuously refuted, denied, and inaccurately professed that chronic brain damage in former

NFL football players was not a result of brain trauma sustained in the players' NFL careers.

80.     The NFL refused to acknowledge that brain damage in former NFL players is an

epidemic that constitutes a national health crisis.

81.     The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that

there are many questions that still are out there as to whether there is a kind of encephalopathy

that associates with football."[9]

82.     In 2009, the NFL distributed a pamphlet to NFL players stating "research is

currently underway to determine if there are any long-term effects of concussions in NFL

athletes."

83.     From 1994 to 2009, the NFL's MTBI Committee published seventeen (17)

articles based upon their research and findings - none of which acknowledged that repetitive head

trauma and/or repetitive concussions contribute to cause CTE in retired players.

84.     Despite its publications and propaganda to the contrary, the NFL knew that former

NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor

insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced

concentration and/or agitation may have CTE[10] and/or other degenerative brain disorders.

85.     The cumulative effect of ROBERT ("BOBBY") DOUGLASS' concussive and

---

[9] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

[10] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

sub-concussive brain trauma, and/or playing through these brain traumas during his NFL playing career, caused permanent brain damage and the associated symptoms.

86.     The NFL has known for decades of the harmful effects on a player's brain of concussions; however, it concealed these facts from ROBERT ("BOBBY") DOUGLASS, other players, retirees, NFL coaches, trainers, players and fans.

87.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during ROBERT ("BOBBY") DOUGLASS' playing career and retirement caused an increased risk of debilitating injury which did, in fact, occur.

88.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during ROBERT ("BOBBY") DOUGLASS' playing career caused him to remain ignorant to the harmful effects of playing through concussion symptoms, which was a cause of him developing brain damage and other cognitive health declines.

89.     The NFL knew that its misrepresentations, material omissions and/or concealment of relevant medical information were false and/or made the statements in reckless disregard of whether the statements were true or false.

90.     ROBERT ("BOBBY") DOUGLASS reasonably believed that the misrepresentations, material omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to permanent brain damage as a result of repetitive trauma sustained during an NFL career, and/or appropriate accommodations from his employer, in justifiable reliance on the truth of the statements made by the NFL.

91.     As a result of ROBERT ("BOBBY") DOUGLASS' reliance upon the NFL's

17

misrepresentations, he continued to play professional football and he failed to pursue necessary counseling, medical care and treatment that would have lessened the symptoms of the permanent brain damage.

WHEREFORE, ROBERT ("BOBBY") DOUGLASS demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois. concussion.

## COUNT IV
### CORNELL v. NFL:  Fraudulent Misrepresentation regarding Linkage Between Brain Trauma Sustained During NFL Playing Career and Permanent Brain Damage

Plaintiff JOHN J. CORNELL re-alleges paragraphs 1-6 above and incorporates each allegation herein.

92.     The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

93.     The NFL failed to prevent, diagnose and/or properly treat JOHN J. CORNELL'S concussive and sub-concussive brain traumas throughout his NFL career.

94.     Prior to and during JOHN J. CORNELL'S NFL career, the NFL knew, or should have known, that the helmets used by NFL players did not adequately protect players from concussions.

95.     Prior to and during JOHN J. CORNELL'S career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

96.     During his NFL career, in practice and game situations, JOHN J. CORNELL

sustained numerous, undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

97.    JOHN J. CORNELL played through the concussions and sub-concussive repetitive brain traumas and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

98.    The NFL failed to prevent, diagnose and/or properly treat JOHN J. CORNELL'S brain traumas throughout his career.

99.    The NFL never warned JOHN J. CORNELL that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

100.    On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged JOHN J. CORNELL, after suffering concussions, to return to play in the same game and/or practice.

101.    The NFL did not document JOHN J. CORNELL'S incidents of concussive or sub-concussive head trauma.

102.    Prior to, during, and after JOHN J. CORNELL'S NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma, and repetitive brain trauma.

103.    In 1994, through a Committee known as the NFL Committee on Mild Traumatic Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma, and repetitive brain trauma.

104.    The NFL's MTBI Committee was supposedly charged, by then Commissioner

Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.[11]

105.    The NFL, through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists "**no evidence of worsening injury or chronic cumulative effects**" from multiple concussions.[12]

106.    The NFL, through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

107.    The NFL, by publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by stating definitively that "**there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players.**"[13]

108.    Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

109.    In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a sixteen (16) year NFL career (1974-1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle

---

[11] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

[12] MTBI Committee Report (2004).

