#02329    WTG\hdd    10/1/2012

FILED

2012N1001

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

GERALD B. SULLIVAN; BRUCE W.
HERRON; and RAYMOND D. AUSTIN,

              Plaintiffs,

     v.

NATIONAL FOOTBALL LEAGUE, INC., a
corporation ("NFL"); and RIDDELL, INC., a
corporation, f/k/a EN&T ASSOCIATES, INC.,
RIDDELL SPORTS GROUP, INC., a
corporation; ALL AMERICAN SPORTS, a
corporation; EASTON-BELL SPORTS INC.,
a corporation; EASTON-BELL SPORTS,
LLC., a Limited Liability Company; EB
SPORTS, a corporation; and RGB
HOLDINGS, a corporation; (collectively
"RIDDELL"),

              Defendants.

No.

2012L013015
CALENDAR/ROOM D
TIME 00:00
PI Other

## COMPLAINT AT LAW

Plaintiffs, GERALD B. SULLIVAN; BRUCE W. HERRON; and RAYMOND D.

AUSTIN, by and through their attorneys, CORBOY & DEMETRIO, P.C., complaining of

defendants. NFL and RIDDELL, state as follows:

### The Parties

1.     GERALD B. SULLIVAN is sixty (60) years old and resides in Chicago, Illinois.

2.     GERALD B. SULLIVAN was selected in the seventh round of the 1974 NFL

Draft out of the University of Illinois and played eight seasons (1974-1982) as a center in the

NFL for the Cleveland Browns and participated in a ninth season (1982) with the Chicago Bears.

Throughout his NFL career, he participated in numerous NFL training camps and practices, and

played in one-hundred nineteen (119) NFL games.

3.      GERALD B. SULLIVAN sustained numerous concussive and sub-concussive brain traumas while playing in the NFL, and as a result, has developed, or is at an increased risk of developing, Chronic Traumatic Encephalopathy ("CTE") and/or other cognitive or mental health deficits due to brain deterioration.

4.      BRUCE W. HERRON[1] is fifty-eight (58) years old and resides in Chicago, Illinois.

5.      BRUCE W. HERRON was selected in the seventh round of the 1977 NFL Draft out of the University of New Mexico and played five seasons (1977-1982) as a linebacker in the NFL for the Miami Dolphins and Chicago Bears.  Throughout his NFL career, he participated in numerous NFL training camps and practices, and played in seventy-one (71) NFL games.

6.      BRUCE W. HERRON sustained numerous concussive and sub-concussive brain traumas while playing in the NFL, and as a result, has developed, or is at an increased risk of developing, Chronic Traumatic Encephalopathy ("CTE") and/or other cognitive or mental health deficits due to brain deterioration.

7.      RAYMOND D. AUSTIN is thirty-seven (37) years old and resides in Chicago, Illinois.

8.      RAYMOND D. AUSTIN was selected in the fifth round of the 1997 NFL Draft out of the University of Tennessee and played three seasons (1997-1999) as a defensive back in

---

[1]BRUCE W. HERRON was previously represented by the Locks Law Firm and Mitnick Law Offices and a named Plaintiff in the previously filed case of, *Hager v. NFL*, 12-cv-0601, United States District Court for the Eastern District of Pennsylvania.  BRUCE W. HERRON has terminated his professional relationship with Locks Law Firm and Mitnick Law Offices.

the NFL for the New York Jets and the Chicago Bears. Throughout his NFL career, he

participated in numerous NFL training camps and practices, and played in forty-three (43) NFL

games.

9.      RAYMOND D. AUSTIN sustained numerous concussive and sub-concussive

brain traumas while playing the in the NFL, and as a result, has developed, or is at an increased

risk of developing, Chronic Traumatic Encephalopathy ("CTE") and/or other cognitive or mental

health deficits due to brain deterioration.

10.      NATIONAL FOOTBALL LEAGUE, INC. is a multi-billion-dollar business with

its principal offices at 280 Park Avenue, New York, New York 10017, and a franchise in

Chicago, Illinois.

11.      The NFL conducts continuous and systematic business within the State of Illinois.

12.      RIDDELL is a number of related corporations that conduct continuous and

systematic business within the state of Illinois and is engaged in the business of designing,

manufacturing, selling and distributing football helmets to the NFL and its players.

## COUNT I

### NFL's Negligence During GERALD B. SULLIVAN'S
### NFL Playing Careers Caused Brain Damage

Plaintiff re-alleges paragraphs 1 - 3 and 10-11 above and incorporates each allegation

herein.

13.      The NFL professes that there is nothing more important to the League than player

safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest

player safety issue.

14.    The NFL failed to prevent, diagnose and/or properly treat GERALD B.
SULLIVAN'S concussive and sub-concussive brain traumas throughout his career.

15.    Prior to and during GERALD B. SULLIVAN's NFL career, the NFL knew, or
should have known, that the helmets used by NFL players do not adequately protect players from
concussions.

16.    Prior to and during GERALD B. SULLIVAN's career, the NFL knew, or should
have known, the harmful effects of poorly managed concussions.

17.    GERALD B. SULLIVAN played through documented and undocumented
concussions and the associated symptoms because he, like the rest of the NFL players at the time,
was not told of the consequences.

18.    On numerous occasions, the NFL, by failing to enact sufficient return-to-play
policies, allowed and encouraged GERALD B. SULLIVAN, after suffering concussions, to
return to play in the same game and/or practice.

19.    The NFL did not document certain incidents of GERALD B. SULLIVAN's
concussive head trauma.

20.    The cumulative effect of GERALD B. SULLIVAN's concussive brain trauma
and/or playing through these brain traumas during his NFL playing career caused permanent
brain injury and brain damage.

21.    The NFL governs and promotes the game of professional football; sets and
enforces league guidelines, policies and game rules; and promotes, markets and distributes
broadcasting rights.

22.    The NFL had a duty to GERALD B. SULLIVAN and all NFL players to keep

4

them reasonably safe during their NFL careers and to provide GERALD B. SULLIVAN with the

most up-to-date medical information on all issues, including brain trauma.

23.     During his playing career, the NFL breached its duty to GERALD B. SULLIVAN

by:

a.     Failing to educate players, including GERALD B. SULLIVAN, coaches and medical professionals about concussions - what they are, what symptoms to look for, and what to do if a player suspects he or a teammate has had a concussion;

b.     Failing to warn GERALD B. SULLIVAN and other NFL players of the potential long-term impact of suffering numerous concussive head traumas;

c.     Failing to warn GERALD B. SULLIVAN and other NFL players of the consequences of playing through the concussions and/or their symptoms;

d      Failing to ensure rapid, accurate diagnosis of GERALD B. SULLIVAN's concussive brain injuries during his playing career;

e.     Failing to establish sideline concussion assessment protocol to assist team physicians and trainers in their initial assessment of brain trauma;

f.     Failing to implement policies to prevent GERALD B. SULLIVAN from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma;

g.     Failing to require that GERALD B. SULLIVAN be cleared by both a team physician and by an independent neurological or neuro-physiological consultant prior to resuming football activities after suffering a concussion;

h.     Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by GERALD B. SULLIVAN;

i.     Failing to monitor and record GERALD B. SULLIVAN's concussive head traumas during his NFL career; and

j.     Failing to protect GERALD B. SULLIVAN from suffering devastating

concussive head traumas.

