# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL LEAGUE
RETIRED PLAYERS' CONCUSSION
INJURY LITIGATION

THIS DOCUMENT APPLIES TO
ALL OPT OUT PLAINTIFFS

No. 2:12-md-02323-AB

MDL NO. 2323

Hon. Anita B. Brody

## OPT OUT PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

1472992.2

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................ 1

II.  STATEMENT OF THE CASE.......................................................... 2

    A.  The NFL's Historical Role as Guardian of Player Health ...................... 3

    B.  The NFL's Monetization of Violence ................................................... 5

    C.  The NFL's Cover-Up .......................................................................... 5

    D.  The NFL's Co-Conspirators ................................................................ 8

III.  LEGAL STANDARD......................................................................... 9

IV.  ARGUMENT ..................................................................................... 11

    A.  The Motion Should be Denied for Abject Failure to Perform Any Choice-of-Law Analysis. ............................................................................. 11

    B.  Even Under the NFL's Hypothetical Law, Plaintiffs' Claims Are Properly Pleaded. ...................................................................................... 15

        1.  Plaintiffs Plausibly Allege Negligence. .................................. 15

            a.  Plaintiffs Plausibly Allege that the NFL Voluntarily Undertook a Duty to Exercise Ordinary Care in Protecting the Health and Safety of the Football Community, and in Studying the Issue of Neurocognitive Injuries in Football. ......... 15

            b.  Plaintiffs Plausibly Allege Negligent Hiring and Retention/Supervision. ................................................ 16

            c.  Plaintiffs Plausibly Allege Negligent Marketing. ....................... 18

        2.  Plaintiffs Plausibly Allege Fraud and Negligent Misrepresentation........ 19

        3.  Plaintiffs Plausibly Allege Conspiracy. .................................. 22

        4.  Plaintiffs Plausibly Allege Claims Against NFL-P. .............................. 24

    C.  Plaintiffs' Negligence, Fraud, and Conspiracy Claims are Timely. ................... 25

        1.  Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by the Discovery Rule........................................................................ 25

        2.  Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by the NFL's Fraudulent Concealment.............................................. 27

        3.  Plaintiffs Who Did Not File Individual Actions Within the Statute of Limitations as Tolled by the Discovery Rule or Fraudulent Concealment Had Their Claims Tolled by the Class Action Pending in this Court. ............................................................ 30

**TABLE OF CONTENTS**
**(continued)**

Page

D.  The Court Should Not Dismiss the Claims of Plaintiffs Who Failed to File
    Short-Form Complaints, Many of Whom are *Pro Se*. ........................................ 33

V.  CONCLUSION ............................................................................................................. 33

1472992.2

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ........................................................................................................ 3

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974) ................................................................................................. 31, 32

*Am. Planned Communities, Inc. v. State Farm Ins. Co.*,
  28 F. Supp. 2d 964 (E.D. Pa. 1998) ............................................................................. 20

*Anesthesia Assocs. of Mt. Kisco, LLP v. N. Westchester Hosp. Ctr.*,
  59 A.D.3d 473 (N.Y. App. Div. 2009) ......................................................................... 24

*Archie v. Pop Warner Little Scholars, Inc.*,
  No. 16-6603, 2017 WL 3084160 (C.D. Cal. May 12, 2017) ....................................... 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................ 9

*Barrett v. Freifeld*,
  77 A.D.3d 600 (N.Y. App. Div. 2010) ......................................................................... 20

*Billiard Balls Mgmt., LLC v. Mintzer Sarowitz Zeris Ledva & Meyers, LLP*,
  42 N.Y.S.3d 730 (N.Y. Sup. Ct. 2016) ........................................................................ 32

*Bohus v. Beloff*,
  950 F.2d 919 (3d Cir. 1991) ......................................................................................... 25

*Bouchard v. N.Y. Archdiocese*,
  719 F. Supp. 2d 255 (S.D.N.Y. 2010) .......................................................................... 17

*Carideo v. Dell, Inc.*,
  706 F. Supp. 2d 1122 (W.D. Wash. 2010) .................................................................... 10

*Christidis v. First Pa. Mortg. Trust*,
  717 F.2d 96 (3d Cir. 1983) ........................................................................................... 10

*Conneen v. Amatek, Inc.*,
  238 F. Supp. 3d 652 (E.D. Pa. 2017) ..................................................................... 28, 29

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Constantinides v. CBS Corp.*,
    747 F. Supp. 2d 488 (E.D. Pa. 2010) ..................................................... 13

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989) ................................................................ 10

*Easterling v. Nat'l Football League*,
    No. 11-5209 (E.D. Pa.) ..................................................................... 30, 31

*Erie Railroad Co. v. Tompkins*,
    304 U.S. 64 (1938) .................................................................. 1, 11, 14

*Esen v. Narian*,
    No. 16-10441, 2017 WL 4931742 (N.Y. App. Nov. 1, 2017) ............................... 15

*Fine v. Checcio*,
    870 A.2d 850 (Pa. 2005) ................................................................ 27, 28

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ................................................................. 9

*Georgine v. Amchem Prods. Inc.*,
    83 F.3d 610 (3d Cir. 1996) ................................................................ 12

*Geralds v. Damiano*,
    128 A.D.3d 550 (N.Y. App. Div. 2015) ..................................................... 18

*Gleason v. Borough of Moosic*,
    15 A.3d 479 (Pa. 2011) .................................................................... 26

*Gnagey Gas & Oil Co., Inc. v. Pa. Underground Storage Tank Indem. Fund.*,
    82 A.3d 485 (Pa. Commw. Ct. 2013) ....................................................... 20

*Graboff v. Collern Firm*,
    No. 10-1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ..................................... 13

*Hayes v. Am. Int'l Grp.*,
    No. 09-2874, 2009 WL 4591531 (E.D. Pa. Nov. 30, 2009) .................................... 13

*Heard v. City of New York*,
    623 N.E.2d 541 (N.Y. 1993) ............................................................. 16, 19

-iv-

**TABLE OF AUTHORITIES**
(continued)

Page

*Hedges v. United States*,
404 F.3d 744 (3d Cir. 2005) ................................................................. 9, 11

*Hoppe v. SmithKline Beecham Corp.*,
437 F. Supp. 2d 331 (E.D. Pa. 2006) .................................................... 28

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) .............................................................. 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
27 F. Supp. 3d 1015 (N.D. Cal. 2014) .................................................. 32

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mkt. & Sales Prac. Litig.*,
No. 12-2320, 2013 WL 1332097 (D.N.H. Apr. 2, 2013) ........................ 12

*In re Linerboard Antitrust Litig.*,
223 F.R.D. 335 (E.D. Pa. 2004) ........................................................... 31

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
MDL No. 1014, 1997 WL 186325 (E.D. Pa. Apr. 16, 1997) ................... 12

*In re Resorts Int'l, Inc.*,
181 F.3d 505 (3d Cir. 1999) ................................................................. 20

*In re Rhone-Poulenc Rorer, Inc.*,
51 F.3d 1293 (7th Cir. 1995) ............................................................... 14

*In re Tobacco II Cases*,
207 P.3d 20 (Cal. 2009) ...................................................................... 21

*In re Toyota Motor Corp. Unintended Acceleration Mkt., Sales Prac., & Prods. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ................................................ 10

*In re Toyota Motor Corp.*,
No. 10-02151, 2012 WL 12929769 (C.D. Cal. May 4, 2012) ................. 20

*In re United Parcel Serv., Air-In-Ground Mkt. & Sales Prac. Litig.*,
580 F. App'x 543 (9th Cir. 2014) ......................................................... 12

*In re Vioxx Prods. Liab. Litig.*,
478 F. Supp. 2d 897 (E.D. La. 2007) .................................................... 13

-v-

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Whirlpool Corp. Front-Loading Prods. Liab. Litig.*,
   684 F. Supp. 2d 942 (N.D. Ohio 2009) ................................................................. 10

*In re: Nat'l Football League Players' Concussion Injury Litig.*,
   842 F. Supp. 2d 1378 (J.P.M.L. 2012) ................................................................. 30

*Kaufman v. Cohen*,
   307 A.D.2d 113 (N.Y. App. Div. 2003) ............................................................... 30

*Marsden v. Select Med. Corp.*,
   No. 04-4020, 2007 WL 1725204 (E.D. Pa. June 12, 2007) ................................. 22

*Ochs v. Woods*,
   117 N.E. 305 (N.Y. 1917) .................................................................................... 20

*Pasternack v. Lab. Corp. of Am. Holdings*,
   59 N.E.3d 485 (N.Y. 2016) .................................................................................. 19

