# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE RETIRED PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | Hon. Anita B. Brody |

**OPT OUT PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE NATIONAL FOOTBAL LEAGUE AND NATIONAL FOOTBALL LEAGUE PROPERTIES' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED MASTER ADMINISTRATIVE LONG-FORM COMPLAINT ON PREEMPTION GROUNDS**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................. 1

II.    RELEVANT BACKGROUND .............................................................. 3

    A.    Background. ................................................................................. 3

    B.    The NFL's Fraudulent and Self-Serving Cover-Up of Known Neurological Risks. ........................................................................ 5

    C.    The Collective Bargaining Agreements Are Outside the SAC and Irrelevant to its Allegations.................................................... 8

III.   LEGAL STANDARD ........................................................................... 18

IV.   ARGUMENT ........................................................................................ 20

    A.    The Players' Claims Against Defendant National Football League Do Not Depend Upon the Interpretation of Any Term of Any CBA. ............................ 20

        1.    Threshold issue:  the NFL Defendants' failure to conduct analysis under the specific laws at issue or the CBAs purportedly at issue. ......... 22

        2.    Fraud-based claims, declaratory relief, and civil conspiracy (Counts I, V, VIII, IX, X). ........................................................ 24

            a.    The NFL misapprehends or misstates the elements of fraudulent concealment and non-disclosure.................... 24

            b.    The NFL misstates how the Players have alleged, and will prove, justifiable reliance.................................... 26

            c.    The NFL's specific arguments relating to reliance fail. .............. 29

        3.    Negligence-based claims (Counts II-VII) ................................ 31

            a.    The Players' negligence claims do not require interpretation of CBA provisions governing Clubs and Club doctors.......................................................... 32

            b.    The Players' negligence claims do not become preempted because of the existence of committees in the abstract............... 35

            c.    The NFL's primary cases do not save their flawed arguments.................................................................. 37

               1.    *Duerson* and *Maxwell* .................................... 37

               2.    *Stringer* ........................................................ 39

         4.    Wrongful death, survival, and loss of consortium claims  (Counts XI, XII, XIII)......................................................... 40

    B.    Plaintiffs' Claims Do Not "Arise" Under the CBAs. ......................... 40

**TABLE OF CONTENTS**
**(continued)**

Page

C.      The Players' Claims Against Defendant NFL Properties, LLC Are Not Preempted. ........................................................................................... 43

D.      Plaintiffs' Estoppel Allegations Have Merit. ......................................................... 44

E.      The Players' Claims Are Not Subject to Arbitration. ........................................... 47

F.      At Minimum, the NFL's Motion Should be Deferred Pending Discovery .......... 48

V.    CONCLUSION ................................................................................................................. 49

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aetna, Inc. v. Health Diagnostic Lab., Inc*.,
  2015 U.S. Dist. LEXIS 172003 (E.D. Pa.  Dec. 28, 2105) ...................................................... 25

*Allis-Chalmers Corp. v. Lueck*,
  471 U.S. 202 (1985) ........................................................................................................... 22

*Antol v. Esposto*,
  100 F.3d 1111 (3d Cir. 1996) ............................................................................................ 41

*Atwater v. NFLPA*,
  626 F.3d 1170 (11th Cir. 2010) ........................................................................................ 26

*Aubrey v. Sanders*,
  No. 07-cv-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008) ........................................ 25

*Ballard v. NFPLA*,
  123 F. Supp. 3d 1161 (E.D. Mo. 2015) ........................................................................ 30, 39

*Beidleman v. Stroh Brewery Co.*,
  182 F.3d 225 (3d Cir. 1999) .............................................................................................. 22

*Benavidez v. Sandia National Labs*,
  212 F. Supp. 3d 1039 (D. N.M. 2016) ............................................................................... 21

*Bentley v. Cleveland Browns Football Co*.,
  194 Ohio App. 3d 826 (Ohio Ct. App. 2011) ..................................................................... 46

*Berda v. CBS Inc.*,
  881 F.2d 20 (3d Cir. 1989) .......................................................................................... 19, 41

*Bortz v. Noon*,
  729 A.D.2d 555 (Pa. 1999) ............................................................................................... 26

*Brown v. Nat'l Football League*,
  219 F. Supp. 2d 372 (S.D.N.Y. 2002) ........................................................................ passim

*Bush v. St. Louis Regional Convention*,
  2016 WL 3125869 (E.D. Mo. 2016) .................................................................................. 37

*Chassen v. Fidelity Nat'l Fin., Inc.*,
  836 F.3d 29 (3d Cir. 2016) ............................................................................................... 48

*Christie v. Public Serv. Elec. & Gas Co.*,
  No. Civ. 04-5978, 2006 WL 462588 (D.N.J. Feb. 24, 2006) ............................................. 49

*DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*,
  No. 10-cv-1341, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012) .............................................. 49

## TABLE OF AUTHORITIES
### (continued)

Page

*Dougherty v. Hooker Chem. Corp.*,
    540 F.2d 174 (3d Cir. 1976).......................................................................... 32

*Duncan v. Icenogle*,
    873 F. Supp. 579 (1994) ............................................................................... 31

*Exal Corp. v. Roeslein & Assocs., Inc.*,
    No. 4:12-CV-01830, 2012 WL 4754748 (N.D. Ohio Oct. 2, 2012)....................... 49

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987)........................................................................................ 19

*Givens v. Tenn. Football, Inc.*,
    684 F. Supp. 2d 985 (M.D. Tenn. 2010)........................................................... 40

*Glatts v. Crozer-Keystone Health Sys.*,
    645 F. Supp. 2d 446 (E.D. Pa. 2009) .............................................................. 38

*Gray v. Keystone Steel & Wire Co.*,
    No. 08-1197, 2009 WL 187895 (C.D. Ill. Jan. 21, 2009) ..................................... 49

*Green v. Bimbo Bakeries USA*,
    77 F. Supp. 3d 980 (N.D. Cal. 2015) ............................................................... 21

*Green v. Pro Football, Inc.*,
    31 F. Supp. 3d 716 (D. Md. 2014) ............................................... 21, 22, 24, 39

*Hendy v. Losse*,
    No. 89-55430, 1991 WL 17230 (9th Cir. Feb. 12, 1991) ..................................... 35

*In re National Hockey League Players' Concussion Injury Litig.*,
    189 F. Supp. 3d 856 (D. Minn. 2016)................................................ 19, 21, 23, 49

*In re Resorts Int'l, Inc.*,
    181 F.3d 505 (3d Cir. 1999).......................................................................... 27

*In re Toyota Motor Corp.*,
    No. 10-02151, 2012 WL 12929769 (C.D. Cal. May 5, 2012) ............................... 27

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
    458 F.3d 244 (3d Cir. 2006).......................................................................... 47

*JM Mechanical Corp. v. United States*,
    716 F.2d 190 (3d Cir. 1983).......................................................................... 49

*Jurevicius v. Cleveland Browns Football Co.*,
    LLC, No. 1:09 CV 1803, 2010 WL 8461220 (N.D. Oh. Mar. 31, 2010) ................. 34

*Kleinknecht v. Gettysburg Coll.*,
    989 F.2d 1360 (3d Cir. 1993)........................................................................ 33

# TABLE OF AUTHORITIES
## (continued)

Page

*Kline v. Security Guards, Inc.*,
    386 F.3d 246 (3d Cir. 2004) ......................................................................... 18, 34

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) .............................................................................. 45

*LaMeau ex rel. Crnkovich v. City of Royal Oak*,
    No. 289947, 2012 WL 3590043 (Mich. Ct. App. Aug. 21, 2012) .......................... 23

*Lingle v. Norse*,
    486 U.S. 399 (1988) ................................................................................. passim

*Livadas v Bradshaw*,
    512 U.S. 107 (1994) ................................................................................. passim

*Lyon v. Ranger III*,
    858 F.2d 22 (1st Cir. 1988) .............................................................................. 32

*M.S. v. Cedar Bridge Military Academy*,
    904 F.Supp.2d 399 (M.D. Pa. 2012) ................................................................... 24

*Manti's Transp., Inc. v. C.T. Lines, Inc.*,
    68 A.D.3d 937 (N.Y. App. Div. 2009) ................................................................. 25

*Matlin Patterson ATA Holdings, LLC v. Fed. Express Corp.*,
    87 A.D. 3d 836 (N.Y. App. Div. 2011) ................................................................ 25

*Maxwell v. Nat'l Football League*,
    No. CV 11-08394 (C.D. Cal. Dec. 8, 2011) ................................................... 37, 38

*Ochs v. Woods*,
    117 N.E. 305 (N.Y. 1917) ................................................................................. 27

*Oliver v. Riddell*, 2016 WL 7336412 (N.D. Ill. Jul. 19, 2016) .................................. 21

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988) .............................................................................. 45

*Patentas v. United States*,
    687 F.2d 707 (3d Cir. 1982) .............................................................................. 35

*Peek v. Philadelphia  Coca-Cola Bottling*,
    No. 97-3372, 1997 WL 399379 (E.D. Pa. July 16, 1997) ...................................... 41

*Podobnik v. U.S. Postal Serv.*,
    409 F.3d 584 (3d Cir. 2005) .............................................................................. 48

*Prost v. Caldwell Store, Inc.*,
    187 A.2d 273 (Pa. 1963) ................................................................................... 31

## TABLE OF AUTHORITIES
### (continued)

Page

*R.J. Reynolds Tobacco Co. v. Martin*,
   53 So. 3d 1060 (Fla. App. 2010)..................................................................... 27

*R.W. v. Manzek*,
   888 A.2d 740 (Pa. 2005)................................................................................. 32

*Rider v. Com. of Pa.*,
   850 F.2d 982 (3d Cir. 1988)............................................................................ 45

*Roberts v. Estate of Barbaglio*,
   531 A.2d 1125 (Pa. Super. Ct. 1987).............................................................. 25

*Rycoline Prods., Inc. v. C & W Unlimited*,
   109 F.3d 883 (3d Cir. 1997)............................................................................ 19

*Sherwin v. Indianapolis Colts., Inc.*,
   752 F. Supp. 1172 (N.D.N.Y. 1990)........................................................ 40, 46

*Small v. Lorillard Tobacco Co., Inc.*,
   252 A.D.2d 1 (N.Y. App. 1998) ..................................................................... 27

*Spence v. ESAB Group, Inc.*,
   623 F.3d 212 (3d Cir. 2010)............................................................................ 35

*Stringer v. Nat'l Football League*,
   474 F. Supp. 2d 894 (S.D. Ohio 2007) .................................................. passim

*Trans Penn Wax Corp. v. McCandless*,
   50 F.3d 217 (3d Cir. 1995).............................................................................. 40

*Tynes v. Buccaneers Ltd. P'ship*,
   134 F.Supp.3d 1351 (M.D. Fla. 2015)............................................................ 46

*United Steelworkers of Amer. v. Rawson*,
   495 U.S. 362 (1990)........................................................................................ 42

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013)............................................................ 27

*Varacallo v. Mass. Mut. Life Ins. Co.*,
   752 A.2d 807 (N.J. App. 2000)....................................................................... 27

*Vasquez v. Super. Ct.*,
   484 P.2d 964 (Cal. 1971) ................................................................................ 27

*Zinman v. Prudential Ins. Co. of Am.*,
   909 F. Supp. 279 (E.D. Pa. 1995) .................................................................. 47

## TABLE OF AUTHORITIES
### (continued)

Page

**Statutes**

29 U.S.C. § 185 ................................................................................................ 1, 18

29 U.S.C. § 185(a) ............................................................................................... 18

**Other Authorities**

57A Am. Jur. 2d Negligence ................................................................................. 32

57A Am. Jur. 2d *Negligence* § 80 ........................................................................ 33

*Prosser and Keeton on the Law of Torts* § 71  (5th ed. 1984) ................................ 33

1464535.8

Opt Out Plaintiffs ("Plaintiffs" or "Players") respectfully request that the motion to dismiss the Second Amended Master Administrative Long-Form Complaint ("SAC") on preemption grounds (Dkt. No. 8403) filed by Defendants the National Football League and NFL Properties, LLC be denied.

