UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323<br>**Hon. Anita B. Brody** |
| Kevin Turner, et al., <br>          Plaintiffs, <br> v. <br> National Football League, et al., <br>          Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**RESPONSE OF THE LOCKS LAW FIRM TO
THE EXPERT REPORT OF PROFESSOR WILLIAM B. RUBENSTEIN**

Pursuant to the December 11, 2017 Order of the Court, Class Counsel The Locks Law Firm (LLF), through its attorney Professor Tobias Barrington Wolff, respectfully submits this response to the December 3, 2017 Expert Report of Professor William B. Rubenstein on the issue of attorney's fees.

**<u>Introduction</u>**

Professor Rubenstein has provided a thorough analysis, and LLF endorses some of his conclusions. LLF respectfully submits, however, that the Expert Report also relies on some unfounded assumptions, and the firm requests discrete modifications to its recommendations. In summary:

- LLF accepts Professor Rubenstein's recommendation on the issue of the proposed 5% set-aside. It is an improper monetary burden on the class.

- LLF accepts the reduction from 20% to 15% on its contractual contingency fee for former players whom the firm began representing after the date of preliminary approval and who do not file a pre-effective date claim, and also for former players who proceed through the Baseline Assessment Program (BAP).

- LLF requests, however, that its 20% contractual contingency fee be respected for clients whom it began representing before preliminary approval of the settlement and who sought a diagnosis through independent medical experts rather than through the BAP. For these higher-risk and more resource-intensive clients, LLF respectfully submits that a 20% contingency fee is fully justified.

LLF bases its request on the following propositions, which the firm asks that Professor Rubenstein and the Court consider when determining whether to adjust the recommendations in the Report:

- The Court's requirement that the settlement remain uncapped (a defining feature of the agreement) and the separate course of negotiations surrounding the common-benefit fees together contradict Professor Rubenstein's treatment of those fees as a tax on the recovery of each individual claimant.

- The Expert Report errs when it relies on out-of-date actuarial figures to estimate the total recovery under the settlement. Those figures are no longer current or reliable. If the total recovery for the class will have any bearing on individual contingency fees — which it should not in this case — then that figure should be projected using actual data, which are now becoming available.

- The NFL's actions have magnified by several-fold the amount of work required to advance a claim. The NFL delays, opposes, or appeals the majority of claims and awards, such that competent counsel is now vital to player recovery.

Following preliminary approval of the Settlement in 2014, LLF voluntarily reduced its contingency fees in individual contracts from 33% to 20%. In light of Professor Rubenstein's recommendations, the firm accepts a further reduction to 15% for the lower-risk, lower-effort claims identified above. But the Expert Report does not support a further reduction for clients whom the firm began representing

before preliminary approval of the Settlement and who sought a diagnosis through independent medical experts rather than through the BAP. As to those claimants, LLF respectfully requests that its contract fees of 20% be confirmed.

## The Uncapped Nature of the Settlement Contradicts Professor Rubenstein's Treatment of the Common-Benefit Fees

Months before the Court's decision to uncap the Settlement, the NFL and Class Counsel negotiated the $112.5 million figure for common-benefit fees separate and apart from the first proposal for a capped Settlement.  Co-Lead Counsel Christopher Seeger emphasized this fact in the initial fee petition submitted on February 13, 2017.  Despite the fee petition's many problems, Mr. Seeger's account of this part of the negotiation is accurate. Unlike traditional common-fund cases where the common-benefit fees are sometimes calculated as a percentage of total recovery, the NFL Parties agreed to pay $112.5 million in attorneys' fees and costs over and above the Settlement's schedule of benefits rather than charging class members for the work done for the common benefit of the class as a whole. *See* Original Settlement Agreement, § 21.1; February 13, 2017 Fee Petition at 26.

The separateness of these negotiations is reinforced by the sequence of events following the Parties' submission of the original Settlement.  After the NFL and Co-Lead Counsel agreed to a capped fund, the Court rejected their proposal and required that the recovery fund be uncapped.  When the parties returned to the negotiating table, they preserved the basic approach to the claims process, Co-Lead Counsel made concessions to the NFL that imposed additional requirements in the claims process, and the NFL agreed to eliminate the cap on the Fund.  The separately negotiated $112.5 million figure for fees and costs, however, did not change.

Professor Rubenstein's treatment of the common-benefit fees as a tax on the recovery available to each individual former player relies on the proposition that defendants may be willing to pay a certain overall sum to settle class claims without regard to how much of that sum goes to claimants and how much to class counsel. In such cases, the argument goes, any amount awarded to class counsel constitutes a *de facto* deduction from the recovery available to the class. Expert Report at 4–5 & n.11. That argument has force when defendants pay a single, lump sum to purchase total peace and common-benefit fees are taken out of that fund. *See, e.g.*, In Re *Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 3896006, at *1 (D. Minn. Aug. 21, 2008) ("[T]he total settlement fund [of $240,000,000.00] included payment for Claimants' recoveries and for common benefit attorney fees."); Expert Report, Exhibit D at D–1 & n. 4 (citing *In Re Guidant*). This is not such a case. The signature feature of this Settlement is the uncapped nature of the NFL's payment obligations to the class under a defined schedule of benefits.

