# EXHIBIT H

Counter-Declaration of Jason E. Luckasevic

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE; NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, | No. 2:12-MD-02323 – AB<br><br>MDL NO. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | CIVIL ACTION NO: 14-cv-0029 |

THIS DOCUMENT RELATES TO ALL ACTIONS

**COUNTER-DECLARATION OF JASON E. LUCKASEVIC
IN RESPONSE TO THE DECLARATION OF CHRISTOPHER A.
SEEGER IN SUPPORT OF PROPOSED ALLOCATION OF COMMON BENEFIT
ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND
<u>PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES</u>**

# COUNTER-DECLARATION OF JASON E. LUCKASEVIC IN RESPONSE TO THE DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES

1. My name is Jason Luckasevic and I have been an attorney since 2000. I am a Shareholder at Goldberg, Persky & White, P.C. in Pittsburgh, PA. I am frequently asked to speak and be interviewed internationally on the topic of sports-related head injuries and the origination of the lawsuit against the NFL.

2. More than a decade ago, I began researching the case that has become commonly known as the NFL Concussion litigation. My firm and I initiated the first lawsuits against the NFL for harm caused to retired players from chronic brain injuries that developed years after their careers ended as a result of years of repeated blows to the head. Along with our co-counsel, my firm and I were the first to file a lawsuit for damages on behalf of individual players. The legal strategies I developed, in consultation with lawyers at my firm in Pittsburgh and lawyers in Miami and Los Angeles that joined with us on this case, became the basis for pursuing the claims in MDL 2323 before this Court.

3. My pioneering role in the NFL litigation regarding brain injuries has been well-documented in the media. It was highlighted by award-winning journalists Mark Fainaru-Wada and Steve Fainaru in the book *League of Denial,* and in their related Frontline documentary of the same name, which won the industry's highest honor, a Peabody Award. In addition, I was the subject of Michael Sokolove's November 2014 cover story in the New York Times Magazine ("How One Lawyer's Crusade Could Change Football Forever"). Jeanne Marie Laskas, in her book *Concussion,* wrote that the family of Junior Seau, an NFL Hall of Famer, "joined the consolidated lawsuits against the NFL that had started with Luckasevic's initial filing."

1

4. I mention the above only to help establish that my firm should be fairly compensated for our leading role in this important case. That role was acknowledged by co-lead class counsel, Christopher Seeger who, when asked about me by Michael Sokolove, said: "Being the first to file is incredibly important. He took a risk." An examination of the facts leads to the conclusion that my firm is entitled to share fairly in Common Benefit funds.

5. Firms that take the risk to originate significant successful litigation like that which arose in this matter should be compensated for their actions out of a Common Benefit Fund. *See re Vioxx Products Liability Litigation*, 802 F.Supp. 2d 740, 780 (E.D.La. 2011) (noting in awarding common benefit fund fees that a firm had "been at the forefront of the Vioxx litigation since its inception in 2001", four years before the beginning of that MDL, having filed the second Vioxx case that year); *In re Cendant Corp. Securities Litigation*, 404 F.3d 173, 195 (3d Cir. 2005)(stating in relation to a securities class action that "[w]e therefore conclude that the court's involvement in the fee decision will be at its height when the fee request is for work performed before the appointment of the lead plaintiff. If an attorney creates a substantial benefit for the class in this period—*by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action*—then he or she will be entitled to compensation whether or not chosen as lead counsel.")

6. The narrative of my efforts on behalf of NFL Players begins with Dr. Bennet Omalu. Dr. Omalu, a neuropathologist, had served as an expert in my cases since the beginning of my legal career. Over the years, we gained a mutual respect for each other professionally and thereupon developed a friendship. In late 2006, Dr. Omalu came to my office in Pittsburgh to discuss an expert report that he had prepared for one of my cases as well as to pick up some pathology

2

materials on the next case that he was going to analyze. Coincidentally, there was an article in that morning's Pittsburgh Post-Gazette concerning Dr. Omalu's findings of chronic traumatic encephalopathy ("CTE") in the brain of Terry Long, a former player for the Pittsburgh Steelers.

