# EXHIBIT I

How One Lawyer's Crusade Could Change Football Forever

**The New York Times Magazine**　　https://nyti.ms/1E7IvyY

Magazine

# How One Lawyer's Crusade Could Change Football Forever

By MICHAEL SOKOLOVE　　NOV. 6, 2014

There are 1.27 million lawyers in the United States, one for about every 300 Americans — about 400,000 more of them than there are doctors. Their work is rarely glamorous, and especially for those just starting out in the profession, it can be grinding and repetitive. Jason Luckasevic, hired out of law school in 2000 by a firm in Pittsburgh, passed the bar exam on his first try and was quickly sworn in to practice. The ceremony, such as it was, took place on a Thursday in a clerk's office, rather than in a courtroom in front of family and friends, because his bosses needed him to get started. The following Monday morning, he drove to Johnstown, about 90 minutes away, where he spent the day taking depositions from former employees of an enormous steel plant that had exposed them to asbestos. Late that afternoon, he climbed back into his Honda Civic and headed home. He repeated this routine for the next six months, five days a week, racking up some 400 depositions and about 20,000 miles on the road.

　　Luckasevic harbored no grandiose visions for himself — no ambition to clerk for a Supreme Court justice, no thought of blazing new legal ground. His father was a machinist, his mother a teller at a credit union, his godfather the president of a United Steelworkers local. "Working lawyers for working people" was the motto of Goldberg, Persky & White, the firm he joined, and it suited him just fine. "We were one of the early firms into the asbestos world," Luckasevic explained to me over breakfast not long ago. "It was difficult, but it was also great. My attitude was, I'm going to work hard, do good at this and be successful. Hopefully, I'll be like some of

the established guys in the firm and start making some nice money and have a nice vehicle."

As Luckasevic was getting started on his legal career, his older brother, Todd, was in his medical residency at the Allegheny County medical-examiner's office, working under a forensic pathologist named Bennet Omalu. The Nigerian-born doctor spent some Thanksgivings with the extended Luckasevic clan. He and the Luckasevic brothers sometimes went out for beers together or to hockey games. Luckasevic found Omalu to be good company, "an easy guy to be around, even though you could tell he was brilliant or even a genius."

In 2002, Omalu performed an autopsy on Mike Webster, a former Pittsburgh Steelers offensive lineman and a member of pro football's Hall of Fame. Webster was just 50 when he died, and he spent the last years of his life suffering from dementia, at times living in his pickup truck. When Omalu studied Webster's brain in his laboratory, he noted a degeneration of tissue and other markers of decline usually present only in people decades older or sometimes in boxers suffering from "punch drunk" syndrome. Over the next few years, he autopsied five other former N.F.L. players, none of them old, and saw the same patterns: tangled brain tissue and the accumulation of tau protein, a characteristic of Alzheimer's disease.

Omalu published his findings on Webster in 2005 in the journal Neurosurgery. He identified what he was seeing as chronic traumatic encephalopathy, or C.T.E., and suggested that football caused irreversible brain damage. The N.F.L.'s response was to attack him, and N.F.L.-affiliated doctors demanded, without success, that Neurosurgery retract the article. Later his conclusions were called "preposterous" and a "misinterpretation of the facts."

Luckasevic by this time had begun to take on other types of cases: auto accidents, slip-and-falls — the bread and butter of the plaintiffs' bar. He did not seem to be on the verge of initiating a landmark case. At first, his response to the public controversy picking up around Omalu, whom he occasionally employed as an expert witness, was just to step up and defend his friend. He remembers thinking: Why would Bennet make this stuff up. I mean, why would he? It's just not done. He worried that Omalu would pay a professional price. "It looked to me like Bennet had

raised his hand and said there's a problem we need to be aware of, and he got savaged for it."

