# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | Case No. 2:12-md-02323-AB<br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden,<br>*on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | CIVIL ACTION NO. 14-cv-29-AB |

## RESPONSE OF THE STERN LAW GROUP, MOKARAM LAW FIRM, AND THE BUCKLEY LAW GROUP TO THE EXPERT REPORT OF <u>PROFESSOR WILLIAM B. RUBENSTEIN</u>

Howard Langer
Edward Diver
Peter Leckman
LANGER GROGAN & DIVER, P.C.
Three Logan Square, Ste. 4130
1717 Arch Street
Philadelphia, PA 19103
(215) 320-5660

Respondents are three law firms that collectively represent over 600 individual players. They respectfully request that the Court reject Professor Rubenstein's proposal that it set aside thousands of private contracts made in the context of an efficient market, and impose an arbitrary cap of 15% on fees paid to individually retained plaintiffs' attorneys ("IRPAs"). Professor Rubenstein's analysis does not assess the economics of individual representation. Instead, it purports to determine the reasonableness of IRPA fees by a process of subtraction. It assumes—without any formal analysis of risk or of the market—that one-third is a reasonable amount for all lawyers. It then substracts what he expects to be allocated to class counsel, which leaves 15% (assuming projections of the value of the settlement turn out to be true).[1] It then concludes—contrary to what the market reflects—that 15% is adequate for IRPAs. For the reasons set forth below, the report is seriously flawed and should not be followed.

## I.    The Court Should Not Set Aside Private Contracts Without Good Reason

As Professor Rubenstein found, the players and attorneys negotiated the contracts at issue in an efficient, active, and competitive legal services market. Report at 28-30. The Third Circuit emphasizes that "courts should be reluctant to disturb contingent fee arrangements freely entered into by knowledgeable and competent parties." *McKenzie Const., Inc. v. Maynard*, 758 F.2d 97, 101 (3d Cir. 1985). Courts should abrogate fee agreements only if, "as against the client, it has resulted in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *Id.* at 101. There is no such unfairness here.

## II.    It Is Incorrect to Determine IRPAs' Share by Subtracting Class Counsel Fees

Professor Rubenstein's analysis does not assess IRPAs' fees on their own merits, but in terms of what remains after substracting class counsel's fees from a level he deems reasonable—approximately one-third of his valuation of the settlement, including attorney expenses. Implicit

---

[1] Professor Rubenstein is open about this—his explanation for recommending a percentage substantially below that in other cases (and substantially below the market, even after the settlement) is that class counsel's 15.6% (as he calculated it) "is a significant limiting factor." Report at 31 n.99.

1

is his assumption that class counsel's fees are part of an overall settlement fund, and that payment to the lawyers is therefore at the direct expense of benefits class members would have otherwise received. But this Court expressly found that negotiation of class counsel's fees occurred only after the negotiation of the principle terms of the settlement, *In re NFL Players Concussion Injury Litig.*, 307 F.R.D. 351, 387 (E.D. Pa. 2015), and Professor Rubenstein's assumption is directly contradicted by the Third Circuit's conclusion that "[t]here is simply no evidence in the negotiation process or the final terms of the settlement that class counsel bargained away the claims of retired players in return for their own fees," *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 447 (3d Cir. 2016). Moreover, the settlement was reached—and implemented—with the understanding that many class members retained independent counsel who would be compensated directly by the players. Notice to class members describes the $112.5 million payment for class counsel and provides that players will pay their own lawyers separately. The official website states, "You can hire a lawyer at your own expense. … The amount the Settlement Class Member must pay his or her lawyer is based on the contract or agreement he or she signs with that lawyer."[2]

By structuring the settlement this way, the parties avoided a problem Professor Rubenstein created: under his approach, the reasonableness of class counsel's $112.5 million fee should be assessed not in terms of such factors as the risks faced and the benefits obtained, but in terms of its fair *portion* of the overall fees. That is not how the litigation has proceeded or how the settlement was designed. Because of the structure of the settlement (and the way it was described to the class), neither class members nor IRPAs had any incentive to challenge the payment to class counsel. Nor would it make sense for them to challenge it now, because reducing class counsel's fee would not benefit the class members, but would merely give money back to the league. Yet Professor Rubenstein's approach would require IRPAs to engage in that

---

[2] https://www.nflconcussionsettlement.com/Un-Secure/FAQDetails.aspx?q=145#145.

pointless endeavor in order to advocate for an increase in their allocation of fees.

