### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL FOOTBALL LEAGUE, et.al, <br><br> Defendants. | No. 2:12-md-02323-AB <br> MDL No. 2323 <br><br> Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: <br> ALL ACTIONS | |

### RESPONSE BY THE YERRID LAW FIRM AND NEUROCOGNITIVE FOOTBALL LAWYERS TO PROFESSOR RUBENSTEIN'S EXPERT REPORT

Pursuant to the Court Notice (DKT No. 9527), Neurocognitive Football Lawyers and The Yerrid Law Firm provide their Response to Professor Rubenstein's Expert Report, and state:

1.      These Respondents contracted with retired NFL players to represent their interests in the concussion injury litigation.  Reduction of Respondents' 25% fee contracts to 15% will cause undue hardship and result in irreparable harm to the players because the 47 page Rubenstein Report fails to meaningfully consider the efforts of counsel for Individually Represented Players (IRPAs) who decided to seek an evaluation for a Qualifying Diagnosis prior to the Effective Date of the Settlement Agreement.  Moreover, frustrating an already difficult claims process and making it difficult to proceed without qualified counsel, the NFL parties have actively litigated claims filed by players who chose to proceed outside of the BAP.  Finally, limiting contingent fee contracts below 25% on this record violates due process and constitutes an impermissible burden on contracts.

2.      In this Response, IRPAs will refer to the lawyers who are representing individual players in all aspects of the claims process.  However, there are at least two classes of IRPAs.  In the first class are IRPAs like The Yerrid Law Firm and Neurocognitive Football Lawyers who provided the resources and legal advice for players to pursue a Qualifying Diagnosis prior to the Effective Date with independent and highly qualified neurologists, neuropsychologists, radiologists, and other providers selected by the former player.  In those claims where a Qualifying Diagnosis was obtained, the undersigned lawyers have then run the gauntlet of the pre Effective Date claims process for their clients.[1]  The second category of IRPAs would be those lawyers who elected to enroll their clients in the BAP where those players are evaluated by physicians approved by the NFL Parties.

3.      At the time the Amended Settlement Agreement was reached, many players simply did not trust the Baseline Assessment Program (the BAP) with doctors approved by the NFL Parties.  In addition, many former players felt the compensation scheme would be inherently unfair against them.  Confirming the belief held by many of these former players, Paragraph 30 of the Rubenstein Report notes "despite large dollar figures of potential individual recoveries in this case, the actuarial data prepared by the parties reveal that the vast bulk of the class will receive no money from the MAF and the vast bulk who do receive money will receive relatively small amounts."  In summary, Professor Rubenstein suggests some 61% of the class members will receive approximately $25,000 to $50,000.  Consequently, many players and their families made the informed decision to avoid that labyrinth without the assistance of skilled counsel with the resources to support their attempts to pursue a fair and accurate diagnosis.

---

[1] In some cases, these IRPAs will have made the effort to pursue a Qualifying Diagnosis without success.  However, under their fee contracts, these IRPAs will then submit those players through the BAP.

4.      Accordingly, as authorized by the Amended Settlement Agreement, many former players desired to be evaluated by independent and highly qualified doctors for a Qualifying Diagnosis prior to the Effective Date of the Settlement Agreement.  This is why many former players opted to retain IRPAs for what can only be described as traditional contingent fee litigation.  With the resources from lawyers like The Yerrid Law Firm and Neurocognitive Football Lawyers, many players were ready to be timely evaluated for a Qualifying Diagnosis prior to the Effective Date of the Settlement Agreement.[2]

5.      Not only did many IRPAs fund that pre Effective Date strategy, but these lawyers also undertook the risk there would be no recovery for their efforts.  Despite the Settlement Agreement, a former player will only receive compensation if they obtain a Qualifying Diagnosis and then complete the gauntlet of deficiencies, audits and claim denials.  Moreover, there is no reward for a second place finish.  A player who obtains a specific Qualifying Diagnosis will only obtain an award after approval of that same diagnosis by the Appeals Advisory Panel (AAP).  For instance, if a player has a major neurocognitive disorder with probable Alzheimer's as a Qualifying Diagnosis, that player will only receive a Monetary Award for that Alzheimer's diagnosis.  Should the AAP determine or find that player has a 1.5 or a 2.0 diagnosis, this injured former player will obtain no recovery whatsoever.  This is why many players chose IRPAs who were willing to undertake the expense and risk to actively pursue the pre Effective Date strategy.  In the case of the undersigned, some 140 claims had been submitted for an award by September 20, 2017.[3]  As of this date, two players received an award but those awards were immediately

