UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION,

Case No. 2:12-md-02323-AB

MDL No. 2323

Civ. Action No.: 14-00029-AB

_____/

## DECLARATION OF JAMES C. HAUSER, ESQUIRE

STATE OF FLORIDA

COUNTY OF ORANGE

I, JAMES C. HAUSER, ESQUIRE, hereby swear under oath that the following statements are true and correct to the best of my personal knowledge:

1. I have given over 150 lectures on attorney's fees issues, including over 50 lectures to Florida judges.

2. I am currently the President of a boutique law firm called "Attorney's Fees in Florida" devoted entirely to attorney's fee cases.

3. I am the author of a three-volume treatise entitled Attorney's Fees in Florida, which has been updated quarterly since 1987.

4. In that treatise, I devote an entire chapter exclusively to constitutional issues involving attorney's fees.

5. If this court sets an artificially-low cap on the amount an attorney can charge a client, then such a decision would **violate Article I, Section 10** of the



United States Constitution and will have the unintended consequence of preventing NFL players from receiving **competent** legal representation.

6. In *Castellanos v. Next Door Company,* 192 So. 3d 431 (Fla. 2016), the Florida Supreme Court declared Florida Statute Section 440.34 to be unconstitutional, as violating the Fourteenth Amendment to the United States Constitution, because the statute limited the amount that a client could pay his/her attorney, which resulted in many litigants not being able to obtain counsel.

7. In *Searcy, Denny, Scarola, Barnhart & Shipley, P.A. v. State,* 194 So. 3d 349 (Fla. 2015), the Florida Supreme Court declared unconstitutional a claims bill from the Florida legislature that gave an individual over $10 million, but limited attorney's fees to $100,000, because it infringed not only upon the client's constitutional right to freedom of contract, but also upon the substantive and procedural due process protections stated in the Fourteenth Amendment.

8. In *Searcy*, the Florida Supreme Court approved the right of the client to pay a $2.5 million fee to the Searcy law firm under a Florida contingent fee contract, or 25% of the amount recovered.

9. The former NFL players must be allowed to obtain **competent** legal counsel in order to have the best possible chance of receiving appropriate compensation.

10. As recognized in *TRG Columbus Development Venture, Ltd. v. Sifontes,* 163 So. 3d 548 (Fla. 3d DCA 2015), the key question is not whether NFL players can obtain counsel, but whether that counsel is competent to handle this type of case.

11. I graduated from the University of Pennsylvania's Wharton School of Finance in 1970. I earned my juris doctor degree from the Boston University Law School in 1973.

12. I served as a Circuit Court Judge for the 9th Judicial Circuit from 1990 to 2007 and have twice served as an appellate judge.

13. In 1989, I was awarded the Statewide Florida Jurist of the Year by the Young Lawyers Division of the Florida Bar.

14. I agree with the Recommendation of Professor William B. Rubenstein that a 5% set aside for class counsel is unreasonable, because:

(a) it would permit additional attorney's fees to class counsel who already seek fees and costs of $112,000,000.00 which the NFL has agreed not to contest; and

(b) class counsel has not obtained forensic or clinical testing to assist the individual players that are represented by Neurocognitive Football Lawyers, PLLC to determine whether they have Qualifying Diagnoses before the Effective Date of the Settlement.

15. For the reasons expressed below, I opine that a 25% contingent fee contract for an IRPA is both reasonable, and necessary where a former NFL player receives a Qualifying Diagnosis before the Effective Date of the Settlement Agreement, because otherwise such former NFL players would be unable to secure competent individual counsel.

16. At the outset, it is clear that Professor Rubenstein wants the former NFL players to receive the maximum compensation, and I concur.

17. However, his analysis is flawed, because this is not a normal class action lawsuit.

18. A review of the nflconcussionsettlement.com website discloses that there are 20,389 registered settlement class members.

19. The nflconcussionsettlement.com website also discloses that a mere one percent (1%) of those claims have been paid.

20. Unlike some other class action settlements, the vast majority of the players seeking compensation must prove their claims through medical and neuropsychological vetting.

21. Based on the above facts, the clients represented by the Neurocognitive Football Lawyers, PLLC are more similar to an injured individual suing in tort, where each person has a unique set of facts, than a traditional

common fund case, where members of the class are compensated without the need of individual counsel.

22. Although class counsel have been able to obtain significant money from which the former NFL players will be paid, most of the claimants seeking compensation must still be approved through the claim procedure to recover.

23. Unfortunately, the 15% fee calculation used by Professor Rubenstein fails to **distinguish** between IRPAs who have their clients participate in the MAF/BAP process versus those IRPAs who have undertaken the effort and expense of requesting the independent testing and evaluation of qualified medical professionals to determine whether the client had a Qualifying Diagnosis before the Effective Date of the Settlement Agreement.

