# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br><br> MDL No. 2323 <br><br> **Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc., <br><br> Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## CO-LEAD CLASS COUNSEL'S RESPONSE TO THE EXPERT <u>REPORT OF PROFESSOR WILLIAM B. RUBENSTEIN</u>

## I.  INTRODUCTION

In accordance with the Court's leave (ECF No. 9527), Co-Lead Class Counsel ("Class Counsel") respectfully submits this response to the Expert Report of Professor William B. Rubenstein, which was docketed on December 11, 2017 (ECF No. 9526) ("Report" or "Rpt.").

Class Counsel appreciates the Report's thoroughness and the level of effort and commitment to detail that unmistakably went into its preparation, as well as the overall constructive tone and nature of Prof. Rubenstein's observations and recommendations. Nevertheless, Class Counsel respectfully disagrees with certain of Prof. Rubenstein's assumptions, findings, and recommendations – in particular, the assumption that Class Members will pay 15.6% out of their recoveries as fees to Class Counsel, which informs both of his recommendations (in favor of a cap on individual attorneys' fees at 15% and against the adoption of a 5% holdback or set-aside from monetary awards[1]) – and accordingly submits this response in order to address them.

## II.  ARGUMENT:  PROF. RUBENSTEIN'S REPORT REFLECTS CERTAIN FAULTY ASSUMPTIONS

### A.  The Threshold Fundamental Assumption That Class Members Are Paying 15.6% of Their Recoveries as Fees to Class Counsel Is Incorrect

The Report's starting point, which shapes both of Prof. Rubenstein's recommendations, is the finding that Class Members are paying 15.6% of their recoveries as fees to Class Counsel. *E.g.*, Rpt. at 1, 5-6, 11, 17-18, 20, 31.[2]  It is based on that repeated core assumption that Prof. Rubenstein determines that, when potential individual retainer fees are added, Class Members are

---

[1] "Monetary award" encompasses Monetary Awards under Article VI of the Settlement Agreement (ECF No 6481-1) and Derivative Claimant Awards under Article VII thereof, including awards made to Representative Claimants.

[2] Page references to the Report are to the original document, not to ECF pagination.  The pagination varies only slightly, with the ECF pagination being only one digit higher.  Thus, page 1 of the Report is page 2 of ECF No. 9526.

paying "two sets of lawyers" and face average "total" potential fees "out" of their recoveries of 44.6% to as much as nearly 61%.  *E.g.*, *id*. at 2, 10-11, 20, 22.

That assumption, however, is flawed for three reasons.  *First*, Class Members are not paying Class Counsel's fees "out" of their recoveries.  Rather, the NFL is paying Class Counsel's fees separately.  Prof. Rubenstein computed the $112.5 million that the NFL deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") to be 15.6% of the $720.5 million that he estimated to be present value of the recovery.  *See id*. at C-2.  This was error because the percentage of the recovery is a relevant calculation here only in gauging the reasonableness of Class Counsel's requested fees and cannot be treated as an actual piece of a common fund being subtracted and parceled out for payment of fees and expenses.[3]

One cannot assume that, had the NFL not agreed to pay Class Counsel's fees directly, it would have surrendered an identical sum as additional settlement benefits.[4]  Indeed, that the Settling Parties negotiated fees only *after* reaching agreement on the Settlement's material terms (*e.g.*, ECF No. 6423-6, at 9 [¶¶ 18-19]) belies any notion that additional settlement consideration from the NFL could have been expected in the absence of its separate payment of fees and expenses.  Put simply, Prof. Rubenstein incorrectly treats this *constructive* common fund case the same as one involving an *actual* common fund out of which fees would be taken.[5]  Settling

---

[3] *Cf. United States v. City of N.Y.*, No. 07-CV-2067-NGG-RLM, 2016 WL 3417218, at *2 (E.D.N.Y. June 16, 2016) ("[T]he  . . .  attorneys' fees are not being taken from the class common fund at all.  Instead, the attorneys' fees here were negotiated separately from the class recovery and are being paid directly by Defendant.").

[4] *Cf. In re HP Inkjet Printer Litig.*, No. 5:05-CV-3580 JF, 2011 WL 2462475, at *1 (N.D. Cal. June 20, 2011) ("Although the fee award was less than class counsel requested, the award is to be paid directly by HP, and thus the [fee award] reduction *did not increase the amount to be received by class members*.") (emphasis added).

