# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323<br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden,<br>*on behalf of themselves and*<br>*others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and<br>NFL Properties LLC,<br>successor-in-interest to<br>NFL Properties, Inc.,<br><br>Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

## DECLARATION OF CHRISTOPHER A. SEEGER

CHRISTOPHER A. SEEGER declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information and belief, the following:

1.    I am Court-appointed Co-Lead Class Counsel for the Settlement Class that this Court certified in its Amended Final Order and Judgment entered on May 8, 2015 (ECF No. 6534) in accordance with its April 22, 2015 decision (ECF No. 6509) granting final approval to the February 13, 2015 Class Action Settlement Agreement, as amended (ECF No. 6481-1).  I am fully familiar with the matters set forth herein, which are based on my personal knowledge and review

of my firm's files.  I submit this Declaration in response to the Expert Report of Professor William B. Rubenstein filed on December 11, 2017 (ECF No. 9526).

2.      My firm regularly receives updated reports from the Court-appointed Claims Administrator, BrownGreer, PLC, concerning Settlement program monetary award claims processing data.

3.      Based on my review of such reports, as of December 19, 2017, 1,542 claims for monetary awards had been submitted, and the Claims Administrator had approved some 202 awards, amounting to nearly $254 million before liens or other withholdings, with 63 awards (totaling nearly $75 million) already paid and the remainder either awaiting the Court's approval of funding, the subject of appeal or audit, or still within the appeal deadline.  The more than 1,300 other claims were in various stages of processing, including denials (60 claims), claims awaiting the Claims Administrator's review, claims the subject of audit, claims requiring that the Class Member respond to a request for additional information, and the Claims Administrator reviewing responses to additional information requests.

4.      In addition, as of December 31, 2017, the NFL had filed 25 appeals of monetary award determinations.   The appeal deadline had yet to expire on 32 monetary award decisions.

5.      Among the Settlement Agreement implementation-related disputes with the NFL that I and my firm have been addressing is the issue of how to resolve the opposition of physicians who participate in the Collective Bargaining Agreement's so-called "88 Plan" to signing Diagnosing Physician Certifications (a form required as part of a monetary award claim package). We are seeking to allow a Retired NFL Football Player with an 88 Plan diagnosis to be either independently examined by a Qualified MAF Physician or to have his medical records reviewed by a member of the Appeals Advisory Panel, with his date of diagnosis related back to the date of

diagnosis for 88 Plan purposes.  The issue of how to accommodate 88 Plan diagnoses is presently before Special Master Verrier for resolution.

6.     Another dispute with the NFL has been over what diagnostic criteria satisfy the pre-Effective Date "generally consistent" language in Section 6.4(b) and Exhibit A-1 of the Settlement Agreement relating to Qualifying Diagnoses for purposes of demonstrating Level 1.5 and Level 2 Neurocognitive Impairment.  *See* ECF No. 6481-1, at 37, 106-08.  The NFL has argued that the impairment levels that drive the BAP, which are narrow, should guide, whereas I maintain that a more generous and inclusive standard, the "dementia" diagnosis, should guide.  We have submitted statements to the Special Masters on this issue in support of individual Class Members in connection with appeals of monetary award determinations.

7.     The foregoing are just are two of many disputed issues between the Settling Parties as to the implementation of the Settlement Agreement that have required negotiation or resolution of one form or another.

8.     Annexed hereto as Exhibit "A" is a report, dated January 3, 2018 and entitled "An Updated Analysis of the NFL Concussion Settlement," prepared by Thomas Vasquez, Ph.D. of Ankura Consulting Group.  The data set forth in paragraph 3 above concerning the number of approved monetary awards and the dollar value thereof were furnished to Dr. Vasquez.

