IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION LITIGATION<br>_____ | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | | |

**RESPONSE TO THE EXPERT REPORT OF
PROFESSOR WILLIAM B. RUBENSTEIN**

Lubel Voyles LLP, Provost Umphrey Law Firm LLP, Washington & Associates PLLC, and The Canady Law Firm file their response to the Expert Report and opinions of Professor William B. Rubenstein ("Rubenstein") as follows:

## I. SUMMARY OF THE RESPONSE

The Court should reject Rubenstein's suggestion to impose a presumptive cap on all contingent fee contracts because, under *US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013), the Court is without such inherent authority.

Even if the Court decides to presumptively cap contingent fees, the Court should reject Rubenstein's suggested 15% presumptive cap on all contingent fee contracts because Rubenstein reaches the presumptive rate, which is well below the average reasonable contingent fee rates analyzed, using assumed facts that are not correct and a flawed analysis of other cases involving different settlement structures.

Finally, because his Report does not address Rubenstein's conflict of interest, the Court should not consider suggestions or opinions in the Report until and unless interested parties have an opportunity to conduct a Fed. R. Civ. P. 706 deposition and respond to his opinions.

1

## II. ARGUMENT

**A.     The Court does not have the inherent authority to limit privately-negotiated contingent-fee agreements.**

In his Report, Rubenstein suggests that the Court "should set a presumptive cap on all contingent fee contracts" (ECF 9526, p. 1 ("Rep.")).  To support this recommendation, Rubenstein first concludes that the Court "possesses the [inherent] authority to assess the reasonableness of each class member's contingent fee contract with his individually retained attorney" (Rep., p. 14).

In reaching this conclusion, Rubenstein reviewed, *inter alia*, the Affidavit of Professor Charles Silver (EFC 7071-1). In that affidavit, Silver categorically opines that nothing in federal class action rules reduce or eliminate "a lawyer's right to collect a payment pursuant to a valid engagement contract" (*See* ECF 7071-1, p. 11 ("Silver Affidavit")).[1] Rubenstein does not mention, discuss, or distinguish Silver's affidavit about the authority of the Court to alter a contingent fee agreement, though he credits Silver as a "scholar" (Rep., p. 8 n. 32).

 Rubenstein is not only silent on Silver's conflicting view on the Court's authority, he is also silent on Silver's contractual and policy bases for opining that the Court is without authority. First, Silver states that reducing fee agreements is actually inconsistent with § 21.1 of the Settlement (*See* Silver Affidavit, p. 17). Then, Silver explains significant negative consequences to a decision to limit contingent fee agreements including, for example, the chilling effect on future class-wide settlements (*See id.*, p. 19).  Rubenstein offers no counter to either opinion.

Rubenstein also fails to discuss U.S. Supreme Court authority which, under analogous circumstances, holds that the common-fund doctrine does not provide a court with the inherent authority to trump a contract.[2] *See US Airways, Inc. v.*

---

[1] Respondents incorporate Silver's Affidavit and Resume (ECF 7071-1) by reference.
[2] Respondents also urge that the Court is without jurisdiction to alter their privately negotiated contracts where, as here, there is no case or controversy regarding their fee contract or whether the client will achieve an award subject to fee. *See Brown v. Watkins*, 596 F.2d 129 (5th Cir. 1979).

*McCutchen*, 569 U.S. 88, 100 (2013) (confirming "if the agreement governs, the agreement governs"). In *McCutchen*, US Airways attempted to enforce a reimbursement provision within its health benefits plan with McCutchen after McCutchen recovered in tort for injuries negligently caused. McCutchen argued US Airways should be limited to reimbursement of sums double-recovered or common-fund sums. However, writing for the Majority, Justice Kagan held a Court may not use equity to disregard a fee agreement under the theory that a party is unjustly enriched by claiming the benefit of its bargain. *Id.* Although the decision arises in the context of an ERISA plan, the reasoning derives from contract, not statute. In upholding the contract language, the Court rejected the argument that the Court had the inherent authority to do equity that conflicts with the parties' contract. *Id* at 99.

Instead, Rubenstein relies heavily upon the Third Circuit authority providing "inherent authority to regulate attorneys appearing before it" (Rep., p.14). Such general authority is neither novel nor disputed. However, none of those cases provide a court with inherent authority to unilaterally rewrite a privately-negotiated contingent fee agreement or are otherwise in conflict with *McCutchen*.

