# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>　　　　　　Defendants. | **Hon. Anita B. Brody**<br><br><br>Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## REPLY OF PROFESSOR WILLIAM B. RUBENSTEIN TO RESPONSES TO EXPERT REPORT

　　　1.　　By Order dated September 14, 2017, this Court appointed me to serve as an expert witness on attorney's fees and directed me to report:

> (1) on whether the Court has the authority to and should order a cap on the percentage that any class member in this case would be obligated to pay his attorney and if so, what that cap should be and how that cap should be implemented and (2) on the reasonableness of requiring class members to contribute a portion of their recoveries to a common benefit fund, whether 5% is an appropriate portion, and whether this process will result in any counsel being over-compensated (e.g., double-dipping).[1]

---

[1] ECF No. 8376 at 2.  All citations to ECF document pages in this filing are to the PDF page number.

2.      On December 3, 2017, I submitted a Report that, after setting forth several factual assumptions, stated and explained two opinions:  (1) that the Court possesses the authority to cap contingent fees and should set a presumptive 15% cap on all contingent fee contracts; and (2) that the Court should not order a 5% set-aside of class members' recoveries.[2]

3.      By Order dated December 11, 2017, the Court directed interested parties to file responses by January 3, 2018.[3]  On that date, 13 briefs were filed by 17 law firms with registered settlement class member clients.

4.      Based on these thoughtful and constructive comments, I make the following updates to my initial report.

## I.
## FACTUAL ASSUMPTION:
## 11% CLASS COUNSEL FEE

5.      My Report's factual section distinguished Class Counsel's $112.5 million fee and expense request from the individually retained plaintiffs' attorneys' (IRPAs) contingent fee contracts and reported that the former constituted 15.6% of the total net present value of the settlement.[4]  In response, Co-Lead Counsel Seeger Weiss has submitted an updated actuarial report reflecting higher participation rates, claim payments, and expenses.[5]  The increased expected value of the settlement reduces the $112.5 million fee and expense request to 11.5% of the total net present value of the settlement, 10.9% of which is the fee component.[6]  I therefore

---

[2] ECF No. 9526 (hereafter "Rubenstein Report").

[3] ECF No. 9527.

[4] Rubenstein Report at 3–13.

[5] ECF No. 9552-1 at 4–12.

[6] ECF No. 9552-1 at 8.

now assume that if the Court were to grant Class Counsel's full $112.5 million fee and expense request, their fees will constitute approximately 11% of the total value of the settlement.

## II.
## 22% CONTINGENT FEE CAP

6.      My Report found that a one-third contingent fee best approximated the risk and work that the two sets of attorneys (Class Counsel and IRPAs) undertook in this case.[7]   I accordingly recommended a 15% cap on contingent fee contracts given Class Counsel's 15.6% proposed class action fee.[8]  Now that Class Counsel's fee request constitutes 11% of the class's likely recovery, I recommend that the Court set a cap on contingent fee contracts at 22% of the

---

[7] Some firms argued that I arbitrarily started with this 33% number and worked backwards from it.  *See, e.g.*, ECF No. 9549 at 1.  However, my Report identified with great specificity the reasons that a 33% fee is appropriate in the circumstances of this case, Rubenstein Report at 21–29, in the context of the known fee agreements at issue here, *id.* at 29–31, and in relationship to caps in other cases, *id.* at 31, and I stand by those conclusions.

