# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS PENDING AND ALL CLAIMS ASSERTED AGAINST ANY RIDDELL DEFENDANT | **Hon. Anita B. Brody** |

## RIDDELL'S[1] BRIEF IN SUPPORT OF MOTION TO DISMISS THE PLAINTIFFS' SECOND AMENDED MASTER ADMINISTRATIVE LONG-FORM COMPLAINT BASED ON LMRA § 301 PREEMPTION

---

[1] For convenience only, "Riddell" refers collectively to the following defendants: Riddell, Inc., All American Sports Corporation, Riddell Sports Group, Inc., BRG Sports, Inc. (f/k/a Easton-Bell Sports, Inc.), BRG Sports, LLC (f/k/a Easton-Bell Sports, LLC), EB Sports Corp., and BRG Sports Holdings Corp. (f/k/a RBG Holdings Corp.). The plaintiffs have amended the case style to reflect the new entity names for the entities previously known as Easton-Bell Sports, Inc. and Easton-Bell Sports, LLC. The plaintiffs also, in what appears to be a typographical error, refer to the "formerly known as" entity for BRG Sports Holdings Corp. as "BRG Holdings Corp." The former entity name was actually RBG Holdings Corp. Riddell has no objection to amending the case style to reflect the new entity names identified in this footnote.

## TABLE OF CONTENTS

Tab

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

A.    The Parties .................................................................................................. 4

B.    The NFL Collective Bargaining Agreements ................................................ 5

C.    Procedural Background............................................................................... 8

     1.    Five years ago, the plaintiffs narrowed their claims against Riddell to assert solely product liability-based claims. ................................................. 8

     2.    Following the approval and implementation of the NFL's class-action settlement, and five years after filing their AMAC, the plaintiffs filed their Second Amended Master Administrative Long-Form Complaint against Riddell (SAMAC-Riddell), which not only included previously abandoned as well as new claims, but also asserted primarily a far-ranging conspiracy and fraud scheme jointly committed by the NFL and Riddell. ............................. 9

ARGUMENT ...................................................................................................................... 13

I.    LMRA § 301 preempts claims, such as the plaintiffs, that substantially depend on or inextricably intertwine with and require interpretation of CBA terms....................... 16

II.    By inextricably intertwining their claims against Riddell with their claims against the NFL as Riddell's alleged co-conspirator, co-guardian, and joint tortfeasor, the plaintiffs have compelled a finding of preemption as to their claims against Riddell. ................................................................................................................................ 18

III.    The plaintiffs' claims against Riddell are substantially dependent on and inextricably intertwined with, and therefore require interpretation of the CBAs. ........... 23

    A.    Resolution of the plaintiffs' fraud-based claims (fraud, fraudulent concealment, misrepresentation, and civil conspiracy) would require interpretation of numerous CBA terms............................................................. 23

    B.    Resolution of the plaintiffs' negligence-based claims would require interpretation of numerous terms of the CBAs. ................................................. 27

    C.    Numerous other necessary considerations in the plaintiffs' claims, including contributory/comparative fault, fault of others, and punitive damages, among many more, would likewise require interpretation of the CBAs. ........... 32

IV.    The plaintiffs cannot avoid the preemption conclusion by attempting to distinguish Riddell's cited case law, or to rely on outcomes in different cases. ................................ 33

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Allis-Chalmers Corp. v. Lueck*
   471 U.S. 202 (1985) ..................................................................................... 17, 18, 33

*Antcliff v. State Emps. Credit Union*
   414 Mich. 624 (1982) ............................................................................................. 27

*Arnold v. Cabot Corp.*
   No. 1:99-CV-75, 2000 WL 1283078, at *9 (N.D.W. Va. May 8, 2000) ................................ 21

*Atwater v. Nat'l Football League Players Ass'n*
   626 F.3d 1170 (11th Cir. 2010) ...................................................................... 21, 25

*Aubrey v. Sanders*
   No. 07-cv-0137, 2008 WL 4443826, at *5–6 (W.D. Pa. Sept. 26, 2008) ................................ 24

*Ballard v. Nat'l Football League Players Ass'n*
   123 F. Supp. 3d 1161 (E.D. Mo. 2015) ..................................................................... 25

*Bartol v. Barrowclough*
   251 F. Supp. 3d 855 (E.D. Pa. 2017) ....................................................................... 28

*Beidleman v. Stroh Brewery Co.*
   182 F.3d 225 (3d Cir. 1999) ............................................................................. 17, 18

*Bortz v. Noon*
   729 A.2d 555 (Pa. 1999) ....................................................................................... 24

*Core Commc'ns, Inc. v. Verizon Maryland LLC*
   744 F.3d 310 (4th Cir. 2014) ................................................................................. 24

*Duerson v. Nat'l Football League, Inc.*
   No. 12 C 2513, 2012 WL 1658353, at *3 (N.D. Ill. May 11, 2012) ........................... 23, 29, 31

*Fla. E. Coast Ry. Co. v. Soper*
   146 So. 2d 605 (Fla. Dist. Ct. App. 1962) ................................................................. 27

*Flowers v. Torrance Mem. Hosp. Med. Ctr.*
   8 Cal. 4th 992 (1994) .......................................................................................... 27

*Givens v. Tenn. Football, Inc.*
   684 F. Supp. 2d 985 (M.D. Tenn. 2010) .................................................................... 17

*Grand Trunk R. Co. v. Ives*
   144 U.S. 408 (1892) ............................................................................................. 27

*Henderson v. Merck & Co., Inc.*
   998 F. Supp. 532 (E.D. Pa. 1998) ........................................................................... 18

*Hinkley v. Safepro, Inc.*
   853 F. Supp. 594 (N.D.N.Y. 1994) .......................................................................... 27

*Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.*
   977 F.2d 895 (4th Cir. 1992) ................................................................................. 21

*Kline v. Sec. Guards, Inc.*
   386 F.3d 246 (3d Cir. 2004) .............................................................................. 14, 26

*Krull v. Keene Corp.*
   601 F. Supp. 547 (D.C. Ill. 1985) ........................................................................... 27

*Local 174, Teamsters v. Lucas Flour Co.*
   369 U.S. 95 (1962) .............................................................................................. 17

*Manti's Transp., Inc. v. C.T. Lines, Inc.*
   68 A.D.3d 937 (N.Y. App. Div. 2009) ....................................................................... 24

*MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*
   87 A.D.3d 836 (N.Y. App. Div. 2011) ................................................................................ 24

*Maxwell v. Nat'l Football League*
   No. 2:11-cv-08394, at 1 (C.D. Cal. Dec. 8, 2011) ...................................................... 30

*Mullins v. Int'l Union of Operating Eng'rs Local No. 77 AFL-CIO of Wash., D.C.*
   214 F. Supp. 2d 655 (E.D. Va. 2002) ............................................................................ 21

*Myre v. Meletio*
   307 S.W.3d 839 (Tex. Ct. App. 2010) ........................................................................... 24

*Oliver v. Riddell, Inc.*
   No. 1:16-cv-04760, 2016 WL 7336412 (N.D. Ill. July 19, 2016) ........................ 34, 35

*Ry. Labor Execs. Ass'n v. Pittsburgh & L.E.R.R.*
   858 F.2d 936 (3d Cir. 1988)............................................................................................ 17

*Sherwin v. Indianapolis Colts, Inc.*
   752 F. Supp. 1172 (N.D.N.Y. 1990)............................................................................... 25

*Smith v. Nat'l Football League Players' Ass'n*
   No. 14-cv-01559, 2014 WL 6776306, at *8 (E.D. Mo. Dec. 2, 2014) ..................... 25

*Smith v. Ramis*
   647 F. App'x 679 (9th Cir. 2016) .................................................................................. 24

*St. Louis Sw. Ry. Co. v. Marks*
   749 S.W.2d 911 (Tex. App. 1988)................................................................................. 27

*Stringer v. Nat'l Football League*
   474 F. Supp. 2d 894 (S.D. Ohio 2007) ......................................................... 18, 28, 29, 33

*Tran v. Metro. Life Ins. Co.*
   408 F.3d 130 (3d Cir. 2005)............................................................................................ 24

*Voilas v. Gen. Motors Corp.*
   170 F.3d 367 (3d Cir. 1999).................................................................................... 17, 18

*White v. Sunoco, Inc.*
   870 F.3d 257 (3d Cir. 2017)............................................................................................ 22

*Williams v. Nat'l Football League*
   582 F.3d 863 (8th Cir. 2009) ................................................................................... 25, 33

*Wilson v. Ritto*
   129 Cal. Rptr. 2d 336 (Cal. App. 2003)....................................................................... 32

*Wolf v. Rawlings Sporting Goods Co., Inc.*
   No. 10 Civ. 3713 (JSR), 2010 WL 4456984, at *3 (S.D.N.Y. Oct. 26, 2010) ............. 3, 22, 23

*Wooddell v. Int'l Bd. of Elec. Workers*
   502 U.S. 93 (1991)............................................................................................................ 3

## Statutes

29 U.S.C. § 185 ....................................................................................................................... 17

Ariz. Rev. Stat. § 12-2506 .................................................................................................... 32

Fla. Stat. § 768.81 ................................................................................................................. 32

LMRA § 301 .................................................................................................................... passim

MCL 600.2957....................................................................................................................... 32

MCL 600.6304 ....................................................................................................................... 32

## INTRODUCTION

For decades, almost all the former players in this litigation played under and enjoyed the benefits of their collective bargaining agreements (CBAs) while playing in the NFL. Among other things, they bargained for pay and benefits, including injury and retirement benefits. They bargained for the right to participate in discussions concerning what equipment they wanted, what rules should be enacted, and how the game should be played to best protect them in what they knew was a dangerous sport. They bargained for rights to have medical professionals and certified trainers on the sidelines to supervise and evaluate them, to diagnose on-field injuries, to decide when it was appropriate for them to return to play, and to protect them from further injury. And they bargained for CBAs that required them to bring grievances in arbitration, not in litigation.

Despite all these bargained-for rights, protections, and obligations, the plaintiffs sued the NFL, NFL Properties (NFLP), and Riddell, asserting various claims, essentially asserting that Riddell should have done something more to protect them in playing NFL football than what they bargained for from the NFL in their CBAs. And after mediation with the NFL, almost all the plaintiffs with ongoing claims against Riddell entered into a massive, uncapped settlement that provides them with extensive relief, including medical monitoring along with substantial monetary awards of as much as $5 million.

With the NFL settlement approved and payments flowing, these remaining plaintiffs have amended their longstanding master complaint to attempt to pursue claims that are even more plainly preempted and must be dismissed. In particular, despite abandoning such claims five years ago in favor of only routine product liability claims, the plaintiffs amended their master complaint to re-assert a wide-ranging (and far-fetched) conspiracy and alleged lockstep campaign of fraudulent concealment by the NFL, NFLP, and Riddell.

As the NFL has shown, the plaintiffs' primarily fraud- and conspiracy-based claims are preempted under § 301 of the Labor Management Relations Act because resolving those claims would substantially depend on interpreting terms of the CBAs.[2] The same goes for Riddell—the same provisions the NFL has shown to implicate preemption apply equally with respect to the claims against Riddell, as the NFL's alleged joint conspirator and actor.[3] Indeed, given the plaintiffs' intertwining the NFL with Riddell by charging both as co-conspirators/tortfeasors, the necessary preemption of claims against the NFL likewise mandates preemption of the claims against Riddell.

