## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

No. 2:12-md-02323-AB

MDL No. 2323

**Hon. Anita B. Brody**

Kevin Turner and Shawn Wooden,
*on behalf of themselves and
others similarly situated,*

Plaintiffs,

v.

National Football League and
NFL Properties LLC,
successor-in-interest to
NFL Properties, Inc.,

Defendants.

Civ. Action No. 14-00029-AB

THIS DOCUMENT RELATES TO:
ALL ACTIONS

## MOTION OF CLASS COUNSEL THE LOCKS LAW FIRM
## FOR APPOINTMENT OF ADMINISTRATIVE CLASS COUNSEL

Undersigned Class Counsel The Locks Law Firm respectfully submits this Motion for the

firm to be Appointed as Administrative Class Counsel to implement the Settlement Agreement in

a manner consistent with their fiduciary duty to the plaintiff Class.

The grounds for this Motion, which are more fully set forth in the accompanying

Memorandum, are as follows:

1.      The Settlement Agreement is in danger of failing in its execution. As advertised,

it was supposed to be a method to distribute tangible benefits to diagnosed players, a safety net

against brain injury and its destructive effects on Class members and their families.

-1-

2.     Sadly, the Settlement is failing to provide a fraction of what the NFL promised. Of nearly 1,100 dementia claims filed to date, only 6 have been paid as of this filing, yet the NFL's projections to this Court predicted 430 dementia claims paid twelve months into implementation. Claims paid for Alzheimer's Disease fall far short of projections.

3.     More than half of all claims have been placed into audit or denied, thereby causing interminable delay and preventing payments.

4.     The NFL seeks to rig the Settlement system. This is part of the League's DNA. Historically, it has always engaged in scorched-earth litigation, and that is what the League is doing here, making this a Settlement in name only.

5.     One year into implementation, the NFL has turned the Settlement into a secret, privately litigated claim system that involves changing standards for claim packages, inconsistent and often improper standards of review, a black hole of audits, alleged deficiencies, anonymous opinions, denials, appeals, remands, technical squabbles over what a valid diagnosis might be, and the refusal by the NFL to agree to almost any interpretation of the Agreement that will streamline and make reasonable the claims process.

6.     Notwithstanding the efforts of the Special Masters and BrownGreer, reflected in part by the recent FAQs, the NFL seeks to avoid its obligations by luring BrownGreer, the AAP, and the Special Masters into second-guessing and discrediting clinical judgments made by board certified neurologists and neuropsychologists who actually evaluate retired players face to face. The NFL wants to remove these expert clinical judgments and substitute (a) the NFL's own self-serving, biased, and inaccurate diagnostic interpretations pulled out of text books; and (b) the NFL's offensive accusations that a mere modicum of functionality shown by a player undercuts

or contradicts the diagnosis by board-certified specialists. The NFL's strategy will defeat valid claims, drive away physicians, lawyers and players, and circumvent the Court's program.

7. The undersigned Class Counsel have a fiduciary duty under Section 28.1 of the Agreement to the entire Class. In light of what has happened in the past 12 months, the undersigned seek an order from the Court appointing the Locks Law Firm as Administrative Class Counsel with the same rights and duties currently exercised by Seeger Weiss alone.

8. LLF is in a unique position. It represents approximately 1,100 registered players, has filed 102 claims, and obtained 35 awards to date. The firm knows the players, diagnostics, medical science, and Settlement process better than anyone else.

9. Based on its expertise, LLF is best positioned to defend and implement the Settlement as intended and in the best interests of the Class. The firm offers structural protection for the Class, because it understands from direct experience how every nuance of the NFL's scheme can harm, deny or set back valid individual claims of injured players.

10. LLF brings vital experience implementing many other similar settlements, including *In Re Diet Drugs*.

11. For those reasons, if the Settlement is to succeed, the Class will be best served by adding a structural protection within the administration.

12. The undersigned Class Counsel also seek a hearing on the Motion and Memorandum where it will provide evidence as the Court deems necessary.

WHEREFORE, the undersigned Class Counsel respectfully requests that the Court (a) appoint the undersigned as Administrative Class Counsel to represent the interests of the Class in

the implementation process; (b) set a hearing date for undersigned to present evidence in support

of the Motion as the Court deems necessary.

Respectfully submitted,

/s/ Gene Locks
Gene Locks
David D. Langfitt
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3423
Fax: (215) 893-3444
Email: glocks@lockslaw.com
dlangfitt@lockslaw.com

CLASS COUNSEL

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

Kevin Turner and Shawn Wooden,
*on behalf of themselves and
others similarly situated*,

        Plaintiffs,

v.

