# EXHIBIT A

## NFL's Treatment Of Retired Players in Concussion Settlement Shows League's Lack of Integrity



January 21, 2018
Sheilla Dingus

Roger Goodell and the NFL talk about integrity quite a bit. Nothing is more important to them than the integrity of the game, they say. Perhaps they need to invest in some dictionaries, because they speak of integrity but deliver the opposite. Consider:

- The NFL has opposed the citizen voters of New Jersey in their desire for legal sports gambling while placing a team in Las Vegas and heartily endorsing daily fantasy sports.

- NFL witch-hunt styled investigations with the purpose of reinforcing unilateral disciplinary power while bowing to the whims of owners and/or perceived public opinion.

- Consistently inconsistent handling of domestic violence incidents

- The pursuit of taxpayer funded stadiums which has resulted in relocation of franchises and disenfranchisement of entire fan bases.

- Ever-increasing ticket prices and personal seat licenses which places live game attendance and season-ticket holder status increasingly out of financial reach of many fans.

- Concussion protocol that applies when convenient and disappears when less convenient

- Excessive use of dangerous opioid and NSAID painkillers while denying players the less harmful choice of medical marijuana

I could fill an article with various bullet points that demonstrate the NFL's version of integrity but no where is the behavior more egregious and despicable than in its treatment of all but a select few retirees. While a torturous disability qualification process has existed for many years, drifting in and out of the public eye and congressional interest, the much heralded, uncapped concussion settlement, estimated at $1 billion dollars is at best a slap-in-the-face, and at worst a death sentence to the players whose labor built the $14 billion league.

> **As the clock ticks down to Super Bowl LII - as you watch the games - look at the players. Really look at them.  Look at their faces when you can see beyond the facemasks, and know - they will be tomorrow's retirees.  And for the love of humanity pray that they see a kinder fate than their discarded brethren who came before.**

In December 2016 the Supreme Court declined to hear an appeal which objected to the concussion settlement which was amended in 2014 and accepted by the lower courts, kicking off a registration period for benefits which ran through August 7, 2017. Widespread efforts were made to recruit enrollment for settlement benefits, warning retired players that if they failed to register

they would be forever unable to file a claim. According to a New York Times article, Co-Lead Class Counsel Chris Seeger stated, "players with diseases that have already been diagnosed should receive checks within weeks after filing their paperwork." This was indeed the mantra touted by both Chris Seeger and the NFL throughout the registration period. Players who had existing diagnoses for ALS, Parkinson's Disease, Alzheimer's, and dementia were led to believe that once their claims were filed checks would be issued in a short time frame. What Seeger failed to inform the players was that it would take in most cases about 36 weeks or *nine months* for approval for the lucky few whose diagnoses made it past the scrutiny of an over zealous claims administrator and didn't wind up the subject of an audit or NFL appeal.

Players were never informed that additional "fraud prevention" language was added to the settlement when it became uncapped that would give the NFL infinite ability to delay and appeal claims; instead they were sold on a process that was so simple they didn't even need an attorney and so unlike the disability nightmare, they had no reason for worry. And Claims Administrator Orran Brown specifically stated in a "sign-up" webinar that the process would be quick. Watch the video below, courtesy of @PlayerJustice and listen to the pitch.



In a September 28 declaration to the court, the same Orran Brown stated that through 67 calls with Chris Seeger and the NFL, "we have developed many policies and procedures necessary to implement the terms of the Settlement Agreement. However, we adopt no procedures on anything, including how we review Monetary Award claims, until we have presented them to Co-Lead Class Counsel and Counsel for the NFL Parties. . . and they have commented upon and approved them, to ensure that we implement the Settlement Agreement according to its terms and the *intentions* of the Parties who wrote it and agreed to it."

"We are pleased the concussion settlement is proceeding as the parties and the court intended," said NFL spokesman Brian McCarthy in a recent New York Times article that described how Mike Webster, the first NFL player posthumously diagnosed with CTE was blocked from the settlement along with Terry Long and Justin Strzelczyk, two other players who were diagnosed prior to 2006 which is one of the cut off dates for death with CTE claims with the other cut-off being July 7, 2014. The settlement does not cover CTE symptoms and the only death with CTE claims that are considered "valid" according to the settlement are those which occurred in the defined 7 ½ year time span.

The chart below is from the January 16, 2018 claims report which indicates that 2,013 claims have been filed. Approved claim totals are shown in the first grid and those which have actually been paid are shown in the second. As you can see, approved claims are sitting at approximately 10% with claims actually paid at under 5% of those filed to date.

| | Status by Confirmed Qualifying Diagnosis | Number | Amount |
|---|---|---|---|
| 1. | Notice of Monetary Award | 210 | $256,729,033 |
| | (a) Death with CTE | 53 | $70,608,267 |
| | (b) ALS | 20 | $56,410,000 |
| | (c) Alzheimer's Disease | 78 | $59,665,300 |
| | (d) Parkinson's Disease | 37 | $32,441,800 |
| | (e) Level 2.0 Neurocognitive Impairment | 7 | $12,667,333 |
| | (f) Level 1.5 Neurocognitive Impairment | 15 | $14,936,333 |
| 2. | Paid Claims | 98 | $95,192,411 |
| | (a) Death with CTE | 36 | $39,215,772 |
| | (b) ALS | 14 | $36,535,411 |
| | (c) Alzheimer's Disease | 25 | $11,587,935 |
| | (d) Parkinson's Disease | 12 | $4,720,065 |
| | (e) Level 2.0 Neurocognitive Impairment | 1 | $1,503,525 |
| | (f) Level 1.5 Neurocognitive Impairment | 3 | $1,509,203 |
| | (g) Derivative Claimants | 7 | $120,499 |

The following table illustrates deductions from these awards.

| 2. | Deductions for Offsets | 67 | $59,417,300 |
|---|---|---|---|
| | (a) Death with CTE | 15 | $20,338,400 |
| | (b) ALS | 5 | $13,040,000 |
| | (c) Alzheimer's Disease | 27 | $9,320,700 |
| | (d) Parkinson's Disease | 16 | $14,168,200 |
| | (e) Level 2.0 Neurocognitive Impairment | 2 | $2,100,000 |
| | (f) Level 1.5 Neurocognitive Impairment | 2 | $450,000 |
| 3. | Deductions for Derivative Claimant Awards | 107 | $1,478,243 |
| | (a) Death with CTE | 39 | $526,691 |
| | (b) ALS | 11 | $415,000 |
| | (c) Alzheimer's Disease | 31 | $298,000 |
| | (d) Parkinson's Disease | 14 | $101,079 |
| | (e) Level 2.0 Neurocognitive Impairment | 3 | $47,173 |
| | (f) Level 1.5 Neurocognitive Impairment | 9 | $90,300 |
| 4. | Withholding for Common Benefit Fees | 210 | $12,807,540 |
| | (a) Death with CTE | 53 | $3,504,079 |
| | (b) ALS | 20 | $3,344,750 |
| | (c) Alzheimer's Disease | 78 | $2,968,365 |
| | (d) Parkinson's Disease | 37 | $1,617,036 |
| | (e) Level 2.0 Neurocognitive Impairment | 7 | $631,008 |
| | (f) Level 1.5 Neurocognitive Impairment | 15 | $742,302 |
| 5. | Withholding for Liens | 104 | $53,019,248 |
| | (a) Death with CTE | 17 | $10,605,140 |
| | (b) ALS | 15 | $21,662,830 |
| | (c) Alzheimer's Disease | 40 | $9,705,644 |
| | (d) Parkinson's Disease | 19 | $4,961,130 |
| | (e) Level 2.0 Neurocognitive Impairment | 5 | $3,661,386 |
| | (f) Level 1.5 Neurocognitive Impairment | 8 | $2,423,118 |

As you will note from the table above, the largest chunk of deductions come by way of "offsets" – NFL imposed conditions such as a having a stroke prior to the qualifying condition's diagnosis, which can reduce a claim by up to 75%.

In looking at approved Death with CTE claims, the total in the first table is $70,608,267, but when adding up the deductions in the second table you see that $34,974,310 was deducted for liens, offsets and other deductions leaving a net of $35,633,957. Dividing by 53 for the total number of approved claims, the average payout comes to $672,338. While this is a substantial sum, it hardly replaces a lost loved one, and doesn't resemble what class members were led to believe they would receive based on the chart below.

| AGE AT DIAGNOSIS | ALS | DEATH w/CTE | PARKINSON'S | ALZHEIMER'S | LEVEL 2 | LEVEL 1.5 |
|---|---|---|---|---|---|---|
| Under 45 | $5,000,000 | $4,000,000 | $3,500,000 | $3,500,000 | $3,000,000 | $1,500,000 |
| 45-49 | $4,500,000 | $3,200,000 | $2,470,000 | $2,300,000 | $1,900,000 | $950,000 |
| 50-54 | $4,000,000 | $2,300,000 | $1,900,000 | $1,600,000 | $1,200,000 | $600,000 |
| 55-59 | $3,500,000 | $1,400,000 | $1,300,000 | $1,150,000 | $950,000 | $475,000 |
| 60-64 | $3,000,000 | $1,200,000 | $1,000,000 | $950,000 | $580,000 | $290,000 |
| 65-69 | $2,500,000 | $980,000 | $760,000 | $620,000 | $380,000 | $190,000 |
| 70-74 | $1,750,000 | $600,000 | $475,000 | $380,000 | $210,000 | $105,000 |
| 75-79 | $1,000,000 | $160,000 | $145,000 | $130,000 | $80,000 | $40,000 |
| 80+ | $300,000 | $50,000 | $50,000 | $50,000 | $50,000 | $25,000 |

In any event, regardless of diagnosis, the numbers depicted in the chart above – those sold to the class of impaired players and the general public look a lot different than the amount of compensation players are actually receiving.

