UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | MDL No. 2323<br>Case No. 12-md-2323 (AB) |
| Kevin Turner and Shawn Wooden,<br>*on behalf of themselves and others similarly situated,*<br><br>        Plaintiffs,<br><br>  vs.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br><br>        Defendants. | Civil Action No. 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

**JOINDER IN REQUEST FOR ACTION TO CORRECT IMPLEMENTATION FAILURES IN THE CLAIMS AND BAP ADMINISTRATION**

Zimmerman Reed joins the recent motions calling for action to correct fundamental implementation failures in the Settlement administration, and proposes the Court appoint an Administrative Committee to promptly and efficiently address complications arising in the Claims and BAP Administrations. In the alternative,

1

Zimmerman Reed requests a hearing to inform the Court of its concerns with the Settlement Administration as outlined below.

## INTRODUCTION

1.  The recent Motions of Class Counsel the Locks Law Firm and of Co-Lead Class Counsel Anapol Weiss join a chorus of media reports highlighting the issues with the Monetary Award Claims review process. *See* Mot. of Class Counsel the Locks Law Firm For Appointment of Admin. Counsel, Mar. 20, 2018, ECF 9786; Mot. of Co-Lead Counsel Anapol Weiss for a Hearing to Seek Court Intervention on the Processing of Certain Claims, Mar. 19, 2018, ECF 9784. The media reports and recent motions discuss the growing barriers in and the lack of transparency with the Claims Administration process. These barriers have caused unnecessary and inappropriate delays in the review of Class Members' claims and have created distrust between Class Members and the Claims review process.

2.  While the media's attention has focused on problems in the Claims Administration, the BAP Administration has fared no better. Nearly a year into the BAP, many of Zimmerman Reed's clients' requests for screening have gone unanswered, and their neuropsychometric exams and neurological consultations remain unscheduled. Those who completed their exams and consultations have waited up to six months to receive their reports from the BAP Administrator. Numerous administrative blunders have led to cancelled appointments, appointments scheduled during times when BAP clinics were closed, players sent home because of scheduling miscommunications, and demands from clinics for payments from Class Members. Some of Zimmerman Reed's

clients have lost money on travel and hotels because the BAP Administrator provided late notice, and sometimes, no notice, of cancellations.

3. At this juncture, it is of the utmost importance to restore the Class's faith in the Settlement by providing transparency to the Claims and BAP Administration and improving the efficiency of the Claims review and BAP scheduling processes. Zimmerman Reed proposes the Court establish an Administrative Committee to operate within the oversight framework already established in the Settlement. The Committee would have 30 days to work in collaboration with the Claims Administrator, the BAP Administrator, and the Special Master to review the causes of administrative delay and recommend immediate measures to the Court to improve the Settlement's administration. Alternatively, Zimmerman Reed requests a hearing to inform the Court of its growing concerns with the Claims and BAP Administration.

## BACKGROUND

### A. Concerns with the Claim Administration

4. Locks Law Firm and Anapol Weiss have sufficiently described the significant administrative burdens in the Claims review process. Zimmerman Reed adds only two points.

5. First, Locks Law Firm's Motion correctly points to interpretations of the Settlement that effectively create new and additional requirements absent from the Settlement itself. One additional example is FAQ 88, which states: "The diagnosing physician who signs a Diagnosing Physician Certification Form for a diagnosis made on

a living Retired NFL Football Player must have examined that Player in person." Settlement FAQs, at 28-29 (Mar. 22, 2018).[1]

6.  The validity of this provision aside, it is not a requirement listed in the Settlement, which Class Members relied on in preparing their Pre-Effective Date Claims. The effect of implementing new requirements is significant. For example, a highly qualified, board-certified neurosurgeon with over forty years of experience assessed whether Zimmerman Reed's clients were likely suffering from a Qualifying Diagnosis. Although this neurosurgeon based his diagnoses on his full review of Players' medical records (which overwhelmingly supported his diagnoses), helped coordinate neuropsychometric testing for Players, and frequently communicated with Players by phone, every one of his diagnoses was issued a deficiency because he did not meet with Players "in person." While each client had an alternative signatory for the Diagnosing Physician forms, the Administrator's new requirement significantly delayed their claims. Had Class Members been notified of these new and previously unknown requirements, their claims would have progressed far more quickly. However, no one knew of these new requirements until they were issued a deficiency by the Claims Administrator.

