**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE RETIRED PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB |
| | MDL NO. 2323 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS PENDING AND ALL CLAIMS ASSERTED AGAINST ANY RIDDELL DEFENDANT | Hon. Anita B. Brody |

**PLAINTIFFS' OPPOSITION TO RIDDELL DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF THE CASE............................................................................ 3

    A.    NOCSAE......................................................................................... 4

    B.    The Agreement with the NFL ......................................................... 5

    C.    Riddell's Involvement with the MTBI Committee .......................... 5

    D.    The Revolution Helmet.................................................................... 7

III.    LEGAL STANDARD......................................................................................... 8

IV.    ARGUMENT ...................................................................................................... 9

    A.    The Motion Should Be Denied for Failure to Perform Any Choice-of-Law Analysis.......................................................................................... 10

    B.    Even Under Riddell's Hypothetical Law, Plaintiffs' Claims Are Properly Pleaded........................................................................................... 13

        1.    Plaintiffs Plausibly Allege Conspiracy. .............................. 13

        2.    Plaintiffs Adequately Allege Fraud and Negligent Misrepresentation........................................................................ 15

            a.    Plaintiffs' Fraud and Negligent Misrepresentation Claims Satisfy Rule 9(b). .......................................................... 16

            b.    Plaintiffs Are Not Required to Allege the Details of Riddell's Internal Corporate Affairs. ............................................ 17

            c.    Plaintiffs Adequately Allege A Duty to Disclose, Even Though Such a Duty Might Not Even Be Required. .................. 18

            d.    Plaintiffs Adequately Allege Detrimental Reliance and Causation................................................................................. 19

        3.    Plaintiffs Plausibly Allege Design Defect, Warranty, and Failure-to-Warn Claims................................................................. 21

        4.    Plaintiffs Plausibly Allege Negligence. ................................ 23

    C.    Plaintiffs' Claims are Timely............................................................ 24

        1.    Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by the Discovery Rule............................................................ 24

        2.    Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by Riddell's Fraudulent Concealment. ....................................... 26

**TABLE OF CONTENTS**
**(continued)**

Page

3.   Plaintiffs' Fraud and Conspiracy Claims Relate Back to 2012 at the Latest. .................................................................................................. 28

V.   CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

Page

**Cases**

*Archie v. Pop Warner Little Scholars, Inc.*,
No. 16-6603, 2017 WL 3084160 (C.D. Cal. May 12, 2017) ................................... 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................. 8

*Baley v. Fed. Signal Corp.*,
982 N.E.2d 776 (Ill.  App. Ct. 2012) ..................................................................... 22

*Bensel v. Allied Pilots Ass'n*,
387 F.3d 298 (3d Cir. 2004) .................................................................................. 28

*Bohus v. Beloff*,
950 F.2d 919 (3d Cir. 1991) .................................................................................. 24

*Carideo v. Dell, Inc.*,
706 F. Supp. 2d 1122 (W.D. Wash. 2010) .............................................................. 9

*Christidis v. First Pa. Mortg. Trust*,
717 F.2d 96 (3d Cir. 1983) .................................................................................... 8

*Church Mut. Ins. Co. v. Alliance Adjust. Grp.*,
102 F. Supp. 3d 719 (E.D. Pa. 2015) ..................................................................... 15

*Conneen v. Amatek, Inc.*,
238 F. Supp. 3d 652 (E.D. Pa. 2017) ..................................................................... 27

*Constantinides v. CBS Corp.*,
747 F. Supp. 2d 488 (E.D. Pa. 2010) ..................................................................... 12

*Craftmatic Sec. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ......................................................................... 2, 9, 17

*Daley v A.W. Chesterton, Inc.*,
37 A.3d 1175 (Pa. 2012) ....................................................................................... 25

*Esen v. Narian*,
No. 16-10441, 2017 WL 4931742 (N.Y. App. Nov. 1, 2017) ................................. 23

*Fichtel v. Bd. of Dirs. of River Shore of Naperville Condo. Ass'n*,
907 N.E.2d 903 (Ill. Ct. App. 2009) ...................................................................... 18

*Fine v. Checcio*,
870 A.2d 850 (Pa. 2005) .................................................................................. 26, 27

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) .................................................................................. 8

# TABLE OF AUTHORITIES
## (continued)

Page

*Garcia v. Chrysler Grp., LLC*,
    127 F. Supp. 3d 212 (S.D.N.Y. 2015) ............................................................ 18

*Georgine v. Amchem Prods. Inc.*,]
    83 F.3d 610 (3d Cir. 1996) ............................................................................. 10

*Geralds v. Damiano*,
    128 A.D.3d 550 (N.Y. App. Div. 2015) ......................................................... 20

*Gleason v. Borough of Moosic*,
    15 A.3d 479 (Pa. 2011) .................................................................................. 25

*Graboff v. Collern Firm*,
    No. 10-1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ......................... 11, 12

*Hayes v. Am. Int'l Grp.*,
    No. 09-2874, 2009 WL 4591531 (E.D. Pa. Nov. 30, 2009) ........................ 11, 12

*Heard v. City of New York*,
    623 N.E.2d 541 (N.Y. 1993) .......................................................................... 23

*Hedges v. United States*,
    404 F.3d 744 (3d Cir. 2005) ....................................................................... 8, 10

*Hoppe v. SmithKline Beecham Corp.*,
    437 F. Supp. 2d 331 (E.D. Pa. 2006) ............................................................. 27

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ....................................................................... 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    27 F. Supp. 3d 1015 (N.D. Cal. 2014) ........................................................... 29

*In re Chrysler-Dodge-Jeep Ecodiesel Mkt., Sales Prac., & Prods. Liab. Litig.*,
    No. 17-02777, 2018 WL 1335901 (N.D. Cal. Mar. 15, 2018) ...................... 18

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mkt. & Sales Prac. Litig.*,
    No. 12-2320, 2013 WL 1332097 (D.N.H. Apr. 2, 2013) .............................. 11

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    MDL No. 1014, 1997 WL 186325 (E.D. Pa. Apr. 16, 1997) ........................ 11

*In re Resorts Int'l, Inc.*,
    181 F.3d 505 (3d Cir. 1999) ........................................................................... 19

*In re Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ..................................................................... 12, 13

*In re Tobacco II Cases*,
    207 P.3d 20 (Cal. 2009) ................................................................................. 20

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Toyota Motor Corp. Unintended Acceleration Mkt., Sales Prac., & Prods. Liab. Litig.*,
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) ....................................................................... 9

*In re Toyota Motor Corp.*,
    No. 10-02151, 2012 WL 12929769 (C.D. Cal. May 4, 2012) ................................... 19

*In re United Parcel Serv., Air-In-Ground Mkt. & Sales Prac. Litig.*,
    580 F. App'x 543 (9th Cir. 2014) ............................................................................. 11

*In re Vioxx Prods. Liab. Litig.*,
    478 F. Supp. 2d 897 (E.D. La. 2007) ........................................................................ 12

*In re Whirlpool Corp. Front-Loading Prods. Liab. Litig.*,
    684 F. Supp. 2d 942 (N.D. Ohio 2009) ................................................................. 9, 16

*Marsden v. Select Med. Corp.*,
    No. 04-4020, 2007 WL 1725204 (E.D. Pa. June 12, 2007) ...................................... 21

*Ochs v. Woods*,
    117 N.E. 305 (N.Y. 1917) ......................................................................................... 19

*Ogbudimkpa v. Ashcroft*,
    342 F.3d 207 (3d Cir. 2003) ...................................................................................... 29

