## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE, et.al,<br><br>Defendants. | No. 2:12-md-02323-AB<br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**THE YERRID LAW FIRM AND NEUROCOGNITIVE FOOTBALL LAWYERS' (1) PARTIAL JOINDER OF THE MOTION BROUGHT BY THE LOCKS LAW FIRM FOR APPOINTMENT OF ADMINISTRATIVE COUNSEL, (2) MOTION TO REVIEW DEPRIVATION OF APPEAL RIGHTS AND (3) REQUESTING ORAL ARGUMENT**

The Yerrid Law Firm and Neurocognitve Football Lawyers, PLLC, join the Locks Law Motion in requesting that the Court appoint a committee represented by, among others, the Locks Law Firm to serve as Administrative Class Counsel, and that said committee also include representatives of the Individually Retained Player's Attorney's (IRPAs).  The Yerrid Law Firm would respectfully request the opportunity to present oral argument on these issues as they relate to those players who are IRPA Subclass I Claimants, and state as follows:

Following the prior direction of this Court, on March 23, 2018, The Yerrid Law Firm and Neurocognitive Football Lawyers filed their Motion Requesting the Special Master Review the Fraud Detection Procedures of the Claims Administrator, to Set Aside Unreasonable Audit Notices, and to Direct the Claims Administrator to Provide Important Information to the Class Members (hereinafter the "Special Master Motion").  On or about that time, the Locks Law Firm

filed its Motion to serve as Administrative Class Counsel.  Accordingly, The Yerrid Law Firm believes some of the matters identified in the Special Master Motion would be of immediate importance to the Court.  The Yerrid Law Firm respectfully requests the limited opportunity to present these views as they concern Subclass I Claims represented by IRPAs.

In particular, the fraud detection procedures used by the Claims Administrator as well as its Audits have unfairly delayed the processing of claims and these Audits have also denied the Claimants of their right to a timely appeal before the Special Master.  As more fully explained below, these Audits have caused an unconstitutional deprivation of Claimants' fundamental rights to due process.  This fundamental deprivation of rights will cause irreparable injury as the injured Claimants have a progressive degenerative brain injury.  Each day that passes, these players with fully-documented injuries will only suffer more.  For these many ailing men, delay is justice denied.

Most every Class Member elected to participate in the claims procedures promoted by the ASA with the expectation that their Claim Packages would be fairly and promptly processed by the Claims Administrator.  With that belief, The Yerrid Law Firm and Neurocognitive Football Lawyers (hereinafter "YLF") filed approximately 143 fully documented Claim Packages. Broken down by month, this would include 37 Claim Packages filed in May 2017, 24 Claim Packages filed in June 2017, 35 Claim Packages filed in August 2017, and the remainder thereafter.  Many other players represented by YLF are still preparing claim packages and other players will seek relief through the MAF or BAP process.

All of these Claim packages filed by YLF are Subclass 1 Claims under the ASA as each had a Qualifying Diagnosis after the Class Certification Order on July 14, 2014, but prior to the Effective Date of the Settlement Agreement.  Three Claims seek recovery for Alzheimer's

disease and the remaining are 1.5 or 2.0 Claims.  In many cases, fully documented Claim Packages have been pending for more than ten months.  For many players with clearly-documented injuries, the settlement has become an illusion.  As demonstrated below, the Audit process is inherently and fundamentally wrong when these Audits are being used to delay or to search for a reason to deny an otherwise valid claim.

As argued below, the Claimants, former NFL Players, are being deprived of fundamental due process.  In addition, despite the progressive nature of the disease process, not one player represented by the undersigned has received any compensation.  In the Special Master Motion, Claimants asked the Special Master to immediately direct the Claims Administrator to:  (1) remove from Audit any Claim that was Denied so the Appellate procedures under Article IX can be completed; (2) strictly construe the Audit requirements and remove any Claim from Audit that does not meet the specific requirements of the Audit Rules under the ASA; and (3) require the Claims Administrator to fully provide information about the number of Claims in Audit, why these Claims are in Audit as well as any other matters that will provide Audit transparency.

