**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

**RESPONSE BY THE CLAIMS ADMINISTRATOR TO MOTION TO PROHIBIT EX
PARTE INTERVIEWS WITH TREATING PHYSICIANS (DOCUMENT NO. 9815) AND
PARTIAL JOINDER (DOCUMENT NO. 9843) TO THE MOTION BROUGHT BY THE
LOCKS LAW FIRM, FILED BY NEUROCOGNITIVE FOOTBALL LAWYERS, LLC**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ............................................................................................................1

II.  FACTUAL BACKGROUND AND ARGUMENT........................................................2

    A.  The Law Firm(s) Involved in These Motions ..........................................................2

    B.  Monetary Award Claims Received from NCFL........................................................5

    C.  The Audit Process Under the Settlement Agreement ...............................................9

        1.  Relevant Provisions of the Settlement Agreement ......................................9
        2.  The Audit Procedure and the Audit Rules ...................................................9
        3.  How an Audit Starts....................................................................................10
        4.  The Goal of an Audit Investigation ...........................................................12
        5.  Our Powers of Investigation in an Audit ...................................................14
        6.  Seeking Information from a Player's Physician in an Audit .....................15

    D.  The NCFL Motion to Prohibit Ex Parte Interviews With
        Treating Physicians .................................................................................................17

    E.  The Partial Joinder by NCFL in the Locks Motion ...............................................21

        1.  The Locks Motion.......................................................................................21
        2.  Audit Investigations of NCFL Claims .......................................................22
        3.  Doctor 1 and Doctor 2................................................................................23
        4.  Neuropsychologist Group A .......................................................................26
        5.  Neuropsychologist B...................................................................................27
        6.  Doctor 3 ......................................................................................................28
        7.  Player A ......................................................................................................29
        8.  Complaints by NCFL in the Partial Joinder...............................................30

III.  CONCLUSION.............................................................................................................32

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

**RESPONSE BY THE CLAIMS ADMINISTRATOR TO MOTION TO PROHIBIT EX
PARTE INTERVIEWS WITH TREATING PHYSICIANS (DOCUMENT NO. 9815) AND
PARTIAL JOINDER (DOCUMENT NO. 9843) TO THE MOTION BROUGHT BY THE
LOCKS LAW FIRM, FILED BY NEUROCOGNITIVE FOOTBALL LAWYERS, LLC**

## I.   INTRODUCTION

BrownGreer PLC, the Court-appointed Claims Administrator of the Class Action

Settlement Agreement of this litigation, submits this Response to two pleadings filed by

Neurocognitive Football Lawyers, LLC ("NCFL"):[1]

1. **Motion on Physicians (Document 9815):**  The "Former NFL Player-Claimants'
   Motion to Prohibit Ex Parte Interviews with Their Treating Physicians," filed on
   March 26, 2018; and

2. **Partial Joinder (Document 9843):**  "The Yerrid Law Firm and Neurocognitive
   Football Lawyers' (1) Partial Joinder to the Motion Brought by the Locks Law Firm
   for Appointment of Administrative Counsel, (2) Motion to Review Deprivation of
   Appeal Rights and (3) Requesting Oral Argument," filed on March 30, 2018.

---

[1] In this Response, we will refer to this company as "NCFL," though the firm name of "Neurocognitive Football
Lawyers" normally would be abbreviated as "NFL," which would be confusingly identical in name to the NFL that
is a party to the NFL Concussion Settlement Agreement.

1

In their Partial Joinder, Yerrid and the NCFL mention a "Motion Requesting the Special Master Review the Fraud Detection Procedures of the Claims Administrator, to Set Aside Unreasonable Audit Notices, and to Direct the Claims Administrator to Provide Important Information to the Class Members," but that Motion was never filed in this docket and is not before the Court. We received a copy of it by email from a Keith O'dell at Gibbs and Parnell on March 23, 2018, but there is no such motions practice with the Special Masters under the Settlement Agreement, the Rules Governing the Audit of Claims adopted by the Special Masters, or under any Order of this Court. On the day before, March 22, 2018, the Yerrid Law Firm and NCFL had filed in the docket a "Notice of Correction of Certificate of Service" (Document 9810) saying the representation in the certificate of service on that motion that it had been filed with the Court was a "Scrivener's error." As a result, this Response does not reply to that motion, though most of what it asserted can be found in NCFL's Partial Joinder.

## II. FACTUAL BACKGROUND AND ARGUMENT

### A. The Law Firm(s) Involved in These Motions.

NCFL is a consortium of four Florida-based lawyers or law firms: (1) Gibbs and Parnell, P.A. (Tampa); (2) Jeffrey D. Murphy, P.A. (Tampa); (3) The Yerrid Law Firm, P.A. (Tampa); and (4) Holliday Karatinos Law Firm, PLLC (Brooksville, Iverness and Lutz). These four firms incorporated NCFL on February 18, 2016, which is after this Court's April 22, 2015 Final Approval of the Settlement Agreement and before the Effective Date of the Settlement Agreement on January 7, 2017, to represent Retired NFL Football Players ("Players") and their representatives in this Settlement Program. The lead person at NCFL appears to be Tom Parnell of Gibbs and Parnell, who also is NCFL's registered agent, though our day-to-day communications are with Mr. O'dell at Gibbs and Parnell. NCFL's mailing

2

address is the same as that of Gibbs and Parnell.  We also have communicated several times with Steven Yerrid of The Yerrid Law Firm, P.A.

None of these four firms was involved in any lawsuits against the NFL before the Settlement Agreement.  NCFL obviously was not, because it did not exist before the Settlement Agreement.

While NCFL apparently has no website of its own, the four member firms do.  Three of them have material on their websites about services in this Program.  Gibbs and Parnell lists "NFL Concussion Lawsuit Claims" as one of its personal injury practice areas.  In its overview of that service (http://www.car-accident-attorney-tampa.com/nfl--concussion-lawsuit-claims), the firm states:  "NFL Concussion?  We can help!" and "It's not too late – join the settlement now – call us to schedule a private medical evaluation at no cost to you." The firm's website summarizes some basic information about the Settlement, but it is outdated because it suggests that registration has not yet started (the Registration deadline passed on August 7, 2017) and that persons still can exclude themselves (the Opt Out deadline passed on October 14, 2014).  Holliday Karatinos Law Firm, PLLC, has a page with the header "NFL Concussion Settlement Claims – Neurocognitive Deficits" on which it discusses the litigation history, medical and scientific information and solicits potential clients (https://www.helpinginjuredpeople.com/nfl-concussion-settlement-claims/neurocognitive-deficits/).  Jeffrey D. Murphy states on his website (https://www.personal-injury-lawyer-tampa-fl.com/) that he is representing 200 retired Players for claims against the NFL in the NFL Concussion Settlement Lawsuit.  The Yerrid Law Firm does not have any information on its website about the Settlement or any clients it

has in the Program (http://yerridlaw.com/firm-profile/).  None of these four websites explains

that the firms have joined forces in NCFL.

