**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden,<br>*on behalf of themselves and*<br>*others similarly situated*,<br><div align="right">Plaintiffs,</div><br>v.<br><br>National Football League and<br>NFL Properties, LLC,<br>successor-in-interest to<br>NFL Properties, Inc.,<br><div align="right">Defendants.</div> | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**MEMORANDUM OF THE NATIONAL FOOTBALL LEAGUE**
**AND NFL PROPERTIES LLC IN OPPOSITION TO**
**MOTION OF THE LOCKS LAW FIRM FOR**
**APPOINTMENT OF ADMINISTRATIVE CLASS COUNSEL**

The National Football League and NFL Properties LLC (collectively, the

"NFL Parties") respectfully submit this memorandum in opposition to the Motion of the

Locks Law Firm for Appointment of Administrative Class Counsel (Doc. No. 9786)

("Locks" and the "Locks Motion") and various joinders thereto.

## PRELIMINARY STATEMENT

The Locks motion—founded solely on rhetoric and lacking any basis in fact—should be denied for the reasons in Co-Lead Class Counsel's Opposition and for the reasons set forth below.

Locks seeks an uncontemplated position as administrative class counsel in the NFL Concussion Settlement Program based on the fundamental—and erroneous—premise that the Settlement Program is "failing."  But far from failing, the Program—in its first year of a sixty-five year term—has registered over 20,000 Settlement Class Members, established nationwide networks of over 300 neurologists and neuropsychologists available to examine Retired NFL Football Players to assess their neurocognitive and neuromuscular health, scheduled over 3,200 eligible Players for free baseline neurological examinations, and issued notices of claim determinations for over 375 Retired NFL Football Players, with the NFL Parties having funded over $225 million in finalized claims.  The neutral Claims, BAP and Lien Resolution Administrators and the Appeals Advisory Panel ("AAP") medical experts appointed by this Court have faithfully executed their responsibilities to fairly implement and oversee the Settlement Program consistent with the negotiated and judicially approved Settlement Agreement.

Locks, nevertheless, self-servingly attempts to insert itself into the Settlement Program by lodging a number of unsubstantiated complaints, including (as addressed in this brief) that the NFL Parties somehow have obstructed the Program because more than half the claims have been placed into audit, and that the NFL Parties have "rigged" the Program because claims are being denied by the AAP and/or the Special Masters based upon their review of the records (as the Settlement Agreement

requires), instead of merely deferring to the clinical judgment of the diagnosing physician. Locks also attacks the integrity and competency of the AAP members. None of these complaints has merit.

First, Locks' efforts to portray the NFL Parties as obstructionists responsible for all delays in the processing of claims is baseless. The NFL Parties are committed to promptly paying all legitimate claims and, to that end, have worked with Co-Lead Class Counsel, the Settlement Administrators and the Court to ensure the effective implementation of the Settlement Program. The Locks Motion ignores that the NFL Parties have assisted over 800 Retired NFL Football Players register and/or establish Eligible Seasons for the Baseline Assessment Program ("BAP") or claims for Monetary Awards when they did not possess the necessary information. The NFL Parties also have appealed only 10% of payable claims decided as of April 9, 2018, thereby ensuring the payment of 90% of payable claims without objection. In addition, the NFL Parties have made reasonable accommodations when Settlement Class Members have been unable to produce certain components of the Claim Package that are required under the terms of the Settlement Agreement. Through these actions and others, the NFL Parties have fulfilled their commitment to, and fully supported, the fair and efficient operation of the Settlement Program.

In fact, contrary to the arguments in the Locks Motion, the delay in claims processing is not the fault of the NFL Parties, but instead the result of an extraordinary number of potentially fraudulent claims filed by dishonest lawyers and doctors (and even some players) clogging the system. To date, the independent Claims Administrator has placed approximately 46% of the total claims into audit due to red flags or other signs of

potential fraud.  Of those audited claims, the Claims Administrator already has issued reports to Co-Lead Class Counsel and the NFL Parties recommending that over 400 claims (including all claims associated with a particular law firm) be denied as a result of the misstatement, omission or concealment of material facts—a striking 23% of the total claims submitted—and that thirteen neurologists or neuropsychologists and one Retired NFL Football Player be permanently disqualified from the Program.  Approximately 230 claims remain under audit and continue to be investigated for suspected fraud.

