# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>      Plaintiffs,<br><br>    v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>      Defendants. | Civ. Action No.:  14-cv-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL FOOTBALL LEAGUE AND NFL PROPERTIES LLC'S MOTION FOR THE APPOINTMENT OF A SPECIAL INVESTIGATOR

The National Football League and NFL Properties LLC (together, the "NFL Parties") respectfully submit the following memorandum of law in support of their Motion for the Appointment of a Special Investigator, pursuant to Federal Rule of Civil Procedure 53, to assist the Claims Administrator and the Court in investigating the submission of fraudulent claims to the NFL Concussion Settlement Program and recommending appropriate sanctions.

## PRELIMINARY STATEMENT

This motion seeks the appointment of a Special Investigator to stop the widespread fraud infecting the NFL Concussion Settlement Program and to ensure that deserving Retired NFL Football Players are compensated in accordance with the terms of the Settlement Agreement in a timely manner.   The NFL Parties, Co-Lead Class Counsel and the Claims Administrator have worked tirelessly to ensure robust registration in, and efficient operation of, the Settlement Program, which—in its first year of a sixty-five year term—has registered over 20,000 Settlement Class Members and issued notices of claim determinations for over 375 Retired NFL Football Players, with the NFL Parties having funded over $225 million in finalized claims.  But those efforts have been hampered by the extraordinary number of fraudulent claims clogging the system.

The independent Claims Administrator placed into audit approximately 46% of the total claims submitted because of red flags or other signs of potential fraud.  Of those audited claims, the Claims Administrator has already recommended that over 400 claims (or 23% of the total claims submitted) be denied, including all claims submitted by a certain law firm, and that thirteen neurologists or neuropsychologists and one Retired NFL Football Player be permanently disqualified from the Program, due to the misstatement, omission or concealment of material facts.  Approximately 230 claims remain under audit and continue to be investigated for possible fraud.

The fraud discovered in the Program so far is deep and widespread.   Some examples:

- A law firm representing more than 100 Settlement Class Members "coached" retired players on how to answer questions during their neuropsychological evaluations and directed at least one retired player to show up for his evaluation hungover and on Valium.

- A law firm representing more than 50 Settlement Class Members charged players more if they obtained an Alzheimer's diagnosis, and virtually all of those players were evaluated by a *pediatric* neurologist who, in turn, diagnosed 75% of the players he/she evaluated with Alzheimer's, many of whom were in their 30s and 40s and one of whom was just 29 years old. Many of those claimants, notwithstanding their purported Alzheimer's, traveled from out of state to be evaluated by that particular neurologist.

- At least 21 medical reports submitted by that same neurologist included *identical* vital signs for different players – a medical improbability of the highest order.

- A neuropsychologist whose testing was relied on by over 150 claimants attested under penalty of perjury that she had evaluated at least three players (and as many as eight players) on each of 25 different days, including eight players on New Year's Eve.  On two separate occasions, the neuropsychologist claimed to have spent more than 130 hours evaluating claimants in just a 24-hour window.

- In multiple cases, a neuropsychologist whose testing was relied on by seven claimants submitted two reports for a single player with different test results, and then provided conflicting explanations when asked about the discrepancy.

- Text messages and other communications reveal a disturbing pattern of a claims service provider coaching players to "beat" the neuropsychological tests.  In one such message, a representative of the claims service provider told a player, "the doctors and myself went through your reports and we found some things that we think we can take advantage of so you can pass the test the second go around."  Another retired player was told, "your [sic] smart enough to perform the right way," to which the player replied, "That's what I'm saying I can do what I need to do, just let me know what I need to do." The claims service provider replied, "we will brother . . . .  a few days before it's game time!!! LoL."

Significantly, in many instances the Settlement Class Members appear to have been knowing participants in the fraud.  Notwithstanding claims of purportedly severe impairment and limited functional abilities, many Settlement Class Members traveled long distances to be evaluated by self-selected medical professionals, likely identified by their lawyers, and, upon receiving purported diagnoses of Alzheimer's or dementia, did not even seek follow-up medical treatment.  In many cases, performance validity testing showed clear evidence of malingering and exaggeration – that is, cheating.  Some Settlement Class Members lied about

3

their purported impairment and functional abilities and/or deliberately concealed employment and other activities that were inconsistent with—and thus would have undermined—their supposed impairment and diagnoses.  Some examples:

- A Retired NFL Football Player diagnosed with purported Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) in January 2017 at the age of 32 claimed that he was unable to work in any capacity due to his cognitive impairment.  Videos available online show that same player giving lengthy and fully coherent motivational speeches, often without the assistance of notes, on numerous occasions subsequent to the supposed diagnosis.

