UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>        Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>        Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CO-LEAD CLASS COUNSEL'S RESPONSE TO THE YERRID
LAW FIRM AND NEUROCOGNITIVE FOOTBALL LAWYERS'
<u>MOTION TO REVIEW DEPRIVATION OF APPEAL RIGHTS</u>**

Co-Lead Class Counsel, Christopher A. Seeger, hereby responds to The Yerrid Law Firm and Neurocognitive Football Lawyers' Motion to Review Deprivation of Appeal Rights. For the reasons set forth below, as well as for those reasons set forth in the Claims Administrator's Response to Motion to Prohibit Ex Parte Interviews with Treating Doctors and Partial Joinder to

the Motion Brought by the Locks Law Firm Filed by Neurocognitive Football Lawyers, LLC Lawyers (Document No. 9870), the motion should be denied.

## BACKGROUND

As a procedural matter, the pleading filed by The Yerrid Law Firm ("YLF") and Neurocognitive Football Lawyers ("NCFL") on March 30, 2018 (Document 9843) is entitled "The Yerrid Law Firm and Neurocognitive Football Lawyers' (1) Partial Joinder to the Motion Brought by the Locks Law Firm for Appointment of Administrative Counsel, (2) Motion to Review Deprivation of Appeal Rights and (3) Requesting Oral Argument." However, despite its title, the document filed by YLF and NCF provides no substantive discussion or support for its "partial joinder" in Locks' Motion. Rather, YLF and NCFL's filing deals exclusively with their Motion to Review Deprivation of Appeal Right. Accordingly, this response is limited to that motion. To the extent that any response is necessary to YLF and NCFL's partial joinder in Locks' Motion, that response can be found in Co-Lead Class Counsel's Opposition to the Motion of The Locks Firm for Appointment of Administrative Class Counsel and all Joinders thereto, being filed today.

This motion is not YLF and NCFL's first attack on the Claims Administrator's use of the audit process. The same firms filed a Motion to Prohibit Ex Parte Interviews with Treating Physicians (Document No. 9815) on March 26, 2018. Co-Lead Class Counsel filed its opposition to that motion on April 9, 2018 (Document No. 9869). While that motion will be decided on its own merits, Co-Lead Class Counsel references that motion because of a striking similarity it has with the current motion. Both motions reveal YLF and NCFL's ignorance of the audit process as provided for in the Amended Settlement Agreement and the Special Master's Rules Governing the Audit of Claims, as well as the Claims Administrator's use of its clear authority to conduct such audits.

**ARGUMENT**

Virtually every complaint made by YLF and NCFL in their motion stems directly from their fundamental misunderstanding of the Amended Settlement Agreement and/or the Special Master's Rules Governing the Audit of Claims. Specifically, throughout their motion, YLF and NCFL mistakenly take the position that the Claims Administrator's right to audit claims is derived solely from Section 10.3(c) of the Amended Settlement Agreement, which reads:

> (c) On a monthly basis, the Claims Administrator will audit ten percent (10%) of the total Claim Packages and Derivative Claim Packages that the Claims Administrator has found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month. The Claims Administrator will select such Claim Packages and Derivative Claim Packages for auditing on a random basis or to address a specific concern raised by a Claim Package or Derivative Claim Package, but will audit at least one Claim Package, if any qualify, each month.

YLF and NCFL believe that the <u>only</u> claims subject to possible audit by the Claims Administrator are those claims that have already been approved for a Monetary Award, and even then that the Claims Administrator can audit only 10% of that population on a monthly basis.

YLF and NCFL simply ignore several other relevant sections of the Amended Settlement Agreement and the Rules Governing the Audit of Claims promulgated by the Special Masters. Specifically, they ignored Sections 8.6(b), 10.3(b), 10.3(j) and 10.4 of the Amended Settlement Agreement.

Section 8.6(b) provides:

> (b) The Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation, including, without limitation, as set forth in Section 10.3.

There is no limitation in this section as to the types of claims that the Claims Administrator can investigate. YLF and NCFL also ignore Sections 10.3(b) and 10.4 of the Amended Settlement

Agreement. Those two sections are closely related so it makes sense to view them together. Section 10.3(b) states, in relevant part, that:

> (b) In addition, Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund. Among other fraud detection and prevention procedures, the Claims Administrator, with the approval of Co-Lead Class Counsel and Counsel for the NFL Parties, will institute the following procedures relating to claim audits:
> . . .

