**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

### <u>DECLARATION OF ORRAN L. BROWN, SR. ON PROGRAM IMPLEMENTATION</u>

I, ORRAN L. BROWN, SR., hereby declare and state as follows:

## I.      <u>INTRODUCTION</u>

1.      *The Declarant and BrownGreer.*  My name is Orran L. Brown, Sr.  I am licensed to practice law in Virginia and Texas and am the Chairman and a founding partner of BrownGreer PLC, located at 250 Rocketts Way, Richmond, Virginia 23231.  BrownGreer has specialized in notice administration and settlement administration since my partner, Lynn Greer, and I founded the firm in 2002.  BrownGreer has performed crucial administration or review roles in over 75 major programs involving over 31,000,000 class members and the disposition of over $34 billion in payments to qualifying claimants.  BrownGreer is the Court-appointed Claims Administrator for the Class Action Settlement in this litigation, approved by this Court on April 22, 2015, as amended May 8, 2015.

2.      *The Purpose of this Declaration.*  I submit this Declaration to explain the status of the implementation of the Settlement Program involving work by BrownGreer as the Claims Administrator.  I am over 21 years of age, have personal knowledge of the facts

in this Declaration and can provide testimony and any other information the Court may find helpful.

## II.   <u>OPENING THE PROGRAM</u>

3.   ***Effective Date.***   The Settlement became final and effective on January 7, 2017, when all appeals to the Court's April 22, 2015 Final Order and Judgment (Document 6510), as amended May 8, 2015 (Document 6534), were concluded and we could move forward with implementing the Settlement Agreement.

4.   ***Registration Submissions.***   In my June 15, 2017 and November 3, 2017 Declarations filed with the Court (Documents 7827-1 and 8881-1), I discussed our launch of the Registration process.   As of April 10, 2018, we had received 20,480 registrations through the Settlement Website and by email and hard copy submissions.   These registrations include 15,983 Retired NFL Football Players, 1,224 Representative Claimants and 3,273 Derivative Claimants.   Of all registrants, 11,007, or 54%, registered as *pro se*, and 19,038, or 93%, registered using an online portal rather than on paper or an electronic image of a form.   We continue to work with Settlement Class Members to try to help them cure any remaining deficiencies with their registrations.   We also have received late registration attempts and are responsible for determining whether they can be accepted under guidelines approved by the Special Masters.

5.   ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.***   I explained this streamlined appointment process in my November 3, 2017 Declaration (Document 8881-1).   As of April 10, 2018, the Special Masters had approved 322 petitions from proposed Representative Claimants for deceased or legally incapacitated or incompetent Players.   We received 77 additional petitions from

proposed Representative Claimants, but the documents they provided as the basis of their authority to act were insufficient for us to send their petitions to the Special Masters. We continue to follow up with those whose petitions remain incomplete to help them through this process, rather than having to be appointed by a local court. The Special Masters have approved the only two petitions we have received from Derivative Claimant Representatives for Derivative Claimants who are minors.

6. ***Registration Reviews and Notices.*** On every registration, we must determine: (1) if the registrant was a Retired NFL Football Player (or a Representative Claimant or Derivative Claimant of a Retired NFL Football Player), as defined in the Settlement Agreement; and (2) whether the Retired NFL Football Player had at least half an Eligible Season and thus is eligible for the Baseline Assessment Program ("BAP"). We compiled data we collected from NFL.com along with information we received from the NFL Parties, which included data on players employed with the NFL from 1983-2014, players who were on a practice squad from 1989-2013, players who were employed with NFL Europe and NFL Europa teams and players who were still under contract as of July 7, 2014. As a result, our review platform contains NFL employment information for over 26,000 players. If we are unable to confirm either of these two requirements based on the information and documents the registrant provided and the data we have, we do internet searches of websites such as NFLPA.com and NFLGSIS.com and any others with football statistics to identify additional information on the registrant's NFL participation. If we exhaust all available resources and still are unable to confirm that the registrant was a Retired NFL Football Player or eligible for the BAP, we send the registrant's information, including any results from our review, to the NFL Parties to research league transactional records. By working with the NFL Parties,

we have been able to confirm that 355 Retired NFL Football Players are eligible for the BAP who would not otherwise have proved sufficient NFL experience. We also have been able to confirm that 534 registrants are Retired NFL Football Players (or Representative Claimants or Derivative Claimants of Retired NFL Football Players) through these efforts with the NFL Parties. We continue this work on any Monetary Award claim where the Retired NFL Football Player's number of Eligible Seasons is at issue. As of April 10, 2018, we had issued 20,476 Registration Notices. Of those, 12,759 Retired NFL Football Players are eligible to participate in the BAP. We work closely with the staff of the BAP Administrator to provide them immediate information on all Retired NFL Football Players who may participate in the BAP.

### III.    COMMUNICATIONS CENTER FOR THE PROGRAM

**7.**    ***Our Contact Activity***. Since our contact center opened on February 6, 2017, we have handled 51,048 total communications (as of April 10, 2018), including 32,502 calls made or received and 16,523 emails to us at ClaimsAdministrator@NFLConcussionSettlement.com.

**8.**    ***Program Specialists***. Settlement Class Members and their lawyers can speak with knowledgeable Program Specialists at BrownGreer for help with any aspect of the Program. We proactively communicate with Settlement Class Members to address issues, provide step-by-step assistance with their portals and guidance to help them complete or submit hard copy documents, such as Claim Forms and medical records. Program Specialists give detailed directions and review document requirements, handle any requests for hard copy forms to be mailed to Settlement Class Members and work closely with them to ensure all documents are received and processed promptly. For Settlement Class Members who express any difficulty completing a hard copy Claim Form, we offer to fill out the Claim Form with information the

Settlement Class Member provides to us during a call.  We then mail the Claim Form to the Settlement Class Member to review, sign and return with any necessary documents.  We have a specially trained Communications Supervisor who acts as the direct contact for Settlement Class Members who need assistance with sensitive or difficult issues, as well as a highly experienced person who serves as the go-to contact for any *pro se* person who needs help.

9.      ***Law Firm Contacts.***  We assign Law Firm Contacts at BrownGreer to all lawyers representing Settlement Class Members to be their single contact point for the Program.  Law Firm Contacts act as omnibus liaisons for the Program by promptly answering questions, providing portal support and proactively communicating with the lawyers to address issues.[1]

10.     ***Settlement Program Website.***  We regularly update the Settlement Website to reflect progress and changes to the Program.  We post new Alerts on the Alerts page, place banners at the top of the Home page to draw attention to important information, provide weekly statistics on registrations/claims and post new materials on the Documents page, including Orders entered by the Court.  On December 15, 2017, we redesigned the layout to include a reporting feature and Quick Link icons for easy access to important features of the website.  We continue to evaluate ways to improve the website design and add helpful resources.  As of April 10, 2018, the Program's Home page had 323,951 unique visits, with representation from all 50 states as determined by IP Addresses, since it became publicly available on July 7, 2014.

