**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br> MDL No. 2323 <br> **Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*, <br>       Plaintiffs, <br> v. <br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., <br>       Defendants. | CIVIL ACTION NO: 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## **DECLARATION OF MATTHEW L. GARRETSON**

I, Matthew L. Garretson, hereby declare as follows:

1. I am an adult over twenty-one years of age and am competent to testify to all matters contained herein. I am the Founder and Chief Executive Officer of The Garretson Resolution Group, Inc. ("GRG") and an attorney licensed to practice law in the State of Ohio. I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2. GRG serves as the BAP Administrator for the Settlement program in the above-captioned action.[1] Since its appointment to serve in this role, GRG has worked diligently with

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

the Parties to discharge its responsibilities under the Settlement Agreement. I submit this declaration to provide an update to the Court on the status of GRG's work.

### *Establishing the Qualified BAP Provider Network*

3.   As the BAP Administrator, GRG is responsible for establishing and maintaining a network of Qualified BAP Providers to provide the specified baseline assessment examinations under the BAP and authorized medical services under the BAP Supplemental Benefits. (ECF No. 6481-1, Settlement Agreement § 5.7(a)(i).)

4.   As of April 9, 2018, GRG is contracted with 310 Qualified BAP Providers in fifty-two cities across the United States. GRG is seeking the participation of an additional 110 neurologists and clinical neuropsychologists, including:

> a. fifty-nine who have been approved for participation by Co-Lead Class Counsel and Counsel for the NFL Parties and are now in the contracting process; and
>
> b. fifty-one providers who are being vetted for participation by Co-Lead Class Counsel and Counsel for the NFL Parties.

5.   GRG is continuing its efforts to enroll qualified BAP Providers to expand the BAP network wherever necessary to ensure sufficient depth of coverage and better the efficiency of the program. These efforts include:

> a. working to complete the contracting process with the fifty-nine providers who have been approved for participation but have not yet been contracted;
>
> b. seeking approval from Co-Lead Class Counsel and Counsel for the NFL Parties for the fifty-one providers submitted for their review;

  c. meeting with administrators at contracted provider organizations to identify administrative obstacles to expanded scheduling;

  d. working with clinicians at contracted provider organizations to recruit additional qualified providers within their organizations;

  e. recruiting additional qualified providers outside contracted network provider organizations; and

  f. identifying contracted Qualified BAP Providers willing to examine Retired NFL Football Players in other cities (this approach has been effective in Dallas, for example, where providers from Tulsa and Houston have made arrangements to see local Retired NFL Football Players on weekends).

6. For cities without currently contracted Qualified BAP Providers, GRG is seeking accommodations, most typically offering appointments to Retired NFL Football Players in nearby cities, but always in direct consultation with the Retired NFL Football Players or their counsel.

7. GRG has been successful in retaining contracted Qualified BAP Providers. Of 333 Qualified BAP Providers who have contracted with the BAP, only 23 have left the program, usually due to their inability to accommodate demand for baseline assessment examination appointments with their existing practices. In these circumstances, GRG immediately assesses the region to determine the importance of contracting with a new provider.

*<u>Scheduling Baseline Assessment Examinations</u>*

8. The BAP offers a two-part baseline assessment examination, consisting of a clinical neuropsychology appointment lasting an average of six to eight hours and a basic

neurological examination lasting approximately one hour. GRG's scheduling process is intended to ensure that Retired NFL Football Players are scheduled at a provider location, date, and time acceptable and convenient to them. Typically, GRG attempts to schedule the clinical neuropsychology appointment so that it occurs first and far enough in advance of the neurology appointment that the clinical neuropsychologist's report is available for review during the neurology appointment.

9. The baseline assessment examination scheduling process begins when a Settlement Class Member submits a request. The process to request an appointment consists of three steps. First, the Settlement Class Member signs a BAP HIPAA[2] Authorization, through which he grants permission to GRG, Qualified BAP Providers, and other entities to exchange data and medical records with each other to the extent necessary to fulfill their obligations under the Settlement Agreement. (The Settlement Class Member has the option to sign the authorization electronically through the secure BAP Settlement Class Member Portal or by signing and submitting a paper copy.) Second, the Settlement Class Member selects up to two preferred locations for the clinical neuropsychology portion of the baseline assessment examination and up to two preferred locations for the neurology portion of the baseline assessment examination. Third, the Settlement Class Member provides any dates he is not available for an appointment, as well as any other needs or preferences he would like GRG to consider when scheduling his appointments.

