### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>          Plaintiffs,<br><br>          v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>          Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

### OPPOSITION OF CO-LEAD CLASS COUNSEL CHRISTOPHER A. SEEGER TO MOTION OF THE LOCKS FIRM FOR APPOINTMENT OF ADMINISTRATIVE CLASS COUNSEL

### I.       INTRODUCTION

Co-Lead Class Counsel Christopher A. Seeger ("Co-Lead Class Counsel" or "Seeger Weiss") respectfully submits this opposition to the Motion of Class Counsel the Locks Firm ("Locks") for Appointment of Administrative Class Counsel ("Locks Motion") (ECF No. 9786) and all Joinders thereto.[1]

---

[1]       The list of firms that have joined in the Locks Motion are Anapol Weiss ("Anapol") (ECF No. 9839); Berkowitz and Hanna LLC ("Berkowitz") (ECF No. 9855); Casey, Gerry, Schenk,

As the foundation for its request, Locks raises a series of purported issues and complaints about the Settlement that, as to those for which there is some basis (as to many, there is none), Seeger Weiss has been addressing or has addressed long before the Locks Motion was filed. Indeed, since well before the Effective Date, Seeger Weiss has worked to create an administrative framework designed to run for decades and to treat all Settlement Class Members uniformly, whether the Members are applying for Monetary Awards based on pre-Effective Date diagnoses in the first two years of the Settlement or on a Qualifying Diagnosis in the 65th year of the Settlement. Locks may have many individually-retained clients, but it is Seeger Weiss that firms and unrepresented Settlement Class Members have consistently turned to when they have faced issues respecting the Settlement.

It is Seeger Weiss who has engaged with the Claims Administrator, the Special Masters, and the NFL in implementing the Settlement. As such, most notably, after an opportunity for comment by Locks and others, an entirely new set of Frequently Asked Questions were promulgated in February 2018 ("FAQs" or "February FAQs") as rules of the road, which address most of the issues Locks now raises publicly and seeks to exploit. *See* Declaration of Orran L.

---

Francavilla, Blatt & Penfield, LLP ("Casey Gerry") (ECF No. 9830); FrancoLaw PLLC and Hodgins Law Group, LLC ("Franco") (ECF No. 9828); Goldberg, Persky & White, P.C. ("Goldberg Persky") (ECF No. 9827); The Law Office of Hakimi & Shariari (f/k/a Top NFL Lawyers) ("Hakimi") (ECF No. 9829); Hagen Rosskopf LLC ("Hagen") (ECF No. 9853); Hausfeld LLC ("Hausfeld") (ECF No. 9816); Kreindler & Kreindler, LLP ("Kreindler") (ECF No. 9842); Lubel Voyles, LLP ("Lubel") (ECF No. 9856); McCorvey Law, LLC ("McGorvey") (ECF No. 9821); Mitnick Law Office ("Mitnick") (ECF No. 9834); Podhurst Orseck, PA ("Podhurst") (ECF No. 9831); Pope McGlamry, Kilpatrick, Morrison & Norwood, PC ("Pope McGlamry") (ECF No. 9813); Provost Umphrey, LLP ("Provost") (ECF No. 9819); Smith & Stallworth, PA ("Smith & Stallworth") (ECF No. 9854); JR Wyatt Law, PLLC ("Wyatt") (ECF No. 9836); Neurocognitive Football Lawyers ("Yerrid" or "Neurocognitive Lawyers") (ECF No. 9843); Zimmerman Reed LLP ("Zimmerman") (ECF No. 9820). Two firms, Lieff Cabraser Heimann & Bernstein, LLP (ECF No. 9824) and Robins Cloud LLP (ECF No. 9837), filed and then withdrew Joinders to the motion.

Brown, Sr. on Program Implementation (ECF No. 9882) ("Brown Decl.") ¶ 24.  The Joinders from other counsel (through the use of a declaration template or even thinner "me too" Joinders) do little or nothing to buttress what is an utterly meritless attempt to usurp Co-Lead Class Counsel's oversight of the Settlement's implementation.  Indeed, many of the Locks Motion's complaints stem from the fact that, although he signed it, Locks has repeatedly ignored (or manifested an ignorance of) the Settlement Agreement.  For the reasons discussed below, the Court should deny the Locks Motion.

## II.   BACKGROUND & SUMMARY

This Settlement is an unprecedented accomplishment – providing immediate baseline assessments to eligible players, Monetary Awards for those Retired NFL Football Players who had already received a Qualifying Diagnosis, and 65 years of security to Retired NFL Football Players who may develop one or more of the Qualifying Diagnoses in their lives.  Contrary to the rhetoric coming from Locks and the Joinders in support of its motion, one should make no mistake – the Settlement is working, albeit not perfectly.   As a Settlement without precedent, it took some time to resolve the many issues attendant to the scope of the Settlement benefits offered.

### A.  The Success of the Settlement

On April 9, 2018, Seeger Weiss as Co-Lead Class Counsel hosted the 88th regular weekly implementation call with the Claims Administrator (Brown Greer), the BAP and Lien Resolution Administrator (Garretson Resolution Group), and counsel for the NFL.  *See* Declaration of Christopher A. Seeger in Support of Opposition of Co-Lead Class Counsel to Motion of the Locks Firm for Appointment of Administrative Class Counsel ("Seeger Decl.") ¶ 4.  These calls became the central platform for coordinating implementation of the Settlement and were accompanied by other *ad hoc* calls and communications focused on particular tasks or problems.  *See* Brown Decl.

3

¶ 23; Seeger Decl. ¶ 4.   Each aspect of the Settlement required, among other things, the development of the basic documents that were to be used to register and submit a claim; the establishment of national networks of physicians and medical providers that would serve as Qualified MAF Physicians and BAP Providers; and the institution of policies that would regulate the operations of the Claims, BAP, and Lien Resolution Administrators.  *Se*e Seeger Decl. ¶ 4. Even before the first of regular weekly calls, Co-Lead Class Counsel was engaged with the Administrators and NFL to begin addressing the innumerable details that this Settlement entails. *See id.* ¶ 5.  As will be discussed in more detail below, Seeger Weiss used the many tools available under the Settlement Agreement, including the appeals process and petitions to the Special Masters to shape a program that is delivering the promised benefits to the Settlement Class Members.

As of April 9, 2018, the Settlement has already offered or scheduled 3,650 BAP examinations with over 2,400 players having already completed at least one appointment.  *See* Declaration of Matthew L. Garretson (ECF No. 9883) ("Garretson Decl.") ¶¶ 15-17, 25.  Thus far, BAP examinations have already led to the diagnosis of 51 players.[2]   377 Notices of Monetary Awards have been sent to Settlement Class Members, reflecting $411,237,005 in awards, and this number is growing on a daily basis.  *See* Brown Decl. ¶ 33.  As Locks points out in the Locks Motion, the NFL had forecast that claims in the first year of the Settlement would amount only to $242.9 million.  Locks Motion ¶ 10.  At the close of the first year of the MAF, the Notices of Monetary Awards are already exceeding that projection, and claims that were submitted in the first

---

[2]       The BAP provides the same baseline assessment to all eligible players, the majority of whom (fortunately) do not suffer from the serious neurocognitive impairments that constitute qualifying dementia diagnoses under the Settlement.  During the first two years of the program, most Monetary Awards will be based on pre-Effective Date diagnoses.

year are still being approved.[3]  *See* Seeger Dec. ¶ 6.  The Qualifying Diagnoses for Alzheimer's

and dementia (Level 1.5 and Level 2 Neurocognitive Impairment) have been a prime focus for

complaints.  These too, however, are being awarded.  Over 192 Notices of Monetary Awards for

these Qualifying Diagnoses of Alzheimer's or dementia have gone out for a value of over $202

million.  *See* Seeger Decl. ¶ 7.  Indeed, now that the many claims requiring further investigation

by the Claims Administrator have been identified and distinguished from the others, there has been

a marked increase in the approval of these claims since February.  *See id.*

       Importantly, since the Locks Motion was filed, 53 new Notices of Monetary Award have

been sent to Settlement Class Members, representing over $63 million in awards, and 45 more

payments have been made, totaling over $34 million.  *Id.* ¶ 9.

