UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323<br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>　　　　　Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF OPPOSITION OF CO-LEAD CLASS COUNSEL TO MOTION OF THE LOCKS FIRM FOR <u>APPOINTMENT OF ADMINISTRATIVE CLASS COUNSEL</u>**

　　　　CHRISTOPHER A. SEEGER declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information and belief, the following:

　　　　1.　　I am a founding member of Seeger Weiss LLP ("Seeger Weiss") and was appointed by the Court on April 25, 2012, to serve as Plaintiffs' Co-Lead Counsel, and as a member of the Plaintiffs' Executive Committee ("PEC") (ECF No. 64). I was the principal negotiator and architect of the Class Action Settlement dated June 25, 2014, between the Plaintiff Class and the Defendants National Football League and NFL Properties LLC (ECF No. 6073-2), which was

1

preliminarily approved on July 7, 2014 (ECF No. 6084, ¶ 3(b)), amended as of February 13, 2015 (ECF No. 6481-1), and finally approved on April 22, 2015 (ECF No. 6510) ("Settlement" or "Settlement Agreement"). Upon these approvals of the Settlement, I was first appointed to serve and then confirmed in my role as Co-Lead Class Counsel.

2. I have previously detailed my work as Co-Lead Counsel Counsel, as well as the work of my firm, in securing the Settlement, and the work performed in the first nine months of the Settlement's implementation in my Declaration in Support of Co-Lead Class Counsel's Petition for an Award of Attorneys' Fees, Reimbursement of Costs and Expenses, Adoption of a Set-Aside of Five Percent of Each Monetary Award and Derivative Claimant Award, and Case Contribution Awards for Class Representatives (ECF No. 7151-2); my Supplemental Declaration in further support of the Fee Petition (ECF No. 7464-1); my Declaration in Support of Proposed Allocation of Common Benefit Attorneys' Fees, Payment of Common Benefit Expenses, and Payment of Case Contribution Awards to Class Representatives (ECF No. 8447); and my Omnibus Reply Declaration in support of the Allocation Recommendation (ECF No. 8934). Those facts need not be repeated here, and familiarity with them is assumed for purposes of this Declaration.

3. Based on my extensive work in securing and effectuating the Settlement, I have personal knowledge and full familiarity with the matters set forth herein. I submit this Declaration in opposition to the Motion of the Locks Firm for Appointment of Administrative Class Counsel (ECF No. 9786) ("Locks Motion").

**Ramp-Up of Implementation and Status of Monetary Awards for the First Year**

4. On April 9, 2018, Seeger Weiss as Co-Lead Class Counsel hosted the 88th regular weekly implementation conference call with the Claims Administrator (BrownGreer PLC), the Baseline Assessment Program ("BAP") and Lien Resolution Administrator (Garretson Resolution

Group), and counsel for the NFL. These calls are the central platform for coordinating implementation of the Settlement and were accompanied by other *ad hoc* calls and communications focused on particular tasks or problems. Each aspect of the Settlement required, among other things, the development of the basic documents that were to be used to register and submit a claim; the establishment of national networks of physicians and medical providers that would serve as Qualified Monetary Award Fund ("MAF") Physicians and BAP Providers; and the institution of policies that would regulate the operations of the Claims, BAP, and Lien Resolution Administrators.

5. Even before the first of regular weekly calls, Co-Lead Class Counsel was engaged with the Administrators and NFL to begin addressing the innumerable details that this Settlement entails. As will be discussed in more detail below, Seeger Weiss used the many tools available under the Settlement Agreement, including the appeals process and petitions to the Special Masters to shape a program that is delivering the promised benefits to the Settlement Class Members.

6. As of April 9, 2018, 377 Notices of Monetary Awards have been sent to Settlement Class Members, reflecting $411,237,005 in awards, and this number is increasing on a daily basis. At the close of the first year of the MAF, the Notices of Monetary Awards are already exceeding the projections for claims in the first year, and claims from the first year are still being approved.

7. The Qualifying Diagnoses for Alzheimer's and dementia (Level 1.5 and Level 2 Neurocognitive Impairment) have been a prime focus for complaints. These too, however, are being awarded. Over 192 Notices of Monetary Awards for these Qualifying Diagnoses of Alzheimer's and dementia have been issued, representing a value of over $202 million. Indeed, now that the many claims requiring further investigation by the Claims Administrator have been

identified and distinguished from the others, there has been a marked increase in the approval of these claims since February.

