UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

9909

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | )<br>)<br>)<br>)<br>) |
| | ) |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| vs. | )<br>) |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

12-MDL-2323-AB

Philadelphia, PA
April 2, 2018
10:10 a.m.

FILED

APR 23 2018

KATE BARKMAN, Clerk
By _____ Dep. Clerk

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Kevin Turner, et al:

TERRIANNE BENEDETTO, ESQUIRE
SEEGER WEISS, LLP
1515 Market Street
Suite 1380
Philadelphia, PA  19102

CHRISTOPHER A. SEEGER, ESQUIRE
SEEGER WEISS, LLP
6th Floor
55 Challenger Road
Ridgefield, NJ 07660

Audio Operator:

JAMES F.G. SCHEIDT

```
Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026
                         Office:   (856) 435-7172
                         Fax:      (856) 435-7124
                         Email:    dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                    I N D E X

2    STATUS UPDATE

3    Mr. Seeger                                6

4

5    PRESENTATION ON CAMBRIDGE ENTITIES

6    Ms. Benedetto                             18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1          (The following was heard at 10:10 a.m.)

2          THE COURT:  There's  woman who's been calling into

3 my Chambers, Mr. Seeger, whose name is Gail Milon.  Do you

4 know anything about her?

5          MR. SEEGER:  Yes, Your Honor.  She is, I believe, an

6 employee of Cambridge Capital.  She's not an attorney.  And

7 she wanted to listen in on the hearing today.

8          THE COURT:  She wants to listen in?

9          MR. SEEGER:  Yeah.

10         THE COURT:  Well listening in is fine.  She's not

11 going to participate, she's just listening in, is that all

12 right with you?

13         MR. SEEGER:  That's fine with me, Your Honor.

14         THE COURT:  Okay.  Good.  There's no reason she

15 shouldn't.  Okay.  Just let her -- let's connect her.

16    (Pause)

17         THE COURT:  Have you contacted the NFL?  Are they

18 going to be here?

19         MR. SEEGER:  They're not going to attend.

20         THE COURT:  They're not going to attend?  Oh.

21         MR. SEEGER:  I thought they were, that's why we were

22 waiting.

23         THE COURT:  Oh, okay.  I didn't know.  All right.

24 Thank you.

25         MR. SEEGER:  Thank you.

1        (Pause)

2              THE COURT:  Hello?

3              MS. MILON:  Gail Milon speaking.

4              THE COURT:  And your name is -- your name is Gail

5     Milon, is that correct?

6              MS. MILON:  That is correct.

7              THE COURT:  Okay.  And I assume that -- am I correct

8     that Cambridge Capital is a corporation, or an LLC, what's

9     your constitution?

10             MS. MILON:  I can hardly hear.  I can hardly hear

11    you.

12             THE COURT:  All right.  I'm asking you whether

13    Cambridge Capital is a corporation?

14             MS. MILON:  It's a LLC.

15             THE COURT:  Okay.  All right.  Well you have to be

16    represented by counsel, but I certainly have no problem with

17    your listening in and knowing everything that's going on here.

18    Okay?

19             MS. MILON:  Thank you, ma'am.

20             THE COURT:  Okay.  All right.  We're here in the

21    matter of the NFL Football League Player's Concussion Injury

22    litigation, and this is a hearing on Cambridge Capital.  Mr.

23    Seeger, would you like to -- would you like to proceed?

24             MR. SEEGER:  Your Honor, because the transcripts

25    from these hearings are widely read and circulated to the

1   players, would you mind if I just give a brief update about

2   the status of the settlement to --

3                 THE COURT:  Not at all.  Come -- so that I can hear

4   you -- what's the problem -- what's the problem with his

5   microphone, Jim?

6                 MR. SEEGER:  Oh, that one over there?  Is that off?

7                 THE COURT:  Yes, you can stay here.  There's no

8   problem, but make sure if you speak from the -- from the

9   attorney's bench, that table, that it's --

10                MR. SEEGER:  Okay.

11                THE COURT:  -- that I can hear you.

12                MR. SEEGER:  Okay.

13                THE COURT:  Okay.  Go on.

14                MR. SEEGER:  So just by way of context, because it's

15  very important when people look at where we are today, you

16  know, we've got over 20,000 class members registered for the

17  settlement --

18                THE COURT:  Incredible.

19                MR. SEEGER:  -- so that was a huge success.  Right.

20  But there were delays that were created by the fact that there

21  were appeals to the Third Circuit, to the Supreme Court.  The

22  result of that delay in getting the settlement implemented

23  allowed players to go out and get tested by their own doctors.

24                THE COURT:  That was in the settlement agreement, is

25  that correct?

1          MR. SEEGER:  Yeah.  We were accept -- the settlement

2     accepts what we call pre-effective date diagnosis.  We got

3     many, many more pre-effective date diagnoses come into the

4     settlement early on when we opened -- opened the doors to

5     review claims.  And that was generated by the two-year delay

6     on the appeals.  Not a bad thing, I'm not commenting on

7     whether that's good or bad.

8          I'm just letting people know, when they comment on

9     the speed that the claims are being reviewed, that's a factor.

10          THE COURT:  Okay.

11          MR. SEEGER:  And so there were many more.  And all

12     settlements have growing pains, and none of them are perfect.

