**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION LITIGATION, <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL FOOTBALL LEAGUE, et.al, <br><br> Defendants. | No. 2:12-md-02323-AB <br> MDL No. 2323 <br><br> Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: <br> ALL ACTIONS | |

**THE YERRID LAW FIRM'S REPLY TO THE RESPONSE BY THE CLAIMS ADMINISTRATOR (NO. 9870) TO THEIR MOTION TO PROHIBIT EXPARTE INTERVIEWS WITH TREATING PHYSICIANS (NO. 9815) AND MOTION TO REVIEW DEPRIVATION OF APPEAL RIGHTS AND REQUESTING ORAL ARGUMENT (NO. 9843)[1]**

On November 2, 2017, this Court entered an Order (No. 8882) that Denied the Motion of X1 Law to Review the Claims Procedures. This Court stated these issues must follow the course of the appellate procedures under the Amended Settlement Agreement (the "ASA"). However, the Audit Procedures, including overreaching ex parte physician interviews, are preventing the Court from hearing the voices of the players because their appeals are being held in abeyance by a procedural quagmire. Players like John Reaves have died and many other players are deteriorating without being heard because many of these players, their physicians, and their lawyers, who are officers of the Court, are being falsely accused of committing fraud. In its

---

[1] On April 18, 2018, the Court entered its Order (No. 9890) Denying the Locks Motion to Serve as Administrative Class Counsel (No. 9786) and the motions in support including No. 9843. However, the Claims Administrator made a Joint Response to the remaining matters in No. 9843 (the" Yerrid Motion") and these are addressed here.

Response, the Claims Administrator continues these attacks by making multiple references to fraud, red flags for fraud, fraudulent submissions, and other similar pejoratives.

The Claims Administrator, however, has not amassed evidence of fraud relating to the claims submitted by the undersigned law firms.  Generally, in American jurisprudence, fraud requires a knowing false representation of a material fact.  The ASA, however, allows the NFL and the Claims Administrator to publicly accuse the players, their doctors and their counsel of fraud because the ASA redefines the definition of fraud.  At best, however, the Claims Administrator has only raised the specter of a debatable diagnosis in some of the Claim Packages.  However, with respect to Neurocognitive Football Lawyers (NCFL), the Claims Administrator cannot even meet that standard.  Instead, the Claims Administrator devotes pages and pages of its Response in an effort to obfuscate the issues and avoid its breach of the ASA procedures preventing the appeals that would otherwise provide due process to badly injured players.

Part 1, Page 3, of the Yerrid Motion to Review the Deprivation of Appeal Rights (No. 9843) asks the very simple question of why has it taken eight months to audit the Monetary Awards that two players received on August 2, 2017.  The Claims Administrator does not deny the facts alleged on Page 5 of Motion 9843 that as of January 24, 2018, "no meaningful action had been taken on either claim."  Nor does the Claims Administrator legally rebut the language of the ASA that provides that 10.3(c) is the only vehicle for auditing a Monetary Award.[2]

Providing a red flag that the Claims Administrator did in fact exceed its audit authority on these Monetary Awards, the Claims Administrator has refused to provide any information explaining how many Monetary Awards were rendered during the relevant time frame so the

---

[2] As argued in Motion 9843, Allowing an Audit of a Monetary Award under any other Paragraph of the ASA would render the limiting language of Paragraph 10.3(c) meaningless.

Claims Administrator could show it had not exceeded its authority in auditing these Monetary Awards.    Moreover, prior to these awards being issued, the Claims Administrator had any number of audit opportunities to evaluate these claims and it failed to do so.    When it comes to the Claims Administrator, finality seems to have no meaning under the ASA.

Even worse, the Claims Administrator provides page after page of the alleged attempts to communicate with Doctors 1 and 2 to audit the alleged anonymous tips it received on August 11, 2017.    However, these efforts did not even begin until February 12, 2018.    The Claims Administrator expresses its frustrations in trying to communicate with these doctors during an approximate three-week interval in February and March yet the Claims Administrator did not try to communicate with these doctors for about six months after the alleged anonymous tips arose.

