# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION, <br><br> THIS DOCUMENT RELATED TO: <br><br> ALL ACTIONS | Civil Action No. 2:12-md-02323-AB <br><br> MDL No. 2323 <br><br> Hon. Anita B. Brody |

**Opinion of Alfred W. Putnam, Jr.**

My name is Alfred W. Putnam, Jr. I have practiced law in Philadelphia as a trial and appellate litigator for almost forty years. I served as the Chairman and Chief Executive Officer of my law firm, Drinker Biddle & Reath LLP, from 2005 to 2015 and I continue to be a partner of the firm, which I joined in 1979. In my capacity as Chairman of the firm, I had to consider and often decide ethical questions regarding the propriety of the conduct (either past or proposed) of lawyers at the firm. Those questions included whether the firm could or should represent particular clients and/or what advice it could or should give to a client and/or whether there were arguments that we could not or should not make on behalf of a client. Since I became the Chairman Emeritus of the firm in 2015, I continue to be called upon to give advice to my successor and/or the firm's General Counsel when questions of this kind arise. A copy of my resume is attached hereto.

I have been asked whether it would have been unethical or otherwise inappropriate for a lawyer representing members of the class covered by the Class Action Settlement in this case to assist a client in obtaining and documenting a cash advance that was to be received from a litigation funder if the documentation for the proposed transaction included an assignment of the client's interest in proceeds that the client expected to receive as a result of the litigation.

I understand the question to arise in the following context:

A.   The Settlement Agreement includes a provision addressing the assignment of claims. It reads:

> Section 30.1 <u>No Assignment of Claims</u>. Neither the Settlement Class nor any Class or Subclass Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint. Any such assignment, or attempt to assign, to any person or entity other than the NFL Parties any rights or claims relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

B.   Notwithstanding the language of Section 30.1, a number of class members have sought the assistance of their counsel in obtaining various kinds of cash advances from various litigation funders which advances were secured by documents that assigned to the litigation funder at least a portion of the class member's interest in the receipt of settlement proceeds.

C.   Prior to the summer of 2016, neither the persons who had negotiated the Settlement Agreement nor the persons who were administering claims made pursuant to that Agreement had provided any written notice to the members of the class or their lawyers advising them that Section 30.1 of the Settlement Agreement prohibited cash advances or loans in which the recipient or borrower assigned a portion of his expected settlement proceeds to the litigation funder or lender.

D.   In July of 2016, Class Counsel sent an "Update on the Settlement" to class members advising them:

2

<u>BE CAUTIOUS IF SOMEONE APPROACHES YOU ABOUT THE SETTLEMENT</u>

> Some of you may be approached by persons who see an opportunity to enrich themselves with your valuable Settlement benefits. There are persons and organizations that offer loans secured by future Settlement payments. These loans typically carry excessive interest rates, sometimes over 3% a month, which allow even small "advances" to quickly snowball into substantial debt. These practices are sometimes referred to as predatory lending. We are very concerned that some of you may be the victim of these predatory lending practices. Though the promise of cash-in-hand can be tempting, especially during difficult financial times, if you are able to resist borrowing against any payments you might be eligible for under the Settlement, you should. We are hopeful that the Settlement will be open for registration before the end of the year and that claims for monetary awards for Qualifying Diagnoses can begin shortly thereafter.

In the course of the following year, neither Class Counsel nor anyone else administering the settlement sent any further notice or advice regarding this subject matter.

E.  In the summer of 2017, a dispute arose in a case captioned *Consumer Finance Protection Bureau, et. al. v. RD Legal Funding LLC, et. al.*, No. 17-cv-890 (S.D.N.Y.) over the question whether an assignment of settlement proceeds was permissible under the Settlement Agreement. On September 8, 2017, the Honorable Loretta Preska of the United States District Court for the Southern District of New York referred that question to Judge Brody, who presides over this litigation.

