

# Fox Rothschild LLP
### ATTORNEYS AT LAW

2000 Market Street
20th Floor
Philadelphia, PA 19103-3222
Tel (215) 299-2000  Fax (215) 299-2150
www.foxrothschild.com

PETER C. BUCKLEY
Direct No: 215.299.2854
Email: PBuckley@FoxRothschild.com

May 1, 2018

**VIA E-MAIL AND ECF**

Orran J. Brown, Esquire       (obrown@browngreer.com)
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231

Wendell E. Pritchett, Esquire   (pritchet@law.upenn.edu)
University of Pennsylvania Law School
1901 Walnut Street, Apt. 16C
Philadelphia, PA 19103

Jo-Ann M. Verrier, Esquire    (jverrier@law.upenn.edu)
University of Pennsylvania Law School
3501 Sansom Street
Philadelphia, PA 19104

   Re: *In Re: National Football League Players' Concussion Injury Litigation*
      **No. 2:12-md-02323-AB**

Dear Claims Administrator Brown and Special Masters Pritchett and Verrier:

I represent Thrivest Specialty Funding, LLC ("Thrivest"). I write with respect to your administration of the settlement in the above-referenced class action generally and, in particular, with respect to your determination that Thrivest's agreement with William E. White ("Mr. White") constitutes an impermissible "assignment" under the Settlement Agreement and the Court's December 8, 2017 Explanation and Order. I am asking for an audience to discuss the concerns raised below and highlighted in bold.

A Pennsylvania Limited Liability Partnership

California    Colorado    Connecticut    Delaware    District of Columbia    Florida    Illinois
Minnesota    Nevada    New Jersey    New York    Pennsylvania    Texas    Washington



**Fox Rothschild** LLP
ATTORNEYS AT LAW

*In re: National Football League Players' Concussion Injury Litigation*
No. 2:12-md-02323-AB
May 1, 2018
Page 2

At the threshold, Thrivest reiterates its objection to any adjudication of rights in this forum because its agreement with Mr. White contains an arbitration clause. The Supreme Court of the United States has made clear that the Federal Arbitration Act prohibits anyone other than an arbitrator from deciding questions of validity where there is a challenge to the contract on the whole as is the case here. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010) ("even … where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of the contract—we nonetheless require the basis of challenge be directed specifically to the agreement to arbitrate before the court will intervene"). Although not a party to the NFL Concussion Litigation, Thrivest raised this objection in its Opposition to Class Counsel's Motion to Withhold and the Court has yet to address the issue. (Opposition to Motion to Withhold, Dkt. 8470). Thrivest commenced AAA arbitration against Mr. White on April 11, 2018. A redacted copy of Thrivest's Demand is enclosed. That arbitration is the appropriate forum for this dispute (and others regarding Thrivest's agreements) to be resolved.

Moreover, notwithstanding this fundamental jurisdictional defect, Thrivest objects to the procedure through which you decided that Thrivest's agreement with Mr. White was invalid. Thrivest was excluded from that process and, indeed, the decision was made before Thrivest was even provided notice of what was going on.[1] As such, the ex parte procedure deprived Thrivest of its right to due process under the law and contravened your expressed desire for fairness and transparency in the administration of this settlement. **Thrivest respectfully asks that you vacate your prior decision with respect to Mr. White's agreement (and withhold ruling on other Thrivest agreements) and, while reserving its jurisdictional challenge, requests an opportunity to be heard regarding the validity of its agreements.**

Indeed, jurisdiction aside, there are important questions that must be considered here and so it imperative that both sides have a voice before a determination is made that Thrivest's agreements are invalid under the Settlement Agreement.

The Court's December 8, 2017 Explanation and Order (which has been appealed) explained, "the purpose of the anti-assignment provision is to protect the interests of Class Members by recognizing that Class Members receiving monetary awards are by definition cognitively impaired." Mr. White is a class member, not because he is suffering from a cognitive impairment,

---

[1] I understand that you will provide notice directly to Thrivest in the event that a class member is not represented by counsel, but that you are relying on counsel to provide that notice when one is present. In view of the disincentive for counsel to notify Thrivest timely, Thrivest respectfully requests that you provide Thrivest notice directly irrespective of whether an attorney is involved.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

*In re: National Football League Players' Concussion Injury Litigation*
No. 2:12-md-02323-AB
May 1, 2018
Page 3

but because he has ALS. Indeed, just last week on April 25, 2018 (long after receiving the benefit of his agreement with Thrivest), Mr. White delivered an eloquent invocation at the memorial for former Ohio State Football Coach Earle Bruce. See Video of White Invocation (beginning at 10:08) available at https://www.youtube.com/watch?v=RmbbOf-ct5I. At the time of the agreement, Mr. White's treating neurologist attested to his competency to enter into the transaction. (Exhibit B to Demand). This disconnect between the rationale for the anti-assignment clause and its application here warrants further examination.

