**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN OF PENNSYLVANIA**

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
LITIGATION

_____

THIS DOCUMENT RELATES TO:
ALL ACTIONS

§
§
§
§
§
§
§
§
§
§
§

**No. 12-md-2323 (AB)**

**MDL No. 2323**

### MEMORANDUM IN SUPPORT OF THE ALEXANDER OBJECTORS' AND LUBEL VOYLES LLP'S FED R. CIV. P. 59 MOTION FOR RECONSIDERATION/NEW TRIAL

The Alexander Objectors and Lubel Voyles, LLP (hereinafter "Movants") respectfully file this memorandum in support of their Fed. R. Civ. P. 59 Motion for Reconsideration/New Trial in connection with the Court's Order/Memorandum Opinion (ECF 9860/9861) granting Class Counsel's Fee Petition and requested 5% holdback (ECF 7151), and the Court's Order/Memorandum Opinion (ECF 9862/9863) presumptively limiting the effective IRPA fee recovery to 17%.

## I. Introduction

On April 5, 2018, the Court decided "[i]t is time to focus on fees." (ECF 9860, p. 1;ECF 9862, p. 1)  Movants agree that it is time to compensate Class Counsel for reasonable fees and expenses incurred to achieve a Settlement Agreement the Court has approved.  On the other hand, it is both premature and fiscally unwise to consider a bonus  to Class Counsel in year one of a 65-year Settlement.  It is premature  because there is an insufficient track record for this Settlement Agreement to be declared a complete victory for Class Members.  In fact, one year of data suggests otherwise.  It is fiscally unwise for a fiduciary to spend all of  the money set aside for common benefits fees in the beginning of year 2.  Exhausting the Fee Fund via bonus does not reserve any fees for implementation.  And, the Court agrees that there is no

1

way to know at this time how much in fees are necessary to implement the Settlement over 64 more years.  (ECF 9860, p. 17-18)  But, the Court's appointed expert sets forth a more fiscally responsible plan for maximizing Class Member dollars.  It is a detailed proposal to compensate Class Counsel a fee and a partial bonus and then invest the rest of the money so that it will grow to meet future fees.  (ECF 9526)

If the Court gives all of the money to Class Counsel now, the Court must reach into Class Members' pockets for new money to pay future fees. Along with the Court's expert, every appointed Class Counsel but one agrees that is a bad plan.  The Court rejects the majority view and finds Class Counsel's $112.5 fee request reasonable in light of evidence secretly considered.  (ECF 9860) As a result of that finding, the Court concludes it is necessary and appropriate at this time to tax each Class Member's settlement recovery by 5% (ECF 9860) and cap the percentage of each Class Member's private attorneys' fee contract (ECF 9862).

It is time to compensate Class Counsel for reasonable efforts to date; the Court appointed an auditor in 2012 to consider ongoing time records for just that purpose.  It is not time, however, for the Court as fiduciary to place Class Counsel's interest in a bonus ahead of the Class Members' interest in maximizing their settlement dollars.  The fee orders will work an irrevocable and manifest injustice on every Class Member.  The Court should grant a new trial.

## II.  Argument and Authority

### A.    Standard for Rule 59 Reconsideration/New Trial

Under Federal Rule of Civil Procedure 59(a)(1)(B), '[a] motion for a new trial in a nonjury case or a petition for rehearing [is appropriate for a] manifest error of law or mistake of fact . . .'" *Glemser v. United States*, 2010

2

WL 1688544, at *1 (D.N.J. Apr. 26, 2010) (quoting 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2804 (2010)).  In this nonjury trial on fees, fee holdback, and fee capping the Court committed a series of related manifest errors of law and fact.  The Court should also grant this motion under Fed. R. Civ. P. 59(e) because there is a need to correct a clear error of law or fact and to prevent manifest injustice. Fed. R. Civ. P. 59(e); *Allah v. Ricci*, 532 Fed.Appx. 48, 51 (3d Cir. 2013) (citing *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)); *see also Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

Under Third Circuit precedent, "clear error [exists] if 'after reviewing the evidence, [the court is] left with a definite and firm conviction that a mistake has been committed.' " *Norristown Area Sch. Dist. v. F.C.*, 636 Fed.Appx. 857, 861 n. 8 (3d Cir. 2016) (quoting *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1220 (3d Cir. 1993)).  Manifest injustice occurs where there is "'an error in the trial court that is direct, obvious, and observable.'" *Greene v. Virgin Islands Water & Power Auth., Civ. Action,* No. 06-11, 2012 WL 4755061, at *2 (D.V.I. Oct. 5, 2012) (quoting *Tenn. Prot. & Advocacy, Inc. v. Wells*, 371 F.3d 342, 348 (6th Cir. 2004)).

The Courts' Order/Memorandum Opinion (ECF 9860/9861) granting Class Counsel's Fee Petition and requested 5% holdback (ECF 7151); and the Court's Order/Memorandum Opinion (ECF 9862/9863) presumptively limiting the effective IRPA fee recovery to 17% contain separate but related obvious errors of law and fact. The Court should grant a new trial.

**B.     The Court committed a clear error *sua sponte* reviewing Class Counsel's time records *in camera* to determine Class Counsel's Fee Petition.**

The Third Circuit recognizes a strong presumption in favor of public

accessibility to judicial records; it is a right that predates the United States Constitution. *See Fair Labor Assoc. Practices v. Riedel*, 666 Fed.Appx. 209, 211-12 (3d Cir. 2016) (citing *LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 220-21 (3d Cir. 2011) and *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 783 (3d Cir. 1994)). The Court violated that right by requesting, receiving, and relying upon Class Counsel's time records *in camera* without notice to the parties; an invocation of privilege or confidentiality; or an opportunity for Class Members to object. (ECF 9860 p. 15; stating "[u]pon my request, Class Counsel submitted copies of time records from these firms for my *in camera* review"). Consideration of secret records to award fee plus bonus and then tax Class Members is particularly erroneous where the Court serves as a fiduciary to Class Members in handling the fee funds.

    **1.**    **The error is obvious and observable because the Court violated the Open Access Doctrine reviewing the documents *in camera***

The Court committed a clear error by denying open access in the fee-award trial. Upon the entry of the Court's fee award, the Court revealed for the first time that it had received and considered time records submitted by Class Counsel. (ECF 9860, p. 15) Based upon those secret records, the Court found that the hours Class Counsel had alleged were spent on common benefit to the class to be fair, reasonable, and presumably nonduplicative. *Id*.; *see See Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983) (holding that to arrive at a reasonable number of hours worked, the court must excise those hours deemed excessive, redundant, or otherwise unnecessary); *see also Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir.1983) (explaining that Class Counsel must properly delegate tasks so that "a Michelangelo [does] not charge Sistine Chapel rates for painting a farmer's barn").

