**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>       Plaintiffs,<br><br> v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>       Defendants. | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF CHRISTOPHER A. SEEGER

CHRISTOPHER A. SEEGER declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information, and belief, the following:

1.      By Order dated April 25, 2012 [ECF No. 64], the Court appointed me as Co-Lead Counsel for the Plaintiffs in this multidistrict litigation ("MDL"). In its Amended Final Order and Judgment approving the class action settlement in this MDL [ECF No. 6534], the Court confirmed my appointment as Co-Lead Class Counsel for the Settlement Class.

2.      Having been appointed as Co-Lead Class Counsel, I am fully familiar with the matters set forth herein.

3.     I submit this Declaration in support of my motion as Co-Lead Class Counsel for an order (1) sanctioning the Cambridge Entities[1] for failure to comply with the Court's February 20, 2018 Order (ECF No. 9750), which directed them to produce accountings for Class Members' retirement funds invested with Cambridge; (2) ordering Cambridge to immediately return the retirement monies and earnings thereon to Class Members and to produce the accountings; (3) appointing an accountant, whose fees shall be borne by Cambridge, to review the accountings and report to the Court as to their accuracy; (4) compelling Cambridge to disclose accountings and all documents related to non-qualified funds (*i.e.*, non-retirement funds) of Class Members invested with Cambridge; (5) compelling certain current and former officers of Cambridge to submit to depositions; and (6) setting a further hearing to determine whether other relief is appropriate.

4.     As Court-appointed Co-Lead Class Counsel, my firm has access to the Claims Portal.  When we previously checked the Claims Portal in preparation for the April 2, 2018 hearing, Phillip Timothy Howard represented 234 Class Members.  As of today, Mr. Howard represents 110 Class Members, and he has not completed a Claim submission for any of them.  According to documents received during discovery, eighty-eight of Mr. Howard's current or former clients entered into assignment agreements – twenty-six with the Cambridge Entities and the remainder with either Global Financial or Beacon Legal.

5.     According to documents received in discovery, 32 Class Members have assignment agreements with the Cambridge Entities.  In addition to the twenty-six of Mr. Howard's current

---

[1]     The "Cambridge Entities" or "Cambridge" include the following: Cambridge Capital Group, LLC; Cambridge Capital Advisors LLC; Cambridge Capital Partners, LP; Cambridge Capital Group Equity Option Opportunities, LP; Cambridge Capital Holdings; Cambridge Capital Funding, Inc.; Your Case, LLC; and their present and former directors, officers, partners, employees, contractors, agents, consultants, affiliates, successors and assigns, including, but not limited to Addys Walker, Gail Milon, and Phillip T. ("Tim") Howard.

and former clients, clients of the following firms also entered into assignment agreements with the Cambridge Entities:  Gibbs & Parnell, Simona Farrise, and Weisberg & Associates or Shenaq P.C.

6.      Gibbs & Parnell, P.A. of Tampa, Florida, is one of four law firms going by the moniker, Neurocognitive Football Lawyers.  Thomas Parnell is a principal of the firm.  As per the Claims Portal, Neurocognitive Football Lawyers represents 188 Class Members.

7.      As per the Claims Portal, the majority of Class Members who were formerly represented by Weisberg & Associates are now represented by Shenaq P.C. ("Shenaq"). Additionally, six of the ten Class Members with retirement monies invested with Cambridge, who were formerly represented by Mr. Howard, are now represented by Shenaq.  Prior to March of 2018, the Claims Administrator did not have record of Shenaq representing any Class Members. Currently, Shenaq represents 216 Class Members, at least 100 of whom are former clients of Tim Howard.

8.      Attached hereto as Exhibit 1 is a true and correct copy of the PowerPoint presentation shown at the April 2, 2018 hearing.

9.      Attached hereto as Exhibit 2 is a true and correct copy of the transcript of the April 2, 2018 hearing.

10.      Attached hereto as Exhibit 3 is a true and correct copy of a letter, dated March 27, 2018, from Gail Milon, Managing Vice President of Cambridge Capital Group, addressed to me. The Class Members' names have been redacted.

11.      Based upon communications from Class Members and the documents produced by Cambridge and Millennium Trust Corporation, I believe that ten Class Members invested retirement monies (qualified funds) with Cambridge.  I do not know for certain how many Class

Members have other non-retirement monies (non-qualified funds) invested with Cambridge, in addition to those identified in Ms. Milon's March 27, 2018 letter.

12.     Attached hereto as Exhibit 4 is a true and correct copy of the opinion of the Securities and Exchange Commission, dated January 14, 2011, in the Matter of Don Warner Reinhard, in which it was held that "it is in the public interest to bar Respondent from association with any broker, dealer, or investment advisor."

13.     Attached hereto as Exhibit 5 is a true and correct copy of the Cambridge Capital Partners L.P.'s Private Offering Memorandum for Offering of Limited Partnership Interests ("Offering Memorandum").

14.     Based upon my firm's communications with the Class Members who have retirement monies invested with Cambridge, I do not believe that any of them are the type of persons who were suitable, as per the Offering Memorandum, for the Cambridge investment.

15.     Attached hereto as Exhibit 6 is a true and correct copy of a letter, dated March 29, 2018, from Ms. Milon addressed to this Court and me.

16.     Attached hereto as Exhibit 7 is a true and correct copy of the Articles of Amendment to Articles of Incorporation for Cambridge Capital Group LLC, dated March 8, 2017.

17.     Attached hereto as Exhibit 8 is a true and correct copy of the Articles of Amendment to Articles of Incorporation for Cambridge Capital Advisors, LLC, dated March 8, 2017.

18.     Attached hereto as Exhibit 9 is a true and correct copy of the Florida Division of Corporations Detail by Entity Name for Your Case, LLC.

19.     Attached hereto as Exhibit 10 is a true and correct copy of the Nevada Secretary of State's website Business Entity Information for Cambridge Capital Group, LLC.

20.     Attached hereto as Exhibit 11 is a true and correct copy of the Nevada Secretary of State's website Business Entity Information for Cambridge Capital Wealth Advisors, LLC.

21.     Attached hereto as Exhibit 12 is a true and correct copy of the Nevada Secretary of State's website Business Entity Information for Cambridge Capital Group Advisors, LLC.

22.     Attached hereto as Exhibit 13 is a true and correct copy of the Nevada Secretary of State's website Business Entity Information for A&T Development, LLC.

23.     Attached hereto as Exhibit 14 is a true and correct copy of the Nevada Secretary of State's website Business Entity Information for Chronicles, LLC.

24.     Attached hereto as Exhibit 15 is a true and correct copy of the Secretary of the Commonwealth of Massachusetts' website Business Entity Summary for Cambridge Capital Partners, LP, with attached Cancellation of Entity, dated May 25, 2017.

25.     Attached hereto as Exhibit 16 is a true and correct copy of the Secretary of the Commonwealth of Massachusetts' website Business Entity Summary for Cambridge Capital Group Equity Option Opportunities, LP, with attached Cancellation of Entity, dated December 7, 2017.

26.     Attached hereto as Exhibit 17 is a true and correct copy of the Secretary of the Commonwealth of Massachusetts' website Business Entity Summary for Cambridge Capital Group Enhanced Large Cap Equity Value, LP.

27.     Attached hereto as Exhibit 18 is a true and correct copy of the Secretary of the Commonwealth of Massachusetts' website Business Entity Summary for Cambridge Capital Group Active Managed S&P 500, LP.

28.     Attached hereto as Exhibit 19 is a true and correct copy of the check issued on behalf of a Class Member, designated for purposes of confidentiality as Player No. 5, by the NFL

Players Second Career Savings Plan, payable to Millennium Trust Company for $619,111.95, dated May 10, 2016.

29.     Attached hereto as Exhibit 20 is a true and correct copy of the check issued on behalf of Class Member, designated for purposes of confidentiality as Player No. 10, by the NFL Players Second Career Savings Plan, payable to Millennium Trust Company for $316,059.98, dated March 28, 2016

30.     Attached hereto as Exhibit 21 is a true and correct copy of the Portfolio Summary for Player No. 5, dated December 31, 2016, issued by Cambridge Capital Group.

31.     Attached hereto as Exhibit 22 are true and correct copies of the Quarterly Capital Account Summary for Player No. 1, dated December 31, 2016, issued by Cambridge Capital Group and the MTC Account Statement for Player No. 1, as of December 31, 2017.

32.     Attached hereto as Exhibit 23 is a true and correct copy of the internal client communications log of Millennium Trust Corporation ("MTC") for Player No. 10.

33.     Attached hereto as Exhibit 24 is a true and correct copy of the internal client communications log of MTC for Player No. 1.

34.     Attached hereto as Exhibit 25 is a true and correct copy of a letter, dated February 7, 2018, from MTC to Player No. 1 with subject "Important Notice: Asset Distribution and Potential Tax Consequences."

35.     Player No. 1 advised my firm that he did not receive a check for his retirement funds in connection with the February 7, 2018 asset distribution letter he received from MTC. Further, he advised that the account balances reflected by Millennium - $100,470.43 and $259,594.35 – are approximately $77,000 short.  He maintains that his deposits were $437,500, and not the approximately $360,000 reflected on the Millennium documents.

36.     Attached hereto as Exhibit 26 is a true and correct copy of an email, dated April 17, 2018, from MTC to Player No. 6.

37.     Attached hereto as Exhibit 27 is a true and correct copy of the internal client communications log of MTC for Player No. 9.

38.     Attached hereto as Exhibit 28 is an email from Mr. Howard to my partner, TerriAnne Benedetto, dated March 6, 2018, including the signature block with reference to his office in Tallahassee as 3522 Thomasville Road, Suite 505.  Mr. Howard indicates that he is being represented by John Leonard of McElroy, Deutsch, Mulvaney & Carpenter, LLP.  Thomas Hurd of McElroy, Deutsch, Mulvaney & Carpenter, LLP has represented to my office that he represents Third-Party Funder, Preferred Capital.


I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 8, 2018

                                        _/s/ Christopher A. Seeger_
                                        CHRISTOPHER A. SEEGER
                                        _Co-Lead Class Counsel_

# Exhibit 1



**NFL CONCUSSION SETTLEMENT**

*IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION*

No. 2:12-md-02323 (E.D. Pa.)

# HEARING ON CLASS MEMBERS' RETIREMENT FUNDS BEING HELD BY CAMBRIDGE

April 2, 2018

Co-Lead Class Counsel Presentation

Offeree Name _____     Copy Number _____

## CAMBRIDGE CAPITAL PARTNERS L.P.

## PRIVATE OFFERING MEMORANDUM
### FOR
### OFFERING OF LIMITED PARTNERSHIP INTERESTS

Required Minimum Investment – $100,000

THIS MEMORANDUM IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN THE LIMITED PARTNERSHIP INTERESTS OF CAMBRIDGE CAPITAL PARTNERS L.P., A MASSACHUSETTS LIMITED PARTNERSHIP ORGANIZED ON FEBRUARY 20, 2015. DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. AS A RESULT, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART OR DELIVERED TO ANY PERSON WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

THE INVESTMENT APPROACH AND TRADING TECHNIQUES USED BY THE FUND INVOLVE A HIGHER DEGREE OF RISK THAN THAT ASSOCIATED WITH LESS AGGRESSIVE INVESTMENT ALTERNATIVES. AN INVESTMENT IN THE FUND IS THEREFORE NOT AN APPROPRIATE INVESTMENT FOR ANYONE UNABLE TO BEAR SUBSTANTIAL RISK OR REQUIRING LIQUIDITY AND SHOULD NOT BE VIEWED AS A COMPLETE DIVERSIFIED INVESTMENT PROGRAM. *SEE* "CERTAIN RISKS".

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE FUND INTERESTS HAVE NOT BEEN APPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE FUND INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS, AS AMENDED. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

The date of this Private Offering Memorandum is March 1, 2015.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO THE REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THERE ARE ALSO FURTHER SUBSTANTIAL RESTRICTIONS ON THE TRANSFERABILITY OF THE FUND INTERESTS.

## I. SUMMARY

THE FUND – Cambridge Capital Partners L.P. (the "Fund") is a Massachusetts limited partnership investment fund organized in February 2015. The General Partner of the Fund (the "General Partner") is Cambridge Capital Advisors, LLC, a Florida limited liability corporation organized in February 2015. The Investment Manager of the Fund (the "Investment Manager") is Cambridge Capital Advisors, LLC, a Florida limited liability corporation organized in February 2015.

INVESTMENT OBJECTIVE AND APPROACH – The objective of the Fund will be to generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset backed securities ("ABS") and derivatives, US and International private and public debt securities ("USI") and derivatives, and litigation settlement claims ("LS"). The Fund may also invest in and trade in other securities, derivatives and financial contracts, both for hedging and for speculative purposes. The Investment may also allocate up to 25% of the Fund's net assets (determined at the time of investment) to other investment managers, including investment managers which may be affiliated with the Investment Manager.

INVESTMENT MANAGER – The General Partner has, subject to delegation, sole responsibility for management of the Fund's business and investments. The General Partner who is also the Investment Manager will manage the Fund's investment portfolio on a discretionary basis. The Investment Manager is registered as an exempt investment advisor with the Securities and Exchange Commission under the Advisors Act Section 203(m), as amended. *See* "Management".

THE OFFERING – The Fund is currently offering limited partnership interests with a current minimum investment by each subscriber of $100,000 (subject to waiver in the discretion of the General Partner). No minimum amount of interests must be subscribed prior to a sale of limited partnership interests.

RISKS AND SUITABILITY – Purchase of a limited partnership interest in the Fund should be deemed to be an aggressive growth investment and is not intended as a complete investment program. *An investment in the Fund is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from their Fund accounts, who are financially able to maintain their investment and who can afford the loss of their investment. There can be no assurance that the Fund will achieve its investment objectives. See "Certain Risks".* Investment in the Fund is available exclusively to sophisticated persons and entities that have a net worth in excess of $2,000,000.00, qualify as "accredited investors" as defined in Rule 501 of Regulation D under the Act and that meet the "qualified client" test of Rule 205-3, as amended, promulgated under the Investment Advisors Act (*see* Appendices B and C of this Memorandum). All investors must also have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from the Fund, must be financially able to maintain their investment for an extended period and must be able to afford the loss of their investment. ADMISSION AS A LIMITED PARTNER IN THE FUND IS NOT OPEN TO THE GENERAL PUBLIC.

AVAILABLE INFORMATION – This Memorandum sets forth the investment objectives, method of operation and certain other pertinent information relating to the Fund; however, this Memorandum does not set forth all the provisions and distinctions of the Amended and Restated Agreement of Limited Partnership of the Fund (the "Partnership Agreement") that may be

7

# PLAYER 1

**Cambridge Capital Group Equity Option LP**
**Transactions by Account**
**As of February 28, 2018**

11:25 PM
02/28/18
Accrual Basis

| Type | Date | Num | Adj | Name | Memo | Clr | Split | Debit | Credit | Balance |
|------|------|-----|-----|------|------|-----|-------|-------|--------|---------|
| Player 1 Equity | | | | | | | | | | 0.00 |
| Deposit | 06/15/2016 | | | | Mill Trust | | Bank of America | | 29,950.00 | 29,950.00 |
| Deposit | 09/06/2016 | | | | Deposit | | Bank of America | | 50,000.00 | 79,950.00 |
| Total Player 1 Equity | | | | | | | | 0.00 | 79,950.00 | 79,950.00 |
| TOTAL | | | | | | | | 0.00 | 79,950.00 | 79,950.00 |

**Cambridge Capital Partners**
**Transactions by Account**
**As of July 1, 2018**

11:33 PM
02/28/18
Accrual Basis

| Type | Date | Num | Adj | Name | Memo | Clr | Split | Debit | Credit | Balance |
|------|------|-----|-----|------|------|-----|-------|-------|--------|---------|
| Player 1 Equity | | | | | | | | | | 0.00 |
| Deposit | 06/16/2016 | | | Millennium Trust | Player 1 | | Bank of America | | 170,000.00 | 170,000.00 |
| Deposit | 09/06/2016 | | | Millennium Trust | | | Bank of America | | ~~50,000.00~~ | ~~220,000.00~~ |
| Total Player 1 Equity | | | | | | | | 0.00 | ~~220,000.00~~ | ~~220,000.00~~ |
| TOTAL | | | | | | | | 0.00 | ~~220,000.00~~ | ~~220,000.00~~ |

*170,000     170,000*

**Cambridge Capitol Advisor**
**Transactions by Account**
**As of February 28, 2018**

11:40 PM
02/28/18
Accrual Basis

| Type | Date | Num | Adj | Name | Memo | Clr | Split | Debit | Credit | Balance |
|------|------|-----|-----|------|------|-----|-------|-------|--------|---------|
| Player 1 Equity | | | | | | | | | | 0.00 |
| Deposit | 08/31/2016 | | | | Deposit | | Checking | | 137,000.00 | 137,000.00 |
| Total Player 1 Equity | | | | | | | | 0.00 | 137,000.00 | 137,000.00 |
| TOTAL | | | | | | | | 0.00 | 137,000.00 | 137,000.00 |

# PLAYER 5

11:25 PM
02/28/18
Accrual Basis

**Cambridge Capital Group Equity Option LP**
**Transactions by Account**
As of February 28, 2018

| Type | Date | Num | Adj | Name | Memo | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Player 5  Equity | | | | | | | | | | 0.00 |
| Deposit | 05/19/2016 | | | | Mill Trust | | Bank of America | | 66,461.95 | 66,461.95 |
| Deposit | 09/06/2016 | | | | Bk 6617 Tran... | | Bank of America | | 65,000.00 | 131,461.95 |
| Total Player 5  Equity | | | | | | | | 0.00 | 131,461.95 | 131,461.95 |
| **TOTAL** | | | | | | | | 0.00 | 131,461.95 | 131,461.95 |

9/6/16

15,000.00 ?

146,461.95

11:16 PM
02/28/18
Accrual Basis

**Cambridge Capital Partners**
**Transactions by Account**
As of February 28, 2018

| Type | Date | Num | Adj | Name | Memo | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Player 5  Equity | | | | | | | | | | 0.00 |
| Deposit | 05/19/2016 | | | Player 5  Equity Chk 2500 | Player 5  I... Deposit | | Bank of America | | 552,600.00 | 552,600.00 |
| Deposit | 09/06/2016 | | | | | | Bank of America | | 65,000.00 | 617,600.00 |
| Total Player 5  Equity | | | | | | | | 0.00 | 617,600.00 | 617,600.00 |
| **TOTAL** | | | | | | | | 0.00 | 617,600.00 | 617,600.00 |

9/6/2016

15,000.00 ?

632,000.00

4

BNY MELLON
ASSET SERVICING
P.O. Box 569
Pittsburgh, PA 15230-0569

NFL PLAYERS SECOND CAREER SAVINGS PLAN

MILLENNIUM TRUST COMPANY
FBO Player 5
SUITE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309

| PAYMENT SUMMARY | |
|---|---|
| ACCOUNT NUMBER: Player 5 | DATE OF CHECK: 05/10/16 |
| PAYEE NAME: | NET PAYMENT AMOUNT: 619,111.95 |

ACCOUNT NUMBER: Player 5

(Detach Here)

NFL PLAYERS SECOND CAREER SAVINGS PLAN

B-25/430

NOT VALID BEFORE OR    CHECK DATE    CHECK NUMBER
180 DAYS AFTER   05/10/16   0000384968

PAY   ******SIX HUNDRED NINETEEN THOUSAND ONE HUNDRED ELEVEN DOLLARS AND 95 CENTS******

NFL0ST

PAYABLE IN U.S. DOLLARS

TO
THE
ORDER
OF
MILLENNIUM TRUST COMPANY
FBO Player 5
SUITE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309

**$619,111.95**

The Bank of New York Mellon
Pittsburgh, Pennsylvania

AUTHORIZED AGENT

---

BNY MELLON
ASSET SERVICING
P.O. Box 569
Pittsburgh, PA 15230-0569

NFL PLAYERS SECOND CAREER SAVINGS PLAN

MILLENNIUM TRUST COMPANY
FBO Player 10
STE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309

| PAYMENT SUMMARY | |
|---|---|
| ACCOUNT NUMBER: | DATE OF CHECK: 03/28/16 |
| PAYEE NAME: Player 10 | NET PAYMENT AMOUNT: 316,059.98 |

ACCOUNT NUMBER:



Overnight to
Millennium Trust
2001 Spring Rd.
Suite 700
Oak Brook, Ill
60523

NFL PLAYERS SECOND CAREER SAVINGS PLAN

B-26/430

NOT VALID BEFORE OR    CHECK DATE    CHECK NUMBER
180 DAYS AFTER   03/28/16   0000381458

PAY   ******THREE HUNDRED SIXTEEN THOUSAND FIFTY NINE DOLLARS AND 98 CENTS******

NFL0ST

PAYABLE IN U.S. DOLLARS

TO
THE
ORDER
OF
MILLENNIUM TRUST COMPANY
FBO Player 10
STE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309

**$316,059.98**

The Bank of New York Mellon
Pittsburgh, Pennsylvania

AUTHORIZED AGENT

5



**PORTFOLIO SUMMARY –** Player 5 IRA

### 12/31/2016 PORTFOLIO ALLOCATION :

| | |
|---|---|
| 11.83% Cambridge Capital Group Equity Option Opportunity LP | $ 88,901.50 |
| 88.17% Cambridge Capital Partners LP | $662,531.00 |
| **TOTAL PORTFOLIO VALUE** | **$751,432.50** |

### PORTFOLIO PERFORMANCE ANALYSIS:

| | |
|---|---|
| Total Funds Contributed | $619,061.95 |
| Total Market Value (12/31/16) | $751,432.50 |
| Total Market Gains (Loss) | $132,370.55 |
| Weighted Average Cost Base | $619,061.95 |
| Total Percentage Return (5/19/16 – 12/31/16) | 21.38% |
| Average Annual Percentage Return | 39.29% |

8/10/2017          Case 2:12-md-02323-AB   Document 6371-13   Filed 09/12/17   Page 2 of 2

**Subject:**   Cambridge Capital Group and Life Insurance

**From:**   cambridge capital (Info@cambridgecapitalgroup.holdings)

**To:**   ████████

**Cc:**   Info@cambridgecapitalgroup.holdings; alidzleli@elefamily.com; csanders@elefamily.com.

**Date:**   Sunday, December 18, 2016 4:08 PM

As we discussed, Dr. Howard and I and our team continue to develop Cambridge Capital Group to provide an unmatched model of services which includes investment management, wealth planning, estate planning, wills, trust creation, life insurance, supplemental health insurance, and loans to meet the unique needs of retired professional athletes. Additionally, ancillary legal services for little or no additional costs via our direct association with Howard & Associates PA makes our creative model unmatched in the marketplace.

While the recent Supreme Court ruling now gives us a clearer picture as to the possible time frame for you to receive your expected settlement from the NFL, our plan was to further discuss the necessary steps to create a viable and opportunistic financial plan, or like I frequently say "a road map", to achieve the goals and dreams of you and your family over the next 6 months. However, recent conversations with life insurance experts and the pending legal effective date of the settlement requires that we address the very important need for life insurance as a death benefit, a living benefit, and a financial planning tool due to your expected future wealth immediately.

Because life insurance applications require you to disclose medical problems and your potential diagnosis of the symptoms of "living" CTE, which will become a legal claim in approximately 30 - 60 days, it is possible that you will become un-insurable for the remainder of your life. Again, due to your expected future wealth and the need to plan accordingly for future estate tax requirements as well as a very important living & death benefit for your family, it is critical that we address this now so you can never be denied in the future.

Attached is an illustration of a $2 million term life insurance policy which will allow us to convert it to whole/permanent life insurance anytime in the next 10 years as we deem it appropriate. This policy is extremely attractive due to its "living" benefit which allows you to access approximately 75% of the death benefit if you become terminally ill, have a chronic illness, have a critical illness, or get critically injured. These "living" benefits could prove very vital given what your future may bring.

Additionally, getting an initial term life insurance policy as opposed to a whole/permanent life insurance policy is a much less expensive strategy to achieve our goal with a monthly premium expense of approximately $380.00. We will initially advance the first year premium and plan on paying the future premiums from investment earnings thereby not effecting your current cash flow.

On Monday, Romona from ELE Wealth Management, who we have partnered with to quickly achieve this important goal, will contact you to set up a time for Connie, Linda, or Torrie to call you to complete the application as time is of the essence to successfully assure that the policy is issued prior to the filing of your legal claim. Please be on the lookout for Romonas call which will come from a 248 area code. You will then need to provide Connie, Linda, or Torrie approximately 30 minutes sometime Tuesday or Wednesday to complete the application.

As always, please do not hesitate to give me a call if you have any questions. Additionally, I have also included an update for your review of the investment returns for Cambridge Capital Group.

Happy Holidays !!
Don

Tim Howard, J.D., Ph. D.
Don Warner
Tom Woods
Harrison Smith
**Cambridge Capital Group, LLC**
850-270-9898

7

**Subject:** Howard & Associates - NFL Settlement Registration by August 7, 2017 - PROMO VIDEO

**From:** Neil Epstein (neil@howardjustice.com)

**To:** neil@howardjustice.com;

**Date:** Friday, June 23, 2017 10:43 PM

To all retired NFL players:

You MUST register for the NFL Concussion Settlement before **August 7, 2017** in order to make any claims on this settlement in the future. You are entitled to register even if you have not had a neuropsychological evaluation yet, or if you have been evaluated but did not qualify. If you have already been evaluated and did not qualify you are able to be evaluated again in the future. HOWEVER, if you do not register for the settlement before **August 7, 2017**, you can no longer make any claim on this settlement in the future.

Here is a link to our new promotional video regarding the registration deadline: https://www.youtube.com/watch?v=nO1EsFAAs5A

Please feel free to share this message with anyone who you believe may qualify, or may eventually qualify in the future for the **billion dollar NFL Concussion Settlement**.

If you have not registered please call us now and we can assist you with this process. If you have not been tested by a qualified NFL neurologist, we can become your legal representatives, and we will pay for you to travel to a NFL qualified neurologist, and we will pay for your hotel, food, and travel expenses while you are being evaluated. It does not matter where in world you live.

If you have already retained another law firm and you are not happy with how they are handling your claim we can easily bring you on board to join the hundreds of other retired NFL players that have already retained Howard & Associates. Just call us, and we will handle the move for you.

Lastly, if you do qualify for the NFL Concussion Settlement we can refer you to independent cash advance programs that may offer immediate cash based upon your proposed settlement.

If you feel that you have sustained severe head injuries from playing with the NFL, or if you feel that you may develop the latent symptoms of severe head injury because of your career with the NFL . . . CALL OR EMAIL US NOW!

**NFL@HowardJustice.com**
**(850) 298-4455**

Again, if you do not register for the NFL Concussion Settlement before **August 7**, you will never be able to register!

Time is running out to register.

Thank you.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL LEAGUE
PLAYERS' CONCUSSION
INJURY LITIGATION

No. 2:12-md-02323-AB

MDL No. 2323

**Hon. Anita B. Brody**

Kevin Turner and Shawn Wooden,
on behalf of themselves and
others similarly situated,

                    Plaintiffs,

CIVIL ACTION NO: 14-cv-0029

          v.

National Football League and
NFL Properties, LLC,
Successor-in-interest to
NFL Properties, Inc.,

                    Defendants.

**NOTICE OF FILING VERIFICATION OF NON-OWNERSHIP, NON-MANAGEMENT
AND DISSOLUTION OF COMPANIES REFERENCED IN MOTION TO COMPEL
AND DISCOVERY DIRECTED TO RESPONDENTS TIMOTHY HOWARD, J.D.,
PH.D., AND HOWARD & ASSOCIATES, P.A., AND DECLARATION OF TIMOTHY
HOWARD, J.D., PH.D.**

Pursuant to the Court's Order dated July 19, 2017 (ECF No. 8037), the August 10, 2017

Interrogatories Directed to Respondent, Timothy Howard, J.D., Ph.D., and Howard &

Associates, P.A., and the September 12, 2017 Motion to Compel, the Respondents provide the

following Notice of Filing Verification of Non-Ownership, Non-Management and Dissolution of

Companies Referenced in Motion to Compel and Discovery Directed to Respondents Timothy

Howard, J.D., Ph.D., and Howard & Associates, P.A., and Declaration of Timothy Howard, J.D.,

Ph.D.:

1.  In order to more fully inform both the Court and Class Counsel verifying the lack of

    ownership, control or management of any Cambridge company, attached as

Cumulative Exhibit A, please find the State of Florida, Department of State,

Dissolution Certificates dated May 3, 2017. These were filed pursuant to a sale of the

Cambridge companies earlier in the year.

2.  Undersigned has reached out to Class Counsel to address and resolve both discovery

    issue and any corrective declarations that maybe considered, and will meet and/or

    consult with Class Counsel after the Tuesday hearing.

3.  The Declaration, attached as Exhibit B, verifies the lack of ownership, control or

    management of Cambridge Capital companies, and the efforts to resolve both

    discovery and any corrective declarations needed with Class Counsel.

Dated: September 15, 2017                   Respectfully submitted,

                                           /s/Tim Howard
                                           Tim Howard, J.D., Ph.D
                                           Florida Bar No.: 655325
                                           **HOWARD & ASSOCIATES, P.A.**
                                           2120 Killarney Way, Suite 125
                                           Tallahassee, FL 32309
                                           Telephone: (850) 298-4455
                                           Fax: (850) 216-2537
                                           tim@howardjustice.com

### CERTIFICATE OF SERVICE

          I HEREBY CERTIFY that a true and correct copy off the foregoing has been

provided via U.S. Mail to Christopher A. Seeger, Seeger Weiss LLP, 77 Water Street, New

York, NY, 10005, and by Electronic Mail to tbenedetto@seegerweiss.com

on this 15th day of September, 2017.

                                           /s/Tim Howard
                                           Tim Howard, Esq.

# State of Florida
## Department of State

I certify from the records of this office that CAMBRIDGE CAPITAL GROUP LLC was a limited liability company organized under the laws of the State of Florida, filed on December 4, 2015, effective January 1, 2016.

The document number of this limited liability company is L15000203070.

I further certify that said limited liability company was voluntarily dissolved on May 2, 2017, effective May 3, 2017.



*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Fifth day of May, 2017*

*Ken Detzner*

*Secretary of State*

Authentication ID: 800298768208-050517-L15000203070
To authenticate this certificate, visit the following site, enter this
ID, and then follow the instructions displayed.
https://efile.sunbiz.org/certauthver.html

# State of Florida
## Department of State

I certify from the records of this office that CAMBRIDGE CAPITAL ADVISORS LLC was a limited liability company organized under the laws of the State of Florida, filed on March 5, 2015, effective March 2, 2015.

The document number of this limited liability company is L15000040994.

I further certify that said limited liability company was voluntarily dissolved on May 2, 2017, effective May 3, 2017.



*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Fifth day of May, 2017*

*Ken Detzner*

*Secretary of State*

Authentication ID: 000298768770-050517-L15000040994
To authenticate this certificate, visit the following site, enter this
ID, and then follow the instructions displayed.
https://efile.sunbiz.org/certauthver.html



MARTIN L. BLACK, ATTORNEY AT LAW
4909 N. MONROE STREET
TALLAHASSEE, FLORIDA 32303
850-354-8008-OFFICE    mbmblack8@gmai.com  Email

August 24, 2017

Christopher A. Seeger, Esq.
SeegerWeiss, LLP
77 Water Street, New York, NY 10005
(212) 584-0700 (ph); (212) 584-0799 (fax)
tbenedetto@seegerweis.com

**VIA U.S. MAIL AND E-MAIL TO:** cseeger@seegerweiss.com, and
tbenedetto@seegerweiss.com

Re:    *August 10, 2017 Discovery Requests to Cambridge Capital Group, LLC, and Timothy
         Howard, Gail Milon and Jeff Kahn*

Dear Mr. Seeger:

This law office represents Cambridge Capital Group, LLC, in response to the discovery requests
referenced above, please be advised that Cambridge Capital Group, LLC, a Florida company was
sold many months ago, and was officially dissolved in early May of 2017.  *See* State of Florida
Corporate Dissolution document attached in addition to this firm response to your discovery
requests.

Cambridge is not a party to the *In re National Football League Players' Concussion Injury
Litigation*, No. 2:12-md-02323-AB (E.D. Pa), litigation; consequently, Cambridge asserts that
the discovery requests do not comply with Federal Rule of Civil Procedure 45, which governs
the discovery of information from non-parties such as Cambridge, including requiring a valid
subpoena in accordance with Rule 45(a)-(c).  The request also seeks information that is not
relevant to any party's claim or defense in the litigation. Thus, it is outside the scope of
discovery under Federal Rule of Civil Procedure 26(b)(1). Moreover, to the extent that the
request is overbroad and unduly burdensome and seeks information that the burden and expense
will far outweigh the likely benefit, the request is also inappropriate.

The Florida Division of Corporations can also confirm that the corporate entity that you are
requesting discovery from, Cambridge Capital Group LLC, no longer exist and was dissolved
pursuant to a confidential sale and dissolution agreement entered into early this year.



The company was sold to Mr. Addys Walker, and he is the corporate representative and is the
individual that discovery demands should be directed towards.  Please note that neither Mr.
Howard nor Ms. Milon or Jeff Kahn were owners or partners in Cambridge Capital Group LLC.
Since neither Mr. Howard nor Ms. Milon or Jeff Kahn are permitted to respond to any discovery
requests pursuant to the confidential sale and dissolution agreement, please redirect your legally
appropriate discovery requests to Mr. Addys Walker via this law firm and we will promptly
address the issues on his behalf and on behalf of Cambridge Capital Group LLC.

Thank you for your consideration and your efforts on behalf of Retired NFL Players.

Sincerely,

Martin L. Black, Attorney



March 29, 2018

Honorable Judge Brody
United State District Court
Eastern District of Pennsylvania

Christopher A. Seeger
Seeger Weiss, LLP
55 Challenger Road
Ridgefield Park, NJ 07660

Re:     In re NFL Players' Concussion Injury Litigation, No. 12-md-2323-AB
        Cambridge Entities' Productions in response to District Court's February 20, 2018 Order

Dear Judge Brody and Mr. Seeger:

I have not agreed to have Mr. Martin Black withdraw as counsel for the Cambridge entities. As I am not sure what Mr. Martin Black will do concerning representation, I want to make sure I am doing all I can to comply with the Court's Order. I am writing to confirm that I am able to appear via telephone at the 10 am hearing on April 2, 2018. I am also writing to provide foundational information pertaining to the issues raised. Most important, all class members assets are invested and being accounted for. These assets are not liquid, and the fund is taking steps to protect the asset value, while pursuing responsible liquidation of the assets for class members. This will take some time. To expedite liquidation would harm the class members investments.

Next, as background, the fund was created in 2015 out of a university project to apply faculty skills through a Global Investment Advisory Team (GIAT) made of faculty and staff, including Dr. Tim Howard. A consultant was hired, Mr. Don Reinhard, which was seeking an opportunity to apply his skills and experience, rehabilitation, and to teach a course or two. He put together the documents and paperwork for the establishment and operations of the fund. He was to temporarily guide compliance and day-to-day management until a licensed manager was hired. The members of the GIAT were engaged full-time in their teaching, jobs, other careers, and did not have the capacity to manage compliance or day-to-day activities. Retired NFL Player investments and advances were neither contemplated nor sought. Based on the model of the fund, ethics conflicts were researched and applied. Updated ethics research and communications with the Florida Bar required that Dr. Tim Howard not have any ownership, management, interest or control, and he has complied with the same.

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010     Fax 850-386-6399
info@cambridgecapitalgroup.holdings



In late 2015 and through most of 2016, the fund sought and interviewed licensed candidates and brokers. While this was going on, this same consultant began communication with retired NFL players that were represented and receiving preliminary claim reviews on another side of the same building. Some of these players were seeking advances, and ultimately the fund, which found a robust market in advances and the potential for good returns, issued a limited number of advances as one investment class. Upon review, and discussions with class members, the consultant did not explain the nature of the fund, that assets maybe illiquid, and didn't cover fund specifics with class members. Over time, as a way to build commissions and fees that he took without approval from the fund, the consultant issued advances to more retired NFL players. The volume of advances was not known until the consultant was dismissed from the fund.

In late 2016, I was interviewed for the licensed position to assist in financial planning services and to oversee administration for Cambridge Capital. In 2017, I accepted the position. I immediately requested an audit. I cannot provide financial information to investors until I have official notification from the auditor that all investments are sound and accounted for. That is why class members have not received quarterly updates as the Private Offering Memorandum contemplates.

The consultant was resistant to my oversight. Within weeks, the consultant was dismissed from his position, and I assumed temporary responsibility for the Cambridge entities. The consultant took much of the documentation needed for the audit. In addition, what information was available, was manual. We have had to automate accounting processes, and this is still being done, including accurate internal lending documents, errors on quick books and ledger designations. This required a forensic audit, which has taken much longer to complete. This same consultant is now in prison for child abuse and violation of probation for theft. The consultant has been trying to sabotage the fund, has threatened the auditor (who informed the state attorney), threatened office members and staff, and threatened extort and harm Dr. Tim Howard and his family from any source possible for the past year.

