# EXHIBIT A

**DECLARATION OF CRAIG R. MITNICK, ESQUIRE IN SUPPORT OF MITNICK LAW OFFICE, LLC's FEE PETITION IN THE MATTER OF**

**_In Re National Football League Player's Concussion Injury Litigation_**

Craig R. Mitnick declares, pursuant to 28 U.S.C. Section 1746, based upon his personal knowledge, information and belief, the following:

## INTRODUCTION

1. I have extensive experience in the areas of complex civil and criminal litigation, public speaking and mass communication. I received my BBA in finance from Emory University (Atlanta, Georgia) in May of 1984 and subsequently received my Juris Doctor from the George Washington University School of Law (Washington DC) in May of 1987.

2. I am licensed to practice law and a member in good standing with the Courts in the state of New Jersey, including the United States District Court for the District of New Jersey. Additionally, I am licensed to practice law and I am in good standing with the Courts of the Commonwealth of Pennsylvania, including the United States District Court for the Eastern District of Pennsylvania and the United States Third Circuit Court of Appeals.

3. I began my professional career as a New Jersey County Assistant Prosecutor in September of 1987, almost 30 years ago. I began my litigation experience by being assigned to a Superior Court trial team where I tried dozens of jury trials and negotiated hundreds of resolutions to matters that were assigned to me. Around the same time, I was selected by my superiors to become a certified instructor of law and procedure at two large county law enforcement academies located in Southern New

1

Jersey. Several years later, after leaving the public sector in 1991, I entered the private practice of law where I began to focus on the practice of complex civil and criminal litigation. I have since litigated over 50 jury trials in the Superior Court of New Jersey, The United States District Court of New Jersey, The Superior Court for the Commonwealth of Pennsylvania and the District Court for The Eastern District of Pennsylvania. Given my diverse litigation and public speaking experience, I was contracted as an on-air legal analyst for Fox News Channel, Fox News Syndicated Radio Station Group, Fox affiliate channels, as well as the CBS syndicated Radio Network from January 2004 until September of 2008. It was during this five (5) year time span that I analyzed complex legal matters that were being covered by the local, regional and national media. Subject matters included Congressional hearings, United States Supreme Court decisions, matters involving multidistrict and mass tort litigation (including the World Trade Center First Responder litigation, asbestos litigation and various other actions and Bellwether trials).

4. Additionally, my professional affiliations include membership in the American Bar Association, Fellow of the American Bar Foundation, The National Association of Criminal Defense Attorneys, The New Jersey Bar Association and The Pennsylvania Bar Association. I have also been selected for inclusion into Distinguished Attorneys (Civil Litigation Division), and The National Trial Attorneys Top 100.

5. Over the past several decades I have developed friendships and professional relationships with countless individuals who played professional football for the NFL and who are now part of the NFL retired player community. Many of these relationships date back almost three decades. In early December of 2011 after hearing rumblings about the initial litigation against the NFL for concussion related injuries, I spoke with several Retired NFL Players that I was acquainted with, as well

2

as a partner with the Locks Law Firm (Philadelphia, Pennsylvania) whose firm was also interested in getting involved in the possible MDL. I began to review the early court pleadings that had been filed in the matter now known as, *In Re National Football League Player's Concussion Injury Litigation*. After spending substantial time reviewing the pleadings, as well as personally conducting online medical research, I made a decision to become involved in the litigation at an early stage in December of 2011. After evaluating the pleadings and research, it was my belief that the correlation between playing football and sustaining *unexpected* long term cognitive injury was real, with the injuries to players often devastating. Given my personal observations of many retired players who I was familiar with, I witnessed the fact that cognitive decline was consistently occurring in Retired NFL Players of all ages and of all demographics within the Retired Player Community and concluded that litigation would appear to be the only avenue to force the NFL to correct it's wrong.

6. After deciding to become involved in the litigation in December of 2011, I began to speak with retired NFL players who inquired about filing suit against the NFL. Initially, I knew most of the players who I spoke to on a personal or professional level. I was also acquainted with many of their wives. In early January of 2012 the word began to spread that lawsuits were being filed against the National Football League for concussion related injuries. At that time, I began to receive more and more calls from players located throughout the country who wanted my professional opinion regarding the validity of the litigation and the consequences of being a named plaintiff in the matter. The number of players who I interacted with beginning in or about January of 2012 increased on an exponential basis, some of who retained my services to represent them in the concussion litigation and others who retained separate counsel, or remained unrepresented.

