### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br>Plaintiffs,<br>v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

<u>**EXPLANATION AND ORDER**</u>

On April 5, 2018, I issued a Memorandum Opinion awarding Class Counsel

$106,817,220.62 in attorneys' fees.  Today I address the allocation of those funds among Class

Counsel for their work in securing the Settlement Agreement.

**I.      Background**

This case began as an aggregation of lawsuits brought by former Players against the NFL

Parties for head injuries sustained while playing NFL football.  This Settlement was secured

without formal discovery, with limited litigation of motions, and with no bellwether trials.

Instead this case was litigated through negotiations that were supported by a creative legal

framework that survived rigorous appellate challenge.

On January 31, 2012, the MDL was formed and proceedings were centralized in this

Court.  In July of 2013, I ordered the parties to engage in mediation and I appointed retired

United States District Court Judge Layn Phillips as mediator.  ECF No. 5128.  The parties

worked intensely in this negotiation, at times around the clock.  A Term Sheet was executed on

August 29, 2013.  ECF No. 5235.

   Following the announcement of a term sheet, the parties continued to negotiate, working

out the detailed terms of the Settlement Agreement.  Recognizing the complicated financial

aspects of the proposed settlement, I appointed Perry Golkin as Special Master to aid me in my

evaluation.  ECF No. 5607.  On January 6, 2014, the parties submitted a motion for preliminary

approval of a class action settlement.  ECF No. 5634.  Though I believed the efforts in the

negotiation were commendable, I denied the motion because I had concerns about the cap on the

Monetary Award Fund.  ECF No. 5658.

   Diligently, the parties returned to their negotiations, working intensely through June of

2014 to further analyze the economic data to construct a fund that would ensure payment to the

class members over the full 65-year term of the Agreement.  On June 25, 2014, the parties

submitted a revised proposed Settlement Agreement, which provided an uncapped Monetary

Award Fund.  ECF No. 6073.  As with the first proposed settlement, the parties chose to

structure the case as a class action, which subjected the Settlement Agreement to the challenges

of compliance with Federal Rule of Civil Procedure 23.  On July 7, 2014, I granted preliminary

approval.  ECF No. 6083.  I instructed Co-Lead Class Counsel to ensure that notice was given to

the class, and I set a schedule for an objection procedure and a fairness hearing.  ECF No. 6084.

   After the Fairness Hearing, I ordered the parties to return to the bargaining table to

consider making the following changes:

- Allow credit for Eligible Seasons when a Player was playing in the World League
  of American Football, the NFL Europe League, and the NFL Europa League;

- Revise the funding limitations to the BAP to ensure that all eligible players would receive a BAP baseline assessment;

- Revise the date for the Qualifying Diagnosis of Death with CTE;

- Add a hardship exemption for fee to appeal an award determination; and

- Allow a reasonable accommodation for *force majeure* type events that preclude class members from obtaining medical records.

ECF No. 6479.

On February 13, 2015, the parties agreed to the proposed changes and submitted an amended settlement.  On April 22, 2015, I certified the class and approved the Settlement Agreement.  ECF No. 6509.

Following my approval, Class Counsel turned their attention to the defense of the class certification under Rule 23 and the approval of the Settlement Agreement.  On April 18, 2016, the Third Circuit Court of Appeals affirmed.  *In re National Football League Players Concussion Injury Litigation,* 821 F.3d 410 (3d Cir. 2016).  The Circuit Court's opinion was challenged through two petitions for writ of certiorari that were submitted to the United States Supreme Court.  The petitions were denied on December 12, 2016.  The Settlement became effective on January 7, 2017.

As a part of the Settlement Agreement, the NFL Parties agreed to pay $112.5 million dollars in fees to Class Counsel.  On April 5, 2018, I approved Co-Lead Class Counsel's petition for the award of attorney's fees for the full amount.  On that same date, I approved the incentive awards for class representatives and awarded the payment of $5,682,779.38 in expenses to Class Counsel.  *In re National Football League Players' Concussion Injury Litigation,* No. 2:12-MD-02323-AB, 2018 WL 1635648 (E.D. Pa. April 5, 2018).

On September 11, 2017, I ordered Co-Lead Class Counsel, Christopher Seeger to submit a proposal for the allocation of lawyers' fees among Class Counsel.  ECF No. 8367.  Mr. Seeger

submitted a detailed proposal on October 10, 2017.  ECF No. 8447.  I also invited any party seeking payment of class benefit fees to submit a counter-declaration.  ECF No. 8448.  On May 15, 2018, I convened a hearing and allowed any party seeking class benefit payment the opportunity to explain their position and basis for the fee requests.[1]

In the April 5th Fee Opinion, I observed that a portion of the $112.5 million would be used to pay Class Counsel's fees for securing the Settlement Agreement and would be used for the implementation of the Settlement Agreement.  Today I allocate $85,619,466.79 to Class Counsel for their work in securing the Settlement Agreement.  I continue to hold the remaining funds in reserve to pay Class Counsel for their services in supporting the class through the implementation of the 65-year term of this Agreement.[2]

## II.    Discussion

This Settlement was obtained through a complex, multi-tracked mediation effort.  It required a pioneering effort by Class Counsel, which allowed for the formation of a legally adequate class despite player differences.  The relatively quick resolution allowed impaired Class Members to receive compensation and access to treatment as quickly as possible.  The Parties made it clear to me that certification of this case as a class action was a keystone to negotiations.  But, Rule 23 and the related case law made class certification in personal injury cases a challenge.  Class Counsel's creativity in structuring a certifiable class against this legal landscape

---

[1]  In advance of this hearing, I required all firms seeking payment for class benefit services to provide declarations related to the illegal assignment of Class Member Awards to Third-Party Funders.  I have decided not to take action on that information at this time.

