UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE | ) | 12-MDL-2323-AB |
| PLAYERS' CONCUSSION INJURY | ) | |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| KEVIN TURNER and SHAWN WOODEN, | ) | |
| on behalf of themselves and | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NATIONAL FOOTBALL LEAGUE and | ) | |
| NFL PROPERTIES, LLC, | ) | |
| successor-in-interest to | ) | |
| NFL Properties, Inc., | ) | Philadelphia, PA |
| | ) | May 9, 2018 |
| Defendants. | ) | 11:04 a.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff Kevin Turner, et al: | CHRISTOPHER SEEGER, ESQUIRE SEEGER, WEISS, LLP 6th Floor 55 Challenger Road Ridgefield, NJ  07660 |
| | TERRIANNE A. BENEDETTO, ESQUIRE SEEGER, WEISS, LLP 1515 Market Street, Suite 1380 Philadelphia, PA 19102 |

Appearances Cont'd.

For the Plaintiff            ARNOLD LEVIN, ESQUIRE
Fred Barnett, et al:         510 Walnut Street, Suite 500
                             Philadelphia, PA 19106


For Non-Party               ERIC E. REED, ESQUIRE
Thrivest Specialty          MARK J. FANELLI, ESQUIRE
Funding, LLC:               PETER C. BUCKLEY, ESQUIRE
                            FOX ROTHSCHILD, LLP
                            20th Floor
                            2000 Market Street
                            Philadelphia, PA  19103



Audio Operator:             JAMES F. G. SCHEIDT



Transcribed by:             DIANA DOMAN TRANSCRIBING, LLC
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-0129
                            Office:  (856) 435-7172
                            Fax:     (856) 435-7124
                            Email:   dianadoman@comcast.net



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

<u>I N D E X</u>

<u>ARGUMENTS</u>:                                                    <u>PAGE</u>

    By Mr. Seeger                                          5, 37

    By Mr. Buckley                                           10

*** Transcriber's note -- The person referred to as James is

Mr. Buckley's tech person.

Colloquy                                    4

1            (The following was held in open court at 11:04 a.m.)

2                    (Hearing commenced before recorder turned on)

3                    THE COURT:   -- In Re: National Football League

4     Players Concussion Injury Litigation at MDL-2012-2323, and I

5     recognize the presence of Mr. Seeger and Mr. Benedetto -- Ms.

6     Benedetto, and with you of course --

7                    MR. LEVIN:   Mr. Levin -- Arnold Levin.

8                    THE COURT:   I know, Mr. Arnold.   Okay.   And Mr.

9     Buckley --

10                   MR. BUCKLEY:   Good morning, Your Honor.

11                   THE COURT:   Good morning.   And Mr. Fanelli --

12                   MR. FANELLI:   Good morning, Your Honor.

13                   THE COURT:   -- and Mr. Reed --

14                   MR. REED:   Yes, Your Honor, good morning.

15                   THE COURT:   -- and there's someone else at the

16    table.

17                   MR. BUCKLEY:   Oh, my client, Mr. Genovesi, is here,

18    Your Honor.

19                   THE COURT:   Oh okay, Mr. Genovesi, okay.

20                   MR. GENOVESI:   Good morning, Your Honor.

21                   THE COURT:   There's something that's going on after

22    this that you're involved in.   Could I -- could I speak with

23    you a second?

24                   UNIDENTIFIED SPEAKER:   Yes.

25                   THE COURT:   Excuse me, this is off the record at

1    sidebar.  It has to do with the next hearing.

2        (Sidebar off the record)

3            THE COURT:  Mr. Seeger, are you going to argue it?

4            MR. BUCKLEY:  One housekeeping matter, Your Honor,

5    before we begin?

6            THE COURT:  Yes?  Well, I think we'll wait on the

7    housekeeping for the moment.  We'll do that after.  Is there

8    anything that relates to this particular hearing, Mr. Buckley?

9            MR. BUCKLEY:  Yes, Your Honor.

10           THE COURT:  What is that?

11           MR. BUCKLEY:  We would ask that this hearing be

12   consolidated --

13           THE COURT:  That's another -- another issue.  You'll

14   be seated.  Please let me hear from you, Mr. Benedetto (sic).

15           MR. SEEGER:  Good morning, Your Honor.  I'll be

16   brief.  I mean, most of the arguments that we rely upon are in

17   our papers, but we're here today seeking a permanent

18   injunction under the All Writs Act to stop Thrivest from

19   basically doing an end-around this Court's December 8th order

20   finding that the lending, financing assignment agreements

21   entered into here are void.

22           As you know, just brief background, Mr. Buckley,

23   despite the fact that the case is here, the MDL is here, this

24   Court has jurisdiction over all matters relating to the NFL

25   Concussion Litigation, I think the whole world knows that by

 1   now -- Mr. Buckley filed a complaint in the Western District

 2   of Pennsylvania in Federal Court seeking --

 3           THE COURT:  Is that what he was talking about?

 4           MR. SEEGER:  I believe --

 5           THE COURT:  Okay.

 6           MR. SEEGER:  -- I believe so.  Seeking to --

 7           THE COURT:  I have not received anything from them

 8   yet.

 9           MR. SEEGER:  Okay.  You haven't -- okay.  But I

10   understand it is on its way to this Court.

11           THE COURT:  Okay.

12           MR. SEEGER:  I believe it's being transferred now

13   either from the Western District or from the panel, I'm not

14   clear, but it's on its way.  And he filed a complaint to

15   compel arbitration in a different Federal Court seeking to

16   have an arbitrator interpret the agreement that you've already

17   interpreted as being void, and that's why we're here today.

18           So I would like to -- I'm going to make some brief

19   comments and I would like to reserve some time to respond to

20   anything Mr. Buckley says.

