UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | ) ) ) ) ) ) | 12-MDL-2323-AB |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, | ) ) ) ) | Philadelphia, PA May 15, 2018 10:11 a.m. |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For Kevin Turner, et al: | CHRISTOPHER S. SEEGER, ESQUIRE SEEGER WEISS, LLP 6th Floor 55 Challenger Road Ridgefield, NJ 07660 |
| For Plaintiffs Ron Solt, et al.: | GENE LOCKS, ESQUIRE LOCKS LAW FIRM 37th Floor 747 Third Avenue New York New York 10017 |
| For Plaintiffs Mravin Jones, et al.: | STEVEN C. MARKS, ESQUIRE PODHURST ORSECK, P.A. Sun Trust International Center STE 2300 One S.E. 3rd Avenue Miami, FLORIDA 33131 |

APPEARANCES:   Continued

| | |
|---|---|
| For Plaintiffs<br>Charles R. Easterling,<br>et al.: | LARRY E. COBEN, ESQUIRE<br>ANAPOL, SCHWARTZ, WEISS, COHAN,<br>FELDMAN & SMALLEY, P.C.<br>1701 Spruce Street<br>Philadelphia, PA 19103 |
| For Plaintiffs<br>Jay Taylor, et al.: | SOL H. WEISS, ESQUIRE<br>ANAPOL, SCHWARTZ, WEISS, COHAN,<br>FELDMAN & SMALLEY, P.C.<br>1701 Spruce Street<br>Philadelphia, PA  19103 |
| For Plaintiffs<br>Dorsey Levens,<br>et al.: | MICHAEL McGLAMRY, ESQUIRE<br>POPE, MCGLAMRY, KILPATRICK, MORRISON,<br>& NORWOOD, LLP<br>STE 300<br>Lenox Overlook<br>3391 Peachtree Road<br>Atlanta, GA 30326 |
| | BRUCE A. HAGEN, ESQUIRE<br>BRUCE A. HAGEN, P.C.<br>119 North McDonough Street<br>Decatur, GA  30030 |
| For Plaintiffs<br>Floyd Little,<br>et al.: | J. GORDON RUDD, ESQUIRE<br>ZIMMERMAN REED, PLLP<br>1100 IDS Center<br>80 South 8th Street<br>Minneapolis, MN  55402 |
| For the Plaintiffs<br>Greg Landry, et al.: | CRAIG R. MITNICK, ESQUIRE<br>MITNICK LAW OFFICE, LLC<br>35 Kings Highway East<br>Haddonfield, NJ  08033 |
| For the Plaintiffs<br>George Adams, et al.: | ANTHONY TARRICONE, ESQUIRE<br>KREINDLER & KREINDLER<br>277 Dartmouth Street<br>3rd Floor<br>Boston, MA  02116 |
| For the Plaintiffs<br>Michael Brooks,<br>et al.: | DERRIEL MCCORVEY, ESQUIRE<br>MCCORVEY LAW, LLC<br>102 Versailles Boulevard<br>Suite 620<br>P.O. Box 2473<br>Lafayette, LA  70502 |

APPEARANCES:   Continued


For the Objectors          STEVEN F. MOLO, ESQUIRE
Roderick Cartwright,       MOLOLAMKEN, LLP
et al.:                    430 Park Avenue
                           New York, NY  10022

For the Objectors          ERIC R. NITZ, ESQUIRE
Roderick Cartwright,       MOLOLAMKEN, LLP
et al.:                    600 New Hampshire Avenue, NW
                           Suite 600
                           Washington, DC  20037

For the Alexander          LANCE H. LUBEL, ESQUIRE
Objectors:                 LUBEL VOYLES, LLP
                           675 Bering Drive
                           Suite 850
                           Houston, TX  77057




Audio Operator:            JAMES F.G. SCHEIDT


Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026
                           Office:  (856) 435-7172
                           Fax:     (856) 435-7124
                           Email:   dianadoman@comcast.net




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                          I N D E X

2      POWERPOINT PRESENTATION                    PAGE

3      Mr. Seeger                                    6

4

5      ARGUMENTS:                                  PAGE

6      By Mr. Weiss                                 27

7      By Mr. Coben                                 30

8         Response by Mr. Seeger                    32

9      By Mr. Locks                                 34

10     By Professor Wolff                           35

11        Response by Mr. Seeger                    41

12     By Mr. Marks                                 46

13        Response by Mr. Seeger                    55

14     By Mr. McGlamry                              56

15        Response by Mr. Seeger                    60

16     By Mr. Hagen                                 63

17        Response by Mr. Seeger                    71

18     By Mr. Mitnick                               72

19        Response by Mr. Seeger                    76

20     By Mr. Tarricone                             77

21        Response by Mr. Seeger                    83

22     By Mr. Rudd                                  85

23        General response by Mr. Seeger            92

24     By Mr. McCorvey                              96

25

1                              I N D E X Continued

2

3      ARGUMENTS:                                           PAGE

4      By Mr. Molo                                          102

5          Response by Mr. Seeger                           112

6      By Mr. Lubel                                         113

7          Response by Mr. Seeger                           120

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (The following was heard at 10:11 a.m.)

 2              THE COURT:  Wow.  Okay.  I hope all of you don't

 3     expect to get paid.  Okay.  And I think I have a map.  Okay.

 4     We're here in the matter In Re National Football League

 5     Players Concussion Injury Litigation, at 2012-2323, and --

 6     that's it.

 7              All right.  Mr Seeger, why don't you begin?

 8              MR. SEEGER:  Thank you, Your Honor.  Your Honor, I

 9     have a really short PowerPoint.  And I expect my comments to

10     probably go about 15 minutes.

11              THE COURT:  Okay.  That's fine.  And I have it here,

12     so I won't be looking at you.

13              MR. SEEGER:  I'm going to also hand you a copy --

14              THE COURT:  A hard copy?

15              MR. SEEGER:  Yes.

16              THE COURT:  Okay.  Thank you.  I'll be looking at --

17     I have a screen.

18              MR. SEEGER:  No problem.  And I think I've got a

19     clicker working, so I'm going to go ahead and get started,

20     Your Honor.

21              THE COURT:  Good.

22              MR. SEEGER:  Your Honor, I believe I speak for

23     everybody when I say generally that this is a -- I'm really

24     unaware of any other settlement that has -- that is more

25     innovative, in the sense that it has created at 65-year

1    program.

2              It compensates injuries in living players who cannot

3    be diagnosed during their lifetimes of certain injuries.  More

4    groundbreaking, has brought more social good in the term -- in

5    terms of recognitions of mild traumatic brain injuries caused

6    by concussions.  And more transparent, which is incredibly

7    important.

8              As you know, Your Honor, we have tried to put

9    everything related to this settlement, the ground rules,

10   everything out there, so class members who are represented by

11   counsel, or anyone else, understands what's going on.  I take

12   a lot of pride in that, and I think I can speak for everybody

13   in the courtroom who is involved in this, they take a lot of

14   pride in that.

15             But, you know, we are here today, obviously, to

16   discuss attorney's fees, so I am going to try to go through a

17   very brief presentation on a little bit about the case, the

18   context of the case, my thinking in terms of making the

19   recommendations to Your Honor.  Which, by the way, are merely

20   recommendations.  Obviously, I'm not the final word, the Court

21   is on these.

22             So I will go ahead and begin with that.  Your Honor,

23   as you know we -- this MDL was formed in 2012.  And there were

24   a number of unique challenges that we faced early on.  There

25   were complex and evolving scientific issues.  The science

Seeger - Presentation                                                8

1   surrounding CTE, and the brain injuries, and the disease sets

2   that are associated with it.

3          THE COURT:  I'm going to put this -- Jim, this is

4   part of the record.  Okay.

5          MR. SEEGER:  There were significant legal issues, as

6   Your Honor knows, because the first one that we confronted

7   here was the issue of preemption, because many players were

8   covered by a collective bargaining agreement.  Had we lost

9   that issue, many thousands of players would have been out.

10         There was substantial alternative causation issues

11  and other defenses that could have been raised by the NLF, and

12  Statute of Limitations issues.

13         Many of which -- almost all, except for players who

14  died with CTE prior to 2006 have really been waived by the NFL

15  in this settlement.  It was a novel litigation course, and I

16  point this out because it's very important to the way -- to

17  the reason we're here today.

18         In many MDLs there were Bellwether trials, there are

19  discovery committees, there are law and briefing committees.

20  We usually form big PSCs, and a lot of that work is done

21  because many of these things lead to trial.

22         And, in fact, had there been trials in this case, I

23  can tell you there are a number of amazing trial lawyers n

24  this courtroom that would have had a substantial amount of

25  work, and would have done, no doubt, great work.

1            But it didn't go that way.  Discovery was stayed in

2      this case pending the preemption issue.  Both sides had a lot

3      at risk on preemption.  The NFL did, and we did.  Which sets

4      the perfect conditions for a settlement.  And that's where we

5      were.

6            The circumstances of this case really dictated the

7      early resolution, and the course that it took.  Just to focus

8      on the settlement, we had negotiated for many months before

9      Your Honor appointed Layn Phillips, Judge Phillips to come in

10     and assist us.

11           And after he assisted us, in August -- on August

12     29th, 2013, we came to terms on a term sheet.  After the term

13     sheet, we negotiated for many months to come up with a

14     settlement agreement.  And Your Honor's very aware of that

15     settlement agreement, because it was presented to Your Honor,

16     and you rejected that.

17           You sent us back to the negotiating table.  And for

18     many months around-the-clock negotiations tweaking the deal

19     and trying to get the NFL to where they ultimately are, which

20     is an uncapped settlement, which benefits the entire class.

21           I think we know, looking at the numbers and the

22     awards that are paid out, that that was obviously the right

23     move for the class.  And then I've got some other benchmarks

24     here.  Final approval April 22nd, 2015, Third Circuit affirmed

25     it.  April 18th, 2016 and the United States Supreme Court

1    denied cert in December of 2016.

2              Now this is also important to the context of how the

3    fees -- and my approach to fees.  It was very clear early on

4    that the way this case was going to settle was going to be a

5    Rule 23 Class Action.  The complicating factor there is that

6    it was a personal injury MDL.

7              There were a number of cases out there that

8    presented many challenges, for good reason.  I'm not critical

9    of AmChem or Ortiz, or the Court cases that came before it,

10   but they dictated the way to do these things.  And for many

11   years lawyers had not been able to pull off personal injury

12   class action settlements because of those cases.

13             Putting aside Diet Drugs.  Diet Drugs in many ways

14   laid the framework for this case.  Now it presented also

15   problems.  Diet Drugs had a back-end opt out, which was not

16   perceived by the plaintiffs as far as a problem, but by the

17   defense Bar it was.

18             And defense lawyers for many years ran away from

19   class action settlements and the concept that the only way to

20   get around AmChem would be to allow people to opt out of the

21   class action settlement years after it was approved.

22             We avoided that in this case by uncapping the deal.

23   So there is no back-end opt out, there's a piece, but there's

24   going to be more than enough money to compensate every player

25   who is entitled to compensation.

1           The BAP program I'd like to talk about a little bit,

2    is really groundbreaking in many respects.  It's not just a

3    medical monitoring program, it's more than that.  We went out

4    and created our own health management network of doctors, both

5    for the BAP and the MAF.  We recruited doctors around the

6    country to be there for players, to do these BAP exams.  And

7    they're paid by the settlement.  Thank you for that.

8           The whole idea of that was to catch impairment

9    early.  Obviously we knew people going through the BAP program

10   may not have neurocognitive injuries that would be diagnosed

11   that would lead to monetary compensation.

12          But the idea was that, if players were starting down

13   that degenerative path, we would get to them early with the

14   testing, and get them to counseling, and get them into the

15   healthcare system.

16          And that included all kinds of things, not just

17   neurocognitive, but mood, anxiety and depressions --

18   depression issues we were hoping would be caught in the BAP

19   program, even though they may not rise to the level of a

20   qualifying diagnosis.

21          Also, importantly, players have the option of

22   volunteering the result of their neurocognitive tests in the

23   BAP.  That provides potentially a database of tens of -- you

24   know, twelve, 13,000 players that will be eligible for the

25   BAP, to make that available to science, so that something

1    really good comes out of this, that we understand more about

2    CTE, more about brain injuries resulting from concussions.

3            These are all important things that you don't see in

4    most class action settlements, but we have it here.  We also

5    have a lien resolution program that provides for substantial

6    discounts.

7            And what we did there, is we took the power of the

8    pot, this big pot we have for the settlement, we took all

9    these claims that are aggregated in this class action, and we

10   went to the Government and negotiated substantial discounts

11   for every player who was going to get a monetary award, on

12   their behalf.  We've done that for them.

13           Now I understand from the time that an MAF award is

14   granted and the time those liens are worked out, they're still

15   -- still taking several weeks to do that.  But we're picking

16   up the pace, we're getting faster with it.  It's a 65-year

17   program, we're in the first year of the 65-year program.

18           And because it was an innovative -- you know, we

19   needed an -- an innovative program that would survive muster

20   under Rule 23 at the Third Circuit, and at the Supreme Court

21   potentially.  We knew there would be objectors.

22           Some objectors are here today seeking fees.  I had -

23   - I thought as lead counsel -- co-lead counsel, it was

24   important, and there was no objection by anybody -- any of the

25   class counsel at the time, to recruit to our team, and we had

1   a good team.  I was on the team; Steve Marks, who has

2   experience in class actions; Sol Weiss; Gene Locks; all

3   fantastic lawyers.  I don't criticize their skill in any

4   respect.  I have nothing but the utmost respect for them.

5          And they had experience in Rule 23, but I don't

6   think, like the people we brought onto the team who all of us

7   through would make a substantial contribution.  Professor Sam

8   Issacharoff, for example, who is a -- Bonnie and Richard

9   Reiss, professor of constitutional law at NYU has argued

10  numerous cases in the Third Circuit.

11         Sullivan v. DB Investments.  He was involved in the

12  BP litigation.  He was involved in many of these things

13  protecting settlements like this on appeal.  He was a

14  necessary component to this.  And I don't think anybody in

15  this courtroom disputes the quality and what he brought to the

16  team.

17         Arnold Levin was lead counsel in the Diet Drugs

18  litigation, and help craft that settlement.  Very familiar --

19  and extensive experience in class actions.  Arnold's here

20  today, Your Honor.  And was an invaluable member of the team.

21         Dianne Nast has substantial experience with Rule 23,

22  antitrust, securities cases.  She has substantial experience

23  with personal injury cases.  So these were people that we

24  brought to the team that complemented what we had, and really

25  helped advance.

1                    And I think Your Honor has recognized this in your

2     decisions.  On the April 5th decision that you wrote, Your

3     Honor, you mentioned:

4                    "The performance of class counsel regarding this

5     complex settlement agreement has been extraordinary."

6                    And then you say:

7                    "Perhaps the strongest factor weighing in favor of

8     acceptance of class counsel's fee requests is the final factor

9     that takes into account the innovative terms of this

10    settlement."

11                   And that was recognized by Your Honor.

12                   THE COURT:  I might add --

13                   MR. SEEGER:  Yeah.

14                   THE COURT:  -- that I was in on -- I was privy to

15    many of these.  And one of the issues was that if this did not

16    get class certification, my evaluation was the NFL might never

17    have gone along with it.  So that -- that's something that I

18    think you have to take into consideration.  That the fact that

19    you -- that you did what you did, and moved it the way you

20    did, really was -- was a very, very substantial factor.

21                   MR. SEEGER:  And, Your Honor, just -- not to do too

22    much brown-nosing here, but Your Honor took --

23                   THE COURT:  Oh, that's okay.

24                   MR. SEEGER:  It's okay?  Your Honor took her

25    responsibility as a fiduciary for the class very seriously

1   from day one.  I believe it was the initial conference when

2   you called the parties in the back and you said there were

3   issues here, and you need to talk.  And you sent people out to

4   talk.  And we reported to you, both sides did, and you were

5   very much aware of what was going on.

6           You also have recruited highly experienced people to

7   help you oversee this.  You appointed Judge Phillips, who

8   helped with the first version.  You appointed then Perry

9   Galkin (phonetic), who helped with the renegotiation that led

10  to the uncapped settlement.

11          And the two Special Masters that are overseeing the

12  settlement right now, Wendell Pritchett and JoAnn Verrier are

13  doing outstanding work, and I'm sure that you would hear that

14  from everybody in this courtroom.

15          The Third circuit also noted that the settlement

16  will provide a billion dollars in value to the class of

17  retired players.  It's a testament to the players,

18  researchers, and advocates who have worked to expose the true

19  human costs of a sport so many love.

20          Which is true, and I agree with that, but it also

21  points out a really interesting dynamic that this case is

22  under a microscope, and rightfully so.

23          It involves probably the biggest sport in America.

24  Players who become beloved figures in families who people grow

25  up watching, and now they're in need of assistance.  So just

1    to discuss the settlement participation, just really briefly

2    again.  It was obviously important, we had a registration

3    period.  Look, a settlement is a give and take.  We didn't get

4    everything we asked for, and the NFL didn't get everything

5    they asked for.

6              There was a time line to get players registered.  We

7    had six months to make sure this class and the players

8    participated in this settlement.  Because, as you know, one of

9    the criticisms of class actions, and it's legit, is that the

10   class members sometimes don't participate.

11             We couldn't allow that to happen.  We did -- we

12   reviewed every case out there, and we saw relatively low

13   participation rates in many class actions.  So in this one, we

14   were determined to get out there and make sure it didn't

15   happen.  We did town hall meetings, television and all kinds

16   of radio interviews.  Conference calls with hundreds of

17   players.

18             Targeting of key market areas in advance of

19   registration, where we would be able to go in and talk to,

20   maybe sometimes ten players in the room, sometimes 200 players

21   in the room.  But they're such a cohesive group that they talk

22   to each other.

23             Those results paid off.  We have over 20,000 total

24   registrations.  15,982 retired players, 3,200 representative

25   claimants.  So participation rates that are driving the

1   numbers that I'm going to talk about now.  The monetary awards

2   we have -- and -- and, Judge, I have to acknowledge we were

3   off to a slow start.

4           I think many people in this room understand the

5   issue.  There were come claims that were coming in, you know,

6   several hundred early on that were being marked for being sus

7   -- with having suspicious activity.

