UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


IN RE: NATIONAL FOOTBALL LEAGUE  )   12-MDL-2323-AB
PLAYERS' CONCUSSION INJURY       )
LITIGATION                       )
                                 )
_____)
                                 )
KEVIN TURNER and SHAWN WOODEN,   )
on behalf of themselves and      )
others similarly situated,       )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
NATIONAL FOOTBALL LEAGUE and     )
NFL PROPERTIES, LLC,             )
successor-in-interest to         )
NFL Properties, Inc.,            )   Philadelphia, PA
                                 )   April 16, 2018
          Defendants.            )   2:01 p.m.


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Opt-Out            WENDY R. FLEISHMAN, ESQUIRE
Plaintiffs:                LIEFF CABRASER HEIMANN &
                           BERNSTEIN, LLP
                           250 Hudson Street
                           8th Floor
                           New York, NY   10013


For the Plaintiffs         STEVEN M. STRAUSS, ESQUIRE
Tyler Seau, et al:         MEGAN DONOHUE, ESQUIRE
                           COOLEY, GODWARD, KRONISH, LLP
                           4401 Eastgate Mall
                           San Diego, CA   92121

APPEARANCES: (continued)


For the Plaintiffs          BRADFORD R. SOHN, ESQUIRE
William Andrews,            THE BRAD SOHN LAW FIRM, PLLC
et al:                      1172 South Dixie Highway
                            Suite 268
                            Coral Gables, FL    33146



For the Plaintiffs          JASON E. LUCKASEVIC, ESQUIRE
Broderick Jones,            GOLDBERG, PERSKY & WHITE
et al:                      1030 Fifth Avenue
                            Pittsburgh, PA    15219



For the Plaintiffs          ANDREW SCHERMERHORN, ESQUIRE
Albert Lewis, et al:        THE KLAMANN LAW FIRM
                            4435 Main Street
                            Suite 150
                            Kansas City, MO    64111



For the Plaintiffs          KENNETH B. McCLAIN, ESQUIRE
Albert Lewis, et al:        HUMPHREY, FARRINGTON, McCLAIN, PC
                            221 West Lexington Avenue
                            Suite 400
                            Independence, MO    64050



For the Defendant           BRUCE BIRENBOIM, ESQUIRE
National Football           LYNN B. BAYARD, ESQUIRE
League, et al:              BRAD S. KARP, ESQUIRE
                            PAUL, WEISS, RIFKIND, WHARTON &
                            GARRISON, LLP
                            1285 Avenue of the Americas
                            New York, NY    10019-6064



Audio Operator:             JAMES F. G. SCHEIDT

```
Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, New Jersey  08026-0129
                           Office:  (856) 435-7172
                           Fax:     (856) 435-7124
                           Email:    dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                          I N D E X

2

3    ARGUMENT:                                           PAGE

4      Re:  Motion to dismiss on preemption grounds

5          By Mr. Birenboim              5, 23, 27, 39, 53

6          By Ms. Fleishman                          18

7        By Mr. Sohn                                 24

8        By Mr. Strauss                              28

9        By Mr. Schermerhorn                     43, 56

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following was held in open court at 2:01 p.m.)

2                  THE COURT:  We're here in the matter of the In re:

3    National Football League Players' Concussion Injury Litigation

4    at 2012-2323.  And I recognize now Mr. Birenboim.

5                  MR. BIRENBOIM:  Thank you, Your Honor, may it please

6    the Court --

7                  THE COURT:  Okay.  You're welcome.

8                  MR. BIRENBOIM:  -- Bruce Birenboim from Paul, Weiss,

9    Rifkind, Wharton & Garrison for the NFL parties.

10                 Your Honor, as you know, we're here on the NFL's

11   motion to dismiss on preemption grounds.

12                 THE COURT:  Yes.

13                 MR. BIRENBOIM:  We're dealing with the opt-out

14   cases.  These are the cases that opted out of the class

15   settlement.

16                 And as Your Honor noted in approving the settlement,

17   the -- the preemption issue, the opt-outs face a stiff

18   challenge, and we think that that's actually an

19   understatement.  We think that these claims are very, very

20   clearly preempted and that despite the mass of material that

21   Your Honor received, the issue is really quite

22   straightforward.  The legal test is clear.

23                 The question is whether in considering these claims,

24   the Court needs to construe any of the provisions of the

25   Collective Bargaining Agreements that govern the parties and

1    whether --

2            THE COURT:  I wouldn't mind going back and forth a

3    minute.  Would you agree with that?  Are you going to be

4    arguing for the opt-outs?

5            MS. FLEISHMAN:  Yes, Your Honor.  And, no, I don't

6    agree with that.

7            THE COURT:  What?

8            MS. FLEISHMAN:  Yes, Your Honor, I am -- I am

9    definitely arguing for the opt-outs, and, no, I don't agree

10   with what --

11           THE COURT:  All right.  Okay.

12           MS. FLEISHMAN:  -- Mr. Birenboim said.

13           THE COURT:  This is what I did before, and I'm not

14   doing -- I'll let you go forward and then I'll ask her the

15   same question.  Okay.

16           MR. BIRENBOIM:  Okay.

17           THE COURT:  One second.  Mr. --

18        (Off the record, 2:04 p.m. to 2:04 p.m.)

19           THE COURT:  All right.  Barnum and Bailey has

20   nothing on me.  Go on.

21           MR. BIRENBOIM:  All right.  The Supreme Court cases

22   addressing preemption starting with Allis-Chalmers lays out

23   the test, which is, do the claims require the Court to

24   construe provisions of the Collective Bargaining Agreement and

25   are the claims inextricably intertwined with the provisions of

1   the Collective Bargaining Agreement?

2               To do that, I think it's best just to go straight to

3   the Collective Bargaining Agreement -- Agreements.  There are

4   seven Collective Bargaining Agreements stretching really 50

5   years, a half century, beginning in 1968 when -- when it was

6   agreed that doctors would be provided on-site at all the

7   games.

8               From that point forward, the League and the clubs

9   and the players negotiated extensively about workplace health

10  and safety, especially when it came to playing the game, the

11  rules of the game, medical care for the players, advising the

12  players on conditions, advising the players on return to play.

13              There were provisions that were enacted in the

14  Collective Bargaining Agreement imposing a duty on doctors to

15  disclose to players and advise players on their medical

16  conditions that affect their health.  There are provisions

17  that impose duties on doctors to determine when a player

18  returns to the game and when a player should not and what the

19  effect of any injuries would be on that player.

20              There are provisions that impose duties to provide

21  appropriate medical care and disclosure, a duty to provide a

22  second opinion, second medical opinion if the player wishes,

23  duties imposing certain qualifications on the doctors and

24  trainers that tend to the players, duties that require the

25  doctors to follow all medical guidelines, a creation of an

1   Accountability in Care Committee that players were involved in

2   to address medical care issues and provide disclosure and

3   information about injuries and medical care, the creation of a

4   Joint Committee on Player Safety and Welfare to address

5   equipment issues and turf issues and things like that.

6           In short, there was a whole mosaic of provisions

7   that the League and the players and the clubs created in this

8   very, very extensive web of Collective Bargaining provisions

9   that deal with player health and safety.  So when the players

10  -- when the players say, the opt-outs say in their brief that

11  the players were left to fend for themselves, nothing could be

12  further from the truth, Your Honor.

13          This was an extremely sophisticated union that

14  bargained with the clubs and bargained with the NFL over half

15  a century to create an entire system that took care of player

16  health and safety.  So this is actually the archetype -- the

17  archetype situation where the players and the League and the

18  clubs took the issue of player health and safety out of the

19  common-law realm and put it into the Collective Bargaining

20  Agreement.

21          And that's exactly the situation where the Courts

22  say you should defer to the Collective Bargaining Agreement so

23  that the Federal Courts can create a uniform system in Federal

24  common-law.

25          THE COURT:  Okay.  Well, that's one issue -- that's

1    one issue that's -- that is certainly before me, is the -- I

2    assume you're going to take some of the plaintiffs' complaints

3    and have me -- and address their specific claims.

4          Right now you're addressing the first part of it

5    which is basically the negligence claim, and I certainly

6    understand that.  Tell me about your -- tell me about the

7    fraud claim.

8          MR. BIRENBOIM:  Well, the fraud claims and the

9    negligence claims should be treated exactly the same under

10   preemption analysis because in the negligence context, the

11   plaintiff has to prove a duty, you know, Torts 101.

12         In the fraud context, it's exactly the same.  You

13   have to have a duty to disclose.  Without a duty, if you don't

14   have a duty to disclose, then not disclosing doesn't breach

15   anything.  There can be no fraud.  There has to be a duty to

16   disclose in the fraud context in a fraudulent concealment case

17   like these are.

18         So it's the same question.  What exactly are the

19   duties of the NFL in light of this extensive web of Collective

20   Bargaining provisions that deal with health and safety.

21         And on top of that, there's also the question of

22   reasonable reliance which is also, obviously, an element of

23   fraud.  And in order to determine whether a player reasonably

24   relied on, for example, an alleged non-disclosure of some fact

25   by the NFL, you have to look at what the Collective Bargaining

1   Agreements did in assigning duties to the club and to the

2   doctors.

