UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE | ) | 12-MDL-2323-AB |
| PLAYERS' CONCUSSION INJURY | ) | |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| Kevin Turner and Shawn Wooden, | ) | Philadelphia, PA |
| on behalf of themselves and | ) | May 30, 2018 |
| others similarly situated, | ) | 11:05 a.m. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| National Football League and | ) | |
| NFL Properties, LLC, | ) | |
| successor-in-interest to | ) | |
| NFL Properties, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For Kevin Turner,          CHRISTOPHER S. SEEGER, ESQUIRE
et al:                     SEEGER WEISS, LLP
                           6th Floor
                           55 Challenger Road
                           Ridgefield, NJ 07660

For Plaintiffs Ron         GENE LOCKS, ESQUIRE
Solt, et al.:              LOCKS LAW FIRM
                           37th Floor
                           747 Third Avenue
                           New York, NY  10017

For Plaintiffs             MATTHEW WEINSHALL, ESQUIRE
Mravin Jones, et al.:      PODHURST ORSECK, P.A.
                           Sun Trust International Center
                           STE 2300
                           One S.E. 3rd Avenue
                           Miami, FL  33131

APPEARANCES:   Continued


For National Football            RICHARD C. TARLOWE, ESQUIRE
League:                          BRUCE BIRENBOIM, ESQUIRE
                                 BRAD S. KARP, ESQUIRE
                                 PAUL, WEISS, RIFKIND, WHARTON
                                 & GARRISON, LLP
                                 1285 Avenue of the Americas
                                 New York, NY  10019


                                 SEAN P. FAHEY, ESQUIRE
                                 PEPPER HAMILTON, LLP
                                 3000 Two Logan Square
                                 18th and Arch Streets
                                 Philadelphia, PA  19103


Special Master:                  JO-ANN M. VERRIER, ESQUIRE
                                 UNIVERSITY OF PENNSYLVANIA LAW
                                 SCHOOL
                                 3501 Sansom Street
                                 Philadelphia, PA  19104

Claims Administrator:            ORRAN L. BROWN, ESQUIRE
                                 BROWNGREER, PLC
                                 250 Rocketts Way
                                 Richmond, VA  23231




Audio Operator:                  JAMES F.G. SCHEIDT


Transcribed by:                  DIANA DOMAN TRANSCRIBING, LLC
                                 P.O. Box 129
                                 Gibbsboro, New Jersey  08026
                                 Office:  (856) 435-7172
                                 Fax:     (856) 435-7124
                                 Email:   dianadoman@comcast.net



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                              I N D E X

