**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | No. 2:12-md-02323-AB |
| IN RE NATIONAL FOOTBALL LEAGUE | : | MDL No. 2323 |
| PLAYERS' CONCUSSION INJURY LITIGATION | : | |
| | : | Hon. Anita B. Brody |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS; 1:18-cv-0464-AB | : | |
| | : | |
| | : | |
| A.H., a minor child, by her guardian and parent | : | |
| Shayanna Jenkins Hernandez | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL FOOTBALL LEAGUE; THE | : | |
| NATIONAL FOOTBALL LEAGUE FOUNDATION | : | |
| (individually and as successor in interest to NFL | : | |
| CHARITIES); NFL PROPERTIES, LLC | : | |
| (individually and as successor in interest to NFL | : | |
| PROPERTIES, INC.); RIDDELL, INC., RIDDELL | : | |
| SPORTS GROUP, INC.; ALL AMERICAN | : | |
| SPORTS CORP; BRG SPORTS CORP. | : | |
| f/k/a Easton-Bell Sports, Inc.; BRG | : | |
| SPORTS, LLC f/k/a Easton Bell Sports, LLC; BRG | : | |
| SPORTS HOLDINGS CORP. f/k/a RBG | : | |
| Holdings Corp., | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S MOTION TO REMAND AND**
**INCORPORATED MEMORANDUM OF LAW**

Bradford R. Sohn, Esq.
Admitted *Pro Hac Vice*
The Brad Sohn Law Firm, PLLC
2600 S. Douglas Road, Suite 1007
Coral Gables, FL 33134
786.708.9750 Office
305.397.0650 Facsimile

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 2

BACKGROUND ............................................................................................................. 3

   I.   THE PERTINENT FACTS ALLEGED IN THE COMPLAINT ...................................... 3

   II.  THE CLAIMS ASSERTED AGAINST DEFENDANTS NFL, NFL P, NFL C, AND
RIDDELL ................................................................................................................... 7

ARGUMENT ................................................................................................................... 9

   I.   THE REMOVAL NOTICE IMPROPERLY FRAMES THE COURT'S INQUIRY ........ 9

        A.   THE REMOVAL NOTICE DODGES THE SUBSTANCE OF THE
COMPLAINT AND MISCASTS ITS ALLEGATIONS. .............................................. 11

        B.   DEFENDANTS OPT AGAINST ATTACHING THE CBA TO THE REMOVAL
NOTICE, RENDERING THE COMPLAINT UNCONTROVERTED. ......................... 14

   II.  THE CASE SHOULD BE REMANDED FOR LACK OF SUBJECT-MATTER
JURISDICTION ......................................................................................................... 15

        A.   COMPLETE PREEMPTION UNDER § 301 OF THE LMRA .......................... 16

        B.   THE PLAINTIFF'S CLAIMS ARISE FROM MASSACHUSETTS LAW, NOT
FROM THE CBA .......................................................................................................... 18

                   1.   NEITHER THE CLAIM NOR THE UNDERLYING INOPERATIVE
TORTS ARISE FROM THE CBA. ........................................................................ 19

                   2.   NOR DO THE CBA'S PROVISIONS REQUIRE
INTERPRETATION ............................................................................................... 24

   III.  NONE OF PLAINTIFF'S CLAIMS REQUIRE CBA INTERPRETATION AND THE
CASES DEFENDANT CITES AS AUTHORITY ARE READILY DISTINGUISHABLE ... 29

CONCLUSION .............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546 (1st Cir. 1994)...........................................23

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985)....................................................................18

*Bar J Sand & Gravel, Inc. v. W. Mobile New Mexico, Inc.*, No. CIV. 05-800JBWPL, 2005 WL
      3663689 (D.N.M. Sept. 29, 2005) ...........................................................................................10

*Barnes v. Nat'l Football League,* No. 11-cv-08395 Dec. 8, 2011, Order (C.D. Cal.)............ 20, 34

*Batoff v. State Farm Ins. Co.,* 977 F.2d 848 (3d Cir.1992)...........................................................17

*Beal v. Broadard*, 2005 WL 1009632 (Mass. Sup. Ct. Feb. 4, 2005) ...........................................24

*Bentley v. Cleveland Browns Football Co., LLC*, 958 N.E.2d 585 (Ohio App.3d 2011).............29

*Berda v. CBS, Inc.*, 881 F.2d 20 (3d Cir. 1989) ...........................................................................19

*Bliss v. Sanguinet*, No. 12-cv- 10123, 2013 WL 3334728 (D. Mass. Jun. 24, 2013)...................22

*Brown v. Nat'l Football League*, 219 F.Supp. 2d 372 (S.D.N.Y. 2002) ............................... 11, 30

*Bush v. St. Louis Reg. Conv. Ctr.*, No. 250, 2016 WL 3125869 (E.D. Mo. Jun. 3, 2016)...... 29, 31

*Caterpillar, Inc. v. Williams*, 482 U.S 386 (1987) ...............................................2, 10, 11, 17, 18

*Dent v. NFL*, No. 15-15143 (9th Cir. Dec. 15, 2016) .....................................................................2

*DiPilato v. Commonwealth Ass'n of Sch. Administrators, Local 502*, 588 F. Supp. 2d 631 (E.D.
      Pa. 2008)............................................................................................................................. 17, 18

*Duerson v. NFL*, No. 12-c-2513, 2012 WL 16558353 (N.D. Ill. May 11, 2012) ................. 20, 34

*Eyssi v. City of Lawrence*, 416 Mass. 194 (1993) .......................................................................22

*Flores-Flores v. Horizon Lines of Puerto Rico, Inc.*, 875 F. Supp. 2d 90 (D. Puerto Rico 2012) 11

*Green v. Arizona Cardinals Football Club*, 21 F. Supp. 3d 1020 (E.D. Mo. 2014) .............. 26, 29

*Green v. Pro Football Inc.,* 31. F. Supp. 3d 7140 (D. Md. 2014)......................................... 24, 29

*Hendy v. Losse*, 925 F.2d 1470 (9th Cir. 1991).............................................................................29

*Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-civ-1803, 2010 WL 8461220 (N.D.
      Ohio Mar. 31, 2010)........................................................................................................... 25, 29

*Kimmel v. DeGasperi*, No. 00-143, 2000 WL 420639 (E.D. Pa. Apr. 7, 2000)..........................16

*Kline v. Security Guards, Inc.*, 386 F.3d 246 (3rd Cir. 2004).......................................... 2, 11, 19

*Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399 (1988)..................................................18

*Livadas v. Bradshaw*, 512 U.S. 107 (1994) ....................................................................... 11, 19

*Lumbermans Mut. Cas. Co. v. Fishman*, No. 99-0929 1999 WL 744016 (E.D. Pa. Sept. 22, 1999) ........................................................................................................................... 17

*Matter of Amoco Petroleum Additives Co.*, 964 F.2d 706 (7th Cir. 1992) .................................. 11

*Maxwell v. Nat'l Football League*, No. 11-cv-08394, Dec. 8, 2011, Order (C.D. Cal.) ........ 20, 34

*McPherson v. Tennessee Football, Inc.*, No. 0002-D.E. 16-1, 2007 WL 5445124 (M.D. Tenn. 2007) ........................................................................................................................... 30

*Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 (N.D. Ill. Jul. 19, 2016).23, 26, 28, 29

*Pear v. Nat'l Football League,* No. 11-cv-08395, Dec. 8, 2011, Order (C.D. Cal.).................... 34

*Purvis v. Hamwi*, 828 F.Supp. 1479 (D. Colo. 1993) .................................................................. 22

*Pyle v. Nat'l Football League,* 2012 WL 4341937 (S.D.N.Y. 2012) .......................................... 15

*Stellar v. Allied Signal, Inc.*, 98 F.Supp. 3d 790, 802 (E.D. Pa. 2015)....................................... 19

*Stringer v. NFL*, 474 F. Supp.2d 894 (S.D. Ohio 2007) .............................................. 8, 26, 29, 31

*Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002) .......................................................... 14

*Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217 (3d Cir. 1995) .............................. 18, 19, 22

*Tynes v. Buccaneers Ltd. Partnership*, 134 F.Supp. 3d 1351 (M.D. Fla. 2015) .........25, 29, 30, 31

*Westmoreland Hosp. Ass'n v. Blue Cross of W. Pa.*, 605 F.2d 119 (3rd Cir. 1979) ................... 15

*Williams v. NFL*, 528 F.3d 863 (8th Cir. 2009)........................................................................... 31

## STATUTES

28 U.S.C. § 1447(c) ............................................................................................... 1, 15, 30

Labor Management Relations Act of 1947, 29 U.S.C. § 185 ............... 1, 9, 10, 11, 14, 16, 24, 30

## TREATISES

H.J. Alperin, Massachusetts Practice: Summary of Basic Law 14D § 17.64 ............................. 23

Restatement of Torts § 551 .................................................................................................. 7, 23

## REGULATIONS

L.R., E.D. Pa. 40.1(c)(1) .......................................................................................................... 1

L.R., E.D. Pa. 7.1 .................................................................................................................... 1

## MOTION TO REMAND

Under 28 U.S.C. § 1447(c), and Local Rules 7.1 and 40.1(c)(1), A.H., a minor, by and through her parent and Guardian, Shayanna Jenkins Hernandez ("Plaintiff"), moves to remand this case to the Superior Court of the Commonwealth of Massachusetts because the Court lacks subject-matter jurisdiction over her non-derivative, independent, loss-of-parental-consortium claim. Defendants National Football League ("NFL"), NFL Properties LLC ("NFL P"), and National Football League Foundation ("NFL C") have vexatiously removed Plaintiff's claim, invoking "complete preemption" through § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (the "LMRA.") But 301-preemption requires proof that the claim's true essence is contractual, with any doubt construed in favor of remand. Defendants have not and cannot do meet this significant jurisdictional burden, requiring that the Court remand. Pursuant to Local Rule 7.1(d), Plaintiff notes her request for oral argument.