[13] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery*, vol. 55, no. 6, Dec. 2004, p. 1299.

pain.

110.    Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

111.    The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery*.

112.    The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery*, requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

113.    In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football. This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage. The NFL's denial of a linkage between brain trauma during an NFL career and long-term brain damage was knowingly and fraudulently disingenuous.

114.    In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine (9) year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

115.    Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

116.    In 2005, Terry Long died at age forty-five (45) after an eight (8) year NFL career (1984 - 1991), as a result of drinking anti-freeze.

117.    Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a

result of repeated blows to the head during his football career.

118.    In 2005, leading health professionals published a study of thousands of retired

NFL players.[14]  The study revealed that retired NFL players with three (3) or more concussions

have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-

times (3x) higher prevalence of reported significant memory problems compared with those who

had not sustained concussions.  One-fourth (25%) of players reported three or more concussions

during their NFL career.

119.    In 2006, Andre Waters died at age forty-four (44) after a twelve (12) year NFL

career (1987 - 1998), as a result of a self-inflicted gun shot wound.

120.    Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a

result of repeated blows to the head during his football career.

121.    In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris

Nowinski, was published.  This book contained numerous accounts of retired NFL players

suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

122.    Also in October 2006, the NFL, by and through its MTBI Committee members,

Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI

Committee's efforts that surveyed twelve (12) years of data collection.  The NFL reported that its

MTBI Committee had analyzed and collected "data on mild TBIs sustained between 1996 and

2001" and concluded that:

> Because a significant percentage of players returned to play in the same

---

[14] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C,
Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in
Retired Professional Football Players, Neurosurgery*, 2005 Oct., 57(5); 719-26.

game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than one week, **it can be concluded that mild TBIs in professional football are not serious injuries.**[15] (Emphasis added).

123.    In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr.

Julian Bailes presented the neuro-pathological findings of the above-noted NFL players.  Dr.

Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused

CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters,

contributing to their untimely deaths.

124.    Also in 2007, researchers from the University of North Carolina's Center for

Retired Players recorded results of a survey of retired NFL football players.[16]  Their findings

showed that players who had multiple concussions were more likely to experience depression.  In

fact, more than twenty-four percent (24%) of former NFL players who had sustained three or

more concussions reported that they were suffering from depression.

125.    On August 14, 2007, the NFL stated in a press release[17] that:

**Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems** *if each injury is managed properly.*  It is important to understand that there is no magic number for how many concussions is too many. [Players] should not be at greater risk of

---

[15] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

[16] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, 39 Med. Sci. Sports Exercise 903 (2007).

[17] Press Release, National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*, (Aug. 14, 2007).

> further injury *once [they] receive proper medical care for a*
> *concussion and are free of symptoms.* (Emphasis added)

126.     The NFL knew that JOHN J. CORNELL'S NFL concussions were never
"managed properly" and that he was never provided "proper medical care for a concussion"
during his NFL career.

127.     In 2008, John Grimsley died at age forty-five (45) after a ten (10) year NFL career
(1984 - 1993), as a result of a self-inflicted gunshot wound.  During the final fifteen (15) years of
his life, John Grimsley's family began to notice impairments in his short-term memory, attention,
concentration, organization, planning, problem solving, judgment, executive function and visual-
spatial abnormalities.  These symptoms gradually increased and became pronounced by the time
of his death.

128.     Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as
a result of repeated blows to the head during his football career.

129.     In 2008, Thomas McHale died at age forty-five (45) after a nine (9) year NFL
career (1987 - 1995), as the result of an apparent drug overdose.

130.     Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE
as a result of repeated blows to the head during his football career.

131.     In 2009, doctors from Boston University School of Medicine's Center for the
Study of Traumatic Encephalopathy held a press conference to explain the significance of their
findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

132.     The NFL responded to the Center for the Study of Traumatic Encephalopathy
findings as "isolated incidents" from which no conclusion could be drawn.

133.   Since 1994, the NFL has closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

134.   During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[18]

135.   Despite knowledge of the above incidents and extensive literature, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.

136.   The NFL refused to acknowledge that brain damage in former NFL players is an epidemic that constitutes a national health crisis.

137.   The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy that associates with football."[19]

138.   In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

139.   From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

140.   Despite its publications and propaganda to the contrary, the NFL knew that former

---

[18] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

[19] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE[20] and/or other degenerative brain disorders.