24.     As a result of the foregoing acts and omissions by the NFL, GERALD B.
SULLIVAN suffers from brain damage and its related symptoms.

25.     If the NFL would have taken the necessary steps to oversee and protect GERALD
B. SULLIVAN by warning him of the dangers of head traumas and by educating and training all
persons involved with the NFL teams in the recognition, prevention and treatment of concussive
brain injuries, then GERALD B. SULLIVAN would not have suffered dangerous repetitive head
trauma; would have recovered more rapidly; and would not have sustained permanent damage to
his brain.

26.     GERALD B. SULLIVAN's permanent brain damage as a result of concussions
sustained during his NFL career was discovered less than two years prior to the filing of this
complaint.

WHEREFORE, GERALD B. SULLIVAN demands judgment against defendant,
NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum
jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II

### NFL's Negligence During BRUCE W. HERRON's
### NFL Playing Careers Caused Brain Damage

Plaintiff re-alleges paragraphs 4-6 and 10-11 above and incorporates each allegation
herein.

27.     The NFL professes that there is nothing more important to the League than player
safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest

player safety issue.

28.     The NFL failed to prevent, diagnose and/or properly treat BRUCE W.

HERRON's concussive and sub-concussive brain traumas throughout his career.

29.     Prior to and during BRUCE W. HERRON's NFL career, the NFL knew, or should

have known, that the helmets used by NFL players do not adequately protect players from

concussions.

30.     Prior to and during BRUCE W. HERRON's career, the NFL knew, or should have

known, the harmful effects of poorly managed concussions.

31.     BRUCE W. HERRON played through documented and undocumented

concussions and the associated symptoms because he, like the rest of the NFL players at the time,

was not told of the consequences.

32.     On numerous occasions, the NFL, by failing to enact sufficient return-to-play

policies, allowed and encouraged BRUCE W. HERRON, after suffering concussions, to return to

play in the same game and/or practice.

33.     The NFL did not document certain instances of BRUCE W. HERRON's

concussive head trauma.

34.     The cumulative effect of BRUCE W. HERRON's concussive brain trauma and/or

playing through these brain traumas during his NFL playing career caused permanent brain injury

and brain damage.

35.     The NFL governs and promotes the game of professional football; sets and

enforces league guidelines, policies and game rules; and promotes, markets and distributes

broadcasting rights.

7

36.     The NFL had a duty to BRUCE W. HERRON and all NFL players to keep them

reasonably safe during their NFL careers and to provide BRUCE W. HERRON with the most up-

to-date medical information on all issues, including brain trauma.

37.     During his playing career, the NFL breached its duty to BRUCE W. HERRON by:

a.      Failing to educate players, including BRUCE W. HERRON, coaches and
        medical professionals about concussions - what they are, what symptoms
        to look for, and what to do if a player suspects he or a teammate has had a
        concussion;

b.      Failing to warn BRUCE W. HERRON and other NFL players of the
        potential long-term impact of suffering numerous concussive head
        traumas;

c.      Failing to warn BRUCE W. HERRON and other NFL players of the
        consequences of playing through the concussions and/or their symptoms;

d       Failing to ensure rapid, accurate diagnosis of BRUCE W. HERRON's
        concussive brain injuries during his playing career;

e.      Failing to establish sideline concussion assessment protocol to assist team
        physicians and trainers in their initial assessment of brain trauma;

f.      Failing to implement policies to prevent BRUCE W. HERRON from
        returning to a game or practice in which he sustained a head injury, in
        order to prevent harmful repetitive brain trauma;

g.      Failing to require that BRUCE W. HERRON be cleared by both a team
        physician and by an independent neurological or neuro-physiological
        consultant prior to resuming football activities after suffering a
        concussion;

h.      Failing to regulate and monitor practices, games, equipment and medical
        care so as to minimize the long-term risk associated with repetitive brain
        injuries suffered by BRUCE W. HERRON;

i.      Failing to monitor and record BRUCE W. HERRON's concussive head
        traumas during his NFL career; and

j.      Failing to protect BRUCE W. HERRON from suffering devastating

8

concussive head traumas.

38.    As a result of the foregoing acts and omissions by the NFL, BRUCE W.

HERRON suffers from brain damage and its related symptoms.

39.    If the NFL would have taken the necessary steps to oversee and protect BRUCE

W. HERRON by warning him of the dangers of head traumas and by educating and training all

persons involved with the NFL teams in the recognition, prevention and treatment of concussive

brain injuries, then BRUCE W. HERRON would not have suffered dangerous repetitive head

trauma; would have recovered more rapidly; and would not have sustained permanent damage to

his brain.

40.    BRUCE W. HERRON's permanent brain damage as a result of concussions

sustained during his NFL career was discovered less than two years prior to the filing of this

complaint.

WHEREFORE, BRUCE W. HERRON demands judgment against defendant,

NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum

jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT III

### NFL's Negligence During RAYMOND D. AUSTIN'S
### NFL Playing Careers Caused Brain Damage

Plaintiff re-alleges paragraphs 7-11 above and incorporates each allegation herein.

41.    The NFL professes that there is nothing more important to the League than player

safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest

player safety issue.

9

42.     The NFL failed to prevent, diagnose and/or properly treat RAYMOND D. AUSTIN's concussive and sub-concussive brain traumas throughout his career.

43.     Prior to and during RAYMOND D. AUSTIN's NFL career, the NFL knew, or should have known, that the helmets used by NFL players do not adequately protect players from concussions.

44.     Prior to and during RAYMOND D. AUSTIN's career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

45.     RAYMOND D. AUSTIN played through documented and undocumented concussions and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

46.     On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged RAYMOND D. AUSTIN, after suffering concussions, to return to play in the same game and/or practice.

47.     The NFL did not document certain instances of RAYMOND D. AUSTIN's concussive head trauma.

48.     The cumulative effect of RAYMOND D. AUSTIN's concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused permanent brain injury and brain damage.

49.     The NFL governs and promotes the game of professional football; sets and enforces league guidelines, policies and game rules; and promotes, markets and distributes broadcasting rights.

50.     The NFL had a duty to RAYMOND D. AUSTIN and all NFL players to keep

them reasonably safe during their NFL careers and to provide RAYMOND D. AUSTIN with the

most up-to-date medical information on all issues, including brain trauma.

51.    During his playing career, the NFL breached its duty to RAYMOND D. AUSTIN

by:

    a.    Failing to educate players, including RAYMOND D. AUSTIN, coaches and medical professionals about concussions - what they are, what symptoms to look for, and what to do if a player suspects he or a teammate has had a concussion;

    b.    Failing to warn RAYMOND D. AUSTIN  and other NFL players of the potential long-term impact of suffering numerous concussive head traumas;

    c.    Failing to warn RAYMOND D. AUSTIN and other NFL players of the consequences of playing through the concussions and/or their symptoms;

    d    Failing to ensure rapid, accurate diagnosis of RAYMOND D. AUSTIN's concussive brain injuries during his playing career;

    e.    Failing to establish sideline concussion assessment protocol to assist team physicians and trainers in their initial assessment of brain trauma;

    f.    Failing to implement policies to prevent RAYMOND D. AUSTIN from returning to a game or practice in which he sustained a head injury, in order to prevent harmful repetitive brain trauma;

    g.    Failing to require that RAYMOND D. AUSTIN be cleared by both a team physician and by an independent neurological or neuro-physiological consultant prior to resuming football activities after suffering a concussion;

    h.    Failing to regulate and monitor practices, games, equipment and medical care so as to minimize the long-term risk associated with repetitive brain injuries suffered by RAYMOND D. AUSTIN ;

    i.    Failing to monitor and record RAYMOND D. AUSTIN's concussive head traumas during his NFL career; and

    j.    Failing to protect RAYMOND D. AUSTIN from suffering devastating

concussive head traumas.