*Prost v. Caldwell Store, Inc.*,
   187 A.2d 273 (Pa. 1963) ...................................................................................... 15

*Pulli v. Ustin*,
   24 A.3d 421 (Pa. Sup. Ct. 2011) ......................................................................... 29

*R.J. Reynolds Tobacco Co. v. Martin*,
   53 So. 3d 1060 (Fla. Dist. Ct. App. 2010) ........................................................... 21

*Rodenbaugh v. Santiago*,
   No. 16-2158, 2017 WL 194238 (E.D. Pa. Jan. 18, 2017) ..................................... 9

*Ross v. Louise Wise Servs., Inc.*,
   868 N.E.2d 189 (N.Y. 2007) ................................................................................ 30

*Royal Mile Co., Inc. v. UPMC*,
   No. 10-1609, 2013 WL 5436925 (W.D. Pa. Sept. 27, 2013) ............................... 29

*S. Pac. Co. v. Jensen*,
   244 U.S. 205 (1917) ............................................................................................. 14

*Schmidt v. Skolas*,
   770 F.3d 241 (3d Cir. 2014) ................................................................................ 26

1472992.2

# TABLE OF AUTHORITIES
## (continued)

Page

*Schneider's Dairy, Inc. v. Serv. Pers. and Emps. Of Dairy Indus., Teamsters Local Union No. 205*,
  No.  13-1325, 2013 WL 6485367 (W.D. Pa. Dec. 10, 2013) .................................................. 12

*Small v. Lorillard Tobacco Co., Inc.*,
  252 A.D.2d 1 (N.Y. App. Div. 1998) ..................................................................... 20

*United States ex rel. Spay v. CVS Caremark Corp.*,
  913 F. Supp. 2d 125 (E.D. Pa. 2012) ..................................................................... 10

*United States ex rel. Waris v. Staff Builders, Inc.*,
  No. 96-1969, 1999 WL 179745 (E.D. Pa. 1999) ..................................................... 10

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) .................................................................... 20

*Varacallo v. Mass. Mut. Life Ins. Co.*,
  752 A.2d 807 (N.J. App. Div. 2000) ..................................................................... 20

*Vasquez v. Sup. Ct.*,
  484 P.2d 964 (Cal. 1971) .................................................................................... 20

*Walk v. Ring*,
  44 P.3d 990 (Ariz. 2002) ..................................................................................... 25

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir. 1997) ................................................................................ 10

## Rules

Fed. R. Civ. P. 9(b) ................................................................................................ 21

## Other Authorities

Safety Rules & Regulations,
  http://www.nfl.com/news/story/0ap1000000228345/article/safety-rules-regulations................ 4

Opt Out Plaintiffs ("Plaintiffs" or "Players") respectfully request that the motion to dismiss for failure to state a claim (dkt. 8404) filed by Defendants the National Football League (the "NFL") and NFL Properties, LLC ("NFL-P")[1] be denied.

## I.    __INTRODUCTION__

The facts of this case are extraordinary—a multi-decade scheme by the NFL to bury knowledge of the risks of concussions in the pursuit of profit—but the claims presented here could not be more ordinary.  These are staple common law tort claims sounding in negligence and fraud, claims with deep roots in State law.  Such claims naturally give rise to inherently fact-bound questions such as whether, under the circumstances, a defendant had a duty, whether it was breached, whether the defendant knew of, and concealed, material information, or whether a statute of limitations has been tolled.  Such claims, by their nature, are rarely resolvable at the motion to dismiss stage.  That is equally true here.  In more than 400 paragraphs of specific, detailed allegations, Plaintiffs state claims for negligence, fraud, and civil conspiracy, in a manner that easily clears the low bars of plausibility under Rule 12(b)(6) and particularity under Rule 9(b).

But the Court need not even reach the merits of the NFL's arguments against Plaintiffs' claims.  The NFL has a threshold problem—its abject failure to perform even a rudimentary choice of law analysis.  Plaintiffs' claims do not arise under some hypothetical national common law.  Such a law does not exist, and has not existed since *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  Rather, Plaintiffs' claims arise under the laws of the various States.  The NFL could have used its fifty pages of briefing to conduct the required choice of law analysis, but it chose not to.  Instead, the NFL briefs its arguments using the laws of Pennsylvania and New

---

[1] The NFL and NFL Properties are identified as the NFL unless otherwise discussed.

York, without making even the slightest showing that those laws apply to *any* Plaintiffs.[2]  Its

motion should be denied on that basis alone.

## II.   <u>STATEMENT OF THE CASE</u>

Nearly a century ago, medical studies first revealed that athletes who suffer repeated

blows to the head risk long-term brain damage.  SAC ¶ 49.[3]  The evidence since overwhelmingly

establishes that the head trauma routinely inflicted in professional football games can cause

neurocognitive decline, permanent mental disability, and death.  *Id.* ¶ 50.  Plaintiffs are retired

football players who suffered concussive and sub-concussive head injuries while participating in

football games supervised by the NFL.  The SAC alleges that the NFL failed to take reasonable

actions to protect Players from the chronic risks created by such injuries and fraudulently

concealed those risks from Players.

The NFL—as the central authority over professional football—had volunteered to

undertake a longstanding duty to protect Players from unreasonable harm.  *Id.* ¶ 51.  From its

very inception in the 1920s, the NFL acted in accordance with that duty: it promulgated

equipment standards, implemented rule changes, and created a host of off-the-field programs

designed to manage Players' and their families' lives.  *Id.*  Through public statements

disseminated by its media empire, the NFL cultivated an image as football's responsible steward,

dedicated to protecting the game and its participants.  Players relied on the NFL to live up to that

image, and they trusted the NFL to exercise its enormous influence in a manner reasonably

consistent with their health and well-being.  *Id.*

---

[2] There are 88 Opt Out Plaintiffs; the schedule of their names, their teams and their home states is attached to the Fleishman Declaration as Exhibit 1.

[3] This Statement of the Case incorporates the equivalent section in Opt Out Plaintiffs' Opposition to the NFL's preemption motion.

When it came to brain injuries in football, the NFL abused that trust.  The NFL knew that players were exposed to risks of severe neurological injuries, yet did nothing to prevent them.  *Id.* ¶¶ 52-54.  It failed to warn players about the dangers of concussive and sub-concussive impacts; to advocate for prophylactic rule changes; or, to implement equipment standards adapted for head trauma.  *Id.*  To the contrary, the NFL glorified the hyper-violent collisions most likely to lead to head trauma and orchestrated a disinformation campaign to conceal the resulting brain injuries.  *Id.* ¶¶ 72-83.  And the NFL engaged in a campaign of misinformation designed to conceal the risk of concussions, all in pursuit of profit.

As a result of the NFL's misconduct, Plaintiffs played football without the benefit of knowing what the NFL knew—that they were putting themselves at risk of long-term neurological diseases.  They now suffer from a variety of concussion-related ailments.  Even after their playing careers ended, Plaintiffs failed to seek the medical treatment they needed because, due to the NFL's cover-up, they did not know to connect their symptoms to football and to concussions.

### A.      The NFL's Historical Role as Guardian of Player Health

Since its inception, the NFL has been the organizer, guardian, and public face of professional football in America.  SAC ¶ 93.  The NFL is an unincorporated association separate from the football teams that play under its auspices.  *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 187 (2010).  The NFL controls professional football, asserting authority over everything from team ownership to the mechanics of gameplay.  SAC ¶ 96.  Since 1929, the NFL has constantly exercised that authority in the name of player safety.  *Id.* ¶¶ 93-98.  As the NFL itself explained, "[s]ince its earliest days, the league has continuously taken steps to eliminate "unnecessary risk"

to players, through measures like "changes and enhancements to game safety rules."[4]  In accordance with that duty, the NFL promulgated equipment standards, implemented rule changes, and created off-the-field programs designed to manage Players' lives.  *Id.* ¶¶ 51, 94-98.