## I.   <u>INTRODUCTION</u>

In asking this Court to preempt all of the Opt Out Plaintiffs' claims based on Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (the "LMRA"), the NFL and NFL Properties ("NFL P") (collectively, "NFL Defendants" or "NFL" unless otherwise indicated) attempt both to recast the facts pled in the SAC and also to ignore fundamental preemption principles. The SAC describes decades of wrongdoing by Defendants. Longstanding Supreme Court and Third Circuit authority explains that preemption is not a one-size-fits-all doctrine. The doctrine requires careful analysis to establish which of the Collective Bargaining Agreement ("CBA") provisions, if any, are at issue, as well as a determination of the nature of the precise law at issue and how it is proven—an exercise the Defendants here ignore.

LMRA preemption exists for the important, but discrete, purpose of facilitating the consistent application of contracts reached via collective bargaining. The doctrine was not intended to immunize misconduct, especially by third parties whose misconduct pre-dates and exists entirely independently of a CBA. The NFL Defendants' motion to dismiss should be denied.

Specifically, the NFL Defendants improperly argue that the duties asserted by Plaintiffs cannot be resolved without "interpretation" of CBA provisions. Nothing could be further from the truth. The NFL Defendants rely on language applicable to Club and to Club doctors' treatment, and to some extent payment for treatment, of active players' immediate injuries, as well as to highly general rulemaking. No CBA provision appears in the SAC, and the CBAs

impose no duties on either the NFL or NFL P, the latter of which is simply the licensing arm of the NFL and was never a signatory to any CBA (and whose preemption argument is factually even more attenuated than the NFL's).[1]  More importantly, all of Plaintiffs' claims against the NFL Defendants are based on the common law duties of care and the prohibition of fraud. That duty of care was repeatedly confirmed (and expressly and voluntarily assumed by the NFL) and is ingrained in the NFL-Player relationships.  The harm to Players by the NFL Defendants' cover-up was foreseeable.  These common-law duties need no interpretative assistance from the CBAs.

The NFL Defendants' erroneous preemption analysis turns the seminal opinion in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988) on its head.  The Supreme Court held that mere "parallelism" between facts supporting a grievance under a CBA and a state-law claim does not support preemption. *Lingle*, 486 U.S. at 408. In *Lingle*, Justice Stevens wrote for the Supreme Court:  "we hold that an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement." *Id.* at 413.

The Supreme Court further solidified and delineated this approach in *Livadas v Bradshaw*, 512 U.S. 107 (1994), noting that "*Lingle* makes plain in so many words that when liability is governed by independent state law, the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301." *Livadas*, 512 U.S. at 125 (citation omitted).  Based on the correct interpretive

---

[1] The NFL P agreed to ensure that the equipment and materials it licensed and approved were of the highest quality and sufficient to protect the players from harm.  NFL P was used by the NFL to fund NFL Charities, which in turn, funded "sham" research.

principles,[2] there is no basis for this Court to take the extraordinary step of dismissing all claims

in the SAC, especially pre-discovery.

## II.   RELEVANT BACKGROUND

Plaintiffs are Opt Outs from the Class of retired professional football players who

suffered concussive and sub-concussive head trauma while participating in football games, or

training and practice, supervised by the National Football League, and who suffer from the

subsequent risk of latent brain injury from this repetitive head trauma.  SAC ¶¶ 1, 8.  Each

injured Player has opted out for his own personal reasons, notwithstanding the NFL Defendant's

inappropriate and ill-taken denigrating suggestion that these people (or their estates) are

somehow mere complainers.

As a result of the accumulation of multiple head traumas they suffered while playing in

the NFL, Plaintiffs are suffering, or are at increased risk of suffering, from debilitating brain

diseases such as early-onset dementia, amyotrophic lateral sclerosis ("ALS"), chronic traumatic

encephalopathy ("CTE"), memory loss, headaches, confusion, severe depression, extreme

emotional liability, inability to control their outbursts, anxiety and other serious neurological

maladies.  *Id.* at ¶ 89.

### A.   Background.

Medical studies dating back more than one hundred years demonstrate that athletes who

suffer repeated blows to the head risk long-term brain damage. *Id.* at ¶ 49. The evidence since

overwhelmingly establishes that the head trauma routinely inflicted in professional football

games can cause latent neurocognitive decline, permanent mental disability, and even death. *Id.*

at ¶ 50.  The NFL voluntarily undertook duties to "protect" Players from those risks and

---

[2] Since the Class Plaintiffs' and Defendants last briefed this issue approximately five years ago, a number of carefully-reasoned decisions have been issued that well illustrate why preemption is inappropriate here.

breached the duties and fraudulently concealed those risks from Players. *Id.* at ¶¶ 51, 53, 93-98, 100.

The NFL—as the central authority over professional football—long ago assumed a duty to protect its players from unreasonable risk of harm. *Id.* at ¶¶ 51, 93. From its very inception in the 1920s, the NFL acted in accordance with that duty:  it promulgated equipment standards, implemented rules changes, and created a host of off-the-field programs designed to manage Players' lives. *Id.* at ¶ 51. Through public statements disseminated by its media empire, the NFL cultivated an image as football's responsible steward, dedicated to protecting the game and its participants.  Players relied on the NFL to live up to that image, and they trusted the NFL to exercise its enormous influence in a manner reasonably consistent with their health and well-being. *Id.*

When it came to brain injuries in football, the NFL abused that trust.  The NFL knew that players were exposed to risks of severe latent neurological injuries yet, did filed to disclose the true risks, concealed and misrepresented the available information and did nothing to prevent or mitigate them.  *Id.* at ¶ 52-54. The NFL failed to warn Players about the dangers of concussive and sub-concussive impacts or to implement equipment standards adapted for head trauma. *Id.* In regard to retired Players in particular, even after their careers were long over, the NFL failed to provide honest information on the risk of latent brain injury to allow the retired Players to obtain proper diagnostic examinations that would facilitate mitigation and treatment of the injuries.  In fact, the NFL did the opposite: rather than publicly acknowledge and confront the concussion crisis, the NFL glorified the hyper-violent collisions most likely to lead to head trauma, and orchestrated a disinformation campaign to conceal the risk of latent brain injury. *Id.* at ¶¶ 72-83.

**B.**     **The NFL's Fraudulent and Self-Serving Cover-Up of Known Neurological Risks.**

Despite knowing for decades the long-term risks of repeated head traumas in professional football, the NFL failed to protect its Players and failed to warn them of the risks and consequences of the accumulation of head trauma their NFL career entailed.  The NFL failed to warn them of the risk of latent brain disease from these repetitive head traumas that may not surface until long after they left professional football.  The NFL voluntarily undertook to "protect" the Players.  But, failed to provide monitoring, education, and treatment.  Left to fend for themselves, some committed suicide, others sought drugs and alcohol to medicate themselves as a result of the symptoms of the latent brain diseases, others were lost and homeless.  Defendants nonetheless refuse to protect many of the retired Players from incurring or exacerbating conditions caused by the accumulation of head traumas.

As set forth in the SAC, Defendants, the NFL, NFL Properties, acted in concert with others, including Riddell Inc., to conceal and downplay the dangers and to attain maximum market share and profits from professional football, while they continued to deceive the Players, their families, and the public that repetitive head trauma did not pose a risk of permanent latent brain injuries.  Defendants possessed actual knowledge connecting concussive and sub-concussive blows to the head to brain injuries and disease, yet created elaborate deceptions to conceal the permanent harm that resulted.  *Id.* at ¶¶ 51, 84-92, 100. Defendants developed sham science, knowingly developed, licensed and marketed ineffective harm reducing technology and equipment.  Defendants funneled millions of dollars in funds to the 501(c)(3) entity that Defendants owned and ran called NFL Charities in order to gain financial benefit in the process of weaving this elaborate web of deception.  *Id.* at ¶ 13. Defendants funded a sham committee of

"experts" Defendants chose to further the "big lie" that concealed and downplayed the permanent harm from repetitive head trauma. *Id.* at ¶¶ 59, 84-92.

Defendants and Riddell, among others, used the Tobacco Playbook to conceal the dangers of professional football and to maximize the profits, as tobacco industry had done with tobacco sales from the 1960s through recent years.  The two industries shared lobbyists, lawyers, publicists and consultants.  Key Tobacco figures were also key NFL leaders.  Those included Preston Tisch, who partly owned Lorillard Tobacco and co-owned the NY Giants, and Miami Dolphins owner Joe Robbie, who also worked as a lobbyist for the tobacco industry from the 1960s until his death. In 1963, Robbie appeared before the United States Senate to voice opposition to a bill which would have regulated tobacco advertising. From 1971 until 1989, Robbie was the head of the Minnesota Candy & Tobacco Distributors Association.  Both Tisch and Robbie were Board members of the Tobacco Institute and the Council for Tobacco Research, the two entities accused of playing a central role in misusing the science to hide the true risks of tobacco. SAC ¶ 43.

Dependent on the Players for their fortune, the football clubs, owners and the NFL exploited the repetitive head traumas the Players suffered.  NFL Films filmed and photographed the violence in order to entice and excite the audience. *Id.* at ¶¶ 75-83.

The NFL together with the NFL P perpetrated a massive fraud on the Players and the public by, among other things:

- Continuing to conceal a known link between amyotrophic lateral sclerosis and repetitive head trauma in NFL Players by funneling $125,000 to in 501(c)(3) contributions to tobacco-industry-supported neurologist Dr. Stanley Appel to research the link between ALS and football;

- Funneling "Mild Traumatic Brain Injury ("MTBI") grant" money to reputed defense-expert firm Exponent Failure Analysis, Inc., which has

previously argued that secondhand smoke did not cause cancer, to devise neuropsychological test protocol under Dr. Robert Fijan, Ph.D.;

- Funneling several hundred thousand dollars per year through the NFL's 501(c)(3) to David C. Viano, a professional defense-side expert in the automotive industry, who spent his entire career testifying for General Motors and other auto manufacturers in product liability lawsuits and has made millions of dollars doing it;

- Funneling "MTBI grant" money to National Operating Committee on Standards for Athletic Equipment ("NOCSAE") to support self-serving research endeavors;

- Publishing a total of 16 papers in the peer-reviewed journal Neurosurgery on "Concussion in Professional Football" premised on knowingly false data sets;

- Agreeing with Riddell to provide the safest possible football helmets licensed as the "official helmet of the NFL" with the Riddell name, while knowing that none of these helmets warned or protected against the dangers of latent brain disease;

- Attempting to create a fraudulent "concussion severity index" in the 1990s;

- Knowingly relied upon false data in concussion "epidemiology" research;

- Funneling money through the NFL's 501(c)(3) arm, NFL Charities to expert-witness firms such as the highly controversial "Exponent Failure Analysis", also infamous for its controversial (and discredited) work for Big Tobacco to create reports so flawed that Defendants largely have not cited them;

- Funneling money through the NFL's 501(c)(3) arm, NFL Charities to the fraudulent "MTBI committee" to support Riddell helmet products as superior, through flawed research at Wayne State University;

- Funneling money with fraudulent "MTBI grant" money to expert witness firms such as the highly controversial "Exponent Failure Analysis," also infamous for its controversial (and discredited) work for Big Tobacco."

SAC ¶¶ 44-45.

Indeed, Defendants—all of whom shared financial responsibility for this undertaking—

published at least 16 sham science journal articles that made notoriously false conclusions on

brain injury as applied not merely to NFL Players but also to teenagers and children. *Id.* at ¶ 46. Plaintiffs placed their trust and confidence in the NFL to protect them from unknown harms and warn them when their health was in jeopardy—particularly, when it had to do with their brains. Defendants voluntarily assumed this duty as overseer and protector of the health and safety of the Players. *Id.* at ¶ 56, 103-115.  But, the members of the NFL were counting their cash, and had long ago turned away from actually and truthfully protecting the Players.