Professor Rubenstein cites Judge Becker's noted decision in the General Motors fuel-tank litigation along with a more recent unpublished Third Circuit ruling in another defective automobile case. *See* In re *Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995); *Dewey v. Volkswagen Atk.*, 558 F.3d 191 (3d. Cir. 2014). These authorities do not support his conclusion. *GM Trucks* involved a coupon settlement with no real value to class members. When the Third Circuit remanded the case to the district court for further proceedings, it expressed skepticism that any class settlement was viable or that any award of attorney fees would be reasonable since "arguably, any settlement based on the

-4-

award of certificates would provide too speculative a value on which to base a fee award." *GM Trucks*, 558 F.3d at 822. The language in *GM Trucks* that Professor Rubenstein quotes is a rejection of class counsel's attempt in that case to shield their common-benefit fee from any percentage-method check in light of the evanescent value of the settlement. It does not stand for the proposition that the structure of a settlement and the actual course of negotiations between the parties are never relevant to the proper characterization of the common-benefit fee. Likewise, *Dewey v. Volkswagen* involved a settlement in which monetary awards were capped at a fixed sum of $8 million, with the balance of benefits coming from in-kind service work and preventive maintenance. *See Dewey*, 558 Fed. Appx. at 194 (describing cap on "$8 million reimbursement fund"); *id*. at 194–195 (describing in-kind benefits of settlement and modifications following remand).

The question before Professor Rubenstein was not whether the proposed award of common-benefit fees is reasonable or how it should be allocated, both of which the Court reserved to itself. Any award of common-benefit fees will be subject to a reasonableness check under Rule 23(e), which is the issue the Third Circuit addressed in *GM Trucks* and *Volkswagen*. The question here is whether and how an award of common-benefit fees might justify a cap on individual contingency contracts. Professor Rubenstein's decision to treat the total amount of the common-benefit fees as a direct tax against the recovery of class members is an error. This is not a fixed common-fund settlement, and the common-benefit fees were not negotiated as a set-off against the uncapped recovery available to class members.

### Any Estimate of the Total Recovery for the Class Should Be <br> Calculated Using Actual Data, Not Out-Of-Date Actuarial Figures

Professor Rubenstein relies on figures advanced as part of the original, capped version of the Settlement when estimating the net present value of the total recovery for all eligible former players. He refers to "the NFL's actuarial analysis as the mean of the range of confidence interval" and similar analysis advanced by Co-Lead Counsel that together estimated the net present value of the Monetary Award Fund in 2014 at between $519,400,000 and $537,000,000. W. Rubenstein Expert Report, Exhibit C, at C-2 (citing ECF No. 6168 at 51; ECF No. 6167 at 50).

If an estimate of the total size of the class recovery will have a bearing on the enforceability of individual contingency fees — which it should not in this case — then that estimate must be based on current data, not out-of-date actuarial figures. As of this filing, the NFL Concussion Settlement Website has logged $260,112,700 in obligations on 206 payable monetary awards. Approximately 1,557 claim packages have been filed, and 20,389 class members are registered. To be clear, these payable monetary awards cannot be taken as a representative sample of all remaining claims. For example, they include high-value awards to former players who have died and received a post-mortem diagnosis of CTE, a type of claim that will not be repeated in the remaining population of claimants. But these data of payable monetary awards, claims filed, and registered former players are a robust and growing dataset from which the Court can, if necessary, make actual projections.

Professor Rubenstein acknowledges in his report that "it is possible that the class may ultimately claim more" than the estimates in the early actuarial figures. Rubenstein Report at 5 n.11. Those estimates were the best information available at

the time, but they have now been superseded, and their utility was always limited. This case involves substantial personal injury claims, a difficult set of diagnostic protocols, and a population of former players who were trained throughout their careers not to admit to injury or pain. Predicting the scope of injury and the number of qualifying claimants has always been difficult.  It is perhaps for this reason the Court concluded that the early actuarial estimates gave insufficient confidence that a capped settlement "would have the funds available over its lifespan to pay all claimants" and required that the Settlement be uncapped.  Order of the Court Denying Preliminary Approval to the Original Settlement, at 11–12

LLF respectfully submits that the actuarial assessments on which Professor Rubenstein relied when setting the denominator for his calculations have been superseded by current claims administration data.  Even if an estimate of total class recovery has some bearing on a possible cap to individual contingency fees, the old Monetary Award Fund figures used in the Expert Report should not form the basis of that estimate.

### The NFL Delays, Opposes, or Appeals the Majority of Claims and Awards, Making Qualified Counsel Vital to Player Recovery

Professor Rubenstein based his 15% cap on contingency fee contracts in part on the assumption that attorneys "should be able to process their clients' claims through the settlement process without enormous time or expense expenditures." Expert Report at 22–23.  There is no empirical evidence to support that assumption, and experience has demonstrated that the contrary is true. The NFL has demanded interpretations of the Settlement Agreement that delay and obstruct claims.  Co-Lead Counsel is resisting, but the NFL now refuses to accept most interpretations of

the Agreement that would make the administration of the claims less burdensome for players. Rather than seeking to settle matters with the class, the NFL litigates claims as though they were individual lawsuits. To cite several examples:

- The NFL imposed BAP criteria on the initial review of every pre-effective date claim, even though BAP criteria do not apply to those claims.