7. Dr. Omalu was harshly criticized in the article by Dr. Elliot Pellman, the head of the NFL's Mild Traumatic Brain Injury Committee, as well as by Dr. Joseph Maroon, the team physician for the Pittsburgh Steelers. Their criticism included words such as "unscientific" and "speculative" when describing Dr. Omalu's findings of CTE in Terry Long's autopsy. I was surprised and shocked by such harsh criticism of a friend whose work I greatly respected, and whose groundbreaking research, in time, would be proven correct.

8. I told Dr. Omalu to fight back. I was concerned that the criticism could ruin his career, and the NFL players and their families deserved to know the truth. It was then that he suggested that I investigate filing a lawsuit against the NFL. The very next day Dr. Omalu began introducing me to certain well-respected members of the scientific community who were not only aware of his opinions, but supported them. He also introduced me to many former players and families who had reached out to him after reading some of the articles on his groundbreaking neuropathology discovery.

9. I began my own investigation into the science of head injuries and spoke with leaders in the field, including two doctors, Robert Cantu, M.D. and Julian Bailes, M.D., who, with Dr. Omalu, are considered pioneers in the field. I briefed myself on the research that led Dr. Omalu to conclude that football had first disabled, and then killed, Pittsburgh football legends Terry Long and Mike Webster. I conferred with Bob Fitzsimmons, a West Virginia lawyer and co-founder of the Brain Injury Research Institute, who was one of the first to contemplate the legal ramifications of football and brain injuries. My investigation involved reading and reviewing

3

scientific journals. I did a literature search of medical articles concerning sports and concussions and CTE-like conditions. I discovered nearly one hundred journal articles, many of which were cited in my original Complaint and then recopied into the Master Class Action Complaint filed by the Plaintiff's Steering Committee.

10. I reviewed the history of the NFL over its decades of existence, the formation of the league and its corporate structure, myriad injury reports, as well as rule changes and new penalties that may have been intended to reduce the occurrence of brain injuries, but failed to do so. I learned about the NFL's Mild Traumatic Brain Injury Committee, and read the articles dozens of articles it published contesting Dr. Omalu's findings.

11. I read about retired players' struggles in media reports. I studied other sports leagues, particularly the NHL and its management of concussions. I researched return-to-play guidelines that had been in existence for decades in published literature. I spoke to players, families, and widows. I ordered medical records and reviewed family histories. I even investigated other causes and sources of the neurocognitive impairments in an effort to understand all aspects of the disease.

12. I studied the issue of neurocognitive impairments intensely and became intimately familiar with the unique cognitive and behavioral symptoms surrounding CTE. I explored the issue of causation. It was always the biggest question: How can it be proven that the disease was caused from football? I also spent countless hours discussing that very issue with Dr. Omalu.

13. I then turned to conducting a legal analysis. I explored past lawsuits against the NFL. There were over 35 published cases where the NFL was sued. Most were anti-trust cases, but there were three cases that analyzed legal issues of negligence and personal injury. I reviewed

4

the materials on the dockets of those cases, reading the pleadings and orders and reviewed the evidence. I learned for the first time that the NFL routinely escaped liability due to labor preemption under the Labor Management Relations Act ("LMRA") based on its collective bargaining agreement with the players. I spent hundreds of hours determining whether there were any legal theories that would circumvent the preemption under the LMRA. I read and studied many of the past voluminous NFL collective bargaining agreements. I studied the NFL disability plan. I researched the Mike Webster case against the disability plan. I analyzed workers compensation cases to rule out the NFL as an employer.

14. During this same time period, I brought the case to the Shareholders of my firm, which for 30 years had primarily litigated asbestos cases. The Shareholders expressed hesitancy about the substantial commitment of financial and personnel resources such an undertaking would involve. Hence the members of my firm refused to take on the NFL on their own. Therefore, I made efforts to associate with other law firms in an effort to consolidate resources, however, I was met time after time with uncertainty and doubt about the massive undertaking of such a lawsuit.

15. Beginning in 2010, additional compelling scientific research was published that supported Dr. Omalu's discovery. Also more deceased players were confirmed to have CTE in their brains at autopsy.