One day as they sat together at his law office, Luckasevic told me, he asked Omalu how he was going to fight back and defend his reputation. "Bennet's response was something like: 'You're a good lawyer. You'll figure it out.' "

Luckasevic began to think about whether he could buttress Omalu's lab findings. In 2006, he had his first meetings with retired N.F.L. players, who introduced him to other players. The damage that Omalu observed when he looked at brain tissue under a microscope, Luckasevic saw in human terms. Many of the men he met suffered from headaches, memory loss, depression and sleeplessness. He went down a checklist when one of them came into his office the first time. Was the former player employed? On disability? Could he follow the conversation, or did his wife have to fill in details and answers to questions? The worst off among them seemed many years older than their chronological age.

To build a case against the N.F.L., Luckasevic knew that he first had to win the trust of the former players. They came from a distinct subculture, men who had built their lives and identities playing a violent game. They were deeply connected to one another and still invested in football — even as they came to believe they were suffering from its effects. "These guys, they have to feel they have a friendship with you before there's a business relationship," Luckasevic said. "They have to have your cellphone number. They'll keep calling and calling and calling until they get you, and you'll have a conversation, and then they'll call you back an hour later and ask the same questions and have the same conversation. It's really horrific."

In 2011, Luckasevic filed suit against the N.F.L., at first on behalf of 75 players. Among them were Mark Duper, a three-time Pro Bowl selection at wide receiver for the Miami Dolphins, and Fred McNeil, a linebacker who played a dozen seasons for the Minnesota Vikings. (McNeil became a lawyer after he retired from football, but dementia has forced him to leave the profession; an article published on the Vikings' website said that he cannot remember the scores of the Super Bowls he competed in.) Luckasevic's civil action, later joined by dozens of lawyers around the nation who brought thousands of their own clients, is now moving toward final settlement,

perhaps as soon as later this month. In September, the N.F.L. filed documents in federal court, prepared by actuaries, estimating that 28 percent of the retired players eligible for payments under the settlement will develop long-term cognitive deficiencies, many of them at "notably younger ages" than the general population. In other words, they will suffer from early-onset dementia. With that, the connection between football and brain damage was validated. There was no more denying it.

Some of Luckasevic's new N.F.L. friends have sent him signed pictures of themselves — action shots from their N.F.L. careers — because that's what former pro athletes do. The photos hang on his office wall. In a couple of them, the players are bent at the knees in an athletic crouch, with their helmets pointed straight at opposing players, just as they were taught since they first put pads on.

**The N.F.L. has been** shadowed by bad news this year. None of it seemed to be directly related to the issue of head injuries, but everything about football now looks a little different knowing what we know about the game's impact on players' brains. Two prominent N.F.L. players faced criminal charges for allegations of physical abuse of loved ones: Ray Rice, whose one-punch knockout of his fiancée inside a casino elevator in Atlantic City was seen by millions on a leaked security video; and Adrian Peterson, who was charged with beating his 4-year-old son with a "switch," or tree branch stripped of its leaves.

Other recent events below the professional level have added to football's season of troubles and to the incipient impression that there might be something defective at the core of the sport. The college game's most prominent player, the Florida State quarterback Jameis Winston, has been embroiled in multiple scandals — the most serious a rape allegation that may have been incompletely investigated. Seven high-school players in Sayreville, N.J., were criminally charged with hazing, and their team, a perennial state champion, was disbanded for the season. Over the course of a week in September and October, three high-school football players died after collapsing on the field.

For decades, the N.F.L. has been seemingly immune to bad publicity, swings in the wider economy or entertainment trends. Every addition to the increasing number of ways that Americans amuse themselves — D.V.R.s, streaming content on

computers and mobile devices and perhaps soon our watches — benefits the lords of professional football. Their game only becomes more valuable as the number of people watching TV programs in real time shrinks. The sole non-N.F.L. event on the 2013 list of the Top 10 most-watched television programs was the Academy Awards broadcast, at No. 7, between two postseason playoff games. The Oscars had 40 million viewers, the Super Bowl 108 million. N.F.L. revenue last year was about $9 billion, but the stated goal of its commissioner, Roger Goodell, in 2010 was to increase that to $25 billion by 2027.

It seemed reasonable, as the season began under a dark cloud, to ask: Could this be the moment when things turn sour for the N.F.L., the beginning of the end of its long dominance? Boxing, once hugely popular, has been pushed to the margins of American culture. Many commentators have asked whether that could happen to football. And yet, past the halfway point of the season, the game is as popular as ever. Ratings are up. The N.F.L.'s associated spinoffs, like the sale of licensed merchandise and participation in the fantasy-football phenomenon, continue to grow. The Buffalo Bills, one of the league's least valuable franchises, recently changed hands for more than $1 billion. The Dallas Cowboys are worth an estimated $3.2 billion.

But what if the template for football's future is not the fate of boxing but rather that of the tobacco industry? The parallels, of course, are not perfect. But tobacco, like football, was once deeply embedded in the American economy, culture and mythology. Its history, in fact, is inseparable from that of the nation itself. The first crop was planted by an early settler in Jamestown, John Rolfe (also known as the husband of Pocahontas), and it quickly became Virginia's largest export and a primary impetus for the growth of slavery through much of the South. Cigarette smoking surged at the beginning of the 20th century, and into the mid-1970s, about 40 percent of American adults were smokers, and they could smoke everywhere they wanted — in restaurants, on buses and airplanes, in workplaces and college classrooms, in their cars with the windows up and their children in the passenger seats.

The fight against tobacco's use has been long and has unfolded in stages, beginning with public-health warnings. A Johns Hopkins researcher reported in

1938 that smokers did not live as long as nonsmokers. A half-dozen years later, the American Society for the Control of Cancer warned that smoking might pose dangers but said "no definite evidence exists" that it caused lung cancer. In 1964, the U.S. surgeon general, Luther L. Terry, issued a landmark report. It linked smoking and cancer and set in motion decades of measures that deeply cut into smoking rates and tobacco's profits and influence, beginning, first, with Congress's passing measures that required health warnings on cigarette packages and later banning cigarette advertising on radio and TV. What came next were the lawyers, as well as more regulations and restrictions. After routinely defeating lawsuits brought by smokers (and families of deceased smokers), tobacco companies became more vulnerable. In 1998, they agreed to pay $206 billion to settle a lawsuit brought by the attorneys general of 46 states, who were seeking compensation for costs to the public related to smoking-related illnesses.

It's worth noting the year that the first tobacco manufacturer acknowledged that cigarettes cause cancer: 1997. By then smoking was already in decline. In most cases now, people can no longer smoke inside their workplaces; inside public buildings and sometimes not even near the entrances of those buildings; in public parks or on beaches; and even not in some casinos, which were just about the last refuge for smokers. Many people who might still want to smoke can't afford it: High taxes have driven the price of a pack of cigarettes above $10 in some states and above $14 in New York. About 18 percent of American adults now smoke — fewer than one in five. Tobacco's shift from integral part of American life to its fringes took about half a century.

**Luckasevic has a** round face, gentle features and big blue eyes. His tone of voice is generally soft, his manner that of a choirboy with an iron will. He was a high-school golfer who was recruited to play in college, though he decided to concentrate on academics. When he plays now with friends and places wagers, as many golfers do, he likes to multiply the stakes on the final holes. "I think I play better when I do that," he told me. He met his wife, Kelly, at Washington & Jefferson College (also Goodell's alma mater), and they overlapped as well at Duquesne's School of Law. She told me that her husband was motivated to pursue the concussions case, in large part, by anger. "What Bennet told him made him irate," she said. "He didn't understand why the N.F.L. wasn't more aggressive about protecting the players."

For lawyers who work on contingency fees, each case is a financial investment. (As the ads say, they get paid only if you do.) Luckasevic had just turned 30 when he picked up on Omalu's research and began reaching out to retired N.F.L. players. At the time he filed suit against the N.F.L. in 2011, he had just been made partner. It was an audacious act. His firm's base of business was in Western Pennsylvania, where football is sacrosanct and the Pittsburgh Steelers are beloved. From a purely legal standpoint, the case presented substantial challenges, chief among them the possibility that the collective-bargaining agreement between the league and its players might prevent the complaints from ever reaching a courtroom. All the hours he invested could have ended up being wasted. "There's a risk-reward analysis you have to do," Peter T. Paladino, the president at Goldberg, Persky & White, told me when I asked him about how Luckasevic's idea was received there. "Do we want to represent these folks? Yes, we do. But is it going to bankrupt the firm? Are we going to put ourselves in such a hole that we can't represent the interests of our other clients?"

His firm's elders did not want to challenge the N.F.L., but Luckasevic could not abide the thought that it was too big to take on. With his firm's O.K., he teamed up with prominent plaintiffs' lawyers, one in Miami and another in Los Angeles, who functioned as mentors. They signed up their own players. Luckasevic's own roster of clients grew to 535.

But the case made his wife anxious. The couple had their first daughter in 2007 and a second the following year, and she left her job to be at home with them. "I'm not a risk taker like he is," she said. "I said, 'What's this going to do to your career?' "

As lawyers from around the country signed up former players as clients, Luckasevic had to struggle to keep from being closed out by more established lawyers from bigger firms. "I've had arguments with all those guys," he said, referring to those who brought the subsequent cases. "I've said, 'If I didn't file that first lawsuit, you would never have done it.' They say, 'Oh, yeah, we would have.' . . . Nobody wanted to. Nobody wants to be the first penguin to jump in the water and get eaten."

When I spoke with Christopher Seeger, a Manhattan lawyer who is one of the two lead negotiators in settlement talks with the N.F.L., he struck a diplomatic tone when I asked about Luckasevic. "Being the first to file is incredibly important," he said. "He took a risk." Seeger said there had been other firms considering suing the league, including his own, which began looking into it in 2008.

I first met Luckasevic last February at a sports bar in North Jersey, where one of his clients, the former New York Giants defensive end Leonard Marshall, was hosting a pre-Super Bowl party. It was an odd sort of event, one designed to both celebrate the coming game and raise money and awareness for research into football-related brain damage. It brought into focus what had been one of Luckasevic's foremost challenges: overcoming his clients' feelings that they were almost suing themselves. They had played the game since boyhood and were caught up in its mythology, just like the fans. "The reason I didn't file earlier is that a lot of guys just couldn't do it," he said. "They wanted to. They knew they needed to. But they couldn't."

At the party, Marshall took a seat beside me at one point. He is a huge human being with a face the size of a dinner plate. He had expected many of his Giants teammates from two Super Bowl championship teams to attend, along with other celebrities, but almost none of them showed. Someone said Chaka Khan had passed through, but I never saw her. Marshall was clearly disappointed at the turnout, and he told me that his day had not begun well, either. "I didn't really want to get out of bed," he said. "I didn't feel good, mentally."

The essential argument of the players' claims is that a compact was broken: They understood that they were giving their bodies over to football, but they did not realize they were also putting their intellectual and emotional well-being at risk. Marshall said he had experienced headaches and depression since the end of his career. "When you get into football, you think about hurting your knees, your back, even your neck. But your brain, man, no. We didn't think about that. I didn't sign up for that."

Later I talked to another of Luckasevic's clients, Joe DeLamielleure, who played for the Buffalo Bills and Cleveland Browns in the 1970s and 1980s and was voted

into pro football's Hall of Fame in 2003. Among his symptoms, he said, are headaches, bursts of anger and 68 percent hearing loss in his left ear, which he attributes to years of right-handed defensive linemen slapping him in the head. "I lived football, I loved football," DeLamielleure said. "I can tell you the starting lineup from the Detroit Lions from 1961. I can tell you their numbers. I can tell you the colleges they attended. That's how much I loved it, but knowing what I know now, I wish I wouldn't have played. . . . I look at how I am now and I think, Is this a temporary thing or am I going to end up like Mike Webster?"

The federal judge in the concussions suit, Anita B. Brody, eased the sides into talks without ever ruling on a key legal issue: whether their collective bargaining agreement with the league prohibited players from suing for damages. If she had ruled for the players, they might have been in a position to bargain for a better settlement or perhaps to win an even bigger award from a jury. But a ruling for the league would have forced the players into mediation or arbitration and most likely only modest payouts. She may approve the settlement as soon as Nov. 19, when a hearing is scheduled in Philadelphia, and retirees who qualify could start seeing money within about 90 days, before this season concludes.

Luckasevic's initial filing charged that the N.F.L. was involved in "a scheme of fraud and deceit" by failing to warn players of the dangers they faced and by publishing research of its own that falsely minimized risks. Under the terms of the proposed settlement, the N.F.L. will compensate retired players (or their heirs) based on the severity of their impairment, sorted into such categories as "early dementia," "moderate dementia," "Alzheimer's disease," "Parkinson's disease" and "death with C.T.E." The maximum payout, for those given diagnoses of Lou Gehrig's disease, or A.L.S., is $5 million.

**The proposed settlement** has been almost universally perceived as a victory for the league. With it, the N.F.L. bought itself — cheaply, considering its $9 billion in annual revenue — a degree of short-term business certainty. It initially agreed to set aside $765 million for brain-injured players or, in the case of those who died, their heirs. After Brody, who presides over the suit, said the fund might not cover payments to all those who qualified, the league agreed to a deal with no upper limit on its liability. But because of how the settlement delineates which afflictions qualify

for financial compensation and caps the awards on what can go out to individuals, the N.F.L.'s total liability, paid out over decades, may not rise much beyond $1 billion. That's nothing for an entity as rich as the N.F.L. Goodell, the league's commissioner, made $44 million last year — or nearly nine times the maximum payment for the most severely brain-damaged N.F.L. retiree.

Luckasevic does not hide the fact that he believes his case was hijacked by more established lawyers who headed the committees that negotiated the deal. "I give them credit," he said. "I think they did what they think was right. But it's not how I would have done things." He says the settlement focuses almost solely on cognitive issues. "It's a weakness of the deal, because what happens to these guys' brains also causes changes in emotion and behavior. Mood swings, depressions. Suicidal thoughts. It's not just that you get in the car to get a loaf of bread and by the time you pull out of the driveway, you can't remember where you're going."

Given the offer that was on the table, he would have fought on to trial if necessary. But the settlement does get money into the hands of some players who need it desperately, perhaps soon. It also sets aside $112 million for lawyers, who, if the case had gone to trial, might have waited years to be paid.

Players still have the choice of "opting out" — rejecting the terms of the deal and suing the league as individuals — and at least a couple of Luckasevic's clients will be among them. The N.F.L. will have to defend or make individual settlements with plaintiffs who opt out, including some notable ones, like the family of Junior Seau, one of the best linebackers in N.F.L. history, who at age 43 died by self-inflicted gunshot and whose autopsied brain showed the markers of C.T.E. (Of the 79 brains of deceased N.F.L. players that have been studied, 76 have shown what appears to be football-related damage.) There is the possibility that Seau's family or other remaining plaintiffs could win a jury award well beyond the $5 million cap in the settlement, into the tens of millions or even more, but they will have to wait for a trial and then what is likely to be a drawn-out appeals process.

It is shortsighted, however, to assume that the N.F.L. and its owners will emerge from the settlement unscathed or that the league's economic and cultural status are not under threat. Now that the N.F.L. has acknowledged that its product comes with

dire health consequences, the sport, below the professional level, faces legal and regulatory challenges that will most likely intensify in the coming years. California recently passed a law barring state middle-school and high-school teams from conducting full-contact practices for more than three hours a week during the season; contact is not allowed at all in the off-season. California is always something of a trendsetter when it comes to lawmaking, as it has been with auto emissions, climate change and smoking bans. And as history has shown in the cases of smoking and other hazardous practices, regulation tends to expand over time: If a state can ban blocking and tackling in practice, what's to prevent it from prohibiting those activities in games by banning football entirely or turning it into flag football? (Several other states, including Alabama and Texas, have similar restrictions on football practices.)

It is not easy in most locales to sue school districts, and in many cases, the dollar amounts on liability are limited. Nonetheless, schools are increasingly being sued over football. Parents of a high-school junior in Tampa who suffered a concussion on the sidelines after jumping for a pass have sued the Hillsborough County school district; he drove himself home, but later was put in a medically induced coma for nine days to reduce brain swelling. It's possible that the very thing meant to protect players — new protocols that define how they should be evaluated for a possible brain injury, and how long they should be kept out of play if one is diagnosed or suspected — will actually put school districts, administrators and coaches at more legal risk. Now that they have, in a sense, been forewarned, what happens if they don't follow the protocols or don't have certified athletic trainers on staff or coaches smart enough to deal with possible concussions while they are also deciding on the right third-down play? What's more, insurers may in time deem the sport too risky. Health insurers might treat it as a costly risk factor like smoking or a bad driving record. As football becomes more and more regulated, many districts may reasonably conclude that it's more than they can handle.

C.T.E. and claims of football-induced brain damage are also likely to play a part in criminal trials, perhaps even some high-profile ones involving N.F.L. stars. "I can't speculate on individual players," David Franklin, a clinical neuropsychologist at the University of California, Riverside, School of Medicine, said when I asked him about this, "but you have to ask how the concussions issue changes the landscape

from a law-enforcement perspective. I think it has to over time, because we now know that players are suffering repeated insults to the parts of the brain that cause changes in behavior." Rates of smoking plunged and the industry declined because tobacco use could not be made safe. The N.F.L. may be at a similar juncture now. It has instituted rules changes to make its own games less violent and is funding and promulgating supposedly less dangerous ways to play at the youth level. But there is no assurance that any of it will make football any more healthful than low-tar cigarettes made smoking. The burden will fall on the N.F.L. to litigate the concussion issue in public and prove that its sport does not rob participants of their consciousness.

It appears the league may already be losing the argument with a segment of the nation's parents. Between 2010 and 2012, Pop Warner, the nation's largest youth-football program, experienced a 10 percent drop in participation after years of steady growth. It attributed the decline to concerns over concussions. There's no reason to think its numbers won't continue to fall.

**Luckasevic's files include** medical and neurological assessments of his clients that would have been used if the case had moved toward a trial. He sent me one of them, with the name redacted. The player had a lengthy N.F.L. career and suffered blows to the head "too numerous to recall." He had been knocked unconscious in games but never hospitalized. Now in his late 50s, he suffers chronic headaches, has stopped taking medications prescribed to alleviate them because they were ineffective, can't concentrate long enough to hold down a job or maintain relationships and lives alone in the house he grew up in, where he passes his time watching TV. He has developed a tremor in his left arm and leg and is having difficulty swallowing.

The settlement class includes only retired players, not current ones. In an interview with The New Yorker earlier this year, President Obama, an avid Chicago Bears fan, said that if he had sons, he would not let them play football but he would remain a fan of the sport. "At this point, there's a little bit of caveat emptor," he said of the current N.F.L. players. "These guys, they know what they're doing. They know what they're buying into. It is no longer a secret." When I talked to Luckasevic about

the president's remarks, he said: "But my guys didn't know. That's the whole point. They didn't assume this risk."

When he was a child, Luckasevic said, Sundays in his household were for "church and football." His family had a couple of Steelers season tickets at about the 40-yard line, behind the visitors bench. "They were actually too low, but it was sort of neat because you were so close to the players."

His father would always take him or his brother. When it was his turn, Luckasevic would take his camera, and he has snapshots of some of the men he now represents. He no longer watches any football. He has lost his taste for the game.

Michael Sokolove is a contributing writer for the magazine. His most recent book, "Drama High," has just been published in paperback.

A version of this article appears in print on November 9, 2014, on Page MM42 of the Sunday Magazine with the headline: Down by Law.

© 2018 The New York Times Company