Compounding the problem, the report assumes—with no analysis—that class counsel's requested fee represents a reasonable proportion of the total allocation. Professor Rubenstein has created a problem that was not there and has failed to undertake the analysis that his approach requires.[3]

Additionally, because the $112.5 million payment is fixed, the percentage Professor Rubenstein ascribes to it—15.6%—is a function of his estimated overall value of the settlement, which is highly speculative. If the estimates are significantly lower than the actual value, IRPAs will receive a percentage that is lower than they should have under his approach.[4] That incorrectly set percentage would further undercut the incentives of IRPAs to invest time and money in their representation.

The approach embedded in the settlement avoids these problems: class counsel's fee is assessed on its merits, taking into account that it is separate from players' recoveries, and the IRPAs' fees are assessed independently, on their merits, with the outcomes of a competitive market as the starting point.

### III. The Report Does Not Adequately Address the Core Economic Question of Incentives

The correct way to analyze fees is to address the fundamental question of the level of fees necessary to attract quality attorneys to undertake and litigate beneficial cases over a period of time that could extend decades. The MDL existed because of the high-risk efforts of the attorneys who initially brought the many individual cases. Given the stark individual issues of

---

[3] This is especially significant because many of the reasons he posits for limiting fees overall apply to class counsel and have nothing to do with IRPAs. For example, he characterizes the efforts of class counsel as modest in relation to other class actions of similar scopes. Report at 21-22, 39-40. Similarly, the efficiencies of class adjudication do not apply to the work that remains for the IRPAs, who must continue to provide services to players on an individual basis, and will have to do so for decades to come. If these factors speak in favor of a reduction, it is of class counsel's, and not the IRPAs', fees.

[4] There is good reason to think this might be true. While only a fraction of claims have made their way through the system, the administrator reports over $260 million in monetary awards.

3

causation and damages among players, class certification would have been hotly contested. The league had an incentive to seek resolution on a classwide basis because of the existence of thousands of individual cases that would have been separately litigated if class certification were denied. The leverage of those negotiating on behalf of plaintiffs in settling the case before class certification was even briefed derived from the vast number of individual actions. Without individual attorneys with sufficient incentive to bring and litigate those cases, there would have been no classwide settlement.

Moreover, Professor Rubenstein's assumption that IRPAs' roles are essentially mechanical and without significant risk is incorrect. The risks to individual attorneys remain substantial after the settlement. Even with the settlement, the vast majority of players are not expected to obtain *any* recovery, *see* Report at 23, which means that much of the time and expenses IRPAs have and will expend on behalf of their clients (over the next several decades) is likely to be uncompensated, and if it is, much of it will come many years from now. The administration of the settlement has also proved to be far more burdensome and complicated than Professor Rubenstein allows. For example, the settlement administrator's report indicates that, as of December 27, nearly 2,000 monetary claims were submitted, yet only 206 Monetary Award Claims were noticed, and the league has appealed a number of those, which require contested litigation with the league's counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP.[5] The league has every incentive to ensure that the claims administrator does not allow a high number of claims, and as a result, the claims process standards have been changed over time and there have been inexplicable denials.[6] Contrary to the characterization of a simple process that unrepresented players can readily navigate, roughly three-quarters of applications have required multiple submissions and remain in limbo, highlighting the uncertainty and need for counsel.

---

[5] *See* https://www.nflconcussionsettlement.com/.
[6] *See generally* http://advocacyforfairnessinsports.org/nfl-concussion-settlement/nfl-concussion-settlement-claims-report-shows-approval-rates-are-still-dismally-low/.

The need for counsel is only increased by the fact that many of the players suffer disabilities—or will in the future—including dementia and Alzheimer's, that make the complexities of the settlement especially challenging.[7]

Furthermore, the settlement's extended timeframe and structure creates inherent risks to the IRPAs not faced by class counsel. Individual attorneys, who have already invested millions of dollars and thousands of hours of time, will expend much more of both over the next sixty-five years. Many players will need to undergo multiple evaluations and submit multiple claims as their conditions progress over this time, so attorneys will have to maintain their relationships with their clients even after any initial claim has been resolved. Others may be fortunate and will not suffer significant deterioration, in which case their IRPAs will recover no compensation for an extended representation. Professor Rubenstein undertakes no analysis of these efforts or risks.

Individual attorneys have sought to be compensated both for the length of the period of their investment and for the risk of non-recovery because of future uncertainties. Individual attorneys understand these risks and costs, which is why they have set their rates as they have, even after the settlement was reached. There are good reasons that players have accepted them—and continue to enter into such agreements—as they understand the value of quality counsel in working hard to maximize their recoveries and assisting them through what may be multiple claims processes.

## IV. Professor Rubenstein's Analysis Undermines His Proposed Cap on Attorneys' Fees

Rather than addressing these market realities, Professor Rubenstein simply assumes that one-third of the recovery is a fair share for the attorneys overall. Presumably, that is because he believes that one-third is a typical fee arrangement. But contingent fee agreements rarely include

---

[7] The only cases that have been rendered more-or-less mechanical for the IRPAs are those that are fully resolved in the Baseline Assessment Program, because that program requires little involvement by the IRPAs and is funded from the settlement fund, requiring no significant financial investment by the IRPAs. Even so, many of these cases may have involved substantial prior investment, and only a fraction of cases with recoveries will be fully resolved without use of the MAF testing process.

costs in the percentage as he has done, so his proposal is even lower than the common 33 ⅓% he cites. In fact, it amounts to a 26% overall allocation of attorneys' fees, with IRPAs receiving only 11% of the overall value of the settlement, plus their expenses.[8]

The data do not support his ad-hoc determination that overall fees should be capped at either 26% or 33%. His analysis shows that early agreements were far above this level—as high as 45%, but averaging roughly 40%. Report at 10, 25. These were, at that time, extremely high-risk cases. Attorneys that players wished to retain were unwilling to take these cases for much less, and 40% rates are not unusual in current practice. Attorneys take on high-risk cases only where there is a possibility of upside reward, yet Professor Rubenstein has proposed to eliminate the risk premium priced into the decision to initiate the cases that made the settlement possible.

The report also confirms that the market efficiently adjusted prices for risk over time. As risks were reduced, the average rate fell. Risk has not come close to being eliminated by the settlement, however, and the settlement also eliminated the upside potential for individuals by capping the recovery at amounts reflecting compromise. Incorporating all this information—including the $112.5 million payment to class counsel—the market arrived at a post-settlement average fee level for IRPAs alone of 25.9%. Report at 25. Thus, players with full knowledge of the settlement, including class counsel's fee and the remaining risks, and after specifically being told that they would be responsible for paying their lawyers according to their individual

---

[8] The actual rate is lower not only because Professor Rubenstein incorporates costs into the one-third allocation (dropping his starting point for calculations to 30.6%), but also because he has erred in his calculations. He calculates fees as a portion of the *total* value of the settlement, including all fees, costs, and the education fund. But IRPAs' fees are percentage of the awards their clients receive—the payments from the MAF. A 15% rate thus amounts to 11% of the overall value of the case and a 20% rate would be needed to obtain 15% of the settlement value.

Professor Rubenstein partially acknowledges the error in a footnote—he backs out class counsel fees, but not other items he includes in the overall value of the settlement. Report at 11 n.42. He nevertheless asserts that these numbers are "a close approximation" because of "unknown" expenses. But he already accounts for IRPA expenses elsewhere, as bringing up the total to around 33% from 30.6%. In any event, the 30.6% number he uses repeatedly for all fees plus class counsel's (but not IRPAs') expenses is incorrect. Correctly calculated, that figure is 26.8%.

contracts, still agreed, in what Professor Rubenstein acknowledges is a competitive, efficient market, to pay an average of nearly 26% of their recoveries *in addition to* what class counsel was to be separately paid from the common fund.[9] Ignoring market realities, the report dramatically cuts these freely negotiated rates in order to keep the total of all fee payments to both sets of lawyers to 26% plus expenses, which is essentially the same as the 25.9% the market set for IRPAs *alone* with full knowledge of the settlement and the separate payment to class counsel.[10] His analysis essentially concludes that this market rate—or any amount higher than 26% for all attorneys—offends "fundamental fairness and equity." *McKenzie*, 758 F.2d at 101 (3d Cir. 1985).

There is no evidence that IRPAs systematically took advantage of vulnerable individuals, or of any other systematic market failure, so there is no reason to depart from these private contracts. Nothing material has changed since the settlement was approved. Professor Rubenstein points to the possibility that some individual players may be vulnerable because of the disabilities this case addresses. Certainly, the Court must take care to ensure that a player has not entered into an unfair contract because of any such vulnerability. But the report does not address any such cases and there is no evidence of overreaching by IRPAs. The report is not about aberrations, but about the norms against which such aberrations must be assessed. For such considerations to apply in this context, there would need to be *systematic* imbalances rendering unfair the norms generated by the market. But there is no evidence in Professor Rubenstein's report suggesting there is such systemwide inequity.[11]

Professor Rubenstein claims that "the 15% IRPA-specific cap … accords with the market

---

[9] This results in an average of 34% of the overall value (and 40% using Professor Rubenstein's erroneous method) for individuals who entered into individual representation agreements after the settlement.
[10] The report notes that a few law firms agreed to reduce their rates post-settlement to 20 or 25%, but every one of the firms that lowered its rates is expected to obtain a substantial allocation from the common fee. Most firms, including Respondents here, will not share in that fund.
[11] Moreover, to the extent Rubenstein believes that individual disabilities are a widespread problem in terms of navigating this process, he cannot then argue that they do not need lawyers to guide them through the process.

rate in this case," but his own analysis shows this is not true. First, he only counts the market rate after the approval of the settlement, eliminating any reward for pursuing these cases when they were riskier, and even though it was the existence of those cases that enabled the classwide settlement. Second, he skews the numbers. He states that the average fee in post-settlement contracts is 25.9%, but then characterizes the post-settlement market rate as "20-25%." Report at 25, 30. Arbitrarily taking the low end of this ad-hoc range, he subtracts another 5% for the set-aside class counsel has requested, bringing the "market" rate down to 15%, even though his own conclusion is that class counsel should get no such set-aside.[12] At every turn, he has made unfounded assumptions to lower the "market rate" to support the fiction that his recommendation comports with the market. Far from being the market rate, there are almost no contracts that include a 15% rate.[13] *See* Report at 10. Indeed, Respondents have over 650 players as clients, including a substantial number signed up post-settlement, and only one (at 20%) is below 25%.

Rejecting the results of the market has serious consequences, both in this case and in future cases. Counsel for the individuals might choose to withdraw from representation rather than remain committed to doing work for decades without appropriate compensation (and without there being any certainty about what fee might be forthcoming under a presumptive 15%

---

[12] There is no evidence that the market incorporated the proposed 5% set-aside. First, the amended settlement merely provided that class counsel may request such a set-aside. But it could have requested a set-aside without mentioning it in the settlement, and its inclusion did not alter the analysis the Court must undertake in determining whether it is appropriate. Its sole practical effect was to signal that class counsel intended to make the request. Thus, the provision represented at most a confirmation of preexisting risk that up to five percent might be set aside for class counsel. And Professor Rubenstein's conclusion that class counsel should not be awarded the set-aside is flatly inconsistent with his suggestion that the full five percent should have been priced in.

Moreover, if the modified settlement had the effect he proposes, then it would be evident in the data. In that case, law firms would have raised their rates by 5% from whatever they were at the time when the set-aside was first proposed. Respondents here never adjusted their rates in response to the proposed set-aside, and there is no evidence that any other firms did, much less the whole market.

[13] Professor Rubenstein also unnecessarily erases rational differences between cases. There are a variety of reasons that attorneys would demand different percentages in different cases. A case that appears to involve lower risk or higher expected return would attract attorneys at lower rates, while other cases may be more difficult and/or risky for a variety of reasons. Reflecting these differences, Respondents have agreements with clients that range from 20% to 40%.

system). Individuals who want lawyers will not be able to find competent lawyers to step in, as attorneys would be asked to accept roughly half of the rate that an efficient market determined correctly reflected the risks and rewards of representation. Counsel who remain will have less incentive to devote time and resources than they would at the rate the market deemed efficient. This will be especially harmful for players who suffer the disabilities at issue.[14] Market prices are concrete reflections of the risks and potential rewards of representation, reflecting the collective judgment of participants that the rates are reasonable. They reflect precisely the factors that determine the reasonableness of the fees and that Professor Rubenstein fails to analyze. Market prices are not necessarily the final word, but any departures from agreements made in an efficient market must be justified, and the report does not contain any such justifications.

## V. Caps Imposed in Other Cases Do Not Support the Proposed Cap Here

Professor Rubenstein cites thirteen cases involving dual-representation situations in which a cap was imposed that limited the percentage of IRPAs recoveries. First, this is a small subset of cases involving dual-representation of this type, indicating that these caps are far from the norm. And the cases he cites do not support the proposed cap. He has lumped in cases of all sorts, whose rates vary widely, reflecting the need to assess each case independently. Most involve limited funds in which class counsel and IRPAs are seeking portions of the same money. They present the problem that the parties here have avoided by creating a separate fund for class counsel fees. Some involve severely limited funds. Most of the justifications for limited caps in these other cases do not apply here.

The cases that most resemble this case support a much higher level than Professor Rubenstein proposes. Only two of the cases he cited—*Medtronic* and *Deepwater Horizon*—involved a separately allocated fee for class counsel. In *Medtronic*, the court expressly *rejected*

---

[14] In future cases, attorneys forced to weigh the risk of their fees being cut will be less likely to pursue cases, or will require higher contingent fees to account for the risk of reduced payments.

9

the claim that the separately allocated fee should reduce individual fees. *See In re Medtronic, Inc. Implantable Defibrillator Prod. Liab. Litig.*, 2008 WL 4861693 (D. Minn Nov. 10, 2008) (order affirming Special Master's Report, 2008 WL 4861694, at *5 (D. Minn. Oct. 20, 2008)). It capped individual fees at 33.3% and separately awarded class counsel approximately 10.4%. *Id. Deepwater Horizon* capped IRPAs' fees, but at 25%. *In re Deepwater Horizon*, 2012 WL 2236737, at *1 (E.D. La. June 15, 2012). And that case lacks many of the risks present here, not least the decades-long time horizon for potential recovery of fees and the need to provide detailed medical evidence, often at considerable cost, to establish claims.[15]

## VI. Conclusion

In sum, neither economics, prior cases, nor, Professor Rubenstein's own analysis and calculations support capping IRPA fees at 15%. In fact, there is no reason to cap IRPA fee agreements. The average rate, according to Professor Rubenstein, is 29%, which amounts to only 21.6% of the overall settlement value and is only modestly higher than the post-settlement average of 25.9%. Leaving the contracts where they are preserves appropriate differentiation between different cases produced in an efficient market while maintaining a fair and reasonable overall allocation and avoiding the risk of undermining future representation of vulnerable class members. If there is any fundamental unfairness, it is to be found in individual cases, which must be assessed on their own merits, rather than in the outcome of an efficient, competitive market.

Dated: January 3, 2018                By:     */s/ Howard Langer*
                                              Howard Langer

---

[15] Nearly all the report's cases involve caps above 15%. Taken together, they result in an average, by Professor Rubenstein's calculation, of 20.6%. His justification for a lower rate is that the 15.6% class counsel fee "is a significant limiting factor." Report 31 n.99. Yet it is only a limiting factor to the extent he has arbitrarily deemed it to be so—especially since those fees are separate and apart from the rest of the settlement. Professor Rubenstein also takes yet another shortcut to the detriment of IRPAs in calculating this average. In one case, the court reduced the bargained-for rate by either one-third or two-thirds. *See In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407, 1418 (D. Wyo. 1998). Yet he entirely ignores the higher "cap," which would be about 27% for 40% fee contracts, and which would raise his average. He further reduces it by assuming that no contracts included a bargained-for rate higher than 33%.

                                              Edward Diver
                                              Peter Leckman
                                              LANGER GROGAN & DIVER, P.C.
                                              Three Logan Square, Ste. 4130
                                              1717 Arch Street
                                              Philadelphia, PA 19103
                                              Tele: (215) 320-5660

## VII.  CERTIFICATE OF SERVICE

      I hereby certify that I caused a true and correct copy of this Response to be served on this date upon all counsel of record via the Court's Electronic Case Filing system.

Dated: January 3, 2018                    By:    */s/ Edward Diver*
                                                             Edward Diver