---

[2] Footnote 33 of the Rubenstein Report perpetuates the mythology that the diminishing inventory of clients held by the firms included in the steering committee is due to "poaching" through the promise of lower fee rates.  Although some players may have been motivated by these concerns, many of the players represented by the undersigned were frustrated that their prior counsel were undertaking no efforts to obtain a Qualifying Diagnosis and instead planned to submit the claims of these players through the BAP physicians paid for by the NFL Parties.

[3] See October 12, 2017, correspondence from The Yerrid Law Firm to Orran Brown, Esquire (Exhibit 1).

audited leaving their award status in doubt.  The vast majority of the remaining claims are still being processed despite the 90-day processing time afforded to the Claims Administrator and the AAP.  The remaining claims have been denied or sent to auditing.

6.     As a result, the current public perception of this concussion injury litigation is that Class Counsel will receive more than a hundred million dollars in compensation while a vast majority of brain damaged players continue to deteriorate and even die while awaiting payment of their claims, assuming those claims are even approved.  Further exacerbating the feelings of the members of the Class is the belief that the process is being "slow played" and unnecessarily delayed.  Without the assistance of robust counsel, the players will be irreparably injured because they will continue to suffer while their claims languish.  Limiting the already low contingent fee of 25% to 15% will inhibit the vast majority of players who selected IRPAs to pursue a Qualifying Diagnosis prior to the Effective Date while their claims are midstream.  Moreover, this limitation will unnecessarily chill future lawyers from representing clients in other similar class actions where the awards remain in doubt.

7.     In recommending the 15% cap, Professor Rubenstein makes no reference to the role of IRPAs in pursuing the pre Effective Date Strategy.  That is why, in the case of the undersigned, that these former players and their families executed 25% contingent fee contracts with The Yerrid Law Firm and Neurocognitive Football Lawyers, PLLC.  Moreover, the undersigned became involved only after the Amended Agreement was in place.  An unfortunate airplane crash and the death of the undersigned's predecessor attorney eventually led to the filing of a Notice of Appearance by The Yerrid Law Firm in this case on December 2, 2016.  And, in support of the reasonableness and fairness of their 25% fee contracts, The Yerrid Law Firm and

Neurocognitive Football Lawyers have filed the Declaration of James C. Hauser, Esquire (Exhibit 2).[4]

8.      In Paragraphs 37 through 38 of his Report, Professor Rubenstein cites numerous class action cases that set an average IRPA cap at approximately 20.6%.  Those cases have little or no application to this matter because the NFL Parties have apparently decided to litigate the claims filed by these retired players.  Moreover, this is not the case where the awards are so small that absent class members need protection from overreaching lawyers they have never met or never worked with.  Nor is this the case where IRPAs had to "do no more than enroll their clients in the settlement and monitor their progress through the claims valuation process." Rubenstein Report at Footnote 71 citing Vioxx Products Liability Litigation, 650 F.Supp. 2d 549, 561 (E.D. La. 2009).

9.      In this regard, Paragraph 29 of the Rubenstein Report is factually inaccurate believing that all IRPAs need only "shepherd the client through the claims process to ensure relief for him" and "IRPAs should be able to process their clients' claims through the settlement process without enormous time or expense expenditures."[5]  Instead, as provided in the Declaration of Judge Hauser, the undersigned have spent nearly a million dollars funding this litigation.  In addition, more than two thousand hours of attorney time has been spent meeting with former players and their families to review their medical history and complete the steps necessary to represent their interests.  Rarely are these medical and employment histories similar. Counsel have then reviewed the medical records of the treating physicians of former players and

---

[4] James C. Hauser, Esquire has served as a Florida Circuit Court and Appellate Judge and is hereinafter referred to as Judge Hauser.

[5] Not only were these unfounded assumptions, these statements are particularly perplexing.  Professor Rubenstein is well aware of the actuarial data suggesting many players will have little or no recovery whatsoever.

have in some circumstances met and worked with these treating physicians to understand the medical issues concerning their clients.  Only then are these player packages assembled for review by the providers who will evaluate the former players under the rigorous standards imposed under the Amended Settlement Agreement.  Although there are some modest economies of scale, most of this work is time consuming and extensive with no promise of an actual award.

10.     In failing to consider the specific efforts of many IRPAs, Professor Rubenstein has done what the Third Circuit said could not be done.  A district court may not determine the existence of a reasonable fee agreement "by limiting its inquiry exclusively to a facial analysis of the contract."  Dunn v. Porter, 602 F.2d 1105, 1110 (3d Cir. 1979).  The Professor Rubenstein Report treats all IRPAs the same and believes that these IRPAs are merely shuffling paper.  Instead, in the case of the undersigned IRPAs, former players and their families specifically contracted with The Yerrid Law Firm and Neurocognitive Football Lawyers to pursue a specific strategy to timely seek evaluation for a Qualifying Diagnosis through their independent and highly qualified private doctors.  Under these circumstances, as stated by the Third Circuit, "the courts should be loathe to intrude into a contractual relationship between an attorney and client…."  602 F.2d at 1112.  That conclusion is buttressed by the fact that in many cases a 25% contingency fee is presumptively reasonable.  As noted by Judge Hauser, a 25% contingent fee agreement is presumptively reasonable as the Federal Tort Claims Act, the Social Security Administration and Medicaid routinely use 25% contingency fees for work under their auspices.  Moreover, as noted by the United States District Court for the Eastern and Southern District of New York, "[w]here attorneys and clients make private agreements not to exceed 25% of the plaintiff's recovery, the equities favor enforcement of the privately negotiated compensation

agreement." See In re Joint E. & S. Dist. Asbestos Litigation, 1991 U.S. Dist. Lexis 7527, Civil

Class Action No. 90-3973 (E.D. New York and S.D. New York 1991). In addition, as noted by

Judge Hauser, the Florida Supreme Court has found an unconstitutional impairment of contracts

when the Florida Legislature sought to reduce a contingent fee agreement below the 25% agreed

to between the parties and authorized by statute. Searcy v. State of Florida, 209 So.3d 1181 (Fla.

2017). As noted by Judge Hauser, this is not a normal class action lawsuit. Unlike other

settlements where members will receive some kind of award, no award will be paid unless each

member proves their claim through medical and neuropsychological testing. Consequently, this

is more of a case of first impression that militates against any such fee reduction.

11. Finally, Professor Rubenstein bases his 15% fee cap in part on the fact that the

former players are paying 15.6% of their effective monetary awards to fund the $112.5 million

dollar common benefit fund. Because of that common benefit fund, Professor Rubenstein seeks

to shoulder 100% of that burden on the IRPA fee contracts. It does not appear, however, that

Professor Rubenstein gave any thought to reducing any amount of the common benefit fund.

Nor does Professor Rubenstein address the issue that many of the same lawyers who will benefit

from the common fund are also asserting attorney liens against the IRPAs that are actively

pursuing the pre Effective Date strategy. Many of these firms have wrongly argued that their

clients had been "poached" by these IRPAs when instead these firms failed to aggressively

represent the interests of those individual players who wanted to follow the pre Effective Date

strategy.

12. In this regard, in Paragraph 35(a), Professor Rubenstein notes that several of the

large firms representing numerous clients have elected to reduce their contingent fee contracts

down to 25% or even 20%. However, those firms will be recipients of their share of the common

benefit fund.  Their compensation is not really 20% and their risk is much less.  Some of the clients who left those firms did so out of frustration that their claims were not being timely processed.  One could argue these firms only processed their most valuable players and the players who left and sought substitute counsel possess inherently riskier claims.  Finally, through their charging liens, the firms who reduced their fees still seek to collect additional fees.

13.     Instead, in those claims represented by The Yerrid Law Firm and Neurocognitive Football Lawyers, these lawyers do not share in the common benefit fund.  Their fees are effectively limited to their fee contracts.  In this regard, Judge Hauser has offered the expert opinion supported by a factual record that the Neurocognitive Football Lawyers have provided a substantial benefit to the clients they represent in this matter, the 25% fee charged by these lawyers is inherently fair because of the risks undertaken and the substantial costs advanced in prosecuting these claims, their clients needed their representation because none of the common benefit fund lawyers assisted them in obtaining a Qualifying Diagnosis, and a 25% contingent fee contract is presumptively reasonable.  Finally, the argument that IRPAs had already reduced their fee expectations by 5% is simply not true.  For the reasons and evidence proffered by Judge Hauser, the 15% contingency fee cap should be rejected by the Court.

14.     With regard to the 5% set aside, the undersigned agree with Professor Rubenstein that the request should be denied; however, there has been insufficient time to address these issues in light of his report.  Instead, the undersigned must rely on their previous filing at Docket No. 7350, dated March 21, 2017, filed as Response Objection and Memorandum in Opposition to Co-Lead Counsel's Petition for an Award of Attorneys' Fee, Reimbursement of Costs and Expenses, Adoption of Set Aside of Each Monetary Award and Other Relief.

15.     As a procedural matter, this Court has put the undersigned at a tremendous disadvantage and due process has not been afforded.  On December 11, 2017, the Court directed that any interested parties had to respond to the Report of Professor Rubenstein on or before January 3, 2018.  As a matter of due process, this deadline provided the undersigned with barely twenty three calendar days to respond to a sweeping expert opinion covering many different issues during the middle of the holiday season.  Although the undersigned have attached the Declaration of Judge Hauser as an Exhibit to this brief, the undersigned have not had the opportunity to present evidence or to cross examine Professor Rubenstein on the 15% cap he seeks to impose.  Moreover, there was insufficient time to even address the 5% fee set aside.  Without the benefit of these rights and a full and fair opportunity to present evidence and argue the law and evidence at a hearing, any reduction of the contingent fee amounts not only becomes an inappropriate impairment of a contract but also a violation of due process.

WHEREFORE, Neurocognitive Football Lawyers, PLLC and The Yerrid Law Firm respectfully request this Honorable Court to reject the 15% contingency fee cap sought to be imposed on the contingency fee contracts between the former players and the undersigned, and all other relief that is just and equitable.  In the alternative, it is requested this Court appoint a Special Master whose sole function will be to determine the reasonable amount of fees and recommend an allocation of those fees to the attorneys involved in this matter.  Such process would undoubtedly unburden the Court from that task, and in doing so, allows your Honor to put exclusive focus and efforts on the long-overdue payments that should have already been made to the injured players or their estates.

Dated: January 3, 2018

Respectfully submitted,

*/s/ Ralph L. Gonzalez*
C. STEVEN YERRID, ESQ.
RALPH L. GONZALEZ, ESQ.
HEATHER N. BARNES, ESQ.
THE YERRID LAW FIRM
101 E. Kennedy Boulevard, Suite 3910
Tampa, Florida 33602
(813) 222-8222 (telephone)
(813) 222-8224 (telefax)
hbarnes@yerridlaw.com
cjameson@yerridlaw.com
kodell@yerridlaw.com
Florida Bar No. 207594
Florida Bar No. 564140
Florida Bar No. 85522


JIM HOLLIDAY, ESQ.
HOLLIDAY KARATINOS LAW FIRM PLLC
18920 N. Dale Mabry Hwy. Suite 101
Lutz, Florida 33548
(813) 868-1887 (telephone)
(813) 909-8535 (telefax)
jamesholliday@helpinginjuredpeople.com
Florida Bar No. 45284


THOMAS PARNELL, ESQ.
GIBBS & PARNELL, P.A.
722 E. Fletcher Ave.
Tampa, Florida 33612
(813) 975-4444 (telephone)
(813) 975-4445 (telefax)
Florida Bar No. 441988


JEFFREY MURPHY, ESQ.
JEFFREY D. MURPHY, P.A.
511 W. Bay St., Suite 352
Tampa, Florida 33606
(813) 443-5553 (telephone)
(813) 436-5190 (telefax)
Florida Bar No. 860808

10

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2018, I caused the foregoing Request to be electronically filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, and that the filing is available for downloading and viewing from the electronic court filing system by counsel for all parties.

*/s/ Ralph L. Gonzalez*
RALPH L. GONZALEZ
THE YERRID LAW FIRM