24. In Paragraph 36 of his report, Professor Rubinstein appears to validate a 25% contingent fee contract but concludes this rate was actually discounted because the IRPAs anticipated that their 25% fee contracts would be reduced by the pending request for a 5% set aside.

25. Without competent counsel, the result would ensue that many former NFL players would have their claims severely limited or denied.

26. I have considered the following data and information:

    (a)    the report of Professor William R. Rubenstein;

    (b)    the Class Action Settlement Agreement;

(c) the nflconcussionsettlement.com website;

(d) the Neurocognitive Football Lawyers, PLLC contingent fee contracts at issue;

(e) the correspondence with the claims administrator, Brown Greer PLC;

(f) the Scot Brantley file; and

(g) I have discussed the case with James Holliday, Esq. who is a Partner with the law firm Neurocognitive Football Lawyers, PLLC.

27. The Long Form Notice notified the former NFL players on page 20: "You do not have to hire your own attorney. However, if you want to be represented by your own lawyer, you may hire one at your own expense."

28. Neurocognitive Football Lawyers, PLLC signed Florida contingent fee contracts to represent a large number of former NFL players before the Amended Settlement Agreement was approved and before the contingency on any individual claim occurred.

29. Based on those Florida contingent fee contracts, attorney's fees will **not** be **paid** from the **common fund**, but from the players themselves.

30. Paragraph 30 of Professor Rubinstein's report seems to suggest that many players will receive small benefits from the MAF process where "61% of the

6

players who will get paid are projected to receive $25,000 - $50,000 at some future date."

32. The fear that they will not be fairly tested during the MAF/BAP procedure led many players to retain their own individual counsel to assist them in proving for their entitlements to compensation under the settlement agreement.

32. In part, this explains why a large number of former NFL players abandoned their prior counsel rather than submit to the MAF/BAP process.

33. These players engaged the IRPAs to aid them in finding independent professionals who would be qualified to perform neurological, neuropsychological, and radiological testing to assess whether they have Qualifying Diagnoses prior to the Effective Date of the Agreement.

34. In this regard, the players represented by Neurocognitive Football Lawyers, PLLC have been tested to determine whether they have qualifying diagnoses.

35. Confirming the fear held by many of these players that they will not be fairly treated, **none** of the retired NFL players represented by Neurocognitive Football Lawyers, PLLC for which a Qualifying Diagnosis has been obtained has so far been paid **any money** from the settlement.

36. In addition, the record evidence shows that Class Counsel did nothing to obtain a Qualifying Diagnosis for any of the individual clients represented by Neurocognitive Football Lawyers, PLLC.

37. Demonstrating the apparent lack of understanding for what some IRPAs do for their clients, Professor Rubenstein seems to suggest in paragraph 29 of his report that "IRPAs should be able to process their clients' through the settlement process without enormous time or expense expenditures. This is especially true given that many players are represented by IRPAs with large inventories of clients." Moreover his Footnote 78 notes the perfunctory nature of completing settlement claim forms. That is not what IRPAs who have obtained a Qualifying Diagnosis have done.

38. The Neurocognitive Football Lawyers, PLLC law firm assisted each client to be examined by various qualified professionals to comply with the Amended NFL Settlement Agreement including, but not limited to: neurologists, psychiatrists, neuropsychologists, and radiologists. Neurocognitive Football Players, PLLC also requested and reviewed prior medical and team records where they could be made available.

39. Neurocognitive Football Players, PLLC designed a third-party affidavit and they have also spoken with family members and friends of their

8

clients to complete the third-party affidavits which have been requested by the NFL claims administrator.

40. Neurocognitive Football Lawyers, PLLC has paid over $1,000,000.00 in expenses to prosecute these claims.

41. For the most part, the existence of numerous clients does not provide opportunities either to achieve economies of scale, or to hold down expenses.

42. Each individual client has a unique medical history, playing history, and personal circumstances.

43. Many of the clients test differently and show neurocognitive deficits in different domains.

44. Unlike Class Counsel, Neurocognitive Football Lawyers, PLLC has invested significant time and serious expense to prepare an individualized forensic workup for each one of Neurocognitive Football Lawyers, PLLC's clients.

45. Neurocognitive Football Lawyers, PLLC is not merely "shuffling paper."

46. After submitting **142 claims** to date, **none** of Neurocognitive Football Lawyers, PLLC's clients have been **paid**.

47. Beyond compiling and filing each individual claims package, Neurocognitive Football Lawyers, PLLC has answered deficiency notices, responded to claim audits, contested liens, and filed appeals.

9

48. Class Counsel has not assisted with any of these legal matters on these individual claims of clients represented by Neurocognitive Football Lawyers, PLLC.

49. Only two clients represented by Neurocognitive Football Lawyers, PLLC have received notification of approval for receipt of a monetary award sometime in the future.

50. Subsequently, both of those players received an "audit notice" meaning 100% of the "approved" claims are now being retroactively audited and neither client has been paid.

51. Based on the record evidence, every single claim is at risk of being denied.

52. For example, the claim of a prominent brain-injured player, Scot Brantley, was denied outright by an unknown member of the Appeals Advisory Panel.

53. As is widely reported, Scot Brantley played football for the University of Florida as a linebacker from 1976 until 1979.

54. He stopped playing college football after suffering a serious concussion from a knee to the head that was reported in the national media.

55. Dr. Peter Indelicato ended Scot Brantley's college football career two games into his senior season and recommended that he never play football again.

10

56. Mr. Brantley proceeded to play in the NFL however, and his medical records report his suffering 20 concussions during NFL play.

57. Mr. Brantley's resulting complaints of headaches, confusion, and memory deficits are thoroughly documented.

58. A treating neurologist, Dr. Nieves, medically documented that "Mr. Brantley must rely upon his wife for his activities of daily living and he is functionally impaired."

59. Mr. Brantley underwent both SPECT scanning and MRI scanning which revealed objective medical evidence of his brain damage. Both a board-certified neurologist and a neuropsychologist diagnosed him with Alzheimer's.

60. On April 27, 2015, the NFL 88 Committee determined that Scot Brantley was entitled to benefits under the 88 plan for dementia.

61. Yet in a stunning turn of events, Scot Brantley's NFL concussion claim was denied outright.

62. The AAP member who revised Mr. Brantley's NFL concussion claim did not reduce his claim to a 2.0 or 1.5 payout.

63. Rather, his claim was denied without any compensation paid.

64. Based on my knowledge, skill, training, education, and experience as a former judge, author, and lecturer on attorney's fees, I offer the following opinions within a reasonable degree of legal certainty:

      a.     The Neurocognitive Football Lawyers, PLLC provided substantial benefit to their former NFL player-clients both before the claims procedure opened, and during the claims procedure.;

      b.     The 25% contingent fee charged by Neurocognitive Football Lawyers, PLLC under their Florida contingent fee contracts is inherently fair, ethical, and reasonable because of the undertaken risks in delayed/denied claims, the substantial costs advanced in prosecuting the claims, the time involved in shepherding each of individual claim, and the high quality of the representation provided to each of the individual claimants.;

      c.     These clients needed their own individually-retained counsel, because Class Counsel did not do anything to assist them in obtaining Qualifying Diagnoses.;

      d.     As recognized by Professor Rubenstein, the Rule 23 process for scrutiny of class counsel's proposed fee has no application to individualized retainer agreements.;

      e.     The equities favor enforcement of the privately-negotiated Florida contingent fee agreements providing for a 25% contingency fee.;

      f.     The 25% contingency fee represents a significant reduction in the prevailing 33 1/3% to 40% fees authorized by the Florida Bar.;

g. The Federal Tort Claims Act permits legal counsel to charge a contingent fee of 25%.;

h. The Florida Tort Claims Act permits legal counsel to charge a contingent fee of 25%.;

i. A contingent fee of 25% is presumptively reasonable in Social Security disability cases even if it exceeds a hypothetical hourly rate.;

j. A contingent fee of 25% is lower than the median fee charged by other firms as calculated by Professor Rubenstein in his report.;

k. While I agree that Professor Rubenstein's opinion that the 5% set aside should not be allowed, what Professor Rubenstein fails to explain is why the IRPAs recognized the 5% set aside constituted an overreach.;

l. Professor Rubenstein's assumption that Neurocognitive Football Lawyers, PLLC expected a lower rate of return is not true.

m. Because Neurocognitive Football Lawyers, PLLC have (1) undertaken serious risk, (2) advanced substantial costs prosecuting these individual claims, (3) spent tremendous time obtaining the forensic, clinical and radiological workup of each client, (4) lack economies of scale in preparing each individual claim and (5) provided high quality representation to the clients, the law firm has rebutted the recommended presumption suggested by Professor Rubenstein that their IRPA fees should be limited to 15% ; and

n. The 25% contingent fee requested by Neurocognitive Football Lawyers, PLLC in the Florida contingent fee contracts with its former NFL-player claimants is reasonable.

**SWORN TO AND SUBSCRIBED** by James C. Hauser, Esquire on January 3, 2018.

_____
JAMES C. HAUSER, ESQUIRE
AFFIANT

James C. Hauser, Esquire personally appeared before the undersigned Notary Public on the date set forth above, produced a Florida Driver's License as identification, and signed this Affidavit under oath.

_____
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires: 04/22/2018       (Seal)

Alexander T. Bowser
State of Florida
My Commission Expires 04/22/2018
Commission No. FF 115566