[5] *See Cohen v. Chilcott*, 522 F. Supp. 2d 105, 121 (D.D.C. 2007) (constructive common fund settlement "has separate funds for class recovery and attorneys' fees" whereas "[i]n a true common fund case, attorneys' fees are paid out of a common fund shared with class plaintiffs, such that the amount recovered by plaintiffs is reduced

defendants are, of course, cognizant of their overall exposure and outlays for fees are part of the overall cost of settling.  But in the unique circumstances of an uncapped settlement and a fee agreement entered into after the merits were resolved, simply lumping together fees and awards belies reality.

*Second*, even accepting Prof. Rubenstein's methodology, his 15.6% figure has to be premised on the right numerator and denominator.  In fact, there are errors in each.  Prof. Rubenstein understates the Settlement's net present value ("NPV")[6] and also overstates the amount to be recovered as fees.  The Settlement's NPV is more than $260 million higher than the $720.5 million value that Prof. Rubenstein ascribes to it.  *See* Rpt. at 4, C-2; *infra* at 4-5.  Prof. Rubenstein ascribes only a $51 million NPV to the $75 million BAP (*id*. at C-2) – almost a full one-third less. That is plainly too low.  Because the deadline for most Retired NFL Football Players to have a BAP examination is two years from the BAP's launch (*see* Settlement Agreement § 5.3 [ECF No. 6481-1, at 25]), the reality is that they will have undergone an examination in the Settlement's early years of implementation.  Furthermore, given the higher-than-projected Class participation rate, *see infra* at 4, the NFL will likely have to spend more than $75 million on the BAP because every eligible Retired NFL Football Player is guaranteed an examination, irrespective of the $75 million BAP funding cap.  Settlement Agreement § 23.1(b) [ECF No. 6481-1, at 84].

In addition to the undervaluation of the BAP, the Monetary Award Fund ("MAF") has a substantially greater present value than $537 million (*see* Rpt. at C-2).  Class Members'

---

by the amount awarded in attorneys' fees"); *see also Dewey v. Volkswagen Aktiengesellschaft*, 558 F. App'x 191, 197 (3d Cir. 2014) ("[T]his case does not involve a true common fund because Volkswagen is paying the fee out of its own pocket and not through the reimbursement fund.").

[6] Prof. Rubenstein opines that, in assessing the reasonableness of the requested fees, the Court should look to the Settlement's NPV, not the total final projected value over the Settlement's lifespan.  Rpt. at 4-5 n.10.   Class Counsel will not dispute the use of NPV.  As discussed below, however, that does not alter the fact that Prof. Rubenstein undervalues the Settlement.

participation rate has proven to be much higher than had been projected at the time that the Class's expert, Dr. Thomas Vasquez (and the NFL's expert, for that matter), had valued the Settlement. *See* Thomas Vasquez, Ph.D., *An Updated Analysis of the NFL Concussion Settlement* at 2-3 & 6 (Jan. 3, 2018) ("Vasquez Updated Analysis") (copy annexed as Ex. A to Decl. of Christopher A. Seeger, dated Jan. 3, 2018 ["Seeger Decl."]); *see also* Seeger Decl. ¶ 3 (monetary award claims data as of Dec. 19, 2017).   Based on this higher-than-anticipated participation rate, Dr. Vasquez now estimates that the NPV of the MAF is more accurately $785 million.  *See* Vasquez Updated Analysis at 4 (Table 1).[7]

*Third*, the use of a "15.6% fee" figure improperly conflates fees and expenses.  Only briefly does Prof. Rubenstein acknowledge that, of the $112.5 million AFQSF, $5,682,779.38 would be allocated to reimbursement of expenses while the fee portion amounts to $106,817,220.62.   Rpt. at 4; *see* ECF No. 7151-1, at 14-15, 67.   Expenses are to be paid off the top because they represent sums that were already advanced and which will be reimbursed.[8]   Thus, the reimbursement of incurred expenses should not be lumped together with the award of Class Counsel's attorneys' fees, and should not be taken into account in determining the reasonableness of the requested fees

---

[7]  It also bears mention that the Settlement is not like a typical securities, consumer fraud, antitrust, employment discrimination, ERISA, or other class action settlement.  The guarantee that *every* member of Subclass 1 (*i.e.*, those without a Qualifying Diagnosis at time of preliminary approval) will be entitled to a monetary award if he manifests a Qualifying Diagnosis at some point over the MAF's 65-year term confers an "insurance policy" benefit that has a genuine value, even if intangible.  Put another way, this should not be looked at as a claims-made settlement that will benefit only a few thousand who manifest a Qualifying Diagnosis.  Rather, it provides protection or coverage for life for many thousands of Retired NFL Football Players, even if they never develop an ailment.  And because the Settlement deals with a population that is unique and has not been fully studied, if the actual illness rates are greater than were forecast, all of those claims will still be paid.

[8]  *See Hackwell v. United States*, 491 F.3d 1229, 1239 (10th Cir. 2007) (noting "the historical and lexical distinction between a fee for services rendered and reimbursement for costs incurred," and that expenses "are charges in addition to the lawyer's fee") (citing treatise; internal quotation marks and italics omitted).

(or in using a lodestar cross-check to test that percentage).[9]  Based on the Settlement's true total NPV of $982.2 million, the correct percentage (*i.e.*, that attributable to fees alone) that the requested fee award would represent is equivalent to 10.9% of the value of the recovery.  Vasquez Updated Analysis, at 3-4 & Table 1.   Even under Prof. Rubenstein's undervaluation of the Settlement, it should be 14.8%, not 15.6%.  *Id.*; Rpt. 4.

### B. The Recommendation Against the Requested Set-Aside Overlooks the Increased Burdens That Class Counsel Faces under the Operative Settlement Agreement

Prof. Rubenstein notes that the initial settlement agreement presented to the Court did not contain a 5% set-aside provision.  Rpt. at 35.  He then opines that the requested 5% set-aside is unwarranted because the second Settlement Agreement neither enhanced the recovery for the Class nor increased the workload of Class Counsel in the Settlement's implementation phase.  *Id*. at 36. Both of those observations are incorrect.

*First*, putting aside that a rejected settlement agreement should have no bearing, it is inaccurate to say that the operative Settlement Agreement did not enhance the Class's recovery.[10]

---

[9] *See*, *e.g.*, *Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 496-500 (3d Cir. 2017) (affirming district court's award of 28% of recovery as class counsel fees, and remanding for further proceedings as to determination of expenses to be awarded); *Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 100-05 (D.D.C. 2013) (analyzing requested fees as percentage of common fund and separately awarding expenses); *Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 474-76 (W.D. Va. 2011) (same); *In re Amgen Inc. Sec. Litig.*, No. CV 7-2536 PSG (PLAX), 2016 WL 10571773, at *9-10 (C.D. Cal. Oct. 25, 2016) (analyzing requested fees both as percentage of common fund and under lodestar method and separately awarding nearly $6.6 million in expenses); *Cox v. Cmty. Loans of Am., Inc.*, No. 4:11-CV-177-CDL, 2016 WL 9130979, at *2-3 (M.D. Ga. Oct. 6, 2016) (analyzing requested fees as percentage of common fund and separately awarding expenses); *Guthrie Cty. State Bank v. Mahlmann*, No. 90 C 4497, 1993 WL 50854, at *1 (N.D. Ill. Feb. 24, 1993) (same).   Indeed, that it is not customary to conflate fees and expenses is confirmed by the very empirical study that Prof. Rubenstein relies upon in discussing the appropriateness of the fee percentages here.  That study *separated* expenses from fees before reporting its fee percentages.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements*, 7 J. OF EMPIRICAL LEGAL STUD. 811, 833 (2010) ("These fee awards are exclusive of awards for expenses whenever the awards could be separated by examining either the district court's order or counsel's motion for fees and expenses (which was 96 percent of the time).") (reproduced at ECF No. 7151-28, at 24).

[10] Prof. Rubenstein refers to the "second" Settlement Agreement (ECF No. 6087) – *i.e.*, the one to which the Court granted preliminary approval on July 7, 2014.  Because it is materially identical for purposes of this

The MAF's uncapping in the operative agreement ensures that every Class Member demonstrating a Qualifying Diagnosis during the MAF's 65-year term will receive the monetary award for which he is eligible without fear of the MAF's exhaustion due to unforeseen circumstances.

*Second*, the MAF's uncapping altered the dynamics of Class Counsel's interactions with the NFL.   Under a capped agreement, the NFL obviously had no incentive to aggressively challenge monetary award claims and determinations because it knew that, at the end of the day, its financial exposure under the MAF was limited to $675 million.   The uncapping of the MAF, however, created an incentive for the NFL to vigorously challenge claims in order to minimize its outlay over the 65-year course of the Settlement.   As of December 31, 2017, the NFL has filed no fewer than 25 appeals of monetary award determinations.   Seeger Decl. ¶ 4.[11]

The uncapping has also incentivized the NFL to seek more restrictive interpretations of the Settlement Agreement in general, as is illustrated by the recent briefing before Special Master Pritchett of the Settling Parties' dispute over the effect of players' deactivation from a team's game-day roster in crediting time spent on the team's "Active List" for purposes of "Eligible Seasons" credit.   *See* ECF No. 9513.   Class Counsel's successful disputation of this issue illustrates not only how he must maintain the fight on Class Members' behalf in the implementation phase but also how his efforts continue to yield a direct, positive class-wide impact.[12]   Put simply,

discussion, Class Counsel refers instead to the amended February 2015 Settlement Agreement (ECF No. 6481-1), which is the operative one to which the Court granted final approval on April 22, 2015.

[11]   The appeal deadline had yet to run in the case of another 32 monetary award determinations.   *Id.*

[12]   Other disputes with the NFL that Class Counsel has been addressing include how to resolve the opposition of physicians who participate in the Collective Bargaining Agreement's so-called "88 Plan" to signing Diagnosing Physician Certifications (a form required as part of a monetary award claim package).   Class Counsel is seeking to allow a Retired NFL Football Player with an 88 Plan diagnosis to be either independently examined by a Qualified MAF Physician or to have his medical records reviewed by a member of the Appeals Advisory Panel, with his date of diagnosis related back to the date of diagnosis for 88 Plan purposes.   The matter of how to accommodate 88 Plan diagnoses has been submitted to Special Master Verrier for resolution.   Seeger Decl. ¶ 5.

although Class Counsel's anticipation of the additional work necessary to deliver the Settlement

Agreement's benefits to Class Members has been borne out in many respects, Class Counsel had

not expected that the NFL would employ the Settlement's anti-fraud provisions to the degree it

has both to challenge monetary awards aggressively and to seek restrictive interpretations of the

Settlement Agreement.[13]

For these reasons, Prof. Rubenstein's argument that common benefit fee awards typically

compensate lead or class counsel both for securing a settlement and in implementing it (Rpt. at 37-

38) is inapposite here given the *sui generis* nature of the Settlement.  The Settlement not only has

a unique 65-year lifespan,[14] but also, as noted above, Class Counsel's responsibilities in overseeing

its effectuation have gone (and will continue to go) well beyond mere administrative or ministerial

functions, resulting in his firm having to expend substantial time and resources on Class Members'

behalf, including by litigating on their behalf (whether before this Court in connection with third

parties' activities or before the Special Masters in connection with disputes with the NFL).[15]  None

---

Another dispute is over what diagnostic criteria satisfy the pre-Effective Date "generally consistent" language in Section 6.4(b) and Exhibit A-1 of the Settlement Agreement relating to Qualifying Diagnoses for purposes of demonstrating Level 1.5 and 2 Neurocognitive Impairment.  *See* ECF No. 6481-1, at 37, 106-08.  The NFL has argued that the impairment levels that drive the BAP, which are narrow, should guide, whereas Class Counsel maintains that a more generous and inclusive standard, the "dementia" diagnosis, should guide.  Class Counsel has submitted statements to the Special Masters on this issue in support of individual Class Members in connection with appeals of monetary award determinations.  Seeger Decl. ¶ 6.

[13] Nor, just as importantly, could Class Counsel have expected the extent to which third-party lenders and claims services providers would emerge to profit off Class Members' backs.  The Court is well acquainted with the extensive work done by Class Counsel to protect Class Members from such third parties over the course of this year.  *E.g.*, ECF Nos. 7101, 7122, 7470, 8037, 8362-63, 8392-93, 8410-11.  What became apparent is that an uncapped MAF created a greater inducement for such profiteers to aggressively target Class Members because there is more financial room to game the system.

[14] In this respect, the Report unfortunately overlooks the unavoidable need down the road to transition responsibility for the oversight and effectuation of the Settlement to future generations of class counsel.

[15] Prof. Rubenstein maintains that "there should not be a high level of work" down the road "if the parties establish a sound claims administration program."  *Id.* at 43.  That belief, however, stems from the incorrect assumption that the claims process is routine or mechanical.  *See id.* at 25 (commenting that, after Settlement's

of the cases that Prof. Rubenstein cites (*id*. at 37-38 n.121) – two of which were consumer actions

and a third an ERISA case – involved settlement implementation as involved and demanding as

that here.  The roughly $6 million in implementation-related lodestar that Class Counsel's firm has

accrued since the Settlement's Effective Date is further testimony to this.[16]

### C. The Suggestion That the AFQSF Also Cover Attorneys' Fees Going Forward Undervalues Class Counsel's Substantial Earlier Work in Securing the Settlement

Prof. Rubenstein proposes that, instead of a holdback, the Court award only a portion of

the requested $106.8 million in common benefit fees and set aside the remainder in order to fund

implementation-related work or, alternatively, that it stagger payment of fees out of the AFQSF

over time (Rpt. at 41-46).  The underpinning of these proposals is Prof. Rubenstein's contention

that little actual litigation went into securing the Settlement in comparison to other cases (*id*. at 20-

---

July 2014 preliminary approval, individual counsel "would be primarily responsible only for processing their clients' claims through the claims facility"); *id*. at 28 ("[S]ince the claims' values are preestablished and based on medical diagnoses, the most an IRPA can do is ensure her client receives his fair share.").  The reality, though, is that the claims process here requires the involvement of designated medical experts in personally examining Retired NFL Football Players, and as discussed above, in many instances has been and will continue to be adversarial, especially given the uncapped nature of the MAF.  Furthermore, as noted above, to the extent that Settlement Agreement interpretation is at issue in individual claims, Class Counsel necessarily will be involved in addition to or in lieu of individual attorneys.

[16] That lodestar alone belies Prof. Rubenstein's suggestion that $1 million annually will suffice to compensate the work that Class Counsel previously enumerated.  *See* Rpt. at 42-43; *see also* ECF No. 7464 [at 36-44], 7151-2 [at 32-35 (¶¶ 107-18)].  To date, Class Counsel's firm has amassed an implementation-phase lodestar many times that low estimate.  Besides, Class Counsel did not purport to enumerate everything being done or that will need to be done to implement the Settlement.  *See* ECF No. 7464, at 36.  Class Counsel has been forced to expend considerable time and resources in dealing with third-party issues (*see supra* at 7 n.13), and with the NFL over its interpretation of the Settlement Agreement.  No more meritorious is Prof. Rubenstein's suggestion that Class Counsel's hourly rates should be capped in the implementation phase.  Rpt. at 44-45.  Even if some other law firms bill at lower rates, Class Counsel is reasonably entitled to be compensated at his firm's normal billing rates because the extensive work that must be committed to this case plainly entails opportunity costs – *i.e.*, his firm must forego work on other cases in which it would bill at its normal rates.  *E.g.*, *Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4, 24 (D.C. Cir. 1984) ("[E]stablished billing rates . . . represent the opportunity cost of what the firm turned away in order to take the litigation[.]") (italics omitted), *overruled in part on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988); *Sec. Ins. Co. of Hartford v. Campbell Schneider & Assocs., LLC*, 481 F. Supp. 2d 496, 504 n.8 (D.S.C. 2007) (opportunity costs are incorporated into billing rates).  As for Prof. Rubenstein's recommendation that no multiplier be awarded for implementation-related work (Rpt. at 44), that is a non-issue.  Class Counsel has not suggested otherwise, and agrees that implementation-phase work should be remunerated at straight lodestar.

22, 39)[17] and that, therefore, the AFQSF is adequate to compensate Class Counsel both for work done in achieving the Settlement and for prospective work in overseeing its implementation.  Prof. Rubenstein justifies his assessment on the need to have a "placeholder" in his analysis.  Rpt. at 4 n.6.  Even if he did so indirectly and for purposes of opining on the issue of a cap on individual retainer fees or the requested set-aside, Prof. Rubenstein strayed beyond the scope of his assignment in commenting on the reasonableness of Class Counsel's requested fee – as well as opining on allocation matters by suggesting that some individual attorneys should be compensated out of the AFQSF.  *See id.* at 32.  The Court specifically reserved to itself the adjudication of Class Counsel's fee petition (ECF Nos. 7446, 8376 [at 2]).

Given the limited scope of this response, Class Counsel will not dwell on the substance of Prof. Rubenstein's assertion concerning the extent of the effort that went into securing and defending the Settlement.  That work is discussed at length in the opening memorandum in support of the fee petition.  ECF No. 7151-1, at 21-36.  Any suggestion that Class Counsel did not invest sufficient time in this litigation to warrant the requested $106.8 million in common benefit fees is simply wrong.  Although this may not have been a typical MDL involving extensive discovery, bellwether trials, and the like, all kinds of labors, resources, and ingenuity went into resolving this litigation.  The Court is well acquainted with those efforts – which is why, consistent with its directives, the Court should be the one to address them.  Because Class Counsel has already earned

---

[17]    The Report's reliance on a disgruntled attorney's uninformed assertion that this is the only "mega-fund" settlement in which there was no discovery, motion practice, or trial (Rpt. at 22), is misplaced.  In *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.* ["*VW Clean Diesel*"], No. MDL 2672 CRB (JSC), 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017), and 2017 WL 3175924 (July 21, 2017), the court awarded a total of $300 million in attorneys' fees and costs based on the extensive work performed by the class counsel there over a much shorter period of time than was the case here, and where that work entailed minimal discovery and no trial.  Here, Class Counsel invested time and incurred expenses over a much longer duration, including defense of the Settlement at three judicial levels (and more than once in the Court of Appeals).

the requested fees and none of the extensive implementation-related work forms the basis for the common benefit fee request, it is simply not correct to say that the adoption of a set-aside would result in Class Counsel being paid twice for the same work (Rpt. at 47).[18]

## III.  CONCLUSION

For the foregoing reasons, because certain aforementioned assumptions and findings in the Report are inaccurate or unsupported, the Court should reject its recommendation and adopt the requested five-percent set-aside from Class Members' monetary awards.

Date:  January 3, 2018

Respectfully submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Tel.:  (212) 584-0700
Fax:  (212) 584-0799
cseeger@seegerweiss.com
***CO-LEAD CLASS COUNSEL***

---

[18]   Nor should the Court accept the Prof. Rubenstein's further alternative suggestion that, instead of a holdback, Class Counsel pursue additional fees from the NFL to fund implementation-related common benefit work.  *See id*. at 40.  That will protract the resolution of Class Counsel's fee petition for months, inasmuch as Prof. Rubenstein himself acknowledges that the Settlement expressly limits the NFL's responsibility for payment of Class Counsel's fees to those "ordered by the Court as a result of the initial petition by Class Counsel." Settlement Agreement § 21.1 [ECF No. 6481-1, at 82]; *see* Rpt. at 37.  Class Counsel would have to prepare a major supplement to the fee petition in order to present a claim that the NFL pay more in fees to fund implementation work, and such a supplemental petition would undoubtedly trigger a round of contentious briefing before the Court can render a final adjudication of the fee petition filed last February.  It would be unjust to further delay an award of fees and reimbursement of expenses by bringing in the NFL for such additional proceedings.  Moreover, Class Counsel should not be put in the position of expending time, money, and resources to effectuate the Settlement and in dealing with the attendant implementation-related disputes with the NFL while simultaneously having to battle the NFL to pay additional fees to fund implementation-phase common benefit work.  Of course, given its familiarity with the work already performed and efforts that will be required over the long haul, the Court can always take the initiative to direct the NFL to augment the AFQSF for the purpose of compensating implementation-related common benefit work.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on all counsel of record via the

Court's ECF system on January 3, 2018.

/s/ Christopher A. Seeger
Christopher A. Seeger