9.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of January, 2018

                                        */s/ Christopher A. Seeger*
                                        CHRISTOPHER A. SEEGER
                                        *Co-Lead Class Counsel*

# EXHIBIT A

# AN UPDATED ANALYSIS OF THE NFL CONCUSSION SETTLEMENT

Prepared by:

**Thomas Vasquez Ph.D.**

**Ankura Consulting Group**

**January 3, 2018**

1

I was originally asked by Co-Lead Class Counsel in *In re National Football League Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.) to undertake an analysis to assist in settlement negotiations in mid-2013. My conclusions from that work are reflected in the NFL Concussion Liability Forecast, dated February 10, 2014. In late 2014, Co-Lead Class Counsel asked me to prepare a Declaration and to elaborate on certain elements of the work I had conducted for my initial report. A discussion of those analyses is contained in my Declaration, dated November 12, 2014. In April of 2017, I provided updated analyses to reflect changes to the initial settlement agreement and additional data concerning Class Member participation rates. A discussion of those analyses is contained in my report, dated April 10, 2017.[1]

I have now been asked by Co-Lead Class Counsel to address certain aspects of the analysis conducted by Professor William B. Rubenstein. Professor Rubenstein computes a measure to show the percent of the settlement value accruing to Class Counsel. He computes the percent by dividing total Class Counsel "Fees" by the Net Present Value of the sum of: (1) payments made to claimants from the MAF, (2) cost of the BAP, (3) the Education Fund, (4) Notice Costs, (5) Claims Administration, and (6) Class Counsel "Fees". I have been asked to determine whether current information on the Class participation rate, actual payments from the MAF fund, and actual administration costs would affect the Net Present Value calculations at the core of Professor Rubenstein's ultimate conclusions.

Current information, as of December 19, 2017, on participation rates—and, relatedly, actual claimant awards and administrative expenses—reveals that the Net Present Value of the Settlement is substantially greater than the value accorded the Settlement by Professor Rubinstein. Participation rate assumptions in my (and the NFL's) original modeling of the Settlement were a primary driver of expected settlement value. Participation rates in the final, as-approved Settlement program substantially exceed those initially projected (and likewise exceed those for reference settlements considered in developing my early settlement estimates). As a result, the anticipated Net Present Value is expected to be substantially greater than previously projected. The actual claimant awards and administrative expenses incurred to date similarly point to higher Settlement-related payments and costs, and a correspondingly higher Net Present Value.

While a relatively small impact when compared to the impact of recent information, Professor Rubenstein also includes expense reimbursements to Class Counsel as a component of "Attorney Fees" in measuring fees to Class Counsel, which serves to overstate Class Counsel's fee percentage.

Table 1 provides a summary of the value of the Settlement as estimated by Professor Rubenstein and as updated for actual participation rates and actual spending patterns. Professor Rubenstein's analysis relies heavily on the estimates prepared in 2014 by the NFL actuaries. Indeed, Professor Rubenstein's nominal amounts are taken directly from the report of the Segal Group to the

---

[1] All three of these documents have been provided earlier and are not reproduced here.

Special Master.[2]  Professor Rubenstein reports total nominal value at $1,088.5 million and Net Present Value (NPV) at $720.5 million.  He then concludes that this results in Attorney's Fees being approximately 15.6% of total Settlement value ($112.5 million divided by $720.5 million).

However, the $112.5 million represented as Attorney Fees includes a request for reimbursement of expenses incurred by Class Counsel prior to the Effective Date of approximately $5.7 million. Actual pre-Effective Date Class Attorneys' Fees are therefore $106.8 million.  The third column of the table shows the effect of eliminating expenses.  As seen on the Table, without consideration of the impact of actual participation rates on Net Present Value, Attorney Fees are 14.8% of the value of the Settlement.

Of greater significance, as noted above, is the impact of actual Class Member participation rates on the total value of the Settlement.  As noted in my original report, the participation rate of eligible Class Members in the Settlement is a critical parameter in valuing the Settlement.  *See* NFL Concussion Liability Forecast, dated February 10, 2014, at p. 9.  Based on experience with participation rates in other mass tort resolutions, both the NFL actuaries (Segal Group) and I projected Class Member participation to be approximately 60% in the analyses prepared in 2014. Participation rates are now known to be approximately 80%--much higher than forecasted, and much greater than that seen in other similar mass torts (see Table 2 below).

Table 1 also presents the valuation presented by Professor Rubinstein as updated to account for final participation rates, changes in settlement terms subsequent to the initial valuations[3] and appropriate treatment of Attorneys' Fees (*i.e.,* net of requested pre-Effective Date expense reimbursement).  After appropriately accounting for these items, the nominal value of the settlement increases by approximately 39% and the NPV increases by approximately 36%.

Thus, while maintaining Professor Rubenstein's framework but with the change of accounting for increases in the value of the settlement and the excluding of Class Counsel's out-of-pocket expenses, Class Attorneys' Fees represent 10.9% of the total settlement value – almost 5 percentage points, or 30% lower than concluded by Professor Rubenstein.

---

[2] "Report of the Segal Group to Special Master Perry Golkin"; In re: National Football League Player's Concussion Injury Litigation, MDL 2323; September 12, 2014.

[3] As reflected in my April 2017 report, the specific changes in benefits and eligibility implemented in the final Settlement Agreement (from that which was initially presented) have increased the value of the Settlement to Class Members by approximately $33 million.

**Table 1**

**Updating Professor Rubenstein's Net Present Value Calculations:
Accounting for Current Participation Rates and Spending Levels**

| Estimate | NFL Actuary's Nominal | Net Present Value Using Rubenstein's 4.5% Discount Rate | |
|---|---|---|---|
| | | All Attorney's Fees Including Expenses | Attorney's Fees Excluding Expenses |
| **Professor Rubenstein's Calculations** | | | |
| Monetary Award Fund (MAF) | $890,000,000 | $537,000,000 | $537,000,000 |
| Baseline Assessment Program (BAP) | $62,000,000 | $51,000,000 | $51,000,000 |
| Education Fund | $10,000,000 | $10,000,000 | $10,000,000 |
| Notice Costs | $4,000,000 | $4,000,000 | $4,000,000 |
| Claims Administration | $10,000,000 | $6,000,000 | $6,000,000 |
| Attorney's Fee Provision | | | |
| Attorney Fees | $106,800,000 | $106,800,000 | $106,800,000 |
| Expenses | $5,700,000 | $5,700,000 | $5,700,000 |
| Subtotal, Attorney's Fee Provision | $112,500,000 | $112,500,000 | $112,500,000 |
| Total | $1,088,500,000 | $720,500,000 | $720,500,000 |
| Rubenstein's Attorney's Fee Provision (% of Total) | 10.3% | 15.6% | 14.8% |
| **Professor Rubenstein's Calculations Updated for Current Participation Rate** | | | |
| Monetary Award Fund (MAF) | $1,297,000,000 | $785,000,000 | $785,000,000 |
| Baseline Assessment Program (BAP)[1] | $75,000,000 | $61,700,000 | $61,700,000 |
| Education Fund | $10,000,000 | $10,000,000 | $10,000,000 |
| Notice Costs | $4,000,000 | $4,000,000 | $4,000,000 |
| Claims Administration[2] | $14,000,000 | $9,000,000 | $9,000,000 |
| Attorney's Fee Provision | | | |
| Attorney Fees | $106,800,000 | $106,800,000 | $106,800,000 |
| Expenses | $5,700,000 | $5,700,000 | $5,700,000 |
| Subtotal, Attorney's Fee Provision | $112,500,000 | $112,500,000 | $112,500,000 |
| Total | $1,512,500,000 | $982,200,000 | $982,200,000 |
| Rubenstein's Updated Attorney's Fee Provision (% of Total) | 7.4% | 11.5% | 10.9% |

1.) Includes administrative costs associated with BAP

2.) MAF administrative costs only.

Note: Updated Calculations include the effect of increased participation rates and expanded settlement coverage
(see Vasquez Report "An Updated Analysis of the NFL Concussion Settlement", April 10, 2017)

*Methodology*

The methodology used in my original analysis in 2014 and all subsequent analyses was based on a life cycle forecasting model. The life cycle model looks at each individual in the population of former NFL players and "ages" them, year-by-year, into the future. The population utilized was based upon the anticipated participation rate.

During the aging process, the life cycle model takes each of the former NFL players individually

4

and first applies the epidemiological risk equations to compute the probability of contracting each one of the compensable injuries. The model then applies overall mortality rates to compute the likelihood of death due to other natural causes[4]. The mortality rates used to compute the likelihood of death due to natural causes are those for all causes for males in the same age group.

Thus, for each player and for each year, computations are made based on the probabilities of each of the following: (1) the player will die of natural causes, (2) he will be diagnosed with one of the compensable terminal diseases (Alzheimer's, ALS, Parkinson's), (3) he will be diagnosed with one of the non-terminal neurocognitive disorders (Level 1.5 or 2), and (4) he will not experience any of these adverse conditions during that year.

These steps are repeated year-by-year, changing the mortality rates and disease incidence rates accordingly for age until the individual player reaches a final resolution – either he dies of natural causes or he is diagnosed with one of the terminal diseases and receives full final compensation. The model then repeats this entire process for the next player until all players in the population have reached the final resolution stage, and the last member of the population of former NFL players is no longer alive.

A diagram of the life cycle modeling methodology is shown in Figure 1.

---

[4] The term "natural causes" refers to any cause of death that is not identified as a compensable disease in the Settlement.

**Figure 1:  Life Cycle Methodology Overview**



The methodology employed by the NFL's actuaries in their 2014 analysis (and on which Professor Rubinstein relies) similarly depends on and is driven by the participation rate.  The more Class Members that participate in the Settlement, the greater the number that are eligible for injury-related compensation and will be compensated according to the Settlement Agreement's terms over the life of the Program.

*Updates to 2014 Estimates*

The updated value of the NFL Concussion Settlement includes two factors/updated information that changed since my original estimate in 2014.  The first includes changes to the settlement.  This factor was addressed in my April 2017 report.  To summarize, I concluded that the nominal value of the MAF award program would increase by approximately 5%.

The second factor is the participation rate in the MAF program.[5]  Table 2 shows the estimated and

---

[5] There was some indication of an increased participation rate at the time I was preparing my April 2017 report.

6

actual participation rates. The original estimates assumed a 95% participation rate for individuals already filing a claim (and/or represented by counsel) and a 50% participation rate for all other former players. These assumptions yielded an approximately 59% participation rate overall. However, the actual participation rate is approximately 80%. This 36% increase in the participation rate (from 59% to 80%) has a direct increase in the value of the MAF and BAP.

## Table 2

### Player Registrations as Class Members: Estimated vs. Actual

| Player Categories | Original NFL Actuary - 2014 Estimate | Final Registration |
|---|---|---|
| Estimated Registered Players[a] | 12,200 | 17,200 |
| Total Class Members[b] | 20,500 | 21,500 |
| Participation Rate | 59% | 80% |

a.) Ex. A; Declaration of Orran L. Brown, Sr. ISO Third Joint Status Report on the Implementation of the Settlement Program; Paragraph 5, (excludes Derivative Claimants.)

b.) Players of NFL affiliate leagues were included as eligible class members in my April, 2017 report

While it is intuitively obvious that higher participation rates will increase the value of the settlement, there is growing substantial evidence that the higher rates are already yielding higher value. Indeed, as shown on Table 3, costs are already on average 57% higher than estimated. This compares to the 39% increase in forecasted nominal costs resulting from the higher participation rates (see Table 1 above). Table 3 compares actual and estimated costs through the first eight months of the settlement.[6]

_____

[6] The settlement was funded in February of 2017, but the first award amount was not determined until May of 2017 and the first payment was made in June of 2017.

## Table 3

### Estimated vs. Actual Costs:
### Experience Through the First Eight Months

| Fund/Expense | May Through December 19, 2017[a] | | |
| --- | --- | --- | --- |
| | NFL Actuary Estimates[b] | Actual | Percent Increase |
| MAF | 160,700,000 | 254,000,000 | 58% |
| MAF Admin. Costs | 2,000,000 | 3,600,000 | 80% |
| BAP[c] | 11,200,000 | 15,800,000 | 41% |
| Total | 173,900,000 | 273,400,000 | 57% |

a.) The settlement was funded in February of 2017, but the first award amount was not determined until May of 2017 and the first payment was made in June of 2017.

b.) Eight months of the NFL Actuary's estimated first full year value for MAF and BAP. Start up costs plus seven months of processing for MAF Admin costs

c.) BAP includes exam costs, supplemental benefits, and admin costs.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, based upon my personal knowledge, information and belief.

Thomas Vasquez, Ph.D.
January 3, 2018

8