Nor do they actually answer the non-class counsel contingent fee question. For example, in *Dunn v. Porter*, 602 F.2d 1105 (3d Cir. 1995), it was <u>class counsel's</u> contingent fee that the Court limited. The *Dunn* court did so under Fed. R. Civ. P. 23 because class counsel's fees were to be paid <u>from the settlement fund</u>. Non-class counsel IRPAs are "on slightly different footing" (Rep., p. 13). That is why Rubenstein acknowledges Rule 23 "has no obvious application to individualized retainer agreements" (Rep., p. 13). *Dunn* is therefore inapposite.

Similarly *Mitzel v. Westinghouse Elec. Corp*, 72 F.3d 414, 417 (3d Cir. 1995) says nothing about a Court's inherent authority to trump a contract. Instead, the Court determined <u>under a choice of law analysis</u>, that New Jersey law invalidated the contingent fee percentage in a New York contingent-fee contract. The Court's

3

authority to limit a fee derived from a state statute, not inherent authority. There are no Third Circuit cases vesting the Court with inherent authority to revise or reduce the non-class counsel individual contingent-fee agreements.

Rubenstein also relies upon *In re Vioxx* and the district court's extensive discussion of the court's authority to limit private contingent-fee contracts. 650 F. Supp. 2d 549, 558 (E.D. La 2009). But, Judge Fallon noted two sources for the court's authority to limit contingency fees: (i) Fed. R. Civ. P. 23 and (ii) the settlement agreement, itself. Here, Rubenstein disclaims any authority from Rule 23, as outlined above, and he says nothing about the Settlement vesting the Court with authority over private contingent fee contracts. But, as mentioned above, Silver does say that the Settlement provides for the private fee contracts, not the revision of same (*See* Silver Affidavit, p. 17, citing § 21.1 of the Settlement).

In sum, the Court should reject Rubenstein's opinion that the Court has the inherent authority to limit non-class counsel contingent fees because it is contrary to U.S. Supreme Court authority, contrary to the Settlement Agreement (for which the Class Members received notice), and represents poor public policy.

**B.     Assuming authority, the Court should not cap contingent fees at 15%**

Even assuming the Court possesses the inherent authority to limit privately-negotiated fee contracts, the Court should not accept Rubenstein's suggestion that the Court place a presumptive 15% cap because the flawed analysis rests upon assumed facts that do not exist. More specifically, Rubenstein uses seven (7) "circumstances" supporting a cap and three (3) measuring sticks to reach 15% and applies them to assumed facts that do not exist. In particular, Rubenstein assumes or concludes—incorrectly—that: (a) "Class Members with [private attorneys] are "paying two sets of lawyers" (Rep., p. 20);[3]  (b) all private attorneys who have

---

[3] Recall, the common-benefit attorney fees are not paid as a percentage of the recovery. Instead, the NFL will pay common benefit fees over and above the Settlement's benefits (*See* ECF No.

4

contributed to the common benefit will be separately compensated for that effort (Rep., p. 28, n. 94); and (c) courts in "cases with similar settlement structures" have capped contingent fees at rates in a lower range than suggested (Rep., p. 30).

Rubenstein begins with his seven circumstances which include, for example, the early settlement, the economies of scale, the likely small compensation for the "bulk of the players," the vulnerability of the class members, and the timing of the contingent fee contracts.[4] These factors, however, do not support the reduction of individual contingent fee agreements.

For example, the early settlement and the economies of scale factors are actually contradictory. Rubenstein again relies upon *In re Vioxx* as support for reducing IRPA fees "saved" through economies of scale (Rep., p. 20 n. 71). But, economies of scale were achieved in *In re Vioxx* through class counsel conducting discovery and engaging in bellwether trials that the individual attorneys then did not need to conduct. *See* 650 F. Supp. 2d at 552. Here, by contrast, Class Counsel saved individual attorneys very little; Rubenstein himself notes settlement in this case was achieved without discovery or trial (Rep., p 21).

Further, the fact that Class Counsel negotiated a settlement that will pay "about 61% of the players … $25,000 - $50,000" (Rep., p. 23) is not a factor for reducing the private attorneys' fee contracts. As the players' recoveries go, so go the private fee contracts. Class Counsel, on the other hand, seeks a percentage of the <u>whole</u>; that is, "the large dollar figures" from the few players receiving them.

---

6481-1, at 82). Thus, Class Members are not incurring those fees. That is, no class member is paying for any portion of the requested "15.6%" common benefit fee; the NFL will pay whatever is awarded separately with no reduction in benefits to the Class. As such, and contrary to Rubenstein's assumptions (*see, e.g.*, Rep., pp. 11, 20) there will never be a total fee payment by any Class Member in the 60+% range.

[4] In this section, and regarding the nature of this action, Rubenstein also notes the Court "deemed" IRPAs unnecessary (Rep., p. 21, citing ECF 6481-1 at 157 ("You do not have to hire your own attorney")). Of course, the Court-approved Class Notice also advised players that "if you want to be represented by your own lawyer, you may hire one at your own expense.").

5

Rubenstein, in comparing Class Counsel to IRPAs to back into a 1/3 fee, forgets that Class Counsel and the IRPAs are not seeking a percentage <u>of the same whole</u>.[5]

Finally, Rubenstein's reliance on the players' cognitive vulnerability for reducing IRPA fee is puzzling in its contradiction.[6] The private attorneys are compensated solely from the Class Member's recovery. The private attorneys are the only counsel who do not have a conflict with the represented Class Members—if the Class Member achieves no recovery, the attorney achieves no recovery. By contrast, Class Counsel negotiated a separate $112.5 fund for its fees. These same private attorneys owe separate ethical duties to the represented Class Members regarding their capacity. These vulnerable Class Members have never needed individual counsel more than they do now, when Class Counsel seek to exhaust the fee fund and begin taking 5% of each Class Member's recovery. As such, the Court should not, by capping an IRPA fee, create a disincentive to the Class Member's only completely-aligned advocate.[7]

---

[5] According to Rubenstein, the 15% cap is designed to ensure Class Members do not pay more than 1/3 in fees and expenses (Rep., p. 1). To arrive at that 1/3 figure, Rubenstein assumes all attorneys will receive the "15.6%" common benefit fee, as well as a 15% fee under their contingent fee contracts. But, attorneys who do not receive any common benefit fee would receive less than half the typical contingent fee arrangement.

[6] For one, it is difficult to reconcile Rubesntein's claim that these men have "physical and mental vulnerabilities" potentially rendering them incapable of negotiating a power of attorney (Rep., p. 24) with the suggestion that they are/were, independent of counsel, capable of filing their own lawsuit, evaluating and comprehending the 100-plus page Settlement agreement, filing, if necessary, objections to the Settlement or appeals, distinguishing differences between pre- and post-effective date diagnoses, funding qualified physician evaluatations, being able to adequately respond to the claims office, file and fund appeals, fund future exams not covered by the NFL, *etc*.

[7] A 15% cap may actually harm many of the class members who are not currently qualified for monetary award, playing right into the NFL's hands. A number of those players will lose representation altogether, and others will not have attorneys willing to fund MAF physician exams or appeals under the Settlement. It is reported to currently cost approximately $4,000 to $5,000 for the MAF approved physician exam along with separate neuropsychological protocol. Class members who undergo the one free BAP exam but do not qualify for a monetary award will be required to self-fund future MAF physician examinations approved under the Settlement as they cannot qualify for benefits by seeing any physician of their own choice.

Rubenstein then moves to the three measuring sticks" to glean a 15% cap; but, like the seven circumstances, these measuring sticks do not support the proposed presumptive cap. Those measuring sticks are: (1) Third Circuit factors; (2) data on contingent fee agreement levels in this case;[8] and (3) "data from other cases." The Third Circuit factors Rubenstein cites are from the four-part test for judicial review of contingent fees set forth in *McKenzie Cost., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987): (1) the attorney must demonstrate the fee is reasonable; (2) the standard is reasonableness "applying principles of equity and fairness;" (3) analysis of circumstances existing at the time of the fee agreement; quality of work performed; results obtained; and attorney contribution; and (4) whether changed circumstances have rendered the fee contract unfair at the time of its enforcement.

In three pages, Rubenstein analyzes these factors though he has not seen any fee contracts and none of the IRPAs have had an opportunity to meet the burden he applies. Rubenstein concludes, based upon anecdotal "data" in this case that the IRPAs, individually, are to presumptively lose their contracted-for fee or a portion thereof because they failed to "demonstrate" their fee is reasonable. The data suggests, for example, that IRPA "generally did not 'substantially contribute' to 'the results obtained' given the aggregate resolution of the case" (Rep., pp. 27-28).[9] But,

---

[8] Regarding this "measuring stick," Rubenstein does not opine that fees between 20 and 30% are unreasonable, unethical, or illegal. Instead, he notes the rates have decreased overtime and states the "most recent" rates are between 20-25% (Rep., 29). But, says Rubenstein, the "actual market rate" is likely 5% lower, *i.e.*, 15-20%, for the reason that those signing contracts after July 7, 2014 would know about the potential 5% set aside (*Id.*). That, however, makes no sense. Rubsenstein's graph (Rep., p. 29) has 13 data points representing contracts executed after mid-July 2014, when the 5% set-aside was disclosed. The rates range from 20% to 33 1/3%. Therefore, to the extent the 5% set-aside impacted the "market rate," it is reflected in the 20-33% range. Moreover, Rubenstein offers no explanation for treating attorneys that invested significant time and resources working on this matter before any settlement was announced the same as lawyers that signed up clients after the settlement.

[9] Rubenstein also suggests IRPAs work going forward will be easy, requiring little time or expense in simply "filling out claims forms" (*See* Rep., pp. 22-23 and n. 78). But, he does not set forth his familiarity with the claims process or the difficulties being faced by the Class and the Claims

the IRPAs were neither hired nor permitted to advance the cause of the aggregate. In other words, this factor would be a reason to reduce every private lawyer in every class action. And, Rubenstein forgets that if the IRPA contributed to "the aggregate," the Settlement contemplated compensation from the fee fund, not the represented Class Member. Rubenstein's flaw in logic here probably arises from his belief that all counsel contributed to the common benefit are going to be compensated from the fee fund. But, private attorneys who have contributed to the common benefit of the Class are not currently forecast to be fully and separately compensated for that effort. Co-Lead Class Counsel has excluded the common benefit contributions of, in particular, respondent Lubel Voyles. Moreover, Co-Lead Class Counsel has unilaterally recommended to the Court that the fees requested by all other common benefit counsel be reduced.

Finally, Rubenstein turns to "data from other cases."[10] Of the thirteen cases set forth by Rubenstein, three set the low range: *In re Copley Pharm, Inc.*, 1 F. Supp. 2d 1407, 1417 (D. Wy. 1998); *In re Beverly Hills Fire Litig.*, 639 F. Supp. 915, 925 (E.D. Ky. 1986); and *In re Rio Hair Naturalizer Prod. Liab. Litig.*, No. MDL 055, 1996 WL 78051 (E.D. Mich. Dec. 20, 1996). Without these three cases, the range of IRPA fees is a low of 18% and a high of 33.5%.[11] Not one of the three cases is, as described by Rubenstein, of "similar settlement structures." None contain a fee fund for common benefit fees. In fact, the *In re Rio Hair Naturalizer Prod. Liab.*

---

Administrator. On this point, Respondents incorporate by reference the discussion on pages 7-9 of ECF 9545, which documents the "complex, slow, and difficult" claims process. According to the Monetary Award Claims Report (as of 1/2/18), sixty seven (67) claims have been paid out of 1569 submitted (far less than the approximately 665 that were forecasted to be paid in year 1, *see* 6168-7 at 4). Although Rubenstein references in footnote 78 authority discussing the potential relevance of the percentage of claims found valid with and without the assistance of counsel, he provides no data or analysis from this claims process.

[10] Rubenstein presents these cases in chart form through exhibit D (ECF 9526, p. 92). Respondents are unable in the 10 pages allotted to demonstrate expressly how different they are from this case.

[11] Rubenstein's proposal of 15% is about 40% below the average from the six cases he states have "similar settlement structures" (D1) and about 27% below the other cases he considered (D2).

*Litig.* Court concluded that the 5% fee awarded was reasonable only because the settlement structure was "limited fund"—that is, the Defendant had no further assets. 1996 WL 78051 *20 (holding that "although a normal 33 ⅓% or 40% contingency fee arrangement in most cases might be deemed reasonable, in a limited fund class action involving a large number of claimants, this otherwise reasonable percentage often proves to amount to an unreasonable fee"). Even the higher fees do not provide the apples-to-apples fee structure the Court should require as legal authority to rewrite every privately-negotiated fee contract. And, not a single case analyzed, not a single capped fee, was tested through the appellate court—in fact, some were <u>agreed</u> fees. As such, they provide no reliable foundation to impose a cap.[12]

In short, the Court itself could not find that a party failed to "demonstrate" entitlement to a fee without holding a fee hearing or permitting evidence. But, as a judicial consultant, Rubenstein uses the Third Circuit factors as applied to data gathered anectdotally from the PACER website to suggest the Court hold that all private contingent fee contracts are presumptively "no longer reasonable." This is the essence of the denial of due process.

**C.    The Court should not consider suggestions or opinions in the Report until and unless interested parties conduct a Fed. R. Civ. P. 706 deposition.**

Lubel Voyles previously pointed out (ECF 8350, p. 7 responding to Order ECF 8310) that Rubenstein's resume discloses conflicts of interest in this case; at a minimum, he has served as an expert consultant for one on the parties. When the Court appointed Rubenstein (ECF 8372) and ordered that "any party may depose …

---

[12] Rubenstein acknowledges the cases on which he relies support a higher IRPA fee, but concludes Class Counsel's common benefit fee request is a "significant limiting factor" (Rep., p. 31 and n. 99). According to Rubenstein, steering committees in the other cases were typically awarded less than 10% (*Id*). And, he confirmed common benefit fees as low as 5-6% typically paid for all of the aggregate work that went into generating and implementing the entire settlement (*Id*. at 38). In fact, Rubenstein's report provides a number of factors that call into question the 15.6% common benefit fee request (*see, e.g.*, Rep., pp. 43-45 and ns. 132, 134).

9

Rubenstein about his opinion after his report is submitted," interested parties would have been able to explore the conflict and its potential impact. Pursuant to the same order appointing Rubenstein, the Court indicated it would consider the concerns about those conflicts "in the context" of responses to the written report.

However, in Rubenstein's 47-page report, he supplies no facts about his work on this case. He does not discuss the facts that he privately gave to the Court information about the conflict (*See* ECF 8372 n.1). And, pursuant to the Court's Order (ECF 9527), interested parties are no longer permitted to depose Rubenstein.

The plain language of Federal Rule of Civil Procedure 706 contemplates a deposition of the Court's expert. Fed. R. Civ. P. 706 (noting the Rule 706 expert "(2) may be deposed by any party"). Therefore, the Court should not consider Rubenstein's Expert Report until the Court permits a deposition. Only through cross examination are respondents provided a meaningful opportunity to explore and present any material conflict of interest.[13]

### III. PRAYER

For the reasons stated, the Court should (i) reject the 15% cap on contingent-fee contracts and (ii) reject the 5% set-aside requested by Class Counsel.

Date: January 3, 2018                                    Respectfully Submitted,

                                                         */s/ Lance H. Lubel*
                                                         Lance H. Lubel
                                                         Texas State Bar No.: 12651125

---

[13] We agree with Rubenstein's rejection of the 5% set-aside and the concept of staggered common benefit fee payments (*See* Rep., p. 1). The most reliable method of compensating common benefit attorneys while keeping their interests aligned with the Class is to pay them from the common benefit fund in relation to the amounts actually paid to the Class. Based on the last Monetary Award Claims Report, approximately $75 million in claims have been paid. If the common benefit lawyers were paid the 6%-common benefit fee average noted by Rubenstein (*see* Rep., 31 and n. 99), then approximately $110,000,000 would remain to be paid as the claims are processed, approved, and paid.

Adam Voyles
Texas State Bar No.: 24003121
Justin R. Goodman
Texas State Bar No.: 24036660
LUBEL VOYLES LLP
675 Bering Dr., Suite 850
Houston, TX 77057
Telephone: (713) 284-5200
Facsimile: (713) 284-5250
Email: lance@lubelvoyles.com
adam@lubelvoyles.com
jgoodman@lubelvoyles.com

*/s/ Matthew C. Matheny*
Matthew C. Matheny
Texas State Bar No. 24039040
mmatheny@pulf.com
Jacqueline Ryall
jryall@pulf.com
PROVOST UMPHREY
      LAW FIRM, L.L.P.
Attorney at Law
Post Office Box 4905
Beaumont, Texas 77704
(409) 835-6000
(409) 838-8888 - Fax Number

*/s/ Mickey Washington*
Mickey Washington
Texas State Bar No.: 24039233
WASHINGTON & ASSOCIATES
2019 Wichita Street
Houston, Texas 77004
Telephone: (713) 225-1838
Facsimile: (713) 225-1866
Email: mw@mickeywashington.com

></br>
> */s/ James C. Canady*
> James Carlos Canady
> Texas State Bar No.: 24034357
> THE CANADY LAW FIRM
> 5020 Montrose Blvd., Suite 701
> Houston, TX 77006
> Telephone: (713) 284-5204
> Facsimile: (713) 284-5250
> Email: ccanady@canadylawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record via the Court's ECF system on January 3, 2018.

></br>
> */s/ Lance H. Lubel*
> Lance H. Lubel