[8] Nearly every firm that commented on my Report argued that Class Counsel's class action fee has no bearing on the class members' recoveries and hence should not be calculated as a factor in the total fee each class member is paying.  A simple analogy helps demonstrate why I continue to believe that Class Counsel's contingent fees must be counted as part of the class's recovery regardless of how the settlement is structured.  Assume a client hired a lawyer to pursue a tort claim on a one-third contingent fee basis.  After some litigation, the lawyer calls the client and says, "Good news, the defendant has agreed to settle the case and you will be getting $1.1 million.  Better yet," she continues, "After we settled your case, we negotiated my fee and the defendant separately agreed to pay me $700,000 directly, with not a penny of that coming out of your $1.1 million."  At that point, the client might think, "Wait a minute.  It appears we are getting $1.8 million in total and my 2/3 share should be $1.2 million and your 1/3 share $600,000, per our retainer agreement."  And of course the client would be right.  The point of the analogy is not to suggest malfeasance by Class Counsel in this case; the analogy simply drives home the point that, in assessing the reasonableness of the fees being paid by individual class members, Class Counsel's fees must be considered a component of the class's relief.  The facts that the parties have set class members' individual recovery levels net of those fees, that the fees were (partially) negotiated separately from the class's recovery, and/or that the NFL has agreed to pay all claims made in the settlement, in no way alter the point, nor are the parties' efforts to distinguish the key Third Circuit precedents convincing.

class member's MAF payment.[9]   The higher cap also acknowledges the many responses to my Report that argued that a 15% cap underestimated the IRPAs' risks and workload.[10] The Court should implement the IRPA cap by directing the Claims Administrator to apportion each MAF award between the class member and IRPA according to (a) the terms of the Court's final fee order or (b) the terms of the contingent fee contract, if the contract reflects a rate lower than an imposed cap.

### III.
### 2% SET-ASIDE ONLY AS LAST RESORT TO FUND FUTURE WORK

7.     My Report found that Co-Lead Counsel had not demonstrated the need for a 5% set-aside at present or at the time it was initially proposed (in conjunction with the second Settlement Agreement).[11]   In response to my Report, Co-Lead Counsel Seeger Weiss described the extensive work that it has been required to undertake (in large part) because of the changed dynamics created by the second Settlement Agreement:  namely, removal of a total cap on the settlement created an incentive for the NFL to contest payments, globally and individually, and

---

[9] The two numbers obviously add up to 33%.  However, as I pointed out in my initial report, *id.* at 12 n.42, the math is not this precise because Class Counsel's fee is a percentage of the class member's gross award, while the IRPA fee is a percentage of the class member's award net of Class Counsel's fee.  An IRPA fee of 25.2% of the class member's recovery net of Class Counsel's fee would yield a total fee of 33% of the class member's gross recovery.  The 22% figure is more transparently obvious to class members and sufficient in the context of this case.

[10] A number of firms supported my conclusions that risks and work diminished as the case progressed, Rubenstein Report at 25–26, and at least one (The Locks Firm) suggested the possibility of varying the cap according to the time at which the retainer agreement was signed. ECF No. 9545 at 9–11.  In theory, that approach is sensible, but I worry that in practice it may be administratively complicated by two factors:  (a) verification of the date of the initial retainer agreement and (b) the concern that since many class members have changed lawyers, leaving the initial lawyer with a potential lien on the ultimate recovery, it could create a complex situation wherein one lawyer had a lien at one rate while the second lawyer has a contract at a lower rate. In any case, my revised recommendation of a 22% cap meets the Locks Firm's suggestion that it be relieved of a 15% cap and entitled to a 20% cap for earlier signed clients.  *Id.* at 9–10.

[11] Rubenstein Report at 36–39.

that new pressure has generated significant work for Co-Lead Counsel.[12]  Other circumstances have similarly generated somewhat unforeseeable additional work for Co-Lead Counsel.[13]

8.      I credit Co-Lead Counsel Seeger Weiss's account of the efforts that it has undertaken on behalf of the class throughout this lawsuit.  The firm has obviously provided invaluable service to the class.  It deserves to be rewarded and, accordingly, seeks a fee allocation nearly four times its own lodestar.[14]  Without diminishing Seeger Weiss's efforts in any way, for the reasons set forth in detail in my Report,[15] I stand by my conclusion that the NFL's $112.5 million fee and expense payment should be sufficient to fund past, present, and future work, so long as certain safeguards are put in place.[16]  Specifically, if $85.5 million in fees and $6.2 million in expenses (or $91.7 million) were paid at present, at least $22.5 million[17]

---

[12] ECF No. 9552 at 7–9.  In reporting this argument, I am not judging the NFL's actions.  It is understandable that it would need to be more vigilant once the settlement's total cap was removed.  Whether those efforts have been over-aggressive, as some have alleged, *see, e.g.*, ECF No. 9545 at 7–9, is irrelevant to this reply – my point is simply that these efforts have created more work for both Co-Lead Counsel and for IRPAs.

[13] *See, e.g.,* ECF No. 9552 at 8 (discussing "the extent to which third-party lenders and claims services providers" have "emerge[d] to profit off Class Members' back").

[14] ECF No. 8447-1 at 2.

[15] Rubenstein Report at 36–46.

[16] *Id.* at 44–46.  Co-Lead Counsel Seeger Weiss agrees with my Report's recommendation that future payments be made on a straight lodestar basis without a multiplier.  *Compare id.* at 45, *with* ECF No. 9552 at 9 n.16.  Co-Lead Counsel Anapol Weiss agrees with my recommendation that the hourly billing rates should be disciplined in some manner.  *Compare* Rubenstein Report at 45, *with* ECF No. 9548 at 1–2.

[17] These three numbers add up to $114.2 million, which is the amount that had accumulated in the relevant funds as of October 10, 2017.  *See* ECF No. 8447-1 at 2.  That number is higher now as interest has continued to accumulate for the subsequent months – and will until Counsel's fees are paid.

could be set aside in an interest-bearing account that should pay out $1,000,000/year for 65 years, leaving nothing at its conclusion.[18]

9.      If the Court is concerned that $1,000,000/year may be insufficient to ensure Class Counsel's future fees, I recommend that it next turn to the NFL (or possibly other litigants[19]). The Settlement Agreement states in no uncertain terms that the NFL will pay Class Counsel's fees[20]: $112.5 million is simply the point at which the NFL begins to protest.  Further, the Settlement Agreement notes – as it must – that the final amount due is the amount that the Court deems reasonable.[21]  Accordingly, the Court could authorize Co-Lead Counsel to update its initial fee petition to encompass (for example) an additional $10 million contribution by the NFL

---

[18] My Report recommended paying $90 million of $112.5 million at present, Rubenstein Report at 43, but in doing so, it did not distinguish fees from expenses.  Here I disaggregate the two and recommend paying 100% of the expenses and just under 80% of the fees at present.  As I stated in my report, "such a bifurcation would award Class Counsel 80% of its aggregate fee now, even though the class is receiving far less than that amount of its total MAF recoveries at present."  *Id.* Indeed, as of January 16, 2018, according to its report at the settlement's website (attached here as Exhibit A), the Claims Administrator had authorized roughly $257 million in MAF payments, while Class Counsel's actuary predicts $1.297 billion in total MAF payments, ECF No. 9552-1 at 8; this means that class members have been awarded less than 20% of their expected recovery. Given this disjuncture, if the Court were concerned that future fees may exceed $1,000,000/year, it would not be inequitable to allocate Class Counsel less than $85.5 million (or 80% of its fee request) at present, thereby leaving more for the future.

[19] Co-Lead Counsel Seeger Weiss has invested significant time on the assignments issue, for example.  *See* note 13, *supra.*  The Court may consider whether it is appropriate to tax Seeger Weiss's fees against the adverse parties in those proceedings.

[20] ECF No. 6481-1 at 82–83 ("[T]he NFL Parties shall pay class attorneys' fees and reasonable costs.").

[21] *Id.* at 83 ("Ultimately, the award of class attorneys' fees and reasonable costs to be paid by the NFL Parties is subject to the approval of the Court."); *see also* ECF No. 9552 at 11 n.18 (Co-Lead Counsel Seeger Weiss's agreement that, "Of course, given its familiarity with the work already performed and efforts that will be required over the long haul, the Court can always take the initiative to direct the NFL to augment the AFQSF for the purpose of compensating implementation-related common benefit work").

to an interest-bearing fund.[22]  According to the parties' actuarial calculations, that fund should yield $450,000 in interest on an annual basis.  If Class Counsel's annual lodestar exceeded the $1,000,000 in its own fund, it could then petition for use of interest in the NFL fund.  All unused interest would revert to the NFL, as would the $10 million principal at the end of the 65-year settlement.  This structure would create an incentive for the NFL to provide a check on the expenditures of Co-Lead Counsel going forward and, in the context of the full settlement, would be a minute adjustment to the NFL's overall obligations.  The NFL would, of course, be entitled to oppose the updated initial fee petition from Class Counsel, though given its familiarity with Co-Lead Counsel's many efforts and the relatively minimal amount of money involved, perhaps it would not do so.[23]

        10.    If necessary as a last resort, the Court should direct the Claims Administrator (a) to withhold 2% of any MAF payment from unrepresented class members or 2% of the contingent fee of a represented player's IRPA and (b) to place these monies in a common benefit fund.  As roughly $257 million in awards have been authorized to date, this set-aside would create an initial fund of more than $5 million, which would yield more than $230,000 in interest each year.

---

[22] This approach complies with the Settlement Agreement's statement that, "the NFL Parties' obligation to pay class attorneys' fees and reasonable costs is limited to those attorneys' fees and reasonable costs ordered by the Court as a result of the initial petition by Class Counsel," and the further limitation that, "The NFL Parties shall not be responsible for the payment of any further attorneys' fees and/or costs for the term of this Agreement."  ECF No. 6481-1 at 83.

[23] Co-Lead Counsel Seeger Weiss worries that an additional round of briefing might forestall fee payments indefinitely.  ECF No. 9552 at 11 n.18.  This is an understandable concern in that many of the plaintiffs' lawyers in this case – Class Counsel and IRPAs – have been litigating for more than half a decade without any award to date, notwithstanding the success of their efforts. If significant delay is a real concern, the Court might consider an interim fee award, while enabling the NFL the opportunity to respond to the updated initial fee petition.

A 2% set aside would also generate another $20 million over 65 years,[24] or more than $300,000/year assuming award distributions are spread evenly over time.  These funds would be a final backstop if Class Counsel's fund and the interest in the NFL's fund were both exhausted in a given year.  Any unused funds in this account would be returned to class members or their IRPAs on some regular basis.  This approach would leave IRPAs with a contingent fee of 20%, with some or all of the remaining 2% available to be recovered if not used by Class Counsel.  This, too, would therefore create an incentive for the IRPAs and *pro se* class members' representative[25] to provide a check on the expenditures of Co-Lead Counsel going forward.

11.    The Court's task is precarious:  if not enough monies are set aside for future work, the class may be disadvantaged, but if too much money is set aside, it may create incentives for lawyers to make work and get paid (on the "if you build it, they will come" theory).  My recommendations aim to balance these competing concerns by identifying *both* sources of nearly $2 million per year for future funding *and* mechanisms to keep spending in check.

Respectfully submitted,

Dated:  January 19, 2018            William B. Rubenstein

---

[24] As previously noted, *see* note 18, *supra*, Co-Lead Counsel Seeger Weiss's actuary estimates total MAF payments of $1.297 billion.  As $257 million in awards have been authorized to date, that leaves about $1 billion yet to be awarded, 2% of which is $20 million.

[25] As the class's counsel is adverse to the class members as to the use of these monies, I recommend that the newly appointed advocate for *pro se* class members be charged with safeguarding these monies for them.  *See* ECF No. 9561 (appointing Dennis R. Suplee to represent *pro se* settlement class members "where there has been a demonstrated need for legal counsel").

# EXHIBIT A

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## Monetary Award Claims Report
### (As of 1/16/18)

| | Table of Contents | Page No. |
|---|---|---|
| **A.** | **Summary Data** | |
| 1. | Chart 1: Claims Submitted | 2 |
| 2. | Chart 2: Qualifying Diagnosis Alleged for Monetary Award Claims | 2 |
| 3. | Chart 3: Qualifying Diagnosis Date | 2 |
| 4. | Chart 4: Notices Issued on Monetary Award Claims | 2 |
| 5. | Chart 5: Payable Claims Summary | 3 |
| 6. | Table 1: Status of Appealed Monetary Award Claims | 3 |
| 7. | Table 2: Reasons in Notices of Denial Issued on Monetary Award Claims | 4 |
| 8. | Chart 6: Claim Profile of All Settlement Class Members | 4 |
| **B.** | **Derivative Claimants** | |
| 1. | Table 3: Derivative Claimant Notices Issued | 5 |
| 2. | Table 4: Notice of Derivative Claimant Award Determination Detail | 5 |
| 3. | Table 5: Reasons in Notices of Denial of Derivative Claim | 5 |
| **C.** | **Payable Claim Details** | |
| 1. | Table 6: Deductions Listed on Notices of Monetary Award | 6 |
| 2. | Table 7: Monetary Award Payments | 7 |

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## Monetary Award Claims Report
## (As of 1/16/18)

**CHART 1: CLAIMS SUBMITTED**
**(TOTAL: 2,013)**
**MONETARY AWARD CLAIMS: 1,594**
**DERIVATIVE CLAIMS: 419**



- Retired Player 1,327 (66%)
- Representative Claimant 267 (13%)
- Derivative Claimant 419 (21%)

**CHART 2: QUALIFYING DIAGNOSIS ALLEGED FOR MONETARY AWARD CLAIMS**



| Qualifying Diagnosis | Count |
|---|---|
| Death with CTE | 74 |
| ALS | 35 |
| Alzheimer's Disease | 252 |
| Parkinson's Disease | 75 |
| Level 2 | 452 |
| Level 1.5 | 597 |
| Unknown / Multiple | 109 |

**CHART 3: QUALIFYING DIAGNOSIS DATE**

■ Pre-Effective Date: 1,241   ■ Post-Effective Date: 114   ■ Unknown: 239



Death with CTE     ALS     Alzheimer's     Parkinson's

Level 2     Level 1.5

The data in Chart 3 reflects Qualifying Diagnoses dates for which Claim Packages have been submitted. The total number of BAP Qualifying Diagnoses and MAF exams will be greater than the number of claims.

**CHART 4: NOTICES ISSUED ON MONETARY AWARD CLAIMS***
**(TOTAL: 1,048)**



|  | Payable | Denied | Closed After Audit | Request for Additional Documents |
|---|---|---|---|---|
| □ TOTAL | 210 | 71 | 139 | 628 |
| ■ Not Appealed | 176 | 50 | | |
| ■ Appealed | 34 | 21 | | |

* Chart 4 provides a unique count of all Monetary Award claims that have received a notice. Claims receiving multiple notices are counted only once in Chart 4 based on the most recent notice issued.

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

No. 2:12-md-02323 (E.D. Pa.)

## Monetary Award Claims Report
## (As of 1/16/18)



CHART 5: PAYABLE CLAIMS SUMMARY

|  | Monetary Awards Issued* | Funding by the NFL Parties for Final Monetary Awards | Payments Made to Retired Players and Rep. Claimants** | Payments Made to Derivative Claimants** |
|---|---|---|---|---|
| Dollars | $256,729,033 | $164,098,132 | $95,071,912 | $120,499 |
| Claims | 210 | 128 | 91 | 7 |

* This figure reflects the Monetary Award totals prior to any application of holdbacks for potential Derivative Claimants, common benefit fees, liens and determinations on appeals.

** The difference between the dollars funded by the NFL and the dollars paid out to Settlement Class Members ("SCMs") represents amounts withheld for Potential Derivative Claimant Awards, common benefit fees and liens and could still be paid to the SCM.

| TABLE 1 | STATUS OF APPEALED MONETARY AWARD CLAIMS | | | |
|---|---|---|---|---|
|  | Status*** | SCM Appeals | NFL Appeals | Total |
| A. | Payable Claims | 5 | 29 | 34 |
| 1. | Appeal Filed and Awaiting Fee Payment or Filed Appeal Notice | 0 | 0 | 0 |
| 2. | Appeal Alert Issued - No Response Yet | 2 | 16 | 18 |
| 3. | Appellee Opposition Memo Received | 0 | 6 | 6 |
| 4. | With Special Masters for Decision | 2 | 2 | 4 |
| 5. | Result Upheld on Appeal | 1 | 4 | 5 |
| 6. | Result Overturned on Appeal | 0 | 1 | 1 |
| B. | Denied Claims | 21 | 0 | 21 |
| 1. | Appeal Filed and Awaiting Fee Payment or Filed Appeal Notice | 2 | 0 | 2 |
| 2. | Appeal Alert Issued - No Response Yet | 7 | 0 | 7 |
| 3. | Appellee Opposition Memo Received | 4 | 0 | 4 |
| 4. | With Special Masters for Decision | 0 | 0 | 0 |
| 5. | Result Upheld on Appeal | 8 | 0 | 8 |
| 6. | Result Overturned on Appeal | 0 | 0 | 0 |
| C. | TOTAL APPEALS | 26 | 29 | 55 |

*** Co-Lead Class Counsel has filed statements in nine of the Appeals listed in Table 1. These Appeals are distributed across multiple statuses in the Appeals Process.

© 2018 BrownGreer PLC

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

| TABLE 2 | REASONS IN NOTICES OF DENIAL ISSUED ON MONETARY AWARD CLAIMS | | |
|---|---|---|---|
| | **Reason** | **Notices\*** | **Appeals** |
| 1. | Death with CTE Claims | 5 | 2 |
| | (a) Death occurred after Final Approval | 2 | |
| | (b) Death occurred before 7/7/14 but QD was after Final Approval | 1 | |
| | (c) Death Betw. 7/7/14 & 4/22/15; QD > 270 Days from Death | 1 | |
| | (e) Appeals Advisory Panel Denial - Inappropriate Physician | 1 | |
| | (f) Appeals Advisory Panel Denial - Qualifying Diagnosis | 1 | |
| 2. | ALS Claims | 0 | 0 |
| 3. | Alzheimer's Disease Claims | 31 | 11 |
| | (a) Appeals Advisory Panel Denial - Inappropriate Physician | 6 | |
| | (b) Appeals Advisory Panel Denial - Qualifying Diagnosis | 30 | |
| 4. | Parkinson's Disease Claims | 3 | 0 |
| | (a) Appeals Advisory Panel Denial - Inappropriate Physician | 3 | |
| | (b) Appeals Advisory Panel Denial - Qualifying Diagnosis | 2 | |
| 5. | Level 2 Claims | 15 | 4 |
| | (a) Appeals Advisory Panel Denial - Inappropriate Physician | 5 | |
| | (b) Appeals Advisory Panel Denial - Qualifying Diagnosis | 13 | |
| 6. | Level 1.5 Claims | 17 | 4 |
| | (a) Appeals Advisory Panel Denial - Inappropriate Physician | 0 | |
| | (b) Appeals Advisory Panel Denial - Qualifying Diagnosis | 17 | |
| 7. | TOTALS | 71 | 21 |

\*Claims receiving a Denial Notice with multiple Denial Reasons will be counted once for each reason in the sub rows of Table 2



CHART 6: CLAIM PROFILE OF ALL SETTLEMENT CLASS MEMBERS

 **CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

| TABLE 3 | DERIVATIVE CLAIMANT NOTICES ISSUED | |
|---|---|---|
| | **Notice Type** | **Total Notices** |
| **1.** | Notice of Derivative Claim Package Submission Deadline | 105 |
| **2.** | Derivative Claim Package Receipt Notice | 410 |
| **3.** | Notice of Denial of Derivative Claim | 2 |
| **4.** | Derivative Claimant Incompleteness Notice | 0 |
| **5.** | Derivative Claimant Challenge Determination Notice | 21 |
| **6.** | Notice of Derivative Claimant Award Determination | 31 |
| **7.** | **TOTAL** | **569** |

| TABLE 4 | NOTICE OF DERIVATIVE CLAIMANT AWARD DETERMINATION DETAIL | | |
|---|---|---|---|
| | **Type** | **Number** | **Amount** |
| **1.** | Full Award (one Derivative Claimant takes all) | 10 | $223,195 |
| **2.** | Equal Allocation (by Claims Administrator to multiple Derivative Claimants) | 21 | $122,128 |
| | (a) Pending | 4 | $56,600 |
| | (b) Final | 17 | $65,528 |
| **3.** | Post-Allocation Objection (state law allocation by Claims Administrator to multiple Derivative Claimants) | 0 | $0 |
| | (a) Pending | 0 | $0 |
| | (b) Final | 0 | $0 |
| **4.** | Post-Appeal (by Special Master to multiple Derivative Claimants) | 0 | $0 |
| | (a) Pending | 0 | $0 |
| | (b) Final | 0 | $0 |
| **5.** | Court Determination | 0 | $0 |
| **6.** | **TOTALS** | **31** | **$345,323** |

| TABLE 5 | REASONS IN NOTICES OF DENIAL OF DERIVATIVE CLAIM | |
|---|---|---|
| | **Reason** | **Notices** |
| **1.** | Duplicate | 0 |
| | (a) Of Pending Claim | 0 |
| | (b) Of Previously-Paid Claim | 0 |
| | (c) Of Previously-Denied Claim | 0 |
| **2.** | No Timely or Proper Registration | 0 |
| | (a) By Retired NFL Football Player | 0 |
| | (b) By Derivative Claimant | 0 |
| **3.** | Retired NFL Football Player is Opt Out | 0 |
| **4.** | Untimely Derivative Claim Package | 0 |
| **5.** | Deceased Derivative Claimant | 2 |
| **6.** | Retired NFL Football Player Claim Denied | 0 |
| **7.** | **TOTAL** | **2** |

© 2018 BrownGreer PLC

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## TABLE 6 — DEDUCTIONS LISTED ON NOTICES OF MONETARY AWARD

| | Deductions by Confirmed Qualifying Diagnosis | Number | Amount |
|---|---|---|---|
| 1. | Grid Amount | 210 | $316,146,333 |
| | (a) Death with CTE | 53 | $90,946,667 |
| | (b) ALS | 20 | $79,450,000 |
| | (c) Alzheimer's Disease | 78 | $68,986,000 |
| | (d) Parkinson's Disease | 37 | $46,610,000 |
| | (e) Level 2.0 Neurocognitive Impairment | 7 | $14,767,333 |
| | (f) Level 1.5 Neurocognitive Impairment | 15 | $15,386,333 |
| 2. | Deductions for Offsets | 67 | $59,417,300 |
| | (a) Death with CTE | 15 | $20,338,400 |
| | (b) ALS | 5 | $13,040,000 |
| | (c) Alzheimer's Disease | 27 | $9,320,700 |
| | (d) Parkinson's Disease | 16 | $14,168,200 |
| | (e) Level 2.0 Neurocognitive Impairment | 2 | $2,100,000 |
| | (f) Level 1.5 Neurocognitive Impairment | 2 | $450,000 |
| 3. | Deductions for Derivative Claimant Awards | 107 | $1,478,243 |
| | (a) Death with CTE | 39 | $526,691 |
| | (b) ALS | 11 | $415,000 |
| | (c) Alzheimer's Disease | 31 | $298,000 |
| | (d) Parkinson's Disease | 14 | $101,079 |
| | (e) Level 2.0 Neurocognitive Impairment | 3 | $47,173 |
| | (f) Level 1.5 Neurocognitive Impairment | 9 | $90,300 |
| 4. | Withholding for Common Benefit Fees | 210 | $12,807,540 |
| | (a) Death with CTE | 53 | $3,504,079 |
| | (b) ALS | 20 | $3,344,750 |
| | (c) Alzheimer's Disease | 78 | $2,968,365 |
| | (d) Parkinson's Disease | 37 | $1,617,036 |
| | (e) Level 2.0 Neurocognitive Impairment | 7 | $631,008 |
| | (f) Level 1.5 Neurocognitive Impairment | 15 | $742,302 |
| 5. | Withholding for Liens | 104 | $53,019,248 |
| | (a) Death with CTE | 17 | $10,605,140 |
| | (b) ALS | 15 | $21,662,830 |
| | (c) Alzheimer's Disease | 40 | $9,705,644 |
| | (d) Parkinson's Disease | 19 | $4,961,130 |
| | (e) Level 2.0 Neurocognitive Impairment | 5 | $3,661,386 |
| | (f) Level 1.5 Neurocognitive Impairment | 8 | $2,423,118 |

© 2018 BrownGreer PLC

# NFL CONCUSSION SETTLEMENT

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*
No. 2:12-md-02323 (E.D. Pa.)

## TABLE 7 — MONETARY AWARD PAYMENTS

| | Status by Confirmed Qualifying Diagnosis | Number | Amount |
|---|---|---|---|
| 1. | Notice of Monetary Award | 210 | $256,729,033 |
| | (a) Death with CTE | 53 | $70,608,267 |
| | (b) ALS | 20 | $66,410,000 |
| | (c) Alzheimer's Disease | 78 | $59,665,300 |
| | (d) Parkinson's Disease | 37 | $32,441,800 |
| | (e) Level 2.0 Neurocognitive Impairment | 7 | $12,667,333 |
| | (f) Level 1.5 Neurocognitive Impairment | 15 | $14,936,333 |
| 2. | Paid Claims | 98 | $95,192,411 |
| | (a) Death with CTE | 36 | $39,215,772 |
| | (b) ALS | 14 | $36,535,411 |
| | (c) Alzheimer's Disease | 25 | $11,587,935 |
| | (d) Parkinson's Disease | 12 | $4,720,065 |
| | (e) Level 2.0 Neurocognitive Impairment | 1 | $1,503,525 |
| | (f) Level 1.5 Neurocognitive Impairment | 3 | $1,509,203 |
| | (g) Derivative Claimants | 7 | $120,499 |
| 3. | Payment in Progress (Claims Currently in the Funding/Disbursement Process) | 60 | $62,828,000 |
| | (a) Death with CTE | 12 | $16,034,000 |
| | (b) ALS | 4 | $9,810,000 |
| | (c) Alzheimer's Disease | 29 | $18,706,400 |
| | (d) Parkinson's Disease | 13 | $16,094,267 |
| | (e) Level 2.0 Neurocognitive Impairment | 1 | $1,050,000 |
| | (f) Level 1.5 Neurocognitive Impairment | 1 | $1,133,333 |
| 4. | Ready to be Included on the Next Monthly Funding/Disbursement List (10th of every month) | 0 | $0 |
| | (a) Death with CTE | 0 | $0 |
| | (b) ALS | 0 | $0 |
| | (c) Alzheimer's Disease | 0 | $0 |
| | (d) Parkinson's Disease | 0 | $0 |
| | (e) Level 2.0 Neurocognitive Impairment | 0 | $0 |
| | (f) Level 1.5 Neurocognitive Impairment | 0 | $0 |
| 5. | Not Ready to be Included on the Next Monthly Funding/Disbursement List (appeal option still available to SCM, Class Counsel, and/or NFL Parties; hold in place) | 59 | $98,829,121 |
| | (a) Death with CTE | 5 | $15,358,495 |
| | (b) ALS | 2 | $20,064,589 |
| | (c) Alzheimer's Disease | 24 | $29,370,965 |
| | (d) Parkinson's Disease | 12 | $11,627,468 |
| | (e) Level 2.0 Neurocognitive Impairment | 5 | $10,113,808 |
| | (f) Level 1.5 Neurocognitive Impairment | 11 | $12,293,797 |