The same fate also befalls the plaintiffs' negligence-based claims[4] because—in addition to largely tethering Riddell to the NFL in them—at their core, these claims require an evaluation of whether Riddell acted "reasonably," which requires interpretation of various rights, duties and obligations created by the CBAs between the players' union, NFL management, NFL clubs, and the players themselves. For example, the plaintiffs assert that Riddell had with the NFL "a joint employee paid to ensure all licensed equipment was safe," but together they were negligent for not recommending and providing different equipment with different features.[5] Such a claim necessarily implicates the numerous CBA provisions throughout the past several decades that allocated responsibility for evaluating and recommending changes in equipment to the bargained-for Joint Committee on Player Safety and Welfare, which includes player representatives (but not Riddell, who is not a party to the CBAs or a member of this Joint Committee). Likewise, the plaintiffs' claims that Riddell failed to warn them of the risk of concussive injury are intertwined with various CBA provisions containing bargained-for requirements for teams to provide certified

---

[2] (ECF No. 8403-1.)
[3] (*See* SAMAC-Riddell Counts IV, VIII, IX, ECF No. 8927.)
[4] (*See id.* Counts I, II, III, V, VI.)
[5] (*Id.* at 6, 7 & ¶¶ 161, 341.)

and licensed medical and training professionals on the sidelines, whose job it was to evaluate, diagnose, and treat player injuries, including concussions and other head injuries.

The plaintiffs' claims against Riddell are, like those against the NFL, inextricably intertwined with and requiring interpretation of substantive provisions of the CBAs, and are therefore preempted. This preemption applies even though Riddell was not a party to the CBAs because, as the Supreme Court has explained, the doctrine of complete preemption barring claims "is more aptly expressed not in terms of parties but in terms of the purpose of the lawsuit."[6] And the purpose of this lawsuit—even more so by this second amended complaint—is to attempt to hold Riddell liable for purportedly acting in lockstep with the NFL as an alleged co-conspirator/tortfeasor, and as co-extensively liable alongside the NFL for breaching its purported duties owed as a joint "guardian of the game" and "of player health and safety."[7]

Indeed, as courts have held in similar circumstances, it doesn't matter whether a defendant is a signatory to a CBA (or an arbitration agreement) where the plaintiff intertwines its claims against that non-signatory defendant with those against a signatory or party to the agreement.[8] That is precisely what the plaintiffs have done here, and they cannot avoid the preemptive outcome of their deliberate litigation decisions as to how they pled their claims. These former players or their representatives can hardly complain that such an outcome would be unfair or unreasonable. Through their union, the former players bargained for the CBAs' exclusive arbitral rights and avenue of relief. The fairness and reasonableness of barring these claims as preempted is all the more apparent in light of the fact that the overwhelming majority of the plaintiffs suing Riddell

---

[6] *Wooddell v. Int'l Bd. of Elec. Workers*, 502 U.S. 93, 112 (1991).
[7] (SAMAC-Riddell ¶¶ 66, 74, 107, 115, 179, 192, ECF No. 8927.)
[8] *See, e.g.*, *Wolf v. Rawlings Sporting Goods Co., Inc.*, No. 10 Civ. 3713 (JSR), 2010 WL 4456984, at *3 (S.D.N.Y. Oct. 26, 2010).

elected to partake in the settlement with alleged co-conspirator/tortfeasor the NFL, which the league agreed to despite the fact that preemption would have barred the settling plaintiffs' claims.

The strong likelihood of conflicting interpretations of the CBA provisions implicated by the plaintiffs' claims adjudicated in multiple different jurisdictions, along with resulting damage those varying interpretations would inflict on the public policy encouraging uniform interpretation of CBA provisions, is why courts have held that preempted claims like the plaintiffs' simply cannot proceed. Rather, as numerous courts have held, those claims must be dismissed as to any former player who played under a CBA, which is the overwhelming majority of the remaining plaintiffs asserting claims against Riddell. The Court should therefore dismiss those claims with prejudice.

## BACKGROUND

### A.    The Parties

"Riddell" as used herein is a shorthand, for-convenience-only reference to seven discrete and legally distinct entities, only some of whom have or have had any involvement in actually designing, manufacturing, selling, or reconditioning football helmets.[9] Despite their corporate separateness, as well as the fact that many of them did not exist until only more recently, the plaintiffs allege that all seven distinct entities have, over the course of the more than sixty years covered by complaint, acted as one indistinguishable entity.

The plaintiffs comprise the small minority of "retired professional football players who played in and as part of the National Football League (the 'NFL') while using RIDDELL helmets,"[10] who, in addition to having sued the NFL, also chose to assert claims against Riddell. Indeed, since its inception, this MDL grew to include more than 5,400 plaintiffs filing claims

---

[9] These separate entities are Riddell, Inc.; All American Sports Corp.; Riddell Sports Group, Inc.; BRG Sports, Inc. (f/k/a Easton-Bell Sports, Inc.); BRG Sports, LLC (f/k/a Easton-Bell Sports, LLC); EB Sports Corp., and BRG Sports Holdings Corp. (f/k/a RBG Holdings Corp.). *See supra* n.1.
[10] (SAMAC-Riddell ¶ 1, ECF No. 8927.)

against the NFL. Yet only 772 plaintiffs have extant claims against Riddell, meaning that they both named Riddell in their underlying complaints and timely filed SAMAC-SFCs. Thus, while the plaintiffs have alleged that Riddell's helmets were "the official helmets of the NFL" for many years,[11] over 85 percent of the plaintiffs in this MDL are not pursuing *any* claims against Riddell.

Of this small minority who chose to sue both the NFL and Riddell, the overwhelming majority played all or parts of their NFL careers under CBAs with the NFL and its related entities, as discussed more below. Moreover, of this small minority, the overwhelming majority also have elected to partake in the NFL class-action settlement. Only 8 of the 772 remaining Riddell plaintiffs opted out of the settlement, with over 98 percent of them electing to receive its benefits.[12]

## B.    The NFL Collective Bargaining Agreements

Since 1968, a series of CBAs have defined the professional relationship between the NFL, its teams or clubs, and its players. As the NFL discusses in greater detail in its parallel briefing on this issue, the CBAs are exhaustively negotiated between NFL management and the players' representative union, the National Football League Players Association (NFLPA)—and also, in early years, between AFL management and the AFL Players Association.[13] The only periods since 1968 without a CBA in effect were August 31, 1987 to March 29, 1993, and March 11 to August 4, 2011.[14] Nearly every former player attempting to assert (or on whose behalf are being asserted) claims under the SAMAC-Riddell played some or all of his career under an operative CBA.[15]

---

[11] (Pls.' Master Admin. Long-Form Compl. ¶ 32 (MAC), ECF No. 83.)

[12] These players are Shante Carver, Tony Dorsett, Richard Eber, Shaun Gayle, Bert Deems May, Ron Pritchard, Tiaina B. "Junior" Seau, and Patrick Stant. *See* Riddell Defs.' Br. in Supp. of Mot. to Dismiss the Pls.' Second Am. Master Admin. Compl. and Am. Short Form Compls. App. 1; *see also* NFL Concussion Settlement: Timely Opt Out Requests Containing All Information Required by Section 14.2(a) or Otherwise Approved by the Court (updated Nov. 6, 2017), https://www.nflconcussionsettlement.com/Documents.aspx.

[13] The NFL attached every CBA to its parallel motion. (*See* ECF Nos. 8403-5 to 8403-29.) For efficiency and to avoid duplication, Riddell relies on the NFL's attachments.

[14] *See* Defs. Nat. Football League's and NFL Properties LLC's Mot. to Dismiss Pls.' Second Am. Master Admin. Long-Form Compl. on Preemption Grounds 6 n.5, ECF No. 8403-1.

[15] Riddell's references to "the plaintiffs" herein acknowledges that there is a small percentage of the former players' careers who were not covered in any part by at least one CBA, and thus uses that term for convenience only.

The NFL extensively catalogued the scope and terms of the CBAs, in exhaustively referencing particularly relevant passages. In the interest of brevity, and given that the plaintiffs' claims against the NFL and Riddell are in large parts identical and their purported conduct and liability co-extensive, Riddell will not reiterate those specific provisions here, and instead refers to and incorporates the NFL's briefing.[16] However, in general, as the NFL notes, the CBAs cover a comprehensive range of subjects related to the players' professional football careers. Indeed, while the CBAs have evolved over the past five decades beginning in 1968, every CBA expressly addresses topics covering player health and safety, and also provides a grievance procedure.[17]

Of particular relevance to the claims against Riddell, however, the CBAs have contained scores of provisions addressing issues such as medical care and treatment[18] and return-to-play decisions and the risks of doing so following injury,[19] requirements for board-certified physicians and certified physical trainers at practices and games,[20] requirements for a physician and ambulance at each game,[21] and procedures for communicating player health issues and injuries to the players and their coaching staffs.[22] The CBAs these players (through their players' association) bargained for also have provided the players with the right to a second medical opinion at his team's expense,[23] the right to choose the physician who would perform medical services on him,[24] and the right to pre- and post-season physical examinations.[25]

---

[16] (Mem. of Law of Defs. Nat'l Football League & NFL Props. LLC in Supp. of Mot. to Dismiss Pls.' SAMAC on Preempt. Grounds 6–12 (NFL's Mem.), ECF No. 8403-1.)

[17] (*Generally id.*)

[18] (1993 CBA Appx. C § 9; 2006 CBA Appx. C § 9; 2011 CBA Appx. A § 9.)

[19] (*See, e.g.*, 1980 Supp. to NFL Const. Art. XVII.)

[20] (1982 CBA Art. XXXI § 1; 1993 CBA Art. XLIV § 1; 2006 CBA Art. XLIV § 1; 2011 CBA Art. 39 § 1(a) (also requiring that newly hired physicians be certified in sports medicine).)

[21] (*See, e.g.*, 1968 NFL and AFL Const. Art. XIX § 19.5.)

[22] (*E.g.*, 1993 CBA Art. XLIV §§ 1, 2; 2006 CBA Art. XLIV §§ 1, 2; *see also* 2011 CBA Art. 39 §§ 1(c), 2; 1982 CBA Art. XXXI §§ 1, 2.)

[23] (1982 CBA Art. XXXI § 3; 1993 CBA Art. XLIV § 3; 2006 CBA Art. XLIV § 3; 2011 CBA Art. 39 § 4.)

[24] (1982 CBA Art. XXXI § 4; 1993 CBA Art. XLIV § 4; 2006 CBA Art. XLIV § 4; 2011 CBA Art. 39 § 5.)

[25] (1982 CBA Art. XXXI § 5; *see also* 1993 CBA Art. XLIV § 5 & Appx. C § 8; 2006 CBA Art. XLIV § 5 & Appx. C § 8; 2011 CBA Art. 39 § 6 & Appx. A § 8; *also* NFL's Mem. 7–10.)

With respect to the plaintiffs' claims concerning playing conditions—in particular, rules and equipment—the CBAs also address that topic in various ways. For example, and as the NFL details, since 1982 the CBAs have provided for the establishment and maintenance of a Joint Committee on Player Safety and Welfare, with members representing both the players and the league, whose purpose is to promote "the player safety and welfare aspects of *playing equipment*, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects,"[26] and whose immediate job it was to review "all current materials on the player safety aspects of player equipment, playing surfaces, and other safety matters . . . ."[27]

The CBAs also contain provisions defining the process for—and giving players a voice in—the evolution of football rules and safety measures.[28] Indeed, the players' union, the NFLPA, has for decades had the right to appoint representatives to attend and vote on proposed rules of play.[29] And the NFLPA has since 1982 had the right to challenge and seek an arbitral advisory opinion on proposed rules changes that it believes may "affect player safety."[30]

The CBAs also contain exclusive grievance-procedure provisions covering all disputes arising under the CBAs but also involving an interpretation of the CBA provisions, an individual players' contract, or the NFL Constitution or Bylaws.[31] Finally, the CBAs contain extensive

---

[26] (1982 CBA Art. XI (emphasis added); 1993 CBA Art. XIII § 1(a); 2006 CBA Art. XIII § 1(a); 2011 CBA Art. 50 § 1(a), (c); *see also* 1970 CBA Art. V; 1977 CBA Art. XI.)

[27] (1982 CBA Art. XI § 7; *see also* 1993 CBA Art. XIII § 1(b); 2006 CBA Art. XIII § 1(b); 1977 CBA Art. XI, § 7; 1982 CBA Art. XI, § 7 (explaining that the initial and ongoing tasks of the Joint Committee on Player Safety and Welfare have included "a review of all current materials on the player safety aspects of player equipment"); NFL's Mem. 10–11.)

[28] (*See, e.g.*, 1984 NFL Const. & Bylaws Art. XI, § 11.2.)

[29] (1993 CBA Art. XIII § 2; 2006 CBA Art. XIII § 2; 2011 CBA Art. 50 § 2; *see also* 1977 CBA Art. XI § 9; 1982 CBA Art. XI § 8.)

[30] (1982 CBA Art. XI § 9; 1993 CBA Art. XIII § 1(c); 2006 CBA Art. XIII § 1(c); 2011 CBA Art. 50 § 1(c); *see also* 1977 CBA Art. XI, § 8 ("If . . . the Commissioner determines that the adoption of the playing rule change could adversely affect player safety, the Commissioner will refer the proposed playing rule change to [the Joint] Committee for consideration and recommendation."); NFL's Mem. 10–11.)

[31] (*E.g.*, 2006 CBA Art. IX, § 1 ("Any dispute (hereinafter referred to as a 'grievance') arising after the execution of this Agreement and involving *the interpretation of*, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution or Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article"

benefits provisions, including—and of particular relevance to these plaintiffs' claims—for former players determined to have dementia, and permanent neurocognitive impairment.[32]

## C.  Procedural Background

### 1.  Five years ago, the plaintiffs narrowed their claims against Riddell to assert solely product liability-based claims.

In June 2012, over Riddell's opposition, the plaintiffs filed their Master Administrative Long-form Complaint (MAC) against the NFL and Riddell.[33] The MAC largely divided the factual allegations and claims against the two sets of defendants. Beginning with the NFL, the MAC contained over 62 pages and 340 paragraphs of allegations that the league exerted improper influence over the game of football, mythologized and marketed violence through the media and NFL Films, and acquired yet concealed specialized knowledge regarding risks associated with repetitive head injuries.[34] On the basis of these allegations, the MAC asserted against the NFL various claims, including on negligence theories, as well as for fraud and misrepresentation, which were *not* asserted against Riddell in the MAC.[35]

As to Riddell, the MAC included comparatively few factual allegations—only 14 paragraphs worth, compared to 205 for the NFL—with the majority of the Riddell facts merely recounting the history of its numerous safety innovations for football helmets.[36] As for the causes of action, with one exception, the plaintiffs asserted claims against Riddell only on product liability theories: strict liability for design and manufacturing defect, failure to warn, and negligence.[37] The

---

(emphasis added)); 1993 CBA Art. IX, § 1 (generally same); 1982 CBA Art. VII, § 1 (generally same); 1977 CBA Art. VII, § 1.) Earlier player medical care provisions, discussing the examination, treatment, and CBAs contained a similar grievance-procedure provision requiring grievances to be resolved exclusively by the Commissioner. (1970 CBA Art. IX; 1968 CBA § 13; *see also* NFL's Mem. 11.)

[32] (2006 CBA Art. XL VIII-D § 1; 2011 CBA Art. 65 § 1; *see also* NFL's Mem. 12.)

[33] (MAC, ECF No. 83.)

[34] (*Id.* ¶¶ 41–245.)

[35] (*Id.* ¶¶ 273–365.)

[36] (*Compare id.* ¶¶ 41–245, *with id.* ¶¶ 383–96.)

[37] (*Id.* ¶¶ 397–421.)

lone exception was one count combining "Civil Conspiracy/Fraudulent Concealment" claims asserted against "all Defendants," including Riddell.[38] That count comprised only four paragraphs and did not name Riddell specifically or with any particularity.[39] Nowhere in the facts section for Riddell (or the NFL) did the plaintiffs allege any facts that Riddell concealed information, perpetrated any fraud, or was part of any conspiracy.[40]

Shortly after filing the MAC, however, the plaintiffs filed their Amended Master Administrative Long-Form Complaint (AMAC).[41] The AMAC contained the same limited 14 paragraphs of alleged facts as to Riddell, along with the same product-liability-based counts as in the MAC, but it *dropped* Riddell from the "Civil Conspiracy/Fraudulent Concealment" claim, asserting that claim *only* as against the NFL.[42] Riddell moved to dismiss the AMAC based on LMRA § 301 preemption on the grounds that the plaintiffs' claims substantially depended on and were inextricably intertwined with numerous provisions of the CBAs and would require their interpretation, thereby triggering preemption.[43] That motion was not decided.

**2.     Following the approval and implementation of the NFL's class-action settlement, and five years after filing their AMAC, the plaintiffs filed their Second Amended Master Administrative Long-Form Complaint against Riddell (SAMAC-Riddell), which not only included previously abandoned as well as new claims, but also asserted primarily a far-ranging conspiracy and fraud scheme jointly committed by the NFL and Riddell.**

In May 2017, with the NFL settlement approved and in implementation, the plaintiffs moved to file a second amended complaint against Riddell, advising the Court that their proposed amendment merely "supplements" the AMAC "by providing additional factual support about the

---

[38] (*Id*. ¶¶ 422–25.) This does not count the derivative consortium claim against all defendants. (*See id.* ¶¶ 366–69.)

[39] (*Id*. ¶¶ 423–24.)

[40] (*Id*. ¶¶ 383–96; *see also id.* ¶¶ 41–245.)

[41] (ECF No. 2642.)

[42] (*Id*. ¶¶ 393–421, 422–25.) To the extent any individual plaintiffs alleged fraudulent concealment or conspiracy in their underlying original complaints, such claims—per CMO-4—were superseded by the MAC and later the AMAC, the latter of which affirmatively dropped those claims against Riddell.

[43] (Riddell Defs.' Mot. to Dismiss Based on LMRA § 301 Preempt., ECF No. 3592.)

conduct being alleged and by describing the harm caused to each individual Plaintiff."[44] In truth, the SAMAC does far more than the plaintiffs represented. Indeed, unlike the AMAC with its mere five pages and 14 paragraphs of alleged facts against Riddell, the SAMAC-Riddell comprises over 50 pages and 265 paragraphs of alleged facts.[45] And unlike the AMAC, which contained only four product-liability-based counts against Riddell, the SAMAC-Riddell includes *14 counts*, including both new and previously abandoned claims.[46]

   In particular, the SAMAC-Riddell contains counts alleging fraud, fraudulent concealment, and civil conspiracy, among many others, based on alleged joint conduct between Riddell and the NFL, despite the plaintiffs having either never pursued or dropped such theories five years earlier.[47] In all, the SAMAC-Riddell largely tracks the SAMAC-NFL—oftentimes, word for word.[48] In fact, the SAMAC-Riddell so closely tracks the SAMAC-NFL that it appears the plaintiffs failed to change the names of the defendants in otherwise identical passages.[49]

   Throughout the SAMAC-Riddell, the plaintiffs refer constantly to the NFL and its alleged conduct, including in "Factual Background" sections such as "The NFL's Influence" and "Co-conspirator NFL Sponsored the Football Injuries Symposia in 1969, which Focused on Head Injuries," and in lengthy discussions of the NFL's Mild Traumatic Brain Injury (MTBI) committee.[50] Indeed, large swaths of the SAMAC-Riddell contain no specific mention of Riddell

---

[44] (Mem. in Supp. of Pls.' Mot. for Leave to File SAMAC 5, ECF No. 7557-1.)
[45] (*Compare* AMAC ¶¶ 383–96, ECF No. 2642, *with* SAMAC-Riddell ¶¶ 58–322, ECF No. 8927.)
[46] (*Compare* AMAC ¶¶ 397–421, ECF No. 2642, *with* SAMAC-Riddell ¶¶ 323–436, ECF No. 8927.)
[47] (*See generally* SAMAC-Riddell, ECF No. 8927.)
[48] (*Compare* SAMAC-NFL ¶¶ 7–16, 43–102, 107–40, 141–322, ECF No. 8026, *with* SAMAC-Riddell ¶¶ 7–16, 58–115, 116–43, 146–244, 245–317, ECF No. 8927.)
[49] (*Compare, e.g.*, SAMAC-NFL ¶ 363(c) (referring in the Negligent Misrepresentation count to the NFL's communications with the plaintiffs and how "the context of those communications shows that the NFL needed to complete or clarify those statements with all material information"), ECF No. 8026, *with* SAMAC-Riddell ¶ 55(c) (referring in the Negligent Misrepresentation count to Riddell's communications with the plaintiffs and how "the context of those communications shows that *the NFL* needed to complete or clarify those statements with all material information" (emphasis added)), ECF No. 8927.)
[50] (*E.g.*, SAMAC-Riddell ¶¶ 61–322, ECF No. 8927.)

at all, and instead allege facts as to only the NFL and its alleged conduct.[51] And where the SAMAC-Riddell does mention Riddell, it is typically alongside the NFL, either called out specially, or simply lumped together indiscriminately with Riddell as alleged "co-conspirators."[52]

The plaintiffs initially portrayed their proposed SAMAC-Riddell to the Court as a mere supplement of their previously narrow product-liability claims found in their AMAC.[53] In truth, this new pleading completely changed the nature and scope of the allegations against Riddell. No longer was their action against Riddell one involving solely product liability based on alleged failure to warn, as the plaintiffs themselves had characterized their claims in the AMAC.[54] Instead, they completely reshaped their complaint to assert a decades-long scheme of fraud and conspiracy supposedly committed jointly by the NFL and Riddell. According to the plaintiffs, Riddell "worked together with the NFL to develop 'sham-science' and spent decades engaging in a scheme of silence and duplicity."[55] Moreover, this sweeping (and absurd) theory alleges that not only did the NFL and Riddell conspire together for the past sixty years to suppress science and medical knowledge—the majority of which is, according to the plaintiffs themselves, in the public domain—but they purportedly also conspired with "Big Tobacco," "international corporations such as Honda," and "even our own federal government in perpetrating a massive fraud."[56]

Beyond their far-fetched conspiracy and fraud theories, the SAMAC-Riddell now largely asserts new claims and liability theories rooted in alleged breaches of duties supposedly shared with the NFL, including: "duties to protect players and the public from unreasonable harm"; "a duty to inform the Plaintiffs, the athletic community, the medical community and the public at

---

[51] (*E.g.*, *id.* ¶¶ 58, 78–97, 108–11, 116–25, 146–47, 164–73, 293–307.)

[52] (*E.g.*, *id.* ¶¶ 60, 64, 76, 112, 115, 158, 169, 179, 216, 305, 309, 325; *see also id.* ¶ 70.)

[53] (Mem. in Supp. of Pls.' Mot. for Leave to File SAMAC, ECF No. 7557-1.)

[54] (*E.g.*, Mem. of Pls. in Opp'n to Riddell Defs.' Mot. to Sever 7 n.2, ECF No. 4137.)

[55] (SAMAC-Riddell ¶ 12, ECF No. 8927.)

[56] (*E.g.*, *id.* ¶¶ 15, 58, 60, 156, 165 & at 5 n.3.)

large of the risk of concussions and long term brain damage"; "a duty to act in the best interests of the health and safety of the football community including the athletes at every level, to provide truthful information regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of the community."[57]

For example, in their Negligence count, the plaintiffs assert that both Riddell and the NFL owed duties in "licensing" Riddell helmets "to ensure that the equipment and materials [Riddell and the NFL] manufactured and had licensed was of the highest possible quality and sufficient to protect Plaintiffs from the risk of injury, including but not limited to, the unnecessarily increased risk of brain injuries," and that they jointly "breached these duties by licensing defective RIDDELL helmets for use while knowing or having reason to know that these products were negligently and defectively designed and manufactured."[58] These allegations mirror verbatim those the plaintiffs lodged against the NFL.[59]

Similarly, in their Negligent Misrepresentation count, the plaintiffs assert that Riddell and the NFL "had a duty to disclose accurate information to the public about the risks of traumatic brain injuries," but they "negligently omitted to disclose material information to Plaintiffs, the medical community, and the public regarding the link between brain injuries and the resulting negative neurological effects and conditions."[60] Again, these allegations mirror verbatim those found in the SAMAC-NFL.[61]

The remainder of the plaintiffs' liability theories assert product-liability design defect and warnings claims.[62] All their claims, however, invoke either alleged negligence or the plaintiffs'

---

[57] (*Id.* ¶¶ 64, 66, 109.)
[58] (*Id.* ¶¶ 341–42.)
[59] (SAMAC-NFL ¶¶ 358–59, ECF No. 8026.)
[60] (SAMAC-Riddell ¶¶ 355–56, ECF No. 8927.)
[61] (SAMAC-NFL ¶¶ 363–64, ECF No. 8026; *see also id* ¶ 365.)
[62] (SAMAC-Riddell ¶¶ 381–401, ECF No. 8927.)

purported reasonable reliance or both.[63] Moreover, in shotgun-pleading fashion, all but one of these counts incorporates all prior allegations and counts.[64] Finally, in addition to the wrongful-death, loss-of-consortium, and survival-action counts, the plaintiffs seek punitive damages, again, alleging concerted and joint conduct by the NFL and Riddell.[65]

Over Riddell's objections,[66] the SAMAC-Riddell—with its repeated allegations of a longstanding, widespread, fraudulent, negligent conspiracy in which Riddell acted in lockstep jointly with the NFL—is now the operative pleading for purposes of this preemption analysis.[67]

## ARGUMENT

The plaintiffs' claims in the AMAC were subject to dismissal as preempted under LMRA § 301, as Riddell showed.[68] With their current complaint, however, inextricably intertwining Riddell with the NFL in an alleged conspiracy and campaign of fraudulent concealment and disinformation spanning the past sixty years, the plaintiffs have only further ensured their claims against Riddell, just like their claims against the NFL, must be dismissed as preempted.

Just as with the plaintiffs' oftentimes identical claims against the NFL, resolution of the plaintiffs' claims against Riddell will—uniformly and across all counts in the SAMAC-Riddell—require interpretation of numerous provisions of the CBAs that define the terms and conditions of these former players' NFL careers. As the NFL has shown, it would be impossible to resolve the

---

[63] (*E.g.*, *id.* ¶¶ 345–50 (Negligent Marketing), 364–80 (Fraud count alleging breaches of duties owed, failure to warn, and reasonable reliance), 381–85 (Strict Liability count alleging negligent design and "other acts of negligence"), 386–94 (Failure to Warn count alleging a duty to warn), 395–401 (Breach of Warranty count alleging the plaintiffs "reasonably relied on RIDDELL Defendants' representations"), 408–13 (Fraudulent Concealment count alleging the plaintiffs' reasonable reliance on Riddell's "silence and fraudulent concealment of the risks and long term effects of brain injuries suffered while using RIDDELL helmets").)

[64] (*E.g.*, *id.* ¶¶ 323, 345, 351, 364, 381, 386, 395, 402, 414, 419, 424, 428, 434.)

[65] (*Id.* ¶¶ 428–33.)

[66] (Riddell's Mem. of Law in Opp'n to the Pls.' Mot. for Leave to File SAMAC. & Am. Short Form Compl. Template Against the Riddell Defs., ECF No. 7849.)

[67] (Order Granting Pls.' Mot. for Leave to File SAMAC Against Riddell Defs., ECF No. 8451; Order, Oct. 24, 2017, ECF No. 8472 (setting briefing schedule for SAMAC-Riddell motions); *see also* SAMAC-Riddell, ECF No. 8927.)

[68] (Br. in Supp. of Riddell Defs.' Mot. to Dismiss Based on LMRA § 301 Preempt., ECF No. 3592-1.)

plaintiffs' claims against it without resorting to interpretation of provisions covering such topics as player health and safety, medical advice and treatment, and playing equipment. Given that the plaintiffs have framed their current complaint as one in which Riddell purportedly acted hand-in-hand with the NFL to provide supposedly defective equipment to the players and in a long-running conspiracy and fraudulent scheme to withhold information about health risks inherent in playing football, about players' injuries and medical conditions, and about limitations of football helmets to protect against certain injuries, it would be equally impossible to resolve the plaintiffs' claims against Riddell without similarly requiring interpretations of the same CBA provisions implicated in resolving the plaintiffs' claims against Riddell's alleged co-conspirator, the NFL. Indeed, inherent in the plaintiffs' fraud-, negligence-, and product-based claims are a host of unavoidable "substantial dispute[s] over the meaning of the" CBAs' provisions when it comes to assessing issues such as reasonableness, justifiable reliance, duty, and degree of care, not to mention myriad other issues like causation, third-party fault, apportionment of fault, and punitive damages.[69]

With their SAMAC, the plaintiffs have given up attempting to posture themselves as ordinary consumers pursuing typical product liability claims (which they could never do anyway). Instead, they say their "official" helmets were manufactured for the NFL as the "central authority over professional football,"[70] and that the NFLP "had a joint employee paid to ensure all licensed equipment was safe."[71] They accuse the NFL of providing "direct financial incentives" to the National Operating Committee on Standards for Athletic Equipment (NOCSAE), thereby "keeping testing standards and warning labels in place for 40 years."[72] And they allege that the NFL provided them with "the official helmet of the NFL with the knowledge these helmets could

---

[69] *See Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 257 (3d Cir. 2004).
[70] (SAMAC-Riddell ¶ 64, ECF No. 8927.)
[71] (*Id.* ¶ 16.)
[72] (*Id.*)

14

not protect against subclinical or mild traumatic brain injuries."[73] At the same time, they say, the NFL, "as the sport's governing entity (with monopolistic power), . . . made it known to players and teams alike that the NFL actively and pervasively governs player conduct and health and safety,"[74] and that the plaintiffs "trusted" the NFL to do so.[75]

The plaintiffs now claim that not only did the NFL influence the design and warnings of their helmets, but it also controlled the environment and way in which they were used. The players allegedly used their NFL-provided equipment, including their helmets, in an NFL-created activity that "mythologized violence," glorified brutality, and lauded "brutal and ferocious players," wherein the NFL purportedly promoted violent head impacts in "a culture in which NFL players were encouraged to play despite injury and which disregarded the results of violent head impacts," contrary to Riddell's warnings and the ordinary and expected use of its helmets.[76]

The NFL agrees that "numerous CBA provisions in fact do delegate responsibility to the NFL, its Clubs and the NFLPA for reviewing, investigating and implementing equipment-related rules and regulations."[77] For example, the CBAs established the Joint Committee on Player Safety and Welfare to address "'playing equipment' such as helmets . . . ."[78] But, as the NFL explains, "the scope of any duty . . . to license or market equipment that adequately protects players can be assessed only by reviewing and interpreting the Joint Committee's concomitant duty to discuss 'playing equipment.'"[79]

---

[73] (*Id.*)
[74] (*Id.* ¶ 110.)
[75] (*Id.* ¶ 111.)
[76] (*E.g.*, *id.* ¶¶ 83, 86, 91–95.)
[77] (*See* NFL's Mem. 42 n.16 (citing CBA provisions delegating to the NFL and its clubs the responsibility to amend or change playing rules, and authorizing the NFLPA to investigate and seek an advisory decision by an arbitrator regarding any playing rule change that it believes "would adversely affect player safety"), ECF No. 8403-1.)
[78] (*Id.* at 42.)
[79] (*Id.*)

The NFL outlines many ways in which interpretations of specific CBA provisions are necessary to define duties essential in this litigation against Riddell, including duties of the NFL, the NFLP, the NFLPA, the NFL clubs, and the players themselves. As addressed in the NFL's brief, the plaintiffs' claims require assessment of the CBA-imposed obligations on the NFL clubs and their medical personnel "for treating player injuries, determining recovery times, making return-to-play decisions and warning players of the risks of continued performance."[80] The plaintiffs' claims also require consideration of the NFLPA's CBA-related responsibilities and the players' rights and obligations concerning their own health, safety, and medical treatment and their participation through their union on broader player safety issues, such as rules of play and review of materials on player safety, including the safety aspects of player equipment.[81] With respect to the NFL, "the CBAs establish the duties of the NFL and its Clubs to provide medical care to NFL players"[82] and impose obligations on "the NFL and its Clubs in implementing and enforcing rules regarding professional football generally, and health and safety-related rules in particular,"[83] which include among other things, "reviewing, investigating and implementing equipment-related rules and regulations."[84] In the interests of economy, Riddell incorporates these portions of the NFL's brief and will not restate them here. For these many reasons, however, the plaintiffs' claims against Riddell are similarly preempted and must be dismissed.

## I.   LMRA § 301 preempts claims, such as the plaintiffs, that substantially depend on or inextricably intertwine with and require interpretation of CBA terms.

LMRA § 301 governs "suits for violation of contracts between an employer and a labor organization," but this provision "is not merely jurisdictional"—rather, it is also "calls on the

---

[80] (NFL's Mem. at 23–25, ECF No. 8403-1.)
[81] (*Id.* at 25–28.)
[82] (*Id.* at 38.)
[83] (*Id.* at 39.)
[84] (*Id.* at 41–42.)

federal courts to create a uniform federal common law of collective bargaining, with the primacy of arbitral resolution of industrial disputes as its centerpiece."[85] Indeed, "a central tenet of federal labor-contract law under section 301 [is] that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance."[86] Therefore, "because preempted claims must first be presented through the arbitration procedure established in a collective bargaining agreement, those claims should be dismissed."[87]

The Supreme Court has further explained that, in enacting LMRA § 301, Congress intended for federal law to preempt state law completely.[88] The reasons for this complete preemption are to achieve national uniformity in interpretation of labor contract terms and the recognition that individual contract terms could have different meanings under state and federal law, compromising the integrity and certainty of labor/management negotiations and relations.[89] Indeed, as the *Lucas Flour* Court explained, the "possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements."[90]

Thus, "to preserve this uniformity, even suits based on torts, rather than on breach of collective bargaining agreements, are governed by federal law if their evaluation is 'inextricably

---

[85] 29 U.S.C. § 185(a); *Voilas v. Gen. Motors Corp.*, 170 F.3d 367, 372 (3d Cir. 1999) (citing *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 455–56 (1957)); *see also Beidleman v. Stroh Brewery Co.*, 182 F.3d 225, 231–32 (3d Cir. 1999) ("[I]f resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is preempted and federal-labor law principles . . . must be employed to resolve the dispute.").

[86] *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 219–20 (1985).

[87] *Givens v. Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 991–92 (M.D. Tenn. 2010).

[88] *Ry. Labor Execs. Ass'n v. Pittsburgh & L.E.R.R.*, 858 F.2d 936, 939 (3d Cir. 1988) ("The complete preemption doctrine holds that 'Congress may so completely preempt a particular area, that any civil complaint raising this select group of claims is necessarily federal in character.'" (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987))).

[89] *See, e.g.*, *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962).

[90] *Id.*; *see also Beidleman*, 182 F.3d at 234 ("[T]he underlying reason for § 301 preemption . . . [is] 'the need for uniform interpretation of contract terms to aid both the negotiation and the administration of collective bargaining agreements.'" (quoting *Antol v. Esposto*, 100 F.3d 1111, 1115 (3d Cir. 1997))); *Voilas*, 170 F.3d at 372–73 ("Accordingly, the Court has held that state laws that might produce differing interpretations of the parties' obligations under a collective bargaining agreement are preempted." (citing *Lucas Flour*, 369 U.S. at 103–04)).

intertwined with consideration of the terms of [a] labor contract,'"[91] or if their resolution is "substantially dependent" upon an interpretation of the terms of a CBA.[92] As this Court has held, a purported state-law claim is "inextricably intertwined with" a CBA and thereby preempted where the claims "require interpretation of" the CBA.[93] Moreover, preemption under LMRA § 301 applies to a broad range of claims, including those sounding in fraud and civil conspiracy, such as the plaintiffs have pled here.[94]

Thus, if the plaintiffs' claims are substantially dependent on or require interpretation of and are inextricably intertwined with the CBAs' terms, they are preempted. That is the case here.

## II. By inextricably intertwining their claims against Riddell with their claims against the NFL as Riddell's alleged co-conspirator, co-guardian, and joint tortfeasor, the plaintiffs have compelled a finding of preemption as to their claims against Riddell.

Riddell showed that the limited, product-liability-based claims asserted against it in the AMAC were preempted, including because the analyses of reasonableness, duty, degree of care, causation, third-party fault, and myriad other issues inherent in those claims necessarily substantially depended on, were intertwined with, and required interpretations of CBA terms.[95] The plaintiffs' SAMAC-Riddell, however, is far different. This is no longer "a case of the plaintiffs versus Riddell," which the Court at one time viewed as "a separate case."[96] Rather, the SAMAC-Riddell—like the SAMAC-NFL—inextricably intertwines the NFL and Riddell as decades-long co-conspirators, co-tortfeasors, and negligent collaborators in a joint venture and joint enterprise.

---

[91] *Allis-Chalmers*, 471 U.S. at 213; *see also Voilas*, 170 F.3d at 374  (explaining that a state-law action can only proceed "as long as the state-law action as pleaded does not require interpretation of the collection bargaining agreement"); *Stringer v. Nat'l Football League*, 474 F. Supp. 2d 894, 900 (S.D. Ohio 2007) ("If resolution of the state law claim is 'substantially dependent' on an analysis of the terms of the collective bargaining agreement, or 'inextricably intertwined with it, the claim will be preempted by § 301.") (quoting *Allis-Chalmers*, 471 U.S. at 220).
[92] *Allis-Chalmers*, 471 U.S. 220.
[93] *Henderson v. Merck & Co., Inc.*, 998 F. Supp. 532 (E.D. Pa. 1998) (Brody, J.) (holding state-law claims requiring interpretation of a CBA to be preempted and dismissing on that ground).
[94] *E.g.*, *Beidleman*, 182 F.3d at 234, 236
(holding preempted fraudulent misrepresentation and civil conspiracy claims).
[95] (Riddell Defs.' Mot. to Dismiss Based on LMRA § 301 Preempt., ECF No. 3592.) § 301
[96] (Audio File from 5/9/2017 conf., ECF No. 7623.)

As a result, as the plaintiffs have now amended their claims, it is impossible to resolve any claims against Riddell without also addressing the claims against the NFL and its alleged conduct, and thereby only further engaging in interpretive disputes as to the CBAs and their terms.

This linkage of the NFL with Riddell pervades the plaintiffs' complaint, starting on the first page, where they allege that Riddell "acted in concert with" the NFL "(referred to sometimes as 'co-conspirators')."[97] They assert it was the NFL who selected the Riddell helmets to be worn by its players, and that Riddell "acted in concert with the NFL and NFL P and subsequently agreed to engage in tortious and injurious conduct and to conceal material facts regarding the connection between blows to the head and latent brain disease from these Plaintiffs, their families and children, and players at all levels."[98] The gravamen of the plaintiffs' complaint is that "[c]o-conspirator NFL, as the central authority over professional football, and RIDDELL, as the manufacturer of helmets for the NFL, had longstanding duties to protect players and the public from unreasonable harm," and that Riddell and the NFL together "acted in accordance with that duty: developing athletic protection such as helmets, promulgating equipment standards, implementing rule changes, and creating off-the-field programs designed to manage players' lives."[99]

The plaintiffs refer to their concocted conspiracy theory as the "NFL/RIDDELL story," in which Riddell "worked together with the NFL to develop 'sham-science' and spent decades engaging in a scheme of silence and duplicity," one in which "overlapping leadership in the NFL, NFL P and RIDDELL advanced and actually funded the advertisement and promotional campaign of deception in marketing this most dangerous, deadly game."[100] They even allege that Riddell

---

[97] (SAMAC-Riddell ¶ 2, ECF No. 8927.)
[98] (*Id.* ¶¶ 7, 8.)
[99] (*Id.* ¶ 64.)
[100] (*Id.* ¶¶ 9, 12, 15.)

"and co-conspirators [the NFL] eventually worked with international corporations such as Honda and even with our own federal government in perpetrating a massive fraud . . . ."[101]

The plaintiffs refer to the NFL and Riddell's 1989 licensing agreement, in which "in return for providing free and discounted helmets, pads and jerseys to each NFL team, RIDDELL received the exclusive right to display its logo during NFL games on the helmets of those players who choose to wear the RIDDELL brand."[102] With no factual support, they nonetheless spin this patently innocuous business arrangement as a "joint-venture [that] served to preserve RIDDELL's financial health and RIDDELL, in turn, provided assistance to NFL football in proliferating junk-science and propaganda that minimized the risks of repetitive head injury and concealed the risks of CTE from those playing the game."[103] And again with no supporting facts, the plaintiffs assert that Riddell "was also provided an exclusive multi-million-dollar market to sell NFL-branded products in exchange for RIDDELL's participation in its conspiracy."[104]

These allegations, intertwining Riddell with the NFL as essentially one unified actor for the past sixty years, persist throughout not only the plaintiffs' fraud and conspiracy theories, but their negligence claims, and even their request for punitive damages.[105] Virtually every count in their complaint incorporates all prior allegations and counts—i.e., the same allegations of the purported decades-long conspiracy and joint fraud and negligence by the NFL and Riddell.[106]

---

[101] (*Id.* ¶ 60.)
[102] (*Id.* ¶ 159.)
[103] (SAMAC-Riddell ¶ 157, ECF No. 8927.)
[104] (*Id.* ¶ 163.)
[105] (*E.g.*, *id.* at 6–8 (providing "Summary Tables" of alleged negligence and fraud referring to both Riddell and its alleged co-conspirator the NFL), 15 (containing the summary chart of the alleged conspiracy), ¶¶ 323–44 (Negligence count), ¶¶ 351–63 (Negligent Misrepresentation count), ¶ 429 ("RIDDELL Defendants the NFL, NFL P and RIDDELL engaged in conduct so reckless, willful, wanton . . .").)
[106] (*Id.* ¶¶ 323, 345, 351, 364, 381, 386, 395, 402, 414, 419, 424, 428, 434.)

Moreover, many of the factual allegations are directed *only* at the NFL, attaching to Riddell solely by (conclusory and factually unsupported) assertions of an NFL/Riddell conspiracy.[107]

The plaintiffs' theories of a "massive" NFL/Riddell negligence- and fraud-based conspiracy are absurd. But they are nonetheless the plaintiffs' theories. As such, they show that in resolving the claims against Riddell, there is simply no separating Riddell and the NFL. This is nowhere more evident than by comparing the SAMAC-Riddell with the SAMAC-NFL, which shows the two complaints are largely identical.[108]

The plaintiffs may argue, as they have in the past,[109] that Riddell cannot assert preemption because it is not a party to any of the CBAs. Both the NFL and Riddell have shown that this argument lacks merit,[110] as what matters is not the parties' status as a signatory, but only whether resolution of the claims is substantially dependent on, inextricably intertwined with, or requiring interpretation of CBA provisions.[111]

Moreover, the fact that the plaintiffs here allege a joint conspiracy and fraudulent scheme and joint negligence perpetrated by both the NFL and Riddell further supports preemption as to

---

[107] (*E.g.*, *id.* ¶¶ 116–25 (an entire section on "Co-conspirator NFL Sponsored the Football Injuries Symposia in 1969, which Focused on Head Injuries").)

[108] (*E.g.*, *compare* SAMAC-Riddell ¶¶ 7–16, 43–45, 48–331, ECF No. 8026, *with* SAMAC-NFL ¶¶ 7–16, 58–60, 61–322, ECF No. 8927.)

[109] (Mem. of Pls.' in Opp'n to Riddell Defs.' Mot. to Dismiss Based on LMRA § 301 § 301Preempt. 10, ECF No. 4133.)

[110] (NFL's Mem. 41, ECF No. 8403-1; Riddell's Br. in Supp. of Mot. to Dismiss Based on LMRA § 301 § 301Preempt. 13–15, ECF No. 3592-1.)

[111] *E.g.*, *Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1177–78 (11th Cir. 2010) (explaining that whether a party is a signatory to a CBA "is not dispositive" of whether claims against that party are preempted and explaining that "[t]he relevant question is, instead, whether Plaintiffs state-law claims asserted against the NFL would require the court to apply or interpret the CBA"); *Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.*, 977 F.2d 895, 895–99 (4th Cir. 1992) (affirming LMRA § 301 preemption as to a union's state-law claims for tortious interference with a collective bargaining agreement against non-signatories to that agreement because inquiry into the state-law claim required interpretation of the CBA); *Mullins v. Int'l Union of Operating Eng'rs Local No. 77 AFL-CIO of Wash., D.C.*, 214 F. Supp. 2d 655, 668–69 (E.D. Va. 2002) (recognizing that § 301 preempts not only state-law claims "against parties to a collective bargaining agreement, but also preempts state law claims against non-signatories where interpretation of the agreement is required for resolution," and granting summary judgment where the claims were "inextricably intertwined with" the CBA); *Arnold v. Cabot Corp.*, No. 1:99-CV-75, 2000 WL 1283078, at *9 (N.D.W. Va. May 8, 2000) (observing that the Fourth Circuit's "decision in *Covenant Coal* clearly recognizes that §301 can preempt state law claims against a non-signatory to a collective bargaining agreement").

the claims against Riddell even though Riddell is not a signatory to the CBAs. Indeed, in analogous circumstances involving similarly intertwined claims against both signatories and non-signatories to employment contracts containing arbitration provisions, courts have held it appropriate to require that the claims against both signatories and non-signatories alike be barred from litigation in favor of arbitration.

Such was the outcome in *Wolf v. Rawlings Sporting Goods Co., Inc.*,[112] where the court found that claims by a minor league baseball player against Major League Baseball (MLB), the Baltimore Orioles, and several other "MLB Defendants" for alleged head and neurological injuries purportedly due to his helmet not adequately protecting him were intertwined with his claims against helmet-manufacturer Rawlings. Rawlings' status as a non-signatory was found to be immaterial "because the factual issues in contention [were] intertwined and because the Amended Complaint itself assert[ed] related claims against Rawlings and the MLB Defendants."[113]

Similarly, here, the factual and legal issues as alleged against both the NFL and Riddell are intertwined, and the plaintiffs' complaints assert related—in some cases, identical—claims against the NFL and Riddell.[114] In addition, as the NFL explained, since "1977, all CBAs have contained a broad arbitration clause providing that all disputes 'involving interpretation of'"[115]—language which courts have found to be "exceedingly broad" and which "clearly intends to encompass all disputes between all relevant parties," including claims against a non-signatory helmet

---

[112] No. 10 Civ. 3713 (JSR), 2010 WL 4456984, at *3 (S.D.N.Y. Oct. 26, 2010).
[113] *Id.* at *3 (citing *JLM Indus., Inc. v. Stolt-Neilsen*, 387 F.3d 163, 178 n.7 (2d Cir. 2004)).
[114] (SAMAC-Riddell ¶¶ 157, 161, 170, 207, 214, 308 (alleging a "joint venture" and "joint enterprise" between Riddell and the NFL), ECF No. 8026); *cf. White v. Sunoco, Inc.*, 870 F.3d 257, 264 (3d Cir. 2017) (finding it equitable under South Dakota law to treat a non-signatory like a signatory for the purposes of arbitration "when all the claims against the non-signatory defendants are based on alleged substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract").
[115] (NFL's Mem. 11, ECF No. 8403-1.)

manufacturer.[116] Given the plaintiffs' purposeful entanglement and inextricable intertwining of their claims against Riddell with their claims against the NFL, it is inescapable that just as the claims against the NFL are preempted, so too are the claims against Riddell.

### III. The plaintiffs' claims against Riddell are substantially dependent on and inextricably intertwined with, and therefore require interpretation of the CBAs.[117]

Beyond the preemptive effect of intertwining Riddell with the NFL, the plaintiffs' claims against Riddell themselves are preempted, as resolving them would invariably require interpretation of numerous CBA provisions, just as it would with the NFL. From their conspiracy claim, to their fraud-based claims, to their negligence-based claims, and even on punitive damages, the plaintiffs' claims against Riddell are all preempted under LMRA § 301.

#### A. Resolution of the plaintiffs' fraud-based claims (fraud, fraudulent concealment, misrepresentation, and civil conspiracy) would require interpretation of numerous CBA terms.

The plaintiffs' fraud, fraudulent concealment, misrepresentation, and civil conspiracy allegations here are virtually identical to their claims against the NFL. Thus, for the same reasons

---

[116] *E.g.*, *Wolf*, 2010 WL 4456984, at *2  (holding that language in a "contract to submit 'all disputes and controversies related in any way to professional baseball' to arbitration" is "exceedingly broad, and it clearly intends to encompass all disputes between all relevant parties," including claims against a non-signatory helmet manufacturer).

[117] The plaintiffs may argue that preemption-analysis requires a full choice-of-law analysis as to each individual plaintiff. Such an argument should fail, for at least two reasons. First, a full choice-of-law analysis is not necessary at this stage because a court can find preemption without knowing exactly which jurisdiction's laws will control when it is plain that resolution of the most fundamental elements of the claim—those base elements that do not change across jurisdictions—require interpretation of a CBA. *See, e.g.*, *Duerson v. Nat'l Football League, Inc.*, No. 12 C 2513, 2012 WL 1658353, at *3 (N.D. Ill. May 11, 2012) (finding preemption as to negligence and fraudulent concealment claims that were substantially dependent on interpretation of CBA provisions, without conducting a choice-of-law analysis). For example, while there are differences and nuances as to constituent elements of a negligence claim across the jurisdictions, at a fundamental level, "a negligence claim in all states requires, in some form, the existence of a duty, the breach of that duty, causation, and damages." *Id.*  (citing *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 3 (2010) ("A person acts negligently if the person does not exercise reasonable care under all the circumstances.")). And second, the plaintiffs should be estopped for a full choice-of-law analysis now, since such an analysis would require far more detailed facts than they have pled in their improper mass complaint and short-form template complaint, as Riddell argued in its motion to sever. (Br. in Supp. of Riddell Defs.' Mot. to Sever 19–21, ECF No. 3593-1.) Yet, the plaintiffs have opposed severance, as well as properly pleading their claims individually and with sufficient facts to enable a full choice-of-law analysis, arguing their claims shared "common issues of . . . law." (*E.g.*, Mem. of Pls. in Opp'n to Riddell Defs.' Mot. to Sever 8–9, ECF No. 4137.) While their argument failed to provide a legally correct basis on which to oppose severance, it should nonetheless estop them from arguing now for a full choice-of-law analysis.

the NFL aptly explained, these same claims against Riddell are similarly preempted.[118] For example, fraudulent concealment and omission generally require a duty to disclose or provide accurate information.[119] The plaintiffs maintain that Riddell shared a joint duty with the NFL and breached that "duty of reasonable and ordinary care to the Plaintiffs by failing to provide them with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during NFL games and practices."[120] And just as with regard to the claims against the NFL, a court cannot evaluate the scope of Riddell's "purported duties without first considering the obligations regarding player health and safety imposed by the CBAs" on its alleged co-conspirator and co-tortfeasor, the NFL.[121]

In addition, another fundamental element of misrepresentation/omission claims is that the plaintiff justifiably relied on the allegedly fraudulent statement or omission.[122] Likewise, to resolve a fraud claim, courts must consider the "relationship of the parties . . . and the nature of the transaction when determining whether one party's reliance . . . is justifiable."[123] The same provisions the NFL discussed (and more) that would have to be interpreted to determine any duty owed by Riddell also would have to be interpreted in considering justifiable reliance.

For example, the CBAs' numerous provisions charging clubs and club medical staff with monitoring player health and treating player injuries, the provisions requiring qualified and highly

---

[118] (NFL's Mem. 32–37.)

[119] See, e.g., Smith v. Ramis, 647 F. App'x 679, 681 (9th Cir. 2016) (discussing elements under California law); Core Commc'ns, Inc. v. Verizon Maryland LLC, 744 F.3d 310, 324 (4th Cir. 2014) (discussing the elements under Maryland law); Aubrey v. Sanders, No. 07-cv-0137, 2008 WL 4443826, at *5–6 (W.D. Pa. Sept. 26, 2008); Myre v. Meletio, 307 S.W.3d 839, 843 (Tex. Ct. App. 2010) (discussing fraudulent concealment under Texas law and explaining that "[f]raud by omission is a subcategory of fraud because the omission or non disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose"); MatlinPatterson ATA Holdings LLC v. Fed. Express Corp., 87 A.D.3d 836, 840 (N.Y. App. Div. 2011); Manti's Transp., Inc. v. C.T. Lines, Inc., 68 A.D.3d 937, 940 (N.Y. App. Div. 2009); Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999).

[120] (SAMAC-Riddell ¶ 115, ECF No. 8927; see also SAMAC-NFL ¶ 132 (same), ECF No. 8026.)

[121] (See SAMAC-NFL 33 (citing Atwater, 626 F.3d at 1182–83), ECF No. 8026.)

[122] See, e.g., Smith, 647 F. App'x at 681 (CA law); Core Commc'ns, Inc, 744 F. 3d at 324 (MD law); Aubrey, 2008 WL 4443826, at *4–5 (PA law); MatlinPatterson ATA Holdings LLC, 87 A.D.3d at 840 (NY law).

[123] Tran v. Metro. Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005).

trained physicians and trainers responsible for examining players and informing them of any medical issues that could affect their health or play, the provisions charging club physicians with making return-to-play determinations and advising players of the risks of doing so[124]—all these provisions (and many more) throughout the CBAs would have to be interpreted to determine whether any individual plaintiff's supposed reliance on any alleged statements or omissions was justifiable.[125] The CBAs' establishment of the player-bargained-for Joint Committee on Player Safety and Welfare "for the purpose of discussing player safety and welfare aspects of playing equipment"[126] and the Accountability & Care Committee charged with providing "advice and guidance regarding the provision of preventive, medical, surgical, and rehabilitative care for players"[127] would likewise require not merely consultation, but interpretation.[128]

Indeed, in defending against the plaintiffs' fraud-based claims, Riddell will undoubtedly argue that these provisions (and more) in the CBAs must be interpreted to charge others with the same duties the plaintiffs attempt to foist on Riddell. And Riddell will further show that these

---

[124] (*See* 2011 CBA Art. 39 §§ 1(a), 1(c), 3; 2011 CBA Appx. A § 9; 2006 CBA Art. XLIV § 1; 2006 CBA Appx. C § 9; 1993 CBA Art. XLIV § 1; 1993 CBA Appx. C § 9; 1982 CBA Art. XXXI § 1; 1980 Supp. to NFL Const. Art. XVII.)

[125] *See Williams v. Nat'l Football League*, 582 F.3d 863, 881 (8th Cir. 2009) ("The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation) are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy."); *see also Atwater*, 626 F.3d at 1183  (negligent misrepresentation claim preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language"); *Sherwin v. Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178 (N.D.N.Y. 1990) (fraud claim preempted because "the court cannot resolve plaintiff's fraud and negligent misrepresentation claims without reference to" provisions of the CBA establishing "duty of a club physician, and arguably the club," to inform player of adverse physical conditions); (*also* NFL's Mem. 33–35).

[126] (1982 CBA Art. XI; *see also*, 2011 CBA Art. 50 § 1(a), (c); 2006 CBA Art. XIII § 1(a), 1(b); 1993 CBA Art. XIII § 1(a); 1977 CBA Art. XI, § 7; 1970 CBA Art. V; 1982 CBA Art. XI, § 7 (stating that the initial and ongoing tasks of the Joint Committee on Player Safety and Welfare have included "a review of all current materials on the player safety aspects of player equipment, . . .").)

[127] (2011 CBA Art. 39 § 3(a); *see also id.* §§ 3(b)–(e).)

[128] *See Smith v. Nat'l Football League Players' Ass'n*, No. 14-cv-01559, 2014 WL 6776306, at *8 (E.D. Mo. Dec. 2, 2014) ("The justification [for reliance] may exist, but it will substantially depend upon interpretation of the CBA. Therefore, the claim of negligent misrepresentation is preempted by § 301 of the LMRA."); *Ballard v. Nat'l Football League Players Ass'n*, 123 F. Supp. 3d 1161, 1169–70 (E.D. Mo. 2015) (concluding that whether players' reliance on NFLPA's statements about the risks of head impacts was justifiable required interpretation of the CBAs, thereby preempting negligent-misrepresentation claim).

provisions must be interpreted to define the relationship between the plaintiffs and Riddell, and to determine whether the plaintiffs were justified in relying on Riddell—a remote helmet manufacturer—for medical oversight and advice on the risks of injury in playing football, as opposed to the team physicians and trainers, for example, whom the players bargained for to be on the field with them and to oversee and safeguard their health and safety. The players will no doubt counter that these provisions cannot be interpreted in such a way as to absolve Riddell of liability. But that is exactly the type of substantial dispute that mandates preemption.[129]

Moreover, with respect to the players' assertions of alleged duties that persisted beyond their NFL playing careers and the players' reliance on those duties owed, as the NFL explained regarding the identical charge against it, those would likewise require interpretation of the CBAs.[130] For example, given that justifiable reliance entails an analysis of the parties' relationship, the CBAs' multiple provisions providing for retirement benefits, including for conditions alleged here such as dementia, and the players' responsibilities to monitor their own medical conditions post-retirement would need to be interpreted to shed light on whether their purported reliance on Riddell's "silence . . . after their careers" was reasonable. [131]

Finally, the need to consult the CBAs on reliance compels a finding of preemption as to not only the fraud-based claims, but the plaintiffs' breach-of-warranty claim as well. As they have pled it, reasonable reliance is an element of their claim, since they assert that they "reasonably relied on RIDDELL Defendants' representations that the RIDDELL helmets were a safe means of reducing head injury."[132] For the same reasons as above, the same CBA provisions would need to be interpreted to determine whether the plaintiffs' purported reliance was, in fact, reasonable.

---

[129] *See, e.g.*, *Kline*, 386 F.3d at 257  (explaining that a "substantial dispute over the meaning" of a CBA's provisions triggers preemption).
[130] (NFL's Mem. 36–37.)
[131] (*See id.*; *see also* SAMAC-Riddell ¶ 410, ECF No. 8927.)
[132] (*Id.* ¶ 399.)

**B.      Resolution of the plaintiffs' negligence-based claims would require interpretation of numerous terms of the CBAs.**

A complete choice-of-law analysis is unnecessary at this time as to the plaintiffs' several negligence-based claims[133] because, under any jurisdiction's law, a negligence-based claim must show that the defendant owed and acted unreasonably in breaching a duty to the plaintiffs.[134]

Here, the plaintiffs assert a confused mess of numerous overlapping and duplicative claims. For example, they assert in duplicative claims that both "the NFL and RIDDELL Defendants voluntarily undertook to study the issue of neurocognitive injuries in former NFL players" and negligently misrepresented information about the "risks of traumatic brain injuries," such as in their Negligence, Negligent Marketing, *and* Negligent Misrepresentation claims.[135] They likewise assert across multiple claims that Riddell allegedly failed to disclose information about "the risk of concussive brain injuries while using their helmets," including not only in their Negligence, Negligent Marketing, and Negligent Misrepresentation claims,[136] but also in their claims for Strict Liability/Design Defect and Failure to Warn.[137]

---

[133] (SAMAC-Riddell ¶¶ 323–44 (Negligence), 345–50 (Negligent Marketing), 351–63 (Negligent Misrepresentation), 381–85 (Design Defect), 386–94 (Failure to Warn), ECF No. 8927.)

[134] *E.g.*, *Hinkley v. Safepro, Inc.*, 853 F. Supp. 594, 596 (N.D.N.Y. 1994) (holding the degree of care "will vary with the surrounding circumstances and will involve a 'balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm'") (applying New York law); *Krull v. Keene Corp.*, 601 F. Supp. 547, 548 (D.C. Ill. 1985) ("'Ordinary care' is by definition a reasonableness standard whose application varies with the circumstances.") (applying IL law); *Flowers v. Torrance Mem. Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997 (1994) ("Because application of [due care] is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances." (citations omitted)); *Fla. E. Coast Ry. Co. v. Soper*, 146 So. 2d 605, 607 (Fla. Dist. Ct. App. 1962) ("However, the degree of care is variable and dependent upon the circumstances of a particular case."); *Antcliff v. State Emps. Credit Union*, 414 Mich. 624 (1982) ("Even though the standard itself never varies, the amount of care and the type of conduct required may vary with the circumstances."); *St. Louis Sw. Ry. Co. v. Marks*, 749 S.W.2d 911 (Tex. App. 1988) (holding as a legally correct instruction on Texas law that "[t]he degree of care required to be exercised depends upon the risk of danger involved under the circumstances"); *see also Grand Trunk R. Co. v. Ives*, 144 U.S. 408, 417 (1892) (explaining that there is "no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances," but rather, the degree of care owed must be evaluated in light of "the special circumstances and surroundings of each particular case").

[135] (SAMAC-Riddell ¶¶ 323–36, 345–50, 355–63, ECF No. 8927.)

[136] (*Id.*)

[137] (*Id.* ¶¶ 382(a)–(d), 386–94.)

The plaintiffs further compound the confusion by their improper shotgun-pleading, incorporating all prior allegations and counts into successive counts.[138] The crux of their action as they explain it, though, is that Riddell along with the NFL and NFLP (and others), as supposed "co-conspirators" in their "historical role as the guardian of player health and safety," "had longstanding duties to protect players and the public from unreasonable harm."[139]

Riddell, however, is far from the only actor in the arena of player health and safety, even according to the plaintiffs' theories and allegations. Indeed, as the plaintiffs allege, the NFL (with its related entities) was a supposed "co-guardian" and collaborating joint tortfeasor with Riddell. This is in addition to the NFL clubs, club medical personnel (physicians and trainers), NFL-player committees, the NFLPA, and the players themselves (and many others), all of whom played roles in safeguarding player health and safety. The existence and extent of these various roles and duties are, in significant part, defined and shaped by numerous provisions in the CBAs. Determining whether, among this crowded field, Riddell owed any duties as alleged—not to mention the scope of those duties, the degree of care owed, and whether Riddell acted reasonably in exercising them—would necessarily require substantial interpretation of numerous CBA terms assigning the same or similar duties to others.[140] Indeed, as one court explained in examining CBA preemption in an analogous context with respect to claims involving a former NFL player, while "the standard of care remains constant, *the degree of care* varies with the facts and circumstances of each particular case."[141] "In other words, the degree of care owed *cannot be considered in a vacuum*."[142]

---

[138] *See, e.g.*, *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 860 (E.D. Pa. 2017) (recognizing that the Third Circuit has criticized "shotgun pleading" as violating Rule 8(a)(2), and dismissing the complaint on that ground) (citing *Hyson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988)).
[139] (SAMAC-Riddell ¶¶ 64, 74, ECF No. 8927.)
[140] *See Stringer*, 474 F. Supp. 2d at 909–10.
[141] *Id.* (emphasis added) (citing *Gordon v. Herzog*, 410 N.W.2d 405, 408 (Minn. Ct. App. 1987)).
[142] *Id.* (emphasis added).

For example, the *Stringer* court noted that CBA provisions require "team physicians to inform a player in writing if the player has a physical condition that will be 'significantly aggravated by continued performance,'" and place "*primary responsibility* for identifying such physical conditions on the team physicians, who are presumably independently prepared, by virtue of medical school training and experience, to recognize the signs of" a medical issue and "to treat it, and need not rely on the content of" information provided by the NFL.[143] The court concluded: "This provision must, therefore, be taken into account in determining the degree of care owed by the NFL and what was reasonable under the circumstances, must be considered in light of pre-existing contractual duties imposed by the CBA on the individual NFL clubs concerning general health and safety of NFL players." For that reason, the court properly concluded that resolution of that plaintiff's claims was "inextricably intertwined with this contractual provision."[144]

As yet another court explained in the context of similar concussion claims in a case transferred into this MDL, "evaluating the reasonableness of the NFL's conduct will require interpretation of terms of the CBAs imposing duties on NFL clubs to protect player health and safety."[145] The court reasoned that if, by virtue of obligations under the CBA, the player's club—rather than the NFL—had a duty to warn and protect players regarding concussive brain injury, "it would be one factor tending to show that the NFL's alleged failure to take action to protect Duerson from concussive brain trauma was reasonable."[146] The court further noted that "[o]ther provisions in the CBAs also address player health and safety, and may be interpreted to impose a general duty on the NFL clubs to diagnose and treat ongoing conditions like the concussive brain

---

[143] *Id.* at 910–11 (emphasis added) (citing 2002 CBA, Art. XLIV, § 1).
[144] *Id.* at 911.
[145] *Duerson*, 2012 WL 1658353, at *3–4 (N.D. Ill. May 11, 2012) (citing 1993 CBA Art. XLIV § 1).
[146] *Id.* at 4.

trauma . . . ."[147] From this, the court concluded: "Determining the meaning of the CBA provisions is thus necessary to resolve Duerson's negligence claim."[148]

Here, the same principles apply, and the same outcome is reached. Whether Riddell owed the plaintiffs the duties alleged, what the scope of those duties was, what degree of care was owed in exercising those duties, and whether Riddell acted reasonably in discharging such duties cannot be considered "in a vacuum."[149] Rather, these negligence-based considerations could only properly be considered in the full context of the CBAs and their numerous provisions governing player health and safety.

That the CBAs are implicated and must be interpreted in resolving the plaintiffs' claims is all the more apparent given the plaintiffs' choice to charge Riddell and the NFL as essentially one unified actor, joined at the hip for the past sixty years in a campaign of negligent disinformation, concealment, and misrepresentation concerning player health and safety. For example, assessing whether Riddell, along with the NFL, owed a duty to provide medical information to former NFL players concerning the risks of and from concussive and sub-concussive brain injuries and return to play could only be properly performed by consulting and interpreting (among others) the "CBA provisions that relate to the duties of team physicians," because the "CBA places primary responsibility for identifying such physical conditions on the team physicians."[150] These "physician provisions," among many others, would have to "be taken into account in determining the degree of care owed by the NFL"—and for the same reasons, likewise with respect to the NFL's alleged collaborator and co-guardian, Riddell.[151]

---

[147] *Id.* (citing 1982 CBA Art. XXXI, §§ 1–2; 1993 CBA Art. XLIV, §§ 1–2).
[148] *Id.*
[149] *Id.* (emphasis added).
[150] *See* Order, *Maxwell v. Nat'l Football League*, No. 2:11-cv-08394, at 1 (C.D. Cal. Dec. 8, 2011) (citing *Stringer*).
[151] *See id.* at 2.

Just as would the NFL, Riddell will surely point to these "physician provisions" (among others) to show that these former players bargained for numerous provisions and safeguards from the NFL and others for their health and safety, including information concerning injuries, risks from continued play following injuries, their treatment, and other health-related issues. Riddell will show that evaluating the reasonableness of its alleged conduct in failing, along with the NFL, to act as the supposed "guardian of player health and safety" will "require interpretation of terms of the CBAs imposing duties on NFL clubs to protect player health and safety."[152]

The NFL aptly explains the numerous tangles between the plaintiffs' negligence-based claims and a score of CBA provisions.[153] That analysis does not bear repeating here, as it applies equally with respect to Riddell, given how the plaintiffs' have joined the NFL and Riddell at the hip, from their alleged share role as "guardian of player health and safety" charged with advising players of the risks of and from brain injuries,[154] to their supposed agreement "to provide the safest possible football helmets licensed as the 'official helmet of the NFL'" and their shared duties to use "the safest materials available in the construction of football helmets,"[155] to their purported collaboration in forming the NFL's MTBI Committee[156]—all of the CBA provisions the NFL has outlined as requiring interpretation apply equally to Riddell. They would all be the subject of substantial interpretive disputes with respect to the existence, scope, degree of care owed, and reasonableness of Riddell's alleged duties and shared negligence with the NFL. Just as with the NFL, the plaintiffs' claims are therefore preempted.[157]

---

[152] *See Duerson*, 2012 WL 1658353, at *3–4; (*see also* SAMAC-Riddell ¶ 192, ECF No. 8927.).

[153] (NFL's Mem. 22–31.)

[154] (SAMAC-Riddell ¶¶ 66, 74, 107, 115, 179, 192, ECF No. 8927.)

[155] (*Id.* at 7–8 & ¶¶ 60, 161, 288.)

[156] (*Id.* ¶¶ 60, 70, 131, 164–244.)

[157] (*See* NFL's Mem. 22–33; *see also id.* 41–42 (addressing the claims with respect to defendant NFLP).) The plaintiffs assert against Riddell the identical wrongful-death, survival-action, and loss-of-consortium claims they assert against the NFL. (*Compare* SAMAC-NFL ¶¶ 410–23, ECF No. 8026, *with* SAMAC-Riddell ¶¶ 414–27, ECF No. 8927.) The NFL also adequately addressed preemption of these claims, which arguments Riddell avoids repeating and incorporates. (NFL's Mem. 31–32.)

**C.      Numerous other necessary considerations in the plaintiffs' claims, including contributory/comparative fault, fault of others, and punitive damages, among many more, would likewise require interpretation of the CBAs.**

The same CBA provisions (and more) that would need to be interpreted to determine what, if any, duties were owed by Riddell versus the teams, their physicians and trainers, the bargained-for committees, the NFL, the NFLPA, and others, and whether the plaintiffs' alleged reliance on Riddell was justifiable and reasonable, would need to be interpreted to determine whether they imposed on the plaintiffs or others duties that they breached, to assess whether the plaintiffs' claims would be barred entirely, or any liability eliminated or mitigated by the plaintiffs' contributory or comparative fault, or by fault of others, which most—if not all—jurisdictions apply. [158]

Similarly, the plaintiffs' request for punitive damages would require interpretation of the same provisions addressed above, and more. Beyond their inextricable intertwining of Riddell with the NFL, which necessarily requires preemption as to this aspect of their claims as well,[159] any constitutionally permissible consideration of punitive damages would have to allow Riddell to point to the CBAs and their duties and obligations imposed on others—the players, their teams, their coaches, their physicians, their trainers, their union, the league, and more—to show that Riddell's alleged conduct was not, for example, reprehensible, wanton, or in flagrant disregard of the players' rights. Indeed, Riddell would do just that, showing how the proper interpretation of the numerous CBA provisions discussed herein and by the NFL reveal that Riddell acted entirely reasonably in light of the array of duties and responsibilities assigned to others throughout the

---

[158] *E.g.*, Ariz. Rev. Stat. § 12-2506 (requiring a jury to "consider the fault of all persons who have contributed to the alleged injury . . . regardless of whether the person was, or could have been, named as a party"); Cal. Civ. Code § 1431.2(a) (generally same); *Wilson v. Ritto*, 129 Cal. Rptr. 2d 336, 340-41 (Cal. App. 2003) (generally same); Fla. Stat. § 768.81(3) (generally same); MCL 600.2957(1) & 600.6304(1) (same under MI law). This list is not exhaustive.
[159] (*See* SAMAC-Riddell ¶ 429, ECF No. 8927.)

CBAs. The plaintiffs would surely argue to the contrary. But, again, that is exactly the sort of substantial interpretive dispute that compels a finding of preemption.[160]

## IV. The plaintiffs cannot avoid the preemption conclusion by attempting to distinguish Riddell's cited case law, or to rely on outcomes in different cases.

The plaintiffs may attempt, as they did previously, to distinguish Riddell's cited case law to avoid preemption. For example, as they have, they may argue that *Stringer* supports a finding of no preemption as to Riddell here because that court declined to find preemption of the claims against Riddell there.[161] This argument would fail for at least two reasons.

First, LMRA § 301 preemption requires a case-by-case analysis of the claims at issue.[162] The *Stringer* plaintiffs' claims were simply routine, one-off, garden-variety product liability claims.[163] The plaintiffs here have moved far away from such claims in favor of their far-fetched, widespread, 60-year conspiracy and fraud scheme jointly perpetrated by the NFL and Riddell (and many others). Unlike here, there were no allegations in *Stringer* of alleged conspiracy and shared guardianship with the NFL over the game of football. The only relevant takeaway from *Stringer*, therefore, is its underlying analysis, not its ultimate outcome.

Second, as the NFL explained, where *Stringer* declined to find preemption—such as with respect to a "negligence claim based on the NFL Defendants' purported duty 'to ensure that players had safe equipment"—it was incorrect.[164] Numerous CBA provisions address the rights, duties, obligations, and expectations with respect to playing equipment, including helmets.[165]

---

[160] *See, e.g.*, *Williams*, 582 F.3d at 882 (finding preemption of plaintiffs' intentional infliction of emotional distress claim, which required showing of extreme, outrageous, and intentional or reckless conduct, because "one can only evaluate the outrageousness of the NFL's conduct, not disclosing to the Players that StarCaps contained bumetanide, in light of what the parties have agreed to in the Policy").

[161] (Mem. of Pls.' in Opp'n to Riddell Defs.' Mot. to Dismiss Based on LMRA § 301 Preempt. 4–7, ECF No. 4133.)

[162] *Allis-Chalmers*, 471 U.S. at 220.

[163] 474 F. Supp. 2d at 899 (identifying the plaintiff's claims there as brought "under theories of negligence, strict products liability, breach of warranty, and failure to warn" for alleged negligent design in the player's helmet and shoulder pads' ability to evaporate and dissipate heat).

[164] (NFL's Mem. 42 n.16.)

[165] (*Id.*)

Similarly, as they did in response to the NFL's motion,[166] the plaintiffs will cite *Oliver v. Riddell, Inc.*[167] Their reliance, however, will be misplaced for multiple reasons.

First, *Oliver* placed great weight on the fact that the NFL was not a named defendant.[168] Here, the plaintiffs all named the NFL in their original complaints, with some continuing to pursue the NFL. The fact that some plaintiffs accepted the settlement and dismissed their claims against the NFL doesn't change the reality that their claims, since their inception, named the NFL as a defendant, and their current master complaint throughout attacks the NFL and Riddell jointly.

Second, just as in *Stringer*, there are material differences between the claims here and in *Oliver*, which further precludes application here of the outcome there. Primarily, throughout, *Oliver* characterizes the claims there as being limited to what Riddell did and said exclusively with respect to the design and manufacture of its helmets, writing, for example, that the plaintiff's claims there focused "on the duties and obligations of a helmet manufacturer, and the issues to be decided will turn on, for example, whether Defendants had common law duties to manufacture safe products and warn others about any dangerous defects, whether they breached those duties, and whether that breach harmed Plaintiffs."[169] While that was an inaccurate characterization of the *Oliver* complaint, the same plainly could not be said about the SAMAC-Riddell. Indeed, nowhere did the *Oliver* complaint allege that Riddell was a joint "guardian of player health and safety" with the NFL.[170] And there were likewise no allegations in *Oliver* of any alleged joint undertaking by the NFL and Riddell "to provide the safest possible football helmets."[171] Thus, unlike in *Oliver*

---

[166] (Opt Out Pls.' Mem. of Law in Opp'n to the NFL & NFL P's Mot. to Dismiss Pls.' SAMAC on Preempt. Grounds 21, ECF No. 9522.)

[167] No. 1:16-cv-04760, 2016 WL 7336412 (N.D. Ill. July 19, 2016).

[168] *Id.* at *2 (finding that "the NFL has not been named as a defendant in this case," which the court found to "strongly counsel against a finding of LMRA preemption").

[169] *Id.* at *4.

[170] *See generally* Compl., *Oliver v. Riddell, Inc.*, No. 16L 02638 (Cook Cty., Ill. March 3, 2011).

[171] (*E.g.*, SAMAC-Riddell ¶ 60, ECF No. 8927.)

where the court found that the "complaint centers on the duties and obligations of a third party helmet manufacturer—not the NFL and its players,"[172] the SAMAC-Riddell centers on the alleged "NFL/RIDDELL story" of massive fraud and conspiracy spanning six decades.[173]

Moreover, entire counts and claims from the SAMAC-Riddell are missing from the *Oliver* complaint, such as the counts here for Negligence and Negligent Marketing in conjunction with the NFL. And even where the claims are similar in name—e.g., "conspiracy" or "negligent misrepresentation"—the allegations across the two complaints are nonetheless materially different. For example, nowhere in *Oliver*'s negligent-misrepresentation claim was there any mention of the NFL—whereas, throughout the SAMAC-Riddell's negligent-misrepresentation claim, the NFL appears as inextricably intertwined with Riddell.[174]

## CONCLUSION

For the foregoing reasons, Riddell respectfully requests the Court to dismiss the SAMAC-Riddell (ECF No. 8927) with prejudice.

---

[172] *Oliver*, 2016 WL 7336412, at *3.

[173] (SAMAC-Riddell ¶ 9, ECF No. 8927.)

[174] *Oliver* is materially distinguishable, but also incorrect in several respects. For example, the court found it wasn't necessary to interpret the CBAs because "either Riddell helmets were dangerously defective, or they were not; and either Riddell and the NFL agreed to hide those dangers by funding/conducting sham studies, or they did not." 2016 WL 7336412, at *3. This ignores several key considerations, such as justifiable reliance and causation. The CBAs would have to be interpreted to determine whether they required others—e.g., team physicians, trainers, etc.—to provide information on helmets' limitations in preventing concussive or sub-concussive head impacts and the risks of continuing play after head injuries (beyond the warnings Riddell provided). Because if the CBAs were interpreted to require others to provide such information to the players, then that would impact whether the players justifiably—or even actually—relied on Riddell for such information, and whether Riddell's actions were a proximate cause.

Dated: January 19, 2018                    Respectfully submitted,

                                           */s/ Paul G. Cereghini*
                                           Paul G. Cereghini
                                           Thomas C. Howard
                                           BOWMAN AND BROOKE LLP
                                           2901 N. Central Avenue, Suite 1600
                                           Phoenix, AZ  85012
                                           Telephone: (602) 643-2300
                                           Facsimile: (602) 248-0947
                                           paul.cereghini@bowmanandbrooke.com
                                           thomas.howard@bowmanandbrooke.com

                                           Robert L. Wise
                                           Eden M. Darrell
                                           BOWMAN AND BROOKE LLP
                                           901 East Byrd Street, Suite 1650
                                           Richmond, VA  23219
                                           Telephone: (804) 649-8200
                                           Facsimile: (804) 649-1762
                                           rob.wise@bowmanandbrooke.com
                                           eden.darrell@bowmanandbrooke.com

                                           Thomas P. Wagner
                                           MARSHALL DENNEHEY WARNER
                                           COLEMAN & GOGGIN
                                           2000 Market Street, Suite 2300
                                           Philadelphia, PA  19103
                                           Telephone: (215) 575-4562
                                           Facsimile: (215) 575-0856
                                           tpwagner@mdwcg.com

                                           Attorneys for Defendants

36

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on January 19, 2018, the foregoing Riddell's Brief in Support of Motion to Dismiss the Plaintiffs' Second Amended Master Administrative Long-Form Complaint Based on LMRA § 301 Preemption was electronically filed and served via ECF on all counsel of record registered to receive service via the Court's CM/ECF system.

 /s/ Paul G. Cereghini