National Football League and
NFL Properties LLC,
successor-in-interest to
NFL Properties, Inc.,

        Defendants.

THIS DOCUMENT RELATES TO:
ALL ACTIONS

No. 2:12-md-02323-AB

MDL No. 2323

**Hon. Anita B. Brody**

Civ. Action No. 14-00029-AB

## MEMORANDUM IN SUPPORT OF
## MOTION OF CLASS COUNSEL THE LOCKS LAW FIRM
## FOR APPOINTMENT OF ADMINISTRATIVE CLASS COUNSEL

Undersigned Class Counsel the Locks Law Firm respectfully submits this Memorandum

of Law in support of the Motion for Appointment of Administrative Class Counsel.

### I. INTRODUCTION

1. The Settlement Agreement, once hailed as a revolutionary compromise and easy

to implement, is in danger of failing in its execution. The Agreement was advertised as a method

through which diagnosed Class members would receive tangible benefits, a safety net, so to

speak, against brain injury and its destructive effects on Class members and their families. Publicly available numbers and the direct experience of Class members establish that the Settlement is failing to provide a fraction of what the NFL promised. Of nearly 1,100 dementia[1] claims filed to date, only 6 have been paid as of this filing, yet the NFL's projections to this Court predicted 430 dementia claims paid twelve months into implementation. Claims paid for Alzheimer's Disease are better, but are far short of projections. More than half of all claims have been placed into audit or denied, thereby causing interminable delay and preventing payments.

2. The primary reason is that the NFL seeks to rig the Settlement system. At a March 2 symposium, NFL Counsel stated: "The league historically had engaged in scorched-earth litigation. They fought everything in every context, decade after decade after decade. I was advised by senior officials at the league that resolving a case consensually is not in ownerships' DNA."[2] Although NFL Counsel implied that the Settlement represented a change in League policy, implementation proves otherwise. The Settlement is going exactly as the NFL planned; it is a purported compensation system designed to evade payments to players in a myriad of ways, all to the benefit of the NFL.

3. One year into implementation, the NFL has turned the Settlement into a secret, privately litigated claim system that involves changing standards for claim packages, inconsistent and often improper standards of review, a black hole of audits, alleged deficiencies, anonymous opinions, denials, appeals, remands, technical squabbles over what a valid diagnosis might be,

---

[1] In 2013, the Parties agreed as a compromise that various gradations of dementia would be a surrogate diagnosis for Chronic Traumatic Encephalopathy (CTE), the signature disease of football and boxing, because dementia (or neurocognitive disorder) was clinically one symptom of CTE that could be measured using existing neurological and neuropsychological examinations.

[2] *See* http://clsbluesky.la.columbia.edu/2018/03/08/video-inside-the-nfl-concussion-case/ at 25:00.

and the refusal by the NFL to agree to almost any interpretation of the Agreement that will streamline and make reasonable the claims process.

4.      Notwithstanding the efforts of the Special Masters and BrownGreer, reflected in part by the recent FAQs, the NFL seeks to avoid its obligations. It seeks to lure BrownGreer, the AAP, and the Special Masters into second-guessing and discrediting clinical judgments made by board-certified neurologists and neuropsychologists who actually evaluate retired players face to face. The NFL wants to remove these expert clinical judgments and substitute (a) the NFL's own self-serving, biased, and inaccurate diagnostic interpretations pulled out of text books; and (b) the NFL's offensive accusations that a mere modicum of functionality shown by a player undercuts or contradicts the diagnosis by board-certified specialists. If not exposed and contained, the NFL's strategy will defeat valid claims, drive away physicians, lawyers, and players, and circumvent the Court's program.

5.      The undersigned Class Counsel have a fiduciary duty to the entire Class under Section 28.1 of the Agreement to implement and administer the Settlement in the best interests of the Class and to make it work. In light of what has happened to the Settlement in the past 12 months, the undersigned seek an order from the Court appointing the Locks Law Firm ("LLF") as Administrative Class Counsel with the same rights and duties currently exercised by Seeger Weiss alone. The basis for this request is as follows:

   a. The undersigned have a fiduciary duty to the Class.

   b. LLF represents approximately 1,100 registered players, have filed approximately 102 claims, and have obtained 35 awards to date. The firm knows the players, diagnostics, medical science, and Settlement process better than anyone else.

   c. Based on its expertise, LLF is best positioned to defend and implement the Settlement as intended and in the best interests of the Class. The firm offers

-3-

> structural protection for the Class, because it understands from direct experience how every nuance of the NFL's scheme can harm, deny or set back valid individual claims of injured players.
>
> d. LLF brings vital experience implementing many other similar settlements, including *In Re Diet Drugs*.

6.      The Seeger Weiss go-it-alone strategy has not worked. The firm was capable of overseeing the Settlement through the approval and appeal process. Alone, it cannot address the current threats to implementation. It has registered only a few clients and filed almost no claims.[3] In 2012, they represented fewer than 25 class members and now they represent fewer still. As a result, Seeger Weiss needs direct help day to day. It has not developed the expertise in the development and administration of individual claims to combat the NFL's scorched-earth strategy. The current state of threatened collapse of the claims process makes the structural problem clear.

7.      For these reasons, if the Settlement is to succeed, the Class will be best served by adding a structural protection within the administration. The undersigned, as Administrative Class Counsel, would provide that protection based on their experience with nearly 1,100 registered players and implementing many other mass tort settlements, including *In Re: Diet Drugs*. The undersigned respectfully requests that the Court appoint LLF as Administrative Class Counsel to help protect the interests of the Class in the implementation process and set a hearing date on the Motion if the Court deems it necessary.

---

[3] Seeger Weiss registered only a handful of players and filed only two claims, both within the last sixty days.

## II.    ARGUMENT

8.     In public pronouncements, this Settlement was hailed as an historic and revolutionary compromise.  Seeger Weiss, without any caution from the NFL, was led to believe that implementation procedures would be clear and simple.  Players would not even need a lawyer.

9.     As implemented, however, the Settlement has not provided the benefits it promised.  The NFL forecasted to the Court payments of $242.9 million during the first year of the claims process.  Today, nearly twelve months later, only 6 dementia claims have been paid and only a total of $156 million has been paid to players and their families.

10.    The chart below compares by compensable injury the NFL's pre-settlement forecasted payments for the first twelve months of the Settlement with the actual results twelve months later.

| Category (% projected incidence such category represents of the Whole , *see* ECF 6423-21, Ex. JJ, p. 5) | NFL Year 1 **Forecasted** Payments (*see* ECF 6168 Ex. F) | **Actual** Payments (eleven months later) (ECF 9571, Ex. A, p. 7 |
|---|---|---|
| ALS (.5 %) | 17 Claims, $42.7 million | 18 Claims, $48 million |
| CTE (1.3%) | 51 Claims, $50.24 million | 49 Claims, $53.8 million |
| Parkinson's (.4 %) | 14 Claims, $7.1 million | 28 Claims, $18.55 million |
| Alzheimer's (48%) | 153 Claims, $70.655 million | 55 Claims, $24.44 million |
| Level 2 (49%) | 111 Claims, $38.64 million | 2 Claim, $2.16 million |
| Level 1.5 (0% as all assumed within in Level 2) | 319 Claims, 33.64 million | 4 Claims, 2.68 million |
| Total Claims Paid | 665 Claims | 156 |
| Total Amount Paid | $242.9 million | $149.63 million |

11.     Information from which the data is derived is publicly available on the Claims Administration website. Unpaid claims, many of which the undersigned filed at the first opportunity twelve months ago, have been subjected to a series of alleged deficiency notices, delays, and audits that have spanned eight to twelve months. On information and belief, nearly half of all claims filed by the Class have been placed in audit. Nearly twenty percent of all claims have been denied. The NFL has appealed at least ten percent of all claims.

12.     Under these circumstances, it should surprise no one that the Class and its advocates have declared that the Settlement is failing the players. *See* Examples of emails and blog posts players and their advocates regularly circulate among the Class, attached as Exhibit A.

13.     The examples of implementation failures set forth below prejudice the Class. They show that the NFL is implementing a scheme, claim by claim and player by player, to create a labyrinth of changing standards of review, secret procedures, audits, appeals and innumerable technical readings of the Agreement to delay and defeat claims and payments. The NFL has not settled this case. It seeks now to attack and remove the judgments neuroscience professionals use in diagnosing patients in a clinical setting and substitute its own biased approach using a lawyer-knows-better-than-a-doctor argument, references to medical text books, and anecdotal, out-of-context evidence about the player's occasional functionality.

14.     In summary form, the primary implementation failures that prejudice the Class are:

   a.  The NFL has tried to obfuscate the correct standard of review by the AAP of pre-effective date claims, and some AAP members do not follow the proper standard.

   b.  The NFL is using its audit right as a second appeal weapon for the purpose of defeating approved claims via an anonymous and secret procedure.

   c.  The NFL is engaged in vexatious, frivolous and bad faith appeals in violation of Settlement Section 9.6(b).

d. The NFL (and some AAP members) have improperly introduced a causation requirement into the review process.

e. Some APC and AAP members apply rigid BAP standards for the review of pre-effective date claims in violation of Settlement Section 6.4(b).

f. BrownGreer has been forced to apply rigid BAP criteria to pre-effective date claims in violation of Settlement Section 6.4(b). This constitutes an unannounced amendment to the Agreement.

g. The third party affidavit that is supposed to corroborate functional impairment in a player diagnosed with neurocognitive impairment (dementia) has also been the subject of an unannounced Amendment.

h. Combined, the two surprise amendments have helped create a backlog of dementia cases that are subjected to baseless alleged deficiencies.

i. The AAP is paid below market rates; it must double in size. Keeping it underpaid and small prejudices the Class and benefits the NFL with delay.

j. The NFL has in bad faith prevented outstanding cognitive and behavioral neurologists from joining the AAP to the prejudice of the Class.

k. The NFL argues rigid interpretations of the Agreement to delay and deny valid claims.

l. The BAP as implemented is failing the players. On information and belief, a *de minimis* number of players have received awards through the BAP and most are rejected. Medical professionals have left the BAP or refused to be part of it.

m. At this juncture, obtaining appointments for players takes three to six months.

n. The BAP neuropsychological protocol is inherently biased against African American retired players, which makes it more difficult for approximately 70% of the Class to recover in the Settlement's compensation system.

## A. **The Standard of Review by the AAP**

15. Section 6.4(b) of the Agreement is a provision to which the NFL agreed. It

requires the AAP to review pre-effective date claims using a standard of review far less rigid

than BAP criteria. *See* Exhibit B.[4] This was well-negotiated and recognizes that standard clinical practice prior to and outside of the BAP is different from the BAP. The NFL has aggressively contested it and sought to persuade the AAP, BrownGreer and the Special Masters that every pre-effective date claim must conform rigidly to BAP criteria.

16. Within its appeals, the NFL does not even acknowledge that section 6.4(b) exists. Rather, it seeks to hold a diagnosing physician to the BAP's rigid standard or a new standard contrived via text books and references found nowhere in the Agreement. This is one of many ways the NFL is trying to persuade BrownGreer, the AAP, and Special Masters that a valid clinical diagnosis must be doubted in ways no clinician can possibly anticipate, particularly clinicians who diagnosed players long before this system was devised.

17. The AAP members sometimes do not apply the correct standard of review. Some denials by the AAP show that members of the AAP have disregarded the 6.4(b) standard and are applying either strict BAP criteria or some other unwritten private textbook criteria.

18. Some AAP members have imposed rigid BAP criteria and openly contradicted the judgment of the examining neuropsychologist and neurologist regarding test validity. One AAP member denied a claim, in part, because the player allegedly did not show evidence of decline. Yet neuropsychological test results and a thorough assessment by a neurologist of the patient's functional impairment (corroborated by the patient's wife) proved otherwise. The case is currently on appeal and in audit. It illustrates that some AAP members produce results that are contrary to the records they have reviewed.

---

[4] The Appeals Advisory Panel ("AAP") must review all pre-effective date claims "based on principles" that are "generally consistent" with BAP criteria. It also commands that a pre-effective date diagnosis need not adhere to the same diagnostic criteria as the BAP, which gives a pre-effective date diagnosis substantial leeway in meeting the AAP standard of review.

19. Sometimes, AAP decisions are divorced from reality. A recent denial by the AAP, currently on remand, suggests that the AAP member may not have read or understood the reports provided. The reviewing AAP member denied the claim, in part, because the Class member presented no evidence of impairment. Yet the evidence provided clearly met criteria for 1.5 neurocognitive disorder. In the appeal, the examining neuropsychologist (who has spent the majority of her career at the Hospital of the University of Pennsylvania and Children's Hospital) submitted a sworn affidavit that, in pertinent part, explained that the AAP member could not have understood her evaluation. It appears that the AAP member imposed rigid BAP criteria (or used his or her own private judgment) to conclude that the battery of neuropsychological tests, including the validity tests, were not "generally consistent" with the principles underlying the BAP. Clearly, though, they were.

20. The denial provided an additional cause for concern. The denial was based in part on the grounds that the examining specialists did not investigate the "psychopathology" (mental illness) of the player. The examining neuropsychologist, however, did acknowledge the condition and adjusted the test process in response. But, more significantly, the denial shows a bias and lack of understanding. Psychiatric symptoms are associated with mild traumatic brain injury; this is common knowledge. And the fact of mental illness, whether or not it is a contributing factor to neurocognitive decline, can never form a basis to deny a claim in this Settlement.

21. This is one example of an AAP member improperly using speculation about a contributing cause (mental illness) to reject a claim. It begs the question whether the AAP member understands Section 6.4(b), but also whether the NFL's efforts to confuse the AAP have

been successful. This and other examples are available for the Court's review either *in camera* or in redacted form.

22.     The example also shows that Class Counsel must track decisions by AAP members to determine whether members show bias against the Class or confusion regarding the standard of review for pre-effective date claims. Without access to any AAP decision other than those the undersigned must address directly, the undersigned cannot track the decisions and, if necessary, take action. An appointment as Administrative Class Counsel will permit the undersigned to perform this evaluation on an ongoing basis.

**B. The NFL's Misuse of the Audit Process**.

23.     On information and belief, more than half of all claims have been placed in audit or been denied outright. Of the claims that have received awards, the NFL has appealed 35.

24.     One case, in particular, shows that the NFL seeks to modify the Settlement into a secret process via audits to defeat approved claims. In this case, a 41 year old player had a decade-long history of neurodegenerative decline, including multiple positive neuropsychological tests (including one from a neuropsychologist employed by the New York Giants). An MAF neurologist evaluated the player and diagnosed him with early onset Alzheimer's Disease based on those test results, a 12/30 score on the Mini-Mental Status Exam and a positive amyloid PET brain scan.[5] The NFL then appealed and lost in November. The claim remains unpaid.

---

[5] Amyloid PET scans allow for accurate detection of amyloid plaques, a hallmark of Alzheimer's Disease in living people. The player also had a positive PET - FDG scan and an MRI that showed brain damage (axonal shearing).

-10-

25. On the last day before the award was to be accepted for check-writing, the NFL demanded an audit. Its basis was a three minute videotape of the player speaking publicly four years earlier. The NFL alleged that the three-minute video was anecdotal evidence of something improper. Notwithstanding overwhelming objective evidence to support the diagnosis, the NFL accused the MAF physician, multiple neuropsychologists, the PET scanning service, the radiologist, the player, and the player's family of fraud.[6] Clearly, the NFL is scouring the internet and social media sites to find isolated out-of-context moments of lucid behavior by a player (in this case, four years earlier) to drum up doubt about a sound MAF diagnosis approved by BrownGreer and the Special Masters.

26. Even more disturbing, the NFL is now demanding that BrownGreer seek a differing medical opinion from the AAP as part of the audit process for the purpose of gutting the approved diagnosis and claim. If it succeeds, the NFL will have morphed the Agreement into an opportunity for the NFL to shop for an anonymous medical opinion via the audit process to defeat a well-supported and approved claim.

27. The implications are enormous. The NFL is placing the Settlement at risk of becoming an NFL-controlled opportunity to defeat a diagnosis through the audit process. The NFL wants this done out of the public view and with anonymous physicians who have never seen or evaluated the player. This is a misuse of the audit procedures, contrary to the purpose of the AAP, and contrary to the purpose of the Settlement Agreement. On information and belief, it's part of an NFL scheme to circumvent the Court's decision to uncap the Settlement.

---

[6] Attached as Exhibit C are an email and letter to the Claims Administrator (without using identifying information about the claimant) that addresses this case and the misuse by the NFL of its audit right.

## C. **The Latest Skirmish**

28.     Yesterday, co-lead counsel Anapol Weiss filed a Motion to Intervene (document no. 9784) for a hearing on the incessant and unfair delays in the processing of dementia and Alzheimer's claims generally, but specifically the claim of their client Wayne Radloff.

29.     Twenty-four hours after Anapol Weiss filed its Motion, Mr. Radloff received a Notice of Monetary Award. It is distressing that, as this case suggests, a player must file a Motion to obtain an award.

30.     It also reflects the larger problem. Like Mr. Radloff's claim, more than a thousand claims sit in some undetermined administrative limbo, audit or appeal. The litany of administrative tangles, delay and constant questioning described in the Anapol Weiss Motion is what nearly every player faces. It is not what was promised and advertised to persuade players and their counsel to become part of the Settlement Class.

31.     Moreover, Mr. Radloff has not been paid. The NFL has thirty days to appeal, which could delay payment for months. Even if the NFL loses on appeal, it may invoke its audit rights improperly and take another chance at defeating Mr. Radloff's claim in a secret procedure with an anonymous opinion from a physician who never examined Mr. Radloff at all.

32.     During this entire time period, Mr. Radloff's claim has lost value. No interest is accumulated or paid. Arguably, the delay to date has cost Mr. Radloff nearly $100,000.

## D. **The NFL's Vexatious Appeals**

33.     As with its audit right, the NFL seeks to stop and deny valid claims via appeal. The NFL has appealed 35 claims largely on frivolous grounds, often arguing, for example, that Alzheimer's Disease cannot occur in younger men, because it is so rare in people under 65 years old in the general population. This reflects the NFL's bad faith approach. Head injury is a well-

-12-

known risk factor for Alzheimer's. The NFL has admitted in papers that the dementia associated with Alzheimer's (major neurocognitive disorder) is 200 times more likely in this population than the general population. *See* Exhibit D attached. Yet the NFL argues that awards granted to players (both Alzheimer's and dementia awards) should be reversed on the grounds that some small functionality by the retired player is evidence that he does not qualify.

34.      The NFL's approach shows three things: (a) the League will argue virtually anything to evade payments; (b) it seeks to substitute via an appeal its lawyer's opinion for the diagnosis of a board-certified neurologist who actually examined the player in a clinical setting; and (c) it refuses to accept that some functionality by the patient at any given moment in time does not negate the clinical evidence and judgment of the diagnosing specialists.

35.      The NFL has often argued that depression or sleep disorder explains the retired players' decline, even though these conditions are common symptoms of brain injury. On that basis, the NFL has argued that the diagnoses of board-certified clinical specialists in Parkinson's Disease and Alzheimer's Disease must be wrong or incomplete.

36.      The NFL has appealed awards on the frivolous grounds that the diagnosing physician did not sufficiently rule out other hypothetical causes. The NFL has speculated on appeal that clinically diagnosed Alzheimer's Disease might be caused by something else (depression or sleep disorder, which are symptoms of brain injury) and, therefore, the hypothetical causes must be ruled out via extensive testing before an award can be granted.

37.      This is contrary to a foundation of the Agreement, which states that the player need not prove that football caused the injuries or exclude the possibility that other risk factors are linked to a qualifying diagnosis. *See* FAQ 15 appended to the Agreement, attached here as Exhibit E ("You also do not need to exclude the possibility that the Qualifying Diagnosis was

-13-

caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.") (Emphasis added.)

## E. The NFL's Bad Faith Interpretations of the Agreement

38. By way of example only, the NFL took the position from the outset of implementation, that under section 8.2 (a) (iii) of the Agreement (attached as Exhibit F) a physician who diagnosed a player in the past must sign the Court-required Diagnosing Physician Form ("DPC") unless the physician was dead or adjudicated incompetent by the court.

39. In June 2017, the undersigned brought to the NFL's attention two easy cases of players who had been on the NFL's 88 Plan (for brain injury) for many years. The players had been diagnosed at a major university in Houston with moderate dementia in 2013 and 2014 respectively, but the physicians no longer practiced at the university and were not inclined to respond or sign a DPC, because the players were no longer their patients. One physician had moved away to Switzerland and could not be contacted except on Facebook messenger.

40. All of this the undersigned explained via letters in response to deficiency notices from BrownGreer. The undersigned argued that the claims had obvious indicia of reliability, and the Parties should read section 8.2 expansively for the players. The NFL refused. Months passed before the NFL responded with a compromise and demanded new and expensive re-testing of each player via the MAF program. Instead of relying on the 88 Plan's acceptance of the players and a major university's neurological evaluations, the NFL chose to impose additional requirements, more costs, and more delay for retired players in their late fifties who are unemployable, depressed, brain damaged, and intermittently homeless but for the grace of family members.

-14-

41.     The NFL has refused to permit its own physicians in the disability benefits plans to sign a Diagnosing Physician Certification required by the Settlement. Many players have been diagnosed with dementia and other diseases by NFL-hired neurologists and received full disability benefits based on the diagnoses. Yet the NFL will not permit its own neurologists to sign the Diagnosing Physician Certification so the player can recover under the Settlement. Rather, the player must submit to re-testing via the BAP or MAF programs and acquire a different physician to sign a DPC.

42.     There is no reason for this, and the consequences to the players are enormous. It prejudices the player and his family by delay; it also places the player at risk of dying before re-testing and making him and/or his family ineligible for benefits. It also creates an unnecessary and unreasonable burden on families and players, many of whom struggle with simple day to day existence, are in chronic pain, and vulnerable.

## F. **The Surprise Amendments**

43.     The NFL's scheme started in the first month of implementation. BrownGreer was instructed to apply BAP Criteria to all Pre-effective Date Claims, even though the standard of review is 6.4(b). *See* Exhibit B. This was an Amendment without notice to the Court, the Class, attorneys for Class members, and the undersigned; it serves the NFL's scheme to change review standards and prejudice the Class. No one who prepared a pre-effective date claim in 2015 and 2016 knew this would happen. It has created an endless backlog of purported deficiencies, delays and arguments. Had the undersigned been involved, the Amendment would not have happened.

44.     In response, the undersigned have argued against the Amendment in nearly all of their pre-effective date dementia claims, most of which were filed in spring and summer of 2017

and remain unresolved and pending. All are of record with BrownGreer and can be produced *in camera* or at a hearing.

45.     BrownGreer was also required to impose a second Amendment. It was required to find deficient any pre-effective date dementia claim if a third-party affidavit used to corroborate the functional impairment of a player was dated after the date of diagnosis. This purported deficiency was applied to nearly every pre-effective date claim and created incessant delays and denials for more than 1,000 players.

46.     The Agreement, however, does not place any date restriction on the corroborating affidavit. *See* the Settlement Agreement's injury definitions for neurocognitive impairment, attached as Exhibit G. This is the only text within the Settlement that requires a third party corroborating affidavit for the functional impairment of a claimant. Nowhere in the text (explicit or implied) is there a date restriction. Also, section 6.4(b) does not require strict adherence to the BAP for pre-effective date claims; therefore, a corroborating affidavit is not strictly necessary for a pre-effective date claim, and striking one based on its date is contrary to both the BAP injury definitions and section 6.4(b).

47.     Obviously, the Amendment exclusively benefits the NFL (via delay and denial of claims) and prejudices the Class by compromising pre-effective date claims based on the whim of the NFL. Not one lawyer or player who submitted a pre-effective date claim had any notice or an opportunity to be heard on this critical modification to the Agreement. The undersigned Class Counsel never knew of the Amendment in advance. We responded case by case (in possibly 70 pre-effective date claims) and laid out our arguments regarding why this second Amendment had no foundation.

-16-

48.     Both Amendments illustrate the need for additional counsel to be involved directly in the day to day decision/negotiation process. Had the undersigned been directly involved, the surprise Amendments would not have happened. To the contrary, we would have brought the self-serving "interpretation" by the NFL directly to the Special Masters and the Court and sought intervention to protect the Class.

49.     When the Locks Law Firm saw the Amendments, we reached out to Seeger Weiss in summer 2017 to address implementation decisions that were adverse to the Class. At that time, we requested direct involvement in implementation and a desire to work directly with Seeger Weiss, but we were rebuffed. If the Court cares to review the correspondence associated with those efforts, it is attached as Exhibit H. Seeger Weiss at first agreed to involve the undersigned in all meetings and phone calls with the NFL and the Special Master, but changed its mind two weeks later. Seeger Weiss agreed to conference calls with the undersigned now and then to report on developments, but this is not the same as direct involvement.

50.     We brought the two surprise Amendments and other problems to the attention to BrownGreer via a memorandum (attached as Exhibit I) dated November 6, 2017 and suggested solutions to every problem that, to our limited knowledge at that time, afflicted the claims process.

51.     The Amendments are still in place and still prejudice the Class. To the best of the undersigned's knowledge, every pre-effective date claim is subject to strict BAP requirements. A corroborating affidavit considered by the physician but dated after the date of diagnosis on the physician's report is barred as evidence of functional impairment for any pre-effective date claim.

-17-

## G. The AAP's Need to Expand

52. One AAP member, now the subject of an approved Application (document no. 9753), was relatively inactive. Only four members of the AAP actually reviewed claims on a regular basis for the past twelve months. This has prejudiced the Class in the same way the surprise Amendment have. Claims cannot be processed properly and expeditiously. It benefits the NFL, because it delays the claims process and payment obligations.

53. The AAP's lack of action and the backlog of claims requires reconstitution of the AAP. It should double in size. Physicians should not be general neurologists but, rather, they should be specialists in mild traumatic brain injury and cognitive and behavioral neurology on a clinical basis, which are the specialties most attuned to the diagnostic issues for the Class.

54. Rates paid to AAP members should rise to proper market rates depending on the background, experience, and stature of the proposed AAP member in the profession. Proposed AAP members should not be turned away because their hourly rates are higher than those set by the Court.

55. AAP members should not be turned away because they have actually treated or evaluated a retired NFL player, yet the NFL consistently objects to exceptionally well-qualified AAP candidates. For example, the NFL objected to one candidate for the AAP submitted by the undersigned, because the physician (a specialist in cognitive and behavioral neurology and formerly a full Professor of Neurology at Duke University) stated in an interview that a player he evaluated had symptoms consistent with CTE. The NFL took the position that the physician was a "CTE believer" and used that as the basis for the objection.

56. This is bad faith. It harms the Settlement and harms the Class. It shows the NFL seeks to suppress from the AAP qualified neurologists who recognize what is diagnostically

-18-

obvious – that players suffer from many symptoms of neurodegenerative disease, including the well-recognized symptoms of CTE.

57. In January 2017 the undersigned Class Counsel proposed as an AAP member the current Chair of the Cognitive and Behavioral Neurology Department at Harvard University, a medical professional familiar with several members of the Class as patients, two of whom have received monetary awards. His rates are higher than those set for the AAP. He declined participation on the AAP based on the fact that the Parties insisted that he take a pay cut. The undersigned requested an exception to the rates, but the request was refused. Sacrificing the candidate's expertise on the basis of an hourly rate prejudices the Class. He is a thought leader on diagnostic issues critical to the Class and is an outstanding clinician.

58. The NFL should not be heard to object to proposed AAP neurologists who are familiar with symptomatic retired players. Familiarity with Class members should weigh in favor of participation on the AAP, not against it. Cognitive and behavioral neurologists who are familiar with the neurological conditions of Class members have the best clinical expertise available and are a benefit to this process.

59. As recently as October 2017 and January 2018, the undersigned Class Counsel nominated two outstanding cognitive and behavioral neurologists to the AAP. Both have extraordinary credentials. One is a Professor of Neurology and the Director of Clinical Traumatic Brain Injury Research at the Hospital of the University of Pennsylvania, less than thirty blocks from the Courthouse. He is a thought leader in this subject matter. The other, a cognitive and behavioral clinical neurologist at Emory University, trained at Mayo Clinic and Penn. He too is a thought leader on the subject matter addressed by the AAP. Both are outstanding clinicians. The NFL objected on the grounds that the physicians had had limited

-19-

contact with the undersigned Class Counsel. This is a bad faith objection and smacks of the NFL's effort to keep off of the AAP neurologists with the right clinical expertise.

## H. **The Need for Structural Protection**.

60. The Settlement is at a crossroads. The foregoing facts and circumstances, all of which can and will be supported by evidence at a hearing if the Court requires, show that the NFL is in full litigation mode against the Class. By appointing LLF as Administrative Class Counsel the Court will provide the Class with a structural protection against the NFL's approach in day to day implementation decisions and negotiations as follows:

(a)    Class Counsel (not just one co-lead counsel) will be aware of and directly involved in implementation decisions, which has not been true to date.

(b)    The undersigned represents nearly 1,100 players via contracts, have filed more than 100 claims and received 35 awards to date, some of which are on appeal by the NFL. They have an ongoing incentive to those players and the Class generally to have claims successfully resolved expeditiously and fairly.

(c)    The undersigned have developed over the past five years a reservoir of knowledge regarding how cognitive and behavioral neurologists address and evaluate symptomatic players (i) under principles generally consistent with BAP criteria and (ii) under rigid BAP criteria.

(d)    They know first-hand the obstructionist tactics of the NFL directed at their clients and the adverse effect those tactics have on players and families.

(e)    They know the network of outstanding cognitive and behavioral neurologists nationwide both within the MAF/BAP network and yet to be nominated to the MAF/BAP network. Those physicians are the experts who should be directly involved in the

-20-

AAP. They should be in a position to advise the Court and Special Masters regarding the proper implementation of the diagnostic standards. They also understand the neuroscience underlying neurodegenerative disease caused by repetitive head trauma. This expertise will help the Court, the Special Masters, and the Class.

(f)     Seeger Weiss cannot satisfy these duties alone. It does not have the resources, the expertise, or the day to day incentives to engage in aggressive advocacy on behalf of players.

58.     For these reasons, the undersigned seeks to work with Seeger Weiss to make the Settlement successful for the Class and to combat the current obstructionist tactics of the NFL.

## III.   **CONCLUSION**

For all of the forgoing reasons, undersigned Class Counsel the Locks Law Firm respectfully requests that the Court grant the Motion and enter the proposed Order appointing the Locks Law Firm as Administrative Class Counsel with all the rights and duties of co-lead counsel Seeger Weiss.

Respectfully submitted,

/s/ Gene Locks
Gene Locks
David D. Langfitt
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 893-3423
Fax: (215) 893-3444
Email: glocks@lockslaw.com
dlangfitt@lockslaw.com