Perhaps the most troubling aspect in examination of the claims picture is that the over 35% of approved claims fall under the "easier" approval process for Death with CTE and ALS, but this certainly doesn't represent 35% of claims filed. Most of the claims in this category for the existing population of retired players are already filed and in process. What this means is that the 5% of claims filed for these categories represent 35% of approved awards. And while every single player suffering from the horrific destruction of ALS deserves priority and every widow who has lost her husband to the devastation of CTE can never be fully compensated for her loss, the other 95% of players who are afflicted with Parkinson's Disease, Alzheimer's, or dementia deserve much better.

A white paper prepared by NFLObjectors points out that:

> "These are the easiest cases to process. Many of the subjects are deceased or near death. Many cases have extensive pathological examinations and documented clinical histories. Further, the subjects will avoid the devious BAP screening program. Nonetheless, the performance of the settlement is as expected. A disaster for the class."

Sobering figures are entered in support of this claim.

- Nearly 50% of the publicly reported CTE deceased (29% class claims) cases have been processed or are in process.

- 80% of eligible ALS (25% of class claims) cases have been processed or are in process.

What this means, as pointed out earlier, the easier claims are either processed or in process, leaving other diagnoses at the mercy (or more appropriately lack of mercy) of the ruthless scrutiny of the NFL. Attorneys have indicated to me that they believe the NFL attorneys have a neurologist examining claims with them looking for any hole or technicality they can use to delay or deny payment of a claim. It's not a process that seeks legitimacy, but one grounded in denial if there is any possible loophole that can be exploited.

> **As predicted before the claims process even commenced, dementia claims are being hardest hit. They make up 65% of submitted claims but only 2% of approved claims and a fraction of 1% of paid monetary awards.**

As pointed out in the Objectors' Report: "Analyzing the NFL Settlement Claim Reports is overcoming the Administrator and Class Counsels' obvious attempts to conceal the egregious deficiencies designed into the settlement."

- 43.8% (137MM/314MM) of the MAF settlement grid amount represents offsets (liens, settlement mandated deductions and derivative claims)

- 19% discount implies these offsets are for young veteran players, with older retirees taking an even larger hit.

Based on this analysis of deductions the projected picture for future awards is bracing:

- 28% of the Death w/ CTE claimants are unlikely to receive any remuneration.

- 25% of ALS claimants are unlikely to receive any remuneration.

- 36% of Alzheimer's claimants will receive an average $240K (approximately 3 years of care).

- 42% of Parkinson's Disease (PD) claimants will receive less $50K (approximately 4 years of out of pocket costs for PD).

# CTE Omissions

Many class members still seem oblivious and even incredulous to the fact that CTE was excluded from the settlement. This was a masterful victory for the NFL and according to sources close to the claims process, medical records which indicate the possibility of CTE, are being used by the NFL in an attempt to discredit other diagnoses which would qualify a claimant for other conditions such as Alzheimer's or dementia.

As detailed previously only a few of the dead will qualify for a CTE award because of the small time window imposed for qualifying claims. Chris Seeger justifies this by claiming that the cutoff was designed to prevent more suicides by CTE sufferers. If this is actually the reason, it has been ineffective, as 20 percent of the completed suicides in the NFL's 93 year history have been completed in the past 31 months – the time since the amended settlement agreement was adopted at which time CTE deaths became noncompensable. In reality, this was probably foresight on the part of the NFL since they undoubtedly realized that a very large population of players would be posthumously diagnosed regardless of whether their deaths were self-inflicted or otherwise. The results of a Boston University study in which 99% of the brains of former NFLers tested positive for CTE would tend to validate this assumption. While the study recognized that the brains donated represented a symptomatic representation of retired players, the Objectors' report projects 1,500 cases at minimum with only 110 eligible to file a claim.

As one attorney in the case pointed out, the NFL's attorneys are doing their jobs and doing them well. Chris Seeger's narrative tends to change depending on his audience but many observers feel he sold out the class of retired players for $112.5 million in NFL money. The NFL has faced enough firestorms in Roger Goodell's tenure as commissioner to kill most businesses but in spite of two years of steady TV ratings declines they have managed to remain the most prosperous sports entity in the United States. I firmly believe the reason for the decline is the lack of integrity shown in pretty much every issue across the board that doesn't reek of a public PR pitch. Unless the league finds a way to put this in check, its lack of integrity will one day be its undoing. If they wish to halt the downward progression and restore some respect, they could start by calling off the bulldogs and taking care of the suffering men who built their fortunes.

**Copyright**

© 2018 Advocacy for Fairness in Sports.

- Return to top

Powered by WordPress and the Graphene Theme.



# **NFL**PLAYERS**BRAINS**MATTER

# FOR PLAYERS ONLY!

**Players Source for the Latest Updates on NFL Concussion Lawsuit**
**From Fred Willis & NFL Players Brains Matter**
Retired NFL Player, Advocate & Councilor
Thursday, March 15th, 2018

# Didn't We Win Our Lawsuit?

**"The Settlement Claims Process is an Acrimonious, Arduous &
Potentially Unfulfilling Journey & for the NFL and BrownGreer to
Make it More Difficult is Beyond Cruel."**

# Is This A Conclusion?

## The Fact Is Most Players Don't Understand How They Have Been Excluded from This Concussion Settlement!

The vast majority of diagnosed dementia players are now faced with huge obstacles from notice of deficiencies, audits and appeals.

Examining doctors must compare cognitive decline with a players prior medical records to become eligible to receive any funds.

Any future claim for anything other than Alzheimer's or ALS is gone.

A player that is diagnosed with CTE – the biggest problem impacting the lives of most players *– gets* *nothing*.

BrownGreer the Claims Administrator is *'immovable'* from their position in interpretation of the settlement language, as opposed to the actual language contained in the settlement.

Players have been examined and have injuries that warrant a pay-out NOW. They have submitted the proof and are being told the proof needed has now changed.

***Players need to get paid according to the settlement agreement*** not delayed/denied based on interpretations outside of the settlement.

## 'If you are a plaintiff in the NFL Concussion Lawsuit and have qualified for a monetary settlement award, this may be the most compelling email you will ever read on why no one is getting paid!'

# The Audits Continue!!

## Audits on Claims Have Increased from 21% to 30% and Rising!

Brown Greer Has 'Reason To Believe' You have committed **Fraud** or may be misrepresenting                                        Your                                        claim!!!

The Claims Administrator is using the Audit procedures to engage in fishing expeditions on a massive scale and there is a systemic bias against 1.5 or 2.0 Claim Packages.  According to the February 19, 2018, Monetary Award Claims Report, 1,079 1.5 and 2.0 Claim Packages have been submitted but only 4 of these          Claims          have          been          paid          to          players!

***We continue to fight for our claims to be paid***, against the 2 Headed Monster; the NFL and Orran Brown of BrownGreer!

The NFL and BrownGreer has unchecked audit power under the settlement and wields it with reckless abandon, in an attempt to frustrate players by delaying claims, hoping the brained damaged victim will die, relent and go away.

# LOOK HERE!!!!

**How Long Is Your Monetary Award Claim Going To Take?**

**Here is a Timeline and Graphic Representation in Chronological Order as to the Sequence of Events that Will Enable Players to Understand Why We Are Not Getting Paid!**

## <u>This Is The Settlement Claim ProcessTimeline!</u>

**PRE-EFFECTIVE CLAIMS** - Estimate **700+** Days
**MAF CLAIMS** - Estimate **255+** days
**BAP CLAIMS** - Estimate **645+** Days

**Download The Settlement Claim Process Timeline!!!**

# EXHIBIT B

(f)     A Qualifying Diagnosis of Death with CTE shall be made only for Retired NFL Football Players who died prior to the Final Approval Date, through a post-mortem diagnosis made by a board-certified neuropathologist prior to the Final Approval Date, provided that a Retired NFL Football Player who died between July 7, 2014 and the Final Approval Date shall have until 270 days from his date of death to obtain such a post-mortem diagnosis.

Section 6.4     Qualifying Diagnosis Review by Appeals Advisory Panel.

(a)     A member of the Appeals Advisory Panel must review, as set forth in Section 6.4(b), Qualifying Diagnoses made prior to the Effective Date by:

(i)     A board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician, who is not a Qualified MAF Physician, between July 1, 2011 and the Effective Date;

(ii)     A neurologist, neurosurgeon, or other neuro-specialist physician, who is not board-certified but is otherwise qualified; and

(iii)     A physician who is not a Qualified MAF Physician and who is not otherwise identified in Section 6.4(a)(i)-(ii) but who has sufficient qualifications (i) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (ii) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment.

(b)     If a review of a Qualifying Diagnosis by a member of the Appeals Advisory Panel is required by Section 6.4(a), the contents of the Claim Package relevant to the Qualifying Diagnosis, including the Claim Form, the Diagnosing Physician Certification, medical records supporting and reflecting the Qualifying Diagnosis, and any other related materials concerning the Qualifying Diagnosis, shall be submitted to a member of the Appeals Advisory Panel for review. The Appeals Advisory Panel member will determine whether the Retired NFL Football Player or deceased Retired NFL Football Player has the Qualifying Diagnosis reported in the Diagnosing Physician Certification, or, where there is no Diagnosing Physician Certification as set forth in Section 8.2(a), reported in the Claim Package submitted by the Representative Claimant. The Appeals Advisory Panel member shall review the Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions), including consideration of, without limitation, the qualifications of the diagnosing physician, the supporting medical records and the year and state of medicine in which the Qualifying Diagnosis was made. The Appeals Advisory Panel member also shall confirm that the Qualifying Diagnosis was made by an appropriate physician as set forth in Section 6.3. For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical

33

diagnostic criteria, including without limitation, the same testing protocols or documentation requirements.

(i)    The review by a member of the Appeals Advisory Panel under this subsection, absent extraordinary circumstances impacting the schedule of such member, shall be completed within forty-five (45) days of the date on which he or she receives a Settlement Class Member's file, except such time limit may be altered to the extent the volume of files warrants, either by agreement between Co-Lead Class Counsel and Counsel for the NFL Parties, subject to approval by the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof), or by application by Co-Lead Class Counsel or Counsel for the NFL Parties to the Court. The Qualifying Diagnoses shall generally be reviewed in the order in which they are received.

Section 6.5    Qualified MAF Physicians

(a)    Within ninety (90) days after the Effective Date, the Claims Administrator will establish and maintain a list of Qualified MAF Physicians eligible to provide Qualifying Diagnoses. Each Qualified MAF Physician shall be approved by Co-Lead Class Counsel and Counsel for the NFL Parties, which approval shall not be unreasonably withheld. To the extent a Retired NFL Football Player is examined by a Qualified MAF Physician, such visit and examination shall be at the Retired NFL Football Player's own expense.

(b)    The Claims Administrator will select Qualified MAF Physicians based on the following criteria:   (a) education, training, licensing, credentialing, board certification, and insurance coverage; (b) ability to provide the specified examinations necessary to make Qualifying Diagnoses; (c) ability to provide all required examinations and services in a timely manner; (d) insurance accessibility; and (e) geographic proximity to Retired NFL Football Players. Under no circumstances will a Qualified MAF Physician be selected or approved who has been convicted of a crime of dishonesty, or who is serving on or after the Final Approval Date as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint. If selected and approved, under no circumstances shall a Qualified MAF Physician continue to serve in that role if convicted of a crime of dishonesty and/or thereafter retained as a litigation expert consultant or expert witness for an Opt Out, or his, her or its counsel in connection with litigation relating to the subject matter of the Class Action Complaint.

(c)    In order to be eligible for selection, each Qualified MAF Physician must provide the following information to the Claims Administrator: (a) state professional license number; (b) National Provider Identifier; (c) board-certification information; (d) evidence of proper licensing and insurance coverage under applicable state laws; (e) experience, including number of years as a healthcare provider; (f) primary and additional service locations; (g) mailing and billing addresses; (h) tax identification information; (i) ability to provide all required examinations and services in a timely manner; (j) capacity for new patients; (k) appointment accessibility; (l) languages spoken;

# EXHIBIT C

**Subject:** [Redacted] Audit
**Date:** Monday, December 11, 2017 at 7:37:31 PM Eastern Standard Time
**From:** Brad Sohn
**To:** obrown@browngreer.com
**CC:** David Smith, Scott George, [REDACTED; REDACTED]

Dear Orran:

On behalf of the [REDACTED], I am sending you this email, having first had occasion to speak with David Smith from your office. I note that David worked with me on this quite quickly and attempted to be as responsive as I believe he could have possibly been. Unfortunately, this is a tricky one. And so, having first huddled with the clients, I now come directly to you.

It is our understanding that an audit, pursuant to Section 10.3, will be commenced shortly as to the [REDACTED] claim. [REDACTED], whom you've met, is quite frustrated, as I'm sure you understand. She has asked for some answers to the following. She further asked, and I agree wholeheartedly, for some information in *advance* of an audit, as opposed to during its process. Hence my email now and not upon first receiving the audit document.

1. First, we have concerns regarding the NFL Parties' purported audit right at this juncture.

Section 10.3(h) does not set forth a specific time-limitation on appeals; we agree there. Nevertheless, this same language very clearly contemplates audits as *preceding* and not *following* appeals. The language references payment upon "completion of an audit" and still subject to an appeal. Obviously, here, there has been an appeal and the NFL Parties lost. If it audit-rights are NOT read as having closed by the time of an appeal, there is simply no other reading of this language than that the NFL parties enjoy audit-rights in perpetuity.

That may well be the case. <u>But</u>, if the NFL Parties enjoy audit-rights in perpetuity, then they are also not prejudiced by having these funds released. In other words, they can seek a TRO/PI; they can contact the U.S. Attorney for the Southern District of Florida to pursue criminal prosecution; they still have rights. The problem here is that your solution (and apologies if my useage of the word "your" is inaccurate) to de-list the payment from the approval list AND perform a post-appeal audit—one permitted to span an indefinite time-period, no less—leaves the NFL Parties' rights fully intact while completely trampling my clients' rights.

The [REDACTED] award, as you know, has now been <u>twice</u>-approved (thrice,

if you count SM Pritchett's opinion) by multiple MAF doctors and was rooted in well-documented and decade-long neurodegenerative decline, as found by the NFL which deemed him totally disabled back in 2011. If the funds remain in the NFL Parties' possession (or at least not in my clients' possession), then my clients lose exceedingly valuable earnings on it. No matter the calculation, this family is losing well over 100k/year (indeed possibly double that) as their claim remains entangled in an audit that is highly questionable.

As a proposed compromise, I ask that this claim be paid but placed into an interest-bearing account. We would not object to BG taking possession of the funds for this purpose. That might be a means through which to soften the blow.

2. Second, while we vehemently deny that any omission/misrepresentation/concealment of material fact has ever taken place, we will of course comply with the terms of any audit. Nevertheless, we request some additional information.

    a. Advance notice in writing as to the duration of the audit and its scope.

    b. Advance notice in writing of the clients' rights, should there an adverse determination, e.g., do they appeal to the Special Master? The Court? The third circuit?

    c. Advance notice in writing of the NFL Parties' rights in the event of an adverse determination for them, to the extent Section 10.3(h) does not compel immediate payment.

    d. Advance notice in writing of Brown Greers' function in the audit process (e.g., references to the settlement agreement) along with notice of AAP involvement in connection with purported evidence of "fraud." In other words: we see nothing under Section 9.8 that indicates an AAP member would be permitted to advise Brown Greer. We are troubled by either scenario, in other words, the idea that your firm would need to make a medical decision absent a doctor. But we are equally if not more troubled by the AAP's being used—once again—as an end-run to the MAF.

Our preference would be that the Court explain its thoughts on this while the money accrues interest. But I understand this may not be feasible. What is unfair to my clients, and I hope you agree, is to repeatedly subject them to additional steps, only to tell them that the NFL has

indefinite permission to claw back the award without any disincentive whatsoever.

Thank you very much for your time, and again I apologize for sending this directly to you.

Brad

Brad R. Sohn, Esq.
The Brad Sohn Law Firm, PLLC
2600 S. Douglas Road
Suite 1007
Coral Gables, Florida 33134
Mob. No.: 310.866.0001
Tel. No.: 786.708.9750
Fax No.: 305.397.0650
Email: brad@sohn.com

*The preceding email message (including any attachments) contains information that may be confidential, may be protected by the attorney-client, work product or other applicable privileges, and may constitute non-public information. It is intended to be conveyed only to the designated recipient(s) named above. If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete all copies of it from your computer system. Any use, dissemination, distribution or reproduction of this message by unintended recipients is not authorized and may be unlawful.*

**THE BRAD SOHN LAW FIRM, PLLC**

Bradford Rothwell Sohn, Esq.
Brad@Sohn.com

March 16, 2018

*VIA E-MAIL*

Mr. Orran Brown
BrownGreer, PLC
250 Rocketts Way
Richmond, Virginia 23231

RE:     Post-Appeal Audits of Post-Effective-Date Qualifying Diagnosis

Dear Orran,

This letter follows our conversation, in which you did not disagree with my stated belief that the Court would benefit by learning of this matter. I have documented the nine-month-long saga involving my clients' post-effective-date MAF-Diagnosis-based Claim Package and ask, so long as you deem it appropriate, that you share this letter with the Court. This award's delayed payment and the vehicles driving that delay expose glaring problems with aspects of this still-nascent process: (1) the NFL is using post-appeal claim-audits to seek *de facto* second-appeals; and (2) through post-appeal claim-auditing, the NFL is vaulting NFL-unfavorable MAF Physician Qualifying Diagnoses, supplanting those in favor of an AAP panel member's (hopefully different) medical judgment. Both of these protections (appeals and audits) are important; I do not write to question them. I simply and strongly condemn their uses as strategy; these protections are not being used as a shield, but as a sword; this is wrong and plainly consistent with the bargain.

Before proceeding, I begin with some important background: death/CTE, ALS, and Parkinson's claims are all highly objective medical decisions. Simply, either one has one of these; or they don't. And while I believe the NFL strived for this level of certainty in every diagnosis, that is simply not the case with Alzheimer's Disease. Alzheimer's Disease cannot *ever* be definitive until death. Many people hypothesize that President Reagan had this disease while *in office*. Thus, in life, its diagnostic features will *always* turn, at least to some extent, on medical judgments and a series of clinically correlating indicators. This fact is material when considering the NFL's use of audits and appeals here, particularly with a post-effective-date claim that theoretically is "automatic" once a MAF Physician renders a Qualifying Diagnosis. In other words, these inquiries—if unchecked—seemingly create an *objective* standard to second-guess a highly subjective medical judgment. Such judgment was theoretically accounted for when the approved list of MAF Physicians was created in the first place.

**I.     In June of 2017, this family submitted a Claim Package, having visited a MAF Physician who arrived at a Qualifying MAF Diagnosis.**

My clients are a 41-year-old disabled player and his family. His documented impairments date back to at least 2010. The player receives social security from an organic brain disease and NFL total/permanent neurocognitive disability benefits. Prior to retaining me, the

THE BRAD SOHN LAW FIRM, PLLC

Bradford Rothwell Sohn, Esq.
Brad@Sohn.com

player (through his wife) submitted a highly detailed, post-effective-date Claim that included positive neuropsychological testing (performed in 2010, 2012, and 2017), positive FDG and amyloid PET scans (revealing Alzheimer's plaques), DTI MRI (showing axonal sheering) and a MAF Physician's substantial evaluation. Based on the foregoing, a MAF Physician located very close to their home diagnosed this player, post effective date, with Alzheimer's Disease.

Although the family's claim was submitted in late June, the NFL began by contesting the first Diagnosing MAF Physician's administration, recommending that the MAF Physician be subjected to an audit. That fact became apparent to my clients after members of Brown Greer sought to interview his wife, and requested billing invoices. We in no way condemnt that audit's propriety. We mention it because the player's wife grew concerned their claim might incur a major delay on account of some wrong-doing by a doctor that they had unwittingly backed into. For that reason, the family booked a second MAF Physician appointment at its own expense, selecting this second MAF Physician located very close to their home from the approved list. Although paying for yet more evaluations left this family feeling mildly frustrated, the player had a decade-long history of profound neurodegenerative illness and ultimately a $3.5M claim; so, with nothing to worry about on the diagnosis (or so the family thought), the cost of a second evaluation would be nominal in relation to the claim's value and any potential earnings lost on the award during a delay.

## II.    A second MAF Physician diagnoses Alzheimer's to no avail.

The second MAF Physician's examination was no different for the family. Once more, the MAF Physician reviewed all prior records and studies, which spanned a decade or so and told a rather harrowing story of severe cognitive decline. Perhaps unsurprisingly, after this second MAF Physician reviewed all past records, performed his own highly-detailed evaluation, examined the player face-to-face for an hour, and spent additional time interviewing the spouse, he also diagnosed AD. That should have spelled game over; it did not.

Waiting until the final day before appeal rights were to have run, the NFL appealed the second post-effective-date diagnosis. In its appeal, the NFL adduced (as I have seen it do elsewhere) zero new evidence, and simply took the opportunity to trying arguing that no MAF Physician could have concluded what was (twice) concluded, based upon the medical evidence. While the correct result was found in the end (the NFL lost), the NFL's dubious appeal of a purportedly sacrosanct MAF Diagnosis left me with concerns. At a minimum, it succeeded by staving off payment for another few months, retaining earnings on the $3.5M claim. But, *now the claim was on the payment list*, we all thought. Not so fast. Special Master Pritchett's ruling would hardly prove to be the end of the road.

## III.    With their appeal rights exhausted, the NFL Parties scream fraud.

Again, waiting until the last possible moment, until after the Special Master denied its appeal, the NFL began screaming fraud and demanding the claim be removed from the payment list. It sought an audit of the monetary award on account of a four-year-old "YouTube.com" video, showing a three-minute-long video clip of the player speaking publicly (to a youth group, notably

THE BRAD SOHN LAW FIRM, PLLC

Bradford Rothwell Sohn, Esq.
Brad@Sohn.com

a youth group disclosed to the second MAF Physician had actually documented in his MAF report diagnosing Alzheimer's.)  This was a proverbial smoking gun, according to the NFL.

On December 11, 2017, having been retained by the family, I emailed Brown Greer (specifically you) to voice my significant concerns.  *See* Letter to Brown, O. from Sohn, B. re Claim Audit, dated December 11, 2017 (*attached as Exhibit "A".*)  Without recapitulating the entirety of that email's contents here, I noted the problems inherent in post-appeal audits proceeding identically to pre-appeal audits, those fundamentally being: (a) that doing so incentivized bad-faith audits and devalued claims (due to lost earnings); and (b) that the nature of this audit conceivably operated as an end-run around a MAF Physician's Qualifying Diagnosis.

Approximately during the week of November 13, 2017, I learned that an audit would be taking place on the claim and that the claim had been removed from the November 10th payment list.  The NFL argued that outdated, three-minute-long footage reasonably gave rise to concerns a material misrepresentation / concealment / omission had taken place, thereby accusing both MAF physicians, multiple neuropsychologists, the PET-scanning service and radiologist, the player, and his family of fraud.  I received formal notice of audit on or about December 11, 2017.  Again: more earnings lost on the award.

At that time, your office requested copies of the videos and (essentially) any other videos displaying functional impairments related to the claim.  My clients were upset at the requests, the label of "fraud", and delays that felt (to them) increasingly suspicious.  Of course, what choice did they have at this (or any) point?  We complied, expending more time and energy, and also subjecting this understandably emotional family to more anxiety.

**IV.    The Diagnosing MAF Physician himself rebuffs the videos as constituting a fraud, but the claim remains in audit.**

On February 17, 2017, on behalf of my clients, and after a generous extension that your office granted to me in light of personal matters, I submitted all documents responsive to the audit request.  In addition, I provided (a) a sworn declaration from the player's wife and (b) a letter signed by the MAF Physician.  The player's wife provided context for the old video clips and also re-affirmed something important: She had directly advised the MAF Physician of her husband's increasingly-limited volunteer-work with at-risk children in their community at the time of their multi-hour appointment; thus (in her mind and not unreasonably) *how could anyone deem this fraud?*

The MAF Physician's letter proved even more powerful, and—in our view— dispositive of the inquiry.  That letter was unequivocal in disagreeing that these video clips had evinced a fraud, even under the standard applied in the Settlement Agreement (e.g., not requiring intent to deceive; only requiring omitted information.)  After spending additional time viewing the entirety of the videos produced, he stated the following:

> none of these videos change or would have affected my findings, as reported last August. The various videos were posted significantly earlier in time than the time at which I evaluated Mr. [name

> redacted.]  Further, I understand the clips within these videos capturing [name redacted] speaking and driving to have been recorded possibly as far back as one year prior to their posting (e.g., at some point between the latter half of 2014 and early 2015.)  *Thus, I continue to feel comfortable in my diagnosis of Alzheimer's Disease, made significantly later in time from the videos, and made in light of the totality of information as personally observed and reviewed.*

(*Emphasis added.*)  And that development is the central cause for my concern.

The Settlement Agreement takes great pains to establish procedures for appeals (§ 9.5) as it does for audits (§ 10.3), and draws a clear distinction between these two procedures.  An appeal tests the sufficiency of medical support underpinning a Qualifying Diagnosis.  An audit—when not random—plainly requires (*see id*) reasonable grounds to believe a *material* concealment / omission / misrepresentation occurred; more simply (as our conversations confirm) an audit asks if a claim would have still been favorably determined in light of then-unknown information.  *Id.*

Here, the MAF Physician—himself—literally dispelled the materiality of this supposed *then-unknown* evidence, in writing.  Yet the audit continues.

### V.      This audit improperly subjects the Qualified MAF Physician's Qualifying Diagnosis to unchecked and limitless <u>scrutiny that can never be dispositive.</u>

On March 14, 2017, I had occasion to speak separately, both with you and also with your team-member handling the claim-audit.  As always, I appreciated your cordiality and prompt attention.  You really do the impossible when it comes to being responsive, Orran.  I state that again because this is not an attack on you, your team.  Nevertheless, the substance of these conversations left me frustrated.

First, I learned that this claim would not yet be removed from audit, following Brown Greer's review of the requested information provided; I still cannot reconcile that fact with the statements made in the MAF Physician's letter.  Second, I learned a forthcoming request would be seeking yet more information for the audit.  This time, because my client's declaration referenced her husband's relatively lengthy history of illness, as first documented in 2010, your office sought the 2010 medical record, which I happily provided, literally within several hours of learning you wanted it.  But.

I am baffled by this additional request's timing, along with the request itself.  Why was it made *only now*?  When I posed this question directly to you, your reply was "that's a good point and I don't have an answer for you."  Second, as I also pointed out late Wednesday night, this very 2010 record was already documented *directly* within the second Qualified MAF Physician's Diagnosing MAF Physician Report.  In other words, that evidence is already within the record; what could it possibly add, particularly when the audit vectors to *materially withheld* information?

The frustrating takeaway is that the audit process, at least with respect to this claim, makes the Qualified MAF Physician's worthless.  The NFL has used these two protections so that it can substitute an AAP panel-member's judgment anytime it seeks to shirk payment.  Once more:

THE BRAD SOHN LAW FIRM, PLLC

Bradford Rothwell Sohn, Esq.
Brad@Sohn.com

This claim is *not*, by way of an easy example, a CTE/Death claim in which the NFL learns the player was alive. This claim involves a nuanced medical judgment-call by a doctor permitted to make such a judgment. In other words, we know at this point that the player isn't "faking" these ailments, which have been ongoing for years. And we also know that the concerning, later-discovered information did not "move the dial" for the MAF Physician. Given these facts, the only thing that the audits and appeal serve to do is provide vehicles for other doctors to second-guess a physician purportedly immune from such second-guessing.

The problem with that is that this entire settlement was sold on a wholly different premise: namely prompt and hassle-free payments for those who are sick. Indeed, at the outset, my clients were proceeding *pro se* because they understood that the process had been designed to be so easy that they would not even need a lawyer. Instead, one of the sickest young players in this MDL has waived his rights and is being beaten down with litigation tactics.

Perhaps worse, how can this process ever conclude? In other words, let's suppose Brown Greer takes the claim out of audit and orders its disbursement. As no one disputes, the Settlement Agreement gives the NFL a post-disbursement audit-right in perpetuity that it may exercise with unbridled discretion; can the NFL therefore follow this player around with surveillance cameras and re-litigate these issues if he ever has a good enough day to go to the grocery store? That sounds ridiculous, but imagine if Ronald Reagan was a football player and not an actor. The world knows he had Alzheimer's, yet he would be audited to oblivion. Once more, the NFL deserves and has every right to use such a tool—to no one's dismay—if, for example, they discover things like a CTE/death claim having been faked. Even less extreme: we certainly know that many pre-effective date claims were (politely stated) aggressively assembled. But this family waited until the program began. And there will truly never be a definitive answer on this claim, at least never more definitive than today. There is truly no way of gaining certainty for a claim like this.

If left unchecked, post-appeal claim-audits following the form of this claim will make mincemeat out of Section 6.3(b) (providing that "[f]ollowing the Effective Date, a Qualifying Diagnosis … ***shall be made only*** by Qualified MAF Physicians …") In this instance, the NFL first sought to ignore the role of the MAF Physician by re-weighing the existing medical evidence in its own favor. Once that failed, the audit, also driven by the NFL, has operated to do precisely the same thing. In other words, if one does not accept a MAF Physician's *own word* as to what evidence was or was not material to his *own pre-blessed diagnosis*—particularly in the instance where the subject QD is Alzheimer's, a diagnosis of art—then everyone's claims simply depend on five AAP panel members.

Possibly my only role in aiding the collective process here is to identify this claim as a vehicle for addressing what is increasingly a huge problem. I would be remiss if I did not reiterate that I do not see this as a "Brown Greer" or a "Class Counsel" problem; I see this as a problem of the NFL's use of the Settlement Agreement in an offensive and improper manner. The agreement itself may be locked in, but there remain—in my view—means to better control abuse of process. Specifically, I would ask that you present my proposal, as made to you back on December 11, 2017. I agree wholeheartedly that the NFL should not be without recourse, should

### THE BRAD SOHN LAW FIRM, PLLC

Bradford Rothwell Sohn, Esq.
Brad@Sohn.com

it discover later that someone's claim was faked. But we need to address these post-effective-date, post-appeal claim-audits differently. The NFL's rights must be considered in tandem with, and not above each Settlement Class Member's rights. One could therefore order payment disbursed, but placed into escrow to retain its earnings, post-appeal, so that *neither* party's rights are impaired (not simply the NFL's rights); certainly, and well within the confines of what has already been agreed to, one can conceive of many options to dis-incentivize what have become wildly abusive tactics by the NFL.

Even if this family ultimately receives its claim, it has lost, while the NFL has "won." Specifically, the family's loss is conservatively estimated at somewhere between $50,000 and $125,000 during the pendency of these series charades. Particularly when aggregated, using these tactics repeatedly is strongly in the NFL's financial best interest. Precisely why something must be done.

I remain happy to discuss this matter at any point with the Parties, the Court, the Special Masters, or you, and hope you receive it in the constructive manner intended.

Warm regards,

Bradford R. Sohn

BRS/brs

# EXHIBIT D

*In re: NFL Players' Concussion Injury Litigation, MDL 2323*
CONFIDENTIAL PURSUANT TO COURT ORDER

## Summary of Initial Prevalence Rates

| Cognitive Impairment | Sample Data | Remaining Population (no diagnosis information available) | | | |
| --- | --- | --- | --- | --- | --- |
| | Observed Prevalence in Sample Group | Non-Deceased Plaintiff | Non-Deceased Non-Plaintiff | Deceased Plaintiffs[16] | Deceased Non-Plaintiffs |
| None/Level 1 | 89.0% | 94.7% | 97.4% | 0.0% | 98.7% |
| Level 1.5 | 4.1% | 2.1% | 1.0% | 39.5% | 0.5% |
| Level 2[17] | 5.8% | 2.9% | 1.5% | 55.1% | 0.7% |
| ALS | 0.6% | 0.3% | 0.1% | 5.4% | 0.1% |
| CTE[18] | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% |

(b)     **Initial age assignment**.   For the same reasons that we adjusted the prevalence rates for the sample group, we also adjusted the initial age assignments of the sample group to reflect that the Qualifying Diagnoses would be diagnosed within the 19,000 players at somewhat later ages than the sample group.   We did so based on epidemiological studies we reviewed that discuss prevalence of the diagnoses by age.   As has been discussed, because plaintiffs—particularly those who provided diagnosis information—are more likely to have Qualifying Diagnoses, we assume a meaningful selection bias in the sample data set.   This selection bias results in higher initial prevalence rates, particularly at younger ages.   We, therefore, adjusted for this bias and made adjustments to the initial age results from the sample group.   Our adjustments still result in a

---

[16]    There are only 32 deceased plaintiffs for whom we do not have diagnosis information. Of the 45 deceased plaintiffs for whom we have diagnosis information, 44 have a Qualifying Diagnosis based upon the information provided to us.

[17]    Includes Level 2, Alzheimer's and Parkinson's.

[18]    We have assumed that all players diagnosed with CTE (based on public information) will participate in the Settlement and claim monetary awards. Because the Settlement will not provide monetary awards for CTE for players diagnosed with CTE after the date of Preliminary Approval, the model assumes that no other players will be diagnosed with CTE.

*In re: NFL Players' Concussion Injury Litigation, MDL 2323*
CONFIDENTIAL PURSUANT TO COURT ORDER

significantly higher prevalence in younger age groups than in the general population.   As just one example, prevalence of dementia, Alzheimer's, and Parkinson's in the general population below age 50 is less than 1%. In fact, it is difficult to find a single study showing prevalence rates of those conditions below age 50 and the rates between ages 60 to 69, which are necessarily higher than the rates below age 60, range from <0.1 to 2.1%.  By contrast, the prevalence rate in the sample group below age 50 is nearly 200 times that observed in the general population (based on a general population prevalence rate of 0.01%, which we believe is a reasonable estimate based on the lack of epidemiology related to the population below age 50).  There is no medical literature suggesting a relative risk of anything close to that magnitude for football players or even non-football players who experience head trauma.  Thus, for the 19,000 players that we project have a current Qualifying Diagnosis, we made a reasonable assumption resulting in a prevalence rate below age 50 for the overall class of retired players that is 35 times the general population rate.  Thus, in making this assumption, we believe we are erring on the side of forecasting that players with current Qualifying Diagnoses will have those diagnoses at earlier ages (and thus receive higher monetary awards).  This is consistent with the conservative approach we have taken in making our assumptions.

## Initial Age Distribution of Qualifying Diagnoses

| | Initial Age Distribution | |
|---|---|---|
| Ages | Observed Age in Sample Group for Qualifying Diagnoses | Assumed Distribution |
| 49 & Younger | 40% | 2% |
| 50 – 59 | 15% | 15% |
| 60 – 69 | 20% | 35% |
| 70 – 79 | 22% | 38% |
| 80 + | 3% | 10% |

(c)     **Progression**.

(i)     In addition to determining current prevalence rates, we also made assumptions regarding progression rates over the 65-year term of the Settlement.  Using the current prevalence rates of Qualifying Diagnoses across the entire class as a starting point, we projected how the conditions of players without a Qualifying Diagnosis (asymptomatic and Level 1) and players who have current diagnoses of Level 1.5 would progress over time.  We believe our projection assumptions are consistent with the various epidemiological studies that we reviewed.  We also discussed the reasonableness of these assumptions with Dr. Yaffe, who concurred that they were reasonable.  Moreover, we validated the results of our progression assumptions by comparing the overall prevalence rates (by Qualifying Diagnosis and age) generated by the model against expectations in the general population based on

# EXHIBIT E

Participation in the BAP does not prevent the retired player from filing a claim for a monetary award. For the next 65 years, retired players will be eligible for compensation paid from the Monetary Award Fund if the player develops a Qualifying Diagnosis (*see* Question 14). Participation in the BAP also will help ensure that, to the extent the retired player receives a Qualifying Diagnosis in the future, he will receive the maximum monetary award to which he is entitled (*see* Question 20).

**13. How does a retired player schedule a baseline assessment examination and where will it be done?**

Retired players need to register for Settlement benefits before they can get a baseline assessment examination. Registration for benefits will not be available until after Final Settlement Approval. **However, a retired player may provide his name and contact information now at www.NFLConcussionSettlement.com or by calling 1-800-000-0000. This ensures that the retired player will receive additional notice about the registration process and deadlines when it becomes available.**

The BAP Administrator will send notice to those retired players determined during registration to be eligible for the BAP, explaining how to arrange for an initial baseline assessment examination. The BAP will use a nationwide network of qualified and independent medical providers who will provide both the initial baseline assessment as well as any further testing and/or treatment. The BAP Administrator, which will be appointed by the Court, will establish the network of medical providers.

## MONETARY AWARDS

**14. What diagnoses qualify for monetary awards?**

Monetary awards are available for the diagnosis of ALS, Parkinson's Disease, Alzheimer's Disease, Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia), Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia), or Death with CTE (the "Qualifying Diagnoses"). A Qualifying Diagnosis may occur at any time until the end of the 65-year term of the Monetary Award Fund.

If a retired player receives a monetary award based on a Qualifying Diagnosis, and later is diagnosed with a different Qualifying Diagnosis that entitles him to a larger monetary award than his previous award, he will be eligible for an increase in compensation. This would also apply to Derivative Claimants.

Qualifying Diagnoses must be made by approved qualified specialists. If and when Final Settlement Approval is obtained, the Claims Administrator will create and maintain a list of specialists who may make an authorized Qualifying Diagnoses if no such diagnosis has already been made by a qualified specialist before the Settlement is effective.

**15. Do I need to prove that playing professional football caused the retired player's Qualifying Diagnosis?**

No. You do not need to prove that a retired player's Qualifying Diagnosis was caused by playing professional football, or that he experienced head injuries in the NFL, AFL, World League of American Football, NFL Europe League, or NFL Europa League in order to receive a monetary award. The fact that a retired player receives a Qualifying Diagnosis is sufficient to be eligible for a monetary award.

**QUESTIONS? CALL 1-800-000-0000 OR VISIT WWW.NFLCONCUSSIONSETTLEMENT.COM**

Exhibit 5                                                                                                      Page 10

You also do not need to exclude the possibility that the Qualifying Diagnosis was caused or contributed to by amateur football or other professional football league injuries or by various risk factors linked to the Qualifying Diagnosis.

### 16. How much money will I receive?

The amount of money you will receive depends on the retired player's:

- Specific Qualifying Diagnosis,
- Age at the time of diagnosis (*see* Question 17),
- Number of seasons played or practiced in the NFL or the AFL (*see* Question 18),
- Diagnosis of a prior stroke or traumatic brain injury (*see* Question 19), and
- Participation in a baseline assessment exam (*see* Question 20).

The amount of money you will receive also depends on whether:

- There are any legally enforceable liens on the award,
- Any retainer agreement with an attorney, and
- The Court makes any further assessments (*see* Question 34).

Certain costs and expenses related to resolving any liens for Settlement Class Members will be paid out of such Settlement Class Members' Monetary Awards or Derivative Claimant Awards.

The table below lists the maximum amount of money available for each Qualifying Diagnosis before any adjustments are made.

| QUALIFYING DIAGNOSIS | MAXIMUM AWARD AVAILABLE |
|---|---|
| Amyotrophic lateral sclerosis (ALS) | $5 million |
| Death with CTE (diagnosed after death) | $4 million |
| Parkinson's Disease | $3.5 million |
| Alzheimer's Disease | $3.5 million |
| Level 2 Neurocognitive Impairment (*i.e.*, moderate Dementia) | $3 million |
| Level 1.5 Neurocognitive Impairment (*i.e.*, early Dementia) | $1.5 million |

Monetary awards may be increased up to 2.5% per year during the 65-year Monetary Award Fund term for inflation.

To receive the maximum amount outlined in the table, a retired player must have played for at least five Eligible Seasons (*see* Question 18) and have been diagnosed when younger than 45 years old.

Derivative Claimants are eligible to be compensated from the monetary award of the retired player with whom they have a close relationship in an amount of 1% of that award. If there are multiple Derivative Claimants for the same retired player, the 1% award will be divided among the Derivative Claimants according to the law where the retired player (or his Representative Claimant, if any) resides.

# EXHIBIT F

there are multiple Derivative Claimants asserting valid claims based on the same subject Retired NFL Football Player, the Claims Administrator will divide and distribute the Derivative Claimant Award among those Derivative Claimants pursuant to the laws of the domicile of the Retired NFL Football Player (or his Representative Claimant, if any).

## ARTICLE VIII
## Submission and Review of Claim Packages
## and Derivative Claim Packages

Section 8.1    All Settlement Class Members applying for Monetary Awards or Derivative Claimant Awards must submit Claim Packages or Derivative Claim Packages to the Claims Administrator.

Section 8.2    Content

(a)    The content of Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation: (i) a Claim Form with the Personal Signature of the Retired NFL Football Player (or Representative Claimant) either on the Claim Form or on an acknowledgement form verifying the contents of the Claim Form; (ii) a Diagnosing Physician Certification; (iii) medical records reflecting the Qualifying Diagnosis; (iv) a HIPAA-compliant authorization form; and (v) records in the possession, custody or control of the Settlement Class Member demonstrating employment and participation in NFL Football.

(i)    Representative Claimants of Retired NFL Football Players who died prior to the Effective Date do not need to include a Diagnosing Physician Certification in the Claim Package if the physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, also died prior to the Effective Date or was deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date. Instead, the Representative Claimant must provide evidence of that physician's death, incapacity or incompetence and of the qualifications of the diagnosing physician.  For the avoidance of any doubt, all other content of Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis.

(ii)    In cases where a deceased Retired NFL Football Player received a Qualifying Diagnosis but the medical records reflecting the Qualifying Diagnosis are unavailable because of a force majeure type event (e.g., flood, hurricane, fire), the Claims Administrator, upon petition by the Representative Claimant, may determine the Claim Package to be valid without the medical records if the Representative Claimant makes a showing of a reasonable effort to obtain the medical records from any available source and presents a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living.  For the avoidance of any doubt, the Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.  If the unavailability of medical records also causes the diagnosing physician to be unable to provide a Diagnosing Physician Certification, the Claims Administrator, upon petition by

the Representative Claimant, and in addition to the presentation of a certified death certificate referencing the Qualifying Diagnosis made while the Retired NFL Football Player was living, may instead allow an accompanying sworn affidavit from the diagnosing physician attesting to the reasons why the diagnosing physician is unable to provide a Diagnosing Physician Certification without the medical records. The Claims Administrator has the sole discretion to determine the sufficiency of this showing, subject to the appeal rights set forth in Section 9.5.

        (iii)    In cases where a Retired NFL Football Player has received a Qualifying Diagnosis and the diagnosing physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, has died or has been deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date, or otherwise prior to completing a Diagnosing Physician Certification, the Retired NFL Football Player (or his Representative Claimant, if applicable) may obtain a Diagnosing Physician Certification from a separate qualified physician for the Qualifying Diagnosis as specified in Exhibit 1 based on an independent examination by the qualified physician and a review of the Retired NFL Football Player's medical records that formed the basis of the Qualifying Diagnosis by the deceased or legally incapacitated or incompetent physician. If the same Qualifying Diagnosis is found by both doctors, the date of Qualifying Diagnosis used to calculate Monetary Awards shall be the date of the earlier Qualifying Diagnosis.

        (b)    The content of Derivative Claim Packages will be agreed to by Co-Lead Class Counsel and Counsel for the NFL Parties, and will include, without limitation: (i) a Derivative Claim Form with the Personal Signature of the Derivative Claimant either on the Derivative Claim Form or on an acknowledgement form verifying the contents of the Derivative Claim Form; and (ii) records sufficient to verify the relationship with the subject Retired NFL Football Player or deceased Retired NFL Football Player that properly and legally provides the Derivative Claimant the right under applicable state law to sue independently and derivatively.

        (c)    All statements made in Claim Forms, Derivative Claim Forms, any acknowledgement forms, and Diagnosing Physician Certifications will be sworn statements under penalty of perjury.

        (d)    Each Settlement Class Member has the obligation to submit to the Claims Administrator all of the documents required in Section 8.2 to receive a Monetary Award or Derivative Claimant Award.

Section 8.3    <u>Submission</u>

        (a)    Settlement Class Members must submit Claim Packages and Derivative Claim Packages to the Claims Administrator in accordance with Section 30.15.

        (i)    Claim Packages must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or

# EXHIBIT G

## INJURY DEFINITIONS

## DIAGNOSIS FOR BAP SUPPLEMENTAL BENEFITS

### Level 1 Neurocognitive Impairment

(a)     For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)     Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a decline in cognitive function.

(ii)     Evidence of moderate cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)     The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale Category 0.5 (Questionable) in the areas of Community Affairs, Home & Hobbies, and Personal Care.

(iv)     The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)     Level 1 Neurocognitive Impairment, for the purposes of this Settlement Agreement, may only be diagnosed by Qualified BAP Providers during a BAP baseline assessment examination, with agreement on the diagnosis by the Qualified BAP Providers.

## QUALIFYING DIAGNOSES FOR MONETARY AWARDS

1.　**Level 1.5 Neurocognitive Impairment**

　　(a)　For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1.5 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

　　　　(i)　Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

　　　　(ii)　Evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

　　　　(iii)　The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care. Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis. In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

　　　　(iv)　The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

　　(b)　For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

　　(c)　For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv)

above, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

2.    **Level 2 Neurocognitive Impairment**

(a)    For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 2 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below:

(i)    Concern of the Retired NFL Football Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function.

(ii)    Evidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in two or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention.

(iii)    The Retired NFL Football Player exhibits functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care. Such functional impairment shall be corroborated by documentary evidence (*e.g.*, medical records, employment records), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis. In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in the executive function cognitive domain or the learning and memory cognitive domain, and at least one other cognitive domain; and (b) the Retired NFL Football Player's functional impairment, as described above, must be corroborated by a third-party sworn affidavit from a person familiar with the Retired NFL Football Player's condition (other than the player or his family members), the sufficiency of which will be determined by the physician making the Qualifying Diagnosis.

(iv)    The cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

(b)    For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician or a board-certified

or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(c)     For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above, unless the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) was medically unnecessary because the Retired NFL Football Player's dementia was so severe, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology or neurocognitive disorders, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

3.     **Alzheimer's Disease**

(a)     For living Retired NFL Football Players, a diagnosis while living of the specific disease of Alzheimer's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)     For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Major Neurocognitive Disorder due to probable Alzheimer's Disease consistent with the definition in *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), or a diagnosis of Alzheimer's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified  neurologist, neurosurgeon, or other neuro-specialist physician, or by a physician with sufficient qualifications in the field of neurology to make such a diagnosis, as set forth and provided in Sections 6.3(c)-(e) of the Settlement Agreement.

4.     **Parkinson's Disease**

(a)     For living Retired NFL Football Players, a diagnosis while living of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(b)     For Retired NFL Football Players deceased prior to the Effective Date, a diagnosis of Parkinson's Disease, made while the Retired NFL Football Player was living by a board-certified or otherwise qualified  neurologist, neurosurgeon, or other neuro-specialist

# EXHIBIT H

From: Gene Locks <glocks@lockslaw.com>
Date: Mon, Jul 24, 2017 at 12:05 PM
Subject:
To: "Seeger, Chris" <cseeger@seegerweiss.com>

Chris:
I understand from our conversation over the weekend that you are unclear and possibly unaware
of any written guidance the parties have furnished to doctors who are participating in the MAF
program (and possibly the BAP program) or guidance given the AAP.

Let me clarify.

BrownGreer and your colleagues (Scott and Mike) made us aware that there is a manual agreed
upon by the parties (NFL counsel and Seeger Weiss) that is being sent to physicians and
neuropsychologists who are participating in the BAP and MAF programs. We were told that the
manual provided guidance to the professionals about how to apply the BAP criteria and how to
interpret relevant parts of the Agreement. We have also been told that there is a second manual
agreed upon by the parties that has been sent to the AAP to provide guidance on how to apply
the Agreement to Claims the AAP review.

As to both manuals, we have been told that Class Counsel is not permitted to see them. If you
are unaware that the manuals even exist, that is of course a concern to us. Of even greater
concern is the fact that Class Counsel has been excluded from this and every other aspect of
implementing the Settlement. We believe this must be a design of NFL counsel to exclude all of
us from the implementation process and to create what is essentially a newly formulated benefits
plan that denies meritorious Claims based on alleged deficiencies that do not or should not apply.

Also, the parties developed alleged numerous "deficiencies" for pre-effective date Claims and
instructed BrownGreer to impose those "deficiencies" on the Claims as they are filed. Some are
substantive "deficiencies" and largely founded on the idea that if the Claim does not conform to
the criteria of the BAP, the Claim is de facto deficient and must be remedied. This, of course, is
not what the Agreement says; to the contrary, the Agreement says pre-effective date Claims must
be "based on principles generally consistent with" the BAP. It also says that pre-effective date
Claims are not subject to the same documentation requirements or the same diagnostic criteria.
See 6.4(b). Some of the alleged "deficiencies" have no basis at all in the Agreement.
We have also learned that the parties have had extensive meetings with the Special Masters on
these subjects, not one of which included any of us.

Our response to this is grave concern. We have been kept in the dark and carved out of the
implementation process. We have been told we cannot participate at all, even though we are
Class Counsel. Now we learn you are unaware of the information I have provided.

We seek a remedy to this at once, because we feel certain that NFL counsel has steered the
Settlement ship into waters that serves the NFL interests alone and harms the players. Sol,
Steve, and I represent nearly 2000 players. Seeger Weiss represents very few. Collectively we

know more about testing, qualified physicians, and how the Settlement should be interpreted to benefit the players.

We want to make this work as quickly and as effectively as possible. We cannot adequately fulfill our responsibilities as class counsel if we have no access to this information. Let's have a meeting to discuss this.

I thank you for your assistance.
Gene
Gene Locks, Founding Partner
e. glocks@lockslaw.com
t. 215.893.3434
Admitted to Practice in NJ, NY, PA

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.
Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

*CONFIDENTIALITY NOTE**
*This transmission and the documents accompanying this transmission contain information from the LOCKS LAW FIRM that is confidential and or privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited and the documents should be returned to this office immediately. Therefore, if you have received this transmission in error, please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

On Wed, Aug 30, 2017 at 11:40 AM, Chris Seeger <CSeeger@seegerweiss.com> wrote:

Because it's a small world, just about everything you guys say to your clients winds up reported beyond your group.  I'm not going to get into all the misinformation your firm has spread about the settlement and the claim administrator or the relationships you guys have with Fred Willis and others (at least not right now).  I'm writing to remind both of you that if you have specific concerns about the implementation of the settlement regarding how the Settlement Agreement is being implemented, I would appreciate it if you could bring those concerns to my attention so I could investigate before you tell players and lawyers involved information that isn't accurate.   I'm happy to schedule a call at any time and have Brown Greer on the call.  Ball is in your court.

Sent from my iPhone

From: **Gene Locks** <glocks@lockslaw.com>
Date: Wed, Aug 30, 2017 at 3:55 PM
Subject: Re: NFL
To: Chris Seeger <CSeeger@seegerweiss.com>
Cc: David Langfitt <dlangfitt@lockslaw.com>, Weiss <sweiss@anapolweiss.com>, Scott
George <sgeorge@seegerweiss.com>


Chris:

This will be a frank email, as we appreciate the frankness of your recent emails to us.

1.       We always assume that anything we say to anyone, whether our clients or not, will be
"reported beyond our group." For that reason and others we never say anything to anyone that is
not both truthful and accurate.

2.       We would welcome the opportunity to bring all of our concerns to your attention and
have been extremely frustrated that we have been unable to do so. We have been seeking a
meeting or phone call with you for over a year, and you have evaded or cancelled all meetings
and calls we have sought. We want to work with you, and believe it would benefit the entire
class if we could work together and present a unified front with the Court, but we believe you
have systematically evaded every request we have made.

3.       Although neither our firm nor the Podhurst Firm are co-lead counsel, we feel strongly
that as class counsel we have responsibilities under the Settlement Agreement and we could play
a valuable role in effectively implementing the settlement for the good of all. We would like to
engage in that role with you.

4.       Because we are class counsel and because at least some people seem to believe that
we have a better understanding of the settlement agreement and of the medicine than others, we
receive an overwhelming number of calls. If a claimant or lawyer complains about the delays in
claim resolution or scheduling of exams, we invariably tell them that this is the early part of the
process (which it is), and there are things to work out, but that the issues will be worked out,
claimant by claimant.

5.       We have no idea what you are talking about when you allege without specifics that
we have spread "misinformation" about the settlement agreement. We have never spread any
misinformation at all about anything to any lawyers or clients. We want this settlement to
succeed. I know you do too, and we see the hard work all Seeger Weiss lawyers are doing every
day. We commend you and them for it.

6.       Your vague reference to Fred Willis makes no sense to us. We represent him in a
single claim and for no other purpose, and you know that. When we speak to him, which is rare,
we speak to him solely about his claim, nothing else. His claim is currently delayed based on the
well-known affidavit issue, because the corroborating third-party affidavit in his claim was dated

after the date of diagnosis provided by the diagnosing physician (Kirk Daffner of Harvard), but it was considered and referenced by Dr. Daffner in a subsequent diagnosing statement. The fact that this constitutes an alleged deficiency is absurd.

7.　　　　Our position on that issue is set forth in a letter (copied to the claimant) to BrownGreer who, by the way, we think is doing an excellent job, including each and every claims representative, who promptly, responsibly and thoughtfully address each and every issue that arise with our claims. You can quote me. If you'd like BrownGreer to attend any call or meeting, we welcome that.

8.　　　　Does our position on the "affidavit" issue set forth a concern about the implementation of the Settlement Agreement? Yes, it does, in a well-informed writing to which Seeger Weiss has had access for many months. There are other concerns as well, many of which are also set forth in letters to BrownGreer for individual claimants, and those letters most likely have been read by Scott and Mike (who, by the way, we think are honorable, thoughtful, and hardworking lawyers with whom we'd be privileged to work). We've offered to help them directly in their dealings with NFL counsel (on, for example, the affidavit issue), but have never heard back.

9.　　　　David and I are available anytime for a phone call or a meeting with or without BrownGreer, and we'd be pleased to include Scott and Mike in that call or meeting. We have high regard for both of them. We believe that the plaintiffs' side of this process should be unified in every respect. But that's difficult to do when you won't call me back, won't respond to my emails, and won't meet with me.

10.　　　　I also do not think it's useful to send a vague and sarcastic email in response to one filing we've made to the Court that shows we'd like an opportunity to be heard. If you'd like to work with us, we'd welcome the opportunity. We are on the same side. We have a knowledge and perspective about these cases, the settlement, and the science that few have, and we think we can help the efforts of everyone, including Seeger Weiss.

11.　　　　You have left the ball in our court. Thank you. We want a call or meeting in the next seven days. Please provide me with dates and times when you can meet or speak. We have much to discuss. I no longer work 24/7, only 24/6.

Many thanks for your email of this morning. We welcome a meaningful dialogue and working relationship.

Very truly yours,

Gene

**Gene Locks**, Founding Partner
**e.** glocks@lockslaw.com
**t.** 215.893.3434
Admitted to Practice in NJ, NY, PA

# ⌐┘ I LOCKS LAW FIRM

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.
Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

**\*CONFIDENTIALITY NOTE\*\***

**\*This transmission and the documents accompanying this transmission contain information from the LOCKS LAW FIRM that is confidential and or privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited and the documents should be returned to this office immediately. Therefore, if you have received this transmission in error, please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.**

From: **Gene Locks** <glocks@lockslaw.com>
Date: Fri, Sep 1, 2017 at 2:15 PM
Subject: Re: NFL. Administration issues.
To: Chris Seeger <CSeeger@seegerweiss.com>
Cc: Steven C Marks <smarks@podhurst.com>, Sol H Weiss <sweiss@anapolschwartz.com>,
Scott George <sgeorge@seegerweiss.com>, Michael Rosenberg
<MRosenberg@seegerweiss.com>, David Langfitt <dlangfitt@lockslaw.com>, PETER PRIETO
<PPrieto@podhurst.com>, "AARON S. PODHURST" <APODHURST@podhurst.com>,
"RICARDO M. MARTINEZ-CID" <RMartinez-Cid@podhurst.com>, Steven Rosenthal
<srosenthal@podhurst.com>, Matt Weinshall <mweinshall@podhurst.com>


Chris and Steve: I too will be at the meeting on the 8th. I'm interested in discussing
implementation issues only. Other issues can wait until another time. In the meantime, I will
provide in writing a list of issues (and possible solutions) that will improve the settlement for the
benefit of all class members. Best, Gene


**Gene Locks**, Founding Partner
**e.** glocks@lockslaw.com
**t.** 215.893.3434
Admitted to Practice in NJ, NY, PA

**⌐╛ | LOCKS LAW FIRM**

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.
Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

**\*CONFIDENTIALITY NOTE\*\***
**\*This transmission and the documents accompanying this transmission contain
information from the LOCKS LAW FIRM that is confidential and or privileged. The
information is intended only for the use of the individual or entity named on this
transmission sheet. If you are not the intended recipient, you are hereby notified that any
disclosure, copying, distribution or the taking of any action in reliance on the contents of
this information is strictly prohibited and the documents should be returned to this office
immediately. Therefore, if you have received this transmission in error, please notify the**

sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

From: David Langfitt [mailto:dlangfitt@lockslaw.com]
Sent: Thursday, October 12, 2017 1:34 PM
To: Scott George; Michael Rosenberg; Chris Seeger
Cc: Steven C Marks; Matt Weinshall; Gene Locks; Weiss
Subject: Phone calls and meetings

Chris, Mike and Scott:

You agreed that we would be included in all future calls and meetings with NFL counsel and
BrownGreer. That agreement was in early September when we met at your office in New York.
Since then, we've never been invited to any call or meeting.

We asked to be included in the meeting on September 19. You advised against that on the
grounds that the negotiations were somehow delicate and you did not want to bring in other class
counsel. We deferred.

Since the 19th, there have been several phone calls with NFL counsel and BrownGreer, but we
have never been informed of the calls or been invited to join them. We have also never received
any reports about the calls.

This is not consistent with the agreement in September. When is the next call and what is the
call in number and passcode? We expect to participate.

David

David Langfitt
215-893-3423-w
610-787-1706-c

From: Scott George <sgeorge@seegerweiss.com>
Date: Thu, Oct 12, 2017 at 2:02 PM
Subject: RE: Phone calls and meetings
To: David Langfitt <dlangfitt@lockslaw.com>, Michael Rosenberg
<MRosenberg@seegerweiss.com>, Chris Seeger <CSeeger@seegerweiss.com>
Cc: Steven C Marks <smarks@podhurst.com>, Matt Weinshall <mweinshall@podhurst.com>,
Gene Locks <glocks@lockslaw.com>, Weiss <sweiss@anapolweiss.com>


David,

I believe that we agreed to have calls among class counsel in advance of or around the weekly
calls with the administrators and the NFL.  For various reasons, some of these calls have not
proceeded as scheduled (for example on Columbus day).   We are happy to provide updates and
get your input, but are not going to start including new people in these calls.

Are you all available for a call on Monday at 1 ET?  As we discussed, we will forward that
week's agenda, typically received late Sunday night, in advance of our call.

Scott George
Seeger Weiss LLP

# EXHIBIT I

**MEMORANDUM**
**11-06-2017**

FROM:    Gene Locks
                David D. Langfitt

TO:        Orran Brown
                Roma Petkauskas
                David Smith

Re:        NFL Settlement Implementation

---

This addresses the systemic problem with the implementation of the NFL Players Concussion Settlement Agreement. We provide below twelve examples of how that problem has delayed valid claims, benefited the NFL, and caused discontent among the retired players.

The systemic problem is the NFL's incessant micro-management of the process and its delay and denial by refusing to agree on disputed issues with Seeger Weiss ("Seeger"). The result is that the majority of pre-effective date claims, particularly dementia claims, are subject to indefinite delay. Even on a case-by-case basis, the NFL refuses to agree on a just result.

Below are twelve examples causing undue delays Locks Law Firm ("LLF") believes arise from NFL's micro-management and refusal to agree to practical and just solutions that will avoid delay and confusion. LLF also offers its brief solution to each example. We seek to be brief here, but will provide a more fulsome position and greater detail on each of these examples if asked.

### EXAMPLES OF THE SYSTEMIC PROBLEMS

1.      **The Affidavit Issue**. The now notorious <u>third-party corroborating affidavit</u> issue has produced unfounded deficiencies and delays in almost every pre-effective date dementia claim. NFL Counsel and Seeger decided long ago that an affidavit that corroborates functional impairment in the player in connection with a dementia claim must be dated before or during the date of diagnosis. Nothing in the Settlement Agreement supports this "Affidavit Rule," and that fact has been laid bare by nearly every lawyer who has submitted a dementia claim to date.

> **LLF Solution**: The Affidavit Rule is <u>not</u> warranted, not supported by the Settlement Agreement, and an unannounced amendment to the Agreement. The Court or Special Master should strike it on that basis.

2.    **The Functional Impairment Requirement.** Under the Agreement, a pre-effective date diagnosis needs no corroborating affidavit. If, in the opinion of BrownGreer, there is sufficient indicia of reliability with respect to the diagnosis (a term LLF has set forth in many letters that respond to alleged deficiencies), then BrownGreer can deem the functional impairment criteria satisfied, and no corroboration is needed.

> **LLF Solution**: The Court or Special Master should issue an Order that BrownGreer has the authority to make these decisions. If the NFL does not agree in any given case, NFL can appeal the award.

3.    **Applying the Strict BAP Criteria to Pre-effective Date Claims.** The NFL Counsel and Seeger instructed BrownGreer to deem deficient all pre-effective date claims if they do not conform to the literal requirements of the BAP criteria. That standard of review is contrary to the Agreement. It is not how pre-effective date claims are reviewed by the AAP under section 6.4(b) of the Agreement. It therefore cannot be how BrownGreer reviews pre-effective date claims. This has created a flood of purported deficiencies and delays, particularly for dementia claims.

> **LLF Solution**: The Court or Special Master should instruct BrownGreer to follow the AAP standard of review under 6.4(b) of the Agreement. If the NFL wants to appeal individual cases as not meeting that standard, it can do so.

4.    **The AAP's Standard of Review.** NFL Counsel has tried to impose on the AAP (through appeals and otherwise) a different standard of review that is contrary to the language set forth in section 6.4(b) of the Settlement Agreement. The NFL has argued that a pre-effective date diagnosis must be "generally equivalent" to the BAP criteria. That is not true and not within section 6.4(b), which states that the AAP member is to review the diagnosis based on principles generally consistent with the BAP criteria, but the diagnosis does not have to use the same criteria or documentation requirements as the BAP.

> **LLF Solution**: The Court or Special Master should issue an Order in consultation with BrownGreer that clearly and unequivocally sets forth the proper standard of review and leaves to the judgment of the AAP member the decision whether to approve or deny a claim.

5.    **The Downgrading of a Claim.** NFL Counsel and Seeger instructed the AAP that it could not use its own judgment to grant a monetary award for a lesser diagnosis if the medical records supported the decision. This is known as the "downgrading" of a claim. This is unfair to the players and prevents AAP members from using their own medical judgment.

> **LLF Solution**: The Court or Special Master should issue an Order that the AAP may use its sound judgment under the proper standard of review to decide whether the medical records in any pre-effective date claim support a greater or lesser qualifying diagnosis.

-2-

6.  <u>Incapacity of Diagnosing Physician</u>.  This is persistent problem under section 8.2 and 8.3.  There are many instances where the diagnosing physician is unavailable because he/she does not live in this country, no longer practices medicine, is too infirm, or is legally restrained from signing a DPC. But the doctor is not dead or deemed incompetent by a court of law.  The NFL refuses to agree to any practical solution that is quick and simple.  In several instances, players were diagnosed long ago by a major university neurologist and placed on the 88 Plan.  Even in those cases, the NFL delayed any agreement for five months and then insisted that sending the players through the BAP and to an MAF physician was the only thing NFL could agree to.

> <u>LLF Solution</u>: Allow BrownGreer the authority to waive the signature requirement if in BrownGreer's judgment (based on an indicia of reliability test) the diagnosis is valid.  If the NFL disagrees with BrownGreer's assessment, it can appeal the award.  If the player disagrees, he can appeal the denial.

7.  <u>The Raw Scores</u>.  NFL has instructed BrownGreer to gather all raw scores from every pre-effective date neuropsychological test.  This is unnecessary and should be reserved only for claims where BrownGreer thinks there is a colorable basis to question the accuracy or validity of the neuropsychological work.

> <u>LLF Solution</u>: The Court or Special Master should instruct BrownGreer that it may seek raw scores if, in its judgment, it believes it has questions about the quality or validity of the neuropsychological testing in any given case.  If the NFL has the same questions regarding any given claim, it can use its audit rights to seek the raw scores.

8.  <u>The NFL's Actuarial Report</u>.  NFL has instructed BrownGreer to use an NFL actuarial report as valid data to challenge and investigate pre-effective date claims.  The NFL's report cannot be used for any purpose.  It was created for the NFL, and the NFL paid for it in an attempt to convince the Court not to uncap the Settlement and that the Monetary Award Fund will never exceed the original $675 million.  It is biased, based on limited data, and wholly unreliable for any medical purpose.

> <u>LLF Solution</u>: The Court or Special Master should instruct BrownGreer that it may not use the NFL actuarial report for any purpose.

9.  <u>Taking the Full Thirty Days</u>.  The NFL delays a full thirty (30) days before revealing whether it will file an appeal of a monetary award.  NFL can surely decide quickly which monetary awards it will <u>not</u> appeal.  If NFL moves with greater haste, the player's Award can move more quickly through the payment process.

> <u>LLF Solution</u>: Narrow the time to 10 days for the NFL to provide a list to BrownGreer of monetary awards it will <u>not</u> appeal.

-3-

10.   <u>**Payment for a Lesser Diagnosis and a Simultaneous Appeal**</u>.   The NFL and Seeger cannot agree on whether a retired player may accept a monetary award, receive payment for that award, and then appeal aspects of the qualifying diagnosis that the AAP or BrownGreer disallowed.

> <u>**LLF Solution**</u>: The Court or Special Master should issue an Order that this kind of partial appeal is allowed, and the player may receive the lesser monetary award while his appeal for a greater award is pending.

11.   <u>**Co-Morbidity**</u>.   In its appeals, NFL Counsel has asked the Special Master to disallow Alzheimer's Disease and Parkinson's Disease claims on the grounds that there can be no co-morbidity and all possible co-morbidities must be ruled before a diagnosis can be made.   The NFL's position is contrary to science.   *See e.g., Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players in American Football*, Journal of the American medical Assn., page 366, (2017).   Co-morbidities are common in this population; autopsy results prove it.

> <u>**LLF Solution**</u>: The Court or Special Master should issue an Order that a finding of a co-morbidity in any qualifying diagnosis is not a basis to deny the claim.

12.   <u>**Earliest Date of Possible Diagnosis**</u>.   There are claims that have arisen and will arise where a neurologist has in her or his possession medical records that show the manifestation of a qualifying disease at an earlier date that the date of encounter.   On information and belief, NFL Counsel has taken the position that those records cannot serve as the basis for dating the qualifying diagnosis before the date of encounter with the neurologist signing the DPC.   This is unfair to the player and contrary to medical practice.

> <u>**LLF Solution**</u>: The Court or Special Master should issue an Order that allows both BrownGreer and the AAP the authority to consider the earlier medical records and approve the claim on the earlier date if in their judgment, the diagnosis for that earlier date is reliable.

GENE LOCKS