7.  Second, the regular appellate process has not produced the type of guidance that is necessary a year into the Settlement's administration. On November 3, 2017, the Court directed movants experiencing issues in the Claims administration to "proceed through the Claims Administration process, and if the claims are denied . . . follow the proper appeals process." Order, Nov. 3, 2017, ECF 8882; Mot. to Determine Proper

---

[1] Available at https://www.nflconcussionsettlement.com/Un-Secure/FAQ.aspx

4

Admin. of Claims Under the Settlement Agreement, Aug. 15, 2017, ECF 8267. While this process has occurred, the Special Master has sometimes chosen not to issue rulings that would provide necessary guidance.

8. For example, the NFL appealed a Notice of Monetary Award issued for one Zimmerman Reed client and relied on medical records from a separate Players' claim. Co-Lead Class Counsel, Chris Seeger, challenged the NFL's use of other Players' medical records in an appeal arguing: (1) the NFL would gain an improper advantage over Class Members because it could "data-mine" Players' medical records, to which individual class members do not have access; and, (2) the NFL violated the Settlement Agreement's confidentiality order. The Special Master denied the appeal without providing guidance on that important issue.

9. The same issue is occurring with the Settlement's good-faith requirements. The Settlement agreement allows appeals of Monetary Awards and audits of Claims only when made in good faith. *See* Am. Class Action Settlement ("Settlement") §§ 9.5, 9.6(b), 10.3(a), ECF No. 6481-1. Co-Lead Class Counsel can, and has, sought petitions for appropriate relief where the NFL Parties submitted vexatious, frivolous or bad faith appeals. To Zimmerman Reed's knowledge, the Special Master has not yet granted any such relief. Utilizing the good faith requirements would assure Class Members that the NFL is not abusing these provisions to cause delay and unnecessary doubt in legitimate Claims.

### B. Concerns with the BAP Administration

10. Although the administrative complaints concerning the Settlement Agreement are focused on the Claims Administration, the BAP Administration has fared no better.

11. Currently, 12,685 registered Class Members are eligible for the BAP, indicating that BAP will have a more significant and immediate effect than Claims on the majority of the Class. Almost a year into the BAP, however, the BAP Administrator has struggled to timely schedule Class Members for BAP appointments and to provide reports after Class Members complete their appointments.

12. Under the BAP, each eligible Class Member is entitled to two appointments: a neuropsychometric exam and a neurological appointment. With 12,685 BAP-eligible Class Members, the BAP Administrator may have to schedule as many as 25,370 appointments. At this time, however, only 5,449 appointments have been scheduled and only 3,851 appointments have been attended. As such, the Administrator has scheduled only about 20% of the total BAP appointments. Most of the remaining appoints will need to be scheduled by June 6, 2019, the two year deadline that exists for the majority of the Class.

13. Some Zimmerman Reed clients have waited months to obtain dates and locations for their exams and consultations. Despite requesting to be scheduled last summer, many still have neither of their appointments scheduled. Likewise, many who completed their neuropsychometric examinations have gone months without receiving a follow up neurological consultation. This is particularly problematic because the BAP

Administrator will not disclose the results from a neuropsychometric exam prior to completion of a neurological consultation. That means Class Members whose neuropsychometric testing reveals a Qualifying Diagnosis or other complication ***may not know of their condition for several months***. Class Members may endure significant time without knowing of or treating their cognitive diseases.

14. The Administrator's delay also has consequences for the Monetary Awards of Players diagnosed with a Qualifying Diagnosis through the BAP. Aging a single year decreases a Level 2.0 Neurocognitive Impairment award by an average of $81,944 and a Level 1.5 Neurocognitive Impairment award by an average of $40,972, assuming no deductions. Ensuring players are tested as quickly as possible maximizes Players' deserved Monetary Awards.

15. Even when the BAP Administrator schedules appointments, often times they do so unsuccessfully. Many Zimmerman Reed clients have appeared for their scheduled appointments only be to be turned away because the appointment was cancelled, never scheduled, or the clinic was closed. As examples:

   a. On September 29, 2017, one Class Member arrived for his scheduled neurological consultation in New York. To make the appointment, the Class Member stayed an additional night in New York instead of traveling home to Florida where his house was potentially impacted by Hurricane Irma. When the Class Member arrived for the appointment, he was told it was cancelled. The BAP Administrator failed to inform him or Zimmerman Reed of the cancellation.

   b. The Administrator scheduled a Class Member for a neurological consultation on January 19, 2018. On January 8, 2018, the Administrator sent a notice requesting confirmation of another neurological consultation on January 27, 2018. Zimmerman Reed informed the Administrator that the Class Member was already scheduled, and then the Administrator

proceeded to cancel the already-confirmed January 19 appointment. Zimmerman Reed noted that January 27 was a Saturday, but the Administrator stated January 27 was the correct date. Zimmerman Reed confirmed the availability of the Class Member, and the Class Member made travel arrangements, including booking a hotel. On January 19, 2018, the Administrator cancelled the January 27 appointment, providing no explanation for the cancellation. Zimmerman Reed informed the Class Member who could not receive a return on his advance payment for a hotel.

c. Another client was scheduled for a neuropsychometric exam on December 2, 2017. When the client arrived, the clinic was closed. Zimmerman Reed contacted the clinic, and was told the clinic was not open on Saturdays and that the clinic informed the BAP Administrator as such. The BAP Administrator did not inform the Class Member or Zimmerman Reed. The Administrator rescheduled the Class Member for a neurological consultation on January 16, 2018, which Zimmerman Reed confirmed was in error because neuropsychometric testing must precede the neurological consultation. As such, the appointment was cancelled. Although Zimmerman Reed cancelled the appointment immediately and never shared the appointment details with the Class Member, the BAP Administrator did not inform the clinic of the cancellation. The clinic sent a notice to the Class Member with details of the consultation. The Class Member incurred travel and hotel expenses in preparation for the appointment, and when he arrived, he was turned away because he had not completed a neuropsychometric exam. This Class Member has still not completed his neuropsychometric exam or neurological consultation.

d. On December 19, 2017, a Class Member showed up for a neurological consultation but was turned away because the appointment had been cancelled. The BAP Administrator failed to inform both the Class Member and Zimmerman Reed that the appointment was cancelled.

e. On December 16, 2017, a Class Member arrived for neuropsychometric testing as scheduled by the BAP Administrator and when the Class Member arrived, the clinic was closed. He has still not been rescheduled.

16. Additionally, the Administrator has failed to provide timely reports for Class Members who completed their BAP visits. Currently, 67 Zimmerman Reed clients completed their neuropsychometric exam and neurological testing, yet only 17 received

their reports. Some of these Class Members without reports completed their appointments nearly five months ago.

17. The delay in providing reports is unacceptable. Class Members who meet the Qualifying Diagnosis criteria should begin immediate treatment; but, many are waiting for months, up to half a year, to even discover they are suffering from a neurocognitive disease.

18. Finally, the BAP Administrator is tasked with creating a nationwide network of vendors and clinics, allowing Class Members to proceed through the BAP as conveniently as possible. Because of the significance of the BAP, convenient testing locations and schedules are necessary to ensure Class Members participate to the fullest extent. However, the BAP Administrator is scheduling Class Members at locations requiring hundreds of miles of travel for their neuropsychometric examinations and then again for their neurological consultations. That type of burden will discourage Class Members from participating in this important program.

## THE ADMINISTRATIVE COMMITTEE

19. To resolve the administrative issues facing both the Claims Administration and BAP Administration processes, Zimmerman Reed proposes establishing an Administrative Committee ("Committee") to work under the direction of the Special Master and within the Settlement's already-established oversight framework. The Committee will be tasked with recommending immediate procedural changes to the Court to improve the efficiency and transparency of the Claims and BAP Administrations.

20. The Committee will collaborate with the BAP and Claims Administrators, and the Special Master, to create a report for the Court recommending immediate measures to improve the Claims and BAP administrative processes. To Committee should convene within 7 days after an Order establishing the Committee members, and submit its report to the Court within 30 days of the Order. After the report is submitted, Zimmerman Reed respectfully requests that the Court hold a hearing on the report.

21. The Committee should emphasize:

    a. Reducing delays and ensuring the timely resolution of Class Member Claims;

    b. Recommending mandatory status updates from the Claims Administrator on the progress of their review of Claims and the causes of any delay;

    c. Recommending immediate and clear timeframes for the review of Claims;

    d. Improving information on the Settlement Agreement website and portal to keep Class Members informed of the progress of the review of their Claims;

    e. Reviewing the AAP's workload and completion rates and suggesting improvements to the AAP's review process;

    f. Implementing mechanisms and procedures to immediately challenge whether audits and appeals were made in good faith;

    g. Recommending deadlines to request an audit of a Claim to ensure audits do not unnecessarily delay the payment of a claim;

    h. Setting deadlines for the BAP Administrator to schedule Class Members for their BAP appointments;

    i. Setting deadlines for the BAP Administrator to provide BAP reports to Class Members, and recommending immediate notices to Class Members who potentially have a neurocognitive disease;

      j.      Identifying disagreements as to the Settlement's interpretation to be resolved by the Court; and,

      k.      Making recommendations on any other issue that may be impairing the efficient and accurate resolution of the Claims and BAP Administrative processes.

22.    The Administrative Committee will also be tasked with improving the transparency of the Settlement Administration, including creating educational materials for Class Members detailing the administrative process and expected timelines and holding a public hearing to discuss and solicit views on delays and concerns with administrative processes.

23.    The Administrative Committee structure aligns with the Settlement's oversight framework. The Court maintains continuing and exclusive jurisdiction over the Parties, the Class Members, Special Master, the Claims and BAP Administrators, and AAP, and it may resolve any "disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement agreement . . . ." Settlement at § 27.1. The Special Master is tasked with taking "all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement." *Id.* at § 10.1(a)(ii). The Special Master also oversees both the Claims Administrator, *id.* at § 10.2(a)(iv), and the BAP Administrator, *id.* at § 5.6(a)(iv), and must resolve "complaints raised by Co-Lead Class Counsel, Counsel for the NFL Parties, the BAP Administrator, [and] Claims Administrator . . . regarding aspects of the Class Action Settlement." *Id.* at § 10.1(b)(i)(2). The Administrative Committee, in

11

conjunction with the Special Master, will utilize these oversight measures to recommend methods to resolve the inefficiencies of the Settlement Administration.

24.  In the alternative, the Court should hold a hearing on the many administrative issues burdening the Claims and BAP Administration processes to provide all Class Members an opportunity to be heard.  Class Members and their counsel have witnessed first-hand the issues in the administrative processes and can best suggest possible solutions.

Respectfully submitted,

ZIMMERMAN REED LLP

Dated:  March 27, 2018

 s/ Charles S. Zimmerman
Charles S. Zimmerman – MN #120054
J. Gordon Rudd, Jr. – MN #222082
Brian C. Gudmundson – MN #336695
Michael J. Laird - MN #0398436
1100 IDS Center, 80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844
Email: Charles.Zimmerman@zimmreed.com
         Gordon.Rudd@zimmreed.com
         Brian.Gudmundson@zimmreed.com
         Michael.Laird@zimmreed.com

ATTORNEYS FOR PLAINTIFFS