*Pasternack v. Lab. Corp. of Am. Holdings*,
    59 N.E.3d 485 (N.Y. 2016) ....................................................................................... 15

*Prost v. Caldwell Store, Inc.*,
    187 A.2d 273 (Pa. 1963) ........................................................................................... 23

*R.J. Reynolds Tobacco Co. v. Martin*,
    53 So. 3d 1060 (Fla. Dist. Ct. App. 2010) ............................................................... 20

*Rodenbaugh v. Santiago*,
    No. 16-2158, 2017 WL 194238 (E.D. Pa. Jan. 18, 2017) .......................................... 8

*S. Pac. Co. v. Jensen*,
    244 U.S. 205 (1917) .................................................................................................. 12

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ...................................................................................... 25

*Schneider's Dairy, Inc. v. Serv. Pers. and Emps. Of Dairy Indus., Teamsters Local Union No. 205*,
    No.  13-1325, 2013 WL 6485367 (W.D. Pa. Dec. 10, 2013) ................................... 10

*Small v. Lorillard Tobacco Co., Inc.*,
    252 A.D.2d 1 (N.Y. App. Div. 1998) ....................................................................... 20

# TABLE OF AUTHORITIES
## (continued)

Page

*United States ex rel. Budike v. PECO Energy,*
 897 F. Supp. 2d 300 (E.D. Pa. 2012) ........................................................ 17

*United States ex rel. Spay v. CVS Caremark Corp.,*
 913 F. Supp. 2d 125 (E.D. Pa. 2012) ...................................................... 8, 9

*United States ex rel. Waris v. Staff Builders, Inc.,*
 No. 96-1969, 1999 WL 179745 (E.D. Pa. 1999) ....................................... 8

*Van Dongen v. CNinsure Inc.,*
 951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...................................................... 19

*Varacallo v. Mass. Mut. Life Ins. Co.,*
 752 A.2d 807 (N.J. App. Div. 2000)......................................................... 19

*Vasquez v. Sup. Ct.,*
 484 P.2d 964 (Cal. 1971) .......................................................................... 19

*Walk v. Ring,*
 44 P.3d 990 (Ariz. 2002) ........................................................................... 25

*Weiner v. Quaker Oats Co.,*
 129 F.3d 310 (3d Cir. 1997) ............................................................. 2, 9, 17

**Rules**

F.R.C.P. 15(c)(1)(B) ...................................................................................... 28

Plaintiffs ("Plaintiffs" or "Players") respectfully request that the motion to dismiss the Second Amended Master Administrative Long-Form Complaint ("Complaint") and Short-Form Complaints for failure to state a claim (Dkt. No. 9575) filed by Riddell[1] be denied.

## I.    **INTRODUCTION**

Riddell sold Revolution football helmets based on the extraordinary claim they would reduce the incidence of concussions by 31%, a claim that Riddell knew was false and was based on unreliable testing and research.  This claim was no isolated, one-off marketing strategy: it was the natural continuation and direct consequence of decades of Riddell's conduct researching head injuries in football, establishing equipment safety standards, and testing, validating, and selling football helmets.  Through the relevant time period, Riddell *never* disclosed to NFL players what it knew: that its helmets could not protect against subclinical or mild traumatic brain injuries ("MTBI").  Instead, Riddell worked hand-in-hand with the NFL,[2] a relationship formalized in 1989 when Riddell became the official helmet manufacturer of the NFL.  Through that agreement, Riddell was an active and critical participant in the NFL's campaign of denial.  The NFL's fraudulent studies and statements were used to validate Riddell's helmets and ensure that players continued to wear them.  Riddell used the NFL's fraudulent research to justify the Revolution helmet and the infamous 31% claim.  Big profits for the NFL meant big profits for Riddell.

In that context, Riddell's motion to dismiss is simply astonishing.  Riddell sold helmets based on the false claim that they would reduce concussions.  Yet Riddell argues it is not liable

---

[1] "Riddell" refers collectively to Riddell, Inc., All American Sports Corporation, Riddell Sports Group, Inc., BRG Sports, Inc. f/k/a Easton-Bell Sports, Inc., BRG Sports holdings Corp. f/k/a BRG Holdings Corp., Easton-Bell Sports, LLC, EB Sports Corp., and BRG Sports, LLC.

[2] The NFL and NFL Properties are identified as the NFL unless otherwise discussed.

to *any* player for *any* claim under the laws of *any* state.  Riddell portrays itself as an innocent helmet manufacturer with nothing to do with the NFL, its long-term business partner.  The specific and well-pleaded allegations in the Complaint belie that characterization.

Two arguments in Riddell's motion bear mentioning upfront.  First, Riddell says that Plaintiffs' claims cannot go forward because the Complaint does not specify which of the inter-related Riddell entities committed each instance of misconduct.  But Plaintiffs cannot be blamed for not knowing, without discovery, the intricate details of Riddell's internal corporate scheme. *Cf. Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) ("Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs.").  Nor can Plaintiffs be faulted for including in the Complaint acts committed by the NFL.  The consequence of a conspiracy is that co-conspirators are liable for the acts of one another committed in furtherance of the unlawful agreement.

Second, Riddell complains that Plaintiffs do not specifically allege which model of Riddell helmet they wore while playing in the NFL.  But, as detailed in the Complaint, Riddell's fraudulent marketing began in the 1960s.  The Revolution helmet, and accompanying 31% claim, were simply the most egregious examples of how Riddell designed, marketed, and sold each of its helmet models, for example the VSR-4.  And Riddell was a major supplier of helmets to the NFL throughout the relevant time and, beginning in 1989, became the "Official Helmet Manufacturer" of the league.  Riddell helmets were free for players and the NFL had specific incentives to ensure that players used them.  To the extent Riddell needs to know which specific model each player wore, that information will be found in records kept by the NFL and its teams, information that can be found in discovery.  For example, game footage will reveal which players wore Riddell helmets because the conspiratorial agreement *required* such logos to be

prominently displayed.  In any event, whether a particular player wore a particular helmet or why (and whether that evidence is relevant on a motion to dismiss) is clearly a "plaintiff-specific" issue which, as the Court has ordered and Riddell acknowledges, is not at issue in this round of briefing.  *See* Mot. at 1 n.1, 9 (referring to "individualized motions practice").

Although the story told in the Complaint may be extraordinary in terms of the depth and gravity of the fraud, the claims could not be more ordinary.  These are staple common law tort claims sounding in negligence, products liability, and fraud, claims with deep roots in State law. Such claims naturally give rise to inherently fact-bound questions such as whether, under the circumstances, a defendant had a duty, whether it was breached, whether the defendant knew of, and concealed, material information, or whether a statute of limitations has been tolled.  Such claims, by their nature, are rarely resolvable at the motion to dismiss stage.  That is equally true here.  In more than 400 paragraphs of specific, detailed allegations, Plaintiffs state claims for negligence, fraud, products liability, and civil conspiracy, in a manner that easily clears the low bars of plausibility under Rule 12(b)(6) and particularity under Rule 9(b).

## II.    STATEMENT OF THE CASE

Plaintiffs are retired football players who suffered concussive and sub-concussive head injuries while participating in football games supervised by the NFL.  The Riddell Defendants are inter-related corporate entities who, at all relevant times, were in the business of manufacturing protective equipment, including helmets, for football players at all levels.  *Id.* ¶¶ 31-57.  For decades, Riddell has manufactured helmets worn by NFL players.  Indeed, to this day Riddell touts its long relationship with the NFL.  *See* http://www.riddell.com/history.  The popularity and success of football in general and the NFL in particular meant big profits for Riddell.  And Riddell was the direct beneficiary of the NFL's long-running efforts to mythologize violence in football and promote the image of player-as-gladiator.  *Id.* ¶¶ 84-97.

Riddell's position as a leading helmet manufacturer, and its close relationship with the NFL (particularly after 1989) afforded it unparalleled access to information and data about the effects of head impacts on football players, and imbued it with a unique authority as a source of information to players. *Id.* ¶¶ 113, 192.  At all relevant times, Riddell knew, or should have known, of the dangers of concussions. *Id.* ¶¶ 98-106.  Yet Riddell helmets never warned about mild traumatic brain injuries ("MTBIs"), concussions, subconcussive blows, long-term latent brain diseases including CTE, or other related repetitive-exposure injuries. *Id.* ¶¶ 152, 153.  Instead of warning the players, Riddell actively participated in the NFL's efforts to conceal the dangers of concussions and sub-concussive blows.

### A.    NOCSAE

Riddell exercised enormous influence over the National Operating Committee on Standards for Athletic Equipment ("NOCSAE"), an organization founded in 1969 with the purported purpose of developing performance standards for athletic equipment, including football helmets. *Id.* ¶¶ 126-27.  In reality, NOCSAE's true agenda was giving cover to members of the protective equipment industry, including Riddell, that controlled its board of directors. *Id.* ¶ 128; *see also id.* ¶ 131 (detailing connections between Riddell and the NOCSAE board).

The ties between Riddell, NOCSAE, and the NFL ran deep.   NOCSAE received significant grant funding from both helmet manufacturers and the NFL. *Id.* ¶ 132.  NOCSAE first began developing performance standards for head protection equipment in 1969. *Id.* ¶ 135. Those standards, first established in the early 1970s, remain materially unchanged today. *Id.* ¶¶ 130, 135, 142, 143.  That is unsurprising in light of its connections to Riddell and the NFL.

B.      <u>The Agreement with the NFL</u>

In 1989, NFL and Riddell entered into a contract by which Riddell provided the "Official Helmet of the NFL." *Id.* ¶¶ 82, 157.   The agreement provided that the NFL and Riddell would jointly employ a person to ensure that equipment used in the NFL was the "safest possible." *Id.* ¶ 161.

In return for providing free and discounted helmets, pads, and jerseys to each NFL team, Riddell received the exclusive right to display its logo during NFL games on the helmet of those players who wore them. *Id.* ¶ 159.  Riddell also received the valuable right to sell NFL-branded mini replica helmets. *Id.* ¶ 163.  Although NFL players remained free to wear the helmet of their choice, the agreement required at least 90% of players to use Riddell helmets for the NFL to realize the cost savings. *Id.*  Additionally, the agreement provided that "manufacturers' logos other than Riddell's must remain covered during league play." *Id.*  From Riddell's perspective, the purpose of this arrangement was clear: as its former president stated in 2013, "to ensure a viable survivor in the helmet industry." *Id.* ¶ 162.

C.      <u>Riddell's Involvement with the MTBI Committee</u>

In 1994, as the evidence of the risks of concussions mounted, the NFL created the Mild Traumatic Brain Injury Committee (the "MTBI Committee"), ostensibly to research and study how MTBI affects NFL Players and improve player safety. *Id.* ¶¶ 164-268.   In reality, the MTBI Committee was intended to create the *appearance* of progress on concussion research and protective-equipment advancement. *Id.*  Its true purpose was to create a façade of scientific research that the NFL could invoke to conceal the fact that the game it oversaw—and from which it and Riddell reaped billions of dollars—was slowly ruining the lives of many Players. *Id.* The NFL—and Riddell—reasonably expected that NFL players and the public at large would

rely on the MTBI committee's research and statements, in part because of the historical special relationship between the NFL and its players.  *Id.* ¶ 191.

Riddell was heavily involved with the fraudulent MTBI committee.  *Id.* ¶¶ 174-76, 185, 196.  NOCSAE worked in sync with the MTBI Committee, propagating sham research, much of it funded by NFL grants.  *Id.* ¶¶ 16, 187.  The MTBI Committee relied on NOCSAE findings and metrics in its analyses.  *Id.* ¶¶ 16, 170, 184, 219.  Two members of the NFL's MTBI committee, both of whom have received financial compensation from Riddell, oversaw NOCSAE's grant dissemination.  *Id.* ¶ 133.  As one Riddell expert testified, "the NFL and NOCSAE try pretty hard to work together," and he "work[s] with the NFL Committee on Mild Traumatic Brain Injury . . . typically through NOCSAE."  *Id.* ¶ 134.  In 2003, NOCSAE announced that "[w]e are working on the details of a new cooperation with the National Football League for research into football concussions and related standards."  *Id.* ¶ 140.  One year later, NOCSAE lauded the work of the sham MTBI committee.  *Id.* ¶ 141.

The MTBI committee specifically worked to engender confidence in the safety of Riddell's products.  *Id.* ¶¶ 174-76, 185, 196.  For example, MTBI grant funding was used to promote sham helmet-safety research between 1997 and 2000.  *Id.* ¶¶ 187, 230, 234.  At least some of this research was jointly funded by the NFL  and Riddell.  *Id.* ¶ 214.  One early paper sponsored by the MTBI committee validated the Riddell VSR-4 helmet over rival technology.  *Id.* ¶ 198.  Other papers concluded (falsely) that the proper use of a mouth-guard could affect MTBI.  *Id.* ¶ 199.  The Committee also worked to keep the Bike Pro Edition, a non-Riddell helmet, out of the league.  *Id.* ¶ 208.

It was the MTBI committee that laid the groundwork for Riddell's signature product: the Revolution helmet.  The MTBI committee used data and tools, such as the ImPACT Concussion

Assessment Tool, that it knew to be unreliable, to test, sponsor, and verify the Revolution.  *Id.* ¶¶ 203-206.

> ## D. The Revolution Helmet.

In 2002, based on flawed and unreliable MTBI committee data, Riddell released the Revolution helmet, purportedly specifically manufactured and designed to "reduce the incidence of concussions."  *Id.* ¶ 269.  Riddell claimed that the Revolution could reduce the incidence of concussions by 31%, a claim that fueled sales of the model.  *Id.* ¶ 271.  Riddell marketed the Revolution as "a first-of-its-kind helmet."  *Id.* ¶ 273.  Riddell knew, or should have known, that these claims were false.  *Id.* ¶ 275, 279.  There was no study that demonstrated that the Riddell Revolution was effective in preventing concussions, or that it was superior to any other helmet.  *Id.* ¶ 276.  In reality, the design of the Revolution was based on research that the NFL and Riddell knew to be flawed and false.

Even after the Revolution's release, Riddell continued shopping around for research to support its marketing claims.  *Id.* ¶¶ 281-92.  One 2003 study, funded by Riddell at UPMC, used fault neuropsychological evaluations and still failed to show a significant difference between the Revolution and Riddell's old VSR-4 helmets.  *Id.* ¶¶ 281-82.  One of the study leaders later agreed that the study had serious problems and that Riddell was shopping for research that would support its claim that the Revolution reduced concussions, stating "I knew Riddell wanted the resulted to look good, okay?  I mean obviously.  I understand that."  *Id.* ¶ 283.  Undeterred, Riddell used the 2003 UPMC study to market the Revolution as reducing concussions by 31%.  *Id.* ¶ 284.

Eventually, Riddell placed a warning on the Revolution, but this warning was laughably inadequate.  *Id.* ¶ 280.  It made no mention of repetitive exposure to sub-concussive traumas, latent disease, or CTE.  *Id.*

Finally, in 2013, Riddell ended its partnership with the NFL.  *Id.* ¶ 318.  In 2014, Riddell

agreed to stop making its claim that the Revolution reduced concussions by 31% after the

Federal Trade Commission determined that the study supporting the claim had "significant

limitations."  *Id.* ¶ 319.

## III.   <u>LEGAL STANDARD</u>

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face."  *Rodenbaugh v. Santiago*, No. 16-2158,

2017 WL 194238, at *3 (E.D. Pa. Jan. 18, 2017) (Smith, J.) (internal quotation marks omitted).

Plausibility requires only "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citation omitted).  The Court "must accept all of the complaint's well-pleaded facts as

true."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  As the moving party,

Defendants "bear[] the burden of showing that no claim has been presented."  *Hedges v. United*

*States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

Under Fed. R. Civ. P. 9(b), claims sounding in fraud must be plead with particularity.

The Third Circuit "has warned against taking an approach to Rule 9(b) that fails to take into

account the 'general simplicity and flexibility contemplated by the rules'" or fails to "be

sensitive to the fact that Rule 9(b)'s application, prior to discovery, may permit sophisticated

defrauders to successfully conceal the details of their fraud."  *United States ex rel. Waris v. Staff*

*Builders, Inc.*, No. 96-1969, 1999 WL 179745, at *4 (E.D. Pa. 1999) (quoting *Christidis v. First*

*Pa. Mortg. Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983).  The point of Rule 9(b) is to provide a

defendant "fair notice" of the charges against it.  *United States ex rel. Spay v. CVS Caremark*

*Corp.*, 913 F. Supp. 2d 125, 144 (E.D. Pa. 2012) (citation omitted).  In particular, the rule "does

not require date, time, and place allegations, provided that the plaintiff gives the defendants other means of precision and substantiation." *Id.* at 174.

Rule 9(b) is necessarily relaxed in an omission case, which "can succeed without the same level of specificity required by a normal fraud claim." *In re Toyota Motor Corp. Unintended Acceleration Mkt., Sales Prac., & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010) (citation omitted). That is because, "[i]n such cases, a plaintiff will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1132 (W.D. Wash. 2010) (internal quotation marks omitted). And "[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place, and content of an event that (by definition) did not occur would effectively gut state laws prohibiting fraud-by-omission." *In re Whirlpool Corp. Front-Loading Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009). Rule 9(b) is also relaxed "when factual information is peculiarly within the defendant's knowledge or control," *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997), "[p]articularly in cases of corporate fraud [where] plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Craftmatic*, 890 F.2d at 645.

## IV.  **ARGUMENT**

Riddell spends the first several pages of its motion complaining that Plaintiffs have alleged a case that is too complicated. According to Riddell, Plaintiffs were permitted to allege (as they do) that Riddell manufactured defective helmets, but not that Riddell knew the dangers of concussions, concealed those dangers, and acted in concert with the NFL, its long-term business partner. But Riddell's fraudulent concealment and conspiracy were part and parcel of its sale of defective helmets, both as evidence of negligence and defect, and as support for fraud and conspiracy claims.

The Complaint, in more than 400 paragraphs of factual allegations, along with accompanying short-form complaints, describes in detail Riddell's alleged misconduct. This is no bare-bones pleading: the Complaint includes specific names, dates, and wrongful acts. This is not a case where the complaint leaves Riddell or the Court wondering what course discovery will take. Potential witnesses are named and sources of critical documents are identified. The Complaint easily satisfies Rule 12 and Rule 9. The motion to dismiss should be denied.

A.     **The Motion Should Be Denied for Failure to Perform Any Choice-of-Law Analysis.**

Plaintiffs' claims here do not arise under some hypothetical, nationwide common law of negligence and fraud. Such a law does not exist, and has not existed since *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Rather, they arise under the common law of the one or more various (and specific) states, each of which has an interest, some courts have held, in applying its own law. Astonishingly, Riddell fails to perform any choice of law analysis *at all*. Instead, Riddell, says, *Plaintiffs* had the burden to plead choice-of-law. That flips the burden of proof on its head. In a motion to dismiss for failure to state a claim, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges*, 404 F.3d at 750. As a first step, the Court "must apply an individualized choice of law analysis to each plaintiff's claims." *Georgine v. Amchem Prods. Inc.*, 83 F.3d 610, 627 (3d Cir. 1996). It is therefore Riddell's obligation to first conduct a choice of law analysis and show what law applies, and *then* make its arguments for why Plaintiffs fail to state claims under those laws. *See, e.g.*, *Schneider's Dairy, Inc. v. Serv. Pers. and Emps. Of Dairy Indus., Teamsters Local Union No. 205*, No. 13-1325, 2013 WL 6485367, at *2 n.1 (W.D. Pa. Dec. 10, 2013) ("[I]t is not the Court's job to research and construct legal arguments open to parties, especially when they are represented by counsel.") (internal quotation marks omitted).

Riddell's motion to dismiss should be denied on this ground alone. *See In re United Parcel Serv., Air-In-Ground Mkt. & Sales Prac. Litig.*, 580 F. App'x 543, 544 (9th Cir. 2014) (vacating grant of motion to dismiss in MDL, and holding that "[t]he district court should have addressed choice of law and conflict of law before making a determination on the merits of [the defendant's] dismissal motions"); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1997 WL 186325, at *9 (E.D. Pa. Apr. 16, 1997) (denying motions to dismiss in an MDL, and explaining that the defendant's "arguments are especially difficult for this transferee court to address because they necessarily implicate the governing state law, including the state's choice of law precedent, of each individual civil action in this ligation" that "[t]his court is not expected to make these determinations if the convenience of the parties, justice, and efficiency are to be achieved by the transferee court," and that choice of law analysis should be left to the transferor courts after remand); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mkt. & Sales Prac. Litig.*, No. 12-2320, 2013 WL 1332097, at *1 (D.N.H. Apr. 2, 2013) (denying motion to dismiss where defendant did not perform choice of law analysis, and explaining that "[n]ot only do the elements of the plaintiffs' claims differ from state to state, but state courts also interpret those elements differently").

To be sure, in some cases, courts in the Third Circuit have concluded that choice of law issues need not be resolved at the motion to dismiss stage. *See, e.g.*, *Graboff v. Collern Firm*, No. 10-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010); *Hayes v. Am. Int'l Grp.*, No. 09-2874, 2009 WL 4591531, at *3 (E.D. Pa. Nov. 30, 2009). But in those cases, the parties agreed that, at most, two potential states' laws were in play, but disagreed merely as to which one applied. The courts there, rather than resolving the issue, analyzed the claims under both states' laws. Here, Riddell asks this Court to apply Pennsylvania and New York law, which *no one* has

argued applies to any Plaintiff's claims.  And, the courts in *Hayes* and *Graboff* did not involve MDLs, in which the Court applies the choice-of-law rules of the transferor courts for the plaintiffs who initially filed their cases elsewhere.  *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007) (explaining that in MDL cases, "the MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice-of-law rules"); *Constantinides v. CBS Corp.*, 747 F. Supp. 2d 488, 491 n.4 (E.D. Pa. 2010) (same).

Riddell seems to imply that the relevant common law does not vary materially from one state to another and so the Court can simply elide the choice-of-law analysis and rule based upon the law of no jurisdiction, or at least none that would apply under any proper choice of law analysis (or could consistent with due process).  As the Seventh Circuit explained in a seminal decision authored by Judge Posner more than twenty years ago, Riddell is wrong:

> The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may as the plaintiffs have argued forcefully to us differ among the states only in nuance …. But nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts.

*In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).

As Justice Holmes aptly wrote, "[t]he common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi sovereign that can be identified."  *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting) (cited in *Rhone-Poulenc*).  The "voices of the quasi-sovereigns that are the states of the United States sing negligence with a different pitch."  *Rhone-Poulenc*, 51 F.3d at 1301.  Under Riddell's approach, Plaintiffs "will have their rights determined, and [Riddell] will have [its] duties determined, under a law that is merely an amalgam, an averaging, of the nonidentical negligence laws of 51 jurisdictions."  *Id.* at

1302.  If that were permissible, "one begins to wonder why this country bothers with different

state legal systems."  *Id.* at 1301. The "point of *Erie* is that Article III of the Constitution does

not empower the federal courts to create such a regime for diversity cases."  *Id*. at 1302*.*

To be sure, it may be difficult or inconvenient for Riddell to perform the required

analysis.  But the Complaint identifies, as best Plaintiffs are able, the locations of the misconduct

alleged (including the Illinois nexus of Riddell's operations), and the short-form complaints

identify the locations of the harm suffered by identifying the teams played for and where Players

reside.  Riddell could well have used its *forty-four* pages of briefing to perform the required

choice of law analysis.  Inconvenience is no excuse: "Differences across states may be costly for

courts and litigants alike, but they are a fundamental aspect of our federal republic and must not

be overridden in a quest to clear the queue in court."  *In re Bridgestone/Firestone, Inc.*, 288 F.3d

1012, 1020 (7th Cir. 2002).

**B.**      **Even Under Riddell's Hypothetical Law, Plaintiffs' Claims Are Properly
Pleaded.**

**1.**      **Plaintiffs Plausibly Allege Conspiracy.**

Plaintiffs adequately allege a civil conspiracy between the NFL and Riddell.  Riddell says

that the Plaintiffs fail to plead the existence of an agreement.  But Plaintiffs identify the 1969

formation of NOCSAE, which served to insulate liability and create an arms-length appearance

of the relationship between the NFL and Riddell, and the 1989 agreement between Riddell and

the NFL to make Riddell products the official helmets of the NFL.  Pursuant to those agreements,

the NFL, Riddell, and NOCSAE worked together to conceal the dangers of concussions.

Riddell argues that the agreements were entered into for lawful purposes.  Mot. at 13-14.

But whether the agreements were in fact innocuous and lawful, or illegal and made with the

intent to deceive Plaintiffs and the public, as the Complaint alleges, are questions of fact.

Riddell simply ignores all of the allegations that show how Riddell, NOCSAE, and the NFL worked together to conceal the dangers of concussions, in part to protect the sales of Riddell products.  For example, Riddell, via NOCSAE, worked in sync with the MTBI Committee, propagating sham research, much of it funded by NFL grants.  Compl. ¶¶ 16, 187.  As one Riddell expert testified, "the NFL and NOCSAE try pretty hard to work together," and he "work[s] with the NFL Committee on Mild Traumatic Brain Injury . . . typically through NOCSAE."  *Id.* ¶ 134.  In 2003, NOCSAE announced that "[w]e are working on the details of a new cooperation with the National Football League for research into football concussions and related standards."  *Id.* ¶ 140.  One year later, NOCSAE lauded the work of the sham MTBI committee.  *Id.* ¶ 141.

The MTBI Committee, for its part, worked to ensure that Riddell products remained widely-used in the NFL by sponsoring papers validating Riddell helmets over its competitors' products.  *Id.* ¶¶ 16, 60.  For example, MTBI Committee grant funding was used to promote sham helmet-safety research between 1997 and 2000.  *Id.* ¶¶ 187, 230, 234.  At least some of this research was jointly funded by the NFL  and Riddell.  *Id.* ¶ 214.  One early paper sponsored by the MTBI Committee validated the Riddell VSR-4 helmet over rival technology.  *Id.* ¶ 198.  Other papers concluded (falsely) that the proper use of a mouth-guard could affect MTBI.  *Id.* ¶ 199.  The Committee also worked to keep the Bike Pro Edition, a non-Riddell helmet, out of the league.  *Id.* ¶ 208.  This partnership culminated in the introduction of the Riddell Revolution Helmet, purportedly manufactured and designed to "reduce the incidence of concussions."  *Id.* ¶ 269, 273.

Because Plaintiffs adequately allege a conspiracy between Riddell and the NFL, Riddell is liable not only for its own actions—but also for the acts taken by the NFL in furtherance of the

conspiracy.  *See, e.g.*, *Church Mut. Ins. Co. v. Alliance Adjust. Grp.*, 102 F. Supp. 3d 719, 732 (E.D. Pa. 2015) ("Once there is an agreement, a conspirator may be liable for overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.") (internal quotation marks omitted).  So, for example, because Riddell, pursuant to its 1989 agreement with the NFL, was an active participant in the fraudulent MTBI Committee's campaign of deception, it is liable for the whole body of fraud—both affirmative misstatements and omissions—committed by the NFL through that Committee.

### 2.    Plaintiffs Adequately Allege Fraud and Negligent Misrepresentation.

Plaintiffs allege that Riddell committed fraud and negligent misrepresentation by failing to disclose material information to Plaintiffs and the public regarding the likely risks of brain injuries caused by concussive and sub-concussive hits.  Riddell participated in the NFL's long-running campaign to conceal the dangers of head injuries in football generally, and is responsible for that campaign by virtue of its conspiracy with the league.  Riddell also specifically concealed the facts that its helmets were never able to protect players from the long-term neurological consequences of head injuries, and that they were validated using testing that Riddell knew to be flawed. This pattern of concealment culminated in the Revolution helmet, which was validated using MTBI Committee data that Riddell knew to be flawed and unreliable, and was marketed under the ruse that it would reduce concussions by 31%.

Fraud requires "a misrepresentation or material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (internal

quotation marks omitted).  Plaintiffs adequately plead all of the required elements.[3]  None of

Riddell's arguments withstand scrutiny.

> **a.**     **Plaintiffs' Fraud and Negligent Misrepresentation Claims Satisfy Rule 9(b).**

Riddell argues that Plaintiffs fail to allege their claims with particularity.  But, as Riddell

does not acknowledge, Rule 9(b) is necessarily relaxed in an omission case, which "can succeed

without the same level of specificity required by a normal fraud claim." *In re Toyota* 754 F. Supp.

2d at 1189.  And "[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place,

and content of an event that (by definition) did not occur would effectively gut state laws

prohibiting fraud-by-omission."  *In re Whirlpool Corp. Front-Loading Prods. Liab. Litig.*, 684 F.

Supp. 2d  at 961.

Here, Riddell (the "who"), as a large helmet manufacturer with close ties to the NFL and

a leading role in the football safety equipment industry, was in a unique position to know about

the dangers of concussions.  Throughout the relevant time period (the "when"), Riddell was in

the business of studying head injuries and validating equipment.  That Riddell knew of the

dangers of concussions, and that its helmets were categorically inadequate to protect against

them (the "what"), is fairly inferable from its position and from its actions.  Any doubt is

dispelled by its conduct post-1989, when it actively participated in the NFL's campaign to

conceal the dangers of concussions.  Yet Riddell never disclosed to Plaintiffs what it knew;

instead, it actively concealed those facts in order to sell helmets.

Riddell dismisses out of hand the relevance of its extraordinary—and plainly

fraudulent—claim that the Revolution helmet reduced the incidence of concussions by 31%.  *See*

---

[3] As Riddell appears to concede, the same factual allegations that support Plaintiffs' fraud claims also support their negligent misrepresentation claims. *See* Mot. at 22-23.

Mot. at 18 (asserting that the role of that claim in Plaintiffs' allegations is "unclear").  But that claim supports Plaintiffs' fraud claims—and lends them the specificity required under Rule 9(b)—in multiple ways.  That claim is prima facie evidence of fraud as to the Plaintiffs who wore the Revolution (i.e., Plaintiffs who played after 2002).  But it is also evidence that Riddell fraudulently marketed and sold its earlier helmets as well, because the methods Riddell used to validate the Revolution (research with connections to NOCSAE and the MTBI Committee) are the same Riddell used for earlier helmets such as the VSR-4.  *See, e.g.*, Compl. ¶ 198.  Riddell cannot credibly claim that it learned of the dangers of concussions—and its helmets' inability to protect—only when it decided to fraudulently market the Revolution.  That claim is belied by its decades of cooperation with the NFL to ensure that helmet sales would not be damaged by the knowledge of their defects.

> ### b. Plaintiffs Are Not Required to Allege the Details of Riddell's Internal Corporate Affairs.

Riddell argues that Plaintiffs' fraud claims must be dismissed because they—at this point—are not able to identify which of the related Riddell corporate entities was responsible for the fraud at issue.  But Rule 9(b) is also relaxed "when factual information is peculiarly within the defendant's knowledge or control," *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997), "[p]articularly in cases of corporate fraud [where] plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs."  *Craftmatic*, 890 F.2d at 645 (citations omitted).  It is neither surprising nor problematic that Plaintiffs, without the benefit of discovery, do not know the specific (and ultimately irrelevant) details of Riddell's corporate organization.  *See, e.g.*, *United States ex rel. Budike v. PECO Energy*, 897 F. Supp. 2d 300, 316 (E.D. Pa. 2012) ("The Third Circuit has recognized, however, that most purveyors of fraud, and

especially those who engage in fraudulent activities within the corporate sphere, are consciously and vigilantly engaged in an effort to disguise the nature of their endeavors.").[4]

       c.      **Plaintiffs Adequately Allege A Duty to Disclose, Even Though Such a Duty Might Not Even Be Required.**

Riddell argues that Plaintiffs fail to allege a duty to disclose. Riddell's failure to conduct any choice of law analysis is fatal here, for whether and when a duty to disclose is required or arises varies dramatically from one state to another. *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mkt., Sales Prac., & Prods. Liab. Litig.*, No. 17-02777, 2018 WL 1335901 at *56-60 (N.D. Cal. Mar. 15, 2018) (explaining that "[a] duty to disclose thus may obtain in a variety of circumstances or indeed, may not be required in some situations," and reviewing the laws of many states); *Garcia v. Chrysler Grp., LLC*, 127 F. Supp. 3d 212, 236-37 (S.D.N.Y. 2015) (same). For example, some states do not require such a duty where the defendant intentionally fails to disclose material information. *See, e.g.*, *Am. Planned Communities, Inc. v. State Farm Ins. Co.*, 28 F. Supp. 2d 964, 968 (E.D. Pa. 1998). And, in any event, Riddell had a duty to disclose because of its decisions, over the decades, to study head injuries in football, establish equipment safety standards, and design, test, and market helmets, all with the express aim of selling products to the specific population of NFL players. *See, e.g.*, *Fichtel v. Bd. of Dirs. of River Shore of Naperville Condo. Ass'n*, 907 N.E.2d 903, 911 (Ill. Ct. App. 2009) (explaining that a voluntary undertaking can create a duty to disclose).

---

[4] The cases on which Riddell relies involved *unrelated* defendants, rather than different entities in one corporate structure. *See Tredennick v. Bone*, 647 F. Supp. 2d 495, 501 (W.D. Pa. 2007); *In re McNeil Consumer Healthcare, Mkt., & Sales Prac. Litig.*, No. 2190, 2011 WL 2802854, at *18-19 (E.D. Pa. July 15, 2011).

### d.   Plaintiffs Adequately Allege Detrimental Reliance and Causation.

Riddell argues that Plaintiffs have not alleged justifiable reliance.  But it is fairly

inferable that Plaintiffs would have better protected themselves on the field, stopped playing

football entirely, or sought medical attention had they known of the dangers their helmets could

not prevent.  Reliance can be inferred "from the various facts and circumstances of a case."  *In re*

*Resorts Int'l, Inc.*, 181 F.3d 505, 510 (3d Cir. 1999).  In particular, reliance on "omitted

information may be presumed where such information is material."  *Van Dongen v. CNinsure*

*Inc.*, 951 F. Supp. 2d 457, 469 (S.D.N.Y. 2013); *see also Ochs v. Woods*, 117 N.E. 305, 306

(N.Y. 1917) ("It is incumbent upon a plaintiff in an action for deceit through false

representations, to show that he was influenced by them.  It does not require very strong proof to

establish it.  In most cases, it may be inferred from the circumstances attending the transaction.");

*Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 817 (N.J. App. Div. 2000) (applying "[t]he

presumption or inference of reliance and causation, where omissions of material fact are

common"); *Vasquez v. Sup. Ct.*, 484 P.2d 964, 973 (Cal. 1971) (en banc) ("[I]f the trial court

finds material misrepresentations were made to the class members, at least an inference of

reliance would arise[.]").

Similarly, reliance may be inferred where affirmative misrepresentations—here, the

Riddell's false marketing of the Revolution and the campaign of deception waged via the MTBI

Committee—come from an authoritative source and/or are so pervasive that plaintiffs could not

help but be exposed.  *See In re Toyota Motor Corp.*, No. 10-02151, 2012 WL 12929769, at *20

(C.D. Cal. May 4, 2012) (applying New York law, and holding that where a defendant

"effectively controlled all the information about the transaction, . . . Plaintiffs are entitled to a

presumption of reliance.") (internal quotations omitted); *Small v. Lorillard Tobacco Co.*, 252

A.D.2d 1, 8 (N.Y. App. Div. 1998) (same); *In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009)

(explaining that "where[] a plaintiff alleges exposure to a long-term advertising campaign, the

plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied

on particular advertisements or statements"); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d

1060, 1069-70 (Fla. Dist. Ct. App. 2010) (same).[5]  Plaintiffs were Riddell's target market and, by

virtue of the NFL's licensing agreement with Riddell, were bombarded with Riddell logos and

marketing on a daily basis.  It is reasonable to infer that they would have acted differently had

they known of the information Riddell concealed.

Riddell also argues that Plaintiffs have failed to plead causation. This is wrong, for two

reasons.  First, the circumstances attendant to an individual's decision to play or not to play

football, resulting medical conditions, and decision to seek or not to seek medical treatment, are

not susceptible to a mass administrative pleading.[6]  *See, e.g.*, *Geralds v. Damiano*, 128 A.D.3d

550, 551 (N.Y. App. Div. 2015) (explaining that "issues of proximate cause are typically fact

questions to be decided by a jury").  As is typical in mass tort cases, expert discovery will be

necessary to establish (or negate) general and specific causation.  And, also in discovery, Riddell

is free to explore why Plaintiffs decided to play NFL football, forego medical treatment, and

other related issues.

Second, the Complaint alleges all that it needs to establish causation at this stage.  The

Complaint alleges that Riddell misrepresented and omitted material information about the

dangers of head injuries in football and the inadequacy of its helmets.  The short form complaints

---

[5] Should the Court determine that any individual Plaintiff should better plead individual reliance, Plaintiffs request leave to amend the short-form complaints to comply with that determination.

[6] Should the Court determine that any individual Plaintiff should better plead individual causation, Plaintiffs request leave to amend the short form complaints to comply with that determination.

establish that Plaintiffs were exposed to repetitive, traumatic sub-concussive or concussive head impacts during NFL games and practices, and that Plaintiffs now suffer from brain injury symptoms.  It is plausible that Riddell's (and, by virtue of the conspiracy, the NFL's) misstatements and omissions caused Plaintiffs' injuries.  *See Marsden v. Select Med. Corp.*, No. 04-4020, 2007 WL 1725204, at *1 (E.D. Pa. June 12, 2007) (emphasizing that causation need not "be plead with particularity (or specificity) of the nature contemplated by Federal Rule of Civil Procedure 9(b)").[7]

### 3.   Plaintiffs Plausibly Allege Design Defect, Warranty, and Failure-to-Warn Claims.

Plaintiffs' product liability claims are simple: Riddell helmets were never designed to protect against concussive injuries.  As a result, they were defectively designed and not fit for their ordinary purpose, facts giving rise to a duty to warn.

Riddell says that these claims fail because Plaintiffs do not identify the specific Riddell helmet models each of them wore, or the warnings on each model.  But Riddell does not contend that some models adequately protect against concussive injuries and others did not.  Plaintiffs' claims apply to *all* models sold by Riddell and worn by Players during the relevant time period. *No* helmet model contained a warning that the helmet would not protect against the long-term neurological damage caused by concussions and sub-concussive blows.  And to the extent it is necessary to determine which specific product each Plaintiff wore, that information will be found in discovery of records kept by the NFL and its teams.  Similarly, although the specific words of the warnings on each helmet are likely not relevant, Riddell surely has that information in its own product records.

---

[7] Because Plaintiffs plausibly allege fraud, Riddell's request to dismiss the punitive damages request should be denied.

Riddell argues that Plaintiffs' design defect claims require an allegation of a specific feasible alternative design.   But, as even Riddell appears to admit, many states do not require an alternative design to be proved, let alone alleged.  *See, e.g.*, *Baley v. Fed. Signal Corp.*, 982 N.E.2d 776, 790-93 (Ill.  App. Ct. 2012) ("[E]vidence of a feasible alternative design is not required to prove a design-defect products liability claim.").  Riddell displays serious panache when it argues that its products could not be defective because no helmet can prevent a concussion, when Riddell said the exact opposite to market and sell the Revolution helmet.

Riddell also argues (again) that Plaintiffs have not alleged individual causation.  But causation with respect to the products liability claims is straightforward: had Riddell designed, manufactured, and sold a helmet that was effective at reducing or eliminating concussions, then Plaintiffs would not have suffered some or all of the concussions or sub-concussive hits they incurred.  Had Riddell warned Plaintiffs of their helmets' defects, then Plaintiffs would not have played football without the knowledge of the risks they were taking.

Finally, Riddell argues that publicly available information obviated the need for any warnings.  But, as Plaintiffs allege, Riddell's superior position gave it unique knowledge of the dangers of concussions, and its relationship with the NFL imbued it with all of the authority of football's monopoly.  It is absurd to expect that Players and former Players should have explored academic medical journals when presented with assurances (and lack of warnings) from football's overseer and primary equipment manufacturer.  In any event, that is a question of fact not resolvable on the pleadings.  *See Conneen v. Amatek, Inc.*, 238 F. Supp. 3d 652, 658 (E.D. Pa. 2017), (explaining that "reasonable diligence . . . is sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question") (internal quotation marks and alterations omitted).

### 4.   **Plaintiffs Plausibly Allege Negligence.**

Plaintiffs allege several claims sounding in negligence, including ordinary negligence (Compl. ¶¶ 323-44) and negligent marketing (*id.* ¶¶ 345-50).  Riddell's arguments against these claims turn principally on whether Riddell owed a duty to Plaintiffs.  But, as Riddell acknowledges, at minimum it owed duties "to its consumers who may be foreseeably injured by use of its products."  Mot. at 30.  Accordingly, Riddell owed a duty to exercise ordinary care— both in how it designed and marketed its products—to every Plaintiff who wore one of its helmets.

Beyond that, Plaintiffs plainly and adequately allege that Riddell assumed a duty to act with reasonable care when, with the aim of protecting its profits, it voluntarily undertook to study and report on the neurological risks to NFL players via the fraudulent MTBI Committee.  The common law recognizes a "social duty of every person," a duty "imposed by law" to "take thought and have a care lest his action result in injuries to others."  *Prost v. Caldwell Store, Inc.*, 187 A.2d 273, 276 (Pa. 1963) (internal quotation marks and emphasis omitted).  Accordingly, "one who assumes a duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully."  *Esen v. Narian*, No. 16-10441, 2017 WL 4931742, at *1 (N.Y. App. Nov. 1, 2017) (internal quotation marks omitted).  Under those circumstances, "the question is whether defendant's conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing."  *Heard v. City of New York*, 623 N.E.2d 541, 544 (N.Y. 1993).

No one forced Riddell to work with the MTBI Committee, to use unreliable and biased research to validate Riddell products, or to market and sell its leading product, the Revolution, using MTBI Committee data it knew to be flawed.  By voluntarily undertaking those actions, Riddell assumed a duty to act carefully.

### C.      Plaintiffs' Claims are Timely.

Perhaps nowhere is Riddell's failure to perform a choice of law analysis more glaring than in its arguments that certain of Plaintiffs' claims are not timely.  Statutes of limitations, the applicability and scope of doctrines such as the discovery rule, fraudulent concealment, and equitable tolling vary widely from state to state.  Those differences may not be smoothed over by assumption.  Consider the absurdity of Riddell's citation (in footnote 141) of a 1970 intermediate Michigan appellate court decision for the proposition that *every state* would apply a "personal injury" four-year statute of limitations to a fraud claim.  Nevertheless, even accepting Riddell's absurd fake-law framework, Plaintiffs' claims are timely.

### 1.      Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by the Discovery Rule.

Plaintiffs adequately plead that their claims, to the extent they require tolling, did not accrue until, at the earliest, when the NFL acknowledged the concussion crisis in 2010 and re-named and re-populated the MTBI Committee.  Until that point, the dangers of concussion were not widely-known among Players and the public.  Indeed, Riddell did not end its partnership with the NFL until 2013 and did not stop making the false claims about the Revolution until 2014.

The discovery rule, which is recognized in some form in most jurisdictions, provides that a claim does not accrue until "the plaintiff has discovered or, exercising reasonable diligence, should have discovered the injury and its cause."  *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir. 1991).  It "is not enough that a plaintiff comprehends a 'what'; there must also be a reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault."  *Walk v. Ring*, 44 P.3d 990, 996

(Ariz. 2002); *see also Gleason v. Borough of Moosic*, 15 A.3d 479, 484-86 (Pa. 2011)
(explaining that the discovery rule applies to both "an injury and its cause").

Further, at the time of the head impacts, some of the Plaintiffs did not suffer from the
devastating disease that occurred long after the Players had retired from professional football.  In
an analogous context presented in *Daley v A.W. Chesterton, Inc*., 37 A.3d 1175 (Pa. 2012), the
Pennsylvania Supreme Court found that the statute accrued for an asbestos worker who had been
diagnosed with pulmonary asbestosis and cancer in the right lung in 1985, when he was
diagnosed with a second injury, mesothelioma.  Here, these Players may have taken several
impacts to the head when they played, but it was not until recently that they began to suffer the
impact of latent brain disease such as CTE and participated in this lawsuit.  Again, this raises a
question of fact for the jury.

It is true that "the plaintiff bears the burden of showing the discovery rule tolls the statute
of limitations."  *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014).  But "while a court may
entertain a motion to dismiss on statute of limitations grounds . . . it may not allocate the burden
of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not
required to plead, in a complaint, facts sufficient to overcome an affirmative defense."  *Id.*  A
motion to dismiss must be denied "where the applicability of the discovery rule is not evident on
the face of the complaint but the plaintiff does not plead facts that unequivocally show that the
discovery rule does not apply."  *Id.*[8]  Application of the discovery rule ordinarily is a question of
fact.  *See, e.g.*, *Gleason*, 15 A.3d at 363 ("The point at which the complaining party should be

---

[8] Riddell relies on *Archie v. Pop Warner Little Scholars, Inc.*, No. 16-6603, 2017 WL 3084160, at *14 (C.D. Cal.
May 12, 2017), but there the complaint did not even allege the discovery rule applied and plaintiffs first raised the
issue in their opposition to the motion to dismiss.  Here, the Complaint clearly alleges the discovery rule applies.
The statute of limitations issue in *Archie* also applied only to one plaintiff's allegations, rather than an administrative
pleading dealing with the claims of hundreds of Plaintiffs.

reasonably aware that he or she has suffered an injury and its cause is ordinarily an issue of fact to be determined by the jury due to the fact intensive nature of the inquiry.").

Here, Plaintiffs adequately plead that the discovery rule tolled their claims through at least 2010, when the NFL half-heartedly came clean about the dangers of concussions and the sham that was the MTBI Committee and the fraud perpetrated by the NFL and Riddell became widely known.  Given Riddell's superior access to information about the health and safety of football and the dangers of head injuries, and its active cover-up of the connection between football and neurological diseases, because of the co-conspirators' extensive misinformation machine, Plaintiffs did not connect their symptoms to their playing career, and did not connect their conditions to Riddell's acts of negligence, products liability, fraud, and conspiracy.  To the extent that the Court requires more specific discovery-rule pleadings from individual Plaintiffs, Plaintiffs respectfully request leave to file amended short form complaints so that each individual Plaintiff can do so.

> **2.     Plaintiffs' Claims Were Tolled Until, at Minimum, 2010 by Riddell's Fraudulent Concealment.**

Plaintiffs adequately plead that Riddell's decades-long campaign of fraudulent omissions and misstatements tolled their claims, at minimum, until the NFL's 2010 change-of-heart. Indeed, even ending the concealment in 2010 is generous because Riddell continued making its 31% concussion-reduction claim for *four more years* after that.  A defendant is not permitted to invoke the statute of limitations if, through fraud or concealment, "he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts."  *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005).  The doctrine of fraudulent concealment "does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception."  *Id.*  Thus, "a statute of limitations that is tolled by virtue of

fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id.* at 861.

Whether a claim is tolled due to fraudulent concealment "[i]n general . . . is a question of fact for the jury." *Conneen*, 238 F. Supp. 3d at 658; *see also Fine*, 870 A.2d at 858 ("[A] court . . . must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it.") (citation omitted).

Here, for the reasons discussed in the fraud section above, Plaintiffs adequately plead fraudulent concealment. The Complaint includes clear, specific allegations that Riddell knew of the dangers of concussions, and, by extension, the inadequacy of its helmets, and suppressed that information through the MTBI Committee for its own profit. Even if Plaintiffs could have known they were injured in some sense, Riddell and the NFL's fraudulent concealment prevented them from knowing the "cause:" playing football without adequate head protection. To the extent that the Court requires more specific fraudulent-concealment pleadings from individual Plaintiffs, Plaintiffs respectfully request leave to file amended short form complaints so that each individual Plaintiff can do so.

In cases, like this one, "involving tolling due to allegations of fraudulent concealment, the Third Circuit has encouraged and approved of allowing the factual record to be sufficiently developed before reaching the issue." *Hoppe v. SmithKline Beecham Corp.*, 437 F. Supp. 2d 331, 336 (E.D. Pa. 2006) (Brody, J.) (denying summary judgment). "Any inquiry into defendants' alleged fraudulent concealment would be premature at this stage, given that the factual record is

completely undeveloped," particularly because Pennsylvania, like many states, "directs a court to leave material factual issues regarding tolling for the jury." *Id.*

### 3. Plaintiffs' Fraud and Conspiracy Claims Relate Back to 2012 at the Latest.

Plaintiffs relate back to—at the latest—the master complaint filed in June 2012.  Under Rule 15, "an amendment to a pleading relates back to the original pleading when[] the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B). Application of this rule "involves a search for a common core of operative facts in the two pleadings."  *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).  As "such, the court looks to whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds."  *Id.*

Here, the Complaint operates from the same "core of operative facts" as the allegations against Riddell filed in 2012.  As Riddell acknowledges, the 2012 Master Administrative Long-Form Complaint included allegations that Riddell manufactured defective helmets and had a duty to protect Players from the long-term health effects of concussions.  *See* Dkt. No. 83 at ¶¶ 383-89. The 2012 Complaint alleged that Riddell's conduct rendered it liable under strict products liability, *id.* at ¶¶ 397-401,  406-15, negligence, *id.* at ¶¶ 416-21, as well as fraud and conspiracy, *id.* at ¶¶422-25.  That "general fact situation" and those "legal theor[ies]" map perfectly onto the new Complaint, albeit with substantially more detail, giving Riddell fair notice of the claims against it.

Moreover, as Riddell acknowledges, when it opposed leave to file the Complaint, it made the same argument it makes now: that the new Complaint impermissibly expands on the previous complaints.  *See* Dkt. No. 7849.  This Court necessarily rejected that argument when it granted

leave to file.  *See* Dkt. No. 8451.  That the complaint was an appropriate amendment to earlier-filed complaints is now the law of the case.  *See, e.g.*, *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210 n.7 (3d Cir. 2003) ("Under the law-of-the-case doctrine, once an issue has been decided, parties may not relitigate that issue in the same case.") (internal quotation marks omitted).

Even if the Complaint did not satisfy the relation-back doctrine under Rule 15, it should be deemed to relate back under the unique circumstances of this case.  Plaintiffs were ready to proceed against both the NFL and Riddell in 2012.  Per this Court's orders, the litigation was divided, with the claims against the NFL proceeding first and the claims against Riddell held in abeyance.  It is not Plaintiffs' fault that resolution of the claims against the NFL delayed the case against Riddell for five years.  Throughout that time, Plaintiffs have dutifully followed this Court's orders, and delayed pursuit of their claims against Riddell until now.  That a case remained in stasis for half a decade does not mean that previously timely claims are now time-barred.  State law may well toll Plaintiffs' claims during that period, *see, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015, 1022-23 (N.D. Cal. 2014) (discussing equitable tolling under California law), but even if it does not, this Court's inherent power to oversee its docket, powers vested by the Federal Rules as well as the multi-district litigation statute, mean that the Complaint was timely-filed.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the motion to dismiss for failure to state a claim be denied.

—

Dated:  March 28, 2018

Respectfully Submitted,

By:      */s/ Wendy R. Fleishman*
       Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com

Lieff Cabraser Heimann & Bernstein, LLP
Andrew R. Kaufman
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219
Telephone:  (615) 313-9000
Facsimile:   (615) 313-9965
akaufman@lchb.com

Seeger Weiss LLP
Christopher A. Seeger
77 Water Street
New York, New York  10005-4401
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
cseeger@seegerweiss.com

*Co-Lead Counsel for the Riddell Litigation*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 28th day of March, 2018, upon all counsel of record.


Dated: March 28, 2018                    <u>*/s/ Wendy R. Fleishman*</u>
                                         Wendy R. Fleishman