**UNDER THE GUISE OF ITS FRAUD DETECTION AND PREVENTION PROCEDURES, THE CLAIMS ADMINISTRATOR IS SYSTEMATICALLY VIOLATING THE TERMS OF THE ASA, DENYING THE PLAYERS DUE PROCESS AND DEPRIVING THESE INJURED PLAYERS OF THEIR JUST COMPENSATION.**

1. **Players who Received a Monetary Award Remain Unpaid Nearly Seven Months Later and the Claims Administrator has Refused to Provide Information that Would Verify it Properly Used its Fraud Detection Powers to Further Evaluate These Claims.**

On August 2, 2017, two Subclass I Claims filed by YLF received a Notice of Monetary Award affirming their 1.5 Neurocognitive Injury as documented in their respective Claim Packages.  Almost eight months later, both Claims remain unpaid and are stuck in the Audit

Process.[1]   These Claims are representative of the fact that only 6 of the more than 1100 1.5 and 2.0 Claims have been paid.

Fort the two players referenced above, as provided in each Award Notice, the deadline to Appeal or Audit the Award was September 2, 2017.   Failing such action, the Claim would be paid.   As these Claims were filed in May, these August Awards gave the initial appearance the ASA was working in accordance with the expectation of the players.   Moreover, the report that the system was working perfectly was the message provided to the Court on September 19, 2017. YLF was present at the hearing on September 19, 2017, and had asked for the opportunity to be heard in their late filed Motion due to the effects of Hurricane Irma.

Unfortunately, although questions were being asked by YLF which we thought should be raised, an insidious process was being orchestrated that was not fully recognized.   On August 23, 2017, both players referenced above received an Audit Notice but no documents were requested and no reason was given for the Audit.   On information and belief, each Audit was simply filed to delay payment of the Claim and allow time for the Claims Administrator to decide how it wanted to proceed.   Under any provision of Paragraph 10.3, this is not a valid use of the Audit process.   Nor is there any provision of the ASA that allows the Claims Administrator to simply call a time out and suspend the rules.   Accordingly, as no appeal was filed and no valid audit was actually issued, the Claims should have been paid on September 1, 2017.

Recognizing its mistake, however, on September 5, 2017, the Claims Administrator issued a second Audit Notice to each player requesting certain prior medical and employment records.   No reason, however, was provided for the Audit.   Knowing what has since transpired,

---

[1] In the Special Master Motion, YLF identified these players and their specific medical issue.  Exhibits reflecting the Awards, Denial, Audits and other documents were served with that Motion.  Because of the public nature of this filing, out of an abundance of caution, that information is not included here.

Claimants contend these subsequent September Audits were untimely and the Claims should have been paid.

Nevertheless, not knowing that the Audit process was being abused and wanting to act in good faith, these former players timely responded to the Audits prior to the October 5, 2017 deadline and provided the requested materials.  However, some seven months later, there has been no further disposition and these Awards remain unpaid.  Despite initiating an Audit on August 23, 2017, it appears the Claims Administrator has taken little or no action to investigate these claims.  On January 24, 2018, YLF wrote the Claims Administrator asking what had been done in the intervening four months since YLF provided the requested record authorizations.  In response, YLF learned no meaningful action had been taken on either Claim.

In addition to the failure to timely process these Claim Packages, the Claims Administrator has also refused to provide information that would validate these Claims are being promptly and properly audited.  On November 1, 2017, YLF wrote the Claims Administrator asking several direct questions.  In the absence of any response, on January 24, 2018, YLF wrote the Claims Administrator asking the same questions and directed our specific concern to the September Audits used on the August 2, 2017 Monetary Awards.

YLF asked these questions because YLF believes that the only basis for an Audit of a Monetary Award is under Paragraph 10.3(c).  Allowing an Audit of a Monetary Award under any other Paragraph of the ASA would render the limiting language of Paragraph 10.3(c) meaningless.   Accordingly, to attempt to verify these Audit rights were properly used, YLF asked the Claims Administrator how many Monetary Awards were rendered in August and what was the number of Audits issued in September under Paragraph 10.3(c) of the ASA.  That Paragraph states the Claims Administrator has the unilateral right to Audit 10% of the Monetary

Awards issued. Moreover, under the ASA, Paragraph 10.3(c) is the only method by which a "Monetary Award" can be audited. As two Monetary Award Audits were issued in September, at least 20 Monetary Awards must have been issued in August. If more than two Audits were issued in September, that would require an even larger number of Monetary Awards in August. If the 10% number was exceeded, Paragraph 10.3(c) has been abused. The same analysis would apply to the August Audits if these August Audits were anything more than simply a tactical delay to obtain more time. On February 12, 2018, the Claims Administrator finally responded and refused to answer these and other questions. Had this information been provided, YLF could verify whether the Claims Administrator had exceeded its authority under Paragraph 10.3(c).

2. **The Claims Administrator Has Violated the Plain Language of Article IX of the ASA by Issuing Audit Notices Against Claims that have Already Been Denied Depriving These Players of their Appellate Rights and the Requirement these Players Exercise their Appellate Rights Prior to Seeking Relief from the Trial Court in Violation of Due Process.**

As will be further demonstrated below, the Claims Administrator is using the Audit procedures to engage in fishing expeditions on a massive scale. This trawling activity was used against YLF Claim Packages on January 10, 2018. These Audits were issued against Claims that had already been Denied and were undergoing Appellate Review. With respect, once a Claim has been Denied that Claim is governed by Article IX of the ASA and the Claims Administrator is without jurisdiction under the ASA to request an Audit of a Denied Claim Package.

These Audits were issued to four players, two of which had Claim packages that fully supported an Alzheimer's diagnosis. Three of these Audits failed to request any information. In addition to the lack of jurisdiction, as noted above, using Audits to hold Claims in abeyance is not a specified purpose under the ASA. More recently, a fifth player went to extraordinary efforts to prepare and file his Appeal to the Denial of his Claim. His Appeal was filed on Friday,

March 9, 2018. On Monday, March 12, 2018, the Claims Administrator issued an Audit Request. This dilatory Audit provides every indication its use was delayed while counsel for Claimant spun their wheels preparing the Appeal. This delayed Audit also served as a discovery device and a motion for extension of time as Claimant was obligated to detail their position in his Appeal and the NFL Parties in effect received an automatic extension of time to prepare their response. Not only does the use of these Audits frustrate the appellate rights of these players, their injuries are progressing so as to cause irreparable harm.

In the case of one of the players who received the January 10, 2018 Audit with Alzheimer's disease, he filed his Appeal on December 27, 2018, and the Claims Administrator issued an Appeal Alert. The Appeal Alert is issued so the interested parties know the appellate procedures are at play. However, on January 10, 2018, he received an Audit Notice. This player is a member of his team's Hall of Fame and he has a severe traumatic brain injury from his many years in the NFL. After a battery of testing, his Qualifying Diagnosis is a Major Neurocognitive Disorder due to Probable Alzheimer's Disease. Not only was he seen by a Board Certified Neurologist, a Board Certified Psychiatrist, and a Neuropsychologist, his diagnosis was also confirmed by a Certified Brain Injury Specialist, John Merritt, M.D. In addition, a well-credentialed recently retired internist executed an affidavit stating his concerns about the problems he has personally observed afflicting that player. This physician stated he would have referred this former player for a neuropsychological evaluation had he been his patient. But, this player is without health insurance and he has only received rudimentary care for his physical injuries. Moreover, he is without a primary care doctor.

In the case of another player with Alzheimer's disease, YLF inquired whether a brief extension could be granted from the January 12, 2018, deadline to file his Appeal because of the

holiday season.  Having heard no response, YLF and its partner firms worked through the holidays and nonetheless timely filed his Appeal on January 12, 2018.  However, unbeknownst to counsel, an Audit had been issued against his Claim two days before his Appeal was filed. This player is a member of the Hall of Fame of a college football powerhouse and he has a severe traumatic brain injury from his years in the NFL.  After a battery of testing, his Qualifying Diagnosis is a Major Neurocognitive Disorder due to Probable Alzheimer's Disease.  Not only was he seen by a Board Certified Neurologist (Dr. Garner), a Board Certified Psychiatrist (Dr. Afield), a Board Certified Brain Injury Specialist (Dr. Merritt), a Board Certified Neuropsychologist (Dr. Hoffman), and a Neuropsychologist (Dr. Barror-Levine), his Alzheimer's diagnosis and his associated problems were also confirmed by his treating neurological physician (Dr. Nieves), multiple MRI Brain scans, Brain SPECT scans and other physicians who treated him during his hospitalization in 2012.

Although YLF and its partner law firms were working through the holidays on the appeals of other players who had had their Claims denied, counsel stopped work on these appeals as it appeared the NFL Parties were receiving the benefit of additional time to conduct further investigations and plan their responses to the appellate packages submitted by the Claimants. None of these Audits should have been issued and by this time, all of these Denials should have been before the Special Master for consideration of the merits of their severe injuries.  All of these January 10, 2018 Audits and the Audit of March 12 fail to comply with the Audit procedures under Article X of the ASA.  In addition, because there was a Denial, by definition, there is no pending Claim to Audit.  Moreover, any interested party waived the right to request an Audit by taking no action while that Claim was pending.

Second, the purpose of Audits under Section 10.3 is, with good faith intent, to evaluate a Claim for fraud. The January 10 Audits are facially non-compliant. With the exception of one Audit, each Audit states "we do not require any information at this time … [and] we will contact you if we determine that additional information and/or records are necessary." The timing of all of these January 10 Audits also question their validity. As such, there should be a presumption all of these Audits fail to meet the standards under Paragraph 10.3. Moreover, it appears these Audits were issued to delay the appeals so that the new Appeal rules could be published prohibiting new evidence. Had there been a good faith basis to issue these Audits, these Audits would not have been at the last minute and each would have requested information and/or records to evaluate the Claim for fraud.

These Audits are further depriving rights of the Subclass 1 Players to present their procedural concerns to the Claims Administrator. Counsel representing Subclass 1 Players were the first lawyers that have openly challenged the many changes to the ASA process. For their efforts, these counsel were personally and needlessly maligned. But they were right. Moreover, none of these IRPA lawyers stand to benefit from the award of fees under the Common Benefit Fund and therefore have no interest in acting in any other interest besides seeing all of their players receive full and timely compensation. Furthermore, on November 2, 2017, this Court entered an Order Denying the Motion of X1 Law (an independently retained firm) to Determine the Proper Administration of Claims Under the Settlement Agreement. The Order stated "movants must follow the proper appeals process…." In addition, on October 24, 2017, this Court entered an order stating "[b]efore Plaintiff can attempt the extraordinary action of modifying the Settlement Agreement … Plaintiff must submit their claim … [and] go through the appeals process."

Having reached the apogee of the procedures under the ASA, as further delineated by the Court, YLF worked tirelessly through the holiday season to perfect the appeals of all five of these players under Article IX, as well as the subsequent Appeal filed in March. Much to their surprise, the Claims Administrator took the ultra vires act of issuing these several Notices of Audits of Claims on January 10, 2018, and March 12, 2018. On information and belief, the issuance of these Audits was an ultra vires act at the apparent insistence of the NFL Parties whose only remedy at this point was as an Appeal under 9.7(b).

Through the issuance of these Audits, none of these players will receive procedural due process nor will they have an opportunity to be timely heard. Players with fully documented claims, including players with Alzheimer's Disease, will obtain only delay, not the relief that was intended. In addition, the direction of these six Claims into the Audit process will further delay these Claims if for no other reason than the NFL has clogged the AAP with other Audits causing further irreparable harm to these players as their claims are stalled in a procedural quagmire.

When our client filed his Appeal on January 12, 2018, he made the argument stated above, that the Claims Administrator was without the authority to issue an Audit once a Denial had been issued and the provisions of Article IX now governed the Appeal. That argument was a corollary to the rule that the only Audit that could issue after a Monetary Award was the 10% rule that allowed limited random Audits at this stage. Not only does the express language of the ASA limit Audits once a Claim is awarded or denied, it makes common sense to believe that any Audit of any Claim should be performed before the Claim reaches finality. Moreover, as noted above, Paragraph 10.3(c) becomes redundant and unnecessary if the Claims Administrator is free to issue Audits anyway.

However, for reasons unknown, and eleven days after YLF presented its argument, the Rules Governing Appeals of Claim Determinations were posted.  As shown below, Appeal Rules 11, 23, and 34 violate fundamental due process.  Seemingly out of order for the sequence of these rules, the last rule included as Rule 34 suggests that the Claims Administrator may place a Claim in Audit at any time.  Rule 34 goes on to state that any Audit suspends the time periods applicable to an Appeal.  Some eight days after the Appeal Rules were posted, the Audit Rules were posted.  As shown below, Audit Rules 7 and 8 also violate fundamental due process.

Audit Rule 8 now makes clear what was only suggested in the last minute addition of Appeal Rule 34.  Audit Rule 8 states the Claims Administrator may place a Claim in Audit at any time, even if the Claim has already been paid.  Nowhere is there any language in the ASA that states the Audit powers extend that far.  Proving that the ASA was never meant to have such unbridled authority, Part VII of the Notice of Monetary Award Determination plainly states the Award will be paid once the Audit process is complete.  Nothing in Part VII says any part of the Monetary Award can be clawed back.  Moreover, payment of the Award must mean that the Audit is complete.  Otherwise, under Part VII, the Award could not be paid.  Moreover, at most, Audit Rule 10.3(c) provides for only an approximate thirty day window for a post Award Audit as the Claims Administrator can only Audit 10% of the Claims that were awarded "during the preceding month."  These material changes to the Audit power of the Claim Administrator and the limitation of the right of review constitute a fundamental denial of due process.

Moreover, in many ways, Audit Rule 7 appears to expand the scope of the Audit power of the Claims Administrator under the ASA.  For instance, it now appears the Claims Administrator can exercise the purposes of Rule 8.6(b)(to verify the sufficiency of a claim) through the Audit procedures.  In other words, the Claims Administrator can issue an Audit after

a Claim has been paid to verify and investigate the nature of the sufficiency of the Claim. However, that should have been done during the first 45 days after the Claim was filed or under the limited Audit provisions of Article X (before those provisions were amended).

Further limiting the Appellants right of review to the Special Master, Appeal Rules 11 and 23 purport to limit the ability of the Claimant to submit new matters for an Appeal. Nowhere does the ASA provide that limitation.    In fact, Part III of the Notice of Denial of Monetary Award Claim issued to another player on November 27, 2017 states "[y]ou must submit supporting evidence to support your appeal."  Frankly, the purpose of the ASA was to allow an injured player to document his Claim so that he could be provided relief.   Now, the Claims Administrator apparently has subpoena power to follow its Audits which under Rule 7 now includes more than fraud and extends to the ability of the Claims Administrator to test the sufficiency of the documentation.  However, the Claimant cannot submit new matters that may prove his injury or correct factual errors in any AAP report.   This process has become decidedly unfair.  And the process used to issue Audits in early January to suspend appeals so that the Rules prohibiting new evidence could be issued is fundamentally unfair.

The Appeal and Audit rules described above have apparently been adopted by the Special Master.  However, as stated by the District Court of Minnesota, "It is neither the role of the Special Master nor the court to sit in judgment of the economics of professional football, nor to second guess the wisdom of the bargain the parties struck."  White v. National Football League, 972 F.Supp. 1230 (D. Minn. 1997).

> **3. On December 13, 2017, The Claims Administrator Improperly Issued Some 65 Notices of Preliminary Review Seeking Raw Testing Scores. These Records are not Required to be Provided under the ASA.  These Claims Were Well Past the Time Allotted to Determine Their Sufficiency and These Requests Were Issued as a Massive Fishing Expedition.**

As has been repeatedly demonstrated above, the prescribed periods of time under the ASA are being routinely ignored to thwart otherwise legitimate Claims.  In yet another violation of the ASA procedures, the Claims Administrator is using another unlawful delay to embark on a massive fishing expedition to find a basis to undermine these and other Claims.

Paragraph 8.4(a) of the ASA provides the Claims Administrator with forty-five (45) days to determine the sufficiency of the required contents and completeness of the Claim. Nevertheless, on December 13, 2017, eight days after the Special Master rendered its findings disqualifying Dr. Hoover and invalidating any Claims Packages that relied on her findings, YLF received approximately 65 Notices of Preliminary Review (NPRs).  These NPRs generally sought the raw scores from the neuropsychiatric evaluators used by YLF.  The NPRs were served months after the deadline the Claims Administrator had to determine the sufficiency of the contents of each Claim.  Some Claims had been pending for nearly seven months.

Moreover, the Claims Administrator and any Interested Parties are only entitled to medical records under the ASA.  Raw scores are not medical records.  Moreover, in most states, including Florida, raw scores can only be provided directly to a properly licensed neuropsychologist.  The Claims Administrator is simply not entitled to these records.  Had it been the intent of the parties to require these records, the ASA Exhibits could have specified that these scores be reported along with the detailed T scores that are otherwise required.  This is another ultra vires act of the Claims Administrator that is enforcing compliance through the Draconian sanction of Denial unless these records are provided.  And, before the proverbial cat is let out of the bag, the Players have no right to appeal this process.

Moreover, had the neuropsychiatric reports been facially non-compliant with the pages of extensive and detailed requirements specified in Exhibit 3 of the ASA, the Claims Administrator

could have requested additional records months before the December 5, 2017, Special Master ruling.  This is the other apparent problem with the NPRs.  Even if there was a legitimate basis, NPRs and Audits are being used *en masse* to frustrate the Claims process.  For instance, in the case of one player, his Claim was filed in May 2017.  On August 22, 2017, a Notice of Deficiency was sent well after the 45-day deadline.  That Deficiency noted three matters including the MRI report which had already been filed with his original Claim Package.  His Response was timely filed.  Nevertheless, on January 4, 2018, a Notice of Preliminary Review (NPR) was sent raising the same identical matters raised in the Deficiency.  Claimant responded and informed the Claims Administrator these matters had already been submitted.  Then, on March 12, 2018, about ten months after his Claim was filed, an Audit was issued asking for routine medical provider and employment information.

One could argue that a series of simple mistakes had been made, the deadlines were unfortunately missed, and these requests were all issued in good faith.  However, the Claims Administrator would have to explain why the nearly identical pattern of delay occurred with another player whose claim was filed on May 15, 2017, a Deficiency was issued on August 22, 2017, his NPR asking for the same matters was issued on January 4, 2018 and his Audit was issued on March 4, 2018.  The coincidences between the treatment of these claim are either extreme serendipity or a planned process.  Unfortunately, because YLF only has a certain number of Claims, it cannot monitor the proceedings from a global perspective.  Nevertheless, even from this small representative sampling, it would appear that the combination of Deficiencies, NPRs and Audits, are being used to frustrate the rights of these injured players to due process.  By no stretch of the imagination is the process working perfectly.

However, despite the delays that are being afforded, on information and belief, having recognized the utility in having a provider disqualified and disposing of hundreds of Claims regardless of the merits of each individual Claim in one fell swoop, the Claims Administrator is withholding review of a thousand or more 1.5 and 2.0 Claim Packages looking for a pretext to thwart these Claims.  That was not the intent of the ASA.

With respect, and on information and belief, it appears there is a systemic bias against 1.5 or 2.0 Claim Packages.  According to the February 5, 2018, Monetary Award Claims Report, 1,079 1.5 and 2.0 Claim Packages have been submitted but only 4 of these 1,079 Claims have been paid to players.

Moreover, as evidenced by the absence of any action on the Monetary Awards of the players referenced above, and the failure to make any other award on approximately 141 fully documented Claim packages after months of languishing in Audits or otherwise, YLF has concluded there is a systemic bias against Subclass 1 Claims.  Furthermore, YLF has previously spoken with lawyers in California, Texas, Connecticut and Florida who represent many other Subclass 1 Claims and not one of these firms has reported payment of a single claim prior to March 1, 2018.  More than a hundred million dollars has been paid to players yet it appears no individually represented player has been paid for a 1.5 or 2.0 claim.  As part of their correspondence to the Claims Administrator, YLF has asked how many Subclass 1 Claims have been paid.  The Claims Administrator has refused to respond.

One cannot help but feel that the individually retained lawyers:  (1) are having their fee contracts challenged; (2) must defend against inappropriate fee liens; and (3) who are not part of the executive committee and are being further frustrated by having the Claims of their players delayed so that their efforts are otherwise chilled.

## MEMORANDUM OF LAW

All affected parties must honor the plain language of the settlement agreement not only as to the timeframes, but also as to the submitted claim documents. "It is essential that the parties to class action settlements have complete assurance that a settlement agreement is binding once it is reached." Ehrheart v. Verizon Wireless, 609 F.3d 590, 596 (3d Cir. 2010). The "obligation" of all affected parties to be bound by a Court-approved settlement agreement "pervades the law." Pugh v. Super Fresh Food Markets, Inc., 640 F.Supp. 1306, 1307 (E.D.Pa. 1986) (enforcing the settlement agreement in a tort case). To overlook deadlines is a breach. To add requirements for submitting the claims is a breach. "It is well established that a court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." Brown v. County of Genesee, 872 F.2d 169, 173 (6th Cir. 1989) (collecting cases). Both the deadlines and the claim-filing requirements must be enforced according to the plain language of the agreement. Moreover, the Claims Administrator should be precluded from any benefit of the raw scores already obtained under the well- recognized law that prohibits the fruit of the poisonous tree.

Based on the plain language of paragraph 8.4(a), these Claimants ask the Court to enforce the 45-day deadline for preliminary review of their claims. Based on the plain language of Article IX and X, Claims that have been Denied should be removed from the Audit track and their Appeals should proceed. Claimants should be provided fifteen days to perfect their Appeals and any responding party should be strictly limited to the record on appeal so that there is no benefit from this extraordinary time out that these interested parties have received. The Third Circuit held that "the settlement agreement is a contract subject to the rules of contract interpretation." Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 79 (3d Cir. 1982). Applying Pennsylvania law, the Third Circuit instructs:

> Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence, instead, the meaning of a clear and unequivocal written contract must be determined by its contents alone.   Where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.   Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract.

Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92-93 (3d Cir. 2001), cert. denied, 534 U.S. 1162 (2002).

The deadlines and procedures referenced above must be enforced.  While the agreement does not state that time is of the essence, it also makes provision for the deadlines to be extended by express agreement of the parties.  No such extension has been granted or amendment has been agreed.  In claim after claim, the 45-day deadline for preliminary review has expired without a response.  An order for specific performance is the proper remedy to enforce the contractual deadline.  Saber v. Finance America Credit Corp., 843 F.2d 697, 702 (3d Cir. 1987); accord, Sotak v. Nitschke, 303 Pa. Super. 361, 374, 449 A.2d 729, 735 (1982) ("[S]pecific performance is an equitable remedy to compel the performance of a contract in the precise terms agreed on, or substantially.").  Otherwise, these contractual rights are meaningless.

Adding unwritten requirements to the claim packages is barred by the settlement agreement.  The settlement agreement plainly describes how to submit the claim packages in detail in Exhibit A-1.  The unambiguous "minutiae of the parties' performance and expectations" in the settlement agreement of a class action are enforceable.  Colella v. University of Pittsburgh, 569 F.Supp. 2d 525, 531 (W.D.Pa. 2008).  Requiring raw scores or the Level 1.5 claimants to provide documents corroborating their traumatic brain injuries before the qualifying diagnosis violates the ASA.  With regard to the latter, Section 1(a)(iii) of the Exhibit A-1 makes no mention of a requirement for corroborating documents before the date of the diagnosis, so that

requirement cannot be unilaterally added to the claim procedure.  Second, requiring a claimant to provide additional information about unrelated medical conditions, such as diabetes, violates the plain language of the agreement.  Exhibit A-1 makes no mention of requiring documents on non-brain-related medical conditions.  These unwritten requirements must be waived and otherwise removed from the claim procedure based on the "clear contractual terms" of the settlement agreement.  Bohler-Uddeholm America, Inc., 247 F.3d at 92-93.

Again, the Special Master should immediately direct the Claims Administrator to:  (1) remove from Audit any Claim that was Denied so the Appellate procedures under Article IX can be completed; (2) strictly construe the Audit requirements and remove any Claim from Audit that does not meet that test; (3) require the Claims Administrator to fully provide information about the number of Claims in Audit, why these Claims are in Audit and any other matters that will provide Audit transparency; and (4) prevent the Claims Administrator for making requirements not embodied in the ASA.

WHERFORE, Claimants, by and through the undersigned counsel, The Yerrid Law Firm and Neurocognitive Football Lawyers, respectfully request the opportunity to address the matters in this motion as further directed by the Court, as well as other relief that is just and equitable.

Dated: March 30, 2018

Respectfully submitted,

*/s/ Ralph L. Gonzalez*
C. STEVEN YERRID, ESQ.
RALPH L. GONZALEZ, ESQ.
HEATHER N. BARNES, ESQ.
THE YERRID LAW FIRM
101 E. Kennedy Boulevard, Suite 3910
Tampa, Florida 33602
(813) 222-8222 (telephone)
(813) 222-8224 (telefax)

18

hbarnes@yerridlaw.com
cjameson@yerridlaw.com
kodell@yerridlaw.com
Florida Bar No. 207594
Florida Bar No. 564140
Florida Bar No. 85522


JIM HOLLIDAY, ESQ.
HOLLIDAY KARATINOS LAW FIRM PLLC
18920 N. Dale Mabry Hwy. Suite 101
Lutz, Florida 33548
(813) 868-1887 (telephone)
(813) 909-8535 (telefax)
jamesholliday@helpinginjuredpeople.com
Florida Bar No. 45284


THOMAS PARNELL, ESQ.
GIBBS & PARNELL, P.A.
722 E. Fletcher Ave.
Tampa, Florida 33612
(813) 975-4444 (telephone)
(813) 975-4445 (telefax)
Florida Bar No. 441988


JEFFREY MURPHY, ESQ.
JEFFREY D. MURPHY, P.A.
511 W. Bay St., Suite 352
Tampa, Florida 33606
(813) 443-5553 (telephone)
(813) 436-5190 (telefax)
Florida Bar No. 860808


## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2018, I caused the foregoing Request to be electronically filed with the United States District Court for the Eastern District of Pennsylvania

via the Court's CM/ECF system, and that the filing is available for downloading and viewing from the electronic court filing system by counsel for all parties.

*/s/ Ralph L. Gonzalez*
RALPH L. GONZALEZ
THE YERRID LAW FIRM