Every lawyer and firm acting for Settlement Class Members in this Program must

identify themselves to us, tell us which Settlement Class Members they represent and then

set up an online portal account with us to register their clients, submit materials to us and

receive notices and information from us on their clients and our processing of their claims.

Not one of the four member firms in NCFL has done any of that.  None has registered with

us as representing any Settlement Class Members; none has set up any online portal with us.

Instead, all their activity in this Program has been in the name of NCFL, which has notified

us that it represents 188 registered Settlement Class Members.  Table 1 shows NCFL's four

authorized users on its portal and their activity on it:

| Table 1 | NCFL PORTAL USERS | |
|---|---|---|
| | **User** | **Access (as of 4/9/18)** |
| **1.** | Tom Parnell (ko@gibbsandparnell.com) | Last accessed on 4/7/18 at 11:05 a.m. |
| | Tom Parnell [personal email address] | Never accessed through this email |
| **2.** | Jim Holliday (jimholliday@helpinginjuredpeople.com) | Never accessed through this email |
| | Jim Holliday (kimberlyclement@helpinginjuredpeople.com) | Last accessed on 4/6/18 at 8:18 a.m. |
| **3.** | Jeff Murphy (JM@JeffMurphyLaw.com) | Last accessed on 8/7/17 at 7:36 p.m. |
| **4.** | Ariel Rodriguez (ar@gibbsandparnell.com) | Last accessed on 4/7/18 at 4:26 p.m. |

We think that Mr. O'dell is using the portal through the account assigned to Tom Parnell.

Mr. Yerrid has no portal account with us and has never logged on himself to see his clients'

information there.

4

**B. Monetary Award Claims Received from NCFL.**

Of the 188 Retired NFL Football Players NCFL registered in the Program, the firm has sent us Monetary Award Claim Packages on 143, as shown in Table 2:[2]

| Table 2 | | MONETARY AWARD CLAIMS FROM NCFL |
|---|---|---|
| | Qualifying Diagnosis Asserted | Claims (% of NCFL Claims) |
| 1. | Level 1.5 Neurocognitive Impairment | 74 (52%) |
| 2. | Level 2 Neurocognitive Impairment | 66 (46%) |
| 3. | Alzheimer's Disease | 3 (2%) |
| 4. | Total | 143 |

We received the first of these claims on May 12, 2017, and the last on October 19, 2017, with 47 claims coming in May, 28 in June, 54 in July, nine in August, three in September and then two in October.  There have been no new claims from them since October 2017.  There are no claims for ALS, Parkinson's, or Death with CTE.  All the NCFL claims rest on Level 1.5, Level 2 and Alzheimer's diagnoses made before the January 7, 2017 Effective Date of the Settlement Agreement, meaning they were not made by Qualified BAP Providers or Qualified MAF Physicians.  Though 182 of NCFL's 188 registered Players are eligible for the BAP, the firm has submitted BAP paperwork and set up a BAP baseline assessment for only one Player, who has yet to be examined.  The firm has not received any Level 1.5 or Level 2 diagnoses in the BAP.  Nor has it submitted any claims based on an examination by a

---

[2] We treat a law firm's client information as confidential to that firm and its clients, except as we are permitted to share it with the Court, the Special Masters, the Parties, the Trustee and the Lien Resolution Administrator.  We do not make public statements about how many clients a particular firm has or what has happened to their claims.  Here, we need to explain these facts to move through the door opened by NCFL in its motions, in which it describes the firm's claims in some detail and alleges nothing has been done with them.

Qualified MAF Physician.  The firm has not sent in any Derivative Claims on behalf of family members of any Players.

Information on Players and their claims is confidential.  We do not disclose it publicly or to anyone not authorized to receive it by the Settlement Agreement, the Court's Orders, or consent from the Player.  Our Audit proceedings are conducted in private among the Special Masters, the Parties and the Settlement Class Members affected by an Audit Report, along with their lawyers if they are represented.  Our Audit Reports are not filed in the public record of this Court.  Normally, we do not discuss the Audit investigations of a firm's claims in this public forum.  The accusations NCFL makes in its Partial Joinder, which it filed in the Court's public docket, require us to do so here.  Nonetheless, we have de-identified the names of the NCFL physicians and Players involved.

NCFL used six neurologists on its 143 claims, as listed in Table 3:

| Table 3 | DIAGNOSING PHYSICIANS USED BY NCFL | | |
|---------|-----------|------|------------------|
|         | Physician | City | Number of Claims |
| 1.      | Doctor 1  | Tampa   | 52  |
| 2.      | Doctor 2  | Tampa   | 25  |
| 3.      | Doctor 3  | Tampa   | 49  |
| 4.      | Doctor 4  | Tampa   | 12  |
| 5.      | Doctor 5  | Houston | 3   |
| 6.      | Doctor 6  | Tampa   | 2   |
| 7.      | **Total** | | **143** |

All but two of the 143 diagnoses were made in 2016:  April (19), May (29), June (24), July (15), August (28), September (10), October (nine), November (five) and December (two); the other two diagnoses were made in June and December of 2015.

While five of the physicians used by NCFL are in Tampa and one is in Houston, the Players these physicians diagnosed live in 26 states, with 76 in Florida and eight in Texas:

| Table 4 | STATES OF RESIDENCE OF NCFL CLIENTS | |
|---|---|---|
| | **State** | **Number of Players** |
| **1.** | Alabama | 5 |
| **2.** | Arkansas | 1 |
| **3.** | Arizona | 3 |
| **4.** | California | 2 |
| **5.** | Colorado | 1 |
| **6.** | Delaware | 1 |
| **7.** | Florida | 76 |
| **8.** | Georgia | 11 |
| **9.** | Idaho | 1 |
| **10.** | Illinois | 3 |
| **11.** | Kentucky | 1 |
| **12.** | Louisiana | 1 |
| **13.** | Maryland | 1 |
| **14.** | Michigan | 1 |
| **15.** | Missouri | 3 |
| **16.** | Mississippi | 2 |
| **17.** | North Carolina | 9 |
| **18.** | New Jersey | 1 |
| **19.** | Nevada | 1 |
| **20.** | Ohio | 1 |
| **21.** | Pennsylvania | 3 |
| **22.** | South Carolina | 3 |
| **23.** | Tennessee | 1 |
| **24.** | Texas | 8 |
| **25.** | Washington | 2 |
| **26.** | Wisconsin | 1 |
| **27.** | **Total** | **143** |

Interestingly, of the eight claims we have from Players who live in Texas, only three saw Doctor 5 in Houston, while the other five were diagnosed by a doctor in Tampa, Florida.

We processed these 143 claims in the same manner we do all Monetary Award Claim Packages. Of them, 98 Level 1.5 and Level 2 claims (70% of the firm's 140 Level 1.5 and Level 2 claims) were missing information required for a complete Claim Package, requiring us to send NCFL notices identifying what we needed and explaining how to get it to us. We began sending these notices to NCFL in June 2017, with the last one on March 1, 2018. The most common problem was missing raw scores (86 of 98 claims) for tests administered by the diagnosing physicians. The AAP requested additional medical information on eight claims, while six others were missing documentary evidence corroborating functional impairment. The firm has responded to 46 of its 98 notices about missing information.

Because the NCFL claims rest on Pre-Effective Date Diagnoses, the Settlement Agreement requires that they be reviewed by a Court-appointed neurologist on the Appeals Advisory Panel ("AAP"). The AAP has found 11 of NCFL's claims not medically eligible; and we issued denial notices on two others because the Special Masters determined the diagnosing physician used (Doctor 6 in Table 3 above) was not sufficiently qualified. But 131 of the NCFL claims (including eight that we previously denied) are under Audit investigations, for reasons explained below, which has led to their present Motions. On two of them, we had issued Monetary Awards, but before those funds were paid to the firm, we determined they needed further inquiry into the legitimacy of the claims.

### C. **The Audit Process Under the Settlement Agreement.**

#### 1. **Relevant Provisions of the Settlement Agreement.**

Sections 10.3(c) and 10.3(d) of the Settlement Agreement require us to Audit:

> (1) 10% of the total Claim Packages or Derivative Claim Packages we have found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month.  We select these Claim Packages at random and are required to audit at least one Claim Package, if any qualify, per month.

> (2) Claims seeking a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player took part in the BAP within the prior 365 days and was not diagnosed with that Qualifying Diagnosis during the BAP baseline assessment examination.

> (3) Claims for a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player submitted a different Claim Package within the prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a different physician and that Claim Package was found not to qualify for a Monetary Award.

> (4) Claims reflecting a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting.

Those are not our only audit duties.  Sections 10.3(b) and 10.4 of the Settlement Agreement mandate that we, in consultation with the Parties, establish and implement procedures and system-wide processes to detect and prevent fraud.

#### 2. **The Audit Procedure and the Audit Rules.**

To implement that mandate, in coordination with the Parties and Special Masters we developed an internal Audit Procedure, which the Parties first approved on December 12, 2016, and Rules Governing the Audit of Claims ("Audit Rules"), which the Special Masters adopted as effective on January 26, 2018.  The Audit Rules are posted on the Settlement Website to detail how the Audit process works.  Under Audit Rule 7, we are to audit specific claims or groups of claims and investigate information we receive from Co-Lead Class Counsel or the NFL Parties (the "Parties").  Since the Audit process began, we have regularly

reported to the Parties and the Special Masters on the Audit investigations underway and their status.

Pursuant to Sections 10.3(b) and 10.4 of the Settlement Agreement, we look at various "red flags" to detect potential fraud. The Parties approved the red flags on December 12, 2016, based on Section 10.4 of the Settlement Agreement: (1) alteration of documents; (2) questionable signatures; (3) duplicative documents submitted on claims; (4) the number of claims from similar addresses or supported by the same physician or office of physicians; and (5) data metrics indicating patterns of fraudulent submissions. The Parties approved amendments to the red flags on July 24, 2017. We continue to refine and add to the matters that arouse suspicion about the legitimacy of a claim or group of claims, but have not posted these publicly, for doing so would provide a road map to persons on how to avoid triggering them and the scrutiny that would result.

We also receive tips about potential fraud, which often are the best leads on claims that are of doubtful veracity. The Settlement Website allows anyone to report potential fraud to us (https://www.nflconcussionsettlement.com/ReportFraud.aspx). We research information from each tip to determine its credibility and decide whether we have reason to place claims in Audit while we investigate it further.

**3.  <u>How an Audit Starts</u>.**

If we put a claim in Audit, we notify the Settlement Class Member (through his lawyers, if represented) and the Parties under Audit Rule 9 and under Audit Rule 8 suspend all claims processing and appeal deadlines during the pendency of the Audit. If the claim ends up being closed because of what we find in the Audit, this spares the Settlement Class Member, the Parties, the Special Masters and the administrators of wasted effort on the

claim.  In the Notice of Audit, we do not provide a specific reason on why the claim is in

Audit.  The best practices approach to assessing the reliability of claim submissions makes

such investigations confidential.  For example, the Association of Certified Fraud Examiners

("ACFE") warns in its Fraud Examiners' Manual (2016 US Edition, Section 3.144):

> Fraud investigations must be structured to preserve confidentiality.  If confidentiality issues are not given attention from the outset of the investigation, the details of the investigation might become public, compromising the entire investigation. Additionally, if the details of the investigation do not remain confidential, employees will be reluctant to report future incidents. Also, if an investigation is not kept confidential, and the allegations giving rise to the investigation prove unsupported, the reputations of those suspected of misconduct might be irreparably damaged. Moreover, if an investigation stems from a complaint and the complaint becomes known, it is possible that the complainant could be retaliated against.

Section 3.145 of the ACFE Manual also advises:

> When responding to a sign or allegation of fraud, those responsible must work to avoid tipping off those suspected of fraud. If the suspect is inadvertently informed of the investigation, a number of different adverse events might occur. For instance, the fraudster might attempt to destroy or alter evidence, making it more difficult to conduct the investigation. When investigation details are leaked, concealment and destruction of evidence typically occurs at a faster rate.

> Additionally, a forewarned suspect might attempt to flee, cut off contact with associates, or try to place the blame on somebody else.

> Because unintentionally notifying the fraudster is a key concern in any investigation, the confidentiality of the internal investigation is critical. To avoid tipping off those suspected of misconduct, it is important to have information about the person who is being investigated and what he can access. Also, to maintain confidentiality, determine in advance who should receive information about the investigation and reevaluate who should receive information as the investigation proceeds.

In our experience over the years, we have found this is the best practice for making these

inquiries effective.

11

### 4.  **The Goal of an Audit Investigation.**

Sections 10.3(g) and 10.3(j) of the Settlement Agreement and Audit Rule 12 require us to determine whether there is a reasonable basis to support a finding that there has been a misrepresentation, omission, or concealment of a material fact made in connection with a claim. Audit Rule 12 sets this out in detail:

**Rule 12.   Standard of Proof Applied by the Claims Administrator.**

(a)  Standard of Proof:  If the Claims Administrator determines there is a reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member, the Claims Administrator will report the Claim to the Parties and then refer it to the Special Masters as permitted by these Rules.  This standard applies to all Audits by the Claims Administrator, including those under Section 10.3(j) of the Settlement Agreement concerning possible fraud in connection with a Claim.

(b)  Fraudulent Intent Not Required:  This standard of proof does not require the Claims Administrator to determine whether the misrepresentation, omission or concealment was intentional.

(c)  Materiality:  A fact is material if it did affect or has any potential to affect whether the Settlement Class Member qualifies for a Monetary Award, Supplemental Monetary Award or Derivative Claimant Award and/or the amount of such award in favor of the Settlement Class Member under the provisions of the Settlement Agreement.

If we conclude there is not a reasonable basis for a finding of misrepresentation, omission, or concealment, we remove the claim from Audit and issue a notice to the Settlement Class Member advising him or her that we have concluded the Audit and will continue processing the claim, pursuant to Audit Rule 14.  If, however, we find there is a reasonable basis for a finding of misrepresentation, omission, or concealment, under Audit Rule 15 we issue to the Parties a Report of Adverse Finding in Audit, explaining what we found and the remedies we feel are appropriate.  Audit Rule 16 gives Co-Lead Class Counsel and the NFL Parties 30 days from the Report to decide whether they agree with us that it should be referred to the Special Masters for review.  If either Party consents to the referral, we send the Report to the Special

Masters, after which each Party has 20 days under Audit Rule 17 to submit their statements of position to the Special Masters.  After all this process, if the Special Masters decide to accept the referral, we follow Audit Rule 19 and send the affected Settlement Class Members (or their lawyers) a notice of the referral and a copy of the Audit Report, with such redactions needed to avoid disclosing to lawyers confidential information about Settlement Class Members they do not represent, or to a Settlement Class Member information about other Settlement Class Members.  Then the affected Settlement Class Members and their lawyers have 30 days under Audit Rule 20 to submit a memorandum to the Special Masters in response to the Audit Report, along with exhibits and additional evidence in support of their positions.  Rule 24 gives the Special Masters discretion to require or permit oral argument on a referred Report.

The Special Masters will determine whether the Settlement Class Members or other parties subject to the Audit Report have established that there is no reasonable basis to support a finding that there has been a misrepresentation, omission, or concealment of a material fact made in connection with a claim by the Settlement Class Member and may find such misrepresentation, omission, or concealment was intentional (Audit Rule 28).  The Special Masters may remand claims to us under Audit Rule 29; dismiss the proceeding under Audit Rule 30; or under Audit Rule 31 deny the claims, require additional audits, refer the matter to the appropriate disciplinary boards or federal authorities, direct re-examination of a living Retired NFL Football Player or review of the medical records of a deceased Retired NFL Football Player by a Qualified BAP Provider or by a Qualified MAF Physician, disqualify the lawyer, law firm, claims service, or healthcare provider, and/or Settlement Class Member(s) from the Program, and/or order other relief that the Special Masters may deem appropriate.  Claims are not closed after an Audit unless the Special Masters agree with our findings and direct us to do so.

5.  <u>**Our Powers of Investigation in an Audit**</u>.

Section 10.3(e) of the Settlement Agreement grants us the authority to require

Settlement Class Members to submit additional records and information to us, including a list

of all the Player's health care providers for the past five years and NFL employment records,

as well as allowing us to obtain medical records from all the Player's doctors.  Audit Rule 10

sets out this investigative authority, which is essential to any effective process for

investigating suspicious claims and sources of claims in a settlement program, and bestows

upon our requests for records or information in connection with an Audit the force and effect

of a subpoena under Fed. R. Civ. P. 45:

> **Rule 10.  Required Information and Records.**  The Claims Administrator may require a Settlement Class Member, within 90 days or such other time as necessary and reasonable under the circumstances, to submit to the Claims Administrator such records and information as may be necessary and appropriate to audit the Claim of the Settlement Class Member, including the records and information described in Sections 10.3(e) and 10.3(f) of the Settlement Agreement.  The Claims Administrator also may require persons and entities other than the Settlement Class Member to submit such records and information within 90 days or such other time as necessary and reasonable under the circumstances.  Any request by the Claims Administrator for records or information in connection with an Audit will have the force and effect of a subpoena under Fed. R. Civ. P. 45 and may be served by any means that will cause the recipient to receive it.  The Claims Administrator has the authority to take testimony, issue follow-up requests for information and records, and/or obtain additional materials and information pursuant to Fed. R. Civ. P. 45 as it deems reasonably necessary to complete the Audit.

Section 10.3(d) of the Settlement Agreement allows audited Settlement Class

Members 90 days, or such other time we determine necessary and reasonable, to respond to a

request for information in an Audit.  If a Settlement Class Member refuses to cooperate with

an Audit, including by unreasonably failing or refusing to obtain and provide us with all the

records and information sought within the time we specified, Section 10.3(b)(ii) of the

Settlement Agreement and Audit Rule 11 gives us the authority to deny the claim, without

right to appeal.

6.  <u>**Seeking Information from a Player's Physician in an Audit**</u>.

A key issue in nearly every Audit investigation is whether the diagnosing physician's stated diagnosis of the Player's condition, to which the physician certifies under penalty of perjury on the Diagnosing Physician Certification Form he or she signs for submission to us in a Monetary Award Claim Package, is based on or contains any misrepresentations or omissions of material fact.  Thus, a significant aspect of an Audit investigation is trying to discern how the physician reached that conclusion, any external factors affecting his or her perspective or incentives, whether the information relied upon and given to us is reliable and genuine, and other factors bearing on the reliability and integrity of the diagnosis asserted, remembering that we are not required to find that a misrepresentation or omission was made with fraudulent intent.

Unfortunately, we have found that many of the Pre-Effective Date claims for neurocognitive impairment—Level 1.5, Level 2 and as an element of Alzheimer's Disease— have attributes that cast doubt on the legitimacy of the claims.  We have questions about such facts, including:

1)  The physician's methodologies and testing protocols;
2)  Represented results;
3)  Possible bias or influence;
4)  Use or non-use of neuropsychological testing;
5)  Disregard of results inconsistent with the diagnosis rendered or perhaps preferred;
6)  Failure to do necessary testing;
7)  Disregard of facts regarding the Player's functional and mental capacities;
8)  The apparently planned omission of tests or consideration of facts that would lead to a lower claim value or no Qualifying Diagnosis at all;
9)  Performing diagnoses in high volumes and in numbers physically impossible to accomplish in the time allowed;
10)  Swearing reliance on evidence that did not exist until a later date;
11)  Reports showing identical vital signs and scores on many different Players;

15

12) Financial incentives to render payable diagnoses;

13) Players traveling great distances to see a particular physician—often a high-volume one—rather than being examined by the neurologists and neuropsychologists where the Player lives;

14) Diagnosing physicians finding abnormally high percentages of Players with Level 1.5 or Level 2 conditions among all those who saw the doctor;

15) Tips to us that Players are being coached by their lawyers or other Players on how to secure a Qualifying Diagnosis; and

16) Tips that lawyers have "guaranteed" a Qualifying Diagnosis from their chosen physicians if a Player hires that lawyer.

Our Audit investigations are designed to explore these issues and assess the integrity and reliability of a claim before the Settlement Fund issues payments of up to $5,000,000 per claim in the face of such circumstances.

All of this obviously requires us to try to get information and records from the diagnosing physician.  Paragraph 7 of the Confidentiality Order (Document 7324) entered by the Court for this Program allows us to provide otherwise confidential Claims Information on a Settlement Class Member to a person who may have relevant documents or information necessary for verification of a claim for the investigation of potential fraud under Sections 10.3 and 10.4 of the Settlement Agreement.  We must contact doctors who are the subject of our Audits to ask questions during our investigations.  Otherwise we have no way to assess the doctor's methodology and the accuracy and reliability of a diagnosis to determine whether the doctor engaged in misrepresentation, omission, or concealment, or perhaps was misled by a lawyer, the Player, or someone else as to the Player's true condition.  We may need to ask general questions of the doctors, Player-specific questions regarding medical histories or diagnoses, or both.

This is a major reason these Audit investigations require time to finish.  Our goal is to start and conclude an Audit in no more than 90 days, though on many claims we can dispel our concerns much more quickly than that and return the claim to normal claims processing.

On many others, however, we need greater details on the claims and what led to the diagnoses asserted.  It is often especially difficult to secure the timely cooperation of the diagnosing physicians, who give us many reasons, ranging from personal illness, demands for compensation, being busy, or simply insult at being questioned about their diagnoses, that delay our receipt of the information and prolong the Audit investigation.  We beg, cajole and plead with these persons to send us the needed materials, but are not always successful.  Though we have the clear power—some might say duty, rather than taking longer trying to finish the Audit—to deny claims for lack of cooperation with the Audit, we have not yet exercised that remedy.  Our goal is to provide the persons under audit with the time needed to explain things adequately so we do not unfairly issue an adverse Audit Report to the Parties and the Special Masters.

    **D.  <u>The NCFL Motion to Prohibit Ex Parte Interviews With Treating Physicians</u>.**

      This Motion strikes at the heart of an Audit investigation.  NCFL says its Motion is by a "group of former NFL player-claimants" it represents, but does not identify those Players.  Paragraph 2 states that "an attorney representing two board-certified neurologists in Tampa, Florida has notified the undersigned that the Claims Administrator engaged in <u>ex parte</u> interviews with his physician clients about the evaluation and treatment of some former NFL players who are participating in the concussion settlement."  We have heard ourselves from one lawyer in Tampa, as explained below.

      NCFL argues our questions to the physicians who have sworn to these claims are "outside the scope and purpose of" the Settlement Agreement (para. 3); seek information "not contemplated under" the Settlement Agreement (para. 4); ask for replies in fewer than 90 days (para. 5);  were posed without consent by the Player under "HIPAA" (para. 3); and

amount to a "governmental intrusion" into a Player's "private life" under the Florida state Constitution (para. 9).[3]   NCFL also worries that such questions may "have a chilling effect on the willingness" of these doctors and others to "participate in the claims process in the future" (para. 15).

    None of these arguments has even facial validity.  Most can be addressed quickly.  As reviewed above, the Settlement Agreement approved by the Court, the Confidentiality Order entered by the Court and the Audit Rules approved by the Special Masters authorize us to request—and even require—physicians to provide us information and medical records. Audit Rule 10 and Section 10.3(e) of the Settlement Agreement allow us to use a 90-day response time "or such other time as necessary and reasonable under the circumstances."  It is odd that a law firm complaining about the time their claims have been in Audit would want us to allow doctors more than 90 days to get back to us with the information we need to do the Audit.  As the Claims Administrator, we are not the government.  Nothing we do is a "governmental intrusion" on anyone.  And the case cited for the proposition that "one federal court" was concerned about interviewing a litigant's treating physician, *In Re: Vioxx Products Liability Litigation*, 230 F.R.D. 470, 473 (E.D. La. 2005), concerned a defendant's contact with the plaintiff's treating physicians during discovery in litigation and has nothing to do with an audit being done to prevent fraud in a settlement program.  Indeed, we administered the $4.5 billion settlement of the Vioxx litigation, which was supervised by the same district judge who issued that order, and there we conducted audit investigations of physicians as we are doing here, with the full approval and endorsement of that court.

---

[3] HIPAA is the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, codified at 42 U.S.C. § 300gg, 29 U.S.C § 1181 *et seq.* and 42 USC 1320d *et seq.*

This brings us to HIPAA.  According to the  U.S. Department of Health and Human Services, an entity that does not meet the definition of a covered entity or business associate does not have to comply with the HIPAA Rules (https://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html).  We are not a covered entity subject to HIPAA.  A covered entity, as that term is defined in 45 C.F.R. § 160.103, includes a health plan, a health plan clearinghouse, or a health care provider who transmits any health information in electronic form in connection with a covered transaction (*i.e.*, a transaction for which a standard has been adopted, as outlined in 45 C.F.R. Part 162).  As the Claims Administrator in this Settlement, we do not provide or pay the cost of medical care.  Nor are we a billing service, repricing company, community health management information system, or community health information system.  We do not provide medical or health services or furnish, bill, or get paid for health care in the normal course of business and are not a business associate of a covered entity, as we do not provide data transmission services with respect to protected health information to any covered entity, offer a personal health record to one or more individuals on behalf of a covered entity, or create, receive, maintain, or transmit protected health information as a subcontractor and on behalf of a business associate to a covered entity.

While we do communicate with physicians who choose to participate in the Program by evaluating and diagnosing Players with Qualifying Diagnoses and such physicians likely are covered entities subject to HIPAA, much of the information we ask them is not protected health information under HIPAA and thus can be shared without Player consent.  Where we do seek protected health information from such physicians, the physician must decide whether disclosure is permitted under HIPAA, but there are several reasons why a physician could reasonably conclude it is permitted where the Player whose information is to be released had sufficient

notice about a potential disclosure in the Program.  Indeed, Section 8.2(a) of the Settlement

Agreement requires every Player making a Monetary Award to give us a "HIPAA-compliant

authorization form."  No Claim Package is complete without it.

Nonetheless, in this and every program we are extremely careful with a claimant's

personal identifying and medical information and respect the wishes of physicians who feel they

need consent from a claimant before talking with us or sending us records about that claimant.

The Settlement Agreement clearly sets out our Audit rights and responsibilities.  Paragraph 7 of

the Confidentiality Order states that the Claims Administrator may provide information on a

Settlement Class Member to a health care provider "that may have relevant documents or

information necessary for the verification of a claim or other submission in the Program,"

recognizing that we would need to seek such relevant documents or information from health care

providers.  Additionally, in the notices we send Settlement Class Members that their claims are

in Audit, we request information about all health care providers they saw in the past five years (if

relevant to the reason the claim is in Audit) and ask them to sign another Audit Process HIPAA

Authorization Form specifically permitting their medical providers to release protected health

information to us for purposes of the Audit.  Further, Audit Rule 10 allows us to require persons

and entities other than the Settlement Class Member to submit records and information and that

such requests have the force and effect of a subpoena under Fed. R. Civ. P. 45.

We clearly have both the need and the authority in an Audit to ask questions of the

physician who has vouched for the diagnosis on which a Monetary Award claim is based.  As

described in more detail below, we have not required any NCFL physician to give us

HIPAA-protected information on a Player without that Player's consent, even though HIPAA

technically does not apply to us in our work as the Claims Administrator.  If our questioning

of physicians engaged in the kind of behavior we have seen from some of them does end up chilling their willingness to participate in the Program, that may not be a negative.  It is the remedy we have requested of the Special Masters when the circumstances warrant—to bar the physician from sponsoring claims in the Program.  The NCFL motion, complaining about us seeking information from the physicians *ex parte*—which if granted would require us to have the Player present during all questioning of his doctors—would mean the end of any effective audit process and should be denied.

### E.  The Partial Joinder by NCFL in the Locks Motion.

#### 1.  The Locks Motion.

On March 20, 2018, the Locks Law Firm filed a motion (Document 9786) for "Appointment of Administrative Class Counsel" asking that the firm be named to that role to "represent the interests of the Class in the implementation process."  On March 30, 2018, the Yerrid Law Firm and NCFL filed a "Partial Joinder" in that motion.[4]  Though the Court has directed that responses to the Locks Motion and the joinders in it are not due until April 13, 2018, we make this pleading a response to the NCFL Partial Joinder as well as their *ex parte* contact motion, because both require an explanation and understanding of the terms of the Settlement Agreement and the Audit Rules on the Audit process.  The NCFL Partial Joinder is not really "partial" in any respect, as it offers no discussion on whether the Locks Law Firm should be appointed Administrative Counsel.  Instead, it recites complaints about the Audit process, the Audit Rules and the Appeal Rules adopted by Special Masters and the requirement—as directed by Co-Lead Class Counsel and the NFL Parties—that they submit

---

[4] The Yerrid Firm should not have been named as a movant on this Partial Joinder, any more than the other three member-firms in NCFL could have been.  Technically, it has no standing, because it has not entered an appearance with us as representing any Settlement Class Members registered in the Program.

the scores assigned to their clients by the neuropsychologists involved in their claims.  The relief they seek has nothing to do with the Locks Law Firm; instead they want to thwart the audit of claims and have their claims relieved from Audit scrutiny, saying we have been solely on a "fishing expedition" (Partial Joinder at p. 6) and have "taken little or no action to investigate" their claims.  (*Id*. at p. 5.)  That forces us to explain in this public forum why their claims are in Audit and what we have done with them.

### 2.  <u>Audit Investigations of NCFL Claims</u>.

There are 131 NCFL claims in one or more Audit investigations; because of the entanglements among the neurologists and neuropsychologists the firm uses, a claim often is affected by more than one investigation.  We have issued the firm notices on every one of those claims, telling the firm and the Settlement Class Member they are in Audit.

Our concerns about NCFL claims have a long history.  On August 11, 2017, we received tips from two anonymous sources, naming two neurologists (to whom we refer in this Response as Doctor 1 and Doctor 2) and stating they had (1) performed evaluations at the offices of a law firm in Florida, which if true would lead to a mandatory Audit under Section 10.3(d) of the Settlement Agreement; (2) rendered Qualifying Diagnoses to every Player they had seen; and (3) used questionable techniques in making their diagnoses.  We immediately began an in-depth review of claims from those neurologists, who are two of the diagnosing physicians used by NCFL.  This resulted in a wider concern about claims from NCFL sponsored by suspect neurologists and neuropsychologists.  Because NCFL argues none of its claims belong in Audit and nothing has been done with them, we summarize all our efforts on these investigations.

**3.  Doctor 1 and Doctor 2.**

Doctors 1 and 2 work together at the same practice in Tampa.  NCFL submitted 84 claims relying on diagnoses from one of these doctors, both of whom were the subject of the two anonymous tips.  Sixty-nine of the 84 claims with diagnoses from Doctors 1 or 2 relied on neuropsychological testing by an also suspect group of neuropsychologists, which in this Response we call Neuropsychologist Group A and discuss in more detail below.

We sent a sample of claims from Doctor 1 and Doctor 2 to an AAP member for medical review.  On February 5, 2018, the AAP sent us a report that the ratings used by these doctors on the Clinical Dementia Rating scale (the "CDR"), which is a required measure of functional impairment under Ex. 1 to the Settlement Agreement, were inconsistent with and did not reflect either the history information in the doctor's own notes, history information in the neuropsychology notes, and/or the information in the third-party affidavits submitted on the claims.  We then began trying to talk with these two doctors by phone.  We review this in detail here, as what transpired with Doctors 1 and 2 is indicative of why these Audits take time:

> (1)  We called Doctor 2's office on February 12, February 14 and February 15, 2018, usually getting a busy signal.  We called a total of seven different times.  We finally were able to speak with Doctor 2 on February 16, 2018.  We did not ask him about any specific Players when we spoke to him, but we did ask him general information about how he became involved with the Program, when he first started seeing the Players (whether it was before or after the Settlement), what law firm(s)/lawyer(s) he worked with, whether his office worked with any other third parties to schedule appointments, how many Players he evaluated, his relation to Doctor 1, how many Players Doctor 2 saw, where he saw the Players (whether he went to them or they came to him), if he did any remote evaluations, whether he reviewed any records of the Players that he saw and if he applied to be a Qualified MAF Physician in the Program.  He denied performing examinations outside of his offices.

> (2)  We made eight attempts to talk to Doctor 1, on February 19, 20 and 26, 2018.  On February 19, 2018, we called twice and got busy signals both times.  On February 20, 2018, we called two more times.  During the first call we were told to call back for his assistant after 4:00 p.m.  We did that but were told his

assistant was not there and we could try to reach her the next day between
2:30 and 6:00 p.m.

(3) On February 26, 2018, we called four times.  We received busy signals for the
first two calls; the third time we were told to call back at 3:30 p.m. for the
assistant.  On the fourth call, we were able to reach the assistant, who
scheduled a phone conference for us to talk to Doctor 1 on February 28, 2018
at 2:30 p.m.  She also gave us a second phone number we could use if we got
a busy signal.

(4) On February 28, 2018, we spoke to Doctor 1 by phone, but he requested that
we send him questions in writing and promised he would call us that day or
the next to give us his answers.  We emailed questions to him that day.  He
responded to confirm he received our email.  He did not call us again after
that, so we followed up with him by email on March 1, 2018 but did not
receive a response.  We followed up with him by email again on March 5,
2018, but he did not respond.  We also called his office three times that day
but were not able to connect with his assistant.

(5) On March 8, 2018, we called Doctor 1's office four times and emailed him
once.  After getting two busy signals, we finally spoke with someone who
agreed to take a message for his assistant, and we asked that the assistant call
us back or ask Doctor 1 to respond to our questions.

(6) On March 12, 2018, Doctor 1 emailed us and said "sorry that I have been
unable to response. [*sic*]  I have been off due to my own surgery and have
been recuperating.  Still researching the questions and will call you today or
tomorrow. Thank you, Doc."  We responded, thanking him.

(7) Having not yet heard back from him afterwards, we emailed him on March
13, 2018, asking if he was available to talk.  Later that day, we emailed him
written questions about six Players he evaluated and three Players, his
colleague, Doctor 2 examined.  On March 15, 2018, Doctor 1 faxed us
responses to our written questions from February 28, 2018.

(8) On March 16, 2018, we emailed Doctor 1 to confirm we received his March
15, 2018 fax.  In that email, we also asked him to let us know if he had
received the second set of questions we sent him on March 13, 2018.

(9) On March 19, 2018, Doctor 1 emailed us saying that he received our
messages, and he asked that we send our questions, which he said he would
answer as best he could.

(10) On March 21, 2018 we faxed to Doctor 1 the names of the Players in our
second set of questions.  We also emailed the questions to him again with
Player-specific information de-identified.  We asked for responses from him
and his colleague by noon on March 26, 2018, warning that if we did not
receive those responses, we may have to deny the claims resting on their
diagnoses.

(11) On March 23, 2018 we received an email from John C. Hamilton, a lawyer in Tampa, Florida, saying Doctor 1 had contacted him about our requests for information.[5]  He asked who we represent; said Doctor 1 was busy and the deadlines were unfair; asked about HIPAA authorizations; and asked "why have you not offered to pay [Doctor 1] an expert fee for the services you are seeking?"  We responded that day describing our role as the Claims Administrator and pointing him to the Audit Rules on the Program website. He emailed us again on March 25, 2018, arguing that we were placing the doctors in the position of violating the Florida Constitution, demanding again that we pay the doctors for responding to our questions, saying that our deadlines for the doctors to respond were unreasonable, asking "what is the rush?", arguing that our requests should be brought before a court authority and requesting that we send all HIPAA releases to him, though he also said "I am not a HIPAA expert."[6]

At that point, we decided it was fruitless to pursue things with Doctor 1 and Mr. Hamilton further.  Haggling with Mr. Hamilton over the legitimacy of our questions and whether we had to pay for answers threatened delaying the completion of our Audit on Doctor 1 for weeks, if not months.  We determined we had enough information to conclude our Audit without engaging in that debate any longer and ceased our efforts to get answers from Doctor 1.  We never heard from Doctor 1 or Mr. Hamilton again.

As we had to proceed with what we had, on March 30, 2018, we issued to the Parties a Report of Adverse Finding under Audit Rule 15 regarding Doctors 1 and 2, finding there is a reasonable basis for a finding of misrepresentation, omission, or concealment of a material fact in their claims.  Doctors 1 and 2 assigned CDR scores that were inconsistent with the Players' functional abilities; provided the exact same score across all three relevant areas of the CDR for 79 of the 84 claims using their diagnoses; and Doctor 1 submitted affidavits in support of six Players whose claims rest on diagnoses from a neurologist who we recommended disqualifying in a Report of Adverse Finding in Audit that the Special Masters

---

[5] Mr. Hamilton sent us the identical email that day about Doctor 3, who is discussed later in this Response.
[6] Again, we got the identical email that day from Mr. Hamilton about Doctor 3.

accepted for referral on March 26, 2018. Those sorts of entanglements among the neurologists used by NCFL have added to our concern over the legitimacy of their claims operation.

### 4.  Neuropsychologist Group A.

There are 118 NCFL claims (81% of the firm's claims) that use neuropsychological testing by Neuropsychologist Group A, a firm located in Tampa, Florida. On August 4, 2017, we sent a sample of these claims to a Court-appointed neuropsychologist on the AAPC for review. On August 24, 2017, the AAPC neuropsychologist recommended that we obtain the raw test scores from Neuropsychologist Group A because of doubts over the validity of the diagnoses.

We asked Neuropsychologist Group A for the raw scores for 62 Players, which they have been sending to us over time. On November 22, 2017, after receiving raw scores for 12 Players from Neuropsychologist Group A, we sent an additional sample of five claims to the AAPC neuropsychologist for review. We received the AAPC neuropsychologist's opinion on three of the five claims on December 17, 2017, and on the remaining two claims on January 10, 2018. After reviewing the AAPC neuropsychologist's opinion and reviewing Neuropsychologist Group A's answers to questions about their T-Score calculations, we concluded the Audit of this provider and notified the Parties on February 2, 2018, that based on what we had at the time, we would not issue an Adverse Audit Report. We continue, however, to monitor the findings of AAPC neuropsychologists as they review these NCFL claims in the claims process and are researching the veracity of the testing methods and scoring of Neuropsychologist Group A.

5. **Neuropsychologist B.**

One of NCFL's claims is connected to Neuropsychologist B, who is in Houston, Texas.  On August 23, 2017, an AAPC neuropsychologist expressed concerns to us regarding Neuropsychologist B's interpretation of validity measures, where he had found that a Player who had failed all validity indicators yet also considered the results of the evaluation a valid assessment of the Player's functioning.  We then began an Audit of claims using testing by Neuropsychologist B.  On September 13, 2017, we sent a sample of claims to an AAPC neuropsychologist for review.  On September 18, 2017, the AAPC neuropsychologist reported to us that the diagnoses in the neuropsychological reports were of questionable accuracy and should be viewed with caution.

On October 5, 2017, we sent Neuropsychologist B several questions to explore the reliability of his methodologies.  Neuropsychologist B told us he would answer our questions, but gave us various excuses over time for not responding, including that he was moving offices.  Finally, on January 23, 2018, he sent to us responses and asked for the names of the Players involved in two of our questions.  We sent him those names on February 2, 2018; he responded further on February 26, 2018.  We sent both his responses to the AAPC neuropsychologist and got that analysis back on March 12, 2018.  Based on it, we determined there is a reasonable basis for a finding of misrepresentation, omission, or concealment in claims done by Neuropsychologist B because he:  (1) substituted tests from the Settlement Agreement test battery in Exhibit A-2 with more difficult tests, making it more likely that the Player would fail and appear to have neurocognitive impairment; (2) systematically disregarded failed scores on validity measures that indicate the Player may be malingering; (3) used poor judgment when he continued to test a Player who displayed

27

severe psychiatric symptoms; and (4) diagnosed 32 Players with Level 2 Neurocognitive Impairment who reported that they were working, which is not consistent with a Level 2 diagnosis. We issued a Rule 15 Report of Adverse Finding to the Parties on March 30, 2018, suggesting denial of the 70 claims from Neuropsychologist B, including the NCFL one. The Parties have until April 30, 2018, to tell us whether they agree to refer the Audit Report to the Special Masters under Rule 16(a).

   **6.  <u>Doctor 3</u>.**

   We investigated another neurologist used by NCFL, "Doctor 3," because we saw suspicious data patterns in his claims and he relied heavily on neuropsychological examinations from Neuropsychologist Group A, one of the entanglements that cause concern over paying these claims. NCFL submitted 49 claims using diagnoses from Doctor 3. We sent a sample of Doctor 3's claims to an AAP member on February 19, 2018, who told us on March 5, 2018, that Doctor 3 was not considering alternative causes of cognitive and functional decline and that his assignment of CDR scores was not reliably consistent with other reports of the Players' daily functions or the published qualitative scoring standards.

   We have communicated with Doctor 3 four times. On March 14, 2018, we spoke with Doctor 3 by phone and asked him the general questions about how he first became involved in the Program, when he first started seeing the Players (whether it was before or after the Settlement), what law firm(s)/lawyer(s) he worked with, whether his office worked with any other third parties to schedule appointments, how many Players he evaluated, how many Players he saw, how many Players for whom he rendered Qualifying Diagnoses, where he saw the Players, if he did any remote evaluations, what his experience was with Neuropsychologist Group A, why he applied to be a BAP and MAF physician, and what his experience was with

evaluating neurocognitive impairment before seeing Players for the Program.  We also told him we would send some Player-specific questions.

On March 16, 2018, we emailed Doctor 3 questions about seven Players he had evaluated.  On March 19, 2018, he emailed us saying that he would be glad to answer any questions we had after we sent him signed authorization forms.  We faxed HIPAA forms for five of the seven Players to him that day, along with the names of the Players who were the subject of our questions.  On March 20, 2018, we emailed him about the HIPAA forms we faxed for five Players the previous day and told him to answer our questions by March 26, 2018, only for those five Players for whom we sent HIPAA forms.[7]

On March 23, 2018, we received the email from the lawyer, Mr. Hamilton, about Doctor 3, identical to his email that same day about Doctor 1, and then on March 25, 2018, got the same email from him on Doctor 3 he sent that day on Doctor 1, asking for compensation and making his other arguments.  By then, we already had sent HIPAA releases for the five Players directly to Doctor 3 and asked him to answer our questions regarding those five Players only.  We have not heard from Doctor 3 or Mr. Hamilton since.

**7.  <u>Player A</u>**.

Player A at one time was represented in this Program by a law firm other than NCFL. While he was represented by that firm, Player A was evaluated by a neuropsychologist and a neurologist on March 28, 2014, and March 31, 2014, respectively, which was before the Settlement Agreement was announced in July 2014.  The neuropsychologist assigned a score of .5 on the CDR to Player A, which the CDR Scoring Table calls "Questionable;" the neurologist gave him a 0 diagnosis, which is "None" under the CDR measure of impairment.

---

[7] We have received signed HIPAA Audit forms from 43 of the NCFL clients in Audit.

But then Player A terminated that firm and switched to NCFL.  On June 8, 2015, we received an email from Kelly Deal at Gibbs and Parnell, one of the NCFL member firms, stating that the firm "now represents" Player A.

Neuropsychologist Group A met with Player A on July 1, 2015, a little over a year after the March 28, 2014 neuropsychological exam while Player A was represented by his first law firm.  Doctor 1, the neurologist, saw Player A on April 20, 2016.  In the Monetary Award claim from NCFL for Player A submitted to us on July 25, 2017, the Diagnosing Physician Certification Form signed by Doctor 1 asserted Level 2 Neurocognitive Impairment.  We received a tip about Player A that there had been previous examinations finding no Qualifying Diagnosis while he was with another law firm, which is how we then found the medical records from the 2014 exams.  We then put Player A in audit.

Player A is very active writing posts on Facebook, almost daily.  On January 28, 2018, he gave a 17-minute long radio interview, during which he had no apparent trouble speaking.  He has posted on Facebook on January 29, 2018, that he is publishing a book regarding his personal life.  He had mentioned that book in his radio interview.  On March 3, 2018, he posted on Facebook about relaunching his foundation.

We sent a Notice of Audit of Claim to NCFL for Player A on December 5, 2017, asking for the names of all health care providers he had seen in the last five years.  NCFL responded to that Notice on January 4, 2017, listing 14 medical providers.  But the doctors who had evaluated Player A in 2014 and found no Qualifying Diagnosis were not on that list.

8.  **Complaints by NCFL in the Partial Joinder.**

The details above concerning why NCFL claims are in Audit make clear that we have not "abused" the Audit process simply to delay payment on the firm's claims and

demonstrate why these Audit investigations consume considerable time.  The rest of the

Partial Joinder hardly needs rebuttal, but for the sake of completeness we offer the following:

> **(a) Three Claims for Alzheimer's Disease:**  The AAP reviewed and denied all
> three of these claims made by NCFL after finding numerous inconsistencies in
> the test results, disregard of functional capabilities, improper assessment of
> cognitive function and other medical issues.

> **(b) Audit is Not Limited to Mandatory Audits:**  NCFL argues that the only
> Audits we can do are the four categories of mandatory audits in Section
> 10.3(c) of the Settlement Agreement.  That completely ignores the rest of
> Section 10.3, including the directive in Section 10.3(b) that we "establish and
> implement procedures to detect and prevent fraudulent submissions to, and
> payments of fraudulent claims from, the Monetary Award Fund," as well as
> the Audit Rules adopted by the Special Masters.  This Program surely would
> suffer raiding by unscrupulous persons if we could investigate only 10% of the
> claims beyond their facial submissions.

> **(c) Claims Can and Must be Audited at Any Time:**  The Settlement Agreement
> and the Audit Rules adopted by the Special Masters allow us to audit claims at
> any time in the claims process, even after they are paid.  Artificially limiting
> Audits to the period before a denial or before payment would severely
> undercut our ability to safeguard the Program from inflated and false claims.
> We regularly find suspicious data patterns across claims, get tips and see
> questionable conduct in claims from the same source as our claim reviews
> progress and must be able to stop ineligible payments whenever we can find
> them.

> **(d) An Audit Must Suspend Claims:**  The Audit Rules adopted by the Special
> Masters suspend processing deadlines while a claim is in Audit.  This too is a
> best practice, avoids wasted claims effort and is essential to prevent money
> leaving the Settlement Fund on misrepresented claims.  While we regret that
> NCFL lawyers had to work "over the holiday season" on claim appeal papers
> due on January 12, if a claim is found not to have misrepresentations, the
> appeal process will resume and thereafter all parties will have their full rights
> under the Appeal Rules adopted by the Special Masters.

> **(e) No Violation of Due Process:**  We explained above how persons auditing the
> integrity of claims try to avoid tipping off the suspects of what they need to
> cover up, get rid of, or arrange common explanations for to avoid detection in
> the Audit.  Settlement Class Members and their lawyers are told their claims
> are in Audit.  If the Special Masters accept referral of an adverse Audit Report,
> the Settlement Class Members and their lawyers are given details on why their
> claims were found unreliable and have a full chance to be heard by the Special
> Masters.  This fair process serves the due process concepts of notice and
> opportunity to be heard, even though the claims administrator in a settlement
> program is neither the federal government subject to the 5th Amendment nor a

state government bound by the 14th Amendment to the United States Constitution.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Claims Administrator submits that NCFL's Motions should both be denied.  To preserve the integrity of the Program and ensure that only valid claims based on reliable diagnoses are paid out of the Monetary Award Fund, we ask that we be permitted to follow the Audit procedures in the Settlement Agreement and Audit Rules adopted by the Special Masters.

Respectfully submitted,

BROWNGREER PLC

By:    /s/ Orran L. Brown, Sr.
Orran L. Brown, Sr.
Virginia State Bar No. 25832
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone:  (804) 521-7201
Facsimile:  (804) 521-7299
Email:  obrown@browngreer.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record through the Court's ECF system on April 9, 2018.

/s/ Orran L. Brown, Sr.
Orran L. Brown, Sr.
Virginia State Bar No. 25832
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone:  (804) 521-7201
Facsimile:  (804) 521-7299
Email:  obrown@browngreer.com