This is the untold story of the Settlement Program to date.  The pervasive fraud by doctors, lawyers and certain players cannot be allowed to continue.  The victims are not only the NFL Defendants, but also deserving, cognitively impaired players whose claims have not been able to be processed promptly as a result of the significant efforts required of the Claims Administrator to thwart fraud.  Indeed, and telling of the merits of the instant Motion, some of the lawyers—including some of those who have joined Locks' Motion—who are complaining most vociferously and publicly about the slow pace of claims administration are themselves associated with the submission of questionable claims and the true cause of the delay.  The suggestion by Locks and other claimant counsel that delay has been caused by the NFL Parties is a transparent, pervasive and dishonest effort to cloud the cause of the delay—the extensive level of fraud that has infected this Settlement.

Second, the Locks Motion complains that claims are being improperly denied.  But this is part of Locks' continuing campaign to alter the negotiated and judicially approved Settlement Agreement Injury Definitions for Qualifying Diagnoses and the standard for the Appeals Advisory Panel's (the "AAP") review of pre-Effective

Date claims.  This Court approved the Settlement with the full understanding that Retired NFL Football Players would need to make showings of a certain requisite level of cognitive and functional impairment set forth in the Injury Definitions, despite objectors' vigorous arguments that those standards were too high and that lesser levels of impairment should be compensated.  To that end, Locks argues that those negotiated standards are applicable only in the Baseline Assessment Program and that diagnoses outside of the BAP based on evaluation and evidence "generally consistent" with that diagnostic criteria means that the Settlement Program should simply defer to the judgment of the hand-picked physicians to whom Locks sent its clients.  But such "anything goes" diagnostic criteria is not what the Parties agreed to and it is not what this Court approved.  Simply put, a player with a given impairment should receive (or not receive) the same Qualifying Diagnosis for dementia regardless of whether seen in the BAP or outside of it—even if the testing and/or diagnostic criteria used by the physician may differ in certain respects.  To allow otherwise, as Locks requests, would render the Injury Definitions meaningless—in clear conflict with the negotiated terms of the Settlement Agreement.

Third, Locks' attacks on the AAP members' integrity and professional judgment—in reality, a complaint that they were not hand-picked by Locks—should be quashed as profoundly meritless.

In sum, the integrity of the Settlement Program is of utmost importance to the NFL Parties.  The Locks Motion's attempt to tarnish the Program's reputation through distortion is baseless and disqualifying for the unsolicited leadership appointment

that Locks seeks.  For these reasons, and those set forth in Co-Lead Class Counsel's opposition brief and below, the Locks Motion should be denied summarily.

## ARGUMENT

### I.      Fraud, Not the NFL Parties, Is Responsible for the Delay in Claim Determinations

Contrary to Locks' specious claims that the NFL Concussion Settlement Program is failing, the Program has achieved an extraordinary amount in its first year as the result of the diligent work of this Court and those to whom it entrusted the task of faithfully and fairly implementing and overseeing the Program, including Claims Administrator BrownGreer PLC ("BrownGreer") and BAP and Lien Resolution Administrator Garretson Resolution Group ("Garretson").

What the Locks Motion excluded—as inconvenient to its narrative—is that, far from obstructing the Program, the NFL has contributed to assisting Settlement Class Members where appropriate through the registration and claims process. Specifically, the NFL Parties helped over 800 Retired NFL Football Players establish their eligibility for the Settlement Program and/or their Eligible Seasons necessary for the BAP or greater Monetary Awards when those Players could not provide the necessary evidence on their own.  The NFL has exercised its appeal right on only 10% of claims decided as of April 9, 2018—while claimant counsel have appealed 16% of denied claims.[1]  Moreover, the NFL has repeatedly made reasonable accommodations, where

---

[1]      Locks argues that the NFL Parties' appeals are "frivolous" and "vexatious," and then mischaracterizes the NFL's arguments about individual claimants in an effort to bolster that rhetoric.  (Locks Mem. at ¶¶ 33-37.)  Locks omits, however, that in two of the NFL Parties' appeals, the Special Master agreed that the diagnoses were not properly supported.  Moreover, contrary to Locks' allegation that the NFL has argued "Alzheimer's Disease cannot occur in younger men," the NFL Parties instead have stated the facts:  such a diagnosis is extraordinarily rare for individuals in their 30s, and any such diagnosis should be supported by a proper clinical workup, including as to other potential treatable causes of impairment.  Unfortunately, certain counsel steered Retired NFL Football Players to physicians prior

possible, when Settlement Class Members have been unable to fulfill requirements under the Settlement Agreement—such as the lack of a Diagnosing Physician Certification Form.[2]

Unfortunately, much of the delay in the claims process has been the result of the Settlement Program confronting the realities of hundreds of potentially fraudulent and unsupported claims advanced by unscrupulous doctors and lawyers. This is an all too familiar experience for high-profile settlement programs, with the 9/11 Victims Compensation Fund and the Deepwater Horizon Settlement programs experiencing similar efforts by wrongdoers looking to take advantage of the generous compensation programs to advance unsupported claims early in the program. The Parties negotiated for, and this Court approved, a series of anti-fraud provisions in the Settlement Agreement for this very reason, including without limitation: the AAP review of pre-

---

to the Effective Date of the Settlement who did not provide such customary standard of care—both to the detriment of the Players in their ongoing lives and to the viability of their submitted claims.

[2]   Again, the Locks Motion distorts the facts. For example, Locks alleges that the "NFL has refused to permit its own physicians in the disability benefits plans to sign a Diagnosing Physician Certification required by the Settlement." (Locks Mem. at ¶ 41.) But the NFL has no say in the matter. Instead, the Disability Plan—which is a benefit plan created by the NFL Players Association and NFL Management Council that operates in consultation with its own independent outside counsel—provided that direction to the Plan's neutral physicians who conducted Independent Medical Examinations ("IMEs") because those IMEs were for the stated limited purpose of evaluating disability, not determining a potential Qualifying Diagnosis under the terms of the Settlement.

Separately, Locks approached the Program for accommodation with respect to two Settlement Class Members alleging Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) who lacked Diagnosing Physician Certification Forms ("DPCs") because the diagnosing physicians refused to sign them. Those refusals did not fit within the permitted exceptions for a lack of DPC under Section 8.2 of the Settlement Agreement. The NFL Parties agreed to allow any board-certified neurologist who had seen the two players in the three to four years since their uncertified diagnoses to sign the DPCs and provide the subsequent medical records. However, if no subsequent treating neurologist existed, the NFL Parties agreed to allow a Qualified MAF Physician to examine the Players today and backdate the diagnosis if the Qualified MAF Physician determined that the evaluation of the player, and the prior medical records, were consistent and supportive of a Level 2 Qualifying Diagnosis. Such accommodation—in conjunction with AAP review of the pre-Effective Date diagnosis and Claims Administrator review of recent medical records of the players—was both reasonable and an appropriate accommodation. Under the strict terms of the Settlement Agreement, no such relief was available.

Effective Date claims; an audit program through which mandatory, random and flagged claims are subject to investigation by the Claims Administrator; and the right of Co-Lead Class Counsel, Counsel for the NFL Parties and the Claims Administrator to establish and implement other "procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund" beyond those specified in the Settlement Agreement. (*See*, *e.g.*, Settlement Agreement §§ 6.4, 10.3.)

The reality is that nearly half of the submitted claims in the Settlement Program have been, or remain in, audit for potential fraud review because the Claims Administrator found cause for concern. Most of these claims are for dementia (*i.e.*, Level 1.5 or 2 Neurocognitive Impairment). For example over 150 claims potentially have been disqualified by the Special Master as a result of finding that claims relying on neuropsychologist Serina Hoover's "testing include a misrepresentation, omission, or concealment of a material fact and that Dr. Hoover's testing results do not meet the standard of care required for a Monetary Award under the Settlement Agreement." (Findings and Remedies of the Special Master Pursuant to Section 10.3(i) Regarding 153 Monetary Award Claims, Doc. No. 9507.) In total, the Claims Administrator has issued reports to Co-Lead Class Counsel and the NFL Parties recommending that over 400 claims be denied as a result of misrepresentation, omission or concealment of material facts, while approximately 230 other claims remain under audit and are being investigated for possible fraud.

Locks misleadingly labels this undisputed reality as the NFL "seek[ing] to rig the Settlement system" (Locks Mem. at ¶ 2), when, in fact, the sad reality is that the

claims themselves have been rigged.  The fraud discovered in the Settlement Program so far is deep and widespread.  Some examples:

- A law firm representing more than 100 Settlement Class Members "coached" retired players on how to answer questions during their neuropsychological evaluations and directed at least one retired player to show up for his evaluation hungover and on Valium.

- A law firm representing more than 50 Settlement Class Members charged players more if they obtained an Alzheimer's diagnosis, and virtually all of those players were evaluated by a *pediatric* neurologist who, in turn, diagnosed 75% of the players he/she evaluated with Alzheimer's, many of whom were in their 30s and 40s and one of whom was just 29 years old. Many of those claimants, notwithstanding their purported Alzheimer's, traveled from out of state to be evaluated by that particular neurologist.

- At least 21 medical reports submitted by that same neurologist included *identical* vital signs (*i.e.*, blood pressure, pulse rate and respiration rate measurements) for different players—a medical improbability of the highest order.

- A neuropsychologist whose testing was relied on by over 150 claimants attested under penalty of perjury that she had evaluated at least three players (and as many as eight players) on each of 25 different days, including eight players on New Year's Eve.  On two separate occasions, the neuropsychologist claimed to have spent more than 130 hours evaluating claimants in just a 24-hour window.

- In multiple cases, a neuropsychologist whose testing was relied on by seven claimants submitted two reports for a single player with different test results, and then provided conflicting explanations when asked about the discrepancy.

- Text messages and other communications reveal a disturbing pattern of a claims service provider coaching players to "beat" the neuropsychological tests.  In one such message, a representative of the claims service provider told a player, "the doctors and myself went through your reports and we found some things that we think we can take advantage of so you can pass the test the second go around."  Another retired player was told, "your [sic] smart enough to perform the right way," to which the player replied, "That's what I'm saying I can do what I need to do, just let me know what I need to do."  The claims service provider replied, "we will brother . . . . a few days before it's game time!!! LoL."

Significantly, in many instances the Settlement Class Members appear to have been knowing participants in the fraud.  Notwithstanding claims of purportedly severe impairment and limited functional abilities, many Settlement Class Members traveled long distances to be evaluated by self-selected medical professionals, presumably identified by their lawyers, and, upon receiving purported diagnoses of Alzheimer's or dementia, did not even seek follow-up medical treatment.  In many cases, performance validity testing showed clear evidence of malingering and exaggeration— that is, cheating.  Some Settlement Class Members lied about their purported impairment and functional abilities and/or deliberately concealed employment and other activities that were inconsistent with—and thus would have undermined—their supposed impairment and diagnoses.  Examples include:

- A Retired NFL Football Player diagnosed with purported Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) in January 2017 at age 32 falsely claimed that he was unable to work in any capacity due to his cognitive impairment.  Videos available online show that same player giving lengthy and fully coherent motivational speeches, often without the assistance of notes, on numerous occasions subsequent to the supposed diagnosis.

- A Retired NFL Football Player diagnosed with purported Alzheimer's Disease in June 2016 at the age of 54 falsely claimed that he had stopped coaching football by the time of his evaluation due to his severe cognitive impairment.  Yet, subsequent to his evaluation, the same retired player participated in multiple videotaped interviews in which he discussed— without any apparent difficulty—his current head coaching duties, and as recently as October 2017, was interviewed by reporters about his ongoing role as a head football coach.

- A Retired NFL Football Player diagnosed with purported Alzheimer's Disease in July 2015 at the age of 39 claimed to have significant cognitive impairments that made him incapable of even doing errands without assistance.  Yet, information available from public sources shows that the same retired player is the head coach of a minor league football team, a developmental football coach and a motivational speaker.  When that player submitted a form to the Claims Administrator asking for his

employment history subsequent to his diagnosis, he concealed his coaching position.

- A Retired NFL Football Player diagnosed with purported Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) in December 2016 at the age of 32 reported that he was unemployed, had significant issues with memory and completing tasks and frequently would go into a room and forget why he was there.  That retired player concealed that was working as a registered wealth manager for a large investment firm.

- A Retired NFL Football Player diagnosed with purported Level 1.5 Neurocognitive Impairment (*i.e.*, early dementia) in May 2017 at the age of 31 reported, among other things, that he had short-term memory problems, difficulty completing tasks, difficulty helping his son with homework, and that he had to quit his job because he had difficulty staying organized.  He did not disclose, however, that he was attending graduate school and received an MBA degree in 2017 in the same month as his evaluation.

The audit process should be allowed to play out pursuant to the rules implemented by the Special Masters appointed by the Court.  But make no mistake, fraud has driven a substantial volume of purported diagnoses for this Settlement Program that must be investigated and remediated—with further fraudulent conduct deterred—for the integrity of the Settlement Program.

Certain of the Joinders filed in support of the Locks Motion also blame the NFL Parties for delays caused by audits with respect to Retired NFL Football Players they allege have valid Qualifying Diagnoses with strong medical support.  (*See*, *e.g.*, Joinder of Mitnick Law Office at ¶ 7, Doc. No. 9834.)   There is no doubt that certain Settlement Class Members with legitimate claims have had their claims delayed because they had the misfortune of being represented by counsel, or being evaluated by neurologists or neuropsychologists, who have otherwise engaged in misconduct.  Settlement Class Members have the right to be upset, but their concerns should be directed at those who sought to take advantage of the generosity of the Settlement

Program for personal gain—not at the NFL, Claims Administrator, Appeals Advisory Panel, or the Special Masters.  These wrongdoers are causing delay for all, and casting shadows over the legitimate claims.  Settlement Class Members and the NFL share a common interest in eliminating this misconduct, and anyone aware of potential fraudulent conduct should report it promptly to the Claims Administrator, which has established both online and telephonic methods to report potential fraud, including through anonymous means.[3]

Finally, the Locks Motion accuses the NFL of misusing the audit process. (*See* Locks Mem. at ¶¶ 23-27.)[4]  Such allegations, which disregard the fundamental reality that fraud is occurring in the Settlement Program, is both misguided and self-serving to the detriment of the Program.  It should not be lost on this Court that Locks has a self-interest in protesting these ongoing Claims Administrator audits because it represents a dozen Retired NFL Football Players who traveled considerable distances from home—despite capable neurologists in their home regions or near their counsel in Philadelphia—to see a specific neurologist who is the subject of an ongoing audit.

In sum, the Locks Motion wrongly casts blame for delay in the processing of claims in the Settlement Program on the NFL Parties when, to the contrary, it is the

---

[3]   Call 1-844-812-5666, email ClaimsAdministrator@NFLConcussionSettlement.com, or submit a report online at https://www.nflconcussionsettlement.com/ReportFraud.aspx.

[4]   Locks specifically seeks to argue through its motion the validity of the claim of an individual Retired NFL Football Player represented by separate counsel.  (Locks Mem. at ¶¶ 24-26.)  Out of respect for the private nature of the claims and audit processes, the NFL Parties will not respond herein to a motion not filed by that Player other than to state that the NFL Parties respectfully believe—based on consultation with leading medical experts—that the functional abilities demonstrated by that Player were inconsistent with the purported Qualifying Diagnosis received and raised significant questions about the reported timing and severity of the impairment.

overwhelming number of questionable claims that require investigation for potential fraud by doctors, lawyers and certain players that bears responsibility for that delay.

## II.      The Locks Motion Wrongly Blames the NFL for Claim Denials

The Locks Motion also launches a series of complaints about the reasons that claims are being denied, and blames the NFL Parties for purportedly "rigging" the Program against Settlement Class Members.   Central to each of Locks' complaints, however, is Locks' continued effort to change and diminish the Settlement Agreement's definitions for Qualifying Diagnoses.   That effort lacks a basis in the Settlement Agreement's clear terms.

To that end, the Locks Motion—much like the numerous appeals of adverse claim determinations that the firm has filed—questions the Claims Administrator and leading neurologists and neuropsychologists appointed by the Court as AAP members and consultants anytime they disagree with the diagnoses of doctors to whom Locks steered its clients before the Effective Date of the Settlement.  (*See*, *e.g.*, Locks Mem. at ¶ 4.)  To the contrary, the AAP members and Claims Administrator are applying Injury Definitions for the Qualifying Diagnoses that the Parties heavily negotiated and were judicially approved.

Despite the protestations of numerous objectors that the criteria were too stringent—and that the Settlement should compensate lesser impairment such as mild cognitive impairment or moderate cognitive impairment, or other conditions such as depression or headaches—this Court approved the parameters of the Qualifying Diagnoses as fair, reasonable and adequate.[5]  Unfortunately, certain claimant counsel and

---

[5]      *See*, *e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 403 (E.D. Pa. 2015), *amended* No. 2:12-MD-02323-AB, 2015 WL 12827803 (May 8, 2015), *and aff'd* 821 F.3d 410

diagnosing physicians do not understand those parameters or refuse to accept them. Claims purportedly for "moderate dementia" are being submitted despite the diagnosing neurologist finding only "mild cognitive impairment."  Claimants who perform within expected norms for individuals of their age and premorbid IQ are being told they have dementia.  And Settlement Class Members who fail numerous performance validity tests scientifically designed and validated to capture malingering (*i.e.*, exaggerated or feigned illness)—including for patients with brain damage—are seeking millions of dollars in compensation when the leading neuropsychology literature states that their testing results are unreliable.

Locks seeks to excuse away any such issues by falling back on the fact that AAP review of pre-Effective Date claims is based on principles "generally consistent" with the Settlement's Injury Definitions.  (*See*, *e.g.*, Locks Mem. at ¶ 15.) Locks goes so far as to falsely allege an "NFL scheme" to "amend" the Settlement Agreement by instructing the Claims Administrator to "change review standards" for pre-Effective Date claims.  (*Id*. at ¶ 43.)  Such accusations are false and designed to diminish the integrity and professionalism of the Claims Administrator, which has consistently worked under the supervision of the Special Masters and this Court to implement and administer the Settlement Agreement pursuant to its terms.

To Locks, "generally consistent" means something "far less rigid" than the negotiated Injury Definitions that are the backbone of the Settlement Agreement, and purportedly gives claimants "substantial leeway" in meeting the review standard.  (*Id*. at ¶ 15 and n.4.)  These arguments seek to fundamentally change the Settlement

(3d Cir. 2016), *as amended* (May 2, 2016) (holding that arguments by objectors that the Injury Definition impairment requirements were unreasonably high were "misguided" because "[b]oth the cognitive and functional cutoffs are drawn directly from well-established sources").

Agreement's intent and meaning.  It is incontestable that a player examined years before the Settlement Agreement's terms were announced may not have undergone precisely the same testing contemplated in the BAP, and the NFL Parties agree that precisely the same testing is not required.  But it is disingenuous for Locks or other claimant counsel to argue that a player examined outside of the BAP, with the same impairment as a player examined in the BAP, should be deemed to meet the Settlement Agreement's Injury Definitions and receive financial compensation when the player examined under the BAP criteria would not.  Nonetheless, such claims are being presented for substantial Monetary Awards—with players facially falling short of the necessary BAP criteria and whose impairments are not "generally consistent" with it.  The appeals by the NFL Parties on these claims—far from being frivolous—have been both necessary and forcefully accompanied by clear and convincing evidence of their merit, and indeed have prevailed.

Locks also argues that the Parties agreed to "a second Amendment" of the Settlement Agreement because the Claims Administrator raised issues when a "third-party affidavit used to corroborate the functional impairment of a player was dated after the date of diagnosis."  (Locks Mem. at ¶ 45.)  Contrary to Locks' argument that "[n]owhere in the text (explicit or implied) is there a date restriction" in the Settlement (*id*. at ¶ 46), the third-party affidavit is an elemental requirement for Level 1.5 or 2 Neurocognitive Impairment claims where the Retired NFL Football Player does not corroborate his functional impairment through the primary means of documentary

evidence, such as medical or employment records.[6]  It is a simple matter of logic that the diagnosing physician could not provide a diagnosis on a given date relying on a third-party affidavit *that did not yet exist*.  For these reasons, Locks' complaints on this front lack any merit.

Finally, Locks actually protests that the NFL Parties have the good-faith right under the Settlement Agreement to appeal diagnoses even when their findings are in conflict with prevailing medical literature[7] or the functionality demonstrated by the Player outside of what he and his family self-reported to the physician.  (*Id*. at ¶¶ 13, 33-37.)  Such complaints have no merit. Instead, the NFL Parties are only appealing claims for which the NFL believes there is clear and convincing evidence that the diagnosis is not supported and fails to meet the Settlement Agreement's Injury Definitions.

Accordingly, Locks' effort to litigate claim denials through the Locks Motion should be ignored in favor of the claim determination and appeals process set up by this Court and the Settlement Program to address these issues on an individual claim basis.

### III.    Locks Wrongly Attacks the Appeals Advisory Panel

---

[6]    The Parties and this Court expected such documentary evidence to be the primary, and most reliable, method of corroboration because those materials would be created in the ordinary course and not for the purpose of litigation or compensation—unlike third-party affidavits.

[7]    It is egregious that the Locks Motion repeatedly protests the NFL's citation to "text books" in appeals. (*See*, *e.g.*, Locks Mem. at ¶¶ 16-17.)  Unlike the Locks Motion, the NFL Parties do not rely on lawyer rhetoric and argument.  Instead, the NFL Parties have filed the limited number of appeals based on advice from medical consultants, and often with citation to leading neurological and neuropsychological literature on medical issues that are pertinent to the claims—ranging from proper interpretation of screening tests and performance validity results, to the effects of acute substance abuse and medication specifically contemplated under the terms of the Settlement Agreement.  Locks' protestations demonstrate less an interest in getting its clients properly diagnosed (including where there may be treatable causes of their impairment), and more an interest in simply grabbing a piece of their Monetary Award.

The Locks Motion also wrongfully attacks the AAP members, including their integrity, judgment and performance.  (*See*, *e.g*., Locks Mem. at ¶¶ 18-20, 52-59.) There is no basis for such allegations of bias and competency, despite Locks' disagreement with certain claim determinations.

The AAP members are Court-appointed board-certified neurologists who are leaders in their fields, who were jointly recommended by Co-Lead Class Counsel and the NFL Parties.  In addition to advising the Court or Special Masters on medical issues that arise in the Settlement Program and on appeals, an AAP member reviews claims based on Qualifying Diagnoses that were made prior to the Effective Date of the Settlement Agreement to confirm that it was made by an appropriately credentialed physician under the terms of the Settlement Agreement and to review the Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in the Injury Definitions of the Settlement Agreement to ensure the validity and appropriateness of the diagnosis.  (*See*, *e.g*., Settlement Agreement § 6.4(b).)  The Court initially appointed five AAP members, and on March 5, 2018, removed one member who did not ultimately have sufficient time to devote to the Program, and appointed two new AAP members to raise the total to six board-certified neurologists.  (*See* Order, Doc. No. 9757.)

Locks attacks the AAP members for doing their job.  In reviewing claims based on pre-Effective Date diagnoses, and assisting the Special Master on medical issues relating to appeals of claim determinations, AAP members are faithfully fulfilling the role assigned to them by the Agreement and the Court.  They are using their significant expertise in the relevant areas to review the Claim Packages to ensure that the

diagnoses are valid and supported.  The Locks Motion—like the firm's appeals—unfairly criticizes that role as "second-guessing and discrediting clinical judgments" made by the diagnosing physicians.  (Locks Mem. at ¶ 4.)  But the very role of the AAP member is to determine whether the diagnosing physician sufficiently supported the diagnosis.  In a settlement program paying upwards of $5 million per diagnosis, such prudence is customary and necessary.  Locks' rhetoric aside, the AAP should be commended for taking time out of their professional schedules seeing patients to devote to this Settlement Program.

In addition, the Locks Motion implicitly questions the bona fides of the current membership by baselessly alleging that "the NFL consistently objects to exceptionally well-qualified AAP candidates."  (Locks Mem. at ¶ 55.)  Yet Locks never approached the NFL about a single potential candidate.  Instead, Locks apparently lobbied Co-Lead Class Counsel to suggest hand-picked Locks favorites and got upset when its choices were not jointly agreed upon.  Not only is agreement of Co-Lead Class Counsel and the NFL Parties necessary under the terms of the Settlement Agreement, but Locks' specific complaints illustrate the firm's lack of consideration for apparent conflicts of interest or practical considerations when inconvenient to its aims.

For example, Locks protests the non-inclusion on the AAP of a "thought leader" and "outstanding clinician" it proposed to Co-Lead Class Counsel because the "NFL objected on the grounds that the physician[ ] had had limited contact with [Locks]" and labels the NFL's non-consent as a "bad faith objection" that "smacks of the NFL's effort to keep off of the AAP neurologists with the right clinical expertise."  (Locks Mem. at ¶ 59.)  What Locks omits is that the purported "limited contact" was sufficient

enough that the neurologist's curriculum vitae submitted to the Program listed a "consultantship" with Locks from "2015-present."  It is unquestionably good faith to decline support of a candidate for a *Court-appointed neutral medical expert role* when he maintains a consultancy relationship with a law firm representing claimants in the Program.

Locks also alleges that the NFL Parties declined to move forward on an AAP member candidate that Locks proposed because "the physician was a 'CTE believer' and used that as the basis for the objection." (Locks Mem. at ¶ 55.)  There is neither truth to that assertion, nor was Locks involved in any conversations with the NFL Parties on AAP candidates.  In addition, Locks erroneously argues that the NFL has refused to approve neurologists for the AAP who are familiar with symptomatic retired players." (Locks Mem. at ¶ 58.)  Such statement is plainly false, as the NFL Parties agreed to the appointment of an AAP member who both had already seen and diagnosed Retired NFL Football Players with Qualifying Diagnoses.

Similarly, Locks objects that another of the neurologists to which it sent clients prior to the Settlement Program becoming effective was not presented to the Court for potential inclusion on the AAP because his billing "rates are higher than those set for the AAP." (Locks Mem. at ¶ 57.)  Locks omits that he sought *double* the compensation of the rate approved by the Court and accepted by the fellow leading neurologists appointed to the AAP.  Moreover, although Locks cites, without citation to any authority, that "[t]he AAP is paid below market rates" (Locks Mem. at ¶ 14.i), the Court-issued hourly fee was both satisfactory to the candidates jointly recommended for approval to the Court and commensurate with their expectations for this type of work.  Locks argues

that the exclusion of its preferred but costly expert "prejudices the Class," but such argument is baseless and demeaning to the unquestionable expertise of the current AAP membership.  Moreover, Co-Lead Class Counsel and the NFL Parties thereafter approved that neurologist as a Qualified MAF Physician, ensuring that any Retired NFL Football Player willing to pay his rates may be examined by him as part of the Settlement Program.

Simply put, Locks' attack on the AAP members is out of bounds and without merit.

## CONCLUSION

For the above reasons, the NFL Parties respectfully submit that the Locks Motion should be denied summarily.

Dated:  April 13, 2018                    Respectfully submitted,

                                          /s/ Brad S. Karp
                                          Brad S. Karp
                                          Bruce Birenboim
                                          Lynn B. Bayard
                                          Doug Burns
                                          PAUL, WEISS, RIFKIND,
                                          WHARTON & GARRISON LLP
                                          1285 Avenue of the Americas
                                          New York, NY 10019-6064
                                          Main: 212.373.3000
                                          Fax: 212.757.3990
                                          bkarp@paulweiss.com
                                          bbirenboim@paulweiss.com
                                          lbayard@paulweiss.com

                                          *Attorneys for the National Football
                                          League and NFL Properties LLC*