- A Retired NFL Football Player diagnosed with purported Alzheimer's Disease in June 2016 at the age of 54 claimed that he had stopped coaching football by the time of his evaluation due to his severe cognitive impairment.  Yet, subsequent to his evaluation, the same retired player participated in multiple videotaped interviews in which he discussed—without any apparent difficulty—his current head coaching duties, and as recently as October 2017, was interviewed by reporters about his ongoing role as a head football coach.

- A Retired NFL Football Player diagnosed with purported Alzheimer's Disease in July 2015 at the age of 39 claimed to have significant cognitive impairments that made him incapable of even doing errands without assistance.  Yet, information available from public sources shows that the same retired player is the head coach of a minor league football team, a developmental football coach and a motivational speaker.  When that player submitted a form to the Claims Administrator asking for his employment history subsequent to his diagnosis, he concealed his coaching position.

- A Retired NFL Football Player diagnosed with purported Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) in December 2016 at the age of 32 reported that he was unemployed, had significant issues with memory and completing tasks and frequently would go into a room and forget why he was there.  That retired player concealed that he was working as a registered wealth manager for a large investment firm.

- A Retired NFL Football Player diagnosed with purported Level 1.5 Neurocognitive Impairment (*i.e.*, early dementia) in May 2017 at the age of 31 reported, among other things, that he had short-term memory problems, difficulty completing tasks, difficulty helping his son with homework, and that he had to quit his job because he had difficulty staying organized.  He did not disclose, however, that he was attending graduate school and received an MBA degree in 2017 in the same month as his evaluation.

The pervasive fraud by doctors, lawyers and certain players cannot be allowed to continue.  The victims are not only the NFL Defendants, but also deserving, cognitively impaired players whose claims have not been able to be processed promptly as a result of the significant efforts required of the Claims Administrator to thwart fraud.  Ironically, some of the lawyers who are complaining most vociferously and publicly about the slow pace of claims administration are themselves associated with the submission of questionable claims and the true cause of the delay.

This extensive and persistent pattern of fraud unquestionably warrants the appointment of a Special Investigator, as the Court previously recognized in directing that "an investigator will be appointed by [the Court], as needed, to look into possible fraudulent claims." The time for that appointment is now.  Given the serious fraud uncovered to date, the appointment of a Special Investigator is necessary to preserve the integrity of the Program, safeguard against the payment of fraudulent claims and provide adequate deterrence to those intent on exploiting the Program for their own financial gain.  The Special Investigator would assist the Court, the Special Masters and the Claims Administrator by investigating potential fraud and recommending appropriate remedies, including, without limitation, denial of claims, permanent disqualification from the Program, referral to appropriate medical and legal licensing authorities, referral to criminal authorities (including the Department of Justice) for potential prosecution, contempt sanctions and sanctions against nonparties, pursuant to Rule 53.

## FACTUAL BACKGROUND

The Settlement Agreement became effective on January 7, 2017.  It provides for Monetary Awards to be paid to Retired NFL Football Players who are diagnosed with a Qualifying Diagnosis under the terms of the Settlement Agreement.  The Program has a 65-year term and is uncapped, meaning that the NFL Parties have agreed to provide full compensation to

all Retired NFL Football Players with valid claims, with no ceiling on the total amount of monetary awards.

## A.    The Settlement Agreement's Fraud Protections

Recognizing the potential for fraud in a Settlement Program of this magnitude, the parties agreed to rigorous fraud protection measures in the Settlement Agreement.

Among other fraud detection and prevention procedures, the Settlement Agreement tasks the Claims Administrator with identifying and conducting audits of potentially fraudulent claims.  The Claims Administrator selects a random sample of 10% of claims on a monthly basis for audit and, in addition, identifies potentially fraudulent claims based on, among other things, the presence of red flags or other suspicious circumstances, information provided through anonymous tips, analysis of claims by independent experts and data analytics.  When a claim is selected for audit, the Settlement Class Member may be required to submit additional records, including other medical records, employment information and other relevant documents or information.

The Claims Administrator's audit is limited to determining whether there is a reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact in connection with the claim.  If the Claims Administrator determines there is no reasonable basis to support such a finding, the process of issuing a Monetary Award proceeds.  If, on the other hand, the Claims Administrator determines there is a reasonable basis to support such a finding, it notifies Co-Lead Class Counsel and the NFL Parties, and as long as at least one of those parties concurs, the Claims Administrator refers its Audit Report to the Special Masters for review and findings and the imposition of remedies.

The Claims Administrator does not attempt to determine whether the misrepresentation, omission or concealment was intentional.  Instead, Section 10.3 of the

Settlement Agreement provides that the Special Masters' review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and the Special Masters may order the following relief, without limitation:  (a) denial of the claim in the event of fraud, (b) additional audits of claims from the same law firm or physician, (c) referral of the attorney or physician to the appropriate disciplinary boards, (d) referral to federal authorities, (e) disqualification from further participation in the Settlement, and/or (f) if a law firm is found to have submitted more than one fraudulent submission, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by Settlement Class Members will be forfeited and transferred to the Monetary Award Fund.  The Special Masters are charged with overseeing fraud detection and prevention procedures, and their responsibilities expressly include reviewing and deciding the appropriate disposition of potentially fraudulent claims under the supervision and oversight of the Court.

> **B.     The Significant and Widespread Fraud in the Settlement Program Uncovered to Date**

To date, the Claims Administrator, through its various fraud detection procedures, has determined that approximately 46% of the total claims submitted warranted audit due to red flags or other signs of potential fraud.  The Claims Administrator has completed a number of those audits, and the information it has uncovered leaves no question that there has been substantial and pervasive fraud targeting the Settlement Program.

In particular, the Claims Administrator has prepared eight audit reports describing evidence supporting its conclusion in each of those reports that there was a reasonable basis to support a finding of a misstatement, omission or concealment of a material fact.  As illustrated and summarized below, this evidence of fraud is egregious and poses a grave threat to the integrity of the Program.

1.      Law Firm-A

The Claims Administrator developed credible evidence from multiple sources that a law firm that represents more than 100 Retired NFL Football Players who have already submitted claims ("Law Firm-A") improperly coached players on how to answer questions during their neuropsychological testing to receive a Qualifying Diagnosis.  More specifically:

- One of the neuropsychologists who evaluated players represented by Law Firm-A expressed concern that a lawyer from Law Firm-A would call and ask what answer to a question would make a difference to the outcome.  The Claims Administrator also obtained evidence that Law Firm-A told players that Law Firm-A could secure qualifying diagnoses and that it was willing to pay doctors directly out of their pocket for those diagnoses.

- In addition, the Claims Administrator developed evidence that Law Firm-A directed at least one Settlement Class Member to show up for his diagnosing appointment hungover and on Valium, in order to make it appear that he had cognitive impairment.

It is not known, however, and cannot be determined without further investigation, how many of the Settlement Class Members represented by Law Firm-A may have received similar coaching or instructions, or participated in the fraudulent conduct identified.  Nor is it possible without further investigation to determine the full extent of the relationships and financial arrangements between Law Firm-A and the physicians to whom it referred claimants.  The Claims Administrator also reported that the neuropsychologist who confirmed that a lawyer from Law Firm-A would call and ask about answers to test questions stated that other law firms would also call him to ask similar questions.  The Claims Administrator specifically identified in its Audit Report certain additional investigative steps that were not part of its audit.

2.      Claims Service Entity-A

At the request of Co-Lead Class Counsel, through Court-authorized discovery, Co-Lead Class Counsel obtained text messages and other communications from a claim service entity retained by over 300 Retired NFL Football Players who have registered in the Program

("Claim Service Entity-A").   Those communications reveal that Claim Service Entity-A attempted to coach players to help them secure qualifying diagnoses, including the following specific examples:

- In one communication, a representative of Claim Service Entity-A told a retired player, "We train you for the test brother.  It's a Neurocognitive level that is judged by two tests! Don't cost you nothing to let us walk you through the process!"  The retired player asked, "How long is the training," to which the Claim Service Entity-A representative replied, "We just have our Director of Psychological Development call you and do it over the phone."

- In another exchange between a representative of Claim Service Entity-A and a retired player, the player wrote, "Because God forbid if I ever do really get messed up I want need y'all lol.  But that's kinda the reason why I signed ya know."   The Claim Service Entity-A representative wrote in response, "Everybody odds are different man . . . . your probably one of the most intelligent clients I have . . . . . your odds aren't as high as some other guys I have . . . but your smart enough to perform the right way as well!"  The retired player replied, "That's what I'm saying I can do what I need to do, just let me know what I need to do."  The representative from Claim Service Entity-A assured the player, "We will brother . . . . a few days before it's game time!!! LoL."

- On another occasion, a representative of Claim Service Entity-A told a retired player, "the doctors and myself went through your reports and we found some things that we think we can take advantage of so you can pass the test the second go around."

- Finally, a representative of Claim Service Entity-A told a retired player, "We have our own doctors we have gotten inside the BAP . . . . that's why our situation is better . . . . unlike majority of the folks . . . you wont have to go to those NFL sides dr's with us!"

Again, without further investigation, it is unknown precisely what "coaching" was provided and to whom, and the nature of the relationship between Claim Service Entity-A and associated physicians and lawyers.

### 3.      Law Firm-B and Doctor-A

The Claims Administrator has also uncovered troubling relationships between certain law firms and doctors, including the following example:

- According to the Claims Administrator, a law firm that represents more than 50 players who have submitted Claim Packages ("Law Firm-B") charged higher fees to players for whom they secured an Alzheimer's diagnosis, as opposed to Level 1.5 or Level 2 Neurocognitive Impairment, and virtually all of those players were evaluated by the same doctor – a ***pediatric*** neurologist ("Doctor-A").

- Doctor-A, in turn, diagnosed a staggering 75% of the players he/she evaluated (or 36 out of 48) with Alzheimer's Disease.  Almost all of the Alzheimer's diagnoses from Doctor-A were for young claimants.  Indeed, 21 of the 36 claims were for players in the their 30s and 40s, and one player was just 29 years old when he received his Alzheimer's diagnosis from Doctor-A.  Doctor-A was singlehandedly responsible for more than 60% of ***all*** of the Alzheimer's claims in the Program for players under 40 years of age.

The Claims Administrator further determined that Doctor-A's reports included

demonstrably false information, including for example:

- 21 of the 48 reports submitted by Doctor-A included ***identical*** vital signs across claimants.  When questioned about that medical impossibility by the Claims Administrator, Doctor-A was unable to provide a credible explanation.

- According to the Claims Administrator, in certain cases, Doctor-A submitted affidavits claiming that his/her diagnosis was based on neuropsychological testing "conducted contemporaneously" with his/her assessment when, in fact, the neuropsychological report did not exist at the time of the diagnosis.

The Claims Administrator also uncovered substantial evidence that Settlement

Class Members were complicit in this conduct.  For example:

- When the Claims Administrator obtained the players' other medical records from healthcare providers unrelated to the Settlement Program, those records were in many instances inconsistent with the diagnosis alleged.

- In one case, a player who was diagnosed with Alzheimer's Disease in July 2015 by Doctor-A completed and signed a medical history questionnaire nearly two years later, in May 2017, in which he denied any problems with speech, memory or concentration.

- Some of the players were evaluated by other medical professionals who did not find any cognitive issues.

- Certain players saw other physicians subsequent to their purported diagnosis from Doctor-A, and the medical records from those physicians contained no reference to the supposed diagnosis from Doctor-A.

- Other players sought no treatment at all following Doctor-A's evaluation, despite being purportedly diagnosed with early or moderate dementia or even Alzheimer's Disease.

Moreover, as to a number of the players evaluated by Doctor-A, there is evidence from social media and other public sources that raises serious concerns about the veracity of their claimed impairment and purported diagnoses. Without further investigation, though, the extent of this behavior, and how many claimants (and other parties) participated in this deceptive conduct, is unknown. Several examples are provided below for illustrative purposes:

- Player-1 is a Retired NFL Football Player who was diagnosed with Alzheimer's Disease by Doctor-A in June 2016 at the age of 54. Player-1 reported severe cognitive issues during his neurological evaluation and submitted a third-party affidavit that stated he was a head football coach but had hired people to do all the administrative work because he could not focus on it. As part of an audit, the Claims Administrator requested clarification from Player-1 regarding his employment status. In response, Player-1 claimed that he had discontinued coaching football by the time of his evaluation in June 2016 and had to relinquish all administrative work to others. However, even after June 2016, Player-1 participated in multiple videotaped interviews about his present coaching duties and, as recently as October 2017, was interviewed by reporters about his role as a head football coach.

- Player-2 is a Retired NFL Football Player who was diagnosed with Alzheimer's Disease by Doctor-A in July 2015 at just 39 years of age. Player-2 reported significant cognitive impairments, including memory loss, becoming easily confused and being incapable of even doing errands without assistance. But publicly-available information reflects that Player-2 is the head coach of a minor league football team, a developmental football coach and a motivational speaker. Of particular concern, when asked by the Claims Administrator to complete a form listing current and past employment, Player-2 still did not list his coaching positions. When the Claims Administrator obtained medical records for Player-2 from other healthcare providers post-dating the Alzheimer's diagnosis by Doctor-A, those records included no reference to Player-2's supposed Alzheimer's Disease.

4. Law Firm-C and Doctors-B&C

The Claims Administrator received an anonymous tip from two separate sources that two neurologists ("Doctors-B&C") who practiced together had rendered Qualifying Diagnoses to every player they had seen and also had used questionable techniques in rendering

these diagnoses, including diagnosing players in the offices of a law firm. Doctors-B&C, together, diagnosed 84 claims valued at over $98.5 million; the law firm in question was associated with 92% of these claims. Following an audit, the Claims Administration concluded, for example:

- Doctors-B&C provided functional impairment ratings that were contrary to the player's apparent abilities. For example, one player was assigned a score of 2—which indicates "no pretense of independent function outside the house"—yet, the player was still actively involved in volunteer work and in no way indicated any inability to function independently or a need for assistance. Further, Doctors-B&C assigned the exact same score across all relevant areas for 79 of the claims diagnosed.

- Of particular concern, the report concluded that Doctor-B submitted an affidavit, under penalty of perjury, that he evaluated certain players in person, when in fact there is no evidence that he did so.

Because the Claims Administrator's audit focused on the practices of Doctors-B&C, additional investigation is necessary to determine the extent that Law Firm-B and/or individual players were complicit in this conduct.

5.    Doctor-D and Doctor-E

The Claims Administrator also identified two neuropsychologists ("Doctor-D" and "Doctor-E") who made material misrepresentations in connection with medical records submitted as part of Claim Packages and, in some cases, thereafter provided conflicting explanations for those misrepresentations, which explanations were deemed not credible by independent experts.

For example, 70 claims relied on evaluations from Doctor-D, a neuropsychologist, to support the diagnosis alleged. The Claims Administrator determined that:

- Doctor-D improperly concluded that a player's test results demonstrated a "valid assessment" of the player's functioning, when in fact that player had clearly failed all reported validity indicators—that is, the player's test results indisputably showed that the player exaggerated impairment to achieve a specific result. Doctor-D also did not report scores on two out of the five

validity tests administered—and always omitted the same two test scores in each report.

Similarly, the Claims Administrator determined that Doctor-E, a separate neuropsychologist, also displayed suspect practices.  By way of example:

- Doctor-E submitted two distinct reports for a single claimant with the same evaluation date, same report date, and same patient background and history, but with different tests allegedly conducted in each report and, for the tests that overlapped between the two reports, different scores.  When asked about this discrepancy, Doctor-E provided inconsistent and conflicting explanations to the Claims Administrator and to an attorney for one of the claimants who also noticed the discrepancy.

- Doctor-E repeated this practice of submitting two reports from the same date with conflicting information in multiple cases.

The Claims Administrator's audits of these claims focused on the practices of the individual doctor.  The Claims Administrator specifically noted that Doctor-D worked closely with two local neurologists, but those neurologists were not interviewed.  The Claims Administrator also observed that at least 32 of the players diagnosed with Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) reported that they were actively employed at the time of their assessments.  Further investigation is warranted to determine the full extent of any fraudulent conduct associated with Doctor-D and Doctor-E.

### 6.      Dr. Serina Hoover and Related Neuropsychologists

In December 2017, following a referral by the Claims Administrator, the Special Masters found that reports submitted by neuropsychologist Dr. Serina Hoover included misstatements, omissions or concealments of material facts and, as a result, disqualified her from the program.  Among other issues:

- Dr. Hoover claimed to have evaluated at least three (and as many as eight) players on each of 25 days, including eight players on New Year's Eve.

- Based on her own sworn statements regarding the amount of time spent on each evaluation and report, Dr. Hoover claimed to have spent 139 hours

evaluating and preparing reports for retired players in a 24-hour window, and 134 hours in another 24-hour window.

- Dr. Hoover submitted "template" reports, including with a comment left in the report that stated "these are scores from sample report."

- The Claims Administrator subsequently determined that seven other neuropsychologists also used the same template report that Dr. Hoover used and that those claims also included a misstatement, omission or concealment of a material fact.

Significantly, there is also evidence that Settlement Class Members who were evaluated by Dr. Hoover and the other template physicians were aware of and complicit in the misconduct. On behalf of the Claims Administrator, an independent expert reviewed a sample of seven claims that relied on testing by the template physicians and in all seven, the performance validity tests showed malingering by the Retired NFL Football Players; that is, that the players were exaggerating impairment to achieve a specific result. The expert also found "clear indications of exaggeration and unbelievable symptoms on a standardized, validated test," and one report characterized the player's complaints and reported symptoms as "unbelievable."

In some cases, publicly available information appears to show that the Settlement Class Members made deliberate misrepresentations and/or concealed employment or other activities. For example:

- Player-3 is a Retired NFL Football Player who was diagnosed with Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) by Dr. Hoover in January 2017 at the age of 32. During his evaluation, Player-3 reported significant cognitive impairment, including that he struggles to follow instructions, has poor attention and is highly distractible. He reported significant memory issues, claiming he could not remember common daily events. According to his medical records, Player-3 was unable to work in any capacity. However, videos available online show Player-3 delivering lengthy and fully coherent motivational speeches, often without the assistance of any notes, on numerous occasions post-dating his evaluation and diagnosis. Moreover, social media profiles show Player-3 traveling around the world and engaging in recreational activities like riding motorcycles, hiking, swimming, and playing golf, all subsequent to his evaluation and purported moderate dementia diagnosis.

14

- Player-4 is a Retired NFL Football Player who was diagnosed with Level 1.5 Neurocognitive Impairment (*i.e.*, early dementia) by Dr. Hoover in May 2017 at the age of 31.  Player-4 reported, among other things, that he had short-term memory problems, difficulty completing tasks, difficulty helping his son with homework, and that he had to quit his job because he had difficulty staying organized.  He did not disclose, however, that he was attending graduate school and received an MBA degree in 2017 in the same month as his evaluation.

- Player-5 is a Retired NFL Football Player who was diagnosed with Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) by Dr. Hoover in December 2016 at the age of 32.  At the time of his evaluation, he reported that he was unemployed, had significant issues with memory and completing tasks, and frequently would go into a room and forget why he was there.  Yet, publicly-available information reflects that he was working at the time as a registered wealth manager for a large investment firm.

As with the other instances of fraud, without further investigation, it is not known which other players, law firms and physicians may also have participated in or been aware of these deceptive practices.

In sum, in only a year of this Program's long life, the Claims Administrator has uncovered significant fraud and a substantial need for a Special Investigator to conduct further investigation to ensure that the appropriate remedies are imposed to preserve the integrity of the program and to ensure that deserving players are paid without delay caused by a continued influx of false claims.

## **ARGUMENT**

It is well established that under Rule 53 and the Court's inherent authority, the Court may appoint a Special Master to investigate allegations of misconduct and preserve the integrity of its judgments.  Courts have appointed a Special Master tasked specifically with investigating misconduct in connection with large class action settlement programs like this one. *See, e.g.*, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010*, No. MDL 2179, 2014 WL 12788985, at *1, *5 (E.D. La. Apr. 29, 2014) (appointing

special master specifically to "investigate allegations of misconduct within the Settlement Program"); *In re Engle Cases*, No. 3:09-CV-10000, 2015 WL 12843860, at *1 (M.D. Fla. Dec. 22, 2015) (appointing special master to investigate potential misconduct by counsel in settlement, including whether "counsel made any material misrepresentations to the Court"); *Ark. Teacher Ret. Sys. v. State St. Bank & Tr. Co.*, No. 11-10230, Order, ECF No. 173 (D. Mass. Mar. 08, 2017) (appointing special master to investigate and report on accuracy and reliability of representations made in connection with request for attorneys' fees, and the reasonableness of the award); *see also Trentadue* v. *U.S. Cent. Intelligence Agency*, No. 2:08-CV-0788, 2015 WL 1968263, at *5–6 (D. Utah Apr. 30, 2015) (appointing special master to investigate compliance with order and allegations of witness tampering).

Here, the Court has already acknowledged the potential need to supplement the Program's existing anti-fraud resources. In a November 13, 2017 oral order, the Court directed that an "an investigator will be appointed by [the Court], as needed, to look into possible fraudulent claims." For good reason. As set forth above, the fraudulent behavior identified to date has been serious and widespread and the need for further investigation and additional remedies is pressing. Accordingly, the NFL Parties submit that the appointment of a Special Investigator is needed immediately.[1]

## I.     A Special Investigator is Needed to Protect the Integrity of the Program

As reflected above, and as further described in the April 9, 2018 Response by the Claims Administrator to Joinder and Motion by Neurocognitive Football Lawyers and in the April 13, 2018 Declaration of Orran L. Brown, Sr., the Claims Administrator has conducted effective and time-consuming audits and uncovered significant evidence of fraud. But the need

---

[1]     The Claims Administrator has advised that it has no objection to the appointment of a Special Investigator and will cooperate fully with a Special Investigator as the Court and the Special Masters direct.

for further investigation is far from over and a Special Investigator is essential to supplement the work of the Claims Administrator and provide the Court and Special Masters with the information needed to identify all culpable parties, fashion appropriate remedies, provide effective deterrence and protect against payment of fraudulent claims.

To that end, the NFL Parties propose that the Special Investigator would have the authority under Rule 53 to conduct investigations and make recommendations regarding appropriate remedies and sanctions.  The role of the Special Investigator would include, without limitation, the following:   (1) assisting the Special Masters in determining questions of knowledge and intent, (2) assisting in determining the full scope of fraud (including by identifying all culpable parties), and (3) otherwise assisting the Claims Administrator and Special Masters as needed.

### A.    The Special Investigator Will Assist the Special Masters in Determining Knowledge and Intent

Pursuant to its duties under Section 10.2 of the Settlement Agreement, the Claims Administrator's audits are intended to determine whether there is a reasonable basis to support a finding of a misstatement, omission or concealment of a material fact.  The Claims Administrator then prepares an Audit Report with its findings on that specific question and provides its recommendations for appropriate remedies to be imposed by the Special Masters.

In light of its narrow mandate, the Claims Administrator generally does not take additional investigative steps once it has reached that determination.  The Claims Administrator does not determine whether a misrepresentation, omission or concealment was intentional.  Instead, the Settlement Agreement tasks the Special Masters with assessing questions of intent and then fashioning appropriate remedies, which, under the Settlement Agreement, may include, without limitation, referral of a physician or lawyer to appropriate disciplinary boards, referral to

17

federal authorities, additional audits of related claims and forfeiting of attorneys' fees paid by a Settlement Class Member to a law firm that engaged in fraud.  These and other more stringent remedies are necessary, where the facts warrant them, in order to provide meaningful deterrence and sufficiently guard against the payment of fraudulent claims.

Without the assistance of a Special Investigator, however, the Special Masters are generally limited to the information developed by the Claims Administrator, which only seeks to determine whether there has been a misstatement, omission or concealment of a material fact.  In order to ensure that the Special Masters have all of the information necessary to evaluate and determine which of the remedies available under the Settlement Agreement are appropriate, it is imperative to have a Special Investigator continue certain investigations of relevant individuals and entities following the completion of the Claims Administrator's audit.

Indeed, the Claims Administrator has recognized this need.  In its Audit Report on Law Firm-A, for example, the Claims Administrator noted that its audit did not attempt to confirm all allegations about Law Firm-A and expressly recognized that there were specific follow-up investigative steps that could be taken to potentially reveal intent.

Moreover, when the Claims Administrator referred Dr. Hoover to the Special Masters, based on a finding that Dr. Hoover had made material misstatements or omissions, the Special Masters disqualified her from the Program and denied the corresponding claims without prejudice, but did not impose additional remedies at that time based on the Audit Report.  The NFL Parties respectfully submit that it is critical to continue the investigation of Dr. Hoover, Law Firm-A, and other similarly situated parties because if a physician or law firm has engaged in *intentional* misconduct, mere disqualification from the Program is not a sufficient remedy and will not serve to provide adequate deterrence to others.  Thus, a Special Investigator should

continue these investigations, determine whether the parties acted intentionally and report its findings and recommendations to the Special Masters so that they may meaningfully evaluate the full range of remedies and sanctions provided for in the Settlement Agreement and available under Rule 53.

**B.      The Special Investigator Will Help Determine the Full Scope of Fraud, Including by Identifying All Culpable Parties**

Relatedly, in addition to determining the intent of the primary subject(s) of an audit report, a Special Investigator is needed to determine the full scope of any fraud, including identifying all of the individuals and entities who knowingly participated in it.  Otherwise, remedies imposed based only on the Claims Administrator's audit may not adequately address all of the conduct or bad actors and may enable those who engaged in fraud to submit new claims without any penalty.  By helping to determine the full extent of any fraudulent conduct, the Special Investigator will protect against the payment of fraudulent claims and deter further fraudulent conduct.

For instance, the Claims Administrator concluded that there was a reasonable basis to support a finding that Doctor-A made material misstatements and therefore recommended that Doctor-A be disqualified and that the associated claims be denied without prejudice.  But, as discussed above, there is already extensive evidence, based largely on publicly-available information obtained without powers of discovery, that a number of these Settlement Class Members were knowing and active participants in the deceptive conduct and in fact made material misrepresentations themselves.  However, without further investigation to determine which Settlement Class Members participated in the misconduct, so that appropriate remedies may be imposed, a retired player who knowingly engaged in fraud would suffer no penalty other than the minimal inconvenience of having to submit a new claim.  This would

provide no deterrence at all and, in fact, would actually incentivize players to engage in precisely this type of behavior.

As another example, the Claims Administrator uncovered credible evidence that Law Firm-A improperly "coached" players on how to approach neuropsychological testing to obtain specific diagnoses.  Absent a full investigation, merely disqualifying that law firm would be an inadequate remedy as to the Settlement Class Members, because players who were coached cannot "unlearn" that coaching and should not be allowed to participate in the Settlement Program and receive future awards without further safeguards to ensure any new claims they submit are valid.

### C.   The Special Investigator Also Will Assist the Claims Administrator and Special Masters as Needed

Finally, in light of the breadth of fraud already detected, and the volume of potentially fraudulent claims, a Special Investigator should be appointed to assist the Claims Administrator and Special Masters with additional investigation, as they deem necessary.

### II.   The Authority of the Special Investigator

The NFL Parties respectfully submit that the Special Investigator should be granted the full authority permitted under Rule 53 to carry out the duties and responsibilities described above, including but not limited to the power to issue subpoenas and to compel and take testimony.  The Special Investigator should report directly to the Court and the Special Masters, and should provide a status update to the Court on at least a monthly basis.  The Special Investigator also should work in consultation with the Claims Administrator and have the discretion to communicate *ex parte* with the Court, the Claims Administrator, Co-Lead Class Counsel, and/or counsel for the NFL Parties, as the Special Investigator deems appropriate.

## CONCLUSION

For the foregoing reasons, the NFL Parties respectfully submit that the Court should promptly appoint a Special Investigator to carry out the responsibilities described herein.

Dated: April 13, 2018

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
/s/  Brad S. Karp
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
Richard C. Tarlowe
Sarah A. Istel
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   (212) 373-3000
Email: bkarp@paulweiss.com

*Attorneys for Defendants the National Football
League and NFL Properties LLC*