Section 10.4 provides:

> The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot "red flags" of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

Again, it is hard to imagine someone reading these two sections and concluding, as YLF and NCFL apparently did, that the only claims subject to possible audit are 10% of those claims found to qualify for Monetary Awards. Rather, as noted above, the Amended Settlement Agreement requires the Claims Administrator to "establish and implement procedures to detect and prevent fraud" without regard to a claim's status in the process. Are YLF and NCFL taking the position that the Claims Administrator should turn a blind eye to potential fraud in claims that have not yet been reviewed for possible Monetary Award, and/or to those claims that were found not to qualify for Monetary Award? If so, that position flies in the face of common sense and the language of the Amended Settlement Agreement and the Rules Governing the Audit of Claims, and would needlessly delay meritorious claims while resources are consumed conducting merits review of

claims that may not survive an audit. Why would the Amended Settlement Agreement require the Claims Administrator to "establish a system-wide process to detect and prevent fraud" but not allow the Claims Administrator to audit the very claims identified by that process?

If it is not yet clear that the Claims Administrator's authority to audit claims is not solely derived from Section 10.3(c), as alleged by YLF and NCFL, Section 10.3(j) resolves the issue once and for all. Sections 10.3(j) states:

> (j) In addition, if the Claims Administrator at any time makes a finding (based on its own detection processes or from information received from Co-Lead Class Counsel or Counsel for the NFL Parties) of fraud by a Settlement Class Member submitting a claim for a Monetary Award or Derivative Claimant Award, and/or by the physician providing the Qualifying Diagnosis, including, without limitation, misrepresentations, omissions, or concealment of material facts relating to the claim, the Claims Administrator will notify the Settlement Class Member and will make a recommendation to Co-Lead Class Counsel and Counsel for the NFL Parties to refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) for review and findings that may include, without limitation, those set forth in Section 10.3(i).

There is nothing ambiguous about the language of 10.3(j). First, it uses the phrase "at any time", so the Claims Administrator's authority to conduct audits is not specifically limited to those claims that have already been approved for a Monetary Award. Similarly, the phrase "submitting a claim for a Monetary Award or Derivative Claimant Award" indicates that the Claims Administrator has the authority to conduct audits of claims that have been submitted, but not yet approved, for a Monetary Award.

As detailed above, YLF and NCFL simply fail to understand that the Amended Settlement Agreement and the Rules Governing the Audit of Claim do not limit the Claims Administrator's authority to audit only claims to only those that have been approved for Monetary Award. Their failure to understand that fact is the genesis of almost every complaint in their motion.

Those complaints raised in YLF and NCFL's motion that do not directly stem from their failure to understand that the Claims Administrator is not limited in the types of claims they can audit, are nonetheless without merit since they are based on other misunderstandings of the Amended Settlement Agreement. For example, YLF and NCFL complain that their players who have had their claims denied are being deprived of their appellate rights because the Claims Administrator is auditing their claims. That is simply not true. As stated in Rules 8 and 14 of the Rules Governing the Audit of Claims, when a claim is placed into audit, all of the claims processing deadlines are suspended wherever the claim is at that time in the review, appeal or payment process. If the audit is completed without the Claims Administrator determining that there is a reasonable basis to support a finding of a misrepresentation, omission, or concealment of a material fact in connection with that claim, the claim is removed from audit and it continues in the process. So, if the claim was under appeal when placed into audit, the appeal process would resume with relevant deadlines adjusted accordingly, and with all parties having their full appellate rights. Those players are not being deprived of any appellate rights.

YLF and NCFL also complain about the appeal process, separate and apart from the audit process. Specifically, YLF and NCFL complain that the Rules Governing Appeals of Claim Determinations do not allow for the submission of "new matters." That claim is without merit. To begin with, the phrase "new matters" is not used in the appeal rules cited in the motion. Co-Lead Class Counsel believes that YLF and NCFL are actually referring to "new evidence" as that phrase is used in the appeal rules at issue. In any event, Rule 23 allows the Special Master to accept "new evidence" (i.e. evidence that was not originally submitted with the Claims Package and, therefore, not considered in the review of that claim) in the appeal process. Again, YLF and NCFL are mistaken.

## **CONCLUSION**

For the foregoing reasons, as well as for the reasons stated in the Claims Administrator's Response to Motion to Prohibit Ex Parte Interviews with Treating Doctors and Partial Joinder to the Motion Brought by the Locks Law Firm Filed by Neurocognitive Football Lawyers, LLC Lawyers, The Yerrid Law Firm and Neurocognitive Football Lawyers' Motion to Review Deprivation of Appeal Rights should be denied.  The Claims Administrator's authority to conduct audits, as provided for in the Amended Settlement Agreement and the Rules Governing the Audit of Claims, is not limited to those situations stated in Section 10.3(c).

Dated:  April 13, 2018                                          Respectfully submitted,

/s/ Christopher A. Seeger
Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Road, 6th Fl
Ridgefield Park, New Jersey 07660
Phone: (212) 584-0700
Fax: (212) 584-0799

*Co-Lead Class Counsel*

## **CERTIFICATE OF SERVICE**

I, Christopher A. Seeger, hereby certify that a true and correct copy of the foregoing response was served electronically via the Court's electronic filing system on the date below upon all counsel of record in this matter.

Dated: April 13, 2018

*/s/ Christopher A. Seeger*
Christopher A. Seeger