---

[1] If a Settlement Class Member is represented in the Program by his or her own lawyer, we send all notices and communications to that lawyer.  Often, however, represented Settlement Class Members contact us with questions. Because we are not acting as counsel for anyone, we ethically are permitted to communicate directly with such Settlement Class Members, but we encourage them in every instance to go through their lawyer.

## IV.   OPENING THE CLAIMS PROCESS

**11.     *Launch of the Claims Process and Early Claim Submissions.***  In my June 15, 2017 and November 3, 2017 Declarations (Documents 7827-1 and 8881-1), I discussed our launch of the claims process on March 23, 2017.  We received 18 online Monetary Award claims in the first 24 hours after we opened the claims process.  We started reviewing claims on March 24, 2017, after the first one was submitted.  We issued the first award notice to an eligible Retired NFL Football Player on May 26, 2017.  The Trustee made the first payment ($4.6 million) to a Retired NFL Football Player on June 21, 2017, for a Claim Package submitted on March 29, 2017.

**12.     *Total Claims Received.***  As of April 10, 2018, we had received 1,757 Monetary Award Claim Packages from registered Retired NFL Football Players and Representative Claimants and 454 Derivative Claim Packages from registered Derivative Claimants.  We thus have claims from 10.2% of registered Players and 13.9% of registered Derivative Claimants or, overall, from 10.8% of all registered Settlement Class Members.  In the early months of the Program, nearly all the claims we received were based on Pre-Effective Date diagnoses; until August 2017, they were 89% or more of the claims submitted each month.  The volume of post-Effective Date diagnoses in the BAP or from Qualified MAF Physicians has in general been on the rise each month and we expect soon will be the majority of claims filed.  We receive about 15 new Monetary Award claims each week.

## V.     QUALIFIED MAF PHYSICIANS

**13.     *Establishing, Maintaining and Expanding the MAF Network.***  In my June 15, 2017 and November 3, 2017 Declarations (Documents 7827-1 and 8881-1), I discussed our role in establishing an initial list of 102 approved Qualified MAF Physicians in or near 31 of

the 53 target cities.  We continue to identify and contact providers, collect Provider Applications, verify credentials, submit applicants to the Parties for approval and contract with approved Qualified MAF Physicians, in conjunction with the BAP Administrator, whose work has been instrumental in this process.[2]  We add Qualified MAF Physicians to the posted list as these steps are completed.  As of April 10, 2018, we had expanded the posted list to include 149 of the total 184 approved Qualified MAF Physicians and will add the remaining 35 potential Qualified MAF Physicians as we are able to get signed contracts back from them.  We have final contracts with 139 Qualified MAF Physicians in or near 38 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside, and we are in the contracting stages with an additional 45 potential Qualified MAF Physicians.  Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.

**14.**     ***Implementing the MAF Network.***  After a Qualified MAF Physician has contracted with us, we go over with him or her the Settlement's diagnostic criteria for each Qualifying Diagnosis, as well as procedural issues related to MAF appointments and the documents required to support each type of Qualifying Diagnosis.  After a Qualified MAF Physician has evaluated a Retired NFL Football Player and made a Qualifying Diagnosis, we instruct the physician to give to us the Diagnosing Physician Certification Form along with the medical records supporting the diagnosis.  The Qualified MAF Physician uploads these documents to a secure online portal with us and we immediately make the documents available to the Settlement Class Member or his or her lawyer through that person's online portal.

---

[2] When I say "Parties" in this Declaration, I mean the parties to the Settlement Agreement, Co-Lead Class Counsel and the NFL Parties.  Our contacts with Co-Lead Class Counsel are at Seeger Weiss LLP; we work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

## VI.     THE AAP AND THE AAPC

15.     *The Functions and Creation of the AAP and the AAPC.*  Sections 2.1(g), 2.1(h) and 9.8(a) of the Settlement Agreement describe the Appeals Advisory Panel ("AAP") of five neurologists and an Appeals Advisory Panel Consultants ("AAPC") of three neuropsychologists to perform certain roles under the Settlement Agreement.  The AAP is to:  (1) review certain Qualifying Diagnoses made prior to the Effective Date, pursuant to Section 6.4 of the Settlement Agreement; (2) review and decide whether a Retired NFL Football Player has a given level of Neurocognitive Impairment when the Qualified BAP Providers who examined the Retired NFL Football Player are not in agreement and the BAP Administrator elects, in its discretion, to refer the matter pursuant to Section 5.13 of the Settlement Agreement; and (3) be available to advise with respect to medical aspects of the Settlement.  When asked to do so, the AAPC provides advice about neuropsychological testing and cognitive impairment.  In February 2017, the Parties sent us a list of potential AAP and AAPC candidates and asked us to contact them to discuss the roles and coordinate calls between each candidate and the Parties.  In April 2017, the Parties agreed on the five AAP neurologists and three AAPC neuropsychologists to present to the Court for approval to serve on the AAP or AAPC.  The Court appointed these eight providers to the AAP or AAPC on May 5, 2017 (Document 7603).

16.     *Implementing the AAP.*  We informed the members of the AAP on how they are to perform the duties prescribed to them by the Settlement Agreement.  We assign claims to AAP members to review on a first in, first out basis.  Each AAP neurologist is asked to devote at least five hours per week to work on this Program.  As the AAP members progressed with the reviews of these claims, it became clear that one of them was not able to devote this amount of time to the Program.  Therefore, in November 2017, we began working with the Parties to

8

identify additional AAP candidates, contact them and coordinate calls as we had done previously.  On February 27, 2018, the Parties presented two additional AAP candidates to the Court for approval and recommended removing the one who did not have time to serve.  The Court appointed the new members and removed one on March 5, 2018 (Document 9753).  The rate at which each AAP member reviews claims depends on that doctor's schedule.  We monitor the productivity of each AAP member and work with the Special Masters and the Parties on the pace of reviews.  All six members of the AAP are producing constant results and we think will be able to keep the review queues nearly current after they finish the claims that accrued before the two new members were added.

17.    ***AAP Review of Monetary Award Claims.***  AAP neurologists use their independent medical judgment when reviewing Qualifying Diagnoses.  If an AAP member finds that a claimed Qualifying Diagnosis is not supported by the records but believes the records show a Qualifying Diagnosis that is less severe medically or lower in value according to the Monetary Award Grid, he or she may approve the lower Qualifying Diagnosis ("downgrade" the claim) and we issue a Notice of Monetary Award for that Qualifying Diagnosis.  We did not obtain this ability until February 5, 2018, when the Special Masters adopted FAQ 138.  We are having the AAP member re-review any claim that member found not eligible before February 2018 to determine whether the medical records support paying the claim on a lower level.  If they do, we will issue that Settlement Class Member a Notice of Monetary Award.

18.    ***Implementing the AAPC.***  As we did with the AAP, we informed the members of the AAPC on how they are to perform the duties prescribed to them by the Settlement Agreement.  We assign claims to the AAPC to review as we receive requests from the AAP members for AAPC assistance.  The AAP members are encouraged to seek input from the AAPC

on the neuropsychological testing supporting Level 1.5 and Level 2 claims and they may do so if they find it necessary on diagnoses of Alzheimer's Disease.  We monitor the productivity of the AAPC, whose members are current on their assignments.

## VII.  SPECIAL MASTERS

19.  ***Appointment.***  On July 13, 2016, the Court (in Document 6871) appointed Wendell Pritchett, the Provost of the University of Pennsylvania and the Presidential Professor of Law and Education at Penn Law School, and Jo-Ann M. Verrier, Vice Dean for Administrative Services at Penn Law School, as Special Masters to oversee the implementation of the Settlement.

20.  ***Our Engagement with the Special Masters.***  We have worked closely with the Special Masters since their appointment on nearly every aspect of our involvement in the Program to ensure the Settlement is faithfully implemented and administered and that only best practices are followed.  The Special Masters have been extremely diligent, are devoted to the success of this Program and have provided invaluable guidance and direction to us.  On January 23, 2017, we started having regular standing calls with the Special Masters to discuss policy and operational issues; we have held 46 such calls to date.  We have had many other calls and exchanged countless emails with them to address issues as they arose.  Their constant involvement has helped shape how we administer the Program, including our policies and materials.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

21.  ***Program Rules.***  The Special Masters have approved seven sets of Rules to govern various aspects of the Program:

(1) Rules Governing Appeals of Claim Determinations (effective January 19, 2018);

(2) Rules Governing Statute of Limitations Proceedings (effective January 19, 2018);

(3) Rules Governing Appeals of Player Challenges to Derivative Claimants (effective January 19, 2018);

(4) Rules Governing the Audit of Claims (effective January 26, 2018);

(5) Rules Governing Registration Appeals (effective January 26, 2018);

(6) Rules Governing Assignment of Claims (effective February 22, 2018); and

(7) Rules Governing Attorneys' Liens (effective March 6, 2018).

All these Rules are posted to the public Settlement Website and on the portals of law firms, lawyers and all represented and *pro se* Settlement Class Members.

## VIII.   PROCEDURES AND FREQUENTLY ASKED QUESTIONS

**22.**     ***Developing Implementation Policies and Procedures.***  In every settlement program, it is necessary to develop policies and procedures on the detailed steps needed to implement the terms of the settlement agreement.  Before the program opens, we carefully scour the settlement agreement to anticipate issues and processes we will use and get them ready. After programs launch and we start receiving and reviewing claims, we always encounter issues not specifically addressed or clearly stated in the settlement agreement.  When that happens, we turn to the parties who wrote and agreed to the document for their input, with the goal being to implement it according to its terms and their intentions.  This is a best practices approach to claims administration.

**23.**     ***Procedures and Policies in This Program.***  We have had policy and operational issues calls with the Parties weekly starting on April 19, 2016.  Since then, we have done 89 such calls.  We also have had many other calls, meetings and emails with the Parties on particular interpretation or operational issues.  Through those steps, we developed many procedures

covering key aspects for the implementation of the Settlement Agreement, many of which the Special Masters reviewed and approved. The Parties do not always agree on the answers to policy and rules questions we present to them. Where we do not have consensus among the Parties, we work with the Special Masters to determine the best practices approach to the issue, while still honoring the terms of the Settlement Agreement.

24. ***Development of Comprehensive Frequently Asked Questions as "Rules of the Road."*** The Court assisted us in setting up this efficient process to adopt implementation rules and to seek guidance from the Special Masters and/or the Court where the Parties could not agree:

(a) On November 13, 2017, the Court held a conference on issues related to implementation of the Settlement Agreement. That conference confirmed a commitment to transparency in the claims administration process. On November 15, 2017, the Court directed that we, as Claims Administrator, submit by December 1, 2017, updated Frequently Asked Questions ("FAQs") with the necessary information to submit a complete claim in the Program (Document 8930). We worked with the Parties to develop these FAQs. We posted 159 questions and answers on December 1, 2017. The Court invited public comment on those posted FAQs by December 15, 2017, on whether they clearly conveyed how to complete all steps necessary to obtain benefits in the Settlement. The Locks Law Firm submitted comments to the Court on the FAQs. Of the 23 law firms that have pending joinders in the March 20, 2018 Motion of Class Counsel The Locks Law Firm for Appointment of Administrative Class Counsel (Document 9786), 19 of them did not offer any comments on the rules in the posted FAQs.

(b) After the two-week comment period, we and the Special Masters reviewed the 122

comments the Court had received on the FAQs, which included those made by the Parties.
During January 2018 we worked with the Special Masters to adjust the FAQs as needed in
light of comments and to make rules for any issues on which the Parties could not agree and
that had not been resolved in the December 1 FAQ set.  As with all implementation steps, the
goal was to adopt processes that best achieve fairness, uniformity and promptness in the
execution of the Program.  On February 5, 2018, we published on the Settlement Website
241 FAQs covering 13 categories and announced them in an Alert as the "rules of the road"
in the Program.  Since then, we added more FAQs to cover new issues as they arose, all of
which have been reviewed by the Special Masters and approved for posting by the Parties.

(c) There now are 303 FAQs covering 14 categories:  (1) Basic Information; (2)
Settlement Agreement Benefits – General Information; (3) Registration; (4) Baseline
Assessment Program; (5) Monetary Awards; (6) Representative Claimants; (7) Derivative
Claimants; (8) Lawyers; (9) Liens – Information for Settlement Class Members; (10) Liens –
Information for Lienholders; (11) Payments; (12) Audit; (13) Bankruptcy; and (14) Appeals.
These FAQs contain links to other tools and resource guides posted to the Settlement
Website to help Settlement Class Members and their lawyers navigate the Program.  We
continuously add to these FAQs as we identify additional points for clarification and the
need for rules to cover new issues in the Program.  The FAQs are available under the
Information tab on the Settlement Website and also can be accessed by clicking the
"Frequently Asked Questions" Quick Link icon on the Home page.

**25.** *Transparency and Consistency in Rule Making.*

(a) We have followed the process described above for establishing operating
procedures and rules for the Program since the beginning of our work on this Program.  From

my years of doing this work, I know that no settlement agreement of multiple claim litigation ever can or ever does codify the multitude of details necessary to put in place to make it work. Those details must be filled in through working with the parties who drafted the agreement. Here, we have the added assistance from the Special Masters, a resource we often do not have in designing the steps to run a program. We make no rules or requirements on our own. Instead, every rule, requirement and process we follow now or have ever followed in this Program is reviewed with, commented upon and approved by the Parties and the Special Masters or, in the instances where the Parties do not agree, by the Special Masters. These rules and requirements are taken directly from the Settlement Agreement or fill in details to implement the Settlement Agreement according to its terms. No rules or requirements are secret. None of these rules and requirements are amendments to the Settlement Agreement or change any of its terms. We cannot and do not follow any policies that would depart from the terms of the Settlement Agreement or lessen the rights or duties of the Parties or the Settlement Class. Instead, the rules and policies adopted implement the language of the Settlement Agreement as directed by its drafters or, if there is no consensus direction from them, as approved by the Special Masters. In this Program—more so than any other program we have handled—the policies affecting the operation of the Program are posted publicly in the FAQs, providing full transparency for the review and payment of claims.

(b) It is necessary, however, that we maintain confidentiality with regard to the inner workings of the Audit system required by the Settlement Agreement. No process for trying to detect and prevent misrepresentations in claim submissions could succeed if those making the submissions knew all the red flags and data analytics that trigger an Audit investigation

and then could avoid triggering them and thereby prevent detection.  The Association of

Certified Fraud Examiners ("ACFE") advises in its Fraud Examiners' Manual (2016 US

Edition, Section 3.144):

> Fraud investigations must be structured to preserve confidentiality.  If confidentiality issues are not given attention from the outset of the investigation, the details of the investigation might become public, compromising the entire investigation. Additionally, if the details of the investigation do not remain confidential, employees will be reluctant to report future incidents. Also, if an investigation is not kept confidential, and the allegations giving rise to the investigation prove unsupported, the reputations of those suspected of misconduct might be irreparably damaged. Moreover, if an investigation stems from a complaint and the complaint becomes known, it is possible that the complainant could be retaliated against.

Section 3.145 of the ACFE Manual counsels:

> When responding to a sign or allegation of fraud, those responsible must work to avoid tipping off those suspected of fraud. If the suspect is inadvertently informed of the investigation, a number of different adverse events might occur. For instance, the fraudster might attempt to destroy or alter evidence, making it more difficult to conduct the investigation. When investigation details are leaked, concealment and destruction of evidence typically occurs at a faster rate.

> Additionally, a forewarned suspect might attempt to flee, cut off contact with associates, or try to place the blame on somebody else.

> Because unintentionally notifying the fraudster is a key concern in any investigation, the confidentiality of the internal investigation is critical. To avoid tipping off those suspected of misconduct, it is important to have information about the person who is being investigated and what he can access. Also, to maintain confidentiality, determine in advance who should receive information about the investigation and reevaluate who should receive information as the investigation proceeds.

I agree this is the best practice for making these audit inquiries effective.

## IX.   MONETARY AWARD CLAIMS

**26.**   *Monetary Award Claim Packages*.  We accept claims submitted to us through

an online portal or in hard copy by mail.  To be complete, Section 8.2 of the Settlement

Agreement requires that a Monetary Award Claim Package must include:  (a) a completed Claim Form signed by the Settlement Class Member; (b) a completed Claim Package HIPAA Form signed by the Settlement Class Member; (c) a Diagnosing Physician Certification Form completed and signed by the physician who made the Qualifying Diagnosis; and (d) medical records reflecting the Qualifying Diagnosis.  The Settlement Agreement also has very specific requirements for what types of physicians can make each Qualifying Diagnosis, the diagnostic criteria such physicians must follow and what the medical records must show for each Qualifying Diagnosis.  We explain all of this through the FAQs and other helpful resources on the Settlement Website, including the "Diagnosis and Review Table" and "Guide to What Medical Records 'Reflect' a Qualifying Diagnosis."  We review claims as quickly as possible on a first in, first out basis.  We apply the "generally consistent" standard prescribed by Ex. 1 to the Settlement Agreement when evaluating Qualifying Diagnoses subject to our review, except for Level 1.5 and 2 diagnoses made by Qualified BAP Providers in the BAP and Alzheimer's Disease, Parkinson's Disease and ALS diagnoses made after the Effective Date by Qualified MAF Physicians, where we determine whether the requirements in Exhibit 1 to the Settlement Agreement are met.

27.   *Incomplete Claim Packages*.

(a) There is no backlog of claims with us to review.  When we get a new claim, we look at it almost immediately, as our internal goal is to do the initial review within 48 business day hours after the Claim Package comes in.  The first thing we do is look at everything submitted to see if it contains all the components required by the Settlement Agreement, instructions from the Parties and, since February 2018, the applicable rules in the governing FAQs.  Before we received any claims, we worked with the Parties, starting in

March 2017, to develop detailed lists of the information or materials that, if not present, would require us to ask the Settlement Class Member to send it to us.

(b) After extensive negotiations, the Parties approved 138 items that make a claim incomplete.  Of them, 64 are mandatory, meaning that we cannot go forward to review the claim without the item and are compelled to deny the claim as incomplete if we do not receive it within the 120 days that the Settlement Agreement allows for Settlement Class Members to send in missing elements of a Claim Package.  The other 74 reasons are optional for Settlement Class Members, meaning that we notify the Settlement Class Member that an item is not in the Claim Package and offer him or her 120 days to supply it, because furnishing it may make the claim stronger, but we also advise that the Settlement Class Member may direct us to go ahead and review the claim without it.  The mandatory items relate to fundamental elements of a complete Claim Package, like the Claim Form, HIPAA Form, Diagnosing Physician Certification Form and medical records reflecting the Qualifying Diagnosis.  The optional items, such as what type of doctor made the diagnosis and certain types of medical records documenting the Qualifying Diagnosis (*e.g.*, raw scores), do not have to be cured for the claim to move forward and do not lead to denial if not submitted.

(c) If our reviewers determine a Claim Package is missing one or more of the components or would be a stronger claim with additional documents or materials, we issue a notice telling the Settlement Class Member what is missing or being requested and what he or she may do to respond.  The notice gives the Settlement Class Member 120 days—four months—either to provide the missing/requested documents or, if the item is not so fundamental that we must deny the claim without it, tell us to continue processing the claim

or send it to the AAP without providing the document we asked for.  The explanations in the notices we issue also were approved by the Parties and Special Masters.  In addition, each notice contains customized explanatory text to provide specific details about the missing information for that particular claim.

  **28.**   *Monetary Award Claims Reviewed by the AAP.*

  (a) Section 6.4(a) of the Settlement Agreement requires that the AAP review Qualifying Diagnoses made before the Effective Date (January 7, 2017) by:  (a) a board-certified neurologist, board-certified neurosurgeon, or other board-certified neurospecialist physician, who is not a Qualified MAF Physician, between July 1, 2011, and January 7, 2017; (b) a neurologist, neurosurgeon, or other neuro-specialist physician, who is not board-certified but is otherwise qualified; and (c) a physician who is not a Qualified MAF Physician and not otherwise identified in (a) or (b) but who has sufficient qualifications (1) in the field of neurology to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease, or ALS, or (2) in the field of neurocognitive disorders to make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment.  This means that we review Qualifying Diagnoses that were made:  (a) after January 7, 2017, by Qualified BAP Providers or Qualified MAF Physicians after they were approved by the Parties and signed a contract with us, and (b) on or before July 1, 2011, by a board-certified neurologist, board-certified neurosurgeon, or other board-certified neuro-specialist physician.  The AAP reviews all other Qualifying Diagnoses.

  (b) As of April 10, 2018, there were 247 claims requiring AAP review.  An AAP neurologist analyzes Qualifying Diagnoses to make sure the diagnostic criteria, testing and

documentation are generally consistent with the Exhibit 1 diagnostic criteria, testing and documentation requirements.  The AAP member may, based on independent medical judgment, determine that additional documents or information are needed to permit an intelligent review of the claim.  When that happens, we send a notice to the Settlement Class Member to explain what the AAP member has required.  Because both the AAP and we at times have to request additional information and/or documents, it is possible that a Settlement Class Member will receive more than one such notice from us on his or her claim. In addition, we seek input from the AAP and AAPC as necessary on medical issues that come up during our reviews.

29.    *Notices of Incompleteness*.  As of April 10, 2018, we had sent one or more notices requesting additional documents or information on 1,215 Monetary Award claims.[3] More of the Level 1.5 and Level 2 claims, which have more detailed diagnosis and review requirements in the Settlement Agreement, have been missing materials than claims involving other Qualifying Diagnoses, as shown in Table 1:

| Table 1 | | | INCOMPLETE MONETARY AWARD CLAIMS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[4] | TOTAL |
| 1. | TOTAL SUBMITTED | 78 | 39 | 306 | 99 | 482 | 652 | 101 | 1,757 |
| 2. | Incompleteness Notice Issued | 17 | 20 | 180 | 50 | 353 | 494 | 101 | 1,215 |
| 3. | % Incomplete | 22% | 51% | 59% | 51% | 73% | 76% | 100% | 69% |

---

[3] Depending on the type of review that led to it, the Notice is called a Notice of Preliminary Review or a Notice of Incompleteness.

[4] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed. We can process and pay a person for only one Qualifying Diagnosis.  All of these claims by nature are incomplete because we need to know what Qualifying Diagnosis should be used.

So far, 39% of Settlement Class Members who have received a notice requesting additional documents have responded to the notice with sufficient information for us or the AAP to continue processing the claim.  On average, it takes Settlement Class Members 54 days to respond to these notices.  When they do, we review what they have submitted to see if it cures the problem.  Missing raw scores, problems with the medical records (*e.g*., whether they are from the diagnosing doctor, issues related to functional impairment and neuropsychological testing, missing pages, etc.) and defects in the Diagnosing Physician Certification Forms are the most common incompleteness reasons.

30.     ***Eligible Seasons.***  We "pre-credit" many Claim Packages with Eligible Seasons from data we collected from NFL.com and data the NFL Parties provided.  If a Settlement Class Member alleges additional Eligible Seasons, we search on the internet for evidence of the Retired NFL Football Player's participation in those seasons.  If we cannot confirm this from our research or from the Player's submitted documents, we ask the NFL to provide information pursuant to Section 9.1(a) of the Settlement Agreement.  We credit any additional Eligible Seasons that we can confirm from the NFL's response, and we share the NFL's findings with the lawyer or unrepresented Settlement Class Member.  We have been able to confirm additional Eligible Seasons for 23 Settlement Class Members, who will receive larger Monetary Awards because of our research.

31.     ***Statute of Limitations Matters.***

(a) Section 6.2(b) of the Settlement Agreement requires a statute of limitations analysis for Monetary Award claims submitted by Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.  The Court appointed the Special Masters to perform this statute of limitations analysis in its July 13, 2016 Order

(Document 6871).  The Special Masters must determine if a Representative Claimant is eligible for a Monetary Award based on whether a wrongful death or survival claim filed by the Representative Claimant would not be barred by the statute of limitations, as specified in Section 6.2(b).

(b) We assisted the Special Masters in establishing how a statute of limitations matter will be reviewed under the terms of Section 6.2(b) and the Court's Order.  In collaboration with the Special Masters, we drafted the Rules Governing Statute of Limitations Proceedings, which became effective on January 19, 2018.  We posted these Statute of Limitations Rules to the public Settlement Website and on the portals for all represented and *pro se* Settlement Class Members.

(c) Since June 21, 2017, we have provided bi-weekly reports to the Special Masters identifying how many registered Settlement Class Members passed away before January 1, 2006, and how many had submitted a Claim Package seeking a Monetary Award that would need a statute of limitations analysis.  The reports detail legal representation status, the Player's date of death and domicile at the time of death, the type and date of the asserted Qualifying Diagnosis and whether the Representative Claimant filed suit against the NFL, which is relevant to tolling the running of a limitations period.

(d) As of April 10, 2018, we had received 351 registrations from Representative Claimants that may require the statute of limitations analysis, 49 of whom had submitted a Claim Package.  Statute of Limitations Rule 7 requires that a Claim Package be complete before commencement of a statute of limitations proceeding.  Of the 49 Claim Packages we have: (a) 19 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Section 6.2(b); (b) 13 are incomplete but still within their

deadlines to submit missing items; and (c) 17 have been denied for failing to cure deficiencies or for not asserting a compensable diagnosis. We have issued a Notice of Commencement of Statute of Limitations Proceeding under Statute of Limitations Rule 16 to the 19 Representative Claimants with a complete Claim Package to start the briefing process under the Statute of Limitations Rules. That briefing will be concluded by May 22, 2018, for the first 10 claims, which will allow the Special Masters to begin ruling on these statute of limitations issues under Statute of Limitations Rule 26.

32. ***Monetary Award Denials.*** As of April 10, 2018, we had denied 225 Monetary Award claims, 39 of which were appealed by the Settlement Class Member, as shown in Table 2:

| Table 2 | DENIED MONETARY AWARD CLAIMS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **CLAIMS** | **CTE** | **ALS** | **ALZHEIMER'S DISEASE** | **PARKINSON'S DISEASE** | **LEVEL 2** | **LEVEL 1.5** | **MULTIPLE/ UNKNOWN** | **TOTAL** |
| **TOTAL SUBMITTED** | **78** | **39** | **306** | **99** | **482** | **652** | **101** | **1,757** |
| Denied | 6 | 0 | 40 | 5 | 49 | 73 | 52 | 225 |
| % Denied | 8% | 0% | 13% | 5% | 10% | 11% | 51% | 13% |

The AAP found many of these claims not medically eligible, and others were denied because a fundamental requirement in the Settlement Agreement was not satisfied (*e.g.*, date of death for a Death with CTE claim) or because Settlement Class Members did not provide the mandatory information and/or documents we requested through our notices.

33. ***Monetary Awards.*** As of April 10, 2018, there were 377 payable Monetary Award claims for $411,273,005 in awards. The Program has paid 187 Retired NFL Football Players and Representative Claimants a total of $171,624,754, which includes amounts paid on behalf of Settlement Class Members (*i.e.*, payments to the Lien Resolution Administrator

for the resolution of outstanding Liens on behalf of Settlement Class Members and payments to third-party funders that have accepted rescission of prohibited assignments entered into with Settlement Class Members).  Of the 377 payable Monetary Award claims, 42 (11%) have been appealed (35 by the NFL Parties and seven by the Settlement Class Member).  The Rules Governing Appeals of Claim Determinations, which we developed with the Special Masters and became effective on January 19, 2018, govern these appeals.  Those Appeal Rules give the Special Masters discretion to direct appropriate relief where appeals by any party, including the NFL, are found to be vexatious, frivolous or in bad faith, but the Special Masters have not yet made such a finding, in the one appeal where the issue was raised.

**34.**  *Process for the Payment of Monetary Awards***.**  Article XXIII of the Settlement Agreement governs the NFL's payment obligations.  It calls for monthly payment cycles from the Monetary Award Fund to cover Program awards and administrative expenses.  The process for issuing payments is as follows:

(1) After we issue a Notice of Monetary Award Claim Determination, the Settlement Class Member and the Parties have 30 days to appeal it.  If anyone does, the claim cannot be paid but instead goes into the appeals process before the Special Masters.

(2) If the Settlement Class Member and the Parties tell us they waive their right to appeal, or if no appeal is filed before the 30-day appeal deadline, we make sure there are no administrative holds on the claim.  Administrative holds are applied for: (a) unresolved bankruptcy issues; (b) claims that are in an Audit investigation; and (c) claims by a Representative Claimant or Derivative Claimant Representative who still needs to be approved to act on behalf of a deceased or legally incompetent Settlement Class Member.

(3) After appeals and if there are no administrative holds or any holds are removed, the Settlement Class Member is ready to be placed on the next monthly Funding Request.  Section 23.3(b)(i) of the Settlement Agreement requires us to submit a Funding Request to the NFL Parties and Co-Lead Class Counsel on or before the 10th day of each month (or the next business day, if the 10th falls on a weekend or holiday).

(4) After we issue the Funding Request, Section 23.3(b)(iii) gives the NFL Parties and Co-Lead Class Counsel 10 days to notify us in writing of any objection to any aspect of the Funding Request.  When that 10-day period has elapsed without objections, we prepare the Disbursement Report to submit to the Special Masters and the Trustee (Citibank).

(5) To be included on that Disbursement Report, we must obtain and review the following documents for each Settlement Class Member who was on the Funding Request:

    (a) Payment Election Form:  In the Payment Election Form, the Settlement Class Member selects how he or she wishes to receive the funds (*i.e.*, by check or by wire).  The lawyer for a represented Settlement Class Member must complete the Payment Election Form.

    (b) Form W-9 – Request for Taxpayer Identification Number and Certification: The lawyer for a represented Settlement Class Member must submit a Form W-9 – Request for Taxpayer Identification Number and Certification, published by the IRS and used for legal entities receiving monies to give the payor their Taxpayer Identification Numbers and certify that they are accurate. We do not need a Form W-9 from a Settlement Class Member who has no personal lawyer in the Program.

    (c) Statement of Attorney Fees and Expenses:  Under the Court's Order of September 7, 2017 (Document 8358), to receive payments for Settlement Class Members it represents, a law firm must provide us a signed, completed Statement of Attorney Fees and Expenses of:  (1) the firm's contingency fee percentage applicable to the payment; (2) the amount of the firm's expenses relating to the payment; and (3) verification that those fees and expenses are reasonable.  We do not need this if the Settlement Class Member has no lawyer in the Program.

(6) The NFL Parties have 30 days from the date of the Funding Request to pay any required funds into the Monetary Award Fund.  If the Monetary Award Fund has sufficient funds when the 10-day objection period expires, we send a Disbursement Report to the Special Masters for approval.  The Disbursement Report instructs the Trustee on who should receive payment, the amount of each payment and the method by which the Trustee is to send the payment (*i.e.*, by wire or by check).  The Special Masters have five days to approve the Disbursement Report.  After we receive their approval, we send the Disbursement Report to the Trustee to issue the payments, which must happen within five days.

As of April 10, 2018, there were 190 payable Monetary Award claims that had not yet been paid.  Table 3 explains where they were in the payment process:

| Table 3 | STATUS OF MONETARY AWARDS NOT YET PAID | | |
|---|---|---|---|
| | **STATUS** | **NUMBER** | **%** |
| 1. | Payment in Progress (in the Funding/Disbursement Process) | 27 | 14% |
| 2. | Not Ready to be Included on the Next Monthly Funding/Disbursement List (in appeal process, appeal option still available, hold in place) | 163 | 86% |
| **3.** | **Total Monetary Awards Not Yet Paid** | **190** | **100%** |

35. *Derivative Claimants.*

(a) After discussions with the Parties, we developed a written procedure approved on May 31, 2017, to handle claims for Derivative Claimant Awards. When we receive a Derivative Claim Package, we notify the Derivative Claimant that nothing further will happen on the claim until there is a reason for us to act, such as the Retired NFL Football Player (or his Representative Claimant) challenging the Derivative Claimant's right to share 1% of his Monetary Award, the Player's claim being denied, or the Player's eligible claim becoming final such that the Derivative Claimant becomes eligible for a Derivative Claimant Award. We also have to deny Derivative Claims where the person has no right under applicable law to make such a claim. All Derivative Claimants track their associated Retired NFL Football Players, meaning their claim progress depends on the status and outcome of the claims of their associated Players. If a registered Derivative Claimant has not yet submitted his or her claim when we notify the associated Player that he is eligible for a Monetary Award, we alert that Derivative Claimant of the deadline for doing so. Derivative Claimants who do not submit timely claims cannot be eligible for Derivative Claimant Awards.

(b) Because the Derivative Claimant Award is 1% of the associated Player's Monetary Award, Players (or their Representative Claimants) have a right to challenge each

registered Derivative Claimant who has or could potentially submit a Derivative Claim.
Depending on the Player's Qualifying Diagnosis, we review a challenge using a state's
wrongful death or loss of consortium laws.  The Player's specific challenge dictates other
aspects of how we review the challenge, such as which state's law we apply.  Derivative
Claimants who are successfully challenged by a Player can object to the determination, and
we review it again.  The Derivative Claimant and, in some circumstances the Player, have
challenge appeal rights.  In coordination with the Special Masters, we developed the Rules
Governing Appeals of Player Challenges to Derivative Claimant to govern such challenge
appeals.  We posted these Rules, which became effective on January 19, 2018, to the public
Settlement Website and on the portals for all represented and *pro se* Settlement Class
Members.

(c) The amount of a particular Derivative Claimant's share from a Monetary Award is
determined by the number of eligible Derivative Claimants there are on that award.  If we
have only one eligible Derivative Claimant for a Player, he or she receives the full 1%
Derivative Claimant Award and cannot appeal.  If we have more than one eligible Derivative
Claimant for a Player, those Derivative Claimants share the 1% equally, but each Derivative
Claimant has a right to object and later appeal his or her award.  The Rules Governing
Appeals of Claim Determinations apply to these appeals.

(d) As of April 10, 2018, we had received 454 Derivative Claim Packages.  Of those,
35 have received Awards and been paid $347,080, while 20 have Awards totaling $85,187
not yet paid, 26 are in line to receive Awards, three were denied because the Derivative
Claimants are deceased (which precludes any Derivative recovery), four were successfully
challenged by the Player and are not eligible for Awards, three have pending Player

challenge determinations and 363 require no action because the associated Player has not yet

submitted a claim or his claim status is not final:

| Table 4 | STATUS OF DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | NUMBER | % |
| 1. | Paid | 35 | 8% |
| 2. | Last Notice was Award Notice | 20 | 4% |
| 3. | Awaiting Notice of Derivative Claimant Award Determination | 26 | 6% |
| 4. | Final Denial | 3 | <1% |
| 5. | Successful Player Challenge – Not Eligible for Award | 4 | <1% |
| 6. | Derivative Claimant Challenge – Pending Determination | 3 | <1% |
| 7. | Derivative Claim Package Receipt Notice Issued | 363 | 80% |
| 8. | Totals | 454 | 100% |

36.   *Assignment Order*.

(a) Under the Court's Explanation and Order entered on December 8, 2017

(Document 9517) (the "Explanation and Order"), we are required to ask all eligible

Settlement Class Members whether they have assigned or attempted to assign any settlement

benefits from their monetary claims.  In coordination with the Special Masters, we developed

the Rules Governing Assignment of Claims to implement the Explanation and Order.  Under

these Assignment Rules, to receive payment, eligible Settlement Class Members must submit

a Sworn Statement: Status of Assignment of Monetary Claim ("SWS-5") to us.  As of April

10, 2018, we had received 206 signed SWS-5s from eligible Settlement Class Members, in

which 190 (92.2%) Settlement Class Members indicated that they have not assigned or

attempted to assign any settlement benefits and 16 (7.8%) said they had.

(b) If a Settlement Class Member tells us on his or her SWS-5 that he or she has

assigned or attempted to assign any settlement benefits from his or her monetary claim to a

third-party funder, or borrowed any funds against his or her monetary claim as collateral, he

or she must provide to us all documents relating to that transaction (a "Third-Party Funder Transaction"). We review each Third-Party Funder Transaction with the Special Masters to determine whether it is an assignment that is prohibited under Section 30.1 of the Settlement Agreement and the Explanation and Order (a "Prohibited Assignment") and notify the affected Settlement Class Member of that decision in a Notice of Assignment Review Determination. As of April 10, 2018, we had reviewed 10 Third-Party Funder Transactions, seven of which are Prohibited Assignments.

(c) On any Prohibited Assignment, we issue a Waiver Relinquishing Rights Under Attempted Assignment contemplated in the Explanation and Order ("Waiver Form") for the third-party funder to sign and return within 30 days to: (a) indicate the amount advanced to the Settlement Class Member that has not been repaid to the third-party funder; and (b) rescind the Prohibited Assignment and relinquish all claims relating to it. We send this Waiver Form to the lawyer for a represented Settlement Class Member and directly to the third-party funder if the Settlement Class Member is not represented by a lawyer. The Waiver Form includes an attachment for the Settlement Class Member to sign and return to us showing agreement with the information the third-party funder provided in the Waiver Form. As of April 10, 2018, we had issued seven Waiver Forms and received four completed, signed Wavier Forms from third-party funders.

**37.    *Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) We accept non-medical Liens asserted by attorneys, child support agencies, judgment creditors and federal and state tax agencies against payments to be made to eligible Settlement Class Members under the Settlement Agreement. As of April 10, 2018, we had

received 1,189 total Lien assertions (824 Attorneys' Liens, 316 Child Support Liens, 36 Judgment Liens and 13 Tax Liens).

(b) We worked with the Parties and the Special Masters to develop a detailed procedure and notices for a streamlined, centralized process for the assertion, resolution and payment of non-medical Liens, and implemented the procedure in March of 2017.  After we receive a complete Lien assertion and the affected Settlement Class Member submits a claim, we issue the lienholder and the Settlement Class Member a Notice of Lien and provide the Settlement Class Member with at least 20 days from the date of the notice to respond whether he or she consents to or disputes payment of the Lien.  As of April 10, 2018, we had issued Notices of Lien for 330 Liens (285 Attorneys' Liens, 35 Child Support Liens, nine Judgment Liens and one Tax Lien).

(c) If the Settlement Class Member fails to consent to or disputes the Lien, we issue a Notice of Duty to Resolve Lien Dispute to both parties and withhold the disputed funds, to the extent funds are available, until the parties resolve the dispute.  On April 4, 2017, the Court referred all Attorneys' Liens disputes to the Honorable David R. Strawbridge, United States Magistrate Judge for the Eastern District of Pennsylvania (Document 7446).  Since that time, we worked closely with Magistrate Judge Strawbridge and the Special Masters to create and implement the Rules Governing Attorneys' Liens, adopted by the Court on March 6, 2018 (Document 9760), that include a dispute resolution process we administer for the Court.  We manage the docket, draft and issue document submission schedules, enforce deadlines and/or extensions, assemble the record of dispute documents and transmit it to the Court, schedule and arrange dispute hearings and serve the parties with copies of all dispute submissions and Court rulings.

(d) As of April 10, 2018, Settlement Class Members disputed 238 Liens (217 Attorneys' Liens, 16 Child Support Liens and five Judgment Liens). For 29 Settlement Class Members who have received a Notice of Monetary Award Claim Determination or a Notice of Derivative Claimant Award Determination, we are holding $10,172,602.08 for disputed Liens ($9,648,197.70 for Attorneys' Liens, $492,847.38 for Child Support Liens and $31,557 for Tax Liens). If a Settlement Class Member consents to a Lien or resolves a dispute with the lienholder or through the Attorneys' Liens dispute process, we will pay the Lien after the affected Settlement Class Member becomes eligible for payment in accordance with the Settlement Agreement and any Court orders regarding Settlement implementation.

## X.    AUDIT

38.    ***Mandatory Audits Required by the Settlement Agreement.***  Sections 10.3(c) and 10.3(d) of the Settlement Agreement require us to investigate in Audit:

(1) 10% of the total Claim Packages or Derivative Claim Packages we have found to qualify for Monetary Awards or Derivative Claimant Awards during the preceding month. We select these Claim Packages at random and are required to audit at least one Claim Package, if any qualify, per month.

(2) Claims seeking a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player took part in the BAP within the prior 365 days and was not diagnosed with that Qualifying Diagnosis during the BAP baseline assessment examination.

(3) Claims for a Monetary Award for a given Qualifying Diagnosis when the Retired NFL Football Player submitted a different Claim Package within the prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a different physician and that Claim Package was found not to qualify for a Monetary Award.

(4) Claims reflecting a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting.

39.    ***Other Reasons for Audit.***  Sections 10.3(b) and 10.4 of the Settlement Agreement require us, in consultation with the Parties, to establish and implement procedures

and system-wide processes to detect and prevent fraud.  To implement that mandate, in coordination with the Parties and Special Masters we developed an internal Audit Procedure, which the Parties first approved on December 12, 2016, and Rules Governing the Audit of Claims, which the Special Masters adopted as effective on January 26, 2018.  The Audit Rules are posted on the Settlement Website and detail how the Audit process works.

40.     ***Explanation of the Audit Process.***  On April 9, 2018, I filed in the Court's ECF docket a Response by the Claims Administrator (Document 9870) to two motions filed by Neurocognitive Football Lawyers, LLC (Motion to Prohibit Ex Parte Interviews with Treating Physicians and Partial Joinder to the Motion Brought by The Locks Law Firm).  In pages 8-16 of that Response, we described in detail the entire Audit process, what we are seeing in Monetary Award claims that has required us to analyze certain claims or groups of claims in more depth to avoid issuing payments on claims involving misrepresentations, omissions, or concealment of facts material to the outcome on the claim, and the amount of time and effort required to do these investigations.  To avoid burdening the Court and the record with repeating all that information here, I refer readers of this Declaration to that Response.

41.     ***Audit Progress.***

(a) We began auditing claims in July 2017.  Not every claim we examine in Audit needs a lengthy investigation; we have looked at a total of 128 potentially suspicious Monetary Award claims and concluded they did not need to be formally audited to determine if there was a misrepresentation, omission, or concealment.  Other claims do get full audit scrutiny that does not lead to a Report of Adverse Finding in Audit; we determined there was no misrepresentation, omission, or concealment in 103 claims after full Audit and then

closed the Audit and returned the claims to the normal claims process.

(b) As of April 10, 2018, we had issued to the Parties eight Reports of Adverse Finding in Audit, affecting 439 Monetary Award claims. The Special Masters issued a decision on the first of these Reports on December 5, 2017 (Document 9507), disqualifying neuropsychologist Serina Hoover from participating in the Program and closing 139 of the 153 Monetary Award claims that relied on her evaluation, testing, or opinions.[5]  Though the Special Masters have the power to disallow a particular Player from participation in the Program, if that Player has misrepresented or concealed any material fact in connection with a claim, the Players affected by the Special Master decision on Serina Hoover may still participate in the Program and are encouraged to participate in the BAP, if eligible, or see a Qualified MAF Physician for an assessment of their neurological condition.  If found to have a Qualifying Diagnosis, under the Special Masters' ruling, the diagnosing physician may determine, based on his or her medical judgment and findings, the appropriate date of the Qualifying Diagnosis, which may be earlier than the date of the new examination, and the Player may submit a new Monetary Award claim.  In fact, the BAP Administrator is affirmatively contacting all eligible Players whose claims are closed as a result of an Audit to offer to schedule a BAP appointment.  This will happen on every claim closed in Audit unless the Special Masters disqualify the Player or Representative Claimant from participating.

(c) Of the seven remaining Audit Reports, as of April 10, 2018, four had been referred to the Special Masters and three were still under consideration by the Parties, in the stage before potential referral to the Special Masters.  The subjects of those seven Audit Reports

---

[5] On the other 14 claims, we asked the Qualified MAF Physicians who used Dr. Hoover to get new neuropsychological testing done by a properly qualified neuropsychologist.

include three neurologists, 10 neuropsychologists and one law firm.  Pursuant to Audit Rule 35, we post publicly on the Settlement Website and on the portal for each portal user any decision the Special Masters designate should be published.

(d) We have other Audit investigations under way that we are working to conclude as soon as possible.  As we do, claims either will be returned to the claims process or, if we find a reasonable basis for a finding of misrepresentation, omission, or concealment, will be the subject of a Report of Adverse Finding in Audit issued to the Parties and then referred to the Special Masters, unless the Parties agree not to send the matter to the Special Masters.

## XI.   <u>OTHER FUNCTIONS</u>

42.   *Portals*.  We developed and maintain secure online portals for use by Settlement Class Members, their lawyers, the Parties, the Special Masters and the Court.  The functions within each portal vary for each type of user:

(1) Unrepresented Settlement Class Members can:  (a) read messages from us; (b) review published appeal decisions of the Special Masters and Court and important Program Rules; (c) view their registration and claim statuses; (d) access the BAP Administrator's Portal; (e) complete a step-by-step process to submit their Claim Packages and Derivative Claim Packages; (f) upload materials; and (g) view and respond to notices that we issue.  Represented Settlement Class Members have more limited functionality within their portals, based on what their lawyers give them access to.

(2) Lawyers who represent Settlement Class Members in the Program can:  (a) read messages from us; (b) view the registration and claim statuses of their clients; (c) see how many of their clients have received each type of notice issued by us or have a certain status; (d) submit claims for Monetary Awards and Derivative Claimant Awards; (e) view and respond to notices we issue; (f) upload materials to their clients' files with us; (g) access the BAP Administrator's Portal; and (h) review published appeal decisions of the Special Masters and Court and important Program Rules.

(3) The Parties are able to:  (a) access data on people who opted out of the Settlement; (b) see materials submitted by Settlement Class Members and their lawyers; (c) view and appeal or object to certain determination notices we issue; (d) submit

materials in the appeals process; and (e) access reports about various aspects of the Program.

(4) The Special Masters:  (a) access a library that contains Court documents relevant to the Settlement and important forms and materials used in the Program; (b) view documents submitted by Settlement Class Members and their lawyers; (c) review reports about various aspects of the Program; and (d) review, make decisions on and upload documents for appeals.

(5) The Court can:  (a) view documents submitted by Settlement Class Members and their lawyers; (b) see reports about the Program; and (c) review, make decisions on and upload documents for objections made to Special Master conclusions of law.

43.     *Reports.*  We prepare regular (daily, weekly, monthly) and ad hoc reports about many aspects of the Program for different purposes.  On December 15, 2017, we started making certain reports publicly available on the Settlement Website.  Since then, each week we post to the Settlement Website three reports:  (1) Summary of Registrations and Claims Submitted; (2) Registration Report; and (3) Claims Report.  These reports cover:  (a) registrant profiles; (b) registration outcomes and notices issued; (c) Monetary Award and Derivative Claim profiles; (d) claim review outcomes; (e) appeals; (f) notices issued and reasons for those notices; and (g) payable claims and payments.

## XII.   <u>CONCLUSION</u>

44.     *General Status.*  It now has been one year since we started accepting and reviewing claims.  This is a massive Program.  We have received 10.52 terabytes (TB) of material so far.  One TB is the equivalent of one trillion bytes.  For comparison purposes, the IBM computer Watson, against which Jeopardy! contestants competed in February 2011, has 16 TB of random-access memory (RAM) from which it can instantly retrieve stored data to answer questions.  We have 143,657 documents, including notices we have issued, stored on Settlement Class Members.  As of April 10, 2018, we had issued 31,248 notices of various

kinds (registration, claims, appeals, audit, etc.) to 20,832 different persons since March 23,

2017.  We developed and programmed over 50 different types of notices and associated

response forms.  Overall, the Program is progressing as it should.  Some types of claims have

taken longer to progress than we or the Parties had anticipated, because of missing materials

or potential misrepresentation issues.  But all claims are moving through the system based on

the requirements of the Settlement Agreement and the Program is working as it was

designed.  We remove and work around barriers to progress, rather than create them.  As in

any other settlement program we administer, we push to address all issues as quickly as

possible and in the most transparent manner possible.

     I, Orran L. Brown, declare under penalty of perjury pursuant to 28 U.S.C. § 1746

that the foregoing is true and correct.  Executed on this 13th day of April, 2018.


               _____/s/ Orran L. Brown, Sr._____
               Orran L. Brown, Sr.