10. Settlement Class Members or their attorneys may submit appointment requests through the secure BAP Settlement Class Member Portal or by calling the GRG Call Center. Firms with a high number of clients participating in the BAP (those with more than 100 clients

---

[2] Health Insurance Portability and Accountability Act of 1996, and its amendments, including the HITECH amendments.

participating) may also upload lists of requests through a secure document exchange system made available to them by GRG.

11. Upon receiving a request for a baseline assessment examination, GRG submits the request first to the Settlement Class Member's requested clinical neuropsychologist. The neuropsychologist will offer a time and date, and GRG will communicate that information to the Settlement Class Member, or in the case of a represented Settlement Class Member, their attorney. If the Settlement Class Member or attorney accepts the date and time, GRG marks the appointment as confirmed and relays that confirmation to the neuropsychologist. If the Settlement Class Member or attorney rejects the date and time proposed (which has occurred with approximately 18% of all offered BAP appointments), GRG begins the process over again with the provider. Once the clinical neuropsychology appointment date and location have been confirmed, GRG immediately initiates an identical process with the Settlement Class Member's requested neurologist.

12. Upon confirmation of each appointment, GRG utilizes multiple methods to communicate and confirm appointment statuses, including any changes to Qualified BAP Providers, Settlement Class Members, and attorneys. These methods include:

      a. mailing reminder letters to Settlement Class Members, with a copy mailed to the attorneys for those represented by counsel;

      b. access to secure online portals with up-to-date appointment information for Qualified BAP Providers, Settlement Class Members, and their attorneys;

      c. notification via email of any updates posted to the online portals;

   d. promulgation of weekly appointment status reports to Qualified BAP Providers and to law firms with more than 100 clients participating in the Settlement;

   e. phone calls to alert Qualified BAP Providers, Settlement Class Members, and attorneys to changes in appointment statuses, dates, times, and/or locations.

  13. Having administered over 4,200 appointments to-date (see paragraph 16 below), GRG has experienced some infrequent issues with failure to communicate changes to appointment status in a timely manner to Qualified BAP Providers, or Settlement Class Members and their attorneys. These have most commonly occurred in situations where GRG received notice of changes on relatively short notice prior to the appointment dates. However, in such circumstances, GRG has usually been able to reschedule the Settlement Class Member for a new appointment within a short period of time of the original appointment date.

### *Baseline Assessment Examinations Scheduled to Date*

  14. GRG has been successful in scheduling Retired NFL Football Players for baseline assessment examinations in a timely manner and in convenient locations. As of April 9, 2018, 12,759 Retired NFL Football Players have been notified by the Claims Administrator of their eligibility for participation in the BAP. Of these individuals, GRG has received requests to schedule baseline assessment examinations from 3,944 Retired NFL Football Players directly or through their attorneys.

  15. Of the 3,944 Retired NFL Football Players who have requested appointments, 3,650 (92.5%) have had one or more appointments offered to them or scheduled since commencement of the BAP. On average, appointments have been booked thirty-six days after

request, with a peak average waiting time in the early days of the program of fifty-six days. The average appointment scheduled is set to take place sixty-eight days after being scheduled.

16. Of those Retired NFL Football Players with scheduled appointments, 2,458 have attended a total of 4,201 appointments as of April 9, 2018. This number consists of 1,583 who have attended two or more appointments (some Retired NFL Football Players have requested to break up their clinical neuropsychology appointments over less than six to eight hours, which GRG has accommodated) and 875 who have completed one appointment. Additionally, the median travel distance to the provider locations for these appointments is 31.3 miles.

17. Of the 3,650 Retired NFL Football Players who have had one or more appointment scheduled or offered to them, 3,268 currently have one or more appointments scheduled (including appointments that have already taken place). Of the 3,268 Retired NFL Football Players with scheduled appointments, 2,534 (77.5%) have been scheduled for both neuropsychology and neurology appointments. The remaining 733 (22.5%) have been scheduled for one appointment, and GRG is working to promptly schedule these Retired NFL Football Players' second appointment.

18. Of the 3,650 Retired NFL Football Players who have had one or more appointment scheduled or offered to them, 382 have had at least one appointment scheduled or offered to them in the past but do not currently have an appointment scheduled. These 382 Retired NFL Football Players have had a total of 1,172 rejected, cancelled, or missed appointments. GRG's analysis indicates that of those 1,172 appointments offered or scheduled:

      a. 670 were rejected by the Retired NFL Football Player;

      b. 260 were confirmed, then later cancelled by the Retired NFL Football Player;

      c. sixty-eight were initially offered to the Retired NFL Football Player at an appointment date and time that was later withdrawn by the provider;

      d. forty-eight were confirmed by the Retired NFL Football Player but later cancelled by the provider;

      e. thirty-three were confirmed by the Retired NFL Football Player but were subsequently missed by the Retired NFL Football Player; and

      f. ninety-three were cancelled for administrative reasons, such as correcting appointments entered incorrectly or in the wrong order.

In all such cases, GRG is continuing to work with BAP Providers, and Settlement Class Members or their attorneys to ensure Settlement Class Members receive appointments that meet their preference for location, provider, and schedule, while also accommodating the Qualified BAP Providers' schedule and availability.

      19. Of the 294 Retired NFL Football Players who have requested baseline assessment examinations but have not yet had appointments scheduled or offered to them, 70% are concentrated in twelve metropolitan areas. Obstacles to prompt scheduling in these twelve metropolitan areas include:

      a. a limited number of qualified providers (Cincinnati, Columbus, Seattle, and Memphis);

      b. contracted providers delivering fewer appointments than projected (New Orleans, Detroit, Tampa, Philadelphia, Washington DC, and Orlando); and

      c. higher demand (Atlanta and Miami).

In these cities, GRG is expanding network capacity by taking the steps outlined in paragraph 6 above, among others.

*<u>Providing Reports from Baseline Assessment Examinations</u>*

20.     As part of its efforts to ensure prompt and accurate production of medical records and reports from BAP Providers, GRG conducts training sessions and offers guidance materials to each Qualified BAP Provider. GRG is also in regular contact with Qualified BAP Providers as questions or issues arise that may slow the production of medical records and reports. Further, in order to provide incentives for Qualified BAP Providers to submit medical records and reports in a timely manner, GRG included a provision in all of its BAP Provider Contracts that makes provider payment contingent on the Qualified BAP Providers submitting such documents.

21.     Since GRG's most recent report to the Court in October 2017, GRG has received BAP-generated medical records and reports from at least one specialist (neurologist or clinical neuropsychologist) for 2,113 Retired NFL Football Players, including records and reports from both specialists for 940 Retired NFL Football Players and records from one specialist for 1,173 Retired NFL Football Players.

22.     After GRG receives the medical records and reports, GRG reviews them for accuracy and completion, particularly as against the requirements of the Settlement Agreement. When either the records or reports are incomplete, GRG works with the BAP Provider to ensure completion. The most common reasons for following up with providers include:

   a. failure to clearly state what, if any, Neurocognitive Impairment level the Retired NFL Football Player qualified for, as defined by the Settlement;
   b. omission of references to corroborating evidence, as required for diagnosing Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment under the Settlement;

9

    c. failure to adequately address test validity and/or functional impairment, two topics required to be reported by clinical neuropsychologists as part of their reports; and

    d. failure to meet other administrative requirements as articulated in the Clinician's Interpretation Guide promulgated pursuant to Exhibit A-2 of the Settlement Agreement.

23. As a result of the additional follow-up described above to ensure that the reports meet the requirements of the Settlement Agreement, GRG has on limited occasions been unable to provide medical records to Settlement Class Members and their attorneys as promptly as desired. GRG has taken steps to address these issues, including:

    a. assigning additional staff to follow up with Qualified BAP Providers who have not submitted their reports;

    b. assigning additional staff to follow up with Qualified BAP Providers for corrections to their previously submitted reports; and

    c. updating educational materials, along with multiple campaigns to distribute those materials and provide additional training (telephonic and written) to Qualified BAP Providers on administrative requirements.

These additional steps have enabled GRG to decrease the amount of time required to follow up with Qualified BAP Providers in the case of missing or incomplete reports and medical records, which will speed the process of producing reports and medical records for Settlement Class Members.

24. Because Section 5.2 of the Settlement Agreement requires both the clinical neuropsychologist and the neurologist to agree on diagnoses of Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment, and Level 2 Neurocognitive Impairment,

GRG has typically waited to issue medical records to Settlement Class Members until medical records from both specialists have been received, reviewed for quality, and approved for distribution. Due to the delays in receiving medical records from some Qualified BAP Providers, however, this approach has created additional delays in publishing records when the BAP Administrator has received records from one specialist but not the other. As stated in paragraph 23 above, GRG is actively taking steps to improve the timeliness of record submission by Qualified BAP Providers, which will help address this issue.

25.  Although the BAP is available to all eligible Retired NFL Football Players, regardless of health, as of April 9, 2018, BAP Examinations have already led to the diagnosis of fifty-one players, including sixteen for Level 1 Neurocognitive Impairment, twenty-one for Level 1.5 Neurocognitive Impairment, and fourteen for Level 2 Neurocognitive Impairment.

THE DECLARANT SAYS NOTHING FURTHER.

I, Matthew L. Garretson, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 13th day of April, 2018.

*[signature]*

Matthew L. Garretson