### B.  Locks Has Been, if Anything, a Hindrance

       For some, it seems, the process just was not quick enough and never will be.  Locks sits

like a Monday morning quarterback making a list of do-able prescriptions *that are already*

*implemented* and a list of complaints and actions that are simply at odds with the Settlement

---

[3]     Locks contends that the Settlement has not even reached first year projections, but does so by myopically focusing only on the checks that have been sent out rather than the larger number of claims that have been submitted during the first year, including those that are continuing to be approved and will be paid in the coming months.  While there are many claims that have been submitted in the first year that have not yet been reviewed on the merits, given the Notices of Monetary Awards that have already been issued, it is clear that the Settlement is on track to deliver in excess of the projections for the first five years.  The data is available on the Settlement Website (www.NFLConcussionSettlement.com) and reflected on April 9, 2018 that the Settlement has already exceeded the projected numbers of ALS claims (28 awards with only 17 projected), Parkinson's claims (61 awards with 14 projected), and Death with CTE claims (61 awards with 51 projected).  There have also been 115 Alzheimer's claims, 43 Level 2.0 claims and 71 Level 1.5 claims approved.  With over 881 claims for Alzheimer's and/or dementia from the first year of the MAF still pending decision, it is evident that these projections too will be exceeded.  *See* Seeger Decl. ¶ 8.

Agreement and good sense.  Distinctly lacking in the Locks Motion is candor about Locks' earlier involvement in the implementation process and resolution of many of the issues that it now raises.

Co-Lead Class Counsel involved Locks in the implementation process for a year and a half and has repeatedly addressed their complaints as they arose.  Seeger Weiss sought input from Locks, along with the other Class Counsel, on everything from the basic forms that were to be used for registration and the claims process, the procedures that would govern fraud investigations, to the medical providers who would serve in the national MAF and BAP networks, and the neurologists and neuropsychologists who would sit on the Appeals Advisory Panel ("AAP") and serve as Appeals Advisory Panel Consultants ("AAPC").  *See* Seeger Dec. ¶ 20.  Indeed, two of the current members of the AAP and AAPC were originally proposed by Locks.  *See id.* ¶ 21.  Co-Lead Class Counsel hosted calls and in person meetings, and exchanged many emails with Class Counsel in this process which continued up until less than two weeks before Locks filed its Motion. *See id.* ¶ 20.  Class Counsel were free to raise issues and they were always apprised of the work that was being undertaken to address these issues.

Similarly, Locks points to its November 6, 2017 memorandum to the Claims Administrator ("November Memo") to argue that its efforts leading up to the filing of the Locks Motion have been ignored.  (Locks Motion ¶¶ 50-51).  What Locks omits from his recitation to the Court, however, is that the Claims Administrator shared the November Memo with Seeger Weiss which swiftly prepared a reply to Locks addressing each of the complaints raised.  *See* Seeger Decl., Exhibit B.  As Seeger Weiss pointed out to Locks, some of the complaints in the November Memo evidenced ignorance of or hostility toward express provisions in the Settlement Agreement. Seeger Weiss also explained to Locks that the other complaints were matters that Seeger Weiss was already addressing through appeals, or through other means with the NFL and Special

Masters.  These efforts by Seeger Weiss have paid off.  Although Locks pays scant attention to the February FAQs, they address, favorably to Locks' clients, many of the issues raised in the Locks Motion.

Locks offers little in support of his qualifications for the invented position of "Administrative Class Counsel" and neglects to mention his short tenure as a Settlement Trustee in the Dalkon Shield Litigation, where he was removed after only eight months "for good cause," which included the failure to pay a single claim, ignorance about the Trust Agreement he was administering, and general malfeasance.  *In re A.H. Robins Co.*, 880 F.2d 779 (4th Cir. 1989).  The Fourth Circuit affirmed Locks' removal as Trustee, noting that the "delays occasioned by the three trustees [including Locks] have increased administrative costs, have delayed full funding of the Trust . . . and have endangered the very life of the plan." *Id.* at 787.  Locks seeks to be put in charge, but he has a bad track record in this regard.

### III.    UNDER SEEGER WEISS' AEGIS, THE SETTLEMENT IS WORKING

Contrary to the false narrative of the Locks Motion and the Joinders in support thereof, the Settlement is working.  377 Players and their families have been awarded hundreds of millions of dollars of compensation, and 3944 Players are in the process of completing their free BAP exams and Co-Lead Class Counsel expects that thousands more will participate during the ten-year life of the BAP program.   *See* Garretson Decl. ¶ 15; Brown Decl. ¶ 33.

These successes are not mere happenstance.  Since Final Approval (and even well before), Seeger Weiss has worked tirelessly in coordination with the Administrators, the Special Masters, and the Court—and both cooperatively with and, as circumstances dictate, against the NFL—to facilitate and oversee the implementation of the Settlement.  The work of Seeger Weiss since Final Approval has been discussed at length in the Declarations of Christopher Seeger that were

submitted in the course of briefing the Common Benefit Fee Petition and proposed allocations. (ECF Nos. 7141-2, 7464-1, and 8447).  For the purposes of the present motion, several of the accomplishments by Seeger Weiss require particular attention and address many of the ill-considered claims made by Locks and some of the firms joining in the motion about the failure of the Settlement Program under Seeger Weiss' leadership. Seeger Weiss has successfully shepherded the Settlement through implementation in the interest of the Settlement Class.[4]

As an unprecedented undertaking where measures of neurocognitive impairment are in play, the Settlement presented challenges in initial implementation, and the commencement of benefits required substantial undertakings.  This can be easily illustrated by the need to establish and train two national networks of physicians and a Monetary Award program that will be in operation for 65 years.  Importantly, the awards are sizeable, ranging up to $5 million.  Given the Settlement program's uncapped structure, to secure the integrity of the Settlement, Seeger Weiss further needed to appropriately balance and address the potential for unfounded claims while protecting the rights and claims of otherwise worthy Settlement Class Members.  As the

---

[4]      In addition to these sorts of global undertakings for the Settlement Class Members, Seeger Weiss has an intimate and sophisticated relationship with the workings of the Settlement program. Seeger Weiss has individual clients, but, as Co-Lead Class Counsel is often the go-to source for unrepresented Settlement Class Members who need guidance.  Similarly, Co-Lead Class Counsel is tracking each Notice of Monetary Award and Notice of Denial of Monetary Award to ensure their accuracy and to identify issues that may need to be addressed in the wider Settlement program.  This process has, for example, led to the identification of missing Eligible Seasons or the use of the wrong age of a player in the calculation of Monetary Awards for certain claims, and corresponding increases in dollars received by Class Members.  Finally, Co-Lead Class Counsel tracks each appeal that is taken by either Settlement Class Members or the NFL.  This allows Seeger Weiss to identify issues that have wider ramifications in the Settlement and may need to be addressed by a Statement of Co-Lead Class Counsel in support of the Settlement Class Member. Also, Seeger Weiss works very closely with Settlement Class Members who are facing the appeals process to help them prepare the best submission that they can—either for their own appeal or to oppose an appeal by the NFL.  *See* Seeger Decl. ¶ 19.  Accordingly, Locks' statement that Seeger Weiss lacks "day to day incentive to engage in aggressive advocacy on behalf of players" is baseless.  Locks Motion ¶ 60(f).

implementation continued under the leadership of Seeger Weiss, the Settlement has come to deliver the negotiated benefits to the Settlement Class.  Among the points on which Seeger Weiss provided leadership are the following.

### A.  The Earlier Date for a Qualifying Diagnosis[5]

The question of determining the date of a Qualifying Diagnosis had been an issue from the beginning of the claims process.  The issue is significant because once a player reaches the age of 45, his monetary award decreases every year.  A difference of even one year can translate into a substantial difference in the amount of a Monetary Award.  The NFL's position was, and still is, that the earliest the date of diagnosis can be is the date that the diagnosing physician first personally examined the player.  It was Co-Lead Class Counsel's position, however—as reflected in briefing for the Special Masters on the issue—that diagnosing physicians, based on their personal examination of the player, as well as a review of that player's existing medical records, may properly determine that the player suffered from a Qualifying Diagnosis on a date earlier than the initial personal examination by the diagnosing physician, and that the diagnosing physicians should be able to use that earlier date if they think that it is appropriate.  The Special Masters accepted Co-Lead Class Counsel's position in the FAQs that they promulgated in early February 2018.  Specifically, FAQ 93 allows physicians to use their "sound clinical medical judgment" to determine that the player's diagnosed conditions "existed at a date earlier than the date of personal examination of the Player by the physician making the diagnosis and signing the DPC [Diagnosing Physician Certification ("DPC") (i.e., medical certification)] form."  *See* Seeger Decl. ¶ 13.

### B.  MAF Physicians' Ability to Rely on Historic Neuropsychological Records[6]

---

[5]     This matter directly addresses the issue raised in the Hausfeld Joinder.  ECF No. 9816.

[6]     This matter addresses the issue raised in the Locks Motion in ¶ 41.

The Settling Parties had differing views as to whether Qualified MAF Physicians could rely on historic neuropsychological testing when making a dementia diagnoses (Level 1.5 and Level 2), or whether they were required to send the player for new neuropsychological testing. This testing included earlier neuropsychological testing for one of the NFL benefit plans, such as the 88 Plan.  The NFL's position was that a Qualified MAF Physician could rely only on neuropsychological testing that was conducted at the direction of the Qualified MAF Physician. Seeger Weiss advocated through submissions before the Special Master to recognize and respect the medical judgment of the Qualified MAF Physicians and enable them to rely on historic neuropsychological testing if they found it to be reliable, particularly when the testing was part of one of the NFL benefits plans.  The Special Masters accepted this position and FAQ 102 now gives the Claims Administrator the discretion "to decide whether to accept neuropsychological testing from other sources based on the unique facts and circumstances of a particular claim" so long as it is less than 12 months old.  Similarly, FAQs 93 and 111 permit the use of earlier neuropsychological testing under the 88 Plan or another NFL benefit plan.  *See id.* ¶ 14.

### C.  Ensuring Fairness and Efficiency While Seeking the Production of Raw Scores[7]

The NFL's position was that the raw scores from the player's neuropsychological testing must be provided in order for a claim to be complete.  Failure to provide the raw scores would result in the claim being denied.  Although Seeger Weiss recognized the potential relevance of raw scores in assessing a claim, Co-Lead Class Counsel further maintained that it would be unfair to penalize a player by denying his claim simply because his neuropsychologist is unable to provide raw scores or delaying the processing of his claim pending such production.  The Special Masters

---

[7]      As regards the Locks Motion and Joinders, this undertaking among many directly addresses the shared concern that the Settlement work as swiftly and efficiently as possible and without undue delay.

agreed with this position and, in accordance with FAQ 105, raw scores are not required "unless the AAP doctor or the Claims Administrator determines they are necessary."   *See id.* ¶ 15.

### D.  Accommodating the "Unavailability" of Diagnosing Physician or Medical Records[8]

Under the Settlement Agreement, one of the few express exceptions to the requirement that the player submit a Diagnosing Physician Certification from the Diagnosing Physician is if the Diagnosing Physician died, or was declared incompetent or legally incapacitated before the Effective Date.  Similarly, the only exception to the requirement that the player submit medical records reflecting the claimed diagnosis was if the records were destroyed by a *force majeure* type event.  For every claim that fit easily into these exceptions, there were some where the diagnosing physician is still alive and competent but unavailable as a practical matter, or where medical records are no longer available due to a variety of reasons, including routine destruction of older records.  These claims were vulnerable to denial under the terms of the Settlement Agreement. Seeger Weiss was initially able to secure the NFL's consent to look at such circumstances on a case-by-case basis rather than categorically rejecting claims affected by them, and Seeger Weiss dedicated many hours to reviewing each Claim Package and negotiating with the NFL.  The claims in which Seeger Weiss successfully negotiated an accommodation of a claim based on a living and competent yet unavailable physician or missing medical records included claims submitted by Locks, Anapol, Pope McGlamry, Goldberg Persky, and many unrepresented Settlement Class Members.  In some of these claims, Seeger Weiss had disputes with the NFL that were irreconcilable – either because of the burden placed on the Settlement Class Member by the only accommodation that the NFL was willing to offer or because of the NFL's refusal to offer an

---

[8]      This undertaking directly addresses the issue raised in the Locks Motion "The NFL's Bad Faith Interpretation of the Agreement."  Locks Motion ¶¶ 38-42.

accommodation. The Special Masters ultimately took up this issue and, in FAQ 115, gave the Claims Administrator the discretion to decide whether the Diagnosing Physician Certification and medical records requirements should be excused in particular cases. *See id.* ¶ 16.

### E.  Providing for the Downgrading of Qualifying Diagnoses to Speed Awards[9]

Early on in the claims process, Seeger Weiss realized that there would be situations in which a player's claim may be denied with respect to the asserted Qualifying Diagnosis, but that there was sufficient evidence in the Claim Package to support a different Qualifying Diagnosis. For example, a player submits a claim for Level 2 Neurocognitive Impairment (moderate dementia) but the evidence supports only a Level 1.5 Neurocognitive Impairment (early dementia). Under the Settlement Agreement, that claim would be subject to denial and the player would need to file a *de novo* claim for a Monetary Award based on an asserted Level 1.5 Neurocognitive Impairment.

Accordingly, in an effort to streamline the process and avoid needless appeals, Co-Lead Class Counsel proposed that the AAP should have the ability to approve a claim for a lesser Qualifying Diagnosis or for the asserted Qualifying Diagnosis but with a later diagnosis date. After much negotiation, the NFL agreed, in part, to "downgrading," but only in very limited circumstances. As a result, Seeger Weiss raised the issue with the Special Masters, who agreed and, pursuant to FAQ 137, gave the AAP the discretion to "downgrade" claims without restriction. *See id.* ¶ 17.

### F.  The Definition of "Eligible Season" and the Full 53-Man Active List

---

[9]     As regards the Locks Motion and Joinders, this undertaking also addresses the shared concern that the Settlement work as swiftly and efficiently as possible, without undue delay. Many denials of claims are because the impairment suffered by a player is not sufficiently severe as to so support the level of impairment (e.g. not as severe as Level 2, but possibly Level 1.5). "Downgrading" eliminates the denial (and ensuing delay of appeal or submission of a new claim).

At the heart of the Settlement benefits is the "Eligible Season," which stands as a proxy for exposure to concussive and sub-concussive hits.  The number of Eligible Seasons is thus a key driver in the amount of a Monetary Award and drives a Retired NFL Football Player's eligibility for participation in the BAP.  A full Eligible Season is earned for each year that a Retired NFL Football Player was on the Active List for at least three games.  The NFL, however, took the rigid position that uninjured players who were listed as "inactive" on game day would earn nothing toward an Eligible Season, even though they were shoulder-to-shoulder in practice all week with all of the other Active List players.  As the Court is aware, Seeger Weiss advocated for parity in treatment of all Retired Players on the Active List up to game day.  After Seeger Weiss prevailed on behalf of the Settlement Class Members before the Special Master (ECF No. 9713), the NFL filed objections to the Special Master's Ruling in this Court (ECF No. 9754-1).  The Court overruled that objection, making the final and binding determination that the more reasonable (and expansive) definition of "Active List" should apply (ECF No. 9754).  This victory has already resulted in a substantial increase in at least one Monetary Award and has increased the number of players eligible for the BAP.  *See id.* ¶ 18.

These and many other accomplishments by Seeger Weiss were known to Locks and the other Class Counsel who joined in the Locks Motion.  Yet no mention is made of these facts in the Locks Motion or any of the Joinders.  Seeger Weiss included Class Counsel (including Locks, Anapol and Podhurst) in the implementation process, including regular calls for open discussions of on-going Settlement implementation issues as they arose.  *See id.* ¶ 20. They were asked for input on the fundamental forms to be used in the claims process, in proposing candidates and in review of candidates' credentials for the BAP and MAF networks, as well as for the AAP.  *See id.* Indeed, in the regular calls that Seeger Weiss began to host with the other Class Counsel, the

above-mentioned issues, and the status, positions, and arguments being made in support of the

players were all discussed.

## IV.   LOCKS IS NOT FIT FOR THE PROPOSED ROLE OF "ADMINISTRATIVE CLASS COUNSEL"

How would this Settlement function if the interests of the Class were turned over to Locks

as its guardian?  This is not merely a hypothetical to be debated.  Locks once served as a trustee

for the Dalkon Shield Settlement Trust.  Within eight months, however, he was removed as a

trustee "for good cause."  *In re A.H. Robins Co.*, 880 F.2d 779 (4th Cir. 1989).   The list of Locks'

"acts of misfeasance and improprieties" exposed at a trial on the matter included:

- Negligent failure to act prudently and expeditiously in setting up the Claims Resolution Facility;
- Endeavoring to hire a costly consulting firm to conduct his responsibilities;
- Opposition to supervision by the Court for the protection of the claimants;
- Failure to deliver a single payment for claims;
- Defiance of the Court;
- Protracted and wasteful efforts to appoint as counsel for the Settlement Trust a firm that had a direct conflict of interest;
- Ignorance of key provisions in the Trust Agreement;
- Inability to work with fellow trustees and others involved in administration of the Trust;
- Placing the interests of the claimants second to his own which lead to a "thwart[ing of] the law of the case and expended time, effort and Trust funds for that purpose to the ultimate delay and detriment to the Trust beneficiaries"; and
- Otherwise delivering no services for the salary paid from the Trust.

*Id.* at 781-85.  The Fourth Circuit affirmed Locks' removal as Trustee, noting that the "delays

occasioned by the three trustees [including Locks] ha[d] increased administrative costs, ha[d]

delayed full funding of the Trust . . . and ha[d] endangered the very life of the plan."  *Id*. at 787.

Similarly, in the *Diet Drugs* litigation, the one litigation that he identifies as establishing

his credentials, Locks was ensnared in litigation over the handling of client settlement proceeds,

particularly regarding an alleged practice of secretly withholding 10% of clients' settlement funds

to short referring counsel and as a reserve fund to remold objecting clients' settlement amounts.

*Morris v. Greitzer and Locks of N.J., LLC*, No. A-4672-06T3, 2009 WL 2525452, at ** 3, 5, 6 (N.J. Super. Aug. 20, 2009).

Apt to the appointment that Locks now seeks and the general tone of his motion, the Fourth Circuit in *Dalkon Shield* noted Locks' braggadocio in the face of his troubling ignorance of the very agreement that he was supposed to oversee: "Mr. Locks testified that he was not aware of this provision of the merger agreement. He was also unaware that under § 4.07(c) of the Trust Agreement if the Order of Confirmation were reversed on appeal, the $100,000,000 already paid into the Trust could no longer be used to compensate claimants. Mr. Locks testified that he was an experienced attorney in mass tort litigation, but months after he became a trustee of one of the largest trusts ever created, he was unfamiliar with critical provisions of the documents making up the Plan of Reorganization."[10] *In re A.H. Robins Co.*, 880 F.2d at 787 n.2.

Locks holds up his duties as Class Counsel under Section 28.1 of the Settlement Agreement as the basis for his requested appointment as Administrative Class Counsel. Locks Motion ¶ 5. There is no such thing, however, as "Administrative Class Counsel." The Settlement Agreement establishes a clear hierarchy of leadership for implementation of the Settlement, with Co-Lead Class Counsel atop that hierarchy, with duties for implementation expressly assigned throughout the Settlement Agreement and Class Counsel (including Subclass Counsel) providing support in the implementation. *See*, *e.g.*, Settlement Agreement §§ 2.1(r) and (u), *passim*. There is no provision for an "Administrative Class Counsel." The parties never negotiated for, nor did the Court approve, such a position. Rather, Co-Lead Class Counsel is primarily responsible for all aspects of implementation. *See*, *e.g.*, Settlement Agreement §§ 4.1 (notice and information to the

---

[10]     Like in *Dalkon Shield*, Locks has frequently demonstrated ignorance about basic terms of the Settlement Agreement he signed. This is discussed in greater detail below, but instances include most notoriously signing-off on over 28 assignments of client benefits.

Class), 5.6 (BAP creation and retention and oversight of BAP Administrator), 8.2 (claims process), 9.1 (review of Claims), 9.8 (appointment of AAP and AAPC), 10.2 (MAF creation and retention and oversight of Claims Administrator), 11.1 (retention and oversight of Lien Resolution Administrator), 23.5 (creation of Settlement Trust).

In addition, Locks overlooks the importance of the common duty that Section 28.1 of the Settlement Agreement establishes for Co-Lead Class Counsel and Class Counsel to support the Settlement:

> Co-Lead Class Counsel and Class Counsel acknowledge that, under applicable law, their respective duty is to the entire Settlement Class, to act in the best interest of the Settlement Class as a whole, with respect to promoting, supporting, and effectuating, as fair, adequate, and reasonable, the approval, implementation, and administration of the settlement embodied in the Settlement Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Settlement Class.

Since the Effective Date, rather than "respect, support, and effectuate" the Settlement Agreement, Locks has actively undermined it and has repeatedly shown ignorance of some basic features of the Settlement and the wider implementation efforts.

## A.     Locks' Deficiencies

Although he touts the "approximately 1,100 registered players" that he represents, Locks' handling of those cases does not advance his cause.  Locks Motion ¶ 5(b). Locks boasts that he "has filed 102 claims, and obtained 35 awards to date" (*Id.*) (a fact that actually undermines Locks' position, in that it demonstrates that the Settlement is working), but neglects to mention that, notwithstanding the Settlement Agreement's clear prohibition on the assignment of settlement benefits (Section 30.1 – "No Assignment of Claims") – about which this Court is well versed (*see, e.g.*, ECF No. 9517) –  Locks has acknowledged and signed off on at least 28 funding agreements

that assigned all or part of 16 of its clients' claims.[11]   *See* Seeger Decl. ¶ 30.  In all, these known assignments relate to over $1.5 million in advances to these players, which when the exorbitant interest rates are applied, would have resulted in these Class Members owing funders double or more the amounts advanced.  *See id.*  The interest rates presented in the assignment agreements are deceptive in that they are monthly and not annual rates, with monthly compounding.  Some of the underlying interest rates are as high as 2.75%.  *See id.*  While this may seem like a low interest rate on its face, with monthly compounding, the rate translates to an effective annual interest rate in excess of 38% for the first year, and grows exponentially in subsequent years.[12]

In 2016, Locks' deficiencies resulted in a complaint filed in this Court by several players against it and several other of the Joinder firms.  The plaintiffs alleged that they had been "represented by [Locks] in the NFL concussion class action litigation, but terminated their attorney-client relationship with [Locks] . . . due to dissatisfaction for various reasons."[13]  Since the filing of that action, Seeger Weiss in its role as Co-Lead Class Counsel, like the Claims Administrator, receives calls from Locks' clients on a regular basis (far more than other firms'

---

[11]     Most of these assignments were identified by Seeger Weiss in the course of its investigation of the funders who entered into prohibited assignments with players.  As the Court is aware, the discovery in that matter has been limited, and even those funders that have been identified have yet to produce information about their funding agreements with players.  There could very well be far more assignments acknowledged by Locks.  *See id.*

[12]     For example, if a Class Member received an advance of $100,000 in April of 2016, at a 2.75% monthly compounded interest rate, now, two years later, he would owe the funder over $191,000—almost double the amount advanced.  Should the retired player not obtain a Qualifying Diagnosis and corresponding monetary award until April 2019, he would owe the funder over $265,000.  *See id.*

[13]     *Sayers v. Hausfeld, LLP*, 2:16-cv-2005-AB, ECF No. 1 at ¶ 2.  The other firms named alongside Locks whose clients had the same "dissatisfaction" and have also joined in the Locks Motion are Hausfeld, Zimmerman, and Pope McGlamry.

clients), relating to concerns or complaints about Locks' representation, most typically that Locks is simply not returning their calls.[14]  *See* Seeger Decl. ¶ 31.

### B. Locks' Undermining of the Settlement

After the Settlement became effective, Locks quickly undermined confidence in the program by spreading inaccuracies about its implementation.  As the Court is aware, a Settlement Class Member, Fred Willis, principal of HPN Neurologic and a client of Locks, has been sending around misrepresentations about the Settlement ever since it became effective.  *See e.g.* ECF Nos. 7151, 7842.  Mr. Willis maintained a Settlement-related blog ("NFL Players Brains Matter") and sends regular blast emails to an expansive list of Settlement Class Members about the Settlement. Even before the BAP launched in June 2017, Mr. Willis sent out the following May 2017 alert that the BAP was being delayed.  The alert was based on information received from "one of the top Law firms in the NFL Concussion Settlement":

#### NFL PLAYERS BRAINS MATTER™

#### UPDATE
#### The NFL Concussion Lawsuit
#### The Baseline Assessment Examination

Based on a recent email received from one of the top Lawfirms in the NFL Concussion Settlement the Baseline Assessment Program may be delayed. In their email they expressed the numbers of former players who will need to be tested and the limited schedules available  for the baseline testing providers (i.e. board-certified neuropsychologists and neurologists),  the BAP administrator has determined that many of the tests will be delayed for 6-12 months

---

[14]     Locks' pre-Effective Date performance was not much better.  Early in the settlement negotiations, when he was on the settlement committee, Locks saw fit to reach out to the press and talk about the status of the litigation despite an agreement of confidentiality.  The Locks "leak" needlessly compromised and delayed negotiations, while Co-Lead Counsel worked to restore Plaintiffs' credibility.  *See id.* ¶ 34.

(or more, in some instances).

**BASED ON THIS INFORMATION IT APPEARS POSSIBLE IT COULD EASILY TAKE 6 MONTHS TO 1 YEAR (OR LONGER) BEFORE YOU WILL BE SCHEDULED FOR TESTING  WITH A BAP DOCTOR, THUS POSSIBLY STRETCHING ANY MONETARY AWARD YOU  MIGHT RECEIVE FROM THE CONCUSSION SETTLEMENT EVEN LONGER!**

*See* Seeger Decl., Exhibit C.

Seeger Weiss learned that the misinformation that Mr. Willis spread, at least in this instance, came directly from Locks, "one of the top Lawfirms."  The content of Mr. Willis' message was lifted directly from an email that he received from Locks:  "As you likely know, the settlement requires baseline testing to begin in June.  Because of the numbers of former players who will need to be tested and the limited schedules available for the baseline testing providers (i.e. neuropsychologists and neurologists), the administrator has determined that many of the tests be delayed for 6-12 months (or more, in some instances)."  *See* Seeger Decl., Exhibit D.

There was no plausible basis for Locks' statement.  Locks' statement to Mr. Willis and Mr. Willis' parroting of it were and remain untrue.  Despite the success of Co-Lead Class Counsel in driving BAP registration numbers beyond even the most optimistic of projections, the BAP launched *on time,* and appointments were scheduled immediately thereafter, typically within 36 days of contact.  *See* Garretson Decl. ¶ 15.

Not only does Locks' email to Mr. Willis raise concerns about other misinformation that Locks may have spread, it also manifests Locks' profound ignorance of the Settlement Agreement itself.  Creating even more confusion with the communication to Mr. Willis and his hundreds of other clients, Locks went on to misrepresent that a delay in BAP evaluations would impact diagnoses of Parkinson's disease, ALS, and Alzheimer's disease:  "Our files indicate that you are

not in immediate distress and if tested, likely would not be diagnosed with a compensable condition (dementia, Alzheimer's, ALS or Parkinson's). Therefore delaying your test will not affect your settlement benefits and we recommend that you follow the request of the administrator.  We will look to schedule your exams in the near future." *See id.*  It is a fundamental fact that the BAP is focused solely on evaluating a player's neurocognitive abilities, and can be the basis for a claim for one of the dementia diagnoses, not any of the other Qualifying Diagnoses.

## V.   THE ISSUES RAISED IN THE LOCKS MOTION LACK MERIT

The Locks Motion reflects the same sort of misapprehensions or outright ignorance of the very Settlement Agreement that he now seeks appointment to oversee.  Putting aside Locks having signed off on *at least* 28 assignments of his clients' claims in contravention of the Settlement Agreement (discussed above), Locks now argues that the very BAP testing battery that he signed off on as Class Counsel, and which the Court approved, is harmful to many of the African-American players he represents.  Locks Motion ¶ 14(n).  He complains that he was not allowed to submit claims without the Diagnosing Physician Certification of a treating physician who was alive, but simply not responsive.  *Id.* ¶ 39.  He complains about the right of the NFL to file appeals, when that right is stated plainly in Section 31 of the Settlement – and essentially argues that the NFL's taking appeals is in itself bad faith.  *Id.* ¶ 33.  All of his arguments lack merit.[15]

### A.   Locks' Complaints Have Already Been Addressed

One of the most troubling things about the Locks Motion is the obliviousness to the salient fact that most of the complaints that he raises have already been addressed by Co-Lead Class

---

[15]    Although the NFL has the right under the Settlement to take appeals, Co-Lead Class Counsel closely monitors the appeals taken by the NFL in order to ensure, among other things, that they are not taken in bad faith.  On two occasions to date, Co-Lead Class Counsel has challenged NFL appeals as taken in bad faith.

Counsel, either in its opposition to the earlier motion of X1Law, in Seeger Weiss' response to the November Memo, and/or overall in the course of implementation of the Settlement, including the February 2018 FAQs.

On August 15, 2017, X1Law filed a motion ("X1Law Motion") to challenge "new rules" that it asserted were being made in the Settlement to the detriment of its clients.  ECF No. 8267. Like the purported "Secret Amendments" and problems in the Settlement that Locks and certain firms having filed Joinders now complain about, the X1Law Motion protested allegedly strict application of BAP standards to claims for Qualifying Diagnoses of dementia (Level 1.5 and Level 2 Neurocognitive Impairment) before the Effective Date of the Settlement (*see* Locks Motion ¶¶ 14(e), 19), improper application of the "generally consistent" standard for pre-Effective Date dementia claims (*see id.* ¶¶ 14(f), 19), the requirement and timing of corroborating affidavits for Qualifying Diagnoses of dementia (*see id.* ¶¶ 14(g)), and the need for the Diagnosing Physician to actually see the Retired NFL Football Player (*see* Zimmerman Joinder).  Despite its agreement with the X1Law Motion now, at the time, Locks was critical of it.  Seeger Weiss provided Locks the opportunity to review the opposition brief to the X1Law Motion before it was filed and he endorsed the briefing while offering additional edits for consideration.  *See* Seeger Decl., Exhibit A.  Not only does Locks sidestep its sudden turnabout in the Locks Motion, but it disregards the Court's resolution of the X1Law Motion:   "Movants must proceed through the Claims Administration process, and if the claims are denied, movants must follow the proper appeals process.  Movants' attempt to circumvent those processes by directly petitioning the Court is improper."  ECF No. 8882.

In the November Memo, which Locks includes with its Motion (Locks Motion, Exhibit I), Locks listed twelve grievances for the Claims Administrator about the Settlement and offered

"LLF Solutions" that the Court, Special Master, or Claims Administrator should make.  Locks neglects to mention that Seeger Weiss prepared a point-by-point response to that memorandum or include it with the Locks Motion.  *See* Seeger Decl., Exhibit B.  As is relevant to the Locks Motion, the November Memo complained about:   (i) requests for affidavits (or other evidence) corroborating a player's claimed functional impairment, as to which Seeger Weiss explained in response that corroborating evidence is a basic feature of the Qualifying Diagnoses of dementia (or such a diagnosis in general); (ii) "strict" application of the BAP criteria and the AAP standard of review, as to which Seeger Weiss explained that it was pursuing any mistakes in application of the "generally consistent" standard through appeals and otherwise; (iii) the handing of the "incapacity of diagnosing physicians," as to which Seeger Weiss explained that it was working to ensure that accommodations were established and players were treated fairly; and (iv) the problem of co-morbidity in claims for Alzheimer's and Parkinson's disease (i.e., causation), as to which Seeger Weiss explained that it was addressing the issue through appeals and other means.[16]

As Seeger Weiss made clear in response to the November Memo and earlier in an in-person meeting with Locks, it was actively engaged in ensuring that the Settlement Agreement is implemented as intended.  Indeed, the many appeals that Seeger Weiss has supported on players' behalf and other submissions to the Special Masters concerning disputes about implementation of the Settlement ultimately culminated in the FAQs that were promulgated in February.  These FAQs address, among many other matters, the recurring complaints that Locks has about the "generally

---

[16]     Additionally, the November Memo evinced further stark ignorance of the actual terms of the Settlement Agreement.  For example, Locks complained that the NFL should have only 10 days to appeal a Notice of Monetary Award and argued that Monetary Awards should be paid pending appeal.  The Settlement Agreement allows the NFL 30 days to appeal and expressly states that payments of Monetary Awards can be made only at the conclusion of any appeals.  *See* Settlement Agreement §§ 9.3(a), 9.7.

consistent" standard (FAQ 95), AAP review (FAQ 119), corroborative evidence (FAQ 101), and the audit process (FAQ 222-226). Locks, like Seeger Weiss and all other counsel and Settlement Class Members, was provided ample opportunity to comment on these FAQs. *See* Brown Decl. ¶ 24. Similarly, the Special Masters recently provided rules governing, among other procedures, the audit and appeals process that provide the kind of transparency that will ensure that these processes are used properly for the ensuing decades. *See* Brown Decl. ¶ 21.

Finally, the issues raised by the Locks Motion are focused almost exclusively on the way that claims for pre-Effective Date Qualifying Diagnoses are being handled. Such claims can be submitted for the first two years of the Settlement, and will need to be filed on or before February 6, 2019. After that date, Retired NFL Football Players who believe that they are suffering from a Qualifying Diagnosis will need to go through either the BAP or see a Qualified MAF Physician to obtain the required diagnosis. Already, the number of claims for pre-Effective Date diagnoses are waning and diagnoses rendered through the BAP or by a Qualified MAF Physician are increasing. Orran Decl. ¶ 12. In the coming weeks, all of the pending pre-Effective Date claims will be reviewed on the merits, and the few that are still being filed will also be promptly reviewed under the procedures and FAQs that are already in place.

### B. The AAP Is Working

Locks has two basic issues with the AAP: its makeup and its performance. *See* Locks Motion ¶¶ 15-22, 52-59. Neither gripe has any merit.

First, Locks complains about the size and constituency of the AAP, *see* Locks Motion ¶¶ 52-59, but this is at odds with the Settlement Agreement and his own involvement in the process. The Settlement Agreement provided for an AAP consisting of five board-certified neurologists who are to be jointly recommended by Co-Lead Class Counsel and the NFL and to be compensated

a "reasonable rate" for their time.  *See* Settlement Agreement § 9.8(a).  In marshaling candidates for consideration for the AAP and the AAPC slots, Seeger Weiss reached out on several occasions to Class Counsel, including Locks.  *See* Seeger Decl. ¶ 21.  Similarly, as the NFL proposed candidates for the AAP and the AAPC, Seeger Weiss sought the input of Class Counsel, including Locks.  *See id.*  Ultimately, each side in the process worked through the qualifications and backgrounds of over 40 possible candidates, reduced that to a smaller pool whom the parties interviewed, and then reached a final slate of candidates that were presented to the Court for appointment along with a common "reasonable rate" that was based on the compensation each of the candidates reported they would typically accept for such an engagement.  *See id.*  The qualifications of these candidates speak for themselves and include two who were originally proposed by Locks.  *See id.*  His complaints at this late date about the composition of the AAP and AAPC or their members' compensation are not only untimely, but also peculiar given the appointment of two of the candidates whom he recommended in the first place.  *See id.*

When the volume of claims, like registrations, exceeded projections, and one member of the AAP was not able to dedicate sufficient time to his responsibilities, the decision was made to remove one member of the AAP and add two new members.  *See id.* 22.  The same process as in the initial selection of members was followed.  Co-Lead Class Counsel identified candidates, including those proposed by Locks and other Class Counsel.  *See id.*  The Parties then engaged in a review of the candidates and ultimately reached an agreement on two candidates, who were submitted to the Court for consideration.  *See id.;* Brown Decl. ¶¶ 15-16.

The Locks Motion completely neglects this second effort by Co-Lead Class Counsel to not only ensure a fully productive AAP, but to augment the AAP's ranks in order to increase its capacity.  Locks also neglects its own role in the process, except to complain that three of its other

candidates did not end up on the AAP.  One of those candidates, though, made clear in conversation with the parties that he was not really looking for new engagements but would possibly consider the opportunity, but for a rate far in excess of the "reasonable rate" ultimately approved by the Court (and accepted by every other candidate).  *See* Seeger Decl. ¶ 23.  The second candidate was originally suggested by the NFL.  *See id.*  The third candidate was not viable because he was plainly conflicted, listing a multi-year "Consultantship" with Locks from 2015-17.  *See id.*  Finally, Locks' suggestion that candidacies were jeopardized if a neurologist had treated a player is simply false.  One of the current members had treated and diagnosed a player who is a Settlement Class Member.  There can be no dispute that all of the candidates approved by the Court are qualified to serve on the AAP or AAPC.  *See id.*

The AAP has not failed.  Since they were appointed on March 5, 2018 (ECF No. 9753), the new members of the AAP were quickly brought up to speed on their duties, and they have already enabled that body to increase the number of claims that it is reviewing on a weekly basis. *See id.*  24.

Second, there is no doubt, as Locks offers, that Section 6.4(b) of the Settlement establishes a standard of review by the AAP and for pre-Effective Date claims that the diagnoses be "based on principles" that are "generally consistent" with the BAP criteria.  Locks Motion ¶¶15-17.  The "generally consistent" standard has been the subject of dispute between the Settling Parties, has been the subject of appeals of Notices of Monetary Awards and Denials of Monetary Awards, and has been addressed in what Seeger Weiss sees as a favorable February FAQ.  *See* FAQ 95.  Locks seeks to take the NFL's disagreement with Locks' understanding of the "generally consistent" standard as proof that the Settlement, like the AAP, is not working.  Through the process of

argument, appeals, and presentations to the Special Masters, guidance on the standard has been developed.

### C.    "The Latest Skirmish" – Locks' Flawed Example of a Failed Settlement Received a Notice of Monetary Award

Locks offers the case of Mr. Radloff to show that the claims process is not working.  Locks Motion ¶¶ 28-32.  To the contrary, Mr. Radloff's situation demonstrates that it is.  Mr. Radloff's claim was approved and he received a Notice of Monetary Award.  *See* Seeger Decl. ¶ 26.  The Anapol Weiss firm filed a Motion for a Hearing to Seek Court Intervention of the Processing of Certain Claims the day prior to the Locks Motion, based solely on the pending claim of Mr. Radloff. [17] ECF No. 9784.  Anapol Weiss complained about the time that Mr. Radloff has been waiting for his claim to be determined, but neglected to offer that Mr. Radloff's claim involved an "Unavailable Physician" (discussed above), which required special accommodation (or the prospect of possible denial).  *See id.*  Once accommodation of the claim was reached through the efforts of Co-Lead Class Counsel, the claim was presented to the AAP for review and, on the Saturday before the Anapol Motion was filed, was approved by the AAP.  *See id.*  When the Notice of Monetary Award was sent to Mr. Radloff, Anapol immediately had to dismiss its motion as moot.  ECF No. 9788.

There is no doubt that some claims will raise more issues than others, leading to longer processing times or even outcomes that will be the subject of an appeal (either by a player or the NFL). [18]  Any denial can be seen as an injustice, just like any appeal of an award can be

---

[17]    It is evident that the Anapol Motion was filed in coordination with the Locks Motion.  Not only does the timing of the two motions suggest coordination – the Anapol Motion on March 19th and the Locks Motion on March 20th – but the Locks Motion discusses the fact that Mr. Radloff received a Notice of Monetary Award even though the Anapol Motion had not yet been withdrawn.

[18]    The Anapol Motion and the Locks Motion were both joined in by Mitnick.  ECF Nos. 9785, 9834.  In both Joinders, Mitnick offers up anecdotes concerning two of his clients to show that

characterized as an effort by the NFL to undo what is right.  There is no disputing the fact that the

NFL has often been difficult to deal with in the Settlement implementation, and the advocacy of

Co-Lead Class Counsel has been necessary to ensure that the Settlement is and remains fair to the

Settlement Class Members.  But hyperbole is not truth.  The Settlement is paying hundreds of

millions of dollars to the Settlement Class Members.  With the increase in tools provided by the

FAQs promulgated in February, Co-Lead Class Counsel is ensuring that the claims process, like

the audit process, works as it should.  No doubt, there may be delays in processing some claims,

but as the Court made clear in disposing of the X1Law Motion, the claims process needs to play

out and a full and proper administrative record created.  Attempting "to circumvent those processes

by directly petitioning the Court is improper." (ECF No. 8882).

     **D.**       **The Audit Process Is Working**

     Locks focuses on one isolated example to argue that the audit process is not working.

Locks Motion ¶¶ 23-27.  Like the example of Mr. Radloff (first raised in the Anapol Motion), the

---

there is a problem with delay. In Mitnick's case, the delay was largely his own creation.  For the
first player that he discussed, in May 2017, Mr. Mitnick had submitted the Claim Package with a
Diagnosing Physician Certification by someone who was not qualified.  Only three months later,
in August 2017, this claim was denied in due course as a result of Mr. Mitnick's error.  When he
resubmitted his client's claim with a new Claim Package in March 2018, with a Diagnosing
Physician Certification signed by a different medical provider, it was subject to immediate audit
as part of the fraud prevention provisions of the Settlement Agreement.  *See* Settlement Agreement
§ 10.3(d)(i)  Notably, although the initial claim was processed in three months, Mr. Mitnick took
*seven months* to file the new claim for his client.  *See* Seeger Decl. ¶ 28.

     The story concerning the claim of the second player that Mitnick discusses is equally a
story about his own delay.  Mitnick originally submitted a deficient Claim Package in May 2017.
Mr. Mitnick quickly received a notice requesting additional records.  Over the next several months,
Mr. Mitnick slowly provided the additional documentation that was requested, culminating in
December 2017 when Mr. Mitnick submitted an updated Diagnosing Physician Certification,
which contained a different diagnosis date than the original Diagnosing Physician Certification.
Only 5 days later, after he finally cured all the deficiencies in his client's claim and provided a
correct Diagnosing Physician Certification, the Claims Administrator approved the claim and
issued a Notice of Monetary Award Determination.  *See id.* ¶ 29.

example that Locks uses is also not a Locks client,[19] and like the Anapol Weiss example, the earlier admonition of the Court when it disposed of the X1Law motion should have been heeded. At any rate, on March 23, 2018, shortly after Locks filed the instant motion, the audit that Locks describes was closed in due course. *See* Seeger Decl. ¶ 27. There was no "gutting [of] the approved diagnosis and claim." Locks Motion ¶ 26. Rather, on April 4, 2018, a substantial payment was made to the Settlement Class Member. *See* Seeger Decl. ¶ 27.

From the start of the audit process, over 100 claims have already been released to proceed to processing on the merits. *See* Brown Decl,, ¶ 41(a). Others are moving through the audit process and may also be released or eventually referred to the Special Masters for consideration. *See id.* ¶ 41(b). Any claims program, particularly one as expansive as this, will require audit procedures.[20] Given questions about the integrity of many of the claims that were submitted in the first year of the program, the audit process is playing an important role in separating claims for more rapid review from those claims that require further investigation.

Seeger Weiss is aware of the potential that any audit process has for abuse – and is vigilantly monitoring each audit as it readies for the next stage of the audit process. Indeed, Seeger Weiss' role in overseeing the audit process is expressly set forth in the Rules Governing Audits that the Special Masters promulgated in February. Co-Lead Class Counsel has the opportunity to

---

[19]     Inasmuch as Locks cannot even find actual examples from his own roster of "approximately 1,100 registered players" and has to rely on inapt examples offered by other firms' clients (whose identifying information Locks has failed to fully redact on multiple occasions), it is difficult to accept Locks' sweeping contention that the Settlement is "in danger of failing in its execution."

[20]     The Claims Administrator describes the Audit process at length in the Response by the Claims Administrator to Motion to Prohibit Ex Parte Interviews with Treating Physicians (Document No. 9815) and Partial Joinder (Document No. 9843) to the Motion Brought by the Locks Law Firm, Filed by Neurocognitive Football Lawyers, LLC (ECF No. 9870).

review and weigh in on any audit report before referral to the Special Master, has the opportunity to submit statements after referral to the Special Master and, in the instances where the Special Master accepts the referral and proceeds to a hearing, the opportunity to submit papers in the course of the proceedings. Co-Lead Class Counsel will continue to ensure that the audit process serves its limited purpose of identifying claims based on misrepresentations, not as a alternative avenue of appeal for the NFL.

### E. Claims Where the Diagnosing "Physician Is Unavailable" to Sign a DPC

The Settlement Agreement, which Locks signed, generally requires the submission of a Diagnosing Physician Certification with the Claims Package. There are some exceptions to that general rule, one of which has caused complications for some of Locks' clients' and other Class Members. As a general principle, the diagnosing physician must sign the Diagnosing Physician Certification. This general principle is subject to a list of enumerated exceptions in Section 8.2(a) of the Settlement Agreement, including the one that has been the focus of another of Locks' recurring complaints. Section 8.2(a)(iii) provides that a Claim Package does not need a Diagnosing Physician Certification from diagnosing physician when that physician is dead, incompetent, or incapacitated:

> In cases where a Retired NFL Football Player has received a Qualifying Diagnosis and the diagnosing physician who provided the Qualifying Diagnosis, as set forth in Exhibit 1, has died or has been deemed by a court of competent jurisdiction legally incapacitated or incompetent prior to the Effective Date, or otherwise prior to completing a Diagnosing Physician Certification, the Retired NFL Football Player (or his Representative Claimant, if applicable) may obtain a Diagnosing Physician Certification from a separate qualified physician for the Qualifying Diagnosis as specified in Exhibit 1 based on an independent examination by the qualified physician and a review of the Retired NFL Football Player's medical records that formed the basis of the Qualifying Diagnosis by the deceased or legally incapacitated or incompetent physician.

As it made clear to Locks in response to the November Memo, Seeger Weiss does not agree with the NFL's position, but has worked tirelessly to ensure that "unavailable physicians" in other circumstances are not grounds for denial of meritorious claims.[21]  In another quixotic effort to champion nonexistent settlement terms, Locks argues that an "obvious indicia of reliability" standard is supposed to guide the process for such claims.  Locks Motion ¶ 40.  The simple answer to that contention is that there is no such standard.

### F.    There Have Been No "Surprise Amendments"

Locks argues that he needs to be in charge because of "surprise amendments" to the Settlement that have been made during implementation.  Locks Motion ¶¶ 43-51.  That is not true, the process is transparent.   *See* Brown Decl. ¶¶ 24-25.  The first supposed "amendment" is the "strict application" of the BAP.  This has been discussed at length above and was briefed in response to the X1Law Motion.  There is no "strict requirement" and if Locks does not believe the information requested after preliminary review of a claims package is needed, he can hit the "Send to AAP" button to expedite review on the merits.

Relatedly, Locks complains about notices of preliminary review in dementia claims, requesting sworn statements to corroborate a player's functional impairment.  Locks Motion ¶¶ 14(f), 43-44.  As discussed above, any corroborative evidence will suffice so long as it provided a basis for the physician's diagnosis, including pre-diagnosis matters stated in a verification.  Although a post-date verification might raise some discussion with the Claims Administrator, there

---

[21]     Locks also raises the issue of physicians under the NFL's 88 Plan (a neurocognitive benefit plan for players) not being permitted to sign Diagnosing Physician Certifications.  *See* Locks Motion ¶ 41.  That, too, is unavailing.  Although these physicians have been directed for legal reasons by the Plan Trustee not to sign Diagnosing Physician Certifications, Seeger Weiss negotiated an accommodation for this as well, which is now reflected in FAQs 93 and 111.

is no mandatory requirement that a verification supporting facts on which a diagnosis is based be dated prior to the date of diagnosis.

## VI.     LOCKS' ALLIES DO NOT ADVANCE HIS CAUSE

A handful of firms joined in the Locks Motion – which is far from impressive given that the Settlement involves over 413 law firms and 11,007 unrepresented Settlement Class Members,[22] and two of those firms have already withdrawn their Joinder.  *See* Seeger Decl. ¶ 35.  An examination of those remaining firms quickly shows three things:   (i) the Settlement *is* working; (ii) they provide no genuine support for Locks; and (iii) if anything, the Joinder of certain firms should give the Court pause.

*First*, the Settlement is working.  Among the firms filing Joinders, there are 172 claims involving their clients that have been approved, representing nearly $173 million in Monetary Awards noticed.  Indeed Kreindler has already had 6 of its 9 claims approved, Casey Gerry has had its one claim approved, and Mitnick has had 8 of his 13 claims approved.  Complaints from various law firms that the Settlement is becoming filled with onerous burdens or, as Locks put it a "labyrinth" (Locks Motion ¶ 13) needs to be considered in light of the fact that 81 unrepresented Settlement Class Members have already received awards.  *See* Seeger Decl. ¶ 36.

*Second*, the Joinders lend no genuine support to the Locks Motion.  There can be little doubt that many of the Joinders were orchestrated.  Three of them are identical, strongly suggesting that a template was employed.  *See* ECF Nos. 9813 (Pope McGlamry Joinder), 9821 (McCorvey Joinder), 9830 (Casey Gerry Joinder).  Another 9 say little more than "me too" and offer no details to support either their interest in joining the Locks Motion or the merits of the Locks Motion,

---

[22]     To date, 122 firms have filed claims for their clients and 677 unrepresented Settlement Class Members have submitted claims.  *See id.*

including Anapol, Franco, Goldberg (with Girardi Keese and Russomano & Borrello), Hakimi, Neurocognitive Football Lawyers, Podhurst, Provost, Smith & Stallworth, and Wyatt.  Indeed, some of these firms do not even have clients of their own or have no claims pending, so their support for the Locks Motion is rather meaningless.  These include Casey Gerry, whose only claim to date has been paid; Franco, which has filed no claims; Hagen, which has not registered for any players; McCorvey, which has filed no claims; and Russomanno (which is listed in the Goldberg Persky Joinder).  *See* Seeger Decl. ¶ 37.  Others make clear that they do not even support Locks' nomination of himself as Administrative Class Counsel, either remaining silent on that matter or proposing the creation of a committee in his stead.[23]  *See* Joinders of Anapol, Hagen, Hausfeld, Kreindler, Podhurst, and Zimmerman.

    *Third*, the involvement of some of the firms that filed Joinders should give the Court pause.[24]  As with Locks' clients, Seeger Weiss and the Claims Administrator receive regular

---

[23]    This is exactly what Seeger Weiss endeavored to do with the regular calls and communications with Locks and the other Class Counsel – establish an informal committee.  As appealing as the notion of a committee is, its utility is limited.  It is good for the development of ideas, the gathering of information, and the identification of problems, but only so long as the members of the committee are truly committed to the common good.  Besides, each side of the Settlement (the administrators, the NFL, and the Settlement Class) have their lead liaison.  The proposal for a liaison committee to work on the implementation of the Settlement is ill-considered and would lead to inefficiency and delay.

[24]    A special case among the Joinder firms is Lubel, who has his particular agenda.  He attacked the Settlement both before and after final approval.  As counsel for the Alexander Objectors, he filed objections to the Settlement and was one of the few who took his objections to the Third Circuit.  *See* ECF Nos. 6237, 6552.  Once the Settlement went into effect, he shifted to attacking Co-Lead Class Counsel, filing objections to the fee petition (arguing inane evidentiary points) (ECF No.  7355), an unsuccessful motion to take discovery of Co-Lead Class Counsel (ECF No. 7606), an unauthorized sur-reply brief in opposition to the fee petition, (ECF No. 7533), a meritless and similarly unauthorized supplement to his objections to the Fee Petition (ECF No. 8395), and a motion to compel compliance with CMO No. 5 (which the Court denied) (ECF Nos. 8396, 8449, 9510).  The Locks Motion simply afforded Lubel another opportunity to emerge and mount more attacks on Co-Lead Class Counsel and reiterate his longstanding contention that the Settlement's promised benefits are illusory.

communications from some of these firms' clients with questions and related complaints that their own lawyers are not returning their calls. [25]  These include most notably Goldberg Persky, Kreindler, Mitnick, Pope McGlamry, and Provost.  *See* Seeger Decl. ¶ 38.  Moreover, based on Seeger Weiss' investigation to date, Locks and many of the Joinder firms have signed-off on 138 funding assignments of the claims of 99 of their clients representing advances of over $5,600,000.[26]  *See id.* ¶ 39.  Yet others are dragging out the claims process for their own clients by not responding to requests from the Claims Administrator for months at a time, resulting in above average response times (even greater than those of unrepresented Settlement Class Members). These include Zimmerman, Girardi, Kreindler, and Wyatt.  *See id.* ¶ 40.

More disturbingly, a few of the firms have either clients' claims under formal audit, or they themselves are under formal audit.  *See id.* ¶ 41.  Perhaps those firms hope that a changing of the guard as to oversight of the claims process will bring them less unwelcome scrutiny.  Because of the sensitivity of these ongoing investigations, the details of these audit investigations will not be

---

[25]     Others appear to be ignorant of basic aspects of the Settlement program.  For instance, the Berkowitz Joinder clumsily refers to a "Claims Commission" that is reviewing claims.  *See* ECF No. 9855, at 4.  There is a Claims Administrator, but no "Claims Commission."

[26]     Two firms that have joined in the Locks Motion went over and above the simple act of signing assignments on behalf of their clients.  Mitnick actually solicited for Thrivest, one of the most notorious funders known to Co-Lead Class Counsel in the Settlement.  *See* Seeger Decl., Exhibit E.  The other, Hakimi (f/k/a Top NFL Lawyers) was also initially engaged in a side business of seeking investors to fund lending arrangements with players with promised returns of nearly 80%.  *See* Seeger Decl., Exhibit F.

provided here, but will be shared *in camera* if the Court requests.[27]  In all, there are over 356 claims

in audit for Locks and the firms who have filed Joinders.[28]  *See id*.

Finally, one of the Joinders, Zimmerman's, raised two concerns in sufficient detail that

have not yet been addressed.  However, Zimmerman, like Locks, does not appreciate how the

Settlement is now working, in large measure because of Seeger Weiss' efforts, or simply does not

understand the Settlement.

In its Joinder, Zimmerman raises a concern with the requirement that the diagnosing

physician needs to actually see the player in the course of rendering a diagnosis.  Co-Lead Class

Counsel, though, spoke with attorneys at Zimmerman in September 2017 about this very issue.

*See id*. ¶ 42.  Although there were treating physicians for many of Zimmerman's clients,

Zimmerman decided to hire a neurologist to review each of the players' medical records and

complete a Diagnosing Physician Certification.  No other firm undertook this practice.  As Co-

Lead Class Counsel explained to the Zimmerman firm last September, this Settlement program is

not one where medical records are simply submitted for review by the AAP or the Claims

Administrator along with a Claim Form.  *See id*.  Rather, there needs to be a diagnosing physician

---

[27]     The circumstances surrounding the so-called Neurocognitive Football Lawyers are discussed at some length in the Response by the Claims Administrator to its Joinder and Motion to Prohibit Ex Parte Interviews, filed on April 9, 2018 (ECF No. 9870).  Neurocognitive Football Lawyers is a consortium of four law firms that were not involved in any of the lawsuits against the NFL before the Settlement.  *Id*. at 3.  They have submitted 143 claims, all based on alleged dementia or Alzheimer's disease.  *Id*. at 5.  Of these, 131 claims are in one or more audits based on the use of questionable examination techniques that yielded diagnoses for virtually every examined player.  *Id*. at 22-30.

[28]     These include the firms that submitted claims supported by a neuropsychologist, Dr. Serena Hoover, who has been banned from the Settlement Program for her conduct in evaluating players. Many of these firms have only a handful of claims in audit, but others, such as Hakimi (f/k/a Top NFL Lawyers), Smith & Stallworth and Neurocognitive Lawyers account for 258 of these claims in audit.  *See* Seeger Decl. ¶ 41.  Of course, some firms with claims pending have no claims in audit, including Girardi, Kreindler, and Provost.  *See id*.

– either a pre-Effective Date physician who might have been a treating physician, or a Qualified MAF Physician or a BAP Provider after the Effective Date.  The diagnosing physician is to examine the player, perhaps administering neuropsychological assessments.  Indeed, the fact that the Settlement requires that a diagnosis be made while a player is living emphasizes this point.  As Co-Lead Class Counsel explained, the treating physicians for Zimmerman's players should simply provide the Diagnosing Physician Certification.  *See* FAQ 88.

Zimmerman also raises concerns with the BAP.[29]  It asserts an alleged failing of the BAP by pointing to the number of players who are eligible for the BAP (over 12,000) and comparing that to the number of appointments that have been scheduled.  As the BAP Administrator makes clear, however, only a fraction of the 12,000 eligible players have yet endeavored to schedule their BAP appointments to date -- only 3,944 have.  *See* Garretson Decl., ¶ 15.  Indeed, many of these players are under the age of 43 and will not need to have their BAP examinations completed until the BAP program begins to wind down in 2027.  Currently, 92.5% of the players who have contacted the BAP Administrator have had one or more appointments offered to them or scheduled.  *See id.*

With respect to the scheduling of the examinations themselves, Seeger Weiss acknowledges that there are, and will always be, instances where the program does not work perfectly.  A BAP Provider may fail to properly notify a player about a cancellation, a player may fail to properly confirm an appointment, or a BAP Provider may be slow to finalize a report.  The BAP Administrator, however, is actively engaged in ensuring that each aspect of the BAP Program

---

[29]      Podhurst refers to this portion of the Zimmerman Joinder in its own Joinder.  ECF No. 9831, at 3.  Locks raises an additional concern (with no supporting detail) that few players are receiving diagnoses and that BAP Providers are leaving the BAP Program.  *See* Locks Motion ¶ 14(l).  The BAP program has already provided 51 diagnoses and there is no exodus of BAP Providers.  *See* Garreston Decl., ¶ 25.

is working as it should, and intervenes to address problems with BAP Providers as they arise.  *See Id.* ¶¶ 5, 6, 12, 13, 18, 20, 22-24.

Similarly, the timing between contact from a player and the scheduled appointment is, on average, 36 days.  *See id.*, ¶ 15. There are some regions where scheduling is currently on a slower schedule.  The BAP Administrator, however, is engaged in identifying and contracting with BAP Providers in those regions and anticipates that appointments can be accelerated when additional Providers are available.  *See id.*, ¶ 19.  Finally, the BAP Administrator has worked to ensure that BAP Providers finalize full and accurate reports of the evaluations to ensure that diagnoses can be paid without problem.  *See id.*, ¶¶ 20-23.

## VII.   CONCLUSION

In short, the Locks Motion and the various Joinders in support thereof make no persuasive case for appointing an "Administrative Class Counsel" more than fifteen months into the Settlement's implementation.  Contrary to the rhetoric and bombast presented, the facts speak for themselves.  The Settlement is working and the existing oversight structure is fully capable of addressing any problems or glitches.  For all of the foregoing reasons, the Court should deny the Locks Motion.

Dated: April 13, 2018                                         Respectfully submitted,

                                                            */s/ Christopher A. Seeger*
                                                            Christopher A. Seeger
                                                            SEEGER WEISS LLP
                                                            55 Challenger Road, 6th Fl
                                                            Ridgefield Park, New Jersey 07660
                                                            Phone: (212) 584-0700
                                                            Fax: (212) 584-0799

                                                            *Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I, Christopher A. Seeger, hereby certify that a true and correct copy of the foregoing response was served electronically via the Court's electronic filing system on the date below upon all counsel of record in this matter.


Dated: April 13, 2018                                    Respectfully submitted,

                                                        */s/ Christopher A. Seeger*
                                                        Christopher A. Seeger
                                                        SEEGER WEISS LLP
                                                        55 Challenger Road, 6th Fl
                                                        Ridgefield Park, New Jersey 07660
                                                        Phone: (212) 584-0700
                                                        Fax: (212) 584-0799

                                                        *Co-Lead Class Counsel*