8.  Locks contends that the Settlement has not even reached first-year projections, but does so by myopically focusing only on the checks that have been sent out rather than the larger number of claims that have been submitted during the first year, including those that are continuing to be approved and which will be paid in the coming months.  While there are many claims that have been submitted in the first year that have not yet been reviewed on the merits, given the Notices of Monetary Awards that have already been issued, it is clear that the Settlement is on track to deliver in excess of the projections for the first five years.  The data are available on the Settlement Website (www.NFLConcussionSettlement.com) and, as of April 9, 2018, reflected that the Settlement has already exceeded the projected numbers of ALS claims (28 awards with only 17 projected), Parkinson's claims (61 awards with 14 projected), and Death with CTE claims (61 awards with 51 projected).  There have also been 115 Alzheimer's claims, 43 Level 2 claims, and 71 Level 1.5 claims approved.  With over 881 claims for Alzheimer's and/or dementia from the first year of the MAF still pending decision, it is evident that these projections, too, will be exceeded.

9.  Importantly, since the Locks Motion was filed, 53 new Notices of Monetary Award have been sent to Settlement Class Members, representing over $63 million in awards, and 45 more payments have been made, totaling over $34 million.

10.  These successes are largely due to the ongoing efforts of Seeger Weiss.  The work of Seeger Weiss since Final Approval through September 2017 has been discussed at length in the aforementioned Declarations that were submitted in the course of briefing the Common Benefit Fee Petition and proposed allocations.

**Seeger Weiss' Leadership and Accomplishments in Implementation**

11. For the purposes of the present motion, several of the more recent accomplishments by Seeger Weiss require particular attention and address many of the ill-considered claims made by Locks and some of the firms joining in the motion about the failure of the Settlement Program under Seeger Weiss' leadership. Seeger Weiss has successfully driven the Settlement in the interest of the Settlement Class.

12. As an unprecedented undertaking in terms of measuring neurocognitive impairment for thousands of Class Members, the Settlement presented challenges in initial implementation and the commencement of benefits required substantial undertakings. This can easily be illustrated by the need to establish and train two national networks of physicians and a Monetary Award program that will be in operation for 65 years. Importantly, the awards are sizeable, ranging up to $5 million. Given the Settlement program's uncapped structure, to secure the integrity of the Settlement, Seeger Weiss further needed to appropriately balance and address the potential for unfounded claims while protecting the rights and claims of otherwise worthy Settlement Class Members. As the implementation continued under the leadership of Seeger Weiss, the Settlement has come to deliver the negotiated benefits to the Settlement Class. Among the points on which Seeger Weiss provided leadership are the following.

13. **The Earlier Date for a Qualifying Diagnosis.** The question of determining the date of a Qualifying Diagnosis had been an issue from the beginning of the claims process. The issue is significant because once a player reaches the age of 45, his monetary award decreases every year. A difference of even one year can translate into a substantial difference in the amount of a Monetary Award. The NFL's position was, and still is, that the earliest the date of diagnosis can be is the date that the diagnosing physician first personally examined the player. It was my

position, however – as reflected in briefing for the Special Masters on the issue – that diagnosing physicians, based on their personal examination of the player, as well as a review of that player's existing medical records, may properly determine that the player suffered from a Qualifying Diagnosis on a date earlier than the initial personal examination by the diagnosing physician, and that diagnosing physicians should be able to use that earlier date if they think that it is appropriate. The Special Masters accepted my position in the FAQs that they promulgated in early February 2018. Specifically, FAQ 93 allows physicians to use their "sound clinical medical judgment" to determine that the player's diagnosed conditions "existed at a date earlier than the date of personal examination of the Player by the physician making the diagnosis and signing the DPC [Diagnosing Physician Certification ("DPC") (i.e., medical certification)] form."

14. **MAF Physicians' Ability to Rely on Historic Neuropsychological Records.** The Settling Parties had differing views as to whether Qualified MAF Physicians could rely on historic neuropsychological testing when making a dementia diagnoses (Level 1.5 and Level 2), or whether they were required to send the player for new neuropsychological testing. This testing included earlier neuropsychological testing for one of the NFL benefit plans, such as the 88 Plan. The NFL's position was that a Qualified MAF Physician could rely only on neuropsychological testing that was conducted at the direction of the Qualified MAF Physician. Seeger Weiss advocated, through submissions before the Special Masters, to recognize and respect the medical judgment of the Qualified MAF Physicians and enabling them to rely on historic neuropsychological testing if they found it to be reliable, particularly when the testing was part of one of the NFL benefits plans. The Special Masters accepted this position and FAQ 102 now gives the Claims Administrator the discretion "to decide whether to accept neuropsychological testing from other sources based on the unique facts and circumstances of a particular claim" so long as it is less than 12 months

old. Similarly, FAQs 93 and 111 permit the use of earlier neuropsychological testing under the 88 Plan or another NFL benefit plan.

15. **Ensuring Fairness and Efficiency While Seeking the Production of Raw Scores.** The NFL's position was that the raw scores from the player's neuropsychological testing must be provided in order for a claim to be complete. Failure to provide the raw scores would result in the claim being denied. Although Seeger Weiss recognized the potential relevance of raw scores in assessing a claim, Co-Lead Class Counsel further maintained that it would be unfair to penalize a player by denying his claim simply because his neuropsychologist is unable to provide raw scores or delaying the processing of his claim pending such production. The Special Masters agreed with this position and, in accordance with FAQ 105, raw scores are not required "unless the AAP doctor or the Claims Administrator determines they are necessary."

16. **Accommodating the "Unavailability" of Diagnosing Physician or Medical Records.** Under the Settlement Agreement, one of the few express exceptions to the requirement that the player submit a Diagnosing Physician Certification from the Diagnosing Physician is if the Diagnosing Physician died, or was declared incompetent or legally incapacitated before the Effective Date. Similarly, the only exception to the requirement that the player submit medical records reflecting the claimed diagnosis was if the records were destroyed by a *force majeure* type event. For every claim that fit easily into these exceptions, there were some where the diagnosing physician is still alive and competent but unavailable as a practical matter, or where medical records are no longer available due to a variety of reasons, including routine destruction of older records. These claims were vulnerable to denial under the terms of the Settlement Agreement. Seeger Weiss was initially able to secure the NFL's consent to look at such circumstances on a case-by-case basis rather than categorically rejecting claims affected by them, and Seeger Weiss

dedicated many hours to reviewing each Claim Package and negotiating with the NFL. The claims in which Seeger Weiss successfully negotiated an accommodation of a claim based on a living and competent yet unavailable physician or missing medical records included claims submitted by Locks, Anapol, Pope McGlamry, Goldberg Persky, and many unrepresented Settlement Class Members. In some of these claims, Seeger Weiss had disputes with the NFL that were irreconcilable – either because of the burden placed on the Settlement Class Member by the only accommodation that the NFL was willing to offer or because of the NFL's refusal to offer an accommodation. The Special Masters ultimately took up this issue and, in FAQ 115, gave the Claims Administrator the discretion to decide whether the Diagnosing Physician Certification and medical records requirements should be excused in particular cases.

17. **Providing for the Downgrading of Qualifying Diagnoses to Speed Awards.** Early on in the claims process Seeger Weiss realized that there would be situations in which a player's claim might be denied with respect to the asserted Qualifying Diagnosis, but that there would be sufficient evidence in the Claim Package to support a different Qualifying Diagnosis. For example, a player submits a claim for Level 2 Neurocognitive Impairment (moderate dementia) but the evidence supports only a Level 1.5 Neurocognitive Impairment (early dementia). Under the Settlement Agreement, that claim would be subject to denial and the player would need to file a *de novo* claim for a Monetary Award based on an asserted Level 1.5 Neurocognitive Impairment. Accordingly, in an effort to streamline the process and avoid needless appeals, Co-Lead Class Counsel proposed that the AAP should have the ability to approve a claim for a lesser Qualifying Diagnosis or for the asserted Qualifying Diagnosis but with a later diagnosis date. After much negotiation, the NFL agreed, in part, to "downgrading," but only in very limited circumstances.

As a result, Seeger Weiss raised the issue with the Special Masters, who agreed and, pursuant to FAQ 137, gave the AAP the discretion to "downgrade" claims without restriction.

18.     **The Definition of "Eligible Season" and the Full 53-Man Active List.**  At the heart of the Settlement's benefits is the "Eligible Season," which stands as a proxy for exposure to concussive and sub-concussive hits.  The number of Eligible Seasons is, thus, a key driver in the amount of a Monetary Award and drives a Retired NFL Football Player's eligibility for participation in the BAP.  A full Eligible Season is earned for each year that a Retired NFL Football Player was on the Active List for at least three games.  The NFL, however, took the rigid position that uninjured players who were listed as "inactive" on game day would earn nothing toward an Eligible Season, even though they were shoulder-to-shoulder in practice all week with all of the other Active List players.  As the Court is aware, Seeger Weiss advocated for parity in treatment of all Retired Players on the Active List up to game day.  After Seeger Weiss prevailed on behalf of the Settlement Class Members before the Special Master (ECF No. 9713), the NFL filed objections to the Special Master's Ruling in this Court (ECF No. 9754-1).  The Court overruled that objection, making the final and binding determination that the more reasonable (and expansive) definition of "Active List" should apply (ECF No. 9754).  This victory has already resulted in a substantial increase in one Monetary Award and has increased the number of players eligible for the BAP.

19.     In addition to these sorts of global undertakings for the Settlement Class Members, Seeger Weiss has an intimate and sophisticated a relationship with the workings of the Settlement program.  Seeger Weiss has individual clients, but, as Co-Lead Class Counsel is often the go-to source for unrepresented Settlement Class Members who need guidance.  Similarly, Co-Lead Class Counsel is tracking each Notice of Monetary Award and Notice of Denial of Monetary Award to

ensure their accuracy and to identify issues that may need to be addressed in the wider Settlement program. This process has, for example, led to the identification of missing Eligible Seasons or the use of the wrong age of a player in the calculation of Monetary Awards for certain claims, and corresponding increases in dollars received by Class Members. Finally, Seeger Weiss tracks each appeal that is taken by either Settlement Class Members or the NFL. This allows Seeger Weiss to identify issues that have wider ramifications in the Settlement and may need to be addressed by a Statement of Co-Lead Class Counsel in support of the Settlement Class Member. Also, Seeger Weiss works very closely with Settlement Class Members who are facing the appeals process to help them prepare the best submission that they can – either for their own appeal or to oppose an appeal by the NFL. Therefore, Locks' statement that Seeger Weiss lacks "day to day incentive to engage in aggressive advocacy on behalf of players" is baseless. Locks Motion ¶ 60(f).

**Locks Neglects to Mention His Role in Matters About Which He Complains**

20. These and many other accomplishments by Seeger Weiss were known to Locks and the other Class Counsel who joined in the Locks Motion. Yet no mention is made of these facts by Locks or the firms that filed Joinders. Seeger Weiss included Class Counsel (including Locks, Anapol and Podhurst) in the implementation process, including regular calls and in-person meetings for open discussions of on-going Settlement implementation issues as they arose. They were asked for input on the fundamental forms to be used in the claims process, in proposing candidates and in review of candidates' credentials for the BAP and MAF networks, as well as for the Appeals Advisory Panel ("AAP") and Appeals Advisory Panel Consultants ("AAPC"). Indeed, in the regular calls that Seeger Weiss began to host with the other Class Counsel, the above-mentioned issues, and the status, positions, and arguments being made in support of the players were all discussed up to less than two weeks before the Locks Motion was filed. Class Counsel,

including Locks reviewed and were able to provide edits to the opposition to the X1Law Motion. A true and correct copy of the email from the Locks Firm to Seeger Weiss reflecting this participation is attached hereto as Exhibit A.

21. In marshaling candidates for consideration for the AAP and the AAPC slots, Seeger Weiss reached out on several occasions to Class Counsel, including Locks. Similarly, as the NFL proposed candidates for the AAP and the AAPC, Seeger Weiss sought the input of Class Counsel, including Locks. Ultimately, each side in the process worked through the qualifications and backgrounds of over 40 possible candidates, reduced that to a smaller pool whom the parties interviewed, and then reached a final slate of candidates that were presented to the Court for appointment along with a common "reasonable rate" that was based on the compensation each of the candidates reported they would typically accept for such an engagement. The qualifications of these candidates speak for themselves and include two who were originally proposed by Locks. His complaints at this late date about the composition of the AAP and AAPC or their members' compensation are not only untimely, but also peculiar given the appointment of two of the candidates whom he recommended in the first place.

22. When the volume of claims, like registrations, exceeded projections, and one member of the AAP was not able to dedicate sufficient time to his responsibilities, the decision was made to remove one member of the AAP and add two new members. The same process used in the initial selection of members was followed. We identified candidates, including those proposed by Locks and other Class Counsel. The Parties then engaged in a review of the candidates and ultimately reached an agreement on two candidates, who were submitted to the Court for consideration.

23. The Locks Motion completely neglects this second effort by Seeger Weiss to not only ensure a fully productive AAP, but to augment the AAP's ranks in order to increase its capacity. Locks also neglects its own role in the process, except to complain that three of its other candidates did not end up on the AAP. One of those candidates, though, made clear in conversations with the parties that he was not really looking for new engagements but would possibly consider the opportunity, but for a rate far in excess of the "reasonable rate" ultimately approved by the Court (and accepted by every other candidate). The second candidate was originally suggested by the NFL. The third candidate was not viable because he was plainly conflicted, having been involved in a multi-year "Consultantship" with Locks from 2015-17. Finally, Locks' suggestion that candidacies were jeopardized if a neurologist had treated a player is simply false. One of the current members had treated and diagnosed a player who is a Settlement Class Member. There can be no dispute that all of the candidates approved by the Court are qualified to serve on the AAP or AAPC.

24. Contrary to Locks' assertion, the AAP has not failed. Since they were appointed on March 5, 2018 (ECF No. 9753), the new members of the AAP were quickly brought up to speed on their duties, and they have already enabled that body to increase the number of claims that it is reviewing on a weekly basis.

### The Examples Locks Raises Provide Not Support for the Locks Motion

25. Locks points to its November 6, 2017 memorandum to the Claims Administrator ("November Memo") to argue that its efforts leading up to the filing of the Locks Motion have been ignored. What Locks omits from his recitation to the Court, however, is that I swiftly prepared a reply to Locks, addressing each of the complaints raised. I attach a true and correct copy of my reply to the November Memo as Exhibit B. In addition, I had hosted an earlier meeting

12

in my offices in September 2017 with Locks and the other Class Counsel to discuss these and any other issues that they had. I and my firm always emphasized open communication with respect to the Settlement.

26. Locks offers the case of Mr. Radloff to show that the claims process is not working. To the contrary, Mr. Radloff's situation demonstrates that it is. Mr. Radloff's claim was approved and he received a Notice of Monetary Award. The Anapol Weiss firm filed a Motion for a Hearing to Seek Court Intervention of the Processing of Certain Claims the day prior to the Locks Motion, based solely on the pending claim of Mr. Radloff. ECF No. 9784. Anapol Weiss complained about the time that Mr. Radloff has been waiting for his claim to be determined, but neglected to offer that Mr. Radloff's claim involved an "Unavailable Physician" (discussed above), which required special accommodation (or the prospect of possible denial). Once accommodation of the claim was reached through the efforts of Co-Lead Class Counsel, the claim was presented to the AAP for review and, on the Saturday before the Anapol Motion was filed, was approved by the AAP. When the Notice of Monetary Award was sent to Mr. Radloff, Anapol immediately had to withdraw its motion as moot. ECF No. 9788.

27. Similarly, Locks focuses on one isolated example to argue that the audit process is not working. On March 23, 2018, shortly after Locks filed the instant motion, the audit that Locks describes was closed in due course and the Settlement Class Member was paid.

28. The Anapol Motion and the Locks Motion were both joined in by attorney Craig Mitnick. ECF Nos. 9785, 9834. In both Joinders, Mr. Mitnick offers up anecdotes concerning two of his clients to show that there is a problem with delay. In Mr. Mitnick's case, the delay was largely his own creation. For the first player that he discussed, in May 2017, Mr. Mitnick had submitted the Claim Package with a Diagnosing Physician Certification by someone who was not

13

qualified. Only three months later, in August 2017, this claim was denied in due course as a result of Mr. Mitnick's error. When he resubmitted his client's claim with a new Claim Package in March 2018, with a Diagnosing Physician Certification signed by a different medical provider, it was subject to immediate audit as part of the fraud prevention provisions of the Settlement Agreement. *See* Settlement Agreement § 10.3(d)(i)   Notably, although the initial claim was processed in three months, Mr. Mitnick took *seven months* to file the new claim for his client.

29. The story concerning the claim of the second player that Mr. Mitnick discusses is equally a story about his own delay. Mitnick originally submitted a deficient Claim Package in May 2017. Mr. Mitnick quickly received a notice requesting additional records. Over the next several months, Mr. Mitnick slowly provided the additional documentation that was requested, culminating in December 2017 when Mr. Mitnick submitted an updated Diagnosing Physician Certification, which contained a different diagnosis date than the original Diagnosing Physician Certification. Only 5 days later, after he finally cured all the deficiencies in his client's claim and provided a correct Diagnosing Physician Certification, the Claims Administrator approved the claim and issued a Notice of Monetary Award Determination.

### Locks Is Not Fit for the Proposed Role of "Administrative Class Counsel"

30. As the Court is aware, Seeger Weiss has led the investigation of funders who entered into prohibited assignments with Settlement Class Members. While our discovery to date has been limited, I have learned that Locks has acknowledged and signed off on at least 28 funding agreements that assigned all or part of 16 of its clients' claims. In all, these known assignments relate to over $1.5 million in advances to these players, which when the exorbitant interest rates are applied would have resulted in these Class Members owing funders double or more the amounts advanced. The interest rates presented in the assignment agreements are deceptive in that

they are monthly and not annual rates, with monthly compounding. Some of the underlying interest rates are as high as 2.75% compounded monthly. At first glance, this may seem like a low interest rate, but with monthly compounding the rate translates to an effective annual interest rate in excess of 38% for the first year, and grows exponentially in subsequent years. For example, if a Class Member received an advance of $100,000 in April 2016, at a 2.75% monthly compounded interest rate, now, two years later, he would owe the funder over $191,000 – almost double the amount advanced. Should the retired player not obtain a Qualifying Diagnosis and corresponding monetary award until April 2019, he would owe the funder over $265,000. There could very well be more such assignments under Locks' watch.

31. In its role as Co-Lead Class Counsel, Seeger Weiss, like the Claims Administrator, receives calls from Locks' clients on a regular basis (far more than other firms' clients), relating to concerns or complaints about Locks' representation, most typically that Locks is simply not returning their calls.

32. After the Settlement became effective, Locks quickly undermined confidence in the program by spreading inaccuracies about its implementation. As the Court is aware, a Settlement Class Member, Fred Willis, principal of HPN Neurologic, and a client of Locks, has been sending around misrepresentations about the Settlement ever since it became effective. *See*, *e.g.*, ECF Nos. 7151, 7842. Mr. Willis maintained a Settlement-related blog ("NFL Players Brains Matter") and sends regular blast emails to an expansive list of Settlement Class Members about the Settlement. Even before the BAP launched in June 2017, Mr. Willis sent out an alert that the BAP was being delayed. A true and correct copy of this email to one of the Settlement Class Members is attached hereto as Exhibit C. The alert was based on information received from "one of the top Lawfirms in the NFL Concussion Settlement."

33.     Seeger Weiss learned from an email from Mr. Willis that the misinformation that Mr. Willis spread, at least in this instance, came directly from Locks, whom Mr. Willis described in his email as "one of the top Law firms in the NFL Concussion Settlement."  A true and correct copy of Mr. Willis' email to my firm, including the embedded email that Willis received from Locks, is attached hereto as Exhibit D.

34.     This was not the first of Locks' misfeasance of this type in the litigation.  Early in the settlement negotiations, when he was on the settlement committee, Locks saw fit to reach out to the press and talk about the status of the litigation despite an agreement of confidentiality.  The Locks "leak" needlessly compromised and delayed negotiations while Co-Lead Class Counsel worked to restore Plaintiffs' credibility.

### Locks' Allies Do Not Advance His Cause

35.     A handful of firms have joined in the Locks Motion[1] – which is far from impressive given that the Settlement involves over 413 law firms and 11,007 unrepresented Settlement Class Members,[2] and two of those firms have already withdrawn their Joinder.  An examination of those remaining firms' submissions and data on their clients quickly shows three things:  (i) the Settlement *is* working; (ii) they provide no genuine support for Locks; and (iii) if anything, the Joinder of certain firms should give the Court pause.

36.     *First*, the Settlement is working.  Among the firms filing Joinders, there are 172 claims involving their clients that have been approved, representing nearly $173 million in Monetary Awards noticed.  Indeed, Kreindler has already had 6 of its 9 claims approved, Casey

---

[1]     Shorthand definitions of the various Joinders and their filers are set forth in the accompanying memorandum of law in opposition to the Locks Motion.

[2]     To date, 122 firms have filed claims for their clients and 677 unrepresented Settlement Class Members have submitted claims.

Gerry has had its one claim approved, and Mr. Mitnick has had 8 of his 13 claims approved. Complaints from various law firms that the Settlement is becoming filled with onerous burdens or, as Locks put it, a "labyrinth" is sheer hyperbole that can quickly be dispelled by the simple fact that 81 *unrepresented* Settlement Class Members have already received awards.

37. *Second*, the Joinders lend no genuine support to the Locks Motion. Some of these firms do not even have clients of their own or have no claims pending, so their support for the Locks Motion is rather meaningless. These include Casey Gerry, whose only claim to date has been paid; Franco, which has filed no claims; Hagen, which has not registered for any players, McCorvey, which has filed no claims; and Russomanno (which is only listed in the Goldberg Persky Joinder).

38. *Third*, the involvement of some of the firms that filed Joinders should give the Court pause. As with Locks' clients, Seeger Weiss *and* the Claims Administrator receive regular communications from some of these firms' clients with questions and related complaints that their own lawyers are not returning their calls. These include, most notably, Goldberg Persky, Kreindler, Mitnick, Pope McGlamry, and Provost.

39. Moreover, based on Seeger Weiss' investigation to date, Locks and many of the Joinder firms have signed off on 138 funding assignments of the claims of 99 of their clients, representing advances of over $5,600,000. Two firms that have joined in the Locks Motion went over and above the simple act of signing assignments on behalf of their clients. Mitnick actually solicited for Thrivest, one of the most notorious funders known to Co-Lead Class Counsel in the Settlement. A true and correct copy of an email solicitation from Mitnick to a Settlement Class Member is attached hereto as Exhibit E. The other, Hakimi (f/k/a Top NFL Lawyers) was also initially engaged in a side business of seeking investors to fund lending arrangements with players,

17

promising returns of nearly 80%. A true and correct copy of a related news article describing that side business is attached hereto as Exhibit F.

40. Yet others are dragging out the claims process for their own clients by not responding to requests from the Claims Administrator for months at a time, resulting in above average response times (even greater than those of unrepresented Settlement Class Members). These include Zimmerman, Girardi, Kreindler and Wyatt.

41. More disturbingly, a few of the firms have either clients' claims under formal audit, or they themselves are under formal audit. Because of the sensitivity of these ongoing investigations, I will not provide details of these audit investigations here, but stand ready to do so in camera if the Court desires that information. In all, there are over 356 claims in audit for Locks and the firms who have filed Joinders. These include the firms that submitted claims supported by a neuropsychologist, Dr. Serena Hoover, who has been banned from the Settlement Program for her conduct in evaluating players. Many of these firms have only a handful of claims in audit, but others, such as Hakimi (f/k/a Top NFL Lawyers), Smith & Stallworth, and Neurocognitive Lawyers account for a whopping 258 of these claims in audit. To be sure, some firms with claims pending have no claims in audit, including Girardi, Kreindler, and Provost.

42. Finally, with respect toZimmerman's concern with the requirement that the diagnosing physician needs to actually see the player in the course of rendering a diagnosis, I spoke with attorneys at Zimmerman in September 2017 about this very issue. Although there were treating physicians for many of Zimmerman's clients, Zimmerman decided to hire a neurologist to review each of the players' medical records and complete a Diagnosing Physician Certification. No other firm undertook this practice. As I explained to the Zimmerman firm last September, this

Settlement program is not one where medical records are simply submitted for review by the AAP or the Claims Administrator along with a Claim Form.

43. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April, 2018.

*/s/ Christopher A. Seeger*
_____
CHRISTOPHER A. SEEGER
Co-Lead Class Counsel