13     But this one is performing really, really well.  And I want to

14     just go a little bit into that.  I mean, first off, initially

15     we had three AAP's, which were doctors, who were reviewing

16     these pre-effective date diagnoses.  We had to let one go,

17     because he wasn't keeping up as well as the other two.

18          But in response, we hired two additional AAP's, so

19     now we're up to four reviewing pre-effective date diagnoses.

20     So we're -- we've got more capacity.

21          THE COURT:  How about the BAPs?

22          MR. SEEGER:  The BAP is doing very well.  We've got

23     over 5,000 players registered for baseline assessment tests.

24     We've heard complaints about a couple of appointments here and

25     there being canceled, but when you put it in the context of

1    almost 6,000 appointments, a few cancellations I think are --

2              THE COURT:  Of course not.  Of course.

3              MR. SEEGER:  -- to be tolerated.

4              THE COURT:  Yes.

5              MR. SEEGER:  The other thing, at your urging, Your

6    Honor, because you want the settlement to be completely

7    transparent, we sat down with the NFL and with the independent

8    claim administrator and created FAQs, the most frequently

9    asked questions.  Now we've posted those on-line.  There's 302

10   of them, which will answer any question anybody would have

11   about this settlement, hopefully.

12             Again, you know, you can't let perfect be the enemy

13   of good, but we think it's really, really good.  They are

14   on-line.  In addition to that we've put --

15             THE COURT:  They're on-line on the -- in the -- on

16   the NFL website.  When you say on-line --

17             MR. SEEGER:  NFL concussion settlement --

18             THE COURT:  -- you mean on the NFL website, isn't

19   that correct?

20             MR. SEEGER:  Correct.

21             THE COURT:  Not on my website, but on the --

22             MR. SEEGER:  No.

23             THE COURT:  -- website maintained by the claims

24   administrator?

25             MR. SEEGER:  Correct, Your Honor.

1    NFLConcussionSettlement.com

2         THE COURT:  Okay.

3         MR. SEEGER:  And in addition to the FAQs, the 302

4    FAQs to make the settlement transparent, so every player knows

5    what to expect about almost any aspect of it, we've posted

6    rules governing appeals, audits, statute of limitations claims

7    for deaths that occurred prior to 2006, and attorney's liens.

8         So the information --

9         THE COURT:  Attorney's what?

10        MR. SEEGER:  Attorney's liens.

11        THE COURT:  Oh, attorney's liens, okay.

12        MR. SEEGER:  Which I know Your Honor I think has

13   those issues with the Magistrate Judge, and will be addressed

14   in the near future.

15        THE COURT:  Probably tomorrow.

16        MR. SEEGER:  Right.  Probably tomorrow.

17        THE COURT:  But I'm not -- I mean, it's -- it's in

18   the works, yes.

19        MR. SEEGER:  The other aspect I think it's important

20   to put this into context is when -- when the settlement went

21   from a capped settlement -- again, at Your Honor's urging to

22   go back and renegotiate, and became --

23        THE COURT:  Because I was unsure about whether or

24   not there was going to be sufficient money --

25        MR. SEEGER:  Correct.

1          THE COURT:  -- in the fund.

2          MR. SEEGER:  Correct, Your Honor.

3          THE COURT:  And that was the sole reason that -- one

4    of the reasons, but the most -- the major reason why I did

5    that.

6          MR. SEEGER:  Right.  And, Your Honor, as you know,

7    the parties went back and for another five or six months

8    renegotiated.  We were able to come up with any uncapped

9    settlement, but in exchange for that we had to put some

10   protections in place that the NFL felt were important

11   regarding fraud.

12         THE COURT:  Well, of course.  Because the answer is

13   they -- they have an interest now to make sure that -- if it's

14   a cap, let's be very clear, if it's a capped settlement they

15   just put in the money and they don't care what happens.

16         MR. SEEGER:  Right.

17         THE COURT:  But the NFL has a legitimate interest in

18   view of the fact that it's uncapped to -- to challenge any --

19   any request that may be fraudulent.

20         MR. SEEGER:  Correct.  And we in -- to do that, we

21   put in provisions to catch fraud.  One was to create an audit

22   process.  There were several things that could get you dragged

23   into an audit.  One was just a random check, and the other

24   ones we created analytics that were designed to catch what

25   could be fraud.  That, surprisingly, slowed down the

1    settlement early on, because it dragged hundreds of claims

2    that were potentially fraudulent.

3           We know now after -- because we have launched

4    investigations, and so has -- the Special Masters are

5    overseeing this, with a claim administrator, we now know that

6    there are -- there were potentially hundreds of claims

7    implicated in fraud.  What we did, though, is instead of

8    sitting and waiting for that, we engineered the settlement

9    around that problem.

10          We took those claims and we put them on the side, so

11   that we could get to legitimate claims.  So we've all heard

12   some of the complaints about the speed, but I want to just

13   give a quick update on where we are, because things are really

14   starting to move.  So at -- this data I'm about to give you is

15   as of March 30th, this is Friday.

16          So we have 369 notices of monetary awards that have

17   gone out to players and their families.  That constitutes a

18   responsibility for the NFL to pay slightly over $400 million.

19          THE COURT:  Is it over 400?

20          MR. SEEGER:  It's over $400 million now.  That, I

21   would like people to understand, exceeds the projections that

22   both sides independently came to on what the payments would be

23   in the first five years of the settlement.  We've already

24   exceeded that.

25          THE COURT:  Well most of those, though, are, as I

1    understand it, the three major, ALS -- for, CTE, ALS --

2              MR. SEEGER:  Parkinson's and Alzheimer's.

3              THE COURT:  What?  Alzheimer's and Parkinson's.

4              MR. SEEGER:  Correct, Your Honor.  And that's also

5    important because in March alone there were 130 notices of

6    awards that went out, and 86 of those were dementia claims.

7    So what we did in the beginning is we focused on ALS,

8    Parkinson's and Alzheimer's, because those are hard diagnoses

9    you get.

10             THE COURT:  Sure.

11             MR. SEEGER:  Dementia requires more judgment by the

12   doctor.  The dementia claims are now moving at the pace we had

13   hoped.  We hoped we'd be -- we would have been there a few

14   months ago, but I think people who have attempted to game the

15   system have to take some responsibility for the delay that was

16   caused in sorting out the -- the potential fraud problem.

17             I mean, if the fraudulent claims were paid, to put

18   this in context, you would be talking about more than a

19   billion dollars.  So that would have not been good for

20   anybody.  It wouldn't have been good for the settlement, it

21   doesn't help retired players to pay fraudulent claims.  So --

22   and as we sit today, in the BAP we have about 5,600

23   appointments, and over 4,000 appointments have already been

24   attended by retired players.

25             So the BAP, seems to be getting on track as well.

1          THE COURT:  That's important.

2          MR. SEEGER:  That is very important, Your Honor.  So

3     thank you for the opportunity to give you that update.  Just

4     -- just also to spend just another minute contextualizing --

5          THE COURT:  Well thank you, I didn't expect this.

6          MR. SEEGER:  Well, thank you, Your Honor.  I wanted

7     to also contextualize a little bit of what my partner Terri

8     Benedetto's going to talk about, why we're here today.  This

9     particular issue came up in the context of a different

10     investigation that we're involved with, which is involving

11     predatory lending practices.

12          I know Your Honor was concerned about this from the

13     beginning.  This is an issue that I have personally been

14     concerned about, because we brought this case to help retired

15     players get the help they needed.  Not to see their money

16     squandered by predatory lenders.

17          THE COURT:  Well that was the reason that you had

18     that -- and I've addressed that already.

19          MR. SEEGER:  Yes.

20          THE COURT:  But I -- did you know -- I don't know if

21     you know, I've opened a new website, have you had a

22     opportunity to take a look at it?

23          MR. SEEGER:  I have not, yet, Your Honor.

24          THE COURT:  Well it's -- whatever I issued also went

25     in the 12-2323, but I have requested of all the lawyers who

1    are in the class counsel to respond to their involvement in

2    the third-party lending issue.

3              MR. SEEGER:  Understood, Your Honor.

4              THE COURT:  So I expect to get those answers, I

5    think, maybe May 1.

6              MR. SEEGER:  Yes.  That's -- I saw that.

7              THE COURT:  They'll come -- do you know which --

8    what I'm refer --

9              MR. SEEGER:  Yes.  May 1.  You wanted the response

10   to the interog --

11             THE COURT:  That's right.

12             MR. SEEGER:  -- they were like a form of questions.

13   Yes.

14             THE COURT:  Interrogatories that the Court basically

15   sent out.

16             MR. SEEGER:  Yeah.

17             THE COURT:  Okay.  I didn't know whether you had

18   seen that.

19             MR. SEEGER:  I did.

20             THE COURT:  I did that on Friday.

21             MR. SEEGER:  And one of the things about this

22   particular case that got my attention, and we are still

23   investigating it, is the fact that there's a principal, Tim

24   Howard, who is an attorney, who represents retired football

25   players, and has yet to file claims on their behalf, also

1    appears to have worn the hat as a lender, and potentially an

2    investment advisor.

3           Now what caught our attention here is, we started to

4    hear from certain players that they had cashed out retirement

5    accounts, and delivered those retirement account monies to

6    Cambridge Capital to be invested.  And when I see people

7    cashing out their retirement accounts, now these players are

8    not millionaires, they may have been at one point in their

9    life, but they are not millionaires today, and these are their

10   retirement monies.

11          We began to follow up with Cambridge and wanted to

12   get answers to exactly where that money was.  We've learned

13   today, and Terri's going to go into this, that that money

14   appears to have gone into some kind of investment company also

15   run by this attorney, Tim Howard, who's an attorney

16   representing players, a lender, and an investment advisor.

17          And we don't really know, sitting here today, where

18   that money is.

19          THE COURT:  Where is he -- where is he a lawyer?

20          MR. SEEGER:  He's out of Tallahassee, Florida, is

21   that right?

22          MS. BENEDETTO:  Florida.

23          THE COURT:  In Florida?

24          MR. SEEGER:  Yeah.

25          THE COURT:  Okay.

1        MR. SEEGER:  So with that --

2        THE COURT:  Has the Attorney General in Florida been

3    interested in this at all, do you know?

4        MR. SEEGER:  Your Honor, I'm not supposed to go into

5    it too much, apparently, but we have -- we've been contacted

6    at both the Federal and State level about --

7        THE COURT:  Oh, have you?  Okay.

8        MR. SEEGER:  -- potential investigations that may --

9        THE COURT:  Because, you know, it's not easy for me

10   to do anything like that.

11       MR. SEEGER:  Yes.

12       THE COURT:  I mean, I have jurisdiction over the

13   class, don't misunderstand me.

14       MR. SEEGER:  Yes.

15       THE COURT:  But when it comes --,if your allegations

16   are accurate there are a lot of other -- may be a lot of other

17   implications.

18       MR. SEEGER:  I'm going to hope, standing here today,

19   that what we are concerned about isn't happening.  And maybe

20   there will be a opportunity from Cambridge, they don't have a

21   lawyer here today, which is another area of concern, Your

22   Honor.  They were represented by an attorney by the name of

23   Martin Black, who I believe is a Florida barred lawyer.  He

24   never sought pro hac admission in this Court, but he was

25   responding for Cambridge at some point.

1          And then he notified us that he was going to

2    withdraw as counsel.  Now one -- two problems with that.  One

3    is the Local Rules require him to get admitted pro hac, he

4    didn't do that.  And the reason that those Local Rules are

5    there is so the Court has somebody to -- to talk to, if

6    there's a problem, like what we have right now, whereas the

7    lawyer's now trying to get out of the case.

8          And we have Ms. Milon who is a non-attorney on the

9    phone, and they appear to not be represented by anybody.  And

10   there are some serious allegations here, they should be

11   represented by an attorney, obviously.

12         THE COURT:  Okay.  Well why don't you start.

13         MR. SEEGER:  Yes.  All right.  With that, I'm going

14   to hand it off to my partner, Terri Benedetto.

15         THE COURT:  Thank you.

16         MR. SEEGER:  Thank you, Your Honor.

17         MS. BENEDETTO:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MS. BENEDETTO:  Terri Benedetto.

20         THE COURT:  Okay.

21         MS. BENEDETTO:  I do have a hard copy of the

22   PowerPoint.  I have several, if you'd like me to hand them up

23   to your clerk?

24         THE COURT:  Well I'm -- yes, I would.  I'd like to

25   have it, but I -- we can use that -- that -- I like the --

1          MS. BENEDETTO:  Certainly.

2          THE COURT:  Yes.  Do you have two of them, or one of

3     them?

4          MS. BENEDETTO:  I have three there --

5          THE COURT:  Oh, do you.

6          MS. BENEDETTO:  -- I have more, if you'd like them.

7          THE COURT:  How about -- why don't we give Sue one?

8          MS. BENEDETTO:  Certainly.

9          THE COURT:  Do you mind giving Sue one?  She's a pro

10    se law clerk who's also helping out here.

11          Okay.  Thanks.

12          MS. BENEDETTO:  Sure.  So, Your Honor, we're here

13    today because self-help has been threatened by these

14    third-party funders going under the moniker of the Cambridge

15    entities.  There are dozens of these Cambridge entities.

16          They are subject to the Court's order of December

17    8th, 2017, under which the Court held that assignment

18    agreements entered into by the third-party funders and class

19    members are void as per the settlement agreement.

20          This self-help that they are trying to engage in is

21    in direct contravention of that order, and also the rescission

22    process that has been put into place and being handled by the

23    claims administrator and the Special Masters.

24          THE COURT:  Well I haven't -- I haven't ordered the

25    -- the -- I haven't ordered the rescission.  That's basically

1    one way that it can be resolved.  But that was -- that is not

2    -- I have not at this point ordered rescission.

3              MS. BENEDETTO:  Correct.  Yes, Your Honor.  Yes.

4              THE COURT:  Is that correct?

5              MS. BENEDETTO:  Yes, Your Honor.  Yes I --

6              THE COURT:  Okay.

7              MS. BENEDETTO:  -- I agree.  I was just referring to

8    the rescission program.  I know that the Special Master filed

9    on either Thursday or Friday a notice that a couple of the

10   rescissions had been entered.

11             THE COURT:  Yes, I understand that two of the

12   third-party lenders have agreed to rescission.

13             MS. BENEDETTO:  Not this one in particular.  Not

14   Cambridge.

15             THE COURT:  No, I don't think so --

16             MS. BENEDETTO:  Yes.

17             THE COURT:  -- but I don't know which ones they are,

18   to tell you the truth.

19             MS. BENEDETTO:  So co-lead class counsel received

20   evidence in the form of an audiotaped telephone conversation

21   between a class member and Cambridge officers.  This

22   particular class member had entered into two different types

23   of arrangements with Cambridge.

24             The first being the assignment agreement that Your

25   Honor has since declared to be void, under which this

1    particular class member received advances -- cash advances in

2    exchange for pledging over to Cambridge under the assignment

3    arrangement far more of his potential future monetary award

4    than the cash advances that he had received.

5         And then a second arrangement was that he had moved

6    his 401k monies out of the NFL's 401k, it's actually called

7    the NFL Players Second Career Savings Plan.  And he rolled

8    those monies over as an IRA rollover into -- to be invested

9    with Cambridge.

10        He and these other class members who cashed out

11   their retirement accounts, there are ten total that are

12   involved in the retirement investment aspect, they did so at

13   the recommendation and the prompting of their individually

14   retained counsel, who Mr. Seeger referenced Mr. Tim -- he goes

15   by Tim Howard, of Howard & Associates.  You know, and he was

16   wearing these two hats of lawyer and financial advisor.

17        And the nature of the self-help that --

18        THE COURT:  Did he sign like a lot of the other

19   people signed?

20        MS. BENEDETTO:  He did.  He signed acknowledgments

21   for his clients on the --

22        THE COURT:  That's what --

23        MS. BENEDETTO:  -- so on the one hand he's marketing

24   with his Cambridge hat on that they should enter into these

25   assignments, and invest their retirement funds with him, and

1  then he also signs the acknowledgment on the Cambridge form as

2  the attorney who was going to give the monies over to

3  Cambridge if and when the particular client gets the monetary

4  award.

5          So on this audiotape that the class member provided

6  to us, which we had transcribed, and also submitted a copy

7  with our motion package, Ms. Milon was also -- who's listening

8  today, was also on this particular phone call.

9          THE COURT:  Did you hear, Ms. Milon?  Ms. Milon?

10         MS. MILON:  Yes.  I'm here.  I'm sorry.

11         THE COURT:  Okay.  I just wanted to make sure you

12  heard.  Okay.

13         MS. BENEDETTO:  Mr. Addys Walker, who was then

14  acting as the head of Cambridge, told this particular class

15  member that, since the Court had ruled that the assignments

16  were void, and that this particular player also had this

17  retirement investment piece with Cambridge, that Cambridge was

18  just going to take this class member's retirement monies as

19  repayment for the advances that the class member had gotten.

20         And, obviously, this class member was extremely

21  distraught at having that told to him.  He had had previous

22  interactions with Cambridge, which led him to desire to

23  audiotape this conversation.  And in response to our motion,

24  this Court issued its February 20th, 2018 order directing

25  Cambridge to turn over both accountings for these 10 class

1    members, and also any other relevant documents.

2           Now they've turned over some relevant documents, but

3    they have yet to turn over these accountings.  And the class

4    member who brought us the audiotape, as well as the other

5    class members involved with these retirement monies who I

6    personally have spoken to are really distressed that they

7    can't get an answer out of Cambridge as to where these monies

8    are, how much are in their accounts, and they've been asking

9    for months.

10          So the filing of our motion, and the revealing of

11   this audiotape was not the first that Cambridge knew that

12   these class members wanted to know, where's my money, how much

13   is in the accounts?

14          And we just received information from Ms. Milon last

15   week that it's now going to take another eight weeks for an

16   audit to be completed, and for them to be able to tell us how

17   much money is in each of these class member's accounts.

18          She also indicated last week that the monies are not

19   liquid, and that it will take time to liquidate these funds

20   and protect the asset values.

21          THE COURT:  What did you understand that meant?

22          MS. BENEDETTO:  I understand that -- well, not being

23   in the finance world, I understand it to mean that the money's

24   not really there.  That it's, you know -- I mean, I understand

25   -- I understand personally the concept of a six-month CD.  So

1    you can't take the money out less than six months, or you pay

2    a significant penalty, and I understand that when they say

3    something's not liquid that that's what that means.

4              THE COURT:  Well who controls it?  Is there any

5    question that Cambridge does control it?

6              MS. BENEDETTO:  Well, Your Honor, that's also --

7    they've turned over documents indicating that another company,

8    Millennium Trust Company is actually where the monies are

9    being held.  We -- when we realized last week that we were not

10   going to be getting the promised accountings from Cambridge,

11   we served a subpoena on Millennium.  So as of yet the time

12   isn't up for Millennium to respond.

13             I had asked them in a cover letter, as a courtesy,

14   you know, we'd asked for all the documents related to these

15   ten players to be produced.  But I asked them as courtesy, if

16   they could just give us the account balances before today's

17   hearing, and they said no.

18             So, as an aside, and, you know, Chris already --

19   Chris Seeger already mentioned the fact that Mr. Black was

20   previously representing Cambridge, and I just wanted to

21   reiterate that he, you know, we had strongly objected to his

22   attempted withdrawal, and maintain that he wasn't permitted to

23   do so under the Rules.

24             So -- I'm sorry, I lost my spot.  So we have one of

25   the documents that they produced.  What we believe is going

1    on, is that Cambridge took the retirement monies of these ten

2    people and they used those monies to pay the advances to other

3    individuals with whom Cambridge had entered into these

4    assignment arrangements.

5              That's what we believe happened.  We don't know for

6    sure, because we don't have all the documents.  But we have

7    the private offering memorandum from Cambridge which indicates

8    that one of the vehicles in which the money was going to be

9    invested is litigation settlement claims, which is abbreviated

10   LS.

11             So because of the fact that Your Honor voided the

12   assignment agreements, as per the December 8th order, now

13   Cambridge doesn't foresee making the type of profits that it

14   was going to make on getting these, you know, sometimes 100

15   percent return on the monies that they had advanced under

16   these assignment arrangements, so we believe that's why the

17   delay, and the excuses, and Mr. Black's no longer representing

18   Cambridge.

19             But as I said, while we surmise this is what

20   happened, we don't know, because we can't get answers to our

21   questions.  And some of this money, this is what they produced

22   as accountings, which we have turned over to Your Honor.  On

23   the screen that's appearing now, this is for player one, and

24   we redacted his name, these monies -- this is just what he

25   deposited back in 2016.

1          And as you can see, there are handwritten changes on

2     this document, but it doesn't indicate what exactly the amount

3     of money is that's in the account currently.  They turned over

4     copies of the checks, you can see this -- this check was from

5     the NFL Players Second Career Savings Plan, back in May of

6     2016 for the player on the left, who was player five.

7          And March of 2016 for the player on the right, who

8     is player ten.  And the checks were made out to Millennium

9     Trust Company for the benefit of the player.  And then the

10    address listed thereunder is Suite 125, 2120 Killarney Way,

11    Tallahassee, Florida.

12         That's Mr. Howard's law practice address.

13         THE COURT:  One second.  I see that BNY Mellon is --

14    what is that?  That's a Pennsylvania company, isn't it?

15         MS. BENEDETTO:  I believe the BNY Mellon is where

16    the NFL had held this -- the 401k monies.

17         THE COURT:  Oh, okay.

18         MS. BENEDETTO:  So it's a check from the NFL's 401k

19    over to this --

20         THE COURT:  All right.

21         MS. BENEDETTO:  -- over to this IRA rollover

22    Millennium Trust Company.

23         So the check was issued by the NFL's 401k, which is

24    being held, evidently, at BNY Mellon.  So that check was

25    written in May of 2016.

1        THE COURT:  Okay.

2        MS. BENEDETTO:  So we're still waiting for

3   Millennium to respond to the subpoena, which we assume will

4   show that they received these monies in May of -- for player

5   number five in May of 2016.  Now player number five did

6   provide us with his portfolio summary.  So here we have -- it

7   shows that the total funds he contributed were $619,000, and

8   as of December of 2016, he purportedly had $751,000.

9        So a gain of $132,000 in seven months.  Now whether

10  those monies -- whether that's real or not, we don't know.

11  But all we know is that's what the player was told he had, and

12  those were the increased profits that he had on his investment

13  as of a year and, you know, four months ago.

14        So, you know, we're not AUSA's, and we've done a lot

15  of digging in what are publicly available documents.  We don't

16  have the investigative tools that they would have.  But these

17  class members, you know, they're not millionaires.  And even

18  the private offering memorandum indicated that the investment

19  in the fund is available exclusively to sophisticated persons

20  and entities that have a net worth in excess of $2 million.

21        That was not these guys.  And they were led into

22  this by Mr. Howard.  Here we have a Cambridge email that was

23  signed by both Mr. Howard at the bottom, JD, PHD, and a Mr.

24  Don Warner, who was also formerly with Cambridge.

25        And it says -- this is written by Don Warner

1    Reinhard.

2         "As we discussed Dr. Howard, and I, and our team

3    continue to develop Cambridge Capital Group to provide an

4    unmatched model of services, which includes investment

5    management, wealth planning, estate planning, wills, trust

6    creation, life insurance, supplemental health insurance, and

7    loans to meet the unique needs of retired professional

8    athletes.  Additionally, ancillary legal services for little

9    or no additional costs via our direct association with Howard

10   & Associates, PA makes our creative model unmatched in the

11   marketplace."

12        Now Mr. Reinhard is presently incarcerated for

13   aggravated child abuse, and he was previously sanctioned by

14   the SEC.  So he -- he's not presently involved in Cambridge,

15   nor is he communicating -- I believe he's email communicating

16   with some of the players from prison.

17        Then there's another email dated June of 2017 from

18   Howard & Associates.  Suggesting that, to his class member

19   clients, that he could refer them to "independent cash advance

20   programs that may offer immediate cash based upon your

21   proposed settlement."

22        So here he is wearing his two hats.  The first email

23   from Cambridge & Associates signed by Tim Howard, the second

24   email from Howard & Associates suggesting to their clients

25   that they enter into assignment arrangements.

1          Since then, Mr. Howard has continually claimed that

2    he has totally divested his interests in Cambridge and he's no

3    longer related to them.  We submit that the only way to really

4    get to the bottom of this is to depose Mr. Howard in

5    Philadelphia, so that we can ask him about his current

6    relationship to Cambridge.  He represents 234 class members in

7    this case.  And 88 of his clients have entered into assignment

8    arrangements.

9          Thirty-three of those with Cambridge -- I'm sorry,

10   26 with Cambridge, and the rest with either Atlas, Global

11   Financial or Beacon Legal.  In total, there were 33

12   assignments by Cambridge, and in addition to the 26 Howard

13   clients, three clients were those of Gibbs & Parnell.  That

14   firm is one of the four firms calling themselves

15   Neurocognitive Football Lawyers.

16         And two of the clients were of a Ms. Simona Farrise.

17   And it could even be that more than 88 of Mr. Howard's clients

18   have entered into assignment arrangements with third-party

19   funders.  We simply don't know, because some of the

20   third-party funders refuse to answer our discovery.  And there

21   is also probably some third-party funders out there of which

22   we are not aware.

23         And Mr. Howard didn't seek common benefit fees, so

24   he is not going to be among those who will be required to

25   answer the questionnaire ordered in Your Honor's March 29th

1   order, since that applies only to those lawyers who have

2   sought common benefit fees.

3          THE COURT:  Well I may expand it, you realize that.

4   I think I mentioned that in the order.

5          MS. BENEDETTO:  Okay.  And -- but obviously we

6   understand that there is a mechanism once a player is -- is

7   imminently going to receive his monetary award, that the

8   claims administrator under a prior order of Your Honor's will

9   ask the class member whether or not he has entered into one of

10  these assignment arrangements.

11         THE COURT:  That's correct.

12         MS. BENEDETTO:  So we may find out through that

13  vehicle.

14         THE COURT:  You don't have these numbered.  Do you

15  want to make sure that you number them, so that when we put

16  them in the record they'll be numbered?

17         MS. BENEDETTO:  The slides, Your Honor?

18         THE COURT:  Yes.

19         MS. BENEDETTO:  Oh, okay.  Yes, we can certainly do

20  that.  Yes.

21         THE COURT:  I'm finding it difficult to follow.

22  Okay.

23         MS. BENEDETTO:  Oh, I apologize.

24         THE COURT:  So this is going to be numbered.  Right

25  now I can follow them all, but you're going to have to make

1    sure you number them.

2                MS. BENEDETTO:  Yes, Your Honor.

3                THE COURT:  Okay.

4                MS. BENEDETTO:  So this next slide, this is actually

5    a slide number nine.  And this is Mr. Howard's filing before

6    this Court.  It's a notice of verification of non-ownership

7    and non-management and dissolution of certain Cambridge

8    entities.

9                And he also filed the State of Florida Department of

10   State certifications alleging the dissolution of Cambridge

11   Capital Group, LLC, and Cambridge Capital Advisors, LLC in May

12   of 2017.

13               The former counsel to Cambridge, Mr. Black, also

14   claimed in a letter that he sent to Mr. Seeger August of 2017,

15   that the Cambridge Capital Group, it no longer exists and was

16   dissolved pursuant to a confidential sale and dissolution

17   agreement entered into only earlier this year, and that the

18   company was sold to Mr. Addys Walker.  Mr. Addys Walker is the

19   gentleman who was on the audiotape who made the threat to take

20   self-help on the part of Cambridge.

21               Mr. Howard was called to task by the Florida Bar,

22   who told him that he could not wear these two hats.  That he

23   needed to extricate himself from Cambridge.  Which he

24   purported to do.  This is a letter from Ms. Milon dated March

25   29th of 2018, indicating that "updated ethics research and

Benedetto - Presentation                                    31

1  communications with the Florida Bar required that Dr. Tim

2  Howard not have any ownership, management interest, or

3  control, and he has complied with the same."

4          So that's what they're contending.  However, in

5  March of 2017, Cambridge Capital Group, LLC had amended its

6  articles of organization to remove Mr. Howard as president,

7  and insert Lois Koons.  Lois Koons is Mr. Howard's 83-year-old

8  mother-in-law, his wife's mother.

9          So that was done for Cambridge Capital Group, and it

10 was also done for Cambridge Capital Advisors, LLC.  You can

11 see that Mr. Phillip T. Howard was removed as president, and

12 Lois Koons was inserted as president.

13         And this change -- this amendment was signed March

14 7, 2017 by Mr. Howard.  So that's what was going on in Florida

15 with the corporations.  So what was happening in Nevada was

16 new corporations were being created.  And this one is with

17 managers Ms. Koons, and Ms. Gail Milon.  That's called --

18 that's another Cambridge Capital Group, LLC created in April

19 of 2017.

20         Just around the time that Mr. Howard was filing his

21 verification of non-ownership.  We have a Cambridge Capital

22 Wealth Advisors, LLC, created in May of 2017 in Nevada, with

23 Ms. Milon as the manager.  And you'll note that these all have

24 this same address, 59 Damonte Ranch Parkway in Reno, Suite

25 Number B-245 -- I'm sorry, Suite Number -- where is it -- B

1   number 245.  Yes.

2          And then the third Nevada Cambridge group is called

3   Cambridge Capital Group Advisors, LLC, and that has managers

4   Jeff Kahn, Lois Koons, Gail Milon and Mr. Addys Walker, that's

5   the same gentleman that's on the audiotape.

6          Additionally, in Nevada, we also have in October of

7   2017, so just five months ago, there was a company created,

8   also at that 59 Damonte Ranch Parkway in Reno, and its

9   managers are Cambridge Development Partners, Tim Howard and

10  Addys Walker.

11         And that -- and we have another one, another Nevada

12  corporation, also at 59 Damonte Ranch Parkway, created in

13  October of 2017, with managing members Tim Howard and Tom

14  Parnell, and another gentleman, Mark Savage.  Now Tom Parnell,

15  that's the name of one of the attorneys at Gibbs & Parnell

16  which goes under the moniker of Neurocognitive Football

17  Lawyers.

18         And, actually, three of Mr. Parnell's clients did

19  enter into assignment arrangements with Cambridge.  So we

20  don't -- we think that's probably the same Parnell.  I don't

21  know for sure.

22         In addition, right after we filed our motion in

23  January of this year and we identified a company called Your

24  Case, LLC in Florida as being one of the affiliates with

25  Cambridge, and you can see that the registered agent is

Benedetto - Presentation

1    Phillip Timothy Howard, and the president is Addys Walker.

2    Well right after Your Honor issued the February 20th, 2018

3    order, they dissolved that corporation.  Two days later,

4    February 22nd, 2018.

5         And there's another issue that we -- just recently

6    came to our attention, based upon Ms. Milon's March 27th

7    letter, and that is that it's not just retirement monies, IRA

8    rollover monies that some of the class members have invested

9    with Cambridge, there's also what Ms. Milon calls

10   non-qualified -- the IRA monies are called qualified monies,

11   and then apparently they've invested other monies in

12   Cambridge.

13        All we know is that five of the ten who had the

14   retirement monies invested with Cambridge, had these also

15   non-qualified monies.  We don't know how many other class

16   members are out there with these non-qualified monies invested

17   with Cambridge.

18        So what we would ask Your Honor is, we'd like to --

19   we don't know what we're going to get from Millennium once

20   they respond to our subpoena.  You know, we'd like to have the

21   assets frozen.  We'd like to seek contempt from Cambridge for

22   failing to comply with the Court's order in providing these

23   accountings in a timely manner.

24        Now they say they're going to produce them eight

25   weeks from now.  I don't know if that -- if that will be the

Colloquy                                                    34

1    case.  And, frankly, I don't understand what the holdup is.

2    Additionally, we'd like to take the depositions of Tim Howard,

3    Gail Milon, Addys Walker, and Lois Koons.  And, you know, if

4    they refuse to enter into -- you know, if they refuse to

5    comply and submit for depositions, we would file motions for

6    sanctions.

7         We'd like to schedule another hearing.  We'd also

8    like to raise at that point perhaps whether Mr. Howard's fee

9    interest in all these 234 class members that he represents

10   should be eliminated.  Whether Cambridge should be required to

11   pay Seeger Weiss's fees and expenses related to this

12   investigation and all the motion practice we've entered into.

13        And we feel that perhaps Mr. Black should face some

14   consequences for having purported to be Cambridge's lawyer,

15   and then neither pro hac viceing, or properly finding

16   substitute counsel when he decided to withdraw.

17        THE COURT:  Okay.

18        MS. BENEDETTO:  So that -- thank you, Your Honor.

19        THE COURT:  All right.  I think that you're going to

20   have to present -- you're going to have to ask me for an order

21   and a justification for the order.  And I'll see what I'm

22   going to do about it after this hearing.

23        MS. BENEDETTO:  Yes, Your Honor.

24        THE COURT:  Because I'm not -- I'm -- you can tell

25   me what you think you've shown.  You can argue it now, but I

1    really do need it in written form.

2              MS. BENEDETTO:  Yes, Your Honor.

3              THE COURT:  So it ought to be in as soon as you

4    possibly can get it in.  And tell me what you want, and what

5    you think you've proven, in order to satisfy me that you're

6    entitled to this kind of relief.

7              MS. BENEDETTO:  Yes, Your Honor.  Thank you.

8              THE COURT:  Okay?  Is there anything else?

9              MS. MILON:  Your Honor, may I -- I'm sorry.  Your

10   Honor may I speak?  This is Gail Milon.

11             THE COURT:  No.  I'm not going -- I can't let you

12   speak.  You're not here, you're not represented by counsel,

13   and I can't let you speak.  They could take your deposition,

14   and then next time I have a hearing, which very well may

15   follow quite soon, you'll have somebody up here who's

16   qualified to represent the LLC.

17             MS. MILON:  Yes, ma'am.

18             THE COURT:  Is there anything else?

19             MR. SEEGER:  Not on this, Your Honor.  We obviously

20   wanted to just give you these updates what -- you know, how

21   these investigations are going.

22             THE COURT:  Okay.  Thank you very much.

23             MR. SEEGER:  Thank you.

24             THE COURT:  All right.  And I expect a submission by

25   you asking me for what you want, and if they want to have --

1  want to employ counsel, they'll have to employ counsel.  And

2  I'll be supportive in any way I can to the players who are

3  involved in this.  How many players are involved?

4            MS. BENEDETTO:  Ten in -- ten in the retirement

5  monies, Your Honor.  There's 88 Cambridge assignments.

6            THE COURT:  Eighty-eight Cambridge assignments.

7  Okay.  And all the lawyers for every one of those assignments

8  is Mr. Howard?

9            MR. SEEGER:  Of those 88, yes.

10           MS. BENEDETTO:  No, Your Honor.  One second.

11  Actually 88 of -- I'm sorry, I misspoke.  Eighty-eight of Mr.

12  Howard's clients have entered into assignment agreements, 26

13  are with Cambridge, and the rest are with Atlas, Global

14  Financial and Beacon Legal.  And the other seven assignments

15  that Cambridge has, those individuals are represented by Gibbs

16  & Parnell, that's the Neurocognitive Football Lawyers, Simona

17  Farrise, and Weisberg.

18           THE COURT:  Okay.  Well write all those things to me

19  and ask -- and you ask me for what the remedy is.  I don't

20  know whether Atlas is one of those that -- that has agreed to

21  -- to vacate -- has agreed to the rescission.

22           It may be.  But we'll have to see the implication of

23  that with these particular players.  Okay?

24           MS. BENEDETTO:  Thank you, Your Honor.

25           THE COURT:  All right.  Is there anything else Mr.

1    Seeger?

2            MR. SEEGER:  No, Your Honor.  Thank you for your

3    time.

4            THE COURT:  All right.  Thank you.  I will -- all

5    right, off the record.

6        (Proceedings concluded at 10:53 a.m.)

7                        * * * * *

8                   C E R T I F I C A T I O N

9    I, Josette Jones, court approved transcriber, certify that the

10   foregoing is a correct transcript from the official digital

11   audio recording of the proceedings in the above-entitled

12   matter.

13

14   _____          _____4-6-18_____

15   JOSETTE JONES                                   DATE

16   DIANA DOMAN TRANSCRIBING, LLC