Instead of addressing the legal issue raised in Part 1 of Motion 9843, the Claims Administrator tries to obfuscate the issues with the specter of alleged fraud and illegitimate claims.    Those fantastic claims based upon inaccurate anonymous tips lie at the heart of Part 2 of Motion 9843.

Again, the Claims Administrator fails to directly counter the argument that once a Claim is Denied, the Claim is now governed under the Appeal procedures of Article IX.[3]    In short, once a Claim is Denied, there is no longer any Claim to Audit.    Motion 9843 argued that the January 10 Audits were issued after Claim Packages were Denied preventing those issues from being heard by the Special Master even though in all cases no information was being requested and in some cases the physician was not under "investigation".[4]    This is not a proper purpose of the

_____

[3] As noted in Motion 9843, the legal argument preventing audit of a denied claim was not only logic but it was also a corollary of the 10% rule that limited audits at the terminal process of review.  These arguments went unrebutted.

[4] As noted in Motion 9843, a player with a Qualifying Diagnosis of Alzheimer's disease, confirmed by his own treating physician of six years, was issued a January 10 Audit requesting no information.  The Qualifying Diagnosis of this Player was rendered by a well-credentialed Board Certified Neurologist that has not been under "investigation" by the Claims Administrator.  There is no reason why this Audit should have been issued.

audit process and these Claims continue to languish.   Moreover, a number of these Claim Packages were Denied in December 2017 and January 2018, a month before the Claims Administrator embarked on its efforts to directly communicate with Doctors 1 and 2 as part of its alleged audit powers.   Again, the complaints made by the Claims Administrator are banging the drum of obfuscation to avoid the real issues that should be reviewed by this Court.

The Yerrid Law Firm believes that the alleged questionable practices used by Doctors 1 and 2 should be heard before the Special Master in the context of the Claim Packages to which these allegations relate.   Only in that context can these allegations be evaluated to determine whether the allegations from the anonymous tipsters are true, and if so, whether they have any material effect on these Claims.   Part 2 of Motion 9843 described in factual detail some of the Claims that were Denied along with the mountain of evidence supporting these Claims.   A common denominator of many of the reasons that the Claims Administrator has for attacking these claims is that the Player can drive or plays chess or has some other function that only seems to contradict the diagnosis.   At best this is only a difference of opinion, not a badge of fraud.   Rather than continue to let the Claims Administrator hold hundreds of Claims hostage because of these vague and unproven concerns, the Special Master should look at the evidence supporting each of those Claims and should decide whether those "flags" are factual, material, or otherwise defeat the diagnosis.

Instead, the Claims Administrator apparently wants to prevent these matters from being heard through the appeal process while it continues its search for a further pretext.   That is the point of Part 3 of the Yerrid Motion and the Motion to Prevent Ex Parte Communications and this is where the arguments of the Claims Administrator are focused.   As noted previously, the Claims Administrator alleges it received anonymous tips in August 2017 but as shown above the

Claims Administrator did not address these issues until six or more months after these issues came to light.  To obfuscate that delay, the Claims Administrator tries to show that it has been auditing NCFL Claims since June.  Although it is true that two deficiency notices were received in June, there was no focused investigation of NCFL Claims until December 2017, after a California doctor was deemed disqualified and the Claims Administrator realized it had a powerful weapon to strike hundreds of claims by obtaining the disqualification of one or more doctors.

As part of that obfuscation trying to link the delay in investigating Doctors 1 and 2 from the alleged anonymous August tips, the Claim Administrator states 70% of the NCFL packages were missing information and the Claims Administrator "began sending notices to NCFL in June 2017" (CA Response at Page 8).  This statement is completely misleading and juiced up by the numbers the Claims Administrator has the power to generate.  Through July 31, 2017, NCFL filed 130 Claim Packages.  Prior to August 10, 2017, NCFL received only 16 notices from the Claims Administrator out of 130 Claim Packages filed.  Most of these 16 notices were requesting documents the Claims Administrator had already received and therefore these notices should never have been sent.  Either the Claims Administrator was being sloppy in sending notices that were not needed or the Claims Administrator was sending notices so it could bolster the number of notices it was sending to give the appearance there were problems with allegedly deficient applications.

After August 15, 2017 through September 30, 2017, a flurry of notices (approximately 26) were sent to NCFL requesting a list of prior doctors seen (a health history) and a HIPPA form to request documents.  None of these notices requested documents and claimed that NCFL Claim Packages failed to comply with the requirements imposed by the ASA.  Moreover, no

reason was given why these audit requests were made. Two of these requests went to the Players who received a Monetary Award. It appears many of these audits were sent simply to buy time to delay the processing of claims in September 2017. But, to be clear, these audits were not due to deficient Claim Packages and that is why the 70% statement by the Claims Administrator is so misleading.

Then, as pled in Part 3 of the Yerrid Motion, some sixty-five audits requesting raw scores were requested by the Claims Administrator eight days after the Special Master invalidated more than a hundred claims that had been rendered by a California doctor. At the time these December notices were sent, no action had been taken by the Claims Administrator to investigate the Monetary Awards and it would be another two months before Doctors 1 and 2 would be contacted by the Claims Administrator. In short, the Claims Administrator has strung together a bunch of unrelated statistics along with innuendo to weave a narrative to justify a massive fishing expedition in its search for a pretext to deny a large number of claims apparently initiated by two anonymous tips.

Moreover, these anonymous tips have no basis in fact. With this Reply, two redacted Physician Declarations have been filed by the physicians believed to be Doctors 1 and 2 (Exhibits 1 and 2). These redacted Declarations clearly refute the allegations the Claims Administrator has made against these physicians. Neither Doctor 1 nor Doctor 2 examined any patient in any law firm office. Any NFL Concussion Injury examinations they performed were performed in their own offices (Exhibits 1 and 2). Nor is it true that every player these doctors saw received a Qualifying Diagnosis. Nor did these Doctors assign the same CDR score in each of the three applicable areas of the CDR. For example, the Claims Administrator would be completely wrong in believing that with a 1.5 Qualifying Diagnosis, the same Doctor found a 1.0

in Community Affairs, a 1.0 in Home and Hobbies and a 1.0 in Personal Care. Instead, only after assessing each CDR component and then assessing all three components as a whole, did Doctors 1 and 2 determine the level of functional impairment. In no event were 79 of 84 scores the same. Again, this is the mistaken analysis that the Claims Administrator is using to allege these are fraudulent Claims.

And that is the problem with letting the Claims Administrator have unlimited and unprotected access to these physicians to conduct ex parte inquisitions. The Claims Administrator waited nearly seven months before contacting these doctors and now claims it is shocked and appalled that these doctors grew concerned when the Claims Administrator threatened them with disqualification if they did not respond within ten days or less to supplemental written questions that asked them for opinion testimony about specific medical histories of their patients. As noted in the Motion to Prevent Ex Parte Communications, the Florida Constitution prohibits many of these contacts. Moreover, it matters not whether the Claims Administrator believes itself a non-HIPPA entity; the legal question is whether these doctors are concerned their conversations may violate HIPPA. Moreover, to avoid a red flag of Claims Administrator misconduct, the Claims Administrator could have attached as an Exhibit all of the written questions it propounded to Doctors 1 and 2 so the parties could evaluate that argument, assuming the Claims Administrator felt confident in its position.

Florida law also precludes the recording of these communications without informed consent. Federal law also recognizes that the subpoena power can become a governmental intrusion when the power of the court is being misapplied to force otherwise protected communications. Instead, the Claims Administrator hides behind the Fraud Manual in trying to protect its procedures, but as noted at the outset, this is not fraud. Those procedures may apply

when there is intentional misconduct. But the Claims Administrator is not charged with looking for intentional misconduct so these more laborious standards should not apply.

Instead, the Response filed by the Claims Administrator continues the Machiavellian strategy to attack their opponents with a veneer of fraud to silence the meritorious legal points vital to the well-being of the players. The Claims Administrator Response states "[o]ur concerns about Neurocognitive Football Lawyers claims have a long history" and the Claims Administrator takes issue with the fact the 143 Claim Packages were evaluated by six Qualifying Physicians. To place these issues in context, some background must be presented.

During 2014, lawyers Holiday, Parnell and Odom began an informal collaboration to represent players and prosecute pre-effective date claims. Mr. Holiday had done significant pro bono work for players representing their interests seeking 88 Plan benefits. At the time it was clear players could be seen free of charge through the BAP program. However, having had years of frustration with doctors representing NFL interests in prior disability programs, these players wanted the opportunity to retain their own counsel so they could have financial access to their own well qualified physicians to evaluate them for pre-effective date claims. Mr. Odom led this group and a brain injury specialist was one of the lead physicians being incorporated into this process. Unfortunately, approximately six months later, Mr. Odom, age 40, died in a tragic plane crash.

The surviving members of this informal legal team and numerous players asked Steven Yerrid if he could lead the team after the death of Mr. Odom. Mr. Yerrid was well familiar with the demands placed on football athletes and the detrimental effects of some of the unfair demands imposed upon these players. Mr. Yerrid has a national following and is a member of the prestigious Inner Circle of Advocates, limited to the top 100 trial lawyers in the country.

Decisions were made to move from using a brain injury specialist to rely solely on well-credentialed, board certified neurologists in the Tampa Bay area. This decision was made so efficient arrangements could be made for a large number of players to see a limited number of physicians in the short period of time remaining due to the death of Mr. Odom. These decisions were also driven by the lack of board certified forensic neurologists that were available on such short notice. It should be noted the Claims Administrator has yet to find any MAF Physician Neurologists in the Tampa Bay Area. In about thirteen months, Mr. Yerrid picked up the pieces and had hundreds of players pass through one or more stages of the evaluation process.

As part of this process, these lawyers formed NCFL so that all of the expenditures and retained experts could be covered by one financial entity, rather than the group of individual firms that were forced to make many adjustments after the death of Mr. Odom. NCFL is proud of their efforts in presenting a large number of claim packages during the short time available.

However, had any of the attorneys at NCFL known that one of the secret audit flags for "fraud" was evaluating whether a large number of patients saw a few doctors, those decisions would have been different. Had we known otherwise, NCFL would have had to find additional well-qualified physicians outside of their geographic area to not only see these patients and evaluate them neurologically, but to evaluate them under the complex demands imposed by the ASA dementia criteria. In a true Catch 22 paradox, that plan would have looked like NCFL was searching for doctors across the nation well beyond their geographic location to "obtain" a diagnosis.

Instead, and in good faith, NCFL used four board certified neurologists to handle the bulk of the claim packages they were able to assemble. Moreover, NCFL correctly perceived the risk of relying upon a brain injury specialist as part of their complement of doctors. As a result, only

two claim packages were actually submitted with that physician providing the Qualifying Diagnosis. Those two claims were ultimately denied because the Claims Administrator determined that physician could not provide a Qualifying Diagnosis. Nevertheless, in many cases, the high quality work performed by that brain injury specialist was used to augment the diagnoses rendered by the neurologists. Demonstrating the efficacy of the neurological and neuropsychological evaluations that were obtained, by August 2, 2017, two players represented by NCFL received a Notice of Monetary Award after evaluation through the AAP. Then the Audit procedures began.

As was first done to X1 Law, the Claims Administrator and Co-Class Counsel have consistently sought to poison the well of anyone who disagrees with what they do. Rather than directly respond to the frustration of the appellate rights of the severely injured players represented by NCFL in their Motion to Review Deprivation of Appeal Rights (No. 9843) and Motion to Prohibit Ex Parte Interviews with Treating Physicians (No. 9815), as demonstrated above, the bulk of the Response by the Claims Administrator is devoted to obfuscation and personal attacks. With regard to these attacks, other than to suggest lawyers of NCFL are ignoring their clients, what possible relevance could there be to the statement that certain members of NCFL have not personally opened the portal to review the status of client claims?

The personal attacks continued. Seemingly oblivious to the national recognition of Mr. Yerrid as a member of the Inner Circle of Advocates, the Claims Administrator tries to further taint NCFL by noting only 76 of the 143 claims filed came from Florida. With respect, had Mr. Yerrid entered this process before December 2015, the ratio of non-Florida players to Florida players would have been much higher. Unfortunately, the Claims Administrator is using the raw

figures it has the power to generate to create a crisis and distract the Court from the real issue; injured players are not timely receiving the compensation they are due.

The alleged fraud detection procedures used by the Claims Administrator, as well as its audits, have unfairly delayed the processing of claims and these audits have also denied the Claimants of their right to a timely appeal before the Special Master. These Audits have caused an unconstitutional deprivation of Claimants' fundamental rights to due process. This fundamental deprivation of rights will cause irreparable injury as the injured Claimants have a progressive degenerative brain injury. Each day that passes, these players with fully-documented injuries will only suffer more. For these many ailing men, justice delayed is justice denied.

The Claimants are being deprived of fundamental due process and despite the progressive nature of the disease process, not one player represented by the undersigned has received any compensation. Claimants respectfully request that the Court direct the Claims Administrator to: (1) remove from audit any Claim that was Denied so the Appellate procedures under Article IX can be completed; (2) strictly construe the audit requirements and remove any Claim from audit that does not meet the specific requirements of the Audit Rules under the ASA; (3) require the Claims Administrator to fully provide information about the number of Claims in audit, why these Claims are in audit, as well as any other matters that will provide audit transparency, and (4) if physicians audits are allowed, the undersigned should be allowed to be present to assist with the process.

WHERFORE, Claimants, by and through the undersigned counsel, The Yerrid Law Firm and Neurocognitive Football Lawyers, respectfully request the opportunity to address the matters in Motions 9815 and 9843, as further directed by the Court, as well as any other relief that is just and equitable.

Dated: April 23, 2018

Respectfully submitted,


*/s/ Ralph L. Gonzalez*
C. STEVEN YERRID, ESQ.
RALPH L. GONZALEZ, ESQ.
HEATHER N. BARNES, ESQ.
THE YERRID LAW FIRM
101 E. Kennedy Boulevard, Suite 3910
Tampa, Florida 33602
(813) 222-8222 (telephone)
(813) 222-8224 (telefax)
hbarnes@yerridlaw.com
cjameson@yerridlaw.com
kodell@yerridlaw.com
Florida Bar No. 207594
Florida Bar No. 564140
Florida Bar No. 85522


JIM HOLLIDAY, ESQ.
HOLLIDAY KARATINOS LAW FIRM PLLC
18920 N. Dale Mabry Hwy. Suite 101
Lutz, Florida 33548
(813) 868-1887 (telephone)
(813) 909-8535 (telefax)
jamesholliday@helpinginjuredpeople.com
Florida Bar No. 45284


THOMAS PARNELL, ESQ.
GIBBS & PARNELL, P.A.
722 E. Fletcher Ave.
Tampa, Florida 33612
(813) 975-4444 (telephone)
(813) 975-4445 (telefax)
Florida Bar No. 441988


JEFFREY MURPHY, ESQ.
JEFFREY D. MURPHY, P.A.
511 W. Bay St., Suite 352
Tampa, Florida 33606
(813) 443-5553 (telephone)
(813) 436-5190 (telefax)

12

Florida Bar No. 860808

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 23,2018, I caused the foregoing Reply to be electronically filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, and that the filing is available for downloading and viewing from the electronic court filing system by counsel for all parties.

*/s/ Ralph L. Gonzalez*
RALPH L. GONZALEZ
THE YERRID LAW FIRM