F.  On December 8, 2017, Judge Brody held that Section 30.1 of the Settlement Agreement unambiguously prohibits a class member from assigning his interest in the proceeds of the litigation to a lender or litigation funder in connection with a transaction designed to secure a loan or cash advance for the class member.

I am also advised that:

G.  On April 18, 2018, Judge Brody entered an order denying a motion filed by the Locks Law Firm seeking the appointment of Administrative Class Counsel. One of the reasons she gave for denying the motion was:

>The Locks Firm's role in facilitating Third-Party Funding Agreement to Class Members prohibited under the Settlement Agreement. This undermines any claim by the Locks Firm that it would be able to faithfully administer the Agreement.

H. The Locks Law Firm did assist client members of the class in obtaining cash advances and loans from various litigation funders up until September of 2017 but it has declined to assist clients in connection with such transactions since Judge Brody's December 8 order. The firm viewed the assistance it provided as part of the legal services that it was expected to provide to its clients pursuant to its existing fee agreements with those clients and it received no additional compensation from the clients for that work. Similarly, neither the firm nor any of its lawyers received any compensation from any of the litigation funders with which they negotiated or documented agreements on behalf of their clients.

Finally, I have also recently been advised that:

I. On April 23, 2018, the Claims Administrator for the NFL Concussion Settlement and the Special Master appointed in the Court's July 13, 2016 order advised the Locks Law Firm that advances obtained from one litigation funder – Esquire Bank – will not be deemed to involve assignments prohibited by Section 30.1 of the Settlement Agreement and/or Judge Brody's December 8, 2017 order. The Claims Administrator and Special Master reached this conclusion even though the Esquire Bank documents include an "Assignment of Litigation Proceeds and other Property" that reads:

>As collateral security for my loan, I assign to the Bank my entire right, title and interest to all funds that I am entitled to receive under, in connection with or as a result of the Litigation.

* * *

Taking into account the context and advice given to me as outlined above, I have been asked to give my opinion on whether lawyers of the Locks Law Firm acted unethically or otherwise inappropriately when they complied with requests from clients of the firm seeking assistance in obtaining and documenting cash advances in transactions in which the clients assigned their prospective interests in settlement proceeds to the lender. I have been asked to give this opinion on account of the reference in Judge Brody's April 18 order to the Firm's role in "facilitating" such loans (Item "G" above). I do not understand that reference to be an assertion of unethical conduct prohibited by a Rule of Professional Conduct but I do agree that it suggests otherwise improper or inappropriate conduct reflecting badly on the lawyers engaging in it. In particular, I understand Judge Brody to have concluded that the Locks Law Firm's assistance to its clients in connection with agreements that those clients wished to enter into was improper because those agreements included assignments prohibited by Section 30.1 of the Settlement Agreement, with which Settlement Agreement the Locks Law Firm lawyers were obliged to comply.

It is my opinion that it was neither unethical nor inappropriate - prior to Judge Brody's order of December 8, 2017 - for lawyers representing members of the class to assist their clients in connection with transactions in which the clients were seeking to obtain a cash advance even if the documentation for that transaction included an assignment of the client's interest in prospective settlement proceeds. In reaching this conclusion, I recognize that Section 30.1 of the Settlement Agreement appears on its face to prohibit any and all assignments of a class member's right or claim relating to the Class Action Complaint (excepting only assignments to the NFL). Even so, I believe that prior to Judge Brody's December 8 ruling, a reasonable lawyer could have believed (and that the lawyers at the Locks Law Firm did in fact believe) that Section

5

30.1 did not apply to the negotiation and documentation of a loan transaction of the type described above.

This understanding of the Settlement Agreement was reasonable, in my opinion, because the Settlement does not directly address litigation funding, loan documentation or lending practices even though the drafters of that Agreement were sophisticated and experienced lawyers who knew that lenders and litigation funders routinely include assignments of various kinds in the documentation of their transactions. They also knew that it was highly likely that at least some members of a class such as this one would seek to obtain a loan or cash advance that would use documentation including an assignment of the class member's interest in settlement proceeds. It seems to me that if the drafters or administrators thought they had prohibited such advances or loans - whether in the text of the Settlement Agreement or otherwise - they would have provided some notice or advice to this effect before the question arose in the Southern District of New York. But they did not do so. Indeed, such advice as they did provide on this subject was a warning against what they characterized as "predatory lending" practices (Item D above) - a warning that made no reference to Section 30.1 and did not so much as suggest, much less warn or advise, that the loans or advances of the type they were describing might be prohibited by the Settlement Agreement itself.

It follows, I think, that a reasonable lawyer approached by a class member client before December 8, 2017 for advice or assistance in obtaining a loan or cash advance might well have believed that the Settlement Agreement itself did not proscribe any particular kind of loan or advance and that he or she was obliged to provide the client with the requested legal assistance. I should add, in this regard, that I understand that the Locks Law Firm (properly in my view) considered a request of this kind to be within the scope of the legal services it had already agreed

6

to provide to the client in connection with the class action litigation and settlement. Accordingly, the firm was already under an obligation to provide advice and assistance to the client consistent with Rule of Professional Conduct 1.2, which contemplates that a lawyer will respect the choices that a client makes about the client's own objectives. It is neither unethical nor otherwise improper for a lawyer to abide by a client's decision to enter into a transaction even if the lawyer has advised against it or recommended an alternative course.

That said, it is my opinion that once Judge Brody entered her December 8 order, lawyers representing members of the class could not appropriately assist a client in negotiating or documenting a loan or cash advance if the documentation included an assignment of the client's interest in prospective proceeds of the settlement. I agree that lawyers representing members of the class owe a duty to the Court not to assist a class member in entering into an agreement that the lawyer knows to be prohibited by the Settlement Agreement. This is so, in my opinion, even if, as here, the risk of entering into the prohibited agreement is entirely borne by the lender or litigation funder and not by the class member.

Finally, I have also been asked whether, in my opinion, a lawyer representing a class member could now assist his or her client in entering into a loan of the type offered by the Esquire Bank given recent advice from the Claims Administrator and Special Master that those loans are not prohibited by the Settlement Agreement notwithstanding their use of assignments of interests in settlement proceeds. I understand that the Locks Law Firm did in fact assist its clients in entering into loans with the Esquire Bank prior to Judge Brody's December 8 Order and, as noted above, I do not consider that assistance to have been unethical or otherwise inappropriate. I also understand that lawyers representing members of the class have been advised that they might reasonably rely on opinions given by the Claims Administrator or one of

7

the Special Masters and for that reason I question whether a lawyer helping a class member in connection with an Esquire loan now runs a significant risk of criticism or sanction on that account.

Even so, I do not consider it to be linguistically possible to reconcile the Claims Administrator's and Special Master's treatment of the assignments in the Esquire Bank loans with the clear language of Section 30.1 of the Settlement Agreement once that language has been held to apply to loans. The various reasons given by the Claims Administrator and Special Master for exempting the Esquire Bank loans – *i.e.*, the existence of a Post Settlement Loan Note and Security Agreement; the fact the bank is regulated by the Office of the Comptroller of the Currency; the absence of application, underwriting or origination fees; the transaction documents' grant of a security interest as collateral; and the presence of a Truth in Lending Disclosure – may distinguish the Esquire Bank loan from other litigation funding transactions but those distinctions all relate to the nature of the bank and/or its lending practices and evidently reflect a preference for the bank and its practices when compared to those of competing litigation funders offering non-recourse loans. That preference may well be justifiable on policy grounds, but the fact is that Section 30.1 of the Settlement Agreement addresses *assignments* – not lending practices – and I do not see how it can be read as applying to assignments made in connection with certain types of loans or lenders but as not applying to assignments made in connection with other types of loans or lenders. In other words, I believe the interpretation advanced by the Claims Administrator and Special Master is contrary to the plain meaning of Section 30.1 as that provision has been construed by Judge Brody in her December 8 order. For this reason, if my firm were representing class members in this case, I would be reluctant to allow one of our partners to assist a client in assigning his interest in litigation proceeds in the manner those

8

interests are assigned in the Esquire Bank documents, absent some express clarification of the Court's December 8 order.

Dated: May 1, 2018

Respectfully submitted,

Alfred W. Putnam, Jr.
Alfred.putnam@dbr.com
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
215-988-2907

9

**ALFRED W. PUTNAM, JR.**
124 Bleddyn Road
Ardmore, PA 19003
(610) 649-7166 (Home)
(215) 988-2907 (Office)
(215) 988-2757 (Fax)
(610) 416-0991 (Cell)
alfred.putnam@dbr.com

## PROFESSIONAL

| | |
|---|---|
| 1979 - present | DRINKER BIDDLE & REATH LLP<br>One Logan Square<br>18th and Cherry Streets<br>Philadelphia, PA 19103-6996<br><br>Chairman Emeritus, 2015 - present<br>Chairman and Chief Executive Officer, 2005 - 2015<br>Partner, 1985 - present<br>Associate, 1979 - 1985 |
| 1978 - 1979 | Law Clerk to<br>THE HONORABLE ARLIN M. ADAMS<br>United States Court of Appeals for the Third Circuit |

## EDUCATIONAL

| | |
|---|---|
| 1975 - 1978 | UNIVERSITY OF PENNSYLVANIA LAW SCHOOL<br>J.D. magna cum laude '78; Editor-in-Chief, <u>University of Pennsylvania Law Review</u> Vol. 126; Order of the Coif. |
| 1973 - 1975 | UNIVERSITY COLLEGE, OXFORD<br>B.A. with First Class Honors (Modern History);<br>Oxford Union; Gridiron Club. |
| 1969 - 1973 | HARVARD COLLEGE<br>A.B. summa cum laude '73 (History);<br>John Harvard Scholar; Hasty Pudding Theatrical 125 (Producer);<br>Delphic Club (President). |
| 1956 - 1969 | CHESTNUT HILL ACADEMY<br>Philadelphia, Pennsylvania '69; Valedictorian (First in class);<br>President of Student Body. |

RELATED PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2002 – present | Member, AMERICAN LAW INSTITUTE |
| 1997 – present | Fellow, AMERICAN COLLEGE OF TRIAL LAWYERS |
| 1994 – present | UNIVERSITY OF PENNSYLVANIA LAW SCHOOL AMERICAN INN OF COURT (Chairman 2005- 2007; President 2002-2004; Secretary and Treasurer, 1994-2002) |
| 1989 – present | President, University of Pennsylvania Chapter of THE ORDER OF THE COIF |
| 1986 – 1991 | Lecturer, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL; Course in Appellate Advocacy |

Member: Federalist Society; Legal Club of Philadelphia (Secretary); Junior Legal Club of Philadelphia.

OTHER ACTIVITIES

| | |
|---|---|
| 2012 - present | Board of Directors, THE PHILADELPHIA CONTRIBUTIONSHIP |
| 1995 – 2014 | Board of Trustees, JEFFERSON HEALTH SYSTEM (Chairman, 2004-2009) |
| 1993 – 1996 1997 – 2005 | Board of Governors, MAIN LINE HEALTH, INC. |
| 1988 – present | Trusteee, LANKENAU HOSPITAL/LANKENAU HOSPITAL FOUNDATION (Chairman, 1996-present) |
| 1995 - 1998 | Trustee, FOX CHASE CANCER CENTER |

Church of the Redeemer, Bryn Mawr (Vestryman, 1990-1993); Philadelphia Club (President, 1993-1997); People for John Heinz (Secretary and Counsel); Harvard and Radcliffe Club of Philadelphia (President, 1996-1998).

PERSONAL

Born: September 27, 1951.

Married (Kathleen G. Putnam), one daughter (Clare Putnam Pozos).