Moreover, Thrivest's transaction with Mr. White is not an "assignment of rights or claims." Mr. White sold Thrivest his right to certain proceeds from the NFL Concussion Litigation (defined in their agreement as, the "TSF Distribution") in exchange for $500,000. Although their agreement contained the word "assign," it was captioned a "Non-Recourse Finance Transaction (Sales and Purchase Agreement)" and evidenced the parties intent that the transaction be a "true sale" and not an assignment. This is a distinction with a difference here.

Professor Charles Mooney has emphasized the need to look beyond labels and focus on the substance of a transaction to determine whether it is a true sale. Steven L. Harris & Charles W. Mooney, Jr., *When Is a Dog's Tail Not a Leg?: A Property-Based Methodology for Distinguishing Sales of Receivables from Security Interests That Secure an Obligation*, 82 U. Cin. L. Rev. 1029, 1051-52 (2014) (nature of transaction should be determined "regardless of the labels [the parties] applied to the transaction"). And, courts have agreed. *See, e.g., In re Olde Prairie Block Owner, LLC*, 464 B.R. 337, 347 (Bankr. N.D. Ill. 2011) (citing *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545 (3d Cir. 1979)) (courts should "ignore[] labels attached by the parties to the transaction").

A true sale occurs where the transferee (here, Thrivest) receives "most of the risk of loss from default by the obligors and most of the opportunity for gain or loss in the market value of the receivables," and the seller (here, Mr. White) receives fair market value for the transfer. *LaSalle Nat'l Bank Ass'n v. Paloian*, 406 B.R. 299, 315 n.11 (N.D. Ill. 2009) (quoting Thomas E. Plank, *The Security of Securitization and the Future of Security*, 25 Cardozo L. Rev. 1655, 1675 (2004)). Mr. White did not assign his "rights or claims" in the NFL Concussion Litigation to Thrivest, he sold his interest in the TSF Distribution in exchange for $500,000. Through the Agreement, Mr. White transferred the risk of loss (i.e., that he would not receive an award, or that his award would be less than expected) to Thrivest in exchange for a sum certain. But he did not assign his rights or claims or in any way allow Thrivest to take over and deal directly with the NFL.



Fox Rothschild LLP
ATTORNEYS AT LAW

*In re: National Football League Players' Concussion Injury Litigation*
No. 2:12-md-02323-AB
May 1, 2018
Page 4

On the other hand, an assignment contemplates the right of the assignee to collect on the assignor's receivable directly. *See, e.g., Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1190 (7th Cir. 1990) (noting that Uniform Commercial Code treats secured party exercising right to collect on assignor's account receivable as assignee). An assignee stands in the shoes of the assignor, and the assignee's rights are neither greater than nor inferior to those of the assignor. *U.S. Steel Homes Credit Corp. v. South Shore Dev. Corp.*, 419 A.2d 785, 789 (Pa. Super. Ct. 1980). In other words, unlike in a true sale, where the transferee assumes the risk of default but does not obtain privity with the obligor, an assignee becomes the "legal owner of the claim" and is "entitled to sue in its own name." *In re Mill Street, Inc.*, 96 B.R. 268, 269 (B.A.P. 9th Cir. 1989). This distinction matters here, but has never been examined.

Courts looks to a number of factors to determine whether a transaction is a "true sale." A true sale may exist where (1) the transaction is entered into without recourse; (2) the buyer can collect assets only if the seller is able to produce them; (3) the transaction is entered into at arms' length and for adequate consideration; and (4) the plain language of the contract indicates an intent to enter into a true sale. *See e.g., In re Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. 558, 708-09 (Bankr. N.D. Ill. 2013). A thorough discussion of these factors is beyond the scope of this letter, but it suffices to say that Thrivest's agreement with Mr. White satisfies each factor. To the extent that you will continue to interpret Thrivest's agreements, **Thrivest respectfully requests an opportunity to be heard regarding whether, in fact, Section 30.1 of the Settlement Agreement has any application to its contracts**.

There has been a rush to judgment regarding "assignments," and a lack of understanding regarding the nature of Thrivest's agreements—no surprise in view of Thrivest's absence from the process. The label is being thrown around and used to invalidate transactions that, in some circumstances (for example, Thrivest's reasonable rates and transparent terms), are economically superior to the loans to which they have been compared—which, as an aside, almost universally contain assignments of security interests in the proceeds from the settlement and thus cannot be distinguished using the criteria that has been applied.

Thrivest purchased the TSF Distribution (a portion of the proceeds from the settlement, currently only $653,058.09 as of April 30, 2018) from Mr. White for $500,000.[2] Unlike a loan, where the borrower is obligated to repay the advance no matter what, Thrivest's agreement was non-

---

[2] Through his agreement with Thrivest, Mr. White was able to pay off nearly $200,000 in tax liens and receive an economic benefit from his claim in the NFL Concussion Litigation well more than a year before his claim was even approved.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

*In re: National Football League Players' Concussion Injury Litigation*
No. 2:12-md-02323-AB
May 1, 2018
Page 5

recourse—meaning that Mr. White had no obligation unless and until he received an award from the settlement. From the agreements that we have seen, Esquire Bank charged 9-12% for one-year term recourse loans, exclusive of compounding and penalties if not satisfied within one year. Thrivest's return under Mr. White's agreement is 19%, which, Thrivest submits, is imminently reasonable in view of the additional risk associated with a non-recourse transaction.

I urge you to proceed with caution for the reasons outlined above, but also in view of the recent reporting regarding Co-Lead Class Counsel's relationship with Esquire Bank (see attached report from Outside the Lines). Thrivest has been demonized because its transactions have been characterized as prohibited "assignments," while recourse lenders such as Esquire Bank have been lauded by Co-Lead Class Counsel.[3] These recent revelations demonstrate the need to proceed with caution and to look past over-simplified name-calling. As summarized above, when the nature and economics of Thrivest's agreements are examined, they look nothing like how Co-Lead Class Counsel has portrayed them.

Thrivest has always been committed to fairness and transparency in its dealings with class members, and fears that these recent events will spawn unnecessary and costly arbitration and related litigation for all involved. It is our sincere hope that, through further dialogue and a voice in your process, we might find a better way.

Thank you for your consideration of these requests.

Very truly yours,

*Peter C. Buckley*

Peter C. Buckley

---

[3] The Expert Opinion of Alfred Putnam (Dkt. 9921-2) submitted in support of a recent Motion for Reconsideration (Dkt. 9921) lends further credibility to Thrivest's concerns about the distinctions that the Claims Administrator and Special Masters are attempting to draw between assignments made in connection non-recourse advance transactions and assignments made in connection with recourse loans—"the fact is that Section 30.1 of the Settlement Agreement addresses assignments - not lending practices - and I do not see how it can be read as applying to assignments made in connection with certain types of loans or lenders but as not applying to assignments made in connection with other types of loans or lenders."



*In re: National Football League Players' Concussion Injury Litigation*
No. 2:12-md-02323-AB
May 1, 2018
Page 6

cc:     All counsel of record via ECF

 **ESPN.com:** OTL     [Print without images] 

Thursday, April 26, 2018

# Documents allege lead attorney in NFL concussion deal did not disclose conflict of interest

By Peter Keating
ESPN.com

The co-lead attorney representing players in the NFL concussion settlement steered multiple plaintiffs to a bank that offered interest-charging cash advances on their settlement proceeds without informing them he was a board member of the bank's parent company, sealed court documents obtained by Outside the Lines state.

Christopher Seeger, the chief architect of the NFL concussion settlement, was on the board of directors at Esquire Financial Holdings, the parent company of Esquire Bank, an entity that made loans to NFL players seeking quick financial help.

Since the NFL concussion settlement went into effect in January 2017, retired players or their representatives have submitted more than 2,200 claims for monetary awards based on diagnoses of conditions such as ALS or Parkinson's disease, which qualify them for compensation if the conditions are confirmed. But of claims that have been processed so far, more than 70 percent have been denied, audited and then denied, or held up due to requests for more paperwork. Just nine cases of dementia have resulted in payouts, for example, according to the most recent claims report in the case, dated April 23.

Many players and their families have found it time-consuming and expensive to work their way through the claims process, and hundreds have struck deals with litigation funders, including companies such as Cash4Cases and Top Notch Funding. These businesses offer money up front in exchange for settlement awards, sometimes charging the equivalent of nearly 40 percent annual interest rates.

Seeger investigated these arrangements, which he called "predatory," and last October he drew up a list of 15 firms he wanted the court that is overseeing the settlement to ban from striking deals with the plaintiffs. In December, Judge Anita Brody of the United States District Court for the Eastern District of Pennsylvania, who is presiding over the case, agreed with Seeger's argument. She voided any agreements that assigned monetary claims to a third party; three companies have appealed that decision.

Amid that legal brouhaha, two funding companies filed a memo with the court in November 2017 noting that Seeger served on the board of directors at Esquire Financial Holdings -- a firm he had not included on the list he made for Brody. Seeger responded by noting he had left Esquire's board in May 2016. He said his "prior directorship" had "nothing to do" with his recommendations to the court to bar specific funders from doing business with the players.

But Seeger, who stands to earn more than $70 million for his law firm, Seeger Weiss LLP, because of his lead role in the settlement, was considerably more active on behalf of Esquire Bank than he has

previously stated. He recommended Esquire Bank to attorneys for former NFL players, and he also helped Esquire develop its concussion settlement funding program.

In one example, Seeger asked Craig Mitnick, another lawyer for plaintiffs in the NFL concussion case, to "meet with and assist Esquire in developing a funding program for Retired Players," according to a letter that Mitnick wrote to Brody this month that was obtained by Outside the Lines.

"Craig, I want to introduce you to a very close friend, Ari Kornhaber, who I think can help you out with all kinds of banking needs and who works for a bank with a special relationship to the plaintiffs' bar," Seeger wrote to Mitnick in a Feb. 13, 2015, email about Kornhaber, executive vice president and director of sales at Esquire Bank. Mitnick and Kornhaber each replied later that day, confirming their contact information.

In August 2016, about three months after Seeger left the Esquire board, Kornhaber wrote Mitnick: "I'm reaching out to you again at the suggestion of Chris Seeger."

After that, Mitnick met in his office with two of Esquire's executives "for a substantial period of time and ... assisted them with developing a funding formula for their proposed Concussion funding program," according to the letter Mitnick filed with Brody.

In a statement to Outside the Lines this week, Seeger said: "Several lawyers for former players asked for my recommendations on lending options, and on these occasions I would introduce them to Esquire Bank. ... I had conversations with Esquire Bank explaining the settlement as they were establishing their program and was happy to do so as a way to combat the predatory lending practices that were taking place. ... Esquire would enter loans at commercially reasonable rates, and they are also a federally regulated bank subject to significant oversight."

Seeger further told Outside the Lines he "never reviewed any individual's funding calculations or agreements; this would have been arranged between Esquire Bank and the class member's attorney."

On Sept. 16, 2016, however, Ayal Glezer, then senior vice president and chief credit and lending officer at Esquire, sent an email to Mitnick about providing an advance payment for a former running back suffering from Parkinson's disease. "Craig," he wrote, "I ran the calc by Seeger and [David] Buchanan today. David had a couple of suggestions that I will run by you." Buchanan is a partner at Seeger Weiss. The message also copied Kornhaber and Ave Doyle, retail director at Esquire Bank.

In a court filing last November, Seeger stated: "I was never a Director of Esquire Bank." Yet Esquire Bank is a wholly owned subsidiary of Esquire Financial Holdings, whose most recent annual report states, "Each director of Esquire Financial is also a director of Esquire Bank." In September 2012, Andrew Sagliocca, president and CEO of both companies, wrote a letter on Esquire Bank letterhead to "My Fellow Shareholders" to "congratulate two of our distinguished Board Members, Russ Herman and Christopher Seeger" for being honored in a ranking of class-action lawyers.

In his statement to Outside the Lines, Seeger said, "I had no vote or governance authority on any Esquire Bank matter."

Mitnick told Outside the Lines that Seeger "encouraged my clients to do business with Esquire Bank, where he was a director. I believe he thought he was doing the best thing for players getting funded by referring them to a bank so they wouldn't be subject to predatory lenders. But a reasonable person would disclose anything that could potentially be a conflict of interest."

Seeger, co-founder of Seeger Weiss, did not answer a question from Outside the Lines about whether he ever disclosed his Esquire ties to the players' attorneys.

In the 

Christopher Seeger, left, is the co-lead players' attorney in the NFL concussion settlement.

documents obtained by Outside the Lines, Mitnick also wrote that he was misled about a key component of any cash advance: whether a borrower has to surrender his legal right to all or part of any eventual settlement payout. Such language is termed an "assignment clause," and its precise definition is at the heart of whether Esquire operates any differently than the funders that Brody has prevented from working with players.

In the November court filing defending his work with Esquire, Seeger insisted that its agreements were "loans secured by the monetary awards, as opposed to 'assignments' of portions of those awards." Mitnick wrote to Brody that he "assisted Esquire at Mr. Seeger's suggestion while never being advised that any eventual funding Agreement would contain an 'Assignment' clause."

But the post-settlement loan note and security agreement for one of Mitnick's clients, a former defensive end who took a $77,310 advance from Esquire in 2017, names the full amount of the player's NFL settlement award ($656,000) and states: "ASSIGNMENT OF LITIGATION PROCEEDS AND OTHER PROPERTY: As collateral security for my loan, I assign to the Bank my entire right, title and interest to all funds that I am entitled to receive under, in connection with or as a result of the Litigation." Esquire also sent Mitnick a lien notice calling this client the "Assignor" and demanded repayment from his settlement "prior to any Proceeds being released to Claimant."

"I helped Esquire develop their funding calculator, but I didn't see the assignment language in the loan agreements until Esquire sent me the final documents, signed by my clients," Mitnick told Outside the Lines. "You can't separate Esquire from other funders if assignment language is in their agreements."

In his statement to Outside the Lines, Seeger said that if the special masters assisting Brody in the case "determine that Esquire has entered into an improper assignment with a class member, these should be voided per the court's order."

This isn't the first time plaintiffs' attorneys have questioned whether Seeger has operated fully in the best interests of the players he represents. In 2013, Outside the Lines reported that Seeger tried to arrange taking a 10 percent cut of any money awarded to a 79-year-old former NFL player. Sam Franklin, the player's lawyer, called the proposal "most troubling" and charged that Seeger was trying to extract money from his client on top of what Seeger Weiss would receive from the settlement's common fund for legal fees.

"It's double-dipping, getting paid by the defendant and getting an additional 10 percent by each client you sign up," Franklin said. "I've never seen anything like this."

Seeger backed off, writing Franklin: "Although we absolutely reject your suggestions and assumptions of anything inappropriate, we will not be executing a retainer with your client."

Relations between Seeger and the plaintiffs he's leading have deteriorated sharply over the past year.

One turning point came last October, when Seeger infuriated many of the leading attorneys in the concussion case by recommending the settlement pay his firm $70.4 million of the $108 million available for legal fees. And as payouts to former players and families have bogged down, Seeger has outraged some plaintiffs by echoing the NFL's assurances that the program is actually working well.

In a motion filed last month, the Locks Law Firm, which is based in Philadelphia and represents more than 1,000 players, asserted that "the Settlement Agreement is in danger of failing" and asked for authority to help Seeger administer the deal. Nineteen plaintiffs' firms joined the Locks motion; even Anapol Weiss, whose attorneys are Seeger's co-lead counsel, agreed there should be a hearing. More than 180 retired players and family members wrote to Brody, too, supporting the motion.

Brody has the authority to decide whether any of Seeger's practices in the case have been improper. But the judge has moved quickly past such questions. On April 2, for instance, she announced that once Seeger answered the Locks motion, she would accept no further replies. Seeger responded on April 13, including in his declaration a series of attacks on other plaintiffs' attorneys, including Mitnick, for allegedly mishandling claims and soliciting funding agreements. Four days later, Mitnick filed his letter to Brody about the Esquire Bank dealings. Almost immediately, Brody put Mitnick's documents under seal.

"The judge knows what's in the documents I sent, because I followed proper procedure and filed them electronically with the court, and she's the one who put them under seal," Mitnick told Outside the Lines. "I would have been happy to redact anything where she had privacy concerns. Instead, she buried it all."

On April 18, Brody denied the Locks motion. She wrote that in reaching her decision, she had considered material from the NFL, Seeger, the administrators of the settlement's claims and baseline testing, and the special masters in the case.

Brody added that she has had "the chance to witness the fine job Seeger Weiss has done in protecting all the Members of the Class."