There are three, distinct reasons that the Court's resolution of the fee-

award matters upon *in camera* filings from Class Counsel and without open access to Class Members creates manifest injustice to those Class Members. First, the Fee Award "trial" was conducted *in camera* by the Court without either notice to the Class Members or assertion of privilege or confidentiality by Class Counsel.  Second, the *in camera* trial was conducted after the Court implicitly refused all of the Alexander Objectors efforts to test the underlying data that the Court ultimately reviewed *in camera*.  Finally, the public version of Class Counsel's Fee Petition (ECF 7151) is not legally or factually supported.

▪ The Court requested and reviewed materials without notice to the Class Members.

There are appropriate legal tools for the Court to receive *in camera* materials or to seal filings.  For example, although a Court may order a judicial record sealed "when justice so requires, but '[t]he burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption.'" *LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 220-21 (3d Cir. 2011) (quoting *In re Cendant Corp.,* 260 F.3d 183, 190 (3d Cir. 2001).

The Eastern District of Pennsylvania Local Rules also speak to sealing documents tendered to the Court.  Local Rule 5.1.5(a) provides that "a document in a civil action may be filed under seal only if (1) the civil action is brought pursuant to a federal statute that prescribes the sealing of the record or of certain specific documents; or (2) the Court orders the document sealed. Further, a party seeking to seal records must show: (a) the nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted, and (d) why a less restrictive

alternative to the relief sought is not available. *See LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d at 219.

Class Counsel filed no motion to seal or to submit time records *in camera*. The Court entered no order sealing the time records. Thus, the Court did not put Class Counsel to its *LEAP* burden or its Local Rule 5.1.5(a) burden. And, the moment Class Counsel submitted the time records to the Court *in camera,* those records became judicial records. *See Republic of the Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 660 (3d Cir.1991) (holding that the right of access attaches when the party submits the material to the Court for the Court's reliance upon it).

Not only did Class Counsel submit the records, the Court relied upon them. The Court clearly states that it used the documents submitted *in camera* for a judicial purpose; that is, the Court determined that "the hours submitted by Class Counsel are a "fair and reasonable representation of the work performed." (ECF 9860) "Under the common law right to access, a presumption of public access attaches to any 'judicial document,' defined as a document 'relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110, 119 (2d Cir. 2006) ). Yet, the PACER system reflects neither the Court's request that Class Counsel submit the documents nor the actual submission of the documents by Class Counsel.

  - The Court's consideration of the underlying time data without notice to Class Members is all the more problematic as the Alexander Objectors have filed a number of objections and motions seeking those materials.

Presumably the very data that the Court ultimately reviewed *in camera* to resolve Class Counsel's Fee Petition is precisely the data that the Alexander Objectors repeatedly urged (a) was necessary to any award of fees; and (b)

was discoverable for Class Members to test Class Counsel's Fee Petition. Initially, the Alexander Objectors tested Class Counsel's fee evidence through evidentiary objection, pointing out the absence of any supporting data and the conclusory nature of form declarations summarily stating total hours spent by twenty-three (23) law firms, eighty-one (81) lawyers, seventeen (17) paralegals, six (6) law clerks, and one (1) information technologist.   The declarations were boilerplate and constituted no evidence to support an analysis of reasonableness.   (ECF 7355, pp. 44-56)[1]   The Court never ruled on the Alexander Objections objections to this evidence.   Movants against seek rulings.

Shortly thereafter, in April, 2017, the Alexander Objectors' sought leave to serve fee-petition discovery on the conclusory fee data.   (ECF 7534) Specifically, the Alexander Objectors sought modest discovery to test Co-Lead Class Counsel Mr. Seeger's statement that he "deemed all work being billed reasonable, necessary, and non-duplicative." See ECF No. 7152-2 at ¶¶ 72-73, 75.   Co-Lead Class Counsel opposed that motion arguing that the discovery was not necessary for the "back of the envelope" analysis the Court was doing.   (ECF 7606, p. 19)   The Court did not rule on the motion for discovery.   And, given the Court's ultimate request for the data *in camera*, it is apparent that the Court felt the underlying data was necessary to the

---

[1] The Alexander Objectors had already asked the Court to enter a case management order governing applications for attorneys' fee so that the Court could receive those materials and evidence is support thereof in a manner compliant with the Settlement Agreement. (ECF 7176; ECF 6087, paragraph 14 stating that "motions for an award of attorneys' fees and reasonably incurred costs, as contemplated by the Parties in Section 21.1 of the Settlement Agreement, may be filed at an appropriate time to be determined by the Court, after the Effective Date of the Settlement Agreement")   Co-Lead Class Counsel opposed orderly resolution.   In fact, Co-Lead Class Counsel described a January 11, 2017 application for fees as "premature"   (ECF 7106)   but urged it own request for fees nineteen days later.   (ECF 7151).

resolution of the Fee Petition. (ECF 9860)

Finally, in September, 2017, the Alexander Objectors sought "open access" to the data through their Motion to Compel Class Counsel to Comply with the Court's 2012 Case Management Order No. 5.  (ECF 8396).  Case Management Order No. 5 (ECF 3710), entered upon the agreed motion of the parties, directed "all plaintiffs' counsel  who intend to see attorneys' fees or expense reimbursement" to maintain data in support of fees and expenses." The Court was specific:  Counsel shall submit time and expenses reports on a quarterly  basis.  (ECF 3710, p. 2)  The order required Class Counsel to "maintain contemporaneous and detailed time and expenses records" on the Summary Time and Expense Report Form in Excel format per the attachment to the Order, segregated by work on Pleadings, Motions, Briefs & Legal Research  Preparing & Responding to Discovery Requests Factual Research and Analysis   Document Analysis   Depositions (including preparation) Officially-Called Meetings of Counsel Common Benefit Case Management Court Appearances  Trial Preparation & Trial  Appeals, Settlement.  (ECF 3710, p. 3)  The Court even appointed an auditor to review those submissions. (ECF 3710, p. 9)  Class Counsel responded to the Alexander Objectors' motion to compel CMO 5 data, suggesting that disclosure of such documentation would lead to "nitpicking."  (ECF 8440, p. 3)  The Court refused to make the CMO data public.  (ECF 9510)

At the same time, the Court's appointed fee expert noted precisely this issue – the absence of any indication in the record that Class Counsel had maintained the CMO 5 data or whether the Court had ever reviewed such materials.  (ECF 9526, p. 44 n. 134; stating "'[T]he Court entered an Order in the summer of 2012 requiring the submission of periodic time and expense reports, ECF No. 3698, but there is no record on PACER of these reports ever

having been filed.")

For a year, the Alexander Objectors sought access to the data underlying the conclusory allegations of Class Counsel seeking a $112.5 million payment.  The Court disregarded those efforts until *after* the Court obtained the data *ex parte* and awarded the full requested fee; then, the Court denied the Alexander Objector's request for discovery *as moot*.  (ECF _)  The Court's consideration of materials without affording open access to the Class Members taints the Court's entire Fee Award analysis.

- Without the *in camera* time records, the Fee Petition is factually and legally insufficient as to the reasonableness of the attorney time alleged spent.

Federal Rule of Civil Procedure 23(h) authorizes the Cout to award "reasonable attorneys' fees" in a class action. Fed. R. Civ. P. 23(h).  The party requesting fees must demonstrate the reasonableness of its request and therefore must submit evidence to support its request. *See Hensley v. Eckerhart*, 461 U.S. at 433.  And, the court "must find the facts and state its legal conclusions under Rule 52(a)[2]." Fed. R. Civ. P. 23(h)(3).  As previously mentioned, Co-Lead Counsel Mr. Seeger's statement that he "deemed all work being billed reasonable, necessary, and non-duplicative" is the only "evidence" on file that the fees relied upon are "reasonable." See ECF No. 7152-2 at ¶¶ 72-73, 75.  The Alexander Objectors objected to the statement, but the Court did not rule on the objection.

In the end, the Court reviewed and based the entire reasonableness determination on data secret to all but the Court and Class Counsel.  Class Counsel never urged, and could not have in good faith, that its time records

---

[2] The Alexander Objections contemporaneously file their Fed. R. Civ. P. 52(b) Request for Additional Findings.

were confidential.  Neither did the Court hold a single hearing on the $112.5 million fee petition.  The Court's fee-award process lacked transparency, open access, and the fundamental due process the Third Circuit demands.  The Court should grant a new trial and allow Class Counsel's fee to be tested in the light of day.

   **2.    In light of the Court's fiduciary duty to the Class Members, the open-access error is a manifest injustice to those Class Members.**

The Court's fee-award discussion begins with the recognition that the Court is "acting as a fiduciary for the class" in conducting the fee analysis. (ECF 9860, p. 4) (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307-08 (3d Cir. 2005) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001). The Court's role as fiduciary surpasses mere "review and approval," however.  The Third Circuit describes the Court's fiduciary role as necessary because of Class Counsel's unavoidable conflict of interest at the fee stage that requires "an agent [ ] to oversee the relationship between the class and its lawyers."  *In re Cendant Corp. Litig.*, 264 F.3d at 254-55. The Third Circuit further reasoned that a Court needs to step between the Class Members and Class Counsel because of the lack of aggressive or effective bargaining over lead counsel's fee."  *Id.* at 255.[3]

According to the Third Circuit, a further role of the fiduciary is to ensure the confidence of the Class Members, confidence that attends open access to proceedings.  *See In re Cendant Corp. Litig.*,  260 F.3d 183, 192 (3d Cir. 2001) (reversing the district court's decision to receive *in camera* all "bids" to serve as class counsel).  Therefore, class members—the public—are

---

[3] In fact, the Court here has exercised greater scrutiny over the fees of private counsel that were bargained and has cut those fees for the "protection" of the Class Members.  (ECF 9862)  It is incongruous.

entitled to the same common law public right of access to judicial proceedings and records in a class action suit as any other civil or criminal action. *See In re Cendant Corp. Litig.*, 260 F.3d 183, 192 (3d Cir. 2001), citing *Littlejohn v. BIC Corporation,* 851 F.2d 673, 677–78 (3d Cir.1988); *see also Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161 (3d Cir. 1993) (holding the "pervasive common law right to inspect and copy public records and documents, including judicial records and documents" is well established).

Regarding the "open access doctrine" in the Third Circuit, the *In re Cendant* Court stated:

> The right of public access is particularly compelling [in a class action], because many members of the "public" are also plaintiffs in the class action. Accordingly, all the reasons we discussed in *Littlejohn* for the right of access to public records apply with even greater force here. Protecting the access right in class actions "promotes [class members'] confidence" in the administration of the case. *Littlejohn,* 851 F.2d at 678.

260 F.3d at 192.

Taken together, these doctrines require that the Court do more than simply *act* as a fiduciary to the Class Members. Through open access to judicial proceedings and records, the Court must allow the Class Members to observe the discharge of that fiduciary duty. "Openness of class actions provides class members with "a more complete understanding of the [class action process] and a better perception of its fairness." *Id.*

In summary, the Court committed clear open-access error basing its Order (ECF 9860/9861) on *in camera* documents without notice, a motion, an order, or an opportunity for the Class Members to object or cross examine the documents. And, particularly in light of the fiduciary position of the Court examining the Fee Petition, the secret bench trial on evidence supporting the Fee Petition resulted in a manifest injustice. The Court should grant a new

trial under Fed. R. Civ. P. 59(b) and 59(e).

**C.     The Court committed a clear error by awarding Class Counsel fees on a pure percentage-of-the-recovery methodology when the value of the Settlement Agreement to Class Members is not reasonably or reliably capable of valuation at this time.[4]**

The Third Circuit forbids use of a common-fund analysis for a pure percent-of-the-recovery fee award when the value of the recovery to the Class Members is uncertain and rests upon subjective evaluation.  *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 819 (3d Cir. 1995).  The face of the Court's opinion shows error because the Court uses a pure percent-of-the-recovery methodology though the Court has held that the Settlement is not a common fund and the Court acknowledges that the Settlement is not capable of objective valuation with reasonable accuracy. (ECF 9860 p. 7, "The Monetary Award Fund is uncapped, requiring its value to be estimated using actuarial projections.")  The "value" of the Settlement Agreement, as established by the Court, is a guestimate based upon (a) pre-Settlement forecasts that are both methodologically unsound and rendered demonstrably false by the passage of time and (b) settlement registrations and notices of monetary fund awards without methodology for tying those figure to Settlement benefits.

The "value" of the Settlement benefits cannot be established until the amount to be distributed over 65 years can be determined with reasonable accuracy as required by the Third Circuit.  Under these circumstances, the Court's choice of a pure percentage-of-the-recovery methodology in year one

---

[4] Movants present this argument in brief and incorporate all of their argument, evidence, and objections previously raised against the fee award, as if fully set forth herein.  *See* (ECF 7355/7354, ECF 7533, 7534, 7627).

upon failed projections and scientific fallacies is clear error.  And, the Third Circuit will not accord any deference to the Court's decision about the proper methodology for awarding fees pursuant to Fed. R. Civ. P 23(h) to a plenary review.  *See In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 299 (3d Cir. 2005).

> **1.      Because the Settlement is not capable of reasonable, nonspeculative valuation, it is clear error to award a fee based upon a pure percent-of-the-recovery.**

The Court analyzed the Settlement as a common fund, without explanation.  This case does not involve a common fund.  The existence of a separate Fee Fund to pay common benefit fees is a factor that distinguishes this settlement from a common fund settlement as this Court originally noted in approving the settlement.  *In re NFL*, 307 F.R.D. at 374 (citing Settlement § 21.1 and stating "[a] fee award in this case will not come from a common fund").  Co-Lead Class Counsel, too, concedes that this Settlement Agreement is neither pure percentage-of-recovery nor pure lodestar; instead, Co-Lead Class Counsel urged the Court to accept a characterization of "constructive common fund."  (ECF 7151, stating "[t]he instant case does not involve either an application for assessment of fees against the defendant pursuant to a fee-shifting statute, or a traditional common fund out of which payment of fees are sought").  The Court nonetheless determines in a single sentence that "the case is most appropriately reviewed as a "common fund." (ECF 9860, p. 5) (citing *In re Prudential*, 148 F. 3d 283, 333-34, *GM Trucks* 55 F.3d at 822).

A percent-of-the-recovery award, such as the award made by the Court here is akin to a contingent fee that is to be calculated upon the client's recovery – the common fund.  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 819 n. 38 (3d Cir. 1995).  It should not

be used when "the amount recovered for the class" can only be determined by "subjective evaluations." *Id* at 821.  Stated differently, a lodestar methodology is best when the value of the settlement is unknown.

As such, the Court should have explained why it is more appropriate to treat this settlement as a pure common fund.  The Third Circuit counsels that lodestar is not, as suggested by Co-Lead Class Counsel, reserved for statutory fee shifting cases.  *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d at 821 (holding that "[o]utside the pure statutory fee case, the lodestar rationale has appeal where as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method").  Yet, the Court did not explain in any way why lodestar or some hybrid of lodestar is inappropriate.  *See Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. PRIDES Litig.),* 243 F.3d 722, 734 (3d Cir. 2001)( holding the district court fee award sufficiently specific, in part, because the Court "highlighted the inadequacy of the lodestar method").[5]  The Court did not discuss why this settlement should not be treated as a mega fund to which a declining or sliding-scale percentage should apply.  *See In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 308 (3d Cir. 2005) (citing *In re Wash. Pub. Power Supply Sys. Secs. Litig.,* 19 F.3d 1291, 1297 (9th Cir.1994) (holding that it is appropriate to consider the size of the fund in determining whether to apply a percentage-of-the-recovery   analysis).  Instead,   the   Court   tracked   the *Prudential/Gunter* factors  with  forumulaic  rigidity  and  without  any consideration of any of the facts and circumstances of this Settlement post-

---

[5] The Court implicitly determined in 2012 that a lodestar was adequate.  After all, the Court ordered the lodestar data maintained and appointed Alan B. Winikur as auditor to "undertake periodic review of the time and expense reports submitted by Common-Benefit attorneys for payment from a Common-Benfit fund that may be established by this Court at a later time."  (ECF 3710, Case Management Order No. 5, p. 9)

effective date. *See  Moore v. Comcast Corp.*, Civ. A. No. 08-773, 2011 WL 238821, at *4 (E.D. Pa. Jan. 24, 2011).The Court's opinion simply provides no analysis on the fee methodology and is, therefore, insufficiently specific under Third Circuit authority.  *See Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. PRIDES Litig.)*, 243 F.3d at 734 (3d Cir. 2001).

> **2.     The Court's attempt to value the Settlement by reference to registrations, notices of monetary award, or pre-Settlement flawed actuarial projections is clear error.**

Co-Lead Class Counsel asks the Court to sidestep the level of certainly for a percent-of-the-recovery method required by *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013) and *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 819 (3d Cir. 1995). Because there is no common fund and the actual Class Member recovery is unknown, Co-Lead Class Counsel resorts to an unreliable methodology to devine the value of any benefit to the Class Members.

Co-Lead Class Counsel first attempts to value a settlement that cannot be valued by pointing to actuarial forecasts used *before* the Court approved the Settlement Agreement.  Specifically, Co-Lead Class Counsel relies upon 2014 report of Dr. Thomas Vasquez.  Dr. Vasquez used a life-cycle forecasting model derived from "disease incidence rates." (ECF 7151)  He purported to update that forecast in 2017, but used precisely the same model. (ECF 9552)  Use of these actuarial forecasts is flawed for two reasons.  First, as the Alexander Objectors' expert witness opined, there is not and could not be disease incidence rates for Level 1.5 and Level 2 Qualifying Diagnoses – diagnoses which represent 97% of the Class Members.  These qualifying diagnoses are creations exclusively of and defined entirely by the Settlement. Neither a Level 1.5 nor a Level 2 neurocognitive disorder appear in published literature, research or even a medical textbook.  (ECF 7355-1, Declaration of

Jamshid Lotfi, Md.).  Thus, Dr. Vasquez simply has no data for 97% of the anticipated qualifying diagnoses.  Stated differently, without a shred of medical evidence, Dr. Vasquez is attempting to predict how many Class Members will qualify for monetary award under Level 1.5 or Level 2, classifications that represent 97% of the total class.

In the absence of this data, Dr. Vasquez reaches for an accepted disease to extrapolate numbers.  He then relies upon dementia studies as a surrogate or a "proxy" for his incidence analysis of Level 1.5 and Level 2; but, he supplies neither analysis nor explanation for dementia as an appropriate surrogate.  Further, Dr. Vasquez uses an "assumed rate of participation" without justifying the assumptions he makes.

Because Dr. Vasquez skips these analytical steps, his opinions do not provide a reliable foundation guessing how many Class Members will participate with a qualifying diagnosis of Level 1.5 or 2.  His opinions do not pass muster under *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993)).  The Alexander Objectors lodged the *Daubert* objections and proferred evidence in support of those objections that remain unchallenged by Co-Lead Class Counsel.  (ECF 7355-1, Declaration of Jamshid Lotfi, Md., ECF 7533, ECF 7627).  The Alexander Objectors objected to the Declaration of Christopher Seeger, ECF No. 7151-2 on the same basis.  (ECF 7355)  The Court has never  ruled on the Alexander Objectors *Daubert* challenges to Co-Lead Class Counsel's evidence.

A second, reason the Court should not rely upon this actuarial data as a method for awarding fees is that it was created and supplied for the purpose of speculating the highest possible participation.  The first Settlement was unacceptable because Court was concerned that "the capped fund would exhaust before the 65-year life of the Settlement."  ECF 6509, p. 10.  So, the

Court "ordered the Parties to share the actuarial data and analyses performed by their economic experts with Special Master Perry Golkin."  ECF 6509, p 11.  In other words, the Court's perspective at the time the Settlement Agreement was presented for approval was, understandably, to ensure future funds to pay whatever claims were approved.  The Court needed to speculate so that the Settlement Agreement provided for every contingency.

However, the Court's perspective at this time must be completely different.  The Court now functions as a fiduciary for the Class Members, an adversary to Class Counsel, and, therefore, may not award a fee upon speculative evaluations.  *See In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013).  The uncapped MAF, for example, is no benefit if the NFL is never required to pay because claims are not being approved.  And, yet, based upon that data, the Court speculates that the "value" of the Settlement to the Class Members is $1.2 billion.[6]

The Court should decline a multiplier at this time upon a speculative

---

[6] The Court also suggests that the Class Members are benefitting beyond the $1.2 billion mark by virtue of, *inter alia*, the services of the Lien Resolution Administrator.   The Alexander Objectors first join issue with the statement.   Under Section 11.3(c) of the Settlement, reasonable compensation of the Lien Resolution Administrator for such efforts is paid out of any Monetary Award to such Settlement Class Member.   Class Members are personally paying for this service.   Moreover, as of April 23, 2018, the Claims Administrator reports that of the total monetary award notices issued, $103,043,898 (or 25%) is subject to lien resolution at this time.   *See* NFL Concussion Website, Claims Report, Table 6, p. 6, Monetary Award Claims.   Under the Medicare Secondary Payer Act, specifically 42 U.S.C. § 1395y(b)(2)(A)(i), the Class Member cannot be paid until Medicare liens ars satisfied. And if, as contemplated by the Settlement Agreement, the Lien Resolution Administrator is attempting to negotiate a global settlement with Medicaid, payment is not forthcoming any time soon.   These points reinforce both that it is premature and speculative to place even a reasonable value on the benefits the Settlement Agreement confers upon the Class Members.

projection of the value of the fund.   After all, the money is not going anywhere; it will only grow larger.  Allowing it to grow would obviate any suggested need to holdback 5% of every class member monetary award.

Finally, even if the actuarial data the Court relies upon had been methodologically sound, it is undisputed that the forecasts the Court uses from that data have turned out to be wrong.   In fact, every projection proffered to the Court about what amount of money the Class Members should have already received has proven dramatically wrong.  The Alexander Objectors previously illustrated the actual Year One results for the vast majority of the qualifying diseases:

| Category (% incidence such category represents of the Whole, *see* ECF 6423-21, (Ex. JJ, p. 5) | NFL Year 1 **Forecasted** Payments (ECF 6168 Ex. F) | **Actual** Year 1 Payments (ECF 9571, Ex. A, p. 7 as of January, 2018) |
|---|---|---|
| Alzheimer's (48% of all class members) | 153 Claims, $70.655 million | 25 Claims, $11.59 million |
| Level 2 (49% of all class members) | 111 Claims, $38.64 million | 1 Claim, $1.5 million |
| Level 1.5 (0% as all assumed in Level 2) | 319 Claims, 33.64 million | 3 Claims, 1.5 million |
| Total Claims | 584 Claims forecasted to be paid within the first year | Less than 30 actually paid |

Class Counsel also persuades the Court to rely upon registration numbers and notices of MAF awards as some evidence of the value of the settlement.  These numbers are similarly no evidence of value.

The registration number bear no relationship to value because there are no qualifying criteria for registering for the Class.   Unlike the *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* class membership

is not the only compensation metric; it is not a compensation metric at all. No class registrant is guaranteed a recovery; not one. Here, the Claims Administrators' reports reflect that over a thousand registrants have already been determined not to even be Class Members. *See* NFL Concussion Concussion Settlement website, Summary of registrations and claims submitted. Another 6,200 registrants are not BAP eligible. *Id*. Barely 10% of the total registrants have even filed a claim for benefits as yet. *Id.* Thus, it is not clear that any more than a small fraction of registrants will receive any benefit whatsoever. What is clear is that the registration number is not the equivalent of value conferred. What is also clear is that the amount of NFL funding for the Settlement is a function solely of successful MAF *payments*. This is not a reversionary fund; the money remains in the NFL pocket pending a need for MAF replenish due to payments made.[7]

For the Court to pay Class Counsel a fee and a bonus on the 20,000 registration number pays Class Counsel a fee as though every Class Member

---

[7] Because this Settlement is not a reversionary fund, such as the fund address by *Boeing v. Van Gemert,* 444 U.S. 472, 478 (1980), there is no way for the Court to analyze the value of the fund "as paid" by the NFL. Stated differently, the Settlement required an initial funding amount (Section 23.3(b) of "six initial monthly installments of Twenty Million United States dollars (U.S. $20,000,000) each." *See* ECF 6087, p. 93 23.3(b). After that, the NFL need only maintain a "targeted reserve" of a maximum of $10 million. *See* ECF 6087, p. 93 23.3(b)(v)(1). The MAF – as valued by the Court – will not revert because it has never left the NFL. The Class Members have no way of knowing how much money the NFL has actually paid into any of the funds. No payment figures have been publicly disclosed for purposes of analyzing Class Counsel's Fee Petition. In an unrelated April, 2018 filing (ECF 9880, p. 2) the NFL disclosed that it has only funded $255 million. That is substantially less than the $400 million the Court relies upon. (ECF 9860, p. 7) Co-Lead Class Counsel Sol Weiss stated in March, 2018, that "to the best of its knowledge," the Educational Fund has also not been funded. (ECF 9807) Apparently not even all of the appointed Class Counse have access to the actual funding data. Only the funded amounts should be included in the calculation of the "value" of the fund for a percent of the recovery analysis.

qualifies for and prevails on a claim – in year 1.  Such a fee is unconscionable fee.  *See Int'l Precious Metals Corp. v. Waters,* 530 U.S. 1223, 1224, 120 S.Ct. 2237, 147 L.Ed.2d 265 (2000) (denial of *cert.*) (O'Connor, J.) (discussing a percentage fee calculated against the entire settlement fund even though a significant portion would revert to the defendant).

Similarly, the notices of award from the MAF bears no relationship to value because of the current audit quagmire.  As of April, 2018, two thirds of the total claims (527 of the 1,737) are held in audit.  *See* NFL Concussion Website, Claims Report, Table 1 (Location of All Monetary Award Claims). That number *includes* claims that have already received a notice of Monetary Fund Award.  *See* ECF 9785, pp. 2-3, Motion to Join Co-Lead Counsel Anapol Weiss Request for a Hearing to Seek Court Intervention on the Processing of Certain Claims, filed by The Mitnick Law Office; *see also* ECF 9843, The Yerrid Law Firm and Neurocognitive Football Lawyers' Partial Joinder in the Motion Brought by the Locks Law Firm for Appointment of Administrative Counsel and Motion to Review Deprivation of Rights (documenting the, to date, eight month delay in paying client claims that received a notice of monetary award).  Co-Lead Class Counsel offers no information about the likelihood of ultimate success of thes claims in audit or the thousands to come.  In light of the NFL's claim that there is rampant fraud in the claims process and the independent auditor's recommendation that 23% of those audited claims be denied, it is impossible to know how many of the claims in audit will emerge with a payment.  (ECF 9880, p. 2, requesting a Special Investigator)  What we do know is that the notices of award from the MAF are not the equivalent of value conferred.

A percentage-of-the-recovery method should not be used *until* the amount *to be distributed* by the Settlement Agreement can be determined with

reasonable accuracy. *See In re Baby Products Antitrust Litigation*, 708 F.3d 163, 179 (3d Cir. 2013) (vacating an award of class attorneys' fees). The Third Circuit is not saying that Class Counsel never gets a bonus. The Third Circuit is not saying that Class Counsel should not recover its reasonable lodestar in the meantime. The Third Circuit is saying that Class Counsel does not get a bonus until it can establish with reasonable precision the amount of money that the Class Members will actually receive *Id*. Sometimes that takes as much as seven years. *See In re Diet Drugs Prods. Liab. Litig*. 582 F.3d 524, 534-35 (3d Cir. 2009). Sometimes it takes ten.

> **3.  Even if the Settlement recovery could be predictably valued for consideration of a percent-of-the-recovery bonus, the Court facially omitted any analysis of the failures of the Settlement necessary to a percent-of-the-recovery analysis.**

The Third Circuit teaches that the purpose of a percent-of-the-recovery methodology is to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re Prudential*, 148 F.3d at 333. As such, the standard necessarily requires the Court to consider the successes of a settlement as well as the failures of that settlement. Stated differently, even if the Court believes the Settlement should be approved, the Court must nonetheless, under *In re Prudential*, balance the successes and the failures of that approved settlement.

The Court gave Class Counsel $112.5 million – that is, $66 million more than Class Counsel's lodestar. The Court states that it has focused the past year upon the "implementation of the Settlemnt," but the Court does not mention the collosal implementation problems over the past year. These implementation problems are a failing of the Settlement not only because they are impeding Class Members access to meaningful recovery of benefits, but also because these problems virtually guarantee Class Counsel exhorbitant

implementation fees.  The failings the Court ignored include:

- Class Counsel the Locks Firm describes the Settlement as "in danger of failing in its execution." (ECF 9786, the motion; ECF 9856 Alexander Objectors' joinder)   The Court denied the motion (ECF 9890) reasoning, in part, that the Locks Law Firm cannot "faithfully administer the Agreement" because it facilitated third party funding agreements.  Yet, when in a reply on the Locks' motion, Mitnick[*], alerted the Court (ECF 9888) with evidence that Co-Lead Class Counsel Seeger has a conflict of interest on party funding agreements, having not only facilitated such agreements but also soliciting the same, the Court *sua sponte* sealed that reply without explanation or adherence to the open access doctrine.  (ECF 9889)

- The latest report the Claims Administrator reports that only 262 of 20,496 registered Class Members have received money from the Settlement; *See* NFL Concussion Website, Summary of Registrations and Claims Submitted, Chart 1; Payable Claims Summary, Chart 5.  Of the 301 Alzheimer's claims submitted, *55 have been paid*; Of the 477 Level 2 claims submitted, *2 have been paid*; Of the 648 Level 1.5 claims submitted, *4 have been paid*;

- "[T]he independent Claims Administrator [has] placed into audit approximately 46% of the total claims submitted"  . . . and recommended that 23% of the total claims submitted be denied. (ECF 9880, p. 2).

- Co-Lead Plaintiffs' Class Counsel Anapol Weiss has questioned the lack of appropriate post-approval notice to Class Members about Settlement Agreement interpretation (ECF 9784, p. 3 n. 1) and the lack of transparency in the administration process (ECF 9784, p. 7 n. 2) noting that "settlement 'interpretative issues' are not served on the Class Member whose claim it at issue.

The Court has rewarded Class Counsel fees for the "uncapped" feature of the Settlement Agreement.  The Court has not, however, punished Class Counsel for an implementation procedure that raises the claims-award bar above that of a traditional trial.  Unlimited audits have all but shut the process down.  The NFL is able to earn monthly interest on the money it need not place in the MAF because the target has not been depleted.  Yet, to reward Class Counsel with the entire Fee Fund in year one, the Court must now penalize the Class Members.  The first penalty is a 5% tax on every Class Members' recovery to pay for "implementation fees."  The second penalty is

a cap on private attorneys' fees rendering a disincentive to those attorneys to accept representation, advance case costs, or represent Class Members through claims administration.

As the Court's appointed expert Professor William Rubenstein [8] observed, there is nothing in the Settlement Agreement that assigns the Fee Fund as "settlement negotiation" fees. (ECF 9526, "Class Counsel's set-aside motion takes the position that the $112.5 million class action fee award they seek will pay them only for securing the settlement, but that they will have to be paid extra for all work implementing the settlement since the settlement's effective date. However, the history and text of the settlement agreements in this case do not support that conclusion.") This is a 65-year Settlement with no established track record of success as properly measured by the benefit it confers upon the Class Members. Thus, Professor Rubenstein notes, it is inappropriate for "Class Counsel [to] seek fees for 100% of the class's recovery now, although the class members will be paid – and the settlement implemented – over 65 years." (ECF 9526, p. 1) And, faced with the balance the Court must draw, Professor Rubenstein concludes that "[t]he solution is not to give Class Counsel more money but to stagger payment of their aggregate fee." *Id.* The Court never explains why that proposed solution is

---

[8] The Alexander Objectors discuss Professor Rubentein's opinions in this motion but expressly reserve their right to pursue their objections to his appointment. The Alexander Objectors pointed out that conflict; Professor Rubenstein was retained to consult for the Plaintiffs' Steering Committee. Co-Lead Class Counsel Sol Weiss confirmed the retention of Professor Rubenstein by the PSC. The Court nonetheless appointed Professor Rubenstein but indicated there would be an opportunity to test the conflict through Rule 706 deposition. The Court subsequently reversed course and declined a Rule 706 deposition. Professor Rubenstein did not address the conflict in either report and the Court never analyzed or addressed that conflict in any way, though the Court has adopted Professor Rubenstein's opinions regarding cutting private counsel's fees in favor of paying Class Counsel.

legally inappropriate or otherwise not a fair course for the Class Members to whom the Court owes the fiduciary duty.

Professor Rubenstein's proposal would allow the Court to gather additional, legally sufficient, data about the actual value of the Settlement. The Court's concession that Class Counsel has not provided "enough information to predict the amount of compensation Class Counsel will need for implementation" (ECF 9860, p. 2 fn 1) is necessarily a concession that the Court does not have enough information to evaluate the Class Member recovery.

It is clear error for the Court to award fees on a percentage-of-the-recovery when the value of the recovery is unknown and incapable of being known with reasonable accuracy. The Court should grant a new trial.

**D.    The Court committed a clear error by ordering a 5% holdback for unspecified "future implementation work." [9] (ECF 9860/9861)**

The Settlement Agreement permits Co-Lead Class Counsel to petition the Court to set aside up to 5% of each Monetary and Derivative Claimant Award to administer the Settlement. (ECF 6509, p. 21) The petition must include the amount of any set aside and its proposed use.

The face of the Court's opinion ordering a 5% holdback shows clear error because, contrary to the Settlement Agreement, the Court orders the holdback for "future implementation work" though the Court acknowledges that Class Counsel has not "provided an adequate estimate for the amount of work that will be required in the future." (ECF 9860, p. 17) In fact, the Court

---

[9] Movants present this argument in brief and incorporate all of their arguments, evidence, and objections previously raised against the fee award, as if fully set forth herein. *See* (???ECF 7355/7354 and April 21, 2017 (ECF 7533 and Response to Rubenstein ECF 9554).

orders the holdback as a "precautionary 5% withholding" in the hope "the 5% holdback will not be necessary for implementation."  (ECF 9862, p. 8 n. 5)[10]

Class Counsel wish for Class Members to take comfort on the 5% holdback, arguing that the 5% will come out of the Class Member's private counsel's contingent fee; the Class Member's recovery will not be reduced. However, for unrepresented parties, the 5% will come out directly of the Class Member's recovery.  Presently, only 46% of the Class Members have private attorneys. *See* NFL Concussion Website, Claims Report.  And, given the cap the Court contemporaneously places on private fee agreements, that number is not going up.  As such, the Court has directly taxed more than 50% of the Class Members in order to serve Class Counsel's bifurcated theory of attorneys' fees.

More troubling, still, is Class Counsel's failure to provide an explanation for why its position on the $112.5 Fee Fund has changed. Specifically, the January, 2014 version of the Settlement Agreement contained no holdback.  Yet, Class Counsel represented to the Court that the Fee Fund was adequate.  The renegotiated June, 2014 Settlement contained no additional Class Counsel obligations or implementation complications, but it did contain a new 5% holdback provisions.  Faced with Class Counsel's persistent silence on the timing of the holdback provision, Professor Rubenstein observed that "[t]his history is troubling in that it implies that Class Counsel sought to significantly enhance their own fees without significantly enhancing their own work or, most importantly, their clients'

---

[10] Glaringly absent from the Court's "just in case" reasoning is an analysis of the end game. Does the Court plan to hold 5% of every Class Members recovery for 65 years?  Will every Class Member pay a proportionate share of implementation fees?  Or, will the lion's share be borne by the early settlements.

recoveries.  (ECF 9526, p. 36)

    Given the concerns the Court should have over Class Counsel securing an additional benefit for itself without enhancing Class Members recoveries, the Court should accept Professor Rubenstein's suggestion to stagger fees and invest the fund to regenerate:  "This approach aligns Class Counsel's fees with the class recoveries in a straightforward manner without requiring extra pay for Class Counsel to do work that is an expected part of its underlying class action fee award."

For additional practical reasons, Professor Rubenstein counseled against this course because the $112.5 Fee Fund is sufficient for all Class Counsel, present and future, if the Court: (a) pays lodestar fees and a multiplier in excess of 2 ($85.5 million in present fees), conservatively invests the remainder of the Fee Fund, considers only lodestar fee awards in the future, and exercises "discipline" over Class Counsel's hourly rates.  (ECF 9571, pp. 5-6) The Court's expert's recommendation that a 5% holdback is not necessary because the Fee Fund, if appropriately unexhausted and invested, will generate sufficient income to pay any future fees is well reasoned and should not have been disregarded.  The Alexander Objectors, too, previously pointed out that if the Court paid Co-Lead Class Counsel the $40 million lodestar argued as reasonable and conservatively invested the $72.5 million remaining, the earnings would exceed the total 5% hold back. (*See* ECF 7533, p. 6). Without acknowledging the disconnect between Class Counsel's 100% payment now but Class Members' 95% payment later, the Court reject Professor Rubenstein's recommendations.

Finally, the Court commits clear error when, at the same time the Court awards Class Counsel $112.5 in fees it also orders a holdback for Class Counsel's implementation fees without accounting for those fees in a percent-

of-the-recovery analysis.  Stated differently, Class Counsel have a new, $45 million fee fund but, in the analysis of percentage-of-the-recovery, the Cort ignores the sum.  The Alexander Objectors pointed out that, taken together and according to Class Counsel's projections, the Court's exhaustion of the Fee Fund and a 5% holdback operates to secure 22.8% of the total Class benefits to Class Counsel.  (ECF 9355, Declaration of Kenneth G. McCoin). The Court fails to include the value of the holdback for fees in its analysis of what is a reasonable and appropriate fee to Class Counsel.

It is both clear error and a departure from the plain language of the Settlement Agreement to tax the Class Members a 5% holdback without the tangible showing required.  It is a manifest injustice for the Court to enter a 5% holdback that decouples the interest of Class Counsel from that of the Class Members and rewards Class Counsel for every hour of delay in a Class Member's recovery.

**E.     The Court committed a clear error by *sua sponte* capping private fee agreements at an effective 17% of each Class Member' recovery because the Court has left the Class Members without claims administration funding and an unconflicted advocate (ECF 9862/9863). [11]**

The Court adopts the recommendation of Professor Rubenstein as to

---

[11] Movants present this argument in brief and incorporate all of their arguments, evidence, and objections previously raised against the fee award, as if fully set forth herein.  Movants also specifically reurge that the Court is without jurisdiction in this case to cap the private fee contracts.  *See US Airways, Inc. v McCutchen*, 569 U.S. 88, 100 (2013) (holding that a Court may not use equity to disregard a fee agreement under the theory that a party is unjustly enriched by claiming the benefit of its bargain); *see also Brown v. Watkins*, 596 F.2d 129 (5th Cir. 1979).

the private attorney cap and determines that the "circumstances of this litigation require the implementation of a cap." The clear error on the face of thie Court's order is that neither the Court nor Professor Rubenstein examined the actual circumstances of the fees capped. Professor Rubenstein based his analysis on representative fee agreements, a sampling. Based upon the data, however, the Court has put in place a presumption upon *every* fee agreement above 17% that the private attorney has negotiated an unfair contingent fee with the client. The Court justifies the cap stating "courts must curb such excessive or unreasonable fees to safeguard the public's perception of the courts and the legitimacy of the legal system's handling of massive MDLs and class actions." It is, first, unclear why the public will have greater reason to question a contingent fee agreement that completely aligns a Class Member with his or her counse than a "percentage-of-the-recovery" fee for Class Counsel that awards $112.5 million for negotiating a right to no ore than a claims-administration trial on damages. It is, indeed, a denial of due process to presumptively hold that a fee agreement the Court has not seen is excessive or unreasonable. The Court has shifted the burden to counsel to prove not only the negative – that the fee is not unreasonable – but also to prove "exceptional or unique circumstances" warranting the contracted fee. (ECF 9862, p. 8 n. 3)

Capping private attorneys' fees will unequivocally harm most of the class members who are not currently qualified for monetary award, playing right into the NFL's hands. The cap will influence any private counsel regarding new representation. A number of players may lose representation altogether, and others may not be able to persuade counsel to advance money for MAF physician exams or appeals under the Settlement. The current cost for the MAF approved physician exam along with separate

neuropsychological protocol  is approximately $4,000 to $5,000.    Class members who undergo the one free BAP exam but do not qualify for a monetary award will be required to self-fund future MAF physician examinations approved under the Settlement as they cannot qualify for benefits by seeing any physician of their own choice.

Again, the Third Circuit is clear on Class Counsel's conflict of interest in the context of fees.  *In re Cendant Corp. Litig.*, 264 F.3d 201, 244-45 (3d Cir. 2001).   Class Members' private counsel, by contrast, have no such conflict of interest because their contingent fee interests are 100% aligned with the Class Members' desire for prompt and full payment.  Class Members private counsel are not paid any hourly rate for compiling medical records, coordinating doctors' visits, or shepherding a claim through administrative review or audit.  Class Counsel will be paid by the hour[12] for every step taken in implementation; the longer the process the greater the "implementation fees."  As such, the Court should not, by capping an IRPA fee, create a disincentive to the Class Member's only completely-aligned advocate.

It is unfortunate for the Class Members as well as their Counsel that, from the outset, they have received mixed messages from the Court about whether they do or do not need private representation.  The NFL Concussion website tells Class Members that they do not need private counsel but if they choose to retain private counsel, they will be responsible for paying such counsel:

If you hire a lawyer, it is at your own expense. . .   The amount

---

[12] Class Counsel initially represented that they would cap their rates.  However, the rates Class Counsel submitted in their Fee Petition far exceeded those rates and, therefore, the Court found them to be unreasonable for purposes of a lodestar check.  It is unclear, going forward, whether Class Counsel will be allowed to bill these unreasonable rates, rates that have already accumulated $5 million in implementation fees.

you must pay your lawyer is based on the contractor agreement
you sign with that lawyer.

*See* NFL Concussion website, Frequently Asked Questions No. 175, 178. However, the Court has also determined that every Class Member who receives a monetary award is cognitively impaired, as a matter of law, and has therefore legally rescinded third-party funding agreements. (ECF 9517) And, shortly after making the cognitive-imparment decision, the Court appointed Dennis Suplee "to represent [ ] pro se Settlement Class Members where there has been a demonstrated need for legal counsel" and to compensate Mr. Suplee as an administrative cost from the Monetary Award Fund. (ECF 9561) The Court invited Class Members to enter into fee contracts with private lawyers and then determined the Class Members' fee contracts to be unreasonable. The unfortunate consequence is that while the Class Members with private lawyers may be losing their lawyer of choice, the *pro se* Class Members are receiving a paid, private lawyer, in addition to Class Counsel, that they did not ask for.

Movants ask the Court to grant a new trial on all of the fee petition-related orders as they are not faithful to Third Circuit authority and do not serve the best interests of Class Members navigating a claims process that has proven impenetrable.

Dated: May 2, 2018                          Respectfully Submitted,

                                            /s/ Lance H. Lubel
                                            Lance H. Lubel
                                            Texas State Bar No.: 12651125
                                            Adam Voyles
                                            Texas State Bar No.: 24003121
                                            Justin R. Goodman
                                            Texas State Bar No.: 24036660
                                            LUBEL VOYLES LLP
                                            675 Bering Dr., Suite 850

Houston, TX 77057
Telephone: (713) 284-5200
Facsimile: (713) 284-5250
Email: lance@lubelvoyles.com
adam@lubelvoyles.com
jgoodman@lubelvoyles.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record via the Court's ECF system on May 2, 2018.

*/s/ Lance H. Lubel*
Lance H. Lubel