Among the findings to date, the consultant was found to have forged numerous documents pertaining to class members, impersonated Dr. Tim Howard by opening bank accounts without his knowledge or approval, created unsustainable advance obligations, and has taken fund profits without authorization. This has been reported to the State Attorney and the Florida Bar, and the SEC has received copies of the same. This same imprisoned consultant has been an information source for class members, who are communicating with Mr. Seeger. This same imprisoned consultant continues to communicate with retired NFL players, attempting to run an investment fund from jail, and received a cease and desist notice nearly a year ago.

Mr. Addys Walker was assigned to temporarily lead the fund due to his private investigative experience, claimed entrepreneurial skills, and experience in raising capital. However, he lacked experience in finance and management, did not manage the fund effectively, and has since resigned. Counsel for the fund,

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010    Fax 850-386-6399
info@cambridgecapitalgroup.holdings

Martin Black, explained Mr. Walker's misunderstanding of the IRA and that the IRA was not security for class member advances, and in written response to an inquiry, informed Mr. Seeger of the same.

The fund is in the audit process for 2015 and 2016. I will provide audit findings upon completion. As stated, I am able to appear at the 10 am hearing via telephone. I will provide the same information found in this letter, and the attached letters sent to Mr. Seeger, for your honor and any further details as I am able.

Your Honor's consideration in appreciating my efforts to comply with the Court's Order, and providing time to complete the forensic audit and orderly management of the fund to protect class member's interest is deeply appreciated.

Sincerely,

Gail Milon
Managing Vice President

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010    Fax 850-386-6399
info@cambridgecapitalgroup.holdings

**ARTICLES OF AMENDMENT**
**TO**
**ARTICLES OF ORGANIZATION**
**OF**

CAMBRIDGE CAPITAL GROUP LLC
(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on _12/04/2015_ and assigned
Florida document number _L15000203070_.

This amendment is submitted to amend the following:

**A.** If amending name, enter the new name of the limited liability company here:

_____
The new name must be distinguishable and contain the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."

Enter new principal offices address, if applicable:  1400 VILLAGE SQUARE BLVD.
(*Principal office address MUST BE A STREET ADDRESS*)  STE 3-268
Tallahassee, FL 32312-1231

Enter new mailing address, if applicable:  SEE ABOVE
(*Mailing address MAY BE A POST OFFICE BOX*)

**B.** If amending the registered agent and/or registered office address on our records, enter the name of the new
registered agent and/or the new registered office address here:

Name of New Registered Agent:  GAIL MILON

New Registered Office Address:  1400 VILLAGE SQUARE BLVD., STE 3-268
Enter Florida street address
Tallahassee _____, Florida 32312
City                                                  Zip Code

New Registered Agent's Signature, if changing Registered Agent:

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the
provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and
accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is
being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability
company has been notified in writing of this change.*

Gail Milon
If Changing Registered Agent, Signature of New Registered Agent

Page 1 of 3

If amending Authorized Person(s) authorized to manage, enter the title, name, and address of each person being added or removed from our records:

MGR = Manager
AMBR = Authorized Member

| Title | Name | Address | Type of Action |
|---|---|---|---|
| PRES. MGR | Howard, Phillip T. | 2120 Killarney Way Tallahassee, FL 32309 | ☐ Add ☒ Remove |
| PRES MGR | LOIS KOONS | 1400 Village Square BLVD. STE 3-268 Tallahassee, FL 32312 | ☐ Change ☒ Add ☐ Remove ☐ Change |
| VP AMBR | GAIL MILON | 1400 Village Square BLVD STE. 3-268 Tallahassee, FL 32312 | ☒ Add ☐ Remove ☐ Change |
| TRE | MARK HALLIM | 1400 Village Square BLVD STE 3-268 Tallahassee, FL 32312 | ☐ Add ☐ Remove ☒ Change |
| | | | ☐ Add ☐ Remove ☐ Change |
| | | | ☐ Add ☐ Remove |

---

D.. If amending any other information, enter change(s) here: *(Attach additional sheets, if necessary.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**E. Effective date, if other than the date of filing:** _____ (optional)
(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b) **Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed on the document's effective date on the Department of State's records.

If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b) The 90th day after the record is filed.

Dated _____March 7_____, __2017__.

_____
Signature of a member or authorized representative of a member

DR. TIM HOWARD
Typed or printed name of signee

Page 3 of 3
Filing Fee: $25.00

2017 MAR -8 AM 11: 53

15

**ARTICLES OF AMENDMENT**
**TO**
**ARTICLES OF ORGANIZATION**
**OF**

CAMBRIDGE CAPITAL ADVISORS, LLC
(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on 03/05/2015 and assigned
Florida document number L15000040994

This amendment is submitted to amend the following:

A. If amending name, **enter the new name of the limited liability company here:**

The new name must be distinguishable and contain the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."

Enter new principal offices address, if applicable: 1400 VILLAGE SQUARE BLVD.
*(Principal office address MUST BE A STREET ADDRESS)* STE 3-268
Tallahassee, FL 32312

Enter new mailing address, if applicable: SEE ABOVE
*(Mailing address MAY BE A POST OFFICE BOX)*

B. If amending the registered agent and/or registered office address on our records, **enter the name of the new
registered agent and/or the new registered office address here:**

Name of New Registered Agent: GAIL MILON
New Registered Office Address: 1400 VILLAGE SQUARE BLVD. STE 3-268
Enter Florida street address
Tallahassee, Florida 32312
City                                Zip Code

New Registered Agent's Signature, if changing Registered Agent:

I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the
provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and
accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is
being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability
company has been notified in writing of this change.

Gail Milon
If Changing Registered Agent, Signature of New Registered Agent

Page 1 of 3

16

If amending Authorized Person(s) authorized to manage, **enter the title, name, and address of each person  being added or removed from our records:**

MGR = Manager
AMBR = Authorized Member

| Title | Name | Address | Type of Action |
|---|---|---|---|
| PRES. MGR | Howard, Phillip T. | 2120 Killarney Way<br>Tallahassee, FL 32309 | ☐ Add<br>☒ Remove<br>☐ Change |
| PRES MGR | LOIS KOONS | 1400 Village Square BLVD.<br>STE 3-268<br>Tallahassee, FL 32312 | ☒ Add<br>☐ Remove<br>☐ Change |
| VP AMBR | GAIL MILON | 1400 Village Square BLVD<br>STE. 3-268<br>Tallahassee, FL 32312 | ☒ Add<br>☐ Remove<br>☐ Change |
| TREA | MARK HALLIM | 1400 Village Square BLVD<br>STE 3-268<br>Tallahassee, FL 32312 | ☐ Add<br>☐ Remove<br>☒ Change |
| SEC | MEHTA, ANKUR | 2120 Killarney Way<br>Tallahassee, FL 32309 | ☐ Add<br>☒ Remove<br>☐ Change |
| TREA | MEHTA, ANKUR | MEHTA, ANKUR<br>2120 Killarney Way<br>Tallahassee, FL 32309 | ☐ Add<br>☒ Remove<br>☐ Change |

Page 2 of 3

D. If amending any other information, enter change(s) here: *(Attach additional sheets, if necessary.)*

E. **Effective date, if other than the date of filing:** _____ (optional)
(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b) **Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b)  The 90th day after the record is filed.

Dated ___March 7___, _2017_.

_____
Signature of a member or authorized representative of a member

DR. TIM HOWARD
Typed or printed name of signee

Page 3 of 3
Filing Fee: $25.00

## NEVADA SECRETARY OF STATE
### Barbara K. Cegavske

Home | Forms | Announcements | FAQ | Contact Us

Search nvsos.gov... GO

SOS INFORMATION    ELECTIONS    BUSINESSES    LICENSING    INVESTOR INFORMATION    ONLINE SERVICES

My Data Reports   Commercial Recordings   Licensing

## CAMBRIDGE CAPITAL GROUP, LLC

🔍 New Search          Manage this Business     $ Calculate List Fees    🖨 Printer Friendly

### Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 4/10/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0169222017-1 |
| Qualifying State: | NV | List of Officers Due: | 4/30/2018 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20171229874 | Business License Exp: | 4/30/2018 |

### Additional Information

| | |
|---|---|
| Central Index Key: | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CORPORATION SERVICE COMPANY | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | DELAWARE | Status: | Active |

View all business entities under this registered agent

### Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

No stock records found for this company

➖ Officers                                          ☑ Include Inactive Officers

**Manager - LOIS KOONS**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY, SUITE B #245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Manager - GAIL MILON**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY, SUITE B #245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

➖ Actions\Amendments

Click here to view 2 actions\amendments associated with this company

Home | Forms | Announcements | FAQ | Contact Us

# NEVADA SECRETARY OF STATE
## Barbara K. Cegavske

Search nvsos.gov...   GO

SOS INFORMATION | ELECTIONS | BUSINESSES | LICENSING | INVESTOR INFORMATION | ONLINE SERVICES

My Data Reports   Commercial Recordings   Licensing

## CAMBRIDGE CAPITAL WEALTH ADVISORS, LLC

Q New Search          Manage this Business      $ Calculate List Fees      🖶 Printer Friendly

### Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 5/2/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0210952017-0 |
| Qualifying State: | NV | List of Officers Due: | 5/31/2018 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20171284161 | Business License Exp: | 5/31/2018 |

### Additional Information

| | |
|---|---|
| Central Index Key: | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

View all business entities under this registered agent

### Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

No stock records found for this company

### Officers

☑ Include Inactive Officers

**Manager - GAIL MILON**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B, #248 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

### Actions\Amendments

Click here to view 2 actions\amendments associated with this company

Business License or Exemption Expiration Date is the date upon which the State Business License or Exemption of a Nevada Business expires. If no information is depicted in the Business License Exp. field, this indicates that a business license or exemption has not been filed with the office of the Secretary of State. The registration may be on file with the Department of Taxation and/or you may request proof from the entity.

## NEVADA SECRETARY OF STATE
### Barbara K. Cegavske

Home | Forms | Announcements | FAQ | Contact Us

Search nvsos.gov...   GO

SOS INFORMATION   ELECTIONS   BUSINESSES   LICENSING   INVESTOR INFORMATION   ONLINE SERVICES

Ny Data Reports   Commercial Recordings   Licensing

## CAMBRIDGE CAPITAL GROUP ADVISORS, LLC

Q New Search          Manage this Business     $ Calculate List Fees      🖶 Printer Friendly

### Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 6/28/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0308052017-9 |
| Qualifying State: | NV | List of Officers Due: | 6/30/2018 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20171411751 | Business License Exp: | 6/30/2018 |

### Additional Information

| | |
|---|---|
| Central Index Key: | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

View all business entities under this registered agent

### Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

No stock records found for this company

| − | Officers | ☑ Include Inactive Officers |
|---|---|---|

| Managing Member - JEFF KAHN | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

| Managing Member - LOIS A KOONS | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

| Managing Member - LOIS A KOONS | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

| Managing Member - GAIL MILON | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

| Managing Member - ADDYS WALKER | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

| − | Actions\Amendments |
|---|---|

Click here to view 3 actions\amendments associated with this company

SOS Information | Elections | Businesses | Licensing | Investor Information | Online Services | Contact Us | Sitemap

101 N Carson Street Suite 3 Carson City, NV 89701 | (775) 684-5708
© 2016 All Rights Reserved. Privacy Policy and Disclaimer | About This Site

# A&T DEVELOPMENT, LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 10/19/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0495752017-9 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2018 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20171676496 | Business License Exp: | 10/31/2018 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

No stock records found for this company

## Officers

☑ Include Inactive Officers

**Managing Member - CAMBRIDGE DEVELOPMENT PARTNERS LLC**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - TIM HOWARD**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - TTSM, INC**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - ADDYS WALKER**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

**Managing Member - ADDYS WALKER**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

## Actions\Amendments

| | | | |
|---|---|---|---|
| Action Type: | Articles of Organization | | |
| Document Number: | 20170443072-10 | # of Pages: | 1 |
| File Date: | 10/19/2017 | Effective Date: | |

(No notes for this action)

| | | | |
|---|---|---|---|
| Action Type: | Initial List | | |
| Document Number: | 20170443073-21 | # of Pages: | 1 |
| File Date: | 10/19/2017 | Effective Date: | |

(No notes for this action)

| | | | |
|---|---|---|---|
| Action Type: | Amended List | | |
| Document Number: | 20170531330-15 | # of Pages: | 1 |
| File Date: | 12/18/2017 | Effective Date: | |

(No notes for this action)

21

## NEVADA SECRETARY OF STATE
### Barbara K. Cegavske

Home | Forms | Announcements | FAQ | Contact Us

Search nvsos.gov...   GO

SOS INFORMATION | ELECTIONS | BUSINESSES | LICENSING | INVESTOR INFORMATION | ONLINE SERVICES

My Data Reports   Commercial Recordings   Licensing

## CHRONICLES, LLC

Q New Search          Manage this Business     $ Calculate List Fees     🖨 Printer Friendly

### Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 10/25/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0503122017-5 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2018 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20171688684 | Business License Exp: | 10/31/2018 |

### Additional Information

| | |
|---|---|
| Central Index Key: | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

View all business entities under this registered agent

### Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

No stock records found for this company

— Officers          ☑ Include Inactive Officers

### Managing Member - TIM HOWARD

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

### Managing Member - TOM PARNELL

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

### Managing Member - MARK K SAVAGE

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

— Actions\Amendments

Click here to view 3 actions\amendments associated with this company

SOS Information | Elections | Businesses | Licensing | Investor Information | Online Services | Contact Us | Sitemap

101 N Carson Street, Suite 3 Carson City, NV 89701 | (775) 684-5708
© 2016 All Rights Reserved. Privacy Policy and Disclaimer | About This Site







March 27, 2018

Christopher A. Seeger
Seeger Weiss, LLP
55 Challenger Road
Ridgefield Park, NJ 07660

Re:   In re NFL Players' Concussion Injury Litigation, No. 12-md-2323-AB
      Cambridge Entities' Productions in response to District Court's February 20, 2018 Order

Dear Mr. Seeger;

I did not recall giving you a March 26, 2018 date to provide the additional information you requested.

The documents I provided you were from the accountant. If you look in the top left-hand corner of the spreadsheets provided, I received the spreadsheets less than eight (8) hours before I fed-ex the documents to you for a March 2, 2018 delivery. That did not give me enough time to review the documents. It is tax season and obtaining the documents during tax season was a task in itself. In my limited time to review the documents I made the corrections based on my review.

Documented below are the "Un Audited" funds I received from the Class Members:

| | | | |
|---|---|---|---|
| 1. | IRA $249,950 | Non-Qualified | $137,000 |
| 2. | IRA $343,761.51 | | |
| 3. | IRA $ 29,328.82 | Non-Qualified | $ 49,940 |
| 4. | IRA $153,247 | | |
| 5. | IRA $619,111.95 | Non-Qualified | $160,000 |
| 6. | IRA $662,886 | | |
| 7. | IRA $ 76,957.44 | | |
| 8. | IRA $335,987.52 | | |
| 9. | IRA $336,453.14 | Non-Qualified | $ 50,000 |
| 10. | IRA $316,059.98 | Non-Qualifies | $ 75,000 |

I requested an audit before providing any information to investors. A forensic audit was later requested. The audit should be finalized in 8 weeks. The auditor is Bill Bogan, Jr. CPA, CGFO, CPFO of Bogan Public Management Company.

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010    Fax 850-386-6399
info@cambridgecapitalgroup.holdings



Millennium Trust Company is our third-party record keeper. Qualified funds are forwarded to Millennium Trust to maintain its "qualified status" and subsequently forwarded to Cambridge Capital where the funds are disbursed into investments. Cambridge Capital Accounts are with Bank of America. No investment company have different investment funds for qualified versus non-qualified investments. The funds are "separated" via the record keeping process. That is the service Millennium Trust Company provides to Cambridge. As stated earlier, Millennium Trust Company is our third-party record keeper. They report the information Cambridge provide them. I have no direct contact person at Millennium Trust Company. Millennium's contact number is 800-258-7878. Your "initial" request was for "qualified funds" invested with Cambridge. Qualified funds flow through Millennium Trust Company. Non-Qualified funds flow through Bank of America. Due to time constraints, I was not able to separate the non-qualified funds. I called the accountant to get an answer regarding your "Split" question. He will get back with me.

The ten individuals provided are the only Class Members whose retirement funds were invested with Cambridge. The "others" including ▮▮▮▮▮▮ do not have qualified funds invested with Cambridge.

The funds are invested in litigation advances, travel advances, medical advances, real estate, technology and bridge loans based on my un-audited observation. I will provide a more accurate observation once the audit is finalized.

The Subscription agreement is the Limited Partnership Agreement. I will attach the Private Offering memorandum.

As for the accounting, once the audit is completed, I will provide you will all the financial information I receive. I do not have anything to report until the audit is finalized.

I hope I have answered your questions. Please do not hesitate to contact me if something was omitted.

In addition, I do not have legal counsel and will not be present for the April 2, 2018 hearing.

Sincerely,

Gail Milon
Managing Vice President

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010    Fax 850-386-6399
info@cambridgecapitalgroup.holdings



Our Team | Cambridge Capital Group

Page 1 of 5

☐ Call us : 850-270-9898

# Cambridge Capital Group

🔍

## Our Team

Cambridge Capital Group > About Us > Our Team

▸ Home

▸ About Us

  ▸ Our Team

▸ Funds

  ▸ CCG Partners LP

  ▸ CCG Large Cap Equity LP

  ▸ CCG Equity Option Opportunities LP

▸ Contact Us

### Managing Vice President

**Gail Milon**

Managing Vice President, Cambridge Capital Group, LLC.  Licensed Broker and Financial Planner with 30 years of experience with Merrill Lynch, NYSE, United Daniels, and Met Life.

## Our Partners

**Addys Walker**

Partner and Brokerage Vice President, Cambridge Capital Group, LLC.  30 years of experience in arbitrage financing, brokering and investing

**Jeff Kahn**

http://cambridgecapitalgroup.holdings/our-partners/our-team/

8/24/2017

Partner and Executive Vice President, Cambridge Capital Group,
LLC. 15 years of experience in legal financing, insurance and
former owner and manager of pre-settlement hedge fund.

## Our Board of Directors

**Dr. Tim Howard, J.D., Ph.D., Chair** – **President, Cambridge
Graduate University International**, and Professor of Law,
Business, Global Studies, Regulatory Science, and Public
Health. President Howard has taken his experience as the
founding Director and Professor of Northeastern University's
Law & Policy Doctorate Program, the world's first and highly
successful Doctorate in Law & Policy Program delivered in an
executive format with a praxis leadership model, and expanded
upon that model to a global graduate education format for ex-
ecutive MBA, MIB, and MGS programs in entrepreneur startups,
NGOs, pharmaceuticals, and high tech innovation, as well as
Ph.D. degrees with Cambridge Graduate University Internation-
al, with regional campus and partners throughout the globe in
regions such as India, Africa, Latin America, and more. Presi-
dent Howard's Ph.D. and J.D. coursework took place at North-
eastern University, Harvard University, Florida State University,
and Oxford University. He is former faculty and visiting scholar
at Boston University School of Law, Public Health, and Political
Science. Fields of Research Specialization, and Publication in-
clude: Environmental and Energy Management; Negotiations
and Mediation; International Trade and Corporate Contracts;
Criminal Justice; Anti-Corruption; Law and Economics; Business;
Free Markets; Consumer Product Liability and Personal Injury
Litigation in State and Federal Courts; Public Policy; Constitu-
tional Law; Law and Society; Cause Lawyering; Leadership; Civil
Rights/Liberties; Negotiations; Electoral Politics; State Legisla-
tures; Media & Politics; Health Care; Regulatory Science; Public

Health; Restorative and Community Criminal Justice; and High-
er Education. President Howard has been the senior faculty
and primary advisor on over 70 completed doctoral theses and
dissertations. As a law, policy, health care, justice, and business
scholar and successful practitioner, President Howard regularly
appears in national and international media, such as CNN, PBS,
Wall Street Journal, Financial Times, BBC, CBS, Associated Press,
NHK, JNN, 360 Law, Bloomberg News, Economist, Reuters, ITN,
Das Spiegel, New York Times, and more, on health, business,
higher education, and national and international business and
consumer justice issues, such as the Toyota recall, BP Oil Spill,
Goldman Sachs Aluminum Warehousing, NFL Brain Injury, UN
Cholera Deaths in Haiti, tobacco litigation, Telecommunications
Consumer Protection Act, and more. www.cguiedu.com.
www.howardjustice.com

**Dr. Goran Ridic, Ph.D.** – Dr. Goran Ridic is an Assistant Profes-
sor of Economics at the IUS. Dr. Ridic studied Economics at
Trinity College in Connecticut, USA, holds a Master of Business
Administration degree in Finance from the University of Con-
necticut – School of Business and a doctorate in Public Policy
from Northeastern University in Boston, Massachusetts, USA.
He has worked and consulted for a number of Fortune 500
companies including General Electric (GE Capital), United Tech-
nologies – Pratt & Whitney, ING Group, The Hartford Invest-
ment Management Company (HIMCO) and USAID.

**Mark Savage** – Mark Savage was born in Melbourne, Victoria,
Australia. He made and sold his first feature "Marauders" at the
age of 24. He has followed it up with years of non-stop produc-
tion and screen writing on projects as diverse as the ac-
tion/comedy "Sensitive New Age Killer"; a documentary on su-
perstar Jackie Chan "Beyond Mr. Nice Guy"; the action/thriller
"Narrow Gauge"; "The Sentimental Assassin"; "Defenceless";
"Ferlisle"; "Pond Scum"; to his latest film "120/80: Stressed to
Kill". "120/80: Stressed to Kill" is a darkly sardonic portrait of
middle age crises, starring Bill Oberst Jr., Armand Assante and
Marshal Hilton. The executive producer is Tommy Parnell. Up-

coming film to be released in late 2017, "Purgatory Road." Mark has also worked in film distribution for Orion Pictures in Detroit; Village/Roadshow in Melbourne, Australia: and David Lynch's Absurda in Los Angeles. He is the writer, director and producer for Delirium and Chronicles film companies.

**Dr. Eric Kupferberg, Ph.D.**– With past appointments to Massachusetts Institute of Technology, Harvard University, Harvard Medical School, Northeastern University and currently Cambridge Graduate University International as VP & Director of India Programs, Dr. Kupferberg brings extensive understanding, knowledge and experience in the opportunities in regulatory science and pharmaceutical industry, as well as the emerging market economy of India. He has created partnership programs with Indian universities in the fields of business and biomedical while also being instrumental in identifying gaps in knowledge among new and emerging leaders in Indian industry and governmental agencies.

**Dr. Patrick Preston, LP.D. –** From 2005-2017, Dr. Preston served as an Associate Professor and the Department Chair for Entertainment Management at Bay State College, Boston, MA. During that time, he taught courses in Entertainment Law, Entertainment Marketing, The Music Industry, and Film/Television Production Management.  He has presented and published on issues affecting the Concert Promotion Industry, Artist Management, and state tax incentives for film/television production. Dr. Preston received his B.A. in Theater Arts from the University of Massachusetts/Boston and both his M.A. in Public History and his Doctorate in Law & Policy from Northeastern University. His current fields of interests include the production, financing and distribution of film and television. Dr. Preston was both an actor and playwright in the Boston/New England markets, and undertook additional coursework in screenwriting at the UCLA Writers Program and Improv training with the Groundlings.

**Dr. Thomas A. Lynch, Ph.D.** – Dr. Lynch brings an extraordinary volume of experience from his former position as Director for the Center for Economic Forecasting and Analysis (CEFA) at Florida State University. CEFA conducts economic analysis in a wide range of areas including health care, environmental and energy, transportation, growth management, land use and real estate development. With a Bachelor of Science, Master of Science and Ph.D from Florida State University, Dr. Lynch has also held the prestigious positions of Assistant Director of the high profile Florida High Speed Rail Transportation Commission and Chief Environmental and Health Care Economist for the State of Florida.

**Dr. J. David Golub, M.B.A., LP.D.** – J. David Golub is professor of law and economics in the Law & Policy Doctoral Program at Northeastern University in Boston, Massachusetts, where he teaches law, finance, accounting, and economics at the European School of Economics.  His areas of expertise are in law, real estate, economics, taxation, accounting, finance, and public policy. He has previously been a visiting scholar at Georgetown University Law Center and Brooklyn Law School.  Professor Golub is the author of various legal and tax publications. journals, and articles. He is also a CPA, an editorial reviewer of the AICPA Journal of Accountancy and a consultant/director to three NY/NJ CPA firms.  He earned his doctor ot law & policy at Northeastern University, his JD, PhD, and MBA from The University of Chicago, and has post-graduate advanced degrees and certificates in finance, taxation, and real estate from New York University. He also earned his 85 in accounting from Binghamton University.



Billy Koons Obituary - Tallahassee, FL | Tallahassee Democrat

**Tallahassee Democrat.**   NEWS   SPORTS   TLH   LIMELIGHT   OPINION   POLICY & POLITICS   OBITUARIES   ● USA TODAY

**RESOURCES** **Billy Rhodes Koons**

☐ More Obituaries for Billy Koons

☐ Looking for an obituary for a different person with this name?

→ Koons Records (100+

● Obituary  ● Condolences

Billy Rhodes Koons Billy Rhodes Koons, 71, the retired director of maintenance for the Fort Myers Jet Center, died Sunday, Sept. 21, 2003. He is survived by his wife, Lois Feener Koons. The service will be at 11 a.m. EDT Thursday at Bradfordville Baptist Church, with burial at Mount Carmel Cemetery in Littlestown, Pa. Family will receive friends from 7 to 9 p.m. EDT Wednesday at Bevis Funeral Home (325-2193 or www.bevisfuneral.com). A native of Hanover, Pa., and formerly of Littlestown, he had been a resident of Florida for the past 22 years and moved to Tallahassee in 1995 from Cape Coral. He was a graduate of Littlestown High School and Embry-Riddle School of Aeronautics. He was an Air Force veteran who served in Korea during the Korean War. He had a wealth of knowledge of aviation, having obtained his private pilot's license at the age of 15. He also had a commercial pilot's license and was a licensed FAA inspector. He was an avid golfer and sports enthusiast. He was also a very talented floral designer, having worked in his family's business, as well as his own floral business. He was a member of Bradfordville Baptist Church and Alpha Fire Co., and was a life member of the VFW Post No. 90 in Littlestown. Other survivors include a son, William Koons of Tallahassee; a daughter, Jennifer Crouse Howard (and husband Tim) of Tallahassee; a sister, Norma Grace Devener of New Oxford, Pa.; and five grandchildren, Jennifer and Julie Koons, both of Lincoln, Neb., and Grayson Howard, Gage Howard and Gunnar Howard, all of Tallahassee. He was preceded in death by his parents, Willie Ernest and Della Rhodes Koons; a brother, Theron Koons; and two sisters, Janet Mathias and Roberta Pettyjohn.

Published in Tallahassee Democrat on Sept. 23, 2003

Our guide to writing an obituary will help yo compose the perfect tribute to your loved on (without leaving out crucial details).

**THE RITZ-CARLTON**

RESORTS OF FLORIDA AND THE CARIBBEA

Experience more this winter. Enjoy our Suites o Club Level and a sense o belonging.

EXPLORE NOW

MORE INFORMATION

Funeral Etiquette
Expert Advice:

http://www.legacy.com/obituaries/tallahassee/obituary.aspx?n=billy-rhodes-koons&pid=142625 [12/15/2018 10:37:48 AM]

# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | ) ) ) ) ) | 12-MDL-2323-AB |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, | ) ) ) ) ) | Philadelphia, PA April 2, 2018 10:10 a.m. |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., | ) ) ) ) ) | |
| Defendants. | ) ) | |


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For Kevin Turner,         TERRIANNE BENEDETTO, ESQUIRE
et al:                    SEEGER WEISS, LLP
                          1515 Market Street
                          Suite 1380
                          Philadelphia, PA  19102

                          CHRISTOPHER A. SEEGER, ESQUIRE
                          SEEGER WEISS, LLP
                          6th Floor
                          55 Challenger Road
                          Ridgefield, NJ 07660


Audio Operator:           JAMES F.G. SCHEIDT

2

Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                                 P.O. Box 129
                                 Gibbsboro, New Jersey  08026
                                 Office:    (856) 435-7172
                                 Fax:       (856) 435-7124
                                 Email:    dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

I N D E X

STATUS UPDATE

Mr. Seeger                                                6


PRESENTATION ON CAMBRIDGE ENTITIES

Ms. Benedetto                                            18

4

1          (The following was heard at 10:10 a.m.)

2          THE COURT:  There's  woman who's been calling into

3     my Chambers, Mr. Seeger, whose name is Gail Milon.  Do you

4     know anything about her?

5          MR. SEEGER:  Yes, Your Honor.  She is, I believe, an

6     employee of Cambridge Capital.  She's not an attorney.  And

7     she wanted to listen in on the hearing today.

8          THE COURT:  She wants to listen in?

9          MR. SEEGER:  Yeah.

10         THE COURT:  Well listening in is fine.  She's not

11    going to participate, she's just listening in, is that all

12    right with you?

13         MR. SEEGER:  That's fine with me, Your Honor.

14         THE COURT:  Okay.  Good.  There's no reason she

15    shouldn't.  Okay.  Just let her -- let's connect her.

16         (Pause)

17         THE COURT:  Have you contacted the NFL?  Are they

18    going to be here?

19         MR. SEEGER:  They're not going to attend.

20         THE COURT:  They're not going to attend?  Oh.

21         MR. SEEGER:  I thought they were, that's why we were

22    waiting.

23         THE COURT:  Oh, okay.  I didn't know.  All right.

24    Thank you.

25         MR. SEEGER:  Thank you.

5

1    (Pause)

2         THE COURT:  Hello?

3         MS. MILON:  Gail Milon speaking.

4         THE COURT:  And your name is -- your name is Gail

5    Milon, is that correct?

6         MS. MILON:  That is correct.

7         THE COURT:  Okay.  And I assume that -- am I correct

8    that Cambridge Capital is a corporation, or an LLC, what's

9    your constitution?

10         MS. MILON:  I can hardly hear.  I can hardly hear

11    you.

12         THE COURT:  All right.  I'm asking you whether

13    Cambridge Capital is a corporation?

14         MS. MILON:  It's a LLC.

15         THE COURT:  Okay.  All right.  Well you have to be

16    represented by counsel, but I certainly have no problem with

17    your listening in and knowing everything that's going on here.

18    Okay?

19         MS. MILON:  Thank you, ma'am.

20         THE COURT:  Okay.  All right.  We're here in the

21    matter of the NFL Football League Player's Concussion Injury

22    litigation, and this is a hearing on Cambridge Capital.  Mr.

23    Seeger, would you like to -- would you like to proceed?

24         MR. SEEGER:  Your Honor, because the transcripts

25    from these hearings are widely read and circulated to the

1    players, would you mind if I just give a brief update about

2    the status of the settlement to --

3                THE COURT:  Not at all.  Come -- so that I can hear

4    you -- what's the problem -- what's the problem with his

5    microphone, Jim?

6                MR. SEEGER:  Oh, that one over there?  Is that off?

7                THE COURT:  Yes, you can stay here.  There's no

8    problem, but make sure if you speak from the -- from the

9    attorney's bench, that table, that it's --

10               MR. SEEGER:  Okay.

11               THE COURT:  -- that I can hear you.

12               MR. SEEGER:  Okay.

13               THE COURT:  Okay.  Go on.

14               MR. SEEGER:  So just by way of context, because it's

15   very important when people look at where we are today, you

16   know, we've got over 20,000 class members registered for the

17   settlement --

18               THE COURT:  Incredible.

19               MR. SEEGER:  -- so that was a huge success.  Right.

20   But there were delays that were created by the fact that there

21   were appeals to the Third Circuit, to the Supreme Court.  The

22   result of that delay in getting the settlement implemented

23   allowed players to go out and get tested by their own doctors.

24               THE COURT:  That was in the settlement agreement, is

25   that correct?

1          MR. SEEGER:  Yeah.  We were accept -- the settlement

2     accepts what we call pre-effective date diagnosis.  We got

3     many, many more pre-effective date diagnoses come into the

4     settlement early on when we opened -- opened the doors to

5     review claims.  And that was generated by the two-year delay

6     on the appeals.  Not a bad thing, I'm not commenting on

7     whether that's good or bad.

8          I'm just letting people know, when they comment on

9     the speed that the claims are being reviewed, that's a factor.

10          THE COURT:  Okay.

11          MR. SEEGER:  And so there were many more.  And all

12    settlements have growing pains, and none of them are perfect.

13    But this one is performing really, really well.  And I want to

14    just go a little bit into that.  I mean, first off, initially

15    we had three AAP's, which were doctors, who were reviewing

16    these pre-effective date diagnoses.  We had to let one go,

17    because he wasn't keeping up as well as the other two.

18          But in response, we hired two additional AAP's, so

19    now we're up to four reviewing pre-effective date diagnoses.

20    So we're -- we've got more capacity.

21          THE COURT:  How about the BAPs?

22          MR. SEEGER:  The BAP is doing very well.  We've got

23    over 5,000 players registered for baseline assessment tests.

24    We've heard complaints about a couple of appointments here and

25    there being canceled, but when you put it in the context of

Seeger - Status Update                                        8

1   almost 6,000 appointments, a few cancellations I think are --

2              THE COURT:  Of course not.  Of course.

3              MR. SEEGER:  -- to be tolerated.

4              THE COURT:  Yes.

5              MR. SEEGER:  The other thing, at your urging, Your

6   Honor, because you want the settlement to be completely

7   transparent, we sat down with the NFL and with the independent

8   claim administrator and created FAQs, the most frequently

9   asked questions.  Now we've posted those on-line.  There's 302

10  of them, which will answer any question anybody would have

11  about this settlement, hopefully.

12             Again, you know, you can't let perfect be the enemy

13  of good, but we think it's really, really good.  They are

14  on-line.  In addition to that we've put --

15             THE COURT:  They're on-line on the -- in the -- on

16  the NFL website.  When you say on-line --

17             MR. SEEGER:  NFL concussion settlement --

18             THE COURT:  -- you mean on the NFL website, isn't

19  that correct?

20             MR. SEEGER:  Correct.

21             THE COURT:  Not on my website, but on the --

22             MR. SEEGER:  No.

23             THE COURT:  -- website maintained by the claims

24  administrator?

25             MR. SEEGER:  Correct, Your Honor.

1   NFLConcussionSettlement.com

2           THE COURT:  Okay.

3           MR. SEEGER:  And in addition to the FAQs, the 302

4   FAQs to make the settlement transparent, so every player knows

5   what to expect about almost any aspect of it, we've posted

6   rules governing appeals, audits, statute of limitations claims

7   for deaths that occurred prior to 2006, and attorney's liens.

8           So the information --

9           THE COURT:  Attorney's what?

10          MR. SEEGER:  Attorney's liens.

11          THE COURT:  Oh, attorney's liens, okay.

12          MR. SEEGER:  Which I know Your Honor I think has

13  those issues with the Magistrate Judge, and will be addressed

14  in the near future.

15          THE COURT:  Probably tomorrow.

16          MR. SEEGER:  Right.  Probably tomorrow.

17          THE COURT:  But I'm not -- I mean, it's -- it's in

18  the works, yes.

19          MR. SEEGER:  The other aspect I think it's important

20  to put this into context is when -- when the settlement went

21  from a capped settlement -- again, at Your Honor's urging to

22  go back and renegotiate, and became --

23          THE COURT:  Because I was unsure about whether or

24  not there was going to be sufficient money --

25          MR. SEEGER:  Correct.

1        THE COURT:  -- in the fund.

2        MR. SEEGER:  Correct, Your Honor.

3        THE COURT:  And that was the sole reason that -- one

4    of the reasons, but the most -- the major reason why I did

5    that.

6        MR. SEEGER:  Right.  And, Your Honor, as you know,

7    the parties went back and for another five or six months

8    renegotiated.  We were able to come up with any uncapped

9    settlement, but in exchange for that we had to put some

10   protections in place that the NFL felt were important

11   regarding fraud.

12       THE COURT:  Well, of course.  Because the answer is

13   they -- they have an interest now to make sure that -- if it's

14   a cap, let's be very clear, if it's a capped settlement they

15   just put in the money and they don't care what happens.

16       MR. SEEGER:  Right.

17       THE COURT:  But the NFL has a legitimate interest in

18   view of the fact that it's uncapped to -- to challenge any --

19   any request that may be fraudulent.

20       MR. SEEGER:  Correct.  And we in -- to do that, we

21   put in provisions to catch fraud.  One was to create an audit

22   process.  There were several things that could get you dragged

23   into an audit.  One was just a random check, and the other

24   ones we created analytics that were designed to catch what

25   could be fraud.  That, surprisingly, slowed down the

1  settlement early on, because it dragged hundreds of claims

2  that were potentially fraudulent.

3      We know now after -- because we have launched

4  investigations, and so has -- the Special Masters are

5  overseeing this, with a claim administrator, we now know that

6  there are -- there were potentially hundreds of claims

7  implicated in fraud.  What we did, though, is instead of

8  sitting and waiting for that, we engineered the settlement

9  around that problem.

10      We took those claims and we put them on the side, so

11  that we could get to legitimate claims.  So we've all heard

12  some of the complaints about the speed, but I want to just

13  give a quick update on where we are, because things are really

14  starting to move.  So at -- this data I'm about to give you is

15  as of March 30th, this is Friday.

16      So we have 369 notices of monetary awards that have

17  gone out to players and their families.  That constitutes a

18  responsibility for the NFL to pay slightly over $400 million.

19          THE COURT:  Is it over 400?

20          MR. SEEGER:  It's over $400 million now.  That, I

21  would like people to understand, exceeds the projections that

22  both sides independently came to on what the payments would be

23  in the first five years of the settlement.  We've already

24  exceeded that.

25          THE COURT:  Well most of those, though, are, as I

1    understand it, the three major, ALS -- for, CTE, ALS --

2              MR. SEEGER:  Parkinson's and Alzheimer's.

3              THE COURT:  What?  Alzheimer's and Parkinson's.

4              MR. SEEGER:  Correct, Your Honor.  And that's also

5    important because in March alone there were 130 notices of

6    awards that went out, and 86 of those were dementia claims.

7    So what we did in the beginning is we focused on ALS,

8    Parkinson's and Alzheimer's, because those are hard diagnoses

9    you get.

10             THE COURT:  Sure.

11             MR. SEEGER:  Dementia requires more judgment by the

12   doctor.  The dementia claims are now moving at the pace we had

13   hoped.  We hoped we'd be -- we would have been there a few

14   months ago, but I think people who have attempted to game the

15   system have to take some responsibility for the delay that was

16   caused in sorting out the -- the potential fraud problem.

17             I mean, if the fraudulent claims were paid, to put

18   this in context, you would be talking about more than a

19   billion dollars.  So that would have not been good for

20   anybody.  It wouldn't have been good for the settlement, it

21   doesn't help retired players to pay fraudulent claims.  So --

22   and as we sit today, in the BAP we have about 5,600

23   appointments, and over 4,000 appointments have already been

24   attended by retired players.

25             So the BAP, seems to be getting on track as well.

1          THE COURT:  That's important.

2          MR. SEEGER:  That is very important, Your Honor.  So

3    thank you for the opportunity to give you that update.  Just

4    -- just also to spend just another minute contextualizing --

5          THE COURT:  Well thank you, I didn't expect this.

6          MR. SEEGER:  Well, thank you, Your Honor.  I wanted

7    to also contextualize a little bit of what my partner Terri

8    Benedetto's going to talk about, why we're here today.  This

9    particular issue came up in the context of a different

10   investigation that we're involved with, which is involving

11   predatory lending practices.

12         I know Your Honor was concerned about this from the

13   beginning.  This is an issue that I have personally been

14   concerned about, because we brought this case to help retired

15   players get the help they needed.  Not to see their money

16   squandered by predatory lenders.

17         THE COURT:  Well that was the reason that you had

18   that -- and I've addressed that already.

19         MR. SEEGER:  Yes.

20         THE COURT:  But I -- did you know -- I don't know if

21   you know, I've opened a new website, have you had a

22   opportunity to take a look at it?

23         MR. SEEGER:  I have not, yet, Your Honor.

24         THE COURT:  Well it's -- whatever I issued also went

25   in the 12-2323, but I have requested of all the lawyers who

1    are in the class counsel to respond to their involvement in

2    the third-party lending issue.

3              MR. SEEGER:  Understood, Your Honor.

4              THE COURT:  So I expect to get those answers, I

5    think, maybe May 1.

6              MR. SEEGER:  Yes.  That's -- I saw that.

7              THE COURT:  They'll come -- do you know which --

8    what I'm refer --

9              MR. SEEGER:  Yes.  May 1.  You wanted the response

10   to the interog --

11             THE COURT:  That's right.

12             MR. SEEGER:  -- they were like a form of questions.

13   Yes.

14             THE COURT:  Interrogatories that the Court basically

15   sent out.

16             MR. SEEGER:  Yeah.

17             THE COURT:  Okay.  I didn't know whether you had

18   seen that.

19             MR. SEEGER:  I did.

20             THE COURT:  I did that on Friday.

21             MR. SEEGER:  And one of the things about this

22   particular case that got my attention, and we are still

23   investigating it, is the fact that there's a principal, Tim

24   Howard, who is an attorney, who represents retired football

25   players, and has yet to file claims on their behalf, also

1    appears to have worn the hat as a lender, and potentially an

2    investment advisor.

3              Now what caught our attention here is, we started to

4    hear from certain players that they had cashed out retirement

5    accounts, and delivered those retirement account monies to

6    Cambridge Capital to be invested.  And when I see people

7    cashing out their retirement accounts, now these players are

8    not millionaires, they may have been at one point in their

9    life, but they are not millionaires today, and these are their

10   retirement monies.

11             We began to follow up with Cambridge and wanted to

12   get answers to exactly where that money was.  We've learned

13   today, and Terri's going to go into this, that that money

14   appears to have gone into some kind of investment company also

15   run by this attorney, Tim Howard, who's an attorney

16   representing players, a lender, and an investment advisor.

17             And we don't really know, sitting here today, where

18   that money is.

19             THE COURT:  Where is he -- where is he a lawyer?

20             MR. SEEGER:  He's out of Tallahassee, Florida, is

21   that right?

22             MS. BENEDETTO:  Florida.

23             THE COURT:  In Florida?

24             MR. SEEGER:  Yeah.

25             THE COURT:  Okay.

1          MR. SEEGER:  So with that --

2          THE COURT:  Has the Attorney General in Florida been

3     interested in this at all, do you know?

4          MR. SEEGER:  Your Honor, I'm not supposed to go into

5     it too much, apparently, but we have -- we've been contacted

6     at both the Federal and State level about --

7          THE COURT:  Oh, have you?  Okay.

8          MR. SEEGER:  -- potential investigations that may --

9          THE COURT:  Because, you know, it's not easy for me

10    to do anything like that.

11         MR. SEEGER:  Yes.

12         THE COURT:  I mean, I have jurisdiction over the

13    class, don't misunderstand me.

14         MR. SEEGER:  Yes.

15         THE COURT:  But when it comes --,if your allegations

16    are accurate there are a lot of other -- may be a lot of other

17    implications.

18         MR. SEEGER:  I'm going to hope, standing here today,

19    that what we are concerned about isn't happening.  And maybe

20    there will be a opportunity from Cambridge, they don't have a

21    lawyer here today, which is another area of concern, Your

22    Honor.  They were represented by an attorney by the name of

23    Martin Black, who I believe is a Florida barred lawyer.  He

24    never sought pro hac admission in this Court, but he was

25    responding for Cambridge at some point.

1        And then he notified us that he was going to

2   withdraw as counsel.  Now one -- two problems with that.   One

3   is the Local Rules require him to get admitted pro hac, he

4   didn't do that.  And the reason that those Local Rules are

5   there is so the Court has somebody to -- to talk to, if

6   there's a problem, like what we have right now, whereas the

7   lawyer's now trying to get out of the case.

8        And we have Ms. Milon who is a non-attorney on the

9   phone, and they appear to not be represented by anybody.  And

10  there are some serious allegations here, they should be

11  represented by an attorney, obviously.

12       THE COURT:  Okay.  Well why don't you start.

13       MR. SEEGER:  Yes.  All right.  With that, I'm going

14  to hand it off to my partner, Terri Benedetto.

15       THE COURT:  Thank you.

16       MR. SEEGER:  Thank you, Your Honor.

17       MS. BENEDETTO:  Good morning, Your Honor.

18       THE COURT:  Good morning.

19       MS. BENEDETTO:  Terri Benedetto.

20       THE COURT:  Okay.

21       MS. BENEDETTO:  I do have a hard copy of the

22  PowerPoint.  I have several, if you'd like me to hand them up

23  to your clerk?

24       THE COURT:  Well I'm -- yes, I would.  I'd like to

25  have it, but I -- we can use that -- that -- I like the --

1          MS. BENEDETTO:  Certainly.

2          THE COURT:  Yes.  Do you have two of them, or one of

3     them?

4          MS. BENEDETTO:  I have three there --

5          THE COURT:  Oh, do you.

6          MS. BENEDETTO:  -- I have more, if you'd like them.

7          THE COURT:  How about -- why don't we give Sue one?

8          MS. BENEDETTO:  Certainly.

9          THE COURT:  Do you mind giving Sue one?  She's a pro

10     se law clerk who's also helping out here.

11          Okay.  Thanks.

12          MS. BENEDETTO:  Sure.  So, Your Honor, we're here

13     today because self-help has been threatened by these

14     third-party funders going under the moniker of the Cambridge

15     entities.  There are dozens of these Cambridge entities.

16          They are subject to the Court's order of December

17     8th, 2017, under which the Court held that assignment

18     agreements entered into by the third-party funders and class

19     members are void as per the settlement agreement.

20          This self-help that they are trying to engage in is

21     in direct contravention of that order, and also the rescission

22     process that has been put into place and being handled by the

23     claims administrator and the Special Masters.

24          THE COURT:  Well I haven't -- I haven't ordered the

25     -- the -- I haven't ordered the rescission.  That's basically

1    one way that it can be resolved.  But that was -- that is not

2    -- I have not at this point ordered rescission.

3              MS. BENEDETTO:  Correct.  Yes, Your Honor.  Yes.

4              THE COURT:  Is that correct?

5              MS. BENEDETTO:  Yes, Your Honor.  Yes I --

6              THE COURT:  Okay.

7              MS. BENEDETTO:  -- I agree.  I was just referring to

8    the rescission program.  I know that the Special Master filed

9    on either Thursday or Friday a notice that a couple of the

10   rescissions had been entered.

11             THE COURT:  Yes, I understand that two of the

12   third-party lenders have agreed to rescission.

13             MS. BENEDETTO:  Not this one in particular.  Not

14   Cambridge.

15             THE COURT:  No, I don't think so --

16             MS. BENEDETTO:  Yes.

17             THE COURT:  -- but I don't know which ones they are,

18   to tell you the truth.

19             MS. BENEDETTO:  So co-lead class counsel received

20   evidence in the form of an audiotaped telephone conversation

21   between a class member and Cambridge officers.  This

22   particular class member had entered into two different types

23   of arrangements with Cambridge.

24             The first being the assignment agreement that Your

25   Honor has since declared to be void, under which this

Benedetto - Presentation                                    20

1  particular class member received advances -- cash advances in

2  exchange for pledging over to Cambridge under the assignment

3  arrangement far more of his potential future monetary award

4  than the cash advances that he had received.

5          And then a second arrangement was that he had moved

6  his 401k monies out of the NFL's 401k, it's actually called

7  the NFL Players Second Career Savings Plan.  And he rolled

8  those monies over as an IRA rollover into -- to be invested

9  with Cambridge.

10         He and these other class members who cashed out

11 their retirement accounts, there are ten total that are

12 involved in the retirement investment aspect, they did so at

13 the recommendation and the prompting of their individually

14 retained counsel, who Mr. Seeger referenced Mr. Tim -- he goes

15 by Tim Howard, of Howard & Associates.  You know, and he was

16 wearing these two hats of lawyer and financial advisor.

17         And the nature of the self-help that --

18         THE COURT:  Did he sign like a lot of the other

19 people signed?

20         MS. BENEDETTO:  He did.  He signed acknowledgments

21 for his clients on the --

22         THE COURT:  That's what --

23         MS. BENEDETTO:  -- so on the one hand he's marketing

24 with his Cambridge hat on that they should enter into these

25 assignments, and invest their retirement funds with him, and

1    then he also signs the acknowledgment on the Cambridge form as

2    the attorney who was going to give the monies over to

3    Cambridge if and when the particular client gets the monetary

4    award.

5             So on this audiotape that the class member provided

6    to us, which we had transcribed, and also submitted a copy

7    with our motion package, Ms. Milon was also -- who's listening

8    today, was also on this particular phone call.

9             THE COURT:  Did you hear, Ms. Milon?  Ms. Milon?

10            MS. MILON:  Yes.  I'm here.  I'm sorry.

11            THE COURT:  Okay.  I just wanted to make sure you

12   heard.  Okay.

13            MS. BENEDETTO:  Mr. Addys Walker, who was then

14   acting as the head of Cambridge, told this particular class

15   member that, since the Court had ruled that the assignments

16   were void, and that this particular player also had this

17   retirement investment piece with Cambridge, that Cambridge was

18   just going to take this class member's retirement monies as

19   repayment for the advances that the class member had gotten.

20            And, obviously, this class member was extremely

21   distraught at having that told to him.  He had had previous

22   interactions with Cambridge, which led him to desire to

23   audiotape this conversation.  And in response to our motion,

24   this Court issued its February 20th, 2018 order directing

25   Cambridge to turn over both accountings for these 10 class

Benedetto - Presentation                                    22

1   members, and also any other relevant documents.

2           Now they've turned over some relevant documents, but

3   they have yet to turn over these accountings.  And the class

4   member who brought us the audiotape, as well as the other

5   class members involved with these retirement monies who I

6   personally have spoken to are really distressed that they

7   can't get an answer out of Cambridge as to where these monies

8   are, how much are in their accounts, and they've been asking

9   for months.

10          So the filing of our motion, and the revealing of

11  this audiotape was not the first that Cambridge knew that

12  these class members wanted to know, where's my money, how much

13  is in the accounts?

14          And we just received information from Ms. Milon last

15  week that it's now going to take another eight weeks for an

16  audit to be completed, and for them to be able to tell us how

17  much money is in each of these class member's accounts.

18          She also indicated last week that the monies are not

19  liquid, and that it will take time to liquidate these funds

20  and protect the asset values.

21          THE COURT:  What did you understand that meant?

22          MS. BENEDETTO:  I understand that -- well, not being

23  in the finance world, I understand it to mean that the money's

24  not really there.  That it's, you know -- I mean, I understand

25  -- I understand personally the concept of a six-month CD.  So

Benedetto - Presentation                                      23

1    you can't take the money out less than six months, or you pay

2    a significant penalty, and I understand that when they say

3    something's not liquid that that's what that means.

4              THE COURT:  Well who controls it?  Is there any

5    question that Cambridge does control it?

6              MS. BENEDETTO:  Well, Your Honor, that's also --

7    they've turned over documents indicating that another company,

8    Millennium Trust Company is actually where the monies are

9    being held.  We -- when we realized last week that we were not

10   going to be getting the promised accountings from Cambridge,

11   we served a subpoena on Millennium.  So as of yet the time

12   isn't up for Millennium to respond.

13             I had asked them in a cover letter, as a courtesy,

14   you know, we'd asked for all the documents related to these

15   ten players to be produced.  But I asked them as courtesy, if

16   they could just give us the account balances before today's

17   hearing, and they said no.

18             So, as an aside, and, you know, Chris already --

19   Chris Seeger already mentioned the fact that Mr. Black was

20   previously representing Cambridge, and I just wanted to

21   reiterate that he, you know, we had strongly objected to his

22   attempted withdrawal, and maintain that he wasn't permitted to

23   do so under the Rules.

24             So -- I'm sorry, I lost my spot.  So we have one of

25   the documents that they produced.  What we believe is going

1    on, is that Cambridge took the retirement monies of these ten

2    people and they used those monies to pay the advances to other

3    individuals with whom Cambridge had entered into these

4    assignment arrangements.

5              That's what we believe happened.  We don't know for

6    sure, because we don't have all the documents.  But we have

7    the private offering memorandum from Cambridge which indicates

8    that one of the vehicles in which the money was going to be

9    invested is litigation settlement claims, which is abbreviated

10   LS.

11             So because of the fact that Your Honor voided the

12   assignment agreements, as per the December 8th order, now

13   Cambridge doesn't foresee making the type of profits that it

14   was going to make on getting these, you know, sometimes 100

15   percent return on the monies that they had advanced under

16   these assignment arrangements, so we believe that's why the

17   delay, and the excuses, and Mr. Black's no longer representing

18   Cambridge.

19             But as I said, while we surmise this is what

20   happened, we don't know, because we can't get answers to our

21   questions.  And some of this money, this is what they produced

22   as accountings, which we have turned over to Your Honor.  On

23   the screen that's appearing now, this is for player one, and

24   we redacted his name, these monies -- this is just what he

25   deposited back in 2016.

Benedetto - Presentation                          25

1        And as you can see, there are handwritten changes on

2    this document, but it doesn't indicate what exactly the amount

3    of money is that's in the account currently.  They turned over

4    copies of the checks, you can see this -- this check was from

5    the NFL Players Second Career Savings Plan, back in May of

6    2016 for the player on the left, who was player five.

7        And March of 2016 for the player on the right, who

8    is player ten.  And the checks were made out to Millennium

9    Trust Company for the benefit of the player.  And then the

10   address listed thereunder is Suite 125, 2120 Killarney Way,

11   Tallahassee, Florida.

12       That's Mr. Howard's law practice address.

13       THE COURT:  One second.  I see that BNY Mellon is --

14   what is that?  That's a Pennsylvania company, isn't it?

15       MS. BENEDETTO:  I believe the BNY Mellon is where

16   the NFL had held this -- the 401k monies.

17       THE COURT:  Oh, okay.

18       MS. BENEDETTO:  So it's a check from the NFL's 401k

19   over to this --

20       THE COURT:  All right.

21       MS. BENEDETTO:  -- over to this IRA rollover

22   Millennium Trust Company.

23       So the check was issued by the NFL's 401k, which is

24   being held, evidently, at BNY Mellon.  So that check was

25   written in May of 2016.

Benedetto – Presentation                                    26

1        THE COURT:  Okay.

2        MS. BENEDETTO:  So we're still waiting for

3   Millennium to respond to the subpoena, which we assume will

4   show that they received these monies in May of -- for player

5   number five in May of 2016.  Now player number five did

6   provide us with his portfolio summary.  So here we have -- it

7   shows that the total funds he contributed were $619,000, and

8   as of December of 2016, he purportedly had $751,000.

9        So a gain of $132,000 in seven months.  Now whether

10  those monies -- whether that's real or not, we don't know.

11  But all we know is that's what the player was told he had, and

12  those were the increased profits that he had on his investment

13  as of a year and, you know, four months ago.

14        So, you know, we're not AUSA's, and we've done a lot

15  of digging in what are publicly available documents.  We don't

16  have the investigative tools that they would have.  But these

17  class members, you know, they're not millionaires.  And even

18  the private offering memorandum indicated that the investment

19  in the fund is available exclusively to sophisticated persons

20  and entities that have a net worth in excess of $2 million.

21        That was not these guys.  And they were led into

22  this by Mr. Howard.  Here we have a Cambridge email that was

23  signed by both Mr. Howard at the bottom, JD, PHD, and a Mr.

24  Don Warner, who was also formerly with Cambridge.

25        And it says -- this is written by Don Warner

Benedetto - Presentation                                    27

1   Reinhard.

2          "As we discussed Dr. Howard, and I, and our team

3   continue to develop Cambridge Capital Group to provide an

4   unmatched model of services, which includes investment

5   management, wealth planning, estate planning, wills, trust

6   creation, life insurance, supplemental health insurance, and

7   loans to meet the unique needs of retired professional

8   athletes.  Additionally, ancillary legal services for little

9   or no additional costs via our direct association with Howard

10  & Associates, PA makes our creative model unmatched in the

11  marketplace."

12         Now Mr. Reinhard is presently incarcerated for

13  aggravated child abuse, and he was previously sanctioned by

14  the SEC.  So he -- he's not presently involved in Cambridge,

15  nor is he communicating -- I believe he's email communicating

16  with some of the players from prison.

17         Then there's another email dated June of 2017 from

18  Howard & Associates.  Suggesting that, to his class member

19  clients, that he could refer them to "independent cash advance

20  programs that may offer immediate cash based upon your

21  proposed settlement."

22         So here he is wearing his two hats.  The first email

23  from Cambridge & Associates signed by Tim Howard, the second

24  email from Howard & Associates suggesting to their clients

25  that they enter into assignment arrangements.

1    Since then, Mr. Howard has continually claimed that
2    he has totally divested his interests in Cambridge and he's no
3    longer related to them.  We submit that the only way to really
4    get to the bottom of this is to depose Mr. Howard in
5    Philadelphia, so that we can ask him about his current
6    relationship to Cambridge.  He represents 234 class members in
7    this case.  And 88 of his clients have entered into assignment
8    arrangements.
9    Thirty-three of those with Cambridge -- I'm sorry,
10   26 with Cambridge, and the rest with either Atlas, Global
11   Financial or Beacon Legal.  In total, there were 33
12   assignments by Cambridge, and in addition to the 26 Howard
13   clients, three clients were those of Gibbs & Parnell.  That
14   firm is one of the four firms calling themselves
15   Neurocognitive Football Lawyers.
16   And two of the clients were of a Ms. Simona Farrise.
17   And it could even be that more than 88 of Mr. Howard's clients
18   have entered into assignment arrangements with third-party
19   funders.  We simply don't know, because some of the
20   third-party funders refuse to answer our discovery.  And there
21   is also probably some third-party funders out there of which
22   we are not aware.
23   And Mr. Howard didn't seek common benefit fees, so
24   he is not going to be among those who will be required to
25   answer the questionnaire ordered in Your Honor's March 29th

1   order, since that applies only to those lawyers who have

2   sought common benefit fees.

3         THE COURT:  Well I may expand it, you realize that.

4   I think I mentioned that in the order.

5         MS. BENEDETTO:  Okay.  And -- but obviously we

6   understand that there is a mechanism once a player is -- is

7   imminently going to receive his monetary award, that the

8   claims administrator under a prior order of Your Honor's will

9   ask the class member whether or not he has entered into one of

10   these assignment arrangements.

11         THE COURT:  That's correct.

12         MS. BENEDETTO:  So we may find out through that

13   vehicle.

14         THE COURT:  You don't have these numbered.  Do you

15   want to make sure that you number them, so that when we put

16   them in the record they'll be numbered?

17         MS. BENEDETTO:  The slides, Your Honor?

18         THE COURT:  Yes.

19         MS. BENEDETTO:  Oh, okay.  Yes, we can certainly do

20   that.  Yes.

21         THE COURT:  I'm finding it difficult to follow.

22   Okay.

23         MS. BENEDETTO:  Oh, I apologize.

24         THE COURT:  So this is going to be numbered.  Right

25   now I can follow them all, but you're going to have to make

1    sure you number them.

2              MS. BENEDETTO:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MS. BENEDETTO:  So this next slide, this is actually

5    a slide number nine.  And this is Mr. Howard's filing before

6    this Court.  It's a notice of verification of non-ownership

7    and non-management and dissolution of certain Cambridge

8    entities.

9              And he also filed the State of Florida Department of

10   State certifications alleging the dissolution of Cambridge

11   Capital Group, LLC, and Cambridge Capital Advisors, LLC in May

12   of 2017.

13             The former counsel to Cambridge, Mr. Black, also

14   claimed in a letter that he sent to Mr. Seeger August of 2017,

15   that the Cambridge Capital Group, it no longer exists and was

16   dissolved pursuant to a confidential sale and dissolution

17   agreement entered into only earlier this year, and that the

18   company was sold to Mr. Addys Walker.  Mr. Addys Walker is the

19   gentleman who was on the audiotape who made the threat to take

20   self-help on the part of Cambridge.

21             Mr. Howard was called to task by the Florida Bar,

22   who told him that he could not wear these two hats.  That he

23   needed to extricate himself from Cambridge.  Which he

24   purported to do.  This is a letter from Ms. Milon dated March

25   29th of 2018, indicating that "updated ethics research and

1    communications with the Florida Bar required that Dr. Tim

2    Howard not have any ownership, management interest, or

3    control, and he has complied with the same."

4           So that's what they're contending.  However, in

5    March of 2017, Cambridge Capital Group, LLC had amended its

6    articles of organization to remove Mr. Howard as president,

7    and insert Lois Koons.  Lois Koons is Mr. Howard's 83-year-old

8    mother-in-law, his wife's mother.

9           So that was done for Cambridge Capital Group, and it

10   was also done for Cambridge Capital Advisors, LLC.  You can

11   see that Mr. Phillip T. Howard was removed as president, and

12   Lois Koons was inserted as president.

13          And this change -- this amendment was signed March

14   7, 2017 by Mr. Howard.  So that's what was going on in Florida

15   with the corporations.  So what was happening in Nevada was

16   new corporations were being created.  And this one is with

17   managers Ms. Koons, and Ms. Gail Milon.  That's called --

18   that's another Cambridge Capital Group, LLC created in April

19   of 2017.

20          Just around the time that Mr. Howard was filing his

21   verification of non-ownership.  We have a Cambridge Capital

22   Wealth Advisors, LLC, created in May of 2017 in Nevada, with

23   Ms. Milon as the manager.  And you'll note that these all have

24   this same address, 59 Damonte Ranch Parkway in Reno, Suite

25   Number B-245 -- I'm sorry, Suite Number -- where is it -- B

Benedetto - Presentation                                    32

1    number 245.  Yes.

2            And then the third Nevada Cambridge group is called

3    Cambridge Capital Group Advisors, LLC, and that has managers

4    Jeff Kahn, Lois Koons, Gail Milon and Mr. Addys Walker, that's

5    the same gentleman that's on the audiotape.

6            Additionally, in Nevada, we also have in October of

7    2017, so just five months ago, there was a company created,

8    also at that 59 Damonte Ranch Parkway in Reno, and its

9    managers are Cambridge Development Partners, Tim Howard and

10   Addys Walker.

11           And that -- and we have another one, another Nevada

12   corporation, also at 59 Damonte Ranch Parkway, created in

13   October of 2017, with managing members Tim Howard and Tom

14   Parnell, and another gentleman, Mark Savage.  Now Tom Parnell,

15   that's the name of one of the attorneys at Gibbs & Parnell

16   which goes under the moniker of Neurocognitive Football

17   Lawyers.

18           And, actually, three of Mr. Parnell's clients did

19   enter into assignment arrangements with Cambridge.  So we

20   don't -- we think that's probably the same Parnell.  I don't

21   know for sure.

22           In addition, right after we filed our motion in

23   January of this year and we identified a company called Your

24   Case, LLC in Florida as being one of the affiliates with

25   Cambridge, and you can see that the registered agent is

1  Phillip Timothy Howard, and the president is Addys Walker.

2  Well right after Your Honor issued the February 20th, 2018

3  order, they dissolved that corporation.   Two days later,

4  February 22nd, 2018.

5            And there's another issue that we -- just recently

6  came to our attention, based upon Ms. Milon's March 27th

7  letter, and that is that it's not just retirement monies, IRA

8  rollover monies that some of the class members have invested

9  with Cambridge, there's also what Ms. Milon calls

10  non-qualified -- the IRA monies are called qualified monies,

11  and then apparently they've invested other monies in

12  Cambridge.

13            All we know is that five of the ten who had the

14  retirement monies invested with Cambridge, had these also

15  non-qualified monies.   We don't know how many other class

16  members are out there with these non-qualified monies invested

17  with Cambridge.

18            So what we would ask Your Honor is, we'd like to --

19  we don't know what we're going to get from Millennium once

20  they respond to our subpoena.   You know, we'd like to have the

21  assets frozen.   We'd like to seek contempt from Cambridge for

22  failing to comply with the Court's order in providing these

23  accountings in a timely manner.

24            Now they say they're going to produce them eight

25  weeks from now.   I don't know if that -- if that will be the

1    case.  And, frankly, I don't understand what the holdup is.

2    Additionally, we'd like to take the depositions of Tim Howard,

3    Gail Milon, Addys Walker, and Lois Koons.  And, you know, if

4    they refuse to enter into -- you know, if they refuse to

5    comply and submit for depositions, we would file motions for

6    sanctions.

7            We'd like to schedule another hearing.  We'd also

8    like to raise at that point perhaps whether Mr. Howard's fee

9    interest in all these 234 class members that he represents

10   should be eliminated.  Whether Cambridge should be required to

11   pay Seeger Weiss's fees and expenses related to this

12   investigation and all the motion practice we've entered into.

13           And we feel that perhaps Mr. Black should face some

14   consequences for having purported to be Cambridge's lawyer,

15   and then neither pro hac viceing, or properly finding

16   substitute counsel when he decided to withdraw.

17           THE COURT:  Okay.

18           MS. BENEDETTO:  So that -- thank you, Your Honor.

19           THE COURT:  All right.  I think that you're going to

20   have to present -- you're going to have to ask me for an order

21   and a justification for the order.  And I'll see what I'm

22   going to do about it after this hearing.

23           MS. BENEDETTO:  Yes, Your Honor.

24           THE COURT:  Because I'm not -- I'm -- you can tell

25   me what you think you've shown.  You can argue it now, but I

1   really do need it in written form.

2          MS. BENEDETTO:  Yes, Your Honor.

3          THE COURT:  So it ought to be in as soon as you

4   possibly can get it in.  And tell me what you want, and what

5   you think you've proven, in order to satisfy me that you're

6   entitled to this kind of relief.

7          MS. BENEDETTO:  Yes, Your Honor.  Thank you.

8          THE COURT:  Okay?  Is there anything else?

9          MS. MILON:  Your Honor, may I -- I'm sorry.  Your

10  Honor may I speak?  This is Gail Milon.

11         THE COURT:  No.  I'm not going -- I can't let you

12  speak.  You're not here, you're not represented by counsel,

13  and I can't let you speak.  They could take your deposition,

14  and then next time I have a hearing, which very well may

15  follow quite soon, you'll have somebody up here who's

16  qualified to represent the LLC.

17         MS. MILON:  Yes, ma'am.

18         THE COURT:  Is there anything else?

19         MR. SEEGER:  Not on this, Your Honor.  We obviously

20  wanted to just give you these updates what -- you know, how

21  these investigations are going.

22         THE COURT:  Okay.  Thank you very much.

23         MR. SEEGER:  Thank you.

24         THE COURT:  All right.  And I expect a submission by

25  you asking me for what you want, and if they want to have --

Colloquy                                          36

1    want to employ counsel, they'll have to employ counsel.   And

2    I'll be supportive in any way I can to the players who are

3    involved in this.   How many players are involved?

4              MS. BENEDETTO:   Ten in -- ten in the retirement

5    monies, Your Honor.   There's 88 Cambridge assignments.

6              THE COURT:   Eighty-eight Cambridge assignments.

7    Okay.   And all the lawyers for every one of those assignments

8    is Mr. Howard?

9              MR. SEEGER:   Of those 88, yes.

10             MS. BENEDETTO:   No, Your Honor.   One second.

11   Actually 88 of -- I'm sorry, I misspoke.   Eighty-eight of Mr.

12   Howard's clients have entered into assignment agreements, 26

13   are with Cambridge, and the rest are with Atlas, Global

14   Financial and Beacon Legal.   And the other seven assignments

15   that Cambridge has, those individuals are represented by Gibbs

16   & Parnell, that's the Neurocognitive Football Lawyers, Simona

17   Farrise, and Weisberg.

18             THE COURT:   Okay.   Well write all those things to me

19   and ask -- and you ask me for what the remedy is.   I don't

20   know whether Atlas is one of those that -- that has agreed to

21   -- to vacate -- has agreed to the rescission.

22             It may be.   But we'll have to see the implication of

23   that with these particular players.   Okay?

24             MS. BENEDETTO:   Thank you, Your Honor.

25             THE COURT:   All right.   Is there anything else Mr.

1  Seeger?

2          MR. SEEGER:  No, Your Honor.  Thank you for your

3  time.

4          THE COURT:  All right.  Thank you.  I will -- all

5  right, off the record.

6      (Proceedings concluded at 10:53 a.m.)

7                      * * * * *

8                  C E R T I F I C A T I O N

9  I, Josette Jones, court approved transcriber, certify that the

10  foregoing is a correct transcript from the official digital

11  audio recording of the proceedings in the above-entitled

12  matter.

13  Josette Jones  Digitally signed by Josette Jones
                   DN: cn=Josette Jones, o, ou,
                   email=dianadoman@comcast.net,
                   c=US
14  _____  Date: 2018.04.06 13:46:51 -04'00'          _____

15  JOSETTE JONES                              DATE

16  DIANA DOMAN TRANSCRIBING, LLC

# Exhibit 3 (Redacted)



March 27, 2018

Christopher A. Seeger
Seeger Weiss, LLP
55 Challenger Road
Ridgefield Park, NJ 07660

Re:     In re NFL Players' Concussion Injury Litigation, No. 12-md-2323-AB
        Cambridge Entities' Productions in response to District Court's February 20, 2018 Order

Dear Mr. Seeger:

I did not recall giving you a March 26, 2018 date to provide the additional information you requested.

The documents I provided you were from the accountant. If you look in the top left-hand corner of the spreadsheets provided, I received the spreadsheets less than eight (8) hours before I fed-ex the documents to you for a March 2, 2018 delivery. That did not give me enough time to review the documents. It is tax season and obtaining the documents during tax season was a task in itself. In my limited time to review the documents I made the corrections based on my review.

Documented below are the "Un Audited" funds I received from the Class Members:

| | | | |
|---|---|---|---|
| 1. | IRA $249,950 | Non-Qualified | $137,000 |
| 2. | IRA $343,761.51 | | |
| 3. | IRA $ 29,328.82 | Non-Qualified | $ 49,940 |
| 4. | IRA $153,247 | | |
| 5. | IRA $619,111.95 | Non-Qualified | $160,000 |
| 6. | IRA $662,886 | | |
| 7. | IRA $ 76,957.44 | | |
| 8. | IRA $335,987.52 | | |
| 9. | IRA $336,453.14 | Non-Qualified | $ 50,000 |
| 10. | IRA $316,059.98 | Non-Qualifies | $ 75,000 |

I requested an audit before providing any information to investors. A forensic audit was later requested. The audit should be finalized in 8 weeks. The auditor is Bill Bogan, Jr. CPA, CGFO, CPFO of Bogan Public Management Company.

**3522 Thomasville Road, Suite 505, Tallahassee, FL 32309**
**850-591-4010    Fax 850-386-6399**
**info@cambridgecapitalgroup.holdings**

CAMB-2_000616



Millennium Trust Company is our third-party record keeper. Qualified funds are forwarded to Millennium Trust to maintain its "qualified status" and subsequently forwarded to Cambridge Capital where the funds are disbursed into investments. Cambridge Capital Accounts are with Bank of America. No investment company have different investment funds for qualified versus non-qualified investments. The funds are "separated" via the record keeping process. That is the service Millennium Trust Company provides to Cambridge. As stated earlier, Millennium Trust Company is our third-party record keeper. They report the information Cambridge provide them. I have no direct contact person at Millennium Trust Company. Millennium's contact number is 800-258-7878. Your "initial" request was for "qualified funds" invested with Cambridge. Qualified funds flow through Millennium Trust Company. Non-Qualified funds flow through Bank of America. Due to time constraints, I was not able to separate the non-qualified funds. I called the accountant to get an answer regarding your "Split" question. He will get back with me.

The ten individuals provided are the only Class Members whose retirement funds were invested with Cambridge. The "others" including ████████████ do not have qualified funds invested with Cambridge.

The funds are invested in litigation advances, travel advances, medical advances, real estate, technology and bridge loans based on my un-audited observation. I will provide a more accurate observation once the audit is finalized.

The Subscription agreement is the Limited Partnership Agreement. I will attach the Private Offering memorandum.

As for the accounting, once the audit is completed, I will provide you will all the financial information I receive. I do not have anything to report until the audit is finalized.

I hope I have answered your questions. Please do not hesitate to contact me if something was omitted.

In addition, I do not have legal counsel and will not be present for the April 2, 2018 hearing.

Sincerely,

Gail Milon
Managing Vice President

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010    Fax 850-386-6399
info@cambridgecapitalgroup.holdings

CAMB-2_000617

Exhibit 4

SECURITIES AND EXCHANGE COMMISSION
Washington D.C.

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 63720 / January 14, 2011

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 3139 / January 14, 2011

Admin. Proc. File No. 3-13280

---

In the Matter of

DON WARNER REINHARD

---

OPINION OF THE COMMISSION

BROKER-DEALER PROCEEDING

INVESTMENT ADVISER PROCEEDING

**Grounds for Remedial Action**

**Civil Injunction**

Former associated person of registered broker-dealer and investment adviser was enjoined from violating the antifraud provisions of the federal securities laws. *Held*, it is in the public interest to bar Respondent from association with any broker, dealer, or investment adviser.

APPEARANCES:

   *Don Warner Reinhard, pro se.*

   *Edward D. McCutcheon* and *Robert K. Levenson* for the Division of Enforcement.

Appeal filed:  July 20, 2010
Last brief received:  November 2, 2010

2

## I.

Don Warner Reinhard, formerly the sole owner and president of Magnolia Capital Advisors, Inc. ("Magnolia"), a registered investment adviser, and formerly associated with Paragon Financial Group, Inc. ("Paragon"), a registered broker-dealer, appeals from the decision of an administrative law judge barring him from association with any broker, dealer, or investment adviser based on his having been enjoined by default, in 2008, from violating the antifraud provisions of the securities laws.[1] We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

## II.

### A.   Civil Injunction

In October 2008, Reinhard was permanently enjoined from future violations of antifraud and other provisions of the federal securities laws, namely Section 17(a) of the Securities Act of 1933; Section 10(b) of the Securities Exchange Act of 1934 and Exchange Act Rule 10b-5;[2] Sections 206(1), (2)[3] and 207[4] of the Investment Advisers Act of 1940; and aiding and abetting violations of Advisers Act Section 204 and Advisers Act Rule 204-2(a)(7).[5] The permanent injunction was entered against Reinhard following the entry of a default judgment against him.[6]

---

[1]      *Don Warner Reinhard*, Supplemental Initial Decision Rel. No. 396 (Jun. 1, 2010), 98 SEC Docket 28878.

[2]      Securities Act Section 17(a), 15 U.S.C. § 77q(a), Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibit fraudulent conduct in connection with securities transactions.

[3]      Advisers Act Sections 206(1) and (2), 15 U.S.C. §§ 80b-6(1) and (2), make it unlawful to defraud a client or a prospective client.

[4]      Advisers Act Section 207, 15 U.S.C. § 80b-7, prohibits the willful making of any untrue statement of material fact, or omission of any material fact, in a report or application required to be filed under Advisers Act Sections 203 or 204.

[5]      Advisers Act Section 204, 15 U.S.C. § 80b-4, and Advisers Act Rule 204-2(a)(7) thereunder, 17 C.F.R. § 275.204-2(a)(7), requires investment advisers to maintain books and records, including written communications relating to their securities recommendations and orders, and to provide copies of these records as directed by the Commission.

[6]      *SEC v. Reinhard*, No. 4:07-CV-529-RH/WCS (N.D. Fla. Oct. 3, 2008), *aff'd*, No. 09-10213-CC (11th Cir. Oct. 28, 2009).

3

In the injunctive proceeding, Reinhard, acting *pro se*, challenged the sufficiency of service and made other procedural objections but did not answer the Commission's complaint. In his Order for Entry of Judgment, the district court judge found that a process server had delivered the complaint and summons to Reinhard on February 13, 2008 but "Reinhard answered the door [and] then slammed it," whereupon the process server left the complaint and summons on Reinhard's front porch. In March 2008, Reinhard moved for an extension of the time to respond to the complaint and the judge granted the motion, directing Reinhard to respond by April 18, 2008.[7] Reinhard did not respond by April 18 but, rather, moved on May 6, 2008 for a further sixty-day extension. On the same day, the judge denied Reinhard's motion for another extension.

The Commission applied for a default judgment on June 9, 2008, which the clerk entered on June 12, 2008. On June 24, 2008, Reinhard objected to the Commission's application for a default judgment. On July 8, 2008, the Commission moved for entry of a default judgment. On July 13, 2008, the judge rejected Reinhard's opposition and granted the Commission's motion for entry of a default judgment.

The court relied on the Commission's complaint in entering judgment. The complaint alleged that, from at least January 2002 through August 2003, Reinhard had, through Magnolia Capital Advisers, "made false and misleading statements and omissions of material fact to his approximately 138 clients in connection with the offer and sale of collateralized mortgage obligations ('CMO's)." These false and misleading statements included "misrepresent[ing] the safety of the highly-leveraged CMO's he purchased for his clients' accounts and the account of . . . a hedge fund he controlled as its general partner." The complaint also alleged that Reinhard "lulled his hedge fund clients into keeping their investments with the hedge fund by providing them with false quarterly account statements showing materially inflated account valuations," and that "[t]hrough all this activity, Reinhard's clients and hedge fund investors lost $6 million." In addition, the complaint asserted that, during a period when the market value of the CMO investments had declined, Reinhard "engaged in a fraudulent scheme to artificially increase the equity in certain brokerage accounts and to avoid margin calls . . . by temporarily 'parking' the CMO investments in the accounts of third parties, while falsely reporting the nature of the transactions to his broker-dealer and clearing firm."

Following a telephonic hearing in which Reinhard participated, the judge entered a permanent injunction against Reinhard on October 3, 2008. In that order, the court held that "Mr. Reinhard in effect admitted the fraud alleged in the complaint." The judge held an evidentiary hearing on December 8, 2008 to rule on various motions filed by Reinhard[8] and to determine the

---

[7]        In his order granting Reinhard's motion, the judge stated that "[n]o further extensions will be granted."

[8]        On October 16, 2008, Reinhard filed a motion to quash the service of process. He
(continued...)

4

appropriate amount of disgorgement, prejudgment interest, and civil penalty to be paid by Reinhard.  Reinhard participated in this hearing and cross-examined the Commission's witness.

The judge found that "[t]he complaint identified the period of the fraud as beginning at least January 2002 and continuing through August 2003," and that the government's proof at trial established that Reinhard received commissions of approximately $5.9 million from the transactions at issue.  The judge ordered Reinhard to disgorge this amount, as well as to pay an award of interest of approximately $2.26 million on the disgorgement amount and a civil penalty of $120,000 -- for a total judgment of approximately $8.2 million.  On October 28, 2009, the Eleventh Circuit affirmed the district court decision.[9]

**B.     Criminal Conviction**

On May 13, 2009, Reinhard entered into a plea agreement with the U.S. Attorney for the Northern District of Florida (the "Plea Agreement") regarding various counts of criminal misconduct (the "2009 Conviction").[10]  In the Plea Agreement, Reinhard stated that he was pleading guilty to these counts because "he is in fact guilty of the charges contained" in these counts and he acknowledged that, "were the case to go to trial, the government could present evidence to support these charges beyond a reasonable doubt."  Reinhard further agreed that he was entering into the Plea Agreement "knowingly, voluntarily and upon the advice of counsel."  The parties also executed a supporting agreement, signed by Reinhard and his attorney, in which they set out the factual basis for Reinhard's guilty plea (the "Factual Basis for Plea Agreement").[11]

The Factual Basis for Plea Agreement identifies various misconduct as the basis for Reinhard's guilty plea, including:

●     In 2003, Reinhard had applied to a bank for a loan of approximately $250,000 to finance his purchase of a boat.  As part of his loan application, he had submitted his purported 2001 federal income tax return.  This purported tax return

---

[8]     (...continued)
filed additional evidentiary and procedural motions in November 2008, including requesting a hearing on his motion to quash service.  On November 26, 2008, the judge denied one of Reinhard's procedural motions and, on December 8, 2008, denied the remainder.

[9]     *SEC v. Reinhard*, No. 09-10213, 2009 U.S. App. LEXIS 23744 (11th Cir. Oct. 28, 2009) (*per curiam*).

[10]     Reinhard's then-counsel also signed the Plea Agreement.

[11]     The Factual Basis for Plea Agreement was also signed by Reinhard and his then-counsel.

5

was not, however, a copy of the actual return he filed for 2001, and it falsely listed his adjusted gross income as $944,322 and his total tax as $253,996, while his actual return listed his adjusted gross income as $389,700 and his total tax as $37,498.

- Reinhard filed a bankruptcy petition in 2006 but failed to disclose "numerous significant assets," although he had represented to the bankruptcy trustee that he had reported all the assets he owned.  The omitted assets included the boat mentioned above, artwork he had purchased for approximately $40,000, and certain investment accounts.  Reinhard also failed to disclose certain of his liabilities, lease obligations and gifts (including gifts valued at approximately $40,000 to his girlfriend).

- Reinhard transferred two unreported assets following the filing of his bankruptcy petition, including artwork that he sold for $24,000, of which approximately $20,000 was deposited to Reinhard's girlfriend's bank account -- an account that was not disclosed to the bankruptcy court.

- Reinhard under-reported Schedule E income on his 2001 federal income tax return by reporting a fraudulent expense of $554,622, the expense purportedly being incurred to reimburse investors for losses they had incurred in one of Reinhard's ventures when, in fact, the evidence reveals that no such payment was made to the investors.  As a result of this false statement, Reinhard underpaid his taxes by $216,498.

- On his 2005 federal income tax return, Reinhard falsely stated that his cost basis in investment properties that he sold in that year was $3.2 million, when it was actually $1.14 million.  Reinhard later benefitted from the incorrect basis information when he used his overstated losses from the 2005 return to offset his reported taxable income on his 2002 tax return, which he was required to file by the bankruptcy court.  As a result of his use of the false information from the 2005 return, Reinhard reported a taxable loss of approximately $1.17 million for 2002, instead of correctly reporting taxable income of approximately $729,000.  Also, by submitting this false 2002 tax return to the bankruptcy court, Reinhard concealed from the court the fact that he had generated substantial capital gains.

Pursuant to the Plea Agreement and the Factual Basis for Plea Agreement, Reinhard pled guilty on May 13, 2009 to seven counts of the criminal indictment against him, including: (i) making false statements on a loan application in violation of 18 U.S.C. § 1014;[12] (ii) making

---

[12]     18 U.S.C. § 1014 prohibits "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action of" a banking institution "upon any

(continued...)

6

false statements to the bankruptcy trustee and aiding and abetting the making of such statements in violation of 18 U.S.C. §§ 152(3) and 2;[13] (iii) transferring assets and concealing them from the bankruptcy trustee in violation of 18 U.S.C. § 152(7);[14] and (iv) making false statements on an income tax return in violation of 26 U.S.C. § 7206(1) and (2).[15] Reinhard was sentenced to 51 months' imprisonment for five of the counts and 36 months' imprisonment for the other two counts, the sentences to run concurrently. In addition, he was ordered to pay restitution of $667,890.28 and a special assessment of $700. He is currently incarcerated in the Beaumont, Texas Federal Correctional Complex.

## C.    Administrative Proceedings

### 1.    Initial Decision and Remand Order

On October 27, 2008, proceedings were instituted based on the default injunction. On February 12, 2009, the law judge issued an Initial Decision barring Reinhard from associating with any broker, dealer or investment adviser.[16] Reinhard appealed. In February 2010, we issued an order (the "Remand Order") holding that, while the statutory basis for the imposition of sanctions was satisfied in that Reinhard was enjoined from violating the antifraud and other provisions of the federal securities laws while in an associated capacity, we were concerned about whether the record was "sufficient to address, in a meaningful manner, the public interest"

---

[12]     (...continued)
application, . . . loan . . . agreement or . . . any change or extension of any of the same . . . ."

[13]     18 U.S.C. § 152(3) prohibits a person from "knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement under penalty of perjury" in a bankruptcy matter. 18 U.S.C. § 2 declares that a person who aids or abets another in the commission of a crime against the United States, or willfully causes an act to be done which, if directly performed by him or another, would be an offense against the United States, will be punishable as a principal. Reinhard also pled guilty to aiding and abetting the concealment of a material fact in violation of 18 U.S.C. § 1001.

[14]     18 U.S.C. § 152(7) prohibits a person from "knowingly and fraudulently transfer[ring] or conceal[ing] any of his property . . . in contemplation of a case under" the bankruptcy laws or "with intent to defeat the provisions" of the bankruptcy laws.

[15]     26 U.S.C. § 7206(1), as relevant here, prohibits the submission of an income tax statement which the filer "does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(2) makes it unlawful to "[w]illfully" assist in the preparation of an income tax return "which is fraudulent or is false as to any material matter. . . ."

[16]     *Don Warner Reinhard*, Initial Decision Rel. No. 370 (Feb. 12, 2009), 95 SEC Docket 14218.

7

because the injunction was entered by default with no litigated or agreed upon findings of fact.[17] The Remand Order noted that the Supreme Court has held that "[i]n the case of a judgment entered by . . . default, none of the issues is actually litigated [and that] [t]herefore [issue preclusion or collateral estoppel] does not apply with respect to any issue in a subsequent action."[18]  The Remand Order further stated that "[i]n determining the need for assessment of sanctions in the public interest, we, like the law judge, are guided by the factors identified in *Steadman v. SEC*."[19]  The parties were directed, on remand, to introduce additional evidence regarding these factors.

      2.    <u>Supplemental Initial Decision and Appeal to Commission</u>

      The law judge then considered the case again pursuant to the Remand Order.  On March 22, 2010, the law judge held a prehearing conference in which she requested that Reinhard state, by May 6, 2010, why his 2009 conviction should not be considered in evaluating whether sanctions should be imposed in the public interest in light of the *Steadman* factors.  At the prehearing conference, Reinhard contended that the conviction was not relevant to the administrative proceeding, but did not file any additional pleadings with the law judge.  On June 1, 2010, the law judge issued a Supplemental Initial Decision, again barring Reinhard from associating with any broker, dealer, or investment adviser based on the default permanent injunction entered against him.[20]  In her Supplemental Initial Decision, the law judge took official notice of Reinhard's 2009 criminal conviction in assessing the public interest.  The law judge held that, "[e]ven disregarding the injunction . . . his criminal conduct shows a lack of honesty

---

    [17]    *Don Warner Reinhard*, Securities Exchange Act Rel. No. 61,506 (Feb. 4, 2010), 97 SEC Docket 25269, 25273.

    [18]    *Arizona v. California*, 530 U.S. 392, 414 (2000) (quoting *Restatement (Second) of Judgments*, § 27 cmt. e, p. 257 (1982)); *but see Harold F. Harris*, Exchange Act Rel. No. 53122A (Jan. 13, 2006), 87 SEC Docket 362, 369 (preclusive effect given to default injunction where district court's accompanying findings took account of "substantive defenses argued by Respondents" in late-filed answer); *Thomas J. Donovan*, 58 S.E.C. 1032, 1035 (2005) (imposing sanctions based on default injunction, where law judge conducted hearing accepting testimony and other evidence related to underlying misconduct and the public interest); *Lamb Bros., Inc.*, 46 S.E.C. 1053, 1058-59 (1977) (sanctions imposed based on default injunction but "allegations made in the injunctive suit [were] remade" in administrative proceeding and "an evidentiary record with respect to those matters was developed").

    [19]    97 SEC Docket at 25273 (citing to *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979).  The relevant public interest factors are identified and discussed in Section III a. below.

    [20]    *Don Warner Reinhard*, Initial Decision Rel. No. 396 (June 1, 2010), 98 SEC Docket 28878.

8

and indicates that he is unsuited to function in the securities industry." On July 28, 2010, we issued an order granting Reinhard's request for review. In this order, we asked the parties to address in their briefs "whether the order instituting proceedings ["OIP"] should be amended to reflect Reinhard's criminal conviction and the relevance of that conviction to the Commission's consideration of the public interest." In response, both parties argued that the OIP should not be amended to reflect the 2009 Conviction. Reinhard contended that amendment is not appropriate because, in his view, the 2009 Conviction is not relevant to the public interest. The Division of Enforcement, on the other hand, maintained that the "OIP does not need to be amended [because] [t]he default permanent injunction entered against Reinhard provides a statutory basis for these proceedings, and the OIP does not need to include a criminal conviction for a Law Judge to consider [the conviction] in determining whether it is in the public interest to order a bar." Under the circumstances, we have determined that there is no need to amend the OIP.[21]  On October 8, 2010, we issued a second order in which we gave the parties "express notice that the Commission may consider the 2009 Conviction in assessing the public interest." We further advised the parties that they would be given "a further opportunity to discuss any mitigating circumstances and any other issues related to that conviction," through the opportunity to file additional briefs on the matter.

## III.

Under Exchange Act Sections 15(b)(4) and (6)[22] and Advisers Act Sections 203(e) and (f),[23] we may impose remedial sanctions on a person associated with a broker, dealer, or investment adviser consistent with the public interest if, among other things, the associated person has been permanently enjoined from engaging in any conduct or practice in connection with the purchase or sale of securities. We find, and Reinhard does not dispute, that Reinhard was an associated person and that he was permanently enjoined from engaging in conduct in connection with the purchase or sale of securities. Accordingly, the statutory requirements for the imposition of sanctions were satisfied here.

a.    The Exchange Act and the Advisers Act authorize us to censure, place limitations on, suspend, or bar an associated person based on these findings if we find that such sanction is in the public interest.[24]  In analyzing the public interest we consider, among other things:  the egregiousness of the respondent's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the respondent's assurances against future violations,

---

[21]     See *Robert Bruce Lohmann*, 56 S.E.C. 573, 583 n.20 (2003) (finding that matters "not charged in the OIP" may nevertheless be considered "in assessing sanctions").

[22]     15 U.S.C. §§ 78*o*(b)(4) and (6).

[23]     15 U.S.C. §§ 80b-3(e) and (f).

[24]     15 U.S.C. § 78*o*(b)(6)(A); 15 U.S.C. § 80b-3(f).

9

the respondent's recognition of the wrongful nature of his or her conduct, and the likelihood that the respondent's occupation will present opportunities for future violations.[25]  Our "inquiry into . . . the public interest is a flexible one, and no one factor is dispositive."[26]  Based on our consideration of these factors, we believe that the bar imposed by the law judge was amply warranted.

According to the Factual Basis for Plea Agreement, Reinhard made repeated false statements on a loan application, to a bankruptcy court, and on his tax returns.  Moreover, the false statements were not mere minor or ministerial errors, as Reinhard maintains, but significant in amount and scope.  For example, Reinhard included a bogus tax return in a loan application that falsely listed his adjusted gross income as $944,322 and his total tax as $253,996 when, in fact, his actual return listed his adjusted gross income as $389,700 and his total tax as $37,498.  He also reported a fraudulent expense of $554,622 on his 2001 tax return, which allowed him to underpay his taxes by $216,498, and on his 2002 income tax return falsely claimed a net operating loss of $4,126,540 that was used to offset his reported income of $3.2 million.  These are, as Enforcement correctly states, "crimes of dishonesty."  His criminal misconduct included making false statements to the government and others concerning financial matters and involved concealing assets and lying about their existence and disposition.  This misconduct is highly relevant in our inquiry where we are required to consider the public interest and determine whether an individual is fit to work in an industry where honesty and rectitude concerning financial matters is critical.[27]

---

[25]     *James C. Dawson*, Investment Advisers Act Rel. No. 3057 (July 23, 2010), 98 SEC Docket 30697, 30699-700, *Scott B. Gann*, Exchange Act Rel. No. 59729 (Apr. 8, 2009), 95 SEC Docket 15818, 15823 (citing *SEC v. Steadman*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981)), *aff'd*, No. 09-60435 (5th Cir. 2010) (per curiam)).

[26]     *David G. Ghysels*, Exchange Act Rel. No. 62937 (Sept. 20, 2010), 99 SEC Docket 32610, 32614, *appeal filed*, No. 10-4634 (2d Cir. Nov. 12, 2010); *Dawson, supra*.

[27]     The fact that Reinhard's criminal misconduct did not involve violations of the federal securities laws is not determinative for our analysis.  Exchange Act Section 15(b)(4)(B) and Advisers Act Section 203(e)(2)(A) authorize Commission action if the respondent has been convicted of "any felony" involving "the taking of a false oath, the making of a false report, . . . [or] perjury."  As we recently stated:

'The securities industry presents a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants.' Indeed, the importance of honesty for a securities professional is so paramount that we have barred individuals even when the conviction was based on dishonest conduct unrelated to securities transactions or securities business.

(continued...)

10

Also significant to our inquiry is the fact that Reinhard's misconduct occurred over an extensive period of time and involved a high degree of scienter. As the Factual Basis for Plea Agreement shows, Reinhard's criminal activity occurred between 2003 through 2007 and involved numerous false filings and statements. Moreover, all of the crimes to which Reinhard pled guilty required that he have acted intentionally or knowingly.[28] Finally, while Reinhard expressed his "remorse" for his actions, he also challenges the facts underlying his conviction, as discussed in section b. below, suggesting an unwillingness to appreciate the wrongfulness of what he did.

       b.      Reinhard appears to concede that some sanction is warranted -- he proposes in his pleadings that, in settlement of this proceeding, he be suspended "for a period of 60 months beginning on the date of the SEC default judgement on October 3, 2008" -- but objects to a permanent bar as excessive.[29] According to Reinhard, a 60-month suspension is "more than sufficient given a default judgement and a plea agreement based on unintentional errors & mistakes." In particular, he objects to the consideration of his 2008 guilty plea in evaluating the public interest, arguing that the facts underlying his criminal conviction "do not lead to concern of the public interest" [emphasis in original].

---

[27]    (...continued)

*Gary M. Kornman*, Exchange Act Rel. No. 59403 (Feb. 13, 2009), 95 SEC Docket 14246, 14255-56, *petition denied*, 592 F.3d 173 (D.C. Cir. 2010) (quoting *Bruce Paul*, 48 S.E.C. 126, 128 (1985)). *See also Ahmed Mohamed Soliman*, 52 S.E.C. 227, 231 (1995) (holding that criminal conviction for tax law violations involving "fraud and deceit" is a "serious" offense which "shows a lack of honesty and judgement and indicates that [respondent was] unsuited to function in the securities industry"); *Benjamin Levy Sec., Inc.*, 46 S.E.C. 1145, 1147 (1978) (holding that respondent's conduct in "play[ing] a key role in a deliberate fraud practiced on the [Small Business Administration] and [a] bank" constituted "serious misconduct" and supported the law judge's decision to bar respondent from association with any broker-dealer or investment adviser).

[28]    *See supra* notes 12-15 and accompanying text.

[29]    Reinhard does not explain his reasons for suggesting a 60 month suspension. Alternatively, Reinhard seeks a stay of this proceeding pending his release from prison. We deny Reinhard's stay request. *Cf. David G. Ghysels, Order Denying Motions to Correct Manifest Errors of Fact and Denying Motions to Stay and for a Fact-Finding Hearing*, Admin. Proc. Rel. No. 648 (Jan. 10, 2010), 97 SEC Docket 25011, 25014 (holding that "pending appeal [of conviction] is not a valid reason for delaying the resolution" of follow-on administrative proceeding); *Charles Trento*, 57 S.E.C. 346-47 (2004) (denying request of incarcerated respondent to set aside law judge's decision pending appeal of his conviction). *See also Jose P. Zollino*, Exchange Act Rel. No. 55107 (Jan. 16, 2007), 89 SEC Docket 2598 (administrative proceeding adjudicated and decided while respondent was incarcerated).

11

Reinhard further argues that "[t]he actual counts that I pled guilty to are not the identical counts as outlined in the Factual Basis of the Plea Agreement." He claims that the discrepancies between the two "are substantiated in the language used when presenting the plea to the judge . . . and in the objections and changes made in the sentence hearing," and would be evident if the transcripts of these events were to be reviewed.[30] He further asserts that the factual record from the plea hearing and the sentencing hearing "proves . . . that [his] plea was based upon unintentional errors and mistakes by [Reinhard] and [his] legal counsel" that "solely dealt with the filing and appropriate ammending [sic] of documents."[31]

As we have repeatedly held, Reinhard is collaterally estopped from attacking the facts underlying his conviction.[32] Moreover, Reinhard cannot now dispute the accuracy of the findings

---

[30]    For example, with respect to the assertion in the Factual Basis for Plea Agreement that he had submitted a false tax return to a bank overstating his adjusted gross income in support of his loan application, Reinhard claims that "the issue on the [2001] tax return is one of a deduction and there was *not* a new loan or a loan application of any kind involved," rather "[i]t was simply an administrative function of a 'change of terms' agreement because of new collateral and [he] even paid the principle [sic] down by approximately $95,000 [emphasis in original]." Also, as to the statement in the Factual Basis for Plea Agreement that he had filed a false tax return in 2001 by reporting a fraudulent expense of $554,622, Reinhard states that the distributions to his limited partners "were actually made in 2002 and 2003 and therefore could be deducted in 2002 and 2003 instead of 2001."

[31]    Among other things, he challenges the facts set forth in the Factual Basis for Plea Agreement by arguing that: (i) the omissions in the various schedules and statements he filed with the bankruptcy court "should have been ammended [sic] by [his] bankruptcy attorney;" (ii) the purportedly false cost basis in his 2005 tax return for which he had pled guilty was, in fact, "accurate" but he "[did] not have the supporting documentation to prove the cost basis used;" and (iii) the distributions made to his limited partners, while not made in 2001 as his tax return for that year indicated, were, in fact, paid in 2002 and 2003 as shown in additional supporting materials provided to the Internal Revenue Service since the Plea Agreement was signed and the sentencing hearing held. Reinhard further claims that the government "acknowledged at the sentence hearing that there was *not* a fraud involving a loan application," and that the government agrees "that an incorrect tax return was supplied to the bank for administrative purposes during a change in collateral of an existing loan [emphasis in original]." Reinhard similarly seeks to minimize the significance of his tax return violations.

[32]    *See, e.g., Kornman*, 95 SEC Docket at 14257 (finding criminal conviction based on guilty plea has collateral estoppel effect precluding relitigation of issues in Commission proceedings); *Phillip J. Milligan*, Exchange Act Rel. No. 61790 (Mar. 26, 2010), 98 SEC Docket 26791, 26796-97 (holding that a respondent in a follow-on proceeding may not challenge the findings made in an underlying criminal or injunctive proceeding). *See also Robert Blakeney*
(continued...)

12

set out in the Factual Basis for Plea Agreement. He and his then-attorney signed this agreement as well as the Plea Agreement. These agreements were entered into as part of a settlement where the U.S. Attorney agreed to dismiss the remaining sixteen counts of the indictment and not to file any further criminal charges against Reinhard arising out of the same transactions and occurrences to which he pled guilty. As noted, Reinhard acknowledged in the Plea Agreement that "were the case to go to trial, the government could present evidence to support these charges [*i.e.*, the ones to which he pled guilty] beyond a reasonable doubt." Moreover, by signing the Plea Agreement and Factual Basis for Plea Agreement, Reinhard waived any objections he may have had to the facts set out in the latter agreement and became bound by the facts recited therein.[33]

      c.     Reinhard asks that we "show mercy on [him] and [his] future as [his] current 51 month prison sentence is more than sufficient punishment." However, as we previously noted, "[t]he specified administrative and criminal remedies are designed to serve different purposes, one to determine whether respondent[] should be barred or suspended from association . . . or censured, and the other to determine whether [respondent] should be fined or imprisoned."[34] Thus, we do not view his criminal sentence as mitigative of the appropriate sanction to be imposed in the public interest in this administrative proceeding.

---

[32]     (...continued)
*Stevenson*, 48 S.E.C. 89, 90 n.4 (noting that it is "well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case [and that] [f]or purposes of applying that principle, this Commission and the United States have been regarded as one and the same." [citations omitted]).

     Reinhard also challenges the validity of the civil injunction order, asserting that "the Commission did not prove that [he] broke or violated any securities laws in obtaining this default judgement." He attributes his civil injunction and the $8.2 million judgment against him to "egregious errors" of Bear Stearns that caused him to be a "victim as well as [his] clients," and argues that imposing a bar on him in this administrative proceeding would be "in effect punishing [him] for the errors of Bear Stearns." If Reinhard wished to challenge these allegations, he should have done so before the court.

[33]     *See United States v. Lomeli-Mences*, 567 F.3d 501, 507 (9th Cir. 2009) (holding that, having admitted to certain facts in "both his written plea agreement and oral change of plea proceedings," defendant could not challenge these facts on appeal); *United States v. Newman*, 148 F.3d 871, 876 (holding that defendant was deemed to have admitted facts in signed plea agreement and waived any subsequent challenge to them).

[34]     *Richard N. Cea*, 44 S.E.C. 8, 25 (1969).

13

The "securities industry presents continual opportunities for dishonesty and abuse, and depends heavily on the integrity of its participants and on investors' confidence."[35]  Here, by his repeated acts of false filings and dishonest conduct over several years and his refusal to appreciate the wrongfulness of his misconduct, Reinhard has demonstrated his unfitness for employment in the industry.  The imposition of a bar reflects the importance of "deterrence, both specific and general, as a component in analyzing the remedial efficacy of sanctions."[36]  By barring Reinhard from associating with broker-dealers and investment advisers, these sanctions address the risks of allowing Reinhard to remain in the securities industry, serving as a "legitimate prophylactic remedy consistent with [our] statutory obligations"[37] to "protect[] investors and the integrity of the markets by preventing those convicted of crimes from acting in the capacity of a securities professional."[38]

Accordingly, we hold that it is in the public interest to bar Reinhard from association with any broker, dealer, or investment adviser.  An appropriate order will issue.[39]

By the Commission (Chairman SCHAPIRO and Commissioners CASEY, WALTER, AGUILAR, and PAREDES).

Elizabeth M. Murphy
Secretary

---

[35]    *Conrad P. Seghers,* Advisers Act Rel. No. 2656 (Sept. 26, 2007), 91 SEC Docket 2293, 2304; *see also Charles Phillip Elliott,* 50 S.E.C. 1273, 1276 (1992) (stating that the securities industry is "a business that presents many opportunities for abuse and overreaching"), *aff'd,* 36 F.3d 86 (11th Cir. 1994) (per curiam).

[36]    *Ghysels,* 99 SEC Docket at 32621 (quoting *McCarthy v. SEC,* 406 F.3d 179, 189 (2d Cir. 2005)).

[37]    *Kornman,* 592 F.3d at 189.

[38]    *Ghysels,* 99 SEC Docket at 32621 (quoting *William F. Lincoln,* 53 S.E.C. 452, 461 (1998)); *see also SEC v. Palmisano,* 135 F.3d 860, 866 (2d Cir. 1998) (finding that "deterrence of securities fraud serves other important nonpunitive goals, such as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry").

[39]    We have considered all of the parties' contentions.  We have rejected or sustained them to the extent that they are inconsistent or are in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 63720 / January 14, 2010

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 3139 / January 14, 2010

Admin. Proc. File No. 3-13280

In the Matter of

DON WARNER REINHARD

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Don Warner Reinhard be barred from association with any broker, dealer or investment adviser.

By the Commission.

Elizabeth M. Murphy
Secretary

# Exhibit 5



CAMB-2_000618



# CAMBRIDGE CAPITAL PARTNERS L.P.

An Alternative Investment Fund with an Investment Focus on Mortgage Backed Securities, Asset Backed Securities, Private Debt Securities, and Litigation Settlements.

CAMB-2_000619

## GENERAL PARTNER and INVESTMENT MANAGER

**Cambridge Capital Advisors, LLC**

**One Broadway, 14th Floor**
**Cambridge, MA 02142**

**340 Royal Poinciana Way, Suite 317/362**
**Palm Beach, FL 33480**

**2120 Killarney Way, Suite 125**
**Tallahassee, FL 32309**

CAMB-2_000620

Offeree Name _____          Copy Number _____

## CAMBRIDGE CAPITAL PARTNERS L.P.

### PRIVATE OFFERING MEMORANDUM
### FOR
### OFFERING OF LIMITED PARTNERSHIP INTERESTS

**Required Minimum Investment – $100,000**

THIS MEMORANDUM IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN THE LIMITED PARTNERSHIP INTERESTS OF CAMBRIDGE CAPITAL PARTNERS L.P., A MASSACHUSETTS LIMITED PARTNERSHIP ORGANIZED ON FEBRUARY 20, 2015. DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. AS A RESULT, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART OR DELIVERED TO ANY PERSON WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

THE INVESTMENT APPROACH AND TRADING TECHNIQUES USED BY THE FUND INVOLVE A HIGHER DEGREE OF RISK THAN THAT ASSOCIATED WITH LESS AGGRESSIVE INVESTMENT ALTERNATIVES. AN INVESTMENT IN THE FUND IS THEREFORE NOT AN APPROPRIATE INVESTMENT FOR ANYONE UNABLE TO BEAR SUBSTANTIAL RISK OR REQUIRING LIQUIDITY AND SHOULD NOT BE VIEWED AS A COMPLETE DIVERSIFIED INVESTMENT PROGRAM. *SEE* "CERTAIN RISKS".

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE FUND INTERESTS HAVE NOT BEEN APPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE FUND INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS, AS AMENDED. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURSIDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

**The date of this Private Offering Memorandum is March 1, 2015.**

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO THE REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THERE ARE ALSO FURTHER SUBSTANTIAL RESTRICTIONS ON THE TRANSFERABILITY OF THE FUND INTERESTS.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE FUND. NO ASSURANCE CAN BE GIVEN THAT THE EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. PROSPESCTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX, AND ECONOMIC CONSIDERATIONS RELATING TO THEIR INVESTMENT. EACH INVESTOR IS RESPONSIBLE FOR THE FEES OF THEIR PERSONAL COUNSEL, ACCOUNTANT, AND OTHER ADVISORS.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM OTHER THAN THIS MEMORANDUM AND THE AGREEMENTS REFERRED TO HEREIN SHALL BE CONSIDERED TO CONSTITUTE AN OFFERING OF FUND INTERESTS. NO PERSON OTHER THAN THE GENERAL PARTNER AND ITS EXECUTIVE OFFICERS AND PLACEMENT AGENTS HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE FUND INTERESTS, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE GENERAL PARTNER, ITS EXECUTIVE OFFICERS OR PLACEMENT AGENTS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND OR ANY OF ITS PARTNERS.

THE FUND WILL MAKE AVAILABLE TO EACH INVESTOR OR HIS AGENT, PRIOR TO THE SALE OF ANY INTEREST TO SUCH INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE FUND AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THAT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR LIMITED PARTNERSHIP INTERESTS UNLESS SATISFIED THAT THEY OR THEIR INVESTMENT REPRESENTATIVE HAVE ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

## TO FLORIDA RESIDENTS:

PURSUANT TO THE PROVISIONS OF THE FLORIDA SECURITIES ACT, IF YOU ARE A FLORIDA RESIDENT, YOU HAVE THE RIGHT TO RESCIND YOUR SUBSCRIPTION AND TO RECEIVE A FULL REFUND OF YOUR SUBSCRIPTION PAYMENT BY GIVING CAMBRIDGE CAPITAL ADVISORS, LLC, AT 2120 KILLARNEY WAY, SUITE 125, TALLAHASSEE, FL 32309, (850) 298-4455 (o), (850) 216-2537 (f), info@cambridgecapitalgroup.holdings, NOTICE OF SUCH RECISSION BY TELEPHONE, LETTER, FACSIMILE, OR EMAIL WITHIN THREE BUSINESS DAYS OF ENTERING INTO YOUR SUBSCRIPTION AGREEMENT. IF YOUR NOTICE IS NOT TRANSMITTED BY SUCH TIME, YOUR RIGHT OF RESCISSION SHALL BE NULL AND VOID.

CAMB-2_000622

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Summary | 1 |
| 2. | Investment Objectives and Approach | 2 |
| 3. | Certain Risks | 5 |
| 4. | Prospective Investors | 11 |
| 5. | Investment Management | 11 |
| 6. | Management Fees and Allocation | 13 |
| 7. | Other Provisions of the Partnership Agreement | 15 |
| 8. | Brokerage and Custody | 20 |
| 9. | Reports to Partners | 21 |
| 10. | Plan of Distribution | 21 |
| 11. | Federal Income Taxation | 21 |
| 12. | Other Taxes | 23 |
| 13. | Fiscal Years and Interim Periods | 23 |
| 14. | Procedure for Becoming a Limited Partner | 23 |
| 15. | Available Materials | 23 |
|  | APPENDIX A: Agreement of Limited Partnership | A-1 |
|  | APPENDIX B: Accredited Investor Definition Per Section 501(a) of Regulation D | B-1 |
|  | APPENDIX C: Qualified Client Definition | C-1 |

CAMB-2_000623

## 1. <u>SUMMARY</u>

**THE FUND** -- Cambridge Capital Partners L.P. (the "Fund") is a Massachusetts limited partnership investment fund organized in February 2015. The General Partner of the Fund (the "General Partner") is Cambridge Capital Advisors, LLC, a Florida limited liability corporation organized in February 2015. The Investment Manager of the Fund (the "Investment Manager") is Cambridge Capital Advisors, LLC, a Florida limited liability corporation organized in February 2015.

**INVESTMENT OBJECTIVE AND APPROACH** -- The objective of the Fund will be to generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset backed securities ("ABS") and derivatives, US and International private and public debt securities ("USP") and derivatives, and litigation settlement claims ("LS"). The Fund may also invest in and trade in other securities, derivatives and financial contracts, both for hedging and for speculative purposes. The Investment may also allocate up to 25% of the Fund's net assets (determined at the time of investment) to other investment managers, including investment managers which may be affiliated with the Investment Manager.

**INVESTMENT MANAGER** -- The General Partner has, subject to delegation, sole responsibility for management of the Fund's business and investments. The General Partner who is also the Investment Manager will manage the Fund's investment portfolio on a discretionary basis. The Investment Manager is registered as an exempt investment advisor with the Securities and Exchange Commission under the Advisors Act Section 203(m), as amended. *See* "Management".

**THE OFFERING** -- The Fund is currently offering limited partnership interests with a current minimum investment by each subscriber of $100,000 (subject to waiver in the discretion of the General Partner). No minimum amount of interests must be subscribed prior to a sale of limited partnership interests.

**RISKS AND SUITABILITY** -- Purchase of a limited partnership interest in the Fund should be deemed to be an aggressive growth investment and is not intended as a complete investment program. *An investment in the Fund is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from their Fund accounts, who are financially able to maintain their investment and who can afford the loss of their investment. There can be no assurance that the Fund will achieve its investment objectives. See "Certain Risks".* Investment in the Fund is available exclusively to sophisticated persons and entities that have a net worth in excess of $2,000,000.00, qualify as "accredited investors" as defined in Rule 501 of Regulation D under the Act and that meet the "qualified client" test of Rule 205-3, as amended, promulgated under the Investment Advisors Act (*see* Appendices B and C of this Memorandum). All investors must also have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from the Fund, must be financially able to maintain their investment for an extended period and must be able to afford the loss of their investment. ADMISSION AS A LIMITED PARTNER IN THE FUND IS NOT OPEN TO THE GENERAL PUBLIC.

**AVAILABLE INFORMATION** -- This Memorandum sets forth the investment objectives, method of operation and certain other pertinent information relating to the Fund; however, this Memorandum does not set forth all the provisions and distinctions of the Amended and Restated Agreement of Limited Partnership of the Fund (the "Partnership Agreement") that may be

CAMB-2_000624

significant to a particular prospective limited partner. A copy of the Partnership Agreement is attached as Appendix A to this Memorandum.

Each prospective limited partner should examine the Memorandum, the Partnership Agreement and the Subscription Agreement contained the Subscription Package delivered with or after delivery of this Memorandum in order to assure himself that the terms of the Partnership Agreement and the Fund's investment objective and method of operation are satisfactory to them. Prospective limited partners are invited to review any materials that the General Partner has available that relate to the Fund, the operations of the Fund and any other matters relating to this Memorandum. All such materials are made available at the administrative offices of the General Partner and the Fund located at 2120 Killarney Way, Suite 125, Tallahassee, FL 32309, Attention: Tim Howard, J.D., Ph.D. The General Partner will afford prospective limited partners the opportunity to ask questions of and receive answers from its officers and the officers of the Investment Manager concerning the terms and conditions of the offering and the Fund's investment objective and strategies, and to obtain any additional information to the extent that the General Partner or the Fund possesses such information or can acquire it without unreasonable effort or expense.

## 2. INVESTMENT OBJECTIVE AND APPROACH

**OBJECTIVE AND GENERAL APPROACH** - The objective of the Fund will be to generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset backed securities ("ABS") and derivatives, US and International private and public debt securities ("USI") and derivatives, and litigation settlement claims ("LS"). The Fund may also invest in and trade in other securities, derivatives and financial contracts, both for hedging and for speculative purposes. The Investment may also allocate up to 25% of the Fund's net assets (determined at the time of investment) to other Investment managers, including investment managers which may be affiliated with the Investment Manager.

**MORTGAGE-BACKED SECURITIES** – Mortgage-backed securities ("MBS") can take a number of forms, including collateralized mortgage obligations ("CMOs") with tranches that include interest only securities ("IO"), principle only securities ("POs"), Inverse Floaters (securities whose coupon rates move in the opposite direction from an index such as LIBOR) and Inverse IOs (IOs whose coupon rates move in the opposite direction from an index). The values of these instruments depend, to differing degrees, on prevailing interest rates (long and short term) and mortgage prepayment rates which are largely a function of long term interest rates.

The Fund's strategy will be to focus on MBS that are issued and guaranteed by Government Sponsored Enterprises ("GSEs") such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") or issued and guaranteed by Government National Mortgage Association ("Ginnie Mae"). While this will significantly reduce default risk, the Fund may also periodically invest in private-label mortgage CMOs.

**ASSET-BACKED SECURITIES** - Asset-backed securities ("ABS") are bonds or notes that are backed by financial assets such as credit card loans, auto loans, manufactured housing loans, legal claims and home equity loans. The values of these instruments depend, to a differing degree, on prevailing interest rates (long and short term) and asset durations, ie. period of time from investment to repayment, which are a function of many outside influences.

**INVESTMENT AUTHORITY AND RESTRICTIONS** – The Fund has broad authority under the Partnership Agreement to acquire, purchase, invest in, hold for investment, own, exchange, assign,

8

sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in "Securities" (as defined below). The Fund may employ an aggressive investment policy and utilize sophisticated trading techniques such as (but not limited to) selling short, borrowing money for the purchase of securities and currency contracts and purchasing and selling put and call options (or combinations thereof), and may also make more conservative investments, including, but not limited to, investment in cash, deposit accounts and cash equivalents, as and when determined appropriate by the General Partner and the Investment Manager. The Fund may invest in Securities that are "restricted" as defined in Rule 144 promulgated under the Securities Act of 1933, as amended, and other Securities for which there is no established trading market. Unless properly registered, the Fund will not invest directly in commodities, commodity futures contracts or financial futures contracts. In addition, the Fund may sell any, all or substantially all of the assets of the Fund and collect and administer proceeds of any such sale and engage in such other activities related to the foregoing as the General Partner deems necessary, advisable or convenient to the promotion or conduct of the business of the Fund.

The term "Securities" includes foreign or domestic stocks, partnership interests, bond, warrants, debentures, puts, calls, notes, CMOs, REMICs and other synthetic, asset-backed and derivative securities, currencies or combinations thereof, mortgages or other obligations, any certificates, receipts, forward or spot contracts, repurchase agreements or other agreements or instruments representing rights to receive, purchase, subscribe for or sell any of the foregoing, or representing any other rights or interests therein or in any property or assets created or issued by any foreign or domestic persons, firms, associations, corporations or governments, agencies or subdivisions thereof, and futures and options of all types, including without limitation futures and options regarding Securities, commodities and financial market indices, except that the Fund will not invest in any instrument, future, option, commitment or other contract, investment or commodity interest that would, if the Fund were to invest, trade or deal in it, cause the General Partner or Investment Manager to be considered a commodity pool operator, unless and until the effectiveness of appropriate registration as a commodity pool operator or otherwise upon compliance with applicable regulations of the Commodity Futures Trading Commission.

The Fund may invest from time to time in securities of an issuer that would constitute more than 10% of a class of the outstanding stock of that company, if the General Partner or Investment Manager determines in its discretion that such an investment is appropriate.

GENERAL INVESTMENT APPROACH – Although the General Partner and the Investment Manager have extremely broad authority to invest and reinvest Fund assets in a wide range of investment situations at any time and may do so as they deem appropriate, the Investment Manager currently intends to emphasize the purchase of CMOs, ABS, and opportunistic loan / debt securities that will generate significant current cash flow as well as capital gains. These securities are often more volatile and less liquid than traditional corporate and US government debt securities. Although the Fund expects to generate attractive returns with a leveraged portfolio, there may be active trading and turnover in response to market conditions. The Investment Manager will also have the authority to use substantial borrowing at times to acquire portfolio positions with market values equal to up to ten times the Fund's net asset value in order to increase the Fund's potential returns. While leverage of this degree would be rare and only for short periods, the Investment Manager does intend to use borrowing to acquire portfolio positions with market values ranging from 2 to 10 times the Fund's net asset value. However, the Investment Manager may also determine to position the Fund entirely in cash equivalents or to take a substantial net short position in the portfolio if its perception of the market's trend is negative. These investment approaches may entail both the possibility of increased potential investment returns and the potential for greater losses.

9

CAMB-2_000626

The Investment Manager will also generally attempt to limit Fund market losses by establishing long or short positions in any number of different securities or instruments, as well as through other hedging strategies that it deems appropriate. These strategies may include, but not limited to, the purchase or sale of mortgage-backed derivatives, US Government securities, mortgage-backed collateral, interest rate caps and floors, and exchange-traded or over-the-counter traded equity and index options. However, the Investment Manager does not currently expect that the Fund will normally be in a fully hedged or market neutral position. *See also* "Potential Changes" below.

INVESTMENT SELECTION PROCESS – The Investment Manager maintains numerous contacts within a network of dealers in the fixed income markets. Through these contacts, the Investment Manager is presented with global investment opportunities. The Investment Manager evaluates these investment opportunities based upon its assumptions as to global interest rate directions and volatility, mortgage prepayment and prepayment trends, consumer debt trends, central bank policies and actions, and general market conditions. Based upon this analysis, the Investment Manager evaluates the risk/reward potential of the securities under consideration and makes an appropriate bid or offer.

As discussed above, a guiding principle for the Investment Manager is to generate a high level of current cash flow in relation to the size of the invested capital as well as capital gains. The Investment Manager will use its experience in the fixed income and mortgage derivatives markets as well as its knowledge of the global economy to establish positions that it believes will best meet these goals and provide a high level of return to the Fund.

CASH POSITIONS – The Fund's assets (other than those required for immediate operating expenses) may be invested fully in securities and other investment instruments, may be held fully in cash or cash equivalents, may be partially invested and partially held in cash, or may be fully or partly committed to short position securities and similar positions in other investment instruments, as the General Partner or Investment Manager believe the circumstances warrant.

DIVERSIFICATION AND CONCENTRATION – The General Partner and Investment Manager do not expect diversification of the Fund's investments among a large number of issuers at all times, and the Fund's investments may be concentrated in securities which can be adversely affected by changes in the interest rate environment as well as general market conditions.

INHERENT RISKS – An investment in the Fund should be viewed as an aggressive growth investment with above average risk. It is not intended as a complete investment program and is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from their Fund accounts, who are financially able to maintain their investment and who can afford the loss of their investment. There can be no assurance that the Fund will achieve its investment objectives. All potential investors in the Fund should understand the investment approaches and techniques that the Investment Manager expects to use in the management of the Fund and the particular risks associated with those approaches and techniques. *See* "Certain Risks" below.

POTENTIAL CHANGES – *The General Partner reserves the right to alter any Fund investment policy or strategy as deemed appropriate from time to time in its discretion without requiring limited partner approval and without prior notice.*

10

CAMB-2_000627

### 3.  CERTAIN RISKS

**OPERATING HISTORY** -  While the Fund does not have any operating history, members of the Fund's Investment Management Committee have vast global experience and involvement in business management, marketing, technology, economic analysis, fixed income analysis, MBS and CMO research, risk and return modeling, and stress investment analysis.

**RESTRICTED WITHDRAWS AND TRANSFERABILITY** -- Limited partner withdraws may not be made until the conclusion of the fourth full calendar quarter after investment and thereafter may be made only as of the first day of a calendar quarter after a 30 day written notice.  The amount of a withdraw, which must generally be paid out within 30 days after the effective date of the respective withdraw, may also be further delayed under certain circumstances.  In addition, the transferability of limited partnership interests will be restricted by provisions of federal and state laws, and transfers are prohibited except with the prior approval of the General Partner.  There is no public market for the Fund's limited partnership interests, and none will develop.

Because of the limitation on withdrawal rights and the fact that limited partnership interests are not tradable, an investment in the Fund is a relatively illiquid investment.  A subscription for limited partnership interests should be considered only by investors who have adequate means of providing for their needs and contingencies without expecting distributions or making withdrawals from the Fund, who are financially able to maintain their investment and who can afford a loss of a substantial part of such investment.

**SPECULATIVE NATURE OF THE FUND'S INVESTMENT PROGRAM** -- Prospective investors should be aware that the Fund's investment program can be speculative and involve a substantial degree of risk.  Prices of mortgage-related securities, asset backed securities and distressed debt and their associated derivatives can be highly volatile.  Price movements of such securities are influenced by, among other things, changing supply and demand relationships; government, trade, fiscal and economic events; and changes in interest rates.  The investment characteristics of mortgage-related securities and asset-backed securities differ from traditional debt securities.  The major differences include more frequent interest and principle payments (usually monthly), and the possibility that the underlying mortgages or financial assets may be prepaid at any time.  Prepayment rates are influenced by changes in interest rates and a variety of other factors.  In general, changes in the rate of prepayments will change the current and future cash flows and the yield to maturity (or total return) of the security.  As a result, these differences can result in significantly greater price and yield volatility than in the case with traditional debt securities.

Despite the risk management techniques which may be utilized by the Fund, there is no assurance that the Fund will not be exposed to risks of significant losses.  The prices of other derivatives and options used for hedging purposes may not correlate with price movements of the underlying securities being hedged.  Except as described herein, there are no material limitations or restrictions on the particular securities or derivatives or the magnitude of the Fund's investments, or on the trading and investment strategies and techniques to be utilized by the Investment Manager, which may differ from time to time from those which are summarized herein.

**LACK OF LIQUIDITY OF MORTGAGE-RELATED, ASSET-BACKED AND PRIVATE DEBT SECURITIES** - Mortgage-related securities, asset-backed securities, private debt securities,

11

CAMB-2_000628

litigation settlement claims and their associated derivatives are generally traded among broker-dealers and other institutional investors in over-the-counter markets or in private placement transactions. The Fund's portfolio may include securities which are not actively and widely traded or which are not registered under U.S. federal and state securities laws and therefore subject to restrictions on resale. Consequently, it may be relatively difficult for the Fund to dispose of investments rapidly and at favorable prices in connection with redemption requests, adverse market developments or other factors. There is no assurance that a liquid secondary market will exist for the securities held by the Fund or that the Fund will be able to dispose of such securities. The spread between the bid price and the asked price for mortgage-related securities, asset-backed securities and private debt securities and their associated derivatives can be very high in adverse market conditions. During these market periods, it is not unusual for the spread to be as high as 10% or more.

LEVERAGE - The Fund expects to finance portfolio positions by entering into repurchase agreements pursuant to which positions are sold to financial institutions subject to an unconditional obligation of the Fund to repurchase the position in the future at a fixed price (typically representing the sales price plus an interest charge) without regard to changes in the market value of the position after the sale to the financial institution. The Fund may also engage in other forms of borrowing in the course of its investments operations. Thus, the Fund may be in a highly leveraged position. The use of borrowed funds is intended to permit the Fund to purchase a portfolio whose value may be several times greater than the Fund's capital, which could result in a greater return on invested capital than is otherwise obtainable, however, if the Fund's investments suffer losses, the Fund's assets could decline in value to a greater extent than would have been the case had no funds been borrowed. Additionally, the Fund's investments and trading program may also involve other forms of leverage.

HEDGING (SHORT SALES; OPTIONS) - The Fund will engage in short sales, option trading and other strategies from time to time. A short sale will result in a gain if the price of the securities sold short declines between the date of the short sale and the date on which securities are purchase to replace those borrowed. A short sale will result in a loss if the price of the securities sold short increases. Any gain is decreased, and any loss is increased by the amount of any payment dividend or interest that the Fund may be required to pay with respect to the borrowed securities, offset (wholly or partly) by short interested credits. In a generally rising market, the Fund's "short" positions may be more likely to result in losses while the Fund's "long" positions increase in value. Conversely, in a generally falling market, the Fund's "short" positions may be more likely to result in gains while the Fund's "long" positions decrease in value. A vast majority of any of the short sales that the Fund will transact will be intended as part of the Fund's hedging strategies which in general are usually intended to limit or reduce investment risk, however, they can also be expected to limit or reduce the potential for profit.

Trading option contracts may be used either as a hedge for the portfolio or as a means of speculation. The prices of most, if not all, option contracts are highly volatile; price movements may fluctuate rapidly and over wide ranges during a short period of time. An option contract is a right, purchased for a certain price, either to buy or sell a particular security during a certain period of time for a pre-established price.

Although successful options trading requires many of the same skills as successful securities trading, the risks are somewhat different. As with short sales, a vast majority of any option purchases or sales will usually be intended as part of the Fund's hedging strategies.

12

CAMB-2_000629

## RELIANCE ON THE GENERAL PARTNER AND INVESTMENT MANAGER

The General Partner has retained the Investment Manager to manage the Fund's investment portfolio on a discretionary basis. The Investment Manager, which will act through its officers, employees and agents from time to time, has substantial discretionary authority to identify structure, execute, administer, monitor and liquidate Fund investments, consistent with the Fund's investment objective, authority and approach as described in this Memorandum and as the same may be altered by the General Partner from time to time. In exercising its authority, the Investment Manager has no responsibility to consult with any limited partner or any other person. Substantially all other decisions with respect to the management of the Fund's affairs are made exclusively by the General Partner (although it may also delegate administrative responsibilities from time to time). Limited partners have no right or power to take part in the management of the Fund. Accordingly, no person should purchase a limited partnership interest unless such person is willing to entrust all aspects of the management and all investment decisions of the Fund to the General Partner, the Investment Manager and their officers, employees and agents from time to time.

For the foreseeable future, it is expected that the Investment Manager will be the only investment manager retained by the General Partner to act on behalf of the General Partner with respect to management of the Fund's investments. The Investment Manager will rely on its investment management team in performing its duties as the investment manager of the Fund. As a result, the Fund's potential for success is expected to depend in particular on the team's ability to manage the Fund's investment. Since the investment management team will be globally diversified with vast talent and experience from many disciplines, the Fund's investments should not be adversely affected in the event the Fund lost the services of any one member.

## NEGOTIATION OF THE PARTNERSHIP AND INVESTMENT MANAGEMENT AGREEMENTS

The General Partner has generally determined the terms of the Partnership Agreement and the General Partner and the Investment Manager have determined the terms of the Investment Management Agreement among the Fund, the General Partner and the Investment Manager, which were not negotiated on an arms-length basis. In addition, legal counsel for the General Partner and the Investment Manager has not acted as counsel for or represented the interests of the limited partners. Potential investors should consult with their own legal counsel with respect to the Fund.

## NO ASSURANCE OF PROFIT OR CASH DISTRIBUTION

There is no assurance that future Fund investments will be profitable or that any future distribution will be made to the limited partners, and any prior successful investment management, recommendations or analysis by the Investment Manager or its investment committee and any future successful Fund performance cannot be relied upon as assuring further successful performance. Any future return on investment to the limited partners will depend upon successful investments made by the Fund at the direction of the Investment Manager and its investment committee. The value of any such investments will depend upon many factors beyond their control

13

CAMB-2_000630

and the control of the Fund, the General Partner and the Investment Manager. The expenses of the Fund may also exceed its income.

## PERFORMANCE-BASED PROFIT ALLOCATIONS

The fees paid by the Fund to the General Partner include quarterly performance-based allocations of profits in an amount equal to 20% of the net profits (including net unrealized profits), if any, subject to limited loss carry-forward provisions, generated in the accounts of limited partners. These quarterly allocations of net profits ("Performance Profit Allocations") will only be allocated after achieving a "soft" hurdle rate of 4% per annum, calculated quarterly, and may create an incentive for the General Partner and Investment Manager to make Fund investments that are riskier or more speculative than would be the case in the absence of such performance-based profit allocation arrangements in order to generate net profits subject to the Performance Profit Allocations. The performance-based allocations will be based on ALL realized and unrealized profits including the 4% hurdle rate after such rate is achieved.

## MANAGEMENT FEES

The Fund also pays quarterly management fees in an amount equal to .5% (2% per annum) of the Net Asset Value ("NAV") to the General Partner which is in addition to the performance-based profit allocation. The initial annual management fee is paid upon deposit in lieu of a one year "lock up" provision. Additionally, each Limited Partner agrees to pay a 6% one time special set up fee to the General Partner subject to waiver by the General Partner. The General Partner may also receive commission income or broker fees as well as loan broker fees from time to time with respect to Fund portfolio transactions.

## HIGH TURNOVER

Due to the nature of the Fund's investments and frequent return of principle capital, the Fund may also trade very actively, with resulting higher portfolio turnover and transaction costs, if the Investment Manager anticipates market conditions where active trading will produce the best overall investment returns. *See* "Conflicts of Interest" and "Brokerage and Custody" below.

## EFFECT OF WITHDRAW

Withdrawals by limited partners could require the Fund to liquidate or close out positions more rapidly than would otherwise be desirable, which could reduce the value of Fund assets and cause a resulting reduction in the value of limited partnership interests, or require the Fund to distribute securities in response to withdrawal requests.

## REPAYMENT OF DISTRIBUTIONS

Limited partners are not personally liable for any debts or losses of the Fund beyond the amount of their capital contribution and profits attributable thereto (if any) if the Fund is otherwise unable to meet its obligations. However, limited partners might be required to repay with interest Fund cash or in-kind distributions (including distributions on partial or complete redemption of limited partnership interests and distributions deemed a return of capital) received by them to the extent of overpayments, if the Fund is insolvent at the time of the payments or if such distributions render the Fund insolvent.

## CONFLICTS OF INTEREST

14

Certain inherent conflicts of interest are likely to arise as a result of the General Partner, the Investment Manager and affiliated persons carrying on similar investment activities both for themselves and for clients other than the Fund. As such, the General Partner and such persons will not be required to refrain from any other activity or to disgorge any profits from any such activity in the future. See *"Other* Provisions of the Partnership Agreement" below.

The Fund, other partnerships in which the General Partner, the Investment Manager and their affiliates may participate as a partner or serve as a manager and other investment management and consulting clients that the General Partner and such other persons or their affiliates may have from time to time may share administrative offices and utilize common services, facilities, investment research and management. The General Partner and such other persons may also determine from time to time that some investment opportunities are appropriate for certain investment management clients and not others, including the Fund, due to differing objectives, time horizons, liquidity needs or availability, tax consequences and assessments of general market conditions and of individual securities. It may also occasionally be necessary to allocate limited investment opportunities among the Fund and others on a basis deemed appropriate by the General Partner or the Investment Manager, which may mean that the General Partner, the Investment Manager, or other accounts managed by them, achieve profits that the Fund does not or avoid losses that the Fund suffers.

The General Partner and the Investment Manager also have complete discretion regarding the selection of those registered securities brokers, including associates of the General Partner or the Investment Manager, who execute and clear transactions on behalf of the Fund and the commissions and fees payable to such brokers. It is also expected that the General Partner and Investment Manager will allocate brokerage business generally on the basis of best available execution, but they may also allocate Fund brokerage business based in part on the provision of or payment for other products or services (including but not limited to investment research) to the Fund, the General Partner or affiliated persons. Such products or services may not be used for the direct or exclusive benefit of the Fund and may reduce the overhead and administrative expenses otherwise payable by the General Partner under the terms of the Partnership Agreement. The General Partner and Investment Manager also expect to allocate brokerage business to brokers who refer investors to the Fund and other investment funds and accounts managed by the General Partner, the Investment Manager or other affiliated persons. The General Partner or any of such persons may also determine in the future to establish or become affiliated with a securities broker-dealer and to execute transactions for the Fund through such affiliated broker-dealer. *See also* "Brokerage and Custody" and "Plan of Distribution" below.

**TAX RISKS**

Limited partners will be subject to income taxation on their distributive shares of Fund net taxable income. In this regard, there are several risk factors of which potential investors should be aware. In addition, the Fund has not received, and does not propose to seek, an opinion of counsel or ruling from the Internal Revenue Service ("Service") on any matter set forth herein. *Investors are expected to seek and rely upon the advice of their own tax advisors.*

It is probable that a partner's share of the Fund's taxable income, and attendant income tax liabilities, will exceed cash distributions from the Fund (since distributions are not currently contemplated). Accordingly, a limited partner should not rely on or anticipate distributions of cash from the Fund to cover income tax liabilities associated with his investment in the Fund. Limited partners will not be permitted to withdraw funds from their capital accounts until the conclusion of the fourth full calendar quarter after investment, and thereafter may be made only as of the first day of a calendar quarter after *30* days prior written notice, even if they have income tax liability

15

associated with an investment in the Fund during that period. It is also possible that Fund net taxable income may occur in a year when the net asset value of the Fund is falling. Further, to the extent that the General Partner is unable to satisfy requests for withdrawals through distributions of securities in kind, the Fund may be required to sell appreciated securities, causing accelerated recognition of gains allocable to both the withdrawing and non-withdrawing Partners.

The Fund also anticipates, based upon the Code and Treasury Regulations ("Regulations") as currently in effect, that the Fund is more likely than not to be characterized for federal income tax purposes as a partnership rather than an association taxable as a corporation. No opinion of counsel has been obtained and no tax ruling will be sought from the Service as to the status of the Fund as a partnership. However, this position of the Fund may be challenged and, while the Fund would expect to prevail in any such dispute, there can be no certainty of that result.

Potential investors should also be aware that the Fund is not a so-called "tax shelter" investment intended to generate net losses that could be used to offset income from other sources. Temporary Treasury Regulations also provide that the activity of trading personal property (such as securities) for the account of owners of interests in the activity is not considered a passive activity that generates "passive" income, without regard to whether such activity is a non-passive trade or business activity. It is therefore not expected that the net income generated from the Fund's activities will be classified by the Service as "passive" income, notwithstanding the general rule that income derived by a limited partner is passive in nature. As a result, it is expected that a limited partner will not be able to use passive losses from other sources to offset Fund net income.

Under Temporary Treasury Regulations, it is also likely that Fund income derived by a limited partner that would otherwise be considered passive income will be deemed to be "portfolio" income. If the income generated by the Fund is characterized as portfolio income, then certain expenses incurred by the Fund could be characterized by the Service as investment advisory fees or other expenses incurred in connection with the production of income. In such event, each non-corporate partner's pro rata share of expenses so characterized would be deductible to such partner only to the extent such amount, when added to the partner's other miscellaneous itemized deductions, exceeded 2% of such partner's adjusted gross income for the year in question.

If the Fund's activities are deemed to constitute trading activity, it will then be deemed to generate "non- passive" income, 'which would allow non-corporate partners to deduct expenses incurred in connection with the Fund's trading without regard to the 2% threshold described above. However, no assurances can be given that the activities of the Fund will be interpreted by the Service to be non-passive in nature or that the Temporary Treasury Regulations will not be modified or withdrawn in the future.

The Fund may also take a more aggressive tax position than a partner might. Should the Service disallow any such position, partners could be audited and required to pay back taxes, interest and perhaps penalties. Under the Internal Revenue Code of 1986, as amended (the "Code"), neither interest nor any penalties incurred in such circumstances would be deductible. Further, the Code provides for centralized resolution of tax disputes where partnerships are involved. As a result, the resolution of tax disputes *affecting* partners' returns may ultimately be controlled by the General Partner. Any audit activity at the Fund level could also result in the audit of individual partners' returns with respect to items unrelated to the Fund's activities.

Any tax-exempt entities that invest in the Fund should also consider that the Fund will likely generate "unrelated Business taxable income." As a result entities may become subject to taxation of such income.

16

CAMB-2_000633

Federal and state tax laws are changing continuously as a result of new legislation, new regulations, and new administrative and judicial pronouncements. These changes may affect the Fund and its partners. All tax matters affecting the Fund and, through it, its partners, are and will be subject to such change. *Potential investors should discuss the particular tax implications for them of an investment in the Fund with their tax advisors. See* "Federal Income Taxation" and "Other Taxes" below.

## QUALIFIED PLAN INVESTORS

Fiduciaries of qualified plans, in consultation with their tax and legal advisers, should carefully consider whether an investment in interests is consistent with their fiduciary responsibilities, particularly the responsibilities outlined in Part 4 of Title 1 of ERISA, the effect of the possible treatment of assets of the Fund as "plan assets", and certain tax risks such as, but not limited to, the probability of a portion of the Fund's net taxable income being taxed to them as "unrelated business taxable income."

## INVESTMENT COMPANY ACT OF 1940

The Fund intends to avoid becoming subject to the Federal Investment Company Act of 1940, as amended. However, it cannot absolutely assure investors that under certain conditions, changing circumstances or changes in the law, it may become subject to the Investment Company Act of 1940 in the future. Becoming subject to that Act could have a material adverse effect on the Fund if it is determined that registration would be cost prohibited. If this were the case, the Fund would be liquidated and the proceeds distributed to the limited partners.

### 4. PROSPECTIVE INVESTORS

The Fund is currently offering limited partnership interests to up to 99 investors. The minimum investment for a subscriber, subject to waiver by the General Partner, is currently $100,000. No minimum amount of interests must be subscribed before additional interests will be sold.

Admission as a limited partner in the Fund is not open to the general public and is limited to persons and entities with a net worth of at least $2,000,000.00, excluding the value of their primary residence, or an initial investment of at least $1,000,000.00 that qualify as "accredited investors" as defined in Rule 501 of Regulation D under the Act and that meet the "qualified client" test of Rule 205-3 promulgated under the Investment Advisers Act (see Appendices B and C to this Memorandum). If an investor is a private investment company (that is, a company that would be defined as an investment company under the Investment Company Act of 1940 but for the exception from that definition provided by section 3(c)(1) of that Act), a qualified purchaser pool as defined in section 3(c)(7) of that Act, an investment company registered under that Act or a business development company (as defined in section 202(a)(22) of the Investment Advisers Act of 1940), then each equity owner of that investor must have a net worth of at least $2,000,000.00 excluding the value of their primary residence.

The Fund is not intended as a complete investment program and is designed only for persons and entities that have adequate means to provide for their needs and contingencies without relying on distributions or withdrawals from the Fund, that are able to bear the economic risk and afford the loss of the investment, and that either are sophisticated regarding financial and business matters or are represented by such a person in connection with their investment in the Fund.

Prospective investors should read carefully this entire Memorandum, the Partnership Agreement attached to this Memorandum as Appendix A and the Subscription Agreement included in the

17

Subscription Package delivered with or after delivery of this Memorandum.   The Partnership Agreement sets forth the specific provisions relating to the operations of the Fund.

## 5.   INVESTMENT MANAGEMENT

**CAMBRIDGE CAPITAL ADVISORS LLC** – The Fund is managed exclusively by the General Partner, Cambridge Capital Advisors LLC ("CCA"), and such persons as the General Partner retains from time to time, as described below and elsewhere in this Memorandum.  CCA is also the Investment Manager.

Cambridge Capital Advisors LLC, is a Florida Limited Liability Corporation organized on February 27, 2015.  Dr. Tim Howard, J.D., Ph.D., and Mark Hallim are the sole shareholders, executive officers and directors with Dr. Howard holding the office of President.  CCA is also advised by Don Reinhard in its capacity as investment manager of the Fund.

Mr. Reinhard graduated from Florida State University in 1979 with a major degree in Finance and a minor in Accounting. He also received his Masters degree in Finance from FSU in 1991.

Mr. Reinhard began an extremely successful investment management and analysis career in 1985 and eventually founded and owned his own SEC Registered Investment Advisory Firm and Hedge Fund business in 1997. From inception to 6/2003 his Hedge Fund clients and parallel separately managed portfolios received an average annual investment return of 25.39% while the S&P 500 returned 0.66% per annum. However, in July 2003, the custodian of his accounts, Bear Stearns, through a computer error, failed to provide accurate market prices. This impacted the margin calculations on 14 of 300 clients, and Mr. Reinhard's personal account as well. This Bear Stearns error caused the liquidation of approximately $7 million in accounts and though Bear Stearns readily admitted its error, it callously required Mr. Reinhard and his clients to sue Bear Stearns for repayment. This cavalier approach to liability was a key reason that Bear Stearns ceased to exist in March of 2008.

Despite the responsibility of Bear Stearns in causing the liquidation, the Securities and Exchange Commission sanctioned Mr. Reinhard before he could prosecute Bear Stearns for its admitted error. Taking full responsibility to protect his clients' interests, Mr. Reinhard organized the damaged clients to pursue a case against Bear Stearns and personally provided over $1 million in litigation fees. Despite 4 clients that wielded substantial political and media influence taking a different and unsuccessful approach by targeting Mr. Reinhard, Bear Stearns was found liable for the errors in a May 2011 arbitration that returned full compensation to the remaining clients.

In addition to Mr. Reinhard's direct investment management experience, he was extensively involved with the former NYSE Assistant Chief of Margin Regulations, Mr. Steven Levine, on various projects related to exempt fixed income securities and the NYSE financing requirements.

**Dr. TIM HOWARD, J.D., Ph.D.** – Dr. Howard, who graduated with a B.A. degree Cum Laude in Government, with Minors in History, Law and Society in 1983, a J.D. degree in 1986 from Florida State University, and a Ph.D. degree in Law, Policy and Society in 2005 from Northeastern University, began his professional career in with Florida Governor Bob Graham, the Florida Legislature, and the Florida Attorney General's Office in the 1980s, including work as Special Assistant Attorney General, and Assistant Attorney General.  During 1993-1995 he held the position as Senior Attorney for the Florida Governor's Agency for Health Care Administration, and in 1995 he founded Howard & Associates, P.A. specializing in Government policy and litigation, health care, securities and consumer litigation, trial practice, personal injury, and

CAMB-2_000635

product liability.  His firm acted as the coordinator of Florida's Historic Tobacco Liability Litigation, which resulted in a $27 billion recovery for the State of Florida.

Dr. Howard also created the world's first Law & Policy Executive Doctoral Program at Northeastern University and served as its Director and Professor from 2007– 2011. In 2012, Dr. Howard founded Cambridge Graduate University International, the world's first global campus graduate university with a focus to prepare global leaders to not only possess the knowledge to impact the world today but give them the necessary skills and tools to implement and execute solutions for business, technology, sustainable economic growth, health care, finance, investing, public and private leadership, and social sciences.  Dr. Howard is highly recognized around the world as a leader in the applied praxis model of education and the Investment Manager intends to leverage the global relationships developed by Dr. Howard and others associated with Cambridge Graduate University International.  *See also* "Investment Advisory Team" insert provided with this Memorandum.

OTHER ACTIVITIES – The General Partner and the Investment Manager intend to devote a significant portion of their business time to Fund activities.  However, the Partnership Agreement recognizes that each of them and their affiliates and other officers, directors and employees may conduct any other business including any business with respect to securities.  Without limiting the generality of the forgoing, each of such persons may serve as an officer, director or consultant to any company, including companies in which the Fund invests, may act as an investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their own names or through other entities, and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms.  The Partnership Agreement also recognizes that it may not always be possible or consistent with the investment objectives of the various persons described above and of the Fund for the same investment positions to be taken or liquidated at the same time or at the same price.

INVESTMENT MANAGEMENT FEE AGREEMENT AND INVESTMENT MANAGER INDEMNIFICATION

The General Partner and Fund currently retain the Investment Manager to manage the Fund's investments on a discretionary basis pursuant to an investment Agreement dated as of February 27, 2015 (the "Management Agreement"). Under the terms of the Management Agreement, the Investment Manager has complete discretion to direct the investment of the Fund's assets subject to the investment authority, objectives and strategies outlined in the Partnership Agreement and in this memorandum.   The Management Agreement expires on December 31, 2025 but will renew automatically for one-year terms absent prior notice. As compensation for its services, the General Partner has assigned the Management Fee to the Investment manager.  In addition, the Fund and General Partner have agreed to indemnify the Investment Manager and its associates with respect to any claims relating to actions performed or omitted to be performed by or on behalf of the Investment Manager in managing the assets of the Fund, except to the extent that such a claim result from bad faith, intentional misconduct, malfeasance or knowing violation of law.  However, no party to the Management Agreement has waived any of the party's rights with respect to compliance by the other parties with any provision of the Investment Advisers Act of 1940, as amended, under state law or with any rule, regulation or order thereunder.

6.  MANAGEMENT FEES AND ALLOCATION OF NET PROFITS AND LOSSES

The following is a brief description of the fees payable to the General Partner, the Investment Manager and their assignees for management and services provided to the Fund, and of the method by which the profits and losses resulting from operation of the Fund will be allocated among the

CAMB-2_000636

partners. The following description is qualified by reference to the full text of the Partnership Agreement attached as Appendix A.

MANAGEMENT FEE - The Partnership Agreement provides for the payment by the Fund to the General Partner and Investment manager of a quarterly fee (the "Management Fee") in an amount equal to 0.5% of the balance of limited partner accounts as of the first day of each calendar quarter. Management Fees are calculated after all allocations of net profits or losses of the Fund (including any Performance Profit Allocations) for the prior quarter, and after giving effect to all capital contributions and withdrawals. Any amounts contributed to a limited partner's capital account on a special opening date during a calendar quarter are also assessed the Management Fee pro rata with respect to that portion of the calendar quarter after the special opening date. The Management Fee is generally payable in cash within thirty days. No part of previously paid Management Fees is refundable with regards to any withdrawals made during a calendar quarter.

The management Fee is generally paid in lieu of reimbursement for administrative and overhead expenses (other than those operating expenses included in calculations of Fund profits and losses) incurred by the General Partner on behalf of the Fund, including "fund services", rent, the cost of computer equipment, telephone service, financial manuals, news services and periodical subscriptions, employee salaries, secretarial services and office supplies and equipment. Such administrative and overhead expenses, other expenses of the Fund, the General Partner and the Investment Manager and the Management Fees themselves may also, in the discretion of the General Partner or Investment Manager, be paid through "soft dollar" arrangements with brokerage firms selected by the General Partner or Investment Manager and used by the Fund in executing and clearing Fund securities transactions. See "Brokerage and Custody" below. In no event shall the General Partner or Investment Manager be obligated to pay or cause to be paid pursuant to soft dollar arrangements any part of the Management Fees or other Fund expenses prior to causing all expenses otherwise to be borne by the General Partner or Investment Manager to be so paid. The amount of the Management Fee paid may be less or more than the total amount of such cost and expenses actually borne by the General Partner. The Management Fee has been assigned to the Investment Manager pursuant to the Management Agreement.

In lieu of the Fund having an initial one year "lock up" period in which limited partners cannot withdraw their funds, each limited partner will pay the full first year management fees of 2.0% upon their initial deposit into the fund. Subsequent deposits into the fund during the first full calendar year will pay a pro rata amount of the first year management upon the subsequent deposit. After the anniversary date of the initial deposit, future management fees will be paid as defined above.

The General Partner may also from time to time negotiate to participate in fees paid by the borrower to brokers of private placement debt and advances on legal settlement claims. However, the General Partner's negotiated share of broker's fees would always be paid from the borrower's proceeds at normal "market" fees and not in excess to the broker's normal "market" fees.

Additionally, each Limited Partner agrees to pay a 6% one time special set up fee to the General Partner subject to waiver by the General Partner.

DETERMINATION AND ALLOCATION OF PROFIT AND LOSS GENERALLY

The net profits or net losses of the Fund as of the end of each fiscal period are generally allocated to each partner in the proportion that his capital account bore to the aggregate of all the capital accounts as of the beginning of such fiscal period (generally, each calendar quarter). Net profits and net losses of the Fund are determined on the accrual basis of accounting in accordance with

20

generally accepted accounting principles consistently applied and are deemed to include net unrealized profits or losses on securities positions as of the end of each fiscal period. See also "Other Provisions of the Partnership Agreement - Determination of Net Asset Value", "Fund Asset valuation" and "Capital Accounts" below.

PERFORMANCE PROFIT ALLOCATIONS - An amount equal to 20% of the excess, if any, of each limited partner's share of net profits during each calendar quarter over the Loss Carryforward Account (as described below) balance, if any, for that limited partner is allocated to the capital accounts of the General Partner and any Special Partners (such as the Investment Manager) designated by the General Partner from the capital accounts of the limited partners. Performance Profit Allocations may also be made at any time for an individual limited partner who makes a substantial withdrawal in the discretion of the General Partner. Performance Profit Allocations do not apply to Related Partners and Special Partners except as directed by the General Partner. The Partnership Agreement will be interpreted as required to comply with Rule 205-3 promulgated under the Investment Advisers Act of 1940.

Performance profit allocations will not be allocated until the Fund reaches a "soft" hurdle rate of 4% per annum calculated quarterly. In other words, the "soft" hurdle rate for the second quarter will be 2% and will increase to 3% at the end of the third quarter. At such time, ALL realized and unrealized profits will be subject to the performance profit allocation.

A memorandum account ("Loss Carryforward Account") is maintained for each limited partner to determine any cumulative net losses over the eight calendar quarters prior to the period for which a performance Profit Allocation is to be made and that may reduce the amount of the Performance Profit Allocation from the limited partner's capital account. Loss Carryforward Account balances are reduced pro rata upon a withdrawal from a limited partner's capital account.

*The performance Profit Allocations may create an incentive for the General Partner and Investment Manager to make investments that are riskier or more speculative than would be the case in the absence Performance Profit Allocations. Including unrealized appreciation when calculating Performance Profit Allocations may increase the amount of such allocations to the General Partner and Investment Manager as opposed to just including realized appreciation.*

### 7.    OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT

The following is a brief description of certain provisions of the Fund and is qualified by reference to the full text of the Partnership Agreement attached as Appendix A.

TERM OF THE FUND - The fund will continue until December 31, 2065, unless earlier dissolved as provided in the Partnership Agreement.

WITHDRAWALS OF CAPITAL AND RETIREMENT OF PARTNERS - Upon giving 30 days written notice, a limited partner may withdraw up to 90% of his capital account balance as of the first day of a calendar quarter. Such notice must state the amount to be withdrawn or the basis on which such amount is to be determined, with a minimum withdrawal of $25,000 unless otherwise permitted by the General Partner. However, the amount of a limited partner's withdrawals in excess of 25% of their capital account may be limited on a *pro rata* basis to the extent that aggregate withdrawals by all limited partners as of any date exceed 50% of the Fund's net asset value. Amounts not subject to withdrawal due to this limitation will be treated as though no withdrawal notice had been given with respect to that amount. Withdrawals may also be delayed during a state of emergency, if securities markets have been closed or under other extraordinary circumstances as

21

determined in good faith by the General Partner. A partner who properly elects to withdraw all of his capital account will be deemed to have retired as of the elective date of such withdrawal. The General Partner may withdraw all or any portion of its capital account at any time.

The General Partner may also, in its discretion, retain from amounts otherwise distributable to a limited partner a reserve in such amount as it deems proper with respect to that limited partner's pro rata share of any contingency, charge, expense or other unliquidated liability or asset accrued or anticipated to be applicable to any period prior to the effective date of the withdrawal and not previously included in calculating the net asset value of the Fund. That amount, so far as such liability is unliquidated or the value of the asset is unrealized, is fixed by the General Partner in its discretion (the "Reserve Amount"). Prior to the liquidation of the amount of the liability or realization of the value of the asset with respect to which the Reserve Amount was established and the inclusion of such amount in determining the net asset value of the Find (if applicable), the Reserve Amount may be invested by the General Partner together with other Fund assets or segregated from other Fund assets, as determined by the General Partner. A withdrawing limited partner is not entitled to receive any share of net profits of the Fund with respect to the Reserve Amount for the period during which the Reserve Amount is invested or any other profits generated, but is entitled to payment of the Reserve Amount (plus or minus his or her pro rata share of the realized amount of the asset or the liquidated amount of the liability with respect to which the Reserve Amount was established). Reserve Amounts shall be distributed and paid promptly upon liquidation of the liability or realization of the asset to which they relate.

In its sole discretion, and without any advance notice, the General Partner may require any limited partner to retire from the Fund at any time. The General Partner also has the authority in its discretion to make disproportionate tax allocations of gain or loss as it determines appropriate in the event of a withdrawal during a period when the Fund has substantial unrealized gains or losses for tax purposes.

Amounts withdrawn and payable to a limited partner as of any date will be paid within 30 days after that withdrawal or payment.

PAYMENT ON RETIREMENT OR SUBSTANTIAL WITHDRAWAL - A partner retiring in accordance with the Partnership Agreement will be entitled to receive an amount equal to the value of his capital account as of the date of his retirement Subject to any Reserve Amount established by the General Partner, 90% of the estimate of such amount will be paid within 30 days after the date of such partner's retirement, and the remainder (the "Retained Amount") will be paid promptly after the Find's independent public accountants have completed their audit of the Fund's year-end financial statements. If the audit indicates that the 90% payment exceeded the value of the retiring partner's account, the partner will be obligated to repay to the Fund the amount of the excess. Any limited partner seeking a withdrawal of more than 90% but less than his entire capital account balance will also be subject to such procedures. The Retained Amount may be invested by the General Partner together with other Fund assets or segregated from other Fund assets, as determined by the General Partner. A withdrawing limited partner is not entitled to receive any share of net profits of the Fund with respect to be Returned Amount, but is entitled to payment for the Retained Amount as adjusted pursuant to the audit.

Any overpayment upon a withdrawal will bear interest at a rate equal to the Prime rate as reported by the *Wall Street Journal* as of the date of such proper notice of the overpayment, plus two percent (2.0%), if the overpayment has not been repaid within 30 days after notice to the withdrawing partner.

CAMB-2_000639

**DISTRIBUTIONS IN CASH OR IN KIND** - Withdrawals of capital and the payment of the value of a partner's capital account to him on retirement will be made in cash or, as determined by the General Partner, in securities selected by the General Partner, or partly in cash and partly in securities selected by the General Partner. The General Partner would then normally sell the assets so distributed for the account of the withdrawing partner and distribute the cash proceeds to that partner in the same manner as though the Fund had sold the assets and distributed cash, but could distribute the assets themselves if the partner so prefers or if the General Partner has determined to distribute securities that are privately or thinly traded and for which a purchaser at an acceptable price has not been identified. While these alternative means of effecting a withdrawal may or may not change the total amount of gain or loss recognized by the withdrawing partner, the choice of method may affect the character of the gain and loss or the tax year in which recognition occurs. The General Partner is not obligated to use one method or the other in effecting withdrawals, but may make distributions that produce favorable tax results for partners not making withdrawals in its discretion. Any partner who receives a distribution in kind will bear the market risk of a decline in the value of the distributed securities. However, the General Partner will make all efforts to make withdrawals of capital and payments of the value of a partner's capital account upon retirement in cash.

**DETERMINATION OF NET ASSET VALUE** - The net asset value of the Fund is determined as of the close of business on the last day of each calendar quarter and the day prior to each other date that the Fund accepts capital contributions or that a withdrawal or distribution is made ("Valuation Dates"). All amounts are stated in United States Dollars, with assets and liabilities denominated in currencies other than United States Dollars on a valuation Date converted to United States Dollars at published exchange rates in effect on that Valuation Date. The net asset value of the Fund is determined as of each Valuation Date by:

(a) Adding (i) the aggregate value of the investments of the Fund (determined as described below in "Fund Asset valuation"), (ii) the unvested cash balances of the Fund (as adjusted), (iii) such assets as would generally be considered pre-payments of expenses to be amortized over future periods, and (iv) such other assets of the Fund as should be considered assets in accordance with generally accepted accounting principles applied in a consistent manner (provided that the value of the name and goodwill of the Fund are not included in calculating the net asset value of the Fund); and

(b) Deducting from that total sum any liabilities as determined in accordance with generally accepted accounting principles applied in a consistent manner.

The net amount remaining is deemed to be the net asset value of the Fund on that Valuation Date. The net profit or net loss of any period is the difference between the net asset value of the Fund at the beginning of the period and the net asset value of the Fund at the close of the same period, such net asset value in each case determined before giving effect to capital contributions and withdrawals. Any increase in net asset value over the period (other than as a result of capital contributions) is then treated as a net profit and any decrease in net asset value (other than as a result of distributions or withdrawals) is treated as a net loss. Capital contributions, distributions and withdrawals are then made, with the net resulting amount constituting the opening net asset value of the Fund for the subsequent fiscal period.

**FUND ASSET VALUATION** - The Fund's assets are valued in the following manner:

(1) Securities for which market quotations are available are valued at their closing sale price on the Valuation Date (or, if on such date securities markets were closed, then the last

23

preceding business day on which they were open) on the composite tape or the primary exchange on which the security is traded;

(2) Securities traded in the over-the-counter market for which no sales quotations are generally available shall be valued at the closing bid price if held long and the closing ask price if sold short on the Valuation Date (or last preceding business day if securities markets were closed);

(3) Securities generally traded in an established securities market but for which there is no recorded sales information or quotations of bid and asked prices on the Valuation Date (or, if applicable, the last preceding business day) shall be valued by the General Partner in good faith with reference to (i) the most recently reported sales or bid and ask prices, (ii) bid and ask price information as of the Valuation Date not generally reported but secured from a reputable and independent broker, investment banker or other expert, and (iii) such other information as the General Partner believes in good faith is relevant;

(4) Puts, calls, futures and other contracts and derivative securities shall be valued in a manner comparable to the method for valuing other securities, except that listed options are valued at the closing bid price if held long and the closing ask price if sold short; and

(5) Securities not listed or traded on any exchange or in the over-the-counter market are considered as having no ascertainable market value and shall be valued at fair value based on information available to the General Partner regarding the value or worthlessness of such securities.

For valuation purposes, sales and bid and asked prices reported in newspapers of general circulation published in New York City, or in standard financial periodicals or in the records of securities exchanges or other markets, any one or more of which may be selected by the General Partner, are accepted as evidence of the price of a security. An investment purchased, and awaiting payment against delivery is included for valuation purposes as an asset held, and the cash account shall be adjusted by the deduction of the purchase price, including broker's commissions or other expenses of the purchase. An investment sold but not delivered pending receipt of proceeds is valued at the net sales price. For the purpose of valuation of an investment, except an investment sold but not delivered, no deduction is made from the value determined above for broker's commissions or other expenses that would be incurred upon a sale thereof.

CAPITAL ACCOUNTS - An individual capital account is maintained for each limited partner to which is added (a) the limited partner's initial capital contribution, (b) any additional capital contribution by the limited partner, and (c) any net profits allocable to the limited partner, and from which is deducted (w) any distribution made to the limited partner (whether or not at his request), (x) any net loss allocable to the limited partner, (y) any management fee then payable from the limited partner's capital account, and (z) any Performance Profit Allocation from the limited partner's capital account that is to be allocated to the General Partner and its assignees. *See also* "Management Fees and Allocation of Net Profits and Losses – Determination and Allocation of Profit and Loss Generally" and "Performance Profit Allocations" above.

OTHER GENERAL PARTNER AND MANAGEMENT ACTIVITIES - The Partnership Agreement recognizes that the General Partner, the Investment Manager and their affiliates and associates invest for their own account, may be associated with other investment entities, engage in investment management for others and engage in other business enterprises. The General Partner and such other persons are not limited or restricted from engaging in or devoting time and

24

attention to the management of any other business, whether of a similar or dissimilar nature, taking advantage of investment and business opportunities without offering the Fund an opportunity to participate, or rendering Services of any kind to any other corporation, partner, firm, individual or association. In no event may the General Partner or any of such other persons be required to account to the Fund or a limited partner for the profits generated by any such business, opportunity or service or through their own investments. The General Partner, such other persons and clients hold positions in securities from time to time both that the Fund owns and that it does not own.

**ADMISSION OF PARTNERS AND ADDITIONAL CAPITAL CONTRIBUTIONS** - The General Partner may admit additional limited partners to the Fund, or accept additional capital contributions from existing limited partners, on any date or dates selected by the General Partner. A person or entity may be added as an additional general partner with the approval of the existing General Partner and without requiring the consent of any limited partner. Capital contributions must be made in cash or, as permitted by the General Partner, readily marketable securities.

**LIABILITY OF PARTNERS AND INDEMNIFICATION OF THE GENERAL PARTNER AND OTHERS** - The General Partner is liable to creditors for the debts of the Fund. The General Partner will not be liable for honest mistakes in judgment or for losses due to such mistakes or for the negligence of employees, brokers or other agents of the Fund. The General Partner and its affiliates and associates will also not be liable to the Fund or any limited partner and will not be required to account for any profits or benefits generated from outside business activities, transactions with the Fund or the allocation of Fund brokerage business other than for the exclusive benefit of the Fund. *See* in particular section 3.1 of the Partnership Agreement attached as appendix A

The Fund will, to the fullest extent legally permissible under the laws of the State of Florida or Massachusetts, as defined in this agreement, indemnify the General Partner, the Investment Manager, any persons designated to wind up the affairs of the Fund pursuant to the Partnership Agreement and any of the Fund's sponsors and their affiliates against any loss, liability or expense reasonably incurred or suffered in connection with the performance by the General Partner or other persons of their responsibilities to the Fund. The Fund is also obligated to advance, subject to reimbursement under certain circumstances, the expenses of any such person incurred in connection with defending an action with respect to which they may be entitled to indemnification.

A limited partner will not be personally liable for any debt or obligation of the Fund. However, limited partners might be required to repay with interest Fund cash or in kind distributions (including distributions on partial or complete redemption of limited partnership interests and distributions deemed a return of capital) received by them to the extent of overpayments, if the Fund is insolvent at the time of the payments or if such distributions render the Fund insolvent.

**EXPENSES** - The General Partner is authorized to incur all operating expenses on behalf of the Fund, which expenses we borne by the Fund. The General Partner and Investment Manager generally bear their own overhead and administrative expenses incurred by them in managing the Fund, although those and other expenses may be paid pursuant to soft dollar arrangements as determined in the discretion of the General Partner or Investment Manager. *See* "Management Fees and Allocation of Net Profits and Losses – Management Fee" and "Brokerage and Custody". Expenses of operating the business borne by the Fund include but are not limited to fees of attorney, accountants, brokers, transfer agents, custodians, registrars and disbursing agents; other costs of effecting portfolio investments and portfolio transactions; taxes; insurance premiums; and interest. The Fund will reimburse Dr. Howard for an aggregate of $7,500.00 of Fund and General Partner organizational and offering expenses advanced by him once the Fund has received

25

$100,000.00 of capital contributions, which expenses will be capitalized and amortized over five years. The Fund will also bear the ongoing expenses of its offering of limited partnership interests.

**AMENDMENT OF THE PARTNERSHIP AGREEMENT** - The Partnership Agreement may be amended by the General Partner acting alone in any manner that does not adversely affect any limited partner and under certain other circumstances. The Partnership Agreement may also be amended by action of the General Partner and limited partners owning a majority in interest in the capital accounts of all the limited partners as to other designated matters. *See* Article 13 of the Partnership Agreement attached as Appendix A.

**DISSOLUTION OF THE FUND** - The Partnership Agreement provides that the Fund may be dissolved at any time by the General Partner without requiring the approval of any limited partner, whereupon its affairs shall be wound up by the General Partner.

The dissolution, death, retirement, bankruptcy, permanent disability or another event of withdrawal of the sole remaining General Partner would dissolve the Fund, and the business of the Fund would thereupon terminate and be wound up unless the limited partner's act unanimously to continue business of the Fund and appoint a new General Partner. If the Fund is dissolved, the General Partner, its designee or another person or entity designated by a majority in interest of the limited partners could take all steps necessary or appropriate to wind up the affairs of the Fund.

Neither the admission of partners nor the withdrawal, retirement, bankruptcy, death or insanity of any limited partner will dissolve the Fund.

**ASSIGNABILITY OF LIMITED PARTNERSHIP INTEREST** - Neither the interest of any limited partner in the Fund nor any beneficial interest therein is assignable, in whole or in part, without the consent of the General Partner.

**POWER OF ATTORNEY** - The General Partner is authorized to sign Fund documents on behalf of each limited partner so long as no personal liability is imposed by any such document on any limited partner.

### 8.   BROKERAGE AND CUSTODY

The Fund pays brokerage commissions and fees to registered securities broker-dealers for executing and clearing transactions on behalf of the Fund on an agency and net basis. The General Partner and Investment Manager have complete discretion regarding the selection of such securities broker-dealers and the amount of brokerage commissions and fees paid to them, many or all of whom may refer prospective limited partners for investment in the Fund. *See* "Plan of Distribution" below. The General Partner or such other persons may also establish or acquire an interest in a securities brokerage firm in the future and execute Fund securities transactions through that firm.

Brokerage fees paid by the Fund vary and may be greater than those typical for investment funds similar to the Fund if the General Partner has determined that the research, execution and other services, including limited partner referrals and services rendered or items paid for pursuant to soft dollar arrangements (see below) of a particular broker merit greater than typical fees. Fund portfolio transactions may or may not also be made on an aggregate basis in conjunction with transactions on behalf of the General Partner, the Investment Manager, their affiliates or associates and other accounts managed by them. In those cases, the Fund may bear a *pro rata* share of brokerage commission expense similar to the commission expense that the Fund would have incurred if it had traded independently.

26

CAMB-2_000643

The Fund may also invest capital in private debt transactions whereby the borrower pays the General Partner or an associated company of the General Partner a "broker fee".

The Fund may also enter into so-called "soft dollar" arrangements with securities broker-dealer firms from time to time. Under these arrangements, the securities broker-dealer firms would provide or pay the costs of certain services, equipment or other items for the benefit of the Fund, the General Partner, the Investment Manager or one or more of their affiliates, in consideration of the allocation to the firm of Fund portfolio transactions (with resulting commission income or profit) made on behalf of the Fund on both an agency and net basis. The services, equipment and other items provided or for which payment is otherwise made using such soft dollar arrangements may include, without limitation, prime brokerage services, research services and products, proxy voting services, computers and other office equipment and services, investment research consulting fees, fees and charges for news wire, local and long distance telephone (land line, cellular and other), data processing, internet service provider, data access line and other service; Fund, General Partner and Investment Manager attorneys and accountants fees and expenses, Fund offering and marketing expenses (including without limitation fees and expenses of placement agents, finders, attorneys and accountants, filing fees, printing and mailing costs, and related travel and entertainment expenses), client and investor referrals, travel expenses related to Fund and other client investment research, office rent and utilities, quotation services, periodical subscription fees, and custody, record keeping and similar charges. The General Partner or Investment Manager may, in their discretion, arrange for the payment of the Management Fees through soft dollar arrangements with securities broker-dealer firms, which soft dollar payments would not reduce the amount of the Management Fees payable to the General Partner or Investment manager. In no event will the General Partner or Investment Manager be obligated to pay or cause to be paid pursuant to soft dollar arrangements any part of the Management Fees or other Fund expenses prior to causing all expenses otherwise to be borne by the General Partner or Investment Manager to be so paid. Any of these soft dollar arrangements may benefit the Fund by reducing its expenses or benefit the General Partner, the Investment Manager or one or more of their affiliates without any direct benefit to the Fund. The General Partner believes, however, that allocations of Fund portfolio transaction business and soft dollar arrangements would generally enhance the Fund's ability to obtain research and optimal execution, as well as other benefits to the Fund.

Custody of the Fund's investments will be maintained at one or more financial institutions or brokerage firms selected by the General Partner for publicly traded assets. Private debt assets will be maintained at the offices of the General Partner.

The Fund and General Partner will obtain verification by an independent representative prior to any payment or disbursement from the Fund to the General Partner, the Investment Manager or their affiliates intending to assure that the General Partner and Investment Manager will not be deemed to have custody of Fund assets for purposes of the federal Investment Advisers Act of 1940. However, such arrangements do not assure that Fund assets will be secure against any fraudulent activities of General Partner or Investment Manager personnel.

## 9. REPORTS TO PARTNERS

The partners will be advised as of the end of each fiscal quarter as to the operation of the Fund. The books and records of the Fund will be audited as of the end of each fiscal year by a firm of independent certified public accountants selected by the General Partner, and the partners will be furnished with audited year-end financial statements, including a statement of profit or loss for such fiscal year. In addition, limited partners will receive a report reflecting the status of the charges in their capital account.

CAMB-2_000644

## 10. PLAN OF DISTRIBUTION

Interests are being offered and sold on behalf of the Fund by the General Partner.  No person is currently entitled to any compensation from the Fund in connection with the offering and selling interests.  However, the General Partner may direct or allocate Fund brokerage business to brokers who refer prospective investors to the Fund or otherwise assist the Fund in raising capital.  *See* "Brokerage and Custody" above.  The General Partner may also determine in the future to pay cash referral fees or to allow participation in Management Fees or Performance Profit Allocations for limited partner referrals, subject to compliance with applicable laws, regulations and disclosure of such compensation arrangements to the particular prospective limited partners.

The Fund intends to reimburse Dr. Howard for approximately $10,000.00 of Fund and General Partner organizational and offering expenses advanced by him once the Fund receives $1,000,000 of capital contributions, which expenses have been capitalized and are being amortized over five years. The Fund will also bear the ongoing expenses of its offering of limited partnership interests.

## 11. FEDERAL INCOME TAXATION

Except as described below, none of this Memorandum, the Fund the General Partner or counsel to the Fund makes or has made any representations to any potential purchaser of the partnership interests as to the federal or state income tax consequences of participating in the Fund or the operation of the Fund itself.  The Fund has not requested, and accordingly will not receive, an opinion of counsel regarding any tax matter, nor has any Service ruling been sought with respect to any tax matter. *Federal and state tax laws are subject to constant change and the Fund cannot project how such changes would affect this investment.*

The Fund also anticipates, based upon the Code and Regulations thereunder as currently in effect, that the Fund is more likely than not to be characterized for federal income tax purposes as a partnership rather than an association taxable as a corporation.  No opinion of counsel has been obtained and tax ruling will be sought from the Service as to the status of the Fund as a partnership.  However, this position of the Fund may be challenged and, while the Fund would expect to prevail in any such dispute, there can be no certainty of that result.

Based on its assumption that the Fund is properly characterized as a partnership for federal income tax purposes, the Fed will file annually a partnership income tax information return, but will not be subject, as an entity, to federal income taxes. Each partner will be required to report on their own personal Federal income tax return his distributive share of the Fund's income, gains, losses, deductions and credits for the taxable year, whether or not actual distributions of cash or other property are made to him.  Each partner's distributive share of such items is determined pursuant to the Partnership Agreement or otherwise in accordance with the partner's respective interests in the Fund, although the General Partner has the authority in its discretion to make disproportionate allocations as it determines appropriate in the event of a withdrawal during a period when the Fund has substantial unrealized gains or losses.

Potential investors should also be aware that the Fund is not a so-called "tax shelter" investment intended to generate net losses that could be used to offset income from other sources.  Further, it is likely the Service will take the position, based on applicable Regulations, that the Fund will generate income against which losses from "passive investments" may not be offset, even though the Fund anticipates that it will operate such that its net income will not be considered "portfolio" income under the Regulations.  In some instances, losses generated by the Fund may not be fully deductible to non-corporate partners. See "Certain Risks – Tax Risks".  No assurances can be given in this regard, and investors are expected to seek and rely upon the advice of their own tax

28

advisors as to the characterization to investors of any net income derived from the Fund's activities and as to any limitations on the deductibility of certain fund expenses.

The Fund will provide annually to each partner a report of its operations and his share of the Fund's taxable income for use in the preparation of such partner's personal income tax return. The filing of such personal returns will be the responsibility of each partner. The Fund is not required to supply, and does not anticipate supplying, tax or accounting information to assignees of limited partners who do not become substituted limited partners.

Any tax-exempt entities that invest in the Fund should also consider that the Fund will likely generate "unrelated business taxable income". As a result, such entities may become subject to taxation of such income.

Partners should be aware that at any particular point in time the tax consequences of an investment in the Fund may vary significantly, and even inversely, from the performance of the Fund as reflected in a Partner's capital account. For example, while the overall performance of the Fund may reflect losses, sales may be primarily of securities, which have appreciated, therefore generating tax liabilities. In addition, dividends and interest can accrue and be taxable to partners in periods when the net asset value of the Fund is falling (though such income will in part be offset by Fund operating expenses). Partners may also have tax liability during a period when they are not permitted to make withdrawals from their Fund accosts.

*It will be the responsibility of each prospective limited partner to satisfy himself as to, among other things, the consequences of any federal taxes, including income and estate taxes, to which they are or they or their estate mink be subject due to his participation in the fund by obtaining advice from his own tax counsel or advisor. The General Partner will give each prospective limited partner and his counsel or advisor, upon request full access to all materials available to the General Partner relating to the projected operations of the Fund.*

### 12. OTHER TAXES

A limited partner's participation in the Fund will probably also affect his income tax liability in the jurisdiction in which he is a resident.

### 13. FISCAL YEARS AND INTERIM PERIODS

The Fund has adopted a fiscal year ending on December 31. Since limited partners may be admitted or required to retire, and additional capital contributions may be made, during the course of a fiscal year, the Partnership Agreement provides for interior fiscal periods that are portions of a fiscal year for the purpose of allocating net profits and net losses due to changes occurring in capital accounts at such times.

### 14. PROCEDURE FOR BECOMING A LIMITED PARTNER

In order to become a limited partner, a prospective investor should follow the instructions set forth in the Subscription Package delivered with or subsequent to delivery of this Memorandum.

### 15. AVAILABLE MATERIALS

In addition to the other materials referred to in this memorandum, prospective investors are invited to review prior to investing copies of the following materials at the administrative offices of the General Partner and Investment Manager located at 2120 Killarney Way, Suite 125, Tallahassee, FL 32309 Attention: Dr. Tim Howard (850) 298-4455 or at some other mutually convenient location, at any reasonable hour after reasonable prior notice:

29

CAMB-2_000646

1. The Fund's Certificate of Limited Partnership, as filed with the Secretary of state of Massachusetts.

2. The Investment Management Agreement among the Fund, the General Partner and the Investment Manager.

3. The instructions to the Fund's brokers with respect to disbursement of Fund cash and assets.

4. The Fund's audited financial statements.

5. The Investment Managers ADV filing with the SEC

CAMB-2_000647

# Exhibit 6



March 29, 2018

Honorable Judge Brody
United State District Court
Eastern District of Pennsylvania

Christopher A. Seeger
Seeger Weiss, LLP
55 Challenger Road
Ridgefield Park, NJ 07660

Re:     In re NFL Players' Concussion Injury Litigation, No. 12-md-2323-AB
        Cambridge Entities' Productions in response to District Court's February 20, 2018 Order

Dear Judge Brody and Mr. Seeger:

I have not agreed to have Mr. Martin Black withdraw as counsel for the Cambridge entities.  As I am not
sure what Mr. Martin Black will do concerning representation, I want to make sure I am doing all I can to
comply with the Court's Order.  I am writing to confirm that I am able to appear via telephone at the 10
am hearing on April 2, 2018.  I am also writing to provide foundational information pertaining to the issues
raised.  Most important, all class members assets are invested and being accounted for. These assets are
not liquid, and the fund is taking steps to protect the asset value, while pursuing responsible liquidation
of the assets for class members.  This will take some time.  To expedite liquidation would harm the class
members investments.

Next, as background, the fund was created in 2015 out of a university project to apply faculty skills through
a Global Investment Advisory Team (GIAT) made of faculty and staff, including Dr. Tim Howard.  A
consultant was hired, Mr. Don Reinhard, which was seeking an opportunity to apply his skills and
experience, rehabilitation, and to teach a course or two.  He put together the documents and paperwork
for the establishment and operations of the fund.  He was to temporarily guide compliance and day-to-
day management until a licensed manager was hired. The members of the GIAT were engaged full-time
in their teaching, jobs, other careers, and did not have the capacity to manage compliance or day-to-day
activities.  Retired NFL Player investments and advances were neither contemplated nor sought. Based on
the model of the fund, ethics conflicts were researched and applied. Updated ethics research and
communications with the Florida Bar required that Dr. Tim Howard not have any ownership,
management, interest or control, and he has complied with the same.

**3522 Thomasville Road, Suite 505, Tallahassee, FL 32309**
**850-591-4010   Fax 850-386-6399**
**info@cambridgecapitalgroup.holdings**

CAMB-2_000749



In late 2015 and through most of 2016, the fund sought and interviewed licensed candidates and brokers. While this was going on, this same consultant began communication with retired NFL players that were represented and receiving preliminary claim reviews on another side of the same building. Some of these players were seeking advances, and ultimately the fund, which found a robust market in advances and the potential for good returns, issued a limited number of advances as one investment class. Upon review, and discussions with class members, the consultant did not explain the nature of the fund, that assets maybe illiquid, and didn't cover fund specifics with class members. Over time, as a way to build commissions and fees that he took without approval from the fund, the consultant issued advances to more retired NFL players. The volume of advances was not known until the consultant was dismissed from the fund.

In late 2016, I was interviewed for the licensed position to assist in financial planning services and to oversee administration for Cambridge Capital. In 2017, I accepted the position. I immediately requested an audit. I cannot provide financial information to investors until I have official notification from the auditor that all investments are sound and accounted for. That is why class members have not received quarterly updates as the Private Offering Memorandum contemplates.

The consultant was resistant to my oversight. Within weeks, the consultant was dismissed from his position, and I assumed temporary responsibility for the Cambridge entities. The consultant took much of the documentation needed for the audit. In addition, what information was available, was manual. We have had to automate accounting processes, and this is still being done, including accurate internal lending documents, errors on quick books and ledger designations. This required a forensic audit, which has taken much longer to complete. This same consultant is now in prison for child abuse and violation of probation for theft. The consultant has been trying to sabotage the fund, has threatened the auditor (who informed the state attorney), threatened office members and staff, and threatened extort and harm Dr. Tim Howard and his family from any source possible for the past year.

Among the findings to date, the consultant was found to have forged numerous documents pertaining to class members, impersonated Dr. Tim Howard by opening bank accounts without his knowledge or approval, created unsustainable advance obligations, and has taken fund profits without authorization. This has been reported to the State Attorney and the Florida Bar, and the SEC has received copies of the same. This same imprisoned consultant has been an information source for class members, who are communicating with Mr. Seeger. This same imprisoned consultant continues to communicate with retired NFL players, attempting to run an investment fund from jail, and received a cease and desist notice nearly a year ago.

Mr. Addys Walker was assigned to temporarily lead the fund due to his private investigative experience, claimed entrepreneurial skills, and experience in raising capital. However, he lacked experience in finance and management, did not manage the fund effectively, and has since resigned. Counsel for the fund,

**3522 Thomasville Road, Suite 505, Tallahassee, FL 32309**
**850-591-4010     Fax 850-386-6399**
**info@cambridgecapitalgroup.holdings**



Martin Black, explained Mr. Walker's misunderstanding of the IRA and that the IRA was not security for class member advances, and in written response to an inquiry, informed Mr. Seeger of the same.

The fund is in the audit process for 2015 and 2016. I will provide audit findings upon completion. As stated, I am able to appear at the 10 am hearing via telephone. I will provide the same information found in this letter, and the attached letters sent to Mr. Seeger, for your honor and any further details as I am able.

Your Honor's consideration in appreciating my efforts to comply with the Court's Order, and providing time to complete the forensic audit and orderly management of the fund to protect class member's interest is deeply appreciated.

Sincerely,

Gail Milon
Managing Vice President

3522 Thomasville Road, Suite 505, Tallahassee, FL 32309
850-591-4010    Fax 850-386-6399
info@cambridgecapitalgroup.holdings

CAMB-2_000751

# Exhibit 7

L15000203070

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP   ☐ WAIT   ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____   Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



000296095670

03/09/17--01004--001   **240.00

RECEIVED
DEPARTMENT OF STATE
17 MAR -8 AM 8: 15

2017 MAR -8 AM 11: 53
SECRETARY OF STATE

M. MILLIGAN
MAR - 9 2017

# COVER LETTER

TO:     **Registration Section**
        **Division of Corporations**

SUBJECT: <u>Cambridge Capital Group LLC</u>
                Name of Limited Liability Company

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

<u>Gail Milon</u>
               Name of Person

<u>Cambridge Capital Wealth Advisors, LLC</u>
               Firm/Company

<u>1400 Village Square Blvd., STE 3-268</u>
               Address

<u>Tallahassee, FL 32312-1281</u>
               City/State and Zip Code

<u>GAIL@CCWEALTHADVISORS.COM</u>
               E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

<u>GAIL</u>         at (<u>850</u>) <u>270-9898</u>
  Name of Person         Area Code   Daytime Telephone Number

Enclosed is a check for the following amount:

☐ $25.00 Filing Fee    ☐ $30.00 Filing Fee &    ☐ $55.00 Filing Fee &    ☒ $60.00 Filing Fee,
               Certificate of Status      Certified Copy       Certificate of Status &
                                      (additional copy is enclosed)   Certified Copy
                                                      (additional copy is enclosed)

**MAILING ADDRESS:**
Registration Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

**STREET/COURIER ADDRESS:**
Registration Section
Division of Corporations
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

**ARTICLES OF AMENDMENT**
**TO**
**ARTICLES OF ORGANIZATION**
**OF**

CAMBRIDGE CAPITAL GROUP LLC
_____
**(Name of the Limited Liability Company as it now appears on our records.)**
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on 12|04|2015 and assigned

Florida document number L15000203070 .

This amendment is submitted to amend the following:

**A. If amending name, <u>enter the new name of the limited liability company here:</u>**

_____

<small>The new name must be distinguishable and contain the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."</small>

**Enter new principal offices address, if applicable:** 1400 Village Square Blvd.

*(Principal office address MUST BE A STREET ADDRESS)* Ste 3-268

Tallahassee, FL 32312-1231

**Enter new mailing address, if applicable:** SEE ABOVE

*(Mailing address MAY BE A POST OFFICE BOX)* _____

_____

**B. If amending the registered agent and/or registered office address on our records, <u>enter the name of the new registered agent and/or the new registered office address here:</u>**

Name of New Registered Agent: Gail Milon

New Registered Office Address: 1400 Village Square Blvd., Ste 3-268
<small>Enter Florida street address</small>

Tallahassee , Florida 32312
<small>City</small>                          <small>Zip Code</small>

<u>New Registered Agent's Signature, if changing Registered Agent:</u>

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

_Gail Milon_
_____
If Changing Registered Agent, <u>Signature of New Registered Agent</u>

**Page 1 of 3**

If amending Authorized Person(s) authorized to manage, <u>enter the title, name, and address of each person  being added or removed from our records</u>:

MGR =   Manager
AMBR =  Authorized Member

| <u>Title</u> | <u>Name</u> | <u>Address</u> | <u>Type of Action</u> |
|---|---|---|---|
| PRES. MGR | Howard, Phillip T. | 2120 Killarney Way Tallahassee, FL 32309 | ☐ Add ☒ Remove ☐ Change |
| PRES MGR | LOIS KOONS | 1400 Village Square BLVD. STE 3-268 Tallahassee, FL 32312 | ☒ Add ☐ Remove ☐ Change |
| VP AMBR | GAIL MILON | 1400 Village Square BLVD STE. 3-268 Tallahassee, FL 32312 | ☒ Add ☐ Remove ☐ Change |
| TRE | MARK HALLIM | 1400 Village Square BLVD STE 3-268 Tallahassee, FL 32312 | ☐ Add ☐ Remove ☒ Change |
| _____ | _____ | _____ | ☐ Add ☐ Remove ☐ Change |
| _____ | _____ | _____ | ☐ Add ☐ Remove ☐ Change |

**D.. If amending any other information, enter change(s) here:** *(Attach additional sheets, if necessary.)*

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**E. Effective date, if other than the date of filing:** _____ **(optional)**
(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b)
**Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.


If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b)   The 90th day after the record is filed.

Dated _____ March 7 _____, 2017 .

_____
Signature of a member or authorized representative of a member

DR. TIM HOWARD
_____
Typed or printed name of signee

Page 3 of 3

**Filing Fee:  $25.00**

# Exhibit 8

# L15000040994

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP     ☐ WAIT     ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____     Certificates of Status _____

┌─────────────────────────────────────┐
│ Special Instructions to Filing Officer: │
│                                         │
│                                         │
│                                         │
│                                         │
│                                         │
└─────────────────────────────────────┘

Office Use Only



**800296095698**

03/09/17--01004--001   **240.00

RECEIVED
DEPARTMENT OF STATE
17 MAR -8 AM 8: 15



M. MILLIGAN
MAR - 9 2017

# COVER LETTER

**TO:**   Registration Section
Division of Corporations

**SUBJECT:** CAMBRIDGE CAPITAL ADVISORS, LLC
Name of Limited Liability Company

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

GAIL MILON
Name of Person

CAMBRIDGE CAPITOL ADVISORS, LLC
Firm/Company

1400 VILLAGE SQUARE BLVD., STE 3-268
Address

Tallahassee, FL 32312
City/State and Zip Code

GAIL @ CCWEALTHADVISORS.COM
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

GAIL MILON                     at (850) 270-9898
Name of Person                    Area Code   Daytime Telephone Number

Enclosed is a check for the following amount:

☐ $25.00 Filing Fee     ☐ $30.00 Filing Fee &      ☐ $55.00 Filing Fee &      ☒ $60.00 Filing Fee,
                          Certified Copy             Certified Copy              Certificate of Status &
                          Certificate of Status     (additional copy is enclosed)   Certified Copy
                                                                                 (additional copy is enclosed)

**MAILING ADDRESS:**                    **STREET/COURIER ADDRESS:**
Registration Section                    Registration Section
Division of Corporations                Division of Corporations
P.O. Box 6327                           Clifton Building
Tallahassee, FL 32314                   2661 Executive Center Circle
                                        Tallahassee, FL 32301

# ARTICLES OF AMENDMENT
## TO
## ARTICLES OF ORGANIZATION
## OF

CAMBRIDGE CAPITAL ADVISORS, LLC

(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on __03/05/2015__ and assigned
Florida document number __L15000040994__

This amendment is submitted to amend the following:

**A. If amending name, <u>enter the new name of the limited liability company here</u>:**

_____

The new name must be distinguishable and contain the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."

**Enter new principal offices address, if applicable:**      1400 Village Square Blvd.
*(Principal office address MUST BE A STREET ADDRESS)*      STE 3-268
                                                            Tallahassee, FL   32312

**Enter new mailing address, if applicable:**      SEE ABOVE
*(Mailing address MAY BE A POST OFFICE BOX)*      _____
                                                   _____

**B.   If amending the registered agent and/or registered office address on our records, <u>enter the name of the new registered agent and/or the new registered office address here</u>:**

Name of New Registered Agent:      GAIL MILON

New Registered Office Address:      1400 Village Square Blvd. STE 3-268
                                    *Enter Florida street address*

                                    Tallahassee , Florida   32312
                                    *City*                   *Zip Code*

<u>New Registered Agent's Signature, if changing Registered Agent</u>:

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

Gail Milon
_____
If Changing Registered Agent, <u>Signature of New Registered Agent</u>

**Page 1 of 3**

If amending Authorized Person(s) authorized to manage, <u>enter the title, name, and address of each person  being added or removed from our records</u>:

MGR =   Manager
AMBR =  Authorized Member

| <u>Title</u> | <u>Name</u> | <u>Address</u> | <u>Type of Action</u> |
|---|---|---|---|
| PRES. ~~MGR~~ | Howard, Phillip T. | 2120 Killarney Way Tallahassee, FL 32309 | ☐ Add ☒ Remove ☐ Change |
| PRES ~~MGR~~ | LOIS KOONS | 1400 Village Square BLVD. STE 3-268 Tallahassee, FL 32312 | ☒ Add ☐ Remove ☐ Change |
| VP AMBR | GAIL MILON | 1400 Village Square BLVD STE. 3-268 Tallahassee, FL 32312 | ☒ Add ☐ Remove ☐ Change |
| TREA | MARK HALLIM | 1400 Village Square BLVD STE 3-268 Tallahassee, FL 32312 | ☐ Add ☐ Remove ☒ Change |
| SEC | MEHTA, ANKUR | 2120 Killarney Way Tallahassee, FL 32309 | ☐ Add ☒ Remove ☐ Change |
| TREA | MEHTA, ANKUR | MEHTA, ANKUR 2120 Killarney Way Tallahassee, FL 32309 | ☐ Add ☒ Remove ☐ Change |

**D.** If amending any other information, enter change(s) here:  *(Attach additional sheets, if necessary.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**E.  Effective date, if other than the date of filing:** _____ **(optional)**
(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b)
<u>Note:</u>  If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.


If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b)   The 90th day after the record is filed.

Dated _____March 7_____, ____2017____.

_____
Signature of a member or authorized representative of a member

_____DR. TIM HOWARD_____
Typed or printed name of signee

**Page 3 of 3**

**Filing Fee:  $25.00**

# Exhibit 9

4/30/2018                                    Detail by Entity Name

DIVISION OF CORPORATIONS



# Detail by Entity Name

Florida Limited Liability Company
YOUR CASE, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L17000044935 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 02/24/2017 |
| **Effective Date** | 02/19/2017 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 02/22/2018 |
| **Event Effective Date** | 02/23/2018 |

**Principal Address**

1400 VILLAGE SQUARE BOULEVARD
SUITE 3-268
TALLAHASSEE, FL 32312-1231

Changed: 05/04/2017

**Mailing Address**

1400 VILLAGE SQUARE BOULEVARD
SUITE 3-268
TALLAHASSEE, FL 32312-1231

Changed: 05/04/2017

**Registered Agent Name & Address**

HOWARD, PHILLIP T
2120 KILLARNEY WAY
SUITE 120
TALLAHASSEE, FL 32309

**Authorized Person(s) Detail**

**Name & Address**

Title PRES

WALKER, ADDYS
2120 KILLARNEY WAY. SUITE 120

Detail by Entity Name

TALLAHASSEE, FL 32309

**Title VP**

ARTECONA, KURT
2120 KILLARNEY WAY, SUITE 120
TALLAHASSEE, FL 32309

**Title TRES**

BEDELL, LINDA
1400 VILLAGE SQUARE BOULEVARD
SUITE 3-268
TALLAHASSEE, FL 32312-1231

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

02/24/2017 -- Florida Limited Liability | View image in PDF format

Florida Department of State, Division of Corporations

# Exhibit 10

# CAMBRIDGE CAPITAL GROUP, LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 4/10/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0169222017-1 |
| Qualifying State: | NV | List of Officers Due: | 4/30/2019 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20171229874 | Business License Exp: | 4/30/2019 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CORPORATION SERVICE COMPANY | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | DELAWARE | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## ☐ Officers                                    ☑ Include Inactive Officers

### Manager - LOIS KOONS

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY, SUITE B #245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

### Manager - GAIL MILON

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY, SUITE B #245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

| Manager - GAIL MILON | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY, SUITE B #245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

## ▬ Actions\Amendments

| Action Type: | Articles of Organization | | |
|---|---|---|---|
| Document Number: | 20170154472-23 | # of Pages: | 2 |
| File Date: | 4/10/2017 | Effective Date: | |
| (No notes for this action) | | | |
| Action Type: | Initial List | | |
| Document Number: | 20170217374-74 | # of Pages: | 1 |
| File Date: | 5/18/2017 | Effective Date: | |
| (No notes for this action) | | | |
| Action Type: | Annual List | | |
| Document Number: | 20180194376-11 | # of Pages: | 1 |
| File Date: | 4/30/2018 | Effective Date: | |
| (No notes for this action) | | | |

# Exhibit 11

# CAMBRIDGE CAPITAL WEALTH ADVISORS, LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 5/2/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0210952017-0 |
| Qualifying State: | NV | List of Officers Due: | 5/31/2018 |
| Managed By: | Managers | Expiration Date: | |
| NV Business ID: | NV20171284161 | Business License Exp: | 5/31/2018 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## ➖ Officers                                    ☑ Include Inactive Officers

**Manager - GAIL MILON**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B, #248 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

## ➖ Actions\Amendments

| | | | |
|---|---|---|---|
| Action Type: | Articles of Organization | | |
| Document Number: | 20170193907-09 | # of Pages: | 2 |

| File Date: | 5/2/2017 | Effective Date: | |
|---|---|---|---|
| (No notes for this action) | | | |
| Action Type: | Initial List | | |
| Document Number: | 20170193908-10 | # of Pages: | 1 |
| File Date: | 5/2/2017 | Effective Date: | |
| (No notes for this action) | | | |

# Exhibit 12

# CAMBRIDGE CAPITAL GROUP ADVISORS, LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 6/28/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0308052017-9 |
| Qualifying State: | NV | List of Officers Due: | 6/30/2018 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20171411751 | Business License Exp: | 6/30/2018 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## ─ Officers                                               ☑ Include Inactive Officers

### Managing Member - JEFF KAHN

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

### Managing Member - LOIS A KOONS

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

**Managing Member - LOIS A KOONS**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - GAIL MILON**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - ADDYS WALKER**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY SUITE B | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Historical | Email: | |

## ☐ Actions\Amendments

| | | | |
|---|---|---|---|
| Action Type: | Articles of Organization | | |
| Document Number: | 20170278008-25 | # of Pages: | 1 |
| File Date: | 6/28/2017 | Effective Date: | |
| (No notes for this action) | | | |
| Action Type: | Initial List | | |
| Document Number: | 20170278009-36 | # of Pages: | 1 |
| File Date: | 6/28/2017 | Effective Date: | |
| (No notes for this action) | | | |
| Action Type: | Amended List | | |
| Document Number: | 20180080990-47 | # of Pages: | 1 |
| File Date: | 2/22/2018 | Effective Date: | |
| (No notes for this action) | | | |

# Exhibit 13

# A&T DEVELOPMENT, LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 10/19/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0495752017-9 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2018 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20171676496 | Business License Exp: | 10/31/2018 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## ▬ Officers                                          ☑ Include Inactive Officers

### Managing Member - CAMBRIDGE DEVELOPMENT PARTNERS LLC

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

### Managing Member - TIM HOWARD

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - TTSM, INC**

| | | | |
|---|---|---|---|
| **Address 1:** | 59 DAVONTE RANCH PARKWAY SUITE B-245 | **Address 2:** | |
| **City:** | RENO | **State:** | NV |
| **Zip Code:** | 89521 | **Country:** | |
| **Status:** | Active | **Email:** | |

**Managing Member - ADDYS WALKER**

| | | | |
|---|---|---|---|
| **Address 1:** | 59 DAVONTE RANCH PARKWAY SUITE B-245 | **Address 2:** | |
| **City:** | RENO | **State:** | NV |
| **Zip Code:** | 89521 | **Country:** | |
| **Status:** | Historical | **Email:** | |

**Managing Member - ADDYS WALKER**

| | | | |
|---|---|---|---|
| **Address 1:** | 59 DAVONTE RANCH PARKWAY SUITE B-245 | **Address 2:** | |
| **City:** | RENO | **State:** | NV |
| **Zip Code:** | 89521 | **Country:** | |
| **Status:** | Active | **Email:** | |

## − | Actions\Amendments

| | | | |
|---|---|---|---|
| **Action Type:** | Articles of Organization | | |
| **Document Number:** | 20170443072-10 | **# of Pages:** | 1 |
| **File Date:** | 10/19/2017 | **Effective Date:** | |
| (No notes for this action) | | | |
| **Action Type:** | Initial List | | |
| **Document Number:** | 20170443073-21 | **# of Pages:** | 1 |
| **File Date:** | 10/19/2017 | **Effective Date:** | |
| (No notes for this action) | | | |
| **Action Type:** | Amended List | | |
| **Document Number:** | 20170531330-15 | **# of Pages:** | 1 |
| **File Date:** | 12/18/2017 | **Effective Date:** | |
| (No notes for this action) | | | |

# Exhibit 14

# CHRONICLES, LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Active | File Date: | 10/25/2017 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0503122017-5 |
| Qualifying State: | NV | List of Officers Due: | 10/31/2018 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20171688684 | Business License Exp: | 10/31/2018 |

## Additional Information

| | |
|---|---|
| Central Index Key: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | CSC SERVICES OF NEVADA, INC. | Address 1: | 2215-B RENAISSANCE DR |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89119 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

**No stock records found for this company**

## ▬ Officers                                    ☑ Include Inactive Officers

### Managing Member - TIM HOWARD

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

### Managing Member - TOM PARNELL

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

**Managing Member - MARK K SAVAGE**

| | | | |
|---|---|---|---|
| Address 1: | 59 DAVONTE RANCH PARKWAY SUITE B-245 | Address 2: | |
| City: | RENO | State: | NV |
| Zip Code: | 89521 | Country: | |
| Status: | Active | Email: | |

## ─ Actions\Amendments

| | | | |
|---|---|---|---|
| Action Type: | Articles of Organization | | |
| Document Number: | 20170450829-18 | # of Pages: | 1 |
| File Date: | 10/25/2017 | Effective Date: | |
| (No notes for this action) | | | |
| Action Type: | Initial List | | |
| Document Number: | 20170450830-40 | # of Pages: | 1 |
| File Date: | 10/25/2017 | Effective Date: | |
| (No notes for this action) | | | |
| Action Type: | Correction | | |
| Document Number: | 20170486016-35 | # of Pages: | 1 |
| File Date: | 11/14/2017 | Effective Date: | |
| (No notes for this action) | | | |

# Exhibit 15



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts

# Corporations Division

## Business Entity Summary

| Request certificate | | New search |

**Summary for: CAMBRIDGE CAPITAL PARTNERS LIMITED PARTNERSHIP**

| | |
|---|---|
| **The exact name of the Domestic Limited Partnership (LP):** CAMBRIDGE CAPITAL PARTNERS LIMITED PARTNERSHIP | |
| **Entity type:** Domestic Limited Partnership (LP) | |
| **Identification Number: 001163086** | |
| **Date of Organization in Massachusetts:** 12-27-2015 | |
| **Date of Cancellation:** 05-25-2017 | **Last date certain: 03-03-2065** |

**The location or address where the records are maintained (A PO box is not a valid location or address):**

Address:

City or town, State, Zip code,
Country:

**The name and address of the Resident Agent:**

Name:    PHILLIP T HOWARD

Address: 8 MUSEUM WAY SUITE 2407

City or town, State, Zip code,    CAMBRIDGE,   MA   02141   USA
Country:

**The name and business address of each General Partner:**

| Title | Individual name | Address |
|---|---|---|
| GENERAL PARTNER | CAMBRIDGE CAPITAL ADVISORS LLC | 2120 KILLARNEY WAY TALLAHASSEE, FL 32309 US |
| GENERAL PARTNER | PHILLIP TIMOTHY HOWARD HOWARD | 2120 KILLARNEY WAY TALLAHASSEE, FL 32309 USA |

| | **Confidential** | | |
|---|---|---|---|
| **Consent** | **Data** | ⌐ ⌐**Merger Allowed** ⌐ ⌐**Manufacturing** | |

**View filings for this business entity:**

ALL FILINGS
Amendments to Limited Partnership Certificate
Annual Report
Article  of Entity Conver ion
Certificate of Cancellation

5/4/2018                                    Mass. Corporations, external master page

**View filings**

**Comments or notes associated with this business entity:**

**New search**

# Exhibit 16

5/4/2018                           Mass Corporations, external master page



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts

# Corporations Division

## Business Entity Summary

**ID Number: 001199382**           [ Request certificate ]   [ New search ]

Summary for:  **CAMBRIDGE CAPITAL GROUP EQUITY OPTION OPPORTUNITIES LIMITED PARTNERSHIP**

| |
|---|
| **The exact name of the Domestic Limited Partnership (LP):**   CAMBRIDGE CAPITAL GROUP EQUITY OPTION OPPORTUNITIES LIMITED PARTNERSHIP |
| **Entity type:**   Domestic Limited Partnership (LP) |
| **Identification Number:** 001199382 |
| **Date of Organization in Massachusetts:** 12-16-2015 |
| **Date of Cancellation:**   12-07-2017          **Last date certain:** 12-31-2065 |
| **The location or address where the records are maintained** (A PO box is not a valid location or address): |
| Address: |
| City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** |
| Name:    PHILLIP T HOWARD |
| Address:  ONE BROADWAY 14TH FLOOR |
| City or town, State, Zip code,       BOSTON,  MA  02142  USA Country: |

**The name and business address of each General Partner:**

| Title | Individual name | Address |
|---|---|---|
| GENERAL PARTNER | PHILIP TIM HOWARD | CAMBRIDGE CAPITAL ADVISORS LLC TALLAHASSEE, FL 32309 USA |

|            | **Confidential** | | |
|---|---|---|---|
| **Consent** | **Data** | **Merger Allowed** | **Manufacturing** |

**View filings for this business entity:**

| |
|---|
| ALL FILINGS |
| Amendments to Limited Partnership Certificate |
| Annual Report |
| Articles of Entity Conversion |
| Certificate of Cancellation |

Mass. Corporations, external master page

**View filings**

**Comments or notes associated with this business entity:**

**New search**

# Exhibit 17

5/4/2018                         Mass. Corporations, external master page



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts

# Corporations Division

## Business Entity Summary

| Request certificate | | New search |

Summary for: **CAMBRIDGE CAPITAL GROUP ENHANCED LARGE CAP EQUITY VALUE LIMITED PARTNERSHIP**

| |
|---|
| **The exact name of the Domestic Limited Partnership (LP):**   CAMBRIDGE CAPITAL GROUP ENHANCED LARGE CAP EQUITY VALUE LIMITED PARTNERSHIP |
| **Entity type:**   Domestic Limited Partnership (LP) |
| **Identification Number:** 001199391 |
| **Date of Organization in Massachusetts:** 12-03-2015 |
| **Last date certain:** 12-31-2065 |
| **The location or address where the records are maintained** (A PO box is not a valid location or address): |
| Address: |
| City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** |
| Name:   PHILLIP T HOWARD |
| Address:  ONE BROADWAY 14TH FLOOR |
| City or town, State, Zip code, Country:       BOSTON,  MA  32309  USA |
| **The name and business address of each General Partner:** |

| Title | Individual name | Address |
|---|---|---|
| GENERAL PARTNER | CAMBRIDGE CAPITAL ADVISORS LLC | 2120 KILLARNEY WAY, SUITE 125 TALLAHASSEE, FL 32309 USA |

|   |   Confidential |   |   |
|---|---|---|---|
| Consent | Data | Merger Allowed | Manufacturing |

| **View filings for this business entity:** |
|---|
| ALL FILINGS |
| Amendments to Limited Partnership Certificate |
| Annual Report |
| Articles of Entity Conversion |
| Certificate of Cancellation |

5/4/2018                                          Mass. Corporations, external master page

**View filings**

**Comments or notes associated with this business entity:**

**New search**

# Exhibit 18

5/4/2018                                    Mass. Corporations, external master page



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts

# Corporations Division

## Business Entity Summary

| Request certificate | | New search |
|---|---|---|

Summary for: **CAMBRIDGE CAPITAL GROUP ACTIVE MANAGED S&P 500 LIMITED PARTNERSHIP**

---

**The exact name of the Domestic Limited Partnership (LP):**  CAMBRIDGE CAPITAL GROUP ACTIVE MANAGED S&P 500 LIMITED PARTNERSHIP

**Entity type:**  Domestic Limited Partnership (LP)

**Identification Number:** 001199394

**Date of Organization in Massachusetts:**
12-03-2015

|  | **Last date certain:** 12-31-2065 |
|---|---|

**The location or address where the records are maintained** (A PO box is not a valid location or address):

Address:

City or town, State, Zip code,
Country:

**The name and address of the Resident Agent:**

Name:    PHILLIP T HOWARD

Address:  ONE BROADWAY 14TH FLOOR

City or town, State, Zip code,       BOSTON,   MA   02142   USA
Country:

**The name and business address of each General Partner:**

| Title | Individual name | Address |
|---|---|---|
| GENERAL PARTNER | CAMBRIDGE CAPITAL ADVISORS LLC | 2120 KILLARNEY WAY, SUITE 125 TALLAHASSEE, FL 32309 USA |

|  | **Confidential** | | |
|---|---|---|---|
| **Consent** | **Data** | **Merger Allowed** | **Manufacturing** |

**View filings for this business entity:**

ALL FILINGS
Amendments to Limited Partnership Certificate
Annual Report
Articles of Entity Conversion
Certificate of Cancellation

5/4/2018                                      Mass. Corporations, external master page

**View filings**

**Comments or notes associated with this business entity:**

**New search**

# Exhibit 19
# (Redacted)



**BNY MELLON**
ASSET SERVICING
P.O. Box 569
Pittsburgh, PA  15230-0569

**NFL PLAYERS SECOND CAREER SAVINGS PLAN**

MILLENNIUM TRUST COMPANY
FBO Player 5
SUITE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309

---

## *PAYMENT SUMMARY*

| | | |
|---|---|---|
| ACCOUNT NUMBER: | Player 5 | DATE OF CHECK:  05/10/16 |
| PAYEE NAME: | | NET PAYMENT AMOUNT:  619,111.95 |

ACCOUNT NUMBER: ███████████

(Detach Here)



NFL PLAYERS SECOND CAREER SAVINGS PLAN

NOT VALID BEFORE OR        CHECK DATE    CHECK NUMBER
180 DAYS AFTER   05/10/16  000384968

PAY **** SIX HUNDRED NINETEEN THOUSAND ONE HUNDRED ELEVEN DOLLARS AND 95 CENTS ****

NPL051                        PAYABLE IN U.S. DOLLARS

TO         MILLENNIUM TRUST COMPANY
THE        FBO Player 5                      **$619,111.95**
ORDER      SUITE 125
OF         2120 KILLARNEY WAY
           TALLAHASSEE FL 32309

The Bank of New York Mellon
Pittsburgh, Pennsylvania
                                              AUTHORIZED AGENT

# Exhibit 20
# (Redacted)



**BNY MELLON**
ASSET SERVICING
P.O. Box 569
Pittsburgh, PA 15230-0569

**NFL PLAYERS SECOND CAREER SAVINGS PLAN**

MILLENNIUM TRUST COMPANY
FBO Player 10
STE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309



**PAYMENT SUMMARY**

ACCOUNT NUMBER: **Player 10**
PAYEE NAME:

DATE OF CHECK: 03/28/16
NET PAYMENT AMOUNT: 316,059.98

ACCOUNT NUMBER:

Overnight to
Millennium Trust
2001 Spring Rd.
Suite 700
Oak Brook, Ill
60523



NFL PLAYERS SECOND CAREER SAVINGS PLAN

NOT VALID BEFORE OR    CHECK DATE    CHECK NUMBER
180 DAYS AFTER   03/28/16   0000381458

PAY ******THREE HUNDRED SIXTEEN THOUSAND FIFTY NINE DOLLARS AND 98 CENTS******

NFL 057    PAYABLE IN U.S. DOLLARS

TO THE ORDER OF
MILLENNIUM TRUST COMPANY
FBO Player 10
STE 125
2120 KILLARNEY WAY
TALLAHASSEE FL 32309

******$316,059.98******

The Bank of New York Mellon
Pittsburgh, Pennsylvania

AUTHORIZED AGENT

CAMB-2_000289

# Exhibit 21
# (Redacted)



PORTFOLIO SUMMARY : Player 5 IRA

12/31/2016 PORTFOLIO ALLOCATION :

| | |
|---|---|
| 11.83% Cambridge Capital Group Equity Option Opportunity LP | $ 88,901.50 |
| 88.17% Cambridge Capital Partners LP | $662,531.00 |
| **TOTAL PORTFOLIO VALUE** | **$751,432.50** |

PORTFOLIO PERFORMANCE ANALYSIS:

| | |
|---|---|
| Total Funds Contributed | $619,061.95 |
| Total Market Value (12/31/16) | $751,432.50 |
| Total Market Gains (Loss) | $132,370.55 |
| Weighted Average Cost Base | $619,061.95 |
| Total Percentage Return (5/19/16 – 12/31/16) | 21.38% |
| Average Annual Percentage Return | 39.29% |

SCMPRODCAMB-PLYR5_000012

# Exhibit 22
# (Redacted)



**12/31/16 Quarterly Capital Account Summary For MT, Cust FBO** Player 1          **IRA**
#Player 1      :

<u>**CAMBRIDGE CAPITAL PARTNERS**</u>

| | |
|---|---|
| 1/1/16 Capital Balance | $0.00 |
| Contributions | $220,000.00 |
| Distributions | $0.00 |
| 12/31/16 Capital Balance | $259,594.35 |
| Gain (Loss) | $39,594.35 |

<u>**CAMBRIDGE CAPITAL GROUP EQUITY OPTION OPPORTUNITIES LP**</u>

| | |
|---|---|
| 1/1/16 Capital Balance | $0.00 |
| Contributions | $79,950.00 |
| Distributions | $0.00 |
| 12/31/16 Capital Balance | $100,470.43 |
| Gain (Loss) | $20,520.43 |

MTC 000194

# MILLENNIUM TRUST COMPANY®

2001 Spring Road, Suite 700 Oak Brook, Illinois 60523   630.368.5600

Player 1

**Account #:** ▮▮▮▮

**Account Type: Traditional IRA**

Statement Period

10/01/2017 - 12/31/2017

IMPORTANT TAX NOTICE: If your Account Type is an Individual Retirement Account (IRA), this information is being furnished to the Internal Revenue Service (IRS) on Form 5498 by May 31: the December 31 fair market value (FMV) of your IRA as listed on the Ending Balance or Ending Value at Market on this statement; and if your IRA holds certain specified assets which typically do not have a readily available FMV, the type of investment and the FMV listed under Alternative Investments in the Portfolio Detail section of this statement. If you are subject to required minimum distributions (RMDs), the RMD requirement will also be reported to the IRS on Form 5498. Since we are providing you with the reportable information in this yearend statement, you will not receive a Form 5498 Copy B unless your IRA also had reportable contributions including rollovers, recharacterizations or conversions. You may review Form 5498 at www.irs.gov.



MILLENNIUM
TRUST COMPANY®

2001 Spring Road, Suite 700 Oak Brook, Illinois 60523   630.368.5600

For the Account of:

10/01/2017 - 12/31/2017

Account #:

Account Type: Traditional IRA

## Account Summary

|  | Market Value On | |
|---|---|---|
|  | 12/31/2017 | % Total Assets |
| Cash | $0.00 | 0.00 |
| Cash Equivalents | $0.00 | 0.00 |
| Other Assets | $360,064.78 | 100.00 |
| **Total** | **$360,064.78** | **100.00** |

## Account Activity Summary

| Activity | Market Value |
|---|---|
| Beginning Market Value | $360,064.94 |
| Contributions/Rollovers | $0.00 |
| Income | $0.00 |
| Transfers In/Out | $0.00 |
| Distributions | $0.00 |
| Account Fees/Expenses | $0.00 |
| Taxes Paid | $0.00 |
| Other Activity | ($0.16) |
| Realized Gain/Loss | $0.00 |
| Change in Investment Value | $0.00 |
| Ending Balance | $360,064.78 |



**MILLENNIUM**
TRUST COMPANY®

2001 Spring Road, Suite 700 Oak Brook, Illinois 60523   630.368.5600

For the Account of:

10/01/2017 - 12/31/2017

Account #: ▮

Account Type: Traditional IRA

## Account Detail

| | Quantity | Unit Price | Price Date | Cost Basis | Market Value | Unrealized Gain/Loss |
|---|---|---|---|---|---|---|
| **OTHER ASSETS** | | | | | | |
| Cambridge Capital Group Equity Option Opportunities LP | 100,470.4300 | $1.0000 | 12/30/16 | $79,950.00 | $100,470.43 | $20,520.43 |
| Cambridge Capital Partners LP | 259,594.3500 | $1.0000 | 12/30/16 | $220,000.00 | $259,594.35 | $39,594.35 |
| **Total Other Assets** | | | | $299,950.00 | $360,064.78 | $60,114.78 |
| **Grand Total All Assets** | | | | $299,950.00 | $360,064.78 | $60,114.78 |

Assets which are not priced on a daily basis will display the last price or valuation date available. Publicly traded securities will not display a price date as they generally price on a daily basis. Other assets such as Certificates of Deposit and Promissory Notes which are valued at current face value will also not display a price date.



**MILLENNIUM**
TRUST COMPANY®

**2001 Spring Road, Suite 700 Oak Brook, Illinois 60523   630.368.5600**

For the Account of:

Account #: ▮

10/01/2017 - 12/31/2017

Account Type: Traditional IRA

## Transaction History

| Date | Description | Cash Amount | Cost Basis | Realized Gain/Loss |
|---|---|---|---|---|
| **OTHER ACTIVITY** | | | | |
| 10/30/2017 | Cash Disbursement Collect Outstanding Invoice<br>Paid To:<br>Paid For:<br>Collect Outstanding Invoice(s) | ($0.16) | | $0.00 |
| **TOTAL OTHER ACTIVITY** | | ($0.16) | | $0.00 |
| **CASH SWEEP ACTIVITY** | | | | |
| | CASH SWEEP BUYS AND SELLS | $0.16 | ($0.16) | $0.00 |
| **TOTAL CASH SWEEP ACTIVITY** | | $0.16 | ($0.16) | $0.00 |

# MILLENNIUM
## TRUST COMPANY®

2001 Spring Road, Suite 700 Oak Brook, Illinois 60523   630.368.5600

For the Account of:

10/01/2017 - 12/31/2017

Account #: ▮▮▮▮▮▮

Account Type: Traditional IRA

## Informational Section

### Memo Transactions

| Date | Description | Amount | Shares |
|---|---|---|---|
| 10/30/2017 | Fee Invoice Paid | ($0.15) | |
| 10/31/2017 | Fee Invoice Generated Late Payment Fee | $30.00 | |
| 11/30/2017 | Fee Invoice Generated Late Payment Fee | $30.00 | |

**MILLENNIUM**
TRUST COMPANY®

2001 Spring Road, Suite 700 Oak Brook, Illinois 60523  630.368.5600

For the Account of:

10/01/2017 - 12/31/2017

Account #: ███████

Account Type: Traditional IRA

## Features of your Statement

**Account/Portfolio Summary** - A snapshot of your account's current value grouped by asset class.
**Account Activity Summary** - A summary of activity in your account for the current reporting and year-to-date periods.
**Realized Gain/Loss Summary (if applicable)** - A summary of all the gains or losses for a calendar year, separated into long term and short term.

## Glossary

**Asset Class** - Cash and securities in your account are grouped into various classes to reflect the diversification of your portfolio.
**Asset Pending Recovery ("APR")** - An asset currently involved in litigation, receivership or bankruptcy, where Millennium has received information that a current value cannot be provided but the asset does not appear to be worthless and a future payout or recognized value is anticipated.
**Change in Investment Value** - The change between statement periods in Total Unrealized Gain/Loss as reported on the Portfolio Detail/Account Detail Section of the statement. The change is calculated as the difference between the Unrealized Gain/Loss reported on the current statement and the Unrealized Gain/Loss reported on the previous period statement.
**Cost Basis** - The cost is usually the value of a security when it was acquired. The initial cost may have been revised for certain types of activity such as dividend reinvestments, bond amortization or other miscellaneous adjustments.
**Description** - In the Account/Portfolio Detail section, the description is name of the security. Under Transaction History, the description includes the type of transaction, name of the security and additional comments.
**Long-term Gain/Loss** - The amount of long-term gain/loss on a sale, redemption, maturity or distribution. If the trade date of the sale is more than one year after the trade date of the purchase you have a long-term gain/loss.
**Market Value** - The value of a security position in your account based on the Quantity and Unit Price.
**Memo Transactions** - Notifications of actions taken by Millennium Trust that do not directly affect the balance of your account.
**Quantity** - The number of shares, face value or units.
**Short-term Gain/Loss** - The amount of short-term gain/loss on a sale, redemption, maturity or distribution. If the trade date of the sale is less than one year after the trade date of the purchase you have a short-term gain/loss.
**Settle Date** - The date the executed securities transaction was settled, by paying for a purchase or by delivering a sold asset.
**Trade Date** - The date on which a security was purchased or sold.
**Unconfirmed Transactions** - Represents transactions where, based on your direction, funds have been sent to the investment sponsor for purchase of an asset, or an asset is transferring and reregistering to Millennium from a prior custodian, and confirmation of this action has not yet been received from the investment sponsor as of the date of this statement. This is effective only for purchases or reregistrations initiated after 3/31/2013. Transactions prior to this date will not be displayed in this section, however, that does not indicate that we have received a confirmation.
**Unrealized Gain/Loss** - An increase (or decrease) in the value of a security that has not been realized because the security hasn't been sold. A security's unrealized appreciation or depreciation figures are valuable because such information may help you determine tax implications on selling a security.

**MILLENNIUM**
TRUST COMPANY®

**2001 Spring Road, Suite 700 Oak Brook, Illinois 60523  630.368.5600**

For the Account of:

10/01/2017 - 12/31/2017

Account #: ▇▇▇▇▇▇

**Account Type: Traditional IRA**

Please read the following carefully as it contains important information about this statement and your account. Also read and consult your Custodial Agreement for the terms that govern your account with Millennium Trust Company, LLC (Millennium). A copy is available on our website for your convenience.

1. Please review your statement carefully and notify us immediately if you believe there is an error(s). You have forty-five (45) days after either (a) the date your paper statement is mailed or (b) your statement is posted online to file any written objections or exceptions with us. If no action is taken within the forty-five (45) day period, it signifies your approval of the statement and precludes you from making future objections or exceptions regarding the statement. Such approval by you shall be full acquittance, release and discharge of Millennium regarding the transactions and information on your statement.

2. For publicly-traded securities, the values shown represent the closing prices on the last business day of the statement period. These values are obtained from quotation services and other sources which we deem reliable, but Millennium cannot guarantee their accuracy. Brokerage accounts are valued at the total asset value in the account supplied by the brokerage firm.

3. Alternative assets are more difficult to value than marketable securities. The valuation is dependent upon information from the investment itself, and will most often be a valuation furnished to Millennium by the investment sponsor. These valuations, the accuracy of which we cannot guarantee, are received at various frequencies and times throughout the year, so they may not reflect the value as of the end of the statement period. If no current valuation is available, then the asset will be valued at the original cost or last value supplied to us as of the date shown on the statement. Therefore, investors should not rely on Millennium's statements for purposes of making investment decisions. Promissory notes and other private debt instruments are reflected at the face amount of the debt, adjusted for any principal payments received, with no adjustments made for fluctuations in interest rates in the market place.

4. With traditional assets like stocks and bonds, and with alternative assets like futures and foreign exchange, prices fluctuate constantly. Make sure you obtain current prices before trading and keep track of futures and forex investments through the broker's statements, confirmations and online access to the brokerage account rather than Millennium's periodic statements.

5. Millennium, as your custodian, holds evidence of ownership of the investments in your account. When you or an authorized third party directs an investment in an alternative asset, funds are sent from your account to a) a broker to make the directed trade or b) to the seller or the investment itself. Millennium does not take physical possession of assets with the exception of precious metals held in a third-party depository and certain original documents, like promissory notes. When you invest in an entity, like a hedge fund, a limited liability company, or a limited partnership, Millennium, as your custodian, does not hold and is not responsible for the assets of that entity or in which that entity may invest.

6. When you hold a brokerage account in your Millennium custody account, the assets held in the brokerage account will be held by the broker not by Millennium. Thus you will be relying on the broker, not Millennium, to have actual custody of the assets reported within the brokerage statements and confirmations.

7. You are responsible for the choice of the assets in your account, including investments directed by an authorized third party. It is also your responsibility to understand the risks associated with such assets. Millennium a) does not offer any investment management or advice b) has no responsibility to investigate any investment or investment sponsor or c) makes no representations as to and has no responsibility or liability for the safety or performance of any asset held in your account. Agreeing to custody an asset in your account does not constitute an endorsement in any way of that asset.

8. All trading activity on Millennium Trust Online is at your own risk. Please read the Terms of Use carefully before use. You are respons ble for a) any errors made in entering information, b) verifying orders are entered and executed correctly and c) to immediately notify Millennium of any issue. You must protect your username and password. You and your account will be liable

Page 7 of 8

MTC 000258

MILLENNIUM
TRUST COMPANY™

**2001 Spring Road, Suite 700 Oak Brook, Illinois 60523   630.368.5600**

For the Account of:

10/01/2017 - 12/31/2017

Account #: ▇▇▇▇▇

Account Type: Traditional IRA

for actions of any unauthorized party using your user name and password. Millennium is not responsible if for any reason the website and/or Millennium Trust Online are not available.

9. Millennium is not a broker and does not solicit orders for securities trades. All trades for publicly-traded securities for your account, including those through Millennium Trust Online, are placed with and executed by an unaffiliated third-party registered brokerage firm. Investments, including purchases through Millennium Trust Online, cannot be executed if it will create an overdraft in your account.

10. If your account is an IRA, other retirement account or an HSA, all investment transactions, including sales, liquidations and redemptions must be made through Millennium as your custodian in order to avoid adverse tax consequences. If you have a taxable custodial account such transactions must also be made through Millennium, as your custodian, in order for Millennium to properly perform its custodial functions, including issuing statements.

11. If you have a taxable account, the Cost Basis shown on the statement is a cumulative figure, but for tax purposes Millennium will do tax lot accounting on a first in, first out basis.

12. Millennium Trust provides a Cash Sweep Program that offers daily liquidity and competitive interest rates. In a Cash Sweep Program, your uninvested cash is automatically transferred into an interest-bearing account. Your account type determines which cash sweep vehicle is used. To view full details, restrictions and the list of banks and funds participating in the Program, visit our website at www.mtrustcompany.com.

MTC 000259

# Exhibit 23
# (Redacted)

| Player 10 | ███████ | **Traditional IRA** |
|---|---|---|

| No ManagerCode | | | |
|---|---|---|---|
| **Open Date:** 01/13/16 | **DOB:** ████ | **Freeze Code:** Legal2 | **Bad Address:** n/a |
| **Fee Receivables over 41 Days Old:** 0.00 | | **Fee Receivables: $580.00** | |

| | | |
|---|---|---|
| 04/04/18 | Subpoena Notice mailed to Client | Patricia Lipscomb |
| 04/04/18 | Client had question about fees | Lynn Carey |
| 04/04/18 | FEES: Email notification sent to client for fees due on account | Jibriel Desai |
| 03/16/18 | Email updated in innovest and request placed in innovue spreadsheet to update email to ████████████ per case #244533 | Evan Lorenz |
| 03/16/18 | Client called for assistance with online account access. | Justin Holt |
| 03/16/18 | Created SF #244533 for e-mail address update. | Justin Holt |
| 03/16/18 | ph# ████████. Cl verified. Cl needs assist logging into online acct. Inter team transfer to ASG  ALT. | Jennifer Loza |
| 03/16/18 | Informed client that we have not received a recent valuation so the values are based on the last one recieved. | Jorge Rodriguez |
| 01/11/18 | Spoke to client and relayed the values are updated by the sponsor and he should reach out to know a true up to date value. | Christopher Wadington |
| 07/13/17 | TPA Web Access Request, gail@ccwealthadvisors.com, submitted through MAC | Ruth George |
| 04/13/17 | FEES: Periodic fee of $580.00 approved via credit card | Ursala Griffith |
| 04/05/17 | FEES: Email notification sent to client for fees due on account | Ursala Griffith |
| 03/03/17 | Verified client & provided w/ online access id. He indicated he will be calling in more frequently as his advisor normally handled the maintenance on his account. | Carlos Contreras |
| 11/09/16 | Exchange from Cambridge Capital Partners, LP to Cambridge Capital Group Equity Option Opportunities, LP assigned to Sarah. | Sarah Douros |
| 06/15/16 | FEES: Account fees for $529.39 approved via credit card. | Lazarela Pavlovic |
| 06/09/16 | Fees: Emailed IT to upload credit card fee portal for $529.39/from fee update report | Lazarela Pavlovic |
| 06/08/16 | Credit Card information updated online by client. | Online payment Processor |
| 06/03/16 | Fee Reminder Notice sent to client via email for past due fees | Christopher Wadington |
| 06/03/16 | Fee Reminder Notice letter mailed to client for past due fees | Christopher Wadington |

| Date | Description | Name |
|---|---|---|
| 05/31/16 | Outstanding Receivable: Late fee of $30 billed to account. | Lisa Powers |
| 05/23/16 | Fees: Past Due Invoice(s) Collected | Lisa Powers |
| 05/10/16 | Emailed IMAP to remove Prosper Marketplace Account purchase. It was assigned to this account incorrectly. | Michael Zan |
| 04/14/16 | Received confirmation of purchase: Cambridge Capital Partners LP | Elijah Radakovich |
| 04/14/16 | Left VM for Tim Howard that he should have online access to this acct. tomorrow. | Keith Sobbe |
| 04/14/16 | TPA web access submitted for Tim Howard | Susan Krueger |
| 04/14/16 | Checking with Accts. dept. to determine status of TPA Tim Howard online access. | Keith Sobbe |
| 04/13/16 | Received confirmation of purchase: Cambridge Capital Group Equity Option Opp LP | Elijah Radakovich |
| 04/08/16 | Emailed client, informing them that Millennium will be sending an invoice for return wire fees. | Michael Zan |
| 04/08/16 | Emailed Fed Ref #'s to fund sponsor Tim Howard for Cambridge Capital Partners, LP and Cambridge Capital Group Equity Option Opportunities Fund. | Michael Zan |
| 04/08/16 | TPA called upset that BOA has not seen the re-sent wire as of yet. Explained to the TPA that we have not received the fed ref # as of yet. Client also said at first that tst made a mistake on the wire but I questioned as to who provided the wrong account number which he did admit he did. | Christopher Wadington |
| 04/08/16 | 2 RETURN WIRES processed in the amount of $286,000 and $30,059.98. Backup scanned in LF. | Lorena Nunez |
| 04/08/16 | Cambridge fund sponsor/TPA Tim, said the wires for the two investments were sent to the wrong account. He said he provided the incorrect account # in the wiring instructions. Tim has sent corrected instructions. | Michael Zan |
| 04/07/16 | IS called and was upset they have not received the wires for both purchases. Advised the wire for 286K went out at 2:30 and the wire for 30+k will go out at 3:30.He is requesting fed reference numbers as his bank has not received anything yet. Mike Z will call him when we get the fed ref #'s | Keith Sobbe |
| 04/07/16 | Establishment fee converted to invoice so purchase can be made for a full amount/per Michael Z. | Lazarela Pavlovic |
| 04/05/16 | TPA web access submitted for Tim Howard | Susan Krueger |
| 04/04/16 | The client called and stated that he received an email asking him to call in and confirm he signed TPA naming Tim Howard. Received confirmation on recorded line that the client signed form and confirmed TPA> | Chanicka Jones |
| 04/01/16 | Received the wire instructions from Cambridge Capital for both investments. Emailed a copy to the client to have him sign as "read | Michael Zan |

MTC 002038

| | | |
|---|---|---|
| | and agreed." | |
| 03/31/16 | Client wrote wire instructions on PPPSED which differed from Millennium's files. Emailed fund sponsor to verify wire instructions for both Cambridge Capital Partners, LP and Cambridge Capital Group Equity Option Opportunities, LP | Michael Zan |
| 03/31/16 | Spoke to TPA who will email over the deposit form so we can post the funds. | Christopher Wadington |
| 03/31/16 | Spoke to TPA and confirmed the fed ex package was received and routed to CM. | Christopher Wadington |
| 03/22/16 | Clients TPA called requesting PPID and adding this account to his existing innovue user id. Sent case to NA | Christopher Wadington |
| 02/08/16 | Emailed client regarding the email address provided by the third party - client approval is needed | Susan Krueger |
| 01/25/16 | Onboarding: LM for client @ ███████████ to see if he needed assistance w/ funding or investing. Refer to Case #29807 | Daniella Berry |
| 01/22/16 | Web Access: Self Enrollment email sent to ████████████ | Mac Processor |
| 01/21/16 | Web access request submitted per AA with supplied email address | Susan Krueger |
| 01/21/16 | Email address added per Dana Berry | Susan Krueger |
| 01/21/16 | Client called to add email address: ████████████ Emailed New Accts Maint. | Daniella Berry |
| 01/15/16 | Emailed Payment of Fees Auth form to client at info@cambridgecapitalgroup.holdings. Also requested client contact us directly as we cannot use that email address. Requested he call to provide a more personal email address. | Daniella Berry |
| 01/14/16 | FEES: Establishment fee of $50.00 charged to the client account. | Fee Processor |
| 01/11/16 | Left VM for client re: email address and CC info - client will have to provide personal info - 3rd party form has general email address of advisor - unable to accept | Susan Krueger |

MTC 002039

# Exhibit 24
# (Redacted)

**2574** Player 1     ████████     Traditional IRA    

| No ManagerCode | | |
|---|---|---|
| **Open Date:** 06/02/16 **DOB:** ████ | **Freeze Code:** n/a  **Bad Address:** n/a | |

| | | |
|---|---|---|
| 04/04/18 | Subpoena Notice mailed to Client | Patricia Lipscomb |
| 02/22/18 | We recently been resigned as of this past Tuesday, 02/20/2018, due to the non-payment of annual fees on the account. The sponsor confirmed they were the ones who paid the client's annual account fees. Sponsor/ TPA Gail Milon is requesting if we can either reverse resignation on these accounts due to the sponsor's failure to pay fees, or if client can open brand new account and re-register the asset back into MTC. Having Maribeth S run this request by compliance to see if either option is a possibility. | Jeremiah Bower |
| 02/20/18 | Account Closing Date: 02-20-2018 | Mac Uploader |
| 02/14/18 | Dist: All Requested Activities for Distribution Complete | Wesley Siu |
| 02/14/18 | ReReg: Completed re-registration of Cambridge Capital Group Equity Option Opp LP to RESIGNATION-CLIENT | Wesley Siu |
| 02/14/18 | ReReg: Completed re-registration of Cambridge Capital Partners LP to RESIGNATION-CLIENT | Wesley Siu |
| 02/09/18 | ReReg: Correspondence (Certified Mail) sent for Cambridge Capital Group Equity Option Opp LP | Tyler Schwichtenberg |
| 02/09/18 | ReReg: Correspondence (Certified Mail) sent for Cambridge Capital Partners LP | Tyler Schwichtenberg |
| 12/15/17 | FEES-email: updated fee model from RN9I to RESG per email received on 12.13.17 from compliance | Maria Garcia |
| 12/13/17 | Fee Resignation letter mailed to client; resignation effective 1/15/2018 | Patricia Lipscomb |
| 11/30/17 | Late fee of $30 billed to account | Lisa Powers |
| 11/03/17 | Final Notice - Past due fee email sent to client. Fees are 50 days past due. Next step: Submit for resignation. | Christopher Wadington |
| 11/03/17 | Final Notice - Past due fee letter sent to client. Fees are 50 days past due. Next step: Submit for resignation. | Christopher Wadington |
| 10/31/17 | Outstanding Receivable:  Late fee of $30 billed to account | Lisa Powers |
| 10/30/17 | Fees:  Past Due Invoice(s) Collected | Lisa Powers |
| 10/17/17 | 2nd Notification - Past Due Fee letter sent to client. Fees are 40 days past due | Christopher Wadington |
| 10/17/17 | 2nd Notification - Past Due Fee email sent to client.  Fees are 40 days past due. | Christopher Wadington |
| 10/05/17 | Reminder Notice - Past due fee letter sent to client. Fees are 30 days past due | Christopher Wadington |
| 10/05/17 | Reminder Notice - Past due fee email sent to client. Fees are 30 | Christopher |

| | days past due | Wadington |
|---|---|---|
| 09/25/17 | FEES: fee model and database updated from credit card to invoice due to credit card decline | Jibriel Desai |
| 09/20/17 | FEE:Decline Letter sent to the client. | Maria Garcia |
| 09/15/17 | FEE:Automated Email sent to client regarding the decline of their credit card | Jennifer Hernandez |
| 09/15/17 | FEES- Invoiced client $30 credit card decline fee | Jibriel Desai |
| 09/14/17 | FEES: Periodic fee of $550.00 declined via credit card | Jibriel Desai |
| 09/07/17 | FEES: Email notification sent to client for fees due on account | Jibriel Desai |
| 07/20/17 | Confirmed 2016 account transactions to client & Cambridge capital rep. | Carlos Contreras |
| 07/17/17 | TPA Web Access Request, gail@ccwealthadvisors.com, submitted through MAC | Ruth George |
| 10/12/16 | FEES: Periodic fee of $610.00 approved via credit card | Ursala Griffith |
| 10/11/16 | Emailed IT to upload CC fee portal for $610/from fee update report | Lazarela Pavlovic |
| 10/10/16 | Credit Card information updated by EXTERNAL | Online payment Processor |
| 09/20/16 | Received confirmation of purchase: Cambridge Capital Group Equity Option Opp LP | Sean Moon |
| 09/20/16 | Follow up email sent to investment sponsor requesting a confirmation of purchase for Cambridge Capital Group Equity Option Opp LP | Sean Moon |
| 09/12/16 | Received confirmation of purchase: Cambridge Capital Partners LP | Sean Moon |
| 09/02/16 | transfer | Chanicka Jones |
| 09/02/16 | Funds Received from Scottrade by 1 wire in the amount of $100,000.00 | Lorena Nunez |
| 08/31/16 | Transfer has been faxed on 8/31. | Zachary Howard |
| 08/31/16 | Transfer in received in good order/processing | Zachary Howard |
| 08/31/16 | Received Scottrade partial transfer of $100,000. Under MTC review. | Zachary Howard |
| 08/31/16 | Received new Transfer or Rollover Form w/ Medallion Signature | Zachary Howard |
| 06/17/16 | Received confirmation of purchase: Cambridge Capital Group Equity Option Opp LP | Elijah Radakovich |
| 06/17/16 | Received confirmation of purchase: Cambridge Capital Partners LP | Elijah Radakovich |
| 06/16/16 | SF 46651 Onboarding: Called client at ████████ lvm. Client is investing in Cambridge Capital | Chanicka Jones |

| | | |
|---|---|---|
| 06/16/16 | Per Ruth, TPA online access was processed. She is not sure on the turn around time for his access to the account. She stated it may be a few days. | Daniella Berry |
| 06/16/16 | Confirmed for TPA Tim Howard that wire was rec'd & 2 purchases are being processed today. Also sent email to NewAcctsMaint as he is stating this client is not showing up online for him when he logs in. | Daniella Berry |
| 06/15/16 | Funds Received from Scottrade by 1 wire in the amount of $200,000.00 | Lorena Nunez |
| 06/15/16 | Notified TPA, Tim Howard, that wire from Scottrade has not been rec'd yet. | Daniella Berry |
| 06/13/16 | Notified TPA, Tim Howard, that wire from Scottrade has not been rec'd yet. | Daniella Berry |
| 06/10/16 | TPA web access request submitted for Tim Howard. | Jennifer Hernandez |
| 06/10/16 | Confirmed for TPA, Tim Howard, that TFR form was FedEx'd to Scottrade on 6/8. He also inquired when TPA form (rec'd 6/3) would be processed. He is unable to view the account yet when he logs in. Emailed NewAcctsMaint. | Daniella Berry |
| 06/08/16 | Mailed via FedEx. Tracking ██████████ | Wesley Siu |
| 06/08/16 | Told the TPA that he or the client will need to contact Scottrade to find out for sure if an original MSG is required. We cannot discuss other companies policies. | Christopher Wadington |
| 06/08/16 | Confirmed for TPA Tim Howard that TFR form w/ MSG was rec'd and we will be forwarding to initiate TFR today. | Daniella Berry |
| 06/08/16 | Transfer in received in good order/processing | Wesley Siu |
| 06/07/16 | TPA sent a copy via overnight and the client emailed a clear copy to Wes. | Christopher Wadington |
| 06/06/16 | Received transfer form with MSG but the MSG is not legible. Emailed client requesting the original. | Wesley Siu |
| 06/03/16 | Emailed client requesting a MSG for Scottrade transfer request. | Wesley Siu |
| 06/03/16 | FEES: Establishment fee of $50.00 charged to the client account. | Fee Processor |
| 06/03/16 | Received Scottrade transfer form. Under MTC review. | Wesley Siu |

# Exhibit 25
# (Redacted)



MILLENNIUM
TRUST COMPANY

ABOVE AND BEYOND CUSTO

February 7, 2018

# Player 1

## IMPORTANT NOTICE: ASSET DISTRIBUTION AND POTENTIAL TAX CONSEQUENCES

Re: Millennium Trust Co. LLC Custodian FBO **Player 1**   Traditional IRA
Asset:  Cambridge Capital Partners LP

Dear Client:

We are distributing the asset(s) referenced above to you, at the last reported value, through the enclosed Assignment of Interest. By assigning all interest to you, Millennium Trust Company is no longer holding custody of your asset(s), and your asset(s) is deemed as having been distributed from your Millennium account as of the date of this letter. If you have sponsor-provided information regarding a more current value, please furnish it to us within 10 business days from the date of this correspondence, and we will update our records accordingly.

Do not return the Assignment of Interest form to Millennium Trust Company. Use it to show that you are the rightful owner as you complete the re-registration of your investment to your name. Although we have supplied your investment sponsor with a duplicate copy of the enclosed Assignment of Interest form and a direction to re-register the asset(s) to you, it is your responsibility to confirm and complete the re-registration of your asset in your name and to pay any associated fees.

A distribution to you from an IRA or retirement account is a taxable event. If the account referenced above was an IRA or other retirement account, we are required to report this distribution on Internal Revenue Service (IRS) Form 1099-R as of the date of this letter at the value listed on the Assignment of Interest form. Following your receipt of this distribution, your asset(s) may be eligible for a tax-free "rollover" to another custodian within 60 days, subject to certain restrictions. You may wish to consult a professional tax advisor regarding your rollover options and the potential tax consequences of receiving such a distribution.

If you should have any questions regarding this matter, please do not hesitate to contact Tyler Schwichtenberg, Account Administrator at tschwichtenberg@mtrustcompany.com or 630-891-6118 during regular business hours, Monday - Friday from 8:00 am - 4:30 pm CT.

We thank you for your previous business and wish you the best in your future retirement planning.

Sincerely,
Millennium Trust Company, LLC

Encl:  Assignment Form(s)CC:
Cambridge Capital Group LLC

SIGNATURE GUARANTEED
MEDALLION GUARANTEED
MILLENNIUM TRUST
COMPANY LLC

(018)
SECURITIES TRANS.FER AGENTS MEDALLION PROGRAM
AUTHORIZED SIGNATURE
A90080 4 0

SCMPRODCAMB-PLYR1_000001

MILLENNIUM TRUST COMPANY, LLC
SIGNING AUTHORITIES RESOLUTION
AS APPROVED AUGUST 10, 2016

The undersigned, being the Secretary or an Assistant Secretary of Millennium Trust Company, LLC, a limited liability company organized and existing by virtue of the Laws of the State of Illinois (the "Company"), does hereby certify that the following is a true, correct and complete copy of the Resolutions duly adopted by the Board of Directors of the Company at a meeting held on August 10, 2016 (the "Resolutions") in accordance with the provisions of the Operating Agreement of the Company, and that said Resolutions have not been rescinded, revoked, amended or modified and remain in full force and effect as of the date hereof:

RESOLVED, that the Chief Executive Officer, Chief Financial Officer, General Counsel, Secretary, any Senior Vice President, Vice President, Assistant Vice President, Assistant Secretary, Supervisor, Team Lead, Senior Account Manager, or Senior Account Administrator included on Appendix A (the "Appendix") attached hereto (the "Authorized Signers") of the Company, be, and each hereby is, authorized to, on behalf of the Company in its capacity as a custodian: (a) make, execute and deliver any and all written instruments, documents, agreements or other writings in the name of and on behalf of the Company that are necessary, proper and advisable for the conduct of the business of the Company in the ordinary course of its business; and (b) transfer, assign, endorse, purchase, sell, set over, exchange or deliver any and all bonds, stocks, mutual funds, debentures, notes, real estate, or any other securities or negotiable instruments of any description as necessary, proper and advisable for the conduct of the business of the Company in the ordinary course of its business; and (c) take such further action, and execute and deliver such further ratifications, instruments and documents, in the name and on behalf of the Company, as are necessary, proper or advisable in order to fully carry out the intent and effectuate the purposes of the foregoing.

FURTHER RESOLVED, that the Secretary of the Company may update or revise the Appendix to include or remove any Authorized Signers, as it from time to time as the Board considers reasonable, necessary and proper and such updates will have the same validity and effect as the original Appendix included herein.

The undersigned further certifies that Appendix A herein contains a true and correct list of the Authorized Signers described in the Resolutions as of the date hereof and a true and correct sample signature of each.

IN WITNESS WHEREOF, I have hereunto set my hand on this 30th day of June, 2017.

MILLENNIUM TRUST COMPANY, LLC

By: _____
Secretary or Assistant Secretary

SCMPRODCAMB-PLYR1_000002

# ASSIGNMENT OF INTEREST
## Change in Ownership

### ASSET INFORMATION

**Asset:**   Cambridge Capital Group Equity Option Opp LP

**Asset Type:**   LPs/LLCs - HEDGE FUNDS

**Units/shares:** 100,470.4300        **Last Reported Value:** $100,470.43

Current registration of Asset being assigned to Assignee:
   Millennium Trust Co., LLC Custodian FBO: **Player 1**   Traditional IRA
   2001 Spring Road, Suite 700
   Oak Brook, IL 60523
   TAX ID: 36-4400066

### ASSIGNOR

Millennium Trust Company, LLC (Assignor) in its capacity as Custodian hereby assigns, transfers and conveys all rights, title, interests and claims which Assignor may have in and to the asset described above to the Assignee. This assignment and transfer is being made to one of the following parties: 1) the beneficial owner of the Millennium account; 2) another custodian/trustee FBO the beneficial owner of the Millennium account; or 3) if the beneficial owner is deceased, the beneficial owner's designated beneficiary on the Millennium account. Assignor hereby certifies that as Custodian it has full authority to make this assignment and transfer. Assignor hereby directs the investment sponsor/issuer to transfer the above referenced assets/interest on its books and records.                                          Sheri Day, AVP, Supervisor
                                                            Millennium Trust Company LLC
**Assignor's Release:** _____

**Date: February 7, 2018**          Signature Guarantee:

### ASSIGNEE

SCMPRODCAMB-PLYR1_000003



ABOVE    BEYOND CUSTODY

# ASSIGNMENT OF INTEREST
## Change in Ownership

## ASSET INFORMATION

**Asset:**     **Cambridge** Capital Partners LP

**Asset Type:**  LPs/LLCs – HEDGE FUNDS

**Units/shares:**  259,594.3500      **Last Reported Value:**  $259,594.35

**Current registration of Asset being assigned to Assignee:**
Millennium Trust Co., LLC Custodian FBO Player 1      Traditional IRA, ****95483
2001 Spring Road, Suite 700
Oak Brook, IL 60523
TAX ID: 36-4400066

## ASSIGNOR
Millennium Trust Company, LLC (Assignor) in its capacity as Custodian hereby assigns, transfers and conveys all rights, title, interests and claims which Assignor may have in and to the asset described above to the Assignee. This assignment and transfer is being made to one of the following parties: 1) the beneficial owner of the Millennium account; 2) another custodian/trustee FBO the beneficial owner of the Millennium account; or 3) if the beneficial owner is deceased, the beneficial owner's designated beneficiary on the Millennium account. Assignor hereby certifies that as Custodian it has full authority to make this assignment and transfer. Assignor hereby directs the investment sponsor/issuer to transfer the above referenced assets/interest on its books and records.

Sheri Duy, AVP - Supervisor
Millennium Trust Company LLC

**Assignor's Release:**  _____

**Date: February 7, 2018**      **Signature Guarantee:**

## ASSIGNEE

**SCMPRODCAMB-PLYR1_000004**

Appendix A
Authorized Officers

| Name | Title | Signature | Name | Title | Signature |
|---|---|---|---|---|---|
| Gary Anetsberger | Chief Executive Officer | | Denise Iles | Supervisor | |
| Daniel Laszlo | Chief Financial Officer & Asst. Sec. | | Josephine Koller | Supervisor | |
| John Perughni | General Counsel & Secretary | | Patti Simikoski | Asst. Vice President | |
| Marie Jordan | Asst. Secretary | | Gena Alvarado | Team Lead | |
| Mary Corrigan | Sr. Vice President & Asst. Sec. | | Yessica Arguello | Team Lead | |
| Jean Moran | Sr. Vice President & Asst. Sec. | | Janell Burke | Team Lead | |
| Lisa Powers | Sr. Vice President & Asst. Sec. | | Amber Folkens | Team Lead | |
| Jeanne Reder | Sr. Vice President & Asst. Sec. | | Gary Fraser | Team Lead | |
| Sharon Robertson | Sr. Vice President & Asst. Sec. | | Lupia Lupso | Sr. Account Admin | |
| Meg Zwick | Sr. Vice President & Asst. Sec. | | Amish Merchant | Team Lead | |
| Heather Carava | Vice President & Asst. Sec. | | LuAnn Patrick | Team Lead | |
| Maribeth Servello | Vice President & Asst. Sec. | | Wojtek Sidorowicz | Team Lead | |
| Kathy Herbert | Vice President | | Patrick Spataforo | Team Lead | |
| Sean Kennedy | Vice President | | Sam Wynne | Team Lead | |
| Adina Lahman | Vice President | | Michael Zan | Sr. Account Admin | |
| Patrick Roche | Vice President | | Steve Blim | Sr. Account Administrator | |
| Marlene Szostak | Vice President | | Sarah Douron | Sr. Account Administrator | |
| Jeannette Weyer | Vice President | | Ruth George | Sr. Account Administrator | |
| Camron Berger | Asst. Vice President | | | | |
| Sheri Duy | Asst. Vice President | | Marnie Potack | Sr. Account Administrator | |
| Dawn Jurewicz | Asst. Vice President | | Robin Shoohen | Sr. Account Administrator | |
| Kelly Leonard | Asst. Vice President | | Michael Troost | Sr. Account Administrator | |
| Candice Mesoh | Asst. Vice President | | Vonveil Walker | Sr. Account Administrator | |
| Andrew Stewart | Asst. Vice President | | | | |
| Greg Tatum | Asst. Vice President | | | | |

SCMPRODCAMB-PLYR1_000005

MILLENNIUM TRUST COMPANY, LLC
SIGNING AUTHORITIES RESOLUTION
AS APPROVED AUGUST 10, 2016

The undersigned, being the Secretary or an Assistant Secretary of Millennium Trust Company, LLC, a limited liability company organized and existing by virtue of the Laws of the State of Illinois (the "Company"), does hereby certify that the following is a true, correct and complete copy of the Resolutions duly adopted by the Board of Directors of the Company at a meeting held on August 10, 2016 (the "Resolutions") in accordance with the provisions of the Operating Agreement of the Company, and that said Resolutions have not been rescinded, revoked, amended or modified and remain in full force and effect as of the date hereof:

RESOLVED, that the Chief Executive Officer, Chief Financial Officer, General Counsel, Secretary, any Senior Vice President, Vice President, Assistant Vice President, Assistant Secretary, Supervisor, Team Lead, Senior Account Manager, or Senior Account Administrator included on Appendix A (the "Appendix") attached hereto (the "Authorized Signers") of the Company, be, and each hereby is, authorized to, on behalf of the Company in its capacity as a custodian: (a) make, execute and deliver any and all written instruments, documents, agreements or other writings in the name of and on behalf of the Company that are necessary, proper and advisable for the conduct of the business of the Company in the ordinary course of its business; and (b) transfer, assign, endorse, purchase, sell, set over, exchange or deliver any and all bonds, stocks, mutual funds, debentures, notes, real estate, or any other securities or negotiable instruments of any description as necessary, proper and advisable for the conduct of the business of the Company in the ordinary course of its business; and (c) take such further action, and execute and deliver such further certifications, instruments and documents, in the name and on behalf of the Company, as are necessary, proper or advisable in order to fully carry out the intent and effectuate the purposes of the foregoing;

FURTHER RESOLVED, that the Secretary of the Company may update or revise the Appendix to include or remove any Authorized Signer, as is from time to time as the Board considers reasonable, necessary and proper and such updates will have the same validity and effect as the original Appendix included herein.

The undersigned further certifies that Appendix A hereto contains a true and correct list of the Authorized Signers described in the Resolutions as of the date hereof and a true and correct sample signature of each.

IN WITNESS WHEREOF, I have hereunto set my hand on this ___ day of _June_____, 2017.

MILLENNIUM TRUST COMPANY, LLC

By: _____
Secretary or Assistant Secretary

SCMPRODCAMB-PLYR1_000006

# Exhibit 26

On Tuesday, April 17, 2018, 10 00 AM, Christopher Wadington <cwadington@mtrustcompany com> wrote:

We are writing as a courtesy to remind you that your Annual Account Fees are now severely past due. Please be advised that your payment in the amount of $580.00 is due within 10 days of the date of this notice.

Failure to make this payment may result in our resignation on your account. If we are forced to resign on your account due to unpaid fees, it may result in a complete distribution of your investments and you will be responsible for any taxes or IRS penalties that may apply. Please keep in mind that a distribution to you may be a taxable event.

Please visit our website at **www.mtrustcompany.com/pay** to provide your payment information.

If you have any questions, please contact a Client Service Specialist at 800 618 6177 during normal business hours, Mon. – Fri. from 8:00 am - 4:30 pm CT, or by email at **alternatives@mtrustcompany.com.**

We appreciate your business and the opportunity to serve you.

Sincerely,

Alternative Investment Client Service

Millennium Trust Company, LLC

1

# Exhibit 27
# (Redacted)

**1574**  Player 9          Player 9          **Traditional IRA**   

| | No ManagerCode |
|---|---|
| | **Open Date:** 02/12/16 **DOB:** ▉▉▉▉  **Freeze Code:** n/a  **Bad Address:** n/a |

| | | |
|---|---|---|
| 04/04/18 | Subpoena Notice mailed to Client | Patricia Lipscomb |
| 08/09/17 | Account Closing Date: 08-09-2017 | Mac Uploader |
| 08/09/17 | Spoke with TPA for Cambridge Partners regarding the client's account. The client NFL plan issued a check to the client which he then deposited with Cambridge directly. The client assumed it was a rollover. Explained that this is not a rollover because Cambridge is not an IRA custodian. Advised her to have the client talk to his accountant regarding this or call IRS. | Chanicka Jones |
| 08/07/17 | Submitted waiver for $160 as client has no holdings. | Christopher Wadington |
| 07/31/17 | Outstanding Receivable:  Late fee of $30 billed to account. | Lisa Powers |
| 07/21/17 | May 2017 Billing - Demand for payment notice for past due fees sent by mail to client. Next steps: Resign | Christopher Wadington |
| 07/21/17 | Enter free form comment here. | Christopher Wadington |
| 07/12/17 | Spoke to TPA/IS and confirmed that we received an asset assignment form but never a statement from the previous custodian showing the asset. As suspected, the previous custodian cut a check to the sponsor directly bypassing MTC for the purchase. Since that took place we are unable to hold the asset. Mentioned to the IS/TPA that the client can contact the IRS or DOL in an attempt for a PLR. | Christopher Wadington |
| 07/10/17 | May 2017 Billing - Final fee notice sent by email to client for past due fees -Fees are severely past due, 2nd and final notice before submitting for resignation | Christopher Wadington |
| 07/10/17 | May 2017 Billing - Final fee notice sent by mail to client for past due fees - 2nd and final notice before submitting for resignation | Christopher Wadington |
| 07/03/17 | TPA, GAIL MILON, called. Put me on hold to pull client's last 4 of SS# & DOB. Call dropped while I was on hold. | Daniella Berry |
| 06/30/17 | Outstanding Receivable:  Late fee of $30 billed to account | Lisa Powers |
| 06/29/17 | Web Access: Email sent for User ID GMilon  96791 to gail@ccwealthadvisors.com linked to this account | Mac Processor |
| 06/27/17 | TPA Web Access Request, gail@ccwealthadvisors.com, submitted through MAC | Ruth George |
| 06/26/17 | Client stated he will call Gail and Tim Howard at Cambridge. He believe he rolled the funds over but they did not come through MTC. He will also check about past due fees. | Chanicka Jones |

MTC 001933

| 06/23/17 | May 2017 Billing - Mailed client Past Due Fee Notice - 1st. Fees are 45 days past due | Christopher Wadington |
|---|---|---|
| 06/21/17 | May 2017 Billing - Emailed client Past Due Fee Notice - 1st. Fees are 45 days past due. | Christopher Wadington |
| 06/12/17 | Spoke to client and Gail - it seems like they confirmed the same before and the rollover went directly to Cambridge Capital and skipped MTC. Relayed to Gail @ Cambridge that the funds are no longer considered to be in a retirement account or at least MTC cannot reflect without proper documentation. | Christopher Wadington |
| 05/26/17 | FEES: fee model and database updated from credit card to invoice due to credit card decline | Jibriel Desai |
| 05/16/17 | FEE:Decline Letter sent to the client. | Jibriel Desai |
| 05/11/17 | FEES- waived $30 CC decline fee as a courtesy due to decline reason "card lost or stolen". | Jibriel Desai |
| 05/11/17 | FEE:Automated Email sent to client regarding the decline of their credit card | Jibriel Desai |
| 05/11/17 | FEES: Periodic fee of $100.00 declined via credit card | Ursala Griffith |
| 05/03/17 | FEES: Email notification sent to client for fees due on account | Ursala Griffith |
| 05/01/17 | SF#102516 Spoke w/ client @ ██████████ Client indicated he would like to keep account open & will reach out to Howard & Associates so he can proceed w/ account funding. | Carlos Contreras |
| 03/08/17 | ZMV: Client returned Carlos' call. He would like acct left open for now. He took ~$325k from his 401k & sent it to Tim Howard @ Cambridge Capital. He does not own the asset in this IRA. He will reach out to Tim Howard to assist him on where the funds are. | Daniella Berry |
| 03/08/17 | SF#102516 ZMV: Left VM @ ██████████ . Informed client we have not yet received account funding method. Provided our contact info so client can indicate whether account s/b kept open or closed. | Carlos Contreras |
| 03/03/17 | Client called in to inquire about what was in his account. Confirmed that account has zero balance. Explained that we tried reaching out since july 2016 regarding funding his acct. He claims he rolled over a check from a previous 401k for roughly $325k. He mentioned Tim Howard helped him send the funds to Cambridge. I advised client that once funds leaves plan, they must be deposited in MTC ira and he would have had to complete a pppsed to direct us to invest in Cambridge Capital. Advised him to contact Cambridge for further information. | Asha Ravoori |
| 10/05/16 | Address updated, letter sent to client | Agnieszka Kus |
| 10/04/16 | ZMV: Client requested we keep acct open & touch base again prior to fees being charged if acct still not funded. Refer to Case #66717 | Daniella Berry |
| 10/04/16 | Client requested we update his address to: ██████████ ██████████  Case #67017 to New Accts. | Daniella Berry |

| | | |
|---|---|---|
| 10/04/16 | ZMV: Client requested we keep acct open & touch base again prior to fees being charged if acct still not funded. Refer to Case #66717 | Daniella Berry |
| 09/30/16 | ZMV: Per email rec'd from Sheri on 8/19, they will honor 60-day R/O, but client must submit a distribution letter & the last statement showing the assets in holdings. Client has not submit required docs as of today's date. | Daniella Berry |
| 09/01/16 | Sent client email in an attempt to update the mailing address | Christopher Wadington |
| 08/22/16 | MIA due to RRD file | Brandon Sharas |
| 08/22/16 | USPS provided forwarding address of: ███████ for ███████ ██████████. - Freeze Code AddChg added, change of address letter sent, Stmt Distribution turned off. | Brandon Sharas |
| 07/18/16 | ZMV report: Client submit 60-Day R/O Request form & 2 Asset Assignment forms to deposit assets distributed from previous custodian (Cambridge Capital Partners, LP & Cambridge Capital Group Equity Option, LP). No statements from previous custodian or current valuation statements rec'd. No one reached out to client for statements to deposit assets. Sending Case #51990 to Alt Ops for review. | Daniella Berry |
| 06/15/16 | FEES: Account fees for $410.00 approved via credit card. | Lazarela Pavlovic |
| 06/09/16 | Fees: Emailed IT to upload credit card fee portal for $410/from fee update report | Lazarela Pavlovic |
| 06/08/16 | Credit Card information updated online by client. | Online payment Processor |
| 06/06/16 | FEES-email: per Chanicka, converted $50 establishment overdraft to invoice. | Jibriel Desai |
| 06/03/16 | Overdraft: Sent email to Fee Support requesting establishment fee be converted to an invoice. | Chanicka Jones |
| 03/02/16 | Web Access: Email sent for User ID THOWARD_5MV82 to INFO@CAMBRIDGECAPITALGROUP.HOLDINGS linked to this account | Mac Processor |
| 02/29/16 | TPA web access request submitted. Per client email, ok to use general email address provided by TPA - Tim Howard | Ruth George |
| 02/26/16 | FEES: Establishment fee of $50.00 charged to the client account. | Fee Processor |
| 02/25/16 | Spoke to IS who will provide a statement from the previous custodian showing the asset held and the distribution. The client did not receive an assignment. | Christopher Wadington |
| 02/25/16 | Confirmed for TPA Tim Howard, that 60-day R/O form was rec'd. | Daniella Berry |
| 02/25/16 | CIP: CIP Verification process has been cleared. Freeze Code has | Mac Processor |

| | | |
|---|---|---|
| | been removed. | |
| 02/25/16 | Birth Certificate and DL rec'd via email. | Janell Burke |
| 02/24/16 | Email Sent - to view full email go to https://na8.salesforce.com/00TC000004H4ce6MAB Subject -> Email: Welcome to Millennium Trust Company [ ref: 00D80M9T5. 500C0z4ENz:ref ] | Chanicka Jones |
| 02/24/16 | SF 33412 Onboarding: Called client at ███████ advised him we needed a copy of DL to clear cip and confirm ██ Client also asked if I could send transfer form to him via email. | Chanicka Jones |
| 02/24/16 | Sent second request email to the client due to missing docs listed below. | Janell Burke |
| 02/16/16 | Emailed client at ███████ - need name verification for ██ to continue account opening process. | Janell Burke |
| 02/12/16 | CIP: CIP Verification Failed Due To: Name | Mac Processor |

MTC 001936

# Exhibit 28

**From:** Tim Howard [mailto:tim@howardjustice.com]
**Sent:** Tuesday, March 6, 2018 4:48 PM
**To:** TerriAnne Benedetto <TBenedetto@seegerweiss.com>; John Leonard <jleonard@mdmc-law.com>
**Cc:** nfl@howardjustice.com, Chris Seeger <CSeeger@seegerweiss.com> ████████████████
**Subject:** Re: NFL Concussion Litigation - Cambridge

Ms. Benedetto,

Thank you for sharing.  This firm has no management, interest or control over Cambridge.  Please share with counsel and management for Cambridge.  I am copying my counsel, Mr. John Leonard, with McElroy, Deutsch & Mulvaney, for his information.


*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
3522 Thomasville Road, Ste. 500
Tallahassee, FL 32309
(850) 298-4455 (o)
(850 216-2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373-6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor

1

Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu com
president@cguglobal net
https://www.facebook.com/tim.howard 752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

On Tue, Mar 6, 2018 at 4:09 PM, TerriAnne Benedetto <TBenedetto@seegerweiss.com> wrote:

Dear Mr. Howard:

Attached please find a letter from Christopher Seeger to ███████, along with an attachment.

Thank you,

TerriAnne Benedetto

Partner

Seeger Weiss LLP

1515 Market Street

Suite 1380

Philadelphia, PA 19102

(t) 215-564-2300

(d) 215-553-7981

(f) 215-851-8029