7. Prior to January of 2012, in mid-December of 2011, I met with Attorney Gene Locks, of the Lock's Law Firm at his request. Mr. Locks proposed working together in the capacity of co-counsel in the NFL concussion litigation matter, representing those player-clients who desired representation. Given the experience and expertise that Mr. Locks had in the practice area of mass tort and multidistrict litigation, I accepted his proposal to work alongside of him as co-counsel. Mr. Locks explained to me the process and complexities that he perceived existed with regard to litigating the concussion matter against the NFL. He further explained to me how the plaintiff attorneys involved in the case would be compensated. Mr. Locks advised me that legal fees for the attorneys involved in the litigation would be garnered through individual client contingency agreements. He never mentioned and remained silent on the concept of common benefit work and the accompanying common benefit fees that are generally awarded to the attorneys who preform work on behalf of the Plaintiff Class.

8. Even though I agreed to co-counsel the individual cases of over 1100 clients who I brought into the litigation with Locks Law Firm, I spent an exurbanite amount of time working individually, from early January 2012 through mid-November 2014, helping to drive the momentum of the number of retired players who were filing suit against the NFL (*See Statement of Bart Oates, Board of Director NFL Alumni Association attached as Exhibit* R ). In helping to drive the momentum of the case, I was engaging hundreds, if not thousands of former NFL players during this period in order to communicate the importance of the litigation to them and to enhance the existing MDL by creating strength by way of numbers. I believed that this would create leverage for the MDL as a whole, in turn placing more pressure on the National Football League to eventually settle the matter rather than to litigate it.

4

## LEADERSHIP AND THE PRE-SETTLEMENT STAGE OF THE LITIGATION

9.  Even though I represented a substantial number of Retired NFL Players in early 2012 around the time the Plaintiff's Executive Committee (PEC), Plaintiff's Steering Committee (PSC) and additional sub-committees were formed, I never became a member of any of these leadership or advisory committees. Procedurally, in early 2012, prior to the first MDL Court hearing in Philadelphia, I was advised by my co-counsel, Gene Locks, Esquire, that he would be sitting on the Plaintiffs' Executive Committee and there was no need for me to sit on any leadership committee as well.

10. The fact that I never ended up on any leadership or advisory committee, never destroyed my passion or vigor for the litigation. At all times throughout my participation in the MDL on behalf of the Plaintiff Class, I worked to protect, educate, and provide value to all parties involved in the matter, including Class Counsel, the NFL Defendants and the global Class of Plaintiffs.

11. From early January 2012 until the time the District Court issued preliminary approval of the matter's Settlement Agreement in April of 2014, I spent a substantial number of hours educating and informing members of the Retired NFL Player Community as to the importance of becoming a named Plaintiff in the concussion litigation. Throughout this time frame, I continually expressed the importance of the litigation to those players with whom I interacted. (See Statement of John Haines, Chapter President NFL Alumni Austin, Texas attached as Exhibit J). It was my firm belief that each player within the Retired NFL Player Community should become a named plaintiff, no matter who they retained as an attorney. This was not only for their personal well-being, but to better the game of football by protecting the well-being of its' young players and by creating awareness surrounding the issues of

5

concussions and cognitive decline. Given efforts during the pre-settlement phase of the MDL litigation, I am confident that I played an extremely essential role in how quickly the litigation gained momentum within the Retired NFL Player Community. (See Declaration of Joseph Piscarcik, President and CEO National Football League Alumni Association attached as Exhibit C ).

12. It was my belief that if the momentum behind the matter was to move quickly, that the chances of stabilizing the well-being of retired players through a successful resolution of the matter with the NFL would be far more probable.  In order to assist in accomplishing that goal, the prerequisite of gaining the early endorsement of respected, high-profile leaders within the Retired Player Community was critical. I garnered the early endorsements of players including: Wide Receiver-*Wesley Chandler*; Super Bowl Champion and long-time Cornerback-*Isaac Holt*; Fullback and well known Broadcaster-*Keith Byers*; Hall of Fame Inductee-*Leroy Kelly*; Super Bowl Champion and player mentor-*John (Golden) Richards*; two time Pro-Bowl Linebacker-*AJ Duhe*; four time Pro-Bowl Offensive Lineman and television -*Alex Karras*; Veteran Cornerback and National Sports Broadcaster-*Eric Allen*; Renown Super Bowl Champion and Pro-Bowl Quarterback-*Mark Rypien*; Super Bowl champion and Veteran Defensive-End *Carl Hairston*; three time Pro-Bowler and Super Bowl Champion-*Billy Joe Dupree*; Long time Strong Safety-*Rich Miano*; two time Super Bowl Champion and Pro-Bowl Quarterback-*Jeff Hostetler*; Six time Pro-Bowl linebacker-*Karl Mecklenburg*; well-respected Veteran Defensive Tackle-*Jim Kanicki*; two time Super Bowl Champion and Pro-Bowl lineman-*Dave Butz*; six time Pro-Bowl Offensive lineman-*Grady Alderman*; two time Pro-Bowl running back- *Marion Butts*; All American and two time Pro-Bowl quarterback-*John Brody*; long time Veteran Running Back-*Theron Sapp*; four time Pro-Bowl Champion and two time All

American Linebacker-*Jeremiah Trotter*; three time Pro-Bowler, Super Bowl Champion and Sports Illustrated NFL Defensive Player of the year-*Seth Joyner*; two time Super Bowl Champion Defensive Tackle-*Jethro Pugh*; two time Super Bowl Champion and thirteen year Veteran-*Kurt Gouveia*; former Buffalo Bills Player and influential NFL blogger-*Jeff Nixon*; five time Pro-Bowl and four time All-Pro Running Back-*Chuck Forman*; Super Bowl Champion and five time Pro-Bowl Defensive End-*George Andre*; Pro-Bowl champion Offensive Tackle-*Ron Solt*; and seventeen year Veteran Linebacker-*Ray Lewis*. These high-profile influencers within the Retired NFL Player Community, in addition to others unnamed, fostered hundreds, if not thousands of additional players to follow by filing suit and becoming named Plaintiffs in the action. It can be argued that this distinguished group of Retired NFL Players helped change public opinion regarding the litigation from "player negative" to "player positive", ultimately placing far more pressure on the NFL to engage in a favorable resolution of the litigation rather than force the matter into protracted litigation.

13. Further, in addition to personally encouraging players to become named Plaintiffs in the multidistrict litigation, I utilized my media background to further influence press coverage of the litigation. Timely and relevant press releases utilizing persuasive quotes that were personally obtained from influential Retired NFL Players were created and distributed through national newswire services, such as PR Newswire and the Associated Press. This path of distribution would permit each release to be distributed to media outlets locally, regionally and nationally. Many, if not all of the press releases that were created and distributed were prominently published in print, as well as appearing online on the websites of top level media organizations including, *ABC News*, *The Washington Post*, *USA Today*, *NBC News*,

*Associated local and regional newspaper and online media groups, Fox News National and Syndicated Media Outlets, CBS News, as well as Business and Sports Journals throughout the top 50 media markets in the country.* An example of an effective press release that was distributed in mid-January of 2012 and subsequently published on all major media outlet websites, as well as in prominent newspapers throughout the country, including the *Washington Post*, the *Los Angeles Times*, the *New York Daily News* and *USA Today* was titled "Growing List of Former NFL Players Join Together as a Team Once Again". The release read as follows:

> *PHILADELPHIA, Jan. 16, 2012. More and more former NFL players are rapidly joining in lawsuits against the NFL in Philadelphia Federal Court.*
>
> *The concussion lawsuit is necessary, because of the debilitating and permanent effects of head injuries and concussions that have afflicted present and former professional football players in the NFL. For close to one hundred years, evidence has linked concussions to long-term neurological problems. For decades, specialists in brain trauma have warned about the risks of permanent brain damage from repetitive concussions. The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which head trauma is a regular occurrence, was aware of these risks but deliberately ignored the risks associated with concussions and actively concealed them.*
>
> *Kevin Turner, a former New England Patriot and Philadelphia Eagle who was diagnosed with ALS in May of 2010 said "I knew that there were risks involved with football. When I say that, I mean I knew I had a risk of knee trouble, arthritis, and neck pain. No trainer or doctor ever cautioned me about concussions and their cumulative effects. I believe that I had well over 100 concussions and they kept me playing.  We need to protect every athlete - and that includes our children. Awareness is the first step".*
>
> *Former center, Steve Everitt, who played for the Cleveland Browns, Philadelphia Eagles, and St. Louis Rams commented that "there must be fundamental fairness with regard to medical monitoring and our health. After being that physical for so long, who knows what the future holds".*
>
> *Former offensive lineman, Joe Panos, now an NFL agent, who previously played for the Philadelphia Eagles and Buffalo Bills, stated "that everyone involved needs to understand that we must move on after our professional football careers and that our health is vital to both our professional and personal lives".*

> *Britt Hager, a former linebacker for the Philadelphia Eagles, Denver Broncos and St Louis Rams said, "If the NFL had evidence regarding our health and didn't tell us, shame on them. I thought we were supposed to be in this thing together".*

An additional example was a press released that was created and distributed on January 14, 2014, after the District Court denied Preliminary Approval of the first proposed Settlement Agreement. This release was titled: "Judge's Decision to Deny NFL Proposed Concussion Settlement Encourages Players". The release read as follows:

PHILADELPHIA, JANUARY 14, 2014 - More and more former NFL players are slowly digesting the terms of the Proposed NFL Concussion Settlement and putting their stamp of approval on the proposed Settlement. On Monday, January 6, 2014 the U.S. District Judge, Judge Anita Brody denied the Parties motion for preliminary approval without prejudice. What this means is that that Judge needs further confidence that the financial monies being put on the table by the NFL are sufficient for payouts to injured players over the next 60 years before considering the Agreement a second time.

Christopher Seeger, Esq. lead negotiator and co-lead counsel for the Class, along with Craig Mitnick, Esq. who represented over 1,400 of the players who actually filed suit against the League, stated that each firmly believe that the Proposed Settlement will ultimately be approved by the Court. Seeger commended the Court for taking the necessary steps required to ensure the Settlement's fairness and reasonableness to both the NFL and the players by guarantying there will be enough money to compensate those injured for the next 60 years.

Here is what some of the players had to say about the Proposed Settlement and Judge Brody's initial denial of that Settlement:

*Mark Rypian*, a 2x Pro Bowl Selection, 2x Super Bowl Champion, Super Bowl MVP and voted one of the 70 greatest Redskins commented as follows regarding the class concussion settlement: "that as long as the League protects all retired players, monitors their health, compensates the ones that truly need help, and supports those players and their families who are in need, then both sides won the battle. The fact that Judge Brody denied the initial Agreement makes me more comfortable because I know that she wants complete comfort with the fact that retired players will be protected under this Agreement for 60 years to come.

*Eric Allen*, a 6x Pro Bowler, AP First Team All-Pro, Eagles Hall of Fame, 3X UPI first team, Television commentator who supports the Settlement. Allen said "the concussion issue has existed for years, however now there is finally awareness we can all make the game of football safer for the players and just as exciting for the fans." "The settlement is a win for everyone because every retired player is protected through medical monitoring,

followed by treatment (if applicable). If any player gets sick they get financial recovery. End of story. That is the way the law is supposed to work.

**Greg Landry,** a former player and coach who played quarterback in the National Football League from 1968 to 1981 and again in 1984 playing for the Detroit Lions, Baltimore Colts, and Chicago Bears stated: "I am in complete favor of the Concussion Settlement because I really want the money to get to the guys and their families that truly need it as soon as possible. Another misconception that many players have is that if they stay in the Settlement and have no symptoms or diagnosis they will be forever releasing the NFL for concussions. The reality is that every player is protected, whether now or if he gets sick in the future. Landry went on to say that he was surprised and delighted that Judge Brody denied preliminary approval of the settlement until she is 100% confident that there will be enough money to take care of all retired players if need be. She is protecting both the NFL and the Players".

**Joe Panos,** an offensive lineman who played for the Philadelphia Eagles from 1994-1997 and then the Buffalo Bills from 1998-2000 is now an active agent representing NFL players. Panos was one of the first Class Representatives to join the action. Panos supports the concussion settlement because he says it is a fair and honest settlement. "It protects all retired players and financially compensates those who are currently ill. It provides medical testing and treatment for all retired players. Furthermore, it offers financial compensation to the guys who may become ill in the future for 65 years. This settlement should not just be about money, it should be about player safety and protecting retired players in every way possible, from health benefits to family support services".

Panos said "On the issue of the Judge denying preliminary approval until she is more comfortable with the amount of money in the injury compensation fund, I think she is brilliant. Let's make sure there is enough money and that we can all sleep better at night knowing we are protected.

**Joe Pisarcik,** President of the NFL Alumni, has said "both sides faced huge legal battles and that Pisarcik believes that the Settlement is fair as it compensates those players that are truly injured, and protects all other retired players through medical monitoring, treatment and compensation". "Everyone must remember that this was a compromise settlement and one of its major objectives was to immediately compensate those players that are truly injured now, while at the same time protecting all other retired players in the future". The main question now is going to be whether the $675 Million Dollar compensation fund is enough money to protect injured players for the next 60 years.

**Rich Miano,** a strong safety for the New York Jets, Philadelphia Eagles and Atlanta Falcons was one of the first Class Representatives who filed suit in the concussion action. Miano's motivation was to help change policies and procedures to better protect football players of all ages. Miano is a huge supporter of the Settlement and when he learned of Judge Brody's denial of the preliminary settlement terms, his reaction was strong. He said "I would rather the final Settlement be delayed a bit, knowing that everything is solid and will hold up for 65 years".

**Britt Hager**, a linebacker with the Philadelphia Eagles from 1989-1994, the Denver broncos from 1994-1996, and the Saint Louis Rams in 1997. Hager commented that "initially he was surprised when he heard that the Judge denied the preliminary Settlement, but after reading about why the Judge wants more clarification (in order to protect both the players and the NFL) Hager was comforted that there would absolute guarantee that there will be enough money to financially compensate every last player who deserves it".

14. Similar press releases that were distributed and published include:

   a. _More former NFL players file suit in Philadelphia_ (released February 10, 2012).

   b. _NFL concussion case alleges fraud & negligence against the League_ (released January, 2012)

   c. _Super-bowl XXVI MVP and two-time Pro Bowler, Mark Rypien joins the concussion battle_ (released March 28, 2012).

   d. _Alex Karras, former NFL player and Webster television star joins fight against the NFL._ (released April 12, 2012)

   e. _NFL concussion lawsuits keep adding former players_ (released March 20, 2012).

   f. _Detailing the concussion litigation against the NFL", "More NFL lawsuits filed as players begin to take a stance_ (released February 6, 2012).

   g. _As NFL training camp begins, lawsuits continue to be filed_ (released July 24, 2012).

   h. _Judge's Decision To Deny NFL Proposed Concussion Settlement Encourages Players_ (released January 14, 2014)

(See Mitnick Press Releases attached as Exhibit D )

11

15. In addition to the above mentioned media releases, in order to further drive the momentum of the MDL, I personally met with individual key decision makers and influencers within the NFL Alumni Community in order to gain their support for the litigation. Several of the key influencers who endorsed the litigation at an early stage include:

   a.  *Joseph Pisarcik,* (President and CEO NFL Alumni Association).

   b.  *Ron Jaworski* (Member NFL Alumni Association Board of Directors),

   c.  *Bart Oates* (President New York/New Jersey NFL Alumni Chapter; member NFL Alumni Association Board of Directors),

   d.  *Al Smith* (President Tennessee NFL Alumni Chapter; member NFL Alumni Association Board of Directors)

   e.  *John Haines* (President Austin, Texas Alumni Chapter and member of the NFL Alumni Association Board of Directors)

   f.  *Bill Schultz* (President Indianapolis, Indiana Alumni chapter; Co-Chair NFL Alumni Association Board of Directors),

   g.  *Ron Rice* (President Detroit, Michigan Alumni Chapter; member NFL Alumni Association Board of Directors),

   h.  *Jim Karsatos* (President Columbus, Ohio NFL Alumni Chapter),

   i.  *Steve Thurlow* (President Connecticut NFL Alumni Chapter),

   j.  *Beasley Reece* (President Philadelphia, Pennsylvania NFL Alumni Chapter),

   k.  *Raul Allegre,* (Former member of the NFL Alumni Association Board of Directors and ESPN Analysis),

   l.  Key influencers and decision makers of smaller Alumni organizations, including *Mike Ditka's* Grid Iron Greats, *Brent Boyd's* Dignity After Football and *Bruce Laird's* Fourth and Goal.

   m.  *Jeffery Nixon,* (NFL retired player influencer and most prominent blogger within the retired player community).

The endorsements and support of many of these influencers helped to trigger the expediential increase in named Retired NFL Plaintiffs who joined the multidistrict

litigation. According to Federal Court filings in the matter, in the summer of 2011, approximately 300 Retired NFL Players had filed formal suit against the League. This number increased from 300 Retired Players to more than 2,000 Retired NFL Players, whose names were consolidated into one uniform Complaint on June 7, 2012. The number of named Players filing suit continually rose to 4,800 as of June 2013 and that number increased beyond 5,800, including many of the Plaintiffs spouses by the time the Court granted Preliminary Approval in July of 2015.

<u>THE POST SETTLEMENT STAGE OF THE LITIGATION</u>

16. In early September of 2013, almost immediately after the terms of the initial Settlement Agreement were made public, I met with Co-lead counsel, Christopher Seeger in the Northern New Jersey/New York City area. During the lunch meeting with Mr. Seeger and after discussions with him, I was authorized to begin to spend "as much time and energy as was necessary to educate, inform and ultimately garner the endorsement of the Settlement Agreement by the global class of plaintiffs". I was aware that Mr. Seeger had spent an enormous amount of time and energy negotiating the terms of that Agreement and I appreciated the confidence that he had placed in me for this undertaking. From the time of that initial meeting with Mr. Seeger and continuing through the time that the District Court granted final Approval of the Settlement Agreement in April of 2015, I spent an exhaustive number of hours on educating retired players throughout the country on the terms of the proposed Settlement (*See NFLAA Board of Directors Declaration attached as Exhibit E* ). Initially following the meeting with Mr. Seeger in September of 2013, I developed a "*Post Settlement Player Awareness and Education Campaign*" designed to maximize

13

endorsement of the Settlement by the Retired NFL Player Community and to minimize player opt-outs.

17. In order to further these goals, I spent the majority of my professional time from September 2013 (the time the initial Settlement was announced) through July 2014 (the time the revised Settlement Agreement received Preliminary Approval), speaking to Retired NFL of all ages and demographics throughout the country, including presentations at the XLVIII Super Bowl venue in New York, New York on January 29, 2014 and at the 2014 Hall of Fame ceremony in Canton, Ohio on August 1, 2014 (*See Hall of Fame presentation materials attached as Exhibit G*). These presentations were geared to educate and engage Retired NFL Players attending these events in order to garner their endorsement of the Settlement Agreement. Additionally, over the course of 34 months between October 3, 2013 through August 10, 2016, I traveled the country engaging thousands of retired players at their respective NFL Alumni chapter meetings. (*See Alumni Chapter presentation photographs materials attached as Exhibit H* ). These in-person Chapter presentations were highly publicized by Alumni Chapter Presidents in order to ensure heavy turnouts by the Retired Player Community. Informational and Frequently asked question sessions were held in cities that included Austin, Texas on October 30, 2013; New York, New York on October 2, 2013, June 7, 2014 and June 6, 2014; Greenwich, Connecticut on May 5, 2014; Indianapolis, Indiana on December 17, 2013; Hackensack-Meadowlands, New Jersey on October 1, 2013, Fargo, North Dakota on October 21, 2014; Orlando, Florida on March 21, 2014; Cincinnati, Ohio on December 18, 2013; Denver, Colorado on October 25, 2014; Franklin, Tennessee on February 5, 2015; Birmingham, Alabama on October 23, 2014; Phoenix, Arizona on April 14, 2015; Las Vegas, Nevada on April 25, 2014; Chicago, Illinois on May 27, 2014; and finally San

14

Diego, California on August 10, 2016. The final presentation that was given to retired players in August 2016 had two separate components; the first focused on the appellate status of the concussion settlement and the second part concentrated on frequently asked questions from former players in regard to specific terms of the Settlement Agreement, the registration process, the baseline assessment program and the medical requirements necessary for financial recovery.

18. In addition to these NFL Alumni Chapter presentations, I traveled to various parts of the country to reinforce and garner new endorsements of individual key decision makers and influencers within the Retired NFL Community. Without exception, high quality brochures and informational materials, detailing the terms of the final Settlement Agreement were distributed to each of these influencers, as well as at every NFL Retired Player event where a presentation took place (*See Alumni presentation materials attached as Exhibit I*). Printed materials always reflected the most up-to-date relevant information on the Settlement. Copies of the informational materials were also distributed to attending spouses, as the players' spouses are often times the main decision makers in the household. Additionally, in order to educate and garner the endorsement of NFL Alumni Chapter Members in areas of the country where no formal presentation took place, literature was sent directly to Chapter Members and Chapter Presidents. Contact information was provided to the players who wanted further information, or had questions or concerns regarding the Settlement, remaining in the Settlement, or considering opting-out of the Settlement.

19. In addition to in-person group presentations, hundreds, if not thousands of Retired Players were engaged through telephonic and video conference calls that focused primarily on garnering the endorsing of Retired NFL Players with regard to the Settlement Agreement, followed by extensive frequently asked question sessions. An

example of a typical conference call took place on March 12, 2014. The conference call included operator assisted services and took place from the National Football League Alumni Association's corporate office in Mount Laurel, New Jersey. Participation during the call exceeded 1,500 Retired NFL Alumni Players and the call lasted over an hour and a half. Members were asked to submit their questions or concerns prior to the call by emailing them directly to the Alumni Association, at which time the most commonly asked questions were identified and subsequently answered during the conference call (*See Conference Call questions attached as Exhibit K*). Additionally, Retired Players from around the Country, as well as from Canada were able to ask live questions utilizing the operator assistance service during the latter part of the call. Additional conference calls, similar to the call described above took place from October of 2013 through the time the Settlement received final approval in July of 2015. These calls varied from mass attendee participation to far more intimate calls where key influencers within the NFL Player Community listened to status updates and then participated in open discussions. During the time period between March of 2012 and May of 2015, multiple calls took place with the NFL Alumni Association Board of Directors and the NFL Alumni Chapter Presidents, as well as with key influencers and decision makers within the NFLPA to garner additional Plaintiffs within the Retired Player Community.

20. To further solidify existing endorsements of the Settlement Agreement and garner new ones, in-person presentations were also conducted at the NFLAA annual meetings in April of 2014, April of 2015 and April of 2016, as well as at the NFLPA 2014 annual conference that took place during the week of March 20, 2014 in Orlando, Florida (*See statement of former NFLPA Board of Director Derrick Frost attached as Exhibit L*). These larger alumni venues were utilized to inform and

16

educate attending NFL Players on Settlement details and to provide one-on-one informational sessions to those Retired Players who requested more information, or who had concerns regarding the Settlement.

21. The ultimate goal of each in-person presentation, or conference call described above, was to garner the endorsement of as many Retired NFL Players as possible by educating the players on the favorable medical and financial benefits afforded to each of them through the Settlement Agreement. This was not an easy task as many Retired Players had misinformation with regard to the Settlement, the medical testing that was proposed through BAP, the financial compensation that was being offered through MAF, as well as the overall risk and obstacles that the Players faced in continuing to litigate the matter in lieu of Settling with the MDL.

## THE NEED FOR ACCURATE INFORMATION

22. Throughout my travels, I was forced to dispel much of the misinformation that was spreading among retired players regarding the litigation with accurate, relevant and timely information. Many retired players and their spouses, some of who had filed suit and others that had not, had either misinformation or no information at all with regard to the litigation, causing serious doubt with the proposed settlement. Many players and their spouses were so uninformed that they believed that by endorsing the litigation, they would be perceived within their community as greedy. The stigma that existed early on in the litigation by the public "that no real correlation existed between concussions and long term injury" and that "those retired players who were filing suit against the NFL were in it for a money grab" was still resonating with many players and their wives. It was apparent that educating these former players and their spouses about the MDL, including the proposed Settlement Agreement, the

validity of the entire subject matter, as well as having them understand the legal obstacles that they faced including pre-emption, causation and the statute of limitations would be critical to their endorsement of the Settlement and to the Settlement receiving final approval by the District Court, as well as with the court of public opinion.

PLAYER INJURY WEBSITE

23. Given the fact that Retired NFL Players throughout the country had no readily available online resource to help educate them on the details of the Settlement, PlayerInjury.com was revamped to become the interim website for educating Retired NFL Players on the status of the litigation, the terms of the Settlement Agreement, and the status of the ongoing appeals. (*See Playerinjury.com documentation attached as Exhibit M*). The website provided concussion Litigation news, updates, informational materials for download, as well as providing an "Open Forum" component for Players to easily publish their thoughts and opinions regarding the Settlement and the appeals that were underway in the Third Circuit. Until PlayerInjury.com became available to the proposed Plaintiff Class, Retired Players had no effective online resource that could provide them with up-to-date, relevant and accurate information. PlayerInjury.com provided Retired NFL Players and their families one centralized location to become educated on the Settlement and address other Retired NFL Players within the Retired Player Community with their personal opinions about the MDL, the Settlement and the legal process pertaining to the pending appeals that had been filed in the matter.

24. With the ever-changing information needs and the rapidly growing interest in the concussion Settlement, players needed a readily available website that they could

access from their cell phones, as well as their computers to gather the latest accurate information in regard to the Settlement. PlayerInjury.com, a website devoted to educating Retired NFL Players and managed in part by Retired Player, Jeffrey Nixon was activated by Mitnick Law Office. The formal website for the litigation, NFLConcussionSettlement.com did not exist at the time and even after it was initially placed online, the PlayerInjury.com website was still utilized by the Retired Player Community to keep up-to-date with the status of the ongoing appeals that had been filed in the matter.

25. Between September 1, 2013 and May 30, 2016 the site had 51,916  unique visitors and provided the personal opinions from over 120 Retired NFL Players.  The Settlement information, news and player opinions that were published on Playerinjury.com were all important factors in the final endorsement of the Class Settlement. The opinions and quotes from numerous Retired NFL players were so critical that many of them were included in an attachment to Class Counsel's brief in support of the Settlement's Final Approval.


## THE UNPRECEDENTED APPROVAL RATE

26. Gaining the endorsement of as many Retired NFL Players within the Retired Player Class was my primary objective from the date the Settlement gained Preliminary Approval from the District Court until the matter received Final Approval from the District Court. The countless hours of preparation time, travel time, presentation time and time spent on development and distribution of informational materials was instrumental to the unprecedented approval rate of over 99% of the 20,000-member Plaintiff-Class who ultimately endorsed the Settlement. This unprecedented Class endorsement was a critical factor in lead counsel's final argument in support of Final

Approval at the Final Fairness Hearing on November 19, 2014. Co-lead counsel, Christopher Seeger's Declaration in Support of the Final Fairness Hearing that was filed with the Court prior to November 19, 2014 read in pertinent part:

> "The reaction of the Class has been extremely favorable. As the Opt-Out/Objection deadline, fewer than 1% of Retired NFL Players filed requests for exclusion from the Settlement....In a case as highly publicized as this one, where significant claims are at stake, and more than 5,000 individual actions were filed in the MDL alone, this positive response of Class Members should be given great weight". Additionally, Mr. Seeger wrote "For a Class of approximately 20,000 Retired NFL Players, this high level of favorable response is remarkable...." (*See Declaration of Christopher Seeger in support of Final Approval of Settlement and Certification of Class and Subclasses, paragraph 71, under date of 11/12/14*)

At the time of the Final Fairness hearing, Mr. Seeger concluded his oral argument in support of the Settlement becoming final by passionately reiterating to the Court the fact that over 99% of the Player-Class endorsed the Settlement that he had so successfully negotiated. After Mr. Seeger's oral argument ended and he turned the floor over to Lead Counsel for the National Football League Parties, Brad Karp, Mr. Karp opened his remarks to the Court with the same 99% endorsement argument (*See Court Transcript under date of November 19, 2014*).

## SUMMARY STATEMENT

27. In order to garner the eventual endorsement from the Retired Player Community, I worked in excess of 2,400 hours during the time frame of January 2012 through the present, always with a sense of continued passion and respect for the litigation. Countless hours were spent on the preparation and distribution of hard-copy

presentation materials; drafting and publishing up-to-date online information at PlayerInjury.com; engaging in individual and mass player conference calls; providing in-person group presentations; continually distributing, publishing and updating frequently asked question materials; drafting and distributing strategic press releases; as well as, continuously and positively reinforcing the litigation to ensure that players understood the fairness, reasonableness and tremendous benefits of the settlement agreement (*See hourly billing statement attached as Exhibit N*).

28. Consistent and persuasive arguments as to why each and every player in the plaintiff class should endorse the final Settlement Agreement took place on a daily basis from the date the Settlement received preliminary approval until the present time. Prior to my efforts being focused on the endorsement of the final Settlement Agreement, hundreds of man hours were spent on promoting the litigation, clearly leading to an exponential increase in the momentum of the litigation. This is evident by the ultimate number of players (5,000 plus) who placed their reputations on the line to become involved in the hundreds of lawsuits that were filed prior to Class Certification at such a rapid pace from the onset of the action.

29. In addition to the efforts set forth above, as outlined in detail in the Mitnick common benefit billing statement (*See Retired Player quotes attached as Exhibit O*) countless hours were expended on obtaining written and video endorsements of the Settlement terms from some of the most influential and high profile players within the Retired NFL Player Community. Many of these Retired Player quotes were so instrumental that they were included in Class Counsel's brief that was filed with the Court in support of Final Settlement approval*).* The statements from these influential Retired Players were also included in videos that were produced and made available to

players through direct email distribution, as well as placed online for easy mobile accessibility at PlayerInjury.com. Videos produced include:

    a.  *"Settlement Urgency"*, released June 8, 2015;

    b.  *"Consequences of Opting Out of the Concussion Settlement"*, released July 20, 2015,

    c.  *"The Legal Battle"*, released May 18, 2013,

    d.  *"Concussion Litigation Question and Answer"*, released September 14, 2014; and

    e.  *"The NFL Concussion Settlement Retired Player Opinions"*, released August 18, 2014.

30. Given the degree of misinformation that was being spread throughout the Retired Player Community with regard to the terms and status of the proposed Settlement, the printed materials and multi-media video presentations mentioned above were made available to further provide players with timely, relevant and accurate Settlement information, as well as serve to inform those players that were considering opting-out of the Settlement (*See Declaration of Retired NFL linebacker Brad Quast attached as Exhibit P and Declaration of Retired NFL wife Val Butts (Marion Butts) attached as Exhibit S*).

31. I do not know of any other direct communications, or similar efforts from attorneys involved in the litigation, that were able to distill the influx of misinformation that was spreading within the tight-knit retired player community. Misinformation was corrected with accurate information through the preparation and distribution of hard-copy literature, in-person presentations at large and small alumni chapter venues, as well as, personal one-on-one interactions with thousands of players. Correcting

misinformation with accurate information curtailed the frustration that much of the player community was exhibiting.

32. My efforts throughout the litigation on behalf of the global Class of Plaintiffs have resulted in tremendous value to the Plaintiff Class, their spouses, Class Counsel, and the NFL parties. Additionally, these efforts in part, greatly helped catapult the unexpected passion within the Retired NFL Player Community in promoting concussion awareness. Retired NFL Players of all ages and backgrounds spoke out to the media, as well as to members of their own communities about the importance of player safety. This new found passion by retired players was a major contributing factor in the fundamental change that has occurred in how the world now views the correlation between concussions and long term injury. Children and athletes of all ages and skill sets are protected now more than even before. The significant changes in medicine, science and law that have come about could not have materialized without the mass support of the Retired Player Community.

33. The time and energy that was expended in educating the Retired NFL Player Community on the science of concussions and the depth and reach of the terms of Settlement Agreement was an enormous task that consumed a countless number of hours and an exhaustive amount of energy.

34. From the onset of the multidistrict litigation through today, I gave up most of my practice of law, as that time was necessary to accomplish the goals set forth in this Declaration.  Prior to the litigation, I was personally responsible for generating hundreds of thousands of dollars in revenues to my firm each year.  The large majority of those revenues were forgone during the course of the concussion litigation given the risk that I incurred to become involved and to the degree of common benefit work which I ultimately performed. To offset the burden of foregoing my regular revenue generating

activity and to fund my office and the costs involved in pursuing the goals described in this Declaration, I was required to secure financing in excess of $1,500,000 during the period from December 2012 until the present.

35. Throughout the litigation I consistently endorsed Class Counsel without exception, and specifically endorsed the efforts of Co-Lead Counsel, Chris Seeger in the overwhelmingly successful negotiation of the Concussion Settlement Agreement.  The combined efforts of all parties in this historic case will now allow 20,000 retired National Football League players living throughout North America to receive medical benefits, as well as financial compensation in excess of $1 billion dollars. Their legacy will live on forever.

36. I am humbled and honored to have been worked alongside of the high caliber of Attorneys, Retired Player Executives and Retired NFL Players as I did throughout this MDL litigation.


   I declare under penalty of perjury, that the foregoing is true and correct.


By: _____
       Craig R. Mitnick, Esquire
       Mitnick Law Office, LLC