[2]  The Settlement Agreement allowed for a reduction of individual Awards by up to 5% to pay implementation fees to Class Counsel.  In my April 5, 2018 opinion, I indicated that I believed a determination of the need for additional funds was premature at this time.  In an abundance of caution, I have instructed the Claims Administrator to hold 5% of all Awards in reserve.  I will revisit Class Counsel's request for additional funds to be paid from that holdback at a later date.

and persuading this Court, the Third Circuit, and United States Supreme Court was groundbreaking.

*Factors Considered in Calculation of the Multipliers*

In his proposed allocation, Co-Lead Class Counsel indicated that he used three broad criteria in calculating his proposed allocation: (1) appointed leadership roles in the litigation; (2) "meaningful" involvement in the litigation from beginning to end; and (3) value of the contribution to the settlement negotiations and defense of the Settlement on appeal.

I will address Co-Lead Class Counsel's third factor first, because I believe it most important. Under present case law, establishing class certification under Rule 23 in mass tort cases is challenging. One of Class Counsel's most important contributions was the creation and negotiation of the necessary provisions that allowed for a settlement under these legal rigors. Class Counsel's innovative terms formed through rigorous negotiation and then defended at the appellate level were outstanding. I place a very high value on the legal acumen necessary to construct and defend this unique settlement.

Secondly, credit should be given to attorneys who were meaningfully involved in this litigation from the earliest stages through to the hard fought appeal. The lawyers that advanced the interests of the class for the full five years of negotiation and defense deserve to be compensated for this work.

Relatedly, several objectors have requested that I consider the common benefit work performed prior to the formation of the MDL. At the start of the MDL proceedings, I adopted the protocol proposed by Plaintiffs' leadership as it related to the submission of fees and expenses. Those regulations prohibited the submission of hours for work performed prior to the

formation of this MDL.  ECF No. 3710.  As is noted below, I have considered work done prior to the formation of the MDL through an increase in the firm's multiplier where applicable.

Finally, the fact that a firm has a leadership role in this MDL/Class Action is a factor that should be considered in the fee allocation.  But, membership in the Plaintiff's Executive Committee (the "PEC") and the Plaintiff's Steering Committee (the "PSC"), standing alone, is insufficient to merit anything greater than a 1.0 "multiplier."  In constructing the PSC and PEC, Plaintiffs provided a list of the tasks that were delegated to the PSC, almost all of which were never necessary to the advancement of this case.  ECF No. 54, at 2-4.  Thus, members of the PEC and PSC are entitled to payment for the work performed at reasonable billing rates, but, without more, are not entitled to an enhancement of those fees.

Some attorneys have argued that they incurred more risk by taking on large numbers of clients.  They argue that their contribution of "critical mass" is a factor worthy of a multiplier.  I disagree.  Every attorney involved in this litigation has taken on the risk that work will be performed, but no payment will be received.  Attorneys who worked a high number of hours advancing the interests of large numbers of clients certainly incurred great risk, but risk incurred for individuals must be paid by those individuals.[3]  On the other hand, attorneys who worked a high volume of hours advancing the interest of the Class incurred a high risk for the Class.  That is the type of risk that should be paid through a class benefit multiplier.

---

[3]  Actually, as Professor Rubenstein noted, the economies of scale actually benefit firms that took on large volumes of clients.  ECF No. 9526 at 32-33.  Though these attorneys have taken on a greater volume of risk, they have actually taken on less risk on a client by client basis.  Either way, this is risk attributable to their representation of individual clients, not their risk as it relates to the Class.

*Billing Rates Used*

As to the lodestars submitted here, I have previously expressed my concerns about the billing rates submitted by some firms.  *See In re National Football League Players' Concussion Injury Litigation,* 2018 WL 1635648, *9.  In seeking the appointment of the PEC and PSC, the attorneys indicated that they had "reached consensus to establish reasonable uniform hourly rates for all partners, associates and paralegals conducting work that benefits all plaintiffs for purposes of reimbursement for fees from the Common Benefit Fund and for lodestar check…."  ECF No. 54.  Despite this, the hourly rates submitted here were not uniform and these agreed rates have not been provided to the Court.  The lodestars submitted break the hours worked into groups of partners, of counsel, associates, staff attorneys and contract attorneys, and paralegals.  I have taken the average billing rate[4] for each of these categories to use as a reference.  Where the overall firm rate has exceeded the rate using these averages, I have adjusted the billing rates.  Where an adjustment is made, it is noted below.

*The Process to Determine this Allocation*

I concluded that this specific case would be most equitably resolved by allowing Co-Lead Class Counsel to recommend an allocation.  I chose this approach because this case was resolved through intensive negotiations, as opposed to widely reviewed discovery, depositions, and bellwether trials.  Co-Lead Class Counsel had a front row seat for the negotiations and the legal rigors of the appellate process.  His perspective is unique and important.  This approach is not unusual and has been endorsed by other courts, including courts in this district.  *See, e.g., Milliron v. T-Mobile, USA, Inc.*, 423 F. App'x 131, 134 (3d Cir. 2011); *In re Processed Egg*

---

[4]  The average billing rate for partners is $758.35.  The average billing rate for "of counsel" attorneys is $692.50.  The average billing rate for associates is $486.67.  The average billing rate for contract attorneys is $537.50.  The average billing rate for paralegals is $260.00.

*Prods. Antitrust Litig.*, No. 08-2002, 2012 WL 5467530, at *7 (E.D. Pa. Nov. 9, 2012); *accord In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 343, 351-52 (E.D. Pa. 2004).

Since it is my obligation to "evaluate what Class Counsel actually did and how it benefitted the class," *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 342 (3d Cir. 1998), I asked Class Counsel to submit his recommendation and then allowed other attorneys to object to the proposed allocation, both in pleadings and in open court. The path of this litigation has also provided me with a very full picture of the roles and responsibilities of the different attorneys in this litigation. As a result, I believed that delegating the allocation to a special master or Magistrate Judge for a report was not advantageous.

*The Firm-by-firm Fee Requests*

I will address each firm in Co-Lead Class Counsel's fee petition in alphabetical order, setting out the amount of the allocation and the factual basis underlying my conclusion. I will then address the fee petitions of the Objectors.

**1. Anapol Weiss.**

Anapol Weiss made contributions to this litigation from its outset to its conclusion. I appointed Sol H. Weiss of Anapol Weiss as Co-Lead Class Counsel in this case, having been selected for that role by the PEC. ECF No. 72. Larry E. Coben was appointed to serve as a member of the PEC.

Anapol Weiss was actively involved in the construction and negotiation of the Settlement Agreement. As was reported by Co-Lead Class Counsel, Mr. Weiss "attended many of the settlement meetings and mediations with the NFL. Mr. Weiss, and his partner, Mr. Coben, assisted in negotiating the battery of tests for the BAP and dealt with other matters relating to the medical issues underpinning the Settlement. Mr. Weiss was active in the settlement process,

8

including review and comment on the drafts of the Settlement Agreement.  Messrs. Weiss and Coben met with and assisted in preparing scientists and physicians who submitted declarations in support of the Settlement."  ECF No. 8447, at 7.

Anapol Weiss was one of the firms involved in this litigation from start to finish.  They were also responsible for filing the first federal case (*Easterling v. NFL*, Civil Action No. 11-5209) on August 17, 2011.  Prior to the formation of the MDL, Anapol Weiss played a leadership role in bringing plaintiffs' counsel together.  I have given some weight to this pre-MDL work in the calculation of their multiplier.

Anapol Weiss submitted 4,241.20 hours for a lodestar of $1,857,436.00.  Based on the contributions and the nature of the work performed by Anapol Weiss, including the firm's pre-MDL work, I award them $4,643,590.00, which amounts a 2.5 multiplier on the firm's lodestar.

### 2. **Casey Gerry Schenk**.

David Casey was appointed to serve on the PSC.  Mr. Casey and his partner, Fred Schenk also served on the Communications Committee.  Co-Lead Class Counsel has recommended that work performed as a member of the Communications Committee is not enough, standing alone, to merit an enhancement through a multiplier.  As discussed above, Co-Lead Class Counsel supervised all aspects of this settlement negotiation.  I respect his unique position in evaluating the impact of the committee's work on the over-all settlement, and I accept his conclusion about the proper multiplier to be used.

Casey Gerry Schenk submitted 417.40 hours for a lodestar of $333,920.00.  This lodestar utilized rates that exceeded the average rates I have identified.  I award the firm $316,533.51, which is the full amount of the adjusted lodestar.

### 3.   **Dugan Law Firm.**

James Dugan was selected to serve on the PSC and served on the Discovery and
Preemption Committees.

The Dugan Law Firm submitted 293.90 hours for a lodestar of $188,340.50.  I award the
full amount of the firm's lodestar.

### 4.   **Girard Gibbs**.

Daniel Girard and Amanda Steiner worked with Co-Lead Class Counsel, experts, and co-
counsel to obtain Final Approval of the Settlement and assisted in the defense of the Settlement
Agreement after Final Approval.  I accept Co-Lead Class Counsel's characterization of the
firm's contribution to the defense of the settlement, which I believe is one of the most complex
aspects of the work done in this case.

Girard Gibbs submitted 373.10 hours for a lodestar of $279,489.00.  I will award the firm
$335,386.80, which amounts a 1.2 multiplier on the firm's lodestar.

### 5.   **Girardi Keese.**

I appointed Thomas V. Girardi and Graham LippSmith of Girardi Keese to serve as
members of the PEC.  Additionally, Girardi Keese, along with Goldberg Persky & White and
Russomanno & Borello, brought the first two cases that were filed in this litigation:  *Maxwell v.
NFL* (filed July 19, 2011) and *Pear v. NFL* (filed August 3, 2011).

The firm has submitted their pre-MDL hours as an exhibit to their objections.  I have
considered that submission and considered the work done by the firm prior to the formation of
the MDL.  This pre-MDL work has provided the basis for the multiplier that I have chosen.

This firm submitted 628.70 hours for a lodestar of $448,190.00.  This lodestar utilized
rates that exceeded the average rates I have identified.  In consideration of the firm's leadership

on the PEC and their pre-MDL common benefit work, I award the firm $526,548.33, which

amounts to a 1.2 multiplier on the adjusted lodestar.

### 6. Goldberg, Persky & White.

Goldberg, Persky & White was not a member of the PEC or the PSC, but the firm (along

with Girardi Keese and Russomanno & Borello) filed the first two cases in this litigation:

*Maxwell v. NFL* (filed July 19, 2011) and *Pear v. NFL* (filed August 3, 2011).

I am aware of Jason Luckasevic's work in mounting litigation against the NFL, including

his relationship with Dr. Bennet Omalu, who was a pioneer in the discussion of CTE.  This pre-

MDL work has provided the basis for the multiplier that I have chosen.

Goldberg, Persky & White submitted 500.60 hours for a lodestar of $262,860.00.  To

ensure that the firm receives an appropriate value for their pre-MDL work, I award them

$328,575.00, which amounts a 1.25 multiplier on the firm's lodestar.

### 7. Hagan, Rosskopf & Earle.

Bruce Hagen served on the Communications Committee of the PSC.

Mr. Hagen has submitted objections, documenting the various tasks he completed for the

Communications Committee.  I have reviewed these, but the arguments do not alter my belief

that the services performed by members of the Communications Committee do not merit a

multiplier.  This is not to say that the work of the committee did not make a difference in this

litigation.  The issue here is whether that work made such a difference that counsel's ordinary

fees should be subject to an enhancement.  Upon review of all the pleadings (including the

information presented by others who were members of the Communications Committee), I have

concluded that membership in the Communications Committee, without more, is not entitled to a

multiplier.

Hagen, Rosskopf & Earle submitted 540.80 hours for a lodestar of $324,480.00, which I award them in full.

### 8.   Hausfeld.

I appointed Richard Lewis and Michael D. Hausfeld to serve as members of the PEC. Additionally, Hausfeld associate, Jeannine M. Kenney, served as the Court-appointed Plaintiffs' Liaison Counsel, and assisted Co-Lead Class Counsel in organizing communications with and between the PEC, the PSC and Co-Lead Class Counsel.

Mr. Lewis also served on the Legal Committee where he conducted factual and legal research in preparation for, and drafting of, the Master Administrative Personal Injury and Medical Monitoring Class Action Complaints, and opposing the NFL Parties' efforts to dismiss Plaintiffs' claims.

Hausfeld submitted 1,281.80 hours for a lodestar of $763,917.50.  This lodestar utilized rates that exceeded the average rates I have identified.  I award the firm $914,903.77, which amounts a 1.3 multiplier on the adjusted lodestar.

### 9.   Herman, Herman & Katz.

At the direction of Co-Lead Class Counsel, Herman Herman & Katz provided research and preparation of materials applicable to the cause and treatment of concussions that assisted in the development of the terms and conditions of the Settlement.  The firm was uniquely positioned to assist through the aid of Joseph Kott, who brought the experience of over 20 years of practicing neurosurgery prior to becoming of counsel.

Herman Herman & Katz submitted 136.30 hours for a lodestar of $89,660.00.  I award the full amount of the firm's lodestar.

**10. Professor Samuel Issacharoff.**

One of the keystones to this litigation was overcoming the challenge presented by Rule 23 in the personal injury context.  In hindsight, it is clear that this was not an insurmountable obstacle.  The creative construction of the Settlement Agreement as well as an intelligent approach to the case law made the defense of this Settlement look almost easy.  But, that hindsight cannot control our evaluation.  The Settlement in this case was a pioneering effort, not just on the science, but also on the law.

Professor Issacharoff's persuasive appellate advocacy and knowledge of class action jurisprudence was invaluable to the Class.  Though Professor Issacharoff's presence is most obviously seen in his appellate pleadings and argument, that contribution was only part of his work.  As Co-Lead Class Counsel explains, Professor Issacharoff was influential in the settlement negotiations, which were conducted with an eye toward the potential Rule 23 issues. ECF No. 8447, at 9.

Several objectors take issue with the multiplier proposed by Co-Lead Class Counsel. These arguments arise out of a fundamental misunderstanding of the nature of the agreement that was reached in this case.  Settlement required the creation of a class.  The complexity of the law in this area required an expert who could help construct an agreement that would withstand the rigors of the appellate process.  If that process looked easy, it was due to Professor Issacharoff's skill.

Professor Issacharoff submitted 801.75 hours for a lodestar of $800,512.50.  As a member of the "team," however, the professor was obligated to comply with the same restrictions on billing rates as law firms seeking common benefit payments.  I have, therefore,

adjusted the billing rates used to comply with the average rate I used for billing by law firm

partners.  I award $1,976,012.00, which amounts a 3.25 multiplier on the adjusted lodestar.

**11. Kreindler & Kreindler.**

Anthony Tarricone co-chaired the Communications Committee of the PSC, which was an

active committee during the negotiations and in the public defense of the Settlement.  As Co-

Lead Class Counsel explained, "Mr. Tarricone helped develop an effective media campaign to

ensure the dissemination of accurate information to interested media, and counter misinformation

concerning the Settlement to potential class members."  ECF No. 8447, at 9.

The objections submitted by Mr. Tarricone, along with the objections submitted by the

other members of the Communications Committee, have provided me with a full picture of the

work performed by the committee.  Co-Lead Class Counsel has also presented me with detailed

information on his views related to the impact of the Communications Committee on the overall

litigation.  Mr. Tarricone was co-chair of the committee and for that leadership I believe that he

is entitled to a multiplier.  Other than the firms that I appointed as Class Counsel and Professor

Issacharoff, no firm will be paid more than the Kreindler firm.  It is entirely clear to me that this

payment is well-earned.  It is equally clear to me that a higher multiplier is not appropriate.

Kreindler & Kreindler submitted 1,573.00 hours for a lodestar of $1,258,400.00.  This

lodestar utilized rates that exceeded the average rates I have identified.  I award the firm

$1,491,097.30, which amounts to a 1.25 multiplier on the adjusted lodestar.

**12. Levin Sedran & Berman**.

Levin Sedran & Berman provided meaningful support of this litigation from start to

finish.  Arnold Levin was selected to serve as a member of the PSC, and was later appointed

Subclass Counsel for Subclass 1.  Mr. Levin was an active participant in the negotiations that led

to the Settlement Agreement.  Co-Lead Class Counsel credits Mr. Levin with his role in the

negotiations regarding "class and subclass definitions, a preliminary injury grid, and foundation

for the Baseline Assessment Program."  ECF No. 8447, at 9.  Additionally, Mr. Levin and

Sandra L. Duggan assisted with negotiations related to players in Subclass 2 with Dianne Nast,

Subclass Counsel for Subclass 2.

At the direction of Co-Lead Class Counsel, the firm assisted with research on a number

of topics relevant to the strength and viability of Plaintiffs' claims, including medical

monitoring, tolling, preemption, and fraudulent concealment, while assisting in the preparation

of the Master Administrative Personal Injury and Medical Monitoring Class Action Complaints.

The firm continued its support of the Settlement through Rule 23 appeals and arguments to the

Third Circuit.

This firm submitted 4,862.75 hours for a lodestar of $4,573,438.75.  This lodestar utilized

rates that exceeded the average rates I have identified.  I award the firm $8,411,720.45, which

amounts a 2.25 multiplier on the adjusted lodestar.

### 13. Locks Law Firm.

The Locks Law Firm was involved in the leadership of this litigation.  I appointed Gene

Locks and David Langfitt to serve as members of the PEC.  Later in the litigation I appointed

Mr. Locks to serve as Class Counsel.  Mr. Langfitt worked with two other PEC members to draft

the Master Administrative Personal Injury and Medical Monitoring Class Action Complaints,

and was involved in preparing the opposition to the NFL's motion to dismiss on the grounds of

preemption.

Though present early in this litigation, the firm's role did not continue throughout the

appellate support of the Settlement.  I accept Co-Lead Class Counsel's assessment that the firm

did not play an active role in either the settlement negotiations or the defense of the Settlement on appeal.  I also have to respect Co-Lead Class Counsel's concerns about the impact of Mr. Locks' interview with *Businessweek*, since Co-Lead Class Counsel led the negotiations with the NFL and is best positioned to advise me on this matter.

Ultimately, I conclude that the Locks firm is entitled to a multiplier for the leadership role they played in this litigation, but their failure to provide meaningful support for other crucial aspects of this process is the basis for the multiplier that I have chosen.  The firm, however, will be compensated more than $3.8 million for their services – only four other firms will receive a higher payment from the common benefit fund.

The Locks Law Firm submitted 4,243.00 hours for a lodestar of $3,084,500.00.  I award the firm $3,855,625.00, which amounts a 1.25 multiplier on the firm's lodestar.

### 14. McCorvey Law.

Derriel McCorvey was selected to serve on the PSC.  Mr. McCorvey also served on the Communications Committee.  The firm, like many others, stood ready to perform additional work, but none was assigned because of the nature of this Settlement.  I have no doubt that McCorvey Law could have provided additional positive support had this litigation taken a different path.  Ultimately, however, I must assess the work actually performed.

McCorvey Law submitted 331.30 hours for a lodestar of $198,780.00.  I award the full amount of the firm's lodestar.

### 15. Mitnick Law.

Mitnick Law was not a member of the PEC or PSC, but served at the direction of Co-Lead Class Counsel in the multi-faceted outreach efforts to the Retired NFL Player Community, including in person events with alumni and other NFL players' associations.

16

Mitnick Law submitted 1,198.15 hours for a lodestar of $898,612.50. Co-Lead Class Counsel proposed multiplier of .75 for Mitnick Law's allocation in this matter. Though Mr. Mitnick initially submitted objections to the proposed allocation, he subsequently *withdrew* those objections, stating, "After much thought and deliberation, I have realized how much time and energy Mr. Seeger and his firm have put into the NFL concussion litigation, its successful resolution and their recommendation for the allocation of common benefit fees. If not for Mr. Seeger's efforts, there is no doubt that this case would have never materialized as quickly as it did." ECF No. 8917.

Despite withdrawing his objection, Mitnick Law submitted a fee petition on May 11, 2018 and appeared before me on May 15, 2018 to argue for fees beyond those recommended by Co-Lead Class Counsel. The time for submitting fee petitions has long passed. I set a deadline of October 27, 2017 for the submission of all requests for fees. ECF No. 8448. Yet in the interest of fairness, I have reviewed the fee petition and I have considered Mr. Mitnick's "objections" submitted during the May 15, 2018 Hearing. I have also reviewed Co-Lead Class Counsel's explanation of the impact of the work performed by Mitnick Law. I do not find Mr. Mitnick's arguments persuasive.

I award Mitnick Law $673,959.38, which amounts a .75 multiplier on the adjusted lodestar.

**16. NastLaw.**

NastLaw provided strong leadership throughout this litigation. Dianne Nast was selected to serve as a member of the PSC, and was later appointed to serve as Subclass Counsel for Subclass 2.

Co-Lead Class Counsel credits NastLaw as one of only six firms that "made contributions from the outset of the litigation all the way to its end." ECF No. 8447-2 at 4. The firm was actively involved from the outset of the litigation, including preparation for, and drafting of, the Master Administrative Personal Injury and Medical Monitoring Class Action Complaints and opposing the NFL Parties' efforts to dismiss Plaintiffs' claims. Ms. Nast participated in settlement negotiations with the NFL Parties as counsel for Subclass 2. The firm also supported efforts in defending the Settlement after Preliminary Approval.

Nast Law submitted 1,211.75 hours for a lodestar of $765,060.25. This lodestar utilized rates that exceeded the average rates I have identified. I award the firm $1,090,636.06, which amounts a 1.5 multiplier on the adjusted lodestar.

### 17. Podhurst Orseck.

Podhurst Orseck supported the Settlement in all three important phases in the litigation. I appointed Stephen Marks and Ricardo M. Martinez-Cid to serve as members of the PEC. Later in the litigation, I appointed Mr. Marks to serve as Class Counsel. Mr. Marks served as co-chair of two committees, including the Communications Committee, Mr. Martinez-Cid also served as co-chair of two committees, and Stephen Rosenthal serves as one of the co-chairs of the Legal Committee, which drafted the Master Administrative Personal Injury and Medical Monitoring Class Action Complaints and opposition to the NFL Parties' efforts to dismiss Plaintiffs' claims. Podhurst was counsel for two individuals who served as Class Representatives in this matter.

Podhurst provided meaningful contributions throughout this litigation. Co-Lead Class Counsel credits Mr. Marks with his important work during settlement negotiations, including in early face-to-face negotiations with the NFL Parties. Also, importantly, Mr. Marks and his firm continued to provide support for the Settlement through Final Approval.

Podhurst Orseck submitted 4,510.80 hours for a lodestar of $3,005,744.50.  This lodestar utilized rates that exceeded the average rates I have identified.  I award the firm $6,048,169.49, which amounts a 2.25 multiplier on the adjusted lodestar.

### 18. Pope McGlamry.

Mike McGlamry was selected to serve as a member of the PSC.  Mr. Glamry served on the Communications Committee.  Several of the firm's shareholders served on a variety of committees and would certainly have provided important services to the Class had this litigation taken a different path to resolution.  However, I agree with Co-Lead Class Counsel's conclusion that the firm's ultimate role was not significant enough to merit a multiplier.

Pope McGlamry submitted 1,274.90 hours for a lodestar of $829,030.00.  I award the full amount of the firm's lodestar.

### 19. Rheinhart Wendorf & Blanchfield.

Garrett Blanchfield served on two committees.  The firm submitted 23.10 hours for a lodestar of $14,899.50.  I award the firm $11,174.63, which amounts a .75 multiplier on the submitted lodestar.

### 20. Rose, Klein & Marias

David Rosen was selected to serve on the PSC and served on the Communications Committee, the Workers' Compensation Committee, and the Lien and Ethics Committees.  I have already addressed both Co-Lead Class Counsel's explanation and my conclusion about the role of the Communications Committee.  As to the additional committees referenced, these groups did not provide the type of support of the Settlement that would entitle counsel to a multiplier.

The firm submitted 243.03 hours for a lodestar of $157,969.50.  I award the full amount of the firm's lodestar.

### 21. Seeger Weiss

Because of the path taken by this litigation, the role played by Seeger Weiss was more significant than other firms.  Following the Initial Organizational Conference, I appointed Chris Seeger to be Co-Lead Class Counsel in this litigation.  ECF No. 64.  I also appointed Seeger Weiss partner David Buchanan to serve as a member of the PEC.

Mr. Seeger led the negotiations that resulted in this historic settlement.  Mr. Seeger and Mr. Buchanan led every session of negotiations with the NFL Parties.  And they led every meeting of plaintiffs' counsel who assisted in the development of the Settlement Agreement.

Seeger Weiss played a key role in evaluating the complex legal issues of this case and defending the case on appeal.  Upon recognizing the potential legal issues related to negotiating the Settlement under Rule 23, Seeger Weiss brought in the necessary experts to help frame the Settlement and position it effectively for the appeal.  After successfully arguing for Preliminary and Final Approval of the Settlement, including the negotiation of amendments to the Settlement Agreement, Seeger Weiss took the lead in defending the Settlement on appeal.  The firm worked closely with Professor Issacharoff in defending the class action settlement on appeal, up through denial of *certiorari* review by the United States Supreme Court.

Seeger Weiss has submitted 21,044 hours of fees, more than four times that submitted by other firms.[5]  Some objectors have attempted to argue that Seeger Weiss did not bear much risk in this litigation.  The billable hours submitted in this case speak for themselves.  Collectively

---

[5]  Attorneys from six firms were appointed to be class counsel in this litigation.  The collective hours of all five remaining firms is less than the hours submitted by Seeger Weiss.

Class Counsel submitted 51,068 hours in lodestar. That is to say that all of the firms that submitted lodestar fees risked that more than fifty-one thousand hours of work would go unpaid. That is a great risk, but it is shared among a large group. Seeger Weiss, individually, risked that more than twenty-one thousand hours of work committed to this litigation would go unpaid. That is almost half of the total risk taken on behalf of the class.

This risk did not dissipate prior to the conclusion of the appeals in this case. Seeger Weiss and Professor Issacharoff constructed a landmark legal theory to defend the settlement of this personal injury case as a class action. This was a great legal challenge that was remarkably well orchestrated both in the design of the Settlement and in the outstanding appellate advocacy that supported it.

Seeger Weiss has submitted 21,044 hours for a lodestar of $18,124,869.10.[6] This lodestar utilized rates that exceeded the average rates I have identified. I award the firm $51,737,185.70, which amounts to a 3.5 multiplier on the submitted lodestar.

### 22. The Brad Sohn Law Firm

Brad Sohn assisted the Ethics Committee on various matters. The Brad Sohn Law Firm submitted 50.00 hours for a lodestar of $26,250.00. I award them $19,687.50, which amounts a .75 multiplier on the firm's lodestar.

### 23. Spector Roseman Kodroff & Willis

William Caldes, of Spector Roseman Kodroff & Willis, served on two committees. The firm submitted 74.40 hours for a lodestar of $51,708.00. I award them $38,781.00, which amounts a .75 multiplier on the firm's lodestar.

---

[6] After the effective date of the settlement, Seeger Weiss has continued to provide services for the class. As set forth below, these bills will be submitted separately at a later date.

### 24. Zimmerman Reed

Charles Zimmerman was selected to serve as a member of the PSC and he served on the Ethics Committee.

The firm has argued that it is entitled to credit for pre-MDL work, noting that it had "formulated a case theory and filed [their] first complaints" by December of 2011.  But the early submissions in this case were filed months before that – in July and August of 2011.  By December of 2011, Plaintiffs' organizational meetings were already being held and the *Maxwell* and *Pear* cases were actively moving forward.  The firm notes its participation in the *Dryer* litigation in 2009, but it is hard to understand how work on that entirely separate litigation should be a common benefit consideration in this litigation.  I have considered this contribution in my calculation of fees for the firm.

Zimmerman Reed submitted 1,106.50 hours for a lodestar of $885,907.25.  This lodestar utilized rates that exceeded the average rates I have identified.  I award the firm $811,600.87, which is the full amount of the adjusted lodestar.

### 25. Faneca Objectors.

The Faneca Objectors have submitted a separate fee petition in this matter (ECF No. 7070), as well as objections to the allocation proposal submitted by Co-Lead Class Counsel. These Objectors claim that the final settlement incorporated four key elements that have roots in their objections:

- Credit for NFL Europe;

- The Uncapping of the BAP Fund;

- Expansion of the death with CTE qualifying diagnosis; and

- Elimination of the appeal fee in cases of hardship.

For these services, the Faneca Objectors seek $20 million for fees and expenses, which is 16.3% of the $122.6 million in value the Objectors' claim they secured for the class. While the amount sought by the Faneca Objectors is unreasonable, they are entitled to compensation for the work they performed for the class.

I appointed the firms representing the Faneca Objectors as Court-appointed liaisons to coordinate the arguments of the Objectors at the November 19, 2014 Fairness Hearing. ECF No. 6344. The firms provided a service to the Court by serving in that leadership role.

In consideration of the service provided as liaison counsel and the firms' role in providing benefits to the class, I award $350,000.00 to the firms that represented the Faneca Objectors.

### 26. Armstrong Objectors.

The Armstrong Objectors have submitted a separate fee petition in this matter (ECF No. 7232), as well as objections to the allocation proposal submitted by Co-Lead Class Counsel. These Objectors claim that they should be credited with many of the improvements that were also submitted by the Faneca Objectors.

I reject the claims submitted by the Armstrong Objectors. The Armstrong Objectors cannot receive credit for parroting the same objections that were made more persuasively by the Faneca Objectors.

I deny the fee petition submitted by the Armstrong Objectors.

### 27. Alexander Objectors.

The Alexander Objectors have filed repeated and largely redundant pleadings seeking fees for themselves and objecting to the fee petition submitted by Co-Lead Class Counsel. The firm has argued that they have provided "well over 1,000 hours attempting to improve the terms

of the settlement." ECF No. 8725, at 9-10. I have reviewed all of the pleadings filed by the Alexander Objectors and conclude that the arguments are too voluminous to restate here. Common benefit attorneys do not receive fees for unsuccessful appeals and unsuccessful objections. For that reason, the fee petition from the Alexander Objectors must be rejected.

**28. Jones Objectors.**

The Jones Objectors have submitted a separate fee petition in this matter (ECF No. 7364, 7555), as well as objections to the allocation proposal submitted by Co-Lead Class Counsel.

The Jones Objectors argue that they should be given fees for their objection that resulted in credit for seasons played in NFL Europe. As I have already indicated, the Faneca Objectors are entitled to credit for their work in presenting the NFL Europe objection. A comparison between the argument presented by the Faneca Objectors (ECF No. 6201 at 34-36) and the argument presented by the Jones Objectors (ECF No. 6235 at 3) speaks for itself.

I deny the fee petition submitted by the Jones Objectors.

**29. Corboy & Demetrio.**

Co-Lead Class Counsel has requested an allocation to Corboy & Demetrio for their work in supporting and defending the Settlement. The firm represented objectors to the initial Settlement Agreement, but ultimately worked with Class Counsel in support of the Settlement and defense of it on appeal.

I award the firm $250,000.00.

*Total Payments at the Present time*

As is set forth above, I approve the payment of $85,619,446.79 of the $112.5 million that I approved for payment of fees for class benefit.

At the May 15, 2018 hearing, Co-Lead Class Counsel provided me with an accounting of the funds available at the present time.  $108,442,700.12 is available to pay Class Counsel for services.  Accordingly, after today's allocation, $22,823,253.33 will remain in the common benefit fund.  I will continue to hold these funds in reserve to pay common benefit fees as attorneys continue to work to implement this Settlement Agreement.

Class Counsel has already performed substantial work for the class in implementing this Settlement Agreement.  I ask Co-Lead Class Counsel to submit a petition detailing the fees for the class benefit work that has been performed since the Effective Date of the Settlement Agreement.  Going forward, fee petitions for the work done in implementing the settlement should be submitted by Co-Lead Class Counsel as he deems appropriate, but at least every six months.  Class Counsel should adopt the blended billing rates used in the present allocation.  In the future, Class Counsel may petition the Court for an increase in the standard billing rates, if he determines that such increase is necessary.  These implementation fees will be paid on a straight lodestar basis, without the use of a multiplier.

## III.  Conclusion

For these reasons, I allocate $85,619,446.79 of common benefit funds to pay attorneys for their work in obtaining the Settlement in this case.  I will hold in reserve the additional funds to pay for fees incurred in implementing the Settlement Agreement.

And now, this _____ day of May, 2018, it is **ORDERED** that the Fund Administrator for the Attorneys' Fees Qualified Settlement Fund ("AFQSF") shall pay each of the firms listed below the amounts, as set forth below, from the AFQSF:

Anapol Weiss .......................................................................................$4,643,590.00

Casey Gerry Schenk............................................................................$316,533.51

Dugan Law Firm .................................................................................$188,340.50

Girard Gibbs................................................................................................$335,386.80

Girardi Keese ..............................................................................................$526,548.33

Goldberg, Persky & White.............................................................................$328,575.00

Hagen, Rosskopf & Earle ..............................................................................$324,480.00

Hausfeld .......................................................................................................$914,903.77

Herman Herman & Katz ...............................................................................$89,660.00

Professor Issacharoff....................................................................................$1,976,012.00

Kreindler & Kreindler...................................................................................$1,491,097.30

Levin Sedran & Berman ...............................................................................$8,411,720.45

Locks Law Firm............................................................................................$3,855,625.00

McCorvey Law ..............................................................................................$198,780.00

Mitnick Law..................................................................................................$673,959.38

NastLaw .......................................................................................................$1,090,636.06

Podhurst Orseck ...........................................................................................$6,048,169.49

Pope McGlamry.............................................................................................$829,030.00

Rheinhart Wendorf & Blanchfield.................................................................$11,174.63

Rose, Klein & Marias ...................................................................................$157,969.50

Seeger Weiss.................................................................................................$51,737,185.70

Brad Sohn Law Firm.....................................................................................$19,687.50

Spector Roseman Kodroff & Willis................................................................$38,781.00

Zimmerman Reed...........................................................................................$811,600.87

Faneca Objectors..........................................................................................$350,000.00

Corboy & Demetrio .......................................................................................$250,000.00

It is further **ORDERED** that each of the law firms listed above shall cooperate with the Fund Administrator of the AFQSF to effectuate this Order.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

5/24/2018

COPIES VIA ECF ON 5/24/2018