21           THE COURT:  Okay.

22           MR. SEEGER:  Just as a preliminary matter, there

23   really is no question that this Court had exclusive and

24   continuing jurisdiction over the settlement.  It's in the

25   agreement, it's in the Court's power overseeing the MDL and

1    the settlement agreement and it's under the -- it's clear

2    under the All Writs Act.  The analysis under the All Writs Act

3    is very simple.

4            They treat statements like a race, like a piece of

5    property, and the Court has the ability to determine all

6    disputes and matters arising with regard to the property.  And

7    the All Writs injunction is slightly different.  It concerns

8    different matters than a Rule 65 injunction.  Rule 65 is

9    looking at maintaining status quo.

10           The basis behind an All Writs injunction is exactly

11   why we're here, it's to prevent third parties from frustrating

12   the Court's ability to reach and resolve disputes arising out

13   of the settlement that is before the Court.

14           Now, the Court has already ruled -- Your Honor has

15   ruled December 8th that the agreement that we're here talking

16   about is void.  Not voidable, you didn't sever out certain

17   provisions and leave others intact, you had ruled that they

18   are void.  That's your order.

19           The severability clause and the arguments I think

20   that Mr. Buckley relies upon probably would apply in a

21   situation if you had just severed out certain provisions and

22   left the agreement intact, but that's not the case.  There's

23   some very clear Supreme Court language in a case that we cite

24   in the brief.

25           It's the Granite Rock Company vs. International

1    Brothers of Teamsters at 561 US 287.  It's a 2010 case.  It's

2    entered -- I think it was a matter of weeks after the case

3    that Mr. Buckley relies upon, and this is the language right

4    from the Supreme Court that's very important.

5            It says, "Our precedents hold that Courts should

6    order arbitration of a dispute only where the Court is

7    satisfied that neither the formation of the parties'

8    arbitration agreement nor its enforceability or applicability

9    to the dispute is in issue.  Where a party contests either or

10   both, the Court must resolve the disagreement."

11           It's completely applicable here because your ruling

12   finds that the agreements don't exist.  The issue of whether

13   there's a contract is Your Honor's decision, not an

14   arbitrator.  It's not for an arbitrator to decide, and you've

15   already decided that.

16           So if you -- you could image a situation where if

17   every lender who has had their -- there's about 1,000

18   agreements out there -- every lender who's had the agreement

19   avoided (sic 11 10 30) now running into arbitration, running

20   into State Court.  You'd have conflicting decisions.  You'd

21   have bedlam.

22           And it's even more acute here where the issues are

23   up on appeal.  They're appealing it to the Third Circuit so

24   there is absolutely no reason to be doing this right now.

25   They're going to get a decision from the Third Circuit at some

1    point and then they can do what they want if they win, and if
2    they lose, a lot of harm will be prevented by issuing the
3    injunction.
4           A couple -- a couple of other matters I want to
5    bring to the Court's attention.  I can hand this up to Your
6    Honor if you want it but it is on the docket at 9924-2, page
7    41 of the submission that I'm referring to.
8           The name is unfortunately -- I'm going to call him
9    Mr. W -- unfortunately Mr. W's name is all over their papers
10   so, I mean, the press has already reported on who Mr. W is.
11          I'll use Mr. W for the purpose of today.  He
12   borrowed $500,000.  If he were to pay this money back today,
13   he would owe close to $900,000 under their lending scheme.
14   Almost $900,000 since -- since 2016.
15          The schedule that's attached -- okay, the schedule
16   that's attached -- actually I misread this.  I'm sorry, Your
17   Honor, I misread this.  Let me be -- let me make sure I read
18   the schedule properly.  It's the left column.
19          As of May 31, 2018 he would owe $663,000 but if it
20   goes on through -- I mean, if he continues to accrue interest
21   on this through 2019, he'll almost double -- he'll almost owe
22   in interest what he -- what he borrowed.  So thank you for
23   that correction, Mr. Buckley, I misread your chart.
24          And, Your Honor, you know, a couple of other things
25   that -- that go on here that I want to bring to the Court's

1    attention.  So Thrivest, when they issued the loan to Mr.

2    White -- this is one of the reasons why I think we're here,

3    that there were concerns about these loans.

4         It was the compounding -- monthly compounding of

5    interest where the terms -- the cash that goes into

6    underwriting these loans were a concern, but also I'm finding

7    that many of these lenders require that if there are tax

8    liens, they require the borrowers to pay those tax liens.

9         I understand the concept behind that.  I don't think

10   lenders like to be in second position to the Federal

11   Government, but with regard to IRS tax liens, when you're

12   forcing a borrower to pay those liens off and you're borrowing

13   money at interest rates that far exceed anything the IRS would

14   ever charge, I just think there are a lot of things about

15   these agreements that don't make sense.

16        That's not really the issue for today but it's

17   something that I wanted to make Your Honor aware of, and I'll

18   just reserve my comments to anything Mr. Buckley --

19        THE COURT:  Okay.  Mr. Buckley, would you like to

20   respond?

21        MR. BUCKLEY:  Thank you, Your Honor.  Certainly on

22   behalf of Thrivest, we regret that we're here today, Your

23   Honor.  This is not what the business is looking to do.  My

24   client is trying to help their individuals meet their

25   financial objectives and certainly ending up in litigation or

1   arbitration is not a desirable outcome for Thrivest.

2                 But our ability --

3                 THE COURT:  So in other words you're telling me that

4   if there's a -- if there is a movement to try and resolve

5   these issues you would be sympathetic toward them?  Is that

6   what you're telling me on behalf of the client who's here?

7                 MR. BUCKLEY:  Your Honor, if I'm permitted today

8   I'll be able to outline a way for us to get there not only for

9   Thrivest --

10                THE COURT:  Not for you, I'm talking about for me

11  because I believe I have jurisdiction over everything

12  involving this case so it has nothing to do with you, it has

13  to do with your client and it has to do with the NFL head

14  concussion case, and to that extent, I'm not asking you for

15  your suggestions, okay?  Just get that straight.  You may

16  proceed.

17                MR. BUCKLEY:  Thank you, Your Honor.  Your Honor, I

18  would like to just start by noting that Mr. Seeger --

19                THE COURT:  All I asked you was whether or not your

20  -- whether or not your client would be willing to discuss

21  working this thing out with everyone else who seems very

22  interested in doing that.

23                That's what I would like to know.  Do you have

24  authority from your client, or don't you have authority from

25  your client to do that?

1          MR. BUCKLEY:  Yes, Your Honor, we would like to work

2    this out.

3          THE COURT:  You would.  Okay.  And you're ready to

4    listen to somebody else's point of view other than yours?

5          MR. BUCKLEY:  Of course, Your Honor.

6          THE COURT:  Okay.  You may proceed.

7          MR. BUCKLEY:  Thank you, Your Honor.  I would like

8    to start by noting for the record that during his time Mr.

9    Seeger did not put on any evidence relating to the formation

10   of the arbitration agreement here.

11         And just so I can create my record here, Your Honor,

12   I would like to submit Mr. Genovesi's declaration which was

13   filed at 9973-1, and also the declaration that was filed by

14   Attorney Robert Wood at 9975.  I would like to submit those

15   for the record of this hearing, Your Honor.

16         THE COURT:  Absolutely.

17         MR. BUCKLEY:  May I hand them up?

18         THE COURT:  You certainly may.  Have you shown it to

19   opposing counsel?

20         MR. BUCKLEY:  I have copies for him and I'll give

21   them to him.

22         THE COURT:  Please do.

23         MR. BUCKLEY:  Now, Your Honor, Mr. Genovesi is here

24   and I can put him on and he can testify --

25         THE COURT:  Not -- I don't believe it's -- I ruled

Buckley - Argument                                          13

1    already that I thought it was a legal issue so his testimony

2    is not really relevant.

3            MR. BUCKLEY:  Okay.  But Your Honor has accepted

4    these two exhibits into evidence?

5            THE COURT:  They are received.

6            MR. BUCKLEY:  I would like to talk today, Your

7    Honor, about really two issues and then set forth what I think

8    is a way forward.  There's two issues presented by this

9    hearing.

10           One I think is a threshold issue and that's the

11   issue under the Federal Arbitration Act about the arbitration

12   clause here, and the second is with respect to the All Writs

13   Act that Mr. Seeger addressed earlier.

14           I would like to start with the arbitration clause

15   and also the Class Action MDL Waiver in the agreement.

16           THE COURT:  Why don't you do it the other way.

17           MR. BUCKLEY:  No problem, Your Honor, I would be

18   glad to.  Now, if I may, Your Honor, just to set the stage

19   here, with respect to the All Writs Act, and I would like -- I

20   filed a lengthy brief yesterday, Your Honor --

21           THE COURT:  I had a chance to look at it.  I haven't

22   studied it.  I have read it --

23           MR. BUCKLEY:  Thank you, Your Honor.

24           THE COURT:  -- but I did not study it so my

25   knowledge of it is superficial.

1          MR. BUCKLEY:  Okay.  Well I would like to, with the

2   Court's indulgence, take a look at the settlement agreement

3   that Your Honor approved and also my client's agreement with

4   Mr. White.

5          But first let me talk about the All Writs Act, and I

6   mention those to Your Honor because I do think that -- I think

7   that we need to get a little granular on the analysis of these

8   issues and that's what I propose to do today.

9          But first with respect to the All Writs Act, I

10  certainly recognize it is a statute that gives the Court

11  significant power, but like anything, that power is not beyond

12  limits, and there's a specific case called <u>Pennsylvania Bureau</u>

13  <u>of Correction vs. US Marshal Service</u> that's a Supreme Court

14  case from 1985 that I think has some relevance here.  And that

15  case, Your Honor, said --

16         THE COURT:  Is that the Pennsylvania Supreme Court

17  or the United States Supreme Court?

18         MR. BUCKLEY:  United States Supreme Court, Your

19  Honor.  The opinion was authored by -- oh, I don't have it

20  here, where is it -- Justice Powell.

21         And that case says that where a statute specifically

22  addresses the issue at hand, it is that authority and not the

23  All Writs Act that is controlling, and here I submit, Your

24  Honor, that there is a statute that controls the issue at

25  hand, namely whether to enjoin an arbitration and that is the

1    Federal Arbitration Act.

2            And that is a specific statute that applies to the

3    question of whether to enjoin an arbitration and I think this

4    case and others like it recognize that if the All Writs -- the

5    general authority under the All Writs Act could trump other

6    statutes, you could use the All Writs Act to trump other

7    statutes and here the Supreme Court of the United States,

8    Justice Powell delivering the opinion said, "Where there's a

9    specific Federal statute, that statute must control over the

10   Court's general authority under the All Writs Act."

11           I would like to look at the All Writs Act case that

12   class counsel cites in his briefs.  It's called In Re: Visa

13   Check, and the In Re: Visa Check case was an unpublished

14   opinion from the United States District Court for the Eastern

15   District of New York, Your Honor.

16           And in that case the Court says that "The Court may

17   prohibit communications with class members entirely, compel

18   communications correcting misleading statements and declare

19   contracts between third parties and class members void."

20           That language is in this agreement, Your Honor -- in

21   this opinion.  And the Court cites In Re: McKesson HBOC from

22   the Northern District of California and In Re: Synthroid

23   Marketing from the Northern District of Illinois in support of

24   its authority to number one, prohibit communications with

25   class members, and number two, to declare contracts between

1     third parties and class members void.

2             Now, I didn't do this in my brief, Your Honor, but I

3     took a look at those cases.  They don't stand for that

4     proposition, Your Honor, and I would encourage Your Honor to

5     take a close look at <u>Visa Check</u> and also the cases it cites to

6     support its authority to prohibit completely communications

7     with class members, which in an entirely different line of

8     cases implicates important First Amendment rights, and also to

9     declare contracts between class members and third parties

10    void.

11            THE COURT:  Let me just ask you something.  Don't

12    you -- you're talking about you're communicating with a class

13    member, the class member and you are involved in some kind of

14    litigation, aren't you?

15            MR. BUCKLEY:  Well, we filed an arbitration --

16            THE COURT:  Are you allowed to go over to somebody

17    else's client who was opposed to you in litigation under the

18    professional rules and talk with them?

19            MR. BUCKLEY:  Of course not, Your Honor.

20            THE COURT:  Okay, I just wanted to know.

21            MR. BUCKLEY:  Now, this I think we're -- the <u>Visa</u>

22    <u>Check</u> case was concerned about communications by Spectrum,

23    which is a claims processing company, and class members and

24    the Court there said that Spectrum was saying things to them

25    that were misleading in an attempt to delay payments and allow

1    them to get more customers, so to speak.

2            And Spectrum, much different than my client, Your

3    Honor -- Spectrum was actually trying to participate in the

4    claims administration process.

5            I want to get to why Visa Check is distinguishable,

6    but I want to start with why the Court's citation to In Re:

7    McKesson and In Re: Synthroid Marketing do not support what

8    the Court says it has the power to do there.

9            The McKesson case was a -- the McKesson case was a

10   10b-5 securities fraud case and the opinion that's cited,

11   albeit with the incorrect citation in the Visa Check decision

12   is a decision on a motion to dismiss that securities fraud

13   case.

14           And in the McKesson case, the Northern District of

15   California said that the plaintiffs there had effectively pled

16   scienter and specificity, but it had nothing to do -- it was a

17   motion to dismiss -- it had nothing to do with the merits of

18   the underlying agreements and importantly, it was not in the

19   context of class action administration.

20           I submit to the Court that the McKesson case does

21   not support the Visa Check Court's -- does not support the

22   point that the Visa Check Court says it supports, which is

23   that "it gives the Court authority to declare contracts

24   between third parties and class members void."

25           That is not what this McKesson case does.  It is a

1    10b-5 securities fraud class action where there's an analysis

2    of scienter.  I won't bore Your Honor with the details but

3    this case basically involved a situation where these

4    securities brokers were entering into agreements with their

5    customers, but then entering into side agreements and it was

6    -- those side agreements were, you know, alleged to have been

7    a way to divert funds around the original agreements.

8            But in any event, it's a motion to dismiss in a 10b-

9    5 securities class action, it is not a decision on the merits

10   and I looked -- it's a long decision, I couldn't find where

11   the Court declared any contract void.

12           The Synthroid Marketing litigation, Your Honor, was

13   a Northern District of Illinois decision and this one did

14   arise in the context of a class action administration.

15           The Court was concerned that there were some

16   communications being made regarding the settlement and that

17   those were false, that there was a third party making false

18   communications to class members about the settlement.  In

19   other words, misleading the class member about their rights

20   under the settlement agreement.

21           And while the Visa Check decision says that that

22   case supports the idea that the Court may prohibit

23   communication with class members entirely, that's not what the

24   -- that's not what the Court in Synthroid Marketing did.

25           In fact, the Court says -- after issuing a

Buckley - Argument                                    19

1    corrective order to clarify the misleading communication, the

2    Court says at the very end, "I therefore deny the motion to

3    enjoin further communications between the third party and the

4    class members."

5         And here the Court was specifically referencing its

6    authority under Rule 23(d), and that's something that we've

7    talked about, Your Honor, and I do not dispute -- nor does my

8    client dispute the Court's authority under Rule 23(d) to

9    control communications with class members about the

10   settlement, and that's where a lot of this case law comes

11   from.

12        I submit to Your Honor that class counsel is going

13   beyond that, beyond the discussion about communications with

14   class members and actually asking the Court to enter

15   substantive relief, namely to invalidate a contract and

16   moreover to overlook an arbitration and class -- arbitration

17   agreement and class action waiver and that those are not only

18   beyond the Court's power under Rule 23(d), but also the All

19   Writs Act.

20        So let's just go back briefly and look at the Visa

21   Check case, and we briefed this, Your Honor, but it's

22   important to take a look at, and I think you should just

23   juxtapose what the Spectrum Company did with what Thrivest did

24   and the results in Visa Check.

25        And moreover, the source of the Court's concern in

1    <u>Visa Check</u>, the Court said, "The nature of the Court's

2    interest is as simple as it is strong.  The class members must

3    not be misled.  Where false and misleading statements are used

4    to solicit business from them, I have no intention to sit by

5    and relegate them to a cause of action for breach of contract

6    for fraud," okay?

7           Spectrum was getting involved with class members.

8    They were asking the class member to retain them as their

9    agent to pursue the monetary relief under the settlement

10   award, okay?  Actually participate in the claims

11   administration process and to do so in exchange for a fee.

12          That is not what Thrivest did, and this is where --

13   you know, we spent a lot of time in our submission, Your

14   Honor, and I do want to take Your Honor through the agreement

15   and through the settlement agreement to demonstrate that the

16   Court's jurisdiction over the settlement res -- and I agree

17   with Mr. Seeger, the Court has jurisdiction over that

18   settlement res, but that jurisdiction ends when the class

19   member receives a monetary award.

20          The class member's obligations to Thrivest to

21   transfer funds to Thrivest do not begin until the class member

22   receives the award.

23          In other words, the class member's obligation to

24   Thrivest to make payment of what's defined as the TSF

25   distribution in our agreement -- and Mr. Seeger is accurate,

1   it's about $663,000 now, it's not $900,000 -- that obligation

2   does not begin until the class member receives the award.

3           And by the very language in the settlement agreement

4   that Your Honor approved, the Court's jurisdiction and indeed

5   Mr. White's rights under the settlement agreement to a

6   monetary award end when he receives that payment.

7           There's a long process involved there.  Once he

8   receives that payment, his rights, his monetary claims under

9   the settlement agreement end and that money is his money.

10          And if Thrivest's rights to the TSF distribution do

11  not begin until he receives that award, then the Court does

12  not have jurisdiction to enjoin how he spends that money.

13          In the same way the Court couldn't tell Mr. White he

14  doesn't have the ability to promise to pay his daughter's

15  tuition for college, the Court does not have the ability to

16  enjoin Mr. White from selling his interest in that property

17  once it is received.

18          I would like to take a look at Thrivest's agreement

19  with Mr. White, Your Honor.  And, James, if you would start by

20  pulling up Section 1A?  And this is in evidence, Your Honor,

21  as Exhibit A to Mr. Genovesi's declaration.

22          THE COURT:  Jim, do you want to let me have access

23  to it?  Do you want to let me have access to it?

24          COURTROOM DEPUTY:  Give it a tap.

25          THE COURT:  Okay, I'm doing it.

1          COURTROOM DEPUTY:  Does it work?

2          THE COURT:  Oh, good.  Okay.

3          COURTROOM DEPUTY:  There you go.

4          MR. BUCKLEY:  Let's take a look at Section 1A.

5          THE COURT:  Oh, you made it -- you can make it --

6     okay.  Go on.

7          MR. BUCKLEY:  In Section 1A, Your Honor, Mr. White

8     sold the TSF distribution to Thrivest in exchange for

9     $500,000.  That was an asset he didn't yet possess, but that

10    he had the right to sell to Thrivest.  Let's look at

11    section --

12         THE COURT:  You're assuming that he had the right to

13    sell to Thrivest.

14         MR. BUCKLEY:  Well, and that is important, Your

15    Honor.  There is a risk that Thrivest took that Mr. White

16    would never obtain an award and therefore never actually

17    possess the TSF distribution.

18         THE COURT:  I assume you did your -- I assume your

19    client did his -- his due diligence on that.

20         MR. BUCKLEY:  He -- my client did, Your Honor, but

21    there's of course risks and, you know, it's no secret that

22    there are claims that have been submitted that have been

23    denied --

24         THE COURT:  Of course.

25         MR. BUCKLEY:  -- and one of the important

1    consequences, Your Honor, that -- you know, this is an aside

2    and I'll get back to, but one of the important consequences is

3    if Your Honor voids all of these agreements requiring

4    recission, these agreements would then be void both for the

5    good and the bad.

6           And so if another player had taken an advance, sold

7    the TSF distribution but never obtained it, under the

8    agreement, that player would be protected.  There's no

9    recourse.

10          But if the agreement is voided, that player would

11   then be obligated to repay the principal, and we can argue

12   about statutory interest --

13          THE COURT:  I know your argument on that.  That's

14   not relevant to this particular issue.

15          MR. BUCKLEY:  Okay.  So if I may continue, and what

16   I'm trying to do here, Your Honor, is to demonstrate that

17   White's financial obligations to Thrivest did not begin until

18   after he received his award --

19          THE COURT:  I understand --

20          MR. BUCKLEY:  -- which marked the end of his

21   monetary claim.

22          THE COURT:  I understand your argument.

23          MR. BUCKLEY:  So then we turn to Section 2A,

24   romanette 1 --

25          THE COURT:  The only issue that's involved is

1   whether or not -- it's irrelevant what this particular

2   agreement said.  That's not relevant to me.  The only question

3   that I see is my power over this to -- and I think that's

4   what's before me, is to enjoin you from -- from going to

5   arbitration court on it.  That's the only issue that's before

6   me.

7          This is not relevant and I don't understand why

8   you're spending the Court's time on it.  It's not relevant.

9   Why don't you address what's relevant to the Court.

10         MR. BUCKLEY:  Well, thank you, Your Honor, and I

11  think what Your Honor is raising is the ability issue and Your

12  Honor asked me to begin with the All Writs analysis, but the

13  point of my analysis here is that the Court's power over the

14  settlement res over the claims administration process

15  necessarily ends when that payment is made --

16         THE COURT:  I understand --

17         MR. BUCKLEY:  -- to Mr. White.

18         THE COURT:  I understand your argument.

19         MR. BUCKLEY:  And under our agreement -- let's look

20  at C -- 2C -- under our agreement, White has no obligation to

21  pay Thrivest anything until three business days after seller's

22  collection and receipt --

23         THE COURT:  I understand that.

24         MR. BUCKLEY:  -- of a distribution.

25         THE COURT:  I understand that.  All I'm saying to

1    you is that the question becomes my authority under the All

2    Writs Act to act to implement the settlement the way it should

3    be implemented.  That's all that's before me, so your

4    agreement with Thrivest is not really material to this.

5              MR. BUCKLEY:  Well, it is --

6              THE COURT:  Well I -- since I don't think it's

7    material, it's not worth arguing about.  Now --

8              MR. BUCKLEY:  Well --

9              THE COURT:  -- the Third Circuit may disagree with

10   me and I certainly recognize that, but it may very well be

11   that you ought to start talking about an issue that might, you

12   know, resonate with me.  I told you that this is not an issue

13   before me.

14             MR. BUCKLEY:  Well, Your Honor has said very clearly

15   that the Court's authority under the All Writs Act is an issue

16   that's before Your Honor --

17             THE COURT:  Hm-hmm.

18             MR. BUCKLEY:  -- and the Court's authority under the

19   All Writs Act --

20             THE COURT:  Hm-hmm.

21             MR. BUCKLEY:  -- and under Rule 23(d) --

22             THE COURT:  Hm-hmm.

23             MR. BUCKLEY:  -- is necessarily limited by the

24   Court's authority over the settlement fund.  Let's take a look

25   at the settlement agreement.

1          THE COURT:  Okay, that -- that I'm willing to look

2     at.

3          MR. BUCKLEY:  Okay.  Let's start with --

4          THE COURT:  The settlement agreement -- the

5     settlement agreement of the parties before me, is that

6     correct?

7          MR. BUCKLEY:  The --

8          THE COURT:  In other words, the NFL and the -- and

9     the plaintiffs.

10         MR. BUCKLEY:  That's right, Your Honor.

11         THE COURT:  All right.  And the class.

12         MR. BUCKLEY:  That's right, Your Honor.

13         THE COURT:  Okay.

14         MR. BUCKLEY:  And to be clear, we're not a party --

15    Thrivest is not a party to that agreement --

16         THE COURT:  Oh, I --

17         MR. BUCKLEY:  -- nor are we a party to this case.

18         THE COURT:  -- I understand that you don't think you

19    are, but you may end up being if this continues.  So why don't

20    you go forward.

21         MR. BUCKLEY:  Okay.  So my intention here is to

22    demonstrate, Your Honor, that under the settlement agreement,

23    the Court's power over the -- over the settlement res, the

24    money, ends when the claims administrator pays Mr. White,

25    which happens before Mr. White has any financial obligation to

1   Thrivest, which is the issue that is at issue in the

2   arbitration that Mr. Seeger seeks to enjoin.

3          So if we start with Rule -- Section 14.2, and I'll

4   admit, Your Honor, I am -- Your Honor and Mr. Seeger are much

5   more facile with this agreement, but as I read Section 14.2(b)

6   --

7          THE COURT:  I don't have it in front of me.

8          MR. BUCKLEY:  James, can you pull that up?

9          JAMES:  Yeah.

10      (Pause)

11          MR. BUCKLEY:  You don't have it?

12          JAMES:  I don't have it just yet.  I'm getting it.

13          MR. BUCKLEY:  Okay.

14          THE COURT:  Well, why don't you start talking.

15          MR. BUCKLEY:  Yeah, sure, Your Honor.  14.2(b)

16   relates to opt outs and, you know, in short it says if you

17   don't opt out, you're entitled to the compensation and

18   benefits set forth in the settlement agreement and you release

19   all other rights and claims including the rights and claims in

20   the NFL Concussion Class Action.

21          Section 14.2 as I read it, Your Honor, is a --

22   basically summarized as if you -- if you don't opt out, you're

23   trading whatever rights and claims you have against the NFL

24   for the rights and claims you have under the settlement

25   agreement.

1              Section 18.1 -- do you not have it, James?

2              JAMES:  I've got it.

3              MR. BUCKLEY:  All right.  We're going to Section

4    18.1 now, unless you have 14.2 up.

5              JAMES:  I have 14. -- well I had --

6              MR. BUCKLEY:  All right, pull it up.  We'll look at

7    it really quickly.

8              JAMES:  I just closed it.

9              MR. BUCKLEY:  Okay.

10        (Pause)

11             MR. BUCKLEY:  But I don't think there's any dispute

12   about that, Your Honor.  I mean, I think it's the fundamental

13   exchange at the heart of the NFL Concussion Settlement is that

14   the players asserted that they had rights and claims, they put

15   them in the class action complaint.

16             Those rights and claims included the entitlement to

17   compensation for ALS and other ailments, and they agreed that

18   they would give those up in exchange for a different set of

19   rights and claims, namely the rights and claims under the

20   settlement agreement.

21             And in Section 18.1 that contains the release, "each

22   settlement class member waives and release -- waives and

23   releases the release parties from claims," and then it -- it

24   says what those claims were.

25             Romanette 1 says, "claims that were, are or could

1    have been asserted in a class action complaint." That's a

2    broad definition of all claims that are asserted in the

3    complaint, and then it also talks -- as is relevant to Mr.

4    White, "claims in romanette 3 arising out of or relating to

5    ALS," and that's right here, Your Honor.

6          We're releasing claims in the class action complaint

7    and we're releasing claims arising out of or relating to ALS

8    and we're trading those claims in for the compensation and

9    benefits that are articulated in the class action settlement

10   agreement.

11         Now let's go to Section 6.3 -- Qualifying Diagnoses.

12   May I approach, Your Honor?

13         THE COURT:  Sure.

14         MR. BUCKLEY:  Section 6.3A says that one of the

15   qualifying diagnoses -- F -- is ALS.  In short, a class member

16   who has ALS qualifies for a monetary award.

17         Now let's go to Section 9.3, and this is where it's

18   important to pay attention to the time line, Your Honor,

19   because my argument is that the arbitration seeking to recover

20   the TSF distribution is wholly outside of the settlement

21   agreement --

22         THE COURT:  I understood that.  You said that

23   before.

24         MR. BUCKLEY:  Yes.  So in Section 9.3, this talks

25   about when the claims administrator can and must pay the class

1    member the monetary award for the qualifying diagnoses, and as

2    Your Honor knows much better than I, there are a number of

3    things that have to happen before the claims administrator can

4    pay that award.

5           There has to be a notice of claim determination.

6    Romanette 1, there has to be an audit or a fraud

7    investigation.  Liens have to be addressed and derivative

8    claims have to be addressed.

9           And the claims administrator can't make payment of

10   the monetary award for the monetary claims under the

11   settlement agreement until all of those things happen.

12          And when it does, that's a recognition that all of

13   the rights, all of the appeals, all of the disputes in the

14   context of the claims administration process have been

15   resolved.  They're over.

16          In Section 3.1(a) which talks about settlement class

17   -- settlement benefits for class members --

18          THE COURT:  Is this in your brief?

19          MR. BUCKLEY:  Yes, it is, Your Honor.

20          THE COURT:  Well then I -- you don't have to go

21   through it.  I'm going to study it but I --

22          MR. BUCKLEY:  I'm almost done, Your Honor.

23          THE COURT:  Okay.  I'll give you give minutes.  Five

24   more minutes.

25          MR. BUCKLEY:  For the rest of my argument?

1            THE COURT:  Yes.  So you may want to go on to

2       something else.

3            MR. BUCKLEY:  Section 3.1 makes clear that this

4       claims administrator cannot pay an award until it is final.

5       Moreover, once there is an award paid -- and this is

6       important, Your Honor -- the class member has no further

7       recourse --

8            THE COURT:  I know, you said that before.  I

9       understand your argument.

10            MR. BUCKLEY:  Right.

11            THE COURT:  Why don't you go on to something else.

12            MR. BUCKLEY:  Well, what's important, Your Honor,

13       is --

14            THE COURT:  You're banging at me doesn't make any

15       difference -- make it any better.  You've made your point and

16       I understand it so I will consider it, I assure you of that.

17            MR. BUCKLEY:  What's important, Your Honor, is that

18       in Your Honor's December 8th explanation and order, Your Honor

19       said that, "class members are prohibited from assigning or

20       attempting to assign monetary claims under the settlement

21       agreement."

22            And what I'm saying, Your Honor, is that Thrivest is

23       not attempting to pursue rights under any assignment of a

24       monetary claim under the settlement agreement.

25            Indeed, the very nature of Thrivest's rights which

1    derive only after the monetary claims under the settlement

2    agreement are paid, satisfied and extinguished means that

3    Thrivest is by definition not seeking to enforce rights in a

4    claim for a monetary award under the settlement agreement.

5            Indeed, once that claims administrator pays the --

6    the player the res that the Court has jurisdiction over, as to

7    that player, has ended and now that money becomes Mr. White's

8    money.

9            And because the promise that we're seeking to

10   enforce in accordance with our agreement, Section 1A, is that

11   we bought that asset in exchange for $500,000 and to the

12   extent that our agreement purports to assign anything beyond

13   that, for example, the right to participate in the settlement

14   agreement or to make a claim on his behalf or to do anything

15   other than you owe us the TSF distribution in exchange for

16   what we paid for it, the Court can sever those provisions and

17   uphold the core promise in that agreement.

18           And that is consistent with Your Honor's authority

19   under the All Writs Act and Rule 23(d) because it basically

20   recognizes that the Court has jurisdiction over communications

21   with class members, it has jurisdiction over third parties'

22   participation in the claims administration process, but it

23   does not have jurisdiction after that money is paid to Mr.

24   White.  And to suggest that --

25           THE COURT:  I know that's -- I know that's been your

1   argument and I understand it and I -- I certainly will

2   consider it.

3               MR. BUCKLEY:  And to --

4               THE COURT:  But saying it again doesn't help --

5               MR. BUCKLEY:  I understand, Your Honor.

6               THE COURT:  -- so why don't you go on --

7               MR. BUCKLEY:  Okay.

8               THE COURT:  -- to something else.

9               MR. BUCKLEY:  And to say, Your Honor, that Mr. White

10  has a monetary claim after he is paid --

11              THE COURT:  You said that.  I understand that.

12              MR. BUCKLEY:  -- would contravene the fundamental

13  release at the heart of the NFL Concussion Settlement.

14              THE COURT:  Okay.

15              MR. BUCKLEY:  Now I would like to address, Your

16  Honor, the arbitrability issue.

17              THE COURT:  Well, you have three minutes because I

18  don't believe this is relevant, so you -- but you do have --

19  I'll certainly give you the rest of the time to address that

20  issue.

21              MR. BUCKLEY:  Okay.  Your Honor, Mr. Seeger has not

22  challenged the fact that there was an agreement signed.

23  Indeed, Mr. White signed the document, initialed the page and

24  his attorney acknowledges notarizing his signature.

25              THE COURT:  Nobody is -- nobody is questioning that.

1              MR. BUCKLEY:  Right.  So the only question, Your

2      Honor, is whether somehow the no assignment of claims

3      provision in the NFL Concussion Settlement Agreement --

4              THE COURT:  Or my rights over the whole settlement.

5              MR. BUCKLEY:  Whether --

6              THE COURT:  That's why I asked you to address that

7      first --

8              MR. BUCKLEY:  Right.

9              THE COURT:  -- because that -- I am not implementing

10     the order that I -- I'm not envisioning, because this is going

11     to go on further, I'm not envisioning just interpreting the

12     agreement that I -- the order that I already issued, but my

13     rights under this -- under this NFL head concussion case to

14     order those issues that are necessary under the All Writs Act.

15              That's all that's before me, not -- not anything

16     else.  So I know you have an arbitration clause, but that is

17     not what's before me.  What's before me is my rights to

18     adjudicate under that -- under the concept of the All Writs

19     Act and my rights that this is a class action.  That's all

20     that's before me.

21              MR. BUCKLEY:  Understood, Your Honor.  And I think

22     the -- the case I cited earlier about Pennsylvania Corrections

23     makes clear that in exercising the Court's rights under the

24     All Writs Act, the Court must also be mindful of its

25     obligations under the Federal Arbitration Act and where there

1   is a specific Federal Arbitration Act, that must govern over

2   the All Writs Act --

3           THE COURT:  Well I understand --

4           MR. BUCKLEY:  -- analysis.

5           THE COURT:  -- I understand your argument and I will

6   consider it, but I don't want you to waste time when I have

7   very serious question about it.

8           MR. BUCKLEY:  Okay.

9           THE COURT:  So why don't you go to --

10          MR. BUCKLEY:  Well here's the heart of the

11  arbitrability issue, Your Honor.  The heart of the

12  arbitrability issue is does Your Honor's analysis of Section

13  30.1 of the settlement agreement somehow invalidate the

14  arbitration agreement.

15          THE COURT:  That -- the only thing I'm simply saying

16  to you is that my ruling under the All Writs Act does not

17  necessarily go -- dovetail with my -- with my ruling on the --

18  on the agreement and my ruling on the agreement.  I have

19  powers outside that and that's my point and that's what I'm

20  looking to in this case.

21          So I think that -- I think that I've made that very

22  clear when I spoke with you on the phone and when I already

23  issued a TRO so I don't think you have to go into that because

24  I don't think that there's a conflict here.

25          I see one as relating to my jurisdiction over the --

Buckley - Argument                                    36

1    over the settlement agreement and the implementation of the

2    settlement agreement and that -- I don't see that as a

3    conflict.  So you have an appealable right on it, but I've

4    told you what my position is and I told you that before so I

5    don't think you have to explain it further to me, okay?

6              MR. BUCKLEY:  Let me just make my record if I may,

7    Your Honor --

8              THE COURT:  You're not making any record --

9              MR. BUCKLEY:  -- by making one last point --

10             THE COURT:  -- you already have made the record.

11   You don't have to argue that to me any further.  That's my

12   ruling so --

13             MR. BUCKLEY:  You've already ruled?

14             THE COURT:  I told you I ruled before.

15             MR. BUCKLEY:  Well --

16             THE COURT:  I haven't ruled yet, but I know your

17   argument and I will rule, I assure you of that, okay?

18             MR. BUCKLEY:  One final point, Your Honor.

19             THE COURT:  One minute.

20             MR. BUCKLEY:  The word "assign" does not appear in

21   the arbitration agreement or the class action waiver --

22             THE COURT:  Okay.

23             MR. BUCKLEY:  -- and there's no basis --

24             THE COURT:  Okay.

25             MR. BUCKLEY:  -- to argue that somehow the no

1   assignment of claims provision could in any way invalidate the

2   arbitration agreement.

3           Under Rent-A-Center and the Supreme Court's decision

4   in Buckeye, that is a threshold question and if there is an

5   agreement to arbitrate -- which there is here -- and if the

6   dispute about validity enforceability falls within the scope

7   of that provision -- which there is here, the Supreme Court

8   directs that the Court must send those questions to an

9   arbitrator.  And the Granite Rock case that Mr. Seeger relies

10  upon --

11          THE COURT:  Mr. --

12          MR. BUCKLEY:  -- involved an issue --

13          THE COURT:  Mr. Buckley, have you -- would you like

14  an opportunity to brief this further after this hearing?

15          MR. BUCKLEY:  No, the brief we've submitted, Your

16  Honor, was thorough.

17          THE COURT:  Well thank you.  Then I don't need any

18  further argument from you and I will get -- have a two-minute

19  response from the -- from the opposing counsel.

20          MR. BUCKLEY:  Thank you, Your Honor.

21          MR. SEEGER:  I may not need two minutes, Your Honor.

22  I just want to make a couple of corrections for the record.

23  Counsel spent a lot of time on one case we cited on the All

24  Writs Act starting on page 10 of our brief at docket entry

25  9924.  There are a whole host of cases that support what we're

1    doing there today.

2          The other thing too is because I think -- I think

3    credibility is important and when a -- a lender like Thrivest

4    stands up before this Court and says we had all this risk, I

5    want to just -- I just want the Court to know the picture

6    here.

7          First of all, Mr. W has ALS, the highest compensated

8    -- compensation level in the settlement.  The Third Circuit

9    had already affirmed this settlement at the time they made

10   their loan.  They got medical doctors and confirmed that Mr.

11   White had an ALS diagnosis at the time they made the loan.  I

12   don't know what risk entitles them to compound interest on a

13   monthly basis and get to the numbers, but if the risk is what

14   they want to be compensated for, I would recommend that they

15   get almost zero on interest.

16         But having said that, there is no -- there was no

17   risk to them at the time, only that the Supreme Court would

18   have accepted cert and overturned and I think we all know that

19   the probabilities of that were very small at that point in

20   time.  That's all I have for Your Honor.

21         THE COURT:  Okay.  All right, thank you.

22         MR. BUCKLEY:  Your Honor --

23         THE COURT:  No, that's it.  I am not ruling on

24   anything else, there's nothing else before me in this Court so

25   Court is adjourned.  I will speak to counsel -- I told you I

1   would speak to counsel and I think you spoke with my law

2   clerk?

3               UNIDENTIFIED SPEAKER:  Yes.

4               THE COURT:  Okay, thank you very much.  Court is

5   adjourned.

6               (Matter concluded, 11:50 a.m.)

7                               *  *  *

8

9

10                    **C E R T I F I C A T I O N**

11

12               I, Diane Gallagher, court approved

13   transcribers, certify that the foregoing is a correct

14   transcript from the official electronic sound recording of the

15   proceedings in the above-entitled matter.

16

17   _____          _____

18   DIANE GALLAGHER                           DATE

19   DIANA DOMAN TRANSCRIBING, LLC

20

21

22

23

24