8           I don't want to use the word fraud, because I'm not

9   sure that's an appropriate word in this context.  But there

10  were some suspicious claims coming through.  That really

11  slowed down the scoring on the dementia claims.  We picked up

12  the pace on everything else, but we fell behind a little bit.

13  Now that's back on track.

14          And I think we have over 100 dementia claims scored,

15  and they're being scored -- every day we're seeing new MAF

16  awards for dementia claims.

17          To date we have 411 monetary award fund notices

18  totaling over $423 million that has been approved for payment.

19  It is not all out the door, unfortunately.  We have liens to

20  reconcile.  There are issues with attorney's fees that have to

21  be held back.

22          But there are things -- it's starting to really

23  move.  But $423 million has been approved.  Now the

24  significance of that is that these awards have exceeded the

25  projections of both sides for the first ten years.  We had

1    projected around two hundred and something million in the

2    first three years to be paid out.  We've already approved for

3    payment over $400 million.

4           That's a success, and it's a success in every

5    respect.  It could mean that these -- in the amount of time

6    that the settlement was delayed because of the appeals, more

7    players went out and got pre-effective date diagnoses.  So

8    maybe that's front-loaded a little bit, but we're encouraged

9    that it's going to be much higher than we anticipated.

10          The BAP examinations are important, because we've

11   got over 12,000 who are eligible.  4,000 are currently

12   scheduled for an appointment.

13          2,400 NFL football players with reports from at

14   least one examination, and we see the results of the BAP, not

15   only paying off in terms of players finding out, and many of

16   them getting the comfort of knowing that they're testing

17   normal or above normal, but for ones where we're finding

18   impairment, we already have 18 who've been identified as a

19   level one neurocognitive impairment, 28 who should be

20   receiving monetary awards, 1.5 neurocognitive impairment; and

21   16 also eligible for monetary awards for level two.

22          Also, and I'll do this quickly, the first year

23   settlement results since the effective date.  You know we've

24   had a number of projects we had to deal with.  There were a

25   number of players and others who had been making

1    misrepresentations about the settlement.  We were here with

2    Your Honor getting corrective statements filed.

3           We have taken on, for better or worse, litigation

4    funding abuses.  As you know, Your Honor, we're very active

5    with that.  In addition to that, we have had to fight with the

6    NFL on appeals, and in many of the ones that we won, we've won

7    substantial concessions.

8           For example, for a favorable interpretations of the

9    rules, the definition of generally consistent, which is the

10   second bullet pont there, Your Honor, is very important.  When

11   we allowed for pre-effective date diagnoses, it was important

12   that people could go to their own doctor, get that diagnosis,

13   and have it be honored in the settlement.

14          We got some push-back from the NFL that wanted to

15   interpret generally consistent as meaning you'd have the same

16   outcome as if you were given a BAP test.  But that's not what

17   was intended.

18          It was intended that you'd be able to take the

19   documentation from that doctor, and as long as it was close,

20   the testing was close to what we had in the BAP, it would be

21   honored.  And we won that with the Special Masters.  We

22   briefed it, and the Special Masters ruled in our favor.

23          The definition of eligible season is a huge -- a

24   huge point here.  The NFL's position was the only players who

25   would get credit for an eligible season were the 45 who suited

1    up on game day.  But the night before, there were 53 players.

2              So we took the position that you practiced all week,

3    you were getting hit in the head all week, you were playing

4    hard, you should get credit for it.

5              And as Your Honor knows, we succeeded on that point,

6    which has now opened up for hundreds of players the ability to

7    get more credit for eligible seasons, more money, and that's

8    very important.

9              The downgrading of claims.  We had a situation in

10   the settlement where somebody applied for a level two, the AAP

11   doctors did not believe they could go ahead and downgrade them

12   to a level 1.5, even though they would be entitled to a level

13   1.5.  Obviously we pointed out the ridiculous nature of that,

14   and have since had that corrected.

15             And with regard to the 88 plan, we've made it --

16   they are -- players are now allowed to take their testing

17   results that they would have obtained from a doctor under the

18   88 plan, which is a plan covered by the collective bargaining

19   agreement of the NFL, and they could take those test results

20   and submit them to -- to the MAF.

21             THE COURT:  Those are still -- that's still being

22   worked out.

23             MR. SEEGER:  That's -- we have issues that are still

24   being worked out, because every time you think you've created

25   a rule, there's something you didn't anticipate, but we are --

1    we're dealing with it and watching it very closely.

2          And we've provided constant support for players and

3    the counsel.  We've worked with many of the lawyers sitting in

4    the courtroom, helping them navigate some of the issues in the

5    settlement.

6          So I'll now turn to common benefit fees.  Under CMO-

7    5, (phonetic) which was an early CMO that Your Honor entered,

8    we took it upon ourselves as co-lead counsel to collect all

9    the time and expenses from all counsel who wanted to seek --

10         THE COURT:  The expenses have been paid.

11         MR. SEEGER:  The expenses have been paid, Your

12   Honor.  We audited that time.  In some instances we've

13   challenged it, and I understand there were people that are

14   unhappy with those challenges, but we made a decision as to

15   what time should be allowed and what expenses should be

16   allowed, and we submitted it to Your Honor.

17         You approved the overall fee on April 5th, but you

18   withheld decision on the five percent hold back.  So we're not

19   dealing with that today.

20         On the allocation of attorney's fees among counsel,

21   I'd like to provide a little bit of my thinking.  And, again,

22   it was -- this is just my perspective on it, I am not the

23   final decision-maker here, Your Honor is.

24         But you directed that recommendations be made by me.

25   I did that.  I -- I knew I believe first-hand everybody's

 1    contributions and what they did.  I read through the time

 2    entries, as you know, that we submitted with the fee

 3    application, the initial one, declarations that were signed by

 4    each and everybody seeking a fee that lays out their

 5    contribution as they saw it to the settlement.

 6         And I created these three areas that I thought were

 7    important.  But because it didn't follow the path of a typical

 8    MDL with a lot of discovery, and motions, and pretrial work,

 9    and trials, the buckets I created to be thought of were, if

10    you were appointed by Your Honor to be on the PSE, if you had

11    an appointed position, I thought that was important.  Because

12    Your Honor screened everybody, and you appointed them.

13         Then the value of the engagement in the litigation,

14    which is obviously my opinion, but I -- I took that into

15    account, and I -- in some ways more importantly contributions

16    to the settlement.

17         Because when it became clear we were not going down

18    the path of trials, we were heading down the path of

19    settlement, then the issue became, what was the value of your

20    contribution in contributing to the result that we got?

21         On the -- page 12, I think this is a point worth

22    noting, and it's -- it's in our fee brief, and it's in Brian

23    --  Professor Brian Fitzpatrick's declaration.  I'll do this

24    briefly.  The range of multipliers that we have proposed goes

25    as low as .75, which is less than a one.

1        And that was only applied to people who were not

2  court-appointed, and had done some work in the case.  And I

3  can speak about each one and why I reduced it.  And it goes up

4  as high as 3.885, which I have asked for, for our firm,

5  obviously.

6             THE COURT:  That .75 has not been objected to?

7             MR. SEEGER:  Well it's -- I don't want to say yes or

8  no off the -- because people are saying they want more, so I

9  don't know if the basis --

10             THE COURT:  Okay.

11             MR. SEEGER:  -- they want more -- so --

12             THE COURT:  All right.  Okay.

13             MR. SEEGER:  What's important to point out here is

14  that if you look at the brief -- the cases that we cite in the

15  brief that deal with this issue of the spread between the

16  lowest and the highest on counsel allocations, this is

17  actually a very, very reasonable spread.

18        Frankly, Your Honor, I have been involved in a

19  number of class actions on the -- where I haven't been lead

20  counsel, and we have received far less than a .75 sometime on

21  our time.

22        And as Professor Fitzpatrick points out, he cites to

23  several cases, just two I picked.  The TFT-LCD case where

24  there was a range of .1 to 5.5 between lead counsel and the

25  lowest allocation, for a spread of 54 to 1.

1            In Re Vitamins antitrust there was a spread of 11 to

2    1 between the lead counsel and the lower people on the

3    tiering.  So my point is that there was a five to one spread

4    here.  I really gave every effort, I understand people are not

5    happy, but I did everything I could to be as fair as possible

6    in this.

7            And, again, just some more of my thinking.  If you

8    received a two or more, it was my view that you were a leader

9    in the litigation, but also that you devoted substantial

10   efforts to securing and defending the settlement.

11           If you were a mid-tier, which was sort of over

12   lodestar, but not a two, it was -- there were noticeable and

13   important contributions, I don't want to minimize anything

14   anyone has done.  And these don't reflect my opinion that

15   people were unimportant in this case.

16           But that in terms of how people should be paid. it

17   was my view that that was worthy of less than a two.  There

18   were a number of people that did very important work and we

19   gave straight lodestar to, which means they got paid their

20   hourly time.

21           And just to point out that when we're talking about

22   objections that relate to a two or a 2.5, we're talking about

23   2.5 times their hourly rate.  So it's -- I thought those were

24   -- my view was, I thought they were fair.  And then I

25   discussed, there were some people we gave less than one to.

1          And I -- I -- and if they get up and speak, I can

2     address the specifics of what they --

3          THE COURT:  You can -- you'll be heard after each

4     person gets up.

5          MR. SEEGER:  All right, Your Honor.

6          And then, last, my last slide on this would be

7     available funds I just wanted you to be aware of.  So the

8     original amount was 112,500, interest has been earned on that

9     amount since it's been sitting there for a few years now.

10         There were fees and taxes associated that have been paid.

11    Court approved expenses which have been paid out that Your

12    Honor approved for the counsel sitting in the courtroom.

13         Instead of awards for the outstanding work done by

14    the three class representatives, and I really can't say enough

15    about that, the class reps were the face of this case.

16         I mean, that's -- that was the way that the PR

17    scheme was setup.  That it was never going to be about the

18    lawyers or their fees.  It was always going to be about the

19    clients.

20         Kevin Turner, who didn't see this case to

21    completion, has passed away, you know, and in many respects I

22    think everybody would agree is the face of this.  Shawn

23    Wooden, who has not been diagnosed, thankfully, with a

24    problem, to this day I talk to him every other day, who's a

25    class rep for the not yet diagnosed class, meets with people

1    in Miami, makes phone calls to people, sends those people to

2    me when he doesn't have an answer for them.

3           And we assist.  And he has been outstanding.  And

4    Corey Swinson, who was the class rep for the underclass,

5    passed away from a heart attack.  And you saw fit to grant our

6    request for the awards for them for $100,000 each.  And thank

7    you for that, Your Honor.  It was very important.

8           Also coming out of the account, and I think it's

9    important for people sitting in the courtroom to know, were

10   not just the incentive awards, but we've appointed an attorney

11   to represent pro se's.

12          There was a portion of that that I have agreed would

13   be covered from this account, setting up the rules and

14   guidance regarding Statute of Limitations challenges, and he's

15   billed to this as well, and through April he's billed the

16   208,000, which leaves the balance that I show, and a total

17   available funds -- oh, I just need to point this out, it's in

18   our brief, but it's important.  On the escrowed funds we had a

19   $4 million expense account with the NFL to do notice and all

20   those things.

21          If money was left over, it could be rolled over to

22   this account.  And that's what the 1.3 million is at the

23   bottom.  So the total amount that's available in the QSF for

24   fees is $180,442,700.12.

25          That's all I have for now, Your Honor.

1                THE COURT:  Okay.

2                MR. SEEGER:  Thank you.

3                THE COURT:  Thank you very much.  Okay.  I think the

4    first person I'm going to recognize, the first firm is going

5    to Anapolis.

6                And, Jim, I have set ten minutes, and I'd like very

7    much to be sure that -- that that's accurately recorded.

8    Thank you very much.

9                MR. WEISS:  Good morning, Your Honor.

10               THE COURT:  Good morning.

11               MR. WEISS:  Sol Weiss.  Glad to see you again, Your

12   Honor.

13               THE COURT:  Yes.

14               MR. WEISS:  And thank you for giving us 10 minutes.

15   Would you like to hear from Mr. Coben as part of my

16   presentation, or not?

17               THE COURT:  Whoever -- he's part of your firm?

18               MR. WEISS:  Yes.

19               THE COURT:  Oh, sure.  Whoever you' like to speak is

20   fine from your firm.

21               MR. WEISS:  So I will leave some time for Mr. Coben.

22               THE COURT:  Okay.  Good.

23               MR. WEISS:  I'd like to start the presentation by

24   referring back to what Mr. Seeger pointed out.  And Chris did

25   have three buckets, roles in leadership, point at which the

1    firm's claimed common benefit contributions were made, and

2    contribution to the settlement.  And I will tell you that

3    Anapol Weiss fits in every one of those three buckets.

4            And so I would like to again talk about with Chris

5    Seeger wrote about us.  We were appointed to the PEC and I was

6    elected, and then appointed by you as co-lead counsel.

7            Larry Coben, my partner, was a member of the PEC.

8    And we contributed to the organization of the PEC and some of

9    its committees.  I attended many, many settlement meetings and

10   mediations with the NFL.  Mr. Coben and I were very active in

11   negotiating the battery of tests for the BAP.

12           And dealt with other matters relating to the medical

13   issues undertaken in settlement.

14           THE COURT:  Okay.  As I understand it, the

15   recommendations to you is 2.5 multiplier, isn't that correct?

16           MR. WEISS:  Correct.  It is.

17           THE COURT:  Do you have any objection to that?

18           MR. WEISS:  I do.  I think it should be higher, and

19   I'll tell you why.  So we did file, I believe, papers, and

20   we'll stick by our papers.  And we may file a supplemental

21   application later, but let me tell you why.  We did a lot of

22   work with regard to the BAP.

23           We brought to the table Grant Iverson, that Mr.

24   Coben will talk about, who was very instrumental in getting

25   the testing protocols done for the BAP, making sure that T

1    scores -- evaluations were appropriate, and so that a fair

2    number of people who deserved to get compensated for

3    neurocognitive benefits were.

4            In addition to that, we had a 2,000 player database

5    that we created, with assists from a lot of the firms.  And

6    that database was given to the NFL when we actively involved

7    in negotiations.

8            And it gave a lot of information about the spread of

9    ages of players, the symptoms they had, when they first

10   developed some neurocognitive injuries.

11           That was a very important tool, and it was used.  It

12   took months to do that.  We also did work on preemption.  At

13   my recommendation, we retained David Frederick, and you

14   remember he argued in front of Your Honor.

15           I was there for all of his prep.  We helped look at

16   the briefs and give suggestions.  And we also went to the mock

17   panel discussions.

18           We also were involved in public relations that Mr.

19   Seeger talked about.  And one of the things that we thought

20   were important was to make sure for communications that it

21   wasn't about lawyers, but it was about players.

22           And so we helped recruit five or six different

23   families who became the face of the communication network

24   throughout the United States, and am happy to say that when we

25   started this program most people in the United States thought

Coben - Argument                                            30

1   that the NFL players didn't deserve to be compensated or sue

2   the NFL, by August of 2012, that turned around and an ESPN

3   survey found that 70 percent of the people who took the survey

4   felt that the players were justified in suing the NFL.

5          And as Chris talked about, this helped shape not

6   only football, but women's soccer, lacrosse.  And the

7   understanding of closed head injuries has grown exponentially

8   because of this litigation, and we are actively a part of that

9   effort.

10         So with that, I'm going to turn over my rest of my

11  time to Mr. Coben.  He'll talk about the science.

12              THE COURT:  Okay.

13              MR. WEISS:  Thank you, Your Honor.

14              THE COURT:  Thank you.

15              MR. COBEN:  Good morning, Your Honor.

16              THE COURT:  Good morning, Mr. Coben.

17              MR. COBEN:  Just very briefly.  When I first had the

18  idea for this lawsuit, I met with a number of experts who were

19  key to issues.  And Your Honor will recall when we first met

20  with you, with the Easterling case, there were six plaintiffs

21  including Ray Easterling and Jim McMahon, and several others

22  of notoriety.

23         And it was at that -- of course right before that is

24  when we created the whole idea of doing this by way of a

25  national lawsuit in concussion.  And to do that, we had to

 1    understand the issues both from liability and damage

 2    standpoint.

 3            And that was my role, since I've been involved in

 4    head injury cases, individual cases for decades.  And so we

 5    organized a team of experts, and that was critical, both to

 6    looking at the liability issues and the damage issues.  And

 7    that was my role primarily.

 8            To hire and to work with people Thomas Gennarelli,

 9    who is a world renowned neurosurgeon, who's written book,

10    after book, after book.  David Hovda, who you cited in your

11    opinion, from UCLA, and Chris Giza.

12            And we worked to develop, not just the liability

13    issues, but then when the case transitioned, to looking at

14    settlement issues.

15            We then used and worked with a gentleman named Grant

16    Iverson, who's only referenced as a footnote in some of the

17    briefs.  Grant Iverson originally is from Vancouver.  He's now

18    at Harvard.  He is a world renowned neuropsychologist.  He

19    developed all of the test modalities, along with Dr. Keilp

20    that Chris's firm hired.

21            Dr. Iverson always wanted to remain in the

22    background.  But he actually -- I traveled to Vancouver, of

23    course I spent a lot of time with him, and then interacting

24    with Dr. Keilp, we then also then developed for the settlement

25    purposes for your guidance, the work of Dr. Hovda, Dr. Giza,

1   Fischer, and Dr. Hamilton.

2           Those are the primary declarations that were

3   attached to explain both the nature of the phenomenal problems

4   confronting these players, as well as ways to measure their

5   losses and then to determine how to compensate.

6           So that was the primary issues -- once we got past

7   the master complaint, all of the legal issues to be worked

8   with, I think the thing I'm most proud of is having developed

9   the science that we could use and was incorporated into the

10  plan, and is so effectively working.

11          I'm so proud that, even for instance with Mr.

12  Easterling, although he took his life two months before Junior

13  Isaiah, I'm very proud of that as well.

14          THE COURT:  Okay.  Thank you very much.

15          MR. COBEN:  Thank you, Your Honor.

16          THE COURT:  Okay.

17          MR. SEEGER:  Your Honor, I have nothing but good

18  things to say about both Mr. Coben and Weiss.  They worked

19  hard on the case, I appreciated their support and their help.

20          But, you know, again, going back to my analysis,

21  they had, in terms of the time that was reported, they had

22  $1.8 million in time.  And I applied to that a multiple of two

23  and a half times that amount, which I thought was very fair

24  under the circumstances.

25          I don't really want to get into a situation here

1    today where I'm picking on the nitty-gritty of whether this

2    person made a, you know, did this or did that.  I just, unless

3    Your Honor has questions for me about it, I will just simply

4    say that there were teams of people involved with experts.

5         But when it came time to turn this thing into a

6    settlement, there were also a very -- a small group of highly

7    qualified people that were able to take those opinions and

8    shape them into what ultimately has become this settlement.

9         And although there was involvement by Mr. Coben and

10   Mr. Weiss, and others, it wasn't as substantial as the work

11   done by other people, frankly.

12        Even the work on the term sheet and the settlement

13   agreement, if you read it today, it was an around-the-clock

14   effort to write it, to rewrite it.  And although Mr. Weiss did

15   review drafts, it wasn't like they were there with us all day

16   and all night on this.

17        So having said that -- as you also know that the

18   main expert for the case was Dr. Keilp from Columbia, who,

19   again, took many of these opinions by all these other great

20   experts and great work done by lawyers, there's no doubt, I

21   don't -- I don't think a 2.5 is me disparaging anything that

22   they have done in this case.

23        THE COURT:  No question about that.

24        MR. SEEGER:  So I'll just rest on that, Your Honor.

25        THE COURT:  Okay.  Thank you.  All right.  Next

1    person on the list is Mr. Locks.  I want to tell you -- I do

2    want to announce, if you don't have any objection, I've asked

3    Mr. Locks to look into the third-party funders and to play a

4    special role in this litigation to try and resolve that.  And,

5    Mr. Locks, I'll appreciate your effort.  Okay?  Okay.  Why

6    don't you come forward?

7              MR. LOCKS:  Your Honor, not knowing exactly the

8    format that you are going to follow today, we have our of

9    counsel, Professor Tobias Wolff here, who was going to address

10   the Court on our behalf concerning all of the issues --

11             THE COURT:  Oh, I thought you were going to argue --

12   is he part of your group?

13             MR. LOCKS:  Well he's been involved in every single

14   issue involving fees and anything with fees.

15             THE COURT:  Okay.

16             MR. LOCKS:  And all the briefs.

17             THE COURT:  I'll hear him.  Okay.

18             MR. LOCKS:  And he -- he's here to present.

19   Obviously, I can amplify on specific things, anything the

20   Court thinks is appropriate.

21             THE COURT:  But is he going to talk about your role?

22             MR. LOCKS:  Yes.

23             THE COURT:  Okay.

24             MR. LOCKS:  Yes.

25             THE COURT:  Okay.  Just as long as he's familiar

 1    with your role, I don't have any --

 2                MR. LOCKS:  He's familiar with our role and he --

 3                THE COURT:  And he participated with you?

 4                MR. LOCKS:  Yes.  And he's also familiar to

 5    recommend a process and procedure that we think is going to be

 6    helpful to the Court.

 7                THE COURT:  Okay.  Thank you.  All right.

 8                MR. SEEGER:  Your Honor, can I just ask -- I'm not

 9    objecting.  Just for the record, Mr. Wolff -- Professor Wolff,

10    I apologize, is not part of Mr. Locks' firm?

11                PROFESSOR WOLFF:  That's correct.

12                MR. SEEGER:  Okay.

13                THE COURT:  You're not part of the law --

14                PROFESSOR WOLFF:  I've been serving as counsel to

15    the firm as a formal matter for about a year and a half now,

16    but I'm not a member of the firm.

17                THE COURT:  Because I had restricted it, but I did

18    not inform Mr. Locks.  I did inform the two that were

19    obviously a problem.  So I have no -- I'm going to let him

20    speak.

21                PROFESSOR WOLFF:  Thank you, Judge.

22                THE COURT:  Okay.  But you'd better introduce

23    yourself, because I have no idea who you are.

24                PROFESSOR WOLFF:  Yes, Your Honor.  Your Honor, my

25    name if Tobias Wolff.  I'm a member of the faculty at the

1    University of Pennsylvania Law School.

2              THE COURT:  Oh, I do know you.

3              PROFESSOR WOLFF:  You do.  Indeed so, Your Honor.

4    It's a pleasure to have the opportunity to appear before you

5    today.  And I'm going to do two things with my time.  The

6    first is to make a couple of brief remarks about the

7    allocation that's specific to the Locks Law Firm.  And then

8    I'd like to make some recommendations about a process and

9    about methodology.

10             And I'm going to pick up, actually, on several

11   things that Mr. Seeger said during his presentation, which I

12   think bear on that question of process and methodology.  Now

13   first and foremost as to the Locks Law Firm, and the issue of

14   the multiplier that should be applied to Mr. Locks and his

15   colleagues.

16             The Locks Law Firm has been subjected to a much

17   lower multiplier than other class counsel.  And the position

18   of the firm, which I think is a reasonable one, is that their

19   multiplier should be commensurate with those of other class

20   counsel, certainly no less than the firms -- the multipliers

21   applied to Podhurst Orseck, or to Levin Sedran & Berman, which

22   is a two and a quarter multiplier.

23             Locks Law Firm was one of the prime movers of this

24   litigation from the very beginning.  It was -- the firm showed

25   leadership from early stages, both in filing some of the

1    earliest cases, both individual cases and proposed class

2    actions, developing both the legal and the medical expertise

3    that would be necessary to conceptualize and frame these

4    cases.

5           Mr. Locks himself argued before the JPML for the

6    creation of this multi-district litigation process.  And after

7    the formation of the MDL, the Locks Law Firm was one of the

8    core group of lawyers and firms involved in the creation of

9    the PSE, the creation of the PEC.  The firm co-drafted the

10   personal injury master complaint, and the medical monitoring

11   master complaint.

12          And at every stage of this litigation, the firm has

13   represented more individual players than any other firm

14   involved in the proceeding.

15          As Mr. Seeger acknowledges in his original petition

16   for the award of class counsel fees, the firm was involved in

17   settlement negotiations, the firm was involved in the

18   opposition to the motion to dismiss on preemption grounds.

19          The factors that my colleague at Vanderbilt,

20   Professor Fitzpatrick identifies as relevant to the

21   designation of the multiplier.  The role that they played as a

22   formal matter by appointment of Your Honor, the early

23   contributions, and also capital investment and opportunity

24   cost investment in this case.

25          This case became a viable enterprise because firms

1   like the Locks Law Firm dedicated their time, their resources,

2   and their reputations to the proposition that these injured

3   players were entitled to a remedy.

4        That the obstacles that were both legal and

5   scientific, and also, with all due respect to the NFL, the

6   reputation well-earned that the NFL had for scorched earth

7   opposition to any attempt to seek compensation for players,

8   those were daunting obstacles.

9        And I think all of the firms that were involved in a

10  core role early in litigation should have that role

11  appropriately recognized.  And the Locks Law Firm is not

12  asking for a larger multiplier than any of their fellow class

13  counsel, but they are certainly asking for equitable treatment

14  in that regard.

15       I'll mention very briefly on the issue of the

16  calculation of the lodestar, it was included in the lodestar,

17  there's some disagreements here.  There's several hundred

18  thousand dollars attorney's fees, and at least several tens of

19  thousands of dollars of paralegal time that were disallowed by

20  Mr. Seeger and his firm.

21       And let me just, as one example, offer the

22  following.  Mr. Seeger in his petition seeking the award of

23  class counsel fees, pointed, quite appropriately, to the

24  player injury database, which was a very important part of

25  both creating the -- the body of knowledge about the nature of

1    the injuries that would form as -- serve as the basis for

2    forming a legal theory about the claims.

3            And also put the NFL on notice of exactly the

4    magnitude of the problem that they were going to be confronted

5    with, both in litigation, and in the popular press.  And the

6    Locks Law Firm dedicated an enormous amount of time, primarily

7    staff and paralegal time, with the creation of that database.

8            That time was disallowed by Mr. Seeger.  Without

9    much explanation, other than some suggestion that paralegal

10   time was not compensable, which doesn't appear to be a

11   consistent rule that he's followed.

12           And I mention that example because it speaks to the

13   issue of process, and I'll spend the balance of my time

14   talking about that, if I could.  Mr. Seeger said three things

15   during his initial presentation that I want to pick up on.

16           The first is that he said that he and his firm have

17   sought to be transparent at every stage of this litigation.

18   And I think that is a laudable principle.  It is not the

19   principle that has characterized the process of negotiating

20   allocations for class counsel fee and common benefit fees.

21           This has been a process which is characterized by a

22   lot of one-sidedness of access to information, and of the

23   principles by which tradeoffs are being made.  Mr. Seeger also

24   said that the Diet Drugs litigation in many ways laid the

25   groundwork for this case, as a matter of the theory of the

1    case.  He's absolutely right.

2              And what Judge Bartle did in the <u>Diet Drugs</u>

3    litigation with respect to the allocation of common benefit

4    fees should also be a model in this case.  What Judge Bartle

5    did in that case was to instruct class counsel to come

6    together and enter into a negotiation through a committee

7    process.

8              A process by which disagreements about both what's

9    included in lodestars, and how multipliers should be awarded

10   or designated for common benefit lawyers, could achieve as

11   much consensus as possible.

12             So that the Court would not be burdened with the

13   micro management of very serious and very real disagreements

14   about money that these lawyers have earned, and tradeoffs that

15   are going to have to be made.

16             Consensus is entirely possible.  And that process

17   hasn't happened yet.  What this Court should have in front of

18   it is the product of a committee process by which most of the

19   lawyers in this room have come to consensus on most of the

20   disputes and most of the questions about what's included in

21   lodestars and how multipliers are awarded.

22             And that's not what this Court has in front of it

23   yet.  And --

24             THE CLERK:  Two minutes remain, Mr. Wolff.

25             PROFESSOR WOLFF:  Thank you so much.  Third, what

1   Judge Bartle did, which we think would be a model for this

2   case, is after imposing some guidance about standardization of

3   approach to lodestar, and billing rates, which this Court has

4   already spoken to, that the rates need to be standardized

5   somewhat, we can't have some lawyers charging two or three

6   times as much.

7               THE COURT:  Please complete.

8               PROFESSOR WOLFF:  That after there's some

9   standardization there, an interim award would be appropriate

10  up front, perhaps 20 percent of claimed lodestar without

11  multipliers.  So that lawyers can start getting paid for their

12  work.  And then, second, the process of instructing counsel,

13  form a committee, enter into negotiations, and produce a

14  consensus proposal to the Court is the preferred process.

15              THE COURT:  Thank you.

16              PROFESSOR WOLFF:  Thank you, Your Honor.

17              THE COURT:  Okay.

18              MR. SEEGER:  Spoken like a man who has had nothing

19  to do with the case, Your Honor.  And that's the problem with,

20  you know, bringing in I think a law professor to come and

21  argue.

22              THE COURT:  I mean, I -- that was my fault, and I

23  apologize.

24              MR. SEEGER:  No, it's fine.  It's fine.  Because it

25  actually --

1          THE COURT:  I did call two other firms when it was

2     obvious to me that they -- that someone else was arguing.  But

3     under the circumstances I -- I'm pleased that I allowed this

4     argument.  Okay.

5          MR. SEEGER:  But my point is that, you know, when

6     you appoint lawyers to do a job, I don't think you've

7     appointed us to go out and hire other lawyers to come and

8     argue our motions, and to do other things.  And I'm not just

9     talking about the fee thing, I'm talking about the credit

10    claimed for hiring David Fredericks.

11         I wouldn't -- I personally would -- it was a group

12    decision.  I personally wouldn't have done that, because I

13    think the lawyers have to stand before the Court when they're

14    appointed and be lawyers.  And we are all capable of doing

15    that.  But I want -- let me address just briefly some of these

16    comments.  The time that was disallowed for the most part for

17    Mr. Locks was pre-MDL time.

18         If you look at the CMO-5, it says it's disallowed.

19    It is not included.  Everybody has lived by that rule.  When

20    you're talking about a database, our view was that many of

21    that was client-specific.  Now Mr. Locks has 1,100 individual

22    clients for which to date 105 claims have been processed, and

23    he is entitled to over $10 million in attorney's fees, for a

24    case that was worked on by many lawyers, those go to him,

25    nobody share in that.

1          Those are his attorney fees.  And I don't fault him

2     for that.  I don't have an issue with it.  But at the end of

3     the day, we don't allow case-specific work in this setting,

4     because it's not for the common benefit.

5          It was for Mr. Locks and his client, and he's being

6     paid.  As far as the reason for the lower multiplier, he did

7     get a lower multiplier.

8          There was a period of time when Mr. Locks during the

9     negotiations, these are in our papers, Mr. Locks gave an --

10    when both sides had promised strict confidentiality, Mr. Locks

11    gave an interview at Business Week that caused the NFL to come

12    back to us and terminate discussions.

13         The only way that could move forward was if we

14    eliminated Mr. Locks from the group, because they believed he

15    would be a source of leaking information.  I'm not agreeing

16    with them at all.

17         But I had to deal with that situation.  I had to

18    deal with many situations like that.  I've had to deal with

19    Mr. Locks launching complaints against the settlement on

20    provisions that he has signed off on as class counsel.

21         And -- and, you know, Mr. Wolff -- Professor Wolff

22    didn't have anything to do with this case, so it's very easy

23    to come in here -- I would have preferred to hear -- have

24    heard from Mr. Locks.

25         But it's very easy for somebody to come in and argue

1   for somebody else, and just give these big picture theories on

2   how it should be done.

3            As far as the committee, I would have had no

4   objection to it.  Your Honor chose to ask me to make

5   recommendations.  They're merely recommendations.

6            THE COURT:  Let me ask you something.

7            MR. SEEGER:  Yes.

8            THE COURT:  Are you familiar with cases -- they keep

9   on raising this issue of getting a special negotiator for

10  this.  Are you familiar with other cases that you would like

11  to address, and I would like to maybe have a subsequent two or

12  three page discussion of this, on whether or not -- whether or

13  not -- this is for my use of you, who I think knows more about

14  this case than I.

15           I mean, you have been the face of the case, and,

16  frankly, you're the only one that faced the Court.  The only

17  one.  Maybe Mr. -- Professor Issacharoff, when he told me that

18  he's sure he can get class certification, I looked at him with

19  real surprise.

20           And he said, just leave it to me.  And I said, well,

21  let's see what goes on.  But the reality is that you were the

22  face of it, and you were the only person that I -- that

23  interacted with the Court, other than the -- than the argument

24  that we had.

25           There's no question about that -- no question about

1    it.  But are there other situations that I may not be familiar

2    with, besides the -- Judge Bartle, whom I respect

3    tremendously, who have used the system of having lead counsel

4    submit to the Court, just as you have?

5              MR. SEEGER:  They're -- I mean, they're in our

6    brief, Your Honor, and I can put those into a two-page letter,

7    it's very simple.  But there are a number of cases in the

8    context of a class action where they not only have allowed

9    lead counsel solely to make those recommendations, but I can

10   tell you I've personally been involved with cases, the most

11   recent one was the Volkswagen case, overseen by Judge Breyer

12   in the Northern District of California where he appointed

13   Elizabeth Kibrazer to just go ahead and make the allocations.

14             It wasn't a recommendation to the Court.

15             THE COURT:  And he approved it?

16             MR. SEEGER:  He approved it.  And he appointed her

17   to go ahead and do it and make those allocations.

18             THE COURT:  Okay.  Thank you.

19             MR. SEEGER:  And there are a number of cases where

20   that -- and, in fact, in many places in class actions that's

21   more the practice.

22             THE COURT:  That's what -- that was my understanding

23   of it, but I wasn't sure.

24             MR. SEEGER:  I just had a couple of other very --

25   very --

 1              THE CLERK:  Less than one minute.

 2              MR. SEEGER:  I'm sorry, what do I have a minute

 3    left, you said?

 4              THE CLERK:  Less than one minute left.

 5              MR. SEEGER:  Less than one minute.  Let me go

 6    quickly.  After the execution of the term sheet, the Locks

 7    firm -- again, great -- Gene Locks is a great lawyer.  He's

 8    well-known, the work he's done in other cases.

 9              But after the signing of the term sheet his firm did

10    not have that much involvement, frankly, with the crafting and

11    drafting of the settlement agreement, and the briefing

12    thereafter.  That's all.

13              THE COURT:  Okay.  Thank you.  All right.  The next

14    person from Podhurst Orseck and you are?

15              MR. MARKS:  Steven Marks, Your Honor.

16              THE COURT:  Oh, okay, Mr. Marks.

17              MR. MARKS:  I want to first start by echoing what

18    Mr. Seeger said.  I'm extraordinarily proud of the role that I

19    was honored to be given.  Mr. Seeger invited me early on, and

20    I thank him for that.  We've worked very well together

21    throughout, and from the beginning.

22              But I want to go back in time long before this MDL

23    was created, and how we got involved.  Because Your Honor has

24    asked us to tell us -- tell the Court about our involvement

25    and our role.  It's an uncomfortable position to be talking

1    about yourself that way, but since you've invited it, I will

2    go back.

3              In -- about seven years ago, I believe it was May of

4    2011, a professor at Boston University, a doctor, and some

5    other folks that were doing research -- you know of Ann McKee,

6    who's one of the famous researchers in this area, contacted

7    our office.

8              At that point in time there was no concussion

9    litigation. or even a thought of concussion litigation.  And

10   as a result of that. Mr. Turner. Kevin Turner was actually

11   being treated by a Dr. Cantu.

12             He was actually in the process of filming a movie, a

13   documentary which ultimately came out through David Frankel at

14   HOB Sports, and was released.  And we participated in helping

15   him get an audience at the Aspen Film Institute, before all of

16   this happened.

17             When Mr. Turner, who was our client throughout these

18   proceedings, and only problems arose after his death by other

19   family members, Mr. Turner and I became exceedingly close.

20             We -- we were very, very close, and I considered him

21   a personal friend.  Kevin came to our office in 2011, met with

22   me and my partners, two of which are here now, and we

23   researched, without anyone else's participation, all of the

24   issues that ultimately were going to be seen in this case,

25   including preemption, causation, collective bargaining

1   agreement, and so on.

2           And at that point in time through word of mouth we

3   started getting lots of clients.  No suit had been filed, we

4   were working on a complaint.  We didn't perceive this as a

5   class action, to be honest with you.  Because it was

6   individualized damage cases, causation was not going to be a

7   common issue.

8           And so we filed a complaint --

9           THE COURT:  Well that was one of the brilliant parts

10  of this --

11          MR. MARKS:  In the settlement, yes.

12          THE COURT:  -- in the settlement.

13          MR. MARKS:  It could only be done through a

14  statement.  And that's where I give everyone who was on the

15  team, I think of myself, Mr. Seeger was kind enough to mention

16  me first in his list of contributors, and I always thought of

17  myself, and I think Chris did too, as having the second most

18  important role in this case.

19          But getting back to the process, we've prepared this

20  master -- our complaint, a whole bunch of firms started filing

21  complaints.  I think we were the second one to file.  The MDL

22  was gathered together, and it happened to be in Miami.  So we

23  held an organizational meeting back then, and we helped to

24  negotiate a structure that we proposed to Your Honor, which

25  Your Honor generally accepted, with the change of having lead

1    counsel.

2              We had decided before that time that we were going

3    to be a committee of six.  Your Honor changed it.  Shortly

4    thereafter, Mr. Seeger called me up, and I was very honored

5    and very respectful of Chris, he's a brilliant lawyer, and

6    very capable.  He asked me to get involved.  And I did.  And

7    from that moment and through today -- well I'm going to cover

8    two periods of time.  Pre-settlement work, post-settlement

9    work.

10             Mr. Seeger I think had respect for our capabilities.

11   So he asked me to identify and vet clients to be class reps.

12   The two class reps in this case are our clients, Kevin Turner

13   and Shawn Wooden.  They were out clients.  We vetted hundreds

14   of people.

15             Chris asked me, and I wanted to be a part of the

16   communications committee, because it was my personal opinion

17   that the only way we were going to get to a result was -- and

18   Kevin wanted this, public awareness.  That was key, in my

19   belief.

20             And I was the chair of the communications, along

21   with -- and Mr. Turkon (phonetic).  And we were very

22   successful.  The public awareness, as Mr. Weiss alluded to,

23   was everywhere.

24             I was taking my son to football games and being

25   asked to sign waiver, concussions, everybody was -- it was a

1    great objective, and we were incredibly successive as creating

2    a dialogue every Sunday, every football game, every halftime.

3    And a lot of the players that were presented were our players

4    that we had vetted.

5          So what did we next do during the negotiations?  I

6    was there from day one and to the end.  I was never -- I never

7    missed a phone call, I never missed a meeting, and I was there

8    through the negotiations even with Layn Phillips.  And I think

9    we played a very major role.

10          And, in fact, the very first MOU at the early stages

11   of the litigation I drafted.  The framework for the settlement

12   that ultimately was approved by Your Honor, and I have

13   correspondence, I can show you in camera all the

14   communications, I drafted the MOU.

15          That had two programs that were ultimately adopted.

16   A monetary award program, and a baseline assessment.  We

17   didn't call it that at that time, but that was the idea of

18   helping these players medically.

19          Then I was asked to work with the actuarial's.  We

20   had to figure out what was going -- this was going to cost.

21   We had to price it.  This was before uncapped became involved,

22   Your Honor.  And I worked with the actuarial's almost

23   exclusively.

24          They came to my office and spent weeks, if not

25   months, going through very complicated actuarial analysis,

1    take rates, and how many people are going to get different

2    disease, and so on.  We then were asked to find experts.

3           You already heard their names.  Who are the two

4    experts of the four that I think were mentioned?  Dr. Hamilton

5    and Fischer.  Dr. Fischer was a neurologist.  Dr. Hamilton was

6    a neuro psych.

7           Where are they?  They're both from Miami.  How did

8    they get selected?  Because I interviewed lots of doctors and

9    I found them, and it was agreed, and Mr. Buchanan, Dave,

10   worked with them and he did great jobs of getting the

11   affidavits done.

12          But they were in your final order of approval.  Who

13   were the faces of the case?  I know a lot of people are going

14   to take credit for this.  Kevin Turner and Shawn Wooden were

15   the faces, our clients.  I accompanied them every single event

16   that they went to, and we were very successful, as I said

17   earlier.

18          We had other faces.  Chris asked me to get medical

19   information, so I had to comb through hundreds of player's

20   files to get medical information to understand disease rates

21   who -- what were the percentages of these players who were

22   likely to be making claims.  Now I don't object, I think Mr.

23   Seeger has tried to do the right thing.  I think he is an

24   honorable person.

25          And like I said, I have nothing but nice things to

1    say.  My comment, though, I believe that our multiplier is

2    low.  And I know it's 2.25, and I saw your reaction before

3    with the 2.5 with Mr. Weiss.  And I will tell you why.

4            We were involved from day one, even before lawsuits

5    were filed.  We had the biggest risk, because at the early

6    stages of this case, we had hundreds and hundreds of players.

7            We have since lost lots of players, because of

8    poachers and advertisers, and people promising them favorable

9    doctor's reports, and loans, and all that kind of nonsense.

10   But we lost half of our cases.  And that's life.  I mean,

11   we're not going to do those things.

12           But for us to get a 70 percent less than -- 70

13   percent increase, Mr. Seeger is at 3.89, he has 70 percent

14   more lodestar.  Now, Chris, like I said, is great.  I have no

15   problem.  But I don't think that's equal, and I don't think

16   it's fair, and I don't think it's right in conjunction with

17   the risk that was taken.

18           The vast majority of his time, and almost all of Mr.

19   Levin's time was post-settlement.  There isn't a lot of risk

20   at that point.  Of course there is a risk of Your Honor

21   approving it, and then the third and --

22           THE COURT:  I -- this is not included in that.  In

23   other words, this is not post-settlement money this is --

24           MR. MARKS:  My work.  My work was -- yes.

25   Pre-settlement.

1              THE COURT:  I understand that, and so was his.

2              MR. MARKS:  Well, you know, but a lot of it has been

3      post-settlement too.

4              THE COURT:  Yes, but that's not what's being

5      discussed today.  Post-statement work is something --

6              MR. MARKS:  Okay.  But I think it's included in the

7      allocation that was done.

8              THE COURT:  I don't believe so.  Is it?

9              MR. SEEGER:  I think what Mr. Marks is referring to,

10     Your Honor, is from the time the term sheet was signed --

11             MR. MARKS:  Right.

12             THE COURT:  Oh, that's a very different --

13             MR. SEEGER:  -- we --

14             THE COURT:  -- that's a different --

15             MR. MARKS:  Yeah.

16             THE COURT:  -- I thought you meant implementation.

17             MR. MARKS:  No.  No, no, no, Your Honor.  I'm glad

18     Mr. Seeger cleared it up.

19             THE COURT:  Okay.

20             MR. MARKS:  He read my mind.  And he's right.

21             THE CLERK:  Less than two minutes remaining.

22             MR. MARKS:  I'm sorry?

23             THE CLERK:  Less than two minutes remaining.

24             MR. MARKS:  All right.  I will speak very fast.

25     Your Honor, I believe that our lodestar should be commensurate

1   with Mr. Seeger's, not only because of the quality of work we

2   did, but because of the important role we played, and the fact

3   that we did so early on when there was the highest amount of

4   risk taken on hundreds and hundreds of players that we since

5   -- we'll never get compensated for.

6           Which is the reason this occurred.  If it weren't

7   for the number of players we had -- we had the stable of

8   players that were always going on news or -- and that were

9   supporting the work that was necessary in order to evaluate

10  the case from a damage standpoint, and from an actuarial

11  standpoint.  If we didn't have that stable of players, which

12  provided us the information, this settlement couldn't have

13  been done.

14          THE COURT:  Right.

15          MR. MARKS:  And so that's why I think our lodestar

16  should be higher.  And we did not have an audit issue in our

17  case at all.  I don't even think any time was taken off.  I

18  think we had the least amount of time of any attorney or law

19  firm in this entire case audited and reduced.

20          THE COURT:  All right.  Thank you.

21          MR. MARKS:  Thank you.

22          THE COURT:  Okay.

23      (Transcriber change)

24          MR. SEEGER:  So, Your Honor, I mean, like I said

25  with Sol and with Steve Marks, he did outstanding work.  That

1    is -- I thought that was represented by a 2.5 -- what was it

2    -- a 2.25 multiplier.  He had $3 million in lodestar and it

3    was earned.  I mean, as Mr. Marks said to you just now, I

4    don't think we pushed back much at all on his time.  It was --

5    it was well earned.

6          But you have to make a judgment call here.  I was

7    asked to do that and my -- and the judgment that I made was

8    that that was a fair multiplier based on a $3 million lodestar

9    as since I'm sort of the benchmark here as opposed to, you

10   know, I had over $18 million in lodestar, a number -- I mean a

11   substantial part of my firm was committed to this case, where

12   for a period of time I wasn't doing anything else and others

13   weren't so there's -- there's an opportunity cost component.

14         But having -- having said that, I would only push

15   back on a couple things that Mr. Marks said.  I have no

16   problem with him showing to the Court the initial MOU that was

17   drafted based on some committee discussions we had.  I don't

18   think it represents the ultimate deal.

19         Now, there are some concepts that are picked up, but

20   they had to go a little bit farther than a couple pages and I

21   don't think Mr. Marks meant to say that worked exclusively

22   with the actuaries.  I think he's talking about the Garrettson

23   (phonetic) folks.

24         There was a time when they were trying to build a --

25   sort of a calculator to calculate damages in the case, which I

1    put an end to because I felt at the end of the day that that

2    calculator and where it was going, the idea was that you would

3    punch in certain characteristics of a player and you'd get a

4    number.

5            I felt it wasn't benefitting our overall

6    negotiations so I decided that we wouldn't go forward with

7    that.  Having said that, there is nothing else, I have no

8    criticisms of the work Mr. Marks did.

9            THE COURT:  Okay, thank you very much.

10           Okay, the next -- the next are seeking class benefit

11   fees.  This is a different group, Pope McGlamry.

12           MR. MCGLAMRY:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. MCGLAMRY:  Mike McGlamry with Pope McGlamry.  I

15   appreciate your time this morning.  We presently represent

16   about 400 players.  At one point we had over 500.  Most of

17   those were in place before the settlement was announced.

18           THE COURT:  One second, please.  Okay, yes, go on.

19           MR. MCGLAMRY:  Okay.  Sorry, Your Honor.  And we

20   lost obviously a lot of these.  I'm not a big fish and I'm not

21   here to complain about anybody.  I think Chris did a great

22   job.  I hate that when we talk about Chris we don't include

23   Sol because as I -- the way it was built was he's co-lead

24   counsel, that's what I think of him as.

25           And it kind of makes me feel bad that Sol or even

1    Gene or Steve have to get up here and justify what they did

2    because this would not have all happened had we not all been

3    together and done what each of us did.

4            This was a very unique case and a very difficult

5    case and anybody that asks -- and I know you know that better

6    than anybody, and a wonderful result.  It's been difficult to

7    administer, but that's the nature of the game.  This was a

8    hard-fought battle.

9            Players were identifiable and accessible so people

10   could get at them and change what they did.  That was -- that

11   was unusual.  You never see that in a class action, much less

12   an MDL.  It involved the NFL so we had huge media attention to

13   it.

14           You had 5,000 individually filed cases against the

15   NFL and you end up settling this case as a class action so you

16   bring both of those dynamics to the table, both with lawyers

17   and with clients.  There were very difficult legal issues.

18           Chris has mentioned most of those, and most of those

19   have not been appreciated once the settlement was announced as

20   to how thing -- how difficult things may have been and so

21   people have taken that for granted.  There's been a tremendous

22   distrust of players of the NFL.

23           I believe that's personal and real and that

24   permeates some of this.  I hate that I'm here today.  I think

25   it makes us all look bad.  I think we look like what the media

1    portrays us as, as greedy plaintiff lawyers.  I remember back

2    when this got started and you appointed us to leadership, we

3    all had our roles.

4            Larry and Sol had their roles, we met at their

5    office.  Chris was the leader.  We did that, we had the

6    Communications Committee that really changed the way the world

7    looked at concussions.  All of those people did things and all

8    of them contributed to this.

9            And I'm not going to say one over the other because

10   I don't think that's fair.  We had, you know, individual

11   players or clients to come out and speak on behalf of this

12   settlement on various issues.  That was all by design so the

13   lawyers didn't speak.

14           But that didn't just come from Chris or Sol or

15   Steve, that included a lot of us.  And I believe that media

16   pressure was -- was incredible.  What we seem to have done

17   here is pit the people with no cases or very few cases against

18   those that have a lot of cases, right?

19           And I know one of the criteria here is how we

20   contributed toward making the settlement happen.  Well I --

21   you know, I had relatively a lot of cases, I don't have as

22   many as Gene or some others or Steve.  Had we not participated

23   to support this settlement, it would never have happened.

24           You can talk about great legal argument which we

25   had, you can talk about briefing, you can talk whatever you

1    want but we all stepped up to the table, we had the clients

2    and we got them into this settlement, and so you can't say

3    we're not important.

4            Or, you can say well, you know, you've got 500

5    clients so you're going to get your day where you're going to

6    get paid off with the individual claims.  I know Chris

7    mentioned that about Gene a minute ago.  Well, number one,

8    those two shouldn't be tied together, but I'll tell you right

9    now from me, I'm losing money.

10           I have like I said, maybe 400 clients now.  Over 300

11   of them I'm going through the BAP process.  We all know how

12   that works -- you might get five percent of those people what

13   will ever qualify for an amount.  I'm working for free and all

14   that.  If you tallied all this up, I'm not making money

15   because I have a lot of clients.

16           What I did bring to the table though is I brought

17   those clients into this settlement, I participated in what I

18   was supposed to do, I was the head -- co-lead of the Discovery

19   Committee.  Unfortunately we didn't get there, but we had

20   worked to get ready to do that.  I had people on the Briefing

21   Committee.

22           I was part of the Communications Committee, which I

23   think made the difference here and forced this settlement.  I

24   was also part of the Ethics Committee, which was the group

25   that was initially put together to look at poaching that led

1    to the work that Chris did and Your Honor did with regard to

2    these funding companies and all of that.

3            And so, you know, you want to say I'm not a big

4    fish, I'm not a big fish.  I did not do as much as Chris did

5    or his people.  He has great people.  But so does Sol and so

6    does Steve and so does Anthony, and those people that stepped

7    up to the plate in the leadership of this case ought to all be

8    treated fairly.

9            And for somebody to come up and say well I'm now

10   supporting this group because they're on my side versus where

11   people were when we all got started, that's just unfair to me,

12   Your Honor.  I think we ought to be all treated fair.

13           THE COURT:  Thank you.  Is there any -- do you want

14   to answer?  Do you want to respond?

15           MR. SEEGER:  It will be very brief because I know

16   it's a theme that's been touched upon by Mr. McGlamry and

17   others, the idea that there are lawyers that have a lot of

18   cases and then some firms that don't.

19           And it's true and it's not that unusual and in MDL,

20   particularly one that has been partially settled by a class

21   action where you have lawyers that do pure common benefit work

22   and you have lawyers that do common benefit work and have

23   individual clients like Mr. McGlamry.  I made a proposal for

24   him to receive common benefit fees --

25           THE COURT:  And he certainly can get paid for his --

1    where appropriate, for his -- for his work on individual

2    clients.

3                    MR. SEEGER:  Well --

4                    THE COURT:  I am not curtailing that.

5                    MR. SEEGER:  No, and you're right, Your Honor, and

6    in fact, and I just took a quick look, Mr. McGlamry has 583

7    clients registered.  I don't know how many he has remaining,

8    I'm not disputing him on that.  I'm just saying what the

9    numbers are in the system.

10                   11 of those claims have been approved, which would

11   give Mr. McGlamry approximately $2.7 million in attorney's

12   fees on 11 out of 500-and -- well, 500.  So, you know, Mr.

13   McGlamry's right, you've got to look at it as a team.  So did

14   I do anything to contribute to helping him receive those fees?

15   I think I did.

16                   I'm not asking him for anything back.  It's very

17   different.  So I think there's a fundamental misunderstanding

18   too of the separation between doing work for your specific

19   clients and common benefit work that -- that helped everybody.

20                   And the issue of media pressure, I think you can see

21   by the objections that there are a number of firms that did

22   important work in that respect, but there are a number of

23   firms claiming the same -- the same work.

24                   And the media -- the media plan all along was never

25   to turn that into a litigation strategy.  It had two

1   objectives; to make sure that if this case was discussed in

2   the media it wasn't just the NFL's view, and that they

3   understood they were real people suffering from these

4   problems, that was it.

5           And we hired an independent PR firm to handle that,

6   CLS.  I think they should get some credit here.  We've been

7   paying them on a monthly basis for the last several years for

8   -- for creating that strategy.

9           THE COURT:  You have?

10          MR. SEEGER:  Well, I am now but at the time it was

11  the -- all of us were.  I mean, there was a -- we had put

12  money in a litigation fund and we were compensating them.  My

13  point was that once we hired a PR firm, yes, there were

14  lawyers overseeing it, agreeing with the strategy, but the PR

15  firm did the PR work.

16          And I'm -- and don't -- I don't want to be

17  misunderstood to be saying that it's not -- I mean, Steve

18  Marks was individually representing Kevin Turner and Shawn

19  Wooden, he did make them available.  We did talk with them and

20  decided they were the perfect class reps.

21          But the reality is that this was a class action and

22  we believed any player -- and  this is not to disparage the

23  work done by the class reps, but obviously in a class they all

24  have to be representative of the claims or you don't have the

25  -- the -- you know, the cohesion that you need.  So anyway, I

1   don't -- I don't want to belabor that point.  Mr. McGlamry did

2   great work.  I think the proposal is fair, but it's just my

3   recommendation.  It would be Your Honor's decision.

4           THE COURT:  Okay, thank you.

5           All right, Bruce Hagen.

6           MR. HAGEN:  Good morning, Your Honor, and thank you

7   for the opportunity to allow me to speak today.  I've been co-

8   counsel with Mike McGlamry on all of the cases that he's

9   representing clients on and he and I have represented all

10  those clients together so when he talks about having had 500

11  clients in the case and that number trimmed down to about 400,

12  it's exactly the same for me.

13          I am also just new to this world, a very small fish

14  in this big pond and it's been quite an honor to work on this

15  case and work around a lot of the brilliant minds that we've

16  seen here, and this has been quite an education for me.

17          And I'm proud to be considered among the group of

18  plaintiffs' counsel, as that term was defined by Mr. Seeger in

19  his petition to also include law firms that have done

20  important common benefit work for this litigation, approved by

21  co-lead class counsel and who are submitting declarations in

22  support of the petition.

23          THE COURT:  And you are not getting anything out --

24  have you been awarded anything?

25          MR. HAGEN:  I got reimbursed my expenses, Your

```
 1    Honor.

 2              THE COURT:  Yes, that's what I --

 3              MR. HAGEN:  Yes, I was reimbursed expenses --

 4              THE COURT:  Okay.

 5              MR. HAGEN:  -- and Mr. Seeger did include me among

 6    the list of folks that were to be paid for the time put into

 7    the case at a multiplier of 1 --

 8              THE COURT:  Oh, okay.

 9              MR. HAGEN:  -- so I am included on that list.  But,

10    Your Honor, looking at the relative values and the issues that

11    were identified as far as how value is to be determined, I

12    believe that that multiplier of 1 is inadequate.

13              And it's unfortunate, Judge, that we're in a

14    position where anybody who's arguing for an increase in what

15    they're to be paid is by necessity arguing that the leader of

16    our team here should get less, and yet that's the reality of

17    the situation that we're in because of the disparity between

18    what our leader is getting --

19              THE COURT:  So you're really --

20              MR. HAGEN:  -- and what everybody else is getting.

21              THE COURT:  -- you're really -- what you're

22    objecting to is what Chris is getting more than what -- more

23    than what you've gotten --

24              MR. HAGEN:  Your Honor --

25              THE COURT:  -- is that correct?
```

1              MR. HAGEN:  -- I don't know where else the

2     adjustment could come from, if not from -- from the top, and

3     that's the reality of this.  Yes, Mr. Seeger played the most

4     important role of anybody on this team here, it's just that

5     the $70 million out of 112 becomes problematic when other

6     folks also contributed to this effort.

7              And looking at the criteria that Mr. Seeger has

8     identified and that the Court is looking at here --

9              THE COURT:  Of course I might decide that I'm going

10    to put some away for the future --

11             MR. HAGEN:  That's --

12             THE COURT:  -- out of the 112.

13             MR. HAGEN:  Yeah, the Court can decide whatever the

14    Court decides, as Mr. Seeger --

15             THE COURT:  Well --

16             MR. HAGEN:  -- has repeatedly pointed out.

17             THE COURT:  -- I wouldn't be quite that generous.

18             MR. HAGEN:  But one of the things that is a point

19    everybody keeps coming back to, Judge, is the point at which a

20    firm's claimed common benefit contributions were made and were

21    they involved in the early stages of the litigation and the

22    project, and also contributions to the settlement.

23             So as you've heard, yes, we -- I was involved, I was

24    at that meeting at Mr. Marks' office, prior to the MDL I was

25    at the meeting in Philadelphia at Mr. Weiss's office.  At that

1    meeting I was asked to put on a presentation talking about a

2    media campaign and how this was being perceived in the media.

3           And based on that, when Mr. Tarricone was appointed

4    as the lead head of the Communications and Public Relations

5    Committee along with Mr. Marks, I was the first one put on

6    that committee because I was geared towards that aspect of

7    things.

8           I was very actively involved and supported the team

9    the entire way in everything that we were asked to do.  We

10   identified the firm to be hired that we picked which is CLS,

11   we vetted them among with several others and we crafted a very

12   specific strategy to try to keep everybody on message.

13          That included particularly keeping the lawyers on

14   message, but also getting the players on message as well.  We

15   created news where news didn't exist, Judge, to try to put

16   pressure on the NFL.

17          And the question really to be asked, and I think

18   this was the question that most of us who were not in the room

19   when the settlement negotiations were taking place asked

20   ourselves was, why did the NFL settle in August, 2013?  Why

21   did they agree to this so early on in the litigation?

22              THE COURT:  They were afraid of me, obviously.

23              MR. HAGEN:  That's -- that's one explanation, but

24   what they were also afraid of, Judge, was the rising tide of

25   negative publicity that was coming against them and how that

1    affects their bottom line.  And they announced this, not

2    coincidentally, the week before the new season was set to

3    begin.  I want to read something to the Court.

4            This is from the proposal that we received from CLS

5    when we were interviewing them.  "Every so often the legal

6    process brings together a combination of factors" --

7            MR. SEEGER:  Your Honor, can I just point something

8    out?  I'm sorry, Mr. Hagen --

9            THE COURT:  Is it ten minutes?

10           MR. HAGEN:  Yes.

11           MR. SEEGER:  I don't know if that's work product

12   that we're reading from.  Can you hand that to the Court?  No,

13   don't hand it to her.

14           MR. HAGEN:  Oh, okay --

15           MR. SEEGER:  Maybe it would just be easier not to

16   read it.  I don't know what it is.  I haven't had a preview of

17   it so --

18           MR. HAGEN:  Oh, it's --

19           MR. SEEGER:  Okay.

20           MR. HAGEN:  I don't mind handing it to the Court but

21   if the Court doesn't mind, "Every so often the legal process

22   brings together a combination of factors that elevates a case,

23   class action or mass tort to a level of attention at which the

24   media can be a great asset if properly managed, or a huge

25   liability if not.  The personal injury cases filed by former

National Football League Players against the League in connection with a variety of head and neurological injuries are just such an instance."

"They bring together the celebrity of former NFL stars, the huge draw of pro football, a set of moving stories about profound health problems and a dramatic clash between players and the League."

"The challenge now is for the Plaintiffs' Steering Committee to make the media work to its advantage and avoid errors that could be used against your interests both in the court of public opinion and in Federal Court in the Eastern District of Pennsylvania."

"The stakes in this mass tort litigation could hardly be higher.  For the NFL, the litigation poses one of the greatest reputational risks in recent history." "Meanwhile, in your own legal camp are several law firms along with a mass of plaintiffs who likely have quite varied perspectives on legal and communications strategies."

"In this environment, a failure to actively manage the strategy message and messengers can result in message chaos with conflicting or worse, quite damaging messages.  The key is to drive our key messages to explain on our terms what this case is about, proactively frame and simplify the debate to foster a positive public environment for the litigation to succeed."

1              Judge, all of those things were done, yes, under the

2    guidance of our PR firm.  But through the actions of folks

3    like me who were actively following through and laying down

4    the base for then when they needed us to identify sympathetic

5    plaintiffs to write stories about or do op-ed pieces, we were

6    there to do all of that.

7              When I say we created where none existed, a

8    ministerial event in this case became a national story when

9    the filing of the Master Complaint in -- June 7th of 2012, we

10   used that as an opportunity to send out a massive press

11   release with carefully cultivated quotes from players, from

12   counsel, and it was picked up by 1,800 media outlets.

13             Judge, we, through our work early on in this case

14   when the risk was at the highest, are the group of folks --

15   and it was myself and Mr. McGlamry, Mr. Marks, David Rosen who

16   I don't see here today, and Anthony Tarricone, who under the

17   guidance of Sol Weiss and Chris Seeger, put this plan in

18   action and made it happen.

19             And I would put it to the Court that that's where

20   the pressure was put on the NFL that led this case to be

21   settled.  You also had the very difficult situation of trying

22   to communicate to the community of players.  This is a

23   fraternity that speaks and talks to each other frequently.

24             So once the settlement was announced, there was a

25   tremendous amount of push-back from players who have a history

1    of distrust of the League.  They look at the disability

2    program that existed and they feel that they get a bad shake

3    there, they feel that they are constantly on the defensive

4    when it comes to medical issues with the League.

5            I and the other folks on the committee helped to

6    craft the communication strategy to the players to try to help

7    get them on board so that we could proudly stand up and as Mr.

8    Seeger has repeated many times, have less than one percent of

9    players who actually objected.

10           That was part of the support that came after the

11   settlement was announced but prior to the final approval.  I

12   wasn't writing briefs, Judge, I wasn't involved in any of

13   that.  But when it came time to try to rally the troops and

14   lay down a foundation for the work that the rest of the guys

15   did, I was there and I answered the call at every single turn.

16           And I know that that contribution is worth to the

17   overall success of this effort, Judge.  It's worth exactly 1-

18   112th, my contribution to this, and that's what I would ask

19   the Court to --

20           THE CLERK:  Less than two minutes.

21           THE COURT:  Okay.

22           MR. HAGEN:  -- consider for mine.

23           THE COURT:  Thank you.

24           MR. HAGEN:  Thank you.

25           THE COURT:  All right, Mr. Mitnick.

1          MR. SEEGER:  Oh, I can --

2          THE COURT:  Oh yes, no, I want you to be heard.  I'm

3    so very sorry.  I'm sorry.

4          MR. SEEGER:  I mean, I don't -- I don't have a

5    problem waiting.  I'm not going to -- two minutes and, you

6    know, so Mr. Hagen's submitted $325,000 in common benefit time

7    and I did give it a 1 multiplier.  The idea that if people

8    argue for more it comes from Mr. Seeger, I have no problem

9    with that again, just to be really clear, it's your decision,

10   Your Honor.

11         Obviously the money has to be rejiggered if you

12   think that my recommendations are inaccurate and there's no

13   problem with that.  Reading from the pitch from a PR company I

14   don't think is all that helpful, that they would point out how

15   important they are in the context of wanting to be hired.

16         But I don't want to diminish either the fact that

17   these lawyers did really good jobs overseeing them and dealing

18   with very important issues.  But it's not a PR case.  This was

19   a legal case at the end of the day and we had big issues.  We

20   had --  preemption was a big issue.

21         If we survived that, we would have had other things

22   and I think we all know there are many cases where the PR is

23   great, but the case goes down in flames and this -- this could

24   have happened.  This could have happened on appeal.  So Mr.

25   Hagen is a great guy, he did great work.  I have nothing else

1    to --

2                THE COURT:  Okay.  All right.  Mr. Mitnick, are

3    you --

4                MR. MITNICK:  Good morning, Your Honor, and thank

5    you for allowing me the opportunity to speak.  Judge, we've

6    heard a lot this morning about big fish and little fish.  I'm

7    the smallest fish of anyone here and --

8                THE COURT:  You don't look so small to me.

9                MR. MITNICK:  No, but, Judge, I was the foot

10   soldier.  I did what no one else did and it's the players who

11   are most important here.  It is Mr. Seeger who is most

12   important here because he negotiated a deal whose benefits

13   were tremendous to these players, but the players didn't

14   understand the benefits.

15               The players didn't understand the obstacles they

16   faced.  The PR company didn't do that, the Communication

17   Committee didn't do that, I did.  I traveled from Fargo, North

18   Dakota to Birmingham, Alabama to Tennessee, to Denver, to New

19   York, to Chicago --

20               THE COURT:  There must be a -- I must misunderstand

21   something.  You -- when you ask for -- when you book your time

22   for common benefit work, you should get compensated for it --

23               MR. MITNICK:  Yes.

24               THE COURT:  -- is that correct?

25               MR. MITNICK:  Yes, Your Honor.

1          THE COURT:  I'm not sure that I understand in all

2     these arguments today why these necessarily should be

3     enhanced.  You certainly are getting -- going to get paid.  I

4     understand that, Mr. Mitnick, that Mr. Seeger suggested that

5     you should be paid $673,000-plus --

6          MR. MITNICK:  That's correct, Your Honor.

7          THE COURT:  -- and because you went these places and

8     did what you did.

9          MR. MITNICK:  Judge, for two-and-a-half years almost

10    on a consistent weekly basis I traveled at my own risk, at my

11    own expense --

12         THE COURT:  You didn't put those in as expenses?

13         MR. MITNICK:  Sure, and I got reimbursed for those,

14    Your Honor --

15         THE COURT:  Yes, well certainly --

16         MR. MITNICK:  -- yes.

17         THE COURT:  -- I should think so.

18         MR. MITNICK:  But those are expenses.  I'm talking

19    about my time.

20         THE COURT:  And that's what you were paid for as I

21    understand it.  Let's get ground rules from this.  That's what

22    you were getting paid for, Mr. Mitnick --

23         MR. MITNICK:  Absolutely.

24         THE COURT:  -- isn't that not correct?

25         MR. MITNICK:  Absolutely, Judge, absolutely.  And my

1    argument is that there is so much talk and everyone believes

2    they're of huge value, okay?  I'm not saying that I'm of great

3    value, but what I'm saying is I was the conduit.  I was the

4    work horse.  I was the foot soldier that went out and spoke to

5    over 10,000 players and their wives through Alumni Chapter

6    organized meetings.

7           This wasn't a rogue tour on my part.  This was

8    organized with presentation materials, with explaining

9    preemption and causation, with explaining the benefits that

10   Mr. Seeger negotiated in this tremendous settlement agreement,

11   and I've been unwavering in my support for that settlement

12   agreement from early -- late 2011.

13          Judge, when I traveled I met with Mr. Seeger one day

14   for lunch or dinner right after the settlement terms sheet was

15   announced and Mr. Seeger said to me, Craig -- or Chris said to

16   me, Craig, do whatever you need to do to get the endorsement

17   of these players to educate them, to make them aware of the

18   issues, and that's what I did.

19          THE COURT:  That's important common benefit work,

20   there's no question about that.

21          MR. MITNICK:  But I didn't receive even my hours.  I

22   received a .75.  Judge, that is what is mind boggling to me.

23   I was in constant communication with Seeger, Weiss throughout

24   this whole process for two-and-a-half years of traveling.  My

25   time is at .75, yet in the final settlement brief submitted to

1    Your Honor before the final fairness hearing, one of the

2    exhibits carried 25 pages of quotes that I gathered from class

3    members.

4         It allowed Mr. Seeger to stand up there and to say

5    to Your Honor at the very end of his argument, Judge, the most

6    compelling reason that you should grant final approval is that

7    99 percent of the player community has endorsed this

8    settlement.  I'm not saying I am the one that caused that 99

9    percent endorsement rate.

10        But, I was the only one that was out there as a foot

11   soldier for Mr. Seeger, for everyone else involved, and for

12   the players to help them understand, to educate them.  And for

13   me to get a .75 when my hours were cut initially, I didn't put

14   that many hours in initially.

15        I had many more, but Mr. Seeger -- Chris said to me,

16   Craig, you have my authority to do whatever it takes, don't be

17   a pig about it.  And, Judge, I tried not to be.  I did what I

18   had to do to make sure that every class member understood this

19   settlement and the benefits.

20        And because of that, that was instrumental in that

21   99 percent endorsement rate that also Mr. Karp was able to

22   stand up and his first remark to the Court after Mr. Seeger's

23   last remark was Mr. Seeger's comment about the 99 percent

24   endorsement rate is correct.

25        THE COURT:  Okay, thank you very much.

1          MR. MITNICK:  Thank you, Judge.

2          THE COURT:  Okay, Mr. --

3          MR. SEEGER:  Your Honor, Mr. Mitnick is correct.

4    When the first settlement -- I believe it started with the

5    very first iteration of settlement, I knew that Mr. Mitnick

6    had not only great access to a lot of players because he's

7    very well-connected in the community, but I knew he referred a

8    lot of cases to Mr. Locks.

9          I knew he had many clients of his own.  He was kind

10   of a logical place for me to turn to to say I want to get the

11   message out.  We had objectors that had websites up at the

12   time with incorrect information --

13         THE COURT:  I'm aware of all those things.

14         MR. SEEGER:  So Mr. Mitnick did great work, all

15   right, let me start with that.  The reason he's at a .75 for

16   his time were two-fold.  One is he did not receive a court

17   appointment.  It was somebody that I tapped to help, but I

18   thought that was important.

19         But I also felt that when I got his time records, I

20   thought they were -- I thought there was some heavy billing

21   that went on so I made adjustments in my judgment that I

22   thought were fair.  But I don't want that to detract from the

23   fact that when I made a phone call to people, he was one of

24   several that I want to get the word out -- we need to get the

25   word out because we're up against the misinformation campaign,

1    he stepped up.

2              THE COURT:  Okay, thank you very much.

3              MR. MITNICK:  Thank you, Your Honor.

4              THE COURT:  Okay, Anthony Tarricone.  Hello, Mr.

5    Tarricone.

6              MR. TARRICONE:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              MR. TARRICONE:  Anthony Tarricone from the Kreindler

9    Law Firm.  Professor Rubenstein in his report to this Court

10   stated, and I quote, "Class counsel settled the entire case

11   after briefing one dispositive motion, without undertaking any

12   formal discovery, without significant motion practice, without

13   summary judgment briefings, and without preparing for, much

14   less engaging in, a class or even a bellwether trial."

15             There were two drivers -- main drivers that made

16   that happen.  The first was the critical mass of cases that

17   were filed representing thousands of retired players, and the

18   second one, and there's been some discussion about it today,

19   was the tide of public opinion.

20             And the tide of public opinion turned against the

21   NFL in a very big way by design.  It turned against the NFL

22   and turned on its head with a C change (phonetic), the common

23   view that people had of this litigation at its outset that was

24   very negative to these players.  And the tide of public

25   opinion, the change, the C change, didn't just happen.  It was

1    because of the plan, the communications plan that you've heard

2    about.  I am the one who conceived it.

3            I went to Mr. Weiss in the late part of 2011 before

4    any of the lawyers who worked on the settlement papers were

5    involved in the case.  At the time, I chaired the

6    Communications Committee for the BP Deepwater Horizon Oil

7    Spill case in the Eastern District of Louisiana, and we had a

8    communications campaign there that I chaired the effort of.

9            And I told Mr. Weiss that I thought this case

10   presented a unique opportunity to use the public opinion to

11   move how people thought about this case in start and to turn

12   the very negative view that people had on its head.

13           And we had an organizational meeting on February

14   21st, 2012 at which time Mr. Weiss asked me if I would chair

15   the effort.  Mr. McGlamry and Mr. Hagen also asked to be on it

16   at that time, and Mr. Marks was asked to co-chair it a few

17   weeks later.

18           And then on April 26th after we were appointed

19   formally by this Court, we continued with a committee and

20   there were some other members as well, but we had that meeting

21   on February 21st.  Two days later, February 23rd, I first

22   contacted Ray De Lorenzi, who at the time was the

23   Communications Director at the American Association for

24   Justice, where I had recently been President.

25           And we had worked together on the Affordable Health

1    Care Act to prevent changes to the law that would have

2    prevented people from having access to justice in malpractice

3    cases, and Mr. De Lorenzi and I talked on the 23rd, it was a

4    Thursday.  On the following Monday, he introduced me to CLS.

5          And a few days later, he gave his notice at AAJ and

6    he went to work for CLS, and that was in February that this

7    happened.  April 26th, some time later, you made the

8    appointments.  On April 26th, I drafted and submitted a

9    request for proposal to several PR firms, including CLS and

10   several others.

11         We then engaged in two weeks of interviews which I

12   arranged.  They were attended by Mr. Seeger, Mr. Weiss, Mr.

13   Marks and myself, and I don't recall whether others

14   participated in those.  We decided on CLS.

15         We retained CLS on May 16th, 2012 and we had a plan

16   that had started -- on February 21st, before we retained CLS,

17   I laid this plan out and you've heard it today, no lawyers

18   talk to the press, we use the stories of the families to tell

19   what happened to educate the public about TBI and the

20   devastating effects it had on these families, and to dispel

21   the myths that were being propagated by the NFL and to turn

22   the tide of public opinion.

23         That began on February 21st we laid that out.  And

24   then after May 16th when we retained CLS on the 22nd, we were

25   in Washington, our core group, meeting with CLS and we came up

1    with a plan to roll out a media campaign the day that the

2    Master Administrative Complaint was filed.

3              And I'm sure you recall, Your Honor, it was all over

4    the papers, it was all over the media, and there was a lot of

5    preparation that went into that, media briefings, and I

6    coordinated that with CLS.

7              But I was involved in it many hours a day, every

8    day, seven days a week, and on June 7th, Kevin Turner was on

9    Good Morning America.  Mary Ann Easterling was on CNN.  Diane

10   Sawyer covered this as the lead story on ABC Evening News.  It

11   was a major coup.

12             We had a teleconference on that day featuring Kevin

13   Turner and Mary Ann Easterling.  It was attended by CBS, ABC,

14   NBC, ESPN, Fox, CNN, Bloomberg, Reuters, New York Times,

15   Atlanta Journal Constitution, Philadelphia Inquirer, HBO

16   Sports, Sports Illustrated, LA Times, Minneapolis Star

17   Tribune, Richmond Times, Milwaukee Journal Sentinel, and

18   others.

19             That didn't just happen.  We made that happen and

20   it's easy today to downplay the effect that this campaign had,

21   but it was an extraordinary result.  It was a unique case to

22   be sure, but I recognized the opportunity and brought it to

23   Mr. Weiss and then he had the -- the faith in me to ask me to

24   do that, as did Mr. Seeger when he was then appointed, and we

25   continued.

1           We had regular committee meetings.  Then we had a
2    core group which consisted of Mr. Seeger, Mr. Marks, Mr. Weiss
3    and myself.  Every week we had a meeting by phone that
4    included us and in some times, the CLS people, Ray De Lorenzi
5    and others.
6           This was a carefully coordinated campaign and there
7    were detractors.  The lawyers didn't like the idea that they
8    had to be quiet.  The only way we could make the filing of the
9    complaint on June 7th a newsworthy event was to keep the
10   lawyers out of the press for months beforehand.
11          That was not easy to do because there are a lot of
12   egos in this room and people wanted to -- you know, they file
13   a complaint, they want to give a press release and so forth,
14   and -- and a lot of them didn't believe it would work.  But it
15   did work.  We were then in the news.
16          One of our goals was to educate the public, turn the
17   tide of opinion, but to do that we wanted to be in the news
18   every single day.  One of our goals was to take the campaign
19   out of the sports pages and move it to the front page, to the
20   news, and we did that.
21          We were in both camps, sports and news, and we were
22   there every day up until the start of the season.  We were
23   there every day during the season.  It dominated the 2012,
24   2013 season.  And it was against that backdrop that in January
25   of 2013 the negotiations started.  And it's easy to say well,

1  it had nothing to do with the NFL coming to the table, but I

2  think we all know that it did and I think if you ask in this

3  room, I don't think there's a lawyer in this room who won't

4  agree that there wasn't another case ever where communications

5  had such an effect and --

6            THE CLERK:  Less than two minutes remaining.

7            MR. TARRICONE:  I'm sorry?

8            THE CLERK:  Less than two minutes remaining.

9            MR. TARRICONE:  So I can't -- I don't have time to

10 go through everything I did.  I was involved every day and

11 right up until the settlement was announced and the committee

12 and myself remained involved to sell this deal and so we were

13 involved in that as well.

14            I was not involved in the negotiation and I was not

15 involved in the -- all the work to push it through.  I wish I

16 had been.  Didn't have that opportunity.  But the creative

17 work that we did was very important.  My firm was given a 1.25

18 multiplier.

19            I believe it's unfair given the circumstances of

20 this case and how it brought the -- the work that we did

21 brought the NFL to the negotiating table and I believe that my

22 firm should have a multiplier that begins with a 2.

23            THE COURT:  Okay.

24            MR. TARRICONE:  The only other thing I would

25 mention, Your Honor, is we were directed by somebody at Mr.

1    Seeger's office to delete any time for people who didn't have

2    a minimum of 50 hours.  I'm a team player, I did it, I didn't

3    question it, I did it.

4              And then I saw that -- afterwards that at least

5    seven firms have multiple timekeepers with less than 50 hours,

6    so we had to take out 73 hours or so, and I would ask that

7    they be put back in.

8              THE COURT:  Okay, thank you.

9              MR. TARRICONE:  Thank you.

10             THE COURT:  Mr. Seeger.

11             MR. SEEGER:  Your Honor, this was a breakthrough

12   legal case that is being studied in law schools throughout the

13   country, has now put the ability to settle personal injury

14   cases using Rule 23 and, you know, this constant -- you know,

15   this -- I'm trying to say this as tactfully as I can and it's

16   something I would say to everyone in this room privately.

17             But to stand here and act as if it was just some PR

18   ploy or some PR case is just inaccurate.  Does that diminish

19   from the fact that I think Mr. Tarricone led that committee

20   and did a great job?  I enhanced his lodestar by .25 for that

21   reason.

22             He -- the case has gone from 2012 to January, 2017

23   which is our relevant time period.  In that time he billed

24   $1.258 million, and I enhanced it by 25 percent to recognize

25   the work that he did.  I understand he's not happy with what I

1    did, but that was my thinking behind it.  Just a couple other

2    points that are really I think important.

3              You know, when I have not -- I have not put in any

4    of the time submissions, the work done for legal fees.  I

5    don't think it's appropriate to do it and that's -- that's the

6    right thing to do.  I'm not complaining about that.

7              But I don't -- I also didn't put in the time that

8    when Professor Rubenstein got the valuation of the settlement

9    wrong, I -- we went out, got the actuaries to revalue the

10   settlement which showed that the common benefit fees were

11   actually less than he had -- as a percentage of the total and

12   allowed individual retainer agreements to go up.

13             That -- even though I don't have that same interest,

14   it was my job as a lead to do that and we did it and we're not

15   billing the case for it.  So just a couple things to point out

16   because I think there's a perception in the room that I

17   somehow am against the guys with individual -- I am not at

18   all, no problem for me so --

19             THE COURT:  You made that pretty clear.

20             MR. SEEGER:  Yeah.  I think that's all I have.

21             THE COURT:  Okay, thank you.

22             All right, Mr. Rude -- Rudd -- Rude?

23             MR. RUDD:  Rudd, Your Honor.

24             THE COURT:  Is it Rudd?  Rude is good enough.

25             MR. RUDD:  Well, I hope I'm not, you know --

1          THE COURT:  Okay.  Okay, Mr. Rudd.

2          MR. RUDD:  Good morning, Your Honor, my name is

3    Gordon Rudd.  I am a partner at Zimmerman Reed Law Firm and

4    I'm appearing on behalf of Bucky Zimmerman, who is out of the

5    country and couldn't attend --

6          THE COURT:  Are you --

7          MR. RUDD:  -- today.

8          THE COURT:  Are you a part of that Zimmerman firm?

9          MR. RUDD:  I am a managing partner at Zimmerman

10   Reed, yes --

11         THE COURT:  Oh, okay.

12         MR. RUDD:  -- and I'm appearing on behalf of Bucky

13   Zimmerman, who couldn't be here today, and we're pleased to be

14   able to present our arguments to the Court --

15         THE COURT:  Okay.

16         MR. RUDD:  -- as to why we believe primarily that

17   all firms that were on the PSC including Zimmerman Reed should

18   be entitled to a multiplier based upon the factors that have

19   been described in Mr. Seeger's declaration and Professor

20   Fitzpatrick's declarations.

21         And I -- part of my presentation was around the

22   fairness to all the team players who were on this case that

23   Mr. McGlamry earlier spoke to.  I'm not going to repeat what

24   he stated, but I wholeheartedly agree that this case involved

25   not just one or a few, but many lawyers who participated at

1    the very earliest stages.  We -- our primary objection to the

2    proposed allocation is the fact that we're not being

3    recognized with a multiplier.

4           We have been given a 1 multiplier which of course is

5    no multiplier at all.  We're receiving our straight time.  And

6    we believe that our early involvement in the case, the

7    leadership roles that we played on behalf of the Plaintiffs'

8    Steering Committee and our work specifically on the Ethics

9    Committee which was a committee that was created and appointed

10   later in the case to support and defend the settlement when

11   issues of poaching and promises of settlement loans and

12   diagnoses that have been referred to throughout the case

13   became prevalent, we -- we spearheaded that effort.

14          I'm going to address that slightly.  But our -- just

15   as by way of background, our background, our role in

16   representing players started as early as 2009.

17          We were lead counsel in a class action involving NFL

18   players -- retired players called Dryer v. NFL that was

19   pending before Judge Magnuson in the District of Minnesota and

20   we reached a class settlement in that case on behalf of

21   players involving their publicity rights.

22          And during the -- the tenure of that case, we came

23   into contact with more than 1,600 players who contacted us to

24   discuss the use of their likeness and images and whether they

25   should be compensated for it.  And what we began to see during

1    that time was cognitive issues with regard to players.

2    Players who were contacting us had cognitive issues.

3            And in 2010, we began to meet with players and we

4    began to meet with other attorneys and we met with Dr. Omalu

5    to discuss concussions in football, and that happened well

6    before this case started.

7            And by early 2011, our firm represented more than

8    350 retired players with regard to concussion issues after the

9    Dryer case finished.  When the MDL was formed, we fully

10   supported the multi-district litigation and we supported the

11   case being transferred to the Eastern District of

12   Pennsylvania, and we met with Sol Weiss and Michael Housefeld

13   (phonetic) at Mr. Housefeld's office to discuss the formation

14   of the MDL.

15           Once the case was formed and we were appointed to

16   the PSC, one of the earliest strategies in the case was to

17   file cases.  The leadership -- Mr. Seeger, Mr. Weiss and

18   others including everyone on the PSC believed that creating a

19   critical mass -- a large number of cases so that the NFL

20   understood that players were coming forward and were willing

21   to present their claims at trial in a court of law was a

22   critical aspect of placing pressure on the NFL to perhaps

23   create the opportunity to explore resolution.

24           And we filed cases at the direction of lead counsel.

25   We filed more than 350 claims in -- in multiple plaintiff

1    complaints.  And when we did that, Your Honor, we did it

2    understanding that we were going to represent each and every

3    one of those 350 individuals through trial, any appeals.  We

4    knew that we were going to be advancing costs and we knew that

5    we --

6              THE COURT:  Do you think you would have won?

7              MR. RUDD:  Your Honor, it's unknown because we never

8    got to that point.

9              THE COURT:  Well, do you think that the odds of

10   winning --

11             MR. RUDD:  It was --

12             THE COURT:  -- were high?

13             MR. RUDD:  -- a very difficult case, Your Honor, a

14   very difficult case --

15             THE COURT:  Yes, I would so say.

16             MR. RUDD:  -- which -- which is why I believe, Your

17   Honor, that the early risk that we took because of the

18   uncertainty and the high -- the high possibility of various

19   defenses being won by the NFL should be compensated through a

20   multiplier.

21             That early risk, that early effort and the lawyers

22   who stepped forward to represent these players and make sure

23   the NFL understood these players were -- were not going to

24   just sit quietly is something that should very much be

25   appreciated by this Court and recognized by this Court through

1     a multiplier.  And in fact, the cases that were filed in this

2     Court, 4 to 5,000 resulted in common benefit to more than

3     20,000 players who registered for this settlement and who are

4     participating.

5              Those clients, those players who stepped forward

6     didn't just get a settlement for 4 or 5,000 people, they got a

7     settlement for 20,000 people.

8              So to use a baseball analogy in a football case,

9     while lead counsel may have negotiated a settlement that --

10    that was a grand slam, we -- and by "we" I mean all the

11    lawyers who filed cases -- loaded the bases, and we believe

12    without loading those bases this settlement would not have

13    been possible.

14             Certainly there are other reasons for the settlement

15    -- the good work of lead counsel, the communications effort,

16    but the fact that these cases were filed played a very

17    important role.

18             And I know that Mr. Seeger diminished the value of

19    filing those cases by saying well, those -- those individual

20    -- those attorneys will be compensated through their

21    individual retainer agreements, but the fact of the matter,

22    like Mr. McGlamry earlier stated, the vast majority of our

23    clients will go through the BAP, but they're not entitled to

24    compensation and yet they, by coming forward, helped achieve

25    this settlement for a far larger group.

1          Additionally, Your Honor, the fees that we will

2   earn, I anticipate Mr. Seeger may stand up and say how many

3   cases we have that we'll receive awards and the fees that

4   we'll receive.

5          We've had -- you know, several claims, I don't know

6   the exact number, it's more than a dozen claims that have been

7   approved, but we have put in substantial efforts in

8   representing the individual clients as well.  There's a lot of

9   work that has been done.

10          So we believe that -- that although Professor

11  Fitzpatrick stated that the lodestars were properly adjusted,

12  the fact that we're receiving a 1 when we were appointed to

13  the PSC, when we took early risk, simply doesn't recognize

14  those efforts and those risks under the case law.

15          I just want to talk about other aspects of our

16  leadership in the case, and certainly, you know, we haven't

17  had the opportunity to appear before the Court, but I can

18  assure the Court we have done a lot of work on behalf of the

19  Plaintiffs' Steering Committee, on behalf of lead counsel in

20  ways to support the settlement and to support the litigation.

21          We worked on preemption issues, we worked on the

22  Master Complaint.  We weren't invited to the Settlement

23  Committee.  We certainly would have been eager to participate,

24  and we believe we would have been fully capable of

25  participating.  Mr. Zimmerman has led many multi-district

Rudd - Argument                                    91

1     litigations where billions of dollars have been paid to

2     individual victims.

3              I think he would have been a very meaningful

4     resource, but it was a small group and we -- we understand

5     that's the way it goes.  Right now, Your Honor, we're serving

6     as lead counsel in the NHL Hockey Concussion Litigation

7     pending in Minnesota and Mr. Zimmerman is lead counsel there.

8              So, we certainly have a lot of -- a lot of

9     capabilities and a lot of experience with regard to this and

10    we believe that leadership should be recognized.  Just turning

11    briefly --

12             THE CLERK:  Less than two minutes remaining.

13             MR. RUDD:  Thank you.  Just turning to the Ethics

14    Committee work, Your Honor, Mr. Seeger discusses the work of

15    the Ethics Committee in his declaration at paragraph 20,

16    subparagraph h, and the Ethics Committee was formed later in

17    the litigation.

18             Mr. Zimmerman and Mike McGlamry both -- both

19    spearheaded that committee and it was when we began to see the

20    issue of poaching evolving where lawyers were soliciting

21    clients that they knew to be represented and -- and seeking to

22    represent them, promising them diagnoses, promising them

23    settlement loans which has been referenced today, and of

24    course the Court is well aware with the issues regarding third

25    party funding.

1              We, I would submit, Your Honor, were the first to

2    present that issue to Mr. Seeger and to counsel.  We were

3    looking at the issue as early as, you know, several years --

4    as early as 2013 when we started seeing a number of our

5    clients moving to other law firms in groups.

6              And we started looking at the issue, we brought the

7    issue to lead counsel, the Ethics Committee was appointed, and

8    I think that the Ethics Committee has played a critical role

9    in supporting the settlement and defending the settlement

10   because without recognizing those issues, identifying those

11   issues and acting on those issues, the settlement could become

12   fraught with issues of -- of fraud and -- and improper claims.

13             And so we believe that the Ethics Committee work was

14   critical, it was work done to support the settlement which is

15   another factor that the Court we hope will consider in

16   approving a multiplier award to the Zimmerman Reed Law Firm.

17   Thank you.

18             THE COURT:  Mr. Seeger, I have a question to ask

19   you.

20             MR. SEEGER:  Yeah.

21             THE COURT:  Do you think -- do you believe that if

22   only five players were suing the NFL on an issue like this,

23   the result would have been very different than if -- than if

24   -- what is it, 800 or 8,000 or 9,000 -- I'm talking about the

25   people --

1              MR. SEEGER:  Yeah.

2              THE COURT:  -- who sued individually, I'm not --

3              MR. SEEGER:  There's no doubt about that, Your

4    Honor.  In fact, there are a string of cases involving several

5    players that had brought cases prior to the MDL and had been

6    confronted with the preemption issue and didn't do very well.

7    So and then I think I've been through this many times about

8    the --

9              THE COURT:  But I don't know -- I don't know those

10   settlement issues.  I don't know how hard they worked on

11   settlement there.

12             MR. SEEGER:  I don't know either.

13             THE COURT:  I mean, that I -- that I really don't

14   know, but I do think -- I do think the fact that this was a

15   public case, it would have been a public case if one -- if one

16   player had fought the NFL --

17             MR. SEEGER:  No doubt.

18             THE COURT:  -- or if a number of players.  I mean,

19   it was the whole issue of discovery and everything else that

20   went into this.  I mean, that was --

21             MR. SEEGER:  No doubt.

22             THE COURT:  -- that was -- I mean, I sat in on those

23   -- on what was presented to me and there is no question that

24   discovery played a very, very, very large role.

25             MR. SEEGER:  Yes.

 1          THE COURT:  Number of players less so; discovery,

 2     very, very important role, and I can be -- testify to that.

 3          MR. SEEGER:  Yeah.  Yeah, and to this day the press

 4     is still, you know, trying to get their -- their hands on

 5     those -- on whatever documents they can.

 6          I just wanted to make to make a couple of -- let me

 7     make an observation generally about the settlement, not

 8     necessarily specific to Zimmerman Reed --

 9          THE COURT:  Okay.

10          MR. SEEGER:  -- because I've heard a number of

11     people stand up here and say, you know, Judge, we've got all

12     these clients that won't be diagnosed with a compensable

13     injury and we're still servicing them and putting them through

14     the BAP.

15          By the way, that is noble, that is important, the

16     fact that they have these great lawyers shepherding them

17     through the settlement.  But let's also be fair and say what

18     would have happened to those players without the settlement if

19     they didn't have a compensable injury?

20          Where would -- where would they be?  I mean, they

21     would be -- right now they're getting BAP tested and we're

22     hopefully catching problems early, they're getting into the

23     healthcare system.  Would these -- you know, I mean I guess

24     the point is that it's not a -- it is a positive thing and the

25     lawyers who accepted those representations, just as I do in

1    many cases where we also accept individual representations,

2    you're there to the bitter end with these clients.

3             You can't just -- you know, obviously you've got to

4    stay with them all the way through it.  So and I do want to

5    talk a little bit about the Ethics Committee because I think

6    this is the first time I'm responding to it.

7             Yeah, it was created specifically because there were

8    firms that were very -- and I was too -- was very concerned

9    about this, what you've heard of as the "poaching issue."  As

10   soon as the case was settled there were a number of all the

11   sudden claims handlers and lawyers who started blitzing

12   clients represented by these guys in the courtroom who had

13   been with the case since 2010, some of them.

14            And they were taking clients from them.  They were

15   offering them cheaper deals and it was a really unfortunate

16   thing and I think some of that anger is directed my way

17   because I think the belief is I could have done more about it.

18            The reality was we all had the obligation to the

19   class and as much as I have been out there doing town halls

20   telling players that that is -- that would be inappropriate,

21   there's a lawyer who took all this risk, he was with you from

22   the beginning and he should be with you in the end, and I also

23   have said to these lawyers and I want to say it in this

24   courtroom, that to the extent somebody has poached their

25   client after the settlement and they've done a lot of work,

1    they can make an application still to Judge Strawbridge and

2    talk about where those fees go.

3              THE COURT:  Absolutely, that's a very -- absolutely.

4    That is understood.

5              MR. SEEGER:  Yeah.  I just -- I just think it's

6    important to point that out.

7              THE COURT:  That's very important because he's going

8    to evaluate the amount of work that each lawyer did on each

9    individual -- for each individual client --

10             MR. SEEGER:  Yeah.

11             THE COURT:  -- and somebody came in and poached may

12   not -- very well may not have done as well as somebody who has

13   held a hand of this client -- this class member for a long

14   period of time.

15             MR. SEEGER:  Right, thank you.

16             THE COURT:  So I think that's certainly something

17   that should be argued to Judge Strawbridge.

18             MR. SEEGER:  Thank you.

19             THE COURT:  Okay, Mr. McCorvey.

20             MR. MCCORVEY:  I was going to say good morning, Your

21   Honor, but it seems like we're at noon now, so I'm going to

22   say good afternoon.

23             THE COURT:  Yes, well we recess when the Judge gets

24   hungry so I'm not hungry yet.

25             MR. MCCORVEY:  All right.

1            THE COURT:  So --

2            MR. MCCORVEY:  All right, well again, Your Honor, my

3    name is Derriel McCorvey.  I thank you for this opportunity to

4    be heard and I also thank you for your foresight in appointing

5    me to this committee.

6            As I stood here at the first hearing I recognized

7    that I was the only former player in the room and the only

8    African American and I really appreciate Your Honor trying to

9    achieve some level of representation of the punitive class.

10           THE COURT:  I think you were the only African

11   American who applied, if I'm not --

12           MR. MCCORVEY:  Well, yeah, it might have been that

13   case, Your Honor, I didn't get to see all the filings.  But I

14   want to talk more so and I'm not here to pump my chest and I

15   don't have an ego, Your Honor.

16           I don't play ball anymore, I just try to live a nice

17   peaceful life.  But as Mr. Seeger said earlier, he submitted

18   what he thought was best, and I'm here to suggest to the Court

19   that I fundamentally disagree with his approach to allocating

20   the fees in this case and I think it's telling that 16 other

21   law firms has joined in our universal opposition to it.

22           We would favor a either committee where various

23   ideas on appropriate lodestars -- for instance, if you were

24   appointed to the PSC, your minimum lodestar should be a 2.0,

25   Your Honor.  A 1.0 lodestar is no lodestar at all.  It doesn't

1    take into consideration that we were here early on in the

2    litigation, we incurred assessment costs that we wasn't going

3    to -- we wasn't sure that we were going to get back.

4           We invested expenses in traveling for meetings, we

5    participated in conference calls --

6           THE COURT:  Did you get -- you got reimbursed for

7    those expenses?

8           MR. MCCORVEY:  Yes, Your Honor, I got reimbursed but

9    when you look at -- I think when a Court values what a lawyer

10   did to achieve an outcome, you look at the amount of financial

11   resources that that lawyer risks, the -- along with assessment

12   and expenses, and the likelihood of failure or success in a

13   litigation.

14          I want to echo many of the lawyers that have spoken

15   today that at the time we spent that money, we weren't sure

16   with how you were going to rule on a preemption issue.

17          We knew very well about the import of the CBA so

18   that was the risk that many of my colleagues are echoing that

19   wasn't really factored in for a PSC member to not receive a

20   minimum lodestar of 2.0.

21          I think the allocation that Mr. Seeger did to the

22   extent that he was essentially Judge and jury is also why I

23   think this Court needs to either appoint a Special Master or

24   require a committee to be formed of the PSC and PEC to

25   determine the matter.  As one counsel said, we wouldn't have

1   this public fight if that would have been done because a

2   consensus would have been reached.  It wouldn't have been one

3   person deciding who had a significant interest --

4           THE COURT:  He's not deciding.

5           MR. MCCORVEY:  Well, you're right, Your Honor, he's

6   not --

7           THE COURT:  I'm the Special Master.

8           MR. MCCORVEY:  Yes, Your Honor.

9           THE COURT:  Take a look at her.

10          MR. MCCORVEY:  Yeah, I stand corrected.

11          THE COURT:  Here she is.

12          MR. MCCORVEY:  I stand corrected, Your Honor, you

13  are the ultimate decision maker on it.  But the process could

14  have went smoother.  We wouldn't have this public fight that

15  really doesn't reflect well on -- on trial lawyers in general.

16          THE COURT:  I have to take some responsibility on

17  that because frankly, he was the face that I saw for years, he

18  and Mr. -- Professor Issacharoff are the people that I've seen

19  for years and years and years and they have been the face of

20  this and I have felt that they would be in the best position.

21          MR. MCCORVEY:  Yeah.

22          THE COURT:  I probably -- I will reevaluate but it

23  think that they -- I think I still believe that, that he --

24  but I certainly will reconsider it, whether or not he is in

25  the best position to allocate.

1          MR. MCCORVEY:  And, Your Honor, respectfully that's

2    what a lot of the objectors have somewhat of an issue with.  I

3    wanted to be here, Your Honor, I wanted to be included in the

4    process, I wanted to take my appointment to serve this class

5    -- the punitive class.

6          But frankly, Your Honor, since the terms sheet was

7    reached in 2013, we were pretty much -- the PSC and the PSC

8    (sic), we were excluded from that process --

9          THE COURT:  Well that I can't -- that's something

10   that's very hard --

11         MR. MCCORVEY:  Yeah.

12         THE COURT:  -- for me to adjudicate on.

13         MR. MCCORVEY:  No, you can't, and I'm not asking you

14   to adjudicate it, Your Honor.  But I'm asking you to consider

15   that 1 when you're looking at the appropriateness of whatever

16   awards Your Honor determines to be reasonable and appropriate

17   in this case.

18         And I would also ask that -- for you to look at -- I

19   think you asked the question earlier did -- to Mr. Seeger, do

20   you think thousands of plaintiffs filing suit had more of an

21   effect than just five.  And I think the answer is certainly,

22   Your Honor, it was the critical mass.

23         That was the strategy that the PSC under the

24   leadership of Mr. Weiss and Mr. Seeger decided that this is

25   what we're going to do, everybody, we're going to start filing

1    cases, we're going to get everybody on the same page --

2              THE COURT:  I appreciate that.

3              MR. MCCORVEY:  -- and I think that has to be valued.

4              THE COURT:  Well, that's why I asked that question.

5    I appreciate that.

6              MR. MCCORVEY:  Okay.  You know what?  And again,

7    Your Honor, I'm not here to attack anyone.  I think Mr.

8    Seeger's a fine lawyer.  My -- my general sentiment is that --

9    that I was prevented from earning more than 331 hours in the

10   litigation.

11             Not because I wasn't available, not because my firm

12   didn't have the resources to devote more time, it's just that

13   systematically, we were prevented from doing work after the

14   settlement term sheet was executed.  My role, Your Honor,

15   again, I was on the Communication Committee, I worked under

16   the leadership of co-leads, I worked with my clients, I did

17   various interviews on behalf of the PSC.

18             But again, I think that the whole value of the

19   collective group was the critical mass, along with the

20   negative adverse publicity that the NFL had to endure because

21   of the Communication Committee was a factor in bringing about

22   the settlement.

23             And the -- the polishing it up and executing it

24   later I don't think should be valued more than the -- the

25   genesis that got the settlement, drove it to its fruition.

1          THE COURT:  Thank you.

2          MR. MCCORVEY:  Thank you for your time, Your Honor.

3          THE COURT:  All right, do you wish to be heard, Mr.

4     Seeger?

5          MR. SEEGER:  No, Your Honor.  I don't have any

6     specific comments.

7          THE COURT:  Okay.  I'm going to take a five-minute

8     recess, okay?  And I'll be back on the bench.

9       (Recess taken)

10         THE COURT:  Okay.

11         THE CLERK:  Your Honor, back on the record, Your

12    Honor.

13         THE COURT:  All right, who was speaking?  Mr. Molo?

14         MR. MOLO:  Good afternoon, Judge Brody.  Thank you

15    very much for hearing us here this morning on behalf of the

16    Feneka objectors (phonetic).  I'd like to say that we weren't

17    invited to the party, but I think eventually we like to think

18    we became the life of the party and so it's a pleasure to be

19    here this morning, and in all sincerity, with the -- with the

20    great lawyers that did achieve a wonderful, wonderful

21    settlement.

22         There's been criticism of us in some of the papers

23    that were filed that we were some kind of anarchists or

24    terrorists that were out to blow up the settlement, and that

25    could not be farther from the truth.  The very --

1          THE COURT:  I looked toward you, there's no -- I

2     asked you to organize the defendant -- the objectors, there's

3     no question about that.

4          MR. MOLO:  And we clearly up front said that we

5     wanted a settlement.  We did not in any way object to the

6     notion of a settlement.  We wanted one that was fair.  And we

7     saw a settlement that was of major import, highly visible

8     case.  It had ramifications beyond the confines of its own

9     facts, but it was legally deficient, Judge.

10          And in the face of strenuous, strenuous opposition

11     from some of the leading lawyers in America on the plaintiffs'

12     part, as well as the NFL that had three excellent law firms

13     representing it, we challenged that and as a result of that,

14     we proposed specific solutions to remedy the deficiencies and

15     fortunately for the class, this Court -- the injured class,

16     this Court agreed.  And as a result of that, we brought about

17     great benefits to the class.

18          You know, objectors --

19          THE COURT:  Why don't you articulate them.

20          MR. MOLO:  Sure.  I have, as a matter of fact,

21     Judge, a set of slides here that I can give the Court, as well

22     as put them up on the screen.  We have a set for Mr. Seeger

23     too.

24          MR. SEEGER:  Thank you.

25          MR. MOLO:  And as we get into the specifics of -- of

Molo - Argument                                                 104

1   the actual financial benefits, Judge, I do want to call

2   attention to the role that we played merely by challenging the

3   settlement.  As Judge Posner said in the <u>Pella Windows</u> case,

4   you know, objectors play a substantial role by providing the

5   clash of adversaries to generate information that a Judge

6   needs to decide a case.

7           That's gone in the settlement context.  So if we

8   were to go through the specific benefits that were achieved as

9   a result of our objection, they would be as follows.  The

10  first one -- and I -- and the screen is not coming up --

11          THE COURT:  Well I have it --

12          MR. MOLO:  Okay.

13          THE COURT:  -- and I think I'm the Special Master

14  here.

15          MR. MOLO:  So the first -- and as we get into the --

16  into the details of the numbers, if Your Honor wishes in terms

17  of our expert's calculations and such, my colleague, Mr. Nitz,

18  will be happy to step up and address the Court as well too.

19          And my colleague Mr. Hangley is here, and the

20  objection by the Feneka Objectors was brought not just by Molo

21  Lamken, but by the Hangley Aronchick firm as well.  So and as

22  to the specific benefits, by including NFL Europe, which was

23  substantially excluded -- players who had played just in NFL

24  Europe -- 2,300 players that would not have gotten a

25  meaningful benefit were given a meaningful benefit by -- and

1   under the BAP, be included in the BAP, getting exams and

2   increasing the amount of eligible seasons that they would be

3   allowed under the settlement, the value there is increased by

4   $36.8 million.

5           On the modification of the BAP, which the Court

6   agreed that the cap on the BAP which had been $75 million

7   would be lifted, by providing additional exams and providing

8   full supplemental benefits that would not have been there had

9   the $75 million cap been in place, $29.6 million --

10          THE COURT:  You -- did you ask for that, or is that

11  what happened?

12          MR. MOLO:  We did.

13          THE COURT:  I don't have any recollection that that

14  was done because you asked for it.

15          MR. MOLO:  It -- well, we asked for it and --

16          THE COURT:  I mean, that was done --

17          MR. MOLO:  -- and it was done.

18          THE COURT:  -- because the Judge asked for it.

19          MR. MOLO:  We asked for it and it was done.

20          THE COURT:  Well, it may have been incidental but

21  that was not, as far as I know -- and I'll have to check on

22  that.

23          MR. MOLO:  It was, Your Honor, and in fact we had

24  slides on that and I can -- I can provide you with specific

25  citations from our brief and petition.

1          THE COURT:  I'm not saying you didn't raise it, but

2     I didn't think you were the impetus of it.

3          MR. MOLO:  Okay, we -- we did.  We did.

4          THE COURT:  You raised it.

5          MR. MOLO:  We raised it.

6          THE COURT:  If you told me you raised it I'll accept

7     that --

8          MR. MOLO:  Okay.

9          THE COURT:  -- but that does not mean that that was

10    the reason for it.

11         MR. MOLO:  Okay.

12         THE COURT:  I'm --

13         MR. MOLO:  But the case law -- the case law says

14    that if an objector raises an issue and the Court modifies or

15    the settlement is modified following that, the objector's

16    entitled to credit for that modification.

17         THE COURT:  Or lucky, one of the two.  Okay, but go

18    on.

19         MR. MOLO:  Well, Your Honor, you know, in all

20    seriousness, this Court gave preliminary approval -- you did

21    great service to the class in the very first instance

22    rejecting the settlement that was initially proposed to you.

23    That's how closely you were -- you were monitoring this

24    without -- sua sponte, before we could even object.

25              And afterwards class counsel and the NFL came to the

1    Court and said we've got a revised settlement that provides,

2    you know, additional benefits and the Court again scrutinized

3    that settlement and gave it preliminary approval.

4          We came in and very vigorously, spending as we

5    pointed out collectively over $4 million in time, our two

6    firms, contested that with extraordinary expert testimony.  We

7    had nine of the leading expert -- 11 of the leading experts in

8    the world that provided affidavits.

9          We had over 1,000 pages of exhibits.  We had

10   extraordinary briefing that we provided to the Court, and

11   after that was provided and after we had a very vigorous

12   fairness hearing which I stood before this Court at this very

13   podium, my friend Mr. Seeger got up, Mr. Karp got up and there

14   were a handful of other people got up, but it was a very

15   vigorous full-day hearing.

16         After that the Court issued its order saying that

17   the settlement could be improved if the following changes were

18   made and the four that I've identified here -- and we've gone

19   through two of them -- are the change as we said by allowing

20   for NFL Europe, the modification of the BAP to lift the cap,

21   the waiver of the appeal fee which is fairly valued at $11.6

22   million for financial hardship waiver, and the last being the

23   extension of the CTE benefit.

24         Now, we didn't get what we wanted.  We wanted that

25   to be unlimited.  But it was extended, at least to the period

1    of final approval, and that picked up another 111 additional

2    class members.

3         Unfortunately we know that there are 111 that had

4    passed away, and the fair value of that based on the NFL and

5    class counsel's expert's valuation of what the general value

6    would be -- the average value of a settlement would be of

7    $400-and-some-thousand dollars, is $44.6 million.

8         So together, Judge, the value of those improvements

9    is approximately $122 million, about 15 percent, 16 percent

10   more than the value of the settlement had been.

11        I don't for one moment take away from the

12   extraordinary work that Mr. Seeger did, from the extraordinary

13   work that Mr. Weiss and all the rest of the lawyers that sit

14   in this room did.

15        But, I can tell you to a certainty that had we not

16   been here, this injured class, these players suffering from

17   terrible, terrible circumstances and terrible diseases would

18   not have gotten the treatment that we've gotten.

19        By including 2,300 players that played only in NFL

20   Europe, we increased the meaningful benefit to more than ten

21   percent of the class.  I mean, I will say, Judge, you know, in

22   doing this work over time and a lot of it on the defense side

23   rather than the plaintiffs' side, it's very rare to see a

24   situation where an objector comes in and would be entitled to

25   the kind of fee that we're requesting, but it's even more rare

1   when you would say that an objector has come in and done the

2   kind of good that we were able to do.

3           And, you know, we've been criticized as having

4   delayed the proceedings.  That could not have been farther

5   from the truth.  We came in and we asked first to intervene

6   where we raised some of these issues.  Class counsel ignored

7   us.  We objected to preliminary approval, the issue wasn't

8   there.

9           The 23(f) petition that we took to the Third Circuit

10  did not  delay anything at all.  In fact, the fairness hearing

11  proceeded just as it was scheduled to proceed and, you know,

12  to the extent that they claimed that that was frivolous

13  somehow, they've actually changed the rules to address the

14  issue that we raised in the 23(f) petition.

15          As far as our appeal goes, we did file an appeal to

16  the Third Circuit, but that appeal was not in any way deemed

17  frivolous.  There is a means for the Third Circuit to -- to

18  deal with a frivolous appeal.  It didn't do so.  The NFL and

19  the class counsel vociferously and aggressively opposed that

20  appeal.

21          They set aside two hours for oral argument and once

22  that appeal was decided, we looked at it and even though some

23  of these statements that have been made in some of the briefs

24  are just wrong, I mean, we did not file a petition for

25  rehearing on en banc, and we did not file a sur petition.  We

1    went about trying to achieve a settlement and get it done in a

2    way that we thought was going to be most expeditious.

3              When there were limitations on what was done at the

4    -- at the conclusion and when we didn't get all the relief

5    that we wanted from the fairness hearing, we actually engaged

6    in independent negotiation with the NFL, to Mr. Seeger's full

7    knowledge.

8              I called up Mr. Seeger and said, Chris, you know, I

9    don't really want to appeal, I want to see if the NFL might go

10   along with what we want to expand the CTE benefit because

11   they've got some money they could devote to this, and he said

12   go have at it.

13             If they could -- if you can get them to, you know,

14   give -- give you more, have them give you more.  And I tried,

15   but I didn't succeed.  But we have had at all times the

16   interest of the class first.

17             The amount that we requested is in our papers and

18   the amount that we've asked for is $20 million which I don't

19   for a moment say is not a significant amount of money, but

20   when you look at the context of what it represents in terms of

21   the value -- increased value to the class, it's well within

22   the precedent that this Circuit and the Courts throughout the

23   country have allowed.  We achieved effectively --

24             THE CLERK:  Less than one minute, sir.

25             MR. MOLO:  I'm sorry?

 1          THE CLERK:  Less than one minute.

 2          MR. MOLO:  We achieved effectively over a $100

 3   million settlement through our objection.  Now, we had a $4.3

 4   million lodestar between our firms.

 5          We were extraordinary efficient and, you know, in

 6   the Shop N' Stop case which is an Eastern District of

 7   Pennsylvania case, they quote the Class Action Reporter as

 8   saying that in a $100 million case, a multiplier of 4.5 is

 9   average, so our multiplier at about 4.6 was -- was right in

10   that neighborhood.

11          I know that when you consider the risk that we took

12   which far exceeded the risk that the plaintiffs -- plaintiffs'

13   counsel had taken that it had taken on the case because by the

14   time we got involved, they had a settlement, they pretty much

15   knew that they were going to get paid something.  We knew

16   nothing.

17          We didn't -- we were facing these armies of both the

18   class counsel and the armies of the NFL and we came in and

19   risked over, you know, $4 million of time and $50,000 in

20   expenses --

21          THE CLERK:  Time, sir.

22          MR. MOLO:  -- to achieve that $100 million, Judge.

23          THE COURT:  Thank you very much.

24          MR. MOLO:  Thank you.

25          THE COURT:  Okay.

1            MR. SEEGER:  I was reminded at counsel table by a

2    statement by Justice Scalia.  It says if you ride with the

3    cops you don't cheer for the robbers.  Mr. Molo and his crew

4    did nothing but try to blow this deal up from day one, Your

5    Honor.

6            The fact that he comes in here right now to take

7    credit for changes that Your Honor was discussing with the

8    parties that even predated the final approval hearing just

9    shows you how out of touch they really are with what happened

10   in this case.

11           Let's talk about the waste, the 23(f) -- what a

12   complete waste of time that was.  He says it was no delay at

13   all.  Well, it's true because he was thrown out 24 hours after

14   oral argument, they dismissed his 23(f) appeal, and although

15   there was a concurrence, they all agreed with the results.

16           It was -- it was not timely, it was not properly

17   brought.  That's a waste of time.  He wants to be paid for

18   that.  He talks about the -- so there are -- there -- you will

19   not find one case, by the way, let's be really clear, he can't

20   because he would have cited to it where an objector was paid

21   anything like he's asking for.  They get paid nothing

22   typically.

23           I put a $150,000 recommendation for one reason at

24   all, because I was on the phone call when Your Honor asked him

25   to coordinate with the other objectors.  I felt that was

1    somewhat of a court-appointed position and that the Court

2    deserved deference for that -- not Mr. Molo, but the Court

3    deserved deference for that.  So for that reason, I made that

4    recommendation.

5         You won't even find a catalyst case -- in the

6    typical catalyst situation where the objector comes in and

7    says we want changes, you accommodate those changes, they then

8    get on board and support the settlement.  They didn't do that,

9    they  continued to try to blow it up.

10         And they put this case at risk every chance they

11   could on their one point that they knew they were wrong on and

12   they -- and we had to go through a  two-and-a-half year delay

13   to prove them and that was that we weren't compensating CTE.

14         He acts like he doesn't understand the deal but he

15   understands we compensated the disease sets associated with

16   CTE, and he also well knows that you can't compensate CTE --

17   you cannot diagnose CTE in living people.  It was a waste of

18   time, he should get zero, Your Honor.

19              THE COURT:  Okay.  I have one more.  Mr. Lubel.

20              MR. LUBEL:  Good afternoon, Judge.

21              THE COURT:  Good afternoon.

22              MR. LUBEL:  I have been referred to by Mr. Seeger as

23   both the nit-picker and the hair splitter.  I assure you I am

24   probably both.  I want to address first the --

25              MR. SEEGER:  I'll tell you what I really think in a

1  minute, okay?

2          MR. LUBEL:  I want to address first, Judge, the

3  three things that he has specified in his declaration that are

4  particular to our law firm and its claim for common benefit

5  fees.  One, he says that the claim is voided, when in fact

6  this Court never set a deadline for that claim.

7          The closest we came to it is when you invited others

8  if they had counter-declarations to his allocation and that's

9  what we did.  We timely filed our counter -- our counter-

10 declaration, his allocation requesting $450,000 for our time.

11 That's one.  He claimed that we were belated.

12         Two, he claimed that all of the discussions that I

13 raised in my counter-affidavit were not at his request or not

14 at anybody's request on the leadership,  the plaintiffs'

15 leadership team.

16         And I find that interesting, first of all because a

17 lot of the common benefit that I personally provided to this

18 group was communications I had with Mr. Seeger that he then

19 delegated -- I guess delegated is the right word to Sol Weiss

20 on what has become and you've heard from today, the generally

21 accepted or generally consistent with language.

22         In the first settlement agreement that you rejected,

23 Judge, it just said "consistent with."  When you looked at

24 Level 1.5 and Level 2, the diagnosis had to be consistent with

25 and it led to Exhibit 2, neuropsychological battery, and I

1    went to Chris first who delegated the conversation to Sol and

2    I said, Sol, look, you're telling us that pre-effective date

3    settlements are going to be covered by this.

4         And, there was no textbook definition or diagnosis

5    of Level 1.5 or Level 2 before this settlement was ever

6    announced and so you're not going to have a pre-effective date

7    diagnoses that amount to that, and we had spirited

8    conversations about it and it proceeded changes.

9         And when you look at the next or revised draft of

10   the settlement, Judge, what you'll see is they substituted

11   "consistent with" for "generally consistent with" in those

12   sections.

13        But then more importantly when you look at 6.4B, an

14   entirely new section appeared and that is the section that

15   said for the avoidance of any doubt, generally consistent with

16   in this agreement does not mean that there must be identical

17   diagnostic criteria, testing protocols or documentation.

18        And so we think those conversations that I had with

19   Mr. Weiss that I have now learned -- or they were in charge of

20   the Medical Committees, led to changes, at least the spirited

21   discussions we had that have improved the settlement.

22        Also, Judge, I was involved in -- I spoke to you, I

23   hadn't seen you in about three-and-a-half years, it's good to

24   see you, I was a spokesperson, I was an objector and I spoke

25   at the -- at the fairness hearing at the request of Mr. Molo.

1     We prepared for and we objected, we made good

2     arguments, and the Court did make substantive suggested

3     changes to the settlement that were actually implemented, in

4     part because of the arguments that were raised by all the

5     objectors.

6          Following the conclusion of that hearing, I was

7     approached by a lawyer out of Beaumont named Matt Matheny,

8     Your Honor, and he had asked that I round up, discuss with all

9     of the objectors what their prioritized issues were so that I

10    could have a meeting with Gene Locks.

11         And I assure you, I didn't show up and -- at Fisher

12    Island, Miami unannounced to -- to Gene's place with Matt

13    Matheny to talk about the objectors' positions, Judge.  I had

14    -- I called them all, I emailed them, I went and met with Mr.

15    Locks about what the position was, this is post-certification

16    hearing.

17         And then after that, Gene asked me if Matt and I

18    would both meet with Chris Seeger at a restaurant in New York

19    and we all dined together and we then -- we then again talked

20    about what the objectors' positions were and whether any

21    agreements could be reached.

22         We had a pleasant meeting.  At that time Mr. Seeger

23    was truly a charming guy.  Following that dinner, Your Honor,

24    I have multiple text messages with -- with Chris at his

25    request where he's asking me to calm down Tom Demetrio

1    (phonetic), who ultimately did not object.  I mean, he

2    objected -- he ultimately did not appeal.

3              But I kept in constant or consistent I should say,

4    communications with Locks and Seeger and others trying to

5    reach a deal post-fairness hearing prior to the appeal being

6    filed.  And so I wanted to address specifically the statement

7    in Chris's declaration that all those discussions that I

8    reference in mine were not at his request or Mr. Locks'

9    request.

10             Because there's just no way that it was a

11   coincidence that we all sat down at the same dinner table in

12   New York City.  It's not a coincidence that I met Mr. Locks at

13   his place in Fisher Island.  I tried, Judge.  I was not

14   successful, but I did what they asked me to do.

15             And I want to talk to you more broadly about the

16   allocation.  Where I grew up I was taught that if you wanted

17   your contractor to build your house correctly and on time, you

18   didn't give him the money up front.

19             I was told that you paid him over time, that you

20   monitored his work and if you were really smart, you held some

21   money back so that you could get that punch list done.

22             Professor Rubenstein when he issued his first report

23   to you, Judge, said what they were trying to do here, what the

24   class counsel petitioned for fees was doing was essentially

25   asking you to pay them in one year for 65 years' worth of fee

1    work, and that's -- that's what concerns me, Judge.  There's

2    legal obstacles to both paying what they're asking for and

3    providing a bonus now.

4            We've written extensively on that.  It's in our

5    motion for reconsideration to this Court, it's referenced in

6    my declaration here related to this specific hearing, Judge.

7            It would be a travesty for the Court to deplete

8    what's remaining of the $112-and-a-half million based on work

9    that's been done to date when we know what the record shows us

10   is that the projections have not been met.  There's not been

11   $411 million in payments.

12           Those $411 million in notices are subject to

13   appeals.  To date, there's been $183 million in payments

14   according to the -- the claims administrator's website.

15   They're way behind the NFL's projections on Alzheimer's, Level

16   1.5 and Level 2.

17           Judge, they represented to you -- the NFL

18   represented to you in 12 months you would see payments on

19   approximately 580 of those three categories and according to

20   the claims administrator's website, to date only 85 people

21   have been paid in Alzheimer's, Level 1.5 and Level 2.

22           This has led to much disharmony and dissension

23   amongst these lawyers in here.  They've -- they've been on

24   their best behavior today, Judge, but we know from the

25   pleadings that Anapol Weiss --

 1          THE CLERK:  Less than two minutes, sir.

 2          MR. LUBEL:  Thank you.  That Anapol Weiss has -- has

 3  questioned, has called into question at a public pleading

 4  Seeger Weiss's -- both their -- their hours --

 5          THE COURT:  Are you talking about lawyer's fees now?

 6          MR. LUBEL:  Totally, I am talking about the fees.

 7          THE COURT:  And what are you trying to say?

 8          MR. LUBEL:  I'm trying -- what I'm trying to say --

 9          THE COURT:  In one minute, because I don't

10  understand what you're trying to understand about the lawyer's

11  fees.

12          MR. LUBEL:  What I'm trying to say is that three out

13  of the four class counsel you've appointed, Judge, they are

14  contesting the fees that Seeger Weiss is claiming.  Sol

15  Weiss's firm has filed a public pleadings questioning both the

16  hours and the billing rate.

17          You yourself in an order, Judge, you've -- you have

18  held that the billing rates were unreasonable.  That's in your

19  April 5th order.  For us to do this right, we do need to have

20  a committee, Judge, but we need to see the data that -- the

21  hourly data that was submitted to you in camera.

22          We need to see the CMO-5 data that allegedly started

23  in 2012 which is supposed to be their quarterly billings.

24  That was their timekeeping and any audit reports from that.

25          Once we get the foundation -- Judge, a house is

1    built on a foundation -- once we get that, then the Court can

2    decide, although we don't think a multiplier is going to be

3    warranted any time soon, if warranted at all under the case

4    law, Judge.

5           Clearly, a bonus is not applicable at this time.  We

6    don't want to stop people from getting paid fairly, but you

7    can -- you can set up a committee, Judge, you can circulate

8    the data and people an start getting paid now.  We don't want

9    to -- we're not trying to stop that from happening.  Thank you

10   for your time.

11          THE COURT:  Thank you.

12          MR. SEEGER:  This guy's a doozy because he stands

13   here and he talks about "we" and all the -- I mean, he's a --

14   he's one of the objectors who also tried to blow up the

15   settlement.  And to this day even at the final approval

16   hearing he misread that he got up there and he misread a

17   provision in the settlement and he still misreads it.

18          All he had to do was go online today and he would

19   have seen that there are 342 claims that have been paid for

20   $296 million.  He can't even get information that's in the

21   public domain correct.  Let's just talk about what he wants to

22   take credit for.

23          First of all, he didn't file a request for fees when

24   he was supposed to.  Mr. Molo did that at least.  He put his

25   request for fees in his objection.  I mean, arguably he's

1    late.   I don't think he should get anything whether he's on

2    time or not anyway because of the role that he played here.

3              He's talking about improving a settlement that all

4    he worked to do was to blow up, up until it was finally --

5    cert was denied by the Supreme Court.

6              And this -- that has real effect.   I mean, the real

7    effect is that we had a class rep who was involved in this

8    case and wanted nothing more to see completion of it -- Kevin

9    Turner.   He didn't survive the appeal period, he passed away.

10   The good news is this settlement is there for his family.

11             But he never got to see the end of this.   That's on

12   a personal note.   That will always bother me about these

13   objectors trying to blow this settlement up.

14             But the second part that bothers me is there were

15   also financial opportunities for the class that they -- they

16   caused us.   One is we get a yearly inflation adjustment.   One

17   was just recently approved.

18             Because it was up on appeal for two years, we didn't

19   get inflation adjustments for the time it was on appeal.

20   There are real consequences to playing the game that Mr. Lubel

21   wants to.   I won't call Mr. Molo a professional objector, he's

22   just wrong.   Mr. Lubel is a professional objector.

23             He -- he objected to fees in BP, he's going to be

24   here throughout no matter what you award him.   He's going to

25   -- he's already attempted to appeal your April 5th order.

1        He filed a notice of intent to appeal, which I would

2   say, Your Honor, you should accommodate him because I don't

3   know if that's a final order, but if it's not, I would ask you

4   to certify it as final and let's take him up on appeal on that

5   one too.

6        Let's not waste any more time with Mr. Lubel.  Let's

7   just get rid of him once and for all and let him go pick on

8   another case.

9        I -- the last point I'll make is this "generally

10  consistent" provision is so ridiculous of his that I think if

11  you call the Special Masters you'll get the real story on what

12  firms raised the "generally consistent" standard.  Mr. Lubel

13  was nowhere near that issue.  Thank you, Your Honor.

14        THE COURT:  Okay, thank you.  Let's -- let me speak

15  with -- just with -- I'm just going to call and speak with Mr.

16  Seeger at sidebar, please.

17        MR. COOPER:  I'm here.  I'm here.

18        THE COURT:  Who's that?

19        MR. COOPER:  Hello?

20        THE CLERK:  That could be either Mr. Dugan

21  (phonetic) --

22        THE COURT:  Who's that?

23        MR. COOPER:  This is Fenn Cooper (phonetic).

24        THE CLERK:  I don't know why he's on there, Judge.

25        THE COURT:  Okay.  We're on the record --

Colloquy                                         123

1            THE CLERK:  Sidebar on the record, Judge?

2            MR. COOPER:  Jack, I heard -- I heard you talking,

3    Jack.

4            THE CLERK:  You have the wrong number, Mr. Cooper.

5            THE COURT:  All right, I will rule and I will take

6    those steps that have to be taken.

7            Yes, you are?

8            MR. BENZA:  I'm Robert Benza (phonetic).

9            THE COURT:  You're not on the list.

10           MR. BENZA:  I filed a notice of intent to argue.

11   I'm not sure if you'll permit me to speak for just minutes,

12   Your Honor?

13           THE COURT:  I got all --

14           MR. BENZA:  I'm class counsel for Kevin Turner, the

15   class rep -- excuse me, I'm not class counsel, I'm counsel for

16   the class representative, Kevin Turner.

17           THE COURT:  Well, one second.  Let me speak with my

18   law clerk.  Turn off the record, Jim, please.

19       (Off the record)

20           THE COURT:  I will rule.  If I need anything else

21   I'll let you know, okay?

22           ALL COUNSEL:  Thank you, Your Honor.

23           THE COURT:  Court is adjourned.

24           (Matter concluded, 12:50 p.m.)

25                              * * *

1

2                    **C E R T I F I C A T I O N**

3

4              We, Josette Jones and Diane Gallagher, court

5    approved transcribers, certify that the foregoing is a correct

6    transcript from the official electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    _____

10   JOSETTE JONES

11

12   _____        _____

13   DIANE GALLAGHER                          DATE

14   DIANA DOMAN TRANSCRIBING, LLC

15

16

17

18

19

20