3           If the -- if the Collective Bargaining Agreement, as

4   these do -- these agreements -- assigned to the clubs and the

5   doctors the principal requirement and duty to disclose to the

6   players their health and safety issues and to advise the

7   players, there's a question, what is reasonable reliance on

8   what the NFL said?  We're not arguing and we don't need to

9   demonstrate what the answer to that question is.

10          All we need to demonstrate for preemption is that

11  the Court is going to have to look at the Collective

12  Bargaining provisions to make a determination what the duties

13  are of the NFL in light of the duties of the clubs that were

14  negotiated.  And this is why in many, many cases that we cite

15  in our brief, <u>Duerson</u>, <u>Maxwell</u>, <u>Stringer</u>, <u>Ballard</u>, <u>Jeffers</u>,

16  <u>Smith</u>, <u>Dent</u>.  They go on and on.

17          All of these Courts have reached the same

18  conclusion, and these are cases that have both fraud claims

19  and negligence claims.  There's rarely a case that doesn't

20  have both.

21          THE COURT:  But why don't you tell me -- just

22  differentiate the case of the NHL.

23          MR. BIRENBOIM:  The NHL case --

24          THE COURT:  Have you -- I assume you're familiar

25  with that.

1            MR. BIRENBOIM:  I'm familiar with the NHL case, and

2    if Your Honor reads the NHL case carefully, the bottom line in

3    the NHL case is that the plaintiffs submitted to the Court

4    lots and lots and lots of documents and letters and things

5    like that that were not part of the Collective Bargaining

6    Agreement and were, therefore, in the view of the Court, not

7    properly before the Court on a motion to dismiss.  So the

8    Judge deferred -- deferred decision on all of these issues.

9            And if you read it carefully, and I read it

10   carefully last night again because I suspected Your Honor

11   might ask me about it.  If you read it carefully, the Judge

12   does not say --

13            THE COURT:  That's requiring too much of me, but

14   I'll try.

15            MR. BIRENBOIM:  -- the Judge did not say that she

16   finds that there is no duty or that interpreting the --

17            THE COURT:  I know, but she delayed it, and she --

18            MR. BIRENBOIM:  She just delayed it.

19            THE COURT:  Yes, but you -- are you ready to have me

20   delay it?

21            MR. BIRENBOIM:  We're not because in this case we

22   haven't placed before Your Honor anything outside of the

23   Collective Bargaining Agreements.  We don't think anything is

24   necessary outside of those agreements.  And all these cases

25   we've been talking about, case after case, decides preemption

1    on basically two legs.  What does the complaint say?  What are

2    the provisions of the Collective Bargaining Agreement?  You

3    don't need anything else.

4           And in this case, as in all the cases that found

5    preemption in cases like this, we think it's perfectly clear

6    that in order to -- let's take claim one in the -- in the

7    amended complaint.  Claim one is, and I'm quoting, "The NFL

8    had a duty to protect the health and safety of the players."

9           We submit that you cannot possibly answer that

10   question without looking at what duties were imposed on the

11   clubs in connection with the negotiations of these labor

12   contracts, and, therefore, what duties would be imposed on the

13   League given what was imposed on the clubs.  You just can't do

14   that without construing the Collective Bargaining Agreement.

15          So really -- I don't think it's an overstatement to

16   say that -- that this case falls as much in the center of

17   labor law preemption as you can imagine.  It's difficult to

18   imagine a Collective Bargaining Agreement that has so many

19   provisions and spends so much time on the issue of player

20   health and safety.  And the notion that you could -- could

21   decide the issue of duty or reasonable reliance without

22   construing these provisions we think is -- is impossible.

23          So we believe that this is really a very

24   straightforward, very clear case.  We've cited all the cases

25   that follow us.

1          THE COURT:  The other case -- case I'd like you to

2     explain -- to make sure that I understand your view on the

3     <u>Kline</u> case.  It's a Third Circuit case.  I bring --

4          MR. BIRENBOIM:  The <u>Kline</u> -- I know the case, Your

5     Honor.  That's -- that's the surveillance case.

6          THE COURT:  Yes.

7          MR. BIRENBOIM:  And we don't have any disagreement

8     with the <u>Kline</u> case.  I mean, what the <u>Kline</u> -- first of all,

9     the <u>Kline</u> case states the test just as we've stated it, and

10    all the <u>Kline</u> case says is that there's nothing in the

11    Collective Bargaining Agreement that speaks to the issue of

12    whether you can have eavesdropping devices all over.

13         And in that case, where the claims were violations

14    of the Wiretap Act and the Surveillance Act and things like

15    that, the Court said we don't need to look at anything in the

16    Collective Bargaining Agreement to determine if there's a

17    violation of the Wiretap Act.  So we have no problem with the

18    <u>Kline</u> case.

19         And I think any -- to the extent it's read to say

20    anything more on the law, that's not the case.  The <u>Kline</u> case

21    is perfectly consistent with <u>Allis-Chalmers</u> and <u>Lincoln Mills</u>

22    and all of the other Supreme Court cases that have laid out

23    the boundaries of labor law preemption.

24         What's interesting about the plaintiffs' briefs are

25    -- is if you read them carefully, the cases they rely on tend

1    to be these Supreme Court cases that just state through

2    abstract principles.  They don't really talk about cases that

3    address these issues in the football context, and that's

4    because they all go against them, Your Honor.  There aren't

5    any cases really that go their way.

6         And, second, they have a bunch of pages in their

7    briefs where they go over each provision of the Collective

8    Bargaining Agreement and try and explain why it needn't be

9    construed in this case.  Well, I think the defensiveness of

10   that position speaks volumes.  The fact that they spend page

11   after page after page trying to convince the Court that the

12   Court needn't look at these provisions actually demonstrates

13   why the Court needs to look at the provisions.

14        And if you read what they say, their principal

15   arguments in each column, principal arguments why you don't

16   need to consult the Collective Bargaining Agreement, there are

17   two.  One, these situations -- these provisions impose duties

18   on the clubs, not the NFL.  Well, that -- that position's been

19   rejected in a whole bunch of cases including Duerson and

20   Maxwell which were both against the NFL.

21        And the second -- and, Your Honor, you have to look

22   at the duties imposed on the clubs to determine what duties

23   reasonably are to be imposed on the NFL since the NFL's duties

24   -- they're not the employer.  So they don't have duties of a

25   safe workplace.  You have to look at what duties are imposed,

1    based on what duties were imposed on the clubs.

2            And the second argument that the plaintiffs make is

3    that all these provisions apply to only active players, not

4    retired players.  Well, that position also has been rejected

5    consistently, <u>Maxwell</u>, <u>Ballard</u>, <u>Smith</u>, <u>Atwater</u>, case after

6    case has rejected that because you have to look at the duties

7    that existed when the player played even if the player is now

8    retired.

9            And on top of that, the Collective Bargaining

10   Agreement does impose certain duties and provides certain

11   benefits in retirement.  And so the players have certain

12   rights even as retirees.

13           The other arguments -- and I don't want to overstay

14   my welcome, Your Honor -- the other arguments that plaintiffs

15   raise in their briefs really don't go anywhere.  They talk

16   about the gap year issue.  Our position on the gap year point

17   is the same as it is in the <u>Duerson</u> case which is you can't

18   artificially look only at, you know, X numbers of years that a

19   player played and ignore the years before and after when a

20   Collective Bargaining Agreement was in effect.

21           They talk about this duty to the world that's

22   somehow separate from any duties imposed in the Collective

23   Bargaining Agreements.  We think that -- the <u>Stringer</u> case

24   dealt with that and basically said even if there is some duty

25   in the abstract to act reasonably toward the world, once you

1   have Collective Bargaining Agreements, you have to look at how

2   the Collective Bargaining Agreement provisions have -- have

3   tempered those duties.

4            THE COURT:  Well, there's really been no -- has

5   there been any football case that has ever -- that has ever --

6   has held that there was no preemption?  Do you know of any

7   football case that has held that there was -- I mean, every

8   one of the cases that I'm familiar with and one of the reasons

9   that I approved the settlement was because everyone who had

10  looked at it had said that there was preemption.

11           MR. BIRENBOIM:  There -- there are -- there's at

12  least one case involving throwing the flag into a player's

13  eye --

14           THE COURT:  I'm not --

15           MR. BIRENBOIM:  -- where I believe there was no

16  preemption.

17           THE COURT:  Okay.

18           MR. BIRENBOIM:  It didn't deal with health and

19  safety by the clubs.  It dealt with a referee that threw --

20  and in their -- so there are a couple of cases that deal with

21  some issues about training facilities which really isn't

22  addressed in the CBAs.  But, no, there are no cases that I'm

23  aware of -- unless my colleagues correct me -- no cases I'm

24  aware of that deal with concussions and health and safety that

25  -- that did not find preemption.

1          THE COURT:  Okay.  Why don't you conclude so I can

2     hear from the other side?  I have been through this before,

3     and I have to tell you that I have certain points of view on

4     it.  I'm not sure that -- I mean, you know, you certainly

5     argue very well.  I can't tell you that it's going to --

6          MR. BIRENBOIM:  Well, the only other point I'll

7     make, Your Honor, is that plaintiffs have this collateral

8     estoppel argument which we think is frankly frivolous and I

9     won't address it unless Your Honor has some questions.

10         And I would just close by saying again that we think

11    that labor law preemption is a central tenet of labor law in

12    this country, and what the Supreme Court has said is that

13    where the parties sit down and decide to make workplace health

14    and safety a subject of Collective Bargaining and it comes out

15    of the State tort system into the labor law system, and that's

16    exactly what's happened here.

17         THE COURT:  Suppose I go one way on one issue and

18    one way on the other?  In other words, on the -- on some of

19    the claims, I say that's preempted and others not, what --

20    what's your position?

21         MR. BIRENBOIM:  Well, you have supplemental

22    jurisdiction over -- once you have a claim, you have

23    supplemental jurisdiction over State Law claims even if they

24    have no Federal -- original Federal jurisdiction so you keep

25    everything.

1           THE COURT:  Okay.  Thank you.

2           MR. BIRENBOIM:  Thank you.

3           THE COURT:  I appreciate that.  All right.

4           MS. FLEISHMAN:  Good afternoon.  Good afternoon,

5    Your Honor.

6           THE COURT:  Good afternoon.

7           MS. FLEISHMAN:  I'm going to start -- Mr. Birenboim

8    just spoke specifically about the -- what the standard was

9    here, and I think that he's misapprehended the standard.

10   Because Justice Stevens --

11          THE COURT:  Put your -- put your -- that's right.

12   Thank you.

13          MS. FLEISHMAN:  Is that better?

14          THE COURT:  Better, yes.

15          MS. FLEISHMAN:  Yes.  Justice Stevens wrote in

16   Lingle that, "We hold that an application of State Law is

17   preempted by 301 of the Labor Management Relations Act of 1947

18   only if such application requires the interpretation of a

19   Collective Bargaining Agreement."

20          An interpretation is quite different than having to

21   look or refer to or consider written documents to rely upon.

22          The other standard for determining whether or not

23   Section 301, preemption, applies is the standard whether or

24   not the claim itself is inextricably intertwined with -- with

25   the claim that -- that the plaintiffs are making.  In this

1  case, we submit to Your Honor that the way this -- this

2  particular complaint was pled, we have not struck that chord

3  at any place in the complaint.

4          Mr. Birenboim said there's no cases that -- in which

5  301 preemption has applied to -- to football when -- when

6  safety or health is at issue, but, in fact, Your Honor, there

7  are several.  In the Cleveland Browns case, it was a case

8  involving a staph infection at the -- at the facility, the

9  training facility, and the Court denied preemption.

10          At the Brown vs. NFL case, the referee threw a stick

11  -- I can't recall what kind of stick it is, but he -- a flag

12  -- at the -- at the football player.  Again, the Court found

13  that that was not preempted -- whether that was not preempted.

14  That went back to State Court.

15          There's another Green vs. NFL case in which there

16  was a bounty -- the bounty case in which there was a bounty to

17  be paid.  And when that case came before the District Court

18  and the NFL argued that Section 301 applied, again, the Court

19  refused to apply that.

20          In Oliver vs. Riddell, the same issue also came up.

21  And, in fact, in Stringer, the issue comes up in the most

22  interesting way, because Stringer is the case when the player

23  is practicing out in the heat and he passes out and dies, and

24  his wife brings an action against the NFL.  And the issue --

25  and there were two sets of issues in that case.

1          So issue one is, they -- the plaintiffs there

2     actually pled all of the language specifically from the

3     Collective Bargaining Agreement about safety and welfare on

4     the -- on the field and they actually talked about him as an

5     active player and what he should have done on the field.

6          But then the Court said -- then looked at the second

7     part of the case -- and unquestionably the first part of the

8     case, because it was directly a quote from the CBA, it was

9     directly about what the NFL had said to the clubs, what they

10    should do, that in that case it was no question that it was

11    preempted.

12         However, interestingly, plaintiff also made a claim

13    about the equipment, about selection of equipment and about --

14    which was exactly what we have made -- those claims we've made

15    here, and they were claimed against the NFL and NFL Properties

16    which we have done here.

17         And in that instance, the Court said that the CBA

18    imposes no duty on either the NFL or NFL Properties to ensure

19    that the equipment used by NFL players adequately protects

20    from risk of injury or illness.  They say any such duty if it

21    exists clearly has its source in common-law.  And then the

22    Court specifically -- on Count 4, the Court specifically said

23    that is not preempted under Section 301.

24         Here we have two defendants.  Defendant number one

25    is NFL Properties.  NFL Properties has nothing to do with the

1    CBA at all and is not referenced and nothing about it is

2    referenced in the CBA because NFL Properties acquires

3    equipment, acquires training equipment, sometimes in the past

4    it sold the films as marketing, that kind of thing.  It has

5    absolutely nothing to do with -- anything to do with the

6    fields or anything that happens on the field.  And there's no

7    question -- that's an easy one.  There's no question any

8    claims against NFL Properties are not -- clearly not preempted

9    under Section 301.

10            NFL we say is also -- the claims against the NFL are

11   also not preempted.  And the reason for that is that we've

12   alleged there was a negligence in the -- specifically -- there

13   was fraud and negligence in the -- in what they said about the

14   safety of football, in showing the films and showing the films

15   that monetize football.  They encouraged all these children

16   over decades and decades and decades to play football.  This

17   is a great He-man sport.

18            That -- this is not possibly protected by Section

19   301.  They deceived the community.  They deceived the public

20   and they deceived the players.  So the players themselves, of

21   course, wanted to continue to go out and play harder and

22   harder since this is this He-man sport.  That's number one.

23            Number two -- I'm not going to address all the

24   claims in our complaint because it would take too long.  But

25   we have an issue about the research that was done and the Mild

1   Traumatic Brain Injury Committee that was set up in 1994.

2   That's not protected under any CBA -- any CBA.  There's no

3   Collective Bargaining Agreement that has anything to do with

4   that.  This is about research.  Frankly, it was about

5   fraudulent research, but it's about research.  And that is

6   absolutely not protected by Section 301.

7              I can keep talking about this for a long time, but

8   -- and I want to just address one other point.  In the NFL

9   case, I think Judge -- I think Judge Nelson's opinion is very

10  instructive to -- to what we are faced with here.  Because in

11  Judge Nelson's case, she had a case --

12             THE COURT:  That's the NHL case?

13             MS. FLEISHMAN:  Yes, that's the NHL case.  In

14  Justice Nelson's case -- exactly.  In the NHL case, she said

15  there are all these issues, all these allegations.  You know,

16  I can't -- I don't know if they're true or not.  I can't make

17  an assessment.

18             So I -- and she said, it was premature.  I think

19  this motion to dismiss is unquestionably premature.  We should

20  go and do the discovery we need to do in order to -- and then

21  to figure out what is or is not properly within Section 301

22  LMRA.

23             THE COURT:  Okay.  Thank you.

24             MS. FLEISHMAN:  Thank you, Your Honor.

25             THE COURT:  All right.  Have you reserved any time?

1    Do you with to respond?

2              MR. BIRENBOIM:  May I respond, Your Honor?

3              THE COURT:  Of course.

4              MR. BIRENBOIM:  Just very, very quickly.  The two

5    cases about staph infection and the referee flag are the two

6    cases that I cited to Your Honor, and there are no other cases

7    involving health and safety issues for football that don't

8    find preemption.  The cases uniformly find preemption.

9              On NFL Properties, there's basically nothing in the

10   entire complaint about NFL Properties other than a single

11   allegation that relates to equipment.  The Joint Committee on

12   Player Health and Safety which began in the '80s and has

13   continued on specifically addresses equipment issues.  So I

14   think the Court does need to look at those provisions to

15   determine whether there is any conceivable duty on the part of

16   NFL Properties to the public.

17             And, finally, Your Honor, despite the NHL case,

18   there are -- there is case after case after case after case

19   after case that we put in our brief where the Courts decide

20   preemption based on looking at the Collective Bargaining

21   Agreement and looking at the claims.  That's all that's

22   required by the Supreme Court.

23             And it completely undermines and turns the entire

24   concept of preemption on its head to say that you should go

25   through a big long discovery process and litigate the case in

1    Federal Court only then to find that the issues should be

2    subject to the grievance procedure which is the point of

3    Federal preemption in the first place.  So that's why we think

4    Courts routinely make a complete preemption finding based on

5    just the Collective Bargaining Agreement and the complaint at

6    the very outset.

7              Thank you, Your Honor.

8              THE COURT:  Okay.

9              MS. FLEISHMAN:  If Your Honor pleases, Brad Sohn is

10   going to address the Court on the -- on one issue which is the

11   equitable estoppel issue and also on some issues that he

12   raised in his <u>Johnson</u> brief (phonetic).

13             THE COURT:  All right.  You have five minutes.  I

14   don't know if I allocated the time to him, but I'm going to --

15   I'll listen to you, Mr. Sohn.

16             MR. SOHN:  Thank you, Your Honor.  I appreciate it.

17             This is an issue --

18             THE COURT:  Yes, I did, I did -- I did allocate.  My

19   apology.

20             MR. SOHN:  No, not at all.

21             THE COURT:  Okay.

22             MR. SOHN:  Good afternoon again, may it please the

23   Court.  I'm going to try and frame this preemption argument a

24   little bit, because I think to some degree what Mr. Birenboim

25   said is not accurate.  I agree wholeheartedly with what Ms.

1    Fleishman said obviously.

2           But what's particularly important when looking at

3    301 preemption is the procedural posture in which the actual

4    issue is teed up.  And defendants are asking the Court to do

5    essentially one of two things.  They're either making a

6    12(b)(6) argument in which they're saying that the four

7    corners of the complaint trigger 301 preemption, and as the

8    case law says -- I won't belabor it, but it's cited in the

9    papers, the Pension Guaranty case and the Burlington Coat

10   Factory case.

11          They make it clear that if we're going under

12   12(b)(6), traveling under that procedural rule to argue

13   preemption, then if the Court's going to even consider a CBA,

14   the CBA needs to be expressly put into the complaint.  In

15   other words, we saw the 20 or so paragraphs about ambulance

16   and right to medical care or something like that -- right to

17   medical records -- one would literally have to have included

18   that express language within the complaint in order for the

19   Court to consider it under 12(b)(6).

20          And I haven't frankly really heard them make that

21   argument.  I tend to think what they're doing is making a

22   jurisdictional argument under 12(b)(1) in one of two ways.

23   Either what they're saying is that -- excuse me for one second

24   -- either they're saying that the -- based on the essence of

25   the claims, not taking them as they appear but the essence of

1   the claims, requires the Court to apply complete preemption,

2   or they're saying that the -- again, the face of the

3   complaint, once we go into the CBA.

4            But the problem with 12(b)(1), and the case law says

5   this as well.  In fact, the case the defendants cite, the <u>Oddo</u>

6   <u>vs. Bimbo Bakeries</u> case, talks about the fact that if the rule

7   travels -- if they're traveling under 12(b)(1), plaintiffs by

8   right get to make an evidentiary rebuttal to their motion.  So

9   -- and Ms. Fleishman alluded to it.  What sorts of evidentiary

10  issues are we talking about?  We don't believe the estoppel

11  issue is frivolous.

12           There is clearly arbitral precedent where there was

13  full and final opportunity to appeal, and the NFL prevailed

14  where they said tort law is just not a remedy under the

15  Collective Bargaining grievance procedures whatsoever.  So

16  certainly that would need factual development.

17           Another key thing, and it's alluded to on the face

18  of the complaint, but it's certainly something that warrants

19  some discovery, if nothing else, to authenticate the

20  documents, in making these claims through the MTBI committee,

21  the MTBI committee's published words said we are expressly

22  claiming our independence.  We have no ability to be regulated

23  by team doctors.  We have no ability to be regulated by the

24  clubs, and we're providing this information so that the

25  football world can be safe.  That I'm paraphrasing, but it's

1   pretty faithful.

2           And so those would definitely be issues that we

3   would want to be able to make an evidentiary rebuttal on as we

4   are allowed to do respectfully by right based on Third Circuit

5   law.  So I think -- the first thing we need to do is clarify

6   exactly which way the defendants are trying to accomplish

7   this, and then if they are trying to accomplish it through

8   12(b)(1), we should at least have that ability to respond.

9           And that's all I have unless Your Honor has

10  questions.

11          THE COURT:  No, I'm -- I'll hear the -- you have a

12  chance to respond to that particular issue.  But this is a

13  very -- this is very close.  I don't want you to think I don't

14  think it is.  It is very close.  So I -- it's the second time

15  I'm hearing it and I'm as perplexed as I was the first time,

16  but that's okay.  Go ahead, go ahead.

17          MR. BIRENBOIM:  We obviously don't think it's that

18  close --

19          THE COURT:  I know that.

20          MR. BIRENBOIM:  -- but you're the Judge.

21          THE COURT:  Well, unfortunately, those are kind of

22  the realities.

23          MR. BIRENBOIM:  But, briefly, Your Honor, we cite a

24  bunch of cases on page 32 of our reply brief for the

25  proposition that you do not need discovery to decide a

1   preemption motion and that's what consistently happens in the

2   Federal Courts in case after case.  You can decide it on the

3   Bargaining Agreements and the complaint --

4           THE COURT:  I have no question that you can do it.

5   Whether it's appropriate in this case is a different story,

6   but I -- I think that that's absolutely accurate.

7           MR. BIRENBOIM:  And just finally on this collateral

8   estoppel point, the Court doesn't need anything other than the

9   decisions in <u>Henderson</u> and <u>Sampson</u> which are the two cases to

10  see that there isn't an identity of interests, that the NFL

11  wasn't even a party, and, therefore, it didn't have the

12  obligation to defend these -- these positions, that the dicta

13  in those decisions was not essential to the holding.  None of

14  the requirements for collateral estoppel apply.

15          The <u>Sherwin</u> case considered these arguments,

16  rejected it -- rejected the arguments, and every case since

17  then has as well.

18          THE COURT:  Okay.

19          MR. BIRENBOIM:  Thank you, Your Honor.

20          THE COURT:  Thank you.  Okay.  Mr. Strauss.

21          MR. STRAUSS:  Thank you, Your Honor.

22          Steve Strauss for the Seau family.  And, Your Honor,

23  I would ask you to indulge me for a few moments because we

24  didn't have an opportunity to address you five years ago when

25  you heard these arguments.  You haven't had a chance to think

1   about the unique arguments of the Seau family, so may it

2   please the Court, it's a fundamental legal maxim that for

3   every wrong there is a remedy unless you are suing the NFL.

4             Junior Seau was one of the greatest linebackers to

5   ever play the game.  He's enshrined in the Hall of Fame.  He

6   was one of football's most passionate, charismatic and beloved

7   players, but his final years were marred, Your Honor, by

8   changes his children could not understand, forgetfulness,

9   depression, irresponsibility to his family and his financial

10  affairs and a lack of connection.

11            Junior's career and tragic decline ended with his

12  suicide on May 2nd, 2012, almost six years ago, Your Honor.

13  It has made him the face of this concussion litigation.  He

14  literally gave his life for the game.  But it's not Junior's

15  injuries I'd like to primarily address today.  Junior's death

16  devastated his four children.

17            Under California law, the children have a separate

18  statutory claim for wrongful death from the loss of their

19  father.  That claim is independent and it was not waived by

20  Junior in a Collective Bargaining Agreement or otherwise.

21            The NFL argues not so.  They say there is no forum

22  for the children to seek relief for the devastation caused by

23  the NFL because Junior signed a Collective Bargaining

24  Agreement.  But the CBA is irrelevant to the children's

25  claims.  They never signed a CBA.  In fact, Your Honor, the

1    NFL did not sign it either.

2              The CBA was not negotiated on the children's behalf.

3    Its terms do not benefit the children in any way or even

4    provide them a right to pursue a grievance.  The CBAs do not

5    purport to waive their wrongful death claims.  They truly have

6    a unique claim in this litigation.  The NFL's argument would

7    leave the children with no remedy, cloaked in total immunity

8    for claims brought by third parties who have no connection to

9    the CBA.  Neither law nor equity would sanction such an

10   outcome.

11             Argument one.  Preemption is not a defense because

12   the children cannot bring a Section 301 claim or a grievance.

13   Courts have recognized that if a party cannot access the CBA

14   remedies, it does not bar State Law claims because it would

15   unjustly deprive them of a remedy.  And this is because the

16   Court does not have jurisdiction to remove such claims since

17   the State Law cannot become a 301 claim if it cannot be

18   grieved.  And that's the <u>Young</u> case from the Ninth Circuit.

19             And because doing so would be a gross injustice.  As

20   the <u>Scott</u> Court said, it would be anomalous to hold that

21   Section 301 preempts the plaintiffs' State remedies because

22   Federal Law provides the exclusive remedy only then to

23   discover that the plaintiff had no remedies under Federal Law.

24             And as the <u>Price</u> Court said, the Court cannot

25   sanction such an outcome.

1    The Ninth Circuit in Young affirmed because the

2    plaintiff in Scott could not grieve his claim, and, therefore,

3    jurisdiction was lacking, like here.

4    It doesn't matter, Your Honor, if the State Law

5    claim may require some interpretation of the CBA.  In Price,

6    for example, the oral contract incorporated terms of the CBA,

7    meaning the Court was required to interpret those -- those

8    terms, but the claim was not preempted, because doing so would

9    deprive the plaintiffs of any remedy.

10    The Third Circuit, Your Honor, also prohibits

11    preemption where it does not provide an opportunity to

12    vindicate the plaintiffs' State Law interest, and that's the

13    Railway Labor case, 1988, Third Circuit.

14    While the LMRA provides a private right of action,

15    the NFL doesn't dispute that the Seau children have any

16    standing to bring such a claim.  The NFL points to cases where

17    preemption applied despite the fact that State Law provided

18    different remedies than Section 301.  Avco and Caterpillar.

19    But these cases differentiate, Your Honor, between

20    different remedies and an absence of relief, which is what's

21    urged here.  The Third Circuit in Railway at Note 2, binding

22    precedent in this district, affirmed that distinction, citing

23    Avco and Caterpillar.

24    And it stated, "The issue is not whether the Federal

25    Law provides the same remedy available to the plaintiff under

1    State Law, but rather whether there is some vindication for

2    the same interest."

3            There has to be vindication for the interest.

4            In the NHL Players' Concussion Litigation at Note 6

5    says, "No question" -- this is a quote -- "plaintiff would

6    have a forum in which to adjudicate his claim."

7            301 is not and never was intended to be an immunity

8    statute that would deprive third parties with no connection to

9    the CBA of their independent State Law right.  The NFL cites

10   many cases where the union specifically negotiated rights on

11   behalf of probationary or temporary employees, and in exchange

12   limited some access to the grievance procedure usually during

13   the probationary period.

14           But none of these cases, none of them, involve a

15   union waiving the rights held by third parties on whose behalf

16   the union did not negotiate at all.  The children are not

17   signatories to the CBA nor is the NFL.  The children could not

18   bring a grievance or a 301 claim.  The NFL does not dispute

19   this.  If their claims are preempted, they will have no way to

20   vindicate their injuries.

21           The NFL argues that the Seau children's status as a

22   signatory to the CBA doesn't matter.  It doesn't cite any

23   authority where neither party is a signatory to the CBA and

24   preemption applies.  Indeed, there is no such case.  And the

25   authority it does cite involve claims against non-signatory

1  defendants who are being sued by signatory plaintiffs like in

2  the Atwater case.

3         Stringer and Dent which have been mentioned do not

4  establish that claims by decedents bringing their own non-

5  derivative statutory claims can be preempted.  In those cases,

6  the decedent's claims were derivative.  Dent was a loss of

7  consortium claim.  Of course, a loss of consortium claim is a

8  derivative right of a spouse.

9         Stringer was a nationwide wrongful death claim, but

10  they did not assert an independent statutory right.  In

11  contrast, Your Honor, in California, the Supreme Court has

12  spoken, the Kincaid case, wrongful death does continue even if

13  the decedent's claim is dismissed.

14         Argument two.  Independent statutory claims like

15  California's wrongful death are protected from preemption.

16  Section 301 does not broadly preempt independent statutory

17  rights even if those rights also deal with issues that are

18  addressed in the CBA.  The children's claims do not rely on

19  any CBA provision; rather, the NFL's duty is a common-law and

20  those voluntarily assumed.

21         As the United States Supreme Court said in Lingle,

22  "State Law analysis might well involve attention to the same

23  factual considerations as the contractual determination under

24  the CBA."

25         But we disagree with the Court's conclusion that

1    such parallelism renders the State Law analysis dependent upon

2    the contractual analysis.  California wrongful death claims

3    like the Seau children's are independent, non-derivative,

4    statutory causes of action.

5         Again, the California Supreme Court has spoken on

6    this in the <u>Horwich</u> case.  Quote.  "Unlike some jurisdictions

7    wherein wrongful death actions are derivative, Code of Civil

8    Procedure Section 377.6" -- the wrongful death statute --

9    "creates a new cause of action in favor of the heirs as

10   beneficiaries based upon their own independent pecuniary

11   injury suffered by loss of a relative and distinct from any

12   the deceased might have maintained had he survived."

13        Junior could not have waived these claims before his

14   death or as part of the CBA, and that's the <u>Erikson</u> (phonetic)

15   case which we cited to you.

16        Again, the Supreme Court has repeatedly emphasized

17   that independent statutory rights provided by State Law are

18   not subject to preemption, and that's the <u>Livadas</u> case which

19   follows <u>Allis-Chalmers</u> which follows after <u>Lingle</u>.

20        There the Court said, "Section 301 cannot be read

21   broadly to preempt non-negotiable rights conferred on

22   individual employees as a matter of State Law."

23        And we stressed it is the legal character of the

24   claim as independent of rights under the Collective Bargaining

25   Agreement and not whether a grievance arising from precisely

1  the same facts could be pursued that decides whether the State

2  cause of action may go forward.

3           The Seau children's independent wrongful death

4  claims have no connection to the CBA.  Neither -- again,

5  neither the children or the League are signatories and the

6  CBAs are silent regarding any duty for latent head injury or

7  the acts alleged in the complaint by either the NFL or the NFL

8  team.  These statutory claims are independent rights that do

9  not arise until Junior's death on May 2nd of 2012.

10          Moreover, Your Honor, reference to the CBA does not

11  require preemption, again, to the U.S. Supreme Court in

12  Livadas.  Quote.  "The bare fact that a Collective Bargaining

13  Agreement will be consulted in the course of State Law

14  litigation plainly does not require the claim to be

15  extinguished."

16          The NFL has cited some limited exceptions to the

17  general rule that 301 should not be read to preempt

18  independent State statutory protection, but none of those

19  address the wrongful death claims brought under California law

20  by the Seau children.

21          The Rawson case which has been cited by the League

22  does not establish that wrongful death claims like the Seau

23  children's are preempted.  There the CBA expressly described

24  the union's duty to provide a safe workplace, and the

25  plaintiffs specifically pled that in their complaint unlike

1    here.

2           It's my only opportunity, Your Honor.   Please, a

3    couple more minutes.

4           THE COURT:   I know but I told you ten minutes and

5    that's --

6           MR. STRAUSS:   Okay.

7           THE COURT:   -- you have to fit it into ten minutes.

8           MR. STRAUSS:   Okay.   Since Rawson, Your Honor,

9    Livadas clarified that even if some reference will be made to

10   a CBA, Section 301 cannot be read broadly to preempt

11   independent State rights.

12          The NFL also cites to the Ruiz case, but that is

13   limited to medical malpractice claims under a California

14   statute.   And they also mentioned ERISA but that's inapposite

15   because that statute is far broader.

16          Argument three, argument last.   Dismissal of the

17   children's claims do not serve any LMRA policy.   301 is

18   limited to two policy objectives, Your Honor, neither of which

19   would be served by dismissing the Seau children's claims.

20          First, ensuring enforcement of private grievance.

21   That's one of the first policies, one of the two.   The CBA

22   does not give the children any right to arbitrate.   And as

23   this Court knows under well-established law, AT&T, you can't

24   force a non-signatory to enter arbitration anyway.   It's a

25   matter of contract.   But they have no right to file a

1   grievance.

2          And, second, Your Honor, the other policy, ensuring

3   the application of uniform Federal Labor Law.  If any CBA

4   interpretation is necessary, the Court can simply apply those

5   principles like the <u>Lingle</u> Court said.  The NFL argues that

6   the Court can't apply Federal Law, it would be inconsistent

7   with <u>Allis-Chalmers</u>.

8          But since <u>Allis-Chalmers</u>, Your Honor, the Supreme

9   Court explicitly recognized a less drastic approach in <u>Lingle</u>

10  and said, "As a general proposition a State Law claim may

11  depend for its resolution upon both the interpretation of a

12  Collective Bargaining Agreement and a separate State Law

13  analysis that does not turn on the agreement.  In such a case,

14  Federal Law would govern the interpretation of the agreement

15  but the separate State Law analysis would not thereby preempt

16  it."

17         And the Third Circuit has said the same, and that's

18  in the <u>Voilas</u> case.

19         Your Honor, if I may make two more points on

20  Junior's claims, because we are also joined with the others

21  here on the decedent claims, if I may.

22         THE COURT:  No, I -- I gave you ten minutes on

23  the --

24         MR. STRAUSS:  Well --

25         THE COURT:  -- I'll read whatever you have down, but

1    I'm going to limit --

2              MR. STRAUSS:  One -- okay.

3              THE COURT:   -- I'm going to limit this now.

4              MR. STRAUSS:  One of them was in response to your

5    question about Kline.  I just wanted to respond to the Court

6    to say --

7              THE COURT:  Oh, that -- and that's the only thing.

8              MR. STRAUSS:  Okay.  And, you know, you'll recall,

9    Your Honor, the reasoning in Kline, it requires a specific

10   interpretive dispute.  But since Kline, there have been two

11   more cases in the circuit that have upheld that requirement,

12   that it has to be a specific interpretive dispute.

13             The first would be Stellar, and that's Eastern

14   District, 2015, and the next would be the Third Circuit in New

15   Jersey Carpenters in 2014.  And they also affirm that if State

16   Law claims do not turn on interpretation of the CBA, even if

17   the State claim addresses facts that parallel issues addressed

18   by the CBA, the claims are not preempted.

19             THE COURT:  All right.

20             MR. STRAUSS:  I think that's helpful to Your Honor.

21   We have -- we have those two cases since you last heard this,

22   and then the NHL case.  And, Your Honor, the NHL case -- you

23   asked is it a football case.  The NHL case completely mirrors

24   this case.  The pleading mirrors it.  It's titled In re NHL

25   Concussion Litigation.

1            And the Court there on a full record said no

2    preemption and said if he was deciding Duerson, he would

3    decide it differently because Duerson was not well reasoned

4    and Duerson didn't cite to any cases or authority for the

5    proposition that the NFL duties flow from the agreement,

6    because they're not a party to it and they flow separately.

7            So I would highly suggest that the Court carefully

8    read NHL.  It's a 2016 case.  It's the most on point case with

9    this case and it's since you last heard this.

10            THE COURT:  I have -- I did read that.

11            MR. STRAUSS:  Thank you, Your Honor.

12            THE COURT:  Would you respond to that, this last

13    argument?

14            MR. BIRENBOIM:  Yes, Your Honor.  It's a completely

15    different Collective Bargaining Agreement involving the NHL.

16    The Collective Bargaining Agreement that is involved in this

17    case, involving football, is the one that's been addressed by

18    every other case which has found preemption.

19            THE COURT:  The only problem I have, frankly, is

20    your definition under -- under Kline.  I mean, I'm not sure

21    that Kline parallels your interpretation of which --

22            MR. BIRENBOIM:  Well --

23            THE COURT:  -- of what I'm to look at.  I mean, I --

24    I'm not dismissing what you have to say, but at the same time,

25    Kline is -- I'm bound by Kline.  I'm not bound by the

1   subsequent cases but I am bound by Kline.

2             MR. BIRENBOIM:  Your Honor, we're happy for you to

3   be bound by Kline.

4             THE COURT:  Repeat that again.

5             MR. BIRENBOIM:  Kline does not state anything about

6   how you construe Federal Labor Law preemption that's different

7   from the Supreme Court cases or the other cases.  It's a fact

8   question.  Kline dealt with surveillance at an -- at an

9   employee's workplace, and there were no Collective

10  Bargaining --

11            THE COURT:  But it -- it made a lot of other

12  statements.

13            MR. BIRENBOIM:  -- there were no provisions that

14  they could look at.

15            THE COURT:  Okay.

16            MR. BIRENBOIM:  There was nothing to construe.  No

17  one -- no one is suggesting that every case involving the

18  workplace is preempted.  They're not.  The cases that are

19  preempted are cases where the parties have taken the issue of

20  workplace safety or whatever is at issue in the case and

21  negotiated it.  And in this case, workplace safety dealing

22  with concussions and things like that has been extensively

23  negotiated, and, therefore, the Court has to construe those

24  provisions.

25            THE COURT:  Okay.  Okay.  I hear your argument.

1          MR. BIRENBOIM:  Your Honor, just very quickly on --

2     I want to address Junior's claims, I'll address the claims of

3     the children.  In fact, Junior Seau did bind his heirs in the

4     Collective Bargaining Agreement.  If you look at Section 14,

5     it is binding on the player and all of his heirs, so the

6     children are bound by the Collective Bargaining Agreement,

7     number one.

8          Number two, the children get survival benefits from

9     the Collective Bargaining Agreement, so it's not as if they

10    got nothing out of this.  But most fundamentally, Mr. Strauss

11    I think misunderstands Federal Labor Law preemption.  Federal

12    Labor Law preemption says that if the Court must construe a

13    Collective Bargaining Agreement, then all State Law claims,

14    contract and tort, are preempted.

15         That by definition means that not only the plaintiff

16    but many other people may lose remedies.  That follows from

17    the fact that the Supreme Court said that if you have a

18    Collective Bargaining Agreement at issue, that you have to

19    construe that the Court develops Federal common-law of labor

20    law.  If the Federal -- if the Federal Court wants to develop

21    Federal common-law that gives remedies to different people, it

22    may do so.

23         But the issue here is does the case belong in State

24    Court or does it stay with this Court and must the claims be

25    dismissed on preemption grounds?

1          And just finally, Your Honor, there are -- look at

2    wrongful death cases in the football context or in other

3    contexts.  Rawson, Shane (phonetic), Negron, Ellison, Corner

4    (phonetic) -- both of those last two are Ninth Circuit.

5    There's case after case, including Stringer by the way which

6    is a wrongful death case, there are many, many wrongful death

7    cases brought for these kinds of injuries that are preempted.

8          When you look at the analysis that's been handed

9    down by the Supreme Court and by Kline and by other cases,

10   there is nothing in the analysis that says you have to

11   construe a Collective Bargaining provision and there must be a

12   remedy.  It just doesn't say that.  None of the cases say

13   that.

14         And, in fact, Caterpillar, the Supreme Court case,

15   said in Footnote 4, "The Court of Appeals appears to have held

16   that a case may not be removed to Federal Court on the ground

17   that it is completely preempted unless the Federal cause of

18   action relied upon provides the plaintiff with a remedy."

19         And then the Court says, "This analysis is squarely

20   contradicted by our decision in Avco.  We there held that a

21   301 claim was properly removed even though at the time the

22   relief sought by the plaintiff could be obtained only in State

23   Court."

24         That's exactly this situation, and that's why --

25   that's why the cases cited in our brief, Young, Chimmel

1   (phonetic), <u>Boatwright</u> (phonetic), there are many, many cases

2   where a State Court claim is extinguished by preemption.

3   That's what preemption is all about.  So we think that in this

4   case the Seau children's claims are preempted just like --

5   just like Junior Seau's claims are as well.

6           Thank you.

7           THE COURT:  Okay.  Thank you.  I think that you're

8   on.

9           MR. McCLAIN:  Mr. Schermerhorn is going to argue on

10  our behalf, Your Honor.

11          THE COURT:  Oh, okay.  I don't have you on this list

12  here.  Let me --

13          MR. SCHERMERHORN:  Judge, I can grab you a card.

14  I'm sure I'm on our pleadings.  I work for the Klamann Law

15  Firm.

16          THE COURT:  You better just tell me your name again.

17  I'm sorry.

18          MR. SCHERMERHORN:  First name is Andrew.  Last name,

19  I'll spell it for you, it's lengthy.  S-C-H-E-R-M-E-R-H-O-R-N.

20          THE COURT:  Schermerhorn, is that correct?

21          MR. SCHERMERHORN:  Exactly.

22          THE COURT:  Okay.  All right, Mr. Schermerhorn.

23          MR. SCHERMERHORN:  Good afternoon, Your Honor, and

24  if it may please the Court --

25          THE COURT:  You're arguing on behalf of the --

1   you're asking for remand?

2                  MR. SCHERMERHORN:  Exactly.

3                  THE COURT:  Okay.

4                  MR. SCHERMERHORN:  I'm here on behalf of various

5   players who played for the Kansas City Chiefs and the St.

6   Louis Cardinals, and I want to make a couple of points.  I

7   understand you've read our briefs, and I will admit, we

8   briefed this issue a couple of times, so there's a lot of

9   material there.  So I won't belabor the point, but I do want

10  to make some important distinctions.

11                 First, our case is unlike all the others because

12  we've sued our employer and we've sued for breach of the

13  common-law duty to provide a safe workplace.  And in --

14                 THE COURT:  Under Missouri law.

15                 MR. SCHERMERHORN:  Under Missouri law, exactly.  And

16  Missouri, like most states, requires that employers provide a

17  safe workplace.  Missouri, unlike most states, although as it

18  happens, like Pennsylvania, provides employees the right to

19  sue their employer as opposed to challenge their injury in

20  work comp, and so that's what our players have chosen to do.

21  They were given by the State Court of Missouri the option of

22  pursuing either a work comp claim or pursuing a civil claim in

23  State Court, and they've chosen to pursue a civil claim in

24  State Court.

25                 In all senses, Your Honor, our claims are exactly

1    like those that were pursued in Stellar and McNeal here in

2    this district.  In those cases, employers alleged that they

3    suffered from occupational diseases.  The Pennsylvania Supreme

4    Court ruled that the statute allowed for occupational disease

5    claimants to bring suit in State Court.

6            In those cases, they did so, and this Court decided

7    three times, once in Stellar, twice in McNeal because the

8    defendants asked that it be reconsidered, this Court decided

9    in all three cases that those claims were independent of the

10   Collective Bargaining Agreement.  And that ultimately, Judge,

11   I think is the question.

12           The Court, the Supreme Court and the Third Circuit,

13   the Eighth Circuit, we cite to a bunch of cases, and they say

14   various things, and we could trace through the development of

15   the law.  Essentially what they all say is that the Court must

16   consider whether, in the absence of a CBA, in our particular

17   case, was there a duty to provide a safe workplace?  And so if

18   the Court can answer that question without resorting to a CBA,

19   then our claims are not preempted.

20           But I want to make another quick point here at the

21   very start, just so you understand how our case is unique.

22   Cases in which preemption is put forth as a defense, the Court

23   considers the claim, the petition and potential defenses.  In

24   our case, preemption is being used in order to establish

25   jurisdiction.  And the cases are clear, that when the question

1   is whether the Court has jurisdiction, the Court cannot

2   consider defenses.

3        So if the NFL, or in our case, the Kansas City

4   Chiefs, the St. Louis Rams or the former Cardinals, stand up

5   and say, well, the scope of the duty's been modified or well,

6   we were given -- we have the right to do particular things in

7   the agreement, or well, the agreement says this or the

8   agreement says that, those are defenses.  They might work

9   under ordinary preemption where the Court is just construing

10  both the claims and the defenses.  But here the Court is only

11  to consider the claims.

12        And, again, the question is in our particular case,

13  could we establish for our negligence claim a duty, breach of

14  that duty and causation all in the total absence of a CBA?

15  And the answer is yes.

16        Missouri common-law provides the duty and there's no

17  question that that duty belonged to the players.  It was not

18  waived in any CBA.  And even if it had been, that would be a

19  defense.  And so as to whether the Court has jurisdiction, I

20  think in our case the answer is -- is very easily, no.

21        The other thing is in our case at least with respect

22  to the players who have sued the St. Louis Cardinals -- you

23  asked earlier is there a case on point?  Is there a case where

24  the NFL or teams have been sued for breach of the duty to

25  provide a safe workplace?  And the answer is, yes, ours.  In

1    our case, Judge Perry of the Eastern District of Missouri,

2    considered the exact claim.

3         These exact claims were brought -- this petition,

4    this exact case.  It was called Green at the time.  It's now

5    Smith.  It is -- it is one of the cases I'm here on behalf of.

6    She decided that the claims were not preempted because they

7    arose under Missouri's common-law and they could be decided

8    under Missouri's common-law.  There was no need to refer to a

9    CBA.

10        In the total absence of a CBA, the players were owed

11   a duty by their employer just like everyone in the State of

12   Missouri is owed a duty by their employer to maintain a safe

13   workplace, those bound by CBAs, those not bound by CBAs.

14        And one of the things she said that I thought was

15   insightful was that in Green, two of the players were never

16   bound by a CBA ever.  They played only during the gap years.

17   And presently I represent four players who played only during

18   the gap years.

19        And so ask yourself, for those individuals, could

20   they bring a suit against their employer, the Kansas City

21   Chiefs or the St. Louis Cardinals, for breach of the common-

22   law duty?  The answer is yes.  If the answer is yes for them,

23   it necessarily is yes for everybody else.  Because if we

24   imagine there's no CBA, all of those players could bring

25   claims just like those who are not bound by the CBA.  So that

1    makes our case unique.

2           And I don't want to spend a lot of time, Judge,

3    because I think we say a lot in our briefs and you've already

4    heard a lot today.  But I would like to set forth what I think

5    is the framework.  You've heard that word before, but I think

6    this is the framework.  It takes into account everything

7    that's been said by the Supreme Court and the Third Circuit.

8           And it's this:  When the Court has considered

9    negligence or breach of contract claims, it's asked in the

10   absence of a CBA, is there a duty or in the absence of a CBA,

11   is there a contract?  So the first case, I would suggest that

12   is on point here, and I don't know how the Chiefs and the

13   Cardinals get around it, is <u>Hechler</u>.

14          That was a case brought by an employee against a

15   union, and she alleged that the union violated its duty to

16   provide a safe workplace.  And the Supreme Court said, that

17   would be true if you had sued your employer but you haven't.

18   Instead, you've sued your union, and so that duty, the one

19   you're claiming, doesn't arise under the common-law as you

20   suggest and so your -- the claim was preempted.

21          In <u>Caterpillar</u>, the Supreme Court was asked whether

22   a duty existed -- I'm sorry, a contract existed, absent the

23   CBA, it's -- consider it -- absent the CBA, was there a

24   contract?  And the Court answered yes, there was an oral

25   agreement, and that was enough because that was a

1    jurisdictional case.

2              In Berta (phonetic), in this circuit, it was a

3    similar situation as the Caterpillar.  Employees alleged that

4    they had an oral agreement for continued employment.  Their

5    employer, through a CBA, had provisions about their employment

6    and ultimately they were terminated.  And they sued for breach

7    of contract.  And the Third Circuit asked, absent that CBA,

8    was there a contract?  And the answer was yes, there had been

9    an oral agreement.  And so the case was not preempted.

10             The same is true for Trans Penn Wax.  I won't get

11   into it.  And then, obviously, Stellar, McNeal, we cite to

12   repeatedly in our brief.  We think they're directly on point,

13   but there the Court asked in Pennsylvania is there a common-

14   law duty to provide a safe workplace?  If the answer is yes,

15   absent a -- you know, in the absence of a CBA, then the claim

16   is not preempted.

17             Gore is directly on -- I mean, I'm sorry.  Green is

18   directly on point.  Green is our case.  So we think when the

19   Court considers the claims of the Cardinals players, it has to

20   not just ask itself the preemption question, the question that

21   it's faced throughout today, it has to first ask itself should

22   Green be overruled?  The law of the case doctrine suggest not.

23             The law of the case doctrine obviously applies where

24   one Judge in at a coordinate branch or at a coordinate level

25   decides a case.  A second Court, the sister Court, should not

1    easily override it.  And the Courts have said that that

2    doctrine applies especially where cases have been transferred

3    from one district to another.

4          And even more especially in the MDL settings.  So in

5    an MDL where a Court has decided an issue once before, a

6    second Judge shouldn't lightly overturn it unless there have

7    -- unless there are extraordinary circumstances.  And I will

8    submit that there are not.

9          Before I go on, though, I started with the

10   framework, and I want to return there very quickly.  As to

11   negligence and contract claims, again the question is in the

12   absence of a CBA, is there a duty or a contract?

13         There is a separate species of cases -- I would call

14   it <u>Allis-Chalmers</u>, <u>Lingle</u> and <u>Livadas</u>.  In those cases, the

15   Court considered whether claims were brought -- in those

16   cases, claims were brought under State statutes that

17   prescribed conduct or established particular rights.

18         In <u>Allis-Chalmers</u> it was the right to a good faith

19   payment of a disability claim.

20         In those cases, the question is in the absence of a

21   CBA, would the rule, the State rule, apply?  And <u>Allis-</u>

22   <u>Chalmers</u> is a perfect example of no, it wouldn't.  Because in

23   that case, the duty to pay a disability payment arose from the

24   CBA.  So absent the CBA, the State rule wouldn't apply.

25         In <u>Lingle</u> and <u>Livadas</u>, the answer was the exact

1    opposite.   In <u>Lingle</u>, there was a rule prohibiting retaliatory

2    discharge if somebody filed a work comp claim.   Well, that

3    rule applies regardless of whether there's a CBA.   The CBA

4    didn't give rise to the right not to be retaliated against.

5    And so there the claim wasn't preempted.

6          In <u>Livadas</u>, a similar thing, the California statute

7    requires that if you're terminated, all the pay that you have

8    owing to you is due upon termination, that day, and the Court

9    said, well, that's a right that's owed to every employee.   It

10   doesn't matter if they're a member of a Bargaining Unit.   And

11   so in the absence of a CBA, that right would have arisen and

12   so the claim was not preempted.

13         So in this case, our claims fit under both of those.

14   Our claims are for negligence.   Does the duty arise absent the

15   CBA?   Yes, under the common-law.   And also our claim is for

16   conduct that is prescribed.   Missouri prohibits that employers

17   do things that result in unsafe workplaces.   So no matter how

18   you look at it, our cases are not preempted.

19         And then finally, there's a third species of cases,

20   and I would put <u>Kline</u> in the third species.   <u>Kline</u> is unique

21   because the claim isn't for negligence, so the Court isn't

22   asking itself is was there a duty absent the CBA.   It's also

23   not a claim in which there are particular rights that have

24   been granted by State statute or the common-law.   Instead,

25   that is a case alleging a violation of State Law.

1            It's similar to a case in the Eighth Circuit called

2    Gore.   In both cases, the allegations are that an employer

3    violated the privacy rights of an employee.  And so there the

4    question's a little more difficult.  It's not so easy to say

5    is there a duty absent the CBA or would the right have arisen

6    absent the CBA?  There the Courts in both cases do get to the

7    question, is there a provision, a specific provision -- they

8    both say that -- is there a specific provision in the CBA that

9    requires interpretation?

10           So no -- none of the other cases fall into the same

11   category as either Kline or Gore.  But Kline and Gore follow

12   those cases because what those cases mean, what they all stand

13   for -- you can -- you could look at them all, and they all

14   stand for the exact same thing, which is in the absence of a

15   CBA, could these claims be pled?

16           And in our case, that's it, that's as far as you

17   would go.  Arguably under ordinary preemption, you could also

18   ask, could they be pled and ultimately litigated without the

19   need to interpret a CBA?

20           So I would suggest that's the framework where the

21   claim is for negligence or breach of contract, the question is

22   simply absent the CBA, would they have a claim under the

23   common-law for breach of the duty to provide a safe workplace?

24   And in our case, the answer is clearly yes.

25           I don't want to take too much time and I hope --

1          THE COURT:  Yes.

2          MR. SCHERMERHORN:  -- am I done?

3          THE COURT:  Yes.

4          MR. SCHERMERHORN:  Okay.  If you'll indulge me just

5    for a quick reply when -- after they're done, then that'll be

6    all.

7          MR. BIRENBOIM:  Your Honor, the Chiefs and Cardinals

8    case should be dismissed as preempted for exactly the same

9    reasons as all the other cases, the same Collective Bargaining

10   provisions apply.  So I won't go through that again, but I

11   will take a minute to explain why the case is not different,

12   which is what counsel has just said.

13         First of all, he started off by saying the case is

14   different because in their case, the club has been sued as

15   opposed to the League.  That doesn't make a difference.

16   First, that does not go to the question of do Collective

17   Bargaining provisions need to be construed?  That's the

18   question in preemption.

19         And, in fact, the -- the Jeffers case, the Sherwin

20   case, the Givens case, those are all cases against clubs where

21   preemption was found.  There's no suggestion in the preemption

22   law that it matters whether -- whether the club is sued or

23   whether some other party is sued.

24         Number two, Your Honor, counsel cited to the Stellar

25   and McNeal cases which are -- were decided under Pennsylvania

1    law.  The law that is applied here for purposes of determining

2    whether these Chiefs and Cardinals had some kind of non-

3    negotiable right under Missouri law is obviously Missouri law.

4          And the Gore case which counsel mentioned really

5    answers everything about plaintiffs' argument.  Plaintiffs'

6    argument in this case is that there's some kind of non-

7    negotiable independent right to a safe workplace under

8    Missouri law.  Gore, Eighth Circuit, controlling law on that

9    issue, completely rejects that.

10          Gore says in this case the District Court concluded

11   that Gore's State Law claims were preempted because they are

12   inextricably intertwined.  Gore asserts that his State Law

13   claims exist independent of the Collective Bargaining

14   Agreement and are not preempted.  That's the Chiefs' and

15   Cardinals' position.

16          Our view of Missouri law, however, convinces us that

17   the rights asserted in Gore's tort claim are not non-

18   negotiable independent State Law rights.  And the rights at

19   issue are, and I'm quoting, "to provide a safe working

20   environment."

21          And, Your Honor, that makes eminent sense because

22   virtually every state has common-law obligations of an

23   employer to provide a safe workplace.  So if you could just

24   sue and say I'm suing under the common-law of the state to

25   provide a safe workplace and get out of labor law preemption,

1    you would utterly eviscerate labor law preemption where

2    there's a Collective Bargaining Agreement.  That's plainly not

3    the law and that's why the cases don't support that.

4         And with respect to the law of the case doctrine,

5    Your Honor, first to be clear, the <u>Green</u> case only applies to

6    the Cardinals, and there are only two Cardinal plaintiffs.  So

7    we're only talking about two -- just to be clear, we're only

8    talking about two plaintiffs here.

9         THE COURT:  Do you agree with that?

10        MR. SCHERMERHORN:  Yes, yes.

11        MR. BIRENBOIM:  So put that aside for a second.

12   Let's also be clear about which kind of law of the case we're

13   talking about.  There's law of the case that says that where a

14   decision is made and it goes up on appeal and is affirmed, the

15   District Court Judge must follow that decision.  That's the

16   law of the case.  That's mandatory.  That's not what we're

17   talking about here.

18        The other kind of law of the case is discretionary,

19   completely discretionary on the part of the Judge to follow a

20   prior --

21        THE COURT:  I apply Third Circuit law to that, don't

22   I?  I apply Third Circuit law to that.

23        MR. BIRENBOIM:  Correct.  And I'm quoting Third

24   Circuit law.  <u>Roberts vs. Ferman</u>.  We'll lay that out and

25   describe that.

1        And in this case, the fact is that the <u>Green</u> case

2   was wrongly decided because it completely ignored <u>Gore</u> which

3   is controlling Eighth Circuit law.  The Judge simply did not

4   apply <u>Gore</u> for the proposition that workplace safety issues

5   are in fact negotiable, and the Judge made a second mistake.

6        She said if there is a player who is in a gap year,

7   and she decides that the Bargaining Agreement does not apply

8   to that player, then it follows that for the other player who

9   is covered by the CBA, that player must have an independent

10  claim.  That actually doesn't follow logically.

11       What really follows is that if you accept one, maybe

12  that player -- there's no preemption for that player possibly.

13  But when the Collective Bargaining Agreement does come into

14  play, then Federal Labor Law preemption comes into play.  So

15  the Judge got it wrong on both those counts.  We think it was

16  clearly erroneously decided.  It's clearly inconsistent with

17  all the other cases in this area, so we think Your Honor is

18  not at all bound by the <u>Green</u> case.

19            THE COURT:  All right.  Thank you.

20            MR. BIRENBOIM:  Thank you, Your Honor.

21            THE COURT:  Do you want a short rebuttal?

22            MR. SCHERMERHORN:  Please.  It's -- it's just simply

23  not true that Judge Perry didn't consider <u>Gore</u>.  She did

24  consider <u>Gore</u>.  She talks about <u>Gore</u> in the opinion.  And it's

25  important that the Court understand what <u>Gore</u> is about.

1         There, like I said, an employee sued their employer

2    for violating their privacy rights.  They had come to work --

3    they worked for TWA -- and they made threats to other

4    employees, suggesting that they were going to both kill --

5    this individual was going to kill his co-workers and then

6    shoot himself.  And TWA retained him, they searched his

7    locker, they searched his car.  They reported that he was a

8    threat to other employees.

9         It ultimately, after an investigation, was decided

10   that he was not a threat, but he brought a claim against his

11   employer for breach of his privacy rights and for wrongful

12   detention.  And Gore said -- Gore is an Eighth Circuit

13   decision.  It didn't overturn any law, it didn't announce any

14   new law.

15        All it said was, of course, an employer through a

16   CBA can negotiate what it can do.  And in this case, the

17   employer negotiated the right to search lockers.  The CBA said

18   the employer had the right to search lockers.  It had the

19   right to detain him if he was a threat.

20        So we don't -- we don't challenge the -- I agree

21   that it is a preceptive labor law that -- through a CBA, the

22   rights and obligations of employees and their employer are

23   negotiated.  I understand that that's what CBAs are.  And so

24   that's all Green says, is that the rights of the employer were

25   negotiated in that case.  And Judge Perry understood that when

1  she decided <u>Gore</u>.

2       What she decided, though, was the right to maintain

3  a safe workplace, he wasn't alleging that.  He himself was a

4  threat to a safe workplace.  The right to maintain a safe

5  workplace is not negotiable.  That is the law of the State of

6  Missouri, and we set that forth very clearly in our -- in our

7  reply brief.

8       It's unfortunate that there isn't a lot of law on

9  that issue, and that's because, much like throughout the rest

10  of the country, once work comp statutes were passed, the

11  development, the annunciation of the law as it applies to the

12  duty that an employer owes to an employee basically stopped.

13  So we cite to older cases, but they're no less precedential,

14  and they're -- and they state the law in the State of

15  Missouri, not <u>Gore</u>.

16       And I would say one other thing about <u>Gore</u>.  After

17  it was decided, the Eighth Circuit considered it and

18  considered a separate line of cases in which they have all --

19  had all held claims not preempted.  And they said in that

20  case, it was called <u>Schnooks</u> (phonetic) -- I can provide the

21  cite.  I think we cite to it in our briefs.

22       But the case said, <u>Gore</u> -- we're choosing to go down

23  the path that is more narrow.  And they cite to <u>Gore</u> as an

24  example of a case in which they had not done that.  So the

25  precedential value of <u>Gore</u> I think is -- is diminished in the

1   Eighth Circuit.

2          The last thing I would say, he mentioned that the

3   analysis should be the same, that our claims are no different

4   than all the others.  We've sued the teams; they've sued the

5   NFL.  The analysis, obviously, cannot be the same, because the

6   question, like I mentioned before, is is there a duty?  In our

7   case, the answer is obvious and it's easy.  I will admit that

8   with respect to the other players it may be a little more

9   difficult, so it cannot be the same.

10          And then he says that the CBAs assign -- assign

11  obligations to the teams.  Sometimes they claim that there may

12  be an obligation owed by a committee.  What they have not

13  done, Judge, even now after five years, is point to a single

14  specific provision that applies to this case, that applies to

15  latent occupational disease.  They have -- there's no

16  provision that applies.

17          And the fact that the NFL assigns to the club some

18  specific duty, that's irrelevant to our case.  We've sued

19  their employer.  They owed those duties, whether it's repeated

20  in a CBA or not, and so we don't need to rely on a CBA for

21  anything.

22          And I will submit this:  If we -- if we are remanded

23  to State Court and we change our mind and it turns out we

24  start citing to the CBA, well, they can remove us.  We'll come

25  right back up here, but that's -- that won't happen.

1          THE COURT:  Okay.  Thank you.

2          MR. SCHERMERHORN:  Thank you, Judge.

3          THE COURT:  Okay.  Thank you very much.

4      I think that that concludes oral argument, and I

5  think that I'm going to -- in the order that I did before -- I

6  will speak to you about when I want you to come back to talk

7  to me.  So first let's start with Mr. Strauss.  Okay, you want

8  -- I need both sides.  Bruce, are you going to come in, too?

9  Are you going to come in?

10      (Proceedings concluded at 3:20 p.m.)

11                          * * *

12

13

14              **C E R T I F I C A T I O N**

15

16      I, Lois A. Vitarelli, court approved transcriber,

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____      April 20, 2018

24  LOIS A. VITARELLI

25  DIANA DOMAN TRANSCRIBING, LLC