2     ARGUMENTS:                                        PAGE

3     Ref: NFL's motion for Special Investigator

4        By Mr. Tarlowe                                   5

5        By Mr. Seeger                                    34

6        By Mr. Weinshall                                 41

7        By Mr. Locks                                     50

8        By Mr. Brown                                     54

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (The following was heard at 11:05 a.m.)
 2                THE COURT:  -- Players Concussion Injury Litigation
 3      at MDL-2012-2323 and 2018-2323.  And I recognize the presence
 4      of plaintiff's lawyer Mr. Seeger, good morning.
 5                MR. SEEGER:  Good morning, Your Honor.
 6                THE COURT:  Mr. Locks.
 7                MR. LOCKS:  Yes.
 8                THE COURT:  Mr. Weinshall --
 9                MR. WEINSHALL:  Good morning, Your Honor.
10                THE COURT:  -- for the plaintiff.  Mr. Birenboim for
11      the Government.
12                MR. BIRENBOIM:  Good morning, Your Honor.
13                THE COURT:  Mr. Fahey.
14                MR. FAHEY:  Good morning, Your Honor.
15                THE COURT:  Okay, Mr. Karp.
16                MR. KARP:  Good morning, Your Honor.
17                THE COURT:  Mr. Tarlowe.
18                MR. TARLOWE:  Good morning, Your Honor.
19                THE COURT:  And there's some other people at the
20      table.  Would you like to introduce them?
21                MR. FAHEY:  Sure.  Sarah Istel, my colleague from
22      Paul Weiss --
23                THE COURT:  Okay.
24                MR. FAHEY:  -- and Anastasia Danias --
25                THE COURT:  I know --
```

1      MR. FAHEY:  -- from the National Football League.

2      THE COURT:  I know Anastasia, yes.  And I think

3  there's some people behind also that are from -- aren't you

4  from the NFL?

5      MR. BURNS:  Yes.  Doug Burns, Your Honor.

6      THE COURT:  Yes, okay.  Okay, all right.  And that's

7  it?  Oh, yes, I'm sorry, these are my -- Special Master, Jo-

8  Ann Verrier and Orran Brown from BrownGreer, who's my Claims

9  Advisor -- Claims Administrator.  And would you introduce

10 yourself?

11     MS. ANDERSON:  Bethany Anderson.

12     THE COURT:  Yes, Bethany, what's your last name?

13     MS. ANDERSON:  Anderson.

14     THE COURT:  Bethany Anderson who's here with

15 BrownGreer.  Okay.  Mr. Karp, are you going -- Mr. Tarlowe I

16 understand is going to be -- is that correct?

17     MR. KARP:  Yes, Your Honor.

18     THE COURT:  Okay, good.  Was somebody else -- excuse

19 me -- oh, I did introduce you, okay.

20     All right, Mr. Tarlowe?

21     MR. TARLOWE:  Good morning, Your Honor.

22     THE COURT:  Good morning.

23     MR. TARLOWE:  Would it be possible to display --

24     THE COURT:  Yes, and on mine too, Jim, yes.  Oh, and

25 my law clerk -- excuse me, Alex, you see her, I didn't

1    introduce him.  Okay.  You know, you may want to -- I can see

2    it up here so you may want to turn it slightly so all the --

3    oh, the other lawyers can see it, you have -- you have your

4    own?

5          (Pause in proceedings)

6          THE COURT:  Yours is not working?  Do you want to

7    turn your -- -- do you want to turn around?

8          MS. VERRIER:  I can see it right here.

9          THE COURT:  They can see one.  They can see it here,

10   Jim.  That's fine.  Okay, and would you like to let my -- it

11   would be nice if I could see it just on general -- just on

12   general principles.

13         COURTROOM DEPUTY:  You're good.

14         THE COURT:  Oh yes, okay.  It says "Paul Weiss" --

15   okay, it's the right case.  Okay, you can go forward.

16         MR. TARLOWE:  Thank you, Your Honor.  So we're here

17   on the NFL parties' motion for the appointment of a Special

18   Investigator --

19         THE COURT:  Okay.

20         MR. TARLOWE:  -- and what I hope to do today, Your

21   Honor, is to provide some additional background on the NFL

22   parties' motion to describe some examples of the evidence of

23   fraud that has been uncovered to date, primarily by the

24   independent Claims Administrator, and to describe the

25   anticipated role of the Special Investigator, and obviously I

1    would be happy to address any questions that the Court may

2    have.

3              THE COURT:  Okay, that's fine.

4              MR. TARLOWE:  The NFL parties' motion for the

5    immediate appointment of a Special Investigator is something

6    that the Court previously recognized the potential need for.

7    Back in November following a conference with the parties, Your

8    Honor indicated that an investigator will be appointed as

9    needed to look into possible fraudulent claims.

10             We believe, Judge, that the appointment of an

11   investigator is now necessary in light of the extensive

12   evidence of fraud that has been uncovered to date.

13             And one point that I want to make clear from the

14   outset is that the Special Investigator is not going to result

15   in any delay in the processing or payment of claims.  The NFL

16   remains committed to ensuring full and prompt payment of all

17   valid claims by deserving retired NFL players, and we

18   believe --

19             THE COURT:  That's a primary -- that's a primary

20   concern of mine.  You understand that.

21             MR. TARLOWE:  Of course, Your Honor.

22             THE COURT:  There will be absolutely no Special

23   Investigator if in any way it's going to curtail the payment

24   of claims --

25             MR. TARLOWE:  Of course, Your Honor.  We --

1          THE COURT:  -- because that is my first -- my first

2     concern.

3          MR. TARLOWE:  And we share that concern, Judge, and

4     the Special Investigator we believe will actually facilitate

5     the efficient and prompt payment of claims by relieving some

6     of the burden that's been placed on the Special Masters and

7     the Claims Administrator as a result of a really extraordinary

8     number of potentially fraudulent claims.

9          And I would note that there's been no objection from

10    the Claims Administrator to the appointment of the Special

11    Investigator and as I understand it, no objection from co-lead

12    class counsel either.

13         We think it's in the interest of all the parties

14    including the retired players to have this investigator to

15    help unclog the system based on the number of potentially

16    fraudulent claims that have been submitted this far.

17         THE COURT:  Okay.

18         MR. TARLOWE:  Since the settlement became effective

19    a little over a year ago, the parties have really been working

20    very diligently to ensure the efficient operation of the

21    program, and I think we've really been able to achieve some

22    pretty extraordinary accomplishments in the first year of the

23    program.

24         Since the effective date, over 20,000 claimants have

25    registered.  Nearly $300 million in finalized claims have been

1    funded by the NFL parties, and again, that's just in the first

2    year of what is a 65-year program.

3              THE COURT:  I think it's even more than that now.

4    Is it?

5              MR. BROWN:  Yes, Your Honor.  It's about -- it's 432

6    notices of awards out.  That now puts us at I think it's a

7    total of $439 million-plus in awards that are out.  Mr.

8    Tarlowe I think is about how much has actually been funded by

9    the NFL that is either paid or right on the cusp of being

10   actually paid.

11             THE COURT:  Oh, okay.  Okay, good.  Thank you.

12             MR. TARLOWE:  And a nationwide network has been

13   established of more than 300 neurologists and

14   neuropsychologists.  As I mentioned, the number of potentially

15   fraudulent claims have unfortunately clogged the system and

16   resulted in some delay.

17             And again, we believe the Special Investigator will

18   actually help to unclog the system and ensure the prompt and

19   efficient payment of any valid claims.

20             Before describing some of the evidence of fraud, I

21   think it would be helpful just to spend a moment describing

22   the audit process because I think it provides helpful context

23   for the role of the Special Investigator.

24             So the way the audit process works is the

25   independent Claims Administrator selects claims for audit

1    based on random sampling, the existence of red flags and other

2    evidence of potential fraud.

3         Once the independent Claims Administrator selects a

4    claim for audit, the Claims Administrator is charged with

5    determining whether there is a reasonable basis to support a

6    finding of misrepresentation, omission or concealment of a

7    material fact.

8         If the Claims Administrator concludes that there is

9    a reasonable basis to support such a finding, the Claims

10   Administrator prepares an audit report describing its

11   conclusions and the basis for those conclusions and refers it

12   to the Special Masters.

13        Now importantly, the Claims Administrator does not

14   conduct additional investigation at that point and the Claims

15   Administrator does not attempt to assess whether the

16   misrepresentations or omissions were made intentionally.

17        Instead, under the terms of the settlement

18   agreement, the Special Masters consider whether the conduct

19   was intentional and determine the appropriate remedies and

20   forms of relief.

21        This is a step in the process where we think the

22   Special Investigator can add significant value, and that is

23   because once there's a determination of a misrepresentation or

24   omission of a material fact, that is a sufficient basis on

25   which to deny a claim.

1          However, the Special Masters have the additional

2     responsibility to evaluate intent and to determine whether

3     other forms of relief are warranted such as disqualification

4     from the program, forfeiting of attorney's fees, referral to

5     the Department of Justice and a variety of other potential

6     remedies, and that's where the question of intent comes into

7     play.

8          And the Claims Administrator, because that is

9     outside their mandate, the Claims Administrator has

10    specifically identified in some of its audit reports

11    additional investigative steps that it believes would be

12    valuable in ascertaining intent, but steps that the Claims

13    Administrator does not take because it's beyond their mandate

14    of simply determining whether there's a reasonable basis to

15    support a finding of a misrepresentation, omission or

16    concealment of a material fact.

17         And so we think the Special Investigator can provide

18    the necessary investigative resources and tools to arm the

19    Special Masters with the information that they need to carry

20    out this responsibility under the settlement agreement.

21         And so what is the status of the Claims

22    Administrator's audits?  Nearly half of all of the claims were

23    selected for audit by the independent Claims Administrator

24    based on the existence of red flags or other signs of

25    potential fraud.

1            The Claims Administrator has made adverse audit

2    findings with respect to more than 440 claims, and to be

3    clear, that means that the Claims Administrator has determined

4    that there is a reasonable basis to support a finding of a

5    material misrepresentation, omission or concealment as to more

6    than 440 claims.

7            THE COURT:  That has to do with doctors and lawyers,

8    isn't that correct?

9            MR. TARLOWE:  Primarily doctors and lawyers, Your

10   Honor --

11           THE COURT:  All doctors and lawyers.

12           MR. TARLOWE:  Primarily doctors and lawyers.  There

13   is one report that also makes a finding --

14           THE COURT:  One out of 20,000, yes.

15           MR. TARLOWE:  -- with respect to a settlement class

16   member --

17           THE COURT:  Okay.

18           MR. TARLOWE:  -- and recommends that that settlement

19   class member be disqualified --

20           THE COURT:  Okay.

21           MR. TARLOWE:  -- from the program.  Approximately

22   150 claims remain in audit for further investigation by the

23   Claims Administrator based on potential fraud, and the Claims

24   Administrator thus far has completed and prepared ten audit

25   reports in which they made an adverse finding of a material

1    misrepresentation or omission.

2           We've listed here for the Court the names of the

3    doctors and the two law firms that were the subjects of those

4    audit reports.

5           But as you can see, there are a number of different

6    doctors implicated, there are multiple law firms, hundreds of

7    claims that total hundreds of millions of dollars and I would

8    note that of the ten audit reports, the Special Masters thus

9    far have ruled on one -- on Dr. Hoover.

10          There are nine additional audit reports that will

11   have to be adjudicated by the Special Masters, who of course

12   have a host of other significant and important

13   responsibilities and again, this is a place where we think the

14   Special Investigator can add significant value in conducting

15   the investigations and arming the Special Masters with the

16   information they need to rule on these referrals of audit

17   reports.

18          So what is the evidence of fraud thus far?  We

19   believe that the Claims Administrator has uncovered

20   significant evidence of widespread fraud, and what we're

21   talking about here, Judge, to be clear, we're not talking

22   about a difference of opinion as to a medical opinion or

23   judgment, we're not talking about testing practices, we're

24   talking here about misrepresentations, misstatements, and

25   there are several examples here that I'll just summarize.

1              Dr. Hoover, who was the subject of an audit report

2     as well as findings by the Special Masters, her testing was

3     relied upon by 153 claimants, and Dr. Hoover claimed under

4     penalty of perjury that she evaluated as many as eight players

5     in one day including on New Year's Eve, even though she also

6     reported having spent seven to 12 hours per patient.

7              Acosta & Associates is a law firm that represents

8     claimants who submitted -- 71 claimants who submitted claims,

9     and the Claims Administrator in its audit report on Acosta &

10    Associates details allegations that the law firm coached

11    retired players on how to take neuropsychological tests and

12    directed one of those players to show up for his medical

13    evaluation hung over and on Valium.

14             Dr. Andrews and the law firm of Smith & Stallworth,

15    Dr. Andrews is a pediatric neurologist who worked exclusively

16    with the law firm of Smith & Stallworth to evaluate claimants.

17    She diagnosed 36 of 48 claimants with Alzheimer's, and she

18    submitted 21 medical reports that contained identical vital

19    signs for different players, something that according to an

20    expert that the Claims Administrator consulted with, is an

21    impossibility.

22             Dr. Dolan-Henderson -- Dr. Dolan-Henderson's testing

23    was relied on by seven claimant's and Dr. Dolan-Henderson,

24    according to the Claims Administrator, submitted two reports

25    for a single player that contained different and conflicting

1    test results and according to the Claims Administrator,

2    provided conflicting explanations for that discrepancy.

3            Now, this goes, Your Honor, to one of the -- the

4    question you asked a moment ago.  The evidence of fraud

5    primarily concerns doctors and law firms.  There is however

6    also evidence that certain of the claimants may have knowingly

7    engaged in fraud.  And again, here we are not quibbling with a

8    medical judgment or testing.

9            What we're -- what this evidence is is evidence of

10   affirmative misrepresentations or deliberate concealment of

11   facts that are clearly material to the evaluation.  And I want

12   to be clear that we're not here today to try to prove that any

13   of these players engaged in a fraud.

14           The point of this is only to indicate that there is

15   undoubtedly, indisputedly evidence of fraud that warrants

16   further investigation, and we think based on the evidence that

17   we'll describe for you in a moment, that there really cannot

18   be any reasonable dispute that further investigation is

19   warranted based on these facts.

20           THE COURT:  Excuse me, you -- as I understand it,

21   none of these have been paid out, you have not lost anything

22   because of your alleged fraud, none of these claims have been

23   paid.  In other words, the Claims Administrator who is aware

24   of this has not paid any of those claims, isn't that correct?

25           MR. TARLOWE:  The Claims Administrator I should say

1    has been doing a fabulous job and --

2          THE COURT:  I think so too, and BrownGreer has done

3    -- and so has the Special Master, and all I'm saying to you is

4    as far as I understand it, nothing has been paid on any

5    alleged fraudulent claim, isn't that correct?  I think that's

6    accurate.

7          Mr. Birenboim, that is accurate, is it not?

8          MR. BIRENBOIM:  I believe that is, Your Honor.

9          THE COURT:  Okay, good.  All right, thank you.

10         MR. TARLOWE:  And some of the examples of the

11   evidence of potential fraud by claimants includes a claimant

12   who was diagnosed with Alzheimer's reported that he had had to

13   -- that he had been forced to stop coaching football due to

14   his condition, but evidence shows that even a year after that,

15   he was continuing to serve as the head coach of the football

16   team.

17         Another claimant who was diagnosed with Alzheimer's

18   reported during his medical evaluation that he had horrible

19   memory problems and word-finding difficulties, but that same

20   player stated during an interview more than a year later that

21   he felt fortunate because unlike some others, he did not

22   notice any symptoms.

23         Another claimant who was diagnosed with moderate

24   dementia reported as part of his evaluation that he was

25   unemployed, but there's evidence showing that at the same time

1    he claimed to be unemployed, he was actually working as a

2    wealth manager for a large investment firm.

3            Another claimant who was purportedly diagnosed with

4    moderate dementia reported as part of his evaluation that he

5    was unable to work in any capacity, but the evidence shows

6    that he continued, among other things, to give lengthy

7    motivational speeches to large public audiences during which

8    he displayed no apparent cognitive or speech impairments.

9            And finally, a claimant diagnosed with Alzheimer's

10   reported that he was not even able to run errands without

11   assistance, but there's evidence showing that he serves and

12   continues to serve as the head coach of a minor league

13   football team.

14           And finally, there's a claimant who was diagnosed

15   with Alzheimer's in 2015 and that claimant completed and

16   signed a medical history questionnaire nearly two years later

17   in which he denied having any problems with speech, memory or

18   concentration.

19           So again, Your Honor, these are just a few of the

20   examples of evidence of potential fraud that we think

21   necessitates and warrants further investigation.

22           And I'd like to just spend just a brief moment

23   describing some of the specific evidence relating to Dr.

24   Hoover and Acosta and Associates.  Dr. Hoover is a clinical

25   neuropsychologist in California.  Her testing was relied on by

1    153 claimants.

2          Virtually all of her exams occurred in the six-month

3    period immediately prior to the effective date of the

4    settlement agreement, and that's significant because as Your

5    Honor knows, as of the effective date, only physicians who are

6    vetted and approved by the parties are able to render

7    qualifying diagnoses.

8          In addition, Dr. Hoover lacks the board

9    certification that's necessary to even be eligible to serve in

10   that role so as of the effective date, Dr. Hoover no longer

11   would have been able to render diagnoses --

12         THE COURT:  And these were -- these were permissible

13   before the effective date --

14         MR. TARLOWE:  Exactly.

15         THE COURT:  -- that's the important thing.

16         MR. TARLOWE:  Exactly, Judge.  And so we think it's

17   significant that those examinations are concentrated in that

18   six-month period.  A number of those claimants had not

19   previously sought any medical treatment for their alleged

20   cognitive impairment.

21         Dr. Hoover in her reports documented in each report

22   the number of hours that she purportedly spent evaluating the

23   claimants and preparing reports and you can see from this

24   example that for this particular claimant, she claims that she

25   spent 17 hours if my math is right -- 17 hours testing,

1    scoring and preparing the report for one particular claimant.

2              Dr. Hoover also certified in each of these reports

3    to the accuracy of the information under penalty of perjury,

4    and you can see from this chart, Judge, that Dr. Hoover

5    claimed repeatedly to have evaluated multiple claimants -- as

6    many as eight -- on the same day.

7              And you can see from this chart, Judge, that

8    December 31st, 2016, New Year's Eve, just about a week before

9    the effective date, Dr. Hoover claims that on that day that,

10   on New Year's Eve, she evaluated eight people.

11             On December 21st she reportedly evaluated eight

12   people and you can see there are a number of days where she

13   claims to have evaluated four or five claimants.

14             And, Your Honor, one of the things that we would

15   expect the Special Investigator to look into for example would

16   be records of travel records to see where these people were on

17   December 31st and whether in fact they did see Dr. Hoover in

18   California on New Year's Eve.

19             And what we did here, Judge, is we added up the

20   hours that Dr. Hoover claimed she spent evaluating claimants

21   and preparing reports on particular days and you can see here

22   that she claims to have evaluated several people on December

23   21st and to have prepared reports on those claimants the

24   following day, December 22nd.

25             And if you look at the column that's labeled

1    "Neuropsychological Testing Hours," that shows that she

2    claimed to have spent 56.5 hours testing claimants on one day.

3            THE COURT:  Whom did she charge for for this?  Do

4    you know?

5            MR. TARLOWE:  I don't know and I think one of the

6    things that the Special Investigator would want to see would

7    be the financial arrangements between the doctors and the

8    lawyers.

9            THE COURT:  Was it the lawyers that paid?  Or you

10   don't know?

11           MR. TARLOWE:  I would --

12           THE COURT:  Jo-Ann, you don't know who paid, do you?

13           MS. VERRIER:  No.

14           THE COURT:  Okay.  All right, go on.

15           MR. TARLOWE:  And on the column on the right we

16   added up the testing, scoring and report time and if you add

17   those numbers up, Dr. Hoover claimed to have spent 139.75

18   hours over a two-day period.  Again, mathematically

19   impossible.

20           The same thing happened for December 31st and

21   January 1st, 56.75 hours testing claimants in a single day --

22   obviously that's not possible, and total time over the two-day

23   period, 134.5 hours.  Again, obviously mathematically

24   impossible.

25           Now, there is also some evidence that some of the

1    claimants who relied on Dr. Hoover's testing may have been

2    complicit, and these are examples of claims that we think

3    warrant further investigation.  108 of the claimants traveled

4    to California to see Dr. Hoover.  That fact in and of itself

5    is not inherently suspect.

6           However, when you consider that these are claimants

7    who purportedly have severe cognitive impairment and many of

8    whom live in states where they have highly qualified

9    physicians nearby yet they're traveling in some cases cross-

10   county in order to be evaluated by Dr. Hoover.

11          There are also claimants who are diagnosed with

12   early and moderate dementia by Dr. Hoover who work in -- as

13   motivational -- as a motivational speaker, a wealth manager, a

14   claimant who received his MBA degree in the same month that he

15   was evaluated and diagnosed as having dementia.

16          THE COURT:  That's a comment on MBAs.

17          MR. TARLOWE:  Someone who was an executive vice

18   president of a technology company and the vice president of a

19   sports marketing company.  And just to give you one example,

20   Judge, that we thought was particularly compelling, here's a

21   player who was seen by Dr. Hoover and diagnosed with moderate

22   dementia in January of 2017.

23          And this player's claim package reflects based on

24   his medical evaluations that he was unable to work in any

25   capacity since 2011, that he struggles to follow instructions

1    and finds it challenging to complete complex tasks, his

2    attention is poor and he is highly distractible, he has

3    difficulty following and understanding directions and he has

4    trouble concentrating on things.

5              Now, this same player is a motivational speaker and

6    there are literally dozens and dozens of videos of this player

7    giving motivational speeches.  And, Judge, what we'd like to

8    do is play an example -- one example of that.  We've taken out

9    any references to the player's name in order to protect his

10   identity.

11             THE COURT:  Okay.

12             MR. TARLOWE:  The image will be displayed on the

13   screen --

14             THE COURT:  That's okay.

15             MR. TARLOWE:  -- if that's okay with Your Honor.

16             THE COURT:  I have no problem in these

17   circumstances.  And before we -- as I understand it, of course

18   the Claims Administrator highlighted this and this was sent to

19   the Special Master, and the Special Master as I understand,

20   has in fact disqualified this physician, is that correct, Jo-

21   Ann?

22             MS. VERRIER:  Yes, Your Honor.

23             THE COURT:  What?

24             MS. VERRIER:  Yes, Your Honor.

25             THE COURT:  Yes, it's correct, and that -- and that

1    all -- none of these claims were paid and none of these claims

2    were approved, is that -- is that correct?

3              MS. VERRIER:  That's correct, Your Honor.

4              THE COURT:  Yes, okay.  All right.  Well that is so.

5         (Video playing at this time)

6              MR. TARLOWE:  Judge, that's just one example of

7    dozens of those videos, and just very briefly, I'll play one

8    other where the same claimant who as you may remember from the

9    previous slide claimed to be unable to work, in this next

10   video is actually lecturing people on how to prepare for job

11   interviews.

12        (Video playing at this time)

13             THE COURT:  Can you make it a little louder?  Jim,

14   make it a little louder, would you?

15        (Pause in proceedings)

16             THE COURT:  All right.  Okay, go on.

17        (Video playing at this time)

18             MR. TARLOWE:  And so, Judge, again, I just want to

19   be clear that the point of this is not to attack the integrity

20   of any of the claimants.

21             We -- you know, the NFL is committed as I said at

22   the outset to ensuring that anybody who has a valid claim

23   receive prompt and full compensation, but we think this

24   provides evidence, again, that just requires further

25   investigation to determine whether or not there was fraud.

1              THE COURT:  Okay.

2              MR. TARLOWE:  Now, this same player is shown in

3    various social media postings -- these are all following his

4    evaluation -- here he is riding motorcycles in Mexico, hiking

5    the Grand Canyon and swimming in Zimbabwe.  Again, all of

6    those occurred months after he was diagnosed by Dr. Hoover

7    with dementia.

8              50 of the claimants with diagnoses by Dr. Hoover are

9    represented by the same law firm, Acosta & Associates.  Acosta

10   & Associates was the subject of an audit report prepared by

11   the Claims Administrator finding a reasonable basis to support

12   a finding of a material misrepresentation, omission or

13   concealment.

14             And specifically, the Claims Administrator found

15   support for allegations that Acosta offered to send players to

16   doctors that he pays for, tells players he can get a

17   qualifying diagnosis and is willing to pay the doctors $7,000

18   out of his pocket; allegations that Acosta works with a

19   particular retired player who is himself a settlement class

20   member in order to recruit players to the Acosta law firm, and

21   that Acosta directed that particular player to show up for his

22   evaluation hung over and on Valium in order to create the

23   impression that he was suffering from cognitive impairment.

24             The Claims Administrator also reported that a

25   neuropsychologist reported to the Claims Administrator that

1    Acosta would call and ask what questions would make a

2    difference to the outcome of the neuropsychological tests.

3         And so again, we think this type of evidence of

4    coaching of players on how to take the neuropsychological

5    tests is evidence of fraud that needs further investigation.

6    And Acosta represents 134 players, 71 of whom have filed

7    claims.

8         Virtually all of those claims, 97 percent, rely on

9    testing either by Dr. Hoover or the so called template doctors

10   which refers to a group of neuropsychologists who use the same

11   template report as Dr. Hoover and who are also the subject of

12   an audit report by the Claims Administrator making an adverse

13   finding.

14        And now if I can, Judge, just to briefly describe

15   some of the evidence relating to Dr. Andrews and the law firm

16   of Smith & Stallworth.  Dr. Andrews is a neurologist in

17   Florida who's board certified with a special qualification in

18   child neurology, and her practice specializes in treating

19   neurological disorders in children.

20        As I'm sure the Court is aware, dementia and

21   Alzheimer's are disorder that are associated with adults, not

22   children.  Dr. Andrews provided diagnoses for 48 claims --

23        THE COURT:  These are pre-effective again on pre-

24   effective date claims, is that not correct?  I think so.

25        MR. TARLOWE:  That is correct, yes.

1          THE COURT:  Yes.

2          MR. TARLOWE:  Dr. Andrews was the subject of an

3     audit report by the Claims Administrator with adverse

4     findings.  75 percent of her diagnoses were for Alzheimer's

5     and all of the claimants she diagnosed were represented by the

6     same law firm, Smith & Stallworth.

7          Smith & Stallworth is a firm in Florida, and the

8     Claims Administrator has found evidence that some of the

9     responses submitted by Smith & Stallworth to the Claims

10    Administrator in connection with audits contained false

11    information including false information about claimants'

12    employment and their purported functional abilities.

13         The Claims Administrator also described that Smith &

14    Stallworth inexplicably charged players higher fees if they

15    received an Alzheimer's diagnosis as opposed to Level 1.5 or a

16    Level 2, which obviously created a financial incentive for the

17    law firm to secure Alzheimer's diagnoses for its clients.

18         And then in turn, those claimants were evaluated by

19    Dr. Andrews, the pediatric neurologist, and lo and behold, Dr.

20    Andrews diagnosed 36 of the 48 claimants with Alzheimer's and

21    all 36 of those were for early onset Alzheimer's, which is a

22    rare condition.

23         I would also point out that Dr. Andrews alone

24    accounts for nearly one-third of all the early onset

25    Alzheimer's claims to date.

Tarlowe - Argument                                                27

 1          And so even if as I know co-lead class counsel and

 2     others have contended that the -- the occurrence -- the rate

 3     of early onset might be different among this population, you

 4     would not expect one doctor to be responsible for one-third of

 5     all the early onset diagnoses.

 6          Dr. Andrews certified to the accuracy of her

 7     statements under penalty of perjury and as I mentioned

 8     earlier, 21 of the 48 claims relying on her diagnoses included

 9     identical vital signs across different players and we grouped

10     these by the identical vital signs.

11          You can see here, Judge, that for those groups of

12     players the blood pressure, the pulse rate, respiration rate

13     -- identical.  And the Claims Administrator consulted with an

14     independent expert who advised the Claims Administrator as

15     detailed in the report that this is simply impossible.

16          Now, as was the case with Dr. Hoover, again, there

17     is some evidence that some of the claimants evaluated by Dr.

18     Andrews may -- may have been complicit, and this requires

19     further investigation.  26 of the 48 claimants traveled to

20     Florida to see Dr. Andrews from other states.

21          Again, what's significant about that here is these

22     are claimants many of whom purportedly have Alzheimer's, they

23     live in states like Texas and New York and California where

24     they undoubtedly have access to highly qualified physicians,

25     but they're traveling to Florida to be evaluated by a

1    pediatric neurologist.

2            And among the claimants diagnosed with Alzheimer's

3    by Dr. Andrews are people who are working as a fixed income

4    analyst at an investment bank, the head coach of a high school

5    football team, the head coach of a minor league football team,

6    a forklift operator, an Uber driver and the CEO of a

7    technology startup.

8            And just to provide a couple of examples of some of

9    these players in a little bit more detail, one player was

10   diagnosed with Alzheimer's by Dr. Andrews in June of 2016.

11   The Claims Administrator was conducting an audit of this claim

12   and asked for some clarification about the player's

13   employment.

14           In response, Smith & Stallworth, the law firm

15   representing the player, reported the following.  "At the time

16   of his evaluation" -- so in June of 2016 -- "the player had

17   discontinued coaching football formally and had to relinquish

18   all administrative work to the several school coaches due to

19   his deteriorating cognitive condition."

20           "He was able to simply oversee the high school's

21   audio-visual weekday morning show whereby he merely monitored

22   the students filming morning announcements."

23           But in fact, there's evidence that this player

24   continued to serve as the head coach of the same high school

25   football team more than a year later.

1              There are a number of videos available online in

2     which he's talking about his head coaching responsibilities

3     and there are various articles quoting him as the head coach

4     talking about the team's recent games.

5              Another player who was diagnosed with Alzheimer's by

6     Dr. Andrews in 2016 reported as part of his evaluation that he

7     has withdrawn himself from social interactions due to anxiety

8     and panic-like episodes, has withdrawn from people and has no

9     ability to get out or meet anyone.

10             We found on his social media pages however that in

11    February of 2017, which is about a year after the evaluation,

12    he was attending All Star weekend and celebrating Mardi Gras

13    in New Orleans.  You can see the post on the right.  He wrote,

14    "All Star weekend and new friends."

15             He also posted several months later several images

16    and videos from a trip to Las Vegas including video at a pool

17    party, attending a boxing match and celebrating on a -- on a

18    party bus.

19             THE COURT:  He hasn't used an award from the NFL for

20    any of this, I assume?

21             MR. TARLOWE:  That is correct, Judge, yes.

22             THE COURT:  Okay.

23             MR. TARLOWE:  And then finally, Judge, just to spend

24    a moment on Legacy Pro Sports, an entity I know the Court has

25    previously heard about, this is claim service entity in

1    Florida that assists former players in obtaining benefits and

2    they have been retained by over 300 retired players who have

3    registered in the program.

4         As the Court may recall, the Court authorized

5    discovery of text messages and other communications at the

6    request of co-lead class counsel and those communications

7    reveal evidence that Legacy Pro Sports was attempting to coach

8    players on how to approach their neuropsychological testing in

9    order to secure a qualifying diagnoses.

10        And, that they were steering players to particular

11   doctors that they claimed to have associations with.  By way

12   of example, this is a text message between someone associated

13   with Legacy Pro Sports and a retired player whose name we've

14   -- we blocked out.

15        And the person from Legacy Pro Sports wrote, "The

16   doctors and myself went through your reports and we found some

17   things that we think we can take advantage of so you can pass

18   the test the second go-around."

19        Here's another text message between Legacy Pro

20   Sports and a retired player in which the person from Legacy

21   Pro Sports said, "You're probably one of the most intelligent

22   clients I have.  Your odds aren't as high as some other guys I

23   have, but you're smart enough to perform the right way as

24   well."

25        The retired player replied, "That's what I'm saying,

1    I can do what I need to do.  Just let me know what I need to

2    do."  And Legacy Pro Sports responded, "We will, brother, a

3    few days before it's game time, lol."

4            As I mentioned, there's also evidence of Legacy Pro

5    Sports steering retired players to particular physicians.  You

6    can see in this text message Legacy Pro Sports told a retired

7    player, "We have our own doctors, we have got an inside-the-

8    BAP, that's why our situation is better.  Unlike the majority

9    of the folks, you won't have to go to those NFL-side doctors

10   with us."

11           Finally, there's an email exchange between someone

12   from Legacy Pro Sports and a retired player in which they're

13   talking about a particular physician, and the top email, the

14   person from Legacy Pro Sports wrote, "Sounds good.  He" --

15   meaning the doctor -- "is a super close friend, so I see him

16   every Wednesday for tennis so it would be easy to make him

17   accountable."  Again, Judge, these are just things that

18   require further investigation and follow up.

19           So the Special Investigator, what will the role of

20   the Special Investigator be?  Well, we think the Special

21   Investigator can assist the Claims Administrator as needed,

22   including by providing additional investigative tools and

23   resources to help conduct audit investigations, including

24   issuing subpoenas, in taking testimony from potentially

25   hostile witnesses.

1          Now, the Special Masters previously determined that

2     it made sense for the Claims Administrator to have certain

3     powers like compelling testimony or issuing subpoenas, and we

4     think that the Special Investigator is best equipped to take

5     those types of additional investigative steps.

6          In addition, I mentioned this earlier, but we

7     envision the Special Investigator as assisting the Special

8     Masters and the Court as needed by providing additional

9     investigative tools and resources to investigate the claims

10    that are referred to the Special Masters based on the adverse

11    audit findings by the Claims Administrator.

12         And as I mentioned earlier, Your Honor, this is

13    where the Claims Administrator ceases its investigation once

14    it determines that there's a reasonable basis to support a

15    finding of material misrepresentation or omission.

16         The Claims Administrator has identified specific

17    additional investigative steps that it believes would be

18    valuable in helping the Special Masters discharge their

19    responsibilities, namely evaluating whether people acted with

20    intent and determining which remedies are appropriate.

21         And as it now stands, the Special Masters have that

22    task and that responsibility, but really don't have the

23    investigative tools or resources in order to carry out that

24    responsibility, in addition to all of its others -- their

25    other significant responsibilities.

1            And so we think this is where the Special

2    Investigator can be especially valuable in lending its

3    expertise, resources and investigative tools in conducting

4    those additional investigative steps, and then turning over

5    its findings to the Special Masters to determine intent and

6    appropriate remedies.

7            And so the Special Investigator can help address

8    questions of intent, can help identify participants in

9    fraudulent conduct and we think it would be advisable for the

10   Special Investigator to provide reports on its findings to the

11   Special Masters, including recommendations for appropriate

12   remedies.

13           Again, this is just a matter of arming the Special

14   Masters and the Court with the investigative resources and

15   tools needed to carry out their existing responsibilities

16   under the settlement agreement.

17           The Special Investigator we believe should be

18   entirely independent of the parties, should be selected by the

19   Court, should have the authority to issue subpoenas, compel

20   and take testimony and exercise other powers permitted or

21   authorized under Rule 53.

22           And, we think the Special Investigator should report

23   directly to the Court and the Special Masters and work in

24   consultation with the Claims Administrator, and, we think it

25   would be advisable for the Special Investigator to provide

 1  regular status updates to the Court.

 2          But again, Judge, I said it a few times but just to

 3  -- just to emphasize, the bottom line here is there really

 4  cannot be any reasonable dispute that there is significant

 5  evidence of fraud.

 6          Whether it's fraud or not remains to be seen, and

 7  the Special Investigator is necessary to carry out those

 8  investigations and to enable -- to help the Special Masters

 9  and if needed, the Claims Administrator, in carrying out their

10  responsibilities.

11          This will result in no delay, it will help relieve

12  the burden that's been imposed on the Special Masters and the

13  Claims Administrator because of the extraordinary number of

14  potentially fraudulent claims, and we think ultimately serves

15  the objective that we all share, which is to ensure that

16  players who have valid claims are paid in full and in a timely

17  manner.

18          THE COURT:  Thank you very much.

19          MR. TARLOWE:  Thank you, Your Honor.

20          THE COURT:  Okay, do you wish to be heard, Mr.

21  Seeger?

22          MR. SEEGER:  Yes, Your Honor.  So, I mean, I'm glad

23  we started with the context of where the case is because it's

24  very important.  This happens to be one negative piece

25  obviously we're here for, but as you heard from I believe

1    Mr. --

2              THE COURT:  This is not surprising.

3              MR. SEEGER:  Yeah.

4              THE COURT:  I mean --

5              MR. SEEGER:  No, and it's common.  I mean, I hate to

6    -- I hate to say this, but I've been involved with enough

7    settlements where this is always some kind of an issue.  And I

8    want to be really clear up front that we didn't object to the

9    appointment of the Special Investigator simply because there

10   was enough suspicious activity to justify getting these claims

11   out of the system and separately investigated.

12             Is it widespread and rampant?  I don't agree with

13   the NFL on that.  I don't think there's evidence that it's

14   widespread, but it's significant enough where it should be

15   looked at, I agree with that.

16             THE COURT:  Well, the Court has a responsibility to

17   see that there aren't fraud -- that no claims are fraudulent.

18             MR. SEEGER:  Nobody -- nobody has an interest in

19   fraud succeeding.

20             THE COURT:  Of course not.

21             MR. SEEGER:  Fraud threatens legitimate claims.  It

22   threatens the integrity of the settlement.  If people don't

23   understand that, they need to just go and look at BP and cases

24   where defendants themselves have asked Courts to consider

25   allowing them out of their settlements.

1            There's risk here for legitimate claims and I,

2    obviously as class counsel, have to protect the class and the

3    legitimate claims.  I'm a little bit disturbed and I don't

4    mean this necessarily as a -- as a swipe, but I didn't know

5    that there was going to be video and images displayed of

6    players on the screen.

7            I know that the motion was filed.  Everybody got

8    notice of it.  These particular players are represented by

9    independent counsel.  I don't know if they're in the courtroom

10   today.

11           I would hope that since players -- you know, certain

12   counsel and players were called out in the papers, they would

13   have been here to object.  I was tempted to, but -- and I

14   actually am standing here --

15           THE COURT:  Well, this is just a -- this is just a

16   threshold presentation, this is not --

17           MR. SEEGER:  I understand.  But I would ask that --

18           THE COURT:  -- this is nothing definitive.

19           MR. SEEGER:  -- be sealed.

20           THE COURT:  Okay, I will seal --

21           MR. SEEGER:  You know, that not be given out.

22           THE COURT:  -- those parts that -- Jim, those parts

23   that are --

24           MR. SEEGER:  Identify the player in any way.

25           THE COURT:  -- identify the player.  But frankly,

1    that can't -- that's not going to be on the ECF --

2            MR. SEEGER:  Yeah.

3            THE COURT:  -- because it can't be.

4            MR. SEEGER:  Thank you, Your Honor.  Okay, so again,

5    just to get back to my -- I know I only have ten minutes and

6    I'll be -- I'll get through it.  You know, the context here is

7    very good, that we were off to a slow start, the suspicious

8    claims and the audits did take the dementia claims for a while

9    and slow them down.

10           But, we're standing here today with about $440

11   million of claims approved for payment.  That's significant

12   because that figure exceeds what we had projected in the first

13   three -- I think five years of the settlement, and that's

14   where we are in the first year.  So, you know, the claims are

15   getting paid and things are back on track.  That's a good

16   thing.

17           The other good thing is that I have never been

18   involved in a settlement with the amount of oversight and

19   qualified people looking -- taking care of this case as this

20   particular case.

21           First it all starts with Your Honor, and I think

22   that people are how aware of how active you have been, not

23   just with the parties, but you have had us in chambers on a

24   number of issues.  You have told us when you thought you were

25   doing a good job, when you thought we were doing a bad job,

1    where you felt we had to step up and do better, and we've

2    heard you.

3              In addition to Your Honor, I haven't -- I've never

4    been involved in a case where a Special Master has put as much

5    time into the case as Jo-Ann Verrier has, and she is always

6    available for us when there are questions.

7              THE COURT:  And also Wendell --

8              MR. SEEGER:  And Wendell.

9              THE COURT:  -- Pritchett.

10             MR. SEEGER:  I don't speak as much to Wendell, but

11   he is always available --

12             THE COURT:  No, she's --

13             MR. SEEGER:  -- and he's always there.

14             THE COURT:  -- she's --

15             MR. SEEGER:  I am often communication with Ms.

16   Verrier and frankly, I believe that BrownGreer is the gold

17   standard for administering these settlements --

18             THE COURT:  Absolutely.

19             MR. SEEGER:  -- and that is why you approved them

20   and we had recommended them, so I want to be clear.  Now, the

21   other thing I think we have to be really clear about is that

22   these analytics that took these claims from -- you know, that

23   were being filed and put them into the audit queue were

24   designed by the parties, but specifically by Mr. Brown and his

25   crew because of their vast experience in identifying what I

1    will call suspicious claims because I don't think we've seen

2    evidence of fraud yet, at least not -- and clearly not at the

3    criminal level.

4              THE COURT:  Well of course somebody could be playing

5    having -- have Alzheimer's and still do what some of these

6    people are doing.

7              MR. SEEGER:  Like I said, there's some suspicious

8    activity, somebody needs to look into it.  I couldn't verify

9    dates on that so I don't want to debate the merits of any

10   particular case right now, I'm not in a position to do it.

11             But I am in the position to talk about how well the

12   settlement is doing overall and the extensive oversight that

13   the people that you've appointed and the good job they're

14   doing, so let's be really clear about that.  And the audit

15   protocols have worked.

16             I mean, I could be a little off, Mr. Brown, on these

17   numbers but I think nearly 900 claims were put into an audit

18   at one point -- the number could be a little higher.  I think

19   about 300 of those claims have come out of audit and are now

20   being processed, so every claim going into audit is not

21   suspicious of fraud.  Every claim being audited is not --

22             THE COURT:  Well ten percent gets audited

23   automatically --

24             MR. SEEGER:  Automatically.

25             THE COURT:  -- am I correct about that?

1            MR. BROWN:  That's right, Your Honor.

2            THE COURT:  Yes.

3            MR. SEEGER:  And the analytics that I'm talking

4    about to really be clear, are on top of the ten percent random

5    audit that says is there something suspicious going on and if

6    there are, let's take a closer look.

7            Claims, frankly to be really fair to the settlement,

8    claims have been flagged as suspicious and have gone through

9    with no problem.  They've gone right back in, they have been

10   determined to be okay claims, gone back into the system and

11   are getting processed and paid.

12           So look, at the end of the day I do not anticipate

13   that this is going to uncover any kind of widespread or

14   rampant fraud.

15           But having said that, if -- I wouldn't want to see

16   the NFL spend $1 on a fraudulent claim, I wouldn't want to see

17   one lawyer get a fee based on a fraudulent claim.

18           But I will say this in terms of controlling whatever

19   you decide to do here, Your Honor, I have absolutely seen zero

20   evidence that players are implicated.

21           I believe that if a player has been involved in a

22   fraudulent or suspicious claim, it's because they were led

23   there by their counsel -- I'm just going to put it right out

24   there -- or some doctor.

25           I really would like the Court to limit the

 1    investigation to lawyers and doctors that may have been

 2    involved with these suspicious claims and not look to

 3    prosecute the players who are -- would be a victim in my view.

 4              THE COURT:  Well, it could start with one and then

 5    move but or it could not.

 6              MR. SEEGER:  Yeah.

 7              THE COURT:  We may not -- it may be premature, we

 8    may need in a little while and not need it now.

 9              MR. SEEGER:  It could be.  I hope not.  Thank you,

10    Your Honor.

11              THE COURT:  Okay, thank you.

12              Okay, Mr. Locks, did you want to say anything or --

13    or not?

14              MR. LOCKS:  Mr. Weinshall is going first --

15              THE COURT:  Oh okay.

16              MR. LOCKS:  -- and then I do --

17              THE COURT:  Okay, all right, fine.

18              MR. LOCKS:  -- want to say something, Judge.

19              THE COURT:  Okay.  Please introduce yourself.

20              MR. WEINSHALL:  Take me a second, Your Honor.

21              THE COURT:  No problem.

22              MR. WEINSHALL:  Good morning, Your Honor, Matt

23    Weinshall of Podhurst Orseck --

24              THE COURT:  Oh, okay.  All right.

25              MR. WEINSHALL:  -- class counsel.  Thank you.  We

1    appreciate the opportunity to address the Court.  I'd like to

2    address three reasons that we believe exist to deny the NFL's

3    motion, some of which expand on co-lead counsel's points.

4            The first is the negotiated fraud detection and

5    investigation apparatus and system is working, and working

6    well.  The second is that the NFL exaggerates the scope of the

7    fraud in the settlement.  And the third is that the NFL's

8    solution to this exaggerated problem is unprecedented and will

9    impede legitimate claims.

10           It will deter legitimate conduct, it will discourage

11   doctors from participating, it will discourage lawyers from

12   participating, and that will hurt the players.

13           So on the first issue, the anti-fraud apparatus in

14   the settlement, to be clear, we had absolutely no tolerance

15   for fraud in the settlement.

16           That's why we negotiated and agreed to the robust

17   anti-fraud measures that are in the settlement with the audit

18   procedures, with the Special Masters, and the NFL's motion

19   however largely overlooks the apparatus that exists to detect

20   fraud, to make sure that there are severe consequences for

21   those who have engaged in any fraud or misstatement or any

22   misconduct.

23           And I just wanted to draw the attention of the Court

24   to the rules governing the audit of claims which we cited in

25   our response which the NFL does not address.

1            Rule 17 allows the co-lead counsel and the NFL

2    parties, after an adverse audit report is produced by the

3    Claims Administrator and referred to the Special Master, it

4    allows the co-lead counsel and it allows the NFL parties to

5    petition the Special Master to do an additional investigation.

6            It says, "the recommendation that the Special

7    Masters direct additional investigation or order further

8    relief."

9            THE COURT:  What section is that?

10           MR. WEINSHALL:  That's Rule 17 of the rules

11   governing the audit of claims.

12           THE COURT:  Okay.

13           MR. WEINSHALL:  So there's already a procedure in

14   place for the NFL if it thinks that a further investigation is

15   necessary and to any conduct discovered by the audit

16   procedures to go to the Special Master and request an

17   additional investigation be performed by the Claims

18   Administrator.

19           In addition, Rule 21 allows co-lead counsel and the

20   NFL parties to file a reply once the party that's involved in

21   the audit files a response to the audit.

22           And significantly, Rule 22 already authorizes the

23   Special Master, "The Special Masters may at any time direct

24   any party to the audit proceeding, the Claims Administrator

25   and any other person or entity whose participation or response

1    is deemed necessary to submit additional memoranda or

2    material."

3              So the Special Masters already have the power to

4    collect additional evidence, to conduct investigations, to

5    order investigations be performed, and if anything, this

6    should be occurring on a case-by-case basis.

7              THE COURT:  Well, I think their argument is that

8    they need another tool, that this is just an additional tool.

9    I think that's what was presented to me.  You do not believe

10   that it would be -- could be a helpful additional tool?

11             MR. WEINSHALL:  Well, I think the tools exist

12   already.  I don't think it's necessary to --

13             THE COURT:  Well, yes -- it doesn't say whom to go

14   to, it just simply says they can do it.

15             MR. WEINSHALL:  Right.  If the investigator is

16   simply an arm of the Special Master whose only authority is to

17   do what the Special Master directs, then it's fine, it sort of

18   exists already within the settlement.

19             But if what the -- and it's not clear from the NFL's

20   motion exactly what they're seeking because they seek they say

21   without limitation the authority --

22             THE COURT:  That's helpful.

23             MR. WEINSHALL:  -- is to investigate anything.

24             THE COURT:  Okay.

25             MR. WEINSHALL:  But if it's simply to conduct an

1   investigation that the Special Master directs should be

2   conducted, you know, we think the Claims Administrator is more

3   than capable of doing that.

4           The Claims Administrator has uncovered

5   misrepresentations or omissions that the NFL presented in its

6   presentation, so our -- our first sort of proposal would be

7   for the Claims Administrator to do that work.

8           If the Court believes a separate entity needs to be

9   appointed to do the work, then it should be someone who works

10  -- not just reports to the Special Master, but only engages in

11  an investigation that the Special Master after some sort of

12  presentation after a threshold is met, believes should be

13  conducted.

14          THE COURT:  Okay.  Or the Court.

15          MR. WEINSHALL:  Or the Court, of course.  Of course

16  or the Court.  So we think the system is working and I think

17  that the NFL's presentation is proof of that.  All the

18  evidence that the NFL presented was uncovered by the Claims

19  Administrator, has been presented to the Special Masters and

20  as -- and the Court hit the nail on the head, none of those

21  claims have been paid.

22          Those claims have been either denied or the players

23  have been required to get retesting and certain doctors have

24  been excluded.  So the claims -- it's working right now.

25          Why introduce, especially if it's to introduce a

1    separate authority who has authority to delay claims, who has

2    authority to burden players, to burden doctors, to burden

3    lawyers with an investigation, why do that when the -- the

4    system that's in place is already uncovering the problems that

5    the NFL says exist?

6          THE COURT:  So you're saying to me your position is

7    that if the Claims Administrator and or the Special Master

8    believe this is necessary, then I should appoint someone?

9          MR. WEINSHALL:  We think that this -- that

10   absolutely the Special Master and the Claims Administrator

11   should be heard on this issue, that if they think that they

12   need additional resources to do a certain task, then they

13   should get those resources.

14         But at most, it should be resources that are under

15   their direction and that only perform the tasks that they

16   recommend.  So if the Claims Administrator and Special Master

17   think that it would help them to do their jobs to have another

18   group reporting to them that does what they direct, you know,

19   it would be -- it would be difficult for us to oppose that.

20         And so that's why, you know, ultimately when the NFL

21   claims that the fraud claims clog the system and that this

22   will simply relieve the burden of the Claims Administrator, I

23   think we need to hear from the Claims Administrator and we

24   need to hear whether the Claims Administrator not just does

25   not object, because that's what the NFL is relying on, but

1   whether the Claims Administrator actually recommends the

2   appointment of a separate group to do the work that the Claims

3   Administrator is already doing very well.

4           THE COURT:  Well, the Claims Administrator can

5   either communicate that today or speak with me after this, and

6   I would certainly have an open ear to the position of the

7   Claims Administrator and the Special Master.

8           MR. WEINSHALL:  Right.  Thank you, Your Honor.  And,

9   you know, we -- I think just, you know, for the benefit of the

10  class to be able to hear from the Claims Administrator and

11  whether it's a filing or in Court, I think would help, you

12  know, be able to -- would help us convey the message to

13  players of what's happened and -- and why if anything is

14  changing it has happened.

15          THE COURT:  Okay.

16          MR. WEINSHALL:  So moving on to the second point

17  which is the exaggeration of the problem, you know, the NFL

18  points to the number of claims -- the percentage of claims

19  that are under audit.

20          But ultimately there's just a few sort of

21  questionable actors.  I'm hesitant to say bad actors in all

22  these cases because we don't know the full --

23          THE COURT:  You can say it.

24          MR. WEINSHALL:  -- you know, scope.  But there

25  certainly are -- there do seem to be some bad actors but --

1          THE COURT:  Well, Hoover has already been

2     determined --

3          MR. WEINSHALL:  Correct.

4          THE COURT:  -- Dr. Hoover has already been

5     determined to be a bad actor.

6          MR. WEINSHALL:  Correct, correct.  And so Dr. Hoover

7     for example effected I think it was 139 claims, so when you --

8     when you look at the percentage of claims that are under audit

9     or the percentage of claims that are affected, it's really

10    magnified just because one doctor has reviewed so many claims.

11         It's not that 46 percent of the claims involved

12    misconduct by the attorneys involved in all of those claims or

13    the players -- certainly not the players involved in all those

14    claims.  As the Court pointed out, you know, one player out of

15    20,000 has been the subject perhaps of an adverse audit

16    report.

17         In the NFL's presentation itself maybe there's seven

18    or eight players out of the 20,000 and out of 2,000-something

19    claims that were submitted, so it's not as widespread as the

20    NFL claims.  There's really if you look at the numbers, I

21    counted in the NFL's motion simply six doctors, one claims

22    service provider and three attorneys.

23         And it looks so far of the eight adverse audit

24    reports so far, they effected 439 claims so it's eight

25    instances of -- of questionable conduct that affected

 1   obviously a large amount of claims because, you know, players

 2   go to the doctors, they rely on the doctors to provide an

 3   honest recommendation as to what their condition is and it's

 4   certainly not a player's fault if a doctor gets it wrong or --

 5   or does something inappropriate.

 6        THE COURT:  Would you like to conclude?

 7        MR. WEINSHALL:  Yes.  And the third issue is the

 8   unprecedented and problematic nature of the NFL's request.

 9   The cases they rely on don't support an unbounded

10   investigator.

11        The BP case was a very specific issue that the

12   investigator looked at, and then the investigator was then

13   directed by the Claims Administrator to look at specific

14   claims.

15        It's not an unbounded investigation which seems to

16   be what the NFL was asking for.  Engle was also a very

17   specific number of cases --

18        THE COURT:  I don't know yet what -- specifically

19   what they were asking for.

20        MR. WEINSHALL:  Right.  And again, our big concern

21   is burdening doctors, discouraging doctors, discouraging

22   mostly doctors but also the lawyers from participating.

23        If there's a constant investigation of conduct that

24   -- that just raises, you know, a small question that then

25   leads to a massive investigation every time by an investigator

1    that's not checked by the Special Master or the Claims

2    Administrator, no doctor in his right mind is going to

3    participate in the program.

4            THE COURT:  This is a very, very narrow question

5    because you can't choose your own doctors after the effective

6    date so it's not really an issue.

7            MR. WEINSHALL:  I agree, I think it's mostly a pre-

8    effective date --

9            THE COURT:  I mean, this is a very -- this is an

10   issue that may exist now but I think may not exist in the

11   very, very near future.

12           MR. WEINSHALL:  I agree, Your Honor.  I think -- I

13   think -- and as the Court suggested with this quote that the

14   NFL relies on, you know, the Court suggested "as needed" an

15   investigator would be appointed.

16           That to me suggests a case-by-case approach where if

17   the NFL makes a showing that a particular case requires

18   additional investigation, perhaps there should be an

19   additional investigation there.

20           THE COURT:  Thank you very much.

21           MR. WEINSHALL:  Thank you, Your Honor.

22           THE COURT:  Okay, do you want to be hear, Mr. Locks?

23           MR. LOCKS:  Yes, please.  Judge, I am going to

24   articulate why you do not need a Special Investigator now.

25   However, I think I have to start by responding to some of the

1    negative comments made by the NFL about myself having a

2    vociferous and public lawyer creating problems, which they

3    have in their papers, that I have only my self-interest at

4    heart and my self-interest is to get the players paid, that

5    they talk about the fact that I have some audits --

6              THE COURT:  In this -- in this action?

7              MR. LOCKS:  In this -- pleadings.

8              THE COURT:  No, I'm talking about the pleadings

9    relating to this issue?

10             MR. LOCKS:  Yes, yes.  They have said that I have my

11   self-interest because I oppose this, and that's nonsense.

12   That's the same kind of comments the NFL has had for years,

13   maybe if we talk about fraud -- who knows.  They say that I

14   have some of my claims in audit.

15             Well, that's true because I filed a lot of claims.

16   But, I have no adverse audit finding and I've had almost 30

17   claims in audit and only two are left.  So, Judge, I start by

18   making it clear that any accusation of self-interest is part

19   of my motivation here -- it's not.

20             Now, I think that the presentation today makes it

21   absolutely clear why you don't need a Special Investigator.

22   Because of the remarkable job the Claims Administrator and the

23   Special Masters have done so far, they have uncovered the

24   problem, they've addressed the problem and the problem is

25   practically over, and I will statically tell you why at the

1    end of my remarks.

2              THE COURT:  Ten minutes.

3              MR. LOCKS:  I will make it ten minutes, Judge, I

4    promise you.

5              THE COURT:  Okay.

6              MR. LOCKS:  Because if you look at how many

7    investigations they have, what the results are, where they

8    stand in the queue, they have identified the problem, they've

9    identified the fraudulent type behavior, and the people who

10   can make that decision are sitting in the courtroom in the

11   Special Master.

12             They can tell if it's fraud or not.  Just as Justice

13   Powell once said of pornography, I don't know what it means

14   but when I see it, I know it.  You can look at any one of

15   these cases and determine if it's fraud or not and you don't

16   need another cop hired by the NFL or asked for by the NFL to

17   make that decision.  You've got competent people who can do

18   it.

19             Now, here's why I think the problem is practically

20   over.  90-plus percent of the issues are pre-effective date

21   matters.  In the groupings that have occurred, they're pre-

22   effective date claimants and the groups they've identified,

23   the eight or nine groups of lawyers or doctors already going

24   forward, there are not that many claims that could possibly

25   arise as have risen in the past.

1            If you look at the statistics there have been over

2    1,800 claims filed.  Over 400 of them have been paid.  I can

3    get the specifics because there is a report.  That leaves only

4    1,400 claims.  2 -- 300 almost have been denied.  That leaves

5    1,100 claims.

6            A portion of those claims are pro se people,

7    probably 100 to 150 or more.  That brings you down to almost

8    maximum currently 1,000 claims of which 670 are presently in

9    audit and only 300 are still being reviewed.

10           So they are reviewing every single claim that exists

11   today and the only claims that can come back in the future are

12   BAP-type claims.  And if somebody can tell me how you can take

13   a BAP claim and make it into a massive amount of widespread

14   fraud, then they're going to have to invent something that

15   can't possibly happen.

16           All I can say, Judge, you don't need a Special

17   Investigator now.  On a specific case or a specific occasion,

18   if the Special Master thinks it's appropriate, they can ask

19   for that case or that circumstance.  Thank you.

20           THE COURT:  Thank you very much.

21           Okay, there's no need for -- there's no need for

22   response, is there?

23           MR. TARLOWE:  No, Your Honor.

24           THE COURT:  Okay.  All right.  Do you want to be

25   heard, Mr. Brown or Ms. Verrier?

 1            MR. BROWN:  Good afternoon, Your Honor.

 2            THE COURT:  Good afternoon.

 3            MR. BROWN:  I'm Orran Brown from BrownGreer and with

 4    me today is Bethany Anderson, who's head of our Special

 5    Investigations Team that handles these audit studies.  And of

 6    course, Your Honor, we will cooperate fully with whatever the

 7    Court determines is appropriate to do here.

 8            We will provide whatever information and findings or

 9    assistance and work with whoever or whatever the Court --

10            THE COURT:  You certainly have done that, Mr. Brown,

11    there's no question about that.

12            MR. BROWN:  From what you've heard today I think it

13    does show us that our job as Claims Administrator is to

14    determine whether a player has the medical conditions that are

15    eligible for payment under the terms of this settlement

16    agreement.  If they do, we pay them.  If they do not, we

17    cannot pay them.

18            That is our fundamental responsibility and so our --

19    our processes is to try to determine whether the players'

20    diagnoses are genuine and whether they really have these

21    conditions, that has led us in many directions to determine

22    whether these pre-effective date -- largely pre-effective date

23    diagnoses that we received in large volumes, whether they were

24    credible, reliable, genuine diagnoses or whether they were

25    not.

1              And as you've heard, we feel like many were not.

2    They were set up in this sort of assembly line process to --

3    it had sort of an orchestrated result, almost a predetermined

4    result --

5              THE COURT:  If I'm not -- I understand that one of

6    them -- one of the doctors performed these examinations in the

7    lawyer's offices.

8              MR. BROWN:  We have had some in offices and hotel

9    rooms --

10             THE COURT:  That's questionable.

11             MR. BROWN:  -- which is a big no-no under the

12   settlement agreement in a non-clinical setting, and that's a

13   red flag.  There are many things that we look at that trigger

14   our further analysis about whether the diagnoses are genuine.

15             And we feel like we have the processes and resources

16   in place to prevent improper payments so we take it up to the

17   point -- as Mr. Tarlowe said -- of determining whether there's

18   a reasonable basis for concluding there's a misrepresentation

19   or an omission of a material fact.

20             And if we feel there is we report it to the parties,

21   it goes to the Special Masters and eventually there's a lot of

22   due process to air that.

23             But if there is a reasonable basis for a

24   misrepresentation or omission of a material fact, the claim

25   does not get paid.  Those players can come back and get a

1    genuine diagnosis and let's find out if they really have the

2    conditions.

3              We also know enough to say that we can turn off some

4    of the sources of suspicious claims at the source and that is

5    by banning a law firm or a doctor or neuropsychologist from

6    the program so that we stop the process from generating these

7    assembly line claims.  And so we're -- we're handling that.

8              Now, if the Court or the Special Masters felt like

9    it needed to go further and investigate intent, whether

10   there's a specific intent to deceive because there may be more

11   aggressive remedies, there may be disbarment or lose your --

12   your medical license or disgorge fees or sanctions, any -- or

13   report to the DOJ for criminal prosecution, those elevated

14   remedies, if they require more of an elevated examination of

15   intent, then the question is who's going to do that.

16             Who's going to go further than we need to go to

17   determine that the claim's not payable, and there's where you

18   end up talking about whether the two Special Masters who are

19   neutral fiduciaries, whether we as a neutral fiduciary Claims

20   Administrator take on that prosecutorial hat and turn into

21   more of an adversarial process which is a little different

22   from what normally -- a lot different from what a fiduciary

23   normally does.

24             So if there's going to be that further investigation

25   of intent, then I think the Special Masters and the Court

1    might determine that it needs to be someone else who's the

2    tool doing that.  And then the question is is it necessary to

3    do that, do we need to go that far -- look at intent.

4           The questions there that have been presented are is

5    it necessary as a deterrent, is it necessary as kind of a

6    penalty for doing this to this process and abusing the

7    process.

8           Because some of the soft spot in the settlement from

9    the pre-effective date diagnoses as the Court mentioned, that

10   vulnerability has been closed because you can no longer go to

11   a doctor of your own choosing, you have to go to the BAP or

12   the MAF to get a diagnosis.

13          So the soft spot from the pre-effective date

14   diagnoses that we're dealing with and you've heard a lot

15   about, that door is closed by now and so the question is do we

16   need to keep digging further on what happened in that

17   situation because that situation doesn't exist anymore.

18          And then the question then becomes one of penalty,

19   do we need to escalate the remedies, is it making an example,

20   is it something that the Court and the program simply will not

21   tolerate, and that's where I think the idea of having an

22   additional tool that the Court and the Special Masters could

23   use when necessary would come into play.

24          THE COURT:  Okay.  I appreciate that and I

25   appreciate basically your offering your input to the Court in

1    determining that issue.

2              MR. BROWN:  Thank you, Your Honor.

3              THE COURT:  Okay.  All right, thank you very much.

4    Is there any further -- I do have a couple things I'd like to

5    speak with the lawyers for the NFL and the lead counsel if you

6    don't mind for a minute, and then, Mr. Locks, I would like to

7    speak with you on another issue if that's -- if you have time.

8    Is that okay?

9              MR. LOCKS:  Yup.

10             THE COURT:  Okay, thank you.  All right.  Mr. Locks

11   is looking into this third-party funder issue so I would like

12   to speak with him about how far he's gone.

13             Okay, thank you.

14             ALL COUNSEL:  Thank you, Your Honor.

15             THE COURT:  Why don't you come forward?

16             (Matter concluded, 12:18 p.m.)

17                          * * *

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2

3                I, Diane Gallagher, court approved transcriber,

4     certify that the foregoing is a correct transcript from the

5     official electronic sound recording of the proceedings in the

6     above-entitled matter.

7

8     _____          _____

9     DIANE GALLAGHER                          DATE

10    DIANA DOMAN TRANSCRIBING, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25