Plaintiff's claim is hers alone and has nothing to do with the contractual bargain between NFL teams (through the NFL's Management Council) and the NFL Players' Association. This sole claim arises purely from Massachusetts consortium law and underlying common-law legal duties: the duty to refrain from intentional misconduct (*e.g.*, intentional torts requiring no duty whatsoever); and duties voluntarily assumed to the general public (to research and publish good-faith science; to license and hire non-negligently), created by Defendants' having created foreseeable danger. Defendants' entire position rests on impermissibly contorting Plaintiff's allegations and then applying them to a collective bargaining agreement ("CBA") extrinsic to the removal record in an attempt to force square pegs into the round hole of § 301 preemption. This is precisely the type of jurisdictional manipulation that the Supreme Court has admonished. The Court should police its jurisdiction and remand this case.

1

## INTRODUCTION

Imagine—for the purpose of this hypothetical—that General Electric had a financial interest in NFL football, and feared football's linkage to neurodegenerative disease might hurt its bottom line; imagine, therefore, that G.E. engaged the same alleged conspirators named here to conceal, misrepresent, and downplay football's linkage to neurodegenerative disease.   Could G.E.—if later sued—even assert a 301-jurisdictional defense, on the premise that the scope of its own duty was shaped by duties delegated amongst NFL teams and physicians within the CBA? As the NFL, itself conceded to the 9th Circuit, in facing this very hypothetical,[1] the answer is no; 301 would provide no help.   Yet that is *exactly* the peg on which the NFL and two wholly-distinct corporate co-Defendants (NFLP and NFLC) hang their legal hats.   As they posit (*Caterpillar* and *Kline* be damned), one cannot analyze claims against *them* without considering CBA-delegated roles and responsibilities of the 32 NFL clubs and various physicians.

This is a specious argument that these Defendants lack standing to make; it may belong to the clubs and conceivably to the physicians, but not to the named Defendants: NFL, NFLP, and NFLC.   Complete preemption requires case-by-case analysis specific each claim and to each party claiming the benefits of the labor contract.   And this is a major problem for these Defendants here. Two of the removing defendants purporting to assert this defense are pure strangers to collective bargaining; none of them have CBA-based, contractual obligations, raised or implied by this action; indeed, only one (NFL) has any CBA duties at all.   Only by stratospherically applying preemption law can Defendant NFL advance this absurd (and effectively limitless) position on jurisdictional preemption: as all three put it, because general concepts such as *NFL player-safety*

---

[1] This was raised in the context of the NFL "drug litigation" by the Ninth Circuit.   The panel skeptically asked whether a player's wife could invoke 301 preemption, were she accused of conspiring with club medical staff to give a player controlled substances.   *See Dent v. NFL*, No. 15-15143 (9th Cir. Dec. 15, 2016) (oral argument)   *Last viewed on February 17, 2018 and available at https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000010751.*

and *NFL player medical-care* are subjects of collective bargaining, the specific claim at issue here—which plainly has *nothing* to do with either *player* safety or *any* medical care—depends on the CBA.  Circuit law has—for decades—only found complete preemption where the scope of a duty requires interpretation of *specific* CBA language.  That is not this case here.  Nor even close.

## BACKGROUND

### I.    THE PERTINENT FACTS ALLEGED IN THE COMPLAINT

Through her guardian, minor child A.H. brings this action, solely claiming a loss of parental consortium.  (D.E. 1-A ("Compl.") at ¶¶ 345-48).  She alleges she has been deprived of her father, whom she alleges suffered injury and ultimately died due to Defendants' tortious conduct.  (Compl. *passim*).

The decedent's injuries stem from a pathologically-unique neurodegenerative process known for its dose-response relationship to football: Chronic Traumatic Encephalopathy (or "CTE").  (Compl.  ¶¶ 4, 6-7, 10, 334-36).  At the time of his death, decedent had the most severe case of Chronic Traumatic Encephalopathy ("CTE") pathology ever observed in such a young person. (Compl.  ¶2).  This level of chronic brain damage had previously only been witnessed in those in their 60s.  (*Id*).  But the decedent had endured approximately twenty years of football exposures, beginning at age five, with NFL-sponsored youth football and ending with three seasons of NFL football. (*Id*. ¶¶ 2, 337).

Decedent and his family were victims of Defendant NFL and NFL P's youth marketing.  (Compl. ¶¶ 5-7, 335).  Defendants NFL P and NFL knew children's brains were vulnerable, yet targeted children and their families in a 1996 campaign called "Play Football" to gain adult season-ticket holders.  (*Id*. ¶¶ 5, 7, 46, 222, 333-35.)  Consequently, decedent lived a "chaotic and horrendous existence" for much of his life, due to the neurologically compromised state

objectively observable upon death.  (*Id.* ¶ 348(e)).

These Defendants (a pro-football trade association, its licensing arm, its *charity*, and its official helmet provider) conspired to insulate themselves from litigation *exactly like this*, specifically by attempting to neutralize unfavorable science in bad faith, and in advance of litigation. (*Id.*, *passim*). These Defendants knew CTE existed in boxing and war veterans. (*Id.* ¶¶ 91-272).   Fearing that chronic brain damage in football could spell football's financial ruin, Defendants NFL, NFL C, and Riddell created a "sham committee" called the Committee on Mild-Traumatic Brain Injury ("MTBI" and the "MTBI Committee"), and undertook to fund this committee's self-serving sham research, designed to do, among others things: (1) biomechanically distinguish boxing-blows (already linked to latent brain damage) from the effects of football-blow; and (2) devise a neuropsychological test battery "based upon the observation that ... cognitive symptoms associated with mild diffuse brain injury (attention, memory and concentration issues) [was] actually an impairment in information processing." (*Id.* ¶¶ 116, 199, 216, 222).  Defendants NFL and NFL C, recognizing their example to "extend[] to all young athletes who play football" (*Id.*, ¶ 222)—both directly and through their committee—provided grant money and were responsible for significant funding of the National Operating Committee on Standards for Athletic Equipment ("NOCSAE), and for its true purpose: providing industry-friendly research on protective equipment. (*Id.* ¶¶ 126-68).

Defendant NFL C, a non-profit organization created by the member clubs of the National Football League to enable the clubs to collectively make grants to charitable and worthwhile causes on the national level, which does not engage in labor negotiations of any sort whatsoever, funneled millions in the 1990s and 2000s at the direction of Defendant NFL's officers, which were in no way legitimate charity contributions but were in fact self-serving litigation-avoidance

investments (something Defendants Riddell also did, as did Defendant NFL directly, albeit to a lesser extent.) (*Id*. ¶¶ 29, 31, 361-74).

Defendant NFL P, the "sole funding source for the trust that funds NFL C[]" and "the licensing arm of the NFL", another entity that "does not engage in labor negotiations of any sort whatsoever", created a mutually beneficial licensing deal with Riddell that required helmets "sufficient to protect the players from the risk of injury", among this deal's many benefits to the parties. (*Id*. ¶¶ 60, 62). Of course, Defendants NFL and Riddell have known for a half-century— first receiving data at the end of the 1961-62 NFL season—that football and repetitive head trauma inherently carry the risk of CTE. (*Id*. ¶¶ 91-336). Further, knowing "helmets were ineffective to protect [against] the problem", the licensing and product-maker Defendants (NFL P and Riddell) promoted the use of the defective Riddell Revolution helmet (what decedent wore in the NCAA and NFL) as mitigating such harm when it did not. (*Id*. ¶¶ 135, 226, 279-307).

Defendants NFL C, NFL, and to a lesser extent Riddell, paid for self-serving defense-side expert consulting firms totaling well into the millions of dollars. They worked with: Exponent (of Deflate-gate fame); Biokinetics (Canada); career defense-side biomechanics expert Dr. David Viano (individually and/or through his LLC and/or through a non-profit he established); and, among others, even a neurologist concurrently researching for Big Tobacco, whom NFL C funded to explore (or refute) the linkage of three 1980s ALS-deaths occurring on one 1960s San Francisco 49ers roster. (*Id*. ¶¶ 154-156, 211, and 188).

They knew for decades that football caused latent brain damage. (*Id*. ¶ 192). CTE had been studied by the government since at least the 1950s. (*Id*. ¶¶ 98, 116). The neuropsychiatrist working on the government CTE study frequently made presentations with NFL neurosurgeons cited in the symposia series. (*Id*. ¶ 118). Helmet-maker Riddell also shared these concerns and worked closely

with the others.  In the 1960s Riddell knew its current helmet technology was insufficient to prevent latent brain damage and even explored so-called "soft-shell" helmets, directly and through NOCSAE.  (*Id.* ¶¶ 108-09, 111-12, 127-28).  Its warnings still ignored CTE, neurodegeneration, or suicidality. (*Id.*)

By the time the decedent was 12 years old (2002), Riddell had begun selling its "Revolution" helmet, a product touted as the first helmet designed with the intent to reduce brain injury. (*Id.* ¶ 279). Defendants NFL and Riddell worked in concert on the research behind this helmet. (*Id.*)  In fact, for the entirety of decedent's football lifetime (if not his entire lifetime) the NFL had been working to engage defense-friendly, self-serving consultants on research into topics such as neuropsychological testing, return-to-play, chronic brain damage, biomechanics of head injury, biomechanical differences of football head injury and boxing head injury, and Riddell helmet efficacy versus that of competitors. (*Id.* ¶ 218).  They did so expressly to influence all levels of football; this research was *not* restricted to NFL football play.  (*Id.* ¶¶ 15-21, 135, 168, 219-21(a)-(h), 222, 313, 331-48).

Between 1989 and 2014, NFL teams that convinced more than 80% of players to wear Riddell helmets benefitted from free Riddell equipment. (*Id.* ¶ 68). Riddell, obligated to approve helmets for play that were sufficiently safe to prevent injury, nevertheless knew that its protective equipment did little to prevent or mitigate against MTBI, and nothing to prevent against sub-clinical MTBI and/or CTE. (*Id.* ¶¶ 67-69, 127-307). Riddell marketed its helmet—worn by the decedent—as a game-changer, literally naming it the "Revolution" and featuring Riddell's cooperation with the NFL on research in order to specifically design a helmet intended to reduce concussion. (*Id.* ¶¶ 290-307) However, even the doctors and scientists paid by the NFL and Riddell, such as those at the University of Pittsburgh Medical Center ("UPMC"), knew Riddell's

claims were scientifically unsupportable. (*Id.* ¶ 431).

## II.   THE CLAIMS ASSERTED AGAINST DEFENDANTS NFL, NFL P, NFL C, AND RIDDELL

The operative pleading is the Complaint filed in the Trial Court of the Commonwealth of Massachusetts, County of Norfolk, No. 1782-cv-01279.  It asserts one claim—loss of parental consortium (*Id.* ¶¶ 345-48)—against Defendants NFL, NFL P, NFL C, and the seven entities "responsible for RIDDELL's [present and successor] liabilities." (*Id.*, ¶ 108).  Through this cause of action, Plaintiff asserts six underlying torts alleged to have injured the decedent, and in so doing, which are alleged to have proximately caused the loss of parental consortium.  (*Id.* ¶¶ 348).  None of the underlying torts reach the CBA, a labor agreement between the management council and the decedent's labor union.   Moreover, under applicable law, the active claim for parental consortium, belongs solely to the minor-child A.H.; it is <u>not</u> derivative of the parental claim and therefore bears zero relationship to the CBA.  Still, the triumvirate of independent, self-proclaimed "NFL Defendants" seek shelter through the CBA, claiming it confers jurisdiction through a satirically broad application of 301-complete preemption.

The first two underlying torts are intentional torts, against all Defendants.  These claims, "Tort I" and "Tort II", ("conspiracy" and "fraud – concealment", respectively) allege Defendants (Defendant NFL and the remaining defendants, which lack even an arguable labor-management relationship) agreed and acted to conceal material information regarding football's link to CTE. These two claims stem from the axiomatic duty to refrain from intentional misconduct, taking further root in sections within the Restatement (Second) of Torts that both this State and Massachusetts apply.

Plaintiff asserts the remaining underlying torts, all negligence claims, as to differing defendant-sets.  "Tort III", ("negligence voluntary undertaking"), alleges all Defendants

voluntarily undertook to study, publish, and advise the general public on science and brain injury applicable to "*football*, not just NFL football"; it alleges Defendants did so negligently, thereby creating foreseeable danger to the general public.  "Tort IV" ("negligence – licensing") asserts— consistent with an identical state claim found non-preempted by the *Stringer* Court[2]—that NFL, NFL P, and "Riddell" breached their respective duties to license helmets non-negligently and to provide equipment sufficient to prevent injury.   "Tort V", denominated "negligent hiring/retention/supervision", asserts that Defendants NFL and Riddell (only) hired, retained, and supervised Dr. Viano for the purpose of performing non-clinical research for "the entire football community."  Plaintiff alleges these Defendants failed to vet and/or supervise Dr. Viano as he propagated injurious false science to the general public; notably, Dr. Viano resigned prior to decedent's NFL football play.   Finally, "Tort VI" alleges that Defendant Riddell (alone) defectively designed its warning by omitting CTE, suicidality, and neurodegeneration.

This action fundamentally concerns allegedly corrupt scientific research.  The Plaintiff never alleges improper clinical medical care from physicians or trainers (*e.g.*, standard of care, credentialing, licensing, supervision, concealment of the decedent's medical condition, etc.), nor could that be fairly read into the Complaint.  The Plaintiff never seeks to impose liability onto NFL Clubs; doing so would constitute a wholly separate claim, arising out of employer-employee liability.  Nor does she express or imply that NFL rules or regulations (*e.g.*, changing, penalizing, or fining game-play, or enacting protocol or sufficient protocol to mitigate in-game, acute *concussion*), if different, would have impacted her father's brain injury.  All of these things are conceivable grounds for suit.  But none are present within the Complaint's four corners.  This Complaint asserts that football is linked to CTE (*id*. ¶ 3) as a "delivery-mechanism for exposure

---

[2] *Stringer v. NFL*, 474 F. Supp.2d 894, 911 (S.D. Ohio 2007).

to repeated blows to the head" (*id.*); no medicine, nor rules of play, nor regulations could change this; they would only confuse the gravamen of the action.  Four entities (*i.e.* a 501(c)(3), a licenser, a helmet-maker, and the NFL) played a substantial factor in decedent's exposures to repetitive head-injury and attendant chronic brain injury by breaching the following state-law duties of care. This is confirmed in this chart within the Complaint (*id.* ¶ 21):

### Negligence Summary Table

| DEF (S) | DUTY OF CARE OWED OUTSIDE 29 U.S.C. § 185(a) |
| --- | --- |
| NFL<br>NFL C<br>RIDDELL | Undertook, a duty to the general public, as stated in the second published paper in *Neurosurgery*[2], with "neither the authority nor the inclination to impose outside medical decisionmaking on the medical staffs of the individual teams." |
| NFL<br><br>NFL C | Undertook a duty to the general public to engage in non-negligent scientific study, and to non-negligently fund and oversee 501(c)(3) NFL and its use of "MTBI Grants" as a means of funneling money toward *de facto* defense expert witnesses. |
| RIDDELL | Supervised and retained consultants and experts on the "MILD TRAUMATIC BRAIN INJURY COMMITTEE" in an expressly **non-clinical capacity** to facilitate their perpetuation of false science. |
| NFL P<br>NFL | Negligently licensed protective equipment as the official helmet of the NFL with the knowledge these helmets could not protect against subclinical or MTBIs.<br><br>Engaged a joint employee, paid to ensure all such licensed equipment was safe, to prevent injury, knowing that this was a literal impossibility. |
| RIDDELL | Created multiple defective warning labels on helmets worn by Aaron Hernandez, none of which mention or warn of chronic brain damage, or CTE; only of "serious brain injury", a medical term of art referring generally to so-called "open head injury", *e.g.*, skull fracture and/or brain bleed. |

## ARGUMENT

### I.   THE REMOVAL NOTICE IMPROPERLY FRAMES THE COURT'S INQUIRY

Defendants invite the Court to commit error with respect to the facts and allegations relied on in its LMRA preemption analysis.  They do so by mischaracterizing and misconstruing allegations within the Complaint itself. (D.E. 1-A). Additionally, they  improperly ask the Court to determine federal subject matter jurisdiction based on matters extrinsic to the record at the time of removal.  Upon correcting for these errors, the Court can proceed from its proper starting point.

In commencing substantive preemption analysis, it is critical to define the inquiry's scope.

The Court cabins its inquiry to the facts alleged in a plaintiff's complaint along with the plaintiff's legal characterization of them; a defendant may not:

> attempt to create the prerequisites to removal by ignoring the set of facts . . . presented by the [plaintiffs], along with their legal characterization of those facts, and arguing that there are different facts that [plaintiff] might have alleged that would have constituted a federal claim.

*Caterpillar, Inc. v. Williams*, 482 U.S 386, 397 (1987).  Stated differently, a defendant cannot "attempt to manufacture grounds for removal"[3] based on federal claims a plaintiff could have plead yet did not.  This is exactly what Defendants attempt to do.  Instead, they must show that federal jurisdiction flows from Plaintiff's own allegations, or a fair reading of what these allegations imply.

The Court resolves jurisdiction by comparing the Plaintiff's claim to the CBA sections contended by the removing party to create the parties' legal relationships, as opposed to state law. It exercises LMRA jurisdiction if it deems that a CBA gives rise to a depended-upon obligation, only styled in state-law tort. The Seventh Circuit explains this unusual preemption:

> When federal law occupies a field, state rules are preempted. But preemption is just a defense, and federal defenses to claims based on state law are adjudicated in state court. There is no general right of federal-defense removal. When national law is so pervasive that is impossible to even state a claim based under state law, though, a court treats the attempt to do the impossible **as equivalent to a spelling error**, which does not affect the body of law invoked by the complaint.

*Matter of Amoco Petroleum Additives Co.*, 964 F.2d 706, 709 (7th Cir. 1992) (*emphasis added*.) Cogently articulated in *Brown v. National Football League*, courts execute this task by asking if the "duties asserted by Plaintiffs are duties owed to the general public [or] creatures of contract."[4] Complete preemption does not arise because a general universe of subject-matter may be covered

---

[3] *Bar J Sand & Gravel, Inc. v. W. Mobile New Mexico, Inc.*, No. CIV. 05-800JBWPL, 2005 WL 3663689, at *10 (D.N.M. Sept. 29, 2005) (*citing Caterpillar*, at 396-97).
[4] 219 F.Supp. 2d 379, 380 (S.D.N.Y. 2002).

by collective bargaining, *e.g.*, *Flores-Flores v. Horizon Lines of Puerto Rico, Inc.*, 875 F. Supp. 2d 90 (D. Puerto Rico 2012).  As the U.S. Supreme Court instructs, Section 301 "cannot be read broadly …" *Livadas v. Bradshaw*, 512 U.S. 107, 114 (1994).  Rather, complete preemption requires looking to the specific CBA language purportedly giving rise to the claim, *e.g. Kline v. Security Guards, Inc.*, 386 F.3d 246 (3rd Cir. 2004), to determine if a claim depends on or directly stems from a CBA.

> **A.**     ***The Removal Notice Dodges the Substance of the Complaint and Miscasts its Allegations.***

Defendants cite *Caterpillar* (D.E. 1, ¶ 9), but brazenly violate its clear prohibition against trying to conjure LMRA jurisdiction up from beyond the Complaint.  Notwithstanding their "background" and "grounds for removal" sections, Defendants devote barely more than a paragraph to their sole task on removal: pointing to actual (non-hypothesized) duties of care that the Complaint itself alleges or (*fairly*) depends upon, purported to implicate specific CBA terms.

First, it is critical to remember that Plaintiff's Complaint asserts but one operative cause of action, which Defendants leave all-but unaddressed: a Massachusetts loss-of-parental-consortium claim, belonging independently to the decedent's young child.  The state law duty owed to this young child is the only operative tort.  She obviously never played football at all, much less professionally as an NFLPA union-member.  Defendants leave her own injury untied to the CBA; because it *is* unrelated to the CBA.  Secondly, although Defendants focus on the CBA's duties, as their own papers concede, these are not the NFL's ; they belong to various *non-parties* (to suit, *e.g.*, each NFL Club and the NFL Management Council.)  The Defendants, all legally distinct entities, never point to CBA-originated duties that relate to *them*.

Ultimately, Defendants focus entirely on inoperative legal duties owed to the decedent by NFL Clubs and the NFLPA, while failing to address the actual Plaintiff, A.H.  These inoperative

duties, too, lack any supportable nexus to the CBA.  So Defendants badly misconstrue them to alchemize a purported LMRA preemption argument for themselves.  Further, they cite a handful of half-sentences from the Complaint, doused them within self-serving spin, *e.g.*, that the "Complaint further alleges the **NFL Defendants owed** a 'duty to reduce injury risks in football' ..." ((*id.* ¶ 2, *citing* D.E. 1-A, ¶ 21) (*emphasis added*)).

But Plaintiff's Complaint never alleges *self-described* "NFL Defendants" (three wholly distinct corporations, including a trade association, a 501(c)(3), and a brand-licenser) to have owed free-standing duties to the general public, related to football-injury prevention.  To the contrary, the Complaint very specifically alleges and supports—among other things—how Defendants undertook a duty "to the general public" by creating very specifically identified and foreseeable risks to the general public.  Plaintiff alleges that this duty was preformed negligently during a time when the decedent was *only* a member of the general public (*i.e.*, when he was *not yet* an NFL football player).  The Complaint in fact alleges that these Defendants jointly-participated in the sham MTBI Committee's acts and misconduct from 1994 to 2011 (between approximately the 4th and 21st years of decedent's life); when they published this:

| NFL NFL C RIDDELL | Undertook, a duty to the general public, as stated in the second published paper in *Neurosurgery*, with "neither the authority nor the inclination to impose outside medical decisionmaking on the medical staffs of the individual teams." |
| --- | --- |

(D.E. 1-A ¶ 21).  In Defendants' own words, they not only intended to publish *science* for the general public's consumption, but they also did so while disavowing any relationship governed by the CBA in doing so; they self-proclaimed an independence from shaping club medical duties.  Moreover, Defendants' removal notice mischaracterizes these Defendants' legal duties—as alleged in the Complaint—as ones *owed* (owed impliedly *by CBA-contract*); but Plaintiff alleges an undertaking, and indeed supports one with Defendants' words and actions as applied to the public at large.  The fact that decedent's late-in-life football-exposures coincided with his

employment is incidental.

The removal notice splices paragraphs where Plaintiff's Complaint—in actuality—alleges a duty "not merely to NFL players but also teenagers and children", and represents the duty these "NFL Defendants" supposedly owed as one owed only to "professional football players." (D.E. 1, ¶13, *citing Compl.* at ¶¶ 21, 221, 348.) The Complaint literally does the opposite. The Defendants' unsupportable misdirection (onto un-plead matters) diverts focus away from those allegations within Plaintiff's Complaint and onto the contractual relationship between decedent's labor-union and the NFL's Management Council (a distinct legal entity), even where the MTBI Committee's alleged wrongdoing almost entirely occurred prior to decedent's time in the NFL.

Defendants apply (D.E. 1, ¶2) similarly healthy spin onto allegations concerning all football and the general public. They self-servingly parse these out, trying to weave a story together that the Complaint *really* alleges duties *owed* to *NFL football* players, and not simply the universe of the football-playing general public. The alchemy (*id.*, *citing Compl.*, ¶¶ 348, 222, 259, 174, 326, 19) fares no better here. It is accurate—though twisted by this paragraph—that Plaintiff has alleged and factually supported allegations of Defendants' (i) intentional concealment and agreement to intentionally conceal, (ii) claims to reduce injury-risk in *all football*, and not simply NFL football, (iii) licensing protective equipment supposedly of the highest possible quality and sufficient to protect from injury, and (iv) work with expert witnesses presented as good-faith scientific researchers. But, as these Defendants are forced to present in their notice of removal, all of these allegations apply to the entirety of the decedent's football life; no legal obligation alleged here concerns or changes due to a later-occurring, and merely coincidental set of contract rights from the CBA. Defendants best and only arguments for complete preemption come on the backs of these straw-men.

13

**B.**     ***Defendants Opt Against Attaching the CBA to the Removal Notice, Rendering the Complaint Uncontroverted.***

Defendants—likely realizing the problem inherent in attaching a CBA—have opted against its inclusion.  In accordance with a Congressional policy to restrict the right of removal, "removal statutes are strictly construed against the exercise of federal jurisdiction."  *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002). Defendants must make a colorable showing that federal jurisdiction is "clear" on the face of the Complaint.  They now cannot do so, by virtue of their choice not to include the CBA.  *Id.*  While the Court constrains its remand inquiry to the state court record on removal, Defendants retain the burden of showing that CBA language supposedly confers jurisdiction- now impossible to meet.  *Id.*

The *joint* removal notice which neglects to specify even the statutory subpart of the removal statute invoked—fails to include their CBA—which is significant for all Defendants, and particularly NFLP and NFLC's which are completely absent from the CBA.  How does such an intentional omission satisfy a weighty jurisdictional burden?  The non-attachment is not argued to constitute a procedural defect; instead, these three separate Defendants jointly purporting to remove have substantively failed to support an objectively reasonable basis for jurisdiction.  "Subject matter jurisdiction is to be determined from the face of the complaint and on the basis of the record in state court, at the time the petition for removal is presented."  *Westmoreland Hosp. Ass'n v. Blue Cross of W. Pa.*, 605 F.2d 119, 124 (3rd Cir. 1979).  Only Defendants' attorney-argument supported federal subject-matter jurisdiction upon removal.

Defendants' decision not to include their CBA, or even a declaration verifying their argument, requires the Court to simply *take their word for it* regarding their CBA.[5]  Defendants'

---

[5] *Compare* the removal of *Pyle v. Nat'l Football League,* 2012 WL 4341937 at *5(S.D.N.Y. 2012)  (not "even bothering to attach" a CBA where the NFL egregiously removed a pre-CBA player early in the MDL) *with* D.E. 3589-

choice to rely solely on attorney argument renders their removal irreparably infirm, given that: (1) the face of Plaintiff's Complaint—accepted as true for the purposes of this analysis—alleges that Defendant NFL is estopped from asserting the 301/LMRA defense[6]; and (2) Defendant NFL offers nothing in the way of an objectively reasonable basis to controvert this allegation other than a self-serving "they're wrong." (D.E. 1, ¶ 14).

Defendants claim they can correct for this error, but only cite cases pertaining to supplemental affidavits and defective removal notices.   Here, Defendants and Plaintiff pre-arranged the terms of removal and both knew the remand motion was coming.   Plaintiff does not contest Defendants' position that they may supplement their notice with affidavits following removal.   (D.E. 1, ¶ 4, n.4).   Defendants may not, however, rely on a strategically-unattached CBA.

Rather than point to the origins of each tort claim and link even one to their unattached CBA, Defendants impermissibly stew *all claims* in the Complaint as to *all defendants* together with *all CBA portions*.   This disorganizes the analytical approach and increases the chance of error, while violating the framework of the Third Circuit and the Supreme Court. Properly viewed, the Plaintiff's claim does not (and indeed cannot, given the barren record) implicate the CBA provisions cited by the NFL. We now turn to that analysis.

## II.    THE CASE SHOULD BE REMANDED FOR LACK OF SUBJECT-MATTER JURISDICTION

This motion to remand implicates several general legal rules.   Remand is mandatory if the court determines it lacks federal subject matter jurisdiction. *Kimmel v. DeGasperi*, No. 00-143,

---

1 at 10-11 (citing to portions of CBA that Defendants NFL and NFL P attached with a sworn declaration from Dennis L. Curran).

6 The Complaint (¶¶ 86-90) alleges that Defendant NFL prevailed in final, non-appealable, binding arbitration when taking the position that the state-law torts were not properly grieved.  Thus, to the extent Defendants seek to proceed under LMRA common-law, an estoppel prevents them from moving to dismiss pending arbitration.

2000 WL 420639 (E.D. Pa. Apr. 7, 2000)  at *1 (*citing* 28 U.S.C. § 1447(c)).  The burden of establishing the existence of federal subject-matter jurisdiction falls on the party invoking it, with any doubts resolved in favor of remand, keeping with the strict construction of removal statutes.[7]

### A.      *Complete Preemption Under § 301 Of The LMRA*

Under the well-pleaded complaint rule, "federal jurisdiction only exists when there is a federal question on the face of the complaint." *Caterpillar Inc.*, 482 U.S. at 392–93 "… A case may not be removed on the basis of a federal defense, including the defense of preemption. *Id.* at 393.  "The 'complete pre-emption doctrine,' a corollary to the well-pleaded complaint rule, provides that a court can decide that a statute's pre-emptive force is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.' *Id.* (*citations omitted*).  Depending on the circumstances, section 301 can confer federal question jurisdiction under the 'complete preemption doctrine.'" *DiPilato v. Commonwealth Ass'n of Sch. Administrators, Local 502*, 588 F. Supp. 2d 631, 634 (E.D. Pa. 2008) (Brody, J.)

The LMRA is an exceptional statute, in which Congress expressed such a strong policy in favor of the development of a uniform body of federal law to govern labor disputes that even state-law claims implicating this federal policy are deemed to arise under federal law, making them subject to removal.  *Caterpillar*, 482 U.S. at 393-94; *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210-11 (1985); *DiPilato*, 502 F.Supp. 2d at 634; *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 228 (3d Cir. 1995).[8]  To protect this interest in interpretive uniformity and arbitration of labor disputes, the LMRA preempts state-law claims "founded directly on rights created by collective-

---

[7] *Lumbermans Mut. Cas. Co. v. Fishman*, No. 99-0929, 1999 WL 744016, at *1 (E.D. Pa. Sept. 22, 1999) (citing *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir.1992).

[8] Section 301 of the LMRA provides:  "Suits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court having jurisdiction over the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).

bargaining agreement," *Caterpillar*, 482 U.S. at 395, and claims whose resolution is "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract," *Allis-Chalmers*, 471 U.S. at 220 – that is, claims which "require[] the interpretation of a collective bargaining agreement," *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408 (1988).

The Supreme Court has cautioned, however, that preemption is required only when the policies animating § 301 would be frustrated, *Livadas v. Bradshaw*, 512 U.S. 107, 122-23 (1994), so that not "every dispute . . . tangentially involving a provision of a [CBA]" is preempted, *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962).  The Court "stressed that it is the legal character of the claim, as 'independent' of rights under the [CBA] (and not whether a grievance arising from 'precisely the same set of facts' could be pursued), that decides whether a state cause of action can go forward."  *Livadas*, 512 U.S. at 123-24 (citations omitted).

The Third Circuit frames the inquiry as follows: whether any of Plaintiffs claims require the Court to interpret a provision of a CBA.  *See Kline v. Security Guards, Inc.*, 386 F.3d 246, 255-56 (3d Cir. 2004) (*citing Trans Penn Wax*, 50 F.3d at 217 (*citing Berda v. CBS, Inc.*, 881 F.2d 20, 27 (3d Cir. 1989))).  As *Kline* instructs:

> a plaintiff may bring a state law tort action against an employer, **even where he could have brought a similar claim based on a provision in his collective bargaining agreement**, so long as the state claim does not require interpretation of the collective bargaining agreement.

*Id*. at 256.  The Court restricts its inquiry to whether it "[has] to interpret any of the clauses in the CBA[] in order for Plaintiffs to establish the scope of the duty."  *Stellar v. Allied Signal, Inc.*, 98 F.Supp. 3d 790, 802 (E.D. Pa. 2015).

Applying this analytical framework to the Massachusetts consortium claim alleged here, it becomes apparent that the Defendants cannot meet their burden to establish § 301 preemption and

the existence of federal subject-matter jurisdiction.   No CBA clauses shape the scope of the Defendants' duties; only non-parties to suit.   Therefore, the case must be remanded.

### B.        *The Plaintiff's Claims Arise From Massachusetts Law, Not From The CBA*

While the third Paragraph in Defendants' Removal Notice claims the Complaint to assert "<u>causes</u> of action for loss of parental consortium, based on several enumerated torts" (D.E. 1, ¶ 3), there is indeed only one cause of action (consortium.)   This arises from Massachusetts law. Defendants shift focus on the inoperative, underlying torts, notwithstanding the fact that A.H. never, at any point, had a contractual relationship with the Defendants.   Nor did the decedent, whose only relevant contractual relationship concerned an NFL Club.   The CBA therefore, certainly does not create the rights of these torts.   Nor can the duties alleged in these torts be shaped by it.   Each tort-duty, and even the alleged breaches, preexisted or remained ongoing and unchanged over the entirety of decedent's life.

Defendants barely try to argue otherwise. The section styled "Grounds for Removal" in Defendants' notice spends nearly the entirety of the section citing to separate actions (*id.*, citing *Duerson*; *Maxwell*; *Pear*; and *Barnes*, (D.E. 1, ¶ 10)), which included a (301-preempted) negligence claim that is radically different from this one.   Those actions contained claims premised on the NFL's duty to regulate the game for its own NFL players; indeed that claim was preempted and logically so.   But that claim does not exist here, and by reference, the notice clearly seeks to litigate remand against *case law*, rather than against the operative Complaint; and inapposite case law, speaking to fundamentally different allegations, and even defendants.

Only in two paragraphs of the removal notice do Defendants present the Court with *eight factual allegations*, that supposedly justify why Plaintiff's claims, at their core, fundamentally turn on rule-making, medical-care, and regulatory duties that *all* of these NFL Defendants (including

18

NFL Charities and Properties) supposedly owed to professional football players, such as the decedent. While Plaintiff agrees that the CBA governs safety-rule adequacy, and guidelines regarding NFL-player health and safety, the Complaint neither addresses these issues nor begs their analysis. *Compare with* D.E. 1, ¶¶ 2, 3, 13 (*citing* D.E. 1-A, ¶¶ 348, 222, 259, 326, 19, 349, 351, 21, 221). None of these paragraphs concerns duties—or artfully plead allegations—that concern safety rules, regulations, or guidelines, much less reveal the Complaint's *essence* as such:

- ¶ 348 (alleging the cause of action and underlying torts, each of which turn on duties to the general public);

- ¶ 222: (alleging Defendants undertook and acknowledged a duty to child-football players);

- ¶ 259: (alleging generally the published words of Defendants' MTBI Committee, in Journal of Neurosurgery, which this paper applied to children);

- ¶ 326 (alleging the Defendants' MTBI Committee, when collecting data from NFL clubs, did so in a knowingly fraudulent manner);

- ¶ 19 (alleging generally that Defendants' conduct in developing sham-science, negligently licensing helmets, and developing knowingly unsafe helmets led to chronic brain damage);

- ¶ 349 (alleging proximate cause for A.H.'s injury);

- ¶ 351 (alleging A.H.'s damages);

- ¶ 21 (alleging the minor child's injuries from a series of breached duties, all alleged in a chart to have occurred outside of the LMRA); and

- ¶ 221 (alleging factual support for the conspiracy).

    *1. Neither the Claim nor the Underlying Inoperative Torts Arise From the CBA.*

None of these claims arise from the NFLMC-NFLPA's CBA. We first address the sole cause of action alleged within the Complaint. Plaintiff's sole claim on behalf of A.H. is separate and her own. *See Eyssi v. City of Lawrence*, 416 Mass. 194 (1993) ("claim for loss of consortium is independent" of the claim of the injury to the spouse, even where the spouse was subject to

workers' compensation exclusivity; "a spouse or child [is] free to assert a loss of consortium claim

…"); *accord Bliss v. Sanguinet*, No. 12-cv- 10123, 2013 WL 3334728 at *9 (D. Mass. Jun. 24,

2013).  Plaintiff must simply advance proof that a tortious act—e.g. a civil conspiracy, for one—

caused the parent's personal injury.  *Id*.  The inquiry need not advance beyond this sole claim:

clearly, the CBA does not bind minor-child A.H.

Even a full analysis of these underlying torts provides no help to Defendants' case for

jurisdiction.  This begins with two underlying torts (Torts I and II, D.E. 1-A at pp. 79-81.)  These

"intentional torts require no traditional finding of duty … [t]he duty, if so named, is obviously to

refrain from intentional harm to others." *Purvis v. Hamwi*, 828 F.Supp. 1479, 1483 (D. Colo.

1993).   Nor is reliance a question of CBA interpretation.   *See Trans Penn Wax Corp. v.*

*McCandless*, 50 F.3d 217, 232 (3rd Cir. 1995).  Further, near-identically plead conspiracy and

concealment claims defeated this argument in a Complaint also drafted by undersigned counsel,

in which the Northern District of Illinois strongly stated the following:

> the only conceivable connection between the complaint and the CBAs lays with the
> conspiracy and fraudulent concealment/omission claims ... [a] jury would not even
> need to glance at the CBAs to determine these facts.

*Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 at *3-4 (N.D. Ill. Jul. 19, 2016).

Massachusetts law remains consistent and offers even more clarity against preempting

these state claims.  Massachusetts law adheres to the Restatement of Torts § 550, which imposes

no "duty of care" for either conspiracy or for intentional concealment.  Thus there is no "duty to

speak."   In Massachusetts, "there must be first, a common design or agreement, although not

necessarily express, between two or more persons to do a wrongful act, and second, proof of

tortious conduct in furtherance of the agreement."  *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d

1546 (1st Cir. 1994).  But "fraudulent concealment is more than mere silence or nondisclosure for

which there is no liability absent a duty to speak; rather, it is the taking of affirmative steps to conceal defects or prevent the plaintiff from acquiring knowledge."  H.J. Alperin, Massachusetts Practice: Summary of Basic Law 14D § 17.64 (4th ed. 2017).  To the extent such a claim implies *any* legal duty to speak (and it does not), such a duty would attach only to and because of the specifically concealment of information.  Plaintiff avers (and supports with robust facts) that Defendants knew football—not NFL football—was deadly and/or injurious, and hid this information *from the world*.  Accordingly, her intentional concealment claim must show only the intentional concealment of a material fact, with knowledge of its falsity, for the purpose of detrimental (e.g., not reasonable) reliance.  *See, e.g., Beal v. Broadard*, 2005 WL 1009632 at *7 (Mass. Sup. Ct. Feb. 4, 2005).  The only "duty" connected to these claims is one to refrain from committing intentional harm to a fellow person.  Indeed, faced with an NFL Club's argument that this same CBA immunized its alleged civil conspiracy to commit an underlying illegal act, the Court in *Green v. Pro Football Incorporated* decried the notion as "ludicrous." 31 F. Supp. 3d 7140 (D. Md. 2014).

Torts III-V comprise the remaining claims where these Defendants can argue preemption (Riddell is the sole Defendant in Tort VI): negligent performance of a voluntary undertaking claim as to all Defendants; negligent licensing as to Defendants NFL, NFL P, and Riddell; negligent licensing as to NFL P and Riddell; and negligent hiring/retention/supervision as to Defendants NFL and Riddell.  Once again, Defendants—saddled with the burden of establishing jurisdiction to a certainty—offer zero specifics as to how any of these counts confer federal subject matter jurisdiction.  We address each of these out of caution only.  Defendants have neither pointed to specific CBA terms entangled in the underlying torts, nor included their CBA.

Tort III is the claim that Defendants' sham MTBI Committee undertook a duty to all

21

football stakeholders and performed it negligently by propagating false science "to all members of society." (D.E. 1-A, ¶ 348, Tort III(c)). Defendants' poorly-advanced argument oddly claims Plaintiff fails to allege exactly what she did. (D.E. 1, ¶ 13). This claim does not require *any* attention to "implement[ation] and enforce[ment] of the rules of professional football." Nor any rules of play. Defendants seemingly argue that these same allegations also require interpretation of the CBA's medical care provision, because that article delegates responsibility to the clubs (therefore shaping the NFL's common law tort duty). Notwithstanding that Plaintiff's claim seeks redress for a non-union member, that both she and the union-member himself had no remedy, and further, that it does so based on underlying torts committed against all football stakeholders (including the decedent, with equal force applied to all years of football-play), the non-clinical research disseminated to the world by Defendants has no nexus to NFL team medical care. *See, e.g., Tynes v. Buccaneers Ltd. Partnership*, 134 F.Supp. 3d 1351 (M.D. Fla. 2015) (claims for negligence and negligent misrepresentations concerning a player's MRSA infection at club medical facility had no nexus to the 2011 CBA's medical care provision); *accord Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-civ-1803, 2010 WL 8461220 at *12-14 (N.D. Ohio Mar. 31, 2010) (2006 CBA). In other words, Plaintiff alleges an injury (CTE) which occurs fully absent medical treatment; it is football itself alleged as the cause. Tort III concerns Defendants' self-serving scientific research by non-treating doctors, not some sort of malpractice.

This argument fails for an added reason: the NFL's common-law duty is "non-delegable" in nature; that is to say, its obligations under the common law remain its own, even if a CBA purports to delegate contractual performance of them. *See Green v. Arizona Cardinals Football Club*, 21 F.Supp. 3d 1020, 1030 (E.D. Mo. 2014) ("the duty to warn is nondelegable ... contractual terms that alter [] common law rights would take the form of a defense and could not serve as the

basis for removal.")  In other words, to the extent that club medical care or regulatory authority matters in the analysis of the claim or underlying tort (and they do not), the CBA might endeavor to place responsibility for medical care onto the shoulders of its clubs; but Defendant NFL remains liable in tort, regardless of its contractual delegation.  As remains the same for Defendants NFL C and NFL P, which simply have no role or beneficiary-relationship to the CBA contract.  Defendant NFL cannot remove—in purported tandem with the co-defendants—simply because it wants to defend Plaintiff's claim by arguing the contractual delegation of comparative negligence to its Member Clubs.  As the *Oliver* Court noted:

> Moreover, even if the CBAs were somehow relevant in this regard, Defendants' argument that state law controls only "duty" while the CBAs supply the common-law "degree of care" does not persuade the Court that preemption exists. It might be true that the CBAs are relevant to the degree of care, which is a fact-specific inquiry into what is reasonable under the circumstances. But preemption does not occur simply because determining liability entails referring to the CBAs.

*Oliver*, at *8.

The analysis of Tort IV ought to pose the greatest challenge for these "NFL Defendants": the negligent licensing claim as to Defendants NFL, NFL P, and Riddell.   While Defendants insistently try to re-write the Order in *Stringer v. National Football League*, 474 F. Supp. 2d 894, 912 (N.D. Ohio 2007), an order which *denied* the NFL and NFL P's 301 motion, under Rule 56, and after discovery, this literally-identical claim for negligent licensing Riddell helmets survived:

> Plaintiff generally alleges that the NFL and NFL Properties breached their duty to ensure that the players had safe equipment. For preemption purposes, the only relevant questions are whether this claim arose out of the CBA and, if not, whether its resolution is substantially dependent on an interpretation of any provisions of the CBA. Plaintiff's claim does not arise out of the CBA. Neither the NFL nor NFL Properties is a party to the CBA. While both NFL Defendants are mentioned in the CBA, the CBA imposes no duty on either of them to ensure that the equipment used by NFL players adequately protects from risk of injury or illness.  Any such duty, if it exists, clearly has its source in the common law.

*Id.*

23

Tort V avers that Defendants NFL and Riddell negligently hired, supervised, and retained a career-defense-side expert witness to purportedly publish good-faith science, intended to apply to pro-football-players and children alike.  It arises from a factual nucleus occurring over the *entirety* of the decedent's life; in other words, these Defendants owed the identical duty of care to the decedent as a non-union-member; how then, does the later-entered-into contract (with a club, and which only mentions clinical medical care; not scientific research for the world) shape the scope of the pre-existing tort-duty?  Dr. David Viano, to whom the NFL and NFL C funneled millions of dollars over decedent's entire lifetime, rendered no clinical care.  According to deposition testimony and his *c.v.*, he appears to have been jointly employed by Riddell and the NFL.  Again, no relationship with this claim seems to flow from professional football. Rather, this is a question of state-law agency concepts.

### 2.  *Nor Do the CBA's Provisions Require Interpretation*

Absent the CBA itself or any sworn declaration, these "NFL Defendants" reference language from several provisions claimed to originate the relationship between the Plaintiff and Defendants.  To the extent that the Court finds the material proper for consideration, it still fails substantively.  Preliminarily as to NFL C and NFL P, these Defendants make zero allegations of contractual privity with the decedent.  Nor are they mentioned within the CBA at all.  In other words, while it is accurate that non-CBA-signatories can, in theory, assert federal jurisdiction based on the CBA and LMRA, it is not good enough for NFL C and NFL P to snuggle into contractual provisions—at best—arguably shaping duties relating to Defendant NFL's standard of care.  As the *Oliver* court reasoned in addressing Riddell—an independent, third-party corporation which has the identical arguments made here by Defendants NFL C and NFL P—these Defendants have not "pointed to any provision in the CBAs that explicitly refers to them by name or even

24

tangentially mentions the relationship between [these corporations] and players, much less their respective duties of care/disclosure.  Nor have Defendants established why this Court should view the relationship … analogously to that of [an employer and an employee.]"  Again: these arguments purely take the form of a 301-affirmative-defense; and this does not confer jurisdiction.

Therefore, Plaintiff focuses on Defendant NFL's CBA duties, since *this is the only defendant that can or does allege any such duties*.  The NFL fails to point out duties that it expressly or impliedly owes, pursuant to the CBA.  Once again and by definition, these duties only apply—where relevant—to union members; not to A.H.; nor to the decedent prior to his being a union-member.  Moreover, the NFL fails to show how its own duties are shaped by those (at best) contractually placed onto others' shoulders.

The CBA is silent, with respect to the NFL's duty to perform non-negligent scientific research and its duties flowing from brand-licensing.  *See, e.g.*, *Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 at *3 (N.D. Ill. Jul. 16, 2016) (non-negligent scientific research and product development); *Stringer v. Nat'l Football League*, 474, F.Supp. 2d 894, 905-06 (S.D. Ohio 2007) (market/license brand); *Hendy v. Losse*, 925 F.2d 1470 (9th Cir. 1991) (unpub.)  (negligent hiring of a club physician not preempted in the direct context of medical malpractice to an active player.)  Moreover, the *defense* that a contractual CBA provision between two parties "shapes" or somehow alters separate tort duties **never confers removal jurisdiction**.  *See Green v. Arizona Cardinals Football Club*, 21 F. Supp. 3d 1020, 1030 (E.D. Mo. 2014).

None of the CBA provisions or purportedly related documents that Defendant NFL points to in the removal notice (DE 1 ¶¶ 11, 13)–Articles 39, 50, the NFL Constitution and Bylaws, or the Player Contract–suggest the existence of any legal duties raised *by the Complaint* and within the CBA, or, raised *by the Complaint* and fairly implied by the CBA. We examine the provisions

25

Defendant NFL cites, in turn.

      **a**.    *Article 39.* At least eleven courts have allowed state claims to proceed in the face of challenges under this article[9], (denominated "Player's Right to Medical Care and Treatment") Section One ("Doctor/Patient Relationship"), which reads as follows:

> If a club physician advises a coach or other Club representative of a player's serious injury or career threatening physical condition which significantly effects the player's performance or health, the physician will also advise the player in writing.

*See e.g. Tynes v. Buccaneers Limited Partnership*, 134 F. Supp. 3d 1351 (M.D. Fla. 2015). Here, clinical medical care, is a subject alien to the Plaintiff's claim; there is literally no way to stop CTE beyond giving the world notice of the harms inherent in football. And while the Plaintiff might have claimed that team doctors failed to disclose these risks, she makes no such allegation; instead, she alleges specific undertakings that created a duty by separate Defendants.

      In full, Article 39 discusses the cost, duties, certifications, nature and scope of medical care supplied to NFL football players. Nowhere, even indirectly, is a duty to engage in scientific (and entirely non-clinical) research fairly read into this provision; by extension, the Complaint, which *only* imposes this duty, has no nexus to this CBA provision. More foreign would be duties to license or market. Assessing the scope of this research-fraud simply does not touch decedent's *clinical* care (much less anything else.) Put differently, Defendant NFL's MTBI Committee had no doctor-patient relationship with *anyone*. They were hired by Defendants to misinform and conceal information from the public. The MTBI Committee's non-professional conduct—their

---

[9] *Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 at *3 (N.D. Ill. Jul. 16, 2016); *Bush v. St. Louis Reg. Conv. Ctr.*, No. 250, 2016 WL 3125869 at *3 (E.D. Mo. Jun. 3, 2016); *Tynes v. Buccaneers Ltd. P'ship*, 134 F. Supp. 3d 1351 (M.D. Fla. 2015); *Green v. Pro Football, Inc.*, 31 F. Supp. 3d 714 (D. Md. 2014); *Green v. Arizona Cardinals Football Club*, 21 F. Supp. 3d 1020, 1030 (E.D. Mo. 2014); *Bentley v. Cleveland Browns Football Co., LLC*, 958 N.E.2d 585 (Ohio App.3d 2011); *Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-cv-1803, 2010 WL 8461220 at *12-14 (N.D. Ohio Mar. 31, 2010); *Stringer v. Nat'l Football League*, 474, F. Supp. 2d 894, 905-06 (S.D. Ohio 2007); *McPherson v. Tennessee Football, Inc.*, No. 0002-D.E. 16-1, 2007 WL 5445124 at *5 (M.D. Tenn. 2007); *Brown v. Nat'l Football League*, 219 F.Supp. 2d 372 (S.D.N.Y. 2002); *Hendy v. Losse and San Diego Chargers Football Co.*, 925 F.2d 1470, 1991 WL 17230 at *2 (9th Cir. 1991) (*unpub*).

breach of ordinary care through negligence in a voluntary undertaking—came into play when they undertook to study and publish in mainstream journals on medical issues.

      The NFL's claims fare no better when they offer up Article 39, Section 2 of the CBA, which applies to athletic trainers but fails for identical reasons: "All athletic trainers employed or retained by Clubs ... must be certified by the National Athletic Trainers Association." Here again, this fails to cover the Plaintiff's claims. Aptly analogized to the difference between malpractice claims and drug-defect claims, the Plaintiff's case concerns medically-*related* misconduct, but not medical negligence.  *See e.g. Tynes v. Buccaneers Limited Partnership*, 134 F. Supp. 3d 1351 (M.D. Fla. 2015).

      **b**.    *Article 50***.** Defendant NFL invokes the "Joint Committee on Player Safety", selecting out only the two words "playing equipment" from Section One of this Article, an article other courts have observed "will not have the power to commit or bind ..." *Bush v. St. Louis Reg. Convention and St. Louis Rams, LLC*, No. 16-cv-250, 2016 WL 3125869 at *3 (E.D. Mo. Jun. 3, 2016) (remanding personal injury claims because the NFL club citing Articles 50 and 39, among others "[did] not show how this is essential to their case") (*citing Williams v. NFL*, 528 F.3d 863, 876 (8th Cir. 2009).[10] This provision plainly does not give rise to any binding duties, *Stringer v. Nat'l Football League*, 474, F.Supp. 2d 894, 905-06 (S.D. Ohio 2007) (denying preemption of identical claim as asserted here in part because Article 50 carried no preemptive weight).

      **c.**    *Article 50 § 1(b)-(c) and 2*. Defendant NFL delves deeper into this Article, characterizing this portion as mandating procedures for review and rule changes.  It parses out the words "would adversely affect player safety" and "to represent the players' viewpoint on rules." Civil disposition of this case would leave the NFLMC-NFLPA's bargain untouched.  The Plaintiff

---

[10] NFL, NFL P and Member Clubs frequently cite to *Williams* without mentioning that this case appealed tort claims asserted by *active players* amidst their contestation of CBA-sanctioned drug suspensions.

neither alleges nor implies the NFL to have breached a duty of a safe workplace. This very notion is offensive, given the Plaintiff's case: Plaintiff claims these Defendants knew and hid evidence that football kills, dose-proportionate to exposure. Suggesting that this claim *really concerns* the NFL's failure to change the kickoff-play is a truly grotesque straw-man. Moreover, a club's failure to maintain its workplace is equally unrelated to the NFL's breach of voluntarily-assumed duty to the general public.

       **d.**    *Article 50 § 1(d)*. The NFL represents that, *in part*, this article states the following:

> The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety.

Plaintiff, as master of the Complaint, has sued the NFL, not the NFLPA. While the entirety of Article 50 already veers widely from what the Complaint alleges, this is especially true where Defendant NFL seemingly tries to rope in the NFL Players' Association. This union has absolutely no relevance whatsoever—once again—to the conduct Plaintiff alleges to have taken place prior to the decedent having been an NFL football player. The union has no role in Defendant NFL C's allocation of (the NFL's) funds to sham research. Nor NFL P's licensing and marketing. To the extent that Defendants seek to assert *fault* on the part of the union, again, a substantive comparative negligence defense would have no bearing on jurisdiction.

       **g.**    *NFL Const. and Bylaws Article 17 § 16(E) (2010)*. The NFL, represents that this article states the following guidelines apply to placing active players on roster-designation lists denominated "Reserve/Injured":

> All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards.

Mere evidence Plaintiff offers as factual support for her underlying torts, *e.g.*, that some of the MTBI Committee's work involved fraudulent return-to-play conclusions, supports the factual

contention that the MTBI Committee performed sham-research.  Also relevant, the MTBI Committee did not restrict this conclusion to NFL football players, but applied it to children. Regardless, Plaintiff never alleges the decedent was negligently returned to play once concussed. Nor is this fairly read into the duty element of her claim.  Indeed, acute concussion is not even a known cause of CTE; the injury and allegations concern simply every snap of football with equal force.  Nor, relatedly, has Plaintiff claimed that club medical staff erred in making clinical judgment-calls.  Maybe Plaintiff could do so; maybe not; but these hypotheticals all miss the mark of the Complaint.

      **h.**     *NFL Const. and Bylaws Article 19 § 5 (2010).* The NFL, without attaching either the NFL Constitution and Bylaws itself or any sworn declaration, represents this article to require each home team to provide doctors and ambulances.  This provides no coverage for the Complaint.

      **i.**     *NFL Player Contract (CBA App'x A) ¶ 9.* The NFL supplies no language but suggests this portion of the contract provides medical and hospital care as deemed necessary by physicians in the event of injury.  Plaintiff's Complaint could not fairly be read to implicate the Defendants' duties to provide hospital care; how would this even serve as a defense?

      **j.**     *NFL Const. and Bylaws Article 11 § 2 (2010).* The NFL, without attaching either the NFL Constitution and Bylaws itself or any sworn declaration, represents this article to concern "[p]laying rules" and the obligation to "amend[] or change" them.  Unless *not ever even beginning to play football* constitutes a "rule", this cannot fairly be read into the Complaint nor even used as a defense.

**III.**    **NONE OF PLAINTIFF'S CLAIMS REQUIRE CBA INTERPRETATION AND THE CASES DEFENDANT CITES AS AUTHORITY ARE READILY DISTINGUISHABLE**

      Much of the authority Defendants cite specific to the NFL's CBA is tied to their fundamental mischaracterization of the Claim and underlying torts.  Defendants lean heavily on

*Duerson*, which involved legal claims specifically applied to NFL football play.  *See Duerson v. NFL*, No. 12-c-2513, 2012 WL 16558353 (N.D. Ill. May 11, 2012) (describing the first count one "alleg[ing] that the NFL [failed] to educate players about the risks of concussions and the dangers of continuing to play after suffering head trauma, fail[ed] to ensure rapid diagnosis and treatment …, and fail[ed] to implement policies to prevent David Duerson from returning to play with his injuries.").  They cite to *Maxwell*, *Pear*, and *Barnes* (*supra*), which are all governed by Judge Real's Order, finding preemption of only one negligence claim, claiming Defendant NFL failed to enact rules and safeguards for NFL football players.[11]  Indeed, many claims along these lines might run afoul of the contract; but no such claim is at issue here.

## CONCLUSION

Plaintiffs' Complaint alleges no claim arising from the CBA, nor one requiring CBA interpretation.  Nor do Plaintiff's underlying torts, when fairly read, require even a glance at the CBA; a CBA, which Defendants opt not to provide.  Defendants have muddied the Court's analytical framework, but as Plaintiff has demonstrated, Defendants never even directly attack one of the duties within her Complaint as stemming from the CBA.  Defendants rely on confusion and straw-men: they repackage themselves as "the NFL Defendants", trying to share a jurisdictional defense only one of them possesses, even theoretically; and they try litigating LMRA jurisdiction based on an alternate universe of case law, instead of Plaintiff's Complaint. This only highlights how far NFL, NFL P, and NFL C each stray from meeting their burdens.  There was not even an objective basis for removal.  For all these reasons, Defendants' arguments fail; they have not doubtlessly established LMRA jurisdiction.  Therefore, the Court lacks jurisdiction and should

---

[11] *See Maxwell v. Nat'l Football League*, No. 11-cv-08394, Dec. 8, 2011, Order (C.D. Cal.); *Pear v. Nat'l Football League,* No. 11-cv-08395, Dec. 8, 2011, Order (C.D. Cal.); *Barnes v. Nat'l Football League,* No. 11-cv-08395 Dec. 8, 2011, Order (C.D. Cal.).

remand the case to state court, awarding fees and costs pursuant to 28 U.S.C. 1447(c).

WHEREFORE Plaintiff's respectfully asks the Court to enter an Order remanding this case, and granting her costs and reasonable attorneys' fees in accordance with 28 U.S.C. § 1447(c).

Respectfully submitted on behalf of Plaintiff,


_____/s/ Bradford R. Sohn_____
Bradford R. Sohn, Esq.
Admitted *Pro Hac Vice*
THE BRAD SOHN LAW FIRM, PLLC
2600 S. Douglas Road, Suite 1007
Coral Gables, FL  33134
786-708-9750
brad@sohn.com

THE BAEZ LAW FIRM
23 South Osceola Ave.
Orlando, FL 32801
407-705-2626
jose@baezlawfirm.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 19th day of July, 2018 that true and accurate copies of the foregoing Notice was served via ECF and electronic mail to all counsel of record.


_____/s/ Bradford R. Sohn_____
Bradford R. Sohn, Esq.


31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| _____ | : | No. 2:12-md-02323-AB |
| **IN RE NATIONAL FOOTBALL LEAGUE** | : | MDL No. 2323 |
| **PLAYERS' CONCUSSION INJURY LITIGATION** | : | |
| _____ | : | **Hon. Anita B. Brody** |
|  | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| **ALL ACTIONS** | : | |
|  | : | |
| **2:18-cv-00464-AB** | : | |
| **A.H., a minor, by her guardian Shayanna Jenkins** | : | |
| **HERNANDEZ,** | : | |
|  | : | |
|  | : | |
| **Plaintiff,** | : | |
|  | : | |
| **v.** | : | |
|  | : | |
| **NATIONAL FOOTBALL LEAGUE; THE** | : | |
| **NATIONAL FOOTBALL LEAGUE FOUNDATION** | : | |
| **(individually and as successor in interest to NFL** | : | |
| **CHARITIES); NFL PROPERTIES, LLC** | : | |
| **(individually and as successor in interest to NFL** | : | |
| **PROPERTIES, INC.); RIDDELL, INC., RIDDELL** | : | |
| **SPORTS GROUP, INC.; ALL AMERICAN** | : | |
| **SPORTS CORP f/k/a Easton-Bell Sports, Inc.; BRG** | : | |
| **SPORTS, LLC f/k/a Easton Bell Sports, LLC; BRG** | : | |
| **SPORTS HOLDINGS CORP. f/k/a RBG** | : | |
| **Holdings Corp.,** | : | |
|  | : | |
| **Defendants.** | : | |
| _____ | : | |

## **ORDER**

**AND NOW,** this _____ day of _____ 2018, upon consideration of Plaintiffs' Motion to Remand ("Plaintiffs Motion") and any response thereto, it is hereby **ORDERED** and **DECREED** as follows:

1.    Plaintiffs' Motion to Remand is **GRANTED**.

2.    The instant case is **REMANDED** to the Superior Court of Massachusetts.

BY THE COURT:

_____