141.   The cumulative effect of JOHN J. CORNELL'S concussive and sub-concussive brain trauma, and/or playing through these brain traumas during his NFL playing career, caused permanent brain damage and the associated symptoms.

142.   The NFL has known for decades of the harmful effects on a player's brain of concussions; however, it concealed these facts from JOHN J. CORNELL, other players, retirees, NFL coaches, trainers, players and fans.

143.   The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during JOHN J. CORNELL'S playing career and retirement caused an increased risk of debilitating injury which did, in fact, occur.

144.   The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during JOHN J. CORNELL'S playing career caused him to remain ignorant to the harmful effects of playing through concussion symptoms, which was a cause of him developing brain damage and other cognitive health declines.

145.   The NFL knew that its misrepresentations, material omissions and/or concealment of relevant medical information were false and/or made the statements in reckless disregard of whether the statements were true or false.

146.   JOHN J. CORNELL reasonably believed that the misrepresentations, material

---

[20] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to permanent brain damage as a result of repetitive trauma sustained during an NFL career, and/or appropriate accommodations from his employer, in justifiable reliance on the truth of the statements made by the NFL.

147.   As a result of JOHN J. CORNELL'S reliance upon the NFL's misrepresentations, he continued to play professional football and he failed to pursue necessary counseling, medical care and treatment that would have lessened the symptoms of the permanent brain damage.

WHEREFORE, JOHN J. CORNELL demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois. concussion.

## COUNT V
### DOUGLASS v. NFL: League Officers and Members of its MTBI Committee Conspire to Publish and Profess False Information to Its Players and Retirees

Plaintiff ROBERT ("BOBBY") DOUGLASS re-alleges paragraphs 1 through 6 above and paragraphs 21 through 76 of Count II and incorporates each allegation herein.

148.   In 1994, the League Officers of the NFL and the members of the NFL's MTBI Committee agreed to publish false statements in its reporting of medical research and findings regarding the linkage between repeated brain trauma experienced during an NFL career and permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to create confusion and uncertainty on this subject.

149.   Creating ambiguity and/or making false statements regarding this critical medical

27

information was unlawful, unethical and blatantly misleading.

150.    ROBERT ("BOBBY") DOUGLASS reasonably believed that the statements made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

151.    As a result of ROBERT ("BOBBY") DOUGLASS' reliance upon the NFL's conspiracy, he failed to pursue necessary counseling, medical care and treatment that would have lessened the effects and symptoms of his permanent brain damage.

WHEREFORE, ROBERT ("BOBBY") DOUGLASS demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

### COUNT VI
### CORNELL v. NFL: League Officers and Members of its MTBI Committee Conspire to Publish and Profess False Information to Its Players and Retirees

Plaintiff JOHN J. CORNELL re-alleges paragraphs 1 through 6 above and paragraphs 21 through 76 of Count II and incorporates each allegation herein.

152.    In 1994, the League Officers of the NFL and the members of the NFL's MTBI Committee agreed to publish false statements in its reporting of medical research and findings regarding the linkage between repeated brain trauma experienced during an NFL career and permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to create confusion and uncertainty on this subject.

153.    Creating ambiguity and/or making false statements regarding this critical medical information was unlawful, unethical and blatantly misleading.

28

154.    JOHN J. CORNELL reasonably believed that the statements made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

155.    As a result of JOHN J. CORNELL'S reliance upon the NFL's conspiracy, he failed to pursue necessary counseling, medical care and treatment that would have lessened the effects and symptoms of his permanent brain damage.

WHEREFORE, JOHN J. CORNELL demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT VII
### DOUGLASS v. Riddell: Negligence in Failing to Warn that its Helmet Design Would Not Prevent Concussion

Plaintiff ROBERT ("BOBBY") DOUGLASS re-alleges paragraphs 1 through 6 above and incorporates each allegation herein.

156.    During ROBERT ("BOBBY") DOUGLASS' career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

157.    Prior to and during ROBERT ("BOBBY") DOUGLASS' career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

158.    Prior to and during ROBERT ("BOBBY") DOUGLASS' career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

159. Prior to and during ROBERT ("BOBBY") DOUGLASS' career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

160. Prior to and during ROBERT ("BOBBY") DOUGLASS' career, RIDDELL knew, or should have known, that its helmets used by NFL players did not adequately protect players from concussions and/or sub-concussive head injury.

161. RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

162. RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

163. RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

164. ROBERT ("BOBBY") DOUGLASS neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

165. ROBERT ("BOBBY") DOUGLASS was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

166. RIDDELL owed a duty to warn ROBERT ("BOBBY") DOUGLASS of the risks of substantial harm associated with the foreseeable use of their products.

167. RIDDELL never warned ROBERT ("BOBBY") DOUGLASS that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could,

and would, cause permanent brain damage.

168.    ROBERT ("BOBBY") DOUGLASS played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

169.    The cumulative effect of ROBERT ("BOBBY")  DOUGLASS' concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused cognitive and mental health deficits due to brain deterioration.

170.    At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

   a.    That its helmets would not protect against concussive brain injury;

   b.    That its helmets did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

   c.    That its helmets did not include a safely configured shock attenuating system; and

   d.    That it had not properly and adequately tested the helmet model.

171.    RIDDELL's failure to warn caused ROBERT ("BOBBY") DOUGLASS' head injuries.

172.    The failure to warn of an unreasonably dangerous condition was a proximate cause of the brain traumas suffered by ROBERT ("BOBBY") DOUGLASS.

31

WHEREFORE, ROBERT ("BOBBY") DOUGLASS, demands judgment against

Defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC., RIDDELL

SPORTS GROUP, INC., a corporation, ALL AMERICAN SPORTS, a corporation, EASTON-

BELL SPORTS INC., a corporation, EASTON-BELL SPORTS, LLC, a Limited Liability

Company, EB SPORTS, a corporation, and RGB HOLDINGS, a corporation for a sum in excess

of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County,

Illinois.

### COUNT VIII
### CORNELL v. Riddell: Negligence in Failing to Warn that its Helmet Design Would Not Prevent Concussion

Plaintiff JOHN J. CORNELL re-alleges paragraphs 1 through 6 above and incorporates

each allegation herein.

173.    During JOHN J. CORNELL'S career, RIDDELL sold, manufactured, designed,

tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings

for helmets used by NFL players.

174.    Prior to and during JOHN J. CORNELL'S career, RIDDELL knew, or should

have known, the harmful effects of poorly managed concussions.

175.    Prior to and during JOHN J. CORNELL'S career, RIDDELL knew, or should

have known, that the NFL would not adequately prevent, recognize or deal with concussions

sustained by NFL players.

176.    Prior to and during JOHN J. CORNELL'S career, RIDDELL knew, or should

have known, that repetitive head trauma could cause long-term brain damage.

177.    Prior to and during JOHN J. CORNELL'S career, RIDDELL knew, or should

have known, that its helmets used by NFL players did not adequately protect players from concussions and/or sub-concussive head injury.

178.   RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

179.   RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

180.   RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

181.   JOHN J. CORNELL neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

182.   JOHN J. CORNELL was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

183.   RIDDELL owed a duty to warn JOHN J. CORNELL of the risks of substantial harm associated with the foreseeable use of their products.

184.   RIDDELL never warned JOHN J. CORNELL that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

185.   JOHN J. CORNELL played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

33

186.    The cumulative effect of JOHN J. CORNELL'S concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused cognitive and mental health deficits due to brain deterioration.

187.    At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

      a.    That its helmets would not protect against concussive brain injury;

      b.    That its helmets did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

      c.    That its helmets did not include a safely configured shock attenuating system; and

      d.    That it had not properly and adequately tested the helmet model.

188.    RIDDELL's failure to warn caused JOHN J. CORNELL'S head injuries.

189.    The failure to warn of an unreasonably dangerous condition was a proximate cause of the brain traumas suffered by JOHN J. CORNELL.

WHEREFORE, JOHN J. CORNELL, demands judgment against Defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC., RIDDELL SPORTS GROUP, INC., a corporation, ALL AMERICAN SPORTS, a corporation, EASTON-BELL SPORTS INC., a corporation, EASTON-BELL SPORTS, LLC, a Limited Liability Company, EB SPORTS, a

corporation, and RGB HOLDINGS, a corporation for a sum in excess of the minimum

jurisdictional limit for the Law Division of the Circuit Court of Cook County. Illinois.

William T. Gibbs

Thomas A. Demetrio
William T. Gibbs
Corboy & Demetrio, P.C.
Attorneys for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois 60602
(312) 346-3191
Firm I.D. No. 02329

35