52.     As a result of the foregoing acts and omissions by the NFL,  RAYMOND D.

AUSTIN suffers from brain damage and its related symptoms.

53.     If the NFL would have taken the necessary steps to oversee and protect

RAYMOND D. AUSTIN by warning him of the dangers of head traumas and by educating and

training all persons involved with the NFL teams in the recognition, prevention and treatment of

concussive brain injuries, then RAYMOND D. AUSTIN would not have suffered dangerous

repetitive head trauma; would have recovered more rapidly; and would not have sustained

permanent damage to his brain.

54.     RAYMOND D. AUSTIN's permanent brain damage as a result of concussions

sustained during his NFL career was discovered less than two years prior to the filing of this

complaint.

WHEREFORE, RAYMOND D. AUSTIN demands judgment against defendant,

NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum

jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT IV

### Sullivan v. NFL:  Fraudulent Misrepresentation regarding Linkage Between Brain Trauma Sustained During NFL Playing Career and Permanent Brain Damage

Plaintiff re-alleges paragraphs 1-3 and 10-11 above and incorporates each allegation

herein.

55.     The NFL professes that there is nothing more important to the League than player

safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest

player safety issue.

56.    The NFL failed to prevent, diagnose and/or properly treat GERALD B. SULLIVAN's concussive and sub-concussive brain traumas throughout his NFL career.

57.    Prior to and during GERALD B. SULLIVAN's NFL career, the NFL knew, or should have known, that the helmets used by NFL players do not adequately protect players from concussions.

58.    Prior to and during GERALD B. SULLIVAN's career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

59.    During his NFL career, in practice and game situations, GERALD B. SULLIVAN sustained numerous undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

60.    GERALD B. SULLIVAN played through the concussions and sub-concussive repetitive brain traumas and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

61.    The NFL failed to prevent, diagnose and/or properly treat GERALD B. SULLIVAN's brain traumas throughout his career.

62.    The NFL never warned GERALD B. SULLIVAN that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

63.    On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged GERALD B. SULLIVAN, after suffering concussions, to return to play in the same game and/or practice.

64.    The NFL did not document GERALD B. SULLIVAN's incidents of concussive or

sub-concussive head trauma.

65.     Prior to, during, and after GERALD B. SULLIVAN's NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma and repetitive brain trauma.

66.     In 1994, through a Committee known as the NFL Committee on Mild Traumatic Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma and repetitive brain trauma.

67.     The NFL's MTBI Committee was supposedly charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.[2]

68.     The NFL, through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists "**no evidence of worsening injury or chronic cumulative effects**" from multiple concussions.[3]

69.     The NFL, through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

70.     The NFL, by publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by

------

[2] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

[3] MTBI Committee Report (2004).

14

stating definitively that "**there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players.**"[4]

71.    Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

72.    In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a sixteen (16) year NFL career (1974-1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

73.    Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

74.    The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery.*

75.    The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery,* requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

76.    In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football.  This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term

---

[4] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery,* vol. 55, no. 6, Dec. 2004, p. 1299.

brain damage. The NFL's denial of a linkage between brain trauma during an NFL career and long-term brain damage was knowingly and fraudulently disingenuous.

77.     In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine (9) year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

78.     Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

79.     Also in 2004, the NFL was presented with medical results regarding GERALD B. SULLIVAN's declining mental and cognitive health. Armed with this knowledge, the NFL did nothing to address the issue with GERALD B. SULLIVAN or his fellow retirees.

80.     In 2005, Terry Long died at age forty-five (45) after an eight (8) year NFL career (1984 - 1991), as a result of drinking anti-freeze.

81.     Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

82.     In 2005, leading health professionals published a study of thousands of retired NFL players.[5] The study revealed that retired NFL players with three (3) or more concussions have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-times (3x) higher prevalence of reported significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

---

[5] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C, Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, *Neurosurgery*, 2005 Oct., 57(5); 719-26.

83.    In 2006, Andre Waters died at age forty-four (44) after a twelve (12) year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

84.    Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

85.    In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris Nowinski, was published.  This book contained numerous accounts of retired NFL players suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

86.    Also in October 2006, the NFL, by and through its MTBI Committee members, Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI Committee's efforts that surveyed twelve (12) years of data collection.  The NFL reported that its MTBI Committee had analyzed and collected "data on mild TBIs sustained between 1996 and 2001" and concluded that:

> Because a significant percentage of players returned to play in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than one week, **it can be concluded that mild TBIs in professional football are not serious injuries.**[6]
> (Emphasis added).

87.    In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr. Julian Bailes presented the neuro-pathological findings of the above-noted NFL players.  Dr. Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters,

---

[6] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

contributing to their untimely deaths.

88.     Also in 2007, researchers from the University of North Carolina's Center for

Retired Players recorded results of a survey of retired NFL football players.[7] Their findings

showed that players who had multiple concussions were more likely to experience depression.  In

fact, more than twenty-four percent (24%) of former NFL players who had sustained three or

more concussions reported that they were suffering from depression.

89.     On August 14, 2007, the NFL stated in a press release[8] that:

> **Current research with professional athletes has not shown that**
> **having more than one or two concussions leads to permanent**
> **problems** *if each injury is managed properly.*  It is important to
> understand that there is no magic number for how many
> concussions is too many. [Players] should not be at greater risk of
> further injury *once [they] receive proper medical care for a*
> *concussion and are free of symptoms.* (Emphasis added)

90.     The NFL knew that GERALD B. SULLIVAN's NFL concussions were never

"managed properly" and that he was never provided "proper medical care for a concussion"

during his NFL career.

91.     In 2008, John Grimsley died at age forty-five (45) after a ten (10) year NFL career

(1984 - 1993), as a result of a self-inflicted gunshot wound.  During the final fifteen (15) years of

his life, John Grimsley's family began to notice impairments in his short-term memory, attention,

concentration, organization, planning, problem solving, judgment, executive function and visual-

spatial abnormalities.  These symptoms gradually increased and became pronounced by the time

---

[7] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, 39 Med. Sci. Sports Exercise 903 (2007).

[8] Press Release, National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*, (Aug. 14, 2007).

of his death.

92.     Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

93.     In 2008, Thomas McHale died at age forty-five (45) after a nine (9) year NFL career (1987 - 1995), as the result of an apparent drug overdose.

94.     Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

95.     In 2009, doctors from Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

96.     The NFL responded to the Center for the Study of Traumatic Encephalopathy findings as "isolated incidents" from which no conclusion could be drawn.

97.     Since 1994, the NFL has closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

98.     During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[9]

99.     Despite knowledge of the above incidents and extensive literature, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.

100.    The NFL refused to acknowledge that brain damage in former NFL players is an

---

[9] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

epidemic that constitutes a national health crisis.

101.   The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy that associates with football."[10]

102.   In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

103.   From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

104.   Despite its publications and propaganda to the contrary, the NFL knew that former NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE[11] and/or other degenerative brain disorders.

105.   The cumulative effect of GERALD B. SULLIVAN's concussive and sub-concussive brain trauma, and/or playing through these brain traumas during his NFL playing career, caused permanent brain damage and the associated symptoms.

106.   The NFL has known for decades of the harmful effects on a player's brain of

---

[10] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

[11] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

concussions; however, it concealed these facts from GERALD B. SULLIVAN, other players, retirees, NFL coaches, trainers, players and fans.

107. The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during GERALD B. SULLIVAN's playing career and retirement caused an increased risk of debilitating injury which did, in fact, occur.

108. The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during GERALD B. SULLIVAN's playing career caused him to remain ignorant to the harmful effects of playing through concussion symptoms, which was a cause of him developing brain damage and other cognitive health declines.

109. The NFL knew that its misrepresentations, material omissions and/or concealment of relevant medical information were false and/or made the statements in reckless disregard of whether the statements were true or false.

110. GERALD B. SULLIVAN reasonably believed that the misrepresentations, material omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, and/or appropriate accommodations from his employer, in justifiable reliance on the truth of the statements made by the NFL.

111. As a result of GERALD B. SULLIVAN's reliance upon the NFL's misrepresentations, he continued to play professional football and he failed to pursue necessary counseling, medical care and treatment that would have lessened the symptoms of the permanent brain damage.

WHEREFORE, GERALD B. SULLIVAN demands judgment against defendant,

NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum

jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT V

### Herron v. NFL:  Fraudulent Misrepresentation Regarding Linkage Between Brain Trauma Sustained During NFL Playing Career and Permanent Brain Damage

Plaintiff re-alleges paragraphs 4-6 and 10-11 above and incorporates each allegation

herein.

112.    The NFL professes that there is nothing more important to the League than player

safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest

player safety issue.

113.    The NFL failed to prevent, diagnose and/or properly treat BRUCE W.

HERRON's concussive and sub-concussive brain traumas throughout his career.

114.    Prior to and during BRUCE W. HERRON's NFL career, the NFL knew, or should

have known, that the helmets used by NFL players do not adequately protect players from

concussions.

115.    Prior to and during BRUCE W. HERRON's career, the NFL knew, or should have

known, the harmful effects of poorly managed concussions.

116.    During his NFL career, in practice and game situations, BRUCE W. HERRON

sustained numerous undocumented concussive brain traumas and thousands of sub-concussive

brain traumas.

117.    BRUCE W. HERRON played through the concussions and sub-concussive

22

repetitive brain traumas and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

118.    The NFL failed to prevent, diagnose and/or properly treat BRUCE W. HERRON's brain traumas throughout his career.

119.    The NFL never warned BRUCE W. HERRON that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

120.    On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged BRUCE W. HERRON, after suffering concussions, to return to play in the same game and/or practice.

121.    The NFL did not document BRUCE W. HERRON's incidents of concussive or sub-concussive head trauma.

122.    Prior to, during, and after BRUCE W. HERRON's NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma and repetitive brain trauma.

123.    In 1994, through a Committee known as the NFL Committee on Mild Traumatic Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma and repetitive brain trauma.

124.    The NFL's MTBI Committee was supposedly charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study

every facet of the injury as it related to the game of football.[12]

125.    The NFL, by and through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists "**no evidence of worsening injury or chronic cumulative effects**" from multiple concussions.[13]

126.    The NFL, by and through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

127.    The NFL, by and through publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by stating definitively that "**there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players.**"[14]

128.    Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

129.    In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a sixteen (16) year NFL career (1974-1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle

---

[12] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

[13] MTBI Committee Report (2004).

[14] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6," *Neurosurgery*, vol. 55, no. 6, Dec. 2004, p. 1299.

pain.

130. Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

131. The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery.*

132. The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery,* requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

133. In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football. This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage. The NFL's denial of a linkage between brain trauma during an NFL career and long-term brain damage was knowingly and fraudulently disingenuous.

134. In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine (9) year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

135. Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

136. In 2005, Terry Long died at age forty-five (45) after an eight (8) year NFL career (1984-1991), as a result of drinking anti-freeze.

137. Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a

result of repeated blows to the head during his football career.

138.     In 2005, leading health professionals published a study of thousands of retired NFL players.[15] The study revealed that retired NFL players with three (3) or more concussions have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-times (3x) higher prevalence of reported significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

139.     In 2006, Andre Waters died at age forty-four (44) after a twelve (12) year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

140.     Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

141.     In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris Nowinski, was published. This book contained numerous accounts of retired NFL players suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

142.     Also in October 2006, the NFL, by and through its MTBI Committee members, Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI Committee's efforts that surveyed twelve (12) years of data collection. The NFL reported that its MTBI Committee had analyzed and collected "data on mild TBIs sustained between 1996 and 2001" and concluded that:

> Because a significant percentage of players returned to play

---

[15] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C, Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, Neurosurgery, 2005 Oct., 57(5); 719-26.

> in the same game [as they suffered a mild traumatic brain injury] and the overwhelming majority of players with concussions were kept out of football-related activities for less than one week, **it can be concluded that mild TBIs in professional football are not serious injuries.**[16]
> (Emphasis added).

143.    In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr. Julian Bailes presented the neuro-pathological findings of the above-noted NFL players. Dr. Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters, contributing to their untimely deaths.

144.    Also in 2007, researchers from the University of North Carolina's Center for Retired Players recorded results of a survey of retired NFL football players.[17] Their findings showed that players who had multiple concussions were more likely to experience depression. In fact, more than twenty-four percent (24%) of former NFL players who had sustained three or more concussions reported that they were suffering from depression.

145.    On August 14, 2007, the NFL stated in a press release[18] that:

> **Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems** *if each injury is managed properly.* It is important to understand that there is no magic number for how many

---

[16] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection & Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4) (2006).

[17] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired Professional Football Players*, 39 Med. Sci. Sports Exercise 903 (2007).

[18] Press Release, National Football League, *NFL Outlines for Players Steps Taken to Address Concussions*, (Aug. 14, 2007).

> concussions is too many. [Players] should not be at greater risk of
> further injury *once [they] receive proper medical care for a*
> *concussion and are free of symptoms.* (Emphasis added)

146. The NFL knew that BRUCE W. HERRON's NFL concussions were never "managed properly" and that he was never provided "proper medical care for a concussion" during his NFL career.

147. In 2008, John Grimsley died at age forty-five (45) after a ten (10) year NFL career (1984 - 1993), as a result of a self-inflicted gunshot wound. During the final fifteen (15) years of his life, John Grimsley's family began to notice impairments in his short-term memory, attention, concentration, organization, planning, problem solving, judgment, executive function and visual-spatial abnormalities. These symptoms gradually increased and became pronounced by the time of his death.

148. Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as a result of repeated blows to the head during his football career.

149. In 2008, Thomas McHale died at age forty-five (45) after a nine (9) year NFL career (1987 - 1995), as the result of an apparent drug overdose.

150. Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE as a result of repeated blows to the head during his football career.

151. In 2009, doctors from Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

152. The NFL responded to the Center for the Study of Traumatic Encephalopathy findings as "isolated incidents" from which no conclusion could be drawn.

28

153.   Since 1994, the NFL has closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

154.   During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[19]

155.   Despite knowledge of the above incidents and extensive literature, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.

156.   The NFL refused to acknowledge that brain damage in former NFL players is an epidemic that constitutes a national health crisis.

157.   The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy that associates with football."[20]

158.   In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL athletes."

159.   From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

160.   Despite its publications and propaganda to the contrary, the NFL knew that former

---

[19] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

[20] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

29

NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor

insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced

concentration and/or agitation may have CTE[21] and/or other degenerative brain disorders.

161.    The cumulative effect of BRUCE W. HERRON's concussive and sub-concussive

brain trauma, and/or playing through these brain traumas during his NFL playing career, caused

permanent brain damage and the associated symptoms.

162.    The NFL has known for decades of the harmful effects on a player's brain of

concussions; however, it concealed these facts from BRUCE W. HERRON, other players,

retirees, NFL coaches, trainers, players and fans.

163.    The NFL's misrepresentations, material omissions and/or concealment of relevant

medical information during BRUCE W. HERRON's playing career and retirement caused an

increased risk of debilitating injury which did, in fact, occur.

164.    The NFL's misrepresentations, material omissions and/or concealment of relevant

medical information during BRUCE W. HERRON's playing career caused him to remain

ignorant to the harmful effects of playing through concussion symptoms, which was a cause of

him developing brain damage and other cognitive health declines.

165.    The NFL knew that its misrepresentations, material omissions and/or concealment

of relevant medical information were false and/or made the statements in reckless disregard of

whether the statements were true or false.

166.    BRUCE W. HERRON reasonably believed that the misrepresentations, material

---

[21] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After
Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee,
Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

167.    As a result of BRUCE W. HERRON's reliance upon the NFL's misrepresentations, he continued to play professional football and he failed to pursue necessary counseling and medical care and treatment that would have lessened the symptoms of his permanent brain damage.

WHEREFORE, BRUCE W. HERRON demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

### COUNT VI

### Austin v. NFL:  Fraudulent Misrepresentation Regarding Linkage Between Brain Trauma Sustained During NFL Playing Career and Permanent Brain Damage

Plaintiff re-alleges paragraphs 7-11 above and incorporates each allegation herein.

168.    The NFL professes that there is nothing more important to the League than player safety, and that the effective prevention, diagnosis, and treatment of concussions is its greatest player safety issue.

169.    The NFL failed to prevent, diagnose and/or properly treat RAYMOND D. AUSTIN's concussive and sub-concussive brain traumas throughout his career.

170.    Prior to and during RAYMOND D. AUSTIN's NFL career, the NFL knew, or should have known, that the helmets used by NFL players do not adequately protect players from

concussions.

171.    Prior to and during RAYMOND D. AUSTIN's career, the NFL knew, or should have known, the harmful effects of poorly managed concussions.

172.    During his NFL careers, in practice and game situations, RAYMOND D. AUSTIN sustained numerous undocumented concussive brain traumas and thousands of sub-concussive brain traumas.

173.    RAYMOND D. AUSTIN played through the concussions and sub-concussive repetitive brain traumas and the associated symptoms because he, like the rest of the NFL players at the time, was not told of the consequences.

174.    The NFL failed to prevent, diagnose and/or properly treat RAYMOND D. AUSTIN's brain traumas throughout his career.

175.    The NFL never warned RAYMOND D. AUSTIN that playing through concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

176.    On numerous occasions, the NFL, by failing to enact sufficient return-to-play policies, allowed and encouraged RAYMOND D. AUSTIN, after suffering concussions, to return to play in the same game and/or practice.

177.    The NFL did not document RAYMOND D. AUSTIN's incidents of concussive or sub-concussive head trauma.

178.    Prior to, during, and after RAYMOND D. AUSTIN's NFL career, the NFL knew of the harmful effects of poorly managed concussions, sub-concussive brain trauma and repetitive brain trauma.

179.    In 1994, through a Committee known as the NFL Committee on Mild Traumatic

32

Brain Injury (hereinafter "MTBI Committee"), the NFL embarked upon a propaganda scheme designed to mislead NFL players and retirees regarding the long-term ramifications of concussions, sub-concussive brain trauma and repetitive brain trauma.

180.    The NFL's MTBI Committee was supposedly charged, by then Commissioner Paul Tagliabue, with determining what was known about concussions in sports and to study every facet of the injury as it related to the game of football.[22]

181.    The NFL, by and through publications of its MTBI Committee, repeatedly misinformed its retirees that there exists **"no evidence of worsening injury or chronic cumulative effects"** from multiple concussions.[23]

182.    The NFL, by and through publications of its MTBI Committee, systematically falsely mandated that "many NFL players can be safely allowed to return to play" on the day of a concussion.

183.    The NFL, by and through publications of its MTBI Committee, continuously denied any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage by stating definitively that **"there is no evidence...of widespread permanent or cumulative effects of single or multiple mild traumatic brain injuries in professional football players."**[24]

184.    Chronic Traumatic Encephalopathy ("CTE") was first discovered in the 1920s and

---

[22] October 28, 2009 testimony of Andrew A. Tucker, M.D. before the Committee on the Judiciary, United States House of Representatives.

[23] MTBI Committee Report (2004).

[24] Elliot J. Pellman, et al., "Concussion in Professional Football: Neuropsychological Testing — Part 6." *Neurosurgery*, vol. 55, no. 6, Dec. 2004, p. 1299.

is found exclusively in the brains of individuals who have been subjected to repetitive head trauma in the form of multiple concussions and/or sub-concussive head injuries.

185.   In 2002, Mike Webster, a four-time Super Bowl Champion with the Pittsburgh Steelers, died at age fifty (50) after a sixteen (16) year NFL career (1974-1990).  During his retirement, Webster suffered from amnesia, dementia, depression and acute bone and muscle pain.

186.   Post-mortem, neuro-pathological review revealed that Mike Webster had CTE as a result of repeated blows to the head during his football career.

187.   The autopsy findings of Mike Webster's brain were reported in the peer-reviewed medical journal, *Neurosurgery.*

188.   The NFL, by and through its MTBI Committee, immediately wrote to the journal, *Neurosurgery,* requesting that Mike Webster's CTE paper be retracted, as it contradicted the NFL's propaganda scheme.

189.   In 2003, the NFL, by and through its MTBI Committee, purportedly began to formulate a plan to scientifically investigate the possibility that there were long-term effects on the brain due to a career in professional football.  This investigation was a sham - the study refuted any linkage between repetitive brain trauma sustained by NFL players and long-term brain damage.  The NFL's denial of a linkage between brain trauma during an NFL career and long-term brain damage was knowingly and fraudulently disingenuous.

190.   In 2004, Justin Strzelczyk died at age thirty-six (36) after a nine (9) year NFL career (1990-1998), as a result of driving a motor vehicle ninety miles-per-hour, against traffic, during a police chase.

191.    Post-mortem, neuro-pathological review revealed that Justin Strzelczyk had CTE as a result of repeated blows to the head during his football career.

192.    In 2005, Terry Long died at age forty-five (45) after an eight (8) year NFL career (1984 - 1991), as a result of drinking anti-freeze.

193.    Post-mortem, neuro-pathological review revealed that Terry Long had CTE as a result of repeated blows to the head during his football career.

194.    In 2005, leading health professionals published a study of thousands of retired NFL players.[25] The study revealed that retired NFL players with three (3) or more concussions have a five-times (5x) higher prevalence of mild cognitive impairment diagnosis and a three-times (3x) higher prevalence of reported significant memory problems compared with those who had not sustained concussions. One-fourth (25%) of players reported three or more concussions during their NFL career.

195.    In 2006, Andre Waters died at age forty-four (44) after a twelve (12) year NFL career (1987 - 1998), as a result of a self-inflicted gun shot wound.

196.    Post-mortem, neuro-pathological review revealed that Andre Waters had CTE as a result of repeated blows to the head during his football career.

197.    In October 2006, Head Games - The NFL's Concussion Crisis, written by Chris Nowinski, was published. This book contained numerous accounts of retired NFL players suffering from significant long-term effects after years of repetitive brain trauma in the NFL.

198.    Also in October 2006, the NFL, by and through its MTBI Committee members,

---

[25] Guskiewicz, KM, Marshall, SW, Bailes, J, McCrea, M, Cantu, RC, Randolph C, Jordan, DD, *Association Between Recurrent Concussions and Late-Life Cognitive Impairment in Retired Professional Football Players*, Neurosurgery, 2005 Oct., 57(5); 719-26.

Drs. Pellman and Viano, published an interim report in *Neurological Focus* on the MTBI

Committee's efforts that surveyed twelve (12) years of data collection.  The NFL reported that its

MTBI Committee had analyzed and collected "data on mild TBIs sustained between 1996 and

2001" and concluded that:

> Because a significant percentage of players returned to play
> in the same game [as they suffered a mild traumatic brain
> injury] and the overwhelming majority of players with
> concussions were kept out of football-related activities for
> less than one week, **it can be concluded that mild TBIs in
> professional football are not serious injuries.**[26]
> (Emphasis added).

199.    In June 2007, at the "NFL's Concussion Summit", in Rosemont, Illinois, Dr.

Julian Bailes presented the neuro-pathological findings of the above-noted NFL players.  Dr.

Bailes, in point-blank fashion, again informed the NFL that multiple NFL concussions caused

CTE in the brains of Mike Webster, Justin Strzelczyk, Terry Long, and Andre Waters,

contributing to their untimely deaths.

200.    Also in 2007, researchers from the University of North Carolina's Center for

Retired Players recorded results of a survey of retired NFL football players.[27]  Their findings

showed that players who had multiple concussions were more likely to experience depression.  In

fact, more than twenty-four percent (24%) of former NFL players who had sustained three or

more concussions reported that they were suffering from depression.

---

[26] Pellman, E & Viano, D, *Concussion in Professional Football: Injury Collection &
Data Analysis*, American Association of Neurological Surgeons, *Neurosurgery Focus*, 21(4)
(2006).

[27] Kevin M. Guskiewicz et al., *Recurrent Concussion and Risk of Depression in Retired
Professional Football Players*, 39 Med. Sci. Sports Exercise 903 (2007).

201.   On August 14, 2007, the NFL stated in a press release[28] that:

> **Current research with professional athletes has not shown that
> having more than one or two concussions leads to permanent
> problems** *if each injury is managed properly.* It is important to
> understand that there is no magic number for how many
> concussions is too many. [Players] should not be at greater risk of
> further injury *once [they] receive proper medical care for a
> concussion and are free of symptoms.* (Emphasis added)

202.   The NFL knew that RAYMOND D. AUSTIN's NFL concussions were never
"managed properly" and that he was never provided "proper medical care for a concussion"
during his NFL career.

203.   In 2008, John Grimsley died at age forty-five (45) after a ten (10) year NFL career
(1984 - 1993), as a result of a self-inflicted gunshot wound. During the final fifteen (15) years of
his life, John Grimsley's family began to notice impairments in his short-term memory, attention,
concentration, organization, planning, problem solving, judgment, executive function and visual-
spatial abnormalities. These symptoms gradually increased and became pronounced by the time
of his death.

204.   Post-mortem, neuro-pathological review revealed that John Grimsley had CTE as
a result of repeated blows to the head during his football career.

205.   In 2008, Thomas McHale died at age forty-five (45) after a nine (9) year NFL
career (1987 - 1995), as the result of an apparent drug overdose.

206.   Post-mortem, neuro-pathological review revealed that Thomas McHale had CTE
as a result of repeated blows to the head during his football career.

---

[28] Press Release, National Football League, *NFL Outlines for Players Steps Taken to
Address Concussions*, (Aug. 14, 2007).

207.    In 2009, doctors from Boston University School of Medicine's Center for the Study of Traumatic Encephalopathy held a press conference to explain the significance of their findings of CTE in the brains of Mr. Grimsley and Mr. McHale.

208.    The NFL responded to the Center for the Study of Traumatic Encephalopathy findings as "isolated incidents" from which no conclusion could be drawn.

209.    Since 1994, the NFL has closely followed the medical literature and the reports of studies suggesting a link between professional football and long-term brain damage.

210.    During this time, there were hundreds of studies that discussed the link between on-field head trauma and the early onset of a number of mental illnesses.[29]

211.    Despite knowledge of the above incidents and extensive literature, the NFL continuously refuted, denied, and inaccurately professed that chronic brain damage in former NFL football players was not a result of brain trauma sustained in the players' NFL careers.

212.    The NFL refused to acknowledge that brain damage in former NFL players is an epidemic that constitutes a national health crisis.

213.    The NFL hid behind the statements of its Co-Chair of the MTBI Committee "that there are many questions that still are out there as to whether there is a kind of encephalopathy that associates with football."[30]

214.    In 2009, the NFL distributed a pamphlet to NFL players stating "research is currently underway to determine if there are any long-term effects of concussions in NFL

---

[29] Testimony of NFLPA Executive Director, DeMaurice Smith, at Congressional Hearing October 28, 2009, in the presence of NFL Commissioner, Roger Goodell.

[30] Alan Schwarz, New York Times, *Sixth NFL Player's Brain is Found to Have Brain Damage*, (Jan. 28, 2009).

athletes."

215.     From 1994 to 2009, the NFL's MTBI Committee published seventeen (17) articles based upon their research and findings - none of which acknowledged that repetitive head trauma and/or repetitive concussions contribute to cause CTE in retired players.

216.     Despite its publications and propaganda to the contrary, the NFL knew that former NFL players exhibiting mood disorder (mainly depression), memory loss, paranoia, poor insight/judgment, outbursts of anger or aggression, irritability, apathy, confusion, reduced concentration and/or agitation may have CTE[31] and/or other degenerative brain disorders.

217.     The cumulative effect of RAYMOND D. AUSTIN's concussive and sub-concussive brain trauma, and/or playing through these brain traumas during his NFL playing career caused permanent brain damage and the associated symptoms.

218.     The NFL has known for decades of the harmful effects on a player's brain of concussions; however, it concealed these facts from RAYMOND D. AUSTIN, other players, retirees, NFL coaches, trainers, players and fans.

219.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during RAYMOND D. AUSTIN's playing career and retirement caused an increased risk of debilitating injury which did, in fact, occur.

220.     The NFL's misrepresentations, material omissions and/or concealment of relevant medical information during RAYMOND D. AUSTIN's playing career caused him to remain ignorant to the harmful effects of playing through concussion symptoms, which was a cause of

---

[31] *Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy After Repetitive Head Injury*, McKee, Cantu, Nowinski, Hedley-White, Garett, Budson, Santini, Lee, Kubilis, Stern, *Journal of Neuropathology*, Vol. 68 Number 7, July 2009.

him developing brain damage and other cognitive health declines.

221.    The NFL knew that its misrepresentations, material omissions and/or concealment of relevant medical information were false and/or made the statements in reckless disregard of whether the statements were true or false.

222.    RAYMOND D. AUSTIN reasonably believed that the misrepresentations, material omissions and/or concealment of relevant medical information made by the NFL were true and refrained from pursuing medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

223.    As a result of RAYMOND D. AUSTIN's reliance upon the NFL's misrepresentations, he continued to play professional football and he failed to pursue necessary counseling, medical care and treatment that would have lessened the symptoms of his permanent brain damage.

WHEREFORE, RAYMOND D. AUSTIN, demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT VII

### Sullivan v. NFL: League Officers and Members of its MTBI Committee Conspire to Publish and Profess False Information to Its Players and Retirees

Plaintiff re-alleges paragraphs 55 through 111 of Count IV and incorporates each allegation herein.

224.    In 1994, the League Officers of the NFL and the members of the NFL's MTBI

Committee agreed to publish false statements in its reporting of medical research and findings regarding the linkage between repeated brain trauma experienced during an NFL career and permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to create confusion and uncertainty on this subject.

225.    Creating ambiguity and/or making false statements regarding this critical medical information was unlawful, unethical and blatantly misleading.

226.    GERALD B. SULLIVAN reasonably believed that the statements made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

227.    As a result of GERALD B. SULLIVAN's reliance upon the NFL's conspiracy, he failed to pursue necessary counseling, medical care and treatment that would have lessened the effects and symptoms of his permanent brain damage.

228.    As a result of GERALD B. SULLIVAN's reliance upon the NFL's conspiracy, he experienced a seemingly inexplicable degeneration of mental capacity with symptoms including, but not limited to the following: short-term memory loss, anxiety, depression, mood swings, insomnia, and headaches.

WHEREFORE, GERALD B. SULLIVAN demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

41

## COUNT VIII

### Herron v. NFL:  League Officers and Members of its MTBI Committee Conspire to Publish and Profess False Information to Its Players and Retirees

Plaintiff re-alleges paragraphs 112 through 167 of Count V and incorporates each allegation herein.

229.    In 1994, the League Officers of the NFL and the members of the NFL's MTBI Committee agreed to publish false statements in its reporting of medical research and findings regarding the linkage between repeated brain trauma experienced during an NFL career and permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to create confusion and uncertainty on this subject.

230.    Creating ambiguity and/or making false statements regarding this critical medical information was unlawful, unethical and blatantly misleading.

231.    BRUCE W. HERRON reasonably believed that the statements made by the NFL were true and refrained from pursuing appropriate medical care and treatment related to his permanent brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable reliance on the truth of the statements made by the NFL.

232.    As a result of BRUCE W. HERRON's reliance upon the NFL's conspiracy, he failed to pursue necessary counseling, medical care and treatment that would have lessened the effects and symptoms of the permanent brain damage.

233.    As a result of BRUCE W. HERRON's reliance upon the NFL's conspiracy, he experienced a seemingly inexplicable degeneration of mental capacity with symptoms including, but not limited to the following: short-term memory loss, anxiety, depression, mood swings,

insomnia, and headaches.

WHEREFORE, BRUCE W. HERRON demands judgment against defendant,

NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum

jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT IX

### Austin v. NFL: League Officers and Members of its MTBI Committee Conspire to Publish and Profess False Information to Its Players and Retirees

Plaintiff re-alleges paragraphs 168 through 223 of Count VI and incorporates each

allegation herein.

234.    In 1994, the League Officers of the NFL and the members of the NFL's MTBI

Committee agreed to publish false statements in its reporting of medical research and findings

regarding the linkage between repeated brain trauma experienced during an NFL career and

permanent brain damage and/or purposefully endorsed ambiguous statements in an effort to

create confusion and uncertainty on this subject.

235.    Creating ambiguity and/or making false statements regarding this critical medical

information was unlawful, unethical and blatantly misleading.

236.    RAYMOND D. AUSTIN reasonably believed that the statements made by the

NFL were true and refrained from pursuing medical care and treatment related to his permanent

brain damage as a result of repetitive trauma sustained during his NFL career, in justifiable

reliance on the truth of the statements made by the NFL.

237.    As a result of RAYMOND D. AUSTIN's reliance upon the NFL's conspiracy, he

failed to pursue necessary counseling, medical care and treatment that would have lessened the

43

effects and symptoms of the permanent brain damage.

238.    As a result of RAYMOND D. AUSTIN's reliance upon the NFL's conspiracy, he experienced a seemingly inexplicable degeneration of mental capacity with symptoms including, but not limited to the following: short-term memory loss, anxiety, depression, mood swings, insomnia, and headaches.

WHEREFORE, RAYMOND D. AUSTIN demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT X

### Sullivan v. Riddell: Negligence in Failing to Warn that its Helmet Design Would Not Prevent Concussion

Plaintiff re-alleges paragraphs 1-3 and 12 above and incorporates each allegation herein.

239.    During GERALD B. SULLIVAN's career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

240.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

241.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

242.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

effects and symptoms of the permanent brain damage.

238.    As a result of RAYMOND D. AUSTIN's reliance upon the NFL's conspiracy, he experienced a seemingly inexplicable degeneration of mental capacity with symptoms including, but not limited to the following: short-term memory loss, anxiety, depression, mood swings, insomnia, and headaches.

WHEREFORE, RAYMOND D. AUSTIN demands judgment against defendant, NATIONAL FOOTBALL LEAGUE, INC., a corporation, for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT X

### Sullivan v. Riddell: Negligence in Failing to Warn that its Helmet Design Would Not Prevent Concussion

Plaintiff re-alleges paragraphs 1-3 and 12 above and incorporates each allegation herein.

239.    During GERALD B. SULLIVAN's career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

240.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

241.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

242.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

44

243.    Prior to and during GERALD B. SULLIVAN's career, RIDDELL knew, or should have known, that its helmets used by NFL players did not adequately protect players from concussions and/or sub-concussive head injury.

244.    RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

245.    RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

246.    RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

247.    GERALD B. SULLIVAN neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

248.    GERALD B. SULLIVAN was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

249.    RIDDELL owed a duty to warn GERALD B. SULLIVAN of the risks of substantial harm associated with the foreseeable use of their products.

250.    RIDDELL never warned GERALD B. SULLIVAN that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

251.    GERALD B. SULLIVAN played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

45

252.   The cumulative effect of GERALD B. SULLIVAN's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused cognitive and mental health deficits due to brain deterioration.

253.   At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

        a.     That its helmets would not protect against concussive brain injury;

        b.     That its helmets did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

        c.     That its helmets did not include a safely configured shock attenuating system; and

        d.     That is had not properly and adequately tested the helmet model.

254.   RIDDELL's failure to warn caused GERALD B. SULLIVAN's head injuries.

255.   The failure to warn of an unreasonably dangerous condition was a proximate cause of the brain traumas suffered by GERALD B. SULLIVAN.

WHEREFORE, GERALD B. SULLIVAN, demands judgment against Defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC., RIDDELL SPORTS GROUP, INC., a corporation, ALL AMERICAN SPORTS, a corporation, EASTON-BELL SPORTS INC., a corporation, EASTON-BELL SPORTS, LLC, a Limited Liability Company, EB SPORTS, a corporation, and RGB HOLDINGS, a corporation for a sum in excess of the minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT XI

### Herron v. Riddell: Negligence in Failing to Warn that its
### Helmet Design Would Not Prevent Concussion

Plaintiff re-alleges paragraphs 4-6 and 12 above and incorporates each allegation herein.

256.     During BRUCE W. HERRON's career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

257.     Prior to and during BRUCE W. HERRON's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

258.     Prior to and during BRUCE W. HERRON's career, RIDDELL knew, or should have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

259.     Prior to and during BRUCE W. HERRON's career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

260.     Prior to and during BRUCE W. HERRON's career, RIDDELL knew, or should have known, that its helmets used by NFL players did not adequately protect players from concussions and/or sub-concussive head injury.

261.     RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

262.     RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

263.     RIDDELL failed to provide necessary and adequate information, warnings and/or

47

instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

264.    BRUCE W. HERRON neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

265.    BRUCE W. HERRON was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

266.    RIDDELL owed a duty to warn BRUCE W. HERRON of the risks of substantial harm associated with the foreseeable use of their products.

267.    RIDDELL never warned BRUCE W. HERRON that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would, cause permanent brain damage.

268.    BRUCE W. HERRON played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

269.    The cumulative effect of BRUCE W. HERRON's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused cognitive and mental health deficits due to brain deterioration.

270.    At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

        a.    That its helmets would not protect against concussive brain injury;

48

b.   That its helmets did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

c.   That its helmets did not include a safely configured shock attenuating system; and

d.   That is had not properly and adequately tested the helmet model.

271.   RIDDELL's failure to warn caused BRUCE W. HERRON 's head injuries.

272.   The failure to warn of an unreasonably dangerous condition was a proximate cause of the brain traumas suffered by BRUCE W. HERRON .

WHEREFORE, BRUCE W. HERRON, demands judgment against Defendant,

RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC., RIDDELL SPORTS

GROUP, INC., a corporation, ALL AMERICAN SPORTS, a corporation, EASTON-BELL

SPORTS INC., a corporation, EASTON-BELL SPORTS, LLC, a Limited Liability Company,

EB SPORTS, a corporation, and RGB HOLDINGS, a corporation for a sum in excess of the

minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT XII

### Austin v. Riddell: Negligence in Failing to Warn that its Helmet Design Would Not Prevent Concussion

Plaintiff re-alleges paragraphs 7-9 and 12 above and incorporates each allegation herein.

273.   During RAYMOND D. AUSTIN's career, RIDDELL sold, manufactured, designed, tested, engineered, marketed, modified, assembled, inspected, distributed and provided warnings for helmets used by NFL players.

274.   Prior to and during RAYMOND D. AUSTIN's career, RIDDELL knew, or should have known, the harmful effects of poorly managed concussions.

275.   Prior to and during RAYMOND D. AUSTIN's career, RIDDELL knew, or should

have known, that the NFL would not adequately prevent, recognize or deal with concussions sustained by NFL players.

276.    Prior to and during RAYMOND D. AUSTIN's career, RIDDELL knew, or should have known, that repetitive head trauma could cause long-term brain damage.

277.    Prior to and during RAYMOND D. AUSTIN's career, RIDDELL knew, or should have known, that its helmets used by NFL players did not adequately protect players from concussions and/or sub-concussive head injury.

278.    RIDDELL knew, or should have known, of the substantial dangers involved in the reasonably foreseeable use of the helmets.

279.    RIDDELL failed to provide necessary and adequate safety and instructional materials and warnings of the risk and means available to reduce and/or minimize the risk of concussive brain injuries while playing football.

280.    RIDDELL failed to provide necessary and adequate information, warnings and/or instructional materials regarding the fact that other model helmets provided greater shock attenuation from blows to the head area.

281.    RAYMOND D. AUSTIN neither knew, nor had reason to know, of the existence of the increased risk of harm he faced during his NFL career due to RIDDELL's omissions.

282.    RAYMOND D. AUSTIN was using the RIDDELL helmets in a reasonably foreseeable manner at all times.

283.    RIDDELL owed a duty to warn RAYMOND D. AUSTIN of the risks of substantial harm associated with the foreseeable use of their products.

284.    RIDDELL never warned RAYMOND D. AUSTIN that its helmets would not prevent concussions and/or that concussions and sub-concussive brain traumas could, and would,

cause permanent brain damage.

285.    RAYMOND D. AUSTIN played through the concussions and sub-concussive repetitive brain traumas and their associated symptoms because he, like the rest of the NFL players at the time, believed he was safe in his helmet.

286.    The cumulative effect of RAYMOND D. AUSTIN's concussive and sub-concussive brain trauma and/or playing through these brain traumas during his NFL playing career caused cognitive and mental health deficits due to brain deterioration.

287.    At the time its helmets were designed, manufactured, sold and/or distributed by RIDDELL, the helmets were unreasonably dangerous and unsafe for their intended purpose because they did not provide adequate warning of the product's inability to protect against the foreseeable risk of concussive brain injury; specifically, RIDDELL failed to warn of one or more of the following:

        a.    That its helmets would not protect against concussive brain injury;

        b.    That its helmets did not include a safe means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head;

        c.    That its helmets did not include a safely configured shock attenuating system; and

        d.    That is had not properly and adequately tested the helmet model.

288.    RIDDELL's failure to warn caused RAYMOND D. AUSTIN's head injuries.

289.    The failure to warn of an unreasonably dangerous condition was a proximate cause of the brain traumas suffered by RAYMOND D. AUSTIN.

WHEREFORE, RAYMOND D. AUSTIN, demands judgment against Defendant, RIDDELL, INC., a corporation, f/k/a EN&T ASSOCIATES, INC., RIDDELL SPORTS

GROUP, INC., a corporation, ALL AMERICAN SPORTS, a corporation, EASTON-BELL

SPORTS INC., a corporation, EASTON-BELL SPORTS, LLC, a Limited Liability Company,

EB SPORTS, a corporation, and RGB HOLDINGS, a corporation for a sum in excess of the

minimum jurisdictional limit for the Law Division of the Circuit Court of Cook County, Illinois.

William T. Gibbs

Thomas A. Demetrio
William T. Gibbs
Corboy & Demetrio, P.C.
Attorneys for Plaintiffs
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No. 02329