The NFL's unique position at the apex of football, paired with its unmatched resources, afforded it unparalleled access to data reflecting the effects of head impacts on football players. *Id.* ¶¶ 52, 100.  At all relevant times, the NFL's accumulated knowledge about head injuries to Players, and the associated health risks, was vastly superior to that readily available to the Players.  The NFL knew, or should have known, that repeated traumatic head impacts (including concussions and sub-concussive blows), regularly experienced while playing or practicing football, cause ongoing and latent brain injury.  *Id.* ¶¶ 84-92.  Players who sustain repeated concussive and sub-concussive impacts are at great risk of developing chronic traumatic encephalopathy ("CTE"), with resulting devastating consequences such as suicide, as well as serious neurological disorders.  *Id.* ¶¶ 89-90.  Those disorders, which remain latent for years, can culminate in severe disability and death.  *Id.*

That informational advantage, coupled with the NFL's position as the guardian of player safety, imposed upon the league a duty to inform the Players of the risk of concussion.  *Id.* ¶ 93. Instead, the NFL ignored and concealed the information from Players and all others who participated in organized football at all levels.  *Id.* ¶¶ 53, 102.  The NFL breached its duty by failing to impose safety regulations to prevent or mitigate long-term brain damage, and by failing to inform NFL Players, athletes at every level, the medical community, and the public of the risks associated with mild traumatic brain injury ("MTBI").  *Id.*  The NFL actively and continuously denied any link between MTBI sustained playing and practicing football and

---

[4] Safety Rules & Regulations, http://www.nfl.com/news/story/0ap1000000228345/article/safety-rules-regulations.

neurological symptoms.  *Id.* ¶ 58.  The NFL glorified and monetized the violence of football. *Id.* ¶¶ 72-83.  And the NFL actively sought to suppress the findings of the medical community that showed the link between on-field MTBI and post-career neuro-cognitive damage, illness, and neurodegenerative decline.  *Id.* ¶ 59.

### B.    The NFL's Monetization of Violence

Due to its financial power, monopoly status, and high visibility, the NFL has had enormous influence over the game of football at all levels.  *Id.* ¶ 70.  Part of the NFL's strategy has long been to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions, and by propagating the falsehood that "getting your bell rung," "being dinged," and putting big hits on others does not seriously threaten one's health.  *Id.* ¶ 72.  The NFL promoted the myth that collisions, including brutal and ferocious collisions well-analogized to car wrecks, are an acceptable, desired, and natural consequence of football, and a measure of the courage and heroism of those involved.  *Id.* ¶ 73.

Through platforms like NFL Films, the NFL crafted a narrative of player as gladiator—an invincible warrior for whom head trauma was simply part of the job.  *Id.* ¶¶ 74-81.  The undeniable message was that players could and should play through any injury, including brain injury.  *Id.*  For the NFL, head injuries were little more than a nuisance that its player-gladiators must overcome; a concussed player supposedly had his "bell rung" or was "dinged," and should return to play immediately.  *Id.*  The NFL even lauded the players who inflicted concussions on others.  *Id.*  Although the NFL occasionally fined players for dangerous hits, it profited from those hits by selling photographs of the same collisions on its website.  *Id.* ¶ 83.

### C.    The NFL's Cover-Up

As early as the 1960s, the NFL voluntarily undertook to study head impacts in football, participating in helmet efficacy study to evaluate "brain damage" in professional football players

in 1962, and going so far as to sponsor a symposium in 1969 focused on head injuries in football. *Id.* ¶¶ 103-15.  By voluntarily inserting itself into the research and public discourse about MTBI, the NFL undertook a responsibility to make truthful statements, not to advance improper, biased, and falsified industry-generated studies; not to discredit well-researched and credible studies that came to opinions and conclusions the NFL did not like, and to inform the then-current and former Players of the risks of MTBI in football.  *Id.* ¶ 56.  But rather than disclose to the Players what it knew, the NFL breached its duty and not only failed to disclose, but also actively concealed, the truth.  *Id.* ¶¶ 25, 99, 102   .

In 1994, as the evidence of the risks of concussions mounted, the NFL created the Mild Traumatic Brain Injury Committee (the "MTBI Committee"), ostensibly to research and study how MTBI affects NFL Players.  *Id.* ¶ 56.  Its stated goal was to "improve player safety" and institute "rule changes aimed at reducing head injuries."  *Id.* ¶ 186.  In reality, the MTBI Committee was intended to create the *appearance* of progress on concussion research and protective-equipment advancement.  *Id.* ¶ 162.  Its true purpose was to create a façade of scientific research that the NFL could invoke to conceal the fact that the game it oversaw—and from which it reaped billions of dollars—was slowly ruining the lives of many Players.  *Id.* ¶¶ 164-65.

To accomplish that deceit, the MTBI Committee performed several studies, purporting to find no link between football-related head trauma and long-term brain damage.  *Id.* ¶¶ 193- 202, 207, 232-41, 306, 322.  The MTBI Committees findings were a sham.  *Id.* ¶¶ 236, 266-70.   Its chairman, Dr. Elliot Pellman, and other key members were unqualified, rife with conflicts of interest, and served as mere mouthpieces for the NFL's agenda.  *Id.* ¶¶ 167-79, 203.  As one researcher whose work was attacked by the MTBI Committee put it, Dr. Pellman was "the wrong

person to chair the committee from a scientific perspective and the right person from the league's

perspective." *Id.* ¶ 284.  Committee members worked to discredit the findings from the medical

community linking head impacts and concussions to neuro-cognitive disorders and disabilities.

*Id.* ¶ 233, 271, 274-78, 292-93.  When Dr. Will Bar, a neuropsychologist who served as an

MTBI Committee consultant, presented NCAA study findings calling into question the MTBI

Committee's conclusions, Pellman fired him.  *Id.* ¶ 272.

        The NFL reasonably expected that Players and the football community would rely on its

research and pronouncements, which were targeted at ensuring that Players continued to play

NFL football.  *Id.* ¶ 184.  For example, the MTBI Committee repeatedly concluded that it was

appropriate for players who suffered a concussion to return to play in the same game or practice

in which the concussion occurred.  *Id.* ¶ 235, 237.  The MTBI Committee found that players who

suffered a concussion were not at greater risk of suffering future concussions.  *Id.*  These

conclusions were directly contrary to the findings of truly independent research.  *Id.* ¶¶ 236, 238-

40.

        The NFL's other public statements reinforced the MTBI Committee's deception.  In 2007,

the NFL issued a "Concussion Pamphlet" to players that stated that "Research is currently

underway to determine if there are any long-term effects of concussion[s] in NFL athletes."  *Id.*

¶ 279.  In a statement around the same time, Commissioner Roger Goodell stated that "We want

to make sure all NFL players . . . take advantage of the most up to date information and resources

as we continue to study the long-term impact on concussions."  *Id.* ¶ 280.  The NFL decided that

the "most up to date information" did not, and would not, include the various independent

studies demonstrating a causal link between multiple concussions and cognitive decline.  *Id.*

-7-

As late as 2010, the then-head of the MTBI Committee testified to Congress that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage." *Id.* ¶ 298. The MTBI Committee, and the NFL, knew differently. *Id.* ¶¶ 299-302. Only after a series of congressional hearings did the NFL begin to acknowledge publicly the risks of head trauma in football, precisely the same risks the medical literature had recognized since the 1920s. Under intense pressure, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" and expelled some of its members, including Dr. Pellman. *Id.* ¶ 303. Under new leadership, the Medical Committee admitted that data collected by the previous leadership was "infected," disavowed previous studies, and formally asked Dr. Pellman not to appear at a Committee conference. *Id.* ¶ 304-05.

D.      **The NFL's Co-Conspirators**

The NFL did not act alone in concealing the dangers of concussions. Its licensing arm, NFL-P, played a key role in the marketing of the violence of football, *id.* ¶ 83, and was responsible for a joint venture with Riddell[5] to provide the exclusive helmet to the NFL from 1989 to 2013, *id.* ¶¶ 68, 152. Riddell played its part and actively concealed the dangers of concussions, maximizing profit for itself and for the NFL. For example, Riddell exercised enormous influence over the National Operating Committee on Standards for Athletic Equipment ("NOCSAE"), an organization that was first proposed at the NFL's 1969 symposium on head injuries. *Id.* ¶ 115. NOCSAE developed performance standards for athletic equipment, including football helmets. *Id.* ¶ 117. Through its presence on NOCSAE's Board, and through influence on its staff, Riddell ensured that standards for football helmets were not changed to

---

[5] For the purposes of this opposition, "Riddell" refers to all of the various Riddell entities.

reduce the damage due to concussions. *Id.* ¶ 122. NOCSAE worked in sync with the MTBI

Committee, propagating sham research, much of it funded by NFL grants. *Id.* ¶¶ 130-40. The

MTBI Committee relied on NOCSAE findings and metrics in its analyses. *Id.* ¶ 215. NOCSAE

specifically lauded the work of the MTBI Committee. *Id.* ¶ 137. The same key personnel

participated in both MTBI Committee and NOCSAE research, and were paid by the NFL and by

Riddell at various times. *Id.* ¶ 226-30. In return, the MTBI Committee made sure that Riddell

helmets continued to be used on NFL Players, for example by sponsoring papers validating

Riddell helmets over its competitors' products. *Id.* ¶¶ 194, 204-05. This conspiracy culminated

in the introduction of the Riddell Revolution Helmet, purportedly manufactured and designed to

"reduce the incidence of concussions." *Id.* ¶ 242. In reality, the design of the Revolution was

based on research that the NFL and Riddell knew to be flawed and false. *Id.* ¶¶ 243-62.

## III.   **LEGAL STANDARD**

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Rodenbaugh v. Santiago*, No. 16-2158,

2017 WL 194238, at *3 (E.D. Pa. Jan. 18, 2017) (Smith, J.) (internal quotation marks omitted).

Plausibility requires only "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citation omitted). The Court "must accept all of the complaint's well-pleaded facts as

true." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). As the moving party,

Defendants "bear[] the burden of showing that no claim has been presented." *Hedges v. United

States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

Under Fed. R. Civ. P. 9(b), claims sounding in fraud must be plead with particularity.

The Third Circuit "has warned against taking an approach to Rule 9(b) that fails to take into

account the 'general simplicity and flexibility contemplated by the rules'" or fails to "be

sensitive to the fact that Rule 9(b)'s application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud." *United States ex rel. Waris v. Staff Builders, Inc.*, No. 96-1969, 1999 WL 179745, at *4 (E.D. Pa. 1999) (quoting *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983). The point of Rule 9(b) is to provide a defendant "fair notice" of the charges against it. *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 144 (E.D. Pa. 2012) (citation omitted). In particular, the rule "does not require date, time, and place allegations, provided that the plaintiff gives the defendants other means of precision and substantiation." *Id.* at 174.

Rule 9(b) is necessarily relaxed in an omission case, which "can succeed without the same level of specificity required by a normal fraud claim." *In re Toyota Motor Corp. Unintended Acceleration Mkt., Sales Prac., & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010) (citation omitted). That is because, "[i]n such cases, a plaintiff will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1132 (W.D. Wash. 2010) (internal quotation marks omitted). And "[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place, and content of an event that (by definition) did not occur would effectively gut state laws prohibiting fraud-by-omission." *In re Whirlpool Corp. Front-Loading Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009). Rule 9(b) is also relaxed "when factual information is peculiarly within the defendant's knowledge or control," *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997), "[p]articularly in cases of corporate fraud [where] plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (citations omitted).

IV.     **ARGUMENT**

The NFL denies that the alleged misconduct occurred.  That is its right.  (To be sure, the NFL's consistent strategy of settling cases promptly after losing early motions ensures that it never has to go on record with its denials under penalty of Rule 11.)  But it cannot credibly argue that the SAC is "conclusory" or composed of "threadbare recitals of the elements of a case of action."  Mot. at 11.  On its face, the SAC refutes that characterization.

The SAC, in more than 400 paragraphs of factual allegations, along with accompanying short-form complaints, describes in detail the Defendants' alleged misconduct.  This is no bare-bones pleading: the SAC includes dozens of specific names, dates, and wrongful acts.  This is not a case where the complaint leaves Defendants or the Court wondering what course discovery will take.  Potential witnesses are named and sources of critical documents are identified.  The SAC easily satisfies Rule 12 and Rule 9.  The motion to dismiss should be denied.

A.     **The Motion Should be Denied for Abject Failure to Perform Any Choice-of-Law Analysis.**

Plaintiffs' claims here do not arise under some hypothetical, nationwide common law of negligence and fraud.  Such a law does not exist, and has not existed since *Erie*.  Rather, they arise under the common law of the various (and specific) States, each of which has an interest, some courts have held, in applying its own law.  Astonishingly, the NFL fails to perform any choice of law analysis *at all*.  Instead, it baldly asserts that the Court should apply Pennsylvania and New York law, without *any* showing that *any* Plaintiffs' claims are governed by those laws under an actual choice of law analysis.  In a motion to dismiss for failure to state a claim, "[t]he defendant bears the burden of showing that no claim has been presented."  *Hedges*, 404 F.3d at 750.  As a first step, the Court "must apply an individualized choice of law analysis to each plaintiff's claims."  *Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 627 (3d Cir. 1996).  It is

therefore the NFL's obligation to first conduct a choice of law analysis and show what law applies, and *then* make its arguments for why Plaintiffs fail to state claims under those laws.  *See, e.g.*, *Schneider's Dairy, Inc. v. Serv. Pers. and Emps. Of Dairy Indus., Teamsters Local Union No. 205*, No.  13-1325, 2013 WL 6485367, at *2 n.1 (W.D. Pa. Dec. 10, 2013) ("[I]t is not the Court's job to research and construct legal arguments open to parties, especially when they are represented by counsel.") (internal quotation marks omitted).

The NFL's motion to dismiss should be denied on this ground alone.  *See In re United Parcel Serv., Air-In-Ground Mkt. & Sales Prac. Litig.*, 580 F. App'x 543, 544 (9th Cir. 2014) (vacating grant of motion to dismiss in MDL, and holding that "[t]he district court should have addressed choice of law and conflict of law before making a determination on the merits of the defendant's dismissal motions"); *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1997 WL 186325, at *9 (E.D. Pa. Apr. 16, 1997) (denying motions to dismiss in an MDL, and explaining that the defendant's "arguments are especially difficult for this transferee court to address because they necessarily implicate the governing state law, including the state's choice of law precedent, of each individual civil action in this ligation" that "[t]his court is not expected to make these determinations if the convenience of the parties, justice, and efficiency are to be achieved by the transferee court," and that choice of law analysis should be left to the transferor courts after remand); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mkt. & Sales Prac. Litig.*, No. 12-2320, 2013 WL 1332097, at *1 (D.N.H. Apr. 2, 2013) (denying motion to dismiss where defendant did not perform choice of law analysis, and explaining that "[n]ot only do the elements of the plaintiffs' claims differ from state to state, but state courts also interpret those elements differently").

To be sure, in some cases, courts in the Third Circuit have concluded that choice of law issues need not be resolved at the motion to dismiss stage. *See, e.g.*, *Graboff v. Collern Firm*, No. 10-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010); *Hayes v. Am. Int'l Grp.*, No. 09-2874, 2009 WL 4591531, at *3 (E.D. Pa. Nov. 30, 2009). But in those cases, the parties agreed that, at most, two potential states' laws were in play, but disagreed merely as to which one applied. The courts there, rather than resolving the issue, analyzed the claims under both states' laws. Here, the NFL asks this Court to apply Pennsylvania and New York law, which *no one* has argued applies to any Plaintiff's claims. And, the courts in *Hayes* and *Graboff* did not involve MDLs, in which the Court must apply the choice-of-law rules of the transferor courts for the plaintiffs who initially filed their cases elsewhere. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007) (explaining that in MDL cases, "the MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice-of-law rules"); *Constantinides v. CBS Corp.*, 747 F. Supp. 2d 488, 491 n.4 (E.D. Pa. 2010) (same).

That the NFL's choice-of-law is merely an "assumption" is confirmed by the fact that the NFL Defendants "do not concede that either [New York or Pennsylvania] law governs any of Plaintiffs' purported claims or that the NFL Defendants are restricted only to those defenses available under those states' laws, and reserve all rights and arguments with respect to choice of law." Mot. at 11 n.9. This is choice of law in the abstract.

The NFL seems to labor under the illusion that the common law does not vary materially from one state to another and so the Court can simply elide the choice-of-law analysis and rule based upon the law of no jurisdiction, or at least none that would apply under any proper choice

of law analysis (or could consistent with due process).  As the Seventh Circuit explained in a

seminal decision authored by Judge Posner more than twenty years ago, the NFL is wrong:

> The law of negligence, including subsidiary concepts such as duty of care,
> foreseeability, and proximate cause, may as the plaintiffs have argued forcefully
> to us differ among the states only in nuance ….  But nuance can be important, and
> its significance is suggested by a comparison of differing state pattern instructions
> on negligence and differing judicial formulations of the meaning of negligence
> and the subordinate concepts.

*In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).

As Justice Holmes aptly wrote, "[t]he common law is not a brooding omnipresence in the

sky, but the articulate voice of some sovereign or quasi sovereign that can be identified." *S. Pac.*

*Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting) (cited in *Rhone-Poulenc*).  The

"voices of the quasi-sovereigns that are the states of the United States sing negligence with a

different pitch." *Rhone-Poulenc*, 51 F.3d at 1301.  Under the NFL's approach, the Opt Out

Plaintiffs "will have their rights determined, and the [NFL Defendants] will have their duties

determined, under a law that is merely an amalgam, an averaging, of the nonidentical negligence

laws of 51 jurisdictions." *Id.* at 1302.  If that were permissible, "one begins to wonder why this

country bothers with different state legal systems." *Id.* at 1301. The "point of *Erie* is that Article

III of the Constitution does not empower the federal courts to create such a regime for diversity

cases." *Id.* at 1302.

To be sure, it may be difficult or inconvenient for the NFL to perform the required

analysis.  But the SAC identifies, as best Plaintiffs are able, the locations of the misconduct

alleged, and the short-form complaints identify the locations of the harm suffered by identifying

the teams and where Players reside.  And the NFL could well have used its army of lawyers and

*fifty* pages of briefing to perform the required choice of law analysis.  Inconvenience is no excuse:

"Differences across states may be costly for courts and litigants alike, but they are a fundamental

aspect of our federal republic and must not be overridden in a quest to clear the queue in court."

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002).

**B.** **Even Under the NFL's Hypothetical Law, Plaintiffs' Claims Are Properly Pleaded.**

The NFL's assumption that Plaintiffs' claims should be analyzed under New York and Pennsylvania law is baseless. But even assuming that those two States' laws apply here, Plaintiffs' claims are adequately pleaded.

**1.** **Plaintiffs Plausibly Allege Negligence.**

Plaintiffs allege several claims sounding in negligence, including ordinary negligence (SAC ¶¶ 336-350), negligent marketing (*id.* ¶¶ 351-56), negligent hiring (*id.* ¶¶ 372-79), and negligent retention/supervision (*id.* ¶¶ 380-87).

**a.** **Plaintiffs Plausibly Allege that the NFL Voluntarily Undertook a Duty to Exercise Ordinary Care in Protecting the Health and Safety of the Football Community, and in Studying the Issue of Neurocognitive Injuries in Football.**

The NFL contends that all of these claims fail because Plaintiffs have not alleged a duty the NFL owed to Plaintiffs. Plaintiffs plainly and adequately allege that the NFL assumed a duty to act with reasonable care when it voluntarily undertook to act as the overseer and protector of the game of football, and when it voluntarily undertook to study and report on the neurological risks to NFL Players. *See id.* ¶¶ 16, 93-115. The common law recognizes a "social duty of every person," a duty "imposed by law" to "take thought and have a care lest his action result in injuries to others." *Prost v. Caldwell Store, Inc.*, 187 A.2d 273, 276 (Pa. 1963) (internal quotation marks and emphasis omitted). Accordingly, "one who assumes a duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Esen v. Narian*, No. 16-10441, 2017 WL 4931742, at *1 (N.Y. App. Nov. 1, 2017) (internal quotation marks omitted). Under those circumstances, "the question is whether defendant's conduct placed

-15-

plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing." *Heard v. City of New York*, 623 N.E.2d 541, 544 (N.Y. 1993).

Here, the NFL voluntarily undertook to act as the guardian and protector of Players, and as the foremost authority on the sport of football.  The NFL chose to gather data on head injuries in football and to create the MTBI Committee, purportedly to report—independently and accurately—on the risk of football-related collisions and the danger of short- and long-term neurological injuries.  By voluntarily undertaking those actions, the NFL assumed a duty to act carefully.

### b.  Plaintiffs Plausibly Allege Negligent Hiring and Retention/Supervision.

Plaintiffs allege that the NFL was negligent in hiring, retaining, and supervising the members of the MTBI Committee.  Those claims sound in ordinary negligence and are based upon the same voluntary-undertaking theory that support Plaintiffs' basic negligence claims.

The NFL told Players and the public that the MTBI Committee would be staffed with independent researchers working in good faith.  Instead, the NFL staffed the MTBI Committee with experts with conflicts of interest due to their financial relationships with the NFL and with Riddell, and biased in favor of the NFL and Riddell.  The NFL voluntarily undertook to create the MTBI Committee with the purpose (or predictable effect) of conducting a campaign of deception with respect to concussions in football.  The NFL's inadequate hiring and retention decisions are part and parcel of that voluntary undertaking to act.[6]

---

[6] The Court can therefore summarily dispose of the NFL's argument (at 23) that Plaintiffs "fail to plead that the MTBI Committee members committed any tort."  The MTBI Committee members' actions were part of the NFL's overall failure to exercise ordinary care in the study and reporting on concussions.

-16-

The NFL ignores this and instead attacks Plaintiffs for not alleging that the MTBI

Committee members acted outside the scope of their employment.  Mot. at 21.  That argument

confuses a claim for ordinary negligence with a freestanding claim based on independent acts of

an employee that, because he was acting outsider the scope of his employment, are not

susceptible to a vicarious liability theory.  *See Bouchard v. N.Y. Archdiocese*, 719 F. Supp. 2d

255, 260 (S.D.N.Y. 2010) (explaining that the latter theory applies where "an employer cannot

be held vicariously liable for its employee's torts because they occur outside the scope of his

employment").  Here, the NFL is directly liable for its negligent decisions to hire, retain, and

supervise MTBI Committee members who, instead of fairly researching and reporting on MTBIs,

engaged in a campaign of disinformation and deception.

The NFL next argues that Plaintiffs' negligent hiring and retention/supervision claims fail

"for want of specificity."  The plain allegations in the SAC belie that characterization.  The SAC

alleges that the MTBI Committee's true mission was to propagate false research, discredit the

scientific consensus, and suppress knowledge of the risks of concussions at the behest of the

NFL.  The SAC alleges that members of the MTBI Committee were rife with conflicts of interest,

including financial connections to the NFL and its co-conspirators, and that the NFL knew (or

should have known) of those biases.  In other words, the NFL negligently permitted the MTBI

Committee to be run by insiders and hacks, with the predictable (and intended) result that the

Committee would participate in the campaign of disinformation.  Further specifics are not

required, but even if they were, the SAC more than satisfies that requirement:  it includes

specific years and dollar amounts that the NFL and its co-conspirators funneled to members of

the Committee, and includes specific research papers (falsely) finding no link between

concussions and long-term neurological injury, and specific statements (falsely) challenging the findings of truly independent scientists.

Finally, the NFL argues that Plaintiffs' claims relating to the hiring, retaining, and supervising the members of the MTBI Committee fail "to the extent that Plaintiffs ended their NFL careers by" 1994, when the MTBI Committee was formed. Mot. at 24. But it is entirely plausible that, but for the MTBI Committee's misrepresentations and distortions, retired Plaintiffs would have sought medical treatment for injuries that they did not realize were caused by their football playing career. In any event, any proximate cause analysis would need to be conducted player-by-player and is not susceptible to resolution on a mass basis. *See, e.g.*, *Geralds v. Damiano*, 128 A.D.3d 550, 551 (N.Y. App. Div. 2015) (explaining that "issues of proximate cause are typically fact questions to be decided by a jury").

### c.  Plaintiffs Plausibly Allege Negligent Marketing.

As with the negligent hiring/retention/supervision claims, the NFL treats Plaintiffs' negligent marketing claims as novel, freestanding claims, and cites cases relating to failure-to-warn allegations on pharmaceutical products. Mot. at 24-25. But, like the negligent hiring claims, Plaintiffs' negligent marketing claims sound in ordinary negligence grounded in duties arising from the NFL's voluntary undertakings. As part of its longstanding role as overseer of football and guardian of player safety, the NFL had a duty to market the game in ways that did not compromise Player safety or distort Player knowledge of the risks of concussions. Instead, the NFL *maximized* those risks by marketing Players as gladiators, promoting violent head collisions injuries as normal, accepted, and safe, and glorifying the violence of the game.

The NFL also voluntarily chose to work with Riddell to market Riddell helmets as safe, in particular the Revolution helmet. Riddell, with the cooperation and assistance of the NFL and its MTBI Committee, marketed the Revolution as designed to reduce the incidence of concussion.

As the NFL knew or should have known, such marketing was false and based on flawed studies. By endeavoring to market football equipment as safe and effective in preventing concussions, the NFL assumed a duty to exercise ordinary case in such marketing.

The NFL argues that Plaintiffs cannot allege any nexus between the marketing of the game of football and injuries Plaintiffs suffered while playing football. Mot. at 27. But marketing the game as violent, as well as Riddell's false marketing of its helmets as safe, filming the violence and using it to inflate the ferocity of the Players certainly was part of the NFL's long-running breach of its duties to warn the Players of the dangers of concussion. It is more than plausible that this course of conduct, considered as a whole, "placed [Plaintiffs] in a more vulnerable position than [they] would have been had [the NFL] done nothing." *Heard*, 623 N.E.2d at 544. Plaintiffs played football without knowing what the NFL knew: that concussions and sub-concussive hits placed them at serious risk of developing serious neurological conditions later in life. These involve causation questions of fact for the jury, not resolvable through motion practice. The NFL's (and its co-conspirator, Riddell's) marketing contributed to that negligent marketing and deception.

## 2.    **Plaintiffs Plausibly Allege Fraud and Negligent Misrepresentation.**

Plaintiffs allege that the NFL committed fraud by failing to disclose the truth, and orchestrating an affirmative campaign of disinformation about head injuries in football. Fraud requires "a misrepresentation or material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely on it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (internal quotation marks omitted). An omission claim generally requires a duty to disclose. *See, e.g.*, *Gnagey Gas & Oil Co., Inc. v. Pa. Underground Storage Tank Indem. Fund.*, 82 A.3d 485, 500 (Pa. Commw.

Ct. 2013); *Barrett v. Freifeld*, 77 A.D.3d 600, 601-02 (N.Y. App. Div. 2010).[7]  Plaintiffs

adequately plead all of the required elements.[8]  None of the NFL's arguments withstand scrutiny.

First, the NFL argues that Plaintiffs have not alleged justifiable reliance.  But reliance can

be inferred "from the various facts and circumstances of a case."  *In re Resorts Int'l, Inc.*, 181

F.3d 505, 510 (3d Cir. 1999).  In particular, reliance on "omitted information may be presumed

where such information is material."  *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 469

(S.D.N.Y. 2013); *see also Ochs v. Woods*, 117 N.E. 305, 306 (N.Y. 1917) ("It is incumbent upon

a plaintiff in an action for deceit through false representations, to show that he was influenced by

them.  It does not require very strong proof to establish it.  In most cases, it may be inferred from

the circumstances attending the transaction."); *Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d

807, 817 (N.J. App. Div. 2000) (applying "[t]he presumption or inference of reliance and

causation, where omissions of material fact are common"); *Vasquez v. Sup. Ct.*, 484 P.2d 964,

973 (Cal. 1971) (en banc) ("[I]f the trial court finds material misrepresentations were made to the

class members, at least an inference of reliance would arise[.]").

Similarly, reliance may be inferred where affirmative misrepresentations—here, the

NFL's campaign of deception—come from an authoritative source and/or are so pervasive that

plaintiffs could not help but be exposed.  *See In re Toyota Motor Corp.*, No. 10-02151, 2012 WL

12929769, at *20 (C.D. Cal. May 4, 2012) (applying New York law, and holding that where a

defendant "effectively controlled all the information about the transaction, . . . Plaintiffs are

entitled to a presumption of reliance.") (internal quotations omitted); *Small v. Lorillard Tobacco*

---

[7] Some States do not require a duty to disclose where a defendant intentionally fails to disclose material information.
*See, e.g.*, *Am. Planned Communities, Inc. v. State Farm Ins. Co.*, 28 F. Supp. 2d 964, 968 (E.D. Pa. 1998).

[8] As the NFL appears to concede, the same factual allegations that support Plaintiffs' fraud claims also support their
negligent misrepresentation claims.  *See* Mot. at 17-18.

*Co., Inc.*, 252 A.D.2d 1, 8 (N.Y. App. Div. 1998) (same); *In re Tobacco II Cases*, 207 P.3d 20,

40 (Cal. 2009) (explaining that "where[] a plaintiff alleges exposure to a long-term advertising

campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the

plaintiff relied on particular advertisements or statements"); *R.J. Reynolds Tobacco Co. v. Martin*,

53 So. 3d 1060, 1069-70 (Fla. Dist. Ct. App. 2010) (same).

Here, during all relevant times (and during all times Plaintiffs played professional

football and suffered from latent conditions caused by their playing career), the NFL's

knowledge about head injuries, and the associated health risks, was vastly superior to that readily

available to Plaintiffs. The NFL operated as football's information monopoly, the entity to

which players and the public looked to for information about the safety of the game. The NFL

created the MTBI Committee because it knew it could—statements and omissions from the NFL

would be given credence by players and the public at large. And the information the NFL failed

to disclose, even before the MTBI Committee ever existed, was undoubtedly material to a

Plaintiff's decision to play football, or to seek medical treatment for latent injuries, the only

evidence of which might have been symptoms he lacked the information to know was related to

his playing career.[9]

Second, the NFL argues the Plaintiffs fail to allege that the NFL intended to mislead

Plaintiffs.[10] But "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally." Fed. R. Civ. P. 9(b). And even if a more exacting pleading requirement

applied, the SAC plainly alleges that the NFL knew of the dangers of head injuries during

---

[9] Should the Court determine that any individual Opt Out Plaintiff should better plead individual reliance, Plaintiffs request leave to amend the short-form complaints to comply with that determination.

[10] This argument, of course, does not apply to Plaintiffs' negligent misrepresentation claims.

football, dating back at least to the 1960s. *Id.* ¶ 16. And the fact that the NFL assembled a biased, sham research committee speaks to the fact that it knew the truth at the time.

Third, the NFL argues that Plaintiffs have failed to plead causation. This is wrong, for two reasons. First, the circumstances attendant to an individual's decision to play or not to play football, resulting medical conditions, and decision to seek or not to seek medical treatment, are not susceptible to a mass administrative pleading.[11] As is typical in mass tort cases, expert discovery will be necessary to establish (or negate) general and specific causation. And, also in discovery, the NFL is free to explore why Plaintiffs decided to play NFL football, forego medical treatment, etc. Second, the SAC alleges all that it needs to establish causation at this stage. The SAC alleges that the NFL misrepresented and omitted material information about the dangers of head injuries in football. The short form complaints establish that Plaintiffs were exposed to repetitive, traumatic sub-concussive or concussive head impacts during NFL games and practices, and that Plaintiffs now suffer from brain injury symptoms. It is plausible that the NFL's misstatements and omissions caused Plaintiffs' injuries. *See Marsden v. Select Med. Corp.*, No. 04-4020, 2007 WL 1725204, at *1 (E.D. Pa. June 12, 2007) (emphasizing that causation need not "be plead with particularity (or specificity) of the nature contemplated by Federal Rule of Civil Procedure 9(b)").[12]

### 3.   Plaintiffs Plausibly Allege Conspiracy.

Plaintiffs adequately allege a civil conspiracy between the NFL and Riddell. First, the NFL argues that Plaintiffs fail to plead the existence of an agreement. But, as the NFL concedes,

---

[11] Should the Court determine that any individual Opt Out Plaintiff should better plead individual causation, Plaintiffs request leave to amend the short form complaints to comply with that determination.

[12] Because Plaintiffs plausibly allege fraud, the NFL's request to dismiss the punitive damages request should be denied.

Plaintiffs identify the 1969 formation of NOCSAE, which served to insulate liability and create an arms-length appearance of the relationship between the NFL and Riddell, and the 1989 agreement between Riddell and NFL-P to make Riddell products the official helmets of the NFL. SAC ¶ 16.  The NFL describes these agreements as "innocuous" and "lawful," but whether the agreements were in fact innocuous and lawful, and the NFL says, or illegal and made with the intent to deceive Plaintiffs and the public, as the SAC alleges, are questions of fact.  The NFL simply ignores all of the allegations in the SAC that show these agreements were carried out with the specific intent to suppress knowledge of the dangers of concussions for profit.  For example, Riddell, via NOCSAE, worked in sync with the MTBI Committee, propagating sham research, much of it funded by NFL grants.  *Id.* ¶¶ 130-40.  The MTBI Committee, for its part, worked to ensure that Riddell products remained widely-used in the NFL by sponsoring papers validating Riddell helmets over its competitors' products.  *Id.* ¶¶ 194, 204-05.  This partnership culminated in the introduction of the Riddell Revolution Helmet, purportedly manufactured and designed to "reduce the incidence of concussions."  *Id.* ¶ 242.  In other words, the facts clearly contradict the NFL's bald assertion that these agreements were merely a "trademark licensing agreement" and "participation in an industry organization."  Mot. at 29.

Second, the NFL argues that Plaintiffs fail to allege the "what, when, where, why, and how" of the conspiracy.  Mot. at 30.  But the SAC includes names, dates, titles of scientific papers, and specific amounts of money transfers.  The NFL may not agree that these acts rose to the level of illegality, but it is simply not the case that the SAC fails to plead the conspiracy with sufficient detail.

Finally, the NFL argues that, because the co-conspirators' purpose was not to injure Plaintiffs, they cannot be liable for civil conspiracy.  But the SAC clearly alleges that the purpose

of the conspiracy was solely to "perpetuate the fraudulent concealment of the decades-long scientific research that linked concussions, sub-concussive impacts and repetitive head trauma to emotional distress, cognitive impairment, intellectual deficits and latent brain disease and neurodegenerative brain disease." SAC ¶ 398. Plaintiffs respectfully submit that, to the extent the line of Pennsylvania authority cited by the NFL immunizes a conspiracy because its motive was also profit, that only underscores the need to perform a true choice of law analysis (which the NFL has not bothered to do), to determine whether a conspiracy can be maintained under the laws of other States. In any event, in New York at least, there is no "independent cause of action for civil conspiracy;" rather, pleading the existence of a conspiracy merely "connect[s] the actions of the individual defendants with an actionable, underlying tort." *Anesthesia Assocs. of Mt. Kisco, LLP v. N. Westchester Hosp. Ctr.*, 59 A.D.3d 473, 479 (N.Y. App. Div. 2009). Whatever the "sole purpose" of the agreements was, the NFL's conspiracy with Riddell makes it liable for Riddell's acts of fraud.

### 4.   Plaintiffs Plausibly Allege Claims Against NFL-P.

Plaintiffs allege that NFL-P was responsible for licensing Riddell's equipment as the official helmet of the NFL. SAC ¶ 16. NFL-P thus played a key role in the agreement between the NFL and Riddell to suppress the truth about football and concussions, resulting in the alleged commissions of negligence, fraud, and conspiracy, and is, at minimum, liable for Riddell's efforts to convince Plaintiffs and the public that helmets could prevent head injuries. NFL-P also played a key role in the NFL's independent negligent conduct, because it was (at least in part) responsible for NFL marketing, and so played a role in the NFL's negligent glorification of the hyper-violent collisions most likely to lead to head trauma. NFL-P also, accordingly, played a role in the NFL's failure to disseminate its knowledge of the dangers of concussions.

To be sure, the precise details of NFL-P's involvement with each decision, statement, and omissions are singularly within the possession of Defendants, and discovery is needed to better understand NFL-P's role.  But that does not mean that the allegations against NFL-P are insufficiently pleaded.  Instead, it means that discovery is justified.

### C.   Plaintiffs' Negligence, Fraud, and Conspiracy Claims are Timely.

Perhaps nowhere is the NFL's failure to perform a choice of law analysis more glaring than in its arguments that certain of Plaintiffs' claims are not timely.[13]  Statutes of limitations, the applicability and scope of doctrines such as the discovery rule, fraudulent concealment, and equitable tolling, and the application of class action tolling vary widely from state to state.  Those differences may not be smoothed over by assumption.  Nevertheless, even accepting the NFL's absurd fake-law framework, Plaintiffs' claims are timely.

### 1.   Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by the Discovery Rule.

Plaintiffs adequately plead that their claims, to the extent they require tolling, did not accrue until, at the earliest, when the NFL acknowledged the concussion crisis in 2010 and re-named and re-populated the MTBI Committee.  SAC ¶¶ 303-05.  The discovery rule, which is recognized in some form in most jurisdictions, provides that a claim does not accrue until "the plaintiff has discovered or, exercising reasonable diligence should have discovered the injury and its cause." *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir. 1991).  It "is not enough that a plaintiff comprehends a 'what'; there must also be a reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault." *Walk v. Ring*, 44 P.3d 990, 996 (Ariz. 2002); *see also Gleason v. Borough of*

---

[13] The NFL apparently concedes that any wrongful death claims (Count XI) are timely.

*Moosic*, 15 A.3d 479, 484-86 (Pa. 2011) (explaining that the discovery rule applies to both "an injury and its cause").

Further, at the time of the head impacts, some of the Plaintiffs did not suffer from the devastating disease that occurred long after the Players had retired from professional football.  In an analogous context presented in *Daley v A.W. Chesterton, Inc*., 37 A.3d 1175 (2012), the Pennsylvania Supreme Court found that the statute accrued for an asbestos worker who had been diagnosed with pulmonary asbestosis and cancer in the right lung in 1985, when he was diagnosed with a second injury, mesothelioma.  Here, these Players may have taken several impacts to the head when they played, but it was not until recently that they began to suffer the impact of latent brain disease such as CTE and participated in this lawsuit.  Again, this raises a question of fact for the jury.

It is true that "the plaintiff bears the burden of showing the discovery rule tolls the statute of limitations."  *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014).  But "while a court may entertain a motion to dismiss on statute of limitations grounds . . . it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense."  *Id*.  A motion to dismiss must be denied "where the applicability of the discovery rule is not evidence on the face of the complaint but the plaintiff does not plead facts that unequivocally show that the discovery rule does not apply."  *Id*.[14]  Application of the discovery rule ordinarily is a question of fact.  *See, e.g.*, *Gleason*, 15 A.3d at 363 ("The point at which the complaining party

---

[14] The NFL relies on *Archie v. Pop Warner Little Scholars, Inc.*, No. 16-6603, 2017 WL 3084160, at *14 (C.D. Cal. May 12, 2017), but there the complaint did not even allege the discovery rule applied and plaintiffs first raised the issue in their opposition to the motion to dismiss.  Here, the SAMLFC clearly alleges the discovery rule applies.  SAMLFC ¶ 26.  The statute of limitations issue in *Archie* also applied only to one plaintiff's allegations, rather than an administrative pleading dealing with the claims of dozens of Plaintiffs.

should be reasonably aware that he or she has suffered an injury and its cause is ordinarily an issue of fact to be determined by the jury due to the fact intensive nature of the inquiry.").

Here, Plaintiffs adequately plead that the discovery rule tolled their claims through at least 2010, when the NFL half-heartedly came clean about the dangers of concussions and the sham that was the MTBI Committee.  Given the NFL's superior access to information about the health and safety of football and the dangers of head injuries, and its active cover-up of the connection between football and neurological diseases, because of the NFL's extensive misinformation machine, Plaintiffs did not connect their symptoms to their playing career, and did not connect their conditions to the NFL's acts of negligence, fraud, and conspiracy.  To the extent that the Court requires more specific discovery-rule pleadings from individual Plaintiffs, Plaintiffs respectfully request leave to file amended short form complaints so that each individual Plaintiff can do so.

2.      **<u>Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by the NFL's Fraudulent Concealment.</u>**

Plaintiffs adequately plead that the NFL's decades-long campaign of fraudulent omissions and misstatements tolled their claims, at minimum, until the NFL's 2010 change-of-heart.  A defendant is not permitted to invoke the statute of limitations if, through fraud or concealment, "he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts."  *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005).  The doctrine of fraudulent concealment "does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception."  *Id.*  Thus, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause."  *Id.* at 861.

Whether a claim is tolled due to fraudulent concealment "[i]n general . . . is a question of fact for the jury." *Conneen v. Amatek, Inc.*, 238 F. Supp. 3d 652, 658 (E.D. Pa. 2017); *see also Fine*, 870 A.2d at 858 ("[T]he court . . . must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause.  Since this is question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it.") (citation omitted).

Here, for the reasons discussed in the fraud section above, Plaintiffs adequately plead fraudulent concealment.  The SAC includes clear, specific allegations of the NFL's decades-long concealment of its knowledge of the dangers of concussions, and how the fact-finder could find that Plaintiffs relied on that concealment.  Even if Plaintiffs could have known they were injured in some sense, the NFL's fraudulent concealment prevented them from knowing the "cause:" playing football and the NFL's misconduct.  To the extent that the Court requires more specific fraudulent-concealment pleadings from individual Plaintiffs, Plaintiffs respectfully request leave to file amended short form complaints so that each individual Plaintiff can do so.

In cases, like this one, "involving tolling due to allegations of fraudulent concealment, the Third Circuit has encouraged and approved of allowing the factual record to be sufficiently developed before reaching the issue."  *Hoppe v. SmithKline Beecham Corp.*, 437 F. Supp. 2d 331, 336 (E.D. Pa. 2006) (Brody, J.) (denying summary judgment).  "Any inquiry into defendants' alleged fraudulent concealment would be premature at this stage, given that the factual record is completely undeveloped," particularly because Pennsylvania, like many states, "directs a court to leave material factual issues regarding tolling for the jury."  *Id.*

The NFL argues that Plaintiffs fail to plead fraudulent concealment because the SAC cites publicly-available studies dating back decades.  Mot. at 38-41.  But, as Plaintiffs allege, at all relevant times, the NFL held itself out as the authoritative source of knowledge about the safety of football in general, and head injuries in particular.  It is absurd to expect that Players and former Players should have explored academic medical journals when presented with assurances (and lack of warnings) from football's monopoly.  In any event, that is a question of fact not resolvable on the pleadings.  *See Conneen*, 238 F. Supp. 3d at 658 (explaining that "reasonable diligence . . . is sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question") (internal quotation marks and alterations omitted).

The NFL argues that Plaintiffs cannot rely on fraudulent concealment because they must allege that the "defendant's allegedly deceptive act that lulled plaintiff into not filing a timely action is a different act from that which forms the basis for the underlying claim."  Mot. at 40-41.  The NFL says Plaintiffs cannot meet that requirement because the bases for their fraud claims are the same as those for their assertions of fraudulent concealment.

To start, the NFL's citations for this "rule" are laughably inadequate.  Its two Pennsylvania cases both use the phrase "affirmative independent act," but do not actually apply this new rule that the NFL asserts applies here.  Indeed, neither case even involved fraud claims.  *See Pulli v. Ustin*, 24 A.3d 421, 426 (Pa. Sup. Ct. 2011) (auto accident case); *Royal Mile Co., Inc. v. UPMC*, No. 10-1609, 2013 WL 5436925, at *43-44 (W.D. Pa. Sept. 27, 2013) (antitrust case, citing *Pulli*).  The NFL's addition of italics to the word "independent" does not a rule of law make.  The NFL's misleading Pennsylvania citations undermine its credibility in the law-free zone in which it insists the Court decide this motion.

To the extent that the NFL's cherry-picked line of cases from New York are even controlling law in that state (only one, and not the case from the New York Court of Appeals, applies the rule to a fraud claim, and New York applies the ordinary discovery rule to fraud claims in any event), the facts here are distinguishable. The NFL's cases involved acts of misconduct with clear end dates before the lawsuit was filed. *See Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 198 (N.Y. 2007) (claims of negligence and IIED filed in the 2000s about alleged adoption agency misrepresentations in the 1960s); *Kaufman v. Cohen*, 307 A.D.2d 113, 121 (N.Y. App. Div. 2003) (claims filed in the 2000s regarding misrepresentations in a 1992 foreclosure). Here, Plaintiffs allege a continuing course of fraudulent misconduct, beginning in the 1960s and ending, if at all, in 2010. The NFL's fraudulent concealment of the facts of concussions is wrapped up in its fraudulent concealment of the material facts underlying their claims.[15]

> ### 3.     Plaintiffs Who Did Not File Individual Actions Within the Statute of Limitations as Tolled by the Discovery Rule or Fraudulent Concealment Had Their Claims Tolled by the Class Action Pending in this Court.

As this Court is well-aware, this case has been pending in this District since the filing of the class action complaint in *Easterling v. Nat'l Football League*, No. 11-5209 (E.D. Pa.), which was the basis for the multi-district litigation ordered in January 2012. *See In re: Nat'l Football League Players' Concussion Injury Litig.*, 842 F. Supp. 2d 1378 (J.P.M.L. 2012). That case was litigated and settled as a class action. At the Court also knows, that procedural outcome has

---

[15] The NFL's argument is too clever by half. In some parts of its brief, it argues that Plaintiffs can only allege claims based on misconduct that occurred during their playing careers (wrong, because the NFL's continuing fraud prevented them from seeking medical treatment they needed). In others, the NFL argues that Plaintiffs must identify some separate act of fraud in order to toll the statute of limitations. But if the Court accepts the NFL's first argument and finds that, say, a player who retired in 1990 cannot allege misconduct based on the MTBI Committee, then the Court could also find that the MTBI Committee was the "independent" act the NFL demands to toll the player's claims.

offered substantial benefit to the NFL.  Had the settlement been structured as an opt-in mass tort

settlement, the NFL would have resolved claims only with Players who filed complaints

transferred to this Court, and only with players who affirmatively accepted the terms of the

settlement.  Instead, the settlement was structured as a class action, granting the NFL global

peace as to any players who did not affirmatively opt out of the class.

Opt Out Plaintiffs acted in accordance with how the case was litigated and guided to

settlement.  They waited, as they were supposed to, to see how the case resolved and whether the

terms of the settlement were in their best interest. After opting out, they waited while objector

appeals delayed movement in the case for years.  They filed renewed complaints on the timeline

ordered by the Court.

For these reasons, any Players who did not otherwise file a timely complaint saw their

claims tolled by the class action pending since 2011.[16]  As the NFL accurately points out, *Am.*

*Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) does not, by its terms, apply to state-law claims.

But, as the NFL begrudgingly acknowledges, many states apply some form of *American Pipe*.

The NFL makes no effort to go state-by-state, other than citing a Pennsylvania case discussing

cases, unlike this one, filed in the Pennsylvania state-court system, and a New York case stating

that the law is unclear in New York.  The NFL has the burden on a motion to dismiss, and a

particular burden as to an affirmative defense like the statute of limitations.  *See In re Linerboard*

*Antitrust Litig.*, 223 F.R.D. 335, 345-52 (E.D. Pa. 2004) (conducting a state-by-state *American*

---

[16] As the NFL notes, the first class action to name NFL-P was filed a few months later, in December 2011.  NFL-P does not identify any specific Plaintiffs whose claims against NFL-P would be timely as of August 2011, but would not as of December.  There is thus no basis to dismiss any claims against NFL-P on this ground.  However, should NFL-P inappropriately expand on this position in its Reply, Plaintiffs reserve all arguments that claims against NFL-P relate back to the filing of *Easterling* under Fed. R. Civ. P. 15.

*Pipe* analysis).  It has not met that burden here and the motion to dismiss, with respect to this issue, should be denied.

Plaintiffs respectfully submit that most states, even ones that do not apply *American Pipe per se*, would find Plaintiffs' claims tolled here under similar principles.  This is not the classic *American Pipe* fact pattern, where absent class members file individual claims after a class action has been dismissed, or class certification denied.  Plaintiffs have filed their opt out claims in the same Court in front of the same Judge that oversaw the class action settlement, and have done so on a timeline dictated by the negotiation, judicial approval, and appeals process of the In every sense but an absurdly formalist one, this is merely the next phase of one, long-running case.

Additionally, many states recognize, independent of well-known doctrines like the discovery rule and fraudulent concealment, judicial authority to find claims tolled under general principles of equity.  *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015, 1022-23 (N.D. Cal. 2014) (discussing equitable tolling under California law); *Billiard Balls Mgmt., LLC v. Mintzer Sarowitz Zeris Ledva & Meyers, LLP*, 42 N.Y.S.3d 730, 737-38 (N.Y. Sup. Ct. 2016) (same, under New York law).  Here, the NFL was plainly on notice of Plaintiffs' claims and Plaintiffs have exercised "good faith and reasonable conduct" in waiting to litigate their claims under after the class proceedings resolved.  *In re Cathode*, 27 F. Supp. 3d at 1022 (citation omitted).  General principles of equity tolled their claims during the pendency of the class action.

Even if state law did not toll Plaintiffs' claims, this Court's inherent power to oversee its docket, powers vested by the Federal Rules as well as the multi-district litigation statute, mean that Plaintiffs' opt out complaints are timely-filed.  Under the NFL's argument, any Plaintiff who

even *might* have been near the end of their limitations periods should have insisted on filing an individual complaint during the class litigation. For example, an Opt Out would have had to file a complaint even before the terms of the settlement were final (i.e., before he could even know whether or not he wanted to opt out). That makes no sense and would have caused unnecessary chaos and confusion as this Court undertook the task of adjudicating the pre-trial phases of thousands of cases. Plaintiffs cannot be punished for following the course of the litigation as directed by the Court.

> **D.** **The Court Should Not Dismiss the Claims of Plaintiffs Who Failed to File Short-Form Complaints, Many of Whom are *Pro Se*.**

The NFL asks the Court to dismiss the claims of Opt Out Plaintiffs who did not file a short form complaint. Plaintiffs respectfully submit that many or most of those that failed to file are likely *pro se*, and the Court should appoint a *pro se* liaison to reach out to these Plaintiffs and determine whether they wish to opt back into the settlement, or file a short form complaint as an opt out, before dismissing their claims.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the motion to dismiss for failure to state a claim be denied.

Dated:  December 8, 2017

Respectfully Submitted,

By:     */s/ Wendy R. Fleishman*
        Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com

*Lead Counsel on Behalf of Opt Out Plaintiffs*

-34-

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 8th day of December, 2017, upon all counsel of record.


Dated: December 8, 2017                    <u>/s/ *Wendy R. Fleishman*</u>
                                           Wendy R. Fleishman