### C.   The Collective Bargaining Agreements Are Outside the SAC and Irrelevant to its Allegations.

The SAC does not mention the CBAs, or any CBA provision.  This is unsurprising because the agreements between the NFL Players Association and the Clubs largely related to game- and season-specific issues.[3]  This case has *nothing* to do with any provision of any agreements, any Player's entitlement to any benefit under any CBA, or any issue of representation by NFPLA.  In fact, as the SAC alleges, neither of the NFL defendants has engaged "in labor negotiations of any sort whatsoever with NFLfootball Players nor their union, the NFL Players Association (the 'NFLPA')."  SAC ¶¶ 38, 41.

Instead, the basic allegation is that the NFL Defendants "agreed to engage in tortious and injurious conduct and to conceal material facts regarding the connection between blows to the head and latent brain disease from [] Plaintiffs, victims in football's chronic-brain-disease concealment fraud."  SAC ¶ 8.  Due to the NFL's *independent* and *independently actionable* fraudulent, tortious, and negligent conduct, the Players sustained injuries, even death.  *Id.*

The NFL does not, and cannot, identify any CBA provision that bears on the distinct issues in this case or as to which there is a bona fide dispute over its applicability.  Instead, the

---

[3] The National Football League was not even a signatory to most of the CBAs, in that it signed only between 1968 and 1970, and as of 2011.  Defs. Mot. Exs. 2, 11.  The NFL P was never a signatory.

NFL points to vague and high-level factual overlap between generalized topics in the CBAs (*e.g.*, safety) and the issues in this case.  Closer examination of the provisions cited by the NFL (assuming this Court will even consider matters outside the pleadings) belies the contention of much or any subject matter overlap at all.  The chart below copies the language relied on by the NFL on pages 8-12 of their brief and adds a column to illustrate why the NFL's reliance on these provisions as a basis to preempt the Players' claims is mistaken:

| | **Provision Cited by NFL, Page Cited** | **Reason(s) Why Provision Inapplicable** |
|---|---|---|
| 1 | "If a Club physician advises a coach or other club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity." (8) | <ul><li>No duties on NFL defendants.</li><li>Only duties on individual Clubs and Club personnel.</li><li>Relates only to active players.</li><li>Relates to timing and circumstances of returning to active play.</li><li>Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties.</li></ul> |
| 2 | "All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards …. The prognosis of the player's recovery time should be as precise as possible." (8) | <ul><li>No duties on NFL defendants.</li><li>Only duties on individual Clubs and Club personnel.</li><li>Relates only to active players.</li><li>Relates to timing and circumstances of returning to active play.</li><li>Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's</li></ul> |

| | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
| | | assumption of its own duties. |
| 3 | "[I]f Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary …." (8) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates only to active players.<br><br>• Relates to player receipt of medical services in real time for injuries at work.<br><br>• Ignores that the neurological and neurocognitive injuries Plaintiffs suffer were not detectable at the time of active play.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 4 | "Each Club will have a board-certified orthopedic surgeon as one of its Club physicians.  The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs." (8) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates only to active players.<br><br>• Relates to type of real-time medical care provided by Club.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 5 | "All full-time head trainers and assistant trainers … will be certified by the National Athletic Trainers Association.  All part-time trainers must work under the direct supervision of | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs |

| | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
| | a certified trainer." (8) | • and Club personnel.<br><br>• Relates only to active players.<br><br>• Relates to trainer qualification.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 6 | "The home team shall provide a physician and an ambulance at each game available to both teams; said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams." (8) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates only to active players.<br><br>• Relates to ensuring doctor and ambulance available to competing and home teams.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 7 | "[A]ll club physicians and medical personnel shall comply with all federal, state, and local requirements, including all ethical rules and standards established by any applicable government and/or other authority that regulates or governs the medical profession in the Club's city." (8)" | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates only to active players.<br><br>• Highly general statement of commitment to compliance, no specific duties.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |

| | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
| 8 | "The NFL shall develop and implement an online, 24-hour electronic medical record system within 24 months of the effective date of this Agreement or such longer period as the parties may agree." (9) | • Part of the 2011 CBA only; facially inapplicable to virtually all of the Plaintiffs here.<br><br>• Uncited language shows it relates to who pays for the development and implementation of a medical record system and whether it is counted as a Player Benefit Cost; no substantive information or suggestion of creating certain kinds of records.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 9 | "The parties agree to establish an Accountability and Care Committee, which will provide advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players by all clubs.  The Committee shall … develop a standardized preseason and postseason physical examination and educational protocol to inform players of the primary risks associated with playing professional football and the role of the player and the team medical staff in preventing and treating illness and injury in professional athletes; … conduct research into prevention and treatment of illness and injury commonly experienced by professional athletes … [and] assist in the development and maintenance of injury surveillance and medical records systems …." (9) | • Part of 2011 CBA only; facially inapplicable to virtually all of the Plaintiffs here.<br><br>• Focus on individual Clubs.<br><br>• Relates only to active players.<br><br>• Nothing to do with cover-up of known long-term and serious and latent neurological injuries or diseases and has nothing to do with NFL's assumption of its own duties. |
| 10 | "If any player submits a complaint to the [Accountability and Care] Committee regarding Club medical care, the complaint shall be referred to the league and the player's Club, which together shall determine an appropriate response | • Part of 2011 CBA only; facially inapplicable to virtually all of the Plaintiffs here.<br><br>• Relates only to active players. |

-12-

|  | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
|  | or corrective action if found to be reasonable." (9) | • No substantive obligations.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 11 | "Each Club shall use its best efforts to ensure that its players are provided with medical care consistent with professional standards for the industry." (9) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates only to active players.<br><br>• Generalized statement.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 12 | "The NFLPA shall have the right to commence an investigation before the Joint Committee [on Player Safety and Welfare] if the NFLPA believes that the medical care of a team is not adequately taking care of player safety." (9) | • No duties on NFL defendants.<br><br>• Relates only to active players.<br><br>• Relates to conduct of Club and Club personnel.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 13 | "A player will have the opportunity to obtain a second medical opinion," and the Club shall bear "the responsibility" for "the costs of [these] medical services." (9) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs.<br><br>• Relates only to active players.<br><br>• Relates to payment.<br><br>• Nothing to do with cover-up of |

-13-

| | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
| | | known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 14 | "A player will have the right to choose the surgeon who will perform surgery … Any such surgery will be at Club expense[.]" (9) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs.<br><br>• Relates only to active players.<br><br>• Relates to surgeon selection.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 15 | "[E]ach player will undergo a standardized minimum pre-season physical examination … which will be conducted by the Club physician," and will further undergo a "post-season physical examination" at the request of the player or Club. (9) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates only to active players.<br><br>• Relates to pre- and post-season exams.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 16 | "Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract …." (10) | • No duties on NFL defendants, it is an obligation of the Clubs alone.<br><br>• Corollary of above.<br><br>• Relates only to active players.<br><br>• Nothing to do with cover-up of known long-term and serious |

| | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
| | | neurological injuries or NFL's assumption of its own duties. |
| 17 | "Player may examine his medical and trainers' records in the possession of the Club or Club physician two (2) times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season.  Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records [] forwarded to him …." (10) | • No duties on NFL defendants.<br><br>• Only duties on individual Clubs and Club personnel.<br><br>• Relates primarily to active players.<br><br>• Appears only to memorialize likely pre-existing access to personal medical records.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 18 | "A Joint Committee on Player Safety and Welfare (hereinafter the 'Joint Committee')[4] will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects." (10) | • No duties on NFL defendants.<br><br>• Relates only to active players.<br><br>• Process for potential rule changes is different from content of rules being memorialized as obligations.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |

---

[4] The Joint Committee was created "for the purpose of discussing, among other things, the player safety and welfare aspects of playing equipment, playing surfaces, and stadium facilities. The Joint Committee does not have the power to commit or bind any of the signatories to the CBA, however, nor does the CBA establish a contractually agreed upon standard of care applicable to Plaintiff's claims." *See, e.g., Bush v. St. Louis Regional Convention,* 2016 WL 3125869, at *4 (E.D. Mo. 2016).

|  | **Provision Cited by NFL, Page Cited** | **Reason(s) Why Provision Inapplicable** |
|---|---|---|
| 20 | "If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety," it may seek to investigate and "request an advisory decision by [an] arbitrator[]" regarding the proposed rule change. (11) | • No duties on NFL defendants.<br><br>• Relates only to active players.<br><br>• Relates to union's non-binding abilities with respect to active player safety.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 21 | "The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules.  One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules." (11) | • No duties on NFL defendants.<br><br>• Relates only to active players.<br><br>• Relates to union attendance at NFL Competition Committee.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 22 | "[T]he interpretation of, application of, or compliance with, any provision of" the CBAs, player contracts, or any applicable provision of the Constitution "pertaining to terms and conditions of employment of NFL players," will be resolved exclusively in accordance with agreed-to arbitration procedures.  Moreover, since 1970, "injury grievances" have been subject to arbitration. (11) | • By its terms relates to CBA provisions.<br><br>• Relates to active players.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 23 | "[A] player … will receive an injury protection benefit … [when the] player … [has] been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club | • No duties on NFL defendants.<br><br>• Involves Clubs and Club personnel.<br><br>• Relates only to active players. |

| | Provision Cited by NFL, Page Cited | Reason(s) Why Provision Inapplicable |
|---|---|---|
| | physician …." (12) | • Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |
| 24 | "The parties agree to design and establish a new plan … to provide medical benefits to former Players who are … determined … to have 'dementia.'" [Amended in 2011: "[T]he Disability Plan will be amended to provide a benefit for those eligible Players, as defined below, who have permanent, neuro-cognitive impairment . . . ."] (12) | • No duties on NFL defendants.<br><br>• No bearing on whether the NFL breached a duty to protect those players from the risk of developing latent dementia in the first place.<br><br>• Remedial  insurance and health benefits provisions unrelated to tort liability.<br><br>• First and only mention of permanent, neuro-cognitive impairment in 2011.<br><br>• Nothing to do with cover-up of known long-term and serious neurological injuries or NFL's assumption of its own duties. |

Thus, the vast majority of the provisions relied on by the NFL relate to the roles and obligations of Clubs and Club doctors and trainers having to do with active player fitness and injuries.  Some address generalized, process-oriented, non-binding statements about subjects related to Player safety only at the most general levels and/or rule-making.  Finally, and notably, the sole language even *mentioning* the issues in this case—the reference to neuro-cognitive impairment (Row 24 above)—first appeared in the 2011 CBA, *see* Ex. 11, Art. 58 § 1, involving a benefit not implemented before then, *and even these provisions say nothing about the duties of protection and mitigation in the first place*.

-17-

III.     **LEGAL STANDARD**

The NFL has raised the affirmative defense of preemption under § 301 of the LMRA, 29

U.S.C. § 185.  *See* 29 U.S.C. § 185(a) ("[s]uits for violation of contracts between an employer

and a labor organization representing employees . . . may be brought in any district court of the

United States having jurisdiction of the parties").

Under the applicable law, which has construed the statutory language to allow LMRA

preemption to be an affirmative defense (on which a defendant has the burden of proof) as a well

as a basis for jurisdiction, the NFL has the burden to establish that the Players' claims require

this Court to resolve an *actual dispute* over the meaning of a *specific provision* of a collective

bargaining agreement ("CBA").  *See Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 256-261 (3d Cir.

2004).  *Kline* instructs that a defendant cannot manufacture a non-credible interpretation of a

CBA to seek preemption; LMRA preemption requires a "reasonable level of credibility" over a

purported dispute.

Thus, mere subject matter similarity or "parallelism" between a claim and a CBA does

not justify preemption.  *See Lingle*, 486 U.S. at 407-409 (§ 301 preempts a state-law claim only

if "resolution" of that claim "requires" the court to construe the CBA; noting that the section

"says nothing about the substantive rights" that employees enjoy under state law); *Livadas v.*

*Bradshaw,* 512 U.S. 107, 124 ("bare fact that a [CBA] will be consulted in the course of state-

law litigation" does not justify the defense).  That a CBA provision in some general sense forms

"part of the context in which [a] claim must be addressed" does not suffice to get claims

dismissed on preemption grounds.  *Kline*, 386 F.3d at 257.

Further, there is no preemption "even if dispute resolution pursuant to a [CBA]" and

"state law" would "require addressing precisely the same set of facts."  *Lingle*, 486 U.S. at 409-

-18-

10; *see also Livadas*, 512 U.S. at 125 (holding that a CBA's relevance to "damages computation" does not justify § 301 preemption).

These principles are consistent with the purpose of the LMRA: ensuring a uniform body of law to resolve labor disputes. *See Berda v. CBS, Inc.*, 881 F.2d 20, 27 (3d Cir. 1989).[5]  The LMRA was not intended, and is not interpreted, to displace state common-law claims and remedies when a party engages in tortious or unlawful conduct independent of a CBA.  *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) (LMRA preemption should not be "lightly inferred" giving it risks usurping "the traditional police power of the State").

In addition, because this case is at the pleading stage, the NFL has an additional burden of showing that the preemption defense is "apparent on the face of the complaint."  *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997) (holding that motion to dismiss is not the "proper vehicle" to decide a preemption defense absent its facial application) (internal quotations omitted).  Recently, for example, under strikingly similar facts, the court in *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 189 F. Supp. 3d 856, 875 (D. Minn. 2016) denied a LMRA pre-discovery motion as premature.  In so doing, the court illustrated the problems with an attempted preemption defense at the pleading in a carefully-reasoned opinion denying a motion to dismiss:

> [T]he Amended Complaint does not reference any CBA's, and to the extent that Defendant has identified particular provisions that purportedly must be interpreted in order to resolve Plaintiffs' claims, it is questionable whether those CBAs are embraced by the pleadings or are even relevant given that Plaintiffs are retired players who are no longer subject to collective bargaining.

---

[5] Another concern expressed by the Supreme Court in discussing LMRA preemption—that "labor unions are protected from burdensome claims of breach of its duty of fair representation"—is not even arguably implicated here.  *See Brown v. Nat'l Football League*, 219 F. Supp. 2d 372, 381 (S.D.N.Y. 2002) (holding that claims of negligent hiring, negligent training, and negligence not preempted under LMRA).

*Id.* (noting the "major fact questions" requires the development of a record).[6]  The NFL has

failed to meet its substantial burden of demonstrating that this Court should dismiss the Players'

claims based on the affirmative defense of LMRA preemption.

## IV.   ARGUMENT

### A.   The Players' Claims Against Defendant National Football League Do Not Depend Upon the Interpretation of Any Term of Any CBA.[7]

Adjudication of the Players' claims does not require interpretation of any CBA provision.

Even putting aside the impropriety of the NFL's going outside of the SAC on a motion to

dismiss as to an affirmative defense, it is noteworthy that the NFL Defendants have been unable

to locate any CBA provision remotely applicable to the Players' claims.  *See* Section II(B).  No

CBA provision speaks to the NFL's duties to safeguard Player health, and no provision pertains

to the duties to speak truthfully about latent neurological injuries in light of the NFL's superior

knowledge.

This case is thus squarely within the line of recent authority (including cases post-dating

the earlier briefing on this issue before this Court) that applies a proper analysis of LMRA

preemption and finds that where, as here, a plaintiff alleges independent misconduct involving

duties under state common-law, preemption is not appropriate.  *See In re Nat'l Hockey League*

---

[6] Additionally, the NFL Defendants generally do not distinguish between complete preemption and ordinary preemption.  *See In re Nat'l Hockey League Players' Concussion Injury Litig.*, 189 F.Supp.3d at 864–68. Complete preemption is a jurisdictionaal doctrine used to remove state claims to federal court. *Id.* at 864.  "In contrast, ordinary preemption is a federal defense that exists where a federal law has superseded a state law claim." *Id.* (internal citations removed).

[7] Notably, there is a dispositive argument against dismissal as to players Jon D. Arnett; Bernard P. Parrish; Edward Scott; Jesse D. Smith; Patrick M. Stant; George Walker; Arthur S. DeCarlo; Roosevelt Grier; Patrick J. Kelly II; Pete Lamana; and Jimmy Lesane.  Even the NFL acknowledges these Individual Plaintiffs (the players or their successors in interest) are not subject to CBAs.  Dkt. No. 8403-3, Appendix A, at 2, 6, 8-11, 13-15.  Thus, their claims are not even subject to preemption analysis.  These players' tenures with the NFL occurred before the CBAs were in effect or during the period between 1987 and 1993 when there was no contract in effect.

*Players' Concussion Injury Litig.*, 189 F. Supp. 3d at 867-883 (LMRA did not preempt

negligence, fraud, or negligent misrepresentation claims; rejecting virtually identical arguments,

in the context of professional hockey, that the NFL makes here); *Benavidez v. Sandia Nat'l Labs*,

212 F. Supp. 3d 1039 (D. N.M. 2016) (illustrating need for careful parsing of CBA language

alongside specific state law at issue and how it is proven; holding that while intentional infliction

of emotional distress claim for employee's being downgraded was preempted, that same

employee's intentional infliction claim based on the employer's belittling her for failing to pass

coursework in connection with advancement turned on whether employer's conduct was

outrageous under state law and was *not* preempted); *Oliver v. Riddell*, 2016 WL 7336412 at *3-4

(N.D. Ill. Jul. 19, 2016) (district court rejected the defense's preemption arguments because

conspiracy and fraudulent concealment had nothing to do with the CBAs);*Green v. Bimbo

Bakeries USA,* 77 F. Supp. 3d 980, 985 (N.D. Cal. 2015) (employee's misrepresentation claims

not preempted *even though oral agreement covered the same subjects as the CBA*; "whether a

right is independent of a collective bargaining agreement does not depend on whether the claim

arises from precisely the same set of facts as a potential claim pursuant to a CBA dispute

resolution process, but rather whether the legal character of the claim is such that the right exists

separate and apart from any provision in the CBA") (internal citations omitted and emphasis

added); *Green v. Pro Football, Inc.*, 31 F. Supp. 3d 716, 727 (D. Md. 2014) (football player's

battery and civil conspiracy claims not preempted; noting that "professional football players have

successfully brought suits for intentional injuries in court systems in the past, unblocked (so to

speak) by the existence of a CBA") (internal citations omitted).

  These cases—and troves of earlier ones in and out of this precise context—reflect that the

courts rolled up their sleeves and did the work, as directed by the Supreme Court and current

appellate law, of carefully examining the CBA provisions at issue (often after discovery) alongside the actual claims in the case.  *See, e.g., Brown*, 219 F. Supp. 2d at 381 (S.D.N.Y. 2002); *Green v. Pro Football,* 31 F.Supp.3d at 725-28*; see* Section (D), below.

The cases the NFL Defendants rely on through their brief are generally distinguishable, if not irrelevant, for one or more reasons: (a) the plaintiff brought claims expressly relying on a CBA provision or claims implicating the union's representation, (b) the case is post-discovery or in a remand posture (in that the defendant had used section 301 preemption as the basis for removal and questions over the court's subject matter jurisdiction, implicating jurisdiction-related discovery, were at issue), or (c) the plaintiff had effectively turned a contract claim into a negligence claim, typically without even alleging intentional tortious conduct. These cases are discussed throughout.

Where, as here, the claims are not based on the CBAs, preemption is inappropriate.  *Cf. Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) (relied on by the NFL) (employee's claim for bad-faith handling under the disability plan included in the CBA, from which the employee had applied for and been approved for benefits, preempted, to preserve goal of uniform interpretation of labor contract's terms); *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999) (same) (the misrepresentation related to the question of whether the purported CBA was binding and the tortious interference claim related to an attempt to deprive the employees of their benefits in the employment agreement).

### 1.  Threshold issue:  the NFL Defendants' failure to conduct analysis under the specific laws at issue or the CBAs purportedly at issue.

The Players make the threshold observation that the NFL did not conduct *any* Plaintiff-specific analysis under the laws that they will likely argue to govern the Players' claims, such as the laws of their home states (where they were injured), instead simply and tactically reserving

"all [their] rights and arguments with respect to choice of law."  Defs. Mem. at n.12.  While

Defendants' misconduct is unlawful under the laws of any and every jurisdiction, and in fact all

states impose a duty to disclose the material information that the NFL covered-up and lied about,

the NFL's glib approach to seeking to dismiss every Player's claim for serious injuries is not

viable.[8]

 In addition, the NFL makes no effort to match Players to the relevant CBAs in their

actual analysis.  Whereas all the CBAs are inapplicable, and many contain largely similar

provisions, the NFL's over-reaching becomes relevant where, for example, the NFL seems to

want to rely heavily on language in the 2011 CBA (which presumably became operative in

2012)—though even they argue may only apply to a couple of individuals (and, of course, it is

the Player's view that none apply at all).[9]

 The NFL's imprecise approach is a basis on which to deny their motion altogether or, at

minimum, underscores that it should be dismissed as premature.  *See, e.g.*, *In Re Nat'l Hockey*

*League Players' Concussion Injury*, 189 F. Supp. 3d at 870 (discussing how the questions about

the different CBAs and their applicability, and questions about when causes of action accrued

further militated in favor of denying a motion to dismiss on the pleadings).

---

[8] For example, in various states, there may be additional arguments for rejecting LMRA preemption or whose law counsels against the need to even look at the CBAs.  Some states impose quasi-fiduciary status to certain relationships, in others, "a tortfeasor cannot shift responsibility to another party" by "contract."  *LaMeau ex rel. Crnkovich v. City of Royal Oak*, No. 289947, 2012 WL 3590043, at *4 (Mich. Ct. App. Aug. 21, 2012) (*per curiam*).

[9] According to the NFL, the only two players with actions pending in his MDL against the NFL Defendants who played on or after 2011 were not eligible members of the Settlement Class.  The NFL also purports to identify three opt outs who have not filed actions who played on or after 2011.  Dkt. No. 4303-3, Appendix A.  Thus, for example, the NFL has not shown how (for example) the 2011 CBA even colorably applies to anyone other than five people maximum.

2.      **Fraud-based claims, declaratory relief, and civil conspiracy (Counts I, V, VIII, IX, X).**

The NFL argues that the Players' fraud-based claims require interpretation of CBA provisions.  The NFL also subsumes the Players' civil conspiracy[10] and declaratory relief claims in their fraud section, but offers no specific argument as to how the conspiracy between and among Defendants or how the Players' right to declaratory relief has anything to do with any CBA, which is reason alone to reject preemption as to those claims for relief.  Even as to the fraud and misrepresentation clams, however, the NFL's arguments are incorrect.

a.      **The NFL misapprehends or misstates the elements of fraudulent concealment and non-disclosure.**

The NFL conflates misrepresentation with concealment, focusing on the duty-to-speak element that only the latter claim implicates.[11]  In any case, the NFL misstates the law of fraudulent concealment and fraud by omission/fraudulent non-disclosure in implying that only certain types of special relationships can give rise to the duty to speak.  In fact where, as here, Defendants cover-up dangerous *and material* information under circumstances giving rise to the duty to speak (including partial misstatements), there is fraud.

To be clear, the Players allege that the NFL committed fraud by failing to disclose the truth, and orchestrating an affirmative campaign of disinformation about head injuries in football.  They further make clear that the NFL's duties  to speak arise due to their: (a) "superior special knowledge, information and access to material scientific research and medical information that Plaintiffs did not have access to, and was not readily available to Plaintiffs and

---

[10] Further, in the recent opinion of *Green v. Pro Football, Inc.*, the court found the plaintiff's civil conspiracy claim not to be preempted. *See Green*, 31 F. Supp. 3d at 727.

[11] Affirmative misrepresentations can be fraudulent whether or not a duty to speak exists. *M.S. v. Cedar Bridge Military Academy*, 904 F.Supp.2d 399, 412 (M.D. Pa. 2012) ("the court may nonetheless impose liability on a defendant who assumes a duty of care by his affirmative actions"); *see also* Section 323 of the Restatement (Second) of Torts.

-24-

the general public"; (b) their having "voluntarily and gratuitously inserted themselves into the

business of studying (and subsequently rendering expert opinions about) the relationship

between repetitive head impacts in football and brain injury"; and (c) communicating with

Plaintiffs and the public "while completely omitting material information."  SAC ¶ 389 (same);

¶ 363 (negligent misrepresentation claim for relief); ¶¶ 404-414 (fraudulent concealment).

These allegations plainly give rise to the NFL's obligations to have told the truth, rather

than affirmatively hiding the truth and lying.  Even absent a fiduciary or special relationship, the

Players' allegations satisfy the requirements of each state's non-disclosure laws.  Courts examine

the facts and circumstances of a case to determine whether a duty to speak exists.  For example,

Pennsylvania law (on which the NFL heavily relies) recognizes a distinction between active

concealment and mere silence.  *See Aetna, Inc. v. Health Diagnostic Lab., Inc*., 2015 WL

9460072, at *4-5 (E.D. Pa.  Dec. 28, 2105); *see also Roberts v. Estate of Barbagallio*, 531 A.2d

1125 (Pa. Super. Ct. 1987) (noting that Pennsylvania common law subsumes, and recognizes, the

tort of fraudulent concealment as stated in the Restatement (Second) of Torts ¶ 550, which

imposes liability on a party who, by concealment or other action, intentionally prevents the other

from acquiring material information).  Other states where the Players reside or played are in

accord.[12]

---

[12] Due to the NFL's refusal and/or failure to conduct any choice of law work, they fail to cite, let
along grapple with, relevant state-specific law.  To the limited extent the NFL looks at any law
regarding the substantive state-law claims themselves, they rely on completely inapposite cases
from only a couple of states that merely state the existence of a duty to disclose as an element of
fraudulent concealment or non-disclosure.  None of their authority undermines the well-
established law that the duty to speak arises in the circumstances here.  *See, e.g., Aubrey v.
Sanders*, No. 07-cv-0137, 2008 WL 4443826 (W.D. Pa. Sept. 26, 2008) (summary judgment
relating to commercial investment context); *Matlin Patterson ATA Holdings, LLC v. Fed.
Express Corp.*, 87 A.D. 3d 836 (N.Y. App. Div. 2011) (business dispute; investor did not
adequately allege special relationship between company and investor); *Manti's Transp., Inc. v.
C.T. Lines, Inc.*, 68 A.D.3d 937 (N.Y. App. Div. 2009) (summary judgment relating to

Thus, the NFL's duty to have told the truth, rather than hiding and lying about the truth is not intertwined with, and does not require interpretation of, any CBA provision.  The NFL has not identified any CBA provision requiring the National Football League (to say nothing of NFL P, where the argument is even more strained) to actually do anything with respect to concussions.  Again, the CBA provisions at issue relate to Clubs and/or active Players and/or simply mention the existence of committees or the ability to make rules, untethered to the content of any purported actual rules, let alone rules credibly requiring application here.

> **b.     The NFL misstates how the Players have alleged, and will prove, justifiable reliance.**

The NFL Defendants argue that the justifiable reliance element of fraud requires the interpretation of the CBA provisions relating to health and safety.  Yet, the fact that reliance can be inferred or demonstrated based on a variety of circumstances does not help the NFL Defendants' arguments.  The NFL is basically arguing that because people can (reasonably) rely on a number of things, the CBA *could have been* one of them. This is a sleight of hand.   The problem for the NFL is that there is no allegation or evidence that any Player *did* rely on any CBA provision, and even were it otherwise it would be arguable whether such reliance would have been reasonable *given the CBA provisions have nothing to do with the allegations in this case*.  Reasonableness as a touchstone applies to both parties.  The CBAs are not relevant to the reliance element of the fraud claims, and certainly have not been shown to be at this early juncture.

---

commercial business dispute); *Bortz v. Noon*, 729 A.D.2d 555 (Pa. 1999) (post- trial context involving circumstances under which real estate brokers are liable for agents' misrepresentations).  The NFL also relies heavily on *Atwater v. NFLPA*, 626 F.3d 1170 (11th Cir. 2010).  That case is also dramatically afield in that it involved claims against the NFL in connection with investment advice from third party financial advisors.  *Atwater* involved a CBA-mandated career-planning program, and the CBA contained a disclaimer that the players were solely responsible for their own financial affairs.

Generally, the reliance element of fraud can be inferred "from the various facts and circumstances of a case." *In re Resorts Int'l, Inc.*, 181 F.3d 505, 510 (3d Cir. 1999). Reliance on "omitted information may be presumed where such information is material." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 469 (S.D.N.Y. 2013); *see also Ochs v. Woods*, 117 N.E. 305, 306 (N.Y. 1917) ("It is incumbent upon a plaintiff in an action for deceit through false representations, to show that he was influenced by them.  It does not require very strong proof to establish it.  In most cases, it may be inferred from the circumstances attending the transaction."); *Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 817 (N.J. App. 2000) (applying "[t]he presumption or inference of reliance and causation, where omissions of material fact are common"); *Vasquez v. Superior Court*, 484 P.2d 964, 973 (Cal. 1971) (en banc) ("[I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise[.]").

Similarly, reliance may be inferred where affirmative misrepresentations—here, the NFL's campaign of deception—come from an authoritative source and/or are so pervasive that plaintiffs could not help but be exposed.  *See In re Toyota Motor Corp.*,  No. 10-02151, 2012 WL 12929769, at *20 (C.D. Cal. May 4, 2012) (applying New York law, and explaining that where a defendant "effectively controlled all the information about the transaction, . . . Plaintiffs are entitled to a presumption of reliance."); *Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 18 (N.Y. App. 1998) (same); *In re Tobacco II Cases*, 207 P.3d 20, 40-41 (Cal. 2009) (explaining that "where[] a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements"); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1069 (Fla. App. 2010) (same).

During all times relevant to this case—including but not limited to all times the Players were active players and already suffered from latent conditions caused by their playing career—the NFL Defendants' knowledge about head injuries, and the associated health risks, was vastly superior to that available to Players.  Defendant National Football League in particular operated as football's information monopoly, the entity to which Players and the public looked to for information about the safety of the game.  It created the MTBI Committee because it knew it would be self-contained, even self-protective in that statements and omissions from the NFL would be given credence by the Players and the public at large.

In addition, the information the NFL failed to disclose, even before the MTBI Committee ever existed, was undoubtedly material to a Plaintiff's decision to play football, to keep playing football, and/or to seek medical treatment for latent injuries, the only evidence of which might—*might*—have been generalized symptoms they lacked the information to know was related to their playing career.

The NFL's reliance on *Williams v. Nat'l Football League*, 582 F. 3d 863 (8th Cir. 2009) for its fraud (and, as shown in the next section, for its negligence) arguments is unavailing. *Williams* involved a steroid testing policy that was *expressly incorporated* into the CBA at issue. That alone is a dispositive difference.  Even so, however, the court there noted that the dispute stemmed from the CBA, but it reasoned that the legality of the procedures under the statutory claims would be determined based on "the facts and the procedure that the NFL actually followed with respect to its drug testing" rather than the meaning of the CBA provision itself.

*Id.* at 876; *but see id.* at 868 (under a different circuit's law, finding common-law claims preempted that required interpretation of specific policy provisions).[13]

> **c.     The NFL's specific arguments relating to reliance fail.**

The NFL's four attempts to intertwine the Players' justifiable reliance allegations with CBA provisions fail.  First, the NFL relies on the duties of Clubs and Club doctors to treat active Player's injuries and make timing decisions regarding return to play.  This imposes no obligations on the NFL, or any duties on retired Players, and they have nothing to do with the NFL's longstanding cover up of the dangers of head trauma in football.

Second, the NFL points to the existence of the Accountability and Care Committee (that was first agreed to be established in 2011) and the existence of the Joint Committee on Player Safety and Welfare, which at least one court has expressly rejected as a basis to find preemption. *See Brown*, 219 F. Supp. 2d at 386-87 ("Article XIII §1(c) of the CBA suggests that while the process of rulemaking has been bargained over and incorporated in the CBA, the content of the NFL Rules has not been made part of the CBA").  Notably, the cases the NFL relies on for its arguments about the relevance of these committees involve claims by players against the *union* and that implicate representation issues.  Defs. Mem. at 36 (citing *Smith v. Nat'l Football League Players Ass'n* 4:14-CV-1559 ERW, 2014 WL 6776306, at *1 (E.D. Mo. Dec. 2, 2014) and *Ballard v. Nat'l Football League Players Ass'n,* 123 F. Supp. 3d 1161 (E.D. Mo. 2015)).  The specific standard for the breach of the duty of fair representation claims against a union—"when

---

[13] Notably, the Court in *Nat'l Hockey League* distinguished *Williams v. Nat'l Football League* on the basis it involved active players and specific CBA revisions raised by the players themselves, but also because that case "was decided after the parties had engaged in discovery and developed a factual record."  189 F. Supp. 3d at 876.

a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith"—has no application here.  *Ballard*, 123 F. Supp. 3d at 1167.[14]

Third, the NFL relies on its purported benefits to retired Players implemented in 2011.[15] However, this is outside the four corners of the Complaint, and should not be considered by the Court without discovery.  Even if the Court considers this language (and assumes that it is applicable in any CBA at issue), the NFL again misses the central question presented.  This is a remedial provision and an insurance benefit that has nothing to do with the liability-creating conduct in the first place.  As stated earlier, there is no preemption "even if dispute resolution pursuant to a [CBA]" and "state law . . . would require addressing precisely the same set of facts."  *Lingle*, 486 U.S. at 409-10; *see also Livadas*, 512 U.S. at 125 (holding that a CBA's relevance to "damages computation" does not justify § 301 preemption).

Finally, and somewhat shockingly, the NFL attempts to blame the Players for not knowing the material information about the hidden dangers of football that the NFL callously profited from—and carefully hid from the retired Players and everyone else.  The NFL presumably makes this argument because, in the *Atwater* case, the court found it relevant that the CBAs put duties on the Players to take care of their own personal finances.

However, in suggesting that Players were responsible for their own health, the NFL ignores that the CBAs did not impose duties on the Players to conduct research about long-term neurological damage or uncover the sham science, and in fact the CBAs did not put health

---

[14] The duty of fair representation claims implicated the complete preemption portion of the LMRA.  The plaintiffs in these cases also argued that the union had duties outside of the CBAs, thus resulting in the sort of preemption analysis at issue here.  However, in those cases, the court found that the CBAs did require interpretation, given the union was the defendant.

[15] The NFL may argue that regardless of when a provision was implemented, it should govern.  However if that were the case, a party could try to evade its common-law obligations by creating a last-minute contract.  Of course, the law of preemption allows no such behavior.  Even when there is subject matter overlap, it is the nature of the claim that is examined.

obligations on the Players.   In this argument, the NFL Defendants try to have it both ways.  On

the one hand, they cite the CBA provisions that require Club medical personnel to comply with

all rules and codes that govern medical professionals.  One is fairly sure that such codes do not

put health care obligations on patients.

Thus, there is no basis to find that any fraud-based claim is preempted: the core issues of

Defendants' knowledge, intent, and the impact of their conduct on Players do not require

application of the CBAs.  *See Duncan v. Icenogle*, 873 F. Supp. 579, 584 (M.D. Ala. 1994)

(rejecting preemption of fraudulent inducement case because plaintiff's claim "focuses on the

conduct of the defendants and not the CBA," and it "centers on the knowledge and intentions of

the employer and not on the construction of the CBA").

### 3.  Negligence-based claims (Counts II-VII)[16]

The Players' negligence claims likewise will not require this Court to interpret any CBA

provision.  The NFL, like "every person in society, has a social duty to take thought and have a

care lest his action result in injuries to others." *Prost v. Caldwell Store, Inc.*, 187 A.2d 273, 276

(Pa. 1963) (internal quotations and citations omitted).  That duty stems from the NFL's historical

actions and statements, and voluntary duties it (generally more recently) assumed, not the CBAs.

*See* Section II(A),(B).  *See also, e.g., Brown*, 219 F. Supp. 2d at 383-386 (preemption

inappropriate notwithstanding the NFL's argument that it didn't owe duties apart from contract).

In arguing for preemption, the NFL points to the same CBA provisions it relies on

throughout its brief  (those that impose duties on Clubs and Club doctors, involve active rather

than retired Players, and that speak generally to rule-making capabilities unconnected to any

rules actually made), and makes the same failed arguments about them.  It also makes some

---

[16] Count IV is a negligence claim against Defendant NFL P alone. Specific additional arguments
relating to NFL P are in Section IV(C) below.

arguments unique to common-law negligence, and relies in particular on a series of inapplicable cases. These are addressed here:

> **a.** **The Players' negligence claims do not require interpretation of CBA provisions governing Clubs and Club doctors.**

Here, as throughout its brief, the NFL cites provisions imposing health-related duties on individual Clubs and Club doctors, maintaining that those provisions are needed to determine the health-related duties owed by the NFL Defendants. Defs. Mem. at 23. This is not a bona fide interpretive dispute over any actual CBA provision; it is an attempt to foist responsibility onto other parties. It is simply incorrect for the NFL to argue as a basis for full dismissal of claims at the pleading stage that the Club's duties under the CBAs affected—or under some far-fetched and entirely counterfactual scenarios could have affected—the NFL's independent duties. "It is no defense" to an alleged breach of common-law tort duties that "a similar duty rested upon another person." 57A Am. Jur. 2d Negligence § 80; *see also Dougherty v. Hooker Chem. Corp.*, 540 F.2d 174, 178 (3d Cir. 1976).

If it were otherwise, as then-Judge Stephen Breyer observed, individual responsibility would "diminish . . . in direct proportion to" the number of wrongdoers involved. *Lyon v. Ranger III*, 858 F.2d 22, 25-26 (1st Cir. 1988). Thus, the common law calibrates a party's duty to another person by analyzing their "relationship" to that person; the "utility" of their conduct; their ability to "foresee[]" relevant risks; the "consequences of imposing [a] duty"; and the "overall public interest." *R.W. v. Manzek*, 888 A.2d 740, 746-47 (Pa. 2005) (internal quotations omitted). None of those factors depends on the legal duties of third parties.

This is especially so here, given the NFL's conduct in deceiving *everyone* involved, and because the NFL held itself out as a protector of Player safety well before the inception of the

first CBA in 1968.[17]  SAC ¶¶ 51, 93;  *see Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1366-67 (3d Cir. 1993) (college's "special relationship" to lacrosse Player supported duty of care under Pennsylvania law).  The NFL's duty was non-delegable:  the NFL "cannot avoid responsibility for its faithful discharge by contracting with another for its performance."  57A Am. Jur. 2d *Negligence* § 80; *accord* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 71, at 512 (5th ed. 1984) (recognizing a class of "duties" reflecting a "responsibility . . . so important to the community" that a party "should not be permitted to transfer [them] to another").

The NFL fares no better when it goes so far as to imply that whether it owes duties *at all*, as distinct from what amounts to the allocation of fault for any breach of duty, depends on the CBAs. Their duties pre-dated and existed independently of the CBAs, and were voluntarily assumed.  *See* 57A Am. Jur. 2d *Negligence* § 80 (noting that "[o]ne upon whom the law devolves a duty cannot shift it to another, so as to exonerate himself or herself from the consequence of its nonperformance").[18]

The duties of Clubs and Club doctors, who focused on individual return-to-play decisions, are not comparable to those of the Defendants.  The NFL's abnegation of their duty means that no one did, in fact, warn the Players of the risks.  This is another basis to dispose of Defendants' arguments relating to Clubs and Doctors. *See* Defs. Mem. at 24. In other words, whatever Clubs' and doctors' duties under the CBAs, Defendants in fact failed to warn Players about the dangers of playing with concussive and sub-concussive injuries. SAC ¶¶ 52-54.  The

---

[17] Further, the NFL alone had the capacity to address football-related head injuries *systematically*.

[18] It is unclear whether the NFL is going so far as to suggest that the Players waived any rights they had.  There is no suggestion in the SAC (or even in the NFL's premature factual proffer, i.e., their opposition brief) to suggest that any waiver, a factual or quasi-factual question, has been effectuated.

NFL knowingly abetted that failure, by insisting publicly that head trauma carried few long-term risks. *Id.*

The NFL cannot escape liability by relying on theoretical CBA duties that it knew to be unfulfilled. *See* Restatement (Third) of Torts: Liability For Physical and Emotional Harm § 19 (2010) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of . . . a third party."). The nature of those CBA duties is therefore irrelevant; evaluating Players' claims will require this Court to "compare the procedures" that were "actually followed" with "common-law requirements." *Jurevicius v. Cleveland Browns Football Co.*, No. 1:09 CV 1803, 2010 WL 8461220, at *13 (N.D. Ohio Mar. 31, 2010) (emphasis added).

The CBA provisions cited by the NFL demonstrate that point. The NFL argues that its duty to warn might be diminished if "Club trainers received instruction on the risks of repetitive head impacts" as part of their CBA-mandated certifications. Defs. Mem. at 25. This raises factual questions that turn on "the facts and the procedure[s] . . . actually followed," not the hypothetical procedures theoretically required under the CBAs. *Williams v. Nat'l Football League*, 582 F.3d 863, 876 (8th Cir. 2009), *cert. denied*, 131 S. Ct. 566 (2010). Evaluating those procedures requires this Court to look at historical events, not at the meaning of the CBAs. *See Kline*, 386 F.3d at 257 ("fact that a [CBA]" is "part of the context" in which a claim arises does not support § 301 preemption).

The NFL also invokes (Defs. Mem. at 23) CBA provisions requiring Club medical staff to advise Players about injuries "that could be significantly aggravated by continued performance," and to determine recovery time. But these retired Players' claims do not require interpretation of those provisions. At most, resolving Players' claims may implicate factual

-34-

questions about the degree to which doctors actually advised Players about neurological risk and the nature of the "medical standards" actually employed in making return-to-play decisions. This does not require CBA interpretation. *See Hendy v. Losse*, No. 89-55430, 1991 WL 17230, at *2 (9th Cir. Feb. 12, 1991) (judgment noted at 925 F.2d 1470) (claim that team negligently hired a doctor not preempted because Player's claim did not turn on whether "he was contractually entitled" to better treatment).

Overall, the provisions relating to Clubs and Club doctors do not implicate the CBAs (and certainly to not warrant deciding fact questions in the Defendants' favor) for various reasons, including the NFL's voluntary undertakings,[19] the fact questions about any warning that occurred, and the principles of the law of negligence that hold that certain duties are non-delegable and/or are not fully discharged by the involvement of others.

> **b.      The Players' negligence claims do not become preempted because of the existence of committees in the abstract.**

The NFL's other arguments fare no better.   One of its boldest arguments—it  the Players understand it correctly (Defs. Mem. at 28)—is that because the NFL created the *MTBI* committee (which was *not* mentioned in the CBAs), and because separate committees were referenced in the CBAs, therefore, the NFL was involved in committees referenced in CBAs, or must depend on them and therefore, any claim having to do with the negligent staffing and retention of those experts is preempted.   First, the shared nomenclature of "committee" does not mean that committees that exist totally outside the CBAs become part of or require interpretation of the

---

[19] The NFL's "undertaking" gave rise to a duty for it "to exercise reasonable care" in educating Players about neurological risk.  *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (quoting Restatement (Second) Of Torts § 323 (1965)).  That duty was extrinsic to the other aspects of the parties' relationship: its scope was "measured" not by the CBAs' default allocation of responsibility, but "by the scope of [the NFL's] undertaking."  *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982).

CBAs.  In any event, the negligent hiring and training claims have nothing to do with any subject in any CBA, as the CBAs do not impose duties on the NFL.  And, the MTBI Committee was created and funded by NFL Charities, not a party to any CBA. *See* SAC ¶ 56.

Furthermore, the NFL's arguments regarding the committees rest on the same fallacy as the other ones:  that the ability to spin a scenario where a CBA may be relevant means the Players' claims can be entirely dismissed at the pleadings.  It does not matter what the committees could have done in a counterfactual universe where they could have collaborated, what we know is that there are no allegations about the relationship of the MTBI Committee to any other.

The NFL also invokes the existence of the CBA-created "Joint Committee on Player Safety and Welfare", which is irrelevant for reasons stated above, and because its recommendations are non-binding.  There is no evidence any recommendations that are relevant were made that appeared in any CBA.  Other courts addressing the same issues have rejected the notion that this committee is relevant for preemption analysis. *See, e.g.,  Brown*, 219 F. Supp. 2d at 385-7 ("CBA suggests that while the process of rulemaking has been bargained over and incorporated in the [Joint Committee CBA provision], the content of the NFL Rules has not been made part of the CBA. . . . Although the process of commenting on rule changes is clearly a subject that was bargained over, this does not mean that the content of the rules themselves is incorporated into the CBA. Given the conspicuous absence from the text of the CBA of language incorporating the NFL Rules, particularly when there are provisions relating to dispute resolution that do explicitly incorporate the Constitution and Bylaws, such as the Article IV no-suit clause and the Article IX non-injury grievance provision, the NFL Rules cannot be said to be incorporated by reference into the CBA.")*, 474 F. Supp. 2d 894, 912-13 (S.D. Ohio 2007)

(holding the plaintiff's claims are not preempted because "the NFL Defendants are not members of that committee and are not required to adopt the committee's recommendations. In short, there is no need to interpret that provision, or any other, to determine whether the NFL Defendants owed [the Plaintiff] a duty to ensure that he had safe equipment, whether they breached that duty, or whether the alleged breach proximately caused his death. The Court therefore concludes that Count 4 of Plaintiff's complaint is not preempted."); *Bush v. St. Louis Regional Convention,* 2016 WL 3125869, at *4 (E.D. Mo. 2016) ("Mere reference to part of a [the Joint Committee CBA provision] is insufficient for preemption; the relevant inquiry is whether the resolution of the claim depends upon the meaning of the CBA." (citing *Williams*, 582 F.3d at 876)).

Finally, similar problems plague the reference to the Accountability and Care Committee. This committee, created sometime after 2011, is not argued to have done anything relevant, and is too little, too late, and more to the point does not require interpretation.

### c.    The NFL's primary cases do not save their flawed arguments.

Finally, the cases on which the NFL relies for its preemption argument are inapposite.

#### 1.    *Duerson* and *Maxwell* [20]

The NFL cites repeatedly to two opinions in cases that were folded into the MDL. *See Duerson v. Nat'l Football League*, No. 12 CV 2513, 2012 WL 1658353 (N.D. Ill. May 11, 2012); *Maxwell v. Nat'l Football League*, No. CV 11-08394 (C.D. Cal. Dec. 8, 2011). As an initial matter, both opinions arose in the procedural posture of denying motions to remand; neither held that the plaintiffs' claims should be dismissed. The LMRA preemption question raised in these cases was related to jurisdiction: where these claims could proceed, not whether these claims could be brought. Further, neither case addressed the legal theories on which

---

[20] Neither of these cases involved a fraud claim, making them only applicable to the negligence discussion.

Players rely.  Here, the SAC alleges historical facts showing that the NFL assumed a duty of care independent of the Clubs and doctors whose duties the CBAs govern.  *Duerson's* complaint focused instead on the general duty "to keep [players] reasonably safe."  *Duerson,* 2012 WL 1658353 at *4.

The *Maxwell* plaintiffs, on the other hand, premised one of the NFL's alleged duties on the need to collaborate with Club doctors to make medical diagnoses.  The court viewed that theory as requiring the "physician provisions of the CBA [to] be taken into account."  *Maxwell* at 2.  And, because the court was faced with a motion to remand, it needed to address complete preemption with respect to only that one claim.  *See id.*  The Players' allegations here are not comparable:  unlike the plaintiffs in *Duerson* and *Maxwell*, Players rely on negligence and fraud theories that simply do not implicate the legal duties of Clubs and doctors.  This Court should not hold the Players' claims in the SAC preempted based on these cases.  *See Glatts v. Crozer-Keystone Health Sys.*, 645 F. Supp. 2d 446, 451 n.6 (E.D. Pa. 2009) (noting that § 301 preemption must rest not on "broad proposition[s]" but on "case-by-case" analysis) (internal quotations omitted).

In any event, to the extent that *Duerson* and *Maxwell* support the NFL's argument, this Court should decline to follow them.  As Players have explained, both decisions rested on the same faulty premise as the NFL's arguments here: that the NFL's common-law duties depended on the separate duties of Clubs and doctors under the CBAs.  That premise is unwarranted, rests on speculation the courts in those cases should have rejected, and whose implausibility is manifest in Defendants' use of these cases in this motion.  Dr. Mem. at 24 (speculating, notwithstanding absence of support in the language of the CBAs, that *mayb*e the NFL relied on

duties that others had, and maybe the CBA language about active Player health could be liberally and creatively read to imply an ongoing duty by the Clubs to Players later on).

> 2. *Stringer*

The NFL's reliance on *Stringer v. Nat'l Football League* is similarly misplaced. *Stringer* undermines their preemption defense as to Players' claims that the NFL failed to adopt equipment standards reasonably adapted to minimize head trauma in football.  As to other aspects of the opinion, any superficial similarities do not justify preemption here. In *Stringer*, and unlike here, the plaintiffs expressly tied the NFL's duty to those of team trainers by alleging that "'[a]thletic trainers . . . serve as the first line of treatment for . . . heat-related illness.'" *Stringer*, 474 F. Supp. 2d at 910).  That allegation—and its dependence on CBA provisions governing trainers—led the *Stringer* court to find preemption.  *See id.* at 910-11.

Players here allege the opposite: that the NFL had an independent duty unconnected to those of doctors and trainers.    Unlike the acute heat stroke that the player in *Stringer* suffered, neurodegenerative disorders develop gradually and often result from initially asymptomatic sub-concussive impacts.  SAC ¶¶ 8, 22.  Individual trainers were not treating such long-term injuries, and were not situationally able to be a buttress against their development.  The common law places an independent duty to address those injuries on the Defendants.  And, unlike in *Stringer*, that duty does not depend on the legal meaning ascribed to the CBA provisions governing athletic trainers.[21] Because of the type and nature of duties the NFL has and that it has assumed, the claims are not preempted.

---

[21] The NFL also relies on *Williams v. Nat'l Football League*, 582 F.3d 863, 876 (8th Cir. 2009), *cert. denied*, 131 S. Ct. 566 (2010) and *Ballard v. Nat'l Football League Players Ass'n,* 123 F. Supp. 3d 1161 (E.D. Mo. 2015)*,* which the Players address elsewhere. *Smith v. Houston Oilers, Inc.*, 87 F.3d 717 was appropriately distinguished in the *Green v. Pro Football, Inc.*, 31 F. Supp. 3d 716, 727 (D. Md. 2014) matter as, among other things, being against a party to the CBA that

### 4.      Wrongful death, survival, and loss of consortium claims  (Counts XI, XII, XIII).

Finally, the NFL Defendants effectively acknowledge—as they must—that if the negligence claims are not preempted (and they are not), then neither are the Players' claims for wrongful death, survival, and loss of consortium.  Defs. Mem. at 31.  The NFL offers no independent argument for the preemption of these claims, and none exists.

### B.      Plaintiffs' Claims Do Not "Arise" Under the CBAs.

The NFL's argument that the Players' claims "arise under" the CBAs is a re-cast of their argument that the Players' claims implicate or are intertwined with specific CBA provisions, and fails for the same reasons, as well as others.  The SAC neither cites any CBA provision nor alleges that the NFL possessed *contractual* duties regarding Player health and safety, and the NFL has not identified any CBA provisions imposing such duties.  Instead, the NFL's voluntary assumption of certain duties outside of and irrelevant to the CBAs, as well as its general obligation to comply with the common law that prohibits fraudulent and negligent conduct in every state, is the basis of the claims here.

In arguing otherwise, as an initial matter, the NFL fails to cite to the correct standard. The Supreme Court has explained that "as long as the state-law claim can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the [CBA] for § 301 pre-emption purposes."  *Lingle*, 486 U.S. at 410; *see id.* at 410 n.10 (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987)).  Thus "a plaintiff may bring a state law tort action . . . so long as the state claim does not require interpretation of the [CBA]."  *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 229 (3d Cir. 1995).  In other words, in the Third Circuit  "the preemption of state law

---

had duties under the CBA.  The NFL's other cases also involved direct CBA obligations, e.g., trainers' alleged refusal to disclose a known injuries or refusing to share x-ray results.  *See Sherwin v. Indianapolis Colts., Inc.*, 752 F. Supp. 1172, 1174-78 (N.D.N.Y. 1990) and *Givens v. Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990-91 (M.D. Tenn. 2010).

engendered by section 301 is only occasioned when the claim raised on the face of the complaint substantially depends on interpretation" of a CBA.  *Berda*, 881 F.2d at 24.  The NFL does not identify how, given the Players' claims do not require analysis of the CBAs' actual provisions, the CBAs nonetheless preempt the claims by dint of their mere existence.  In attempting to draw a distinction between claims requiring interpretation of CBA provisions and claims generally arising under the CBAs, the NFL falls back on *referencing the same CBA provisions as in its earlier arguments*.  Defs. Mem. at 38-40.

The NFL focuses largely on general rule-making provisions in certain of the CBAs. They do so presumably to suggest that such rule-making potential means the NFL *could have been* differently involved—namely, involved at all—in the CBAs, and that the CBAs *could have had* different requirements and obligations.  This is about as powerful as the argument that the NFL could have warned the Club doctors about the dangers but didn't: not powerful at all, perhaps even Monday morning quarterbacking.  The CBAs did not in fact set forth Defendants' duties as to health and safety, especially as material to the retired Players in this case.

The NFL's argument that the Players' claims are preempted as arising out of the CBAs is unsupported.  In one case cited by the NFL, *Brown v. NFL*, the court found no preemption.  *See Brown v. Nat'l Football League*, 219 F. Supp. 2d 372, 381 (S.D.N.Y. 2002). In *Stringer*, 474 F. Supp. 2d 894, also cited by the NFL, the court held that certain claims against the NFL were not preempted.  Other cases contained unremarkable holdings finding preemption in cases based "squarely on the terms of the" CBAs at issue.  *Antol v. Esposto*, 100 F.3d 1111, 1117 (3d Cir. 1996); *see also, e.g., Peek v. Philadelphia  Coca-Cola Bottling Co.,* No. 97-3372, 1997 WL 399379, at *5 (E.D. Pa. July 16, 1997) (slander claim preempted because it concerned statements made during an "investigation and subsequent grievance and arbitration proceeding[]" conducted

-41-

under the CBA).  While there may exist scenarios where LMRA preemption applies on the basis of a claim "arising under" a CBA, even if not requiring interpretation or application of a CBA, this is not that case.

In addition, and more fundamentally, the NFL's argument that the only source of the NFL's duties to Players (notwithstanding the general absence of specific obligations on the NFL in the CBAs) could be from the CBAs misapplies the law of negligence and fraud.  The NFL argues that it doesn't owe duties to literally everyone in the world, so therefore that the only way it could owe duties to *some* people in the world, namely football Players, is via contract.  Defs. Mem. at 39 (citing *United Steelworkers of Am. v. Rawson,* 495 U.S. 362 (1990)).    Not so.

If you negligently run over someone with your car, you may well be liable to them, and it is no defense to say that you never expressly assumed a duty to them or that it isn't your job to ensure the safety of every pedestrian on the planet.  Further, if by tragic and ironic coincidence the victim was your kid's driving teacher, with whom you had a contract for services, it is irrelevant.  Negligence is situational and does require an explicit assumption by the defendant of an express duty to each of the billions of people on the planet.

Thus, while the NFL's misconduct directed toward the general public, and to football Players before they were playing professional football, is relevant, the case does not turn on or require this aspect of the misconduct.  Nor is it relevant that the NFL was not involved in promulgating safety rules for everyone in the world.  *See Brown*, 219 F. Supp. 2d at 385 (that the nature of duties owed to everyone may differ from those owed to the plaintiff does not itself make a plaintiffs' claim preempted:  while "it would appear that the duty owed by the NFL . . . to players such as [plaintiff] is not quite the same as that owed to" others, namely, those to whom only the "general duty of reasonable care" is owed, this does not resolve the question of

-42-

preemption).  The NFL's negligence and fraud turns on their assumption of duties, their superior

knowledge, and their cover-up and misrepresentations to the Players.

Unsurprisingly, past case law has disposed of the NFL's argument.  As the *Stringer* court

observed, the "complaint in *Rawson* specifically referred to the [CBA] as the source of the duty

that was breached."  *Stringer*, 474 F. Supp. 2d at 907.  The Third Circuit has likewise

distinguished *Rawson* on similar grounds.  *See Kline*, 386 F.3d at 261 (noting that the *Rawson*

"plaintiffs' pleadings indicated that the duty of care relied on . . . was one allegedly assumed by

the union in a [CBA]").  Accordingly, *Rawson* is inapplicable because the SAC does not rely on

the CBAs as the source of the NFL's alleged duties.  The claims here do not arise under any

CBA.

### C.    The Players' Claims Against Defendant NFL Properties, LLC Are Not Preempted.

The NFL's arguments that the Players' claims against NFL Properties, LLC ("NFL P")

are preempted are wrong.  The NFL misstates or ignores the specific allegations in the SAC

relating to the NFL P.  These allegations are not only clear (and adequate) for purposes of

pleading under the Federal Rules of Civil Procedure, but they confirm why there is no

preemption.  Plaintiff's "Negligence Summary Table" describes how the NFL P "negligently

licensed protective equipment as the official helmet of the NFL with the knowledge these

helmets could not protect against subclinical or MTBIs."  *See* SAC 5 and 6; *see also id.* ¶¶ 141-

157 (describing in detail the NFL P and Riddell Agreement); Rule 9b Summary Table, *id.* 7-8

(listing what NFL P knew and when); Conspiracy Summary Table, *id.* 13-14.   Further, the claims

for relief detail the claims the Players are bringing specifically against the NFL P, including

specific claims for negligence.

In light of these allegations, the lack of preemption is clear:  NFL P knew about the risks of professional football and hid them, choosing instead to enter into a self-serving and profitable agreement that exacerbated the cover-up.  Even one of the chief cases on which the NFL relies, *Stringer v. Nat'l Football League*, held that negligence claims based on the duty to ensure safe equipment were not preempted.  *Stringer,* 474 F. Supp. 2d 894. In arguing that *Stringer* was wrongly decided as to this point, the NFL simply repeats its failed argument that subject matter overlap, without more, gives rise to preemption.  It does not.

### D.    Plaintiffs' Estoppel Allegations Have Merit.

The NFL argues that the Players' estoppel allegations arising out of the *Henderson*[22] and *Sampson*[23] decisions have no merit.  Yet the gist of the NFL Defendants' arguments against estoppel requires them to jettison positions they take in the rest of their brief and, notably, to rely on the distinction between the NFL and the Clubs that they otherwise try to collapse.  Defs. Mem. at 45.[24]  Thus, even if this Court stops short of finding that the NFL is estopped from making their preemption arguments (and it should not do so, as the NFL should not be rewarded for its contradictory positions), at the very minimum these decisions undercut the NFL's substantive positions.

In *Henderson*, a player suffered an injury during play, the team's doctor allegedly mistreated the player's injury, and the team refused to pay injury protection benefit.  *Henderson* at 2-3.  The player filed a grievance against his team for denial of injury protection benefit and

---

[22] *Nat'l Football League Mgmt. Council & Miami Dolphins* v. *Nat'l Football League Players' Ass'n & Henderson* (Jan. 22, 1988), Defs. Mot.,  Ex.15.

[23] *Nat'l Football League Players' Ass'n ex rel. Sampson* v. *Nat'l Football League Mgmt. Council ex rel. Houston Oilers* (July 28, 1988), Defs. Mot., Ex. 16.

[24] The NFL argues that *Henderson* and *Sampson* are against the weight of authority of the law of LMRA preemption, but, as the Players demonstrate in Sections IV(A) and (B), the NFL ignores much of the relevant authority, and relies mostly on cases where (unlike here) actual provisions of a CBA are at issue, or where a factual record had been developed.

-44-

negligence under Florida law based on the team doctor's mistreatment.  *Id.* at 7, 11.  The NFL, on behalf of the team, successfully argued that the "negligence [claim] warranting damages under Florida law is . . . not properly addressed in [a CBA arbitration proceeding]."  *Id.* at 17.

In *Sampson*, a player suffered an injury on the field and filed a grievance against his team for the remaining salary in his contract.  *Sampson* at 4.  In addition to the negligence claims, the player sought punitive damages for alleged mistreatment that the doctors provided for his injury.  *Id.* at 1-2.  With regard to the negligence claim, the NFL argued that this claim was not able to be arbitrated under the CBA.  *Id.* at 15.  The arbitrator agreed and found that "whether such an action would involve misdiagnosis or malpractice, the fact remains that the claim is not in this case properly within the scope of the [CBA]."  *Id.* at 19.

Taken together, these decisions show that the preemptive force of the CBAs is far more precise than the NFL argues here and is not amenable to the shotgun approach they advocate, even in situations where (as in those cases) the CBAs were squarely at issue in that players had sought benefits or remedies under or involving them.  It is the nature of the properly-understood claim that matters.

The NFL argues that judicial estoppel and issue preclusion (collateral estoppel)[25] are not warranted because of the absence of identity of issues and because the determinations were not

---

[25] Judicial estoppel "preclude[s] a party from assuming a position in a legal proceeding inconsistent with one previously asserted."  *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988).  "[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003).  Under collateral estoppel (commonly known as issue preclusion), "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Rider v. Com. of Pa.*, 850 F.2d 982, 989 (3d Cir. 1988).

critical.  *See Rider*, 850 F.2d at 989–90 (noting that issue preclusion requires identify of issues as the existence of a full and fair [26] opportunity to litigate among its four requirements).

Yet both *Henderson* and *Sampson* decided the issue raised here—whether state-law personal injury claims are arbitrable under the CBA.  In both decisions, the plaintiffs alleged claims against their respective teams under state law.  In both decisions, the NFL argued for, and the arbitrators found, that a claim that "constituted negligence under [state] law is . . . a question not properly addressed in this forum."  *Henderson* at 17; see also *Sampson* at 19 ("whether such an action would involve misdiagnosis or malpractice . . . such a claim . . . is not properly addressed in the forum of this Collective Bargaining Agreement").

The NFL attempts to distinguish *Sampson* on the basis it involved a third-party doctors, while the doctor in *Henderson* was employed by the team, and the NFL also successfully argued there that the state law tort claims there were not subject to the CBA.  Given this, the NFL's reliance on *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172 (N.D.N.Y. 1990), is particularly unavailing, as *Sherwin* did not appear to advert to the fact that the doctor in *Henderson* was an employee of the team.  *Cf. Bentley v. Cleveland Browns Football Co.*, 194 Ohio App. 3d 826, 832 (Ohio Ct. App. 2011) (distinguishing *Sherwin*; finding that state law tort claims like "fraud and negligent misrepresentation do not implicate the CBA"); *Tynes v. Buccaneers Ltd. P'ship*, 134 F.Supp.3d 1351, 1358 (M.D. Fla. 2015) (plaintiff's personal injury "claims neither arise from the CBA nor does their resolution depend upon the meaning of any provision of the CBA"); *Jurevicius*, 2010 WL 8461220, at *12–*14 (granting a motion to

---

[26] To the extent the NFL argues it didn't address certain issues in these arbitrations, it does not explain either why it could not have, or why the omission matters for the specific and narrow purpose for which the Players are arguing for estoppel.

remand for negligence and negligent misrepresentation claims because they do not arise out of the CBA).

Finally, the NFL relies on *Zinman v. Prudential Ins. Co. of Am.* for its argument that the *Henderson* and *Sampson* opinions on the state law tort issue were incidental and not essential to the prior judgment. 909 F. Supp. 279, 282 (E.D. Pa. 1995). This is misplaced. In *Zinman*, the defendant challenged the plaintiff's right to a jury trial, and the plaintiff claimed collateral estoppel based on a previous decision denying the defendant's challenge. *Id.* at 281-82. The court rejected the collateral estoppel argument there, noting that "[t]he decision that plaintiff was entitled to a jury trial was incidental to any judgment of the court. It does not go to the merits of the case . . . ." *Id.* at 282. Here, argument that state-law tort claims are not subject to the CBA was one of the NFL's *substantive* defenses in *Sampson* and *Henderson,* and one that the arbitrators accepted. Finally, alternative holdings can have preclusive effect. *See, e.g.*, *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 255 (3d Cir. 2006) ("[I]ndependently sufficient alternative findings should be given preclusive effect."). The NFL's attempt to have it both ways should be rejected.

E.     **The Players' Claims Are Not Subject to Arbitration.**

The NFL Defendants have not moved to compel arbitration.     However, given the NFL's discussion of the arbitration provisions, the Players note in response that the grievance procedures the NFL cites for the post-1977 period are inapplicable. The grievance procedures are tied to specific CBA *provisions*.[27] Defs. Mem. at 11 (citing requirements for arbitration for "the interpretation of, application of, or compliance with" any CBA provision). The Players have shown that adjudication of their claims does not require complying, interpreting, or

---

[27] The NFL also references player contracts, which are not at issue, and the NFL Constitutions, which the NFL only references a couple of times, citing immaterial provisions.

applying CBA provisions.  Because LMRA preemption "does not disable state courts from interpreting the terms of [CBAs] in resolving non-pre-empted claims," and the claims before this Court are not preempted, arbitration is not an issue.  *Livadas*, 512 U.S. at 123 n.17.

The Players also observe that the NFL is trying to have it both ways for apparently tactical reasons.  If, as the NFL argues, the Players' claims are simply claims under the CBA, no different from a situation where (for example) there is a dispute over a fine levied on a player for showing up late, or ingesting anabolic steroids, then there is the question of why the NFL did not simply move to compel arbitration.  *See Chassen v. Fidelity Nat'l Fin., Inc.*, 836 F.3d 291 (3d Cir. 2016) (confirming the right to seek access to the arbitral forum can be waived and listing factors pertinent to the consideration of waiver).

If, on the other hand, preemption is inapplicable, there is no basis to consider arbitration—now or later.  Should the NFL lose this motion and still attempt to invoke arbitration, their heads-we-win-tails-you-lose strategy will be made manifest.

The NFL appears so concerned about what discovery may show that they also did not move to seek limited discovery related to arbitration.  In any event, even in the unlikely event that some legitimate interpretive dispute over a CBA provision arose, this Court could determine at that time whether or not to refer the dispute to an arbitrator to determine issues such as waiver, or the futility of grievance procedures, *see, e.g., Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005), and the impact of expired agreements on retired Players.  *See generally Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207-08 (1991).

### F.   At Minimum, the NFL's Motion Should be Deferred Pending Discovery.

Finally, while there is more than ample basis to *deny* the NFL's motion, there is none to consider granting it—even in part—at this early stage, pre-discovery.  It is well-established that a motion to dismiss is not the "proper vehicle" for adjudicating an affirmative defense unless the

defense is "apparent on the face of the complaint." *Rycoline Prods.*, 109 F.3d at 886 (internal

quotations omitted).  Even if the NFL had demonstrated that Players' claims might ultimately

implicate § 301, their argument for dismissing Players' claims now falls well short of meeting

that strict standard.

As a general matter, as also reflected in the lengthy discussion of this issue in *In re Nat'l*

*Hockey League Players' Concussion Injury Litig.*, courts have noted a "preference for allowing

fuller factual development prior to ruling on preemption" on the pleadings.  *Exal Corp. v.*

*Roeslein & Assocs., Inc.*, No. 4:12-CV-01830, 2012 WL 4754748, at *3 (N.D. Ohio Oct. 2,

2012)).   Courts routinely deny motions to dismiss based on § 301 preemption where it is

"unclear" whether CBA interpretation will actually be required.  *DeSilva v. North Shore-Long*

*Island Jewish Health Sys., Inc.*, No. 10-cv-1341, 2012 WL 748760, at *10-11 (E.D.N.Y. Mar. 7,

2012).  If it is required, it can be addressed in context.  There is, at present, zero danger to the

principle of uniform application of labor contracts.

In other words, because the SAC does not "refer to the CBA[s]," the NFL's reliance on

them at the pleading stage is improper.  *Gray v. Keystone Steel & Wire Co.*, No. 08-1197, 2009

WL 187895, at *1 (C.D. Ill. Jan. 21, 2009).[28]  Further, the problems with the NFL's seeking a

ruling at this phase are exacerbated by the fact that the NFL relies heavily, albeit unpersuasively,

on CBA provisions applicable to active Players only on or after 2011, not the Plaintiffs here and

has not grappled with the state laws at issue.

## V.     CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.

---

[28] *See also JM Mechanical Corp. v. United States*, 716 F.2d 190, 197 (3d Cir. 1983) (reversing dismissal of claim based on "matters outside the bounds of the complaint"); *Christie v. Public Serv. Elec. & Gas Co.*, No. Civ. 04-5978, 2006 WL 462588, at *7-8 (D.N.J. Feb. 24, 2006) (declining to consider CBA on a motion to dismiss).

Dated:  December 8, 2017

Respectfully Submitted,

By: _____

Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein, LLP
Wendy R. Fleishman
Rachel Geman
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com
rgeman@lchb.com

*Lead Counsel on Behalf of Opt Outs*

Lieff Cabraser Heimann & Bernstein, LLP
Andrew R. Kaufman
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219
Telephone:  (615) 313-9000
Facsimile:   (615) 313-9965
akaufman@lchb.com

1464535.8

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE RETIRED PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>**All Actions** | Hon. Anita B. Brody |

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, I caused a true and correct copy of the foregoing *Opt Out Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Master Administrative Long-Form Complaint on Pre-Emption Grounds* to be filed via CM/ECF system, in the United States District Court, Eastern District of Pennsylvania, on all parties registered for CN/ECF in this litigation dated April 26, 2017.

Dated:  December 8, 2017

Respectfully Submitted,

By: _____
    Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein, LLP
Wendy R. Fleishman
Rachel Geman
250 Hudson Street
8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com
rgeman@lchb.com

*Lead Counsel on Behalf of Opt Outs*

1464535.8