- The NFL imposed a list of more than 100 alleged deficiencies on all pre-effective date claims that have impeded almost all dementia claims.

- The NFL will not agree to the Appeals Advisory Panel's standard of review, even though that standard is clearly set forth in section 6.4(b) of the Agreement.

- The NFL has sought audits on nearly 50% of all submitted claims, substantially delaying those claims and clogging the process so that non-audited claims are adversely affected.

- The NFL has demanded raw neuropsychological scores for 100% of the pre-effective date claims, even for testing that pre-existed the lawsuits.

- The NFL has appealed nearly 20% of the pending monetary awards granted to players, and it appears to be ramping up that effort.

For these and many other reasons, the processing of claims to date has been complex, slow, and difficult. Whether the NFL's actions are based on a legitimate concern to prevent fraudulent claims or a deliberate effort to delay and deny legitimate payment obligations, their actions impose high barriers. Without skilled counsel to navigate this minefield, the cognitively impaired player has little chance.[1]

---

[1] The NFL has a history of this kind of obstruction with disabled players. The case of "Iron Mike" Webster, for example, was the subject of an unpublished Fourth Circuit ruling that detailed the dogged refusal of the NFL Retirement and Supplemental Disability Plans to pay their obligations. Even though every examining neurologist diagnosed Webster with complete neurocognitive disability and found that his disabilities began while he was still an active player, the NFL administrator forced Webster to sue in federal court to receive full benefits. *Jani v. Bell*, 209 Fed. Appx. 305, 306–07 (4th Cir. 2006) (unpublished opinion) (concluding that "the Board

Professor Rubenstein's assumption that claimants would enjoy a streamlined process has proven to be incorrect. Rather, the process of identifying qualified experts who can provide an accurate diagnosis in a form that the claims administrator will accept and that can succeed in the face of the NFL's obstruction has required sophisticated individual representation for each former player. Very few claims have succeeded without a litigated fight over alleged deficiencies, audits, and appeals. Qualified attorneys remain vital to recovery.

### LLF Requests that its 20% Fee be Respected for its Highest-Risk and Most Resource-Intensive Clients

For the reasons described above, LLF respectfully submits that Professor Rubenstein's recommendation for a presumptive, undifferentiated cap of 15% on all contingency fee contracts is flawed. That recommendation depends on the incorrect assertion that the $112.5 million in common-benefit fees should be treated as a direct tax on player recoveries; it relies on out-of-date actuarial estimates to value the overall size of the class recovery instead of developing projections based on concrete claims administration data; and it proceeds on an assumption of smooth sailing for claimants that experience has shown to be incorrect.

LLF recognizes the imperative to ensure that former players receive the maximum compensation that is compatible with a fair recognition of the efforts of the attorneys working on their behalf. LLF therefore accepts the further reduction of its fee to 15% for lower-risk, less-resource-intensive clients. But LLF requests that its contingency fee of 20% be respected for its high-risk and resource-intensive

---

ignored the unanimous medical evidence, including that of its own expert, disregarded the conclusion of its own appointed investigator, and relied for its determination on factors disallowed by the Plan").

clients: those the firm has represented since before preliminary approval of the Settlement and who have used independent medical experts rather than the BAP.

LLF has dedicated six years to providing individual representation to nearly 1,400 former players, about 1,100 of whom remain active clients. The firm has spent thousands of hours and millions of dollars on individual clients to obtain the most qualified experts and assemble impeccable claim files, even though many may never receive a compensable diagnosis. LLF recognizes that players who became clients later in the course of these proceedings represented a lower risk and that players who employed the BAP process have required less effort. But for higher-risk, higher-effort clients, the Locks Law Firm respectfully requests that Professor Rubenstein or the Court affirm its 20% contingency fee as reasonable and valid.

                                                             Respectfully submitted,

/s/ Tobias Barrington Wolff                  /s/ Gene Locks
Tobias Barrington Wolff                     Gene Locks
Professor of Law                             David D. Langfitt
University of Pennsylvania Law School*     LOCKS LAW FIRM
3501 Sansom Street                           The Curtis Center
Philadelphia, PA 19104                     Suite 720 East
Phone: 215-898-7471                       601 Walnut Street
twolff@law.upenn.edu                     Philadelphia, PA 19106
*For identification purposes only           Phone: (215) 893-3423
                                                          Fax: (215) 893-3444
                                                          Email: glocks@lockslaw.com
                                                          dlangfitt@lockslaw.com

Dated: January 3, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing Response of The Locks Law Firm to Report of Professor William B. Rubenstein dated January 3, 2018 was served via the Electronic Filing System to all counsel of record in Case No. 2:12-md-02323-AB, MDL No. 2323.

DATE: January 3, 2018

/s/ Gene Locks
Gene Locks, Class Counsel