16. At the end of 2010, we became associated with the law firm Russomanno & Borrello from Miami, FL as a litigation partner in this matter. In early 2011, our team added the California firm Girardi Keese, and we decided to file the first lawsuit against the NFL in California state court.

5

17. Before we could file the lawsuit, the NFL locked out its players in February of 2011. We continued to work on the draft Complaint and researched the issue of suing an entity when there was no active collective bargaining agreement and the players' union had been disbanded. Ultimately, we decided it was to our client's benefit to file the Complaint during the period of the lockout and while the union was disbanded. By July 19th, we had 75 clients and filed the Complaint against the NFL in *Maxwell v. NFL* in Los Angeles County Superior Court, California. This case has repeatedly been referenced by this Court and the Third Circuit Court of Appeals as the case which originated the NFL Concussion litigation. Word of the lawsuit against the NFL spread quickly as national media outlets reported on the filing and continued bringing attention to the "concussion in sports crisis." By August 3rd, our team filed suit on behalf of another 47 players, *Pear vs. NFL*.

18. Shortly thereafter, as anticipated, the NFL removed the case to Federal Court, arguing LMRA preemption. It was assigned to Judge Manuel Real, of the United States District Court of California. On December 8, 2011, Judge Real denied Plaintiffs' Motion to Remand. In fact, Judge Real compared the claims to those in *Stringer v. NFL*. In *Stringer vs. NFL*, the Court dismissed the negligence claims as to the NFL, but litigated the claim as to negligence for licensing the Riddell helmet. As an aside, the Stringer plaintiffs did not allege claims of fraud or negligence as a monopolist.

19. Shortly after Judge Real's decision, a scheduling order was issued on the briefing of the Motions to Dismiss based on preemption filed by the NFL. My office took the lead on preparing the responses with input from our co-counsel. *Maxwell* and *Pear* were scheduled for argument on the issue of legal preemption until law firms from around the country started copying our Complaints and filed claims for other retired NFL players. This resulted in the NFL requesting

6

the creation of an MDL before the Judicial Panel on Multidistrict Litigation. Ultimately, all present and future cases were assigned to this Court.

20. In support of this Counter-Declaration I have attached as Exhibits the Declarations or Affidavits of Bennet I. Omalu, M.D. (Exhibit A), Thomas V. Girardi, Esquire (Exhibit B), Robert P. Fitzsimmons, Esquire (Exhibit C), Robert A. Stein, Esquire (Exhibit D), Herman J. Russomanno, Esquire (Exhibit E), Robert Cohen, Esquire (Exhibit F), and Peter J. Paladino, Jr., Esquire (Exhibit G).

21. In his Declaration, Mr. Seeger seemingly minimizes the work of my firm detailed above in relation to this matter, relating only the following sentence: "Goldberg, Persky & White was involved in certain early cases that preceded the formation of this MDL." Declaration of Christopher A. Seeger in Support of Proposed Allocation of Common Benefit Attorneys' Fees, Payment of Common Benefit Expenses, and Payment of Case Contribution Awards to Class Representatives, ECF No. 8447, at ¶15f.

22. Moreover, Mr. Seeger recommended that Goldberg, Persky & White receive a lodestar of only "1" in relation to its MDL work.

23. Based on the information provided above, this Court should fairly award us Common Benefit funds or, in the alternative, should increase the lodestar multiplier to which Goldberg, Persky & White is entitled.

Further Affiant sayeth naught:

_____   10-26-17
Jason E. Luckasevic           (date)

Commonwealth of Pennsylvania }
}
County of Allegheny }

On this, the 26th day of October, 2017, before me, Jason E. Luckasevic, Esquire, of Goldberg, Persky & White, P.C., the undersigned, personally appeared.

Sworn to and subscribed before me
this 26th day of October, 2017

_____
Kimberly J. Siebert, Notary Public

*My commission expires:*

**COMMONWEALTH OF PENNSYLVANIA**
NOTARIAL SEAL
Kimberly J. Siebert, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires June 27, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES